# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALENTINO DIXON, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF BUFFALO and COUNTY OF ERIE; and DETECTIVE MARK R. STAMBACH, DETECTIVE RANIERO MASECCHIA, DETECTIVE JAMES P. LONERGAN, DETECTIVE JOHN VICKERD, CHIEF RICHARD T. DONOVAN, JOHN DOES, Unknown Buffalo Police Department Supervisors, and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER BELLING, in their individual capacities, <br><br> Defendants. | CASE NO. _____ <br><br><br> **COMPLAINT AND JURY DEMAND** |

## INTRODUCTION

1.      Plaintiff Valentino Dixon spent over 27 years wrongfully incarcerated for a crime that he did not commit: a 1991 Buffalo shooting that resulted in the death of Torriano Jackson.

2.      In 2018, the newly-elected Erie County District Attorney, John Flynn, thoroughly reinvestigated the crime, interviewing over thirty witnesses, and concluded what many had long known: Mr. Dixon was innocent. The true shooter was Lamar Scott—someone who had initially and repeatedly confessed to the crime. On September 19, 2018, Mr. Dixon's convictions for the shooting were vacated and Mr. Scott pled guilty.

3.     The 1991 shooting occurred during a street-fight between Mario Jarmon and two brothers, Torriano and Aaron Jackson. Lamar Scott had entered the fight with a semiautomatic TEC-9 to help Mr. Jarmon, his friend, who Torriano had shot and injured. Mr. Scott emptied the clip and fired at least twenty-seven shots. Torriano Jackson was killed; Aaron Jackson and a bystander, John Sullivan, were wounded.

4.     Mr. Dixon—present in the area that night, along with approximately one hundred other bystanders—was not involved in the fight or the shooting. Mr. Dixon did not look anything like the true shooter, Mr. Scott, who was accurately described to the police by a number of witnesses.

5.     Nonetheless, Defendants—Buffalo Police Department ("BPD") detectives and Assistant District Attorney Christopher Belling—committed egregious misconduct to fabricate a case against Mr. Dixon, causing him to be convicted of a crime he did not commit.

6.     At the time, the BPD and ECDA maintained and shared a list of targets that they intended to get "off the street" by making any colorable charges stick to them. Upon information and belief, Defendants fabricated a case against Mr. Dixon because he had been present at the scene and he was one of the targets on their list, likely because he drove flashy cars or because they suspected he was involved in selling drugs. Throughout the year before the shooting, the BPD had engaged in a campaign of harassment against Mr. Dixon: pulling him over on the street almost every day, sometimes roughing him up, and once raiding and ransacking his house. One BPD officer even warned Mr. Dixon that the BPD "would not stop" until they "gave him ten years."

7.     Defendants built their case against Mr. Dixon by using improper suggestion and coercion to induce three witnesses to falsely identify him as the shooter, even though he looked

nothing like the true shooter, Mr. Scott—who was significantly taller and stockier than Mr. Dixon. These three false "identifications" were the core of the prosecution, and the only evidence at Mr. Dixon's trial that specifically incriminated him.

8. Not only did none of the other nearly one hundred people at the scene misidentify Mr. Dixon as the shooter, but a number specifically told Defendants that Mr. Dixon was *not* involved in the shooting.

9. In fact, days after the shooting, eyewitnesses Leonard Brown and Walter Lee Dennis, as well as Mr. Jarmon, all gave sworn statements indicating that Mr. Dixon was not involved in the shooting. And although she remained anonymous at the time, eyewitness Tamara Frida called the BPD Homicide Section, saying that Mr. Dixon was not the shooter and offering to identify people at the scene.

10. When Defendants nevertheless arrested Mr. Dixon for the shooting, Mr. Scott himself confessed to BPD detectives, his friends, and even the local Channel 7 evening news that he was the shooter, not Mr. Dixon.

11. Despite this extraordinary evidence that Mr. Scott was guilty and Mr. Dixon was innocent, Defendants remained committed to making the charges against Mr. Dixon stick. When Mr. Scott went to the BPD Homicide Section and confessed, the lead detective, Defendant Mark Stambach, told him, "We got who we want. Get the hell out of here." Defendant Stambach—a former BPD narcotics officer with a reputation for planting evidence, and whose work as a homicide detective has now resulted in multiple exonerations—later threatened Mr. Scott's life, coercing him to recant his truthful confession. Meanwhile, when two eyewitnesses, Mr. Jarmon and Mr. Brown, tried to testify that they saw Mr. Scott, not Mr. Dixon, shoot Torriano Jackson, Defendant Belling

threatened them, charging and causing them to be wrongfully convicted of perjury—a move he later called "a stroke of tactical genius."

12.    Mr. Dixon's wrongful conviction was also the direct result of the unconstitutional and otherwise illegal policies, practices, and customs of both the BPD and the ECDA.

13.    In the 1980s and 1990s, the BPD maintained a pattern and practice of fabricating evidence, suppressing exculpatory evidence, abusing its authority, and threatening or using excessive force. BPD officers were routinely falsifying search warrant affidavits, illegally raiding civilians' homes and stealing their property. BPD narcotics officers were routinely selling drugs, targeting rival drug dealers and partnering with others. And BPD officers were routinely using and threatening illegal force, beating witnesses, suspects, and complainants to serious injury. In fact, in just the year 1990, there were at least four such high-profile instances of illegal force.

14.    Meanwhile, in homicide investigations, including the high-profile cases of Lynn DeJac and Cory Epps, BPD detectives were fabricating, tainting, and coercing witness statements and identifications, conspiring to present false testimony, and suppressing exculpatory evidence.

15.    This widespread misconduct was the direct result of systemic deficiencies in supervision and discipline within the BPD.

16.    The City of Buffalo was on notice about these problems. In 1990, they paid out millions in settlements over police misconduct. In 1991—only a few months before Mr. Dixon's arrest—the International Association of Chiefs of Police issued a 300-page report on the BPD, finding a "serious breakdown" in the BPD's disciplinary procedures. It observed that a large number of civilian complaints about police misconduct remained in

"inconclusive limbo" and that the BPD failed to even keep proper records about its misconduct. And in 1992—a few months before Mr. Dixon's trial—the U.S. Department of Justice issued a report, finding that it received more illegal force complaints about the BPD than about police in other midsized cities between 1985 and 1990.

17. Despite these obvious warnings, and despite additional newspaper investigations, complaints from citizens and lawyers, and FBI investigations, the City ignored the BPD's problems, with BPD Commissioner Ralph V. Degenhart insisting that the state of the department was "not too bad."

18. Defendant City of Buffalo's response to the BPD's well-documented pattern and practice of illegal conduct evidenced its deliberate indifference to that conduct. The BPD maintained a culture of total impunity.

19. The corrosive culture at BPD went hand in hand with a similar pervasive culture at ECDA of tolerating egregious constitutional violations to obtain convictions at any cost. Supervisors directed and allowed prosecutors to act as *de facto* investigative supervisors of the BPD Homicide Section, where they both directed detectives to engage in misconduct and personally engaged in misconduct themselves. The ECDA allowed these prosecutors, with impunity, to fabricate inculpatory evidence to build cases against targets they wanted to get off the street. Prosecutors not only suppressed exculpatory evidence, they as a matter of policy and practice took aggressive action to destroy any exculpatory statements, threatening witnesses with force or other consequences to silence them or make them falsely "recant" truthful statements. Prosecutors believed that if they lost their cases, they would lose their jobs. This "win-at-all-costs" culture led to several proven wrongful convictions in addition to Mr. Dixon's.

20.     Indicative of the undisciplined attitude of many prosecutors in the office, Defendant

        Belling would often tell people his motto: "It takes a good lawyer to get a guilty man off,

        but it takes a great lawyer to convict an innocent one."

21.     The ECDA's systemic failures in training, supervising, and disciplining prosecutors

        allowed this toxic culture to sustain itself for decades.

22.     The corrupt culture at the BPD and the ECDA allowed the individual defendants in this

        case to fabricate a case against Mr. Dixon, even as evidence poured in demonstrating his

        innocence. Indeed, Defendants astonishingly refused to even entertain the repeated

        confessions from the true shooter.

23.     Twenty years after his wrongful conviction and while in prison, Mr. Dixon, a former art

        student at Buffalo Academy for Visual and Performing Arts, began sketching pastel

        drawings of golfscapes. His artwork caught the attention of Golf Digest, which

        investigated his case and published evidence of his innocence. The Golf Digest

        investigation was followed up with investigations by NBC, Georgetown University Law

        Center's Prisons and Justice Initiative, and eventually, the newly-elected Erie County

        District Attorney. Each concluded that Mr. Dixon was innocent.

24.     Indeed, in the time since Mr. Dixon's trial, four more witnesses who saw the shooting

        came forward to say that Mr. Dixon was not the shooter. Many of them identified Mr.

        Scott. And although Mr. Scott was coerced into recanting his confession in the grand jury

        against Mr. Dixon, he soon reverted back to the truth.

25.     Because of Defendants' refusal to accept Mr. Scott's confession to the 1991 shooting—

        due to their zeal to go after the innocent Mr. Dixon—Mr. Scott remained free to shoot

        another teenager in the face in 1993. He left his victim a quadriplegic for life.

26.    Mr. Dixon—now exonerated and finally free—brings this lawsuit to hold those who

illegally caused his wrongful conviction accountable.

## JURISDICTION AND VENUE

27.    This Court has federal-question jurisdiction over the claims arising out of violations of

the United States Constitution, through 42 U.S.C. § 1983, under 28 U.S.C. §§ 1331 and

1343. It has supplemental jurisdiction over pendent state law claims under 28 U.S.C.

§ 1367(a).

28.    Plaintiff has complied with the requirements of New York City General Municipal Law

§ 50-i. He made and served a notice of claim on all municipal defendants on December

18, 2018. More than thirty days have elapsed since the service of those notices, and no

offer of settlement has been made.

29.    Plaintiff submitted to hearings for both the City of Buffalo and the County of Erie

pursuant to New York General Municipal Law § 50-h on October 1, 2019.

30.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York,

the judicial district in which the claims arose and in which the Defendants conducted

business.

## PARTIES

31.    Plaintiff VALENTINO DIXON was wrongfully arrested, indicted, prosecuted, tried,

convicted, and imprisoned by the acts of the Defendants in this complaint. He is, and at

all times relevant herein was, an individual residing in the State of New York.

32.    Defendant CITY OF BUFFALO is, and at all times relevant herein was, a municipality

organized and existing under the laws of the State of New York. At all times relevant to

this action, the Buffalo Police Department ("BPD") is and was a part, and under the responsibility, of the City of Buffalo.

33.  Defendant COUNTY OF ERIE is, and at all times relevant herein was, a municipality organized and existing under the laws of the state of New York. At all times relevant to this action, the Erie County District Attorney's Office ("ECDA") is and was a part, and under the responsibility, of the County of Erie.

34.  Defendant MARK R. STAMBACH, at all relevant times herein, was a duly appointed and acting detective in the BPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York.

35.  Defendant RANIERO MASECCHIA, at all relevant times herein, was a duly appointed and acting detective in the BPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York.

36.  Defendant JAMES P. LONERGAN, at all relevant times herein, was a duly appointed and acting detective in the BPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York.

37.  Defendant JOHN VICKERD, at all relevant times herein, was a duly appointed and acting detective in the BPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York.

38.   Defendant Chief RICHARD T. DONOVAN, at all relevant times herein, was a duly
      appointed and acting supervisor in the BPD acting under color of law and in his
      individual capacity within the scope of employment pursuant to the statutes, ordinances,
      regulations, policies, customs, and usage of the City of Buffalo and the State of New
      York.

39.   Defendants JOHN DOES, whose actual names Mr. Dixon has been unable to ascertain
      notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious
      designation "John Doe" and who include supervisors within the BPD, were at all times
      relevant to this Complaint duly appointed and acting police officers of the BPD and
      include officers with responsibilities over the hiring, training, and supervision of BPD
      homicide detectives, including the individual defendants named herein, acting under
      color of law and in their individual capacities within the scope of employment pursuant to
      the statutes, ordinances, regulations, policies, customs, and usage of the City and State of
      New York.

40.   Defendant CHRISTOPHER BELLING, at all relevant times herein, was a duly appointed
      and acting assistant district attorney in the ECDA acting under color of law and in his
      individual capacity within the scope of employment pursuant to the statutes, ordinances,
      regulations, policies, customs, and usage of the County of Erie and the State of New
      York.

## FACTS

### Defendants at the BPD and ECDA Target Valentino Dixon

41.   In the late 1980s and early 1990s, the Buffalo Police Department ("BPD") had a culture
      of tolerating systemic misconduct by its officers, including fabricating evidence, using

and threatening excessive force, and even stealing property and dealing drugs. Despite these widespread practices, BPD's internal supervision and discipline systems completely failed to stop obvious and blatant misconduct or hold officers accountable. Instead, this misconduct was only uncovered by external bodies—including the FBI and the U.S. Department of Justice, which repeatedly investigated and even charged BPD officers for fabricating affidavits and official statements; dealing drugs; stealing cash, jewelry, and property; and using and threatening excessive force.

42.     Defendant BPD Homicide Detective Mark Stambach was representative of the problems of the department. A former BPD narcotics officer—one of the most corrupt divisions of the BPD—he had a reputation for planting evidence; had caused the City of Buffalo to pay out over $300,000 in settlements for his misconduct; and would be involved in investigating several homicide convictions that would later result in exonerations.

43.     The "win-at-all-costs" culture at the Erie County District Attorney's Office ("ECDA") was no better. In particular, Defendant Assistant District Attorney Christopher Belling was an exemplar of the office's problems. He had a reputation for hiding *Brady* evidence. He always carried a gun. He was known for regularly threatening defense witnesses with perjury charges—so much so that defense attorneys were often reluctant to call witnesses, even if they were exonerating. And he would even regularly threaten to prosecute defense attorneys with witness tampering if they sought to interview witnesses who had participated in police-arranged identification procedures.

44.     At the time, the BPD and ECDA shared and maintained a list of Buffalo citizens that they wanted to "take off the street" despite the lack of probable cause to bring charges against them. True to their disregard for constitutional obligations, and for the truth, there was a

mutual understanding that BPD officers would, if presented with an opportunity, create evidence by any means necessary to make any colorable charges against targeted people stick.

45.    Upon information and belief, in 1991, Mr. Dixon was a person on this list of targets. At the time, the BPD and ECDA suspected that he was involved in selling drugs. The BPD and ECDA were aware that Mr. Dixon drove at least three flashy cars. Consistent with their pattern of activity at the time, BPD narcotics detectives had recently raided and ransacked his house, seizing and keeping his property, even his personal photographs. In addition, throughout the first six months of 1991, BPD officers were pulling over Mr. Dixon on the street almost every single day, harassing him and sometimes roughing him up. One BPD officer had warned him that the department "would not stop" until they "gave him ten years."

46.    The BPD and ECDA were so motivated to arrest Mr. Dixon that when Mr. Dixon's house was raided and ransacked, BPD officers even seized and kept a photograph of him holding a toy BB gun. In fact, a year later Defendant Belling introduced the photo of the toy against Mr. Dixon in the eventual grand jury in this case.

47.    All BPD detectives in this case were supervised by Defendant BPD Chief Richard Donovan, to whom, for instance, all investigative memoranda were addressed. These BPD detectives were also supervised by John Does, unknown BPD supervisors.

**Lamar Scott Shoots and Kills Torriano Jackson**

48.    On August 10, 1991, around 1:00 a.m., near the intersection of East Delevan and Bailey Avenues in Buffalo, NY, two brothers, Torriano Jackson and Aaron Jackson, jumped out

of their car and approached a man with whom they had an earlier argument, Mario

Jarmon.

49.     The intersection was near Louie's Texas Red Hots, a local hangout for teenagers. At the

time, there was a crowd of nearly one hundred people present.

50.     The Jackson brothers confronted Mr. Jarmon. After exchanging words, Aaron Jackson

quickly became violent. He knocked Mr. Jarmon on the ground and started kicking him.

Mr. Jarmon lay on the sidewalk.

51.     Torriano Jackson was armed with a .32 caliber revolver. During the altercation, he shot

Mr. Jarmon.

52.     Lamar Scott—a friend of Mr. Jarmon's—entered the fight carrying a TEC-9, a

semiautomatic gun. He walked towards the Jacksons, firing the weapon, emptying the

gun's clip. In total, he fired at least 27 shots. As he would soon confess to the police, his

friends, and the television news, he shot and killed Torriano Jackson.

53.     During the fight, Mr. Scott also shot and injured Aaron Jackson, as well as a 17-year-old

bystander and friend of the Jacksons, John Sullivan.

54.     Mr. Scott then ran down the street, got rid of the gun, and rode his bicycle home.

55.     Responding to the scene, the BPD collected twenty-seven 9mm shell casings (from the

TEC-9), as well as a .32 caliber revolver and a spent .32 caliber casing. This evidence

confirmed that there were two shooters involved in the fight.

56.     Although present in the area along with nearly one hundred other bystanders, Mr. Dixon

was not involved in the fight. He did not shoot anybody. He is innocent.

57.     Mr. Dixon looks nothing like true shooter Mr. Scott. While Mr. Scott was six-feet tall and

heavyset, Mr. Dixon was only five-foot-seven and skinny. Mr. Dixon and Mr. Scott's

faces do not look alike, and they were wearing differently colored clothes on the night of the shooting. No true or reliable report of the shooting identified Mr. Dixon as the shooter or provided a description of the shooter that matched Mr. Dixon.

58.  Nevertheless, BPD officers quickly learned that Mr. Dixon had been present in the area during the time of the shooting because his vehicle—a recognizable and well-known red Mazda RX-7 sports car—had been present. On information and belief, Defendants decided to fabricate a case against Mr. Dixon even though they lacked any true evidence implicating him.

### Defendants Falsify a Case Against Valentino Dixon

*BPD and ECDA learn that Mr. Dixon was present, interview Emil Adams, and begin attempting to coerce witnesses*

59.  In their first step in fabricating the case against Mr. Dixon, BPD officers approached eyewitness Emil Adams and asked him to come to the precinct. At the precinct, Mr. Adams explained that he saw a six-foot-tall, heavyset man wielding a TEC-9—a description fitting Lamar Scott. Mr. Adams also said he saw a five-foot-ten, skinny black man firing a handgun—a description fitting Torriano Jackson. He told the police that he did not know the names of the shooters.

60.  Defendants Detective Mark Stambach and Christopher Belling, acting as an investigator, were present with Mr. Adams at the precinct.

61.  Defendants Stambach and Belling had learned that Mr. Dixon was present in the area of the shooting and told Mr. Adams that they wanted Mr. Dixon for "a lot of things." They attempted to pressure Mr. Adams into saying that he saw Mr. Dixon commit the shooting.

62.   At the time, there was no grand jury proceeding nor any other judicial proceeding about the shooting, nor did Defendants have any evidence suggesting that Mr. Dixon was the shooter.

63.   Mr. Adams was vulnerable. He was out on bail for charges pending in Michigan, and the officers used the precarious state of his liberty to intimidate and coerce a false identification of Mr. Dixon. Defendant Stambach, Defendant Belling, and other BPD officers repeatedly alluded to what "could happen" if he did not identify Mr. Dixon. They tried to intimidate him, telling him, "we got you where we want you." Mr. Adams "got the point"—he was afraid of doing more time, and he was scared that if he did not identify Mr. Dixon, Defendants would be able to retaliate against him.

64.   Nonetheless, at the time, Mr. Adams refused to identify Mr. Dixon as the shooter. Worse for Defendants, Mr. Adams's description demonstrated that the shooter with the TEC-9— someone heavyset and six-feet tall—was not Mr. Dixon.

65.   Upon information and belief, Defendant Stambach continued to contact Mr. Adams after this initial statement. He wanted Mr. Adams to claim that Mr. Dixon was the sole shooter, despite his initial description of the shooters.

66.   The pressure, coercion, or improper suggestion of Defendant Stambach, other Defendant detectives, and Defendant Belling eventually worked. Although his initial description of the shooter demonstrated that Mr. Dixon was innocent, Mr. Adams eventually falsely identified Mr. Dixon as the shooter in the grand jury in November 1991 and at trial in June 1992.

67. However, the statement that Mr. Adams gave the night of the shooting was his only accurate statement: that he did not know who the shooter was—only that he was six-feet tall and heavyset, a description that did not match Mr. Dixon, but matched Mr. Scott.

68. In their official police reports and other documentation, Defendant Stambach and other BPD officers misrepresented and failed to accurately document their misconduct in obtaining false incriminating evidence from Mr. Adams.

*Knowing that Mr. Dixon had been present on the scene, BPD interviews John Sullivan and causes the first false incriminatory statement*

69. The night of the shooting, while Mr. Adams was interviewed at the BPD precinct, Defendant BPD Detective John Vickerd traveled to Sister's Hospital to work on John Sullivan, the 17-year-old bystander who had been shot by a stray bullet while running away from Mr. Scott's shooting.

70. Mr. Sullivan had been in no position to accurately identify the person who shot Torriano Jackson. He was about 100 yards—a football field—away when he looked back and observed the shooter for 15–30 seconds, in the dark at 1:30 a.m., and among a crowd of people. At the time Mr. Sullivan saw the shooter he had been shot and was bleeding, scared, and in significant pain.

71. Moreover, he had spent the previous twelve hours drinking malt liquor and smoking marijuana laced with cocaine.

72. At the hospital, Mr. Sullivan told Detective Vickerd that that shooter was six-feet tall and 160 pounds. He also told police the shooter was wearing black and white clothes.

73. Although he did not know his name, Mr. Sullivan was describing Mr. Scott. Mr. Scott is six feet tall. And on the night of the shooting, he was wearing black and white clothes. Mr. Dixon is not six feet tall, he is five-foot-seven. On the night of the shooting, he was

not wearing black and white clothes. Moreover, Mr. Dixon and Mr. Scott have completely different facial features. They look nothing alike.

74.     Upon information and belief, Defendant Vickerd knew that the BPD and ECDA wanted to fabricate a case against Mr. Dixon for the shooting, either because Defendants Stambach, Belling or other Defendants had told him this at the scene or because he learned that Mr. Dixon had been at the scene and was aware that Mr. Dixon was on the BPD and ECDA target list.

75.     Upon information and belief, Defendant Vickerd fed Mr. Dixon's name to Mr. Sullivan and then used improper coercion, pressure, or suggestion to cause Mr. Sullivan to falsely identify Mr. Dixon as the shooter.

76.     Mr. Sullivan was vulnerable to coercion, pressure, or suggestion. He was a 17-year-old in the hospital recovering from a gunshot wound to the leg. He had serious felony charges pending in Georgia. He was interviewed without his parents or a guardian present. And he had recently been intoxicated with liquor, marijuana, and cocaine.

77.     Other than Defendant Vickerd's misconduct, Mr. Sullivan had no reason to, by name, identify the same wrong person as the shooter that Defendants had already targeted.

78.     Approximately seven hours later, BPD detectives brought Mr. Sullivan to the BPD Homicide Section's office to speak again with Mr. Sullivan and fabricate a typed statement.

79.     The interview of Mr. Sullivan was not audio or video recorded. The BPD Homicide Section had the technical ability to record its interviews in the 1970s and did so as a matter course, but intentionally stopped the practice of recording in the 1980s to avoid creating an accurate, verbatim record of interviews. Instead, the Homicide Section would,

as a practice, interview a witness or suspect, then have an officer type up an artificial "question-and-answer" statement that gave the false impression that it memorialized a verbatim conversation. They would then have the witness sign it.

80.    Defendant Masecchia produced such a fabricated typed statement for Mr. Sullivan. On its face, that statement purported to memorialize verbatim the questions asked to Mr. Sullivan and the answers Mr. Sullivan gave. In reality, Defendant Masecchia wrote "a lot of [] stuff" that Mr. Sullivan did not say and omitted parts of the conversation to falsely make Mr. Sullivan's identification appear reliable.

81.    As a result, the statement omitted exculpatory and otherwise impeaching information about Mr. Sullivan's false identification. For example, it omitted the improper coercion, pressure, or suggestion that resulted in Mr. Sullivan misidentifying a photo of Mr. Dixon as the shooter—two people who have completely different heights, weights, and facial features.

82.    At the grand jury and trial against Mr. Dixon, after and because of police coercion, pressure, or suggestion, Mr. Sullivan continued to falsely claim that Mr. Dixon was the shooter.

83.    In their official police reports and other documentation, Defendants Vickerd and Masecchia, as well as other BPD officers, misrepresented and failed to accurately document their misconduct in obtaining false incriminating evidence from Mr. Sullivan.

84.    Upon information and belief, although Defendant Belling was not present for Defendants Vickerd and Masecchia's misconduct in obtaining Mr. Sullivan's false identification and incriminating statements, this misconduct was done pursuant to a conspiracy to build a

false case against Mr. Dixon. In the alternative, Defendants Vickerd and Masecchia suppressed this information from Defendant Belling.

### *The BPD arrests Valentino Dixon*

85.  Solely based on Mr. Sullivan's fabricated identification, and only twelve hours after the shooting, BPD officers pulled over Mr. Dixon's car. They arrived with two tow trucks ready to seize and keep his vehicles. BPD officers arrested Mr. Dixon, and they did so without probable cause.

86.  At the precinct, Mr. Dixon waived his *Miranda* rights and was interviewed by Defendant Stambach. He truthfully denied being a part of the fight between Mr. Jarmon and the Jackson brothers, and he truthfully denied shooting anyone. He explained that although he was present in a store in the area, he ran away out of the store and away from the area once the shooting started.

87.  Defendant Stambach and other Defendant officers had Mr. Dixon change into jail clothes and paraded him down a hallway that they had already lined with media personnel and cameras.

88.  Upon information and belief, a few hours after the BPD arrested Mr. Dixon, and knowing the only basis for the arrest was an identification from Mr. Sullivan that they had fabricated, suggested, or coerced, BPD detectives fabricated an "anonymous tip" to bolster their case. Defendant Lonergan memorialized this fake "anonymous tip" in BPD reports, writing that an anonymous "Black male" had called the BPD and claimed that Mr. Dixon and "one of the Jackson boys were dating the same girl, . . . Heather Smith . . . at City Honors School," and that the shooting was over that girl. But this was not true:

Mr. Dixon was not dating Ms. Smith and did not know her. Upon information and belief, this anonymous "tip" was wholly fabricated.

89.   Given the weakness of the case against Mr. Dixon, had the tip been legitimate, BPD detectives would have had every incentive to investigate the tip immediately, including by interviewing Ms. Smith and others who knew her. Instead, BPD detectives did not bother to speak to Ms. Smith until many months after Mr. Dixon had already been indicted. When they finally did, they learned Ms. Smith had never heard of Valentino Dixon, let alone dated him.

### *Defendants undo evidence of Mr. Dixon's innocence by threatening witnesses*

90.   While Defendants were fabricating incriminating evidence against Mr. Dixon, they were also receiving extraordinary proof that Mr. Dixon was innocent.

91.   As a result, and as detailed below, Defendants set out to undo this proof of innocence in order to continue building a fake case against Mr. Dixon. Some truthful witnesses, they ignored; others, they directly threatened with "perjury" charges and prison time, and then made good on those threats. They even threatened Mr. Scott, the true shooter, with physical violence to coerce him into "recanting" his confession.

92.   On August 11, 1991, Defendant Stambach, as well as BPD Detective Daniel DiPirro, interviewed Mario Jarmon at the hospital. Defendant Stambach and Detective DiPirro were old friends and coworkers from their time in BPD's narcotics division. Mr. Jarmon told Defendant Stambach and Detective DiPirro that Mr. Dixon did not shoot him, that he was shot by Torriano Jackson, and that he did not see Mr. Dixon with a gun.

93.   On August 12, 1991, Defendant Detective Raniero Masecchia interviewed Leonard Brown. Mr. Brown explained to Defendant Masecchia what he had seen: Lamar Scott

holding a gun that was "black and looked like a machine gun" and losing control of it as it "just kept going off."

94.     Defendant BPD officers and Defendant Belling tried to pressure Mr. Jarmon and Mr. Brown to change their accounts of what they saw to falsely identify Mr. Dixon as the shooter. Their tactics included, but were not limited to, threatening Mr. Jarmon and Mr. Brown with perjury charges, and upon information belief, threatening their physical safety, if they continued to say that Mr. Scott was the shooter.

95.     Defendants' threats did not deter Mr. Jarmon and Mr. Brown. At the grand jury, Mr. Jarmon and Brown refused to perjure themselves, and they told the truth. In response, Defendants followed through on their threats, arresting, indicting, and eventually convicting Mr. Jarmon and Mr. Brown for "perjury." They were sentenced to 2.5–5 and 2.5–7 years, respectively. (Today, their wrongful perjury convictions have been vacated.)

96.     Shortly after the BPD Defendants arrested Mr. Dixon, the true shooter—Lamar Scott— came forward and confessed.

97.     Mr. Scott confessed on the televised Channel 7 local news, to his friends, and to the police.

98.     On August 12, 1991, Mr. Scott gave a formal, sworn statement at the precinct to Defendant Stambach, confessing to killing Torriano Jackson with the TEC-9.

99.     Mr. Scott was fully cooperative with the police. He waived his *Miranda* rights. When he was asked whether he would take a lie detector test, he agreed. He offered to have his clothes tested for gunshot residue. And he answered all the detectives' questions.

100.    When asked why he was confessing, Mr. Scott explained that he did not want Mr. Dixon to "get any time for something that he did not do." Mr. Dixon and Mr. Scott were

acquaintances who'd met a few months prior and who occasionally spent time together socially. Before going to Louie's the night of the shooting, Mr. Dixon was hanging out at Mr. Jarmon's home with Mr. Scott, Mr. Brown, and other individuals. Mr. Scott and Mr. Dixon are not related nor were they ever close.

101.   Shockingly, despite Mr. Scott's sworn voluntary confession to the shooting, which was corroborated by other witnesses, Defendants refused to arrest Mr. Scott. They did not submit him to a lie detector test. They did not test his clothes for gunshot residue. Instead, after Mr. Scott gave his confession and offered to corroborate it, Defendant Stambach told him, "We got who we want, get the hell out of here."

102.   Because his confession to the police fell on deaf ears, Mr. Scott continued publicly confessing.

103.   As a result, Defendant Stambach began harassing Mr. Scott. He told Mr. Scott that charges would proceed against Mr. Dixon. He made threats on Mr. Scott's life and on his family members' lives in order to coerce him to stop truthfully reporting he had committed the crime. Defendant Stambach also made clear he wanted Mr. Scott to perjure himself in the grand jury and falsely testify that Mr. Dixon had committed the crime.

104.   The BPD's threats felt credible to Mr. Scott. It was well-known that the BPD had killed people in Buffalo. They had used illegal chokeholds. They had shot people. They maintained a culture of impunity for police brutality.

105.   Indeed, in an incident that was well-publicized, Defendant Stambach and four other police officers had brutally beaten the son of a retired police officer. The case and

subsequent civil rights settlement were widely reported in 1990, including in the Buffalo News.

106. Because he feared violent retribution from Defendant Stambach and the BPD, Mr. Scott moved in with his friend, Pamela Yates. Mr. Scott explained to her that he was hiding, scared that if he told the truth—that he killed Torriano Jackson—the BPD would hurt or kill him.

107. Mr. Scott also explained that he had killed Torriano Jackson to other friends: Eric Doss, Ronnie Bryant, and LaRosa Carson.

108. A few months later, before the grand jury was empaneled, Defendant Belling also contacted Mr. Scott. Like Defendant Stambach, Defendant Belling also threatened Mr. Scott, telling him that it would be "tragic" if people close to him were hurt or killed. Defendant Belling told Mr. Scott that if he went into the grand jury and told them what they wanted him to say, "nothing would ever happen to them." Defendant Belling advised Mr. Scott that it was in his "best interest" to testify in the grand jury and say that Mr. Dixon had committed the crime.

109. Mr. Scott eventually gave in to the threats, pressure, and coercion from Defendant BPD officers and Defendant Belling. He perjured himself in the grand jury, falsely testifying that Mr. Dixon had committed the shooting. He did so because he feared that if he testified truthfully, the police were going to kill him.

110. Upon information and belief, if Defendant Stambach and Defendant Belling had not intimidated Mr. Scott into perjuring himself in the grand jury, Mr. Dixon would not have been indicted.

111. In their official police reports and other documentation, Defendants Stambach, Masecchia, Detective DiPirro, and other BPD officers misrepresented and failed to accurately document their misconduct in their interactions with Mr. Brown, Mr. Jarmon, and Mr. Scott.

### *BPD misconduct improperly causes a false identification by Aaron Jackson*

112. Undeterred by exculpatory evidence, Defendant Stambach and other officers, including BPD Detectives Robert Grabowski and Detective DiPirro, also set out to fabricate an identification of Mr. Dixon by Aaron Jackson.

113. Mr. Jackson had been injured in the shooting and was at the Erie County Medical Center ("ECMC").

114. On August 12, 1991, Defendant Stambach interviewed Mr. Jackson at ECMC. Defendant Stambach showed Mr. Jackson a six-photo array including Mr. Dixon's photo. Upon information and belief, Defendant Stambach improperly suggested that Mr. Dixon was the person who committed the shooting and that Mr. Jackson should select him as the shooter.

115. Mr. Jackson told Defendant Stambach that "he cannot be sure" who shot his brother, but based on Defendant Stambach's suggestion eventually selected Mr. Dixon "as looking like the person" who shot his brother. Mr. Dixon had not been involved in the altercation that led to the shooting and looked nothing like Mr. Scott. And Mr. Jackson did not know Mr. Dixon. Mr. Jackson would not have selected Mr. Dixon at all without Defendant Stambach's improper suggestion.

116.   Yet despite the improper suggestion, Mr. Jackson did not definitively identify Mr. Dixon as the shooter on August 12. He said at that Mr. Dixon "was there," but that it "happened so quick."

117.   Between the initial hospital interview and Mr. Jackson's grand jury testimony, however, Defendant BPD detectives induced Mr. Jackson to falsely identify Mr. Dixon as the shooter through coercion or improper suggestion. For instance, Defendants Stambach and other officers, including Detectives Grabowski and DiPirro, repeatedly asked Mr. Jackson about Valentino Dixon. Mr. Jackson repeatedly told officers that he did not know a Valentino Dixon, but these detectives improperly indicated to Mr. Jackson that they wanted him to identify Mr. Dixon as the shooter.

118.   Mr. Jackson ultimately succumbed to the coercion, pressure, or improper suggestion by Defendant Stambach and Detectives Grabowski, DiPirro, and others. In the grand jury, Mr. Jackson was shown a single photograph of Mr. Dixon. Even though Mr. Dixon was not the person Mr. Jackson had seen shoot him, and even though Mr. Jackson had originally truthfully told Defendants he could not identify Mr. Dixon as the shooter, at the grand jury Mr. Jackson identified Mr. Dixon as the shooter without any qualifications.

119.   Over the ten months between the shooting and his testimony at Mr. Dixon's trial, Mr. Jackson spoke repeatedly with Defendant BPD detectives. During these meetings they continued to reinforce the false identification of Mr. Dixon.

120.   Ten months after the shooting, and after suggestion by Defendant BPD detectives, at trial, Aaron Jackson again identified Mr. Dixon as the shooter, without qualification.

121.   In their official police reports and other documentation, Defendant Stambach, as well as Detectives DiPirro and Grabowksi and other BPD officers, misrepresented and failed to

accurately document their misconduct in obtaining false incriminating evidence from Mr. Jackson.

122.   Upon information and belief, although Defendant Belling was not present for Defendant Stambach and Detectives DiPirro and Grabowski's misconduct in obtaining Mr. Jackson's false identification, this misconduct was done pursuant to a conspiracy to build a false case against Mr. Dixon. In the alternative, Defendant Stambach and the other officers suppressed this information from Defendant Belling.

### Defendants ignore other exculpatory evidence

123.   Despite Defendants' desperate efforts to build a case against Mr. Dixon and bury or negate any inconsistent evidence, it soon became clear to the community that the BPD and ECDA were trying to pin the shooting on someone who was totally innocent. As a result, more witnesses began coming forward.

124.   On August 14, 1991, Walter Lee Dennis came forward. He had witnessed the shooting and told Evan Kenner, a private investigator, that "he was sure" the shooter was not Mr. Dixon, with whom he was familiar. He did not recognize the shooter because, on information and belief, he did not know Lamar Scott.

125.   On August 14, 1991, Tamara Frida called the BPD Homicide Section. She had also witnessed the shooting and told Defendant Stambach that Mr. Dixon was not the shooter. Although she was reluctant to give her name over the phone, Defendant Stambach knew who she was and that she was at the scene because her car had been hit by bullets there. She also offered to look at pictures and make identifications of people who were there. Defendant Stambach intentionally refused to take her up on her offer.

126.   Defendant Richard Donovan, as well as Defendants John Does, knew or should have known about what was going on in this investigation, including Defendants' extensive misconduct with witnesses. The case was high profile and much of it was on the news— including one of Mr. Scott's confessions.

127.   When Mr. Dixon was arrested, Defendant Stambach seized and vouchered Mr. Dixon's clothes so he could have them tested forensically. Defendant Stambach specifically had Mr. Dixon's clothes tested for gunshot residue. This would be a helpful investigatory tool: BPD officers responding to the scene of the shooting had reported that there was significant gunpowder in the air. The absence of gunshot residue on Mr. Dixon's clothes would thus have been powerful exculpatory evidence, corroborating that he was not the shooter.

128.   Mr. Dixon's clothes tested negative. Consistent with the practice at the ECDA at the time, Defendant Belling did not disclose this exculpatory information to Mr. Dixon or his lawyers before or during the trial. Instead, he buried or destroyed the exculpatory test results. Mr. Belling did not disclose that information until nearly 27 years later, in 2018, to two Georgetown University law students reinvestigating the case.

### On the Basis of Police-Manufactured Evidence, Mr. Dixon is Convicted

129.   Mr. Dixon's trial took place over five days in June of 1992.

130.   At trial, the only witnesses who specifically incriminated Mr. Dixon in the shooting were the three whose false identifications Defendants had fabricated or coerced: John Sullivan, Emil Adams, and Aaron Jackson. The prosecution presented no physical or forensic evidence specifically linking Mr. Dixon to the shooting.

131. Mr. Dixon knew he was innocent, and he knew who committed the crimes. But because of Defendants' campaign of suppression and intimidation, he did not have the evidence to prove it. The jury did not hear from Mr. Scott, who had earlier confessed to the crime before he was threatened by Defendants Stambach and Belling into recanting. Nor did the jury hear from Mr. Brown and Mr. Jarmon, who had earlier told the police that Mr. Dixon was innocent and Mr. Scott was the shooter, before they were threatened by Defendants and prosecuted for "perjury." Finally, the jury did not hear about the exculpatory gunshot residue testing, because Mr. Belling hid that information from the defense.

132. On June 16, 1992, Valentino Dixon was convicted of murder in the second degree, attempted murder in the second degree, assault in the third degree, and criminal possession of a weapon in the second degree. These convictions were based on the coerced, pressured, or suggested identifications by Mr. Sullivan, Mr. Jackson, and Mr. Adams, and it was secured on an indictment premised upon Mr. Scott's police-manufactured perjured grand jury testimony.

133. Despite Defendants' efforts to fabricate a case against Mr. Dixon, and although the jury convicted Mr. Dixon, it had its doubts. Indeed, the initial vote amongst the jurors was 9-to-3 to acquit. To the jurors, the "prosecutor's witnesses weren't credible at all." After the verdict, the jury's foreman expressed his doubts to the judge who presided over the trial, Michael D'Amico. He told Judge D'Amico that he was "upset by this whole thing."

134. Judge D'Amico responded that "there's a lot of things you're not allowed to know." "Just trust me," he said, "this guy is a menace; he should be off the street."

135. Upon information and belief, Judge D'Amico made these comments because Defendant BPD officers or Defendant Belling communicated to him that, consistent with his

27

placement on their target list, Mr. Dixon was someone they believed should be taken "off the street."

### Mr. Dixon's Convictions Are Vacated

136.    After his conviction, Mr. Dixon maintained his innocence. He filed appeals. He continued to hire lawyers and investigators to search for additional witnesses and evidence to challenge his conviction. In this time, four witnesses who saw the shooting—Michael Bland, Tamara Frida, Anthony Watkins, and Antoine Shannon—came forward again to say that Mr. Dixon was not the shooter. Mr. Bland, Ms. Frida, and Mr. Shannon all also identified Mr. Scott as the shooter.

137.    Meanwhile, Mr. Scott was repeatedly explaining that he had been forced to recant his truthful confession. He sent several notarized letters over the years to Erie County District Attorney Frank Clark, the BPD Commissioner, the FBI office in Buffalo, the Internal Affairs department, and several news organizations.

138.    For twenty years, all these efforts were unsuccessful in vacating Mr. Dixon's wrongful conviction.

139.    Then, in 2012, Golf Digest magazine profiled Mr. Dixon and his artwork. While incarcerated, Mr. Dixon had begun sketching meticulously detailed pastels of golf courses. Although he had never played golf, his drawings were stunning. Golf Digest simultaneously investigated Mr. Dixon's case, finding significant reasons to believe that he was innocent of the shooting for which he was convicted.

140.    NBC and the Golf Channel followed up the Golf Digest article with a program highlighting the various witnesses who identified Mr. Scott, and not Mr. Dixon, as Torriano Jackson's shooter. In addition, students from the Georgetown University Law

Center's Prisons and Justice Initiative reinvestigated Mr. Dixon's case and created a

video documentary demonstrating Mr. Dixon's innocence. Meanwhile, one of Mr.

Dixon's daughters, Valentina, was leading a grassroots campaign to free her father.

141.    In 2017, John Flynn was newly elected to be the Erie County District Attorney. He

instituted changes in the office to correct some of its longstanding problems. For

instance, he staffed the formerly defunct Public Integrity Unit with a full-time prosecutor

and instituted a Conviction Integrity Unit—a division that his predecessors had found

anathema to their practice.

142.    As part of cleaning up the office's corruption, D.A. Flynn also fired Defendant Belling.

143.    In 2018, Mr. Dixon's post-conviction attorney, Donald Thompson, filed a motion

pursuant to C.P.L. § 440, seeking that his convictions be vacated. By this time, Mr. Scott

had given multiple written statements and three video statements confessing to the

shooting.

144.    Later that year, D.A. Flynn agreed to comprehensively reinvestigate the case. After

interviewing thirty witnesses and thoroughly reviewing the prosecution's case file, the

trial transcripts, and the physical evidence, D.A. Flynn agreed that Mr. Scott, and not Mr.

Dixon, was the shooter. In other words, D.A. Flynn agreed Mr. Dixon was actually

innocent of murder, attempted murder, and assault, and that these convictions should be

vacated.

145.    On September 19, 2018, after more than 27 years since his arrest in 1991, the Erie

County District Court vacated Mr. Dixon's convictions for second-degree murder,

attempted murder, and assault. D.A. Flynn then dismissed those charges. However,

because D.A. Flynn believed that the gun used by Mr. Scott was owned by Mr. Dixon, he

did not consent to vacating Mr. Dixon's conviction for criminal possession of a weapon. That sole count stood.

146.    On the same day, Lamar Scott pled guilty to Torriano Jackson's murder. Mr. Scott was already in prison. In 1993, only two years after killing Mr. Jackson—and free because Mr. Dixon was wrongfully incarcerated for the murder instead—Mr. Scott shot a teenager in the face, leaving him a quadriplegic.

## BPD's Pattern and Practice of Unconstitutional Misconduct in Criminal Investigations, Including the Fabrication of Incriminating Evidence and Suppression of Exculpatory Evidence

147.    In addition to the specific misconduct of individual Defendants, Mr. Dixon's wrongful conviction was also the direct result of the failure of Defendant City of Buffalo to act on notice prior to Mr. Dixon's arrest that the BPD maintained unconstitutional and otherwise illegal policies, practices, and customs, and that its existing supervision and disciplinary systems were woefully inadequate to prevent this rampant misconduct. In the 1980s and 1990s, the BPD's pattern of illegal conduct evidenced deliberate indifference by Defendant City of Buffalo to widespread and persistent practices of coerced or suggested witness statements or identifications, suppression of exculpatory evidence, abuse of authority, threatened and actual excessive force, fabrication of evidence, and the systemic failures in supervision and discipline that enabled such misconduct to occur.

148.    These widespread and persistent practices with respect to criminal investigations within the BPD were well known to the City of Buffalo and its policymakers, before Mr. Dixon's arrest, because of newspaper investigations, complaints from lawyers and civilians, federal investigations by the FBI and the U.S. Department of Justice, and a 300-page report by the International Association of the Chiefs of Police.

149.   These investigations put the City of Buffalo on notice before 1991 that the BPD was regularly violating the constitutional rights of Buffalo citizens and failing to adequately train, discipline, and supervise its officers. Despite that notice, the City of Buffalo took no action.

150.   Thus, many cases—as detailed below—demonstrate pervasive misconduct within the BPD at the time of the investigation of the Jackson shooting. BPD supervisors knew or were willfully blind to the misconduct described below.

151.   This policy, practice, or custom involved the use of various techniques to coerce or fabricate incriminatory statements or identifications, including, without limitation: the use or threat of physical violence; authoritative, suggestive, or repeated assertions of a suspect's guilt; aggressively badgering witnesses into silence or false recantations; and leveraging or exploiting vulnerabilities of witnesses or suspects, including mental vulnerabilities and the threat of criminal penalties; and perjury and false statements in police and court documents and proceedings.

152.   This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: providing a witness or recklessly allowing a witness to learn details about the crime that only the real perpetrator or police could know, whether through leading questions or more direct communication; taking misleading steps to make coerced or suggested statements or identifications appear as though they originated from the suspect following a lawful procedure; selectively documenting a witness or suspect's eventual statement and not the preceding preparation or rehearsal; misrepresenting that a witness's formal statement was a verbatim statement in the witness's own words; and concealing promises for leniency.

153.   The City of Buffalo also had in force and effect a policy, practice, or custom of failing to adequately supervise and discipline BPD officers in the exercise of their constitutional obligations, including their obligations not to fabricate evidence, commit perjury, or hide exculpatory evidence. This failure by policymakers to properly train, supervise or discipline their subordinates amounted to a deliberate indifference to the rights of those who came into contact with BPD officers.

### *Defendant City of Buffalo evinced deliberate indifference*

154.   The BPD exhibited a long-standing pattern of fabricating incriminatory information and suppressing exculpatory information, beginning before Mr. Dixon's prosecution and continuing for decades.

155.   The BPD maintained and shared with ECDA a list of targets that it wanted to take "off the street" by making charges against those people stick by any means necessary, including by fabricating evidence. The existence of such a list was widely known and policymakers knew or should have known about it.

156.   The narcotics department—where Defendant Stambach and Detective DiPirro originally worked for many years—was particularly corrupt. By 1990, the Buffalo News was regularly reporting that BPD narcotics officers were raiding purported "drug dealers'" homes and seizing their property. As a result, cash and jewelry belonging to both non-arrested and arrested civilians were repeatedly found in the personal drawers and desks of BPD officers.

157.   The false drug raids were well-known in the Buffalo community, particularly amongst criminal defense lawyers. They regularly heard their clients speak of BPD officers

breaking in, trashing their homes, stealing cash and property, opening refrigerator doors and dumping out their contents, and cutting furniture upholstery with knives.

158. Despite this longstanding pattern of serious misconduct, the BPD internal supervision and discipline systems did not act to stop the rampant misconduct among BPD officers. Instead, by 2000, after over a decade of complaints from citizens, attorneys, and community groups, the FBI began investigating and arresting BPD officers who had been abusing their authority over the 1990s. It found that BPD officers had been fabricating information in search warrant affidavits to stage illegal "drug" raids—in reality, home invasions of innocent persons—in order to steal money, jewelry, and other valuables from Buffalo citizens.

159. Building on FBI investigations, the U.S. Department of Justice indicted at least seven narcotics detectives and officers for fabricating information for its illegal "drug" raids during the 1990s.

160. Using false information to stage illegal drug raids and other unreasonable searches and seizures was not cabined to only the officers indicted by the federal government. Indeed, as one of the attorneys for an indicted BPD officer publicly complained, his client "should not be [a] scapegoat[] for what seems to be a much larger problem in the department."

161. Around the time of Mr. Dixon's prosecution, the BPD also exhibited a department-wide long-standing pattern in its use and threat of illegal and excessive force against suspects, witnesses, complainants, and other civilians. Indeed, in just the year 1990, there were several highly publicized instances of police brutality. BPD officers beat Jeffrey Dunbar after they covered his eyes and mouth with duct tape. BPD officers broke Mageda

Dhali's nose and called her a "camel jockey" after there was a disturbance at her store. BPD officers kicked and beat Domingo Morales, a 56-year-old wheelchair-bound paralyzed man, breaking his legs. And BPD officers handcuffed and then beat 19-year-olds Mark Aiken and Steven Johnson while screaming racial epithets at them.

162.    As of 1991, Defendant City of Buffalo was paying out millions in settlements as a result of its various police brutality cases. Indeed, Defendant Stambach was the subject of one such settlement. He and four other police officers beat Robert Staudacher, the stepson of a retired city police detective. In 1990, the Defendant City of Buffalo agreed to pay Mr. Staudacher $360,000.

163.    In May of 1992, the U.S. Department of Justice issued a report on the BPD. It found that it received more brutality complaints about the BPD than about police in other midsized cities between 1985 and 1990. In line with its complete failure to police itself, the BPD Commissioner dismissed the report, saying that in his view, the finding was "not too bad." By ignoring these findings, the BPD sent a message that it tolerated and even endorsed this misconduct.

164.    Meanwhile, the U.S. Department of Justice also indicted several BPD officers for illegally using their guns and other force to harass and intimidate citizens.

165.    Corrupt narcotics and other BPD officers were not punished for their misconduct. Instead, they were shielded from consequences and, in some instances, promoted. For example, Defendant Stambach, despite having engaged in excessive force, was promoted to become a homicide detective.

166.    It is therefore no surprise that in addition to the BPD narcotics department, the BPD's serious felony investigations also exemplified the BPD's pattern and practices of misconduct.

167.    In 1985, BPD detectives, convinced that a man named Anthony Capozzi was "suspicious looking," wrongfully arrested him and, through their misconduct, caused him to be convicted of two rapes he did not commit.

168.    The rape victims had told BPD officers that their attacker was 160 pounds. Mr. Capozzi weighed 200 to 220 pounds. The rape victims said nothing about any scars on their attacker's face. Mr. Capozzi had a prominent three-inch scar on his face. Despite these glaring and obvious differences, each victim independently misidentified Mr. Capozzi as her attacker in a police-orchestrated lineup. Upon information and belief, there is no innocent explanation for why both victims would independently misidentify the wrong person: they did so because of improper coercion, pressure, or suggestion from BPD officers.

169.    After spending almost 22 years wrongfully incarcerated, DNA testing proved that another man, Altemio Sanchez, was responsible for the rapes. After Mr. Capozzi's convictions were vacated, the State of New York settled his lawsuit for $4.25 million.

170.    Because the BPD had focused its efforts fabricating a case against the innocent Mr. Capozzi, Mr. Sanchez went on to rape at least an additional seven women and murder three others.

171.    In another case, BPD homicide detectives—including Defendants Stambach and Lonergan—fabricated incriminating evidence and suppressed exculpatory evidence in the prosecution of Lynn DeJac.

172. In 1994, Ms. DeJac was wrongfully convicted of killing her daughter and served 14 years in prison before she was finally exonerated by DNA evidence.

173. While interviewing witnesses, BPD homicide detectives told witnesses about selective information in a deliberate effort to fabricate evidence against Ms. DeJac. For instance, they revealed to witnesses that the victim had been strangled—at the time, a fact not known to the public—and they also left their files open and alone with witnesses.

174. BPD homicide detectives also conspired to present false testimony to explain away otherwise exculpatory evidence. For instance, in order to explain why the victim's body was naked despite the prosecution's theory that the crime involved a mother-daughter quarrel, BPD detectives falsely testified that the victim's body was wet, falsely suggesting that she had come from the shower.

175. In the investigation of Ms. DeJac, Defendant Lonergan obtained a false incriminating statement from a purported "witness" named Wayne Hudson. Before giving his statement, Mr. Hudson had just been arrested on felony charges, the conviction of which would have led to a sentence of 25-years-to-life. In exchange for the false statement, Mr. Hudson had his felony charges dismissed and received a favorable plea offer to a misdemeanor charge.

176. When Mr. Hudson later attempted to recant his statement, admitting it was false, Defendant Stambach compelled him to sign a new statement reaffirming his previous false allegations.

177. After her exoneration, Ms. DeJac brought a § 1983 suit to hold BPD and its officers accountable for its constitutional violations. Fighting a battle with terminal cancer, she settled for a total of $5.3 million.

178.   In 1998, Cory Epps was wrongfully convicted of the murder of Tomika Means. He was
wrongfully imprisoned for over 20 years before his conviction was vacated.

179.   In Mr. Epps's case, like in Mr. Dixon's case, BPD homicide detectives—including
Defendants Stambach and Masecchia—suppressed powerful exculpatory evidence
pointing to the true shooter, Russel Montgomery. Specifically, they interviewed a witness
who said that Mr. Montgomery looked like a sketch of the shooter and who said that Mr.
Montgomery had confessed to the crime to a third person—a person who Mr.
Montgomery later murdered. Defendant Stambach nonetheless prepared a written
statement from the witness that omitted this information and he suppressed this powerful
exculpatory evidence.

180.   Like in Mr. Dixon's case, Defendant Stambach had aggressively badgered or coerced the
witness into remaining silent about the powerful exculpatory evidence she possessed.
And like in Mr. Dixon's case, Defendant Stambach had fabricated a written statement
that falsely purported to memorialize a verbatim conversation with the witness.

181.   Meanwhile, other BPD homicide detectives employed suggestive identification
procedures to fabricate the only identification introduced at trial against Mr. Epps. A
witness to the shooting initially described the shooter as someone who did not look like
Mr. Epps—someone who was 5'8" and had an acne-marked face. Mr. Epps was over
6'2" and had clear skin. The witness also failed to identify Mr. Epps as the shooter when
shown a series of photographs that included a photo of him.

182.   Nonetheless, BPD homicide detectives persisted in showing the witness photographs,
including a photo of Mr. Epps, until she made an identification, suggesting which one she
should choose. The detectives bolstered the false identification by telling her Mr. Epps's

name. By trial, based on BPD misconduct, the witness had gone from failing to identify Mr. Epps as the shooter to being "certain" that Mr. Epps was the shooter.

183. Mr. Epps's civil suit for his wrongful conviction is pending in the Western District of New York.

184. In 2004, BPD homicide detectives—again, including Defendant Stambach—fabricated evidence by coercing a false "confession" from an obviously schizophrenic and deeply mentally ill person named Jose Ortiz. As a result, Mr. Ortiz spent over ten years wrongfully incarcerated for murders he did not commit.

185. Defendant Stambach and other BPD homicide detectives elicited the purported "confession" while Mr. Ortiz displayed behaviors later described by ECMC medical professionals as "suicidal," "bizarre," "in need of physical and chemical restraints," "irrational," "illogical," and "psychotic." For a time afterwards, he was deemed incompetent to stand trial.

186. In addition to obtaining and relying upon an obviously false "confession," Defendant Stambach and other BPD homicide detectives concealed evidence inconsistent with the purported "confession," amongst other exculpatory evidence.

187. Mr. Ortiz remained in prison until the FBI and U.S. Department of Justice independently investigated the murders. In reviewing witness statements, physical evidence, and DNA forensics, they concluded that Mr. Ortiz was innocent. In 2012, the U.S. Attorney indicted three other individuals for the murders, announcing that Mr. Ortiz had "zero role" in the offense and requesting that the ECDA release him. Mr. Ortiz was finally released two years later in 2014.

188. The BPD's Homicide Section maintained practices that helped it engage in and hide its misconduct. For instance, in the 1980s it purposely ended its earlier practice of audio and video recording witness and suspect interviews. Instead, it would interview witnesses and suspects at length and then artificially create a typed "question-and-answer" statement that falsely appeared to memorialize the conversation between the interviewing officer and the witness or suspect. These statements—like that created for Mr. Sullivan in this case—misrepresented what was said by witnesses and excluded exculpatory evidence.

### *Defendant City of Buffalo had a policy, practice, or custom of failing to adequately train, supervise, and discipline police*

189. As a result of this extraordinary pattern of police misconduct in the late 1980s and 1990s, the BPD was a subject of repeated investigation—particularly with respect to its complete failure to adequately train, supervise, and discipline its officers. Its internal mechanisms were entirely feckless. As the Buffalo News explained at the time, "Ask those who hear the complaints of police brutality about Internal Affairs or the DA's office, and the responses range from disappointment to derision to outright laughter."

190. In March 1991—five months before Mr. Dixon's arrest—the International Association of Chiefs of Police issued a 300-page report documenting the BPD's misconduct and, in particular, the department's internal failures to adequately train, supervise, and discipline officers. It found a "serious breakdown" in the BPD's disciplinary procedures, as well as evidence demonstrating that a large number of complaints remained in "inconclusive limbo." It also found that the BPD did a poor job of keeping records about police misconduct.

191. The report also found instances of officers selling drugs and "ripping off" some drug dealers while protecting others.

192.  At the same time, BPD officers were coming forward to the Buffalo News, lamenting the lack of training at the department. Instead of training, veteran officers would just tell subordinate officers to "[b]e the intimidator."

193.  By April 1991, the Buffalo News, along with the Buffalo NAACP and other citizen advocacy groups, was regularly calling for the BPD to be reformed because of its pattern of abuse and the City of Buffalo's complete lack of any police supervision and discipline or any other meaningful response.

194.  Officials from the U.S. Department of Justice joined by urging that Buffalo create an independent police review board. The Buffalo NAACP supported the same because, as its president explained, Black Buffalo citizens felt there was "nowhere for them to go" with complaints about BPD misconduct. "Whether it's the Police Internal Affairs Unit [or] the D.A.'s office," he explained, "there are too many negative results." "The police always come out smelling like a rose." In other words, both the BPD and ECDA were whitewashing the BPD's misconduct.

195.  Despite well-known and well-publicized evidence of police fabricating evidence, suppressing exculpatory evidence, routinely engaging in threatened or actual excessive force, the City of Buffalo policymakers and BPD supervisors took no action whatsoever to curb the deeply embedded misconduct. Their inaction evinced a deliberate indifference to the obvious probability that BPD officers would, and in fact did, violate the constitutional rights of many Buffalo residents.

196.  In summary, at the time of the investigation and prosecution of Mr. Dixon, the BPD had a practice, policy, and custom of: fabricating evidence, including witness statements, identifications and affidavits; failing to disclose exculpatory evidence; failing to take

appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct; failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers; ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful searches and arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence; failing to properly sanction or discipline BPD officers, who are aware of and concealed or aided and abetted violations of constitutional rights of individuals by other BPD officers, thereby causing and encouraging BPD officers, including the Defendant officers in this case, to violate the rights of citizens like Mr. Dixon.

197.   At the time of the investigation and prosecution of Mr. Dixon, and for many years before and after, the BPD and the City of Buffalo was deliberately indifferent to the need to train, supervise, and discipline police officers. In particular, the BPD failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects, among others: a complete lack of disciplinary and remedial actions; a failure to discipline substantial numbers of officers engaging in misconduct; and excessive and chronic delays in resolving disciplinary complaints.

198.   The customs, policies, practices, failures, and inactions of the BPD elaborated above were or should have been known to the policymakers responsible for the BPD, including Defendants Donovan and John Does, and occurred with deliberate indifference to either the recurring constitutional violations elaborated above or to the strong likelihood that

constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the BPD and its policymakers were on notice of these deficiencies and failures.

199. The City of Buffalo through its acts and omissions—including failing to train, supervise, and discipline BPD officers who engaged in misconduct as alleged above and condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of acts and omissions alleged above—is directly responsible for the pattern of misconduct perpetuated by BPD officers, including the egregious misconduct by Defendant detectives in the investigation of Mr. Dixon.

200. As a direct and proximate result of the City of Buffalo's acts and omissions alleged above, Mr. Dixon sustained injury and damage to be proved at trial. That included, but was not limited to: fabricating a case against Mr. Dixon because he was on a list of targets to fabricate cases against; coercing, pressuring, or suggesting witnesses, including Lamar Scott, Aaron Jackson, Emil Adams, and John Sullivan into making false statements and false identifications and then burying the means used to obtain that false evidence; falsely memorializing conversations with witnesses like Mr. Sullivan that were engineered to appear as though they were reliable and uncorrupted and hiding impeachment and other exculpatory evidence; fabricating an anonymous tip; and coercing false statements and false testimony through the threat of excessive or illegal force.

**ECDA's Pattern and Practice of Unconstitutional Misconduct in Criminal Investigations,
Including Failing to Discipline Prosecutorial Misconduct, Ignoring and Suborning
Police Misconduct, and Failing to Adequately Train Prosecutors to Turn Over
Exculpatory Evidence**

201.    In the 1980s and 1990s, the ECDA was steeped in a "win-at-all-costs" culture. As part

and result of that culture, Defendant County of Erie had in force and effect a policy,

practice, or custom of unconstitutional misconduct in the ECDA's criminal investigations

and prosecutions. Specifically, it had policies, practices, and customs of failing to

discipline prosecutorial misconduct; ignoring and suborning police misconduct, including

perjury; failing to prosecute police misconduct; encouraging or participating in the

fabrication of evidence to create a false basis for charges against targets they wanted "off

the street"; and not only failing to turn over exculpatory evidence, but also actively

seeking to destroy such evidence by threatening witnesses to obtain their silence or false

recantations.

202.    The "win-at-all-costs" environment that resulted in these policies, practices, and customs

at the ECDA led to an outsized number of convictions—including several wrongful ones

like Mr. Dixon's. That environment also exacerbated unconstitutional policies and

practices by imposing severe penalties for assistant district attorneys who risked

weakening their cases by following their constitutional obligations. ECDA assistant

district attorneys understood that if they lost their cases—even if that was because they

were honoring their constitutional obligations—they would lose their jobs.

203.    Accordingly, it was no surprise that Frank Clark, one of the assistant district attorneys at

the time, would later comment on the office: "We have had just an extraordinary record.

We have never lost a major prosecution, and I just think that is a wonderful, wonderful

record."

204. There was also a policy, practice, and custom of the Defendant County of Erie for the ECDA to act as *de facto* investigators, directing and controlling the BPD's serious felony investigations. Indeed, the ECDA and BPD were so intertwined that the ECDA would take extraordinary measures to protect BPD officers. For instance, when the Department of Justice investigated the officers who handcuffed and beat Mr. Aiken and Mr. Johnson, it sought the minutes of the ECDA's grand jury proceeding that failed to indict the officers. The ECDA refused to turn over the minutes because the officers were friends with prosecutors in the ECDA. As a result, the assistant U.S. attorney had to get a federal court order compelling the ECDA to turn over the minutes.

205. As *de facto* investigators directing and controlling the BPD's serious felony investigations, Defendant County of Erie, through the ECDA assistant district attorneys, fabricated inculpatory evidence; suppressed exculpatory evidence; coerced witness statements through the use of threats of physical force, imprisonment, criminal charges, and other negative consequences; aggressively badgered witnesses into silence or recantations; and leveraged or exploited vulnerabilities of witnesses or suspects.

206. The BPD and ECDA shared and maintained a list of Buffalo citizens that they wanted to "take off the street," despite the lack of probable cause to bring charges against them. The ECDA encouraged or directed BPD officers to, when presented with an opportunity, create evidence by any means necessary against these targeted suspects, which would then provide a false basis to bring charges. Given their close involvement in BPD investigations, ECDA prosecutors at times directly participated in fabricating such evidence themselves.

207.   The ECDA also had a policy or practice of refusing to credit or consider exculpatory statements—that is, statements that the suspect the ECDA had targeted, arrested, or charged was not guilty. Pursuant to this policy or practice, when faced with such an exculpatory statement, ECDA prosecutors would reflexively accuse the witness of lying and threaten the witness—including with perjury charges—to coerce the witness's silence or false recantation. Similarly, the ECDA had a policy or practice of threatening witness tampering charges against criminal defense attorneys who sought to comply with their professional obligations by interviewing prosecution witnesses.

208.   The ECDA took absolutely no steps to prevent its assistant district attorneys from engaging in this investigative misconduct; instead, its environment and culture encouraged it.

209.   Thus, it is no surprise that Valentino Dixon was only one of several victims of the ECDA's corrupt policies, practices, or customs.

210.   Lynn DeJac was another victim. Like in Mr. Dixon's case, in Ms. DeJac's case, the ECDA and the BPD conspired to falsely prosecute her. The ECDA—specifically, prosecutors named Joseph Marusak and Frank Clark—directed the investigation. Amongst other investigative misconduct, they instructed BPD homicide detectives to focus their investigation on Ms. DeJac as the main suspect, to the exclusion of other reasonable and potential suspects. They instructed BPD homicide detectives to forego collecting a DNA sample from the person, Dennis Donohue, whose DNA would, post-exoneration, match that found at the crime scene. They instructed BPD not to test Mr. Donohue's blood-stained shirt from the night of the murder. They instructed BPD Detective Lonergan to take a statement from Wayne Hudson, falsely incriminating Ms.

DeJac, even though he was a clearly unreliable witness who had just been arrested on felony charges for which he faced 25-to-life. They suborned Mr. Hudson's perjury and then withheld from the defense that they dismissed Mr. Hudson's felony charges in exchange for his perjured testimony.

211. In sum, ADAs Marusak and Clark directed and suborned police misconduct and failed to turn over exculpatory evidence. Thus, ADAs Marusak and Clark were able to engage in all these practices because of the ECDA's policies, practices, and customs in failing to discipline prosecutorial misconduct, ignoring and suborning police misconduct, including perjury, and failing to adequately train prosecutors to turn over exculpatory evidence. Indeed, neither the ECDA nor Defendant County of Erie ever disciplined these ADAs for their egregious misconduct.

212. Other victims of these ECDA policies, practices, and customs included Louis Eze, Joy Wosu, and Emeka Okongwu, three Nigerian immigrants who moved to Buffalo and were wrongfully convicted of sexually assaulting Mr. Okongwu's two young daughters in 1991. The ECDA—specifically, ADA Michael Cooper, known, like Defendant Belling, for his aggression—wrongfully prosecuted the three. After serving over a decade in prison, their convictions were later vacated and their cases dismissed.

213. As the two daughters later explained, an unreliable witness had made bogus claims about their father, and then ECDA prosecutors took direction of the investigation and coached the young daughters through false testimony. Specifically, the daughters were given a script to rehearse, and through numerous rehearsals, they were rewarded when they did well and admonished when they did not. The daughters repeatedly attempted to recant their coached statements to both BPD and ECDA agents, but were coerced through

pressure and threats to stick to the fabricated story. ADA Cooper did not disclose to the

defense information about each of the times the daughters attempted to recant the story,

nor did he disclose the coercion, pressure, and threats used to maintain the story.

214.   ADA Cooper, like Defendant Belling and ADAs Marusak and Clark, was able to engage

in such practices with impunity because of the ECDA's policies, practices, and customs

in failing to discipline prosecutorial misconduct, ignoring and suborning police

misconduct, and failing to adequately train prosecutors to turn over exculpatory evidence.

215.   The "win-at-all-costs" culture had other effects. For instance, ECDA prosecutors virtually

never met their constitutional *Giglio* obligations to turn over impeachment evidence

relating to prior officer misconduct. They regularly failed to submit police personnel files

to courts for *in camera* inspection. And they regularly threatened exonerating or

exculpatory witnesses with perjury charges and threatened defense attorneys with witness

tampering if they sought to interview witnesses who participated in police-arranged

identifications. Because these strategies were so pervasive and common, they regularly

deterred defense attorneys and investigators from calling and interviewing witnesses,

thereby helping the ECDA effectively bury exculpatory evidence in its criminal

investigations and prosecutions.

216.   Despite the open and notorious nature of these unconstitutional policies, customs, and

practices, and in deliberate indifference to the constitutional rights of criminal defendants

they prosecuted, the ECDA failed for decades to intervene. Not only were repeat offender

prosecutors not disciplined, they were promoted to the highest levels of the office. For

example, ADA Clark became the head of the office and ADA Marusak was promoted to

the highest levels of the office's administration.

217.   As a result of the ECDA's aforementioned customs, policies, and practices, in this case, Defendant Belling coerced witnesses into fabricated statements, ignored and suborned police misconduct, including perjury, suppressed exculpatory evidence, including gunshot residue evidence, and threatened exculpatory witnesses into either false recantations or silence, thereby securing the wrongful conviction of Valentino Dixon.

## **DAMAGES**

218.   The unlawful, intentional, willful, deliberately indifferent, reckless, or bad-faith acts and omissions of the municipal and individual Defendants caused Valentino Dixon to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 9,002 days—over 27 years—in jail and prison for a crime he did not commit.

219.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Mr. Dixon sustained injuries and damages that continue to date and will continue into the future, including: loss of freedom for over 27 years; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

220.   Specifically, and as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Mr. Dixon sustained physical

injuries and damages, including: physical pain and suffering; personal injuries; infliction of physical illness; and inadequate medical care, for which he is entitled to monetary relief.

221.    In addition to the physical injury of being wrongfully imprisoned and confined for over 27 years, Mr. Dixon suffered additional physical harm while incarcerated as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions.

222.    Mr. Dixon's daughters first two daughters were both young when Mr. Dixon was falsely arrested for this crime and in their late twenties when his conviction was finally vacated. His third daughter was twenty years old when his conviction was vacated. Defendants' unlawful actions caused Mr. Dixon to miss the entirety of his daughters' childhood and adolescence.

223.    All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## **CLAIMS**

**Count I: 42 U.S.C. § 1983 Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence**

*Against Defendants Stambach, Lonergan, Vickerd, Masecchia, and Belling*

224.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

225.   Defendants Stambach, Lonergan, Vickerd, Masecchia, and Belling, acting individually and in concert, deprived Valentino Dixon of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial and not to be deprived of liberty without due process.

226.   These Defendants, acting in investigative capacities, deprived Valentino Dixon of his right to a fair trial by fabricating inculpatory evidence and statements and intentionally using unduly suggestive identification procedures, direct suggestion, or coercion to obtain witness identifications. These acts included, but were not limited to:

a.   Defendant Belling, acting in an investigative capacity, and Defendant detectives conspiring to fabricate a case against Mr. Dixon because he was a person on their list of targets, despite the lack of probable cause and before any criminal proceeding had begun;

b.   Defendant Stambach and Defendant Belling, acting in an investigative capacity, coercing Emil Adams into making a false identification and falsely incriminating statements, despite the lack of probable cause and before any criminal proceeding had begun;

c.   Defendant Vickerd using improper coercion, pressure, or suggestion to cause Mr. Sullivan to falsely identify Mr. Dixon as the shooter;

d.   Defendant Masecchia continuing to cause and bolster Mr. Sullivan's false identification and false incriminating statements through improper coercion, pressure, or suggestion and creating a fabricated statement;

e.   Defendant Lonergan fabricating a false "anonymous tip" to bolster the BPD's false case against Mr. Dixon;

      f.    Defendants Stambach and Belling, acting in an investigative capacity, coercing Lamar Scott into falsely claiming and testifying that Mr. Dixon, and not Mr. Scott, was the shooter; and

      g.    Defendant Stambach using improper coercion, pressure, or suggestion to cause Aaron Jackson to falsely identify Mr. Dixon as the shooter.

227.    Defendants Stambach, Lonergan, Vickerd, and Masecchia deprived Valentino Dixon of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense including evidence of their misconduct in obtaining false identifications.

228.    These Defendants, acting in investigative capacities, performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Valentino Dixon's clearly established constitutional rights. No reasonable officer or prosecutor acting as an investigator in 1991 or 1992 would have believed this conduct was lawful.

229.    Valentino Dixon is completely innocent of the shooting of Torriano Jackson, Aaron Jackson, and John Sullivan. The prosecution finally terminated in Mr. Dixon's favor on September 19, 2018, when the conviction was vacated and the indictment was dismissed.

230.    As a direct and proximate result of Defendants' actions, Valentino Dixon was wrongly convicted and imprisoned for over 27 years and suffered the other grievous and continuing damages and injuries set forth above.

### Count II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Defendants Stambach, Lonergan, Vickerd, and Masecchia*

231.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

232.    Defendants Stambach, Lonergan, Vickerd, and Masecchia, with malice and knowing that probable cause did not exist to arrest Valentino Dixon and prosecute him for the shooting of Torriano Jackson, Aaron Jackson, and John Sullivan, acting individually and in concert caused Mr. Dixon to be arrested, charged, and prosecuted for that crime, thereby violating his clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable searches and seizures.

233.    Specifically, these Defendants, in their investigative capacities, and acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Valentino Dixon and would have impeached witnesses for the prosecution at trial, including but not limited to the fact that the identifications of Mr. Dixon as the culprit were the result of impermissible suggestion or coercion, and that the police had fabricated inculpatory evidence and withheld exculpatory and impeachment evidence.

234.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Dixon's clearly established constitutional rights. No reasonable officer acting as an investigator in 1991 or 1992 would have believed this conduct was lawful.

235.   Valentino Dixon is completely innocent of the shooting of Torriano Jackson, Aaron

Jackson, and John Sullivan. The prosecution finally terminated in Mr. Dixon's favor on

September 19, 2018, when his conviction was vacated and the indictment was dismissed.

### Count III: 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against Defendants Stambach, Lonergan, Vickerd, Masecchia, and Belling*

236.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

237.   Defendants Stambach, Lonergan, Vickerd, Masecchia, and Belling, acting within the

scope of their employment and under color of state law agreed among themselves and

with other individuals , including Detectives Robert Grabowski and Daniel DiPirro, to act

in concert in order to deprive Valentino Dixon of his clearly established Fourth, Fifth,

and Fourteenth Amendment rights to be free from unreasonable searches and seizures,

false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without

due process of law, and to a fair trial.

238.   In furtherance of the conspiracy Defendants, while acting as investigators, engaged in and

facilitated numerous overt acts, including, without limitation, the following:

   a.   Falsely arresting and imprisoning Valentino Dixon, knowing that they lacked

        probable cause;

   b.   Fabricating inculpatory evidence in reports and pretrial communications with the

        prosecution, including the purported independent identifications of Mr. Dixon;

   c.   Committing perjury during hearings and trials;

   d.   Intentionally or with deliberate indifference failing to comply with their duty to

        disclose *Brady* material during the pendency of the case; and

    e.   Coercing Lamar Scott into recanting his confession and thereby fabricating evidence against Mr. Dixon for the crime Mr. Scott committed; and

    f.   Coercing Mr. Jarmon and Mr. Brown in an attempt to buy their silence or cause further false incriminating statements and identifications.

239.   Valentino Dixon is completely innocent of the shooting of Torriano Jackson, Aaron Jackson, and John Sullivan. The prosecution finally terminated in Mr. Dixon's favor on September 19, 2018, when his conviction was vacated and the indictment was dismissed.

240.   As a direct and proximate result of these Defendants' actions, Valentino Dixon was wrongly convicted and imprisoned for over 27 years and suffered the other grievous and continuing damages and injuries set forth above.

## Count IV: 42 U.S.C. § 1983 Failure to Intercede

*Against Defendants Stambach, Masecchia, Lonergan, Vickerd, Donovan, John Does, and Belling*

241.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

242.   By their conduct and under color of state law, Defendants Donovan, John Does, Stambach, Lonergan, Vickerd, and Masecchia had opportunities to intercede on behalf of Valentino Dixon to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct, recklessness, or deliberate indifference, declined or refused to do so.

243.   These Defendants' failures to intercede violated Valentino Dixon's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth, Fifth, and Fourteenth Amendments. No reasonable police officer or investigative supervisor in 1991

or 1992 would have believed that failing to intercede to prevent these Defendants from fabricating inculpatory evidence, intentionally using unduly suggestive identification procedures, direct suggestion, or coercion to obtain witness identifications, withholding material, exculpatory, or impeachment evidence, and causing Mr. Dixon to be arrested and prosecuted without probable cause, were lawful.

244. In addition, Defendant Belling, by his conduct and under color of state law, had opportunities to intercede on behalf of Valentino Dixon, particularly in an investigative context, before developing any probable cause for his arrest or prosecution, to prevent his deprivation of liberty without due process of law. Due to his intentional conduct, recklessness, or deliberate indifference, he declined to stop fabrication of evidence, improper suggestion, and coercion.

245. Valentino Dixon is innocent of the shooting of Torriano Jackson, Aaron Jackson, and John Sullivan. The prosecution finally terminated in Mr. Dixon's favor on September 19, 2018, when his conviction was vacated and the indictment was dismissed.

246. As a direct and proximate result of these Defendants' actions, Valentino Dixon was wrongly convicted and imprisoned for over 27 years and suffered the other grievous and continuing damages and injuries set forth above.

**Count V: 42 U.S.C. § 1983 Supervisory Liability Claim**

*Against BPD Supervisor Donovan and John Does*

247. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

248. The individual defendant Detectives Stambach, Lonergan, Vickerd, and Masecchia acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendants Donovan John Does, in this case and as a matter of practice.

249. Defendants Donovan and John Does knew or should have known about the extensive misconduct in this investigation. The reports were all address to him, the case was high profile, and much of it was on the news—including one of Mr. Scott's confessions.

250. Defendants Donovan and John Does acted with gross negligence, recklessness, or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the Defendant BPD detectives, as under their command, and thereby caused the individual defendant detectives to deprive Valentino Dixon of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

251. Had Defendants Donovan and John Does not provided grossly inadequate training, supervision, and discipline of the defendant officers, these defendants would not have used unduly suggestive identification procedures, direct suggestion or coercion to obtain false witness identifications of Valentino Dixon, fabricated inculpatory evidence, committed perjury, withheld exculpatory and impeachment evidence, and intentionally and maliciously caused Valentino Dixon to be arrested and prosecuted without probable cause. Defendant Donovan and John Does directly supervised the specific investigative acts taken by the individual officer defendants in this case.

252. The grossly negligent, reckless, or deliberately indifferent conduct of Defendants Donovan and John Does under color of state law violated their clearly established duty,

in 1991 and 1992, to supervise defendants Stambach, Lonergan, Vickerd, and Masecchia, and no reasonable police supervisor in 1991 or 1992 would have believed that grossly negligent, reckless, or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

253.    Valentino Dixon is completely innocent of the shooting of Torriano Jackson, Aaron Jackson, and John Sullivan. The prosecution finally terminated in Mr. Dixon's favor on September 19, 2018 when his conviction was vacated and the indictment was dismissed.

254.    As a direct and proximate result of these Defendants' actions, Valentino Dixon was wrongly convicted and imprisoned for over 27 years and suffered the other grievous and continuing damages and injuries set forth above.

**Count VI: 42 U.S.C. § 1983 Monell Claim: Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, or Condoning Improper, Illegal, and Unconstitutional Investigative Techniques, and Failure to Supervise, Discipline and Train**

*Against Defendant City of Buffalo*

255.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

256.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of Valentino Dixon, the City of Buffalo, by and through the final policymakers of the BPD, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques in serious felony investigations, including but not limited to the following: the reliance on witness statements that law enforcement knew or should have known were false; the use of suggestive techniques, direct suggestion, or coercive techniques in interviews and interrogations to obtain false statements; the fabrication of inculpatory evidence; the

suppression of exculpatory and impeachment evidence; and engaging in the affirmative concealment and cover up of this type of misconduct. Examples of these acts included, but were not limited to:

a. **Fabrication of evidence:** BPD officers swore out false search warrant affidavits; committed perjury in major cases, including the Lynn DeJac case, the Cory Epps case, and the Jose Ortiz case; suggested information to witness to cause them to make false incriminating statements; relied on statements they knew or should have known were completely unreliable, like Wayne Hudson's statement in the DeJac case or Jose Ortiz's statement in his own case; caused false statements through illegal compulsion; badgering or coerced witnesses who tried to come forward with exculpatory evidence, like in the Epps case; employing suggestive identification procedures.

b. **Abuse of authority:** BPD officers illegally broke into and raided the homes of Buffalo citizens, stealing their cash, jewelry, and other property and keeping it for personal gain; excessively destroyed property and ransacked homes; and protected some drug dealers while "ripping off" others.

c. **Threatened or actual excessive force:** BPD officers kidnapped, bound, beat, and used racial epithets against suspects, complainants, and witnesses, including, in just the year 1990, Jeffrey Dunbar, Mageda Dhali, Domingo Morales, Mark Aiken, and Steven Johnson. The Department of Justice found more brutality complaints against the BPD than the police of other similarly midsized cities.

d. **Pattern and practice of suppressing exculpatory evidence:** BPD officers suppressed evidence they were fabricating statements in search warrant affidavits;

suppressed evidence about their perjury in search warrant applications;
suppressed coercion used to obtain false statements, like in the Cory Epps and
Lynn DeJac cases; suppressed circumstances that rendered statements unreliable
and illegitimate, like in the Jose Ortiz case; maintained a practice of fabricating
witness and suspect interviews by typing up "question-and-answer" statements
that falsely purported to accurately memorialize conversations with witnesses and
suspects.

257.   Prior to and at the time of the unlawful investigation, prosecution, and conviction of
Valentino Dixon, the BPD, by and through its final policymakers, maintained a policy,
custom, or pattern and practice of failing to adequately supervise, discipline and train
BPD detectives and officers in connection with fundamental investigative tasks
implicating the constitutional rights of witnesses and suspects, including but not limited
to refraining from employing threats, suggestion, coercion, or other improper pressure in
conducting witness interviews; documenting and disclosing exculpatory and
impeachment evidence to prosecutors; and the affirmative ongoing obligation to come
forward with exonerating evidence. Corrupt officers were promoted, not disciplined, and
there was a serious breakdown in disciplinary procedures as complaints remained in
inconclusive limbo.

258.   The final policymakers were on notice of the BPD's problems from newspaper
investigations, complaints from lawyers and civilians, FBI investigations, DOJ
investigations, and a 300-page report from the International Association of the Chiefs of
Police. In deliberate indifference to the obvious risk that BPD officers would and in fact

did violate constitutional rights, BPD failed to take steps to obviate this risk. Instead,

BPD sent the message it tolerated or even endorsed this misconduct.

259.    Such unconstitutional municipal customs, practices, or policies were the moving force

behind the false evidence used against Valentino Dixon, causing his arrest, prosecution,

and over 27 years of incarceration, as well as all the other grievous injuries and damages

set forth above.

**Count VII: 42 U.S.C. § 1983 <u>Monell</u> Claim: Unconstitutional Policy, Custom, or Pattern
and Practice of Promoting, Facilitating, or Condoning Improper, Illegal, and
Unconstitutional Investigative Techniques, and Failure to Supervise, Discipline and
Train**

*Against Defendant County of Erie*

260.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

261.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of

Valentino Dixon, the County of Erie, by and through the final policymakers of the

ECDA, maintained a policy, custom, or pattern and practice of promoting, facilitating, or

condoning improper, illegal, and unconstitutional investigative techniques in serious

felony investigations, including but not limited to the following: failing to discipline

prosecutorial misconduct; ignoring and suborning police misconduct, including perjury;

failing to prosecute police misconduct; encouraging the fabrication of evidence to create

a false basis for cases against targets they wanted "off the street"; failing to adequately

train prosecutors to turn over exculpatory evidence; allowing prosecutors to routinely

destroy exculpatory evidence, like causing witnesses to be silent or recant, or creating an

atmosphere in which defense attorneys could not interview witnesses and otherwise

investigate cases.

262.   Meanwhile, the County of Erie, through the ECDA, by and through the final policymakers of the ECDA, also maintained a policy, custom, or pattern and practice of acting as the investigatory supervisors to the BPD's Homicide Section, and in so doing, engaged in a policy, custom, or pattern and practice of fabricating inculpatory evidence; suppressing exculpatory evidence; coercing witness statements through the use of threats of physical force, imprisonment, criminal charges, and other negative consequences; aggressively badgered witnesses into silence or recantations; and leveraging or exploiting vulnerabilities of witnesses or suspects.

263.   The final policymakers were on notice of the ECDA's problems from newspaper investigations, complaints from lawyers and civilians, FBI investigations, DOJ investigations, and a 300-page report from the International Association of the Chiefs of Police. In deliberate indifference to the obvious risk that ECDA assistant district attorneys would and in fact did violate constitutional rights, the County of Erie failed to take steps to obviate this risk. Instead, the County of Erie sent the message it tolerated or even endorsed this misconduct.

264.   Such unconstitutional municipal customs, practices, or policies were the moving force behind the false evidence used against Valentino Dixon, causing his arrest, prosecution, and over 27 years of incarceration, as well as all the other grievous injuries and damages set forth above.

### Count VIII: Malicious Prosecution under New York State Law

*Against Defendants Stambach, Lonergan, Vickerd, and Masecchia*

265.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

266.    Defendants Stambach, Lonergan, Vickerd, and Masecchia, despite knowing that probable

cause did not exist to arrest and prosecute Valentino Dixon for the shooting of Torriano

Jackson, Aaron Jackson, and John Sullivan, intentionally, recklessly, and with malice

caused Mr. Dixon to be arrested, prosecuted, and convicted for this shooting.

Furthermore, these Defendants intentionally withheld from and misrepresented to

prosecutors and the grand jury facts that further vitiated probable cause against Mr.

Dixon, including but not limited to the facts that the purported independent

identifications of Mr. Dixon were the product of unduly suggestive identification

procedures, direct suggestion, or coercion and that the police and prosecutor while acting

as an investigator had fabricated inculpatory evidence and withheld exculpatory and

impeachment evidence.

267.    Mr. Dixon is completely innocent of the shooting of Torriano Jackson, Aaron Jackson,

and John Sullivan. The prosecution finally terminated in Mr. Dixon's favor on September

19, 2018 when his conviction was vacated and the indictment was dismissed.

268.    As a direct and proximate result of these Defendants' actions, Valentino Dixon was

wrongly convicted and imprisoned for over 27 years and suffered the other grievous and

continuing damages and injuries set forth above.

**Count IX: Intentional, Reckless, or Negligent Infliction of Emotional Distress Under New York State Law**

*Against Stambach, Lonergan, Vickerd, Masecchia, and Belling*

269.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

270.    The improper, deliberate, and traumatizing conduct of Defendants Stambach, Lonergan,

Vickerd, Masecchia, and Belling in deliberately causing, or recklessly disregarding the

risk of causing, the wrongful prosecution, conviction, incarceration, and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

271. In the alternative, Defendants Stambach, Lonergan, Vickerd, Masecchia, and Belling negligently and grossly negligently, and in breach of their duties owed to Valentino Dixon to refrain from relying on statements from witnesses that these Defendants knew or should have known were false; refrain from fabricating evidence; refrain from using suggestive techniques, direct suggestion, or coercive techniques in interviews and interrogations to obtain false witness statements; disclose material exculpatory and impeachment evidence; and otherwise act to deny Mr. Dixon due process of law, directly and proximately caused Mr. Dixon to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for over 27 years.

272. Defendants' actions unreasonably endangered Mr. Dixon's physical health and safety, and caused him to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration. These Defendants engaged in these acts within the scope of their employment.

273. These claims are tolled as these defendants concealed from Mr. Dixon—and still are concealing to this day—their conduct giving rise to this cause of action.

### Count X: Negligence under New York State Law

*Against Defendants Stambach, Lonergan, Vickerd, Masecchia, and Belling*

274. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

275.   Defendants Stambach, Lonergan, Vickerd, Masecchia, and Belling are liable for negligence, having breached their duty of reasonable care to Valentino Dixon. Specifically, and by way of example, these Defendants: failed to accurately report how Valentino Dixon became a suspect in the crime; failed to accurately report the circumstances of John Sullivan's, Emil Adams's, and Aaron Jackson's false identifications of Valentino Dixon as the person who murdered Torriano Jackson; failed to properly investigate Lamar Scott; and failed to properly investigate leads in the investigation which suggested that Valentino Dixon was not involved.

276.   Defendants' negligence and gross negligence directly and proximately caused Valentino Dixon to be wrongfully prosecuted and imprisoned for over 27 years or extended the length of time he was wrongfully imprisoned.

277.   These Defendants engaged in these acts within the scope of their employment.

278.   Valentino Dixon is completely innocent of the shooting of Torriano Jackson, Aaron Jackson, and John Sullivan. The prosecution finally terminated in Mr. Dixon's favor on September 19, 2018, when his conviction was vacated and the indictment was dismissed.

279.   As a direct and proximate result of these Defendants' actions, Valentino Dixon was wrongly convicted and imprisoned for over 27 years and suffered the other grievous and continuing damages and injuries set forth above.

280.   Valentino Dixon's cause of action for negligence was unavailable to him until the prosecution finally terminated in his favor on September 19, 2018, when his conviction was vacated and the indictment was dismissed. These claims are tolled as Defendants concealed from Mr. Dixon—and still are concealing to this day—their conduct giving rise to this cause of action.

## Count XI: *Respondeat Superior* under New York State Law

*Against Defendant City of Buffalo*

281.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

282.    At all times relevant to this Complaint, Defendants Stambach, Lonergan, Vickerd, and

Masecchia acted as agents of the City of Buffalo, in furtherance of the business, including

law enforcement functions, of the City of Buffalo, and within the scope of their

employment or agency with the City of Buffalo.

283.    The conduct by which the Defendant detectives committed the torts of malicious

prosecution, intentional, reckless or negligent infliction of emotional distress, and

negligence was not undertaken for the Defendant detectives' personal motives, but rather

was undertaken while the Defendant detectives were on duty.

284.    Under the doctrine of *respondeat superior*, the City of Buffalo is liable for its agents'

state law torts of malicious prosecution, intentional, reckless or negligent infliction of

emotional distress, and negligence.

## Count XII: *Respondeat Superior* under New York State Law

*Against Defendant County of Erie*

285.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

286.    At all times relevant to this Complaint, Defendant Belling acted as an agent of the County

of Erie, in in furtherance of the business, including law enforcement functions, of the

County of Erie, and within the scope of their employment or agency with the County of

Erie.

287.   The conduct by which the Defendant Belling committed the torts of intentional, reckless, or negligent infliction of emotional distress and negligence was not undertaken for Defendant Belling's personal motives, but rather was undertaken while Defendant Belling was on duty, carrying out investigative functions.

288.   Under the doctrine of *respondeat superior*, the County of Erie is liable for its agents' state law torts of intentional, reckless or negligent infliction of emotional distress and negligence.

**COUNT XIII: Negligent Hiring, Supervision, and Training under New York State Law**

*Against Defendants City of Buffalo, Donovan, John Doe Supervisors*

289.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

290.   Defendants Donovan, John Does, and the City of Buffalo knew or should have known that their employees exhibited dangerous characteristics, such that it was reasonably foreseeable that they would harm others. Despite this knowledge, the Defendant supervisors and City of Buffalo failed to exercise reasonable care in their hiring, supervision, and training of their employees. As a direct and proximate result of Defendant supervisors' and City of Buffalo's actions, Mr. Dixon suffered serious injury and damage.

291.   Defendant supervisors and the City of Buffalo had a duty to train their employees. Defendant supervisors and the City of Buffalo failed to provide proper training to their employees, as described above. As a result of these failings by Defendant supervisors and the City of Buffalo, Mr. Dixon suffered serious injury and damage.

292.   In addition, Defendant City of Buffalo is also liable under principles of *respondeat superior*.

**COUNT XIV: Negligent Hiring, Supervision, and Training under New York State Law**

*Against Defendant County of Erie*

293.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

294.    Defendant County of Erie knew or should have known that their employees exhibited

dangerous characteristics, such that it was reasonably foreseeable that they would harm

others. Despite this knowledge, Defendant County of Erie failed to exercise reasonable

care in its hiring, supervision, and training of its employees. As a direct and proximate

result of Defendant County of Erie's actions, Mr. Dixon suffered serious injury and

damage.

295.    Defendant County of Erie had a duty to train their employees. It failed to provide proper

training to their employees, as described above. As a result of these failings by Defendant

County of Erie, Mr. Dixon suffered serious injury and damage.

**WHEREFORE,** Plaintiff Valentino Dixon prays as follows:

A.  That the Court award compensatory damages to Plaintiff and against all

Defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to Plaintiff, and against all individual

Defendants in their individual capacity, in an amount to be determined at trial,

that will deter such conduct by Defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs,

including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42

U.S.C. § 1983 claims; and

E.  For any and all other relief to which Plaintiff may be entitled.

DATED: December 16, 2019

/s/ Nick Joel Brustin

Nick Joel Brustin
Anna Benvenutti Hoffmann*
Mary Katherine McCarthy*
Avinash Nitin Samarth*

NEUFELD SCHECK & BRUSTIN LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
T: (212) 965-9081

*Petition for admission forthcoming

Donald M. Thompson

EASTON THOMPSON KASPEREK
  SHIFFRIN LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
T: (585) 423-8290