**STATE OF NEW YORK**
**COUNTY COURT : COUNTY OF ERIE**

---

**THE PEOPLE OF THE STATE OF NEW YORK**

-VS-                                                    **Indictment No. 91-1476-001**

**VALENTINO DIXON,**

              **Defendant.**

---

        **Frank J. Clark, III, Esq.,**
        Erie County District Attorney
        By: **J. Michael Marion, Esq.,**
        Assistant District Attorney,
        Appearing for the People.

        **Gregory G. McPhee, Esq.,**
        For the Defendant.

### MEMORANDUM AND ORDER

**D'AMICO, J.**

        The defendant moves pursuant to Section 440.10 of the Criminal Procedure Law to vacate a conviction entered August 7, 1992. Following a jury trial, the defendant was found guilty of murder in the second degree (Penal Law §125.25-1), attempted murder in the second degree (Penal Law §§110/125.25-1), assault in the third degree (Penal Law § 120.00-2) and criminal possession of a weapon in the second degree (Penal Law§265.03). The convictions stemmed from a shooting near the intersection of Bailey and East Delavan Avenues in the City of Buffalo in the early hours of August 10, 1991, which resulted in the death of Torriano Jackson and injury to Aaron Jackson and John Sullivan.

The court sentenced the defendant to an indeterminate term of imprisonment of 25 years to life for the conviction of murder in the second degree and to a consecutive term of eight and one-third (8-1/3) to twenty-five (25) years for the conviction of attempted murder. The defendant received concurrent terms for the other convictions.

The judgment was unanimously affirmed by the Appellate Division, Fourth Department on April 28, 1995. That court found that the defendant had failed to preserve his challenge to the trial court's limiting instruction regarding the admission of hearsay testimony into evidence, and further that the court's error was rendered harmless by the overwhelming evidence of guilt. The Appellate Division also rejected the contention that the identification of the defendant as the shooter was against the weight of the evidence (*People v. Dixon,* 214 A.D. 2d 1010). On December 7, 1995, the Court of Appeals denied the defendant's application for leave to appeal.

The defendant initially argues that his conviction should be vacated because his attorney, Joseph J. Terranova, failed to provide effective assistance. The specific allegations offered in support of this proposition are set forth in Points I, II and III of the motion.

In Point I, the defendant complains that counsel's failure to call any witnesses was, in itself, a serious miscalculation, because counsel had previously informed the prospective jurors that the defendant and other witnesses would be testifying for the defense. In conjunction with that argument, the defendant names nine (9) eyewitnesses, whose identities were known or should have been discovered by his attorney, who would have testified that the defendant was not the shooter.

In Point II of his motion, the defendant cites counsel's failure to place the prior contradictory statements of three (3) prosecution witnesses - John Sullivan, Emil Adams and Aaron Jackson - in evidence. Also noting that his attorney referred to those statements in summation, the defendant argues that the prejudicial effect of that omission was manifested when the deliberating jury specifically asked for, but could not be provided with, the statements.

In Point III, the defendant alleges that his attorney failed to investigate and interview witnesses in connection with Lamarr Scott's written confession and his subsequent grand jury recantation. This claim is interrelated with the alleged failure of counsel to investigate eyewitnesses who either exonerated the defendant, specifically identified Scott as the shooter or whose physical description of the shooter or his clothing matched that of Lamarr Scott. Based upon conversations between counsel and defendant's parents had prior to trial, the defendant further alleges that counsel falsely promised that Scott would admit to the crimes at trial. The defendant also generally complains that his attorney abdicated his responsibility to investigate and unfairly placed that burden upon the defendant's family. He also criticizes counsel for failing to call Scott to testify or otherwise adducing evidence of Scott's confession.

The District Attorney opposes this branch of the motion on several grounds. The People contend that the defendant has failed to allege facts essential to the claim that counsel did not investigate. Furthermore, the People assert that the defendant is in effect complaining that his attorney should have attempted to affirmatively establish that Lamarr Scott was the shooter, rather than simply attempting to discredit the prosecution's identification testimony. Arguing that Scott's confession was much less detailed than his recantation, and that the facts of the recantation, but not the confession, are consistent with the testimony of the other eyewitnesses, the People emphasize the futility of the approach suggested by the defendant. The People also note that even if Scott were available and admitted to being the shooter, the prosecutor would have impeached Scott with his grand jury testimony, revealing to the jury both the defendant's motive for the shooting and that the defendant's father, with the knowledge of Leonard Brown, persuaded Scott to falsely admit to the crime. The District Attorney justifies defense counsel's decision to forego the testimony of Mario Jarmon and Leonard Brown, noting that both were subsequently convicted of perjury for falsely testifying in the grand jury that Lamarr Scott was the shooter. The People also suggest a rationale for counsel's declining to call Michael Bland, Antoine Shannon, Tamara Frida, Floyd Fisher and the remaining prospective defense witnesses.

After reviewing the proof at trial in conjunction with the exhibits of the parties, the court holds that this branch of the motion for *vacatur* must fail. It is well settled that the pursuit of unsuccessful trial strategy by a defendant's attorney does not, in itself, constitute ineffective assistance (*People v. Satterfield*, 66 NY2d 796, 798; *People v. Barnes*, 305 A.D.2d 1095). Based upon the submissions and its review of the proof at trial, the court finds serious credibility issues with respect to those witnesses who would have incriminated Lamarr Scott. In actuality, any attempt to blame the shooting on Scott could well have backfired, in that the jury could have concluded that these witnesses had conspired to exonerate the defendant by blaming another individual.

It is difficult to reconcile the representation, purportedly made by counsel to the defendant's family just a few days before trial commenced, that Lamarr Scott would willingly admit to the shooting with the fact that Scott recanted his confession in the grand jury[1]. However, since Scott's grand jury testimony was not subject to compulsory disclosure, it is conceivable that counsel may have been unaware that Scott recanted his confession. In the alternative, Scott may have assured counsel that he would revert to his original version of the events and admit to the shooting. Regardless of what counsel told defendant's family, however, absent any evidence that Scott was then willing to admit to the crimes, the court finds that Scott's testimony would not have benefitted the defendant.

The failure of defendant's attorney to properly move the statement of Emil Adams into evidence is of little import. Although Adams would not admit telling Detective Stambach that the shooter was "heavy set," counsel vigorously attacked Adams' in court identification of the defendant. Counsel also successfully elicited that Adams could not presently describe the shooter's clothing or appearance.

Under cross-examination, Aaron Jackson affirmed that his written statement to police indicated that he was not sure that the person he selected from the photo array was the

---

[1] The defendant alleges that this conversation was tape recorded, but he has not furnished the tape.

shooter. Counsel effectively juxtaposed Jackson's initial uncertainty with his ability to make a photo identification of the defendant in the grand jury and an in-court identification at trial, causing the witness to make the incredible assertion that his memory had improved over time (240-252).[2] It was reasonable for counsel to conclude that Jackson's identification was sufficiently shaken, and that admitting the statement itself would produce no added benefit.

The statement of John Sullivan is remarkably consistent with his trial testimony. While the statement does describe the shooter as approximately six feet tall, which is substantially taller than the defendant, it confirms the circumstances of Sullivan's prior contacts with the defendant, and refers to Sullivan's selecting defendant's photo from an array on the day the crimes were committed. The statement was more damaging then beneficial to the defendant, and counsel wisely did not seek to admit it in evidence. Instead, counsel's cross-examination was focused on more productive issues, such as Sullivan's consumption of alcohol, marihuana and cocaine, the witness's vantage point, and the fact that Sullivan saw the shooter only in profile.

The court has reviewed the statements or subsequent testimony of the other witnesses who would have purportedly identified Lamarr Scott as the shooter or at least exonerated the defendant. Counsel clearly had a legitimate reason for not calling Mario Jarmon and Leonard Brown, as those individuals were then under indictment for falsely identifying Scott as the shooter. Moreover, Brown was present, and possibly involved, in devising the plan for Scott to accept responsibility. Jarmon's credibility was further damaged by his assertion that he was shot by Torriano Jackson and attacked by Aaron Jackson with a knife or box cutter, since this rendition of the events was contradicted by other witnesses.

The defendant has not established that Tamara Frida, Michael Bland and Wendell Williams were available witnesses. Although Frida told defendant's investigator in 1998 that Scott was responsible, she did not identify the perpetrator during the course of the police investigation and at the intervening perjury trial of Jarmon and Brown. In that regard, the court

---

[2] Numbers in parentheses refer to page numbers of trial transcript.

finds no substantiation of defendant's claim that the person who telephoned Detective Stambach on April 14, 1991 stating that Scott was the shooter was in fact Tamara Frida.

Michael Bland is alleged to have told defendant's investigator in a 2002 interview that Scott was the killer. However, Bland told the grand jury that he did not see the shooter.

The defendant has not demonstrated the absence of a strategic reason for counsel's not calling Walter Lee Dennis and Antoine Shannon. As the brother-in-law of Leonard Brown, Dennis was not a disinterested witness. Antoine Shannon is a blood relative of the defendant whose testimony would have established a motive for shooting the Jackson brothers.

Assuming that Floyd Fisher was available, counsel could have reasonably concluded that his friendship with Mario Jarmon and Leonard Brown detracted from his credibility. Furthermore, although Fisher described the shooter as stocky and about six feet in height, the accuracy of these observations was suspect, because Fisher saw the shooter only through the rear view mirror of his vehicle.

In a related argument, the defendant blames counsel for stating during *voir dire* that the defendant and other witnesses would testify that the defendant was not the shooter. As demonstrated by counsel's comments at the pre-charge conference, the defendant had decided prior to opening statements that he would not testify, however the defendant was then insistent upon calling witnesses. Counsel and the defendant later agreed to rest at the conclusion of the People's case (540-544).

Any prejudice caused by the defendant's failure to testify was dissipated by the court's instruction to draw no adverse inference from that fact. While Mr. Terranova realized that his representation to the prospective jurors was problematic, the fact remains, as discussed previously, that there were legitimate reasons underlying his decision to call no witnesses. Therefore, although ill-advised, his statement to the jurors does not amount to ineffective assistance.

The record reflects that counsel conceived a viable defense strategy that was effectively implemented. Defendant's attorney conducted a scathing cross examination of the

People's eyewitnesses, challenging their ability to observe the shooting, contrasting their physical description of the shooter with the defendant's appearance, and eliciting that Aaron Jackson did not accuse the defendant until some time afterward. In his summation, counsel questioned the People's failure to call Mario Jarmon, one of the initial combatants, who could likely provide a motive for the shooting. He also noted the delay or initial uncertainty in connection with the identification of defendant by various witnesses, even those who were acquainted with him. Counsel also advanced the theory that Sullivan and Aaron Jackson were actually shot by a third party with a handgun that was recovered at the scene. The court concludes that counsel provided the level of representation to which the defendant was constitutionally entitled (*see, People v. Baldi*, 54 N.Y.2d 137 ).

In the second branch of the motion, the defendant argues that new evidence has been discovered which entitles him to *vacatur*. On February 21, 2001, defendant's investigator, Roger Putnam, interviewed Michael Bland at Wyoming Correctional Facility. Putnam executed an affidavit on May 23, 2001 memorializing the interview. According to the investigator, Bland was an eyewitness to the crime and observed Lamarr Scott, and not the defendant, shoot Torriano Jackson. Bland refused to provide a sworn statement.

The statement now attributed to Michael Bland contradicts his grand jury testimony that he could not identify the shooter because he ran from the scene as soon as he heard shots. Bland further testified that he was not acquainted with either Lamarr Scott or the defendant (see People's Exhibit B). Investigator Putnam's statement is inadmissible hearsay. Furthermore, the declaration it purports to memorialize is essentially a recantation, which the law recognizes as inherently unreliable (*People v. Shilitano,* 218 N.Y.161), and which the court finds would not have created a probability of a verdict more favorable to the defendant. Lastly, the court agrees with the District Attorney that with due diligence, the defendant could have located Bland and secured his testimony at trial. The court concludes that there is no merit to defendant's claim (CPL §440.10, subd. 1 [g]; *People v. Salemi,* 309 N.Y. 208, cert denied 350 U.S. 950).

The defendant further contends that the affidavit given to investigator Putnam by Tamara Frida in 1998 identifying Lamarr Scott as the shooter constitutes newly - discovered evidence (*see,* Defendant's Exhibit A, pp.131-134). The District Attorney avers that Frida's connection to the incident was known to all parties and that she refused to cooperate. Frida's affidavit alleges that she was "afraid to get involved" and therefore told the police and the District Attorney that she saw nothing. As previously noted, the defendant has not demonstrated that Frida was the person who telephoned Detective Stambach on August 14, 1991 and stated that the defendant was the shooter (*see,* Defendant's Exhibit A, p.59). Frida did not testify at the defendant's trial. However, in her testimony at the perjury trial, she denied observing the shooting and could not identify anyone who was present with the exception of Mario Jarmon.

Clearly, Frida's identity was known to the defendant's attorney.[3] However, at the time of trial, neither the prosecutor nor the defense had reason to call this individual, because she was not "available" to furnish any material evidence. Because of her stated inability to provide information, counsel cannot be faulted, as the "new evidence" set forth in her affidavit could not have been discovered with due diligence.

However, the court finds that the "new evidence" does not entitle the defendant to *vacatur*. Because Frida's affidavit is essentially a recantation of her testimony at the perjury trial of Jarmon and Brown, it is inherently unreliable (*People v. Shilitano, supra*). Furthermore, were Frida to testify consistent with her affidavit at a new trial, her inability or refusal to provide information to the police, her contradictory testimony at the perjury trial, and the fact that she waited some seven (7) years to come forward would be persuasive impeachment evidence (*see, People v. Robinson,* 211 AD 2d 733; *People v. Scarincio,* 109 A.D. 2d 928). Three (3) witnesses identified the defendant as the shooter, and the Appellate Division found "overwhelming evidence" of the defendant's guilt. Under these circumstances there is no probability that the defendant would receive a more favorable verdict if a new trial were held (*People v. Salemi, supra*; *People v. Crisler,* 303 A.D. 2d 948).

---

[3] Tamara Frida appeared on the People's "Relevant Name And Place List."

- 8 -

Furthermore absent any evidence of coercion or undue influence, the testimony of a previously uncooperative witness known to all parties who discloses her alleged observations long subsequent to the completion of the direct appellate process, should not constitute grounds for a new trial. To hold otherwise would undermine the societal interest in the finality of judgments in criminal matters.

The third item purporting to constitute "new evidence" is information suggesting that a .32 caliber bullet was removed from the body of Mario Jarmon, who died in 2002. The defendant's argument is premised upon a letter dated May 28, 2002, from attorney Kimberly Duguay stating that "the initial analysis seems to prove that the bullet is consistent with a .32 caliber gun" (Defendant's Exhibit A, p. 161). According to the defendant, this discovery corroborates Jarmon's claim that Torriano Jackson shot him with a handgun and disproves the prosecutor's theory that Jarmon was shot with the Tech-9 that killed Jackson.

Attorney Duguay's letter certainly does not substantiate the factual allegation underlying the claim of new evidence. Furthermore, the Forensic Laboratory-Analysis report concluded that the bullet removed from the "old wound" in Jarmon's abdomen could have been fired by a 9 millimeter weapon (People's Exhibit I). Therefore, there is no merit to the defendant's claim (CPL 440.30, subd. 4 [d]).

The defendant also contends that his conviction should be vacated because of misconduct on the part of the prosecutor. Specifically, he accuses the prosecution of misrepresenting facts at the *Sandoval* hearing, the suborning of perjury through coercion of witnesses, and knowingly adducing false testimony from two (2) police officers.

At the *Sandoval* hearing, the prosecutor indicated that he had received information from the Buffalo Police Department that the defendant offered $3000 to one Ronnie Bryant if Bryant would admit responsibility for the crimes. The court ruled that the People could cross-examine the defendant in connection with that event (15-31). The defendant now provides an affidavit from Ronnie Bryant made in December 1992 denying that the defendant had offered him money to accept the blame for killing Torriano Jackson (Defendant's Exhibit A, p.128).

Notwithstanding Bryant's affidavit, the defendant has failed to demonstrate that the prosecutor acted in bad faith. Furthermore, taking into account the court's entire *Sandoval* ruling - which permitted the prosecutor to elicit that defendant had more than one (1) prior felony conviction, had used an alias up to trial in a drug case, and was involved with the plan to induce Lamarr Scott to admit to this shooting - the exposure to cross-examination relative to Bryant would have carried little weight in the defendant's decision to not testify.

Defendant also attaches an investigator's affidavit summarizing several interviews with Emil Adams conducted in 2000. According to the investigator, Adams stated that his trial testimony was untrue and that the District Attorney "coerced" him to testify against the defendant (Defendant's Exhibit A, pp135-136). As a further instance of prosecutorial misconduct, the defendant provides affidavits of Lamarr Scott made in December 1998 and February 2002, in which Scott admits to shooting Torriano Jackson with a Tech 9. Scott further states that he repeatedly refused to retract his confession, and eventually did so because he was pressured by the prosecutor and harassed and threatened by Detective Stambach. Scott is presently serving a life sentence for an unrelated crime (Defendant's Exhibit A, pp. 137-141).

The allegations attributed to Emil Adams are entitled to little weight. Aside from his failure to provide a sworn statement, Adams does not specify what he lied about at the trial or amplify the nature of the "coercion" to which he was subjected. Scott's affidavits also constitute a recantation of grand jury testimony accusing the defendant. Although Scott now states that he acted voluntarily in confessing to the crime on television, he does not address the plan described in his grand jury testimony preceding that confession. Scott's allegation that he was harassed and threatened, which form the gravamen of defendant's argument, are set forth in conclusory terms. Based upon this analysis, the court concludes that the allegations do not constitute a substantiation of the facts essential to this portion of the motion (CPL § 440.30, subd. 4 [b]).

Detective Tucci testified at the defendant's trial that he measured the distance between light pole 1180 and light pole 1155, finding that distance to be 258 feet (491).

- 10 -

However, at the perjury trial of Jarmon and Brown, Tucci stated that he had no idea as to the distance between the streetlights (Defendant's Exhibit A, pp.150-151). The defendant urges the court to conclude that Detective Tucci, with the prosecutor's knowledge, testified falsely at the defendant's trial.

The defendant also charges the prosecutor with knowingly eliciting false testimony from Officer Diegelman in connection with the discovery of a .32 caliber revolver at the scene of the crime and the chain of custody of the weapon. Relying upon certain police documents and Floyd Fisher's testimony at the perjury trial, defendant claims that Fisher, and not Diegelman, found the weapon, and that Officer Ra-Chelle Brown, rather than Diegelman, turned the gun over to Detective Smardz (Defendant's Exhibit A., pp. 152-155).

There is no merit to this branch of the motion. Detective Tucci's testimony at the perjury trial, although facially inconsistent with that given at defendant's trial, does not substantiate that his testimony at the defendant's trial was falsely given. Likewise, assuming that the police documents are accurate, Officer Diegelman's testimony could simply be the product of faulty recollection. Most significantly however, the defendant has utterly failed to demonstrate an essential element of his claim - that the prosecutor knew that the testimony was false (*see,* CPL §440.10, subd. 1 [c]; *People v. Lent,* 204 A.D.2d 855, lv den. 84 N.Y.2d 869).

There is also no merit to the defendant's claim, set forth in his reply, that the prosecutor failed to adduce evidence that another firearm - a .22 caliber handgun - was found at the scene. Defendant's argument is based upon a report from Officers Brown and Diegelman stating that the officers recovered a "small caliber gun believed to be a .22 cal, silver in color " (Defendant's Exhibit A, p.226). It is apparent from the Evidence Control Report and Police Correspondence (Defendant's Exhibit A, pp. 6, 228-229) and from the trial testimony of Officer Diegelman and Detective Smardz (384-386; 455-459) that the officers were mistaken. This particular gun was in fact the same .32 caliber revolver disclosed by the People as having been found in the area.

NOW, THEREFORE, upon reading and filing the annexed motion dated November 6, 2003, the opposing affidavit of J. Michael Marion, Assistant District Attorney, sworn to on March 12, 2004, the defendant's reply dated April 15, 2004 and Memorandum of Law dated June 29, 2004, and due deliberation having been had thereon, it is

ORDERED, ADJUDGED AND DECREED, that the said motion be and the same is hereby denied in all respects.

This decision shall constitute the order in this matter for appeal purposes, and no other or further order shall be required. Pursuant Criminal Procedure Law Sections 450.15 and 460.15, the defendant may appeal from this order denying his post-conviction motion to vacate conviction only if a certificate is obtained granting him leave to appeal. If he wishes to appeal, the defendant must apply to the Supreme Court, Appellate Division, Fourth Department, for such a certificate within thirty (30) days after service upon him of a copy of this Memorandum and Order [CPL 460.10 (4) (a)]. If the Defendant is unable to pay the cost of such an appeal, he may apply to the Appellate Division for leave to appeal as a poor person.

*s/ Michael L. O'Brien*
**HON. MICHAEL L. D'AMICO**
**County Court Judge**

ENTER:

**GRANTED**

AUG 3 0 2004
BY *K. O'Connor*
KEVIN J. O'CONNOR
COURT CLERK