UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VALENTINO DIXON,

                    Petitioner,

        -vs-                                    **No. 05-CV-208(RJA)(VEB)**

JAMES T. CONWAY, Superintendent of             **AMENDED REPORT AND**
Attica Correctional Facility,                  **RECOMMENDATION**

                    Respondent.

I.      **Introduction**

        Represented by counsel,[1] Valentino Dixon ("Dixon" or "Petitioner") filed a petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his August 7, 1992 conviction

following a jury trial in Erie County Court on charges of second degree (intentional) murder,

attempted second degree murder, first degree assault, and related charges. In particular, Dixon

contends that (1) there exists newly discovered evidence of his actual innocence in the form of

positive results from "voice stress analysis" testing, Petitioner's Memorandum of Law ("Pet'r

Mem.") a. 4-8 (Docket No. 3), and (2) that trial counsel was ineffective for failing to "undertake

an adequate investigation," "call witnesses at the criminal trial," "live up to the expectations of

the jury when he did not call any witnesses," and "impeach prosecution witnesses with prior

inconsistent statements made to the police," Pet'r Mem. at viii, 8-24 (Docket No. 3). He also

_____

[1]        Gregory McPhee, Esq. represented Dixon at the time of filing and prepared all of the pleadings
submitted so far in this case. On October 10, 2006, a Stipulation and Order was entered substituting James
Ostrowski, Esq., as Dixon's attorney of record. *See* Docket No. 19.

contends that the prosecutor committed misconduct by offering perjured testimony and using coercion and threats to dissuade certain individuals from testifying favorably for the defense. Pet'r Mem. at 24-35.

Respondent contends that Dixon failed to file his petition within the limitations period provided by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1). Respondent's Memorandum of Law ("Resp't Mem.") at 1 (Docket No. 15). Respondent indicates in his memorandum of law that Dixon concedes that his petition is untimely. *Id.* However, Dixon, in his traverse replying to respondent's memorandum, "disagrees with the question of untimeliness . . . ." Petitioner's Traverse ("Trav.") at 1 (Docket No. 18). In any event, Dixon contends that the limitations period should be tolled because he is actually innocent of the offense for which he was convicted. Dixon also asserts that any delay in his filing in federal court was caused due to mistakes and "fraudulent concealment" on the part of the state court in allegedly losing one of his post-conviction motions to vacate the judgment. Trav. at 11-13 (Docket No. 18). Respondent was directed, in its answer and memorandum of law, to address whether Dixon's actual innocence claim equitably tolls the statute of limitations, in light of the Second Circuit's decision in *Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004). *See* Decision and Order, dated April 5, 2005 (Larimer, D.J.) (Docket No. 5).

This matter has been referred to the undersigned for the issuance of a report and recommendation regarding the disposition of Dixon's petition. *See* Docket No. 20. For the reasons that follow, I recommend finding that the petition was not timely filed under AEDPA, and that Petitioner is not entitled to either statutory or equitable tolling. In addition, I recommend finding that Petitioner has not carried his burden of establishing a credible claim of "actual

innocence." In the alternative, I recommend finding that none of Petitioner's claims warrant habeas relief on the merits. Accordingly, I recommend that the petition be dismissed as untimely, or, in the alternative, as without merit.

## II. Factual Background and Procedural History

### A. Overview of the Prosecution's Case at Trial

By Erie County Indictment 91-1476-001, Dixon was charged with intentional and depraved indifference murder in connection with the fatal shooting of Torriano Jackson ("Torriano" or "the victim") on August 10, 1991, near the intersection of Bailey and East Delevan Streets in the City of Buffalo. Dixon also was charged with attempted second degree murder with regard to the shooting of Torriano's brother, Aaron Jackson ("Aaron"); and first degree (deadly weapon) assault with regard to the shooting of John Sullivan, III ("Sullivan"). *See* The prosecution presented six eyewitnesses–Aaron Jackson, Travis Powell ("Powell"), Sullivan, Emil Adams ("Adams"), Robert Lewis ("Lewis"), and Fred Stancil ("Stancil"). Three of them–Sullivan, Adams, and Aaron, identified Dixon as the shooter. Although there were some minor differences in the details related, their descriptions of the shooting essentially were all consistent.

During the prosecution's case, all six witnesses testified that there was an argument followed by a physical fight between brothers Aaron, Torriano, and their friend Powell on one side, and Mario Jarmon ("Jarmon") and two of his friends, Leonard Brown ("Brown") and Antoine Shannon ("Shannon") on the other.[2] According to the prosecution's witnesses, none of the participants in the fight had a gun, and no shots were fired during the fight by any of them.

---

[2]     The record indicates that Brown and Shannon are petitioner's half-brothers.

These witnesses also stated that the gunman was *not* involved in the fight, but rather approached the group some time after the confrontation began. The shooter first sprayed bullets from an automatic weapon into the crowd that had gathered in order to disperse them. He then shot directly at Aaron as he tried to crawl into his car, and fired numerous shots into Torriano as he lay wounded in the street.

### B.      The Prosecution Witnesses

#### 1.      Aaron Jackson

Twenty-one-year-old Aaron was Torriano's older brother. T.212.[3] Aaron was driving around with his friend Powell in Powell's mother's car, a yellow Geo Storm, on the night of August 9, 1991. T.212-13. They stopped at a convenience store next to the Norstar Bank so that Powell could buy cigarettes. While Aaron was waiting in the car for Powell, Aaron was approached by Jarmon, Brown and Shannon. T.214. Of those three men, Aaron only knew Brown. T.214. Jarmon said something to the effect of, "let's just get out the car and let's take care of this." T.214. Jarmon started talking about someone who had pointed a gun at his cousin's head. T.214-15. Aaron testified that he did not know what Jarmon was talking about. T.215.

Aaron then moved over to the driver's side of the car and pulled up to the front of the store, calling for Powell. Powell exited the store, and he and Aaron left the scene. They drove to Aaron's home, where they picked up his younger brother, Torriano, at around 11:30 or 11:45 p.m. T.215-16. Torriano had not been with the other two earlier because he had been working at Burger King. T.216. Aaron claimed that he "felt safer" having his brother around after Jarmon had accosted him. T.216.

---

[3]      Citations to "T.__" refer to the transcript of petitioner's trial.

Aaron, Powell, and Torriano proceeded to drive back to the area around the store parking lot so Aaron could point out Jarmon to Torriano, thinking maybe Torriano would know who Jarmon was. T.217. No one was there, however, so the three drove around to various parties. T.217. According to Aaron, they consumed no alcohol or drugs. T.217, 312-13.

After the night of party-going, during the early morning hours of August 10, the Jackson brothers were asleep in Powell's car. Powell was driving. As they passed by the location where Jarmon had confronted Aaron, Powell nudged Aaron awake and pointed out Jarmon to him. T.218. Powell asked, "Isn't that the guy we saw earlier?" T.218. Aaron agreed and asked Torriano if he knew him; Torriano said he did. T.218. Torriano did not say who the guy was, just that he had "seen him around." T.218.

Aaron testified that Jarmon gestured to him and said, "Come on, let's do it." T.256. Aaron got out of the car and ran up to Jarmon. He was followed by Torriano. Powell was parking the car. T.218-219, 256. Aaron testified that neither he nor his brother Torriano had a weapon of any kind. T.220-221.

Since Jarmon had said earlier that he wanted "to see" Aaron, Aaron said to him, "[W]ell here I am . . . what is the problem now?" Aaron stated that Torriano addressed Jarmon, too, saying "You didn't know this was my brother, did you?" T.220.

Aaron recalled that there were two or three "other guys" with Jarmon, standing two or three feet away. Jarmon turned his back so that Aaron and Torriano had to turn their backs to the "other guys." T.258, 259, 276-77. Jarmon "put up his hand like as if [sic] to throw a blow so [Torriano] hit him," and at that point Torriano hit Jarmon, causing Jarmon to stumble and fall. T.220, 259. Aaron testified that while Jarmon was on the ground, Aaron hit him and kicked him.

-5-

T.221. Their friend, Sullivan, who had not been involved with any of the 0confrontations between these individuals before, ran up and tried to break up the fight. T 262.

As Aaron and Torriano were hitting Jarmon, Aaron heard someone say, "[Y]ou better run, Tino is going to his car." T.221.[4] Then Aaron heard "a lot" of rapidly fired shots. T.222. recalled that the shooter came from behind him, on his right. T.267. Aaron said that as he felt the shells striking his body, he hit Torriano's hand and told him to "get out of here." T.224, 268. Aaron ran towards Louie's hot dog shop, while Torriano started running toward the store. T.224.

Aaron turned around to see where the shots were coming from, and felt a sharp pain in his stomach. T.224-25. Stumbling, he saw Torriano fall to the ground. T.224-25. Aaron testified that he watched the shooter walking up slowly and "a lot" of sparks coming from the shooter's direction. T.225. Torriano was lying on his back in the street. T.226, 270. Aaron stated that the shooter, who was about ten feet to fifteen feet away, moved over Torriano and continued firing into him. T.225. Aaron indicated that he could see the gunman's face as he shot Torriano. T.225

Aaron crawled into the Geo and looked at the ignition for the keys, thinking he might run the shooter over with the car. T.226-27. Aaron saw that the shooter's focus had left Torriano and had shifted to himself. Aaron thought the shooter was going to fire into the car, as shots started coming in that direction and he "heard a shot hit the top of the car." T.227. However, Aaron saw the shooter turn back and keep firing at Torriano. T.227. Aaron tried to get out of the car to help his brother, but he could not walk and fell to the ground, unable to move due to his injuries. T.227.

The firing finally stopped and the shooter left the scene. T.228. Torriano looked to Aaron

---

[4]      Defense counsel objected to this hearsay statement but the objection was overruled. T.221-22.

and asked if Aaron could help him. Aaron replied he was shot and could not move. T.228. The

police arrived first, followed by an ambulance. T.229. By that point, Torriano had been moved by

someone else (Powell) to the parking lot next to Louie's. T.228-29. Aaron was taken to the

hospital, where he spent three weeks and underwent three surgeries, including placement and

removal of a colostomy bag. T.229-30.

      Aaron identified the shooter as Dixon. T.227-28. Aaron stated that he had known Dixon

before the shooting. He maintained that he knew Dixon's face and his name, and could put the

name to Dixon's face. T.236-37. Aaron admitted that he had not been introduced to Dixon, but

he had seen Dixon driving around in his car and someone had pointed out Dixon to him before.

T.238. Furthermore, Aaron claimed, he had seen Dixon driving around under nighttime

conditions, and had in fact seen Dixon at the location where the shooting took place. T 236-39.[5]

However, he admitted he was not sure precisely when that sighting had occurred.

      While Aaron was in the hospital, he was shown a six-photograph array by the police

which included a photograph of Dixon in position four. This was less than forty-eight hours after

the shooting. Aaron selected petitioner's photograph. T.241-42. At trial, Aaron at first testified

that he told the police that photo number four was "definitely" the shooter. T.243. On cross-

examination, defense counsel confronted Aaron with the "photo array identification affidavit,"

T.241-49, dated August 12, 1991, attached to the photo array. On the accompanying

documentation, Aaron identified photo number four as the person "who looks like the guy that

---

    [5]      Respondent points out that at the hospital, before he spoke to police, Aaron told his mother that
Dixon had shot him with an automatic. A 213. Citations to "A.__" refer to the record on appeal. The documents from
the record on appeal have been submitted as part of the original state court file, and also have been reproduced as
exhibits to the Petition (Docket No. 1).

shot my brother." *Id.*; *see also* Docket No. 1-3. Aaron notes on the statement that the person in

photo four "was there," but states, "I cannot be sure because it happened so quick.." T.244. Based

on this affidavit, trial counsel forced Aaron to admit that his prior testimony was incorrect when

he stated he told police number four was "definitely" the shooter. T 244-45. Aaron stated he

observed Dixon's face at three points. The first was when he fell down after being shot and

looked back for his brother. T.270-71. The second time was when he had crawled inside the car,

and the shooter faced toward Aaron to shoot at him. T.271-72. The third was when Aaron

watched the shooter stand over Torriano firing bullets into him. T.273-74. At that point, the

shooter was ten to fifteen feet away from Aaron. T.274.

When defense counsel pressed him regarding this discrepancy, Aaron testified that on

August 12, 1991, he was certain petitioner had shot his brother, and that he did not "remember"

why he had not said so to police:

> Q:  You don't remember. You don't remember why you couldn't make an
>      identification like you made in court here today two days after the
>      incident?
> A:  I was in the hospital, my brother was dead, my older brother had just
>      passed away six [sic] weeks ago. I had a colostomy bag on, I was under
>      medication. I don't remember.
> Q:  August 12th, two days after the incident?
> A:  Yes.
> Q:  Didn't you tell us a few minutes ago under direct examination that you
>      didn't even know your brother had died until a week or two weeks later?
> A:  I didn't know.
> Q:  Just a moment ago you told us that you were under some stress,
>      apparently, and that's why you don't remember?
> A:  And I didn't know my brother was dead.
> Q:  Okay. So, on August 12th you didn't know who shot your brother, did you?
> A:  Yes, I did.
> Q:   You didn't tell the police that?
> A:  I picked the picture of the person who looked like the one who shot my
>      brother.

> Q: All right, but you told us that at the scene, at the time the incident occurred that you knew that the shooter was Valentino Dixon. Now you're telling us two days later you picked a picture that you say looked like the person who shot you and your brother. Am I right so far?
>
> A: Yes.
>
> Q: But, on August 12th when you picked out that picture, you didn't tell the police that you knew that the person who shot you and your brother was Valentino Dixon, did you?
>
> A: No.
>
> Q: Why not?
>
> A: I didn't remember.
>
> Q: You didn't remember. What refreshed your recollection? What jogged your memory? What causes you to come into this courtroom today and say that the person seated next to me is the person that shot you and your brother?
>
> A: I have had to think about this since August 10th over and over again. The thoughts go through my mind so vividly, and I have no doubt in my mind that that person sitting right there next to you is who shot my little brother.

T.246-48. When trial counsel pressed him on how he was more sure of the shooter's identity now, Aaron claimed that his memory had gotten better over time. T.252. Trial counsel cross-examined Aaron further about his ability to identify Dixon, suggesting that Aaron had been influenced by watching media reports of the shooting and by the length of the investigation. T.252-53.

### 2. Travis Powell

Twenty-three-year-old Travis Powell considered himself a "close friend" of the Jacksons. T.284. Powell testified, as Aaron had, that the two of them had stopped at the store so that Powell could go in to get cigarettes. T.284-85. However, Powell recalled, he left the store without making his purchase because Aaron had pulled the car up to the store entrance and was beeping the horn. T.285-86. Aaron told Powell to get in the car, and they drove to the Jackson's house and picked up Torriano. According to Powell, the three of them then rode around to

various parties, but did not get out of the car. T.287.

Late that night or early the next morning, Powell was driving by the area in the vicinity of the store where they had been earlier, when Powell had gone to buy cigarettes. Powell indicated that they were going to get something to eat at Louie's hot dog shop, which was next to the store. T.288-89. Powell stated that as he was pulling into the parking lot, he woke up Aaron to let him know they were at the restaurant. T.289. Upon being awakened, Aaron jumped out of the car and walked across the street to Jarmon, starting an argument with him. T.289-91. Powell, who knew Jarmon from prior occasions, had seen Jarmon earlier when he (Powell) and Aaron had stopped by the store to buy cigarettes. T.289-90.

Powell parked the Geo and he and Torriano got out of the car. T.290. By the time that he and Torriano had exited the car, Aaron "was across the street conversing with [Jarmon] and they start[ed] getting in an argument . . . ." T.289. Powell testified that none of them had weapons of any sort. T.291. Powell estimated that about half a minute after Aaron confronted Jarmon, he (Powell) and Torriano arrived in the same area. T.290-91.

Powell indicated that the argument got louder, shifting from Aaron arguing with Jarmon, to Torriano arguing with Jarmon. Powell could not saw who threw the first punch. T.321. He said that "[t]hey just started fighingt." T.292-93. Powell testified that none of the fighters had a weapon. T.292.

Powell recalled that as Torriano and Jarmon were wrestling each other, they fell to the ground, and that is when the shooting started. T.293. Powell did not see the shooter, but he did see bullets sparking off the curb. T.293, 323. Powell stated that he was looking at Torriano when the shooting started. T.293-94. Torriano and the others began running, but Torriano fell in the

-10-

street. T.294-95. Powell did not seek where Aaron ran because he was watching Torriano. T.325, 330. After the shooter left, Powell picked up Torriano and carried him to the parking lot, where he held him and tried to stop the bleeding until emergency assistance arrived. T.297-98.

Powell said that the only time he actually saw the shooter was when the shooter stood over Torriano firing bullets into him. T.295. Powell did not see the shooter approach and did not see him leave. He also did not see the shooter's face and was unable to make a positive identification. T.295-300. Powell said that the shooter was wearing "black clothing and a baseball cap." T.327-28.

Powell testified that the shooter was holding the gun with two hands and that the shots were rapidly fired, like an automatic weapon. T.296. Powell had some experience with automatic weapons from his service in the military. T.325-26.

### 3.    Emil Adams

Nineteen-year-old Emil Adams was a resident of Michigan but had been staying with relatives in Buffalo at the time of the shooting. He had gotten a ride to Louie's hot dog shop from a friend of his, "Mike," whose last name he did not know. T.145. He was at the intersection of Bailey and East Delavan some time after midnight on August 10, 1991. T.144. Adams testified that he was completely sober at the time. T.145, 175-76. Adams testified that he knew both Jackson brothers and he also knew Jarmon. T.145-46.

Adams was talking to the Jacksons and Powell, who were sitting in Powell's mother's Geo Storm. At that time, he saw Dixon and Jarmon walking down the street. T.146,177-78. Adams knew Petitioner's brothers, Brown and Shannon, since they had grown up near Adams' grandmother's house. Adams testified that he had seen petitioner a few times over the past five

-11-

years, but did not really know him personally. T.153, 209-11.

At some point, Adams stated, Torriano and Aaron got out of the Geo and ran over to Jarmon; Powell, however, did not. T.146-149. An argument developed into a fistfight between Aaron and Jarmon. T.148-49. Adams recalled that Torriano was yelling "[O]ne on one. Nobody else jump in." T.149-50, 186. Neither Aaron nor Torriano nor Jarmon had weapons, as far as Adams could see. T.149. Specifically, Adams said, neither Aaron nor Torriano had a weapon at anytime throughout the entire incident. T.162.

At one point, Aaron had knocked Jarmon to the ground and was "[k]icking on [him]." T.186. The next thing that Adams saw was Dixon and another man, whom he could not identify, walk toward the fight from the direction of Jarmon's nearby house on East Delavan. T.150-51, 187-88. Adams recalled that neither Dixon nor his companion were displaying a gun. T.151. Then Dixon and the other man walked back towards Jarmon's house. When they returned, "both of them [were] walking with a gun." T.151. Dixon was holding what Adams described as a "long" weapon; the unidentified man had a handgun. T.151. Adams testified that Dixon and his companion were about the same size. T.150-51.

Adams related that Dixon walked into the crowd that had gathered around the fight and began shooting, holding the weapon with both hands. T.152, 154, 192-93. The gunfire was "pretty rapid." T.155. The crowd scattered and Adams jumped behind the yellow Geo Storm. T.154, 195. Adams saw Aaron run toward the Geo and fall to the ground next to the car. T.154. Adams saw Torriano fall in the street, as well. Adams watched from behind the car as Dixon stood over Torriano and fired bullets into him. T.155. However, Adams did not see if the man who was with Dixon also fired his weapon (the handgun). T.155-56. When Dixon was done

-12-

shooting, he and the other man went back toward Jarmon's house. T.156.

Adams pulled Aaron, who was calling out for someone to go get his brother, behind the car. When Adams went to retrieve Torriano, he found that Powell had already carried him to the nearby parking lot. T.156, 200.

While he was holding Torriano, Adams was approached by a police officer. T.165. Adams told the officer what he had just seen, and Adams went to headquarters and gave a statement. T.165-67; *see also* A.13-15. In the statement, Adams described the shooter as six feet tall and "heavyset." A.14.

On cross-examination, defense counsel attacked Adams about his ability to observe the gun under the stressful circumstances of the shooting. T.177-199. For instance, trial counsel challenged Adams' description of Dixon as "heavyset" by having petitioner stand up for Adams' observation. Adams admitted that petitioner was not heavyset. T.205-06. However, Adams maintained that he saw the shooter's face. T.196.

In addition to challenging Adams' description of the shooter and testimony regarding the incident as unreliable, Dixon also alleges that Adams deliberately lied to the police and at trial after being "coerced" by the authorities. The only "proof" Dixon presents that Adams was coerced into perjuring himself is an unsworn, undated statement submitted by defense investigator Roger Putnam ("Putnam");[6] *see also* A.135-36. Putnam claims to have visited Adams on six occasions in February and March of 2000, eight years after the 1992 trial. Putnam states that he "asked Emil Adams if the testimony he gave during the trial of Valentino Dixon

---

[6]     Respondent has submitted all of the relevant affidavits in a separately bound appendix ("Affidavits").

-13-

was true." Putnam Stmt., ¶7. According to Putnam, Adams stated that "he was coerced by the District Attorney to give testimony against Valentino Dixon[,]" and purportedly agreed to meet Putnam at his office "for the purpose of giving a sworn statement to the effect that he lied at the trial of Valentino Dixon." *Id.*, ¶¶9, 10. Putnam avers that "[a]fter repeated attempts by telephone and personal visits" to Adams, he "was unable to convince Emil Adams to come to [Putnam's office] in order to give a sworn statement" because Adams "was afraid of retaliation from the District Attorney's Office and/or the Police Department." *Id.*, ¶¶11, 12. Apart from the infirmities in the form of Putnam's statement (it is unsworn and undated), the content is devoid of any details of the alleged coercion of, and threats of retaliation against, Adams by the police and prosecutor. I agree with respondent that Putnam's statement lacks credibility and does not undermine either Adams' statement to the police after the incident, his identification of Dixon from a photo array on the night of the shooting, or his testimony at trial. Furthermore, it does not come close to substantiating Dixon's claim that Adams was subjected to pressure or coercion by the prosecutor or police.

Refuting Putnam's allegations about Adams is the sworn affidavit dated July 12, 2005, from Investigator Daniel A. Dill ("Dill Aff."), to which is attache a sworn statement from Adams. Investigator Dill avers that he showed the original photo array to Adams on July 11, 2005, along with Putnam's statement. According to Investigator Dill, "Adams denied ever talking with Putnam and says everything in the affidavit is fabricated." Dill Aff., ¶5. Adams said that he "remembered the [photo] array and picking out Valentino Dixon," and that his identification of Dixon "was true and accurate," that he had "never lied about the shooting, and . . . [had] never been coerced by the District Attorney's office." *Id.*, ¶7. During their interview,

Investigator Dill obtained from Adams a sworn and dated deposition in which Adams stated as

follows:

> I was shown an affidavit by Inv D. Dill regarding a statement I made to Roger
> Putnam. I do not know a Roger Putnam, I never talked to Putnam, I never lied in
> court or [sic] coerced by the District Attorney's Office. I was giving [sic] 3 copies
> of the affidavit by the news reporter who wrote an article about this case. The
> news reporter told me Roger Putnam gave him the information[.] That is not true.
> Roger Putnam made this entire affidavit up which upset me, if I can sue him I
> would.

Deposition of Emil Adams, attached to Dill Aff.

Because Dixon has submitted only speculation and unsubstantiated hearsay to buttress his

attacks on Adams' credibility, they lack any indicia of trustworthiness and should be rejected.

### 4. John Sullivan

John Sullivan stated that he was living in Buffalo during the summer of 1991; he moved

to Georgia about a week after the shooting. T.74. He acknowledged that he had been charged

with a crime since moving to Georgia, and that charge was still pending at the time of Dixon's

trial. T.74-75. Sullivan was seventeen-years-old at the time of the shooting.

He was at the intersection of Bailey and East Delavan in the early morning hours of

August 10, 1991, sitting in a car with his friends Fred Stancil and Robert Lewis. T.75. Their car

was between the parking lot of Louie's hot dog shop and East Delevan. Sullivan saw the Jackson

brothers get out of Travis Powell's yellow car and go up to Mario Jarmon and start to argue.

T.75-77. He indicated that at first, the ensuing fight was between Aaron and Jarmon.

Sullivan testified that he was friends with both Jarmon and the Jackson brothers. T.77-78.

Because Sullivan knew them both, he told Aaron not to fight, and he tried to break up the fight.

-15-

T.78. When Aaron insisted on fighting, Sullivan stood back. T.78-79. Eventually, Sullivan stated,

Torriano started hitting Jarmon, so it was two-on-one, but Jarmon was still on his feet. All three

(Jarmon, Aaron, and Torriano) all exchanged punches. T.79-81.

As the fight continued, Sullivan heard Mike Bland[7] say "watch out, he's got a gun."

T.80-81. Sullivan could see the hands of the two Jacksons and of Jarmon, and none of them had a

gun when Bland spoke those words. T.81-82; T.90-91. Sullivan stated that the Jacksons and

Jarmon were fighting each other with their fists.

When he heard Bland's warning, Sullivan ran toward a nearby church. As he was

running, Sullivan heard rapidly fired gunshots. T.82-83. Once Sullivan crossed the street, he

looked back and saw Dixon standing over Torriano, shooting into him for "[m]aybe between

fifteen and thirty seconds." T.83, 86. Dixon was holding the gun in both hands. T.85. Torriano

was lying face up in the street, and he did not have a gun. T.86.

Sullivan indicated that when he was done firing, Dixon ran back down East Delavan.

T.86. Sullivan realized that he had been shot, because of the pain he felt and the blood he saw

running down on his leg. T.86-87.

As soon as Dixon had left the scene, Sullivan called the police. He recalled speaking with

them within three to five minutes after the shooting. T.142-143. Sullivan then went to the

hospital, where he was treated for a "through and through" bullet wound of his thigh and

released. T.519. Afterwards, Sullivan went to police headquarters and gave a statement. T.97,

142-143.  Sullivan told police "Tino" was the shooter, and he described "Tino" as six feet tall,

---

[7]        Mike Bland ("Bland") testified at the grand jury proceeding but did not testify at trial. Bland is one
of the witnesses whom Dixon contends would have offered favorable evidence, and his statements are discussed
further in this Report and Recommendation, *infra*.

-16-

weighing about one hundred and sixty or one hundred and seventy pounds. A 12. Sullivan

recognized Dixon from having previously seen him between two to five times at M&M Sporting

Goods store, owned by one of Sullivan's friends. T.84. Sullivan said that he knew Dixon's name

to be "Tino." T.84-85; T.128-130.[8] Sullivan admitted that he saw the shooter's face in profile and

could not describe the shooter's clothing. T.141-42.

On cross-examination, defense counsel challenged Sullivan's credibility and ability to

identify the shooter. He elicited again that Sullivan had been arrested for a crime in the state of

Georgia, and the charges were pending. T.74-75.[9] Defense also counsel focused on Sullivan's

consumption of alcohol and drugs during the day prior to the shooting. T.101-08. As noted

above, the murder took place at about 1:30 a.m. on August 10, 1991. Sullivan testified he rolled

marijuana sprinkled with cocaine into a joint and smoked it around 3:30 p.m. on August 9, 1991,

about ten hours before he witnessed the murder. T.103-04. The mixture apparently made Sullivan

drowsy, and he "slept off" the high, awakening at ten o'clock in the evening. T.104-06. When he

awoke, Sullivan consumed two bottles of malt liquor. T.107-08.

---

[8]     Immediately after describing "Tino" to the police, Sullivan was shown an array containing six
photographs:

Q:     I will now show you six photos on a blue folder numbered 1 thru 6. If you see anyone in
        these photos that you recognize. Tell me what number and his name if you know and
        where you know him from . . . . Do you understand what I mean?

A:     Number 6, I know him as Tino, last night or this morning he was the one that was
        shooting Torrano [sic], Torre [sic].

A.12.  Petitioner contends that Sullivan's description to the police is a "prior inconsistent statement" in
regards to Sullivan's trial testimony because Dixon allegedly does not fit that description. Pet'r Mem. at 5
(Docket No. 15). However, Sullivan simultaneously identified petitioner from a photo array. Thus, as
respondent argues, any "inconsistency" in Sullivan describing "Tino" as six feet tall is substantially
diminished by virtue of Sullivan's positive identification of him after viewing the photo array.

[9]     He had never been convicted of a crime before, though, nor is there anything on the record to
indicate that Sullivan's charges pending in Georgia influenced his testimony. T.96.

-17-

Defense counsel next challenged Sullivan's ability to observe the shooter from the place that Sullivan said he did. Defense counsel inquired about the large crowd surrounding the incident; the vehicle traffic on Bailey, across which Sullivan allegedly saw Dixon shooting into Torriano; and the effect the headlights in the traffic would have had on Sullivan's ability to see clearly. T.113-24. Lastly, trial counsel asked Sullivan to estimate the distance from which he saw petitioner, and Sullivan estimated one hundred to one hundred and fifty yards. T.124.[10]

### 5. Robert Lewis

Twenty-four-year-old Lewis was sitting with his friends Stancil and Sullivan, in Stancil's truck at the intersection of Bailey and East Delavan in the early morning hours of August 10, 1991. T.331-32. Lewis recalled that Sullivan tapped him on the shoulder and pointed out the Jackson brothers driving by with Powell. T.334. Lewis saw that Powell parked the car in a parking lot, and Aaron got out and went up to Jarmon. Aaron was followed by Torriano and Powell. T.334-35.

According to Lewis "[t]hey was [sic] just standing there passing words, and then they just started swinging at each other. . . ." T.335. Aaron threw the first punch, setting off the fight. T.335-36. Lewis and Stancil got out of the truck and tried to break up the fight. Lewis said that they were "in the middle of them [the three men fighting] trying to get them [the Jacksons] away from" Jarmon. T.336.

Lewis indicated that none of the individuals present had a weapon, although Aaron did

---

[10] Respondent points out that Detective Tucci of the Buffalo Police Department measured the distance from a lamppost behind which Sullivan saw Dixon to the lamppost behind which the fatal shooting occurred. Detective Tucci measured the distance to be eighty-six yards, T.491, meaning that Sullivan actually viewed Dixon from a distance of less than eighty-six yards.

have something that looked like a roll of quarters or a battery in his hand. Aaron did not have a boxcutter-type knife, however. T.359-60.

Lewis stated that fight started and stopped about three times. The third time, the three fighters all fell in the street, and Lewis tried to get the group back up on their feet. T.336-37. Lewis testified that was when the shooter approached with the gun. Lewis "saw some legs coming towards [them] and he [the shooter] screamed out "[W]hat the hell you all going to do now?" and started firing. T.336-37. Lewis recalled that the bullets bounced off the ground in front of him. T.354.

The shooter ran up to the crowd, shooting at the people gathered "in general." T.338. As the bullets started flying, Lewis grabbed Torriano, who "fell away" from him. T.337. Torriano tried to get up, but fell again. T.338-39. Lewis ran around the corner where he saw Jarmon stagger and then fall. T.337. The shooter then ran past Torriano and started shooting at Aaron. T.338, 358. Lewis looked back and there was a "second round" of firing, with the shooter getting right up over Torriano and shooting bullets into him. T.339-40, 356. Lewis did not want to leave Torriano on the ground, but he had to when he saw the shooter running up to Torriano. After the shooter finished, he ran back in the direction of Jarmon's house on East Delevan. T.358-59.

Lewis did not see who the shooter was, but described him shooter as "short." T.340. Lewis, who described himself as five feet, eleven inches-tall at trial, said that the shooter was a "little bit" shorter than him. T.340-41. Like Powell, Lewis said that the shooter was wearing a hat, which Lewis described as "black." He also had "some dark colored jeans and red, a reddish like shirt and red sneakers." T.340-41.

### 6. Fred Stancil

-19-

As Lewis and Sullivan indicated, twenty-two-year-old Stancil was sitting with them in his truck at the intersection of Bailey and East Delavan in the early morning hours of August 10, 1991. T.361-63. The Jackson brothers and Powell arrived in Powell's mother's yellow car. Stancil knew the Jacksons, Powell, and Jarmon. One of them (Aaron, Torriano, or Powell) commented to Stancil that "they" had a "problem" with somebody. T.363. Stancil thought it was Powell who said it, since Aaron and Torriano were already walking over to Jarmon. They did not explain the remark. T.373. Stancil recalled that neither the Jacksons nor Powell had a weapon. T.363. Stancil watched the Jacksons and Powell walk over to Jarmon, who also did not have a weapon. T.364.

Stancil attempted to break up the fight that ensued because he knew all the parties involved. T.365. Stancil testified that none of the fighters had any weapon of any kind during the course of the altercation. T.365-366. As Lewis had indicated, Stancil also said the fight broke up and re-started two or three times. T.365.

After the last time it broke up, Stancil observed a person come running up the street and shout "What the fuck are you all going to do now?" T.365, 366. The person "just started opening up and started shooting the gun." T.367. The shots "sounded like firecrackers at first." T.367. At the moment the shooting started, Stancil looked over his shoulder to see Torriano fall to the ground. Stancil did not see who shot him. T.367. Stancil immediately ran into a nearby store and asked the clerk to call the police. T.367-68.

### 7. The Police Investigation

Detective James Lonergan ("Det. Lonergan") testified that when he arrived at the crime scene at about 1:45 a.m., he saw a large pool of red wet stain in the vicinity of 1157 East Delevan

and approximately nine feet from the curb. He also saw four slugs on the ground. T.430. He

learned from Officers Diegelman and Brown that they had already picked up 27 9-mm shell

casings and a .32-caliber handgun and a copper-jacketed bullet. T.430. Officers Diegelman and

Brown turned these items over to Detective Henry Smardz ("Det. Smardz") was in charge of the

evidence collection unit. T.455, 471. Officer Diegelman replaced the handgun in the spot where

he had found it and evidence photographs were taken, depicting its location. T.432. Det. Smardz

found that the four of the gun's five chambers were empty, and one of the chambers contained a

spent cartridge. T.458.

Detective John Vickerd ("Det. Vickerd") attempted to interview the victims from the

shooting (i.e., Aaron and Jarmon) at Erie County Medical Center. However, Aaron was in

surgery. Det. Vickerd then learned of another witness, Sullivan, who was at Sisters Hospital.

Det. Vickerd was advised by Sullivan that he could make an identification of the shooter. T.449.

Sullvan described the shooter as approximately twenty-one years of age, six-feet-tall, 160

pounds, with short hair, and wearing a black and white jogging suit. T.453.

### C.   The Jury Verdict

The jury returned a verdict finding Dixon guilty of second degree (intentional) murder

(with regard to Torriano Jackson) (New York Penal Law ("P.L." § 125.25 (1), count one);

attempted second degree (intentional) murder (with regard to Aaron Jackson) (P.L. §§ 110.00,

125.25 (1), count three); third degree (reckless) assault (with regard to John Sullivan) (P.L. §

120.00 (2), count eight); and criminal possession of a weapon in the second degree (P.L. §

265.03, count nine). At the time, there was no indication that any jurors indicated they did not

individually assent to the verdict reached. Dixon was thereafter sentenced to consecutive

-21-

sentences of twenty-five years to life on the murder count and eight and one-third to twenty five

years on the attempted murder counts;

### D.     Post-Conviction Proceedings

The Appellate Division, Fourth Department, of New York State Supreme Court,

unanimously affirmed Dixon's conviction on direct appeal. The memorandum decision and order

read, in relevant part, as follows:

> Defendant contends that County Court denied him a fair trial by improperly
> permitting hearsay testimony into evidence, and then compounded the problem by
> giving a misleading limiting instruction to the jury. Specifically, defendant asserts
> that a prosecution witness [Sullivan] was permitted to testify, over objection, that
> he heard a person say "watch out, he's got a gun", and that another witness was
> permitted to testify, over objection, that he heard someone say "you better run,
> Tino is going to his car". We agree that those statements were hearsay and should
> not have been admitted. Following a bench conference, the court gave a limiting
> instruction to the jury. The People concede that the court made a misstatement in
> its limiting instruction. The court's limiting instruction was inadequate because it
> failed to advise the jury that it should consider the hearsay statements not for their
> truth, but rather, for the limited purpose for which they were received. Defendant,
> however, concedes that he did not object to the court's limiting instruction, and
> thus the issue has not been preserved for review (*see*, [New York Criminal
> Procedure Law] 470.05(2)). Moreover, the errors in admitting the hearsay
> statements in evidence and in the limiting instruction are harmless in light of the
> overwhelming evidence of guilt.
>
> Defendant further contends that the identification of him as the person who shot
> the victims is against the weight of the evidence. Three eyewitnesses positively
> identified defendant as the shooter. In addition, those witnesses testified that they
> knew defendant or had seen him on a number of prior occasions. The contention
> that defendant was misidentified as the shooter was rejected by the jury and its
> verdict is not against the weight of the credible evidence.

*People v. Dixon*, 214 A.D.2d 1010, 1011, 626 N.Y.S.2d 900 (N.Y. App. Div. 4th Dept. 1995).


The New York Court of Appeals denied leave to appeal. *People v. Dixon*, 87 N.Y.2d 900, 663

N.E.2d 1260, 641 N.Y.S.2d 230 (N.Y. 1995).

Dixon filed an unsuccessful motion to vacate the judgment pursuant to New York

Criminal Procedure Law ("C.P.L.") § 440.10 in 2003, which is discussed further in Section II,

*infra*.

## II.    Timeliness of the Petition

### A.    The Statute of Limitations Period Under 28 U.S.C. § 2244(d)(1)

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28

U.S.C. § 2241 *et seq.*, became effective on April 24, 1996. AEDPA governs the filing date for

this action because Petitioner filed his petition after the AEDPA's effective date. *See Lindh v.*

*Murphy*, 521 U.S. 320, 336 (1997). Among other changes, AEDPA amended 28 U.S.C. § 2244 to

include a new one-year period of limitations for habeas petitions brought by prisoners

challenging state court judgments. 28 U.S.C. § 2244(d)(1). The revised statute provides that the

limitation period shall run from the latest of the following four dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

-23-

In most cases, a prisoner is required to file a federal habeas petition within one year of completing direct review of the habeas claims. *See* 28 U.S.C. § 2244(d)(1)(A). Dixon's conviction was affirmed on direct appeal by the Appellate Division, Fourth Department, of New York State Supreme Court on April 28, 1995. *People v. Dixon*, 214 A.D.2d at 1010. Leave to appeal was denied by the New York Court of Appeals on December 7, 1995. *People v. Dixon*, 87 N.Y.2d at 900. Dixon's conviction became final 90 days thereafter, on March 6, 1996, when his time to file a petition for a writ of *certiorari* with the United States Supreme Court expired. *Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005).

Habeas corpus petitioners like Dixon, whose state convictions were concluded by direct review prior to the effective date of the AEDPA on April 24, 1996, were afforded a one-year grace period, until April 24, 1997, in which to file a § 2254 petition. Because Dixon's conviction became final for purposes of 28 U.S.C. § 2244(d)(1)(A) before the effective date of AEDPA on April 24, 1996, Petitioner was provided a one-year grace period for filing a timely habeas corpus petition. *Ross v. Artuz*, 150 F.3d 97, 102 (2d Cir.1998) ("[I]n light of Congress's selection of one year as the limitations period, we conclude that prisoners should have been accorded a period of one year after the effective date of AEDPA in which to file a first § 2254 petition or a first § 2255 motion."). Thus, in the absence of tolling, Dixon had until April 24, 1997, or one year from the effective date of AEDPA, to file his petition for a writ of habeas corpus in federal district court. *Carey v. Saffold*, 536 U.S. 214, 217 (2002). However, Dixon filed his petition in federal court on March 28, 2005, nearly eight years after the grace-period expired. Thus, Dixon must avail himself of statutory or equitable tolling in order for his petition to escape dismissal as untimely under AEDPA.

-24-

**B.      Statutory Tolling**

AEDPA's statutory language specifically contemplates tolling of the limitations period in only one circumstance–when the petitioner has spent time pursuing properly filed state post-conviction or other state collateral review proceedings. *See* 28 U.S.C. § 2244(d)(2). AEDPA's tolling provision states that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation . . . ."  28 U.S.C. § 2244(d)(2). The Court has reviewed the procedural history of Dixon's filings in state court to see whether the expired one-year grace period was tolled by any properly filed applications for post-conviction or other collateral review.

In the form habeas petition submitted to this Court, Attorney McPhee represented that Dixon filed one motion to vacate the judgment pursuant to C.P.L. § 440.10 on November 6, 2003, in Erie County Court. *See* Petition, ¶15(a)-(d) (Docket No. 1). Dixon asserted claims of ineffective assistance of trial counsel, newly discovered evidence, use of false evidence by the prosecutor, denial of rights under the compulsory process clause, and prosecutorial misconduct. *See id.*, ¶15(d) (Docket No. 1). This motion was denied without a hearing on August 30, 2004. *See* Erie County Court Order, attached as Exhibit B to Petition (Docket No. 1-7). Leave to appeal to the Appellate Division, Fourth Department, was denied on February 7, 2005 (Docket No. 1-7).

When respondent pointed out Dixon could not avail himself of statutory tolling under 28 § 2244(d)(2) because his 2003 C.P.L. § 440.10 motion was filed *after* the statute of limitations had run, attorney McPhee stated that Dixon actually had filed a C.P.L. § 440.10 motion sometime in 1998. McPhee states that when he sought to inquire on the status of the motion,

-25-

some five years later, in 2003, he was told by the County Court that they had "lost" Dixon's

motion papers. Even if the Court were to accept that Dixon had filed a C.P.L. § 440.10 motion in

1998, that still does not assist him because the statute of limitations expired on April 24, *1997*.

*See Doe v. Menefee*, 391 F.3d at 154 ("When the AEDPA limitations period expired on

November 19, 1999, Wall had not yet filed the § 440 motion, thereby losing the opportunity to

invoke 28 U.S.C. § 2244(d)(2)'s provision for tolling the limitations period during the pendency

of a state post-conviction motion."). Since Section 2244(d)(2)'s tolling provision is not

applicable here, Dixon must attempt to avail himself of the doctrine of "equitable tolling".

### C. Equitable Tolling

"Although AEDPA does not provide that its limitations period may be tolled for any

reason other than the pendency of a state post-conviction motion, *see* 28 U.S.C. § 2244(d)(2), in

'rare and exceptional circumstances' a petitioner may invoke the courts' power to equitably toll

the limitations period. *Doe v. Menefee*, 391 F.3d at 159 (quoting *Smith v. McGinnis*, 208 F.3d 13,

17 (2d Cir. 2000) (*per curiam*) (internal quotation marks and citations omitted in original). To

qualify for equitable tolling, the petitioner must establish that "'extraordinary circumstances

prevented him from filing his petition on time,' and that he 'acted with reasonable diligence

throughout the period he seeks to toll.'" *Id.* (quoting *Smith*, 208 F.3d at 17). The Second Circuit

has "established only a limited number of circumstances that may merit equitable tolling, such as

where an attorney's conduct is so outrageous and incompetent that it is truly extraordinary, *see*

*Baldayaque* [*v. United States*], 338 F.3d [145], 152 [(2d Cir. 2003)], and where prison officials

intentionally obstruct a petitioner's ability to file his petition by confiscating his legal papers, *see*

-26-

*Valverde v. Stinson*, 224 F.3d 129, 133-34 (2d Cir. 2000)." *Doe v. Menefee*, 391 F.3d at 160.[11]

Dixon has not alleged that his attorney's conduct was "so outrageous and incompetent" as to be "truly extraordinary. Nor has he asserted intentional interference with his filings on the part of prison officials or others in authority. Thus, Dixon has not demonstrated "extraordinary circumstances" as that term has been interpreted by the Second Circuit.

Although Dixon acknowledges the "reasonable diligence" requirement, *see* Pet'r Mem. at 7, he does not address it. I agree with respondent that Dixon failed to demonstrate reasonable diligence in the years after his conviction and sentence became final, thereby disqualifying him from receiving the benefit of equitable tolling. *See Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."); *Johnson v. Nyack Hosp.*, 88 F.3d 8, 12 (2d Cir.1996) ("Equitable tolling requires a party to pass with reasonable diligence through the period it seeks to have tolled."). Dixon's conviction became final on March 3, 1996, as noted above. Taking Dixon's timeline as true, he did not file his first C.P.L. § 440.10 motion until 1998. He did not inquire as to the status of that motion until 2003, at which time he was purportedly told that he should file another motion since his original papers had been lost.  Dixon's one-year grace period under AEDPA expired one year before the 1998 motion and five and half years before the 2003 motion. Thus, Dixon's time to file in federal court expired before he even commenced efforts to exhaust his claims of newly discovered evidence via a C.P.L. § 440.10 motion. On these facts, I cannot

---

[11]     District courts in this Circuit have found extraordinary circumstances when, *e.g.*, serious physical or mental illness prevents the petitioner from filing, *Rhodes v. Senkowski*, 82 F. Supp.2d 160, 173 (S.D.N.Y. 2000), and "[w]here a petitioner, through no fault of his own, first learns of the outcome of a final appeal after the time for seeking habeas has expired," *Hunter v. Greiner*, No. 99 Civ. 4191(SAS), 2000 WL 245864, at * 3 (S.D.N.Y. Mar.3, 2000) (quoting *Vasquez v. Greiner*, 68 F. Supp.2d 307, 309 (S.D.N.Y.1999) (quotation marks omitted)).

conclude that Dixon "acted with reasonable diligence throughout the period he seeks to toll."

*Doe v. Menefee*, 391 F.3d at 159. Therefore, I recommend finding that he cannot take advantage

of the doctrine of "equitable tolling" as it is generally understood.

### D.     Equitable Tolling for "Actual Innocence"

Whether the United States Constitution requires an "actual innocence" exception to the

AEDPA one-year statute of limitations on federal habeas petitions is a novel question of

constitutional law.[12] No actual innocence exception to § 2244(d)(1) exists in the language of the

statute itself, and the United States Supreme Court and the Court of Appeals for the Second

Circuit have yet to endorse an actual innocence exception. The Second Circuit noted in *Menefee*

that it has "reserved the question of whether a claim of actual innocence based on newly

discovered evidence constitutes an extraordinary circumstance that merits equitable tolling,

however, as well as the question of whether the Constitution would require equitable tolling for

actual innocence." 391 F.3d at 154 (citing *Lucidore v. New York State Div. of Parole*, 209 F.3d

107, 114 (2d Cir. 2000)). The Second Circuit has not yet decided the question of whether

"considerations of justice mandate adopting the actual innocence gateway as a means of tolling

AEDPA's limitations period." *Id.* at 161 (citing *Whitley v. Senkowski*, 317 F.3d 223, 225-26 (2d

Cir. 2003)). The Second Circuit reasoned that it "should decide whether the Constitution requires

tolling for innocence only in a case in which the petitioner can show that, because he can

---

[12]     Although several courts have suggested that a complete procedural bar to federal habeas review for a prisoner who makes a credible claim of actual innocence would raise significant questions under the Due Process Clause, the Eighth Amendment, and the Suspension Clause, none has decided the issue. *Garcia v. Portuondo*, 334 F. Supp.2d 446, 456 n.64 (citing *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000); *Triestman v. United States*, 124 F.3d 361, 379 (2d Cir. 1997); *Hamilton v. Miller*, 292 F. Supp.2d 437, 456 (E.D.N.Y. 2003); *Russo v. United States*, 313 F. Supp.2d 263, 267-68 (S.D.N.Y. 2004); *Alexander v. Keane*, 991 F. Supp. 329, 337 (S.D.N.Y. 1998)).

-28-

demonstrate his actual innocence, he would be injured if not entitled to tolling on this basis." *Id.* (citing *Lucidore*, 209 F.3d at 113-14). Thus, the Second Circuit has instructed district courts faced with untimely petitions in which the petitioner asserts his actual innocence "to determine, in each case, whether the petitioner has presented a credible claim of actual innocence *before* ruling on the legal issues of whether such a showing provides a basis for equitable tolling and whether the petitioner must also demonstrate that he or she pursued his or her claim with reasonable diligence." *Id.* (citing *Whitley*, 317 F.3d at 225) (emphasis supplied). The Second Circuit determined that it did not need to decide the issue in *Menefee* because the petitioner had failed to adduce a credible claim of "actual innocence."

*Doe v. Menefee* also clarified that the "actual innocence" evidentiary standard articulated by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298, 324 (1995), applies in the tolling context. 391 F.3d at 161 (citing *Lucidore*, 209 F.3d at 114 (applying *Schlup*'s standard and concluding that petitioner had not demonstrated "actual innocence").[13] As the Second Circuit explained, the *Schlup* court "carefully limited the type of evidence on which an actual innocence claim may be based and crafted a demanding standard that petitioners must meet in order to take advantage of the gateway," *id.*, in that "[t]he petitioner must support his claim 'with new *reliable* evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or

---

[13] To invoke the rare actual innocence exception, a petitioner may argue that he is actually innocent of the offense or that he is actually innocent of the death penalty. In *Murray v. Carrier*, 477 U.S. 478 (1986) the Supreme Court stated, a petitioner arguing that he is actually innocent of the offense must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496. In *Schlup v. Delo*, the Supreme Court clarified that standard. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." 513 U.S. at 327. The Supreme Court has also held that "actual innocence," within the meaning of the fundamental miscarriage of justice exception, means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

critical physical evidence–*that was not presented at trial*[,]'" *id.* (quoting *Schlup*, 513 U.S. at

324) (emphases supplied). The Second Circuit explained that in light of *Schlup*'s explicit

requirement of reliability, "the habeas court must determine whether the new evidence is

trustworthy by considering it both on its own merits and, where appropriate, in light of the

pre-existing evidence in the record." *Id.* (citing *Schlup*, 513 U.S. at 327-28). If the district court

determines that the new evidence is reliable, the next step is for the court to consider the

petitioner's claim of actual innocence "in light of the evidence in the record as a whole, including

evidence that might have been inadmissible at trial." *Id.* The Supreme Court explained that the

standard articulated in *Schlup*

> is intended to focus the inquiry on actual innocence. In assessing the adequacy of
> petitioner's showing . . . the district court is not bound by the rules of
> admissibility that would govern at trial. Instead, the emphasis on "actual
> innocence" allows the reviewing tribunal also to consider the probative force of
> relevant evidence that was excluded or unavailable . . . . [W]e believe that Judge
> Friendly's description of the inquiry is appropriate: The habeas court must make
> its determination concerning the petitioner's innocence "in light of all the
> evidence, including that alleged to have been illegally admitted (but with due
> regard to any unreliability of it) and evidence tenably claimed to have been
> wrongly excluded or to have become available only after the trial."

*Schlup*, 513 U.S. at 327 (quoting Henry Friendly, Is Innocence Irrelevant? Collateral Attack on

Criminal Judgments, 38 U. CHI. L. REV. 142, 160 (1970)); *accord Doe v. Menefee*, 391 F.3d at

161.

Following the Second Circuit's instructions in *Menefee*, I have first examined Dixon's

claim of "actual innocence" in light of the *Schlup* standard. After careful consideration, I

recommend finding that Dixon has not met the stringent standard of required to demonstrate a

credible claim that he is factually innocent of slaying Torriano Jackson and seriously injuring

Aaron Jackson and John Sullivan as hereinafter set forth in Section IV. Therefore, this Court

need not address whether equitable tolling in the case of "actual innocence" is constitutionally

required.

## IV.    Petitioner's Evidence of "Actual Innocence"

### A.    Lamarr Scott

The purported "confession" made by Dixon's friend Lamarr Scott is fundamental to

Dixon's claim of actual innocence. In fact, Scott made six statements, all of which are different

from one another.[14] The only statement which appears to have any reliability, in this Court's

opinion, is his sworn testimony before the grand jury, wherein he inculpated Dixon. In the

remaining statements, Scott took the blame for the shooting but gave markedly different versions

of the events in the various statements.

### 1.    Scott's "Confession" to the Media on August 12, 1991

#### a.    Background

On August 12, 1991, two days after the shooting, Scott contacted the local news media at

the behest of petitioner's family and gave a statement taking responsibility for the shooting.

When Scott subsequently testified before the grand jury, he explained to assistant district attorney

Christopher Belling ("A.D.A. Belling") how Dixon's father convinced him to confess to the

shooting by misrepresenting how much time he would have to serve. Scott said that Dixon's

father coached him about what to say, and insisted that he speak to the media before even going

to the police. The following excerpt from the grand jury transcript has Scott explaining the events

---

[14]    Respondent has submitted all of Scott's statements in a separately bound appendix ("Lamarr Scott Statements"). In addition, respondent has submitted relevant excerpts from Dixon's grand jury proceeding in a separately bound appendix ("Grand Jury Testimony").

leading up to his media "confession":

Q:    [D]o you remember going to the corner of Bailey and Delavan and talking with the news media?

A:    Yes.

Q:    And at that time you told the news media that you did the shooting, didn't you?

A:    Yes.

Q:    Why did you do that?

A:    Because I didn't – the way it happened, you know, it happened so fast and I don't think Tino meant to kill him but I was trying to help him as much as I can so he won't get no twenty-five years to life. I didn't want him, you know, to go to jail for that alone.

Q:    Weren't you worried that you yourself would go to jail for twenty-five to life?

A:    See, the way his father was coaching me and telling me I didn't have any felonies and that would be my first felony or offense as an assault so he said all you could get is do six months or whatever and get five years probation. So I said well, that ain't nothing. If that's all I got to do to help him, you know, he won't get twenty-five years, I'd do it, you know. But I didn't know it was going to come down to all this.

Q:    Now, eventually you also gave the police a sworn statement that same night?

A:    Yeah, that same night.

Q:    In the sworn statement to the police you told them that you did it?

A:    Yeah, the same thing that I told them on the video.

Q:    The news media?

A:    Yeah.

MR. BELLING: Can I have this marked, please?

(Whereupon, a VIDEOTAPE was received and marked Grand Jury Exhibit 12.)

MR. BELLING: LaMarr, I want you to watch this, okay?

(Whereupon, a video tape was played for the Grand Jury.)

(Whereupon, a STATEMENT was received and marked Grand Jury Exhibit 13.)

BY MR. BELLING:

Q:    Lamarr, who is that man she [the reporter] is talking to right there?

A:    That was Tino's [Dixon's] father.

Q:    Tino's father?

A:    Yes.

Q:    The same guy who told you you [sic] could save Tino some time on this?

A:    Yeah.

Q:    [Y]ou've just seen the video played there which was Grand Jury Exhibits

-32-

Number 13. Is it your sworn testimony at this time that you did not do the
shooting but that Valentino Dixon did?

A: Yes.

Q: Now, I want to show you Grand Jury Exhibit Number 12. I'm sorry. I want
to show you Exhibit Number 13. It's a four page statement which you gave
to the Buffalo Police on August 12th, 1991. Do you recognize your
signature on the last page, LaMarr?

A: Yes.

Q: Is it your testimony at this time that this statement in which you also
claimed to be the shooter is untrue?

A: Yes.

Q: You repudiate the statement you gave to the Buffalo Police Department on
August 12th, 1991 which is here marked Exhibit 13?

A: What does repudiate mean?

Q: Repudiate means is this statement not true?

A: Yes.

Q: It is untrue, correct?

A: Yes.

Q: And the things you said about these guys riding around threatening you all
day long as far as you personally know, you have no information about
that because you came upon the scene just before the shooting?

A: Yes. I was informed that that's what they were doing all day.

Q: You were telling the news media what you had heard from others, correct?
A. Yeah, from Tino's father. He told me everything that, you know, the
whole situation was from the West Side when they was coming from
somewhere and a guy put a gun to his head. I don't know if that was true
or not. That's what I was told.

Q: They supposedly put a gun to Antwan[15] Shannon's [petitioner's half-
brother] head?

A: Yeah.

Q: Tino's father told you that?

A: Yeah, he told me everything that was going on in like a half an hour. He
told me I had a half an hour to get my little story together to tell the news. I
kept telling him I didn't want to go to the news. He said he wanted to go to
the news anyway. He said that would help him a lot more, that they put it
on the news.

Q: Did he ever threaten you to get you to go to the news?

A: Unh-nun [sic]. He never threatened me.

Q: He just sort of talked you into it by saying that you could afford to do the
time, you probably would get less time than Tino would?

A: Yeah. He came to me. He told me, he said LaMarr, talking to me is like

---

[15]     This individual's name is variously spelled in the records as Antoine, Antwane, and Antwan.

-33-

talking to Tino. Whatever you say to me, you know Tino is going to go
with the same thing. He was my friend, Tino. That's the only reason I did
it. I wanted to help him but I see I can't help him.

### b. Transcript of Scott's Videotaped Media Statement

Respondent has provided a copy of Dixon's videotaped statement to the news media as

well as a transcription of that statement, which is reproduced below:

| | |
|---|---|
| Reporter: | I'm Wanda Stark, and your name? |
| Scott: | Lamarr Scott. |
| Reporter: | And Lamarr, why did you call us? |
| Scott: | I'm calling to turn myself in because I don't want my friend to take the rap for something that I did. |
| Reporter: | Okay, now, why don't you back up and tell us exactly what happened. |
| Scott: | Well, first of all, the guys that, um, the guy that did it, the guy that I shot, him and his friends were threatening us all day long. A couple of my friends, a couple of my buddies, they were threatening us all day long, about what they were going to do to us, and things like that. The guy that's dead, he's known for having a trigger finger and, uh, I wasn't sure if he was serious about the situation or not, so I rode home on my bike on Montana Street and came back with an Uzi that I have obtained on the street and I brought it back, not to, not to, uh, not to kill the guy or shoot him but just for self-protection, you know, because he has a trigger finger – he's known on the streets for being a triggerfing – trigger happy person, you know. So, we're all on the corner of Delavan and Bailey and the guy came back and they just, they opened fire, they jumped out the car, a yellow, um, Dodge Shadow,[16] with tinted windows. They jumped out the car and started shooting and so . . .me, I was scared, you know, I didn't know whether he was gonna, you know, kill anybody or not, you know, so I just, I opened fire back on him. I, I, the reason he died, because, I, I didn't have any control of the automatic weapon at all and it was out of control and I panicked at the same time. That's why I kept shooting him as many times as I shot him. |
| Reporter: | Now, you said that you were threatened – what kinds of threats were they making and why were they threatening you? |
| Scott: | They, because of, um, a situation that happened with a couple of |

---

[16]     The vehicle in which the victim and his friends were riding was actually a Chevy Geo Storm.

my friends earlier in the day, and, uh, um, a couple weeks before that they put a gun to my friend . . . they put a gun to my friend head a couple weeks before that. They said they were going to kill him . . . to do something to him, you know, and [draws deep breath] I didn't really take that to heart at the time, but then I took it to heart when I seen them guys riding around all day long and they kept saying they was going to do something to us – do something to us, you know, and its [sic] dangerous out here on the streets. You never know who's going to shoot you or who's going to do what to you, so I, I rode my bike home on Montana Street and I went and got the Uzi that I, that I have. And, I came back not to shoot anyone or to kill anyone – just to have it there, just in case something did happen, you know. So unfortunately, the guys that jumped out of the car and they started shooting first and I shot back at them not intending, not in . . . not intentionally to kill anyone at all. It just happened that way, you know, and I'm apologizing to his parents and his, um, all his people that I'm sorry that I killed your son, but it was a situation that just happened, it was a self-protection type thing. I didn't mean to kill anyone. He was either going to kill me or some of my friends and it was self-protection. I didn't mean to shoot him, I didn't mean to do anything wrong, but it just happened that way and I apologize.

Reporter:    Can you be a little bit more specific about the situation that you're talking about. You said that there was a situation . . .

Scott:    Yeah, they . . .

Reporter:    Prior . . .

Scott:    They were arguing, they were arguing with us earlier . . .

Reporter:    But, what were they arguing with you about?

Scott:    Um, first of all, they were, it was, my friend, my friend was on the west side and they had got into an incident with my friend on the west side and they put a gun to his head and told him to get onto his knees.

Reporter:    I know you said that, but you're still a little vague – you're not, I mean people have disagreements, arguments about something. I mean, what started all of this?

Scott:    Well, well . . . we were . . . we were, um, coming out of a mini mall and the guys they seen us again and we didn't say anything to us, and they said, you know, yeah, we gonna get them boys right there, we're gonna get them, we'll be right back. And one of my friends stopped them and said can I talk to you about it, you know, cause we didn't want any trouble, we wanted no fight or nothing like that. He went over to the car and wanted to talk to him, but he said no, no, I don't want to talk, no, forget that, I'm tired of people

-35-

threatening me and stuff like that and I'm tired of, you know, I'm tired of people doing stuff that they doing to me and stuff like that, you know, so we went to the house. We went to one of my friend's house down the street and was just chillin' [sic] out there for a while and they kept riding back and forth so that's when I went home and got the gun that I had.

Reporter: And you said you purchased that on the street?

Scott: Yes, I did.

Reporter: Have you ever been in trouble before?

Scott: No ma'am, no ma'am.

Reporter: And how old are you?

Scott: Nineteen.

Reporter: And do you work?

Scott: No, ma'am.

Reporter: Um, what prompted you to turn yourself in?

Scott: I didn't want my friend to take a rap for something that I did.

Reporter: Did he do any shooting?

Scott: No, he didn't, he didn't do anything. He was just there [pause] and it was unfortunate that he was there because on the street, you know, um, police, police know him as a drug kingpin or as a person to be bad or whatever and he's really not. I didn't want him to get into any trouble that he don't need.

Reporter: So, was this disagreement that you had with this other person, was it over drugs?

Scott: No, it wasn't. I don't, I don't understand why they, why they were doing things that they did and why they kept messing with us all day long, you know what I mean. It was just an argument and for them to drive around with guns in their car and looking for us and stuff like that to do something to us was, was real silly of them, you know, cause we wouldn'ta [sic] did that to them, it was just an argument, it was just words trans–, transacted back and forth, but they took it to an extreme measure where they would go and look for us. It was like they was looking for trouble. It was like they provoked the whole thing.

Reporter: So, how many of, uh, were you, were there?

Scott: Of us?

Reporter: Yes.

Scott: Um, four of us.

Reporter: And, how many of them?

Scott: Um, three of them.

Reporter: Is there anything else you want to tell us, think we should know?

Scott: No, ma'am.

-36-

*See also* Respondent's Appendix of LaMarr Scott Statements.

The Court has watched the videotape and matched it to the transcript. In this Court's opinion, the statement given by Scott to the news media does not have the ring of truth. Whether considered on its own or in conjunction with his other five statements, it is sorely lacking in credibility. In fact, it does not seem to be the statement of a person who actually witnessed the shooting; Scott is clearly stymied every time that the reporter asks him for details, such when she presses him about what he and the others were arguing about. Scott also appears to be looking to someone off-camera for prompting or help with his answers. In this Court's opinion, it appears that Scott is making up his responses on the spot and not doing a very convincing job of it. Whenever Scott is forced to stray off his "talking points" (on which he clearly appears to have been coached), his answers become even more rambling, disjointed, and nonsensical. For instance, Scott describes Torriano as an individual whom he knew to be "trigger happy," but he never repeats this alleged character trait in any of his subsequent statements. In addition, in his later statements, Scott states that he did not know Torriano before the incident.

Scott clearly cannot provide any substantive details about what actually happened. Scott is also peculiarly unable to provide details such as the nature of the threats allegedly issued by Torriano and his cohorts or the basis for the argument that led to the shooting. Scott clearly he appears to be fabricating a response when the reporter presses him to explain the genesis of the dispute. Moreover, Scott's version of events, which has Torriano and his cohorts bursting out of Powell's car with their guns blazing is in stark contrast to the description given by the prosecution's six witnesses, who described a fistfight followed by a shooting. Although Scott says he "lost control" of the weapon, this is contradicted by the same six witnesses who describe

-37-

the shooter standing over Torriano's prone body and deliberately firing multiple rounds into him.

Scott's "confession" to the media, which is not consistent with Scott's other "confessions" or

with the trial evidence, cannot be viewed as "reliable" evidence under *Schlup*.

### 2. Scott's Statement to the Police on August 12, 1991

After Scott gave the interview to the news media, he went to the police station and was

questioned by investigators there. Again, his statement to the police is lacking in the kinds of

detail that one would expect from a person who had been at the crime scene:

Scott later gave a sworn statement to police, A.19-2-22, in which his entire description of

the shooting is as follows:

> Well, the guys came back, they jumped out of a yellow [D]odge [S]hadow and
> opened fire on me and my friends. I shot back in self-defense. After that I ran
> down the street and I threw the gun. I went home. That was it.

A.19. In this statement by Scott, only the victim, Torriano had a gun. By contrast, in his

statement to the news media, Scott related that "they" jumped out of the car firing their guns,

implying that not just Torriano was armed. In this statement, Scott for the first time describes

Torriano's gun with precision, stating that it was a ".38 silver gun with a nickel plate." A.20.

Scott told the police that Aaron did not have a weapon, which contradicts his media statement.

A.21. This statement, as with Scott's media statement, cannot be reconciled with the

observations of the prosecution's six eyewitnesses because it precludes the possibility of a fight

preceding the shooting. In addition, in this statement, Scott denied walking up to Torriano to fire

more bullets into him. A.21. Again, this conflicts with the six prosecution witnesses' testimony.

### 3. Scott's Grand Jury Testimony on January 13, 1992

Scott testified before the grand jury about five months after the incident, and named

Dixon as the shooter under questioning by Erie County assistant district attorney Chris Belling.

Q:   Now, Mr. Scott, I want to call your attention to August the 10th of 1991 in the early morning hours shortly after midnight in the vicinity of Louie's Texas Hots, Bailey and Delavan. Were you present at that area at the time that a shooting took place?
A:   Yes.
Q:   How did you get to the area that night?
A:   I was driven. I was driven over there.
Q:   By who?
A:   One of my friends.
Q:   What friend?
A:   Valentino Dixon.
Q:   You were in a car with Valentino?
A:   Yeah.
Q:   Which car?
A:   The red Mazda RX-7.
Q:   And that's one of Valentino's two cars, correct?
A:   Yes.
Q:   Did you know when you went over there that Valentino had been called by his half brothers [Brown and Shannon] to come over there because there was some trouble brewing?
A:   He knew there was some trouble but I didn't know what type of trouble it was.
Q:   And when you arrived, where did you go?
A:   To Mario Jarmon's house.
Q:   That's 1122 East Delavan?
A:   Yes.
Q:   And who was at Mario Jarmon's house when you got there?
A:   Antwan [Shannon], Leonard [Brown], Mario Jarmon and that's it.
Q:   So then when you and Valentino got there, there were five people, correct?
A:   Yes.
Q:   Once you got there did you stay there for the rest of the evening or what happened?
A:   No. We stayed there for about fifteen minutes. Then we walked to the store, walked down to the corner to get some beer.
Q:   And the store you're referring to is the drugstore type of place that is on the UB [i.e., University of Buffalo] side of that corner really, it's on the same side of Bailey as UB and the same side of Delavan?
A:   Yeah.
Q:   Who also walked down there?

-39-

| | |
|---|---|
| A: | Me, Tino [i.e., Petitioner], Antwan, Mario Jarmon, Leonard. |
| Q: | Leonard went down also to the store? |
| A: | Yeah. |
| Q: | What happened? |
| A: | Well, some guy drove up in a yellow car and Mario, Mario Jarmon and Antwan got into it with Torriano Jackson, John Sullivan and Aaron. They started fighting and everything. Torri pulled out a gun and shot Mario three times and then Valentino shot Torri. |
| Q: | Now, let me stop you a second. When you guys went up to the corner, did Valentino have the gun with him? |
| A: | I guess he had it. I didn't see the gun with him at the time when we walked to the corner because we was all laughing and giggling and everything. I wasn't paying attention. |
| Q: | Okay. |
| A: | But the incident didn't occur as soon as we got up to the corner. It occurred like twenty minutes after. We was sitting on the bench and drinking beer. They kept driving by and pointing their fingers at us like that. So Tino went into the store again. Then he walked back down to the house and again parked the car on the side of the driveway of the drugstore. |
| Q: | Okay. Then it was after that that the shooting took place? |
| A: | Yeah. |
| Q: | I couldn't hear you. |
| A: | Yes. |
| Q: | And Valentino Dixon did the shooting. |
| A: | Yes. |
| Q: | What did the weapon look like? |
| A: | It was a Tech-9. It was similar to an Uzi. |
| Q: | Nine millimeter and this weapon was fully automatic? |
| A: | Yes. |
| Q: | And you heard it fired full automatic that night? |
| A: | Yes, yeah. |
| Q: | Had you seen that gun before? |
| A: | Yeah. I haven't seen it with him but I seen it in magazines and stuff like that before. |

*See* 1/13/92 GJ at 56-73 (Respondent's Appendix of Grand Jury Testimony).[17] In the foregoing

testimony, the description of events given by Scott conforms more to the description given by the

---

[17]     Citations to "GJ.___" refer to the transcript of the grand jury proceedings held on January 13, 1992. Respondent has submitted the relevant grand jury testimony in a separately bound appendix, "Grand Jury Testimony."

prosecution's witnesses in that a fistfight precedes the shoot-out. This lends credibility to Scott's grand jury testimony.

### 4. Scott's Interview with Petitioner's Attorney Barbara Sims on January 15, 1994

Five months after Dixon was sentenced, on January 15, 2004, Scott agreed to give an interview on Dixon's behalf for the purpose of making a motion to vacate petitioner's judgment of conviction. *See* A.30-35 (Docket No. 1-2).[18] His description of the shooting given to petitioner's attorney that day is as follows:

> L.S. [S]omebody said "there they go," so [petitioner] turns around and walks back towards me. They stopped the car, Mario stood on the curb and was saying something to'em [sic], I don't know what he said, and then Antoine and Leonard, they walked over to where Mario was at and they was all saying something. And then they jumped out of the car.
>
> B.S. The Jackson boys?
>
> L.S. The Jackson boys jumped out of the car, I still can't remember how many jumped out of the car, and Mario was fighting them, I heard three shots, pow, pow, pow, and then it dawned on me that it was shots being fired. That's when I reached up under the car, not the car, reached up under the seat and pulled the joint out of the plastic bag and I was like which one is it? which one is it? which one is it? Leonard was like, right here, right here, right here, see, if it wasn't for Leonard, I wasn't familiar, I wouldn't have known who Toriano [sic] Jackson was. Leonard was standing on the side.
>
> B.S. I gotcha, I gotcha.
>
> L.S. Leonard was standing on the side.
>
> B.S. Where was, at this point, where was Tino Dixon?
>
> L.S. Tino had, We wasn't even thinking about Tino. Tino, When everything was over Tino was at his car.
>
> B.S. OK. Well now was the store open at this point.
>
> L.S. Yeah, the store was open.
>
> B.S. And he went in and bought beer?

---

[18] At the time, Scott was in the Erie County Jail holding center having been charged in relation to an armed robbery committed two months earlier wherein he had robbed several individuals at gunpoint. When Scott felt one victim was hiding something, Scott shot him, rendering him a quadriplegic. Scott was convicted of those charges and is presently serving a term of twenty-eight and a half to fifty-seven years.

L.S.   No. He didn't buy the beer.

B.S.   He went in to go buy the beer. I gotcha.

L.S.   To go to the store. But he never even stepped in the store. His foot stepped in the door. Then somebody said, "there they go". Then he walked back towards me. But I did see Tino. Tino had walked by me. He was in the middle of the street walking backwards like this looking at everything, and then I asked Leonard, "Which one is it? Which one is it? Which one is it." And Leonard was like do right here, here you go do right there. Cocked the joint. I started shooting, ba, ba, ba [sic]. First I shot three times to spread the crowd cause I didn't really want to shoot and Mario, I don't know what happened to Mario and Taun [sic] but I thought I killed Mike Bland [sic], I had seen him walk around the corner. I remember he had on a maroon sweat suit and a baseball cap, and some Nike sneakers, I remember because I had complimented him on the sweatsuit. So I know he had walked around the corner and Tino, I mean, Leonard, was like that's him right there, that's what it was like, so I sprayed in the crowd, everybody dispersed that way, and then that's when I said which one is it, which one is it, and Leonard pointed me to Torian [sic], and I just started shooting, and after everything was over, I put the gun in my coat, and I started running like this and I got to the car, I put my hand on the car, I opened it, Tino was like, nuh-uh nuh-uh [sic], ain't getting into the car, ran back this way three houses, past Mario's house, hopped the gate, hopped the gate, hopped the gate, first I put the gun up, then I chilled for a minute, then everybody was saying Mario's dead, Mario's dead, Mario's dead.

B.S.   Was Mario dead?

L.S.   That's what everybody was saying at first. I was like damn, damn, damn. So I hopped on my bike and jetted down Delavan going towards Grider Street, and I just went home.

B.S.   Well, how did they get Tino for that?

L.S.   'Cause his car was there. His car was there.

B.S.   You mean to tell me nobody saw that incident?

L.S.   Yeah, people saw it. I just don't understand how they got Tino for it anyway. First of all, I better let you know. How they got Tino for it too. 'Cause Tino had brought the red car. His white car was at home. He let somebody else drive his white car, and told the person that was driving the white car to bring the car back in front of Mario [sic] house. Have it back and have it back and have it back at the house by twelve o'clock tomorrow noon. So his car his Cadillac is sitting in front of Mario's house. And the people of the incident was involved with Tino's brothers. OK? So when he go back to get his car that next day, they arrested him because Tino never was seen.

B.S.   Yeah, but what I can't understand is, there were people, according to this, who gave testimony that night to the police. They gave statements to the

-42-

|      | police. John Sullivan gave a statement, Emile [sic] Adams gave a statement. How did they get so far off? |
|------|---|
| L.S. | The reason why they got so far off like that is because there was so much confusion. There was so much confusion. Everybody was running this way. Everybody was running this way. However you explain that. You know as quiet as its [sic] kept, they didn't even see Tino running to his car because there was so much confusion. |
| B.S. | Well why did the police in your opinion feel that Tino was involved at all? Was it merely because he had a white Cadillac sitting there? |
| L.S. | Because his Caddy was sitting there at that morning. That's all they had to see. |
| B.S. | Was that Cadillac. |
| L.S. | Was that white Cadillac. Plus he got a reputation for carrying pistols. He had a reputation for shooting when he get [sic] drunk, stuff like that. |
| B.S. | So nobody actually saw you fire the shot. |
| L.S. | Nobody actually seen me fire the shots. I had my cap over. They seen me fire the shots. Yes, but didn't see me. |
| B.S. | OK. So the guy who testified that he's hiding behind the church. He hiding. He's gotten shot in the backside or someplace. He gets shot. He doesn't realize it. I guess it was like in his hip or his thigh, and he's watching you shoot Jackson while he's down, he's telling a lie? |
| L.S. | Yes. He didn't first, I'm gonna tell you, because there was too many people. OK. The yellow line was here. There's another yellow line. Taurian [sic] was sprawled across the yellow line. First he was on his knees. Then when I popped in the head, he fell towards the yellow line. And then when I stood over him and pumped the rest of em [sic] in him, there was too much confusion, too many cars trying to get away. There was too much confusion. Too many people hollerin [sic] an [sic] screaming for them to really see me. |
| B.S. | But wouldn't they say that both people had a gun? |
| L.S. | Tory [i.e, Torriano] had a gun and I had a gun. The police was playin [sic] with Tory's gun. |
| B.S. | Tory had a gun but not Tino. |
| L.S. | Tino never had a gun. |
| B.S. | I gotcha. I gotcha. |
| L.S. | Tino never had a gun at all. Tory had the gun. The police was handling Tory's gun. |
| B.S. | Did they admit that it was their gun or no? |
| L.S. | I don't know if they admitted it was their gun or not. But see, and another thing that was wrong, Tory was moved from the spot that I killed him in. He was moved to the parking lot Now you can't move a person that he had 18 or 20 bullets in his body. You cannot pick him up and move him to another spot. That's how he died like that. He died from internal bleeding |

-43-

and multiple bullet wounds. But he died really from being move.

B.S.   Who picked him up, do you know?

L.S.   I think it was John Sullivan that picked him up.

B.S.   I see. OK. Because John said he had him resting on his lap.

L.S.   It was John Sullivan that picked him up, cause he was not supposed to be moved. So it was like, first, nobody never even seen me first because when I came up from under the seat with the gun and I took it out of the bag, ain't nobody never seen nothing.

B.S.   Well, when somebody asked you about this incident, somebody asked you about it, did you tell them the same thing you told me?

L.S.   Yeah. Yeah. Yeah.

B.S.   What did they say? How come they did never bring [sic], cause [sic] over here it said something about Tory, I mean Tino always getting somebody else to take the rap for him.

L.S.   No. No. See, Tino wasn't trying to get me to take the rap for him. What it was, I did it. But OK. They arrested Tino. OK. I'm like damn, what's going to happen? So I went and turned myself in and I told them what happened. You know. We went to Central Booking. I told them what happened, and they told me they was like you going to come down there and lie, you want to be a trooper for the Dixon family, the next time get your lies straight. And I looked at him, like what is he talking about? Ain't nobody in their right mind really going to come down here and turn hisself [sic] in for a murder. Evidently, I had to do it. I'm coming down here and turnin [sic] myself in, and I told you what's going on and everything. You know what I'm saying?

B.S.   OK. You never went down to police headquarters and made a statement.

L.S.   Yeah.

B.S.   You went down . . .

L.S.   Me and Leonard went down.

B.S.   And you made a statement and they said they didn't believe you.

L.S.   Yeah, they said they didn't believe me. It was like get the fuck out of here. We don't believe you. Then they watched some videotapes because I turned myself into the news. So they watched the videotapes and kept seeing Tino's father's face on the video . . . they was like who is this guy?

B.S.   I gotcha. I gotcha.

L.S.   So I was like I said that's Tino's father. They was like, Oh. So now we get it. Oh that's Tino's father. He came and got you. Gave you some money and said come down here and testify. I said they didn't give me no damn money.

B.S.   How much money is it worth? He hasn't got that much. Right?

L.S.   What you talkin [sic] about? That's what a lot of people were saying. Tino paid you off to say so and so, so and so, to take the rap, this and that, you

-44-

know, startin [sic] to get to me.[19]

B.S.    OK. Alright. Now let me, let me, put it to you straight. If when I call you to testify in this case, are you going to tell them the same thing you told me without a doubt?

L.S.    Yeah. Yeah.

B.S.    You've told me the whole truth, right?

L.S. Yeah.

*See* Docket No. 1-2; *see also* Respondent's Appendix of Lamarr Scott Statements.

     I agree with respondent that Scott's 1994 statement is "wildly inconsistent with his media and police statements," Resp't Mem. at 46 (Docket No. 15). Furthermore, it is jumbled, at times incoherent, and internally inconsistent. Recall that in Scott's statement to the news media, he said that Torriano was well-known as a "trigger happy guy." However, in the excerpt quoted above from the 1994 interview, Scott told Dixon's attorney that he needed Brown to point out Torriano to him or else he would not have known who Torriano was.

     Tellingly, Scott also incorporates several new details which were not mentioned in his earlier statements: He says that the police handled a gun (which Scott called "Tory's gun") and that Torriano was moved after he was shot. And here, nearly three years after the incident, Scott for the first time recalls that he stood over Torriano Jackson and pumped bullets into him (as described by the prosecution witnesses at trial). A.33. These facts only came out at Dixon's trial, and–coincidentally–this statement by Scott was taken after Dixon's sentencing hearing.

     **5.**     **Scott's Statement to the Defense Investigator on December 11, 1998**

     Four years later after his jailhouse interview with petitioner's attorney, Scott gave

---

[19]     Scott obviously misunderstood the attorney's previous comment.

a statement to Roger Putnam ("Putnam"), a private investigator retained on behalf of the defense. *See* A.137-38; *see also* Respondent's Appendix of Affidavits. It is unclear why the statement was given, although it appears to be an attempt to bolster the statements of Tamara Frida, a witness who allegedly had evidence favorable to petitioner. (Frida's statement is discussed further, *infra*.)

Scott told Putnam that "[t]he doors on both sides of the Shadow opened and everybody piled out. I think about six (6) guys got out of that car." A.138. In his media statement given two days after the shooting, Scott was certain that three individuals got out of the car. In his 1994 interview, Scott could not remember how many individuals emerged from the car. To Putnam, seven years after the fact, Scott was certain that there were six individuals piling out of Powell's vehicle.

Coincidentally, about five weeks earlier, Putnam had obtained a statement from Frida on petitioner's behalf. *See* A.131-34. In her November 6, 1998 statement, Frida says she met Putnam, whom she did not know, after she testified at a perjury trial against Shannon and Brown–Dixon's half-brothers who participated in the fight with the Jacksons. Frida told Putnam that she had witnessed the shooting and petitioner was not the shooter. She described the arrival of the Jacksons in Powell's car as follows:

> I saw a car pull up on East Delavan headed east toward Bailey. The car stopped and a lot of guys got out of the car. I remember it did remind us of a clown car at the circus because so many guys got out of the car. The car was maybe 30 or 40 feet ahead of us. The corner of Bailey and East Delavan is well lit by street lights and lights for the parking lot. These guys, about 10 of them all went over to the number 12 bus stop on the north side of East Delavan west of Bailey. All of a sudden they converged on another group of guys and fighting broke out.

-46-

*See* A.131-34. Frida's description of the "clown car" arrival of the Jacksons was then substantially confirmed by Scott in his December 11th statement to Putnam, when Scott indicates that "about six guys" got out of Powell's car (which he states is a Dodge Shadow).

When he spoke with Putnam in 1998, Scott also offered a reason for having he retracted his initial confession, telling Putnam that he had only inculpated Dixon at the grand jury proceeding because of prosecutorial and police misconduct. Scott said he named Dixon as the shooter "because [he] felt [his] life was threatened because of the harassment done by Det. Stambach and the District Attorney Chris Belling." Not surprisingly, Putnam did not ask any follow-up questions to elucidate this dramatic accusation. And, not surprisingly, Scott has never explained why he did not bring this alleged misconduct to light sooner.

As respondent points out, in Scott's interview with petitioner's attorney Barbara Sims given almost four years earlier, Scott was not asked about why he named petitioner in the grand jury. He *was* asked why he was not at the trial, and Scott said he was told by petitioner's father and family to stay away, "Like they was [sic] hiding me from someone." A 26. There was no mention whatsoever of the supposed life-threatening "harassment" by the police and the district attorney's office.

### 6.    Scott's Letter Dated February 27, 2002

Four years after speaking with the defense investigator, Scott wrote a letter on petitioner's behalf addressed "To Whom It May Concern." He apparently had it notarized on February 27, 2002. *See* A.140-41; Respondent's Appendix of Lamarr Scott Statements. In pertinent part, Scott states that a few months after the shooting he was contacted by the prosecutor:

[Belling, the prosecutor] advised me that it was in my best interest to testify at the

-47-

grand jury and say that Valentino Dixon committed the crime. I repeatedly refused to do so. After our meeting I found myself being harrassed [sic] by the lead detective in the case Mr. Mark Stambach. Who repeatedly made threats on my life if I didn't come to the grand jury and testify. Eventually I went to the grand jury and recanted my original confession; and told the grand jury that Valentino Dixon committed the crime.

*See* A.140-41. Apart from Scott's bald assertions, Dixon has come forward with no evidence to substantiate these contentions of misconduct on the part of A.D.A. Belling and Detective Stambach. In this Court's opinion, Scott's claims of coercion and threats on the part of the prosecution seem manufactured in an attempt to discredit his grand jury testimony naming petitioner as the shooter.

### D. Petitioner's Other "Exculpatory" Witnesses

#### 1. Mario Jarmon

Apart from Scott, Jarmon (the third participant in the fight), was the most significant person to give statements on Dixon's behalf.[20]  Like Scott, Jarmon gave several differing accounts of the shooting. Immediately after the shooting, Jarmon told a paramedic what happened; in the hospital, he told a contradictory story to the police; and before the grand jury, he told a third version.

The first version, told to the paramedic, was that he had been shot in a drive-by shooting

---

[20]        Respondent indicates Jarmon died in 2002 and that "[a] lthough the record is very incomplete, an autopsy apparently revealed that he carried in his corpse a 9mm bullet from an 'old wound,' which petitioner alleges was the wound Jarmon received in the early morning hours of August 10, 1991," during the shooting spree in which Torriano Jackson was killed. Resp't Mem. at 48 (Docket No. 15) (citing A.11). Respondent contends that if the 9mm bullet had been inflicted on that occasion, it demonstrated that Jarmon was accidentally hit by petitioner when petitioner initially sprayed the crowd to move them back before he shot Torriano while he was lying on the ground. In his motion to vacate, in an attempt to prove that the 9mm bullet came from a gun fired by Toriano, petitioner alleged that the bullet was of a different caliber. However, respondent notes, petitioner has since abandoned that claim. Resp't Mem. at 49 (Docket No. 15) (citing Pet'r Mem. at  78-81) (Docket No. 3).

by an unidentified gunman. Resp't Mem. at 49 (Docket No. 15) (citing PT.446-55).[21] No witness–prosecution or defense–ever described the incident as a drive-by shooting, not even Jarmon in his subsequent statements. The next day, unable to speak because of a tracheal tube, Jarmon was interviewed at the hospital by the police. Then, he told a different version of events, indicating that he knew that Torriano had shot him, and that he did not see petitioner with a gun. A.213. As respondent points out, if Torriano had indeed shot him, Jarmon had no reason to lie to the paramedic about what happened, or to have withheld the identity of the shooter. On the other hand, respondent argues, "if Jarmon knew that petitioner had accidentally shot him before proceeding to execute Torriano, he had every motivation to disguise what really had occurred." Resp't Mem. at 49 (Docket No. 15). I agree with respondent that when Jarmon's later claim to be able to identify the shooter is undermined by his initial story, told to the paramedic, that he did not know who shot him and that it was a drive-by shooting.

Five months later, Jarmon told the grand jury yet another version of what took place, stating that Scott had killed Torriano. Jarmon testified that he, along with the Dixon's half-brothers Brown and Shannon, confronted Aaron about allegedly having put a a gun to Shannon's head a couple weeks before the August 10, 1991 shooting. 1/13/92 GJ.4. Aaron, who was just with Powell at the time, supposedly reacted by making threats and promising to be back. 1/13/92 GJ.5. A while later, both Jackon brothers and Powell drove past Jarmon's house. 1/13/92 1/13/92 GJ.5-6. Jarmon paged Dixon, who came over. Scott did, too. 1/13/92 GJ.6-7. Scott had an automatic weapon, but Jarmon told him it would not be necessary, so Scott put it in the hallway. 1/13/92 GJ.7-8. The group went up to the corner to get beer where they saw Powell's

---

[21]     Citations to "PT.___" refer to the transcript of the joint perjury trial of Jarmon and Brown.

yellow car pull into the nearby parking lot, with someone inside pointing and waving a gun. Jarmon told the grand jury that this caused Dixon, Scott, and Shannon to run back to Jarmon's house, leaving Jarmon alone. 1/13/92 GJ.8-9.

Jarmon saw Torriano come out of the car with a gun and Aaron come out with a knife or boxcutter. *Id.* The brothers came after Jarmon and tried to corner him, as Sullivan tried to break it up. 1/13/92 GJ.9.According to Jarmon, Torriano swung the gun and nicked Jarmon's head and then shot him two or three times. Jarmon kept "coming at him" and hit Torriano and "threw him in the street." 1/13/92 GJ.10. Aaron came at the Jarmon swinging the knife, but Jarmon was able to fight him off, too. Jarmon testified that Scott (who apparently had left the scene) nevertheless "heard the shots" being fired by Torriano and started shooting. *Id.* Jarmon then ran around the corner. 1/13/92 GJ.13-14.

As respondent points out, there is no version of events told by anyone in this matter, including petitioner's witnesses, which can be reconciled with Jarmon's grand jury testimony. Jarmon was subsequently indicted on four counts of perjury in the first degree after he appeared before the grand jury investigating Dixon, and he was convicted in November 1992, following a joint trial with Brown, of falsely testifying that "LaMarr Scott was at the scene shooting a machine gun," the "clear implication" being that Scott shot Torriano. *People v Jarmon*, 202 A.D.2d 965 (App. Div. 4th Dept.), *leave to appeal denied*, 83 N.Y.2d 1004 (N.Y. 1994).

## 2. Leonard Brown

As noted above, Brown was petitioner's half-brother. Brown gave a statement to police two days after the shooting. A.17. He said that two weeks previously, the Jackson brothers had confronted Brown's half-brother Shannon. Torriano had a gun. The Jacksons ordered Shannon to

get on his knees. According to Brown, during the day before the shooting, Brown and Shannon saw Aaron Jackson and approached him. Shannon wanted to fight Aaron one on one, but Aaron refused, saying he was going to come back and "spray" all of them. When Brown and the others saw the car pass by a few minutes later, they contacted petitioner.

A while later the car with the Jacksons returned and five young men started beating up Jarmon. Jarmon was backing away from the fight, so Brown went up to help him, followed by Scott and petitioner. Then Brown heard shots, and saw that it was Scott shooting. Echoing Scott's media statement, Brown told the police that "Lamarr must have lost control of the gun it just kept going off." A.18. According to Brown, petitioner fled to his car and drove away. Brown and Shannon ran to Jarmon's house, and Scott ran off through yards. In a statement he would later contradict, Brown said he had seen nobody other than Scott with a gun. A.18.

Five months later Brown told the grand jury that during the day preceding the shooting, Brown and Shannon confronted Aaron because of the alleged gun incident two weeks before. Aaron said he was coming back to "smoke all of [them]" and left. 1/13/92 GJ.24-25. Brown and the others saw the car drive by Jarmon's house. 1/13/92 GJ.25. Scott came on the scene and they told him about the incident, including the fact that "they" were going to come back and shoot. 1/13/92 GJ.24-25. Petitioner was not there, so Scott, Brown and Shannon walked up to the corner store. 1/13/92 GJ.26-27. They saw petitioner drive down the street and park. 1/13/92 GJ.28.

Scott left the group and returned with a package which he put behind Jarmon's house. 1/13/92 GJ.28. While petitioner, Scott, Jarmon and Shannon walked to the corner to get some beer, Brown stayed at Jarmon's house. 1/13/92 GJ.28-29. The yellow car containing the Jacksons

-51-

pulled into the parking lot, and Brown saw four "of them" run across the street. 1/13/92 GJ.29-30. Then petitioner, Scott and Shannon ran down the street to Jarmon's house, while Jarmon stayed behind to fight all four "of them". 1/13/92 GJ.30-31.

Contradicting his statement to police, Brown told the grand jury that Torriano, who was one of those fighting Jarmon, had a gun, and Brown heard him fire the gun twice. 1/13/92 GJ.31-32. Scott ran into the back yard, got a gun, and returned just as Torriano was firing his gun. 1/13/92 GJ.32. Brown recalled that Scott started firing everywhere. 1/13/92 GJ.34. At this point in Brown's testimony, the prosecutor asked, "Did you see when LaMarr [Scott] ran up and stood over Torri and shot him while he was down on the ground?" Brown was evasive under extensive questioning by the prosecutor; the most he would admit was that Scott shot Torriano "while he was on the ground." 1/13/92 GJ.34-36. Brown testified that Dixon ran down the street, jumped in his car and drove off. Brown and Shannon ran to Jarmon's house on East Delavan, and Scott ran into a backyard before returning to Jarmon's house. 1/13/92 GJ.36-37.

Brown told the grand jury that the machine gun that Scott used was shorter than petitioner's own personal machine gun, and therefore the murder weapon used could not have belonged to petitioner. 1/13/92 GJ.38. Brown also testified that, after the incident, Scott had come over to petitioner's family's house. According to Brown, Scott said he was too frightened to go turn himself into the police, but he wanted to confess to the media. Petitioner's mother then called the television station. 1/13/92 GJ.39-41, 54-55.[22]

Brown subsequently was indicted on four charges of first degree perjury, and tried jointly

---

[22]  Scott testified at the grand jury that Brown helped petitioner's father orchestrate Scott's story for the media. 1/13/92 GJ at 70-71.

with Jarmon, for testifying falsely to the grand jury that Scott had killed Torriano Jackson. His

conviction was affirmed. *People v. Brown*, 207 A.D.2d 962 (App. Div. 4th Dept. 1994), *leave to

appeal denied*, 85 N.Y.2d 860 (N.Y. 1995).

### 3. Antoine Shannon

Shannon, petitioner's brother, left Buffalo to attend college in Kentucky prior Dixon's

trial. When the prosecutor, A.D.A. Belling, traveled to Kentucky to interview him, Shannon gave

a statement exonerating petitioner. The exculpatory statement, handwritten by the prosecutor,

was taken on November 21, 1991. A.61-66. Shannon stated he was with his half-brother, Brown

and his friend Jarmon, in a parking lot at East Delavan and Bailey before the shooting took place.

A.61. Aaron Jackson was in Powell's car. A.61. Shannon and Brown "had words" with Aaron.

A.61. They started to leave and then Jarmon "had words" with Aaron. A.61. The three thereafter

went over to Jarmon's house and called petitioner. A.61. When petitioner arrived, they told him

about the earlier argument with the Jacksons. A.62. Ten minutes later, Scott came over and he

too was told of the argument. Scott then left, saying, "I'll be back." A.62. Scott returned fifteen

minutes later with a long black gun inside a garbage bag. A.62. Scott showed Shannon the gun,

then put it back in the bag and hid it. A.62.

Shannon, Jarmon and petitioner went back to the intersection of Bailey and East Delavan

where Shannon saw Aaron and Powell in the car again, this time with Torriano in the back seat.

A.63. Aaron had some words with Jarmon, causing Shannon and petitioner to step toward them

after hearing the words. A.63. Aaron, followed by Torriano, exited the car. According to

Shannon, Torriano had a silver .38-caliber gun in his hand and pulled something back on the top

of the gun. A.63. Petitioner then grabbed Shannon and said "come on," while Aaron rushed

Jarmon and began fighting with him. A.63. As Shannon started to run away, he heard a shot. He looked back and saw Jarmon "jerk." A.64. At the same time, Scott ran up to the melée and started shooting at Aaron. Shannon looked back at petitioner, looked again toward the shooting scene, and saw Torriano running away. A.64. Shannon said that Scott shot Torriano in the back. Torriano fell to the ground and Scott stood over him, firing shots into him as he lay in the street. A.64.

Shannon then ran through Jarmon's yard and eventually called a taxicab to take him home. Petitioner got into his car and drove away. A.64-65. Shannon, Brown, petitioner's girlfriend, Shannon's mother, and Shannon's father, Robert Bryant, and all went to Scott's house. The troupe then brought Scott to Shannon's house where they discussed Scott turning himself in. A.65. A call was made to the television station to arrange to have Scott make his media statement. A.65. Three days after the shooting, Shannon left for college in Kentucky. A.65.

What is significant about of Shannon's statement is the way it supports the justification defense that Scott made in his media and police statements. In Shannon's version of events, as in Scott's first two statements, Torriano emerged from the car, gun in hand, and began shooting immediately. Scott then immediately returned fire. Shannon offered the same, precise description as Scott had of Torriano's gun–a silver .38-caliber handgun.

Shannon testified at the joint perjury trial of Brown and Jarmon. His testimony there was generally consistently with his police statement. PT.625-98. Respondent points out a strange incongruity in Shannon's testimony that, in this Court's opinion, undermines his overall credibility even further. Shannon stated that Scott was at best a casual acquaintance of his, but

-54-

Scott was not an acquaintance with either of Shannon's brothers, petitioner, or Brown. PT.648-49, 674. According to Shannon, Scott was not "tight" with any of the three, or with Jarmon. PT.674. Thus, if Shannon is to be credited, Scott went to get a machine gun, returned, and proceeded to kill Torriano despite barely knowing the group on whose side he was fighting.

As respondent notes, it is "impossible to reconcile" Shannon's statement with any other version of events, except Scott's media and police statements–and even Scott had stopped repeating the self-defense theory contained in those two appearances by the time he testified at the grand jury. Resp't Mem. at 57 (Docket No. 15). At the grand jury, as noted above, Scott said that a fight preceded the shooting, during which Torriano pulled out a gun and started shooting. 1/13/92 GJ.63. Shannon simply is not consistent with the other witnesses claiming to exonerate Dixon. As respondent notes, if Torriano did not emerge from the car with his gun blazing, as Shannon stated, and if the fight was a protracted one, as all the other witnesses said or implied, then Shannon's version of events cannot have been true. The fact that it dovetails with Scott's first two statements to the police–the essence of which he later abandoned–supports the inference the petitioner's actual innocence defense was "bogus from the beginning." Resp't Mem. at 57 (Docket No. 15).

### 4. Michael Bland

Michael Bland testified at the grand jury that he was standing in the parking lot at Bailey and East Delavan talking to a girl when the Jackson brothers ran up to Jarmon. Transcript of November 20, 1991 Grand Jury Proceeding 11/20/91 GJ.3-4. Aaron and Jarmon had words, but did not exchange blows. 11/20/91 GJ.4. Bland knew that Aaron did not have a gun because Aaron was waving his hands, but he could not say whether Torriano had a gun. 11/20/91 GJ.5-6.

-55-

As he was wrapping up his conversation with the girl, Bland heard shots and immediately ran away. GJ I..5, 7-8. The gunfire Bland heard was just "one kind of sound," rapid firing as if from an automatic weapon. GJ I.6-7. He did not see the shooting or the shooter because he ran behind a building. 11/20/91 GJ 5, 7-8. Bland stated that did not know petitioner or Scott, although he knew the Jacksons on what he described as a "hi, bye" basis. 11/20/91 GJ.8-9.

Ten years after Bland's grand jury testimony, defense investigator Putnam prepared an affidavit, dated May 23, 2001, in which he says he interviewed Bland in prison. According to Putnam, Bland said that he *did* see the shooter and it was not petitioner, it was Scott. A.121-22.

On July 14, 2005, Investigator Daniel A. Dill of the Erie County District Attorney's office interviewed Bland and showed him the Putnam affidavit. After reading it, Bland disavowed what Putnam had said. Investigator Dill then prepared an affidavit memorializing Bland's statements to him: "'This is  Roger Putnam's affidavit not Michael Bland's. I stand by everything I testified to in court [the grand jury] regarding the Valentino Dixon case.'" Affidavit of Daniel A. Dill, dated July 14, 2005.

### 5.    Walter Lee Dennis

Four days after the shooting, fifteen-year-old Walter Lee Dennis gave a statement to a private investigator who worked for Sean Dennis Hill, Esq., who was then representing petitioner. A.41-57. Dennis related that he knew petitioner and Brown. Brown was "with" Dennis' sister and was "like" Dennis' "brother-in-law." A.45, 48. As noted above, Brown is petitioner's half-brother.

Dennis said that on the night of August 10, 1991, he was at Bailey and East Delavan and witnessed the incident. He saw petitioner running away during the shooting. A.45-46. Dennis

also saw Jarmon, because when Jarmon got shot, Dennis grabbed Jarmon's hand and helped him after Jarmon was around the corner out of sight of the shooting. A.49-50. Dennis stated that he comforted Jarmon, who was calling Dennis' name. When Dennis was asked if Jarmon said who shot him, Dennis related that he told Jarmon to be quiet because talking would only make the pain worse. A.57. Dennis said he saw the gunman run away after the shooting. A53. Dennis also said that "someone was shooting over there with a .22. The one that shot Mario [Jarmon]." According to Dennis, the shooter with the .22 was shooting in his (Dennis') direction. A.54. Dennis did not explain how he knew that the person with the .22 was the one who shot Jarmon, or how he knew the gun was a .22.

Dennis said that after the crowd dispersed, he saw the police pick up a pistol off the ground, and he remembered seeing a yellow Geo at the scene. A.55. When asked by the investigator how it became known that he saw the entire incident, Dennis stated that Brown asked Dennis if Dennis had seen anything, and when told that Dennis had, Brown directed Dennis to the investigator. A.56.

Dennis' statement contains several different aspects that are inconsistent, and the statement itself is curiously incomplete for a supposed eyewitness. As respondent points out, it sounds as if Dennis is parroting petitioner's talking points–such as his observation of the police picking up a pistol off the ground and his accurate description of the car as a yellow Geo–while Scott, the alleged shooter, mistakenly refers to it as Dodge Shadow. I agree with respondent that Dennis' story lacks any indicia of reliability.

### 6.    Wendell Williams

On May 28, 1992, fifty-two-year-old Wendell Williams ("Williams"), an unemployed

resident of Buffalo, gave a statement to a private investigator retained by petitioner. The statement was conducted in the presence of petitioner's parents. A.67-99. Williams related that n the early morning hours of August 10, 1991, he was exiting the hot dog shop at Bailey and East Delavan. A.72. Williams had just bought six hot dogs for himself and friends, and was going to deliver them to the house right next door to Jarmon's on East Delavan. A.72-74; 1/13/92 GJ at 5. As Williams was leaving the shop, he heard two men arguing near a yellow car, and someone threatening to kill someone else. A.76-81. Williams described the man who was being threatened as a "little guy," about five feet five or five feet six, and weighing one hundred forty or one hundred forty-five pounds. A.86. The person doing the threatening suddenly fired three shots, the only shots Williams heard that night. A 76, 88-90, 91. Williams clambered into a nearby dumpster. A 88-89, 91-92. He heard no other shots thereafter, as he ran back to the house next door to Jarmon's. A 93. Williams was shown a photograph by the defense investigator, which the investigator identified as petitioner's. Williams stated that petitioner was not the man who threatened to kill the "little guy" and then fired three shots. A.90-91, 95.

Although Dixon has presented Williams' statement as proof that he did not murder Torriano, it is difficult to discern why Dixon believes Williams to be such a favorable witness. *See* Pet'r Br. at 4. As respondent points out, what Williams said bears essentially no resemblance to any other witness' version of what happened. Indeed, Williams does not even seem to be describing the shooting that occurred.

### 7.    Floyd Fisher

Floyd Fisher ("Fisher") testified at the perjury trial on behalf of Brown and Jarmon. PT.572-601.  Fisher was a childhood friend to both Jarmon and to Brown, petitioner's half-

brother, a connection which significantly undercuts Dixon's assertion that Fisher was an "objective" witness.[23] In any event, Fisher said he was in his car driving by the intersection of Bailey and East Delavan in the early morning hours of August 10, 1991, when he saw some "guys" run up to his Jarmon. Fisher pulled up in his car to tell "them" to "stop beefing." PT.575-76.

Fisher then continued driving. He heard a shot, and in his rear view mirror saw a man running. He heard another shot, and then saw a man fall down in the street. After the second shot, Fisher pulled off to the side of the road to take a look. At first, Fisher testified that he did not think the shots were real rounds, and that he really was not "aware of the sound" of the shots. PT.576-80. Later, Fisher contradicted himself, testifying that the first shot sounded like it came from a revolver and the subsequent shots sounded like automatic gunfire, testimony which was consistent with the petitioner's story. PT.583-84. Fisher stated that the shooter of the person who fell in the street was big and stocky, although Fisher did not identify who the shooter was. PT.578, 581-582. The jury rejected Fisher's testimony and convicted Brown and Jarmon of first degree perjury, as noted above.

### 8. Tamara Frida

Frida testified at the perjury trial of Jarmon and Brown on November 4, 1992. She stated she was in her car, a red Geo Tracker, near Bailey and East Delavan in the early morning hours of August 10, 1991, when she saw a fight break out "between a lot of individuals." PT.313. Frida did not observe weapons of any kind being used in the fight, and Frida saw no gun-flashes during

---

[23]     According to the files of the Erie County District Attorney's office, Fisher was arrested during petitioner's trial for felony possession of a weapon in regard to any an incident which happened the day after petitioner's trial began. Resp't Mem. at 63 (Docket No. 15) citing Erie County Indictment Number 92-1344).

the fight. PT.313-14. At some point she heard gunfire coming from down the street, toward the

fight. PT.314. She did not hear single shots; rather, the shots sounded like firecrackers.

PT.320-21. As soon as the gunfire started Frida got out of her car, ran around to the back and

"took cover" on the ground, putting her hands over her head. PT.315, 320. When the gunfire

stopped, she got up and left in her car. PT.315. Frida was not asked by either the prosecutor or

the two defendants if she knew who the shooter was.

Shortly afterward, Frida talked to a police officer at the scene but said she saw nothing

because she was "afraid to become involved." She later heard petitioner was arrested for the

crime, and knew petitioner was not the shooter, but said nothing to anyone. She received a

subpoena for the grand jury from the District Attorney but also told the District Attorney's office

she saw nothing because she was afraid to become involved, although she did testify at the

subsequent perjury trial of Jarmon and Brown. A.132.

Six years later, in 1998, she had a chance encounter with defense investigator Putnam at

the Buffalo courthouse. Frida states,

> [M]y ex-boyfriend was on trial in September 1998. I testified in that trial and met
> Private Investigator Roger Putnam. After my testimony Mr. Putnam gave me a
> ride to Buffalo State College where I am attending college. Since I had told him
> that one of my courses was Criminal Justice he asked me if this trial was my first
> encounter with the Criminal Justice system. I at that time told him that I had
> witnessed a shooting some years ago. He was familiar with the case and asked me
> if Tino Dixon was the real shooter. I told him no[,] that Lamarr Scott was the real
> shooter. I knew what Tino looked like and the guy I saw shooting Torrey Jackson
> was not Tino Dixon. I did not know who Lamarr Scott was until I met him some
> months later. Mr. Putnam asked me why I did not come forward before when the
> investigations and trials were going on and I told him I was scared to death.

A.133-34. Frida gave a sworn statement to Putnam, part of which is quoted above. She avers that

she was parked on East Delavan facing Bailey when a car pulled up and "about 10 guys" got out.

*Id.* They converged on another "group of guys" and a fight broke out. After three to five minutes, Frida states, a "guy wearing sunglasses" approached with a gun. He raised it up, shouted at the crowd, and fired a single shot. Torriano started running toward Frida's car, and was followed by the gunman shooting at him in rapid fire. Torriano fell and the shooter stood over him continuing to fire. The shooter finished and ran west on East Delavan. A.131-132.

Respondent indicates that six years after her encounter with Putnam, Frida was interviewed in July 2004 by the Buffalo News, and allegedly refused to give her name for the article because she was "fearful of retribution, given that so many of the people at the scene of the shooting that night had been tied to drugs and violent crimes." A.239. Later in the article, she is alleged to have said she was scared to say anything at the time of the shooting because she was worried that if the shooting were drug-related her house would get fire-bombed. A.240. She also points out that Brown and Jarmon were convicted of perjury for saying Scott killed Torriano Jackson. A.240.

There are several anomalies surrounding Frida, in this Court's opinion. First, it seems very odd that seven years after the shooting, and after consistently denying all knowledge, Frida would just casually reveal her knowledge of petitioner's innocence to him during a chance meeting with Putnam, a total stranger. It is equally curious that Putnam, who purportedly was unknown to her, was not only able to get her to overcome her extreme fear of discussing the incident but also had her sign a sworn statement, under the penalties of perjury. Doing so could only have exposed Frida to the same danger of retribution that she believed she faced on August 10, 1991, were she to get involved.

Respondent points out what while Frida was expressing her fear of disclosing her identify

to the newspaper in July of 2004, the 1998 sworn statement she gave to Putnam–which contains her name–had been a public record for many months, since it had been filed in support of petitioner's motion to vacate judgment. It is odd that while the newspaper reporter apparently knew of the motion and the supporting documents, he nevertheless agreed to honor Frida's request for anonymity despite the fact that Frida's sworn statement was public and her name was liberally used in petitioner's C.P.L. § 440.10 motion to vacate the judgment, just as her name is freely used in the instant habeas petition.

Another incongruity is that in the 2004 newspaper article, Frida stated that she had known Scott while they were in grammar school together. A.240. However, when she talked to defense investigator Putnam six years previously, she said she did not know Scott until she met him several months *after* meeting Putnam. This is a glaring inconsistency. Curiously, Frida did not describe to Putnam the circumstances of how she met Scott.

In addition, Frida identified the shooter as wearing sunglasses. No other witness describes shooter as wearing sunglasses. If the shooter had been wearing sunglasses, it would seem to be a sufficiently noteworthy detail for more witnesses to remember.

Like the story offered by Williams, the man buying hotdogs at the time of the shooting, Frida's story simply does not make sense. It is quite difficult to believe that she would stand by silently while Dixon, whom she purportedly knew to be an innocent man, was charged, convicted, and imprisoned, based only upon her notion that she might be subject to retribution by persons unknown for reasons unknown. Her explanation for waiting so long to come forward with her testimony exonerating Dixon is not credible. As respondent points out, Frida had nothing to fear from implicating Scott, who had confessed to the media two days after the

shooting. If petitioner were innocent, then she had nothing to fear from him in naming someone

other than him as the shooter. On the other hand, if Frida *did* see petitioner shoot Torriano, her

fear of coming forward would be more logical. Regardless of what Frida's rationale was, the

Court believes she is lacking in credibility as witness.

### 9.    Anthony Watkins

In an article dated July 25, 2004, a Buffalo newspaper printed a story asserting that

Anthony Watkins had come forward to exonerate petitioner based his having read several articles

that appeared in the paper a few weeks before. Watkins told the reporter that he was at the nearby

hot dog shop when the shooting took place. Watkins allegedly heard two shots from a gun that

was *not* a .22, followed by automatic fire from a Tech-9. A.242-43. Watkins told the reporter that

he knew petitioner from high school, and petitioner was not the shooter.  He was certain of this

because he saw petitioner ducking down during the shooting. Because he was ducking, Watkins

reason, it was impossible for petitioner to have been the shooter. A.241. The article did not

explain why Watkins needed to deduce that petitioner was *not* the shooter.

Watkins is quoted as saying that he did not come forward at the time with his helpful

testimony because, as a teenager, he "didn't feel that anyone would listen to him." A.241.

Watkins is also quoted as saying, at the end of the news story, "They were out to get him . . . I

think they knew it [was an injustice]. They didn't care." A.243 (alteration by reporter in original

news article). The article is silent as to why Watkins did not come forward when he was no

longer an adolescent. It is very odd that Watkins, who had known petitioner from childhood, and

knew he was purportedly an innocent man, allowed him to languish in prison for thirteen years. I

also note that Watkins does not allege, like Frida did, a fear of retribution by persons known or

unknown. Nor does he allege, like Scott did, that he was coerced into silence by officials committing criminal misconduct. He simply withheld his exculpatory information because he was afraid of "not being taken seriously."

Coincidentally, petitioner's motion to vacate the judgment was pending when the article featuring Watkins was published, and the motion was decided five days later, on August 30, 2004. Several months later, petitioner obtained an affidavit from Watkins, on December 8, 2004. Watkins avers in the affidavit that he was in the parking lot and saw petitioner going into the corner store. A.244. Then, when he was in the hot dog shop, Watkins heard a single "pop" followed by a burst of automatic gunfire. Respondent points to two aspects of Watkin's affidavit that are particularly salient:

> FOURTH: A little while later I was inside [the hot dog shop], I heard first a sound like a "pop" and then a burst of what I thought was gunfire. I now know from my experience in the Marine Corps what semi-automatic and automatic weapons fire sounds like. That is what I heard that night after the "pop".
> FIFTH: From the view that I had to outside from Louie's, I could see VALENTINO DIXON, still across the street on the other corner on Delavan and Bailey, ducking as if he was trying to get out of the way of the shooting. He was not shooting. I saw no weapon in his hands.

A.244. Although consistent with his statements to the newspaper, the affidavit pointedly omits stating that when Watkins saw petitioner ducking, it was contemporaneous with the shooting sounds.

When Inv. Dill interviewed Anthony Watkins four days after the newspaper article appeared, Watkins told him that some things in the article were taken out of context, some things were omitted, and that the reporter actually fabricated the statement ending the article, "'They were out to get him, I think they knew it (was an injustice).'" Affidavit of Daniel A. Dill, dated

July 25, 2005; *see also* A.242-43. Watkins told Inv. Dill that he was facing the counter at the hot

dog shop when he heard the gunfire, and that everybody inside the shop either ducked or ran

when they heard it. *See id.*  Watkins told Inv. Dill that he did not see the shooting and did not see

anyone with a gun. *Id.* Watkins said that after the shots were fired, he saw petitioner "ducking

and running from the parking lot." *Id.*

### B.  Criminal Misconduct by the Police, the Prosecutor, and Prosecution Witnesses

A crucial component of Dixon's claim of actual innocence are several alleged instances

of perjury and criminal misconduct on the part of part of individuals acting on behalf of the

prosecution. As an initial matter, I note that Dixon labors under a serious misapprehension of

what of what constitutes perjury.  "Minor inconsistencies alone do not constitute perjury, but

merely present a credibility question to be resolved by the jury." *United States v. Laza*, No. 92

Cr. (CSH),1993 WL 438910, at *3 (S.D.N.Y. Oct. 28, 1993) (citing *United States v. Bortnovsky*,

879 F.2d 30, 33 (2d Cir.1989) (inconsistencies in witness' prior and current testimony should be

resolved by the jury); *United States v. Sprayregen*, 577 F.2d 173, 175 (2d Cir. 1978) (differences

between testimony of two government witnesses properly placed before the jury); *United States

v. Passero*, 290 F.2d 238, 245 (2d Cir. 1961) (discrepancies between witness' prior and current

testimony do not amount to perjury); *United States v. Miranne*, 688 F.2d 980, 989 (5th Cir.1982)

(difference in testimony of government witnesses presented at most a credibility question for the

jury).*Campbell v. Greene*, 440 F. Supp.2d 125, 147 (N.D.N.Y. 2006) ("In the present case,

Campbell's claim of perjury is based upon discrepancies which he claims exists between the trial

testimony of prosecution witnesses and: a) such witnesses' grand jury testimony; and/or b)

-65-

Campbell's trial testimony. However, such discrepancies may well be the product of 'flaws of memory as opposed to perjurious statements.'") (quoting *United States v. Shoals*, No. 1:05-CR-64, 2006 WL 1457707, at *2 (N.D. Ind. May 23, 2006); internal citation to the record omitted). The fact that there may exist "'discrepancies and inconsistencies in the record are not 'proof 'that perjury was committed at trial.'" *Id.* (quoting *Edwards v. Dretke*, No. CIV.05-0526, 2005 WL 3504121, at * 6 (S.D. Tex. Dec.21, 2005) and citing *Johnson v. Walsh*, 01-CV-1651, 2005 WL 928616, at *16 (N.D.N.Y. Apr.20, 2005) (report and recommendation) ("The fact that the victim testified inconsistently may affect her credibility in the eyes of the jury, but it does not show that she was lying."), *adopted by Johnson v. Walsh*, 01-CV-1651 (Dkt. No. 26) (N.D.N.Y. May 13, 2005); *United States ex rel. Blumenberg v. Frey*, No. 04 C 3260, 2005 WL 326976, at *2 (N.D. Ill. Feb. 9, 2005) ("At most, the discrepancies in [witness's] testimony went to the weight of his testimony. It is the province of the trier of fact to resolve conflicts in testimony and to make credibility determinations"); *United States v. Huggins*, No. CR-03-091, 2004 WL 2434301, at *1 (D. Del. Oct.21, 2004) (stating that any discrepancies of record suggest, at most, misstatements, not perjury).

Since the only "proof" provided by Dixon in support of his claim of perjury is based upon inconsistencies in the testimony of some of the prosecution witnesses, as well differences between the testimony of prosecution witnesses and petitioner's witnesses' version of events, Dixon has not established that any of the testimony upon which his claim of actual innocence is based was, in fact, perjurious. Indeed, the Second Circuit has held that "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir.1995); *see also Moore v. Greiner*, 02-CV-6122, 2005 WL 2665667, at *13 (S.D.N.Y. Oct.19,

2005) ("At most, Petitioner has shown that [witness]'s grand jury and trial testimony regarding her apartment number were inconsistent, but inconsistencies between a witness's statements before a grand jury and at trial do not warrant the inference that the prosecutor knowingly used false testimony.").

Dixon's allegations in this regard are summarized in the following paragraphs. In this Court's opinion, Dixon has not come close to establishing, by a preponderance of the evidence, that any witness committed perjury. Rather, petitioner has simply pointed out inconsistences in the testimony of certain witnesses and described alleged discrepancies between the testimony and certain records. At best, all petitioner has shown that there are minor inconsistencies based on differences in witnesses' perceptions, the frailty of human memory, and simple ministerial errors. As a matter of law, this is insufficient to establish that perjury was committed.  In addition, Dixon has offered no plausible motive or explanation as to why the prosecutor and the police officers in question would engage in a conspiracy and commit perjury, subjecting themselves to possible criminal liability, in an attempt to secure Dixon's conviction.

## 1.   Detective Frank Tucci's "Perjury"

Petitioner accuses the prosecutor of suborning perjured testimony from Detective Frank Tucci ("Det. Tucci") who performed an investigation of the crime scene at the prosecutor's behest. Pet. at 8. An issue at petitioner's trial was the distance from which Sullivan saw and recognized petitioner as the shooter. Sullivan estimated the distance to have been from 100 to 150 yards. T.124. Det. Tucci was asked by the prosecutor to measure the distance from lamppost #1180, behind where Sullivan saw petitioner, to lamppost #1155, behind where the shooting of Torriano took place. Det. Tucci testified that he measured the distance to be 86 yards, which

notably was less than Sullivan's estimate of the distance from which he viewed petitioner. T.491.

Five months later, at Brown and Jarmon's joint perjury trial, Det. Tucci testified that he had made a map of the crime scene a year previously. However, Det. Tucci stated that he had not–at that time or subsequently–made any measurements of the scene. PT.47-48, 51. Petitioner claims that this inconsistency proves not only that the Det. Tucci perjured himself at petitioner's trial, but also that the prosecutor knew of the perjury. I agree with respondent that petitioner is mistaken that perjury "is established whenever a person gives inconsistent testimony, regardless of whether there might be  another explanation, such as the frailty of human memory." Resp't Mem. at 72 (Docket No. 15).

In any event, as respondent points out, petitioner always could have had a private investigator visit the crime scene and do the measurement for himself or herself. This he apparently has not done, however.[24]

### 2.    Officer James Diegelman's "Perjury"

At petitioner's trial, Officer Diegelman testified that he arrived at the scene of the shooting immediately after and "found" a revolver which he turned over to Detective Henry Smardz ("Det. Smardz") of the Buffalo Police Department. T.384-386. Officer Diegelman also testified that no witnesses volunteered any information "worthwhile saving or reporting." T.399. As noted above, Fisher testified at Brown and Jarmon's perjury trial that he "found" the revolver,

---

[24]        Respondent indicates that on July 12, 2005, Inv. John Cleary of the Erie County District Attorney's office measured the distance. Lamppost #1180 no longer exists; it was replaced by lamppost #1188, which is farther away from #1155 than lamppost #1180 was. The distance between lamppost #1188 and lamppost #1155 is 91 yards, five yards more than the distance Det. Tucci measured from the closer lamppost, #1180. *See* Affidavit of Inv. John Cleary, dated July 19, 2005. A computer measurement of the distance, based on aerial photography, shows the distance to be 270.55 feet, or close to 90 yards. *See* Affidavit of Inv. Daniel A. Dill, dated July 27, 2005. Respondent has submitted the original map created by Det. Tucci, showing the lampposts; the photographs of the lampposts, taken by Inv. Cleary; and the computer-generated aerial photograph.

-68-

and pointed it out to a police officer who retrieved the weapon. From this, petitioner concludes

that Officer Diegelman committed perjury with the prosecutor's knowledge of the prosecutor.

PT.585-86. Again, this claim is specious. Petitioner employs no legal analysis to support his

claim. He is apparently under the belief that perjury is committed whenever two witnesses

disagree, although it is not apparent why he believes Officer Diegelman and not Fisher is guilty

of perjury, let alone why he believes the prosecutor knew of the alleged perjury. Nor does

petitioner explain what difference it would make anyway. Diegelman also testified that he gave

the gun to Det. Smardz. Yet Det. Smardz, in a certified report of his, read to the grand jury, states

he received the gun from Officer Diegelman's partner, Officer Rochelle Brown. A.154-55. Also,

in a police report dated August 10, 1991, the reporting officer said he "was informed" that

Officer Brown had the weapon and he told her to maintain possession until it was picked up by

the evidence unit. A.152. From this, petitioner concludes that Officer Diegelman further perjured

himself with the knowledge of the prosecutor. It is possible that Officer Diegelman could have

been using imprecise language when he said he "gave" the gun to Det. Smardz through Officer

Brown as an intermediary; or that Officer Diegelman's memory was faulty about the trivial

detail; or that Det. Smardz and the police report were mistaken; or that Officer Brown, Officer

Diegelman's partner, caused a misunderstanding somehow. In fact, the report submitted and

signed by both Officers Diegelman and Brown reflects that they considered the finding and

transmission of the evidence to be a joint effort. A.226.

      As respondent correctly notes, chain of custody was not an issue at trial–identification

was.  This Court cannot discern from petitioner's pleadings how the issue of who "found" the

gun is even relevant, let alone proves his innocence.

### 3. Emil Adams' "Perjury"

This Court has already discussed the alleged coercion of Adams by the prosecution, *supra*, in the context of evaluating Adams' trial evidence. Dixon also suggests that Adams might have committed perjury when he testified that petitioner was accompanied by a second gunman, one who had a handgun. This is because, petitioner asserts, Adams' testimony supposedly conflicted with the prosecutor's theory of the case. Pet'r Br. at 27; T.150-51. First, the Court does not agree, based on its reading of the trial transcript, that there was the conflict that Dixon asserts. The prosecutor in his summation addressed the issue of the second gun,[25] and attributed the weapon to the gunman (whose identity remains uncertain) was seen walking up to the scene with petitioner. T.593. There was no conflict between the prosecutor's theory of the case and Adams' observations which could give rise to a potentially colorable basis for charging Adams with perjury. Furthermore, Dixon has not provided any legal precedent supporting his contention that a witness comments perjury when he or she gives testimony that does not support the prosecution's theory of the case.

### 4. The "Official Threats" Against Lamarr Scott

When Scott was interviewed in 1993, he was never asked why he testified at the grand jury proceeding that Dixon was the shooter. Five years later, in 1998, while he was serving a lengthy term of imprisonment for his involvement in an unrelated shooting, Scott, for the first time, accused the prosecutor (A.D.A. Belling) and a police officer (Det. Mark Stambach) of threatening his life and coercing him into fingering petitioner as the shooter. A.139. Tellingly,

---

[25] Whoever was with Dixon at the time of the shooting left the gun behind. The record does not reflect whether that gun was deliberately left at the crime scene for the officers to find or dropped in haste as the person was fleeing.

Scott has never provided any details regarding the nature of the alleged death threats, by whom or how they were communicated, or why the prosecutor would have been motivated to "coerce" him into falsely proclaiming his innocence.

Back in 1993, when the alleged death threats were supposedly alive in his mind, Scott said nothing. Interestingly, when asked by his lawyer in 1998 how the authorities could have made the mistake of accusing petitioner of the shooting, Scott belatedly adopted the very explanation that petitioner's trial counsel had argued–that there was so much "confusion" during the shooting melée that six eyewitnesses, including three who identified petitioner were unable to discern what really was happening. A.31-33.

Scott's claim that the authorities were threatening his life in order to force him to inculpate Dixon is, in this Court's opinion, simply not believable. Scott has come forward with no proof of these alleged threats apart from his bald, unsupported assumptions. It is telling that Scott did not mention the purported death threats to the attorney assigned to represent him in connection with his giving testimony at the grand jury proceeding in Dixon's case.[26] Assigned counsel stated that he met with Scott in person on January 10, 1992, two days before Scott's grand jury testimony. He then spoke to Scott on four separate occasions on the telephone before Scott's appeared before the grand jury to testify. And, the attorney was present with Scott during his grand jury appearance and testimony. I agree with respondent that considering the intense consultation Scott had with counsel before he gave his testimony naming petitioner, the

---

[26]    The court clerk's notes indicate that on January 9, 1992, Justice Joseph McCarthy assigned John Molloy "for witness Lamarr Scott." A.257. Mr. Molloy confirms as much in an affidavit dated July 19, 2005. Affidavit of John J. Molloy, dated July 19, 2005. Mr. Molloy bases his affidavit largely on information and belief, and upon a review of his file.

plausibility of the purported death threats evaporates. Respondent argues that Dixon's statement in his grand jury testimony as to why he came to name petitioner as the shooter "has the truthful ring of an uncomfortable realization." Scott testified, "I wanted to help him, but I see I cannot help him." In this respect, petitioner's unwavering insistence on the justification defense as key to his actual innocence claim is understandable. Scott testified in the grand jury that petitioner's father convinced him he would do less time because he had a clean record and petitioner did not. The only way to make sense of this is if Scott had been assured by petitioner's father that Scott could beat murder charges with a justification or accident defense. Scott told the grand jury this about petitioner's father:

> He came to me. He told me, he said[,] LaMarr, talking to me is like talking to Tino. Whatever you say to me, you know Tino is going to go with the same thing. He was my friend, Tino. That's the only reason I did it. I wanted to help him but I see I can't help him.

1/13/92 GJ.70. A reasonable interpretation of Scott's comment is that he was told by petitioner's father that petitioner would back up Scott's claimed justification defense. However, after speaking with his attorney in preparation for testifying at the grand jury, it is likely that it became apparent to Scott that this scheme would not pan out, and that Scott's efforts to help petitioner by taking the blame were fruitless.

### 5.  A.D.A. Christopher Belling's "Perjury"

At the grand jury proceeding, A.D.A. Belling advised the jurors that the bullet which hit Jarmon during the gunfight created a "through and through" wound from which no bullet was

-72-

recovered "that [they] can match with anything." A.160.[27] Dixon now accuses the prosecutor of

committing perjury in stating those words. *See* Pet'r Mem. at 32-33. Petitioner made the same

accusation of perjury against the prosecutor in his C.P.L. § 440.10 motion. *See* Pet'r C.P.L. §

440.10 Motion, ¶¶ 210-216. He did so, however, in a somewhat different context. There, Dixon

claimed that the injury Jarmon suffered on August 10, 1991, was not a "through and through"

wound, but rather left a bullet in Jarmon's body. Attorney McPhee, who represented petition in

connection with that motion affirmed that Jarmon had recently died in 2002, that the autopsy

revealed a bullet lodged in his body, and "scientific analysis proves that the bullet is consistent

with a .32 caliber gun." *Id.*, ¶214 (emphases omitted). Petitioner argued that the recovery of the

.32 caliber bullet from Jarmon's corpse verified the story urged by Jarmon and petitioner that

petitioner did not shoot him, and that Torriano shot Jarmon with the .32 caliber gun found at the

scene, wounding him (Jarmon) and justifying Scott's killing of Torriano in self-defense. The

source of Attorney McPhee's statement that the extracted bullet was a .32 caliber, was a letter

written by another attorney, Kimberly F. Duguay of Rochester, New York.  As Attorney McPhee

states, Attorney Duguay had written to petitioner on May 28, 2002. The following excerpt from

Duguay's letter was the basis for petitioner's accusation of "perjury":

> I am very upset to hear of Mario's [i.e., Jarmon's] death. Ironically, it appears the
> bullet that killed him was the bullet he received during the shooting involved in
> your case . . . I spoke with Roger[28] yesterday. It is my understanding that there has
> been an analysis and the initial analysis seems to prove that the bullet is consistent
> with a .32 caliber gun.

---

[27] The prosecutor was referring to Jarmon's medical records at the time. Jarmon's medical records
are not a part of the record in this case, however.

[28] Presumably, this reference is to defense investigator Roger Putnam.

A.161. Thus, to make the accusation of criminal conduct against the prosecutor, petitioner's only support is a letter written by another attorney who cited "Roger" as the source of the information essential to the claim. Respondent points out that the laboratory report upon which "Roger" allegedly based his report was available five weeks before attorney Duquay's letter to petitioner, and more than a year and seven months before petitioner's C.P.L. § 440 motion. A.236. The report, dated April 23, 2002,[29] does not contain any indication that Jarmon had a .32-caliber bullet taken from his corpse. Rather, it appears that Jarmon had two wounds, an "old" one and a "new" one. Petitioner has adduced no evidence that the "old" wound was the one Jarmon received on August 10, 1991. Even assuming it was, the report states the extracted bullet was of "the 38/9mm class," which contradicts petitioner's assertion that the bullet was from the .32-caliber gun allegedly carried by Torriano. I agree with respondent that the report actually supports the prosecutor's theory that it was *petitioner* who shot Jarmon with the 9mm weapon as petitioner initially sprayed bullets into the crowd.

Now, however, petitioner has abandoned his claim that the prosecutor's "perjury" prevented the discovery of a bullet in Jarmon's body, which purportedly would have bolstered his justification claim. Petitioner's present claim is merely that the prosecutor committed perjury because it allegedly was not a "through and through" wound Jarmon suffered but rather was a wound with an embedded bullet. According to petitioner, the purpose of the prosecutor's alleged "perjury" at the grand jury, when he stated that Jarmon suffered a "through and through" bullet

---

[29]     Petitioner received a fax dated September 9, 2003, which contained the report number, and the name and telephone number of the person who issued the report. A 225. That was two months before he filed his motion to vacate and fifteen months after Duguay wrote to petitioner.

wound on August 10, 1991, was to prevent anyone from discovering the truth of the bullet's existence and "to secure the indictment charging the Petitioner with the killing of Torriano Jackson and, wounding Sullivan and Aaron Jackson." Pet'r Mem. at 32-33. As respondent points out, petitioner fails to explain how, under any circumstances, the indictment charging him with the murder of *Torriano* was more easily attained by the supposed "perjury" of stating that *Jarmon* suffered a "through and through" bullet wound. Moreover, in this Court's opinion, Dixon has failed to demonstrate that the prosecutor committed perjury at any time during Dixon's criminal proceeding.

### 6. The "Suppression" of Evidence

Petitioner asserts the prosecution "suppressed"evidence supporting petitioner's claim that the shooting was preceded not by a fistfight, but by "a premeditated gunfight between at least three individuals." Pet'r Mem. at 33 (Docket No. 3). This allegation is based on a police report in which Officers Diegelman and Brown recount[30] that they recovered four 9mm bullets, twenty-seven spent casings, and "a small caliber gun believed to be a .22 cal[iber] silver in color . . . containing one spent casing in the gun." A.226. Because this supposed .22 caliber gun was never produced, petitioner alleges that it was suppressed by the prosecution. He argues that the .22, along with the .32, corroborated his contention that the Jacksons came out of their car shooting at petitioner and his friends.

Respondent points out that the .22-caliber gun was never produced because it never existed. As Officer Diegelman explained at petitioner's trial, he picked up the .32-caliber, silver, chrome-plated gun, thinking it was a .22-caliber gun. T.386, 397. Officer Diegelman said that he

---

[30]    Officer Rochelle Brown did not testify at trial.

was later told it was a .32-caliber gun. T.386. Officer Diegelman's misapprehension explains

why in the report he said he and Officer Brown recovered a .22-caliber gun. Significantly,

Officers Diegelman and Brown's report did not mention the .32-caliber gun, which petitioner

does not dispute was handled by Officer Diegelman. It did not mention the .32, because the .22

the officers did mention was actually the .32.

Officer Diegelman also testified that the gun he recovered had a single fired round, and

the gun Det. Smardz says he obtained at the scene had a single fired round. T.386-387, 398,

457-458. Two other police reports, one dated August 10, 1991, and the other August 12, 1991,

both mention a .32-caliber gun and do not mention a .22-caliber gun. *See* A.6, 52. The evidence

jacket, property report, and evidence report, all dated August 10, 1991, also mention only a .32-

caliber gun. A.227-229.

I agree with respondent that the evidence in the record, taken together and viewed in

context, supports the conclusion that it was a was a simple human error on the officer's part

which resulted in the .32-caliber gun found at the scene being mistakenly described as a .22.

Dixon's argument that there was "suppression" of a .22 22-caliber gun relies upon factual and

logical contortions and inferential leaps, rather than substantive, credible facts.

### C.     The Results of the "Voice-Stress Analysis" Test

In 2005, Dixon, represented by attorney Gregory McPhee, Esq., retained one Melvin

Plummer, who conducted "voice stress analysis" testing on Dixon and his half-brother, Shannon.

Dixon makes somewhat contradictory claims about the probative value of the test results. On the

one hand, Dixon contends that the results of voice-stress analysis tests undergone by himself and

eyewitness Antoine Shannon in 2005 (some thirteen years after the incident) "exonerate" him

-76-

and "reveal[ ] the petitioner is innocent." Pet'r Br. at 4, 7 (Docket No. 4). In the next breath, however, Dixon argues that this "scientific evidence . . . *combined* with the potential exculpatory testimony of six eyewitnesses, the confession of Lamarr Scott never introduced at trial, the suppression of *Brady* material, the perjured and contradictory testimony of the prosecution's witnesses, and the nondisclosed physical evidence discovered by police at the crime scene deprived Petitioner Dixon of a fair trial and resulted in the conviction of an innocent man." Pet'r Br. at 4-5 (emphasis supplied). After reviewing Dixon's submissions concerning the "voice stress analysis" testing, the Court recommends finding, for the reasons discussed below, that they are not reliable.

In his Brief, Dixon states that he seeks to introduce "two voice detector stress tests"[31] which "fulfill the *Daubert*[32] standard for scientific evidence" because, he claims, "DVSA [voice stress analysis testing] accurately determines the veracity of the examinees." Pet'r Br. at 4 (Docket No. 4). According to Petitioner, the voice-stress analysis is "more advanced" than a traditional polygraph test. Trav. at 3 (Docket No. 18). However, petitioner provides no citations or support for these bold contentions, and he does not actually address *Daubert* or Federal Rule of Evidence 702, which governs the admissibility of expert scientific evidence. Nor does Dixon provide any particulars about the circumstance surrounding the procedures or explain the

---

[31]     The New York Court of Appeals has noted that "[i]ts purpose, like that of the polygraph or "lie detector", is to measure certain physiological manifestations of stress which commonly are thought to accompany untruthful or evasive answers. While a polygraph records changes in respiration, blood pressure, heart rate and the skin's resistance to electric current, the theory of the voice stress test is that the utterance of false responses causes involuntary nervous reactions which are manifested by inaudible frequency modulations in the human voice detectable with the aid of a device known as the voice stress evaluator." *People v. Tarsia*, 50 N.Y.2d 1, 6 (N.Y. 1980) (internal citations omitted).

[32]     *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)

scientific principles behind voice stress analysis.

Although a habeas petitioner is not bound by the rules of evidentiary admissibility in presenting alleged new evidence of actual innocence, he nevertheless must be able to establish that the evidence is "reliable," *Schlup v. Delo*. The Court finds it significant that Dixon discusses the results of the voice-stress analysis tests under the heading "Polygraph Evidence" in his briefs to this Court. No federal court has held that as a constitutional matter, polygraph evidence must be admitted in any criminal trial, or that polygraph evidence is reliable. *See United States v. Scheffer*, 523 U.S. 303 (1998) (finding there is no consensus among jurisdictions that polygraph evidence is reliable). Voice stress tests and psychological stress tests have fared no better in the courts. *See State v. Arnold*, 533 So.2d 1311, 1314 (La. App. 3d Cir. 1988) ("The Louisiana and Federal courts have both had occasion to examine the admissibility at trial of PSE [Psychological Stress Evaluator] results. In *State v. Thompson*, 381 So.2d 823 (La.1980) and *United States v. Traficant*, 566 F. Supp. 1046, 1047 (E.D. Ohio 1983), the courts found that the long line of cases which reject the admissibility of polygraph test results at trial is analagous [sic].").[33] Indeed, the

---

[33] *See also United States v. Bothwell*, 17 M.J. 684, 688 (A.C.M.R. 1983) (noting "the weight of case law, empirical data and articles in legal journals generally placing PSE in the "experimental" rather than the "demonstrable" stage) (citing *United States v. Traficant*, 566 F. Supp. 1046 (N.D. Ohio 1983) (PSE has not gained general acceptance); *Virgin Islands v. Leycock*, 93 F.R.D. 569 (D.C. Virgin Islands 1982) (PSE "probably viewed by courts" with even greater disdain than polygraphy); *People v. Tarsia*, 50 N.Y.2d at 8 (reliability of PSE not established even to degree of that of polygraphy); *Smith v. State*, 31 Md.App. 106, 355 A.2d 527, 535-536 (1976) (polygraph evidence generally inadmissible, *ipso facto* so is PSE evidence; "a lie detector test by any other name is still a lie detector test"); *State v. Thompson*, 381 So.2d 823 (La. 1980) (PSE results inadmissible on basis of prior cases holding polygraph results inadmissible); *State v. Schouest*, 351 So.2d 462 (La. 1977) (no showing of reliability of voice stress tests, similar to PSE); *Simon Neustadt Family Center v. Bludworth*, 97 N.M. 500, 641 P.2d 531 (1982) (noting a diversity of opinion concerning the reliability of PSE; admission of PSE (i.e., psychological stress evaluation) testimony within sound discretion of trial court); Hearings on the Use of Polygraphs and Similar Devices by Federal Agencies before the Subcommittee on Foreign Affairs and Government Information of the House Committee on Government Operations, 93d Cong., 2d Sess. 220-354, 428-433, 503-555 (1974) (reprinting studies with divergent conclusions on PSE reliability); Kenety, The Psychological Stress Evaluator: The Theory, Validity and Legal Status of an Innovative "Lie Detector", 55 IND. L. J. 349, 357-362, 374  (1980) (further testing is needed to resolve controversy surrounding validity and reliability of PSE); Horvath, The Promise and Reality of Voice Stress Analysis, 27 J. FORENSIC SCI. 340, 342 (1982); Note, The Psychological Stress Evaluator: Yesterday's

general consensus in the courts appears to be that is that the scientific validity of voice stress tests is even *less* established than that of polygraph testing. *See People v. Tarsia*, 50 N.Y.2d at 8 ("[A]uthorities on voice stress analysis tend to agree that test is not reliable.") (citing Moenssens and Inbau, SCIENTIFIC EVIDENCE IN CRIMINAL CASES (2d ed.), § 15.14; Link, DETECTION THROUGH VOICE-ANALYSIS, 3 MILITARY POLICE LAW ENFORCEMENT J., pp. 38, 40). As one court has pointedly observed about the voice stress test, "[a] lie detector test by any other name is still a lie detector test." *Smith v. State*, 31 Md. App. 106, 120) (cited in *People v. Tarsia*); *see also People v. Santana*, 159 Misc.2d 301, 304, 604 N.Y.S.2d 1016, 1018 (N.Y. Sup. Ct. 1993) ("In determining the admissibility of hypnosis as direct evidence, hypnosis has been lumped into the same category of scientific procedures such as polygraph or voice stress tests which claim to establish the veracity of the subject's statements. Historically, this jurisdiction as well as others has held these types of scientific procedures to be inadmissible as a result of their general unreliability.") (citing *People v. Leone*, 25 N.Y.2d 511, 307 N.Y.S.2d 430, 255 N.E.2d 696 (N.Y. 1969) (holding that polygraph test results inadmissible); *People v. Tarsia*, 50 N.Y.2d at 8 (holding that voice stress tests not reliable); *People v. Adams*, 53 Cal. App.3d 109, 125 Cal. Rptr. 518 (1975) (holding that statements induced by "truth serum" held inadmissible).

## V.     The Alleged New Evidence of "Actual Innocence" Under the *Schlup* Standard

The Supreme Court explained in *Schlup v. Delo* that "[i]n assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial . . . [but may] consider the probative force of relevant evidence that was

---

Dream-Tomorrow's Nightmare, 24 CLEV. ST. L. REV. 299 (1975); Note, The Psychological Stress Evaluator: A Recent Development in Lie Detector Technology, 7 U. CAL. D. L. REV. 332 (1974)).

either excluded or unavailable at trial." 513 U.S. at 327. Moreover, the habeas court must make

its determination "in light of all the evidence, including . . . . evidence tenably claimed to have

been wrongly excluded or to have become available only after the trial." *Id.* at 328. "To be

credible, [a claim of actual innocence] requires petitioner to support his allegations of

constitutional error with new reliable evidence–whether it be exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Id.*

at 324.

      To establish the requisite probability of a different outcome, the petitioner advancing a

claim of actual innocence must show that it is "more likely than not that no reasonable juror

would have convicted him in light of the new evidence." 513 U.S. at 327. It bears repeating that

"actual innocence" means factual innocence, not mere legal insufficiency. *Bousley v. United

States*, 523 U.S. 614, 623 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

The Supreme Court explained that

> [t]he meaning of actual innocence as formulated by *Sawyer*, and *Carrier* does not
> merely require a showing that a reasonable doubt exists in the light of the new
> evidence, but rather that no reasonable juror would have found the defendant
> guilty. It is not the district court's independent judgment as to whether reasonable
> doubt exists that the standard addresses; rather the standard requires the district
> court to make a probabilistic determination about what reasonable, properly
> instructed jurors would do. Thus, a petitioner does not meet the threshold
> requirement *unless* he persuades the district court that, in light of the new
> evidence, *no juror, acting reasonably, would have voted to find him guilty beyond
> a reasonable doubt.*

*Schlup*, 513 U.S. at 329 (emphases supplied). In other words, "the use of the word 'would'

focuses the inquiry on the likely behavior of the trier of fact. In addition, under standard

described in *Schup*, "the newly presented evidence may indeed call into question the credibility

-80-

of the witnesses presented at trial" and therefore "the habeas court may have to make some credibility assessments," which is different than what occurs in assessing legal sufficiency of the evidence on habeas review.

### A.     Reliability of the new evidence of innocence

In addressing the evidence upon which a claim of actual innocence is based, I must preliminarily assess the reliability of the evidence proffered by petitioner in light of all of the evidence in the record, admissible or not. *Menefee*, 391 F.3d at 161. It appears to this Court that petitioner's counsel has taken the "shotgun" approach and has let fly a barrage of information. The problem is that he does not and cannot demonstrate its reliability, much less weave it into a coherent narrative of events. As an initial matter, Dixon has offered no basis whatever for this Court to find his voice stress analysis test results to be anything other than a polygraph-in-sheep's clothing, and wholly unreliable.

With regard to the witnesses who offered testimonial statements of petitioner's behalf, the Court has noted, in the context of its discussion of each of the items of new evidence and testimony, that there are many instances of witnesses being both internally inconsistent, as well as totally contradictory of other witnesses' testimony. The Court has also pointed out instances where the various witnesses seem to be concocting their stories out of thin air, or at least embellishing their recollections to suit petitioner's purposes. In this Court's view, petitioner's witnesses' stories appears contrived. The Court believes that with regard to Scott, in particular, his verboseness cannot obscure the fact that his various stories simply do not make sense. Excluding the testimony of the six prosecution witnesses, and further excluding the grand jury testimony of Scott inculpating petitioner, the inconsistencies and implausibilities in petitioner's

evidence are so numerous that the various pieces, considered singly or together, would strike any rational person as suspect.

The Court will take Lamarr Scott as an example. Six individuals, including the three who identified petitioner, described the shooting in a way fundamentally contradictory to each of the five exculpatory statements Scott made. Petitioner cannot account for the fact that three people testified that they watched the shooting either as a victim (Aaron and Sullivan) or as a close bystander (Adams), recognized him, and identified him as the shooter. Thus, even isolating Scott's exculpatory statements (which, incidentally, cannot be reconciled with each other) and considering what he said and how, the Court cannot escape the conclusion that none of Scott's "favorable" statements are reliable. This is so, despite the fact that innocent people typically do not confess to murder–as respondent has pointed out. It appears that when Scott realized the gravity of the situation into which petitioner's family had gotten him by convincing him to be the "fall guy," Scott identified petitioner as the shooter, in the only of his statements (his grand jury testimony) that makes sense. In contrast, Scott's five exculpatory statements, taken together, compel the conclusion that he agreed to play a part in petitioner's deceptive enterprise from the beginning. After backing out when the stakes got too high, he agreed to play again once his own 25 to 50-year sentence for attempted murder and armed robbery left him with nothing to lose.

As respondent points out, Dixon has never come out and presented a single, coherent description of what happened on August 10, 1991, based on the evidence he says proves his actual innocence. It is impossible for him to do so, because there is no way he could show the reliability of the many versions of the event he presents.

**B.    The probability of a reasonable juror reaching a different result**

In light of my recommendation that none of Dixon's new evidence of actual innocence is even marginally reliable, it is not necessary to apply the *Schlup* "no reasonable juror" standard. However, I also recommend finding that, presented with all the evidence, at least one reasonable, properly instructed juror would find petitioner guilty beyond a reasonable doubt. *Doe v. Menefee*, 391 F.3d at 163. This is because there is a simple and direct line of reasoning which leads to the conclusion that Dixon pulled the trigger on the gun that killed Torriano and wounded Aaron.

First, three witnesses testified for the prosecution, under oath, that Dixon was the shooter. These three witnesses, and three additional eyewitnesses each told a similar version of events: there was an argument followed by a physical altercation between the Jackson brothers, Jarmon, Shannon, and Brown. None of the participants had guns, according to these six witnesses. Moreover, they all testified that no shots were fired during the fight by any of the young men who were fighting. Eventually, a gunman with an automatic weapon approached the fight and started firing. This person did not approach immediately as the confrontation began. When he did arrive, he sprayed bullets into the crowd to scatter them, shot at Aaron as he tried to get into Powell's car, and then executed Torriano as he lay in the street. As noted above, three of the six prosecution eyewitnesses identified petitioner as the shooter. All three knew petitioner and had previously seen him in the area. Two of those witnesses chose petitioner from a photo array very soon after the incident, and the third chose petitioner a couple of days later. None of the six have ever been shown to have any motive to falsely accuse petitioner. Even given due weight to the reliability issues raised by defense counsel during his cross-examination of Sullivan (e.g., his drug use earlier in the day) and Jackson (e.g., his alleged vacillation regarding his degree of certainty about Dixon being the killer), Dixon has failed to meaningfully discredit their

-83-

testimony. With regard to the third identifying witness (Adams), Dixon's challenge to his credibility does not bear up under scrutiny, based as it is on an unsworn, undated "affidavit" that contains statements Adams denied ever making.

In contrast to the six eyewitnesses who testified for the prosecution, petitioner's witnesses contend that the shooting occurred in a dramatically different way–how it happened, however, depends upon which of petitioner's witnesses one chooses to believe. These witnesses frequently contradict themselves as well as each other, making it impossible to piece together a cogent narrative from their statements.

The issue of who actually had a weapon illustrates the incoherence of petitioner's position. Prosecution witnesses Jackson, Powell, Sullivan, Stancil, and Lewis all said nobody had a weapon except the killer. Prosecution witness Adams said no one had a weapon, but he recalled seeing Aaron with what appeared to be a roll of quarters or a battery in one hand. Petitioner's witness Frida also said no one had a weapon except the killer. Petitioner's half-brother, Brown, told police immediately after the shooting that no one had a weapon except the killer.

However, five months later, and after petitioner father (Robert Bryant) and Scott had confabulated the story exculpating petitioner, Brown testified that the killer *and* Torriano, the murder victim, each had a weapon. Scott and petitioner's half-brother, Shannon, stated that the killer had a weapon and Torriano had a silver .38-caliber gun. Dixon has claimed that Torriano shot Jarmon two or three times. Jarmon said that Torriano, the victim, had a gun *and* Aaron had a boxcutter.

Looking at the conflicting testimony given by petitioner's witnesses on this issue, one can only conclude that some of the witnesses are telling the truth and some are not. Brown

-84-

contradicts himself, and the other witnesses (e.g., Frida and Scott, contradict each other). All of petitioner's witnesses except Frida contradict the six eyewitnesses presented by the prosecution. I agree with respondent that a reasonable juror would be able to easily reject petitioner's witnesses because they frequently appear to be telling deliberate falsehoods. The only explanation for the widely differing stories is that someone is telling the truth and someone is deliberately not. Dixon has not informed the Court *which* of his witnesses should be believed, however.

Leaving aside the morass created by the defense witnesses' testimony on the issue of who had a weapon, I turn to the physical evidence. This, however, not only fails to shore up petitioner's witnesses, but directly undermines their story about the victim shooting Jarmon. Although there was a second gun (the .32-caliber handgun) found at the crime scene, the only evidence linking it to Torriano was the testimony offered by four of petitioner's witnesses–Scott, Jarmon, Brown, and Shannon. Prosecution witness Adams, on the other hand, testified that the person who approached the fight with petitioner had a gun in his hand as he and petitioner walked up the street. In all likelihood, the companion described by Adams was either Scott, Shannon, or Brown. And, in all likelihood, the .32-caliber gun found at the scene was dropped by this unidentified individual.

Furthermore, the prosecution's ballistics evidence undercuts Dixon's contention that Torriano used the .32-caliber gun to shoot Jarmon. The ballistics expert testified that the .32 had one fired round and four unfired rounds in the five-round cylinder. T.506. This was the condition of the gun when it was recovered at the crime scene. T.458. The expert also found that the .32 had a defective hammer which did not return to its original position–which was necessary to advance the cylinder and permit the user to fire another shot. When the gun was retried, the

hammer was *not* in the requisite forward position, which means that Torriano could not have used the .32 to shoot Jarmon two or three times. *See* T.508-09.

The bullet recovered from Jarmon's body after he died is additional physical evidence contradicting Dixon's claim that Torriano shot Jarmon. That bullet was of the 9mm variety, which supports the prosecution's theory that Dixon shot Jarmon while peppering the crowd with bullets to clear them away.

### C.   Summary

The Court is mindful of the Supreme Court's admonition in *Schlup* that a petitioner's attempted showing of innocence "is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." 513 U.S. at 331. In order to pass through the gateway of actual innocence, a petitioner must "persuade[ ] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329. In truth, this Court believes that it would not have been rational for a juror to have voted to acquit Dixon, for neither logic nor reason can reconcile petitioner's new evidence into a sensible narrative. When one considers the new evidence in conjunction with the evidence at trial, the dissonance becomes yet more pronounced.

### VI.   Merits of Petitioner's Habeas Claims

In the alternative, the Court recommends finding that none of Dixon's habeas claims, when considered on the merits, warrant habeas relief. As he did in his 2003 C.P.L. § 440.10 motion to vacate the judgment, Dixon here contends that trial counsel was ineffective on several grounds. Dixon also alleges prosecutorial and police misconduct. The trial court rejected all of these claims on the merits in a thorough and well-reasoned decision and order. *See* County

Court's August 30, 2004 Order Denying C.P.L. § 440.10 Relief, attached as part of Exhibit D in

Respondent's Appendix of Exhibits ("the C.P.L. § 440.10 Order").

### A.  Standard of Review for Federal Claims "Adjudicated on the Merits" in State Court

A federal court may not grant habeas relief on a federal constitutional claim that has been

adjudicated on the merits in state court unless the state court's ruling "(1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established federal law;

or (2) resulted in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); *see also*

*Williams v. Taylor*, 529 U.S. 375-76 (2000).

Dixon's habeas claims were adjudicated on the merits by the state trial court in its

decision and order denying Dixon's C.P.L. § 440.10 motion. In light of the "adjudication on the

merits", the Court applies the deferential standard set forth in Section 2254(d)(1).

### B.  Analysis of Petitioner's Claims

#### 1.  Ineffective Assistance of Trial Counsel

The Supreme Court has recognized that the Sixth Amendment's guarantee of "the right to

counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S.

668, 686 (1984) (setting forth the "clearly established" legal principles applicable to claims

alleging ineffective assistance of counsel under the Sixth Amendment) (quoting *McMann v.*

*Richardson*, 397 U.S. 759, 771, n. 14 (1970)). To fulfill *Strickland*'s rigorous two-prong

standard, the petitioner first "must show that counsel's representation fell below an objective

standard of reasonableness." The Supreme Court has explained that "[j]udicial scrutiny of

counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Second, the petitioner must show that counsel's performance "prejudiced" the petitioner. That is, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

The Court now turns to a consideration of the errors assigned to counsel by petitioner. Dixon first contends that trial counsel's failure to call any witnesses was a serious error, because counsel had mentioned to the prospective jurors during jury selection that petitioner and other witnesses would be testifying for the defense. Dixon names nine eyewitnesses (all of whom are discussed above in this Report and Recommendation), whose identities were known by, or could have been discovered by trial counsel, who would have testified that Dixon was not the shooter. Second, Dixon faults trial counsel for failing to introduce into evidence prior sworn statements of three of the prosecution witnesses (Sullivan, Adams, and Aaron Jackson). Third, and interrelated with the first claim, is Dixon's contention that trial counsel failed to investigate and interview witnesses in connection with Scott's written confession and subsequent recantation in the grand jury, and failed to argue that Scott was the shooter.

### a. Failure to Seek to Introduce Witnesses' Prior Inconsistent Statements

In rejecting Dixon's ineffective assistance claim, the trial court found flaws in all of Dixon's arguments. Specifically, the trial court found "serious credibility issues with respect to

those witnesses who would have incriminated Lamarr Scott" as the shooter. *See* C.P.L. § 440.10 Order at p.4 (Resp't Ex. D). The trial court found that "any attempt to blame the shooting on Scott could well have backfired, in that the jury could have concluded that these witnesses had conspired to exonerate the defendant by blaming another individual." *Id.* (Resp't Ex. D). The trial court observed,

> It is difficult to reconcile the representation, purportedly made by counsel to the defendant's family just a few days before trial commenced, that Lamarr Scott would willingly admit to the shooting[,] with the fact that Scott recanted his confession in the grand jury. However, since Scott's grand jury testimony was not subject to compulsory disclosure, it is conceivable that counsel may have been unaware that Scott recanted his confession. In the alternative, Scott may have assured counsel that he would revert to his original version of the events and admit to the shooting. Regardless of what counsel told defendant's family, however, absent any evidence that Scott was then willing to admit to the crimes, the court finds that Scott's testimony would not have benefitted the defense.

C.P.L. § 440.10 Order at 4 (Respondent's Exhibit ("Resp't Ex.") D) (footnote omitted). As detailed above in its discussion of Scott's various and contradictory statements, this Court agrees with the trial court Scott would not have been a credible exculpatory witness.

Next, the trial court found Dixon's criticisms of trial counsel's handling of Adams', Aaron's, and Sullivan's prior statements to be unfounded. *See id.* In particular, the trial court found "[t]he failure of defendant's attorney to properly move the state of Emil Adams into evidence is of little import." C.P.L. § 440.10 Motion at 4 (Resp't Ex. D). As the trial court pointed out, defense counsel "vigorously attacked Adams' in court identification" of Dixon, and "successfully elicited that Adams could not presently describe the shooter's clothing or appearance," and that Adams agreed that Dixon was not "heavyset," as Adams had described the shooter in his statement.

-89-

With regard to Aaron Jackson, defense counsel conducted a powerful cross-examination of that witness, eliciting an admission that he told the police, "I cannot be sure" when he selected Dixon's picture during the photo array procedure. *Id.* at 4-5. I agree with the trial court that "[c]ounsel effectively juxtaposed Jackson's initial uncertainty with his ability to make a photo identification of the defendant in the grand jury and an in-court identification at trial, causing the witness to make the incredible assertion that his memory had improved over time." *Id.* at 5 (citing T.240-52). As the trial court found, it "was reasonable for counsel to conclude that Jackson's identification was sufficiently shaken, and that admitting the statement [made during the first photo array] itself would produce no added benefit." *Id.*

Turning to Sullivan, the third witness whom Dixon contends defense counsel mishandled, the trial court found that Sullivan's written statement was "remarkably consistent with his trial testimony." *Id.* Although Sullivan's statement described the shooter as approximately 6' tall, which was "substantially taller" than Dixon, it "confirm[ed] the circumstances of Sullivan's prior contacts with the defendant, and refer[red] to Sullivan's selecting defendant's photo from an array on the day the crimes were committed." *Id.* This Court wholly agrees with the trial court that, as a result, Sullivan's statement "was more damaging than beneficial," and therefore trial counsel "wisely did not seek to admit it into evidence. *Id.* A review of the trial transcript reveals that trial counsel's cross-examination of Sullivan focused on more fruitful areas of impeachment–namely, Sullivan's consumption of alcohol, marijuana, and cocaine; the fact that he was currently under indictment in Georgia; his vantage point during the shooting; and the fact that Sullivan only saw the shooter in profile. *Id.*

**b.     Failure to Call Exculpatory Witnesses**

-90-

In rejecting this aspect of Dixon's ineffectiveness claim, the trial court discussed the reasons trial counsel had for not calling the witnesses who "would have purportedly identified Lamarr Scott as the shooter or at least exonerated the defendant." C.P.L. § 440.10 Motion at 5 (Resp't Ex. D). As the trial court found, there was "clearly . . . a legitimate reason for not calling Mario Jarmon and Leonard Brown, as those individuals were then under indictment for falsely identifying Scott as the shooter" during the presentation of Dixon's case to the grand jury. *Id.*

With regard to Frida, Bland, and Williams, the trial court found that Dixon had failed to demonstrate that these three individuals were available witnesses. First, as the trial court pointed out, Frida did not identify the shooter during the course of the police investigation or at the intervening perjury trial of Jarmon and Brown. *Id.* at 5. At the perjury trial, Frida denied observing the shooting and could not identify anyone who was present, except Jarmon. *Id.* at 8. The trial court further found that her belated identification in 1998, years after petitioner's trial, of Scott as the shooter was not reliable and did not constitute newly discovered evidence. *Id.* at 8. Because Frida had, for many years, claimed to be unable to provide information, trial counsel could not be faulted for not calling her, "as the 'new evidence' set forth in her affidavit could not have been discovered with due diligence." *Id.* Moreover, as the trial court found, "[b]ecause Frida's affidavit [to defense investigator Putnam in 1998] is essentially a recantation of her testimony at the perjury trial . . . , it is inherently unreliable." *Id.* (citation omitted). Both as a matter of state and federal law, recantations are considered with great skepticism. Thus, even if Frida were to testify as Dixon hoped, the prosecution would have had compelling impeachment evidence against her–namely, "her inability or refusal to provide information to the police, her contradictory testimony at the perjury trial, and the fact that she waited some seven (7) years to

-91-

come forward . . . ." *Id.* (citations omitted).

With regard to the failure to call Michael Bland to exonerate petitioner and inculpate Scott, the trial court noted that during the grand jury, Bland testified that he did *not* see the shooter. Bland stated that he ran away as soon as he heard shots. And, he was not acquainted with Scott or petitioner. *Id.* (citing Peoples Exhibit B in Opposition to C.P.L. § 440.10 Motion). As was the case with Frida, Bland's purported statement to defense investigator Putnam[34] claiming that Scott was the shooter was essentially a recantation, "which the law recognizes as inherently unreliable." *Id.* (quotation omitted). Again, given these inconsistencies in Bland's pre-trial and post-conviction stories, the prosecution had fertile ground for impeaching Bland and his accusation of Scott. *See id.* at 6, 7. Trial counsel was reasonable in declining to call him as a witness.

As to trial counsel's decision not to call Dennis, Shannon, and Fisher, the trial court found that all three had some connection to Dixon that made them not wholly impartial witnesses. *See id.* at 6. Shannon was petitioner's half-brother. Dennis was the brother-in-law of Brown, petitioner's other half-brother. And, Fisher was friends with Jarmon and Brown. As the trial court found, it was reasonable for defense counsel to conclude that these relationships to petitioner "detracted" from their credibility. *Id.* Furthermore, Shannon's statement to the prosecutor, as detailed above in this Report and Recommendation, actually would have established a motive for shooting the Jackson brothers. *Id.* Again, trial counsel acted reasonably

---

[34]    On February 21, 2001, defense investigator Putnam interviewed Bland at Wyoming Correctional Facility, where Bland was incarcerated. Petitioner has submitted Putnam's affidavit, executed on May 23, 2001, purporting to memorialize his conversation with Bland. Notably, however, Bland refused to provide a sworn statement to Putnam. C.P.L. § 440.10 Motion at 7 (Resp't Ex. D).

in declining to put these witnesses on the stand for the defense.

      **c.**      **Reasonableness of Trial Counsel's Performance and Lack of Prejudice to Petitioner.**

In the foregoing paragraphs, this Court has detailed its agreement with the trial court's assessment of defense counsel's performance. This Court has reviewed the trial transcript in its entirety, as well as all of the alleged newly discovered evidence, and the trial court's conclusions are amply supported by the factual record. As discussed at length above, trial counsel had legitimate, strategic reasons for declining to follow the defense course subsequently claimed by Dixon to be the correct one. The trial court found that "[t]he record reflects that counsel conceived a viable defense strategy that was effectively implemented." C.P.L. § 440.10 Motion at 6. This Court agrees. The trial court pointed to defense counsel's "scathing cross examination of the People's eyewitnesses" in which he "challeng[ed] their ability to observe the shooting, contrast[ed] their physical description[s] of the shooter with the defendant's appearance, and elicit[ed] that Aaron Jackson did not accuse the defendant until some time afterward." *Id.* at 6-7. In addition, trial counsel "questioned the People's failure to call Mario Jarmon, . . . who could likely [have] provide[d] a motive for the shooting." *Id.* at 7. Defense counsel also "noted the delay or initial uncertainty in connection with the identification of defendant by various witnesses, even those who were acquainted with him." *Id.* Defense counsel put forward his own theory–that Sullivan and Aaron were actually shot by a third party with the .32-caliber handgun that was recovered at the scene. After highlighting these positive aspects of trial counsel's performance, the trial court concluded that "counsel provided the level of representation to which the defendant was constitutionally entitled[.]" *Id.* (citing *People v. Baldi*, 54 N.Y.2d 137, 141

-93-

(1981)).

It bears noting that the New York Court of Appeals has held that the standard it articulated in *People v. Baldi* is more generous to the defendant than the federal *Strickland* standard, because under *Strickland*, the defendant affirmatively must prove prejudice in addition to deficient performance. *See People v. Henriquez*, 3 N.Y.3d 210, 230 (N.Y. 2004) ("One major difference between the New York standard and the standard announced in Strickland v. Washington is the way that prejudice is analyzed (*see Stultz*, 2 N.Y.3d at 284, 778 N.Y.S.2d 431, 810 N.E.2d 883). Th[e *Henriquez*] Court indicated that under the New York standard, the prejudice test of *Strickland* need not be fully satisfied and that while a defendant's showing of prejudice is important, it is not an 'indispens[a]ble element in assessing meaningful representation' (*Stultz*, 2 N.Y.3d at 284, 778 N.Y.S.2d 431, 810 N.E.2d 883). Further, th[e New York] Court [of Appeals] noted that '[o]ur focus is on the fairness of the proceedings as a whole.' (*see id.*; *see also Benevento*, 91 N.Y.2d at 714, 674 N.Y.S.2d 629, 697 N.E.2d 584)). Thus, even if this Court were to recommend accepting that Dixon's counsel's alleged errors amounted to unreasonably deficient performance, that would only fulfill half of the *Strickland* test. Petitioner still is required to demonstrate that he was prejudiced by counsel's performance, that is, a reasonable probability exists that but for counsel's deficiencies, the outcome of the trial would have been different. Based upon my review the record, I recommend finding that he is unable to do so.

The Second Circuit has explained that

[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. To merit habeas relief, the defendant must show that the deficient

performance prejudiced the defense. The level of prejudice the defendant need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case. Thus the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The [Supreme] Court [in *Strickland*] defined reasonable probability as one that undermines confidence in the outcome.

*Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (alterations in original, internal quotation marks and citations omitted) (quoted in *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006)).

At this point, three courts have evaluated the evidence against Dixon–the Appellate Division on direct appeal, the trial court in the collateral C.P.L. § 440.10 proceeding, and this Court sitting in habeas review. The Appellate Division found there to be "overwhelming evidence" of Dixon's guilt. *People v. Dixon*, 214 A.D.2d at 1011. The trial court noted the Appellate Division's holding this regard and implicitly agreed, *see* C.P.L. § 440.10 Order at 8, when it considered the potential effect of trial counsel's failure to call Bland and Frida, who later made statements purporting to inculpate Scott as the shooter. The trial court held that "[u]nder these circumstances there is no probability that the defendant would receive a more favorable verdict if a new trial were held[.]" *Id.* (citation omitted); *see also id.* at 7. Thus, after reviewing trial counsel's alleged errors, as well as petitioner's newly discovered evidence, the trial court essentially found a lack of prejudice as defined in *Strickland*. This Court has independently reviewed the trial transcript in conjunction with all of the alleged new evidence of innocence generated by Dixon after trial. In this Court's opinion, the evidence against Dixon was so compelling that there is no reasonable probability of a different outcome, even if trial counsel's performance had been substandard as alleged.

In sum, this Court recommends finding that none of trial counsel's alleged errors or omissions, taken singly or cumulatively, were objectively unreasonable in light of prevailing professional standards of practice. Moreover, this Court remains unconvinced that even if trial counsel had performed as Dixon wishes, there is a reasonable probability of a more favorable outcome. When a petitioner, such as Dixon, cannot fulfill both prongs of the *Strickland* test, his ineffective assistance claim must fail. Based upon this Court's review of the record, Dixon has not demonstrated that the state courts' factual findings were unreasonable in light of the evidence presented at trial. *See* 28 U.S.C. § 2254(d)(2). In addition, Dixon has not shown that the state courts' rejection of his ineffective assistance claim was either contrary to, or an unreasonable application of, clearly established Supreme Court law as articulated in *Strickland*. The Court wishes to add that it has also considered Dixon's ineffective assistance claims under the less deferential, pre-AEDPA standard of review. The Court recommends finding that even under that standard, Dixon's ineffective assistance claim lacks merit.

## 2. Subornation of Perjury and Other Prosecutorial Misconduct

Dixon here contends, as he did in support of his C.P.L. § 440.10 motion to vacate the judgment, that the prosecutor suborned perjured testimony for various, and that the prosecutor and the police engaged in substantial misconduct (e.g., coercing witnesses, misrepresenting findings made at the crime scene). The trial court thoroughly explored Dixon's allegations and found them to be wholly lacking in substance. *See* C.P.L. § 440.10 Order at 6 *et seq.*

"[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (citation and internal quotation marks omitted); *accord Jenkins v. Artuz*, 294 F.3d 284,

293 (2d Cir. 2002) (citations omitted). The Supreme Court "t has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (internal citations omitted); *accord Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.") (citations omitted).

As the Second Circuit and Supreme Court have instructed, a witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony; to be distinguished from perjury are mere inaccuracies or inconsistencies in testimony resulting from confusion, mistake, or faulty memory. *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). Assuming that a claim of witness perjury is cognizable in a post-AEDPA habeas petition, the Second Circuit has held that even where perjury has been committed, the petitioner must show that the prosecution knew or should have known of it. *Drake v. Portuondo*, 321 F.3d 338, 345 n. 2 (2d Cir.2003) (noting that under AEDPA, habeas relief may not be granted in the absence of prosecutorial knowledge of perjury). In addition, the habeas petitioner alleging perjury must show that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 345 (quoting *United States v. Agurs*, 427 U.S. at 103).

In the context of its discussion of Dixon's actual innocence claim, *supra*, this Court has discussed at length each alleged instance of perjury and misconduct. As explained above, Dixon has failed to substantiate any of these alleged instances of malfeasance by the prosecutor and

officials acting his behalf. Rather, Dixon's claims stack inference upon inference, but there is no

concrete factual underpinning; all he has proffered in support of his claims of perjury and official

misconduct are bald assertions by himself and witnesses sympathetic to him, conjecture and

surmise.  Moreover, Dixon has not come forward with any credible evidence whatsoever that the

prosecutor knew or should have known of perjury by the state's witnesses. The Court reiterates

its agreement with respondent's argument–the alleged instances of "false" testimony amount to

no more than inaccuracies or inconsistencies in testimony resulting from confusion, mistake, or

faulty memory, which has been consistently held not to constitute perjury by the Second Circuit

and the Supreme Court. *See United States v. Monteleone*, 257 F.3d at 219 (citing *United States v.*

*Dunnigan*, 507 U.S. at 94). Even if the Court were to accept all of Dixon's allegations as true, it

still would not recommend granting relief on this claim as there is no reasonable likelihood than

any of the alleged "perjury" could have affected the jury's judgment and assessment of the

evidence. *See Agurs*, 427 U.S. at 103. For these reasons, and for those discussed above in this

Report and Recommendation, the Court recommends that Dixon's claim of perjury and official

misconduct be dismissed.

### 3. Newly Discovered Evidence

In my discussion, and recommended rejection, of Dixon's claim of actual innocence in

connection with the *Doe v. Menefee* and *Schlup v. Delo* holdings, I discussed at length my

reasons for finding all of Dixon's items of newly discovered evidence to be inherently unreliable,

from the purportedly exculpatory testimony to be offered by uncalled witnesses, to the results of

the voice-stress analysis testing. For all of these previously stated reasons, I must recommend

dismissal of Dixon's claim of newly discovered evidence as a stand-alone basis for habeas relief.

There is an additional reason for dismissing Dixon's claim of newly discovered evidence, and that is the fact that the Supreme Court has stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

## VII. Conclusion

For the foregoing reasons, I recommend finding that Valentino Dixon's habeas petition is untimely, and he is not entitled to statutory tolling under 28 U.S.C. § 2244(d)(2). I further recommend finding that Dixon has failed to establish that extraordinary circumstances prevented him from filing his petition on time, or that he acted with reasonable diligence throughout the period he seeks to have tolled, so as to invoke the equitable tolling. I also recommend finding that Dixon has failed to set forth a credible claim of actual innocence, and therefore there is no need to determine whether the possibility of tolling for actual innocence is constitutionally required. As discussed above, in light of all the evidence–admissible at trial or not–I believe that Dixon has failed to demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, and recommend concluding that he has not made out a credible claim of actual innocence under the *Schlup v. Delo* standard. I therefore recommend dismissing the petition as untimely. Finally, because I do not believe that Dixon has made a substantial showing of the denial of a constitutional right, I also recommend that no certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January 7, 2009
        Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January 7, 2009
        Buffalo, New York

-101-