STATE OF NEW YORK
COUNTY OF ERIE          COUNTY COURT

THE PEOPLE OF THE STATE OF NEW YORK

       -vs-

VALENTINO DIXON,

                  Defendant.

**NOTICE OF MOTION**

Indictment no.: 91-1476-001

PLEASE TAKE NOTICE that upon the Affirmation of Donald M. Thompson, Esq., and upon the Indictment, the attached exhibits and all prior papers and proceedings, the defendant moves this Court for an order pursuant to CPL § 440.10 vacating his conviction entered in this court on August 7, 1992 or in the alternative, for an order directing that a hearing be held to permit the defendant to further develop the factual basis for this motion based on the arguments set forth herein. Oral argument of this motion is requested.

Dated: May 28, 2018

                Yours,

                **EASTON THOMPSON**
                **KASPEREK SHIFFRIN LLP**
                By: Donald M. Thompson
                Counsel for the Defendant
                16 West Main Street, Suite 243
                Rochester, New York 14614
                (585) 423-8290
                www.etksdefense.com

To:

**JOHN J. FLYNN, ESQ.**
Erie County District Attorney
25 Delaware Avenue
Buffalo, New York 14202

STATE OF NEW YORK
COUNTY OF ERIE                    COUNTY COURT

_____

THE PEOPLE OF THE STATE OF NEW YORK

       -vs-

VALENTINO DIXON,

                 Defendant.

_____

**ATTORNEY'S
AFFIRMATION**

Indictment no.: 91-1476-001

DONALD M. THOMPSON, attorney for the defendant, VALENTINO DIXON, hereby affirms that:

1. I am an attorney duly licensed in the State of New York. Along with Alan Rosenthal, I represent the defendant in the above-captioned matter and I make this affirmation in support of the relief sought in the annexed Notice of Motion.

2. The sources of my information and grounds for my belief are conversations between myself and the defendant, examination of the papers filed relative to the prosecution of the above-numbered indictment including the transcripts of proceedings before the trial court, appellate briefs and decisions and post-trial motions, examination of the discovery provided by the prosecution, my conversations with defendant's prior trial and appellate counsel and my review of their files, and my independent investigation of this matter.

3. In support of this motion defendant asserts that evidence that has not previously been presented to or considered by the County Court, including compelling newly discovered statements and other evidence more fully described below satisfy defendant's burden on this

1

Dixon-003490

motion of demonstrating a reasonable possibility of a more favorable verdict had a jury had the opportunity to consider such evidence.

4. Four videos in support of this motion are included on the attached USB drive. Video 1 includes statements from many witnesses and other information from both police and defense investigations referenced in this motion and provides an overview of the case as well as some of the exculpatory witnesses and evidence relied on by this motion. This video also includes footage from an independent investigation of this case by The Golf Channel in 2017, which followed up on a feature on Mr. Dixon in Golf Digest in 2012. Golf Digest became interested in Mr. Dixon and subsequently in his case (which it also independently investigated), because of his artistic talent, displayed through his drawings of golf courses.

5. Video 2 contains excerpts from a documentary prepared by Georgetown University Law students, who also independently investigated Mr. Dixon's case as part of the Georgetown University Prison Reform Project, a wrongful conviction project through the law school associated with a class on wrongful convictions co-taught by Georgetown professor and exoneree Marty Tankleff. The students were tasked with creating a video documentary of their investigation of a wrongfully convicted person's innocence. They selected Valentino Dixon's case for their investigation and documentary, which was also covered by Strong Island films, a television production crew producing a multi-episode docu-series covering this case and other cases entitled "Making An Exoneree."

2

Dixon-003491

6. Video 3 contains excerpts from the documentary relating to Mr. Dixon's case prepared by Strong Island Films that will be broadcast on one of the major networks.

7. Video 4 contains footage of trial prosecutor Christopher Belling describing the absence of any gunshot residue on defendant's clothes that were seized when he was arrested based on testing that was performed after defendant's arrest. The existence of such testing and the test results were never disclosed to the defense at the time of trial, as more fully discussed below.

8. Also on the attached USB drive is a copy of defendant's trial and sentencing transcripts, his previous CPL § 440.10 motion, the County Court's order denying that motion, the Appellate Division, Fourth Department's order denying leave to appeal, and defendant's petition for habeas corpus to the District Court for the Western District of New York, portions of which are referred to below.

9. Finally, as additional supplemental material in support of this motion, defendant has included a copy of his application for commutation of sentence that was filed in October, 2017. This application includes exhibits detailing Golf Digest's investigation and report on defendant's case in 2012, and The Golf Channel followup investigation in 2017 along with and other materials in support of this motion referred to or cited below.

10. Defendant respectfully suggests viewing the included videos before proceeding would aid the Court in understanding the remainder of defendant's submission.

3

## PROCEDURAL HISTORY

11. Valentino Dixon was convicted of Murder in the Second Degree, Attempted Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree and Assault in the Third Degree, following a jury trial before the Erie County Court. On August 7, 1992, Mr. Dixon was sentenced by the County Court (D'Amico, J.) to terms of 25 years to life (Murder in the Second Degree), 8⅓ to 25 years (Attempted Murder in the Second Degree), and 5 to 15 years (Criminal Possession of a Weapon in the Second Degree) to be served consecutively, for an aggregate sentence of 38⅓-life.

12. Mr. Dixon filed a timely notice of appeal. His conviction was unanimously affirmed by the Supreme Court, Appellate Division, Fourth Department on April 28, 1995 (*People v Dixon*, 214 AD2d 1010 [4th Dept 1995]) and his application for leave to appeal to the Court of Appeals was denied (*People v Dixon*, 87 NY2d 900 [1995]).

13. On November 6, 2003, Mr. Dixon filed a CPL § 440.10 motion principally alleging ineffective assistance of counsel and newly discovered evidence based on trial counsel's failure to call two witnesses at trial, although there was no indication at the time of trial that either witness would offer exculpatory evidence (*see* USB drive). On August 30, 2004, defendant's motion was denied by the Erie County Court (D'Amico, J.) without a hearing, by Memorandum and Order (*see* USB drive). On February 7, 2005, the Appellate Division, Fourth Department denied defendant's application for leave to appeal the lower court order (*see* USB drive).

4

Easton Thompson Kasperek Shiffrin LLP

Dixon-003493

14. On March 28, 2005, Mr. Dixon filed a petition for writ of habeas corpus in the district court for the Western District of New York (*see* USB drive). He attempted to present additional affidavits and information obtained after the filing of his CPL § 440.10 motion that had not been included with that motion. The district court dismissed Mr. Dixon's petition as untimely (*Dixon v Conway*, 613 F Supp 2d 330 [W.D.N.Y. 2009]).

15. In October, 2017, Mr. Dixon, with the encouragement of DOCCS counselors and corrections officers, including former Superintendent of the Attica Correctional Facility James T. Conway, filed both an application for pardon and an application for commutation of sentence with the Governor's Office. The Governor took no action on either application.

16. Mr. Dixon's sentence has not been stayed and he remains incarcerated in the Wende Correctional Facility in Alden, New York.

## Factual Background

17. On August 10, 1991, there was a shooting at 1:29 a.m. at the intersection of East Delavan and Bailey Avenues in Buffalo, near Louie's Red Hots. It was a busy summer night at a popular intersection and as many as 100 people were in the immediate area (*see* Video 1; Trial transcript, hereafter "T," 100). Just before the shooting, brothers Torriano and Aaron Jackson had Mario Jarmon on the ground kicking and punching him. When a spectator, Michael Bland, exclaimed "watch out he's got a gun," people scattered in all different directions as more than two dozen shots rang out (T 69-70, 212, 221, 260-263).

5

Easton Thompson Kasperek Shiffrin LLP

Dixon-003494

18. Torriano Jackson was fatally shot. Aaron Jackson, John Sullivan and Mario Jarmon were also wounded. When officers arrived minutes after the incident they recovered 27 spent 9mm shell casings, one spent .22 casing, a .22 caliber handgun, one spent .32 casing and a .32 caliber revolver (Exhibit A).

19. Although both Mario Jarmon and Leonard Brown told police that Jarmon was shot by Torriano Jackson who was armed with a small handgun (Exhibit B), several hours after the shooting officers stopped a car driven by Valentino Dixon who was known to police because he was out on bail awaiting trial on other felony charges. Mr. Dixon was arrested him, and charged as the lone gunman involved in the shooting.

20. Mr. Dixon's clothing was seized when he was arrested, as were two separate vehicles. The spent shell casings were negative for latent fingerprints, and there was no other forensic evidence connecting Mr. Dixon to the crime (T 710-11; Exhibit C).

21. Dixon – neither a close friend of Jarmon nor an enemy of Jackson – had no apparent motive to intervene in their fight, much less fatally shoot anyone. At trial, both defense counsel and the prosecutor focused on the absence of any apparent motive. In particular, the prosecutor repeatedly reminded the jury that motive was not an element of the crimes that he was required to prove (*see e.g.* T 599).

22. Attention was first directed to Dixon by an anonymous call to police just after the shooting in which the caller claimed that the shooting was over a girl named Heather Smith who dated Valentino Dixon and one of the Jackson boys (Exhibit D). However when

6

Dixon-003495

detectives interviewed Heather Smith on December 1, 1991, four months after the shooting, she told them that while she was a close friend of Aaron Jackson, she did not know Valentino Dixon: "I never heard of him," she said (Exhibit D).

23. On the day of shooting, after Dixon was identified by police as a suspect, Torriano Jackson's friend John Sullivan, who was also wounded during the shooting, gave police a statement claiming that a man he knew as "Tino" was the shooter.  In fact, by the time John Sullivan gave his initial statement, this record reveals that any true investigation had already ceased.  From that point forward, the "investigation" focused on gathering evidence inculpating Dixon and ignoring any evidence tending to exculpate him or suggest that someone else was responsible.

24. Calling into question the reliability of his original statement, at trial Mr. Sullivan testified that as he was watching a fight involving Torriano Jackson, Aaron Jackson and Mario Jarmon, he heard Michael Bland say "watch out he's got a gun" (T 80, 127, 128) and without waiting to see who had a gun, Sullivan turned and ran, heard gunfire behind him and was hit by a stray shot as he ran.  He estimated that he stopped 100-150 yards away, looked back across the intersection of Bailey and East Delavan and supposedly saw the shooter (who he claimed was Mr. Dixon) for 15-30 seconds at 1:30 a.m., after being shot, while he was bleeding and claimed to be scared and in "significant pain."  Sullivan later admitted that his observations were made after a long day of drinking beer, snorting cocaine and smoking marijuana (Exhibit E).  Further undercutting his identification of Mr. Dixon as the shooter

7

when Mr. Sullivan first spoke to police he described the shooter as six feet tall, 160 pounds, a physical description that did not match Valentino Dixon, but did match Lamarr Scott, another man who was present at the time of the shooting.

25. In fact, even though police suspicion quickly focused on Dixon, within days of the shooting three men – Leonard Brown, Walter Lee Dennis and Mario Jarmon – gave sworn statements indicating that Valentino Dixon was not involved in the shooting, instead identifying Lamarr Scott as the man who shot the Jacksons (Exhibits B, F).

26. The day after the shooting, police questioned Mario Jarmon who was in the hospital and seriously injured. Mr. Jarmon told Buffalo Police Detective Mark Stambach that it was Torriano Jackson, not Valentino Dixon, who shot him (Exhibit G). Brown and Dennis were similarly adamant that Scott, but not Dixon was involved the shooting.

27. Then, three days after the shooting and Mr. Dixon's arrest, Lamarr Scott called a Buffalo television news reporter and said he wanted to the confess to the crime. When a reporter and cameraman met Scott as he requested, he confessed on camera, describing how he was involved in the shooting and Valentino Dixon was not (Video 1). Mr. Scott was then arrested and interviewed by Detective Stambach (and later, separately, by defense investigator Evan Kenner). During both interviews, Scott claimed that he, not Mr. Dixon, shot Torriano Jackson after Jackson and his brother Aaron began shooting at Mario Jarmon. Mr. Scott claimed that he was not related to Mr. Dixon, was not threatened or promised

8

Easton Thompson Kasperek Shiffrin LLP

Dixon-003497

anything for his statements, and did not speak to Mr. Dixon before making his statements. He also told Detective Stambach that he was willing to take a polygraph test (Exhibit H).

28. Mr. Scott was never charged with any crimes relating to this shooting. Instead, immediately after he gave his statement to Detective Stambach, he was told "we got who we want, get the hell out of here" (Exhibit I).

29. Not to be deterred, within days of the shooting Mr. Scott also told four civilians – LaRosa Carson, Eric Doss, Ronnie Bryant and Pamela Yates (now Richardson) – that he, not Valentino Dixon, was the shooter. Each of these individuals have since given sworn statements detailing what Mr. Scott told them. For example, Mr. Scott was staying at Ms. Richardson's house after the shooting and described to her how he was involved. She recalled that he was not secretive or hesitant, but rather freely admitted his involvement to her and described his role in the shooting (Video 1).

30. According to both the pretrial investigation and the trial proof, eyewitnesses described the shooter as wearing shorts, a hat, sneakers, a jacket and a T-shirt. When he spoke to investigators, Mr. Scott said that he was wearing shorts, a hat, sneakers, a jacket and a T-shirt at the time of the shooting.

31. Witnesses described the shooter as six feet tall and about 170 pounds or "heavy set." Lamarr Scott was six feet tall and heavy set or well-built (see Exhibit I). By contrast, Mr. Dixon was five feet, seven inches tall and 130 pounds. Even Prosecutor Belling, called as a witness at Jarmon's and Leonard's perjury trial, described Lamarr Scott as six feet tall,

9

Easton Thompson Kasperek Shiffrin LLP

husky – "quite a substantial fellow" – and described Valentino Dixon as being five feet seven inches tall, weighing about 140 pounds. He went on to confirm that Valentino Dixon did not "look anything like Lamarr Scott" (Exhibit J).

32. When called before the grand jury, Lamarr Scott was threatened with perjury if he persisted in his claims that he was the shooter. Consequently, he recanted his confession and testified before the grand jury that Mr. Dixon was the shooter (Exhibit I).

33. Mario Jarmon and Leonard Brown were also called as witnesses before the same grand jury, but refused to recant their statements and testified that Scott, not Dixon, fatally shot Torriano Jackson (Exhibit B). Prosecutor Belling then charged Jarmon and Brown with four counts of perjury based on their testimony that Torriano Jackson possessed and fired a handgun during the incident and that Scott fatally shot Jackson. Belling later characterized the perjury charges against Jarmon and Brown as "a brilliant stroke of tactical genius" (Commutation application, Exhibit E).

34. Mr. Dixon was indicted for the shooting of both Jacksons and John Sullivan. No one was charged with shooting Mario Jarmon, who by then was a perjury defendant and persona non grata with the District Attorney's Office.[1] Mr. Dixon was tried first; the perjury trial of Jarmon and Brown followed.

---

[1] At Dixon's grand jury presentation Prosecutor Belling falsely claimed that Jarmon's medical records showed that he was shot only twice – "one through and though wound and one grazing wound . . . no bullets were recovered in his body that can be matched with anything." Prosecutor Belling went on to argue to the grand jury that Jarmon "does not have three wounds," a claim since contradicted by Mario Jarmon's mother, Lillie Jarmon (Exhibit L). Contrary to the prosecutor's claim that Mario Jarmon suffered only two through and through wounds, after Jarmon passed away on April 10, 2002, a bullet from the August 10, 1991 shooting was removed from his body and preserved by Erie County authorities (*id*).

10

Dixon-003499

35. Lead Detective Mark Stambach was not called to testify at Mr. Dixon's trial (T 572, 582-585), nor was first responding Buffalo Police officer RaChelle Brown. Officer Brown had collected evidence at the scene and prepared numerous police reports regarding what she had found, which affirmatively disproved the prosecutor's claim that Mr. Dixon (or anyone else for that matter) acted as a lone gunman.

36. At trial, the prosecutor argued that Dixon was the lone shooter and fired all of the shots, from a .9mm automatic weapon, striking all four victims (T 69-70). This argument – crafted to obtain a conviction against Mr. Dixon – was demonstrably false. Reports filed by Officer Brown and Officer James Diegelman documented that they recovered two handguns at the scene: a .22 caliber revolver and a .32 caliber revolver, as well as spent .22, .32, and .9mm shell casings. Both of the recovered handguns had been fired, as had the .9mm weapon that was not recovered (Exhibit A).

37. When Officer Brown was interviewed by Buffalo News reporter Anthony Cardinale after Mr. Dixon's trial, the officer told Cardinale that she was likely not called at trial because she would have testified truthfully that she found two guns at that scene that night and "it might have been that they wanted this other guy" (Dixon, not Scott) (Exhibits A, K). Neither Jarmon nor Leonard Brown, by that time themselves indicted for perjury, were called at Mr. Dixon's trial by either party. Likewise, Lamarr Scott, who had initially confessed on camera then to Detective Stambach, then recanted his confessions before the grand jury, was not called as a witness by either party.

11

www.etksdefense.com

Easton Thompson Kasperek Shiffrin LLP

Dixon-003500

38. The prosecutor's insistence that Dixon was the shooter – and the only shooter – was contradicted not only by the physical evidence by eyewitness statements, including those from Jarmon and Brown, who told police just after the incident that Torriano Jackson brandished and fired a handgun during the incident. In particular, Jarmon told police officers that he was shot by Jackson, the man who had been beating him just before the shooting, not Dixon, with whom he had no argument. Finally, the prosecutor's claim was undercut by the other eyewitnesses (also never called at trial by either party) who described Lamarr Scott as the man firing multiple rounds from an automatic weapon. The eyewitnesses that were called by the prosecution, while not identifying Scott by name, described a shooter fitting Scott's physical description, not Dixon's.

39. None of the other witnesses who could have exculpated Mr. Dixon were called by the defense; the defense rested without calling any witnesses or presenting any proof. By contrast, the prosecution called six eyewitnesses to the incident: John Sullivan, Emil Adams, Aaron Jackson, Travis Powell, Robert Lewis and Freddie Stancil. Powell, Lewis and Stancil did not identify Mr. Dixon as the shooter. Aaron Jackson and John Sullivan, who were both injured in the shooting, and Emil Adams, a friend of Torriano Jackson's, identified Mr. Dixon as the shooter.

40. John Sullivan, who was facing a rape charge when he was called as a witness at Mr. Dixon's trial, was Torriano Jackson's friend (T 74, 78) and testified Dixon as the man he saw shooting, as described in paragraph 23 above.

12

Dixon-003501

41. Emil Adams testified that he was watching the fight between Jarmon and the Jacksons from the opposite side of East Delavan Avenue when he saw two people walking toward the fight with guns. He identified Mr. Dixon as the shooter. Although Mr. Adams told police just after the shooting that the shooter was "heavy set," he testified at trial that Mr. Dixon was not heavy set (T 143-212). Eight years after the trial, Mr. Adams told private investigator Roger Putnam Jr. that he was coerced by the prosecutor to give false testimony identifying Mr. Dixon as the shooter (Exhibit L).

42. Torriano Jackson's older brother Aaron, who was shot and seriously injured during the incident also identified Mr. Dixon at trial as the shooter. Aaron Jackson admitted that he and Torriano had Mario Jarmon on the ground and were beating him just before the shooting started (T 260). When he spoke to police just after the incident, Mr. Jackson said he didn't know who the shooter was. When he was first shown a photo array that included Mr. Dixon's photo, he told police he couldn't be sure whether Mr. Dixon was the shooter because "it happened so fast" (Exhibit M).

43. After Mr. Jackson learned that Mr. Dixon had been charged, after he was shown a single photo of Mr. Dixon to identify before the grand jury, and after he was told that Mr. Dixon would be in court, he identified Mr. Dixon at trial as the shooter. He claimed that he was able to do so because "my memory gets better with time" (Exhibit M).

44. Although Valentino Dixon was convicted of all counts of the indictment, the verdict was questioned from the moment it was returned. When the jury foreman was

13

Easton Thompson Kasperek Shiffrin LLP

Dixon-003502

interviewed by Buffalo News reporter Anthony Cardinale, he told Cardinale that "the whole thing just bothered me . . . the prosecutor's witnesses weren't credible at all, kind of shady." He also indicated that the jury's initial vote was 9 to 3 to acquit, even after defense counsel failed to call the witnesses that he had promised would prove Mr. Dixon's innocence, testimony that the jury was anxious to hear and was expecting to hear (Exhibit N).

45. Mr. Dixon unsuccessfully appealed his conviction and continued to investigate and search for additional witnesses and evidence to collaterally challenge his conviction. Such witnesses have come forward and additional evidence supporting Mr. Dixon's unwavering claim that he did not commit these crimes has continued to be revealed bit by bit over the 26 years since his conviction.

46. For example, on May 23, 2001, Michael Bland, the man who shouted "he's got a gun," but who was never called to testify at trial, told private investigator Roger Putnam that he witnessed the shooting of Torriano Jackson and that it was Lamarr Scott, not Valentino Dixon who shot Jackson (Exhibit O).

47. Eyewitness Tamara Frida initially refused to speak to either the police or the defense, because she feared for her life (Video 1). Ms. Frida, a college sophomore at the time of the crime, has since admitted that she was sitting in a car near the intersection of East Delavan and Bailey at the time of the shooting and that she witnessed the shooting. She also gave a statement to private investigator Roger Putnam and, more recently, has given two videotaped statements asserting, unequivocally, that Lamarr Scott, not Valentino Dixon was

14

Dixon-003503

the shooter (Exhibit P; Video 1; Video 3). On February 27, 2009, Mr. Putnam forwarded the content of Ms. Frida's statement to him along with a summary of his observations of Ms. Frida and her credibility to Erie County District Attorney Frank Sedita, III (Exhibit Q). District Attorney Sedita took no action on this information.

48. In 2004, as Mr. Dixon continued to challenge his conviction – efforts that were reported in the media – Anthony Watkins came forward and spoke to the Buffalo News after he realized that the event he witnessed differed in important respects from the case as described in the newspaper and in particular, that the man he saw shooting that night was not the man who had been convicted. Watkins, who knew Dixon from high school, was in the crowd when the shooting started and saw Dixon ducking and running away, not shooting. As reported in the Buffalo News by Anthony Cardinale, Mr. Watkins did not know the shooter, he only knew that it wasn't Valentino Dixon (Exhibit R; Video 1).

49. In February 2005, witness Antoine Shannon voluntarily submitted to a voice stress analysis during which he stated (truthfully, according to the analyst) that he also witnessed the shooting and saw Lamarr Scott, not Valentino Dixon shoot Torriano Jackson, consistent with his original handwritten statement of November 21, 1991 (Exhibit S; Video 1).

50. Mr. Dixon submitted to similar analysis and was found to be non-deceptive and truthful when he denied shooting Mr. Jackson; this was also reported in the Buffalo News by Anthony Cardinale (Exhibit T; Video 1).

**Easton Thompson Kasperek Shiffrin LLP**

Dixon-003504

51. In all, nine eyewitnesses to the shooting have now given statements and could have testified that Mr. Dixon was not the shooter: Lamarr Scott, Leonard Brown, Walter Lee Dennis, Mario Jarmon, Wendell Williams, Michael Bland, Tamara Frida, Anthony Watkins and Antoine Shannon.

52. Still other witnesses, including some of the prosecution's trial witnesses as noted above, gave physical descriptions of the shooter that are inconsistent with Valentino Dixon but consistent with Lamarr Scott.

53. For example, at Jarmon's and Brown's perjury trial, which followed Dixon's trial, ex-Marine Floyd Fisher testified that he found a revolver at the scene and pointed it out to police officers. Mr. Fisher further testified, for the first time, that he had witnessed the shooting and described the shooter as "a big guy," stocky and about six feet tall, like Mr. Scott, but unlike Mr. Dixon (Exhibit U). Even prosecutor Belling, called as a witness at Jarmon's and Leonard's perjury trial, described Lamarr Scott as six feet tall, husky, "quite a substantial fellow" and described Valentino Dixon as being five feet, seven inches tall and weighing about 140 pounds (Exhibit J). Notably, Jarmon's and Brown's jury also found that their statements that Torriano Jackson had a gun and was shooting at the time of the incident were not untruthful, acquitting them of perjury with respect to those statements.

54. As indicated above, LaRosa Carson, Eric Doss, Ronnie Bryant and Pamela Yates (now Richardson) have all given statements alleging that Lamarr Scott confessed to them that

www.etksdefense.com

Easton Thompson Kasperek Shiffrin LLP

Dixon-003505

he, not Valentino Dixon was the shooter. By contrast, Mr. Dixon has never confessed to anyone that he was involved in shooting anyone on August 10, 1991.

55. Upon information and belief, the source of such information and belief being my independent investigation and my conversations with counsel, attorney Bruce Barket together with a paralegal from his office (in 2015) and attorney Kimberly Duguay (in 2002) separately interviewed Mr. Scott during their independent investigations of Mr. Dixon's case. In each case, Mr. Scott asserted that if called at a hearing or trial, he would testify that he was the shooter and not Mr. Dixon. Ms. Duguay in particular discussed with Mr. Scott that he could still be prosecuted for murder based on such admissions together with the other evidence. However, Mr. Scott did not waiver or retract his admissions despite being advised of such possibility. Mr. Barket, Ms. Duguay, or both, could testify to their conversations with Mr. Scott at any hearing or trial.

56. It is not a stretch to believe that Mr. Scott might engage in the violent acts he claims to have committed. Rather, such behavior is consistent with his character. As Mr. Scott noted in his second written statement, after he was not arrested in this case, he went on to shoot another man during a robbery, the crime for which he is currently serving prison time (Exhibit I). Viewing Mr. Scott's recorded interviews in which he re-enacts while describing it how the automatic weapon jumped and he lost control of it as he fired lends credibility to his statement and is consistent with the physical evidence (*see* Video 1). Mr. Scott also notes that he is eligible for parole this year but even so, and despite having

17

Easton Thompson Kasperek Shiffrin LLP

Dixon-003506

everything to lose and nothing to gain, he persists in his insistence that he is guilty of the crimes for which Valentino Dixon was convicted.[2]

57. Finally, just last month I received in the mail an unsolicited letter from Dwight James. Mr. James described Lamarr Scott's confessions to him while they were incarcerated together (Exhibit V). Mr. James indicated that he would provide an affidavit (which he incorrectly believed he had done, however intended to do through his letter) and/or testify about what Mr. Scott told him if called to do so at any hearing or trial.

58. If Mr. Scott's admissions were made only to Mr. James while the two were incarcerated, his claim might be easily discounted, however as detailed above, Mr. Scott made similar admissions and confessions contemporaneously to investigators, paralegals, attorneys, district attorneys, other inmates and members of the media, with whom he had no relationship and who did not and could not promise him anything in exchange for his incriminating statements, generally unbidden and upon his own initiative or at his insistence.

59. Over the past 26 years, Lamarr Scott has consistently insisted that he is responsible for the crimes Valentino Dixon was convicted of in writing, in conversation and on camera. Mr. Scott, now in prison for an unrelated shooting, has reiterated that he, not Valentino Dixon, fatally shot Torriano Jackson and that he perjured himself when he testified before

---

[2] Prosecutor Belling also falsely claimed that Mr. Scott has nothing to lose, as he could never be prosecuted for the crimes he has confessed to (Video 1). The witnesses who pointed to Mr. Scott as the perpetrator either never testified at Mr. Dixon's trial or those that did have claimed they were intimidated into identifying Mr. Dixon as the perpetrator, claims that are bolstered by Belling's prosecution of Jarmon and Brown, the two witnesses who refused to change their testimony to fit the prosecutor's theory. Additionally, there is no statute of limitations for a murder prosecution. Thus, contrary to Belling's assertions, nothing prevents the District Attorney from prosecuting Mr. Scott for the crimes he has repeatedly confessed to committing.

18

Dixon-003507

Dixon's grand jury, denied his involvement, and identified Valentino Dixon as the shooter (Exhibit H, I; Video 1).  To date, Mr. Scott has given three written statements (Exhibits H, I) and three video statements describing (and in his video statements, re-enacting) how he and not Valentino Dixon fatally shot Torriano Jackson (Videos 1-3).

60. In 2012, Golf Digest independently investigated the Mr. Dixon's case and the evidence leading to his conviction (Commutation submission, Exhibits D, E).  This investigation was followed up on and updated by another independent investigation of Mr. Dixon's case in 2017 by The Golf Channel (Commutation submission, Exhibit F; Video 1). During its investigation, The Golf Channel interviewed not only Lamarr Scott, but also trial prosecutor Christopher Belling, who claimed that he was unaware of any of the witnesses that had come forward in support of Mr. Dixon's innocence (although some had been included on his trial witness list).  In the same interview, Prosecutor Belling admitted that with respect to his prosecution of Mr. Dixon, "I could have made a mistake, I'm only human" (Commutation submission, Exhibit F; Video 1).

61. Additional newly discovered evidence reveals that whether Prosecutor Belling's prosecution of Mr. Dixon was mistaken or not, Mr. Dixon's conviction was secured, at least in part, through the prosecutor's intentional misconduct.

62. As noted above, Mr. Dixon's clothing was seized from him upon his arrest hours after the incident (Exhibit C).  There was no information supplied during voluntary discovery nor any evidence introduced at trial suggesting that any gunshot residue testing of the

19

Dixon-003508

defendant or his clothing had been performed nor, for that matter, was there any discovery or evidence offered suggesting that there was any physical evidence whatsoever that could have connected the defendant to the commission of any of the crimes charged.

63. In his summation, defense counsel highlighted the absence of any physical evidence tying the defendant to the crimes:

> Henry Smardz from the Buffalo Police Department Evidence Collection Unit. He can only say what he looked at. He looked at the shell casings and he found that they had no fingerprints on them. He examined the .32 caliber handgun. There were no fingerprints that he could use to make an analysis. We didn't hear about any other tests that were conducted so I guess there were none others because we didn't hear about them here.

(T 569).

64. At sentencing, defense counsel again stressed the lack of any physical evidence and, in particular, the absence of any gunshot residue testing results, arguing that

> [t]he Court will note that the trial proof was absent of any scientific tests which could have been performed on him to in fact we believe pointed toward his innocence, a number of scientific tests which could have been performed on his clothes which, by the way, was seized, no analysis was ever made of them, analysis designed to determine whether a firearm had been recently operated by the defendant, that type of scientific test which exists and is common was not performed on my client at that time.

(T 710-11).

65. Consistent with defense counsel's arguments, there is nothing in the record or the discovery supplied to the defense indicating that the People conducted any gunshot residue testing on defendant's clothing or ever provided defense counsel with any gunshot residue testing results, nor is there any indication in this record that defense counsel obtained any

20

Dixon-003509

such information by other means (*see e.g.* Exhibit C). As made clear by defense counsel's comments during summation and sentencing, he believed, for good reason, that there was no physical evidence that could either inculpate or exculpate the defendant.

66. Prosecutor Belling never controverted defense counsel's arguments to the jury concerning the lack of any physical evidence, and never otherwise responded to those assertions in any way.

67. Now for the first time, just weeks ago and decades after defendant's trial, Prosecutor Belling has revealed that Mr. Dixon's clothing *was* tested for the presence of gunshot residue and that those tests were negative for the presence of gunshot residue. He offered these revelations while being interviewed by Georgetown University law students for their documentary film about Mr. Dixon's case. The documentary footage containing this disclosure is included as Video 4 on the attached USB drive.

68. The fact that defendant's clothing *was* tested and that such tests were negative was not previously disclosed to the defense, which was consequently unaware of the information at the time of defendant's trial. This information would have been critical to defendant's claim that he had not fired a weapon at the time of the incident, just hours before his arrest.

69. It also would have been highly probative of whether, as the prosecution claimed, defendant fired at least 27 rounds from a .9mm automatic pistol, killing one and wounding three others just shortly before his arrest.

21

70. In addition to Lamarr Scott's repeated and detailed confessions along with the other corroborating evidence suggesting that Mr. Scott not Mr. Dixon committed the crimes Mr. Dixon was convicted of, the decades-belated disclosure of this exculpatory evidence provides another, independent ground for the argument that Mr. Dixon is actually innocent of the crimes for which he was convicted and that his conviction should therefore be vacated.

## LEGAL ARGUMENT

71. Defendant moves to vacate his conviction based upon newly discovered evidence pursuant to CPL § 440.10(1)(g). In the alternative, defendant moves to vacate his conviction based on violations of his constitutional rights pursuant to CPL §§ 440.10(1)(c) and (h).

72. CPL § 440.10 states, in relevant part, that

1. At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment on the ground that: . . .

(c) Material evidence adduced at a trial resulting in the judgment was false and was, prior to the entry of the judgment, known by the prosecutor or by the court to be false; or

(g) New evidence has been discovered since the entry of judgment . . . which is of such character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to the defendant; or

(h) the judgment was obtained in violation of a right of the defendant under the constitution of this state or the United States.

73. This motion alleges grounds constituting a sufficient legal basis for a CPL § 440.10 motion. Each of the essential facts in support of the claims made are supported by

22

either sworn allegations or unrefuted documentary proof (CPL § 440.10[4][a], [b]) and there are no conceded or uncontradicted allegations establishing circumstances that would require summary denial of defendant's motion pursuant to CPL § 440.10(2) or § 440.20(2) (CPL § 440.30[2]).

74. CPL § 440.10(4)(c) provides that a court may deny a motion made pursuant to CPL § 440.10 without a hearing where an allegation of fact essential to support the motion is conclusively refuted by unquestionable documentary proof, which is clearly not the case here. Rather, here, the available documentary proof uniformly supports defendant's claims.

75. Sections 440.10(2) and 440.20(2) provide that the court must deny a § 440.10 motion when the issue raised therein (1) was raised and decided on direct appeal, (2) may still be raised and decided on direct appeal, or (3) even though sufficient facts were present in the record for such issue to be raised and decided on direct appeal, it was not, due to defendant's failure to raise the issue on appeal or take an appeal. The claims made herein were not, and could not have been, raised on direct appeal (CPL §§ 440.10[2], 440.20[2]), because they rely on information that is outside of the trial or appellate record and/or are based on information developed after the conclusion of the direct appeal.

## NEWLY DISCOVERED EVIDENCE

76. Reversal of defendant's conviction is warranted based on newly discovered evidence which, if introduced at trial, would likely have resulted in a verdict more favorable to him.

Easton Thompson Kasperek Shiffrin LLP

Dixon-003512

77. CPL § 440.10(1)(g) provides that a judgment of conviction may be vacated where (1) there is new evidence – i.e., evidence that could not have been produced at trial even with due diligence; (2) the motion is made with due diligence after discovery of the new evidence; and (3) the new evidence is of such character as to create a probability that had it been received at trial, the verdict would have been more favorable to the defendant.  As detailed below, each of the criteria of the newly discovered evidence subdivision of CPL § 440.10 are met here.

78. It should first be noted that CPL § 440.10 does not require that the defendant exercise diligent efforts to discover evidence *after trial*; the due diligence requirement relates only to defendant's efforts to obtain the evidence prior to or at the time of trial and in that respect defendant's efforts clearly constitute due diligence in that regard.  In this regard, newly discovered evidence under CPL § 440.10 is defined as evidence that could not have been produced *for trial* even had due diligence been exercised.

79. Here, according to trial proof as many as 100 people were in the vicinity of the crime and in position to have witnessed it.  No amount of diligence would have allowed defense counsel to have identified, located and interviewed these potential witnesses, including those that have now belatedly come forward, a task beyond the capacity of the Buffalo Police Department with all of its superior resources and present at the scene within moments of the crime, before many of the potential witnesses had dispersed.  This evidence

24

Dixon-003513

was unavailable to the defendant prior to the entry of judgment and unquestionably would have had direct bearing on the issues decided by the jury at trial.

80. The witnesses who have come forward had no legal obligation to speak, ever and the existence and content of their potential testimony was actually unknown. Defendant cannot, therefore, be faulted for failing to discover it more quickly. Likewise he cannot be faulted for failing to subpoena or otherwise compel testimony of unknown content from previously-unidentified witnesses.

81. The post-trial statements of Lamarr Scott are also newly discovered under this standards. After Mr. Scott initially confessed to a television reporter and Detective Stambach, he was called to the grand jury and threatened with a perjury prosecution should he testify to his unsworn admissions. Under oath, Mr. Scott recanted his admissions and identified the defendant as the shooter. Thus, at and prior to defendant's trial, he had no ability to compel Mr. Scott's subsequent incriminating statements, as he faced (and faces) prosecution for murder, criminal possession of a weapon and perjury based on those statements. Because Mr. Scott always had (and continues to have) a Fifth Amendment right to not incriminate himself, but for his repeated and voluntarily waiver of that right, his statements (and demonstrations of how he committed this crime) upon which this motion is based would never have been available to the defendant through any means (*see* CPL § 440.10[3][a]).

25

Dixon-003514

82. Further, Prosecutor Belling was duty-bound to disclose the favorable gunshot residue test results to the defense before trial but never did so, then remained silent about such testing for 26 years after defendant's conviction. It was purely fortuitous that Belling made such admissions in the course of recorded interviews by students independently investigating defendant's case; this information never would have come to light otherwise. Obviously, since Belling chose to violate his constitutional obligations of disclosure at the time of trial, defendant lacked a more compelling vehicle to secure such evidence (which, as a result of Belling's silence, the defense was totally unaware of at and after trial).

83. Thus, none of this newly discovered evidence could not have been secured prior to conviction, even with the exercise of due diligence by the defendant.

84. This motion is made with due diligence following discovery of the newly discovered evidence upon which it is based. To the extent that the delay in obtaining evidence, pursuing additional leads, and completing the post-appellate investigation is attributable to defendant's indigence, he cannot be faulted for not producing such evidence more quickly, as his "diligence" is limited by this financial resources. The evidence upon which this motion relies has trickled in, piece-meal, over the decades since defendant's conviction (and the 15 years since his initial, limited CPL 440.10 motion), largely through the efforts of altruistic investigators, attorneys, students, forensic professionals, and family members.

26

Easton Thompson Kasperek Shiffrin LLP

Dixon-003515

85. Further, this new evidence is "of such character that had such evidence been received at . . . trial the verdict would have been more favorable to the defendant" (CPL § 440.10[1][g]). This is not a case where the relevance of the new evidence is marginal (*see, People v Haupt*, 71 NY2d 929 [1988]). This information contained in Scott's confessions to investigators and other witnesses, the other identification witness statements and the negative gunshot residue testing goes directly to the central issue in the People's case against the defendant – who fatally shot Torriano Jackson and wounded Aaron Jackson, John Sullivan and (although not included as a named victim) Mario Jarmon?

86. Each item of this new evidence, alone, would be sufficient to create a reasonable possibility of a more favorable verdict, however when considered cumulatively, this evidence unquestionably creates a reasonable possibility of a verdict more favorable to the defendant in what was unquestionably a close case, in which the proof was far from overwhelming.

87. According to the jury foreman's comments to Buffalo News reporter Anthony Cardinale, the jury struggled with the People's claim that defendant was the shooter, even *absent* any direct proof that another individual was involved (as promised but not produced by defense counsel).

88. Although CPL § 440.10(4)(d) provides that a court may deny a CPL § 440.10 motion where an allegation of fact essential to support the motion is contradicted by a court record or other official document or is made solely by the defendant and unsupported by any other affidavit or evidence and, under all the circumstances of the case, there is no reasonable

27

Dixon-003516

possibility that defendant's allegations are true, that is not the case here, where defendant's claims are not made by him alone, but rather are supported by the testimony of numerous witnesses who have nothing to gain by offering their statements and no apparent motive, other than speaking the truth, for doing so. As such, the newly-obtained evidence, when viewed in light of the prior testimony and other proof, suggests that defendant's allegations *are* true.

89. The new evidence when considered cumulatively and measured against the trial evidence, provides compelling support for defendant's claim that he did not shoot any of the victims. Had the trial jury heard this new evidence in support of defendant's claims including the fact that gunshot residue testing was performed on the defendant's clothing and the results were negative, the repeated confessions of Lamarr Scott both before and during the years after defendant's conviction, as well as the other witnesses that have come forward and evidence that has been discovered for the first time in the years after defendant's conviction, there is at very least a reasonable possibility that the trial verdict would have been more favorable to the defendant.

90. Likewise, defendant's claims are not barred by virtue of having been raised in a prior CPL § 440.10 motion. Defendant's previous CPL § 440.10 motion filed on November 6, 2003 focused primarily on ineffective assistance of counsel, a claim not raised here. Further, the evidence defendant relies on in support of this motion post-dates November 6, 2003, did not exist at that time of defendant's prior CPL § 440.10, and could not have been

28

Easton Thompson Kasperek Shiffrin LLP

Dixon-003517

included in that motion even with the exercise of due diligence. Thus, the evidence relied on by the defendant in support of this motion has never been considered by the District Attorney's Office or ruled on by this Court.

91. Finally, to the extent that the types of claims raised herein could have been raised in a prior post-conviction motion, the failure to do so does not bar consideration of the defendant's claims (*People v Reed*, 159 AD3d 1550 [4th Dept 2018]).

92. Defendant contends that these facts are more than sufficient to demonstrate both that the portion of this motion alleging newly discovered evidence is made with due diligence (CPL §§ 440.10[1][g], 440.10[3][a]), and that such evidence would create a reasonable possibility of a more favorable verdict if presented to a jury, when considered together with all the other evidence in the case.

## *BRADY* VIOLATION

93. CPL § 440.10(1)(c) provides that a judgment of conviction may be vacated where material evidence known by the prosecutor to be false was presented at defendant's trial, which dovetails with CPL § 440.10(1)(h) which provides that a judgment that was obtained in violation of a right of the defendant under the constitution of this state or the United States may be vacated on that ground. Specifically, a defendant may raise the People's failure to supply *Brady* material in a post-conviction motion (*People v Jackson*, 78 NY2d 638 [1991]). Defendant contends that his conviction should be reversed and the indictment dismissed pursuant to these authorities, for the reasons set forth below.

29

Dixon-003518

94. Here, the trial prosecutor's failure to provide defense with exculpatory evidence violated defendant's in addition to defendant's constitutional rights to be furnished with such evidence.

95. Prosecutor Belling's failed to supply the defense with the negative results of the gunshot residue testing of defendant's clothing, or even information indicating that such testing had been conducted. This non-disclosure violated defendant's state and federal constitutional rights to a fair trial and due process rights to evidence tending to exculpate him, pursuant to *Brady v Maryland*, 373 US 83 [1963] (*see also United States v Agurs*, 427 US 97 [1976]; *United States v Bagley*, 473 US 667 [1985]).

96. In addition to violating his constitutional and ethical obligation to provide this exculpatory evidence to the defense, when defense counsel argued that there was no forensic evidence relevant to the issue of defendant's identity as the shooter (which Prosecutor Belling knew was not correct), Prosecutor Belling stood silent, did not supply the evidence at that point, did not correct counsel's misstatement of fact and effectively allowed defense counsel to unintentionally mislead the jury concerning the nature and quality of the evidence, or lack of evidence.

97. The prosecutor's non-disclosure of the fact of gunshot residue testing, followed by his silence in the face of defense counsel's arguments that no such testing had been conducted prevented defense counsel from affirmatively arguing that the absence of any

30

Dixon-003519

gunshot residue on defendant's clothing undercut the prosecution's claim that the defendant fired over two dozen rounds from a .9mm machine gun just hours before he was arrested.

98. CPL § 440.10(1)(h) provides that such violation of a constitutional right of the defendant may, without more, provide the basis for a motion to vacate defendant's conviction (*see People v Robinson*, 133 AD2d 859 [2nd Dept 1987]), particularly where, as here, the material in question is not only inconsistent with the prosecution witnesses' direct testimony, but also relates to events crucial to the People's theory of the case (*see People v Wahad*, 204 AD2d 156 [1st Dept 1994], *lv den* 83 NY2d 1005 [1994]; *People v White*, 200 AD2d 351 [1st Dept 1994], *lv den* 83 NY2d 859 [1994]).

99. By now it is well-established that a defendant has a constitutional right to present competent evidence relevant to non-collateral matters (*see Chambers v Mississippi*, 410 US 284 [1973]; *People v Hudy*, 73 NY2d 40, 56-57 [1988]).  Mr. Dixon's right to present such evidence in this case was frustrated by the People's failure to disclose this forensic testing tending to exclude him as a shooter at the time of the incident.  Importantly, a defendant is entitled to rely upon the People's representation that they have complied with their statutory and constitutional disclosure obligations (*Strickler v Green*, 527 US 263 [1999]; *People v Colavito*, 87 NY2d 423 [1996]).

100. The negative gunshot residue test results would have constituted direct proof (and the *only* direct forensic evidence that would have available to the defense at the time of trial) challenging the People's claim that defendant fired over two dozen .9mm rounds at the

31

time of the incident, causing the death of one victim, and wounding three others (*see Wood v Bartholomew*, 516 US 1 [1995]; *Kyles v Whitley*, 514 US 419 [1995]).

101. There can be no question that the prosecutor was actually aware of the substance of this evidence as he recently revealed publically for the first time, that he was. There is also no question that the defense was *not* aware of this favorable information during trial.

102. At trial, Buffalo Police Detective Henry Smardz testified about the cartridge cases, other ballistics evidence and at least one weapon recovered from scene, all of which he processed for fingerprints and none of which yielded any prints of value for comparison purposes (*see* Exhibit A). The prosecutor never asked Detective Smardz about any other forensic testing and defense counsels cross-examination was thus confined to the fingerprint testing and test results (T 455-484). As noted above, at summation and sentencing, defense counsel highlighted the absence of any other forensic testing or physical evidence that could have informed the jury's decision concerning whether the defendant was the perpetrator (T 569, 710-11).[3]

---

[3] When interviewed by The Golf Channel (*see* Video 1), Mr. Dixon reported that when he was arrested, his clothes were taken from him and he was told that if he had fired a gun "it would show." He denied possessing or firing a gun. When asked by the interviewer what happened, Dixon represented that they "took that stuff to the lab and it all came back clean," which he could not have known either at the time of trial or the time of The Golf Channel interview, as revealed by his attorney's arguments at trial concerning the lack of any forensic testing. Not until Prosecutor Belling revealed for the first time last month that gunshot residue testing had, in fact, been performed on defendant's clothing and come back negative, was there any indication in the discovery or in the record that such test was conducted and what the results were. What defendant did know was that after his clothes were taken from him there was no further discussion of any gunshot residue testing or test results from which defendant might have guessed, but could not have known, that testing had been conducted and shown no gunshot residue on his clothing, since no such evidence was ever used against him as he was promised it would be, were it incriminating.

32

Dixon-003521

103. Because this constitutional violation prejudiced Mr. Dixon's right to a fair trial, reversal of defendant's conviction is warranted on this ground.

## INTERESTS OF JUSTICE

104. When interviewed by Georgetown University law students last month, Prosecutor Belling commented that "it's in vogue to be saying that we're helping people that were wrongfully convicted. Even if they weren't wrongfully convicted, it's still in vogue" (Video 2). Contrary to Prosecutor Belling's cynical view, evolving standards of jurisprudence not only justify but compel the objective examination of questionable convictions obtained by the questionable practices of the very prosecutors and law enforcement that have resisted and delayed such examinations for too long.

105. CPL § 440.10(3)(c) provides that even where a court may otherwise lawfully deny a CPL § 440.10 motion, "in the interest of justice for good cause shown it may in its discretion grant the motion if it is otherwise meritorious and vacate the judgment." Even if the Court were to find a lawful basis to deny defendant's motion, the interests of justice warrant the exercise of the Court's discretion to direct that a hearing "be held to promote justice" because the issues raised by this motion "are sufficiently unusual and suggest searching investigation" (*People v Nicholson*, 222 AD2d 1055 [4th Dept 1995], quoting *People v Crimmins*, 38 NY2d 407, 416 [1975]; *People v Ausserau*, 77 AD2d 152, 155 [4th Dept 1980]; *see also* CPL §§ 440.10[3], 440.30[5]).

33

WHEREFORE, defendant respectfully requests that the Court grant the relief sought in the Notice of Motion attached hereto.

Affirmed under penalty of perjury pursuant to CPLR § 2106.

Dated: May 28, 2018

_____
DONALD M. THOMPSON, ESQ.

www.etksdefense.com

Easton Thompson Kasperek Shiffrin LLP

Dixon-003523

# EXHIBIT A

Dixon-003524



Ralph V. Degenhart
Commissioner

74 Franklin Street
Buffalo, N.Y. 14202
Phone : ( 716 ) 851 - 4444

State of New York
County of Erie          SS          Certification
City of Buffalo

Re: CD#221504
    Hom.Case#91-145
    ECU/LP#91-0853
    Fatal Shooting, Bailey & E.Delevan - 08/10/91
    Victim: Torriano Jackson,BM,17 (Deceased)

On Sat. 08/10/91,  0220 hrs I was requested by the Homicide Section to
assist them in regards to the above aforementioned Ftal Shooting as per
Hom.Case#91-145.

During the course of this investigation a certain .32 cal. H&R Revolver
came into my possession (item #7   H&R .32 cal.revolver serial # 7747
5 shot, silver finish, w/2" bbl.) I received this item at the Scene
(Bailey & E.Delevan) from PO Ra-Chelle Brown (Prct.#16).

I did examine this article and perform a Latent Fingerprint Exam on
same. My results would be described as Negative, due to the fact that
although Latent Prints were developed they lacked sufficient identifiable
ridge detail for comparable purposes. They were discarded.

Chief Angelo P. Alessandra
Det.Div. - BPD

By: _Henry M. Smardz_

Detective Henry M. Smardz
Buffalo PD/ECU

Sworn to before me this date

_24_ th day of _December_ 19 _91_

_signature_
Commissioner of Deeds, Buffalo,NY

My Commission expires 12/3/1/91

Orig:ECDA's Ofc    XC:ECU

_Exhibit 1_

Dixon-003525

# BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

| TO | Richard T. Donovan, Chief Homicide Section | SUBJECT | | DATE 8-10-91 |
|---|---|---|---|---|
| FROM | Det. James P. Lonergan, Homicide Section | | Torriano Jackson Homicide | |

ATTN: Lt. James Rautenstrauch

Sir;

 At 0145hrs I received a call to respond to Bailey & Delevan regarding a shooting. I responded & arrived at 0155hrs. Present upon my arrival were numerous police personnell including Lt.'s Manka & Sack, PO's Makowski, Lopez & Padin of Preceinct #11 & PO's Brown & Diegalman of Pct #16. Also present was Duty Inspector Anthony Labedz.

 I was informed by Officers on the scene that as it stood at this point there were 3 people shot. They are as follows: Torriano, age 17 residing at 19 Thatcher, his brother, Aaron Jackson, age unknown, who also resides at 19 Thatcher & Mario Germain of 1122 East Delevan. I was informed that the victim's had been taken to the ECMC via ambulance. I called for the Evidence Collection Unit, Police Photographer & additional Homicide Dets. to respond to the scene.

 I observed in the street, at approximately 1157 East Delevan, a pool of wet red stain, which was approximately 9' from the curb. Also in this vicinity, Iobserved 3 copper jacketed slugs and one lead slug in the street. I was also informed by Lt. Manka that PO Ra-Chelle Brown of Pct. 16 had in her possession 27 spent 9mm casings & a 32cal revolver. I informed PO Brown to retain possession of said evidence until the arrival of the Evidence Collection Unit.

 I was informed at the scene that there was apparently another victim from this shooting at the Sister's Hospital. The victim's name is unknown at this time, however, Det. John Vickerd responded to the ECMC & also the Sister's Hospital and will cover his activities in a seperate report.

 Evidence Collection Unit Det. Henry Smardz & Police Photographer William Sheppard arrived on the scene & performed their respective duties. Det. Stanley Suszek also responded to the scene & assisted in this investigation. It should also be noted that while at the scene I was informby Inspector Labedz that several shots had hit Louie's Hot Dog Stand at Bailey & Delevan and there were several slugs inside the restaurant that had to be collected. I informed Det. Smarz of this & he stated he would retrieve this Evidence.

 I then interviewed Travis Powell, who is a possible witness, to the shooting. He said himself, Aaron Jackson & Tory Jackson were going to Louie's Hot Dogs. Travis was driving his mother(s GEO-Storm which he parked in Louie's parking lot. They exited the vehicle and Tory got into a fight with some guy across. All of a sudden alot of shooting started. Travis turned around and saw a guy standing over Tory (who was lying in the street) and the guy was shooting at Tory. Travis said he didn't see the shooter's face and couldn't recognize him. It was then requested that Travis be transported down to the Homicide Office for a more detailed statement.

 I observed a 1989 GEO, yellow in color, NY Reg. # ECF 131 parked in the lot at Louie's. This vehicle is registered to Willie C. Wilson of 46 Poultney St. who is Travis Powell's father. The car has what appears to be a ricochette off the passenger side roof. I also observed a spent .22cal shell casing lying on the ground in the parking lot approximately 5' East of 1155 East Delevan. This .22cal casing was retrieved by Det. Smardz.

Dixon-003526

## BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

| TO | SUBJECT | DATE 8-1-91 |
|----|---------|-------------|
| FROM | FILE 91-145 Jackson Homicide | |

I then returned to the Homicide Office to continue this investigation.

Respectfully Submitted,

*James P. Lonergan*

Det. James P. Lonergan

Dixon-003527

BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

TO    Ralph V. Degenhart
      Commissioner of Police

SUBJECT
Homicide at Bailey & East Delava
CD # 221-504

DATE 8/10/9

RECEIVED
HOMICIDE BUREAU
BUFFALO POLICE DEPT
91 AUG 4 5:12

FROM  Police Officers  PCT. 16
      RaChelle M. Brown
      James R. Diegelman

Attention: Homicide Chief Richard Donovan

Sir:  At 0129Hrs on 8/10/91 a call was received by PO's Diegelman/Brown
in 18N of shots fired, officer in trouble at Bailey & East Delavan. Upon
arrival, officers observed several blood splotches in the middle of the
street on East delavan, near the address of 1157. Next to the blood spots
were (4) spent bullets, believed to be 9 millimeter caliber, also found
was a small caliber gun belived to be a ████████████████████
handels, containing one (1) spent casing in the cyl. Officer's ██████████
25 spent casings within a 25' diameter area. The 25 spent casing and the
bullet also found by Officers Diegelman/Brown were then turned over to D
Henry Smardz of evidence squad and pictures of the scent were ██████ by
William Shepard of photography squad. Above informtion ███████████████
Det. James Lonergan of homicide. Both of the above weapons ████████████
released by Homicide CURT. 22 Cal gun was ████████████████████████████

                                        Respectfully Submit████

                                        ████████████████████
                                        PO RaChelle Brown ████████
                                        ████████████████
                                        PO James Diegelman ███
                                        RESPECTFULLY FORWARDED

Respectfully forwarded,                                David Caruso

Dixon-003528

1    in regard to the above mentioned fatal

2    shooting.  During the course of this

3    investigation a certain thirty-two caliber H & R

4    revolver came into my possession.  I received

5    this item from Police Officer Rochelle Brown who

6    is Diegelman's partner at the scene.  I did

7    examine this article and performed a latent

8    fingerprint examination on same.  My results

9    would be described as negative due to the fact

10   that although latent prints were developed, they

11   lack significant identifiable ridge detail for

12   comparable purposes. They were there before

13   discharge.  It's signed by Henry Smardz,

14   detective in the evidence unit and sworn to

15   before a Commissioner of Deeds.

16

17                          *      *      *

18

19

20

21

22

23

                              20

Dixon-003529

P-127 (Rev.11/85)                    POLICE DEPARTMENT, BUFFALO, N.Y.

## EVIDENCE CONTROL REPORT

CD ___221504___

Date___8/10/91___

NOTE:   For Fingerprint Examination, Use Form P-77-C
          For Laboratory Analysis, Use Form DCPS-L-1

TT Pg.#_____

Hrs._____

EVIDENCE DESCRIPTION: (A) silver break-front .32 cal.revolver make UNK,ser.#747,2"b

lk.grips w/5 shot cylinder, 1 spent .32 round in cylinder under hammer (B)Twenty

Seven (27) spent brass 9mm shell casings and (C.) one (1) copper jacketed bullet

| WHERE FOUND | (Specify: Ex. Kitchen; Car; Suspect's Person; inc.) in street | | (Address  No.  St. 1157 E.Delavan | | Apt.No) |
|---|---|---|---|---|---|
| Time 0133 HRS. | MO. 8 | DATE DAY 10 | YEAR 91 | Charge Homicide/Shooting | (Suspect's Mug No.) |
| (Suspect's | Last Name  First  M.I.) | (Date of Birth) MO.  Day  Year | (Address  No.  St. | | Apt.No.) |
| (Suspect's | Last Name  First  M.I.) | (Date of Birth) MO.  Day  Year | (Address  No.  St. | | Apt.No.) |
| (Victim's | Last Name  First  M.I.) Jackson, Torriano (Deceased) | | (Address  No.  St. 19 Thatcher,bflo.NY | | Apt.No.) |
| EVIDENCE SEIZED By: Ra-Chelle Brown | (Name-Print or Type) | (Rank) PO | (Unit) 116 | (Signature) | |

### CHAIN OF POSSESSION OF EVIDENCE

| OBTAINED FROM (Signature Required) | GIVEN TO (Signature Required) | TIME Hrs. | MO. | DATE DAY | YEAR |
|---|---|---|---|---|---|
| 1. PO#M13 | Henry M. Smards | 0215 | 08 | 10 | 91 |
| 2. Henry M. Smards | Mr. Ng | 0930 | 8 | 12 | 91 |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |

REMARKS:   items are evidence re:Fatal Shooting from E.Delavan & Bailey,8/10/91
          Hom#91-143

Case No.   ECU/LP#91-0853          Property #  179477       Refer to: CH 6 MF

Dixon-003530

*EVIDENCE*

*BUFFALO POLICE DEPT.* 7 /NUMBER

Date of Crime 8/10/91                    P-112
Type of Crime Homicide/Shootings
Location     Bailey & E.Delevan
Victim   1. Torriano Jackson,BM,17(Deceased)

2.Mario Jarmon,BM,19  3.Aaron Jackson,BM,20  4.Johnsullivan,BM,17

Description of Evidence & Location Found. (A) .32 cal. 5 shot revolver,silver colored make UNKN. break front, ser.#747 w/2"bbl containing spent .32 cal casing (B). Twenty-Seven (27) spent 9mm casings (brass) (C) one (1) copper jacketed bullet. items received at the scene from PO Ra-Chelle Brown Pnct #18

8/10/91 - 0225 hrs

Case No. ECU/LP#91-0853    Collected By HS/ HS    Date 8/10/91

*all 27-9r casings were fired from t same fireurm*

---

*EVIDENCE*

*BUFFALO POLICE DEPT.* 8 /NUMBER

Date of Crime 8/10/91                    P-112
Type of Crime Homicide/Shootings
Location     Bailey & E.Delevan
Victim   1.Torriano Jackson,BM,17(Deceased)

2.Mario Jarmon,BM,19  3. Aaron Jackson,BM,20  4. John Sullivan,BM,17

Description of Evidence & Location Found. sample of dry red stain (susp.blood) recvd off the seat portion of the frnt.pass.seat '90 Chev.2dr.yellow,NY Plt. ECF-131,in the parking lot of Louie's Red Hots. SW corner of Bailey and E.Delevan (2484 Bailey)

Case No. ECU/LP#91-0853    Collected By HS/ HS    Date 8/10/91

---

*EVIDENCE*

*BUFFALO POLICE DEPT.* 9 /NUMBER

Date of Crime 8/10/91                    P-112
Type of Crime Homicide/Shootings
Location     Bailey & E.Delevan
Victim   1.Torriano Jackson,BM,17(Deceased)

2.Mario Jarmon,BM,19  3.Aaron Jackson,BM,20  4.John Sullivan,BM,17

*Badly demeg But consistent w/being cores of jacketed Br*

Description of Evidence & Location Found. lead slug recvd.on the top cellar stair of the cellar stairway,NW corner of 2484 Bailey Ave (Louie's Red Hots) 13" E.of the W.wall & 8" N.of the front edge of the top stair

Case No. ECU/LP#91-0853    Collected By HS/ HS    Date 8/10/91

Dixon-003531

# EXHIBIT B

Dixon-003532

State of New York)
County of Erie ) SS.
City of Buffalo )

LEONARD L. BROWN Date of birth 12-7-70 20yrs of age a black male residing
63 Fay in the lower phone #893-1497. Being duly sworn deposes and makes t
following statement in Room #304 of the Buffalo Police Headquarters the o
of the Homicide Section. Statement typed and questions asked by Det. Ranie
Masecchia, in the presence of Det. Dan DiPirro.

Q. Can you read and write and how far did you attend school?
A. Yes, I got my G.E.D. from High School.

Q. Are you employed and if so where?
A. Yes, At a BUCK OR TWO 2129 Bailey.

Q. Where do you and with whom?
A. 63 Fay, with my Mother and my little brother, Antoine Shannon.

Q.  The Buffalo Police Homicide Section is presently investigating a shoot
that happened E. Delavan and Bailey Ave. on 8-10-91 at approximately 1:3
As a result of this shooting a Torrano Jackson B-Male 17yrs of age of 19
Thatcher st. was pronounced dead at the ECMC Hospital a short while late
Also the following were also shot and are presently being treated for
gunshot wounds. Aaron ~~Thacher~~ black male 20yrs. of 19 Thatcher, Mario
Jarmon B-M-19yrs of age of 1122 E. Delavan and a John Sullivan black mal
17yrs of age of 49 Elmer. Can you tell me what you know of this incident
A. Let me tell how it started, Aaron Jackson and Torre Jackson and a coupl
of other boys a few weeks before the shooting, they was at a party at a
new club somewhere downtown. My little brother Antione Shannon was also
there with a couple of his friends. One of the boys that he was with ha
a little controversy over something. Torre and Aaron and bunch of those
guys pulled out a gun, my brothers friends ran, they surrounded my brot
Antione and told him to get down on his knees. Torre had the gun. My
brother wouldn't get down and he just ran, nobody shot at him. OK the
night of the shooting, Me my little brother Antione and Mario Jarmon we
was in this corner store on Bailey and Delavan, I was in the store and
they was outside, my little brother came and called me to come out. He
me that one of the guys that pulled the gun on him was sitting in a car
a little Geo across the street in a Parking lot at the Norse Star bank.
We walked across the street to the car, I told my little brother to tel
Aaron Jackson to get out of the car, I wanted to fight him one on one
I mean my brother wanted to fight one on one. But Aaron didn't want to
he kept talking about his brother just dying. That was Fred Jackson he
about 4 weeks ago he OD or something. He jumped in the car with a anot
guy named Travis he was saying to wait that he was gonna come back and
spray all us Mother Fuckers. Me, my little brother and Marion walk back
rips house on E. Delavan. We were there for about 5 minutes when we see
Yellow Geo go back towards Bailey, this time there are a some more peop
in the back seat. We went into the house and my little brother called
Tino, thats Valentino Dixon. It took Tino around 45 minutes to get ther
When he came he was with Lamarr. All of them walked up to the corner ar
they told me to stay by the house. Then I saw the Geo pull up and they
started exchanging words on the corner, Tino and Lamarr started to come
back towards the houses, the Geo parked in Louies parking lot. As Tino,
Lamarr and Antoine were coming to me, I saw about 5 guys, Aaron, Torre
and some others start with Mario who still up at the corner, They were
going after Mario throwing punches, Mario was backing up so I ran up th
to help Mario and Tino and Lamarr were behind me. I was to get up to th
fight and thow a bottle at someone when I heard a shot. Then I was look
around and then I heard all kinds of shots. I seen Lamarr with the gun
he was shooting. I started backing up, the duds was lying on the groun
and Lamarr must have lost control of the gun it just kept going off. T
had run away and ran behind him. Tino jumped in his car and drove and r
and my little brother ran up into Marios house. Then Lamarr ran away i
some yard.

Q. How old is your little brother Antione  Shannon?
A. 18yrs.

Q. Can you describe the gun Lamarr had?
A. It was black, it had a handle and he held it with two hands, it looked
like a machine gun. L.B

Statement of Leonard L. Brown continued on page #2.....................

A.17

Q. Do you know Lamarr's full name?
A. No, but we came down here together, I didn't know him until that time of the shooting.

Q. How did you and Lamarr happen to come here together?
A. My father, Step father had talked to Tino in jail and he got us all together and had us call the News.

Q. What is your relationship to Tino, Valentino Dixon?
A. He's my half brother, we got the same Father.

Q. Did you see anyone else besides Lamarr with a gun at the time of the shooting?
A. No.

Q. Did you have a gun?
A. No,

Q. How many shots did you see Lamarr shoot?
A. I don't know I heard the first shot coming from the street, then Lamarrs shots were like firecrackers.

Q. Did you and Lamarr discuss what you were going to tell the Police tonight
A. No.

Q. Do you know what happened to the gun that was used in the shooting?
A. No.

Q. Do you know where Lamarr was when he called Channel 2 News?
A. Yes, 63 Fay he was my house.

Q. Who else was in the house when he called?
A. My Father Robert Bryant and my Mother Ann Shannon, and my brother Antione.

Q. Channel 2 stated that they called 893-1497 whose phone # is that?
A. My mothers Anne Shannon at 63 Fay.

Q. Did you see Lamarr with the gun before the shooting started?
A. No.

Q. Did Lamarr give you the gun after the shooting?
A. No.

Q. Did Tino have a gun the night of the shooting?
A. No. I didn't see one.

Q. OK, is there anything else you can think of that might assist us in this investigation?
A. No.

Q/ I will now have you read this 1 3/4 page statement and if there are any additions or corrections tell me and I will make them now. Do you understand?
A. Yes.

Q. OK, now that you have read the statement, is it true and correct?
A. Yes.

Q. Will you sign it?
A. Yes.

Sworn to and subscribed before me this the
12th Day of August, 1991

_____  Signed  _____
Commissioner of Deeds in and for the
City of Buffalo, County of Erie, State of NY.
Exp. 12/92

A.18

```
1

2        91-1476
         1/13/92
3        10:30 AM
         CLW
4

5

6             L E O N A R D    B R O W N, sworn, testified:

7

8

9                  (Whereupon, a PHOTOGRAPH was received
         and marked Grand Jury Exhibit 10.)
10

11

12        BY MR. BELLING:

13   Q.   I want you to state your name and spell your

14        last name for the stenographer, please?

15   A.   Leonard Brown, B- R- O- W- N.

16   Q.   Your date of birth, Mr. Brown?

17   A.   12/7/70.

18   Q.   Your home address?

19   A.   63 Fay.

20   Q.   Who do you live with at 63 Fay?

21   A.   My mother.

22   Q.   What is her name?

23   A.   Annie Shannon.
```

21

A.175

Dixon-003535

```
 1      Q.   And what is your father's name?

 2      A.   Samuel Brown.

 3      Q.   Do you go to school or work or what?

 4      A.   I work.

 5      Q.   Where do you work?

 6      A.   Sheraton Hotel.

 7      Q.   The one out --

 8      A.   Walden.

 9      Q.   By the Galleria?

10      A.   Yeah.

11      Q.   Okay.  Are you related to Valentino Dixon?

12      A.   No, no relation really.

13      Q.   Isn't he your half brother?

14      A.   He not my half --  he's half brother like cause

15           my father --  I don't have the same father as my

16           brother but my mother like was with his father.

17           His father raised me as we was growing up

18           because my mother broke up with his father.

19      Q.   What is Valentino's father's name?

20      A.   Robert.

21      Q.   Robert Dixon?

22      A.   Robert Bryant.

23      Q.   Robert Bryant?
```

22

A.176

Dixon-003536

```
 1      A.    Yeah.

 2      Q.    You know Robert Bryant because he was around

 3            when you were being raised, right?

 4      A.    Yeah.

 5      Q.    Is Robert Bryant still living with your mom on

 6            Fay Street?

 7      A.    No.

 8      Q.    Now, the night of August 10th, 1991, or the

 9            early morning hours, were you present at the

10            corner of Bailey and East Delavan when a

11            shooting took place?

12      A.    Yes.

13      Q.    Why don't you describe for the Grand Jury the

14            events starting from your first encounter with

15            Aaron and Torri Jackson through the shooting.

16            I'll let you do the narrative.

17      A.    Okay.  It was me, Mario and Twan.  That's my

18            little brother.  We was walking up the street.

19            We went to the store, went in the store and my

20            little brother came in the store.  I was up to

21            the counter and my little brother came in the

22            store and said Leonard, come here, come here,

23            come here.  I put everything down and ran out
```

23

A.177

```
 1          the store.  It was like Aaron because they

 2          had -- Aaron had put a gun on him.

 3    Q.    On Antwan Shannon?

 4    A.    Torri had put a gun on me.  They was

 5          altogether.  They told him to get on his knees

 6          like two weeks before that.

 7    Q.    Okay.

 8    A.    At a party.  We was going over there to confront

 9          him.

10    Q.    Take your time, no rush.

11    A.    We was going over there to confront him.  We

12          went over across the parking lot.  He was

13          sitting in the driver's seat of the car, the

14          passenger seat.

15    Q.    A little yellow car?

16    A.    Yeah.  We was like -- it was like why did you

17          put a gun on my brother for.  He started getting

18          all loud and everything.  He said my other

19          brother, you know who I am, my other brother

20          just died because his other brother died like

21          two weeks before that, something like that.

22    Q.    Right.

23    A.    And he was like you know who I am.  Then he
```

ACF 10

24

A.178

Dixon-003538

1       jumped over on the passenger --  I mean the

2       driver's side, pulled off and then his friend

3       Travis got in the car, too.  They was like just

4       stay right here and we going to come back and

5       smoke all of you.

6    Q. Who said that?

7    A. That's what Aaron said.

8    Q. Okay.

9    A. Then they drove off.  So we walked down to Mario

10      house and we just see the yellow car. We in

11      Mario driveway.  They couldn't see us.  His

12      house is on Delavan.  They was riding by.  They

13      rolled by and they ain't see us and they got

14      more people in the car this time.  So they ain't

15      see us.  We walked back up to Delavan.  Then we

16      seen LaMorr.  LaMorr came on the bike.  We seen

17      LaMorr riding down the street on a bike.

18   Q. Which street was he riding down?

19   A. Delavan.

20   Q. From the Chevy Plant or Cheektowaga?

21   A. Chevy.

22   Q. Okay.

23   A. He was coming.  We got in the house.  I guess he

25

A.179

Dixon-003539

```
1              was coming from Chevy.  We was right in front of
2              his house.  I was coming up the driveway when I
3              seen LaMorr.
4      Q.      What about Valentino Dixon?
5      A.      He wasn't there.
6      Q.      He wasn't there when LaMarr got there?
7      A.      Uhn-nun.
8      Q.      Go ahead.
9      A.      LaMorr came.  We was telling him we got a beef
10             and everything with them.  They said they was
11             going to come and shoot.
12     Q.      Take your time.  You sound like you're very
13             nervous.  This poor lady has to take everything
14             down.  It hard when you talk real fast and
15             jittery.
16     A.      We seen LaMorr and told him there was a beef and
17             everything.  They kept riding around in a
18             circle.
19     Q.      Now Valentino was still not there?
20     A.      No, he was never there, not yet.
21     Q.      Okay.
22     A.      LaMorr, he was going to come right back.  I got
23             a beef with him, I'll be right back.  LaMorr
```

ACF 10

26

A.180

Dixon-003540

```
 1          left.  We walked on Delavan then.

 2     Q.   Who all walks up on Delavan?

 3     A.   Me, Mario and Twan.

 4     Q.   Just the three of you?

 5     A.   Yes.

 6     Q.   Where do you go?

 7     A.   To the store.

 8     Q.   Drugstore on your side of the street, on Mario's

 9          house side of the street?

10     A.   Yeah.  Then we seen Tino.  First we called Tino.

11          We called him first.

12     Q.   Okay.

13     A.   Then we seen him coming down Bailey and we waved

14          him down.

15     Q.   Tino comes down Bailey?

16     A.   Yeah.

17     Q.   And you and Mario and Twan are there?

18     A.   Uh-huh.

19     Q.   You wave him down?

20     A.   Yeah, we stopped him.  He pulled over.

21     Q.   Okay, he pulls over on Bailey?

22     A.   No. He pulled over down the street.  We stopped

23          him.  He ain't pull over right then.  He rode
```

27

A.181

Dixon-003541

```
 1              and turned around and we started walking down
 2              Delavan towards Mario house.  Then he pulled
 3              over and we was talking to him.  We was telling
 4              him what went on.  Then LaMorr came coming
 5              back.  It was like something like ten, fifteen
 6              minutes later because we was sitting there
 7              because then they rode past again.  They ain't
 8              see us.  We all back in the backyard because the
 9              way Mario house is, he sit back on Delavan.  You
10              can't see when you're riding around.
11      Q.     So now Valentino is with you but LaMarr is not
12              there?
13      A.     No.  Then LaMorr come on a bike.  He got a
14              little book bag, package with him.  He came in
15              the driveway.  Then he went, took the whatever
16              bag back in the back.
17      Q.     Back of Mario's house?
18      A.     Yeah.
19      Q.     Okay.
20      A.     Then Tino, Twan, LaMorr and Mario walk up to the
21              store on Delavan right there.  They was going to
22              get some beer.  They walk up there.  Then they
23              come -- while they walk up there, I stayed
```

28

A.182

```
 1              there.  I stayed.

 2      Q.      You stayed at Mario's house?

 3      A.      Yeah, because they told me to stay there and see

 4              if they ride back by again.

 5      Q.      Okay.

 6      A.      They went up to the store.  Torri and them was

 7              riding right by at the same time.  I seen them

 8              all.  They was like at the corner of Bailey and

 9              Delavan.  They was talking.  I don't know what

10              they was talking about.  I was down the street.

11      Q.      Let me stop you a second.  When you say you saw

12              them all, was it Torri and Aaron and --

13      A.      And a lot of people in the back seat of the car,

14              like three people in the back seat of the car.

15      Q.      Besides Torri and Aaron?

16      A.      They was in the yellow car.

17      Q.      There is Travis Powell, Torri and Aaron, anybody

18              else in the car?

19      A.      Yeah, it looked like there was at least three

20              people in the back seat.

21      Q.      Leonard, calm down.  Assuming you're telling the

22              truth, you don't have anything to be nervous

23              about.  Okay.  Now, when they're out of the car,
```

29

A.183

Dixon-003543

```
1              who are they talking to in the street?

2      A.      Okay.  When they jumped -- they didn't jump out

3              of the car.  When they jumped out, they ain't

4              jump out.  They pulled in the parking lot.

5      Q.      Pulled in the parking lot of Louie's?

6      A.      Yes.

7      Q.      After they did that, what did you see happen?

8      A.      I seen them run across the street.  It was like

9              four of them.

10     Q.      Four of them?

11     A.      They ran across the street.

12     Q.      Okay.

13     A.      And then it was like four of them.  Then Twan,

14             Tino and LaMorr come running back down.  They

15             was saying something in the car at the light

16             because they had to stop at the red light first

17             because they could turn in Louie's.  I don't

18             know what they said.  I wasn't down there.

19     Q.      Okay.

20     A.      Then they made a right, pulled up in Louie's

21             parking lot and Twan, Tino and LaMorr ran down

22             towards Mario house.

23     Q.      Okay.
```

30

A.184

Dixon-003544

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ERIE

* * * * * * * * * * * * * * * *

THE PEOPLE OF THE STATE OF NEW YORK

         -vs-            RELEVANT NAME AND PLACE LIST
      VALENTINO DIXON,
           Defendant      Indictment No. 91-1476-001

* * * * * * * * * * * * * * * *

Crime Date and Place:       August 10, 1991 at
                        approximately 1:30 A.M.

Crime Location:          East Delavan and Bailey Avenues,
                        Buffalo, New York.

------

1.  Torianno Jackson -victim- ꝺⅭↃ   Buffalo, New York

2.  Aaron Jackson           Buffalo, New York

3.  John A. Sullivan III      Buffalo, New York

4.  Emil Adams            Buffalo, New York

5.  Fred Stancil           Buffalo, New York

6.  Robert Lewis, Jr.        Buffalo, New York

7.  Tamara Frida           Buffalo, New York

8.  Jeffrey Shelton        Buffalo, New York

9.  Mario Jarmon          1122 East Delavan Avenue,
                        Buffalo, New York

10.  Leonard Brown         63 Fay Street, Buffalo,
                        New York

11.  Heather Smith         Buffalo, New York

12.  Richard Jarrett (Wallace)  Buffalo, New York

13.  Walter Dennis         Buffalo, New York

14.  Lamar Scott           Buffalo, New York

15.  Antoine Shannon      63 Fay Street, Buffalo,
                        New YOrk

16.  Sonya James           Buffalo, New York

A.210

Dixon-003545

```
 1              shooting everybody, just shooting, just started
 2              shooting.  Everybody was --  at first I didn't
 3              think no bullets was in the gun, he was shooting
 4              so much.  Nobody was falling. Everybody just
 5              started dropping down.
 6         Q.   Did you see when Torri Jackson fell down?
 7         A.   Yeah, I seen when everybody fell down.
 8         Q.   After Torri Jackson fell down, what happened?
 9         A.   When he was shooting, when Torri Jackson fell
10              down, LaMarr was shooting.
11         Q.   Did you see when LaMarr ran up and stood over
12              Torri and shot him while he was down on the
13              ground?
14         A.   Well, I seen when Torri was on the ground.
15         Q.   Okay.  We've had other witnesses in here who
16              testified and all of them testified that when he
17              was down, the guy with the machine gun ran up
18              and stood over him and shot him.  Did you see
19              that part?
20         A.   Ran up to him when he was on the ground, I
21              seen -- yeah, he was shooting.
22         Q.   You saw LaMarr shoot him when he was down on the
23              ground?
```

34

A.188

Dixon-003546

```
 1    A.    He was shooting.  Yeah, he was shooting the
 2          gun.  Everybody was on the ground.  He was
 3          shooting.  Like the gun wouldn't stop.  He
 4          just --
 5    Q.    Let me stop you.  Let me stop you a second.  Did
 6          you see it when LaMarr had the gun pointed down
 7          at the ground and was shooting into Torri
 8          Jackson laying on the ground?
 9    A.    Just shooting just exactly at him?
10    Q.    Right.
11    A.    No, I didn't see him shooting exactly.
12    Q.    You didn't see that?
13    A.    Like he was down on the ground but he just like,
14          like shooting at him like that.
15    Q.    The reason you didn't see it is because if you
16          saw that, that would ruin LaMarr's claim that
17          this was self-defense, wouldn't it?
18    A.    I didn't see that.  I didn't see him shoot him
19          on the ground like that.
20    Q.    So you would disagree with the other witnesses
21          who said they did see that?
22    A.    Who said --
23    Q.    You were watching it, right?
```

35

A.189

```
1    A.   I was right there, yeah.

2    Q.   So you would disagree with other witnesses who

3         say that whoever had the machine gun stood over

4         Torri and unloaded it into him while he was

5         down?

6    A.   Just over him and unloaded the whole thing on

7         him?

8    Q.   Not the whole thing, several shots?

9    A.   Just standing over him on top of him?

10   Q.   Yeah.

11   A.   I would say I disagree with that but he did

12        shoot him while he was on the ground but he

13        didn't jump all over him and shoot him like

14        that.

15   Q.   Okay.

16   A.   He did shoot him while he was on the ground.

17   Q.   After that, what happened?

18   A.   So then we started -- everybody was scared.  I

19        looked at Tino and then Tino looked at me.  Twan

20        looked at me.  Tino started running first down

21        the street.  Twan started running and I started

22        running.  LaMorr was the last one.  We didn't

23        know where Mario was at.  Mario was around the
```

36

A.190

Dixon-003548

```
 1          corner because he had got shot.  We didn't know

 2          how bad he was hurt.  We thought it was because

 3          he was fighting.  They say his lungs collapsed

 4          and everything.  Then we was running up the

 5          street.  Tino jumped in his car, pulled off.

 6          LaMorr ran with the gun, ran in the backyard,

 7          ran in Mario's backyard.  Me and Twan went in

 8          Mario's house.  LaMorr ran in the backyard,

 9          running back.  He ran in the backyard and jumped

10          the fence and came back.

11    Q.    Didn't LaMarr hide the gun in the backyard?

12    A.    He hid the gun somewhere.  I ain't know.  He hid

13          the gun somewhere.  He had to.

14    Q.    Eventually didn't you tell LaMarr you got the

15          gun and took care of it?

16    A.    Did I say that?

17    Q.    Yes?

18    A.    No.

19    Q.    If LaMarr in his sworn statement told the police

20          you got the gun, that was wrong?

21    A.    Yeah, that was wrong.  If he told the police that,

22          that was wrong at the time.  I don't know what

23          he was saying right then.
```

37

A.191

1    Q.    Now, let me show you an Exhibit here.  Let me

2          show you an Exhibit.  I want to show you Grand

3          Jury Exhibit Number 10.  Why don't you tell me

4          what that is a picture of?

5    A.    This --

6    Q.    Is that a picture of your half brother Valentino

7          Dixon with a machine gun in his lap?

8    A.    Yeah.

9    Q.    Do you know where that was taken?

10   A.    No, I ain't too familiar with the house.

11   Q.    Is that the same machine gun that LaMarr had

12         that night?

13   A.    No, it's not that big.

14   Q.    Okay.

15   A.    The gun he had was like this big.

16   Q.    Smaller machine gun, just for the record you're

17         gesturing about two feet like?

18   A.    This big because LaMorr can hide it in his

19         jacket.  When he was running up the street, he

20         was taking it out of his jacket running with it

21         at the same time.  It's not that long.  It's

22         like this big, something like this.

23   Q.    Now, LaMarr came back then you say, right?

38

A.192

Dixon-003550

```
 1    A.   Yeah.

 2    Q.   Okay.  Then later that night all of you guys

 3         went your separate ways?

 4    A.   Yeah.

 5    Q.   Now, two days later didn't Robert Bryant, you,

 6         your mother and Antwan go out and find LaMarr?

 7    A.   Uhn-nun.  LaMorr always kept in touch with my

 8         father.

 9    Q.   LaMarr kept in touch with your father and on the

10         night of August 12th, two days later, didn't

11         your whole family go pick up LaMarr and take him

12         to 63 Fay?

13    A.   No.  LaMorr came over there.

14    Q.   Came over to 63 Fay?

15    A.   No, he didn't come over to 63 Fay.  He came over

16         to my father's house.

17    Q.   Which is where?

18    A.   Well, they all met up on Goodyear.

19    Q.   That's your father's house on Goodyear?

20    A.   Uhn-nun.  They was altogether.  They met up.

21         Somehow they all met up together.

22    Q.   Who is they, who all met up on Goodyear?

23    A.   It was LaMorr, my father, Arnece (sic).
```

39

A.193

Dixon-003551

```
 1    Q.   Who is your niece?

 2    A.   Arnece.

 3    Q.   Arnece, okay.  Arnece is her name, okay.

 4    A.   That's it.

 5    Q.   So they met on Goodyear.  Then they came to 63

 6         Fay Street?

 7    A.   Yeah, because LaMorr say he wanted to testify

 8         because Tino didn't do it.  He say he did it.

 9    Q.   So from 63 Fay Street somebody called Channel 2

10         News, right?

11    A.   Yeah.

12    Q.   Who called?

13    A.   My mother did.

14    Q.   And your mother called Channel 2 News because

15         LaMarr was going to confess to it, right?

16    A.   Yeah.  He wanted to confess.  He scared to go

17         right to the police.  He say he ain't going to

18         the police.

19    Q.   LaMarr was there at 63 Fay Street with you and

20         Twan, right?

21    A.   Yeah.

22    Q.   Your mother and your father, right?

23    A.   Yeah.
```



40

A.194

```
 1    Q.   And Arnece, whoever she is?

 2    A.   Uh-huh.

 3    Q.   Arnece is Valentino's girlfriend, isn't she?

 4    A.   Yeah.

 5    Q.   All these people are there and LaMarr is going

 6         to call Channel 2 News because he's going to

 7         confess?

 8    A.   Yeah.

 9    Q.   Then a bunch of you went in a car and took him

10         to the corner of Genesee and Bailey where he met

11         Channel 2, right?

12    A.   Yeah.

13    Q.   You were all in the car?

14    A.   I wasn't in a car. I was on a bike.

15    Q.   Too many people to get all in a car?

16    A.   Yeah.  The car was small.

17    Q.   You're all over and standing around when Channel

18         2 News shows up?

19    A.   Yeah.

20    Q.   You ever seen the videotape of that?

21    A.   Yeah.

22    Q.   Your father is in the background of the

23         videotape?
```

41

A.195

Dixon-003553

```
1      A.    Yeah.

2      Q.    As a matter of fact Channel 2 wants to talk to

3            him and he says he doesn't want to talk to them,

4            right?

5      A.    I don't know.

6      Q.    Then LaMarr tells the police that he was the one

7            who did the shooting, right?

8      A.    Yeah.

9      Q.    Now, Leonard, I want to read you something.

10           There is a crime that's called perjury in the

11           first degree.  It reads a person is guilty of

12           perjury in the first degree when he swears

13           falsely and when his false statement consists of

14           testimony, and is material to the action or

15           proceeding or matter in which it is made.  I'm

16           telling you that your information on who did

17           this shooting is clearly material.  You're here

18           testifying before a Grand Jury.  Now, are you

19           prepared at this point in time to stand by the

20           testimony you just gave that LaMarr is the

21           shooter?

22     A.    Yeah.

23     Q.    Okay.
```

42

A.196

Dixon-003554

```
 1      A.   Yeah.

 2      Q.   You are?

 3      A.   Uh-huh, yeah.

 4      Q.   Any doubt in your mind?

 5      A.   No doubt.  LaMorr, yeah, LaMorr did the

 6           shooting.

 7      Q.   Okay.

 8      A.   Everybody knows LaMorr did the shooting.

 9      Q.   Now, I think I can tell you and I'm not telling

10           you this to frighten you or scare you in any

11           way, I can tell you that at this point in time

12           several other witnesses have identified your

13           half brother Valentino Dixon as having been the

14           shooter.  I want to ask you if you agree with

15           their testimony, disagree with their testimony,

16           feel that they couldn't observe or what the

17           problem might be?

18      A.   I disagree with their testimony.

19      Q.   So it's your sworn testimony under oath here

20           that Valentino Dixon was not the shooter?

21      A.   Okay.  What if, if like the people that testify

22           against Tino, right.

23      Q.   Right?
```

43

A.197

Dixon-003555

```
 1   A.   Like Travis, he testified against Tino that Tino
 2        did the shooting.
 3   Q.   I'm not going to  tell you what anybody
 4        testified to.
 5   A.   And he telling people out on the street that he
 6        know Tino didn't do the shooting, like we can
 7        get some kind of tape of him saying he know Tino
 8        didn't do the shooting.  Would that make any
 9        difference, if we could get him on tape that he
10        know Tino didn't do the shooting?
11   Q.   I don't know if it would make any difference if
12        you and your family would get it on tape.
13   A.   Somebody else.  A girl came up to me and tell me
14        that Travis say he know Tino ain't do the
15        shooting.
16   Q.   You're telling this Grand Jury that some girl
17        told you that Travis told her?
18   A.   He know Tino didn't do the shooting.
19   Q.   We don't have to worry about that.  That's third
20        or fourth generation hearsay.  We don't have to
21        worry about that.  I'm more concerned about you
22        right now.  I'm more concerned about you.  I
23        want to make sure that I've given you every
```

44

A.198

Dixon-003556

```
 1            possible opportunity to tell us the truth and
 2            you've done that, right?
 3     A.     Uh-huh.
 4     Q.     And there is no doubt in your mind that you've
 5            done that?
 6     A.     No doubt.
 7     Q.     No doubt in your mind that you've told the
 8            truth?
 9     A.     Yes.
10            MR. BELLING:       Any Grand Jurors have any
11            questions for Leonard Brown?
12            BY MR. BELLING:
13     Q.     Now, Leonard, it's your testimony that you were
14            down Delavan towards Mario's house as you
15            witnessed this, correct?
16     A.     Witnessed what?
17     Q.     The shooting, August 10th?
18     A.     No.  I was right there.  I was right there at
19            the shooting when everything happened.
20     Q.     Okay.
21     A.     We ran.  Everybody had ran.  I was down at his
22            house when they had pulled up.  Then they had
23            ran back down.  Everybody had ran back up
```

45

A.199

1      towards me.

2   Q.  You told us that you waited behind back at

3       Mario's house when Valentino, LaMarr, Mario and

4       Twan went up to the corner, right?

5   A.  Uh-huh.

6   Q.  Now, Valentino, Twan and LaMarr start to retreat

7       back toward Mario's house?

8   A.  Yeah.

9   Q.  While they're retreating, you're walking up

10      towards the corner?

11  A.  Yeah.  I started coming.  I didn't just walk.

12      When they started running, I waited until they

13      got down to the house.  Then I started running

14      first.

15  Q.  Now you're running back while they're still at

16      the house, correct?

17  A.  No.  They're right with me.  They started

18      running, too.  I had waited until they got down

19      to Mario's house and LaMorr had run in the

20      backyard.  Then when he got in the backyard, I

21      started running back up towards the house,

22      towards where they were at.

23  Q.  You started running back towards --

46

A.200

Dixon-003558

```
 1    A.    Everybody did.

 2    Q.    Okay.

 3    A.    I was the first one.

 4    Q.    You start doing that before the shooting occurs,

 5          correct?

 6    A.    Yeah.

 7    Q.    By the time the shooting occurs, are you up to

 8          where Mario and Torri Jackson are in hand to

 9          hand combat?

10    A.    When the shooting occurs, I'm right there in

11          front of everybody.

12    Q.    How far away from LaMarr shooting were you?

13    A.    LaMorr was right -- I was right here.  He is

14          like right at the chair right there.

15    Q.    Okay.  For reference later on that's no more

16          than six feet away?

17    A.    No more than six feet.

18    Q.    No ---

19    A.    No more than five feet.

20    Q.    Okay.  Does LaMarr stay in one place while he

21          shoots?

22    A.    When he shooting, yeah -- no, he don't stay in

23          one place.  He walks in the street though.
```

47

A.201

Dixon-003559

```
1    Q.    Does he move up towards where Torri Jackson fell
2          on the ground?
3    A.    Yeah.
4    Q.    When he moved up towards Torri Jackson on the
5          ground, where do you go?
6    A.    I'm staying in my same spot.
7    Q.    As he walks away from you, he's got the gun and
8          still shooting, correct?
9    A.    Yeah.
10   Q.    Where is Valentino?
11   A.    He's on the sidewalk.  Him and my little brother
12         Twan, they gone on the sidewalk by the bus stop
13         standing right there.
14   Q.    That's the bus stop on the drugstore side of
15         this whole street, right?
16   A.    Yeah, store side.
17   Q.    And the shooting that LaMarr is doing is going
18         away from where they're standing, correct?
19   A.    Yeah.
20   Q.    They must be behind him at that point then?
21   A.    Yeah, right behind him.
22   Q.    They're also behind you?
23   A.    No, because I'm on the other side of LaMorr.
```

48

A.202

Dixon-003560

```
 1    .     I'm like closer to Bailey.

 2    Q.    Closer to Bailey than LaMarr?

 3    A.    Yeah.

 4    Q.    How far would you say you were away from LaMarr

 5          when he shot Torri Jackson?

 6    A.    I'd say from like here to like -- from right

 7          here to the end of that table.

 8    Q.    You're talking about the coat rack in Grand Jury

 9          Room A to the end of the foreman's table here, a

10          distance of approximately fifteen to twenty

11          feet?

12    A.    Yes, something like that.

13          MR. BELLING:        Any other questions for

14          Leonard?

15          BY MR. BELLING:

16    Q.    A question from a Grand Juror.  You said earlier

17          you saw Torri Jackson with a gun, correct?

18    A.    Yeah.

19    Q.    Were you watching when Torri Jackson supposedly

20          shot Mario Jarmon those two times that you told

21          us about?

22    A.    No, I wasn't watching.  See, I seen him with the

23          gun but I heard the gunshots.  I ain't see the
```

49

A. 203

Dixon-003561

1         gun.  I ain't see him just pull the trigger.

2   Q.   That's the question; why not, were you looking

3         at Torri Jackson, could you see him at the time

4         you heard the gunshots?

5   A.   Yeah, I could see him.

6   Q.   Okay, when you heard the gunshots, was the gun

7         pointed at Mario?

8   A.   Yeah.  He was the only one there.  I was the

9         first one up.  I heard the gunshots but I ain't

10        see him when this all happened.  I just seen the

11        gun in his hand and I ain't see him --  when I

12        seen him when I got up to him, I ain't see him

13        just shoot.  I heard gunshots on my way like up

14        there.  When I first started running, I heard

15        gunshots.

16   Q.   Let's break it down a little.  When you saw the

17        gun in Torri Jackson's hand, did you hear any

18        gunshots?

19   A.   When I saw it in his hand?

20   Q.   Right.

21   A.   No.

22   Q.   Next question is when you heard the gunshots,

23        did you see Torri Jackson with a gun in his

50

A.204

Dixon-003562

```
 1        hands?
 2    A.  When I heard the gunshots?  When I heard the
 3        gunshots after, then I seen him with the gun.
 4        After I heard the gunshots, I heard the gunshots
 5        then I seen him.  He had the gun in his hand.
 6    Q.  Did you see him both before and after that?
 7    A.  I ain't see him before the gunshots.
 8    Q.  So you don't see the gun in Torri Jackson's
 9        hands until after you heard gunshots?
10    A.  Yeah.
11    Q.  Where were you looking when you heard those
12        gunshots?
13    A.  I was running up the street.
14    Q.  Could you see Torri Jackson when you heard the
15        shots?
16    A.  Yeah.  I could see them all.
17    Q.  Who is them all?
18    A.  It was Torri, Travis, Aaron and a few --
19        somebody else.
20    Q.  Who else?
21    A.  I don't know all the other guys.  I guess Robert
22        was one of them.
23    Q.  Robert who?
```

51

A.205

Dixon-003563

```
 1      A.    Rabbit.

 2      Q.    Rabbit?

 3      A.    Yes.

 4      Q.    Okay.

 5            At the time that you heard Torri Jackson

 6            shooting Mario as you say, how far away from the

 7            two of them were you?

 8      A.    Like -- how far when I heard the first gunshot?

 9      Q.    Correct, the first gunshot.

10      A.    I was kind of far.  I was like from that wall

11            back there to this wall like and halfway to

12            that, another half.

13      Q.    So you're talking the depth this room and then

14            another half the depth of the room?

15      A.    Yeah.

16      Q.    So if this room is --

17      A.    Like well, like two of this room.

18      Q.    Two of this room?

19      A.    Yeah.

20      Q.    Okay, just for the record Grand Jury Room A, the

21            depth of the room doubled?

22      A.    Yeah.

23      Q.    You're that far away.  Were you running towards
```

52

A.206

```
 1              them?

 2      A.      Yeah, I was running up the street.

 3      Q.      Did you see the gun in Torri Jackson's hand at

 4              the time?

 5      A.      When he fired?

 6      Q.      Yes.

 7      A.      Uhn-nun.  I was too far away.  I couldn't see

 8              it.

 9      Q.      You heard him fire?

10      A.      Yeah.

11      Q.      You heard him fire at least twice?

12      A.      Yeah.

13      Q.      When you got closer, you saw it?

14      A.      Yeah, when I got closer up.  That's when LaMorr

15              came and started shooting, shooting everywhere.

16      Q.      Those two shots are the only shots Torri Jackson

17              fired?

18      A.      Yeah, that's the only shots I heard from his

19              gun.  I just heard all kinds of other shots from

20              LaMorr.

21      Q.      Now, LaMarr was behind you when you heard

22              shooting everywhere, right?

23      A.      Yeah -- no, no, he wasn't behind me.  When
```

53

A.207

```
 1              LaMorr started shooting everywhere, he was on
 2              the side of me when he started shooting
 3              everywhere.
 4         Q.   You were not behind him and Torri Jackson at
 5              that time?
 6         A.   Uhn-nun.
 7         Q.   You were next to him?
 8         A.   Yeah.
 9         Q.   You say from the chair away is what you told us,
10              five feet?
11         A.   Yeah.
12         Q.   He was shooting out this way?
13         A.   Yeah. He had moved, walked up in the street and
14              started shooting.
15         Q.   Okay. Now, as I understand it then on the 12th
16              LaMarr ended up on Fay Street where your whole
17              family was including your father, Robert Bryant,
18              right? You've got to answer yes or no.
19         A.   Yes.
20         Q.   From Fay Street your mother called the news
21              media saying LaMarr wanted to make a statement?
22         A.   Yeah. He didn't want to go to the police. He
23              said he want to call the news, yeah.
```

54

A.208

Dixon-003566

```
1   Q.   What other relationship, if any, does LaMarr
2        Scott have with your father or your family?
3   A.   Never seen them before in his life.  That's the
4        first time I ever seen him before that night.
5   Q.   The night of the shooting?
6   A.   That was the first time I ever seen him before.
7        That was the first time my father ever seen
8        him.  I guess he know Arnece and he know Tino
9        didn't do this and I don't know how they hooked
10       all up.  They hooked up.
11  Q.   Isn't it true that your father told LaMarr that
12       if he claimed it was an accident, he would only
13       do two to six for manslaughter, isn't that true?
14  A.   I don't know.
15  Q.   If that was said, It wasn't said in your
16       presence?
17  A.   No.
18  Q.   That wasn't said at 63 Fay Street?
19  A.   It wasn't said in my presence.
20       MR. BELLING:     Any other questions? Okay,
21       Leonard, you're all done.
22
23                        *     *     *
```

55

A. 209

Dixon-003567

DID NOT TETIFY AT TINO'S

```
 1
 2         91-1476
           1/13/92
 3         10:10 AM
           CLW
 4

 5

 6         M A R I O   J A R M O N, sworn, testified:

 7

 8         BY MR. BELLING:

 9    Q.   Would you state your name and spell your last

10         name for the stenographer?

11    A.   Mario Jarmon, J- A- R- M- O- N.

12    Q.   Your home address, Mario?

13    A.   1122 East Delavan.

14    Q.   Your date of birth?

15    A.   12/23/71.

16    Q.   And who do you live with at 1122 East Delavan?

17    A.   My mother.

18    Q.   What is her name?

19    A.   Lillie Jarmon.

20    Q.   And do you know a person by the name of

21         Valentino Dixon?

22    A.   Yes, I do.

23    Q.   How long have you known Valentino Dixon?
```

ACF 10

A.162

Dixon-003568

```
 1      A.   I'd say five years.

 2      Q.   Would you rate yourself as one of his friends?

 3      A.   Yes.

 4      Q.   Do you know his two half brothers?

 5      A.   Yes.

 6      Q.   What are their names?

 7      A.   Leonard Brown --  Leonard Brown, Twan Shannon.

 8      Q.   Twan Shannon?

 9      A.   Yes.

10      Q.   Do you know his true name to be Antwan Shannon?

11      A.   Yeah.

12      Q.   I want to call your attention to the night of

13           August the 10th, 1991.  Do you remember that

14           particular night?

15      A.   Yes, I do.

16      Q.   Do you remember being out in the vicinity of

17           Bailey and Delavan at that time?

18      A.   Yes, I do.

19      Q.   As a matter of fact your house is right down the

20           street from Bailey and Delavan, isn't it?

21      A.   Yes.

22      Q.   I want you to describe for the Grand Jury what

23           happened that night in terms of you're coming
```

3

A.163

Dixon-003569

1        into contact with a couple of fellows named

2        Aaron and Torri Jackson.  Keep your voice up.

3    A.  Me, Leonard and Antwan seen Aaron Jackson and we

4        approached him, told him about pulling a gun to

5        Antwan's head.

6    Q.  This is something that happened before, the

7        claim that Aaron Jackson had put a gun to

8        Antwan's head?

9    A.  Yes, two weeks before.

10   Q.  On this time, August 10th, you and the two half

11       brothers are going to confront Aaron?

12   A.  Yes.

13   Q.  Where is the car?

14   A.  Across the street in the Norstar parking lot.

15   Q.  Little yellow car?

16   A.  Yes.

17   Q.  Do you know whose car it was?.

18   A.  Travis's mother, I believe.

19   Q.  Travis Powell?

20   A.  Yes.

21   Q.  You first have a confrontation with him in the

22       Norstar parking lot?

23   A.  Yes.

4

A. 164

Dixon-003570

1    Q.    How does that confrontation end up?

2    A.    We asked him a couple of questions.  He just got

3          hyper and started going off like making threats

4          and he say I'll be right back.  He got Travis

5          and drove away.  I'd say about twenty minutes

6          later they had his brother and Travis.  They

7          came back looking for us.

8    Q.    Now it's Travis, Torri Jackson and Aaron Jackson

9          all in a little yellow car?

10   A.    Yes.

11   Q.    They come back to the vicinity where you are?

12   A.    We was sitting in my driveway in my car.

13   Q.    Your driveway at 1122 is a little ways down from

14         that intersection going towards the city,

15         correct?

16   A.    Right.

17   Q.    And it's also on the same side of the street as

18         the drug store that is on that corner, right?

19   A.    Right.

20   Q.    Where were you when you first saw them coming

21         back around in the little yellow car?

22   A.    We was in my driveway in the driver's seat and

23         there was like I guess they was like looking for

5

A. 165

```
 1           my house.

 2      Q.   Sort of cruising slow down there?

 3      A.   Yeah, looking around.

 4      Q.   When you saw them, what did you do?

 5      A.   We laughed.  Me, Leonard and Twan laughed.

 6      Q.   Did anybody at that point in time make a phone

 7           call to Valentino to get him to come over?

 8      A..  Yes, Twan beeped Valentino.

 9      Q.   What do you mean beeped him, telepager?

10      A.   Yes.

11      Q.   He had to go in the house and use the phone?

12      A.   Right.

13      Q.   Is it a voice pager or just to get him to come

14           over?

15      A.   Just to get him to come over.  I'm not sure.

16           Valentino came about ten minutes after that.

17      Q.   Okay.  By the time Valentino was there, where

18           were the Jacksons and Travis Powell?

19      A.   They had drove away.

20      Q.   What happened next?

21      A.   Well, after that, after Tino pulled up, LaMorr

22           came.

23      Q.   LaMorr is LaMarr Scott?
```

ACF 10

6

A.166

Dixon-003572

```
 1    -  A.   Yes.

 2       Q.   Tino came first and then LaMarr came?

 3       A.   Yes.

 4       Q.   How did LaMarr get there?

 5       A.   I think he was on a Moped, bike, something like

 6            that.

 7       Q.   How did Valentino get there?

 8       A.   He drove.

 9       Q.   They showed up not together but close in time?

10       A.   Close in time, yeah.

11       Q.   Did either of them have a weapon that you could

12            see when they arrived?

13       A.   LaMorr.

14       Q.   What kind of weapon was it?

15       A.   I believe it was an automatic one.

16       Q.   A machine gun-type thing?

17       A.   Yeah.

18       Q.   Had you ever seen that gun before?

19       A.   No.

20       Q.   Now, after they were both there, what was done

21            with the gun?

22       A.   LaMorr asked me to put it in my hallway because

23            I told him it wasn't going to be necessary to
```

7

A.167

Dixon-003573

```
 1         -      use that.

 2         Q.     Okay.

 3         A.     He put it in my hallway and we walked to the

 4                store, back to the corner store to get some

 5                beer.

 6         Q.     Who is we at this point, how many people went?

 7         A.     Me, Twan, LaMorr and Valentino.

 8         Q.     So that's five people including yourself?

 9         A.     Leonard stayed at my house.

10         Q.     Leonard stayed.  It's four people including

11                yourself?

12         A.     Right.

13         Q.     Now, you go down to the store.  What happens

14                when you get down there?

15         A.     Okay. We get right by the mailbox and we see

16                Travis pulling back up and they like pointing in

17                the car.  They pointing at us, we going to get

18                you, waving a gun and everything.  They pulled

19                in Louie's parking lot.  I stayed there, Twan,

20                LaMorr and Tino ran back to his house.  I stayed

21                there.

22         Q.     You're there alone when the car stops. What

23                happens then?
```

8

A.168

```
 1    A.   They come out the car with a gun.  Torri had the

 2         gun.   Revolver ??

 3    Q.   Torri Jackson?

 4    A.   Yes.

 5    Q.   Okay.

 6    A.   And Aaron had like a knife, box cutter,

 7         whatever.  I don't know.  I don't know where

 8         Travis went.

 9    Q.   You don't know where Travis went?

10    A.   No.  He was there but there was a lot of people

11         trying to break it up.  They was coming at me

12         trying to corner me.

13    Q.   Let me stop you a second.  You know a kid whose

14         street name is Rabbit, his real name John

15         Sullivan?

16    A.   Yes.

17    Q.   Was he one of the ones trying to break it up?

18    A.   I believe so, he was.

19    Q.   Right in the fray though, right?

20    A.   Yeah.

21    Q.   Okay.  Now --

22    A.   Him and another guy named John.

23    Q.   Okay.  So what happens then?
```

9

A.169

Dixon-003575

```
 1          ambulance found you?

 2    A.    Well, one of my friends came by and helped me

 3          out, told me to lay on the ground.

 4    Q.    Eventually you found you were wounded and you

 5          ended up spending some time in the hospital,

 6          right?

 7    A.    Yes.

 8    Q.    And the hospital you went to is ECMC, right?

 9    A.    Yes.

10    Q.    You were admitted that night, the night of

11          August 10th or early on the 11th, whichever?

12    A.    Yes.

13          MR. BELLING:        Any questions for Mario

14          Jarmon from the Grand Jury?  Okay, you can step

15          down.  You're all done.

16

17                            *      *      *

18

19

20

21

22

23
```

ACF 10

14

A.174

Dixon-003576

# EXHIBIT C

Dixon-003577

EVIDENCE

BUFFALO POLICE DEPT. $\frac{22}{\text{NUMBER}}$

Date of Crime _____ 8/10/91

Type of Crime _____ Homicide/Shootings

Location _____ Bailey & E.Delevan

Victim 1. Torriano Jackson,BM,17(Deceased)

2.Mario Jackson,BM,19   3.Aaron Jackson,BM,20   4.John Sullivan,BM,17

Description of Evidence & Location Found. Clothes of Susp/Deft.Valentino Dixon,BM

received from Valention Dixon,1500 hrs 8/10/91 at the Hom.Sec.Ofc.

A. 1pr. Blue/Blk."Nike" Sneakers Airmax size 9½   B. Blk.nylon jogging

pants "NIKE" size L   C. grey sweatshirt w/blk.trim on sleeves "NIKE"

"Force"   D. baseball cap "G" navy blue w/wht.bill -w/"Villanova Wildcats"

logo

Case No.  ECU/LP#91-0853        Collected By ___ MS/4?        Date 8/10/91

Exhibit 2

Dixon-003578

(l)   A Buffalo Police Department form P-127 with an attached form P-10A dated 8-10-91 and both bearing the property number 179477.

(m)   An Erie County Medical Center Personal Property Statement regarding Torriano Jackson.

(n)   An Erie County Medical Center Personal Property Statement regarding Aaron Jackson with one page attached.

(o)   Medical records of Aaron Jackson.

(p)   Medical records of John A. Sullivan III.

4.   Various crime scene photographs and related photographs as well as videotapes relative to this matter are available for inspection by the defense by making arrangements through Assistant District Attorney Christopher J. Belling.

5.   Stolen property is not involved in this case and as far as might be germaine under Paragraph e of the defendant's Demand to Produce.

6.   Upon information and belief two vehicles connected with the defendant were seized in regard to this investigation.

7.   Upon information and belief at this time the People are not possessed of any tapes or other electronic recordings which we intend to introduce at trial.

8.   In terms of required disclosure, the People hereby disclose to the defense the following information:

(a)   Attached hereto is a Form P-73 dated 8-14-91 authored by Det. Mark R. Stambach.

Dixon-003579

# BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

| TO | Lt.L.J.Baehre<br>ID Section | SUBJECT | DATE 8/12/91 |
|---|---|---|---|
| | | CD#221504 Hom.#91-145 ECU/LP#91-0853<br>Re:Hom/Shooting,8/10/91- Bailey & E.Delevan | |
| FROM | Det.H.M.Smardz<br>ECU | Victim(s):1.Torriano Jackson,BM,17(Deceased)<br>2.Mario Jarmon,BM,19   3.Aaron Jackson,BM,2<br>4.John Sullivan,BM,17 | |

Attn: Capt.R.T.Donovan
        Chief/Hom.Section

Sir;

On Sat.08/10/91, 0140 hrs. I was notfd. at home via phone by Lt.Wm.Smith of the DDSO that the services of the ECU were requested by the Hom.Sec. in the 16th Prct. Re: Homicide/Shootings - Bailey & E.Delevan.

I arrived at the scene at 0220 hrs 8/10/91 and was metby Insp.Labedz (DI) and Det.Lonergan (Hom.Sec.) who along w/Prct.Officers from #16 advised me of what had thus far possibly transpired. After Wm.Shephard (Photo Unit) videotaped and photographedthe area I conducted a Crime Scene Search & collected Physical Evidence (please refer attached XC P-112 for further info/description of recvd.items.) At this time during the initial crime scene search Items #1 thru #10 were recovered.

At approx. 0420 hrs 8/10/91 Evid.Items #11 ,12 & #13 were collected at the ECMC/ER (#11-Clothes of Torriano Jackson) - (#12-clothes of Mario Jarmon) and (#13 - clothes of Aaron Jackson)-refer XCP-112 for further information.

At 0630 hrs. 08/10/91 Item #14 (clothes of John Sullivan)was collected at the Sister's Hosp.ER.

Items #15 thru #21 were collected on 8/10/91, 1000 hrs of thereafter during the Autopsy of Hom.Victim Torriano Jackson,BM,17.Alkso at this time a set of inked fingerprint impressions of the victim were recvd.(A check of the BPD-ID Section file for known impressions on file was Negative).

At 1500 hrs 8/10/91 Item #22 (clothes of Valentino Dixon) was collected from the Susp/Date. at the BPD Hom.Section Ofc.

A daylight crime scene search of the area (Bailey & E.Delevan) was conducted on Sat. 1145 hrs 8/10/91 - No Additional Physical Evidence was recovered.

Thus far all toll - Twenty-Two (22) items of Evidence have been collected pertainin g to this incident.

On Mon.8/12/91,all Twenty-Two (22) items were forwardedto the Erie Co.CPS Lab for further analysis.Lab # 76336.(Refer XC DCPS-L 1)

A latent print exam was conducted onitems #5 (.22 cal.casing) and #7 ( .32 cal revolver ,and 27 spent 9mm casings) The results were Negative as No Latent Prints were developed.(Also refer P-778-91)

Respectfully,

Henry M. Smardz

Detective Henry M. Smardz
BPD/ID Section-ECU

Forwarded,

Lt.Larry J. Baehre
BPD/ID Section

# EXHIBIT D

Dixon-003581

BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

| TO Richard T. Donovan, Chief | SUBJECT | DATE 8-10-91 |
|---|---|---|
| Homicide Section | | |
| FROM James P. Lonergan, Det. | File 91-145 | |
| Homicide Section | Jackson Homicide | |

ATTN: Lt. James Rautenstrauch, Homicide Section

Sir;

At 1645hrs, today, I received a phone call from a B-M who wanted to remain anonymous. This B-M stated that the shooting last night at Bailey & Delevan was over a girl: he said that Valentino Dixon and one of the Jackson boys were dating the same girl and this is how the whole thing started. He said the girl'd name is Heather Smith and she attends City Honors School. He then hung up.

Respectfully Submitted,

*James P Lonergan*

Det. James P. Lonergan

*Exhibit 22*

Dixon-003582

# BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

| TO | Richard T. Donovan, Chief Homicide Section | SUBJECT | DATE 12/4/91 |
|---|---|---|---|
| FROM | Det. James P. Lonergan Det. John Vickerd | | File 91-145 Jackson Homicide Dictated by Det. Lonergan |

ATTN: James Rautenstrauch, Lt.

SIR:

Continuing this investigation, the above officers proceeded to City Honors School at Best/Masten. We spoke with Asst. Principal Theresa Pope and informed her we would like to speak with Heather Smith, a student at that school. Mrs. Pope stated she would have to obtain permission from the girl's mother and we agreed.

She contacted the mother, Sandra Smith at 882-5953, who stated she did not object to us talking with her daughter, as long as Mrs. Pope was present.

We then interviewed Heather Smith, B-F, age 16 dob 6/30/75 of 3 Monticello St., phone 882-5953. She stated she was a very close friend of Aaron Jackson. She also stated she was not present when the shooting occurred and found out about it later that evening when some dude she never saw before came up to her and said that "TINO" shot Aaron. We asked her if she knew TINO and she said no. She was asked if she knew Valentino Dixon and she replied "I never heard of him".

This interview was concluded and Heather returned to class.

It should be noted that Heather was interviewed in the presence of Mrs. Pope.

Respectfully submitted,

Det. James Lonergan

JL/les

Det. John Vickerd

Exhibit 23

Dixon-003583

# EXHIBIT E

Dixon-003584

                                                          137

                        Sullivan - Terranova - Cross

1

2      A.   No.

3      Q.   Okay, now you're a hundred or 150 yards away in the

4  dark and you see his face, do you?

5      A.   Yes.

6      Q.   Okay. And, you don't know what he's wearing?

7      A.   No.

8      Q.   Now you also told us that you saw the defendant,

9  Mr. Dixon, standing over Tori Jackson; is that right?

10     A.   Yes.

11     Q.   Okay.  Now, what was Tori Jackson wearing that

12 day?  Do you remember, that night?

13     A.   No.

14     Q.   What was Aaron Jackson wearing?

15     A.   One of them was wearing gray.

16     Q.   The truth is, the truth is, Mr. Sullivan that when

17 you looked from a hundred or 150 yards away in the dark

18 through all this light, glaring light, possibly --

19              MR. BELLING:  Well, your Honor, I'll object.

20          It's already compound, already testifying, and

21          already improper.

22              THE COURT:  Sustained.  You have covered this

23          in pretty great detail.

24              MR. TERRANOVA:  Not in my opinion, Judge.

25              THE COURT:  Let's move along.

                                        Exhibit 12

                                        Dixon-003585

102

Sullivan - Terranova - Cross

1

2    Q.    And you had a couple beers?

3    A.    Yes.

4    Q.    Who bought you the beers?

5    A.    Me.

6    Q.    You went and bought them yourself?

7    A.    Yes.

8    Q.    When you say a couple beers, what do you mean,

9    three or four?

10    A.    Two.

11    Q.    Two beers?

12    A.    Couple.

13    Q.    Were those malt liquor or were they regular beer?

14    A.    Malt liquor.

15    Q.    Would these be 40 bowls?

16    A.    No.

17    Q.    What is a 40 bowl?

18    A.    40 ounces.

19    Q.    40 ounces of malt liquor, right?

20    A.    Yes.

21    Q.    What size beers did you have?

22    A.    12 ounces.

23    Q.    Okay, and this was just before you left the house;

24    is that right?

25    A.    Yes.

Dixon-003586

103

Sullivan - Terranova - Cross

1

2      Q.    Okay.    And did you have anything to smoke?    Did

3   you have any other sort of drug or anything like that?

4      A.    Yes.

5      Q.    What did you have?

6      A.    Had some marijuana and cocaine.

7      Q.    Some marijuana and some cocaine.    Now, how long

8   before you left your house at 49 Elmer did you smoke some

9   reefer and did you snort some cocaine?

10     A.    I didn't snort cocaine.

11     Q.    Pardon me?

12     A.    I didn't snort any of it.

13     Q.    You smoked it?

14     A.    Smoked it.

15     Q.    You smoked crack cocaine, did you?

16     A.    No.

17     Q.    What did you do?

18     A.    I smoked that morning, but it wasn't crack cocaine.

19     Q.    You smoked cocaine in the morning?

20     A.    At home asleep.

21     Q.    What, did you free base the cocaine?

22     A.    No.

23     Q.    How did you smoke the cocaine?

24     A.    On the top of reefer.

25     Q.    So you took some marijuana and you rolled it into a

Dixon-003587

**BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE**

| TO | SUBJECT | DATE 8/10/91 |
|---|---|---|
| | Page 2 | |
| | Multiple Shooting | |
| FROM Det. John Vickerd | File 91-145 Bailey/E.Delavan | |
| Det. James Lonergan | Dictated by Det. John Vickerd | |

a large crowd in the area.  A fight broke out and he saw he was between
Torrey and Aaron Jackson fighting with Mario, lnu, at this time.  He
knew all three persons and went over to try and break it up.  He noticed
a B-M known to him as TINO, go behind a van and come out with a black
Uzi.  He pointed it at Torrey and started firing and that is when John
states he was hit in the leg.

John describes TINO as a B-M, age 21, 6', 160 lbs, short hair, wearing
a black/white jogging suit, possibly with another color trim.  John
states TINO'S real name is Valentino, lnu.  John states he has known
TINO from around the neighborhood and the Genesee/Moselle area and can
identify him.  John states there were multiple gun shots fired in very
rapid succession.  After the shooting, he observed TINO and another B-M
run west on Delavan towards Olympic and saw Mario run toward Bailey.

John states he knows Torrey Jackson was shot because he saw him fall to
the ground and TINO stood over him and kept firing at him, but does not
know who else was hit at this time.

At this time, your writer returned to the Homicide office to further
assist in this investigation.

Subsequent developments will be reported via additional P-73's.

Respectfully submitted,

*John T Vickerd*

Det. John Vickerd

JV/les

*Exhibit 12*

Dixon-003588

# EXHIBIT F

Dixon-003589

STATEMENT of WALTER LEE DENNIS

taken at E. Delavan and Bailey, Buffalo, New York,

on Wednesday, August 14th, 1991.


PRESENT:                    EVAN P. KENNER,
                           Licensed Private Investigator


                           GRETCHEN A. MASLOWSKY,
                           Court Reporter



*Evan P. Kenner*
LICENSED PRIVATE INVESTIGATORS
P.O. BOX 328
GETZVILLE, NEW YORK 14068
716-885-6030
FAX 716-695-5367

Gretchen A. Maslowsky, Freelance Reporter

A-41

Dixon-003590

```
 1      QUESTIONS BY EVAN P. KENNER:

 2      ANSWERS BY WALTER LEE DENNIS:

 3

 4      Q       My name is Evan Kenner.  I'm a Private

 5              Investigator.  I'm going to give you one

 6              of my cards.  I work for a lawyer in

 7              Buffalo.  His name is Sean Hill.  I wrote

 8              his name down on the back of the card.  He

 9              is the attorney for Valentino Dixson.

10              Valentino was charged with murder and related

11              charges for an incident that occurred on this

12              corner where we are now, on the corner of

13              Bailey and East Delavan in Buffalo, on

14              Saturday morning, August 10th, 1991.  The

15              shooting took place shortly after one o'clock

16              in the morning.  I think 1:39 A.M., according

17              to the police.  1:29 A.M.

18              Do you remember the incident that I'm talking

19              about?

20      A       Yes.

21      Q       Here's my card.

                Let me get your full name; it's Walter?

22      A       Dennis.

23
```

Gretchen A. Maslowsky, Freelance Reporter

A.4a

Dixon-003591

```
1    Q        Do you have a middle initial?

2    A        Lee.

3    Q        How old are you, Walter?

4    A        15.

5    Q        And your date of birth?

6    A        5-25-76.

7    Q        Where do you live, Walter?

8    A        210 Ericson.

9    Q        Ericson?

10   A        Yes.

11   Q        E-R-I-C-K-S-O-N?

12   A        No K.

13   Q        That's in Buffalo?

14   A        Yes.

15   Q        Do you have a phone?

16   A        895-5905.

17   Q        Walter, you live with your mom?

18   A        Yes.

19   Q        What is her name?

20   A        Bessy; B-E-S-S-Y Dennis.

21   Q        You told me she's a nurse's aide?

22   A        Right.

23   Q        Now, do you understand 100 percent who I am?
```

Gretchen A. Maslowsky, Freelance Reporter

A.43

Dixon-003592

1      Do you know who I am?

2   A   A lawyer; right?

3   Q   I'm a Private Detective for the lawyer.

4      I'm an investigator hired by the lawyer for

5      Valentino; do you understand?

6   A   Yes.

7   Q   Do you watch television?

8   A   Yes.

9   Q   Do you ever see Magnum P.I.?

10  A   Yes.

11  Q   Do you ever see programs where they have

12     private detectives?

13  A   Matlock?

14  Q   Like Matlock; okay?

15  A   Yes.

16  Q   I'm going to be asking you some questions.

17     I'm going to ask you some questions about

18     what happened on the morning of August 10th,

19     right here at the corner.  One of the Jackson

20     boys was shot and killed, and a brother was

21     critically injured.  Two other boys were

22     wounded as well; do you understand what we're

23     talking about now?


        Gretchen A. Maslowsky, Freelance Reporter

A.44

Dixon-003593

1     A     Yes.

2     Q     Do you know Valentino Dixson?

3     A     Yes.

4     Q     Do you know him personally?

5     A     Kind of, yeah.

6     Q     You recognize him?

7     A     Yeah.

8     Q     Do you remember seeing Valentino Dixson

9        here on the morning of August 10th?

10    A     What I seen was when he ran, that's it.

11    Q     That's the first time you saw him that

12       night?

13    A     Yes.

14    Q     You first saw him running from the scene?

15       Which way was he running?

16    A     That way (indicating).  When he ran everybody

17       ran.

18    Q     That would be westbound?

19    A     Yeah.

20    Q     Along the sidewalk, on the street, where we

21       are?

22    A     Yeah.

23    Q     He went down, westbound, along the sidewalk,

Gretchen A. Maslowsky, Freelance Reporter

A.45

Dixon-003594

```
1              on the north side?  We're on the north side

2              of the street; okay?

3         A    Yes.

4         Q    That was after the shooting or during the

5              shooting?

6         A    During the shooting everybody ran, scattered.

7              He ran.

8         Q    So, you hadn't seen Valentino earlier?  You

9              just remember him when the shooting started?

10        A    Yes.

11        Q    That's what you're saying?

12        A    Yes.

13        Q    Do you recall what was going on at the

14             corner of this particular morning?  Were there

15             a lot of people here?

16        A    A lot of people.

17        Q    How long had you been here?

18        A    At the corner?

19        Q    Yeah?

20        A    Ever since 12:30.  I was coming from a

21             party.

22        Q    You arrived on the corner at 12:30 A.M.?

23        A    Uh-huh.
```

Gretchen A. Maslowsky, Freelance Reporter

A.46

Dixon-003595

1  Q  Now, you told me that you were standing

2     on the corner in front of the deli?

3  A  Correct.

4  Q  Just so you know that's the north side of

5     the street, west side of the intersection.

6     That's the northwest corner; okay?  Do you

7     understand?

8  A  Yeah.

9  Q  Did you have anything to drink at the party?

10 A  No.

11 Q  Did you do any drugs?

12 A  No, I don't do drugs.

13 Q  So, you were sober, straight?

14 A  Straight out sober.  I knew what was going on.

15 Q  Were you with anybody?

16 A  My friend, but he was on the other side of

17    the store.

18 Q  He was around the corner?

19 A  Yes.

20 Q  What is his name?

21 A  Richard Morris.

22 Q  He didn't see anything?

23 A  No, all I know, he started running when

Gretchen A. Maslowsky, Freelance Reporter

A.47

Dixon-003596

| 1 | | everybody else started running. |
|---|---|---|
| 2 | Q | Which way did he run? |
| 3 | A | That way (indicating). |
| 4 | Q | North? |
| 5 | A | He was around the corner. |
| 6 | Q | Do you know any other people that were |
| 7 | | standing around by the bench here? |
| 8 | A | Bench? |
| 9 | Q | I guess there was some other people who were |
| 10 | | friends of Valentino's.  Did you recognize |
| 11 | | any of these guys? |
| 12 | A | I didn't recognize nobody at all.  I heard |
| 13 | | gunshots and luckily before I ran, I looked, |
| 14 | | and I seen him standing up like this, shooting. |
| 15 | Q | You're talking about the shooter? |
| 16 | A | Yes. |
| 17 | Q | You're standing on the corner, and your |
| 18 | | buddies are just around the corner?  You don't |
| 19 | | know Leonard or Antoine? |
| 20 | A | Leonard was with my sister.  He is like my |
| 21 | | brother-in-law. |
| 22 | Q | So, Leonard Brown was here that night? |
| 23 | | You had seen him? |

Gretchen A. Maslowsky, Freelance Reporter

A.48

Dixon-003597

1    A       He was down there.

2    Q       At the time of the shooting?

3    A       Earlier.

4    Q       Earlier.  So, you know Leonard.  You saw him

5           earlier, west of the intersection?  How much

6           earlier?

7    A       About 45 minutes.

8    Q       At the time of the shooting, did you know where

9           he was?

10    A       I didn't know anything was going to happen.

11           I was just standing there.  I didn't know where

12           he was at.  I ran this way (indicating).

13    Q       Don't talk, I'm trying to write it down.

14           Do you know Mario Jarmon?

15    A       Mario Jarmon?

16    Q       Yes.

17    A       Yes.

18    Q       Do you remember seeing him that night?

19    A       He got shot right there (indicating).  I

20           helped him.  We had each other's hand.

21    Q       You had seen him before the incident?

22    A       Yes.

23    Q       You know him?

Gretchen A. Maslowsky, Freelance Reporter

A.49

Dixon-003598

1    A    Yes, I know him.

2    Q    You knew he was shot?

3    A    Yes, he was calling my name.  I told him to

4         lay down.

5    Q    Where was he when you were holding his hand,

6         and where was he after he got shot?

7    A    Over by that first house.

8    Q    Around the corner?  The first house north of

9         the deli?  That's where he went after being

10        shot?

11   A    Yes.

12   Q    Do you know where he was shot?

13   A    At the corner.

14   Q    You think he was shot around the corner?

15   A    Yeah.

16   Q    To set the stage here, you're on the corner

17        with your buddy, and around the corner, Mario

18        is down on the corner?  You had seen Leonard

19        earlier.  Valentino, you don't see until the

20        shooting started, and he's running away?  The

21        guy with the machine gun; do you know who he

22        is?

23   A    I don't know.


Gretchen A. Maslowsky, Freelance Reporter


A.50

Dixon-003599

11

```
1    Q    You don't know his name?

2    A    Nope.

3    Q    When is the first time you saw him; the

4         shooter?

5    A    Right there.

6    Q    He was in the street?  You showed me just

7         out in the street?

8    A    In the middle of the street.

9    Q    In the middle of Delavan?  The opposite of

10        these benches on the north side?

11   A    Yes.

12   Q    What was he dressed in?

13   A    Shorts, a jacket with a T-shirt under it.

14   Q    What kind of jacket?

15   A    I don't know, because when I glanced back

16        he had a jacket on and a hat.

17   Q    What kind of hat?

18   A    A regular baseball hat.

19   Q    Do you know the color of the baseball hat?

20   A    I think it was dark.  It was dark blue,

21        black, something like that.

22   Q    Could you see the weapon that he was

23        shooting?
```

Gretchen A. Maslowsky, Freelance Reporter

A.51

Dixon-003600

1   A   Yeah, it was like an uzi or something.

        It was like it had two handles on it,

        like a heavy gun.  It had two handles on

        it.

5   Q   You're sure, then, seeing that you know who

        Valentino is, that the fellow who was doing

        the shooting was not Valentino Dixson?

8   A   No, it was a dark skin man.

9   Q   Well, Valentino is a black male, so is

        the shooter; right?

11  A   Yes.

12  Q   But you knew Valentino?  You knew who he

        was?

14  A   I know him.

15  Q   If he was shooting you would have recognized

        him?  It definitely wasn't him?

17  A   It definitely wasn't him.

18  Q   How much did he shoot?  Do you remember?

19  A   He shot a round that way (indicating).

20  Q   He shot to the south, towards Louie's, and

        he shot downward to the ground?

21  A   Yeah.

22  Q   How many bullets did he fire?

23

Gretchen A. Maslowsky,Freelance Reporter

A.5a

Dixon-003601

1   A     Like caps dropped out.

2   Q     Did it sound like it was a fully automatic

3         or semiautomatic?  Do you know the

4         difference?

5   A     I don't know the difference.

6   Q     A fully automatic all you do is press the

7         trigger and it keeps firing.  A semiautomatic

8         you are to keep pulling the trigger.

9   A     It's a semiautomatic.

10   Q     The bullets didn't come out in quick bursts?

11         They went boom, boom, boom, boom; not

12         boom boom boom boom?  Do you know what

13         I mean?

14   A     Yeah.

15   Q     What did the guy do after he fired?

16   A     Ran.

17   Q     Which way?

18   A     West.

19   Q     West.  You're pointing the same direction

20         Valentino ran?

21   A     Yes.

22   Q     What did he do with the rifle; did you see?

23   A     Nope.

Gretchen A. Maslowsky, Freelance Reporter

A.53

Dixon-003602

1   Q   You don't know?

2   A   No.

3   Q   Do you have any idea how many bullets were

4       fired?

5   A   A lot.  It was a lot that was fired, because

6       that's not the only gun that was fired.

7   Q   From him only?

8   A   There was a lot fired.

9   Q   Was anybody else shooting?

10  A   Somebody was shooting over there with a

11      22. . The one that shot Mario.

12  Q   So, was there somebody over there on the

13      other side of the street?

14  A   In the parking lot.

15  Q   You're saying an unidentified person was

16      shooting?

17  A   Towards my direction.

18  Q   To the north towards the deli?

19  A   Yes.

20  Q   Was that a machine gun or like a

21      semiautomatic?

22  A   That was a pow, pow.

23  Q   Like a revolver you felt?

Gretchen A. Maslowsky, Freelance Reporter

A.54

Dixon-003603

1    A    It was like a 22.

2    Q    It sounded like a 22?

3    A    Yes.

4    Q    Did it seem like it was a rifle or pistol?

5    A    Pistol.

6    Q    Did you see any pistols?

7    A    All I seen was a pistol they picked off the

8        ground.

9    Q    Who is they?

10    A    The police.

11    Q    Where was that?

12    A    Over towards the curb; over that way.

13    Q    Do you know the Jackson brothers?  Do you

14        know who they are?

15    A    This is the first I ever heard about them.

16    Q    Now, the Jackson's supposedly jumped out of

17        a car and started firing guns.  That is the

18        story we heard.

19    A    A yellow canary car; right?

20    Q    Do you remember that?

21    A    It was a little yellow Geo.

22    Q    And who got out of that car?

23    A    I don't know.


        Gretchen A. Maslowsky, Freelance Reporter

A.55

Dixon-003604

1    Q    Do you recall the yellow Geo at the scene?

2    A    Yes.

3    Q    How many people were firing from that side

4         of the street?

5    A    I don't know.

6    Q    You recall a yellow Geo at the scene, but

7         you don't know how many people were firing

8         on the other side of the street?

9    A    One that I know of.

10   Q    Last question, Walter.  Has anybody made

11        any promises or offered you any money to

12        tell me this?

13   A    Nope.

14   Q    Why are you telling me this?

15   A    Because I seen it.

16   Q    How did it come to be known that you saw

17        what happened?

18   A    Because Leonard asked me if I seen anything.

19   Q    Leonard?

20   A    And I said, "I seen it all."  He said, I

         could tell you everything I seen.

21
22   Q    You helped Mario when he was shot; right?

23   A    Yes.


     Gretchen A. Maslowsky, Freelance Reporter

A.56

Dixon-003605

1   Q       What was he saying to you?

2   A       He was calling my name.

3   Q       Anything else?

4   A       "I'm shot, man."

5   Q       Did he say who shot him?

6   A       No, I told him, "Be quiet."  I said, "The

7           more you talk, the worse it's going to

8           hurt."

9   Q       That is good for now.  I appreciate

10          it.

11          Did you leave the scene after Mario left?

12   A      I ran and told his mother, but at first I

13          told the policeman he was in the middle of

14          the street.

15   Q      You told the policeman what?

16   A      That the man over there is shot, and he

17          ran over there too.  His mom wasn't home.

18   Q      Walter, that's good.  I will be able to get

19          a hold of you later if I need you.  You

20          have my address and I have your address, and

21          you have my card.  Thank you.

22

23          (STATEMENT OF WALTER LEE DENNIS CONCLUDED.)


          Gretchen A. Maslowsky, Freelance Reporter

A.57

Dixon-003606

# EXHIBIT G

Dixon-003607

P-73

# BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

| TO | Richard T. Donovan, Chief<br>Homicide Section | SUBJECT | | DATE | 8/11/91 |
|---|---|---|---|---|---|
| FROM | Det. Mark R. Stambach<br>Det. Daniel R. DiPirro | File 91-145 Torrano Jackson<br>Homicide<br>Dictated by Det. Mark R. Stambach | | | |

ATTN:   James Rautenstrauch, Lieutenant

SIR:

Continuing the above investigation, your writers did go to E.C.M.C.
There your writers did interview Mario Jarmon after obtaining permission
from his doctor, Dr. Vilardo.

He was currently in surgical ICU in Rm. 1934. He had a trach tube and
was not able to speak. He did nod and tell us the following after
several questions.

He said TINO. Valentino Dixon did not shoot him by nodding no. He
nodded that the guy that shot him was the dead guy. He was shot and did
not see TINO with a gun. He will sign a statement when better.

Respectfully submitted,

Det. Daniel R. DiPirro

MS/les

Det. Mark R. Stambach

Mark R. Stambach

Exhibit 3

# EXHIBIT H

Dixon-003609

City of Buffalo
Department of Police

State of New York
County of Erie
City of Buffalo

Lamarr Scott age 18, D.O.B. 9-19-72 residing at 122 Montana street no pho
being duly sworn makes the following sworn statement in the Buffalo Polic
Homicide Squad office. Statement taken by Detective Mark R. Stambach and
questions asked by Detective Mark R. Stambach and Typed also.

Q.  You have the right to remain silent do you understand?
A.  Yes.

Q.  Anything that you say can be used against you in a court of law do
    you undertsand?
A.  Yes.

Q.  You have the right to a attorney and have him present while you are
    being questioned do you understand?
A.  Yes.

Q.  If you cannot afford to hire a attorney one will be appointed to rep-
    resent you before any questioning, if you wish one, Do you understand
A.  Yes.

Q.  Do you undertand these right I have given you?
A.  Yes.

Q.  Having these rights in mind do wish to talk with us now?
A.  Yes.

Q.  You were advised of your rights by me at Genesee and Bailey do you
    remember that?
A.  Yep.

Q.  Can you read and write?
A.  Yes.

Q.  What school did you go to?
A.  Buffalo Alternative, 12th grade.

Q.  The Buffalo Police Homicide Squad is investigating the shooting death
    of Mister Torrano Jackson who was shot to death at Bailey and Delavan
    at 130AM on 8-10-91. Can you tell me in your own words what you know
    about that Homicide and also the shooting of Aaron Jackson, Mario
    Jermon, and John Sullivan?
A.  Yes. Well when the guys came back, they jumped out of a yellow dodge
    shadow and opened fire on me and my friends. I shot back in self d
    yes. After that I ran down the street and I threw the gun. I went
    That was it.

Q.  Who shot and killed Torrano Jackson?
A.  I did.

Q.  What kind of a gun did you use?
A.  A TECH-NINE.

Q.  What caliber is that gun?
A.  I dont know.

Q.  Is it automatic?
A.  Yes.

Q.  Were did you get that gun?
A.  I bought it off the street.

Q.  When you did this shooting who were you with at the time of the
    shooting?
A.  Valentino Dixon, His brother Leonard, and his other brother TWON and
    Mario and that was it.

*Exhibit 4*

Q. How long have you known this guy?
A. Two months.

Q. What was this all about?
A. A argument, threats, the guy Torrano Jackson put a gun to TWONS head and he said he was going to do something to him and that same night he kept on threatining us. After they threatened us they came back and thats when the shooting started.

Q. Do you know Valentino TINO Dixon?
A. Yes.

Q. Is he realated to you?
A. No.

Q. Why are you confessing tonight?
A. I dont want him to get any time for something that he did not do.

Q. Have there been any threats or promises made to you?
A. No.

Q. Have you talked with Valentino TINO Dixon about this since the shooti
A. No.

Q. Did you shot Mario Jarmon?
A. Yes but I dont know!

Q. When the firing started was evryone in front of you?
A. No.

Q. Ware was TINO?
A. About forty five feet to the side of me, to the sidewalk.

Q. Were did you stand when you opened up?
A. On the sidewalk.

Q. Did you ever walk into the street?
A. Yes.

Q. Were you shooting then?
A. Yes.

Q. As Torrano Jackson went down did you run up and put a couple more in him?
A. No.

Q. Did anyone else have a weapon at the time?
A. Torrano and me.

Q. Did Aaron Jackson have a weapon?
A. No.

Q. Did you see Arron with a weapon in his hand?
A. No.

Q. Did you see a man by the name of John Sullivan with a weapon in his
A. No I dont know him.

Q. The only persons that had weapons in there hands were you and Torran
A. Yes.

Q. Did you shot up Delavan towards Grider?
A. No.

Q. Did you shot up Delavan towards Suffolk?
A. No.

Q. Did you shot across the street on Delavan towards Ferry?
A. Yes.

Q. Did you shot anyone in the back?
A. I dont know were I shot them I was just shooting.

Dixon-003611

Q. Did you confess on television tanight?
A. Yes.

Q. Why did you do that?
A. Because I did not want TINO to get any time because he did not do it

Q. Will you take a lie detctor for us tommorrow?
A. Yes.

Q. Did you tell any one after the shooting that you did this shooting?
A. No.

Q. Did you go to a bar and brag about this shooting?
A. No.

Q. Did you talk with Leonard Brown about this shooting?
A. Yes.

Q. Did TINOS mother make you turn yourself in?
A. No.

Q. Is there anything else that you want to add in this statement that I
have not asked that would help me in this investigation?
A. Well not really but the reason I did this was self defense.

Q. I am now going to have you read this four page statement and ask you
if it is OK?
A. Yeah its OK

Q. Will you now sign this statement?
A. Yes.

SIGNED _____

WITNESSED _____

SWORN AND SUBSRIBED BEFORE ME THIS
AUGUST 12 th, 1991

COMMISSIONER OF DEEDS IN AND
FOR THE CITY OF BUFFALO. MY
COMMISSION EXPIRES ON 12-31-91

Dixon-003612

# EXHIBIT I

Dixon-003613

*Exhibit 6*

TO WHOM IT MAY CONCERN:

I'm sending you this letter in hopes that it finally falls in the right hands. 14 years ago I killed a man, which another man is currently serving a life sentence for. Two days after his arrest I confessed to Police and WGRZ T.V news in Buffalo. After I confessed I was arrested on camera and taken to the Buffalo Police station, where I was released an hour later and told "we got who we want, get the hell out of here". Even though several people saw me commit this shooting, the person they wanted was someone I knew in the streets. His name is Valentino Dixon.

Approximately six months later, after constant threats by members of the Buffalo Police Dept. and the D.A. on the case Christopher Belling, I was forced to recant my confession at the grand jury proceeding. Since that day I have carried the burden and the injustice that I helped place an innocent man in prison for a crime I committed. During Valentino's trial I was willing to testify that I was the shooter and was waiting to be called by his attorney, but I was never called.

I have written the District Attorney's Office, The Police Commissioner, The F.B.I in Buffalo and Internal Affairs, more than I care to count and no one has responded or taken my letters seriously. It seems no one cares that an innocent man is in prison, except for the Buffalo News who have written several articles, but it still don't seem to be enough for Buffalo Authorities to except responsibility for what happened. Please read the articles.

I am currently serving time for shooting another man in a unrelated incident. Had I been charged when I confessed, he would not have been a quadriplegic.

I am willing to give an interview hoping that it will finally reveal the injustice that has occurred.   Thank you for your time.

*Lamarr Scott*
Lamarr Scott

CC:  DATELINE NBC, PRIME TIME LIVE, 20/20, AMERICAN JUSTICE, 60 MINUTES, MONTEL WILLIAMS SHOW, OPRAH WINFREY, THE INVESTIGATORS COURT T.V, THE NEW YORK TIMES, THE NEW YORK POST

BCC: The Erie County District Attorney's office: Frank Clark, The Buffalo Police Commissioner: Rocco Diina, The F.B.I. in Buffalo, Internal Affairs

Richard H. Penkalski
Notary Public, State of New York
No. 01PE5032916

SWORN TO ME THIS 27TH DAY OF APRIL 2005

*signature*

Dixon-003614

To whom it may concern,                    2-27-2002.

My name is Lamarr Scott, eleven years ago I committed a homicide that Valentino Dixon is serving life for, after he was arrested, I turned myself in and confessed to the Buffalo police detectives, that I was responsible for the death of Torriano Jackson, I was told that they had who they wanted, and to leave the situation up to them. A few months later I was contacted by the District attorney in the case Christopher Billings. He advised me that it was in my best interest to testify at the grand jury and say that Valentino Dixon committed the crime. I repeatedly refused to do so. After our meeting I found myself being harassed by the ~~lead~~ [lead] detective in the case mr. mark stambach,

Who repeatedly made threats on my life if I didn't come to the grand jury and testify. Eventually I went to the grand jury and recanted my original confession; and told the grand jury that Valentino Dixon committed the crime. I a currently serving a life sentence for another crime. Everyday I wish that there was something I was able to do, to correct this injustice. I'm willing to give an interview in hope that the truth will finally be revealed.

Pg 1 of 2.                    Exhibit 6

Dixon-003615

thank you for your time and consideration into this matter.

SWORN TO BEFORE ME
THIS 27 DAY OF February 2005

DAVID D. ADAMY
Notary Public, State of New York
No. 01AD6039610
Qualified in Erie County
Commission Expires January 31, 20 06

Sincerely
mr Laman Scott - 94B2722

L. S.

L. S.

L. S.

L. S.

pg 1 of 2

Dixon-003616

# EXHIBIT J

Dixon-003617

492

Belling - Coughlin - Cross

1

2       Q.    Incidentally, just for the moment, you likened

3  Lamarr Scott to being something in the area of six feet and

4  rather husky or well-built fellow, is that right?

5       A.    Yes. He's a substantial lad.

6       Q.    On, that happens to correspond with the physical

7  description of automatic weapon shooter given by Emil Adams,

8  doesn't it?

9                    MR. SEDITA:   Objection.

10                   THE COURT:   Sustained.

11  BY MR. COUGHLIN:

12       Q.    Let me ask you this:   You have reviewed all the

13  reports, all the investigation prior to the Grand Jury.   You

14  interviewed the witnesses again before it actually went into

15  the Grand Jury, right?

16       A.    Some of them, yes.   Some of them, no.

17       Q.    The important ones you did, though, right?

18       A.    I think that's a fair characterization, yes.

19       Q.    Were the descriptions of the person who fired the

20  automatic weapon, were they uniform?

21                   MR. SEDITA:   Objection.

22                   THE COURT:   Overruled.

23                   THE WITNESS:   Descriptions are never

24              uniformed, and I have no doubt they were in this

25              case

*Exhibit 19*

Dixon-003618

566

Belling - Sedita - Redirect

2    testified about what Torriano Jackson allegedly did with a

3    handgun that he had.

4        Q.    He alleged that, Mario Jarmon said that Torriano

5    Jackson shot him, right?

6        A.    Two, possibly three times, yes.

7        Q.    Kind of hard to possess a handgun unless you

8    possess it, would that be fair to say?

9        A.    That's correct.

10       Q.    One more question.    You have had occasion to see

11   Valentino Dixon, is that correct?

12       A.    Yes.

13       Q.    Describe to the best of your recollection what

14   Valentino Dixon looks like?

15       A.    Five-seven, five-eight, very youthful looking

16   appearance, 130, 140 pounds.

17       Q.    Look anything like Lamar Scott?

18       A.    No.

19           MR. SEDITA:    Nothing further.

20           THE COURT:    Mr. Coughlin, any recross?

21           MR. COUGHLIN:    No, your Honor.

22           THE COURT:    Mr. Newcomb?

23           MR. NEWCOMB:    Sorry, Judge.

24           THE COURT:    You don't have to apologize, Mr.

25   Newcomb.    Go right ahead and ask.

# EXHIBIT K

Dixon-003620

From :    Cardinale, Anthony <ACardinale@buffnews.com>
Sent :    Friday, 17 September 2004 3:45:30 AM
To :      "'luisapiromalli@hotmail.com'" <luisapiromalli@hotmail.com>
Subject : RaChelle


RaChelle Brown, 457 Sweet St., 892-5456

Sat. 9/11/04

She sees herself in the police video, with her partner, Diegelman.

"I was a rookie."

"It might have been they wanted this other guy" (Dixon, not Scott).

We found two guns.


"Whatever I found, I'm not a gun buff."


"So they never called me... because I tell the truth...
And you can't change my story."

"This is probably why they didn't call me."


"I'd just sued the department and got my job back."

"If you don't say what they want you to say... or how they want you to
say it... they won't/
call you."


Q. Is the gun that's in Det. Szmats' hand the same as the gun on the
ground?

A. I don't think so.  That looks smaller. (The silver one on the ground
looks) Like a
six-shooter.


She started on the force in 1989, fired that same year.

"They said I couldn't pass the physical (and) do karate and can't defend
myself."

*Exhibit 17*

Dixon-003621

# EXHIBIT L

Dixon-003622

STATE OF NEW YORK
COUNTY COURT   :   COUNTY OF ERIE

PEOPLE OF THE STATE OF NEW YORK


        -vs-                                    AFFIDAVIT


VALENTINO DIXON


State of New York    )
                     ss.:
County of Erie       )


        ROGER W. PUTNAM, JR., being duly sworn, deposes and says that:

        1.      I am a Licensed Private Investigator in the State of New York.

        2.      I am aware of the facts surrounding People of the State of New York
vs. Valentino Dixon, Erie County Indictment No.  91-1476.

        3.      I am aware that one Emil Adams appeared as one of the People's
witnesses in the trial of Valentino Dixon.

        4.      On February 3, 13, and 15, 2000 and March 3, 8, 9, 2000 I met with
Emil Adams at Uncle Johnny's Hair Company, 11 East Utica Street, Buffalo, New
York, for the purpose of interviewing him regarding the events centered on the
shooting of Torriano Jackson at the location of East Delavan and Bailey streets
about 1:30 a.m. August 10, 1991.

        5.      I am aware that Emil Adams' original statement to the police stated
that the shooter of a tech-9 semi-automatic weapon was a six-foot tall, husky
built black male.

        6.      I am aware that Emil Adams testifies before the grand jury and in
Court during the trial, that Valentino Dixon was the shooter of the tech-9 semi-
automatic weapon which caused the death of Torriano Jackson.

*Exhibit 11*

Dixon-003623

7. I asked Emil Adams if the testimony that he gave during the trial of Valentino Dixon was true.

8. Emil Adams stated on more than one occasion, that he did not tell the truth.

9. Emil Adams stated to me that he was coerced by the District Attorney to give testimony against Valentino Dixon.

10. Emil Adams stated that he would meet with me at my office 484 Delaware Avenue, Buffalo, New York, for the purpose of giving a sworn statement to the effect that he lied at the trial of Valentino Dixon.

11. After repeated attempts by telephone and by personal visits to Uncle Johnny's Hair Company, i was unable to convince Emil Adams to come to 484 Delaware in order to give a sworn statement.

12. Emil Adams stated that he was afraid of retaliation from the District Attorney's Office and/or the Police Department.

ROGER W. PUTNAM, JR.

205

Adams - Terranova - Cross

1

2      A.    Yes.

3      Q.    Okay.  I know you couldn't give us much of a

4  description here under oath just a few minutes ago, but do

5  you recall what you told the police on August 10th what the

6  shooter looked like?

7      A.    No, I don't recall.

8      Q.    You don't recall?

9      A.    No.

10     Q.    Okay.  Mr. Dixon, would you stand up, please.  Does

11  Mr. Dixon look heavy set to you?

12     A.    No, not really.

13     Q.    No, he doesn't, does he?

14     A.    No.

15            MR. TERRANOVA:  Could I have this marked as

16         Defendant's A, please.

17                   (Whereupon, Defendant's Exhibit A was

18                   marked for identification.)

19  BY MR. TERRANOVA:

20     Q.    Mr. Adams, I'm going to show you what has been

21  marked as Defendant's Exhibit A for identification and ask

22  you if you recognize the signature at the bottom of the third

23  page of that exhibit?

24     A.    Yes.

25     Q.    Whose signature is that?

Dixon-003625

August 10th, 1991

City of Buffalo
Department of the Police

State of New York
County of Erie
City of Buffalo

Emil Adams age 18 D.O.B. 12-30-72 of 65 Hastings phone number 834-2421
Being duly sworn makes the following sworn statement at the Buffalo
Police Departments Homicide Squad. Statement taken by Detective Mark
R. Stambach.

Q. Can you read and write?
A. Yeah.

Q. What school do you go to?
A. Attending a school here I have not finished yet.

Q. The Buffalo Police are investigating a shooting that occured at
   Bailey and Delavan street at 0130AM. Because of this shooting
   there are four people shot. Torriano Jackson was shot tonight
   and because of thisshooting was D.O.A. at the Erie County Medical
   Center. Can you tell me in your own words what you know about this
   shooting?
A. Tonys brother Aron was telling us that he had got into it with
   Mario. But at that time he did not know Marios name. Then the
   police cleared the area out. The police left and then evryone came
   back. Then I was standing by a truck talking with some girls. Then
   Tony , and Aron, and another guys name I forgot got out of the car.
   We was just up there talking. Then Mario and two other guys came walk-
   ing by. Mario said something to Aron. Aron said something back to
   Mario. Then Aron went across the street. The crowd followed Aron
   across the street. To see the fight I guess. Then they never got a
   chance to hit each other. Then the two guys left Mario and came back.
   Thye had some guns. They went to shooting. Tony fell in the street.
   Aron made it across the street. The other guy that was with Tony and
   Aron picked Tony up and brought him to Louies parking lot. While he
   was picking Tony up the Two guys ran back down towards Marios house.
   Thats all I could tell you.

Q. Do you know Mario?
A. Yes I do.

Q. Were does Mario live?
A. On Delavan, I dont know the house number but it is six houses away
   from were everything happened.

Q. Do you know Marios name?
A. Not full name I just know Mario.

Q. What does Mario look like?
A. Maybe six six one, black male kind of stocky, about twenty, brown
   skinned.

Q. Did you see Mario do any shooting tonight?
A. No I did not Mario did not do any shooting.

Q. Who did the shooting?
A. I dont know the guys names but they are friends of Marios.

Q. What kind of gun was used for this shooting?
A. I cant say what kind, it looked like a TECH-NINE to me.

Q. Were did the shooting take place?
A. On the sidewalk and the street in front of the drug store.

Q. As you were standing were did you see Mario first?
A. I seen Mario crosing the street on Delavan and crossing Bailey.
   He was with the two guys that did the shooting.

Q. When this fight broke out were did Mario go?
A. He stayed right there.

*Exhibit 11*

Dixon-003626

PAGE TWO OF STATEMENT FROM EMIL ADAMS

Q.  Were did the two shooters go?
A.  Down by Marios house.

Q.  They walked which way?
A.  Down Delavan towards Olympic on the same side as the drug store.

Q.  Is that the side of Marios house?
A.  Yes.

Q.  Did you see them go into Marios house?
A.  No I did not.

Q.  How many of them came back with guns?
A.  I paid attention to one the other one I thing just had a hand gun.

Q.  How long were they away from Mario and the fight?
A.  About forty seconds or so.

Q.  Can you tell me what the person that had the TECH-NINE looked like?
A.  A black male, heavy set, maybe about twenty the same age as Mario about six feet tall, and I did not see any hair as he had a hat on.

Q.  The shooter with the TECH-NINE what was he wearing at the time?
A.  He was wearing some blue jeans cut up like I have on, a white T-shirt with something on the front. A hat white with a black or blue brim. Thats about it.

Q.  Do you know his name or were he might live or who he hangs with?
A.  Nothing.

Q.  The second shooter do you know him the guy with the handgun?
A.  Nothing.

Q.  The second shooter what did he look like?
A.  A black male, maybe about 5-9 or 5-10, kind of skinny, about eighteen or nineteen, dark skinned.

Q.  What was he wearing?
A.  I could only say Jeans and a T-shirt and a hat.

Q.  After the shooting what way did these two guys run?
A.  Back towards Marios house.

Q.  What kind of pistol was this?
A.  I cant say, it was chrome.

Q.  What color was the TECH-NINE?
A.  Black.

Q.  I am now going to show you a mugg shot number 162576 can you tell me who that is?
A.  Thats Mario.

Q.  These two guys that did the shooting were with before and also after the shooting?
A.  They were with Mario.

Q.  Who were you standing with at the time of the shooting?
A.  A guy named Mack and those three girls.

Q.  Who is Mack?
A.  A guy I know that lives a couple doors down from my cousin. My cousin is Joseph Vernard Washington he lives at 18 Humber street.

Q.  Who are these girls?
A.  I dont know them I was just getting to meet them/

Q.  What kind of a car were they in?
A.  A GEO Tracker, red with a white soft top, there truck got shot and the police have there names. There are three girls.

Q.  Who else was there that you know by name or nickname?

# EXHIBIT M

Dixon-003628

[Rev. 12/86]

**DEPARTMENT OF POLICE**
**CITY OF BUFFALO**
**Photo - Array Identification Affidavit**

DATE: 8 / 12 / 91

STATE OF NEW YORK
COUNTY OF ERIE        } SS. :
CITY OF BUFFALO

AARON   JACKSON _____ , AGE 20 , ADDRESS 19 THATCHER   STREET

_____ , PHONE 836 2809 , BEING DULY SWORN, DEPOSES AND MAKES THE

FOLLOWING STATEMENT TO DETECTIVE   MARK   P.   STAMBACH _____
_____ [Name] _____ [Rank]

AT 1915 HRS., DATE 8 / 12 / 91 , WHILE AT E.C.M.C.   GRIDER STREET
_____ [Address] ___ [City / Town] ___ [State]

NOTE : STRIKE OUT SECTION A OR B THAT DOES NOT APPLY.

I WAS SHOWN A FOLDER WITH SIX [6] PHOTOGRAPHS IN SEPARATE SLOTS :

I PICKED OUT A PHOTO IN THE NUMBER _____ SLOT AND I POSITIVELY IDENTIFY THE PERSON IN THE

PHOTOGRAPH AS BEING THE ONE THAT _____ ME ON ___/___/___
_____ (Describe criminal act) _____ [Date]
I WAS TOLD BY THE ABOVE POLICE OFFICER THAT THE NAME OF THE PERSON IN THE PHOTOGRAPH IS

_____
(Enter name)

I PICKED OUT A PHOTO IN THE NUMBER 4 SLOT AND I IDENTIFIED THE PERSON IN THAT PHOTOGRAPH

AS LOOKING LIKE THE PERSON WHO SHOT MY BROTHER TORRY ME ON 8 / 10 / 91 BUT I CANNOT BE SURE
_____ (Describe criminal act) ____ [Date]
UNLESS HE WAS THERE IT HAPPENED SO QUICK
NUMBER FOUR (Describe why)

*I SWEAR THAT THE ABOVE STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.*

Signed X Aaron Jackson

SUBSCRIBED AND SWORN TO BEFORE ME,

THIS 12TH DAY OF August , 19 91

COMMISSIONER OF DEEDS IN AND
FOR THE CITY OF BUFFALO, N.Y.

*Exhibit 18*

Dixon-003629

245

1                   Jackson - Terranova - Cross

2   happened so quick.  That's different from what you told us

3   earlier today.  Isn't that true?

4       A.   Yes.

5       Q.   Okay, you didn't say to the police in this written

6   statement I'm certain that the person depicted in Number 4 is

7   the one who shot me and my brother, did you?

8       A.   No.

9       Q.   Okay.  You said something different, and that's

10  what I just read to you, right?

11      A.   Yes.

12      Q.   Okay, so you want to change your sworn testimony

13  right now to conform with that?

14      A.   No.

15      Q.   You don't?

16      A.   No.

17      Q.   You're telling us in your sworn testimony now on

18  this witness stand that you were certain that the person that

19  you picked out in slot Number 4 was the shooter?

20      A.   No.  I was not sure.

21      Q.   You weren't sure?

22      A.   No.

23      Q.   Okay, so now you agree with your previous written

24  statement?

25      A.   Yes.

Dixon-003630

Jackson - Terranova - Cross

1

2      A.    No.

3      Q.    When Mr. Belling interviewed you, or whoever

4  handled you when you were in the Grand Jury, they showed you

5  Valentino Dixon's photograph and they told you we're going to

6  show you this photograph in the Grand Jury, didn't they?

7      A.    Yes.

8      Q.    Okay.  So when you saw Valentino Dixon's photograph

9  in the Grand Jury during your testimony, you had seen that

10  photograph before, hadn't you?

11      A.    Yes.

12      Q.    All right.  Now, Mr. Valentino Dixon is the only

13  defendant sitting in this courtroom right now, isn't he?

14      A.    Yes.

15      Q.    And you were told that he would be here, right?

16      A.    Yes.

17      Q.    And, Mr. Belling, and maybe Mr. Klawczyk told you

18  that while you were on the witness stand you'd be asked to

19  point out who the defendant is in the courtroom, didn't he?

20      A.    I knew that.

21      Q.    All right.  And you did that today; isn't that

22  right?

23      A.    Exactly.

24      Q.    My question to you is -- and I'll put it to you one

25  more time -- how do we get from your hospital room on August

252

Jackson - Terranova - Cross

2  12, 1991 at a time when you pick out a photograph and you say
3  you think it looks like the person who did the shooting --
4      A.   Yes.
5      Q.   -- but you don't tell the police that Valentino
6  Dixon is the shooter, how do we get from that point to a
7  courtroom here today where you're pointing out Valentino
8  Dixon as the shooter?  How do we do that?
9      A.   My memory gets better with time.
10     Q.   Your memory got better with time?
11     A.   Yes, exactly.
12     Q.   And the fact that your family members reviewed
13 certain events with you has nothing to do with it?
14     A.   No.
15     Q.   The fact that you have reviewed newspaper articles,
16 seen media reports, seen news clips about the incident, that
17 didn't jog your memory at all?
18     A.   No.
19     Q.   That didn't affect you a bit?
20     A.   No.
21     Q.   The fact that this investigation went on from
22 August until nearly January or February before an indictment
23 occurred and all that contact with the police and the
24 District Attorney's office didn't jog your memory a bit?
25     A.   No.

260

Jackson - Terranova - Cross

1

2   Q.   What was the problem?  You have not told us yet.

3   A.   I don't know still.

4   Q.   You still don't know?

5   A.   He said he had a problem.

6   Q.   So we go from what's up to Tori taking a swing at

7   Mario Jarmon?

8   A.   Yes.

9   Q.   Have I got that right so far?

10   A.   Yes.

11   Q.   What happens next?

12   A.   Then I took a swing at him, and then he swung back,

13   but the flury, took too many, he was taking too many.

14   Q.   Well, there were two Jacksons on one Jarmon, right?

15   A.   Yes

16   Q.   Okay, and you got two fists and your brother has

17   two fists, right?

18   A.   Exactly.

19   Q.   So all of a sudden Mario is down on the road?

20   A.   Yes.

21   Q.   And you're kicking him?

22   A.   Yes.

23   Q.   You admit that, right?

24   A.   Yes.

25   Q.   What is Tori doing?

Dixon-003633

# EXHIBIT N

Dixon-003634

I wasn't sure about a lot of things.

I remember the guard or something knocking on the door after we had deliberated probably 14 hours or so. It was about 11 o'clock at night and they said, ""We're going to have to keep you up in a hotel room'' and all that kind of stuff, and I'm thinking, ""Oh, boy.'' So finally they all said, ""Really, don't be afraid to side with us, because we're convinced of it if you're not.'' So I kind of broke down. I didn't pull a Henry Fonda. We didn't go overnight.

So we went down and, of course, I had to be the one to pronounce the thing. I had to stand up and they said, ""How do you find the defendant?'' And when I said ""Guilty,'' it was like the courtroom erupted. It must have been Valentino's mother who was screaming and crying, and the police were all around us and they had to escort us out.

This was the topper afterwards. We went up and gathered our things, and I'm leaving the courtroom and I saw the judge's chamber door was open and he was in there. And I just stopped and I said, ""Listen, I have to talk to you because I'm upset by this whole thing.'' I said, ""I really don't know how the system works and I was kind of going by gut instinct.'' I said, ""Explain to me why the defense didn't present anybody.'' And he said, ""Well, there's a lot you're not allowed to know.'' But he said, ""Just trust me, you did the right thing on this. This guy lied to the grand jury, he was already doing time for weapons charges and drive-by shootings, drug dealings.'' He said, ""This guy is a menace. He should be off the street.'' The judge told me that kind of in confidence afterwards. He goes ""Sleep well tonight'' you did the right thing.'' And that's how I left.

I came home completely wiped out. I was emotionally just a wreck, the whole thing.

I was waiting for defense witnesses. I was expecting it. You've got to bring somebody to this guy's defense.

Terranova was a sharp guy. He seemed like a pretty slick lawyer. It appeared to me ---- like again, my limited experience and exposure to this ---- that he knew what he was doing. I think he was representing him well. I think he was doing the best he could do. My feel ---- even though the judge didn't clarify it for me, my feeling on it was he just couldn't really find any credible witnesses. It sounded like a crazy situation how it happened ---- it was a large group and there was gunfire and people running everywhere.

I just had so many questions afterwards. It wasn't clear. It wasn't that the prosecution had such good witnesses. They weren't credible at all, I thought. By the time he (Terranova) was done cross examining them, I thought, ""You can't pay attention to these guys.'' Drinking, smoking pot, the whole bit. These guys went from one party to another. ""And then,'' he said, ""here it is at 1 in the morning, it's dark and these shots ring out and you're across the street, and you're going to tell me you can identify this guy and you're high?''

# EXHIBIT O

Dixon-003636

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : FOURTH DEPARTMENT
--------------------------------------------------------

PEOPLE OF THE STATE OF NEW YORK

                   Respondent

    – vs –

VALENTINO DIXON,

              Defendant-Appellant.

                                 Erie County Indictment
                                   No. 91-1476

--------------------------------------------------------

STATE OF NEW YORK    :
COUNTY OF ERIE      : S S :
CITY OF BUFFALO    :

Being duly sworn ROGER W. PUTNAM JR. deposes and says:

    That he is a Licensed Private Investigator with primary offices at 9500 East

Eden Road, Eden, NY 14057.

    That on February 2nd, 2001 he did interview Michael Bland at the New York

State Wyoming Correctional Facility in Attica, New York.

    That the purpose of the interview with Michael Bland was to review his

recollection of an incident that occurred August 10, 1991 at about 0130 hours at the

corner of East Delavan and Bailey Avenue, Buffalo, New York.

    That on that date at that time and place Torriano Jackson was shot and killed.

    That Valentino Dixon was charged and convicted for the murder of Torriano

Jackson.

    That deponent asked Michael Bland if he was present at this incident and did

he see the killer of Torriano Jackson.

A. 121

Dixon-003637

That Michael Bland responded that he was there and did see the individual who shot and killed Torriano Jackson.

That Michael Bland stated to deponent that Lamar Scott was the shooter causing the death of Torriano Jackson.

That he would recognize Valentino Dixon by sight and that Valentino Dixson was not the shooter and killer of Torriano Jackson.

That Michael Bland stated to deponent that he did not testify at the trial of Valentino Dixon.

That Michael Bland stated to deponent that he would not give deponent a sworn statement since he felt it might impede his own appeal process.

I have read this statement and it is true and accurate to the best of my recollection.

ROGER W. PUTNAM JR.

Sworn to before me this 23rd day of May, 2001.

GLENN E. MURRAY
Notary Public, State of New York
Qualified in Erie County
My Commission Expires April 30, 2002

A.122

Dixon-003638

# EXHIBIT P

Dixon-003639

BUFFALO POLICE DEPARTMENT INTRA-DEPARTMENTAL CORRESPONDENCE

| TO | Lt.L.J.Baehre<br>ID Section | SUBJECT | | DATE  8/12/91 |
|---|---|---|---|---|
| | | CD#221504    Hom.#91-145  ECU/LP#91-0853<br>Re:Hom/Shooting-8/10/91-Bailey & E.Delevan<br>Victim(s):1.Torriano Jackson,BM,17(Decease<br>  2.Mario Jarmon,BM,19  3.Aaron Jackson,BM<br>  4.John Sullivan,BM,17 | | |
| FROM | Det.H.M.Smardz<br>ECU | | | |

Attn:Capt.R.T.Donovan
     Chief/Hom.Sec.

Sir;
     On Sat. 8/10/91 at 0330 hrs. I accompanied Wm.Shepherd (Photo Unit) to the
Mobil Station located on Fillmore & E.Ferry St. (1507 Fillmore Ave.) in regards
to the investigation of Hom.Case #91-145 (Torriano Jackson Homicide).

     After photos were taken of a certain vehicle which was struck by gunfire
during this incident, it was determined that the vech.was hit but the missle
did ricochet off of it. The vech.in question was a '90 Chev.GEO Tracker -  2dr.
red w/wht.canvas top, NY Plts#99X-997, regis.to Tamara L. Frida, 40 W.Balcom
Bflo.NY. The vech.was hit on the driver's side door post area.

     The Mgr.on duty at the time the vech.was brought into the station was one;
Tony Chambers.

Respectfully,

Henry M. Smard

Detective Henry M. Smardz
BPd/ID Section-ECU

Forwarded,

Lt.Larry J. Baehre
ID Section /BPD

Orig:ECU FIle
XC:Hom.sec.

Dixon-003640

ROGER W. PUTNAM, JR.
Licensed Private Investigator

SEPTEMBER 15, 1998

VALENTINO DIXON
DIN: 91B1615
ATTICA CORRECTIONAL FACILITY
BOX 149
ATTICA, NY 14011-0149

DEAR VALENTINO:

I WAS RETAINED BY YOUR MOTHER, BARBARA DIXON AND YOUR FATHER,
ROBERT BRYANT, BACK IN 1992 TO RESEARCH YOUR CASE FOR APPEAL
ISSUES. AT THAT TIME I WAS UNSUCCESSFUL.

LAST FRIDAY I CAME UP WITH A WITNESS WHO CLAIMS TO HAVE SEEN
THE ENTIRE INCIDENT ON AUGUST 2, 1991. SHE AND 2 OTHER GIRLS
WERE SCARED BY POLICE AND DIDN'T WANT TO GET INVOLVED. SHE
STATES THAT SHE WILL NOW TESTIFY THAT YOU DID NOT DO THE
SHOOTING.

I NEED TO GET IN TOUCH WITH BARBARA AND/OR ROBERT IN ORDER TO
RETAIN A LAWYER.

A FRIEND OF YOURS AND CLIENT OF MINE, LEE JACKSON, WROTE
GLENN MURRAY, ATTORNEY, ON YOUR BEHALF SOME TIME AGO. I
RECOMMEND MR. MURRAY FOR MOTIONS AND RE TRIAL IF WE ARE
SUCCESSFUL.

EITHER WRITE ME WITH THE INFORMATION OR TELL ME WHERE TO
REACH THEM. YOU ALSO HAVE MY PERMISSION TO CALL ME AT 992-
2083.

I DON'T WANT TO GET YOUR HOPES TOO HIGH, BUT THIS IS <u>NEW</u>
EVIDENCE.

SINCERELY,

ROGER W. PUTNAM, JR.
LICENSED PRIVATE INVESTIGATOR

5 (D)

Exhibit 5(F)

Being duly sworn I depose and say that my name is Tamdra K. Frida. I live at 177 Best Street, Buffalo NY 14207. My Social Security number is (118-56-003). My birth date April 29, 1971. I recall an incident that occured August 10, 1991 at about 1:30 AM at the corner of East Delavan and Bailey Ave. Buffalo, N.Y. I was in Lovee Texas Red Hots parking lot parked in my 1990 620 Machi N.Y. Reg # 397 997. I was with 2 girlfriends, Jacqueline Banks and Sandra Smith. I was parked on the west end of the East Delavan facing toward Bailey about 15' from the curb on the south side of East Delavan. The N.3 of us were sitting in the car eating while 2 guys were talking to us. One guy, Lucky and the other 2 guys were sitting in the car through the passenger side windows. The driver side window & passengers side windows were on the back seat. I saw a car pull up on East Delavan headed east toward Bailey. The car stopped and a lot of guys got out of the car. I remember it did... coming no go around out of the car. There was a lot of guys. So many guys got out of the car. The car was maybe 20 or 25 feet behind us. The corner of Bailey and East Delavan is well lit. Sky bright lights and lights in the parking lot. Two guys about 10 or 15 stopped the number 12 bus stop on the North side of East Delavan west of Bailey. All of a sudden they emerged with another group of guys and the fighting broke out. All of us we were looking. I counted about 3 & 5 minutes after the fight started the crowd grew bigger. I stared to observe. I saw a guy approaching the group from the west of where the fighting was... He was Delavan. He was wearing sun flowers... cloth colored baseball cap. A black sofred... shirt and a gray sweater... remember what kind of pants he was wearing or if... He had a gun. I saw him raise it up and shoot it all the top... He struck his gun out and pointed to...

keys. I told him I would have a tow truck come and get it in the morning. Then a guy in a green Blazer drove up and asked who did the red Tracker belong to and were we at Louies. He told us that the Police wanted to talk to us. Tabby drove us back to Louies. I went up to the 1st officer I saw and identified myself as the driver of the red Tracker. The officer was in plain clothes. He asked me if I saw anything and I told him no. I was afraid to become involved. He wrote down my name, address, and phone number and where my vehicle was. Then Tabby took me home to 40 W. Balcolm St. The Police contacted my mother at least once but did not contact me again. I was supoenaed by the District Attorney. I spoke to a DA and told him the same as I told to Police. I heard that Tino Dixon was arrested for this crime. I do not know Tino Dixon but I knew what he looks like. The guy I saw shooting the gun was not Tino Dixon. I heard from my mother, Brenda Frida that Tino's mother came to 40 W. Balcolm St. looking for me. My mother told her I had moved out of town and did not know anything. I in fact had moved to Cheektowaga. I was not called to testify at Tino Dixon's trial, but was subpoenaed by the District Attorney to a later trial concerning the same matter. Leonard Brown and Mario Yarmon were on trial for perjury. The District Attorney asked me about the shooting fired and to identify my truck. I was not cross examined. Nothing more was said or done about this matter until my ex boyfriend was on trial in September 1998. I testified in that trial and met Private Investigator Roger Putnam. After my testimony Mr. Putnam gave me a ride to Buffalo State College where I am attending college. Since I had told him that one of my courses was Criminal Justice he asked me if this trial was my first encounter with the Criminal Justice system. I at that time

# EXHIBIT Q

Dixon-003644

# ROGER W. PUTNAM, JR.

LICENSED PRIVATE INVESTIGATOR

February 27, 2009

FRANK SEDITA, III, ESQ.
ERIE COUNTY DISTRICT ATTORNEY
25 DELAWARE AVENUE
BUFFALO, NEW YORK 14202

Re: People v. Dixon, Valentino

Dear Frank:

Several years ago in 1990/1, there was a shooting at the corner of E.Delavan and Bailey Avenue. In that shooting, several young men were shot and wounded, and on Torriano Jackson was killed. The person charged and convicted was Valentino Dixon. · He was sentenced to 33-1/3 years to life in prison. He is currently serving his sentence at the Attica Correctional Facility. His trial attorney was Joe Terranova, Esq. and the prosecutor was Chris Belling, Esq. Subsequent to Dixon's conviction there was a perjury trial involving Dixon's half-brother, Mario Jarmon. This office was involved in that perjury trial, however I was not involved in the Dixon trial, but did become aware of some of the facts surrounding Torriano Jackson's death.  At that time I agreed with two of my investigators that Dixon did not commit this crime.

Several years later I was transporting Tamara Frieda, a female witness in an unrelated robbery case, to her class at Buffalo State College. I asked her regarding the trial she just testified in if it had been her first encounter with the criminal justice system.  Tamara replied that she was a witness to a murder that occurred about ten [10] years ago. I then asked her which case that was and she answered "'Tino Dixon". Without qualifying my position, I asked her if Tino Dixon was the shooter and she replied, "Absolutely not", and then named Lamar Scott as the true shooter. She said that she didn't know Tino personally but knew of him through the neighborhood. She stated that the day after Tino was arrested she called Homicide and stated that she was the person who owned the red Tracker that was shot up and she witnessed the entire incident and that Tino Dixon was the wrong guy. Tamara said that she had been afraid to come forward, along with her two friends that were with her in the vehicle; because she feared the shooting was a part of a drug war and she didn't want to get involved. So, at the time of the shooting, she told the police that none of them saw anything. I asked her if she would now

consider becoming a witness and she replied in the affirmative. I eventually took a sworn statement from her.

I proceeded to Attica to visit Mr. Dixon and to inform him of this new found evidence in his case. I advised him to hire an attorney to prepare a motion for a new trial and he informed me that he'd already retained Donald Thompson, Esq., of Rochester, New York. Shortly after this visit I received a letter from Lamar Scott stating that he was in fact the shooter and not Dixon. Mr. Scott requested to meet with me to make a sworn statement attesting to same. I did in fact acquire a sworn statement from Mr. Scott. I then took my file and information to Donald Thompson, Esq. in Rochester.

I have been working on this matter pro bono ever since my meeting with Tamara Frieda. As a result of a newspaper article another witness came forward who is a counselor at the Jesse Nash Center. He stated that he was thirteen years old at the time and was outside the delicatessen at the corner when the shooting ensued. He stated that he could not see the shooter but he could see Tino Dixon who was hunched up against the building on the north side of Delavan and the shooting took place on the south side. He'd thought at the time that Tino had been shot. Although he doesn't know who the shooter was, he does know that Tino Dixon was not.

Frank Clark's comment to an inquiry regarding this case made by the Buffalo News was, "Putnam's witnesses are not credible." The witnesses he referred to were fully employed college graduates with nothing to gain whatsoever. The witnesses against Valentino Dixon however, were convicted felons.

Accordingly, please contact me at your earliest convenience to discuss this matter further and/or arrange a meeting. Mr. Dixon has served eighteen [18] years for a crime, I truly believe he did not commit.

Sincerely,

ROGER W. PUTNAM, JR.
LICENSED PRIVATE INVESTIGATOR

RWP/jlk

cc: Valentino Dixon

# EXHIBIT R

Dixon-003647

**STATE OF NEW YORK**
**ERIE COUNTY COURT**

THE PEOPLE OF THE STATE OF NEW YORK

vs.
                                                    **AFFIDAVIT OF**
                                                    **ANTHONY WATKINS**
VALENTINO DIXON
                                                    **INDICTMENT NO. 91-1476-001**
                            Defendant

STATE OF NEW YORK    )
                     )
COUNTY OF ERIE       )

ANTHONY WATKINS, being duly sworn, deposes and says:

FIRST:                I am 31 years old and a lifelong resident of the City of

Buffalo. I am a certified social worker for the Community Action Organization. I am a graduate

of Jackson State University and hold Bachelors of Social Work and Masters of Social Work

degrees. I am a military veteran, having served in the United States Marine Corps, both on

active duty and in the reserve, for a total of 13 years.

SECOND:               I know VALENTINO DIXON. I am younger than he, but

we attended Buffalo Performing Arts School at the same time. That school has both a high

school and lower grades. When we were both going to school there, we lived in the same

neighborhood. We shared a bus to school often. I would see him around the neighborhood

often.

THIRD:                In August, 1991, at the time that TORIANO JACKSON

was shot at Bailey and East Delavan Avenues in Buffalo, I was at Louie's Texas Red Hots, on

*Exhibit 5 (B)*

Dixon-003648

things, he asked to see a copy of my diploma.

_____
ANTHONY WATKINS

Sworn to before me this

8th day of December, 2004

JUDITH E. LaPRELL
Notary Public State of New York
Qualified in Erie County
My Commission Expires Jan. 31, 2007

3

Dixon-003649

THE BUFFALO NEWS

*Sunday, July 18, 2004*

# Another witness found in Jackson murder

## *Defense attorneys hope recent evidence will force a new trial*

BY ANTHONY CARDINALE

NEWS STAFF REPORTER

Another witness has come forward and says he's willing to testify that Valentino Dixon did not gun down Torriano Jackson at Bailey and East Delavan avenues in August 1991.

Anthony Watkins, now 31, said this week that he was in the crowd at that corner when Jackson, 17, was mowed down by machine gun fire outside Louie's Texas Red Hots. Dixon was arrested hours later and is now serving 39 years to life for the killing.

Watkins told The Buffalo News

that he knew Dixon from high school and that he is certain Dixon was not the shooter.

"When the shooting started, everybody was running," Watkins said. "And (Dixon) was ducking. That's all I saw him doing. So it was impossible for him to duck and shoot at the same time. He was hiding. You could hear a lot of gunshots. At first I thought he was shot."

Watkins said he and many others in the crowd were asked for their names and addresses by police at the scene. But he said nobody contacted him later to tell what he saw, and as a teenager, he

didn't feel that anyone would listen to him if he came forward.

He also said he couldn't identify who the shooter was.

But Watkins decided to come forward after reading articles in The News on July 4 and 5 about Dixon's bid for a new trial, based on witnesses who were never called. Dixon maintains his innocence, while another man, Lamarr Scott — currently imprisoned on an unrelated charge — insists that he, not Dixon, did the shooting.

"Reading about it brings back memories," said Watkins, a Ma-



Harry Scull Jr./Buffalo News

**Lawyers for Valentino Dixon, an inmate in Attica Correctional Facility, say they have several witnesses who claim Dixon wasn't the shooter.**

See **Witness** on Page B2

Dixon-003650



Ronald J. Colleran/Buffalo News

Anthony Watkins, a Little League coach, says he is willing to testify that Valentino Dixon did not gun down Torriano Jackson at Bailey and East Delavan avenues in August 1991.

# One murder witness was reluctant out of fear

## WITNESS • from B1

...rine Corps veteran who is a certified social worker counseling youths through the Community Action Organization and is working on a doctorate degree.

Watkins was interviewed near a football field behind the Buffalo Academy for the Visual and Performing Arts on South Division Street, where he coaches Little League baseball.

"You want to put a nightmare behind you," Watkins said, recalling the shooting at 1:30 a.m. Aug. 10, 1991, outside Louie's Texas Red Hots.

Watkins is the second witness in the past three weeks to tell The News that Dixon was not the shooter.

The other witness is a woman who was sitting in a red Tracker eating a hot dog when the shooting broke out. She said she knew both Dixon and Scott and will testify that Scott killed Jackson.

She said she didn't come forward during Dixon's trial because she feared retaliation if she got involved. The woman, still fearful, has asked The News to withhold her name.

Dixon's lawyers believe both new witnesses will be helpful in their quest for a new trial

shooter then stood over him and emptied the Tech-9. In all, 27 rounds were fired.

When the violence ended, Jackson was dead, and three others, including his brother, Aaron Jackson, were injured.

Police later found a .32 caliber hand gun, with one spent shell in the chamber, in Louie's parking lot. Scott and other witnesses claim that Torriano Jackson fired one or two shots before the machine gun fire erupted. Police never determined who fired the handgun.

Three witnesses, including Aaron Jackson, identified Dixon as Torriano Jackson's killer. Two days after the shooting, Scott confessed, and other witnesses backed him up in statements to police. But by then police had picked up Dixon, who was out on bail awaiting sentencing for two incidents in which he and another drug dealer had exchanged shots. Neither hit his mark.

Police discounted Scott's confession, saying he was trying to protect his friend Dixon, who was facing a stiffer sentence than the younger Scott would get. But Scott later recanted when threatened with perjury. Recently he told The News that he really was the killer.

The two others who initially told police that Scott was the shooter were convicted of

Dixon-003651

# EXHIBIT S

Dixon-003652



**CONFIDENTIAL
REPORT**

*W. Malcolm Plummer*
*Truth Verification Examiner: Voice Stress Analysis,*
*Behavior Analysis and Psychological Stress Evaluation*

February 1, 2005

*Arrangements*
On this date, the subject, Antoine Shannon, was interviewed and submitted to a detection of deception examination. Standardized voice stress analysis techniques with the self-calibrations Digital Voice Stress Analyzer were utilized. A Dell laptop computer Model PP02L was used.

*Examiner's Credentials*
This examiner has practiced voice stress analysis and the detection of deception since 1974. He is a member of the International Society of Stress Analysts, an Adjunct Professor of Criminal Justice at Onondaga Community College, a graduate of the Decktor Counter Intelligence School, holds certificates in homicide, forensic science and lie detection. He is a life member of the World Association of Detectives, listed in Who's Who in American Law Enforcement and has administered over 15,000 truth verification examinations.

*Purpose*
The subject was interviewed and examined for the purpose of determining if he knew who shot and killed Torriano Jackson on August 10, 1991.

*Case Information*
Confidential

*Procedure*
International Society of Stress Analysis standardized truth verification procedure was exercised throughout the examination. The subject signed a release and acknowledged that the examination was taken freely and that he was is good health. Questions were reviewed with the subject to protect against outside issues and insure that only the issues in question were relevant to the examination.

1

Dixon-003653



**CONFIDENTIAL
REPORT**

Shannon VSA, cont'd

The test was administered, consisting of relevant, irrelevant, control and outside issue questions.   The relevant questions asked were:

1.    Were you on the corner of Delevan and Bailey on August 10, 1991?                Ans:   Yes

2.    Did you exchange words with Aaron Jackson?                                      Ans:   Yes

3.    Did you see Torriano Jackson get shot?                                          Ans:   Yes

4.    Did you see Aaron Jackson get shot?                                             Ans:   Yes

5.    Did your half-brother, Valentino ("Tino") Dixon shoot Torriano Jackson?         Ans:   No

6.    Did your half-brother, Valentino ("Tino") Dixon shoot Aaron Jackson?            Ans:   No

7.    Did you see Lamarr Scott shoot Torriano Jackson?                                Ans:   Yes

8.    Did you shoot anyone on August 10, 1991?                                        Ans:   No

9.    Did you ever ask Lamarr Scott to confess to the killing of Torriano Jackson?    Ans:   No

*Conclusion*
Based upon the case details provided by the subject and upon standardized chart reading criteria, Antoine Shannon did not register any notable degree of deceptive stress on his examination.  He substantially stated the truth in all areas.  Further, it is my professional opinion that Mr. Shannon stated the truth when he stated that Lamarr Scott shot and killed Torriano Jackson, and that Valentino Dixon did not shoot Torriano Jackson or Aaron Jackson on August 10, 1991.

Respectfully submitted,



W. M. Plummer
Examiner/Analyst

DISCLAIMER - The intelligence contained in this report is confidential and intended solely for the personal use of the requester.  P.I.B. Investigations accepts no liability for the content of the report or for the consequences of any actions taken on the basis of the information provided.  P.I.B. Investigations/W. M. Plummer assumes no responsibility for inaccurate or incomplete analyzed information, and is held harmless for error or omissions, and cannot guarantee 100% accuracy of reports for the fee charged, as a fallible electronic source was utilized.  There are no expressed or implied warranties made by P.I.B. Investigations with regards to Voice Stress Analysis results and/or services.

2

Dixon-003654

Exhibit 5 (A)                    Setting

C

November 21, 1991

Antoine Shannon, being duly sworn
deposes & says:

1. that I am 18 yrs old and my date
of birth is July 2, 1973

2. That I made this statement in the
conference room at the old gym, Campbellsville
College, Campbellsville Ky.

3. that on or about August 10, 1991 I was
in the vicinity of Bailey Ave & E. Delevan
in the city of Buffalo N.Y.

4. I was with my brother Leonard Brown,
& my friend Mario Jarmon

5. that my brother Leonard and I "had
words" with Aaron Jackson in the Norstar
Bank parking lot. Aaron was in Travis
Powells mothers yellow Geo. After my
brother & I talked to Aaron he started
to leave and Mario "had words" with
Aaron.

6. that after Aaron left we went to
Marios house to call my half brother Valentino Dix

Dixon-003655

③

13. then Mario, Tino and I went up to the store on corner of Bailey and Delevan.

14. at this time Aaron Jackson came back to the area in Travis Powells yellow Geo, Torri Jackson was in the back seat.

15. Aaron, then had some words with Mario and Tino and I came out from the doorway of the store after hearing them

16. Aaron gets out of the car, Travis gets out then Torri gets out of the car and I saw that Torri had a gun. It was silver, a hand gun, looked like a .38. I saw Torri' pull something back on top of the gun.

17. Tino grabbed me & said "come on", I ~~told~~ told Mario to come along. Aaron then rushed Mario & they began fighting on the sidewalk by the "Bailey Delevan Market"

Dixon-003656

(5)

4. Tino's clothing this night was : jeans, a white shirt (fancy dress) sneakers and a red baseball hat w/ white letters.

25. I then called a cab from a friends house on Kermit St (I don't know his name) and the cab picked me up at Delevan and Olympic & took me home to 63 Fay. It was a fillmore Cab

26. I was present at Genessee & Bailey on the night that LaMarr Scott talked to the TV news crew & the Buffalo Police took LeMarr into custody.

27. My Brother Leonard, Me, my father Robert Bryant, my mother Annie Shannan and Tino's girlfriend Arnice had picked up LaMarr earlier and brought him to our house on Fay St. and called the TV station to set up the meeting at Genessee and Bailey.

28. I left Buffalo on August 14th to come to Campbellsville.

Dixon-003657

# EXHIBIT T

Dixon-003658



**CONFIDENTIAL REPORT**

## *W. Malcolm Plummer*
*Truth Verification Examiner: Voice Stress Analysis,*
*Behavior Analysis and Psychological Stress Evaluation*

January 28, 2005

### *Arrangements*

On this date, the subject, Valentino Dixon, was interviewed and submitted to a detection of deception examination. Standardized voice stress analysis techniques with the self-calibrations Digital Voice Stress Analyzer were utilized. A Dell laptop computer Model PP02L was used.

### *Examiner's Credentials*

This examiner has practiced voice stress analysis and the detection of deception since 1974. He is a member of the International Society of Stress Analysts, an Adjunct Professor of Criminal Justice at Onondaga Community College, a graduate of the Decktor Counter Intelligence School, holds certificates in homicide, forensic science and lie detection. He is a life member of the World Association of Detectives, listed in Who's Who in American Law Enforcement and has administered over 15,000 truth verification examinations.

### *Purpose*

The subject was interviewed and examined for the purpose of determining if he caused the shooting death of Torriano Jackson on April 10, 1991 in Buffalo, NY.

### *Case Information*
Confidential

### *Procedure*

International Society of Stress Analysis standardized truth verification procedure was exercised throughout the examination. The subject signed a release and acknowledged that the examination was taken freely and that he was is good health. Questions were reviewed with the subject to protect against outside issues and insure that only the issues in question were relevant to the examination.

1

**PIB**
**INVESTIGATIONS**

**CONFIDENTIAL
REPORT**

Dixon VSA, cont'd

The test was administered, consisting of relevant, irrelevant, control and outside issue questions.   The
relevant questions asked were:

1.     Prior to August 10, 1991, did you know Torriano Jackson?       Ans:  No

2.     Prior to August 10, 1991, did you know Aaron Jackson?       Ans:  No

3.     Were you on the corner of Bailey and East Delevan on August 10, 1991?   Ans: Yes

4.     Did you exchange any words with Torriano and/or Aaron Jackson on August 10, 1991? Ans:  No

5.     Did you shoot and kill Torriano Jackson?       Ans:  No

6.     Did you shoot Aaron Jackson?       Ans:  No

7.     Did you shoot Mario Jarmon?       Ans:  No

8.     Did you shoot John Sullivan?       Ans:  No

9.     Did you discharge or fire any type of weapon on August 10, 1991?   Ans:  No

10.    Did you ask Lamarr Scott to kill Torriano Jackson?       Ans:  No

11.    Have you ever arranged to have anyone killed?       Ans:  No

12.    Did you ask or convince Lamarr Scott to confess to killing Torriano Jackson?   Ans:  No

13.    To the best of your knowledge, did your father, Robert Bryant, convince Lamarr
Scott to falsely confess to killing Torriano Jackson?   Ans:  No

14.    To the best of your knowledge, did your mother, Barbara Dixon, ask or convince
Lamarr Scott to falsely confess to killing Torriano Jackson?   Ans:  No

15.    To the best of your knowledge, has any other member of your family asked
Lamarr Scott to confess to killing Torriano Jackson?   Ans:  No

2

Dixon-003660

**PIB**
**INVESTIGATIONS**

CONFIDENTIAL
REPORT

Dixon VSA, cont'd

*Conclusion*
Based upon the case details provided by the subject and upon standardized chart reading criteria, Valentino Dixon did not register any notable degree of deceptive stress on his examination. He substantially stated the truth in all areas. Further, it is my professional opinion, based on said examination, that Mr. Dixon did not shoot Torriano Jackson on the date in question.

Respectfully submitted,

W. M. Plummer
Examiner/Analyst

CERTIFIED
No. 380r

DISCLAIMER - The intelligence contained in this report is confidential and intended solely for the personal use of the requester. P.I.B. Investigations accepts no liability for the content of the report or for the consequences of any actions taken on the basis of the information provided. P.I.B. Investigations/W. M. Plummer assumes no responsibility for inaccurate or incomplete analyzed information, and is held harmless for error or omissions, and cannot guarantee 100% accuracy of reports for the fee charged, as a fallible electronic source was utilized. There are no expressed or implied warranties made by P.I.B. Investigations with regards to Voice Stress Analysis results and/or services.

Dixon-003661

MURDER CASE

# Polygraph results filed as inmate seeks freedom

BY ANTHONY CARDINALE

NEWS STAFF REPORTER

The results of two polygraph tests were filed Monday in U.S. District Court on behalf of Valentino Dixon, who contends that he is serving a prison term for a murder that another man has confessed to.

Dixon's attorney is asking the federal court to take jurisdiction over the case and order Dixon's release from Attica Correctional Facility unless the state courts grant him a new trial.

Dixon, 34, is serving a term of 39 years to life in prison for the murder of Torriano Jackson with a semiautomatic weapon at Bailey and East Delavan avenues Aug. 10, 1991. The appellate court in Rochester recently declined to review a decision filed Aug. 30 by the original trial judge, Senior Erie County Judge Michael L. D'Amico, not to hold a new hearing on the case.

"The state court denial is an injustice, for an innocent man is languishing in prison," attorney Gregory McPhee of Syracuse said in his papers.

McPhee submitted the results of polygraph tests taken Jan. 28 by Dixon and Feb. 1 by Antoine Shannon, Dixon's half brother.

Shannon, who was not called to testify at trial, had told prosecutors that the Tec-9 semiautomatic pistol was fired by Lamarr Scott. Scott confessed to police two days after the shooting, but police discounted it and arrested Dixon, a known drug dealer.

Scott recanted his confession after two other witnesses were indicted on perjury charges for telling the grand jury that Scott was the killer. Since then, Scott has insisted that he did the shooting. He is now in prison on an unrelated charge.

W. Malcolm Plummer of Syracuse, who has conducted 15,000 lie-detector tests, said Dixon and Shannon apparently were not lying when they told him that Dixon was not the shooter and that they did not ask Scott to confess to the shooting. Shannon also told

the examiner that he saw Scott do the shooting.

McPhee cited a 1993 decision by the U.S. Supreme Court supporting lie-detector tests as "proof recognized in federal courts."

In his habeas corpus petition, McPhee also identified two new witnesses to the shooting who were not called during Dixon's trial. Both came forward after The Buffalo News published a series of articles on the case last summer.

In addition, McPhee argues that Dixon was denied a fair trial because his court-appointed attorney, Joseph J. Terranova, did not call any of several known witnesses who were ready to testify that Dixon did not do the shooting. Some of them said they saw Scott firing the Tec-9.

Toward the end of Dixon's trial, Terranova asked the judge for "advice regarding his failure to follow through with witnesses he promised the jury," according to the trial record. McPhee says the record indicates that D'Amico's reply was "that one is not my responsibility" and "I would help you if I could, but I don't know if I should."

The defense also took aim at three key prosecution witnesses who alleged that Dixon was the killer. McPhee says that:

• Jackson's brother, Aaron, who was seriously wounded in the incident, told police from his hospital bed that he did not know the identity of the shooter. But at trial, he said Dixon was the shooter, explaining: "My memory gets better with time."

• Emil Adams testified against Dixon but later told a private investigator that he had lied because he faced criminal charges in Michigan. He has since denied having lied.

• When John Sullivan testified against Dixon, he was facing a rape charge in Georgia and had admitted smoking crack cocaine and marijuana and consuming two bottles of malt liquor before the shooting.

e-mail: acardinale@mffnews.com

*Exhibit 24*

Dixon-003662

# EXHIBIT U

Dixon-003663

Case 1:05-cv-00208-RJA-VEB    Document 14    Filed 03/28/05    Page 96 of 98

578

Fisher - Coughlin - Direct

1    A.    And then when I lost sight, I heard a shot, so I

2    started looking around, making sure, you know, the car wasn't

3    hit or the shot wasn't aimed at me, or nothing; and so, I'm

4    looking around like this, seeing where the shot came from,

5    and all of a sudden I seen a guy running, and then I heard

6    another shot and he fell in the street, and so I pulled off.

7    And I'm looking through my rearview mirror, and then I seen

8    another guy behind where he was laying in the street

9    shooting, a bigger guy, a big guy.

10    Q.    When you heard the first shot, you didn't see --

11    A.    I didn't see anything.

12    Q.    Anybody run?

13    A.    No, I didn't know where it was coming from.    I

14    couldn't find out.

15    Q.    All right.    Then you have indicated that there was

16    another shot?

17    A.    Yes.    After --

18    Q.    All right.    Was there any difference in the sound --

19    A.    I can't say I was aware of the sound.

20    Q.    Pardon?

21    A.    I really can't say as far as, you know, me trying

22    to be aware of it, but I was just really concerned, wonder

23    was the guy getting hit because the way the shooting went on,

24    the way I was seeing the guy get shot, I didn't even think

*Exhibit 18*

Dixon-003664

579

Fisher - Coughlin - Direct

1

2  there was rounds, I didn't think they was real rounds.

3       Q.   Hold on a minute, please, Mr. Fisher.   I'm asking

4  about you heard a shot?

5       A.   Right.

6       Q.   And you started looking around and didn't see

7  anybody?

8       A.   No, not at that time.

9       Q.   All right.   Then I thought you indicated --

10      A.   Yeah.

11      Q.   -- there was then a second shot?

12      A.   It was.

13      Q.   And, did you or were you aware of any difference in

14  the sounds?

15      A.   As far as the sounds of the shooting?

16      Q.   Pardon?

17           THE COURT:   Let him finish the question before

18           you answer the question.   And, I thought he

19           answered this, but ask your question, Mr. Coughlin,

20           and let's get to it.

21  BY MR. COUGHLIN:

22      Q.   Was there any difference between the first shot you

23  heard and the second shot you heard?

24      A.   I really can't answer that.

25      Q.   Okay.   Now, what happened then exactly after the

Dixon-003665

585

Fisher - Coughlin - Direct

1

2    A.    As soon as I ran up, I ran right back to the scene

3    where everything was happening in the street, and that's

4    where I spotted the gun.

5    Q.    You ran right back to where you saw the guy fall

6    down on the street?

7    A.    Yes, uh-huh, to see if he was still there, but he

8    was in a parking lot over at Louie's.

9    Q.    He had been moved, that person had been moved over

10   to the parking lot?

11   A.    Yeah, I'm not quite sure how he got there, but he

12   was there.

13   Q.    Okay, and what did you see when you ran up to the

14   spot where you had seen somebody lying?

15   A.    I saw some blood and I saw a pistol.

16   Q.    Then what did you do?

17   A.    A patrol car was coming up Delevan and I stopped

18   the patrol car and I say here go a gun on the street, and so

19   the officer picked the gun up with they hand.    I thought they

20   was going to, you know, wrap it up, or something.    They

21   retrieved the gun.

22   Q.    Okay.    You saw a patrol car coming towards you?

23   A.    Uh-huh.

24   Q.    That would be eastbound on East Delevan Avenue?

25   A.    Yes.

Dixon-003666

587

Fisher - Coughlin - Direct

1

2   going by.

3       Q.   Cars were still going by?

4       A.   Yeah, on this side, and the gun was right in the

5   street and people was all over there. It was officers at the

6   scene, but no one seem to notice the gun.

7       Q.   How long did you remain on the scene, Mr. Fisher?

8       A.   Maybe about 10 minutes, or until they got the other

9   guy in the ambulance. I was standing there, you know,

10  talking to him.

11      Q.   And, by this time had the police done anything in

12  particular or specifically with respect to the whole area --

13      A.   Oh, they sealed it off. The parking lot, they had

14  sealed it off with yellow tape.

15      Q.   You were still there at Louie's --

16      A.   I was inside the yellow tape.

17           THE COURT:  Look, it's going to be a lot

18           easier if you let him finish the question before

19           you jump in and answer it, okay. So, just pause a

20           second and let him finish the question. You keep

21           cutting off all of his questions. What is your

22           question, Mr. Coughlin?

23  BY MR. COUGHLIN:

24      Q.   You were still -- you were there in Louie's lot

25  after the entire area had been roped off with yellow tape?

Dixon-003667

# EXHIBIT V

Dixon-003668

4th April 2018

Dwight James

4 Butterfly Place

Palm Coast, Florida 32137


TO    : D. Thompson, Esq.

SUBJ : Affidavit


Please be advised, pursuant to the above referenced and foregoing, upon receipt of this communication, your attention is directed to the following, post viz:

During the years 2007-2008, I was at Attica Correctional Facility with Larmar Scott and Valentino Dixon. Mr. Scott's position then with respect to the charged offense against Mr. Dixon, has been unchanged since the actual commission of the crime. Mr. Scott stated then exactly what he stated again at Cayuga Correctional Facility in 2017-2018. I left Mr. Scott at Cayuga the 13th February 2018. Lamar Scott does not deny the fact that he committed the charged offense that Mr. Valentino Dixon is currently incarcerated on.


The above affirmation is not a novalty. In fact, at the time of the offense charged, Lamar Scott admitted to the authorities that he committed the charged crime. For whatever reason, the authorities ingored Mr. Scott's admission. Consequently, an innocent man has been incarcerated for nearly thirty years.


I give this affidavit willingly and without any interest in any determination. I am also willing to provide testimony (electronically or otherwise) with respect to the contents herein. I understand that providing false statements is a violation of the law, punishable by fine, imprisonment or both.


If you have any further questions, please feel free to contact me at: (386)585-2341.


1

Dixon-003669

Respectfully Submitted,

4/4/18

affiant: Dwight James

Sworn and subcribed to before

me this 4th day of April 2018

***NOTARY PUBLIC FOR THE STATE OF FLORIDA***

Mitchell DiPersio
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG068002
Expires 1/31/2021

2

Dixon-003670