UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

VALENTINO DIXON,

                              Plaintiff,

v.

CITY OF BUFFALO, *et al.*,

                              Defendants.

**DECISION AND ORDER**

1:19-CV-1678(WMS)(JJM)

---

        Following a jury trial Erie County Court, on August 7, 1992 Valentino Dixon was convicted of murder in the second degree under New York Penal Law ("PL") §125.25[1], attempted murder in the second degree (PL §§110.00, 125.25[1]), assault in the third degree (PL §120.00[2]), and criminal possession of a weapon in the second degree. (PL §265.03). In September 2018, after Dixon had been incarcerated for 27 years, three of those convictions were vacated with the consent of Erie County District Attorney ("ECDA") John Flynn, resulting in his release. Thereafter, Dixon commenced this action for alleged constitutional violations and New York State law claims arising from his prosecution.

        Before the court are Dixon's motion to compel certain discovery related to his Monell[1] liability claims against the City of Buffalo and County of Erie [52][2] and the County

---

[1]     Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 694 (1978).

[2]     Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.

defendants'[3] cross-motion to bifurcate and stay discovery on Dixon's <u>Monell</u> claims [58].[4] Having heard oral argument on February 2, 2022 [63] and considered the parties' submissions [52, 53, 57, 58, 60-62, 66-72], for the following reasons the County's motion is granted and Dixon's motion is denied.

## BACKGROUND

Dixon's conviction arose from an August 10, 1991 shooting in Buffalo, which resulted in the death of Torriano Jackson and injury to Aaron Jackson and John Sullivan. By Dixon's own account, it was a "busy summer night at a popular intersection" at the time of the 1:29 a.m. shooting, with "as many as 100 people . . . in the immediate area". [66-2], ¶17. Just before the shooting, Torriano and Aaron Jackson were kicking and punching Mario Jarmon, who was on the ground. <u>Id</u>.

Shortly after Dixon's arrest, Lamarr Scott came forward and gave the City of Buffalo Police Department ("BPD") a signed confession ([66-2] at 122-24), stating that he was the shooter. Scott contends that he was later forced by members of the BPD and ADA Belling to recant his confession at the grand jury. <u>See</u> Scott's April 2005 sworn statement [66-2] at 126. Others, including Leonard Brown, Dixon's half brother, and Mario Jarmon, also identified Scott as the shooter (<u>see</u> Scott's August 12, 1991 sworn statement [66-2] at 45-46) and testified to this before the grand jury. <u>Id</u>. at 47-79; Thompson Affirmation [66-2] at 11, ¶32. They were both

---

[3]   The "County defendants" refer to the County of Erie and former Assistant Erie County District Attorney ("ADA") Christopher Belling.

[4]   Although the "City defendants" (collectively, the City of Buffalo and all individual defendants other than ADA Belling), did not formally join in the County defendants' cross-motion, they filed a Memorandum of Law [60-1] in support of that relief, and I have treated the motion as seeking relief applicable to all defendants.

charged with perjury for their grand jury testimony, but were later acquitted. *See* Thompson Affirmation [66-2] at 11, ¶33, 17, ¶53

However, three individuals, including shooting victims Aaron Jackson and John Sullivan, as well as Emil Adams, identified Dixon as the shooter at trial. Thompson Affirmation [66-2] at 13, ¶39. The defense rested without presenting any witnesses or presenting any evidence. Id.

After his earlier direct appeal (People v. Dixon, 214 A.D.2d 1010 (4th Dept. 1995), lv denied, 87 N.Y.2d 900 (1995)), motion to vacate the conviction pursuant to Criminal Procedure Law ("CPL") §440.10 (August 30, 2004 Memorandum and Order), and a habeas corpus petition (Dixon v. Conway, 613 F.Supp.2d 330 (W.D.N.Y. 2009), were unsuccessful, on May 28, 2018 Dixon moved to vacate his conviction pursuant to CPL §440.10 [66-2] based on newly discovered evidence and the withholding of exculpatory evidence (a negative gunpowder residue test of Dixon's clothes) by the prosecution.

This motion prompted an investigation by the ECDA, which determined that "Scott was the shooter, just as he has maintained - albeit not always with the same version of events, and with the exception of a recantation before the grand jury - since August 12, 1991". Heraty Answering Affidavit [66-3], ¶12. The new evidence included an identification of Scott as the shooter by a credible witness who had been previously afraid to come forward ([66-2] at 15-16, ¶47; [66-3] at 4), as well as a recorded August 2018 interview of Scott conducted by the ECDA,[5] wherein he confessed to being the shooter, and explained why he denied being the shooter during his grand jury testimony and why his earlier confessions[6] differed.

---

[5]     At my request, copies of these interviews were supplied to me by the County defendants.

[6]     In addition to his initial confession, Scott signed two additional confessions in 2002 and 2005. [66-2] at 126-28.

Although Dixon was not himself the shooter, he "placed a loaded Tex-9 machine gun into his car, picked up Lamarr Scott, and drove him to Mario Jarmon's house, which was about eight houses from the murder scene . . . . In other words, he drove both the murder weapon and murderer to the scene", and it was his "intent to use the weapon unlawfully against another". Heraty Answering Affidavit [66-3], ¶14. Contrary to Dixon's allegations (Complaint [1], ¶128), the ECDA's investigation also determined that ADA Belling did not withhold any exculpatory evidence, since no gunpowder residue test was performed on Dixon's clothes. September 19, 2018 hearing transcript [66-4] at 3.

Therefore, the ECDA consented to the vacatur of Dixon's conviction on all counts, except for his conviction for criminal possession of a weapon in the second degree, on the basis of newly discovered evidence [66-3]. Dixon withdrew his motion to vacate his conviction for criminal possession of a weapon in the second degree, and on September 19, 2018 the balance of his motion to vacate was granted, resulting in his immediate release from custody. *See* September 19, 2018 Memorandum and Order [66-5] and transcript [66-4].

The claims in this action relate to Dixon's contention that the "the BPD and ECDA maintained and shared a list of targets that they intended to get 'off the street' by making any colorable charges stick to them", and that those entities acted in concert to "fabricate[ ] a case against [him] because he had been present at the scene and he was one of the targets on their list". Complaint [1], ¶6. Dixon alleges that this was not an isolated incident, and that "[i]n the 1980s and 1990s, the BPD maintained a pattern and practice of fabricating evidence, suppressing exculpatory evidence, abusing its authority", which "went hand in hand with a similar pervasive culture at ECDA of tolerating egregious constitutional violations to obtain convictions at any cost". Id., ¶¶13, 19.

In support of these claims, Dixon seeks to compel the production of a wide range of documents, including the complete investigative files and communications with the ECDA for the prosecutions of the following individuals, who he contends "were also wrongfully convicted due to similar misconduct" (Dixon's Memorandum of Law [52-1] at 6):

-- 1985 prosecution of Anthony Capozzi for rape;

-- 1984 prosecution of Lynn DeJac for the murder of her daughter;

-- 1991 prosecution of Louis Eze, Joy Wosu, and Emeka Okongwu for the assault of Okongwu's two daughters;[7]

-- 1998 prosecution of Cory Epps for the murder of Tomika Means; and

-- 2004 prosecution of Josue Ortiz for murder.

See Dixon's First Set of Requests for Production directed to the City [53-1], ¶19;[8] Dixon's Revised First Set of Requests for Production directed to the County [53-2], ¶13.

Although this case has been pending for more than two years, little discovery has occurred. According to the County defendants, the parties have only "engaged in preliminary document disclosures and discovery" and no depositions have been taken. Soehnlein Declaration [58-1], ¶6.

At oral argument Dixon indicated that he intends to proceed with depositions this month, with or without Monell-related discovery. Because of Dixon's position that the

---

[7] This request is only directed to the County defendants because this case involved the Erie County Sheriff, not the BPD. See Dixon's Memorandum of Law in Opposition [61] at 11 n.1. The County defendants' counsel represents that ADA Belling denies participation in the Okongwu prosecution. See February 24, 2022 letter [71].

[8] Dixon's motion also seeks to compel a response to request No. 20 of his First Set of Requests for Production directed to the City [53-1], which seeks, inter alia, "copies of any and all documents listing individuals that the ECDA or BPD sought to surveil, monitor, stop, arrest, prosecute, or incarcerate". That portion of the motion was rendered moot by the City's representation that "[t]here are no lists" (the City defendants' Memorandum of Law in Opposition [57-4] at 12), as well as Dixon's decision to serve a new request for materials. See Dixon's Reply Memorandum of Law [62] at 12.

discovery sought in his requests was also relevant to his claims against the individual defendants, I asked that he identify what specific non-Monell discovery he seeks in advance of the depositions. February 2, 2022 Text Order [64]. Dixon states that he is seeking "the production of the homicide files for the DeJac, Epps, Ortiz, and Okongwu cases"; "the deposition transcripts of the applicable Defendant officers from the Epps and Ortiz litigation"; and "the DA file" from the Okongwu case (Dixon's February 22, 2022 letter [69]), but has since abandoned his request for production of the Okongwu homicide file before the depositions. Dixon's March 7, 2022 letter [72].

## DISCUSSION

"[U]pon a showing of good cause a district court has considerable discretion to stay discovery pursuant to [Fed. R. Civ. P. ("Rule")] 26(c). Rule 26(d) also allows the Court to control the sequence and timing of discovery, particularly where [,as here,] resolution of a preliminary matter may decide the entire case." Oliver v. City of New York, 540 F.Supp.3d 434, 435 (S.D.N.Y. 2021). *See also* Baker v. Orleans County, 1997 WL 436703, *1 (W.D.N.Y. 1997) ("district courts are given reasonable latitude and discretion to establish a priority or to fashion an appropriate sequence of the discovery to be performed in each case").

"It is well-established that a plaintiff must prove the denial of a constitutional right by a municipal officer in order to hold a municipality liable under Monell". Aquino v. City of New York, 2017 WL 2223921, *1 (S.D.N.Y. 2017). *See also* Oliver, 540 F.Supp.3d at 436 ("[i]n a lawsuit containing a Monell claim, if the plaintiff cannot show that his or her constitutional rights were violated by any individual defendants, the Monell claim will also fail"); Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) ("[b]ecause the district court properly found no underlying constitutional violation, its decision not to address the municipal

- 7 -

defendants' liability under <u>Monell</u> was entirely correct"). Consequently, "[i]t has long been the position of courts in the Second Circuit that since the [municipality's] liability is derivative of the individual defendants' liability, and since the proof required to establish a <u>Monell</u> claim is substantially different from the proof necessary to establish individual liability, the most prudent course is to address the <u>Monell</u> claims separately and to stay discovery concerning those claims until the liability of the individual defendants is established." <u>Gavin v. City of New York</u>, 2021 WL 3774113, *5 (S.D.N.Y. 2021) (citing cases). *See also* <u>Aquino</u>, 2017 WL 2223921, *1 ("courts in this Circuit often order bifurcation in § 1983 cases involving both claims against individual officers and <u>Monell</u> claims against a municipality"); <u>Morales v. Irizarry</u>, 1996 WL 609416, *1 (S.D.N.Y. 1996) ("[t]he overwhelming weight of authority holds that since the City's liability is derivative of the individual defendants' liability, and since the proof required to establish a <u>Monell</u> claim is substantially different from the proof necessary to establish individual liability, the most prudent course is to try the <u>Monell</u> claims separately and to stay discovery concerning those claims until the liability of the individual defendants is established"); <u>Roper v. City of New York</u>, 2017 WL 462270, *2 (S.D.N.Y. 2017) ("courts often stay discovery on <u>Monell</u> claims until enough information is available individual claims - either at the close of discovery or following summary judgment - to assess the strength of a claim that a constitutional violation actually took place").

    From the limited materials which I have reviewed in connection with the pending motions, I cannot predict whether Dixon will prevail on some or all of his claims against the individual defendants or on what grounds. However, bifurcating discovery at this point potentially reduces some of the vast, costly and time-consuming discovery into Dixon's <u>Monell</u> allegations, which creates a benefit to the parties as well as the court. *See* <u>Oliver</u>, 2021 WL

2007444, *2 (without bifurcation, "discovery on a plaintiff's Monell claim could prove entirely irrelevant to a section 1983 case and cause unnecessary burden"). Therefore, a stay of the Monell-related discovery is warranted.

Dixon argues that even if ADA Belling prevails on an immunity defense, it may not moot the need for Monell discovery against the County. Dixon's Memorandum of Law in Opposition [61] at 12. *See* Lopez v. The City of New York, 2021 WL 2739058, *2 (S.D.N.Y. 2021) ("[u]nder Monell municipal liability for constitutional injuries may be found to exist even in the absence of individual liability. That is because an individual who violates another's rights may still be qualifiedly immune from civil liability"). Nevertheless, "courts in this circuit often favor bifurcating Monell clams, and may do so even when the individual defendants may assert a defense of qualified immunity such that a finding in their favor does not necessarily dispose of the Monell claim". Felix v. City of New York, 344 F. Supp. 3d 644, 662 (S.D.N.Y. 2018). *See also* Brown v. City of New York, 2016 WL 616396, *2 (S.D.N.Y. 2016) ("courts have ordered bifurcation even when the individual defendants may assert a defense of qualified immunity such that a finding in their favor does not necessarily dispose of the Monell claim").

The need for at least some Monell discovery does not outweigh the efficiency to be gained from bifurcating discovery. As the City notes, it is possible that after discovery of the individual claims, "at least some of the forms of police officer and prosecutor misconduct alleged in the Complaint will not be substantiated", thereby mooting the need to conduct discovery into those specific activities. The City defendants' Memorandum of Law [60-1] at 8.

Dixon next argues that bifurcation will "significantly prejudice [him] by delaying discovery of his Monell claims and preventing him from presenting his individual claims on summary judgment in the full context in which they arose". Dixon's Memorandum of Law in

Opposition [61] at 13. I disagee. "By limiting the scope of this initial stage of litigation, it is possible to resolve the[ ] threshold issue[ ] [of individual liability] more quickly." Williams v. City of Chicago, 315 F. Supp. 3d 1060, 1083 (N.D. Ill. 2018). That is especially likely here, where the discovery into the individual claims alone, which involve a litany of allegations involving a homicide investigation and prosecution that took place nearly 30 years ago with multiple witnesses and participants, will "be a significant undertaking for the parties". City defendants' Memorandum of Law in Support [60-1] at 4.

Bifurcation may also narrow or eliminate the need for Monell discovery, a significant potential benefit given the expansive Monell discovery currently sought, which would delve into unrelated cases over an approximately 19-year span, and the likely substantial ancillary discovery that would flow from these initial requests. *See* Price v. Kraus, 2016 WL 369682, *2 (N.D. Ind. 2016) ("[t]he discovery of Monell claims can add significant time, effort, and complications to the discovery process"). Dixon's delay concerns also ring somewhat hollow given the slow pace of discovery undertaken by the parties thus far, including Dixon's own delay in waiting more than a year after City's Response to his First Set of Requests for Production [53-3] before moving to compel.

Nor am I persuaded that bifurcation would prejudice Dixon from presenting his individual claims on summary judgment. The merit of those claims will turn primarily on what occurred in Dixon's prosecution, not on evidence of wrongdoing in other criminal investigations and prosecutions. *See* Mineo v. City of New York, 2013 WL 1334322, *1 (E.D.N.Y. 2013) ("the claims against the individual defendant and the City will involve divergent factual proof and standards of causation"); Gavin, 2021 WL 3774113, *5 ("the proof required to establish a Monell claim is substantially different from the proof necessary to establish individual liability").

Dixon further argues that bifurcation of discovery will lead to a *de facto* bifurcation of these issues at trial. Dixon's Memorandum of Law in Opposition [61] at 6 (bifurcation of discovery "would effectively tie the trial court's hands because the Monell claims against the County would not be ready for trial at the same time as . . . the individual claims . . . . As a result, either the trial would have to be bifurcated or trial on all other claims would have to be delayed substantially"). However, at this stage I am ruling only on bifurcation of *discovery*. Bifurcation of the Monell claims for trial is a distinct issue to be resolved by the trial judge, and no party has yet moved for that relief. Moreover, my decision to bifurcate discovery at this time "does not signify a need for a bifurcated trial, should [Dixon's] claims reach trial. It merely reflects the logic that, until it is clear that [Dixon's] claims have survived summary judgment, efficiency counsels in favor of foregoing the separate inquiry into whether a broader municipal policy or custom exists involving unlawful conduct akin to that here." Mei Ling Lin v. City of New York, 2015 WL 13882390, *1 (S.D.N.Y. 2015).

Finally, Dixon argues that the requests seek materials that are discoverable for non-Monell purposes, and overlap with the Monell discovery which he seeks, thereby undermining any efficiencies to be gained from bifurcation.[9] Specifically, he notes that bifurcation is inappropriate where questions of individual and Monell liability are 'inextricably intertwined'". Dixon's Memorandum of Law in Opposition [61] at 7 (*quoting* Pavone v. Gibbs, 1997 WL 833472, *1 (E.D.N.Y. 1997)). Dixon also forecasts that bifurcation will "spur additional discovery disputes about what types of questions are permitted during regular discovery and what must be put off to any second phase". Id. at 10.

---

[9] Since I have granted the County defendants' motion to bifurcate and stay the Monell discovery, at this time it is unnecessary for me to determine whether Dixon is entitled to the requested discovery in support of his Monell claims. If necessary, Dixon may later renew this portion of his motion.

While there may be some overlap between the discovery needed for Dixon's individual and Monell claims, he fails to establish that the discovery for these distinct claims is inextricably intertwined. The boundaries of that overlap may lead to disputes about what constitutes non-Monell discovery, but I do not believe that it will undermine the potential efficiencies to be gained from bifurcation. See Claxton v. City of Chicago Illinois, 2015 WL 5304630, *2 (N.D. Ill. 2015) ("[p]laintiffs assure the Court that it will need to referee discovery disputes on what is or is not Monell-related discovery if bifurcation is ordered. If anything, the Parties' seemingly inevitable discovery battles weigh in favor of postponing this discovery and the related motion practice until after individual liability is established").

Dixon notes that "courts in the Second Circuit have held that incidents or complaints occurring after the events at issue in a Section 1983 lawsuit may be relevant and discoverable for reasons other than proving the existence of a municipal policy or custom". Dobson v. Dougherty, 2018 WL 6321390, *5 (W.D.N.Y. 2018). For example, "post-incident investigations regarding a police officer defendant in a section 1983 case may be relevant to issues of pattern, intent, and absence of mistake" under Fed. R. Evid. 404(b). Barrett v. City of New York, 237 F.R.D. 39, 41 (E.D.N.Y. 2006). See also Walls v. City of New York, 502 F. Supp. 3d 686, 692 (E.D.N.Y. 2020) ("[a]t trial some courts have held misconduct records to be relevant evidence of pattern, intent and absence of mistake under Rule 404(b) of the Federal Rules of Evidence"); Phillips v. City of New York, 277 F.R.D. 82, 83 (E.D.N.Y. 2011) ("[t]he theory for permitting discovery concerning disciplinary history is that it may lead to evidence of pattern, intent and absence of mistake . . . or support a plaintiff's claim for municipal liability under Monell").[10]

---

[10] Pursuant to Fed. R. Evid. 404(b), "evidence of prior wrongful conduct is inadmissible to show propensity to commit the conduct at issue in the case, but 'may be admissible for another purpose, such as

The City does not dispute that Dixon is entitled to discovery relevant to the Fed. R. Evid. 404(b) exceptions. Instead, the City defendants contend that Dixon's current requests are too broad and should be narrowed to "information regarding officers or detectives engaged in the specific conduct he takes issue with in his Complaint". The City defendants' Memorandum of Law [57-4] at 10. Although Dixon acknowledges that he is "open to narrowing his request", he still contends that "at the very least needs and is entitled to the homicide investigation files for each of those cases". Dixon's Reply Memorandum of Law [62] at 7.

The City defendants have the better of this argument. A party's entitlement to discovery concerning the Fed. R. Evid. 404(b) exemptions is circumscribed. "Not all post-incident police misconduct would be potentially relevant to issues of pattern, intent and absence of mistake . . . . Rather, only misconduct of a nature similar to the misconduct alleged in the complaint is likely to be relevant to those issues." Moore v. City of New York, 2006 WL 1134146, *1 (E.D.N.Y. 2006). *See also* Estate of Richards by Stephens, 2020 WL 6162130, *2 ("[r]ecords concerning the investigation of complaints *of a similar nature* against a police officer defendant in a section 1983 case may lead to the discovery of evidence 'relevant to issues of pattern, intent, and absence of mistake" (emphasis in original)).

Dixon's reliance on Dobson demonstrates the overbreadth of his requests. In Dobson, the plaintiff alleged constitutional violations arising from his arrest for driving under the influence. The court found that the plaintiff was entitled to records that "pertain[ed] to a factually analogous arrest involving the same officers [occurring several months later] where the arrestee [, like the plaintiff], was later determined not to have narcotics in his system". 2018 WL 6321390, *6. *See also* Moore, 2006 WL 1134146, *1 (limiting discovery to "allegations of post-

---

proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident'". Estate of Richards by Stephens v. City of New York, 2020 WL 6162130, *2 (S.D.N.Y. 2020).

incident misconduct by Police Officer Jones involving supposed false arrest, excessive force, assault and battery, and illegal strip search").

Dobson stands in sharp contrast to the scope of Dixon's expansive requests (Dixon's First Set of Requests for Production directed to the City [53-1], ¶19; Dixon's Revised First Set of Requests for Production directed to the County [53-2], ¶13), which appear to encompass information unrelated to the alleged specific misconduct perpetrated by particular defendants here and are not sufficiently tailored to the Fed. R. Evid. 404(b) exceptions. As the City notes, Dixon's allegations of concerted targeting are absent from the DeJac, Epps, and Ortiz cases. Sahasrabudhe Declaration [57], ¶¶15, 18-19, 22. The City also argues - and Dixon fails to dispute - that none of the individual City defendants were involved in Capozzi's prosecution. The City defendants' Memorandum of Law in Opposition [57-4] at 11. Likewise, the County defendants point out that Dixon "does not allege or proffer wrongdoing on the part of ECDA with regard to the Capozzi, DeJac, Epps, or Ortiz cases". The County defendants' Memorandum of Law in Support [58-4] at 21. While Dixon may be entitled to discover whether particular individual defendants committed the similar alleged acts of misconduct (*e.g.*, falsifying evidence) in other specific prosecutions and investigations, blanket requests for entire case files and other related material are overbroad.

Dixon also points to the broad construction of relevant discovery under Rule 26 to argue that "these other wrongful conviction cases 'bear on or could reasonably lead to other matters that bear' on issues central to [his] claims - like officers' understanding of their training and relevant BPD polices - which are relevant to establishing liability for the individual Defendants (as evidence of, for example, their mindset in intentionally violating rules)". Dixon's Reply Memorandum of Law [62] at 8 ("[p]laintiff can use discovery from those cases as a

starting point and tool to further unravel each Defendant's own understanding of his training and what he believes constitutes a deviation of that training"). Dixon certainly has the right to conduct discovery in order to rebut the individual defendants' anticipated immunity defenses, but his current requests are far too broad. Much of the alleged misconduct by the individual defendants appears sufficiently egregious that establishing the intentional nature of that conduct should not require expansive discovery into their training.

Dixon further contends that "examining the investigation in other cases where similar misconduct is alleged will very likely shed light during discovery on steps the officers did or did not take in investigating [his] case, which is highly relevant". Dixon's Reply Memorandum of Law [62] at 8. However, as discussed above, the primary basis for determining whether the individual defendants violated Dixon's constitutional and state law rights turns on their conduct in this case, not others. I am not foreclosing the possibility that upon a more particularized showing, Dixon may be entitled to some discovery from other investigations to shed light on what transpired here.

While I am sensitive to Dixon's desire to proceed with depositions on March 14, 2022, but even his narrowed requests, which include entire homicide files for the DeJac, Epps, and Oritz cases, remain too broad. Moreover, as I stated at oral argument, I am open to adjusting the deadlines of the current scheduling order [44], if necessary.

## CONCLUSION

For these reasons, Dixon's motion to compel [52] is denied, without prejudice, and the County defendants' cross-motion to bifurcate and stay discovery Monell discovery [58] is granted, without prejudice to Dixon's right to seek to lift the stay prior to dispositive motion

practice on the individual defendants' liability, if he believes that he has a basis for doing so. *See* Roper, 2017 WL 462270, *2.

**SO ORDERED**.

Dated: March 8, 2022

                                                                                          JEREMIAH J. MCCARTHY
                                                                                         United States Magistrate Judge