# Exhibit F

Excerpts of the Deposition of Tamara Frida, dated October 19, 2022

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | FOR THE WESTERN DISTRICT OF NEW YORK |
| 2 | |
| | VALENTINO DIXON, |
| 3 | |
| |     Plaintiff, |
| 4 | |
| |  vs.   Civil Action No. 19-CV-01678 |
| 5 | |
| | CITY OF BUFFALO, et al., |
| 6 | |
| |     Defendants. |
| 7 | |
| 8 | VIDEOTAPED   TAMARA L. FRIDA |
| 9 | DEPOSITION OF: |
| 10 | DATE:    October 19, 2022 |
| 11 | TIME:    10:27 a.m. |
| 12 | LOCATION:   Offices of |
| |     HUSEBY GLOBAL LITIGATION |
| 13 |     1230 West Morehead Street |
| |     Suite 104 |
| 14 |     Charlotte, North Carolina |
| 15 | TAKEN BY:   Counsel for the Plaintiff |
| 16 | REPORTED BY:  MINDY VISLAY |
| 17 | _____ |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1  APPEARANCES OF COUNSEL:

 2      ATTORNEYS FOR PLAINTIFF VALENTINO DIXON:

 3        NEUFELD SCHECK & BRUSTIN, LLP
          BY:  NICK JOEL BRUSTIN
 4        99 Hudson Street
          Eight Floor
 5        New York, New York  10013
          212-965-9081
 6        nick@nsbcivilrights.com

 7      ATTORNEYS FOR DEFENDANT CITY OF BUFFALO:

 8        HODGSON RUSS, LLP
          BY:  PETER SAHASRABUDHE
 9        605 3rd Avenue
          Suite 2300
10        New York, New York  10158
          212-751-4300
11        psahasra@hodgsonruss.com

12      ATTORNEYS FOR THE DEFENDANT COUNTY OF ERIE:

13        LIPPES MATHIAS, LLP
          BY:  MARGARET A. HURLEY
14        50 Fountain Plaza
          Suite 1700
15        Buffalo, New York  14202
          716-853-5100
16        mhurley@lippes.com

17      ATTORNEYS FOR THE DEFENDANT COUNTY OF
        ERIE (via Zoom):
18
          LIPPES MATHIAS, LLP
19         BY:  JENNIFER C. PERSICO
          50 Fountain Plaza
20         Suite 1700
          Buffalo, New York  14202
21         716-853-5100
          jpersico@lippes.com
22

23      ALSO PRESENT:Sona Shah (via Zoom)
                 Gerardo Romo (via Zoom)
24                Moises Soto-Brito (via Zoom)
                 Darren Carreras, Videographer
25
```

```
 1              I N D E X

 2                         Page    Line

 3   TAMARA L. FRIDA         4      23

 4   DIRECT EXAMINATION

 5   BY MR. BRUSTIN          4      25

 6   CROSS-EXAMINATION

 7   BY MR. SAHASRABUDHE    51       8

 8   CROSS-EXAMINATION

 9   BY MS. HURLEY          76      14

10   REDIRECT EXAMINATION

11   BY MR. BRUSTIN         82       6

12   RECROSS-EXAMINATION

13   BY MR. SAHASRABUDHE    86       1

14   RECROSS-EXAMINATION

15   BY MS. HURLEY          87       2

16   CERTIFICATE OF REPORTER   89    1

17

18              E X H I B I T S

19                         Page    Line

20   EXHIBIT 21, Affidavit of   47   1

21   Tamara L. Frida

22

23

24

25
```

1  able to identify pictures, correct?

2      A.  Yes.

3      Q.  And although you didn't identify yourself

4  by name, you told them that in fact you were the

5  person from the red Tracker, correct?

6      A.  Yes.

7      Q.  And you understood when you did that that

8  you were telling him who you were?

9          MR. SAHASRABUDHE:  Form.

10         THE WITNESS:  Yes.

11 BY MR. BRUSTIN:

12     Q.  Your understanding was that the police knew

13 you because you talked to them about being in the red

14 Tracker which was shot by one of the bullets, correct?

15     A.  Yes.

16     Q.  And, so, although you didn't give him your

17 name, you understood that you were identifying

18 yourself to this officer?

19         MR. SAHASRABUDHE:  Form.

20         THE WITNESS:  Yes.

21 BY MR. BRUSTIN:

22     Q.  Even though you were scared?

23     A.  Yes.

24     Q.  All right.  After this time did any police

25 officer, Detective Stambach or anybody else, ever come

```
 1  and show you pictures?
 2      A.  No.
 3      Q.  And if they had come to your house at this
 4  time and shown you pictures, including a picture of
 5  Lamar Scott, do you think you would have had the
 6  courage at that time to identify him?
 7          MR. SAHASRABUDHE:  Form.
 8          THE WITNESS:  At that time, yes, with
 9  reservation.
10  BY MR. BRUSTIN:
11      Q.  Okay.  And by the way, I'm asking you about
12  before people were prosecuted for telling the truth
13  about Lamar Scott being the shooter.  Before that
14  time.
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  Yes.  It would have been with
17  reservation still, yes.
18  BY MR. BRUSTIN:
19      Q.  But you think you would have done it?
20      A.  Yes.
21          MR. SAHASRABUDHE:  Form.
22  BY MR. BRUSTIN:
23      Q.  And did you understand when you told them
24  that you were the girl from the red Tracker that they
25  would likely come and visit you?
```

```
 1            MR. SAHASRABUDHE:  Form.
 2            THE WITNESS:  At that time I did not know
 3   because it was three of us.  So it could have been any
 4   three of us.
 5   BY MR. BRUSTIN:
 6       Q.   Okay.
 7       A.   And to my understanding -- well, I won't
 8   even say to my understanding.  They did contact the
 9   other two young ladies as well.  So --
10       Q.   Okay.  All right.  Do you know whether they
11   showed them pictures?
12       A.   I do not believe that they showed them
13   pictures.  It was just a contact.  No one was, you
14   know, ever -- neither one of the girls ever went
15   down --
16       Q.   Okay.
17       A.   -- to talk to them.
18       Q.   All right.  But no question that when you
19   spoke to the police on August 10th you told them that
20   the red Tracker was yours, correct?
21       A.   That's correct.
22       Q.   And was it registered in your name, the
23   car?
24       A.   Yes.
25       Q.   Okay.  Now, I want to know -- I want to ask
```

1 second.

2    A. Okay.

3    Q. Did you know the Jacksons, Torriano and
4 Aaron Jackson?

5    A. I did not know them personally. I just
6 knew who they were from just hanging out.

7    Q. Did you know them by reputation? Did they
8 have any reputation, to your knowledge?

9       MR. SAHASRABUDHE: Form.

10      THE WITNESS: No.

11 BY MR. BRUSTIN:

12    Q. Okay. You just knew them from the
13 community?

14    A. Uh-huh.

15    Q. You didn't know much about them?

16    A. No.

17    Q. All right. In the days following this
18 shooting what was the discussion in the community
19 among you and your peers about who shot Torriano
20 Jackson?

21      MR. SAHASRABUDHE: Form.

22 BY MR. BRUSTIN:

23    Q. If any?

24    A. Okay. The discussion was -- I think
25 everybody who was there knew that it was not

1  Valentino. That was definitely the discussion. The
2  other discussion was why was 'Tino targeted, you know,
3  as being the shooter when everybody who witnessed it
4  visually knew that he was not.
5      Q.  Okay. Now, did there come a point in time
6  when you learned that Lamar Scott had actually
7  confessed to the crime?
8      A.  Yes. I did hear about that.
9      Q.  Do you remember how long after -- how many
10 days after the shooting you had learned that,
11 approximately?
12     A.  I would -- I would be moved to say maybe
13 about two to three days that I had heard about that he
14 had made the confession on the news, but I didn't see
15 it myself.
16     Q.  But you heard about it?
17     A.  Yes.
18     Q.  All right. And the discussion in the
19 community was that -- for people who had been there
20 was that that was actually the person who had shot
21 Torriano Jackson?
22     A.  Yes.
23         MR. SAHASRABUDHE: Form.
24 BY MR. BRUSTIN:
25     Q.  Did you discuss that with your friends?

1  said that the reason why he had to say that 'Tino was

2  the shooter was because the police department was

3  threatening him with some charges he had in Michigan.

4  BY MR. BRUSTIN:

5      Q.  Okay.  I think you skipped the first part.

6      A.  Oh.  Okay.

7      Q.  But that was the second part of the

8  question.

9      A.  Okay.

10     Q.  The first part of the question is did he

11 tell you who the shooter was?

12         MS. HURLEY:  Form.

13         THE WITNESS:  No, he didn't tell me who the

14 shooter was.  By name, when you say --

15 BY MR. BRUSTIN:

16     Q.  It was a bad question.

17     A.  Okay.

18     Q.  Did you talk to Emil Adams about whether or

19 not Valentino Dixon was in fact the shooter?

20     A.  Yes.

21     Q.  And what did he tell you, if anything?

22     A.  He told me that he knew that Valentino was

23 not the shooter.  He knew that.

24     Q.  Okay.

25     A.  And then he went on to explain why he said

1  about?

2      A.  We just talked about him being out.  Of

3  course I verbally apologized to him for, you know, all

4  those years, but he said he understood.  We talked

5  about religion, God, and just his experience and being

6  out, you know, in the world.

7      Q.  Okay.  And you said -- you mentioned you've

8  spoken to him a couple times since?

9      A.  Oh, yeah.

10     Q.  Okay.  Has Valentino Dixon ever asked you

11  to say anything that wasn't true about what you saw or

12  heard or your interactions with the police?

13     A.  Never.

14     Q.  Has anybody from my office ever asked you

15  to say or do anything that wasn't true?

16     A.  Never.

17     Q.  Would you do it if we had?

18     A.  No.  No.

19     Q.  Now, did there come a point in time when

20  you were interviewed in connection with a

21  reinvestigation of Valentino Dixon's conviction?

22     A.  Yes.  Quite a few times.

23     Q.  Do you remember how many times you were

24  interviewed?  I know you were interviewed by some

25  private investigators.  Were you also interviewed by

1  the District Attorney reinvestigating the case?

2      A.  Yes.

3      Q.  And during all of those interviews did you

4  do your best to tell them the best you could remember

5  what happened?

6      A.  Yes.

7      Q.  Now, over time have some of the details

8  about what you saw and heard faded a bit from your

9  memory?

10     A.  Yes.

11     Q.  Now, did you also volunteer to take a

12  polygraph examination?

13         MR. SAHASRABUDHE:  Form.

14         MS. HURLEY:  Form.

15         THE WITNESS:  I did not --

16  BY MR. BRUSTIN:

17     Q.  Let me withdraw.

18     A.  Okay.

19     Q.  Were you asked to take a polygraph?

20     A.  I was asked.

21     Q.  Okay.  And did you in fact take a polygraph

22  examination?

23     A.  I did.

24         MR. SAHASRABUDHE:  And can we -- when?

25  BY MR. BRUSTIN:

1  did you request to review documents to refresh your
2  recollection in the case?
3      A.  Yes.
4      Q.  And did you in fact review some documents
5  that we sent to you?
6      A.  Yes.
7      Q.  What did you review?
8      A.  It would have been the -- my statement to
9  Roger Putnam, the police statement or the police's
10 correspondence here, and as well as the perjury trial,
11 the --
12          MR. SAHASRABUDHE:  Transcript.
13          THE WITNESS:  The transcript.  I'm sorry.
14 BY MR. BRUSTIN:
15     Q.  And did you have a chance to review that?
16     A.  Yes.
17     Q.  Okay.  Do you recall, Ms. Frida, when you
18 were meeting with the D.A.'s office in connection with
19 the reinvestigation whether or not any of your
20 statements were tape-recorded?
21     A.  I believe they were tape-recorded.
22     Q.  Do you remember seeing a tape recorder?
23     A.  Yes.
24     Q.  Okay.  I think that's all I have right now.
25 I may have some follow-up questions, but I'm going to

1  made?

2      A.  No.  He didn't tell me when.  He just told

3  me just in general --

4      Q.  Okay.

5      A.  -- that that was why.

6      Q.  Did he go into any detail as to who had

7  made those threats?

8      A.  He just said that the police were saying

9  that they were going to bring up those charges in

10  Michigan or call Michigan and have him arrested or

11  whatever on those charges.

12      Q.  But he never mentioned the name of an

13  individual detective or police officer --

14      A.  No, he did not.

15      Q.  And did he specify -- do you know for a

16  fact that he's testified that it was a Buffalo Police

17  Department employee or individual?

18      A.  He said it was the police.  He just said

19  the police, so I'm assuming Buffalo police.  He said

20  the police and the District Attorney.  He just said

21  the District Attorney.  He didn't say like ADA or

22  specific, he just said like their office pretty much.

23      Q.  Okay.  And besides saying that charges in

24  Michigan were being -- potentially going to be used

25  against him he didn't go into any further detail; is

1  STATE OF NORTH CAROLINA

2  COUNTY OF MECKLENBURG

3

4        CERTIFICATE OF VERBATIM TRANSCRIPT

5

6        I, Mindy Vislay, Court Reporter and Notary

7  Public for the State of North Carolina at Large, do

8  hereby certify that the foregoing transcript of TAMARA

9  L. FRIDA was taken by me and transcribed by me and is

10 a true, accurate, and complete record.

11       I further certify that I am neither related

12 to nor counsel for any party to the cause pending or

13 interested in the events thereof.

14       In witness whereof, I have hereunto set my

15 hand this 1st day of November, 2022 at Charlotte,

16 North Carolina.

17

18

19

20       _____
         Mindy Lynn Vislay
21         #200926400076

22

23

24

25