UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

VALENTINO DIXON,

                Plaintiff,                    Civil Action No. 19-cv-01678

    v.

CITY OF BUFFALO, et al.,

                Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**LIPPES MATHIAS LLP**
Jennifer C. Persico
James P. Blenk
*Attorneys for Defendants, County of Erie
and former Assistant District Attorney
christopher Belling*
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
(716) 853-5100
jpersico@lippes.com
jblenk@lippes.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................................iii

INTRODUCTION ........................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 1

PROCEDURAL HISTORY............................................................................................................ 5

SUMMARY JUDGMENT STANDARD....................................................................................... 6

ARGUMENT .................................................................................................................................. 7

I.    THIS COURT SHOULD DISMISS ALL CLAIMS AGAINST CHRISTOPHER
      BELLING BECAUSE HE IS ABSOLUTELY IMMUNE FROM LIABILITY FOR THE
      CONDUCT HE UNDERTOOK IN CONNECTION WITH THE PLAINTIFF.................7

      i.    The Scope of Absolute Immunity ............................................................................ 7

      ii.   Christopher Belling's Conduct Relative to the Plaintiff is Subject to Absolute
            Immunity.................................................................................................................. 11

II.   THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANT
      BELLING BECAUSE DEFENDANT BELLING DID NOT VIOLATE THE
      CONSTITUTIONAL RIGHTS OF THE PLAINTIFF ......................................................16

      A. This Court should dismiss Plaintiff's First Cause of Action Alleging Denial of a Fair
         Trial by Fabrication of Evidence and Withholding Material Evidence (§1983). ...............16

      i.    Summary of Plaintiff's claim................................................................................. 16

      ii.   Legal Standard ....................................................................................................... 17

      iii.  The Plaintiff's Various Theories Advanced in the Plaintiff's First and Third Causes of
            Action Fail as a Matter of Law and Fact................................................................ 17

            a.   *Defendant Belling Cannot be Liable for Pre-Arrest Fabrication of Evidence.* ...... 17

            b.   *Defendant Belling Cannot be Liable for Pre-Arrest Coercion of Emil Adams.* ..... 18

            c.   *Defendant Belling Cannot be Liable for Post-Arrest Coercion of Lamar Scott.*.... 18

            d.   *Defendant Belling Cannot be Liable for Post-Arrest Coercion of Mario Jarmon
                 and Leonard Brown.* ............................................................................................ 19

            e.   *Defendant Belling Cannot be Liable for failing to Disclose Brady Material.*........ 19

            f.   *Conclusion* ......................................................................................................... 20

      iv.   The Plaintiff's Various Theories Advanced in the Plaintiff's First and Third Causes of
            Action Fail as a Matter of Law and Fact................................................................ 20

B. This Court should dismiss Plaintiff's Third Cause of Action Alleging Civil Rights Conspiracy (§1983)..........................................................................................................21

C. This Court should dismiss Plaintiff's Fourth Cause of Action Alleging Failure to Intercede (§1983). ..............................................................................................................21

III.    THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANT BELLING ON PLAINTIFF'S STATE LAW CLAIMS.......................................................22

A. This Court should dismiss Plaintiff's Ninth Cause of Action Alleging Negligent or Intentional Infliction of Emotional Distress, pursuant to New York law. ..........................22

B. This Court should dismiss Plaintiff's Tenth Cause of Action Alleging Negligence..........23

IV.    THIS COURT SHOULD DISMISS ALL CLAIMS AGAINST ERIE COUNTY ...........23

A. This Court should dismiss Plaintiff's Seventh Cause of Action Alleging Monell Liability (§1983)..............................................................................................................................23

B. This Court should dismiss Plaintiff's Twelfth Cause of Action Alleging Respondeat Superior. ..........................................................................................................................24

C. This Court should dismiss Plaintiff's Fourteenth Cause of Action Alleging Negligent Hiring, Supervision and Training pursuant to New York law. .............................................25

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................... 6

*Baez v. Hennessy*,
  853 F.2d 73 (2d Cir. 1988)........................................................... 24

*Barnes v. City of New York*,
  68 F.4th 123 (2d Cir. 2023) ......................................................... 17

*Batten v. City of New York*,
  133 A.D.3d 803 (2nd Dept. 2015) ............................................... 11

*Boria v. Hicks*,
  2017 WL 2983304 (N.D.N.Y. 2017) ............................................. 8

Brady v. Town of Colchester,
  863 F.2d 205 (2d Cir. 1988)........................................................... 6

*Buari v. City of New York*,
  530 F. Supp. 3d 356 (S.D.N.Y. 2021)................................... 9, 19, 22

*Buckley v. Fitzsimmons*,
  509 U.S. 259 (1993)........................................................... passim

*Burke v. Jacoby*,
  981 F.2d 1372 (2d Cir. 1992)......................................................... 7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................... 6

*Collazo v. Pagano*,
  656 F.3d 131 (2d Cir. 2011)........................................................... 6

*Deanda v. Hicks*,
  137 F. Supp. 3d 543 (S.D.N.Y. 2015)........................................... 22

*Dieter v. Quintilone*,
  764 F. App'x 71 (2d Cir. 2019) ................................................ 9, 12

*Dorman v. Higgins*,
  821 F.2d 133 (2d Cir.1987)......................................................... 21

*Dory v. Ryan*,
  25 F.3d 81 (2d Cir. 1994)........................................................... 21

*Eckardt v. City of White Plains*,
  87 A.D.3d 1049 (N.Y. App. Div. 2d Dep't 2011) ........................ 24

*Giraldo v. Kessler*,
  694 F.3d 161 (2d Cir. 2012)........................................................... 8

*Goenaga v. March of Dimes Birth Defects Foundation*,
  51 F.3d 14 (2d Cir. 1995)............................................................. 7

*Hampton v. City of Chicago, Cook Cnty., Ill.*,
  484 F.2d 602 (7th Cir. 1973) ......................................................... 8

*Hansel v. Sheridan*,
  991 F. Supp. 69 (N.D.N.Y 1998).................................................. 22

*Hayes v. New York City Dept. of Corrections*,
 84 F.3d 614 (2d Cir. 1996)................................................................................... 7

*In re Omnicom Group, Inc., Sec. Litig.*,
 597 F.3d 501 (2dCir. 2010).................................................................................. 7

*Johnson v. Kings Cty. Dist. Attorney's Office*,
 308 A.D.2d 278, 763 N.Y.S.2d 635 (2d Dep't 2003).................................. 23

*Kanciper v. Lato*,
 989 F. Supp. 2d 216 (E.D.N.Y. 2013) .......................................................... 12

*Lee v. Willins*,
 617 F.2d 320 (2d Cir. 1980)............................................................ 9, 10, 19

*McKeon v. Daley*,
 101 F. Supp. 2d 79 (N.D.N.Y. 2000) .............................. 9, 10, 11, 19

*Mei Ling Lin v. City of New York*,
 2015 WL 13882390 (S.D.N.Y. 2015)............................................................ 5

*Miller v. Wolpoff & Abramson, L.L.P.*,
 321 F.3d 292 (2d Cir. 2003)............................................................................ 6

*Monell v. Department of Social Services of the City of New York*,
 436 U.S. 658 (1978)..................................................................... 5, 23, 24

*Morales v. City of New York*,
 59 F. Supp. 3d 573 (S.D.N.Y. 2014)......................................................... 10, 12

*Murphy v. City of Rochester*,
 986 F. Supp. 2d 257 (W.D.N.Y. 2013) ........................................................ 22

*Myers v. Cnty. of Orange*,
 157 F.3d 66 (2d Cir. 1998)............................................................................. 24

*People v. Dixon*,
 214 A.D.2d 1010 (4th Dep't 1995)............................................................... 4

*Pinaud v. Cnty. of Suffolk*,
 52 F.3d 1139 (2d Cir. 1995).................................................................... 7, 24

Roe v. City of Waterbury,
 542 F.3d 31 (2d Cir. 2008).............................................................................. 6

*Shmueli v. City of New York*,
 424 F.3d. 231 (2d Cir. 2005)..................................................................... 8, 10

*Smith v. Garretto*,
 147 F.3d 91 (2d Cir. 1998).................................................... 8, 12, 13, 15

*Talavera v. Arbit*,
 18 A.D.3d 738 (2d Dep't 2005).................................................................... 24

*Tapp v. Champagne*,
 164 F. App'x 106 (2d Cir. 2006).................................................................. 21

*Taravella v. Town of Wolcott*,
 599 F.3d 129 (2d Cir. 2010).......................................................................... 20

*Taylor v. Kavanagh*,
 640 F.2d 450 (2d Cir. 1981).......................................................................... 10

*Thompson v. Kline*,
 504 F. Supp. 3d 200 (W.D.N.Y. 2020) ...................................................... 21

*Van de Kamp v. Goldstein*,
    555 U.S. 335, 129 S. Ct. 855, 172 L. Ed. 2d 706 (2009) ........................................................ 24
*Ying Li v. City of New York*,
    246 F. Supp. 3d 578 (E.D.N.Y. 2017) ................................................................................. 22
*Zanfardino v. City of New York*,
    230 F. Supp. 3d 325 (S.D.N.Y. 2017) ................................................................................. 12

**Statutes**
42 U.S.C. §1983 ...................................................................................................................... passim
New York CPL Section 440.10 ........................................................................................................ 4

**Rules**
FRCP 56(a) .................................................................................................................................. 6
FRCP 56(b) .................................................................................................................................. 6

# INTRODUCTION

In this motion, the Defendants County of Erie and former Assistant District Attorney Christopher Belling (collectively the "County Defendants") move for the dismissal of all claims alleged against them in Plaintiff's Complaint [1][1].

As is more fully set forth below, the instant case does not present the traditional conviction of an "innocent" person. The Plaintiff, Valentino Dixon ("Dixon" or "Plaintiff") provided the means, motive and opportunity for the brazen murder of Toriano Jackson and non-fatal shooting of John Sullivan and Aaron Jackson (the "Jackson Murder") at the corner of Bailey and E. Delavan Avenues in Buffalo, New York on August 10, 1991. After reinvestigation ultimately demonstrated that Valentino Dixon was not the actual shooter that evening, the Plaintiff commenced this action to try to show that it was police and prosecutorial misconduct rather that Plaintiff's own personal involvement as well as the lies of Plaintiff and his allies that resulted in his conviction for the Jackson Murder.

For the reasons that follow, the County Defendants are entitled to summary judgment on all causes of action pleaded against them.

# STATEMENT OF FACTS

After a brief fight between Mario Jarmon and Aaron and Toriano Jackson, the Jackson Murder occurred approximately 1:29am on August 10, 1991. [A 1285.[2]] Evidence now demonstrates that it is more likely that Lamar Scott was the shooter that evening, but he was present that evening as an agent of Valentino Dixon.

---

[1] Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.
[2] Bracketed reference to [A___] refer to the Appendix filed herewith.

Mr. Scott "wouldn't have been at the [crime scene] if it wasn't for [Mr. Dixon]." See Deposition of Lamar Scott, dated March 14, 2022, p. 79:4-5. [A 1147] At the scene, Mr. Dixon provided his gun to Mr. Scott (*Id*., 79:6-7) [A 1147], who saw himself as a "protector" (*Id*., 83:9) [A 1151].

Regarding motive, the shooting arose from a conflict involving Mr. Dixon and his brothers. As Mr. Scott put it, the "beef wasn't with him." (Scott Dep. Trans., p. 14:14-15.) [A 1082.] Right before Mr. Scott pulled the trigger, Mr. Dixon told him, "stop them from shooting my brother." (*Id*., 81:21) When Leonard Brown pointed out Toriano Jackson as the threat, Lamar Scott began shooting. (*Id*., 81:22.)

By 5:05 am on the same day, Emil Adams had identified Valentino Dixon as the shooter. Valentino Dixon was detained by police at 1:10 pm (BPD0064, COE001513) [A 1553]. From approximately 1:30pm to 2:30 pm, Valentino Dixon provided a materially inaccurate account of his observations at the Jackson Murder (BPD0071-73; COE 1525-26) [A 1560-62].[3] In the same office at approximately the same time, John Sullivan identified Valentino Dixon as the perpetrator of the Jackson Murder. (BPD Comp. 0076-77; COE1535-36) (the "Sullivan Identification") [A 1565-67].

After meeting with his attorney, Sean Dennis Hill, Esq. (BPD 0064), Dixon was booked for murder, weapons possession and assault. (BPD0064-65) [A 1553-54]; *see also* Arrest Documents (COB 00152-91.) [A 1273-1312]) Detective Mark Stambach completed and executed a criminal complaint supporting the charge. (COE 1672-1673.) [A 1285-86.]

---

[3] Valentino Dixon denied knowing who did the shooting (BPD0072) [A 1561]; admitted that he was present with Mario Jarmon and Antoine Shannon, but did not mention the presence of Lamar Scott (BPD0071) [A 1560]; and denied ever possessing a Tech-Nine machine pistol (BPD0072) [A 1561].

During the early morning of August 12, 1991, while accompanied by Valentino Dixon's father, [A 1742] Lamar Scott came forward to confess to the Jackson Murder. [A 1686-88.]

Later during the day of August 12, 1991, from his hospital bed, Aaron Jackson identified Valentino Dixon as the perpetrator of the Jackson Murder.  (COE001550; BPD Comp. 0185.) [A 1674.] Christopher Belling was not present for this identification. [A 1674.]

On August 12, 1991, Erie County Assistant District Attorney Christopher Belling took possession of a copy of the Buffalo Police Department's file on the Jackson Murder. (COB232; BPD Comp. 0174.) [A 1663.] Relying on that criminal complaint, as well as the identification of Valentino Dixon by John Sullivan, Defendant Belling sought the revocation of Valentino Dixon's bail[4].  (COE1696-1698).

On January 9, 1992, John J. Malloy was appointed as counsel to Lamas Scott to represent him based on Scott's confession to the Jackson murder.  (COE 1692.) [A 1804.]

From November 6, 1991 through January 13, 1992, a grand jury considered testimony from eleven (11) witnesses.  During his testimony on January 13, 1992, Lamar Scott recanted his confession to the Buffalo Police Department, explained the circumstances surrounding his false confession and identified Valentino Dixon as the perpetrator of the Jackson Murder.  However, the Grand Jury was also presented with the live testimony of Mario Jarmon and Leonard Brown identifying Lamar Scott as the shooter, the videotaped confession of Lamar Scott (Dixon 1606-1609) [A 1441-1444], and the written confession of Lamar Scott (Dixon 1609-1611) [A 1444-1446].  Law enforcement only testified at the grand jury proceedings to convey the existence of another weapon at the scene of the Jackson Murder (which would only tend to complicate the

---

[4] At the time of the Jackson Murder, Valentino Dixon had pleaded guilty and was awaiting sentencing on a felony gun charge.

prosecution narrative, whether against Dixon or Scott).  (Grand Jury Transcript, (Dixon1556 – 1559).)

The grand jury ultimately decided to indict Dixon, to the exclusion of Scott, on January 13, 1992.  (COE001702.)  [A 1808.] The grand jury also indicted Mario Jarmon and Leonard Brown for perjury.

The trial of Valentino Dixon took place from June 8 through June 16, 1992.  Jackson, Adams and Sullivan testified and withstood sustained, aggressive cross-examination from Valentino Dixon's counsel.

Defense counsel did not call any witnesses.  The Plaintiff was found guilty of all counts: murder in the second degree, attempted murder in the second degree, criminal possession of a weapon in the second degree and assault in the third degree.  (Affidavit of David Herarty, dated September 17, 2018 [Doc 66-3] (Herarty Aff.) at 3, ¶6.)  Mr. Dixon appealed his conviction to the Appellate Division, Fourth Department, and it was unanimously affirmed (*Id*. at ¶7.)  *See People v. Dixon*, 214 A.D.2d 1010 (4th Dep't 1995) *lv denied* 87 NY2d 900.  On November 6, 2003, Dixon filed his first motion to vacate his conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL").  (*Id*. at ¶8.)  The motion was denied by an order of Erie County Court (D' Amico, J.) issued on August 30, 2004, and his application for leave to appeal was denied by the Fourth Department.  (*Id*. at ¶8.)  On April 14, 2005, Dixon filed a petition for a writ of habeas corpus with the United States District Court for the Western District of New York.  (*Id*. at ¶9.)  The petition was denied by an order of District Court (Acara, J., adopting recommendation ·of Bianchini, Magistrate Judge) issued on May 5, 2009.  (*Id*. at ¶9.)

On May 28, 2018, Dixon brought a second motion pursuant to Section 440.10 of the CPL. In reply, the Erie County District Attorney's Office conducted a reinvestigation of the Jackson

Murder. (*Id*. at 1, ¶4.)  During the course of the reinvestigation, the Plaintiff continued to falsely downplay his involvement including lying about his prior knowledge of the weapon used in the Jackson Murder.  (Dixon Dep. Trans. p. 144-145.) [A 0977-0978.] However, in the course of reinvestigation, Erie County District Attorney personnel concluded that Lamar Scott was the actual shooter of Valentino Dixon.  (Herarty Aff. [Doc. 66-3] at 3, ¶12.)  The Erie County District Attorney's Office therefore consented to the vacatur of Valentino Dixon's conviction on the basis of "newly discovered evidence."  (*Id*. at 8.)

## PROCEDURAL HISTORY

The Plaintiff filed his Complaint on December 16, 2019.  (Compl. [Doc. 1].) Both the County and City Defendants answered without moving to dismiss the Complaint or any portions thereof. (*See* Answers [Doc .27, 28].)  On motion of the County Defendants and City Defendants, this Court (McCarthy, J.) bifurcated discovery between the Plaintiff's individual claims, which would proceed through discovery and Plaintiff's municipal claims (*i.e. Monell*[5] claims), which would be bifurcated for the purpose of discovery.  (Decision and Order, dated March 8, 2022 [73] at 10.)  The court cited *Mei Ling Lin v. City of New York,* 2015 WL 13882390, *1 (S.D.N.Y. 2015) for the rationale that "until it is clear that Dixon's claims have survived summary judgment, efficiency counsels in favor of foregoing the separate inquiry into whether a broader municipal policy or custom exists involving unlawful conduct akin to that here."  (*Id*. at 10.)  This Court's decision was made "without prejudice to Dixon's right to seek to lift the stay prior to dispositive motion practice on the individual defendants' liability, if he believes that he has a basis for doing so."  The Plaintiff has made no such motion to lift the stay.

---

[5] *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).

Pursuant to this Court's Fifth Amended Case Management Order (McCarthy, J), dated September 15, 2023 [156], the deadline for dispositive motions is December 15, 2023.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  FRCP 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  A defendant is entitled to summary judgment where "the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re*

*Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2dCir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).

Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

## ARGUMENT

### I.  THIS COURT SHOULD DISMISS ALL CLAIMS AGAINST CHRISTOPHER BELLING BECAUSE HE IS ABSOLUTELY IMMUNE FROM LIABILITY FOR THE CONDUCT HE UNDERTOOK IN CONNECTION WITH THE PLAINTIFF

All allegations alleged against Defendant Belling must be dismissed because all allegations against him relate to his conduct in his role as prosecutor for which he is entitled to absolute immunity. *See Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995) ("The doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney.")

#### i.    The Scope of Absolute Immunity

"[A] district attorney is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial. Such official is also immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged." *Boria v. Hicks*, 2017 WL 2983304, *4

7

(N.D.N.Y. 2017). "Prosecutorial immunity from §1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate." *Id.* "The rationale for conferring absolute immunity in such circumstances is that the public trust of the prosecutor's office would suffer if [prosecutors] were constrained in making every decision by the consequences in terms of [their] own potential liability in a suit for damages." *Shmueli v. City of New York*, 424 F.3d. 231, 237 (2d Cir. 2005) (citations omitted).

In contrast to the prosecutor's role as an advocate, Prosecutors are not immune from purely investigatory conduct. The Supreme Court "has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) *quoting Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). To illustrate the *qualified immunity* side of the absolute-qualified immunity dichotomy, courts have found that prosecutors are not entitled to only qualified immunity for organizing a "sting" operation (*Smith v. Garretto*, 147 F.3d at 94; *accord Hampton v. City of Chicago, Cook Cnty., Ill.*, 484 F.2d 602, 607 (7th Cir. 1973)) or for generating false evidence through expert shopping before developing probable cause (*Buckley v. Fitzsimmons*, 509 U.S. 259, 272-74 (1993)).

Absent these extraordinary circumstances – typically, before the development of probable cause against a suspect – absolute immunity attaches at the very earliest participation of a prosecutor. *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) ("prosecutor's functions preliminary to the initiation of proceedings include whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present."

(internal quotation omitted.))  The context of "evaluating evidence and interviewing witnesses" is applied broadly to include nearly all manner of interaction between prosecutors and witnesses, including pursuit of witnesses with threatened or actual legal process and charges.  *See Lee v. Willins*, 617 F.2d 320, 321 (2d Cir. 1980) (holding absolute immunity barred action brought by criminal defendant who alleged that prosecutor "(1) induced a defense witness…to render herself unavailable to testify in return for dropping felony charges against her, (2) compelled a witness…to perjure herself by arresting and incarcerating her for fifteen days without cause and threatening to 'take away' her baby, [and] (3) coerced false testimony from Joseph Cox by imprisoning him and depriving him of methadone."); *see also Buari v. City of New York*, 530 F. Supp. 3d 356, 380 (S.D.N.Y. 2021) (allegations that prosecutor threatened witnesses with prosecution were subject to absolute immunity); *see also McKeon v. Daley*, 101 F. Supp. 2d 79, 88 (N.D.N.Y. 2000) (holding that prosecutor was entitled to absolute immunity for allegations that he ordered arrest of grand jury witness on a charge of perjury as punishment for witness' refusal to testify against suspect).

    When considering the distinction between advocacy and investigation, courts consider the state of probable cause.  *See Buckley v. Fitzsimmons*, 509 U.S. 259, 274, 113 S. Ct. 2606, 2616, 125 L. Ed. 2d 209 (1993) ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to arrest someone."); *see also* McKeon *v. Daley*, 101 F. Supp. 2d 79, 88 (N.D.N.Y. 2000) (prosecutor ceased acting in an administrative or investigative capacity once he had identified the wrongdoer), *aff'd*, 8 F. App'x 138 (2d Cir. 2001).    However, cases are also clear that a prosecutor remains in his capacity as advocate even in the face of contradictory evidence.  *See Dieter v. Quintilone*, 764 F. App'x 71, 73 (2d Cir. 2019) (holding that witness' equivocation in interview with prosecutor did not undermine prosecutorial role or defeat probable

cause arising from witness' prior account); *see also Morales v. City of New York*, 59 F. Supp. 3d 573, 579 (S.D.N.Y. 2014) (absolute immunity barred suit alleging that prosecutor failed to pursue evidence that contradicted witness' account).

The immunity provided to a prosecutor in the context of his prosecutorial role is not limited by gravity of the conduct alleged. Absolute immunity applies "even when the prosecutor is alleged to have engaged in such conduct as falsification of evidence, coercion of witnesses, solicitation or subornation of perjured testimony, withholding of evidence, or relying on illegally seized evidence at trial." *Id.*; *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citations omitted). "Absolute immunity even prevents claims that a prosecutor commenced and continued a prosecution that was within his jurisdiction but did so for purposes of retaliation or for purely political reasons." *Shmueli* at 237 (citations omitted).

Relevant to the allegations here, Second Circuit caselaw is also clear that a prosecutor's actions in pursuing and indicting witnesses is subject to absolute immunity. *See Lee v. Willins*, 617 F.2d 320, 321 (2d Cir. 1980) (holding absolute immunity barred action brought by criminal defendant who alleged that prosecutor "(1) induced a defense witness…to render herself unavailable to testify in return for dropping felony charges against her, (2) compelled a witness…to perjure herself by arresting and incarcerating her for fifteen days without cause and threatening to 'take away' her baby, [and] (3) coerced false testimony from Joseph Cox by imprisoning him and depriving him of methadone."); *McKeon* at 88 (holding that prosecutor was entitled to absolute immunity for allegations that he ordered arrest of grand jury witness on a charge of perjury as punishment for witness' refusal to testify against suspect).

ii.    Christopher Belling's Conduct Relative to the Plaintiff is Subject to Absolute Immunity.

By 4:15 pm on August 10, 1991, the police had "solved" the Jackson Murder.  At that time, Mark Stambach had completed and executed a criminal complaint charging Dixon with murder in the second degree, possession of a weapon in the second degree and assault in the first degree. (COE 1672-1673.) [A 1802-1803.]

Two days later, on August 12, 1991, the Buffalo Police Department first transferred their file to the Erie County District Attorney's Office.  (BPD174; COB 000232.) [A 1663.] Relying on Defendant Stambach's criminal complaint, as well as the identification of Valentino Dixon by John Sullivan, Defendant Belling sought the revocation of Valentino Dixon's bail[6].  (COE1696-1698.) [A 1805-1807.]  In the view of Defendant Belling, the witness identification were "probable cause to arrest Valentino Dixon."  (Belling Dep. Trans., p. 35-6-7.) [A 36.] Even after Lamar Scott came forward, "that didn't change."  (*Id*., p. 35.)[7]  [A 36.] Importantly, Christopher Belling took no action of any nature until Valentino Dixon had been identified by at least two eyewitnesses, criminal process had issued and Valentino Dixon had been arrested.

In this way, Mr. Belling was not put in a position to seek out "clues and corroboration that might lead to a recommendation for an arrest." *Buckley v. Fitzsimmons*, 509 U.S. at 260.  The "wrongdoer" had been identified and a strong presumption that his subsequent behavior was in the role of advocacy *preceded* his involvement in the case.  *McKeon* at 88 (prosecutor ceased acting in an administrative or investigative capacity once he had identified the wrongdoer), *aff'd*, 8 F.

---

[6] At the time of the Jackson Murder, Valentino Dixon had pleaded guilty and was awaiting sentencing on a felony gun charge.

[7] Mr. Belling's analysis was correct as a matter of law.  *See Batten v. City of New York*, 133 A.D.3d 803, 807 (2nd Dept. 2015) ("[T]he existence of a lead regarding a possible additional suspect does little to diminish the probable cause created by the eyewitness identification of [the original arrestee].")

App'x 138 (2d Cir. 2001). Mr. Belling remained in this role indefinitely notwithstanding Lamar Scott's confession. *See Dieter v. Quintilone*, 764 F. App'x 71, 73 (2d Cir. 2019) (holding that witness' equivocation in interview with prosecutor did not undermine prosecutor role or defeat probable cause arising from witness' prior account); *see also Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 335 (S.D.N.Y. 2017) (allegation that prosecutor knowingly ignored evidence was subject to absolute immunity)' *Morales v. City of New York*, 59 F. Supp. 3d 573, 579 (S.D.N.Y. 2014) (absolute immunity barred suit alleging that prosecutor failed to pursue evidence that contradicted witness' account).

While Lamar Scott's emergence created uncertainty, it did not change Belling's role as an advocate "evaluating evidence and interviewing witnesses" (*Smith v. Garretto*, 147 F.3d at 94) in preparation for presentation to a grand jury. To put it another way, on August 10, 2012, Mr. Belling's only role in the case was to seek and obtain an indictment against Valentino Dixon. On August 12, 2012, Mr. Belling's only role in the case was to seek and obtain an indictment against Valentino Dixon *or* Lamar Scott. Both the former and the latter involved "presenting a case to a grand jury...along with the tasks generally considered adjunct to those functions, such as witness preparation [and] witness selection." *Kanciper v. Lato*, 989 F. Supp. 2d 216, 228 (E.D.N.Y. 2013); *Smith v. Garretto*, 147 F.3d at 94 (prosecutor's evaluation of evidence and interviewing of witnesses entitled to absolute immunity).

As Belling described it, the confession of Lamar Scott simply meant that "in the context of preparation of the case for Grand Jury, [he] had to...look at a bigger picture than [he] would have had to look at beforehand." (Belling Dep. Trans., p. 34). [A 34.] The grand jury record confirms this analysis. Mr. Belling presented eleven (11) witnesses to the grand jury, including the live testimony of Mario Jarmon and Leonard Brown identifying Lamar Scott as the shooter (Dixon

1574-75, Dixon 1553) [A 1409-10, A 1388.]; the videotaped confession of Lamar Scott (Dixon 1606-1609) [A 1441-1444]; the written confession of Lamar Scott (Dixon 1609-1611) [A 1444-1446].  Law enforcement only testified at the grand jury proceedings to convey the existence of another weapon at the scene of the Jackson Murder (which would only tend to complicate the prosecution narrative, whether against Dixon or Scott).  (Grand Jury Transcript, (Dixon1556 – 1559).)  [A 1391-1394.]

Belling's grand jury presentation in the Jackson Murder culminated in the following:

> Consider first of all if LaMarr Scott did it, then you don't have to vote on Valentino Dixon. Then vote on Valentino Dixon. Then buzz me and I may have additional charges after we review that part of it.

(Dixon 1647.) [A 1482.] Viewed from the perspective at the close of the grand jury presentation, every conversation and thought that Mr. Belling expended, which considered the evidence probative of the guilt of Valentino Dixon or Lamar Scott was in anticipation of this moment.

The degree of Mr. Belling's preparation with witnesses does not defeat that the purpose of his preparation, which was to "evaluat[ed] evidence and interview[ed] witnesses" (*Smith v. Garretto*, 147 F.3d at 94).  In his deposition, Mr. Belling described meeting Tamara Frida, Antoine Shannon, Robert Lewis, Fred Stancil, Emil Adams, Travis Powell, Aaron Jackson, John Sullivan, III.  Each of these witnesses, save for Frida and Shannon, had provided statements to the police before meeting with Belling and ultimately appeared before the grand jury to testify.  (Dixon 1484-1623.)  [A 1319-1458.]

In her deposition testimony, Tamara Frida describes an interaction with the District Attorney – possibly Defendant Belling.  (Frida Dep. Trans., p.38:14-18.) [A 1174.] Belling did not threaten Frida in any way during the meeting.  (Frida Dep. Trans., p. 39:11-12.) [A 1175.] Tamara

Frida was adamant that any interaction with the Erie County District Attorney was not in connection to the murder investigation against Valentino Dixon. (Frida Dep. Trans., p. 63:1-8) [A 1223]. Rather, it related to the prosecution of Mario Jarmon and Leonard Brown. (Frida Dep. Trans., p. 63:9-12.) [A 1223.] Tamara Frida did not come forward to provide a complete and truthful account of the events of August 10, 1992 until 1998 (Dixon 3801-3804) [A 1484-1487]. Tamara Frida does not claim that she made any attempt to convey Lamar Scott's guilt to anyone in law enforcement or the District Attorney's Office. (*See gen* Frida Dep. Trans.) When she was approached by police at the scene, Frida denied that she "saw anything" because she "was afraid to become involved." (Dixon 3803.) [A 1486.]

Mr. Belling denied meeting with Tamara Frida in connection with the perjury trial of Jarmon and Brown. (Belling Dep. Trans., p. 167:14-19.) [A 168.] Mr. Belling did testify concerning two interactions with Ms. Frida in connection with the Jarmon Murder. (Belling Dep. Trans., p. 146:13-15.) [A 147.] The first occurred at Ms. Frida's home while grand jury proceedings were pending. (*Id*. 162:2-12) [A 163]. Mr. Belling described the interaction:

> As I recall, we thought that Tamara Frieda [sic] was the anonymous phone caller, the person that called into the police department and said Valentino Dixon didn't do it. So we approached it from that. You know, we -- she said, I'm not – I wasn't there.· I said, well, your car was there with a bullet hole in it. I wasn't there. Well, aren't you the person that called in and said this. No, I'm not that person, I wasn't there, I left early. And she just continued to deny, deny, deny that she knew anything about it, and that was where it ended up, where it went.

(Belling Dep. Trans., p. 134:15 – 135:2.) [A 135-136.] Despite her denial, Mr. Belling issued a subpoena to Ms. Frida for her appearance at the grand jury, which resulted in Mr. Belling meeting with Frida and her mother at his office. (*Id*. 146:3 – 147:11.) [A 147-148.] Mr. Belling's notes

reflect that Frida described "duck[ing] [at] the [first] shot – doesn't know any of the parties." (Belling (*Id*. at (COE2309).  [A 1814.]

Here, Ms. Frida's recollection and the documentary evidence are at odds, but not in any way that is material to a claim against Mr. Belling.  Ms. Frida does not raise any issue with the manner in which any law enforcement personnel interacted with her.[8]

In preparation for his presentation of the case to the grand jury, Mr. Belling traveled to Kentucky to interview Antoine Shannon, who is Dixon's half-brother (BPD Comp. 249; COB00274) [A 1738; 1313].   (Belling Dep. Trans., p. 251:19-252:5.) [A 252-253.] Belling explained that Shannon's testimony was "something that had to be dealt with before we put the case to the Grand Jury."  (*Id*. 252:3-5.) [A 253.] (Antoine Shannon had been present for the confession of Lamar Scott, but he did not provide a statement to police.)   During the course of that interview, Belling captured an affidavit from Shannon that implicated Lamar Scott as the perpetrator of the Jackson Murder.  (COB274-279; BPD Comp 249-254.) [A 1313-1318; 1738-1743.] Antoine Shannon's identification of Lamar Scott as the shooter was disclosed to Dixon's counsel.  (ECDAO's Response to Demand to Produce (COE1855-1859).) [A 1809-1813.]

Mr. Belling's interaction with the witnesses in this case plainly involved "evaluating evidence and interviewing witnesses."  *Smith v. Garretto*, 147 F.3d at 94.  And to the extent that this Court finds that any of Mr. Belling's conduct was outside the scope of his role as advocate, it still is not actionable because there is no record evidence from which a reasonable jury could

---

[8] Notably, Brown and Jarmon were indicted on January 30, 1991 in connection with their testimony at the final grand jury proceedings in the Jackson Murder.  (COE2693-2701) (Brown/Jarmon Indictment Records); Dixon 1484-1648 (Grand Jury Proceedings in Jackson Murder).  This is the same date on which Valentino Dixon was indicted.  More than likely, Ms. Frida is conflating prior interactions with Mr. Belling in connection with the Jackson Murder prosecution with interactions with Assistant District Attorney Frank Sedita in connection with the prosecution of Brown and Jarmon, where Tamara Frida testified.

conclude that Mr. Belling "violate[d] clearly established statutory or constitutional rights of which reasonable prosecutor would have known" as they existed in 1991. *Buckley*, 509 U.S. at 268 (1993).

## II. THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANT BELLING BECAUSE DEFENDANT BELLING DID NOT VIOLATE THE CONSTITUTIONAL RIGHTS OF THE PLAINTIFF

Beyond the general applicability of absolute immunity to Mr. Belling's conduct, absolute immunity specifically applies to the theories and causes of action specifically alleged against him, and the claims must be dismissed for this independent reason. Moreover, whether under an absolute immunity or qualified immunity standard, there is insufficient evidence to establish that Mr. Belling acted improperly in connection with the Dixon prosecution or engaged in any of the bad conduct alleged by the Plaintiff. *See Anilao v. Spota*, 27 F.4th 855, 871 (2d Cir. 2022) (even in the context of qualified immunity, "speculation…poses no bar to summary judgment in the defendants' favor").

### A. This Court should dismiss Plaintiff's First Cause of Action Alleging Denial of a Fair Trial by Fabrication of Evidence and Withholding Material Evidence (§1983).

i.  Summary of Plaintiff's claim

As against Defendant Christopher Belling, the Plaintiff's First Cause of Action alleges:

- While in an investigative capacity, Belling and BPD detectives conspired to fabricate a case against Dixon despite a lack of probable cause and before any criminal proceedings had begun. (Compl. (Doc. 1), ¶226(a).)
- While in an investigative capacity, Belling coerced Emil Adams into making a false identification and falsely incriminating statements, despite the lack of probable cause and before any criminal proceedings had begun. (Compl. (Doc. 1), ¶226(b).)
- While in an investigative capacity, Belling coerced Lamar Scott into falsely claiming and testifying that Mr. Dixon and not Mr. Scott, was the shooter. (Compl. (Doc. 1), ¶226(f).)

Plaintiff's Third Cause of Action[9] adds the following theories, as part of a civil conspiracy:

- The false arrest of Valentino Dixon without probable cause. (Compl. (Doc. 1), ¶238(a).)
- Fabricated inculpatory evidence including the identifications of Mr. Dixon. (Compl. (Doc. 1), ¶238(b).)
- Failing to disclose *Brady* material. (Compl. (Doc. 1), ¶238(d).)
- Coercing Lamar Scott to recant his confession. (Compl. (Doc. 1), ¶238(e).)
- Coercing Mr. [Mario] Jarmon and Mr. [Leonard] Brown in an attempt to buy their silence or cause further false incriminating statements and identifications.

In sum, the Plaintiff alleges the following bad conduct: (a) *pre-arrest* fabrication of evidence, including the identifications; (b) *pre-arrest* coercion of Emil Adams; (c) *post-arrest* coercion of Lamar Scott; (d) *post-arrest* coercion of Mario Jarmon and Leonard Brown; (e) failing to disclose *Brady* material.

      ii.     <u>Legal Standard</u>

"To succeed on a fabricated-evidence claim, a plaintiff must establish that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Barnes v. City of New York*, 68 F.4th 123, 128 (2d Cir. 2023) (internal quotation and formatting omitted).

      iii.     <u>The Plaintiff's Various Theories Advanced in the Plaintiff's First and Third Causes of Action Fail as a Matter of Law and Fact.</u>

      a.  *Defendant Belling Cannot be Liable for Pre-Arrest Fabrication of Evidence.*

---

[9] The additional legal infirmities of the Plaintiff's claim as it is specific to a *conspiracy* cause of action are addressed below. The underlying allegations of conduct are addressed herein because they are largely overlapping in substance.

17

As is more fully set forth above, all of Mr. Belling's conduct in connection with Mr. Dixon is governed by absolute immunity. Even if it were not, there is no record evidence that Mr. Belling "violate[d] clearly established statutory or constitutional rights of which reasonable prosecutor would have known" as they existed in 1991. *Buckley*, 509 U.S. at 268 (1993). More specifically, there is no record evidence that Mr. Belling had any role, of any kind, in the arrest of Mr. Dixon or developing the evidence that led to that arrest. Further, there is no record evidence that any of the evidence that formed the basis for Mr. Dixon's arrest was coerced by any person, let alone Mr. Belling. Indeed, the first three parties to identify Mr. Dixon as the perpetrator of the Jackson Murder continue to identify Mr. Dixon as the perpetrator of the Jackson Murder.

b. *Defendant Belling Cannot be Liable for Pre-Arrest Coercion of Emil Adams.*

As is more fully set forth above, all of Mr. Belling's conduct in connection with Mr. Dixon is governed by absolute immunity. Even if it were not, there is no record evidence that Mr. Belling "violate[d] clearly established statutory or constitutional rights of which reasonable prosecutor would have known" as they existed in 1991. *Buckley*, 509 U.S. at 268 (1993). More specifically, there is no record evidence that Mr. Belling had any role, of any kind, in coercing Emil Adams to identify Mr. Dixon as the perpetrator of the Jackson Murder. Further, there is no record evidence that Mr. Adams was coerced by any person, let alone Mr. Belling. Indeed, Mr. Adams continues to identify Mr. Dixon as the shooter to this day.

c. *Defendant Belling Cannot be Liable for Post-Arrest Coercion of Lamar Scott.*

As is more fully set forth above, all of Mr. Belling's conduct in connection with Mr. Dixon is governed by absolute immunity. Even if it were not, there is no record evidence that Mr. Belling

"violate[d] clearly established statutory or constitutional rights of which reasonable prosecutor would have known" as they existed in 1991. *Buckley*, 509 U.S. at 268 (1993). More specifically, there is no record evidence that Mr. Belling had any role, of any kind, in coercing Lamar Scott to recant his August 12, 1991 confession. At the time that Lamar Scott recanted his confession, he was represented by counsel. (Dixon001597.) [A 1432.] At deposition, Lamar Scott did not blame Mr. Belling for recanting, but noted that the presence of his parents made him feel deeply ashamed. (Scott Dep. Trans., p. 64:5.) [A 1132.]

> ### d.  *Defendant Belling Cannot be Liable for Post-Arrest Coercion of Mario Jarmon and Leonard Brown.*

As is more fully set forth above, all of Mr. Belling's conduct in connection with Mr. Dixon is governed by absolute immunity. The alleged coercion – presumably, the initiation of criminal proceedings against Mario Jarmon and Leonard Brown – is clearly subject to absolute immunity. *See Lee*, 617 F.2d at 321; *see also Buari*, 530 F. Supp. 3d at 380; *McKeon* at 88. Even if it were not, there is no record evidence that Mr. Belling "violate[d] clearly established statutory or constitutional rights of which a reasonable [prosecutor] would have known" as they existed in 1991 by initiating a criminal prosecution against Mario Jarmon and Leonard Brown. *Buckley*, 509 U.S. at 268 (1993). Moreover, there is no record evidence that any person coerced Mario Jarmon or Leonard Brown.

> ### e.  *Defendant Belling Cannot be Liable for failing to Disclose Brady Material.*

As is more fully set forth above, all of Mr. Belling's conduct in connection with Mr. Dixon is governed by absolute immunity.

Moreover, there is no record evidence that any *Brady* material was withheld from Valentino Dixon's defense.  In Plaintiff's CPL § 440 motion, Plaintiff pursued a theory that the defense had failed to turn over negative gunshot residue testing.  (Affirmation of Donald Thompson, dated May 18, 2018 [66-2] at 31-34.)  That theory proved unfounded and was based exclusively on a misstatement by Mr. Belling.  (Answering Affidavit of David A. Herarty, dated September 17, 2018 [66-3], at 6-7.)

f.  *Conclusion*

Based on the foregoing, the record evidence does not contain evidence from which a rational jury could conclude that Christopher Belling knowingly fabricated evidence during the investigation of the Jackson Murder, or otherwise violated Plaintiff's constitutional rights in the investigative phase of the case.  As follows, even under the qualified immunity standard applicable to investigative conduct, this Court should conclude that Christopher Belling is entitled to Judgment dismissing Plaintiff's First and Third causes of action.  At the very least, this Court should conclude that the Christopher Belling is entitled to judgment on the defense of qualified immunity.  *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) ("Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.")

iv.    The Plaintiff's Various Theories Advanced in the Plaintiff's First and Third Causes of Action Fail as a Matter of Law and Fact.

To the extent applicable to Defendant Belling, The County Defendants adopt and incorporate the arguments and case law cited by the City Defendants.

**B. This Court should dismiss Plaintiff's Third Cause of Action Alleging Civil Rights Conspiracy (§1983).**

The Plaintiff's Third Cause of Action alleges that Belling participated in a civil conspiracy with Defendants Stambach, Lonergan, Vickerd and Massechia. The actions and subject matter of that conspiracy and the applicability of absolute immunity to such conduct is addressed above. To the extent that the underlying conduct is not actionable against Belling, there can be no independent claim against Belling for a conspiracy relating to that conduct. *See Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (holding that prosecutors are absolutely immune from claims relating to presenting perjured testimony as well as conspiring to prevent perjured testimony); *accord Tapp v. Champagne*, 164 F. App'x 106, 108 (2d Cir. 2006) (*quoting Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir.1987)) ("Since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity."); *Thompson v. Kline*, 504 F. Supp. 3d 200, 216 (W.D.N.Y. 2020) (holding that absolute immunity barred allegation of post-arrest conspiracy between prosecutor and officer). Furthermore, there is no record evidence from which a reasonable jury could conclude that Belling engaged in a conspiracy.[10]

**C. This Court should dismiss Plaintiff's Fourth Cause of Action Alleging Failure to Intercede (§1983).**

In the Plaintiff's Fourth Cause of Action, the Plaintiff alleges that Belling "had opportunities to intercede on behalf of Valentino Dixon, particularly in an investigative context,

---

[10] The elements of civil conspiracy are "(1) an agreement between two or more state actors or between a state actor and a private entity, (2) to act in concert to inflict an unconstitutional injury and (3) an overt act done in furtherance of that goal causing damages." *Thompson v. Kline*, 504 F. Supp. 3d 200, 210–11 (W.D.N.Y. 2020) (internal quotation and formatting removed).

before developing any probable cause for his arrest or prosecution, to prevent his deprivation of liberty without due process of law."  (Compl. (Doc. 1), ¶244.))

To establish a claim for failure to intervene, a Plaintiff must show "(1) the officer's failure permitted fellow officers to violate plaintiff's clearly established statutory or constitutional rights, and (2) it was objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 619 (E.D.N.Y. 2017) (internal quotation, citation and formatting omitted). Additionally, "Plaintiff must show that the officer had a realistic opportunity to intervene to prevent the harm from occurring but failed to do so."  *Id.*  (internal quotation, citation and formatting omitted).  And any claim for failure to intervene is "contingent on the underlying [constitutional] claim." *Buari v. City of New York*, 530 F. Supp. 3d 356, 392 (S.D.N.Y. 2021)

As is set forth above, all of Defendant Belling's conduct is entitled to absolute immunity. Further there is no record evidence from which a reasonable jury could conclude that Belling had an opportunity to intervene before Valentino Dixon's arrest on August 10, 1991, which is the only timeline at issue in the Plaintiff's failure to intervene claim.  Finally, the Plaintiff's claim fails because the record evidence does not support an underlying constitutional violation that preceded Plaintiff's arrest.

### III.   THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANT BELLING ON PLAINTIFF'S STATE LAW CLAIMS.

#### A. This Court should dismiss Plaintiff's Ninth Cause of Action Alleging Negligent or Intentional Infliction of Emotional Distress, pursuant to New York law.

The Plaintiff's Ninth Cause of Action is not actionable because the conduct alleged "falls within the ambit of traditional tort liability."  *Hansel v. Sheridan*, 991 F. Supp. 69, 75 (N.D.N.Y

Case 1:19-cv-01678-MAV-JJM    Document 167-1    Filed 12/15/23    Page 29 of 31


1998); *see Deanda v. Hicks*, 137 F. Supp. 3d 543, 581 (S.D.N.Y. 2015) ("The conduct of which Plaintiff complains falls within the scope of claims of unreasonable search and seizure, false arrest, and malicious prosecution, as discussed above.") *see also Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 271 (W.D.N.Y. 2013) (Emotional distress claim would not lie based on allegations in 1983 case against school district).  Moreover, such a claim is barred by absolute prosecutorial immunity.  And finally, there is no record evidence from which a rational jury could conclude that Defendant Belling engaged in conduct sufficiently outrageous to be actionable under New York law.

### B. This Court should dismiss Plaintiff's Tenth Cause of Action Alleging Negligence

This claim fails to state a cause of action.  *Johnson v. Kings Cty. Dist. Attorney's Office*, 308 A.D.2d 278, 284, 763 N.Y.S.2d 635, 640 (2d Dep't 2003) ("It is well settled that New York courts do not recognize claims for negligent or malicious investigation.")  Moreover, such a claim is barred by absolute prosecutorial immunity.  And finally, there is no record evidence from which a rational jury could conclude that Defendant Belling was negligent.

### IV.  THIS COURT SHOULD DISMISS ALL CLAIMS AGAINST ERIE COUNTY

### A. This Court should dismiss Plaintiff's Seventh Cause of Action Alleging Monell Liability (§1983).

This claim should be dismissed all of the four following bases.

First, as is more fully set forth above, the conduct of Mr. Belling is not actionable as a matter of law based on absolute or, at least, qualified immunity, and Mr. Belling did not engage in any conduct that violated the constitutional rights of Valentino Dixon.  Accordingly, the Plaintiff's *Monell* claim should be dismissed.

Second, even to the extent that Mr. Belling did engage in constitutionally infirm conduct, that conduct was not caused by a policy that was pleaded by Plaintiff and supported by record evidence. The Plaintiff's *Monell* claim should therefore be dismissed.

Third, even to the extent that this Court does not grant judgment on the basis of the foregoing, this Court should grant judgment dismissing Plaintiff's *Monell* claim because they are barred by the doctrine of absolute immunity. *Van de Kamp v. Goldstein*, 555 U.S. 335, 129 S. Ct. 855, 857, 172 L. Ed. 2d 706 (2009).

Fourth, to the extent that this Court does not grant judgment on the prior three bases, the Court should grant judgment on the basis that the County is not the proper party to this action because the Plaintiff's *Monell* theory relate to the practice of the Erie County District Attorney concerning "whether or not and on what charges to prosecute." *See Pinaud,* 52 F.3d 11139, n. 14; *see also Myers v. Cnty. of Orange*, 157 F.3d 66, 77 (2d Cir. 1998) (New York courts recognize a narrow exception to this general rule when a prosecutor makes individual determinations about whether to prosecute violations of state penal laws.")

### B. This Court should dismiss Plaintiff's Twelfth Cause of Action Alleging Respondeat Superior.

This claim should be dismissed on the following two grounds. First, in the absence of any underlying liability, this claim is meaningless. Second, this claim should be dismissed because the County lacks authority to control assistant district attorneys. *See Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988)

**C.  This Court should dismiss Plaintiff's Fourteenth Cause of Action Alleging Negligent Hiring, Supervision and Training pursuant to New York law.**

New York Courts generally eschew negligence theories against employers in favor of *respondeat superior liability*. *Talavera v. Arbit*, 18 A.D.3d 738, 738-739 (2d Dep't 2005) Thus, negligent hiring and retention is not a cognizable claim in the instant context. *Eckardt v. City of White Plains*, 87 A.D.3d 1049, 1051 (N.Y. App. Div. 2d Dep't 2011) (in conjunction with 1983 excessive force claims, "no claim may proceed against the employer for negligent hiring, retention, supervision or training.")  Based on the foregoing, this Court should dismiss the Plaintiff's Fourteenth Cause of Action.

## CONCLUSION

Based on the foregoing, this Court should grant summary judgment to the County Defendants dismissing the Plaintiff's Complaint.

Dated: December 15, 2023
        Buffalo, New York

                                    Respectfully submitted,

                                    **LIPPES MATHIAS LLP**

                        By:      */s/James P. Blenk*
                                    Jennifer C. Persico
                                    James P. Blenk
                                    *Attorneys for Defendants, County of Erie and
                                    former Assistant District Attorney
                                    Christopher Belling*
                                    50 Fountain Plaza, Suite 1700
                                    Buffalo, New York 14202
                                    (716) 853-5100
                                    jpersico@lippes.com
                                    jblenk@lippes.com