UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

VALENTINO DIXON,

               Plaintiff,                       Civil Action No. 19-cv-01678

     v.

CITY OF BUFFALO, et al.,

               Defendants.
_____

## COUNTY DEFENDANTS'APPENDIX TO LOCAL RULE 56 STATEMENT OF MATERIAL FACTS

    Defendants County of Erie and former Assistant District Attorney Christopher Belling (collectively the "County Defendants") provide the following appendix evidence in support of their motion for summary judgment dismissing all claims alleged against them in this case:

| Appendix Page Number(s) | Document | Bates Number(s) |
|---|---|---|
| 1-459 | Deposition Transcript of Christopher Belling taken April 11, 2023 | n/a |
| 460-638 | Deposition Transcript of Aaron Jackson taken January 12, 2023 | n/a |
| 639-833 | Deposition Transcript of Emil Adams taken January 17, 2023 | n/a |
| 834-1068 | Deposition Transcript of Valentino Dixon taken June 7, 2022 | n/a |
| 1069-1160 | Deposition Transcript of Lamarr Scott taken March 14, 2022 | n/a |
| 1161-1272 | Deposition Transcript of Tamara Frida taken October 19, 2022 | n/a |
| 1273-1312 | Arrest Documents | COB 00152-191 |
| 1313-1318 | Antoine Shannon Affidavit | COB 00274-279 |
| 1319-1483 | Grand Jury Proceedings in Jackson Murder | Dixon-001484-1648 |

| 1484-1487 | Tamara Frida Affidavit, dated November 6, 1998 | Dixon-003801-3804 |
|---|---|---|
| 1488 | Affidavit of Emil Adams, dated July 10, 2005 | Dixon-005976 |
| 1489-1793 | Buffalo Police Department File Compilation Used prepared by Plaintiff's counsel and referred to in depositions as "Plaintiff's 2." | BPD Comp. 0001-303 |
| 1794-1801 | Excerpts from the Jackson murder trial transcript | COE00001-4; COE000165-166; COE000170; COE000207 |
| 1802-1803 | Criminal Complaint against Valentino Dixon | COE001672-1673 |
| 1804 | Christopher Belling letter to John Malloy, Esq., dated January 9, 1992 | COE001692 |
| 1805-1807 | Affidavit of Christopher Belling, dated August 12, 1991 | COE001696-1698 |
| 1808 | ECDAO Grand Jury Report | COE001702 |
| 1809-1813 | ECDAO's Response to Demand to Produce | COE001855-1859 |
| 1814 | Belling notes regarding Frida | COE002309 |
| 1815-1823 | Brown/Jarmon Indictment Records | COE002693-2701 |
| 1824 | Excerpt from Redacted Confidential Report | COE004765 |

The undersigned declares under penalty of perjury that the documents that follow are true and correct versions of the documents exchanged in discovery that bear the Bates numbers set forth above and were maintained in the records and files of Lippes Mathias LLP.

Dated: December 15, 2023
     Buffalo, New York            Respectfully submitted,

**LIPPES MATHIAS LLP**

By:     */s/James P. Blenk*
           Jennifer C. Persico
           James P. Blenk
           *Attorneys for Defendants, County of Erie and former Assistant District Attorney Christopher Belling*
           50 Fountain Plaza, Suite 1700
           Buffalo, New York 14202
           (716) 853-5100
           jpersico@lippes.com
           jblenk@lippes.com

**APPENDIX 0001**

In the Matter Of:

DIXON V. CITY OF BUFFALO

1:19-cv-01678-WMS

---

**CHRISTOPHER J. BELLING**

*April 11, 2023*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

2                    VIDEO DEPOSITION
                  CHRISTOPHER J. BELLING
3


4
    UNITED STATES DISTRICT COURT
5   WESTERN DISTRICT OF NEW YORK

6
    ----------------------------------------
7   VALENTINO DIXON,

8                          Plaintiff,

9                - vs -      Case No.
                            1:19-cv-01678-WMS
10
    CITY OF BUFFALO and COUNTY OF ERIE;
11  and DETECTIVE MARK R. STAMBACH,
    DETECTIVE RANIERO MASECCHIA, DETECTIVE
12  JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
    CHIEF RICHARD T. DONOVAN, JOHN DOES,
13  Unknown Buffalo Police Department Supervisors,
    and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
14  BELLING, in their individual capacities,

15                         Defendants.
    ----------------------------------------
16

17          Video recorded deposition of CHRISTOPHER

18  J. BELLING Defendant, taken pursuant to the Federal

19  Rules of Civil Procedure, in the law offices of

20  HARRINGTON & MAHONEY, 70 Niagara Street, Third

21  Floor, Buffalo, New York, on April 11, 2023,

22  commencing at 10:18 a.m., before JOAN M.

23  METZGER-HUBBELL, CM, Realtime Reporter, Notary

24  Public.

25



```
 1
 2   APPEARANCES:       NEUFELD SCHECK & BRUSTIN, LLP,
                        By NICK J. BRUSTIN, ESQ.,
 3                      nick@nsbcivilrights.com,
                        GERARDO ROMO, ESQ.,
 4                      gerardo@nsbcivilrights.com,
                        via Zoom,
 5                      KATIE McCARTHY, ESQ.,
                        katie@nsbcivilrights.com,
 6                      via Zoom,
                        99 Hudson Street,
 7                      8th Floor,
                        New York, New York  10013,
 8                      (212) 965-9081,
                        Appearing for the Plaintiff.
 9
                        HODGSON RUSS LLP,
10                      By HUGH M. RUSS, III, ESQ.,
                        The Guaranty Building,
11                      140 Pearl Street, Suite 100,
                        Buffalo, New York  14202,
12                      (716) 856-4000,
                        hruss@hodgsonruss.com,
13                      Appearing for the Defendants,
                        City of Buffalo; Detective
14                      Mark R. Stambach, Detective
                        Raniero Masecchia, Detective
15                      James P. Lonergan, Detective
                        John Vickerd, Chief Richard T.
16                      Donovan, and John Does, Unknown
                        Buffalo Police Department
17                      Supervisors, via Zoom.

18                      LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                        By JAMES P. BLENK, ESQ.,
19                      jblenk@lippes.com and
                        JENNIFER C. PERSICO, ESQ.,
20                      jpersico@lippes.com,
                        50 Fountain Plaza, Suite 1700,
21                      Buffalo, New York  14202,
                        (716) 853-5100,
22                      Appearing for the Defendants,
                        County of Erie and
23                      Assistant District Attorney
                        Christopher Belling.
24
     PRESENT:           MOISES SOTO-BRITO
25                      JEFFREY J. LOFTUS, Videographer
```



```
 1                    Christopher J. Belling
 2           (The following discussion was held before
 3    videotaping commenced.)
 4           THE REPORTER:  Do counsel stipulate that I
 5    may swear in the witness without him showing me
 6    photo ID?
 7           MR. BRUSTIN:  Yes.
 8           MR. BLENK:  Yes.
 9           MR. RUSS:  Yes.
10           (Off the record at 10:07 a.m.)
11           THE REPORTER:  Is everyone ordering a copy
12    of the transcript and paying for their own copy?
13           MR. BRUSTIN:  Yes.
14           MR. BLENK:  Yes.
15           MR. RUSS:  Yes.
16           (Off the record at 10:07 a.m.)
17           (Videotaping commenced at 10:18 a.m.)
18           THE VIDEOGRAPHER:  This will begin the
19    video-recorded testimony of Christopher Belling
20    taken for a case to be tried in the United States
21    District Court, Western District of New York, and
22    to be used in the matter of Valentino Dixon versus
23    City of Buffalo, et al.
24           The testimony is being taken in the office
25    of Harrington & Mahoney, 70 Niagara Street, 4th
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                                4

```
 1                      Christopher J. Belling
 2   Floor, Buffalo, New York, on 4/11/2023 and
 3   commencing at a time of 10:18 as indicated on the
 4   video screen.
 5          The court reporter and notary public from
 6   Esquire Deposition Services is Joan
 7   Metzger-Hubbell.  My name is Jeffrey J. Loftus.
 8   I'm the video technician also from the same
 9   company.  Counsel for the plaintiff ill introduce
10   themselves followed by counsel for the defendants,
11   and the reporter will then swear in the witness.
12          MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &
13   Brustin, for the plaintiff, Valentino Dixon.  By
14   video is Katie McCarthy and Gerardo Romo.
15          MR. BLENK:  James P. Blenk of Lippes Mathias
16   for Christopher Belling and County of Erie.
17          MR. RUSS:  Good morning.  Hugh Russ from
18   Hodgson Russ.  We represent the city and police
19   defendants.
20   CHRISTOPHER J. BELLING, 212 Woodbury Drive,
21   Amherst, New York 14226, after being duly called
22   and sworn, whose identity was confirmed by
23   stipulation by all counsel, testified as follows:
24                      EXAMINATION
25          BY MR. BRUSTIN:
```



```
 1                  Christopher J. Belling
 2        Q.   Mr. Belling, what's your date of birth?
 3        A.                1949.
 4        Q.   Are you currently employed?
 5        A.   No.
 6        Q.   All right.  Before I get rolling, I'm
 7   sure that you've spoken to your attorney about the
 8   process.  Have you had your deposition taken
 9   before?
10        A.   Not in this case.
11        Q.   In other cases?
12        A.   I have been deposed once in a federal
13   case, yes.
14        Q.   Okay.  Have you ever taken a
15   deposition?
16        A.   No.
17        Q.   Okay.  So I'm sure you understand the
18   rules.  Just the important ones from my
19   perspective, I'm going to be asking you a series of
20   questions.  You'll be answering them under oath.
21   If at any time you don't understand any part of my
22   question or the entire question, please let me know
23   and I'll rephrase it.  If you do answer it, I'm
24   going to assume you understood it.
25        Is that fair enough?
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                                 6

```
 1                  Christopher J. Belling
 2         A.    I think so.
 3         Q.    If you want to take a break at any
 4  time, that's fine.  The only thing I would ask is
 5  that you answer the question pending before taking
 6  a break, okay?
 7         A.    Sure.
 8         Q.    Do you have any health conditions or
 9  are you taking any medication that you think in any
10  way affect your memory or your ability to testify
11  here today?
12         A.    No.
13         Q.    All right.  Let's start with your
14  career, and I think let's start with where you
15  graduated from high school and then take me up
16  through -- through college and law school to the
17  DA's office.
18         A.    High school, 1967, graduate of
19  Williamsville Central High School.
20         Q.    I'm sorry, where's that?
21         A.    Williamsville Central High School.
22         Q.    Is that nearby?
23         A.    It's in Williamsville, New York, which
24  is right out Main Street.
25         Q.    Gotcha.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            7

```
 1              Christopher J. Belling
 2         A.   And then I started college at the
 3  University of California in Santa Barbara, came
 4  back to the State University of New York at
 5  Buffalo, received my bachelor's degree magna cum
 6  laude from the University of Buffalo.  Then went to
 7  University of Buffalo Law School.
 8         Q.   Straight from college?
 9         A.   Yes.  And from -- yeah, got my JD, and
10  then I went to work in the DA's office.
11         Q.   Right off the bat?
12         A.   Yes.
13         Q.   Erie County?
14         A.   Yes.
15         Q.   Okay.  And why don't you take me
16  through your career in Erie County as a prosecutor.
17  And what year did you start?
18         A.   March of 1975 I started in the DA's
19  office in Erie County.  I was hired by Edward
20  Cosgrove, who was the DA at the time.  I started in
21  the so-called Administrative Bureau.  By June of
22  '75 I was transferred to the Buffalo City Court
23  Bureau.  August of '75 I was transferred to the
24  Town Court Bureau, worked mainly in the Town of
25  Cheektowaga, until August of '77.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            8

1                    Christopher J. Belling

2          In August of '77 I was transferred to the

3   Felony Trial Bureau and stayed in the Felony Trial

4   Bureau until around '79, I think.  We got some

5   grant funding.  That's when the legislature passed

6   the violent offense laws, and we got some funding.

7   I first went to the Violent Offender Bureau, and

8   then we got some more grant funding and created

9   what was called the Career Criminal Prosecution

10  Unit.

11         Q.   Let me stop you for a minute.  I

12  apologize for interrupting, and I may do it from

13  time to time.  So up to '79 you're in felony

14  trial -- felony trial unit.

15         A.   Correct.

16         Q.   What crimes does that include?  Does

17  that include homicides, rapes?

18         A.   Yeah, it includes everything, rapes,

19  anything that's a felony.

20         Q.   Gotcha, okay.  All right.

21         A.   Okay.  So 1979, '80, we received some

22  more grant funding, and we created the Career

23  Criminal Prosecution Bureau.  I was assigned to

24  that bureau with two other assistant DA's.

25  Eventually I became chief of that bureau.  Towards



```
 1                    Christopher J. Belling
 2   the end of 1981, I would say, DA's election end of
 3   '81 Richard Arcara became the District Attorney.
 4   He kept me as chief of Career Criminal until there
 5   was an office-wide restructuring at which point --
 6            Q.   When was that, approximately?
 7            A.   When was that?  '82, '83.
 8            Q.   Okay.
 9            A.   I don't know exactly.  There was a
10   restructuring at that point, and I became chief of
11   the major Violent Offender Bureau, that I may not
12   be the accurate name, but it was dealing with --
13   actually, it was dealing with career criminals,
14   violent felonies, and at that point also some sex
15   crimes was under my bureau at that point.
16            And then another office restructuring, and
17   we divided up the responsibilities somewhat
18   differently.  I became chief of one of three felony
19   trial bureaus and --
20            Q.   Approximately when is that?
21            A.   '85, '86 maybe.
22            Q.   Okay.  And which trial bureau?
23            A.   I think -- I think I was chief of
24   felony trial bureau three, but there's only three.
25   There's one, two, and three.
```



CHRISTOPHER J. BELLING                                         April 11, 2023
DIXON V. CITY OF BUFFALO                                                   10

```
1                    Christopher J. Belling

2          Q.    Okay.

3          A.    And 1988 Kevin Dillon became the

4    District Attorney, and when Kevin Dillon became the

5    District Attorney, he instituted for the first time

6    a homicide bureau within the DA's office, and that

7    would have been early in his era.  He started June

8    1st, 1988, so by the fall of '88 he had created a

9    homicide bureau, and I was designated as the

10   co-chief of that bureau, and I stayed there with a

11   different co-chief.  There was a co-chief switch in

12   there, but I stayed, until 1997.  When Kevin Dillon

13   left, Frank Clark was elected DA.  Frank Clark made

14   me the deputy --

15         Q.    What year?

16         A.    I think the election was '97, and Frank

17   Clark was sworn in '98.

18         Q.    All right.  Just before you get to '97,

19   1988, is that around the same time when the

20   Intelligence Task Force -- Intelligence Task Force

21   started, in 1988 when Dillon came in?

22         MR. BLENK:  Form.

23         THE WITNESS:  I have no idea what the

24   Intelligence Task Force is, sorry.

25         BY MR. BRUSTIN:
```



1             Christopher J. Belling

2        Q.   Or the Anti-Drug Task Force.

3        MR. BLENK:   Form.

4        THE WITNESS:   Not a clue.  I don't know what

5   you're talking about.

6        BY MR. BRUSTIN:

7        Q.   Okay.  We'll get to it in a little bit.

8   1997 you --

9        A.   Okay.  1997 Frank Clark's elected.

10  When he takes office, he makes me Deputy District

11  Attorney in charge of the investigation division,

12  which had white collar crime, vehicular crimes,

13  narcotics actually was under my supervision at that

14  point, sex crimes.  Although, at some point that

15  sort of drifted away.

16       But I was there until the fall of 1999 when

17  I was transferred to be the chief of the Buffalo

18  City Court bureau where I was until 2003.  And in

19  2003 I came back as a slightly different title,

20  Chief Assistant District Attorney in the homicide

21  bureau.  I was in the homicide bureau as a chief

22  assistant until November 2007.

23       In November of 2007 I was recruited by and

24  went to the New York Prosecutors Training Institute

25  where I worked for three years until December of



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                   12

1                    Christopher J. Belling

2   2010.

3        By December 2010 Frank Sedita had been

4   elected District Attorney in Erie County.  He asked

5   me to come back to the DA's office, which I did,

6   end of 2010, beginning of 2011.  I was delayed a

7   little bit.  I was tied up in a murder case in

8   St. Lawrence County at that point in time.

9        Came back to the DA's office around the

10  first of the year 2011.  Stayed through Frank

11  Sedita's -- came back, by the way, as what was

12  called senior trial counsel.  Stayed through

13  Sedita's era.  Sedita left.  He was elected to

14  Supreme Court in 2015, took the bench in '16.

15       In '16 Michael Flaherty became the acting

16  DA.  Michael changed my title and the pecking order

17  a little bit, and I moved up and I was then called

18  the chief trial counsel where I stayed until the

19  end of 2016.  And then I left the Erie County

20  District Attorney's office and --

21       Q.   In 2016?

22       A.   End of 2016.  December 31st, 2016, was

23  my resignation effective day.

24       Q.   And what were the circumstances of your

25  resignation?



```
 1                   Christopher J. Belling
 2           A.    John Flynn was elected District
 3    Attorney, and he demoted the number 2 person and
 4    fired the number 3 and 4, and I was number 3.
 5           Q.    Okay.  Any -- were you given any reason
 6    for your firing?
 7           A.    No.
 8           Q.    Do you have any understanding as you
 9    sit here today the basis for your firing?
10           A.    Yes.
11           Q.    What is it?
12           A.    Flynn was upset with the fact that I
13    had been quoted in the media as saying that Michael
14    Flaherty, who was his opponent in the election, was
15    a superior candidate.  I had also given Flaherty
16    significant money in the campaign that year, and
17    Flynn had made a determination that he wanted to
18    have his own people in his administration, the
19    higher-ups, so that's why he told me he didn't need
20    me back after the first of the year.
21           Q.    So your view it was solely political,
22    nothing to do with performance?
23           MR. BLENK:  Form.
24           THE WITNESS:  I believe that to be true,
25    yes.
```



APPENDIX 0015

CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           14

```
 1                  Christopher J. Belling

 2         BY MR. BRUSTIN:

 3         Q.   All right.  So you retire in 2016 from

 4    the DA's office?

 5         A.   Not exactly.  I stopped working at the

 6    Erie County DA's office.  Didn't work for a while,

 7    and then the spring of 2017 the District Attorney

 8    in Chautauqua County contacted me, asked me if I

 9    would come down and be his counsel, counsel to the

10    District Attorney of Chautauqua County.  I did that

11    until the end of 2018.

12         At the end of 2018 I thought I was going to

13    retire, but then the DA from Genesee County called

14    me, and he asked me to please, please come to work

15    for him.  He had a personnel issue, he couldn't

16    fill his slots, and he needed somebody who knew

17    what they were doing.

18         So I went to Genesee County with the

19    understanding that as soon as he could fill the

20    slot, I would then retire, and that was probably

21    July of 2018 when I stopped working at the Genesee

22    County DA's office.  No, July of 2019, I'm sorry.

23         Q.   And you've been retired since then?

24         A.   Yeah.  Do a little special DA work in

25    surrounding counties doing some consulting, expert
```



 1                   Christopher J. Belling

 2   witness stuff, and training.

 3        Q.   What kind of expert witness work have

 4   you done?

 5        A.   I am presently an expert witness in a

 6   case pending in the Southern District of New York.

 7   My topic of expertise is prosecutorial procedure

 8   and ethics.

 9        Q.   What kind of case is it?

10        A.   It's a case entitled Galgano versus

11   Putnam County, et al., where the DA's office,

12   individual assistant DAs, the county, some police

13   are being sued by a guy with the name George

14   Galgano for wrongful arrest, alleged inadequacies

15   of search warrant applications, et cetera,

16   et cetera, et cetera.

17        Q.   Were you hired by Putnam County?

18        A.   Yes.

19        Q.   And who -- which attorneys are you

20   working with there?

21        A.   My contact guy is a guy name Maurizio

22   Savoiardo, and he works out of Mineola, New York.

23        Q.   Okay.  Do you know what firm?

24        A.   I do.  If I could check on my phone.

25   It's SSV, and I don't know what that --



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          16

```
 1                      Christopher J. Belling
 2           Q.    Maybe at a break if you wouldn't mind.
 3           A.    Sure, whatever.
 4           Q.    And who -- do you know who the
 5   plaintiff's counsel is?
 6           A.    Plaintiff's counsel is Boies Schechter?
 7           Q.    Boies Schiller?
 8           A.    Yeah, Boies Schiller, yeah.  Galgano's
 9   wife is a partner at Boies Schiller, and that's why
10   Galgano has got Boies Schiller.
11           Q.    Gotcha.  Okay.  Have you issued a
12   report in that case?
13           A.    Yes.
14           Q.    A Rule 26 report, federal report?
15           A.    I issued a report, and they did
16   something with it, filed it with the court, and I
17   testified about it.
18           Q.    Oh, you testified in court?  Did it go
19   to trial?
20           A.    No, testified in deposition.
21           Q.    Deposition, okay.  But it's in Federal
22   Court?
23           A.    Correct, Southern District.
24           Q.    Gotcha.  What other expert work have
25   you done?
```



```
 1                  Christopher J. Belling
 2          A.   I think that's probably about it.  I've
 3   done some CLEs, some trainings and stuff, but I
 4   can't think of other specific expert stuff.
 5          Q.   Okay.  By the way, have you ever
 6   been -- I may have asked you this.  I don't think I
 7   did.  Have you ever been named as a defendant in a
 8   lawsuit as a -- as a prosecutor?
 9          A.   No.
10          Q.   The depositions that you sat for were
11   depositions that you were not actually a defendant?
12          A.   Right.  It was Galgano.  There's only
13   once, and it was Galgano.
14          Q.   Gotcha.  Okay.  Back to your career,
15   when you became head of the homicide bureau in
16   1988, what percentage of your time was spent
17   supervising and what percentage of your time was
18   spent prosecuting cases?
19          MR. BLENK:  Form.
20          BY MR. BRUSTIN:
21          Q.   I mean, I think to the better question,
22   I can get right to it.  By the time of this case in
23   1991 to '92 or so, what percentage of your time was
24   spent prosecuting cases yourself and what
25   percentage of your time was spent supervising other
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              18

```
 1              Christopher J. Belling
 2  district attorneys, assistant district attorneys?
 3         MR. BLENK:  Form.
 4         THE WITNESS:  It's hard to say.  I would say
 5  certainly probably two-thirds of my time was
 6  prosecuting cases and maybe one-third of my time
 7  was supervising other prosecutions.  The homicide
 8  bureau was small, so I -- and the people were
 9  competent, so I didn't really have to do much in
10  terms of supervising them other than assiging
11  cases.
12         BY MR. BRUSTIN:
13         Q.   And what were your supervisory
14  responsibilities at that time?
15         A.   Assigning cases --
16         MR. BLENK:  Form.
17         THE WITNESS:  Assigning cases, dividing them
18  up, and just anything that anybody needed, to try
19  and, you know, help out.
20         BY MR. BRUSTIN:
21         Q.   Did -- were you also responsible for
22  ensuring that the assistant DAs in your chain of
23  command were fulfilling their ethical obligations
24  and constitutional obligations?  Was that your
25  role?
```



 1                    Christopher J. Belling

 2          A.    I would say no.

 3          Q.    Okay.  Now, in preparation for this

 4    deposition, have you reviewed any documents?

 5          A.    Yes.

 6          Q.    All right.  And what have you reviewed?

 7          A.    Various documents from the Buffalo

 8    police homicide file, from the Erie County DA's

 9    office file, notes that I took that are in those

10    files, the DA file.  I have reviewed some of the

11    depositions of other people who have already been

12    deposed in this case.  I reviewed a transcript of

13    something that appeared to be an interview that I

14    did with some I believe it was Georgetown

15    University students, and that's -- in general terms

16    that's about it.

17          Q.    So let me go a little deeper on some of

18    that, and let's take it by topic area.  First of

19    all, can you estimate how much time in total you

20    spent reviewing documents, estimate?

21          MR. BLENK:  Form.

22          THE WITNESS:  Not really.

23          BY MR. BRUSTIN:

24          Q.    Was it more than 50?

25          A.    Excuse me?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          20

```
 1                  Christopher J. Belling
 2         Q.   More than 50 hours?
 3         A.   Oh, no, nowhere near 50 hours.
 4         Q.   Okay.  More than ten?
 5         A.   Ballpark, could be around ten.  I don't
 6   know.
 7         Q.   Okay.  So let's start with the -- so,
 8   first of all, is it your belief that you reviewed
 9   the entire homicide file in this case from the
10   police department?
11         A.   No.
12         Q.   Okay.  Were you given the entire
13   homicide file?
14         A.   No.
15         Q.   What portion did you review?
16         A.   The portions that were called to my
17   attention.
18         Q.   Okay.  Do you remember what those were
19   generally?
20         A.   No.  They were officers' notes.  They
21   were police reports, various what Buffalo calls
22   P-73s and various other P-88s, which are
23   identification forms.  P-10s, which are evidence
24   collection forms.
25         Q.   Sure.  Did you review, for example,
```



1                    Christopher J. Belling

2   P-73s and P-88s for -- in relation to Emil Adams?

3           A.   I think I did see the P-88 on Emil

4   Adams.

5           Q.   And how about Sullivan?

6           A.   I don't remember Sullivan, whether I

7   did or not.

8           Q.   How about Jackson, Aaron Jackson?

9           A.   I do not remember that one either.

10          Q.   Okay.  Lamarr Scott?

11          A.   Well, there's no P-88 on Lamarr Scott

12  as far as I know.  I read a P-73 about his being --

13  coming into contact with Buffalo police.

14          Q.   Okay.  How about your DA file?  Did you

15  review the entire DA file on this case on the

16  perjury case?

17          A.   No.

18          Q.   You just reviewed portions?

19          A.   Correct.

20          Q.   And did you decide what portions to

21  review, or were they given to you?

22          A.   They were given to me.

23          Q.   Okay.  And what about testimony?  You

24  mentioned you read some testimony.  Whose testimony

25  did you read?  Was it deposition testimony or trial



```
 1                    Christopher J. Belling
 2   testimony?
 3            MR. BLENK:  Form.
 4            THE WITNESS:  I read some trial testimony
 5   from the perjury case.  Actually mostly my trial
 6   testimony from the perjury case.  I saw, if I'm not
 7   mistaken, Ray Masecchia's deposition in this case.
 8   I saw part of Mark Stambach's deposition in this
 9   case.  I believe I read Jack Vickerd's deposition
10   in this case.  I saw some of Valentino Dixon's
11   recorded testimony, and I saw Lamarr Scott's
12   deposition in this case.
13            BY MR. BRUSTIN:
14            Q.   Okay.  You read -- did you read Lamarr
15   Scott's deposition in its entirety?
16            A.   I honestly don't remember.  I have some
17   memories of the high points, if you will, of that,
18   but I don't remember if I read the whole thing.
19            Q.   Okay.  Did you read Valentino Dixon's
20   in its entirety?
21            A.   I don't think so, no.
22            Q.   Okay.  How about Masecchia and Vickerd?
23   Did you read them in their entirety?
24            A.   I believe so, yes.
25            Q.   And Stambach, you said you read
```



```
 1                  Christopher J. Belling
 2   portions of it?
 3        A.   I actually saw the video of it.
 4        Q.   You watched the entire video?
 5        A.   No, portions of the video.
 6        Q.   How did you determine which portions to
 7   watch?
 8        A.   I didn't determine.  It was just
 9   playing, and we were doing other things and it was
10   playing and, you know --
11        Q.   Okay.  Any other documents you
12   reviewed?
13        A.   Not that I have specific recollection
14   of.
15        Q.   All right.  How about meeting with your
16   attorneys?  How many meetings have you had either
17   in person or by phone or video that addressed more
18   than just scheduling?
19        A.   Five.
20        Q.   Five.  And when were those meetings?
21        A.   One was yesterday, two were the last
22   week in March of this year, and then two were
23   pre-pandemic.
24        Q.   Okay.  And how long were those
25   meetings?
```



```
 1                    Christopher J. Belling

 2         A.    Three, four hours.

 3         Q.    Each one?

 4         A.    Yes.

 5         Q.    Okay.  And, by the way, just from your

 6   going through your career history, it sounds like

 7   you have an excellent memory.  Would that be fair

 8   to say?

 9         MR. BLENK:  Form.

10         THE WITNESS:  It has been said.

11         BY MR. BRUSTIN:

12         Q.    Okay.  And I take it that your

13   reviewing documents in this case has also assisted

14   you in remembering at least your activities in this

15   case; fair to say?

16         MR. BLENK:  Form.

17         THE WITNESS:  Yes.

18         BY MR. BRUSTIN:

19         Q.    All right.  Now, in addition to your --

20   your three-year stint as a trainer of assistant

21   district attorneys, did you also do other training

22   of district attorneys during your career?

23         A.    Yes.

24         Q.    Okay.  Tell me about that.

25         A.    I did my first presentation for the
```



1          Christopher J. Belling

2  National College of District Attorneys at the

3  University of Houston facility in 1986.

4  Thereafter, I travelled to many different locations

5  on behalf of the National College of District

6  Attorneys doing presentations on various topics

7  over the years.

8          And then eventually, I want to say in the

9  late '90s, the National District Attorneys

10  Association moved to Columbia, South Carolina, with

11  the advent of the National Advocacy Center, and I

12  taught at the National Advocacy Center many times

13  until the advocacy center was taken over by federal

14  prosecutors, and state prosecutors were eliminated

15  from the plate there.

16          Q.   Okay.  So it sounds like you've done

17  quite a bit of training of assistant district

18  attorneys throughout your career; fair to say?

19          A.   Yes.

20          Q.   And I take it that as -- in conjunction

21  with that, you -- you have a very clear

22  understanding and you had a very clear

23  understanding for a long time of your ethical

24  obligations as an Assistant District Attorney; fair

25  to say?



1              Christopher J. Belling

2         MR. BLENK:  Form.

3         THE WITNESS:  I have a clear understanding

4    of my ethical obligations.

5         BY MR. BRUSTIN:

6         Q.   Both the ethical obligations under

7    state law, federal law, correct?

8         MR. BLENK:  Form.

9         THE WITNESS:  Well, I understand my ethical

10   obligations.

11        BY MR. BRUSTIN:

12        Q.   And your constitutional obligations?

13        A.   Certainly.

14        Q.   And you take them extremely seriously?

15        A.   I take them seriously.

16        Q.   And do you consider yourself -- you

17   consider yourself to be a -- you were a very

18   conscientious hard-working Assistant District

19   Attorney; fair to say?

20        MR. BLENK:  Form.

21        THE WITNESS:  I was a conscientious

22   hard-working Assistant District Attorney.

23        BY MR. BRUSTIN:

24        Q.   And you made it your business, for

25   example, to review all relevant documents in a case



1              Christopher J. Belling

2  before making important decisions in a case; fair

3  to say?

4          MR. BLENK:  Form.

5          THE WITNESS:  No, I don't think that's fair

6  to say.

7          BY MR. BRUSTIN:

8          Q.  All right.  We'll get to that a little

9  bit later.

10          In terms of your ethical obligations, you've

11  already told us how seriously you took them, and

12  you would agree that there's no more important

13  ethical obligation as a prosecutor than your

14  obligation in regard to Brady, correct?

15          MR. BLENK:  Form.

16          THE WITNESS:  I'm having problems with your

17  hyperbolic use of adjectives and adverbs, so the

18  answer is no.

19          BY MR. BRUSTIN:

20          Q.  If we're going to be cute, that's fine.

21  Do you understand your Brady obligations?

22          A.  Yes.

23          Q.  And did you take them seriously?

24          A.  Yes.

25          Q.  And when you trained on them, did you



1                    Christopher J. Belling

2   try to instill that in the prosecutors that you

3   trained that they should take their Brady

4   obligations seriously?

5           A.   Yes.

6           Q.   And you understood that Brady

7   obligation was an important obligation for an

8   Assistant District Attorney?

9           A.   Yes.

10          Q.   And it included both evidence tending

11  to -- that might tend to suggest innocence, and it

12  included evidence that might be used to impeach a

13  prosecution witness?

14          MR. BLENK:  Form.  Calls for a legal

15  conclusion.

16          THE WITNESS:  Yes.

17          BY MR. BRUSTIN:

18          Q.   All right.  You also understood

19  obviously, it was never -- it would never be

20  appropriate as an Assistant District Attorney to

21  coerce a witness?

22          MR. BLENK:  Form.

23          THE WITNESS:  That's correct.

24          BY MR. BRUSTIN:

25          Q.   Or to threaten a witness?



1                   Christopher J. Belling

2          A.    Correct.

3          Q.    Subtly or overtly.

4          MR. BLENK:  Form.  Calls for a legal

5    conclusion.

6          THE WITNESS:  Subtly or what?

7          MR. BRUSTIN:  Overtly.

8          MR. BLENK:  Same objection.

9          THE WITNESS:  Yeah, I agree with that.

10         BY MR. BRUSTIN:

11         Q.    You understood that as an Assistant

12   District Attorney you were not acting as an

13   advocate; you were acting on behalf of the People

14   of the State of New York?

15         MR. BLENK:  Form.  Calls for a legal

16   conclusion.

17         THE WITNESS:  The answer to that is no.

18         BY MR. BRUSTIN:

19         Q.    Interesting.  How did I misstate your

20   obligation?

21         A.    I was acting as an advocate on behalf

22   of the People of the State of New York.

23         Q.    Okay.  You understood your role as a DA

24   to be an advocate?

25         A.    Correct.  In the adversarial system I



1                    Christopher J. Belling

2   was an advocate for one side, and there were

3   advocates on the other side.

4        Q.   And you're sure that that's -- that's

5   how it's described in the ethical rules?

6        MR. BLENK:  Form.

7        THE WITNESS:  I haven't read the ethical

8   rules specifically in regard to that.

9        BY MR. BRUSTIN:

10       Q.   You were supposed to be an objective

11  enforcer of the criminal law, correct?

12       MR. BLENK:  Form.  Calls for a legal

13  conclusion.

14       THE WITNESS:  Yeah, I -- that question's too

15  loaded.  I can't really answer it.

16       BY MR. BRUSTIN:

17       Q.   You understood that your job as a

18  prosecutor was to objectively search for the truth

19  on behalf of the People of the State of New York,

20  correct?

21       MR. BLENK:  Form.  Calls for a legal

22  conclusion.

23       THE WITNESS:  That's true.

24       BY MR. BRUSTIN:

25       Q.   And your job was to handle cases



```
 1                   Christopher J. Belling
 2   without regard to who you were prosecuting in an
 3   objective manner, correct?
 4           MR. BLENK:  Form.
 5           THE WITNESS:  Oh, true.
 6           BY MR. BRUSTIN:
 7           Q.   And to go wherever the evidence leads
 8   you?
 9           MR. BLENK:  Form.
10           THE WITNESS:  True.
11           BY MR. BRUSTIN:
12           Q.   Regardless of whether it helped or hurt
13   your case against a particular defendant?
14           MR. BLENK:  Form.
15           THE WITNESS:  True.
16           BY MR. BRUSTIN:
17           Q.   And you understood that obviously you
18   couldn't prosecute a person for a crime without
19   having sufficient evidence of probable cause?
20           MR. BLENK:  Form.
21           THE WITNESS:  A prima facie case is what we
22   would call it, but yes.
23           BY MR. BRUSTIN:
24           Q.   You can't prosecute a person for
25   motives unrelated to the crime in question.  For
```



```
1                    Christopher J. Belling
2    example, you can't prosecute them because you think
3    they were a bad person who's done other bad things;
4    fair to say?
5              MR. BLENK:  Form.
6              THE WITNESS:  Oh, that's fair to say, yes.
7              BY MR. BRUSTIN:
8         Q.   That would be unethical?
9              MR. BLENK:  Form.
10             THE WITNESS:  It would be inappropriate.
11             BY MR. BRUSTIN:
12        Q.   Another way of saying that is you have
13   an obvious obligation to only bring charges and
14   prosecute in good faith, not for any ulterior
15   motive.
16             MR. BLENK:  Form.
17             BY MR. BRUSTIN:
18        Q.   Fair to say?
19        A.   Yes, I'd say that's fair to say.
20        Q.   You always need objective proof for the
21   crime that's being charged, correct?
22             MR. BLENK:  Form.
23             THE WITNESS:  You need admissible proof
24   that's going to be admissible in a court of law to
25   support the crime charge.  That's what a prima
```



```
 1                 Christopher J. Belling
 2   facie case is.
 3         BY MR. BRUSTIN:
 4         Q.   Okay.  And if at any time during the
 5   process of an investigation or prosecution that
 6   calculation changes because of new evidence, you
 7   have an obligation to carefully investigate that
 8   new evidence, correct?
 9         MR. BLENK:  Form.  Calls for a legal
10   conclusion.
11         THE WITNESS:  Certainly you have the
12   obligation to investigate that, yes.
13         BY MR. BRUSTIN:
14         Q.   In fact, there are many times during
15   cases you're involved in when you are acting as an
16   investigator as opposed to a prosecutor, or at
17   least you're doing both at the same time; fair to
18   say?
19         MR. BLENK:  Form.
20         THE WITNESS:  Well, in the context of --
21   when there's a charged case in existence or when
22   there's a case that is an investigation-type file,
23   yeah, you do both.
24         BY MR. BRUSTIN:
25         Q.   So, for example, in this case, when
```



1               Christopher J. Belling

2    Lamarr Scott came forward and said he was the

3    shooter and not Valentino Dixon, at that point part

4    of your role became the role of an investigator,

5    correct?

6          MR. BLENK:  Form.

7          THE WITNESS:  Well, part of my role became

8    the person that asked the Buffalo police to do some

9    investigating, and in the context of preparation of

10   the case for Grand Jury, I had to certainly look at

11   a bigger picture than I would have had to look at

12   beforehand.

13         BY MR. BRUSTIN:

14         Q.   Right, because once, as you've said --

15   I'm going to show you some letters you wrote, but

16   once Lamarr Scott came forward, there was a

17   question about whether there was still probable

18   cause to prosecute Valentino Dixon that needed to

19   be investigated, correct?

20         MR. BLENK:  Form.

21         THE WITNESS:  No.

22         BY MR. BRUSTIN:

23         Q.   At no time did you ever question

24   whether there was probable cause to prosecute

25   Valentino Dixon after Lamarr Scott came forward?



```
 1                    Christopher J. Belling
 2          MR. BLENK:  Form.
 3          THE WITNESS:  Well, that was the issue.  The
 4   issue is to determine who did it.
 5          MR. BRUSTIN:  Right.
 6          THE WITNESS:  And it was probable cause to
 7   establish that Valentino Dixon did it.  That
 8   existed.  That didn't change.
 9          MR. BRUSTIN:  Okay.
10          THE WITNESS:  But there also became at least
11   potential probable cause that he didn't.
12          BY MR. BRUSTIN:
13      Q.   Okay.  And so at that point in time
14   when Lamarr Scott came forward you -- part of your
15   role was to ensure that the case was properly
16   investigated in regard to Lamarr Scott's
17   confession?
18          MR. BLENK:  Form.
19          THE WITNESS:  Yes.
20          BY MR. BRUSTIN:
21      Q.   And I think I heard you right, but I
22   think what you said is your only role in that
23   regard was to direct the Buffalo police to do it.
24   You didn't do any of it yourself.  Did I understand
25   you correctly, sir?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              36

1                     Christopher J. Belling

2          A.    You did not.

3          Q.    Okay.  You also conducted some

4    independent investigation, speaking to witnesses,

5    including Lamarr Scott, in regard to that

6    confession, correct?

7          MR. BLENK:  Form.

8          THE WITNESS:  No.

9          BY MR. BRUSTIN:

10         Q.    Okay.  Is it your testimony that you

11   never spoke to Lamarr Scott?

12         A.    It is not my testimony.  I did talk to

13   him.

14         Q.    Okay.  And, in fact, you talked to him

15   soon after he came forward in --

16         A.    It was August 12th of 2000 -- or 1991.

17         Q.    My memory's not so good.  So soon after

18   he came forward on August 12th of 1991 you spoke to

19   him, correct?

20         A.    Yes.

21         Q.    And you also spoke to him in the

22   presence of his foster parents, correct?

23         A.    I do not remember that, no.

24         Q.    Okay.  Is it your testimony that you

25   did not speak to him in the presence of his foster



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          37

1                    Christopher J. Belling

2   parents, or you don't recall one way or another

3   whether you spoke to him with his foster parents

4   present?

5            A.   I don't recall whether or not I spoke

6   to him with his foster parents.

7            Q.   Do you remember ever speaking to his

8   foster parents or anybody associated with him as

9   family?

10           MR. BLENK:  Form.

11           THE WITNESS:  I do not remember that.

12           BY MR. BRUSTIN:

13           Q.   Sounds like what you're saying is it's

14  possible you spoke to -- with him with his foster

15  parents.  You just don't recall one way or another?

16           MR. BLENK:  Form.

17           THE WITNESS:  No, I'm saying I don't recall

18  whether or not I did.

19           BY MR. BRUSTIN:

20           Q.   Okay.  But you certainly may have?

21           MR. BLENK:  Form.

22           THE WITNESS:  I just don't remember doing

23  it.

24           BY MR. BRUSTIN:

25           Q.   Now, I take it -- and this I think is



1                    Christopher J. Belling

2    going to be easier since you've reviewed a lot of

3    this already, but you let me know if you need to

4    see anything specifically, but one of the things

5    that Detective Stambach testified as to the other

6    officers is that they understood that the basic

7    role in policing that applies to them, that they

8    had an absolute obligation to document any

9    potentially exculpatory or impeachment evidence and

10   provide it in writing to the prosecutor.

11        Do you agree with that?

12        MR. BLENK:  Form.

13        THE WITNESS:  No, not exactly.

14        BY MR. BRUSTIN:

15        Q.   Tell me how you disagree with that.

16        A.   Well, there was an evolution in case

17   law between exculpatory evidence and impeachment

18   evidence, and their obligation sort of evolved in

19   there, and the whole hard-and-fast and document it

20   in writing in front of the prosecutor, I think

21   that's also a little bit too specific, so to speak.

22        Q.   So let me make it specific for you.

23   You understood certainly by 1991 based on Brady and

24   Kyle's that by that time certainly you understood

25   that police officers, your expectation of police



1                     Christopher J. Belling

2    officers, was that they would document any

3    potentially exculpatory or impeachment evidence and

4    provide it to you so you could determine whether it

5    had to be disclosed, correct?

6           MR. BLENK:  Form.

7           THE WITNESS:  Oh, definitely.

8           BY MR. BRUSTIN:

9           Q.   And you understood that that was a

10   basic function of the Buffalo Police Department

11   homicide division?

12          MR. BLENK:  Form.

13          THE WITNESS:  I don't know if it's a basic

14   function, but they were supposed to do it.

15          BY MR. BRUSTIN:

16          Q.   Okay.  Did you ever have any reason to

17   question whether they were doing it?

18          A.   I don't recollect any time that I did.

19          Q.   Okay.  So certainly -- and in this case

20   your understanding with your expectation is that

21   they were -- they were documenting and providing to

22   you any potential exculpatory or impeachment

23   evidence, correct?

24          A.   Yes.

25          Q.   And you had no reason to question



1                    Christopher J. Belling

2      whether or not they were fulfilling that

3      obligation.  You believe they did?

4           MR. BLENK:  Form.

5           THE WITNESS:  I didn't have any reason to

6      doubt that they would.

7           BY MR. BRUSTIN:

8           Q.   Okay.  And obviously you didn't have

9      the time or the role of supervising directly

10     Buffalo Police Department homicide detectives,

11     correct?

12          A.    Correct.

13          MR. BLENK:  Form.

14          BY MR. BRUSTIN:

15          Q.   You made it clear what your

16     expectations were, and you assumed that through

17     their supervisors they would follow those rules,

18     correct?

19          MR. BLENK:  Form.

20          THE WITNESS:  In general terms, yes.

21          BY MR. BRUSTIN:

22          Q.   And I take it you made it clear that to

23     the extent of homicide detectives who typically

24     weren't lawyers had any questions about whether a

25     particular piece of evidence was Brady material,



1                    Christopher J. Belling

2    they should err in documenting it so you could

3    determine it, correct?

4         MR. BLENK:  Form.

5         THE WITNESS:  Again, I don't think it was

6    anywhere near that specific.  It was if they found

7    anything that was Brady material, let us know about

8    it.

9         BY MR. BRUSTIN:

10        Q.   Okay.  But if they were on the fence,

11   you expected that they would document it because

12   you were the lawyer who would make the decision,

13   correct?

14        MR. BLENK:  Form.

15        THE WITNESS:  I would hope they would

16   document it.

17        BY MR. BRUSTIN:

18        Q.   All right.  Did you ever -- and I think

19   you've told us this already, but you never had any

20   reason to question whether or not homicide

21   detectives in the Buffalo Police Department were

22   properly documenting Brady material, correct?

23        MR. BLENK:  Form.

24        THE WITNESS:  I never had any issue with

25   that.



CHRISTOPHER J. BELLING                                  April 11, 2023
DIXON V. CITY OF BUFFALO                                          42

```
 1                  Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   Certainly not on this case.
 4          A.   Not on this case.
 5          Q.   If, for example, you understood, for
 6   example, a homicide detective spoke to an
 7   eyewitness two or three times and that eyewitness
 8   provided contradictory statements, you expected
 9   that that -- those contradictory statements would
10   be documented so you could evaluate them, correct?
11          MR. BLENK:  Form.
12          THE WITNESS:  It would have been standard
13   procedure that whatever they talked to anybody
14   about would have been the subject of a police
15   report, and I would have gotten those police
16   reports and been able to compare them.
17          BY MR. BRUSTIN:
18          Q.   So your answer is yes, you would have
19   expected that to be documented, any contradictions,
20   including any contradictions?
21          MR. BLENK:  Form.
22          THE WITNESS:  I would expect that it would
23   be documented.
24          MR. BRUSTIN:  Okay.  Let's mark -- let's mark
25   this as -- what number are we on, Mo?
```



1              Christopher J. Belling

2         MR. SOTO-BRITO:  I want to say 30.

3         MR. BRUSTIN:  So what we did, while he's

4    looking, is we took some portions from the DA's

5    file and put it in a binder.  It's not -- it's in

6    Bates stamp chronological order, but there are a

7    number of pages that are missing, but I'm going to

8    use that to refer to certain pages for you.

9         THE WITNESS:  Dixon DA file.

10        MR. BRUSTIN:  Yeah.  And we're going to mark

11   this as 30, please.

12   The following was marked for Identification:

13    EXH. 30              excerpt of Dixon DA file

14        MR. BLENK:  Excerpt of the Dixon DA file?

15        MR. BRUSTIN:  Yeah.  And I'll refer to

16   specific Bates stamps as I'm going through it.

17        MR. RUSS:  While he's looking at that, is

18   that one of the documents that you produced

19   yesterday?

20        MR. BRUSTIN:  Mo?

21        MR. SOTO-BRITO:  I just put the whole DA

22   file, but I can put the -- it's just pages out of

23   it.

24        MR. BRUSTIN:  It's just pages out of the

25   whole DA file, but I'm going to refer by Bates



1                    Christopher J. Belling

2    stamps.  It's what we sent around on Friday.

3            MR. RUSS:  Okay.

4            BY MR. BRUSTIN:

5            Q.  If you could take a look at page

6    COE1768, and I'll represent to you that Exhibit 30

7    are portions of the file that was produced to us by

8    Erie County as the DA file in this case, okay?  But

9    take a look at page 1768.

10           A.  68, okay.

11           MR. BLENK:  Please review the whole --

12   review the whole letter.

13           THE WITNESS:  Okay.

14           MR. BRUSTIN:  It's just one page.

15           THE WITNESS:  Okay.

16           MR. BRUSTIN:  And this is --

17           MR. BLENK:  Could you give him a second to

18   read it?

19           THE WITNESS:  I read it, because I think

20   it's also the same letter that's in here with the

21   attachments.

22           MR. BRUSTIN:  Yeah, probably.

23           THE WITNESS:  Okay.

24           BY MR. BRUSTIN:

25           Q.  Okay.  You've had a chance to read it?



CHRISTOPHER J. BELLING                                          April 11, 2023
DIXON V. CITY OF BUFFALO                                                    45

```
 1                   Christopher J. Belling

 2        A.   Yes.

 3        Q.   Okay.  And this is an example of you

 4   fulfilling your Brady obligations as a prosecutor,

 5   correct?

 6        MR. BLENK:  Form.

 7        THE WITNESS:  Yes.

 8        BY MR. BRUSTIN:

 9        Q.   You received what you believe would

10   arguably be Brady material and you turned it over,

11   correct?

12        A.    Correct.

13        Q.    And when you say arguably Brady

14   material here, I take it that it was your practice

15   certainly by June of 1992 that if you received

16   information that you thought was even arguably

17   Brady material, whether because it tended to show

18   innocence or because it was impeachment, you would

19   disclose it.

20        MR. BLENK:  Form.

21        THE WITNESS:  Yes.

22        BY MR. BRUSTIN:

23        Q.   And that's why you used the word

24   arguably in here, correct?

25        MR. BLENK:  Form.
```



```
 1                Christopher J. Belling
 2        THE WITNESS:  I don't know why I used the
 3   word arguably.
 4        BY MR. BRUSTIN:
 5        Q.   Well, that's what arguably means.  It
 6   means it may or may not be Brady material, correct?
 7        MR. BLENK:  Form.
 8        THE WITNESS:  That's probably true.
 9        BY MR. BRUSTIN:
10        Q.   So you took a broad view in your
11   disclosure obligations as to what constitutes
12   Brady, correct?
13        MR. BLENK:  Form.
14        THE WITNESS:  I took the view that if I
15   found something that I thought could be either
16   exculpatory or impeachment, I turned it over.
17        BY MR. BRUSTIN:
18        Q.   So let me -- let me try it a different
19   way.  If I'm Mr. Terranova and I'm reading this
20   article -- reading this letter as a lawyer, I can
21   glean from this that what you're telling me is you
22   take a broad view of Brady.  You've given me what's
23   arguably Brady may not even be, correct?
24        MR. BLENK:  Form.
25        THE WITNESS:  I can't say what Joe was
```



```
 1                  Christopher J. Belling
 2   thinking, but -- yeah, there you go.
 3        BY MR. BRUSTIN:
 4        Q.   Okay.  Well, it's really what you're
 5   thinking.  Again, you're -- you are -- you've
 6   discovered evidence that arguably could be Brady,
 7   meaning it may or may not be Brady, and you're
 8   disclosing it in an abundance of caution, correct?
 9        A.   Correct.
10        MR. BLENK:  Form.
11        BY MR. BRUSTIN:
12        Q.   And that was your practice, correct?
13        MR. BLENK:  Form.
14        THE WITNESS:  Yes.
15        BY MR. BRUSTIN:
16        Q.   And you understood that that was
17   supposed to be the practice of the Buffalo Police
18   Department?
19        MR. BLENK:  Form.
20        THE WITNESS:  No.
21        BY MR. BRUSTIN:
22        Q.   You just told us it was.
23        MR. BLENK:  Form.
24        BY MR. BRUSTIN:
25        Q.   You just told us that you understood
```



1            Christopher J. Belling

2   that they were documenting any evidence that could

3   potentially be Brady material, correct?

4            MR. BLENK:  Form.

5            THE WITNESS:  I told you they were doing

6   police reports and they were turning them over and

7   that the police reports should have been accurate,

8   and once I got them, I would determine whether

9   there was Brady material in them.

10           BY MR. BRUSTIN:

11           Q.   But your expectation was that those

12  reports would include any potential Brady material,

13  correct, from the case?

14           A.   They would include anything that came

15  up at the time of the report.

16           Q.   But I'm not asking about other things

17  in the report.  I'm asking about Brady material.

18  One of your expectations would be, so that you

19  could fulfill your Brady obligation, was that the

20  reports you received from police officers who

21  interviewed witnesses that you didn't would include

22  any potential Brady material, correct?

23           MR. BLENK:  Form.

24           THE WITNESS:  Yes.

25           BY MR. BRUSTIN:



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              49

1                    Christopher J. Belling

2           Q.    You couldn't possibly fulfill your role

3    in disclosing Brady material if the police

4    department is not fulfilling their role in

5    documenting it and providing it to you, correct?

6           MR. BLENK:   Form.

7           THE WITNESS:   Yes, I think that's right.

8           BY MR. BRUSTIN:

9           Q.    You didn't have the time to

10   reinvestigate cases yourself and interview every

11   witness about everything in the case, correct?

12          MR. BLENK:   Form.

13          THE WITNESS:   Well, I think that's, again,

14   investigate cases, interview every witness, they

15   did reports, they sent me the reports.   I evaluated

16   the reports.   That's what I can tell you.

17          BY MR. BRUSTIN:

18          Q.    My understanding of how you operated as

19   a prosecutor, and you correct me if I'm wrong, was

20   that you were certainly not shy about telling

21   people what you wanted; is that fair to say?

22          MR. BLENK:   Form.

23          THE WITNESS:   No, it's not.

24          BY MR. BRUSTIN:

25          Q.    Okay.   Did you have any trouble telling



1                  Christopher J. Belling

2    homicide detectives what you needed to be done in a

3    case?

4         A.   I often trod fairly lightly in regard

5    to telling homicide detectives what I wanted them

6    to do.

7         Q.   Would you be surprised to learn, you

8    probably read this, that many of the homicide

9    detectives in this case, I don't know if it's fair

10   to say were scared of you but certainly were

11   respectful of your authority?

12        MR. BLENK:  Form.

13        MR. RUSS:  Objection to form.

14        THE WITNESS:  I would be surprised, yeah.

15        BY MR. BRUSTIN:

16        Q.   Now, although you weren't a police

17   officer, you were a DA, you understood a number of

18   basics about police procedure, particularly police

19   procedure that implicated constitutional rights?

20        MR. BLENK:  Form.

21        BY MR. BRUSTIN:

22        Q.   Fair to say?

23        A.   Yes, in general.

24        Q.   So, for example, you had a good working

25   knowledge of permissible identification procedures,



```
 1                    Christopher J. Belling
 2   correct?
 3          MR. BLENK:  Form.
 4          THE WITNESS:  Insofar as when I was
 5   preparing to run a Wade hearing, I knew what I was
 6   looking for, yeah.
 7          BY MR. BRUSTIN:
 8          Q.  So you understood, for example, that
 9   there were permissible ways to conduct
10   identification procedures and ways that were not
11   permissible for a variety of reasons?
12          MR. BLENK:  Form.
13          THE WITNESS:  Ways that were less
14   permissible, yeah.
15          BY MR. BRUSTIN:
16          Q.  And that could be unduly suggestive?
17          MR. BLENK:  Form.
18          THE WITNESS:  A court makes that
19   determination but, yeah, if it was, I suppose that
20   could be the case.
21          BY MR. BRUSTIN:
22          Q.  You understood that there were
23   procedures in place in the Buffalo Police
24   Department, like any police department, that were
25   designed to eliminate suggestiveness in
```



 1                  Christopher J. Belling

 2  identification procedures?

 3          MR. BLENK:  Form.

 4          THE WITNESS:  No, I didn't know what their

 5  procedures were about identification.  It was --

 6  we'd run Wade hearings, and we'd figure out what

 7  they did.

 8          BY MR. BRUSTIN:

 9          Q.   Maybe -- maybe I'm not being specific

10  enough.  You understood a as general matter, for

11  example, that any time an eyewitness was shown

12  photos, for example, any time more than a few

13  minutes after the crime, it was in the context of a

14  six-person photo array with one suspect and five

15  fill-ins?

16          MR. BLENK:  Form.

17          THE WITNESS:  Yeah, that's true.

18          MR. RUSS:  Objection to form.

19          BY MR. BRUSTIN:

20          Q.   Same as the lineup, a live lineup?

21          MR. BLENK:  Form.

22          THE WITNESS:  Correct.

23          BY MR. BRUSTIN:

24          Q.   And you understood, for example, that

25  it would never be permissible for reasons,



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              53

```
 1              Christopher J. Belling
 2  including constitutional reasons, to show
 3  individual photos to an eyewitness of a suspect or
 4  more than one suspect, correct?
 5         MR. BLENK:  Form.
 6         THE WITNESS:  It could generate problems if
 7  that occurred.
 8         BY MR. BRUSTIN:
 9         Q.   And it could be a constitutional issue,
10  correct?
11         MR. BLENK:  Form.
12         THE WITNESS:  That would be the problem,
13  yes.
14         BY MR. BRUSTIN:
15         Q.   Okay.  And so certainly if anything
16  like that happened, you expected to be told about
17  it, correct?
18         MR. BLENK:  Form.
19         THE WITNESS:  I would have hoped to find out
20  about it, yeah.
21         BY MR. BRUSTIN:
22         Q.   Well, it's more than hoping to find out
23  about it.  If a witness was shown individual photos
24  of a suspect, that would, among other things, be
25  Brady material that would have to be disclosed to
```



CHRISTOPHER J. BELLING                                              April 11, 2023
DIXON V. CITY OF BUFFALO                                                        54

```
 1                  Christopher J. Belling
 2   the defense, correct?
 3          MR. BLENK:  Form.
 4          MR. RUSS:  Objection to form.
 5          THE WITNESS:  I'm trying to -- that just is
 6   so far out there, I -- I don't think anything like
 7   that ever happened in a case that I worked, so
 8   that's why I'm sort of -- don't know how to answer
 9   that.
10          BY MR. BRUSTIN:
11          Q.   Well, I'll be more specific.  If, for
12   example, a witness was shown an individual photo or
13   two photos of potential suspects as opposed to a
14   photo array with fillers in a case and then that
15   witness testified at trial that the defendant was,
16   in fact, the perpetrator, you would understand that
17   the defense would have a right to know that -- that
18   that suspect wasn't selected in a properly
19   conducted photo array, correct?
20          MR. BLENK:  Form.
21          MR. RUSS:  Objection to form.
22          THE WITNESS:  Right.  That's what the Wade
23   hearing's for.  That's when that information comes
24   out, and that's litigated.
25          BY MR. BRUSTIN:
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             55

```
 1                 Christopher J. Belling
 2        Q.   But you can only litigate it if you
 3   have full information about what actually
 4   transpired, correct?
 5        MR. BLENK:  Form.
 6        THE WITNESS:  True.
 7        BY MR. BRUSTIN:
 8        Q.   So, again, you were reliant on the
 9   police to accurately and completely describe to you
10   what happened during identification procedures so
11   you could properly conduct Wade hearings, correct?
12        MR. BLENK:  Form.
13        THE WITNESS:  Yes.
14        BY MR. BRUSTIN:
15        Q.   And the form for that was as you
16   described, in P-73s and P-88s, correct?
17        A.   Correct.
18        Q.   And you were relying on those P-73s and
19   P-88s to be accurate in regard to identification
20   procedures, correct?
21        A.   Yes.
22        Q.   Including how many photos were shown to
23   a witness?
24        A.   Yes.
25        Q.   Which photos were shown to a witness?
```



1                Christopher J. Belling

2         A.   Yes.

3         Q.   What, if anything, was said to the

4    witness during the photo array?

5         MR. BLENK:  Form.

6         THE WITNESS:  I'm trying to remember what

7    the P-88 looks like.  There's a narrative part in

8    there, but I think the -- the blank is what did the

9    witness say after they saw the photos.  I don't

10   know if there's a blank or what the officers said

11   to the witness.

12        BY MR. BRUSTIN:

13        Q.   Well, obviously you understood that to

14   the extent that the police officers said anything

15   suggestive about who to pick before, during, or

16   after a photo array, that had to be documented so

17   that you could properly litigate that in a Wade

18   hearing?

19        MR. BLENK:  Form.

20        THE WITNESS:  Sure.

21        BY MR. BRUSTIN:

22        Q.   Basic as it gets, right?

23        MR. BLENK:  Form.

24        THE WITNESS:  I would say that's pretty

25   basic, yeah.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            57

```
 1                 Christopher J. Belling

 2          BY MR. BRUSTIN:

 3          Q.    And you understood, for example, that

 4   it would never be inappropriate for a police

 5   officer to tell a witness that -- after an

 6   identification procedure that the suspect they

 7   picked is the person that they believe did it

 8   because of other evidence?

 9          MR. BLENK:   Form.

10          MR. RUSS:  Objection to form.

11          THE WITNESS:  Again, that's a whole body of

12   case law that developed during my career as a

13   prosecutor, and in the later years, yeah, there

14   was -- that was litigated a lot and, you know --

15          BY MR. BRUSTIN:

16          Q.   Well, certainly by 1991 -- and I'm

17   reading to you right from testimony from the

18   officers in this case telling us that they clearly

19   understood that obligation in 1991.  Do you have

20   any reason to dispute that?

21          MR. BLENK:   Form.

22          MR. RUSS:  Objection to form.

23          THE WITNESS:  I just don't know what stage

24   of the drift we were at at that point in time.

25          BY MR. BRUSTIN:
```



1          Christopher J. Belling

2          Q.   Okay.  So is it your testimony that

3   you're not sure as you sit here today whether or

4   not officers were responsible for documenting if

5   they told a witness after a photo ID that they had

6   picked the right person because there's other

7   evidence implicating that person?

8          MR. BLENK:  Form.

9          MR. RUSS:  Objection to form.

10         THE WITNESS:  Yeah, I -- I don't understand

11  the question.  The form is a problem.  There's too

12  much there.

13         BY MR. BRUSTIN:

14         Q.   Okay.  I'll give you a hypothetical.

15  If, for example, a photo array is conducted with an

16  eyewitness and the witness makes the selection and

17  the police officer says to that witness, you've

18  picked the right guy, we know he did it from three

19  other witnesses.  Would that information have to be

20  documented and disclosed to you?

21         MR. BLENK:  Form.

22         THE WITNESS:  In the current state of the

23  law, yes.

24         BY MR. BRUSTIN:

25         Q.   But perhaps not in 1991?



CHRISTOPHER J. BELLING                                       April 11, 2023
DIXON V. CITY OF BUFFALO                                                 59

```
 1                  Christopher J. Belling
 2        A.   I -- I think that that might be where
 3   the situation is, yeah.
 4        Q.   You certainly understood the difference
 5   between a tentative ID and a positive ID, correct?
 6            MR. BLENK:  Form.
 7            THE WITNESS:  Yeah.
 8            BY MR. BRUSTIN:
 9        Q.   A tentative ID -- a positive ID is
10   that's the guy or that's the person that shot --
11   that shot me, something like that, correct?
12            MR. BLENK:  Form.
13            THE WITNESS:  Yeah, I would say so.
14            BY MR. BRUSTIN:
15        Q.   And a tentative ID is anything that
16   expresses any uncertainty about the identification,
17   correct?  It may be him, it looks like him.  Those
18   are tentative IDs, correct?
19            MR. BLENK:  Form.
20            THE WITNESS:  A less than positive ID is
21   what that would be, yes.
22            BY MR. BRUSTIN:
23        Q.   And a positive ID provides probable
24   cause, and a tentative ID does not, correct?
25            MR. BLENK:  Form.  Calls for a legal
```



```
 1                    Christopher J. Belling
 2    conclusion.
 3         THE WITNESS:  I suppose it would depend on
 4    what the so-called tentative ID was, what was said.
 5         BY MR. BRUSTIN:
 6         Q.   So you think there are circumstances
 7    where a tentative ID expressing uncertainty could
 8    provide probable cause inside a homicide?
 9         MR. BLENK:  Form.
10         THE WITNESS:  I think it could contribute to
11    probable cause.  It might not establish probable
12    cause.
13         BY MR. BRUSTIN:
14         Q.   Okay.  But a positive ID could
15    establish probable cause?
16         A.   True.
17         Q.   A confession could establish probable
18    cause?
19         A.   Possibly, yes.
20         Q.   Now, I take it that you -- tell me
21    about your process for meeting with detectives in a
22    homicide case.  At what points in time in the case
23    would you meet with them, and which would you meet
24    with?
25         MR. BLENK:  Form.
```



```
 1                    Christopher J. Belling
 2          THE WITNESS:  The second part of the
 3   question was which would you meet?
 4          BY MR. BRUSTIN:
 5          Q.   Which detective.  Would it be a lead
 6   detective?  Would it be any -- would it be more
 7   than that?  Would it vary from case to case?
 8          MR. BLENK:  Form.
 9          THE WITNESS:  It varied from case to case.
10          BY MR. BRUSTIN:
11          Q.   Did you have a general process in a
12   homicide case for when you would first meet with
13   the homicide detectives?
14          MR. BLENK:  Form.
15          THE WITNESS:  No.  It was ad hoc.
16          BY MR. BRUSTIN:
17          Q.   Okay.  Let's talk about this case just
18   broadly.  Would it be fair to say that the first
19   time you became involved in this case was when
20   Lamarr Scott came in?
21          MR. BLENK:  Form.
22          THE WITNESS:  I would say that the first
23   time I was actually at the homicide office in
24   regard to this case was when Lamarr Scott came in,
25   yes.
```



CHRISTOPHER J. BELLING                                     April 11, 2023
DIXON V. CITY OF BUFFALO                                              62

```
 1                    Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   Okay.  Had you had discussions, to your
 4   recollection, did you have discussions with anybody
 5   from the BPD concerning this case prior to that?
 6          A.   I do not recollect any.
 7          Q.   Okay.  Do you think you would recollect
 8   that today?
 9          A.   Not necessarily.
10          Q.   All right.  But your first recollection
11   is coming to the homicide office in regard to
12   Lamarr Scott?
13          A.   My first recollection of actually
14   talking face to face with homicide detectives would
15   be that -- the middle of the night visit to
16   homicide on the 12th of August.
17          Q.   And you came that night or the next
18   morning?
19          MR. BLENK:  Form.
20          THE WITNESS:  It was about 3 in the morning
21   on the 12th of August.
22          BY MR. BRUSTIN:
23          Q.   Okay.  And how many hours did you spend
24   in the homicide division at that time?
25          A.   Probably an hour.
```



```
 1                 Christopher J. Belling
 2         Q.   Did you speak to Lamarr Scott at that
 3   time?
 4         A.   Yes, I did.
 5         Q.   For how long?
 6         A.   Five minutes.
 7         Q.   Did you speak to Leonard Brown at that
 8   time?
 9         A.   I don't recall talking to Leonard
10   Brown.
11         Q.   And I take it you spoke to Lamarr Scott
12   after the police had already taken a statement from
13   him, correct?
14         A.   Yes.
15         Q.   When did you speak to Lamarr Scott
16   next, after that five-minute conversation that
17   night, or that morning?
18         A.   Probably in December of 1991.
19         Q.   You're sure about that?
20         A.   No, I'm not.  I said probably.  I don't
21   know if I talked to him in between.
22         Q.   Well, let me do it this way, then.  In
23   those first few days after Lamarr Scott came
24   forward, is it your testimony that you only spoke
25   to him for five minutes, or is it possible you
```



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                   64

```
 1                   Christopher J. Belling
 2   spoke to him more than that?
 3        A.   My recollection is I only spoke to him
 4   at the homicide office for about five minutes.
 5        Q.   Okay.  And not again for months?
 6        A.   Again, that's my recollection, yes.
 7        Q.   Okay.  But it sounds like, unlike some
 8   other things, you're not certain about that; is
 9   that fair?
10        MR. BLENK:  Form.
11        THE WITNESS:  I just -- I jump from talking
12   to him in the homicide office establishing that he
13   existed and then went on to the whole process of
14   getting him a lawyer and when Jack Molloy was
15   assigned to represent him.  I don't remember
16   contact with him in between those two times.
17        BY MR. BRUSTIN:
18        Q.   Okay.  And when you -- when you -- when
19   you spoke to -- withdrawn.
20        I take it it wasn't unusual for you to be
21   called down to -- requested to come to the precinct
22   in a homicide case.  That was something -- that was
23   one of your responsibilities, to give assistance to
24   the homicide detectives when needed, correct?
25        MR. BLENK:  Form.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             65

```
 1                 Christopher J. Belling
 2         THE WITNESS:  It was, but it didn't happen
 3    that often.
 4         BY MR. BRUSTIN:
 5         Q.   Okay.  So this was -- so this was
 6    somewhat unusual?
 7         A.   Relatively speaking, yes.
 8         Q.   Okay.  And certainly it was unusual
 9    after a person had been arrested for a homicide for
10    somebody else to come forward and say, no, they
11    were the person who actually committed the crime,
12    correct?
13         A.   That was unusual, yes.
14         Q.   In fact, would it be fair to say that
15    absent clear mental illness, this was the only time
16    in your career when that's ever happened?
17         MR. BLENK:  Form.
18         THE WITNESS:  Yes.
19         BY MR. BRUSTIN:
20         Q.   Okay.  It was an extraordinary event?
21         A.   Very unusual.
22         Q.   And as a result of this happening, you
23    took a more substantial role in directing the
24    investigation after that point in time than you
25    otherwise would have in a typical homicide
```



1                    Christopher J. Belling

2    investigation; fair to say?

3            MR. BLENK:  Form.

4            THE WITNESS:  Yes.

5            BY MR. BRUSTIN:

6            Q.   Fair to say that you took over the

7    direction of the investigation at that point in

8    time?

9            A.   No.

10           MR. BLENK:  Form.

11           BY MR. BRUSTIN:

12           Q.   You were certainly an integral part of

13   directing the investigation after he came forward;

14   fair to say?

15           MR. BLENK:  Form.

16           THE WITNESS:  No.

17           BY MR. BRUSTIN:

18           Q.   How did I get that wrong?

19           A.   Well, the investigation was ongoing.  I

20   had my concerns.  I told the chief of homicide.  I

21   told the individual detectives, and they went out

22   and did whatever they did to deal with the issues.

23           Q.   But you told them what you wanted?

24           MR. BLENK:  Form.

25           THE WITNESS:  I told them what I was



CHRISTOPHER J. BELLING                                                April 11, 2023
DIXON V. CITY OF BUFFALO                                                        67

```
 1                Christopher J. Belling
 2  concerned about.
 3        BY MR. BRUSTIN:
 4        Q.   Okay.  Now, when you spoke to -- and I
 5  take it that that conversation concerning what you
 6  were concerned about was an ongoing conversation.
 7  You had a conversation -- you had conversations
 8  beginning the night Lamarr Scott came forward,
 9  correct?
10        A.   Yes.
11        Q.   Then you had ongoing conversations as
12  they conducted the investigative tasks that you
13  suggested?
14        MR. BLENK:  Form.
15        THE WITNESS:  Yes, in general.
16        BY MR. BRUSTIN:
17        Q.   And that went on for months?
18        A.   Yes.
19        MR. BLENK:  Form.
20        BY MR. BRUSTIN:
21        Q.   What did you say to -- withdrawn.
22        Who was present for your conversation with
23  Lamarr Scott?
24        A.   I don't recollect if any detectives
25  were in the room with me or not.  It could have
```



CHRISTOPHER J. BELLING                                         April 11, 2023
DIXON V. CITY OF BUFFALO                                                    68

1                   Christopher J. Belling

2   been me and Lamarr Scott alone.  It could have been

3   Stambach there, or it could have been whoever was

4   with Stambach that night.  I think it was DiPirro.

5          Q.   Okay.  And what did you say to Lamarr

6   Scott and what did he say to you during that

7   five-minute conversation?

8          A.   I asked him to identify himself, and I

9   asked if he had just given a statement implicating

10  himself in a homicide.  And I told him that given

11  that set of circumstances, I felt that it would be

12  appropriate for arrangements to be made to get him

13  a lawyer.  And that if he needed a lawyer, he

14  should contact the DA's office and we'd take him to

15  criminal special term and get him an assigned

16  lawyer.

17         Q.   Okay.  And what did he say to you?

18         A.   I don't recollect exactly what he said.

19  I don't think he was particularly talkative.  He

20  told me he was Lamarr Scott.  I think I asked him

21  his age.  I may have asked him about Valentino

22  Dixon's parents having brought him to the scene of

23  the videotape with Wanda Starke, but I tried to

24  stay away from substantive information about what

25  he said, because I felt that that would be -- you



**APPENDIX 0070**

```
 1                    Christopher J. Belling
 2   know, I didn't want to end up a witness at my own
 3   Huntley hearing, so to speak.
 4        Q.   Okay.  So you made it your business not
 5   to speak to him about any substance?
 6        A.   I tried to avoid the substance of what
 7   was going on and tried to get the context.
 8        Q.   The only substantive question you asked
 9   him was about Valentino Dixon's parents bringing
10   him to the interview?
11        MR. BLENK:  Form.
12        THE WITNESS:  If I asked that, and I don't
13   remember specifically, but it's possible.
14        BY MR. BRUSTIN:
15        Q.   And what did he say about that?
16        A.   I believe he said they had.
17        Q.   What information, if any, without --
18   tell me everything you remember him telling you in
19   substance.
20        A.   That he had given the police a
21   statement, his name, his age.
22        Q.   So he told you he was 18?
23        A.   Yeah, I thought he was 19, but
24   whatever.  And that he told me he had talked to
25   Wanda Starke on TV and that the events that got him
```



1              Christopher J. Belling

2  there involved Robert Bryant and Annie Shannon.

3        Q.   So you knew he was an adult when you

4  met with him?

5        A.   Oh, yeah.

6        Q.   That was never a question?

7        A.   Well, not once I got his date of birth

8  or his age.

9        Q.   So why did you tell the Georgetown

10  students that you thought he was a minor?

11        A.   Because that's what he had been told by

12  Annie Shannon and Robert Bryant.

13        Q.   But that's not what you said to the

14  Georgetown students.  You said he was a minor.

15        A.   That's because that's what I believed

16  was the situation why he was -- why they got him to

17  confess was because they told him he was a minor.

18        Q.   You knew he wasn't a minor, right?

19        A.   I knew it that night, yes.

20        Q.   But the tape -- the tape says you

21  thought he was a minor.

22        MR. BLENK:  Form.

23        BY MR. BRUSTIN:

24        Q.   Just a mistake you made?

25        A.   Could be.



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                 71

```
 1                  Christopher J. Belling
 2        Q.   Were you showing off a little bit for
 3   the Georgetown students?
 4        A.   Yes.
 5        MR. BLENK:   Form.
 6        BY MR. BRUSTIN:
 7        Q.   Feel like a bit of a big shot talking
 8   to the law students?
 9        MR. BLENK:   Okay.   That's -- don't respond
10   to that.
11        BY MR. BRUSTIN:
12        Q.   But you were showing off, right?
13        MR. BLENK:   Asked and answered.   Move on.
14        BY MR. BRUSTIN:
15        Q.   You were proud of your conviction even
16   then, right?
17        A.   I don't think a conviction is proud of.
18   You know, it was a conviction.   It was legally
19   based.   It was properly obtained, and it was a
20   conviction.
21        Q.   Well, let me ask you this:   If I were
22   to play portions of that video to a jury, do you
23   think they would glean from that that you seemed
24   really proud of your conviction?
25        MR. BLENK:   Argumentative.   Asked and
```



1                 Christopher J. Belling

2    answered.  Don't respond to that.  Calls for

3    speculation.

4         MR. BRUSTIN:  That's not appropriate.

5    That's not appropriate.  I'm not going to fight you

6    on that, but that's not an appropriate instruction.

7    You don't get to instruct him not to answer

8    questions, not unless it's privileged or something

9    like that.  You know that.  Please don't do that.

10        MR. BLENK:  I can instruct him not to

11   answer.  Let's move on.

12        BY MR. BRUSTIN:

13        Q.   All right.  In any case, you spoke to

14   him for, according to you, five minutes.  Could it

15   have been a little bit more than that?

16        A.   I don't recollect it being much longer

17   than that but, you know, anything's possible, I

18   suppose.

19        Q.   Did you make any notes of your

20   conversation?

21        A.   Yes.

22        Q.   What did you do with those notes?

23        A.   I presume I put them in the file.

24        Q.   Have you seen -- I didn't notice them.

25   Have you seen those notes in preparation for today?



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              73

```
 1                    Christopher J. Belling

 2          A.   Yes.

 3          Q.   You don't recall where they are or what

 4    they said?

 5          A.    There's one page of notes, and it

 6    points out a couple of the issues.  It says Lamarr

 7    Scott, and then it points out a couple of the

 8    issues in his statement.  There's an issue of what

 9    kind of a weapon it was.  There's the issue of the

10    bicycle and those things.

11          Q.   I think I do know what you're talking

12    about.  So the notes -- the notes -- I assume those

13    were notes of you reviewing -- you reviewing his

14    statement, but you're telling me that in addition

15    to notes of reviewing his statement, it also was

16    notes of your brief conversation with him; is that

17    correct?

18          A.    It was notes of that whole night when I

19    went down there.

20          Q.    Gotcha.

21          A.    I don't know actually if -- if you had

22    those notes, I couldn't tell you, you know, that

23    was from reviewing his statement, that was from

24    talking to him, I don't know that, but --

25          Q.   You have notes from that night?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              74

```
1              Christopher J. Belling

2        A.   Yes.

3        Q.   All right.  And when's the next time --

4   I know eventually Mr. Scott got an attorney that

5   you arranged, at least you had a role in arranging.

6   When's the next time you spoke to Mr. Scott before

7   he got an attorney?

8        MR. BLENK:  Form.

9        THE WITNESS:  Before he got an attorney?  I

10  sent out a subpoena to him with a letter saying

11  call in.  He called in.  I'm sure I talked to him

12  on the phone and told him to come to criminal

13  special term to get a lawyer, and so I had that

14  conversation with him.

15       The morning he came into criminal special

16  term, I probably met him at the DA's front desk and

17  took him to criminal special term, so there was a

18  brief conversation there, and then he had a lawyer

19  and I didn't speak to him again.

20       BY MR. BRUSTIN:

21       Q.   Okay.  So your testimony here today is

22  that you never spoke to him about the substance of

23  his confession -- withdrawn.

24       You never spoke to him about the substance

25  of anything he was saying during that phone call
```



1                    Christopher J. Belling

2    when he called you or during the brief meeting

3    after he received a subpoena, correct?

4            MR. BLENK:  Form.

5            THE WITNESS:  I don't have a recollection of

6    talking to him about anything other than that.

7            BY MR. BRUSTIN:

8            Q.   Is it possible you did?

9            A.   I just don't recollect whether I did or

10   not.

11           Q.   How long was the phone call?

12           A.   No clue.

13           Q.   How long was the meeting with him?

14           MR. BLENK:  Form.

15           THE WITNESS:  Again, I can sort of

16   reconstruct how it would have occurred.

17           MR. BRUSTIN:  Okay.

18           THE WITNESS:  But I have no idea how long it

19   took.

20           BY MR. BRUSTIN:

21           Q.   Your testimony here is you don't have

22   an independent recollection -- let's go through the

23   three times you believe you met with him before the

24   attorney.

25           You spoke to him for approximately five



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                                76

```
 1                  Christopher J. Belling
 2   minutes the night he came in and confessed,
 3   correct?
 4          A.   Correct.
 5          Q.   You're not sure who was present.
 6          A.   Correct.
 7          Q.   You spoke to him again on the phone
 8   after he was subpoenaed for the Grand Jury?
 9          A.   I assume I did, because he would have
10   called in.  That's how we arranged him to get
11   assigned counsel.
12          Q.   Okay.  But your testimony is you have
13   no recollection of that phone call?
14          A.   Correct.
15          Q.   And then you spoke to him again when he
16   came in in connection with the subpoena?
17          A.   Again, exactly the same.  He would have
18   come in, and we would have gone down to special
19   term.
20          Q.   Okay.  And that was the last
21   conversation you ever had with him without --
22   without having an attorney present?
23          A.   Correct.
24          Q.   Did you have any conversations with him
25   with an attorney present, his attorney present?
```



1                 Christopher J. Belling

2          A.    Yes.

3          Q.    Okay.

4          A.    I had a conversation with him in terms

5    of, you know, actual Grand Jury preparation with

6    his attorney present, and we talked about the facts

7    of the event, how it occurred, what happened, what

8    he saw, what he did, and then, of course, he

9    testified in Grand Jury.

10         Q.    All right.  Now, one of the things that

11   Mr. Stambach testified to, and you might recall

12   this from reading it, is that before they charged

13   anyone with a homicide, somebody from the DA's

14   office would come over and review the file before

15   an arrest.  This was in -- describing what happened

16   in 1991.

17         Is that your recollection of the process?

18         MR. BLENK:  Form.

19         THE WITNESS:  No.

20         BY MR. BRUSTIN:

21         Q.    Okay.  And I will represent to you that

22   Masecchia testified that, in fact, the DA didn't

23   get involved until after an arrest was made.  Is

24   that your understanding of the process?

25         MR. RUSS:  Objection to form.



```
 1                     Christopher J. Belling
 2          THE WITNESS:  That was more often the case
 3   than not.
 4          BY MR. BRUSTIN:
 5          Q.   It wasn't a hard-and-fast rule I guess
 6   is what you're describing?
 7          A.   Not at that point in time, it was not.
 8          Q.   Was there any involvement of you or any
 9   other Assistant District Attorney in this case
10   prior to Valentino Dixon being arrested?
11          A.   Not that I know of.
12          Q.   And that would be something given your
13   involvement in this case you likely would have
14   known, correct, you would have expected to have
15   known about?
16          MR. BLENK:  Form.
17          THE WITNESS:  Maybe.  I don't know.  I
18   just -- there wasn't any that I'm aware of.
19          BY MR. BRUSTIN:
20          Q.   All right.  But you do agree with
21   Mr. Stambach that certainly in this case after an
22   arrest was made and after Lamarr Scott came
23   forward, you did a careful review of the file,
24   correct?
25          MR. BLENK:  Form.
```



1                    Christopher J. Belling

2          THE WITNESS:  I did review the file, yes.

3          BY MR. BRUSTIN:

4          Q.   And that would have been certainly

5   within a week or so of Lamarr Scott coming in?

6          A.   Yes.

7          Q.   And when you say review the file, you

8   would have reviewed every page in the homicide

9   file, correct?

10         MR. BLENK:  Form.

11         THE WITNESS:  Yes, every page as it came

12  into existence, yes.

13         BY MR. BRUSTIN:

14         Q.   And that was -- and given the

15  extraordinary circumstance of this case, Lamarr

16  Scott coming forward and saying he confessed to a

17  crime -- him confessing to a crime that Valentino

18  Dixon was being charged with, I take it that going

19  forward you reviewed every report or document in

20  the file that in any way went to the issue of who

21  the shooter was.

22         MR. BLENK:  Form.

23         THE WITNESS:  I reviewed everything that was

24  in the file as it came into existence, yes.

25         BY MR. BRUSTIN:



```
 1                  Christopher J. Belling

 2          Q.   And you reviewed it carefully.

 3          MR. BLENK:  Form.

 4          THE WITNESS:  I reviewed it in the normal

 5   practice of my business.

 6          BY MR. BRUSTIN:

 7          Q.   All right.  And certainly by 1991 you

 8   were very experienced at reviewing homicide files;

 9   fair to say?

10          A.   I was experienced, yes.

11          Q.   You knew how to read P-73s, you knew

12   how to read P-88s, and know exactly what was

13   happening pretty quickly.

14          MR. BLENK:  Form.

15          THE WITNESS:  In general I had that

16   experience, yes.

17          BY MR. BRUSTIN:

18          Q.   And I take it you even -- you probably

19   by that time were -- understood how particular

20   homicide detectives documented cases?

21          MR. BLENK:  Form.

22          MR. BRUSTIN:  As a general matter.

23          MR. BLENK:  Form.

24          THE WITNESS:  Yeah.

25          BY MR. BRUSTIN:
```



1              Christopher J. Belling

2        Q.   It wasn't the first time you looked at

3    a Stambach P-73 in this case, right?

4        A.   Correct.

5        Q.   Or a Masecchia P-73, right?

6        A.   Correct.

7        Q.   You saw them all the time.

8        A.   Yes.

9        Q.   And I take it that one of the

10   discussions that was going on around the time that

11   Lamarr Scott came in was whether there was

12   sufficient evidence to continue prosecuting

13   Valentino Dixon, correct?

14        MR. BLENK:   Form.

15        THE WITNESS:   No.

16        BY MR. BRUSTIN:

17        Q.   Explain.

18        A.   There already was sufficient evidence

19   to prosecute Valentino Dixon.  The issue became,

20   was that evidence reliable vis-a-vis Lamarr Scott

21   coming out of the woodwork and saying he did it.

22        Q.   Okay.  All right.  Now -- and I take it

23   that given Lamarr Scott coming forward, you

24   interviewed the detectives or you spoke to the

25   detectives on that day and the days following



1              Christopher J. Belling

2    concerning the quality of the evidence that they

3    had against Valentino Dixon?

4           MR. BLENK:  Form.

5           THE WITNESS:  Not in particular.  I knew

6    that there were three eyewitnesses who were

7    identified, and I knew that they had a little of

8    the background story and, you know --

9           BY MR. BRUSTIN:

10          Q.   Well, you knew there were two

11   eyewitnesses who identified.  You understood that

12   Mr. Jackson's identification was tentative,

13   correct?

14          MR. BLENK:  Form.

15          THE WITNESS:  I don't recollect that, no.

16          BY MR. BRUSTIN:

17          Q.   You thought it was positive, his first

18   ID?

19          MR. BLENK:  Form.

20          THE WITNESS:  I remember that there was --

21   somebody made -- maybe Joe Terranova or someone had

22   mentioned something about it, but I don't remember

23   what -- what it was.

24          BY MR. BRUSTIN:

25          Q.   Now, one of the things -- I just want



```
1                    Christopher J. Belling
2    to get a sense, I think I understand, but I want to
3    make sure I have a good understanding of your
4    process for reviewing the file, and it sounds like
5    in any case, but certainly this case, you were
6    reviewing police records, reports, as they came in.
7         A.   Yes.
8         MR. BLENK:  Form.
9         BY MR. BRUSTIN:
10        Q.   And in addition to that, you did
11   another review of the entire file before you made a
12   presentation to the Grand Jury?
13        MR. BLENK:  Form.
14        THE WITNESS:  It -- it's an ongoing process.
15   You're looking at the stuff as it comes in, and
16   then you determine what you need for Grand Jury.
17        BY MR. BRUSTIN:
18        Q.   I'm actually reading -- well, what you
19   testified to at the perjury trial was that you
20   review all available evidence before the
21   presentation to the Grand Jury.  You know
22   everything that has been reported.
23        Is that consistent with your practice?
24        A.   I would say so.
25        Q.   And you made it your business in any
```



1              Christopher J. Belling

2    case, but certainly this case, to know every piece

3    of evidence before you went to the Grand Jury,

4    correct?

5          MR. BLENK:  Form.

6          MR. BRUSTIN:  If you could.

7          MR. BLENK:  Form.

8          THE WITNESS:  I think that's overstating it.

9    I made a determination of what elements were needed

10   for a prima facie case and, you know, that's --

11   that's where we are.

12         BY MR. BRUSTIN:

13         Q.   Just so we're clear, I'm reading to you

14   from your -- from the perjury testimony on

15   cross-examination, perjury trial testimony, page

16   47.

17         MR. BLENK:  Is that in the --

18         MR. BRUSTIN:  It's in this one, I believe.

19   Yeah, it's the -- it's the final -- the final tab.

20         MR. BLENK:  Grand Jury or perjury?

21         MR. BRUSTIN:  Sorry, this is the perjury

22   trial, your testimony in the perjury trial.  And by

23   the way --

24         MR. BLENK:  Is it this?

25         MR. BRUSTIN:  No, it's the one he's got.



1              Christopher J. Belling

2         THE WITNESS:  Okay.  Page you said?

3         MR. BRUSTIN:  So, first of all, before you --

4    before you --

5         MR. BLENK:  Is this marked?

6         MR. BRUSTIN:  It's not.  I don't think we

7    need to mark the testimony, but we can.  Would you

8    prefer it?

9         MR. BLENK:  Why does the binders --

10        MR. BRUSTIN:  The binder is just a

11   compilation of documents, so we're not going to

12   mark the binder, but we can mark -- we can mark his

13   perjury trial testimony as Exhibit 31.

14        MR. RUSS:  31?

15        MR. BRUSTIN:  31.

16        MR. BLENK:  So are these not -- these are

17   not --

18        MR. BRUSTIN:  That's a different document.

19        MR. BLENK:  So this is not including --

20   okay.  So this includes Grand Jury -- the document

21   we're marking as 31 --

22        MR. BRUSTIN:  All we're marking -- all we're

23   marking is his testimony, which is the tab that

24   he's looking at right now.

25        MR. BLENK:  Okay.  Do you want to remove it



1                  Christopher J. Belling

2     from the --

3          MR. BRUSTIN:  No, we're just going to mark

4     it.  We'll deal with it later.  Just put a tab --

5     just put a sticker on 31.

6     The following was marked for Identification:

7      EXH. 31                  excerpt of Christopher

8                               Belling perjury testimony

9          MR. BRUSTIN:  It's testimony from the --

10    it's testimony from the perjury trial on November

11    10th, 1992, page 425 to page 568.

12         MR. BLENK:  But it's not -- it's not all the

13    pages within that range.

14         MR. BRUSTIN:  It's all of his testimony.  So

15    I think there's some -- there's some other parts

16    that are missing.  This is his entire testimony.

17         MR. BLENK:  I'm not saying you're doing

18    anything wrong.  I just want to make sure that the

19    record reflects what he's actually looking at.

20         MR. BRUSTIN:  Okay.  He's looking at his

21    entire testimony from the perjury trial, okay?  So,

22    first of all, this is --

23         MR. BLENK:  So do you want him to -- do you

24    want him to read his entire testimony?

25         MR. BRUSTIN:  Of course not.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              87

```
 1                    Christopher J. Belling
 2           MR. BLENK:  Okay.
 3           MR. BRUSTIN:  Why would I want him to do
 4     that?
 5           MR. BLENK:  So that's not what he's looking
 6     at.  He's look --
 7           MR. BRUSTIN:  Because you took it from him.
 8           MS. PERSICO:  We're just trying to make sure
 9     that the record is clear.
10           MR. BLENK:  This is really -- does not have
11     to be confrontational.
12           MR. BRUSTIN:  We don't need -- we're doing
13     fine without you.  We don't need two people
14     talking.  One person talks during the deposition,
15     not you.  You can choose, you can switch seats, but
16     one person talks.
17           MR. BLENK:  What page -- what page do you
18     want him to look at?
19           MR. BRUSTIN:  I'm going to give it to him in
20     a minute.  Can you put it in front of him?  So
21     let's mark it first as 31.
22           BY MR. BRUSTIN:
23           Q.   So, Mr. Belling, first of all, my
24     understanding is this is the only testimony you've
25     given in connection with this case; is that
```



1                    Christopher J. Belling

2    correct?

3          A.    As far as I know, yes.

4          Q.    All right.  So take a look at page 487.

5          A.    47?

6          Q.    487.

7          A.    Oh, 487.

8          Q.    Yeah.

9          A.    487, yes.

10         Q.    And line 15.

11         "Question:  Okay.  And prior to the formal

12   presentation of anything to a Grand Jury, you

13   review all the available investigation, don't you?

14         "Answer:  Yes.

15         "Question:  So that even before you walk

16   into a Grand Jury for the first time you know

17   everything that has been reported.

18         "Answer:  I would say that's a fair

19   statement."

20         A.    Okay.

21         Q.    Okay.  And that's an accurate

22   description of what you knew by the time of the

23   Grand Jury, correct?

24         A.    I would say that's a fair statement.

25         MR. BLENK:  Form.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            89

```
 1                Christopher J. Belling
 2        BY MR. BRUSTIN:
 3        Q.   And, in fact, you knew all of that
 4   information long before the Grand Jury, because you
 5   were reviewing the file and the reports as they
 6   came in, correct?
 7        A.   Correct.
 8        Q.   Okay.  Now, you mention that -- I'm
 9   going to get more specifically to Lamarr Scott a
10   little bit later, but you mention that when Lamarr
11   Scott came in, you provided input to the homicide
12   detectives about what issues you believe needed to
13   be followed up on, correct?
14        MR. BLENK:  Form.
15        THE WITNESS:  Yes, in general.
16        BY MR. BRUSTIN:
17        Q.   All right.  And in addition to that,
18   did you conduct any independent investigation on
19   your own?
20        MR. BLENK:  Form.
21        THE WITNESS:  I don't know what you mean by
22   independent investigation.
23        MR. RUSS:  I'm sorry, could you ask that
24   again?  The connection was kind of garbled.  Could
25   you ask the question again?
```



 1                    Christopher J. Belling

 2            MR. BRUSTIN:  Yeah.  It wasn't a good

 3     question, so I'm going to change it.

 4            BY MR. BRUSTIN:

 5            Q.   Prior to the Grand Jury proceedings,

 6     did you conduct any investigation yourself?  Did

 7     you interview any witnesses yourself, for example?

 8            MR. BLENK:  Form.

 9            THE WITNESS:  I presume you're talking about

10     Antoine Shannon and, yes, obviously I did.

11            BY MR. BRUSTIN:

12            Q.   Okay.  Anybody else?

13            A.   I also talked to Tamara Frieda and

14     various witnesses.  Robert Lewis, Fred Stencil,

15     people whose names were in the file, people who

16     were witnesses.

17            Q.   Anybody else?

18            A.   I don't remember.  Those are the people

19     that I just happened to remember their names from

20     the file.

21            Q.   Now, you weren't present for the

22     interviews of Robert Lewis and Fred Stencil when

23     they were shown photo arrays, were you?

24            A.   No.

25            Q.   That was a separate interview of Robert



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              91

```
 1              Christopher J. Belling
 2  Lewis and Fred Stencil?
 3       A.   Well, they weren't shown photo arrays
 4  in my presence, I can tell you that.
 5       Q.   Okay.  And when you interviewed those
 6  witnesses, were you interviewing them with a
 7  homicide detective or a DA investigator?
 8       MR. BLENK:  Which one are you talking about?
 9       BY MR. BRUSTIN:
10       Q.   Well, let's start with Antoine Shannon.
11  That was alone, correct?
12       A.   No, Antoine Shannon was with a DA's
13  investigator.
14       Q.   DA investigator, that's right.  And
15  Tamara Frieda, DA investigator?
16       A.   No.  I recollect -- I thought it was a
17  homicide detective.  It could have been a DA's
18  investigator, but I think it was a homicide
19  detective.
20       Q.   How about Robert Lewis and Fred
21  Stencil?
22       A.   I think those were just in my office,
23  and there was nobody there other than me.
24       Q.   Okay.  And --
25       A.   Although, at one -- I think that's
```



CHRISTOPHER J. BELLING                              April 11, 2023
DIXON V. CITY OF BUFFALO                                      92

```
 1                   Christopher J. Belling
 2   accurate, yeah.
 3        Q.   Okay.  And anybody else you remember
 4   interviewing?
 5        A.   Well, Emil Adams, Travis Powell, Aaron
 6   Jackson, John Sullivan III, certainly them.
 7        Q.   And you would agree that certainly Emil
 8   Adams and John Sullivan took a great deal of effort
 9   to get them to proceedings, correct?
10        MR. BLENK:  Form.
11        THE WITNESS:  At various points in the
12   proceedings, yes.  Sometimes they were around.
13   Sometimes they weren't.
14        BY MR. BRUSTIN:
15        Q.   All right.  And your communications
16   with them was limited as a result?
17        A.   It was.
18        Q.   And -- okay.  So in addition to your
19   interviews that you conducted, what direction or
20   what recommendation, you tell me the right word,
21   what did you tell the homicide detectives that you
22   wanted done in connection with Lamarr Scott
23   confessing?
24        A.   Well, I wrote a letter to Chief
25   Donovan, and I indicated some things in there, and
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            93

1                Christopher J. Belling

2  other than that, I honestly don't recollect

3  anything specific.

4       Q.   Why did you wait three months to write

5  that letter to Chief Donovan?

6       A.   Because we were getting ready to wind

7  up the Grand Jury presentation, and I wanted to

8  make sure that we at least attempted to address

9  loose ends.

10       Q.   So my question is a different one then,

11  because we're going to get to that letter, but you

12  told us that when this extraordinary event

13  happened, Lamarr Scott came forward and confessed,

14  what that night and the days following did you

15  direct the homicide detectives to do in regard to

16  that statement?

17       MR. BLENK:   Form.

18       THE WITNESS:  I don't remember.

19       BY MR. BRUSTIN:

20       Q.   So would it be fair to say the best of

21  your recollection is you didn't direct them or ask

22  them to do anything?

23       A.    No, I don't think that would be fair.

24       MR. RUSS:  Objection to form.

25       THE WITNESS:  I think the answer is I don't



1              Christopher J. Belling

2    remember what I did with them at that point.

3         BY MR. BRUSTIN:

4         Q.   Do you remember anything that you did,

5    even generally?

6         MR. BLENK:  Form.

7         BY MR. BRUSTIN:

8         Q.   Let me be more specific.  Do you

9    remember anything that you did in regard to

10   directing or recommending investigation concerning

11   the Lamarr Scott confession in the days following

12   that confession?

13        A.   I don't remember anything specific that

14   I told them to do.

15        Q.   Do you remember anything general at

16   all?

17        A.   Well, I told them to get some

18   background on Robert Bryant and Annie Shannon, and

19   make sure they got the tape from Wanda Starke.

20   Other than that, I don't have any specific recall

21   of things I told them to do.

22        Q.   Why did you want background on Robert

23   Bryant and his mother?

24        A.   Because I was told and then I saw on

25   video that they were the people that were



1                   Christopher J. Belling

2    responsible for getting Lamarr Scott to the

3    original TV confession.

4          Q.    They drove him there?

5          A.    Excuse me?

6          Q.    They drove him there is what you mean?

7          MR. BLENK:   I didn't hear that.

8          BY MR. BRUSTIN:

9          Q.    They drove him there is what you mean?

10         A.    No, that's not what I mean.

11         Q.    What do you mean?

12         A.    I mean, they put him up to going there

13   and doing that.

14         Q.    Ah, and where did that information come

15   from?

16         A.    Well --

17         Q.    Other than in your head?

18         A.    It came from the homicide detectives,

19   and it came from my looking at the video.

20         Q.    Okay.  So you learned from the homicide

21   detectives that night that they had determined that

22   the only reason Lamarr Scott came forward was

23   because Valentino Dixon's parents had put him up to

24   it?

25         MR. BLENK:   Form.  Argumentative.



```
 1                  Christopher J. Belling
 2          THE WITNESS:  That was information that I
 3   got at some point right in there time-wise, yes.
 4          BY MR. BRUSTIN:
 5          Q.   All right.  So, in other words, what
 6   you learned was from the homicide detectives -- and
 7   I take it you were dealing mostly with Stambach at
 8   that point, correct?
 9          MR. BLENK:  Form.
10          THE WITNESS:  Yes, my recollection.
11          BY MR. BRUSTIN:
12          Q.   All right.  And so what you learned
13   from Stambach that night or the next day is that
14   they had determined that the reason that -- through
15   their investigation they had determined that the
16   reason Lamarr Scott came forward and confessed was
17   because Valentino Dixon's parents made him do it?
18          MR. BLENK:  Form.
19          THE WITNESS:  That was the undercurrent,
20   that was the tenor of what was operating at that
21   point, yes.
22          BY MR. BRUSTIN:
23          Q.   Well, DA's don't work with
24   undercurrents.  They work with evidence, right?
25          A.   When we have it.
```



CHRISTOPHER J. BELLING                                  April 11, 2023
DIXON V. CITY OF BUFFALO                                            97

```
 1                 Christopher J. Belling
 2         Q.   Well, if you don't have it, then you --
 3   then you have nothing, right?
 4         MR. BLENK:  Form.
 5         MR. BRUSTIN:  You can't prosecute someone
 6   based on an undercurrent.
 7         MR. BLENK:  Form.
 8         THE WITNESS:  That's true.
 9         BY MR. BRUSTIN:
10         Q.   All right.  So what evidence did they
11   describe to you in those following days, the day
12   after he came in and confessed to committing a
13   murder, what evidence did they provide to you that
14   made it clear to them that Valentino Dixon's
15   parents had made Lamarr Scott confess to a crime
16   that Valentino Dixon committed?
17         MR. BLENK:  Form.
18         THE WITNESS:  I don't recall any specific,
19   you know, individual points of evidence other than
20   their presence on the video, their -- the fact that
21   they brought him there.  Other than that, I don't
22   recall specifically what was discussed at that
23   point.
24         BY MR. BRUSTIN:
25         Q.   Well, you understood that the most
```



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                                           98

 1                    Christopher J. Belling

 2   important issue when this extraordinary event

 3   happened, Lamarr Scott said I committed this

 4   murder, the most important issue was, was it true,

 5   right?

 6          MR. BLENK:  Form.

 7          THE WITNESS:  That was an issue, sure.

 8          BY MR. BRUSTIN:

 9          Q.   And if it wasn't true, then why would

10   he say something crazy like that, right?

11          A.   True.

12          Q.   And that required a full and careful

13   investigation, correct?

14          MR. BLENK:  Form.

15          THE WITNESS:  It required some

16   investigation, yes.

17          BY MR. BRUSTIN:

18          Q.   Just some?

19          A.   Well, I think some was done, and I

20   think that it was clear where the situation was

21   going.

22          Q.   Okay.  What investigation was done?

23   Because I haven't seen any documentation of any of

24   it.

25          MR. BLENK:  Form.



1              Christopher J. Belling

2         THE WITNESS:  I don't know what they did.

3    The information they gave me was what I just told

4    you.

5         MR. BRUSTIN:  Okay.

6         THE WITNESS:  Then I viewed the video of his

7    supposed confession to Wanda Starke and, you know,

8    that that was the tenor of the situation.

9         BY MR. BRUSTIN:

10        Q.   The undercurrent, so to speak?

11        A.   That's what I said.

12        Q.   And so I think I understand.  Your

13   understanding, you expressed your concern to the

14   police that you wanted to make sure that it was

15   investigated as to whether or not what he said was

16   true and, if not, why he made it, correct?

17        MR. BLENK:  Form.

18        MR. BRUSTIN:  In substance.

19        THE WITNESS:  It's a little -- that's a

20   little broken down.  The bottom line is, is he a

21   false confessor because he was put up to it or not.

22        BY MR. BRUSTIN:

23        Q.   Did you start with the premise that he

24   was a false confessor?

25        MR. BLENK:  Form.



```
 1              Christopher J. Belling
 2        THE WITNESS:  After viewing the video, I
 3   certainly was inclined to believe that.  After
 4   viewing his statement, I saw significant
 5   discrepancies in it, and then having heard the
 6   circumstances of how it came about, that was the
 7   undercurrent.  And the total unusualness, as you
 8   point out, of the situation.  People just don't
 9   come in and confess to a murder unless they're put
10   up to it.  That's what investigations are for.
11        BY MR. BRUSTIN:
12        Q.   Or unless they committed it.
13        A.   I suppose --
14        MR. BLENK:  Form.
15        THE WITNESS:  -- that's one possibility.
16        BY MR. BRUSTIN:
17        Q.   So it's not been your experience that
18   in -- routinely in your cases people who commit
19   murders sometimes confess to them?
20        MR. BLENK:  Form.
21        THE WITNESS:  In my experience, not sua
22   sponte.
23        BY MR. BRUSTIN:
24        Q.   You don't recall cases in your career
25   where, when -- where people come forward and
```



```
 1                    Christopher J. Belling
 2   confess to murders?
 3        A.   Not where somebody walks into a TV
 4   station on a street corner and confesses to a
 5   murder, no.
 6        Q.   All right.  But certainly in your
 7   experience, I take it you've had lots of experience
 8   where when someone -- well, withdrawn.
 9        You certainly have lots of experience when
10   someone is arrested and agrees to speak they
11   confess to a murder?
12        A.   Either arrested or questioned and
13   speaks, yeah.
14        Q.   That happens all the time, right?
15        A.   It does.
16        Q.   And routinely, when murderers confess
17   to murders, they often are not honest about every
18   aspect of the event, correct?
19        MR. BLENK:  Form.
20        THE WITNESS:  Yes, that's true.
21        BY MR. BRUSTIN:
22        Q.   That maybe happens in 75 percent of
23   confessions; fair to say?
24        MR. BLENK:  Form.
25        MR. RUSS:  Objection to form.
```



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                 102

```
 1              Christopher J. Belling

 2         BY MR. BRUSTIN:

 3         Q.   You know what?  Let me withdraw the

 4    question.

 5         You would agree that it was -- it was

 6    routine or common for people who commit homicides

 7    to confess to parts of the crime but not others?

 8         MR. BLENK:  Form.

 9         THE WITNESS:  No, I wouldn't agree with

10    that.

11         BY MR. BRUSTIN:

12         Q.   You would agree that it was common for

13    people confessing to homicides not to be truthful

14    about all aspects of their confession?

15         MR. BLENK:  Form.

16         THE WITNESS:  Again, too broad a statement.

17    No, I can't agree with that.

18         BY MR. BRUSTIN:

19         Q.   Would you agree -- I think it's a

20    pretty common occurrence, but would you agree that

21    as a general matter oftentimes -- withdrawn.

22         Would you agree that sometimes in your

23    experience people confess to murders and are not

24    completely accurate or reliable as to all aspects

25    of their confession?
```



1                    Christopher J. Belling

2          MR. BLENK:  Form.

3          THE WITNESS:  Sometimes that's true.

4          BY MR. BRUSTIN:

5          Q.   And that doesn't cause you to believe

6    that they didn't commit the crime necessarily,

7    correct?

8          MR. BLENK:  Form.

9          THE WITNESS:  Correct.

10         BY MR. BRUSTIN:

11         Q.   In fact, oftentimes it makes it seem

12   like they're more guilty?

13         MR. BLENK:  Form.

14         THE WITNESS:  Sometimes it does, I suppose.

15         BY MR. BRUSTIN:

16         Q.   And what -- we're going to get to it

17   more specifically, but what were some of the

18   significant discrepancies that you saw in Lamarr

19   Scott's television statement and his statement to

20   Stambach that caused you to believe he was not, in

21   fact, the shooter in this case?

22         A.   Well, first, there was some discrepancy

23   between the gun.  At some point he says it's an

24   Uzi.  At some point he says it's a TEC-9 or a

25   MAC-10 or something like that.  Nobody in the other



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              104

1                    Christopher J. Belling

2   statements that I saw had anybody coming to the

3   scene on a bicycle, particularly not the shooter.

4   And I think Leonard Brown's statement also, when

5   you compare it with Lamarr Scott's statement,

6   there's some discrepancies between those two as

7   well, which was concerning.

8        And then just the fact that it occurred

9   where -- how it occurred and how he looked on the

10  video.

11       Q.   How did he look that made you believe

12  he wasn't the shooter?

13       A.   He looked like someone who had been

14  dressed up and brought to the street corner by

15  Valentino Dixon's parents to tell a story to the

16  media so that the media could assist Valentino

17  Dixon's parents in compromising the investigation

18  of a murder committed by their son.

19       Q.   What I'm asking you is:  How did that

20  conclusion that you just gave me, what evidence did

21  you see of that?  How did you form that opinion in

22  your mind, that the evidence proved that?

23       MR. BLENK:  Form.

24       THE WITNESS:  I formed the opinion based on

25  having seen a lot of people confess to murders on



1              Christopher J. Belling
2   video.
3         BY MR. BRUSTIN:
4         Q.   And he just didn't seem like someone
5   who was confessing to a murder he really committed?
6         A.   Yes, to me.
7         Q.   And that was really the most compelling
8   part for you.
9         MR. BLENK:   Form.
10        BY MR. BRUSTIN:
11        Q.   He just didn't seem like someone who --
12   even though he confessed to committing this crime,
13   he just didn't seem like he did it.
14        MR. BLENK:   Form.
15        THE WITNESS:   His retelling of the event was
16   not consistent with his having done it.
17        BY MR. BRUSTIN:
18        Q.   All right.  And you would agree that
19   countless times you had major discrepancies between
20   witnesses providing admissions concerning crimes?
21        MR. BLENK:   Form.
22        THE WITNESS:   Discrepancies among witnesses?
23        MR. BRUSTIN:   Yes.
24        THE WITNESS:   Oh, sure.
25        BY MR. BRUSTIN:



```
 1                    Christopher J. Belling

 2          Q.   And oftentimes people who commit crimes

 3    try to tell the story in ways that minimize their

 4    culpability?

 5          MR. BLENK:  Form.

 6          THE WITNESS:  Right.

 7          BY MR. BRUSTIN:

 8          Q.   Even when they really committed the

 9    crime.

10          A.   True.

11          Q.   And you saw evidence of that in Lamarr

12    Scott's statement, correct?

13          MR. BLENK:  Form.

14          THE WITNESS:  To a degree.

15          BY MR. BRUSTIN:

16          Q.   But, in any case, it sounds like you

17    determined just that night that based on how he

18    looked to you on TV and how he looked to you when

19    you spoke to him and the discrepancies you saw

20    between the statements between Leonard Brown and

21    Lamarr Scott that he didn't really commit this

22    murder?

23          MR. BLENK:  Form.

24          THE WITNESS:  At that point in time I didn't

25    reach my conclusion, but there was certainly
```



1               Christopher J. Belling

2   indicia that there was an issue there.

3           MR. BRUSTIN:  Okay.

4           THE WITNESS:  He looked to me like someone

5   who was, in fact, attempting to exonerate Valentino

6   Dixon rather than soft pedal his own involvement.

7           BY MR. BRUSTIN:

8           Q.   Gotcha.  What about him made him look

9   that way to you?  Was it what he was wearing?  Was

10  it the way he spoke?  What was it?

11          MR. BLENK:  I'd ask you to stop raising your

12  voice, okay?  You could just ask the questions.

13          THE WITNESS:  It was his appearance.

14          MR. BLENK:  Form.

15          THE WITNESS:  It was his lack of --

16          BY MR. BRUSTIN:

17          Q.   Well, let's take them one at a time.

18  I'm sorry, I don't mean to interrupt you.  What

19  about his appearance made it seem like he was

20  covering for Valentino Dixon?  Was it the clothes

21  that he was wearing?

22          MR. BLENK:  Form.

23          THE WITNESS:  Brand new -- brand new

24  flat-brimmed baseball hat, completely scrubbed and

25  washed clean white T-shirt, no indication that he



 1                    Christopher J. Belling

 2   had any level of remorse or had been in any

 3   stressful situation, under any pressure, and then

 4   the content when he continues to say, I'm just here

 5   because Valentino didn't do it, I'm just here

 6   because Valentino didn't do it.  Those things and

 7   the fact that this comes out of the blue and the

 8   fact that it comes to the media were all

 9   suspicious.

10         BY MR. BRUSTIN:

11         Q.   Okay.  And did you consider the

12   possibility that somebody who emptied a TEC-9 as

13   they stood over a person might not have actual

14   remorse for doing it?

15         MR. BLENK:  Form.

16         THE WITNESS:  I don't know what actual

17   remorse is.

18         BY MR. BRUSTIN:

19         Q.   Feelings of remorse, feeling bad about

20   having shot someone 20 times.

21         MR. BLENK:  Form.

22         THE WITNESS:  If you could do it, you'd feel

23   remorseful.

24         BY MR. BRUSTIN:

25         Q.   Okay.  And did you consider the



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             109

```
 1                 Christopher J. Belling
 2   possibility that -- withdrawn.
 3        So -- all right.  So it sounds like you
 4   formed some pretty strong beliefs based on your
 5   impression of him that night, and you said that you
 6   learned that, among other things, the -- the
 7   homicide detectives checked the background of
 8   Robert Bryant and Valentino Dixon's mother,
 9   correct?
10        MR. BLENK:  Form.
11        THE WITNESS:  I think I asked them to do
12   that.  I don't know that they had done that at that
13   point in time.
14        BY MR. BRUSTIN:
15        Q.  Do you remember seeing any paperwork on
16   that?  Because I don't.
17        A.  No, I don't remember seeing any
18   paperwork.
19        Q.  What else did -- other than -- other
20   than asking them to check the background, what else
21   did you ask them to check, if anything?
22        MR. BLENK:  Form.  Asked and answered.
23        BY MR. BRUSTIN:
24        Q.  Withdrawn.  It sounds like that's the
25   sum total of what you asked them to do; is that
```



```
 1                   Christopher J. Belling
 2   fair to say?
 3        MR. BLENK:  Form.
 4        THE WITNESS:  No, I actually had them show
 5   photo arrays to some witnesses, particularly Fred
 6   Stencil and Robert Lewis, who were purportedly
 7   there to see if they could identify Lamarr Scott.
 8        BY MR. BRUSTIN:
 9        Q.   Sorry, I'm not talking about what you
10   did three months later.  I'm talking about what you
11   did before the -- before you sent that letter three
12   months later, or maybe it was more than three
13   months.  I think it was November, it was August,
14   September, October.  Three months.
15        A.   I don't know when the Fred Stencil and
16   Robert Lewis photo arrays were done.
17        Q.   Well, your letter was in November.  You
18   think you might have asked before that?
19        A.   I think it might have happened before
20   that.  I just don't know.
21        Q.   All right.  Do you remember anything
22   else you asked in the first few days?  You would
23   agree that the -- withdrawn.
24        You would agree that the investigation into
25   whether or not Lamarr Scott's confession was true
```



1                    Christopher J. Belling

2   or was fabricated, the most important time to

3   investigate that was in the days following that --

4   those statements, correct?

5           MR. BLENK:  Form.

6           THE WITNESS:  I would not agree with that.

7           BY MR. BRUSTIN:

8           Q.   No?  It wouldn't be important, for

9   example, to interview Valentino Dixon's parents or

10  other people who may have information about some

11  bribe potentially as soon as -- as soon as possible

12  after the statements were made?

13          MR. BLENK:  Form.

14          THE WITNESS:  It certainly could have been

15  helpful.

16          BY MR. BRUSTIN:

17          Q.   Those are some of the basic things you

18  would expect would be done by homicide detectives

19  to determine whether or not Lamarr Scott's

20  confession was true or not, correct?

21          MR. BLENK:  Form.

22          THE WITNESS:  It would have been helpful.

23          BY MR. BRUSTIN:

24          Q.   Were you -- by the way, is it possible

25  that maybe you shared your view with the homicide



1                   Christopher J. Belling

2   detectives and you told them, you know what, I just

3   don't think he's telling the truth, no need to

4   investigate?

5            MR. BLENK:  Form.

6            THE WITNESS:  No.

7            BY MR. BRUSTIN:

8            Q.   You expected them to do a full

9   investigation into the reliability and the accuracy

10  of Lamarr Scott's admissions, correct?

11           MR. BLENK:  Form.

12           THE WITNESS:  I expected them to continue

13  investigating.

14           BY MR. BRUSTIN:

15           Q.   All right.  Did you notice that in the

16  days following Lamarr Scott's confession no reports

17  were generated concerning an investigation into

18  whether Lamarr Scott was the shooter?

19           MR. BLENK:  Form.

20           MR. RUSS:  Objection to form.

21           THE WITNESS:  And I don't recollect that.

22           BY MR. BRUSTIN:

23           Q.   Did you notice when you looked at

24  police reports, which you said you were reviewing

25  as they came in, that nobody showed Lamarr Scott's



1                    Christopher J. Belling

2   picture to anybody for months?

3          MR. BLENK:  Form.

4          MR. RUSS:  Objection to form.

5          THE WITNESS:  Again, I don't know that

6   that's the case.

7          BY MR. BRUSTIN:

8          Q.  Well, we have the police file here.

9   There's no reports of it.  You would certainly

10  expect if pictures of Lamarr Scott were shown in a

11  photo array to any witness, there would be a report

12  on that, correct?

13         MR. BLENK:  Form.

14         MR. RUSS:  Objection to form.

15         THE WITNESS:  I would expect there should be

16  a report.

17         BY MR. BRUSTIN:

18         Q.  And although you don't remember it

19  today, you know, 30 years, more -- more than 30

20  years later, certainly at the time you would have

21  recognized it, correct?

22         MR. BLENK:  Form.

23         THE WITNESS:  There's no way to answer that.

24         BY MR. BRUSTIN:

25         Q.  Well, foremost in your mind from the



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                                          114

```
 1                   Christopher J. Belling
 2   time that Lamarr Scott came in through this trial
 3   was whether or not Lamarr Scott was the shooter or
 4   Valentino Dixon was the shooter, correct?
 5           MR. BLENK:  Form.
 6           THE WITNESS:  That was the significant issue
 7   in the case.
 8           BY MR. BRUSTIN:
 9           Q.   And it remained the significant issue
10   in the case through the trial and the perjury
11   trial, right?
12           A.   Actually, it didn't seem to be much of
13   an issue in the homicide trial itself, but it was a
14   big issue in the perjury trial.
15           BY MR. BRUSTIN:
16           Q.   Well, the reason it wasn't a big issue
17   in the homicide trial is because you -- you charged
18   Leonard Brown and Mario Jarmon with perjury,
19   correct?
20           MR. BLENK:  Form.
21           THE WITNESS:  No.
22           MR. BRUSTIN:  All right.  Let's take a
23   five-minute break.
24           THE VIDEOGRAPHER:  Going off the record.
25   The time is 12:01.
```



```
 1                    Christopher J. Belling

 2           (A recess was then taken at 12:01 p.m.)

 3           THE VIDEOGRAPHER:  Back on the record at a

 4    time of 12:12.

 5           BY MR. BRUSTIN:

 6           Q.   Mr. Belling, just a couple of

 7    follow-ups before I move on.  If you could just

 8    switch the -- if you put that forward, the

 9    testimony forward, I want to go back to the DA

10    file.

11           A.   Okay.

12           Q.   Thank you.  If you could take -- let's

13    start with page 1686.

14           A.   1686.  1686, okay.

15           Q.   Yeah.  This is the letter you're

16    referring to, correct?

17           A.   Yes, it is.

18           Q.   And this letter was written November

19    22nd, 1991?

20           A.   Correct.

21           Q.   More than three months after the

22    shooting?

23           A.   Correct.

24           Q.   And more than two weeks after the Grand

25    Jury had started on November 9th?
```



1                    Christopher J. Belling

2          A.    Correct.

3          Q.    And it was written one day after you

4   met with Antoine Shannon?

5          A.    That's what it says in the letter,

6   yeah.

7          Q.    And you remember your meeting with

8   Antoine Shannon, correct?

9          A.    I do.

10         Q.    In fact, you wrote a letter to his

11  school saying that you didn't think he -- that he

12  wasn't a suspect and in your view had done nothing

13  wrong, correct?

14         A.    I might have.  I don't remember the

15  letter, but that makes sense.

16         Q.    Why didn't you charge Antoine Shannon

17  with perjury given that he claimed Lamarr Scott

18  committed the shooting?

19         A.    Because he didn't commit perjury.

20         Q.    Got it.  Otherwise, you would have?

21         A.    It depends on the circumstances, but he

22  gave a sworn statement.  The sworn statement was

23  not in the context where it was clearly, you know,

24  true or not true.

25         Q.    Gotcha.  There was enough gray area



1                     Christopher J. Belling

2    there where you felt comfortable not charging him?

3           A.   No.  I didn't charge him because I

4    didn't perceive he did any crime.

5           Q.   All right.  And was there something

6    about the interview with Antoine Shannon that

7    caused you to write this letter suggesting that

8    there be follow-up investigation into whether

9    Lamarr Scott was the shooter?

10          A.   I would presume that there probably

11   was.  I got back from Kentucky, and I sat down with

12   the District Attorney and we probably said, you

13   know, there's still some things that need to be

14   looked at here, and the letter was then generated.

15          Q.   Because Antoine Shannon seemed pretty

16   credible and reliable to you, right?

17          A.   No.

18          Q.   Then why did you write a letter on his

19   behalf to the school?

20          A.   I didn't want him to get in trouble at

21   school.

22          Q.   But you didn't believe him any more

23   than you believed Leonard Brown or Lamarr Scott or

24   Mario Jarmon, right?

25          MS. PERSICO:  Form.



```
 1                   Christopher J. Belling
 2          THE WITNESS:  I did not believe his version
 3   of the events, that's correct.
 4          BY MR. BRUSTIN:
 5          Q.   Was there something about the way he
 6   looked or was dressed?
 7          MS. PERSICO:  Form.
 8          THE WITNESS:  No.
 9          BY MR. BRUSTIN:
10          Q.   His mannerisms?
11          A.   No.
12          Q.   What was it about what Mario Jarmon
13   told you that caused you to believe he was lying?
14          MS. PERSICO:  Form.
15          THE WITNESS:  The content.
16          BY MR. BRUSTIN:
17          Q.   In other words, the contents saying
18   that Valentino Dixon wasn't the shooter and Lamarr
19   Scott was?
20          MS. PERSICO:  Form.
21          THE WITNESS:  Well, his biggest issue was
22   the inconsistencies within his statement.
23          BY MR. BRUSTIN:
24          Q.   Okay.  But as you've already told us,
25   oftentimes you get inconsistencies among witnesses
```



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                119

1                    Christopher J. Belling

2    telling the truth about who committed a crime,

3    correct?

4             MS. PERSICO:  Form.

5             THE WITNESS:  I haven't said that.

6             MR. BRUSTIN:  You did actually.

7             MS. PERSICO:  Form.

8             THE WITNESS:  I didn't.

9             BY MR. BRUSTIN:

10            Q.  Oh.  Well, let me ask you again.  Would

11   it be fair to say that on almost every case you try

12   as a homicide DA, there are large -- especially in

13   drug crimes, there are large discrepancies between

14   prosecution witnesses that you call?

15            MS. PERSICO:  Form.

16            MR. RUSS:  Objection to form.

17            THE WITNESS:  I never tried any drug cases.

18   I did try one.

19            BY MR. BRUSTIN:

20            Q.  You didn't try any homicides that were

21   related to drugs in Buffalo?

22            A.  I thought of one as I was driving down

23   here today, but, yeah, not -- not that many.

24            Q.  How is that possible?

25            MS. PERSICO:  Form.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             120

```
 1                  Christopher J. Belling

 2          BY MR. BRUSTIN:

 3          Q.   Weren't the majority of homicides in

 4     Buffalo related to -- related to the sale of drugs?

 5          MS. PERSICO:  Form.

 6          THE WITNESS:  No.

 7          BY MR. BRUSTIN:

 8          Q.   Okay.  Not in the '90s?

 9          MS. PERSICO:  Form.

10          THE WITNESS:  Not to my recollection.

11          BY MR. BRUSTIN:

12          Q.   All right.  In any case, this appears

13     that -- it says:  Obviously after review of the

14     statement it becomes apparent that we have major

15     discrepancies in regard to who committed the murder

16     of Torriano Jackson, right, that's what you write?

17          A.   Okay.

18          Q.   You had major discrepancies on

19     October -- on August 12th when Lamarr Scott and

20     Leonard Brown came in, right?

21          MS. PERSICO:  Form.

22          THE WITNESS:  We had the same discrepancies.

23          BY MR. BRUSTIN:

24          Q.   And what caused you to decide that on

25     November 22nd, three months later, it was time to
```



1              Christopher J. Belling

2    investigate those discrepancies?

3         MS. PERSICO:  Form.

4         THE WITNESS:  I have no idea.

5         BY MR. BRUSTIN:

6         Q.   All right.  Does this -- does the

7    timing of this letter and the content of this

8    letter jog your memory in any way as to any other

9    investigation that you suggested in between August

10   12th and this time?

11        A.   No.

12        Q.   The only thing you remember is --

13   withdrawn.

14        Now, it appears from this letter that by

15   this time you knew Tamara Frieda as the person who

16   owned the red Tracker who was -- whose car was hit

17   by a bullet, correct?

18        A.   Correct.

19        Q.   And so it appears that -- explain this

20   to me.  Maybe I'm just confused.  It certainly

21   appears that you met with Tamara Frieda sometime

22   after this letter, correct?

23        MS. PERSICO:  Form.

24        THE WITNESS:  It does appear that way, yes.

25        BY MR. BRUSTIN:



```
 1                   Christopher J. Belling
 2          Q.    Okay.   Now, one of the things -- so one
 3   of the things we have, we have some rough
 4   transcripts of the statements that you made to the
 5   Georgetown students, which we can use if we need
 6   to, but hopefully we won't need to.  I don't think
 7   there's anything too precise, but if we need to, we
 8   can, and if we need to play something, we can, too,
 9   but let's try without it first.
10          MS. PERSICO:  I'm sorry, what are we trying
11   without?
12          MR. BRUSTIN:  We're going to try to do it
13   without -- without showing him the documents.  I'm
14   just going to ask him some questions about what he
15   said, because he's told us he has a very good
16   memory, and if -- if we don't need to and waste
17   time with it, I'm not going to do it.
18          BY MR. BRUSTIN:
19          Q.    So one of the things in general that
20   you talked to the students about was that you
21   remember being in an interview with Miss Frieda and
22   another detective.  Do you recall telling them
23   that?
24          A.    There was one detective and me.
25          Q.    Right.
```



```
 1                   Christopher J. Belling

 2          A.   Right.

 3          Q.   Good enough.

 4          A.   Okay.

 5          Q.   And you got to her because you had

 6  traced her plate, and that's how you got to her

 7  house, license plate?

 8          A.   That's correct.

 9          MS. PERSICO:  Form.  Can we -- are you

10  asking -- I want to be clear.

11          MR. BRUSTIN:  I'll clarify.

12          BY MR. BRUSTIN:

13          Q.   So now I'm -- let me do -- let me do it

14  a better way, because it wasn't clear.  Let me

15  first ask you straight.  So, first of all, you went

16  to Tamara Frieda's house with another detective,

17  correct?

18          A.   With a detective.

19          Q.   Sorry, with a detective, one detective.

20          A.   Correct.

21          Q.   And you got there because you had

22  traced her plate and learned where she lived?

23          A.   Police traced the plate, yes.

24          Q.   Okay.  And she said that she didn't --

25  when you met with her, she was a nice young women,
```



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                                         124

```
 1                    Christopher J. Belling
 2   right?
 3           MS. PERSICO:  Form.
 4           THE WITNESS:  I don't know.  She seemed like
 5   a person.  I don't know if she was a nice young
 6   woman.  She was a person.
 7           BY MR. BRUSTIN:
 8           Q.  Didn't seem like a drug dealer or
 9   anything like that, right?
10           A.   No.
11           MS. PERSICO:  Form.
12           BY MR. BRUSTIN:
13           Q.  All right.  In fact, I can tell you
14   that she's actually gone on to become a
15   decades-long social worker.  Does that surprise
16   you?
17           MS. PERSICO:  Form.
18           THE WITNESS:  That -- I don't know.  It
19   doesn't mean anything to me.
20           BY MR. BRUSTIN:
21           Q.  Doesn't mean a thing to you?
22           A.   No.
23           Q.  All right.  And she told you she didn't
24   know anything?
25           A.   I think she told us actually that she
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            125

```
 1                   Christopher J. Belling
 2   somehow left before it ever happened.
 3        Q.   Okay.
 4        A.   That she didn't -- but she didn't know
 5   anything, that's correct.
 6        Q.   And one of the things that you told the
 7   students and you also testified to at the perjury
 8   trial, but one of the things you told the students
 9   was that you believe that there was a large
10   credibility gap, that's the term you used, in
11   regard to Miss Frieda because she didn't come
12   forward with the fact that Lamarr Scott was
13   actually the shooter until many years later,
14   correct?
15        MS. PERSICO:   Form.
16        THE WITNESS:   Yes, that's true.
17        BY MR. BRUSTIN:
18        Q.   And you told the students that that was
19   one of the reasons why you found her to be an
20   uncredible witness, correct?
21        MS. PERSICO:   Form.
22        MR. BRUSTIN:   When she came -- when she
23   finally came forward later on.
24        MS. PERSICO:   Mr. Brustin, could you ask the
25   question and wait for him to answer before asking
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              126

```
 1              Christopher J. Belling
 2   the next one.
 3       MR. BRUSTIN:  I'll ask the questions the way
 4   I want.
 5       MS. PERSICO:  Well, if you're not going to
 6   let him answer, then why are you asking the
 7   question?
 8       MR. BRUSTIN:  All right.  I'm not going to
 9   sit here and argue with you.
10       BY MR. BRUSTIN:
11       Q.   So one of the things that you told the
12   students, because you believed it, was that she was
13   not credible when she said Lamarr Scott was the
14   shooter years later because there was such a long
15   gap as to when she came forward?
16       MS. PERSICO:  Form.
17       THE WITNESS:  What I said was that in
18   practical terms 25 years didn't help her
19   credibility any.
20       BY MR. BRUSTIN:
21       Q.   But the point was that she didn't --
22   she didn't come forward and say that Lamarr Scott
23   was the shooter for many years, correct?
24       MS. PERSICO:  Form.
25       THE WITNESS:  True.
```



1              Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   That's what caused you to question her

4    credibility.

5         MS. PERSICO:   Form.

6         THE WITNESS:   25 years later, yes.

7         BY MR. BRUSTIN:

8         Q.   And that's what cause -- and that's

9    what you told the students?

10        A.   Yes.

11        Q.   And -- and certainly by the time that

12   you had met Tamara Frieda -- withdrawn.

13        Another thing that you told the students,

14   and maybe you were just showing off as you told us,

15   but another thing you told the students was that

16   you believed that she conformed her recollection

17   out of convenience years later due to community

18   ground swell?

19        MS. PERSICO:   Form.

20        THE WITNESS:   I think that's out of context,

21   but -- yeah, that's out of context.

22        BY MR. BRUSTIN:

23        Q.   Is that generally what you thought and

24   what you told the students, that you thought that

25   she came forward because other people had come



1                    Christopher J. Belling

2    forward later and she wanted to join with them?

3            MS. PERSICO:  Form.

4            THE WITNESS:  That was one explanation for

5    her coming forward at that point.

6            BY MR. BRUSTIN:

7            Q.   Another explanation you gave to the

8    students was that maybe she just wanted to be on

9    TV.

10           MS. PERSICO:  Form.

11           THE WITNESS:  I do remember saying that.

12           BY MR. BRUSTIN:

13           Q.   And you thought that, right?

14           MS. PERSICO:  Form.

15           THE WITNESS:  It's certainly a possibility.

16           BY MR. BRUSTIN:

17           Q.   Were you telling -- when you were

18   talking to the students, were you trying to tell

19   them the truth?

20           MS. PERSICO:  Form.

21           THE WITNESS:  There was no truth issue

22   involved.  They were asking me about an event in

23   the past, and I told them what I knew about it.

24           BY MR. BRUSTIN:

25           Q.   Well, when you speak to someone about



1                    Christopher J. Belling

2    events, were you attempting to accurately and

3    credibly relay what happened and what -- and what

4    you actually thought?

5              MS. PERSICO:  Form.

6              BY MR. BRUSTIN:

7              Q.   That was a bad question.  When I say

8    were you telling them the truth, what I mean was:

9    Were you accurately portraying to them the best you

10   could what you thought about the case?

11             MS. PERSICO:  Form.

12             THE WITNESS:  I was answering their

13   questions.

14             BY MR. BRUSTIN:

15             Q.   Were you trying to do it honestly?

16             MS. PERSICO:  Form.  You don't need to

17   answer that.

18             BY MR. BRUSTIN:

19             Q.   Were you trying to tell them the truth?

20             MS. PERSICO:  What does that have to do with

21   this?

22             MR. BRUSTIN:  It has to do with the

23   reliability of what he's told them.

24             MS. PERSICO:  Well, why don't we --

25             MR. BRUSTIN:  I'm not going to do it your



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              130

 1                  Christopher J. Belling

 2    way.  I'm going to do it my way.  And don't

 3    instruct him not to answer.  You're already making

 4    improper speaking objections.  Please, just object

 5    to form.

 6          MS. PERSICO:  Well, if you start asking more

 7    proper questions, then I'll stop --

 8          MR. BRUSTIN:  I'm going to ask the questions

 9    the way I want.  You make form objections.  Go

10    ahead.

11          THE WITNESS:  What was the question?

12          BY MR. BRUSTIN:

13          Q.   When you answered the questions that

14    the students asked you, were you trying to tell

15    them the truth?

16          A.   I was trying to tell them the story.

17          Q.   Truthfully?

18          MS. PERSICO:  Form.

19          THE WITNESS:  As I remembered it.

20          BY MR. BRUSTIN:

21          Q.   All right.  Now -- and I think another

22    term that you used on the tape was that she had a

23    come to Jesus moment much later.  Do you remember

24    saying that?

25          A.   I do.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           131

1                    Christopher J. Belling

2          MS. PERSICO:  Form.

3          BY MR. BRUSTIN:

4          Q.   And you meant that, right?  That's what

5    you thought?

6          MS. PERSICO:  Form.

7          THE WITNESS:  Well, it was an expression,

8    and I used it.

9          BY MR. BRUSTIN:

10         Q.   Do you stand by it?

11         MS. PERSICO:  Form.

12         THE WITNESS:  I don't even know what it

13   means really.

14         BY MR. BRUSTIN:

15         Q.   Why did you say it then?

16         MS. PERSICO:  Form.

17         THE WITNESS:  Because it's an expression

18   that explains someone coming out of the woodwork in

19   the future or at a later time talking about an

20   event that was in the past.

21         BY MR. BRUSTIN:

22         Q.   And you reiterated to the students that

23   you thought she did it to get on TV, right?

24         MS. PERSICO:  Form.

25         THE WITNESS:  I did say that.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              132

```
 1                    Christopher J. Belling

 2         BY MR. BRUSTIN:

 3         Q.   That's not a very nice thing to say

 4    about somebody, is it?

 5         MS. PERSICO:  Form.

 6         THE WITNESS:  I think it's neutral.  I don't

 7    know whether it's bad or good.

 8         BY MR. BRUSTIN:

 9         Q.   In any case, back to your interview of

10    her --

11         A.   Right.

12         Q.   -- you and another -- you and a

13    detective --

14         A.   Correct.

15         Q.   -- went and interviewed her, and you

16    determined that she had seen nothing, correct?

17         A.   No.

18         Q.   What did you determine?

19         A.   I determined that she wasn't going to

20    tell us anything.

21         Q.   Okay.  You asked her, you gave her an

22    opportunity to tell you, and she didn't.  That was

23    your view.

24         A.   Correct.

25         Q.   In other words, you thought that she
```



1               Christopher J. Belling

2    had seen the shooting and just wasn't willing to

3    tell you what she saw?

4          MS. PERSICO:  Form.

5          THE WITNESS:  Correct.

6          BY MR. BRUSTIN:

7          Q.   And what, if anything, did you do

8    during that interview to -- withdrawn.

9          You understood through your many years as a

10   homicide DA that oftentimes in Buffalo for a

11   variety of reasons witnesses are reluctant to say

12   what they saw?

13         MS. PERSICO:  Form.

14         THE WITNESS:  Oftentimes witnesses are

15   reluctant to speak, yes.

16         BY MR. BRUSTIN:

17         Q.   For all kinds of reasons, right?

18         A.   I don't know what the reasons are.

19         Q.   Really?  In your experience --

20         MS. PERSICO:  Form.

21         BY MR. BRUSTIN:

22         Q.   -- you don't know that the reasons

23   include things like being afraid?

24         A.   I do not know what the reasons are.

25         Q.   Do you suspect that that might be one



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              134

```
 1              Christopher J. Belling
 2  reason based on your experience?
 3        MS. PERSICO:  Form.
 4        THE WITNESS:  I don't suspect.
 5        BY MR. BRUSTIN:
 6        Q.  You only deal with facts, right?
 7        MS. PERSICO:  Form.
 8        MR. BRUSTIN:  And evidence.
 9        THE WITNESS:  I try to.
10        MS. PERSICO:  Form.
11        BY MR. BRUSTIN:
12        Q.  What, if anything, did you say to Miss
13  Frieda to try to make her comfortable to tell you
14  the truth?
15        A.  As I recall, we thought that Tamara
16  Frieda was the anonymous phone caller, the person
17  that called into the police department and said
18  Valentino Dixon didn't do it.  So we approached it
19  from that.  You know, we -- she said, I'm not -- I
20  wasn't there.  I said, well, your car was there
21  with a bullet hole in it.  I wasn't there.  Well,
22  aren't you the person that called in and said this.
23  No, I'm not that person, I wasn't there, I left
24  early.  And she just continued to deny, deny, deny
25  that she knew anything about it, and that was where
```



```
 1                  Christopher J. Belling
 2   it ended up, where it went.
 3         Q.   So you understood -- withdrawn.
 4         You understand that Tamara Frieda --
 5   withdrawn again.
 6         There's not a single record anywhere in any
 7   of your testimony about Tamara Frieda or in your
 8   statement to the students or in any reports of your
 9   asking her a single question about her being the
10   anonymous caller.
11         MS. PERSICO:  Form.
12         MR. RUSS:  Objection to form.
13         BY MR. BRUSTIN:
14         Q.   Can you explain that?
15         A.   I have no idea why there's no record of
16   that.
17         Q.   And she doesn't remember you asking her
18   anything about the anonymous call.  Is she lying or
19   mistaken?
20         MS. PERSICO:  Form.
21         MR. RUSS:  Objection to form.
22         THE WITNESS:  Either perhaps.  I don't know.
23         BY MR. BRUSTIN:
24         Q.   But you're certain that you said to
25   her, aren't you the anonymous caller?
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                                136

```
 1              Christopher J. Belling
 2       A.   No, I'm not certain of that, but I
 3   think that that was part of the conversation.  You
 4   asked me what the conversation was, and I think
 5   that was part it.
 6       Q.   All right.  So, in other words, when
 7   you spoke to the students and when you spoke to
 8   Tamara Frieda, you understood that she was likely
 9   the person who had called the police on her own and
10   said that Valentino Dixon wasn't the shooter?
11          MS. PERSICO:  Form.
12          THE WITNESS:  It's a compound question.  I,
13   you know --
14          BY MR. BRUSTIN:
15       Q.   You don't understand the question?
16       A.   No, which one do you want me to answer?
17       Q.   You understood when you talked to
18   Tamara Frieda that she was likely the person who
19   had called the police on her own and said Valentino
20   Dixon wasn't the shooter?
21          MS. PERSICO:  Form.
22          THE WITNESS:  There was that possibility,
23   yes.
24          BY MR. BRUSTIN:
25       Q.   Well, Stambach testified that he had
```



CHRISTOPHER J. BELLING                                          April 11, 2023
DIXON V. CITY OF BUFFALO                                                    137

```
 1                 Christopher J. Belling
 2  determined she was that person.
 3        MS. PERSICO:  Form.
 4        BY MR. BRUSTIN:
 5        Q.   Do you dispute that?
 6        A.   I have no idea what Stambach
 7  determined.
 8        Q.   All right.  But you had -- you just had
 9  an inkling.  You weren't certain of it?
10        MS. PERSICO:  Form.
11        THE WITNESS:  I don't think anybody was
12  certain of it.
13        BY MR. BRUSTIN:
14        Q.   All right.  In any case, you understood
15  that it was likely that she was the person who made
16  that call?
17        MS. PERSICO:  Form.
18        THE WITNESS:  My understanding was that the
19  police thought she might have been the person that
20  made the call.
21        BY MR. BRUSTIN:
22        Q.   Okay.  And you went into the interview
23  knowing that this person may have actually tried
24  months before to tell her story about Valentino
25  Dixon not being the shooter?
```



```
 1                    Christopher J. Belling

 2         MS. PERSICO:  Form.

 3         THE WITNESS:  And that's why we wanted to

 4    talk to her, because we wanted to determine whether

 5    Lamarr Scott was the shooter or whether Valentino

 6    was the shooter.

 7         BY MR. BRUSTIN:

 8         Q.   Three months later.

 9         MS. PERSICO:  Form.

10         THE WITNESS:  When we came to it, sure.

11         BY MR. BRUSTIN:

12         Q.   Three months later.

13         A.   When we were in the Grand Jury, yeah.

14         Q.   Did you ask any of the police officers

15    why they didn't go and follow up with her knowing

16    who she was in the days after she claimed that

17    Valentino Dixon wasn't the shooter within days of

18    Lamarr Scott confessing?

19         MS. PERSICO:  Form.

20         MR. RUSS:  Objection to form.

21         MS. PERSICO:  You're being very

22    argumentative.

23         THE WITNESS:  Well, plus, it was compound.

24    The answer is no.

25         MR. BRUSTIN:  Ah, thank you, sir.  It's a
```



 1                    Christopher J. Belling

 2    good objection.  I'll make it a not compound

 3    question.

 4            THE WITNESS:  Okay.

 5            BY MR. BRUSTIN:

 6            Q.   Did you ask the police why they didn't

 7    follow up for three months on Tamara Frieda?

 8            A.   No.

 9            Q.   Would it be fair to say that if you're

10    being honest, you don't recall one way or another

11    whether or not you mentioned to Tamara Frieda when

12    you met with her that she was the person who made

13    that call?

14            MS. PERSICO:  Form.

15            THE WITNESS:  My recollection is that we

16    thought she was and that it was mentioned at that

17    time, because that would be the inducement for her

18    to talk to us.  She had already called in and said

19    Valentino didn't do it, and we said, okay, if he

20    didn't do it, tell us he didn't do it, here we are.

21            BY MR. BRUSTIN:

22            Q.   So there's no mention of that anywhere.

23    Why didn't you mention that in the perjury trial

24    when you testified about why she wasn't reliable?

25            MS. PERSICO:  Form.



1          Christopher J. Belling

2          THE WITNESS:  I don't recall testifying in

3   the perjury trial about her reliability or not

4   other than the fact that she has admitted since

5   then that she lied at the perjury trial, too.

6          BY MR. BRUSTIN:

7          Q.   Fair to say you're making up today for

8   the first time that you talked to Tamara Frieda

9   about that call after having reviewed her

10  testimony?

11         MS. PERSICO:  Form.

12         THE WITNESS:  No.

13         BY MR. BRUSTIN:

14         Q.   All right.  Sir, take a look at your

15  testimony on page 561 and 562.

16         A.   Okay.  So we're in a different book

17  here, I think.

18         Q.   Testimony.

19         A.   Perjury trial testimony?

20         Q.   Yes, please.

21         A.   Exhibit 31, I think?

22         Q.   There it is.

23         A.   Okay.

24         Q.   Last tab.

25         A.   Oh, there we go.  Okay.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           141

```
 1                    Christopher J. Belling

 2          Q.    561.

 3          A.    561.   Okay.   561.   I'm there.

 4          Q.    By the way, when you spoke to Tamara

 5    Frieda, did she tell you -- did you ask her whether

 6    or not she was the person who made the call?

 7          MS. PERSICO:   Form.

 8          THE WITNESS:   I don't recollect her response

 9    to that specifically, no.

10          BY MR. BRUSTIN:

11          Q.    The question is did you ask her.

12          A.    That's what I just said.   I think -- I

13    think we did ask her.   I think we confronted her

14    with it.   Said, look, you already called up and

15    said that it wasn't him so what do you know.

16          Q.    So you knew that she had called, and

17    you believe that she had called and said it wasn't

18    him?

19          MS. PERSICO:   Form.

20          THE WITNESS:   I knew there was an anonymous

21    call, and I was operating under the assumption

22    while interviewing her that it was her that made

23    it.

24          BY MR. BRUSTIN:

25          Q.    And you confronted her with it?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          142

```
 1                    Christopher J. Belling

 2          A.   Yes.

 3          Q.   And, by the way, by that point in time

 4     it was well known that -- by the time you met with

 5     her in late November, it was well known that Mario

 6     Jarmon and Leonard Brown were being prosecuted for

 7     perjury, correct?

 8          A.   No, absolutely not.

 9          Q.   Nobody knew about that?

10          A.   Nobody knew about that.

11          Q.   Nobody knew that they were being

12     accused of perjury?

13          A.   No.

14          Q.   She says she knew.  Is she lying?

15          A.   Yes.  I think she's confabulating, but

16     she's not telling the truth.

17          Q.   All right.  So there was no -- by that

18     point in time nobody had been -- you threatened

19     Mario Jarmon with perjury during the Grand Jury

20     proceedings.

21          MS. PERSICO:  Form.

22          THE WITNESS:  I don't recall that.

23          BY MR. BRUSTIN:

24          Q.   It's on the transcript.

25          A.   I thought the Grand Jury proceeding was
```



1               Christopher J. Belling

2    fairly even-handed.

3        Q.    You testified in the perjury trial

4    about reading him a charge of perjury.

5        A.    I think that was Leonard Brown that I

6    read it to.

7        Q.    Ah, Leonard Brown.  But it was a great

8    big secret that they were going to be charged with

9    perjury?

10       MS. PERSICO:   Form.

11       THE WITNESS:   It was unknown to anybody

12   until January of 1992.

13       BY MR. BRUSTIN:

14       Q.    And, by the way, you don't know whether

15   or not you spoke to Miss Frieda before --

16   withdrawn.

17       Take a look at page 561 and page 562.

18       A.    Okay.

19       Q.    Line 17.

20       A.    17.

21       Q.    Through page 562, line 10.

22       A.    Okay.

23       Q.    Why no mention that Tamara Frieda you

24   believe was the person who called -- called the

25   department and said that Valentino Dixon wasn't the



```
 1               Christopher J. Belling
 2   shooter?
 3        MS. PERSICO:  Form.
 4        THE WITNESS:  Because my suspicion is not
 5   something I can testify to in a trial.
 6        BY MR. BRUSTIN:
 7        Q.   Ah, so you hadn't been able to confirm
 8   that she was the person who called, the woman from
 9   the red Tracker?
10        A.   Correct.
11        Q.   That's the reason you didn't talk about
12   it?
13        A.   Maybe it was just not part of the
14   answer, responsive in the context of what's going
15   on, I have no idea, but you don't just throw stuff
16   in when you're asked a question and trying to
17   answer it.
18        Q.   All right.  Take a look at page -- of
19   the DA file, page 2309.
20        A.   Okay.
21        Q.   Are you there?
22        A.   Yes.
23        Q.   Am I reading this right?  Is this -- is
24   this your notes of your interview with Tamara
25   Frieda?
```



```
 1                    Christopher J. Belling
 2          A.   Yes, it is.
 3          Q.   All right.  And you've got her birth
 4   date on top, right?
 5          A.   Correct.
 6          Q.   And it looks like she was interviewed
 7   with her mom, Brenda Frieda, right?
 8          A.   Correct.
 9          Q.   And no mention here of anything about
10   her anonymous call, correct?
11          A.   Correct.
12          Q.   Not anything -- nothing about it,
13   correct?
14          MS. PERSICO:  Form.
15          THE WITNESS:  Not in these notes.
16          BY MR. BRUSTIN:
17          Q.   You think it may be written somewhere
18   else?
19          A.   I don't think these notes were written
20   at her house.  I don't think these are notes from
21   that interview.
22          Q.   My question is different.  My question
23   is:  Do you think that you wrote some other notes
24   where maybe you mentioned that you confronted her
25   with being the anonymous caller?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          146

```
 1                    Christopher J. Belling

 2          A.    No.

 3          Q.    These are your notes of that

 4    conversation, correct?

 5          A.    No.

 6          Q.    Well, what are they?

 7          A.    I think these are my notes in my office

 8    when she showed up pursuant to her Grand Jury

 9    subpoena.

10          Q.    Okay.  And how do you know that?

11          A.    Just based upon the format and based

12    upon where they are in the file.

13          Q.    So it looks like you conducted a second

14    substantive interview of Miss Frieda.

15          A.    Correct.

16          Q.    And I take it at that time did you also

17    ask her again, do you want to talk to us about the

18    anonymous call you made?

19          MS. PERSICO:  Form.

20          THE WITNESS:  I don't know if I asked her

21    that at that time.

22          BY MR. BRUSTIN:

23          Q.    Why not?

24          A.    Because I don't -- I don't remember.  I

25    didn't write it down and I don't remember.
```



```
 1                 Christopher J. Belling
 2        Q.    Okay.  And what about this document
 3   makes you think this is from your interview with
 4   her in connection with the subpoena as opposed to
 5   when you went to her house?
 6        A.    Because I don't remember her mother
 7   being at the interview at her house.
 8        Q.    You remember her being in the office
 9   when she --
10        A.    The note reflects that she was present
11   with her mother, and that would be in the office.
12        Q.    You're certain about that?
13        A.    As best as these notes refresh my
14   recollection.
15        Q.    Take a look at page 2438.  And while
16   you're looking, why did you tell the law students
17   that she didn't come forward for years if you
18   believed that she was the person who made the
19   anonymous call?
20        MS. PERSICO:  Form.
21        THE WITNESS:  Now that I found the page you
22   wanted me to find, do you want to ask the question?
23        BY MR. BRUSTIN:
24        Q.    Sure.  Why did you tell the law
25   students if you knew that she was the person who
```



```
 1                    Christopher J. Belling
 2   made the anonymous call saying that Valentino Dixon
 3   was not the shooter and nobody followed up with her
 4   on that call for three months, why did you tell the
 5   law students that she only came forward to be on TV
 6   years later?
 7           MS. PERSICO:  Form.
 8           THE WITNESS:  I was referring to her claim
 9   that Lamarr Scott was the shooter and that she saw
10   him that night.
11           BY MR. BRUSTIN:
12           Q.   But she called within days.
13           MS. PERSICO:  Form.
14           BY MR. BRUSTIN:
15           Q.   Trying -- did you see her testimony
16   that she said she called from her therapist's
17   office?
18           A.   I don't remember that, no.
19           Q.   She testified that she was so
20   distraught over what she saw that she went and saw
21   a therapist, and after communicating with the
22   therapist, she decided that she would make an
23   anonymous call to the police department and tell
24   them what she saw.
25           MS. PERSICO:  Form.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             149

```
 1                  Christopher J. Belling

 2          BY MR. BRUSTIN:

 3          Q.   Any reason to dispute that?

 4          A.   I don't know anything about that.

 5          Q.   Well, based on the document that you

 6   reviewed concerning her anonymous call, it appears

 7   that she was trying -- she was trying to tell them

 8   that Valentino Dixon was the shooter but she was

 9   scared.

10          MS. PERSICO:  What document are you talking

11   about?

12          BY MR. BRUSTIN:

13          Q.   So take a look at -- well, before we go

14   there, let's just finish this page first.  You have

15   notes here on Tamara Frieda, correct?

16          A.   On 2438?

17          Q.   Yes.

18          A.   Yes.

19          Q.   No mention of her being the anonymous

20   caller, right?

21          A.   Correct.

22          Q.   Take a look at -- take a look at page

23   2275.

24          A.   Okay.

25          Q.   And what is this, please?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             150

```
 1                   Christopher J. Belling

 2          A.    It appears to be a phone message slip.

 3          Q.    Do you know anything else about it?

 4          A.    It reflects that Tamara Frieda called

 5   and left a message for me.

 6          Q.    In late December?

 7          A.    December 27th.

 8          Q.    Do you know what this is about?

 9          A.    I presume it's in response to the Grand

10   Jury subpoena.

11          Q.    Okay.  Now, take a look at the police

12   file that's already been marked as Exhibit 2.

13          A.    Okay.

14          Q.    And take a look at page --

15          MS. PERSICO:  Can you hang on one second?  I

16   just want to grab the --

17          THE WITNESS:  Okay.  What page?  Go ahead.

18          BY MR. BRUSTIN:

19          Q.    203, BPD203.

20          A.    BPD -- oh, okay.  They're on the other

21   side.  203.  Yeah.

22          Q.    This is the report that you claim to

23   have asked Tamara Frieda about when you went to see

24   her in November?

25          MS. PERSICO:  Form.
```



1                    Christopher J. Belling

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   Have you reviewed this in preparation

5     for today?

6          A.   I've seen it, yes.

7          Q.   And here she is, according to Stambach,

8     she is identifying herself by everything other than

9     name, correct?

10         MS. PERSICO:  Form.

11         THE WITNESS:  She said she was the girl from

12    the red Tracker.

13         BY MR. BRUSTIN:

14         Q.   That's a form of identifying herself,

15    correct?

16         A.   Yes.

17         MS. PERSICO:  Form.

18         BY MR. BRUSTIN:

19         Q.   It suggests a woman who is -- or a girl

20    who is afraid but is reluctantly telling the police

21    who she is.

22         MS. PERSICO:  Form.

23         BY MR. BRUSTIN:

24         Q.   That's what it suggests, correct?

25         A.   Sure.



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                             152

```
 1                   Christopher J. Belling
 2         Q.   And she's saying that Valentino was not
 3   the shooter, correct?
 4         A.   That's what she said.
 5         Q.   Indicating that she saw who the shooter
 6   was?  In fact, she's saying that she would make --
 7         MS. PERSICO:  Form.
 8         BY MR. BRUSTIN:
 9         Q.   I'll withdraw the question.  Fair
10   enough.
11         She is making clear, according to Stambach,
12   if he's accurately documenting it, she is telling
13   him that she will make an attempt to look at
14   pictures and see if she can identify the shooter,
15   correct?
16         A.   No.
17         Q.   She did say she could look at pictures
18   and make an identification of the people that were
19   there.  She would not say if she could identify the
20   shooter.  In other words, she couldn't say one way
21   or the other.
22         MS. PERSICO:  Form.
23         THE WITNESS:  She said two things.  She'll
24   look at pictures to see if she could say who was
25   there.  Number 2, she would not say if she could
```



1                    Christopher J. Belling

2    identify the shooter.

3         BY MR. BRUSTIN:

4         Q.   All right.   Let's make it real simple.

5    This is October 14th, two days after Lamarr Scott

6    in an extraordinary turn of events comes in and

7    confesses to the murder, correct?

8         MS. PERSICO:   You mean August 14th.

9         MR. BRUSTIN:   August 14th.

10        THE WITNESS:   Yes.

11        BY MR. BRUSTIN:

12        Q.   So what any competent detective with a

13   pulse would do at this point is to go to Tamara

14   Frieda immediately and interview her and show her

15   photos, correct?

16        MS. PERSICO:   Form.

17        MR. RUSS:   Objection to form.

18        THE WITNESS:   And the answer is I don't know

19   what they would do.

20        BY MR. BRUSTIN:

21        Q.   Does that seem like something that you

22   might expect a homicide detective to do, to follow

23   up with this alleged eyewitness who says Valentino

24   Dixon isn't the shooter after Lamarr Scott came and

25   confessed?



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              154

1              Christopher J. Belling

2         MS. PERSICO:  Form.  Calls for speculation.

3         MR. RUSS:  Objection to form.

4         THE WITNESS:  I don't know.  I have no

5    expectations.

6         BY MR. BRUSTIN:

7         Q.   And I take it when you went to Tamara

8    Frieda you didn't -- that didn't strike you as odd.

9    How come nobody followed up with this?

10        MS. PERSICO:  Form.

11        THE WITNESS:  I don't know if it struck me

12   as odd or not.  We were following up on it then and

13   there.

14        BY MR. BRUSTIN:

15        Q.   Okay.  And what you wanted to do, and

16   it sounds like you did this, even though she denies

17   it, is to go to her and say, look, we're really

18   sorry that we didn't come to you before, we know

19   you called us, we just want the truth.  Is that

20   what you said to her?

21        MS. PERSICO:  Form.

22        THE WITNESS:  I'd have to answer no, because

23   your compound question again.  You got two things

24   in there.

25        BY MR. BRUSTIN:



```
 1              Christopher J. Belling
 2         Q.   Ah, it was too compound.  So you didn't
 3    ask her -- you didn't say a word to her about the
 4    anonymous call because that didn't help your case
 5    against Valentino Dixon; isn't that true?
 6         MS. PERSICO:  Form.
 7         THE WITNESS:  No, no, absolutely not.
 8         BY MR. BRUSTIN:
 9         Q.   Did you ever ask anybody whether or not
10    they showed her pictures?
11         MS. PERSICO:  Form.
12         THE WITNESS:  I don't recall asking anybody
13    whether or not they showed her photos.
14         BY MR. BRUSTIN:
15         Q.   That would be an important question,
16    right?
17         MS. PERSICO:  Form.
18         THE WITNESS:  It would be.
19         BY MR. BRUSTIN:
20         Q.   To the best of your recollection, you
21    never noticed any gaps in the police investigation
22    into Tamara Frieda; fair to say?
23         MS. PERSICO:  Form.
24         THE WITNESS:  No.
25         MR. RUSS:  Objection to form.
```



1                   Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   Do you agree with me or no?

4         A.   I do not agree with you.

5         Q.   Ah.  So you did notice that this should

6    have been followed up on and it wasn't?

7         MS. PERSICO:  Form.

8         MR. RUSS:  Objection to form.

9         THE WITNESS:  I think it was followed up on.

10        BY MR. BRUSTIN:

11        Q.   All right.  And you said you went with

12   a detective.  Do you remember which detective you

13   went with?

14        MS. PERSICO:  Form.

15        THE WITNESS:  I don't remember if it was a

16   DA's investigator or a detective.  I think it was a

17   detective, and I don't remember which one.

18        BY MR. BRUSTIN:

19        Q.   Well, you testified both at the perjury

20   trial and here that it was a detective from the

21   BPD.

22        A.   Okay.

23        Q.   Do you have any reason to dispute that?

24        A.   No.

25        Q.   Can you explain why there's no report



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                               157

```
 1              Christopher J. Belling
 2  from that interview from the BPD detective?
 3         MS. PERSICO:  Form.
 4         THE WITNESS:  No.
 5         MR. RUSS:  Objection to form.
 6         BY MR. BRUSTIN:
 7         Q.   During that interview, I take it -- do
 8  you know if it was Stambach?  Could it have been
 9  Stambach?
10         A.   It could have been.  He was one of the
11  detectives on the case.
12         Q.   All right.  And certainly it was a
13  joint interview, correct?
14         MS. PERSICO:  Form.
15         THE WITNESS:  You mean, both he and I were
16  talking?
17         MR. BRUSTIN:  Yes, sir.
18         THE WITNESS:  Yes.
19         BY MR. BRUSTIN:
20         Q.   And you were both taking notes?
21         MS. PERSICO:  Form.
22         THE WITNESS:  I probably wasn't taking
23  notes.
24         BY MR. BRUSTIN:
25         Q.   Do you remember if the detective was?
```



CHRISTOPHER J. BELLING                                           April 11, 2023
DIXON V. CITY OF BUFFALO                                                     158

```
 1                   Christopher J. Belling
 2          A.    I do not.
 3          Q.    Do you have an understanding as to why
 4    there was no police report, P-73, created of that
 5    interview?
 6          A.    Not a clue.
 7          Q.    It's an important interview, right?
 8          MR. RUSS:  Objection to form.
 9          MS. PERSICO:  Form.
10          THE WITNESS:  In the long run, no.
11          BY MR. BRUSTIN:
12          Q.    That day when you left there, did you
13    think that was an important interview?
14          A.    No.
15          Q.    The fact that she contradicted what she
16    had said when she made an anonymous call saying
17    Valentino Dixon wasn't the shooter, not a
18    significant interview?
19          MS. PERSICO:  Form.
20          THE WITNESS:  That day she was a nonwitness,
21    so it didn't matter.
22          BY MR. BRUSTIN:
23          Q.    You have no problem with no P-73 being
24    created by the police department?
25          MS. PERSICO:  Form.
```



1                    Christopher J. Belling

2          MR. RUSS:  Objection to form.

3          THE WITNESS:  It's not my job to have a

4    problem with the police department.

5          BY MR. BRUSTIN:

6          Q.   That's their issue, not yours?

7          MS. PERSICO:  Form.

8          THE WITNESS:  Not my issue.

9          MR. RUSS:  Objection to form.

10         BY MR. BRUSTIN:

11         Q.   Now, according to Stambach, he gave

12   this report, page 203, to you within days of it

13   being made.  Do you have any reason to dispute

14   that?

15         MS. PERSICO:  Form.

16         MR. RUSS:  Objection to form.

17         THE WITNESS:  Well, he gave -- I don't know

18   whether he gave it to me or how I got it, but I

19   would have gotten it within a few days of it being

20   created.

21         BY MR. BRUSTIN:

22         Q.   Okay.  So, in other words, you were

23   aware certainly by let's say mid-August, August

24   15th, or let's say August 20th, of this call from

25   Tamara -- from the person who you believe was in



```
 1                   Christopher J. Belling
 2   the red Tracker?
 3          MS. PERSICO:  Form.
 4          THE WITNESS:  Who the report says was in the
 5   red Tracker.
 6          MR. BRUSTIN:  Right.
 7          THE WITNESS:  Yeah.
 8          BY MR. BRUSTIN:
 9          Q.   And why -- and I take it you took no
10   steps to follow up on this yourself, correct, until
11   November?
12          A.   I myself did not, no.
13          Q.   All right.  And you didn't direct
14   anybody else to follow up on it when you read it?
15          A.   Not that I remember.  I may have called
16   over and said, you know, did we do anything more on
17   this but --
18          Q.   And can you explain why you waited two
19   and a half months to follow up on this?
20          MS. PERSICO:  Form.
21          THE WITNESS:  Just the timing of the -- the
22   events, the Grand Jury presentation.
23          BY MR. BRUSTIN:
24          Q.   Look at the police file, page 258.
25   Have you reviewed this document?
```



```
 1                    Christopher J. Belling

 2          A.    No.

 3          Q.    This is a document from -- and as

 4    you've told us, you were in close communication

 5    with Detective Stambach and other detectives during

 6    the course of this investigation, correct?

 7          A.    No, I didn't tell you that.

 8          Q.    Well, you did, but --

 9          MR. RUSS:  Form.

10          THE WITNESS:  No, I didn't.

11          MR. BRUSTIN:  You did, but that's okay.  The

12    record will be what it is.

13          BY MR. BRUSTIN:

14          Q.    In any case, is it -- is it your

15    testimony that Detective Stambach -- withdrawn.

16          Based on reviewing this document, does it

17    appear that you did not interview Miss Frieda until

18    sometime after December 5th, 1991?

19          MS. PERSICO:  Form.

20          THE WITNESS:  That -- that's probably the

21    chronology.  I can't tell one way or another, but

22    it would not have made sense for -- if they had

23    interviewed her on the 5th, then I wouldn't have

24    had to be involved in the finding of her interview.

25          BY MR. BRUSTIN:
```



```
 1                     Christopher J. Belling

 2         Q.   All right.  So, in other words, it

 3   appears that Stambach on December 5th, 1991, went

 4   to interview her.  She wasn't home, and then

 5   sometime later you went to interview her, correct?

 6         MS. PERSICO:  Form.

 7         THE WITNESS:  That's the extrapolation you

 8   can make.

 9         BY MR. BRUSTIN:

10         Q.   And you have no idea when in December

11   or January that was; fair to say?

12         A.   Before the Grand Jury was concluded in

13   January.

14         Q.   Sometime before the conclusion of the

15   Grand Jury in January?

16         A.   Correct.

17         Q.   It could have been the day before?

18         A.   Could have been.

19         Q.   But it was -- based on the

20   documentation, it appears it was after 12/5/91?

21         MS. PERSICO:  Form.

22         THE WITNESS:  It appears that way.

23         BY MR. BRUSTIN:

24         Q.   And you don't have any understanding as

25   to how Detective Stambach -- withdrawn.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           163

```
 1                  Christopher J. Belling
 2            Fair to say you don't have any understanding
 3    as to why Detective Stambach went to see her on
 4    December 5th, 1991?
 5            MS. PERSICO:  Form.
 6            THE WITNESS:  I think that's one of the
 7    things that's in my letter from November asking
 8    them to do, so, again, extrapolating, there you go.
 9            BY MR. BRUSTIN:
10            Q.   Okay.  And why doesn't your letter, by
11    the way, reference the anonymous call?
12            MS. PERSICO:  Form.
13            THE WITNESS:  I don't know.
14            MR. RUSS:  Objection to form.
15            BY MR. BRUSTIN:
16            Q.   Isn't that -- you were writing a letter
17    to the detectives.  16 -- and, by the way, this is
18    you writing to Chief Donovan telling him what you
19    want investigated, correct?
20            A.   Correct.
21            Q.   You're not asking for a favor or if he
22    feels like doing it.  You're telling him, this is
23    what I need you to do, correct?
24            A.   Yeah, in general terms, yes.
25            Q.   And, in fact, you're even telling him
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              164

1                    Christopher J. Belling

2    that you want to be present for these interviews if

3    possible.

4            A.   Yes.

5            MS. PERSICO:   Form.

6            BY MR. BRUSTIN:

7            Q.   And you're telling him the people --

8    these are the people who need to be located and

9    interviewed, correct?

10           A.   That's what it says.

11           Q.   Not a suggestion.   It's a direction,

12   correct?

13           MS. PERSICO:   Form.

14           THE WITNESS:   No, it's a statement.

15           BY MR. BRUSTIN:

16           Q.   That you intended to be followed; fair

17   to say?

18           MS. PERSICO:   Form.

19           THE WITNESS:   That I made to them.

20           BY MR. BRUSTIN:

21           Q.   And you're giving descriptions of the

22   people you want them to interview?

23           A.   Correct.

24           Q.   For example, for Mario Jarmon you

25   write:  He is one of the victims of the shooting



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              165

```
 1                  Christopher J. Belling
 2  who has all along claimed that he was not shot by
 3  Valentino Dixon.
 4          A.   That's what the line says, yes.
 5          Q.   And then for Tamara Frieda who owned a
 6  red and white Geo Tracker which was hit by a stray
 7  bullet at the scene, and you give -- her auto
 8  registration reflects an address of 40 West Balcom
 9  Street.
10          A.   That's what it says.
11          Q.   But no mention that the important thing
12  to follow up with her on is when she called the
13  police department and said Valentino Dixon wasn't
14  the shooter, correct?
15          MS. PERSICO:  Form.
16          THE WITNESS:  It's not mentioned in the
17  letter, you are correct.
18          BY MR. BRUSTIN:
19          Q.   But you do mention, for example,
20  what -- what is important about what Mario Jarmon
21  says, correct?
22          A.   No.
23          MS. PERSICO:  Form.
24          BY MR. BRUSTIN:
25          Q.   He claimed that he was not shot by
```



1              Christopher J. Belling

2   Valentino Dixon.

3         MS. PERSICO:  Is there a question?

4         BY MR. BRUSTIN:

5         Q.   That's what you want followed up on,

6   among other things, right?

7         MS. PERSICO:  Form.

8         THE WITNESS:  That's one of the things I

9   stated in the letter for them to follow up on, yes.

10         MR. BRUSTIN:  All right.

11         MR. RUSS:  If you're moving on, can you just

12   say the page number?  I missed that.

13         MR. BRUSTIN:  1686 and 87.

14         MR. RUSS:  Thank you.

15         MR. BRUSTIN:  So I think this is a

16   reasonable time to stop for lunch.

17         MS. PERSICO:  Sure.

18         MR. BRUSTIN:  Can we shoot for 45 minutes?

19   It may not be possible but give it a shot, though.

20         MS. PERSICO:  I think it's probably

21   possible.

22         THE VIDEOGRAPHER:  Going off the record at a

23   time of 1301 as indicated on the video screen.

24         (A luncheon recess was taken at 1:00 p.m.)

25         THE VIDEOGRAPHER:  We are back on the record



```
 1                    Christopher J. Belling
 2   at a time of 1346.
 3        BY MR. BRUSTIN:
 4        Q.   All right.  And I think you were --
 5   when we left, if you can go back to page 2309, your
 6   notes on meeting with Miss Frieda.
 7        A.   2309.  Here we go.  I got it.  I got
 8   it.  I got it.
 9        Q.   And you were telling us that you
10   thought that these were notes that you took from
11   your meeting with her in connection with the
12   perjury trial before she testified, correct?
13        A.   No.
14        Q.   Do you think you met with her -- you
15   didn't meet with her in connection with the perjury
16   trial?
17        A.   No.
18        Q.   Are you sure about that?
19        A.   Yes.
20        Q.   When did you become -- when did you
21   stop being the prosecutor in the perjury trial and
22   become a witness?
23        A.   I think right after the case was
24   indicted.
25        Q.   Okay.  All right.  I want to ask you
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              168

```
 1              Christopher J. Belling
 2  some questions -- all right.  I want to ask you
 3  some questions about Emil Adams, and for this,
 4  first of all, let's start with the DA file, and I
 5  want to ask you about a few documents.  If you can
 6  take a look at 2910.  Is that a different document?
 7       A.   Well, it's not 2910, because this ends
 8  at 2439.
 9       MR. BRUSTIN:  Is that a second binder?  Give
10  me the binder.
11       MR. SOTO-BRITO:  It's the compilation of
12  Jarmon and Brown perjury file documents.
13       MR. BRUSTIN:  So let's mark that as Exhibit
14  32, please.
15  The following was marked for Identification:
16   EXH. 32              compilation of Jarmon and
17                        Brown perjury file documents
18       BY MR. BRUSTIN:
19       Q.   2910.  These are some documents we
20  pulled out of the perjury file from the DA's
21  office, and they are consecutive but they're not --
22  they don't have all of the documents in there, just
23  the ones we needed potentially.
24       So if you take a look at 2910 and 2911.
25       A.   Okay.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           169

```
 1              Christopher J. Belling
 2         Q.   Does this refresh your recollection, or
 3    maybe you don't need it.  Do you recall
 4    testifying -- withdrawn.
 5         Do you recall making efforts to -- to reach
 6    out to Emil Adams and law enforcement in Michigan
 7    concerning Emil Adams?
 8         A.   Yes.
 9         MS. PERSICO:  I'm sorry, are we talking
10    about in connection with the perjury trial or just
11    generally asking?
12         MR. BRUSTIN:  I'm asking him generally.  In
13    fact, in both trials, right?
14         THE WITNESS:  I didn't do the perjury trial,
15    so I don't know.
16         BY MR. BRUSTIN:
17         Q.   You recall reaching out to him in
18    connection with the -- with the Valentino Dixon
19    trial?
20         A.   Correct.
21         Q.   Okay.  And it was very difficult to get
22    him to come to trial, correct?
23         A.   It was challenging.
24         Q.   And you actually ended up sending a
25    couple detectives out there to go get him, correct?
```



CHRISTOPHER J. BELLING                                  April 11, 2023
DIXON V. CITY OF BUFFALO                                          170

1              Christopher J. Belling

2         MS. PERSICO:  Form.

3         THE WITNESS:  I honestly don't remember.  I

4    remember he was in Michigan and we had to arrange

5    to get him back, and I don't know the mechanism

6    that was pursued at this point.

7         BY MR. BRUSTIN:

8         Q.   Okay.  And one of the things you

9    mentioned to the students at Georgetown and it's

10   consistent with other information that we have in

11   the file is that -- I don't know if you can

12   remember specifically, but that Emil Adams had some

13   legal issues going on in Michigan around the time

14   of the trial.  Do you recall that?

15        A.   I recollect that he did have some legal

16   issues, yes.

17        Q.   Okay.  And I know it's a long time ago,

18   but I want to know a couple of things.  One is,

19   what's your recollection as best you can as to what

20   his legal issues were in Michigan at the time?

21   And -- that's the first question.

22        A.   Okay.  First question, I don't

23   remember.  I knew he had some issues in Michigan,

24   that's all.

25        Q.   Okay.  You don't remember whether it



1              Christopher J. Belling

2    was in connection with an ongoing prosecution or

3    investigation that was going on?  Some criminal

4    involvement that there was -- withdrawn.

5         Would it be fair to say that there was

6    some -- some -- something going on with the

7    criminal justice system and Emil Adams in Michigan

8    to the best of your recollection?

9         MS. PERSICO:  Form.

10        THE WITNESS:  That's correct.

11        BY MR. BRUSTIN:

12        Q.  And you just can't remember today what

13   it was?

14        A.   Correct.

15        Q.  But you do remember having -- even

16   though you don't remember the substance, you

17   remember having conversations about local law

18   enforcement concerning Emil Adams?

19        MS. PERSICO:  Form.

20        THE WITNESS:  I remember having to talk to

21   people in Michigan who were involved in law

22   enforcement to arrange for Emil Adams to come back

23   to Buffalo.

24        BY MR. BRUSTIN:

25        Q.  And also, I take it, talking about his



1                   Christopher J. Belling

2   criminal situation in Michigan.

3        MS. PERSICO:  Form.

4        MR. BRUSTIN:  Even though you can't remember

5   the specifics.

6        THE WITNESS:  I don't know what his

7   situation was, so I don't remember what I talked to

8   them about.  I remember we had to do something with

9   Michigan getting him back.

10       BY MR. BRUSTIN:

11       Q.   And you don't remember how you learned

12  about his criminal issues in Michigan?

13       A.   No.

14       Q.   Only that they existed?

15       A.   Yes, that's correct.

16       Q.   But you remember learning about those

17  criminal issues at or around the time you were

18  trying to get him to come to testify, correct?

19       MS. PERSICO:  Form.

20       THE WITNESS:  Yes, that's true.

21       BY MR. BRUSTIN:

22       Q.   And you remember as a general matter

23  that those criminal issues were one of the

24  impediments in your -- at least in your mind to him

25  coming to testify?



 1                    Christopher J. Belling

 2          MS. PERSICO:  Form.

 3          THE WITNESS:  It was a problem.  It wasn't

 4   an impediment.

 5          BY MR. BRUSTIN:

 6          Q.   One of -- one of the things that was

 7   causing you a problem in getting him to come

 8   testify was his ongoing criminal issues in

 9   Michigan, correct?

10          MS. PERSICO:  Form.

11          THE WITNESS:  No.  One of the things making

12   it difficult for him to physically be in Buffalo

13   was whatever was going on in Michigan.

14          BY MR. BRUSTIN:

15          Q.   The criminal issues in Michigan?

16          A.   Whatever was going on in Michigan.

17          Q.   In other words, there was -- there was

18   a process going on in Michigan that was making it

19   difficult for him to come out of state; is that

20   what you're saying?

21          A.   No.

22          MS. PERSICO:  Form.

23          BY MR. BRUSTIN:

24          Q.   There were things happening in Michigan

25   with the criminal justice system that, to your



1                        Christopher J. Belling

2    understanding, made it difficult for him to come?

3            MS. PERSICO:  Form.  Asked and answered.

4            THE WITNESS:  No.

5            BY MR. BRUSTIN:

6            Q.   So what was your understanding as to

7    what was going on in Michigan?

8            A.   I don't remember.  He was in Michigan.

9    That's what I remember.

10           Q.   Okay.  And do you recall providing any

11   assistance with him concerning any potential

12   criminal issues in Michigan as a result of his

13   cooperation in this case?

14           MS. PERSICO:  Form.

15           THE WITNESS:  I do not specifically

16   remember.

17           BY MR. BRUSTIN:

18           Q.   Do you remember anything in general

19   about talking to law enforcement to try to assist

20   him or at least let them know that he was

21   cooperating in your case?

22           MS. PERSICO:  Form.

23           THE WITNESS:  And that's fairly standard

24   what -- how I would have done it.  I would have

25   told him, I'll talk to whatever law enforcement is



| | |
|---|---|
| 1 | Christopher J. Belling |
| 2 | on the other end telling them you cooperated. |
| 3 | BY MR. BRUSTIN: |
| 4 | Q.   And you remember that broadly.  You |
| 5 | just can't remember the specifics? |
| 6 | MS. PERSICO:  Form. |
| 7 | THE WITNESS:  Correct. |
| 8 | BY MR. BRUSTIN: |
| 9 | Q.   Is that correct? |
| 10 | A.   Correct. |
| 11 | Q.   But, in any case, it was very difficult |
| 12 | for a variety of reasons to get him to come and |
| 13 | testify, correct? |
| 14 | MS. PERSICO:  Form. |
| 15 | THE WITNESS:  It was difficult. |
| 16 | BY MR. BRUSTIN: |
| 17 | Q.   And that limited the amount of time |
| 18 | that you were able to spend with him in preparation |
| 19 | for trial; fair to say? |
| 20 | MS. PERSICO:  Form. |
| 21 | THE WITNESS:  I don't know. |
| 22 | BY MR. BRUSTIN: |
| 23 | Q.   Do you have any recollection as you sit |
| 24 | here today of meeting with Mr. Adams before trial |
| 25 | concerning what he observed on the day of the crime |



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              176

1                   Christopher J. Belling

2    and what transpired with the police during the

3    investigation?

4          MS. PERSICO:  Form.

5          THE WITNESS:  I don't recall that -- those

6    conversations, no.

7          BY MR. BRUSTIN:

8          Q.   Okay.  And is it your testimony that

9    you don't believe that you met with him prior to

10   the trial or you just can't recall one way or

11   another whether you did?

12         A.   I can't recall whether I did or not.

13         Q.   Do you expect that you would have had

14   some form of meeting with him?

15         A.   Yes.

16         Q.   Okay.  And certainly you would have met

17   with the detectives who interacted with him before

18   trial, correct?

19         MS. PERSICO:  Form.

20         THE WITNESS:  No.

21         BY MR. BRUSTIN:

22         Q.   Well, you -- you've already told us

23   that you were talking to the detectives throughout

24   the case, including Stambach, about the activities

25   they conducted, correct?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              177

1                        Christopher J. Belling

2          A.    When the need arose, I talked to them

3    about what they did in the case, yeah.

4          Q.    Okay.  But primarily you were relying

5    on their police reports as to what transpired; fair

6    to say?

7          A.    I think that's fair to say.

8          Q.    All right.  So let's take a look at

9    some of the police reports in this case.  So, first

10   of all, if you take a look at -- going back to the

11   police file.

12         MR. RUSS:  Exhibit 2?

13         MR. BRUSTIN:  Yes, please.

14         BY MR. BRUSTIN:

15         Q.    Take a look and start at page 47.

16         A.    What was that number again?

17         Q.    47.

18         A.    Okay.  I've got it.

19         Q.    And this is one of the reports

20   concerning Emil Adams' alleged identification of

21   Valentino Dixon as the shooter, correct?

22         A.    His identification.  Yes, this is the

23   document, the P-73 about the process.

24         Q.    Okay.  And, by the way, there's been

25   some discrepancy in the case as to whether or not



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            178

1                    Christopher J. Belling
2    Detective Stambach was present for this
3    identification procedure.  Do you recall one way or
4    another whether he was or not?
5              MS. PERSICO:  Form.
6              MR. RUSS:  Objection to form.
7              THE WITNESS:  I have no idea.
8              BY MR. BRUSTIN:
9         Q.   Okay.  But certainly this is one of the
10   key documents that you reviewed in preparation for
11   Grand Jury and trial, correct?
12             MS. PERSICO:  Form.
13             THE WITNESS:  No.
14             BY MR. BRUSTIN:
15        Q.   The -- the initial identification
16   procedure that was conducted with -- with Emil
17   Adams was not an important document that you
18   reviewed?
19             MS. PERSICO:  Form.
20             THE WITNESS:  It was not a document that I
21   reviewed -- reviewed in regard to Grand Jury or
22   trial, no.
23             BY MR. BRUSTIN:
24        Q.   Well, how would you know what happened
25   during the ID procedure, how he came to identify



1            Christopher J. Belling

2   Valentino Dixon if you didn't review this document?

3         A.   Well, I undoubtedly read this document,

4   but I didn't -- it wasn't an important document to

5   review at those other stages you talked about.

6         Q.   All right.  But certainly you

7   understood that according to this police report and

8   according to your discussions with the detectives,

9   Emil Adams identified Valentino Dixon from a

10  properly conducted six-person photo array, correct?

11        MS. PERSICO:  Form.

12        THE WITNESS:  That was my understanding,

13  yes.

14        BY MR. BRUSTIN:

15        Q.   And that there was -- and that it was

16  your understanding that there was no suggestion as

17  to who he should pick, correct?

18        A.   I didn't know of any suggestion.

19        Q.   Okay.  And that he positively

20  identified -- in other words, you understood

21  through this report and others that he positively

22  identified Valentino Dixon through a properly

23  conducted six-person photo array, correct?

24        A.   That's what the document reflects, yes.

25        Q.   And you never received any information



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              180

```
 1              Christopher J. Belling
 2  from any detective to the contrary, correct?
 3       A.   Not that I recall.
 4       Q.   And as you said, you have no
 5  recollection of discussing any of this with Emil
 6  Adams, correct?
 7       A.   Correct.
 8       Q.   Now, if you take a look at page 30.
 9       A.   Okay.
10       Q.   And do you recall reviewing BPD30
11  through 32, the statement of Emil Adams taken by
12  Mark Stambach?
13       A.   I don't recall reviewing it, but I
14  certainly would have.
15       Q.   Okay.  Take a look at page 25.  And by
16  the way, before you leave that -- withdrawn.
17       Take a look at page 25.
18       A.   Okay.
19       Q.   And read this if you haven't reviewed
20  it in preparation for today.
21       MR. RUSS:  I'm sorry, what page?
22       MR. BRUSTIN:  25.
23       BY MR. BRUSTIN:
24       Q.   Just let me know when you're ready.
25       A.   Okay.  I've read it.
```



```
 1                    Christopher J. Belling
 2          Q.   And you -- certainly this is a -- this
 3    is a report that you would have reviewed early on
 4    in the investigation, correct?
 5          MS. PERSICO:  Form.
 6          THE WITNESS:  I have no doubt I did, yes.
 7          BY MR. BRUSTIN:
 8          Q.   Okay.  And you would agree that
 9    according to this report from Detective Stambach,
10    Emil Adams was first interviewed, gave a sworn
11    statement, after which time he was shown a photo
12    array with six pictures and positively identified
13    Valentino Dixon as the shooter, correct?
14          A.   That's what the report says.
15          Q.   In other words, no suggestion in this
16    report that he was ever -- there was ever any
17    suggestion used, correct?
18          MS. PERSICO:  Form.
19          THE WITNESS:  No suggestion in the report
20    that any suggestion was used in the showing of the
21    array?
22          BY MR. BRUSTIN:
23          Q.   There's nothing in the report telling
24    you that -- withdrawn.
25          This report indicates that he was properly
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            182

```
 1              Christopher J. Belling
 2  interviewed and that there was a properly conducted
 3  photo array and he made a positive identification?
 4        A.   This report indicates that he was
 5  interviewed, he made an identification.
 6        Q.   And nothing -- nothing in this report
 7  suggests anything improper was done, correct?
 8        A.   Correct.
 9        Q.   Nothing in this report indicates any
10  suggestion, correct?
11        A.   Correct.
12        Q.   And you did not receive any information
13  from any police officer to the contrary, correct?
14        A.   Correct.
15        Q.   Another report indicating that -- that
16  everything that was done with Emil Adams was
17  consistent with proper procedure, correct?
18        A.   I don't know about another report, but
19  it's a report that indicates that.
20        Q.   As to the other reports you reviewed
21  today, just now.
22        MS. PERSICO:   Form.
23        THE WITNESS:   Well, I reviewed a statement
24  of his, and I reviewed a P-88.
25        BY MR. BRUSTIN:
```



```
 1                    Christopher J. Belling
 2        Q.    And both seem to suggest proper form
 3  was used with Mr. Adams, correct, proper procedure?
 4        A.    As far as they read, sure.
 5        Q.    Okay.  No hint of suggestion or
 6  anything like that, correct?
 7        A.    No.
 8        Q.    And you -- you understand that
 9  consistent with those reports Emil Adams testified
10  at trial that he -- the police showed him a group
11  of photos and he made a positive identification,
12  correct?
13        MS. PERSICO:  Form.
14        THE WITNESS:  I would doubt that, because it
15  would not have come out at trial that he was shown
16  a photo array.
17        MR. BRUSTIN:  Sorry, the Grand Jury, sorry.
18        THE WITNESS:  Oh, at the Grand Jury?  I'd
19  have to see the Grand Jury minutes, but I would
20  have no doubt that that was what happened.
21        BY MR. BRUSTIN:
22        Q.    I'm reading from my summary, but you
23  have no doubt that's what happened?
24        MS. PERSICO:  Form.
25        THE WITNESS:  Well, no.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                               184

```
 1                    Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   Let me put it this way:  If, in fact,
 4   Mr. Adams had testified inconsistently at the Grand
 5   Jury with a police report, you would have noted it,
 6   correct?
 7          MS. PERSICO:  Form.
 8          THE WITNESS:  I don't -- inconsistently with
 9   a police --
10          MR. RUSS:  Objection to form.
11          THE WITNESS:  If he said he didn't identify
12   the guy, it would have been a problem.  I don't
13   know what else we're talking about here.
14          BY MR. BRUSTIN:
15          Q.   All right.  I'll represent to you what
16   he testified to was that the police showed him a
17   group of photos and he picked out Valentino Dixon.
18   Any reason to dispute that?
19          A.   No.
20          MS. PERSICO:  Form.
21          BY MR. BRUSTIN:
22          Q.   And certainly as per his report,
23   Stambach represented to you in writing and in your
24   discussions pretrial that Emil Adams made a
25   positive ID of Valentino Dixon through a six-person
```



1                    Christopher J. Belling

2    photo array, correct?

3         A.   If that's what the report says.

4         Q.   The report makes clear that -- the

5    reports make clear that Emil Adams never expressed

6    any uncertainty about who the shooter was or

7    whether Valentino Dixon was the shooter, correct?

8         MS. PERSICO:  Form.

9         THE WITNESS:  I don't know the answer to

10   that.  The report --

11        BY MR. BRUSTIN:

12        Q.   You just reviewed the reports.

13        A.   Right.  And what number was the report?

14        Q.   For example --

15        A.   Where is the report?

16        Q.   Page 25, for example.

17        A.   Okay.

18        Q.   Nothing in page 25 suggesting that Emil

19   Adams expressed any uncertainty about who the

20   shooter was, right?

21        A.   That's correct.

22        Q.   Or whether it was Valentino Dixon,

23   correct?

24        A.   Correct.

25        Q.   All it expresses is that he made a



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           186

```
 1                     Christopher J. Belling
 2    certain identification, correct?
 3          A.   He positively identified Valentino
 4    Dixon as the shooter.
 5          Q.   And you took that to be true, correct?
 6          A.   Correct.
 7          Q.   Now, did you ever become aware at any
 8    time that Mr. Bryant, Valentino Dixon's father,
 9    along with his wife and another witness -- and
10    Antoine Shannon took a tape-recorded interview --
11    did a tape-recorded interview of Emil Adams after
12    the -- after the crime?
13          MS. PERSICO:  Form.
14          THE WITNESS:  No, I was never aware of that.
15          BY MR. BRUSTIN:
16          Q.   The first you've ever heard of that is
17    me saying it?
18          A.   I had heard of the Robert Bryant and
19    Annie Shannon tape-recording Joe Terranova, and I
20    don't know if I ever heard about taping anybody
21    else.
22          Q.   Okay.  As you sit here today, you don't
23    recall learning that there was a taped statement of
24    Emil Adams at his home?
25          A.   I do not recall that.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            187

1                    Christopher J. Belling

2          Q.    Okay.    But you would agree that

3    certainly you don't recall seeing any report or

4    receiving any information from any detective that

5    Emil Adams told the police he couldn't make an

6    identification?

7          MS. PERSICO:    Form.

8          THE WITNESS:    That is correct.

9          BY MR. BRUSTIN:

10         Q.    And you don't recall seeing any report

11   indicating that Emil Adams was shown three

12   individual photos, including a photo of Mario

13   Joiner and Valentino Dixon, as opposed to a

14   six-person array?

15         MS. PERSICO:    Form.

16         MR. RUSS:    Objection to form.

17         THE WITNESS:    I have no idea what -- if that

18   ever happened or anything like that.    I know

19   nothing about it.

20         BY MR. BRUSTIN:

21         Q.    No one ever told you about that?

22         A.    No.

23         Q.    And no one ever -- in fact, more

24   specifically, nobody ever told you in writing or

25   orally that Emil Adams was shown an individual



1              Christopher J. Belling

2   photo of Valentino Dixon, correct?

3          MS. PERSICO:  Form.

4          MR. RUSS:  Objection to form.

5          THE WITNESS:  That's correct.

6          BY MR. BRUSTIN:

7          Q.   In fact, if that had happened, you

8   would have remembered it, correct?

9          MS. PERSICO:  Form.

10         THE WITNESS:  If what had happened?

11         MR. RUSS:  Objection to form.

12         BY MR. BRUSTIN:

13         Q.   If he had been shown individual photos,

14   including an individual photo of Valentino Dixon,

15   of course you'd remember that?

16         MS. PERSICO:  Form.

17         MR. RUSS:  Objection to form.

18         THE WITNESS:  If I knew about it, it would

19   be something that would be memorable.

20         BY MR. BRUSTIN:

21         Q.   And you would obviously have to

22   disclose that as Brady material?

23         MS. PERSICO:  Form.

24         THE WITNESS:  If I knew about it, yes.

25         MR. RUSS:  Objection to form.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   And it would have caused you to

4    question the integrity of the entire investigation?

5          MS. PERSICO:   Form.

6          THE WITNESS:   No.

7          MR. RUSS:   Objection to form.

8          BY MR. BRUSTIN:

9          Q.   If -- if you learned that -- let's do

10   it this way:   If you learned that Stambach showed

11   individual photos or Stambach and/or others showed

12   individual photos to Emil Adams, including photos

13   of Valentino Dixon, and then represented in the

14   reports that they only showed him a six-person

15   array, that wouldn't cause you to question the

16   integrity of the investigation?

17         MS. PERSICO:   Form.

18         MR. RUSS:   Objection to form.

19         THE WITNESS:   It would have caused an issue

20   with the identification by Emil Adams certainly.

21         BY MR. BRUSTIN:

22         Q.   Would it have caused you any issues as

23   to the credibility, the reliability of Stambach and

24   the other detectives in their reporting?

25         MS. PERSICO:   Form.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           190

1              Christopher J. Belling

2         MR. RUSS:  Objection to form.

3         THE WITNESS:  It's -- it's just too

4   hypothetical.  I don't know.  I can't tell you.

5         BY MR. BRUSTIN:

6         Q.   Well, Emil Adams was on tape stating

7   that he was shown individual photos, including an

8   individual photo of Valentino Dixon and Mario

9   Joiner and a third unidentified person.

10        MS. PERSICO:  Objection to form.

11        MR. RUSS:  Objection to form.

12        MS. PERSICO:  You're mischaracterizing the

13  prior testimony.

14        MR. BRUSTIN:  I'm characterizing what's on

15  the tape-recorder.

16        MS. PERSICO:  Which Mr. Adams --

17        MR. RUSS:  No, you're not.  You questioned

18  Emil extensively about it.  He couldn't even say it

19  was him, and he didn't agree with any of what

20  you're saying.  So I object to the form.

21        MR. BRUSTIN:  I'm not asking you what he

22  agreed to.  I'm asking what's -- I'm telling you

23  what's on the tape-recorder.  So this is not for

24  you.  This is an issue for trial, but assume that

25  he said that --



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           191

1                     Christopher J. Belling

2          MS. PERSICO:  Well, we're not going to go

3    there, because there is no -- there is nothing that

4    said that he --

5          MR. BRUSTIN:  Well, of course we're going to

6    go there.  That's the heart of the case.  That's

7    what summary judgment's going to be about.

8          MS. PERSICO:  Well, then find somebody who

9    can authenticate Emil Adams before you represent --

10         MR. BRUSTIN:  Well, I got it.

11         MS. PERSICO:  That was not the testimony, or

12   at least we don't have that testimony.

13         MR. BRUSTIN:  I've got it.

14         BY MR. BRUSTIN:

15         Q.   So, in any case, you would agree that

16   if Stambach represented in his report that he was

17   shown a six-person photo array but, in fact, he was

18   shown three individual photos, including a photo of

19   Valentino Dixon, you would agree that would be a

20   serious misrepresentation in his report, correct?

21         MS. PERSICO:  Objection.  Asked and

22   answered.

23         MR. RUSS:  Objection to form.

24         THE WITNESS:  If it was true.

25         MR. BRUSTIN:  If true, of course.  That's



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            192

```
 1                    Christopher J. Belling
 2   all I'm asking.
 3          BY MR. BRUSTIN:
 4          Q.   And that would cause you to question
 5   the integrity of the investigation?
 6          MS. PERSICO:  Asked and answered.
 7          THE WITNESS:  It would cause me to question
 8   the integrity of identification by Emil Adams.
 9          BY MR. BRUSTIN:
10          Q.   But not the entire investigation?
11          A.   No.
12          Q.   Okay.  In any case, you had no
13   knowledge of that whatsoever?
14          A.   That's my recollection, yeah, I never
15   heard that.
16          Q.   Okay.  Now, let's talk about Sullivan.
17   So, first of all, you've already told us, but I
18   want to ask you more specifically, about the
19   difficulties you had getting Sullivan to come and
20   testify, correct?
21          A.   What --
22          Q.   You've already told us he had some
23   difficulties, correct?
24          A.   He was in Georgia, as I recall, and we
25   had to arrange to get him back.
```



1               Christopher J. Belling

2        Q.   All right.  And he was a reluctant

3   witness; fair to say?

4        MS. PERSICO:  Form.

5        THE WITNESS:  Apples and oranges.  He was in

6   Georgia because he had some criminal problems.  He

7   wasn't necessarily a reluctant witness once he was

8   here.

9        BY MR. BRUSTIN:

10       Q.   Do you recall meeting with him?

11       A.   I don't recall it specifically, but I

12   did I'm sure.

13       Q.   Okay.  As you sit here today, though,

14   you don't recall meeting with him and discussing

15   what he saw -- withdrawn.

16       Do you know whether or not you met with Mr.

17   Sullivan before trial and discussed what he

18   observed at the scene of the crime and what

19   happened with the police?

20       MS. PERSICO:  Form.

21       THE WITNESS:  I don't recall doing it, but

22   I'm sure I did.

23       BY MR. BRUSTIN:

24       Q.   Okay.  But you have no recollection of

25   it, correct?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          194

```
 1                  Christopher J. Belling

 2          A.   Correct.

 3          Q.   And, again, I take it with Mr. Adams,

 4   like with Mr. Adams, you relied on the police

 5   reports concerning what transpired between the

 6   police and Mr. Sullivan, correct?

 7          MS. PERSICO:  Form.

 8          THE WITNESS:  Yes.

 9          BY MR. BRUSTIN:

10          Q.   Now, let's go to the DA file, 30, the

11   first DA file, the Dixon DA file, and let's take a

12   look at page 2130.

13          MS. PERSICO:  Is this the one there's only

14   one of?  There's not another copy of this floating

15   around, is there?

16          MR. BRUSTIN:  Yeah, sorry.

17          MS. PERSICO:  What page?

18          MR. BRUSTIN:  2130.

19          THE WITNESS:  2130.

20          BY MR. BRUSTIN:

21          Q.   Okay.  Have you reviewed these notes in

22   preparation for today?

23          A.   No.

24          Q.   All right.  Why don't you take a minute

25   and review 2130, let me know when you're done.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            195

```
 1                  Christopher J. Belling
 2          A.   Okay.  I've read it.
 3          Q.   And here, why is it then in these notes
 4   you're putting the date when the interview happened
 5   as opposed to other notes you did not?
 6          MS. PERSICO:  Form.
 7          THE WITNESS:  I have no idea.
 8          BY MR. BRUSTIN:
 9          Q.   Okay.  In any case it appears this
10   interview -- withdrawn.
11          In any case, it appears that these notes
12   were taken on May 18th, 1992, correct?
13          A.   This -- these notes are May 18th, May
14   19th, and June 1st of 1992.
15          Q.   Just before the trial in June, correct?
16          A.   Correct.
17          Q.   And it looks like on May 18th or
18   thereabouts you were learning that Mr. Sullivan is
19   about to be indicted for some type of rape offense
20   concerning a 15-year-old girl in Georgia, correct?
21          A.   Correct.
22          Q.   Tell me what you learned about that.
23          A.   Exactly what the notes say, that the
24   indictment will be returned within the next two
25   weeks, be arraigned within a month, 15-year-old
```



1                    Christopher J. Belling

2    girl, and the assistant DA's name was Petrey,

3    P-E-T-R-E-Y, Petrey, and his address, the ADA's

4    address.

5           Q.   And did you disclose that information

6    to Mr. Terranova?

7           A.   I disclosed to Mr. Terranova the fact

8    that John Sullivan had a pending case in Georgia.

9           Q.   Did you tell him it was for raping a

10   15-year-old girl?

11          A.   I believe so.

12          Q.   Did you do it in writing?

13          A.   I don't remember.

14          Q.   Did you have an obligation to do it in

15   writing since you have Brady obligations?

16          A.   I don't think there's an obligation to

17   do it in writing.  There's an obligation to let him

18   know.

19          Q.   Is it your practice -- withdrawn.

20          Would it be fair to say that -- I showed you

21   a document earlier where you disclosed Brady

22   material in writing, correct?

23          A.   Oh, yes.

24          Q.   And one of the reasons why you disclose

25   Brady material in writing is because you want to



```
 1                  Christopher J. Belling
 2   keep a record in case anybody questions whether you
 3   disclosed it, correct?
 4        A.   It's one of the reasons, yeah.
 5        Q.   This is basic -- a basic concept for a
 6   District Attorney, correct?
 7             MS. PERSICO:  Form.
 8             BY MR. BRUSTIN:
 9        Q.   You document what you give to the
10   defense?
11             MS. PERSICO:  Form.
12             THE WITNESS:  In general you do, yes.
13             BY MR. BRUSTIN:
14        Q.   All right.  And so obviously, being
15   charged with raping a 15-year-old girl just months
16   before -- just months before this trial could be
17   important impeachment evidence against
18   Mr. Sullivan, correct?
19        A.   Yes.
20             MS. PERSICO:  Form.
21             BY MR. BRUSTIN:
22        Q.   And, frankly, you don't know enough
23   about the circumstances of what transpired, at
24   least based on these notes, to know whether or not
25   it would be admissible impeachment, correct?
```



```
 1                  Christopher J. Belling
 2          MS. PERSICO:  Form.
 3          THE WITNESS:  I can't answer that.  I don't
 4   know the answer.
 5          BY MR. BRUSTIN:
 6          Q.   All right.  But certainly you had an
 7   obligation to disclose the information you learned
 8   to Mr. Terranova, correct?
 9          A.   Yes.
10          MS. PERSICO:  Form.
11          BY MR. BRUSTIN:
12          Q.   And as you sit here today, would it be
13   fair to say, and maybe I'm reading into your --
14   your pause, but is it fair to say you don't
15   remember one way or another whether or not you
16   provided this information to Mr. Terranova?
17          MS. PERSICO:  Form.
18          THE WITNESS:  No, that's not fair to say.
19          BY MR. BRUSTIN:
20          Q.   You're certain that you did?
21          A.   I am.
22          Q.   You're just not certain whether you did
23   it in writing or not?
24          A.   Correct.
25          Q.   And why wouldn't you have provided this
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            199

```
 1                  Christopher J. Belling
 2   information in writing?
 3        A.   It depends on timing.  I could have run
 4   into Joe somewhere and said, you know, by the way,
 5   his trial's coming up, John Sullivan's in jail in
 6   Georgia, appears to be some sort of a rape case,
 7   and if I get anything more, I'll let you know,
 8   something like that.
 9        Q.   Would it be fair to say that, and I
10   think you've testified before and you've certainly
11   spoken about it, that you held Mr. Terranova in
12   high esteem?  You thought he was a competent
13   criminal defense lawyer?
14        A.   I felt he was a competent criminal
15   defense lawyer.
16        Q.   Any doubt in your mind that
17   Mr. Terranova would have attempted to impeach
18   Mr. Sullivan with a charge that he raped a
19   15-year-old girl?
20        MS. PERSICO:  Form.
21        THE WITNESS:  I can't answer that.
22        BY MR. BRUSTIN:
23        Q.   Can you think of any reason why he
24   wouldn't?
25        MS. PERSICO:  Form.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              200

```
 1                    Christopher J. Belling
 2          THE WITNESS:  No, not really.
 3          BY MR. BRUSTIN:
 4          Q.   But you're certain you gave it to him?
 5          A.   Yes.
 6          Q.   He may have just forgotten to question
 7   him about it?
 8          MS. PERSICO:  Form.
 9          THE WITNESS:  I don't know what you just
10   said there, I don't think that's --
11          BY MR. BRUSTIN:
12          Q.   You don't know what I just said?  I
13   said --
14          A.   Correct.
15          Q.   -- do you think he just forgot to
16   question John Sullivan about raping the
17   15-year-old?
18          A.   Or he tactically decided not to for
19   whatever reason.
20          Q.   Take a look at page 2170.
21          A.   Okay.
22          Q.   This appears to be a call with John
23   Sullivan on June 2nd?
24          MS. PERSICO:  Form.
25          THE WITNESS:  It is a call from John
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            201

```
 1                  Christopher J. Belling
 2   Sullivan, yes.
 3        BY MR. BRUSTIN:
 4        Q.   Do you recall this call?
 5        A.   No, not specifically.
 6        Q.   Do you recall discussing with John
 7   Sullivan the rape charges?
 8        A.   There's two John Sullivans.  This I
 9   think is a call from his father, John Sullivan, Jr.
10        Q.   Gotcha.  Do you recall any
11   conversation -- well, do you recall what you talked
12   about with John Sullivan, Sr.?
13        A.   He's Jr.  Rabbit is the III.
14        Q.   Gotcha.  Do you recall what you
15   discussed with his father?
16        A.   No.
17        Q.   Do you recall whether you discussed
18   with his father or with John Sullivan, Jr.-Jr.,
19   that -- anything about the rape case?
20        A.   No.
21        Q.   Take a look at page 2160.
22        A.   2160, okay.
23        MS. PERSICO:  We're not looking at the same
24   thing as you are.  Are you on a different --
25        MR. BRUSTIN:  I'm wrong.  2126, I'm sorry.
```



1                    Christopher J. Belling

2          THE WITNESS:  2126.

3          BY MR. BRUSTIN:

4          Q.   Actually, start with 2125.

5          A.   Okay.  2125, okay.

6          Q.   So it looks like, you correct me if I'm

7     wrong, on 2125 you're getting a call from John

8     Sullivan, the witness?

9          A.   On 2125?

10         Q.   Yes.

11         A.   No.

12         Q.   2125, while you were out -- oh, Mrs.

13    Sullivan.

14         A.   Right, John Sullivan's mother.

15         Q.   Gotcha.  Do you recall that call?

16         A.   No.

17         Q.   All right.  But then it appears that in

18    response to that call you reached out to -- you

19    also got a call that same day concerning John

20    Sullivan's bond being $50,000, correct?

21         A.   That's what the message says, yes.

22         Q.   Presumably that was from the rape

23    charge, correct?

24         MS. PERSICO:  Form.

25         THE WITNESS:  I have no idea.  He was in



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            203

```
 1              Christopher J. Belling
 2   jail, and he had $50,000 bail.
 3        BY MR. BRUSTIN:
 4        Q.   You have no idea -- you don't remember
 5   today or you had no idea then?
 6        A.   Oh, I undoubtedly knew then, but I
 7   don't remember what it is now.
 8        Q.   All right.  And this appears to be you
 9   making efforts to help him work out so he can come
10   to New York; is that right?
11        A.   No, it's me attempting to locate him so
12   that I can take steps to secure his appearance at
13   the trial.
14        Q.   All right.  And this doesn't refresh
15   your recollection about the -- about the rape,
16   anything more about the rape charge?
17        A.   No.
18        Q.   Do you know whether or not he was
19   convicted?
20        A.   I do not.
21        Q.   Take a look at page 2129.
22        A.   Okay.
23        Q.   These are your May 18, 1992, notes.  Is
24   this with John Sullivan, the witness, or John
25   Sullivan, his father?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              204

```
 1                  Christopher J. Belling
 2         A.   I'm thinking it's the father, because
 3    it says John Sullivan, Jr., and I did try to be
 4    fairly specific about differentiating Jr. from the
 5    III.
 6         Q.   And does this refresh your recollection
 7    about what you spoke to John Sullivan, the father,
 8    concerning the rape charge?
 9         A.   Well, there's one line, and it seems to
10    be what the dad, John Sullivan, Jr., is describing
11    to me what went on in Georgia.
12         Q.   And does this refresh your recollection
13    about what he said went on?
14         A.   No.
15         Q.   What happened to your great memory?
16         MS. PERSICO:  That's uncalled for.  Don't
17    answer that question.
18         BY MR. BRUSTIN:
19         Q.   Do you remember him describing to you
20    that he had sex with this girl who was 15 while
21    they were watching a porno movie?
22         A.   No.
23         Q.   No recollection of the details at all?
24         MS. PERSICO:  Form.
25         THE WITNESS:  That's correct.
```



800.211.DEPO (3376)
EsquireSolutions.com

1          Christopher J. Belling

2        BY MR. BRUSTIN:

3        Q.   You understood John Sullivan was an

4    important witness, right?

5        A.   John Sullivan III was an important

6    witness, yes.

7        Q.   And obviously a rape charge where he

8    raped a 15-year-old was an important issue in his

9    credibility and reliability, correct?

10       A.   It certainly would be, yeah.

11       Q.   But you remember nothing about it?

12       MS. PERSICO:  Form.

13       THE WITNESS:  It's -- yeah, that's true.

14       BY MR. BRUSTIN:

15       Q.   Do you remember talking to the DeKalb

16   County solicitor?

17       A.   No, I don't.  I talked to somebody who

18   didn't handle the case.  That's a note at the

19   bottom of this page, but I don't remember talking

20   to the people that were handling the case.

21       Q.   Take a look at page 2161.

22       A.   2161, okay.  Okay.  Here we go.

23       Q.   Have you reviewed this in preparation

24   for today?

25       A.   No.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                               206

```
1                    Christopher J. Belling
2          Q.    So why don't you take a minute and
3    review it.
4          A.    Okay.
5          Q.    It's a two-page document.
6          A.    Okay.
7          Q.    And this is you writing a letter in
8    support of Mr. Sullivan, the witness, after he
9    testified in the trial, correct?
10         A.    Correct.
11         Q.    And you're cc'ing his father, correct?
12         A.    Correct.
13         Q.    And I take it that one of the things
14   you told his father and one of the things you told
15   his son is that if he cooperated and came to trial,
16   you would -- you would write a letter on his
17   behalf, correct?
18         MS. PERSICO:  Form.
19         THE WITNESS:  I don't think I would have
20   done that, because had I done that, it would have
21   been a Brady issue, so I didn't do it.
22         BY MR. BRUSTIN:
23         Q.    Of course it would have been.  Do you
24   deny doing that?
25         A.    I don't remember doing it, no.
```



 1                   Christopher J. Belling
 2         Q.   Do you deny doing it, sir?
 3         A.   I don't know whether I did it or not.
 4         Q.   All right.  So, in other words, it's
 5    possible that you did it knowing it was a Brady
 6    violation, correct?
 7         MS. PERSICO:  Form.
 8         THE WITNESS:  That I did what?
 9         BY MR. BRUSTIN:
10         Q.   Let me be very clear, sir.  It's
11    possible that you talked to Mr. Sullivan and/or his
12    son about writing a letter if he cooperated and
13    it's possible that you didn't disclose that to the
14    other side, correct?
15         MS. PERSICO:  Form.
16         THE WITNESS:  I would have been much more
17    general than that, and I don't -- just don't know
18    what happened with that.
19         BY MR. BRUSTIN:
20         Q.   So, in other words, it's possible that
21    you failed to disclose that you told John Sullivan,
22    Jr., if he cooperated you would write a letter for
23    him in support of his rape prosecution?
24         MS. PERSICO:  Form.
25         THE WITNESS:  I have no idea.



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                               208

```
1                   Christopher J. Belling
2          BY MR. BRUSTIN:
3          Q.   You may have?
4          MS. PERSICO:  Form.
5          THE WITNESS:  I'm not going to say I may
6     have or may have not.  I just don't know.
7          BY MR. BRUSTIN:
8          Q.   You certainly can't deny it.
9          MS. PERSICO:  Form.
10         THE WITNESS:  If before this letter was
11    written I had some conversation about it?
12         MR. BRUSTIN:  Yes, sir.
13         THE WITNESS:  I just don't know.
14         BY MR. BRUSTIN:
15         Q.   Do you think you just wrote this out of
16    the goodness of your heart because he was such a
17    great guy?
18         MS. PERSICO:  Form.
19         THE WITNESS:  He was a nice kid, and I could
20    have written it out of the goodness of my heart,
21    sure.
22         BY MR. BRUSTIN:
23         Q.   Do you think that's what happened?
24         A.   That's absolutely possible.
25         Q.   And you say here he wasn't -- he wasn't
```



1                    Christopher J. Belling

2   your average street punk that you're both used to

3   dealing with, right?

4        A.    Correct.

5        Q.    And you were writing this in hopes that

6   it would cause the DA in Georgia to take a

7   favorable view of Mr. Sullivan in connection with

8   his rape prosecution, correct?

9        MS. PERSICO:  Form.

10       THE WITNESS:  Yeah, I say that I hope that

11  you have some discretion to factor in his

12  background when it comes time to dispose of his

13  Georgia case.

14       BY MR. BRUSTIN:

15       Q.    Well, it didn't say that.  It says,

16  when it comes time for disposition of his Georgia

17  charges, correct?

18       A.    Yes.

19       Q.    So, in other words, when he's

20  considering how to handle the charges against him,

21  he should consider your recommendation, correct?

22       MS. PERSICO:  Form.

23       THE WITNESS:  No.  It's asking him if he has

24  the discretion to consider the fact that John

25  Sullivan III had testified in a murder case.



 1              Christopher J. Belling

 2        BY MR. BRUSTIN:

 3        Q.   Okay.  And that could be very helpful

 4   in connection with those rape charges in Georgia.

 5   You knew that, right?

 6        MS. PERSICO:  Form.

 7        THE WITNESS:  I would expect that it could

 8   be, sure.

 9        BY MR. BRUSTIN:

10        Q.   Okay.  And obviously to the extent that

11   you had talked to Mr. Sullivan or his son or his

12   wife about writing a letter on his behalf, that

13   would be Brady material that Mr. Terranova would

14   have been entitled to, correct?

15        MS. PERSICO:  Form.

16        THE WITNESS:  If there was discussion of

17   writing a letter, it probably could be Brady

18   material.

19        BY MR. BRUSTIN:

20        Q.   If there was discussion of putting in a

21   good word for him, doing a favor for him, that's

22   classic Brady material, correct?

23        MS. PERSICO:  Form.

24        THE WITNESS:  No, it's not classic Brady

25   material.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           211

```
 1              Christopher J. Belling
 2         BY MR. BRUSTIN:
 3         Q.   You would agree, sir, that if you had a
 4  discussion with him of doing a favor for him and
 5  calling the DA or writing the DA a letter on his
 6  behalf, that's Brady material?
 7         A.   It is not Brady material.
 8         Q.   It's -- it's impeachment material?
 9         A.   It is.
10         Q.   Clearly -- clearly information you have
11  to disclose?
12         A.   That's true.
13         MS. PERSICO:  Form.
14         BY MR. BRUSTIN:
15         Q.   And should be disclosed in writing?
16         MS. PERSICO:  Form.
17         THE WITNESS:  It -- maybe yes, maybe no.
18  Who knows.
19         BY MR. BRUSTIN:
20         Q.   I take it that one of the concerns, and
21  we see it in your notes, from John Sullivan's
22  father and from John Sullivan when he spoke to you
23  were these pending charges in Georgia, right?
24         MS. PERSICO:  Form.
25         THE WITNESS:  There was concern --
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            212

```
 1                   Christopher J. Belling

 2          MS. PERSICO:  I'm sorry, what are you

 3   referring to?

 4          MR. BRUSTIN:  The notes you just looked at

 5   indicating your conversations with Mr. Sullivan,

 6   Sr.

 7          MS. PERSICO:  Can you point us to the page?

 8          BY MR. BRUSTIN:

 9          Q.   No.  Do you recall, sir, just a few

10   moments ago looking at notes concerning you

11   discussing his bond and the charges against him?

12          A.   No, I recall looking at some phone

13   messages, and then there were some notes that had

14   that type of information in them, yes.

15          Q.   Yes, and when you spoke to

16   Mr. Sullivan, Sr. -- withdrawn.

17          When you spoke to Mr. Sullivan's father and

18   when you spoke to Mr. Sullivan, one of the things

19   they expressed to you was their concern about the

20   rape charges, correct?

21          MS. PERSICO:  Form.

22          THE WITNESS:  I don't think I talked to John

23   Sullivan III, Rabbit, at all.  His parents

24   undoubtedly expressed their concern to me about the

25   fact that he had these charges in Georgia.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              213

```
 1                    Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   Well, you've already told us that you
 4   would have talked to Rabbit or John Sullivan III
 5   before he testified at trial, correct?
 6          A.   Correct.
 7          Q.   And one of the things -- you don't
 8   recall John Sullivan III when he was about to
 9   testify at a murder trial in New York talking to
10   you about his concern about the rape charges in
11   Georgia?
12          MS. PERSICO:  Form.
13          THE WITNESS:  I don't recall any
14   conversation about that with him.
15          BY MR. BRUSTIN:
16          Q.   Do you recall any conversation about
17   that with mother -- with mom or dad?
18          MS. PERSICO:  Form.
19          THE WITNESS:  Certainly I recall the dad
20   calling with his concern.  I don't recall talking
21   to the mom about specifically her concerns.
22          BY MR. BRUSTIN:
23          Q.   You don't remember any of them asking
24   whether you could put a good word in for Rabbit
25   with the DA?
```



1                  Christopher J. Belling

2          MS. PERSICO:  Form.

3          THE WITNESS:  No, I don't recall them asking

4    that.

5          BY MR. BRUSTIN:

6          Q.   In fact, to the best of your

7    recollection, nobody mentioned it, right?

8          MS. PERSICO:  Form.

9          THE WITNESS:  As far as I recall, that's

10   correct.

11         BY MR. BRUSTIN:

12         Q.   And you just thought of it on your own

13   after he testified?

14         MS. PERSICO:  Form.

15         THE WITNESS:  Well, it -- it was the

16   appropriate time to think about it after he

17   testified, yes.

18         BY MR. BRUSTIN:

19         Q.   And, by the way, you do recall that

20   when he testified, there were massive problems with

21   his testimony, correct?

22         MS. PERSICO:  Form.

23         THE WITNESS:  No, I just recall he

24   testified.

25         BY MR. BRUSTIN:



1                        Christopher J. Belling

2            Q.    Don't recall major contradictions

3    between what was in the reports and what he

4    testified to?

5            A.    No.

6            Q.    You don't recall him being

7    cross-examined intensely and effectively by

8    Mr. Terranova?

9            A.    No.

10           Q.    Your memory is he was just a good,

11   reliable, honest witness?

12           MS. PERSICO:   Form.

13           THE WITNESS:   I remember he was a witness

14   and he testified at the trial.

15           BY MR. BRUSTIN:

16           Q.    Take a look at page 82.  I'm sorry, I'm

17   now going back to the police reports.

18           A.    Okay.  BPD COMP 0082.

19           Q.    I'm sorry, hold on just one second.

20   Actually, let's start with page 74.  And if you

21   could read to yourself page 74 and 75 if you

22   haven't already in preparation for today.  It's the

23   state -- BPD 74 and 75.  It's John Sullivan's

24   statement.

25           A.    Okay.  I'll read it.



1                    Christopher J. Belling

2          Q.    Just 74 and 75.

3          A.    That's fine.  I'm good.

4          Q.    Have you had a chance to read it?

5          A.    Yeah, I've read it.

6          Q.    Okay.  And so what this document is

7    purporting to say is that John Sullivan is the

8    first person to mention Valentino Dixon, correct?

9          MS. PERSICO:  Form.

10         THE WITNESS:  As far as I know, yes.

11         MR. RUSS:  Objection to form.

12         BY MR. BRUSTIN:

13         Q.    And that he identifies him without

14   ever -- him ever having been mentioned as the

15   shooter, correct?

16         A.    Correct.  He injects Tino's name into

17   the event.

18         Q.    He's the person -- your understanding

19   was he's the person who interjected Valentino

20   Dixon's name into this case, correct?

21         A.    Correct.

22         Q.    And it's your understanding based on

23   this report and your communications with detectives

24   that he then confirmed his identification, his

25   volunteering Valentino Dixon for the first time in



1                    Christopher J. Belling

2   this case, he confirmed it by picking him out of a

3   photo array?

4           MS. PERSICO:  Form.

5           THE WITNESS:  That's what the statement

6   says.

7           BY MR. BRUSTIN:

8           Q.   And according to the statement, it's a

9   properly conducted six-person array, correct?

10          A.   That's what it says.

11          Q.   With no suggestion whatsoever?

12          MS. PERSICO:  Form.

13          THE WITNESS:  It doesn't -- there's none in

14  there, no suggestion is shown in the statement.

15          BY MR. BRUSTIN:

16          Q.   But the most important thing is that

17  he's the person volunteering Valentino Dixon's

18  name, not the other way around, correct?

19          MS. PERSICO:  Form.

20          THE WITNESS:  That's correct.

21          BY MR. BRUSTIN:

22          Q.   And your understanding throughout this

23  case has been that John Sullivan is the first

24  person in this investigation to mention Valentino

25  Dixon?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              218

 1                    Christopher J. Belling

 2          A.    That's my understanding, yes.

 3          Q.    Now, let's go back for a minute to the

 4   DA file, and let's go to 2171.

 5          A.    Okay.

 6          Q.    Now, this appears to be a call on 6/9

 7   from John Sullivan.  Do you know if it's dad or --

 8   dad or John III?

 9          A.    It's dad.

10          Q.    Okay.  Son going back to Georgia.  Not

11   going to testify under the circumstances.  Very

12   disgusted.  Then he hung up before I could say

13   anything.

14          A.    Oh, okay, yeah.

15          Q.    Did I read that correctly?

16          A.    Yes.

17          Q.    So the date -- and I will represent to

18   you that John Sullivan testified on June 10th.

19          A.    John Sullivan III testified on June

20   10th at the trial?

21          Q.    Well, John Sullivan's dad never

22   testified, right?

23          A.    As far as I know.

24          MS. PERSICO:  Wait.  Are you saying that he

25   testified on the 10th of this year or --



```
 1                    Christopher J. Belling
 2          MR. BRUSTIN:  No.  I wasn't clear.
 3          BY MR. BRUSTIN:
 4          Q.   The day after you got this call from
 5    John Sullivan, you understand that John Sullivan
 6    III testified, correct?
 7          A.   I don't know the date, but if that's
 8    the date he testified at the trial, that's the date
 9    he testified on.
10          Q.   Assuming I'm accurately describing to
11    you as June 10th.
12          A.   Assuming that, yes.
13          Q.   And it appears from this note that it's
14    just before he's about to testify, correct?
15          A.   That's what it appears, sure.
16          Q.   Okay.  And so my question to you is:
17    What did you tell John Sullivan III in between this
18    phone call and when he testified to get him to
19    testify?
20          MS. PERSICO:  Form.
21          THE WITNESS:  I have no idea.
22          BY MR. BRUSTIN:
23          Q.   Is it possible that maybe what you told
24    him is that you put a good word in for him with the
25    DA in Georgia on the rape case?
```



```
 1                  Christopher J. Belling
 2           MS. PERSICO:  Form.
 3           THE WITNESS:  I would not have told him
 4    that.
 5           BY MR. BRUSTIN:
 6           Q.   Well, you must have told him something,
 7    because he was leaving town.
 8           MS. PERSICO:  Form.
 9           THE WITNESS:  He couldn't leave town.  He
10    was in custody.  He came back in custody, and he
11    couldn't leave town by himself.
12           BY MR. BRUSTIN:
13           Q.   Well, it certainly doesn't suggest he's
14    going to be a cooperative witness, right?
15           A.   It does seem to indicate he's
16    recalcitrant.
17           MS. PERSICO:  Form.
18           BY MR. BRUSTIN:
19           Q.   And you've testified that you didn't
20    notice him to be recalcitrant at all at trial.  He
21    testified freely and openly according to you,
22    right?
23           A.   As far as I remember.
24           Q.   So what did you do --
25           MS. PERSICO:  Form.
```



1              Christopher J. Belling

2        BY MR. BRUSTIN:

3        Q.   -- in between this call and the next

4   day to get him to be a good witness?

5        A.   I have no idea.

6        Q.   But one thing you know you didn't do is

7   you didn't tell him, I'll put a good word for you

8   in your rape case.

9        A.   I would not have done that.  It would

10  have not have been the appropriate thing to do.

11       Q.   You thought of that sometime later as a

12  reward?

13       MS. PERSICO:  Form.

14       THE WITNESS:  After the fact.

15       BY MR. BRUSTIN:

16       Q.   You're sure about that now.  Before you

17  didn't remember.  Now you're sure?

18       MS. PERSICO:  Form.

19       THE WITNESS:  I'm remembering normal

20  procedure, and that's the way it would have

21  happened.

22       BY MR. BRUSTIN:

23       Q.   Ah, so you don't remember one way or

24  another.  That's what you're thinking you must have

25  done?



1                    Christopher J. Belling

2          MS. PERSICO:   Form.   I can't even understand

3    that question.   Could you rephrase?

4          MR. BRUSTIN:   That wasn't a good question.

5          BY MR. BRUSTIN:

6          Q.   Before you were unwilling to deny that

7    you talked to John Sullivan III about putting

8    the -- putting the word in for him.   Are you now

9    denying it?

10         MS. PERSICO:   Form.   That's not what the

11   testimony was.

12         THE WITNESS:   I wasn't before unwilling to

13   -- that's a bad question, and yes, I didn't talk to

14   him beforehand about it.

15         BY MR. BRUSTIN:

16         Q.   You're sure about that?

17         A.   Yeah.

18         Q.   Okay.   Now, one of the things you told

19   the Georgetown students was that one of the

20   concerns about John Sullivan, Jr., as a witness was

21   where he was standing at the time of the crime,

22   correct?

23         MS. PERSICO:   Form.

24         THE WITNESS:   I don't recall saying that to

25   them.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           223

1                         Christopher J. Belling

2            BY MR. BRUSTIN:

3            Q.   Do you remember having a concern in

4    your mind that John Sullivan may have been in a

5    position where it would be difficult for him to see

6    what he claims to have seen?

7            MS. PERSICO:   Form.

8            THE WITNESS:  No.

9            BY MR. BRUSTIN:

10           Q.   Do you remember having a concern in

11   general about where he was standing in relation to

12   the shooting?

13           A.   No.

14           Q.   That never crossed your mind?

15           A.   I don't remember being concerned about

16   it.

17           Q.   How about his physical condition at the

18   time of the shooting, whether he had been drunk or

19   high?  Do you remember having that concern?

20           A.   No, I didn't have any concerns like

21   that.

22           Q.   Now, you would agree that Mr. Dixon was

23   arrested and convicted of murder in the second

24   degree and for possession of a weapon in the second

25   degree, correct?



```
1                    Christopher J. Belling

2        A.   Yes.

3        Q.   And --

4        MR. RUSS:  And assault.

5        MR. BRUSTIN:  And assault.

6        BY MR. BRUSTIN:

7        Q.   And the supporting evidence for the

8   weapons charge, the intent to kill, is that he did,

9   in fact, shoot them, correct?

10        MS. PERSICO:  Form.

11        THE WITNESS:  I don't understand that

12   question.

13        BY MR. BRUSTIN:

14        Q.   The supporting evidence for the

15   possession of the weapon in the second degree was

16   that there was an intent to shoot them, which he,

17   in fact, did?

18        MS. PERSICO:  Form.

19        THE WITNESS:  As I recall, 265.03, which is

20   weapons possession second, at the time required

21   possession of a loaded handgun with intent to use

22   unlawfully.

23        BY MR. BRUSTIN:

24        Q.   All right.  Do you recall -- do you

25   recall that in this case the evidence put forward
```



1                  Christopher J. Belling

2    for intent was the fact that he did, in fact,

3    shoot?

4          MS. PERSICO:  Form.

5          THE WITNESS:  I -- you know, the evidence

6    was the evidence, the trial transcript.

7          BY MR. BRUSTIN:

8          Q.   Okay.  One of the things you also told

9    the Georgetown students -- and, by the way, when

10   you spoke to the Georgetown students, that was

11   before Lamarr Scott pled guilty to second-degree

12   murder, correct?

13         MS. PERSICO:  Form.

14         THE WITNESS:  He didn't plead guilty to

15   second-degree murder.

16         BY MR. BRUSTIN:

17         Q.   Before Lamarr Scott pled guilty to

18   shooting and killing Torriano Jackson and shooting

19   others, that was -- that was after you spoke to the

20   Georgetown students, correct?

21         MS. PERSICO:  Form.

22         THE WITNESS:  That plea occurred after.

23         BY MR. BRUSTIN:

24         Q.   And one of the things you told the

25   Georgetown students was that Lamarr Scott was not



CHRISTOPHER J. BELLING                                                     April 11, 2023
DIXON V. CITY OF BUFFALO                                                              226

```
 1                    Christopher J. Belling
 2  compromising himself at all by saying that he did
 3  it, correct?
 4          A.   Correct.
 5          MS. PERSICO:   Form.
 6          BY MR. BRUSTIN:
 7          Q.   And you said that over and over to the
 8  Georgetown students, right?
 9          A.   Correct.
10          MS. PERSICO:   Form.
11          BY MR. BRUSTIN:
12          Q.   And one of the things you said is the
13  system is not designed to prosecute two different
14  people for the same crime.
15          MS. PERSICO:   Form.
16          THE WITNESS:   True.
17          BY MR. BRUSTIN:
18          Q.   And that prosecuting Lamarr Scott was
19  futile.
20          MS. PERSICO:   Form.
21          THE WITNESS:   True.
22          BY MR. BRUSTIN:
23          Q.   And that Lamarr Scott was never going
24  to be prosecuted, there was no --
25          MS. PERSICO:   Are you saying is that what he
```



```
 1                    Christopher J. Belling
 2   said to the students rather than just asking him
 3   the question?
 4         BY MR. BRUSTIN:
 5         Q.   Yeah.  What you told the students is
 6   that Lamarr Scott was never going to be prosecuted,
 7   correct?
 8         MS. PERSICO:  Form.
 9         THE WITNESS:  I don't recall exactly what I
10   told them, but that was the thematic content, that
11   there were no criminal consequences inuring to
12   Lamarr Scott.
13         BY MR. BRUSTIN:
14         Q.   And that Lamarr Scott knows he won't be
15   tried?
16         MS. PERSICO:  Form.
17         THE WITNESS:  I don't know if I said that.
18         BY MR. BRUSTIN:
19         Q.   Okay.  And you made those confident
20   statements to those students before he pled guilty,
21   correct?
22         MS. PERSICO:  Mischaracterization.  Form.
23         THE WITNESS:  I made those statements before
24   he pled guilty.
25         BY MR. BRUSTIN:
```



```
 1                    Christopher J. Belling
 2        Q.   Now, another thing you told the
 3   students is that Valentino Dixon's parents told
 4   Lamarr Scott because he was only 16 any conviction
 5   would be less consequential to him.
 6        MS. PERSICO:  Can we look at the documents
 7   that you're reading from.
 8        BY MR. BRUSTIN:
 9        Q.   Do you remember saying that to them?
10        A.   I said something in that genre, yes.
11        Q.   All right.  Now --
12        MS. PERSICO:  But can we just look -- if
13   you're going to use those, can we look at the
14   transcript that you --
15        MR. BRUSTIN:  No.  You can do it.  You can
16   ask him about it.
17        BY MR. BRUSTIN:
18        Q.   You said something along those lines,
19   correct?
20        A.   Correct.
21        Q.   Now, was that your belief?  Was it your
22   belief that Lamarr Scott believed he was only 16
23   years old even though he was 18?
24        MS. PERSICO:  Form.
25        THE WITNESS:  As I said before, my
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             229

```
 1                  Christopher J. Belling
 2   information at one point was that Robert Bryant and
 3   Annie Shannon told Lamarr Scott that the system
 4   would be lighter on him because of his age.
 5        BY MR. BRUSTIN:
 6        Q.    Because he was 16?
 7        A.    Whatever the age was.  16, 17, 18, I
 8   don't know.
 9        Q.    But he was 19.
10        A.    That's what he said in the TV
11   interview, yes.
12        Q.    He was an adult.
13        A.    That's what he said in the TV
14   interview.
15        Q.    Okay.  And you also told the students
16   that you didn't know anything about Lamarr Scott's
17   relationship with Valentino Dixon's family,
18   correct?
19        MS. PERSICO:  Form.
20        THE WITNESS:  Anything in particular, that's
21   correct.
22        BY MR. BRUSTIN:
23        Q.    And that's because you never
24   investigated that, correct?
25        MS. PERSICO:  Form.
```



```
 1                  Christopher J. Belling

 2          THE WITNESS:  I didn't investigate that, no.

 3          BY MR. BRUSTIN:

 4          Q.    And, to your knowledge, neither did the

 5   BPD?

 6          A.    I don't know what they did.

 7          Q.    Well, do you recall -- you reviewed --

 8   you've reviewed reports and testimony in

 9   preparation for today.  Do you remember seeing

10   anything concerning an investigation into Lamarr

11   Scott's relationship with Valentino Dixon's family?

12          MS. PERSICO:  Form.

13          THE WITNESS:  The information came out,

14   unfolded, that Lamarr Scott was part of Valentino

15   Dixon's circle of people.  I don't know from whence

16   that came, but it developed out he knew Mario

17   Jarmon.  He knew Leonard Brown.  He knew these

18   people, and he was called to the scene with

19   Valentino because he knew these people.

20          BY MR. BRUSTIN:

21          Q.    And the reason that you -- so your

22   understanding was -- throughout this case was that

23   19-year-old Lamarr Scott came in as an adult and

24   voluntarily admitted to shooting with a machine

25   gun, as you called it throughout the trial,
```



1                    Christopher J. Belling

2  Mr. Jackson?

3          MS. PERSICO:   Form.

4          THE WITNESS:   Yes, that's true.

5          BY MR. BRUSTIN:

6          Q.   And your theory as to why he did that

7  was some kind of pressure from Valentino Dixon's

8  family, correct?

9          A.   That's true.

10          Q.   And you conducted zero investigation

11  into that pressure, correct?

12          A.   No.

13          MS. PERSICO:   Form.

14          THE WITNESS:   That's what the Grand Jury

15  did.  We had Lamarr Jackson -- or Lamarr Scott in

16  the Grand Jury and testified about that very fact.

17          BY MR. BRUSTIN:

18          Q.   Ah, so it was an investigative Grand

19  Jury?

20          A.   No.  It was a Grand Jury investigation.

21          Q.   Yes.  You know what an investigative

22  Grand Jury is, right?

23          A.   Right, and we don't use them here.

24          Q.   You don't use them here.  What you do

25  is you do good old-fashioned police work, right, in



1                    Christopher J. Belling

2    Buffalo?

3          MS. PERSICO:  Form.

4          THE WITNESS:  I don't do any police work.

5          BY MR. BRUSTIN:

6          Q.   Well, my question is:  Before the Grand

7    Jury, many months later you conducted, first

8    yourself, you conducted zero investigation into the

9    connection between Lamarr Scott and Valentino

10   Dixon's family, correct?

11         A.   I did not, that's correct.

12         Q.   You have no idea whether the police

13   department conducted any investigation into the

14   relationship between Lamarr Scott and Valentino

15   Dixon's family?

16         MS. PERSICO:  Form.

17         THE WITNESS:  I can't agree with that,

18   because there was information coming in.  I don't

19   know how it came in, but it came in.

20         BY MR. BRUSTIN:

21         Q.   Well, was there -- what information

22   came in?

23         A.   That Lamarr Scott was part of Tino's

24   crew and that he was buddies with Mario, he was

25   buddies with Leonard Brown, he was buddies with



1                Christopher J. Belling

2   Antoine Shannon, and he was buddies with Valentino

3   Dixon.

4        Q.   And that's why he committed to a brutal

5   homicide that he didn't commit?

6        MS. PERSICO:  Form.

7        THE WITNESS:  That's -- you know, call him

8   crazy, but that's what happened.

9        BY MR. BRUSTIN:

10       Q.   Was there any investigation to whether

11  he was paid?

12       MS. PERSICO:  Pardon me?

13       BY MR. BRUSTIN:

14       Q.   Was there any investigation to whether

15  Lamarr Scott was paid?

16       MS. PERSICO:  Form.

17       THE WITNESS:  That was inquired into later

18  but not at the time I don't think.

19       BY MR. BRUSTIN:

20       Q.   By who?

21       A.   Let's see who got into that.  A lot

22  later.  Actually, in this -- in this case, I think

23  that was spoken about in his -- in his deposition.

24       Q.   Ah, so 30 years later?

25       A.   Apparently.



```
 1                    Christopher J. Belling
 2          Q.   Did anyone look at bank accounts?
 3          A.   No.
 4          MS. PERSICO:  Form.
 5          BY MR. BRUSTIN:
 6          Q.   Why wouldn't -- is that a crazy
 7    question that I'm asking?
 8          A.   It is.
 9          Q.   It is?
10          A.   This is a street murder.  We weren't
11    looking at bank accounts in 1991.
12          Q.   Ah, it would be crazy to think that
13    these street people like Mr. Bryant and his wife
14    might have a bank account, right?
15          MS. PERSICO:  Form.
16          BY MR. BRUSTIN:
17          Q.   Street people like that don't have bank
18    accounts, right?
19          A.   It would be something that would be --
20          MR. RUSS:  Objection to form.
21          THE WITNESS:  It would be something that
22    would be even more unusual that Lamarr Scott
23    walking in and confessing to a murder.
24          BY MR. BRUSTIN:
25          Q.   It would be.  If, for example, there
```



1              Christopher J. Belling

2    was a withdrawal from Mr. Bryant's bank account or

3    his wife's bank account, that would be -- that

4    would be crazy, right?

5           MS. PERSICO:  Form.

6           THE WITNESS:  It's just something that

7    wasn't in the realm of focus of this investigation.

8           BY MR. BRUSTIN:

9           Q.   That these kinds of people would

10   actually take money out of a bank, right?

11          MS. PERSICO:  Form.

12          THE WITNESS:  It wasn't the realm of focus.

13          MR. RUSS:  Objection to form.

14          THE WITNESS:  This wasn't a white-collar

15   crime investigation.

16          MR. BRUSTIN:  It wasn't white at all, I

17   agree.

18          MS. PERSICO:  Enough with that.  That's

19   improper.  Don't respond to that.

20          BY MR. BRUSTIN:

21          Q.   What made you -- so presumably as a --

22   as a decades-long homicide prosecutor, you were

23   interested in determining, what did these people

24   say to Lamarr Scott?  What did they give him to

25   cause him to confess to a brutal murder he didn't



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             236

1                     Christopher J. Belling

2    commit, correct?

3          MS. PERSICO:  Form.

4          THE WITNESS:  No.

5          BY MR. BRUSTIN:

6          Q.    Never crossed your mind?

7          A.    No.  I just knew they did it.

8          Q.    How did you know they did it?

9          A.    I saw it on TV.

10         Q.    What did you see them doing on TV that

11   made you convinced that they put him up to it?

12         MS. PERSICO:  Form.

13         THE WITNESS:  The fact that they brought him

14   to the scene of the so-called TV confession.

15         BY MR. BRUSTIN:

16         Q.    Did you have reason to believe that

17   Valentino Dixon's parents were criminals?

18         A.    Yes.

19         MS. PERSICO:  Form.

20         BY MR. BRUSTIN:

21         Q.    Oh, tell me about that.

22         A.    As I recall, Robert Bryant, it was told

23   to me by the police, did have some criminal

24   history.  I don't know about Annie Shannon.

25         Q.    Ah, when did that happen?



```
 1                    Christopher J. Belling

 2         A.    Sometime in the same chain of events.

 3         Q.    All right.  And do you know what his --

 4    what his criminal history was?

 5         A.    No.

 6         Q.    And is there a reason why that's not in

 7    the file?

 8         A.    No.

 9         Q.    And did that cause you to conclude

10    because he had had some criminal history that you

11    can't recall right now that he must have caused

12    Lamarr Scott to confess to a murder he didn't

13    commit?

14         MS. PERSICO:  Form.  I don't understand that

15    question.

16         THE WITNESS:  Yeah, I can't answer.

17         BY MR. BRUSTIN:

18         Q.    You're having trouble with that

19    question, too?

20         A.    Yeah.

21         Q.    So because he had a criminal history,

22    is that why you didn't conduct any further

23    investigation -- withdrawn.

24         So I'm trying to get at why you decided just

25    based on what you saw on TV that they somehow
```



 1                    Christopher J. Belling

 2    convinced Lamarr Scott to confess to a murder he

 3    didn't commit.

 4          MS. PERSICO:  Form.

 5          THE WITNESS:  That was the appearance of the

 6    event.  The -- this wasn't resolved until January

 7    of '92 when Lamarr Scott testified in the Grand

 8    Jury.

 9          BY MR. BRUSTIN:

10          Q.   Right.  So what did you do to

11    investigate what, if anything --

12          MS. PERSICO:  Form.

13          MR. BRUSTIN:  -- the family did to cause

14    Mr. Scott to lie as you -- as you concluded the

15    first day?

16          MS. PERSICO:  Objection.  Asked and

17    answered.

18          THE WITNESS:  There's nothing to investigate

19    there.

20          BY MR. BRUSTIN:

21          Q.   Really?  It wouldn't have been

22    necessary to talk -- to interview the parents

23    separately if they were willing to talk?

24          MS. PERSICO:  Mr. Brustin, Mr. Belling has

25    told you many times that he doesn't investigate.



1                   Christopher J. Belling

2           BY MR. BRUSTIN:

3           Q.   Ah.  So was that something you expected

4    the BPD to do?

5           A.   I would have expected the BPD to try

6    and them to say, no, we're not talking to you.

7           Q.   All right.  You've also told us today

8    that, in fact, you do investigate, and you

9    conducted a lot of investigative activities in this

10   case, correct?

11          MS. PERSICO:  Objection.  That has not been

12   the testimony.

13          THE WITNESS:  I conducted the Grand Jury

14   inquiry, which we call the Grand Jury

15   investigation, and during the process of putting

16   that together I did what I did.  The record's

17   clear.

18          BY MR. BRUSTIN:

19          Q.   You listed -- you told us earlier that

20   you interviewed as many as five or six witnesses,

21   correct?

22          A.   Right, for Grand Jury.

23          Q.   Just for Grand Jury purposes, not as an

24   investigator?

25          A.   Right, for Grand -- the Grand Jury



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                240

```
 1                    Christopher J. Belling
 2  investigation was ongoing from November, and I was
 3  talking to people November, December, January.
 4            MR. BRUSTIN:  All right.  You know what?
 5  Let's take a two-minute break or a five-minute
 6  break.
 7            THE VIDEOGRAPHER:  Going off the record at a
 8  time of 1459 as indicated on the video screen.
 9            (A recess was then taken at 2:59 p.m.)
10            THE VIDEOGRAPHER:  Back on the record at a
11  time of 1507.
12            BY MR. BRUSTIN:
13            Q.   Okay.  Just before we got on the
14  record, Mr. Belling, one of the things -- I take it
15  you and Mr. Russ are friends.
16            A.   Yes, I know Hugh.
17            Q.   And one of the things he said to you
18  during the break is that he gave you a reason as to
19  why -- he suggested a reason to you as to why you
20  wouldn't have mentioned contacting the DA before
21  trial, correct?
22            A.   Correct.
23            Q.   And is that your explanation as to why
24  you didn't say anything to him?
25            MS. PERSICO:  Form.
```



1                    Christopher J. Belling

2          THE WITNESS:  That's why I would not have

3    said anything to John Sullivan III, Rabbit, about

4    that.

5          BY MR. BRUSTIN:

6          Q.   Or you might have told -- you might

7    have told his father or John Sullivan just not to

8    mention anything, right?

9          MS. PERSICO:  Form.

10         BY MR. BRUSTIN:

11         Q.   You're happy to do it, but don't

12   mention it?

13         A.   No, I wouldn't have done that.

14         Q.   You wouldn't have done that.  But it

15   sounds like -- so are you saying now that you

16   always intended to do it, you just didn't tell him?

17         MS. PERSICO:  Form.

18         THE WITNESS:  No, I'm not saying that.

19         BY MR. BRUSTIN:

20         Q.   All right.  But I take it you were

21   appreciative of Mr. Russ's suggestion as to why you

22   might do that.

23         MS. PERSICO:  You don't need to answer that.

24         MR. BRUSTIN:  If Mr. Russ is giving him

25   information on the -- off the record about



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                                          242

```
 1                    Christopher J. Belling
 2   testimony he's giving in this case, I'm free to
 3   question him about it.
 4          MS. PERSICO:  Well, he wasn't.  He asked him
 5   a question.  You were here.  You've already asked
 6   him questions about it, and if you -- you're just
 7   making kind of a snarky commentary so --
 8          MR. BRUSTIN:  All right.  So let's mark this
 9   as Exhibit 33.
10   The following was marked for Identification:
11    EXH. 33              9/17/18 Answering Affidavit
12                         of DA Heraty (Dixon 4226-35)
13          MR. RUSS:  Okay.  What is it?
14          MR. BRUSTIN:  I'm going to give it to you
15   once she gets back on the record.  Patience.  It's
16   Bates-stamped pages Dixon 4226 through 4235, and
17   it's an affidavit from DA Heraty in connection with
18   the prosecution of Lamarr Scott.
19          BY MR. BRUSTIN:
20          Q.   So, first of all, have you reviewed
21   this document in preparation for today?
22          A.   No.
23          Q.   So, first of all, I'm not going to have
24   you read the whole thing.  It's too long, and we
25   don't have time.  But I will certainly let you read
```



```
 1                    Christopher J. Belling
 2   any portion that I ask you about, okay?
 3          Do you know David Heraty and Sara Dee?
 4          A.   Yes.
 5          Q.   And did you work with them as assistant
 6   district attorneys?
 7          A.   Yes.
 8          Q.   Did you ever have any reason to
 9   question their honesty or integrity?
10          A.   Yes.
11          Q.   Tell me about that.
12          A.   Well, Sara Dee was fired from the DA's
13   office for drinking on the job, and eventually
14   there was some disclosures on Facebook that she had
15   admitted to cheating on the bar exam.  I also knew
16   her to be often distracted at work.
17          David Heraty, one of the first things when I
18   came back to the DA's office in 2011 is I was asked
19   to review a Grand Jury transcript of his, and he
20   had fed a Grand Jury witness the wrong date of the
21   crime, and his proposed solution to the problem was
22   for him to go into the Grand Jury and tell them
23   that he gave the Grand Jury -- that he gave the
24   witness the wrong date and tell them what the right
25   date was.  And that forever marked David Heraty for
```



1                    Christopher J. Belling

2    me in terms of his level of competence.

3         Q.   Okay.  So that was a competence issue

4    and not an integrity issue?

5         A.   Well, if he wanted to go back in the

6    Grand Jury and testify himself to change a date, I

7    think it was both.

8         Q.   And what did you do -- what type of

9    action did you take as a result of his -- of that

10   conduct?  Did you report him to the DA?

11        A.   I told the DA about what had occurred,

12   and I directed Heraty that he had to get the

13   witness back into the Grand Jury and straighten it

14   out appropriately.

15        Q.   Was there any discipline taken against

16   Heraty as a result of that?

17        A.   I don't know.

18        Q.   Did you put anything in writing about

19   that complaint?

20        A.   No.

21        Q.   And in terms of -- anything else with

22   Heraty?

23        A.   Well, Heraty's now out of the DA's

24   office, and it's my understanding that's because he

25   conducted an unauthorized exoneration review.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          245

```
 1                Christopher J. Belling
 2        Q.   Okay.  And that's just what you're
 3   hearing.  You don't know that to be the fact,
 4   correct?
 5        A.   Well, I received the information from
 6   many authoritative sources, including studying the
 7   news reports of what went on, et cetera.
 8        Q.   Okay.  And in terms of -- anything else
 9   about Heraty?
10        A.   Not that I can think of.
11        Q.   And in terms of Miss Dee, did you also
12   know there were allegations of sexual harassment on
13   the job against her?
14        A.   That she was sexually harassing
15   someone?
16        Q.   That she was being sexually harassed.
17        A.   Oh.  I was not aware of those, no.
18        Q.   Okay.  Or that there were other
19   issues -- other issues that she complained of on
20   the job?
21        MS. PERSICO:  Form.
22        THE WITNESS:  Not that I was made aware of.
23        BY MR. BRUSTIN:
24        Q.   And certainly you didn't -- did you --
25   did you hear rumors that she was drinking on the
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            246

1                    Christopher J. Belling

2    job, or did you observe her to be drinking on the

3    job?

4            A.   No, she was fired for drinking on the

5    job.  I didn't observe it.  It was in one of the

6    town courts at a night court.

7            Q.   Okay.  And when was that?

8            A.   During the Frank Clark years, because

9    she was fired, and then she threatened to sue the

10   county because alcoholism is a disease, and she was

11   reinstated with a program and eventually, you know,

12   sort of righted that part of the ship.

13           Q.   Any other -- any other concerns about

14   Sara Dee?

15           A.   That she married a complete knucklehead

16   sheriff's deputy who's now indicted himself for

17   stuff out of the jail, and as I said, may --

18   admitted cheating on the bar exam and --

19           Q.   When did she admit to that?

20           A.   In a journal entry which her then

21   husband published online.

22           Q.   Okay.  Now, you were interviewed in

23   connection with the reinvestigation into the

24   Valentino Dixon prosecution, correct?

25           A.   I don't know that I was interviewed.  I



1                     Christopher J. Belling

2   know that Heraty called up and told me that they

3   were reaching a conclusion and, you know, sort of

4   sought my -- you know, sought my approval.  I don't

5   know if that's the right word but wanted to tell me

6   what was going on.

7          Q.   And what did you -- tell me about that

8   conversation you had with him.

9          A.   He said they conducted an investigation

10  and that they had reached a conclusion or John

11  Flynn had reached a conclusion and that they were

12  going to declare Valentino Dixon exonerated.

13         Q.   And what was your reaction to that?

14  What did you say to them?

15         A.   I said, you're going to do what you're

16  going to do, I'm not there anymore.

17         Q.   Take a look at paragraph 16.

18         A.   16.

19         Q.   And 17.

20         A.   Okay.

21         Q.   Let me know when you're done reading

22  those.

23         A.   Okay.

24         Q.   You read them both?

25         A.   Yes.



```
 1                 Christopher J. Belling

 2        Q.   Does this accurately describe the

 3   conversation that you had with them concerning the

 4   testing of gunpowder residue?

 5        A.   Yes.

 6        MS. PERSICO:  When you say them, you mean --

 7        THE WITNESS:  Paragraphs 16 and 17?

 8        MR. BRUSTIN:  Yes.

 9        THE WITNESS:  Yes.

10        BY MR. BRUSTIN:

11        Q.   Does Mr. Heraty in this -- what is it

12   called -- this affidavit accurately describe the

13   conversation he had with you?

14        MS. PERSICO:  I'm sorry, I think that this

15   is 16 -- 16 and 17 are talking about conversations

16   with the Georgetown?

17        MR. BRUSTIN:  No, 17 is talking about

18   conversations with --

19        MS. PERSICO:  Oh, I'm sorry.  16 is with the

20   students and 17 is --

21        THE WITNESS:  17, yeah, I accepted the

22   questioner's premise, yeah.

23        BY MR. BRUSTIN:

24        Q.   So he did -- he did talk to you -- he

25   did talk to you about this?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             249

```
 1                    Christopher J. Belling
 2          A.    Correct.
 3          Q.    And he accepted your answer as true?
 4          A.    Well, actually he established my answer
 5    to the students as having been wrong.
 6          Q.    And did you, in fact -- you did, in
 7    fact, tell the students that you thought that there
 8    had been testing on Valentino Dixon's case which
 9    came back negative?
10          A.    No, the students told me that there had
11    been testing that came back negative, and I just
12    went with it.
13          Q.    Okay.  But you -- you assumed it to be
14    true?
15          A.    I assumed them to be telling me the
16    truth.
17          Q.    Okay.  And your position today is you
18    just misremembered it?
19          A.    Correct, and they were lying to me, the
20    students.
21          Q.    Ah, they were lying.  They weren't --
22    they weren't mistaken, they were lying?
23          A.    They could have been mistaken as well.
24          Q.    Okay.  Now, I think -- is it still your
25    position that Mr. Scott faced no jeopardy by
```



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
250

```
 1                  Christopher J. Belling
 2   pleading guilty to the crimes that he pled to?
 3          A.   Yes.
 4          Q.   None whatsoever?
 5          A.   Correct.
 6          Q.   No jeopardy in terms of parole?
 7          A.   Not inured to him.
 8          Q.   And so you remain as confident today as
 9   you did at the time of the investigation that
10   Lamarr Scott was not the shooter?
11          A.   I wasn't there.  I don't know who was
12   the shooter.  But I think there are bigger problems
13   with Lamarr Scott being the shooter than with
14   Valentino Dixon being the shooter.
15          Q.   Well, just be clear.  You prosecuted
16   Valentino Dixon as being the shooter, correct?
17          A.   Correct.
18          Q.   And you prosecuted Mario Jarmon and
19   Leonard Brown for lying about Lamarr Scott being
20   the shooter, correct?
21          A.   Correct.
22          Q.   You must have been pretty sure about
23   it, right?
24          A.   At the time certainly.
25          Q.   Do you remain as sure today?  Simple
```



CHRISTOPHER J. BELLING                                          April 11, 2023
DIXON V. CITY OF BUFFALO                                                    251

```
 1                    Christopher J. Belling
 2   question.
 3           A.   I would say yes.
 4           Q.   Okay.  Now, just to -- just to finish
 5   up with this document, Exhibit 32, take a look at
 6   paragraph 13.  Now, I want you just to read to
 7   yourself number 6 of the bullet points.
 8           A.    Number 6, okay.
 9           Q.    On page 4.
10           A.    Okay.  Okay.
11           Q.    Other than Antoine Shannon, are you
12   familiar with any of these other witnesses and what
13   they say in regard to Lamarr Scott being the
14   shooter?
15           A.    I'm familiar with the name Walter
16   Dennis.  That goes back to the original
17   investigation.  The others, I have no idea.  I
18   never heard the names.
19           Q.    And you've already told us that you
20   went to Kentucky to interview Antoine Shannon?
21           A.    Correct.
22           Q.    As part of your investigation, correct?
23           A.    As part of getting everything ready for
24   the Grand Jury, yes.
25           Q.    You travelled to Kentucky as part of
```



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                               252

```
 1                  Christopher J. Belling
 2  getting ready for the Grand Jury?
 3         A.   Right.  He was a loose -- something
 4  that had to be dealt with before we put the case to
 5  the Grand Jury.
 6         Q.   And you could have easily sent a
 7  detective to do it, correct?
 8         A.   Buffalo would have never paid for it.
 9         Q.   Well, what you said in your letter was
10  that you wanted to do it personally, correct?
11         A.   No, what I said in my letter is that if
12  they locate any of these witnesses during the
13  daytime, I'd like to be there for the interview.
14         Q.   What you said was in particular with
15  Antoine Jarmon -- with Antoine Shannon, that you
16  wanted to be there for that one.  Do I need to show
17  it to you again?
18         A.   Yeah, because that's not what I said.
19  The letter was written after I talked to Antoine
20  Shannon.
21         Q.   All right.
22         MS. PERSICO:  Would you like him to look at
23  the letter?
24         MR. BRUSTIN:  The letter does say that but,
25  no, it's not worth it.
```



```
1                    Christopher J. Belling
2           BY MR. BRUSTIN:
3           Q.    Any of these other names you know?
4           A.    No.
5           Q.    So, to the best of your knowledge, you
6     were not aware of them at the time of the
7     investigation?
8           A.    Correct.
9           Q.    And you don't remember what, if
10    anything, Walter Dennis had to say?
11          A.    Yeah, I -- I do not remember what
12    Walter Dennis had to say or not say.  He was a
13    relative of Leonard Brown's I think, but that's all
14    I remember about him.
15          Q.    Okay.  And we're going to get to
16    Antoine Shannon in a minute, but the others you
17    don't recognize?
18          A.    Correct.
19          Q.    Okay.  Now, let's take a look at the
20    DA's file again, page 2409.
21          A.    2409.  2409.
22          Q.    Yeah.
23          A.    Yes.
24          Q.    And do you see at the bottom of the
25    page 2409, this is a handwritten version of a
```



1                    Christopher J. Belling

2    report that Stambach did.  It begins on 2407.

3          A.   Yes.

4          Q.   And the bottom it says:  Both bad boys

5    let go.  See you in the morning?

6          A.   Yes.

7          Q.   Well, that doesn't appear -- that

8    doesn't appear in the actual report.  Do you have

9    any understanding as to where that came from and

10   whose handwriting it is?

11         MS. PERSICO:  Form.

12         THE WITNESS:  No, not really.

13         BY MR. BRUSTIN:

14         Q.   Do you remember having any discussion

15   with Detective Stambach that morning or the next

16   day about letting two bad boys go?

17         MS. PERSICO:  Form.

18         THE WITNESS:  Not in those terms, no.

19         BY MR. BRUSTIN:

20         Q.   Those are not your terms, bad boys?

21         A.   No.

22         Q.   You didn't have discussion with

23   Lamarr -- with Stambach about Lamarr Scott and

24   Leonard Brown being bad boys and they should let

25   them go?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            255

```
 1                Christopher J. Belling
 2          MS. PERSICO:  Form.
 3          THE WITNESS:  No, I did not.
 4          BY MR. BRUSTIN:
 5          Q.   And I take it you didn't notice that
 6  that statement was on the handwritten document but
 7  not in the report?
 8          MS. PERSICO:  Form.
 9          THE WITNESS:  I've seen the statement on the
10  handwritten notes, but I didn't know whether it was
11  on the report or not.
12          BY MR. BRUSTIN:
13          Q.   Do you think "both bad boys let go, see
14  you in the morning" is in the report that's in the
15  police file?
16          MS. PERSICO:  Form.
17          THE WITNESS:  I haven't seen the report, so
18  I don't know.
19          BY MR. BRUSTIN:
20          Q.   All right.  So let's take a look at
21  2213.
22          MR. RUSS:  Sorry, did you say 2213?
23          MR. BRUSTIN:  I did.
24          THE WITNESS:  Okay.
25          MS. PERSICO:  We're not looking at the same
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            256

```
 1                Christopher J. Belling
 2  book.  Our 2213 is --
 3        THE WITNESS:  Is Antoine Shannon's
 4  statement.
 5        MR. BRUSTIN:  Yeah.  I will represent to you
 6  that --
 7        MS. PERSICO:  Well, what are you looking
 8  for?  We might know where it is.
 9        MR. BRUSTIN:  I'm going to skip it.
10        BY MR. BRUSTIN:
11        Q.   I will represent to you that Lamarr
12  Scott was subpoenaed to testify in the Grand Jury
13  on January 13th.  Does that sound about right?
14        A.   That's the right time frame, yes,
15  and -- yeah.
16        Q.   All right.  I want you to take a look
17  at the DA file again, and I want you to look at
18  1692.
19        A.   Got it.
20        Q.   And do you -- have you reviewed this
21  document in preparation for today?
22        A.   Yes.
23        Q.   All right.  And can you explain the
24  process by which Mr. Molloy was appointed?
25        A.   Okay.  As I testified earlier, at some
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             257

1                   Christopher J. Belling

2   point in this few days here, Lamarr Scott called in

3   and said, okay, I do want that lawyer.  So I had

4   him come to the DA's office.  From the DA's office,

5   we went to so-called criminal special term.

6        Criminal special term was in front of Judge

7   Joseph McCarthy in County Court at the time.  We

8   went in front of Judge McCarthy.  I explained to

9   Judge McCarthy the situation, that this individual

10  needed counsel in regard to a potential Grand Jury

11  appearance.  Judge McCarthy may have asked for some

12  more information, may not have, and Judge McCarthy

13  then would have just gotten out the book of

14  assigned counsel and said, okay, Jack Molloy.

15       Q.   It was the judge who decided Jack

16  Molloy?

17       A.   Oh, yeah.

18       Q.   Okay.  And did you know Jack Molloy?

19       A.   Yes.

20       Q.   How did you know him?

21       A.   He was an assistant DA earlier in my

22  career.  He came after I came to the DA's office

23  and left before I did.

24       Q.   Is he a friend of yours?

25       A.   He's a professional acquaintance.  I



```
 1              Christopher J. Belling
 2   don't know that he's a friend.  I don't think I've
 3   ever been out with him on any occasion.  Might have
 4   been at like a kind of retirement party perhaps.
 5         Q.   And did you talk to Mr. Molloy in
 6   connection with Lamarr Scott once he became
 7   appointed?
 8         A.   Yes.
 9         Q.   All right.  Did you meet with the two
10   of them together?
11         A.   Yes.
12         Q.   All right.  And what did you -- what,
13   if anything -- well, withdrawn.
14         First of all, what did you tell -- did you
15   speak to Mr. Molloy substantively about Lamarr
16   Scott prior to meeting with the two of them?
17         A.   I have no recollection of doing it, but
18   I certainly would have.
19         Q.   All right.  You have no recollection of
20   what you said -- what you said to Mr. Molloy prior
21   to him meeting with Mr. Scott?
22         MS. PERSICO:  Form.
23         MR. BRUSTIN:  I'm sorry, that was a bad
24   question.
25         BY MR. BRUSTIN:
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           259

```
 1                 Christopher J. Belling
 2        Q.   Prior to your meeting with Mr. Scott
 3   and Mr. Molloy --
 4        A.   Right.
 5        Q.   -- you believe you spoke to Mr. Molloy
 6   but you don't have any recollection as to what you
 7   said to him?
 8        A.   I briefed him on what was going on in
 9   the case, that he had been assigned by Judge
10   McCarthy.  I would have given him access to the TV
11   confession, Lamarr Scott's statement to the police,
12   so he had all those materials before he talked to
13   his client, and then he and I spoke.
14        Q.   Did you talk to him about -- did you
15   talk to either him or Mr. Scott about the
16   possibility of Mr. Scott being charged with perjury
17   if he maintained that he was the shooter and
18   Valentino Dixon was not?
19        MS. PERSICO:  Form.
20        THE WITNESS:  No, I don't think so.
21        BY MR. BRUSTIN:
22        Q.   Is it possible that you did?
23        A.   Certainly not with Lamarr Scott,
24   because I did not talk to Lamarr Scott other than
25   interviewing him as a witness in the presence of
```



```
 1                    Christopher J. Belling
 2    his lawyer.  And I don't know that I ever said
 3    anything to Molloy about that either.
 4         Q.   But you may have.
 5         A.   I was more concerned with talking to
 6    Molloy about getting to the bottom of this.  He --
 7    Jack Molloy is the kind of guy that would be able
 8    to get to the bottom of this.
 9         Q.   And Jack Molloy was able to get to the
10    bottom of this between January 9th and January
11    10th; is that right?  In one day he got to the
12    bottom of it?
13         A.   Apparently.
14         Q.   All right.  In any case, I'm not asking
15    you about other things that you talked to Jack
16    Molloy about.  I'm asking you whether it's possible
17    you said to him that Lamarr Scott might be charged
18    with perjury if he maintains the story that he shot
19    Torri Jackson.
20         A.   No.
21         Q.   You're sure -- now you're sure you
22    didn't say that?
23         MS. PERSICO:  Form.
24         THE WITNESS:  No, I didn't say that.
25         BY MR. BRUSTIN:
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            261

```
 1                    Christopher J. Belling
 2         Q.    Nothing like that.  Nothing about the
 3   possibility of perjury if you maintain the story?
 4         A.    No.
 5         Q.    And nothing like that in front of --
 6   nothing like that with Mr. Scott when you were
 7   meeting with the two of them?
 8         A.    No.
 9         Q.    And, again, you're certain about that?
10         A.    Yes.
11         Q.    You're certain you never said anything
12   about perjury before and you're certain you never
13   said anything about perjury when you met with the
14   two of them?
15         MS. PERSICO:  Form.
16         THE WITNESS:  I did not say that to Lamarr
17   Scott in regard to this thing.
18         BY MR. BRUSTIN:
19         Q.    And you're certain you never said it to
20   Molloy?
21         A.    I'm not certain what we discussed.
22         Q.    Well, that was my question before.  You
23   may have talked about the possibility of perjury
24   charges against him, correct?
25         A.    He may have said it to me.  I don't
```



```
 1                  Christopher J. Belling
 2    know.
 3         Q.   Well, you may have said it to him,
 4    correct?
 5         MS. PERSICO:   Form.
 6         THE WITNESS:   I would doubt it given the
 7    procedural posture of what was going on at the
 8    time.
 9         BY MR. BRUSTIN:
10         Q.   All right.   Well, you were certainly by
11    that time considering perjury charges against
12    Jarmon and Brown, correct?
13         MS. PERSICO:   By what time?
14         MR. BRUSTIN:   By the time -- by January 9th
15    of 1992.
16         THE WITNESS:   No, I don't think so.
17         BY MR. BRUSTIN:
18         Q.   Never crossed your mind?
19         A.   I don't think so, no.
20         Q.   Hadn't threatened it yet?
21         MS. PERSICO:   Form.   Don't answer that.
22         BY MR. BRUSTIN:
23         Q.   You hadn't mentioned that thought to
24    anybody?
25         MS. PERSICO:   Form.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            263

```
 1                   Christopher J. Belling
 2           THE WITNESS:  I don't recollect it, no.
 3           BY MR. BRUSTIN:
 4           Q.   Has there ever been another case in
 5   your career where you prosecuted two witnesses --
 6   withdrawn.
 7           Has there ever been another case in your
 8   career when you prosecuted a witness to a crime for
 9   misrepresenting who committed the crime?
10           MS. PERSICO:  Form.
11           THE WITNESS:  Yes.
12           BY MR. BRUSTIN:
13           Q.   What is the other case?
14           A.   There were a couple of cases in the --
15   the 2000s, after I came back to the office.  I
16   never prosecuted anybody for perjury, but we
17   prosecuted a couple people for contempt, for going
18   to the Grand Jury and saying they didn't know about
19   something that they obviously knew about.
20           Q.   And you actually prosecuted them, took
21   them to trial?
22           A.   Yes, yes.
23           Q.   And what case was that?
24           A.   I don't remember the names of the
25   people.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            264

```
 1                    Christopher J. Belling

 2         Q.    When was it?

 3         A.    Well, it was between 2011 and 2017.

 4         Q.    Okay.  Do you remember any other -- was

 5   it more than once?

 6         A.    At least twice that I'm recollecting.

 7         Q.    Do you remember anything about those

 8   two cases?

 9         A.    They were murder cases, and somebody

10   showed up in the Grand Jury and said they -- you

11   know, like they were standing here facing this

12   young lady and they didn't see anything, that kind

13   of thing.

14         Q.    And you prosecuted them for that?

15         A.    Yes.

16         Q.    And who were the defense lawyers in the

17   case?

18         A.    Not a clue.

19         Q.    Don't remember?

20         A.    No.

21         Q.    Nothing else you remember about it so

22   that I could find them?

23         A.    I don't remember anything about them.

24         Q.    But they were prosecuted for criminal

25   contempt?
```



1                   Christopher J. Belling

2         A.    That's my recollection, yes.

3         Q.    And it was sometime between 2000 and

4    2017?

5         A.    Correct.

6         Q.    All right.

7         MS. PERSICO:   2011 I think.

8         MR. BRUSTIN:   2011, I'm sorry, and 2017.

9         THE WITNESS:   Right.

10        BY MR. BRUSTIN:

11        Q.    Any other cases that you were involved

12   in where someone was prosecuted for lying about who

13   committed a crime?   That's what Brown -- withdrawn.

14        Brown essentially, Brown and Jarmon were

15   prosecuted for lying about who committed this

16   crime, correct?

17        MS. PERSICO:   Form.

18        THE WITNESS:   Yes.

19        BY MR. BRUSTIN:

20        Q.    Other than those contempt cases that

21   you just told us about, any other cases in your

22   career?

23        A.    I want to say one of the hinterlands.

24   I may have at least crossed paths with a case of

25   similar ilk in St. Lawrence County or maybe



1              Christopher J. Belling

2    Chenango County, but I'm not sure.

3         Q.   You have a vague recollection of

4    somebody else doing it in one of those counties?

5         A.   Yes.

6         Q.   Anybody else in your office prosecute

7    under those circumstances?

8         A.   I don't know.  Neither of the contempt

9    cases were mine, by the way.  They were somebody

10   else's.

11        Q.   Oh, okay.  Any other case -- so you

12   were actually -- you were answering a question as

13   to any case in the office?

14        A.   Correct.

15        Q.   Have there been other cases when you

16   have threatened witnesses or their attorneys with

17   prosecuting them for perjury based on information

18   they had provided to you prior to their testifying

19   at a trial?

20        MS. PERSICO:  Form.

21        THE WITNESS:  No.

22        BY MR. BRUSTIN:

23        Q.   Not once?

24        A.   Not that I recollect.

25        Q.   Okay.  So the only time you've ever



1              Christopher J. Belling

2    threatened or -- or prosecuted somebody for perjury

3    was this case?

4          MS. PERSICO:  Form.

5          THE WITNESS:  Well, I don't think I

6    threatened anybody in this case, but prosecuted,

7    yes.

8          BY MR. BRUSTIN:

9          Q.   Well, when they testified in the Grand

10   Jury, at least Leonard Brown, you read him the

11   perjury statute?

12         A.   Correct.

13         Q.   That's -- maybe threat's not the right

14   word, but warned?

15         MS. PERSICO:  Form.

16         THE WITNESS:  Informed.

17         BY MR. BRUSTIN:

18         Q.   Warned is too strong?

19         A.   I think so.

20         Q.   All right.  But the only case -- you've

21   done that in other cases?

22         MS. PERSICO:  I'm sorry.

23         THE WITNESS:  Done what?

24         BY MR. BRUSTIN:

25         Q.   Have you warned during the -- during



1                   Christopher J. Belling

2    testimony by reading them the perjury statute other

3    witnesses about lying?

4         A.   I think I can think of at least one

5    case where I may have done that, yes.

6         Q.   In connection with the perjury case, by

7    the way, because I've asked you what investigation

8    you directed or conducted in regard to Lamarr Scott

9    lying --

10        A.   Lamarr Scott what?

11        Q.   Lying about the shooter.

12        A.   Okay.

13        Q.   Did you conduct any additional

14   investigation of Lamarr Scott's version of the

15   shooting in connection with the perjury

16   investigation or trial?

17        MS. PERSICO:  Form.

18        THE WITNESS:  I didn't run the perjury

19   trial, so I don't know what Frank Sedita who did

20   run it did.

21        BY MR. BRUSTIN:

22        Q.   Well, up until the time of trial you

23   were the prosecutor on the case, correct?

24        MS. PERSICO:  Form.

25        THE WITNESS:  Not that I recall.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             269

```
 1                    Christopher J. Belling

 2          BY MR. BRUSTIN:

 3          Q.   That's what documentation suggests.

 4   Are you sure?

 5          MS. PERSICO:  I think he testified that as

 6   soon as -- he stopped being a prosecutor as soon as

 7   the Grand Jury indictment.

 8          BY MR. BRUSTIN:

 9          Q.   All right.  So in connection with the

10   Grand Jury, let's start with that, what

11   investigation -- what additional investigation into

12   Lamarr Scott's version of events did you conduct or

13   did you direct be conducted by the BPD?

14          MS. PERSICO:  In addition to what?

15          MR. BRUSTIN:  What you've described in

16   regard to Valentino Dixon's prosecution.

17          MS. PERSICO:  Object to the form of that.

18          THE WITNESS:  I still don't understand that.

19          BY MR. BRUSTIN:

20          Q.   So you talked about doing zero

21   investigation yourself in connection with

22   Valentino -- in connection with Lamarr Scott's

23   being the shooter, and you said you don't know what

24   the police did.  Do you remember that testimony

25   earlier today?
```



```
 1                  Christopher J. Belling

 2        A.   Yes.

 3        Q.   Did you conduct any -- any

 4   investigation in connection with -- withdrawn.

 5        The perjury charges were based on your

 6   belief that Lamarr Scott was lying about being the

 7   shooter, correct?

 8        MS. PERSICO:  Form.

 9        THE WITNESS:  No.

10        BY MR. BRUSTIN:

11        Q.   Well, that was a condition necessary to

12   prosecuting them, correct?

13        MS. PERSICO:  Form.

14        BY MR. BRUSTIN:

15        Q.   Lamarr Scott had to be lying about

16   being the shooter, correct?

17        MS. PERSICO:  Form.

18        THE WITNESS:  No, that's not a condition

19   necessary, no.

20        BY MR. BRUSTIN:

21        Q.   So, in other words, you -- even if you

22   knew that Lamarr Scott was the shooter, you still

23   might have prosecuted Leonard Brown and Mario

24   Jarmon for perjury?

25        MS. PERSICO:  Form.
```



```
 1                  Christopher J. Belling

 2          THE WITNESS:  It's the result of the Grand

 3    Jury investigation that caused them to be

 4    prosecuted for perjury.

 5          BY MR. BRUSTIN:

 6          Q.   But it's based on the lie that Lamarr

 7    Scott told in your view, correct?

 8          MS. PERSICO:  Form.

 9          THE WITNESS:  That's the --

10          BY MR. BRUSTIN:

11          Q.   That's the big lie?

12          MS. PERSICO:  Form.

13          THE WITNESS:  That's the net issue of the

14    whole event, yeah.

15          BY MR. BRUSTIN:

16          Q.   All right.  So did you conduct -- so my

17    simple question is:  Did you conduct any additional

18    investigation or direct any additional

19    investigation of Lamarr Scott's version of events

20    in connection with the perjury Grand Jury?

21          A.   The perjury Grand Jury was the same

22    Grand Jury.

23          Q.   Okay.  Take a look at page 1696 through

24    1700.

25          A.   1696?
```



```
 1                    Christopher J. Belling
 2          Q.   Yes, which is an affidavit you created
 3   on January 13th, 1992.
 4          A.   Okay.  You want me to read it?
 5          Q.   No, I want to direct your attention to
 6   certain portions.  First take a look at number 4.
 7          A.   Okay.
 8          Q.   And in number 4 you are making clear
 9   that pursuant to the investigation of the case, it
10   has been determined that Lamarr Scott came forward
11   as a result of the urging of Valentino Dixon's
12   family, correct?
13          A.   Correct.
14          Q.   And you've already described that
15   investigation, right?
16          A.   Correct.
17          Q.   Which was nonexistent?
18          MS. PERSICO:  Form.
19          THE WITNESS:  Is that a question?
20          BY MR. BRUSTIN:
21          Q.   Yeah, do you agree it was nonexistent
22   based on what you described earlier today under
23   oath?
24          A.   No.
25          Q.   Okay.  And -- and implicit in this is
```



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                              273

```
 1                  Christopher J. Belling
 2   you determined it was false, that statement?
 3          A.   That was my belief.
 4          Q.   And take a look at paragraph 6.  Read
 5   that, and tell me when you're done.
 6          A.   I read that.
 7          Q.   Do you remember what time Mr. Molloy
 8   was appointed on January 9th?
 9          A.   I do not.
10          Q.   Do you remember what time you spoke to
11   him on January 10th?
12          A.   No.
13          Q.   But fair to say it was a very short
14   period of time between when Mr. Molloy was
15   appointed, when you met with Mr. Molloy and
16   Mr. Scott, and when Mr. Scott recanted his
17   statement?
18          MS. PERSICO:  Form.
19          MR. RUSS:  Objection to form.
20          THE WITNESS:  And when Mr. Scott testified
21   in the Grand Jury.
22          BY MR. BRUSTIN:
23          Q.   No, I'm not talking about that.  I'm
24   only talking between the 9th and the 10th.
25          A.   Oh, okay.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            274

 1                  Christopher J. Belling

 2        Q.    That's all I'm talking about now.

 3   Presumably you learned either in the meeting with

 4   Mr. Molloy and Mr. Scott or soon after that

 5   Mr. Scott was recanting his statement, correct?

 6        A.    Yes, I did.

 7        Q.    And it all happened in a matter of

 8   hours, correct?

 9        A.    I don't know the time frame.  It

10   happened between when Molloy got involved and

11   whenever I talked to him and Mr. Scott.

12        Q.    Sometime on the 9th to sometime on the

13   10th, correct, it all happened?

14        A.    That's the time frame, yeah.

15        Q.    During that time frame you spoke to --

16   he was appointed.  You spoke to Molloy.  Then you

17   spoke with the two of them, and Scott fully

18   recanted.

19        A.    Correct.

20        Q.    Without any threats or promises from

21   you?

22        A.    Correct.

23        MS. PERSICO:  Form.  I'm not sure that this

24   indicates -- just to be clear, I'm not sure that

25   this affidavit indicates that Mr. Belling had that



CHRISTOPHER J. BELLING                                           April 11, 2023
DIXON V. CITY OF BUFFALO                                                    275

```
 1              Christopher J. Belling
 2  conference with Mr. Scott and Mr. Molloy.
 3       BY MR. BRUSTIN:
 4       Q.   It does not, but -- but I assume what
 5  you're telling us is that you had that conference
 6  before he recanted, correct?  Or was it during that
 7  conference when he recanted?  Or something else?
 8       A.   Okay.  Let me read paragraph 6 again.
 9       Q.   Sure.
10       A.   Yeah, this reflects a meeting with
11  Molloy where he told me what Lamarr Scott had told
12  him.
13       Q.   So you don't know one way or another --
14       A.   Whether Lamarr Scott was there or not.
15       Q.   Let me finish the question.  You don't
16  know one way or another whether you met with Molloy
17  and Lamarr Scott prior to learning that he was
18  recanting?
19       A.   That is correct.
20       Q.   You may have, you may not have,
21  correct?
22       A.   According to this paragraph, I did not.
23  I just met with Molloy or talked to him on the --
24       Q.   Where does it say that?
25       A.   Conference with Molloy wherein he
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                               276

 1              Christopher J. Belling

 2  confirmed that Lamarr Scott had falsely confessed,

 3  so I'm -- paragraph 6.  I'm only talking to Molloy

 4  at this point.

 5        Q.   Okay.  But you have no mention in here,

 6  which is done by the 13th, of any meeting with

 7  Mr. Scott and Mr. Molloy, correct?

 8        A.   No mention in here, no.

 9        Q.   So you don't know as you sit here today

10  whether or not you met with them and just didn't

11  put it in your affidavit, correct?

12        MS. PERSICO:  Form.

13        THE WITNESS:  That's true.  I had to have

14  met with the two of them at some point before the

15  Grand Jury which was I think the 13th.

16        BY MR. BRUSTIN:

17        Q.   Okay.  In any case, though, no threats

18  to Mr. Molloy regarding Mr. Scott or to Mr. Scott

19  directly that caused him to recant, correct?

20        A.   Absolutely not.

21        Q.   And, by the way, you had no idea, I

22  take it, on January 9th that Mr. Scott was going to

23  recant; is that your position?

24        A.   That is correct.

25        Q.   And anybody who says differently would



1                    Christopher J. Belling

2    be lying, correct?

3              MS. PERSICO:  Form.

4              THE WITNESS:  I can't say who's lying or

5    who's not.  I can tell you what I know, and there's

6    no such conversation.

7              BY MR. BRUSTIN:

8              Q.   Fair enough.  Anybody who suggests that

9    you knew before January 9th that Lamarr Scott was

10   going to recant is either lying or mistaken?

11             MS. PERSICO:  Form.

12             THE WITNESS:  That's not what I knew, let's

13   put it that way.

14             BY MR. BRUSTIN:

15             Q.   Do you have a problem calling somebody

16   a liar?

17             MS. PERSICO:  Form.

18             THE WITNESS:  Inappropriately, yes.

19             BY MR. BRUSTIN:

20             Q.   Okay.  You would only call someone a

21   liar appropriately?

22             MS. PERSICO:  Form.  You don't need to

23   answer that.

24             BY MR. BRUSTIN:

25             Q.   Like you did with Mr. Brown and



```
 1                  Christopher J. Belling
 2   Mr. Jarmon.
 3           A.   Mr. Who?
 4           Q.   Mr. Brown and Mr. Jarmon.
 5           A.   I didn't call them liars.
 6           Q.   You charged them with perjury.  That's
 7   lying.
 8           A.   No, the Grand Jury charged them with
 9   perjury.
10           Q.   Based on your presentation.
11           A.   Based on the presentation that occurred
12   that day.
13           Q.   By you?
14           A.   The evidence was presented by me.
15           Q.   You were the only lawyer in the room?
16           A.   Correct.
17           Q.   You ran that Grand Jury?
18           A.   In the expression, yes.
19           Q.   Take a look at the perjury binder,
20   please.
21           A.   Okay.
22           Q.   And take a look at page 3130 --
23           MR. RUSS:  Sorry.  I'm not sure why that
24   happened.  That's the music I was listening to this
25   morning.
```



1                    Christopher J. Belling

2           MR. BRUSTIN:  Just make it stop, please.

3           THE WITNESS:  3130?  There is no 3130.

4           BY MR. BRUSTIN:

5           Q.    There's 3133.

6           A.    I have 3133, yes.

7           Q.    Yeah, that's what I want.  3133 and

8    3134.

9           A.    Yes.

10          Q.    And this is when you are bringing

11   perjury charges against Leonard Brown and Mario

12   Jarmon?

13          A.    This is the computer input form that

14   reflects opening of these cases.

15          Q.    And that was on 1/13/92.

16          A.    That is correct.

17          Q.    January 13th, 1992.

18          A.    Correct.

19          Q.    This is two days after Mr. Scott

20   recanted, correct?

21          A.    I think this is the same day as the

22   Grand Jury presentment.

23          Q.    Okay.  And does this refresh your

24   recollection about anything you may have said to

25   Mr. -- Mr. Molloy or Mr. Scott in regard to



CHRISTOPHER J. BELLING                                              April 11, 2023
DIXON V. CITY OF BUFFALO                                                        280

1                    Christopher J. Belling
2    potential perjury charges three days before?
3             A.    No.
4             MS. PERSICO:  Form.
5             BY MR. BRUSTIN:
6             Q.    But certainly you were aware by the 9th
7    and the 10th that you were going to be bringing
8    perjury charges against Mario Jarmon and Leonard
9    Brown, right?
10            A.    No.
11            MS. PERSICO:  Form.  Asked and answered.
12            BY MR. BRUSTIN:
13            Q.    You decided it on the 13th?
14            A.    It was determined that they would --
15   the Grand Jury would be given that charge on the
16   law on the 13th.
17            Q.    You hadn't considered it -- but you
18   hadn't considered it by the 9th?
19            A.    I didn't, no.
20            Q.    When did they testify?
21            A.    I think on the 13th.
22            Q.    Okay.  Now, do you deny, Mr. Belling,
23   telling Lamarr Scott that it would be in his best
24   interest -- best interest to testify at the Grand
25   Jury and say that Valentino Dixon committed the



```
 1                    Christopher J. Belling
 2  crime?
 3          MS. PERSICO:  Form.
 4          THE WITNESS:  I do deny that, yes.
 5          BY MR. BRUSTIN:
 6          Q.   And do you deny conspiring with
 7  Detective Stambach to threaten Mr. Scott if he
 8  didn't recant his testimony?
 9          A.   Yes, I deny that.
10          Q.   Do you deny any knowledge of Mr. -- of
11  Detective Stambach making threats to Mr. Scott
12  concerning recanting his testimony in between
13  August 12th of 1991 and the Grand Jury?
14          MS. PERSICO:  Form.
15          MR. RUSS:  Objection to form.
16          THE WITNESS:  I don't know anything about
17  that.
18          BY MR. BRUSTIN:
19          Q.   Do you deny telling Mr. Scott that you
20  know he didn't commit the crime but that you're
21  going to prosecute Valentino Dixon for it anyway?
22          MS. PERSICO:  Form.
23          THE WITNESS:  That question has a double
24  entendre in it.
25          BY MR. BRUSTIN:
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            282

```
 1                  Christopher J. Belling
 2          Q.   Okay.  I'll make it clear.
 3          A.   Okay.
 4          Q.   Do you recall telling -- withdrawn.
 5          Do you deny telling Lamarr Scott in
 6  substance that you know Valentino Dixon didn't
 7  commit the crime but that you were going to
 8  prosecute him anyways?
 9          A.   I never said anything like that to
10  Lamarr Scott.
11          Q.   Do you deny telling Lamarr Scott that
12  you know he's being pressured by the Dixon family
13  and that there was even a rumor that they gave him
14  $5,000?
15          A.   I never said anything like that to
16  Lamarr Scott.
17          Q.   Do you deny saying anything about a
18  money payment from the family to Lamarr Scott?
19          A.   Yes, I deny that.
20          Q.   And you deny having any information,
21  even rumor, that the family paid Lamarr Scott money
22  to falsely confess to the crime?
23          MS. PERSICO:  Form.
24          THE WITNESS:  I don't know that one way or
25  the other.
```



800.211.DEPO (3376)
EsquireSolutions.com

CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          283

```
1                    Christopher J. Belling
2          BY MR. BRUSTIN:
3          Q.   Well, you didn't receive any
4   information to that effect; is that fair to say?
5          A.   After the fact, in this proceeding I
6   have heard that bandy develop, but I didn't know
7   anything about it then.
8          Q.   What did you hear about it in this
9   proceeding?
10         A.   As I recall, during somebody's
11  deposition there was an inquiry as to whether Scott
12  and Dixon had colluded in prison to agree to
13  somebody gets paid for something if you say
14  something.
15         Q.   Ah.   Do you remember where you saw
16  that?
17         A.   No, not really.
18         Q.   All right.  But at the time that you
19  were prosecuting this case, you didn't have any
20  information concerning payments from the Dixon
21  family to Lamarr Scott?
22         MS. PERSICO:  Form.
23         THE WITNESS:  I didn't have any such
24  information, no.
25         BY MR. BRUSTIN:
```



```
 1                    Christopher J. Belling

 2          Q.   And I think you told us you couldn't

 3    recall one way or another whether or not you met

 4    with Mr. Scott's foster parents at any point in

 5    time; is that correct?

 6          A.   Correct.  I just don't remember that at

 7    all.

 8          Q.   All right.  But you certainly deny

 9    telling Lamarr Scott that his parents could be held

10    responsible for his actions; fair to say?

11          A.   Yeah, that's ludicrous.

12          Q.   Okay.  And if he said that, he's lying?

13          MS. PERSICO:  Form.

14          THE WITNESS:  Well, he's mistaken clearly.

15          BY MR. BRUSTIN:

16          Q.   You certainly never did that?

17          A.   I never did that.  I never -- don't

18    remember talking to his parents, and if I had, I

19    wouldn't have said that.

20          Q.   And it would have been totally

21    inappropriate to do it, correct?

22          A.   True.

23          Q.   It would have been clear coercion?

24          MS. PERSICO:  Form.

25          THE WITNESS:  It would have been wrong.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            285

```
 1                    Christopher J. Belling

 2          BY MR. BRUSTIN:

 3          Q.   It would have been coercive.

 4          MS. PERSICO:  Form.

 5          THE WITNESS:  Well, coercion is a crime that

 6   has elements, but it would have been wrong.

 7          BY MR. BRUSTIN:

 8          Q.   All right.  And you never would have

 9   done that?

10          A.   Correct.

11          Q.   And you deny providing any pressure on

12   him to change his story by bringing his foster

13   parents into a meeting with him, correct?

14          A.   Correct.

15          Q.   And you deny any type of threats of any

16   kind to their well-being after they left?

17          A.   Absolutely.

18          Q.   And you deny telling Lamarr Scott you

19   got the guy you wanted, there's nothing he can do,

20   he's going to be convicted?

21          A.   Again, you had some misplaced pronouns

22   there.

23          Q.   I did, you're right.  Let me do it

24   again.  Do you deny telling Mr. Scott, we got the

25   guy you wanted, there's nothing you can do, he,
```



 1                   Christopher J. Belling

 2  being Valentino Dixon, is going to be convicted?

 3        MS. PERSICO:  Form.

 4        THE WITNESS:  I never said that.

 5        BY MR. BRUSTIN:

 6        Q.   Do you deny ever telling him in words

 7  or in substance that you knew Valentino Dixon

 8  wasn't the shooter?

 9        MS. PERSICO:  Form.

10        THE WITNESS:  Absolutely not.

11        BY MR. BRUSTIN:

12        Q.   And that he was going to be convicted

13  with or without Lamarr's confession.  Do you deny

14  that?

15        A.   Correct, I do deny that.

16        MS. PERSICO:  Form.

17        BY MR. BRUSTIN:

18        Q.   And obviously either of those things

19  would have been completely inappropriate if you had

20  done them?

21        MS. PERSICO:  Form.

22        THE WITNESS:  Yeah.

23        BY MR. BRUSTIN:

24        Q.   If you used either of those things to

25  get him to recant his statement, they would have



```
 1                  Christopher J. Belling

 2    been wholly inappropriate, correct?

 3         A.    Yes.

 4         Q.    And you deny telling Lamarr Scott in

 5    substance that if he didn't change his story, you

 6    would go after Mr. Scott every time he was charged

 7    and Lamarr would ultimately serve a lot of time

 8    anyway?

 9         MS. PERSICO:  Form.

10         THE WITNESS:  I never said anything like

11    that.

12         BY MR. BRUSTIN:

13         Q.    And that would have been totally

14    inappropriate if you had, correct?

15         A.    Yeah.

16         Q.    He's lying if he says that you said

17    that, correct?

18         MS. PERSICO:  Form.

19         THE WITNESS:  It's clearly inaccurate on his

20    part.

21         BY MR. BRUSTIN:

22         Q.    Well, that's not the kind of thing you

23    make a mistake about, right?

24         MS. PERSICO:  Form.  You don't need to

25    answer that.
```



1              Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   You never said it?

4         A.   I never said it.

5         Q.   Nothing like that, correct?

6         A.   No.

7         Q.   Now, I know that you said that you

8    don't investigation homicides, that's for the

9    police to do, but you did have numerous cases where

10   you relied on physical evidence for -- to prove

11   guilt, correct?

12        MS. PERSICO:  Form.

13        THE WITNESS:  I have had cases with physical

14   evidence, yes.

15        BY MR. BRUSTIN:

16        Q.   And certainly based on the

17   circumstances described concerning this shooting,

18   you would have expected that the shooter who was

19   firing the machine gun as you refer to it as and

20   was standing over the victim unloading the

21   automatic weapon, you would expect that the shooter

22   would likely have all kinds of potential forensic

23   evidence on their person, correct?

24        MS. PERSICO:  Form.

25        THE WITNESS:  Not necessarily.



CHRISTOPHER J. BELLING                                         April 11, 2023
DIXON V. CITY OF BUFFALO                                                289

1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Well, certainly you would expect there

4  was a possibility of there being blood on the

5  shooter, correct?

6          MS. PERSICO:  Form.

7          THE WITNESS:  Expect the possibility?

8          BY MR. BRUSTIN:

9          Q.   You would expect there's a reasonable

10  likelihood that there would be blood given the

11  circumstances of this shooting somewhere on the

12  shooter's body, correct?

13          MS. PERSICO:  Form.

14          THE WITNESS:  It's possible.

15          BY MR. BRUSTIN:

16          Q.   Perhaps on their clothes or their

17  shoes, correct?

18          MS. PERSICO:  Form.

19          THE WITNESS:  If it's possible, it's

20  possible, yeah.

21          BY MR. BRUSTIN:

22          Q.   All right.  And do you know something

23  about weapons through either your personal life or

24  through your experience as a prosecutor?

25          A.   A little bit.



CHRISTOPHER J. BELLING                                              April 11, 2023
DIXON V. CITY OF BUFFALO                                                        290

```
 1                   Christopher J. Belling
 2          Q.    In fact, didn't you carry a gun
 3    yourself for a long time?
 4          A.    I have a pistol permit and I have
 5    carried a gun, yes.
 6          Q.    All right.  And would it be fair to say
 7    that you would expect that someone who fired that
 8    TEC-9 in the manner and in which it was fired and
 9    the range at which it was fired, you would expect
10    that that person, their clothing would be covered
11    in gunpowder, correct?
12          MS. PERSICO:  Form.
13          THE WITNESS:  Not necessarily.  There's a
14    lot of variables in there.
15          BY MR. BRUSTIN:
16          Q.    Certainly there's a possibility of that
17    given the weapon and the number of shots fired and
18    the distance, correct?
19          A.    Possibilities are endless.
20          Q.    Okay.  And one of the ways that the
21    police could have investigated Lamarr Scott's story
22    would have been to ascertain whether there was any
23    physical evidence connecting him to the crime,
24    correct?
25          MS. PERSICO:  Form.
```



1                    Christopher J. Belling

2          MR. RUSS:  Objection to form.

3          THE WITNESS:  Speculatively, sure, I guess.

4          BY MR. BRUSTIN:

5          Q.   You guess?

6          A.   Yeah.

7          Q.   Well, what about blood evidence?  What

8    if, for example, Lamarr Scott had blood on his

9    clothing or his shoes from the victim?  Would that

10   be evidence that might tend to corroborate his

11   version of events?

12         MS. PERSICO:  Form.

13         THE WITNESS:  If -- on the happenstance that

14   he did, sure.

15         BY MR. BRUSTIN:

16         Q.   Do you know whether or not he ever

17   volunteered providing any clothing to the police?

18         MS. PERSICO:  Form.

19         THE WITNESS:  I do not know that.

20         BY MR. BRUSTIN:

21         Q.   Do you know whether or not the

22   police -- whether or not he ever volunteered

23   providing his clothing to the police?

24         MS. PERSICO:  You just asked that question.

25         MR. RUSS:  Objection to form.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              292

```
 1                  Christopher J. Belling
 2        BY MR. BRUSTIN:
 3        Q.   I'm sorry, do you know whether or not
 4   the police ever questioned Lamarr Scott about what
 5   clothes he was wearing and whether he would provide
 6   them?
 7        A.   I do not know that.
 8        Q.   You certainly did not make any
 9   suggestions in that regard, correct?
10        A.   No.
11        Q.   Now, you understood by 1991 that
12   gunpowder residue testing -- I have a couple of
13   articles actually about cases that were going on in
14   Erie County.  Although it was recognized that
15   gunpowder testing wasn't conclusive frankly in any
16   case, it was still evidence that was used in a
17   variety of criminal investigations; fair to say?
18        MS. PERSICO:  Form.
19        THE WITNESS:  It was used during a period of
20   time, yes.  I don't know what the period of time
21   was.
22        BY MR. BRUSTIN:
23        Q.   Do you remember the Clarissa Gladden
24   trial?  This is a case in which she was accused and
25   convicted of -- no, this is the wrong one.
```



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                                          293

```
 1                    Christopher J. Belling

 2          MS. PERSICO:  Do you need a minute?

 3          MR. BRUSTIN:  Let's take a break.

 4          THE VIDEOGRAPHER:  Going off the record at a

 5    time of 1601.

 6          (A recess was then taken at 4:01 p.m.)

 7          THE VIDEOGRAPHER:  Going back on the record

 8    at a time of 1606.

 9          BY MR. BRUSTIN:

10          Q.   Before we get to the article, can you

11    go back to -- is that the perjury file?  I think it

12    is.

13          A.   Yes, compilation of Jarmon and Brown

14    perjury file documents.

15          Q.   Take a look at page 2757, please.

16          A.   2757.  Got it.

17          Q.   And this indicates that -- this letter

18    on page 2757 indicates that you're still the DA,

19    assistant DA, on the perjury prosecution as of June

20    24th, 1992, correct?

21          A.   Let me read it.  It indicates that I'm

22    still somehow involved.  I don't know.  If my name

23    was on the file, it's because I was city to --

24    supervisor or whatever.

25          Q.   Had you been taken off the case by this
```



1                    Christopher J. Belling

2    point as the assistant DA?

3        A.   My belief is that I took myself off the

4    case and gave it to one of my assistants, Frank

5    Sedita.

6        Q.   But you continued to conduct activities

7    as the Assistant District Attorney in the case?

8        A.   I continued to conduct activities as an

9    Assistant District Attorney in Erie County who was

10   involved in this case.

11       Q.   Now, one of the things you told -- you

12   know, I'll come back to that.

13       MR. BRUSTIN:  Let's take a look at this.

14   Let's mark this please as 34.

15   The following was marked for Identification:

16    EXH. 34              article headed Chemist Tells

17                         of Tests After Gladden

18                         Slaying

19       BY MR. BRUSTIN:

20       Q.   So I'm showing the witness a newspaper

21   article from May 1993 from The Buffalo News

22   concerning the Gladden case.  You know what?  This

23   is super short.  Why don't you just read it.

24       A.   Okay.

25       Q.   Do you recall this case?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              295

```
 1                    Christopher J. Belling

 2          A.   I do not.

 3          Q.   But at least pursuant to this

 4   description of the case, it appears that as of 1993

 5   in Buffalo, in Erie County, they were still doing

 6   gunpowder residue testing on clothes, correct?

 7          MS. PERSICO:  Form.

 8          THE WITNESS:  That's -- I don't know if The

 9   Buffalo News is accurate here, but there seems to

10   be a 1990 homicide on trial in '93 so -- and

11   supposedly in this 1990 homicide there is -- there

12   was a gunshot residue test done.

13          BY MR. BRUSTIN:

14          Q.   And, in fact, at least according to

15   this article, the clothing was gathered around the

16   time of the crime, and the testing wasn't conducted

17   for two weeks, correct?

18          MS. PERSICO:  I don't know where you're

19   getting that from.

20          BY MR. BRUSTIN:

21          Q.   Second paragraph, Dr. Germani told

22   State Supreme Court Justice Vincent Doyle he did

23   tests on the nightgown several weeks after the

24   November 25th, 1990, slaying, correct?

25          A.   Oh, okay, yeah.
```



1              Christopher J. Belling

2          MS. PERSICO:  You're asking if that's what

3     it says?

4          MR. BRUSTIN:  Yes.

5          BY MR. BRUSTIN:

6          Q.   And your understanding was that that's

7     the kind of testing that was being done in Erie

8     County in 1990, 1991, correct?

9          A.   Sometimes yes, sometimes no.

10         Q.   All right.  And would it be fair to say

11    that although you as a lay person in regard to

12    forensic testing -- withdrawn.

13         You were not a forensic analyst, correct?

14         A.   Correct.

15         Q.   But you often presented forensic

16    evidence at trial, correct?

17         A.   True.

18         Q.   And you became accustomed with how it

19    worked, at least in general, from a layman's

20    perspective?

21         A.   True.

22         Q.   Enough to explain it to a jury?

23         A.   True.

24         Q.   And you understood, for example, that

25    in 1991, although gunshot residue testing wasn't



1              Christopher J. Belling

2    dispositive, the presence of gunshot residue,

3    particularly a large amount of gunshot residue,

4    could be incriminating evidence.

5         A.   Could be.

6         Q.   And --

7         MS. PERSICO:  I'm sorry, this is my office

8    keeps calling.  I feel like there's an emergency.

9    I'm sorry.

10        MR. BRUSTIN:  Let's go off the record for a

11   minute.

12        THE VIDEOGRAPHER:  Going off the record at a

13   time of 1612 as indicated on the video screen.

14        (Off the record at 4:12 p.m.)

15        THE VIDEOGRAPHER:  Back on the record at a

16   time of 1613 as indicated on the video screen.

17        (Off the record at 4:13 p.m.)

18        BY MR. BRUSTIN:

19        Q.   I can't remember exactly where I left

20   off, but certainly you understood in 1991 that

21   large -- particularly large amounts of gunpowder

22   residue on a shooter's clothing could be evidence

23   used to demonstrate that they committed a crime?

24        MS. PERSICO:  Form.

25        THE WITNESS:  Could be helpful evidence,



1                 Christopher J. Belling

2  yes.

3          BY MR. BRUSTIN:

4          Q.   And in this case you understood, as

5  you've described, Lamarr Scott came in and

6  voluntarily confessed to this crime, correct?

7          A.   Correct.

8          Q.   The police didn't go to his house.  He

9  came in on his own?

10         A.   Correct.

11         Q.   And he voluntarily gave a statement?

12         A.   Correct.

13         Q.   As far as you knew, he answered all the

14 questions that were asked of him?

15         A.   As far as I know.

16         Q.   And you would agree that one of the

17 best ways to determine whether or not what he was

18 saying was truthful or not would be to look for

19 corroborating evidence, correct?

20         MS. PERSICO:  Form.

21         THE WITNESS:  Could have been helpful.

22         BY MR. BRUSTIN:

23         Q.   Well, it would have been -- it could

24 have been dispositive, correct?

25         A.   No, I don't think so.



1              Christopher J. Belling

2       Q.   It would have been very helpful in

3  determining whether he was telling the truth,

4  correct?

5       A.   It could have been helpful.

6       Q.   All right.  And you would expect if he

7  was telling the truth, one of the things he may

8  well have done is offered, if he's asked, offered

9  to provide clothing that he was wearing that night,

10  correct?

11       MS. PERSICO:  Form.

12       THE WITNESS:  Double speculation.  I don't

13  know how to answer that.

14       BY MR. BRUSTIN:

15       Q.   Well, the way to answer it is, he

16  should have been asked, right?

17       MS. PERSICO:  Let him do the answering.

18       THE WITNESS:  Yeah, exactly, if you want to

19  do the answering.  I don't know.  They didn't ask,

20  so there's no clothing, so there you go.

21       BY MR. BRUSTIN:

22       Q.   Did it ever strike you as odd that

23  nobody asked him --

24       MS. PERSICO:  Form.

25       BY MR. BRUSTIN:



CHRISTOPHER J. BELLING                          April 11, 2023
DIXON V. CITY OF BUFFALO                                      300

```
 1              Christopher J. Belling
 2       Q.   -- for what he was wearing the night
 3  of -- the night where he claims to have killed
 4  someone at close range with a semiautomatic -- with
 5  a machine gun, as you called it?
 6       A.   Right.  It didn't seem particularly
 7  unusual, no.
 8       Q.   Okay.  Did it ever cross your mind that
 9  maybe we should ask him what he was wearing and see
10  if it's filled with gunpowder?
11       MS. PERSICO:  Form.
12       THE WITNESS:  Never crossed my mind, as I
13  recall.
14       BY MR. BRUSTIN:
15       Q.   Well, you know -- you knew at that time
16  based on your involvement with gunpowder residue
17  testing in other case that if, in fact, he shot
18  that gun the way he described and if, in fact, he
19  didn't wash, for example, the shirt or the coat
20  that he was wearing, there might well be large
21  amounts of gunpowder remaining on that garment?
22       MS. PERSICO:  Form.
23       THE WITNESS:  I did not know that, no.
24       BY MR. BRUSTIN:
25       Q.   You didn't know that was a possibility?
```



1            Christopher J. Belling

2        MS. PERSICO:  Form.

3        THE WITNESS:  I did not know that all those

4   potential possibilities were out there, no.

5        BY MR. BRUSTIN:

6        Q.   All right.  It sounds like one thing we

7   can agree on for sure is that you don't recall

8   having any discussion with any police officers

9   concerning potential forensic testing on Mr. Scott.

10       A.   Right.  Mr. Scott showed up wearing

11   absolute fresh out-of-the-box clean clothes based

12   on my observations of him.  So, yeah, no, I had no

13   discussions about any other clothes.

14       Q.   Did you look at him for that reason, to

15   see if there might be something he was wearing that

16   could be tested?

17       MS. PERSICO:  Form.

18       THE WITNESS:  No, I looked at him because I

19   looked at him.  That's -- saw who he was.

20       BY MR. BRUSTIN:

21       Q.   Did you look at his shoes?

22       MS. PERSICO:  Form.

23       THE WITNESS:  I don't recall looking at his

24   shoes.

25       BY MR. BRUSTIN:



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              302

```
 1                  Christopher J. Belling
 2        Q.   All right.  But you remember being
 3   struck by how new his clothes were?
 4        A.   Yes.
 5        Q.   Are you suggesting that they bought him
 6   these clothes as a reward?
 7        MS. PERSICO:  Form.
 8        THE WITNESS:  I have no idea where his
 9   clothes came from.
10        BY MR. BRUSTIN:
11        Q.   Why was it striking that he was wearing
12   very clean clothes?
13        A.   Because that was just, you know, item
14   number 72 on the list of bizarre things with him
15   showing up to confess on a street corner to the
16   news media dressed in a brand new flat-brimmed hat
17   and a brand-spanking-new white T-shirt.
18        Q.   Yeah, what I'm asking you about is why
19   is it unusual?  It doesn't strike me as unusual.
20   I'm trying to find out what you thought was unusual
21   about it.
22        A.   Because he's showing up to confess to a
23   murder, and he's apparently dressed up to do it.
24        Q.   So what you viewed as a new hat and a
25   clean or new T-shirt --
```



1                     Christopher J. Belling

2          A.    Right.

3          Q.    -- you thought was dressed up?

4          A.    I thought was dressed up to show up to

5     confess to a murder, yes.

6          Q.    That he was wearing a T-shirt and a

7     hat?

8          A.    A bright white T-shirt and a

9     flat-brimmed hat, yes.

10         Q.    Okay.  Now, one of the things you told

11    the students at Georgetown was that Lamarr Scott

12    was not charged with perjury because he went to the

13    Grand Jury and retracted his lying statements,

14    correct?

15         A.    Yes.

16         MS. PERSICO:  Form.

17         BY MR. BRUSTIN:

18         Q.    And you also told them that effectively

19    that eliminated him as a witness in Valentino

20    Dixon's criminal trial.

21         MS. PERSICO:  Form.

22         THE WITNESS:  Well, it certainly --

23         MS. PERSICO:  Are you asking what he said to

24    them or his -- or are you asking him a question?

25         MR. BRUSTIN:  First of all, I'm asking what



CHRISTOPHER J. BELLING                              April 11, 2023
DIXON V. CITY OF BUFFALO                                        304

```
 1                  Christopher J. Belling
 2   he said to them.
 3            THE WITNESS:  I did say that to them.
 4            BY MR. BRUSTIN:
 5            Q.  And that's true, correct?  You knew
 6   that?
 7            MS. PERSICO:  Form.
 8            THE WITNESS:  Actually, I wasn't thinking
 9   that far down the road when he was at the Grand
10   Jury, but in retrospect, that's the case.
11            BY MR. BRUSTIN:
12            Q.  Okay.  And obviously the same is true
13   for Leonard Brown and Mario Jarmon.
14            MS. PERSICO:  Form.
15            BY MR. BRUSTIN:
16            Q.  By prosecuting them for perjury, they
17   were worthless as witnesses to Mr. Dixon, correct?
18            A.  No, I don't agree with that.  I think
19   that with an appropriate application from defense
20   counsel, they probably could have still testified
21   and that wouldn't have come out.
22            Q.  Did you think that that might be a
23   hindrance to their willingness to testify in
24   Mr. Dixon's criminal trial, the fact that you were
25   prosecuting them for perjury?
```



```
 1                    Christopher J. Belling

 2         MS. PERSICO:  Form.

 3         THE WITNESS:  I don't know what they

 4    considered.

 5         BY MR. BRUSTIN:

 6         Q.   You haven't considered that?

 7         A.   No.

 8         Q.   I think I may have asked you this, but

 9    I just want to make sure.  Did you ever have any

10    discussion with any of the officers concerning why

11    Aaron Jackson or other witnesses who were

12    interviewed after Mr. Scott came forward weren't

13    shown photo arrays with Mr. Scott in them?

14         MS. PERSICO:  Form.

15         MR. RUSS:  Objection to form.

16         THE WITNESS:  I know some witnesses were.  I

17    don't know who they all were.

18         BY MR. BRUSTIN:

19         Q.   Okay.  What I can tell you from the

20    records is that there is a note in the file, an

21    undated note, of Fred Stencil and one other person

22    being showing photo arrays of Lamarr Scott but no

23    police reports whatsoever of anyone being shown

24    photos of Lamarr Scott.  Do you have an explanation

25    for that?
```



1                    Christopher J. Belling

2          A.    Of Fred Stencil and who being showed

3    photos of who?

4          Q.    Fred Stencil and --

5          A.    And Robert Lewis.

6          Q.    And Robert Lewis.

7          A.    Being showed a photo array with Lamarr

8    Scott in it.

9          Q.    Being shown two photo arrays.  One

10   was -- there's a note of Robert Lewis and Fred

11   Stencil being shown two photos -- photo arrays, one

12   with Valentino Dixon and one with Lamarr Scott, and

13   according to the note making no identification.

14         A.    Okay.

15         MS. PERSICO:  Whose note is that?

16         THE WITNESS:  It's my note.

17         MS. PERSICO:  Okay.

18         BY MR. BRUSTIN:

19         Q.    And it's undated?

20         A.    I don't remember it that well, but I

21   remember seeing it.

22         Q.    Okay.  I can represent to you it's

23   undated, and you don't remember when it happened?

24         A.    No.

25         Q.    Okay.  It may have been months after



1                    Christopher J. Belling

2    the shooting, correct?

3          A.    Could have been.

4          Q.    And do you have any explanation as to

5    why there are no police reports of any witness

6    being shown photo arrays of Lamarr Scott?

7          MR. RUSS:  Objection to form.

8          THE WITNESS:  I do not know.

9          BY MR. BRUSTIN:

10         Q.    And you don't recall having any

11   discussions with any officers about that?

12         A.    No.

13         Q.    Including Aaron Jackson?

14         A.    Aaron Jackson is not a police officer.

15         Q.    Including -- showing -- no discussions

16   with police officers concerning their failure to

17   show Aaron Jackson a photo array with Lamarr Scott?

18         MS. PERSICO:  Form.

19         THE WITNESS:  Yeah, I don't recall

20   discussing that with anybody.

21         BY MR. BRUSTIN:

22         Q.    All right.  So let's take a look at

23   page -- in the police file, page 155.

24         A.    Oh, at the BPD COMP number, okay.

25         Q.    Yes.



```
 1                    Christopher J. Belling

 2         A.    155.  Okay.  BPD COMP 0155.

 3         Q.    Actually, this is the wrong page.

 4  Sorry about that.  Let's take a look at page 185.

 5         A.    Okay.

 6         MS. PERSICO:  COMP 185?

 7         MR. BRUSTIN:  Yes.

 8         THE WITNESS:  COMP 185.  A P-73 from Mark

 9  Stambach reflecting --

10         MR. BRUSTIN:  Interaction with Aaron

11  Jackson.

12         THE WITNESS:  Okay.

13         BY MR. BRUSTIN:

14         Q.    And, first of all, you understood based

15  on this report and others that the initial

16  identification by Aaron Jackson of Valentino Dixon

17  was tentative?

18         A.    That's what this report reflects.

19         Q.    And you did not receive any information

20  from any police officer or any other report

21  contradicting that; fair to say?

22         MS. PERSICO:  Form.

23         MR. RUSS:  Objection to form.

24         THE WITNESS:  From the police, I don't know.

25  I don't think so.
```



1              Christopher J. Belling

2        BY MR. BRUSTIN:

3        Q.   Okay.  In other words, the police

4   reported to you consistently that the initial

5   viewing of a photo of Valentino Dixon by Aaron

6   Jackson resulted in only a tentative

7   identification, correct?

8        MS. PERSICO:  Form.

9        THE WITNESS:  This report reflects that.

10       BY MR. BRUSTIN:

11       Q.   All right.  And you don't recall the

12   police telling you anything inconsistent with this

13   report, correct?

14       MS. PERSICO:  Form.

15       THE WITNESS:  Not that I recall.

16       BY MR. BRUSTIN:

17       Q.   Do you recall receiving any information

18   from any source inconsistent with this report?

19       MS. PERSICO:  Form.

20       THE WITNESS:  Well, eventually talking to

21   Aaron Jackson, he told me that he was sure it was

22   Valentino, but that's not from the police.

23       BY MR. BRUSTIN:

24       Q.   Did he tell you that he was certain

25   when he had looked at the photo array?



1                    Christopher J. Belling

2          A.    I don't remember.

3          Q.    Did he tell you when he became certain

4    it was Valentino Dixon?

5          A.    I don't remember that either.

6          Q.    Did he tell you it had anything to do

7    with anything the police said to him?

8          A.    I don't remember anything like that.

9          Q.    Certainly the police never disclosed to

10   you anything they said or did with Aaron Jackson to

11   change his identification from a tentative

12   identification to a certain identification,

13   correct?

14         A.    Correct.

15         MR. RUSS:  Objection to form.

16         BY MR. BRUSTIN:

17         Q.    Now, what investigation did you

18   conduct, if any, into whether Aaron Jackson or

19   Torriano Jackson had a gun the night of the

20   homicide?

21         MS. PERSICO:  Form.

22         THE WITNESS:  Interviewed the witnesses in

23   regard to the Grand Jury presentation to see if

24   anybody said they saw Torriano or Aaron Jackson

25   with a gun.



1                     Christopher J. Belling

2           BY MR. BRUSTIN:

3           Q.    Okay.  So sometime months later you

4      asked some witnesses about that?

5           MS. PERSICO:    Form.

6           THE WITNESS:  Well, November, and then

7      December, and then January.

8           BY MR. BRUSTIN:

9           Q.    Which witnesses did you ask?

10          A.    Any witnesses I could get to come in

11     and talk to me who claimed to know about that.

12          Q.    Well, tell me one.

13          A.    Emil Adams, Travis Powell.

14          Q.    Did you document those interviews where

15     they told you that -- you asked them if Torri

16     Jackson or Aaron Jackson had weapons and they said

17     no?

18          A.    I haven't seen notes that I did, so I

19     presume I didn't.

20          Q.    Are you aware of any investigation that

21     was conducted by the BPD into whether or not Aaron

22     Jackson or Torri Jackson had a gun that night?

23          A.    I am not aware of any.

24          Q.    All right.  Now, one of the things that

25     you would agree, I take it, is -- from your



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            312

1                    Christopher J. Belling
2    experience as a prosecutor is that oftentimes
3    well-meaning witnesses are notoriously bad at
4    describing how many shots were fired?
5         A.   I could not agree with that.
6         MR. RUSS:  Objection to form.
7         BY MR. BRUSTIN:
8         Q.   It hasn't been your experience that
9    oftentimes witnesses in traumatic situations like
10   shootings misremember how many shots were fired?
11        A.   That has not been my experience.
12        MR. RUSS:  Objection to form.
13        BY MR. BRUSTIN:
14        Q.   Your experience has been typically
15   witnesses remember exactly how many shots were
16   fired?
17        MS. PERSICO:  Form.
18        THE WITNESS:  My experience has been they
19   testify to what they testify to.  I didn't keep
20   score of who got the number of shots right and who
21   got it wrong.
22        BY MR. BRUSTIN:
23        Q.   But you certainly -- you certainly
24   evaluate the reliability and credibility of
25   witnesses that you call, correct?



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                 313

1                    Christopher J. Belling

2          A.   Yes.

3          Q.   And my question is:  In your

4   experience, have you noticed in general that

5   witnesses who you believe are otherwise telling the

6   truth often are mistaken about the number of shots

7   that were fired?

8          MS. PERSICO:  He's answered that question.

9          MR. RUSS:  Objection to form.

10         THE WITNESS:  And the answer is no, I have

11  never made any observation like that.

12         BY MR. BRUSTIN:

13         Q.   All right.  In fact, best you can

14  recall, that never happened?

15         MS. PERSICO:  That is not what the testimony

16  was, and you've asked him that question three

17  times.  He's not going to give you the answer you

18  want.  You may just move on.

19         MR. BRUSTIN:  That's exactly the answer I

20  want.

21         BY MR. BRUSTIN:

22         Q.   Has it been your experience then that

23  generally people are pretty reliable about how many

24  shots were fired and how many they heard?

25         MS. PERSICO:  Object to form.



```
 1                   Christopher J. Belling
 2          THE WITNESS:  I'm trying to think of cases
 3   where that mattered, and I can't even think of any.
 4          BY MR. BRUSTIN:
 5          Q.   It certainly didn't matter in this
 6   case, correct?
 7          MS. PERSICO:  Form.
 8          THE WITNESS:  Well, it was certainly
 9   mentioned in this case, but in the long run, it
10   wasn't a particularly pivotal issue.
11          BY MR. BRUSTIN:
12          Q.   One of the reasons you mentioned to the
13   Georgetown students as to why you determined that
14   Aaron Jackson and Torri Jackson didn't have a gun
15   is because Leonard Brown and Mario Jarmon described
16   more than one shot, correct?
17          MS. PERSICO:  Form.
18          THE WITNESS:  Leonard --
19          MR. RUSS:  Objection to form.
20          THE WITNESS:  Mario Jarmon said that one of
21   the Jacksons shot him three times which was a
22   physical impossibility, so that was of
23   significance.
24          BY MR. BRUSTIN:
25          Q.   In other words, what was significant to
```



1              Christopher J. Belling

2  you was that based on the physical evidence you

3  were told that there was only one shot that could

4  have been fired by that gun, correct?

5         A.   If that gun was fired at all, yes.

6         MS. PERSICO:  Form.

7         BY MR. BRUSTIN:

8         Q.   If it was fired at all, it was fired

9  once?

10        A.    Correct.

11        Q.    And so the fact that he said it was

12  three times when it was only one time was highly

13  significant to you?

14        MS. PERSICO:  Form.

15        THE WITNESS:  It was significant to me.

16        BY MR. BRUSTIN:

17        Q.   So this was a case where a -- a witness

18  saying the wrong number of shots was significant?

19        MS. PERSICO:  Form.

20        THE WITNESS:  No, this is a case where a

21  witness who had an interest in the outcome, namely

22  was a friend of Valentino's, was saying something

23  that was demonstrably untrue.

24        BY MR. BRUSTIN:

25        Q.   So that's something that you determined



CHRISTOPHER J. BELLING                                   April 11, 2023
DIXON V. CITY OF BUFFALO                                          316

1                    Christopher J. Belling
2  wasn't a mistake when he said three shots versus
3  one shot.  You determined that it was a
4  fabrication?
5          MS. PERSICO:  Form.
6          THE WITNESS:  It was the conclusion that the
7  evidence versus what he said brought me to, sure.
8          BY MR. BRUSTIN:
9          Q.   The fact that he said three shots when
10  the evidence showed it was only one shot?
11          MS. PERSICO:  Form.
12          THE WITNESS:  At best it was one shot, if it
13  was any.
14          BY MR. BRUSTIN:
15          Q.   Well, the physical evidence certainly
16  allowed for one shot, correct?
17          MS. PERSICO:  Form.
18          THE WITNESS:  Correct, it allowed for it.
19          BY MR. BRUSTIN:
20          Q.   All right.  Now, you talked about going
21  to visit Antoine Shannon in Kentucky, correct?
22          A.   I did go to visit him in
23  Campbellsville, Kentucky.
24          Q.   And the reason you went there, you
25  said, is because you knew the BPD wouldn't have



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          317

```
 1                   Christopher J. Belling
 2   authorized detectives to go there?
 3         MS. PERSICO:  Form.
 4         THE WITNESS:  Well, the District Attorney at
 5   the time suggested strongly that he was a loose end
 6   who should be interviewed, and I knew the BPD
 7   wouldn't spring for it.
 8         BY MR. BRUSTIN:
 9         Q.   Well, how did you get the BPD to spring
10   for them going to Michigan to get Emil Adams?
11         A.   They had no option.  They had to do
12   that.
13         Q.   But the only reason you went to
14   interview Antoine Shannon in person is because you
15   knew that BPD wouldn't do it?
16         A.   I suspected BPD wouldn't do it, and the
17   DA told me to do it.
18         Q.   All right.  Now, do you deny trying to
19   persuade -- withdrawn.
20         First of all, did you tape-record the
21   interview with Antoine Shannon?
22         A.   No.
23         Q.   Did you take notes at that interview?
24         A.   No, not that I remember.
25         Q.   And you said you were with the DA at
```



1                    Christopher J. Belling

2    the time, correct?

3        A.   Correct.

4        Q.   At that time in 1991, was it the

5    practice of the DEA investigators to create reports

6    of witness interviews they conduct?

7        A.   No, not necessarily.

8        Q.   Sometimes?

9        A.   I suppose there would be circumstances

10   when you'd ask an investigator to go out and

11   interview a witness and bring back a report on what

12   was said, but there was no policy in regard to

13   that.

14       Q.   Okay.  Did the investigator that you

15   brought with you to Kentucky take notes?

16       A.   Not that I'm aware of.

17       Q.   Did he create a report?

18       A.   No.

19       Q.   Do you deny trying to persuade Antoine

20   Shannon not to say that Valentino was innocent?

21       MS. PERSICO:  Form.

22       THE WITNESS:  Do I -- triple negative.  Do I

23   deny trying to persuade not to --

24       BY MR. BRUSTIN:

25       Q.   It was a bad question.  It was a bad



1              Christopher J. Belling

2    question.  Let me ask you a different question.  Do

3    you deny trying to get Antoine Shannon to recant

4    his statement saying that Valentino Dixon was not

5    the shooter?

6         MS. PERSICO:  Form.

7         THE WITNESS:  No, he gave the statement to

8    me.

9         BY MR. BRUSTIN:

10        Q.   During that interview did you try to

11   get him to recant that statement?

12        A.   No.

13        Q.   If he's saying that, he's lying or

14   mistaken, correct?

15        A.   Yes.

16        MS. PERSICO:  Form.

17        BY MR. BRUSTIN:

18        Q.   Do you deny telling Mr. Shannon that

19   you knew he was getting pressure from the family

20   and that's why he was giving this false statement?

21        MS. PERSICO:  Form.

22        THE WITNESS:  I have no recollection of ever

23   having said anything like that.  That doesn't make

24   sense in the context in which we were at this point

25   but -- yeah, I didn't say that.



```
 1                 Christopher J. Belling

 2        BY MR. BRUSTIN:

 3        Q.   It certainly doesn't make sense if you

 4   weren't trying to convince him to change his story,

 5   right?

 6        A.   True.

 7        MS. PERSICO:  Form.

 8        BY MR. BRUSTIN:

 9        Q.   And you deny doing that, right?

10        A.   True.

11        Q.   And according -- do you deny repeatedly

12   during that interview trying to get Mr. Shannon to

13   admit that Mr. Dixon's family put him up to lying?

14        MS. PERSICO:  Form.  Wait a minute, I can't

15   even process that question.

16        BY MR. BRUSTIN:

17        Q.   Mr. Shannon --

18        A.   The answer is that never happened.  I

19   took his statement.  I wrote it out as he told it

20   to me.

21        Q.   All right.  And you never -- you never

22   once, let alone numerous times, tried to convince

23   him that he was lying because of pressure from

24   Valentino's family, correct?

25        A.   No, I just took his statement.
```



1              Christopher J. Belling

2        Q.   And do you deny that Mr. Shannon told

3   you that Torriano Jackson had a gun?

4        A.   No, I think it's in his statement.

5        Q.   All right.  Have you ever been -- have

6   you ever been accused of prosecutorial misconduct

7   other than in this case?

8        A.   Other than what?

9        Q.   In this case.

10       A.   I don't remember ever having been.

11       Q.   To the best of your recollection, you

12  never were?

13       A.   Yes.

14       Q.   All right.  What about -- what about

15  the Anitha Ubiles case?

16       MS. PERSICO:  Can you spell that?

17       THE WITNESS:  Anitha Ubiles, not that I

18  recall.  That was a simple straight-up murder.

19       MR. BRUSTIN:  Okay.  Do you --

20       MS. PERSICO:  Do you mind spelling that?

21       MR. BRUSTIN:  Yeah.  I think it's

22  A-N-I-T-H-A, U-B-I-L-E-S.

23       THE WITNESS:  That's correct.

24       BY MR. BRUSTIN:

25       Q.   And this was a case where Miss Ubiles



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            322

```
 1              Christopher J. Belling
 2   was charged with arson and murder for killing her
 3   husband's pregnant girlfriend and their two sons,
 4   correct?
 5         A.   Correct.
 6         Q.   And although the conviction was upheld,
 7   do you recall the Court of Appeals rebuking you for
 8   your contemptuous comments to the jury, their
 9   words, including that she invoked her right to an
10   attorney?
11         MS. PERSICO:  Form.  Do you have that case?
12         MR. BRUSTIN:  I don't.
13         THE WITNESS:  I don't recall either that
14   happening during the trial or the Court of Appeals'
15   decision.
16         BY MR. BRUSTIN:
17         Q.   Okay.  Certainly if that ever happened,
18   you weren't made aware of it, to the best of your
19   knowledge?
20         MS. PERSICO:  I'm sorry, can you just be
21   clear?
22         BY MR. BRUSTIN:
23         Q.   If you -- if you were rebuked, as I
24   just described, for contemptuous comments to the
25   jury by the Court of Appeals, the Appellate
```



1                    Christopher J. Belling

2    Division --

3          A.    Which is it?

4          Q.    I think it's the Appellate Division,

5    sorry.

6          A.    Okay.

7          MS. PERSICO:  Do you have the cite?

8          MR. BRUSTIN:  I don't have the cite with me,

9    but I'm reading from -- I'm quoting from a

10   newspaper article around the time.

11         BY MR. BRUSTIN:

12         Q.    Do you -- would it be fair to say that

13   if that had been in a decision from the Appellate

14   Division, that's something you'd remember?

15         A.    Might be if it was brought to my

16   attention.

17         MS. PERSICO:  When was that?

18         MR. BRUSTIN:  1985.

19         BY MR. BRUSTIN:

20         Q.    In any case, you have no recollection

21   of it?

22         A.    No.

23         Q.    While I'm looking for this --

24         A.    You know -- no, never mind.  I was

25   trying to think of the Ubiles case.



1           Christopher J. Belling

2           MS. PERSICO:  Wait for a question.

3           BY MR. BRUSTIN:

4           Q.   I should have told you outright in the

5    beginning.  If at any time you have a clearer

6    memory of anything, please put it on the record.

7           Okay.  So one of the other things you told

8    the Georgetown students was that there was

9    communication after Mr. Dixon's trial between the

10   judge and a juror concerning a mistake being made

11   at the trial.

12          So, first of all, do you remember saying

13   that to the Georgetown students?

14          A.   No, they said that to me as I recall.

15          Q.   All right.  Did you recall a

16   conversation between the judge and a juror about

17   the validity of the conviction?

18          A.   No.

19          Q.   You have no recollection whatsoever?

20          A.   No, never heard that.

21          Q.   No recollection of a juror expressing

22   doubt to the judge and the judge telling the juror

23   in substance that they had made the right decision?

24          A.   Well, that's been --

25          MR. RUSS:  Objection to form.



```
 1                    Christopher J. Belling
 2          THE WITNESS:  That's been bandied about in
 3    this whole process, but I don't have any direct
 4    knowledge of it.
 5          BY MR. BRUSTIN:
 6          Q.   That's what I'm asking you.  You don't
 7    remember ever hearing anything like that?
 8          A.   No.
 9          Q.   And you were certainly present for
10    those proceedings?
11          MS. PERSICO:  Object to form.
12          THE WITNESS:  No, I wasn't.
13          BY MR. BRUSTIN:
14          Q.   Let me rephrase the question.  Would it
15    be fair to say that to the extent the judge was
16    talking to the jury in the courtroom, you would
17    have been present?
18          A.   Talking to the jury in the courtroom,
19    yes, you're accurate.
20          Q.   All right.  Let's go back to -- let's
21    do this first.  Let's mark this as 35.
22    The following was marked for Identification:
23     EXH. 35              10/9/07 Affidavit of Thomas
24                          Roland (Dixon 5943-45)
25          MR. BRUSTIN:  Just let me know when you're
```



1              Christopher J. Belling

2  done.

3         MS. PERSICO:  I just have a -- so is this --

4  so this is a statement of Thomas Roland on behalf

5  of Johnnie Lane?

6         MR. BRUSTIN:  Yeah.

7         MR. RUSS:  Thomas who?

8         THE WITNESS:  Thomas Roland, R-O-L-A-N-D.

9         MR. RUSS:  Thank you.

10        MS. PERSICO:  Made an affidavit on behalf of

11 Derrick Brown.

12        THE WITNESS:  And Johnnie Lane, yeah.  Okay.

13        BY MR. BRUSTIN:

14        Q.   So, first of all, are you -- prior to

15 seeing this just now, have you ever been made aware

16 of these allegations against you?

17        A.   No.

18        Q.   Do you recall this case?

19        A.   Yes.

20        Q.   Can you describe the case?

21        A.   The case was called The Tomatoes

22 Pizzeria Murders.  Actually, it was three different

23 cases linked together by a common firearm.  Johnnie

24 Lane and Derrick Brown were the defendants charged

25 in each of those three cases.  Thomas Roland was a



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             327

1                     Christopher J. Belling

2  witness.

3          Q.   And I take it you deny the allegations

4  in here against you, correct?

5          A.   Yes.

6          Q.   And specifically you deny coaching this

7  witness --

8          MS. PERSICO:  Which witness do you think

9  this is?

10         MR. BRUSTIN:  This is Mr. Roland.

11         BY MR. BRUSTIN:

12         Q.   You deny coaching Mr. Roland to

13  implicate defendant Johnnie Lane, correct?

14         A.   Correct.

15         MS. PERSICO:  Form.

16         BY MR. BRUSTIN:

17         Q.   And you deny learning from Mr. Lane

18  that he knew nothing about these crimes and

19  covering it up, correct?

20         MS. PERSICO:  Form.

21         THE WITNESS:  I don't think I ever talked to

22  Mr. Lane.

23         BY MR. BRUSTIN:

24         Q.   Mr. Roland, I'm sorry.

25         A.   I --



```
 1                    Christopher J. Belling
 2          Q.   You deny -- you deny that Mr. Roland
 3   told you he knew nothing and you effectively
 4   coerced him into implicating Mr. Lane, you deny
 5   that, correct?
 6          A.   Certainly, yes.
 7          MS. PERSICO:  Form.
 8          BY MR. BRUSTIN:
 9          Q.   But you would agree that those are the
10   same allegations that we're making against you in
11   this case, correct?
12          MS. PERSICO:  Form.
13          THE WITNESS:  No.
14          BY MR. BRUSTIN:
15          Q.   They're similar.
16          MS. PERSICO:  Form.
17          BY MR. BRUSTIN:
18          Q.   You coerced Mr. Scott into recanting?
19          A.   No.
20          MS. PERSICO:  Form.
21          BY MR. BRUSTIN:
22          Q.   You don't see the similarity in the
23   allegations?
24          A.   I do not.
25          MS. PERSICO:  Form.
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              329

```
 1                    Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   Mr. Lane is accusing you of coercing --
 4   Mr. Roland is accusing you of coaching him into
 5   implicating Mr. Lane, correct?
 6          MS. PERSICO:  Form.  He's already denied
 7   those allegations.
 8          MR. BRUSTIN:  I understand that.
 9          MS. PERSICO:  Well, then don't ask him to
10   say that the allegations are correct.
11          BY MR. BRUSTIN:
12          Q.   Well, I'm asking you to say the
13   allegations are similar, that's all.
14          A.    The allegations are --
15          MS. PERSICO:  Form.
16          THE WITNESS:  -- not similar.
17          BY MR. BRUSTIN:
18          Q.   How are they different?
19          A.    Well, Roland was a witness, not a
20   potential target in the investigation.  And Roland
21   makes --
22          MS. PERSICO:  First of all, we won't --
23          THE WITNESS:  I disagree that they're
24   similar, let's put it at that.
25          MR. BRUSTIN:  Okay.  And please don't stop
```



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                                        330

```
 1                 Christopher J. Belling
 2  him during an answer.
 3        BY MR. BRUSTIN:
 4        Q.   Now, one of the things I've been told
 5  by a number of defense attorneys is that, or my
 6  colleagues have been told, is that one of the
 7  things you would brag about as a prosecutor is that
 8  it's easy to convict a guilty man.  It's really
 9  difficult to convict an innocent man.  Do you
10  remember saying that to any defense attorneys?
11        MS. PERSICO:  Form.
12        THE WITNESS:  No.
13        BY MR. BRUSTIN:
14        Q.   Is that something you remember ever
15  saying?
16        MS. PERSICO:  Form.
17        BY MR. BRUSTIN:
18        Q.   Did those words ever come out of your
19  mouth, to your recollection?
20        MS. PERSICO:  That's a -- how can he answer
21  that question?  Did those words all come out in a
22  sequence?  What are you asking him?
23        BY MR. BRUSTIN:
24        Q.   I'm really -- I think I'm obviously
25  asking about the sequence.  Did you ever say in
```



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                              331

 1                    Christopher J. Belling

 2  substance what I just described to you out loud,

 3  that it's easy to convict a guilty man but it's

 4  difficult to convict an innocent man?

 5         MS. PERSICO:  It's easy to convict a guilty

 6  man --

 7         THE WITNESS:  Yeah, I -- I don't recall

 8  saying that.

 9         BY MR. BRUSTIN:

10         Q.   Okay.  Do you deny saying that?

11         A.   Yeah, I would say so.

12         Q.   So anybody who would state that you

13  said in words or substance it's easy to convict a

14  guilty man but it's hard to convict an innocent man

15  is either lying or mistaken?

16         MS. PERSICO:  Form.

17         THE WITNESS:  Yes, or misinterpreting the

18  statement.

19         BY MR. BRUSTIN:

20         Q.   Okay.  And you also deny, I think

21  you've already done this but I want to make it

22  clear, you deny ever threatening other witnesses

23  with prosecution the way you prosecuted Mario

24  Jarmon and Leonard Brown for perjury?

25         MS. PERSICO:  Object to the form.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              332

```
 1                  Christopher J. Belling

 2          THE WITNESS:  I do deny that.  Again, it's a

 3   compound question, but I do deny it.

 4          BY MR. BRUSTIN:

 5          Q.   You certainly deny using the

 6   prosecution of Mario Jarmon and Leonard Brown to

 7   convince other witnesses to tell the story that you

 8   want them to tell?

 9          MS. PERSICO:  Objection to form.

10          THE WITNESS:  That just makes no sense.

11          BY MR. BRUSTIN:

12          Q.   Sure.  Do you ever -- do you deny ever

13   telling, after you prosecuted Mario Jarmon and

14   Leonard Brown for perjury --

15          A.   Right.

16          Q.   -- do you deny ever using that

17   successful prosecution to convince other witnesses

18   in your cases to stick with the version of events

19   that you want?

20          A.   No, never happened.

21          MS. PERSICO:  You mean, in other unrelated

22   matters?

23          MR. BRUSTIN:  Yes.

24          BY MR. BRUSTIN:

25          Q.   Okay.  Okay.  What I'd like you to do,
```



CHRISTOPHER J. BELLING                               April 11, 2023
DIXON V. CITY OF BUFFALO                                       333

1                Christopher J. Belling

2   if you don't mind, and I'm going to give you a few

3   minutes to do it, but if you can review -- I'm

4   going to go through my notes while you're doing it

5   and see if I can short-circuit some of this.  If

6   you can take a look at the DA's file and read to

7   yourself your affidavit on page 1716 through 1720.

8   I want to question you about that.

9         MS. PERSICO:  We're ready when you are.

10        BY MR. BRUSTIN:

11        Q.   Okay.  You've had an opportunity to

12   review this?

13        A.   Yes.

14        Q.   All right.  Now, I take it that this

15   wasn't the first case where you utilized

16   information from surveillance done by the Buffalo

17   Police Department intelligence section; fair to

18   say?

19        A.   I honestly don't remember whether I did

20   or not.

21        Q.   Okay.  Fair to say that you understood

22   as evidenced by this affidavit that Valentino Dixon

23   was a well-known drug dealer long before this case?

24        MS. PERSICO:  Form.

25        THE WITNESS:  That's the information I



1                  Christopher J. Belling

2    received, yes.

3         BY MR. BRUSTIN:

4         Q.   All right.  Is it your testimony that

5    you did not know anything about Valentino Dixon

6    prior to this case?

7         A.   That's correct, yes.

8         Q.   Not that you don't remember.  It's that

9    you're certain you had no -- you had no knowledge

10   of him whatsoever?

11        A.   I had never heard his name before.

12        Q.   All right.  And how did you access the

13   information that's contained in this affidavit?

14        A.   Another Assistant District Attorney who

15   had two indictment files on Valentino Dixon brought

16   that information to me.

17        Q.   And who was that?

18        A.   Barry Zavah, Z-A-V-A-H.

19        Q.   And you didn't ask for that.  He

20   just -- he volunteered it to you?

21        A.   Yes, I think he did.

22        Q.   Now, are you familiar with any efforts

23   that were conducted, joint efforts by the homicide

24   bureau and the BPD and the prosecutor's office,

25   your section of the prosecutor's office, to



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              335

```
 1                  Christopher J. Belling
 2   investigate street-level violence and particularly
 3   drug-related violence?
 4        A.   I am not aware of any such
 5   interrelationship or cooperation.
 6        Q.   Are you familiar with the term
 7   operation crackdown?
 8        A.   No.
 9        Q.   Or a unit headed by Lieutenant Timothy
10   Scioli who was the commander of the BPD
11   intelligence unit and ADA George Quinlan?  Are you
12   familiar with them?
13        A.   I know both those people, but I don't
14   know what they were doing.
15        Q.   You weren't familiar with an operation
16   that they were conducting to surveil and track drug
17   dealers in Buffalo?
18        A.   No, I was not.
19        Q.   Or a prosecutor named Kevin Kane and
20   his involvement in that effort?
21        A.   I know Kevin Kane, but I don't know
22   anything about his involvement in anything that
23   you're talking about.
24        MR. BRUSTIN:  All right.  Let's take a
25   two-minute break.
```



CHRISTOPHER J. BELLING                                   April 11, 2023
DIXON V. CITY OF BUFFALO                                           336

1                       Christopher J. Belling

2           THE VIDEOGRAPHER:  Going off the record.

3    The time is 1655.

4           (A recess was then taken at 4:55 p.m.)

5           THE VIDEOGRAPHER:  Back on the record at a

6    time of 1704.

7           BY MR. BRUSTIN:

8           Q.   And I think I read to you your alleged

9    motto incorrectly, so let me give it to you again.

10   Do you deny telling -- stating publicly it takes a

11   good lawyer to get a guilty man off but it takes a

12   great lawyer to convict an innocent one?

13          MS. PERSICO:  Form.

14          THE WITNESS:  I deny saying that.

15          BY MR. BRUSTIN:

16          Q.   And you've also told us that you deny

17   threatening defense witnesses with perjury charges?

18          A.   True.

19          Q.   Do you also deny -- deny threatening

20   defense attorneys with prosecution for witness

21   tampering if they sought to interview witnesses who

22   had participated in police arranged identification

23   procedures?

24          MS. PERSICO:  Form.

25          THE WITNESS:  I would never threaten a



CHRISTOPHER J. BELLING                                  April 11, 2023
DIXON V. CITY OF BUFFALO                                          337

```
 1                   Christopher J. Belling

 2   defense lawyer.

 3          BY MR. BRUSTIN:

 4          Q.   Well, I'm trying to explain very

 5   specific.  Do you deny threatening any defense

 6   lawyers for attempting to speak to witnesses who

 7   have participated in identification procedures?

 8          MS. PERSICO:  Form.

 9          THE WITNESS:  I deny that.

10          BY MR. BRUSTIN:

11          Q.   Now, do you recall telling the

12   Georgetown students that the fact that Leonard

13   Brown and Mario Jarmon were indicted put the

14   defense in a compromised position in the Valentino

15   Dixon prosecution?

16          MS. PERSICO:  Form.

17          THE WITNESS:  I do not remember specifically

18   saying that, no.

19          BY MR. BRUSTIN:

20          Q.   But you agree with that, correct?  You

21   knew that?

22          MS. PERSICO:  Form.

23          THE WITNESS:  As I said in the perjury

24   trial, it's not necessarily true.  I -- so I would

25   say no.
```



CHRISTOPHER J. BELLING                                   April 11, 2023
DIXON V. CITY OF BUFFALO                                          338

```
1                    Christopher J. Belling

2           BY MR. BRUSTIN:

3           Q.   Do you deny telling the students on

4    tape for everyone to see that Brown and Jarmon

5    couldn't testify because their lawyers would never

6    allow it?

7           MS. PERSICO:  Form.

8           THE WITNESS:  Well, that's something

9    different, and I did say that to the students.

10          BY MR. BRUSTIN:

11          Q.   And you meant that, right?

12          MS. PERSICO:  Form.

13          THE WITNESS:  I assumed that their lawyers

14   would be difficult about that.

15          BY MR. BRUSTIN:

16          Q.   No defense lawyer in their right mind

17   would allow it, correct?

18          MS. PERSICO:  Form.

19          THE WITNESS:  I have no idea what defense

20   lawyers in their right minds or wrong minds would

21   do.

22          BY MR. BRUSTIN:

23          Q.   Well, you did, because you said to the

24   students that they wouldn't allow it, right?

25          MS. PERSICO:  Form.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          339

```
 1                  Christopher J. Belling

 2          BY MR. BRUSTIN:

 3          Q.   You were happy to tell them that.

 4          MS. PERSICO:  Form.

 5          THE WITNESS:  The two things do not match,

 6  so I can't answer that.

 7          BY MR. BRUSTIN:

 8          Q.   Two things don't match.  You understood

 9  that when you prosecuted Brown and Jarmon, it was

10  unlikely that their defense lawyers, regardless of

11  who they were, would allow them to testify at

12  Valentino Dixon's trial, correct?

13          MS. PERSICO:  Form.

14          THE WITNESS:  I suspected that could occur.

15          BY MR. BRUSTIN:

16          Q.   Do you recall testifying in the perjury

17  trial that when Leonard Brown testified at the

18  Grand Jury he appeared to be -- to you to be

19  nervous and jittery?

20          A.   Yes, I do recall testifying to that in

21  the perjury trial.

22          Q.   And, in other words, you were

23  testifying that based on your observations of him

24  during the Grand Jury testimony, you believed he

25  was lying?
```



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                                          340

 1                    Christopher J. Belling

 2          A.    No.   I believed he was nervous and

 3     jittery.

 4          Q.    You understood the purpose of that

 5     testimony would suggest that he was lying, correct?

 6          MS. PERSICO:   Form.

 7          THE WITNESS:   I was asked a question.   I

 8     gave an answer.

 9          BY MR. BRUSTIN:

10          Q.    Never gave it a thought as to what it

11     meant?

12          A.    I was a witness at that time.   I

13     testified as best I could in regard to answering

14     the question.

15          Q.    Just a regular old witness in that

16     case?

17          A.    Yes.

18          Q.    And when you testified about him being

19     nervous and jittery, you hadn't discussed that with

20     Mr. Sedita, that might be a good question to ask?

21          MS. PERSICO:   Form.

22          THE WITNESS:   No.

23          BY MR. BRUSTIN:

24          Q.    How did it come up?

25          MS. PERSICO:   Form.



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                               341

```
 1                Christopher J. Belling
 2         THE WITNESS:  Mr. Sedita asked it.
 3         BY MR. BRUSTIN:
 4         Q.   In fact, is it your testimony that the
 5   first time he asked about what Leonard Brown looked
 6   like on the Grand Jury stand or during the Grand
 7   Jury was on the stand at the perjury trial?
 8         MS. PERSICO:  Form.
 9         THE WITNESS:  I don't recall when the first
10   time he asked me about that was.
11         BY MR. BRUSTIN:
12         Q.   How would he ever know to ask that if
13   you hadn't told him about it?
14         MS. PERSICO:  Form.
15         THE WITNESS:  I have no idea.  Frank's a
16   very good lawyer, very thorough.
17         BY MR. BRUSTIN:
18         Q.   Well, Sedita wasn't present at the
19   Grand Jury to see Leonard Brown testify, correct?
20         A.   I don't think he was, no.
21         MS. PERSICO:  Form.
22         BY MR. BRUSTIN:
23         Q.   The fact that he was nervous and
24   jittery didn't show up on the transcript, right?
25         MS. PERSICO:  Form.
```



```
 1                    Christopher J. Belling
 2          THE WITNESS:  I think I might have mentioned
 3   it, that he looked nervous, but I don't know.  I
 4   don't know precisely.
 5          BY MR. BRUSTIN:
 6          Q.  Okay.  In any case, the first time you
 7   remember being asked about it was on the stand in
 8   the perjury trial?
 9          A.  Yes.
10          Q.  Do you remember any meetings occurring
11   in around December of 1990 -- 1989 between senior
12   aides in the DA's office and Mr. Dillon and BPD
13   concerning drug violence?
14          MS. PERSICO:  I think you just asked that
15   question.  Form.
16          THE WITNESS:  No.
17          BY MR. BRUSTIN:
18          Q.  Certainly you were a senior aide to
19   Mr. Dillon in 1989, correct?
20          MS. PERSICO:  Form.
21          THE WITNESS:  Among many, yes.
22          BY MR. BRUSTIN:
23          Q.  Among how many?
24          A.  Well, higher than me would have been
25   whoever was the chief of special investigations at
```



CHRISTOPHER J. BELLING                                        April 11, 2023
DIXON V. CITY OF BUFFALO                                                343

1                    Christopher J. Belling

2    the time, chief of Grand Jury at the time, the

3    first assistant DA, the chief of appeals.  They

4    were all higher than me so --

5          Q.   All those people were higher than you

6    in 1989?

7          A.   Yeah.

8          Q.   And that would be the same in 1991?

9          A.   Yes.

10          Q.   How many homicide prosecutors were

11    there in 1991?

12          A.   Four.

13          Q.   How many total prosecutors were there

14    in 1990 -- in 1991?

15          A.   Ballpark, 90.  It fluctuated with

16    grants and things like that, but in the range I

17    would think of 90.

18          Q.   All right.  And you were about fourth

19    in command, does that sound about right?

20          A.   Probably more fifth or sixth.

21          MR. BRUSTIN:  I think that's all I have

22    right now.  I may have some follow-ups depending on

23    what other lawyers ask you, if anything.

24          MS. PERSICO:  Could we just take another

25    two-minute break?  Hugh, do you have questions?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             344

```
 1                   Christopher J. Belling
 2           MR. RUSS:  I do.  Not many.  A few.
 3   Certainly less than five minutes.
 4           MS. PERSICO:  All right.
 5           MR. RUSS:  Can you start, though, by opening
 6   up in front of Mr. Belling --
 7           MS. PERSICO:  Can we start by just letting
 8   me take a facilities break for two minutes?
 9           MR. BRUSTIN:  Hugh, what do you want?  I can
10   do it.  Tell me what you want.
11           MR. RUSS:  Yeah, sure.  Take a break, yeah.
12           THE VIDEOGRAPHER:  Going off the record at a
13   time of 1712.
14           (A recess was then taken at 5:12 p.m.)
15           THE VIDEOGRAPHER:  Back on the record at a
16   time of 1714.
17                         EXAMINATION
18           BY MR. RUSS:
19           Q.   Okay.  Thank you.  Mr. Belling, much
20   earlier today you gave testimony concerning being
21   woken up at like 3 in the morning and coming into
22   the homicide office and Lamarr Scott was there.  Do
23   you recall that testimony?
24           A.   Yes, I do.
25           Q.   And I believe you indicated that
```



 1                    Christopher J. Belling

 2   Detective Stambach was the detective on duty, so to

 3   speak?

 4        A.   He's the person that called me in who I

 5   met when I got to police headquarters.

 6        Q.   Okay.  I know we've already put Exhibit

 7   2 in front of you.  Can you turn to page BPD 0200.

 8        MR. BRUSTIN:  0200?  Oh, 200, sorry.

 9   Gotcha.  You mean 200, right?

10        MR. RUSS:  Yes.  I just wanted to be as

11   precise as you've been all day.

12        MR. BRUSTIN:  All right.  I'm just trying to

13   find it.

14        THE WITNESS:  Yeah, I've got it.

15        BY MR. RUSS:

16        Q.   Okay.  So page 200 appears to be a P-73

17   authored by Detective Stambach concerning that

18   night in the homicide bureau; is that correct?

19        A.   That is correct.

20        Q.   Is this one of the documents that you

21   reviewed prior to testifying today?

22        A.   I have reviewed it, yes.

23        Q.   And does that P-73 accurately describe

24   what transpired that night?

25        A.   In general terms, yes.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            346

```
 1                    Christopher J. Belling

 2         Q.   You were asked some questions

 3   concerning task forces and whether there were task

 4   forces.  It's been alleged in this case both

 5   verbally and in writing that the DA's office and

 6   the Buffalo Police Department had a list of

 7   criminals they wanted to take off the street.  Have

 8   you ever heard anything like that?

 9         A.   I saw it in the complaint here, but I

10   haven't heard anything about it other than that.

11         Q.   Did the DA's office have a -- Buffalo

12   Police Department have a list of criminals that

13   they wanted to take off the street on or about

14   1991?

15         A.   Not that I was aware of.

16         Q.   And was the DA's office acting with the

17   Buffalo Police Department actively trying to find

18   this list of criminals to indict them for anything?

19         MR. BRUSTIN:  Objection to form.

20         THE WITNESS:  As far as I know, there was no

21   such list.  That's all I can say.

22         BY MR. RUSS:

23         Q.   I forgot the page, but in this exhibit

24   was the criminal complaint against Valentino Dixon.

25   Do you remember that?
```



```
 1                    Christopher J. Belling

 2          A.   I know it existed, yes.

 3          MR. BRUSTIN:  I think it's 80 if you want

 4     it.

 5          THE WITNESS:  No, that's the arrest booking

 6     form, but it's in the neighborhood.

 7          MS. PERSICO:  I think it's 82.

 8          THE WITNESS:  It's 82, Hugh.

 9          BY MR. RUSS:

10          Q.   Okay.  And on the complaint which is

11     page 82, does it give a brief description of the

12     crimes for which Valentino Dixon was charged?

13          A.   It does.

14          Q.   And is that a document that would have

15     been prepared by your office, that is, the DA's

16     office, or by the Buffalo Police Department?

17          A.   It would have been prepared by the

18     Buffalo Police Department report technicians in

19     so-called central booking.

20          Q.   Do you and the DA's office have any

21     input into what goes into a criminal complaint?

22          A.   In general, no.

23          Q.   Do you remember whether you had any

24     input into what went into this specific criminal

25     complaint?
```



```
 1                 Christopher J. Belling
 2        A.   I did not.
 3        Q.   You did not have input?
 4        A.   I did not have input.  This -- yeah, I
 5   did not have input into this document.
 6        MR. RUSS:  That's all I have.  Thank you.
 7        MS. PERSICO:  Thank you.
 8        MR. BRUSTIN:  I have a few follow-up, unless
 9   you have anything.
10        MS. PERSICO:  Do you want to do it now?  Why
11   don't you go now, and then I'll finish up.
12        MR. BRUSTIN:  Well, no, you should finish,
13   and then I'll follow.
14                   EXAMINATION
15        BY MS. PERSICO:
16        Q.   Mr. Belling, on the -- I think you have
17   the right booklet exhibit here, so can I ask you --
18        MR. BRUSTIN:  Can I stop for one minute,
19   just so I know for planning purposes, do you have
20   more than a few minutes?
21        MS. PERSICO:  Like maybe ten minutes.  Are
22   you late for your flight?
23        MR. SOTO-BRITO:  No.
24        BY MS. PERSICO:
25        Q.   Can you turn, Mr. Belling, to BPD COMP
```



CHRISTOPHER J. BELLING                                   April 11, 2023
DIXON V. CITY OF BUFFALO                                          349

```
 1                   Christopher J. Belling
 2  0186, please, and just take a look at that
 3  document.
 4           A.   0186, okay.
 5           Q.   Just read that over, and let me know
 6  when you're done.
 7           A.   Okay.  I've read it, 0186.
 8           Q.   Okay.  And then I'm going to ask you to
 9  turn to what we were just looking at, which is BPD
10  COMP 200.
11           MR. BRUSTIN:  200?
12           MS. PERSICO:  Yes.
13           THE WITNESS:  200, okay.  I've got that.
14           BY MS. PERSICO:
15           Q.   Okay.  And I think as Mr. Russ was
16  questioning you, does document 200 reflect the fact
17  that you got a call in the middle of the night to
18  come down to look at the tape of Lamarr Scott
19  confessing and review Leonard Brown and Lamarr
20  Scott's statements?
21           A.   Yes.  That's what 200 is about.
22           Q.   And so you went down there that night,
23  right?
24           A.   Correct.
25           Q.   And just flip back to 186.  Would you
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            350

1               Christopher J. Belling

2   also have reviewed the document at BPD COMP 186,

3   the notes?

4         A.    If it existed at the time.  I would

5   have if it was there.  I don't know if it was there

6   or not.

7         Q.    Okay.  So you went down to -- you went

8   down to headquarters and watched Lamarr Scott's

9   video confession and read both his and Leonard

10  Brown's statements; is that correct?

11        MR. BRUSTIN:  Objection to form.

12        THE WITNESS:  That is correct.

13        BY MS. PERSICO:

14        Q.    And you then made a determination as I

15  think when Mr. Brustin was questioning you that

16  Lamarr Scott's confession was not credible and that

17  both he and Leonard Brown should be released that

18  evening; is that correct?

19        A.    Well, yeah, in general terms, yeah.

20        Q.    Did that mean that the investigation

21  with regard to the shooting of Torriano Jackson was

22  concluded?

23        A.    Nowhere near.  It meant that there was

24  a lot more to do in that investigation.

25        Q.    And there were -- so just so that --



1              Christopher J. Belling

2  I'm not sure, and if you guys covered this before I

3  arrived, I apologize, but we did go through since

4  I've been here quite a bit of the Buffalo Police

5  Department investigation, and we discussed -- I

6  think briefly touched upon the Grand Jury process.

7         But I just wanted to have you briefly tell

8  the record how the Grand Jury comes about and what

9  its function is.

10         A.   The --

11         Q.   In a -- you know, in a minute.

12         MR. BRUSTIN:   Objection to form.

13         THE WITNESS:   The Grand Jury is a body that

14  in New York State law must hear every felony charge

15  to determine whether it should be indicted.

16  There's 23 citizens.   The District Attorney's

17  office coordinates the presentation of evidence to

18  the Grand Jury.   An Assistant District Attorney

19  questions the witness.

20         And after the witnesses are questioned, the

21  Assistant District Attorney advises the Grand Jury

22  about the applicable law for the charge that's

23  before it, and the Grand Jury votes.   Some counties

24  do it in a different order, but that's what's done

25  in Erie County.



1              Christopher J. Belling

2          BY MS. PERSICO:

3          Q.   And that's the way it was done in

4    connection with this case?

5          A.   Correct.

6          Q.   And in preparation for your

7    presentation of the case to the Grand Jury, you

8    reviewed the witness statements and Buffalo Police

9    Department file?

10         A.   Yes.

11         Q.   And that means you would have reviewed

12   the statement taken of Valentino Dixon?

13         A.   Yes.

14         Q.   And you would have reviewed the

15   statement of Lamarr Scott?

16         A.   Correct.

17         Q.   And both of those documents would have

18   been important in your mind in assessing the case

19   going up into the Grand Jury?

20         MR. BRUSTIN:  Objection to form.

21         THE WITNESS:  Yes, I think so.

22         BY MS. PERSICO:

23         Q.   So you then eventually presented this

24   case to the Grand Jury beginning in November of

25   1991; is that correct?



1                     Christopher J. Belling

2          A.   That is correct.

3          Q.   And on November 6th of 1991 you

4    presented to the Grand Jury the following

5    witnesses:  Aaron Jackson, John Sullivan III, and

6    Travis Powell; is that correct?

7          A.   Yeah.  I haven't seen the transcript

8    recently, but I have no doubt that, you know, those

9    are the people that testified that day.

10         Q.   Okay.  And then on November 20th of

11   1991 Michael Bland testified; is that correct?

12         A.   Correct.

13         Q.   Now, at that time there was no -- there

14   was no vote at the Grand Jury.  There was no

15   indictment.  There were further proceedings that

16   continued in January of 1992; is that correct?

17         A.   That is correct.

18         Q.   And I think -- I'm going to try and use

19   the exhibits that we've already talked about today,

20   so just bear with me for a second.  I'm just

21   looking for the Antoine Shannon statement and the

22   letter to Donovan, and I think those are probably

23   in the DA file.

24         So we talked quite a bit earlier about the

25   fact that you went to -- in preparation for putting



1                   Christopher J. Belling

2     the case in the Grand Jury in November of 1991, you

3     went to Campbellsville, Kentucky, and took a

4     statement from Antoine Shannon?

5            A.    Correct.

6            Q.    And then we looked at what is COE1686.

7     I apologize if it's not the same as what was in the

8     files we looked at today.  And that was a letter

9     you wrote to Chief Donovan listing additional

10    investigations that you would like to have seen

11    happen; is that right?

12           MR. BRUSTIN:  Objection to form.

13           THE WITNESS:  Right.  That's a November 22nd

14    letter which lists seven things that I asked them

15    to look into.

16           BY MS. PERSICO:

17           Q.    So, in fact, even though you had

18    already had the Grand Jury convened in November, at

19    that time you still wanted additional investigation

20    done; is that correct?

21           MR. BRUSTIN:  Objection to form.

22           THE WITNESS:  Yes.

23           BY MS. PERSICO:

24           Q.    And what did that do to your Grand Jury

25    proceedings?



1                Christopher J. Belling

2          A.    Well, it caused the Grand Jury to go

3    into what we call holdover mode.  The Grand Jury

4    sits officially for one month and then has to vote,

5    and a judge has to authorize them to be held over

6    to hear evidence to complete the cases that they

7    opened up in that first month.

8          Q.    And so in this case you had the Grand

9    Jury hold over until the next January at which time

10   you presented Mario Jarmon, Leonard Brown, Lamarr

11   Scott, Emil Adams, Fred Stencil, and Robert Lewis;

12   is that correct?

13         A.    Correct.

14         Q.    And a number of those witnesses who

15   testified in January were -- were not, as

16   Mr. Brustin was calling it earlier, were not going

17   to testify to the story that, using air quotes

18   here, you wanted to tell.  In fact, they were going

19   to say that Valentino Dixon did not do the

20   shooting; is that correct?

21         MR. BRUSTIN:  Objection to form.

22         THE WITNESS:  Well, I didn't really know

23   what Lamarr Scott was going to do other than the

24   representations his attorney, John Molloy, had made

25   to me, and I honestly didn't know what Brown and



1                   Christopher J. Belling

2    Shannon would do either -- Brown and Jarmon would

3    do either until we got in there and what happened

4    happened.

5          BY MS. PERSICO:

6          Q.   So the Grand Jury could have come back

7    and said Valentino Dixon -- they could have

8    no-billed you, right, and said Valentino Dixon was

9    not the shooter?

10         MR. BRUSTIN:  Objection to form.

11         THE WITNESS:  They could have, yes.

12         BY MS. PERSICO:

13         Q.   And so in connection with your

14   preparation for the Grand Jury, you reviewed all

15   the statements that we talked about of all those

16   witnesses, right?

17         A.   Yes.

18         Q.   And you read Valentino Dixon's

19   statement?

20         A.   Yes.

21         Q.   And Valentino Dixon's statement does

22   not indicate anywhere on it that Lamarr Scott was

23   the shooter, does it?

24         A.   It does not.

25         Q.   Had Valentino Dixon said in his



```
 1                 Christopher J. Belling
 2   statement when he was arrested that Lamarr Scott
 3   was the shooter, would that have changed your
 4   evaluation of Lamarr Scott's confession?
 5        MR. BRUSTIN:  Objection to form.
 6        THE WITNESS:  It would have changed the
 7   tenor of the case significantly.
 8        BY MS. PERSICO:
 9        Q.   And during the -- during the ensuing
10   investigation, Mr. Dixon had a lawyer, correct?
11        A.   Correct.
12        Q.   And there came a time, as I think we
13   talked about with Mr. Brustin, wherein you were
14   instrumental in getting Mr. Scott an attorney?
15        A.   Correct.
16        Q.   Why did you do that?
17        MR. BRUSTIN:  Objection to form.
18        THE WITNESS:  Because he had confessed to a
19   murder, and he was going to be asked to testify in
20   the Grand Jury and he was going to be asked to
21   execute a waiver of immunity in order to testify,
22   and all of those things left the clear and obvious
23   conclusion that he needed a lawyer to advise him.
24        BY MS. PERSICO:
25        Q.   And so you -- you, as I think we looked
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            358

1                      Christopher J. Belling

2  at in your affidavit and as you testified to,

3  brought him over and Judge McCarthy appointed John

4  Molloy to be his attorney.  You sent the letter to

5  John Molloy, and let me back that up a little bit.

6           Has that happened in other cases in your

7  experience, where you have been instrumental in

8  getting an unrepresented person counsel before they

9  go to the Grand --

10          A.   Yes.

11          MR. BRUSTIN:  Objection to form.  Sorry.

12          THE WITNESS:  It's happened many times.

13          BY MS. PERSICO:

14          Q.   And is the speed with which the

15 assigned counsel gets in touch with their client --

16 well, that's a bad question.  Strike that.

17          There was some discussion about the fact

18 that the letter to Mr. Molloy was dated the 9th and

19 then there was a subsequent conversation that you

20 had with him on the 10th.  In your experience, is

21 it unusual that there be a very short amount of

22 time in between assigned counsel communicating with

23 their client pre-Grand Jury and then further

24 communicating with you?

25          MR. BRUSTIN:  Objection to form.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                          359

```
 1                  Christopher J. Belling
 2          THE WITNESS:  It is not unusual.
 3          BY MS. PERSICO:
 4          Q.   So the mere fact that Mr. Molloy got in
 5   touch with his client either on the 9th when he was
 6   appointed as counsel or on the 10th, that was
 7   not -- that didn't stand out in this particular
 8   case?
 9          MR. BRUSTIN:  Objection to form.
10          THE WITNESS:  It was not unusual.
11          BY MS. PERSICO:
12          Q.   And once Mr. -- once Mr. Scott had
13   Mr. Molloy as an attorney, would there ever have
14   been an opportunity for you to be with Mr. Scott
15   without the presence of his lawyer?
16          MR. BRUSTIN:  Objection to form.
17          THE WITNESS:  There wasn't such an
18   opportunity, and it wouldn't have been appropriate
19   to do that.
20          BY MS. PERSICO:
21          Q.   Right.  You understand as a -- as a
22   practicing attorney that you are not permitted to
23   communicate directly with represented people?
24          A.   Correct.
25          Q.   And so in this case once -- once
```



1               Christopher J. Belling

2   Mr. Molloy was assigned to represent Mr. Scott, you

3   didn't have any individual conversations with

4   Mr. Scott alone?

5          A.   Correct.

6          Q.   And you really didn't know what he was

7   going to say in terms of his Grand Jury testimony?

8          MR. BRUSTIN:  Objection to form.

9          THE WITNESS:  No.  That's why I asked him to

10  sign the waiver of immunity, because I didn't want

11  to be in a position where he admitted to killing

12  and obtained transactional immunity.

13         BY MS. PERSICO:

14         Q.   So can you just briefly explain

15  transactional immunity?

16         A.   Well, in New York State the concept of

17  transactional immunity means that if you testify in

18  the Grand Jury about a criminal event, a robbery, a

19  murder, a rape, you receive immunity from any

20  transaction around that event except for perjury.

21  So if Lamarr Scott had gone in and said as he did

22  in his original statement to the police, yup, I did

23  it, I shot Torriano Jackson with a machine gun in

24  the middle of the street, he would have been

25  immunized from prosecution in regard to that



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           361

```
 1                  Christopher J. Belling
 2   charge.
 3           Q.   And had you not gotten him an attorney
 4   and he had -- and he had gone in there and said
 5   that, obviously he would have been immunitized --
 6   wait.  That's not -- you know what I mean, I don't
 7   know if you can spell that properly, but on the
 8   flip side, had you had him sign a waiver of
 9   immunity without counsel, what would the impact of
10   that have been?
11           A.   I -- I don't know that I've ever done
12   that.  I expect litigation would have ensued, but I
13   don't know exactly his -- the form that we use says
14   you got a lawyer and your lawyer's sitting here
15   with you, so I don't know how you'd get to that
16   point, and I don't think I ever did it.
17           Q.   It's so out of the norm that your forms
18   didn't account for someone signing a waiver of
19   immunity without a lawyer?
20           MR. BRUSTIN:  Objection to form.
21           THE WITNESS:  Correct.
22           MS. PERSICO:  I think that's just about all
23   I have.  So if, Nick, you want to jump in.
24                  FURTHER EXAMINATION
25           BY MR. BRUSTIN:
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            362

1                    Christopher J. Belling

2          Q.   Just a few follow-ups.  Let me start

3    backwards with where you left off.  You would

4    agree, Mr. Belling, that at least as a matter of

5    ethics you were free to talk to Mr. Scott between

6    August 12th and when you got him an attorney just

7    before the Grand Jury, correct?

8          A.   I would not have been comfortable doing

9    that, because I don't think it would be ethical.

10   He at that point had implicated himself in an

11   extremely serious crime and, therefore, our roles

12   would have been in conflict.

13         Q.   So you thought -- at a minimum it's a

14   gray area as to whether or not you could have

15   talked to him?

16         MS. PERSICO:  Form.

17         THE WITNESS:  At least a gray area.

18   Probably more.

19         BY MR. BRUSTIN:

20         Q.   Okay.  And was it permissible in your

21   view once he came in and confessed for the police

22   to talk to him at that point, if he was voluntarily

23   talking?

24         A.   For the police to talk to him some more

25   after they already talked to him?



1              Christopher J. Belling

2        Q.    Yes.  If he wanted to.

3        A.    Again, I wouldn't have wanted to run

4   that Huntley hearing, but I think that the law --

5   it would probably have been a lighter gray area.

6        Q.    All right.  But if you had -- if you

7   had clearly warned him that he had a right to an

8   attorney and he chose not to speak to an attorney,

9   you were free to speak to him, correct?

10       A.    I could have, I could have.

11       Q.    Nothing preventing you that under the

12  ethics rules that you're aware of, correct?

13       A.    I don't think it would have been

14  proper, and I wouldn't have done it.

15       Q.    All right.  Well, that's a different

16  issue, but, now, it sounds like what you just said

17  on cross-examination from your attorney is that

18  when you got Mr. Scott a lawyer, all you were

19  trying to do was to protect him, correct?

20       A.    Trying to protect his rights.

21       Q.    That was all that was in your mind, is

22  protecting Mr. Scott's rights?

23       A.    Well, and by protecting Mr. Scott's

24  rights enabled the investigation of the killing of

25  Torriano Jackson to proceed.



1                    Christopher J. Belling

2          Q.    And as a secondary matter it sounds

3     like what you're saying is, in addition to

4     protecting his rights, you also wanted to protect

5     your ability to get a conviction against Valentino

6     Dixon, correct?

7          A.    No, I wanted to protect the ability of

8     the investigation in the Grand Jury to be resolved

9     uncompromised.

10         Q.    You were completely objective.  You

11    wanted truth and justice to be served.  You had no

12    ulterior motive in getting him a lawyer.  It was

13    all about protecting everybody's rights, correct?

14         MR. RUSS:  Objection to form.

15         THE WITNESS:  Yes, that's true.

16         BY MR. BRUSTIN:

17         Q.    Not about getting a conviction against

18    Valentino Dixon?  That never crossed your mind?

19         A.    It was not about getting a conviction

20    of Valentino Dixon.

21         Q.    All right.  What would have changed,

22    how would the tenor have changed if Valentino Dixon

23    had told you when he came in and voluntarily gave a

24    statement that Lamarr Scott did it?  How would that

25    have changed the tenor of the investigation?  What



1                    Christopher J. Belling

2    would have happened?

3            A.    Well, then the police should have gone

4    out and looked for Lamarr Scott and attempted to

5    get his version of these events, and presuming they

6    found Lamarr Scott, they would have gotten whatever

7    version he was going to tell them when they got

8    him, and that may have been something that impacted

9    the eventual outcome of the case.

10           Q.    I'm not understanding.   Lamarr Scott

11   came in on his own and volunteered a confession?

12           A.    Correct.

13           Q.    So what would have changed in regard to

14   the quality or scope of the investigation?

15           A.    If we were looking for Lamarr Scott

16   because he was implicated in this case, that's

17   different than Lamarr Scott coming forward at the

18   behest of Valentino Dixon's family and saying I did

19   it.   That's the thing that makes it incredible.

20           Q.    Ah, and so that's what -- that's what

21   caused you to do less investigation?

22           MS. PERSICO:   Form.

23           THE WITNESS:   I don't know what -- the

24   police did the investigation.

25           BY MR. BRUSTIN:



1              Christopher J. Belling

2         Q.   All right.  And, again, when you say

3  when he came forward at the behest of Valentino

4  Dixon's family, all you mean is they took him to

5  give the statement, correct?

6         MS. PERSICO:  Form.

7         THE WITNESS:  Well --

8         MR. RUSS:  Objection to form.

9         BY MR. BRUSTIN:

10        Q.   In other words -- let me withdraw the

11 question.

12        You never received a scintilla of proof,

13 evidence, that Valentino Dixon's parents did

14 anything improper in regard to Lamarr Scott,

15 correct?

16        A.   No.

17        MR. RUSS:  Objection to form.

18        THE WITNESS:  That's not true.

19        BY MR. BRUSTIN:

20        Q.   What evidence did you receive that they

21 did?

22        A.   In the Grand Jury Lamarr Scott

23 testified that Valentino Dixon's parents put him up

24 to the statement.

25        Q.   I'm sorry, what I meant to say was:



 1                  Christopher J. Belling

 2  Prior to your objective Grand Jury, your

 3  truth-seeking Grand Jury, is there anything -- any

 4  piece of evidence that you're aware of actually

 5  implicating Lamarr Scott's parents in doing

 6  anything wrong with Lamarr Scott?

 7         MS. PERSICO:  Not Lamarr Scott.

 8         MR. RUSS:  Objection to form.

 9         MR. BRUSTIN:  No, Lamarr Scott.

10         THE WITNESS:  You're talking about Valentino

11  Dixon's parents.

12         MS. PERSICO:  You mean, Valentino Dixon's

13  parents.

14         BY MR. BRUSTIN:

15         Q.  Valentino Dixon.  Let me do the

16  question again.  Prior to the Grand Jury, did you

17  receive a single piece of information or evidence

18  that Valentino Dixon's parents did anything

19  improper with Lamarr Scott?

20         MR. RUSS:  Objection to form.

21         THE WITNESS:  The answer is yes.  I was told

22  the night that I came down there, which I think was

23  the early morning hours of the 12th of August, that

24  the -- Robert Bryant and Annie Shannon had brought

25  Lamarr to the street corner, arranged for the news



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              368

1                    Christopher J. Belling

2   media to interact, and then arranged for the police

3   to interact with that whole thing.

4        BY MR. BRUSTIN:

5        Q.    Anything else?

6        A.    No, I didn't have anything else that I

7   remember.

8        Q.    And all of that would have been

9   consistent with Lamarr Scott confessing to them and

10  them encouraging him to come forward, correct?

11       MR. RUSS:  Objection to form.

12       THE WITNESS:  No.

13       BY MR. BRUSTIN:

14       Q.    Explain -- explain what I'm missing in

15  my logic.

16       A.    If Lamarr Scott said to anybody on the

17  street, including the parents, that he had

18  committed this crime, the appropriate thing to do

19  is call 911 and let the police in on it.  Trying to

20  leverage this into a media event is where it became

21  really remarkably transparent to me that this guy

22  was being put up to make this statement by

23  Valentino's parents.

24       Q.    Do you think -- let's assume Valentino

25  Dixon is innocent, like the current conviction



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              369

1              Christopher J. Belling

2   states.  Assuming Valentino Dixon didn't do the

3   shooting and he was in jail and arrested for doing

4   the shooting, would it make sense that Valentino

5   Dixon's parents -- who, by the way, didn't live on

6   the street -- would it make sense that they might

7   be concerned about simply going to the police and

8   not having the protection of making a statement on

9   the record -- I mean, in the media?  Would that

10  make sense to you?

11          MS. PERSICO:  Form.

12          MR. RUSS:  Objection to form.

13          THE WITNESS:  No.

14          BY MR. BRUSTIN:

15          Q.   Would it make sense that Valentino

16  Dixon's parents might not trust the police given

17  that he had been arrested for a crime he didn't

18  commit, assuming that to be true?

19          MR. RUSS:  Objection to form.

20          THE WITNESS:  It doesn't ring true to me,

21  no.

22          BY MR. BRUSTIN:

23          Q.   Okay.  And you would agree that lots of

24  people in Buffalo didn't trust the police or the

25  prosecutors, right?



 1              Christopher J. Belling

 2         MR. RUSS:  Objection to form.

 3         THE WITNESS:  I would not agree with that, no.

 4         BY MR. BRUSTIN:

 5         Q.   No?  It wasn't your experience that a

 6    lot of black people in particular didn't trust the

 7    police?

 8         MS. PERSICO:  Form.

 9         THE WITNESS:  I don't know that to be true

10    or not.

11         MR. RUSS:  Objection to form.

12         BY MR. BRUSTIN:

13         Q.   And would you expect that one way to

14    protect against police misconduct would be to make

15    sure that the statement was on the news so you

16    could never take it back?

17         MS. PERSICO:  Form.

18         THE WITNESS:  That could be one motive for

19    doing it the way it was done.

20         BY MR. BRUSTIN:

21         Q.   But you had determined that night that

22    that wasn't the motive, correct?

23         A.   That was my belief at that time.

24         Q.   And that's been your belief since that

25    day?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           371

```
 1                    Christopher J. Belling

 2          A.    True.

 3          Q.    All right.  Take a look at 186, police

 4    file.

 5          A.    In which file?

 6          Q.    Police file.  And I just want to make

 7    one point clear, that I think it is, but I want to

 8    make sure that it is from you.  So my

 9    understanding, because there's been a little

10    confusion in some of the reports, is that Lamarr

11    Scott came -- came forward to the press late on

12    August 11th, 1991, correct?

13          A.    That's what the reports indicate, and I

14    recall that it was sometime around the time of the

15    11 o'clock news.

16          Q.    All right.  And then the interview in

17    your presence at the department was very early in

18    the morning on the 12th?

19          A.    There was no interview in my presence.

20          Q.    I'm sorry, the interview of Lamarr

21    Scott and your coming to the precinct happened very

22    early in the morning on the 12th?

23          A.    The police interview of Lamarr Scott

24    happened very early on the 12th, and my coming to

25    the precinct also happened very early on the 12th.
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                               372

```
 1                  Christopher J. Belling

 2        Q.    Okay.  Now take a look at page 82.

 3        A.    82?  I thought you said 186.

 4        Q.    I did.  We're done with that now.  Page

 5   82 now, because you're going to need it.

 6        A.    82, the complaint?

 7        Q.    No, I don't -- oh, I'm sorry, yeah, one

 8   quick question on 82.  I think you talked something

 9   about a unit that would prepare this?

10        A.    Correct.

11        Q.    But you understood that the information

12   in this document all came from Detective Stambach,

13   correct?

14        MR. RUSS:  Objection to form.

15        THE WITNESS:  It came from the police

16   investigation obviously, because the report

17   technicians don't know what to write in here if

18   they don't get it from somebody else.

19        BY MR. BRUSTIN:

20        Q.    Well, does the fact that Stambach

21   signed this indicate that he provided this

22   information?

23        A.    He has to sign it.  He's the charging

24   officer.

25        MR. RUSS:  Objection to form.
```



 1              Christopher J. Belling

 2         BY MR. BRUSTIN:

 3         Q.   Does it indicate that the substance,

 4    the text in the body here, is from Detective

 5    Stambach?

 6         MR. RUSS:  Objection to form.

 7         THE WITNESS:  That's the general information.

 8         BY MR. BRUSTIN:

 9         Q.   All right.  Now take a look at page

10    200.  And I hadn't noticed this, but it appears

11    that the description of what you did in this

12    document is different than what you talked about on

13    my direct examination, and in particular it says:

14    ADA Belling talked with Lamarr Scott and a

15    polygraph was set up for him.  At this time ADA

16    Belling requested that both Brown and Scott be let

17    go to return to their homes.

18         Maybe I'm reading this wrong, but this

19    suggests that you conducted an interview with

20    Lamarr Scott where you talked about things,

21    including a polygraph.  Did I miss -- did I misread

22    this?

23         A.   You're misreading it or they miswrote

24    it, because that didn't happen.

25         Q.   So you deny talking to Lamarr Scott



 1                    Christopher J. Belling

 2   about a polygraph?

 3        A.    You are correct, I did not.

 4        Q.    And you deny -- and, frankly, you were

 5   certainly free -- is it true that you made a

 6   decision to let them go?

 7        A.    I -- they asked me should we arrest

 8   Lamarr Scott, and my answer was no, you're just

 9   going to complicate this thing, we got to sort it

10   out, don't arrest anybody at this point.

11        Q.    Okay.  But your testimony is that you

12   did not interview Lamarr Scott in regard to making

13   that decision, correct?

14        A.    Correct.

15        Q.    Why not?

16        A.    Because, as I've said, I didn't want to

17   be in a position of testifying at my own Huntley

18   hearing.

19        Q.    And you certainly could have directed

20   additional questioning by the officers that you

21   observed, correct?

22        A.    The statement was already complete.  I

23   suppose I could have done many things.  This is

24   what I did.

25        Q.    So you reviewed the statement and you



1              Christopher J. Belling

2  determined that it was invalid, correct, he didn't

3  commit this crime?

4         A.   No, I determined that there were issues

5  with the statement that needed more inquiry.

6         Q.   Okay.  But you certainly were free, and

7  you've done this before, I take it, to ask the

8  officers after reviewing the statement to conduct a

9  follow-up interview of Lamarr Scott, correct?

10         MS. PERSICO:  Form.

11         THE WITNESS:  I don't recall ever doing

12  that.  There was nothing that was stopping me from

13  doing it.

14         BY MR. BRUSTIN:

15         Q.   Okay.  And you could have observed it?

16         A.   Yeah, I suppose I could have.

17         Q.   And that wouldn't jeopardize your

18  ability to prosecute the case, correct?

19         A.   It could have.  Advocate witness rule.

20  I could have -- it could have been a problem.

21         Q.   If you stood through a two-way mirror

22  and observed an interview of a suspect?

23         MS. PERSICO:  Form.

24         THE WITNESS:  I don't know that there was a

25  two-way mirror, but it -- I would not have been



1              Christopher J. Belling

2  comfortable doing it, no.

3          MR. BRUSTIN:  Okay.  That's all I have.

4          MS. PERSICO:  I have one quick follow-up.

5          MR. BRUSTIN:  Mo's got to go, come on.

6          MS. PERSICO:  I know.  I'll be quick.  I

7  promise.  I'm sorry, Mo.

8                  FURTHER EXAMINATION

9          BY MS. PERSICO:

10         Q.   Mr. Belling, I'm showing you what has

11  been marked COE2411, and that is a statement of --

12         A.   Leonard Brown.

13         Q.   For expediency purposes, that's a

14  statement of Leonard Brown who came to the police

15  station on the same night that Lamarr confessed; is

16  that correct?

17         A.   It is.

18         Q.   And you testified earlier that you

19  reviewed that in connection -- in assistance with

20  your evaluation of Lamarr's confession and your --

21  your determination that Valentino Dixon's parents

22  may have been involved.  Can you turn to the second

23  page of that statement, please.

24         A.   Okay.

25         Q.   COE2412, and can you -- can you read



1              Christopher J. Belling

2    this highlighted -- well, actually -- you don't get

3    the highlighted version, but you'll be able to

4    follow along.  It's COE24 --

5              MR. BRUSTIN:  Why don't you read it, then

6    I'll look at it.

7              THE WITNESS:  I had forgotten this.  Right

8    in Leonard Brown's statement --

9              BY MS. PERSICO:

10             Q.   Just read this highlighted portion

11   starting at the first space there.

12             A.   It says:  My father, stepfather, talked

13   to Tino in jail, and he got us all together and had

14   us call the deuce.

15             Q.   And then can you read that next section

16   there.

17             A.   What is your relationship to Tino,

18   Valentino Dixon.  He's my half-brother.  We got the

19   same father.

20             Q.   And then you'll see three other

21   highlighted sections there.  Could you just read

22   the questions and the answers.

23             A.   Do you know where Lamarr was when he

24   called Channel 2 News.  Yes, he was at 63 Fay

25   Street, my house.  Who else was at your house when



```
 1                  Christopher J. Belling
 2  he called.  My father, Robert Bryant, my mother,
 3  Anne Shannon, and my brother, Antoine, and then
 4  Channel 2 stated that they called 893-1497.  Whose
 5  phone number is that.  That's my mother's phone
 6  number, Anne Shannon.
 7        Q.   And Anne Shannon at --
 8        A.   Oh, at 63 Fay Street.
 9        Q.   And that would have been one of the
10  documents that you reviewed in evaluating whether
11  or not Mr. Scott's confession was credible?
12        A.   Correct.
13        Q.   And whether or not Mr. Dixon's parents
14  were at least tangentially involved in that?
15        MR. BRUSTIN:  Object to form.
16        THE WITNESS:  Correct.
17        MS. PERSICO:  That's all I have.
18                  FURTHER EXAMINATION
19        BY MR. BRUSTIN:
20        Q.   Every single thing that you just read
21  is consistent with Lamarr Scott committing the
22  crime, admitting it to the family, and the family
23  making efforts to bring the truth out; isn't that
24  true, sir?
25        MS. PERSICO:  Form.
```



1                    Christopher J. Belling

2          MR. BRUSTIN:  Potentially.

3          THE WITNESS:  Well, potentially true is --

4    is a little hard.  I would say no, it's not.

5          BY MR. BRUSTIN:

6          Q.   It's outlandish?

7          A.   I would say it demonstrates Valentino's

8    family putting their finger on the scale trying to

9    get a result.

10         Q.   Even assuming that Lamarr Scott

11   committed -- withdrawn.

12         So Lamarr Scott coming to them or Valentino

13   Dixon telling them that Lamarr Scott committed the

14   crime and Lamarr Scott admitting it and then trying

15   to get him to come forward is outlandish?

16         MS. PERSICO:  Form.

17         THE WITNESS:  No, it's manipulative of the

18   system.

19         MR. BRUSTIN:  Okay.  I think that's --

20   that's a good place to end.

21         MS. PERSICO:  Okay.  Thanks.

22         THE VIDEOGRAPHER:  This concludes today's

23   video deposition.  The time is 1754.

24         (Deposition concluded at 5:54 p.m.)

25                         *    *    *



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            380

```
 1

 2   STATE OF NEW YORK)

 3                     ss:

 4   COUNTY OF ERIE   )

 5

 6        I DO HEREBY CERTIFY as a Notary Public in and

 7   for the State of New York, that I did attend and

 8   report the foregoing deposition, which was taken

 9   down by me in a verbatim manner by means of machine

10   shorthand.  Further, that the deposition was then

11   reduced to writing in my presence and under my

12   direction.  That the deposition was taken to be

13   used in the foregoing entitled action.  That the

14   said deponent, before examination, was duly sworn

15   to testify to the truth, the whole truth and

16   nothing but the truth, relative to said action.

17

18

19                      --------------------------
20                      JOAN M. METZGER-HUBBELL,
                        CM, Realtime Reporter,
21                      Notary Public.

22

23

24

25
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              381

```
 1
 2              DEPOSITION ERRATA SHEET
 3   Our Assignment No.  J9466053
 4   Case Caption:  VALENTINO DIXON
 5   vs.  CITY OF BUFFALO, et al.
 6      DECLARATION UNDER PENALTY OF PERJURY
 7       I declare under penalty of perjury
 8   that I have read the entire transcript of
 9   my Deposition taken in the captioned matter
10   or the same has been read to me, and
11   the same is true and accurate, save and
12   except for changes and/or corrections, if
13   any, as indicated by me on the DEPOSITION
14   ERRATA SHEET hereof, with the understanding
15   that I offer these changes as if still under
16   oath.
17   _____
18           CHRISTOPHER J. BELLING
19   Subscribed and sworn to on the _____ day of
20   _____, 20____ before me,
21   _____
22   Notary Public,
23   in and for the State of _____
24
25
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            382

```
1
2              DEPOSITION ERRATA SHEET
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24  SIGNATURE:_____DATE:_____
25            CHRISTOPHER J. BELLING
```



```
1

2              DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24   SIGNATURE:_____DATE:_____

25            CHRISTOPHER J. BELLING
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              384

```
 1
 2                        INDEX TO EXHIBITS
 3   Exhibit               Description                 Page
 4     EXH. 30        excerpt of Dixon DA file           43
 5     EXH. 31        excerpt of Christopher             86
                      Belling perjury testimony
 6
 7     EXH. 32        compilation of Jarmon and         168
                      Brown perjury file
                      documents
 8
 9     EXH. 33        9/17/18 Answering Affidavit       242
                      of DA Heraty (Dixon
10                    4226-35)
11     EXH. 34        article headed Chemist            294
                      Tells of Tests After
                      Gladden Slaying
12
13     EXH. 35        10/9/07 Affidavit of Thomas       325
                      Roland (Dixon 5943-45)
14
15
16   * Exhibits retained by Mr. Brustin.
       Copies of exhibits supplied to all counsel.
17
18
19
20
21
22
23
24
25
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           385

```
 1
 2                      INDEX TO WITNESSES
 3   Witness                Examination                Page
 4    CHRISTOPHER J.       BY MR. BRUSTIN              4
      BELLING
 5                         BY MR. RUSS               344
 6                         BY MS. PERSICO            348
 7                         BY MR. BRUSTIN            361
 8                         BY MS. PERSICO:           376
 9                         BY MR. BRUSTIN            378
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: $5,000..18th

**Exhibits**

9466053 Chr
istopher.J.
Belling.
EXHIBIT30
  43:13
  44:6
  384:4

9466053 Chr
istopher.J.
Belling.
EXHIBIT31
  85:13
  86:7
  140:21
  384:5

9466053 Chr
istopher.J.
Belling.
EXHIBIT32
  168:13,
  14,16
  251:5
  384:6

9466053 Chr
istopher.J.
Belling.
EXHIBIT33
  242:9,11
  384:8

9466053 Chr
istopher.J.
Belling.
EXHIBIT34
  294:16
  384:10

9466053 Chr
istopher.J.
Belling.
EXHIBIT35
  325:23
  384:12

**$**

$5,000
  282:14

$50,000
  202:20
  203:2

**0**

0082
  215:18

0155
  308:2

0186
  349:2,4,7

0200
  345:7,8

**1**

1/13/92
  279:15

10
  143:21

10/9/07
  325:23

10:07
  3:10,16

10:18
  3:17 4:3

10th
  86:11
  218:18,
  20,25
  219:11
  260:11
  273:11,24
  274:13

280:7
358:20
359:6

11
  371:15

11th
  371:12

12/5/91
  162:20

12:01
  114:25
  115:2

12:12
  115:4

12th
  36:16,18
  62:16,21
  120:19
  121:10
  281:13
  362:6
  367:23
  371:18,
  22,24,25

13
  251:6

1301
  166:23

1346
  167:2

13th
  256:13
  272:3
  276:6,15
  279:17
  280:13,
  16,21

14226
  4:21

1459
  240:8

14th
  153:5,8,9

15
  88:10
  204:20

15-year-old
  195:20,25
  196:10
  197:15
  199:19
  200:17
  205:8

1507
  240:11

155
  307:23
  308:2

15th
  159:24

16
  12:14,15
  163:17
  228:4,22
  229:6,7
  247:17,18
  248:7,15,
  19

1601
  293:5

1606
  293:8

1612
  297:13

1613
  297:16

1655
  336:3

1686
  115:13,14
  166:13

1692

256:18

1696
  271:23,25

17
  143:19,20
  229:7
  247:19
  248:7,15,
  17,20,21

1700
  271:24

1704
  336:6

1712
  344:13

1714
  344:16

1716
  333:7

1720
  333:7

1754
  379:23

1768
  44:9

18
  69:22
  203:23
  228:23
  229:7

185
  308:4,6,8

186
  349:25
  350:2
  371:3
  372:3

18th
  195:12,
  13,17



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: 19..27th

19
  69:23
  229:9

19-year-old
  230:23

1949
  5:3

1967
  6:18

1975
  7:18

1979
  8:21

1981
  9:2

1985
  323:18

1986
  25:3

1988
  10:3,8,
  19,21
  17:16

1989
  342:11,19
  343:6

1990
  295:10,
  11,24
  296:8
  342:11
  343:14

1991
  17:23
  36:16,18
  38:23
  57:16,19
  58:21
  63:18
  77:16
  80:7

115:19
161:18
162:3
163:4
234:11
281:13
292:11
296:8,25
297:20
318:4
343:8,11,
14 346:14
352:25
353:3,11
354:2
371:12

1992
  45:15
  86:11
  143:12
  195:12,14
  203:23
  262:15
  272:3
  279:17
  293:20
  353:16

1993
  294:21
  295:4

1997
  10:12
  11:8,9

1999
  11:16

19th
  195:14

1:00
  166:24

1st
  10:8
  195:14

— 2 —

2
  13:3
  150:12
  152:25
  177:12
  345:7
  377:24
  378:4

20
  108:20

200
  345:8,9,
  16
  349:10,
  11,13,16,
  21 373:10

2000
  36:16
  265:3

2000s
  263:15

2003
  11:18,19

2007
  11:22,23

2010
  12:2,3,6

2011
  12:6,10
  243:18
  264:3
  265:7,8

2015
  12:14

2016
  12:19,21,
  22 14:3

2017

14:7
264:3
265:4,8

2018
  14:11,12,
  21

2019
  14:22

203
  150:19,21
  159:12

20th
  159:24
  353:10

212
  4:20

2125
  202:4,5,
  7,9,12

2126
  201:25
  202:2

2129
  203:21

2130
  194:12,
  18,19,25

2160
  201:21,22

2161
  205:21,22

2170
  200:20

2171
  218:4

2213
  255:21,22
  256:2

2275
  149:23

22nd
  115:19
  120:25
  354:13

23
  351:16

2309
  144:19
  167:5,7

2407
  254:2

2409
  253:20,
  21,25

2438
  147:15
  149:16

2439
  168:8

24th
  293:20

25
  126:18
  127:6
  180:15,
  17,22
  185:16,18

258
  160:24

25th
  295:24

26
  16:14

265.03
  224:19

2757
  293:15,
  16,18

27th
  150:7



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: 2910..9th

**2910**
168:6,7,
19,24

**2911**
168:24

**2:59**
240:9

**2nd**
200:23

---

**3**

**3**
13:4
62:20
344:21

**30**
43:2,11,
13 44:6
113:19
180:8
194:10
233:24

**31**
85:13,14,
15,21
86:5,7
87:21
140:21

**3130**
278:22
279:3

**3133**
279:5,6,7

**3134**
279:8

**31st**
12:22

**32**
168:14,16
180:11

251:5

**33**
242:9,11

**34**
294:14,16

**35**
325:21,23

---

**4**

**4**
13:4
251:9
272:6,8

**4/11/2023**
4:2

**40**
165:8

**4226**
242:16

**4226-35**
242:12

**4235**
242:16

**425**
86:11

**45**
166:18

**47**
84:16
88:5
177:15,17

**487**
88:4,6,7,
9

**4:01**
293:6

**4:12**
297:14

**4:13**
297:17

**4:55**
336:4

**4th**
3:25

---

**5**

**50**
19:24
20:2,3

**561**
140:15
141:2,3
143:17

**562**
140:15
143:17,21

**568**
86:11

**5943-45**
325:24

**5:12**
344:14

**5th**
161:18,23
162:3
163:4

---

**6**

**6**
251:7,8
273:4
275:8
276:3

**6/9**
218:6

**63**

377:24
378:8

**68**
44:10

**6th**
353:3

---

**7**

**70**
3:25

**72**
302:14

**74**
215:20,
21,23
216:2

**75**
7:22,23
101:22
215:21,23
216:2

**77**
7:25 8:2

**79**
8:4,13

---

**8**

**80**
8:21
347:3

**81**
9:3

**82**
9:7
215:16
347:7,8,
11 372:2,
3,5,6,8

**83**
9:7

**85**
9:21

**86**
9:21

**87**
166:13

**88**
10:8

**893-1497**
378:4

---

**9**

**9/17/18**
242:11

**90**
343:15,17

**90s**
25:9
120:8

**911**
368:19

**92**
17:23
238:7

**93**
295:10

**97**
10:16,18

**98**
10:17

**9th**
115:25
260:10
262:14
273:8,24
274:12
276:22



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: A-N-I-T-H-A..affect

277:9
280:6,18
358:18
359:5

—————————

**A**

—————————

**A-N-I-T-H-A**
321:22

**a.m.**
3:10,16,
17

**Aaron**
21:8 92:5
305:11
307:13,
14,17
308:10,16
309:5,21
310:10,
18,24
311:16,21
314:14
353:5

**ability**
6:10
364:5,7
375:18

**absent**
65:15

**absolute**
38:8
301:11

**absolutely**
142:8
155:7
208:24
276:20
285:17
286:10

**abundance**
47:8

**accepted**
248:21
249:3

**access**
259:10
334:12

**account**
234:14
235:2,3
361:18

**accounts**
234:2,11,
18

**accuracy**
112:9

**accurate**
9:12 48:7
55:19
88:21
92:2
102:24
295:9
325:19

**accurately**
55:9
129:2,9
152:12
219:10
248:2,12
345:23

**accused**
142:12
292:24
321:6

**accusing**
329:3,4

**accustomed**
296:18

**acquaintanc
e**
257:25

**acting**
12:15
29:12,13,
21 33:15
346:16

**action**
244:9

**actions**
284:10

**actively**
346:17

**activities**
24:14
176:24
239:9
294:6,8

**actual**
77:5
108:13,16
254:8

**ad**
61:15

**ADA**
335:11
373:14,15

**ADA's**
196:3

**Adams**
21:2,4
92:5,8
168:3
169:6,7
170:12
171:7,18,
22 175:24
178:17
179:9
180:6,11
181:10
182:16
183:3,9
184:4,24
185:5,19

**186:11,24
187:5,11,
25
189:12,20
190:6,16
191:9
192:8
194:3,4
311:13
317:10
355:11

**Adams'**
177:20

**addition**
24:19
73:14
83:10
89:17
92:18
269:14
364:3

**additional**
268:13
269:11
271:17,18
354:9,19
374:20

**address**
93:8
165:8
196:3,4

**addressed**
23:17

**adjectives**
27:17

**administrat
ion**
13:18

**Administrat
ive**
7:21

**admissible**
32:23,24

**197:25

**admissions**
105:20
112:10

**admit**
246:19
320:13

**admitted**
140:4
230:24
243:15
246:18
360:11

**admitting**
378:22
379:14

**adult**
70:3
229:12
230:23

**advent**
25:11

**adverbs**
27:17

**adversarial**
29:25

**advise**
357:23

**advises**
351:21

**advocacy**
25:11,12,
13

**advocate**
29:13,21,
24 30:2
375:19

**advocates**
30:3

**affect**



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                         Index: affidavit..appointed

6:10

**affidavit**
242:11,17
248:12
272:2
274:25
276:11
325:23
326:10
333:7,22
334:13
358:2

**afraid**
133:23
151:20

**age**
68:21
69:21
70:8
229:4,7

**agree**
27:12
29:9
38:11
78:20
92:7
102:5,9,
12,17,19,
20,22
105:18
110:23,24
111:6
156:3,4
181:8
187:2
190:19
191:15,19
211:3
223:22
232:17
235:17
272:21
283:12
298:16
301:7

304:18
311:25
312:5
328:9
337:20
362:4
369:23
370:3

**agreed**
190:22

**agrees**
101:10

**ahead**
130:10
150:17

**aide**
342:18

**aides**
342:12

**air**
355:17

**alcoholism**
246:10

**allegations**
245:12
326:16
327:3
328:10,23
329:7,10,
13,14

**alleged**
15:14
153:23
177:20
336:8
346:4

**allowed**
316:16,18

**Amherst**
4:21

**amount**

175:17
297:3
358:21

**amounts**
297:21
300:21

**analyst**
296:13

**and/or**
189:11
207:11

**Anitha**
321:15,17

**Anne**
378:3,6,7

**Annie**
70:2,12
94:18
186:19
229:3
236:24
367:24

**anonymous**
134:16
135:10,
18,25
141:20
145:10,25
146:18
147:19
148:2,23
149:6,19
155:4
158:16
163:11

**answering**
5:20
129:12
242:11
266:12
299:17,19
340:13

**answers**
377:22

**Anti-drug**
11:2

**Antoine**
90:10
91:10,12
116:4,8,
16 117:6,
15 186:10
233:2
251:11,20
252:15,19
253:16
256:3
316:21
317:14,21
318:19
319:3
353:21
354:4
378:3

**anymore**
247:16

**anything's**
72:17

**apologize**
8:12
351:3
354:7

**apparent**
120:14

**apparently**
233:25
260:13
302:23

**appeals**
322:7,25
343:3

**Appeals'**
322:14

**appearance**

107:13,19
203:12
238:5
257:11

**appeared**
19:13
339:18

**appears**
120:12
121:14,
19,21
149:6
150:2
162:3,20,
22 195:9,
11 199:6
200:22
202:17
203:8
218:6
219:13,15
295:4
345:16
373:10

**Appellate**
322:25
323:4,13

**Apples**
193:5

**applicable**
351:22

**application**
304:19

**applications**
15:15

**applies**
38:7

**appointed**
256:24
258:7
273:8,15
274:16



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: appreciative..attorney

358:3
359:6

appreciativ
e
241:21

approached
134:18

appropriate
ly
244:14
277:21

approval
247:4

approximate
ly
9:6,20
75:25

Arcara
9:3

area
19:18
116:25
362:14,17
363:5

arguably
45:10,13,
16,24
46:3,5,23
47:6

argue
126:9

argumentati
ve
71:25
95:25
138:22

arose
177:2

arraigned
195:25

arrange

170:4
171:22
192:25

arranged
74:5
76:10
336:22
367:25
368:2

arrangement
s
68:12

arranging
74:5

array
52:14
54:14,19
56:4,16
58:15
113:11
179:10,23
181:12,21
182:3
183:16
185:2
187:14
189:15
191:17
217:3,9
306:7
307:17
309:25

arrays
90:23
91:3
110:5,16
305:13,22
306:9,11
307:6

arrest
15:14
77:15,23
78:22
347:5

374:7,10
17

arrested
65:9
78:10
101:10,12
223:23
357:2
369:3,17

arrived
351:3

arson
322:2

article
46:20
293:10
294:16,21
295:15
323:10

articles
292:13

ascertain
290:22

aspect
101:18

aspects
102:14,24

assault
224:4,5

assessing
352:18

assigned
8:23
64:15
68:15
76:11
257:14
259:9
358:15,22
360:2

assigning
18:10,15,

17

assist
104:16
174:19

assistance
64:23
174:11
376:19

assistant
8:24
11:20,22
15:12
18:2,22
24:20
25:17,24
26:18,22
28:8,20
29:11
78:9
196:2
243:5
257:21
293:19
294:2,7,9
334:14
343:3
351:18,21

assistants
294:4

assisted
24:13

Association
25:10

assume
5:24
73:12
76:9
190:24
275:4
368:24

assumed
40:16
249:13,15

338:13

assuming
219:10,12
369:2,18
379:10

assumption
141:21

attachments
44:21

attempt
152:13

attempted
93:8
199:17
365:4

attempting
107:5
129:2
203:11
337:6

attention
20:17
272:5
323:16

attorney
5:7 9:3
10:4,5
11:11,20
12:4 13:3
14:7,10
25:24
26:19,22
28:8,20
29:12
74:4,7,9
75:24
76:22,25
77:6 78:9
117:12
197:6
294:7,9
317:4
322:10



334:14
351:18,21
355:24
357:14
358:4
359:13,22
361:3
362:6
363:8,17

**Attorney's**
12:20
351:16

**attorneys**
15:19
18:2
23:16
24:21,22
25:2,6,9,
18 243:6
266:16
330:5,10
336:20

**August**
7:23,25
8:2
36:16,18
62:16,21
110:13
120:19
121:9
153:8,9
159:23,24
281:13
362:6
367:23
371:12

**authenticate**
191:9

**authored**
345:17

**authoritative**
245:6

**authority**
50:11

**authorize**
355:5

**authorized**
317:2

**auto**
165:7

**automatic**
288:21

**average**
209:2

**avoid**
69:6

**aware**
78:18
159:23
186:7,14
245:17,22
253:6
280:6
311:20,23
318:16
322:18
326:15
335:4
346:15
363:12
367:4

———————
**B**
———————

**bachelor's**
7:5

**back**
7:4 11:19
12:5,9,11
13:20
17:14
115:3,9
117:11
132:9

166:25
167:5
170:5
171:22
172:9
177:10
192:25
215:17
218:3,10
220:10
240:10
242:15
243:18
244:5,13
249:9,11
251:16
263:15
293:7,11
294:12
297:15
318:11
325:20
336:5
344:15
349:25
356:6
358:5
370:16

**background**
82:8
94:18,22
109:7,20
209:12

**backwards**
362:3

**bad**
32:3
108:19
129:7
132:7
222:13
254:4,16,
20,24
255:13
258:23

312:3
318:25
358:16

**bail**
203:2

**Balcom**
165:8

**Ballpark**
20:5
343:15

**bandied**
325:2

**bandy**
283:6

**bank**
234:2,11,
14,17
235:2,3,
10

**bar**
243:15
246:18

**Barbara**
7:3

**Barry**
334:18

**baseball**
107:24

**based**
38:23
71:19
97:6
104:24
106:17
109:4
134:2
146:11
149:5
161:16
162:19
197:24
216:22

237:25
266:17
270:5
271:6
272:22
278:10,11
288:16
300:16
301:11
308:14
315:2
339:23

**basic**
38:6
39:10,13
56:22,25
111:17
197:5

**basics**
50:18

**basis**
13:9

**bat**
7:11

**Bates**
43:6,16,
25

**Bates-stamped**
242:16

**bear**
353:20

**begin**
3:18

**beginning**
12:6 67:8
324:5
352:24

**begins**
254:2

**behalf**
25:5



| | | | | |
|---|---|---|---|---|
| 29:13,21 | 31:1 32:1 | 111:1 | 158:1 | 205:1 |
| 30:19 | 33:1 34:1 | 112:1 | 159:1 | 206:1 |
| 117:19 | 35:1 36:1 | 113:1 | 160:1 | 207:1 |
| 206:17 | 37:1 38:1 | 114:1 | 161:1 | 208:1 |
| 210:12 | 39:1 40:1 | 115:1,6 | 162:1 | 209:1 |
| 211:6 | 41:1 42:1 | 116:1 | 163:1 | 210:1 |
| 326:4,10 | 43:1 44:1 | 117:1 | 164:1 | 211:1 |
| **behest** | 45:1 46:1 | 118:1 | 165:1 | 212:1 |
| 365:18 | 47:1 48:1 | 119:1 | 166:1 | 213:1 |
| 366:3 | 49:1 50:1 | 120:1 | 167:1 | 214:1 |
| | 51:1 52:1 | 121:1 | 168:1 | 215:1 |
| **belief** | 53:1 54:1 | 122:1 | 169:1 | 216:1 |
| 20:8 | 55:1 56:1 | 123:1 | 170:1 | 217:1 |
| 228:21,22 | 57:1 58:1 | 124:1 | 171:1 | 218:1 |
| 270:6 | 59:1 60:1 | 125:1 | 172:1 | 219:1 |
| 273:3 | 61:1 62:1 | 126:1 | 173:1 | 220:1 |
| 294:3 | 63:1 64:1 | 127:1 | 174:1 | 221:1 |
| 370:23,24 | 65:1 66:1 | 128:1 | 175:1 | 222:1 |
| **beliefs** | 67:1 68:1 | 129:1 | 176:1 | 223:1 |
| 109:4 | 69:1 70:1 | 130:1 | 177:1 | 224:1 |
| | 71:1 72:1 | 131:1 | 178:1 | 225:1 |
| **believed** | 73:1 74:1 | 132:1 | 179:1 | 226:1 |
| 70:15 | 75:1 76:1 | 133:1 | 180:1 | 227:1 |
| 117:23 | 77:1 78:1 | 134:1 | 181:1 | 228:1 |
| 126:12 | 79:1 80:1 | 135:1 | 182:1 | 229:1 |
| 127:16 | 81:1 82:1 | 136:1 | 183:1 | 230:1 |
| 147:18 | 83:1 84:1 | 137:1 | 184:1 | 231:1 |
| 228:22 | 85:1 | 138:1 | 185:1 | 232:1 |
| 339:24 | 86:1,8 | 139:1 | 186:1 | 233:1 |
| 340:2 | 87:1,23 | 140:1 | 187:1 | 234:1 |
| **Belling** | 88:1 89:1 | 141:1 | 188:1 | 235:1 |
| 3:19 4:1, | 90:1 91:1 | 142:1 | 189:1 | 236:1 |
| 16,20 | 92:1 93:1 | 143:1 | 190:1 | 237:1 |
| 5:1,2 6:1 | 94:1 95:1 | 144:1 | 191:1 | 238:1,24 |
| 7:1 8:1 | 96:1 97:1 | 145:1 | 192:1 | 239:1 |
| 9:1 10:1 | 98:1 99:1 | 146:1 | 193:1 | 240:1,14 |
| 11:1 12:1 | 100:1 | 147:1 | 194:1 | 241:1 |
| 13:1 14:1 | 101:1 | 148:1 | 195:1 | 242:1 |
| 15:1 16:1 | 102:1 | 149:1 | 196:1 | 243:1 |
| 17:1 18:1 | 103:1 | 150:1 | 197:1 | 244:1 |
| 19:1 20:1 | 104:1 | 151:1 | 198:1 | 245:1 |
| 21:1 22:1 | 105:1 | 152:1 | 199:1 | 246:1 |
| 23:1 24:1 | 106:1 | 153:1 | 200:1 | 247:1 |
| 25:1 26:1 | 107:1 | 154:1 | 201:1 | 248:1 |
| 27:1 28:1 | 108:1 | 155:1 | 202:1 | 249:1 |
| 29:1 30:1 | 109:1 | 156:1 | 203:1 | 250:1 |
| | 110:1 | 157:1 | 204:1 | 251:1 |



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: bench..Blenk

| | | | | |
|---|---|---|---|---|
| 252:1 | 299:1 | 346:1 | **bigger** | 17:19 |
| 253:1 | 300:1 | 347:1 | 34:11 | 18:3,16 |
| 254:1 | 301:1 | 348:1,16, | 250:12 | 19:21 |
| 255:1 | 302:1 | 25 349:1 | **biggest** | 22:3 |
| 256:1 | 303:1 | 350:1 | 118:21 | 24:9,16 |
| 257:1 | 304:1 | 351:1 | **binder** | 26:2,8,20 |
| 258:1 | 305:1 | 352:1 | 43:5 | 27:4,15 |
| 259:1 | 306:1 | 353:1 | 85:10,12 | 28:14,22 |
| 260:1 | 307:1 | 354:1 | 168:9,10 | 29:4,8,15 |
| 261:1 | 308:1 | 355:1 | 278:19 | 30:6,12, |
| 262:1 | 309:1 | 356:1 | | 21 31:4, |
| 263:1 | 310:1 | 357:1 | **binders** | 9,14,20 |
| 264:1 | 311:1 | 358:1 | 85:9 | 32:5,9, |
| 265:1 | 312:1 | 359:1 | **birth** | 16,22 |
| 266:1 | 313:1 | 360:1 | 5:2 70:7 | 33:9,19 |
| 267:1 | 314:1 | 361:1 | 145:3 | 34:6,20 |
| 268:1 | 315:1 | 362:1,4 | **bit** | 35:2,18 |
| 269:1 | 316:1 | 363:1 | 11:7 | 36:7 |
| 270:1 | 317:1 | 364:1 | 12:7,17 | 37:10,16, |
| 271:1 | 318:1 | 365:1 | 25:17 | 21 38:12 |
| 272:1 | 319:1 | 366:1 | 27:9 | 39:6,12 |
| 273:1 | 320:1 | 367:1 | 38:21 | 40:4,13, |
| 274:1,25 | 321:1 | 368:1 | 71:2,7 | 19 41:4, |
| 275:1 | 322:1 | 369:1 | 72:15 | 14,23 |
| 276:1 | 323:1 | 370:1 | 89:10 | 42:11,21 |
| 277:1 | 324:1 | 371:1 | 289:25 | 43:14 |
| 278:1 | 325:1 | 372:1 | 351:4 | 44:11,17 |
| 279:1 | 326:1 | 373:1,14, | 353:24 | 45:6,20, |
| 280:1,22 | 327:1 | 16 374:1 | 358:5 | 25 46:7, |
| 281:1 | 328:1 | 375:1 | | 13,24 |
| 282:1 | 329:1 | 376:1,10 | **bizarre** | 47:10,13, |
| 283:1 | 330:1 | 377:1 | 302:14 | 19,23 |
| 284:1 | 331:1 | 378:1 | **black** | 48:4,23 |
| 285:1 | 332:1 | 379:1 | 370:6 | 49:6,12, |
| 286:1 | 333:1 | | | 22 50:12, |
| 287:1 | 334:1 | **bench** | **Bland** | 20 51:3, |
| 288:1 | 335:1 | 12:14 | 353:11 | 12,17 |
| 289:1 | 336:1 | **bicycle** | **blank** | 52:3,16, |
| 290:1 | 337:1 | 73:10 | 56:8,10 | 21 53:5, |
| 291:1 | 338:1 | 104:3 | | 11,18 |
| 292:1 | 339:1 | | **Blenk** | 54:3,20 |
| 293:1 | 340:1 | **big** | 3:8,14 | 55:5,12 |
| 294:1 | 341:1 | 71:7 | 4:15 | 56:5,19, |
| 295:1 | 342:1 | 114:14,16 | 10:22 | 23 57:9, |
| 296:1 | 343:1 | 143:8 | 11:3 | 21 58:8, |
| 297:1 | 344:1,6, | 271:11 | 13:23 | 21 59:6, |
| 298:1 | 19 345:1 | | | 12,19,25 |



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

60:9,25
61:8,14,
21 62:19
64:10,25
65:17
66:3,10,
15,24
67:14,19
69:11
70:22
71:5,9,
13,25
72:10
74:8
75:4,14
77:18
78:16,25
79:10,22
80:3,14,
21,23
81:14
82:4,14,
19 83:8,
13 84:5,
7,17,20,
24 85:5,
9,16,19,
25 86:12,
17,23
87:2,5,
10,17
88:25
89:14,20
90:8 91:8
92:10
93:17
94:6
95:7,25
96:9,18
97:4,7,17
98:6,14,
25 99:17,
25
100:14,20
101:19,24
102:8,15
103:2,8,

13 104:23
105:9,14,
21 106:5,
13,23
107:11,
14,22
108:15,21
109:10,22
110:3
111:5,13,
21 112:5,
11,19
113:3,13,
22 114:5,
20

**blood**
289:4,10
291:7,8

**blue**
108:7

**body**
57:11
289:12
351:13
373:4

**Boies**
16:6,7,8,
9,10

**bond**
202:20
212:11

**book**
140:16
256:2
257:13

**booking**
347:5,19

**booklet**
348:17

**bottom**
99:20
205:19
253:24

254:4
260:6,8,
10,12

**bought**
302:5

**boys**
254:4,16,
20,24
255:13

**BPD**
62:5
150:20
156:21
157:2
215:18,23
230:5
239:4,5
269:13
307:24
308:2
311:21
316:25
317:6,9,
15,16
334:24
335:10
342:12
345:7
348:25
349:9
350:2

**BPD203**
150:19

**BPD30**
180:10

**Brady**
27:14,21
28:3,6
38:23
40:25
41:7,22
45:4,10,
13,17
46:6,12,

22,23
47:6,7
48:3,9,
12,17,19,
22 49:3
53:25
188:22
196:15,
21,25
206:21
207:5
210:13,
17,22,24
211:6,7

**brag**
330:7

**brand**
107:23
302:16

**brand-
spanking-
new**
302:17

**break**
6:3,6
16:2
114:23
240:5,6,
18 293:3
335:25
343:25
344:8,11

**Brenda**
145:7

**bribe**
111:11

**briefed**
259:8

**briefly**
351:6,7
360:14

**bright**
303:8

**bring**
32:13
318:11
378:23

**bringing**
69:9
279:10
280:7
285:12

**broad**
46:10,22
102:16

**broadly**
61:18
175:4

**broken**
99:20

**brother**
378:3

**brought**
68:22
97:21
104:14
236:13
316:7
318:15
323:15
334:15
358:3
367:24

**Brown**
63:7,10
106:20
114:18
117:23
120:20
142:6
143:5,7
168:12,17
230:17
232:25
250:19
254:24
262:12



265:13,14
267:10
270:23
277:25
278:4
279:11
280:9
293:13
304:13
314:15
326:11,24
331:24
332:6,14
337:13
338:4
339:9,17
341:5,19
349:19
350:17
355:10,25
356:2
373:16
376:12,14

**Brown's**
104:4
253:13
350:10
377:8

**Brustin**
3:7,13
4:12,13,
25 10:25
11:6 14:2
17:20
18:12,20
19:23
22:13
24:11,18
26:5,11,
23 27:7,
19 28:17,
24 29:7,
10,18
30:9,16,
24 31:6,
11,16,23

32:7,11,
17 33:3,
13,24
34:13,22
35:5,9,
12,20
36:9
37:12,19,
24 38:14
39:8,15
40:7,14,
21 41:9,
17 42:2,
17,24
43:3,10,
15,20,24
44:4,14,
16,22,24
45:8,22
46:4,9,17
47:3,11,
15,21,24
48:10,25
49:8,17,
24 50:15,
21 51:7,
15,21
52:8,19,
23 53:8,
14,21
54:10,25
55:7,14
56:12,21
57:2,15,
25 58:13,
24 59:8,
14,22
60:5,13
61:4,10,
16 62:2,
22 64:17
65:4,19
66:5,11,
17 67:3,
16,20
69:14
70:23

71:6,11,
14 72:4,
12 74:20
75:7,17,
20 77:20
78:4,19
79:3,13,
25 80:6,
17,22,25
81:16
82:9,16,
24 83:9,
17 84:6,
12,18,21,
25 85:3,
6,10,15,
18,22
86:3,9,
14,20,25
87:3,7,
12,19,22
89:2,16
90:2,4,11
91:9
92:14
93:19
94:3,7
95:8
96:4,11,
22 97:5,
9,24
98:8,17
99:5,9,
18,22
100:11,
16,23
101:21
102:2,11,
18 103:4,
10,15
105:3,10,
17,23,25
106:7,15
107:3,7,
16
108:10,
18,24

109:14,23
110:8
111:7,16,
23 112:7,
14,22
113:7,17,
24 114:8,
15,22
115:5
118:4,9,
16,23
119:6,9,
19 120:2,
7,11,23
121:5,25
122:12,18
123:11,12
124:7,12,
20
125:17,
22,24
126:3,8,
10,20
127:2,7,
22 128:6,
12,16,24
129:6,14,
18,22,25
130:8,12,
20 131:3,
9,14,21
132:2,8
133:6,16,
21 134:5,
8,11
135:13,23
136:14,24
137:4,13,
21 138:7,
11,25
139:5,21
140:6,13
141:10,24
142:23
143:13
144:6
145:16

146:22
147:23
148:11,14
149:2,12
150:18
151:3,13,
18,23
152:8
153:3,9,
11,20
154:6,14,
25 155:8,
14,19
156:2,10,
18 157:6,
17,19,24
158:11,22
159:5,10,
21 160:6,
8,23
161:11,
13,25
162:9,23
163:9,15
164:6,15,
20
165:18,24
166:4,10,
13,15,18
167:3
168:9,13,
18
169:12,16
170:7
171:11,24
172:4,10,
21 173:5,
14,23
174:5,17
175:3,8,
16,22
176:7,21
177:13,14
178:8,14,
23 179:14
180:22,23
181:7,22



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: brutal..Bryant

182:25
183:17,21
184:2,14,
21 185:11
186:15
187:9,20
188:6,12,
20 189:2,
8,21
190:5,14,
21 191:5,
10,13,14,
25 192:3,
9 193:9,
23 194:9,
16,18,20
195:8
197:8,13,
21 198:5,
11,19
199:22
200:3,11
201:3,25
202:3
203:3
204:18
205:2,14
206:22
207:9,19
208:2,7,
12,14,22
209:14
210:2,9,
19 211:2,
14,19
212:4,8
213:2,15,
22 214:5,
11,18,25
215:15
216:12
217:7,15,
21 219:2,
3,22
220:5,12,
18 221:2,
15,22

222:4,5,
15 223:2,
9 224:5,
6,13,23
225:7,16,
23 226:6,
11,17,22
227:4,13,
18,25
228:8,15,
17 229:5,
22 230:3,
20 231:5,
17 232:5,
20 233:9,
13,19
234:5,16,
24 235:8,
16,20
236:5,15,
20 237:17
238:9,13,
20,24
239:2,18
240:4,12
241:5,10,
19,24
242:8,14,
19 245:23
248:8,10,
17,23
252:24
253:2
254:13,19
255:4,12,
19,23
256:5,9,
10
258:23,25
259:21
260:25
261:18
262:9,14,
17,22
263:3,12
265:8,10,
19 266:22

267:8,17,
24 268:21
269:2,8,
15,19
270:10,
14,20
271:5,10,
15 272:20
273:22
275:3
276:16
277:7,14,
19,24
279:2,4
280:5,12
281:5,18,
25 283:2,
25 284:15
285:2,7
286:5,11,
17,23
287:12,21
288:2,15
289:2,8,
15,21
290:15
291:4,15,
20 292:2,
22 293:3,
9 294:13,
19
295:13,20
296:4,5
297:10,18
298:3,22
299:14,
21,25
300:14,24
301:5,20,
25 302:10
303:17,25
304:4,11,
15 305:5,
18 306:18
307:9,21
308:7,10,
13 309:2,

10,16,23
310:16
311:2,8
312:7,13,
22
313:12,
19,21
314:4,11,
24 315:7,
16,24
316:8,14,
19 317:8
318:24
319:9,17
320:2,8,
16
321:19,
21,24
322:12,
16,22
323:8,11,
18,19
324:3
325:5,13,
25 326:6,
13
327:10,
11,16,23
328:8,14,
17,21
329:2,8,
11,17,25
330:3,13,
17,23
331:9,19
332:4,11,
23,24
333:10
334:3
335:24
336:7,15
337:3,10,
19 338:2,
10,15,22
339:2,7,
15 340:9,
23 341:3,

11,17,22
342:5,17,
22 343:21
344:9
345:8,12
346:19
347:3
348:8,12,
18 349:11
350:11,15
351:12
352:20
354:12,21
355:16,21
356:10
357:5,13,
17
358:11,25
359:9,16
360:8
361:20,25
362:19
364:16
365:25
366:9,19
367:9,14
368:4,13
369:14,22
370:4,12,
20 372:19
373:2,8
375:14
376:3,5
377:5
378:15,19
379:2,5,
19

**brutal**
  233:4
  235:25

**Bryant**
  70:2,12
  94:18,23
  109:8
  186:8,18
  229:2



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: Bryant's..case

234:13
236:22
367:24
378:2

**Bryant's**
235:2

**buddies**
232:24,25
233:2

**Buffalo**
3:23 4:2
7:5,6,7,
22 11:17
19:7
20:21
21:13
34:8
35:23
39:10
40:10
41:21
47:17
51:23
119:21
120:4
133:10
171:23
173:12
232:2
252:8
294:21
295:5,9
333:16
335:17
346:6,11,
17
347:16,18
351:4
352:8
369:24

**bullet**
121:17
134:21
165:7
251:7

**bureau**
7:21,23,
24 8:3,4,
7,23,24,
25 9:11,
15,22,24
10:6,9,10
11:18,21
17:15
18:8
334:24
345:18

**bureaus**
9:19

**business**
26:24
69:4 80:5
83:25

——————

————— C —————

**calculation**
33:6

**California**
7:3

**call**
31:22
74:11,25
75:11
76:13
119:14
135:18
137:16,20
139:13
140:9
141:6,21
145:10
146:18
147:19
148:2,4,
23 149:6
155:4
158:16
159:24

163:11
200:22,25
201:4,9
202:7,15,
18,19
218:6
219:4,18
221:3
233:7
239:14
277:20
278:5
312:25
349:17
355:3
368:19
377:14

**called**
4:21 8:9
12:12,17
14:13
20:16
64:21
74:11
75:2
76:10
134:17,22
136:9,19
139:18
141:14,
16,17
143:24
144:8
148:12,16
150:4
154:19
160:15
165:12
230:18,25
247:2
248:12
257:2
300:5
326:21
345:4
377:24

378:2,4

**caller**
134:16
135:10,25
145:25
149:20

**calling**
211:5
213:20
277:15
297:8
355:16

**calls**
20:21
28:14
29:4,15
30:12,21
33:9
59:25
72:2
154:2

**campaign**
13:16

**Campbellsvi
lle**
316:23
354:3

**candidate**
13:15

**car**
121:16
134:20

**career**
6:14 7:16
8:9,22
9:4,13
17:14
24:6,22
25:18
57:12
65:16
100:24
257:22

263:5,8
265:22

**careful**
78:23
98:12

**carefully**
33:7 80:2

**Carolina**
25:10

**carried**
290:5

**carry**
290:2

**case**
3:20
5:10,13
12:7
15:6,9,10
16:12
17:22
19:12
20:9
21:15,16
22:5,6,7,
9,10,12
24:13,15
26:25
27:2
31:13,21
33:2,21,
22,25
34:10
35:15
38:16
39:19
42:3,4
44:8
48:13
49:11
50:3,9
51:20
54:7,14
57:12,18
60:22



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

61:7,9,
12,17,19,
24 62:5
64:22
72:13
78:2,9,
13,21
79:15
81:3 83:5
84:2,10
87:25
103:21
106:16
113:6
114:7,10
119:11
120:12
129:10
132:9
137:14
155:4
157:11
161:14
167:23
174:13,21
175:11
176:24
177:3,9,
25 191:6,
15 192:12
195:9,11
196:8
197:2
199:6
201:19
205:18,20
209:13,25
216:20
217:2,23
219:25
221:8
224:25
230:22
233:22
239:10
242:2
249:8

252:4
259:9
260:14
263:4,7,
13,23
264:17
265:24
266:11,13
267:3,6,
20 268:5,
6,23
272:9
276:17
283:19
292:16,24
293:25
294:4,7,
10,22,25
295:4
298:4
300:17
304:10
314:6,9
315:17,20
321:7,9,
15,25
322:11
323:20,25
326:18,
20,21
328:11
333:15,23
334:6
340:16
342:6
346:4
352:4,7,
18,24
354:2
355:8
357:7
359:8,25
365:9,16
375:18

cases
5:11

17:18,24
18:6,11,
15,17
30:25
33:15
49:10,14
80:20
100:18,24
119:17
263:14
264:8,9
265:11,
20,21
266:9,15
267:21
279:14
288:9,13
292:13
314:2
326:23,25
332:18
355:6
358:6

caused
103:20
117:7
118:13
120:24
127:3
189:3,19,
22 237:11
271:3
276:19
355:2
365:21

causing
173:7

caution
47:8

cc'ing
206:11

center
25:11,12,
13

central
6:19,21
347:19

cetera
15:15,16
245:7

chain
18:22
237:2

challenging
169:23

chance
44:25
216:4

change
35:8 90:3
244:6
285:12
287:5
310:11
320:4

changed
12:16
357:3,6
364:21,
22,25
365:13

Channel
377:24
378:4

characteriz
ing
190:14

charge
11:11
32:25
116:16
117:3
143:4
199:18
202:23
203:16
204:8

205:7
224:8
280:15
351:14,22
361:2

charged
32:21
33:21
77:12
79:18
114:17
143:8
197:15
259:16
260:17
278:6,8
287:6
303:12
322:2
326:24
347:12

charges
32:13
201:7
209:17,20
210:4
211:23
212:11,
20,25
213:10
261:24
262:11
270:5
279:11
280:2,8
336:17

charging
117:2
372:23

Chautauqua
14:8,10

cheating
243:15
246:18



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: check..Christopher

| | | | | |
|---|---|---|---|---|
| **check** | 32:1 33:1 | 112:1 | 159:1 | 206:1 |
| 15:24 | 34:1 35:1 | 113:1 | 160:1 | 207:1 |
| 109:20,21 | 36:1 37:1 | 114:1 | 161:1 | 208:1 |
| **checked** | 38:1 39:1 | 115:1 | 162:1 | 209:1 |
| 109:7 | 40:1 41:1 | 116:1 | 163:1 | 210:1 |
| | 42:1 43:1 | 117:1 | 164:1 | 211:1 |
| **Cheektowaga** | 44:1 45:1 | 118:1 | 165:1 | 212:1 |
| 7:25 | 46:1 47:1 | 119:1 | 166:1 | 213:1 |
| **Chemist** | 48:1 49:1 | 120:1 | 167:1 | 214:1 |
| 294:16 | 50:1 51:1 | 121:1 | 168:1 | 215:1 |
| | 52:1 53:1 | 122:1 | 169:1 | 216:1 |
| **Chenango** | 54:1 55:1 | 123:1 | 170:1 | 217:1 |
| 266:2 | 56:1 57:1 | 124:1 | 171:1 | 218:1 |
| **chief** | 58:1 59:1 | 125:1 | 172:1 | 219:1 |
| 8:25 9:4, | 60:1 61:1 | 126:1 | 173:1 | 220:1 |
| 10,18,23 | 62:1 63:1 | 127:1 | 174:1 | 221:1 |
| 11:17,20, | 64:1 65:1 | 128:1 | 175:1 | 222:1 |
| 21 12:18 | 66:1 67:1 | 129:1 | 176:1 | 223:1 |
| 66:20 | 68:1 69:1 | 130:1 | 177:1 | 224:1 |
| 92:24 | 70:1 71:1 | 131:1 | 178:1 | 225:1 |
| 93:5 | 72:1 73:1 | 132:1 | 179:1 | 226:1 |
| 163:18 | 74:1 75:1 | 133:1 | 180:1 | 227:1 |
| 342:25 | 76:1 77:1 | 134:1 | 181:1 | 228:1 |
| 343:2,3 | 78:1 79:1 | 135:1 | 182:1 | 229:1 |
| 354:9 | 80:1 81:1 | 136:1 | 183:1 | 230:1 |
| | 82:1 83:1 | 137:1 | 184:1 | 231:1 |
| **choose** | 84:1 85:1 | 138:1 | 185:1 | 232:1 |
| 87:15 | 86:1,7 | 139:1 | 186:1 | 233:1 |
| **chose** | 87:1 88:1 | 140:1 | 187:1 | 234:1 |
| 363:8 | 89:1 90:1 | 141:1 | 188:1 | 235:1 |
| | 91:1 92:1 | 142:1 | 189:1 | 236:1 |
| **Christopher** | 93:1 94:1 | 143:1 | 190:1 | 237:1 |
| 3:19 4:1, | 95:1 96:1 | 144:1 | 191:1 | 238:1 |
| 16,20 5:1 | 97:1 98:1 | 145:1 | 192:1 | 239:1 |
| 6:1 7:1 | 99:1 | 146:1 | 193:1 | 240:1 |
| 8:1 9:1 | 100:1 | 147:1 | 194:1 | 241:1 |
| 10:1 11:1 | 101:1 | 148:1 | 195:1 | 242:1 |
| 12:1 13:1 | 102:1 | 149:1 | 196:1 | 243:1 |
| 14:1 15:1 | 103:1 | 150:1 | 197:1 | 244:1 |
| 16:1 17:1 | 104:1 | 151:1 | 198:1 | 245:1 |
| 18:1 19:1 | 105:1 | 152:1 | 199:1 | 246:1 |
| 20:1 21:1 | 106:1 | 153:1 | 200:1 | 247:1 |
| 22:1 23:1 | 107:1 | 154:1 | 201:1 | 248:1 |
| 24:1 25:1 | 108:1 | 155:1 | 202:1 | 249:1 |
| 26:1 27:1 | 109:1 | 156:1 | 203:1 | 250:1 |
| 28:1 29:1 | 110:1 | 157:1 | 204:1 | 251:1 |
| 30:1 31:1 | 111:1 | 158:1 | 205:1 | 252:1 |



| | | | | |
|---|---|---|---|---|
| 253:1 | 300:1 | 347:1 | **circumstanc** | **classic** |
| 254:1 | 301:1 | 348:1 | **es** | 210:22,24 |
| 255:1 | 302:1 | 349:1 | 12:24 | **clean** |
| 256:1 | 303:1 | 350:1 | 60:6 | 107:25 |
| 257:1 | 304:1 | 351:1 | 68:11 | 301:11 |
| 258:1 | 305:1 | 352:1 | 100:6 | 302:12,25 |
| 259:1 | 306:1 | 353:1 | 116:21 | |
| 260:1 | 307:1 | 354:1 | 197:23 | **clear** |
| 261:1 | 308:1 | 355:1 | 218:11 | 25:21,22 |
| 262:1 | 309:1 | 356:1 | 266:7 | 26:3 |
| 263:1 | 310:1 | 357:1 | 288:17 | 40:15,22 |
| 264:1 | 311:1 | 358:1 | 289:11 | 65:15 |
| 265:1 | 312:1 | 359:1 | 318:9 | 84:13 |
| 266:1 | 313:1 | 360:1 | **cite** | 87:9 |
| 267:1 | 314:1 | 361:1 | 323:7,8 | 97:14 |
| 268:1 | 315:1 | 362:1 | | 98:20 |
| 269:1 | 316:1 | 363:1 | **citizens** | 123:10,14 |
| 270:1 | 317:1 | 364:1 | 351:16 | 152:11 |
| 271:1 | 318:1 | 365:1 | **city** | 185:4,5 |
| 272:1 | 319:1 | 366:1 | 3:23 4:18 | 207:10 |
| 273:1 | 320:1 | 367:1 | 7:22 | 219:2 |
| 274:1 | 321:1 | 368:1 | 11:18 | 239:17 |
| 275:1 | 322:1 | 369:1 | 293:23 | 250:15 |
| 276:1 | 323:1 | 370:1 | | 272:8 |
| 277:1 | 324:1 | 371:1 | **claim** | 274:24 |
| 278:1 | 325:1 | 372:1 | 148:8 | 282:2 |
| 279:1 | 326:1 | 373:1 | 150:22 | 284:23 |
| 280:1 | 327:1 | 374:1 | | 322:21 |
| 281:1 | 328:1 | 375:1 | **claimed** | 331:22 |
| 282:1 | 329:1 | 376:1 | 116:17 | 357:22 |
| 283:1 | 330:1 | 377:1 | 138:16 | 371:7 |
| 284:1 | 331:1 | 378:1 | 165:2,25 | |
| 285:1 | 332:1 | 379:1 | 311:11 | **clearer** |
| 286:1 | 333:1 | | **claims** | 324:5 |
| 287:1 | 334:1 | **chronologic** | 223:6 | **CLES** |
| 288:1 | 335:1 | **al** | 300:3 | 17:3 |
| 289:1 | 336:1 | 43:6 | **clarify** | **client** |
| 290:1 | 337:1 | **chronology** | 123:11 | 259:13 |
| 291:1 | 338:1 | 161:21 | | 358:15,23 |
| 292:1 | 339:1 | **circle** | **Clarissa** | 359:5 |
| 293:1 | 340:1 | 230:15 | 292:23 | |
| 294:1 | 341:1 | | **Clark** | **close** |
| 295:1 | 342:1 | **circumstanc** | 10:13,17 | 161:4 |
| 296:1 | 343:1 | **e** | 246:8 | 300:4 |
| 297:1 | 344:1 | 79:15 | | **clothes** |
| 298:1 | 345:1 | | **Clark's** | 107:20 |
| 299:1 | 346:1 | | 11:9 | 289:16 |



292:5
295:6
301:11,13
302:3,6,
9,12

**clothing**
290:10
291:9,17,
23 295:15
297:22
299:9,20

**clue**
11:4
75:12
158:6
264:18

**co-chief**
10:10,11

**coaching**
327:6,12
329:4

**coat**
300:19

**COE1686**
354:6

**COE1768**
44:6

**COE24**
377:4

**COE2411**
376:11

**COE2412**
376:25

**coerce**
28:21

**coerced**
328:4,18

**coercing**
329:3

**coercion**

284:23
285:5

**coercive**
285:3

**collar**
11:12

**colleagues**
330:6

**collection**
20:24

**college**
6:16 7:2,
8 25:2,5

**colluded**
283:12

**Columbia**
25:10

**comfortable**
117:2
134:13
362:8
376:2

**command**
18:23
343:19

**commander**
335:10

**commenced**
3:17

**commencing**
4:3

**commentary**
242:7

**comments**
322:8,24

**commit**
100:18
102:6
103:6
106:2,21

116:19
233:5
236:2
237:13
238:3
281:20
282:7
369:18
375:3

**committed**
65:11
97:16
98:3
100:12
104:18
105:5
106:8
116:18
119:2
120:15
233:4
263:9
265:13,15
280:25
297:23
368:18
379:11,13

**committing**
97:12
105:12
378:21

**common**
102:6,12,
20 326:23

**communicate**
359:23

**communicating**
148:21
358:22,24

**communication**
161:4
324:9

**communications**
92:15
216:23

**community**
127:17

**COMP**
215:18
307:24
308:2,6,8
348:25
349:10
350:2

**company**
4:9

**compare**
42:16
104:5

**compelling**
105:7

**competence**
244:2,3

**competent**
18:9
153:12
199:12,14

**compilation**
85:11
168:11,16
293:13

**complained**
245:19

**complaint**
244:19
346:9,24
347:10,
21,25
372:6

**complete**
246:15
355:6
374:22

**completely**
55:9
102:24
107:24
286:19
364:10

**complicate**
374:9

**compound**
136:12
138:23
139:2
154:23
155:2
332:3

**compromised**
337:14

**compromising**
104:17
226:2

**computer**
279:13

**concept**
197:5
360:16

**concern**
99:13
211:25
212:19,24
213:10,20
223:3,10,
19

**concerned**
67:2,6
223:15
260:5
369:7

**concerns**
66:20
211:20
213:21
222:20



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 406 of 1202

**APPENDIX 0404**

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: conclude..constitutes

223:20
246:13

**conclude**
237:9

**concluded**
162:12
238:14
350:22

**concludes**
379:22

**conclusion**
28:15
29:5,16
30:13,22
33:10
60:2
104:20
106:25
162:14
247:3,10,
11 316:6
357:23

**conclusive**
292:15

**condition**
223:17
270:11,18

**conditions**
6:8

**conduct**
51:9
55:11
89:18
90:6
237:22
244:10
268:13
269:12
270:3
271:16,17
294:6,8
310:18
318:6

375:8

**conducted**
36:3
54:19
58:15
67:12
92:19
146:13
176:25
178:16
179:10,23
182:2
217:9
231:10
232:7,8,
13 239:9,
13 244:25
247:9
268:8
269:13
295:16
311:21
334:23
373:19

**conducting**
335:16

**confabulati
ng**
142:15

**conference**
275:2,5,
7,25

**confess**
70:17
97:15
100:9,19
101:2,11,
16 102:7,
23 104:25
235:25
237:12
238:2
282:22
302:15,22

303:5

**confessed**
76:2
79:16
93:13
96:16
97:12
105:12
153:25
276:2
298:6
357:18
362:21
376:15

**confesses**
101:4
153:7

**confessing**
79:17
92:23
102:13
105:5
138:18
234:23
349:19
368:9

**confession**
35:17
36:6
60:17
74:23
94:11,12
95:3 99:7
102:14,25
110:25
111:20
112:16
236:14
259:11
286:13
350:9,16
357:4
365:11
376:20
378:11

**confessions**
101:23

**confessor**
99:21,24

**confident**
227:19
250:8

**confirm**
144:7

**confirmed**
4:22
216:24
217:2
276:2

**conflict**
362:12

**conformed**
127:16

**confrontati
onal**
87:11

**confronted**
141:13,25
145:24

**confused**
121:20

**confusion**
371:10

**conjunction**
25:20

**connecting**
290:23

**connection**
76:16
87:25
89:24
92:22
147:4
167:11,15
169:10,18
171:2

209:7
210:4
232:9
242:17
246:23
258:6
268:6,15
269:9,21,
22 270:4
271:20
352:4
356:13
376:19

**conscientio
us**
26:18,21

**consecutive**
168:21

**consequence
s**
227:11

**consequenti
al**
228:5

**considered**
280:17,18
305:4,6

**consistent**
83:23
105:16
170:10
182:17
183:9
368:9
378:21

**consistentl
y**
309:4

**conspiring**
281:6

**constitutes**
46:11



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: constitutional..correct

constitutional
18:24
26:12
50:19
53:2,9

consulting
14:25

contact
15:21
21:13
64:16
68:14

contacted
14:8

contacting
240:20

contained
334:13

contempt
263:17
264:25
265:20
266:8

contemptuous
322:8,24

content
108:4
118:15
121:7
227:10

contents
118:17

context
33:20
34:9
52:13
69:7
116:23
127:20,21
144:14

319:24

continue
81:12
112:12

continued
134:24
294:6,8
353:16

continues
108:4

contradicted
158:15

contradicting
308:21

contradictions
42:19,20
215:2

contradictory
42:8,9

contrary
180:2
182:13

contribute
60:10

convened
354:18

convenience
127:17

conversation
63:16
67:5,6,7,
22 68:7
72:20
73:16
74:14,18
76:21

77:4
136:3,4
146:4
201:11
208:11
213:14,16
247:8
248:3,13
277:6
324:16
358:19

conversations
67:7,11
76:24
171:17
176:6
212:5
248:15,18
360:3

convict
330:8,9
331:3,4,
5,13,14
336:12

convicted
203:19
223:23
285:20
286:2,12
292:25

conviction
71:15,17,
18,20,24
228:4
322:6
324:17
364:5,17,
19 368:25

convince
320:4,22
332:7,17

convinced
236:11

238:2

cooperated
175:2
206:15
207:12,22

cooperating
174:21

cooperation
174:13
335:5

cooperative
220:14

coordinates
351:17

copy
3:11,12
194:14

corner
101:4
104:14
302:15
367:25

correct
8:15
16:23
21:19
26:7
27:14
28:23
29:2,25
30:11,20
31:3
32:21
33:8
34:5,19
36:6,19,
22 39:5,
23 40:11,
12,18
41:3,13,
22 42:10
45:5,11,
12,24

46:6,12,
23 47:8,
9,12
48:3,13,
22 49:5,
11,19
51:2
52:22
53:4,10,
17 54:2,
19 55:4,
11,16,17,
20 59:5,
11,17,18,
24 63:13
64:24
65:12
67:9
73:17
75:3
76:3,4,6,
14,23
78:14,24
79:9
81:4,6,13
82:13
84:4
88:2,23
89:6,7,13
91:11
92:9 96:8
98:13
99:16
101:18
103:7,9
106:12
109:9
111:4,20
112:10
113:12,21
114:4,19
115:16,
20,23
116:2,8,
13 118:3
119:3
121:17,



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: correctly..county

18,22
123:8,17,
20 125:5,
14,20
126:23
132:14,
16,24
133:5
142:7
144:10
145:5,8,
10,11,13
146:4,15
149:15,21
151:9,15,
24 152:3,
15 153:7,
15 157:13
160:10
161:6
162:5,16
163:19,
20,23
164:9,12,
23
165:14,
17,21
167:12
169:20,
22,25
171:10,14
172:15,18
173:9
175:7,9,
10,13
176:18,25
177:21
178:11
179:10,
17,23
180:2,6,7
181:4,13,
17 182:7,
8,10,11,
13,14,17
183:3,6,
12 184:6

185:2,7,
21,23,24
186:2,5,6
187:8
188:2,5,8
191:20
192:20,23
193:25
194:2,6
195:12,
15,16,20,
21 196:22
197:3,6,
18,25
198:8,24
200:14
202:6,20,
23 204:25
205:9
206:9,10,
11,12,17
207:6,14
209:4,8,
17,21
210:14,22
212:20
213:5,6
214:10,21
216:8,15,
16,20,21
217:9,18
20 219:6,
14 222:22
223:25
224:9
225:12,20
226:3,4,9
227:7,21
228:19,20
229:18,
21,24
231:8,11
232:10,11
236:2
239:10,21
240:21,22
245:4

246:24
249:2,19
250:5,16,
17,20,21
251:21,22
252:7,10
253:8,18
261:24
262:4,12
265:5,16
266:14
267:12
268:23
270:7,12,
16 271:7
272:12,
13,16
274:5,8,
13,19,22
275:6,19,
21 276:7,
11,19,24
277:2
278:16
279:16,
18,20
284:5,6,
21
285:10,
13,14
286:15
287:2,14,
17 288:5,
11,23
289:5,12,
17
290:11,
18,24
292:9
293:20
295:6,17,
24 296:8,
13,14,16
298:6,7,
10,12,19,
24 299:4,
10 303:14

304:5,17
307:2
309:7,13
310:13,14
312:25
314:6,16
315:4,10
316:16,
18,21
318:2,3
319:14
320:24
321:23
322:4,5
327:4,13,
14,19
328:5,11
329:5,10
334:7
337:20
338:17
339:12
340:5
341:19
342:19
345:18,19
349:24
350:10,
12,18
352:5,16,
25 353:2,
6,11,12,
16,17
354:5,20
355:12,
13,20
357:10,
11,15
359:24
360:5
361:21
362:7
363:9,12,
19 364:6,
13 365:12
366:5,15
368:10

370:22
371:12
372:10,13
374:3,13,
14,21
375:2,9,
18 376:16
378:12,16

**correctly**
35:25
218:15

**corroborate**
291:10

**corroborati
ng**
298:19

**Cosgrove**
7:20

**counsel**
3:4 4:9,
10,23
12:12,18
14:9
16:5,6
76:11
257:10,14
304:20
358:8,15,
22 359:6
361:9

**counties**
14:25
266:4
351:23

**countless**
105:19

**county**
4:16
7:13,16,
19 12:4,
8,19
14:6,8,
10,13,18,



22 15:11,
12,17
19:8 44:8
205:16
246:10
257:7
265:25
266:2
292:14
294:9
295:5
296:8
351:25

**couple**
73:6,7
115:6
169:25
170:18
263:14,17
292:12

**court**
3:21 4:5
7:22,24
11:18
12:14
16:16,18,
22 32:24
51:18
246:6
257:7
295:22
322:7,14,
25

**courtroom**
325:16,18

**courts**
246:6

**covered**
290:10
351:2

**covering**
107:20
327:19

**crackdown**
335:7

**crazy**
98:10
233:8
234:6,12
235:4

**create**
318:5,17

**created**
8:8,22
10:8
158:4,24
159:20
272:2

**credibility**
125:10
126:19
127:4
189:23
205:9
312:24

**credible**
117:16
126:13
350:16
378:11

**credibly**
129:3

**crew**
232:24

**crime**
11:12
31:18,25
32:21,25
52:13
65:11
79:17
97:15
102:7
103:6
105:12
106:9

117:4
119:2
175:25
186:12
193:18
222:21
226:14
235:15
243:21
263:8,9
265:13,16
281:2,20
282:7,22
285:5
290:23
295:16
297:23
298:6
362:11
368:18
369:17
375:3
378:22
379:14

**crimes**
8:16 9:15
11:12,14
105:20
106:2
119:13
250:2
327:18
347:12

**criminal**
8:9,23
9:4 30:11
68:15
74:12,15,
17 171:3,
7 172:2,
12,17,23
173:8,15,
25 174:12
193:6
199:13,14
227:11

236:23
237:4,10,
21 257:5,
6 264:24
292:17
303:20
304:24
346:24
347:21,24
360:18

**criminals**
9:13
236:17
346:7,12,
18

**cross**
300:8

**cross-
examination**
84:15
363:17

**cross-
examined**
215:7

**crossed**
223:14
236:6
262:18
265:24
300:12
364:18

**culpability**
106:4

**cum**
7:5

**current**
58:22
368:25

**custody**
220:10

**cute**
27:20

---

**D**

---

**DA**
7:20
10:13
12:16
14:13,24
19:10
21:14,15
29:23
43:9,13,
14,21,25
44:8
50:17
77:22
91:7,14,
15 115:9
119:12
133:10
144:19
168:4
194:10,11
209:6
211:5
213:25
218:4
219:25
240:20
242:12,17
244:10,11
256:17
257:21
293:18,19
294:2
317:17,25
343:3
353:23

**DA's**
6:17
7:10,18
8:24 9:2
10:6
12:5,9
14:4,6,22
15:11



19:8 43:4
68:14
74:16
77:13
91:12,17
96:23
156:16
168:20
196:2
243:12,18
244:23
253:20
257:4,22
333:6
342:12
346:5,11,
16
347:15,20

dad
204:10
213:17,19
218:7,8,
9,21

DAS
15:12
18:22

date
5:2 70:7
145:4
195:4
218:17
219:7,8
243:20,
24,25
244:6

dated
358:18

David
243:3,17,
25

day
12:23
81:25
96:13

97:11
116:3
158:12,20
162:17
175:25
202:19
219:4
221:4
238:15
254:16
260:11
278:12
279:21
345:11
353:9
370:25

days
63:23
81:25
93:14
94:11
97:11
110:22
111:3
112:16
138:16,17
148:12
153:5
159:12,19
257:2
279:19
280:2

daytime
252:13

DEA
318:5

deal
66:22
86:4 92:8
134:6

dealer
124:8
333:23

dealers

335:17

dealing
9:12,13
96:7
209:3

dealt
252:4

decades-
long
124:15
235:22

December
11:25
12:3,22
63:18
150:6,7
161:18
162:3,10
163:4
240:3
311:7
342:11

decide
21:20
120:24

decided
148:22
200:18
237:24
257:15
280:13

decision
41:12
322:15
323:13
324:23
374:6,13

decisions
27:2

declare
247:12

Dee

243:3,12
245:11
246:14

deeper
19:17

defendant
17:7,11
31:13
54:15
327:13

defendants
4:10,19
326:24

defense
54:2,17
197:10
199:13,15
264:16
304:19
330:5,10
336:17,20
337:2,5,
14
338:16,19
339:10

degree
7:5
106:14
223:24,25
224:15

Dekalb
205:15

delayed
12:6

demonstrabl
y
315:23

demonstrate
297:23

demonstrate
s
379:7

demoted
13:3

denied
329:6

denies
154:16

Dennis
251:16
253:10,12

deny
134:24
206:24
207:2
208:8
222:6
280:22
281:4,6,
9,10,19
282:5,11,
17,19,20
284:8
285:11,
15,18,24
286:6,13,
15 287:4
317:18
318:19,23
319:3,18
320:9,11
321:2
327:3,6,
12,17
328:2,4
331:10,
20,22
332:2,3,
5,12,16
336:10,
14,16,19
337:5,9
338:3
373:25
374:4

denying



222:9

**department**
20:10
39:10
40:10
41:21
47:18
49:4
51:24
134:17
143:25
148:23
158:24
159:4
165:13
232:13
333:17
346:6,12,
17
347:16,18
351:5
352:9
371:17

**depend**
60:3

**depending**
343:22

**depends**
116:21
199:3

**deposed**
5:12
19:12

**deposition**
4:6 5:8,
15 16:20,
21 19:4
21:25
22:7,8,9,
12,15
87:14
233:23
283:11
379:23

**depositions**
17:10,11
19:11

**deputy**
10:14
11:10
246:16

**Derrick**
326:11,24

**describe**
55:9
97:11
248:2,12
326:20
345:23

**describing**
77:15
78:6
204:10,19
219:10
312:4

**description**
88:22
295:4
347:11
373:11

**descriptions**
164:21

**designated**
10:9

**designed**
51:25
226:13

**desk**
74:16

**details**
204:23

**detective**
38:5 42:6
61:5,6
91:7,17,

19
122:22,24
123:16,
18,19
132:13
153:12,22
156:12,
16,17,20
157:2,25
161:5,15
162:25
163:3
178:2
180:2
181:9
187:4
252:7
254:15
281:7,11
345:2,17
372:12
373:4

**detectives**
40:10,23
41:21
50:2,5,9
60:21
61:13
62:14
64:24
66:21
67:24
80:20
81:24,25
89:12
92:21
93:15
95:18,21
96:6
109:7
111:18
112:2
157:11
161:5
163:17
169:25

176:17,23
179:8
189:24
216:23
317:2

**determination**
13:17
51:19
84:9
350:14
376:21

**determine**
23:6,8
35:4 39:4
41:3 48:8
83:16
111:19
132:18
138:4
298:17
351:15

**determined**
95:21
96:14,15
106:17
132:16,19
137:2,7
272:10
273:2
280:14
314:13
315:25
316:3
370:21
375:2,4

**determining**
235:23
299:3

**deuce**
377:14

**develop**
283:6

**developed**
57:12
230:16

**difference**
59:4

**differentiating**
204:4

**differently**
9:18
276:25

**difficult**
169:21
173:12,19
174:2
175:11,15
223:5
330:9
331:4
338:14

**difficulties**
192:19,23

**Dillon**
10:3,4,
12,21
342:12,19

**Dipirro**
68:4

**direct**
35:23
93:15,21
160:13
269:13
271:18
272:5
325:3
373:13

**directed**
244:12
268:8
374:19



directing
    65:23
    66:13
    94:10

direction
    66:7
    92:19
    164:11

directly
    40:9
    276:19
    359:23

disagree
    38:15
    329:23

discipline
    244:15

disclose
    45:19
    188:22
    196:5,24
    198:7
    207:13,21
    211:11

disclosed
    39:5
    53:25
    58:20
    196:7,21
    197:3
    211:15
    310:9

disclosing
    47:8 49:3

disclosure
    46:11

disclosures
    243:14

discovered
    47:6

discrepancies

100:5
103:18
104:6
105:19,22
106:19
119:13
120:15,
18,22
121:2

discrepancy
    103:22
    177:25

discretion
    209:11,24

discussed
    97:22
    193:17
    201:15,17
    261:21
    340:19
    351:5

discussing
    180:5
    193:14
    201:6
    212:11
    307:20

discussion
    210:16,20
    211:4
    254:14,22
    301:8
    305:10
    358:17

discussions
    62:3,4
    81:10
    179:8
    184:24
    301:13
    307:11,15

disease
    246:10

disgusted
    218:12

dispose
    209:12

disposition
    209:16

dispositive
    297:2
    298:24

dispute
    57:20
    137:5
    149:3
    156:23
    159:13
    184:18

distance
    290:18

distracted
    243:16

distraught
    148:20

district
    3:21 9:3
    10:4,5
    11:10,20
    12:4,20
    13:2
    14:7,10
    15:6
    16:23
    18:2
    24:21,22
    25:2,5,9,
    17,24
    26:18,22
    28:8,20
    29:12
    78:9
    117:12
    197:6
    243:6
    294:7,9

317:4
334:14
351:16,
18,21

divided
    9:17

dividing
    18:17

division
    11:11
    39:11
    62:24
    323:2,4,
    14

dixon
    3:22 4:13
    34:3,18,
    25 35:7
    43:9,13,
    14 78:10
    79:18
    81:13,19
    82:3
    97:16
    107:6,20
    114:4
    118:18
    134:18
    136:10,20
    137:25
    138:17
    143:25
    148:2
    149:8
    153:24
    155:5
    158:17
    165:3,13
    166:2
    169:18
    177:21
    179:2,9,
    22 181:13
    184:17,25
    185:7,22

186:4
187:13
188:2,14
189:13
190:8
191:19
194:11
216:8,25
217:25
223:22
233:3
242:12,16
246:24
247:12
250:14,16
259:18
280:25
281:21
282:6,12
283:12,20
286:2,7
304:17
306:12
308:16
309:5
310:4
319:4
325:24
333:22
334:5,15
337:15
346:24
347:12
352:12
355:19
356:7,8,
25 357:10
364:6,18,
20,22
367:15
368:25
369:2
377:18
379:13

Dixon's
    22:10,19



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 413 of 1202
APPENDIX 0411

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: document..eliminate

68:22
69:9
95:23
96:17
97:14
104:15,17
109:8
111:9
186:8
216:20
217:17
228:3
229:17
230:11,15
231:7
232:10,15
236:17
249:8
269:16
272:11
303:20
304:24
320:13
324:9
339:12
356:18,21
365:18
366:4,13,
23
367:11,
12,18
369:5,16
376:21
378:13

document
38:8,19
39:2
41:11,16
79:19
85:18,20
147:2
149:5,10
160:25
161:3,16
168:6
177:23

178:17,20
179:2,3,
4,24
196:21
197:9
206:5
216:6
242:21
251:5
255:6
256:21
311:14
347:14
348:5
349:3,16
350:2
372:12
373:12

documentati
on
98:23
162:20
269:3

documented
42:10,19,
23 56:16
58:20
80:20

documenting
39:21
41:2,22
48:2 49:5
58:4
152:12

documents
19:4,7,20
23:11
24:13
26:25
43:18
85:11
122:13
168:5,12,
17,19,22
178:10

228:6
293:14
345:20
352:17
378:10

Donovan
92:25
93:5
163:18
353:22
354:9

double
281:23
299:12

doubt
40:6
181:6
183:14,
20,23
199:16
262:6
324:22
353:8

Doyle
295:22

dressed
104:14
118:6
302:16,23
303:3,4

drift
57:24

drifted
11:15

drinking
243:13
245:25
246:2,4

Drive
4:20

driving
119:22

drove
95:4,6,9

drug
119:13,17
124:8
333:23
335:16
342:13

drug-
related
335:3

drugs
119:21
120:4

drunk
223:18

due
127:17

duly
4:21

duty
345:2

_____

_____
          E

earlier
196:21
239:19
256:25
257:21
269:25
272:22
344:20
353:24
355:16
376:18

early
10:7
134:24
181:3
367:23
371:17,

22,24,25

easier
38:2

easily
252:6

easy
330:8
331:3,5,
13

Edward
7:19

effect
283:4

effective
12:23

effectively
215:7
303:18
328:3

effort
92:8
335:20

efforts
169:5
203:9
334:22,23
378:23

elected
10:13
11:9
12:4,13
13:2

election
9:2 10:16
13:14

elements
84:9
285:6

eliminate
51:25



eliminated
  25:14
  303:19

else's
  266:10

emergency
  297:8

Emil
  21:2,3
  92:5,7
  168:3
  169:6,7
  170:12
  171:7,18,
  22 177:20
  178:16
  179:9
  180:5,11
  181:10
  182:16
  183:9
  184:24
  185:5,18
  186:11,24
  187:5,11,
  25
  189:12,20
  190:6,18
  191:9
  192:8
  311:13
  317:10
  355:11

employed
  5:4

emptied
  108:12

enabled
  363:24

encouraging
  368:10

end
  9:2 12:6,

19,22
14:11,12
69:2
175:2
317:5
379:20

ended
  135:2
  169:24

endless
  290:19

ends
  93:9
  168:7

enforcement
  169:6
  171:18,22
  174:19,25

enforcer
  30:11

ensued
  361:12

ensuing
  357:9

ensure
  35:15

ensuring
  18:22

entendre
  281:24

entire
  5:22
  20:9,12
  21:15
  23:4
  83:11
  86:16,21,
  24 189:4
  192:10

entirety
  22:15,20,

23

entitled
  15:10
  210:14

entry
  246:20

era
  10:7
  12:13

Erie
  4:16
  7:13,16,
  19 12:4,
  19 14:6
  19:8 44:8
  292:14
  294:9
  295:5
  296:7
  351:25

err
  41:2

Esquire
  4:6

essentially
  265:14

establish
  35:7
  60:11,15,
  17

established
  249:4

establishi
ng
  64:12

esteem
  199:12

estimate
  19:19,20

et al
  3:23

15:11

ethical
  18:23
  25:23
  26:4,6,9
  27:10,13
  30:5,7
  362:9

ethics
  15:8
  362:5
  363:12

evaluate
  42:10
  312:24

evaluated
  49:15

evaluating
  378:10

evaluation
  357:4
  376:20

even-handed
  143:2

evening
  350:18

event
  65:20
  77:7
  93:12
  98:2
  101:18
  105:15
  128:22
  131:20
  216:17
  238:6
  271:14
  360:18,20
  368:20

events
  69:25

118:3
129:2
153:6
160:22
237:2
269:12
271:19
291:11
332:18
365:5

eventual
  365:9

eventually
  8:25 25:8
  74:4
  243:13
  246:11
  309:20
  352:23

everybody's
  364:13

evidence
  20:23
  28:10,12
  31:7,19
  33:6,8
  38:9,17,
  18 39:3,
  23 40:25
  47:6 48:2
  57:8 58:7
  81:12,18,
  20 82:2
  83:20
  84:3
  96:24
  97:10,13,
  19
  104:20,22
  106:11
  134:8
  197:17
  224:7,14,
  25 225:5,
  6 278:14



288:10,
14,23
290:23
291:7,10
292:16
296:16
297:4,22,
25 298:19
315:2
316:7,10,
15 351:17
355:6
366:13,20
367:4,17

evidenced
333:22

evolution
38:16

evolved
38:18

exam
243:15
246:18

examination
4:24
344:17
348:14
361:24
373:13
376:8
378:18

excellent
24:7

excerpt
43:13,14
86:7

exculpatory
38:9,17
39:3,22
46:16

Excuse
19:25
95:5

execute
357:21

EXH
43:13
86:7
168:16
242:11
294:16
325:23

exhibit
44:6
85:13
140:21
150:12
168:13
177:12
242:9
251:5
345:6
346:23
348:17

exhibits
353:19

existed
35:8
64:13
172:14
347:2
350:4

existence
33:21
79:12,24

exonerate
107:5

exonerated
247:12

exoneration
244:25

expect
42:22
111:18
113:10,15
153:22

176:13
210:7
288:21
289:3,7,9
290:7,9
299:6
361:12
370:13

expectation
38:25
39:20
48:11

expectation
s
40:16
48:18
154:5

expected
41:11
42:8,19
53:16
78:14
112:8,12
239:3,5
288:18

expediency
376:13

experience
80:16
100:17,21
101:7,9
102:23
133:19
134:2
289:24
312:2,8,
11,14,18
313:4,22
358:7,20
370:5

experienced
80:8,10

expert
14:25

15:3,5
16:24
17:4

expertise
15:7

explain
81:17
121:19
135:14
156:25
160:18
256:23
296:22
337:4
360:14
368:14

explained
257:8

explains
131:18

explanation
128:4,7
240:23
305:24
307:4

expressed
99:13
185:5,19
212:19,24

expresses
59:16
185:25

expressing
60:7
324:21

expression
131:7,17
278:18

extensively
190:18

extent
40:23

56:14
210:10
325:15

extraordina
ry
65:20
79:15
93:12
98:2
153:6

extrapolati
ng
163:8

extrapolati
on
162:7

extremely
26:14
362:11

eyewitness
42:7
52:11
53:3
58:16
153:23

eyewitnesse
s
82:6,11

———————

F

———————

fabricated
111:2

fabrication
316:4

face
62:14

Facebook
243:14

faced
249:25



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: facie..file

facie
  31:21
  33:2
  84:10

facilities
  344:8

facility
  25:3

facing
  264:11

fact
  13:12
  33:14
  36:14
  54:16
  65:14
  77:22
  89:3
  97:20
  103:11,21
  104:8
  107:5
  108:7,8
  116:10
  124:13
  125:12
  140:4
  152:6
  158:15
  163:25
  169:13
  184:3
  187:23
  188:7
  191:17
  196:7
  209:24
  212:25
  214:6
  221:14
  224:9,17
  225:2
  231:16
  236:13
  239:8

  245:3
  249:6,7
  283:5
  290:2
  295:14
  300:17,18
  304:24
  313:13
  315:11
  316:9
  337:12
  341:4,23
  349:16
  353:25
  354:17
  355:18
  358:17
  359:4
  372:20

factor
  209:11

facts
  77:6
  134:6

failed
  207:21

failure
  307:16

fair
  5:25
  24:7,15
  25:18,24
  26:19
  27:2,5
  32:4,6,
  18,19
  33:17
  49:21
  50:9,22
  61:18
  64:9
  65:14
  66:2,6,14
  80:9

  88:18,24
  93:20,23
  101:23
  110:2
  119:11
  139:9
  140:7
  152:9
  155:22
  162:11
  163:2
  164:16
  171:5
  175:19
  177:5,7
  193:3
  196:20
  198:13,
  14,18
  199:9
  273:13
  277:8
  283:4
  284:10
  290:6
  292:17
  296:10
  308:21
  323:12
  325:15
  333:17,21

fairly
  50:4
  143:2
  174:23
  204:4

faith
  32:14

fall
  10:8
  11:16

false
  99:21,24
  273:2
  319:20

falsely
  276:2
  282:22

familiar
  251:12,15
  334:22
  335:6,12,
  15

family
  37:9
  229:17
  230:11
  231:8
  232:10,15
  238:13
  272:12
  282:12,
  18,21
  283:21
  319:19
  320:13,24
  365:18
  366:4
  378:22
  379:8

father
  186:8
  201:9,15,
  18 203:25
  204:2,7
  206:11,14
  211:22
  212:17
  241:7
  377:12,19
  378:2

favor
  163:21
  210:21
  211:4

favorable
  209:7

Fay
  377:24

  378:8

fed
  243:20

federal
  5:12
  16:14,21
  25:13
  26:7

feel
  71:7
  108:22
  297:8

feeling
  108:19

Feelings
  108:19

feels
  163:22

felonies
  9:14

felony
  8:3,13,
  14,19
  9:18,24
  351:14

felt
  68:11,25
  117:2
  199:14

fence
  41:10

fight
  72:5

figure
  52:6

file
  19:8,9,10
  20:9,13
  21:14,15
  33:22
  43:5,9,



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: filed..form

13,14,21
25 44:7,8
72:23
77:14
78:23
79:2,7,9,
20,24
83:4,11
89:5
90:15,20
113:8
115:10
144:19
146:12
150:12
160:24
168:4,12,
17,20
170:11
177:11
194:10,11
218:4
237:7
253:20
255:15
256:17
293:11,
14,23
305:20
307:23
333:6
352:9
353:23
371:4,5,6

filed
16:16

files
19:10
80:8
334:15
354:8

fill
14:16,19

fill-ins
52:15

filled
300:10

fillers
54:14

final
84:19

finally
125:23

find
53:19,22
147:22
191:8
264:22
302:20
345:13
346:17

finding
161:24

fine
6:4 27:20
87:13
216:3

finger
379:8

finish
149:14
251:4
275:15
348:11,12

firearm
326:23

fired
13:4
243:12
246:4,9
290:7,8,
9,17
312:4,10,
16 313:7,
24 315:4,
5,8

firing
13:6,9
288:19

firm
15:23

five-minute
63:16
68:7
114:23
240:5

Flaherty
12:15
13:14,15

flat-
brimmed
107:24
302:16
303:9

flight
348:22

flip
349:25
361:8

floating
194:14

Floor
4:2

fluctuated
343:15

Flynn
13:2,12,
17 247:11

focus
235:7,12

follow
40:17
138:15
139:7
153:22
160:10,
14,19

165:12
166:9
348:13
377:4

follow-up
117:8
348:8
375:9
376:4

follow-ups
115:7
343:22
362:2

Force
10:20,24
11:2

forces
346:3,4

foremost
113:25

forensic
288:22
296:12,
13,15
301:9

forever
243:25

forgot
200:15
346:23

forgotten
200:6
377:7

form
10:22
11:3
13:23
17:19
18:3,16
19:21
22:3
24:9,16

26:2,8,20
27:4,15
28:14,22
29:4,15
30:6,12,
21 31:4,
9,14,20
32:5,9,
16,22
33:9,19
34:6,20
35:2,18
36:7
37:10,16,
21 38:12
39:6,12
40:4,13,
19 41:4,
14,23
42:11,21
45:6,20,
25 46:7,
13,24
47:10,13,
19,23
48:4,23
49:6,12,
22 50:12,
13,20
51:3,12,
17 52:3,
16,18,21
53:5,11,
18 54:3,
4,20,21
55:5,12,
15 56:5,
19,23
57:9,10,
21,22
58:8,9,
11,21
59:6,12,
19,25
60:9,25
61:8,14,
21 62:19



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 418 of 1202

APPENDIX 0416

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: ..form

| | | | | |
|---|---|---|---|---|
| 64:10,25 | 113:3,4, | 153:16,17 | 191:23 | 11,13 |
| 65:17 | 13,14,22 | 154:2,3, | 193:4,20 | 236:3,12, |
| 66:3,10, | 114:5,20 | 10,21 | 194:7 | 19 237:14 |
| 15,24 | 117:25 | 155:6,11, | 195:6 | 238:4,12 |
| 67:14,19 | 118:7,14, | 17,23,25 | 197:7,11, | 240:25 |
| 69:11 | 20 119:4, | 156:7,8, | 20 198:2, | 241:9,17 |
| 70:22 | 7,15,16, | 14 157:3, | 10,17 | 245:21 |
| 71:5 74:8 | 25 120:5, | 5,14,21 | 199:20,25 | 254:11,17 |
| 75:4,14 | 9,21 | 158:8,9, | 200:8,24 | 255:2,8, |
| 77:18,25 | 121:3,23 | 19,25 | 202:24 | 16 258:22 |
| 78:16,25 | 123:9 | 159:2,7, | 204:24 | 259:19 |
| 79:10,22 | 124:3,11, | 9,15,16 | 205:12 | 260:23 |
| 80:3,14, | 17 | 160:3,20 | 206:18 | 261:15 |
| 21,23 | 125:15,21 | 161:9,19 | 207:7,15, | 262:5,21, |
| 81:14 | 126:16,24 | 162:6,21 | 24 208:4, | 25 263:10 |
| 82:4,14, | 127:5,19 | 163:5,12, | 9,18 | 265:17 |
| 19 83:8, | 128:3,10, | 14 164:5, | 209:9,22 | 266:20 |
| 13 84:5,7 | 14,20 | 13,18 | 210:6,15, | 267:4,15 |
| 88:25 | 129:5,11, | 165:15,23 | 23 | 268:17,24 |
| 89:14,20 | 16 130:5, | 166:7 | 211:13, | 269:17 |
| 90:8 | 9,18 | 170:2 | 16,24 | 270:8,13, |
| 92:10 | 131:2,6, | 171:9,19 | 212:21 | 17,25 |
| 93:17,24 | 11,16,24 | 172:3,19 | 213:12,18 | 271:8,12 |
| 94:6 | 132:5 | 173:2,10, | 214:2,8, | 272:18 |
| 95:25 | 133:4,13, | 22 174:3, | 14,22 | 273:18,19 |
| 96:9,18 | 20 134:3, | 14,22 | 215:12 | 274:23 |
| 97:4,7,17 | 7,10 | 175:6,14, | 216:9,11 | 276:12 |
| 98:6,14, | 135:11, | 20 176:4, | 217:4,12, | 277:3,11, |
| 25 99:17, | 12,20,21 | 14,19 | 19 219:20 | 17,22 |
| 25 | 136:11,21 | 178:5,6, | 220:2,8, | 279:13 |
| 100:14,20 | 137:3,10, | 12,19 | 17,25 | 280:4,11 |
| 101:19, | 17 138:2, | 179:11 | 221:13,18 | 281:3,14, |
| 24,25 | 9,19,20 | 181:5,18 | 222:2,10, | 15,22 |
| 102:8,15 | 139:14,25 | 182:22 | 23 223:7 | 282:23 |
| 103:2,8, | 140:11 | 183:2,13, | 224:10,18 | 283:22 |
| 13 | 141:7,19 | 24 184:7, | 225:4,13, | 284:13,24 |
| 104:21,23 | 142:21 | 10,20 | 21 226:5, | 285:4 |
| 105:9,14, | 143:10 | 185:8 | 10,15,20 | 286:3,9, |
| 21 106:5, | 144:3 | 186:13 | 227:8,16, | 16,21 |
| 13,23 | 145:14 | 187:7,15, | 22 228:24 | 287:9,18, |
| 107:14,22 | 146:19 | 16 188:3, | 229:19,25 | 24 |
| 108:15,21 | 147:20 | 4,9,11, | 230:12 | 288:12,24 |
| 109:10,22 | 148:7,13, | 16,17,23 | 231:3,13 | 289:6,13, |
| 110:3 | 25 150:25 | 25 189:5, | 232:3,16 | 18 |
| 111:5,13, | 151:10, | 7,17,18, | 233:6,16 | 290:12,25 |
| 21 112:5, | 14,17,22 | 25 190:2, | 234:4,15, | 291:2,12, |
| 11,19,20 | 152:7,22 | 10,11,20 | 20 235:5, | 18,25 |



292:18
295:7
297:24
298:20
299:11,24
300:11,22
301:2,17,
22 302:7
303:16,21
304:7,14
305:2,14,
15 307:7,
18
308:22,23
309:8,14,
19
310:15,21
311:5
312:6,12,
17 313:9,
25 314:7,
17,19
315:6,14,
19 316:5,
11,17
317:3
318:21
319:6,16,
21 320:7,
14 322:11
324:25
325:11
327:15,20
328:7,12,
16,20,25
329:6,15
330:11,16
331:16,25
332:9
333:24
336:13,24
337:8,16,
22 338:7,
12,18,25
339:4,13
340:6,21,
25 341:8,

14,21,25
342:15,20
346:19
347:6
350:11
351:12
352:20
354:12,21
355:21
356:10
357:5,17
358:11,25
359:9,16
360:8
361:13,20
362:16
364:14
365:22
366:6,8,
17 367:8,
20 368:11
369:11,
12,19
370:2,8,
11,17
372:14,25
373:6
375:10,23
378:15,25
379:16

**formal**
88:11

**format**
146:11

**formed**
104:24
109:4

**forms**
20:23,24
361:17

**forward**
34:2,16,
25 35:14
36:15,18

63:24
65:10
66:13
67:8
78:23
79:16,19
81:23
93:13
95:22
96:16
100:25
115:8,9
125:12,23
126:15,22
127:25
128:2,5
147:17
148:5
224:25
272:10
305:12
365:17
366:3
368:10
371:11
379:15

**foster**
36:22,25
37:3,6,8,
14 284:4
285:12

**found**
41:6
46:15
125:19
147:21
365:6

**fourth**
343:18

**frame**
256:14
274:9,14,
15

**Frank**

10:13,16
11:9
12:3,10
246:8
268:19
294:4

**Frank's**
341:15

**frankly**
197:22
292:15
374:4

**Fred**
90:14,22
91:2,20
110:5,15
305:21
306:2,4,
10 355:11

**free**
242:2
362:5
363:9
374:5
375:6

**freely**
220:21

**fresh**
301:11

**Friday**
44:2

**Frieda**
90:13
91:15
121:15,21
122:21
125:11
127:12
134:13,16
135:4,7
136:8,18
139:7,11
140:8

141:5
143:15,23
144:25
145:7
146:14
149:15
150:4,23
153:14
154:8
155:22
161:17
165:5
167:6

**Frieda's**
123:16

**friend**
257:24
258:2
315:22

**friends**
240:15

**front**
38:20
74:16
87:20
257:6,8
261:5
344:6
345:7

**fulfill**
48:19
49:2

**fulfilling**
18:23
40:2 45:4
49:4

**full**
55:3
98:12
112:8

**fully**
274:17



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: function..Grand

function
   39:10,14
   351:9
funding
   8:5,6,8,
   22
futile
   226:19
future
   131:19

―――――――――
         G
―――――――――

Galgano
   15:10,14
   16:10
   17:12,13
Galgano's
   16:8
gap
   125:10
   126:15
gaps
   155:21
garbled
   89:24
garment
   300:21
gathered
   295:15
gave
   99:3
   104:20
   116:22
   128:7
   132:21
   159:11,
   17,18
   181:10
   200:4
   240:18

243:23
282:13
294:4
298:11
319:7
340:8,10
344:20
364:23
general
   19:15
   40:20
   50:23
   52:10
   61:11
   67:15
   80:15,22
   89:15
   94:15
   102:21
   122:19
   163:24
   172:22
   174:18
   197:12
   207:17
   223:11
   296:19
   313:4
   345:25
   347:22
   350:19
   373:7
generally
   20:19
   94:5
   127:23
   169:11,12
   313:23
generate
   53:6
generated
   112:17
   117:14
Genesee

14:13,18,
   21
genre
   228:10
Geo
   165:6
George
   15:13
   335:11
Georgetown
   19:14
   70:9,14
   71:3
   122:5
   170:9
   222:19
   225:9,10,
   20,25
   226:8
   248:16
   303:11
   314:13
   324:8,13
   337:12
Georgia
   192:24
   193:6
   195:20
   196:8
   199:6
   204:11
   209:6,13,
   16 210:4
   211:23
   212:25
   213:11
   218:10
   219:25
Gerardo
   4:14
Germani
   295:21
girl

151:11,19
195:20
196:2,10
197:15
199:19
204:20
girlfriend
   322:3
give
   44:17
   58:14
   64:23
   87:19
   165:7
   166:19
   168:9
   197:9
   235:24
   242:14
   313:17
   333:2
   336:9
   347:11
   366:5
giving
   164:21
   241:24
   242:2
   319:20
Gladden
   292:23
   294:17,22
glean
   46:21
   71:23
good
   4:17
   32:14
   36:17
   50:24
   83:3 90:2
   122:15
   123:3
   132:7

139:2
210:21
213:24
215:10
216:3
219:24
221:4,7
222:4
231:25
336:11
340:20
341:16
379:20
goodness
   208:16,20
Gotcha
   6:25 8:20
   16:11,24
   17:14
   73:20
   107:8
   116:25
   201:10,14
   202:15
   345:9
grab
   150:16
graduate
   6:18
graduated
   6:15
Grand
   34:10
   76:8
   77:5,9
   83:12,16,
   21 84:3,
   20 85:20
   88:12,16,
   23 89:4
   90:5 93:7
   115:24
   138:13
   142:19,25



146:8
150:9
160:22
162:12,15
178:11,21
183:17,
18,19
184:4
231:14,
16,18,20,
22 232:6
238:7
239:13,
14,22,23,
25
243:19,
20,22,23
244:6,13
251:24
252:2,5
256:12
257:10
263:18
264:10
267:9
269:7,10
271:2,20,
21,22
273:21
276:15
278:8,17
279:22
280:15,24
281:13
303:13
304:9
310:23
339:18,24
341:6,19
343:2
351:6,8,
13,18,21,
23 352:7,
19,24
353:4,14
354:2,18,
24 355:2,

3,8
356:6,14
357:20
358:9
360:7,18
362:7
364:8
366:22
367:2,3,
16

grant
8:5,8,22

grants
343:16

gray
116:25
362:14,17
363:5

great
92:8
143:7
204:15
208:17
336:12

ground
127:18

group
183:10
184:17

guess
78:5
291:3,5

guilt
288:11

guilty
103:12
225:11,
14,17
227:20,24
250:2
330:8
331:3,5,
14 336:11

gun
103:23
230:25
288:19
290:2,5
300:5,18
310:19,25
311:22
314:14
315:4,5
321:3
360:23

gunpowder
248:4
290:11
292:12,15
295:6
297:21
300:10,
16,21

gunshot
295:12
296:25
297:2,3

guy
15:13,21
58:18
59:10
184:12
208:17
260:7
285:19,25
368:21

guys
351:2

_____

H

_____

half
160:19

half-
brother
377:18

handgun
224:21

handle
30:25
205:18
209:20

handling
205:20

handwriting
254:10

handwritten
253:25
255:6,10

hang
150:15

happen
65:2
236:25
354:11
373:24

happened
53:16
54:7
55:10
65:16
77:7,15
90:19
93:13
98:3
110:19
125:2
129:3
178:24
183:20,23
187:18
188:7,10
193:19
195:4
204:15
207:18
208:23
221:21
233:8
274:7,10,

13 278:24
306:23
313:14
320:18
322:17
332:20
356:3,4
358:6,12
365:2
371:21,
24,25

happening
65:22
80:13
173:24
322:14

happenstanc
e
291:13

happy
241:11
339:3

harassed
245:16

harassing
245:14

harassment
245:12

hard
18:4
331:14
379:4

hard-and-
fast
38:19
78:5

hard-
working
26:18,22

Harrington
3:25



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 422 of 1202

APPENDIX 0420

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: hat..Hugh

hat
107:24
302:16,24
303:7,9

head
17:15
95:17

headed
294:16
335:9

headquarters
345:5
350:8

health
6:8

hear
95:7
245:25
283:8
351:14
355:6

heard
35:21
100:5
186:16,
18,20
192:15
251:18
283:6
313:24
324:20
334:11
346:8,10

hearing
51:5
56:18
69:3
245:3
325:7
363:4
374:18

hearing's

54:23

hearings
52:6
55:11

heart
191:6
208:16,20

held
199:11
284:9
355:5

helped
31:12

helpful
111:15,22
210:3
297:25
298:21
299:2,5

Heraty
242:12,17
243:3,17,
25
244:12,
16,22
245:9
247:2
248:11

Heraty's
244:23

high
6:15,18,
19,21
22:17
199:12
223:19

higher
342:24
343:4,5

higher-ups
13:19

highlighted
377:2,3,
10,21

highly
315:12

hindrance
304:23

hint
183:5

hinterlands
265:23

hired
7:19
15:17

history
24:6
236:24
237:4,10,
21

hit
121:16
165:6

hoc
61:15

Hodgson
4:18

hold
215:19
355:9

holdover
355:3

hole
134:21

home
162:4
186:24

homes
373:17

homicide
10:6,9

11:20,21
17:15
18:7 19:8
20:9,13
39:11
40:10,23
41:20
42:6
50:2,5,8
60:8,22
61:12,13,
23 62:11,
14,16,24
64:4,12,
22,24
65:9,25
66:20
68:10
77:13
79:8
80:8,20
89:11
91:7,17,
18 92:21
93:15
95:18,20
96:6
109:7
111:18,25
114:13,17
119:12
133:10
153:22
233:5
235:22
295:10,11
310:20
334:23
343:10
344:22
345:18

homicides
8:17
102:6,13
119:20
120:3

288:8

honest
101:17
139:10
215:11

honestly
22:16
93:2
129:15
170:3
333:19
355:25

honesty
243:9

hope
41:15
209:10

hoped
53:19

hopes
209:5

hoping
53:22

hour
62:25

hours
20:2,3
24:2
62:23
274:8
367:23

house
123:7,16
145:20
147:5,7
298:8
377:25

Houston
25:3

Hugh
4:17



240:16
343:25
344:9
347:8

**hung**
218:12

**Huntley**
69:3
363:4
374:17

**hurt**
31:12

**husband**
246:21

**husband's**
322:3

**hyperbolic**
27:17

**hypothetical**
58:14
190:4

------------

**I**

**ID**
3:6 58:5
59:5,9,
15,20,23,
24 60:4,
7,14
82:18
178:25
184:25

**idea**
10:23
75:18
121:4
135:15
137:6
144:15
162:10

178:7
187:17
195:7
202:25
203:4,5
207:25
219:21
221:5
232:12
251:17
276:21
302:8
338:19
341:15

**identification**
20:23
43:12
50:25
51:10
52:2,5
55:10,19
57:6
59:16
82:12
86:6
152:18
168:15
177:20,22
178:3,15
182:3,5
183:11
186:2
187:6
189:20
192:8
216:24
242:10
294:15
306:13
308:16
309:7
310:11,12
325:22
336:22
337:7

**identified**
82:7,11
179:9,20,
22 181:12
186:3

**identifies**
216:13

**identify**
68:8
110:7
152:14,19
153:2
178:25
184:11

**identifying**
151:8,14

**identity**
4:22

**IDS**
59:18

**III**
92:6
201:13
204:5
205:5
209:25
212:23
213:4,8
218:8,19
219:6,17
222:7
241:3
353:5

**ilk**
265:25

**ill**
4:9

**illness**
65:15

**immediately**
153:14

**immunitized**
361:5

**immunity**
357:21
360:10,
12,15,17,
19 361:9,
19

**immunized**
360:25

**impact**
361:9

**impacted**
365:8

**impeach**
28:12
199:17

**impeachment**
38:9,17
39:3,22
45:18
46:16
197:17,25
211:8

**impediment**
173:4

**impediments**
172:24

**implicate**
327:13

**implicated**
50:19
362:10
365:16

**implicating**
58:7 68:9
328:4
329:5
367:5

**implicit**
272:25

**important**
5:18
27:2,12
28:7
98:2,4
111:2,8
155:15
158:7,13
165:11,20
178:17
179:4
197:17
205:4,5,8
217:16
352:18

**impossibility**
314:22

**impression**
109:5

**improper**
130:4
182:7
235:19
366:14
367:19

**inaccurate**
287:19

**inadequacies**
15:14

**inappropriate**
32:10
57:4
284:21
286:19
287:2,14

**Inappropriately**
277:18

**inclined**
100:3



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: include..interview

include
    8:16,17
    48:12,14,
    21 133:23

included
    28:10,12

includes
    8:18
    85:20

including
    36:5
    42:20
    53:2
    55:22
    85:19
    176:24
    187:12
    188:14
    189:12
    190:7
    191:18
    245:6
    307:13,15
    322:9
    368:17
    373:21

inconsistencies
    118:22,25

inconsistent
    309:12,18

inconsistently
    184:4,8

incorrectly
    336:9

incredible
    365:19

incriminating
    297:4

independent
    36:4
    75:22
    89:18,22

indicating
    152:5
    182:15
    187:11
    212:5

indication
    107:25

indicia
    107:2

indict
    346:18

indicted
    167:24
    195:19
    246:16
    337:13
    351:15

indictment
    195:24
    269:7
    334:15
    353:15

individual
    15:12
    53:3,23
    54:12
    66:21
    97:19
    187:12,25
    188:13,14
    189:11,12
    190:7,8
    191:18
    257:9
    360:3

inducement
    139:17

information
    45:16

54:23
55:3
58:19
68:24
69:17
89:4
95:14
96:2 99:3
111:10
170:10
179:25
182:12
187:4
196:5
198:7,16
199:2
211:10
212:14
229:2
230:13
232:18,21
241:25
245:5
257:12
266:17
282:20
283:4,20,
24 308:19
309:17
333:16,25
334:13,16
367:17
372:11,22
373:7

Informed
    267:16

initial
    178:15
    308:15
    309:4

injects
    216:16

inkling
    137:9

innocence
    28:11
    45:18

innocent
    318:20
    330:9
    331:4,14
    336:12
    368:25

input
    89:11
    279:13
    347:21,24
    348:3,4,5

inquired
    233:17

inquiry
    239:14
    283:11
    375:5

inside
    60:8

instill
    28:2

Institute
    11:24

instituted
    10:5

instruct
    72:7,10
    130:3

instruction
    72:6

instrumental
    357:14
    358:7

integral
    66:12

integrity
    189:4,16

192:5,8
243:9
244:4

intelligence
    10:20,24
    333:17
    335:11

intended
    164:16
    241:16

intensely
    215:7

intent
    224:8,16,
    21 225:2

interact
    368:2,3

interacted
    176:17

Interaction
    308:10

interest
    280:24
    315:21

interested
    235:23

Interesting
    29:19

interjected
    216:19

interrelationship
    335:5

interrupt
    107:18

interrupting
    8:12

interview



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: interviewed..issue

19:13
49:10,14
69:10
90:7,25
111:9
117:6
122:21
132:9
133:8
137:22
144:24
145:21
146:14
147:3,7
153:14
157:2,7,
13 158:5,
7,13,18
161:17,24
162:4,5
164:22
186:10,11
195:4,10
229:11,14
238:22
251:20
252:13
317:14,
21,23
318:11
319:10
320:12
336:21
371:16,
19,20,23
373:19
374:12
375:9,22

**interviewed**
48:21
81:24
91:5
132:15
145:6
161:23
164:9

181:10
182:2,5
239:20
246:22,25
305:12
310:22
317:6

**interviewing**
91:6 92:4
141:22
259:25

**interviews**
90:22
92:19
164:2
311:14
318:6

**introduce**
4:9

**inured**
250:7

**inuring**
227:11

**invalid**
375:2

**investigate**
33:7,12
49:14
111:3
112:4
121:2
230:2
238:11,
18,25
239:8
335:2

**investigated**
34:19
35:16
99:15
163:19

229:24
290:21

**investigating**
34:9
112:13

**investigation**
11:11
33:5 36:4
65:24
66:2,7,
13,19
88:13
89:18,22
90:6
94:10
96:15
98:13,16,
22 104:17
110:24
112:9,17
117:8
121:9
155:21
161:6
171:3
176:3
181:4
189:4,16
192:5,10
217:24
230:10
231:10,20
232:8,13
233:10,14
235:7,15
237:23
239:15
240:2
247:9
250:9
251:17,22
253:7
268:7,14,
16

269:11,21
270:4
271:3,18,
19 272:9,
15 288:8
310:17
311:20
329:20
350:20,24
351:5
354:19
357:10
363:24
364:8,25
365:14,
21,24
372:16

**investigation-type**
33:22

**investigations**
100:10
292:17
342:25
354:10

**investigative**
67:12
231:18,21
239:9

**investigator**
33:16
34:4
91:7,13,
14,15,18
156:16
239:24
318:10,14

**investigators**
318:5

**invoked**

322:9

**involved**
33:15
61:19
70:2
77:23
128:22
161:24
171:21
265:11
274:10
293:22
294:10
376:22
378:14

**involvement**
78:8,13
107:6
171:4
300:16
335:20,22

**issue**
14:15
35:3,4
41:24
53:9
73:8,9
79:20
81:19
98:2,4,7
107:2
114:6,9,
13,14,16
118:21
128:21
159:6,8
189:19
190:24
205:8
206:21
244:3,4
271:13
314:10
363:16



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: issued..jury

issued
  16:11,15

issues
  66:22
  73:6,8
  89:12
  170:13,
  16,20,23
  172:12,
  17,23
  173:8,15
  174:12
  189:22
  245:19
  375:4

item
  302:13

―――――――
    J
―――――――

Jack
  22:9
  64:14
  257:14,
  15,18
  260:7,9,
  15

Jackson
  21:8 92:6
  120:16
  225:18
  231:2,15
  260:19
  305:11
  307:13,
  14,17
  308:11,16
  309:6,21
  310:10,
  18,19,24
  311:16,22
  314:14
  321:3
  350:21

353:5
360:23
363:25

Jackson's
  82:12

Jacksons
  314:21

jail
  199:5
  203:2
  246:17
  369:3
  377:13

James
  4:15

January
  143:12
  162:11,
  13,15
  238:6
  240:3
  256:13
  260:10
  262:14
  272:3
  273:8,11
  276:22
  277:9
  279:17
  311:7
  353:16
  355:9,15

Jarmon
  114:18
  117:24
  118:12
  142:6,19
  164:24
  165:20
  168:12,16
  230:17
  250:18
  252:15
  262:12

265:14
270:24
278:2,4
279:12
280:8
293:13
304:13
314:15,20
331:24
332:6,13
337:13
338:4
339:9
355:10
356:2

JD
  7:9

Jeffrey
  4:7

jeopardize
  375:17

jeopardy
  249:25
  250:6

Jesus
  130:23

jittery
  339:19
  340:3,19
  341:24

Joan
  4:6

job
  30:17,25
  159:3
  243:13
  245:13,20
  246:2,3,5

Joe
  46:25
  82:21
  186:19
  199:4

jog
  121:8

John
  13:2
  92:6,8
  196:8
  199:5
  200:16,
  22,25
  201:6,8,
  9,12,18
  202:7,14,
  19 203:24
  204:3,7,
  10 205:3,
  5 207:21
  209:24
  211:21,22
  212:22
  213:4,8
  215:23
  216:7
  217:23
  218:7,8,
  18,19,21
  219:5,17
  222:7,20
  223:4
  241:3,7
  247:10
  353:5
  355:24
  358:3,5

Johnnie
  326:5,12,
  23 327:13

join
  128:2

Joiner
  187:13
  190:9

joint
  157:13
  334:23

Joseph
  257:7

journal
  246:20

Jr
  201:9,13
  204:3,4,
  10 207:22
  222:20

Jr.-jr.
  201:18

judge
  257:6,8,
  9,11,12,
  15 259:9
  324:10,
  16,22
  325:15
  355:5
  358:3

judgment's
  191:7

July
  14:21,22

jump
  64:11
  361:23

June
  7:21 10:7
  45:15
  195:14,15
  200:23
  218:18,19
  219:11
  293:19

juror
  324:10,
  16,21,22

jury
  34:10
  71:22
  76:8



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 427 of 1202

APPENDIX 0425

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: justice..Lamarr

77:5,9
83:12,16,
21 84:3,
20 85:20
88:12,16,
23 89:4
90:5 93:7
115:25
138:13
142:19,25
146:8
150:10
160:22
162:12,15
178:11,21
183:17,
18,19
184:5
231:14,
16,19,20,
22 232:7
238:8
239:13,
14,22,23,
25
243:19,
20,22,23
244:6,13
251:24
252:2,5
256:12
257:10
263:18
264:10
267:10
269:7,10
271:3,20,
21,22
273:21
276:15
278:8,17
279:22
280:15,25
281:13
296:22
303:13
304:10

310:23
322:8,25
325:16,18
339:18,24
341:6,7,
19 343:2
351:6,8,
13,18,21,
23 352:7,
19,24
353:4,14
354:2,18,
24 355:2,
3,9
356:6,14
357:20
358:23
360:7,18
362:7
364:8
366:22
367:2,3,
16

justice
171:7
173:25
295:22
364:11

———————

K
———————

Kane
335:19,21

Katie
4:14

Kentucky
117:11
251:20,25
316:21,23
318:15
354:3

Kevin
10:3,4,12
335:19,21

key
178:10

kid
208:19

kill
224:8

killed
300:3

killing
225:18
322:2
360:11
363:24

kind
15:3,9
73:9
89:24
231:7
242:7
258:4
260:7
264:12
285:16
287:22
296:7

kinds
133:17
235:9
288:22

knew
14:16
51:5
70:3,18,
19 80:11
82:5,7,10
88:22
89:3
121:15
128:23
134:25
141:16,20
142:9,10,
11,14
147:25

170:23
188:18,24
203:6
210:5
230:16,
17,19
236:7
243:15
263:19
270:22
277:9,12
286:7
298:13
300:15
304:5
316:25
317:6,15
319:19
327:18
328:3
337:21

knowing
137:23
138:15
207:5

knowledge
50:25
192:13
230:4
253:5
281:10
322:19
325:4
334:9

knucklehead
246:15

Kyle's
38:24

———————

L
———————

lack
107:15

lady
264:12

Lamarr
21:10,11
22:11,14
34:2,16,
25 35:14,
16 36:5,
11 61:20,
24 62:12
63:2,11,
15,23
67:8,23
68:2,5,20
73:6
78:22
79:5,15
81:11,20,
23 89:9,
10 92:22
93:13
94:11
95:2,22
96:16
97:15
98:3
103:18
104:5
106:11,21
110:7,25
111:19
112:10,
16,18,25
113:10
114:2,3
116:17
117:9,23
118:18
120:19
125:12
126:13,22
138:5,18
148:9
153:5,24
225:11,
17,25



226:18,23
227:6,12,
14 228:4,
22 229:3,
16
230:10,
14,23
231:15
232:9,14,
23 233:15
234:22
235:24
237:12
238:2,7
242:18
250:10,
13,19
251:13
254:23
256:11
257:2
258:6,15
259:11,
23,24
260:17
261:16
268:8,10,
14
269:12,22
270:6,15,
22 271:6,
19 272:10
275:11,
14,17
276:2
277:9
280:23
282:5,10,
11,16,18,
21 283:21
284:9
285:18
287:4,7
290:21
291:8
292:4
298:5

303:11
305:22,24
306:7,12
307:6,17
344:22
349:18,19
350:8,16
352:15
355:10,23
356:22
357:2,4
360:21
364:24
365:4,6,
10,15,17
366:14,22
367:5,6,
7,9,19,25
368:9,16
371:10,
20,23
373:14,
20,25
374:8,12
375:9
376:15
377:23
378:21
379:10,
12,13,14

**Lamarr's**
286:13
376:20

**Lane**
326:5,12,
24
327:13,
17,22
328:4
329:3,5

**large**
119:12,13
125:9
297:3,21
300:20

**late**
25:9
142:5
150:6
348:22
371:11

**laude**
7:6

**law**
6:16 7:7
26:7
30:11
32:24
38:17
57:12
58:23
71:8
147:16,24
148:5
169:6
171:17,21
174:19,25
280:16
351:14,22
363:4

**Lawrence**
12:8
265:25

**laws**
8:6

**lawsuit**
17:8

**lawyer**
41:12
46:20
64:14
68:13,16
74:13,18
199:13,15
257:3
260:2
278:15
336:11,12
337:2

338:16
341:16
357:10,23
359:15
361:14,19
363:18
364:12

**lawyer's**
361:14

**lawyers**
40:24
264:16
337:6
338:5,13,
20 339:10
343:23

**lay**
296:11

**layman's**
296:19

**lead**
61:5

**leads**
31:7

**learn**
50:7

**learned**
95:20
96:6,12
109:6
123:22
172:11
189:9,10
195:22
198:7
274:3

**learning**
172:16
186:23
195:18
275:17
327:17

**leave**
180:16
220:9,11

**leaving**
220:7

**left**
10:13
12:13,19
125:2
134:23
150:5
158:12
167:5
257:23
285:16
297:19
357:22
362:3

**legal**
28:14
29:4,15
30:12,21
33:9
59:25
170:13,
15,20

**legally**
71:18

**legislature**
8:5

**Leonard**
63:7,9
104:4
106:20
114:18
117:23
120:20
142:6
143:5,7
230:17
232:25
250:19
253:13
254:24



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 429 of 1202

APPENDIX 0427

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: let alone..lying

267:10
270:23
279:11
280:8
304:13
314:15,18
331:24
332:6,14
337:12
339:17
341:5,19
349:19
350:9,17
355:10
376:12,14
377:8

**let alone**
320:22

**letter**
44:12,20
46:20
74:10
92:24
93:5,11
110:11,17
115:15,18
116:5,10,
15 117:7,
14,18
121:7,8,
14,22
163:7,10,
16 165:17
166:9
206:7,16
207:12,22
208:10
210:12,17
211:5
252:9,11,
19,23,24
293:17
353:22
354:8,14
358:4,18

**letters**
34:15

**letting**
254:16
344:7

**level**
108:2
244:2

**leverage**
368:20

**Lewis**
90:14,22
91:2,20
110:6,16
306:5,6,
10 355:11

**liar**
277:16,21

**liars**
278:5

**license**
123:7

**lie**
238:14
271:6,11

**lied**
140:5

**Lieutenant**
335:9

**life**
289:23

**lighter**
229:4
363:5

**lightly**
50:4

**likelihood**
289:10

**limited**
92:16

175:17

**lines**
228:18

**lineup**
52:20

**linked**
326:23

**Lippes**
4:15

**list**
302:14
346:6,12,
18,21

**listed**
239:19

**listening**
278:24

**listing**
354:9

**lists**
354:14

**litigate**
55:2
56:17

**litigated**
54:24
57:14

**litigation**
361:12

**live**
52:20
369:5

**lived**
123:22

**loaded**
30:15
224:21

**local**
171:17

**locate**
203:11
252:12

**located**
164:8

**locations**
25:4

**Loftus**
4:7

**logic**
368:15

**long**
23:24
25:23
63:5
75:11,13,
18 89:4
126:14
158:10
170:17
242:24
290:3
314:9
333:23

**longer**
72:16

**looked**
81:2
104:9,13
106:18
107:4
112:23
117:14
118:6
212:4
301:18,19
309:25
341:5
342:3
354:6,8
357:25
365:4

**loose**

93:9
252:3
317:5

**lot**
38:2
57:14
104:25
233:21
239:9
287:7
290:14
350:24
370:6

**lots**
101:7,9
369:23

**loud**
331:2

**ludicrous**
284:11

**lunch**
166:16

**luncheon**
166:24

**lying**
118:13
135:18
142:14
249:19,
21,22
250:19
265:12,15
268:3,9,
11 270:6,
15 277:2,
4,10
278:7
284:12
287:16
303:13
319:13
320:13,23
331:15
339:25



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 430 of 1202

APPENDIX 0428

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: MAC-10..material

340:5

—————

M
—————

MAC-10
103:25

machine
230:24
288:19
300:5
360:23

made
10:13
13:17
26:24
40:15,22
68:12
69:4
70:24
77:23
78:22
82:21
83:11,25
84:9
96:17
97:14,15
99:16
104:11
107:8,19
111:12
122:4
137:15,20
139:12
141:6,22
146:18
147:18
148:2
158:16
159:13
161:22
164:19
174:2
182:3,5
183:11
184:24

185:25
227:19,23
235:21
236:11
245:22
313:11
322:18
324:10,23
326:10,15
350:14
355:24
374:5

magna
7:5

Mahoney
3:25

Main
6:24

maintain
261:3

maintained
259:17

maintains
260:18

major
9:11
105:19
120:14,18
215:2

majority
120:3

make
38:22
41:12
72:19
83:3
86:18
87:8 93:8
94:19
99:14
130:9
134:13
139:2

148:22
152:6,13,
18 153:4
162:8
185:5
187:5
279:2
282:2
287:23
292:8
305:9
319:23
320:3
331:21
368:22
369:4,6,
10,15
370:14
371:6,8

makes
11:10
51:18
58:16
103:11
116:15
147:3
185:4
329:21
332:10
365:19

making
27:2
130:3
140:7
152:11
169:5
173:11,18
203:9
242:7
272:8
281:11
306:13
328:10
369:8
374:12
378:23

man
330:8,9
331:3,4,
6,14
336:11

manipulativ
e
379:17

manner
31:3
290:8

mannerisms
118:10

March
7:18
23:22

Mario
114:18
117:24
118:12
142:5,19
164:24
165:20
187:12
190:8
230:16
232:24
250:18
270:23
279:11
280:8
304:13
314:15,20
331:23
332:6,13
337:13
355:10

mark
22:8
42:24
43:10
85:7,12
86:3
87:21

168:13
180:12
242:8
294:14
308:8
325:21

marked
43:12
85:5 86:6
150:12
168:15
242:10
243:25
294:15
325:22
376:11

marking
85:21,22,
23

married
246:15

Masecchia
22:22
77:22
81:5

Masecchia's
22:7

massive
214:20

match
339:5,8

material
40:25
41:7,22
45:10,14,
17 46:6
48:3,9,
12,17,22
49:3
53:25
188:22
196:22,25
210:13,



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: materials..minutes

18,22,25
211:6,7,8

materials
259:12

Mathias
4:15

matter
3:22
52:10
80:22
102:21
158:21
172:22
274:7
314:5
362:4
364:2

mattered
314:3

matters
332:22

Maurizio
15:21

Mccarthy
4:14
257:7,8,
9,11,12
259:10
358:3

meaning
47:7

means
46:5,6
131:13
352:11
360:17

meant
131:4
338:11
340:11
350:23
366:25

mechanism
170:5

media
13:13
104:16
108:8
302:16
368:2,20
369:9

medication
6:9

meet
60:23
61:3,12
167:15
258:9

meeting
23:15
60:21
75:2,13
116:7
167:6,11
175:24
176:14
193:10,14
258:16,21
259:2
261:7
274:3
275:10
276:6
285:13

meetings
23:16,20,
25 342:10

memorable
188:19

memories
22:17

memory
6:10 24:7
121:8
122:16

204:15
215:10
324:6

memory's
36:17

mental
65:15

mention
89:8,10
139:22,23
143:23
145:9
149:19
165:11,19
216:8
217:24
241:8,12
276:5,8

mentioned
21:24
82:22
139:11,16
145:24
165:16
170:9
214:7
216:14
240:20
262:23
314:9,12
342:2

mere
359:4

message
150:2,5
202:21

messages
212:13

met
70:4
74:16
75:23
116:4

121:21
123:25
127:12
139:12
142:4
167:14
176:9,16
193:16
261:13
273:15
275:16,23
276:10,14
284:3
345:5

Metzger-
hubbell
4:7

Michael
12:15,16
13:13
353:11

Michigan
169:6
170:4,13,
20,23
171:7,21
172:2,9,
12 173:9,
13,15,16,
18,24
174:7,8,
12 317:10

mid-august
159:23

middle
62:15
349:17
360:24

mind
16:2
104:22
113:25
172:24
199:16

223:4,14
236:6
262:18
300:8,12
321:20
323:24
333:2
338:16
352:18
363:21
364:18

minds
338:20

mine
266:9

Mineola
15:22

minimize
106:3

minimum
362:13

minor
70:10,14,
17,18,21

minute
8:11
87:20
194:24
206:2
218:3
253:16
293:2
297:11
320:14
348:18
351:11

minutes
52:13
63:6,25
64:4
72:14
76:2
166:18



183:19
333:3
344:3,8
348:20,21

mirror
375:21,25

Mischaracte
rization
227:22

mischaracte
rizing
190:12

misconduct
321:6
370:14

misinterpre
ting
331:17

misplaced
285:21

misread
373:21

misreading
373:23

misremember
312:10

misremember
ed
249:18

misrepresen
tation
191:20

misrepresen
ting
263:9

missed
166:12

missing
43:7
86:16

368:14

misstate
29:19

mistake
70:24
287:23
316:2
324:10

mistaken
22:7
135:19
249:22,23
277:10
284:14
313:6
319:14
331:15

miswrote
373:23

Mo
42:25
43:20
376:7

Mo's
376:5

mode
355:3

Molloy
64:14
256:24
257:14,
16,18
258:5,15,
20 259:3,
5 260:3,
6,7,9,16
261:20
273:7,14,
15 274:4,
10,16
275:2,11,
16,23,25
276:3,7,

18 279:25
355:24
358:4,5,
18 359:4,
13 360:2

mom
145:7
213:17,21

moment
130:23

moments
212:10

money
13:16
235:10
282:18,21

month
195:25
355:4,7

months
64:5
67:17
93:4
110:10,
12,13,14
113:2
115:21
120:25
137:24
138:8,12
139:7
148:4
160:19
197:15,16
232:7
306:25
311:3

morning
4:17
62:18,20
63:17
74:15
254:5,15
255:14

278:25
344:21
367:23
371:18,22

mother
94:23
109:8
147:6,11
202:14
213:17
378:2

mother's
378:5

motive
32:15
364:12
370:18,22

motives
31:25

motto
336:9

mouth
330:19

move
71:13
72:11
115:7
313:18

moved
12:17
25:10

movie
204:21

moving
166:11

murder
12:7
97:13
98:4
100:9
101:5,11
104:18

105:5
106:22
120:15
153:7
209:25
213:9
223:23
225:12,15
234:10,23
235:25
237:12
238:2
264:9
302:23
303:5
321:18
322:2
357:17
360:19

murderers
101:16

murders
100:19
101:2,17
102:23
104:25
326:22

music
278:24

_____

N

_____

named
17:7
335:19

names
90:15,19
251:18
253:3
263:24

narcotics
11:13

narrative



56:7

**National**
25:2,5,9,
11,12

**nearby**
6:22

**necessarily**
62:9
103:6
193:7
288:25
290:13
318:7
337:24

**needed**
14:16
18:18
34:18
50:2
64:24
68:13
84:9
89:12
168:23
257:10
357:23
375:5

**negative**
249:9,11
318:22

**neighborhood**
347:6

**nervous**
339:19
340:2,19
341:23
342:3

**net**
271:13

**Neufeld**
4:12

**neutral**
132:6

**news**
245:7
294:21
295:9
302:16
367:25
370:15
371:15
377:24

**newspaper**
294:20
323:10

**Niagara**
3:25

**nice**
123:25
124:5
132:3
208:19

**Nick**
4:12
361:23

**night**
62:15,17
63:17
67:8 68:4
70:19
73:18,25
76:2
93:14
95:21
96:13
106:17
109:5
148:10
246:6
299:9
300:2,3
310:19
311:22
345:18,24
349:17,22

**neutral**

367:22
370:21
376:15

**nightgown**
295:23

**no-billed**
356:8

**nonexistent**
272:17,21

**nonwitness**
158:20

**norm**
361:17

**normal**
80:4
221:19

**notary**
4:5

**note**
147:10
205:18
219:13
305:20,21
306:10,
13,15,16

**noted**
184:5

**notes**
19:9
20:20
72:19,22,
25 73:5,
12,13,15,
16,18,22,
25 144:24
145:15,
19,20,23
146:3,7
147:13
149:15
157:20,23
167:6,10

194:21
195:3,5,
11,13,23
197:24
203:23
211:21
212:4,10,
13 255:10
311:18
317:23
318:15
333:4
350:3

**notice**
72:24
112:15,23
156:5
220:20
255:5

**noticed**
155:21
313:4
373:10

**notoriously**
312:3

**November**
11:22,23
86:10
110:13,17
115:18,25
120:25
142:5
150:24
160:11
163:7
240:2,3
295:24
311:6
352:24
353:3,10
354:2,13,
18

**number**
13:3,4

42:25
43:7
50:17
152:25
166:12
177:16
185:13
251:7,8
272:6,8
290:17
302:14
307:24
312:20
313:6
315:18
330:5
355:14
378:5,6

**numerous**
288:9
320:22

───────────

O

───────────

**oath**
5:20
272:23

**object**
130:4
190:20
269:17
313:25
325:11
331:25
378:15

**objection**
29:8
50:13
52:18
54:4,21
57:10,22
58:9
77:25
93:24



101:25
112:20
113:4,14
119:16
135:12,21
138:20
139:2
153:17
154:3
155:25
156:8
157:5
158:8
159:2,9,
16 163:14
178:6
184:10
187:16
188:4,11,
17,25
189:7,18
190:2,10,
11
191:21,23
216:11
234:20
235:13
238:16
239:11
273:19
281:15
291:2,25
305:15
307:7
308:23
310:15
312:6,12
313:9
314:19
324:25
332:9
346:19
350:11
351:12
352:20
354:12,21
355:21

356:10
357:5,17
358:11,25
359:9,16
360:8
361:20
364:14
366:8,17
367:8,20
368:11
369:12,19
370:2,11
372:14,25
373:6

**objections**
130:4,9

**objective**
30:10
31:3
32:20
364:10
367:2

**objectively**
30:18

**obligation**
27:13,14
28:7
29:20
32:13
33:7,12
38:8,18
40:3
48:19
57:19
196:14,
16,17
198:7

**obligations**
18:23,24
25:24
26:4,6,
10,12
27:10,21
28:4 45:4

46:11
196:15

**observation**
313:11

**observation
s**
301:12
339:23

**observe**
246:2,5

**observed**
175:25
193:18
374:21
375:15,22

**obtained**
71:19
360:12

**obvious**
32:13
357:22

**occasion**
258:3

**occur**
339:14

**occurred**
53:7
75:16
77:7
104:8,9
225:22
244:11
278:11

**occurrence**
102:20

**occurring**
342:10

**October**
110:14
120:19
153:5

**odd**
154:8,12
299:22

**Offender**
8:7 9:11

**offense**
8:6
195:19

**offered**
299:8

**office**
3:24 6:17
7:10,19
9:16 10:6
11:10
12:5,9,20
14:4,6,22
15:11
19:9
61:23
62:11
64:4,12
68:14
77:14
91:22
146:7
147:8,11
148:17
168:21
243:13,18
244:24
257:4,22
263:15
266:6,13
297:7
334:24,25
342:12
344:22
346:5,11,
16
347:15,
16,20
351:17

**office-wide**

9:5

**officer**
50:17
57:5
58:17
182:13
307:14
308:20
372:24

**officers**
38:6,25
39:2
48:20
56:10,14
57:18
58:4
138:14
301:8
305:10
307:11,16
374:20
375:8

**officers'**
20:20

**officially**
355:4

**oftentimes**
102:21
103:11
106:2
118:25
133:10,14
312:2,9

**old-
fashioned**
231:25

**one-third**
18:6

**ongoing**
66:19
67:6,11
83:14
171:2



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: online..people

173:8
240:2

online
246:21

opened
355:7

opening
279:14
344:5

openly
220:21

operated
49:18

operating
96:20
141:21

operation
335:7,15

opinion
104:21,24

opponent
13:14

opportunity
132:22
333:11
359:14,18

opposed
33:16
54:13
147:4
187:13
195:5

option
317:11

orally
187:25

oranges
193:5

order
12:16

43:6
351:24
357:21

ordering
3:11

original
95:3
251:16
360:22

out-of-the-
box
301:11

outcome
315:21
365:9

outlandish
379:6,15

outright
324:4

overstating
84:8

overtly
29:3,7

owned
121:16
165:5

——————

P

——————

P-10S
20:23

P-73
21:12
81:3,5
158:4,23
177:23
308:8
345:16,23

P-73S
20:22
21:2

55:16,18
80:11

P-88
21:3,11
56:7
182:24

P-88S
20:22
21:2
55:16,19
80:12

P-E-T-R-E-Y
196:3

p.m.
115:2
166:24
240:9
293:6
297:14,17
336:4
344:14

pages
43:7,8,
22,24
86:13
242:16

paid
233:11,15
252:8
282:21
283:13

paperwork
109:15,18

paragraph
247:17
251:6
273:4
275:8,22
276:3
295:21

Paragraphs
248:7

Pardon
233:12

parents
36:22
37:2,3,6,
8,15
68:22
69:9
95:23
96:17
97:15
104:15,17
111:9
212:23
228:3
236:17
238:22
284:4,9,
18 285:13
366:13,23
367:5,11,
13,18
368:17,23
369:5,16
376:21
378:13

parole
250:6

part
5:21 22:8
34:3,7
35:14
56:7 61:2
66:12
105:8
136:3,5
144:13
230:14
232:23
246:12
251:22,
23,25
287:20

participate
d

336:22
337:7

partner
16:9

parts
86:15
102:7

party
258:4

passed
8:5

past
128:23
131:20

paths
265:24

Patience
242:15

pause
198:14

paying
3:12

payment
282:18

payments
283:20

pecking
12:16

pedal
107:6

pending
6:5 15:6
196:8
211:23

people
13:18
18:8
19:11
29:13,22
30:19



49:21
87:13
90:15,18
94:25
100:8,18,
25 102:6,
13,23
104:25
106:2
111:10
127:25
152:18
164:7,8,
22 171:21
205:20
226:14
230:15,
18,19
234:13,17
235:9,23
240:3
263:17,25
313:23
335:13
343:5
353:9
359:23
369:24
370:6

**perceive**
117:4

**percent**
101:22

**percentage**
17:16,17,
23,25

**performance**
13:22

**period**
273:14
292:19,20

**perjury**
21:16
22:5,6

83:19
84:14,15,
20,21,22
85:13
86:8,10,
21
114:10,
14,18
116:17,19
125:7
139:23
140:3,5,
19 142:7,
12,19
143:3,4,9
156:19
167:12,
15,21
168:12,
17,20
169:10,14
259:16
260:18
261:3,12,
13,23
262:11
263:16
266:17
267:2,11
268:2,6,
15,18
270:5,24
271:4,20,
21 278:6,
9,19
279:11
280:2,8
293:11,
14,19
303:12
304:16,25
331:24
332:14
336:17
337:23
339:16,21
341:7

342:8
360:20

**permissible**
50:25
51:9,11,
14 52:25
362:20

**permit**
290:4

**permitted**
359:22

**perpetrator**
54:16

**PERSICO**
87:8
117:25
118:7,14,
20 119:4,
7,15,25
120:5,9,
21 121:3,
23 122:10
123:9
124:3,11,
17
125:15,
21,24
126:5,16,
24 127:5,
19 128:3,
10,14,20
129:5,11,
16,20,24
130:6,18
131:2,6,
11,16,24
132:5
133:4,13,
20 134:3,
7,10
135:11,20
136:11,21
137:3,10,
17 138:2,

9,19,21
139:14,25
140:11
141:7,19
142:21
143:10
144:3
145:14
146:19
147:20
148:7,13,
25 149:10
150:15,25
151:10,
17,22
152:7,22
153:8,16
154:2,10,
21 155:6,
11,17,23
156:7,14
157:3,14,
21 158:9,
19,25
159:7,15
160:3,20
161:19
162:6,21
163:5,12
164:5,13,
18
165:15,23
166:3,7,
17,20
169:9
170:2
171:9,19
172:3,19
173:2,10,
22 174:3,
14,22
175:6,14,
20 176:4,
19 178:5,
12,19
179:11
181:5,18

182:22
183:13,24
184:7,20
185:8
186:13
187:7,15
188:3,9,
16,23
189:5,17,
25
190:10,
12,16
191:2,8,
11,21
192:6
193:4,20
194:7,13,
17 195:6
197:7,11,
20 198:2,
10,17
199:20,25
200:8,24
201:23
202:24
204:16,24
205:12
206:18
207:7,15,
24 208:4,
9,18
209:9,22
210:6,15,
23
211:13,
16,24
212:2,7,
21
213:12,18
214:2,8,
14,22
215:12
216:9
217:4,12,
19 218:24
219:20
220:2,8,



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: person..photo

17,25
221:13,18
222:2,10,
23 223:7
224:10,18
225:4,13,
21 226:5,
10,15,20,
25 227:8,
16,22
228:6,12,
24
229:19,25
230:12
231:3,13
232:3,16
233:6,12,
16 234:4,
15 235:5,
11,18
236:3,12,
19 237:14
238:4,12,
16,24
239:11
240:25
241:9,17,
23 242:4
245:21
248:6,14,
19 252:22
254:11,17
255:2,8,
16,25
256:7
258:22
259:19
260:23
261:15
262:5,13,
21,25
263:10
265:7,17
266:20
267:4,15,
22
268:17,24

269:5,14,
17 270:8,
13,17,25
271:8,12
272:18
273:18
274:23
276:12
277:3,11,
17,22
280:4,11
281:3,14,
22 282:23
283:22
284:13,24
285:4
286:3,9,
16,21
287:9,18,
24
288:12,24
289:6,13,
18
290:12,25
291:12,
18,24
292:18
293:2
295:7,18
296:2
297:7,24
298:20
299:11,
17,24
300:11,22
301:2,17,
22 302:7
303:16,
21,23
304:7,14
305:2,14
306:15,17
307:18
308:6,22
309:8,14,
19 310:21
311:5

312:17
313:8,15,
25 314:7,
17 315:6,
14,19
316:5,11,
17 317:3
318:21
319:6,16,
21 320:7,
14
321:16,20
322:11,20
323:7,17
324:2
325:11
326:3,10
327:8,15,
20 328:7,
12,16,20,
25 329:6,
9,15,22
330:11,
16,20
331:5,16,
25 332:9,
21 333:9,
24
336:13,24
337:8,16,
22 338:7,
12,18,25
339:4,13
340:6,21,
25 341:8,
14,21,25
342:14,20
343:24
344:4,7
347:7
348:7,10,
15,21,24
349:12,14
350:13
352:2,22
354:16,23
356:5,12

357:8,24
358:13
359:3,11,
20 360:13
361:22
362:16
365:22
366:6
367:7,12
369:11
370:8,17
375:10,23
376:4,6,9
377:9
378:17,25
379:16,21

**person**
13:3
23:17
31:18,24
32:3 34:8
57:7
58:6,7
59:10
65:9,11
87:14,16
108:13
121:15
124:5,6
134:16,
22,23
136:9,18
137:2,15,
19,23
139:12
141:6
143:24
144:8
147:18,25
159:25
190:9
216:8,18,
19
217:17,24
288:23
290:10

296:11
305:21
317:14
345:4
358:8

**personal**
289:23

**personally**
252:10

**personnel**
14:15

**perspective**
5:19
296:20

**persuade**
317:19
318:19,23

**Petrey**
196:2,3

**phone**
15:24
23:17
74:12,25
75:11
76:7,13
134:16
150:2
212:12
219:18
378:5

**photo**
3:6 52:14
54:12,14,
19 56:4,
16 58:5,
15 90:23
91:3
110:5,16
113:11
179:10,23
181:11
182:3
183:16



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: photos..police

185:2
187:12
188:2,14
190:8
191:17,18
217:3
305:13,22
306:7,9,
11 307:6,
17 309:5,
25

photos
52:12
53:3,23
54:13
55:22,25
56:9
153:15
155:13
183:11
184:17
187:12
188:13
189:11,12
190:7
191:18
305:24
306:3,11

physical
223:17
288:10,13
290:23
314:22
315:2
316:15

physically
173:12

pick
56:15
179:17

picked
57:7
58:6,18
184:17

picking
217:2

picture
34:11
113:2

pictures
113:10
152:14,
17,24
155:10
181:12

piece
40:25
84:2
367:4,17

pistol
290:4

pivotal
314:10

Pizzeria
326:22

place
51:23
379:20

plaintiff
4:9,13

plaintiff's
16:5,6

planning
348:19

plate
25:15
123:6,7,
22,23

play
71:22
122:8

playing
23:9,10

plea

225:22

plead
225:14

pleading
250:2

pled
225:11,17
227:20,24
250:2

point
9:5,10,
14,15
11:14
12:8 34:3
35:13
57:24
65:24
66:7 78:7
94:2
96:3,8,21
97:23
100:8
103:23,24
106:24
109:13
126:21
128:5
142:3,18
153:13
170:6
212:7
229:2
257:2
276:4,14
284:4
294:2
319:24
361:16
362:10,22
371:7
374:10

points
22:17
60:22

73:6,7
92:11
97:19
251:7

police
4:18
15:12
19:8
20:10,21
21:13
34:8
35:23
38:25
39:10
40:10
41:21
42:14,15
47:17
48:6,7,20
49:3
50:16,18
51:23,24
55:9
56:14
57:4
58:17
63:12
69:20
83:6
99:14
112:24
113:8
123:23
134:17
136:9,19
137:19
138:14
139:6
148:23
150:11
151:20
155:21
158:4,24
159:4
160:24
165:13

176:2
177:5,9,
11 179:7
182:13
183:10
184:5,9,
16 187:5
193:19
194:4,6
215:17
231:25
232:4,12
236:23
255:15
259:11
269:24
288:9
290:21
291:17,
22,23
292:4
298:8
301:8
305:23
307:5,14,
16,23
308:20,24
309:3,12,
22 310:7,
9 333:17
336:22
345:5
346:6,12,
17
347:16,18
351:4
352:8
360:22
362:21,24
365:3,24
368:2,19
369:7,16,
24 370:7,
14 371:3,
6,23
372:15
376:14



CHRISTOPHER J. BELLING                                       April 11, 2023
DIXON V. CITY OF BUFFALO                               Index: policing..pretty

policing
    38:7

policy
    318:12

political
    13:21

polygraph
    373:15,21
    374:2

porno
    204:21

portion
    20:15
    243:2
    377:10

portions
    20:16
    21:18,20
    23:2,5,6
    43:4 44:7
    71:22
    272:6

portraying
    129:9

position
    223:5
    249:17,25
    276:23
    337:14
    360:11
    374:17

positive
    59:5,9,
    20,23
    60:14
    82:17
    182:3
    183:11
    184:25

positively
    179:19,21
    181:12

186:3

possession
    223:24
    224:15,
    20,21

possibilities
    290:19
    301:4

possibility
    100:15
    108:12
    109:2
    128:15
    136:22
    259:16
    261:3,23
    289:4,7
    290:16
    300:25

possibly
    49:2
    60:19

posture
    262:7

potential
    35:11
    39:22
    48:12,22
    54:13
    174:11
    257:10
    280:2
    288:22
    301:4,9
    329:20

potentially
    38:9 39:3
    48:3
    111:11
    168:23
    379:2,3

Powell

92:5
    311:13
    353:6

practical
    126:18

practice
    45:14
    47:12,17
    80:5
    83:23
    196:19
    318:5

practicing
    359:22

pre-grand
    358:23

pre-
pandemic
    23:23

precinct
    64:21
    371:21,25

precise
    122:7
    345:11

precisely
    342:4

prefer
    85:8

pregnant
    322:3

premise
    99:23
    248:22

preparation
    19:3 34:9
    72:25
    77:5
    151:4
    175:18
    178:10

180:20
    194:22
    205:23
    215:22
    230:9
    242:21
    256:21
    352:6
    353:25
    356:14

prepare
    372:9

prepared
    347:15,17

preparing
    51:5

presence
    36:22,25
    91:4
    97:20
    259:25
    297:2
    359:15
    371:17,19

present
    37:4
    67:22
    76:5,22,
    25 77:6
    90:21
    147:10
    164:2
    178:2
    325:9,17
    341:18

presentation
    24:25
    83:12,21
    88:12
    93:7
    160:22
    278:10,11
    310:23

351:17
    352:7

presentations
    25:6

presented
    278:14
    296:15
    352:23
    353:4
    355:10

presently
    15:5

presentment
    279:22

press
    371:11

pressure
    108:3
    231:7,11
    285:11
    319:19
    320:23

pressured
    282:12

presume
    72:23
    90:9
    117:10
    150:9
    311:19

presuming
    365:5

pretrial
    184:24

pretty
    56:24
    80:13
    102:20
    109:4
    117:15
    250:22



313:23

preventing
363:11

prima
31:21
32:25
84:10

primarily
177:4

prior
62:5
78:10
88:11
90:5
176:9
190:13
258:16,20
259:2
266:18
275:17
326:14
334:6
345:21
367:2,16

prison
283:12

privileged
72:8

probable
31:19
34:17,24
35:6,11
59:23
60:8,11,
15,17

problem
53:12
58:11
158:23
159:4
173:3,7
184:12
243:21

277:15
375:20

problems
27:16
53:6
193:6
214:20
250:12

procedural
262:7

procedure
15:7
42:13
50:18,19
57:6
178:3,16,
25 182:17
183:3
221:20

procedures
50:25
51:10,23
52:2,5
55:10,20
336:23
337:7

proceed
363:25

proceeding
142:25
283:5,9

proceedings
90:5
92:9,12
142:20
325:10
353:15
354:25

process
5:8 33:5
60:21
61:11
64:13

77:17,24
83:4,14
173:18
177:23
239:15
256:24
320:15
325:3
351:6

produced
43:18
44:7

professiona
l
257:25

program
246:11

promise
376:7

promises
274:20

pronouns
285:21

proof
32:20,23
366:12

proper
130:7
182:17
183:2,3
363:14

properly
35:15
41:22
54:18
55:11
56:17
71:19
179:10,22
181:25
182:2
217:9
361:7

proposed
243:21

prosecute
31:18,24
32:2,14
34:18,24
81:19
97:5
226:13
266:6
281:21
282:8
375:18

prosecuted
142:6
226:24
227:6
250:15,18
263:5,8,
16,17,20
264:14,24
265:12,15
267:2,6
270:23
271:4
331:23
332:13
339:9

prosecuting
17:18,24
18:6 31:2
81:12
226:18
266:17
270:12
283:19
304:16,25

prosecution
8:9,23
28:13
33:5
119:14
171:2
207:23
209:8

242:18
246:24
269:16
293:19
331:23
332:6,17
336:20
337:15
360:25

prosecution
s
18:7

prosecutor
7:16 17:8
27:13
30:18
33:16
38:10,20
45:4
49:19
57:13
167:21
235:22
268:23
269:6
289:24
312:2
330:7
335:19

prosecutor'
s
334:24,25

prosecutori
al
15:7
321:6

prosecutors
11:24
25:14
28:2
343:10,13
369:25

protect
363:19,20



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 441 of 1202
APPENDIX 0439

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: protecting..quoting

364:4,7
370:14

**protecting**
363:22,23
364:4,13

**protection**
369:8

**proud**
71:15,17,
24

**prove**
288:10

**proved**
104:22

**provide**
38:10
39:4 60:8
97:13
292:5
299:9

**provided**
42:8
89:11
198:16,25
266:18
372:21

**providing**
39:21
49:5
105:20
174:10
285:11
291:17,23

**public**
4:5

**publicly**
336:10

**published**
246:21

**pulled**
168:20

**pulse**
153:13

**punk**
209:2

**purportedly**
110:6

**purporting**
216:7

**purpose**
340:4

**purposes**
239:23
348:19
376:13

**pursuant**
146:8
272:9
295:3

**pursued**
170:6

**put**
43:5,21,
22 72:23
86:4,5
87:20
95:12,23
99:21
100:9
115:8
184:3
213:24
219:24
221:7
224:25
236:11
244:18
252:4
276:11
277:13
320:13
324:6
329:24
337:13

345:6
366:23
368:22

**Putnam**
15:11,17

**putting**
195:4
210:20
222:7,8
239:15
353:25
379:8

_____

**Q**

_____

**quality**
82:2
365:14

**question**
5:22 6:5
17:21
31:25
34:17,23
39:17,25
41:20
58:11
61:3 69:8
70:6
88:11,15
89:25
90:3
93:10
102:4
125:25
126:7
127:3
129:7
130:11
135:9
136:12,15
139:3
141:11
144:16
145:22

147:22
152:9
154:23
155:15
166:3
170:21,22
189:4,15
192:4,7
200:6,16
204:17
219:16
222:3,4,
13 224:12
227:3
232:6
234:7
237:15,19
242:3,5
243:9
251:2
258:24
261:22
266:12
271:17
272:19
275:15
281:23
291:24
303:24
313:3,8,
16 318:25
319:2
320:15
324:2
325:14
330:21
332:3
333:8
340:7,14,
20 342:15
358:16
366:11
367:16
372:8

**question's**
30:14

**questioned**
101:12
190:17
292:4
351:20

**questioner'
s**
248:22

**questioning**
349:16
350:15
374:20

**questions**
5:20
40:24
72:8
107:12
122:14
126:3
129:13
130:7,8,
13 168:2,
3 197:2
242:6
298:14
343:25
346:2
351:19
377:22

**quick**
372:8
376:4,6

**quickly**
80:13

**Quinlan**
335:11

**quoted**
13:13

**quotes**
355:17

**quoting**
323:9



**R**

R-O-L-A-N-D
  326:8

Rabbit
  201:13
  212:23
  213:4,24
  241:3

raising
  107:11

ran
  278:17

range
  86:13
  290:9
  300:4
  343:16

rape
  195:19
  199:6
  201:7,19
  202:22
  203:15,16
  204:8
  205:7
  207:23
  209:8
  210:4
  212:20
  213:10
  219:25
  221:8
  360:19

raped
  199:18
  205:8

rapes
  8:17,18

raping
  196:9
  197:15

200:16

Ray
  22:7

reach
  106:25
  169:5

reached
  202:18
  247:10,11

reaching
  169:17
  247:3

reaction
  247:13

read
  21:12,24,
  25 22:4,
  9,14,18,
  19,23,25
  30:7
  44:18,19,
  25 50:8
  80:11,12
  86:24
  143:6
  160:14
  179:3
  180:19,25
  183:4
  195:2
  215:21,25
  216:4,5
  218:15
  242:24,25
  247:24
  251:6
  267:10
  272:4
  273:4,6
  275:8
  293:21
  294:23
  333:6
  336:8

349:5,7
350:9
356:18
376:25
377:5,10,
15,21
378:20

reading
  46:19,20
  57:17
  77:12
  83:18
  84:13
  143:4
  144:23
  183:22
  198:13
  228:7
  247:21
  268:2
  323:9
  373:18

ready
  93:6
  180:24
  251:23
  252:2
  333:9

real
  153:4

realm
  235:7,12

reason
  13:5
  39:16,25
  40:5
  41:20
  57:20
  95:22
  96:14,16
  114:16
  134:2
  144:11
  149:3

156:23
159:13
184:18
199:23
200:19
230:21
236:16
237:6
240:18,19
243:8
301:14
316:24
317:13

reasonable
  166:16
  289:9

reasons
  51:11
  52:25
  53:2
  125:19
  133:11,
  17,18,22,
  24 175:12
  196:24
  197:4
  314:12

rebuked
  322:23

rebuking
  322:7

recalcitran
t
  220:16,20

recall
  37:2,5,
  15,17
  63:9 73:3
  77:11
  94:20
  97:18,22
  100:24
  122:22
  134:15

139:10
140:2
142:22
155:12
169:3,5,
17 170:14
174:10
176:5,10,
12 178:3
180:3,10,
13
186:23,25
187:3,10
192:24
193:10,
11,14,21
201:4,6,
10,11,14,
17 202:15
212:9,12
213:8,13,
16,19,20
214:3,9,
19,23
215:2,6
222:24
224:19,
24,25
227:9
230:7
236:22
237:11
268:25
282:4
283:10
284:3
294:25
300:13
301:7,23
307:10,19
309:11,
15,17
313:14
321:18
322:7,13
324:14,15
326:18



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: recant..reinstated

331:7
337:11
339:16,20
341:9
344:23
371:14
375:11

**recant**
276:19,23
277:10
281:8
286:25
319:3,11

**recanted**
273:16
274:18
275:6,7
279:20

**recanting**
274:5
275:18
281:12
328:18

**receive**
182:12
283:3
308:19
360:19
366:20
367:17

**received**
7:5 8:21
45:9,15
48:20
75:3
179:25
245:5
334:2
366:12

**receiving**
187:4
309:17

**recently**
353:8

**recess**
115:2
166:24
240:9
293:6
336:4
344:14

**recognize**
253:17

**recognized**
113:21
292:14

**recollect**
39:18
62:6,7
67:24
68:18
72:16
75:9
82:15
91:16
93:2
112:21
141:8
170:15
263:2
266:24

**recollecting**
264:6

**recollection**
23:13
62:4,10,
13 64:3,6
75:5,22
76:13
77:17
93:21
96:10
120:10
127:16
139:15
147:14

155:20
169:2
170:19
171:8
175:23
180:5
192:14
193:24
203:15
204:6,12,
23 214:7
258:17,19
259:6
265:2
266:3
279:24
319:22
321:11
323:20
324:19,21
330:19

**recommendation**
92:20
209:21

**recommending**
94:10

**reconstruct**
75:16

**record**
3:10,16
86:19
87:9
114:24
115:3
135:6,15
161:12
166:22,25
197:2
240:7,10,
14 241:25
242:15
293:4,7
297:10,

12,14,15,
17 324:6
336:2,5
344:12,15
351:8
369:9

**record's**
239:16

**recorded**
22:11

**records**
83:6
305:20

**recruited**
11:23

**red**
121:16
144:9
151:12
160:2,5
165:6

**refer**
43:8,15,
25 288:19

**reference**
163:11

**referring**
115:16
148:8
212:3

**reflect**
349:16

**reflecting**
308:9

**reflects**
86:19
147:10
150:4
165:8
179:24
275:10
279:14

308:18
309:9

**refresh**
147:13
169:2
203:14
204:6,12
279:23

**regard**
27:14
30:8 31:2
35:16,23
36:5 50:4
55:19
61:24
62:11
93:15
94:9
120:15
125:11
178:21
251:13
257:10
261:17
268:8
269:16
279:25
292:9
296:11
310:23
318:12
340:13
350:21
360:25
365:13
366:14
374:12

**registration**
165:8

**regular**
340:15

**reinstated**
246:11



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: reinvestigate..reports

reinvestigate
49:10

reinvestigation
246:23

reiterated
131:22

related
119:21
120:4

relation
21:2
223:11

relationship
229:17
230:11
232:14
377:17

relative
253:13

relay
129:3

released
350:17

relevant
26:25

reliability
112:9
129:23
140:3
189:23
205:9
312:24

reliable
81:20
102:24
117:16
139:24
215:11
313:23

reliant
55:8

relied
194:4
288:10

reluctant
133:11,15
193:2,7

reluctantly
151:20

relying
55:18
177:4

remain
250:8,25

remained
114:9

remaining
300:21

remarkably
368:21

remember
20:18
21:6,9
22:16,18
36:23
37:7,11,
22 56:6
64:15
69:13,18
82:20,22
90:18,19
92:3
93:18
94:2,4,9,
13,15
109:15,17
110:21
113:18
116:7,14
121:12
122:21
128:11

130:23
135:17
146:24,25
147:6,8
148:18
156:12,
15,17
157:25
160:15
170:3,4,
12,23,25
171:12,
15,16,17,
20 172:4,
7,8,11,
16,22
174:8,9,
16,18
175:4,5
188:15
196:13
198:15
203:4,7
204:19
205:11,
15,19
206:25
213:23
215:13
220:23
221:17,23
223:3,10,
15,19
228:9
230:9
253:9,11,
14 254:14
263:24
264:4,7,
19,21,23
269:24
273:7,10
283:15
284:6,18
292:23
297:19
302:2

306:20,
21,23
310:2,5,8
312:15
317:24
321:10
323:14
324:12
325:7
330:10,14
333:19
334:8
337:17
342:7,10
346:25
347:23
368:7

remembered
130:19
188:8

remembering
24:14
221:19

remorse
108:2,14,
17,19

remorseful
108:23

remove
85:25

repeatedly
320:11

rephrase
5:23
222:3
325:14

report
16:12,14,
15 42:15
48:15,17
79:19
113:11,16
150:22

156:25
158:4
159:12
160:4
179:7,21
181:3,9,
14,16,19,
23,25
182:4,6,
9,15,18,
19 184:5,
22 185:3,
4,10,13,
15 187:3,
10
191:16,20
216:23
244:10
254:2,8
255:7,11,
14,17
308:15,
18,20
309:9,13,
18
318:11,17
347:18
372:16

reported
83:22
88:17
309:4

reporter
3:4,11
4:5,11

reporting
189:24

reports
20:21
42:16
48:6,7,
12,20
49:15,16
83:6 89:5
112:16,24



113:9
135:8
177:5,9,
19 182:20
183:9
185:5,12
189:14
194:5
215:3,17
230:8
245:7
305:23
307:5
318:5
371:10,13

**represent**
4:18 44:6
64:15
77:21
184:15
191:9
218:17
256:5,11
306:22
360:2

**representat
ions**
355:24

**represented**
184:23
189:13
191:16
359:23

**requested**
64:21
373:16

**required**
98:12,15
224:20

**residue**
248:4
292:12
295:6,12
296:25

297:2,3,
22 300:16

**resignation**
12:23,25

**resolved**
238:6
364:8

**respectful**
50:11

**respond**
71:9 72:2
235:19

**response**
141:8
150:9
202:18

**responsibil
ities**
9:17
18:14
64:23

**responsible**
18:21
58:4 95:2
284:10

**responsive**
144:14

**restructuri
ng**
9:5,10,16

**result**
65:22
92:16
174:12
244:9,16
271:2
272:11
379:9

**resulted**
309:6

**retelling**

105:15

**retire**
14:3,13,
20

**retired**
14:23

**retirement**
258:4

**retracted**
303:13

**retrospect**
304:10

**return**
373:17

**returned**
195:24

**review**
20:15,25
21:15,21
26:25
44:11,12
77:14
78:23
79:2,7
83:11,20
88:13
120:13
179:2,5
194:25
206:3
243:19
244:25
333:3,12
349:19

**reviewed**
19:4,6,
10,12
20:8
21:18
23:12
38:2
79:8,19,
23 80:2,4

140:9
149:6
151:4
160:25
178:10,
18,21
180:19
181:3
182:20,
23,24
185:12
194:21
205:23
230:7,8
242:20
256:20
345:21,22
350:2
352:8,11,
14 356:14
374:25
376:19
378:10

**reviewing**
19:20
24:13
73:13,15,
23 80:8
83:4,6
89:5
112:24
161:16
180:10,13
375:8

**reward**
221:12
302:6

**Richard**
9:3

**righted**
246:12

**rights**
50:19
363:20,

22,24
364:4,13

**ring**
369:20

**road**
304:9

**robbery**
360:18

**Robert**
70:2,12
90:14,22,
25 91:20
94:18,22
109:8
110:6,16
186:18
229:2
236:22
306:5,6,
10 355:11
367:24
378:2

**Roland**
325:24
326:4,8,
25
327:10,
12,24
328:2
329:4,19,
20

**role**
18:25
29:23
34:4,7
35:15,22
38:7 40:9
49:2,4
65:23
74:5

**roles**
362:11

**rolling**



5:6

Romo
    4:14

room
    67:25
    278:15

rough
    122:3

routine
    102:6

routinely
    100:18
    101:16

rule
    16:14
    78:5
    375:19

rules
    5:18
    30:5,8
    40:17
    363:12

rumor
    282:13,21

rumors
    245:25

run
    51:5 52:6
    158:10
    199:3
    268:18,20
    314:9
    363:3

Russ
    3:9,15
    4:17,18
    43:17
    44:3
    50:13
    52:18
    54:4,21
    57:10,22

58:9
77:25
85:14
89:23
93:24
101:25
112:20
113:4,14
119:16
135:12,21
138:20
153:17
154:3
155:25
156:8
157:5
158:8
159:2,9,
16 161:9
163:14
166:11,14
177:12
178:6
180:21
184:10
187:16
188:4,11,
17,25
189:7,18
190:2,11,
17 191:23
216:11
224:4
234:20
235:13
240:15
241:24
242:13
255:22
273:19
278:23
281:15
291:2,25
305:15
307:7
308:23
310:15

312:6,12
313:9
314:19
324:25
326:7,9
344:2,5,
11,18
345:10,15
346:22
347:9
348:6
349:15
364:14
366:8,17
367:8,20
368:11
369:12,19
370:2,11
372:14,25
373:6

Russ's
    241:21

─────────

─────────

        S

sale
    120:4

Santa
    7:3

Sara
    243:3,12
    246:14

sat
    17:10
    117:11

Savoiardo
    15:22

scale
    379:8

scared
    50:10
    149:9

scene
    68:22
    104:3
    165:7
    193:18
    230:18
    236:14

Schechter
    16:6

Scheck
    4:12

scheduling
    23:18

Schiller
    16:7,8,9,
    10

school
    6:15,16,
    18,19,21
    7:7
    116:11
    117:19,21

scintilla
    366:12

Scioli
    335:10

scope
    365:14

score
    312:20

Scott
    21:10,11
    34:2,16,
    25 35:14
    36:5,11
    61:20,24
    62:12
    63:2,11,
    15,23
    67:8,23
    68:2,6,20
    73:7

74:4,6
78:22
79:5,16
81:11,20,
23 89:9,
11 92:22
93:13
94:11
95:2,22
96:16
97:15
98:3
106:21
110:7
112:18
113:10
114:2,3
116:17
117:9,23
118:19
120:19
125:12
126:13,22
138:5,18
148:9
153:5,24
225:11,
17,25
226:18,23
227:6,12,
14 228:4,
22 229:3
230:14,23
231:15
232:9,14,
23 233:15
234:22
235:24
237:12
238:2,7,
14 242:18
249:25
250:10,
13,19
251:13
254:23
256:12



CHRISTOPHER J. BELLING                                April 11, 2023
DIXON V. CITY OF BUFFALO                      Index: Scott's..shoot

257:2
258:6,16,
21 259:2,
15,16,23,
24 260:17
261:6,17
268:8,10
270:6,15,
22 271:7
272:10
273:16,20
274:4,5,
11,17
275:2,11,
14,17
276:2,7,
18,22
277:9
279:19,25
280:23
281:7,11,
19 282:5,
10,11,16,
18,21
283:11,21
284:9
285:18,24
287:4,6
291:8
292:4
298:5
301:9,10
303:11
305:12,
13,22,24
306:8,12
307:6,17
328:18
344:22
349:18
352:15
355:11,23
356:22
357:2,14
359:12,14
360:2,4,
21 362:5

363:18
364:24
365:4,6,
10,15,17
366:14,22
367:6,7,
9,19
368:9,16
371:11,
21,23
373:14,
16,20,25
374:8,12
375:9
378:21
379:10,
12,13,14

**Scott's**
22:11,15
35:16
103:19
104:5
106:12
110:25
111:19
112:10,
16,25
229:16
230:11
259:11
268:14
269:12,22
271:19
284:4
290:21
349:20
350:8,16
357:4
363:22,23
367:5
378:11

**screen**
4:4
166:23
240:8
297:13,16

**scrubbed**
107:24

**search**
15:15
30:18

**seats**
87:15

**second-
degree**
225:11,15

**secondary**
364:2

**secret**
143:8

**section**
333:17
334:25
377:15

**sections**
377:21

**secure**
203:12

**Sedita**
12:3,13
268:19
294:5
340:20
341:2,18

**Sedita's**
12:11,13

**selected**
54:18

**selection**
58:16

**semiautomat
ic**
300:4

**sending**
169:24

**senior**

12:12
342:11,18

**sense**
83:2
116:15
161:22
319:24
320:3
332:10
369:4,6,
10,15

**separate**
90:25

**separately**
238:23

**September**
110:14

**sequence**
330:22,25

**series**
5:19

**serve**
287:7

**served**
364:11

**Services**
4:6

**set**
68:11
373:15

**sex**
9:14
11:14
204:20

**sexual**
245:12

**sexually**
245:14,16

**Shannon**
70:2,12

90:10
91:10,12
94:18
116:4,8,
16 117:6,
15
186:10,19
229:3
233:2
236:24
251:11,20
252:15,20
253:16
316:21
317:14,21
318:20
319:3,18
320:12,17
321:2
353:21
354:4
356:2
367:24
378:3,6,7

**Shannon's**
256:3

**shared**
111:25

**She'll**
152:23

**sheriff's**
246:16

**ship**
246:12

**shirt**
300:19

**shoes**
289:17
291:9
301:21,24

**shoot**
166:18
224:9,16



225:3

**shooter**
34:3
79:21
103:21
104:3,12
112:18
114:3,4
117:9
118:18
125:13
126:14,23
136:10,20
137:25
138:5,6,
17 144:2
148:3,9
149:8
152:3,5,
14,20
153:2,24
158:17
165:14
177:21
181:13
185:6,7,
20 186:4
216:15
250:10,
12,13,14,
16,20
251:14
259:17
268:11
269:23
270:7,16,
22 286:8
288:18,21
289:5
319:5
356:9,23
357:3

**shooter's**
289:12
297:22

**shooting**
115:22
116:18
133:2
164:25
223:12,18
225:18
230:24
268:15
288:17
289:11
307:2
350:21
355:20
369:3,4

**shootings**
312:10

**short**
273:13
294:23
358:21

**short-
circuit**
333:5

**shot**
59:10,11
71:7
108:20
165:2,25
166:19
260:18
300:17
314:16,21
315:3
316:3,10,
12,16
360:23

**shots**
290:17
312:4,10,
15,20
313:6,24
315:18
316:2,9

**show**
34:15
45:17
53:2
110:4
153:14
252:16
303:4
307:17
341:24

**showed**
112:25
146:8
155:10,13
183:10
184:16
189:10,
11,14
196:20
264:10
301:10
306:2,7
316:10

**showing**
3:5 71:2,
12 122:13
127:14
181:20
294:20
302:15,22
305:22
307:15
376:10

**shown**
52:11
53:23
54:12
55:22,25
90:23
91:3
113:10
181:11
183:15
187:11,25
188:13

190:7
191:17,18
217:14
305:13,23
306:9,11
307:6

**shy**
49:20

**side**
30:2,3
150:21
207:14
361:8

**sign**
360:10
361:8
372:23

**signed**
372:21

**significanc
e**
314:23

**significant**
13:16
100:4
103:18
114:6,9
158:18
314:25
315:13,
15,18

**significant
ly**
357:7

**signing**
361:18

**similar**
265:25
328:15
329:13,
16,24

**similarity**

328:22

**simple**
153:4
250:25
271:17
321:18

**simply**
369:7

**single**
135:6,9
367:17
378:20

**sir**
35:25
138:25
140:14
157:17
207:2,10
208:12
211:3
212:9
378:24

**sit**
13:9 58:3
126:9
175:23
186:22
193:13
198:12
276:9

**sits**
355:4

**sitting**
361:14

**situation**
59:3
70:16
98:20
99:8
100:8
108:3
172:2,7
257:9



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: situations..spring

situations
    312:9

six-person
    52:14
    179:10,23
    184:25
    187:14
    189:14
    191:17
    217:9

sixth
    343:20

skip
    256:9

slaying
    294:18
    295:24

slightly
    11:19

slip
    150:2

slot
    14:20

slots
    14:16

small
    18:8

snarky
    242:7

so-called
    7:21 60:4
    236:14
    257:5
    347:19

social
    124:15

soft
    107:6

solely
    13:21

solicitor
    205:16

solution
    243:21

somebody's
    283:10

son
    104:18
    206:15
    207:12
    210:11
    218:10

sons
    322:3

sort
    11:15
    38:18
    54:8
    75:15
    199:6
    246:12
    247:3
    374:9

SOTO-BRITO
    43:2,21
    168:11
    348:23

sought
    247:4
    336:21

sound
    256:13
    343:19

sounds
    24:6
    25:16
    37:13
    64:7 83:4
    106:16
    109:3,24
    154:16
    241:15
    301:6

363:16
    364:2

source
    309:18

sources
    245:6

South
    25:10

Southern
    15:6
    16:23

space
    377:11

speak
    36:25
    38:21
    63:2,7,15
    69:3,5
    74:19
    99:10
    101:10
    128:25
    133:15
    258:15
    337:6
    345:3
    363:8,9

speaking
    36:4 37:7
    65:7
    130:4

speaks
    101:13

special
    14:24
    68:15
    74:13,15,
    17 76:18
    257:5,6
    342:25

specific
    17:4

23:13
    38:21,22
    41:6
    43:16
    52:9
    54:11
    93:3
    94:8,13,
    20 97:18
    204:4
    337:5
    347:24

specificall
y
    30:8 38:4
    69:13
    89:9
    97:22
    103:17
    141:9
    170:12
    174:15
    187:24
    192:18
    193:11
    201:5
    213:21
    327:6
    337:17

specifics
    172:5
    175:5

speculation
    72:3
    154:2
    299:12

Speculative
ly
    291:3

speed
    358:14

spell
    321:16
    361:7

spelling
    321:20

spend
    62:23
    175:18

spent
    17:16,18,
    24,25
    19:20

spoke
    36:11,18,
    21 37:3,
    5,14 42:6
    63:11,24
    64:2,3,19
    67:4
    72:13
    74:6,22,
    24 75:25
    76:7,15
    81:24
    106:19
    107:10
    136:7
    141:4
    143:15
    204:7
    211:22
    212:15,
    17,18
    225:10,19
    259:5,13
    273:10
    274:15,
    16,17

spoken
    5:7
    199:11
    233:23

sponte
    100:22

spring
    14:7
    317:7,9



| | | | | |
|---|---|---|---|---|
| **Sr** | **Stambach's** | **starting** | 274:5 | 376:15 |
| 201:12 | 22:8 | 377:11 | 286:25 | **statute** |
| 212:6,16 | **stamp** | **state** | 298:11 | 267:11 |
| **SSV** | 43:6 | 7:4 25:14 | 319:4,7, | 268:2 |
| 15:25 | **stamps** | 26:7 | 11,20 | **stay** |
| **St** | 43:16 | 29:14,22 | 320:19,25 | 68:24 |
| 12:8 | 44:2 | 30:19 | 321:4 | **stayed** |
| 265:25 | **stand** | 58:22 | 326:4 | 8:3 |
| **stage** | 131:10 | 173:19 | 331:18 | 10:10,12 |
| 57:23 | 341:6,7 | 215:23 | 352:12,15 | 12:10,12, |
| **stages** | 342:7 | 295:22 | 353:21 | 18 |
| 179:5 | 359:7 | 331:12 | 354:4 | **Stencil** |
| **Stambach** | **standard** | 351:14 | 356:19,21 | 90:14,22 |
| 22:25 | 42:12 | 360:16 | 357:2 | 91:2,21 |
| 38:5 | 174:23 | **stated** | 360:22 | 110:6,15 |
| 68:3,4 | **standing** | 166:9 | 364:24 | 305:21 |
| 77:11 | 222:21 | 378:4 | 366:5,24 | 306:2,4, |
| 78:21 | 223:11 | **statement** | 368:22 | 11 355:11 |
| 81:3 | 264:11 | 63:12 | 369:8 | **stepfather** |
| 96:7,13 | 288:20 | 68:9 | 370:15 | 377:12 |
| 103:20 | **Starke** | 69:21 | 374:22,25 | **steps** |
| 136:25 | 68:23 | 73:8,14, | 375:5,8 | 160:10 |
| 137:6 | 69:25 | 15,23 | 376:11, | 203:12 |
| 151:7 | 94:19 | 88:19,24 | 14,23 | **stick** |
| 152:11 | 99:7 | 93:16 | 377:8 | 332:18 |
| 157:8,9 | **start** | 100:4 | **statements** | **sticker** |
| 159:11 | 6:13,14 | 102:16 | 42:8,9 | 86:5 |
| 161:5,15 | 7:17 20:7 | 103:19 | 104:2 | **stint** |
| 162:3,25 | 91:10 | 104:4,5 | 106:20 | 24:20 |
| 163:3 | 99:23 | 106:12 | 111:4,12 | **stipulate** |
| 176:24 | 115:13 | 116:22 | 122:4 | 3:4 |
| 178:2 | 130:6 | 118:22 | 227:20,23 | **stipulation** |
| 180:12 | 168:4 | 120:14 | 303:13 | 4:23 |
| 181:9 | 177:15 | 135:8 | 349:20 | **stood** |
| 184:23 | 202:4 | 164:14 | 350:10 | 108:13 |
| 189:10, | 215:20 | 180:11 | 352:8 | 375:21 |
| 11,23 | 269:10 | 181:11 | 356:15 | **stop** |
| 191:16 | 344:5,7 | 182:23 | **states** | 8:11 |
| 254:2,15, | 362:2 | 186:23 | 3:20 | 107:11 |
| 23 281:7, | **started** | 215:24 | 369:2 | 130:7 |
| 11 308:9 | 7:2,18,20 | 217:5,8, | **stating** | 166:16 |
| 345:2,17 | 10:7,21 | 14 255:6, | 190:6 | |
| 372:12,20 | 115:25 | 9 256:4 | 336:10 | |
| 373:5 | | 259:11 | **station** | |
| | | 273:2,17 | 101:4 | |



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: stopped..Sullivan

167:21
279:2
329:25
348:18

stopped
14:5,21
269:6

stopping
375:12

story
82:8
104:15
106:3
130:16
137:24
260:18
261:3
285:12
287:5
290:21
320:4
332:7
355:17

straight
7:8
123:15

straight-up
321:18

straighten
244:13

stray
165:6

street
3:25 6:24
101:4
104:14
165:9
209:2
234:10,
13,17
302:15
346:7,13
360:24

367:25
368:17
369:6
377:25
378:8

street-
level
335:2

stressful
108:3

strike
154:8
299:22
302:19
358:16

striking
302:11

strong
109:4
267:18

strongly
317:5

struck
154:11
302:3

students
19:15
70:10,14
71:3,8
122:5,20
125:7,8,
18 126:12
127:9,13,
15,24
128:8,18
130:14
131:22
135:8
136:7
147:16,25
148:5
170:9
222:19

225:9,10,
20,25
226:8
227:2,5,
20 228:3
229:15
248:20
249:5,7,
10,20
303:11
314:13
324:8,13
337:12
338:3,9,
24

studying
245:6

stuff
15:2
17:3,4
83:15
144:15
246:17

sua
100:21

subject
42:14

subpoena
74:10
75:3
76:16
146:9
147:4
150:10

subpoenaed
76:8
256:12

subsequent
358:19

substance
69:5,6,19
74:22,24
99:18

171:16
282:6
286:7
287:5
324:23
331:2,13
373:3

substantial
65:23

substantive
68:24
69:8
146:14

substantive
ly
258:15

Subtly
29:3,6

successful
332:17

sue
246:9

sued
15:13

sufficient
31:19
81:12,18

suggest
28:11
183:2
220:13
340:5

suggested
67:13
121:9
240:19
317:5

suggesting
117:7
185:18
302:5

suggestion
164:11
179:16,18
181:15,
17,19,20
182:10
183:5
217:11,14
241:21

suggestions
292:9

suggestive
51:16
56:15

suggestiven
ess
51:25

suggests
151:19,24
182:7
269:3
277:8
373:19

Sullivan
21:5,6
92:6,8
192:16,19
193:17
194:6
195:18
196:8
197:18
199:18
200:16,23
201:2,7,
9,12,18
202:8,13
203:24,25
204:3,7,
10 205:3,
5 206:8
207:11,21
209:7,25
210:11



211:22
212:5,16,
18,23
213:4,8
216:7
217:23
218:7,18,
19 219:5,
17 222:7,
20 223:4
241:3,7
353:5

**Sullivan's**
199:5
202:14,20
211:21
212:17
215:23
218:21

**Sullivans**
201:8

**sum**
109:25

**summary**
183:22
191:7

**super**
294:23

**superior**
13:15

**supervising**
17:17,25
18:7,10
40:9

**supervision**
11:13

**supervisor**
293:24

**supervisors**
40:17

**supervisory**
18:13

**support**
32:25
206:8
207:23

**supporting**
224:7,14

**suppose**
51:19
60:3
72:18
100:13
103:14
318:9
374:23
375:16

**supposed**
30:10
39:14
47:17
99:7

**supposedly**
295:11

**Supreme**
12:14
295:22

**surprise**
124:15

**surprised**
50:7,14

**surrounding**
14:25

**surveil**
335:16

**surveillance**
333:16

**suspect**
52:14
53:3,4,24
54:18
57:6
116:12

133:25
134:4
375:22

**suspected**
317:16
339:14

**suspects**
54:13

**suspicion**
144:4

**suspicious**
108:9

**swear**
3:5 4:11

**swell**
127:18

**switch**
10:11
87:15
115:8

**sworn**
4:22
10:17
116:22
181:10

**system**
29:25
171:7
173:25
226:13
229:3
379:18

_____

_____

**T**

_____

**T-SHIRT**
107:25
302:17,25
303:6,8

**tab**
84:19

85:23
86:4
140:24

**tactically**
200:18

**takes**
11:10
336:10,11

**taking**
6:5,9
157:20,22

**talk**
36:12
61:17
138:4
139:18
144:11
146:17
171:20
174:25
192:16
222:13
238:22,23
248:24,25
258:5
259:14,
15,24
311:11
362:5,22,
24

**talkative**
68:19

**talked**
36:14
42:13
63:21
69:24
74:11
77:6
90:13
122:20
136:17
140:8
172:7

177:2
179:5
201:11
205:17
207:11
210:11
212:22
213:4
222:7
252:19
259:12
260:15
261:23
269:20
274:11
275:23
316:20
327:21
353:19,24
356:15
357:13
362:15,25
372:8
373:12,
14,20
377:12

**talking**
11:5
62:14
63:9
64:11
71:7
73:11,24
75:6
87:14
90:9 91:8
110:9,10
128:18
131:19
149:10
157:16
169:9
171:25
174:19
176:23
184:13



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 453 of 1202
APPENDIX 0451

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: talks..testified

205:15,19
213:9,20
239:6
240:3
248:15,17
260:5
273:23,24
274:2
276:3
284:18
309:20
325:16,18
335:23
362:23
367:10
373:25

**talks**
87:14,16

**Tamara**
90:13
91:15
121:15,21
123:16
127:12
134:15
135:4,7
136:8,18
139:7,11
140:8
141:4
143:23
144:24
149:15
150:4,23
153:13
154:7
155:22
159:25
165:5

**tampering**
336:21

**tangentiall**
**y**
378:14

**tape**
70:20
94:19
130:22
190:6
338:4
349:18

**tape-record**
317:20

**tape-**
**recorded**
186:10,11

**tape-**
**recorder**
190:15,23

**tape-**
**recording**
186:19

**taped**
186:23

**taping**
186:20

**target**
329:20

**task**
10:20,24
11:2
346:3

**tasks**
67:12

**taught**
25:12

**TEC-9**
103:24
108:12
290:8

**technician**
4:8

**technicians**
347:18
372:17

**television**
103:19

**telling**
46:21
49:20,25
50:5
57:18
69:18
73:14
112:3
119:2
122:22
128:17
129:8
142:16
151:20
152:12
163:18,
22,25
164:7
167:9
175:2
181:23
190:22
249:15
275:5
280:23
281:19
282:4,5,
11 284:9
285:18,24
286:6
287:4
299:3,7
309:12
313:5
319:18
324:22
332:13
336:10
337:11
338:3
379:13

**Tells**
294:16

**ten**
20:4,5
348:21

**tend**
28:11
291:10

**tended**
45:17

**tending**
28:10

**tenor**
96:20
99:8
357:7
364:22,25

**tentative**
59:5,9,
15,18,24
60:4,7
82:12
308:17
309:6
310:11

**term**
68:15
74:13,16,
17 76:19
125:10
130:22
257:5,6
335:6

**terms**
18:10
19:15
27:10
40:20
77:4
126:18
163:24
244:2,21
245:8,11
250:6
254:18,20
345:25

350:19
360:7

**Terranova**
46:19
82:21
186:19
196:6,7
198:8,16
199:11,17
210:13
215:8

**test**
295:12

**tested**
301:16

**testified**
4:23
16:17,18,
20 38:5
54:15
77:9,11,
22 83:19
125:7
136:25
139:24
143:3
148:19
156:19
167:12
183:9
184:4,16
199:10
206:9
209:25
213:5
214:13,
17,20,24
215:4,14
218:18,
19,22,25
219:6,8,
9,18
220:19,21
231:16
238:7



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 454 of 1202

APPENDIX 0452

CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: testify..threatened

256:25
267:9
269:5
273:20
304:20
339:17
340:13,18
353:9,11
355:15
358:2
366:23
376:18

**testify**
6:10
144:5
172:18,25
173:8
175:13
192:20
213:9
218:11
219:14,19
244:6
256:12
280:20,24
304:23
312:19
338:5
339:11
341:19
355:17
357:19,21
360:17

**testifying**
140:2
169:4
266:18
339:16,
20,23
345:21
374:17

**testimony**
3:19,24
21:23,24,
25 22:2,

4,6,11
36:10,12,
24 57:17
58:2
63:24
74:21
75:21
76:12
84:14,15,
22 85:7,
13,23
86:8,9,
10,14,16,
21,24
87:24
115:9
135:7
140:10,
15,18,19
148:15
161:15
176:8
190:13
191:11,12
214:21
222:11
230:8
239:12
242:2
268:2
269:24
281:8,12
313:15
334:4
339:24
340:5
341:4
344:20,23
360:7
374:11

**testing**
248:4
249:8,11
292:12,15
295:6,16
296:7,12,

25 300:17
301:9

**tests**
294:17
295:23

**text**
373:4

**thematic**
227:10

**theory**
231:6

**therapist**
148:21,22

**therapist's**
148:16

**thereabouts**
195:18

**thing**
6:4 22:18
121:12
124:21
127:13,15
132:3
165:11
201:24
217:16
221:6,10
228:2
242:24
261:17
264:13
287:22
301:6
365:19
368:3,18
374:9
378:20

**things**
23:9 32:3
38:4
48:16
53:24
64:8

73:10
77:10
82:25
92:25
94:21
108:6
109:6
111:17
117:13
122:2,3,
19 125:6,
8 126:11
133:23
152:23
154:23
163:7
166:6,8
170:8,18
173:6,11,
24
206:13,14
212:18
213:7
222:18
225:8,24
226:12
240:14,17
243:17
260:15
286:18,24
294:11
299:7
302:14
303:10
311:24
324:7
330:4,7
339:5,8
343:16
354:14
357:22
373:20
374:23

**thinking**
47:2,5
204:2

221:24
304:8

**Thomas**
325:23
326:4,7,
8,25

**thought**
14:12
45:16
46:15
69:23
70:10,21
82:17
91:16
119:22
127:23,24
128:13
129:4,10
131:5,23
132:25
134:15
137:19
139:16
142:25
167:10
199:12
214:12
221:11
249:7
262:23
302:20
303:3,4
340:10
362:13
372:3

**threat's**
267:13

**threaten**
28:25
281:7
336:25

**threatened**
142:18
246:9



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                           Index: threatening..told

262:20
266:16
267:2,6

**threatening**
331:22
336:17,19
337:5

**threats**
274:20
276:17
281:11
285:15

**three-year**
24:20

**throw**
144:15

**tied**
12:7

**time**
4:3 5:21
6:4 7:20
8:13
10:5,19
12:8
17:16,17,
22,23,25
18:5,6,14
19:19
25:23
33:4,17
34:23
35:13
38:24
39:18
40:9
48:15
49:9
52:11,12
57:24
60:22
61:19,23
62:24
63:3,8
65:15,24

66:8
74:3,6
78:7
80:19
81:2,7,10
88:16,22
101:14
106:24
107:17
109:13
111:2
113:20
114:2,25
115:4
120:25
121:10,15
122:17
127:11
131:19
139:17
140:8
142:3,4,
18
146:16,21
166:16,23
167:2
170:13,
17,20
172:17
175:17
181:11
186:8
209:12,16
214:16
216:25
222:21
223:18
224:20
233:18
240:8,11
242:25
250:9,24
253:6
256:14
257:7
262:8,11,
13,14

266:25
268:22
273:7,10,
14 274:9,
14,15
283:18
284:5
287:6,7
290:3
292:20
293:5,8
295:16
297:13,16
300:15
315:12
317:5
318:2,4
323:10
324:5
336:3,6
340:12
341:5,10
342:6
343:2
344:13,16
350:4
353:13
354:19
355:9
357:12
358:22
370:23
371:14
373:15
379:23

**time-wise**
96:3

**times**
25:12
33:14
42:7
64:16
75:23
105:19
108:20
238:25

313:17
314:21
315:12
320:22
358:12

**timing**
121:7
160:21
199:3

**Timothy**
335:9

**Tino**
377:13,17

**Tino's**
216:16
232:23

**title**
11:19
12:16

**today**
6:11 13:9
58:3 62:8
72:25
74:21
113:19
119:23
140:7
151:5
171:12
175:24
180:20
182:21
186:22
193:13
194:22
198:12
203:5
205:24
215:22
230:9
239:7
242:21
249:17
250:8,25

256:21
269:25
272:22
276:9
344:20
345:21
353:19
354:8

**today's**
379:22

**told**
13:19
27:11
41:19
47:22,25
48:5
53:16
58:5
66:20,21,
23,25
68:10,20
69:22,24
70:11,17
74:12
93:12
94:14,17,
21,24
99:3
112:2
118:13,24
122:15
124:23,25
125:6,8,
18 126:11
127:9,13,
14,15,24
128:23
129:23
161:4
174:25
176:22
187:5,21,
24
192:17,22
206:14
207:21



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: Tomatoes..true

213:3
219:23
220:3,6
222:18
225:8,24
227:5,10
228:2,3
229:3,15
236:22
238:25
239:7,19
241:6,7
244:11
247:2
249:10
251:19
265:21
271:7
275:11
284:2
294:11
295:21
303:10,18
309:21
311:15
315:3
317:17
320:19
321:2
324:4,7
328:3
330:4,6
336:16
341:13
364:23
367:21

**Tomatoes**
326:21

**top**
145:4

**topic**
15:7
19:18

**topics**
25:6

**Torri**
260:19
311:15,22
314:14

**Torriano**
120:16
225:18
310:19,24
321:3
350:21
360:23
363:25

**total**
19:19
100:7
109:25
343:13

**totally**
284:20
287:13

**touch**
358:15
359:5

**touched**
351:6

**town**
7:24
220:7,9,
11 246:6

**traced**
123:6,22,
23

**track**
335:16

**Tracker**
121:16
144:9
151:12
160:2,5
165:6

**trained**
27:25

28:3

**trainer**
24:20

**training**
11:24
15:2
24:21
25:17

**trainings**
17:3

**transaction**
360:20

**transaction
al**
360:12,
15,17

**transcript**
3:12
19:12
142:24
225:6
228:14
243:19
341:24
353:7

**transcripts**
122:4

**transferred**
7:22,23
8:2 11:17

**transparent**
368:21

**transpired**
55:4
176:2
177:5
194:5
197:23
345:24

**traumatic**
312:9

**travelled**
25:4
251:25

**Travis**
92:5
311:13
353:6

**trial**
8:3,14
9:19,22,
24 12:12,
18 16:19
21:25
22:4,5
54:15
83:19
84:15,22
85:13
86:10,21
114:2,10,
11,13,14,
17 125:8
139:23
140:3,5,
19 143:3
144:5
156:20
167:12,
16,21
169:10,
14,19,22
170:14
175:19,24
176:10,18
178:11,22
183:10,15
190:24
193:17
195:15
197:16
203:13
206:9,15
213:5,9
215:14
218:20
219:8

220:20
225:6
230:25
240:21
263:21
266:19
268:16,
19,22
292:24
295:10
296:16
303:20
304:24
322:14
324:9,11
337:24
339:12,
17,21
341:7
342:8

**trial's**
199:5

**trials**
169:13

**triple**
318:22

**trod**
50:4

**trouble**
49:25
117:20
237:18

**true**
13:24
30:23
31:5,10,
15 46:8
52:17
55:6
60:16
97:8
98:4,9,11
99:16
101:20



103:3
106:10
110:25
111:20
116:24
125:16
126:25
155:5
172:20
186:5
191:24,25
205:13
211:12
226:16,21
231:4,9
249:3,14
276:13
284:22
296:17,
21,23
304:5,12
320:6,10
336:18
337:24
364:15
366:18
369:18,20
370:9
371:2
374:5
378:24
379:3

**trust**
369:16,24
370:6

**truth**
30:18
112:3
119:2
128:19,21
129:8,19
130:15
134:14
142:16
154:19
249:16

299:3,7
313:6
364:11
378:23

**truth-
seeking**
367:3

**truthful**
102:13
298:18

**Truthfully**
130:17

**turn**
153:6
345:7
348:25
349:9
376:22

**turned**
45:10
46:16

**turning**
48:6

**TV**
69:25
95:3
101:3
106:18
128:9
131:23
148:5
229:10,13
236:9,10,
14 237:25
259:10

**two-minute**
240:5
335:25
343:25

**two-page**
206:5

**two-thirds**

18:5

**two-way**
375:21,25

**type**
195:19
212:14
244:8
285:15

**typical**
65:25

**typically**
40:23
312:14

———————

———————

U

———————

**U-B-I-L-E-S**
321:22

**Ubiles**
321:15,
17,25
323:25

**ulterior**
32:14
364:12

**ultimately**
287:7

**unauthorize
d**
244:25

**uncalled**
204:16

**uncertainty**
59:16
60:7
185:6,19

**uncompromis
ed**
364:9

**uncredible**

125:20

**undated**
305:21
306:19,23

**undercurren
t**
96:19
97:6
99:10
100:7

**undercurren
ts**
96:24

**understand**
5:17,21
26:9
27:21
35:24
54:16
58:10
83:2
99:12
135:4
136:15
183:8
219:5
222:2
224:11
237:14
269:18
329:8
359:21

**understandi
ng**
13:8
14:19
25:22,23
26:3
39:20
49:18
77:24
83:3
87:24
99:13

137:18
158:3
162:24
163:2
174:2,6
179:12,16
216:18,22
217:22
218:2
230:22
244:24
254:9
296:6
365:10
371:9

**understood**
5:24
28:6,18
29:11,23
30:17
31:17
38:6,23,
24 39:9
42:5
47:16,25
50:17
51:8,22
52:10,24
56:13
57:3,19
59:4
80:19
82:11
97:25
133:9
135:3
136:8,17
137:14
179:7,20
205:3
292:11
296:24
297:20
298:4
308:14
333:21



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

April 11, 2023
Index: undoubtedly..video

339:8
340:4
372:11

**undoubtedly**
179:3
203:6
212:24

**unduly**
51:16

**unethical**
32:8

**unfolded**
230:14

**unidentifie
d**
190:9

**unit**
8:10,14
335:9,11
372:9

**United**
3:20

**University**
7:3,4,6,7
19:15
25:3

**unknown**
143:11

**unlawfully**
224:22

**unlike**
64:7

**unloading**
288:20

**unrelated**
31:25
332:21

**unrepresent
ed**
358:8

**untrue**
315:23

**unusual**
64:20
65:6,8,
13,21
234:22
300:7
302:19,20
358:21
359:2,10

**unusualness**
100:7

**unwilling**
222:6,12

**upheld**
322:6

**upset**
13:12

**urging**
272:11

**utilized**
333:15

**Uzi**
103:24

———————

**V**

———————

**vague**
266:3

**Valentino**
3:22 4:13
22:10,19
34:3,18,
25 35:7
68:21
69:9
78:10
79:17
81:13,19
82:3
95:23

96:17
97:14,16
104:15,16
107:5,20
108:5,6
109:8
111:9
114:4
118:18
134:18
136:10,19
137:24
138:5,17
139:19
143:25
148:2
149:8
152:2
153:23
155:5
158:17
165:3,13
166:2
169:18
177:21
179:2,9,
22 181:13
184:17,25
185:7,22
186:3,8
187:13
188:2,14
189:13
190:8
191:19
216:8,19,
25
217:17,24
228:3
229:17
230:11,
14,19
231:7
232:9,14
233:2
236:17
246:24

247:12
249:8
250:14,16
259:18
269:16,22
272:11
280:25
281:21
282:6
286:2,7
303:19
306:12
308:16
309:5,22
310:4
318:20
319:4
333:22
334:5,15
337:14
339:12
346:24
347:12
352:12
355:19
356:7,8,
18,21,25
364:5,18,
20,22
365:18
366:3,13,
23
367:10,
12,15,18
368:24
369:2,4,
15 376:21
377:18
379:12

**Valentino's**
315:22
320:24
368:23
379:7

**validity**
324:17

**variables**
290:14

**varied**
61:9

**variety**
51:11
133:11
175:12
292:17

**vary**
61:7

**vehicular**
11:12

**verbally**
346:5

**version**
118:2
253:25
268:14
269:12
271:19
291:11
332:18
365:5,7
377:3

**versus**
3:22
15:10
316:2,7

**Vickerd**
22:22

**Vickerd's**
22:9

**victim**
288:20
291:9

**victims**
164:25

**video**
4:4,8,14
23:3,4,5,



17 71:22
94:25
95:19
97:20
99:6
100:2
104:10
105:2
166:23
240:8
297:13,16
350:9
379:23

**video-recorded**
3:19

**videotape**
68:23

**view**
13:21
46:10,14,
22 111:25
116:12
132:23
209:7
271:7
362:21

**viewed**
99:6
302:24

**viewing**
100:2,4
309:5

**Vincent**
295:22

**violation**
207:6

**violence**
335:2,3
342:13

**violent**
8:6,7
9:11,14

**vis-a-vis**
81:20

**visit**
62:15
316:21,22

**voice**
107:12

**voluntarily**
230:24
298:6,11
362:22
364:23

**volunteered**
291:17,22
334:20
365:11

**volunteering**
216:25
217:17

**vote**
353:14
355:4

**votes**
351:23

—————————

**W**

**Wade**
51:5 52:6
54:22
55:11
56:17

**wait**
93:4
125:25
218:24
320:14
324:2
361:6

**waited**
160:18

**waiver**
357:21
360:10
361:8,18

**walk**
88:15

**walking**
234:23

**walks**
101:3

**Walter**
251:15
253:10,12

**Wanda**
68:23
69:25
94:19
99:7

**wanted**
13:17
49:21
50:5
66:23
92:22
93:7
99:14
128:2,8
138:3,4
147:22
154:15
244:5
247:5
252:10,16
285:19,25
345:10
346:7,13
351:7
354:19
355:18
363:2,3
364:4,7,
11

**warned**
267:14,

18,25
363:7

**warrant**
15:15

**wash**
300:19

**washed**
107:25

**waste**
122:16

**watch**
23:7

**watched**
23:4
350:8

**watching**
204:21

**ways**
51:9,10,
13 106:3
290:20
298:17

**weapon**
73:9
223:24
224:15
288:21
290:17

**weapons**
224:8,20
289:23
311:16

**wearing**
107:9,21
292:5
299:9
300:2,9,
20
301:10,15
302:11
303:6

**week**
23:22
79:5

**weeks**
115:24
195:25
295:17,23

**well-being**
285:16

**well-known**
333:23

**well-meaning**
312:3

**West**
165:8

**Western**
3:21

**whatsoever**
192:13
217:11
250:4
305:23
324:19
334:10

**when's**
74:3,6

**white**
11:12
107:25
165:6
235:16
302:17
303:8

**white-collar**
235:14

**wholly**
287:2

**wife**
16:9



186:9
210:12
234:13

**wife's**
235:3

**Williamsville**
6:19,21,
23

**willingness**
304:23

**wind**
93:6

**withdraw**
102:3
152:9
366:10

**withdrawal**
235:2

**withdrawn**
64:19
67:21
74:23
101:8
102:21
109:2,24
110:23
121:13
127:12
133:8
135:3,5
143:16
161:15
162:25
169:4
171:4
180:16
181:24
193:15
195:10
196:19
212:16
237:23
258:13

263:6
265:13
270:4
282:4
296:12
317:19
379:11

**witnesses**
36:4
48:21
58:19
90:7,14,
16 91:6
105:20,22
110:5
118:25
119:14
133:11,14
239:20
251:12
252:12
263:5
266:16
268:3
304:17
305:11,16
310:22
311:4,9,
10 312:3,
9,15,25
313:5
331:22
332:7,17
336:17,21
337:6
351:20
353:5
355:14
356:16

**woken**
344:21

**woman**
124:6
144:8
151:19

**women**
123:25

**Woodbury**
4:20

**woodwork**
81:21
131:18

**word**
45:23
46:3
92:20
155:3
210:21
213:24
219:24
221:7
222:8
247:5
267:14

**words**
96:5
118:17
132:25
136:6
152:20
159:22
162:2
173:17
179:20
181:15
207:4,20
209:19
270:21
286:6
309:3
314:25
322:9
330:18,21
331:13
339:22
366:10

**work**
7:10
14:6,14,

24  15:3
16:24
96:23,24
203:9
231:25
232:4
243:5,16

**worked**
7:24
11:25
54:7
296:19

**worker**
124:15

**working**
14:5,21
15:20
50:24

**works**
15:22

**worth**
252:25

**worthless**
304:17

**write**
93:4
117:7,18
120:16
146:25
164:25
206:16
207:22
372:17

**writing**
38:10,20
163:16,18
184:23
187:24
196:12,
15,17,22,
25 198:23
199:2
206:7

207:12
209:5
210:12,17
211:5,15
244:18
346:5

**written**
115:18
116:3
145:17,19
208:11,20
252:19

**wrong**
49:19
66:18
86:18
116:13
201:25
202:7
243:20,24
249:5
284:25
285:6
292:25
308:3
312:21
315:18
338:20
367:6
373:18

**wrongful**
15:14

**wrote**
34:15
92:24
116:10
145:23
208:15
320:19
354:9

———————

**Y**

———————

**year**



CHRISTOPHER J. BELLING
DIXON V. CITY OF BUFFALO

```
  7:17
 10:15
 12:10
 13:16,20
 23:22
 218:25
years
 11:25
 25:7
 57:13
 113:19,20
 125:13
 126:14,
 18,23
 127:6,17
 133:9
 147:17
 148:6
 228:23
 233:24
 246:8
yesterday
 23:21
 43:19
York
 3:21 4:2,
 21 6:23
 7:4 11:24
 15:6,22
 29:14,22
 30:19
 203:10
 213:9
 351:14
 360:16
young
 123:25
 124:5
 264:12
yup
 360:22
```

----

**Z**

----

**Z-A-V-A-H**
 334:18

**Zavah**
 334:18



**APPENDIX 0460**

In the Matter Of:

DIXON V. CITY OF BUFFALO

1:19-cv-01678-WMS

---

**AARON JACKSON**

*January 12, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

2                          AARON JACKSON

3

4

5    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF NEW YORK
6

7    ----------------------------------------
     VALENTINO DIXON,
8
                              Plaintiff,
9
                     - vs -        Case No.
10                                1:19-cv-01678-WMS

11   CITY OF BUFFALO and COUNTY OF ERIE;
     and DETECTIVE MARK R. STAMBACH,
12   DETECTIVE RANIERO MASECCHIA, DETECTIVE
     JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
13   CHIEF RICHARD T. DONOVAN, JOHN DOES,
     Unknown Buffalo Police Department Supervisors,
14   and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
     BELLING, in their individual capacities,
15
                              Defendants.
16   ----------------------------------------

17

18           Examination before trial of AARON

19   JACKSON, taken pursuant to Subpoena, in the law

20   offices of HODGSON RUSS LLP, The Guaranty Building,

21   140 Pearl Street, Suite 100, Buffalo, New York, on

22   January 12, 2023, commencing at 10:12 a.m., before

23   JOAN M. METZGER-HUBBELL, CM, Realtime Reporter,

24   Notary Public.

25



```
 1

 2   APPEARANCES:     NEUFELD SCHECK & BRUSTIN, LLP,
                      By NICK J. BRUSTIN, ESQ.,
 3                    nick@nsbcivilrights.com,
                      GERARDO ROMO, ESQ.,
 4                    gerardo@nsbcivilrights.com
                      KATIE McCARTHY, ESQ.,
 5                    katie@nsbcivilrights.com, and
                      SONA R. SHAH, ESQ.,
 6                    sona@nsbcivilrights.com,
                      99 Hudson Street,
 7                    8th Floor,
                      New York, New York  10013,
 8                    (212) 965-9081,
                      Appearing for the Plaintiff,
 9                    via Zoom.

10                    HODGSON RUSS LLP,
                      By PETER A. SAHASRABUDHE, ESQ.,
11                    psahasra@hodgsonruss.com and
                      HUGH M. RUSS III, ESQ.,
12                    hruss@hodgsonruss.com,
                      The Guaranty Building,
13                    140 Pearl Street, Suite 100,
                      Buffalo, New York  14202,
14                    (716) 856-4000,
                      Appearing for the Defendants,
15                    City of Buffalo; Detective
                      Mark R. Stambach, Detective
16                    Raniero Masecchia, Detective
                      James P. Lonergan, Detective
17                    John Vickerd, Chief Richard T.
                      Donovan, and John Does, Unknown
18                    Buffalo Police Department
                      Supervisors.
19
                      LIPPES MATHIAS WEXLER FRIEDMAN LLP,
20                    By JAMES P. BLENK, ESQ.,
                      50 Fountain Plaza, Suite 1700,
21                    Buffalo, New York  14202,
                      (716) 853-5100,
22                    jblenk@lippes.com,
                      Appearing for the Defendants,
23                    County of Erie and
                      Assistant District Attorney
24                    Christopher Belling.

25   PRESENT          MOISES SOTO-BRITO
     VIA ZOOM:
```



AARON JACKSON                                              January 12, 2023
DIXON V. CITY OF BUFFALO                                                  3

| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | THE REPORTER:  So before we begin, can | 10:12:27 |
| 3 | counsel please state their orders on the record for | 10:12:29 |
| 4 | the transcript. | 10:12:34 |
| 5 | MR. RUSS:  Yes.  I'm Hugh Russ.  I represent | 10:12:35 |
| 6 | the city defendants, and we will -- we definitely | 10:12:38 |
| 7 | want a transcript.  We will pay. | 10:12:43 |
| 8 | MR. BLENK:  James P. Blenk of the county -- | 10:12:46 |
| 9 | representing the county defendants.  Same. | 10:12:49 |
| 10 | MR. BRUSTIN:  Plaintiff as well. | 10:12:54 |
| 11 | AARON JACKSON, 19 Thatcher Avenue, Buffalo, | 10:12:54 |
| 12 | New York, after being duly called and sworn, | 10:12:54 |
| 13 | testified as follows: | 10:13:23 |
| 14 | EXAMINATION | 10:13:23 |
| 15 | BY MR. BRUSTIN: | 10:13:23 |
| 16 | Q.   Good morning, Mr. Jackson. | 10:13:27 |
| 17 | A.   Good morning. | 10:13:28 |
| 18 | Q.   Mr. Jackson, you and I have spoken on | 10:13:29 |
| 19 | the phone a few times but have never met in person; | 10:13:32 |
| 20 | is that right? | 10:13:35 |
| 21 | A.   Yes. | 10:13:36 |
| 22 | Q.   And the only thing we've spoken about | 10:13:36 |
| 23 | on the phone is discussing you being present in the | 10:13:38 |
| 24 | deposition.  Would that be fair to say? | 10:13:41 |
| 25 | A.   Yes. | 10:13:44 |



```
 1                        Aaron Jackson

 2          Q.   You are here today under subpoena.  You      10:13:45

 3   understand that?                                         10:13:48

 4          A.   Yes.                                         10:13:49

 5          Q.   Are you being represented by counsel         10:13:50

 6   here today?                                              10:13:52

 7          A.   No.                                          10:13:53

 8          Q.   Have you met with Mr. Russ in                10:13:54

 9   preparation for today?                                   10:13:58

10          A.   No.                                          10:13:59

11          Q.   Have you ever had your deposition taken      10:14:02

12   before?                                                  10:14:04

13          MR. RUSS:  He did come in at about 9:15, and      10:14:04

14   we have talked.                                          10:14:07

15          BY MR. BRUSTIN:                                   10:14:10

16          Q.   Okay.  I'm sorry, I wasn't -- I              10:14:11

17   probably wasn't being clear.  I wasn't talking           10:14:13

18   about a formal meeting.  I should have been more         10:14:15

19   clear.                                                   10:14:18

20          Have you had any discussions at all with          10:14:18

21   Mr. Russ about this case?                                10:14:20

22          A.   Yes.                                         10:14:22

23          Q.   Okay.  Tell me about those discussions,      10:14:22

24   what you said to him and what he said to you.            10:14:24

25          A.   Just general about me coming in,             10:14:26
```



```
 1                    Aaron Jackson
 2  thanking me for coming in today for today's        10:14:30
 3  deposition.                                         10:14:33
 4       Q.   Okay.  And how do you know Mr. Russ?     10:14:34
 5       A.   He's the lawyer for the City of          10:14:35
 6  Buffalo, correct?                                   10:14:38
 7       Q.   That is true.  But do you have any        10:14:40
 8  other relationship --                               10:14:41
 9       A.   No.                                       10:14:42
10       Q.   -- with Mr. Russ through work?           10:14:42
11       A.   No.                                       10:14:44
12       Q.   Okay.  And other than just talking        10:14:45
13  about coming in today and Mr. Russ expressing       10:14:48
14  gratitude that you did come in, did you talk at all 10:14:51
15  about the case at all, about what you remembered or 10:14:53
16  anything specific like that?                        10:14:56
17       A.   No.                                       10:14:58
18       Q.   Okay.  Have you ever had -- I should      10:14:58
19  have asked this first.  Have you ever had your      10:15:00
20  deposition taken before?                            10:15:03
21       A.   Say it again?                             10:15:04
22       Q.   Have you ever had -- first of all, are   10:15:05
23  you able to hear me okay?                           10:15:07
24       A.   Yes, I can.                               10:15:08
25       Q.   Sometimes I talk a little quickly.  The  10:15:09
```



1              Aaron Jackson

2  first rule of the deposition is, if you don't                 10:15:11

3  understand my question for any reason, please let             10:15:13

4  me know and I'll rephrase it for you, okay?                   10:15:15

5        A.   Yes.                                               10:15:17

6        Q.   If you do answer it, I'm going to                  10:15:18

7  assume you understood my question.  Is that fair?             10:15:20

8        A.   Yes.                                               10:15:22

9        Q.   If at any time you want to take a                  10:15:22

10  break, that's fine.  Please just let me know.  The           10:15:24

11  only thing I would ask is that you try to answer             10:15:27

12  the question pending before you take a break, okay?          10:15:30

13        A.   Yes.                                              10:15:32

14        Q.   But the question was:  Have you ever              10:15:33

15  taken a deposition.  Meaning, have you ever sat in           10:15:37

16  a room like this with a bunch of lawyers and been            10:15:39

17  asked questions under oath?                                  10:15:42

18        A.   No.                                               10:15:43

19        Q.   Have you ever testified other than in            10:15:44

20  the proceedings related to the shooting of you and          10:15:48

21  your brother?                                                10:15:52

22        A.   No.                                               10:15:53

23        Q.   All right.  Now, do you recall,                   10:15:56

24  Mr. Jackson, that on a number of occasions some             10:16:01

25  investigators that we hired, one named Tony and             10:16:03



```
 1                    Aaron Jackson
 2    another named Maria, served you with some paperwork    10:16:07
 3    in relation to this case.  Do you recall that?         10:16:12
 4         A.   Yes.                                          10:16:15
 5         Q.   Okay.  And I understand you weren't           10:16:15
 6    happy about participating, and you have made that      10:16:17
 7    clear, and we all understand why, but on one           10:16:20
 8    occasion most recently, on March 24th, do you          10:16:24
 9    recall being served at -- in Buffalo at your           10:16:28
10    cousin's house?  You were called to your cousin's      10:16:34
11    house to receive a subpoena?                           10:16:41
12         A.   No.                                          10:16:45
13         Q.   On -- at 20 Andover Street, do you know      10:16:45
14    who lives there?                                        10:16:47
15         A.   Yes.                                          10:16:48
16         Q.   Is that your cousin's house?                 10:16:48
17         A.   No.                                          10:16:50
18         Q.   I must be getting the relation wrong.        10:16:51
19    Who lives there?                                        10:16:53
20         A.   The people who live there.                   10:16:54
21         Q.   Okay.  Well, do you remember going to        10:16:55
22    20 Andover Street?                                      10:16:57
23         A.   Yes.                                          10:16:59
24         Q.   Okay.  To receive a subpoena from the        10:17:00
25    investigators that we hired to serve you?              10:17:02
```



| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | A.   Yes. | 10:17:05 |
| 3 | Q.   All right.  And you -- and you drove | 10:17:06 |
| 4 | up, and you were in your truck, correct? | 10:17:08 |
| 5 | A.   Yes. | 10:17:11 |
| 6 | Q.   And, in fact, what happened was, they | 10:17:12 |
| 7 | went to the house.  You weren't there.  The person | 10:17:15 |
| 8 | in the house agreed to call you, and then you | 10:17:19 |
| 9 | kindly drove to the house to receive the subpoena. | 10:17:21 |
| 10 | Am I describing it accurately? | 10:17:25 |
| 11 | A.   Yes. | 10:17:26 |
| 12 | Q.   And then what happened is you took the | 10:17:27 |
| 13 | subpoena, and you had a short discussion with the | 10:17:31 |
| 14 | investigators.  Do you recall that? | 10:17:33 |
| 15 | A.   Yes. | 10:17:36 |
| 16 | Q.   And obviously all of these events are | 10:17:37 |
| 17 | traumatic for you, correct? | 10:17:42 |
| 18 | A.   Yes. | 10:17:44 |
| 19 | Q.   And do you recall in that discussion, | 10:17:44 |
| 20 | one of the things that these investigators told you | 10:17:50 |
| 21 | was that Lamarr Scott had pled guilty to shooting | 10:17:54 |
| 22 | you and your brother as being the only shooter, and | 10:17:59 |
| 23 | in response to that -- | 10:18:04 |
| 24 | MR. RUSS:  Objection to form. | 10:18:05 |
| 25 | BY MR. BRUSTIN: | 10:18:05 |



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | Q.   -- my understanding is that what you | 10:18:06 |
| 3 | said is that it did not matter to you if Valentino | 10:18:09 |
| 4 | Dixon pulled the trigger.  You blamed him for the | 10:18:13 |
| 5 | shooting death of your brother and for shooting you | 10:18:17 |
| 6 | because he was the person who brought the gun that | 10:18:19 |
| 7 | night.  Do you recall saying that to them? | 10:18:22 |
| 8 | A.   I don't recall. | 10:18:25 |
| 9 | MR. RUSS:  Objection to form.  You may | 10:18:25 |
| 10 | answer. | 10:18:27 |
| 11 | THE WITNESS:  I don't recall. | 10:18:27 |
| 12 | BY MR. BRUSTIN: | 10:18:29 |
| 13 | Q.   You don't recall saying anything like | 10:18:29 |
| 14 | that to them? | 10:18:31 |
| 15 | A.   No. | 10:18:32 |
| 16 | Q.   Are you suggesting that my investigator | 10:18:33 |
| 17 | is lying when he told me that that's what you said? | 10:18:35 |
| 18 | A.   Yes. | 10:18:39 |
| 19 | Q.   Okay.  So if in court, if asked, what | 10:18:40 |
| 20 | you will say is that when my investigator wrote | 10:18:45 |
| 21 | that down in quotes from you, he just made it up; | 10:18:46 |
| 22 | is that right, sir? | 10:18:52 |
| 23 | A.   Yes. | 10:18:53 |
| 24 | Q.   Did you say anything even like that to | 10:18:54 |
| 25 | my investigator? | 10:18:57 |



```
 1                        Aaron Jackson
 2         A.   We did have a conversation.              10:18:58
 3         Q.   Well, I'm -- I'm focusing on the words   10:19:00
 4    relating to Lamarr Scott being the shooter and you  10:19:04
 5    blaming Valentino Dixon nonetheless.  Did you have  10:19:08
 6    any conversation whatsoever about that?            10:19:12
 7         A.   We may have.                             10:19:14
 8         Q.   Okay.  Did you say anything to that      10:19:16
 9    effect?  In other words, even like that --         10:19:18
10         A.   No.                                      10:19:21
11         Q.   -- in substance, that you didn't care   10:19:21
12    whether or not Valentino Dixon pulled the trigger,  10:19:24
13    you blamed him nonetheless?                        10:19:27
14         A.   No, because I do care.                   10:19:28
15         Q.   Okay.  So you deny saying that to them?  10:19:31
16         A.   Yes.                                     10:19:37
17         Q.   Correct?                                 10:19:38
18         A.   Yes.                                     10:19:38
19         Q.   And if anyone -- if they suggest that   10:19:39
20    you said anything like that, they would be liars,  10:19:42
21    correct?                                           10:19:43
22         A.   Yes.                                     10:19:44
23         MR. RUSS:  Objection to form.                 10:19:44
24         BY MR. BRUSTIN:                               10:19:45
25         Q.   Both of the investigators who claim you  10:19:45
```



```
 1                  Aaron Jackson

 2  said that would both be liars, correct?          10:19:48

 3       A.   Yes.                                    10:19:50

 4       MR. RUSS:  Objection to form.                10:19:50

 5       BY MR. BRUSTIN:                              10:19:51

 6       Q.   And, by the way, this conversation      10:19:55

 7  didn't happen 20 years ago.  It happened less than  10:19:57

 8  six months ago, right?                           10:20:00

 9       A.   Yes.                                    10:20:02

10       MR. RUSS:  You said March.  That's ten       10:20:03

11  months ago, if it's March '22.                   10:20:05

12       MR. BRUSTIN:  You're better at math than I   10:20:12

13  am.  That's fair.                                10:20:13

14       BY MR. BRUSTIN:                              10:20:14

15       Q.   Mr. Jackson, tell me the best you can   10:20:15

16  recall what you said to them and what they said to  10:20:17

17  you.                                             10:20:18

18       A.   I don't recall.                         10:20:18

19       Q.   You don't recall anything that you said  10:20:20

20  to them or they said to you?                     10:20:22

21       A.   There was a little bit of              10:20:24

22  back-and-forth, but I don't recall exactly the   10:20:26

23  extent of that conversation.                     10:20:27

24       Q.   Okay.  The only thing you recall for   10:20:29

25  sure is you didn't say anything like --          10:20:31
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      12

```
 1                    Aaron Jackson
 2       A.   I don't care.                          10:20:34
 3       Q.   -- you blame Valentino Dixon whether he  10:20:35
 4  was -- whether he was the shooter or not.       10:20:44
 5       (Reporter interruption.)                    10:20:44
 6  BY MR. BRUSTIN:                                  10:20:44
 7       Q.   So hold on.  I'm going to say it again.  10:20:44
 8  So what you're telling us is, the one thing -- you  10:20:48
 9  don't remember any of the words you spoke to them.  10:20:51
10  The one thing you remember for certain is you      10:20:54
11  didn't say anything like what I just described to   10:20:57
12  you, that you -- you blamed Valentino Dixon        10:20:59
13  regardless of whether or not he pulled the trigger.  10:21:03
14  You never said anything like that --               10:21:05
15       A.   No.                                      10:21:07
16       Q.   -- to them?                              10:21:07
17       MR. SAHASRABUDHE:  Objection.  Asked and      10:21:09
18  answered.                                          10:21:10
19  BY MR. BRUSTIN:                                    10:21:10
20       Q.   That you're certain of?                 10:21:11
21       MR. SAHASRABUDHE:  Objection.  Same thing.   10:21:12
22  BY MR. BRUSTIN:                                    10:21:16
23       Q.   You can -- unless somebody tells you    10:21:16
24  not to answer, you can always answer, sir.        10:21:18
25       A.   I've already answered it.               10:21:21
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      13

```
 1                    Aaron Jackson
 2        Q.   You can answer it again.              10:21:23
 3        A.   No.                                   10:21:24
 4        MR. SAHASRABUDHE:  Same objection.         10:21:25
 5        MR. BRUSTIN:  Who was that?                10:21:28
 6        MR. SAHASRABUDHE:  Hugh stepped out.  He's 10:21:29
 7   going to be gone for the next half hour, so I'm 10:21:31
 8   objecting on behalf of the city.                10:21:35
 9        MR. BRUSTIN:  That's fine.  I just want to 10:21:37
10   make sure it's not two.                         10:21:39
11        BY MR. BRUSTIN:                            10:21:41
12        Q.   Now, you do understand today that     10:21:42
13   Valentino Dixon was exonerated for shooting you and 10:21:44
14   your brother?                                   10:21:48
15        MR. SAHASRABUDHE:  Objection to form.  You 10:21:50
16   may answer.                                     10:21:51
17        THE WITNESS:  Yes.                         10:21:51
18        BY MR. BRUSTIN:                            10:21:53
19        Q.   By a court.                           10:21:54
20        A.   Yes.                                  10:21:57
21        Q.   Based on the recommendation of the    10:21:57
22   District Attorney's office that prosecuted him. 10:22:00
23        A.   Yes.                                  10:22:04
24        Q.   And you also understand that Lamarr   10:22:04
25   Scott has pled guilty to shooting you and your  10:22:07
```



```
 1                     Aaron Jackson
 2   brother?                                         10:22:11
 3        A.   Yes.                                   10:22:11
 4        Q.   Would it be fair to say that as you sit   10:22:27
 5   here today you don't know one way or another    10:22:31
 6   whether or not it was Lamarr Scott -- withdrawn.  10:22:33
 7        Do you accept today that Lamarr Scott was   10:22:38
 8   the person who shot you and your brother?        10:22:41
 9        MR. SAHASRABUDHE:  Objection to form.       10:22:43
10        THE WITNESS:  No.                           10:22:44
11        BY MR. BRUSTIN:                             10:22:45
12        Q.   I didn't hear you because of the       10:22:46
13   objection.                                       10:22:47
14        A.   No.                                    10:22:48
15        Q.   Okay.  So your position today is that  10:22:48
16   you are as certain as you were at the time of this  10:22:51
17   investigation and shooting that Valentino Dixon  10:22:53
18   shot you and your brother as you were then?      10:22:56
19        A.   Yes.                                   10:23:00
20        Q.   And it's your testimony you've always  10:23:03
21   been certain, correct?                           10:23:06
22        A.   Yes.                                   10:23:07
23        Q.   You've known from the moment of the    10:23:12
24   shooting that Valentino Dixon was the shooter,   10:23:15
25   correct?                                         10:23:17
```



```
 1                    Aaron Jackson

 2          A.   No.                                    10:23:19

 3          Q.   All right.  Let's talk about your     10:23:22

 4   interactions with the police.  Now, have you      10:23:24

 5   reviewed -- first of all, have you reviewed any   10:23:28

 6   testimony in preparation for today?               10:23:30

 7          A.   No.                                    10:23:32

 8          Q.   Have you reviewed any documents in    10:23:34

 9   preparation for today?                             10:23:36

10          A.   No.                                    10:23:37

11          Q.   You do recall, sir, that you testified 10:23:38

12   in three different proceedings.  You testified at 10:23:43

13   Mr. Dixon's criminal trial.  You testified in the 10:23:46

14   Grand Jury.  And you also testified in the perjury 10:23:49

15   trial, correct?                                    10:23:56

16          A.   Yes.                                   10:23:58

17          Q.   Before I get to that, since Mr. Dixon 10:24:01

18   has been released from prison, have you had any   10:24:07

19   contact with him?                                  10:24:09

20          A.   No.                                    10:24:10

21          Q.   Have you ever seen him?               10:24:11

22          A.   Yes.                                   10:24:13

23          Q.   When did you see him?                 10:24:14

24          A.   About a year or so ago.               10:24:15

25          Q.   What happened when you saw him?       10:24:18
```



AARON JACKSON                                        January 12, 2023
DIXON V. CITY OF BUFFALO                                           16

| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | A.   Nothing. | 10:24:20 |
| 3 | Q.   Did you speak to him? | 10:24:29 |
| 4 | A.   Not at all. | 10:24:30 |
| 5 | Q.   Did he speak to you? | 10:24:32 |
| 6 | A.   Not at all. | 10:24:33 |
| 7 | Q.   Did either of you approach one another? | 10:24:35 |
| 8 | A.   No. | 10:24:37 |
| 9 | Q.   Did you make any type of contact | 10:24:38 |
| 10 | whatsoever with one another? | 10:24:40 |
| 11 | A.   Eye contact. | 10:24:42 |
| 12 | MR. BRUSTIN:  All right.  Peter, do you have | 10:24:55 |
| 13 | in front of the witness in case I need it the | 10:24:55 |
| 14 | various trial testimonies, those three testimonies? | 10:25:00 |
| 15 | MR. SAHASRABUDHE:  Yeah, we have a binder. | 10:25:02 |
| 16 | MR. BRUSTIN:  Perfect.  And do you also have | 10:25:04 |
| 17 | the police file? | 10:25:06 |
| 18 | MR. SAHASRABUDHE:  Yes, we do. | 10:25:07 |
| 19 | MR. BRUSTIN:  Those are the two things I'll | 10:25:12 |
| 20 | be using.  If you want to just take a second and | 10:25:14 |
| 21 | grab that, that would be great. | 10:25:17 |
| 22 | MR. SAHASRABUDHE:  Yeah, we have both of | 10:25:18 |
| 23 | them so -- | 10:25:20 |
| 24 | MR. BRUSTIN:  Great. | 10:25:21 |
| 25 | BY MR. BRUSTIN: | 10:25:21 |



| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | Q.   So I'm going to ask you, Mr. Jackson, | 10:25:22 |
| 3 | some questions about things you've testified | 10:25:25 |
| 4 | before.  I'll only go to the testimony itself if | 10:25:27 |
| 5 | you want me to.  Hopefully we won't need to do | 10:25:30 |
| 6 | that.  I assume you want to get this done as | 10:25:33 |
| 7 | quickly as possible.  You just let me know. | 10:25:35 |
| 8 | So, first of all, do you recall that one of | 10:25:37 |
| 9 | the things you testified -- withdrawn. | 10:25:39 |
| 10 | You understand -- you recall today the | 10:25:40 |
| 11 | difference between the various proceedings you | 10:25:43 |
| 12 | testified in.  You recall that first there was a | 10:25:46 |
| 13 | Grand Jury of Valentino Dixon to determine whether | 10:25:50 |
| 14 | he would stand trial.  Do you recall that? | 10:25:52 |
| 15 | A.   Yes. | 10:25:54 |
| 16 | Q.   And then after that you testified, I | 10:25:55 |
| 17 | believe it was after that, you testified in the | 10:25:59 |
| 18 | criminal trial, or was the perjury trial first?  Do | 10:26:01 |
| 19 | you recall? | 10:26:05 |
| 20 | A.   No. | 10:26:05 |
| 21 | Q.   Okay.  But both of those were after the | 10:26:05 |
| 22 | Grand Jury? | 10:26:08 |
| 23 | A.   Yes. | 10:26:09 |
| 24 | Q.   Okay.  Now, one of the things you | 10:26:10 |
| 25 | testified to in the Grand Jury -- withdrawn. | 10:26:28 |



AARON JACKSON                                        January 12, 2023
DIXON V. CITY OF BUFFALO                                           18

```
 1                     Aaron Jackson
 2        Did you -- did you tell the truth each time        10:26:30
 3   you testified under oath in the criminal               10:26:34
 4   proceedings, the three criminal proceedings?           10:26:37
 5        A.   Yes.                                          10:26:39
 6        Q.   Did you say anything that was                 10:26:40
 7   inaccurate, even if by accident, to your knowledge?    10:26:43
 8        A.   I don't recall.                               10:26:46
 9        Q.   To the best of your recollection,            10:26:48
10   everything you said was accurate; would that be       10:26:51
11   fair to say?                                           10:26:53
12        A.   Yes.                                          10:26:54
13        Q.   And you certainly didn't lie?               10:26:54
14        A.   Yes.                                          10:26:57
15        Q.   All right.  Now, one of the things that     10:26:59
16   you talked about at the Grand Jury was that you had    10:27:01
17   seen Valentino Dixon before the night of the          10:27:05
18   shooting driving in his white Cadillac in the area    10:27:08
19   of the mini mall.  Do you recall that?                10:27:12
20        A.   No.                                           10:27:15
21        Q.   All right.  Let's take a look at your       10:27:16
22   testimony, then.  And let's go to your Grand Jury     10:27:18
23   testimony at page 13 and 14.  Let me know when        10:27:26
24   you're there, please, and I'll tell you which line.   10:27:30
25   If you could read to yourself on page 13 lines 18     10:27:44
```



AARON JACKSON                                            January 12, 2023
DIXON V. CITY OF BUFFALO                                          19

```
 1                    Aaron Jackson

 2   to 20 --                                        10:27:50

 3        MR. SAHASRABUDHE:  Nick, can you call out  10:27:51

 4   the Bates label?  I think that will make it easier  10:27:52

 5   for us to get to the right page.                10:27:55

 6        MR. BRUSTIN:  Sure.  It's Bates label 1499.  10:27:56

 7   Just let me know when you're there.             10:28:04

 8        MR. SAHASRABUDHE:  Okay.  Here we go.       10:28:31

 9        MR. BRUSTIN:  Got it?                       10:28:35

10        MR. SAHASRABUDHE:  Yeah.  I'm getting there.  10:28:36

11   Sorry.                                          10:28:38

12        MR. BRUSTIN:  No problem.                   10:28:38

13        THE WITNESS:  Yes.                          10:28:59

14        BY MR. BRUSTIN:                             10:29:00

15        Q.   Okay.  I want you to read to           10:29:00

16   yourself -- I'll represent to you this is your  10:29:02

17   testimony to the Grand Jury, okay?  And what I want  10:29:04

18   you to do is I just want you to read to yourself  10:29:06

19   lines 18 to lines 22.  Have you read that?      10:29:09

20        A.   Yes.                                   10:29:19

21        Q.   Okay.  Does that refresh your          10:29:19

22   recollection --                                 10:29:22

23        A.   Yes, it does.                          10:29:22

24        Q.   -- about seeing -- having seen him in  10:29:23

25   his white Cadillac in the neighborhood?         10:29:26
```



800.211.DEPO (3376)
EsquireSolutions.com

| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | A.   Yes. | 10:29:27 |
| 3 | Q.   All right.  And you also testified that | 10:29:28 |
| 4 | you also knew of Valentino Dixon by name before the | 10:29:34 |
| 5 | shooting, that you had heard of him before.  Do you | 10:29:39 |
| 6 | recall that? | 10:29:42 |
| 7 | A.   Yes. | 10:29:42 |
| 8 | Q.   And that was true, correct? | 10:29:43 |
| 9 | A.   Yes. | 10:29:45 |
| 10 | Q.   You had heard of Valentino Dixon.  And | 10:29:45 |
| 11 | you further testified that you would have been able | 10:29:48 |
| 12 | to match the name and the face of Valentino Dixon | 10:29:52 |
| 13 | before the shooting.  Do you recall that? | 10:29:55 |
| 14 | A.   I don't recall. | 10:29:56 |
| 15 | Q.   Take a look at the -- at the trial on | 10:29:58 |
| 16 | page 237, which is also Bates-stamped 238.  They're | 10:30:03 |
| 17 | almost the same. | 10:30:14 |
| 18 | MR. SAHASRABUDHE:  What lines? | 10:30:19 |
| 19 | MR. BRUSTIN:  I would like you to read, | 10:30:20 |
| 20 | please, lines -- lines 9 through lines 24.  Let me | 10:30:22 |
| 21 | know when you're done, please. | 10:30:45 |
| 22 | THE WITNESS:  I read it. | 10:30:47 |
| 23 | BY MR. BRUSTIN: | 10:30:49 |
| 24 | Q.   Are you sure? | 10:30:50 |
| 25 | A.   Yes. | 10:30:51 |



```
 1                     Aaron Jackson
 2       Q.   Okay.  And here you're testifying that        10:30:51
 3  you knew him by name and face before the shooting,     10:30:56
 4  correct?                                                10:30:59
 5       A.   Yes.                                          10:31:00
 6       Q.   And you also testified that you had           10:31:00
 7  seen him driving his car every once in a while,         10:31:03
 8  correct?                                                10:31:06
 9       A.   Yes.                                          10:31:06
10       Q.   And that -- but you had never spoken to       10:31:07
11  him before, correct?                                    10:31:10
12       A.   No.                                           10:31:13
13       Q.   And then, finally, if you take a look         10:31:13
14  at the next page -- oh, now read lines 25 -- page       10:31:20
15  238, lines 25 to 239, to line 18 on 239.  So the        10:31:27
16  rest of the page through line 19 on the next page.      10:31:45
17       A.   Yes.                                          10:32:05
18       Q.   Okay.  And here you're describing under       10:32:06
19  oath that the only time you had ever seen Valentino     10:32:10
20  Dixon is driving in the mini mall a few times,          10:32:14
21  correct?                                                10:32:17
22       A.   Say that again?  Repeat?                      10:32:18
23       Q.   The only time you had ever seen               10:32:20
24  Valentino Dixon before the shooting was driving in      10:32:23
25  the mini mall a few times?                              10:32:24
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      22

```
 1                   Aaron Jackson

 2         A.   Yes.                              10:32:26

 3         Q.   You had never spoken to him?      10:32:27

 4         A.   No.                               10:32:29

 5         Q.   But people had pointed him out to 10:32:29

 6   you --                                       10:32:32

 7         A.   Yes.                              10:32:32

 8         Q.   -- as being Valentino Dixon?      10:32:33

 9         A.   Yes.                              10:32:34

10         Q.   And, in other words, generally, you 10:32:34

11   understood that Valentino Dixon was someone who you 10:32:36

12   knew from the neighborhood by reputation as someone 10:32:38

13   who drove nice cars and was a drug dealer, right? 10:32:42

14         A.   No.                               10:32:48

15         MR. BLENK:   Form.                     10:32:48

16         MR. SAHASRABUDHE:   Objection.   You may 10:32:48

17   answer.                                      10:32:49

18         BY MR. BRUSTIN:                        10:32:49

19         Q.   Is that correct?                  10:32:49

20         A.   No.                               10:32:50

21         Q.   You didn't know him -- you didn't know 10:32:50

22   him as a drug dealer?                        10:32:52

23         A.   No.                               10:32:53

24         Q.   You didn't know him as someone who 10:32:53

25   drove a nice car?                            10:32:56
```



```
 1                    Aaron Jackson
 2         A.   Saw him in nice cars.                    10:32:57
 3         Q.   Okay.  And then people had pointed out   10:32:59
 4    to you that that was Valentino Dixon when you saw  10:33:02
 5    him drive by, correct?                             10:33:04
 6         A.   Yes.                                     10:33:06
 7         Q.   And that was months or even years        10:33:06
 8    before the shooting, correct?                      10:33:08
 9         A.   I don't recall.                          10:33:10
10         Q.   Certainly months, as you testified to   10:33:12
11    here, correct?                                     10:33:14
12         A.   I don't recall.                          10:33:15
13         Q.   Okay.  In any case, you had never        10:33:18
14    spoken to him.  You just knew of him by sight and  10:33:20
15    name and reputation, correct?                      10:33:23
16         A.   Yes.                                     10:33:26
17         Q.   And you've now described the sum total   10:33:37
18    of your interaction and knowledge of Valentino     10:33:41
19    Dixon prior to the night of the shooting, correct? 10:33:46
20         A.   Prior to -- prior to him shooting and    10:33:48
21    killing my younger brother, yes.                   10:33:51
22         Q.   Now, the first -- and I understand -- I  10:34:07
23    understand you haven't reviewed this stuff before  10:34:12
24    today, so I will show you anything you need to see, 10:34:14
25    of course.  But the first recorded interview with  10:34:17
```



AARON JACKSON                                       January 12, 2023
DIXON V. CITY OF BUFFALO                                          24

1                    Aaron Jackson

2  you, at least as far as the police reports go, is        10:34:21

3  an interview on August 12th with Detective               10:34:26

4  Stambach.  Do you remember Detective Stambach?           10:34:30

5         A.   No.                                            10:34:33

6         Q.   Okay.  Do you remember while you were         10:34:35

7  recovering in the hospital a detective?  Withdrawn.      10:34:37

8  Excuse me.                                                10:34:42

9         Do you remember while you were recovering in      10:34:43

10  the hospital from your gunshot wounds a detective       10:34:45

11  coming to the hospital and interviewing you and         10:34:49

12  showing you pictures?                                    10:34:52

13         A.   Yes.                                          10:34:54

14         Q.   Do you have that detective's face in         10:34:55

15  mind today?                                               10:34:57

16         A.   No.                                           10:34:58

17         Q.   Do you remember him?                          10:34:58

18         A.   No.                                           10:35:00

19         Q.   Okay.  But you do remember it was a          10:35:00

20  plainclothes detective?                                  10:35:02

21         A.   I don't recall.                               10:35:04

22         Q.   Okay.  Certainly you don't dispute that     10:35:06

23  if Detective Stambach's name is on the report, he       10:35:10

24  was the person that came to you; would that be          10:35:13

25  fair?                                                     10:35:15



```
 1                    Aaron Jackson
 2         A.   I don't recall.                          10:35:15
 3         Q.   Do you have any reason to dispute if     10:35:16
 4    his name is on the report that he was the one who  10:35:18
 5    came to you?                                        10:35:21
 6         A.   No.                                       10:35:22
 7         Q.   Okay.  And do you have an understanding  10:35:22
 8    that -- withdrawn.                                  10:35:24
 9         Now, at that time you were in the hospital    10:35:32
10    still recovering, correct?                         10:35:34
11         A.   Yes.                                      10:35:35
12         Q.   From your very serious injuries?         10:35:35
13         A.   Yes.                                      10:35:38
14         Q.   And according to this report, and I      10:35:39
15    will -- I'm not going to show it to you just yet,  10:35:48
16    but according to the report, you were both         10:35:51
17    interviewed about what you remembered concerning   10:35:53
18    the shooting, and you were also shown photographs. 10:35:55
19    Do you recall that?                                10:35:57
20         A.   Yes.                                      10:35:59
21         Q.   Did I accurately describe it?  First     10:36:01
22    there was an interview, and then you were shown    10:36:03
23    some photos?                                        10:36:06
24         A.   I don't recall that.                      10:36:06
25         Q.   You don't recall which order it was?     10:36:07
```



```
 1                    Aaron Jackson

 2        A.   Yes.                                    10:36:10

 3        Q.   Now, I will represent to you that by    10:36:15

 4   the time you were interviewed on August 12th and  10:36:19

 5   shown photographs -- withdrawn.                    10:36:29

 6        According to the report, you were shown       10:36:30

 7   photographs at 1915 hours, which is 7:15 at night. 10:36:33

 8   Do you recall that?                                10:36:43

 9        A.   No.                                      10:36:44

10        Q.   Being at nighttime when they came to     10:36:44

11   see you?                                           10:36:47

12        A.   No.                                      10:36:47

13        Q.   You just don't recall one way or         10:36:48

14   another what time it was; fair to say?             10:36:50

15        A.   Yes.                                     10:36:52

16        Q.   Okay.  And I will represent to you by    10:36:53

17   that time Lamarr Scott had already confessed on    10:36:59

18   television to being the shooter and had already    10:37:04

19   been interviewed by Detective Stambach that he, in 10:37:07

20   fact -- and telling him in substance that he, in   10:37:15

21   fact, was the shooter, okay?  I'll represent that  10:37:18

22   to you, just based on the way the reports are      10:37:20

23   written, okay?                                     10:37:23

24        MR. SAHASRABUDHE:  Objection.                 10:37:25

25        BY MR. BRUSTIN:                               10:37:26
```



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | Q.   So the question for you is:  Do you | 10:37:27 |
| 3 | recall being asked questions about Lamarr Scott in | 10:37:28 |
| 4 | the hospital and about whether or not he may have | 10:37:34 |
| 5 | been the shooter? | 10:37:36 |
| 6 | A.   No. | 10:37:38 |
| 7 | Q.   In other words, the best you can | 10:37:41 |
| 8 | recall, you were never asked any questions about | 10:37:42 |
| 9 | Lamarr Scott; is that correct? | 10:37:45 |
| 10 | A.   Yes. | 10:37:47 |
| 11 | Q.   Take a look at your Grand Jury | 10:38:13 |
| 12 | testimony, page 1501, which is also page 15. | 10:38:16 |
| 13 | MR. SAHASRABUDHE:  Any particular line or -- | 10:39:04 |
| 14 | MR. BRUSTIN:  Yeah, I just want to make | 10:39:06 |
| 15 | sure -- just let me know when you're there. | 10:39:08 |
| 16 | MR. SAHASRABUDHE:  Yeah, he's there. | 10:39:09 |
| 17 | BY MR. BRUSTIN: | 10:39:10 |
| 18 | Q.   Gotcha.  If you could just read lines | 10:39:11 |
| 19 | 5 -- I'm going to read it to you.  The question | 10:39:11 |
| 20 | was:  Now, the police came to see you in the | 10:39:14 |
| 21 | hospital, didn't they, and they showed you a group | 10:39:16 |
| 22 | of six photographs and asked you if you could pick | 10:39:18 |
| 23 | out Tino.  And your answer was yes. | 10:39:21 |
| 24 | So, first of all, my first question to you, | 10:39:25 |
| 25 | Mr. Jackson, is:  Did you know before the night of | 10:39:28 |



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | the shooting that Valentino Dixon's nickname was | 10:39:32 |
| 3 | Tino or only know him as Valentino Dixon? | 10:39:35 |
| 4 | A.   I knew him as Tino. | 10:39:38 |
| 5 | Q.   You knew him as Tino.  Okay.  So I take | 10:39:41 |
| 6 | it that what happened was, what must have happened | 10:39:43 |
| 7 | was, you discussed with the police who you knew -- | 10:39:46 |
| 8 | who you knew at the scene.  You mentioned Tino or | 10:39:49 |
| 9 | Valentino Dixon.  Then they showed you photos and | 10:39:53 |
| 10 | asked you if you can pick out Tino from the photos; | 10:39:56 |
| 11 | is that accurate? | 10:40:02 |
| 12 | A.   I don't -- no. | 10:40:02 |
| 13 | MR. BLENK:  Form. | 10:40:04 |
| 14 | BY MR. BRUSTIN: | 10:40:06 |
| 15 | Q.   Did you say no or you don't recall? | 10:40:07 |
| 16 | A.   No, no. | 10:40:08 |
| 17 | Q.   So you're saying that's not what | 10:40:09 |
| 18 | happened? | 10:40:11 |
| 19 | MR. BLENK:  Form. | 10:40:11 |
| 20 | THE WITNESS:  Yes, I'm saying that's not | 10:40:12 |
| 21 | what happened. | 10:40:13 |
| 22 | BY MR. BRUSTIN: | 10:40:14 |
| 23 | Q.   Okay.  Well, you do -- according to the | 10:40:15 |
| 24 | report, first there was an interview, and would it | 10:40:18 |
| 25 | be fair to say that in some manner during that | 10:40:22 |



| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | interview you discussed -- you discussed Valentino | 10:40:24 |
| 3 | Dixon? | 10:40:30 |
| 4 | A.   I don't recall that. | 10:40:30 |
| 5 | Q.   What do you recall in the interview? | 10:40:32 |
| 6 | A.   I don't. | 10:40:34 |
| 7 | Q.   Well, is this testimony inaccurate?  It | 10:40:36 |
| 8 | says they showed you a group of six photos and | 10:40:39 |
| 9 | asked you if you could pick out Tino.  Is that what | 10:40:41 |
| 10 | happened? | 10:40:46 |
| 11 | A.   Yes. | 10:40:46 |
| 12 | MR. SAHASRABUDHE:  Form. | 10:40:46 |
| 13 | BY MR. BRUSTIN: | 10:40:47 |
| 14 | Q.   Okay.  And, in fact, you knew who Tino | 10:40:48 |
| 15 | was from before, and so you were able to pick out | 10:40:50 |
| 16 | Tino, correct? | 10:40:53 |
| 17 | A.   Yes. | 10:40:54 |
| 18 | Q.   Am I accurately describing what | 10:40:55 |
| 19 | happened during the photo array? | 10:41:00 |
| 20 | MR. BLENK:  Form. | 10:41:01 |
| 21 | BY MR. BRUSTIN: | 10:41:02 |
| 22 | Q.   The officer put the photo array in | 10:41:02 |
| 23 | front of you and asked you if you could pick out | 10:41:05 |
| 24 | the person named Tino, correct? | 10:41:07 |
| 25 | MR. SAHASRABUDHE:  Form. | 10:41:10 |



```
 1                    Aaron Jackson

 2         MR. BLENK:  Form.                            10:41:10

 3         THE WITNESS:  Don't recall.                  10:41:11

 4         BY MR. BRUSTIN:                              10:41:13

 5         Q.   Is that generally what you remember     10:41:14

 6  happening?                                          10:41:15

 7         MR. SAHASRABUDHE:  Form.                     10:41:16

 8         THE WITNESS:  I don't recall.                10:41:17

 9         BY MR. BRUSTIN:                              10:41:19

10         Q.   All right.  Well, you testified under   10:41:20

11  oath, and you were being honest, correct?          10:41:22

12         A.   Yes.                                    10:41:24

13         Q.   And you would have had a better         10:41:25

14  recollection then, correct?                        10:41:26

15         A.   Yes.                                    10:41:28

16         Q.   All right.  Do you have a -- well, and  10:41:29

17  you've already told us that you knew who Tino was   10:41:32

18  before the night of the shooting, correct?         10:41:35

19         A.   Yes.                                    10:41:38

20         Q.   Let me try another thing.  Let's take a 10:41:40

21  look at the police report now.  Take a look at      10:41:43

22  what's been marked as BPD166.  Just let me know     10:41:50

23  when it's in front of you, okay?                   10:42:01

24         MR. BRUSTIN:  It's the -- the photo array    10:42:06

25  page, Peter.                                        10:42:14
```



```
  1                    Aaron Jackson
  2        MR. SAHASRABUDHE:  Well, 166 is the          10:42:15
  3   affidavit, and then 167 --                        10:42:17
  4        MR. BRUSTIN:  That's what I want to start    10:42:19
  5   with.                                             10:42:21
  6        MR. SAHASRABUDHE:  Okay.                      10:42:21
  7        BY MR. BRUSTIN:                               10:42:22
  8        Q.   Okay.  So I will represent to you,      10:42:23
  9   Mr. Jackson, that this is the document that       10:42:26
 10   Detective Stambach has told us he created that   10:42:34
 11   night on August 12th when he came to your hospital 10:42:37
 12   room, okay?                                       10:42:41
 13        A.   Yes.                                     10:42:42
 14        Q.   And I will represent to you that this   10:42:42
 15   is Detective Stambach's handwriting on this      10:42:45
 16   document, okay?                                   10:42:48
 17        MR. SAHASRABUDHE:  Form.                      10:42:52
 18        BY MR. BRUSTIN:                               10:42:53
 19        Q.   Are you with me?                         10:42:53
 20        A.   Yes.                                     10:42:54
 21        Q.   Okay.  And you can -- you see from this 10:42:55
 22   document that according to Detective Stambach, he 10:42:59
 23   did this photo array with you at 1915 hours, right? 10:43:03
 24        A.   Yes.                                     10:43:10
 25        Q.   About 7:15 at night, and that he marked 10:43:11
```



AARON JACKSON                                                January 12, 2023
DIXON V. CITY OF BUFFALO                                                   32

| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | that you made what he called -- well, let's look | 10:43:18 |
| 3 | at -- let's look at what he wrote down.  So what he | 10:43:22 |
| 4 | did was he wrote down, according to him, the words | 10:43:25 |
| 5 | that you spoke to him, okay? | 10:43:29 |
| 6 | A.   Yes. | 10:43:33 |
| 7 | Q.   And what he wrote down is that you told | 10:43:33 |
| 8 | him that picture number 4 looked like the person | 10:43:36 |
| 9 | who shot your brother.  He was there.  It happened | 10:43:41 |
| 10 | so quick. | 10:43:46 |
| 11 | Do you see that? | 10:43:46 |
| 12 | A.   Yes. | 10:43:48 |
| 13 | Q.   Okay.  And so would you agree that what | 10:43:49 |
| 14 | happened here is that you had been discussing with | 10:43:53 |
| 15 | him prior to the photo show Valentino Dixon, or | 10:43:56 |
| 16 | maybe you refer to him as Tino.  Then you saw the | 10:43:59 |
| 17 | photo array.  You picked out the picture that you | 10:44:04 |
| 18 | believe was Valentino Dixon, and at that point all | 10:44:06 |
| 19 | the you could say was that he looked like the | 10:44:10 |
| 20 | shooter and you remembered him being there. | 10:44:12 |
| 21 | MR. BLENK:   Form. | 10:44:15 |
| 22 | MR. SAHASRABUDHE:   Form. | 10:44:16 |
| 23 | THE WITNESS:   No. | 10:44:16 |
| 24 | BY MR. BRUSTIN: | 10:44:17 |
| 25 | Q.   What did I get wrong in that scenario? | 10:44:18 |



```
 1                     Aaron Jackson

 2         A.   The conversation -- you're talking        10:44:21

 3    about prior conversation which led up to this.      10:44:22

 4         Q.   Okay.  And so what was the prior          10:44:26

 5    conversation that you had that caused him to ask    10:44:28

 6    you to pick out Tino from the photo array?          10:44:31

 7         MR. SAHASRABUDHE:  Object to the form.         10:44:35

 8    There's no evidence of that.                        10:44:36

 9         THE WITNESS:  I don't recall.                  10:44:38

10         BY MR. BRUSTIN:                                10:44:38

11         Q.   All right.  You do agree that he asked    10:44:39

12    you to pick out Tino from the photo array, correct? 10:44:42

13         MR. BLENK:  Form.                              10:44:44

14         MR. SAHASRABUDHE:  Object to the form.         10:44:46

15         THE WITNESS:  No.                              10:44:46

16         BY MR. BRUSTIN:                                10:44:47

17         Q.   All right.  Well, what did he ask you     10:44:48

18    to do?                                              10:44:49

19         A.   Pick out the person who shot my brother  10:44:49

20    and shot me.                                        10:44:52

21         Q.   Okay.  And so is it your testimony that  10:44:53

22    you never talked about Tino or Valentino Dixon --  10:44:55

23    withdrawn.                                          10:44:59

24         Is it your testimony that you don't recall    10:44:59

25    talking about Valentino Dixon or Tino, his         10:45:02
```



| | |
|---|---|
| 1 | Aaron Jackson |
| 2 | nickname, prior to this photo array, being shown | 10:45:06 |
| 3 | the photos? | 10:45:13 |
| 4 | MR. BLENK:  Form. | 10:45:14 |
| 5 | THE WITNESS:  I don't recall. | 10:45:14 |
| 6 | BY MR. BRUSTIN: | 10:45:15 |
| 7 | Q.  All right.  Are you saying that you | 10:45:15 |
| 8 | didn't or that you just don't recall whether you | 10:45:17 |
| 9 | did or did not? | 10:45:19 |
| 10 | MR. BLENK:  Form. | 10:45:21 |
| 11 | THE WITNESS:  I don't recall. | 10:45:21 |
| 12 | BY MR. BRUSTIN: | 10:45:22 |
| 13 | Q.  You understand the difference.  I just | 10:45:22 |
| 14 | want to make sure I'm not misquoting you.  You're | 10:45:24 |
| 15 | not saying it didn't happen.  You're just saying | 10:45:26 |
| 16 | today you don't recall one way or another; is that | 10:45:29 |
| 17 | correct? | 10:45:31 |
| 18 | A.  Yes. | 10:45:31 |
| 19 | MR. BLENK:  Form. | 10:45:32 |
| 20 | BY MR. BRUSTIN: | 10:45:32 |
| 21 | Q.  So you may have talked about Tino | 10:45:32 |
| 22 | before, you may not have.  You just don't remember | 10:45:34 |
| 23 | today, correct? | 10:45:37 |
| 24 | A.  No. | 10:45:38 |
| 25 | MR. BLENK:  Form. | 10:45:38 |



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | BY MR. BRUSTIN: | 10:45:39 |
| 3 | Q.   That's what -- I want to make sure that | 10:45:40 |
| 4 | I'm getting your answers, not mine.  So what did I | 10:45:42 |
| 5 | get wrong? | 10:45:45 |
| 6 | A.   Prior conversation before this photo | 10:45:46 |
| 7 | array. | 10:45:49 |
| 8 | Q.   Okay.  So are you telling us that you | 10:45:50 |
| 9 | never discussed Tino prior to the photo array? | 10:45:52 |
| 10 | A.   Yes. | 10:45:55 |
| 11 | Q.   You're sure of that? | 10:45:55 |
| 12 | A.   No. | 10:45:59 |
| 13 | Q.   You don't believe that you did; is that | 10:46:02 |
| 14 | fair? | 10:46:04 |
| 15 | A.   I don't believe that I did. | 10:46:04 |
| 16 | Q.   Okay.  In any case, at the time that | 10:46:06 |
| 17 | you were first shown -- first of all, obviously | 10:46:12 |
| 18 | when -- by the time you first spoke to Detective | 10:46:20 |
| 19 | Stambach on August 12th, that was two days after | 10:46:41 |
| 20 | the shooting, correct? | 10:46:49 |
| 21 | A.   Yes. | 10:46:52 |
| 22 | Q.   Okay.  And prior to speaking to | 10:46:53 |
| 23 | Detective Stambach on the 12th, you had -- you've | 10:46:57 |
| 24 | already told us you were in serious condition and | 10:47:03 |
| 25 | not in good shape at all in the hospital, correct? | 10:47:06 |



```
 1                    Aaron Jackson
 2        A.   Yes.                                    10:47:08
 3        Q.   But you also during that time period   10:47:08
 4   had been conscious for large periods of time?    10:47:12
 5        A.   Yes.                                    10:47:16
 6        Q.   And you had been able to see your      10:47:16
 7   family during that time period?                  10:47:18
 8        A.   Yes.                                    10:47:20
 9        Q.   And I imagine that was a very difficult 10:47:20
10   time for you.                                     10:47:25
11        A.   Yes.                                    10:47:28
12        Q.   Which family members did you get to    10:47:29
13   spend time with during that time period?         10:47:31
14        A.   My mother.                              10:47:33
15        Q.   Anybody else?                           10:47:34
16        A.   My father.                              10:47:35
17        Q.   Okay.  And, sir, did you also during   10:47:38
18   that time speak to doctors?                       10:47:40
19        A.   I don't recall.                         10:47:44
20        Q.   Okay.  And by that time -- and I       10:47:47
21   apologize for this, but I have to ask you these  10:47:54
22   questions.  At that time did you know, before you 10:47:56
23   spoke to Detective Stambach, that your brother   10:47:59
24   had -- was deceased?                              10:48:04
25        A.   No.                                     10:48:05
```



1                    Aaron Jackson

2        Q.    Okay.  You did know, however, that your        10:48:07

3    brother had been shot and was in very serious           10:48:09

4    condition, correct?                                     10:48:12

5        A.    Yes.                                          10:48:13

6        Q.    Okay.  And, of course, you were very          10:48:13

7    worried about him, correct?                             10:48:15

8        A.    Yes.                                          10:48:17

9        Q.    And so one of the things that you were        10:48:18

10   doing during that time period is trying to figure       10:48:23

11   out who did this to you and your brother, correct?      10:48:29

12       A.    I don't recall that.                          10:48:35

13       Q.    Well, do you have any doubt in your           10:48:38

14   mind that one of your goals at that time as you lay     10:48:41

15   in a hospital bed was to figure out who did this        10:48:46

16   terrible thing to you and your brother?                 10:48:48

17       A.    No.                                           10:48:50

18       MR. SAHASRABUDHE:   Form.                           10:48:51

19       BY MR. BRUSTIN:                                     10:48:52

20       Q.    Of course you were, right?                    10:48:53

21       A.    No.                                           10:48:54

22       Q.    That never -- it never crossed your           10:48:55

23   mind before August 12th who had actually shot you      10:48:57

24   and your brother?                                       10:49:01

25       A.    I don't recall if those were the             10:49:01



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | thoughts on that particular day. | 10:49:03 |
| 3 | Q.   Okay.  Would it be fair to say, though, | 10:49:04 |
| 4 | even though you don't recall it, knowing yourself | 10:49:06 |
| 5 | and the kind of person you were and how much you | 10:49:09 |
| 6 | cared about your brother, that of course those were | 10:49:12 |
| 7 | the kinds of thoughts you were thinking? | 10:49:16 |
| 8 | A.   Of course. | 10:49:18 |
| 9 | Q.   All right.  Now -- and so certainly, | 10:49:22 |
| 10 | because you were thinking in those days about who | 10:49:34 |
| 11 | was involved in this and because you -- you knew | 10:49:37 |
| 12 | Valentino Dixon from before and because you, at | 10:49:46 |
| 13 | least by August 12th, thought that Valentino Dixon | 10:49:54 |
| 14 | looked like the shooter and you knew he was there, | 10:49:57 |
| 15 | obviously you provided that information to the | 10:50:01 |
| 16 | police when they interviewed you, correct? | 10:50:05 |
| 17 | MR. BLENK:  Form. | 10:50:08 |
| 18 | MR. SAHASRABUDHE:  Form. | 10:50:09 |
| 19 | THE WITNESS:  Can you repeat that? | 10:50:10 |
| 20 | BY MR. BRUSTIN: | 10:50:12 |
| 21 | Q.   Sure.  Obviously, by the time the | 10:50:13 |
| 22 | police came there, you knew, because you had | 10:50:15 |
| 23 | already seen Valentino Dixon before the night of | 10:50:19 |
| 24 | the shooting, you knew that he was someone at the | 10:50:22 |
| 25 | scene of the shooting?  You figured that out | 10:50:25 |



```
 1                      Aaron Jackson
 2   already, correct?                                  10:50:27
 3          MR. BLENK:  Form.                            10:50:28
 4          MR. SAHASRABUDHE:  Form.                     10:50:29
 5          THE WITNESS:  Yes.                           10:50:29
 6          BY MR. BRUSTIN:                              10:50:30
 7          Q.   Okay.  And -- but by that point in     10:50:30
 8   time, on August 12th when you met with the police, 10:50:35
 9   you weren't able to identify him as the shooter.   10:50:38
10   The best you could do was to say that he looked    10:50:42
11   like the shooter, it all happened quickly, you know 10:50:45
12   he was there, correct?                             10:50:49
13          A.   From this form in front of me, yes.    10:50:50
14          Q.   And you have no reason to believe that 10:50:53
15   they misrepresented the words you spoke to them, do 10:50:55
16   you?                                               10:50:58
17          A.   No.                                    10:50:58
18          Q.   Okay.  So at that point in time in your 10:50:59
19   mind you were -- you believed that you did -- that 10:51:03
20   Valentino Dixon, the person you had seen driving   10:51:07
21   around a few times before and knew by name, was at 10:51:10
22   the scene of the crime, correct?                   10:51:14
23          A.   Repeat that?                           10:51:16
24          Q.   Sure.  By August 12th, when you met    10:51:17
25   with these police officers, you met with Stambach  10:51:20
```



| 1 | Aaron Jackson | |
|---|---|---|
| 2 | in your hospital room, in your mind what you knew | 10:51:24 |
| 3 | at that time was Valentino Dixon was the person you | 10:51:27 |
| 4 | had seen driving around before the 10th in his car | 10:51:31 |
| 5 | and who you knew by name was at least at the scene | 10:51:35 |
| 6 | of the crime, you remembered seeing him there, | 10:51:37 |
| 7 | correct? | 10:51:39 |
| 8 |      A.   He was the shooter at the scene of the | 10:51:40 |
| 9 | crime. | 10:51:43 |
| 10 |      Q.   Well, what you told the police on | 10:51:44 |
| 11 | August 12th is not that he was the shooter.  It's | 10:51:46 |
| 12 | that it all happened fast. | 10:51:51 |
| 13 |      A.   It did. | 10:51:53 |
| 14 |      Q.   And that he looked like the shooter, | 10:51:53 |
| 15 | correct? | 10:51:55 |
| 16 |      A.   Yes. | 10:51:56 |
| 17 |      Q.   So that by August 12th, in your mind, | 10:51:56 |
| 18 | you were not convinced that he was the shooter or | 10:51:59 |
| 19 | you would have told the police that he was the | 10:52:02 |
| 20 | shooter, correct? | 10:52:04 |
| 21 |      MR. BLENK:  Form. | 10:52:05 |
| 22 |      MR. SAHASRABUDHE:  Objection to form. | 10:52:05 |
| 23 |      THE WITNESS:  No. | 10:52:06 |
| 24 |      BY MR. BRUSTIN: | 10:52:07 |
| 25 |      Q.   All right.  So you tell us.  Is it your | 10:52:08 |



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      41

```
 1                   Aaron Jackson

 2   testimony that you knew when the police came into        10:52:12

 3   your hospital room on August 12th, you knew with         10:52:14

 4   complete certainty that Valentino Dixon had shot         10:52:17

 5   you and had shot -- and had shot your brother?           10:52:20

 6        A.   I knew who shot my brother and I knew          10:52:23

 7   who shot me.                                             10:52:25

 8        Q.   Okay.  And so I take it then that when         10:52:26

 9   they came in the room and asked you who shot your        10:52:30

10   brother, you told them it was Valentino Dixon.           10:52:32

11        MR. BLENK:  Form.                                   10:52:37

12        MR. SAHASRABUDHE:  Form.                            10:52:38

13        THE WITNESS:  I don't recall.                       10:52:38

14        BY MR. BRUSTIN:                                     10:52:42

15        Q.   Well, what would be the conceivable           10:52:43

16   reason in the -- what conceivable reason in the          10:52:45

17   world would you have for not telling the detective       10:52:47

18   who came to your hospital room the name of the           10:52:50

19   person who shot you and your brother?                    10:52:54

20        A.   Quite possibly not wanting to deal with       10:52:57

21   the police or even put the police in it.  Did that       10:53:00

22   ever cross your mind, that maybe I just didn't want      10:53:04

23   to deal with the police at all and leave that            10:53:07

24   matter in the streets and let that handle itself.        10:53:09

25        Q.   Okay.  So what happened was -- it's           10:53:12
```



```
 1                     Aaron Jackson
 2   your testimony that what happened was, when the      10:53:18
 3   police came to you on the 12th, when you were in     10:53:20
 4   bed, you lied to the police about knowing Valentino  10:53:24
 5   Dixon was the shooter.                               10:53:29
 6         MR. SAHASRABUDHE:  Objection to form.          10:53:33
 7         MR. BLENK:  Form.                              10:53:33
 8         THE WITNESS:  Not at all.                      10:53:34
 9         BY MR. BRUSTIN:                                10:53:36
10         Q.  Well, you just told us that you knew he    10:53:36
11   was the shooter, correct?                            10:53:38
12         A.  Yes.                                       10:53:39
13         Q.  You've also told us that they             10:53:40
14   accurately documented what you said to them,         10:53:42
15   correct?                                             10:53:44
16         A.  Yes.                                       10:53:45
17         Q.  And what you -- what you said to them      10:53:45
18   is not that Valentino Dixon was the shooter.  What   10:53:48
19   you said to them was that he was at the scene and    10:53:50
20   he looked like the shooter, correct?                 10:53:55
21         MR. BLENK:  Form.                              10:53:56
22         THE WITNESS:  Yes.                             10:53:57
23         BY MR. BRUSTIN:                                10:53:58
24         Q.  And, in fact, what you're telling us      10:53:58
25   today is that you knew with certainty on that day    10:54:00
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                       43

```
 1                    Aaron Jackson
 2   that he was the person who shot you and your      10:54:03
 3   brother, correct?                                 10:54:05
 4        A.   Yes.                                     10:54:07
 5        Q.   And so what you're telling us is you    10:54:07
 6   lied to the police when you told them you weren't 10:54:10
 7   sure?                                             10:54:13
 8        MR. SAHASRABUDHE:  Objection to form.        10:54:13
 9        MR. BLENK:   Form.                           10:54:14
10        MR. SAHASRABUDHE:  Mischaracterizes.         10:54:15
11        THE WITNESS:  No, no.                        10:54:16
12        BY MR. BRUSTIN:                              10:54:17
13        Q.   Okay.  How else can you describe it?    10:54:18
14   If you were sure and you told them that you weren't 10:54:20
15   and he just looked like the shooter, how is that 10:54:22
16   anything other than a lie?                        10:54:26
17        MR. BLENK:   Form.                           10:54:27
18        MR. SAHASRABUDHE:  Object to the form.       10:54:28
19        THE WITNESS:  Can you ask that again?        10:54:30
20        BY MR. BRUSTIN:                              10:54:33
21        Q.   Sure.  You know what a lie is, right?   10:54:33
22        A.   Yes.                                     10:54:36
23        Q.   It's saying something that you know not 10:54:36
24   to be truthful, correct?                          10:54:39
25        A.   Yes.                                     10:54:41
```



```
 1                      Aaron Jackson

 2          Q.   And you're telling us that you were      10:54:41

 3    certain Valentino Dixon was the shooter on August   10:54:44

 4    12th.                                               10:54:46

 5          A.   I said I knew who shot my brother.  I    10:54:48

 6    knew who shot my brother.                           10:54:50

 7          Q.   You knew it was Tino because you knew    10:54:51

 8    him from before, right?                             10:54:54

 9          A.   Yes.                                     10:54:57

10          Q.   Despite the fact that you knew Tino      10:54:59

11    shot your brother, rather than telling the police   10:55:01

12    the truth, that it was Valentino Dixon who shot my  10:55:05

13    brother, you told them Valentino Dixon, the picture 10:55:09

14    of Valentino Dixon, looks like the person who shot  10:55:13

15    my brother, it all happened fast, I can't be sure.  10:55:16

16          MR. BLENK:  Form.                             10:55:20

17          MR. SAHASRABUDHE:  Form.                      10:55:21

18          THE WITNESS:  Yes.                            10:55:22

19          BY MR. BRUSTIN:                               10:55:23

20          Q.   In other words, you told them something 10:55:24

21    that wasn't truthful?                               10:55:25

22          MR. BLENK:  Form.                             10:55:26

23          MR. SAHASRABUDHE:  Form.                      10:55:27

24          THE WITNESS:  No.                             10:55:27

25          BY MR. BRUSTIN:                               10:55:29
```



```
 1                    Aaron Jackson
 2        Q.   How is it truthful?              10:55:30
 3        A.   How is it not?                   10:55:34
 4        Q.   You were certain he shot him.  You told   10:55:37
 5   the police he looked like the shooter.  You can't   10:55:40
 6   be -- it all happened fast.  The only thing you    10:55:44
 7   know for sure is he was there.            10:55:47
 8        A.   He was there.  He was definitely there.  10:55:48
 9        Q.   Okay.  Now, obviously either before or   10:55:56
10   after you picked out the picture of Valentino      10:56:05
11   Dixon --                                   10:56:11
12        A.   Yes.                             10:56:12
13        Q.   -- and you -- and you said what's        10:56:12
14   written on this document, you discussed your prior 10:56:15
15   knowledge of Valentino Dixon, correct?     10:56:20
16        MR. SAHASRABUDHE:  Form.              10:56:22
17        MR. BLENK:  Form.                     10:56:23
18        THE WITNESS:  No.                     10:56:23
19        BY MR. BRUSTIN:                       10:56:24
20        Q.   The police never asked you whether or    10:56:26
21   not you had seen the man that you picked out in the 10:56:29
22   photograph prior to that night?            10:56:33
23        MR. BLENK:  Form.                     10:56:35
24        THE WITNESS:  I don't recall that.    10:56:35
25        BY MR. BRUSTIN:                       10:56:36
```



AARON JACKSON                                      January 12, 2023
DIXON V. CITY OF BUFFALO                                         46

```
 1                    Aaron Jackson

 2        Q.   Prior to -- so your testimony is today      10:56:56

 3   that you -- your plan was on August 12th, your plan   10:57:00

 4   was to simply tell the police that Valentino Dixon    10:57:05

 5   looked like the shooter but not tell them he was      10:57:10

 6   the shooter so that you could take care of            10:57:15

 7   Valentino Dixon on the street?                        10:57:20

 8        MR. BLENK:  Form.                                 10:57:23

 9        MR. SAHASRABUDHE:  Objection to form.            10:57:23

10   Completely mischaracterizes the testimony.            10:57:25

11        THE WITNESS:  I never said that.  I never        10:57:27

12   said anything like that.  I never said I had a        10:57:29

13   plan.  I never said I had a plan.  I never said       10:57:31

14   anything of that, Nick.                               10:57:33

15        BY MR. BRUSTIN:                                   10:57:33

16        Q.   You just said to me -- didn't you --        10:57:34

17   you said to me, did I ever think of the fact that     10:57:35

18   maybe you didn't want to involve the police, you      10:57:38

19   wanted to settle it yourself.                          10:57:40

20        MR. SAHASRABUDHE:  Objection to form.            10:57:42

21   That's not what he said.                               10:57:43

22        MR. BLENK:  Form.                                 10:57:44

23        THE WITNESS:  That's not what I said.            10:57:45

24        BY MR. BRUSTIN:                                   10:57:46

25        Q.   So what -- so I must have                    10:57:46
```



|    |                                                          |          |
|----|----------------------------------------------------------|----------|
| 1  | Aaron Jackson                                            |          |
| 2  | misunderstood.  So what was your reason for not         | 10:57:47 |
| 3  | being completely truthful to the police about your      | 10:57:50 |
| 4  | certainty regarding Valentino Dixon?                     | 10:57:52 |
| 5  | MR. BLENK:  Form.                                        | 10:57:54 |
| 6  | MR. SAHASRABUDHE:  Objection to form.                    | 10:57:57 |
| 7  | THE WITNESS:  I don't recall.  Your line of             | 10:57:58 |
| 8  | question is kind of confusing me a little bit, and      | 10:58:01 |
| 9  | I think that that's what your intent is to do, and      | 10:58:04 |
| 10 | I'm trying to give you the honest -- I'm trying to      | 10:58:07 |
| 11 | be as honest as possible with you, but you're          | 10:58:10 |
| 12 | trying to trap me up in all of these different ways     | 10:58:12 |
| 13 | that you're asking me the exact same question.          | 10:58:15 |
| 14 | I'm answering what you're asking.  Can you              | 10:58:17 |
| 15 | please move on to maybe more questions?  Because        | 10:58:19 |
| 16 | what you're doing right now is you're stuck right       | 10:58:21 |
| 17 | here in this one area, and we're both getting           | 10:58:24 |
| 18 | nowhere.                                                | 10:58:29 |
| 19 | BY MR. BRUSTIN:                                          | 10:58:29 |
| 20 | Q.   Okay.  Well, first of all, I do not               | 10:58:29 |
| 21 | want to confuse you, and if you're confused, as we     | 10:58:30 |
| 22 | talked about earlier, you need to tell me.  If you     | 10:58:33 |
| 23 | don't understand my question, please tell me.  I       | 10:58:34 |
| 24 | will change it, okay?                                   | 10:58:37 |
| 25 | A.   Yes.                                               | 10:58:38 |



| | |
|---|---|
| 1 | Aaron Jackson |
| 2 | Q.   Okay.  But I'm not done here, not at | 10:58:38 |
| 3 | all. | 10:58:41 |
| 4 | A.   You don't have to be. | 10:58:41 |
| 5 | Q.   So you -- when you told the police that | 10:58:43 |
| 6 | Valentino Dixon was there and looked like the | 10:58:47 |
| 7 | shooter but it happened so quick you couldn't be | 10:58:51 |
| 8 | sure, in your mind, you knew at that time that he | 10:58:55 |
| 9 | was, in fact, the shooter, correct? | 10:58:59 |
| 10 | A.   That was a true statement that I made, | 10:59:00 |
| 11 | yes. | 10:59:02 |
| 12 | Q.   All right.  So then why did you tell | 10:59:03 |
| 13 | the police something that wasn't completely | 10:59:05 |
| 14 | truthful? | 10:59:08 |
| 15 | MR. BLENK:  Form. | 10:59:08 |
| 16 | MR. SAHASRABUDHE:  Form. | 10:59:09 |
| 17 | THE WITNESS:  And what was that? | 10:59:10 |
| 18 | MR. BRUSTIN:  That you weren't sure. | 10:59:13 |
| 19 | MR. SAHASRABUDHE:  Form. | 10:59:16 |
| 20 | THE WITNESS:  What are you waiting on? | 10:59:25 |
| 21 | BY MR. BRUSTIN: | 10:59:27 |
| 22 | Q.   I'm asking a question, sir.  You -- it | 10:59:28 |
| 23 | says here -- | 10:59:31 |
| 24 | A.   You're asking me a question, but | 10:59:33 |
| 25 | there's no answer. | 10:59:35 |



```
 1                      Aaron Jackson

 2        Q.   All right.  So let's do it again, sir.     10:59:36

 3   Mr. Jackson, you just told us that when the police   10:59:37

 4   came to you on August 12th you were certain that     10:59:40

 5   Valentino Dixon was the person who shot you and      10:59:43

 6   your brother, correct?                               10:59:45

 7        A.   Yes.                                        10:59:46

 8        Q.   When you looked at the picture of          10:59:47

 9   Valentino Dixon, you knew it was Valentino Dixon in  10:59:48

10   the picture, right, because you had seen him         10:59:52

11   before?                                              10:59:54

12        MR. BLENK:   Form.                               10:59:55

13        THE WITNESS:  Yes.                               10:59:56

14        BY MR. BRUSTIN:                                  10:59:57

15        Q.   And you knew that you had seen him         10:59:58

16   before prior to the night of the shooting, correct?  11:00:00

17        A.   Yes, yes.                                   11:00:03

18        Q.   You knew him as Tino, correct?             11:00:04

19        A.   Yes.                                        11:00:07

20        Q.   Okay.  And so although you were            11:00:08

21   certain, according to you, that he was the shooter,  11:00:11

22   rather than tell the police officer you were         11:00:13

23   certain, instead what you told him was that he       11:00:17

24   looked like the person who shot your brother, he     11:00:20

25   was there, it all happened so quick, you couldn't    11:00:25
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                       50

```
 1                    Aaron Jackson
 2  be sure.                                        11:00:27
 3        A.   Yes.                                  11:00:28
 4        Q.   Why did you tell him that?            11:00:28
 5        MR. BLENK:   Form.                         11:00:29
 6        MR. SAHASRABUDHE:   Object to form.        11:00:31
 7        THE WITNESS:   That's what I said.         11:00:32
 8        BY MR. BRUSTIN:                            11:00:33
 9        Q.   Why?                                  11:00:34
10        A.   That's what I said.                   11:00:35
11        Q.   Why did you say that if you were      11:00:37
12  actually certain?                                11:00:39
13        A.   I honestly have no answer for you with 11:00:43
14  that, with regards to that question, Nick.       11:00:46
15        Q.   Okay.  Take a look at -- is it        11:00:52
16  possible, Mr. Jackson, that, in fact, on August  11:01:08
17  12th you weren't sure at all and you only became  11:01:12
18  sure sometime after?                             11:01:16
19        MR. SAHASRABUDHE:   Object to the form.    11:01:19
20        THE WITNESS:   Can you repeat that?        11:01:21
21        BY MR. BRUSTIN:                            11:01:23
22        Q.   Yes, sir.  Is it possible, given your  11:01:23
23  condition and everything you had gone through, that 11:01:28
24  your memory today is wrong about you being certain  11:01:32
25  on August 12th who had shot you and your brother   11:01:36
```



```
 1                    Aaron Jackson
 2  and you only became certain sometime later?          11:01:40
 3        MR. BLENK:  Form.                               11:01:42
 4        THE WITNESS:  Can you repeat that?             11:01:43
 5        BY MR. BRUSTIN:                                 11:01:45
 6        Q.  Yeah.  Is it not -- should I rephrase       11:01:45
 7  it?                                                    11:01:48
 8        A.  Can you repeat it?                          11:01:49
 9        Q.  Sure.  Is it possible that on August        11:01:50
10  12th you were not really sure about who shot your     11:01:56
11  brother and that you only became certain sometime    11:02:02
12  later?                                                11:02:05
13        MR. BLENK:  Form.                               11:02:05
14        MR. SAHASRABUDHE:  Form.                        11:02:06
15        THE WITNESS:  No.                               11:02:06
16        BY MR. BRUSTIN:                                 11:02:07
17        Q.  Take a look at page -- this is still in     11:02:13
18  the police file -- 168.  Do you see it?              11:02:20
19        MR. SAHASRABUDHE:  He's got it now.            11:02:34
20        BY MR. BRUSTIN:                                 11:02:35
21        Q.  This is another version of what            11:02:36
22  Detective Stambach filled out that night when he      11:02:41
23  was showing you photographs, and it reads:  I have,   11:02:44
24  and then positively is crossed out, and it says       11:02:46
25  identified the photo in slot number 4 as being the    11:02:50
```



```
 1                      Aaron Jackson

 2  person that was there and looks like the suspect      11:02:54

 3  who shot my brother.                                  11:03:00

 4        A.    Yes.                                      11:03:01

 5        Q.    Do you see that?                          11:03:02

 6        A.    Yes.                                      11:03:02

 7        Q.    And you're not -- you're not suggesting   11:03:02

 8  that he misrepresented what you said, correct?        11:03:05

 9        A.    Yes.                                      11:03:07

10        Q.    You agree he wrote down what you told     11:03:08

11  him?                                                  11:03:10

12        A.    Yes.                                      11:03:10

13        Q.    You simply have no explanation today      11:03:10

14  why you told him you weren't sure who the shooter     11:03:13

15  was at that time even though you were?                11:03:17

16        MR. BLENK:  Form.                               11:03:21

17        THE WITNESS:  Yes.                              11:03:22

18        BY MR. BRUSTIN:                                 11:03:30

19        Q.    Now, prior to meeting with Detective      11:03:31

20  Stambach on the 12th, had you told anybody else in    11:03:35

21  the world that you believed Valentino Dixon was the   11:03:40

22  shooter?                                              11:03:43

23        A.    I don't recall.  I wasn't able to talk.   11:03:43

24  I wasn't able to talk.  I had a breathing tube -- I   11:03:47

25  had a thing in my nose and in my throat.  I don't     11:03:50
```



```
 1                    Aaron Jackson
 2   think that I was doing much talking.              11:03:53
 3        Q.   You weren't doing -- would it be fair   11:03:55
 4   to say that you were having -- you were having    11:03:57
 5   difficulty talking as opposed to not being able to 11:03:59
 6   talk at all?                                      11:04:02
 7        A.   Not being able to talk.  I was kind of  11:04:02
 8   jotting things down.                              11:04:05
 9        Q.   So is it your -- is it your belief at   11:04:08
10   this time you didn't say any words to Detective   11:04:11
11   Stambach on the 12th or you didn't say much?      11:04:13
12        A.   I trust that I said something to him.   11:04:16
13        Q.   Okay.  So you were able to speak, but   11:04:18
14   it was very difficult for you; is that fair?      11:04:21
15        A.   Very.                                   11:04:23
16        Q.   Okay.  And that was the same on the     11:04:24
17   11th, the day after the shooting?                 11:04:25
18        A.   Yes.                                    11:04:28
19        Q.   All right.  And so would it be fair to  11:04:28
20   say to the best of your recollection you never said 11:04:31
21   to anybody in your family or any doctor or anybody 11:04:33
22   else that you believed Valentino Dixon was the    11:04:37
23   shooter prior to meeting with Detective Stambach? 11:04:39
24        A.   I don't recall.                         11:04:42
25        Q.   As you sit here today, you have no      11:04:45
```



1              Aaron Jackson

2   recollection of doing so; is that fair?          11:04:46

3          A.   Yes.                                  11:04:50

4          Q.   Okay.  And when you met with Detective  11:04:50

5   Stambach, you can't remember whether or not you   11:04:55

6   discussed Valentino Dixon before the shooting,    11:04:58

7   correct?                                          11:05:02

8          A.   I don't recall.  I don't recall.      11:05:03

9          Q.   I'm sorry, I misspoke.  As you sit here  11:05:05

10  today, you can't remember --                      11:05:09

11         A.   Can you slow down a little bit?  Can   11:05:11

12  you slow down?                                     11:05:13

13         Q.   Sure.                                  11:05:14

14         A.   Can you slow down?                     11:05:15

15         Q.   Yeah, I will.  I speak very quickly.  I  11:05:16

16  apologize.                                         11:05:19

17         As you sit here today, you can't remember   11:05:19

18  one way or another whether or not you spoke to     11:05:23

19  Detective Stambach about Tino or Valentino Dixon   11:05:27

20  before he showed you photos, correct?             11:05:32

21         A.   Yes.                                   11:05:35

22         Q.   And you can't remember one way or       11:05:35

23  another whether or not you spoke about Tino or      11:05:39

24  Valentino Dixon after he showed you photos,         11:05:41

25  correct?                                            11:05:44



AARON JACKSON                                      January 12, 2023
DIXON V. CITY OF BUFFALO                                        55

```
1                        Aaron Jackson
2          A.    Yes.                                   11:05:45
3          Q.    What you do remember, though, is you   11:05:46
4   never discussed Lamarr Scott?                       11:05:48
5          A.    Yes.                                   11:05:51
6          MR. SAHASRABUDHE:   Form.                    11:05:52
7          BY MR. BRUSTIN:                              11:05:53
8          Q.    Okay.   When did you first learn that  11:05:53
9   Lamarr Scott had confessed to being the shooter?   11:05:56
10         A.    I don't recall that.                   11:06:01
11         Q.    You do -- you recall knowing it at some 11:06:06
12  point before you testified, correct?               11:06:08
13         A.    I don't recall.                        11:06:10
14         MR. BLENK:   Form.                           11:06:11
15         BY MR. BRUSTIN:                              11:06:12
16         Q.    How long -- do you recall how long you 11:06:13
17  were in the hospital for after you were shot?      11:06:18
18         A.    Two weeks.                             11:06:20
19         Q.    Okay.   If you don't mind, I'd like to 11:06:30
20  just take a two-minute break.   Is that okay?      11:06:33
21         A.    Yes.                                   11:06:36
22         MR. BRUSTIN:   Okay.   Thank you.            11:06:36
23         (A recess was then taken at 11:06 a.m.)      11:06:38
24         BY MR. BRUSTIN:                              11:14:14
25         Q.    Okay.   I want to go back to the police 11:14:15
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      56

```
 1                    Aaron Jackson
 2  file, and I want to show you the -- the photos that      11:14:22
 3  Detective Stambach represented he showed you on the      11:14:34
 4  12th.                                                    11:14:36
 5        MR. SAHASRABUDHE:  167?                            11:14:40
 6        MR. BRUSTIN:  167.  Actually, you know what?       11:14:42
 7  There's a color copy on 171.                             11:14:46
 8        BY MR. BRUSTIN:                                    11:14:55
 9        Q.   So before I ask you about this,               11:14:56
10  Mr. Jackson, I will represent to you that my            11:15:00
11  understanding is that Valentino Dixon in position       11:15:04
12  number 4 is the only person who was placed into         11:15:11
13  this photo array who was -- was allegedly related       11:15:15
14  to the crime.  The other people here are just           11:15:21
15  fillers that they put in, people who -- who were        11:15:24
16  put in who looked like Mr. Dixon, okay?  And I just     11:15:28
17  want to confirm that with you.                          11:15:35
18        Would it be fair to say that Valentino Dixon      11:15:37
19  is the only person in this photo array who you knew     11:15:40
20  prior to the 10th of August?                            11:15:46
21        A.   That I saw, that I saw?                       11:15:50
22        Q.   I'm asking you something a little            11:15:52
23  different now, and I appreciate the clarification,      11:15:55
24  and you've already told us that you saw Valentino       11:15:57
25  Dixon on the night of the shooting, okay?               11:16:00
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      57

```
 1                  Aaron Jackson
 2        My question's a little different.  Would it      11:16:03
 3   be fair to say that -- well, first of all, I'll ask   11:16:06
 4   you both.  Is Valentino Dixon the only person in      11:16:09
 5   this photo array that you saw the night of the        11:16:12
 6   shooting?                                             11:16:15
 7        A.   Yes.                                        11:16:15
 8        Q.   And he's also the only person that you      11:16:15
 9   knew of by face and name prior to the night of the    11:16:18
10   shooting, correct?                                    11:16:21
11        MR. BLENK:  Form.                                11:16:21
12        THE WITNESS:  Yes.                               11:16:22
13        BY MR. BRUSTIN:                                  11:16:31
14        Q.   And nothing that I've shown you has in      11:16:31
15   any way refreshed your recollection about any         11:16:34
16   discussions that you had that night with Detective    11:16:39
17   Stambach about your prior knowledge of Valentino      11:16:42
18   Dixon?                                                11:16:45
19        A.   Yes.                                        11:16:45
20        Q.   Would it be fair to say, though, that       11:16:53
21   the testimony I read to you from the Grand Jury --    11:16:57
22   and let me just show it to you one more time.  On     11:17:02
23   page 1501, lines 5 to 9.  I know you don't remember   11:17:09
24   it, but does your answer there suggest to you --      11:17:24
25        MR. SAHASRABUDHE:  Hold on one second.  I'm      11:17:27
```



```
 1                    Aaron Jackson

 2   flipping to it.                                  11:17:30

 3        MR. BRUSTIN:  Oh, I'm sorry.                11:17:31

 4        MR. SAHASRABUDHE:  1501?                    11:17:35

 5        MR. BRUSTIN:  Yeah.  Also page 15 of the    11:17:37

 6   Grand Jury.                                      11:17:48

 7        MR. SAHASRABUDHE:  He's there, he's there.  11:17:53

 8   Sorry.                                           11:17:55

 9        BY MR. BRUSTIN:                             11:17:56

10        Q.   Yeah, just lines 5 -- we already looked 11:17:56

11   at this, but I just want to show you one more time. 11:18:07

12   Lines 5 to 9, and my question is:  Does your     11:18:10

13   answer -- I know you don't remember it, but does 11:18:12

14   your answer there many years ago suggest to you  11:18:14

15   that you must have been discussing Valentino Dixon 11:18:18

16   with the officer prior to being shown the photos? 11:18:21

17        A.   No.                                    11:18:25

18        MR. SAHASRABUDHE:  Form.                    11:18:25

19        BY MR. BRUSTIN:                             11:18:28

20        Q.   Okay.  Now, when -- when you selected  11:18:28

21   the photograph of Valentino Dixon, do you remember 11:18:43

22   the police officer asking you any questions about 11:18:46

23   that photograph or the person you saw in it?     11:18:49

24        A.   I don't recall.                        11:18:53

25        Q.   Now, take a look at the trial testimony 11:19:29
```



1                     Aaron Jackson

2  on page 245.  It's also 246, the bottom Bates stamp        11:19:39

3  number, whichever --                                       11:19:55

4        MR. BRUSTIN:  Do you mind if I go by the             11:19:56

5  page numbers on top?                                       11:19:58

6        MR. SAHASRABUDHE:  Yeah, no, I just needed           11:19:59

7  to orient myself to how the binder was labeled.            11:20:01

8  You can just do transcript and regular page number.        11:20:04

9        MR. BRUSTIN:  Okay.  So if you could show            11:20:07

10  him 245, please.                                          11:20:08

11        MR. SAHASRABUDHE:  Yeah, he's got it.                11:20:11

12        MR. BRUSTIN:  Okay.  And if you could read to       11:20:13

13  yourself lines 17 to lines 22.                            11:20:15

14        MR. SAHASRABUDHE:  245, 17 to 22.                    11:20:22

15        MR. BRUSTIN:  I'm sorry, 17 to 25.  You know        11:20:26

16  what?  I apologize.  What I want you to read is all       11:20:38

17  the way from line 17 on 245 to line 14 on 246.            11:20:41

18        BY MR. BRUSTIN:                                      11:21:23

19        Q.   Have you read that?                             11:21:23

20        A.   Yes.                                            11:21:24

21        Q.    And here you're admitting under oath,          11:21:24

22  criminal trial, that, in fact, on August 12th you         11:21:28

23  weren't certain that Valentino Dixon was the              11:21:32

24  shooter, correct?                                          11:21:33

25        MR. SAHASRABUDHE:  Form.                             11:21:34



```
 1                     Aaron Jackson

 2          THE WITNESS:  On line 7 it says that, yes, I      11:21:35

 3   was certain.                                             11:21:38

 4          BY MR. BRUSTIN:                                   11:21:38

 5          Q.   And then you -- you were asked further       11:21:39

 6   questions and you admit, in fact, you weren't           11:21:41

 7   certain, correct?                                        11:21:43

 8          MR. BLENK:  Form.                                 11:21:43

 9          MR. SAHASRABUDHE:  Form.                          11:21:44

10          THE WITNESS:  Where does it say that at?          11:21:45

11   What line?                                               11:21:47

12          BY MR. BRUSTIN:                                   11:21:48

13          Q.   So read line -- do it again, line 17 on      11:21:48

14   page 245 to line 14.                                     11:21:51

15          A.   Are you asking me something that I've        11:21:58

16   already answered?  It's right there.  If it's right      11:22:00

17   there and this is the content of that conversation,      11:22:03

18   you're asking me questions on it -- you're trying        11:22:05

19   to trip me up on what's already there.  What's          11:22:08

20   there is what I said.                                    11:22:11

21          Q.    Well, okay.  Let's take it a step at a      11:22:14

22   time.  First of all, you're telling -- it says on       11:22:19

23   line 17:  "You're telling us in your sworn              11:22:21

24   testimony now on this witness stand that you are        11:22:23

25   certain that the person that you picked out in slot     11:22:26
```



1                    Aaron Jackson

2  number 4 was the shooter.                              11:22:29

3         "Answer:  No, I was not sure.                   11:22:31

4         "Question:  No, you weren't sure?               11:22:34

5         "Answer:  No."                                  11:22:35

6         Right?  That's the first thing you said,        11:22:37

7  right?                                                 11:22:39

8         A.   It says -- it says you weren't sure.       11:22:40

9  It doesn't say no, you weren't sure.                   11:22:42

10         Q.   First question, line 17, I'll make sure   11:22:44

11  I'm reading it right.                                  11:22:47

12         "You're telling us in your sworn testimony     11:22:48

13  now on this witness stand that you were certain       11:22:50

14  that the person that you picked out of slot number    11:22:52

15  4 was the shooter."  And your answer was:  "No, I     11:22:55

16  was not sure."  Correct?                              11:22:58

17         A.   Yes, it says that.                         11:22:59

18         Q.   And then you changed your answer to say   11:23:01

19  you were sure, correct?                               11:23:04

20         A.   It says that.                              11:23:06

21         MR. SAHASRABUDHE:  And then --                  11:23:07

22         BY MR. BRUSTIN:                                 11:23:08

23         Q.   Why did you change your answer?  The      11:23:09

24  initial answer you gave when you said no, I was not   11:23:11

25  sure, was the truthful answer, correct?              11:23:13



AARON JACKSON                                              January 12, 2023
DIXON V. CITY OF BUFFALO                                              62

```
 1                    Aaron Jackson
 2          MR. SAHASRABUDHE:  Object to the form.        11:23:16
 3          MR. BLENK:  Form.                             11:23:16
 4          THE WITNESS:  I'm not answering that.         11:23:18
 5          BY MR. BRUSTIN:                               11:23:22
 6          Q.   Why did you say when confronted on       11:23:22
 7   cross-examination by Mr. Dixon's lawyer that you     11:23:25
 8   weren't sure?                                        11:23:28
 9          MR. SAHASRABUDHE:  Object to the form.        11:23:30
10          BY MR. BRUSTIN:                               11:23:31
11          Q.   Did I read the words that came out of    11:23:32
12   your mouth correctly?                                11:23:34
13          A.   Yes.  It's documented right here.        11:23:35
14          Q.   Why did you say that?                    11:23:37
15          A.   I don't know.                            11:23:38
16          Q.   Okay.  Take a look at page 241.          11:23:42
17   Actually, let's go right to page 243.  Read to       11:24:23
18   yourself lines 5 through line 14.  Let me know when  11:24:38
19   you're done.                                         11:24:46
20          A.   5 through what?                          11:24:55
21          Q.   Just lines 5 through 14.                 11:24:58
22          A.   Okay.  I've read it.                     11:25:00
23          Q.   You read that?                           11:25:02
24          A.   Yes.                                     11:25:03
25          Q.   And so here what you testified to under  11:25:03
```



| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | oath is that you, in fact, told Detective Stambach | 11:25:09 |
| 3 | when he showed you the photo array that you were | 11:25:13 |
| 4 | certain Valentino Dixon was the shooter, correct? | 11:25:16 |
| 5 | A.   Yes. | 11:25:18 |
| 6 | Q.   And that he just wrote down the wrong | 11:25:19 |
| 7 | thing, right? | 11:25:22 |
| 8 | A.   I didn't say that. | 11:25:23 |
| 9 | Q.   Well, he wrote down that you weren't | 11:25:25 |
| 10 | sure and you're saying you told him you were sure, | 11:25:27 |
| 11 | correct? | 11:25:30 |
| 12 | MR. SAHASRABUDHE:   Form. | 11:25:30 |
| 13 | THE WITNESS:   If that's what you're saying, | 11:25:32 |
| 14 | I mean. | 11:25:35 |
| 15 | BY MR. BRUSTIN: | 11:25:35 |
| 16 | Q.   Well, let's do it this way:  Today you | 11:25:35 |
| 17 | told us that Detective Stambach accurately | 11:25:38 |
| 18 | documented what you said to him, correct? | 11:25:41 |
| 19 | A.   Yes. | 11:25:43 |
| 20 | Q.   And under oath at the trial you | 11:25:44 |
| 21 | testified that, in fact, what you told him is you | 11:25:48 |
| 22 | were sure that was the person that shot your | 11:25:51 |
| 23 | brother. | 11:25:52 |
| 24 | A.   Yes. | 11:25:53 |
| 25 | Q.   It can't both be true, right? | 11:25:53 |



```
 1                    Aaron Jackson

 2          A.   No, they can't both be true.           11:25:56

 3          Q.   Which one's true?                      11:25:58

 4          A.   Do you want me -- what are you trying   11:26:02

 5   to get here?  What are you trying to get from me?   11:26:04

 6   What answer are you trying to get from me?          11:26:07

 7          Q.   Mr. Jackson, I don't want to be -- I    11:26:09

 8   don't want to -- I want to be very clear with you.  11:26:12

 9          A.   No, no, no, you do.                     11:26:14

10          Q.   I want to be very clear with you.       11:26:16

11          A.   You're confusing me.  You're confusing  11:26:17

12   me.                                                 11:26:20

13          Q.   I am suggesting, sir, that you weren't  11:26:20

14   being completely candid about your certainty.       11:26:22

15   That's what I'm suggesting.  I'm not hiding this    11:26:25

16   from you.                                           11:26:27

17          A.   I was being certain.                    11:26:28

18          Q.   That's my contention.                   11:26:29

19          A.   I was being certain.                    11:26:30

20          Q.   That's why I'm asking these questions.  11:26:32

21   The report I just showed you, you read it, it says  11:26:34

22   that you -- he looked like the person who shot your 11:26:38

23   brother, it all happened fast, you know he was      11:26:43

24   there.  That's what the report says, correct?       11:26:47

25          A.   Yes.                                    11:26:48
```



| | |
|---|---|
| 1 | Aaron Jackson |
| 2 | Q.   Under oath you testified that, in fact, | 11:26:48 |
| 3 | what you told the officer is that you were sure | 11:26:50 |
| 4 | Valentino Dixon shot your brother, correct? | 11:26:53 |
| 5 | A.   Yes. | 11:26:55 |
| 6 | Q.   They can't both be true.  They're | 11:26:56 |
| 7 | different things, right? | 11:26:58 |
| 8 | A.   Two totally different time frames, | 11:26:59 |
| 9 | right?  Two totally different time frames, right? | 11:27:01 |
| 10 | Q.   Well, which one is accurate? | 11:27:05 |
| 11 | A.   No, no, two totally different time | 11:27:06 |
| 12 | frames these statements came, right?  One was | 11:27:09 |
| 13 | earlier on, you're saying the 12th, and then we're | 11:27:11 |
| 14 | talking about the trial? | 11:27:14 |
| 15 | Q.   Well, the trial, you're being asked | 11:27:15 |
| 16 | questions about the 12th.  That's what they're | 11:27:18 |
| 17 | asking you questions about. | 11:27:20 |
| 18 | A.   Okay.  But what I'm saying is those are | 11:27:20 |
| 19 | two totally different mind frames.  Do you know | 11:27:21 |
| 20 | what mind frame I was in on the 12th?  Do you know | 11:27:24 |
| 21 | my medical condition?  Do you know that I just came | 11:27:27 |
| 22 | out of surgery?  Do you know I was highly | 11:27:29 |
| 23 | medicated?  Do you know that, Nick? | 11:27:32 |
| 24 | Q.   Yes, sir. | 11:27:33 |
| 25 | A.   Do you know that, Nick? | 11:27:34 |



1                    Aaron Jackson

2          Q.   I do, sir.                                  11:27:35

3          A.   Do you know that in this trial where        11:27:36

4   I'm sitting right in front of the person who shot       11:27:38

5   and killed my brother and shot me, totally             11:27:40

6   different dynamics.  Totally different               11:27:43

7   understanding of what happened.  Totally different.     11:27:45

8          Q.   Okay.                                       11:27:46

9          A.   You're questioning me about this, and       11:27:47

10  you're questioning me about this.  Two totally          11:27:49

11  different situations, and I just have to get that       11:27:51

12  out in the open, because it seems like you don't        11:27:53

13  understand.                                             11:27:55

14         Q.   And by the way --                           11:27:55

15         A.   It seems like you don't understand.         11:27:56

16         Q.   You should feel comfortable clarifying      11:27:58

17  anything any way -- any way you want to.                11:28:01

18         A.   Two totally different time frames.          11:28:04

19         Q.   Sir, I just want to make sure you           11:28:06

20  understand.  You can clarify any answer you want.       11:28:08

21  Anything you want to say you should feel                11:28:11

22  comfortable saying, okay?                               11:28:12

23         A.   Yes.                                        11:28:13

24         Q.   I don't want you to feel like I'm           11:28:13

25  cutting you off or anything like that.  I have to       11:28:15



1               Aaron Jackson

2   ask you these questions.  That's my job.  You          11:28:17

3   should feel comfortable saying anything you feel       11:28:20

4   you need to say, okay?                                 11:28:23

5         A.   Yes.                                        11:28:25

6         Q.   All right.  Let's move on from this.        11:28:25

7   Let me ask you some other questions, and I'm going     11:28:29

8   to just follow up on this, that you were in --         11:28:31

9   certainly as of August 12th, you were still in         11:28:37

10  rough shape, correct?                                  11:28:40

11        A.   Yes.                                        11:28:42

12        Q.   All right.  Do you remember whether you     11:28:43

13  were still in intensive care or not?                   11:28:46

14        A.   Yes.                                        11:28:49

15        Q.   Do you remember when, approximately,        11:28:49

16  you started to feel a little bit better?               11:28:54

17        A.   No.                                         11:28:56

18        Q.   For example, when did the tube come         11:28:56

19  out, do you remember?                                  11:28:58

20        A.   No.                                         11:28:58

21        Q.   In the two-week period, was it within       11:28:59

22  three, four days that you started to feel a little     11:29:02

23  better?                                                11:29:04

24        A.   I don't recall.                             11:29:04

25        Q.   Well, you left the hospital after two       11:29:11



```
 1                    Aaron Jackson
 2    weeks, correct?                              11:29:14
 3         A.   Yes.                               11:29:17
 4         Q.   Do you remember -- do you remember 11:29:17
 5    being moved from one room to another during your  11:29:19
 6    hospital stay?                               11:29:22
 7         A.   Yes.                               11:29:24
 8         Q.   Do you remember approximately what --  11:29:24
 9    do you remember being moved more than once?   11:29:27
10         A.   Yes.                               11:29:30
11         Q.   Okay.  Do you remember the first time  11:29:30
12    you were moved approximately how long after you had  11:29:32
13    been shot?                                   11:29:36
14         A.   No.                                11:29:36
15         Q.   Approximately?                     11:29:37
16         A.   I'm not going to guess.            11:29:37
17         Q.   Was it within the first week?      11:29:39
18         A.   I can't tell you.                  11:29:41
19         Q.   Can't say.  And you have no memory of  11:29:42
20    when in relation to the shooting the tube was  11:29:51
21    removed -- the tubes were removed?           11:29:53
22         A.   I don't recall.                    11:29:56
23         Q.   Okay.  Now, I want to ask you about --  11:29:57
24    you were shown a photo array of Valentino Dixon on  11:30:06
25    the 12th.  I want to ask you about any other times  11:30:10
```



```
 1                      Aaron Jackson
 2   when you were shown photographs by the police.      11:30:15
 3   Were there other times when you were shown          11:30:16
 4   photographs?                                        11:30:18
 5          A.   I don't recall.                         11:30:18
 6          Q.   Okay.  Now I just want to make sure     11:30:22
 7   that you're understanding my question.  I'm asking  11:30:24
 8   you just very broadly whether you have any          11:30:27
 9   recollection whatsoever of ever being shown any     11:30:29
10   type of photos in this case other than that night   11:30:32
11   from the hospital bed.                              11:30:35
12          A.   I have no recollection.                 11:30:38
13          Q.   Okay.  One way or the other?  As you    11:30:39
14   sit here today, you don't remember?                 11:30:41
15          A.   I just answered the question.           11:30:42
16          Q.   Okay.  The difference is, the reason I  11:30:44
17   say that, the difference is whether you think it    11:30:47
18   never happened or you just can't remember one way   11:30:49
19   or another.  Those are two different things.        11:30:52
20   That's why I'm asking that.  So is it your best     11:30:54
21   recollection that you never saw photos again after  11:30:57
22   that night, or you just can't remember one way or   11:31:00
23   another?                                            11:31:03
24          A.   I don't recall.                         11:31:03
25          Q.   Now, would it be fair to say,           11:31:10
```



| 1 | Aaron Jackson | |
|---|---|---|
| 2 | Mr. Jackson, that you remain as certain today as | 11:31:44 |
| 3 | you were in -- at the time of the shooting that | 11:31:48 |
| 4 | Valentino Dixon was the shooter? | 11:31:57 |
| 5 | A.   Yes. | 11:31:59 |
| 6 | MR. BLENK:  Form. | 11:31:59 |
| 7 | BY MR. BRUSTIN: | 11:32:00 |
| 8 | Q.   And it's your testimony that you've | 11:32:12 |
| 9 | never wavered or questioned in any way whether or | 11:32:14 |
| 10 | not he was the person who pulled the trigger? | 11:32:16 |
| 11 | A.   Can you repeat it? | 11:32:19 |
| 12 | Q.   Sure.  You've never wavered or | 11:32:21 |
| 13 | questioned in any way since that time whether | 11:32:23 |
| 14 | Valentino Dixon was the person who pulled the | 11:32:26 |
| 15 | trigger? | 11:32:28 |
| 16 | A.   No, I never wavered. | 11:32:28 |
| 17 | Q.   You have a vivid image in your mind of | 11:32:33 |
| 18 | him being the shooter? | 11:32:39 |
| 19 | A.   I looked directly at him. | 11:32:40 |
| 20 | Q.   Do you have any explanation as you sit | 11:32:44 |
| 21 | here today, Mr. Jackson, as to why so many other | 11:32:49 |
| 22 | people, including Lamarr Jackson -- | 11:32:53 |
| 23 | MR. SAHASRABUDHE:  Lamarr Scott. | 11:32:57 |
| 24 | MR. BRUSTIN:  I apologize, sorry. | 11:32:59 |
| 25 | THE WITNESS:  Slow down, Nick, please.  And | 11:33:00 |



 1                     Aaron Jackson

 2   thank you.                                      11:33:02

 3          MR. BRUSTIN:  I will, I will.            11:33:02

 4          BY MR. BRUSTIN:                          11:33:03

 5          Q.   Do you have any explanation as you sit    11:33:04

 6   here today as to why so many people, including   11:33:06

 7   Lamarr Scott, now admit that it was Lamarr Scott  11:33:10

 8   who shot you and your brother?                  11:33:13

 9          A.   Repeat that?                        11:33:16

10          Q.   Yes, sir.                           11:33:18

11          MR. BLENK:  Objection.                   11:33:19

12          BY MR. BRUSTIN:                          11:33:20

13          Q.   Do you have any explanation or theory   11:33:20

14   as you sit here today why so many people now have   11:33:23

15   stated that it was Lamarr Scott who shot you and   11:33:28

16   your brother as opposed to Valentino Dixon?     11:33:32

17          MR. BLENK:  Form.                        11:33:36

18          MR. SAHASRABUDHE:  Objection.            11:33:37

19          THE WITNESS:  No.  I can't speak for what   11:33:38

20   other people think.  I was there.               11:33:40

21          BY MR. BRUSTIN:                          11:33:42

22          Q.   Okay.  And I'm referencing people who   11:33:42

23   were also there.                                11:33:44

24          A.   Not in the condition -- or not in the   11:33:45

25   situation that I was placed in, Nick.           11:33:47



AARON JACKSON                                         January 12, 2023
DIXON V. CITY OF BUFFALO                                           72

| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | Q.  I agree with that.  I agree completely. | 11:33:49 |
| 3 | Okay.  So, now, let's take a look at -- | 11:33:53 |
| 4 | well, you've already told us that the first person | 11:34:08 |
| 5 | you ever remember -- you ever believed you | 11:34:11 |
| 6 | referenced Valentino Dixon in connection with the | 11:34:15 |
| 7 | shooting was Detective Stambach on August 12th, | 11:34:17 |
| 8 | correct? | 11:34:20 |
| 9 | MR. SAHASRABUDHE:  Objection to form. | 11:34:20 |
| 10 | THE WITNESS:  I don't recall saying that. | 11:34:21 |
| 11 | BY MR. BRUSTIN: | 11:34:23 |
| 12 | Q.  Well, do you agree with that, that the | 11:34:23 |
| 13 | first person -- the first time you mentioned | 11:34:26 |
| 14 | Valentino Dixon as the potential shooter was with | 11:34:30 |
| 15 | Stambach on the 12th? | 11:34:34 |
| 16 | MR. SAHASRABUDHE:  Objection to form. | 11:34:35 |
| 17 | THE WITNESS:  I don't recall saying that. | 11:34:37 |
| 18 | BY MR. BRUSTIN: | 11:34:38 |
| 19 | Q.  Well, you certainly never told | 11:34:38 |
| 20 | anybody -- you've already told us that you had | 11:34:40 |
| 21 | never spoken to Valentino Dixon before the night of | 11:34:42 |
| 22 | the shooting, correct? | 11:34:44 |
| 23 | A.  You're asking me the same question | 11:34:45 |
| 24 | again.  I answered that earlier. | 11:34:47 |
| 25 | Q.  Okay.  So because of that, you | 11:34:49 |



```
 1                    Aaron Jackson
 2  certainly never told anybody that Valentino Dixon    11:34:52
 3  had threatened you before the night of the           11:34:54
 4  shooting, correct?                                    11:34:57
 5         MR. SAHASRABUDHE:  Form.                        11:34:58
 6         THE WITNESS:  Where did that come from?         11:34:58
 7         BY MR. BRUSTIN:                                 11:35:02
 8         Q.   Sir, if you can answer my question,        11:35:02
 9  please try to.  So as far as you recall --            11:35:05
10  withdrawn.                                            11:35:11
11         Valentino Dixon never threatened you in        11:35:12
12  words or in action before the night of the           11:35:15
13  shooting, correct?                                    11:35:18
14         A.   No.                                        11:35:20
15         Q.   In other words, you agree with me?         11:35:20
16         A.   I just answered the question, Nick.        11:35:23
17         MR. SAHASRABUDHE:  Form.                        11:35:25
18         BY MR. BRUSTIN:                                 11:35:26
19         Q.   It's a double negative.  That's why --     11:35:26
20  that's why I'm clarifying.                            11:35:28
21         A.   I'm only going to answer one question      11:35:29
22  at a time.                                            11:35:33
23         Q.   Do you agree with me that Valentino        11:35:34
24  Dixon never threatened you --
25         A.   Never threatened me.
```



1                    Aaron Jackson

2         Q.    -- before the night of the shooting,

3    correct?

4         (Reporter interruption.)

5         BY MR. BRUSTIN:

6         Q.   I'm not trying to twist it, I swear.        11:35:43

7    I'm just trying to get a -- I'm just trying to get   11:35:45

8    a clear answer, and it's my fault for doing a        11:35:47

9    double negative.                                     11:35:49

10        Valentino Dixon never threatened you before     11:35:52

11   the night of the shooting, correct?                  11:35:54

12        A.   Yes, that's correct.                        11:35:55

13        Q.   You never saw Valentino Dixon in front     11:36:03

14   of your house before the night of the shooting,      11:36:06

15   correct?                                             11:36:09

16        A.   Correct.                                    11:36:11

17        Q.   All right.  Now, do you recall -- all      11:36:15

18   right.  So do you recall two other officers          11:36:37

19   named -- plainclothes officers/detectives named      11:36:44

20   Grabowski and DiPirro coming to interview you on     11:36:48

21   August 21st?                                         11:36:53

22        A.   No.                                         11:36:54

23        Q.   All right.  Even if you don't recall       11:36:57

24   them by name, do you recall two detectives coming    11:37:00

25   to visit you in the hospital after Detective         11:37:03



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      75

1                       Aaron Jackson

2    Stambach on the 12th?                              11:37:07

3         A.    No.                                     11:37:08

4         Q.    Now, by August 21st, that was 11 days  11:37:15

5    after the shooting, correct?                       11:37:36

6         A.    Yes.                                    11:37:39

7         Q.    And you went home a few days later,    11:37:39

8    correct?                                           11:37:43

9         A.    Yes.                                    11:37:44

10        Q.    And so certainly -- by the way, when   11:37:44

11   you went home, and I don't mean to pry, I         11:37:48

12   apologize, I'll just ask a couple of questions.   11:37:51

13   What limitations did you have health-wise when you 11:37:54

14   got home?  Did you have to stay in bed?  Were you 11:37:57

15   able to walk around?  How -- what kind of shape   11:37:59

16   were you in by the time you got home?             11:38:02

17        A.    You don't mean to pry, but then you    11:38:04

18   start asking me questions that are prying.  I don't 11:38:06

19   get you.  I don't get you.  I had a colostomy bag. 11:38:09

20   I had a colostomy bag, and I was shot, and I lost a 11:38:15

21   lot of weight.                                     11:38:21

22        Q.    I'm asking you for a reason.           11:38:21

23        A.    Okay.                                   11:38:21

24        Q.    Okay.  Were you able to walk?  Were you 11:38:22

25   able to speak and do all those things when you got 11:38:23



```
 1                    Aaron Jackson

 2   home?                                            11:38:25

 3        A.    Barely.                               11:38:25

 4        Q.    Were you -- I didn't hear that, I'm   11:38:27

 5   sorry.                                           11:38:29

 6        A.    I said barely.                        11:38:30

 7        Q.    Barely, okay.  All right.  But by the 11:38:31

 8   21st, 11 days after the shooting, you were getting 11:38:40

 9   close to being able to go home, correct?         11:38:42

10        A.    Yes.                                  11:38:46

11        Q.    And you were certainly feeling somewhat 11:38:46

12   better?                                          11:38:48

13        A.    No.                                   11:38:48

14        Q.    Fair to say, as compared to the 11th or 11:38:49

15   the 12th?                                        11:38:51

16        A.    No.                                   11:38:52

17        Q.    Well, do you recall whether three days 11:38:53

18   before you went home from the hospital you had a 11:38:55

19   tube in your nose?                               11:38:57

20        A.    I don't recall.                       11:38:59

21        Q.    Okay.  Take a look at page 216 to 217, 11:39:02

22   and I want you to read -- let me know when you're 11:39:18

23   there, and I'll tell you to read.                11:39:21

24        MR. SAHASRABUDHE:  He has it.               11:39:24

25        BY MR. BRUSTIN:                             11:39:24
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      77

```
 1                    Aaron Jackson
 2        Q.   Okay.  So the interview, the alleged    11:39:25
 3   interview with you starts in the middle of the    11:39:26
 4   third paragraph where it says "officers then went 11:39:27
 5   to ECMC."  Do you see that?                        11:39:29
 6        A.   Yes.                                     11:39:32
 7        Q.   Okay.  If you could read from that       11:39:33
 8   point all the way through to the end of this -- of 11:39:35
 9   this document, I would appreciate it, okay?        11:39:42
10        A.   Yes.  Okay.                              11:39:45
11        Q.   Okay.  So, first of all, this appears,   11:40:31
12   you would agree, to be an interview of you in the  11:40:35
13   hospital room, room 869, while you were in the     11:40:38
14   hospital by these two detectives, correct?         11:40:43
15        A.   Yes.                                     11:40:47
16        Q.   Does reading this refresh your memory    11:40:47
17   at all about meeting with these two detectives in  11:40:50
18   the hospital?                                      11:40:53
19        A.   Somewhat.                                11:40:53
20        Q.   Okay.  So you don't deny that you, in    11:40:54
21   fact, met with these two detectives in the         11:40:57
22   hospital, correct?                                 11:40:59
23        A.   Yes.                                     11:41:00
24        Q.   All right.  And it appears -- it         11:41:01
25   appears from this document that you -- they were   11:41:04
```



```
 1                        Aaron Jackson
 2   asking you questions and you were able to give them        11:41:08
 3   answers verbally, correct?                                 11:41:11
 4        A.   Yes.                                             11:41:13
 5        Q.   And I take it each time you were                 11:41:14
 6   meeting with the officers, you were doing your best        11:41:21
 7   to give them honest, accurate information, correct?        11:41:25
 8        A.   Yes.                                             11:41:30
 9        Q.   That would be -- that would be true on           11:41:31
10   August 12th, and that would be true on August 21st,       11:41:33
11   correct?                                                   11:41:36
12        A.   Yes.                                             11:41:37
13        Q.   You were never trying to mislead the            11:41:37
14   police, correct?                                           11:41:39
15        A.   No.                                              11:41:41
16        Q.   Is that correct?                                 11:41:41
17        A.   Yes.                                             11:41:43
18        Q.   You were trying to give them all of the         11:41:43
19   information that you had so that they could bring          11:41:47
20   the people -- the person --                                11:41:50
21        A.   Valentino Dixon, Valentino Dixon to             11:41:52
22   justice.                                                   11:41:55
23        Q.   Okay.  So what you were trying to do --         11:41:57
24   you understand that Valentino Dixon has been               11:42:01
25   exonerated for this crime, right?                          11:42:03
```



```
 1                        Aaron Jackson
 2          MR. SAHASRABUDHE:  Object to the form.        11:42:06
 3          BY MR. BRUSTIN:                               11:42:08
 4          Q.   Do you even -- do you even think it's    11:42:09
 5   possible that you could be mistaken about who the    11:42:11
 6   shooter had been?                                    11:42:14
 7          MR. BLENK:  Form.                             11:42:14
 8          MR. SAHASRABUDHE:  Form.                      11:42:15
 9          THE WITNESS:  No.                             11:42:15
10          BY MR. BRUSTIN:                               11:42:17
11          Q.   All right.  You were trying to do your   11:42:19
12   best to ensure that Valentino Dixon was bought to    11:42:22
13   justice, correct?                                    11:42:27
14          MR. SAHASRABUDHE:  Objection to form.         11:42:29
15          THE WITNESS:  Yes.                            11:42:34
16          BY MR. BRUSTIN:                               11:42:34
17          Q.   That was your goal on August 12th when   11:42:35
18   you met with Detective Stambach, correct?            11:42:36
19          MR. BLENK:  Form.                             11:42:38
20          THE WITNESS:  That wasn't my goal.            11:42:39
21          BY MR. BRUSTIN:                               11:42:40
22          Q.   Well, your goal wasn't to ensure that    11:42:41
23   there was justice?                                   11:42:43
24          A.   Justice, yes, yes.                       11:42:44
25          Q.   Okay.  And you wanted him to be          11:42:46
```



```
 1                    Aaron Jackson
 2   prosecuted and put in prison, correct?              11:42:48
 3        A.   Yes.                                       11:42:51
 4        Q.   And you were doing everything in your      11:42:51
 5   power to cooperate with the police in that regard,   11:42:53
 6   correct?                                             11:42:55
 7        A.   Yes.                                       11:42:56
 8        Q.   That's what you mean by justice,           11:42:57
 9   correct, putting him in prison?                      11:42:59
10        A.   Justice.                                   11:43:01
11        Q.   Well, what do you mean by justice?         11:43:04
12        A.   Being brought to justice, arrested,        11:43:05
13   taken to trial.                                      11:43:07
14        Q.   Prosecuted.                                11:43:10
15        A.   Yes.                                       11:43:11
16        Q.   Okay.  And so you were doing everything    11:43:12
17   you could on August 21st when you met with these     11:43:13
18   officers to ensure that justice as you just          11:43:17
19   described it was done?                               11:43:19
20        A.   Yes.                                       11:43:21
21        MR. BLENK:   Form.                              11:43:21
22        MR. SAHASRABUDHE:   Form.                       11:43:22
23        BY MR. BRUSTIN:                                 11:43:26
24        Q.   Okay.  And do you have any reason to       11:43:26
25   dispute their description of the conversation that   11:43:28
```



```
 1                    Aaron Jackson

 2   they had with you?                              11:43:30

 3        A.   No.                                   11:43:32

 4        Q.   It appears to be a generally accurate 11:43:36

 5   description?                                    11:43:38

 6        A.   Yes.                                  11:43:38

 7        Q.   Can you explain then why you didn't   11:43:38

 8   tell these officers on August 21st that Valentino 11:43:42

 9   Dixon was the person who shot and killed -- who 11:43:46

10   shot and killed your brother and who shot you?  11:43:50

11        A.   I have no clue.                       11:43:52

12        Q.   But you would agree that based on this 11:43:56

13   document you never told them that, correct?     11:43:58

14        A.   Say it again?                         11:44:00

15        Q.   You would agree that based on this    11:44:01

16   report of your conversation with them, you never 11:44:04

17   told them that Valentino Dixon was the person who 11:44:08

18   shot you and killed your brother?               11:44:11

19        MR. BLENK:   Form.                         11:44:13

20        MR. SAHASRABUDHE:   Form.                  11:44:13

21        THE WITNESS:   Not in this document.       11:44:14

22        BY MR. BRUSTIN:                            11:44:18

23        Q.   So is it your belief that you told them 11:44:18

24   that Valentino Dixon -- withdrawn.              11:44:21

25        Certainly by the 21st you knew that your   11:44:25
```



1                     Aaron Jackson

2   brother had been killed, correct?                    11:44:28

3         A.   Yes.                                       11:44:30

4         Q.   Is it your testimony that you told        11:44:31

5   these officers in your room on the 21st that         11:44:36

6   Valentino Dixon was the person who killed your       11:44:39

7   brother and shot you, they just failed to write it   11:44:42

8   down?                                                 11:44:44

9         A.   No.                                        11:44:45

10        MR. SAHASRABUDHE:   Object to form.             11:44:45

11        BY MR. BRUSTIN:                                 11:44:47

12        Q.   Okay.  And it appears from this            11:44:48

13  document that they're asking you lots of questions   11:44:54

14  about what you saw and heard in relation to the      11:44:58

15  shooting, correct?                                    11:45:02

16        A.   Yes.                                       11:45:04

17        Q.   And that's consistent with your memory    11:45:04

18  of this conversation?                                 11:45:06

19        A.   Yes.                                       11:45:08

20        Q.   And, in fact, it states in the bottom     11:45:09

21  of page 216:  Aaron states he saw Travis behind the  11:45:19

22  guy who was doing the shooting, correct?             11:45:26

23        A.   Yes.                                       11:45:30

24        Q.   And so, in other words, it's clear from   11:45:30

25  this document that you did not identify the guy who  11:45:32



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | was doing the shooting as Valentino Dixon? | 11:45:36 |
| 3 | MR. BLENK:  Form. | 11:45:39 |
| 4 | MR. SAHASRABUDHE:  Form. | 11:45:40 |
| 5 | THE WITNESS:  Not in that statement. | 11:45:40 |
| 6 | BY MR. BRUSTIN: | 11:45:42 |
| 7 | Q.   Not anywhere in this interview with | 11:45:43 |
| 8 | these two detectives, correct? | 11:45:45 |
| 9 | A.   From reading it, it doesn't say that. | 11:45:48 |
| 10 | Q.   What would be the conceivable reason if | 11:45:52 |
| 11 | you were sure at this time that Valentino Dixon | 11:45:54 |
| 12 | shot and killed your brother and shot you and your | 11:45:57 |
| 13 | goal was to bring him to justice by getting him | 11:46:00 |
| 14 | prosecuted, what would be the conceivable reason | 11:46:06 |
| 15 | for not telling these two detectives that Valentino | 11:46:07 |
| 16 | Dixon was the shooter? | 11:46:10 |
| 17 | MR. SAHASRABUDHE:  Objection to form. | 11:46:11 |
| 18 | MR. BLENK:  Form. | 11:46:12 |
| 19 | THE WITNESS:  I don't know. | 11:46:12 |
| 20 | BY MR. BRUSTIN: | 11:46:15 |
| 21 | Q.   Is it possible, sir, that you were, in | 11:46:16 |
| 22 | fact, not certain even at this time that he was the | 11:46:21 |
| 23 | shooter? | 11:46:24 |
| 24 | MR. SAHASRABUDHE:  Objection to form.  Asked | 11:46:25 |
| 25 | and answered. | 11:46:26 |



|  |  |  |
|---|---|---|
| 1 | Aaron Jackson |  |
| 2 | MR. BLENK:  Form. | 11:46:26 |
| 3 | THE WITNESS:  He asked me this already. | 11:46:29 |
| 4 | You've asked me this already, and I've answered it. | 11:46:31 |
| 5 | MR. BRUSTIN:  I have.  I'm asking -- | 11:46:34 |
| 6 | THE WITNESS:  But you're doing it again. | 11:46:35 |
| 7 | MR. BRUSTIN:  I'm allowed to do that. | 11:46:36 |
| 8 | THE WITNESS:  You're doing it again and | 11:46:37 |
| 9 | again and again.  You're asking me the same thing | 11:46:39 |
| 10 | over and over and over, Nick.  There was -- no. | 11:46:41 |
| 11 | BY MR. BRUSTIN: | 11:46:45 |
| 12 | Q.   You know what?  I'm not going to.  I'm | 11:46:45 |
| 13 | going to withdraw the question. | 11:46:46 |
| 14 | A.   Please.  Thank you. | 11:46:47 |
| 15 | Q.   Okay.  I'm going to withdraw the | 11:46:48 |
| 16 | question.  Any explanation whatsoever as to why on | 11:46:49 |
| 17 | August 21st you did not mention to these officers | 11:46:57 |
| 18 | that Valentino Dixon was the shooter? | 11:47:01 |
| 19 | MR. SAHASRABUDHE:  Asked and answered. | 11:47:03 |
| 20 | Objection. | 11:47:04 |
| 21 | MR. BLENK:  Form. | 11:47:04 |
| 22 | THE WITNESS:  No explanation. | 11:47:06 |
| 23 | BY MR. BRUSTIN: | 11:47:08 |
| 24 | Q.   Now, you see that you were asked some | 11:47:13 |
| 25 | questions here about Lamarr Scott.  Do you see that | 11:47:33 |



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | on page 217, at least according to this document? | 11:47:36 |
| 3 | A.   Yes. | 11:47:42 |
| 4 | Q.   Is it your recollection that this is | 11:47:42 |
| 5 | the first time you've been asked any questions | 11:47:45 |
| 6 | about Lamarr Scott? | 11:47:48 |
| 7 | MR. SAHASRABUDHE:  Form. | 11:47:49 |
| 8 | THE WITNESS:  Possibly. | 11:47:50 |
| 9 | BY MR. BRUSTIN: | 11:47:52 |
| 10 | Q.   Okay.  And you would agree here that | 11:47:53 |
| 11 | there's no -- you correct me if I'm wrong, but it | 11:48:17 |
| 12 | appears from this document that what these officers | 11:48:27 |
| 13 | did is they came in and asked you to describe from | 11:48:30 |
| 14 | start to finish in your words what you saw and | 11:48:34 |
| 15 | heard the night of the shooting.  Is that a fair | 11:48:38 |
| 16 | characterization? | 11:48:41 |
| 17 | MR. SAHASRABUDHE:  Form. | 11:48:42 |
| 18 | THE WITNESS:  No. | 11:48:42 |
| 19 | BY MR. BRUSTIN: | 11:48:46 |
| 20 | Q.   How is that inaccurate? | 11:48:47 |
| 21 | A.   It was much more than this but, I mean, | 11:48:50 |
| 22 | I'm just reading what's down, so these are the | 11:48:53 |
| 23 | answers that I gave to the questions they asked. | 11:48:57 |
| 24 | Q.   Okay.  And fair to say that in general | 11:49:01 |
| 25 | what this document suggests is they asked you in | 11:49:03 |



```
 1                    Aaron Jackson

 2   general what you remember seeing and hearing that      11:49:06

 3   night?                                                 11:49:09

 4          MR. BLENK:  Form.                                11:49:10

 5          THE WITNESS:  Yes.                               11:49:11

 6          BY MR. BRUSTIN:                                  11:49:12

 7          Q.   And you did your best at this time to      11:49:12

 8   tell them what you remember?                           11:49:14

 9          A.   Yes.                                        11:49:15

10          Q.   And at this time you did not give them     11:49:16

11   any description of the shooter, correct?               11:49:18

12          MR. BLENK:  Form.                                11:49:23

13          THE WITNESS:  It's not in there.                 11:49:24

14          BY MR. BRUSTIN:                                  11:49:27

15          Q.   Not by name or by description as to        11:49:27

16   what he was wearing or what he looked like,            11:49:29

17   correct?                                               11:49:30

18          MR. SAHASRABUDHE:  Form.  Asked and             11:49:31

19   answered.                                              11:49:32

20          MR. BLENK:  Form.                                11:49:32

21          BY MR. BRUSTIN:                                  11:49:32

22          Q.   Well, let me be more specific.  There      11:49:33

23   is nothing in here giving a description of what the    11:49:35

24   shooter looked like or was wearing, correct?          11:49:37

25          A.   No.                                         11:49:40
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                       87

| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | MR. SAHASRABUDHE:  Form.  Same objection. | 11:49:40 |
| 3 | THE WITNESS:  There's no description. | 11:49:44 |
| 4 | MR. BRUSTIN:  I didn't hear your answer, | 11:49:46 |
| 5 | sir.  I'm sorry, it's my fault. | 11:49:48 |
| 6 | THE WITNESS:  There's no description. | 11:49:49 |
| 7 | BY MR. BRUSTIN: | 11:49:52 |
| 8 | Q.   Now, on page 216 it says -- I'm just | 11:50:16 |
| 9 | going to ask you:  If you look at the paragraph | 11:51:03 |
| 10 | beginning "he states."  It's on the bottom of page | 11:51:05 |
| 11 | 216, the second-last paragraph. | 11:51:09 |
| 12 | A.   Yes. | 11:51:11 |
| 13 | Q.   Is this an accurate description of what | 11:51:11 |
| 14 | happened to you? | 11:51:14 |
| 15 | A.   Yes. | 11:51:18 |
| 16 | Q.   Okay.  Take a look at page 217.  Do you | 11:51:20 |
| 17 | see the second sentence, it says:  He states that | 11:51:55 |
| 18 | he does not know a Lamarr Scott and a Valentino | 11:51:58 |
| 19 | Dixon. | 11:52:01 |
| 20 | A.   Yes. | 11:52:02 |
| 21 | Q.   Do you see that? | 11:52:02 |
| 22 | A.   Yes. | 11:52:03 |
| 23 | Q.   Do you deny making that statement to | 11:52:04 |
| 24 | the police? | 11:52:07 |
| 25 | A.   No.  It's right here in front of me. | 11:52:07 |



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                        88

| | |
|---|---|
| 1 | Aaron Jackson |
| 2 | Q.   Why would you ever tell the police that | 11:52:11 |
| 3 | you didn't know Valentino Dixon if you knew him to | 11:52:14 |
| 4 | be the person that shot you and your brother? | 11:52:18 |
| 5 | MR. BLENK:  Form. | 11:52:20 |
| 6 | MR. SAHASRABUDHE:  Objection to form. | 11:52:22 |
| 7 | THE WITNESS:  Know him and seeing him, two | 11:52:23 |
| 8 | totally different things.  I didn't know him | 11:52:25 |
| 9 | personally, no. | 11:52:27 |
| 10 | BY MR. BRUSTIN: | 11:52:34 |
| 11 | Q.   But even with this sentence, no | 11:52:34 |
| 12 | explanation -- | 11:52:38 |
| 13 | MR. SAHASRABUDHE:  You froze, Nick. | 11:52:38 |
| 14 | (Off the record due to technical | 11:52:38 |
| 15 | difficulties.) | 11:52:38 |
| 16 | BY MR. BRUSTIN: | 11:52:38 |
| 17 | Q.   Even with this sentence, you still have | 11:52:46 |
| 18 | no explanation as to why you did not tell him | 11:52:47 |
| 19 | Valentino Dixon is the person who shot my brother? | 11:52:50 |
| 20 | MR. BLENK:  Form. | 11:52:52 |
| 21 | MR. SAHASRABUDHE:  Objection to form.  Asked | 11:52:53 |
| 22 | and answered. | 11:52:55 |
| 23 | THE WITNESS:  They may not have asked that | 11:52:55 |
| 24 | question.  They may have just asked if I knew him, | 11:52:57 |
| 25 | and I did not know him nor do I know Lamarr Scott. | 11:53:03 |



AARON JACKSON                                          January 12, 2023
DIXON V. CITY OF BUFFALO                                            89

```
 1                    Aaron Jackson
 2   I don't know them personally.                       11:53:07
 3        BY MR. BRUSTIN:                                 11:53:08
 4        Q.   Any explanation as to why you told them   11:53:09
 5   that Travis was behind the guy who was doing the    11:53:12
 6   shooting as opposed to saying he was behind         11:53:15
 7   Valentino Dixon?                                    11:53:19
 8        MR. BLENK:   Form.                             11:53:19
 9        MR. SAHASRABUDHE:   Objection to form.         11:53:20
10        THE WITNESS:   No.                             11:53:21
11        BY MR. BRUSTIN:                                11:53:31
12        Q.   Okay.   I want to ask you some questions  11:53:32
13   about what happened in the hours leading up to the  11:53:34
14   shooting, okay?                                     11:53:38
15        A.   Yes.                                      11:53:40
16        Q.   And if I need to, I'm happy to go to      11:53:41
17   the testimony.   I'm going to try without that.   You 11:53:44
18   just tell me if you prefer to see the testimony,    11:53:46
19   and I will show it to you, okay?                    11:53:49
20        A.   Yes.                                      11:53:51
21        Q.   Okay.   Based on the testimony, my        11:53:53
22   understanding is that on August 9th, the night      11:53:56
23   before the morning of the shooting, you were out    11:54:01
24   with your friend, Mr. Powell, and you wanted to get 11:54:09
25   some cigarettes from the store; is that correct?    11:54:12
```



```
 1                      Aaron Jackson
 2          A.    No.                                  11:54:15
 3          Q.    What did I get wrong about that?     11:54:17
 4          A.    I don't smoke.  He wanted to get     11:54:18
 5   cigarettes.                                       11:54:21
 6          Q.    Thank you.  You went with him to get 11:54:21
 7   cigarettes?                                       11:54:24
 8          A.    Yes.                                 11:54:25
 9          Q.    Okay.  And you went to the store on  11:54:26
10   Bailey and Delavan across from Louie's?           11:54:32
11          A.    Yes.                                 11:54:41
12          Q.    And you parked outside of the bank; is 11:54:41
13   that right?                                       11:54:44
14          A.    Yes.                                 11:54:44
15          Q.    And then Mr. Powell went into the mini 11:54:46
16   mall to buy cigarettes?                           11:54:49
17          A.    Yes.                                 11:54:51
18          Q.    And you went into the car?           11:54:53
19          A.    Yes.                                 11:54:56
20          Q.    And at that time you were approached by 11:54:56
21   three black men?                                  11:55:00
22          A.    Leonard Brown, Antoine Shannon, and  11:55:03
23   Mario Jarmon.                                     11:55:10
24          Q.    You knew one of them from school?    11:55:13
25          A.    Leonard.                             11:55:15
```



```
 1                     Aaron Jackson
 2         Q.   And they told you to get out of the          11:55:16
 3    car?                                                    11:55:18
 4         A.   Yes.                                          11:55:20
 5         Q.   And they were acting in a very               11:55:21
 6    aggressive manner?                                      11:55:24
 7         A.   Very much so.                                 11:55:25
 8         Q.   And the men -- the three black men were      11:55:27
 9    holding their hands behind their back, correct?        11:55:42
10         A.   Yes.                                          11:55:46
11         Q.   In such a way that you believed they         11:55:46
12    might have guns?                                        11:55:49
13         A.   Yes.                                          11:55:50
14         Q.   That was what was in your mind?              11:55:51
15         A.   Yes.                                          11:55:53
16         Q.   And you were very concerned, correct?        11:55:53
17         A.   Yeah, somewhat.                               11:55:56
18         Q.   That three men were threatening you          11:55:58
19    with guns behind their back, correct?                  11:56:00
20         A.   Yes.                                          11:56:02
21         MR. BLENK:  Form.                                  11:56:02
22         MR. SAHASRABUDHE:  Form.                           11:56:03
23         BY MR. BRUSTIN:                                    11:56:03
24         Q.   Obviously there would be nothing you         11:56:04
25    could do to protect yourself from three men with       11:56:07
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                       92

```
 1                    Aaron Jackson

 2   guns, correct?                                11:56:11

 3        MR. BLENK:  Form.                         11:56:12

 4        THE WITNESS:  Yes.                        11:56:12

 5        BY MR. BRUSTIN:                           11:56:13

 6        Q.  You didn't have a gun, correct?      11:56:14

 7        A.   Not at all.                          11:56:15

 8        Q.   As a result of that -- of their     11:56:23

 9   behavior, you then told your friend, Mr. Powell, to   11:56:25

10   hurry up so you could get out of there, correct?     11:56:30

11        A.   No.  I got into the driver's seat, and    11:56:33

12   I pulled in front of the store.  I blew the horn     11:56:36

13   and asked him to come out, because it seemed like    11:56:39

14   there was going to be an issue with me and these     11:56:41

15   guys in the parking lot.                      11:56:43

16        Q.  Okay.  Your concern was that there were   11:56:44

17   three guys with guns in the parking lot who were     11:56:46

18   acting in a very aggressive manner, and you     11:56:48

19   choose -- it made sense for you to leave?     11:56:51

20        A.   Yes.                                 11:56:54

21        MR. BLENK:  Form.                         11:56:54

22        MR. SAHASRABUDHE:  Yeah, form.            11:56:55

23        BY MR. BRUSTIN:                           11:56:56

24        Q.  You didn't engage with them.  You    11:56:58

25   didn't get in a shouting match with them.     11:57:00
```



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | MR. BLENK:  Form. | 11:57:02 |
| 3 | BY MR. BRUSTIN: | 11:57:03 |
| 4 | Q.   You saw they may have guns, you got | 11:57:03 |
| 5 | your friend, and you got the hell out of there, | 11:57:06 |
| 6 | right? | 11:57:09 |
| 7 | A.   Yes. | 11:57:09 |
| 8 | MR. BLENK:  Form. | 11:57:09 |
| 9 | BY MR. BRUSTIN: | 11:57:09 |
| 10 | Q.   And that was the smart thing to do, | 11:57:10 |
| 11 | right? | 11:57:12 |
| 12 | MR. BLENK:  Form. | 11:57:12 |
| 13 | MR. SAHASRABUDHE:  Form. | 11:57:13 |
| 14 | THE WITNESS:  Yes. | 11:57:14 |
| 15 | BY MR. BRUSTIN: | 11:57:14 |
| 16 | Q.   All right.  Then at that time, by the | 11:57:15 |
| 17 | way, you were 20 years old, correct? | 11:57:16 |
| 18 | A.   Yes. | 11:57:19 |
| 19 | Q.   And your brother, Torri, was 17? | 11:57:20 |
| 20 | A.   Yes. | 11:57:24 |
| 21 | Q.   In fact, he just turned 17, right? | 11:57:24 |
| 22 | A.   Yes. | 11:57:27 |
| 23 | Q.   And he was about 135 pounds at the | 11:57:28 |
| 24 | time? | 11:57:32 |
| 25 | A.   No, no.  I think he weighed a little | 11:57:32 |



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | more. | 11:57:34 |
| 3 | Q.   A little bit more, but he was a | 11:57:34 |
| 4 | relatively small guy? | 11:57:36 |
| 5 | A.   No.  He was bigger than me. | 11:57:37 |
| 6 | Q.   Was he taller than you? | 11:57:40 |
| 7 | A.   Yes. | 11:57:42 |
| 8 | Q.   Okay.  Was he more than 150 pounds? | 11:57:43 |
| 9 | A.   Possible.  I mean, I don't know. | 11:57:45 |
| 10 | Q.   Okay.  But he was a teenager and you | 11:57:48 |
| 11 | were an adult? | 11:57:53 |
| 12 | A.   Yes. | 11:57:55 |
| 13 | Q.   And you testified -- withdrawn. | 11:58:00 |
| 14 | You went back, and your brother had been | 11:58:06 |
| 15 | working, correct? | 11:58:09 |
| 16 | A.   Yes. | 11:58:10 |
| 17 | Q.   And you went back to your house | 11:58:10 |
| 18 | specifically to pick him up, correct? | 11:58:14 |
| 19 | A.   Yes, yes. | 11:58:17 |
| 20 | Q.   And you and your brother -- after you | 11:58:17 |
| 21 | picked him up, you and your brother and Mr. Powell | 11:58:22 |
| 22 | continued to go out that evening, right? | 11:58:27 |
| 23 | A.   Yes, yes. | 11:58:28 |
| 24 | Q.   You went to a couple of parties? | 11:58:31 |
| 25 | A.   No. | 11:58:39 |



AARON JACKSON                                          January 12, 2023
DIXON V. CITY OF BUFFALO                                         95

```
 1                    Aaron Jackson

 2         Q.    Did you go to a party?                    11:58:43

 3         A.    From what I understand, Travis went.  I  11:58:45

 4   was in the car sleeping.                             11:58:47

 5         Q.    Okay.  And at some point you saw the     11:58:52

 6   three guys who you believed had threatened you with 11:58:56

 7   guns behind their backs earlier that night?         11:59:02

 8         A.    Yes.                                      11:59:06

 9         Q.    Okay.  And, by the way, one of the       11:59:07

10   reasons you were driving around, the three of you   11:59:09

11   that night, was to look for, if you saw them, the   11:59:12

12   three people who were threatening you?              11:59:17

13         A.    No.                                       11:59:20

14         Q.    It never crossed your mind that night    11:59:21

15   that you were looking for those people?             11:59:23

16         A.    No.  When I went to go pick my younger   11:59:24

17   brother up, I wanted to ride back by Bailey.  We    11:59:27

18   did that initially just to see if those three guys  11:59:29

19   were there and to ask my little brother, did he     11:59:32

20   know any of them outside of the one that I knew, so  11:59:35

21   yes.                                                 11:59:37

22         Q.    Okay.  It wasn't to confront them?       11:59:38

23         A.    No.  Just to see.                         11:59:40

24         Q.    You never had that intention to          11:59:41

25   confront them?                                       11:59:43
```



```
 1                    Aaron Jackson
 2         A.   No.                                    11:59:44
 3         Q.   Not at any time that night?            11:59:45
 4         A.   Not at that point.                     11:59:48
 5         Q.   Okay.  We'll get -- so at some point   11:59:49
 6   you did -- at some point -- withdrawn.            11:59:53
 7         First of all, that night, had you had       11:59:55
 8   anything to drink?                                11:59:57
 9         A.   No.                                    11:59:59
10         Q.   Did you have -- did you smoke anything? 12:00:00
11         A.   I don't smoke.                         12:00:02
12         Q.   Okay.  At that time you didn't smoke or 12:00:04
13   drink?                                            12:00:05
14         A.   No.                                    12:00:06
15         Q.   How about your brother?                12:00:07
16         A.   No.                                    12:00:08
17         Q.   Did he have anything to drink or smoke? 12:00:09
18         A.   No smoke, no drink.                    12:00:11
19         Q.   How about Mr. Powell?                  12:00:12
20         A.   No smoke.  Cigarettes.                 12:00:13
21         Q.   Okay.  So you were all sober?          12:00:17
22         A.   Yes.                                   12:00:19
23         Q.   Okay.  And at some point that night    12:00:20
24   around 11 -- I'm sorry, at some point early in the 12:00:24
25   morning you saw the three men who had threatened  12:00:28
```



```
 1                    Aaron Jackson
 2   you?                                        12:00:33
 3        A.   Yes.                              12:00:34
 4        Q.   And you parked the car?           12:00:40
 5        MR. SAHASRABUDHE:  Form.               12:00:43
 6        THE WITNESS:  No.                      12:00:44
 7        BY MR. BRUSTIN:                        12:00:45
 8        Q.   I'm sorry?                        12:00:46
 9        A.   No.                               12:00:46
10        Q.   What happened?                    12:00:46
11        A.   I was nudged awake by Travis that Mario   12:00:48
12   was standing to the left of us on the curb  12:00:53
13   gesturing with his hands up like, come on, and I   12:00:57
14   woke my younger brother up that was in the back   12:01:01
15   seat and we exited the vehicle right there.  12:01:03
16        Q.   Okay.  You exited the vehicle?    12:01:06
17        A.   Yes.                              12:01:07
18        Q.   To -- to confront them?           12:01:07
19        A.   Approach.                         12:01:10
20        Q.   Would it be fair to say -- well, let's   12:01:12
21   take a look at page 120 of the trial.  I'm sorry,   12:01:15
22   of the perjury trial.  Take a look at page 120.   12:01:27
23   Are you there?                              12:01:54
24        A.   Yes.                              12:02:00
25        Q.   Read lines 2 through lines 9.     12:02:00
```



1                    Aaron Jackson

2       A.   Yes.                                    12:02:21

3       Q.   So, in other words -- was that accurate 12:02:22

4  testimony?                                        12:02:26

5       A.   Yes.                                    12:02:27

6       Q.   Okay.  So you approached -- you got out 12:02:27

7  of your car.  The three of you approached those   12:02:29

8  three men that you had seen earlier.              12:02:31

9       A.   Two, two.                               12:02:33

10      Q.   Two men.                                12:02:35

11      A.   Me and my younger brother got out of    12:02:36

12 the vehicle to approach Mario.  Travis went and   12:02:39

13 parked the car.                                    12:02:42

14      Q.   Okay.  Did you get out of the car?       12:02:43

15      A.   Yes.                                     12:02:45

16      Q.   Okay.  And the purpose was to let them   12:02:45

17 know that if they had -- if they had a problem with 12:02:47

18 one of you, they had a problem with both of you;   12:02:50

19 fair to say?                                       12:02:53

20      A.   You just said let them know.  It was     12:02:54

21 just Mario.  It was him.                           12:02:56

22      Q.   To let him know to confront him about    12:02:58

23 what had happened earlier, correct?                12:03:03

24      A.   Yes, yes.                                12:03:04

25      Q.   Okay.  And you've already told us that   12:03:05



1                    Aaron Jackson
2    you left those three men because you believed they          12:03:07
3    had been holding guns behind their back, correct?           12:03:11
4          A.   Yes, yes.                                          12:03:14
5          MR. SAHASRABUDHE:   Form.                               12:03:15
6          BY MR. BRUSTIN:                                         12:03:15
7          Q.   Then you went looking for them with               12:03:16
8    your 17-year-old brother, correct?                          12:03:18
9          MR. SAHASRABUDHE:   Objection to form.                 12:03:21
10         THE WITNESS:   We just rode up there to see            12:03:21
11   if they were there, to see if he knew who they              12:03:23
12   were.                                                        12:03:25
13         BY MR. BRUSTIN:                                         12:03:25
14         Q.   And then you got out of the car, and             12:03:26
15   you confronted those men who you believed were              12:03:28
16   armed and had earlier taken their guns out of their         12:03:30
17   pockets?                                                     12:03:34
18         MR. SAHASRABUDHE:   Objection to form.                 12:03:35
19   That's not what he said.                                     12:03:36
20         MR. BLENK:   Form.                                      12:03:37
21         THE WITNESS:   I confronted Mario.  I walked          12:03:37
22   up to Mario.                                                 12:03:39
23         BY MR. BRUSTIN:                                         12:03:40
24         Q.   Who was one of the men who you believed          12:03:41
25   had a gun behind his back, correct?                          12:03:42



```
 1                      Aaron Jackson

 2          MR. SAHASRABUDHE:  Form.                    12:03:44

 3          THE WITNESS:  Yes.                          12:03:45

 4          BY MR. BRUSTIN:                             12:03:46

 5          Q.   And you were looking with your brother 12:03:46

 6     that evening for the three men who had confronted 12:03:49

 7     you earlier, correct?                            12:03:54

 8          MR. BLENK:  Form.                           12:03:55

 9          MR. SAHASRABUDHE:  Form.  Asked and         12:03:55

10     answered.                                        12:03:57

11          THE WITNESS:  No.                           12:03:57

12          BY MR. BRUSTIN:                             12:03:58

13          Q.   Just for one of them?                  12:03:59

14          MR. BLENK:  Form.                           12:04:00

15          MR. SAHASRABUDHE:  Form.                    12:04:01

16          THE WITNESS:  I told you, we rode by there  12:04:01

17     to see if they were there, to see if my younger  12:04:04

18     brother could recognize any of them and let me   12:04:07

19     know.                                            12:04:09

20          BY MR. BRUSTIN:                             12:04:09

21          Q.   But you got out of the car --          12:04:09

22          A.   Yes.                                   12:04:11

23          Q.   -- to confront them.                   12:04:11

24          A.   Because he was gesturing to come to    12:04:13

25     him.                                             12:04:14
```



AARON JACKSON                                         January 12, 2023
DIXON V. CITY OF BUFFALO                                           101

```
 1                    Aaron Jackson

 2        Q.   Okay.   The men who you believed each      12:04:15

 3   had been holding guns, you got out of the car to     12:04:18

 4   confront them?                                       12:04:20

 5        MR. BLENK:   Form.                              12:04:21

 6        MR. SAHASRABUDHE:   Asked and answered.         12:04:22

 7   Form.                                                12:04:24

 8        THE WITNESS:   You're doing it again, Nick.     12:04:24

 9   You're asking the same question over and over        12:04:25

10   again.                                               12:04:27

11        BY MR. BRUSTIN:                                 12:04:28

12        Q.   Let me tell you why I'm asking,            12:04:28

13   Mr. Jackson.                                         12:04:31

14        A.   It was one person.   It was one person.    12:04:31

15   It was Mario Jarmon, and we approached him.          12:04:33

16        Q.   Okay.   And you had been looking for       12:04:36

17   him?                                                 12:04:37

18        MR. BLENK:   Form.                              12:04:37

19        MR. SAHASRABUDHE:   Objection to form.          12:04:38

20        THE WITNESS:   No, I hadn't.                    12:04:39

21        BY MR. BRUSTIN:                                 12:04:40

22        Q.   All right.   The reason -- why would you   12:04:40

23   have felt safer with your 17-year-old brother        12:04:45

24   unless he was carrying a firearm?                    12:04:48

25        MR. SAHASRABUDHE:   Objection to form.          12:04:51
```



AARON JACKSON                                             January 12, 2023
DIXON V. CITY OF BUFFALO                                              102

| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | MR. BLENK:  Form. | 12:04:52 |
| 3 | THE WITNESS:  That's my younger brother. | 12:04:53 |
| 4 | I'm going to always feel safer with my younger | 12:04:55 |
| 5 | brother, more than any friend, more than any | 12:04:58 |
| 6 | friend.  It had nothing to do with anything other | 12:05:01 |
| 7 | than being with my younger brother.  In case | 12:05:03 |
| 8 | anything happened, I was going to always be with | 12:05:05 |
| 9 | him.  I did that thousands of times before, and he | 12:05:08 |
| 10 | did as well.  He was always dependable and he would | 12:05:11 |
| 11 | always be there for me, Nick. | 12:05:13 |
| 12 | BY MR. BRUSTIN: | 12:05:15 |
| 13 | Q.  Okay.  So you decided that -- and you | 12:05:16 |
| 14 | didn't know those three men -- you didn't know -- | 12:05:18 |
| 15 | did you know all of the three men at that time who | 12:05:21 |
| 16 | you believe had guns behind their back? | 12:05:24 |
| 17 | MR. BLENK:  Form. | 12:05:29 |
| 18 | MR. SAHASRABUDHE:  Form. | 12:05:30 |
| 19 | THE WITNESS:  I told you I knew Leonard.  We | 12:05:30 |
| 20 | went to school together. | 12:05:31 |
| 21 | BY MR. BRUSTIN: | 12:05:31 |
| 22 | Q.  My question is:  Did you know all of | 12:05:31 |
| 23 | them? | 12:05:33 |
| 24 | MR. SAHASRABUDHE:  Objection to form. | 12:05:33 |
| 25 | THE WITNESS:  I told you I rode back past | 12:05:33 |



AARON JACKSON                                           January 12, 2023
DIXON V. CITY OF BUFFALO                                         103

```
 1                    Aaron Jackson

 2  with my younger brother to see if he knew them.        12:05:35

 3       BY MR. BRUSTIN:                                   12:05:38

 4       Q.   Okay.  I'm asking you a different            12:05:38

 5  question now.  I'm going back to when you first saw    12:05:39

 6  the men who you believe had guns behind their back.   12:05:42

 7  At that time did you know all of them?                 12:05:45

 8       MR. SAHASRABUDHE:  Form.  He has already          12:05:46

 9  answered that.                                         12:05:48

10       THE WITNESS:  No.                                 12:05:48

11       MR. SAHASRABUDHE:  Go ahead.                      12:05:49

12       BY MR. BRUSTIN:                                   12:05:50

13       Q.   So, in other words, you had no idea          12:05:51

14  whether or not any of those three men, certainly      12:05:53

15  the two you didn't know, were capable and willing     12:05:55

16  to shoot you?                                          12:05:59

17       MR. BLENK:  Form.                                 12:06:01

18       MR. SAHASRABUDHE:  Objection to form.             12:06:01

19       THE WITNESS:  I didn't know that.                 12:06:02

20       BY MR. BRUSTIN:                                   12:06:05

21       Q.   Okay.  And, frankly, because you didn't      12:06:05

22  know them, you had to assume that they would,         12:06:07

23  right?                                                 12:06:11

24       MR. BLENK:  Form.                                 12:06:11

25       MR. SAHASRABUDHE:  Objection to form.  Calls      12:06:12
```



AARON JACKSON                                                January 12, 2023
DIXON V. CITY OF BUFFALO                                                  104

```
 1                    Aaron Jackson
 2   for speculation.                                     12:06:15
 3        BY MR. BRUSTIN:                                 12:06:15
 4        Q.   Withdrawn.  I'm going to ask it a          12:06:15
 5   different way.                                       12:06:17
 6        Would it be fair to say that given that you     12:06:18
 7   didn't know the two men who had guns behind their   12:06:20
 8   back at that time you assumed that they might be     12:06:23
 9   willing to use those guns?                           12:06:26
10        MR. BLENK:  Form.                               12:06:27
11        MR. SAHASRABUDHE:  Objection to form.           12:06:28
12        THE WITNESS:  I'm not -- I don't have an        12:06:31
13   answer for you, Nick.                                12:06:33
14        BY MR. BRUSTIN:                                 12:06:35
15        Q.   Certainly that was a concern, right?       12:06:36
16        MR. BLENK:  Form.                               12:06:38
17        MR. SAHASRABUDHE:  Form.                        12:06:38
18        THE WITNESS:  No.  Because as he was            12:06:39
19   gesturing, you could clearly see his hands were     12:06:45
20   available, they were out and open, there was no     12:06:47
21   weapon in his hands.  So it was safe to assume that 12:06:49
22   he didn't have a gun.                                12:06:53
23        BY MR. BRUSTIN:                                 12:06:55
24        Q.   Okay.  So when you approached him the      12:06:55
25   second time, although you believed he had a gun the 12:06:57
```



```
 1                    Aaron Jackson
 2   first time, you could see his hands, and he wasn't       12:07:00
 3   carrying a weapon at that time?                          12:07:02
 4           A.   Yes.                                        12:07:03
 5           Q.   And you had no idea where the other two     12:07:04
 6   guys you believed had guns behind their back were,       12:07:10
 7   correct?                                                 12:07:10
 8           MR. SAHASRABUDHE:  Form.                         12:07:10
 9           MR. BLENK:  Form.                                12:07:10
10           THE WITNESS:  Say that again?                    12:07:13
11           BY MR. BRUSTIN:                                  12:07:14
12           Q.   You had no idea where the other two         12:07:14
13   people who you had seen earlier and believed had         12:07:16
14   guns behind their back, where they were at that          12:07:19
15   time?                                                    12:07:22
16           A.   Yes.                                        12:07:22
17           MR. BLENK:  Form.                                12:07:22
18           MR. SAHASRABUDHE:  Form.                         12:07:24
19           BY MR. BRUSTIN:                                  12:07:24
20           Q.   You agree with me, right?                   12:07:25
21           A.   Yes.                                        12:07:26
22           Q.   And so you approached them with your        12:07:27
23   17-year-old brother?                                     12:07:31
24           A.   Yes.                                        12:07:32
25           Q.   Not knowing where the other two men         12:07:32
```



| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | were who you believed were armed, correct? | 12:07:35 |
| 3 | A.   Yes. | 12:07:37 |
| 4 | Q.   Not knowing -- | 12:07:37 |
| 5 | MR. SAHASRABUDHE:  Form to the last | 12:07:40 |
| 6 | question.  Go ahead.  Sorry. | 12:07:41 |
| 7 | THE WITNESS:  Say it again? | 12:07:43 |
| 8 | BY MR. BRUSTIN: | 12:07:44 |
| 9 | Q.   Not knowing whether Mario was armed. | 12:07:45 |
| 10 | MR. SAHASRABUDHE:  Objection to form. | 12:07:47 |
| 11 | MR. BLENK:  Form. | 12:07:49 |
| 12 | THE WITNESS:  I just said he had his hands | 12:07:49 |
| 13 | out. | 12:07:49 |
| 14 | (Reporter interruption.) | 12:08:03 |
| 15 | BY MR. BRUSTIN: | 12:08:03 |
| 16 | Q.   You believed Mario had a gun earlier | 12:08:04 |
| 17 | that evening, correct? | 12:08:06 |
| 18 | MR. BLENK:  Form. | 12:08:07 |
| 19 | MR. SAHASRABUDHE:  Objection.  Asked and | 12:08:08 |
| 20 | answered. | 12:08:12 |
| 21 | MR. BRUSTIN:  You can answer again. | 12:08:12 |
| 22 | MR. BLENK:  Form. | 12:08:14 |
| 23 | THE WITNESS:  The same question again. | 12:08:15 |
| 24 | You're doing the same thing over and over and over | 12:08:17 |
| 25 | again.  They approached the vehicle, and they had | 12:08:19 |



1              Aaron Jackson

2    their hands behind their back.  It was safe to          12:08:21

3    assume that they had weapons, yes.  When I saw him      12:08:24

4    the next time in the street with his hands -- on        12:08:28

5    the curb with his hands like this, he didn't have a     12:08:32

6    gun.                                                    12:08:35

7         BY MR. BRUSTIN:                                    12:08:35

8         Q.   Okay.  And at that time you had no idea       12:08:35

9    whether he had a gun in his pocket or on his            12:08:39

10   person, correct?                                        12:08:43

11        MR. SAHASRABUDHE:  Objection to form.              12:08:44

12        MR. BLENK:  Form.                                  12:08:44

13        THE WITNESS:  No.                                  12:08:45

14        BY MR. BRUSTIN:                                    12:08:46

15        Q.   Did you think that he had thrown his          12:08:47

16   gun away by that point in time?                         12:08:48

17        MR. SAHASRABUDHE:  Objection to form.              12:08:51

18        MR. BLENK:  Form.                                  12:08:52

19        THE WITNESS:  Nick --                              12:08:52

20        BY MR. BRUSTIN:                                    12:08:56

21        Q.   Here's what I'm getting at:  Why would        12:08:56

22   you bring your 17-year-old brother to confront a        12:08:58

23   man who you believed had threatened you with a gun      12:09:02

24   earlier that evening unless he had a gun?               12:09:05

25        MR. SAHASRABUDHE:  Asked and answered.             12:09:08



AARON JACKSON                                       January 12, 2023
DIXON V. CITY OF BUFFALO                                        108

```
 1                    Aaron Jackson
 2        MR. BLENK:  Form.                        12:09:09
 3        MR. SAHASRABUDHE:  Go ahead.             12:09:11
 4        THE WITNESS:  Can you ask that again?    12:09:12
 5        BY MR. BRUSTIN:                          12:09:13
 6        Q.  Yes, sir.  The reason that you brought    12:09:14
 7   your brother, Torri, to confront Mario and possibly    12:09:15
 8   the other two men who you believed were armed was     12:09:21
 9   because Torri had a gun, correct?             12:09:25
10        A.  No.                                  12:09:28
11        MR. SAHASRABUDHE:  Objection to form.    12:09:28
12        THE WITNESS:  Not at all, no.            12:09:29
13        BY MR. BRUSTIN:                          12:09:32
14        Q.  So anybody who claims to have seen you    12:09:33
15   or your brother with a gun that night is lying,    12:09:34
16   correct?                                      12:09:37
17        A.  Yes, yes.                            12:09:38
18        Q.  You and your brother and Mr. Powell    12:09:39
19   never had guns, correct?                      12:09:42
20        A.  Never.                               12:09:43
21        MR. BLENK:  Form.                        12:09:44
22        BY MR. BRUSTIN:                          12:09:46
23        Q.  As far as you know it, you and your    12:09:47
24   brother, Torri, never had a gun, correct?     12:09:48
25        A.  I just --                            12:09:51
```



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | MR. SAHASRABUDHE:  Asked and answered. | 12:09:51 |
| 3 | MR. BLENK:  Form. | 12:09:54 |
| 4 | THE WITNESS:  Asked and answered. | 12:09:55 |
| 5 | BY MR. BRUSTIN: | 12:09:57 |
| 6 | Q.   Not just that night but ever. | 12:09:58 |
| 7 | A.   Period. | 12:10:00 |
| 8 | Q.   Okay.  And so your testimony is that | 12:10:01 |
| 9 | you simply got your 17-year-old brother because | 12:10:05 |
| 10 | that would make you feel more comfortable? | 12:10:08 |
| 11 | A.   Yes. | 12:10:11 |
| 12 | Q.   Now, the reason that Mr. Powell nudged | 12:10:30 |
| 13 | you awake, you and your brother awake, was because | 12:10:36 |
| 14 | you had told him if you see those three men to let | 12:10:40 |
| 15 | you know, correct? | 12:10:43 |
| 16 | MR. BLENK:  Form. | 12:10:44 |
| 17 | MR. SAHASRABUDHE:  Form. | 12:10:44 |
| 18 | THE WITNESS:  No. | 12:10:45 |
| 19 | BY MR. BRUSTIN: | 12:10:46 |
| 20 | Q.   Then why did he nudge you awake? | 12:10:47 |
| 21 | MR. SAHASRABUDHE:  Form. | 12:10:49 |
| 22 | THE WITNESS:  Because that was the issue | 12:10:50 |
| 23 | that we had drove away from earlier, and he was | 12:10:51 |
| 24 | just pointing out that isn't this the guy as he was | 12:10:54 |
| 25 | gesturing with his hands for us to come on, to | 12:10:57 |



```
 1                    Aaron Jackson
 2   fight.                                               12:10:59
 3        BY MR. BRUSTIN:                                 12:11:00
 4        Q.   Is it your testimony, Mr. Jackson,        12:11:01
 5   under oath that you were not affirmatively looking  12:11:02
 6   for Mario and the other two men who had threatened  12:11:06
 7   you earlier?                                         12:11:10
 8        A.   Yes.                                       12:11:11
 9        MR. SAHASRABUDHE:   Form.   Asked and           12:11:11
10   answered.                                            12:11:12
11        THE WITNESS:   I wasn't looking for them.       12:11:12
12        BY MR. BRUSTIN:                                 12:11:14
13        Q.   Nor was Mr. Powell, nor was your          12:11:15
14   brother?                                             12:11:18
15        A.    Not at all.                               12:11:18
16        MR. SAHASRABUDHE:   Form.                       12:11:20
17        BY MR. BRUSTIN:                                 12:11:21
18        Q.   You just happened to come upon them?      12:11:21
19        A.   Happened to come upon them.   We were     12:11:23
20   both asleep in the vehicle.                          12:11:25
21        Q.   Now, Mr. Jackson, do you recall any       12:12:22
22   communications with any other police officers other 12:12:32
23   than Stambach and the two detectives who came to    12:12:42
24   your hospital room on the 21st after that time      12:12:49
25   concerning this case?                                12:12:52
```



AARON JACKSON                                          January 12, 2023
DIXON V. CITY OF BUFFALO                                          111

| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | A.   No. | 12:12:54 |
| 3 | Q.   Okay.  Is it -- is it your recollection | 12:12:56 |
| 4 | that you didn't have any additional communication | 12:12:59 |
| 5 | with police or you just don't remember one way or | 12:13:02 |
| 6 | the other? | 12:13:05 |
| 7 | A.   I don't remember. | 12:13:05 |
| 8 | Q.   Okay.  Now, I want to show you -- do | 12:13:07 |
| 9 | you recall giving a statement to -- in connection | 12:13:30 |
| 10 | with sentencing to a probation officer named | 12:13:35 |
| 11 | Charles Skipper regarding Mr. Dixon in August of | 12:13:42 |
| 12 | '92, so about a year after the shooting? | 12:13:49 |
| 13 | A.   I don't recall. | 12:13:51 |
| 14 | Q.   All right.  So I'm going to put this on | 12:13:53 |
| 15 | the screen for you.  Then I'll have it there, and | 12:13:55 |
| 16 | let's mark this -- | 12:13:58 |
| 17 | MR. BRUSTIN:  Mo, what exhibit are we on? | 12:13:59 |
| 18 | MR. SOTO-BRITO:  22. | 12:14:05 |
| 19 | MR. BRUSTIN:  Let's mark this as Exhibit 22, | 12:14:06 |
| 20 | please, and we'll send a copy around to everybody. | 12:14:08 |
| 21 | Actually, would you mind doing that now. | 12:14:12 |
| 22 | MR. SOTO-BRITO:  Yeah.  What exhibit was it | 12:14:19 |
| 23 | again? | 12:14:21 |
| 24 | MR. BRUSTIN:  This is the statement that -- | 12:14:22 |
| 25 | the interview concerning -- probation interview of | 12:14:22 |



```
 1                    Aaron Jackson
 2  Mr. Jackson.  It's Bates-stamped COE1837 through     12:14:24
 3  1842.                                                 12:14:32
 4       MR. BLENK:  Whose Bates stamp is it?            12:14:34
 5       MR. BRUSTIN:  COE.                               12:14:37
 6       MR. BLENK:  Thank you.                           12:14:38
 7       MR. SAHASRABUDHE:  It would be helpful if        12:14:44
 8  you zoomed in a little.                               12:14:46
 9       MR. BRUSTIN:  Is that good enough, or do you     12:14:52
10  want more?                                            12:14:54
11       MR. SAHASRABUDHE:  That's -- I mean, I won't     12:14:56
12  speak for the witness but --                          12:14:58
13       MR. BLENK:  Can you just give us a second?       12:14:58
14  Because the rest of us can't see the screen.          12:15:00
15       MR. BRUSTIN:  Yeah.  Just let me know when       12:15:03
16  you're ready, okay?                                   12:15:04
17       THE WITNESS:  I read it.                         12:15:06
18       MR. BRUSTIN:  I'm sorry, the other lawyers.      12:15:07
19       MR. BLENK:  Are you going to send it to us?      12:15:12
20       MR. BRUSTIN:  Have you sent it, Mo?             12:15:16
21       MR. SOTO-BRITO:  No.  Give me one second.        12:15:19
22  All right.  Just sent.                                12:15:40
23       MR. BRUSTIN:  Okay.                              12:15:42
24       MR. BLENK:  I think it will take a second        12:15:46
25  here.                                                 12:15:48
```



```
 1                      Aaron Jackson
 2          MR. BRUSTIN:  Sorry.                         12:15:48
 3          MR. BLENK:  Sorry.                           12:15:50
 4   The following was marked for Identification:        12:15:50
 5    PLF. EXH. 22          report
 6          (Off the record at 12:16 p.m.)              12:16:19
 7          MR. BRUSTIN:  So I'm only going to show you  12:19:09
 8   just a couple things.  If you can go to the next    12:19:12
 9   page which is -- so, first of all, I'm going to     12:19:14
10   mark this as Plaintiff's Exhibit 22, and it's a --  12:19:16
11   it's Bates-stamped pages COE1837 to 1842, and it    12:19:23
12   looks to be a report concerning sentencing from a   12:19:30
13   probation officer named Skipper, okay?  And it      12:19:42
14   references an interview with you, Mr. Jackson.      12:19:49
15          I know you don't recall it, but I want to    12:19:51
16   just show you a portion of it and see if it -- if   12:19:53
17   it refreshes your recollection.  Let's take a look  12:19:57
18   at page 1838, which is also page 4, and if you      12:20:00
19   could read -- if you could read the first three     12:20:05
20   paragraphs on this page, and let me know when       12:20:15
21   you're done.                                        12:20:17
22          MR. SAHASRABUDHE:  He wants you to start at  12:20:20
23   the top.                                            12:20:22
24          THE WITNESS:  Read the whole thing?  On June 12:20:22
25   29th?                                               12:20:25
```



| | |
|---|---|
| 1 | Aaron Jackson |
| 2 | MR. BRUSTIN:  These three paragraphs to | 12:20:26 |
| 3 | yourself.  Yes, please. | 12:20:27 |
| 4 | MR. SAHASRABUDHE:  Can you lift where it | 12:21:11 |
| 5 | says apps for you?  Because I think you're sharing | 12:21:13 |
| 6 | your screen, because it's blocking -- | 12:21:15 |
| 7 | MR. BRUSTIN:  I'm not understanding, Peter. | 12:21:18 |
| 8 | I'm sorry. | 12:21:21 |
| 9 | MR. SAHASRABUDHE:  Why don't you just scroll | 12:21:21 |
| 10 | up, because something's happening -- | 12:21:22 |
| 11 | MR. BRUSTIN:  This is all I want him to | 12:21:23 |
| 12 | read. | 12:21:25 |
| 13 | MR. SAHASRABUDHE:  I know, but he can't read | 12:21:25 |
| 14 | the full third paragraph.  He's on the third | 12:21:27 |
| 15 | paragraph.  Something on the screen is blocking | 12:21:30 |
| 16 | part of it, so if you could scroll up. | 12:21:31 |
| 17 | MR. BRUSTIN:  Is that better? | 12:21:34 |
| 18 | MR. SAHASRABUDHE:  I think so, yes.  Can you | 12:21:35 |
| 19 | still read it?  Okay.  I believe he's -- | 12:21:36 |
| 20 | THE WITNESS:  Yes. | 12:21:47 |
| 21 | BY MR. BRUSTIN: | 12:21:48 |
| 22 | Q.   Okay.  Does this refresh your | 12:21:48 |
| 23 | recollection about speaking to this probation | 12:21:50 |
| 24 | officer? | 12:21:52 |
| 25 | A.   Yes. | 12:21:52 |



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      115

```
 1                    Aaron Jackson
 2        Q.   Okay.  And this is -- do these three      12:21:53
 3   paragraphs accurately describe what you told him?   12:21:56
 4        A.   Yes.                                       12:21:59
 5        Q.   Is there anything that's inaccurate in    12:21:59
 6   what's written here?                                 12:22:02
 7        A.   No.                                        12:22:04
 8        Q.   For example, in the third paragraph       12:22:16
 9   where he says Mr. Jackson said, quote, if we saw    12:22:22
10   him again that night, he was going to ask them why  12:22:26
11   they came up on him.                                 12:22:28
12        Did you tell him that?                          12:22:30
13        A.   Yes.  If that's what's stated, yes.       12:22:32
14        Q.   Okay.  And it all states that you went    12:22:37
15   home to get your younger brother for security.  Is  12:22:39
16   that what you told him?                              12:22:41
17        A.   No.  I mean -- no.                         12:22:42
18        Q.   Well, it says:  Mr. Jackson said he       12:22:46
19   went home to get his younger brother, Torriano, age 12:22:49
20   17, for security.  Did he -- did he misrepresent    12:22:52
21   what you told him?                                   12:22:54
22        A.   Yes.  I didn't go get my little brother   12:22:56
23   for security.  I never went to get my little        12:22:58
24   brother for security.                                12:23:00
25        Q.   Okay.  So he must have misunderstood      12:23:01
```



```
 1                    Aaron Jackson

 2   what you said?                              12:23:04

 3        A.   Yes.                              12:23:05

 4        Q.   You never said that to him?       12:23:05

 5        A.   No.  I don't recall saying for    12:23:06

 6   security.                                   12:23:08

 7        Q.   He's either mistaken or lying about  12:23:08

 8   that?                                       12:23:11

 9        MR. BLENK:  Form.                       12:23:11

10        MR. SAHASRABUDHE:  Form.                12:23:11

11        THE WITNESS:  Are you --               12:23:14

12        BY MR. BRUSTIN:                         12:23:15

13        Q.   Is that correct?                   12:23:15

14        A.   Do you want an answer?             12:23:15

15        Q.   Yes, sir.                          12:23:17

16        MR. BLENK:  Form.                       12:23:18

17        THE WITNESS:  I don't know, but I don't  12:23:18

18   recall saying for security.                 12:23:20

19        BY MR. BRUSTIN:                         12:23:24

20        Q.   And that's what I was asking, by the  12:23:24

21   way.  Is there anything else in here that you think  12:23:26

22   is inaccurate?                              12:23:28

23        A.   Yeah, that.                       12:23:29

24        Q.   Anything else?                    12:23:33

25        A.   No.                               12:23:44
```



1                          Aaron Jackson

2          Q.   And you see on the second paragraph, it          12:23:50

3     says:  Mr. Jackson said that they did not say his          12:23:53

4     name but said, quote, let's get out of the car,            12:23:57

5     let's take care of this.  Is that something you            12:24:00

6     would have said -- is that what you remember saying        12:24:04

7     to him?                                                    12:24:05

8          A.   Yeah.  They said that.  That's what             12:24:05

9     they said.                                                 12:24:07

10         Q.   They said that while they had their             12:24:07

11    hands behind their backs --                                12:24:10

12         A.   Yes.                                             12:24:10

13         Q.   -- with what you believe were guns,             12:24:10

14    correct?  That's what they said to you while they          12:24:15

15    had their hands behind their backs with what you           12:24:18

16    believe to be were guns?                                   12:24:22

17         MR. BLENK:  Form.                                     12:24:24

18         MR. SAHASRABUDHE:  Objection to form.                 12:24:26

19         THE WITNESS:  Yes.                                    12:24:26

20         BY MR. BRUSTIN:                                       12:24:32

21         Q.   Okay.  So we can take that down now.             12:24:32

22    Thank you.                                                 12:24:35

23         Oh, wait.  Hold on one second.  Let's go to          12:24:37

24    page -- the next page, page 5, the first full              12:24:51

25    paragraph.  And I want to just focus on the first          12:24:54



AARON JACKSON                                          January 12, 2023
DIXON V. CITY OF BUFFALO                                          118

```
1                      Aaron Jackson

2    part where it says Mr. Jackson said that there was    12:25:12

3    a group of guys about five to six feet away from     12:25:15

4    Marino.  He said that he and his brother got out of  12:25:18

5    the car and he confronted Marino and asked him       12:25:21

6    what's the problem.  Is that an accurate             12:25:26

7    description of what happened?                         12:25:28

8         A.   Yes.                                        12:25:29

9         Q.   And I assume when he says Marino, he        12:25:29

10   means Mario.                                          12:25:32

11        A.   Yes.                                        12:25:34

12        Q.   Okay.  And so at the time you               12:25:34

13   approached Mario, there was a group of people        12:25:35

14   there, correct?                                       12:25:38

15        A.   Yes, off to the side.                       12:25:39

16        Q.   And would it be fair to say that at         12:25:40

17   that time you couldn't be sure one way or another    12:25:42

18   whether or not anybody in that group was one of the  12:25:44

19   prior men who had threatened you earlier with what   12:25:46

20   you believe to be were guns?                          12:25:50

21        MR. SAHASRABUDHE:  Form.                         12:25:51

22        MR. BLENK:  Form.                                12:25:52

23        THE WITNESS:  I wasn't focused on them.  I       12:25:53

24   was focused on him.                                   12:25:55

25        BY MR. BRUSTIN:                                  12:25:56
```



AARON JACKSON                                      January 12, 2023
DIXON V. CITY OF BUFFALO                                        119

```
 1                    Aaron Jackson
 2        Q.   But you knew that there was a group of      12:25:56
 3  people right next to him?                              12:25:58
 4        A.   Yeah.                                       12:26:00
 5        Q.   Group of men.                               12:26:00
 6        MR. SAHASRABUDHE:  Form.                          12:26:02
 7        THE WITNESS:  Yes.                                12:26:03
 8        BY MR. BRUSTIN:                                   12:26:06
 9        Q.   And whereas when they first approached      12:26:06
10  you when you were with Mr. Powell who was in the       12:26:08
11  store, rather than confront them then, you decided     12:26:13
12  to drive away, but when you came back and you were     12:26:17
13  with your 17-year-old brother, you decided to          12:26:20
14  confront them?                                         12:26:22
15        MR. BLENK:  Form.                                12:26:23
16        MR. SAHASRABUDHE:  Asked and answered.           12:26:24
17  Form.  We covered this.                                12:26:25
18        MR. BRUSTIN:  You can answer.                     12:26:26
19        THE WITNESS:  No answer.                          12:26:27
20        BY MR. BRUSTIN:                                   12:26:30
21        Q.   Okay.  Is there anything else that          12:26:31
22  changed about -- is there anything you haven't told    12:26:40
23  us that was different about the situation with         12:26:42
24  Mario and that group of men when you approached        12:26:46
25  them the second time as compared to the first time     12:26:48
```



```
 1                    Aaron Jackson

 2   other than Mario's hands were in front of him and       12:26:53

 3   didn't appear to be holding any weapon?               12:26:56

 4          MR. BLENK:  Form.                                12:26:59

 5          MR. SAHASRABUDHE:  Form.                         12:27:00

 6          THE WITNESS:  He was by himself and I was       12:27:00

 7   with my brother.                                       12:27:02

 8          BY MR. BRUSTIN:                                  12:27:03

 9          Q.   Well, you had been with Mr. Powell the     12:27:03

10   first time, correct?                                   12:27:05

11          A.   Yes.                                        12:27:06

12          MR. SAHASRABUDHE:  Form.                         12:27:06

13          BY MR. BRUSTIN:                                  12:27:07

14          Q.   And you didn't know if Mario was by        12:27:08

15   himself.  There was a group of men standing next to    12:27:10

16   him, correct?                                          12:27:12

17          MR. BLENK:  Form.                                12:27:13

18          MR. SAHASRABUDHE:  Form.                         12:27:13

19          THE WITNESS:  No answer.                         12:27:14

20          BY MR. BRUSTIN:                                  12:27:16

21          Q.   Why did you believe Mario was by           12:27:23

22   himself if there was a group of men standing next      12:27:25

23   to him?                                                12:27:27

24          MR. SAHASRABUDHE:  Form.                         12:27:27

25          THE WITNESS:  Because he was the only person    12:27:28
```



1                   Aaron Jackson

2    standing out there gesturing for us to come on.          12:27:30

3         BY MR. BRUSTIN:                                    12:27:33

4         Q.    Okay.   Any other differences between        12:27:34

5    the scenarios?                                          12:27:36

6         A.    You tell me.                                 12:27:38

7         Q.    I'm asking you, sir.   I wasn't there.       12:27:40

8         MR. BLENK:   Form.                                 12:27:42

9         MR. SAHASRABUDHE:   Form.                          12:27:42

10        THE WITNESS:   No.                                 12:27:43

11        MR. BRUSTIN:   All right.   So I don't know --     12:27:45

12   let's just plan the rest of the day.   I can           12:27:49

13   probably finish this in the next -- with less than     12:27:51

14   an hour, but if other people think they have           12:27:56

15   substantial questioning, it probably makes sense to    12:28:00

16   take a lunch.   Do other people think they're going    12:28:03

17   to have substantial questioning?                       12:28:05

18        MR. SAHASRABUDHE:   No.                            12:28:07

19        MR. BLENK:   I don't think so.                     12:28:08

20        MR. RUSS:   Why don't you ask the witness          12:28:10

21   what would best serve him.                             12:28:12

22        MR. BRUSTIN:   I'm going to ask the witness,       12:28:13

23   but I want to know first whether this -- there's no    12:28:16

24   question we should take a break if people are going    12:28:17

25   to ask a bunch of questions.                           12:28:18



1                    Aaron Jackson

2         MR. SAHASRABUDHE:  No substantial              12:28:20

3    questioning from the city.                          12:28:22

4         MR. BLENK:  Nor the county.                    12:28:23

5         MR. BRUSTIN:  So, Mr. Jackson, would you       12:28:24

6    prefer for me to try to get this done without       12:28:26

7    taking a break?                                     12:28:29

8         THE WITNESS:  Yes.                             12:28:30

9         MR. BRUSTIN:  Okay.  Can we just take          12:28:30

10   another two-minute break then, and I'll look at my  12:28:32

11   notes to make sure that I'm being efficient.        12:28:35

12        THE WITNESS:  Yes.                             12:28:37

13        MR. BRUSTIN:  Okay.  Great.  Thank you.        12:28:38

14        (A recess was then taken at 12:28 p.m.)        12:28:42

15        BY MR. BRUSTIN:                                12:36:43

16        Q.   Okay.  Mr. Jackson, just a couple of      12:36:44

17   more areas, okay?                                   12:36:46

18        A.   Okay.                                     12:36:47

19        Q.   So, Peter, if you could give him the      12:36:50

20   police reports, please.                             12:36:54

21        Actually, before I do that, I've asked you     12:36:55

22   questions now, Mr. Jackson, about your              12:36:58

23   communications with the police, and you told me     12:37:02

24   your memory of that.  Do you recall any             12:37:06

25   communications with anybody from the DA's office,   12:37:09



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      123

1               Aaron Jackson

2   whether it be Mr. Belling or anybody else, at the      12:37:12

3   time up to and including your testimony?              12:37:16

4        A.   I don't recall.                             12:37:18

5        Q.   Okay.  Do you recall any communications    12:37:21

6   with anybody from the DA's office in connection       12:37:24

7   with the reinvestigation of the case?                 12:37:28

8        MR. BLENK:  Form.                                12:37:30

9        MR. BRUSTIN:  When Mr. Dixon was exonerated      12:37:31

10  and Lamarr Scott was convicted.                       12:37:35

11       MR. BLENK:  Form.                                12:37:37

12       MR. SAHASRABUDHE:  Objection to form.            12:37:38

13       THE WITNESS:  No.                                12:37:39

14       BY MR. BRUSTIN:                                  12:37:39

15       Q.   You don't remember talking to anybody       12:37:40

16  from the DA's office at that time in the last few     12:37:42

17  years?                                                12:37:45

18       A.   Mr. Flynn, DA Flynn, yes.                   12:37:46

19       Q.   Anybody from the DA's office?               12:37:48

20       A.   Yes, I spoke with DA Flynn.                 12:37:50

21       Q.   When did you speak with DA Flynn?           12:37:52

22       A.   I don't recall.                             12:37:55

23       Q.   Approximately.                              12:37:56

24       A.   I don't recall.                             12:37:57

25       Q.   Five years ago, ten years ago?             12:37:57



```
 1                     Aaron Jackson

 2          A.    Prior to this release.                        12:37:59

 3          Q.    Okay.  Sometime prior to Mr. Dixon's          12:38:02

 4   release?                                                   12:38:05

 5          A.    Yes.                                          12:38:05

 6          Q.    Okay.  And what did he say to you and         12:38:06

 7   what did you say to him, to the best of your               12:38:09

 8   recollection?                                              12:38:11

 9          MR. BLENK:  Form.                                   12:38:11

10          THE WITNESS:  We just talked.  We just              12:38:12

11   talked.  There was nothing too in depth.                  12:38:14

12          BY MR. BRUSTIN:                                     12:38:17

13          Q.    Okay.  Did he ask you questions about         12:38:17

14   whether you still believed Valentino Dixon was the        12:38:20

15   shooter, anything like that?                               12:38:22

16          A.    No.                                           12:38:24

17          MR. BLENK:  Form.                                   12:38:24

18          BY MR. BRUSTIN:                                     12:38:24

19          Q.    No?                                           12:38:27

20          A.    No.                                           12:38:28

21          Q.    Do you remember what you talked about,        12:38:29

22   generally?                                                 12:38:31

23          MR. SAHASRABUDHE:  Objection to form.               12:38:32

24          THE WITNESS:  I don't recall.                       12:38:33

25          BY MR. BRUSTIN:                                     12:38:35
```



AARON JACKSON                                          January 12, 2023
DIXON V. CITY OF BUFFALO                                          125

```
 1                    Aaron Jackson
 2         Q.   Okay.  Anybody else in the DA's office      12:38:35
 3    that you spoke to?                                     12:38:38
 4         A.   No.                                          12:38:42
 5         Q.   Now, if you take a look at page 154 of      12:38:49
 6    the police file, I want to ask you a couple of        12:38:54
 7    questions about these reports.  Not 154, I            12:38:57
 8    apologize.  155.  This is a report from Detective     12:39:14
 9    Stambach, okay?                                        12:39:39
10         A.   Yes.                                         12:39:42
11         Q.   And I want you to look at -- I want to      12:39:42
12    go a little bit out of order here and ask you some    12:39:45
13    questions about it, okay?                              12:39:48
14         A.   Yes.                                         12:39:49
15         Q.   And I want to start with the paragraph     12:39:49
16    where it says -- the third-to-the-last paragraph,     12:39:52
17    Aaron's father, Frederick Jackson.                     12:39:55
18         A.   Yes.                                         12:39:58
19         Q.   Could you read that paragraph to           12:39:58
20    yourself, and let me know -- let me know when         12:40:00
21    you're done.                                           12:40:02
22         A.   Yes.                                         12:40:11
23         Q.   Okay.  And would it be fair to say that    12:40:12
24    you have no idea what your father -- assuming that    12:40:14
25    your father gave this statement, you have no idea     12:40:17
```



AARON JACKSON                                          January 12, 2023
DIXON V. CITY OF BUFFALO                                            126

```
 1                    Aaron Jackson
 2   what he's talking about?                              12:40:20
 3        A.   No, I do know what he's talking about.      12:40:20
 4        Q.   Well, this never happened, right?           12:40:22
 5        MR. SAHASRABUDHE:  Form.                          12:40:24
 6        MR. BLENK:  Form.                                 12:40:25
 7        THE WITNESS:  I can recall having this            12:40:25
 8   conversation.                                         12:40:27
 9        BY MR. BRUSTIN:                                   12:40:28
10        Q.   So is it your testimony now that            12:40:28
11   Valentino Dixon drove by your house in his white      12:40:32
12   Cadillac three times just before the shooting and     12:40:41
13   you didn't mention that earlier?                      12:40:43
14        MR. BLENK:  Form.                                 12:40:45
15        MR. SAHASRABUDHE:  Form.                          12:40:46
16        THE WITNESS:  I'm thinking that this did          12:40:48
17   happen, but I can't really recall, but this           12:40:56
18   conversation may have happened.                       12:40:59
19        BY MR. BRUSTIN:                                   12:41:00
20        Q.   Well, I asked you in 12 different ways       12:41:01
21   earlier today all of your prior contacts with         12:41:03
22   Mr. Dixon, and I also showed you your testimony       12:41:07
23   that you gave closer in time about your prior         12:41:09
24   contacts with Mr. Dixon, and there was no mention     12:41:12
25   anywhere of him driving by your house in his          12:41:16
```



```
 1                    Aaron Jackson
 2   Cadillac.                                    12:41:19
 3        MR. BLENK:  Form.                        12:41:20
 4        BY MR. BRUSTIN:                          12:41:20
 5        Q.   Are you telling me now that you     12:41:21
 6   remember that?                                12:41:22
 7        MR. BLENK:  Form.                         12:41:22
 8        MR. SAHASRABUDHE:  Objection to form.     12:41:24
 9        THE WITNESS:  I just said that I may.  This  12:41:24
10   is 31 years ago.  Like I'm trying to be as honest  12:41:25
11   as possible with you an give you the best     12:41:27
12   recollection that I have, so when you're mentioning  12:41:30
13   things, I'm trying to give it to you honestly.  12:41:32
14        MR. BRUSTIN:  Okay.                       12:41:35
15        THE WITNESS:  Like this may quite possibly  12:41:35
16   have happened.                                 12:41:38
17        BY MR. BRUSTIN:                           12:41:38
18        Q.   Now, you remember that you testified  12:41:39
19   about this much -- much closer in time to these  12:41:40
20   events, correct?                              12:41:44
21        A.   31 years ago.                        12:41:44
22        Q.   Right.  And I showed you that        12:41:45
23   testimony.                                     12:41:47
24        A.   Okay.                                12:41:48
25        Q.   And there's no mention anywhere --   12:41:48
```



```
 1                      Aaron Jackson
 2         A.   Okay.                                    12:41:50
 3         Q.   -- in any police report or any          12:41:50
 4   testimony of yours suggesting that Mr. Dixon drove  12:41:52
 5   by your house three times in a white Cadillac,      12:41:57
 6   correct?                                            12:41:59
 7         MR. BLENK:   Form.                            12:42:00
 8         MR. SAHASRABUDHE:   Objection to form.        12:42:02
 9   Outside the scope of his knowledge.                 12:42:03
10         THE WITNESS:   I can't recall.                12:42:06
11         BY MR. BRUSTIN:                               12:42:06
12         Q.   Well, I just showed it to you.  I        12:42:06
13   showed you your testimony about your prior          12:42:08
14   interactions with Mr. Dixon.                        12:42:11
15         A.   You're make this difficult.  You're     12:42:13
16   making this difficult.  You're making this          12:42:14
17   difficult on yourself, Nick.                        12:42:15
18         MR. SAHASRABUDHE:   Let him finish.           12:42:18
19         BY MR. BRUSTIN:                               12:42:18
20         Q.   Mr. Jackson, let me make sure you        12:42:19
21   understand the question.  I read to you earlier     12:42:22
22   today your prior testimony from 30 years ago about  12:42:24
23   your knowledge of Mr. Dixon prior to the shooting,  12:42:28
24   and there was no mention in that testimony of him   12:42:33
25   driving by your house in a Cadillac.  You recall    12:42:36
```



```
 1                      Aaron Jackson

 2  that, correct?                                    12:42:41

 3         MR. SAHASRABUDHE:  Objection to form.      12:42:41

 4         MR. BLENK:  Form.                           12:42:43

 5         THE WITNESS:  No answer.                    12:42:45

 6         BY MR. BRUSTIN:                             12:42:46

 7         Q.   Mr. Jackson, as you sit here today, you   12:42:46

 8  have no recollection whatsoever of Mr. Dixon     12:42:48

 9  driving by your house in his Cadillac in the days   12:42:51

10  before the shooting, correct?                    12:42:54

11         MR. SAHASRABUDHE:  Objection to form.      12:42:56

12         THE WITNESS:  I don't recall.              12:42:57

13         BY MR. BRUSTIN:                             12:43:01

14         Q.   Do you remember earlier I specifically   12:43:02

15  asked you whether he had ever threatened you in any   12:43:04

16  way, and you told me no.  Do you remember that?   12:43:06

17         MR. BLENK:  Form.                           12:43:09

18         MR. SAHASRABUDHE:  Objection to form.      12:43:09

19         THE WITNESS:  I remember that question.    12:43:10

20         BY MR. BRUSTIN:                             12:43:12

21         Q.   Take a look at the next -- the         12:43:46

22  paragraph above it.  We then contacted Aaron's   12:43:49

23  mother at her residence.  Do you see that        12:43:56

24  paragraph?                                         12:43:58

25         A.   Yes.                                    12:43:58
```



```
  1                      Aaron Jackson

  2        Q.  And I think you've already told us, but    12:43:58

  3   let me know if this has changed it.  You don't      12:44:01

  4   remember ever telling your mother on the 11th, the  12:44:04

  5   first day you were in the hospital, that Valentino  12:44:06

  6   Dixon had shot you, correct?                        12:44:08

  7        MR. SAHASRABUDHE:  Form.                        12:44:10

  8        MR. BLENK:  Form.                               12:44:10

  9        THE WITNESS:  That's a possibility.             12:44:11

 10        BY MR. BRUSTIN:                                 12:44:14

 11        Q.  You don't remember it, correct?            12:44:14

 12        A.   I don't recall.                            12:44:16

 13        MR. SAHASRABUDHE:  Objection to form.           12:44:17

 14        BY MR. BRUSTIN:                                 12:44:18

 15        Q.  And this -- but does this paragraph and    12:44:19

 16   this report from the 11th refresh your memory about 12:44:22

 17   Detective Stambach when he came to see you the next 12:44:27

 18   day after speaking to your mother asking you        12:44:29

 19   questions about Valentino Dixon?                    12:44:33

 20        A.   No.                                        12:44:35

 21        MR. BLENK:  Form.                               12:44:35

 22        MR. SAHASRABUDHE:  Form.                        12:44:35

 23        BY MR. BRUSTIN:                                 12:44:36

 24        Q.  All right.  So you don't recall            12:44:37

 25   Detective Stambach asking -- this doesn't refresh   12:44:40
```



```
 1                    Aaron Jackson
 2   your recollection about -- about Detective Stambach   12:44:43
 3   asking you questions about the statements you          12:44:45
 4   made -- allegedly made to your mother or to your       12:44:49
 5   father?                                                12:44:52
 6          MR. BLENK:  Form.                                12:44:52
 7          MR. SAHASRABUDHE:  Objection to form.  Asked     12:44:53
 8   and answered.                                          12:44:54
 9          THE WITNESS:  Can you ask that again,            12:44:54
10   please?                                                12:44:56
11          BY MR. BRUSTIN:                                  12:44:57
12          Q.   Yes, sir.  This report doesn't refresh     12:44:57
13   your recollection about Detective Stambach asking      12:45:01
14   you questions about either of these alleged            12:45:03
15   statements that you made to your mother or father?     12:45:07
16          A.   No.                                        12:45:09
17          MR. BLENK:  Form.                                12:45:10
18          MR. SAHASRABUDHE:  Same objection.              12:45:11
19          THE WITNESS:  No.                               12:45:12
20          BY MR. BRUSTIN:                                 12:45:12
21          Q.   And as you sit here today, you have no     12:45:28
22   memory with any -- of any prior dispute or            12:45:30
23   interaction or threats by Valentino Dixon prior to    12:45:34
24   the 10th of August, correct?                          12:45:38
25          MR. BLENK:  Form.                               12:45:40
```



```
 1                      Aaron Jackson

 2          MR. SAHASRABUDHE:  Same objection.          12:45:41

 3          THE WITNESS:  No answer.                    12:45:42

 4          BY MR. BRUSTIN:                             12:45:45

 5          Q.   You have to answer that, sir.          12:45:45

 6          A.   Ask it again.                          12:45:48

 7          Q.   Sure.  As you sit here today, you have 12:45:49

 8    no memory whatsoever of any prior communication   12:45:52

 9    with Valentino Dixon or any threats from Valentino 12:45:57

10    Dixon or seeing Valentino Dixon in the days before 12:46:01

11    the shooting, correct?                            12:46:04

12          MR. SAHASRABUDHE:  Form.                    12:46:06

13          THE WITNESS:  I told you that I saw him.    12:46:07

14          MR. SAHASRABUDHE:  Same objection.          12:46:09

15          BY MR. BRUSTIN:                             12:46:10

16          Q.   You told us that you saw him driving in 12:46:11

17    the mall, correct?                                12:46:13

18          A.   Yes.  I saw him.  I saw him before,    12:46:14

19    yes.                                              12:46:16

20          Q.   What you told us is that you saw him   12:46:16

21    driving in the mall, correct?                     12:46:18

22          A.   Yes.                                   12:46:20

23          Q.   Okay.  Last thing, if you could take a 12:46:26

24    look -- I want to go back to your testimony in just 12:46:31

25    a minute.  This is from the trial.  Let's go to   12:46:43
```



| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | page 272, please.  Take a look at page 272, lines 2 | 12:46:46 |
| 3 | through lines 10.  Let me know when you're done, | 12:47:25 |
| 4 | please. | 12:47:29 |
| 5 | A.   Line 2 to what? | 12:47:36 |
| 6 | Q.   10. | 12:47:38 |
| 7 | A.   10, okay.  Okay. | 12:47:39 |
| 8 | Q.   And is this accurate, that you were not | 12:47:52 |
| 9 | able to remember by the time of trial anything that | 12:47:54 |
| 10 | the shooter was wearing? | 12:47:58 |
| 11 | A.   No, not at all. | 12:47:59 |
| 12 | Q.   It's a double negative again, my fault. | 12:48:03 |
| 13 | In other words, you agree with me that by the time | 12:48:05 |
| 14 | of trial, you were not able to remember anything | 12:48:07 |
| 15 | the shooter was wearing, correct? | 12:48:09 |
| 16 | A.   Yes, yes. | 12:48:11 |
| 17 | Q.   Wait one minute.  I'm just about done. | 12:48:31 |
| 18 | A.   Thank you. | 12:48:34 |
| 19 | MR. BRUSTIN:  Okay.  Mr. Jackson, I think | 12:48:47 |
| 20 | that's all I have right now.  I may have a few | 12:48:48 |
| 21 | follow-up questions based on what other attorneys | 12:48:50 |
| 22 | ask you, but I greatly appreciate your time today | 12:48:52 |
| 23 | and your patience.  Thank you. | 12:48:55 |
| 24 | THE WITNESS:  Thank you, Nick. | 12:48:56 |
| 25 | EXAMINATION | 12:49:05 |



AARON JACKSON                                          January 12, 2023
DIXON V. CITY OF BUFFALO                                          134

```
 1                     Aaron Jackson
 2        BY MR. SAHASRABUDHE:                          12:49:05
 3        Q.   Mr. Jackson, my name's Peter            12:49:07
 4   Sahasrabudhe, and I represent the City of Buffalo  12:49:11
 5   and a handful of retired homicide detectives in   12:49:13
 6   connection with a lawsuit brought by Valentino Dixon. 12:49:19
 7        So, first of all, before today, have you and  12:49:21
 8   I ever met?                                        12:49:24
 9        A.   No.                                      12:49:24
10        Q.   Have you and I ever discussed this case  12:49:25
11   in any way?                                        12:49:28
12        A.   No.                                      12:49:29
13        Q.   Have I or any of my colleagues here at   12:49:29
14   Hodgson Russ ever told you how we want you to      12:49:33
15   testify or suggested to you how we want you to     12:49:35
16   testify today?                                     12:49:37
17        A.   No.                                      12:49:39
18        Q.   Okay.  I want to show you the photo      12:49:40
19   array that we were speaking about earlier in your  12:49:43
20   testimony, and I'll show you the color copy.  And  12:49:48
21   just for everyone else's purposes, this is in the  12:49:53
22   police comp. file, and it's BPD comp. 171.         12:49:58
23        Mr. Jackson, did the police officer who      12:50:06
24   showed you -- first of all, do you recall being    12:50:10
25   shown this photo array?                            12:50:13
```



Aaron Jackson

A. Yes. 12:50:15

Q. Does it appear to be the photo array that you were, in fact, shown? 12:50:15 12:50:18

A. Yes, quite possibly. 12:50:19

Q. In the days following the murder of your brother? 12:50:21 12:50:23

A. Yes. 12:50:24

Q. All right. Did any police officer ever suggest to you that they wanted you to pick a particular photo in this photo array? 12:50:25 12:50:27 12:50:31

A. No. 12:50:34

MR. BRUSTIN: Object to the form. 12:50:34

BY MR. SAHASRABUDHE: 12:50:36

Q. Did any police officer ever do anything to suggest to you that the shooter, a picture of the shooter would, in fact, be one of the six photos present in the photo array? 12:50:37 12:50:39 12:50:46 12:50:49

A. No. 12:50:51

MR. BRUSTIN: Objection to form. 12:50:51

BY MR. SAHASRABUDHE: 12:50:56

Q. Did any police officer ever point to photo number 4 or any other photo in the -- or any other photo in the photo array that would make a singular photo stand out to you amongst the others? 12:50:56 12:50:59 12:51:04 12:51:08

1                    Aaron Jackson

2        A.    No.                                          12:51:10

3        MR. BRUSTIN:   Objection to form.  Foundation.    12:51:12

4        BY MR. SAHASRABUDHE:                               12:51:16

5        Q.    In your conversations with the Buffalo      12:51:17

6   Police Department, did anyone ever suggest to you      12:51:21

7   that they wanted you to state or claim that            12:51:25

8   Valentino Dixon was the shooter?                       12:51:31

9        A.    No.                                          12:51:35

10        Q.    Why is it that you identified Valentino      12:51:36

11   Dixon as the shooter?                                  12:51:39

12        A.    Because he was the person that was          12:51:39

13   standing with the machine gun shooting into my         12:51:42

14   younger brother.                                       12:51:45

15        Q.    If you had a recollection of anyone         12:51:47

16   else being the shooter in the time that the murder     12:51:51

17   was being investigated, what would you have done?      12:51:55

18        A.    I would have spoke about it.  I would       12:51:58

19   have talked about it.                                  12:52:00

20        Q.    And the reason -- what is the reason        12:52:02

21   that you have not identified any other person as       12:52:04

22   the shooter who murdered your brother, Torriano        12:52:07

23   Jackson?                                               12:52:11

24        A.    Because there was no other person.  It      12:52:11

25   was Valentino Dixon.                                   12:52:14



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      137

| | | |
|---|---|---|
| 1 | Aaron Jackson | |
| 2 | Q.   On the night of the shooting, initially | 12:52:16 |
| 3 | I think you testified earlier that you were unable | 12:52:23 |
| 4 | to move, correct? | 12:52:30 |
| 5 | A.   Yes. | 12:52:31 |
| 6 | Q.   Did there come a time where you were | 12:52:31 |
| 7 | ultimately able to move? | 12:52:33 |
| 8 | A.   That night? | 12:52:34 |
| 9 | Q.   Yes. | 12:52:35 |
| 10 | A.   Yes. | 12:52:36 |
| 11 | Q.   Okay.  Can you describe -- first of | 12:52:37 |
| 12 | all, had your brother already been moved by Travis | 12:52:40 |
| 13 | Powell when you regained the ability to move? | 12:52:44 |
| 14 | A.   No. | 12:52:46 |
| 15 | Q.   Okay.  Was he still in the street? | 12:52:47 |
| 16 | A.   Yes. | 12:52:48 |
| 17 | Q.   Okay.  Can you describe what you did | 12:52:49 |
| 18 | when you realized that you could move? | 12:52:52 |
| 19 | A.   I was in the car.  I was in the -- | 12:52:58 |
| 20 | possibly in the front seat passenger's side looking | 12:53:00 |
| 21 | to see if there were keys in the vehicle, because I | 12:53:04 |
| 22 | just in my brain, drive across the street and hit | 12:53:06 |
| 23 | the shooter. | 12:53:10 |
| 24 | Q.   What car are you referring to? | 12:53:12 |
| 25 | A.   The yellow Geo.  The car that we | 12:53:14 |



1                     Aaron Jackson

2    arrived in.                                        12:53:17

3         Q.   How far away from the car were you when  12:53:18

4    the shooting started?                              12:53:21

5         A.   It was in the parking lot.               12:53:22

6         Q.   Okay.  And when you got in the car, did  12:53:24

7    you have occasion to observe the shooter?          12:53:29

8         A.   Yes.                                      12:53:32

9         Q.   And who did you see shooting a gun on    12:53:32

10   the corner of Bailey and Delavan?                  12:53:36

11        A.   Valentino Dixon, and he actually lifted  12:53:38

12   the gun up from my brother and looked over at me in 12:53:41

13   the vehicle and started to fire shots over towards 12:53:44

14   the vehicle, and I was almost sure that it was     12:53:46

15   bullets going to come into the car, and I ducked   12:53:49

16   down and it hit the top of the vehicle, but I was  12:53:52

17   looking directly at him.                           12:53:56

18        Q.   Did you ever communicate that to any     12:53:58

19   law enforcement official, whether it was a District 12:54:02

20   Attorney or a police officer?                      12:54:05

21        A.   I think I may have conveyed that to      12:54:08

22   Mr. Belling, DA Belling.                           12:54:10

23        Q.   Do you recall what occurred when you --  12:54:13

24   how -- withdrawn.                                   12:54:17

25        How did Mr. Belling respond?                  12:54:18



```
 1                    Aaron Jackson
 2        A.   He then took a picture out and showed      12:54:20
 3   me a picture of the Geo, and there was actually a    12:54:22
 4   gunshot on top, that skimmed over the top of the     12:54:25
 5   car right where I was underneath in that seat as     12:54:28
 6   proof that what I was saying was true.               12:54:32
 7        MR. SAHASRABUDHE:   That's all I have for the   12:54:35
 8   time being.                                          12:54:37
 9                    EXAMINATION                         12:54:37
10        BY MR. BLENK:                                   12:54:37
11        Q.   Mr. Jackson, my name is James P. Blenk,    12:54:42
12   and I represent the county defendants and Chris      12:54:45
13   Belling in this case.                                12:54:48
14        Have we ever had the occasion of meeting        12:54:50
15   before today?                                        12:54:53
16        A.   Not at all.                                12:54:54
17        (Off the record at 12:54 p.m.)                  12:54:57
18        BY MR. BLENK:                                   12:55:00
19        Q.   I just wanted to cover two points.  You    12:55:00
20   mentioned that you had a conversation with a         12:55:05
21   Mr. Flynn.  Are you referring to the Erie County     12:55:10
22   District Attorney John Flynn?                        12:55:13
23        A.   Yes.                                       12:55:15
24        Q.   And do you recall whether he was the       12:55:15
25   actual District Attorney or an Assistant District    12:55:18
```



AARON JACKSON                                      January 12, 2023
DIXON V. CITY OF BUFFALO                                       140

```
 1                      Aaron Jackson
 2   Attorney at the time that you spoke to him?        12:55:21
 3         A.   I think he was the head attorney, head  12:55:23
 4   attorney here in the City of Buffalo.              12:55:25
 5         Q.   And this was shortly before             12:55:28
 6   Mr. Valentino Dixon's release from prison?         12:55:32
 7         A.   Yes.                                     12:55:34
 8         Q.   Okay.  This was not close in time to    12:55:35
 9   the underlying events?                             12:55:37
10         A.   No.                                      12:55:39
11         Q.   You said that you had a conversation    12:55:54
12   with Christopher Belling during which you spoke    12:55:56
13   about this gunshot -- or evidence of a gunshot     12:56:01
14   having hit the top of the Geo.                     12:56:05
15         A.   Yes.                                     12:56:08
16         Q.   What was -- at what time did you have   12:56:08
17   that conversation?                                 12:56:10
18         A.   This is following the actual shooting  12:56:11
19   and my release from the hospital.  This is when I  12:56:14
20   was going down, I guess I was talking to him a     12:56:16
21   little bit more about the case and giving him a    12:56:18
22   little bit more information.  I don't know exactly 12:56:21
23   when.                                              12:56:23
24         Q.   Do you recall where that conversation  12:56:24
25   took place?                                        12:56:27
```



1                    Aaron Jackson

2          A.    It may have been down at his office.        12:56:28

3          Q.    Do you recall if this was before you        12:56:33

4  testified in the Grand Jury proceeding?                   12:56:38

5          A.    Quite possibly.                             12:56:40

6          Q.    Or it could have been after you             12:56:41

7  testified in the Grand Jury proceeding?                   12:56:43

8          A.    That's possible.                            12:56:44

9          Q.    Did Christopher Belling suggest to you      12:56:59

10 that Valentino Dixon was the shooter?                     12:57:02

11         A.    No.                                         12:57:05

12         Q.    Did Christopher Belling give you any        12:57:05

13 indication that he preferred that you would               12:57:11

14 identify Valentino Dixon as the shooter?                  12:57:14

15         A.    No.                                         12:57:16

16    MR. BRUSTIN:   Objection to form.                      12:57:17

17    BY MR. BLENK:                                          12:57:23

18         Q.    Do you recall what the purpose of this      12:57:24

19 conversation with Christopher Belling -- or did           12:57:27

20 Christopher Belling ask you to come to his office?        12:57:31

21         A.    Yes.                                        12:57:34

22         Q.    How did he communicate that to you?         12:57:34

23         A.    It may have been a phone call.              12:57:37

24         Q.    Do you recall any other details of that     12:57:42

25 conversation other than this conversation that            12:57:54



AARON JACKSON                                      January 12, 2023
DIXON V. CITY OF BUFFALO                                       142

```
 1                    Aaron Jackson
 2   you -- this specific issue that you had discussed,    12:57:56
 3   the yellow Geo with Mr. Belling?                       12:58:00
 4        A.   We were just fact finding and talking        12:58:03
 5   about the case.                                        12:58:05
 6        Q.   Did Mr. Belling tell you how you             12:58:08
 7   should -- tell you the substance -- or did             12:58:17
 8   Mr. Belling tell you what he wanted you to say at      12:58:24
 9   the Grand Jury proceeding?                             12:58:26
10        A.   No.                                          12:58:27
11        MR. BLENK:   I don't have any further             12:58:32
12   questions at this time.                                12:58:34
13               FURTHER EXAMINATION                         12:58:34
14        BY MR. BRUSTIN:                                    12:58:34
15        Q.   Just a couple of quick follow-ups.  So,     12:58:37
16   Mr. Jackson, when I asked you questions -- can you    12:58:40
17   move the camera back?  I apologize.  Thank you very   12:58:40
18   much.  Mr. Jackson, when I asked you earlier about    12:58:47
19   whether you remembered having a conversation with     12:58:50
20   Mr. Belling and what you said to him and what he      12:58:53
21   said to you, you told me you had no memory            12:58:55
22   whatsoever as to what he said to you and what you     12:58:57
23   said to him.  Do you recall that?                      12:59:00
24        A.   I don't recall, but I did have              12:59:01
25   conversations with him.  I mean, I had to meet with   12:59:03
```



```
 1                       Aaron Jackson
 2   him prior.                                        12:59:06
 3        Q.   No, my question is, when I asked you    12:59:06
 4   questions about what you talked about, why is it  12:59:08
 5   that you didn't raise any of these issues about   12:59:11
 6   telling him about crawling to the car and him not 12:59:14
 7   trying to suggest Mr. Dixon?  Is there a reason why 12:59:19
 8   you didn't mention that when I asked you what you  12:59:22
 9   discussed with him?                               12:59:24
10        MR. BLENK:  Form.                            12:59:25
11        MR. SAHASRABUDHE:  Form.  Asked and          12:59:26
12   answered.                                         12:59:27
13        THE WITNESS:  I already answered it, correct. 12:59:27
14        BY MR. BRUSTIN:                              12:59:32
15        Q.   Now, on questioning from counsel for    12:59:33
16   the police defendants, you said that the police   12:59:37
17   never said anything to you about Valentino Dixon or 12:59:44
18   who you should pick.  Do you remember that?       12:59:49
19        A.   Yes.                                    12:59:51
20        Q.   You told me four or five different      12:59:52
21   times on my questioning that you had no memory    12:59:56
22   whatsoever as to what the police said to you,     12:59:58
23   correct?                                          13:00:01
24        MR. BLENK:  Form.                            13:00:01
25        MR. SAHASRABUDHE:  Form.  That's not what he 13:00:02
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      144

```
 1                    Aaron Jackson
 2   said.                                               13:00:03
 3         THE WITNESS:  We're now talking about         13:00:03
 4   Mr. Belling.  We're not talking about the police,   13:00:06
 5   correct?                                            13:00:08
 6         BY MR. BRUSTIN:                                13:00:08
 7         Q.   Now I'm talking about the police.  I've  13:00:09
 8   moved on from Mr. Belling to the police.            13:00:09
 9         A.   Okay.  I have no recollection of the     13:00:13
10   conversations I had with them.                      13:00:15
11         Q.   So you don't know whether or not they    13:00:16
12   pointed, for example, to a picture of Mr. Dixon and 13:00:17
13   asked you how you knew him?  You don't know one way 13:00:20
14   or another, correct?                                13:00:23
15         MR. BLENK:  Form.                              13:00:25
16         MR. SAHASRABUDHE:  Form.                       13:00:26
17         THE WITNESS:  I don't recall.                  13:00:26
18         BY MR. BRUSTIN:                                13:00:27
19         Q.   Is that correct, sir?                     13:00:27
20         A.   I don't recall.                           13:00:27
21         Q.   You don't recall whether they told you   13:00:28
22   that when you picked out tentatively a picture of   13:00:30
23   Mr. Dixon, they told you that's the person we think 13:00:33
24   shot your brother?  You don't recall one way or     13:00:37
25   another whether they said that, correct?            13:00:40
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      145

```
 1                     Aaron Jackson
 2         MR. SAHASRABUDHE:  Form.                    13:00:41
 3         MR. BLENK:  Form.                           13:00:42
 4         THE WITNESS:  I don't recall.  You're doing 13:00:42
 5    it again, Nick.  You're doing that thing again.  13:00:43
 6         BY MR. BRUSTIN:                             13:01:01
 7         Q.   And fair to say you don't recall one   13:01:02
 8    way or another whether or not Mr. Belling told you 13:01:05
 9    that he, in fact, believed there was other evidence 13:01:07
10    that proved Valentino Dixon was the shooter?  You 13:01:10
11    don't recall whether he said that to you one way or 13:01:13
12    another, correct?                                13:01:15
13         A.   No.                                    13:01:16
14         MR. BLENK:  Form.                           13:01:16
15         MR. SAHASRABUDHE:  Form.                    13:01:17
16         THE WITNESS:  No.                           13:01:17
17         BY MR. BRUSTIN:                             13:01:19
18         Q.   In other words, you agree you don't    13:01:20
19    recall whether he did or didn't?                 13:01:21
20         A.   He didn't.                             13:01:22
21         Q.   You're sure about that even though you 13:01:24
22    don't recall the conversations?                  13:01:26
23         MR. SAHASRABUDHE:  Objection to form.       13:01:29
24         THE WITNESS:  I'm like clueless at this     13:01:34
25    point.  Can you ask that again?                  13:01:36
```



AARON JACKSON                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                      146

```
 1                    Aaron Jackson
 2        BY MR. BRUSTIN:                              13:01:38
 3        Q.   Sure.  I asked you earlier to describe  13:01:39
 4   the conversations you had with Mr. Belling before 13:01:40
 5   you testified, and you told me you remember nothing 13:01:43
 6   about that.  Do you remember?                     13:01:45
 7        A.   We talked about the case.               13:01:46
 8        MR. BLENK:  Form.                             13:01:47
 9        THE WITNESS:  I mean, I don't mean -- I       13:01:48
10   don't mean the specifics.  He asked a specific     13:01:49
11   question, and I answered it.  I'm talking about the 13:01:51
12   guy that's here in the room right now.            13:01:54
13        BY MR. BRUSTIN:                               13:01:55
14        Q.   Okay.  I'm sorry?                        13:01:56
15        A.   I'm talking about the guy that's in the 13:01:57
16   room right now.  He asked a specific question, and 13:01:58
17   I answered it.  You didn't.  You trying to get     13:02:01
18   me -- you asked me a question about what I          13:02:04
19   remembered about talking to him.  Any specific --  13:02:06
20        Q.   Is Mr. Belling in the room?             13:02:08
21        A.   No.                                      13:02:11
22        MR. SAHASRABUDHE:  He's talking about me.     13:02:11
23        MR. BLENK:  No, he's talking about me.        13:02:13
24        MR. SAHASRABUDHE:  Or JP, sorry.              13:02:16
25        MR. BRUSTIN:  Okay.  I think we've covered    13:02:18
```



| | |
|---|---|
| 1 | Aaron Jackson | |
| 2 | this enough.  Mr. Jackson, thank you for your time. | 13:02:19 |
| 3 | Again, I appreciate it. | 13:02:21 |
| 4 | (Off the record at 1:02 p.m.) | 13:02:54 |
| 5 | BY MR. BRUSTIN: | 13:02:54 |
| 6 | Q.   I apologize, one thing I forgot to ask | 13:02:54 |
| 7 | you.  I really will be quick.  I apologize, | 13:02:57 |
| 8 | Mr. Jackson. | 13:02:59 |
| 9 | Have you had any communications with Emil | 13:02:59 |
| 10 | Adams since Mr. Dixon's release? | 13:03:05 |
| 11 | A.   No. | 13:03:09 |
| 12 | Q.   Not by phone, not by email, nothing? | 13:03:09 |
| 13 | A.   No contact. | 13:03:13 |
| 14 | Q.   To your knowledge, has anybody in your | 13:03:15 |
| 15 | family had any contact with him? | 13:03:16 |
| 16 | A.   No, no contact. | 13:03:20 |
| 17 | MR. BRUSTIN:  Thank you.  That's all I have. | 13:03:23 |
| 18 | (Discussion off the record.) | 13:03:41 |
| 19 | MR. SAHASRABUDHE:  Do you want an | 13:03:41 |
| 20 | opportunity to review your testimony to see if | 13:03:42 |
| 21 | there's any errors or corrections you need to make? | 13:03:43 |
| 22 | THE WITNESS:  Yeah, why not. | 13:03:46 |
| 23 | MR. SAHASRABUDHE:  Okay. | 13:03:47 |
| 24 | (Deposition concluded at 1:03 p.m.) | 13:03:51 |
| 25 | *    *    * | |



AARON JACKSON                                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                                      148

```
1

2   STATE OF NEW YORK)

3                    ss:

4   COUNTY OF ERIE   )

5

6        I DO HEREBY CERTIFY as a Notary Public in and

7   for the State of New York, that I did attend and

8   report the foregoing deposition, which was taken

9   down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18

19
                         --------------------------
20                       JOAN M. METZGER-HUBBELL,
                         CM, Realtime Reporter,
21                       Notary Public.

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1

 2

 3              DEPOSITION ERRATA SHEET

 4   Our Assignment No.  J9108597

 5   Case Caption:  VALENTINO DIXON

 6   vs.  CITY OF BUFFALO, et al.

 7       DECLARATION UNDER PENALTY OF PERJURY

 8         I declare under penalty of perjury

 9   that I have read the entire transcript of

10   my Deposition taken in the captioned matter

11   or the same has been read to me, and

12   the same is true and accurate, save and

13   except for changes and/or corrections, if

14   any, as indicated by me on the DEPOSITION

15   ERRATA SHEET hereof, with the understanding

16   that I offer these changes as if still under

17   oath.

18   _____

19              AARON JACKSON

20   Subscribed and sworn to on the _____ day of

21   _____, 20____ before me,

22   _____

23   Notary Public,

24   in and for the State of _____

25
```



AARON JACKSON                                     January 12, 2023
DIXON V. CITY OF BUFFALO                                      150

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

            AARON JACKSON



AARON JACKSON                                      January 12, 2023
DIXON V. CITY OF BUFFALO                                        151

1

2              DEPOSITION ERRATA SHEET

3     Page No._____Line No._____Change to:_____

4     _____

5     Reason for change:_____

6     Page No._____Line No._____Change to:_____

7     _____

8     Reason for change:_____

9     Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24    SIGNATURE:_____DATE:_____

25              AARON JACKSON



AARON JACKSON                                              January 12, 2023
DIXON V. CITY OF BUFFALO                                              152

1

2                        INDEX TO EXHIBITS

3    Exhibit                Description                Page

4     PLF. EXH. 22    report                              113

5

6

7    *Copies of exhibit supplied to all counsel.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2                    INDEX TO WITNESSES
 3   Witness              Examination              Page
 4    AARON JACKSON         BY MR. BRUSTIN            3
 5                         BY MR. SAHASRABUDHE       134
 6                         BY MR. BLENK              139
 7                         BY MR. BRUSTIN            142
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 616 of 1202

APPENDIX 0614

AARON JACKSON
DIXON V. CITY OF BUFFALO
January 12, 2023
Index: 10..5

---

**1**

**10**
133:3,6,7

**10th**
40:4
56:20
131:24

**11**
75:4 76:8
96:24

**11:06**
55:23

**11th**
53:17
76:14
130:4,16

**12**
126:20

**120**
97:21,22

**12:16**
113:6

**12:28**
122:14

**12:54**
139:17

**12th**
24:3 26:4
31:11
35:19,23
37:23
38:13
39:8,24
40:11,17
41:3 42:3
44:4 46:3
49:4
50:17,25
51:10
52:20

53:11
56:4
59:22
65:13,16,
20 67:9
68:25
72:7,15
75:2
76:15
78:10
79:17

**13**
18:23,25

**135**
93:23

**14**
18:23
59:17
60:14
62:18,21

**1499**
19:6

**15**
27:12
58:5

**150**
94:8

**1501**
27:12
57:23
58:4

**154**
125:5,7

**155**
125:8

**166**
31:2

**167**
31:3
56:5,6

**168**

51:18

**17**
59:13,14,
15,17
60:13,23
61:10
93:19,21
115:20

**17-year-old**
99:8
101:23
105:23
107:22
109:9
119:13

**171**
56:7
134:22

**18**
18:25
19:19
21:15

**1838**
113:18

**1842**
112:3
113:11

**19**
3:11
21:16

**1915**
26:7
31:23

**1:02**
147:4

**1:03**
147:24

---

**2**

2

97:25
133:2,5

**20**
7:13,22
11:7 19:2
93:17

**216**
76:21
82:21
87:8,11

**217**
76:21
85:2
87:16

**21st**
74:21
75:4 76:8
78:10
80:17
81:8,25
82:5
84:17
110:24

**22**
11:11
19:19
59:13,14
111:18,19
113:5,10

**237**
20:16

**238**
20:16
21:15

**239**
21:15

**24**
20:20

**241**
62:16

**243**
62:17

**245**
59:2,10,
14,17
60:14

**246**
59:2,17

**24th**
7:8

**25**
21:14,15
59:15

**272**
133:2

**29th**
113:25

---

**3**

**30**
128:22

**31**
127:10,21

---

**4**

**4**
32:8
51:25
56:12
61:2,15
113:18
135:23

---

**5**

**5**
27:19
57:23
58:10,12
62:18,20,
21 117:24



**7**

**7**
   60:2

**7:15**
   26:7
   31:25

**8**

**869**
   77:13

**9**

**9**
   20:20
   57:23
   58:12
   97:25

**92**
   111:12

**9:15**
   4:13

**9th**
   89:22

**A**

**a.m.**
   55:23

**Aaron**
   3:1,11
   4:1  5:1
   6:1  7:1
   8:1  9:1
   10:1  11:1
   12:1  13:1
   14:1  15:1
   16:1  17:1

18:1  19:1
20:1  21:1
22:1  23:1
24:1  25:1
26:1  27:1
28:1  29:1
30:1  31:1
32:1  33:1
34:1  35:1
36:1  37:1
38:1  39:1
40:1  41:1
42:1  43:1
44:1  45:1
46:1  47:1
48:1  49:1
50:1  51:1
52:1  53:1
54:1  55:1
56:1  57:1
58:1  59:1
60:1  61:1
62:1  63:1
64:1  65:1
66:1  67:1
68:1  69:1
70:1  71:1
72:1  73:1
74:1  75:1
76:1  77:1
78:1  79:1
80:1  81:1
82:1,21
83:1  84:1
85:1  86:1
87:1  88:1
89:1  90:1
91:1  92:1
93:1  94:1
95:1  96:1
97:1  98:1
99:1
100:1
101:1
102:1
103:1
104:1

105:1
106:1
107:1
108:1
109:1
110:1
111:1
112:1
113:1
114:1
115:1
116:1
117:1
118:1
119:1
120:1
121:1
122:1
123:1
124:1
125:1
126:1
127:1
128:1
129:1
130:1
131:1
132:1
133:1
134:1
135:1
136:1
137:1
138:1
139:1
140:1
141:1
142:1
143:1
144:1
145:1
146:1
147:1

**Aaron's**
   125:17
   129:22

**ability**
   137:13

**accept**
   14:7

**accident**
   18:7

**accurate**
   18:10
   28:11
   65:10
   78:7  81:4
   87:13
   98:3
   118:6
   133:8

**accurately**
   8:10
   25:21
   29:18
   42:14
   63:17
   115:3

**acting**
   91:5
   92:18

**action**
   73:12

**actual**
   139:25
   140:18

**Adams**
   147:10

**additional**
   111:4

**admit**
   60:6  71:7

**admitting**
   59:21

**adult**
   94:11

**affidavit**

31:3

**affirmatively**
   110:5

**age**
   115:19

**aggressive**
   91:6
   92:18

**agree**
   32:13
   33:11
   52:10
   72:2,12
   73:15,23
   77:12
   81:12,15
   85:10
   105:20
   133:13
   145:18

**agreed**
   8:8

**ahead**
   103:11
   106:6
   108:3

**alleged**
   77:2
   131:14

**allegedly**
   56:13
   131:4

**allowed**
   84:7

**Andover**
   7:13,22

**answering**
   47:14
   62:4

**answers**



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 618 of 1202

APPENDIX 0616

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: Antoine..binder

35:4 78:3
85:23

**Antoine**
90:22

**apologize**
36:21
54:16
59:16
70:24
75:12
125:8
142:17
147:6,7

**appears**
77:11,24,
25 81:4
82:12
85:12

**approach**
16:7
97:19
98:12

**approached**
90:20
98:6,7
101:15
104:24
105:22
106:25
118:13
119:9,24

**approximate**
**ly**
67:15
68:8,12,
15 123:23

**apps**
114:5

**area**
18:18
47:17

**areas**
122:17

**armed**
99:16
106:2,9
108:8

**array**
29:19,22
30:24
31:23
32:17
33:6,12
34:2
35:7,9
56:13,19
57:5 63:3
68:24
134:19,25
135:3,11,
18,24

**arrested**
80:12

**arrived**
138:2

**asleep**
110:20

**Assistant**
139:25

**assume**
6:7 17:6
103:22
104:21
107:3
118:9

**assumed**
104:8

**assuming**
125:24

**attorney**
138:20
139:22,25
140:2,3,4

**Attorney's**
13:22

**attorneys**
133:21

**August**
24:3 26:4
31:11
35:19
37:23
38:13
39:8,24
40:11,17
41:3 44:3
46:3 49:4
50:16,25
51:9
56:20
59:22
67:9 72:7
74:21
75:4
78:10
79:17
80:17
81:8
84:17
89:22
111:11
131:24

**Avenue**
3:11

**awake**
97:11
109:13,20

_____

_____

**B**

_____

**back**
55:25
91:9,19
94:14,17
95:17
97:14
99:3,25
102:16,25
103:5,6

104:8
105:6,14
107:2
119:12
132:24
142:17

**back-and-**
**forth**
11:22

**backs**
95:7
117:11,15

**bag**
75:19,20

**Bailey**
90:10
95:17
138:10

**bank**
90:12

**barely**
76:3,6,7

**based**
13:21
26:22
81:12,15
89:21
133:21

**Bates**
19:4,6
59:2
112:4

**Bates-**
**stamped**
20:16
112:2
113:11

**bed**
37:15
42:4
69:11
75:14

**begin**
3:2

**beginning**
87:10

**behalf**
13:8

**behavior**
92:9

**belief**
53:9
81:23

**believed**
39:19
52:21
53:22
72:5
91:11
95:6
99:2,15,
24 101:2
104:25
105:6,13
106:2,16
107:23
108:8
124:14
145:9

**Belling**
123:2
138:22,25
139:13
140:12
141:9,12,
19,20
142:3,6,
8,20
144:4,8
145:8
146:4,20

**bigger**
94:5

**binder**
16:15



59:7

**bit**
11:21
47:8
54:11
67:16
94:3
125:12
140:21,22

**black**
90:21
91:8

**blame**
12:3

**blamed**
9:4 10:13
12:12

**blaming**
10:5

**Blenk**
3:8 22:15
28:13,19
29:20
30:2
32:21
33:13
34:4,10,
19,25
38:17
39:3
40:21
41:11
42:7,21
43:9,17
44:16,22
45:17,23
46:8,22
47:5
48:15
49:12
50:5
51:3,13
52:16
55:14

57:11
60:8 62:3
70:6
71:11,17
79:7,19
80:21
81:19
83:3,18
84:2,21
86:4,12,
20 88:5,
20 89:8
91:21
92:3,21
93:2,8,12
99:20
100:8,14
101:5,18
102:2,17
103:17,24
104:10,16
105:9,17
106:11,
18,22
107:12,18
108:2,21
109:3,16
112:4,6,
13,19,24
113:3
116:9,16
117:17
118:22
119:15
120:4,17
121:8,19
122:4
123:8,11
124:9,17
126:6,14
127:3,7
128:7
129:4,17
130:8,21
131:6,17,
25
139:10,

11,18
141:17
142:11
143:10,24
144:15
145:3,14
146:8,23

**blew**
92:12

**blocking**
114:6,15

**bottom**
59:2
82:20
87:10

**bought**
79:12

**BPD**
134:22

**BPD166**
30:22

**brain**
137:22

**break**
6:10,12
55:20
121:24
122:7,10

**breathing**
52:24

**bring**
78:19
83:13
107:22

**broadly**
69:8

**brother**
6:21 8:22
9:5 13:14
14:2,8,18
23:21

32:9
33:19
36:23
37:3,11,
16,24
38:6
41:5,6,
10,19
43:3
44:5,6,
11,13,15
49:6,24
50:25
51:11
52:3
63:23
64:23
65:4 66:5
71:8,16
81:10,18
82:2,7
83:12
88:4,19
93:19
94:14,20,
21 95:17,
19 96:15
97:14
98:11
99:8
100:5,18
101:23
102:3,5,7
103:2
105:23
107:22
108:7,15,
18,24
109:9,13
110:14
115:15,
19,22,24
118:4
119:13
120:7
135:7
136:14,22

137:12
138:12
144:24

**brought**
9:6 80:12
108:6
134:6

**Brown**
90:22

**BRUSTIN**
3:10,15
4:15 8:25
9:12
10:24
11:5,12,
14 12:6,
19,22
13:5,9,
11,18
14:11
16:12,16,
19,24,25
19:6,9,
12,14
20:19,23
22:18
26:25
27:14,17
28:14,22
29:13,21
30:4,9,24
31:4,7,18
32:24
33:10,16
34:6,12,
20 35:2
37:19
38:20
39:6
40:24
41:14
42:9,23
43:12,20
44:19,25
45:19,25



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 620 of 1202

APPENDIX 0618

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: Buffalo..claim

46:15,24
47:19
48:18,21
49:14
50:8,21
51:5,16,
20 52:18
55:7,15,
22,24
56:6,8
57:13
58:3,5,9,
19 59:4,
9,12,15,
18 60:4,
12 61:22
62:5,10
63:15
70:7,24
71:3,4,
12,21
72:11,18
73:7,18
74:5
76:25
79:3,10,
16,21
80:23
81:22
82:11
83:6,20
84:5,7,
11,23
85:9,19
86:6,14,
21 87:4,7
88:10,16
89:3,11
91:23
92:5,23
93:3,9,15
97:7
99:6,13,
23 100:4,
12,20
101:11,21
102:12,21

103:3,12,
20 104:3,
14,23
105:11,19
106:8,15,
21 107:7,
14,20
108:5,13,
22 109:5,
19 110:3,
12,17
111:17,
19,24
112:5,9,
15,18,20,
23 113:2,
7 114:2,
7,11,17,
21
116:12,19
117:20
118:25
119:8,18,
20 120:8,
13,20
121:3,11,
22 122:5,
9,13,15
123:9,14
124:12,
18,25
126:9,19
127:4,14,
17
128:11,19
129:6,13,
20
130:10,
14,23
131:11,20
132:4,15
133:19
135:13,20
136:3
141:16
142:14
143:14

144:6,18
145:6,17
146:2,13,
25 147:5,
17

**Buffalo**
3:11 5:6
7:9 134:4
136:5
140:4

**bullets**
138:15

**bunch**
6:16
121:25

**buy**
90:16

——————

C

——————

**Cadillac**
18:18
19:25
126:12
127:2
128:5,25
129:9

**call**
8:8 19:3
141:23

**called**
3:12 7:10
32:2

**Calls**
103:25

**camera**
142:17

**candid**
64:14

**capable**
103:15

**car**
21:7
22:25
40:4
90:18
91:3 95:4
97:4
98:7,13,
14 99:14
100:21
101:3
117:4
118:5
137:19,
24,25
138:3,6,
15 139:5
143:6

**care**
10:11,14
12:2 46:6
67:13
117:5

**cared**
38:6

**carrying**
101:24
105:3

**cars**
22:13
23:2

**case**
4:21 5:15
7:3 16:13
23:13
35:16
69:10
102:7
110:25
123:7
134:10
139:13
140:21
142:5

146:7

**caused**
33:5

**certainty**
41:4
42:25
47:4
64:14

**change**
47:24
61:23

**changed**
61:18
119:22
130:3

**characteriz
ation**
85:16

**Charles**
111:11

**choose**
92:19

**Chris**
139:12

**Christopher**
140:12
141:9,12,
19,20

**cigarettes**
89:25
90:5,7,16
96:20

**city**
3:6 5:5
13:8
122:3
134:4
140:4

**claim**
10:25
136:7



claims
  108:14

clarificati
on
  56:23

clarify
  66:20

clarifying
  66:16
  73:20

clear
  4:17,19
  7:7 64:8,
  10 74:8
  82:24

close
  76:9
  140:8

closer
  126:23
  127:19

clue
  81:11

clueless
  145:24

COE
  112:5

COE1837
  112:2
  113:11

colleagues
  134:13

color
  56:7
  134:20

colostomy
  75:19,20

comfortable
  66:16,22
  67:3

communicate
  138:18
  141:22

communicati
on
  111:4
  132:8

communicati
ons
  110:22
  122:23,25
  123:5
  147:9

comp
  134:22

compared
  76:14
  119:25

complete
  41:4

completely
  46:10
  47:3
  48:13
  64:14
  72:2

conceivable
  41:15,16
  83:10,14

concern
  92:16
  104:15

concerned
  91:16

concluded
  147:24

condition
  35:24
  37:4
  50:23

65:21
71:24

confessed
  26:17
  55:9

confirm
  56:17

confront
  95:22,25
  97:18
  98:22
  100:23
  101:4
  107:22
  108:7
  119:11,14

confronted
  62:6
  99:15,21
  100:6
  118:5

confuse
  47:21

confused
  47:21

confusing
  47:8
  64:11

connection
  72:6
  111:9
  123:6
  134:6

conscious
  36:4

consistent
  82:17

contact
  15:19
  16:9,11
  147:13,
  15,16

contacted
  129:22

contacts
  126:21,24

content
  60:17

contention
  64:18

continued
  94:22

conversatio
n
  10:2,6
  11:6,23
  33:2,3,5
  35:6
  60:17
  80:25
  81:16
  82:18
  126:8,18
  139:20
  140:11,
  17,24
  141:19,25
  142:19

conversatio
ns
  136:5
  142:25
  144:10
  145:22
  146:4

conveyed
  138:21

convicted
  123:10

convinced
  40:18

cooperate
  80:5

copy
  56:7
  111:20
  134:20

corner
  138:10

correct
  5:6 8:4,
  17 10:17,
  21 11:2
  14:21,25
  15:15
  20:8
  21:4,8,
  11,21
  22:19
  23:5,8,
  11,15,19
  25:10
  27:9
  29:16,24
  30:11,14,
  18 33:12
  34:17,23
  35:20,25
  37:4,7,11
  38:16
  39:2,12,
  22 40:7,
  15,20
  42:11,15,
  20 43:3,
  24 45:15
  48:9
  49:6,16,
  18 52:8
  54:7,20,
  25 55:12
  57:10
  59:24
  60:7
  61:16,19,
  25 63:4,
  11,18
  64:24
  65:4



67:10
68:2
72:8,22
73:4,13
74:3,11,
12,15,16
75:5,8
76:9
77:14,22
78:3,7,
11,14,16
79:13,18
80:2,6,9
81:13
82:2,15,
22 83:8
85:11
86:11,17,
24 89:25
91:9,16,
19 92:2,
6,10
93:17
94:15,18
98:23
99:3,8,25
100:7
105:7
106:2,17
107:10
108:9,16,
19,24
109:15
116:13
117:14
118:14
120:10,16
127:20
128:6
129:2,10
130:6,11
131:24
132:11,
17,21
133:15
137:4
143:13,23

144:5,14,
19,25
145:12

corrections
147:21

correctly
62:12

counsel
3:3 4:5
143:15

county
3:8,9
122:4
139:12,21

couple
75:12
94:24
113:8
122:16
125:6
142:15

court
9:19
13:19

cousin's
7:10,16

cover
139:19

covered
119:17
146:25

crawling
143:6

created
31:10

crime
39:22
40:6,9
56:14
78:25

criminal

15:13
17:18
18:3,4
59:22

cross
41:22

cross-
examination
62:7

crossed
37:22
51:24
95:14

curb
97:12
107:5

cutting
66:25

_____

_____

D

DA
123:18,
20,21
138:22

DA's
122:25
123:6,16,
19 125:2

day
38:2
42:25
53:17
121:12
130:5,18

days
35:19
38:10
67:22
75:4,7
76:8,17
129:9

132:10
135:6

deal
41:20,23

dealer
22:13,22

death
9:5

deceased
36:24

decided
102:13
119:11,13

defendants
3:6,9
139:12
143:16

Delavan
90:10
138:10

deny
10:15
77:20
87:23

Department
136:6

dependable
102:10

deposition
3:24 4:11
5:3,20
6:2,15
147:24

depth
124:11

describe
25:21
43:13
85:13
115:3
137:11,17

146:3

describing
8:10
21:18
29:18

description
80:25
81:5
86:11,15,
23 87:3,
6,13
118:7

details
141:24

detective
24:3,4,7,
10,20,23
26:19
31:10,15,
22 35:18,
23 36:23
41:17
51:22
52:19
53:10,23
54:4,19
56:3
57:16
63:2,17
72:7
74:25
79:18
125:8
130:17,25
131:2,13

detective's
24:14

detectives
74:24
77:14,17,
21 83:8,
15 110:23
134:5



AARON JACKSON                                                    January 12, 2023
DIXON V. CITY OF BUFFALO                                Index: determine..effect

determine
  17:13

difference
  17:11
  34:13
  69:16,17

differences
  121:4

difficult
  36:9
  53:14
  128:15,
  16,17

difficulties
  88:15

difficulty
  53:5

Dipirro
  74:20

directly
  70:19
  138:17

discussed
  28:7 29:2
  35:9
  45:14
  54:6 55:4
  134:10
  142:2
  143:9

discussing
  3:23
  32:14
  58:15

discussion
  8:13,19
  147:18

discussions
  4:20,23
  57:16

dispute
  24:22
  25:3
  80:25
  131:22

District
  13:22
  138:19
  139:22,25

Dixon
  9:4 10:5,
  12 12:3,
  12 13:13
  14:17,24
  15:17
  17:13
  18:17
  20:4,10,
  12 21:20,
  24 22:8,
  11 23:4,
  19 28:3,9
  29:3
  32:15,18
  33:22,25
  38:12,13,
  23 39:20
  40:3
  41:4,10
  42:5,18
  44:3,12,
  13,14
  45:11,15
  46:4,7
  47:4 48:6
  49:5,9
  52:21
  53:22
  54:6,19,
  24 56:11,
  16,18,25
  57:4,18
  58:15,21
  59:23
  63:4 65:4
  68:24

70:4,14
71:16
72:6,14,
21 73:2,
11,24
74:10,13
78:21,24
79:12
81:9,17,
24 82:6
83:2,11,
16 84:18
87:19
88:3,19
89:7
111:11
123:9
124:14
126:11,
22,24
128:4,14,
23 129:8
130:6,19
131:23
132:9,10
134:6
136:8,11,
25 138:11
141:10,14
143:7,17
144:12,23
145:10

Dixon's
  15:13
  28:2 62:7
  124:3
  140:6
  147:10

doctor
  53:21

doctors
  36:18

document
  31:9,16,
  22 45:14

77:9,25
81:13,21
82:13,25
85:2,12,
25

documented
  42:14
  62:13
  63:18

documents
  15:8

double
  73:19
  74:9
  133:12

doubt
  37:13

drink
  96:8,13,
  17,18

drive
  23:5
  119:12
  137:22

driver's
  92:11

driving
  18:18
  21:7,20,
  24 39:20
  40:4
  95:10
  126:25
  128:25
  129:9
  132:16,21

drove
  8:3,9
  22:13,25
  109:23
  126:11
  128:4

drug
  22:13,22

ducked
  138:15

due
  88:14

duly
  3:12

dynamics
  66:6

_____

E

earlier
  47:22
  65:13
  72:24
  95:7
  98:8,23
  99:16
  100:7
  105:13
  106:16
  107:24
  109:23
  110:7
  118:19
  126:13,21
  128:21
  129:14
  134:19
  137:3
  142:18
  146:3

early
  96:24

easier
  19:4

ECMC
  77:5

effect
  10:9



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 624 of 1202

APPENDIX 0622

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: efficient..form

efficient
  122:11

else's
  134:21

email
  147:12

Emil
  147:9

end
  77:8

enforcement
  138:19

engage
  92:24

ensure
  79:12,22
  80:18

Erie
  139:21

errors
  147:21

evening
  94:22
  100:6
  106:17
  107:24

events
  8:16
  127:20
  140:9

evidence
  33:8
  140:13
  145:9

exact
  47:13

EXAMINATION
  3:14
  133:25
  139:9

142:13

Excuse
  24:8

EXH
  113:5

exhibit
  111:17,
  19,22
  113:10

exited
  97:15,16

exonerated
  13:13
  78:25
  123:9

explain
  81:7

explanation
  52:13
  70:20
  71:5,13
  84:16,22
  88:12,18
  89:4

expressing
  5:13

extent
  11:23

Eye
  16:11

————————

F

face
  20:12
  21:3
  24:14
  57:9

fact
  8:6
  26:20,21

29:14
42:24
44:10
46:17
48:9
50:16
59:22
60:6
63:2,21
65:2
77:21
82:20
83:22
93:21
135:4,17
142:4
145:9

failed
  82:7

fair
  3:24  6:7
  11:13
  14:4
  18:11
  24:25
  26:14
  28:25
  35:14
  38:3
  53:3,14,
  19  54:2
  56:18
  57:3,20
  69:25
  76:14
  85:15,24
  97:20
  98:19
  104:6
  118:16
  125:23
  145:7

family
  36:7,12
  53:21

147:15

fast
  40:12
  44:15
  45:6
  64:23

father
  36:16
  125:17,
  24,25
  131:5,15

fault
  74:8  87:5
  133:12

feel
  66:16,21,
  24  67:3,
  16,22
  102:4
  109:10

feeling
  76:11

feet
  118:3

felt
  101:23

fight
  110:2

figure
  37:10,15

figured
  38:25

file
  16:17
  51:18
  56:2
  125:6
  134:22

filled
  51:22

fillers

56:15

finally
  21:13

finding
  142:4

fine
  6:10  13:9

finish
  85:14
  121:13
  128:18

fire
  138:13

firearm
  101:24

flipping
  58:2

Flynn
  123:18,
  20,21
  139:21,22

focus
  117:25

focused
  118:23,24

focusing
  10:3

follow
  67:8

follow-up
  133:21

follow-ups
  142:15

forgot
  147:6

form
  8:24  9:9
  10:23
  11:4
  13:15



14:9
22:15
28:13,19
29:12,20,
25 30:2,7
31:17
32:21,22
33:7,13,
14 34:4,
10,19,25
37:18
38:17,18
39:3,4,13
40:21,22
41:11,12
42:6,7,21
43:8,9,
17,18
44:16,17,
22,23
45:16,17,
23 46:8,
9,20,22
47:5,6
48:15,16,
19 49:12
50:5,6,19
51:3,13,
14 52:16
55:6,14
57:11
58:18
59:25
60:8,9
62:2,3,9
63:12
70:6
71:17
72:9,16
73:5,17
79:2,7,8,
14,19
80:21,22
81:19,20
82:10
83:3,4,
17,18,24

84:2,21
85:7,17
86:4,12,
18,20
87:2
88:5,6,
20,21
89:8,9
91:21,22
92:3,21,
22 93:2,
8,12,13
97:5
99:5,9,
18,20
100:2,8,
9,14,15
101:5,7,
18,19,25
102:2,17,
18,24
103:8,17,
18,24,25
104:10,
11,16,17
105:8,9,
17,18
106:5,10,
11,18,22
107:11,
12,17,18
108:2,11,
21 109:3,
16,17,21
110:9,16
116:9,10,
16
117:17,18
118:21,22
119:6,15,
17 120:4,
5,12,17,
18,24
121:8,9
123:8,11,
12 124:9,
17,23

126:5,6,
14,15
127:3,7,8
128:7,8
129:3,4,
11,17,18
130:7,8,
13,21,22
131:6,7,
17,25
132:12
135:13,20
136:3
141:16
143:10,
11,24,25
144:15,16
145:2,3,
14,15,23
146:8

**formal**
4:18

**Foundation**
136:3

**frame**
65:20

**frames**
65:8,9,
12,19
66:18

**frankly**
103:21

**Frederick**
125:17

**friend**
89:24
92:9 93:5
102:5,6

**front**
16:13
29:23
30:23
39:13

66:4
74:13
87:25
92:12
120:2
137:20

**froze**
88:13

**full**
114:14
117:24

—————————

—————————

G

—————————

**gave**
61:24
85:23
125:25
126:23

**general**
4:25
85:24
86:2

**generally**
22:10
30:5 81:4
124:22

**Geo**
137:25
139:3
140:14
142:3

**gesturing**
97:13
100:24
104:19
109:25
121:2

**give**
47:10
78:2,7,18
86:10
112:13,21

122:19
127:11,13
141:12

**giving**
86:23
111:9
140:21

**goal**
79:17,20,
22 83:13

**goals**
37:14

**good**
3:16,17
35:25
112:9

**Gotcha**
27:18

**grab**
16:21

**Grabowski**
74:20

**Grand**
15:14
17:13,22,
25 18:16,
22 19:17
27:11
57:21
58:6
141:4,7
142:9

**gratitude**
5:14

**great**
16:21,24
122:13

**greatly**
133:22

**group**
27:21



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 626 of 1202

APPENDIX 0624

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: guess..identified

29:8
118:3,13,
18 119:2,
5,24
120:15,22

**guess**
68:16
140:20

**guilty**
8:21
13:25

**gun**
9:6 92:6
99:25
104:22,25
106:16
107:6,9,
16,23,24
108:9,15,
24 136:13
138:9,12

**guns**
91:12,19
92:2,17
93:4 95:7
99:3,16
101:3
102:16
103:6
104:7,9
105:6,14
108:19
117:13,16
118:20

**gunshot**
24:10
139:4
140:13

**guy**
82:22,25
89:5 94:4
109:24
146:12,15

**guys**
92:15,17
95:6,18
105:6
118:3

———————

**H**

———————

**half**
13:7

**handful**
134:5

**handle**
41:24

**hands**
91:9
97:13
104:19,21
105:2
106:12
107:2,4,5
109:25
117:11,15
120:2

**handwriting**
31:15

**happen**
11:7
34:15
126:17

**happened**
8:6,12
11:7
15:25
28:6,18,
21 29:10,
19 32:9,
14 39:11
40:12
41:25
42:2
44:15
45:6 48:7

49:25
64:23
66:7
69:18
87:14
89:13
97:10
98:23
102:8
110:18,19
118:7
126:4,18
127:16

**happening**
30:6
114:10

**happy**
7:6 89:16

**head**
140:3

**health-wise**
75:13

**hear**
5:23
14:12
76:4 87:4

**heard**
20:5,10
82:14
85:15

**hearing**
86:2

**hell**
93:5

**helpful**
112:7

**hiding**
64:15

**highly**
65:22

**hired**

6:25 7:25

**hit**
137:22
138:16
140:14

**Hodgson**
134:14

**hold**
12:7
57:25
117:23

**holding**
91:9 99:3
101:3
120:3

**home**
75:7,11,
14,16
76:2,9,18
115:15,19

**homicide**
134:5

**honest**
30:11
47:10,11
78:7
127:10

**honestly**
50:13
127:13

**horn**
92:12

**hospital**
24:7,10,
11 25:9
27:4,21
31:11
35:25
37:15
40:2
41:3,18
55:17

67:25
68:6
69:11
74:25
76:18
77:13,14,
18,22
110:24
130:5
140:19

**hour**
13:7
121:14

**hours**
26:7
31:23
89:13

**house**
7:10,11,
16 8:7,8,
9 74:14
94:17
126:11,25
128:5,25
129:9

**Hugh**
3:5 13:6

**hurry**
92:10

———————

**I**

———————

**idea**
103:13
105:5,12
107:8
125:24,25

**Identificat
ion**
113:4

**identified**
51:25
136:10,21



AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: identify..JP

**identify**
  39:9
  82:25
  141:14

**image**
  70:17

**imagine**
  36:9

**inaccurate**
  18:7  29:7
  85:20
  115:5
  116:22

**including**
  70:22
  71:6
  123:3

**indication**
  141:13

**information**
  38:15
  78:7,19
  140:22

**initial**
  61:24

**initially**
  95:18
  137:2

**injuries**
  25:12

**intensive**
  67:13

**intent**
  47:9

**intention**
  95:24

**interaction**
  23:18
  131:23

**interactions**
  15:4
  128:14

**interruption**
  12:5  74:4
  106:14

**interview**
  23:25
  24:3
  25:22
  28:24
  29:2,5
  74:20
  77:2,3,12
  83:7
  111:25
  113:14

**interviewed**
  25:17
  26:4,19
  38:16

**interviewing**
  24:11

**investigated**
  136:17

**investigation**
  14:17

**investigator**
  9:16,20,
  25

**investigators**
  6:25  7:25
  8:14,20
  10:25

**involve**
  46:18

**involved**
  38:11

**issue**
  92:14
  109:22
  142:2

**issues**
  143:5

―――――――――

**J**

―――――――――

**Jackson**
  3:1,11,
  16,18  4:1
  5:1  6:1,
  24  7:1
  8:1  9:1
  10:1
  11:1,15
  12:1  13:1
  14:1  15:1
  16:1
  17:1,2
  18:1  19:1
  20:1  21:1
  22:1  23:1
  24:1  25:1
  26:1
  27:1,25
  28:1  29:1
  30:1
  31:1,9
  32:1  33:1
  34:1  35:1
  36:1  37:1
  38:1  39:1
  40:1  41:1
  42:1  43:1
  44:1  45:1
  46:1  47:1
  48:1
  49:1,3
  50:1,16
  51:1  52:1
  53:1  54:1

  55:1
  56:1,10
  57:1  58:1
  59:1  60:1
  61:1  62:1
  63:1
  64:1,7
  65:1  66:1
  67:1  68:1
  69:1
  70:1,2,
  21,22
  71:1  72:1
  73:1  74:1
  75:1  76:1
  77:1  78:1
  79:1  80:1
  81:1  82:1
  83:1  84:1
  85:1  86:1
  87:1  88:1
  89:1  90:1
  91:1  92:1
  93:1  94:1
  95:1  96:1
  97:1  98:1
  99:1
  100:1
  101:1,13
  102:1
  103:1
  104:1
  105:1
  106:1
  107:1
  108:1
  109:1
  110:1,4,
  21  111:1
  112:1,2
  113:1,14
  114:1
  115:1,9,
  18  116:1
  117:1,3
  118:1,2
  119:1

  120:1
  121:1
  122:1,5,
  16,22
  123:1
  124:1
  125:1,17
  126:1
  127:1
  128:1,20
  129:1,7
  130:1
  131:1
  132:1
  133:1,19
  134:1,3,
  23  135:1
  136:1,23
  137:1
  138:1
  139:1,11
  140:1
  141:1
  142:1,16,
  18  143:1
  144:1
  145:1
  146:1
  147:1,2,8

**James**
  3:8
  139:11

**Jarmon**
  90:23
  101:15

**job**
  67:2

**John**
  139:22

**jotting**
  53:8

**JP**
  146:24



AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: June..make

**June**
113:24

**Jury**
15:14
17:13,22,
25 18:16,
22 19:17
27:11
57:21
58:6
141:4,7
142:9

**justice**
78:22
79:13,23,
24 80:8,
10,11,12,
18 83:13

———————

**K**

———————

**keys**
137:21

**killed**
66:5
81:9,10,
18 82:2,6
83:12

**killing**
23:21

**kind**
38:5 47:8
53:7
75:15

**kindly**
8:9

**kinds**
38:7

**knew**
20:4 21:3
22:12
23:14

28:4,5,7,
8 29:14
30:17
38:11,14,
22,24
39:21
40:2,5
41:2,3,6
42:10,25
44:5,6,7,
10 48:8
49:9,15,
18 56:19
57:9
81:25
88:3,24
90:24
95:20
99:11
102:19
103:2
119:2
144:13

**knowing**
38:4 42:4
55:11
105:25
106:4,9

**knowledge**
18:7
23:18
45:15
57:17
128:9,23
147:14

———————

**L**

———————

**label**
19:4,6

**labeled**
59:7

**Lamarr**
8:21 10:4

13:24
14:6,7
26:17
27:3,9
55:4,9
70:22,23
71:7,15
84:25
85:6
87:18
88:25
123:10

**large**
36:4

**law**
138:19

**lawsuit**
134:6

**lawyer**
5:5 62:7

**lawyers**
6:16
112:18

**lay**
37:14

**leading**
89:13

**learn**
55:8

**leave**
41:23
92:19

**led**
33:3

**left**
67:25
97:12
99:2

**Leonard**
90:22,25
102:19

**liars**
10:20
11:2

**lie**
18:13
43:16,21

**lied**
42:4 43:6

**lift**
114:4

**lifted**
138:11

**limitations**
75:13

**lines**
18:25
19:19
20:18,20
21:14,15
27:18
57:23
58:10,12
59:13
62:18,21
97:25
133:2,3

**live**
7:20

**lives**
7:14,19

**long**
55:16
68:12

**looked**
32:8,19
38:14
39:10
40:14
42:20
43:15
45:5 46:5
48:6

49:8,24
56:16
58:10
64:22
70:19
86:16,24
138:12

**lost**
75:20

**lot**
75:21
92:15,17
138:5

**lots**
82:13

**Louie's**
90:10

**lunch**
121:16

**lying**
9:17
108:15
116:7

———————

**M**

———————

**machine**
136:13

**made**
7:6 9:21
32:2
48:10
92:19
131:4,15

**make**
13:10
16:9 19:4
27:14
34:14
35:3
61:10
66:19



AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: makes..murdered

69:6
109:10
122:11
128:15,20
135:24
147:21

**makes**
121:15

**making**
87:23
128:16

**mall**
18:19
21:20,25
90:16
132:17,21

**man**
45:21
107:23

**manner**
28:25
91:6
92:18

**March**
7:8
11:10,11

**Maria**
7:2

**Marino**
118:4,5,9

**Mario**
90:23
97:11
98:12,21
99:21,22
101:15
106:9,16
108:7
110:6
118:10,13
119:24
120:14,21

**Mario's**
120:2

**mark**
111:16,19
113:10

**marked**
30:22
31:25
113:4

**match**
20:12
92:25

**math**
11:12

**matter**
9:3 41:24

**Meaning**
6:15

**means**
118:10

**medical**
65:21

**medicated**
65:23

**meet**
142:25

**meeting**
4:18
52:19
53:23
77:17
78:6
139:14

**members**
36:12

**memory**
50:24
68:19
77:16
82:17
122:24

130:16
131:22
132:8
142:21
143:21

**men**
90:21
91:8,18,
25 96:25
98:8,10
99:2,15,
24 100:6
101:2
102:14,15
103:6,14
104:7
105:25
108:8
109:14
110:6
118:19
119:5,24
120:15,22

**mention**
84:17
126:13,24
127:25
128:24
143:8

**mentioned**
28:8
72:13
139:20

**mentioning**
127:12

**met**
3:19 4:8
39:8,24,
25 54:4
77:21
79:18
80:17
134:8

**middle**

77:3

**mind**
24:15
37:14,23
39:19
40:2,17
41:22
48:8
55:19
59:4
65:19,20
70:17
91:14
95:14
111:21

**mine**
35:4

**mini**
18:19
21:20,25
90:15

**minute**
132:25
133:17

**mischaracte
rizes**
43:10
46:10

**mislead**
78:13

**misquoting**
34:14

**misrepresen
t**
115:20

**misrepresen
ted**
39:15
52:8

**misspoke**
54:9

**mistaken**
79:5
116:7

**misundersto
od**
47:2
115:25

**Mo**
111:17
112:20

**moment**
14:23

**months**
11:8,11
23:7,10

**morning**
3:16,17
89:23
96:25

**mother**
36:14
129:23
130:4,18
131:4,15

**mouth**
62:12

**move**
47:15
67:6
137:4,7,
13,18
142:17

**moved**
68:5,9,12
137:12
144:8

**murder**
135:6
136:16

**murdered**
136:22



---

**N**

---

**name's**
  134:3

**named**
  6:25 7:2
  29:24
  74:19
  111:10
  113:13

**needed**
  59:6

**negative**
  73:19
  74:9
  133:12

**neighborhood**
  19:25
  22:12

**nice**
  22:13,25
  23:2

**Nick**
  19:3
  46:14
  50:14
  65:23,25
  70:25
  71:25
  73:16
  84:10
  88:13
  101:8
  102:11
  104:13
  107:19
  128:17
  133:24
  145:5

**nickname**
  28:2 34:2

**night**
  9:7 18:17
  23:19
  26:7
  27:25
  30:18
  31:11,25
  38:23
  45:22
  49:16
  51:22
  56:25
  57:5,9,16
  69:10,22
  72:21
  73:3,12
  74:2,11,
  14 85:15
  86:3
  89:22
  95:7,11,
  14 96:3,
  7,23
  108:15
  109:6
  115:10
  137:2,8

**nighttime**
  26:10

**nonetheless**
  10:5,13

**nose**
  52:25
  76:19

**notes**
  122:11

**nudge**
  109:20

**nudged**
  97:11
  109:12

**number**
  6:24 32:8
  51:25

**56**:12
  59:3,8
  61:2,14
  135:23

**numbers**
  59:5

---

**O**

---

**oath**
  6:17 18:3
  21:19
  30:11
  59:21
  63:2,20
  65:2
  110:5

**Object**
  33:7,14
  43:18
  50:6,19
  62:2,9
  79:2
  82:10
  135:13

**objecting**
  13:8

**occasion**
  7:8 138:7
  139:14

**objection**
  8:24 9:9
  10:23
  11:4
  12:17,21
  13:4,15
  14:9,13
  22:16
  26:24
  40:22
  42:6 43:8
  46:9,20
  47:6
  71:11,18
  72:9,16
  79:14
  83:17,24

**84**:20
  87:2
  88:6,21
  89:9
  99:9,18
  101:19,25
  102:24
  103:18,25
  104:11
  106:10,19
  107:11,17
  108:11
  117:18
  123:12
  124:23
  127:8
  128:8
  129:3,11,
  18 130:13
  131:7,18
  132:2,14
  135:20
  136:3
  141:16
  145:23

**observe**
  138:7

**occasion**
  7:8 138:7
  139:14

**occasions**
  6:24

**occurred**
  138:23

**office**
  13:22
  122:25
  123:6,16,
  19 125:2
  141:2,20

**officer**
  29:22
  49:22
  58:16,22

**65**:3
  111:10
  113:13
  114:24
  134:23
  135:9,15,
  22 138:20

**officers**
  39:25
  74:18
  77:4 78:6
  80:18
  81:8 82:5
  84:17
  85:12
  110:22

**officers/
detectives**
  74:19

**official**
  138:19

**one's**
  64:3

**open**
  66:12
  104:20

**opportunity**
  147:20

**opposed**
  53:5
  71:16
  89:6

**order**
  25:25
  125:12

**orders**
  3:3

**orient**
  59:7



---

**P**

---

**p.m.**
113:6
122:14
139:17
147:4,24

**pages**
113:11

**paperwork**
7:2

**paragraph**
77:4
87:9,11
114:14,15
115:8
117:2,25
125:15,
16,19
129:22,24
130:15

**paragraphs**
113:20
114:2
115:3

**parked**
90:12
97:4
98:13

**parking**
92:15,17
138:5

**part**
114:16
118:2

**participating**
7:6

**parties**
94:24

**party**
95:2

**passenger's**
137:20

**past**
102:25

**patience**
133:23

**pay**
3:7

**pending**
6:12

**people**
7:20 22:5
23:3
56:14,15
70:22
71:6,14,
20,22
78:20
95:12,15
105:13
118:13
119:3
121:14,
16,24

**Perfect**
16:16

**period**
36:3,7,13
37:10
67:21
109:7

**periods**
36:4

**perjury**
15:14
17:18
97:22

**person**
3:19 8:7
9:6 14:8

24:24
29:24
32:8
33:19
38:5
39:20
40:3
41:19
43:2
44:14
49:5,24
52:2
56:12,19
57:4,8
58:23
60:25
61:14
63:22
64:22
66:4
70:10,14
72:4,13
78:20
81:9,17
82:6
88:4,19
101:14
107:10
120:25
136:12,
21,24
144:23

**personally**
88:9 89:2

**Peter**
16:12
30:25
114:7
122:19
134:3

**phone**
3:19,23
141:23
147:12

**photo**
29:19,22
30:24
31:23
32:15,17
33:6,12
34:2
35:6,9
51:25
56:13,19
57:5 63:3
68:24
134:18,25
135:3,11,
18,23,24,
25

**photograph**
45:22
58:21,23

**photographs**
25:18
26:5,7
27:22
51:23
69:2,4

**photos**
25:23
28:9,10
29:8 34:3
54:20,24
56:2
58:16
69:10,21
135:18

**pick**
27:22
28:10
29:9,15,
23 33:6,
12,19
94:18
95:16
135:10
143:18

**picked**
32:17
45:10,21
60:25
61:14
94:21
144:22

**picture**
32:8,17
44:13
45:10
49:8,10
135:16
139:2,3
144:12,22

**pictures**
24:12

**place**
140:25

**plainclothes**
24:20
74:19

**Plaintiff**
3:10

**Plaintiff's**
113:10

**plan**
46:3,13
121:12

**pled**
8:21
13:25

**PLF**
113:5

**pocket**
107:9

**pockets**
99:17

**point**
32:18



39:7,18
55:12
77:8 95:5
96:4,5,6,
23,24
107:16
135:22
145:25

**pointed**
22:5 23:3
144:12

**pointing**
109:24

**points**
139:19

**police**
15:4
16:17
24:2
27:20
28:7
30:21
38:16,22
39:8,25
40:10,19
41:2,21,
23 42:3,4
43:6
44:11
45:5,20
46:4,18
47:3
48:5,13
49:3,22
51:18
55:25
58:22
69:2
78:14
80:5
87:24
88:2
110:22
111:5
122:20,23

125:6
128:3
134:22,23
135:9,15,
22 136:6
138:20
143:16,22
144:4,7,8

**portion**
113:16

**position**
14:15
56:11

**positively**
51:24

**possibility**
130:9

**possibly**
41:20
85:8
108:7
127:15
135:5
137:20
141:5

**potential**
72:14

**pounds**
93:23
94:8

**Powell**
89:24
90:15
92:9
94:21
96:19
108:18
109:12
110:13
119:10
120:9
137:13

**power**
80:5

**prefer**
89:18
122:6

**preferred**
141:13

**preparation**
4:9 15:6,
9

**present**
3:23
135:18

**prior**
23:19,20
32:15
33:3,4
34:2
35:6,9,22
45:14,22
46:2
49:16
52:19
53:23
56:20
57:9,17
58:16
118:19
124:2,3
126:21,23
128:13,
22,23
131:22,23
132:8
143:2

**prison**
15:18
80:2,9
140:6

**probation**
111:10,25
113:13
114:23

**problem**
19:12
98:17,18
118:6

**proceeding**
141:4,7
142:9

**proceedings**
6:20
15:12
17:11
18:4

**proof**
139:6

**prosecuted**
13:22
80:2,14
83:14

**protect**
91:25

**proved**
145:10

**provided**
38:15

**pry**
75:11,17

**prying**
75:18

**pulled**
9:4 10:12
12:13
70:10,14
92:12

**purpose**
98:16
141:18

**purposes**
134:21

**put**
29:22
41:21

56:15,16
80:2
111:14

**putting**
80:9

_____

Q
_____

**question**
6:3,7,12,
14 27:2,
19,24
47:8,13,
23 48:22,
24 50:14
58:12
61:4,10
69:7,15
72:23
73:8,16,
21 84:13,
16 88:24
101:9
102:22
103:5
106:6,23
121:24
128:21
129:19
143:3
146:11,
16,18

**question's**
57:2

**questioned**
70:9,13

**questioning**
66:9,10
121:15,17
122:3
143:15,21

**questions**
6:17 17:3
27:3,8



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 633 of 1202

APPENDIX 0631

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: quick..refreshes

36:22
47:15
58:22
60:6,18
64:20
65:16,17
67:2,7
75:12,18
78:2
82:13
84:25
85:5,23
89:12
121:25
122:22
124:13
125:7,13
130:19
131:3,14
133:21
142:12,16
143:4

**quick**
32:10
48:7
49:25
142:15
147:7

**quickly**
5:25 17:7
39:11
54:15

**quote**
115:9
117:4

**quotes**
9:21

——————

**R**

——————

**raise**
143:5

**read**
18:25

19:15,18,
19 20:19,
22 21:14
27:18,19
57:21
59:12,16,
19 60:13
62:11,17,
22,23
64:21
76:22,23
77:7
97:25
112:17
113:19,24
114:12,
13,19
125:19
128:21

**reading**
61:11
77:16
83:9
85:22

**reads**
51:23

**ready**
112:16

**realized**
137:18

**reason**
6:3 25:3
39:14
41:16
47:2
69:16
75:22
80:24
83:10,14
101:22
108:6
109:12
136:20
143:7

**reasons**
95:10

**recall**
6:23 7:3,
9 8:14,19
9:7,8,11,
13 11:16,
18,19,22,
24 15:11
17:8,10,
12,14,19
18:8,19
20:6,13,
14 23:9,
12 24:21
25:2,19,
24,25
26:8,13
27:3,8
28:15
29:4,5
30:3,8
33:9,24
34:5,8,
11,16
36:19
37:12,25
38:4
41:13
45:24
47:7
52:23
53:24
54:8
55:10,11,
13,16
58:24
67:24
68:22
69:5,24
72:10,17
73:9
74:17,18,
23,24
76:17,20
110:21

111:9,13
113:15
116:5,18
122:24
123:4,5,
22,24
124:24
126:7,17
128:10,25
129:12
130:12,24
134:24
138:23
139:24
140:24
141:3,18,
24
142:23,24
144:17,
20,21,24
145:4,7,
11,19,22

**receive**
7:11,24
8:9

**recently**
7:8

**recess**
55:23
122:14

**recognize**
100:18

**recollectio
n**
18:9
19:22
30:14
53:20
54:2
57:15
69:9,12,
21 85:4
111:3
113:17

114:23
124:8
127:12
129:8
131:2,13
136:15
144:9

**recommendat
ion**
13:21

**record**
3:3 88:14
113:6
139:17
147:4,18

**recorded**
23:25

**recovering**
24:7,9
25:10

**refer**
32:16

**referenced**
72:6

**references**
113:14

**referencing**
71:22

**referring**
137:24
139:21

**refresh**
19:21
77:16
114:22
130:16,25
131:12

**refreshed**
57:15

**refreshes**
113:17



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 634 of 1202

APPENDIX 0632

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: regained..Sahasrabudhe

regained
  137:13

regard
  80:5

regular
  59:8

reinvestiga
tion
  123:7

related
  6:20
  56:13

relating
  10:4

relation
  7:3,18
  68:20
  82:14

relationshi
p
  5:8

release
  124:2,4
  140:6,19
  147:10

released
  15:18

remain
  70:2

remember
  7:21
  12:9,10
  24:4,6,9,
  17,19
  30:5
  34:22
  54:5,10,
  17,22
  55:3
  57:23
  58:13,21
  67:12,15,

19 68:4,
  8,9,11
  69:14,18,
  22 72:5
  86:2,8
  111:5,7
  117:6
  123:15
  124:21
  127:6,18
  129:14,
  16,19
  130:4,11
  133:9,14
  143:18
  146:5,6

remembered
  5:15
  25:17
  32:20
  40:6
  142:19
  146:19

removed
  68:21

repeat
  21:22
  38:19
  39:23
  50:20
  51:4,8
  70:11
  71:9

rephrase
  6:4 51:6

report
  24:23
  25:4,14,
  16 26:6
  28:24
  30:21
  64:21,24
  81:16
  113:5,12

125:8
  128:3
  130:16
  131:12

reporter
  3:2 12:5
  74:4
  106:14

reports
  24:2
  26:22
  122:20
  125:7

represent
  3:5 19:16
  26:3,16,
  21 31:8,
  14 56:10
  134:4
  139:12

represented
  4:5 56:3

representin
g
  3:9

reputation
  22:12
  23:15

residence
  129:23

respond
  138:25

response
  8:23

rest
  21:16
  112:14
  121:12

result
  92:8

retired

134:5

review
  147:20

reviewed
  15:5,8
  23:23

ride
  95:17

rode
  99:10
  100:16
  102:25

room
  6:16
  31:12
  40:2
  41:3,9,18
  68:5
  77:13
  82:5
  110:24
  146:12,
  16,20

rough
  67:10

rule
  6:2

Russ
  3:5 4:8,
  13,21
  5:4,10,13
  8:24 9:9
  10:23
  11:4,10
  121:20
  134:14

—————————

S

—————————

safe
  104:21
  107:2

safer
  101:23
  102:4

Sahasrabudh
e
  12:17,21
  13:4,6,15
  14:9
  16:15,18,
  22 19:3,
  8,10
  20:18
  22:16
  26:24
  27:13,16
  29:12,25
  30:7
  31:2,6,17
  32:22
  33:7,14
  37:18
  38:18
  39:4
  40:22
  41:12
  42:6
  43:8,10,
  18 44:17,
  23 45:16
  46:9,20
  47:6
  48:16,19
  50:6,19
  51:14,19
  55:6 56:5
  57:25
  58:4,7,18
  59:6,11,
  14,25
  60:9
  61:21
  62:2,9
  63:12
  70:23
  71:18
  72:9,16



AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: sat..shooting

73:5,17
76:24
79:2,8,14
80:22
81:20
82:10
83:4,17,
24 84:19
85:7,17
86:18
87:2
88:6,13,
21 89:9
91:22
92:22
93:13
97:5
99:5,9,18
100:2,9,
15 101:6,
19,25
102:18,24
103:8,11,
18,25
104:11,17
105:8,18
106:5,10,
19
107:11,
17,25
108:3,11
109:2,17,
21 110:9,
16 112:7,
11 113:22
114:4,9,
13,18
116:10
117:18
118:21
119:6,16
120:5,12,
18,24
121:9,18
122:2
123:12
124:23

126:5,15
127:8
128:8,18
129:3,11,
18 130:7,
13,22
131:7,18
132:2,12,
14 134:2,
4 135:14,
21 136:4
139:7
143:11,25
144:16
145:2,15,
23
146:22,24
147:19,23

**sat**
6:15

**scenario**
32:25

**scenarios**
121:5

**scene**
28:8
38:25
39:22
40:5,8
42:19

**school**
90:24
102:20

**scope**
128:9

**Scott**
8:21 10:4
13:25
14:6,7
26:17
27:3,9
55:4,9
70:23
71:7,15

84:25
85:6
87:18
88:25
123:10

**screen**
111:15
112:14
114:6,15

**scroll**
114:9,16

**seat**
92:11
97:15
137:20
139:5

**second-last**
87:11

**security**
115:15,
20,23,24
116:6,18

**selected**
58:20

**send**
111:20
112:19

**sense**
92:19
121:15

**sentence**
87:17
88:11,17

**sentencing**
111:10
113:12

**serve**
7:25
121:21

**served**
7:2,9

**settle**
46:19

**Shannon**
90:22

**shape**
35:25
67:10
75:15

**sharing**
114:5

**shoot**
103:16

**shooter**
8:22 10:4
12:4
14:24
26:18,21
27:5
32:20
38:14
39:9,11
40:8,11,
14,18,20
42:5,11,
18,20
43:15
44:3 45:5
46:5,6
48:7,9
49:21
52:14,22
53:23
55:9
59:24
61:2,15
63:4
70:4,18
72:14
79:6
83:16,23
84:18
86:11,24
124:15
133:10,15

135:16,17
136:8,11,
16,22
137:23
138:7
141:10,14
145:10

**shooting**
6:20 8:21
9:5
13:13,25
14:17,24
18:18
20:5,13
21:3,24
23:8,19,
20 25:18
28:2
30:18
35:20
38:24,25
49:16
53:17
54:6
56:25
57:6,10
68:20
70:3
72:7,22
73:4,13
74:2,11,
14 75:5
76:8
82:15,22
83:2
85:15
89:6,14,
23 111:12
126:12
128:23
129:10
132:11
136:13
137:2
138:4,9
140:18



**short**
　8:13

**shortly**
　140:5

**shot**
　14:8,18
　32:9
　33:19,20
　37:3,23
　41:4,5,6,
　7,9,19
　43:2
　44:5,6,
　11,12,14
　45:4
　49:5,24
　50:25
　51:10
　52:3
　55:17
　63:22
　64:22
　65:4
　66:4,5
　68:13
　71:8,15
　75:20
　81:9,10,
　18 82:7
　83:12
　88:4,19
　130:6
　144:24

**shots**
　138:13

**shouting**
　92:25

**show**
　23:24
　25:15
　32:15
　56:2
　57:22
　58:11

　59:9
　89:19
　111:8
　113:7,16
　134:18,20

**showed**
　27:21
　28:9 29:8
　54:20,24
　56:3 63:3
　64:21
　126:22
　127:22
　128:12,13
　134:24
　139:2

**showing**
　24:12
　51:23

**shown**
　25:18,22
　26:5,6
　34:2
　35:17
　57:14
　58:16
　68:24
　69:2,3,9
　134:25
　135:4

**side**
　118:15
　137:20

**sight**
　23:14

**simply**
　46:4
　52:13
　109:9

**singular**
　135:25

**sir**
　9:22

　12:24
　15:11
　36:17
　48:22
　49:2
　50:22
　64:13
　65:24
　66:2,19
　71:10
　73:8
　83:21
　87:5
　108:6
　116:15
　121:7
　131:12
　132:5
　144:19

**sit**
　14:4
　53:25
　54:9,17
　69:14
　70:20
　71:5,14
　129:7
　131:21
　132:7

**sitting**
　66:4

**situation**
　71:25
　119:23

**situations**
　66:11

**skimmed**
　139:4

**Skipper**
　111:11
　113:13

**sleeping**
　95:4

**slot**
　51:25
　60:25
　61:14

**slow**
　54:11,12,
　14 70:25

**small**
　94:4

**smart**
　93:10

**smoke**
　90:4
　96:10,11,
　12,17,18,
　20

**sober**
　96:21

**something's**
　114:10

**SOTO-BRITO**
　111:18,22
　112:21

**speak**
　16:3,5
　36:18
　53:13
　54:15
　71:19
　75:25
　112:12
　123:21

**speaking**
　35:22
　114:23
　130:18
　134:19

**specific**
　5:16
　86:22
　142:2
　146:10,

　16,19

**specifically**
　94:18
　129:14

**specifics**
　146:10

**speculation**
　104:2

**spend**
　36:13

**spoke**
　12:9 32:5
　35:18
　36:23
　39:15
　54:18,23
　123:20
　125:3
　136:18
　140:2,12

**spoken**
　3:18,22
　21:10
　22:3
　23:14
　72:21

**Stambach**
　24:4
　26:19
　31:10,22
　35:19,23
　36:23
　39:25
　51:22
　52:20
　53:11,23
　54:5,19
　56:3
　57:17
　63:2,17
　72:7,15
　75:2
　79:18



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 637 of 1202

APPENDIX 0635

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: Stambach's..testimony

110:23
125:9
130:17,25
131:2,13

**Stambach's**
24:23
31:15

**stamp**
59:2
112:4

**stand**
17:14
60:24
61:13
135:25

**standing**
97:12
120:15,22
121:2
136:13

**start**
31:4
75:18
85:14
113:22
125:15

**started**
67:16,22
138:4,13

**starts**
77:3

**state**
3:3 136:7

**stated**
71:15
115:13

**statement**
48:10
83:5
87:23
111:9,24
125:25

**statements**
65:12
131:3,15

**states**
82:20,21
87:10,17
115:14

**stay**
68:6
75:14

**step**
60:21

**stepped**
13:6

**store**
89:25
90:9
92:12
119:11

**street**
7:13,22
46:7
107:4
137:15,22

**streets**
41:24

**stuck**
47:16

**stuff**
23:23

**subpoena**
4:2 7:11,
24 8:9,13

**substance**
10:11
26:20
142:7

**substantial**
121:15,17
122:2

**suggest**

10:19
57:24
58:14
135:10,16
136:6
141:9
143:7

**suggested**
134:15

**suggesting**
9:16 52:7
64:13,15
128:4

**suggests**
85:25

**sum**
23:17

**surgery**
65:22

**suspect**
52:2

**swear**
74:6

**sworn**
3:12
60:23
61:12

─────────

─────────
**T**
─────────

**taking**
122:7

**talk**
5:14,25
15:3
52:23,24
53:6,7

**talked**
4:14
18:16
33:22

34:21
47:22
124:10,
11,21
136:19
143:4
146:7

**talking**
4:17 5:12
33:2,25
53:2,5
65:14
123:15
126:2,3
140:20
142:4
144:3,4,7
146:11,
15,19,22,
23

**taller**
94:6

**technical**
88:14

**teenager**
94:10

**television**
26:18

**telling**
12:8
26:20
35:8
41:17
42:24
43:5
44:2,11
60:22,23
61:12
83:15
127:5
130:4
143:6

**tells**
12:23

**ten**
11:10
123:25

**tentatively**
144:22

**terrible**
37:16

**testified**
3:13 6:19
15:11,12,
13,14
17:3,9,
12,16,17,
25 18:3
20:3,11
21:6
23:10
30:10
55:12
62:25
63:21
65:2
94:13
127:18
137:3
141:4,7
146:5

**testify**
134:15,16

**testifying**
21:2

**testimonies**
16:14

**testimony**
14:20
15:6 17:4
18:22,23
19:17
27:12
29:7
33:21,24
41:2 42:2
46:2,10
57:21



58:25
60:24
61:12
70:8 82:4
89:17,18,
21 98:4
109:8
110:4
123:3
126:10,22
127:23
128:4,13,
22,24
132:24
134:20
147:20

**thanking**
5:2

**Thatcher**
3:11

**theory**
71:13

**thing**
3:22 6:11
11:24
12:8,10,
21 30:20
37:16
45:6
52:25
61:6 63:7
84:9
93:10
106:24
113:24
132:23
145:5
147:6

**things**
8:20
16:19
17:3,9,24
18:15
37:9 53:8

65:7
69:19
75:25
88:8
113:8
127:13

**thinking**
38:7,10
126:16

**third-to-
the-last**
125:16

**thought**
38:13

**thoughts**
38:2,7

**thousands**
102:9

**threatened**
73:3,11,
24,25
74:10
95:6
96:25
107:23
110:6
118:19
129:15

**threatening**
91:18
95:12

**threats**
131:23
132:9

**throat**
52:25

**thrown**
107:15

**time**
6:9 14:16
18:2
21:19,23

25:9
26:4,14,
17 35:16,
18 36:3,
4,7,10,
13,18,20,
22 37:10,
14 38:21
39:8,18
40:3 48:8
52:15
53:10
57:22
58:11
60:22
65:8,9,11
66:18
68:11
70:3,13
72:13
73:22
75:16
78:5
83:11,22
85:5
86:7,15
90:20
93:16,24
96:3,12
102:15
103:7
104:8,25
105:2,3,
15 107:4,
8,16
110:24
118:12,17
119:25
120:10
123:3,16
126:23
127:19
133:9,13,
22 136:16
137:6
139:8
140:2,8,

16 142:12
147:2

**times**
3:19
21:20,25
39:21
68:25
69:3
102:9
126:12
128:5
143:21

**Tino**
27:23
28:3,4,5,
8,10
29:9,14,
16,24
30:17
32:16
33:6,12,
22,25
34:21
35:9
44:7,10
49:18
54:19,23

**today**
4:2,6,9
5:2,13
13:12
14:5,7,15
15:6,9
17:10
23:24
24:15
34:16,23
42:25
46:2
50:24
52:13
53:25
54:10,17
63:16
69:14

70:2,21
71:6,14
126:21
128:22
129:7
131:21
132:7
133:22
134:7,16
139:15

**today's**
5:2

**told**
8:20 9:17
30:17
31:10
32:7
35:24
40:10,19
41:10
42:10,13
43:6,14
44:13,20
45:4 48:5
49:3,23
52:10,14,
20 56:24
63:2,10,
17,21
65:3
72:4,19,
20 73:2
81:13,17,
23 82:4
89:4 91:2
92:9
98:25
100:16
102:19,25
109:14
115:3,16,
21 119:22
122:23
129:16
130:2
132:13,



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 639 of 1202

APPENDIX 0637

AARON JACKSON
DIXON V. CITY OF BUFFALO

January 12, 2023
Index: Tony..visit

16,20
134:14
142:21
143:20
144:21,23
145:8
146:5

**Tony**
6:25

**top**
59:5
113:23
138:16
139:4
140:14

**Torri**
93:19
108:7,9,
24

**Torriano**
115:19
136:22

**total**
23:17

**totally**
65:8,9,
11,19
66:5,6,7,
10,18
88:8

**transcript**
3:4,7
59:8

**trap**
47:12

**traumatic**
8:17

**Travis**
82:21
89:5 95:3
97:11
98:12

137:12

**trial**
15:13,15
16:14
17:14,18
20:15
58:25
59:22
63:20
65:14,15
66:3
80:13
97:21,22
132:25
133:9,14

**trigger**
9:4 10:12
12:13
70:10,15

**trip**
60:19

**truck**
8:4

**true**
5:7 20:8
48:10
63:25
64:2,3
65:6
78:9,10
139:6

**trust**
53:12

**truth**
18:2
44:12

**truthful**
43:24
44:21
45:2 47:3
48:14
61:25

**tube**
52:24
67:18
68:20
76:19

**tubes**
68:21

**turned**
93:21

**twist**
74:6

**two-minute**
55:20
122:10

**two-week**
67:21

**type**
16:9
69:10

_____

**U**

_____

**ultimately**
137:7

**unable**
137:3

**underlying**
140:9

**underneath**
139:5

**understand**
4:3 6:3
7:5,7
13:12,24
17:10
23:22,23
34:13
47:23
66:13,15,
20 78:24
95:3

128:21

**understanding**
9:2 25:7
56:11
66:7 69:7
89:22
114:7

**understood**
6:7 22:11

_____

**V**

_____

**Valentino**
9:3 10:5,
12 12:3,
12 13:13
14:17,24
17:13
18:17
20:4,10,
12 21:19,
24 22:8,
11 23:4,
18 28:2,
3,9 29:2
32:15,18
33:22,25
38:12,13,
23 39:20
40:3
41:4,10
42:4,18
44:3,12,
13,14
45:10,15
46:4,7
47:4 48:6
49:5,9
52:21
53:22
54:6,19,
24 56:11,
18,24
57:4,17

58:15,21
59:23
63:4 65:4
68:24
70:4,14
71:16
72:6,14,
21 73:2,
11,23
74:10,13
78:21,24
79:12
81:8,17,
24 82:6
83:2,11,
15 84:18
87:18
88:3,19
89:7
124:14
126:11
130:5,19
131:23
132:9,10
134:6
136:8,10,
25 138:11
140:6
141:10,14
143:17
145:10

**vehicle**
97:15,16
98:12
106:25
110:20
137:21
138:13,
14,16

**verbally**
78:3

**version**
51:21

**visit**
74:25



**vivid**
  70:17

---

**W**

---

**wait**
  117:23
  133:17

**waiting**
  48:20

**walk**
  75:15,24

**walked**
  99:21

**wanted**
  46:19
  79:25
  89:24
  90:4
  95:17
  135:10
  136:7
  139:19
  142:8

**wanting**
  41:20

**wavered**
  70:9,12,
  16

**ways**
  47:12
  126:20

**weapon**
  104:21
  105:3
  120:3

**weapons**
  107:3

**wearing**
  86:16,24
  133:10,15

**week**
  68:17

**weeks**
  55:18
  68:2

**weighed**
  93:25

**weight**
  75:21

**whatsoever**
  10:6
  16:10
  69:9
  84:16
  129:8
  132:8
  142:22
  143:22

**whichever**
  59:3

**white**
  18:18
  19:25
  126:11
  128:5

**withdraw**
  84:13,15

**withdrawn**
  14:6
  17:9,25
  24:7 25:8
  26:5
  33:23
  73:10
  81:24
  94:13
  96:6
  104:4
  138:24

**woke**
  97:14

**words**

**10:3,9**
**12:9**
**22:10**
**27:7 32:4**
**39:15**
**44:20**
**53:10**
**62:11**
**73:12,15**
**82:24**
**85:14**
**98:3**
**103:13**
**133:13**
**145:18**

**work**
  5:10

**working**
  94:15

**world**
  41:17
  52:21

**worried**
  37:7

**wounds**
  24:10

**write**
  82:7

**written**
  26:23
  45:14
  115:6

**wrong**
  7:18
  32:25
  35:5
  50:24
  63:6
  85:11
  90:3

**wrote**
  9:20
  32:3,4,7

**52:10**
  63:6,9

---

**Y**

---

**year**
  15:24
  111:12

**years**
  11:7 23:7
  58:14
  93:17
  123:17,25
  127:10,21
  128:22

**yellow**
  137:25
  142:3

**York**
  3:12

**younger**
  23:21
  95:16
  97:14
  98:11
  100:17
  102:3,4,7
  103:2
  115:15,19
  136:14

---

**Z**

---

**zoomed**
  112:8



**APPENDIX 0639**

In the Matter Of:

DIXON V CITY OF BUFFALO

19-cv-01678

---

**EMIL TOUSSAINT ADAMS**

*January 17, 2023*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

1            UNITED STATE DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NEW YORK
2

3   _____
                                   |
4   VALENTINO DIXON,               |
                                   |
5        Plaintiff,                |   Civil Action No. 19-cv-01678
                                   |
6        v.                        |
                                   |
7   CITY OF BUFFALO et al.,        |
                                   |
8        Defendants.               |
    _____|
9

10                  DEPOSITION OF

11              EMIL TOUSSAINT ADAMS

12                January 17, 2023

13                   10:00 a.m.

14

15

16           (Via Hybrid Videoconference.)

17             75 Ted Turner Drive SW

18                  Room 2221

19             Atlanta, GA 30303-3309

20

21

22

23        Lisa L. Sims, CCR #5072-0730-2093-2096

24  Videographer:  Norman Andrews, AVS - Affordable Video Solutions

25



```
1                    A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3         NICK JOEL BRUSTIN, ESQ.
          SONA R. SHAH, ESQ.
4         GERARDO ROMO, ESQ.
          NEUFELD SCHECK & BRUSTIN LLP
5         99 Hudson Street, Eighth Floor
          New York, NY 10013
6         Office: (212) 965-9081
          Email:  nick@nsbcivilrights.com

7

8    ON BEHALF OF THE DEFENDANT(S)

9         JAMES P. BLENK, ESQ.
          LIPPES MATHIAS WEXLER FRIEDMAN, LLP
10        50 Fountain Plaza, Suite 1700
          Buffalo, New York 14202
11        Office: (716)853-5100
          Email:  jblenk@lippes.com

12

13        JENNIFER C. PERSICO, ESQ.
          LIPPES MATHIAS WEXLER FRIEDMAN, LLP
14        50 Fountain Plaza, Suite 1700
          Buffalo, New York 14202
15        Office: (716)853-5100
          Email: jpersico@lippes.com

16
          Attorneys for Defendants, County of Erie and Assistant
17        District Attorney Christopher Belling in his individual
          capacity
18
          Hugh M. Russ III, Esq.
19        Hodgson and Russ LLP
          140 Pearl Street
20        Buffalo, New York 14202
          Office:  (716)856-4000
21        Email:  HRuss@hodgsonruss.com

22        Attorneys for Defendants City of Buffalo,
          Detective Mark R. Stambach, Detective Raniero
23        Masecchia, Detective James P. Lonergan, Detective John
          Vickerd; Chief Richard T. Donovan, John Does, and
24        Unknown Buffalo Police Department Supervisors

25
```



```
 1              A P P E A R A N C E S - CONT'D

 2    ON BEHALF OF THE WITNESS, EMIL ADAMS:

 3
         AVERWICK WALKER, ESQ.
 4       WALKER LAW OFFICE
         P.O. Box 414
 5       Redan, GA 30074
         Office: (404) 405-7790
 6       Email:  averickwalker@gmail.com

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              4

```
 1 │              INDEX TO EXAMINATIONS
   │
 2 │ WITNESS: EMIL ADAMS
   │
 3 │ EXAMINATIONS
   │               CROSS  DIRECT   RE-X  RE-D  FRE-X  FRE-D
 4 │ By Mr. Brustin   --      7      --   145    --     --
   │ By Mr. Blenk    144     --      --    --    --     --
 5 │ By Mr. Russ     141     --      --    --    --     --
   │
 6 │              INDEX OF EXHIBITS
   │
 7 │ PLTFF        DESCRIPTION              MARKED/IDENTIFIED
   │
 8 │ P-1    Notice of Deposition For Emil Adams        --
   │
 9 │ P-2    Compilation Exhibit of Police File         111
   │
10 │ P-5    11/5/92 Adams Warrant Investigation Report  84
   │
11 │ P-23   3/7/1993 Interview of Emil Adams by Robert Bryant
   │
12 │        Transcript [Dixon 9601-9633]               15
   │
13 │ P-24   3/7/1993 Interview of Emil Adams Audio Dixon 8876]  15
   │
14 │ P-25   Emil Adams Grand Jury Testimony [Dixon 1615-23]  53
   │
15 │ P-26   Emil Adams Trial Testimony [Dixon 144-213]   61
   │
16 │ P-27   6/5/1992 Letter from DA Dillion and Belling to Adams
   │
17 │        [COE 1769-70]                               79
   │
18 │ P-28   6/5/1992 Letter from DA Dillion and Belling
   │
19 │        to Saginaw APA Gave [COE 1784-85]           79
   │
20 │ P-29   7/11/2005 Affidavit of Daniel Dill [Dixon 5973-76]  101
   │
21 │        (All original Plaintiff's Exhibits Nos. 1, 2, 5, 23,
   │     24, 25, 26, 27, 28, 29 are attached to the original
22 │     transcript.)
   │
23 │
   │ DEFENDANT(S)      DESCRIPTION          MARKED/IDENTIFIED
24 │ P-29   7/11/2005 Affidavit of Daniel Dill [Dixon 5973-76]  145
   │
25 │        (All original Defendants's Exhibits Nos.
   │     are attached to the original transcript.)
```



```
1            DEPOSITION OF EMIL ADAMS

2                 January 17, 2023

3       (Whereupon, the court reporter complied with the

4    requirements of O.C.G.A. §9-11-28(d).)

5       THE VIDEOGRAPHER:  Standby, please.  One more moment.

6    This begins the video recorded deposition of

7    Emil Toussaint Adams in the matter of

8    Valentino Dixon v. City of Buffalo, et al.  Today's date

9    is January 17th, 2023.  The time is 11:04 a.m.  Would

10   counsel present, please, state your name and affiliation,

11   for the record.

12      MR. BRUSTIN:  Nick Brustin.  Neufeld Scheck &

13   Brustin, LLP, for the plaintiff, Valentino Dixon.

14      MR. BLENK:  James P. Blenk of Lippes Mathias for the

15   County defendant's, Christopher Belling and Erie County.

16   And I'm joined by Jennifer Persico; who may participate at

17   some point.

18      MR. RUSS:  My name is Hugh Russ.  Our firm is Hodgson

19   and Russ LLP.  We represent the city of Buffalo, the

20   police department and various Buffalo police officers.

21      THE VIDEOGRAPHER:  Is that all of the attorneys?

22   Mr. Walker, do want to put your appearance on, or no?

23      MR. WALKER:  Yes.  My name is Averick Walker.  I'm an

24   attorney here in Atlanta.  My role, today, it was very

25   limited.  It was to assure that Mr. Adams understands that
```



1  he had to be at this deposition.  My understanding from

2  the firm, is that they were trying to contact him.  And

3  they told me that they had -- that they were not able to

4  contact him, but alleged that he had been served.

5      Mr. Adams said that he wasn't served all the

6  paperwork.  But I made sure that he was able to make it

7  here today, so that I explained the deposition.  Also, I

8  let him know that the City of Buffalo had their own

9  attorney and all those persons that are, you know -- are

10 opposing whatever is going on.  So, I have a hearing at

11 10:30 a.m.  So, I'm going to have to leave you guys in

12 about another 20 minutes, but I'm going to stay for the

13 beginning.

14     THE VIDEOGRAPHER:  Okay.  But you're not here

15 representing Mr. Adams as his attorney?

16     MR. WALKER:  No, I'm not.  I'm not.  I have nothing

17 to do with this case.

18     THE VIDEOGRAPHER:  Okay.  Okay.  Thank you.

19     MR. WALKER:  I just wanted to make sure that he

20 wasn't arrested.  I just wanted to make sure that he

21 understood that he had to be here, because I was told that

22 y'all had in contempt order for his arrest.  So I had to

23 impress upon him that he had to be here.  You all

24 impressed upon me that he had to be here -- to make sure

25 that he would be arrested -- or held in contempt.



EMIL TOUSSAINT ADAMS                                          January 17, 2023
DIXON V CITY OF BUFFALO                                                      7

```
 1            THE VIDEOGRAPHER:  Thank you.  If that's all, would
 2       the Court Reporter please swear in the witness.
 3            THE COURT REPORTER:  Mr. Adams, would you raise your
 4       right hand, please, sir.
 5                        EMIL TOUSSAINT ADAMS,
 6          having been duly sworn, the witness hereby
 7       testifies as follows:
 8                        DIRECT EXAMINATION
 9   BY MR. BRUSTIN:
10       Q    Good morning, Mr. Adams.
11       A    Good morning.
12       Q    My name is Nick Brustin, we met off the record.  I'm
13   one of the attorneys for Valentino Dixon.  You and I have never
14   met in person before; is that correct?
15       A    Correct.
16       Q    We've spoken on the phone a few times --
17       A    (Indicating.)
18       Q    -- trying to get a deposition scheduled; is that
19   right?
20       A    (Indicating.)
21       Q    So, have you ever had a deposition taken before?
22       A    No.
23       Q    Okay.  So, it's just like being in court, except
24   there is no judge here.  You are going to be asked a series of
25   questions, you'll be under oath, the same oath that you would
```



1  take in a courtroom.  If you want to take a break at any time,

2  that's fine, you just let us know; there's a bathroom here,

3  we'll give you water, or whatever you need.

4        If you don't understand one of my questions or

5  anybody questions, some of the other lawyers will probably ask

6  you questions, too.  Just please let me know and I'll change it

7  for you.  But if you do answer it, I'm going to assume that you

8  understood it; is that fair?

9     A    Fair.

10    Q    The other thing I want to tell you, I know it's been

11 very difficult to get you here.  I know you don't want to be

12 here?

13    A    (Indicating.)

14    Q    I can tell you -- I'm -- I'm guessing that you

15 probably spoke to Mr. Walker about this, but --?

16    A    Well, once the judge -- I didn't even know if it was

17 a judge that called me.  I thought you might have had somebody

18 call me trying to manipulate me to come down here, because I

19 was never served no papers.

20    Q    Okay?

21    A    But was he found out it was an actual judge, I said

22 okay, I'll come.

23    Q    So your position here, under oath, is that you were

24 never served with papers?

25    A    No.



EMIL TOUSSAINT ADAMS                                        January 17, 2023
DIXON V CITY OF BUFFALO                                              9

 1      Q    Never?  Not once?

 2      A    Not once.

 3      Q    Not one of the four times, when --?

 4      A    Not one of the four times.

 5      Q    Okay.  Nobody came to your house and delivered

 6  papers?

 7      A    Not to me.

 8      Q    All right.  So let me stop you right now, because I

 9  think this is really important.  Any testimony that you gave --

10      A    (Indicating.)

11      Q    -- back at the time of the criminal proceedings in

12  this case --

13      A    (Indicating.)

14      Q    -- to the extent that you did not tell the truth, the

15  statute of limitations on that have run.  In other words, you

16  can't get in trouble for that.

17      A    Okay.

18      Q    But you are here testifying, under oath, in federal

19  court and you have an obligation to tell the truth.  The same

20  as if you were in -- the same as if you were in a courtroom; do

21  you understand that?

22      A    (Indicating.)

23      Q    And you're testifying under penalty of perjury?

24      A    Okay.

25      Q    And that means that, for example, if you tell me you



EMIL TOUSSAINT ADAMS                                              January 17, 2023
DIXON V CITY OF BUFFALO                                                         10

1  don't remember something or you don't understand something,

2  when you do; that's not the truth --

3      A    (Indicating.)

4      Q    -- that -- that can be a problem; do you understand

5  that?

6      A    (Indicating.)

7      Q    Okay.  You also have to answer all the questions

8  verbally, because the Court Reporter has to write them down.

9  So, if you could say, "yes, or no" --

10     A    Yes.

11     Q    -- I appreciate it.  Okay.  The first thing I want to

12 ask you about, Mr. Adams, is the -- first of all, you were --

13 you were a witness to a shooting back in 1996; correct?

14     A    Yes.

15          MR. BLENK:  1991.

16          MR. BRUSTIN:  1991.  I apologize.  Thanks.

17 BY MR. BRUSTIN:

18     Q    Back in 1991, and you testified in court, a couple of

19 times; correct?

20     A    (Indicating.)  Yes.

21     Q    And you also, you recall, there was a time a couple

22 of years after the shooting, in March 1993, when -- withdrawn.

23 Do you remember Antwon -- Antwon Shannon?

24     A    Yeah, vaguely.  Yeah.

25     Q    How did you know -- how did you know Antwon?



1    A    Is that Valentino's brother.

2    Q    His stepbrother.

3    A    I went to school with him.

4    Q    Okay.  A friendly guy?

5    A    Yeah.

6    Q    A nice guy?

7    A    To my knowledge.

8    Q    You were never afraid of him?

9    A    Never.

10    Q    But it was someone you knew, but not a close friend,

11   but a friend from school; would that be fair?

12    A    (Indicating.)  (Crosstalk.)

13         MR. RUSS:  Form.

14   BY MR. BRUSTIN:

15    Q    Is that a fair way to characterize it?

16    A    Yeah.

17    Q    Okay.  Someone you liked?

18    A    Yeah.

19    Q    Okay.  Never threatened you or anything like that?

20    A    No.

21    Q    All right.  And do you recall there was a time in

22   March of 1993, a couple of years after the -- after the

23   shooting, when Mr. Shannon came to talk to you at your house

24   with Valentino Dixon's parents, Robert Bryant and Barbara

25   Dixon?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              12

```
 1       A    Yes.

 2       Q    Okay.  And before they came to your house,

 3  Mr. Shannon had talked to you about the shooting privately; do

 4  you recall that?

 5       A    No.

 6       Q    Okay.  Well, do you remember that when they came to

 7  your house, it wasn't out of the blue, that you knew they were

 8  coming?  You'd said it was okay for them to come?

 9       A    No.

10       Q    You don't remember that?

11       A    No.

12       Q    Are you saying you don't remember, one way or the

13  other?  Or you don't think you did?

14       A    I don't believe I talked to him and told him it was

15  okay for anybody to come by my house.

16       Q    Okay.  But you do remember that --?

17       A    I know they came by my house.

18       Q    Okay.  And -- and, by the way, when they came by your

19  house, you were polite to them and you spoke to them; correct?

20       A    (Indicating.)

21       Q    Yes?

22       A    Yes.

23       Q    Maybe for 10 -- 15 minutes?

24       A    Probably, yes.

25       Q    Okay.  Nobody -- none -- none -- none of the three
```



 1  people -- Mr. Shannon -- you remember Valentino Dixon's dad's

 2  name was Robert Bryant?

 3      A    I don't remember that name.

 4      Q    Okay.  Seemed like a nice, older guy when he came to

 5  see you?

 6      A    It was -- actually, I believe it was his dad and --

 7  (crosstalk) --

 8      Q    His mom, Barbara Dixon?

 9      A    -- and some other guy.

10      Q    And Antwon Shannon; right?

11      A    No, Antwon wasn't there.

12      Q    You don't remember him being there?

13      A    No.

14      Q    Okay.  But you remember they were both polite and

15  nice to you; right?

16      A    Yeah.  No one threatened me -- no one threatened me.

17      Q    No, no threat.  Nothing even like that; right?

18      A    No.

19      Q    They were -- they were nice, nice older people that

20  came to speak to you?

21      A    Yes.

22           MR. BLENK:  Form.

23  BY MR. BRUSTIN:

24      Q    Okay.  Now, did you know that they were

25  tape-recording that conversation?



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                14

1      A    No.

2      Q    They didn't tell you they were tape-recording it?

3      A    No.

4      Q    Okay.  So, but you do remember that it was about

5   sometime in March 1993; right?

6      A    I don't remember the year or time.  It was, you

7   know -- if it was around that time, yeah --  (Crosstalk.)

8      Q    About -- (crosstalk)?

9      A    -- and I now they came.

10     Q    And you knew it was at nighttime; right?

11     A    No, I don't remember the time of day it was.

12     Q    Okay.  So, here's what I want to start with on.  I'm

13   going to give you this binder (handing).  And I want you to

14   turn -- so this binder, I want you to turn to the third tab in

15   this binder (indicating).  And this is -- this tab is a

16   transcription --

17     A    (Indicating.)

18     Q    -- that we made from a tape-recording that Robert

19   Bryant made, when he went to your house and talked to you.

20   Robert Bryant is Valentino's dad; okay?

21     A    Okay.

22     Q    And I'm going to ask you some questions about it;

23   okay?

24     A    Go right ahead.

25     Q    So here's what I want you to do, I want you to --



1  unfortunately, the tape-recording is a little fuzzy, so we're

2  going to play as loud as I can.  But I want you to follow along

3  as we do it, with the transcript, so that it's easier to

4  follow; okay?

5      A    (Indicating.)

6      Q    All right so, the first thing that I want to do is --

7          MR. BLENK:  Nick, sorry to interrupt, but are you

8      going to mark either of these?

9          MR. BRUSTIN:  I am.  I'm going to mark both.

10     Thank -- thank you.  I'm going to mark the transcript as

11     Plaintiff's 23.

12         (Whereupon, Plaintiff's Exhibit No. 23 was marked and

13     identified.)

14         THE WITNESS:  So they recorded me?

15         MR. BRUSTIN:  Yes.

16         THE WITNESS:  Back when we were talking?

17         MR. BRUSTIN:  Yes.

18         THE WITNESS:  Okay.

19         MR. BRUSTIN:  And I'm going to mark the -- and I want

20     to mark the tape-recording -- the audio recording -- as

21     Plaintiff's 24; this is just for the record.

22         (Whereupon, Plaintiff's Exhibit No. 24 was marked and

23     identified.)

24  BY MR. BRUSTIN:

25     Q    So, I want you to start by -- so,  I want to start --



1  look on Page 2, you see where it starts (indicating).  I'm

2  going to use the page numbers on the top.  So, you were right.

3  I'm using the page numbers in the top right corner.  The next

4  page.  Page 2 at the top right corner; do you see that?

5       A    (Indicating.)

6       Q    Gotcha.

7            MR. BRUSTIN:  So, what I'd like you to do is I'd like

8       you to play from the start and I'll tell when to stop, Mo.

9       And then, if that doesn't work, I can play it from my --

10      my computer, too.  But I want to try this first.  And, Mo,

11      when I tell you to stop, if you could announce the time on

12      the tape, that will be great; okay?

13           MR. BLENK:  Is this -- can you just confirm the Bates

14      number on the audio, because I don't think the audio was

15      circulated this morning.

16           MR. BRUSTIN:  What's the Bates number on the audio,

17      Mo?

18           MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Give me

19      one second.

20           MR. BRUSTIN:  That's probably right, I don't -- yeah,

21      that's probably right.

22           MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  It might

23      take me an extra second to find it.  I could just send it

24      (inaudible).

25           MR. BRUSTIN:  Yeah.  Why don't you just do that, just



1  send it.

2       THE VIDEOGRAPHER:  Question -- question from the

3  videographer.  Should we go off the record for a minute to

4  take care details, or --?

5       MR. BRUSTIN:  I think we're okay.  Do you mind,

6  James?  Should we keep going or do you want to wait?

7       MR. BLENK:  Well, I don't know if I'm going to have

8  the same -- I guess, if I could -- as long as I could hear

9  it, I guess I could follow along for now.  But I want to

10 make sure that it's the same -- ultimately, it's the same

11 audio recording that was -- that has been reproduced and

12 not a version that's shorter or longer or whatever.

13      MR. BRUSTIN:  Well, you're going to -- you can do

14 that afterwards, but we're going to send it to you.

15 You're not going to listen to it at the same time, there's

16 no way you could do that.

17      MR. BLENK:  No, I mean -- yeah, but  want to be able

18 to hear it -- (crosstalk) --

19      MR. BRUSTIN:  Yeah.

20      MR. BLENK:  -- through the way you're present it to

21 him; right?

22      MR. BRUSTIN:  Yes.

23      MR. BLENK:  Yeah, Okay.

24      MR. BRUSTIN:  Okay.  So -- so, let's start -- let's

25 start from the beginning on Page 2, if you could, Mo, and



1  just -- I'll tell you when to stop.

2       MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Okay.

3  One second.

4       MR. BRUSTIN:  And you don't have to write down this

5  (indicating).

6       THE COURT REPORTER:  (Complies.)

7       (Whereupon, Plaintiff's Exhibit No. 24 audio was

8  played.)

9       MR. BRUSTIN:  Can you stop for a minute, please?  Can

10 someone turn off -- why are we getting the background

11 feedback?

12      (Whereupon, Plaintiff's Exhibit No. 24 audio

13 recording was paused.)

14      THE VIDEOGRAPHER:  Good question.  I don't know if

15 it's coming through from their end or our end.  Is

16 computer muted all the way around?

17      MR. BRUSTIN:  It's not coming for me.

18      THE VIDEOGRAPHER:  Okay.  I suspect if there are two

19 computers -- (crosstalk) --

20      MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  I fixed

21 it.

22      MR. BRUSTIN:  You fixed it?  Okay.  Thank you.  Let's

23 try it again, right from the beginning.

24      (Whereupon, Plaintiff's Exhibit No. 24 audio

25 recording was played, again, from the beginning.)



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              19

```
 1   BY MR. BRUSTIN:
 2       Q    Go to Page 3 (indicating).  Look at the page, at the
 3   same time.
 4            MR. BRUSTIN:  Let me stop it there.  Can you give us
 5       the time?  Mo?  Can you give us the time?
 6            MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yes, time
 7       is 535 [00hrs:5mins:35secs].
 8            MR. BRUSTIN:  Okay.  So --
 9            MR. RUSS:  So, did you -- so, did you play from first
10       second to 535?
11            MR. BRUSTIN:  We did.
12            MR. RUSS:  Okay.  Thank you.
13   BY MR. BRUSTIN:
14       Q    Okay.  Ms. Adams, you recognize that as a
15   conversation had in March -- (crosstalk) --
16       A    I couldn't even you hear.
17       Q    We're going to -- well, we're going to follow along
18   exactly with the words in the transcript.  You heard them and
19   you recognize that from the men that came to your house that
20   night; right?
21            MR. BLENK:  Form. (Crosstalk.)
22            THE WITNESS:  If you say so.  I can't hear it.  It
23       sounds --(crosstalk)--
24   BY MR. BRUSTIN:
25       Q    Do you -- (crosstalk) --?
```



1    A    -- distorted to me.  I know somebody came to my house

2  to talk to me with his parents, so.

3    Q    Okay.  Okay.  And you just heard your voice on the

4  tape; correct?

5    A    If you say so.

6    Q    Do -- do you dispute that that was your voice?

7    A    I -- I can't hear it to dispute it.

8    Q    Okay.  Well, let's -- let's -- there's some better

9  parts.  We're going to make it as loud as we possible can.

10  We'll try it a couple of different ways, if we have to.  But

11  what I want to do, so you can make sure that you're following

12  this, I want you to follow the transcript.  So, what we did --

13  what we did is that we had a court reporter -- (crosstalk) --

14    A    If I can't hear -- (crosstalk) --

15    Q    (Crosstalk.)  Let -- let me finish.

16    A    -- (crosstalk) I can't follow here.

17    Q    Let me finish, sir.  What I what you to do is I want

18  you to listen and I want you try to follow with the transcript,

19  if you can -- the best you can; okay? So let's start with that.

20  Let's go to -- first of all, do you remember, in fact, that a

21  man and a woman came to your house; correct?

22    A    Correct.

23    Q    And you -- and you understood it to be Valentino

24  Dixon's parents; correct?

25    A    Correct.



EMIL TOUSSAINT ADAMS                                         January 17, 2023
DIXON V CITY OF BUFFALO                                                   21

1        Q    And you her their voices on the tape; correct?

2        A    I don't know if the voice --

3             MR. BLENK:  Form.

4             THE WITNESS:  -- (crosstalk) -- I keep telling you.

5        I don't know.  I can't hear that audio.

6   BY MR. BRUSTIN:

7        Q    All right.  But you certainly know that you lived at

8   65 Hastings; correct?

9        A    Yes.

10       Q    And you do remember opening the door -- (crosstalk)

11  --

12       A    Yes.

13       Q    -- and speaking to them?  And so far you weren't able

14  to recognize your voice; is that what you're saying?

15       A    Yes.

16       Q    Okay.  So, now what I want you to do [sic], is I want

17  to play --

18            MR. BRUSTIN:  So, Mo, I want you to play -- I want

19       you to play -- let me see if this is -- we'll try this one

20       more time.  Let's play this, again.  Is this as loud as it

21       will go?

22            THE VIDEOGRAPHER:  Yes.

23            MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, it

24       is.

25            MR. BRUSTIN:  Okay.  So, I want to -- let's play it,



```
 1        again, right from where we left off.  And tell us what we
 2        are starting, again?
 3             MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Were
 4        starting at 535 [00hrs:5mins:35secs].
 5   BY MR. BRUSTIN:
 6        Q    Okay.  And I want you to -- I want you to follow
 7   along, starting at Line 15; do you see that on your page?  Page
 8   3, Line 15.
 9        A    Okay.
10        Q    Okay.  And I want you to following along as you're
11   listening; okay?  This is -- this is you talking on the tape.
12             MR. BLENK:  Form.
13             MR. BRUSTIN:  Okay.  Go ahead.
14             MR. RUSS:  Objection to form.
15             (Whereupon, (Whereupon, Plaintiff's Exhibit No. 24
16        audio recording was played from 535 [00hrs:5mins:35secs].)
17             MR. BRUSTIN:  Can -- can you go -- can you go back a
18        little further?  Go back a little further, Mo, to line --
19        to Line 11.
20             THE WITNESS:  I was never on bail.
21   BY MR. BRUSTIN:
22        Q    Okay.  Go back.  You know what, let's -- let's come
23   back to this.  Let's go to Page 4 (indicating).  And I want you
24   to look at -- I want you to look at Line 9; okay?
25             MR. BRUSTIN:  And I want you to play, Mo, from 621 to
```



```
 1       631.
 2   BY MR. BRUSTIN:
 3       Q    Look on line on Page 4 (indicating).
 4       A    I'm here.
 5            (Whereupon, Plaintiff's Exhibit No. 24 audio
 6       recording was played from  621 to 631
 7       [00hrs:06mins:21secs] to [00hrs:06mins:31secs].)
 8   BY MR. BRUSTIN:
 9       Q    Look at the page (indicating). Okay.  Do you
10   recognize your voice there?
11       A    Yeah.
12       Q    Okay.  And that's -- you heard yourself say, "they
13   locked me up threw -- no, they did not let me go home.  They
14   locked me up threw me out that night"?
15       A    They didn't let me go home.
16            MR. RUSS:  Objection to form.
17   BY MR. BRUSTIN:
18       Q    That's what you said to him on the tape?
19       A    Yeah.  I had to stay there until, like, six in the
20   morning.  It was like -- (crosstalk) --
21       Q    I'm going to get into the specifics.  Right now, I'm
22   just trying to confirm that's what you said to Mr. Bryant on
23   tape.  That's all I'm doing right now.
24       A    Okay.
25       Q    We're going to take it one step at a time, okay?
```



EMIL TOUSSAINT ADAMS                                          January 17, 2023
DIXON V CITY OF BUFFALO                                                    24

1        A    (Indicating.)

2        Q    But you did say those words to him; correct?

3        A    That they didn't let me out?

4        Q    Yes?

5        A    Yes.

6        Q    Okay.  So, now, what I want to do -- that's all I'm

7    doing right now is confirming they're your words.  Let's go to

8    Page 12 (indicating).  And I want to play -- I want you to

9    start looking from Line 14 on Page 12, where it says, "it

10   seemed" (reading); do you see that?

11       A    (Indicating.)

12            MR. BRUSTIN:  Okay.  And I want to -- Mo, I want you

13       to start playing 1513 to 1522.

14   BY MR. BRUSTIN:

15       Q    And just read it and listen (indicating).

16            (Whereupon, Plaintiff's Exhibit No. 24 audio

17       recording was played from [00hrs:15mins:13secs] to

18       [00hrs:15mins:22secs].)

19   BY MR. BRUSTIN:

20       Q    Okay.  So you heard yourself on the tape; right?

21       A    Yeah, but I'm not sure.

22       Q    Okay.  But -- just -- I'm going to get to all of

23   that.  I just want to ask you what you said on the tape.

24       A    (Indicating.)

25       Q    So you -- you heard yourself on the tape; right?



1    A    If that's me; yes.

2    Q    Okay.  And you saw that -- and you're looking at

3   transcription on Page 12, Lines 13 to Page 14 -- page --

4   line -- I'm sorry.  Page 12, Line 13 to Page 13, Line 3.  And

5   that accurately -- it accurately -- the words are the words

6   that you spoke on the tape on these pages; correct?

7    A    Not -- no, because I've never been on bail.

8    Q    I'm asking you right about just the sections that

9   you've just heard?

10    A    Right, but if that's the same thing -- (crosstalk) --

11    Q    So I'm going to -- (crosstalk) --

12    A    -- (crosstalk) how am I going to say that's me --

13   (crosstalk)--

14    Q    -- (crosstalk) here's what I'm going to do --

15   (crosstalk)--

16    A    -- (crosstalk) saying what I'm saying.  And I've --

17   I've never been on bail.

18    Q    Okay?

19    A    I'm never had a charge in Michigan.

20    Q    Okay.  So, I'm just asking you to confirm -- so,

21   they're going to come in and testify that they made this tape.

22    A    That's fine.

23    Q    Okay.  Are you -- are you denying that this is --

24   this you on the tape?

25    A    I didn't know they had a tape -- (crosstalk) --



1      Q    I -- I know you don't.

2      A    -- (crosstalk) for me to be on.  So, I can -- I'm

3  going to deny that I was on tape.  Yes, because I didn't know I

4  was on tape, until you playing it right here, right now.

5      Q    Sir, I'm going to -- we're going to go step at a

6  time.  Are you denying that was you speaking on the tape?

7      A    It could have been.  But I don't -- I've never been

8  on bail.  So, if I said that I was on bail, then that's not me.

9      Q    Okay.  Is it possible you said you were bail and you

10 weren't telling them the truth?

11     A    No.  Why would I say that I was on bail.

12     Q    All right.  But you do remember the conversation;

13 they came to your house?

14     A    Somewhat.

15     Q    Okay.  I want to play the same section I just played

16 you, again.

17     A    (Indicating.)

18     Q    And I want you to read -- I want you to read along

19 with it.  And I want you to tell me if this transcription, on

20 Pages 12 and 13, accurately documents the words that you spoke;

21 okay?

22     A    (Indicating.)

23          MR. BRUSTIN:  Okay.  Play it again, Mo.

24          MR. BLENK:  What's the timestamps?  (Crosstalk.)

25          MR. RUSS:  (Inaudible).



 1          MR. BRUSTIN:  The timestamps are 1513 --

 2          (Whereupon, audio began to play.)

 3          MR. BRUSTIN:  Stop, stop it, please.  Sorry.  So we

 4     are, now, going to play, again, 1513 to 1552.  While

 5     Mr. ADAMS is reading, finds 13 on Page 12 to Lines 3 on

 6     Page 13; okay?  Go ahead, Mo.  Thanks.

 7          (Whereupon, Plaintiff's Exhibit No. 24 audio

 8     recording was played, again, from [00hrs:15mins:13secs] to

 9     [00hrs:15mins:22secs].)

10  BY MR. BRUSTIN:

11     Q    Okay.  So, you hear yourself on the tape and you

12  spoke those words; correct?

13     A    I don't know.

14          MR. RUSS:  Objection to form.

15  BY MR. BRUSTIN:

16     Q    The words that are transcribed here, are the words

17  that you spoke on the tape; correct?

18          MR. RUSS:  Objection form.

19          THE WITNESS:  I don't know about that.

20  BY MR. BRUSTIN:

21     Q    Let's do it the -- did you hear yourself saying --

22  did you hear yourself saying on the tape,(reading), "It seemed,

23  you know what I'm saying, Tino would have did it."  Did you

24  hear yourself say that?

25     A    I heard the tape say that.



1      Q    Okay.  So, you don't believe that's you on the tape?

2      A    It -- no, because I've never been on bail.  That's

3  where it's like a lot of things being said on there that had

4  nothing to do with me.

5      Q    Okay.  So, I -- I just want to make sure that you're

6  telling me, under oath, that's not you speaking?

7      A    I'm not telling you anything.  But I don't know if

8  that's me, because that audio I can't really hear.  I hear some

9  pieces.  But I've never been on bail.  So, right there, I'm

10  going to tell you that's not me.

11      Q    All right.  Let's go back to that, because you seem

12  caught up with that.

13      A    You want me to admit to some tape that somebody said

14  they was on bail.  I haven't been on bail.  Then, you said,

15  "they locked me up."  They didn't lock me up.  They kept me

16  down there for questioning.

17      Q    Right.  And that's what you said.

18      A    You said they locked me up and threw away the key.

19      Q    This is -- sir, I'm going to have three people come

20  into to court and swear that this is you on the tape.

21      A    You can have ten.  They've never -- Buffalo police

22  never locked me up and threw away the key.  I've never been on

23  bail -- (crosstalk) --

24      Q    Are you -- (crosstalk) --

25      A    -- in Michigan.



1    Q   -- (crosstalk) are you denying that was -- that's you

2  speaking on the tape, under oath, here today?

3          MR. RUSS:  Objection form.  You can answer.

4          THE WITNESS:  Listen -- I don't know if that's me on

5     the tape.

6  BY MR. BRUSTIN:

7    Q   Okay.  Keep going.  So let's take a look at -- let's

8  look at Page 16.  Now you were -- you had been arrested in

9  Michigan; correct?

10   A   For?

11   Q   Had you been arrested in Michigan anytime in between

12  1990 and 1993?

13   A   No.

14   Q   You're sure about that?

15   A   100 percent positive.

16   Q   Okay.  You weren't -- you weren't in illegal trouble

17  in trouble Michigan -- (crosstalk) --

18   A   (Crosstalk.) Never day of my life.

19   Q   -- (crosstalk) in 1991?

20   A   Never a day in my life.

21   Q   All right.  Now, take a look at Page 16.  Were you

22  living in Michigan at the time?

23   A   I was living in Michigan, yes; Saginaw, Michigan.

24   Q   But no legal trouble Michigan -- (crosstalk) --

25   A   No -- (crosstalk) --



1    Q    -- (crosstalk) in your entire life?

2    A    -- (crosstalk) never.  Never seen the courtroom, any

3  altercations with any police.

4    Q    Let's take a look at Page 16.  Sorry.  Page 13.

5         THE VIDEOGRAPHER:  And one note from the

6    Videographer, we may be able to try something to try to

7    get the sound a little clearer.  Although, the main

8    problem is the recording.  If you wanted to try that, I

9    would have to go off the record and take two to five

10   minutes.

11        MR. BRUSTIN:  All right.  Well, let's take a -- let's

12   take a minute to try that.

13        THE VIDEOGRAPHER:  Okay.  We're going off the record

14   at 11:35 a.m.

15        (Whereupon, a brief break was taken at 11:35 a.m.)

16        THE VIDEOGRAPHER:  We're going back on the record at

17   11:40 a.m.

18        (Whereupon, the deposition resumed at 11:40 a.m.)

19  BY MR. BRUSTIN:  (Resumed.)

20   Q    So I want you -- I want you to look at Page 13

21  (indicating) --

22   A    (Indicating)

23   Q    -- Line 8; okay?  And I'm going to play you some more

24  statements that you made on the tape; okay?  And I want you to

25  follow along and tell me if you recognize it.



1            MR. BRUSTIN:  And I want to play from 1604, Mo, to

2       1734.

3            (Whereupon, Plaintiff's Exhibit No. 24 audio

4       recording was played from 1604 to  1734

5       [00hrs:16mins:04secs] to [00hrs:07mins:34secs].)

6            THE WITNESS:  No, absolutely not.

7   BY MR. BRUSTIN:

8       Q    Okay.  Were you living in Saginaw, Michigan at the

9   time?

10      A    Yes.

11      Q    Okay?

12      A    I have never been on bail.

13      Q    Okay.  And whether you were on bail or not, you're

14  sure you didn't tell them that you were on bail on the tape,

15  when you -- (crosstalk) --

16      A    Why would I tell them I'm on bail, if I'm not on

17  bail.

18      Q    First of all, you heard your voice on the tape.  You

19  hear yourself talking; right?

20      A    No.

21      Q    That wasn't you?

22      A    I don't know if that's me or not.  That's -- that --

23  that don't sound like me.

24      Q    You didn't recognize your voice there?

25      A    It does not sound like me.



EMIL TOUSSAINT ADAMS                                          January 17, 2023
DIXON V CITY OF BUFFALO                                                    32

1      Q     Okay?

2      A     I do remember a conversation with his mother  and

3   father and some guy.

4      Q     Okay?

5      A     But -- (crosstalk) --

6      Q     So -- (crosstalk) --

7      A     -- I can't tell you that's me.

8      Q     Okay.  So, the words that -- the words that you just

9   heard, from 1604 to 1734 -- (crosstalk) --

10     A     So me and you talking right now, do that sound like

11   me; right now?

12     Q     Please, stop.  -- when you were a much younger man.

13   Let me.  But look, let me -- I -- I want to make sure I

14   understand your testimony, under oath.  Are you saying that you

15   did not provide any of the information you just heard to them?

16           MR. BLENK:  Form.

17           THE WITNESS:  Provide any information?

18   BY MR. BRUSTIN:

19     Q     Are you telling me that you did not say the words

20   that wee just heard on the tape to them?

21     A     I've never been on bail, no.  So, no, I wouldn't have

22   said I was on bail.

23     Q     So putting aside the bail issue, did you say any of

24   the other things about being shown three pictures?

25     A     I was shown pictures, yes.



EMIL TOUSSAINT ADAMS                                        January 17, 2023
DIXON V CITY OF BUFFALO                                              33

1      Q    Do you remember telling them that you were shown

2   three, just like it says on Page 13?

3      A    I don't know if it was just three pictures, but I

4   remember pictures being shown.

5      Q    All right.  Well, let's take a look -- let's take a

6   look at -- you tell me what you do remember saying to them;

7   let's do it that way.  So, let's go to the transcript.  First

8   of all, you -- you -- you were able to follow the transcript

9   along with the audio; right?

10          MR. BLENK:  Form.

11          THE WITNESS:  Somewhat, yeah.

12  BY MR. BRUSTIN:

13     Q    Okay.  So, now, I want you to go to the top of

14  page -- to Page 13, Line 12; okay? Actually, let's start on the

15  starting Line 4.  This is -- this is -- this is the person they

16  are claiming as you on tape at Line 4; okay?  Are you there?

17          (Atty. Brustin read from Plaintiff's Exhibit No. 23.)

18      "And I thought if just said," and then there is an

19  "(inaudible)" part.  "I'm not really sure, he said if I just

20  show you a picture.  You know, if he's in or not.  They brought

21  me three pictures."  The question is: "So?"  And the answer is:

22  "I saw the three pictures first and they showed me Mario, Tino

23  and somebody else.  And they said were they there?"

24          So, first of all, did you say that to Valentino

25  Dixon's father, when he came to your house?



EMIL TOUSSAINT ADAMS                                     January 17, 2023
DIXON V CITY OF BUFFALO                                              34

```
 1        A    I could have, because they did ask me about some

 2   pictures --

 3        Q    Okay.  And so you -- (crosstalk) --

 4        A    -- and how -- and how I was able to --

 5        Q    Okay?

 6        A    -- point them out.

 7        Q    And by the way, when -- when Valentino Dixon's father

 8   came to your house --

 9        A    (Indicating.)

10        Q    -- with his wife --

11        A    (Indicating.)

12        Q    -- you attempted to tell them the truth the best that

13   you could; correct?

14             MR. BLENK:  Form.

15             THE WITNESS:  I told them everything that they asked

16        me.

17   BY MR. BRUSTIN:

18        Q    You didn't lie to them, did you?

19        A    No.

20        Q    Okay.  And so, one of the things you said, you tell

21   me if I'm wrong, is that you saw three pictures:  Mario, Tino,

22   and somebody else; right?

23        A    Yeah, but it wasn't only three pictures.  It was

24   pictures and they were in the pictures, yes.

25        Q    Okay.  And -- well, you said that they showed you
```



EMIL TOUSSAINT ADAMS                                        January 17, 2023
DIXON V CITY OF BUFFALO                                              35

1    Mario's picture --

2         A    Yes --

3         Q    -- and Tino's picture and one other picture?

4         A    -- because it was in, like. groups of people these --

5    the pictures they showed me.  So, Mario was in the picture and

6    Valentino was in picture.

7         Q    Okay.  And you recognized both of them?

8         A    Yes.

9         Q    And they asked you if they were there; correct?

10        A    Yeah.

11        Q    Okay.  And now, let's go back to Page 12

12   (indicating).  And you've already told me you don't ever

13   remember saying anything about bail; I got that.  I want to ask

14   you something else though.

15        A    I'm never been on bail.

16        Q    I -- I understand.  I understand.

17        A    Pull my record up.

18        Q    I understand.

19        A    I don't have legal issues.

20        Q    I understand.  Take a look at page -- well, let's go

21   back to -- let's start with Page 4, again.  Let's go back to

22   Page 4 and I want you to look at Lines 9 to 11.

23        (Atty. Brustin read from Plaintiff's Exhibit No 23.)

24        (Reading) "So, when you went down to the police station,

25   they kept you, they didn't let you come back home?  Answer: No,



EMIL TOUSSAINT ADAMS                                January 17, 2023
DIXON V CITY OF BUFFALO                                              36

1   they did not let me come home."

2        A    (Indicating.)

3        Q    And that's true, you did tell them that; correct?

4        A    Yeah.  They kept everybody down there.

5        Q    Right.  But that -- that is in fact true, that's what

6   happened; right?

7        A    Yeah.

8        Q    And that's what you told them happened.  Once you got

9   to the precinct, you were -- you were placed by yourself until

10  you met with the police; correct?

11       A    No.  We were sitting in the hallway.

12       Q    Okay.  Who were you with?

13       A    Who?  A bunch of people that was there as witnesses.

14  I don't remember their names it was, like, a bunch of people in

15  the little hallway and they called us in individually.

16       Q    Okay.  And then, but once they brought you to the

17  station after the shooting, you weren't allowed to go home

18  until they were done with you; correct?

19            MR. BLENK:  Form.

20            THE WITNESS:  Yeah, to my knowledge.  Yeah

21  BY MR. BRUSTIN:

22       Q    Okay.  So, this accurately describes what happened on

23  page -- on 9 to 12; that's really what happened?

24       A    Yeah.  They wouldn't --

25       Q    So let's look at Line 14 --



EMIL TOUSSAINT ADAMS                                  January 17, 2023
DIXON V CITY OF BUFFALO                                              37

1     A    -- they would let me go home.

2     Q    -- look at Lines 14 to 15 -- 14 to 17?

3     A    (Indicating.)

4     Q    (Reading continued.) "Okay. Okay, so then you went

5   back to Michigan?  And then you didn't come back --  Answer:

6   "They kept flying me back.  And I think I flew back here about

7   three times."  Did you tell them that?

8     A    (Indicating.)

9     Q    Because you did fly back three times; right?

10    A    (Indicating.)

11    Q    Yes?

12    A    Yes.

13    Q    Okay.  That's -- that's -- that's you telling them on

14  the tape; correct?

15    A    It could be.

16    Q    All right.  Now, I want you to look --

17    A    But if this audio is the same audio that say I had

18  bail and I had legal issues in Michigan; then, no.

19    Q    You don't remember ever telling them anything about

20  bail, because you didn't have -- (crosstalk)?

21    A    I didn't have bail.  I don't have legal issues

22  anywhere in any State.

23    Q    Okay.  Fine and I accept that.

24    A    Any.

25    Q    Fair enough.  Now, let's take a look at -- let's take



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                            38

1  a look at Page 12.  Now, I want you to look at Line 14; okay?

2       A    (Indicating.)

3       Q    And you heard the tape I just played, where it said

4  (reading continued) "It seemed -- it seemed, you know what I'm

5  saying, Tino would have did it, but no, what I'm saying in

6  front the police lieutenant was I can't really just point the

7  finger, you know what I mean?  I can't do that.  I don't want

8  to lock an innocent man, you know what I'm saying.  Question:

9  "Yeah.  It's not about being scare or nothing like that.  It

10 just don't seem, you know what I'm saying, right.  And if

11 Jackson say he did it, you know what I'm saying, it would be

12 wrong to say he's not.  That's the beginning a heavy set guy

13 with a hat and I kind of saw the guy.  And so I never said who

14 it were, because I wasn't really sure."  Do remember hearing

15 yourself saying that?

16      A    No.

17      Q    Okay?

18           MR. BLENK:  Form.

19           MR. RUSS:  Objection to form.

20           MR. BRUSTIN:  You just heard it on the tape, you say

21      that; right?

22      A    I guess -- (crosstalk) --

23           MR. BLENK:  Form.

24           MR. RUSS:  Objection to form.

25           THE WITNESS:  -- if that's what you say.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                               39

1   BY MR. BRUSTIN:

2        Q    Is it your testimony that you never said that to Mr.

3   Adams [sic]?

4        A    I've never said --

5        Q    I mean -- I'm sorry.  Let me finish that.  I withdraw

6   the question.  Is it your testimony that you never said that to

7   Valentino Dixon's father?

8        A    Yes.

9        Q    You never said those words.

10       A    Nah, no.

11       Q    You never said you weren't sure?

12       A    That -- that Tino wasn't the person that shot him.

13       Q    That you weren't sure if he was the person?

14       A    No.

15       Q    You never said that?

16       A    No.

17       Q    Because you were always sure?

18       A    That Tino shot him, yes.

19       Q    Okay.  Now, just to be clear, your recollection is

20   that you were doing your best, when you spoke to Valentino

21   Dixon's parents at your house that night to tell them what you

22   truthfully recalled; correct?

23            MR. BLENK:  Form.

24            MR. RUSS:  Object to the form.

25            THE WITNESS:  Yeah.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              40

```
 1   BY MR. BRUSTIN:

 2        Q    You weren't afraid of them?

 3        A    I'm not afraid of anybody.

 4        Q    You -- including them?

 5        A    Yeah.

 6        Q    They never threatened you?

 7        A    No.  I mean, they threatened people, you know, in the

 8   neighborhood, you know, Travis and a couple of other people.

 9   But they never threatened me.

10        Q    Who -- who -- who threatened -- who threatened

11   Travis?

12        A    I'm not sure.  It's been 30 years ago.  I don't

13   remember who it was.  But who ever was around, you know,

14   running around with Tino and, you know, and that -- those

15   people, I don't -- you know what I mean?  I don't know to tell

16   you, specifically, this person of that person.  But I know

17   Travis was having issues with someone connected to him.  But

18   that never happened to me.

19        Q    All right.  But you certainly were not threatened at

20   all by Valentino Dixon's parents, when his mom and dad came to

21   your house; correct?  You didn't feel threatened?

22        A    I wasn't threatened --

23             MR. BLENK:  Form.

24             THE WITNESS:  -- but for them to be at my house that

25        was kind of alarming.
```



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                41

1  BY MR. BRUSTIN:

2      Q    Well, but they didn't threaten you in any way;

3  correct?

4      A    They don't have to.

5      Q    And you were not afraid of them in any way; correct?

6      A    I'm not afraid of anybody, but --

7      Q    Okay?

8      A    -- even if you're not afraid, that doesn't mean that

9  the situation isn't alarming to you.

10     Q    Fair enough.  Nevertheless, you did your best to tell

11  them the truth; correct?

12     A    Yes.

13     Q    All right.  Now, let's take a look at --  let's take

14  a look at -- let's go back to Page 16 -- back to Page 13 in

15  this transcript; okay? this is another part you just heard.  So

16  back to Page 13, Lines 4 through 11; okay?  Well, here you're

17  saying on your own, "they brought me three pictures;" right?

18  Remember hearing that on the tape?

19            MR. BLENK:  Form.

20            THE WITNESS:  I (crosstalk) --

21            MR. RUSS:  Objection to form

22            THE WITNESS:  -- (crosstalk) I don't know.

23  BY MR. BRUSTIN:

24     Q    Do you remember -- (crosstalk) --

25     A    Yeah.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              42

1      Q    -- (crosstalk) -- initially being -- initially being

2    shown three separate pictures.  One of Mario, one of Tino, and

3    one of somebody else?

4      A    About themselves?

5           MR. RUSS:  Objection to form.

6    BY MR. BLENK:

7      Q    Yes, by the police?

8      A    No.  I mean, just those people -- (crosstalk)

9      Q    Yes?

10     A    -- (crosstalk) in the picture?

11     Q    Yes?

12     A    No.

13     Q    You don't ever remember being shown three pictures?

14     A    I remember being shown groups of pictures of people.

15     Q    How many groups of pictures of people were you shown?

16     A    That was years ago.  I don't know, but I had to pick

17   the guy out at the pictures.  It wasn't just his picture, his

18   picture, and his picture.

19     Q    All right?

20     A    It was pictures.

21     Q    All right.  But you remember two of the pictures you

22   saw, one was of -- one was of -- you remember -- you remember

23   one of the pictures was of Mario and one was a Valentino Dixon?

24     A    (Indicating.)

25     Q    Yes?



1      A    Yes.

2      Q    And do you recognized them both and you told them

3  that?

4      A    Yes.

5      Q    Person that you also recognized?

6      A    No.

7      Q    Okay?

8      A    I don't remember if I recognized the other guy.

9      Q    The only two people who do you recognized in the

10  pictures that you saw were Mario and Valentino?

11     A    (Indicating.)

12     Q    Yes?

13     A    Yes.  I knew Mario, so I automatically recognized

14  him.  And I knew of Tino.  I don't know Tino, but I knew of

15  Tino.

16     Q    Okay.  Everybody.  Everybody knew Valentino Dixon at

17  that time; right?  They knew he was?

18     A    I couldn't tell you.

19          MR. RUSS:  Objection to form.

20          MR. BLENK:  Form.

21  BY MR. BRUSTIN:

22     Q    All right?

23     A    I didn't know him.

24     Q    Okay.  Well, I'm going to tell you a testimony about

25  that in just a minute.  But is it your testimony today that you



EMIL TOUSSAINT ADAMS                                          January 17, 2023
DIXON V CITY OF BUFFALO                                                    44

```
 1   have never seen Valentino Dixon before?
 2        A    In the neighborhood -- (crosstalk)
 3             MR. BLENK:  Form.
 4             THE WITNESS:  -- (crosstalk) maybe.  Buffalo is not a
 5        big place, so, you know, I may have saw him in the city.
 6        But to say that I know him --
 7   BY MR. BRUSTIN:
 8        Q    Okay?
 9        A    -- and that he knows me.  We don't know each other.
10        Q    That's fair. all right.  Let's -- let's go to -- so,
11   is it your testimony -- we'll go back to Page 12.  Is it your
12   testimony that you didn't say any of the words, on page 12, to
13   Mr. Bryant?
14             MR. BLENK:  Form.
15             THE WITNESS:  Any of these words?
16   BY MR. BRUSTIN:
17        Q    Yeah.  Well, let me go specifically.  Is it your
18   testimony that you didn't say to him (reading continued), "It
19   seemed, you know what I'm saying, Tino would have did it, but
20   know, what I'm saying in front of the police you lieutenant was
21   I can't really just point the finger, you know what, I mean?"
22   Is it your testimony that you never said those words to
23   Mr. Bryant?
24        A    No.
25             MR. RUSS:  Objection to form.
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                               45

```
 1   BY MR. BRUSTIN:

 2       Q    (Crosstalk.) You didn't -- (crosstalk) --

 3       A    I don't believe I did, no.

 4       Q    And is it your testimony that you never said the

 5   words (reading) "I can't do that.  I don't want to lock an

 6   innocent man, you know what I'm saying."

 7            MR. RUSS:  Objection to form.

 8            THE WITNESS:  No.

 9   BY MR. BRUSTIN:

10       Q    You never said that to him?

11       A    Not to my knowledge, no.

12       Q    Even though you heard is on the tape?

13       A    (Indicating.)

14            MR. RUSS:  Objection to form.

15            THE WITNESS:  I still can't -- I don't believe that's

16       me on that tape.

17   BY MR. BRUSTIN:

18       Q    And when you said, (reading), "And it is Jackson's

19   say he did it, you know what I'm saying, it would be wrong to

20   say he's not."  Did you say those words to him on that tape?

21       A    I don't remember.

22            MR. RUSS:  Objection to form.

23   BY MR. BRUSTIN:

24       Q    Is it possible you said those words to him, when he

25   came to see you that night?
```



800.211.DEPO (3376)
EsquireSolutions.com

EMIL TOUSSAINT ADAMS                                January 17, 2023
DIXON V CITY OF BUFFALO                                          46

```
 1         A    I don't know.

 2              MR. RUSS:  Objection to form.

 3              THE WITNESS:  I doubt it, but, you know, anything is

 4         possible.  But I don't recall saying that.

 5    BY MR. BRUSTIN:

 6         Q    And you heard on the tape it said that's at the

 7    beginning, a heavyset guy with the hat and I kind of saw, and I

 8    kind of saw.  Did you hear that on the tape?

 9              MR. RUSS:  Objection to form.

10              THE WITNESS:  (Inaudible from crosstalk.)

11    BY MR. BRUSTIN:

12         Q    Did you say that to him?

13         A    I don't remember.

14         Q    You may have, you just can't remember today?

15         A    That was 30 years ago, man.

16         Q    And Dennis says (reading), "I never said who it was

17    because I wasn't really sure."  Did you hear yourself say that

18    on the tape?

19         A    (Inaudible from crosstalk.)

20              MR. RUSS:  Objection to form.

21              MR. BRUSTIN:  Form.

22    BY MR. BRUSTIN:

23         Q    You didn't hear that, and we just played it?

24         A    I keep telling you, I don't believe that's myself.

25         Q    Okay?
```



 1      A    A lot of things being said on that tape have zero to

 2   with at me.

 3      Q    Okay.  But the thing we know for sure is that you do

 4   remember a conversation that when mister -- when Valentino

 5   Dixon's parents, both, came to your house that night --

 6   (crosstalk) --

 7      A    I remember they came.  I can't remember every detail

 8   or a conversation for 30 years ago.

 9      Q    Okay.  But they only came one time; right?

10      A    Yeah, but still it's not going to make me remember --

11   (crosstalk) --

12      Q    I understand.

13      A    Can you remember a conversation you had with one

14   person 30 years ago?

15      Q    Of course not.

16      A    Okay.  So why -- what are you -- what are we -- why

17   do you keep trying to make me say that, yeah, I said that.

18   Yeah, that's me in the tape.  Like, I keep telling you, you

19   look at my record, I don't have a bail.  I've never had bail.

20          I've never had legal issues in any state in the

21   United States of America.  So, if someone is saying that I have

22   bail issues or legal issues and this is why I'm doing this or

23   whatever it is.  Okay, right there, that's not me.  I don't

24   have those issues.  Never had.

25      Q    Okay?



EMIL TOUSSAINT ADAMS                                        January 17, 2023
DIXON V CITY OF BUFFALO                                                  48

 1      A    But you keep trying to lock me down to make me say,

 2   yes.  And is not going to happen, because I never had these

 3   issues.

 4      Q    That's fair.

 5      A    And you want me to remember specific things about

 6   this conversation.  I can't.  I know the lady and the man came

 7   to my house with another guy.  What was said, I can't remember

 8   all that.

 9      Q    Okay.  But you do remember that they came to your

10   house and it was 65 Hastings; right?

11      A    Yeah.

12      Q    And they -- you -- you invited them in?

13      A    Yeah.

14      Q    And you spoke to them in your house for more than a

15   few minutes?

16      A    Yeah.

17      Q    And it may well have been at night?

18      A    I don't remember time of day.

19      Q    Okay.  But it was sometime after you had testified at

20   the trials; correct?  It was '93?

21      A    I believe, yeah.

22      Q    And you certainly did know you're being

23   tape-recorded?

24      A    No.

25      Q    But there was only one conversation that you had with



1  Valentino Dixon's parents at your house at 65 Hastings;

2  correct?

3       A    Yeah.

4       Q    And you do remember that they introduce themselves as

5  his parents; they didn't hide that from you?

6       A    No, they didn't hide it.

7       Q    And you remember it was mostly, in fact, it was only

8  Valentino's father, Mr. Bryant, that was asking you questions?

9       A    I don't remember.  Maybe both of them.  I don't

10 remember.

11      Q    But do remember that it was mostly Mr. Bryant that

12 was leading -- leading the interview?

13      A    I don't remember from 30 years ago who was leading.

14 I don't remember that.

15      Q    Okay.

16           MR. BRUSTIN:  Okay.  But if you could just play, Mo,

17      just one more time.  And I want you to go to page -- Page

18      13.  I'm sorry.  Page 12, line 21.  And if you could just

19      play, again, Mo, from 1540 to 1552.

20           (Whereupon, Plaintiff's Exhibit No. 24 audio

21      recording was played from 1540 to 1552

22      [00hrs:15mins:40secs] to [00hrs:15mins:52secs].)

23 BY MR. BRUSTIN:

24      Q    You hear -- you hear on the tape it said, "Never said

25 who it was, because I wasn't really sure."  Did you hear that?



EMIL TOUSSAINT ADAMS                                January 17, 2023
DIXON V CITY OF BUFFALO                                           50

```
 1        A    (Indicating.)
 2             MR. RUSS:  I -- I object to the form.  First of all,
 3        is the third time you done this.  And I object to the form
 4        of the specific question.
 5   BY MR. BRUSTIN:
 6        Q    Did you hear the person on the tape saying that
 7   (reading),"And so, I never said who it was, because I wasn't
 8   really sure"?
 9        A    Did I hear them say that?
10             MR. RUSS:  Objection to form.
11   BY MR. BRUSTIN:
12        Q    Do you remember hearing on the tape somebody say
13   that?
14        A    Yeah.
15        Q    And you deny that was you?
16        A    Yeah, because I was sure about who did it.
17        Q    So you deny that was you on the tape saying
18   (reading), "So I never said who it was, because I wasn't really
19   sure."  You deny under oath, today?
20        A    That was -- that it was me on that tape?
21        Q    Yes?
22        A    I very seriously doubt it.  Because I don't have any
23   of these issues that they're saying that I have.
24        Q    Okay.  So, now, I want to go to Page 19, Line 13.
25   Approximately line 13; okay?
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              51

1          MR. BRUSTIN:  And I want you to play, Mo, from 2256

2      to 2308.

3          (Whereupon, Plaintiff's Exhibit No. 24 audio

4      recording was played from 2256 to 2308

5      [00hrs:22mins:56secs] to [00hrs:23mins:08secs].)

6  BY MR. BRUSTIN:

7      Q    Was that your voice on the tape?

8      A    I couldn't even hear that.

9      Q    Okay.

10         MR. BRUSTIN:  You can keep playing.  Let's play --

11     hold on just a second, Mo.

12         MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, got

13     it.

14  BY MR. BRUSTIN:

15     Q    Okay.  So now let's look at Page 8, Line 17.  Let me

16  know when you are there.

17     A    I'm there.

18     Q    Okay.

19         MR. BRUSTIN:  And then, if you could play, Mo, 1057

20     to 1135.

21         (Whereupon, Plaintiff's Exhibit No. 24 audio

22     recording was played from 1057 to 1135

23     [00hrs:10mins:57secs] to [00hrs:11mins:35secs].)

24  BY MR. BRUSTIN:

25     Q    Did you -- did you say those things, Mr. Adams?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              52

1     A    Nah.  I don't have any legal issues, no, sir.

2     Q    So that wasn't your voice on the tape?

3     A    No.

4     Q    It must have been somebody else?

5     A    It could've been.

6     Q    Okay?

7     A    It wouldn't be me saying that, because I don't have

8   those types of issues.  No one scared me, put pressure, or

9   whatever.

10    Q    So no -- no police officer, no DA --

11    A    No.

12    Q    -- ever put any pressure on you to come testify?

13    A    For what they were saying on that tape, because of

14  something in Michigan?

15    Q    For any reason.  Did they put pressure on you to come

16  and testify, when you didn't want to testify?

17    A    No.

18         MR. BLENK:  Form.

19         THE WITNESS:  No, they didn't pressure me into

20    anything.

21  BY MR. BRUSTIN:

22    Q    Okay.  Nobody tried to scare you to come and testify?

23    A    No.

24    Q    No police officer, no DA?

25    A    No.



1       Q    And you never said that to Mr. Bryant?

2       A    Not to my -- no, I never said that to Mr. Bryant.

3    I've never had a legal issue, so why -- what would I say for

4    that someone put pressure on me about something, legal issues

5    in Michigan to -- to testify in this case here?

6       Q    Okay.  So, now, what I want to do is, I want you to

7    look at the same binder and I want you to go to the first tab,

8    the grand jury tab.  Do you remember testifying in the grand

9    jury, before the trial?

10      A    No.

11      Q    Have you ever --

12      A    I remember testifying (inaudible).

13      Q    -- let me ask you this:  Other than testifying in

14   this case, have you ever testified in any other cases?

15      A    No.

16      Q    Take a look at Page 75.

17           MR. BLENK:  Are you going to mark this?

18           MR. BRUSTIN:  Yeah, I think we -- did we already mark

19      the entire thing?  I guess we haven't.  We can mark this.

20      Let's mark this as 25.  This is Emil Adams's Grand Jury

21      Testimony.  It is Bates stamped [Dixon 1484 to 1623].

22           (Whereupon, Plaintiff's Exhibit No. 25 was marked and

23      identified.)

24           THE WITNESS:  What page am I going to here?

25   BY MR. BRUSTIN:



1    Q   So, it's this first tab.  And I'm using -- and I'm

2  using the page numbers on the top, on the bottom, and the

3  middle.  And I want you to go to Page 75.

4    A   Okay.

5    Q   But before I do, this is the only -- was this the

6  only case where you testified in court?

7    A   (Indicating.)

8    Q   Is this the only case where you ever testified in

9  court?

10    A   Yes.

11    Q   Okay.  Take a look at Page 75.  And you were asked on

12  Line 14.  Read to yourself Line 14 to Line 21 and let me know

13  you're done.?

14    A   (Indicating.)

15    Q   Now, how did you know Torriano?  Do you recognize

16  that as your testimony?

17    A   Tori?

18    Q   First of all, do you recognize that as your testimony

19  and was that truthful testimony?

20    A   Yes.

21    Q   Okay.  First of all, how did you know Tori and Aaron?

22    A   Oh, we grew up in the same neighborhood and went to

23  school together.

24    Q   Were your friends with both?

25    A   (Indicating.)



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              55

```
 1       Q    Who were you better friends with, if -- if there was
 2   one?
 3       A    I don't really have a better friend out of them.  I
 4   know them, all of the brothers and sisters.  You know, it
 5   wasn't -- I just knew them all.
 6       Q    What was the last time you spoke to Aaron Jackson?
 7       A    A few days ago, actually.
 8       Q    Yeah?
 9       A    Yeah.
10       Q    What did you guys talk about a few days ago?
11       A    Nothing.  I told him I had to do a deposition.
12       Q    And did you call from your cell phone?
13       A    Yeah.
14       Q    Did you call his cell phone?
15       A    Yeah.
16       Q    How long was that conversation?
17       A    Not long.
18       Q    Do you and Mr. Jackson, also, text one another; is
19   that how you communicate?
20       A    No.
21       Q    You never texted Jackson?
22       A    No.  I actually haven't talked to him in years.  It's
23   been years, since I've talked to him.
24       Q    Okay?
25       A    And then, when this came back out, I reached out to
```



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                56

1  him about, you know, I had to come down here.  And he just

2  said, hey, just go in there and tell the truth.  I said all

3  right.

4       Q    So when this came up, you that we have been trying to

5  get you to come to this deposition for many months; right?

6       A    Yeah.

7       Q    You and I have talked on the phone before, and you've

8  told me that you weren't going to come; right?

9       A    (Indicating.)

10      Q    You said, "I don't care what you do, I'm not coming;"

11 right?

12      A    (Indicating.)

13      Q    Yes?

14      A    Yes.

15      Q    Okay.  And that started many months ago; right?

16      A    Not many months, a couple of months ago.

17      Q    All right.  And when that happened, that's when you

18 first reached out to Aaron Jackson; correct?

19      A    No.

20      Q    Well, you said what this also the happening, you

21 called Mr. Jackson.  When did that happen?

22      A    I just told you, I talked to him yesterday.

23      Q    And you can?

24      A    Before that, is been years.

25      Q    Okay.  So the first time you talked to him was



EMIL TOUSSAINT ADAMS                                     January 17, 2023
DIXON V CITY OF BUFFALO                                               57

1   yesterday?

2        A    Yeah, in years.

3        Q    And you call him?

4        A    Yes.

5        Q    Okay.  And what did you say to him and what did he

6   say to you?

7        A    He asked me how the family was doing.  I asked him

8   how his family was doing.  I told him that they have been

9   harassing me, you know, trying to serve the papers.  He said,

10  "yeah, I know, they did the same thing to me."  He just, you

11  know, go in there and tell the truth of whatever.  And I'm

12  like, yeah, I'm praying for you.  Pray for me and we hung up.

13       Q    So if we were to subpoena your phone records?

14       A    (Indicating.)

15       Q    There will be no calls to Aaron Jackson --

16       A    (Indicating.)

17       Q    Let me finish, sir -- there would be no calls to

18  Aaron Jackson, other than yesterday in the last two years?

19       A    You can go back further than that.

20       Q    Okay.  So the only time you ever talk to him was

21  yesterday?

22       A    Yes.

23       Q    No texting him back and forth, no emails?

24       A    No.  I meant, -- I post, said things, you know,

25  commented on pictures on Facebook or Instagram.  But no



EMIL TOUSSAINT ADAMS                                          January 17, 2023
DIXON V CITY OF BUFFALO                                                    58

 1   conversation -- like a picture, you know.

 2        Q    Okay?

 3        A    Hey, praying for you or whatever.  But no, you know,

 4   communication between us in years.

 5        Q    And certainly not about this case?

 6        A    No, definitely not about -- there's no case.  It was

 7   no case to talk about.

 8        Q    What else did you say to him yesterday?

 9        A    Nothing.

10        Q    Okay.  What else did he say to you?  He tell you

11   anything about his deposition?

12        A    No.

13        Q    Did he tell you that he had -- he had his deposition?

14        A    No.

15        Q    He didn't even say that?

16        A    No.  He said that they were doing the same thing to

17   him, trying to serve papers or something.  But we really didn't

18   touch on the subject of, hey, do this or do; no.

19        Q    What time did you talk to him yesterday?

20        A    Yesterday afternoon.  I don't remember the time.

21        Q    Okay.  Sometime in the afternoon?

22        A    (Indicating.)

23        Q    So very recently.  Just a matter of hours ago?

24        A    Yesterday.

25        Q    And you called him?  You reached out to him?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              59

1        A    Yes.

2        Q    And before that you hadn't called him in two years?

3        A    More than two years.

4        Q    Okay.  All right.  So back to this testimony on Page

5   75.  You said (reading), "I didn't really know no Valentino

6   Dixon.  I just knew him like hi and bye."

7        A    (Indicating).

8        Q    And that's truthful full testimony; right?

9        A    (Indicating.)

10       Q    You knew him from seeing him before on the street;

11  right?

12       A    Yeah --

13       Q    You knew what he looked like --

14       A    -- periodically.

15       Q    -- you knew what he looked like; right?

16       A    (Indicating.)  Didn't know his name.

17       Q    Okay.  But you knew his name Tino.  Everybody called

18  him "Tino"?

19       A    I didn't know him.

20       Q    But you knew him -- you knew him by face and

21  reputation; fair to say?

22       A    He didn't have a reputation.

23       Q    So when you said," I knew him like hi and bye," what

24  did you mean by that?

25       A    Meeting that someone that you would see,



 1  periodically, and you recognize that you've seen him before.

 2  And that was it, like --

 3      Q    You might nod in and say hello?

 4      A    Maybe.

 5      Q    Okay?

 6      A    You know.

 7      Q    Do you remember the kind of car that he drove?  Do

 8  you remember him driving a fancy car?

 9      A    No.

10      Q    And seeing him in a car?

11      A    No.

12      Q    No?

13      A    No.

14      Q    All right.  So, now, let's take a look at --

15      A    When he was driving, I was in Michigan.  So I

16  wouldn't know his cars.

17      Q    -- take a look at the trial, which is the second tab,

18  Page 153.

19          MR. BLENK:  Are you going to mark it?

20          MR. BRUSTIN:  Yeah.  So what are we on now, Mo, 26?

21          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah.

22      Q    Let's mark this as 26.  This is your testimony from

23  the criminal trial.  It's Bates stamped [Dixon 1 through 690].

24  And the date is June 8th, 1992.

25          (Whereupon, Plaintiff's Exhibit No. 26 was



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              61

1        marked and identified.)

2    BY MR. BRUSTIN:

3        Q    Okay.  Let's take a look at 153.  Read it to

4    yourself, Line 11 through Line 25; okay?  Let me know when you

5    are done?

6        A    Okay.

7        Q    And does this refresh your recollection that you also

8    knew him from knowing his brothers grew up by your

9    grandmother's house.

10       A    I didn't know that --

11            MR. RUSS:  Objection to form.

12            THE WITNESS:  -- it was his -- Antwon's brother,

13       until all of this happened.

14   BY MR. BRUSTIN:

15       Q    All right.  But when you said (reading), "I had seen

16   him a few times, but I didn't really know him personally."  Was

17   that truthful?

18       A    I've been saying that a hundred times.

19       Q    Okay.  So, on August 10th of 1991, you knew who

20   Valentino Dixon was by sight, because you has seen it a few

21   times; correct?

22       A    Not like that.  Not like that.  It would be like if I

23   had come to this court in a couple times and she seen me

24   (indicating).  Would she know me?

25       Q    But you said you knew him Hi and Bye; you had seen



1   him before?

2       A    I said that we grew up in the same city.  I've seen

3   him in the city.

4       Q    And you knew it was.  So you said, "Hi and Bye," what

5   did you mean by that?

6       A    Okay.  Let me clear it up for you.  I moved to

7   Michigan in the 6th of February, didn't come back until after

8   high school.  So, if you're asking me, how many times I've seen

9   him before that day, it would be almost none.  I have seen him.

10  But I -- -- I lived in Michigan.

11      Q    So why --?

12      A    So -- so for you to keep trying to make me know this

13  guy, I'm never going to know him.

14      Q    So then why --?

15      A    He doesn't know me.

16      Q    Then why did you testify?

17      A    I've seen him.  That does not mean I know him.

18      Q    All right.  So you had seen him to recognize him

19  before August 10th; correct?

20      A    No, I seen him.  I don't recognize him as being Tino

21  or Valentino or --

22      Q    You just don't know his name?

23      A    -- or big guy, or whatever you want to say.

24      Q    But you knew what he looked like before August

25  10th?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              63

```
 1        A    Okay.

 2        Q    I'm asking you, sir?

 3        A    That's kind of shaky right there.  I can just say I

 4   knew him, because I didn't.

 5        Q    You knew what he looked like, before August 10th;

 6   correct?

 7        A    Not really.

 8        Q    Than how could you have known him Hi and Bye?

 9        A    I didn't say I knew him Hi and Bye.  I said I saw him

10   in the city.  You keep saying I knew him Hi and Bye.  And maybe

11   it was just a phrase that you use by saying, you know, if you

12   give them a, you know, what's up.  That's not saying you know

13   them.

14        Q    Go back to grand jury testimony, Page 75.

15        A    What page; 75?

16        Q    Seventy-five?

17        A    Grand jury (mumbling).

18        Q    Line 17.

19        A    (Indicating.)

20        Q    Are you on Page 75?

21        A    (Indicating.)

22        Q    Line 17.  (Reading), "I knew the other kid that they

23   were fighting Mario, but I didn't really know no Valentino

24   Dixon.  I just knew him like Hi and Bye."  Question:  "You had

25   seen him before hand?"  Answer:  "Yeah."
```



1       A    So, I told you, I seen in the city before, maybe once

2    or twice.  And then, if I see somebody, you know, you go like

3    that (indicating).  But that's not knowing him.

4       Q    Okay.  But you knew what he looked like?

5       A    I can't believe you, man.

6       Q    Correct?

7       A    I knew like I seen him before, but not to say that I

8    knew him.

9       Q    All right?

10      A    I don't know what you -- you crazy, man.

11      Q    Take a look at page the trial?

12      A    Go to trial?

13      Q    You have seen him before, but you didn't know him;

14   correct?  Is that what you're saying?

15      A    I saw him --

16           MR. BLENK:  Form.

17           THE WITNESS:  -- but I don't know him.

18   BY MR. BRUSTIN:

19      Q    But you had seen him before?

20      A    If see anybody once or twice I would waive and say,

21   hi, what's up.  That's not saying that I know him.  Or can just

22   saying, like, yeah, I know this guy.  Or any type way you're

23   trying to make it seem.

24      Q    Okay?

25      A    Ask him.  He don't know me.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              65

1      Q    Okay.  You knew him well enough that if you saw him,
2  you might say Hi and Bye --
3      A    No.
4      Q    -- you might not; is that fair to say?
5      A    No, we never spoke to each other.  To me and Tino
6  have never spoken to each other in our life.  Now, if you're
7  saying his brother Twon, yes.  I went to school with him, I
8  played football with them, I played with him.  Yes, I did not
9  know he had a brother.
10     Q    Okay.  Now, let's take a look at your trial testimony
11 Page 153.?
12     A    153, okay.
13     Q    And Line 3.  Read to yourself, lines three withdrawn.
14 Let's do this --
15     A    I see Line 3.
16     Q    Let's -- let's skip that for now.  I want to go
17 somewhere else for now.
18     A    (Reading.)
19     Q    I want to skip that and go somewhere else.  Let's
20 take a look at -- I'm going to give you a portion of the police
21 file and ask you some questions about it.  This is an exhibit
22 that has already been marked as Exhibit No. 2.  And the first
23 thing I want you to look at -- well, first of all, let's go
24 back to keep -- keep that right there.  Let's go to your --
25 let's go to your trial testimony, again.  I want to go to Page



1    204.  Actually, 205.  Go to Page 205 and let me know when you

2    are there?

3         A    Here.

4         Q    Take a look at Line 10.  This is cross-examination.

5    Do you remember being cross-examination by Mr. Dixon's attorney

6    at the trial?

7         A    Kind of.

8         Q    Okay?

9         A    But not really.

10        Q    Okay.  I refresh your recollection then.  (Reading),

11   "So, Line 10, question: "Okay.  Mr. Dixon, will you stand up,

12   please.  Does Mr. Dixon look heavyset to you?"  Answer: "No,

13   not really."  Question:  "No he doesn't it, does he?"  Answer:

14   "No."  Do you remember giving that testimony?

15        A    (Indicating.)

16        Q    You do?

17        A    Somewhat.

18        Q    And you remember --?

19        A    Somewhat.

20        Q    Okay.  You do remember Valentino Dixon was a very

21   skinny guy; right?

22        A    Not really.  But we wore extremely baggy and big

23   clothes back then, so to give a -- his weight, like, you

24   know -- it may be off.

25        Q    Do you remember him being skinny?



1      A      No.

2      Q      You don't remember him being skinny?

3      A      No.

4      Q      You don't remember him saying --?

5      A      No, I don't know him.  So you want --

6      Q      Okay?

7      A      -- me to tell you someone's weight, height, that I

8   don't know.

9      Q      All right.  Let's take a look at -- let's go back to

10   the police reports and if you take a look at --?

11      A      If I put on oversized clothes right now and stand up

12   you couldn't -- do you think you could guess my weight.

13      Q      Take a look at -- in this packet of documents right

14   here (indicating), look at the second page, which is Page 30

15   Okay.  Now, do you remember sometime early in the morning the

16   night of -- the morning of the shooting, being interviewed by a

17   detective named Mark Staumbach [phonetically spelled] at the

18   precinct?

19      A      I remember being interviewed, but I don't remember

20   names or.

21      Q      Okay.  You'd, certainly, if he remember he created a

22   report saying he interviewed you, you'd have no reason to

23   dispute that it was Mark Staumbach [phonetically spelled] that

24   interviewed you?

25      A      No.  Like I said, I don't it was 30 years ago, man.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                               68

1   So you are asking me to recall who the names was not.  I

2   don't -- I don't -- I can't do that.

3       Q    You remember --?

4       A    I remember being interviewed after the shooting, yes.

5       Q    Do you remember that it was a plainclothes detective

6   that interviewed you?

7       A    I don't remember.  I remember going into a room that

8   had a typewriter and was asking questions and was shown

9   pictures.

10      Q    Okay.  And how many times that night were you shown

11  pictures?  You mentioned that you were shown a number of sets

12  of pictures; correct?

13      A    I don't remember how many times.

14      Q    Okay.  Was it more than three?

15      A    I don't remember.

16      Q    Okay.  You remember being shown pictures -- do you

17  remember talking to the detectives before they tape-recorded

18  your statement?

19      A    At the scene.

20      Q    Okay.  How about at the station?

21      A    No.  We were sitting in the hallway.  They never

22  talked to me before that.

23      Q    Were you talking to anybody in the hallway?

24      A    No.  They had us, like, separate, but, you know, like

25  around.  And they said we couldn't talk and blah, blah, blah



1   so, you know.

2          Q    Did you follow that rule?

3          A    Yes.

4          Q    Okay.  Now, take a look at the -- you do remember --

5   do you remember knowing that they were taping your statement in

6   the precinct?

7          A    Like, you know, I'm pretty sure they were.

8               MR. RUSS:  Objection to form.  You have a tape?

9               MR. BRUSTIN:  We have a transcription.

10              MR. RUSS:  He said it was the guy sitting with a

11         typewriter; is not a tape.

12              MR. BRUSTIN:  That's right.  I forgot how they do it.

13         That's -- that's correct.

14   BY MR. BRUSTIN:

15         Q    Do you remember -- do you remember him sitting by

16   typewriter and typing what you are saying?

17         A    I remember a guy typing as I was talking, yes.

18         Q    Okay.  And do you remember what he looked like?

19         A    No.

20         Q    Okay.  Do you remember before you started typing, you

21   talked to him saw him before that?

22         A    No.

23         Q    Do you remember whether you'd seen any pictures

24   before you started -- before he started typing?

25         A    I don't know what came first.  Pictures, talk.  I --



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              70

1   no, that was 30 years ago.  I don't know.

2       Q    Okay.  But you do remember, at some point, early in

3   the morning that he started typing up a statement from you?

4       A    Yeah.

5       Q    I will represent to you that Page 30 through 32; BPD

6   30 through 32 has been represented as the statement that he

7   took from you; okay?

8       A    Okay.

9       Q    Now, take a look at Page 31.  Now, do you see the

10  question beginning (reading), "Can you tell me what the person

11  who had the TEC-9 look like," about eight lines down?

12      A    (Indicating.)

13      Q    Okay.  So I'm going to read it to you.  (Reading),

14  "Can you tell me what the person who had the TEC-9 look like?"

15  Answer:  "A black male, heavyset, maybe about 20, the same age

16  as Mario, about 6 feet tall.  And I did not see any hair, he

17  had a hat on."  Question:  "The shooter with the TEC-9, what

18  was you wearing at the time?  He was wearing some blue jeans

19  cut offs, like I have on, a white T-shirt with something on the

20  front, a hat white with a black or blue brim, that's about it."

21  Right?  Did you say that to him?

22      A    Yeah.

23      Q    Okay.  And --?

24      A    If I said -- I -- I can't remember what the people

25  had on.



1    Q    Okay.  But you -- but you -- you appeared to

2  remember, at that time, what they had on; correct?

3    A    At that time, yes.

4    Q    Okay.  And you are also were able to describe that

5  the person was heavyset; correct?

6    A    Well, appeared.

7    Q    And the person was wearing baggy clothes, the person

8  was wearing cut up blue jeans and a T-shirt; correct?

9    A    Oversized, though, we were oversized clothes.

10   Q    Do you remember that -- do you remember that the

11  person was wearing oversized clothes?

12   A    Okay --

13   Q    I --

14   A    -- like in the 80s, with polkadots, right?  Things

15  like that.  So it is like a generalization of saying we all

16  wore baggy close, we all we're oversized clothes.

17   Q    Okay?

18   A    The whole genre of people were over size clothes, so

19  this is why I may have said he was heavyset, because of the

20  clothing he was wearing --

21   Q    When did you --

22   A    -- you can't get your description.

23   Q    When did you think of that?  Because that's never --

24  that doesn't appear anywhere in any report.  Doesn't appear in

25  any testimony?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              72

1      A    That's because your --

2      Q    Sir?  Sir, you need to let me finish my question.

3   When is the first time you thought in your mind that the reason

4   that you described him as heavyset, was because he was wearing

5   baggy clothes?  When did that first occur to you?

6      A    Just now.

7           MR. RUSS:  Objection to form.

8           MR. BLENK:  Form.

9   BY MR. BRUSTIN:

10     Q    Okay.  All right.  You --

11     A    Because that could have been the reason why I said he

12   may have looked heavyset.

13     Q    All right?

14     A    Because of his oversized clothes.

15     Q    Do you have any -- but there's nothing here about him

16   having oversized clothes; correct?

17     A    They never asked me if you had over size clothes.

18     Q    All right.  Do you remember him having oversized

19   clothes?

20     A    I remember everybody wearing oversized clothes.

21     Q    Okay?

22     A    Everyone.

23     Q    Even --

24     A    Everyone.

25     Q    -- even with oversized clothes, when you saw someone,



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              73

1  were you able to tell they were fat or skinny, generally?

2       A    No.

3            MR. BLENK:  Form.

4  BY MR. BRUSTIN:

5       Q    All right.  So, in any case, these are -- do you have

6  any reason to dispute that these are the words you spoke and

7  that this detective typed down?

8       A    No.

9       Q    In other words, you agree, you did say those words?

10      A    Yes.

11      Q    Now, take a look at further down in this page.  Do

12  you see where it says, (reading), "I am now going to show you a

13  mug shot, Number 162576"?

14      A    Indicating.

15      Q    Do you see that?  You have to say, yes?

16      A    Yes.

17      Q    Okay.  Is says (reading), "I am now going to show you

18  a mug shot, Number 162576.  Can you tell me what that is?"

19  Answer:  "That's Mario."

20      A    (Indicating.)

21      Q    Right?

22      A    Yes.

23      Q    That's what you say; right?

24      A    Yes.

25      Q    Okay.  Now, do you remember when I played the tape



1   recording, you -- the person on the tape, who you say you're

2   not sure that is you saying they were shown three photos.  A

3   photo of Mario, a photo of Tino, and a photo of someone else?

4        A    Yes.

5        Q    Does this refresh your recollection that this is when

6   you were shown the photo of Mario and then the photo of Tino?

7        A    No, it doesn't.

8             MR. BLENK:  Form.

9             MR. BRUSTIN:  Okay.  But --

10            MR. RUSS:  Objection to form.

11  BY MR. BRUSTIN:

12       Q    -- you're describing here being shown an individual

13  photo of Mario; correct?

14       A    I'm not saying it's an individual, but --

15       Q    It's saying (reading), "I am now going to show you a

16  mug shot, Number 162576.  Can you tell me what that is?"

17  Answer:  "That's Mario."

18       A    Okay.

19       Q    Do you remember him showing you an individual mug

20  shot photo of Mario?

21       A    I don't remember him showing me an individual picture

22  of him.  I don't remember any individual pictures.

23       Q    Okay.  But he remember hearing on the tape, the

24  person you're saying is that you, saying that they were shown

25  three pictures.  A picture of Mario --



1          MR. RUSS:  Objection to form.

2          MR. BRUSTIN:  -- a picture of Tino and another

3      picture; right?

4          MR. RUSS:  Objection to form.

5          THE WITNESS:  Yeah, yeah.

6   BY MR. BRUSTIN:

7      Q    Do you deny being shown a picture of Tino at the same

8   time you're being shown a picture of Mario?

9      A    No, I can't recall.

10         MR. BLENK:  Form.

11         THE WITNESS:  I can't remember all of the specific

12     details of 30 years ago.

13  BY MR. BRUSTIN:

14     Q    Okay.  Do you remember now that I shown you this

15  document, do you remember being shown some individual photos,

16  just like was described on this tape, before you saw the array

17  of photos?

18     A    No.

19     Q    You don't remember that?

20     A    No.

21     Q    Now, you do remember at some point -- was it that --

22  you remember at some point, after your interview.  Let me go

23  right to it actually.  Take a look at page -- take a look at

24  Page 47, which is the next page to your document?

25     A    In this (indicating)?



1          MR. RUSS:  Which Exhibit are you in now?

2          MR. BRUSTIN:  It's still -- this is still from the

3     police report, Exhibit 2, BPD 47.

4          THE WITNESS:  32, Page 32?

5   BY MR. BRUSTIN:

6     Q     Page 47, Exhibit 2.

7     A     Okay.

8     Q     And according to this report, after your interview

9   with Detective Staumbach [phonetically spelled], you were shown

10  a photo array of six different photographs.  Do you remember

11  being shown a folder all right?

12    A     I remember being shown pictures, yes.

13    Q     Okay.  Well, do you remember being shown a group of

14  six photos together?

15    A     I don't remember how many it was, but it was a few

16  pictures; yeah.

17    Q     And do you remember if you selected a photograph of

18  Valentino Dixon's from those six photos?

19    A     Yes.

20    Q     Okay.  Now, I will represent to you that the photo of

21  Mario was not in those photos.  And as you saw from the

22  statement you just gave, you saw a picture of Mario before you

23  were shown that six person folder all right; Okay?

24    A     Okay, if you say so.

25    Q     Now my question is --



```
 1       A    I don't remember that.

 2            MR. BLENK:  Form.

 3  BY MR. BRUSTIN:

 4       Q    Do you remember that as he heard on that video --

 5  that audiotape, do you remember in addition to be showing an

 6  individual photo of Mario, being shown an individual photo of

 7  Tino -- or Valentino -- and somebody else?

 8       A    No.

 9       Q    Okay.  But you certainly don't deny that you were

10  shown individual photos of Valentino; do you?

11       A    I am denying, because I don't remember that.

12       Q    Okay.  You also don't remember, today, being shown a

13  picture of Mario; correct?

14       A    No.

15       Q    But it's clear from the -- it's clear from the

16  statement that you were; correct?

17       A    Yes.

18            MR. BLENK:  Form.

19            MR. RUSS:  Objection to form.

20  BY MR. BRUSTIN:

21       Q    And you just don't remember one way --

22            MR. RUSS:  Objection to form.

23  BY MR. BRUSTIN:

24       Q    -- you don't remember one way or another whether or

25  not you were shown an individual photo of Valentino Dixon;
```



1    correct?

2        A    Not from 30 years ago, man, no.

3             MR. BRUSTIN:  Okay.  Let's take a five-minute break.

4             THE VIDEOGRAPHER:  We are going off the record at

5        12:35 p.m.

6             (Whereupon, a brief break was taken at 12:35 p.m.)

7             THE VIDEOGRAPHER:  We are going back on the record at

8        1:09 p.m.

9             (Whereupon, the deposition resumed at 1:09 p.m.)

10   BY MR. BRUSTIN:  (Resumed.)

11       Q    Okay.  Mr. Adams, one of the things you told us this

12   morning was that you were friends with, both, Aaron and Tori

13   Jackson?

14       A    (Indicating.)

15       Q    Yes?

16       A    Yes.

17       Q    Friends growing up?

18       A    Yes.

19       Q    Close friends?

20       A    Yeah, pretty close.

21       Q    And you -- you would want to do anything you can to

22   honestly help them; correct?

23       A    Yeah.

24             MR. BLENK:  Form.

25   BY MR. BRUSTIN:



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              79

1      Q    And that was same back in 1991?

2      A    Yeah.  I would do the same thing for Mario.

3      Q    And you also told us that you never -- you never had

4  to be pressured by the police or the DA to do anything in this

5  case; correct?

6      A    Correct.

7      Q    All right.  I want to show you what we'll mark --

8           MR. BRUSTIN:  What number are we on, Mo, 27 or 28?

9      Let's mark as --

10          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):

11          (Indiscernible.)

12          MR. BRUSTIN:  Let's mark as 27, the letter -- a June

13          5th letter from Chris Belling to you, Bates stamped [COE

14          1769].  And as 28, a letter dated June 5th, 1992 from

15          Belling to Mr. Gave., which is [COE 1784]; okay?  And

16          let's start with 27 (handing).

17          (Whereupon, Plaintiff's Exhibit Nos. 27 and 28 were

18          marked and identified.)

19  BY MR. BRUSTIN:

20     Q    Okay.  Take a minute to review this and tell me if

21  you recollect receiving this.

22     A    I don't.

23     Q    You've got to read it first and then you can tell me

24  after you've read it.

25     A    I was in high school.  I received no mail, while I



1    was in high school --

2        Q    So--

3        A    So, how much mail do you get, when you were in high

4    school?

5        Q    -- so --

6        A    My mom and dad checks the mailbox, not you.

7        Q    -- so, I want to know if anyone gave you this letter

8    read it.  And the only way you can tell that for sure is if you

9    read it.  So, are you refusing to read it, sir?

10       A    No, I'm not refusing to.

11       Q    So, then, read it, please.

12       A    (Complies.)

13           MR. BLENK:  Nick, your video is not on (indicating)?

14           MR. BRUSTIN:  Sorry.  Thank you.

15           MR. BLENK:  Thank you.

16           THE WITNESS:  N,o, I don't remember this.

17   BY MR. BRUSTIN:

18       Q    Does this refresh your recollection about receiving a

19   letter from DA Belling?

20       A    No, sir.

21       Q    Okay.  And, in this letter, DA Belling is telling you

22   unless you cooperate in the case and voluntarily come, you are

23   going to be arrested; correct?

24       A    Yes.

25           MR. RUSS:  Objection to form.



1   BY MR. BRUSTIN:

2        Q    And that's because, prior to this, you had refused to

3   cooperate; correct?

4        A    No.

5             MR. BLENK:  Form.

6   BY MR. BRUSTIN:

7        Q    So, DA Belling was mistaken, when he said that you

8   had not been cooperative?

9        A    I believe what this (crosstalk) --

10            MR. BLENK:  Form.

11            THE WITNESS:  -- letter was referring to is that they

12       wanted me to testify about Mario Germany.  And I could not

13       do that, because whatever happened, I could not see that.

14       So, therefore, there was nothing for me to say.  They

15       actually did put a warrant out.  I went and turned myself

16       in.

17            They called the judge and said, no.  They killed the

18       warrant.  I never was booked.  I never was anything.  So,

19       I believe that's what this letter is, because the trial I

20       was always cooperative and willing.  And I flew there a

21       few times to do it.

22       Q    Okay.  So, you understand -- you understand that this

23  is all in connection with the criminal trial of Valentino

24  Dixon?

25       A    Yeah, I'm assuming -- (crosstalk).



EMIL TOUSSAINT ADAMS                                     January 17, 2023
DIXON V CITY OF BUFFALO                                              82

```
1           MR. BLENK:  Form.
2           THE WITNESS:  But there was no pressure on me about
3      cooperating --
4  BY MR. BRUSTIN:
5      Q    (Crosstalk.)  Sure --
6      A    -- other than when it had pertained to Mario, I
7  didn't see what took place with him.
8      Q    Right.  And you understand that the -- that the trial
9  regarding Mario, also had to do with who the shooter was;
10 correct?
11     A    I don't know.
12     Q    Al right.  Is it your testimony here, under oath
13 today, that you would never, as described in this letter,
14 uncooperative with DA Belling?
15     A    No.  Other than the time I said I won't show to
16 testify in Mario's situation, because I had nothing to say
17 there.  I didn't witness it, so.
18     Q    You'd always been -- and you never testified in that
19 situation; correct?
20     A    No.
21     Q    Okay.  And you'd always been cooperative in regard to
22 testifying in the Jackson -- in the Valentino Dixon case;
23 correct?
24     A    Correct.
25     Q    You'd always answered calls from the DA or the
```



1   police?

2       A    I don't remember.  That might have been my parents

3   answering calls, at the time, and telling me what I had to do.

4       Q    No one --

5       A    (Indiscernible.)

6       Q    -- and you wanted to help.  No one ever threatened

7   you to come and help; right?

8       A    No.

9       Q    You -- you were always open and willing to come court

10  to testify about Valentino Dixon being the shooter?

11      A    Because that's what I witnessed.

12      Q    And it's true, though.  No one had to ever -- you

13  were never uncooperative, you always willing to do it?

14      A    Yes.

15      MR. BLENK:  Form.

16  BY MR. BRUSTIN:

17      Q    And you'll see that this is -- now, take a look at --

18  take a look at 28.

19      A    Take a look at what?

20      Q    We marked as 28, which is this the letter that they

21  wrote to have you served with an arrest warrant for not

22  cooperating.  In fact, what he writes -- what Mr. Belling

23  writes here at the bottom of the page is (reading), "he had to

24  request a continuance of the trial in hopes of securing you as

25  a witness."  You don't remember anything like that happening?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                                84

1          MR. RUSS:  Objection to form.

2          THE WITNESS:  No.

3   BY MR. BRUSTIN:

4      Q    You don't remember ever failing to operate with

5   Mr. Belling in connection with Valentino Dixon's trial?

6      A    Not -- no.

7      Q    Okay.  Now, take a look at -- look at what's already

8   been marked as Exhibit 5 in this case, which is [COE 2934].

9   Now, when you lived at 65 Hastings, in 1992, who did you live

10  with?

11         (Whereupon, Plaintiff's Exhibit No. 5, previously

12         marked, was identified.)

13     A    When?  My parents.

14     Q    Okay?

15     A    I've always lived with my parents, until after high

16  school.

17     Q    And this is a record of -- withdrawn.  So you're

18  telling me that the reason why you refused -- are you -- do

19  remember refusing to testifying in the perjury trial?

20         MR. BLENK:  Form.

21         THE WITNESS:  I don't remember if it was perjury or

22         whatever.  I know it had something to do with Mario and it

23         wasn't -- I think we had already did the -- Tino's trial.

24         I think I'd already did that.  And I think after that --

25         after I did that, I had to testify there.  They asked me



1        to come and testify in the Mario; something that had to do

2        with him.  And I couldn't do that, because I didn't know

3        anything, I didn't see that, so.

4   BY MR. BRUSTIN:

5        Q    Okay.  Now, do you recall that at the time the

6   shooting happened, just before that you had been talking to

7   some girls by a car?

8        A    I was talking to a group of people.  I don't know

9   what girls.

10       Q    Do you remember --

11       A    It was girls and guys.

12       Q    -- do you remember talking, in particular, to a group

13  of girls who were in a small car?

14       A    I don't know what car they were in or what they were

15  or who they were.

16       Q    All right.  I'm going to show you do remember that

17  there was a car there were some bullets went into their car, do

18  you remember noting -- knowing that?

19       A    Vaguely.

20       Q    Well, let me ask you this.  All right.  Do you

21  remember talking to a girl named Tamara Freida [phonetically

22  spelled] the night of the shooting?

23       A    No.

24       Q    Do you remember a witness, a girl, who was another

25  witness to the shooting, who was also talking to the police



1  around the time you were talking to them?

2       A    No.

3       Q    Do you remember talking to a girl, who was a witness

4  to the case, a few months later at a club?

5       A    No.

6       Q    All right.  Sp, let me show you some testimony from

7  Ms. Freida; I would ask about it, okay?  This is a woman, who

8  was at the scene at Louie's, as well, who testified in this

9  case a few months back.  She actually lives in North Carolina

10  now.  She's a social worker.

11          MR. RUSS:  Nick, have you marked this Exhibit?

12          MR. BRUSTIN:  I haven't.  It's a deposition

13      transcript.  I -- I -- I don't think I need to.  I'm just

14      going to read to you from the deposition transcript.

15          MR. RUSS:  It's the deposition transcript of Tamara?

16          MR. BRUSTIN:  Let me -- yeah, I'm going to describe

17      it.

18  BY MR. BRUSTIN:

19      Q    I'm going to show you some portions of her testimony.

20  This is a deposition taken on October 19th, 2022 in this case,

21  as well, just like you.  And according to Ms. Freida, she was

22  talking to you at Louie's that night.  Just flirting, talking

23  to you and a couple of her friends.  Does that jog your memory,

24  at all, about talking to some girls?

25      A    No.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              87

1      Q     Okay?

2      A     I mean, like I said, there was a bunch of people

3   there.  So I'm not saying that I didn't talk to her, but to

4   specifically remember this conversation with this young lady

5   about whatever it is?  No, I'm not -- I don't remember that.

6      Q     Okay.  This is Page 33.  You can read along with me,

7   if you want, of her transcript.  Let me know when you're there.

8   It's not all of the pages.  I just brought some.

9      A     (Indicating.)

10     Q     So let's start on Page 33, and I want to start on

11  Line 18.  This is -- these are the questions that I asked her

12  and the answers she gave.  (Reading) Question:  "Did you talk

13  to Emil Adams about whether or not Valentino Dixon was, in

14  fact, the shooter?"  Withdrawn.  Let me just give you a little

15  framework.  She mentioned that she had a couple of

16  conversations with you in the months following the shooting and

17  this is what I'm asking her about; okay?

18     A     Okay.

19     Q     All right?  (Reading.) Question --

20           MR. BRUSTIN:  Form.

21  BY MR. BRUSTIN:

22     Q     -- (Reading.)  Question: "Did you talk to Emil Adams

23  about whether or not Valentino Dixon was the shooter?" Answer:

24  "Yes."  Question: "And what did he tell you, if anything?"

25  Answer: "He told me that he knew that Valentino was not the



1   shooter; he knew that.  Question: "Okay. And then, he went on

2   to explain why he said Valentino was the shooter.  Okay.  Other

3   pending charges that he had, did he give you any other reasons

4   as to why" -- withdrawn.

5          "Did he give you any other information about any

6   pressure that the police of the prosecutors put on him to state

7   that Valentino Dixon was the shooter, even when he knew that he

8   wasn't?"  Answer:  "The only thing that he told me that they

9   were threatening to actually send him back to Michigan to face

10  charges.  That was it."  Question:  "Do you remember how many

11  times you talked to Emil Adams about the shooting?"  Answer:

12  "I would say, maybe, two.  About two times."  And then, on Page

13  53 --

14          MR. RUSS:  Are you going to as a question, or are you

15      just reading that transcript?

16          MR. BRUSTIN:  I'm going ask a question in just a

17      minute Hugh.  Thanks, Hugh.

18  BY MR. BRUSTIN:

19      Q    And then, she's asked the same question --a similar

20  question on Page 53, Line 7.  Question:  "Okay.  And after the

21  evening of the shooting, when was the next time that you talked

22  to Emil Adams?"  Answer:  "The next time that I spoke to him it

23  was probably, it might have been about two- three months after

24  the shooting."  Question:  "Okay.  And two- three months after

25  the shooting, do you recall where that took place?"  Answer: "I



1    can't recall exactly."

2              Question:  "Would it have been an in-person

3    conversation?" Answer:  "Yes.  And would it have been a meeting

4    through happenstance?  I would say it would have been, like,

5    maybe out in the community somewhere. It might have been out,

6    like, at that time going out to the club or something like

7    that, yeah."

8              Question:  "Okay.  In other words, you hadn't planned

9    to meet up with him?"  Answer:  "No."  "You ran into him out in

10   public?"  Answer: "Exactly."  Okay.  And I believe you said it

11   was about two to three months after the shooting?  Answer:

12   "Uh-huh."  Questions: "Is this an instance where Emil Adams

13   relayed to you why he was identifying Valentino Dixon as the

14   shooter?"

15             Question:  "One of the two that we talked about

16   earlier?"  Answer:  "Yes."  Question:  "Okay.  And you had

17   mentioned that he said something about being threatened with

18   charges that were pending against him Michigan; correct?"

19   Answer:  "Yes."  Question:  "Did he tell you when those threats

20   had been made?"  Answer:  "He didn't tell me when.  He just

21   some told me just in general."  Now, first of all, do you deny

22   having those conversations with Tamara Freida?

23             MR. BLENK:  Form.

24             MR. RUSS:  Objection to form.

25             THE WITNESS:  I don't even recall the conversation,



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                90

 1      so.

 2   BY MR. BRUSTIN:

 3      Q    Do you deny telling someone, who you learned was

 4   another witness at the scene, when you spoke months after the

 5   shooting that, in fact, you knew Valentino Dixon wasn't the

 6   shooter?

 7      A    No, I deny it.  (Crosstalk.)

 8           MR. RUSS:  Objection to form.

 9   BY MR. BRUSTIN:

10      Q    You never said that to her?

11      A    No.

12      Q    She's either mistaken or lying?

13      A    You'll have to ask her.  (Crosstalk.)

14           MR. RUSS:  Objection to form.

15           MR. BLENK:  Form.

16   BY MR. BRUSTIN:

17      Q    Okay.  And you never told her that the reason you

18   said those reason were that there was charges pending against

19   you in Michigan?

20      A    I don't have charges in -- (crosstalk) --

21           MR. RUSS:  Objection to form.

22           THE WITNESS:  -- or in any other state; so, no.

23   BY MR. BRUSTIN:

24      Q    Sir, to be clear, I'm suggesting to you that you're

25   not telling the truth about Valentino Dixon so, perhaps --



EMIL TOUSSAINT ADAMS                          January 17, 2023
DIXON V CITY OF BUFFALO                                      91

 1  withdrawn.  Are you -- were you -- were you always honest with

 2  people, at that time?

 3       A    I'm always honest now.

 4            MR. RUSS:  Objection to form.

 5  BY MR. BRUSTIN:

 6       Q    Okay.  And so, you never would have told Tamara

 7  Freida or anybody that you were afraid of charges in Michigan

 8  to cover up the fact that you did not want to say who the real

 9  shooter was?

10       A    No.

11       Q    Okay?

12            MR. BLENK:  Form.

13            MR. RUSS:  Objection to form.

14  BY MR. BRUSTIN:

15       Q    In any case, you deny telling Tamara Freida at any

16  time -- withdrawn.  You deny telling any woman?

17       A    Any person that I ever had a charges in Michigan.

18  And I was worried anything that could happen to me with law,

19  there or in Buffalo.

20       Q    Okay.  And you certainly deny telling anybody that

21  you knew Valentino Dixon wasn't the shooter?

22       A    No, I never said that he wasn't the shooter.

23       Q    You never said that anybody?

24       A    Anybody.

25       Q    Certainly not the woman, who was the scene, that



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                           92

1  night?

2      A    No, I wouldn't have said that he wasn't the shooter

3  that night.  I wouldn't have said that at any time.

4      Q    Let me read one more portion and see if it jogs your

5  memory at all.  Take a look at Page 56 (indicating). First of

6  all, were you in Buffalo in 2002 -- 2003?

7      A    Living there?

8      Q    Yeah?

9      A    I don't remember the year that I moved back.

10     Q    Okay?

11     A    But I may have been; yeah.

12     Q    But you sometimes go out to clubs in Buffalo?

13     A    At that age?  I -- I may have.

14     Q    Do you ever remember anybody, who was present --

15  withdrawn.  Do you remember ever meeting any other women, who

16  were present at the night of the shooting, in the months or the

17  years following the shooting?

18     A    Like I said, we're in a small city.  So, I ran into

19  people that had -- who were there; yeah.

20     Q    In 1991, were you living in Buffalo?

21     A    When -- when it happened?

22     Q    Yes?

23     A    No.

24     Q    Were you coming back and forth?

25     A    Yes, I was there visiting for the summer.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              93

1    Q    Okay.  You were there for the whole summer?

2    A    (Indicating.)

3         MR. RUSS:  I'm sorry.  I didn't hear the whole -- the

4    last response.

5         MR. BRUSTIN:  He was visiting for the summer.

6         MR. RUSS:  Thank you.

7  BY MR. BRUSTIN:

8    Q    And when did you go back to Michigan?

9    A    Shortly after the incident happened.

10   Q    And when is the next time you came back to Buffalo?

11   A    When they flew me back for the trial.

12   Q    And when is the next time you came back, after the

13   trial?

14   A    When they flew me back, again.

15   Q    About how after that?  When did you move back?

16   A    Shortly after I got out of high school.

17   Q    So '92, '93?

18   A    Yeah, maybe.  I don't remember the year, but it was

19   shortly after I got out of school.

20   Q    And do you remember ever meeting anybody -- any

21   women -- who were present at the scene of the shooting in the

22   months or the years after the shooting?

23   A    It's possible.  I mean, we're in a small place.  I,

24   probably, ran into someone that was there.

25   Q    I'm asking you if remember it today?



1       A    No, not specifically to say, you know, yes, or no.

2   I'm not going to say I didn't.  But I don't recall meeting

3   anyone and talking about -- especially, this Michigan stuff.  I

4   don't have cases.

5       Q    Okay?

6       A    So, no.

7       Q    All right?

8       A    I can tell you this conversation didn't happen.

9       Q    All right.  But do you remember, generally, speaking

10  to a woman in the months or the years after the shooting?

11      A    I spoke to a lot of people, generally speaking, and

12  after that time.

13      Q    Well, do you remember speaking to any women, who were

14   present at the shooting?

15      A    No.

16      Q    Okay.  You certainly don't deny talking to Tamara

17  Freida; do you?

18      A    No.

19      Q    Okay.  And if you look at now on Page 56, Line 17

20  (reading), Question:  "And I don't want to belabor the point,

21  but that's the second conversation you've had with him that

22  we've talked about earlier.  When, approximately, was that

23  conversation, if you remember?"  Answer:  "The second

24  conversation would have been, maybe, I want to say maybe 2002

25  to 2003.  I think it was around time when I did the interview



1   with the Buffalo News.  So we had ran into each other; it was

2   in public.  We were both at a store.  And we had, at that time,

3   a discussion.  Okay.  And he said it, again.  And he reiterated

4   that, you know, he said that Valentino was the shooter, because

5   of the charges in Michigan."

6          Question:  "Did he go into any further detail on the

7   second conversation as he did in the first conversation?"

8   Answer: "No, not really."  Question:  "So, again, just

9   generally a claim that charges may have been used against him

10  if he didn't identify Valentino Dixon?  Answer:  "Yes."

11  Question:  "As a shooter, but nothing further?"  Answer:

12  "Nothing further."  Question:  "And no information as to who

13  the individual was that made those threats or when those

14  threats may have been made?" Answer: "No."

15         Okay.  Now, do you recall seeing a woman on TV in or

16  around 2002 or 2003, in Buffalo, saying that Valentino Dixon

17  was not the shooter?

18     A    No.

19         MR. RUSS:  Objection to form.

20  BY THE WITNESS:

21     Q    Do you remember -- does this refresh your

22  recollection about, during that time period, meeting a woman

23  named Tamara Freida or a woman, in a store, who was present the

24  night of the shooting and talking to her about the shooting?

25     A    No.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                               96

1      Q     You don't deny it, but you don't remember it?

2      A     I definitely don't remember.

3      Q     And it is possible that you told people that you were

4    facing charges in Michigan, and that's why you testified as you

5    did?  Not because you were facing charges, because you didn't

6    want to tell the truth about what happened?

7            MR. BLENK:  Form.

8            MR. RUSS:  Objection to form.

9    BY MR. BRUSTIN:

10     Q     Has anyone from the DAs office come to speak -- has

11   anyone -- has anyone from the District Attorney's Office or the

12   City come to speak to you, since the criminal proceedings

13   involving Valentino Dixon, after say, 1995?

14     A     No --

15           MR. BLENK:  Form.

16           THE WITNESS:  (Crosstalk) -- not that I can recall.

17   BY MR. BRUSTIN:

18     Q     You don't remember having -- being interviewed by

19   anybody from the District Attorney's office, before Valentino's

20   release?

21     A     No.

22     Q     Okay.  Do you remember in, approximately, 2000 --

23   withdrawn.  In 2000, did you use to work or hang out at a place

24   called Uncle Johnny's Hair Company?

25     A     Yeah, I used to cut hair there.



1    Q    Okay.  And did you getting hair there in,

2  approximately, 2000?

3    A    I believe that was around that time, yeah.

4    Q    Okay.  Do you remember meeting with an Investigator

5  named Roger Putnam, who was working for the Dixon family, who

6  came to see you in the shop.  He claims he saw you there on

7  seven different occasions?

8         MR. RUSS:  Objection to form.

9         THE WITNESS:  No.

10  BY MR. BRUSTIN:

11    Q    You have no memory of meeting with an Investigator

12  for Mr. Dixon at Uncle Johnny's Hair Company in, approximately,

13  2000 even once?

14    A    I don't remember that at all.

15    Q    Do you deny telling Mr. Putnam -- withdrawn.  Do you

16  deny telling an Investigator for Mr. Dixon at Uncle Johnny's

17  Hair Company that you did not tell the truth at the trial, when

18  you testified that Valentino Dixon was the shooter?

19         MR. BLENK:  Form.

20         THE WITNESS:  I don't remember talking to this

21      person, so, yeah, I would deny that conversation.

22  BY MR. BRUSTIN:

23    Q    All right.  You never told -- you never had any

24  conversation at Johnny's at --  at -- at Johnny's Hair Company

25  or anything like that; is that what you're saying?



EMIL TOUSSAINT ADAMS                                        January 17, 2023
DIXON V CITY OF BUFFALO                                                  98

```
 1        A    No, not that I can recall.

 2             MR. BLENK:  Form.

 3   BY MR. BRUSTIN:

 4        Q    Well, you told us already that you never told anybody

 5   that Valentino Dixon wasn't the shooter; correct?

 6        A    I never told anyone that he was not the shooter.

 7        Q    Okay.  So, if Roger Putnam says that you told him

 8   that seven times in 2000, at Uncle Johnny's Hair Company, he

 9   would be a liar; correct?

10             MR. RUSS:  Objection to form.

11             THE WITNESS:  Uh -- yeah.

12   BY MR. BRUSTIN:

13        Q    The same with Tamara Freida; she's lying, as well;

14   right?  You never told her --

15        A    I never said she was lying.  I said I don't recall

16   the conversation.

17        Q    Well --

18        A    You're asking me -- you asking me to give you a

19   specific on something that I can't remember.  So, how can I do

20   that?

21        Q    Well, you heard her testimony, which said that you

22   told her twice that Valentino Dixon wasn't the shooter;

23   correct?

24        A    Okay.  Well, you have to ask her if she's lying or

25   not.  I wasn't there, when she gave that testimony.  When it
```



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                99

```
 1   comes to me, I never talked to her.  I can never recall talking
 2   to her about anything that had to do with me in Michigan --
 3        Q    Okay?
 4        A    -- and Tino and whoever else you want to say.
 5        Q    Okay.  So it's possible then that you just don't
 6   remember telling her twice that Valentino Dixon wasn't the
 7   shooter; is that right?
 8        A    Is it possible that they talked to you about it?
 9             MR. RUSS:  Objection to form.
10   BY MR. BRUSTIN:
11        Q    I wasn't a witness to the shooting?
12        A    But is it possible?  I know, but is it possible?
13        Q    So you don't deny telling her that Valentino Dixon
14   wasn't the shooter?
15        A    I deny telling her that Valentino wasn't the shooter.
16   (Crosstalk.)
17             MR. RUSS:  Objection to form. (Crosstalk.)
18   BY MR. BRUSTIN:
19        Q    So, she's either mistaken or lying?
20        A    You'll have to ask her.  (Crosstalk.)
21             MR. RUSS:  Objection to form.  (Crosstalk.)
22             THE WITNESS:  I can only speak on me.  I never said
23        these words, so.
24   BY MR. BRUSTIN:
25        Q    And you never said those words to Roger Putnam?
```



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                              100

1    A    No.

2    Q    Mr. Putnam also claims that you agreed to go to his

3    office, on 484 Delaware Avenue, and give a sworn statement to

4    that effect.  But that you never came and told him tat you were

5    afraid of retaliation for doing so?

6    A    No.

7    Q    Do you deny doing that?

8         MR. RUSS:  Object to form.

9         THE WITNESS:  I definitely deny doing that.

10   BY MR. BRUSTIN:

11   Q    Okay?

12   A    I was never afraid.

13   Q    And us talking about an investigator coming to see

14   you at Johnny's Haircut -- at Uncle Johnny's Hair Company --

15   A    (Indicating.)

16   Q    -- that doesn't refresh your recollection, by ever

17   having any conversation with anyone claiming to be an

18   investigator for Valentino Dixon?

19   A    Correct.

20        MR. RUSS:  Objection to form.

21   BY MR. BRUSTIN:

22   Q    It's your belief that Roger Putnam just made those

23   interactions up?

24   A    I don't have any belief.

25        MR. RUSS:  Objection to form.



1          THE WITNESS:  I don't know.

2          MR. BRUSTIN:  Now, let's mark this as -- 29 are we

3      on?

4          THE COURT REPORTER:  (Indicating.)

5          MR. BRUSTIN:  And, Mo, will you send around the Dill

6      Affidavit.

7          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Will do.

8          MR. BRUSTIN:  Thanks.

9   BY MR. BRUSTIN:

10     Q    So what I'm showing you, Ms. Adams, is a document --

11  it's a two-page affidavit -- three pages -- affidavit from

12  someone named Daniel Dill; which is Bates stamped [Dixon 5973

13  through 5975].  And, according to this affidavit, Mr. Dill, who

14  is an investigator for the Erie County District Attorney's

15  Office, came to you in 2005 -- July 10th, 2005 to talk to you

16  about your identification at the trial.  Do you remember that

17  at all?

18          (Whereupon, Plaintiff's Exhibit No. 29 was

19      marked and identified.)

20     A    No.

21          MR. RUSS:  Objection to form.

22  BY MR. BRUSTIN:

23     Q    You have no memory of meeting with the investigator

24  from the Erie County District Attorney's Office, in or around,

25  July 2005?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              102

1       A    No.

2            MR. BLENK:  Form.

3            MR. BRUSTIN:  All right.  Let's take a look at the

4       next page; it's his affidavit.  Take a minute and read

5       Page 5974 to 5975.  Let me know when you're done.

6       A    I remember something about the newspaper.

7       Q    Do you remember anything about what's contained in

8    this affidavit?

9       A    No.

10      Q    You don't remember meeting with Mr. Dill?  No?

11      A    (Indicating.)

12      Q    You don't remember him showing a photo array, in

13   2005?

14      A    No.

15      Q    Do you remember telling he you had called newspaper,

16   being upset?

17           MR. BLENK:  Form.

18           THE WITNESS:  I did call the reporter, who had put a

19      story out.  And I can't be remember what it was about.

20      But -- but it wasn't good for me.  So, that's why I was,

21      like, well, where you get this from?

22   BY MR. BRUSTIN:

23      Q    What were you upset about?

24      A    Whatever he was saying, it was like I was supposed to

25   have did something or said something or something like that.



1   All I know it wasn't a true statement by that reporter.

2          Q    Okay.  You don't remember anything else about?

3          A    No.

4          Q    You have no memory of being shown a photo array?

5          A    Other than, when everything happened.  Like I said,

6   it's 30 years ago.  I can't -- I don't remember.

7          Q    Well, this is actually less than 30 years ago, this

8   is 2005, when it said this happened.  That's only 17 years ago.

9          A    Okay.  Seventy years ago.

10         Q    Okay.  You don't remember it?

11         A    No.

12         Q    Okay.  You don't remember at any time after -- you

13  don't remember anything that's contained in this affidavit?

14  Other than, calling the newspaper reporter, for some reason,

15  about something he said about you?

16         A    (Indicating.)

17         Q    Yes?

18         A    Correct.  And they actually came to -- that reporter

19  came to Aaron -- Aaron's house.  And I voiced my opinion there

20  about why I was upset with them at that interview there.  I

21  don't know what happened after that or what.  You know, that's

22  pretty much the last thing I heard about that until, I believe,

23  recently.  Because I don't remember anything other than that.

24         Q    Okay.  What kind of work are you currently doing?

25         A    I work at the airport.



EMIL TOUSSAINT ADAMS                          January 17, 2023
DIXON V CITY OF BUFFALO                                    104

1       Q    Okay.  What kind of work do you do there?

2       A    General maintenance.

3       Q    Full time?

4       A    Yeah.

5       Q    And I think you told us that you've never been in

6    trouble with the law?

7       A    Other than,  minor traffic are, you know, small

8    marijuana possession.

9       Q    Okay.  But nothing more serious is that?

10      A    No.

11      Q    Not even -- you haven't been arrested for anything

12   more serious and that?

13      A    One-time, yes.  But it was the individual, whose car

14   and he took the blame and set me -- and I didn't have to go to

15   court or anything it.

16      Q    When was that?

17      A    I was working at Uncle Johnny's, so I don't remember

18   the year.

19      Q    Okay.  Do you remember what -- were you in charged

20   with any crime?

21      A    I was charged with the same thing he was.  Possession

22   of --

23      Q    Stolen vehicle?

24      A    No.

25      Q    Oh.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                            105

1      A    I've never been in trouble for a stolen vehicle.

2      Q    I was just asking.  I thought that's what you were

3  describing.

4      A    No.

5      Q    But what was -- what were you charged with?

6      A    No.  He had drugs in his car.  It was his car, his

7  drugs.  Somewhere in there they found it.  He was literally

8  giving me a ride home --

9      Q    Okay?

10     A    -- because I had just cut his hair.  So, we went to

11 jail that night; got bail Bill.  He took the charges.  They

12 told me I was fine; I didn't have to show up to court or

13 anything.  They dropped the charges.  That's the only other

14 thing in my life that I have been arrested for, outside of a

15 misdemeanor or traffic or small marijuana possession.

16     Q    Okay.  So, let's go back -- you can put those away.

17 So, what's on top there, you can give that back to me.  Thank

18 you.

19          MR. BLENK:  Are you going to mark that?

20          MR. BRUSTIN:  Mark what?

21          MR. BLENK:  The Dill Affidavit?

22          MR. BRUSTIN:  I did; it's 29.  Can I have that back?

23          THE WITNESS:  (Handing.)

24          MR. BRUSTIN:  That one, too; I'm done with that too.

25 Any small ones.  Yeah.  Thank you.



EMIL TOUSSAINT ADAMS                                January 17, 2023
DIXON V CITY OF BUFFALO                                         106

```
 1   BY MR. BRUSTIN:
 2        Q    All right.  I want to go back to your testimony.
 3   So --
 4        A    (Handing.)
 5        Q    Thanks.  What you have in front of you, so, if you
 6   can probably to the first tab.  And maybe I won't even need
 7   this.  Today -- let's take a look at Page 79 of the Grand Jury,
 8   the first tab.
 9        A    (Indicating.)
10        Q    All right.  Line 14, Page 79 to Line 19.  Read that
11   to yourself -- or to Line 22.
12        A    (Complies.)
13        Q    Just to Line 22.
14        A    Okay.
15        Q    First of all, you told us you were, in fact, close
16   friends with the Jackson brothers; correct?
17        A    (Indicating.)
18        Q    Yes?
19        A    Yes.
20        Q    Okay.  And after the shooting, you stuck -- you
21   stuck -- you stuck around and you spoke with some police at the
22   scene; is that right?
23        A    Yes.
24        Q    Do you remember how many police officers you spoke to
25   at the scene?
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              107

1       A    No.

2       Q    Do you remember where you spoke to them?  Was it in a

3    police car, was it out of a car; do you remember where?

4            MR. BLENK:  Form.

5            THE WITNESS:  I was never in a car, so it was outside

6       of the car.

7       Q    Did you approach them?

8       A    No, they approached me.

9       Q    Okay.  And how long did you speak with that officer,

10   before they brought you down to the precinct?

11      A    I don't remember how long.  It wasn't a super long

12   time, but a few -- a few minutes, I guess.

13      Q    Okay.  And I can represent to you that at time --

14   around that time same, Valentino Dixon's name was put out over

15   the radio.  Do you remember either hearing Valentino Dixon's

16   name of the radio or discussing Valentino Dixon with those

17   officers, at the scene?

18      A    No.

19           MR. BLENK:  Form.

20           MR. RUSS:  Object to form.

21   BY MR. BRUSTIN:

22      Q    No memory of that?

23      A    No, I wouldn't have spoken to them about him.

24           MR. BLENK:  Form.

25           THE WITNESS:  Because, like I said, I did not know



```
 1        his name.
 2   BY MR. BRUSTIN:
 3        Q    Okay?
 4        A    I did not know him.  So, if they're saying his name,
 5   I wouldn't know.
 6        Q    Okay?
 7        A    No more that I know her name (indicating).  If you
 8   started telling me, remember Mrs. Johnson.  I don't know this
 9   to be Mrs. Johnson.
10        Q    Okay.  So, you don't know one way or another whether
11   or not they were asking about Valentina Dixon; fair to say?
12             MR. BLENK:  Form.
13             THE WITNESS:  No, they didn't ask me about any
14        specific name or person.
15   BY MR. BRUSTIN:
16        Q    Okay.  Do you remember what you told those officers
17   at the scene?
18        A    I told them what happened that night.
19        Q    Okay.  And did you tell them -- did you describe to
20   them the person that you saw?
21        A    Yes.
22        Q    Okay.  And were they taking notes, as you were
23   describing it?
24        A    Yes --
25        Q    Okay?
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              109

1      A    -- to my knowledge, I believe; yeah.

2      Q    Okay.  But that was the first description that you

3  gave of what you saw?

4      A    Yes.

5      Q    Okay.  And that was before you were brought down to

6  the precinct?

7      A    Yes.

8      Q    And you -- can you estimate if you spoke to them for

9  10 minutes, 15 minutes; how long?

10     A    No.

11     Q    Was anybody else present, when you speaking with

12  them, other than the officers?

13     A    Ms. Jackson might have been -- Ms. Jackson.  Yeah,

14  Ms. Jackson was there.

15     Q    Okay.  And did she -- do you remember talking to her

16  at scene?

17     A    Vaguely, yes.

18     Q    Did she mention any names or ask you about any names

19  about who could have done it?

20     A    No.

21     Q    By the way, did you know who Lamar Scott was, at that

22  point in time?

23     A    Not --

24     Q    Have you ever met him before?

25     A    -- like I said, I've seen him --



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                            110

```
 1              MR. BLENK:  Form.
 2              THE WITNESS:  -- because, you know, he be around the
 3      neighborhood.  But I don't -- I never knew him.
 4   BY MR. BRUSTIN:
 5      Q    Okay.  Did you -- did you know -- did you know Lamar
 6   Scott in the same way that you knew Valentina Dixon?  In other
 7   words, that you had seen him somewhere around the neighborhood?
 8      A    Yea.
 9              MR. RUSS:  Object to the form.
10   BY MR. BRUSTIN:
11      Q    You knew him -- you knew him similarly to Valentino.
12   That same -- does that describe it accurately?
13      A    Just -- yeah.
14              MR. RUSS:  Objection to form.
15   BY MR. BRUSTIN:
16      Q    Someone you would recognize as just having seen him
17   around the neighborhood?
18      A    Yes.
19      Q    So, for example, if you had been shown a
20   photograph -- if you had been shown a photograph of Lamar
21   Scott, at the time, you might recognize him as somebody you
22   knew from around the neighborhood; fair to say?
23              MR. BLENK:  Form.
24              THE WITNESS:  Not really -- no.
25   BY MR. BRUSTIN:
```



1    Q    Now, according to the police reports, it was a

2    detective -- let me go back to the photos -- that group of

3    reports that I had before.  This is Plaintiff's 2.  Let me give

4    it to you, again  (handing).

5              (Whereupon, Plaintiff's Exhibit No. 2, previously

6         marked, was reviewed.)

7    A    This is Page 25?

8    Q    Yeah, the first page of this.  The very first page.

9    This is a report that Detective Staumbach [phonetically

10   spelled] did and he references a detective named Lockwood, who

11   had brought you -- it says said (reading) that he "had met with

12   you a witness at the shooting."  Do you remember the name

13   Lockwood is the person you had spoken to at the scene of the

14   crime?

15   A    No.

16   Q    Now, do you remember the same person, who did -- who

17   was typing the statement that you gave, being the same person

18   that was present when you saw the photo array with Valentino

19   Dixon in it?

20   A    No, I don't remember who was in there -- (crosstalk)

21   --

22   Q    You don't remember -- (crosstalk) --

23   A    -- who drove me to the police station.  None of that,

24   no.

25   Q    Now, do you have any reason to believe that you gave



EMIL TOUSSAINT ADAMS                                                January 17, 2023
DIXON V CITY OF BUFFALO                                                          112

1  a description that was any different at the scene of the crime

2  of the person that you saw as the shooter, than you gave your

3  typed statement?

4      A    Say that again?

5      Q    Sure.  Was -- to your recollection, was there any

6  differences between the description you gave -- (crosstalk) --

7      A    Not that I can recall.

8      Q    -- none that you recall; fair to say?

9      A    No.

10     Q    This report also says that you taken home by

11  detective Lockwood.  Do you remember if it was the same person

12  who spoke to you a the scene, that night, or that morning?

13     A    I don't even remember them taking me home.  If they

14  say they took me home, I don't remember.

15     Q    You were just leaving?

16     A    Yes, it was like 6:00 in the morning or something

17  like that, by the time I got home.  The sun was about to come

18  up.  It was -- I don't remember that.

19     Q    Okay.  Do you remember how many hours you actually

20  spent talking to police that night?

21     A    All night.  I don't remember the amount of time.  But

22  I know it was very, very late.

23     Q    Okay.  Do you remember being brought in to speak --

24  so, you told us that they brought you down to the police

25  station?



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                              113

1        A    (Indicating.)

2        Q    Do you remember -- and you told us you remember that

3    there was an interview, where the detective was typing?

4        A    (Indicating.)

5        Q    And there was also a time you shown an array that

6    included Valentino Dixon?

7        A    (Indicating.)

8        Q    How many other times where you meeting with the

9    police that night; do you recall?

10       A    Just at night.

11       Q    How may any other means that night?  Like, how often

12   were you being brought back and forth, from where you were

13   sitting, to talk to the police?

14       A    I think it was only one time -- maybe twice.  I'm not

15   sure.

16       Q    Okay.  Now, you mentioned, I think at that time, that

17   you knew Mario pretty, as well?

18       A    (Indicating.)

19       Q    And he was about 20 years old; is that right?

20       A    Somewhere around there.

21       Q    Okay?

22       A    I don't know if he was that old.  He might have been.

23       Q    I'm sorry; 19?

24       A    Yeah, something like that.  Yeah.

25       Q    How old were you in -- how -- how old are you now?



1    A    I just turned 50.

2    Q    So 1991, you were how old?

3    A    Ninety-one?

4    Q    Yes?

5    A    Jesus -- 17, 18.

6    Q    Okay.  Do you remember what year you were going into

7    school?  Were going to be a senior or were a junior?

8    A    I think it was a junior, maybe a senior.  Because

9    this happened, like, right at the end of school.  So it was,

10   either, a junior or senior.

11        MR. RUSS:  I didn't hear the response.  I'm sorry.

12        MR. BRUSTIN:  I think he said, "junior or senior."

13        MR. RUSS:  All right.

14   BY MR. BRUSTIN:

15   Q    Do you remember if -- was your sister was still

16   living in Buffalo, when you were living in Michigan?

17   A    My sister?

18   Q    Yes?

19   A    When I was in Buffalo, she was living in Michigan?

20   Q    No.  When you were living in Michigan, was your

21   sister still in Buffalo?

22   A    Yes.

23   Q    And you flew back to Michigan, for the criminal

24   proceedings, do you remember seeing your sister?

25   A    Yes.



EMIL TOUSSAINT ADAMS                                        January 17, 2023
DIXON V CITY OF BUFFALO                                                  115

1      Q    How old was she?

2      A    She's three -- well, I've got two sisters.  Three

3  years and six years apart from me.  So if I was 17, she was 20.

4      Q    Is -- does your mother have a brother?

5      A    Yes.

6      Q    What's his name?

7      A    Skipper.

8      Q    Is it -- is it also Ron?

9      A    No.

10     Q    Does she have a brother named Ron?

11     A    No.

12     Q    Back in Michigan, was there anyone in your house

13  named Ron?

14     A    Just me, my mother, and my father.

15     Q    What's your father's name?

16     A    Ernest.

17     Q    Now, at the time the shooting occurred, you were in

18  the parking lot of Louie's; is that correct?

19     A    Correct.

20          MR. BLENK:  Form.

21  BY MR. BRUSTIN:

22     Q    And you were standing behind a metal barriers; is

23  that right?

24     A    Yes.

25     Q    And at the time, you were with -- you were standing



1    with a guy named Mark, is that right?

2          MR. BLENK:  Form.

3          THE WITNESS:  I don't remember.

4    BY MR. BRUSTIN:

5          Q    Okay.  Well, let's take a look at -- let's take a

6    look at the statement on Page 31; the police reports, again.

7    Exhibit 2, look at Page 31.  Right -- see about eight lines

8    from the bottom (indicating).  It says (reading), "Who were you

9    standing with, at the time of the shooting"?

10          A    (Indicating.)

11          Q    (Reading.)  It says, "Who were you standing with, at

12    the time of the shooting?"  Answer:  "A guy named Mark and

13    those three girls".  Who is Mark?  A guy I know that lives a

14    couple of doors down from my cousin.  My cousin is Joseph

15    Bernard Washington, he lives at 18 Humber Street [sp?]."

     Question:  "Who --

16

17          A    Oh, that Mark.  Okay?

18          Q    (Reading) -- who are those girls?"  Answer:  "I don't

19    know them.  I was just getting to meet them."  Question:  "What

20    kind of a car were they in?  A Geo tracker, red, with a

21    white-soft top.  Their truck got shot and the police have their

22    names.  They are three girls."  Okay.  Now, does that refresh

23    your -- I will represent to you --

24          A    (Indicating.)

25          Q    -- that Tamara Freida has testified that she was



EMIL TOUSSAINT ADAMS                                     January 17, 2023
DIXON V CITY OF BUFFALO                                              117

1  the -- she was the owner of the car and one of those three

2  girls -- (crosstalk.)

3       A    (Crosstalk.)  Yeah, I remember that.

4       Q    Do you now remember Tamara Freida, the woman, who was

5  driving the car?

6       A    I always remember -- (crosstalk) --

7            MR. BLENK:  Form.

8            THE WITNESS:  -- I know her.  I was saying I don't

9       recall talking to her about -- I know I didn't talk

10      about -- I know that I didn't talk about anything that I'm

11      supposed to be in trouble in Michigan to anybody, because

12      that's false.

13  BY MR. BRUSTIN:

14      Q    Okay?

15      A    That's untrue.

16      Q    Okay.  You would never say anything untrue to

17  anybody?

18      A    No.

19      Q    Okay.  So, first of all, you do know who Tamara

20  Freida is now?

21      A    I didn't say that I didn't know her.  You asked me

22  about something that is said to her.

23      Q    You know who tamara Freida is?

24      A    Yes.

25      Q    She was the girl -- at that time, the young girl --



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              118

 1        A     (Indicating.)

 2        Q     -- who was driving the tracker; right?

 3        A     (Indicating)  Well, yeah -- yeah, yeah, yeah.

 4        Q     Okay.  It's also clear that you knew they were

 5   witnesses to the shooting.  You said, "the police had their

 6   names"?

 7        A     Because her car had gotten hit.

 8        Q     Okay.  And how did you know that the police had their

 9   names?

10        A     Because the car got shot and I remember them talking

11   to the police.

12        Q     You remember them talking to the police?

13        A     (Indicating.)

14        Q     Okay.  Now, and do you remember, specifically,

15   Tamara, the one who was driving?

16        A     (Indicating.)

17        Q     Yes?  You have to answer, yes or no.

18        A     Yes.

19        Q     That's why I keep doing that.  And was she one of the

20   girls that you were flirting with?

21              MR. BLENK:  Form.

22              THE WITNESS:  You're saying flirting?  I probably was

23        talking to her.

24   BY MR. BRUSTIN:

25        Q     Withdrawn.



1        A    I'm not going to say --

2        Q    Let me -- let me withdraw the question.  You -- you

3    were -- you tell me; were you flirting with those girls?

4              MR. BLENK:  Form.

5              THE WITNESS:  Well, to be perfectly honest, I don't

6         remember, specifically, talking to her that night.  I

7         remember some girls we were talking to.

8    BY MR. BRUSTIN:

9        Q    Okay.  And you certainly don't dispute that it was

10   Tamara Freida?

11       A    I know.

12       Q    Okay?

13       A    I never have.  I just said, I never said --

14       Q    Okay?

15       A    -- that I had any issues with police of any kind in

16   any State --

17       Q    Okay?

18       A    -- including Michigan --

19       Q    All right?

20       A    -- and in Buffalo, New York --

21       Q    Okay?

22       A    -- is what I said.

23       Q    Fair enough?

24       A    I do know her.

25       Q    Okay.  You do know her?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                               120

```
 1        A    And I don't know her well, but I do know her.

 2        Q    Okay.  And you do remember speaking to her, not about

 3   legal problems in Michigan, but you do remember speaking to

 4   her?

 5        A    I -- no --

 6        Q    Let me finish.  -- in the months and the years after

 7   the shooting; correct?

 8             MR. BLENK:  Form.

 9             MR. RUSS:  Objection to form.

10             THE WITNESS:  No, I can't recall a conversation that

11        me and her had.

12   BY MR. BRUSTIN:

13        Q    I'm -- I'm not asking that.  I'm asking if you did,

14   in fact, have a conversation with her?

15        A    That's what I said, I don't recall having a

16   conversation with her.

17        Q    All right?

18        A    I'm not talking about specific.  I said, I don't

19   remember having a conversation.  I'm not saying it didn't --

20   that I didn't have a conversation with her, because I probably

21   seen her in the city somewhere and said, Hi, or something like

22   that.  But to remember a conversation?  No.  Me and her never

23   talked on the phone.  I can't recall me and her conversing

24   about nothing.

25        Q    Okay.  Do you remember -- do you have any
```



1  recollection or seeing her in a club?

2      A    I probably did see her at the club.  We don't have

3  but -- back then, it may have been two -- two or two clubs in

4  the City of Buffalo --

5      Q    Okay?

6      A    -- so, everybody attended.

7      Q    Okay?

8      A    I wouldn't say that she didn't see me in the club, or

9  I didn't see her in the club, but --

10     Q    Do you remember talking to her, generally, about how

11 traumatic --

12     A    No.

13     Q    -- the shooting was?

14         MR. BLENK:  Form.

15         MR. RUSS:  Objection to form.

16         THE WITNESS:  No.

17 BY MR. BRUSTIN:

18     Q    No?  I mean, it was traumatic; right?

19     A    Yes.

20         MR. BLENK:  Form.

21 BY MR. BRUSTIN:

22     Q    Did you ever see anything like that before?

23     A    Yeah.

24     Q    You have?

25     A    It happens all the time in city, in our neighborhood.



1      Q    Okay.  In any case, it was still traumatic; fair to

2    say?

3      A    Yes.

4      Q    All right.  And so, you made it clear that you never

5    told Tamara Freida that you were in trouble in Michigan, and

6    that's why they pressured you?

7      A    I've never told anyone.

8           MR. BLENK:  Form.

9           MR. BRUSTIN:  Okay?

10          MR. RUSS:  Objection to form.

11   BY MR. BRUSTIN:

12     Q    Would it be fair to say that it's possible though,

13   now that you remember this is or now that you know who this is,

14   that you may have told her that Valentino Dixon was not the

15   shooter?

16     A    No.

17          MR. RUSS:  Objection to form.

18   BY MR. BRUSTIN:

19     Q    She's either mistaken or lying about that?

20     A    You have to talk to her about that --

21          MR. BLENK:  Form.

22          MR. RUSS:  Objection to form.

23          THE WITNESS:  -- I can't on, but what I say.

24   BY MR. BRUSTIN:

25     Q    Those words never came out of your mouth?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                            123

1     A     No.

2     Q     Not once, let alone twice?

3     A     No.

4     Q     Did you ever talk to Aaron about whether or not he

5  and Tori, or the other gentlemen that was with them, had guns

6  that night?

7     A     No.

8          MR. BLENK:  Form.

9  BY MR. BRUSTIN:

10    Q     To your knowledge, have Aaron or Tori ever been

11 arrested prior to that night?

12    A     Not to my knowledge.  Like I said, I was in Michigan.

13 So when, you know -- when they were old enough to be arrested,

14 I was living in Michigan.

15         So, I wouldn't know their day-to-day and what they

16 were into or what happened.  You know, I'd just see them when I

17 come home.  We'd play basketball, you know, something like

18 that.  But I have never known them to be in any kind of

19 trouble.

20    Q     Okay.  Can you take a look at your testimony.  You

21 can put the report away for now.  Thank you.  You can keep it

22 there, just in the case.  So, now, I want you to look at --

23         MR. RUSS:  While you're searching for it, Nick, which

24    testimony, grand jury, trial?

25         MR. BRUSTIN:  Yeah.  I'm trying to figure out which



EMIL TOUSSAINT ADAMS                                        January 17, 2023
DIXON V CITY OF BUFFALO                                                  124

 1        one I'm going to start with.

 2   BY MR. BRUSTIN:

 3        Q    Let's start with trial.  Let's start with the trial,

 4   Page 154, the second tab?

 5        A    You said, "154"?

 6        Q    Yeah.  Okay.  Now, you testified here on Page 154.

 7   Look at lines -- read Lines 5 to 24?

 8             MR. RUSS:  I'm sorry.  I missed the page, Nick?

 9             MR. BRUSTIN:  Page 154, Lines 5 to 24.

10             MR. RUSS:  Thank you.

11   BY MR. BRUSTIN:

12        Q    Just 5 to 24.

13        A    Okay.

14        Q    Do you remember now, as you sit here today,

15   Mr. Jackson falling as he was running towards the car?

16        A    (Indicating.)

17        Q    Yes?

18        A    He was running towards the car?

19        Q    And you saw him fall?

20        A    Yes.

21        Q    After he was shot?

22        A    Yes.

23        Q    And you understand, today, that Mr. Jackson -- Aaron

24   Jackson -- was also seriously injured?

25        A    Yes.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              125

1        Q    Okay.  And do you remember how far he was from the

2   car, approximately?

3        A    No, he was pretty much right at the car.

4        Q    Okay.  And then --

5             MR. RUSS:  I'm sorry.  I didn't catch that response.

6   BY MR. BRUSTIN:

7        Q    He was right behind the car.

8        A    He was -- he fell just about at the car --

9             MR. BLENK:  You said, "right at the car."

10            THE WITNESS:  -- because he came running to get in

11       the car and fell.  Yeah, that's how the girl's car end up

12       being shot and the bullet hole that was in Louie's door,

13       because they started shooting at him -- that way.

14   BY MR. BRUSTIN:

15       Q    Okay.  But you never saw him, actually, get into the

16   car.  You only saw him fall, because he was shot; correct?

17       A    Right.

18       Q    Okay?

19       A    I jumped behind the car, you know, at that time.

20       Q    And you testified more specifically,  both -- let's

21   look at Page 139?

22       A    (Indicating). 169?

23       Q    199.  Okay.  So, look at Line 13.  Read Line 13 to

24   Line 25.

25       A    (Indicating.)



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              126

1      Q    So what happened was you saw Aaron Jackson get shot

2    and fall by the side of the car; correct?

3      A    (Indicating.)

4      Q    Yes?

5      A    Yes.

6      Q    And you were at the back of the car; correct?

7      A    Yes.

8      Q    Ducking?

9      A    Yes.

10     Q    And then, if you take a look at Page 156 of the trial

11   (indicating)?

12     A    (Indicating.)

13     Q    Look at Lines 17, on Page 156, to Line 25.

14     A    (Indicating.)

15     Q    So after the bullet stop, you got up and you saw

16   Aaron lying in the spot where he had fallen, before -- when he

17   was shot; correct?

18     A    Yeah.

19     Q    He was too injured to move?

20     A    (Indicating.)

21     Q    Yes?

22     A    Yes.

23     Q    And you had to move him behind the car --

24     A    Behind the car, yes.

25     Q    -- because he wasn't able to move?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              127

```
 1        A    Correct.

 2        Q    So, in other words -- to -- to your knowledge, from

 3   the time that he was shot, until the shooting stopped, he

 4   remained on the ground, where he had been shot?

 5             MR. BLENK:  Form.

 6             THE WITNESS:  No.  He stumbled, after he got shot,

 7        and got up and tried to make to the car to get into the

 8        car, it seemed; and that's when he fell by the car.

 9   BY MR. BRUSTIN:

10        Q    Okay.  So, he never made it to the car?

11        A    He made it to the car, but he never made it in the

12   car.

13        Q    Okay.  He fell next to the car?

14        A    Yes.

15        Q    He was up for a few seconds and then fell?

16        A    (Indicating.)

17        Q    Yes?

18        A    Yes.

19        Q    And that's when you helped him?

20        A    Behind the car.

21        Q    Behind the car.  And, to your knowledge, he didn't

22   move, until the ambulance took him?

23             MR. BRUSTIN:  Form.

24             THE WITNESS:  Yes.

25   BY MR. BRUSTIN:
```



1    Q    Okay.  I want to go back, for a minute, about your

2    opportunity you -- you mentioned your opportunity to see the

3    shooting?

4    A    (Indicating.)

5    Q    You mentioned that, at the time of the shooting, you

6    were standing wit those girls by their car; correct?

7    A    No.

8         MR. BLENK:  Form.

9         MR. RUSS:  Object to form.

10        THE WITNESS:  By the time that happened, I was done

11        -- I was done talking to the females, you know, because it

12        was about to happen.

13   BY MR. BRUSTIN:

14   Q    How far away were you from them?

15   A    From who?

16   Q    The females, when the shooting started?

17   A    It's a -- it's a small parking lot --

18        MR. BLENK:  Form.

19        THE WITNESS:  -- so it's not far.  So, they may have

20        been where the door is maybe (indicating).  I'm not sure.

21   BY MR. BRUSTIN:

22   Q    Okay.

23   A    Probably, at least that far.

24   Q    And once the shooting started, you jumped behind the

25   car; is that right?



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                129

1        A    Yeah, I ran and jumped behind the car.

2        Q    Okay.  At what point were you able to see the

3    shooter?

4        A    As soon as it happened.  I was standing at middle

5    barrier, when it all went down.

6        Q    And how far -- how far away were you, approximately?

7        A    From?

8        Q    The shooter?

9        A    Maybe, the wall (indicating).

10       Q    So, 20 -- 20- 30-feet?

11            MR. BLENK:  Form.

12            THE WITNESS:  If that's 20 feet, yeah.

13            MR. BRUSTIN:  Okay?

14            THE VIDEOGRAPHER:  And just to note, we can't see in

15       the video how far the wall is; for the record.

16   BY MR. BRUSTIN:

17       Q    And so --?

18       A    Two car lengths.

19       Q    Okay.  And, certainly, close enough to describe what

20   that person was wearing; correct?

21       A    Yeah.

22       Q    And what the -- and what the persons build was like;

23   correct?

24       A    Yeah.  Remember, I told you about the clothes.  So,

25   the description may be -- well, go back and look at a Hip Hop



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              130

1   video from 1991.  You can't tell me the actual size of the

2   people; that's how they wore clothes.  It's not if I can look

3   at you and the clothes you're wearing now and see your

4   physique.  It may have been that.

5       Q    (Indicating.)

6       A    So, you know, that maybe why I said, he may have been

7   heavyset, you know?

8       Q    So it may -- it may have been the reason -- the

9   reason you say he was heavy set, because the cut-off shorts --

10      A    The baggy --

11      Q    Let me -- let me -- the cut-off shorts?

12      A    -- baggy clothes is the reason.  You keep --

13      Q    Hold on a second.  Let me -- let me finish the

14  question.  The shorts and the T-shirt he was wearing may have

15  been baggy; correct?

16      A    Correct.

17      Q    Okay.  And you would agree that you don't ever

18  remember describing the clothes as being baggy?

19      A    No one asked me.

20          MR. RUSS:  Objection to form.

21          MR. BLENK:  Form.

22  BY MR. BRUSTIN:

23      Q    Okay.  But, by the way, have you ever talked Aaron

24  Jackson about the fact that the reason you may have said he was

25  heavyset, was because of baggy clothes?



1    A    No --

2         MR. RUSS:  Objection to form.

3         THE WITNESS:  -- I never talked to anyone about the

4    reason why I describe him that way.

5    Q    Okay.

6         MR. BRUSTIN:  Well, let's do this, let's take a five

7    minute break.  I'm pretty close to done.  Let's just take

8    five minutes.

9         THE VIDEOGRAPHER:  We are going off the record at

10   2:16 p.m.

11        (Whereupon, a brief break was taken.)

12        THE VIDOEGRAPHER:  We are going back on the record at

13   2:28 p.m.

14        MR. BRUSTIN:  Actually, I probably should check.  Is

15   someone there from each side?  James, are you there?

16   Hugh?

17        MR. BLENK:  Yes.

18        MR. RUSS:  Yes.

19        MR. BRUSTIN:  Okay.  Great.

20   BY MR. BRUSTIN:

21   Q    So, what I want you to do now, I want you to take a

22   look, first, at the transcript on page, so it's the third tab

23   and look at Page 22.  Third tab, there you go and Page 22,

24   right-hand numbers, top -- numbers on the right-hand side,

25   right-hand top Okay.  And what I want you to do is I want you



EMIL TOUSSAINT ADAMS                              January 17, 2023
DIXON V CITY OF BUFFALO                                        132

```
 1  to read from new Line 4 on Page 22 to Line 2 on Page 23; okay?

 2      A    Okay?

 3      Q    Did you read all the way -- all the way to Line 2 on

 4  Page 23?

 5      A    (Indicating.)

 6      Q    Yes?

 7      A    Yes.

 8      Q    And go to play the part of the tape in just a minute.

 9  But do you remember telling this to Valentino Dixon's father?

10      A    No.

11      Q    Okay.  Do you remember --

12           MR. RUSS:  Objection to form.

13           MR. BRUSTIN:  -- do you remember telling Valentino

14      Dixon's father, for example, that you left -- you left

15      Michigan, because you had to watch your back?

16           MR. BLENK:  Form.

17           THE WITNESS:  No.

18  BY MR. BRUSTIN:

19      Q    Do you remember telling him that (reading),  "every

20  time it down here every time I turned around, I got to look

21  over my back now."  Do you remember telling him that?

22      A    No.

23           MR. BLENK:  Form.

24  BY MR. BRUSTIN:

25      Q    Do you deny telling him that?
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              133

```
 1        A    I don't recall it, so, yeah.
 2        Q    And do you remember saying Mr. Dixon's girlfriend and
 3   court?
 4        A    No.
 5        Q    Do you remember expressing any remorse to Valentino
 6   Dixon's dad about your role in his son being convicted?
 7        A    I may have said that I feel bad for him.  You know,
 8   nobody won on -- on either side.
 9        Q    But never -- you never said to him anything like, I
10   know your son didn't do it?
11        A    No.
12        Q    Okay.  If -- if that must have been somebody else and
13   he spoke to and it wasn't you?
14        A    I don't know.
15             MR. BLENK:  Form.
16             MR. RUSS:  Object to form.
17             MR. BRUSTIN:  Okay.  Are you ready to play this, Mo?
18             MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, I'm
19        all set.
20             MR. BRUSTIN:  So give me -- I want you to give me the
21        timestamp -- the time number, please, of where we're
22        starting and where we've stopped.  Just (crosstalk) --
23             MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  -- yeah,
24        (crosstalk) --
25             MR. BRUSTIN:  -- I'm sorry.  Just do it where we
```



EMIL TOUSSAINT ADAMS                                              January 17, 2023
DIXON V CITY OF BUFFALO                                                         134

1        start and I'll tell you when to stop.

2              MR. BLENK:  What time is it?

3              MR. BRUSTIN:  It's two --

4              MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  It's

5        2618.

6              MR. BLENK:  Thank you.

7              MR. BRUSTIN:  Okay. go ahead and play it.

8              (Whereupon, Plaintiff's Exhibit No. 24 audio

9        recording was played from 2618 [00hrs:26mins:18secs].)

10   BY MR. BRUSTIN:

11       Q    Can you follow along with page (indicating)?

12             MR. BRUSTIN:  Stop.  Stop.  Mo?  Mo, can you stop it,

13       please?  Guys?  Mo, can we stop it and start it, again,

14       please?

15             (Whereupon, the audio was paused.)

16             THE WITNESS:  Where am I starting from?

17             MR. BRUSTIN:  Can you hear me?

18             MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yes, I

19       can hear you.

20             MR. BRUSTIN:  Let's go ahead and start it, again.

21   BY MR. BRUSTIN:

22       Q    And I want you to start at Line 3 and read it with it

23   (indicating).

24             MR. BRUSTIN:  Okay.  Go ahead.

25             (Whereupon, Plaintiff's Exhibit No. 24 audio



EMIL TOUSSAINT ADAMS                               January 17, 2023
DIXON V CITY OF BUFFALO                                         135

```
 1        recording was played, again, from 2618
 2        [00hrs:26mins:18secs].)
 3             MR. BRUSTIN:  Okay.  You can stop it now, Mo.
 4             MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Okay.
 5        Stopping it 2733.
 6   BY MR. BRUSTIN:
 7        Q    Okay.  And if he recognize that is you speaking on
 8   the tape; correct?
 9        A    If you say so, but I didn't have to watch my back.
10        Q    Okay.  But you recognize that you speak you; right?
11   That's your voice?
12             MR. RUSS:  Objection to form.
13             MR. BLENK:  Form.
14             THE WITNESS:  No, I can't say that's me.
15   BY MR. BRUSTIN:
16        Q    Okay.  So you think that's someone else --
17        A    Do that sound like me to you?
18        Q    -- so you think that's someone else, not you?
19        A    It could be, yeah.  It could be anybody you don't
20   sound like me.
21        Q    Do you deny -- do you deny saying those words --
22        A    Yes.
23        Q    -- to Mr. Bryant?
24        A    Yes.
25        Q    That's not you?
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              136

1      A    I deny saying those words.  I told you, I don't --

2   that tape, it doesn't sound like me.

3      Q    Okay?

4      A    It doesn't sound like anything that I would say.

5   What am I watching my back in Michigan about?

6      Q    Okay.  So just to be clear, you deny that that's you

7   on the tape?

8      A    Yeah.

9      Q    Okay.  Last thing.

10          MR. BRUSTIN:  Mo, do you know on Page 9, where that

11      starts?  Somewhere around 1130, Line 14?

12          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, let

13      me look for it.

14   BY MR. BRUSTIN:

15      Q    So while he's looking, can you take a look,

16   Mr. Adams, at Page 9 of the same transcript.  If you could read

17   to yourself Page 9, Line 14 to Page 10, Line 6.

18      A    You said read this page to this page to Line 6

19   (indicating)?

20      Q    Yeah.  You know what, read all the way through --

21   sorry -- all the way through to line -- to the bottom of

22   page -- of Page 10.

23          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  And Page

24      line -- Page 9 to Line 14, you said, until when?

25          MR. BRUSTIN:  To Page 10, Line 25.



1          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  I'm ready

2     whenever.

3          MR. BRUSTIN:  No, I just want him to read it.  I'll

4     let you know.  Thanks.  Thanks, Mo.

5          THE WITNESS:  Okay.

6  BY MR. BRUSTIN:

7     Q   Now, I want him to play this and I want you to read

8  it, again, with the -- with the -- listening -- I want you to

9  read it listening to the tape.

10          MR. BRUSTIN:  Okay.  Go ahead and play, Mo.  Give the

11     time, please?

12          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah,

13     it's starting at 1150.  And then, what line did you want

14     to stop at, again?

15          MR. BRUSTIN:  I'll tell you when to stop?

16          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Okay.

17          MR. BRUSTIN:  And then, you can announce what the

18     time is.  Thanks.

19          (Whereupon, Plaintiff's Exhibit No. 24 audio

20     recording was played, again, from 1150

21     [00hrs:11mins:50secs].)

22          MR. BRUSTIN:  Mo, you can't stop now, Mo.

23          (Whereupon, the audio was stopped.

24  BY MR. BRUSTIN:

25     Q   So, first of all, do you remember the police coming



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                              138

1   to your house, as you just -- as described here on the tape, in

2   Michigan?

3            MR. RUSS:  Objection to form.

4            THE WITNESS:  No.

5   BY MR. BRUSTIN:

6       Q    Do you remember spending the night until, as a result

7   of not showing up to testify, as you -- as described here on

8   the tape?

9       A    No.

10           MR. BLENK:  Form.

11           THE WITNESS:  I never spent the night in jail.

12  BY MR. BRUSTIN:

13      Q    Did you spend any time in jail as a result of not?

14      A    When I came and turn myself in for the warrant they

15  said I had.  But I was immediately released.

16      Q    Okay.  And that's what you're describing here; right?

17      A    Okay, if you're telling me --

18           MR. BLENK:  Form.

19           THE WITNESS:  -- that I spent the night or that I

20      turn myself in, I sat office and I was never in a jail

21      cell.

22      Q    Well, what you said here -- I'm sorry -- what you

23  said here is they said you want to turn yourself in, if you're

24  just 16.  Is that something you said?

25           MR. BLENK:  Form.



1              MR. RUSS:  Objection to form.

2    BY MR. BRUSTIN:

3         Q    Is that true?

4         A    I don't even recall that.  But.

5         Q    Do you remember calling your mother and telling her

6    to come up for a couple of weeks.  You need to show up for

7    court and there was a warrant in the mailbox?

8         A    I was living with my mother.

9         Q    Okay.  So that's true, you did do that?

10        A    No.

11             MR. BLENK:  Form.

12             THE WITNESS:  I can't call my mother, if I'm living

13        with my mother.

14             MR. RUSS:  Objection to form.

15   BY MR. BRUSTIN:

16        Q    Okay.  Was there a warrant in your mailbox?

17        A    Again, I don't check the mail.  My mother, gets the

18   mail.

19        Q    It say here (reading) "I was in jail for that

20   morning, and they let me right out, because they won't charge."

21   Is that true, were you in jail for the morning?

22        A    I was held in an office.

23             MR. RUSS:  Objection to form.

24             THE WITNESS:  I was never in a jail cell, take my

25        shoes, all this other stuff that comes with it.  No, they



EMIL TOUSSAINT ADAMS                               January 17, 2023
DIXON V CITY OF BUFFALO                                        140

```
 1        help me to see if I had a -- if they were going to press
 2        charges or whatever and they let me right out.
 3   BY MR. BRUSTIN:
 4        Q    Okay?
 5        A    Right away.
 6        Q    So this is you describing that in this tape; right?
 7        A    If you say so.
 8             MR. BLENK:  Form.
 9             MR. RUSS:  Objection to form.
10             THE WITNESS:  But, like I said, I don't recall any of
11        that.
12   BY MR. BRUSTIN:
13        Q    Do you deny -- do you deny that what you just heard
14   on the tape your reading in this transcript, is you?
15             MR. BLENK:  Form.
16             MR. RUSS:  Objection to form.
17             THE WITNESS:  Well, I -- I don't remember anything
18        tape recording of me and me saying these things.
19   BY MR. BRUSTIN:
20        Q    I know you don't remember saying any of these things
21   on tape.  But do you deny that -- you've already told us that
22   much of this -- withdrawn.  You've already told us to some of
23   this is true.  You did turn yourself in and you were at the
24   jail for the morning; correct?
25        A    Well, that's public knowledge that I turn myself in
```



```
 1   for a warrant.

 2           MR. BLENK:  Form.

 3           MR. RUSS:  Objection to form.

 4   BY MR. BRUSTIN:

 5       Q    Is the conversation that's described at the bottom of

 6   Page 10, a conversation that you had with Belling?

 7       A    I don't remember.

 8           MR. RUSS:  Objection to form.

 9   BY MR. BRUSTIN:

10       Q    Do you remember the police ever coming to the house

11   in Michigan and you answering the door?

12       A    No.

13           MR. BRUSTIN:  Okay.  I think that's all I have right

14       now.  I may have some other questions after these lawyers

15       ask you questions.  Who's up?

16           MR. RUSS:  My turn, I guess?

17           MR. BRUSTIN:  Yeah.

18                       CROSS-EXAMINATION

19   BY MR. RUSS:

20       Q    Mr. Adams, I know that we introduced ourselves, sort

21   of, earlier on this morning, but my name is Hugh Russ.  And I

22   represent the city of Buffalo, Buffalo Police Department, and

23   various police officers in this case.  I just have a few

24   questions for you.  I'm not going to try to go for everything

25   that you were asked, I just want to fill in a couple of holes;
```



1  okay?

2      A    Yes, sir.

3      Q    We spent a fair time, this morning and this

4  afternoon, talking about this tape and listening to the tape

5  and looking at the transcript from the tape.  Do you recall

6  those questions?

7      A    Yes.

8      Q    Did you know you were being taped?

9      A    No.

10     Q    Did they ever tell you that they were going to tape

11 you?

12     A    No, sir.

13     Q    Did they ever ask your permission?

14     A    No, sir.

15     Q    You were asked some questions about whether you were

16 sure that Valentino Dixon was a shooter; do you remember those

17 questions?

18     A    Yes.

19     Q    As you sit here today, 30 plus years later, are you

20 still sure that Valentino Dixon was the shooter?

21     A    Yes.

22     Q    You were asked a number of questions about how you

23 knew and if you knew Valentino Dixon; do you remember some of

24 those?

25     A    Yes.



EMIL TOUSSAINT ADAMS                                           January 17, 2023
DIXON V CITY OF BUFFALO                                                     143

1      Q    Did you know him to be a drug dealer?

2      A    No.  Like I said, I was living at Michigan at the

3   time.  So any -- any person that you would ask me about there

4   day to day and what they do, I wouldn't know.  Because I was

5   living in Michigan and in high school and at my parents home.

6   So, I didn't have time to know what these gentlemen were doing

7   or into.

8      Q    Okay.  Thank you.  Did anyone, whether from the

9   Buffalo Police Department or the District Attorney's Office,

10  ever force you to testify?

11     A    No, sir.

12     Q    Did they ever tell you what you should say?

13     A    No, sir.

14     Q    Did they ever threaten you?

15     A    No, sir.

16     Q    On the night of the shooting, you said you were

17  behind a metal barrier.  Is that just like a bumper in a

18  parking lot?

19     A    Yeah.

20     Q    It's not a fence; is it?

21     A    No, it's like the metal guard rails that be along the

22  Expressway or something like that -- that was in the parking

23  lot.

24     Q    So you could see the intersection?

25     A    I was standing at it, at the barrier, literally.



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                144

1            MR. RUSS:  That's all I have.  Thank you.

2                       CROSS-EXAMINATION

3   BY MR. BLENK:

4       Q    Hi, Mr. Adams.  My name is J.P. Blenk.  I think I

5   mentioned that earlier, but thank you for being here today.  I

6   represent Erie County and Christopher Belling in this case.

7   Just like Mr. Ross, just one or two clean up questions to

8   clarify your prior testimony; okay?

9       A    Yes.

10      Q    You testified earlier about interaction with the

11  investigator named Mr. Dill from the Erie County District

12  Attorney's Office.  Do you remember that?

13      A    Yes.

14      Q    And there was what -- what we've marked as Exhibit 29

15  was placed in front of you?

16      A    (Indicating.)  Yes.

17      Q    Do you still have access to Exhibit 29 there?

18      A    No.  Is this it hear (indicating)?

19           MR. BRUSTIN:  Hold on.  I'll give it to him.  The

20      Dill Affidavit, is that what you want?

21           MR. BLENK:  Yes.

22           MR. BRUSTIN:  Here you go (handing).  He's got it.

23  BY MR. BLENK:

24      Q    How many pages is that document?

25      A    Two.



1          MR. BRUSTIN:  It's three, actually it is four pages.

2          THE WITNESS:  Oh, back?

3          MR. BRUSTIN:  It's four pages back and front.  It's

4      four pages back and front.

5   BY MR. BLENK:

6      Q    Did you -- did you see I'm talking numbers here, I'm

7   talking about the number in the bottom right corner

8   (indicating).  Did you see the page that's marked [Dixon

9   005976]?  It's probably the last page?

10          (Whereupon, Plaintiff's Exhibit No. 2 was reviewed.)

11      A    Yeah.

12      Q    Had you been given the opportunity to review that,

13   before answering questions?  Did you -- did you review that

14   portion of the document, before answering about your

15   interactions with Mr. Dill?

16      A    Today, you mean?

17      Q    Yes?

18      A    No, this is my first time ever seeing the back of

19   this.

20      Q    Is that your signature at the bottom of that page?

21      A    The first -- the first name, yeah, but the last name

22   is kind of sketchy.  But you could say, yeah.  Yeah, I might

23   have bad handwriting right there, yeah.

24      Q    But you -- you would have signed the first name --

25      A    Yeah.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              146

```
1      Q    -- so you can infer from that day, you must have
2   signed the whole name?
3      A    (Indicating.)
4      Q    Okay.
5           MR. BRUSTIN:  Objection to form.
6           MR. BLENK:  I don't have any further questions.
7           MR. BRUSTIN:  So, I just have a few followup.
8                       REDIRECT EXAMINATION
9   BY MR. BRUSTIN:
10     Q    So, let's start with this document, 5976.  So, first
11  of all, is this your handwriting in the body of this document?
12  (Reading), "I was shown an affidavit by Investigator Dill;" is
13  that your handwriting?
14     A    Yeah.
15     Q    It is.  Okay.  And, does this refresh your -- okay.
16  So -- so, this was in 2005, much closer in time to when
17  Mr. Putnam said he met with you; correct?
18     A    I guess.  See, I don't remember.  Like I said, you're
19  asking me things from 17 years.  That's a long time.
20     Q    I understand. (Crosstalk.)
21     A    Seven months ago is a long time, let alone 17 years.
22     Q    But that's what I'm getting at; this is 2005.  And in
23  2005, you're claiming that Roger Putnam lied, when he said he
24  even met with you; right?
25     A    No, I said I don't recall.
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              147

1      Q    Well, that's not what you wrote here.  You said

2    (reading), "I do not know a Roger Putnam."

3      A    I don't know Roger Putnam.

4      Q    "I never talked to Roger Putnam."

5      A    How -- how would I know him or remember talking to

6    him, if I don't remember talking to him.

7      Q    Right.  So, you're saying you never talked to him;

8    correct?

9      A    I said I don't remember.

10     Q    Well, no.  Here you write, "I never talked to him."

11   Not that you don't remember what I'm trying to get that is, is

12   if Roger Putnam come to the court and testifies that he met

13   with you seven times --

14     A    (Indicating.)

15     Q    -- you're telling me -- about this case, you're

16   telling me he's lying; right?

17     A    I do not remember a gentleman coming into Uncle

18   Johnny's to talk to me.

19     Q    Okay.  But you're not saying that didn't happen, now,

20   you're just saying you don't remember.  Is that what you're

21   telling me?

22          MR. BLENK:  Form.

23          THE WITNESS:  What did you get out of that?

24   BY MR. BRUSTIN:

25     Q    It's two different things.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              148

1       A    It's one thing I said, and one thing only.  I told
2  you I do not recall talking to this man.

3       Q    Is it possible --?

4       A    You keep trying to ask the question a different way
5  --

6       Q    Nope.

7       A    -- and I am telling you the same answer.  I don't
8  recall a gentleman coming to Uncle Johnny's to talk to me about
9  whatever -- about this here.  Now, could it have happened?
10 Yeah.  But, do I remember that it happened?  No.

11      Q    Okay.  So, it is possible that, in fact, Roger Putnam
12 came and talk to you inside uncle Johnny's --

13      A    It's possible.

14      Q    You just don't remember today?

15      A    It's possible.

16           MR. BLENK:  Form.

17      Q    Okay.  Now, another thing you were asked questions
18 from Mr. Russ about whether or not you are certain, today, that
19 Valentino Dixon was a shooter and you said you were?

20      A    And who was I talking to?

21      Q    Mr. Ross.  One of the attorneys -- the first attorney
22 that was questioning you after me.

23      A    Okay?

24      Q    And you told him that you're certain -- as certain
25 today as you were then that Valentino Dixon was the shooter;



1    correct?

2        A    Yeah.

3        Q    And you also deny ever telling anybody in the world

4    that Valentino Dixon was not the shooter; correct?

5        A    Correct.

6        Q    And you deny telling anyone in the world that you

7    were threatened to say that Valentino Dixon was a shooter;

8    correct?

9        A    Correct.

10       Q    In fact, your answer today that you never told

11   anybody that you -- that Valentino Dixon was not the shooter,

12   as you are that you saw him doing the shooting; correct?

13       A    Correct.

14            MR. BLENK:  Form.

15   BY MR. BRUSTIN:

16       Q    And anybody who says that you told them that

17   Valentino Dixon was not the shooter, is lying, or mistaken

18   correct?

19       A    Correct.

20            MR. BLENK:  Form.

21            MR. RUSS:  Objection to form.

22   BY MR. BRUSTIN:

23       Q    And anybody that says the words that came out of your

24   mouth that you were threatened by the DA or the police, is

25   lying or mistaken; correct?



EMIL TOUSSAINT ADAMS                                     January 17, 2023
DIXON V CITY OF BUFFALO                                              150

1        A    Correct.

2             MR. BLENK:  Form.

3    BY MR. BRUSTIN:

4        Q    And you are as certain about that, as you are that

5    Valentino Dixon was the shooter?

6        A    Correct.

7             MR. BLENK:  Form.

8    BY MR. BRUSTIN:

9        Q    You never told anybody that you knew Lamar Scott was

10   the shooter; correct?

11       A    Never.

12       Q    Not Tamara Freida?

13       A    No one.

14       Q    And you never told anybody that you where never sure

15   that Valentino Dixon was the shooter; correct?

16       A    Correct.

17            MR. BLENK:  Form.

18   BY MR. BRUSTIN:

19       Q    Not Tamara Freida?

20       A    No one.

21       Q    Not Roger Putnam?

22       A    I said no one.

23       Q    Not Valentino Dixon's mother or father?  Please

24   answer.

25            MR. BLENK:  Form.



EMIL TOUSSAINT ADAMS                                              January 17, 2023
DIXON V CITY OF BUFFALO                                                        151

```
1              THE WITNESS:  No one.

2      Q    Now, you -- I think I heard you say earlier today

3  that you deny that anybody on behalf of Mr. Dixon ever served

4  you with a subpoena for a deposition or a notice for you to

5  appear in court at your home; correct?

6      A    Correct.

7              MR. BLENK:  Form.

8              MR. RUSS:  Objection to form.

9              THE WITNESS:  No one gave me papers. him.

10 BY MR. BRUSTIN:

11     Q    Okay.  Now, where do you live?

12     A    They had gave me -- my wife told me they left a paper

13 outside the house.

14     Q    Okay.  Is it your testimony that your wife never

15 opened the door and never spoke to any investigator that we

16 hired?

17     A    I never asked her.

18             MR. BLENK:  Form.

19 BY MR. BRUSTIN:

20     Q    In fact, what -- I don't -- what's your address?

21     A    3321 Beulah Ridge Court.

22     Q    Do you live with your wife?

23     A    Yes.

24     Q    Okay.  And do you deny on multiple occasions you were

25 served at your home, your wife was handed a given a subpoena on
```



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                              152

```
 1  multiple occasions for you to testify in a deposition?

 2      A    I don't know --

 3           MR. BLENK:  Form.

 4           THE WITNESS:  -- what's handed to my wife, when I'm

 5      not home.

 6  BY MR. BRUSTIN:

 7      Q    Okay.  And you also received a notice that you were

 8  being -- that you were facing possible contempt charges in

 9  court; correct?

10      A    No.

11      Q    You never saw that?

12           MR. BLENK:  Form.

13           THE WITNESS:  The only thing I knew about a content

14      was with the judge called me and said that I had two weeks

15      and he is going to start finding me 250 bucks a day, the

16      400 bucks a day --

17  BY MR. BRUSTIN:

18      Q    Okay?

19      A    -- and jail, if I don't.

20      Q    In fact, there were many -- a number times --

21           MR. RUSS:  What's the relevance -- what's the

22      relevance of this whole line of questioning?

23           MR. BRUSTIN:  It goes to state of mind, but I don't

24      need to show you relevance.  But I -- I -- but that's the

25      point.
```



EMIL TOUSSAINT ADAMS                                          January 17, 2023
DIXON V CITY OF BUFFALO                                                    153

```
 1              MR. RUSS:  State of mind, as he sits here today?
 2              MR. BRUSTIN:  Yes, his credibility.
 3    BY MR. BRUSTIN:
 4        Q    And, in fact, you spoke to him in the phone number
 5    times; correct?
 6        A    (Indicating.)
 7        Q    At each time you told me a substance, that I could do
 8    whatever I wanted to do, but you weren't coming to testify;
 9    correct?
10        A    Correct.
11              MR. RUSS:  Objection to form.
12    BY MR. RUSS:
13        Q    Now, you told me in substance, that I can have you
14    arrested, I could fine you, but you're never showing up; right
15    him?
16              MR. RUSS:  Objection to form.
17              THE WITNESS:  I didn't think that you could.
18    BY MR. BRUSTIN:
19        Q    All right.  And then, I texted you a number times,
20    you didn't respond; correct?
21        A    Yeah, I guess that was your number.
22        Q    And I texted you -- well, you know it was my number,
23    because you spoke to you on the phone; right?
24        A    I don't have your number in my phone.
25        Q    Well --
```



EMIL TOUSSAINT ADAMS                                      January 17, 2023
DIXON V CITY OF BUFFALO                                                154

1       A    Without looking at them papers, tell me my phone

2  number.  You texted me, you called me, tell me my phone number.

3       Q    Do you remember when I texted you from the courtroom?

4       A    See what I mean, you don't know my phone number?

5       Q    I don't.

6       A    But you want me to know yours.

7       Q    I don't.

8       A    But you expect me to know yours?

9       Q    I'm not asking to know what the numbers -- what the

10  digits were.  You knew that when you looked at the phone, that

11  it came from me in New York; correct?

12       A    Correct.

13       Q    All right.  And when I -- and when I -- I didn't ask

14  if you memorized the digits.  When I --

15       A    But you said I knew your number.

16       Q    You knew it was from me, the lawyer in New York City;

17  right?

18       A    Okay?

19       Q    And when I texted you, in court, because you didn't

20  want to pick up the phone, and I texted you that I was sitting

21  in the courtroom and the judge wanted to talk to you, finally

22  you picked up the phone; right?

23       A    No, you called me.

24       Q    The judge called you; right?

25       A    Right.  I didn't respond to any text or whatever it



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              155

1  was.  I called -- you called me with a guy saying he was a

2  judge.  I didn't believe that.  But was you started telling me

3  he was this judge and I can get find and blah, blah, blah and

4  jail.

5            I contacted my lawyer, because he gave you two

6  weeks -- that he was going to give me two weeks.  And after the

7  two weeks, he was going to start fining me, every day.  And

8  then, after that it was going to be jail time.  So I contacted

9  my lawyer.  In about five days later, he got in contact with

10  you, after that phone call.

11       Q    So he is a question for you, why -- you already told

12  us that the Jackson Brothers are good friend of yours; correct?

13       A    (Indicating.)

14       Q    And you wanted to help them any way you could; right?

15            MR. BLENK:

16            THE WITNESS:  No, not them in any way, you know, that

17       I can.  It was not about them.

18  BY MR. BRUSTIN:

19       Q    And so, you said you've always told the truth at

20  trial?

21       A    Correct.

22       Q    You always came voluntarily?

23       A    Correct.

24       Q    And you've told the truth, today, according to you?

25       A    Correct.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                            156

1      Q    So why do we have to get a court order and threatened

2    you with arrest to get you to come here testify?

3           MR. BLENK:  Form.

4           MR. RUSS:  Objection to form.

5           THE WITNESS:  One, I did not know what this is about.

6       In the grand scheme of things, I thought that the guy

7       Valentino Dixon was trying to use me, somehow or way to

8       help them get money from the State.  So that's what I told

9       you, specifically on the phone, I do remember our call

10      from a couple weeks ago; okay.  He found a loophole.  God

11      bless him.  He should be happy with his freedom.  But to

12      help them in any shape form or fashion to get money for

13      what he did, is absolutely ridiculous.  And I won't help

14      him.

15      Q    Right.  But you told us all -- all you ever intended

16    to say was that he was a shooter; correct?

17      A    No, I did not say, all that I intended to say him.

18      Q    But you're --?

19      A    I intended to tell the truth.  I didn't intend to say

20    anything specific to just -- killed this guy.  If he's getting

21    money out of the State, then God bless him, he gets money.  He

22    found a loophole out of the damn jail cell, God bless him.  He

23    did it --

24      Q    So --

25      A    -- so.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              157

1      Q    -- and you never -- you never had, just to -- just to

2   close the loop.  You never any communications with Aaron

3   Jackson or anybody else about statements that you had me in the

4   past suggested that Valentino Dixon was not t]he shooter?

5      A    Correct.

6           MR. BLENK:  Form.

7   BY MR. BRUSTIN:

8      Q    And that had nothing to do with your reluctance to

9   testify here, today?

10     A    No.

11          MR. BRUSTIN:  Okay.  That's all I have.

12          THE VIDEOGRAPHER:  Anything further from other

13     counsel?

14          MR. BLENK:  No.

15          THE VIDEOGRAPHER:  We are going to present.  Wait --

16     staying on the record.

17          MR. BRUSTIN:  You have the option if you want.  You

18     can -- you can look at the transcript and read it to make

19     sure it's accurate, if you want to.

20          THE WITNESS:  I don't want to keep reliving that.

21          MR. BRUSTIN:  Okay.  Do you want a copy of it?

22          THE WITNESS:  No.

23          MR. BRUSTIN:  Okay.  Then you're done.  Thank you.

24     We're done.

25          THE VIDEOGRAPHER:  We're going off the record at 3:02



1  p.m.  This includes today's testimony of the Emil

2  Toussaint Adams.

3        (Pursuant to Rule 30(e) of the Federal Rules of Civil

4  Procedure and/or O.C.G.A. 9-11-30(e), signature of the

5  witness has been waived.)

6        (Whereupon the deposition concluded at 3:02 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    DISCLOSURE OF NO CONTRACT

 2

 3          Pursuant to Article 8.B of the Rules and Regulations

 4   of the Board of Court Reporting of the Judicial Council of

 5   Georgia which states: "Each court reporter shall tender a

 6   disclosure form at the time of the taking of the deposition

 7   stating the arrangements made for the reporting services of the

 8   certified  court reporter, by the certified court reporter, the

 9   court reporter's employer, or the referral source for the

10   deposition, with any party to the litigation,counsel to the

11   parties or other entity.  Such form shall be attached to the

12   deposition transcript," I make the following disclosure:

13   I am a certified Georgia Certified Court Reporter.  I am here

14   as a representative of Esquire Deposition Solutions.

15

16          Esquire Deposition Solutions was contacted to provide

17   court reporting services for the deposition.  Esquire

18   Deposition Solutions will not be taking this deposition under

19   any contract that is prohibited by O.C.G.A 15-13-37(a) and (b).

20   Esquire Deposition Solutions has no contract/agreement to

21   provide reporting services with any party to the case, any

22   counsel in the case, or any reporter or reporting agency from

23   whom a referral might have been made to cover this deposition.

24   Esquire Deposition Solutions will charge its usual and

25   customary rates to all parties to all parties in the case,and a
```



1  financial discount will not be given too any party to this

2  litigation.

3

4          This, the 17th day of January 2023.

5                                _Lisa Sims_____

6                                Lisa L. Sims

7                                Certified Court Reporter

8                                #5072-0730-2093-2096

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    C E R T I F I C A T E

2    STATE OF GEORGIA

3    COUNTY OF DEKALB

4

5        I hereby certify that the foregoing transcript was

6    reported, as stated in the caption, and the questions, and

7    answers thereto were reduced to typewriting under my direction;

8    that the foregoing pages represent a true, complete and correct

9    transcript of the evidence given upon said hearing, and I

10   further certify that I am not of kin or counsel to the parties

11   in the case; am not in the employ of counsel for any of said

12   parties; nor am I in any way interested in the result of said

13   case.

14                    This, the 17th day of January 2023.

15

16                    _____

17                    Lisa L. Sims

18                    Certified Court Reporter

19                    #5072-0730-2093-2096

20

21

22

23

24

25



```
 1                    DEPOSITION ERRATA SHEET

 2

 3   Our Assignment No. [J9079557]

 4   Case Caption: [VALENTINO DIXON V. CITY OF BUFFALO ET AL]

 5

 6             DECLARATION UNDER PENALTY OF PERJURY

 7

 8       I declare under penalty of perjury that I have read the

 9   entire transcript of my deposition taken in the above-captioned

10   matter or the same has been read to me, and the same is true

11   and accurate, save and except for changes and/or corrections,

12   if any, as indicated by me on the DEPOSITION ERRATA SHEET

13   hereof, with the understanding that I offer these changes as if

14   still under oath.

15

16   Signed on the _____ day of _____, 20___.

17   _____

18   [EMIL TOUSSAINT ADAMS]

19

20

21

22

23

24

25
```



1                   DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____ Reason for

5    change:_____ Page No._____Line

6    No._____Change to:_____

7    _____ Reason for

8    change:_____ Page No._____Line

9    No._____Change to:_____

10   _____ Reason for

11   change:_____ Page No._____Line

12   No._____Change to:_____

13   _____ Reason for

14   change:_____ Page No._____Line

15   No._____Change to:_____

16   _____ Reason for

17   change:_____ Page No._____Line

18   No._____Change to:_____

19   _____ Reason for

20   change:_____ Page No._____Line

21   No._____Change to:_____

22   _____ Reason for

23   change:_____

24   SIGNATURE:_____DATE:_____

25   [EMIL TOUSSAINT ADAMS]



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              164

```
 1                    DEPOSITION ERRATA SHEET

 2

 3     Page No._____Line No._____Change to:_____

 4     _____ Reason for

 5     change:_____ Page No._____Line

 6     No._____Change to:_____

 7     _____ Reason for

 8     change:_____ Page No._____Line

 9     No._____Change to:_____

10     _____ Reason for

11     change:_____ Page No._____Line

12     No._____Change to:_____

13     _____ Reason for

14     change:_____ Page No._____Line

15     No._____Change to:_____

16     _____ Reason for

17     change:_____ Page No._____Line

18     No._____Change to:_____

19     _____ Reason for

20     change:_____ Page No._____Line

21     No._____Change to:_____

22     _____ Reason for

23     change:_____

24     SIGNATURE:_____DATE:_____

25     [EMIL TOUSSAINT ADAMS]
```



Exhibits

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT1
 4:8

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT2
 4:9 65:22
 76:3,6
 111:5
 116:7
 145:10

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT5
 4:10
 84:8,11

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT23
 4:11
 15:12
 33:17
 35:23

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT24

4:13
15:22
18:7,12,24 22:15
23:5
24:16
27:7 31:3
49:20
51:3,21
134:8,25
137:19

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT25
 4:14
 53:22

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT26
 4:15
 60:25

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT27
 4:16

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT28
 4:18

9079557 Emil. Toussaint Adams PLAINTIFF. EXHIBIT29
 4:20,24
 101:18
 144:14,17

_____

(

(crosstalk)--
 25:13,15
(reading),"
and
 50:7

_____

-

--(
crosstalk)--
 19:23
--a
 88:19

_____

0

005976
 145:9
00hrs:
06mins:
21secs
 23:7
00hrs:
06mins:
31secs
 23:7

00hrs:
07mins:
34secs
 31:5
00hrs:
10mins:
57secs
 51:23
00hrs:
11mins:
35secs
 51:23
00hrs:
11mins:
50secs
 137:21
00hrs:
15mins:
13secs
 24:17
 27:8
00hrs:
15mins:
22secs
 24:18
 27:9
00hrs:
15mins:
40secs
 49:22
00hrs:
15mins:
52secs
 49:22
00hrs:
16mins:
04secs
 31:5
00hrs:
22mins:
56secs
 51:5

00hrs:
23mins:
08secs
 51:5
00hrs:
26mins:
18secs
 134:9
 135:2
00hrs:
5mins:
35secs
 19:7
 22:4,16

_____

1

1
 60:23
10
 12:23
 66:4,11
 109:9
 136:17,
 22,25
 141:6
100
 29:15
1057
 51:19,22
10:30
 6:11
10th
 61:19
 62:19,25
 63:5
 101:15
11
 22:19
 35:22
 41:16
 61:4



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 807 of 1202
APPENDIX 0805

EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: 1130..24

**1130**
  136:11

**1135**
  51:20,22

**1150**
  137:13,20

**11:04**
  5:9

**11:35**
  30:14,15

**11:40**
  30:17,18

**12**
  24:8,9
  25:3,4
  26:20
  27:5
  33:14
  35:11
  36:23
  38:1
  44:11,12
  49:18

**12:35**
  78:5,6

**13**
  25:3,4
  26:20
  27:5,6
  30:4,20
  33:2,14
  41:14,16
  49:18
  50:24,25
  125:23

**139**
  125:21

**14**
  24:9 25:3
  36:25
  37:2 38:1
  54:12

**106:10**
  136:11,
  17,24

**145**
  4:24

**1484**
  53:21

**15**
  12:23
  22:7,8
  37:2
  109:9

**1513**
  24:13
  27:1,4

**1522**
  24:13

**153**
  60:18
  61:3
  65:11,12

**154**
  124:4,5,
  6,9

**1540**
  49:19,21

**1552**
  27:4
  49:19,21

**156**
  126:10,13

**16**
  29:8,21
  30:4
  41:14
  138:24

**1604**
  31:1,4
  32:9

**1623**
  53:21

**162576**
  73:13,18
  74:16

**169**
  125:22

**17**
  5:2 37:2
  51:15
  63:18,22
  94:19
  103:8
  114:5
  115:3
  126:13
  146:19,21

**1734**
  31:2,4
  32:9

**1769**
  79:14

**1784**
  79:15

**17th**
  5:9

**18**
  87:11
  114:5
  116:15

**19**
  50:24
  106:10
  113:23

**199**
  125:23

**1990**
  29:12

**1991**
  10:15,16,
  18 29:19
  61:19
  79:1
  92:20

**114:2**
  130:1

**1992**
  60:24
  79:14
  84:9

**1993**
  10:22
  11:22
  14:5
  29:12

**1995**
  96:13

**1996**
  10:13

**19th**
  86:20

**1:09**
  78:8,9

—————————

          **2**

—————————

**2**
  16:1,4
  17:25
  65:22
  76:3,6
  111:3,5
  116:7
  132:1,3
  145:10

**20**
  6:12
  70:15
  113:19
  115:3
  129:10,12

**20-**
  129:10

**2000**
  96:22,23
  97:2,13

**98:8**

**2002**
  92:6
  94:24
  95:16

**2003**
  92:6
  94:25
  95:16

**2005**
  101:15,25
  102:13
  103:8
  146:16,
  22,23

**2022**
  86:20

**2023**
  5:2,9

**204**
  66:1

**205**
  66:1

**21**
  49:18
  54:12

**22**
  106:11,13
  131:23
  132:1

**2256**
  51:1,4

**23**
  15:11,12
  33:17
  35:23
  132:1,4

**2308**
  51:2,4

**24**
  15:21,22



18:7,12,
24 22:15
23:5
24:16
27:7 31:3
49:20
51:3,21
124:7,9,
12 134:8,
25 137:19

**25**
53:20,22
61:4
111:7
125:24
126:13
136:25

**250**
152:15

**26**
60:20,22,
25

**2618**
134:5,9
135:1

**27**
79:8,12,
16,17

**2733**
135:5

**28**
79:8,14,
17 83:18,
20

**29**
101:2,18
105:22
144:14,17

**2934**
84:8

**2:16**
131:10

**2:28**
131:13

---

**3**

---

**3**
19:2 22:8
25:4 27:5
65:13,15
134:22

**30**
40:12
46:15
47:8,14
49:13
67:14,25
70:1,5,6
75:12
78:2
103:6,7
142:19

**30(e)**
158:3

**30-feet**
129:10

**31**
70:9
116:6,7

**32**
70:5,6
76:4

**33**
87:6,10

**3321**
151:21

**3:02**
157:25
158:6

---

**4**

---

**4**

22:23
23:3
33:15,16
35:21,22
41:16
132:1

**400**
152:16

**47**
75:24
76:3,6

**484**
100:3

---

**5**

---

**5**
84:8,11
124:7,9,
12

**50**
114:1

**53**
88:13,20

**535**
19:7,10
22:4,16

**56**
92:5
94:19

**5973**
101:12

**5973-76**
4:24

**5974**
102:5

**5975**
101:13
102:5

**5976**

146:10

**5th**
79:13,14

---

**6**

---

**6**
70:16
136:17,18

**621**
22:25
23:6

**631**
23:1,6

**65**
21:8
48:10
49:1 84:9

**690**
60:23

**6:00**
112:16

**6th**
62:7

---

**7**

---

**7**
88:20

**7/11/2005**
4:24

**75**
53:16
54:3,11
59:5
63:14,15,
20

**79**
106:7,10

---

**8**

---

**8**
30:23
51:15

**80s**
71:14

**8th**
60:24

---

**9**

---

**9**
22:24
35:22
36:23
136:10,
16,17,24

**9-11-30(e)**
158:4

**92**
93:17

**93**
48:20
93:17

---

**A**

---

**a.m.**
5:9 6:11
30:14,15,
17,18

**Aaron**
54:21
55:6
56:18
57:15,18
78:12
103:19
123:4,10
124:23



126:1,16
130:23
157:2

Aaron's
103:19

absolutely
31:6
156:13

accept
37:23

access
144:17

accurate
157:19

accurately
25:5
26:20
36:22
110:12

actual
8:21
130:1

Adams
5:1,7,25
6:5,15
7:3,5,10
10:12
19:14
27:5 39:3
51:25
78:11
87:13,22
88:11,22
89:12
101:10
136:16
141:20
144:4
158:2

Adams's
53:20

addition

77:5

address
151:20

admit
28:13

affidavit
4:24
101:6,11,
13 102:4,
8 103:13
105:21
144:20
146:12

affiliation
5:10

afraid
11:8
40:2,3
41:5,6,8
91:7
100:5,12

afternoon
58:20,21
142:4

age
70:15
92:13

agree
73:9
130:17

agreed
100:2

ahead
14:24
22:13
27:6
134:7,20,
24 137:10

airport
103:25

alarming

40:25
41:9

alleged
6:4

allowed
36:17

altercations
30:3

ambulance
127:22

America
47:21

amount
112:21

and/or
158:4

announce
16:11
137:17

answering
83:3
141:11
145:13,14

answers
87:12

Antwon
10:23,25
13:10,11

Antwon's
61:12

anytime
29:11

apologize
10:16

appearance
5:22

appeared
71:1,6

approach
107:7

approached
107:8

approximately
50:25
94:22
96:22
97:2,12
125:2
129:6

array
75:16
76:10
102:12
103:4
111:18
113:5

arrest
6:22
83:21
156:2

arrested
6:20,25
29:8,11
80:23
104:11
105:14
123:11,13
153:14

assume
8:7

assuming
81:25

assure
5:25

Atlanta
5:24

attempted
34:12

attended
121:6

attorney
5:24 6:9,
15 66:5
148:21

Attorney's
96:11,19
101:14,24
143:9
144:12

attorneys
5:21 7:13
148:21

atty
33:17
35:23

audio
15:20
16:14,16
17:11
18:7,12,
24 21:5
22:16
23:5
24:16
27:2,7
28:8 31:3
33:9
37:17
49:20
51:3,21
134:8,15,
25
137:19,23

audiotape
77:5

August
61:19
62:19,24
63:5

automatically



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 810 of 1202

APPENDIX 0808

EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: Avenue..Blenk

43:13

**Avenue**
100:3

**Averick**
5:23

―――――――

**B**

―――――――

**back**
9:11
10:13,18
15:16
22:17,18,
22,23
28:11
30:16
35:11,21,
25 37:5,
6,9
41:14,16
44:11
55:25
57:19,23
59:4 62:7
63:14
65:24
66:23
67:9 78:7
79:1 86:9
88:9
92:9,24
93:8,10,
11,12,14,
15
105:16,
17,22
106:2
111:2
113:12
114:23
115:12
121:3
126:6
128:1
129:25

131:12
132:15,21
135:9
136:5
145:2,3,
4,18

**background**
18:10

**bad**
133:7
145:23

**baggy**
66:22
71:7,16
72:5
130:10,
12,15,18,
25

**bail**
22:20
25:7,17
26:8,9,11
28:2,9,
14,23
31:12,13,
14,16,17
32:21,22,
23 35:13,
15 37:18,
20,21
47:19,22
105:11

**Barbara**
11:24
13:8

**barrier**
129:5
143:17,25

**barriers**
115:22

**basketball**
123:17

**Bates**
16:13,16
53:21
60:23
79:13
101:12

**bathroom**
8:2

**began**
27:2

**beginning**
6:13
17:25
18:23,25
38:12
46:7
70:10

**begins**
5:6

**behalf**
151:3

**belabor**
94:20

**belief**
100:22,24

**Belling**
5:15
79:13,15
80:19,21
81:7
82:14
83:22
84:5
141:6
144:6

**Bernard**
116:15

**Beulah**
151:21

**big**
44:5
62:23

66:22

**Bill**
105:11

**binder**
14:13,14,
15 53:7

**black**
70:15,20

**blah**
68:25
155:3

**blame**
104:14

**Blenk**
5:14
10:15
13:22
15:7
16:13
17:7,17,
20,23
19:21
21:3
22:12
26:24
32:16
33:10
34:14
36:19
38:18,23
39:23
40:23
41:19
42:6
43:20
44:3,14
52:18
53:17
60:19
64:16
72:8 73:3
74:8
75:10
77:2,18

78:24
80:13,15
81:5,10
82:1
83:15
84:20
89:23
90:15
91:12
96:7,15
97:19
98:2
102:2,17
105:19,21
107:4,19,
24 108:12
110:1,23
115:20
116:2
117:7
118:21
119:4
120:8
121:14,20
122:8,21
123:8
125:9
127:5
128:8,18
129:11
130:21
131:17
132:16,23
133:15
134:2,6
135:13
138:10,
18,25
139:11
140:8,15
141:2
144:3,4,
21,23
145:5
146:6
147:22
148:16



149:14,20
150:2,7,
17,25
151:7,18
152:3,12
155:15
156:3
157:6,14

**bless**
156:11,
21,22

**blue**
12:7
70:18,20
71:8

**body**
146:11

**booked**
81:18

**bottom**
54:2
83:23
116:8
136:21
141:5
145:7,20

**BPD**
70:5 76:3

**break**
8:1 30:15
78:3,6
131:7,11

**brim**
70:20

**brother**
11:1
61:12
65:7,9
115:4,10

**brothers**
55:4 61:8
106:16

155:12

**brought**
33:20
36:16
41:17
87:8
107:10
109:5
111:11
112:23,24
113:12

**Brustin**
5:12,13
7:9,12
10:16,17
11:14
13:23
15:9,15,
17,19,24
16:7,16,
18,20,22,
25 17:5,
13,19,22,
24 18:2,
4,9,17,
20,22
19:1,4,6,
8,11,13,
24 21:6,
18,23,25
22:3,5,
13,17,21,
25 23:2,
8,17
24:12,14,
19 26:23
27:1,3,
10,15,20
29:6
30:11,19
31:1,7
32:18
33:12,17
34:17
35:23
36:21

38:20
39:1 40:1
41:1,23
43:21
44:7,16
45:1,9,
17,23
46:5,11,
21,22
49:16,23
50:5,11
51:1,6,
10,12,14,
19,24
52:21
53:18,25
60:20,21
61:2,14
64:18
69:9,12,
14 72:9
73:4
74:9,11
75:2,6,13
76:2,5
77:3,20,
23 78:3,
10,25
79:8,10,
12,19
80:14,17
81:1,6
82:4
83:16
84:3 85:4
86:12,16,
18 87:20,
21 88:16,
18 90:2,
9,16,23
91:5,14
93:5,7
96:9,17
97:10,22
98:3,12
99:10,18,
24

100:10,21
101:2,5,
7,8,9,22
102:3,22
105:20,
22,24
106:1
107:21
108:2,15
110:4,10,
15,25
114:12,14
115:21
116:4
117:13
118:24
119:8
120:12
121:17,21
122:9,11,
18,24
123:9,25
124:2,9,
11 125:6,
14 127:9,
23,25
128:13,21
129:13,16
130:22
131:6,14,
19,20
132:13,
18,24
133:17,
18,20,23,
25 134:3,
4,7,10,
12,17,18,
20,21,24
135:3,4,
6,15
136:10,
12,14,23,
25 137:1,
3,6,10,
12,15,16,
17,22,24

138:5,12
139:2,15
140:3,12,
19 141:4,
9,13,17
144:19,22
145:1,3
146:5,7,9
147:24
149:15,22
150:3,8,
18
151:10,19
152:6,17,
23 153:2,
3,18
155:18
157:7,11,
17,21,23

**Bryant**
11:24
13:2
14:19,20
23:22
44:13,23
49:8,11
53:1,2
135:23

**bucks**
152:15,16

**Buffalo**
5:8,19,20
6:8 28:21
44:4
91:19
92:6,12,
20 93:10
95:1,16
114:16,
19,21
119:20
121:4
141:22
143:9



build
  129:22

bullet
  125:12
  126:15

bullets
  85:17

bumper
  143:17

bunch
  36:13,14
  87:2

bye
  59:6,23
  61:25
  62:4
  63:8,9,
  10,24
  65:2

_____

C

call
  8:18
  55:12,14
  57:3
  102:18
  139:12
  155:10
  156:9

called
  8:17
  36:15
  56:21
  58:25
  59:2,17
  81:17
  96:24
  102:15
  152:14
  154:2,23,
  24  155:1

calling
  103:14
  139:5

calls
  57:15,17
  82:25
  83:3

car
  60:7,8,10
  85:7,13,
  14,17
  104:13
  105:6
  107:3,5,6
  116:20
  117:1,5
  118:7,10
  124:15,18
  125:2,3,
  7,8,9,11,
  16,19
  126:2,6,
  23,24
  127:7,8,
  10,11,12,
  13,20,21
  128:6,25
  129:1,18

care
  17:4
  56:10

Carolina
  86:9

cars
  60:16

case
  6:17  9:12
  53:5,14
  54:6,8
  58:5,6,7
  73:5  79:5
  80:22
  82:22
  84:8

86:4,9,20
91:15
122:1
123:22
141:23
144:6
147:15

cases
  53:14
  94:4

catch
  125:5

caught
  28:12

cell
  55:12,14
  138:21
  139:24
  156:22

change
  8:6

characteriz
e
  11:15

charge
  25:19
  139:20

charged
  104:19,21
  105:5

charges
  88:3,10
  89:18
  90:18,20
  91:7,17
  95:5,9
  96:4,5
  105:11,13
  140:2
  152:8

check
  131:14

139:17

checks
  80:6

Chris
  79:13

Christopher
  5:15
  144:6

circulated
  16:15

city
  5:8,19
  6:8  44:5
  62:2,3
  63:10
  64:1
  92:18
  96:12
  120:21
  121:4,25
  141:22
  154:16

Civil
  158:3

claim
  95:9

claiming
  33:16
  100:17
  146:23

claims
  97:6
  100:2

clarify
  144:8

clean
  144:7

clear
  39:19
  62:6
  77:15

90:24
118:4
122:4
136:6

clearer
  30:7

close
  11:10
  71:16
  78:19,20
  106:15
  129:19
  131:7
  157:2

closer
  146:16

clothes
  66:23
  67:11
  71:7,9,
  11,16,18
  72:5,14,
  16,17,19,
  20,25
  129:24
  130:2,3,
  12,18,25

clothing
  71:20

club
  86:4  89:6
  121:1,2,
  8,9

clubs
  92:12
  121:3

COE
  79:13,15
  84:8

commented
  57:25

communicate



55:19

**communicati
on**
58:4

**communicati
ons**
157:2

**community**
89:5

**Company**
96:24
97:12,17,
24 98:8
100:14

**complied**
5:3

**Complies**
18:6
80:12
106:12

**computer**
16:10
18:16

**computers**
18:19

**concluded**
158:6

**confirm**
16:13
23:22
25:20

**confirming**
24:7

**connected**
40:17

**connection**
81:23
84:5

**contact**
6:2,4

155:9

**contacted**
155:5,8

**contained**
102:7
103:13

**contempt**
6:22,25
152:8

**content**
152:13

**continuance**
83:24

**continued**
37:4 38:4
44:18

**conversatio
n**
13:25
19:15
26:12
32:2
47:4,8,13
48:6,25
55:16
58:1 87:4
89:3,25
94:8,21,
23,24
95:7
97:21,24
98:16
100:17
120:10,
14,16,19,
20,22
141:5,6

**conversatio
ns**
87:16
89:22

**conversing**
120:23

**convicted**
133:6

**cooperate**
80:22
81:3

**cooperating**
82:3
83:22

**cooperative**
81:8,20
82:21

**copy**
157:21

**corner**
16:3,4
145:7

**correct**
7:14,15
10:13,19
12:19
20:4,21,
22,24,25
21:1,8
24:2 25:6
27:12,17
29:9
34:13
35:9
36:3,10,
18 37:14
39:22
40:21
41:3,5,11
48:20
49:2
56:18
61:21
62:19
63:6
64:6,14
68:12
69:13
71:2,5,8
72:16

74:13
77:13,16
78:1,22
79:5,6
80:23
81:3
82:10,19,
23,24
89:18
98:5,9,23
100:19
103:18
106:16
115:18,19
120:7
125:16
126:2,6,
17 127:1
128:6
129:20,23
130:15,16
135:8
140:24
146:17
147:8
149:1,4,
5,8,9,12,
13,18,19,
25 150:1,
6,10,15,
16 151:5,
6 152:9
153:5,9,
10,20
154:11,12
155:12,
21,23,25
156:16
157:5

**could've**
52:5

**counsel**
5:10
157:13

**County**

5:15
101:14,24
144:6,11

**couple**
10:18,21
11:22
20:10
40:8
56:16
61:23
86:23
87:15
116:14
139:6
141:25
156:10

**court**
5:3 7:2,
3,23 9:19
10:8,18
18:6
20:13
28:20
54:6,9
61:23
83:9
101:4
104:15
105:12
133:3
139:7
147:12
151:5,21
152:9
154:19
156:1

**courtroom**
8:1 9:20
30:2
154:3,21

**cousin**
116:14

**cover**
91:8



EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: crazy..Dill

**crazy**
64:10

**created**
67:21

**credibility**
153:2

**crime**
104:20
111:14
112:1

**criminal**
9:11
60:23
81:23
96:12
114:23

**cross-
examination**
66:4,5
141:18
144:2

**crosstalk**
11:12
13:7
14:7,8
17:18
18:19
19:15,21,
25 20:13,
14,15,16
21:4,10
23:20
25:10,11,
12,14,16,
25 26:2,
24 28:23,
24 29:1,
17,18,19,
24,25
30:1,2
31:15
32:5,6,9
34:3
37:20

38:22
41:20,22,
24 42:1,
8,10
44:2,4
45:2
46:10,19
47:6,11
81:9,25
82:5
90:7,13,
20 96:16
99:16,17,
20,21
111:20,22
112:6
117:2,3,6
133:22,24
146:20

**cut**
70:19
71:8
96:25
105:10

**cut-off**
130:9,11

———————

**D**

**DA**
52:10,24
79:4
80:19,21
81:7
82:14,25
149:24

**dad**
13:6
14:20
40:20
80:6
133:6

**dad's**
13:1

**damn**
156:22

**Daniel**
4:24
101:12

**DAS**
96:10

**date**
5:8 60:24

**dated**
79:14

**day**
14:11
29:18,20
48:18
62:9
143:4
146:1
152:15,16
155:7

**day-to-day**
123:15

**days**
55:7,10
155:9

**dealer**
143:1

**defendant's**
5:15

**Defendants'
s**
4:25

**Delaware**
100:3

**delivered**
9:5

**Dennis**
46:16

**deny**
26:3

50:15,17,
19 75:7
77:9
89:21
90:3,7
91:15,16,
20 94:16
96:1
97:15,16,
21 99:13,
15 100:7,
9 132:25
135:21
136:1,6
140:13,21
149:3,6
151:3,24

**denying**
25:23
26:6 29:1
77:11

**department**
5:20
141:22
143:9

**deposition**
5:1,6
6:1,7
7:18,21
30:18
55:11
56:5
58:11,13
78:9
86:12,14,
15,20
151:4
152:1
158:6

**describe**
71:4
86:16
108:19
110:12
129:19

131:4

**describes**
36:22

**describing**
74:12
105:3
108:23
130:18
138:16
140:6

**description**
71:22
109:2
112:1,6
129:25

**detail**
47:7 95:6

**details**
17:4
75:12

**detective**
67:17
68:5 73:7
76:9
111:2,9,
10 112:11
113:3

**detectives**
68:17

**differences**
112:6

**difficult**
8:11

**digits**
154:10,14

**Dill**
4:24
101:5,12,
13 102:10
105:21
144:11,20
145:15



146:12

**DIRECT**
 7:8

**discussing**
 107:16

**discussion**
 95:3

**dispute**
 20:6,7
 67:23
 73:6
 119:9

**distorted**
 20:1

**District**
 96:11,19
 101:14,24
 143:9
 144:11

**Dixon**
 4:24 5:8,
 13 7:13
 11:25
 13:8
 42:23
 43:16
 44:1
 53:21
 59:6
 60:23
 61:20
 63:24
 66:11,12,
 20 77:25
 81:24
 82:22
 83:10
 87:13,23
 88:7
 89:13
 90:5,25
 91:21
 95:10,16
 96:13

97:5,12,
16,18
98:5,22
99:6,13
100:18
101:12
107:16
108:11
110:6
111:19
113:6
122:14
142:16,
20,23
145:8
148:19,25
149:4,7,
11,17
150:5,15
151:3
156:7
157:4

**Dixon's**
 11:24
 13:1
 20:24
 33:25
 34:7
 39:7,21
 40:20
 47:5 49:1
 66:5
 76:18
 84:5
 107:14,15
 132:9,14
 133:2,6
 150:23

**document**
 75:15,24
 101:10
 144:24
 145:14
 146:10,11

**documents**

26:20
67:13

**door**
 21:10
 125:12
 128:20
 141:11
 151:15

**doors**
 116:14

**doubt**
 46:3
 50:22

**driving**
 60:8,15
 117:5
 118:2,15

**dropped**
 105:13

**drove**
 60:7
 111:23

**drug**
 143:1

**drugs**
 105:6,7

**Ducking**
 126:8

**duly**
 7:6

───────────

─────  **E**  ─────

**earlier**
 89:16
 94:22
 141:21
 144:5,10
 151:2

**early**
 67:15

70:2

**easier**
 15:3

**effect**
 100:4

**emails**
 57:23

**Emil**
 5:1,7 7:5
 53:20
 87:13,22
 88:11,22
 89:12
 158:1

**end**
 18:15
 114:9
 125:11

**entire**
 30:1
 53:19

**Erie**
 5:15
 101:14,24
 144:6,11

**Ernest**
 115:16

**estimate**
 109:8

**et al**
 5:8

**evening**
 88:21

**EXAMINATION**
 7:8 146:8

**exhibit**
 15:12,22
 18:7,12,
 24 22:15
 23:5
 24:16

27:7 31:3
33:17
35:23
49:20
51:3,21
53:22
60:25
65:21,22
76:1,3,6
79:17
84:8,11
86:11
101:18
111:5
116:7
134:8,25
137:19
144:14,17
145:10

**Exhibits**
 4:25

**expect**
 154:8

**explain**
 88:2

**explained**
 6:7

**expressing**
 133:5

**Expressway**
 143:22

**extent**
 9:14

**extra**
 16:23

**extremely**
 66:22

───────────

─────  **F**  ─────

**face**
 59:20



88:9

**Facebook**
57:25

**facing**
96:4,5
152:8

**fact**
20:20
36:5 49:7
83:22
87:14
90:5 91:8
106:15
120:14
130:24
148:11
149:10
151:20
152:20
153:4

**failing**
84:4

**fair**
8:8,9
11:11,15
37:25
41:10
44:10
48:4
59:21
65:4
108:11
110:22
112:8
119:23
122:1,12
142:3

**fall**
124:19
125:16
126:2

**fallen**
126:16

**falling**
124:15

**false**
117:12

**family**
57:7,8
97:5

**fancy**
60:8

**fashion**
156:12

**fat**
73:1

**father**
32:3
33:25
34:7 39:7
49:8
115:14
132:9,14
150:23

**father's**
115:15

**February**
62:7

**federal**
9:18
158:3

**feedback**
18:11

**feel**
40:21
133:7

**feet**
70:16
129:12

**fell**
125:8,11
127:8,13,
15

**females**
128:11,16

**fence**
143:20

**fighting**
63:23

**figure**
123:25

**file**
65:21

**fill**
141:25

**finally**
154:21

**find**
16:23
155:3

**finding**
152:15

**finds**
27:5

**fine**
8:2 25:22
37:23
105:12
153:14

**finger**
38:7
44:21

**fining**
155:7

**finish**
20:15,17
39:5
57:17
72:2
120:6
130:13

**firm**
5:18 6:2

**five-minute**
78:3

**fixed**
18:20,22

**flew**
37:6
81:20
93:11,14
114:23

**flirting**
86:22
118:20,22
119:3

**fly**
37:9

**flying**
37:6

**folder**
76:11,23

**follow**
15:2,4
17:9
19:17
20:12,16,
18 22:6
30:25
33:8 69:2
134:11

**followup**
146:7

**football**
65:8

**force**
143:10

**forgot**
69:12

**form**
11:13
13:22
19:21
21:3

22:12,14
23:16
27:14,18
29:3
32:16
33:10
34:14
36:19
38:18,19,
23,24
39:23,24
40:23
41:19,21
42:5
43:19,20
44:3,14,
25 45:7,
14,22
46:2,9,
20,21
50:2,3,10
52:18
61:11
64:16
69:8
72:7,8
73:3
74:8,10
75:1,4,10
77:2,18,
19,22
78:24
80:25
81:5,10
82:1
83:15
84:1,20
87:20
89:23,24
90:8,14,
15,21
91:4,12,
13 95:19
96:7,8,15
97:8,19
98:2,10
99:9,17,



21 100:8,
20,25
101:21
102:2,17
107:4,19,
20,24
108:12
110:1,9,
14,23
115:20
116:2
117:7
118:21
119:4
120:8,9
121:14,
15,20
122:8,10,
17,21,22
123:8
127:5,23
128:8,9,
18 129:11
130:20,21
131:2
132:12,
16,23
133:15,16
135:12,13
138:3,10,
18,25
139:1,11,
14,23
140:8,9,
15,16
141:2,3,8
146:5
147:22
148:16
149:14,
20,21
150:2,7,
17,25
151:7,8,
18 152:3,
12
153:11,16

156:3,4,
12 157:6

**found**
8:21
105:7
156:10,22

**framework**
87:15

**freedom**
156:11

**Freida**
85:21
86:7,21
89:22
91:7,15
94:17
95:23
98:13
116:25
117:4,20,
23 119:10
122:5
150:12,19

**friend**
11:10,11
55:3
155:12

**friendly**
11:4

**friends**
54:24
55:1
78:12,17,
19 86:23
106:16

**front**
38:6
44:20
70:20
106:5
144:15
145:3,4

**full**
59:8
104:3

**fuzzy**
15:1

_____

G

_____

**gave**
9:9 76:22
79:15
80:7
87:12
98:25
109:3
111:17,25
112:2,6
151:9,12
155:5

**general**
89:21
104:2

**generalizat
ion**
71:15

**generally**
73:1
94:9,11
95:9
121:10

**genre**
71:18

**gentleman**
147:17
148:8

**gentlemen**
123:5
143:6

**Geo**
116:20

**Germany**
81:12

**girl**
85:21,24
86:3
117:25

**girl's**
125:11

**girlfriend**
133:2

**girls**
85:7,9,
11,13
86:24
116:13,
18,22
117:2
118:20
119:3,7
128:6

**give**
8:3 14:13
16:18
19:4,5
63:12
65:20
66:23
87:14
88:3,5
98:18
100:3
105:17
111:3
133:20
137:10
144:19
155:6

**giving**
66:14
105:8

**God**
156:10,
21,22

**good**
7:10,11
18:14

102:20
155:12

**Gotcha**
16:6

**grand**
53:8,20
63:14,17
106:7
123:24
156:6

**grandmother
's**
61:9

**great**
16:12
131:19

**grew**
54:22
61:8 62:2

**ground**
127:4

**group**
76:13
85:8,12
111:2

**groups**
35:4
42:14,15

**growing**
78:17

**guard**
143:21

**guess**
17:8,9
38:22
53:19
67:12
107:12
141:16
146:18
153:21



guessing
  8:14

guns
  123:5

guy
  11:4,6
  13:4,9
  32:3
  38:12,13
  42:17
  43:8 46:7
  48:7
  62:13,23
  64:22
  66:21
  69:10,17
  116:1,12,
  13 155:1
  156:6,20

guys
  6:11
  55:10
  85:11
  134:13

――――――――

      H

hair
  70:16
  96:24,25
  97:1,12,
  17,24
  98:8
  100:14
  105:10

Haircut
  100:14

hallway
  36:11,15
  68:21,23

hand
  7:4 63:25

handed
  151:25
  152:4

handing
  14:13
  79:16
  105:23
  106:4
  111:4
  144:22

handwriting
  145:23
  146:11,13

hang
  96:23

happen
  48:2
  56:21
  91:18
  94:8
  128:12
  147:19

happened
  36:6,8,
  22,23
  40:18
  56:17
  61:13
  81:13
  85:6
  92:21
  93:9 96:6
  103:5,8,
  21 108:18
  114:9
  123:16
  126:1
  128:10
  129:4
  148:9,10

happening
  56:20
  83:25

happenstance
  89:4

happy
  156:11

harassing
  57:9

Hastings
  21:8
  48:10
  49:1 84:9

hat
  38:13
  46:7
  70:17,20

hear
  17:8,18
  19:16,22
  20:7,14
  21:5
  27:11,21,
  22,24
  28:8
  31:19
  46:8,17,
  23 49:24,
  25 50:6,9
  51:8 93:3
  114:11
  134:17,19
  144:18

heard
  19:18
  20:3
  23:12
  24:20,25
  25:9
  27:25
  31:18
  32:9,15,
  20 38:3,
  20 41:15
  45:12
  46:6 77:4

98:21
  103:22
  140:13
  151:2

hearing
  6:10
  38:14
  41:18
  50:12
  74:23
  107:15

heavy
  38:12
  130:9

heavyset
  46:7
  66:12
  70:15
  71:5,19
  72:4,12
  130:7,25

height
  67:7

held
  6:25
  139:22

helped
  127:19

hey
  56:2
  58:3,18

hide
  49:5,6

high
  62:8
  79:25
  80:1,3
  84:15
  93:16
  143:5

Hip
  129:25

hired
  151:16

hit
  118:7

Hodgson
  5:18

hold
  51:11
  130:13
  144:19

hole
  125:12

holes
  141:25

home
  23:13,15
  35:25
  36:1,17
  37:1
  105:8
  112:10,
  13,14,17
  123:17
  143:5
  151:5,25
  152:5

honest
  91:1,3
  119:5

honestly
  78:22

Hop
  129:25

hopes
  83:24

hours
  58:23
  112:19

house
  9:5 11:23
  12:2,7,



EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: Hugh..investigator

15,17,19
14:19
19:19
20:1,21
26:13
33:25
34:8
39:21
40:21,24
47:5
48:7,10,
14 49:1
61:9
103:19
115:12
138:1
141:10
151:13

**Hugh**
5:18
88:17
131:16
141:21

**Humber**
116:15

**hundred**
61:18

**hung**
57:12

_____

I

_____

**identificat
ion**
101:16

**identified**
15:13,23
53:23
61:1
79:18
84:12
101:19

**identify**

95:10

**identifying**
89:13

**illegal**
29:16

**immediately**
138:15

**important**
9:9

**impress**
6:23

**impressed**
6:24

**in-person**
89:2

**inaudible**
16:24
26:25
33:19
46:10,19
53:12

**incident**
93:9

**included**
113:6

**includes**
158:1

**including**
40:4
119:18

**indicating**
7:17,20
8:13
9:10,13,
22 10:3,
6,20
11:12
12:20
14:15,17
15:5
16:1,5

18:5 19:2
22:23
23:3,9
24:1,8,
11,15,24
26:17,22
30:21,22
34:9,11
35:12
36:2
37:3,8,10
38:2
42:24
43:11
45:13
50:1
54:7,14,
25 56:9,
12 57:14,
16 58:22
59:7,9,16
61:24
63:19,21
64:3
66:15
67:14
70:12
73:14,20
75:25
78:14
80:13
87:9 92:5
93:2
100:15
101:4
102:11
103:16
106:9,17
108:7
113:1,4,
7,18
116:8,10,
24 118:1,
3,13,16
124:16
125:22,25
126:3,11,

12,14,20
127:16
128:4,20
129:9
130:5
132:5
134:11,23
136:19
144:16,18
145:8
146:3
147:14
153:6
155:13

**Indiscernib
le**
79:11
83:5

**individual**
74:12,14,
19,21,22
75:15
77:6,10,
25 95:13
104:13

**individuall
y**
36:15

**infer**
146:1

**information**
32:15,17
88:5
95:12

**initially**
42:1

**injured**
124:24
126:19

**innocent**
38:8 45:6

**inside**
148:12

**Instagram**
57:25

**instance**
89:12

**intend**
156:19

**intended**
156:15,
17,19

**interaction**
144:10

**interaction
s**
100:23
145:15

**interrupt**
15:7

**intersectio
n**
143:24

**interview**
49:12
75:22
76:8
94:25
103:20
113:3

**interviewed**
67:16,19,
22,24
68:4,6
96:18

**introduce**
49:4

**introduced**
141:20

**investigato
r**
97:4,11,
16
100:13,18



101:14,23
144:11
146:12
151:15

**invited**
48:12

**involving**
96:13

**issue**
32:23
53:3

**issues**
35:19
37:18,21
40:17
47:20,22,
24 48:3
50:23
52:1,8
53:4
119:15

---

**J**

**J.P.**
144:4

**Jackson**
38:11
55:6,18,
21 56:18,
21 57:15,
18 78:13
82:22
106:16
109:13,14
124:15,
23,24
126:1
130:24
155:12
157:3

**Jackson's**
45:18

**jail**
105:11
138:11,
13,20
139:19,
21,24
140:24
152:19
155:4,8
156:22

**James**
5:14 17:6
131:15

**January**
5:2,9

**jeans**
70:18
71:8

**Jennifer**
5:16

**Jesus**
114:5

**jog**
86:23

**jogs**
92:4

**Johnny's**
96:24
97:12,16,
24 98:8
100:14
104:17
147:18
148:8,12

**Johnson**
108:8,9

**joined**
5:16

**Joseph**
116:14

**judge**

7:24
8:16,17,
21 81:17
152:14
154:21,24
155:2,3

**July**
101:15,25

**jumped**
125:19
128:24
129:1

**June**
60:24
79:12,14

**junior**
114:7,8,
10,12

**jury**
53:8,9,20
63:14,17
106:7
123:24

---

**K**

**key**
28:18,22

**kid**
63:22

**killed**
81:17
156:20

**kind**
38:13
40:25
46:7,8
60:7 63:3
66:7
103:24
104:1
116:20

119:15
123:18
145:22

**knew**
11:10
12:7
14:10
43:13,14,
16,17
55:5
59:6,10,
13,15,17,
20,23
61:8,19,
25 62:4,
24 63:4,
5,9,10,
22,24
64:4,7,8
65:1
87:25
88:1,7
90:5
91:21
110:3,6,
11,22
113:17
118:4
142:23
150:9
152:13
154:10,
15,16

**knowing**
61:8 64:3
69:5
85:18

**knowledge**
11:7
36:20
45:11
109:1
123:10,12
127:2,21
140:25

---

**L**

**lady**
48:6 87:4

**Lamar**
109:21
110:5,20
150:9

**late**
112:22

**law**
91:18
104:6

**lawyer**
154:16
155:5,9

**lawyers**
8:5
141:14

**leading**
49:12,13

**learned**
90:3

**leave**
6:11

**leaving**
112:15

**left**
22:1
132:14
151:12

**legal**
29:24
35:19
37:18,21
47:20,22
52:1
53:3,4
120:3



EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: lengths..mark

**lengths**
129:18

**let alone**
123:2
146:21

**letter**
79:12,13,
14 80:7,
19,21
81:11,19
82:13
83:20

**liar**
98:9

**lie**
34:18

**lied**
146:23

**lieutenant**
38:6
44:20

**life**
29:18,20
30:1 65:6
105:14

**limitations**
9:15

**limited**
5:25

**lines**
25:3 27:5
35:22
37:2
41:16
65:13
70:11
116:7
124:7,9
126:13

**Lippes**
5:14

**listen**
17:15
20:18
24:15
29:4

**listening**
22:11
137:8,9
142:4

**literally**
105:7
143:25

**live**
84:9
151:11,22

**lived**
21:7
62:10
84:9,15

**lives**
86:9
116:13,15

**living**
29:22,23
31:8
92:7,20
114:16,
19,20
123:14
139:8,12
143:2,5

**LLP**
5:13,19

**lock**
28:15
38:8 45:5
48:1

**locked**
23:13,14
28:15,18,
22

**Lockwood**

111:10,13
112:11

**long**
17:8
55:16,17
107:9,11
109:9
146:19,21

**longer**
17:12

**looked**
59:13,15
62:24
63:5 64:4
69:18
72:12
154:10

**loop**
157:2

**loophole**
156:10,22

**lot**
28:3 47:1
94:11
115:18
128:17
143:18,23

**loud**
15:2 20:9
21:20

**Louie's**
86:8,22
115:18
125:12

**lying**
90:12
98:13,15,
24 99:19
122:19
126:16
147:16
149:17,25

—————————

**M**

—————————

**made**
6:6
14:18,19
25:21
30:24
89:20
95:13,14
100:22
122:4
127:10,11

**mail**
79:25
80:3
139:17,18

**mailbox**
80:6
139:7,16

**main**
30:7

**maintenance**
104:2

**make**
6:6,19,
20,24
17:10
20:9,11
28:5
32:13
47:10,17
48:1
62:12
64:23
127:7
157:18

**male**
70:15

**man**
20:21
32:12
38:8 45:6

46:15
48:6
64:5,10
67:25
78:2
148:2

**manipulate**
8:18

**March**
10:22
11:22
14:5
19:15

**marijuana**
104:8
105:15

**Mario**
33:22
34:21
35:5
42:2,23
43:10,13
63:23
70:16
73:19
74:3,6,
13,17,20,
25 75:8
76:21,22
77:6,13
79:2
81:12
82:6,9
84:22
85:1
113:17

**Mario's**
35:1
82:16

**mark**
15:8,9,
10,19,20
53:17,18,
19,20



60:19,22
67:17,23
79:7,9,12
101:2
105:19,20
116:1,12,
13,17

**marked**
15:12,22
53:22
61:1
65:22
79:18
83:20
84:8,12
86:11
101:19
111:6
144:14
145:8

**Mathias**
5:14

**matter**
5:7 58:23

**means**
9:25
113:11

**meant**
57:24

**meet**
89:9
116:19

**meeting**
59:25
89:3
92:15
93:20
94:2
95:22
97:4,11
101:23
102:10
113:8

**memorized**
154:14

**memory**
86:23
92:5
97:11
101:23
103:4
107:22

**men**
19:19

**mention**
109:18

**mentioned**
68:11
87:15
89:17
113:16
128:2,5
144:5

**met**
7:12,14
36:10
109:24
111:11
146:17,24
147:12

**metal**
115:22
143:17,21

**Michigan**
25:19
28:25
29:9,11,
17,22,23,
24 31:8
37:5,18
52:14
53:5
60:15
62:7,10
88:9
89:18
90:19

91:7,17
93:8 94:3
95:5 96:4
99:2
114:16,
19,20,23
115:12
117:11
119:18
120:3
122:5
123:12,14
132:15
136:5
138:2
141:11
143:2,5

**middle**
54:3
129:4

**mind**
17:5 72:3
152:23
153:1

**minor**
104:7

**minute**
17:3 18:9
30:12
43:25
79:20
88:17
102:4
128:1
131:7
132:8

**minutes**
6:12
12:23
30:10
48:15
107:12
109:9
131:8

**misdemeanor**
105:15

**missed**
124:8

**mistaken**
81:7
90:12
99:19
122:19
149:17,25

**mister**
47:4

**Mo**
16:8,10,
17 17:25
19:5
21:18
22:18,25
24:12
26:23
27:6 31:1
49:16,19
51:1,11,
19 60:20
79:8
101:5
133:17
134:12,13
135:3
136:10
137:4,10,
22

**mom**
13:8
40:20
80:6

**moment**
5:5

**money**
156:8,12,
21

**months**
56:5,15,

16 86:4,9
87:16
88:23,24
89:11
90:4
92:16
93:22
94:10
120:6
146:21

**morning**
7:10,11
16:15
23:20
67:15,16
70:3
78:12
112:12,16
139:20,21
140:24
141:21
142:3

**mother**
32:2
115:4,14
139:5,8,
12,13,17
150:23

**mouth**
122:25
149:24

**move**
93:15
126:19,
23,25
127:22

**moved**
62:6 92:9

**mug**
73:13,18
74:16,19

**multiple**
151:24
152:1



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 823 of 1202

APPENDIX 0821

EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: mumbling..officers

mumbling
  63:17
muted
  18:16

_____

**N**

_____

N,o
  80:16
Nah
  39:10
  52:1
named
  67:17
  85:21
  95:23
  97:5
  101:12
  111:10
  115:10,13
  116:1,12
  144:11
names
  36:14
  67:20
  68:1
  109:18
  116:22
  118:6,9
neighborhood
  40:8 44:2
  54:22
  110:3,7,
  17,22
  121:25
Neufeld
  5:12
News
  95:1
newspaper
  102:6,15

103:14
nice
  11:6
  13:4,15,
  19
Nick
  5:12 7:12
  15:7
  80:13
  86:11
  123:23
  124:8
night
  19:20
  23:14
  39:21
  45:25
  47:5
  48:17
  67:16
  68:10
  85:22
  86:22
  92:1,3,16
  95:24
  105:11
  108:18
  112:12,
  20,21
  113:9,10,
  11 119:6
  123:6,11
  138:6,11,
  19 143:16
nighttime
  14:10
Ninety-one
  114:3
nod
  60:3
North
  86:9
Nos

4:25
  79:17
note
  30:5
  129:14
notes
  108:22
notice
  151:4
  152:7
noting
  85:18
number
  16:14,16
  68:11
  73:13,18
  74:16
  79:8
  133:21
  142:22
  145:7
  152:20
  153:4,19,
  21,22,24
  154:2,4,
  15
numbers
  16:2,3
  54:2
  131:24
  145:6
  154:9

_____

**O**

_____

O.C.G.A.
  5:4 158:4
oath
  7:25 8:23
  9:18 28:6
  29:2
  32:14
  50:19

82:12
object
  39:24
  50:2,3
  100:8
  107:20
  110:9
  128:9
  133:16
Objection
  22:14
  23:16
  27:14,18
  29:3
  38:19,24
  41:21
  42:5
  43:19
  44:25
  45:7,14,
  22 46:2,
  9,20
  50:10
  61:11
  69:8 72:7
  74:10
  75:1,4
  77:19,22
  80:25
  84:1
  89:24
  90:8,14,
  21 91:4,
  13 95:19
  96:8 97:8
  98:10
  99:9,17,
  21
  100:20,25
  101:21
  110:14
  120:9
  121:15
  122:10,
  17,22
  130:20

131:2
  132:12
  135:12
  138:3
  139:1,14,
  23 140:9,
  16 141:3,
  8 146:5
  149:21
  151:8
  153:11,16
  156:4
obligation
  9:19
occasions
  97:7
  151:24
  152:1
occur
  72:5
occurred
  115:17
October
  86:20
office
  96:10,11,
  19 100:3
  101:15,24
  138:20
  139:22
  143:9
  144:12
officer
  52:10,24
  107:9
officers
  5:20
  106:24
  107:17
  108:16
  109:12
  141:23



EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: offs..phrase

**offs**
70:19

**older**
13:4,19

**One-time**
104:13

**open**
83:9

**opened**
151:15

**opening**
21:10

**operate**
84:4

**opinion**
103:19

**opportunity**
128:2
145:12

**opposing**
6:10

**option**
157:17

**order**
6:22
156:1

**original**
4:25

**oversized**
67:11
71:9,11,
16 72:14,
16,18,20,
25

**owner**
117:1

_____

**P**

_____

**P-29**

4:24

**p.m.**
78:5,6,8,
9 131:10,
13 158:1,
6

**packet**
67:13

**pages**
25:6
26:20
87:8
101:11
144:24
145:1,3,4

**paper**
151:12

**papers**
8:19,24
9:6 57:9
58:17
151:9
154:1

**paperwork**
6:6

**PARALEGAL**
16:18,22
18:2,20
19:6
21:23
22:3
51:12
60:21
79:10
101:7
133:18,23
134:4,18
135:4
136:12,23
137:1,12,
16

**parents**
11:24

20:2,24
39:21
40:20
47:5
49:1,5
83:2
84:13,15
143:5

**parking**
115:18
128:17
143:18,22

**part**
33:19
41:15
132:8

**participate**
5:16

**parts**
20:9

**past**
157:4

**paused**
18:13
134:15

**penalty**
9:23

**pending**
88:3
89:18
90:18

**people**
13:1,19
28:19
35:4
36:13,14
40:7,8,15
42:8,14,
15 43:9
70:24
71:18
85:8 87:2
91:2

92:19
94:11
96:3
130:2

**percent**
29:15

**perfectly**
119:5

**period**
95:22

**periodicall
y**
59:14
60:1

**perjury**
9:23
84:19,21

**permission**
142:13

**Persico**
5:16

**person**
7:14
33:15
39:12,13
40:16
43:5
47:14
50:6
70:10,14
71:5,7,11
74:1,24
76:23
91:17
97:21
108:14,20
111:13,
16,17
112:2,11
129:20
143:3

**personally**
61:16

**persons**
6:9
129:22

**pertained**
82:6

**phone**
7:16
55:12,14
56:7
57:13
120:23
153:4,23,
24 154:1,
2,4,10,
20,22
155:10
156:9

**phoneticall
y**
67:17,23
76:9
85:21
111:9

**photo**
74:3,6,
13,20
76:10,20
77:6,25
102:12
103:4
111:18

**photograph**
76:17
110:20

**photographs**
76:10

**photos**
74:2
75:15,17
76:14,18,
21 77:10
111:2

**phrase**



63:11

**physique**
130:4

**pick**
42:16
154:20

**picked**
154:22

**picture**
33:20
35:1,3,5,
6 42:10,
17,18
58:1
74:21,25
75:2,3,7,
8 76:22
77:13

**pictures**
32:24,25
33:3,4,
21,22
34:2,21,
23,24
35:5
41:17
42:2,13,
14,15,17,
20,21,23
43:10
57:25
68:9,11,
12,16
69:23,25
74:22,25
76:12,16

**pieces**
28:9

**place**
44:5 82:7
88:25
93:23
96:23

**plainclothes**
68:5

**plaintiff**
5:13

**Plaintiff's**
15:11,12,
21,22
18:7,12,
24 22:15
23:5
24:16
27:7 31:3
33:17
35:23
49:20
51:3,21
53:22
60:25
79:17
84:11
101:18
111:3,5
134:8,25
137:19
145:10

**planned**
89:8

**play**
15:2
16:8,9
19:9
21:17,18,
19,20,25
22:25
24:8
26:15,23
27:2,4
30:23
31:1
49:16,19
51:1,10,
19 123:17
132:8
133:17

134:7
137:7,10

**played**
18:8,25
22:16
23:6
24:17
26:15
27:8 31:4
38:3
46:23
49:21
51:4,22
65:8
73:25
134:9
135:1
137:20

**playing**
24:13
26:4
51:10

**point**
5:17 34:6
38:6
44:21
70:2
75:21,22
94:20
109:22
129:2
152:25

**police**
5:20
28:21
30:3
35:24
36:10
38:6 42:7
44:20
52:10,24
65:20
67:10
76:3 79:4
83:1

85:25
88:6
106:21,24
107:3
111:1,23
112:20,24
113:9,13
116:6,21
118:5,8,
11,12
119:15
137:25
141:10,
22,23
143:9
149:24

**polite**
12:19
13:14

**polkadots**
71:14

**portion**
65:20
92:4
145:14

**portions**
86:19

**position**
8:23

**positive**
29:15

**possession**
104:8,21
105:15

**post**
57:24

**Pray**
57:12

**praying**
57:12
58:3

**precinct**
36:9
67:18
69:6
107:10
109:6

**present**
5:10
17:20
92:14,16
93:21
94:14
95:23
109:11
111:18
157:15

**press**
140:1

**pressure**
52:8,12,
15,19
53:4 82:2
88:6

**pressured**
79:4
122:6

**pretty**
69:7
78:20
103:22
113:17
125:3
131:7

**previously**
84:11
111:5

**prior**
81:2
123:11
144:8

**privately**
12:3



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 826 of 1202

APPENDIX 0824

EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: problem..recently

**problem**
10:4 30:8

**problems**
120:3

**Procedure**
158:4

**proceedings**
9:11
96:12
114:24

**prosecutors**
88:6

**provide**
32:15,17

**public**
89:10
95:2
140:25

**Pull**
35:17

**pursuant**
158:3

**put**
5:22
52:8,12,
15 53:4
67:11
81:15
88:6
102:18
105:16
107:14
123:21

**Putnam**
97:5,15
98:7
99:25
100:2,22
146:17,23
147:2,3,
4,12
148:11

150:21

**putting**
32:23

---

**Q**

---

**question**
17:2
18:14
33:21
38:8 39:6
50:4
63:24
66:11,13
70:10,17
72:2
76:25
87:12,19,
22,24
88:1,10,
14,16,19,
20,24
89:2,8,
15,16,19
94:20
95:6,8,
11,12
116:16,19
119:2
130:14
148:4
155:11

**questioning**
28:16
148:22
152:22

**questions**
7:25 8:4,
5,6 10:7
14:22
49:8
65:21
68:8
87:11

89:12
141:14,
15,24
142:6,15,
17,22
144:7
145:13
146:6
148:17

---

**R**

---

**radio**
107:15,16

**rails**
143:21

**raise**
7:3

**ran**
89:9
92:18
93:24
95:1
129:1

**reached**
55:25
56:18
58:25

**read**
24:15
26:18
33:17
35:23
54:12
61:3
65:13
70:13
79:23,24
80:8,9,11
86:14
87:6 92:4
102:4
106:10
124:7

125:23
132:1,3
134:22
136:16,
18,20
137:3,7,9
157:18

**reading**
24:10
27:5
35:24
37:4 38:4
44:18
45:5,18
46:16
50:18
59:5
61:15
63:22
65:18
66:10
70:10,13
73:12,17
74:15
83:23
87:12,19,
22 88:15
94:20
111:11
116:8,11,
18 132:19
139:19
140:14
146:12
147:2

**ready**
133:17
137:1

**real**
91:8

**reason**
52:15
67:22
72:3,11
73:6

84:18
90:17,18
103:14
111:25
130:8,9,
12,24
131:4

**reasons**
88:3

**recall**
10:21
11:21
12:4 46:4
68:1 75:9
85:5
88:25
89:1,25
94:2
95:15
96:16
98:1,15
99:1
112:7,8
113:9
117:9
120:10,
15,23
133:1
139:4
140:10
142:5
146:25
148:2,8

**recalled**
39:22

**received**
79:25
152:7

**receiving**
79:21
80:18

**recently**
58:23
103:23



recognize
  19:14,19
  21:14
  23:10
  30:25
  31:24
  54:15,18
  60:1
  62:18,20
  110:16,21
  135:7,10

recognized
  35:7
  43:2,5,8,
  9,13

recollect
  79:21

recollectio
n
  39:19
  61:7
  66:10
  74:5
  80:18
  95:22
  100:16
  112:5
  121:1

record
  5:11 7:12
  15:21
  17:3
  30:9,13,
  16 35:17
  47:19
  78:4,7
  84:17
  129:15
  131:9,12
  157:16,25

recorded
  5:6 15:14

recording
  15:20

17:11
18:13,25
22:16
23:6
24:17
27:8 30:8
31:4
49:21
51:4,22
74:1
134:9
135:1
137:20
140:18

records
  57:13

red
  116:20

REDIRECT
  146:8

references
  111:10

referring
  81:11

refresh
  61:7
  66:10
  74:5
  80:18
  95:21
  100:16
  116:22
  146:15

refused
  81:2
  84:18

refusing
  80:9,10
  84:19

regard
  82:21

reiterated

95:3

relayed
  89:13

release
  96:20

released
  138:15

relevance
  152:21,
  22,24

reliving
  157:20

reluctance
  157:8

remained
  127:4

remember
  10:1,23
  12:6,10,
  12,16
  13:1,3,
  12,14
  14:4,6,11
  20:20
  21:10
  26:12
  32:2
  33:1,4,6
  35:13
  36:14
  37:19
  38:14
  40:13
  41:18,24
  42:13,14,
  21,22
  43:8
  45:21
  46:13,14
  47:4,7,
  10,13
  48:5,7,9,
  18 49:4,

7,9,10,
11,13,14
50:12
53:8,12
58:20
60:7,8
66:5,14,
18,20,25
67:2,4,
15,19,21
68:3,4,5,
7,13,15,
16,17
69:4,5,
15,17,18,
20,23
70:2,24
71:2,10
72:18,20
73:25
74:19,21,
22,23
75:11,14,
15,19,21,
22 76:10,
12,13,15,
17 77:1,
4,5,11,
12,21,24
80:16
83:2,25
84:4,19,
21 85:10,
12,16,18,
21,24
86:3
87:4,5
88:10
92:9,14,
15 93:18,
20,25
94:9,13,
23 95:21
96:1,2,
18,22
97:4,14,
20 98:19

99:6
101:16
102:6,7,
10,12,15,
19 103:2,
6,10,12,
13,23
104:17,19
106:24
107:2,3,
11,15
108:8,16
109:15
111:12,
16,20,22
112:11,
13,14,18,
19,21,23
113:2
114:6,15,
24 116:3
117:3,4,6
118:10,
12,14
119:6,7
120:2,3,
19,22,25
121:10
122:13
124:14
125:1
129:24
130:18
132:9,11,
13,19,21
133:2,5
137:25
138:6
139:5
140:17,20
141:7,10
142:16,23
144:12
146:18
147:5,6,
9,11,17,
20



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 828 of 1202

APPENDIX 0826

EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: remorse..school

148:10,14
154:3
156:9

**remorse**
133:5

**report**
67:22
71:24
76:3,8
111:9
112:10
123:21

**reporter**
5:3 7:2,3
10:8 18:6
20:13
101:4
102:18
103:1,14,
18

**reports**
67:10
111:1,3
116:6

**represent**
5:19 70:5
76:20
107:13
116:23
141:22
144:6

**represented**
70:6

**representing**
6:15

**reproduced**
17:11

**reputation**
59:21,22

**request**
83:24

**requirements**
5:4

**respond**
153:20
154:25

**response**
93:4
114:11
125:5

**result**
138:6,13

**resumed**
30:18,19
78:9,10

**retaliation**
100:5

**review**
79:20
145:12,13

**reviewed**
111:6
145:10

**ride**
105:8

**Ridge**
151:21

**ridiculous**
156:13

**right-hand**
131:24,25

**Robert**
11:24
13:2
14:18,20

**Roger**
97:5 98:7
99:25
100:22
146:23
147:2,3,

4,12
148:11
150:21

**role**
5:24
133:6

**Ron**
115:8,10,
13

**room**
68:7

**Ross**
144:7
148:21

**rule**
69:2
158:3

**Rules**
158:3

**run**
9:15

**running**
40:14
124:15,18
125:10

**Russ**
5:18,19
11:13
19:9,12
22:14
23:16
26:25
27:14,18
29:3
38:19,24
39:24
41:21
42:5
43:19
44:25
45:7,14,
22 46:2,
9,20

50:2,10
61:11
69:8,10
72:7
74:10
75:1,4
76:1
77:19,22
80:25
84:1
86:11,15
88:14
89:24
90:8,14,
21 91:4,
13 93:3,6
95:19
96:8 97:8
98:10
99:9,17,
21 100:8,
20,25
101:21
107:20
110:9,14
114:11,13
120:9
121:15
122:10,
17,22
123:23
124:8,10
125:5
128:9
130:20
131:2,18
132:12
133:16
135:12
138:3
139:1,14,
23 140:9,
16 141:3,
8,16,19,
21 144:1
148:18
149:21

151:8
152:21
153:1,11,
12,16
156:4

_____

**S**

**Saginaw**
29:23
31:8

**sat**
138:20

**scare**
38:9
52:22

**scared**
52:8

**scene**
68:19
86:8 90:4
91:25
93:21
106:22,25
107:17
108:17
109:16
111:13
112:1,12

**Scheck**
5:12

**scheduled**
7:18

**scheme**
156:6

**school**
11:3,11
54:23
62:8 65:7
79:25
80:1,4
84:16



Case 1:19-cv-01678-MAV-JJM    Document 167-2    Filed 12/15/23    Page 829 of 1202

**APPENDIX 0827**

EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: Scott..sister

93:16,19
114:7,9
143:5

**Scott**
109:21
110:6,21
150:9

**searching**
123:23

**seconds**
127:15

**section**
26:15

**sections**
25:8

**securing**
83:24

**selected**
76:17

**send**
16:23
17:1,14
88:9
101:5

**senior**
114:7,8,
10,12

**separate**
42:2
68:24

**series**
7:24

**serve**
57:9
58:17

**served**
6:4,5
8:19,24
83:21
151:3,25

**set**
38:12
104:14
130:9
133:19

**sets**
68:11

**Seventy**
103:9

**Seventy-
five**
63:16

**shaky**
63:3

**Shannon**
10:23
11:23
12:3
13:1,10

**shape**
156:12

**shoes**
139:25

**shooter**
70:17
82:9
83:10
87:14,23
88:1,2,7
89:14
90:6
91:9,21,
22 92:2
95:4,11,
17 97:18
98:5,6,22
99:7,14,
15 112:2
122:15
129:3,8
142:16,20
148:19,25
149:4,7,

11,17
150:5,10,
15 156:16
157:4

**shooting**
10:13,22
11:23
12:3
36:17
67:16
68:4
85:6,22,
25 87:16
88:11,21,
24,25
89:11
90:5
92:16,17
93:21,22
94:10,14
95:24
99:11
106:20
111:12
115:17
116:9,12
118:5
120:7
121:13
125:13
127:3
128:3,5,
16,24
143:16
149:12

**shop**
97:6

**shorter**
17:12

**shortly**
93:9,16,
19

**shorts**
130:9,11,

14

**shot**
39:12,18
73:13,18
74:16,20
116:21
118:10
124:21
125:12,16
126:1,17
127:3,4,6

**show**
33:20
73:12,17
74:15
79:7
82:15
85:16
86:6,19
105:12
139:6
152:24

**showed**
33:22
34:25
35:5

**showing**
74:19,21
77:5
101:10
102:12
138:7
153:14

**shown**
32:24,25
33:1,4
42:2,13,
14,15
68:8,10,
11,16
74:2,6,
12,24
75:7,8,
14,15

76:9,11,
12,13,23
77:6,10,
12,25
103:4
110:19,20
113:5
146:12

**sic**
21:16
39:3

**side**
126:2
131:15,24
133:8

**sight**
61:20

**signature**
145:20
158:4

**signed**
145:24
146:2

**similar**
88:19

**similarly**
110:11

**sir**
7:4 20:17
26:5
28:19
52:1
57:17
63:2 72:2
80:9,20
90:24
142:2,12,
14
143:11,
13,15

**sister**
114:15,
17,21,24



Case 1:19-cv-01678-MAV-JJM   Document 167-2   Filed 12/15/23   Page 830 of 1202

APPENDIX 0828

EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: sisters..statement

sisters
  55:4
  115:2

sit
  124:14
  142:19

sits
  153:1

sitting
  36:11
  68:21
  69:10,15
  113:13
  154:20

situation
  41:9
  82:16,19

size
  71:18
  72:17
  130:1

sketchy
  145:22

skinny
  66:21,25
  67:2 73:1

skip
  65:16,19

Skipper
  115:7

small
  85:13
  92:18
  93:23
  104:7
  105:15,25
  128:17

So--
  80:2

social
  86:10

someone's
  67:7

son
  133:6,10

sort
  141:20

SOTO-BRITO
  16:18,22
  18:2,20
  19:6
  21:23
  22:3
  51:12
  60:21
  79:10
  101:7
  133:18,23
  134:4,18
  135:4
  136:12,23
  137:1,12,
  16

sound
  30:7
  31:23,25
  32:10
  135:17,20
  136:2,4

sounds
  19:23

Sp
  86:6

sp?]
  116:15

speak
  13:20
  96:10,12
  99:22
  107:9
  112:23
  135:10

speaking
  21:13

26:6 28:6
29:2
94:9,11,
13 109:11
120:2,3
135:7

specific
  48:5 50:4
  75:11
  98:19
  108:14
  120:18
  156:20

specifically
  40:16
  44:17
  87:4 94:1
  118:14
  119:6
  125:20
  156:9

specifics
  23:21

spelled
  67:17,23
  76:9
  85:22
  111:10

spend
  138:13

spending
  138:6

spent
  112:20
  138:11,19
  142:3

spoke
  8:15
  12:19
  25:6
  26:20
  27:12,17

39:20
48:14
55:6 65:5
73:6
88:22
90:4
94:11
106:21,24
107:2
109:8
112:12
133:13
151:15
153:4,23

spoken
  7:16 65:6
  107:23
  111:13

spot
  126:16

stamped
  53:21
  60:23
  79:13
  101:12

stand
  66:11
  67:11

Standby
  5:5

standing
  115:22,25
  116:9,11
  128:6
  129:4
  143:25

start
  14:12
  15:25
  16:8
  17:24,25
  20:19
  24:9,13
  33:14

35:21
79:16
87:10
124:1,3
134:1,13,
20,22
146:10
152:15
155:7

started
  56:15
  69:20,24
  70:3
  108:8
  125:13
  128:16,24
  155:2

starting
  22:2,4,7
  33:15
  133:22
  134:16
  137:13

starts
  16:1
  136:11

state
  5:10
  37:22
  47:20
  88:6
  90:22
  119:16
  152:23
  153:1
  156:8,21

statement
  68:18
  69:5
  70:3,6
  76:22
  77:16
  100:3
  103:1



111:17
112:3
116:6

statements
30:24
157:3

States
47:21

station
35:24
36:17
68:20
111:23
112:25

statute
9:15

Staumbach
67:17,23
76:9
111:9

stay
6:12
23:19

staying
157:16

step
23:25
26:5

stepbrother
11:2

stolen
104:23
105:1

stop
9:8 16:8,
11 18:1,9
19:4 27:3
32:12
126:15
134:1,12,
13 135:3
137:14,

15,22

stopped
127:3
133:22
137:23

Stopping
135:5

store
95:2,23

story
102:19

street
59:10
116:15

stuck
106:20,21

stuff
94:3
139:25

stumbled
127:6

subject
58:18

subpoena
57:13
151:4,25

substance
153:7,13

suggested
157:4

suggesting
90:24

summer
92:25
93:1,5

sun
112:17

super
107:11

supposed
102:24
117:11

suspect
18:18

swear
7:2 28:20

sworn
7:6 100:3

─────────────

T

─────────────

T-SHIRT
70:19
71:8
130:14

t]he
157:4

tab
14:14,15
53:7,8
54:1
60:17
106:6,8
124:4
131:22,23

taking
108:22
112:13

talk
11:23
20:2
55:10
57:20
58:7,19
68:25
69:25
87:3,12,
22 101:15
113:13
117:9,10
122:20
123:4

147:18
148:8,12
154:21

talked
12:3,14
14:19
55:22,23
56:7,22,
25 68:22
69:21
88:11,21
89:15
94:22
99:1,8
120:23
130:23
131:3
147:4,7,
10

talking
15:16
22:11
31:19
32:10
68:17,23
69:17
85:6,8,
12,21,25
86:1,3,
22,24
94:3,16
95:24
97:20
99:1
100:13
109:15
112:20
117:9
118:10,
12,23
119:6,7
120:18
121:10
128:11
142:4
145:6,7

147:5,6
148:2,20

tall
70:16

tamara
85:21
86:15
89:22
91:6,15
94:16
95:23
98:13
116:25
117:4,19,
23 118:15
119:10
122:5
150:12,19

tape
16:12
20:4 21:1
22:11
23:18,23
24:20,23,
25 25:6,
21,24,25
26:3,4,6
27:11,17,
25 28:1,
13,20
29:2,5
30:24
31:14,18
32:20
33:16
37:14
38:3,20
41:18
45:12,16,
20 46:6,
8,18
47:1,18
49:24
50:6,12,
17,20



EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: tape,(reading)..time

51:7
52:2,13
69:8,11
73:25
74:1,23
75:16
132:8
135:8
136:2,7
137:9
138:1,8
140:6,14,
18,21
142:4,5,
10

**tape,(
reading)**
27:22

**tape-
recorded**
48:23
68:17

**tape-
recording**
13:25
14:2,18
15:1,20

**taped**
142:8

**taping**
69:5

**tat**
100:4

**TEC-9**
70:11,14,
17

**telling**
21:4
26:10
28:6,7
32:19
33:1
37:13,19

46:24
47:18
80:21
83:3
84:18
90:3,25
91:15,16,
20 97:15,
16 99:6,
13,15
102:15
108:8
132:9,13,
19,21,25
138:17
139:5
147:15,
16,21
148:7
149:3,6
155:2

**ten**
28:21

**testified**
10:18
48:19
53:14
54:6,8
82:18
86:8 96:4
97:18
116:25
124:6
125:20
144:10

**testifies**
7:7
147:12

**testify**
25:21
52:12,16,
22 53:5
62:16
81:12
82:16

83:10
84:25
85:1
138:7
143:10
152:1
153:8
156:2
157:9

**testifying**
9:18,23
53:8,12,
13 82:22
84:19

**testimony**
9:9 32:14
39:2,6
43:24,25
44:11,12,
18,22
45:4
53:21
54:16,18,
19 59:4,8
60:22
63:14
65:10,25
66:14
71:25
82:12
86:6,19
98:21,25
106:2
123:20,24
144:8
151:14
158:1

**text**
55:18
154:25

**texted**
55:21
153:19,22
154:2,3,
19,20

**texting**
57:23

**thing**
8:10
10:11
15:6
25:10
47:3
53:19
57:10
58:16
65:23
79:2 88:8
103:22
104:21
105:14
136:9
148:1,17
152:13

**things**
28:3
32:24
34:20
47:1 48:5
51:25
57:24
71:14
78:11
140:18,20
146:19
147:25
156:6

**thought**
8:17
33:18
72:3
105:2
156:6

**threat**
13:17

**threaten**
41:2
143:14

**threatened**

11:19
13:16
40:6,7,9,
10,19,21,
22 83:6
89:17
149:7,24
156:1

**threatening**
88:9

**threats**
89:19
95:13,14

**threw**
23:13,14
28:18,22

**time**
5:9 8:1
9:11
10:21
11:21
14:6,7,11
16:11
17:15
19:3,5,6
21:20
23:25
26:6
29:22
31:9
43:17
47:9
48:18
49:17
50:3 55:6
56:25
57:20
58:19,20
70:18
71:2,3
72:3 75:8
82:15
83:3 85:5
86:1
88:21,22



89:6
91:2,16
92:3
93:10,12
94:12,25
95:2,22
97:3
103:12
104:3
107:12,
13,14
109:22
110:21
112:17,21
113:5,14,
16
115:17,25
116:9,12
117:25
121:25
125:19
127:3
128:5,10
132:20
133:21
134:2
137:11,18
138:13
142:3
143:3,6
145:18
146:16,
19,21
153:7
155:8

times
7:16 9:3,
4 10:19
37:7,9
61:16,18,
21,23
62:8
68:10,13
81:21
88:11,12
98:8

113:8
147:13
152:20
153:5,19

timestamp
133:21

timestamps
26:24
27:1

Tino
27:23
33:22
34:21
38:5
39:12,18
40:14
42:2
43:14,15
44:19
59:17,18
62:20
65:5
74:3,6
75:2,7
77:7 99:4

Tino's
35:3
84:23

today
5:24 6:7
29:2
43:25
46:14
50:19
77:12
82:13
93:25
106:7
124:14,23
142:19
144:5
145:16
148:14,
18,25

149:10
151:2
153:1
155:24
157:9

today's
5:8 158:1

told
6:3,21
12:14
34:15
35:12
36:8 43:2
55:11
56:8,22
57:8 64:1
78:11
79:3
87:25
88:8
89:21
90:17
91:6 96:3
97:23
98:4,6,7,
14,22
100:4
104:5
105:12
106:15
108:16,18
112:24
113:2
122:5,7,
14 129:24
136:1
140:21,22
148:1,24
149:10,16
150:9,14
151:12
153:7,13
155:11,
19,24
156:8,15

top
16:2,3,4
33:13
54:2
105:17
116:21
131:24,25

Tori
54:17,21
78:12
123:5,10

Torriano
54:15

touch
58:18

Toussaint
5:7 7:5
158:2

tracker
116:20
118:2

traffic
104:7
105:15

transcribed
27:16

transcript
15:3,10
19:18
20:12,18
33:7,8
41:15
86:13,14,
15 87:7
88:15
131:22
136:16
140:14
142:5
157:18

transcripti
on
14:16

25:3
26:19
69:9

traumatic
121:11,18
122:1

Travis
40:8,11,
17

trial
53:9
60:17,23
64:11,12
65:10,25
66:6
81:19,23
82:8
83:24
84:5,19,
23 93:11,
13 97:17
101:16
123:24
124:3
126:10
155:20

trials
48:20

trouble
9:16
29:16,17,
24 104:6
105:1
117:11
122:5
123:19

truck
116:21

true
36:3,5
83:12
103:1
139:3,9,
21 140:23



EMIL TOUSSAINT ADAMS
DIXON V CITY OF BUFFALO

January 17, 2023
Index: truth..wall

truth
  9:14,19
  10:2
  26:10
  34:12
  41:11
  56:2
  57:11
  90:25
  96:6
  97:17
  155:19,24
  156:19

truthful
  54:19
  59:8
  61:17

truthfully
  39:22

turn
  14:14
  18:10
  138:14,
  20,23
  140:23,25
  141:16

turned
  81:15
  114:1
  132:20

TV
  95:15

two-
  88:23,24

two-page
  101:11

Twon
  65:7

type
  64:22

typed
  73:7

112:3

types
  52:8

typewriter
  68:8
  69:11,16

typing
  69:16,17,
  20,24
  70:3
  111:17
  113:3

_____

U

Uh-huh
  89:12

ultimately
  17:10

uncle
  96:24
  97:12,16
  98:8
  100:14
  104:17
  147:17
  148:8,12

uncooperati
ve
  82:14
  83:13

understand
  8:4 9:21
  10:1,4
  32:14
  35:16,18,
  20 47:12
  81:22
  82:8
  124:23
  146:20

understandi
ng
  6:1

understands
  5:25

understood
  6:21 8:8
  20:23

United
  47:21

untrue
  117:15,16

upset
  102:16,23
  103:20

_____

V

vaguely
  10:24
  85:19
  109:17

Valentina
  108:11
  110:6

Valentino
  5:8,13
  7:13
  11:24
  13:1
  20:23
  33:24
  34:7 35:6
  39:7,20
  40:20
  42:23
  43:10,16
  44:1 47:4
  49:1 59:5
  61:20
  62:21
  63:23
  66:20

76:18
77:7,10,
25 81:23
82:22
83:10
84:5
87:13,23,
25 88:2,7
89:13
90:5,25
91:21
95:4,10,
16 96:13
97:18
98:5,22
99:6,13,
15 100:18
107:14,
15,16
110:11
111:18
113:6
122:14
132:9,13
133:5
142:16,
20,23
148:19,25
149:4,7,
11,17
150:5,15,
23 156:7
157:4

Valentino's
  11:1
  14:20
  49:8
  96:19

vehicle
  104:23
  105:1

verbally
  10:8

version
  17:12

video
  5:6 77:4
  80:13
  129:15
  130:1

VIDOEGRAPHE
R
  131:12

visiting
  92:25
  93:5

voice
  20:3,6
  21:2,14
  23:10
  31:18,24
  51:7 52:2
  135:11

voiced
  103:19

voices
  21:1

voluntarily
  80:22
  155:22

_____

W

wait
  17:6
  157:15

waive
  64:20

waived
  158:5

Walker
  5:22,23
  6:16,19
  8:15

wall
  129:9,15



wanted
    6:19,20
    30:8
    81:12
    83:6
    153:8
    154:21
    155:14

warrant
    81:15,18
    83:21
    138:14
    139:7,16
    141:1

Washington
    116:15

watch
    132:15
    135:9

watching
    136:5

water
    8:3

ways
    20:10

wearing
    70:18
    71:7,8,
    11,20
    72:4,20
    129:20
    130:3,14

wee
    32:20

weeks
    139:6
    152:14
    155:6,7
    156:10

weight
    66:23
    67:7,12

white
    70:19,20

white-soft
    116:21

wife
    34:10
    151:12,
    14,22,25
    152:4

wit
    128:6

withdraw
    39:5
    119:2

withdrawn
    10:22
    65:13
    84:17
    87:14
    88:4
    91:1,16
    92:15
    96:23
    97:15
    118:25
    140:22

witnessed
    83:11

witnesses
    36:13
    118:5

woman
    20:21
    86:7
    91:16,25
    94:10
    95:15,22,
    23 117:4

women
    92:15
    93:21
    94:13

won
    133:8

words
    9:15
    19:18
    24:2,7
    25:5
    26:20
    27:12,16
    32:8,19
    39:9
    44:12,15,
    22 45:5,
    20,24
    73:6,9
    89:8
    99:23,25
    110:7
    122:25
    127:2
    135:21
    136:1
    149:23

wore
    66:22
    71:16
    130:2

work
    16:9
    96:23
    103:24,25
    104:1

worker
    86:10

working
    97:5
    104:17

world
    149:3,6

worried
    91:18

write
    10:8 18:4

    147:10

writes
    83:22,23

wrong
    34:21
    38:12
    45:19

wrote
    83:21
    147:1

_____

    Y
_____

y'all
    6:22

Yea
    110:8

year
    14:6 92:9
    93:18
    104:18
    114:6

years
    10:22
    11:22
    40:12
    42:16
    46:15
    47:8,14
    49:13
    55:22,23
    56:24
    57:2,18
    58:4
    59:2,3
    67:25
    70:1
    75:12
    78:2
    92:17
    93:22
    94:10
    103:6,7,

    8,9
    113:19
    115:3
    120:6
    142:19
    146:19,21

yesterday
    56:22
    57:1,18,
    21 58:8,
    19,20,24

York
    119:20
    154:11,16

young
    87:4
    117:25

younger
    32:12

_____

    §
_____

§9-11-28(d)
    5:4



**VALENTINO DIXON**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

----------------------------------------
VALENTINO DIXON,

                          Plaintiff,

                - vs -       Case No.
                          1:19-cv-01678-WMS

CITY OF BUFFALO and COUNTY OF ERIE;
and DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA, DETECTIVE
JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN, JOHN DOES,
Unknown Buffalo Police Department Supervisors,
and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
BELLING, in their individual capacities,

                          Defendants.
----------------------------------------

        Examination before trial of **VALENTINO**

**DIXON**, Plaintiff, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of

HODGSON RUSS LLP, The Guaranty Building,

140 Pearl Street, Suite 100, Buffalo, New York, on

June 7, 2022, commencing at 9:58 a.m., before

LORI K. BECK, CSR, CM, Notary Public.

*JACK W. HUNT & ASSOCIATES, INC.*

2

```
 1  APPEARANCES:       NEUFELD SCHECK & BRUSTIN, LLP,
                       By NICK J. BRUSTIN, ESQ.,
 2                     nick@nsbcivilrights.com and
                       GERARDO ROMO, ESQ.,
 3                     gerardo@nsbcivilrights.com
                       99 Hudson Street,
 4                     8th Floor,
                       New York, New York  10013,
 5                     (212) 965-9081,
                            and
 6                     EASTON THOMPSON KASPEREK
                       SCHIFFRIN, LLP,
 7                     By DONALD M. THOMPSON, ESQ.,
                       16 West Main Street, Suite 243,
 8                     Rochester, New York  14614,
                       (585) 423-8290,
 9                     dmthompson@etksdefense.com,
                       Appearing for the Plaintiff.
10
                       HODGSON RUSS LLP,
11                     By HUGH M. RUSS, III, ESQ.,
                       hruss@hodgsonruss.com and
12                     PETER A. SAHASRABUDHE, ESQ.,
                       psahasra@hodgsonruss.com,
13                     The Guaranty Building,
                       140 Pearl Street, Suite 100,
14                     Buffalo, New York  14202,
                       (716) 856-4000,
15                     Appearing for the Defendants,
                       City of Buffalo; Detective
16                     Mark R. Stambach, Detective
                       Raniero Masecchia, Detective
17                     James P. Lonergan, Detective
                       John Vickerd, Chief Richard T.
18                     Donovan, and John Does, Unknown
                       Buffalo Police Department
19                     Supervisors.

20

21

22

23
```

3

```
 1              LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                By JENNIFER C. PERSICO, ESQ.,
 2              50 Fountain Plaza, Suite 1700,
                Buffalo, New York  14202,
 3              (716) 853-5100,
                jpersico@lippes.com,
 4              Appearing for the Defendants,
                County of Erie and
 5              Assistant District Attorney
                Christopher Belling.
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

*Valentino Dixon - Ms. Persico - 06/07/2022*

4

1          THE REPORTER:  Are usual stipulations all

09:58:32   2    right, or do you want him to read and sign?

09:58:32   3          MR. BRUSTIN:  I think we'll reserve the

09:58:34   4    right to read and sign.

09:58:36   5          THE REPORTER:  And is everyone supplying Mr.

09:58:36   6    Brustin with the transcript?  Splitting and

09:58:36   7    supplying, the Buffalo way of providing

09:58:45   8    transcripts?

09:58:45   9          MS. PERSICO:  Yes.

09:58:46  10          MR. SAHASRABUDHE:  Yes, that's fine.

09:58:47  11

09:58:47  12    VALENTINO DIXON, 87 Hagen Street, Buffalo, New York

09:58:47  13    14211, after being duly called and sworn, testified

09:59:15  14    as follows:

09:59:15  15                      EXAMINATION

09:59:15  16          BY MS. PERSICO:

09:59:17  17          Q.   Good morning, Mr. Dixon.

09:59:18  18          A.   Good morning.

09:59:19  19          Q.   My name is Jen Persico, and I represent

09:59:22  20    the county and the Defendant -- the county

09:59:27  21    Defendants and the District Attorney Defendants

09:59:29  22    named in your lawsuit.

09:59:30  23          A.   Okay.

*Valentino Dixon - Ms. Persico - 06/07/2022*

5

09:59:30  1      Q.    Just a couple of ground rules before we

09:59:34  2  get started:

09:59:37  3          This wonderful woman here needs to take down

09:59:40  4  everything that we say, so she can't take down nods

09:59:45  5  of the head or shakes of the head, so each of your

09:59:48  6  answers must be verbal.

09:59:51  7      A.    Okay.

09:59:52  8      Q.    Do you understand that?

09:59:53  9      A.    Yes.

09:59:54  10     Q.    If you don't understand any of the

09:59:55  11 questions that I ask you, just let me know, and I'm

09:59:57  12 happy to rephrase them, okay?

09:59:59  13     A.    Okay.

10:00:00  14     Q.    If you do answer the questions, I'm

10:00:02  15 going to assume that you understood them.

10:00:03  16         Fair enough?

10:00:04  17     A.    Yes.

10:00:05  18     Q.    If you want to take a break at any

10:00:07  19 time -- you know, this is not a marathon -- just

10:00:09  20 let us know.

10:00:11  21         I'd just ask that if you're in the middle of

10:00:14  22 a question, if I've asked you a question and you

10:00:16  23 have not yet answered, please don't take a break at

*Valentino Dixon - Ms. Persico - 06/07/2022*

6

10:00:19  1  that point, but at any time other than that, just

10:00:21  2  let us know if you need a facilities break or

10:00:23  3  anything else, and we'll be happy to accommodate

10:00:26  4  you, okay?

10:00:26  5          A.   Okay.

10:00:29  6          Q.   So I'm sure that you have spoken with

10:00:38  7  your attorney.  I don't want to know what you

10:00:40  8  talked about, but you understand that we're here to

10:00:43  9  talk about allegations contained in a Complaint

10:00:46  10  that you filed in 2019 alleging that you were

10:00:51  11  wrongfully convicted; is that right?

10:00:53  12          A.   Yes.

10:00:53  13          Q.   In preparation for today's deposition,

10:00:59  14  did you meet with your attorney?

10:01:02  15          MR. BRUSTIN:  Objection to the form.  Phone

10:01:04  16  calls, meetings in person, you want all of it?

10:01:08  17          MS. PERSICO:  You can object to the form,

10:01:10  18  and the rest of the speaking I'll -- I'll leave to

10:01:12  19  the witness.

10:01:13  20          MR. BRUSTIN:  Well, make it clear.  Basic

10:01:17  21  stuff.

10:01:17  22          MS. PERSICO:  I think that I told him if he

10:01:18  23  didn't understand, that he could tell me.

*Valentino Dixon - Ms. Persico - 06/07/2022*

7

10:01:20  1          **BY MS. PERSICO:**

10:01:21  2          **Q.**   So I'm going to ask you again,

10:01:23  3   Mr. Dixon:

10:01:24  4          In preparation for today's deposition, did

10:01:26  5   you meet with your attorney?

10:01:28  6          **MR. BRUSTIN:**   Objection to the form.  You

10:01:28  7   can answer.

10:01:29  8          **THE WITNESS:**   Yes.

10:01:30  9          **BY MS. PERSICO:**

10:01:30  10         **Q.**   Was that by phone?

10:01:32  11         **A.**    Both.

10:01:34  12         **Q.**   When you say both, do you mean by phone

10:01:36  13   and in person?

10:01:36  14         **A.**    Yes.

10:01:39  15         **Q.**   And how many times did you meet in

10:01:43  16   person?

10:01:46  17         **A.**    One time.

10:01:46  18         **Q.**   Okay.  And when was that?

10:01:49  19         **A.**    Yesterday.

10:01:52  20         **Q.**   And how many times did you talk on the

10:01:54  21   phone?

10:01:55  22         **A.**    Approximately four or five times.

10:01:57  23         **Q.**   Did you review any documents in

*Valentino Dixon - Ms. Persico - 06/07/2022*

8

10:02:01  1  preparation for today's proceeding?

10:02:03  2        **A.**   No.

10:02:04  3        **MR. BRUSTIN:**  I just want to be clear, I'm

10:02:06  4  sorry.  That means any -- any papers you read in

10:02:09  5  preparation for today.  Anything you read.

10:02:14  6        **THE WITNESS:**  I haven't read -- yes.  Yes, I

10:02:17  7  haven't read anything today or yesterday.

10:02:19  8        Last week, you know.

10:02:20  9        **BY MS. PERSICO:**

10:02:21  10        **Q.**   Okay.  Have you at any time read any

10:02:26  11  documents in preparation for today's proceeding?

10:02:30  12        **A.**   Yes.

10:02:31  13        **Q.**   And what documents were those?

10:02:33  14        **A.**   Police statements that was made during

10:02:37  15  the investigation of the case.

10:02:38  16        **Q.**   When you say police statements, do you

10:02:43  17  mean statements made to the police or statements of

10:02:46  18  the police?

10:02:46  19        **A.**   Statements made to the police by

10:02:49  20  witnesses.

10:02:49  21        **Q.**   Which ones?

10:02:50  22        **A.**   Leonard Brown, Antoine Shannon.  Just

10:03:00  23  those two.

*Valentino Dixon - Ms. Persico - 06/07/2022*

9

10:03:01  1        Q.   Did you review your own statement?

10:03:03  2        A.   Yes.

10:03:11  3        Q.   And how did you come to obtain those

10:03:14  4   documents?

10:03:14  5        MR. BRUSTIN:   Just to be clear, he has not

10:03:16  6   given you a complete answer as to the things he

10:03:18  7   reviewed.   Just so you know that.

10:03:20  8        MS. PERSICO:   I figured as much.   We'll work

10:03:24  9   through that later.

10:03:26 10        BY MS. PERSICO:

10:03:26 11        Q.   And how did you obtain the documents

10:03:28 12   that you reviewed?

10:03:30 13        A.   I've -- I've had those documents for 30

10:03:34 14   years.

10:03:50 15        Q.   So prior to filing the Complaint that

10:03:56 16   we're here to talk about today, your attorneys --

10:04:02 17   perhaps not Mr. Brustin but Mr. Thompson -- filed

10:04:05 18   what's commonly known as a 440 motion.

10:04:08 19        Do you understand that?

10:04:09 20        A.   Yes.

10:04:09 21        Q.   Okay.   Do you know what the purpose of

10:04:11 22   the 440 motion was?

10:04:12 23        A.   Yes.

*Valentino Dixon - Ms. Persico - 06/07/2022*

10

10:04:13  1          **Q.**   And what's your understanding of that?

10:04:14  2          **MR. BRUSTIN:**   Objection to form, calls for a

10:04:16  3   legal conclusion, but you can answer.

10:04:18  4          **THE WITNESS:**   Well, there were a couple

10:04:21  5   issues.  Prosecutory misconduct, a Brady violation,

10:04:28  6   ineffective assistance of trial counsel.

10:04:33  7          These are the issues that I've raised for 30

10:04:37  8   years.

10:04:40  9          **BY MS. PERSICO:**

10:04:40  10         **Q.**   So in the -- in the most recent 440

10:04:44  11   motion, do you recall meeting with Assistant

10:04:47  12   District Attorneys Sara Dee and David Heraty in

10:04:51  13   August of 2018?

10:04:52  14         **A.**   Yes.

10:04:53  15         **Q.**   And you knew that that meeting -- or

10:04:57  16   those meetings were in connection with resolution

10:04:59  17   of the 440 motion, correct?

10:05:01  18         **A.**   Yes.

10:05:02  19         **Q.**   So you had an initial meeting with them

10:05:04  20   on August 17th of 2018?

10:05:09  21         **A.**   I'm not certain of the date.

10:05:10  22         **Q.**   Okay.  Do you recall that you had three

10:05:15  23   meetings with the District Attorney's office in

*Valentino Dixon - Ms. Persico - 06/07/2022*

11

| | | |
|---|---|---|
| 10:05:17 | 1 | 2018? |
| 10:05:20 | 2 | **A.**   I'm not certain.  I believe it was two |
| 10:05:21 | 3 | meetings, but it could have been three. |
| 10:05:23 | 4 | **Q.**   Okay.  So could it have been two |
| 10:05:25 | 5 | meetings and one polygraph examination? |
| 10:05:29 | 6 | **A.**   No, because the polygraph examination |
| 10:05:31 | 7 | came on a day that we had a meeting. |
| 10:05:33 | 8 | **Q.**   Okay.  So if I told you -- well, let |
| 10:05:38 | 9 | me -- let me back up. |
| 10:05:39 | 10 | Those meetings -- were you aware that those |
| 10:05:45 | 11 | meetings were videotaped? |
| 10:05:46 | 12 | **A.**   I saw a camera, so I didn't know if it |
| 10:05:48 | 13 | was working or not. |
| 10:05:49 | 14 | **Q.**   Okay.  Did you ever review the videos |
| 10:05:56 | 15 | of those meetings? |
| 10:05:57 | 16 | **A.**   No. |
| 10:05:57 | 17 | **Q.**   Do you recall being at those meetings? |
| 10:06:21 | 18 | **A.**   Yes. |
| 10:06:21 | 19 | **Q.**   And you were there with your attorney, |
| 10:06:26 | 20 | Don Thompson? |
| 10:06:26 | 21 | **A.**   Yes. |
| 10:06:28 | 22 | **Q.**   So in the last meeting, which I'll |
| 10:06:36 | 23 | represent to you was on August 31st, 2018, you |

*Valentino Dixon - Ms. Persico - 06/07/2022*

12

10:06:43  1   indicated -- well, let me back up.  Strike that.

10:06:46  2         You recall speaking with the Assistant

10:06:52  3   District Attorneys during those meetings.

10:06:53  4         **A.**   Yes.

10:06:53  5         **Q.**   And as we established, you understood

10:06:57  6   that those meetings were intended to assist the

10:07:00  7   District Attorney's office with its reinvestigation

10:07:03  8   of your case.

10:07:04  9         **MR. BRUSTIN:**  Objection, asked and answered.

10:07:05  10  You can answer again.

10:07:06  11        **THE WITNESS:**  Yes.

10:07:08  12        **BY MS. PERSICO:**

10:07:14  13        **Q.**   And in -- in that last meeting on

10:07:17  14  August 31st, 2018, you -- you indicated that --

10:07:24  15  well, you told the story of what actually happened

10:07:28  16  on August 9th, 10th, 1991, correct?

10:07:33  17        **MR. BRUSTIN:**  Objection, form, vague.

10:07:35  18        **THE WITNESS:**  Yes.

10:07:36  19        **BY MS. PERSICO:**

10:07:39  20        **Q.**   And -- and so you indicated that

10:07:43  21  sometime on August 9th, 1991, you received -- or

10:07:48  22  perhaps it was August 10th -- you received a page

10:07:51  23  by your half-brother, Leonard Brown; is that

*Valentino Dixon - Ms. Persico - 06/07/2022*

13

10:07:55  1  correct?

10:07:55  2          **MR. BRUSTIN:**  Objection to the form.

10:07:57  3          **THE WITNESS:**  Yes.

10:07:57  4          **BY MS. PERSICO:**

10:08:00  5      **Q.**   And then you --

10:08:02  6          **MR. BRUSTIN:**  Just for the record, we have a

10:08:04  7  transcript of this meeting.

10:08:05  8          **MS. PERSICO:**  I don't care.

10:08:07  9          **MR. BRUSTIN:**  Okay.  Just for the record.

10:08:09 10  That would be a proper -- a better way to ask him

10:08:11 11  questions about it, but go ahead.

10:08:13 12          **MS. PERSICO:**  Listen, if you want to run

10:08:14 13  your deposition however you want to run it, why

10:08:17 14  don't you let me run this one.

10:08:19 15          **MR. BRUSTIN:**  I'm going to make every

10:08:21 16  objection I need to make.  Go ahead.

10:08:23 17          **MS. PERSICO:**  Clearly.

10:08:23 18          **BY MS. PERSICO:**

10:08:25 19      **Q.**   So once you received the page from

10:08:26 20  Leonard, did you call him back?

10:08:29 21      **A.**   Yes.

10:08:30 22      **Q.**   And during that telephone conversation

10:08:33 23  with him, you learned that he and some of his

*Valentino Dixon - Ms. Persico - 06/07/2022*

14

| | | |
|---|---|---|
| 10:08:39 | 1 | colleagues were having some trouble with the |
| 10:08:41 | 2 | Jackson brothers; is that correct? |
| 10:08:43 | 3 | **A.**   Yes. |
| 10:08:45 | 4 | **Q.**   So at some point after that telephone |
| 10:08:51 | 5 | call and/or page, you drove your Mazda RX-7 to pick |
| 10:09:02 | 6 | up Lamarr Scott on -- on Koons Avenue at Richard |
| 10:09:08 | 7 | Jarrett's house? |
| 10:09:10 | 8 | **A.**   Yes. |
| 10:09:10 | 9 | **Q.**   When you picked up -- pardon me.  It's |
| 10:09:15 | 10 | terrible allergy season around here. |
| 10:09:18 | 11 | So when you went to pick up Lamarr Scott on |
| 10:09:25 | 12 | Koons, you had your TEC-9 in the car with you. |
| 10:09:29 | 13 | **A.**   Yes. |
| 10:09:30 | 14 | **Q.**   So then you picked up Lamarr Scott and |
| 10:09:35 | 15 | drove him and the TEC-9 to Mario Jarman's house in |
| 10:09:40 | 16 | your car. |
| 10:09:40 | 17 | **A.**   Yes. |
| 10:09:43 | 18 | **Q.**   Prior to that date, you had owned that |
| 10:09:46 | 19 | TEC-9 for about six months? |
| 10:09:50 | 20 | **A.**   Approximately, yes. |
| 10:09:50 | 21 | **Q.**   And you kept it in your house on |
| 10:09:55 | 22 | Lisbon? |
| 10:09:55 | 23 | **A.**   Yes. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

15

10:09:58  1      Q.   And sometime prior to August 10th,

10:10:02  2  1991, you bought bullets for that gun.

10:10:04  3      A.   Yes.

10:10:05  4      Q.   When you went to pick up Lamarr, you --

10:10:16  5  you already knew that the Jackson brothers had held

10:10:18  6  a gun to your brother Toine's head in the preceding

10:10:22  7  weeks, correct?

10:10:23  8      **MR. BRUSTIN:**  Objection to form, calls for

10:10:25  9  speculation.

10:10:25  10      **THE WITNESS:**  I was told that.

10:10:26  11      **BY MS. PERSICO:**

10:10:26  12      Q.   Okay.  So you knew -- you were aware

10:10:28  13  that that was the allegation?

10:10:30  14      A.   Yes.

10:10:30  15      Q.   And you were aware of that on the --

10:10:34  16  the night of August 10th, 1991.

10:10:37  17      A.   Yes.

10:10:37  18      Q.   So just to sort of sum up the events

10:10:58  19  that we've covered so far, in response to Leonard's

10:11:00  20  page, you -- well, let me back up.

10:11:03  21      Where were you when you received the page

10:11:06  22  from Leonard?

10:11:07  23      A.   I don't remember.  Could have been

*Valentino Dixon - Ms. Persico - 06/07/2022*

16

10:11:11  1 | anywhere.

10:11:17  2 |         Q.    I remember back in those days as well

10:11:21  3 | that we didn't all have cell phones, so when you

10:11:23  4 | received the page, you would have had to go to a

10:11:27  5 | place with a phone to make the call; is that

10:11:30  6 | correct?

10:11:30  7 |         A.    Yes.

10:11:30  8 |         Q.    Do you remember where you made the

10:11:31  9 | phone call?

10:11:33 10 |         A.    No, because whenever I got a page, I

10:11:36 11 | could just stop at a phone booth somewhere.

10:11:39 12 | There's phone booths everywhere, so -- that's all I

10:11:41 13 | remember.

10:11:41 14 |         MR. BRUSTIN:  So just -- remember, just

10:11:42 15 | answer her question.

10:11:43 16 |         THE WITNESS:  Okay.

10:11:44 17 |         BY MS. PERSICO:

10:11:44 18 |         Q.    That's all right.  There were phone

10:11:46 19 | booths then.

10:11:46 20 |         A.    Yes.

10:11:47 21 |         Q.    There aren't anymore.

10:11:52 22 |         MR. SAHASRABUDHE:  Phone booths are not an

10:11:53 23 | issue in this lawsuit.

*Valentino Dixon - Ms. Persico - 06/07/2022*

17

10:11:54  1          MR. BRUSTIN:  Not yet.

10:11:55  2          MR. SAHASRABUDHE:  Not yet.  They might be.

10:11:57  3          MS. PERSICO:  That's true.

10:12:05  4          BY MS. PERSICO:

10:12:20  5          Q.    So what time do you think you picked up

10:12:27  6  Lamarr from Mr. Jarrett's house on -- on Koons?

10:12:34  7          A.    I'm not certain.  I can say an

10:12:36  8  approximate time, if that's what you want.

10:12:38  9          Q.    Sure.

10:12:38 10          A.    I would say maybe eight or nine in the

10:12:43 11  evening.

10:12:46 12          Q.    And that would have been on August 9th.

10:12:48 13          A.    Correct.

10:12:48 14          Q.    And -- and how did you know that Lamarr

10:13:02 15  was at Mr. Jarrett's house?

10:13:05 16          A.    Well, I didn't specifically go there to

10:13:09 17  get him.  This is a place where we all hung out.

10:13:12 18  We were all at Richard Jarrett's house almost every

10:13:15 19  day, you know.

10:13:16 20          So I went over there, and he was just over

10:13:18 21  there, you know.

10:13:18 22          Q.    Okay.

10:13:18 23          A.    And it was -- that was either me, him,

*Valentino Dixon - Ms. Persico - 06/07/2022*

18

10:13:21  1  or Richard together or -- all three of us, but

10:13:25  2  because I had the Mazda RX-7, it's a two-seater,

10:13:30  3  okay, and so really I just chose to take Lamarr

10:13:35  4  with me.  It could have been Rich, could have been

10:13:38  5  any one of them.

10:13:39  6       **Q.**  Okay.  So -- and then you drove over to

10:13:46  7  Lamarr -- I mean over to Mario Jarman's house on

10:13:50  8  Delavan?

10:13:51  9       **A.**  Yes.

10:13:57 10       **MR. BRUSTIN:**  Sorry to interrupt.  I think

10:13:58 11  Don is here looking for us.

10:14:01 12       **MS. PERSICO:**  Can we go off?

10:14:04 13            (Off the record: 10:14 a.m.)

10:15:10 14            (Mr. Thompson entered the deposition.)

10:15:10 15            (On the record: 10:15 a.m.)

10:15:13 16       **BY MS. PERSICO:**

10:15:19 17       **Q.**  So -- so you and Lamarr arrived at

10:15:25 18  Mario's house together.

10:15:26 19       **A.**  Yes.

10:15:27 20       **Q.**  So if -- if Mario Jarmon testified in

10:15:34 21  the Grand Jury that you arrived at his house before

10:15:36 22  Lamarr Scott, that would not be true.

10:15:38 23       **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

19

10:15:41 1          THE WITNESS:  That would not be true.

10:15:44 2          BY MS. PERSICO:

10:15:47 3          Q.    So if Mario Jarmon testified at the

10:15:51 4   Grand Jury that Lamarr came to his house on a bike

10:15:55 5   or a Moped, that would also be false.

10:15:58 6          MR. BRUSTIN:  Objection to form.

10:16:00 7          THE WITNESS:  I believe it would be false.

10:16:01 8          BY MS. PERSICO:

10:16:01 9          Q.    Well, he came with you in the car.

10:16:03 10         A.    Yes.

10:16:04 11         Q.    Okay.  So he didn't come on a bike.

10:16:06 12         MR. BRUSTIN:  Objection to form,

10:16:08 13  argumentive, asked and answered.

10:16:09 14         MS. PERSICO:  Mr. Brustin, if you're going

10:16:11 15  to make objections, please do, but as you know, the

10:16:14 16  rules -- you and I are both older, so the rules

10:16:17 17  used to be different, but there really are no

10:16:21 18  speaking objections.

10:16:22 19         MR. BRUSTIN:  I'm just stating the form

10:16:24 20  objection.

10:16:26 21         MS. PERSICO:  You can just say, "Objection,

10:16:27 22  form."  They're all preserved.  We know this,

10:16:30 23  right?

*Valentino Dixon - Ms. Persico - 06/07/2022*

20

10:16:31  1          MR. BRUSTIN:  Okay, well, I think it's fine.

10:16:32  2     You have an objection to me saying what the actual

10:16:34  3     form objection is?

10:16:35  4          MS. PERSICO:  I think that the rules

10:16:36  5     prohibit that.

10:16:39  6          MR. BRUSTIN:  Okay.

10:16:45  7          MS. PERSICO:  You achieved your goal.  I

10:16:48  8     forgot what my question was.

10:16:50  9          Can you read that back?

10:16:51 10          MR. BRUSTIN:  That really wasn't my goal.

10:16:52 11          (The record was read as requested.)

10:17:12 12          BY MS. PERSICO:

10:17:12 13          Q.  He didn't come on a bike, right?

10:17:14 14          MR. BRUSTIN:  Objection to form.

10:17:15 15          THE WITNESS:  No.

10:17:19 16          BY MS. PERSICO:

10:17:20 17          Q.  That was my --

10:17:20 18          A.  I don't believe --

10:17:23 19          Q.  -- a bad question.  So you agree that

10:17:26 20     he --

10:17:26 21          A.  I have an explanation for that.

10:17:28 22          Q.  I don't -- I'll just ask the questions,

10:17:30 23     and then you can --

*Valentino Dixon - Ms. Persico - 06/07/2022*

21

10:17:30  1        **A.**    Okay.

10:17:31  2        **MR. BRUSTIN:**  You can always explain any

10:17:33  3  answer you want.

10:17:33  4        **THE WITNESS:**  Yes, I need to explain that.

10:17:34  5        **MR. BRUSTIN:**  Just let her ask the question

10:17:36  6  first.

10:17:36  7        **THE WITNESS:**  Okay.

10:17:37  8        **MR. BRUSTIN:**  Then you answer it the way you

10:17:37  9  see fit.

10:17:37 10        **BY MS. PERSICO:**

10:17:37 11        **Q.**    And I think your lawyer can ask you

10:17:39 12  whatever questions in follow-up he wants, but how

10:17:42 13  about when you and I are talking, you listen to my

10:17:44 14  questions and answer them, and if your lawyer wants

10:17:46 15  to follow up with additional questions, he can do

10:17:49 16  that, okay?

10:17:49 17        **MR. BRUSTIN:**  So let me say it again,

10:17:51 18  counselor.  You answer her question the way you

10:17:54 19  think it's appropriate to answer, okay?

10:17:55 20        **THE WITNESS:**  Okay.

10:17:59 21        **MS. PERSICO:**  This is going to be a long day.

10:18:01 22        **MR. BRUSTIN:**  It is what it has to be.  You

10:18:03 23  just ask questions.  This is serious -- this is

*Valentino Dixon - Ms. Persico - 06/07/2022*

22

10:18:05  1  serious business.  Just ask questions.

10:18:06  2      MS. PERSICO:  Well, and how about I ask the

10:18:07  3  questions and you stop testifying?

10:18:08  4      MR. BRUSTIN:  Why are you talking to me?

10:18:09  5  Just ask questions.  I'm not testifying.  Don't

10:18:11  6  instruct my witness not -- to answer the question

10:18:14  7  the way you want to.  He's going to answer it the

10:18:14  8  way he sees fit.

10:18:18  9      So let's just move on.  Ask questions.

10:18:18  10     MS. PERSICO:  Okay.  Stop coaching, and I'll

10:18:21  11 ask questions.

10:18:24  12     MR. BRUSTIN:  Great.

10:18:25  13     MS. PERSICO:  Okay.  He's actually very good

10:18:32  14 at making me forget what I'm doing.

10:18:45  15     Can you read it back, please?

10:18:45  16     (The record was read as requested.)

10:19:11  17     BY MS. PERSICO:

10:19:11  18     Q.   That's the question.  He didn't come on

10:19:14  19 a bike, right?

10:19:15  20     A.   No.  He did not come on a bike.

10:19:18  21     Q.   Thank you.

10:19:20  22     MS. PERSICO:  Would you like to take your

10:19:21  23 break now?

*Valentino Dixon - Ms. Persico - 06/07/2022*

23

10:19:22  1          **MR. BRUSTIN:**  Just 30 seconds, if you don't

10:19:23  2   mind.  Appreciate it.

10:19:25  3          **MS. PERSICO:**  Thanks.  We can go off.

10:19:31  4          (A recess was then taken at 10:19 a.m.)

10:20:42  5          **BY MS. PERSICO:**

10:20:43  6          Q.   So in keeping with our prior

10:20:44  7   questioning, if Leonard Brown testified at the

10:20:47  8   Grand Jury that Lamarr came on a bike, that would

10:20:50  9   also be false, correct?

10:20:52  10         **MR. BRUSTIN:**  Objection to form.

10:20:53  11         **THE WITNESS:**  I believe it to be.  I believe

10:20:56  12   it to be false.

10:20:57  13         **BY MS. PERSICO:**

10:20:57  14         Q.   Okay.  And -- and if Leonard Brown were

10:21:07  15   to testify at the Grand Jury that you were not at

10:21:12  16   Mario's house when Lamarr got there, that would

10:21:14  17   also be false --

10:21:16  18         **MR. BRUSTIN:**  Objection --

10:21:18  19         **BY MS. PERSICO:**

10:21:18  20         Q.   -- correct?

10:21:20  21         **MR. BRUSTIN:**  Sorry.  Objection to form.

10:21:21  22         **THE WITNESS:**  I believe that to be false.

10:21:24  23         **BY MS. PERSICO:**

*Valentino Dixon - Ms. Persico - 06/07/2022*

24

10:21:24  1       **Q.**     Similarly, if Leonard Brown testified

10:21:28  2   at the -- at the Grand Jury -- strike that.

10:21:38  3       If -- if Mr. Scott testified at the Grand

10:21:50  4   Jury that you drove him to Mario's house on the

10:21:54  5   night in question in your red Mazda RX-7, that

10:21:59  6   would be true, correct?

10:22:00  7       **MR. BRUSTIN:**   Objection to form.

10:22:02  8       **THE WITNESS:**   That would be true.

10:22:03  9       **BY MS. PERSICO:**

10:22:18 10       **Q.**     Do you recall at some point on

10:22:21 11   August 10th, 1991, being arrested by the Buffalo

10:22:25 12   police?

10:22:28 13       **A.**     Yes, I recall.

10:22:28 14       **Q.**     And you -- you went to the police

10:22:37 15   station and gave a statement; is that correct?

10:22:39 16       **A.**     Yes.

10:22:41 17       **Q.**     And you were -- when you were arrested,

10:22:45 18   that was on Delavan?

10:22:49 19       **A.**     Yes.

10:22:51 20       **Q.**     And I think your prior testimony was

10:22:53 21   that you returned to Delavan to pick up one of your

10:22:57 22   cars; is that correct?

10:22:58 23       **MR. BRUSTIN:**   Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

25

10:23:00   1          **THE WITNESS:**  Yes.

10:23:01   2          **BY MS. PERSICO:**

10:23:01   3          **Q.**   And it was at that time when you went

10:23:03   4   to retrieve the car that you were arrested.

10:23:06   5          **MR. BRUSTIN:**  Objection to form.

10:23:07   6          **THE WITNESS:**  Yes.

10:23:08   7          **BY MS. PERSICO:**

10:23:16   8          **Q.**   So prior to giving your statement at

10:23:21   9   the police station, you were advised of your

10:23:24  10   rights; is that correct?

10:23:28  11          **A.**   I don't recall.

10:23:45  12          **MS. PERSICO:**  Can we just take a quick break

10:23:47  13   so we can mark something?

          14   **The following was marked for Identification:**

          15    **COUNTY EXH. 1         document dated August 10th,**

          16                            **1991, Bates numbers**

          17                            **COE001524 through COE001526**

10:25:30  18          **BY MS. PERSICO:**

10:25:32  19          **Q.**   Mr. Dixon, I'm going to hand you what

10:25:34  20   has been marked as County 1 in connection with

10:25:39  21   today's deposition, and I'd just ask you to take a

10:25:44  22   quick look at that, please.

10:25:49  23          **MR. BRUSTIN:**  You want him to read it or

*Valentino Dixon - Ms. Persico - 06/07/2022*

26

10:25:51  1    just --

10:25:51  2         BY MS. PERSICO:

10:25:53  3         Q.    Just have a look, and I'll ask you some

10:25:54  4    questions.  Let me know when you've had a chance to

10:25:57  5    look it over to your satisfaction.

10:25:59  6         A.    Yes, I'm familiar with this statement.

10:26:02  7    I've read it a million times, so --

10:26:04  8         Q.    So -- so this is the statement -- or

10:26:08  9    this is a copy -- a copy of the statement that you

10:26:14 10    gave to the Buffalo police on August 10th, 1991?

10:26:19 11         MR. BRUSTIN:  Objection to form.

10:26:21 12         THE WITNESS:  Yes.

10:26:22 13         BY MS. PERSICO:

10:26:22 14         Q.    And just for the record, this

10:26:24 15    particular Exhibit, which I'm sure has been marked

10:26:27 16    before, so I apologize, is -- that we're looking at

10:26:30 17    is COE1524 through 1526.

10:26:38 18         Do you see those numbers on the bottom of

10:26:40 19    the page there on the right-hand side?

10:26:41 20         A.    Yes.

10:26:41 21         Q.    Okay.  Those -- those are what we call

10:26:45 22    Bates stamps to identify the documents for us, so

10:26:53 23    it doesn't necessarily have anything to do with the

*Valentino Dixon - Ms. Persico - 06/07/2022*

27

| | | |
|---|---|---|
| 10:26:55 | 1 | document itself. |
| 10:26:58 | 2 | And do you see on the top of that document |
| 10:27:04 | 3 | your name and date of birth and address? |
| 10:27:07 | 4 | **A.**   Yes. |
| 10:27:08 | 5 | **Q.**   And do you see that you were duly |
| 10:27:18 | 6 | sworn? |
| 10:27:18 | 7 | **A.**   Yes. |
| 10:27:19 | 8 | **Q.**   And do you see after that that you were |
| 10:27:24 | 9 | advised that you had the right to remain silent? |
| 10:27:27 | 10 | **A.**   Yes. |
| 10:27:28 | 11 | **Q.**   And that anything you say can be used |
| 10:27:31 | 12 | against you in a court of law, and you said that |
| 10:27:34 | 13 | you understood that? |
| 10:27:35 | 14 | **MR. BRUSTIN:**  Objection to form.  You're |
| 10:27:38 | 15 | asking if that's what the document says. |
| 10:27:40 | 16 | **MS. PERSICO:**  Yes. |
| 10:27:41 | 17 | **THE WITNESS:**  Yes. |
| 10:27:41 | 18 | **BY MS. PERSICO:** |
| 10:27:46 | 19 | **Q.**   And -- well, let's clear that up. |
| 10:27:51 | 20 | Can you turn to the last page of that |
| 10:27:53 | 21 | document, which is County -- COE1526? |
| 10:28:00 | 22 | **A.**   Yes. |
| 10:28:00 | 23 | **Q.**   Okay.  Do you see your signature on |

*Valentino Dixon - Ms. Persico - 06/07/2022*

28

10:28:06  1  that page?

10:28:06  2        **A.**    Yes.

10:28:07  3        **Q.**    And did you have an opportunity to read

10:28:14  4  this document in 1991 before you signed it?

10:28:20  5        **A.**    I don't remember.

10:28:23  6        **Q.**    It -- that is your signature at the

10:28:29  7  middle of the last page, COE1526?

10:28:35  8        **A.**    Yes, it is.

10:28:43  9        **Q.**    And do you see there the second to last

10:28:48 10  question where it says:  I am now going to have you

10:28:52 11  read this statement now and ask you if it is going

10:28:54 12  to be correct.  If it is not, I will change it.  Is

10:28:59 13  it all right?

10:29:01 14        And the answer says:  It okay.

10:29:06 15        Possibly a typo, but do you have any reason

10:29:08 16  to believe that you did not read that statement?

10:29:15 17        **MR. BRUSTIN:**  Objection to form.

10:29:17 18        **THE WITNESS:**  I don't remember reading it.

10:29:18 19        **BY MS. PERSICO:**

10:29:18 20        **Q.**    Okay.  Do you have any reason to

10:29:19 21  believe that -- that what's -- what's written there

10:29:24 22  in the Q&A on the page is incorrect?

10:29:28 23        **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

29

10:29:29   1         **THE WITNESS:**  It appears to be accurate.

10:29:30   2         **BY MS. PERSICO:**

10:29:32   3         **Q.**  Okay.  So -- so before you gave the

10:29:42   4 statement that we're talking about, you were

10:29:45   5 essentially read your rights and informed that you

10:29:48   6 could have an attorney, that anything you said

10:29:52   7 could be used against you, et cetera.

10:29:54   8         You were advised of that, correct?

10:29:57   9         **MR. BRUSTIN:**  Objection to form.

10:29:58  10         **THE WITNESS:**  It appears that I was, you

10:30:01  11 know.

10:30:03  12         **BY MS. PERSICO:**

10:30:04  13         **Q.**  So in that -- in that statement on the

10:30:19  14 second page, which is COE1525 -- are you on that

10:30:26  15 page?

10:30:27  16         **A.**  Yes.

10:30:29  17         **Q.**  Do you -- do you see the -- one, two --

10:30:32  18 third question down where you were asked:  Did you

10:30:35  19 ever have a TEC-9 machine pistol?

10:30:40  20         Do you see that?

10:30:43  21         **A.**  I see it.

10:30:44  22         **Q.**  Okay.  And that was a question that you

10:30:47  23 were asked by the detective at that time, correct?

*Valentino Dixon - Ms. Persico - 06/07/2022*

30

| | | |
|---|---|---|
| 10:30:52 | 1 | **A.**   Yes. |
| 10:30:52 | 2 | **Q.**   And your answer to that question was |
| 10:30:55 | 3 | no; is that correct? |
| 10:30:56 | 4 | **A.**   Yes. |
| 10:30:57 | 5 | **Q.**   That was not true, correct? |
| 10:31:00 | 6 | **A.**   That was not true. |
| 10:31:01 | 7 | **Q.**   On that same page, second from the |
| 10:31:29 | 8 | bottom -- second -- yes, second question from the |
| 10:31:32 | 9 | bottom, you were asked:  Do you know the people |
| 10:31:33 | 10 | that were doing the shooting? |
| 10:31:35 | 11 | Do you see that? |
| 10:31:35 | 12 | **A.**   Yes. |
| 10:31:37 | 13 | **Q.**   And you responded no; is that correct? |
| 10:31:39 | 14 | **A.**   Yes. |
| 10:31:40 | 15 | **Q.**   And that was not true. |
| 10:31:43 | 16 | **A.**   That was not true. |
| 10:31:44 | 17 | **Q.**   On the last page of the Exhibit, third |
| 10:32:24 | 18 | question from -- from the end, you were asked: |
| 10:32:29 | 19 | Is there anything else you can add that |
| 10:32:32 | 20 | would help me in this investigation? |
| 10:32:34 | 21 | Do you see that? |
| 10:32:35 | 22 | **A.**   Yes, I do. |
| 10:32:37 | 23 | **Q.**   And you answered:  Everything happened |

*Valentino Dixon - Ms. Persico - 06/07/2022*

31

10:32:40  1  so fast and when I was running and I got half a

10:32:42  2  glance and there was six people in the middle of

10:32:44  3  the street.

10:32:46  4          That was your answer, correct?

10:32:47  5          **A.**    Yes.

10:32:54  6          **Q.**    At that time, you did not tell the

10:32:57  7  police that Lamarr Scott was the one who did the

10:33:02  8  shooting, correct?

10:33:03  9          **A.**    No, I didn't tell them.

10:33:04 10          **Q.**    And you did not tell them that you

10:33:14 11  brought Lamarr and the gun to Mario Jarmon's house.

10:33:19 12          **A.**    No.

10:33:19 13          **Q.**    And you did not tell them that you were

10:33:25 14  paged by Leonard Brown to -- to come over to

10:33:30 15  Mario's house because there was some trouble with

10:33:33 16  the Jackson brothers.

10:33:34 17          **MR. BRUSTIN:**  Objection to form.

10:33:36 18          **THE WITNESS:**  No.

10:33:37 19          **BY MS. PERSICO:**

10:33:56 20          **Q.**    So after you were arrested on

10:34:18 21  August 10th, 1991, you were taken to central

10:34:24 22  booking to be booked; is that correct?

10:34:25 23          **A.**    Yes.

*Valentino Dixon - Ms. Persico - 06/07/2022*

32

| | | |
|---|---|---|
| 10:34:26 | 1 | **Q.**    And then were you transferred to the |
| 10:34:31 | 2 | holding center at that time? |
| 10:34:33 | 3 | **A.**    I believe I was. |
| 10:34:34 | 4 | **Q.**    And -- and let me back up. |
| 10:34:41 | 5 | While you were at the police station giving |
| 10:34:44 | 6 | your statement -- or -- or after that, I should |
| 10:34:50 | 7 | say, your attorney, Sean Hill, arrived at the |
| 10:34:54 | 8 | police station; is that correct? |
| 10:34:55 | 9 | **A.**    I believe so. |
| 10:34:56 | 10 | **Q.**    Did you call him? |
| 10:34:58 | 11 | **MR. BRUSTIN:**  So I'm going to object to any |
| 10:35:02 | 12 | conversations he had -- I'll let him answer this, |
| 10:35:05 | 13 | but I just want to make you -- you understand I'm |
| 10:35:07 | 14 | going to object to any conversations you had with |
| 10:35:12 | 15 | your attorney.  We have not waived privilege. |
| 10:35:19 | 16 | **BY MS. PERSICO:** |
| 10:35:19 | 17 | **Q.**    Yes, Mr. Dixon, I don't -- I don't want |
| 10:35:21 | 18 | to know about the conversations that you had with |
| 10:35:23 | 19 | Mr. Hill.  I -- I asked whether you called him. |
| 10:35:28 | 20 | **A.**    I believe I did. |
| 10:35:29 | 21 | **Q.**    And had he represented you previously? |
| 10:35:36 | 22 | **A.**    Yes. |
| 10:35:38 | 23 | **Q.**    In connection with what? |

*Valentino Dixon - Ms. Persico - 06/07/2022*

33

| | | |
|---|---|---|
| 10:35:40 | 1 | **A.**    Some gun possessions and an assault |
| 10:35:48 | 2 | case. |
| 10:35:49 | 3 | **Q.**    When you say some gun possessions and |
| 10:35:51 | 4 | an assault case, you're talking about several |
| 10:35:54 | 5 | different cases? |
| 10:35:55 | 6 | **A.**    Yes. |
| 10:35:57 | 7 | **Q.**    Can you tell me about each one of |
| 10:35:59 | 8 | those, please? |
| 10:36:02 | 9 | **A.**    Yes, well, I was pulled over and |
| 10:36:06 | 10 | arrested for gun possession. |
| 10:36:06 | 11 |          (Mr. Russ entered the deposition.) |
| 10:36:10 | 12 | **BY MS. PERSICO:** |
| 10:36:10 | 13 | **Q.**    Let me stop you there.  And when was |
| 10:36:14 | 14 | that? |
| 10:36:14 | 15 | **A.**    I believe in 1990, somewhere around |
| 10:36:19 | 16 | there. |
| 10:36:21 | 17 | **Q.**    So in the gun possession charge from |
| 10:37:17 | 18 | 1990, tell me what happened there. |
| 10:37:22 | 19 | **A.**    I was in traffic, and Buffalo police |
| 10:37:27 | 20 | had a habit of pulling me over a lot, and they |
| 10:37:30 | 21 | found the gun in my car. |
| 10:37:32 | 22 | **Q.**    And -- and in that particular incident |
| 10:37:52 | 23 | that you're talking about, what kind of gun did |

*Valentino Dixon - Ms. Persico - 06/07/2022*

34

10:37:54   1   they find in your car?

10:37:55   2         **A.**   I believe it was a .22 caliber or a .25

10:37:58   3   caliber weapon.

10:38:03   4         **Q.**   In 1990, did you own both a .22 caliber

10:38:06   5   and a .25 caliber weapon?

10:38:09   6         **A.**   I did.

10:38:58   7         **Q.**   Was that the only time in 1990 that you

10:39:02   8   were arrested?

10:39:04   9         **A.**   No.

10:39:06  10         **Q.**   Okay.  Tell me about other times in

10:39:11  11   1990 that you were arrested.

10:39:12  12         **A.**   I was --

10:39:14  13         **MR. BRUSTIN:**  Just to be clear, so now

10:39:15  14   you're off -- you're not asking any more about

10:39:17  15   cases he was represented by Hill.  You're asking

10:39:20  16   him generally about arrests.

10:39:21  17         **MS. PERSICO:**  Yes.

10:39:22  18         **MR. BRUSTIN:**  Got you.

10:39:25  19         **THE WITNESS:**  I was arrested for assault.

10:39:30  20         **BY MS. PERSICO:**

10:39:30  21         **Q.**   What were the circumstances of that?

10:39:36  22         **MR. BRUSTIN:**  Objection to form.  Go ahead.

10:39:40  23         **THE WITNESS:**  A guy had robbed me, and I

*Valentino Dixon - Ms. Persico - 06/07/2022*

35

10:39:43  1  took a shot at him, at -- towards his foot area.

10:39:47  2     **BY MS. PERSICO:**

10:39:48  3     **Q.** When you say you took a shot at him,

10:39:50  4  that was with a gun?

10:39:51  5     **A.** With a rifle.

10:39:52  6     **Q.** What kind of rifle was that?

10:39:54  7     **A.** With a .22 rifle.

10:40:01  8     **Q.** Did -- did Mr. Hill represent you in

10:40:04  9  connection with that charge?

10:40:05 10     **A.** Yes.

10:40:11 11     **Q.** Okay.  So any other arrests in 1990?

10:40:22 12     **A.** Well, you would have to ask me about

10:40:25 13  anything that's before you, because I don't want to

10:40:27 14  speculate.  You know, it was so long ago, you know.

10:40:29 15     **Q.** I'm just --

10:40:30 16     **A.** Yes.

10:40:30 17     **Q.** -- asking --

10:40:31 18     **A.** I can't think of any more right now,

10:40:33 19  but if you mention -- you know, bring it to my

10:40:36 20  attention, then I can explain it.

10:40:37 21     **Q.** Fair enough.  So in the -- in the gun

10:41:24 22  possession arrest that we were talking about first

10:41:29 23  in 1990 -- pardon me for the delay just one

*Valentino Dixon - Ms. Persico - 06/07/2022*

36

10:41:46  1  second -- you -- you said the police pulled you

10:41:52  2  over and discovered that you -- you had some guns.

10:41:55  3      **A.**   Yes.

10:41:56  4      **MR. BRUSTIN:**  Objection to form.

10:41:57  5      **BY MS. PERSICO:**

10:41:57  6      **Q.**   And did you have those guns hidden in a

10:42:01  7  secret compartment of your car?

10:42:03  8      **MR. BRUSTIN:**  Objection to form.

10:42:04  9      **THE WITNESS:**  They were in the middle

10:42:06 10  console of the car.  So constitute that a secret

10:42:11 11  compartment, it was a factory compartment.

10:42:14 12      **BY MS. PERSICO:**

10:42:14 13      **Q.**   Okay.  So we'll -- we'll come back to

10:42:32 14  those in a minute.  Let's -- let's go back to the

10:42:38 15  night of August 10th when you were -- were

10:42:44 16  arrested.

10:42:45 17      So -- sorry I got a little off track there.

10:42:50 18  We were talking about the fact that you -- you

10:42:51 19  think you were then taken to the Erie County

10:42:55 20  Holding Center once you were processed.

10:42:56 21      **A.**   I believe so.

10:42:58 22      **Q.**   And did you remain in the holding

10:43:04 23  center continuously from the time of that arrest

*Valentino Dixon - Ms. Persico - 06/07/2022*

37

| | | |
|---|---|---|
| 10:43:12 | 1 | through the trial of this meter? |
| 10:43:15 | 2 | **A.**    Yes. |
| 10:43:15 | 3 | **Q.**    Were you -- did Mr. Hill make a bail |
| 10:43:19 | 4 | application for you? |
| 10:43:20 | 5 | **A.**    Yes. |
| 10:43:22 | 6 | **Q.**    And so what happened?  You couldn't |
| 10:43:24 | 7 | make bail? |
| 10:43:25 | 8 | **A.**    Bail was not given.  Denied. |
| 10:43:28 | 9 | **Q.**    Okay.  Do you recall why bail was |
| 10:43:30 | 10 | denied? |
| 10:43:30 | 11 | **A.**    I don't recall. |
| 10:43:32 | 12 | **Q.**    Okay.  When you were arrested in 1991, |
| 10:43:35 | 13 | were -- were you already out on bail for a prior |
| 10:43:39 | 14 | gun charge? |
| 10:43:40 | 15 | **A.**    Yes. |
| 10:43:40 | 16 | **Q.**    And which gun charge was that? |
| 10:43:45 | 17 | **A.**    I believe the -- the same charge as we |
| 10:43:48 | 18 | just spoke of. |
| 10:43:49 | 19 | **Q.**    Okay.  Okay.  So the charge that we |
| 10:43:54 | 20 | were just talking about where the police pulled you |
| 10:43:57 | 21 | over and found two guns in your car, you were |
| 10:43:59 | 22 | arrested for that. |
| 10:44:02 | 23 | **A.**    Correct. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

38

| | | |
|---|---|---|
| 10:44:02 | 1 | **Q.**   And at that time, Mr. Hill represented |
| 10:44:07 | 2 | you, correct? |
| 10:44:08 | 3 | **A.**   Yes. |
| 10:44:09 | 4 | **Q.**   And made a bail application on your |
| 10:44:11 | 5 | behalf. |
| 10:44:11 | 6 | **A.**   Yes. |
| 10:44:12 | 7 | **Q.**   And at that time, you were let out on |
| 10:44:15 | 8 | bail. |
| 10:44:16 | 9 | **A.**   Yes. |
| 10:44:16 | 10 | **Q.**   Do you recall -- do you recall that one |
| 10:44:27 | 11 | of the conditions of your bail was that you were |
| 10:44:31 | 12 | not to possess any firearms during the period in |
| 10:44:35 | 13 | which you were out on bail? |
| 10:44:39 | 14 | **A.**   I don't recall. |
| 10:44:46 | 15 | **Q.**   So you're in the holding center on the |
| 10:44:51 | 16 | 10th of August, 1991, and you'd been in the holding |
| 10:45:00 | 17 | center before, correct? |
| 10:45:02 | 18 | **A.**   Yes. |
| 10:45:03 | 19 | **Q.**   So when you were in the holding center, |
| 10:45:15 | 20 | who did you call first? |
| 10:45:18 | 21 | **A.**   I don't remember.  Maybe my mom. |
| 10:45:20 | 22 | **Q.**   Okay.  And you called Mario Jarmon? |
| 10:45:29 | 23 | **A.**   No. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

39

| | | |
|---|---|---|
| 10:45:31 | 1 | **Q.**    Did you call Leonard Brown? |
| 10:45:33 | 2 | **A.**    No. |
| 10:45:33 | 3 | **Q.**    So you've always known exactly what |
| 10:46:17 | 4 | happened on the night of August 10th, 1991, |
| 10:46:21 | 5 | relative to the shooting of -- of Torri, right? |
| 10:46:27 | 6 | **MR. BRUSTIN:**  Objection to form. |
| 10:46:29 | 7 | **THE WITNESS:**  Pretty much, I believe. |
| 10:46:31 | 8 | **BY MS. PERSICO:** |
| 10:46:32 | 9 | **Q.**   Well, you were there, right? |
| 10:46:35 | 10 | **MR. BRUSTIN:**  Objection to form. |
| 10:46:35 | 11 | **THE WITNESS:**  Yes, I was there. |
| 10:46:36 | 12 | **BY MS. PERSICO:** |
| 10:46:36 | 13 | **Q.**    Okay.  So -- so you are in the unique |
| 10:46:45 | 14 | position of having been the person who brought the |
| 10:46:52 | 15 | weapon and Lamarr Scott to the scene of the |
| 10:46:58 | 16 | shooting, right? |
| 10:46:59 | 17 | **MR. BRUSTIN:**  Objection to form. |
| 10:47:00 | 18 | **THE WITNESS:**  I brought them to Mario's |
| 10:47:04 | 19 | house. |
| 10:47:04 | 20 | **BY MS. PERSICO:** |
| 10:47:05 | 21 | **Q.**    Okay.  And you -- you knew why you were |
| 10:47:09 | 22 | going to Mario's house, right? |
| 10:47:11 | 23 | **MR. BRUSTIN:**  Objection to form. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

40

10:47:12  1          THE WITNESS:  I knew that there was trouble.

10:47:15  2    I didn't know how serious it was.

10:47:17  3          BY MS. PERSICO:

10:47:23  4          Q.    You heard from your -- you heard from

10:47:25  5    Leonard that there was trouble, correct?

10:47:27  6          MR. BRUSTIN:  Objection to form.

10:47:28  7          THE WITNESS:  Yes.

10:47:29  8          BY MS. PERSICO:

10:47:31  9          Q.    And you heard that the trouble involved

10:47:35 10    the Jackson family?

10:47:41 11          MR. BRUSTIN:  Objection to form.

10:47:42 12          THE WITNESS:  Yes.

10:47:42 13          BY MS. PERSICO:

10:47:42 14          Q.    And you knew that the trouble stemmed

10:47:44 15    from one of the Jackson brothers holding a gun to

10:47:47 16    your brother Toine's head some weeks earlier,

10:47:51 17    right?

10:47:51 18          MR. BRUSTIN:  Objection to form.

10:47:52 19          THE WITNESS:  Yes.

10:47:52 20          BY MS. PERSICO:

10:47:55 21          Q.    And you -- you knew the trouble was

10:48:01 22    serious enough for you to bring a weapon, right?

10:48:06 23          A.    No.

*Valentino Dixon - Ms. Persico - 06/07/2022*

41

10:48:08  1       **Q.**   Well, you brought the -- the weapon,

10:48:10  2  correct?

10:48:10  3       **A.**   Yes.

10:48:11  4       **Q.**   Did you -- did you just drive around in

10:48:16  5  your RX-7 with the TEC-9 in it?

10:48:19  6       **MR. BRUSTIN:**   Objection to form.

10:48:21  7       **THE WITNESS:**   No.

10:48:21  8       **BY MS. PERSICO:**

10:48:21  9       **Q.**   So you -- you consciously -- let me

10:48:25 10  back up a little bit.

10:48:26 11       I think you said that when you were paged by

10:48:29 12  Leonard, you weren't sure where you were, right?

10:48:32 13       **A.**   Yes.

10:48:36 14       **Q.**   So you may or may not have been at your

10:48:40 15  house on Lisbon, right?

10:48:42 16       **A.**   Yes.

10:48:45 17       **Q.**   Either way, you made a conscious

10:48:48 18  decision to get the TEC-9 from your house on Lisbon

10:48:52 19  and put it in your car, right?

10:48:54 20       **A.**   Yes.

10:48:56 21       **Q.**   And you did that in response to the --

10:49:00 22  the page and subsequent conversation with Leonard,

10:49:04 23  right?

*Valentino Dixon - Ms. Persico - 06/07/2022*

42

10:49:04  1          **A.**    Yes.

10:49:39  2          **MS. PERSICO:**  Do you mind if we just take a

10:49:43  3   break for a five minutes?

10:49:44  4          **MR. BRUSTIN:**  Sure.

10:49:44  5          (A recess was then taken at 10:49 a.m.)

10:59:54  6          **BY MS. PERSICO:**

10:59:57  7          **Q.**    So Mr. Dixon, when -- when we spoke

11:00:01  8   earlier when I -- I asked about whether or not you

11:00:07  9   had seen what was marked as County 1, which was

11:00:13 10   your statement to the BPD, you said you've had that

11:00:17 11   document for 30 years, and so I got the impression

11:00:20 12   that you have reviewed the relevant documents in

11:00:25 13   this case many times over the years.

11:00:32 14          Is that a correct impression?

11:00:35 15          **MR. BRUSTIN:**  Objection to form.

11:00:36 16          **THE WITNESS:**  Yes, when fighting for my

11:00:39 17   freedom, yes.

11:00:40 18          **BY MS. PERSICO:**

11:00:40 19          **Q.**    Okay.  So you've had a chance to look

11:00:42 20   over the statements of the other witnesses in this

11:00:47 21   matter, right?

11:00:50 22          **MR. BRUSTIN:**  Objection to form.

11:00:51 23          **THE WITNESS:**  Yes.

*Valentino Dixon - Ms. Persico - 06/07/2022*

43

11:00:51  1          BY MS. PERSICO:

11:00:52  2          Q.   So, you know -- for example, you've --

11:00:54  3   you've read the statement that Leonard Brown gave

11:00:58  4   to the police, right?

11:00:59  5          A.   Yes.

11:01:00  6          Q.   And have you also had an opportunity to

11:01:05  7   read the Grand Jury testimony in this case?

11:01:10  8          A.   Not recently, but yes, over the years.

11:01:14  9          Q.   Okay.  And did you have an opportunity

11:01:19 10   to view the videotaped confession made by Lamarr

11:01:24 11   Scott on August 12th, 1991?

11:01:28 12          A.   About a month ago.

11:01:29 13          Q.   Okay.  For the first time?

11:01:31 14          A.   Yes, and I was going through Channel 2

11:01:35 15   News, all the stuff that Channel 2 News did, and

11:01:39 16   that was the first time I seen it.

11:01:40 17          Q.   So you'd never seen -- prior to a month

11:01:43 18   ago, you'd never seen that videotaped confession.

11:01:47 19          A.   No.

11:01:48 20          Q.   So I'm going to --

11:02:40 21          MS. PERSICO:  Can you just mark this?

         22   **The following was marked for Identification:**

         23    **COUNTY EXH. 2        document dated 8-12-91,**

*Valentino Dixon - Ms. Persico - 06/07/2022*

44

|  |  |  |
|---|---|---|
|  | 1 | **Bates numbers COE001560** |
|  | 2 | **through COE001561** |
| 11:03:29 | 3 | **BY MS. PERSICO:** |
| 11:03:30 | 4 | **Q.** Mr. Dixon, you've just been handed what |
| 11:03:33 | 5 | has been marked as County 2, which is Bates stamped |
| 11:03:37 | 6 | COE1560 and 1561, for the record. |
| 11:03:44 | 7 | That is a statement of Leonard Brown given |
| 11:03:50 | 8 | to the Buffalo police on 8/12/91. Do you see that? |
| 11:03:56 | 9 | **A.** Yes. |
| 11:03:56 | 10 | **Q.** And is this one of the statements we |
| 11:04:01 | 11 | talked about earlier that you said you'd had an |
| 11:04:04 | 12 | opportunity to review? |
| 11:04:06 | 13 | **A.** Yes. |
| 11:04:10 | 14 | **Q.** And you understand this to be -- well, |
| 11:04:13 | 15 | let me -- let me back up. |
| 11:04:14 | 16 | What is your relation to Leonard Brown, if |
| 11:04:18 | 17 | any? |
| 11:04:20 | 18 | **A.** He's a half-brother, but not by |
| 11:04:23 | 19 | paternal or anything like that. |
| 11:04:26 | 20 | **Q.** Okay. So -- |
| 11:04:27 | 21 | **A.** My father was a -- is like a stepfather |
| 11:04:32 | 22 | to him. |
| 11:04:32 | 23 | **Q.** So while your father was not his |

*Valentino Dixon - Ms. Persico - 06/07/2022*

45

11:04:34  1  biological father --

11:04:35  2       **A.**   Yes.

11:04:36  3       **Q.**   -- your father was in a relationship

11:04:38  4  with Leonard Brown's mother.

11:04:46  5       **A.**   Yes.

11:04:46  6       **Q.**   Okay.  And in 1991, were you close with

11:04:50  7  Leonard Brown?

11:04:50  8       **A.**   Sort of.

11:04:56  9       **Q.**   So I'm going to ask you to just take a

11:04:58  10 minute to take a -- a read through this statement,

11:05:05  11 and then I'm going to ask you some questions about

11:05:07  12 it.

11:05:07  13      Take as much time as you need to read it.  I

11:05:10  14 realize it's single-spaced, so let me know when

11:05:14  15 you've had an opportunity to review.

11:05:16  16      **MR. BRUSTIN:**  Do you want him to read it?

11:05:18  17      **MS. PERSICO:**  Not out loud, but I would like

11:05:20  18 him to review the -- yes, I would like him to read

11:05:22  19 the statement.

11:06:46  20      **THE WITNESS:**  Okay.  I'm done.

11:06:49  21      **BY MS. PERSICO:**

11:06:49  22      **Q.**   Okay.  In the -- in the middle of the

11:06:54  23 first page, which is COE1560 -- I know it's a

*Valentino Dixon - Ms. Persico - 06/07/2022*

46

| | | |
|--|--|--|
| 11:07:00 | 1 | little difficult to see because the type is so |
| 11:07:03 | 2 | small, but there is a -- a Q where then it says: |
| 11:07:09 | 3 | The Buffalo Police Homicide Section is |
| 11:07:14 | 4 | presently investigating a shooting. |
| 11:07:16 | 5 | Do you see that question? |
| 11:07:17 | 6 | **A.** Yes. |
| 11:07:18 | 7 | **MR. BRUSTIN:** I don't. |
| 11:07:20 | 8 | **MS. PERSICO:** Okay. It's the one -- |
| 11:07:22 | 9 | **MR. BRUSTIN:** Oh, I got it. |
| 11:07:24 | 10 | **BY MS. PERSICO:** |
| 11:07:24 | 11 | **Q.** And then there's an A after that |
| 11:07:26 | 12 | question. See that? Like an answer? |
| 11:07:30 | 13 | **A.** Yes. |
| 11:07:30 | 14 | **Q.** Okay. I'm just trying to orient you |
| 11:07:36 | 15 | without having to -- to read through the whole |
| 11:07:39 | 16 | thing, but midway, I guess, in that answer, do you |
| 11:07:45 | 17 | see a sentence that says: |
| 11:07:48 | 18 | We went into the house, and my little |
| 11:07:50 | 19 | brother called Tino, that's Valentino Dixon. |
| 11:07:54 | 20 | **MR. BRUSTIN:** Why don't you give us like a |
| 11:07:56 | 21 | general how many lines down. |
| 11:07:57 | 22 | **MS. PERSICO:** It's -- it's -- it's 15 from |
| 11:08:06 | 23 | the bottom. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

47

11:08:09  1      MR. BRUSTIN:  You're saying "my little

11:08:12  2  brother" -- 15 lines from the bottom, you said?

11:08:15  3      MS. PERSICO:  Yes.  "We went into the house,

11:08:18  4  and my little brother called Tino, that's Valentino

11:08:22  5  Dixon."

11:08:23  6      MR. BRUSTIN:  I'm sorry.  Are you sure it's

11:08:34  7  15 from the bottom?

11:08:35  8      MS. PERSICO:  From the bottom of that

11:08:36  9  paragraph.

11:08:45 10      MR. BRUSTIN:  Oh, I see it.  So this one.

11:08:48 11      MS. PERSICO:  Yes.

11:08:49 12      MR. BRUSTIN:  "We went into the house."  Do

11:08:50 13  you see that?

11:08:51 14      THE WITNESS:  Yes.

11:08:51 15      MR. BRUSTIN:  Okay.

11:08:51 16      MS. PERSICO:  Okay.  We all know where we

11:08:53 17  are?

11:08:54 18      MR. BRUSTIN:  Yes.

11:08:54 19      MS. PERSICO:  I'm sorry it's --

11:08:55 20      MR. BRUSTIN:  It's hard to read.

11:08:57 21      MS. PERSICO:  Yes.

11:08:59 22      BY MS. PERSICO:

11:09:00 23      Q.   Okay.  So do you see where it says:

*Valentino Dixon - Ms. Persico - 06/07/2022*

48

11:09:02  1       We went into the house, and my little

11:09:04  2   brother called Tino, that's Valentino Dixon.  It

11:09:07  3   took Tino around 45 minutes to get there.  When he

11:09:11  4   came, he was with Lamarr.

11:09:12  5       Do you see that?

11:09:13  6       **A.**   Yes.

11:09:14  7       **Q.**   Okay.  And that -- that statement is in

11:09:22  8   agreement with the description of the night's

11:09:25  9   events that you provided to us earlier, right?

11:09:28 10       **MR. BRUSTIN:**  Objection to form.

11:09:29 11       **THE WITNESS:**  No, not -- it's not accurate,

11:09:32 12   okay, because I believe that Leonard called me, not

11:09:36 13   Antoine.

11:09:37 14       **BY MS. PERSICO:**

11:09:37 15       **Q.**   Okay.

11:09:38 16       **A.**   Yes.

11:09:39 17       **Q.**   In any event, one of them called you.

11:09:42 18       **A.**   Yes.

11:09:42 19       **Q.**   And if he were to say it took you

11:09:45 20   around 45 minutes to get there and you came with

11:09:47 21   Lamarr, that would be in keeping with what we

11:09:50 22   talked about earlier.

11:09:51 23       **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

49

11:09:52  1          THE WITNESS:  Well, not necessarily.  I

11:09:57  2   don't believe the 45 minutes.  Could have been an

11:09:58  3   hour, two hours later, you know.

11:09:58  4          BY MS. PERSICO:

11:10:00  5          Q.   Okay.

11:10:00  6          A.   Yes.

11:10:01  7          Q.   But I guess my point is they called

11:10:04  8   you, and you arrived with Lamarr.

11:10:07  9          A.   Yes.

11:10:07  10         Q.   Okay.  Now, when Leonard Brown

11:10:16  11  testified at the Grand Jury, he -- he testified

11:10:19  12  that Lamarr came on a -- on a bicycle.

11:10:28  13         And that, we established earlier, was

11:10:30  14  incorrect, right?

11:10:31  15         MR. BRUSTIN:  Objection to form.

11:10:32  16         THE WITNESS:  I know that I brought him in

11:10:36  17  my car.

11:10:37  18         BY MS. PERSICO:

11:10:37  19         Q.   Okay.

11:10:37  20         A.   Okay?

11:10:38  21         Q.   So --

11:10:39  22         MR. BRUSTIN:  Are you done answering?

11:10:41  23         THE WITNESS:  No.  And I dropped him off,

*Valentino Dixon - Ms. Persico - 06/07/2022*

50

| | | |
|---|---|---|
| 11:10:43 | 1 | and then I left at some point, and I came back to |
| 11:10:45 | 2 | the scene.  You know, this is what I was trying to |
| 11:10:48 | 3 | explain to you earlier. |
| 11:10:49 | 4 | **BY MS. PERSICO:** |
| 11:10:49 | 5 | **Q.**  Okay.  If you -- well, so you -- you |
| 11:10:55 | 6 | said to me earlier -- when I asked you if -- if |
| 11:10:59 | 7 | Leonard said that Lamarr came on a bike, that would |
| 11:11:04 | 8 | have been incorrect, you agreed with me. |
| 11:11:07 | 9 | **MR. BRUSTIN:**  Objection to form. |
| 11:11:08 | 10 | **THE WITNESS:**  Well, I agreed with you |
| 11:11:10 | 11 | because I know I brought Lamarr in the car. |
| 11:11:13 | 12 | **BY MS. PERSICO:** |
| 11:11:13 | 13 | **Q.**  Okay. |
| 11:11:14 | 14 | **A.**  Okay.  And at some point I left, and I |
| 11:11:16 | 15 | left for maybe an hour or two.  Then I came back. |
| 11:11:22 | 16 | **Q.**  This statement that -- |
| 11:11:23 | 17 | **A.**  I don't know what happened between that |
| 11:11:24 | 18 | time. |
| 11:11:25 | 19 | **Q.**  I'm not asking about that. |
| 11:11:26 | 20 | **A.**  Yes. |
| 11:11:26 | 21 | **Q.**  This statement that we just looked at |
| 11:11:31 | 22 | given by Leonard Brown indicates that you and |
| 11:11:37 | 23 | Lamarr arrived together at Mario's house, right? |

*Valentino Dixon - Ms. Persico - 06/07/2022*

51

11:11:43  1          A.    Yes.

11:11:43  2          MR. BRUSTIN:  Objection to form.

11:11:44  3          BY MS. PERSICO:

11:11:45  4          Q.    And then in your interview with the

11:11:53  5    ADAs in August of 2018, they asked you about

11:12:03  6    Leonard changing his story in his Grand Jury

11:12:06  7    testimony.  Do you remember talking with them about

11:12:08  8    that?

11:12:09  9          A.    I don't remember that.

11:12:10 10          Q.    Okay.  Why don't we take a minute to

11:12:19 11    have a look at that video, okay?

11:12:22 12          MS. PERSICO:  Might as well go off for a

11:12:23 13    second.

11:12:24 14              (Off the record: 11:12 a.m.)

11:13:42 15              (On the record: 11:13 a.m.)

11:13:43 16          MS. PERSICO:  So for the record, this was

11:13:49 17    County of Erie --

11:13:57 18          MR. BRUSTIN:  Are you going to mark this?

11:14:02 19          MS. PERSICO:  Yes, let me just -- so this

11:14:10 20    was Bates stamp County of Erie 2556.  I think the

11:14:23 21    best that we can do in terms of marking this is

11:14:26 22    simply to -- to identify the timestamp.

11:14:29 23          MR. BRUSTIN:  Yes, that's fine.  Can we make

*Valentino Dixon - Ms. Persico - 06/07/2022*

52

11:14:31  1  it an Exhibit?  You don't have to attach it to the

11:14:37  2  transcript.

11:14:37  3          **MS. PERSICO:**  Yes.

11:14:39  4          **MR. BRUSTIN:**  Do you want to make it an

11:14:40  5  Exhibit?

11:14:42  6          **MS. PERSICO:**  Sure.

11:14:42  7          **MR. BRUSTIN:**  Yes.

11:14:42  8          **MS. PERSICO:**  County 3.

         9  **The following was marked for Identification:**

        10  **COUNTY EXH. 3         videotaped interview of**

        11  **Valentino Dixon dated**

        12  **8/31/2018, Bates number**

        13  **COE002556**

11:15:02 14          **BY MS. PERSICO:**

11:15:03 15          **Q.**  Mr. Dixon, what I have up on the screen

11:15:04 16  here is a videotape of an interview with you and

11:15:14 17  Assistant District Attorneys Sarah Dee and David

11:15:20 18  Heraty; Joseph Lee, their investigator;

11:15:25 19  Mr. Thompson, your attorney; and yourself.

11:15:27 20          Can you see that?

11:15:28 21          **A.**  Yes.

11:15:29 22          **Q.**  And do you recall that interview taking

11:15:33 23  place?

*Valentino Dixon - Ms. Persico - 06/07/2022*

53

11:15:33  1        A.    Yes.

11:15:36  2        Q.    And do you recall that this interview

11:15:43  3    happened the day after you took a polygraph

11:15:46  4    examination?

11:15:49  5        A.    I believe so.

11:15:52  6        Q.    And again, the purpose of this and the

11:15:55  7    prior interviews that you had with the District

11:15:58  8    Attorney's office was in furtherance of resolution

11:16:02  9    of your 440 motion seeking to vacate your

11:16:07 10    conviction, right?

11:16:08 11        MR. BRUSTIN:  Objection to form.

11:16:08 12        THE WITNESS:  Yes.

11:16:09 13        BY MS. PERSICO:

11:16:14 14        Q.    And you talk about a number of things

11:16:16 15    in this interview, and we'll probably go through a

11:16:19 16    couple of them, but -- but this -- we were talking

11:16:22 17    about -- right before I queued this up, that Mario

11:16:32 18    and Leonard changed their stories at the -- at the

11:16:35 19    Grand Jury, and they asked you about why.

11:16:38 20        So I'm going to play this for you.

11:16:45 21        MR. BRUSTIN:  Would you just mind stating

11:16:49 22    the start and end time, please?

11:16:51 23        MS. PERSICO:  Yes.  Okay.  So I'm going to

*Valentino Dixon - Ms. Persico - 06/07/2022*

54

11:16:58  1  start this particular portion at the 10:30:31 a.m.

11:17:07  2  mark.

11:17:28  3      (Video played.)

11:18:58  4      **BY MS. PERSICO:**

11:18:58  5      **Q.**  Okay.  Did you --

11:19:00  6      **MR. BRUSTIN:**  Can you say the stop time,

11:19:02  7  please?

11:19:02  8      **MS. PERSICO:**  Oh, I'm sorry.  So we ended

11:19:04  9  that clip at 10:31:41.

11:19:09 10      **BY MS. PERSICO:**

11:19:10 11      **Q.**  Mr. Dixon, could you hear what was said

11:19:11 12  on that -- on that videotape?

11:19:13 13      **A.**  Yes.

11:19:16 14      **Q.**  And did you hear the Assistant District

11:19:21 15  Attorneys ask you about the fact that Mario and

11:19:24 16  Leonard changed their testimony at the Grand Jury?

11:19:26 17      **A.**  Yes.

11:19:28 18      **Q.**  And did you understand that to be

11:19:36 19  the -- the change from the statements given to the

11:19:38 20  police that you and Lamarr arrived at Mario's and

11:19:45 21  then the subsequent Grand Jury testimony that

11:19:47 22  Lamarr arrived on a bike?

11:19:49 23      **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

55

| | | |
|---|---|---|
| 11:19:50 | 1 | THE WITNESS:  Yes. |
| 11:19:52 | 2 | BY MS. PERSICO: |
| 11:19:52 | 3 | Q.   And did you understand that they were |
| 11:19:54 | 4 | trying to figure out why Leonard and Mario changed |
| 11:20:03 | 5 | their story? |
| 11:20:03 | 6 | MR. BRUSTIN:  Objection to form. |
| 11:20:04 | 7 | THE WITNESS:  Yes. |
| 11:20:05 | 8 | BY MS. PERSICO: |
| 11:20:07 | 9 | Q.   And you indicated that it was possible |
| 11:20:08 | 10 | that your father, while trying to protect you or |
| 11:20:15 | 11 | whatever, told Mario and Leonard to change their |
| 11:20:19 | 12 | stories. |
| 11:20:19 | 13 | MR. BRUSTIN:  Objection to form. |
| 11:20:20 | 14 | THE WITNESS:  Yes, I -- it's possible. |
| 11:20:25 | 15 | BY MS. PERSICO: |
| 11:20:25 | 16 | Q.   Okay.  Now, going back briefly to |
| 11:20:43 | 17 | Lamarr Scott, you indicated that you never reviewed |
| 11:20:46 | 18 | his -- his videotaped confession from August 12th, |
| 11:20:55 | 19 | 1991, until a month ago; is that right? |
| 11:20:57 | 20 | A.   Yes. |
| 11:20:58 | 21 | MR. BRUSTIN:  Objection to form. |
| 11:20:59 | 22 | BY MS. PERSICO: |
| 11:21:24 | 23 | Q.   And in that -- well, do you remember |

*Valentino Dixon - Ms. Persico - 06/07/2022*

56

11:21:31  1  generally the substance of that videotaped

11:21:35  2  confession today?

11:21:36  3          **A.**   Yes.  I seen it about a month ago --

11:21:40  4          **Q.**   Okay.

11:21:41  5          **A.**   -- so I -- yes, I remember.  It was

11:21:42  6  only a couple minutes.  Not even that.

11:21:44  7          **Q.**   All right.

11:21:46  8          **MR. BRUSTIN:**  Are we talking about the same

11:21:47  9  thing?  You're talking about the television -- the

11:21:49 10  televised --

11:21:50 11          **MS. PERSICO:**  Yes.

11:21:50 12          **MR. BRUSTIN:**  Got you.

11:21:51 13          **BY MS. PERSICO:**

11:21:51 14          **Q.**   Talking about the Lamarr Scott

11:21:53 15  televised confession that he gave to Wanda Stark on

11:21:58 16  October -- on August 12th, 1991.

11:22:01 17          **A.**   Yes.

11:22:01 18          **Q.**   Okay.  And do you recall in that -- in

11:22:04 19  that confession, Lamarr Scott indicated that he

11:22:14 20  arrived on the scene on a bicycle?

11:22:25 21          **A.**   I believe that's what he said.

11:22:26 22          **Q.**   Okay.  And that would have been a lie.

11:22:29 23          **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

57

11:22:30  1          THE WITNESS:  I remember taking him to the

11:22:34  2  scene.

11:22:34  3          BY MS. PERSICO:

11:22:43  4      Q.    And -- and -- well, actually, let's

11:22:50  5  have a look at the -- at the videotape.

11:22:53  6          MS. PERSICO:  Can we just go off for a

11:22:56  7  minute?

11:22:57  8              (Off the record: 11:22 a.m.)

11:23:14  9              (On the record: 11:23 a.m.)

11:23:15 10          MS. PERSICO:  Okay.  I'm going to mark as

11:23:17 11  County 4 the County of Erie Bates-stamped video

11:23:25 12  COE3997, and this is the Lamarr Scott confession of

11:23:31 13  August 12th, 1991.

         14  **The following was marked for Identification:**

         15   **COUNTY EXH. 4        videotaped interview of**

         16                          **Lamarr Scott dated**

         17                          **August 12, 1991, Bates**

         18                          **number COE003997**

11:23:46 19          MR. BRUSTIN:  If you could indicate, if you

11:24:23 20  wouldn't mind for the record, what we're playing.

11:24:25 21          MS. PERSICO:  I did.

11:24:27 22          MR. BRUSTIN:  The time.

11:24:28 23          MS. PERSICO:  Oh, it just has the -- it

*Valentino Dixon - Ms. Persico - 06/07/2022*

58

11:24:29  1  doesn't have the time of day or night.  It just has

11:24:32  2  the length of the video.

11:24:35  3      **MR. BRUSTIN:**  Okay.  I just think it's good

11:24:37  4  to be -- if we can just use that, that would be

11:24:40  5  great.  If we start at zero, and then when you

11:24:44  6  stop, say when you stop.

11:24:46  7      **MS. PERSICO:**  Sure.

11:24:46  8      **MR. BRUSTIN:**  Thank you.

11:24:46  9      (Video played.)

11:24:46 10      **BY MS. PERSICO:**

11:32:34 11      **Q.**   Now, I stopped that at the

11:32:36 12  eight-minute-21-second-mark.

11:32:40 13      In that -- in that picture, there's --

11:32:42 14  there's the reporter, who we know is Wanda Stark.

11:32:45 15  Who is the other person in that picture?

11:32:47 16      **A.**   Where?  Right there?

11:32:49 17      **Q.**   On the screen, yes.

11:32:50 18      **A.**   That's my father.

11:32:53 19      **Q.**   Okay.

11:33:42 20      (Video played.)

11:33:42 21      **BY MS. PERSICO:**

11:33:43 22      **Q.**   Now, I've stopped that at nine minutes

11:33:45 23  and four seconds.  There's -- there's no image on

*Valentino Dixon - Ms. Persico - 06/07/2022*

59

11:33:48  1  the screen, but there was a -- a voice that we

11:33:51  2  could kind of hear.

11:33:52  3          Could you hear that voice?

11:33:53  4          **A.**    Yes.

11:33:54  5          **Q.**    Did you recognize that voice?

11:33:55  6          **A.**    Yes.

11:33:56  7          **Q.**    Who was that?

11:33:56  8          **A.**    My brother Antoine.

11:34:03  9          **Q.**    And were you able to make out what he

11:34:07 10  was saying?

11:34:08 11          **MR. BRUSTIN:**  Objection to form.

11:34:09 12          **THE WITNESS:**  To some extent.

11:34:11 13          **BY MS. PERSICO:**

11:34:11 14          **Q.**    Okay.

11:34:12 15          **A.**    He was saying that the guys pulled up

11:34:14 16  on Torriano Jackson.  He didn't say their names,

11:34:21 17  but he said that they pulled out a gun and he was

11:34:23 18  trying to talk to a girl.

11:34:25 19          This whole thing started over a girl.

11:34:27 20          **Q.**    Okay.  So is Antoine, during that

11:34:28 21  portion that we heard -- and we'll listen to the

11:34:31 22  rest of it -- is he describing the incident of --

11:34:34 23  that occurred on August 10th or the -- the prior

*Valentino Dixon - Ms. Persico - 06/07/2022*

60

11:34:37  1  incident?

11:34:38  2          **MR. BRUSTIN:**  Objection to form.

11:34:38  3          **THE WITNESS:**  Prior -- yes, the prior

11:34:40  4  incident.

11:34:40  5          **BY MS. PERSICO:**

11:34:40  6          **Q.**  Okay.  So I'll -- I'll continue.

11:34:42  7          **A.**  He mentioned a party or something.  He

11:34:47  8  mentioned a party.  I could hear him mention a

11:34:49  9  party.

11:34:50  10          **Q.**  Okay.

11:35:53  11          (Video played.)

11:35:53  12          **BY MS. PERSICO:**

11:35:53  13          **Q.**  I'm going to rewind that for -- I think

11:36:01  14  I will --

11:36:01  15          **MR. BRUSTIN:**  Where did you stop it?

11:36:03  16          **MS. PERSICO:**  I'm trying to find a place to

11:36:07  17  stop it.

11:36:21  18          So I've now stopped this at the ten minute

11:36:24  19  four second mark.

11:36:24  20          **BY MS. PERSICO:**

11:36:28  21          **Q.**  Mr. Valentino, can you see on the

11:36:30  22  right-hand part of the screen there is an

11:36:32  23  individual, a person there?

*Valentino Dixon - Ms. Persico - 06/07/2022*

61

| | | | |
|---|---|---|---|
| 11:36:34 | 1 | **A.** | On the bicycle? |
| 11:36:35 | 2 | **Q.** | Yes. |
| 11:36:35 | 3 | **A.** | Yes, I see that. |
| 11:36:36 | 4 | **Q.** | Do you know who that is? |
| 11:36:38 | 5 | **A.** | I don't. |
| 11:36:38 | 6 | **Q.** | Okay. |

11:37:07  7      (Video played.)

11:37:07  8      **BY MS. PERSICO:**

11:37:08  9      **Q.**   Okay.  So we all had an opportunity to

11:37:10 10  watch that videotaped confession to the news,

11:37:14 11  correct?  You saw that as well, Mr. Dixon, right?

11:37:17 12      **A.**   Yes.

11:37:18 13      **Q.**   And you -- you heard Lamarr say that he

11:37:25 14  went home to his house on Montana Street on his

11:37:31 15  bike to get his Uzi.  You heard that?

11:37:35 16      **A.**   Yes.

11:37:37 17      **Q.**   That is not correct, right?

11:37:39 18      **A.**   Not to my understanding.

11:37:40 19      **Q.**   Okay.  Because you brought him to Mario

11:37:48 20  Jarmon's with a TEC-9 in your car, right?

11:37:53 21      **A.**   Yes.

11:37:53 22      **Q.**   Okay.  So his -- in the -- in the

11:37:55 23  course of that confession that we just saw, Lamarr

*Valentino Dixon - Ms. Persico - 06/07/2022*

62

11:38:01  1   Scott did not truthfully relay the facts leading up

11:38:03  2   to the shooting of Torriano Jackson.

11:38:07  3          **MR. BRUSTIN:**  Objection to form.

11:38:08  4          **THE WITNESS:**  No, not to my understanding.

11:38:11  5          **BY MS. PERSICO:**

11:38:11  6          **Q.**   Okay.  And your -- your father was at

11:38:13  7   the -- at this confession scene with him; is that

11:38:15  8   right?

11:38:15  9          **MR. BRUSTIN:**  Objection to form.

11:38:17 10          **THE WITNESS:**  Yes, from what I seen.

11:38:19 11          **BY MS. PERSICO:**

11:38:19 12          **Q.**   Okay.  Do you know why that was?

11:38:20 13          **A.**   I don't know.  In fact, that's the

11:38:23 14   first time I ever saw that right there, you know.

11:38:26 15          **Q.**   Okay.  Did you -- so this -- this was

11:38:33 16   on August 12th, 1991, which is two days after you

11:38:39 17   were arrested, correct?

11:38:40 18          **A.**   Correct.

11:38:42 19          **Q.**   In between August 12th -- I'm sorry,

11:38:45 20   August 10th and August 12th, did you have

11:38:50 21   communications with your parents?

11:38:54 22          **A.**   Yes.

11:38:54 23          **Q.**   Okay.  And what's the first

*Valentino Dixon - Ms. Persico - 06/07/2022*

63

11:39:00  1    communication you had with them after you were

11:39:02  2    arrested?

11:39:03  3         A.   I would have to say August 11th at my

11:39:10  4    court hearing when I was arraigned.

11:39:11  5         Q.   Okay.  And what did you talk about?

11:39:14  6         A.   We didn't talk.  My dad just told me

11:39:17  7    everything was going to be all right.

11:39:20  8         Q.   Okay.  And what was the next

11:39:23  9    conversation that you had with them?

11:39:24  10        A.   I believe it was that night in the

11:39:28  11   holding center.  It could have been the next day,

11:39:30  12   but I believe it was that -- that evening in the

11:39:32  13   holding center.  My parents came to visit me.

11:39:34  14        Q.   So that would have been on the -- on

11:39:36  15   the 11th of August?

11:39:37  16        A.   I believe so.

11:39:40  17        Q.   So both of them came to visit you on --

11:39:43  18   on that -- on the 11th.

11:39:45  19        A.   Yes.  I believe so.

11:39:47  20        Q.   Okay.

11:39:48  21        A.   I believe the 11th or the 12th.

11:40:47  22        **MS. PERSICO:**  Can you mark this as County 5?

          23   **The following was marked for Identification:**

*Valentino Dixon - Ms. Persico - 06/07/2022*

64

|  |  |  |
|--|--|--|
| 1 | COUNTY EXH. 5 | Buffalo Police Department |
| 2 | | Intra-Departmental |
| 3 | | Correspondence dated |
| 4 | | 8/20/91, Bates number |
| 5 | | COE001571 |

11:42:25  6      BY MS. PERSICO:

11:42:25  7          Q.   Mr. Dixon, I've just given you what's

11:42:29  8   been marked as County 5, which is a single-page

11:42:33  9   document -- thank you, Mr. Brustin -- and the Bates

11:42:36 10   stamp is COE1571.

11:42:42 11          And do you see that the -- on the top of

11:42:47 12   this document, it is identified as Buffalo Police

11:42:51 13   Department Intra-Departmental Correspondence?

11:42:53 14          A.   Yes.

11:42:56 15          Q.   And the date of that document is

11:43:08 16   8/20/91.  Do you see that?

11:43:09 17          A.   Yes.

11:43:17 18          Q.   And I'm just going to ask you to take a

11:43:21 19   minute to read through that and let me know when

11:43:25 20   you're comfortable enough with the substance so

11:43:28 21   that I can ask you questions about it.

11:43:29 22          A.   I already did.

11:43:30 23          Q.   Okay.  You're a fast reader.

*Valentino Dixon - Ms. Persico - 06/07/2022*

65

11:43:35  1          So in that document, it indicates that

11:43:40  2     officers interviewed Mario Dillard Jarmon.  Do you

11:43:44  3     see that?

11:43:44  4          **A.**   Yes.

11:43:48  5          **Q.**   And, you know, that he suffered three

11:43:51  6     gunshot wounds on August 10th, 1991, correct?

11:43:55  7          **A.**   Yes.

11:43:56  8          **Q.**   And they interviewed him at ECMC,

11:44:01  9     right?

11:44:02  10         **A.**   Yes.

11:44:02  11         **Q.**   So I'm just going to ask you so skip

11:44:21  12    down to the -- it's the third paragraph from the

11:44:27  13    bottom, which starts out with Jamar, but I think it

11:44:32  14    should read Jarmon.

11:44:33  15         Do you see what I'm talking about?

11:44:34  16         **A.**   Yes.

11:44:35  17         **Q.**   And that says:  Jamar describes the gun

11:44:37  18    that Lamarr is shooting as being a TEC-9 that

11:44:41  19    Lamarr and Tino Dixon brought to his house earlier

11:44:44  20    that night and put in his back hallway.

11:44:47  21         Do you see that?

11:44:47  22         **A.**   Yes.

11:44:48  23         **Q.**   Okay.  And you -- you said you had an

*Valentino Dixon - Ms. Persico - 06/07/2022*

66

| | | |
|---|---|---|
| 11:45:00 | 1 | opportunity to review the Grand Jury testimony of |
| 11:45:07 | 2 | the -- of some of the witnesses in this case; is |
| 11:45:10 | 3 | that correct? |
| 11:45:10 | 4 | **A.**    Yes. |
| 11:45:10 | 5 | **Q.**    And would -- would one of those -- did |
| 11:45:27 | 6 | you have an opportunity to review the Grand Jury |
| 11:45:29 | 7 | testimony of Mario Jarmon? |
| 11:45:33 | 8 | **A.**    Not recently. |
| 11:45:40 | 9 | **Q.**    Okay. |
| 11:45:40 | 10 | **MR. BRUSTIN:**  I mean, I think the question |
| 11:45:41 | 11 | was do you know if you've ever reviewed it, do you |
| 11:45:45 | 12 | remember today. |
| 11:45:45 | 13 | **THE WITNESS:**  Over the years, yes. |
| 11:45:47 | 14 | **MR. BRUSTIN:**  Okay. |
| 11:45:48 | 15 | **THE WITNESS:**  When I was in prison. |
| 11:45:49 | 16 | **BY MS. PERSICO:** |
| 11:46:00 | 17 | **Q.**    So -- and we -- we can certainly take a |
| 11:46:05 | 18 | look at -- and mark that Grand Jury testimony, but |
| 11:46:07 | 19 | if -- if I were to tell you that -- that |
| 11:46:14 | 20 | Mr. Jarmon, in his Grand Jury testimony, indicated |
| 11:46:17 | 21 | that Mr. Scott came to the scene on a bike with the |
| 11:46:24 | 22 | gun, that would be inconsistent with not only the |
| 11:46:33 | 23 | statement we just read, but also what you told us, |

*Valentino Dixon - Ms. Persico - 06/07/2022*

67

| | | |
|---|---|---|
| 11:46:38 | 1 | right? |
| 11:46:39 | 2 | **MR. BRUSTIN:**  Objection to form. |
| 11:46:40 | 3 | **THE WITNESS:**  I believe so. |
| 11:46:41 | 4 | **BY MS. PERSICO:** |
| 11:46:43 | 5 | **Q.**   Okay.  And the Grand Jury testimony was |
| 11:46:53 | 6 | taken in January of 1992, and can you tell me the |
| 11:47:09 | 7 | date of the document that you are currently looking |
| 11:47:13 | 8 | at, County Exhibit 5? |
| 11:47:17 | 9 | **A.**   August 20th, 1991. |
| 11:47:19 | 10 | **Q.**   Okay.  So ten days after the incident, |
| 11:47:27 | 11 | Mr. Jarmon, while still in the hospital, advised |
| 11:47:30 | 12 | the police that -- that Lamarr and you brought the |
| 11:47:38 | 13 | TEC-9 to his house on the night of the shooting, |
| 11:47:40 | 14 | correct? |
| 11:47:41 | 15 | **MR. BRUSTIN:**  Objection to form. |
| 11:47:41 | 16 | **THE WITNESS:**  Yes. |
| 11:47:42 | 17 | **BY MS. PERSICO:** |
| 11:47:44 | 18 | **Q.**   And then, over a year later at the |
| 11:47:50 | 19 | Grand Jury, testified that Lamarr Scott brought the |
| 11:47:56 | 20 | weapon on his bicycle. |
| 11:48:05 | 21 | Do you know why Mr. Jarmon would have |
| 11:48:11 | 22 | changed his story? |
| 11:48:12 | 23 | **MR. BRUSTIN:**  Objection to form. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

68

11:48:14  1          THE WITNESS:  I don't know why.

11:48:14  2          BY MS. PERSICO:

11:48:15  3          Q.    But you indicated in -- in the 2018

11:48:18  4  interview that we looked at before that perhaps

11:48:20  5  your father asked him to change his story.

11:48:23  6          MR. BRUSTIN:  Objection to form,

11:48:25  7  mischaracterizes his -- his statement.

11:48:28  8          You can answer.

11:48:29  9          THE WITNESS:  I said it was a possibility,

11:48:31 10  but I don't know.

11:48:32 11          BY MS. PERSICO:

11:48:32 12          Q.    Okay.  But it's possible.

11:48:34 13          MR. BRUSTIN:  Objection to form.

11:48:35 14          THE WITNESS:  That he was trying to protect

11:48:38 15  me in some way, but I don't know.

11:48:38 16          BY MS. PERSICO:

11:48:39 17          Q.    Okay.  And then you looked at

11:48:43 18  previously Leonard Brown's statement to the police,

11:48:53 19  which I think you have in front of you as --

11:48:55 20          A.    Yes.

11:48:55 21          Q.    -- County 2.

11:48:58 22          A.    Um-hum.

11:48:58 23          MR. BRUSTIN:  That's right.

*Valentino Dixon - Ms. Persico - 06/07/2022*

69

| | | |
|---|---|---|
| 11:48:59 | 1 | **BY MS. PERSICO:** |
| 11:49:00 | 2 | **Q.**   And in that statement, Mr. Brown |
| 11:49:05 | 3 | indicated -- excuse me -- in sum and substance, the |
| 11:49:16 | 4 | portion that we looked at -- I won't make you find |
| 11:49:20 | 5 | it again, because I know it's difficult, but that |
| 11:49:22 | 6 | you and Lamarr arrived at Mario Jarmon's house |
| 11:49:27 | 7 | together, right? |
| 11:49:28 | 8 | **MR. BRUSTIN:**   Objection to form. |
| 11:49:28 | 9 | **THE WITNESS:**   Yes. |
| 11:49:28 | 10 | **BY MS. PERSICO:** |
| 11:49:29 | 11 | **Q.**   But Mr. -- but Mr. Brown, in his Grand |
| 11:49:33 | 12 | Jury testimony, also then changed his -- well, let |
| 11:49:38 | 13 | me back up. |
| 11:49:38 | 14 | So the date of County Number 2 is -- is |
| 11:49:43 | 15 | August 12th, 1991, correct? |
| 11:49:47 | 16 | **A.**   Yes. |
| 11:49:47 | 17 | **Q.**   And the Grand Jury testimony given by |
| 11:49:51 | 18 | Mr. Brown was in November of 1992, and that Grand |
| 11:49:56 | 19 | Jury testimony, just like Mr. Jarmon's, was that -- |
| 11:50:06 | 20 | that Lamarr Scott arrived with the gun on his |
| 11:50:10 | 21 | bicycle. |
| 11:50:11 | 22 | Do you know why Mr. Brown would have changed |
| 11:50:14 | 23 | his story? |

*Valentino Dixon - Ms. Persico - 06/07/2022*

70

11:50:15    1      **MR. BRUSTIN:** Objection to form.

11:50:15    2      **THE WITNESS:** I don't know why.

11:50:16    3      **BY MS. PERSICO:**

11:50:20    4      **Q.** Is it possible, as you indicated to the

11:50:21    5 ADAs, that that was at the request of your father?

11:50:25    6      **MR. BRUSTIN:** Objection to form.

11:50:26    7      **THE WITNESS:** I'm not certain.

11:50:27    8      **BY MS. PERSICO:**

11:50:28    9      **Q.** Okay. But it's possible.

11:50:29 10      **MR. BRUSTIN:** Same objection.

11:50:30 11      **THE WITNESS:** Anything's possible, but I'm

11:50:32 12 not certain.

11:50:33 13      **BY MS. PERSICO:**

11:50:33 14      **Q.** Okay. Did you have reason to believe

11:50:41 15 that Lamarr Scott was going to go to the Grand Jury

11:50:44 16 and also testify, in keeping with his televised

11:50:51 17 confession, that he came on a bike with his gun?

11:50:54 18      **A.** No.

11:50:58 19      **Q.** Prior to when you saw the video a month

11:51:01 20 ago, had anyone ever told you what Lamarr said in

11:51:07 21 that confession?

11:51:08 22      **MR. BRUSTIN:** Objection to form.

11:51:09 23      **THE WITNESS:** Yes, I've heard it several

*Valentino Dixon - Ms. Persico - 06/07/2022*

71

11:51:11  1  times when I was in prison, but I never got a

11:51:14  2  chance to view it.

11:51:15  3          **BY MS. PERSICO:**

11:51:15  4          **Q.**   Okay.

11:51:16  5          **A.**   So I was always just told the contents

11:51:18  6  of it.

11:51:19  7          **Q.**   And did -- were you told that Lamarr

11:51:20  8  said he came to the scene on a bicycle?

11:51:25  9          **MR. BRUSTIN:**  Objection to form.

11:51:26 10          **THE WITNESS:**  No.

11:51:26 11          **BY MS. PERSICO:**

11:51:26 12          **Q.**   Okay.

11:51:27 13          **A.**   I was just told that he confessed.

11:51:29 14          **Q.**   All right.  So let me talk a little bit

11:51:43 15  about -- and we'll come back to this after we take

11:51:46 16  a lunch break, but just a couple of quick questions

11:51:51 17  that I think we can fit in before we take --

11:51:53 18          **MR. BRUSTIN:**  You have plenty of time.

11:51:58 19          **BY MS. PERSICO:**

11:51:58 20          **Q.**   So in Lamarr's -- in Lamarr's

11:52:01 21  videotaped confession, he -- he says that he went

11:52:04 22  to get his -- his Uzi, but that's -- that's not

11:52:15 23  true, right?

*Valentino Dixon - Ms. Persico - 06/07/2022*

72

11:52:15  1          **MR. BRUSTIN:**  Objection to form.

11:52:16  2          **THE WITNESS:**  I'm not certain.

11:52:18  3          **BY MS. PERSICO:**

11:52:18  4          **Q.**   Well, you know that a TEC-9 was used in

11:52:22  5   the shooting, correct?

11:52:24  6          **A.**   This is what I was told.

11:52:25  7          **Q.**   Well, you brought the TEC-9 to the

11:52:29  8   scene, correct?

11:52:30  9          **A.**   I did.

11:52:30 10          **Q.**   Okay.  And you saw Lamarr Scott do the

11:52:35 11   shooting.

11:52:36 12          **A.**   Yes.  From a distance.

11:52:42 13          **Q.**   And you knew that it was the gun that

11:52:44 14   you brought that he was using, correct?

11:52:45 15          **A.**   No.

11:52:46 16          **Q.**   Oh, you didn't know that --

11:52:49 17          **A.**   It was dark, you know.

11:52:51 18          **Q.**   Oh.  So you're saying now that -- that

11:52:58 19   you were unable to see him do the shooting?

11:53:02 20          **A.**   I saw it from a distance.

11:53:05 21          **Q.**   Where were you?

11:53:06 22          **A.**   Down the street by my car.

11:53:08 23          **Q.**   Okay.  Do you have any reason to

*Valentino Dixon - Ms. Persico - 06/07/2022*

73

11:53:14  1  believe that it was not the TEC-9 that you brought

11:53:18  2  to the scene that Lamarr Scott was using?

11:53:21  3       **A.**   It was never recovered, so --

11:53:27  4       **Q.**   So in -- in connection with preparing

11:53:34  5  for today's -- for today's proceeding, did you have

11:53:40  6  an opportunity to review the deposition transcript

11:53:43  7  of Lamarr Scott from earlier this year?

11:53:45  8       **A.**   No.

11:53:46  9       **Q.**   Did anyone ever talk to you about the

11:53:53  10  testimony that Lamarr gave at that deposition?

11:53:57  11       **MR. BRUSTIN:**  Objection to form.  Don't

11:53:58  12  answer.

11:53:59  13       **MS. PERSICO:**  Why?

11:54:00  14       **MR. BRUSTIN:**  Because it's privileged.

11:54:02  15       **MS. PERSICO:**  I -- I -- he did not say that

11:54:05  16  anybody talked to him about it, much less --

11:54:06  17       **MR. BRUSTIN:**  He's not going to answer.

11:54:08  18  It's privileged.  Move on, please.

11:54:10  19       **MS. PERSICO:**  No, I will not.

11:54:11  20       **MR. BRUSTIN:**  No, whoa, whoa, whoa.  I'm

11:54:12  21  telling him not to answer.  You can go to the judge

11:54:15  22  if you want, but don't -- don't fight with him.

11:54:16  23       **MS. PERSICO:**  I'm not fighting with him.

*Valentino Dixon - Ms. Persico - 06/07/2022*

74

11:54:18  1          **MR. BRUSTIN:**  He's not going to answer that

11:54:20  2   question.  It's privileged.  What I talked -- what

11:54:22  3   he --

11:54:23  4          **MS. PERSICO:**  You're the one who just said

11:54:24  5   that he -- you're the one who talked to him about

11:54:26  6   it.  He didn't even answer that.

11:54:28  7          **MR. BRUSTIN:**  The only way he could learn it

11:54:31  8   is through conversation with his attorneys, so that

11:54:33  9   would be privileged.  I'm telling you it's all

11:54:35 10   privileged, so he's not talking about it.

11:54:39 11          **MS. PERSICO:**  The fact that he had the

11:54:41 12   discussion is not privileged.

11:54:42 13          **MR. BRUSTIN:**  It is privileged.  I disagree

11:54:45 14   with you.  You can go to the judge if you want, but

11:54:46 15   I disagree with you.  I'm telling you he's not

11:54:49 16   going to answer that question.

11:54:55 17          **BY MS. PERSICO:**

11:54:57 18          Q.    So Mr. Dixon, you were told about the

11:55:01 19   sum and substance of the deposition testimony of

11:55:04 20   Mr. Scott?

11:55:05 21          **MR. BRUSTIN:**  Objection to form.  Don't

11:55:06 22   answer the question.

11:55:07 23          I'm -- I'm sorry, objection, privileged,

*Valentino Dixon - Ms. Persico - 06/07/2022*

75

11:55:09  1  don't answer the question.

11:55:18  2          **MS. PERSICO:**  Okay.

11:55:28  3          **MR. BRUSTIN:**  While you look for that, can

11:55:29  4  we take a 30-second break?  Do you mind?

11:55:31  5          **MS. PERSICO:**  I do mind.

11:55:33  6          **MR. BRUSTIN:**  Well, we're doing it anyways,

11:55:33  7  then.  Unless you're in the middle of a question,

11:55:35  8  we're taking a break.

11:55:35  9          **MS. PERSICO:**  I was in the middle of a

11:55:37 10  question.

11:55:37 11          **MR. BRUSTIN:**  Okay.  I don't think you were,

11:55:40 12  but you're in charge.  Go ahead.  I don't

11:55:43 13  appreciate it, but go ahead.

11:56:07 14          **MS. PERSICO:**  Well, you might as well take

11:56:09 15  your break.  I have to find the right spot anyway.

11:56:11 16          **MR. BRUSTIN:**  Fair enough.

11:56:13 17          **MS. PERSICO:**  And since it's 11:56 and I'm

11:56:15 18  hungry --

11:56:16 19          **MR. BRUSTIN:**  Really?  We've been an hour

11:56:17 20  and 50 minutes.  Really?

11:56:20 21          All right.  If you want to take lunch, we'll

11:56:25 22  take lunch.  It's just early.

11:56:28 23                  (A luncheon recess was then taken at

*Valentino Dixon - Ms. Persico - 06/07/2022*

76

| | | |
|---|---|---|
| 11:56:28 | 1 | 11:56 a.m.) |
| 11:56:28 | 2 | **BY MS. PERSICO:** |
| 12:31:00 | 3 | **Q.**    Mr. Dixon, so you -- so you were in the |
| 12:31:09 | 4 | holding center from the night of the 10th of |
| 12:31:18 | 5 | August, 1991, until when? |
| 12:31:23 | 6 | **A.**    September 19th, 2018.  I was -- I mean, |
| 12:31:29 | 7 | in jail that time, I stayed ten months. |
| 12:31:31 | 8 | **Q.**    Ten months? |
| 12:31:32 | 9 | **A.**    Ten months before trial started on |
| 12:31:34 | 10 | June 5th or the 6th.  Approximately around |
| 12:31:37 | 11 | June 5th, 6th. |
| 12:31:39 | 12 | **Q.**    And Mr. Hill represented you at the |
| 12:31:44 | 13 | outset when you were first -- first arrested, and |
| 12:31:48 | 14 | then at some point, Mr. Terranova became your |
| 12:31:53 | 15 | attorney? |
| 12:31:54 | 16 | **A.**    Yes. |
| 12:31:54 | 17 | **Q.**    How did that happen? |
| 12:31:56 | 18 | **A.**    I couldn't -- I couldn't afford to pay |
| 12:31:58 | 19 | for Mr. Hill's services any longer, and |
| 12:32:02 | 20 | Mr. Terranova took over from there. |
| 12:32:07 | 21 | **Q.**    Had -- had Mr. Terranova represented |
| 12:32:13 | 22 | you in connection with prior matters also? |
| 12:32:16 | 23 | **A.**    Only until after Mr. Hill relieved |

*Valentino Dixon - Ms. Persico - 06/07/2022*

77

12:32:19  1  himself, you know.  Once he relieved himself,

12:32:22  2  Mr. Terranova represented me, yes, for the first

12:32:33  3  time.  He had never represented me before that.

12:32:35  4       **Q.**  Okay.  So in connection with your prior

12:32:37  5  arrests, your attorney had always been Sean Hill?

12:32:40  6       **A.**  Yes.

12:32:43  7       **MR. BRUSTIN:**  I think maybe it wasn't clear.

12:32:45  8  I think what he's saying is once he began

12:32:47  9  representing him, he represented him in more than

12:32:49 10  just this case.

12:32:50 11       **MS. PERSICO:**  Thank you.

12:32:54 12       **BY MS. PERSICO:**

12:32:54 13       **Q.**  Is -- is what Mr. Brustin just said

12:32:57 14  accurate?

12:32:58 15       **A.**  Correct.

12:32:58 16       **Q.**  Okay.

12:32:59 17       **A.**  Yes.

12:32:59 18       **Q.**  So in addition to this indictment

12:33:03 19  relative to the shooting on August 10th, 1991,

12:33:09 20  Mr. Terranova represented you, correct?

12:33:11 21       **A.**  Yes.

12:33:11 22       **Q.**  And what other matters did

12:33:16 23  Mr. Terranova represent you for?

*Valentino Dixon - Ms. Persico - 06/07/2022*

78

| | | |
|---|---|---|
| 12:33:18 | 1 | **A.**   On the assault and a weapons |
| 12:33:24 | 2 | possession, I believe.  They have the plea bargain |
| 12:33:37 | 3 | for those cases. |
| 12:33:45 | 4 | **Q.**   After -- after the trial of this matter |
| 12:33:53 | 5 | and your sentencing, did you get moved from the |
| 12:33:57 | 6 | holding center to a different facility? |
| 12:33:59 | 7 | **A.**   Yes. |
| 12:34:00 | 8 | **Q.**   And where was that? |
| 12:34:02 | 9 | **A.**   Elmira reception. |
| 12:34:08 | 10 | **Q.**   And how long were you there? |
| 12:34:09 | 11 | **A.**   Two months. |
| 12:34:13 | 12 | **Q.**   And from there where did you go? |
| 12:34:15 | 13 | **A.**   Clinton Correctional Facility. |
| 12:34:19 | 14 | **Q.**   And how long were you there? |
| 12:34:20 | 15 | **A.**   Ten months. |
| 12:34:23 | 16 | **Q.**   And after that? |
| 12:34:24 | 17 | **A.**   Wende Correctional Facility. |
| 12:34:28 | 18 | **Q.**   How long were you there? |
| 12:34:29 | 19 | **A.**   One year. |
| 12:34:31 | 20 | **Q.**   And after that? |
| 12:34:32 | 21 | **A.**   Attica Correctional Facility. |
| 12:34:34 | 22 | **Q.**   And how long were you there? |
| 12:34:35 | 23 | **A.**   23 years. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

79

12:34:43  1      **Q.**   And Lamarr Scott was also at Attica

12:34:47  2   while you were there; is that correct?

12:34:49  3      **A.**   Yes.

12:34:49  4      **Q.**   And how much of the 23 years that you

12:34:53  5   were there was Lamarr Scott also there?

12:34:55  6      **A.**   I believe ten years, from 1999 to -- he

12:35:00  7   stayed about ten years.  He arrived in 1999,

12:35:04  8   though, yes.

12:35:05  9      **Q.**   And while you were at Attica together,

12:35:09 10   were you housed in the same section?

12:35:11 11      **A.**   Yes.

12:35:14 12      **Q.**   So you spoke to each other often.

12:35:15 13      **A.**   Yes.

12:35:16 14      **MR. BRUSTIN:**   Objection.  Objection to form.

12:35:27 15      **BY MS. PERSICO:**

12:35:28 16      **Q.**   Did you talk about this incident with

12:35:30 17   Mr. Scott?

12:35:31 18      **A.**   Yes.

12:35:56 19      **Q.**   So Mr. Scott was in Attica from 1999

12:36:04 20   through 2009?

12:36:07 21      **A.**   I believe -- no, a little longer than

12:36:10 22   that.  2000 -- he left in 2012.

12:36:14 23      **Q.**   And where did he go, do you know?

*Valentino Dixon - Ms. Persico - 06/07/2022*

80

| | | |
|---|---|---|
| 12:36:16 | 1 | **A.**   A medium correctional facility.  I |
| 12:36:18 | 2 | believe it was Cayuga. |
| 12:36:21 | 3 | **Q.**   Did you keep in touch with him? |
| 12:36:25 | 4 | **A.**   For about a year. |
| 12:36:43 | 5 | **Q.**   Did you speak with Mr. Scott about the |
| 12:36:50 | 6 | 440 motion that was filed that eventually vacated |
| 12:36:57 | 7 | your conviction? |
| 12:36:58 | 8 | **A.**   No. |
| 12:37:03 | 9 | **Q.**   Did you speak with Mr. Scott about this |
| 12:37:06 | 10 | lawsuit? |
| 12:37:07 | 11 | **A.**   No. |
| 12:37:07 | 12 | **Q.**   Have you ever spoken with Mr. Scott's |
| 12:37:23 | 13 | attorneys? |
| 12:37:24 | 14 | **A.**   No. |
| 12:37:24 | 15 | **Q.**   Pamela Yates is your relative in some |
| 12:37:36 | 16 | fashion? |
| 12:37:37 | 17 | **A.**   My daughter's aunt.  My daughter's |
| 12:37:39 | 18 | aunt.  My daughter Valentina, her aunt. |
| 12:37:42 | 19 | **Q.**   Okay.  So Valentina's mom's sister? |
| 12:37:45 | 20 | **A.**   Valentina's mom's aunt.  Auntie. |
| 12:37:50 | 21 | **Q.**   Okay.  Val -- Val -- okay.  So |
| 12:37:54 | 22 | Valentina's -- |
| 12:37:56 | 23 | **A.**   Mom's auntie, yes. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

81

12:38:03  1          Q.    Okay.  So she's Valentina's like

12:38:07  2    grand --

12:38:07  3          A.    Great-aunt, maybe.  Yes, I think it

12:38:10  4    would be great-aunt.

12:38:11  5          Q.    All right.  I get confused about those.

12:38:11  6          A.    Yes.

12:38:14  7          Q.    Okay.

12:38:14  8          A.    So it would be my ex-girlfriend's

12:38:16  9    auntie, you know, so if I have a baby by my ex, and

12:38:21 10    then she has an auntie --

12:38:22 11          Q.    Got it.

12:38:23 12          A.    -- you know, so it would be great-aunt.

12:38:26 13          Q.    I've never been good at that family

12:38:28 14    tree stuff.

12:38:46 15          And it's also now Pamela Yates Richardson;

12:38:50 16    is that right?

12:38:50 17          A.    I believe that is -- I believe so.

12:38:53 18          Q.    Okay.  Do you speak with her?

12:38:54 19          A.    I haven't in the last couple years.  I

12:38:56 20    did when I came home.

12:38:57 21          Q.    Does she live locally?

12:39:03 22          A.    She lives -- I believe she lives in

12:39:05 23    Buffalo.

*Valentino Dixon - Ms. Persico - 06/07/2022*

82

12:39:06　1　　　　Q.　Do you know if Valentina keeps in touch

12:39:12　2　with her?

12:39:13　3　　　　A.　I believe so.

12:39:30　4　　　　Q.　So I just want to talk for a few

12:39:36　5　minutes about this -- the allegations that you make

12:39:38　6　in this lawsuit, okay?

12:39:41　7　　　　A.　No problem.

12:39:42　8　　　　Q.　Okay.  Are you familiar with the

12:39:48　9　allegations contained in the Complaint?

12:39:51　10　　　　A.　Somewhat.

12:39:53　11　　　　Q.　Did you have an opportunity to review

12:39:55　12　it before it was filed?

12:39:58　13　　　　MR. BRUSTIN:  Objection to the form.  In

12:40:00　14　fact -- you can answer that.

12:40:05　15　　　　THE WITNESS:  I don't know if I received it

12:40:08　16　after or before it was filed.  I know I received a

12:40:11　17　copy.

12:40:13　18　　　　BY MS. PERSICO:

12:40:13　19　　　　Q.　And once you received a copy, did

12:40:15　20　you -- did you look at it?

12:40:17　21　　　　A.　I glanced at it, yes.

12:40:20　22　　　　Q.　Did you look at it in any detail?

12:40:24　23　　　　A.　I'm going to say I glanced at it,

*Valentino Dixon - Ms. Persico - 06/07/2022*

83

12:40:26  1  because after 27 years of reading over documents

12:40:31  2  and -- it was like, you know, I just glanced at it,

12:40:34  3  you know.

12:40:35  4       It wasn't real lengthy.  You know, it just

12:40:38  5  had, you know, grounds on which, you know, the

12:40:40  6  lawsuit was based on, so I just glanced at it, went

12:40:43  7  over -- I think I took maybe ten minutes.

12:40:46  8       Q.   Okay.  So if -- if the Complaint

12:40:57  9  indicated that you were not involved in the

12:41:03 10  shooting, would that be inaccurate?

12:41:09 11       MR. BRUSTIN:  Objection to form.  I really

12:41:11 12  don't understand the question.

12:41:12 13       MS. PERSICO:  Okay.

12:41:13 14       BY MS. PERSICO:

12:41:13 15       Q.   The Complaint says that you weren't

12:41:15 16  involved in the shooting; however, your testimony

12:41:18 17  today has established that you -- that you brought

12:41:22 18  the shooter and the gun to the scene, right?

12:41:27 19       MR. BRUSTIN:  Objection.  He wasn't involved

12:41:28 20  in the shooting.

12:41:30 21       MS. PERSICO:  I'm asking the question.

12:41:31 22       MR. BRUSTIN:  Well, it's a ridiculous

12:41:32 23  question.

*Valentino Dixon - Ms. Persico - 06/07/2022*

84

12:41:33  1          **MS. PERSICO:**  Well, I think your objection

12:41:34  2  is ridiculous --

12:41:35  3          **MR. BRUSTIN:**  Okay.

12:41:35  4          **MS. PERSICO:**  -- but I'm at least polite

12:41:37  5  enough not to say it out loud.

12:41:39  6          **MR. BRUSTIN:**  All right.  Go ahead.

12:41:41  7          I object to the form.  Answer if you

12:41:43  8  understand.  If you don't, ask for clarification.

12:41:44  9          **THE WITNESS:**  I brought the shooter and the

12:41:46 10  gun to Mario's house.

12:41:48 11          **BY MS. PERSICO:**

12:41:48 12          Q.    Okay.

12:41:49 13          A.    The scene is a different place.

12:41:55 14          Q.    Are you saying that the -- well, strike

12:41:59 15  that.  So you brought Lamarr Scott to Mario's

12:42:04 16  house, right?

12:42:05 17          A.    Yes.

12:42:05 18          Q.    You brought the TEC-9 to Mario's house,

12:42:09 19  right?

12:42:13 20          A.    Yes.

12:42:14 21          Q.    You walked up to the scene at some

12:42:18 22  point, right?

12:42:19 23          **MR. BRUSTIN:**  Objection to the form.  Answer

*Valentino Dixon - Ms. Persico - 06/07/2022*

85

12:42:21  1  if you understand it.

12:42:21  2      **THE WITNESS:**  Not at that moment.  Couple

12:42:24  3  hours later, you know.  It's time -- there's a time

12:42:27  4  difference here that you're missing.

12:42:29  5      **BY MS. PERSICO:**

12:42:30  6      **Q.**  I don't think I'm missing it, but

12:42:31  7  thanks for the pointer.

12:42:32  8      **A.**  Okay.

12:42:33  9      **MR. BRUSTIN:**  No, we're not going to have --

12:42:34  10  we're not going to have back and forth.  You ask

12:42:36  11  questions; he will answer them.  No back and forth.

12:42:39  12  Don't do that.  Do not argue with my witness.

12:42:41  13      **MS. PERSICO:**  I'm not arguing with the

12:42:42  14  witness.

12:42:43  15      **MR. BRUSTIN:**  You are.  Don't do it.

12:42:45  16      **MS. PERSICO:**  Mr. Brustin --

12:42:45  17      **MR. BRUSTIN:**  Please don't do it.

12:42:47  18      **MS. PERSICO:**  I'm going to hold my tongue.

12:43:02  19      **BY MS. PERSICO:**

12:43:04  20      **Q.**  You -- the Complaint further alleges

12:43:08  21  that the Defendants fabricated a case against you

12:43:20  22  because they suspected that you were involved in

12:43:22  23  selling drugs.

*Valentino Dixon - Ms. Persico - 06/07/2022*

86

12:43:24  1        The fact of the matter is you were involved

12:43:26  2  in selling drugs, right?

12:43:27  3        **A.**   Yes.

12:43:31  4        **Q.**   In fact --

12:43:49  5        **MS. PERSICO:**   Can you mark this as County 6?

         6  **The following was marked for Identification:**

         7   COUNTY EXH. 6          **Erie County Central Police**

         8                          **Services Arrest/Booking**

         9                          **Form, various Bates numbers,**

        10                          **HR-Dixon-0001446 through**

        11                          **HR-Dixon-0001531**

12:44:17 12        **BY MS. PERSICO:**

12:44:18 13        **Q.**   Mr. Dixon, I've just handed you what's

12:44:21 14  been marked as County 6, and that is -- just for

12:44:32 15  the record, I will identify the pages.

12:44:33 16        So they are Bates stamps HR-Dixon-1446,

12:44:46 17  1450, 1452, 1454, 1481, 1483, 1497, 1498, 1500,

12:45:09 18  1502, 1506, 1508, 1510, 1512, 1462 through 1472,

12:45:42 19  1530 and 1531.

12:45:56 20        So Mr. Dixon, I'm just going to ask you a

12:45:59 21  couple of questions about these documents.  Let's

12:46:05 22  just start with the first one, and this one is

12:46:12 23  entitled Erie County Central Police Services

*Valentino Dixon - Ms. Persico - 06/07/2022*

87

| | | |
|---|---|---|
| 12:46:16 | 1 | Arrest/Booking Form. |
| 12:46:18 | 2 | Do you see that? |
| 12:46:18 | 3 | **A.**   Yes. |
| 12:46:19 | 4 | **Q.**   And this -- this booking form relates |
| 12:46:21 | 5 | to you; is that correct? |
| 12:46:22 | 6 | **A.**   Yes. |
| 12:46:25 | 7 | **Q.**   And the allegation contained in this |
| 12:46:30 | 8 | arrest/booking form is that you, while at the above |
| 12:46:33 | 9 | location, had in your possession and under your |
| 12:46:37 | 10 | control a small quantity of cocaine and a quantity |
| 12:46:40 | 11 | of glassine envelopes and a small quantity of |
| 12:46:44 | 12 | marijuana when officer executed a search warrant |
| 12:46:47 | 13 | for the above location. |
| 12:46:52 | 14 | Is that correct? |
| 12:46:52 | 15 | **A.**   It's not accurate. |
| 12:46:53 | 16 | **Q.**   Is that what it says in the document? |
| 12:46:55 | 17 | **MR. BRUSTIN:**   She's just asking if that's |
| 12:46:57 | 18 | what the document says. |
| 12:46:57 | 19 | **THE WITNESS:**   Yes.  Yes. |
| 12:46:58 | 20 | **BY MS. PERSICO:** |
| 12:46:58 | 21 | **Q.**   Okay.  And also, a little bit further |
| 12:47:00 | 22 | down on the page, there's a -- there's an Anderson, |
| 12:47:08 | 23 | comma, Shawn.  Do you see that? |

*Valentino Dixon - Ms. Persico - 06/07/2022*

88

| | | |
|---|---|---|
| 12:47:10 | 1 | **A.**    Yes. |
| 12:47:10 | 2 | **Q.**    Was that another name by which you |
| 12:47:13 | 3 | went? |
| 12:47:13 | 4 | **A.**    Yes. |
| 12:47:17 | 5 | **Q.**    And this -- the date of this was -- |
| 12:47:27 | 6 | **MR. BRUSTIN:**   I think it's October '90. |
| 12:47:27 | 7 | **BY MS. PERSICO:** |
| 12:47:30 | 8 | **Q.**    -- yes, 10 -- was October 23rd, 1990; |
| 12:47:33 | 9 | is that correct? |
| 12:47:33 | 10 | **A.**    Yes. |
| 12:47:34 | 11 | **Q.**    Okay.  So you were arrested on that |
| 12:47:35 | 12 | date for -- allegedly for -- for what is -- what we |
| 12:47:42 | 13 | read in the -- the possession of cocaine, |
| 12:47:47 | 14 | et cetera, right? |
| 12:47:47 | 15 | **A.**    Yes. |
| 12:47:48 | 16 | **Q.**    Okay.  Now, on the next page, which is |
| 12:47:56 | 17 | HR-Dixon-1450, this is another arrest/booking form, |
| 12:48:03 | 18 | correct? |
| 12:48:03 | 19 | **A.**    Yes. |
| 12:48:03 | 20 | **Q.**    Also relating to you? |
| 12:48:07 | 21 | **A.**    Yes. |
| 12:48:07 | 22 | **Q.**    Okay.  And this one is dated |
| 12:48:13 | 23 | March 26th, 1991, right? |

*Valentino Dixon - Ms. Persico - 06/07/2022*

89

12:48:17  1          **A.**    Yes.

12:48:17  2          **Q.**    Do you see that in the middle of the

12:48:19  3   page?

12:48:19  4          **A.**    Yes, I see it.

12:48:20  5          **Q.**    And -- and this one alleges that you

12:48:25  6   did shoot at complainant with an unknown weapon

12:48:28  7   while in front of 338 Walden; is that correct?

12:48:31  8          **A.**    Yes.

12:48:34  9          **Q.**    And it alleges that -- my eyes are

12:48:39  10  getting worse by the day.

12:48:41  11          This alleges that you shot at Harold Foster;

12:48:47  12  is that correct?

12:48:47  13          **A.**    Yes.

12:48:48  14          **MR. BRUSTIN:**  What page are you on now?

12:48:49  15          **MS. PERSICO:**  1450.

12:48:53  16          **MR. BRUSTIN:**  Where do you see that?

12:48:54  17          **MS. PERSICO:**  In the middle.

12:48:55  18          **THE WITNESS:**  Right here.

12:48:56  19          **MR. BRUSTIN:**  Oh, got it.

12:48:56  20          **MS. PERSICO:**  Got it?

12:49:02  21          **MR. BRUSTIN:**  I just didn't see the name,

12:49:05  22  but yes, got you.

12:49:05  23          **BY MS. PERSICO:**

*Valentino Dixon - Ms. Persico - 06/07/2022*

90

12:49:06  1          **Q.**    Okay.  And who was Harold Foster?

12:49:09  2          **A.**    The guy that robbed me.

12:49:10  3          **Q.**    Did he rob you on March 26th, 1991?

12:49:15  4          **A.**    No.

12:49:21  5          **Q.**    And were you -- did this particular

12:49:24  6  charge go to trial?

12:49:27  7          **A.**    Yes.

12:49:28  8          **Q.**    What was the outcome?

12:49:31  9          **A.**    Not -- not guilty of a serious charge.

12:49:35 10  I was convicted of an A misdemeanor.

12:49:37 11          **Q.**    Who represented you in connection with

12:49:38 12  that?

12:49:39 13          **A.**    Joseph Terranova.

12:49:44 14          **Q.**    And that was after trial that you were

12:49:46 15  convicted of the A misdemeanor, or was it a plea?

12:49:49 16          **A.**    Yes, well, I was convicted of the A

12:49:53 17  misdemeanor.  That was the verdict.  So the highest

12:49:57 18  count was dismissed.

12:49:58 19          **Q.**    Okay.  So that -- but that was -- you

12:50:00 20  didn't plea to that.

12:50:01 21          **A.**    I didn't plea to it, no.

12:50:03 22          **Q.**    Okay.  And what kind of -- so what kind

12:50:11 23  of gun was used in that shooting?

*Valentino Dixon - Ms. Persico - 06/07/2022*

91

12:50:12  1          A.    A handgun.  It was a .30 -- I believe

12:50:17  2    it was a .32 handgun.

12:50:20  3          Q.    And that belonged to you?

12:50:21  4          A.    Yes.

12:50:33  5          Q.    Okay.  Now please turn to the next

12:50:37  6    page, which is 1452, another arrest/booking form.

12:50:43  7          This -- this one is related to Shawn

12:50:46  8    Anderson, but in reality, that is you, correct?

12:50:51  9          A.    Yes.

12:50:56  10          Q.    And this -- this was an arrest for a

12:50:59  11    material witness order warrant.  Do you see that?

12:51:04  12          A.    Yes.

12:51:07  13          Q.    In what case were you a material

12:51:09  14    witness?

12:51:09  15          A.    I was a witness in a shooting, and I

12:51:13  16    didn't want to testify, so they picked me up.

12:51:16  17          Q.    What were the circumstances of that

12:51:18  18    shooting?

12:51:19  19          A.    A guy from my neighborhood was shot in

12:51:21  20    the leg, and I was there on the scene of the crime,

12:51:28  21    a couple of us, and questioned by the police, and

12:51:33  22    afterwards, they wanted me to testify at trial, and

12:51:37  23    I refused to.

*Valentino Dixon - Ms. Persico - 06/07/2022*

92

| | | |
|---|---|---|
| 12:51:38 | 1 | **Q.**  Why? |
| 12:51:38 | 2 | **A.**  Because, you know, it was dangerous for |
| 12:51:41 | 3 | me. |
| 12:51:42 | 4 | **Q.**  Why? |
| 12:51:42 | 5 | **A.**  You get killed in the streets for |
| 12:51:45 | 6 | testifying.  Police is not going to protect you. |
| 12:51:56 | 7 | **Q.**  So the police wanted you to testify as |
| 12:52:00 | 8 | to who did the shooting? |
| 12:52:02 | 9 | **A.**  Yes. |
| 12:52:02 | 10 | **Q.**  And you refused. |
| 12:52:03 | 11 | **A.**  Yes. |
| 12:52:04 | 12 | **Q.**  But you knew who did it. |
| 12:52:08 | 13 | **A.**  I had an idea. |
| 12:52:10 | 14 | **Q.**  Did you eventually testify? |
| 12:52:12 | 15 | **A.**  Yes. |
| 12:52:20 | 16 | **Q.**  Any retribution for that testimony? |
| 12:52:22 | 17 | **A.**  Yes, well, they tried to kill me twice |
| 12:52:27 | 18 | after that, but -- |
| 12:52:28 | 19 | **Q.**  Who's the they? |
| 12:52:30 | 20 | **A.**  The LA Boys. |
| 12:52:43 | 21 | **MR. BRUSTIN:**  So I've let you ask a lot of |
| 12:52:46 | 22 | questions about this.  I'm sure it's all very |
| 12:52:48 | 23 | exciting and fun, but could you explain how this |

*Valentino Dixon - Ms. Persico - 06/07/2022*

93

12:52:50  1  could possibly lead to relevant evidence?

12:52:52  2          **MS. PERSICO:**  No.

12:52:52  3          **MR. BRUSTIN:**  I'm going to cut it off soon,

12:52:54  4  because this is way beyond what could conceivably

12:52:57  5  lead to relevant evidence unless you can explain to

12:53:00  6  me how it could.

12:53:00  7          **MS. PERSICO:**  Mr. Brustin, I don't believe

12:53:02  8  that I have to explain to you.

12:53:03  9          **MR. BRUSTIN:**  If it gets to the point where

12:53:05  10  it's just harassing and couldn't lead to relevant

12:53:08  11  evidence, that's my objection.

12:53:09  12          I'm not going to stop you now, but I'm

12:53:11  13  asking if you could state for the record how the

12:53:13  14  circumstances of him testifying about a material

12:53:15  15  witness order could possibly be admissible evidence

12:53:20  16  in this trial.

12:53:21  17          **MS. PERSICO:**  I don't believe that I need to

12:53:22  18  explain that to you, Mr. Brustin.

12:53:23  19          **MR. BRUSTIN:**  I think you might, soon you

12:53:25  20  might, because we'll have to go to the judge.  I'm

12:53:29  21  going stop him from answering, but you keep asking.

12:53:32  22  Use your time as you want.

12:53:33  23          **BY MS. PERSICO:**

*Valentino Dixon - Ms. Persico - 06/07/2022*

94

12:53:34  1          Q.    Mr. Dixon, please turn to 1454, which

12:53:36  2    is the next page.

12:53:45  3          This -- this was from May 19th, 1989.  Do

12:53:55  4    you see that?

12:53:56  5          A.    Yes.

12:53:57  6          Q.    Okay.  And again this is Shawn

12:54:01  7    Anderson, which is an alias that you used, right?

12:54:04  8          A.    Yes.

12:54:07  9          Q.    Please turn to the next page, which is

12:54:10 10    1481.  This one is from April 6th, 1991, correct?

12:54:24 11          A.    Yes.

12:54:25 12          Q.    And this relates to you, correct?

12:54:28 13          A.    Yes.

12:54:31 14          Q.    And -- and the allegation in the middle

12:54:35 15    of the page is that you sold a small amount of

12:54:37 16    cocaine in exchange for $7 and remained at the

12:54:43 17    above location for the purpose of using and

12:54:48 18    possessing cocaine.

12:54:51 19          Right?  That's what it says on the document?

12:54:54 20          A.    Yes.

12:54:54 21          Q.    What was the outcome of this arrest?

12:54:57 22          A.    I took a plea bargain of one to three.

12:55:01 23          Q.    One to three years?

*Valentino Dixon - Ms. Persico - 06/07/2022*

95

12:55:04  1      **A.**    Yes.  For $7 worth.  It's ridiculous.

12:55:14  2      **Q.**    And so did you do that time?

12:55:16  3      **A.**    Well, I was already arrested on the

12:55:19  4   murder charge, so this was pending.

12:55:22  5      **Q.**    Okay.

12:55:22  6      **A.**    And Joseph Terranova --

12:55:24  7      **MR. BRUSTIN:**  Don't -- okay.  You can tell

12:55:26  8   who represented you.  Just don't talk about

12:55:29  9   conversations.

12:55:29 10      **THE WITNESS:**  Yes, he represented me on this

12:55:31 11   plea of one to three.

12:55:31 12      **BY MS. PERSICO:**

12:55:32 13      **Q.**    So -- so these charges that we're

12:55:34 14   talking about listed on 1481 -- that matter was

12:55:43 15   pending when you were arrested in connection with

12:55:44 16   the shooting of Torri Jackson.

12:55:49 17      **A.**    Yes.

12:55:49 18      **Q.**    Did you take the -- the plea to one to

12:55:53 19   three years before the trial in the Torriano

12:56:03 20   Jackson matter?

12:56:03 21      **A.**    Yes.

12:56:07 22      **Q.**    And so were you serving the -- the time

12:56:09 23   for this while -- at the time that the -- this

*Valentino Dixon - Ms. Persico - 06/07/2022*

96

12:56:15  1  trial took place?

12:56:16  2      **MR. BRUSTIN:**  Objection to form.  Answer if

12:56:17  3  you know.

12:56:18  4      **THE WITNESS:**  I took this plea, I'm going to

12:56:24  5  say, two months before my trial started with

12:56:28  6  Torriano Jackson.  Two months before.

12:56:33  7      **MR. BRUSTIN:**  She asked if you -- if you

12:56:35  8  knew whether you were serving time on this at that

12:56:37  9  time.

12:56:37 10      **THE WITNESS:**  Oh, I didn't know.  I didn't

12:56:38 11  know.  I didn't know how the time was running.

12:56:44 12      **BY MS. PERSICO:**

12:56:45 13      Q.   You were -- you were in jail when the

12:56:46 14  trial of this matter started.

12:56:48 15      A.   Yes.

12:56:48 16      Q.   Okay.  Can you turn to the next one,

12:56:51 17  which is 1483, an arrest/booking form.

12:56:58 18      This one is from February 8th of 1991, and

12:57:06 19  this one relates to you, correct?

12:57:08 20      A.   Yes.

12:57:09 21      Q.   And the -- the narrative states that

12:57:13 22  you were loud and used abusive and obscene language

12:57:16 23  while at the above address and did have in his

*Valentino Dixon - Ms. Persico - 06/07/2022*

97

12:57:19  1  possession and did drink from a 12-ounce can of

12:57:23  2  Colt 45 beer while seated in a Mercedes.  Defendant

12:57:27  3  arrested on the above listed traffic charges and

12:57:30  4  did fight and struggle and had to be forcibly

12:57:34  5  subdued and handcuffed.

12:57:36  6        Is that what it says on the document?

12:57:37  7        A.    That's what it says.

12:57:39  8        Q.    Okay.  What was the outcome of this

12:57:40  9  matter?

12:57:41  10       A.    It was dismissed.

12:57:42  11       Q.    Did Mr. Terranova represent you in

12:57:45  12  connection with this?

12:57:46  13       A.    No, Sean Hill did.

12:57:54  14       Q.    Please turn to page -- the next page,

12:57:57  15  which is 1497.

12:58:03  16       This one is -- also lists Shawn Anderson as

12:58:09  17  the -- the person, but that's really you, right?

12:58:15  18       MR. BRUSTIN:  Objection to form, asked and

12:58:15  19  answered.

12:58:18  20       THE WITNESS:  That's me.

12:58:19  21       BY MS. PERSICO:

12:58:20  22       Q.    Okay.  Can you tell me how the police

12:58:25  23  would list Shawn Anderson on 1497 and then, you

*Valentino Dixon - Ms. Persico - 06/07/2022*

98

12:58:32  1  know, Valentino Dixon on the one before that?

12:58:34  2      Would you -- would you give -- affirmatively

12:58:36  3  give them the wrong name?

12:58:38  4      A.   It's called incompetence.  They knew

12:58:40  5  who I was.  Once I used Shawn Anderson one time,

12:58:44  6  they started putting it on all my arrests.

12:58:47  7      Q.   Why did you start using Shawn Anderson?

12:58:49  8      A.   Well, he was my friend in high school,

12:58:51  9  and whenever I got pulled over -- my license was

12:58:54 10  suspended.  I'd use it a couple times.

12:58:57 11      It only worked a couple times, and then

12:58:59 12  after that, I couldn't use it no more.  Everybody

12:59:01 13  knew who I was.

12:59:02 14      Q.   Oh, so you mean whenever you got pulled

12:59:04 15  over, you didn't -- you did not have a valid

12:59:08 16  license, so you used Shawn's name.

12:59:11 17      MR. BRUSTIN:  Objection.

12:59:11 18      THE WITNESS:  A couple times, yes.

12:59:13 19      BY MS. PERSICO:

12:59:13 20      Q.   Did you have his license?

12:59:15 21      A.   No.  Just gave the date of birth and

12:59:18 22  his address.

12:59:18 23      Q.   Okay.  Did Shawn know you were doing

*Valentino Dixon - Ms. Persico - 06/07/2022*

99

12:59:23  1  that?

12:59:23  2      **A.**   Yes.  He's my buddy, my best friend.

12:59:35  3           And then eventually I got --

12:59:36  4      **MR. BRUSTIN:**  There's no question.  There's

12:59:38  5  no question.  Just answer her question.

12:59:40  6      **BY MS. PERSICO:**

12:59:40  7      **Q.**   Okay.  I'm going to ask you to skip to

12:59:43  8  page 1502, and that -- that is an arrest/booking

12:59:55  9  form relative to you, and the date is 7/28/90; is

13:00:00 10  that correct?

13:00:07 11      **A.**   Which page are we on?

13:00:08 12      **Q.**   It's -- on the bottom, it says HR1502.

13:00:11 13      **A.**   Okay.  I've got 1498.  Sorry about

13:00:19 14  that.

13:00:19 15      **Q.**   So this relates to you, and it's dated

13:00:22 16  July 28th, 1990.

13:00:24 17      **A.**   Yes.

13:00:24 18      **Q.**   That's just like a couple of days,

13:00:28 19  really, before the shooting of Torriano Jackson,

13:00:34 20  right?

13:00:35 21      **A.**   No.

13:00:35 22      **Q.**   Oh, no, it's a year before.  Right.  A

13:00:39 23  year and a couple of days.

*Valentino Dixon - Ms. Persico - 06/07/2022*

100

| | | |
|---|---|---|
| 13:00:40 | 1 | **A.**  Yes. |
| 13:00:42 | 2 | **Q.**  So -- and this arrest is related to |
| 13:00:47 | 3 | your possession of a .38 caliber gun and some |
| 13:00:51 | 4 | cocaine, correct? |
| 13:00:53 | 5 | **A.**  Yes. |
| 13:00:54 | 6 | **Q.**  Okay.  What was the disposition of |
| 13:00:57 | 7 | this -- these charges? |
| 13:00:58 | 8 | **A.**  It was dismissed. |
| 13:01:02 | 9 | **Q.**  Was that after trial? |
| 13:01:04 | 10 | **A.**  No trial.  This was never in my |
| 13:01:07 | 11 | possession.  This is why it was dismissed. |
| 13:01:10 | 12 | **Q.**  Okay.  Who represented you in |
| 13:01:12 | 13 | connection with this? |
| 13:01:13 | 14 | **A.**  Sean Hill. |
| 13:01:17 | 15 | **MR. BRUSTIN:**  Jen, I apologize.  At a |
| 13:01:20 | 16 | reasonable time, could we just take a quick |
| 13:01:23 | 17 | restroom break? |
| 13:01:24 | 18 | **MS. PERSICO:**  Sure.  You want to do it now? |
| 13:01:26 | 19 | **MR. BRUSTIN:**  If you want. |
| 13:01:29 | 20 | **MS. PERSICO:**  Okay. |
| 13:01:30 | 21 | (A recess was then taken at 1:01 p.m.) |
| 13:04:21 | 22 | **BY MS. PERSICO:** |
| 13:04:22 | 23 | **Q.**  Mr. Dixon, I'd ask you to turn to page |

*Valentino Dixon - Ms. Persico - 06/07/2022*

101

13:04:26  1  1506, and -- and this is an arrest/booking form

13:04:35  2  relating to you dated January 30th, 1991; is that

13:04:39  3  correct?

13:04:40  4        **A.**   Yes.

13:04:41  5        **Q.**   And it alleges that you had in your

13:04:47  6  possession more than one ounce of cocaine and had a

13:04:51  7  12-gauge pistol grip Maverick shotgun, and that's

13:04:57  8  the allegation contained on the document?

13:05:01  9        **A.**   Yes.

13:05:03  10        **Q.**   What was the outcome of these charges?

13:05:06  11        **A.**   Dismissed.

13:05:08  12        **Q.**   Was that after trial?

13:05:10  13        **A.**   There was no trial.

13:05:11  14        **Q.**   Who represented you?

13:05:23  15        **A.**   Sean Hill.

13:05:26  16        **Q.**   On -- please turn to 1508.

13:05:39  17        And that is an arrest/booking form relating

13:05:42  18  to you dated April 9th, 1990, correct?

13:05:46  19        **A.**   Yes.

13:05:47  20        **Q.**   And that one alleges that while you

13:05:49  21  were driving a Cadillac, you shot at Frank Love,

13:05:58  22  Sr. at Fillmore and French Streets and possessed a

13:06:03  23  .22 caliber Jennings J-22 with six live rounds in

*Valentino Dixon - Ms. Persico - 06/07/2022*

102

13:06:08  1  the clip and a .25 caliber automatic Raven handgun

13:06:13  2  with seven live rounds in the clip.

13:06:15  3           That's the allegation, right?

13:06:17  4       **A.**    Yes.

13:06:18  5       **Q.**    How did those charges get resolved?

13:06:21  6       **A.**    A plea bargain.

13:06:24  7       **Q.**    And what was the plea?

13:06:26  8       **A.**    I believe it -- I believe it was two to

13:06:27  9  six years.

13:06:31 10       **Q.**    And when did you serve that time?

13:06:41 11       **A.**    Well, just so we're clear, I was

13:06:43 12  arrested August 10th, 1991.  These cases were

13:06:50 13  pending, so I stayed in.  I never got out.

13:06:53 14       **Q.**    I see.  So you --

13:06:55 15       **A.**    Okay.

13:06:55 16       **Q.**    You're just unsure of whether --

13:06:57 17       **A.**    Yes, because I stayed in jail the whole

13:06:59 18  time.  I never got out after that time.

13:07:01 19       **Q.**    Okay.

13:07:01 20       **A.**    You know what I'm saying?  So --

13:07:03 21       **Q.**    Yes.  I think that -- let me see if I

13:07:06 22  have this right.

13:07:06 23           So this arrest from 1990, the plea bargain

*Valentino Dixon - Ms. Persico - 06/07/2022*

103

13:07:11  1  happened sometime later, and you --

13:07:16  2      A.   Okay.

13:07:17  3      Q.   Before -- before your arrest on

13:07:20  4  August 10th of 1991, these various charges that we

13:07:25  5  are in the midst of discussing were pending; is

13:07:29  6  that correct?

13:07:29  7      A.   Yes.

13:07:30  8      Q.   And you had not yet been sentenced and

13:07:33  9  taken to jail on any of these --

13:07:35  10     A.   Yes.

13:07:36  11     Q.   -- so far.

13:07:37  12     MR. BRUSTIN:  Just to be clear, he -- some

13:07:38  13  of them.

13:07:39  14     MS. PERSICO:  Okay.

13:07:40  15     MR. BRUSTIN:  Not all the ones you've

13:07:41  16  mentioned --

13:07:41  17     MS. PERSICO:  Right.

13:07:41  18     MR. BRUSTIN?  -- but at least a couple.

13:07:43  19     MS. PERSICO:  That's why I've been trying to

13:07:45  20  go through each one and get the outcome so that

13:07:49  21  we're not adding more than we have to.

13:07:50  22     THE WITNESS:  But all charges were resolved,

13:07:52  23  you know, within -- after 1991, after my arrest.

*Valentino Dixon - Ms. Persico - 06/07/2022*

104

13:07:59  1  All of them were resolved.

13:08:02  2          This plea bargain was a month before I was

13:08:06  3  arrested for Torriano.  I just hadn't been -- you

13:08:10  4  know, started the sentence.  I was waiting to go

13:08:12  5  to -- you know, to be sentenced.

13:08:12  6          **BY MS. PERSICO:**

13:08:14  7          **Q.**   Okay.

13:08:15  8          **A.**   Yes.

13:08:15  9          **Q.**   So even though this one happened in

13:08:24 10  1990, you didn't take the plea until shortly before

13:08:27 11  the shooting and -- and had not been sentenced.

13:08:32 12          **A.**   Yes, I -- yes, about six months before

13:08:34 13  the shooting, I took the plea.

13:08:38 14          **Q.**   And do you remember what the -- what

13:08:44 15  you pled to?

13:08:45 16          **A.**   Yes.  I remember pleading to a

13:08:47 17  nonviolent reckless endangerment.

13:08:59 18          **Q.**   Okay.  So I -- so -- and then you did

13:09:02 19  own the .22 caliber and the .25 caliber?

13:09:14 20          **A.**   Yes, ma'am.

13:09:14 21          **Q.**   Please -- please, then, turn to 1510,

13:09:26 22  another arrest/booking form relating to you dated

13:09:29 23  March 30th, 1991, correct?

*Valentino Dixon - Ms. Persico - 06/07/2022*

105

13:09:32  1          A.    Yes.

13:09:32  2          Q.    And that narrative on the -- on the

13:09:39  3    paper indicates that you had in your possession a

13:09:41  4    loaded handgun, a .22 caliber long rifle, and an

13:09:51  5    open bottle of beer.

13:09:54  6          How was that arrest resolved?

13:09:56  7          A.    Just give me a second.  I'm trying to

13:10:24  8    really recollect.

13:10:26  9          Q.    Take your time.

13:10:35 10          MR. BRUSTIN:  If you don't remember, it's

13:10:36 11    fine.  There are other sources for this

13:10:38 12    information, but just do the best you can.

13:10:50 13          THE WITNESS:  Yes, I don't remember this

13:10:52 14    now.  This is strange.

13:10:54 15          BY MS. PERSICO:

13:10:55 16          Q.    Can I ask you:  In the description

13:10:57 17    here, they say -- and this may demonstrate my

13:11:02 18    ignorance about guns, but -- so this says you had

13:11:05 19    under your control a loaded handgun, a .22 caliber

13:11:09 20    long rifle.

13:11:10 21          Is that the same .22 caliber that we just

13:11:13 22    talked about that you owned, or is this some -- is

13:11:16 23    this a different type of gun?

*Valentino Dixon - Ms. Persico - 06/07/2022*

106

13:11:18  1          **MR. BRUSTIN:**  Objection to form.

13:11:18  2          **THE WITNESS:**  It's the same one, because I

13:11:20  3  only owned one, so this is what's confusing here,

13:11:24  4  you know.

13:11:26  5          **MS. PERSICO:**  Okay.

13:11:26  6          **MR. BRUSTIN:**  Just tell what you know.

13:11:31  7          **THE WITNESS:**  Yes, I'm looking at the

13:11:32  8  address, and I'm trying to match the address with

13:11:35  9  the -- there's no location here, but then it's

13:11:39  10  saying Goodyear, and I know I was not arrested ever

13:11:42  11  at Genesee and Goodyear, so this is what's throwing

13:11:45  12  me off.

13:11:45  13          **BY MS. PERSICO:**

13:11:46  14          Q.    That's all right.  If you don't know --

13:11:47  15          A.    Yes, they don't have a -- have a number

13:11:50  16  there, you know, an address number.  They just have

13:11:52  17  a vague Genesee and Goodyear.

13:11:55  18          Q.    Fine.  We'll move on to the next one.

13:11:57  19          Okay.  This is 1512, an arrest/booking form

13:12:03  20  dated 11/9/90 relative to you, and this -- this

13:12:10  21  alleges that you -- that you used a .22 caliber

13:12:21  22  rifle to shoot the complainant in the foot.

13:12:29  23  Defendant did refuse to open door for officers

*Valentino Dixon - Ms. Persico - 06/07/2022*

107

13:12:31  1  after being told he was under arrest.

13:12:33  2        Do you see that allegation?

13:12:34  3        **A.**    Yes.

13:12:36  4        **Q.**    How was this resolved?

13:12:38  5        **A.**    Plea bargain.

13:12:41  6        **Q.**    And what did you plea to?

13:12:43  7        **A.**    Assault.

13:12:47  8        **Q.**    And was that assault against Officer

13:12:50  9  Anthony Wright?

13:12:52 10        **A.**    Officer --

13:12:53 11        **Q.**    It says --

13:12:55 12        **MR. SAHASRABUDHE:**  I think it's just Anthony

13:12:57 13  Wright.  I'm not sure why Officer --

13:13:00 14        **MS. PERSICO:**  Oh, okay.  So --

13:13:00 15        **BY MS. PERSICO:**

13:13:01 16        **Q.**    Okay.  So it says Officer Anthony

13:13:02 17  Wright, but it was just Anthony Wright, it should

13:13:05 18  say?

13:13:06 19        **A.**    Of course.  They -- I mean, reason I'm

13:13:09 20  saying is because Anthony Wright, he has a rap

13:13:12 21  sheet this long, and he was the bully of the

13:13:13 22  neighborhood, you know.  Everybody in the city

13:13:15 23  knows him.

*Valentino Dixon - Ms. Persico - 06/07/2022*

108

13:13:16  1         Q.   So you shot him in the foot.

13:13:19  2         A.   I just aimed that way like, you know.

13:13:22  3         MR. BRUSTIN:  Just for the record -- for the

13:13:24  4    record, he's just pointing to the side down to the

13:13:28  5    ground.

13:13:28  6         THE WITNESS:  Yes.

13:13:30  7         BY MS. PERSICO:

13:13:31  8         Q.   And so you -- you pled to assault, and

13:13:34  9    did you get sentenced to any time in jail for that?

13:13:39 10         A.   I believe it was a year that ran with

13:13:42 11    the other charges.

13:13:45 12         Q.   And was that Terranova or Hill?

13:13:50 13         A.   That was Hill.  Can I just point out

13:14:01 14    something?

13:14:01 15         MR. BRUSTIN:  Only if it's responsive.

13:14:02 16         THE WITNESS:  Well, yes.  With the .22

13:14:06 17    rifle, if you back up, it's the same rifle they're

13:14:08 18    talking about here, which was confusing, you know.

13:14:13 19    There's two different reports with the same .22

13:14:17 20    rifle.

13:14:20 21         MR. BRUSTIN:  All you're doing here is

13:14:22 22    giving your best memory.  You're not the best

13:14:24 23    source for this information.

*Valentino Dixon - Ms. Persico - 06/07/2022*

109

13:14:25  1          THE WITNESS:  Okay.

13:14:28  2          BY MS. PERSICO:

13:14:36  3          Q.   So -- so --

13:14:39  4          MR. BRUSTIN:  Just --

13:14:45  5          MR. THOMPSON:  A .22 long rifle is a type of

13:14:48  6     ammunition.  It doesn't mean a rifle.

13:14:51  7          When you shoot with a .22, you can shoot

13:14:53  8     with regular .22 or a .22 -- it's a different type

13:14:56  9     of cartridge, that's all.

13:14:58  10         So let's not confuse what type of a gun.

13:15:06  11    It's a reference to a cartridge, that's all.

13:15:08  12         MR. BRUSTIN:  I don't know anything about

13:15:09  13    guns either.

13:15:10  14         MS. PERSICO:  But Mr. Dixon knows quite a

13:15:11  15    bit about guns, so let's talk to him about that.

13:15:11  16         BY MS. PERSICO:

13:15:15  17         Q.   Mr. Dixon, so we've established that

13:15:16  18    around the time of this shooting, you owned a .32

13:15:20  19    caliber gun, a .25 caliber gun, and a .22 caliber

13:15:25  20    gun; is that correct?

13:15:26  21         A.   Yes.

13:15:27  22         Q.   In addition, you, prior to the

13:15:36  23    shooting, owned the TEC-9, right?

*Valentino Dixon - Ms. Persico - 06/07/2022*

110

13:15:42  1        **MR. BRUSTIN:**  Objection, form, asked and

13:15:45  2    answered repeatedly.  You can answer again.

13:15:47  3        **THE WITNESS:**  Yes.

13:15:52  4        **MS. PERSICO:**  And -- look at my notes here.

13:16:38  5    I'm sorry, just give me one second to look at my

13:16:43  6    notes.

13:16:44  7            (Off the record: 1:16 p.m.)

13:17:33  8            (On the record: 1:17 p.m.)

13:17:37  9        **BY MS. PERSICO:**

13:17:37  10       Q.   Did -- other than the -- the guns we

13:17:39  11   just spoke about, did you own -- I'm having trouble

13:17:46  12   remembering the name of it, because I am also

13:17:48  13   unfamiliar with guns, so I'm just looking through

13:17:51  14   my notes.

13:17:53  15       Oh, did you own an Uzi?

13:17:57  16       **A.**    I did.

13:17:58  17       Q.    Okay.  And did you also own a Mag-10?

13:18:02  18       **A.**    No.

13:18:03  19       Q.    Okay.  I'm just going to refer us back

13:18:09  20   to --

13:18:22  21       **MR. BRUSTIN:**  That's a good multimedia

13:18:25  22   presentation.

13:18:26  23       **MS. PERSICO:**  I know.  It's exciting, isn't

*Valentino Dixon - Ms. Persico - 06/07/2022*

111

13:18:28  1   it?  The wonders of technology.

13:18:32  2          **BY MS. PERSICO:**

13:18:32  3          Q.   Okay.  This is -- I've forgotten the

13:18:35  4   Exhibit number.

13:18:42  5          This is the 8/31/18 --

13:18:53  6          **MR. ROMO:**  Exhibit 3.

13:18:54  7          **MS. PERSICO:**  Oh, thank you.

13:18:54  8          **BY MS. PERSICO:**

13:18:55  9          Q.   It's County Exhibit Number 3, 8/31/18

13:18:58 10   interview, and let me just look for where I need to

13:19:08 11   be here.

13:19:42 12          Okay.  So I'm -- okay.  So we are at

13:20:12 13   timestamp 10:03:25 a.m.  Let me play this for you.

13:20:26 14          (Video played.)

13:20:43 15          **BY MS. PERSICO:**

13:20:44 16          Q.   Does that refresh your recollection

13:20:45 17   that you did, in fact --

13:20:45 18          A.   Yes.

13:20:46 19          Q.   -- have a Mag-10 and an Uzi?

13:20:49 20          A.   Well, I knew the Uzi, but I had a gun

13:20:52 21   that could have resembled a Mag-10.  I never knew

13:20:55 22   what caliber it was.  I'm only assuming it was a

13:20:57 23   Mag-10, but I got rid of both of those guns.

*Valentino Dixon - Ms. Persico - 06/07/2022*

112

13:21:00  1          Q.    Okay.  When did you get rid of those?

13:21:03  2          A.    Sometime in, I believe, early 1991

13:21:08  3    or -- or late 1990.

13:21:13  4          Q.    Okay.  All right.  So did that -- did

13:21:30  5    that cover the inventory of guns that you owned in

13:21:33  6    the 1990-1991 time frame, which would be a .22

13:21:39  7    caliber, .25 caliber, .32 caliber, Uzi, Mag-10, and

13:21:45  8    TEC-9?

13:21:46  9          MR. BRUSTIN:  Objection to form.

13:21:48 10          THE WITNESS:  I believe so.

13:21:48 11          BY MS. PERSICO:

13:21:48 12          Q.    Okay.  Now, did you also file a lawsuit

13:22:39 13    in the Court of Claims seeking compensation for

13:22:45 14    wrongful conviction?

13:22:48 15          A.    I believe so.

13:22:49 16          MR. BRUSTIN:  Yes.

13:22:51 17          BY MS. PERSICO:

13:22:52 18          Q.    And is that still pending?

13:22:55 19          A.    I'm not certain.

13:22:57 20          MR. BRUSTIN:  I'm happy to tell you the

13:22:59 21    history off the record, if you want.

13:23:03 22          MS. PERSICO:  Okay.

13:23:37 23          MR. BRUSTIN:  You know, off the -- it was

*Valentino Dixon - Ms. Persico - 06/07/2022*

113

13:23:39  1  dismissed, and it's on appeal.

13:23:41  2      **MS. PERSICO:**  Oh, okay.  Fair enough.

13:23:44  3  Thanks.

13:23:50  4      **MR. SAHASRABUDHE:**  What department?

13:23:57  5      **MR. BRUSTIN:**  Fourth Department.  It's

13:24:01  6  coming up for argument soon.

13:24:16  7      **MS. PERSICO:**  Can we just take a two-minute

13:24:18  8  break?  I just want to talk with Peter for a

13:24:21  9  minute.

13:24:21 10      **MR. BRUSTIN:**  Sure.

13:24:21 11      **MS. PERSICO:**  Okay.

13:24:22 12          (A recess was then taken at 1:24 p.m.)

13:29:53 13      **BY MS. PERSICO:**

13:29:54 14      Q.   In -- in prior testimony in this case,

13:30:00 15  we -- we came to learn that you met Lamarr through

13:30:05 16  a guy nicknamed New York?

13:30:08 17      A.   Yes.

13:30:10 18      Q.   Was his real name -- well, what was his

13:30:13 19  real name?

13:30:14 20      A.   Calvin Stratford.

13:30:17 21      Q.   And -- and how did you know Calvin?

13:30:21 22      A.   Just from the neighborhood.

13:30:24 23      Q.   Did he work for you?

*Valentino Dixon - Ms. Persico - 06/07/2022*

114

13:30:25  1        **A.**    Briefly.

13:30:31  2        **Q.**    And what did he do?

13:30:33  3        **A.**    Sold some cocaine for me.

13:30:37  4        **Q.**    Was he also like a bodyguard?

13:30:45  5        **A.**    No.

13:30:45  6        **Q.**    And we also learned that -- that Lamarr

13:30:55  7  brought you a message from New York when he first

13:30:59  8  met you?

13:31:00  9        **MR. BRUSTIN:**  Objection to form.

13:31:01 10        **THE WITNESS:**  Yes.

13:31:03 11        **MR. BRUSTIN:**  Are you asking him if you

13:31:05 12  learned that, or are you asking him if that

13:31:05 13  happened?

13:31:05 14        **MS. PERSICO:**  I said we learned it, and now

13:31:08 15  I guess I'm asking if that happened, and I think he

13:31:09 16  said yes.

13:31:09 17        **THE WITNESS:**  Yes.

13:31:09 18        **BY MS. PERSICO:**

13:31:10 19        **Q.**    What was the message?

13:31:11 20        **A.**    He said New York needed some money on

13:31:14 21  his books.  He was in the county jail with him.

13:31:18 22        **Q.**    Which meant that he needed some money

13:31:21 23  in his commissary account?

*Valentino Dixon - Ms. Persico - 06/07/2022*

115

13:31:22  1          A.    Yes.

13:31:23  2          Q.    And did you put some money in his

13:31:25  3     commissary account?

13:31:25  4          A.    Yes.

13:31:32  5          Q.    Just a couple of stray questions, and

13:31:35  6     then I'll -- I'll wrap things up.

13:31:36  7          At the -- in and around the period of

13:31:43  8     August of 1991, you -- you mentioned that you lived

13:31:48  9     at a house on Lisbon.

13:31:50 10          A.    Yes.

13:31:51 11          Q.    And you also, I think, had an address

13:31:55 12     on Rounds?

13:31:56 13          A.    My mother's address.

13:31:57 14          Q.    Okay.  So your mom lived at --

13:31:59 15          A.    61 Rounds.

13:32:00 16          Q.    Okay.  And then your -- you lived on

13:32:09 17     Lisbon?

13:32:10 18          A.    Yes.

13:32:11 19          Q.    Did you have any other residences or

13:32:14 20     places that you later had or whatever, hung out?

13:32:19 21          A.    Not at that time, no.

13:32:20 22          Q.    And at that time, you were dating a

13:32:27 23     woman named Arniece?

*Valentino Dixon - Ms. Persico - 06/07/2022*

116

| | | |
|---|---|---|
| 13:32:29 | 1 | **A.**   Yes. |
| 13:32:29 | 2 | **Q.**   And where did she live? |
| 13:32:32 | 3 | **A.**   She lived at Goodyear at the time. |
| 13:32:53 | 4 | **Q.**   And did you -- after the events of |
| 13:33:00 | 5 | August 10th, 1991, did you go Arniece's house? |
| 13:33:06 | 6 | **A.**   Yes. |
| 13:33:07 | 7 | **Q.**   Okay. |
| 13:33:08 | 8 | **A.**   No.  No, I went home.  I went on |
| 13:33:12 | 9 | Lisbon. |
| 13:33:12 | 10 | **Q.**   Okay. |
| 13:33:12 | 11 | **A.**   Yes. |
| 13:33:13 | 12 | **Q.**   So -- so after -- so as I understand |
| 13:33:19 | 13 | it, the shooting takes place.  You run to your car. |
| 13:33:26 | 14 | Lamarr tries to get in your car, and you tell him, |
| 13:33:30 | 15 | "No way," right? |
| 13:33:32 | 16 | **MR. BRUSTIN:**   Objection to form. |
| 13:33:33 | 17 | **THE WITNESS:**   Yes. |
| 13:33:33 | 18 | **BY MS. PERSICO:** |
| 13:33:43 | 19 | **Q.**   And your car was at that point parked |
| 13:33:45 | 20 | on Delavan? |
| 13:33:47 | 21 | **A.**   Yes. |
| 13:33:48 | 22 | **Q.**   And that was the red Mazda, correct? |
| 13:33:51 | 23 | **A.**   Yes. |

*Valentino Dixon - Ms. Persico - 06/07/2022*

117

13:33:53 1          Q.    And so from Delavan, you went to your

13:33:58 2     house on Lisbon?

13:33:59 3          A.    Yes.

13:34:02 4          Q.    Did you speak with Arniece at all after

13:34:09 5     the events of August 10th?

13:34:12 6          MR. BRUSTIN:  Objection to form.  You mean

13:34:13 7     that night or ever?

13:34:15 8          BY MS. PERSICO:

13:34:15 9          Q.    Well, let's start with that night.

13:34:17 10         A.    Yes.

13:34:19 11         Q.    Did you -- did you call her up or what?

13:34:21 12         A.    No, I didn't have a phone.

13:34:23 13         Q.    So did you -- how did you speak to her?

13:34:26 14         A.    I was with her.

13:34:27 15         Q.    Okay.  Did you go pick her up and take

13:34:31 16    her to your house on Lisbon?

13:34:33 17         A.    She was already at my house.

13:34:35 18         Q.    Okay.  Did you tell her what happened?

13:34:43 19         A.    Yes.

13:34:45 20         Q.    What did you say?

13:34:48 21         A.    That a shooting occurred.  I didn't

13:34:50 22    know if someone passed away at the time.  I just

13:34:53 23    said the shooting occurred.

*Valentino Dixon - Ms. Persico - 06/07/2022*

118

13:34:55  1          Q.    Did you tell her -- did you tell her

13:34:57  2    that Lamarr Scott did it?

13:34:59  3          A.    I believe so.

13:35:00  4          Q.    Did you tell her that he did it with

13:35:02  5    your gun?

13:35:03  6          A.    No.  I don't believe -- I don't believe

13:35:06  7    I did.

13:35:20  8          Q.    Did she ask you where Lamarr was?

13:35:22  9          A.    No.

13:35:23 10          Q.    Did Lamarr ever come over to your

13:35:25 11    house?

13:35:25 12          A.    Yes.

13:35:27 13          Q.    When was that?

13:35:29 14          A.    I believe later that -- I believe later

13:35:33 15    that night or early in the morning.

13:35:35 16          Q.    So like later the 11th, on --

13:35:40 17          A.    Yes.

13:35:41 18          Q.    Okay.

13:35:42 19          A.    Well, no, it would be -- still be the

13:35:44 20    10th.  It still would be August 10th.

13:35:47 21          Q.    Okay.  So at -- in sort of the middle

13:35:49 22    of the night --

13:35:50 23          A.    Possibly.

*Valentino Dixon - Ms. Persico - 06/07/2022*

119

13:35:51  1          Q.    -- you went to your house on Lisbon.

13:35:55  2          A.    I went to my house straight away.

13:35:57  3          MR. BRUSTIN:  Let her finish the questions.

13:35:59  4          BY MS. PERSICO:

13:35:59  5          Q.    I'm just trying to get the timing.

13:36:01  6          So, you know, if the -- if the shooting

13:36:04  7     happened -- you know, it was after midnight on the

13:36:12  8     9th, which makes it the 10th, right?  I always have

13:36:14  9     a hard time with this myself.

13:36:16 10          So when -- when that's all over with, you --

13:36:19 11     you get in your car, and you drive to your house on

13:36:22 12     Lisbon, where Arniece already is.

13:36:27 13          A.    Yes.

13:36:28 14          Q.    So that's kind of the middle of the

13:36:30 15     night in my estimation.

13:36:32 16          MR. BRUSTIN:  Wait for a question.

13:36:33 17          BY MS. PERSICO:

13:36:33 18          Q.    But if you have a better recollection

13:36:35 19     as to what time you got to the house on Lisbon,

13:36:38 20     what do you think it is?

13:36:40 21          MR. BRUSTIN:  Objection to form.  You can

13:36:41 22     answer.

13:36:41 23          THE WITNESS:  Approximately maybe one

*Valentino Dixon - Ms. Persico - 06/07/2022*

120

13:36:42  1  o'clock in the morning.

13:36:43  2          BY MS. PERSICO:

13:36:43  3          Q.    Okay.  Fair enough.  So -- and then

13:36:48  4  what time do you think Lamarr came over?

13:36:53  5          A.    Approximately around three in the

13:36:59  6  morning, maybe.

13:37:02  7          Q.    And did you and Lamarr talk about the

13:37:04  8  events of the evening?

13:37:09  9          A.    I believe briefly.  Yes, I believe so.

13:37:11  10          Q.    Okay.  And what was that conversation?

13:37:14  11          A.    I don't remember.  It's so vague.  I

13:37:16  12  mean, I seen what happened, he knew what happened,

13:37:21  13  so I don't remember the conversation.  I don't --

13:37:24  14  you know, I don't remember it, you know.

13:37:26  15          I mean, what is there to talk about?  I

13:37:29  16  mean, it's a bad thing happened.  It's horrible,

13:37:31  17  you know, so I don't remember the exact words.

13:37:33  18          Q.    I mean, did you talk about -- was

13:37:38  19  anybody worried about getting arrested?

13:37:40  20          MR. BRUSTIN:  Objection to form.

13:37:41  21          THE WITNESS:  I don't believe so.  I -- I do

13:37:44  22  remember turning on the TV to watch the news, okay,

13:37:48  23  and they had some coverage, but they hadn't said

*Valentino Dixon - Ms. Persico - 06/07/2022*

121

13:37:52  1  that no one passed.  They hadn't, you know, given

13:37:57  2  that to the public that someone passed, you know,

13:37:59  3  so it was --

13:38:00  4       **BY MS. PERSICO:**

13:38:00  5       **Q.**   But you -- but you knew somebody had

13:38:02  6  passed.

13:38:03  7       **MR. BRUSTIN:**  Objection to form.

13:38:03  8       **THE WITNESS:**  No, I didn't know, you know.

13:38:05  9  You can only hope that no one passed, you know.

13:38:08  10       And it appeared that someone could have

13:38:10  11  passed because of so many rounds was being fired,

13:38:14  12  you know, but, you know, you still hope that's just

13:38:16  13  not -- that this is not the case.

13:38:17  14       **BY MS. PERSICO:**

13:38:18  15       **Q.**   Okay.  So while Lamarr is at your

13:38:20  16  house, you knew that he was the guy who had done

13:38:23  17  the shooting.

13:38:24  18       **A.**   Yes.

13:38:24  19       **Q.**   Did -- did he ask you whether you were

13:38:30  20  going to tell the police it was him?

13:38:33  21       **A.**   No.

13:38:34  22       **Q.**   Why not, do you think?

13:38:37  23       **MR. BRUSTIN:**  Objection to form.  You can

*Valentino Dixon - Ms. Persico - 06/07/2022*

122

13:38:38  1    answer.

13:38:39  2        **THE WITNESS:**  I mean, we were guys in the

13:38:42  3    street not doing the right thing.  We're not going

13:38:45  4    to go tell the police what happened, you know.  I

13:38:47  5    mean, even though Torriano and Aaron Jackson, you

13:38:58  6    know, pulled up and started shooting and --

13:39:00  7    everything happened so quickly, you know.

13:39:05  8        You know, what was running through my mind

13:39:07  9    and his mind, I believe, is that it was

13:39:10  10   self-defense.  You know, nothing else, you know.

13:39:13  11   And if the police don't come asking, nobody's going

13:39:15  12   to say anything.  I'm not going to say anything.

13:39:17  13       **BY MS. PERSICO:**

13:39:22  14       Q.  Did you guys discuss that it was in --

13:39:26  15   in self-defense?

13:39:28  16       A.  We didn't have to.  It was obvious.  He

13:39:31  17   jumped out of the car and started shooting.

13:39:36  18       Q.  Were you able to -- to see Lamarr Scott

13:39:39  19   do the shooting?

13:39:40  20       A.  Well, when I ran out of the store, I

13:39:44  21   ran with Antoine.  I grabbed him, and we ran toward

13:39:48  22   my car and turned around maybe 40 yards back and

13:39:52  23   was able to see the shooting from there, and we

*Valentino Dixon - Ms. Persico - 06/07/2022*

123

13:39:54　1　just looked at each other like "Whoa."

13:39:57　2　　　　Q.　And -- and you said there were so many

13:40:01　3　bullets fired.　How many bullets did that gun hold?

13:40:08　4　　　　A.　I believe 30.

13:40:14　5　　　　Q.　And did you come to learn that

13:40:18　6　approximately 27 shells were recovered at the

13:40:23　7　scene?

13:40:25　8　　　　A.　Later on when I received the paperwork,

13:40:27　9　yes.

13:40:27　10　　　　Q.　And when you were there, did you

13:40:31　11　hear -- did you hear a lot of shots being fired?

13:40:35　12　　　　A.　Well, the first shots I heard fired, I

13:40:39　13　was inside the store, you know.

13:40:40　14　　　　Q.　Okay.

13:40:41　15　　　　A.　It was like a pop, pop, you know, so

13:40:43　16　it's like, "Oh, God," you know, and I ran out,

13:40:46　17　because I was thinking of my brother, and he was

13:40:47　18　kind of standing at the doorway.

13:40:49　19　　　　And I looked to the side, and I saw Mario

13:40:53　20　tussling with Aaron and Torri.　At first I thought

13:40:57　21　it was just a fight, and then I saw this handgun,

13:41:00　22　one of them holding a handgun.

13:41:01　23　　　　So my brother --

*Valentino Dixon - Ms. Persico - 06/07/2022*

124

13:41:01  1          **Q.**   I'm sorry to cut you off, Mr. Dixon,

13:41:03  2   but I just asked if -- did -- did you hear a lot of

13:41:06  3   shots.

13:41:07  4          **MR. BRUSTIN:**  Don't -- no, no, no, no,

13:41:09  5   finish your answer, please.  Don't -- you're not

13:41:11  6   going to cut him off.

13:41:12  7          Please finish your answer.  You saw Torri

13:41:13  8   with a handgun.  Continue, please.

13:41:13  9          **THE WITNESS:**  Yes.

13:41:16  10         **MS. PERSICO:**  If you want to ask --

13:41:16  11         **MR. BRUSTIN:**  No, no, no, he's going to

13:41:17  12   finish.

13:41:17  13         **MS. PERSICO:**  No.  Mr. Brustin, I asked a

13:41:17  14   question.

13:41:18  15         **MR. BRUSTIN:**  You are not going to cut off

13:41:20  16   his answer.  That's not happening.

13:41:21  17         Please finish your answer.

13:41:23  18         **THE WITNESS:**  Yes.  Well, I saw one of the

13:41:25  19   guys -- I didn't know him personally -- one of the

13:41:27  20   guys with a handgun, and my brother was trying to

13:41:31  21   like maybe help Mario, like go in there and help

13:41:31  22   him.

13:41:33  23         And I says, "No, he got a handgun," and I

*Valentino Dixon - Ms. Persico - 06/07/2022*

125

13:41:35  1  pulled him away, you know, and we ran around the

13:41:39  2  situation and ran towards my car, and Lamarr come

13:41:39  3  running past us.

13:41:52  4      We ran around the incident that was

13:41:52  5  occurring and ran towards my car.  I pulled him

13:41:53  6  towards my car, and we ran up the street, and

13:41:55  7  Lamarr came running towards the scene in the

13:42:01  8  opposite direction.

13:42:03  9      **BY MS. PERSICO:**

13:42:04  10     **Q.**   So you saw a handgun.

13:42:06  11     **A.**   Yes.  Silver.

13:42:11  12     **Q.**   And you're familiar with handguns.

13:42:13  13     **A.**   Well, yes, I mean, I had a few.

13:42:17  14     **Q.**   Did the handgun that you saw hold 30

13:42:20  15  rounds?

13:42:20  16     **A.**   No.  I mean, it was a small handgun.

13:42:24  17  It would maybe hold five rounds or seven.

13:42:28  18     **Q.**   So let's go back to you're -- you --

13:42:33  19  you, Arniece, and Lamarr are at your house on

13:42:36  20  Lisbon.  Does Arniece ask what happened?

13:42:40  21     **A.**   I already told her, you know, there was

13:42:42  22  a shooting, you know.

13:42:43  23     **MR. BRUSTIN:**  She's just asking if you

*Valentino Dixon - Ms. Persico - 06/07/2022*

126

| 13:42:44 | 1 | remember what Arniece said. |

**13:42:46  2      THE WITNESS:**  I don't remember, no.

**13:42:46  3      BY MS. PERSICO:**

13:42:47  4      **Q.**   Did -- and -- and I apologize if I

13:42:50  5  asked you this.  Did you tell Arniece that it was

13:42:53  6  Lamarr Scott that did it?

**13:42:55  7      MR. BRUSTIN:**  Object -- objection to form.

**13:42:57  8      THE WITNESS:**  Yes, I believe I did.

**13:42:59  9      BY MS. PERSICO:**

13:43:13  10      **Q.**   So you know that Lamarr Scott was also

13:43:22  11  interviewed by the District Attorney's office in

13:43:25  12  connection with the resolution of your 440 motion,

13:43:27  13  right?

13:43:28  14      **A.**   Yes.

13:43:29  15      **Q.**   Did you talk to him about that

13:43:30  16  interview?

13:43:31  17      **A.**   Who?

13:43:33  18      **Q.**   Lamarr Scott.

13:43:34  19      **A.**   No.

13:43:36  20      **Q.**   Do you know what the sum and substance

13:43:40  21  of his statements in that interview were?

13:43:43  22      **A.**   No.  He cut me off years prior to that,

13:43:46  23  so we had no contact.  He wouldn't write me

*Valentino Dixon - Ms. Persico - 06/07/2022*

127

13:43:48  1  anymore, and he cut me off.  Said he had an

13:43:52  2  attorney, he was trying to get out of jail.  No

13:43:55  3  more contact after that.  I wrote him a letter and

13:43:59  4  said, "I wish you well."

13:44:02  5      Q.    So you haven't discussed this case with

13:44:04  6  Lamarr.

13:44:04  7      A.    Not one time since he left Attica.

13:44:08  8  After he left Attica, we never discussed the case.

13:44:10  9  He cut me off about a year later.  He didn't want

13:44:13  10  to have anything to do with me.  He says, "I'm

13:44:15  11  trying to get out of jail."

13:44:17  12      Q.    So you got -- you don't have any

13:44:19  13  arrangement with Mr. Scott that you would share in

13:44:23  14  the proceeds of any recovery you got from this suit

13:44:25  15  with him.

13:44:26  16      A.    Not at all.

13:44:28  17      Q.    Never had that discussion with him?

13:44:30  18      A.    Never.

13:44:32  19      Q.    Did he ever ask you for a portion of

13:44:34  20  any proceeds?

13:44:37  21      A.    Through a third party, yes.

13:44:40  22      Q.    And when was that?

13:44:41  23      A.    Month and a half ago.

*Valentino Dixon - Ms. Persico - 06/07/2022*

128

| | | |
|---|---|---|
| 13:44:45 | 1 | **Q.**   And who was the third party? |
| 13:44:47 | 2 | **A.**   His name is Jabril, J-A-B-R-I-L. |
| 13:44:57 | 3 | **Q.**   And -- and what was the -- what did |
| 13:45:02 | 4 | Mr. -- is that a first or last name? |
| 13:45:04 | 5 | **A.**   His first name is Jabril. |
| 13:45:06 | 6 | **Q.**   Okay.  What did -- what did Jabril ask |
| 13:45:09 | 7 | you for on Lamarr's behalf? |
| 13:45:10 | 8 | **A.**   Well, he was -- first, a couple people |
| 13:45:14 | 9 | said Lamarr wanted to speak to me, you know, after |
| 13:45:18 | 10 | he got out, and I wouldn't speak to him. |
| 13:45:21 | 11 | Okay.  Starting with my ex-sister-in-law. |
| 13:45:23 | 12 | He went to her rest -- he went to her clothing |
| 13:45:25 | 13 | store. |
| 13:45:25 | 14 | **Q.**   I'm sorry, who's your ex-sister-in-law? |
| 13:45:28 | 15 | **A.**   Her name is Lynette Ridgeway.  He -- he |
| 13:45:32 | 16 | even, you know, left a message on her machine, |
| 13:45:36 | 17 | "Tell Valentino I want to speak to him." |
| 13:45:37 | 18 | And we have that message, okay? |
| 13:45:39 | 19 | **Q.**   He left a message on Lynnette -- |
| 13:45:41 | 20 | **A.**   On her -- yes, after he went to her |
| 13:45:43 | 21 | business and told her he wanted to speak to me. |
| 13:45:46 | 22 | I -- I refused to speak to him.  She gave him her |
| 13:45:49 | 23 | telephone number.  He left a message on the machine |

*Valentino Dixon - Ms. Persico - 06/07/2022*

129

13:45:51  1  sometime after that, you know, "Tell him I really

13:45:53  2  need to speak to him."

13:45:56  3       You know, we have the message.  I ignored

13:45:58  4  it.  Jabril reaches out, because Jabril was in

13:46:01  5  Attica with both of us, to be a mediator.

13:46:06  6       Told Jabril I'm not going to speak to him.

13:46:06  7  I says, "I'm not going to speak to Lamarr Scott,"

13:46:09  8  and so Jabril says he's -- he says, "He wants you

13:46:14  9  to look out for him."

13:46:15 10       And I says, "I'm not going to look out for

13:46:17 11  him."

13:46:17 12       And Jabril sent me a text, and Lamarr sent

13:46:22 13  the account number and says, "Look out for me.  I

13:46:24 14  need $50,000."

13:46:25 15       I have the text logged in my phone with the

13:46:31 16  account numbers.  I screenshotted it.  We have

13:46:35 17  never spoken in years.

13:46:38 18       **MR. SAHASRABUDHE:**  Going to index a demand

13:46:39 19  for any audio-recorded messages left by Lamarr

13:46:42 20  Scott or any text messages received by Lamarr Scott

13:46:45 21  from Mr. Dixon or a third party, and I'll put that

13:46:48 22  in writing following the deposition.

13:46:50 23       **MS. PERSICO:**  Thanks.

*Valentino Dixon - Ms. Persico - 06/07/2022*

130

13:46:50  1          BY MS. PERSICO:

13:46:53  2          Q.    So -- I think I understood you to say

13:46:59  3    that you were willing to speak with Jabril as a

13:47:03  4    mediator between you and Lamarr Scott; is that

13:47:06  5    correct?

13:47:06  6          MR. BRUSTIN:    Objection to form.  I don't

13:47:09  7    think it is, but tell her.

13:47:11  8          THE WITNESS:    Yes.  I spoke to Jabril over

13:47:14  9    the phone.

13:47:15 10          BY MS. PERSICO:

13:47:15 11          Q.    Okay.  Can you tell me a little bit

13:47:17 12    more about that?  So that -- was your initial

13:47:23 13    conversation with Jabril like a month and a half

13:47:25 14    ago or before that?

13:47:27 15          A.    Yes.  Yes.  I just told Jabril to tell

13:47:32 16    him to do the right thing.  I wasn't going to pay

13:47:34 17    him anything to tell the truth here, okay?

13:47:37 18          Because, you know, when I was getting -- or

13:47:41 19    what I was thinking is that he was trying to imply

13:47:44 20    something other than what happened, so I says, "I'm

13:47:46 21    not going to give him anything.  Tell him to do the

13:47:48 22    right thing."  That was the end of it.

13:47:49 23          Q.    So did that conversation take place

*Valentino Dixon - Ms. Persico - 06/07/2022*

131

13:47:51  1  before Mr. Scott pled guilty to the murder of

13:48:00  2  Torriano Jackson?

13:48:02  3       **MR. BRUSTIN:**  Objection.

13:48:03  4       **THE WITNESS:**  Yes, the conversation took

13:48:04  5  place about a month and a half ago, maybe.

13:48:06  6       **MR. BRUSTIN:**  So that's long after.

13:48:08  7       **THE WITNESS:**  Yes, long after.  Three years,

13:48:10  8  you know, later.

13:48:11  9       **BY MS. PERSICO:**

13:48:13 10       Q.   Did you have any conversations with

13:48:17 11  Lamarr Scott or an intermediary about Lamarr

13:48:24 12  Scott's pleading guilty to the murder of Torriano

13:48:27 13  Jackson?

13:48:28 14       **MR. BRUSTIN:**  Objection to form.  You're

13:48:29 15  asking before the plea.

13:48:30 16       **MS. PERSICO:**  Yes.

13:48:31 17       **THE WITNESS:**  No.

13:48:31 18       **BY MS. PERSICO:**

13:48:38 19       Q.   So when you -- when you told Jabril

13:48:41 20  that you thought Lamarr Scott should just do the

13:48:43 21  right thing because you thought he wasn't going to

13:48:49 22  tell the -- what really happened, that was after he

13:48:56 23  pleaded guilty?

*Valentino Dixon - Ms. Persico - 06/07/2022*

132

| | | |
|---|---|---|
| 13:48:57 | 1 | **MR. BRUSTIN:** Objection to form. He's |
| 13:48:58 | 2 | talking about in connection with the civil case. |
| 13:49:00 | 3 | The timing is -- understand the timing. |
| 13:49:02 | 4 | **MS. PERSICO:** Can I -- can I ask the witness |
| 13:49:03 | 5 | the question? |
| 13:49:04 | 6 | **MR. BRUSTIN:** Yes, but understand the |
| 13:49:06 | 7 | timing. |
| 13:49:06 | 8 | **MS. PERSICO:** Mr. Brustin -- |
| 13:49:07 | 9 | **MR. BRUSTIN:** Stop you for a minute. You |
| 13:49:09 | 10 | should -- you should understand the timing. It was |
| 13:49:12 | 11 | three years before. Your question's clearly -- you |
| 13:49:14 | 12 | clearly didn't understand that, so I'm trying -- |
| 13:49:15 | 13 | **MS. PERSICO:** I don't know that you should |
| 13:49:16 | 14 | comment on what I understand or don't understand. |
| 13:49:18 | 15 | **MR. BRUSTIN:** All right. I'm -- okay. All |
| 13:49:20 | 16 | right. Just please be clear on the time. |
| 13:49:23 | 17 | **MS. PERSICO:** I'm trying to get some |
| 13:49:24 | 18 | clarity, and I'd like to get it from the witness |
| 13:49:27 | 19 | and not from you. |
| 13:49:28 | 20 | **MR. BRUSTIN:** Fair enough. |
| 13:49:29 | 21 | **MS. PERSICO:** That's how these work. |
| 13:49:30 | 22 | **MR. BRUSTIN:** I do not want you to |
| 13:49:31 | 23 | misrepresent the timeframes. That's what I'm |

*Valentino Dixon - Ms. Persico - 06/07/2022*

133

13:49:34  1  concerned about.  He's very clear on what happened.

13:49:36  2       **MS. PERSICO:**  Well, we would all be if you

13:49:38  3  stopped interrupting.

13:49:39  4       **MR. BRUSTIN:**  I'm not so sure.

13:49:40  5       **MS. PERSICO:**  Mr. Brustin, I think your

13:49:41  6  comments are getting a little too personal, and --

13:49:43  7       **MR. BRUSTIN:**  You know what?  I don't

13:49:45  8  mean -- I don't mean to be personal.  I really just

13:49:46  9  want the right times, and I apologize for that.

13:49:48  10      **BY MS. PERSICO:**

13:49:50  11      Q.   Mr. Dixon, perhaps we can start over.

13:49:54  12      A.   No problem.

13:49:57  13      Q.   Jabril was an intermediary between you

13:50:02  14  and Lamarr Scott, correct?

13:50:05  15      A.   If that's what you want to call it.

13:50:06  16      Q.   Well, I -- what --

13:50:08  17      A.   Yes.

13:50:08  18      Q.   That was the word you used.  I don't

13:50:23  19  want to put words in your mouth.  I thought that --

13:50:26  20  perhaps I misspoke.

13:50:28  21      Did you indicate that Jabril was a mediator

13:50:31  22  between you and Lamarr Scott at some period?

13:50:34  23      **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

134

13:50:35  1          THE WITNESS:  Can I explain?

13:50:37  2          BY MS. PERSICO:

13:50:37  3          Q.   Sure.

13:50:37  4          A.   I didn't need a mediator and didn't

13:50:40  5   want one, so, you know -- I mean, that's the term I

13:50:42  6   use, but if you don't want to -- if I say mediator,

13:50:46  7   that means that I'm -- I'm agreeing for -- to a

13:50:50  8   mediator, as in Valentino's agreeing to a mediator,

13:50:52  9   and I'm not agreeing to a mediator.

13:50:55 10          Jabril was someone that I respected and I

13:50:57 11   was in prison with, you know, so I was open to a

13:50:59 12   conversation with him.

13:51:00 13          Q.   Okay.

13:51:00 14          A.   That's it.

13:51:01 15          Q.   So I'm just trying to figure out.

13:51:04 16          So the first conversation that you had with

13:51:08 17   Jabril about this issue was about a month and a

13:51:12 18   half ago, which would make it -- well, you tell me

13:51:18 19   when.  It's like -- can you give me a date?

13:51:20 20          A.   Yes, about a month and a half ago.

13:51:23 21   This is June.  I would say around April, sometime

13:51:27 22   in April.

13:51:28 23          Q.   And how did that conversation come

*Valentino Dixon - Ms. Persico - 06/07/2022*

135

13:51:33  1    about?  Did he call you?

13:51:36  2         A.    Several people had been trying to reach

13:51:40  3    out to me, and I don't know how Jabril got my

13:51:45  4    number, okay, but he called me up, and -- and

13:51:51  5    that's how the conversation took place.

13:51:52  6         Q.    Okay.  And what did he say to you?

13:51:59  7         A.    Well, first he was upset because he had

13:52:02  8    been trying to reach me for some time.  A lot of

13:52:05  9    guys been trying to reach me, but I was

13:52:08 10    unreachable, you know.

13:52:09 11         And anybody that I thought was associated

13:52:11 12    Lamarr Scott, I cut them off.  I didn't want to

13:52:13 13    talk to them.  Guys that were in jail.  There's a

13:52:15 14    lot of guys that was released from prison, you

13:52:18 15    know -- you know, and I've seen pictures with them

13:52:23 16    and Lamarr Scott on Facebook.

13:52:25 17         So I've seen a picture of you and Lamarr

13:52:28 18    Scott on Facebook, and I'm in prison with these

13:52:32 19    guys, and I'm not going to associate with none of

13:52:35 20    them, you know, and that was my position.

13:52:37 21         So he was a little upset that I took that

13:52:39 22    position against him.  There was nothing really

13:52:41 23    against him, but, you know, I got to protect

*Valentino Dixon - Ms. Persico - 06/07/2022*

136

13:52:44  1  myself, and I got to look out for myself.

13:52:47  2          Q.   Okay.  So he was a little upset.

13:52:48  3          A.   Yes, because he was trying to reach me

13:52:51  4  for the longest -- I think maybe like a year, he

13:52:54  5  said, and I was making myself unreachable to

13:52:56  6  anybody.

13:52:56  7          Q.   Other than him expressing his upset --

13:52:59  8          A.   Yes.

13:53:03  9          Q.   -- what else did -- did he talk about

13:53:07 10  with you?

13:53:07 11          A.   Nothing really.  About Lamarr Scott.

13:53:12 12  He mentioned him, you know, and I explained to him

13:53:16 13  things that occurred in the case, you know.

13:53:19 14          For instance, Lamarr Scott going into the

13:53:21 15  Grand Jury and he's saying I did the shooting, you

13:53:24 16  know, which was crazy, and, you know, I forgave him

13:53:29 17  for that.  He came to Attica, and, you know, once

13:53:34 18  he left, he cut off all ties with me.

13:53:37 19  Unforgiveable, you know.

13:53:38 20          And, you know, we survived -- made it

13:53:44 21  happen.  We survived in Attica.  I mean, they put

13:53:48 22  him in the same block as me.  What am I supposed to

13:53:51 23  do here?  Make him an enemy or make it work?

*Valentino Dixon - Ms. Persico - 06/07/2022*

137

13:53:53  1          And, you know, we made it work for ten

13:53:55  2   years.  We respected each other, and when he left,

13:53:58  3   he said he couldn't have anything to do with me,

13:54:01  4   you know?  He says, "It's over with.  I'm trying to

13:54:04  5   get out of prison."

13:54:05  6          I said, "Okay, no problem," you know.  "No

13:54:07  7   problem.  I wish you the best."

13:54:09  8          So why would I have anything to say to you

13:54:12  9   once I get out of prison?  I have nothing to say to

13:54:15 10   you.

13:54:16 11          **Q.**   So you mentioned earlier that Jabril

13:54:21 12   called you on behalf of Lamarr Scott.

13:54:23 13          **A.**   Yes.

13:54:24 14          **Q.**   So did he explain what Lamarr wanted

13:54:32 15   him to say to you?

13:54:33 16          **A.**   Yes, he only -- Lamarr only wanted

13:54:35 17   money.  He felt that I owed him something.  You

13:54:36 18   know, he felt like, "If you going to get any money,

13:54:39 19   you got to give me something."  Like it's crazy.

13:54:42 20          **Q.**   Do you think that that's because he

13:54:44 21   pleaded guilty to the crime that you had been in

13:54:48 22   prison for?

13:54:49 23          **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Ms. Persico - 06/07/2022*

138

13:54:49  1          **THE WITNESS:**  He pleaded guilty and received

13:54:51  2     no time.  That's obvious.  He received not one day.

13:54:54  3          **BY MS. PERSICO:**

13:54:54  4          **Q.**   No, I mean -- my -- my question was do

13:54:57  5     you think that Lamarr Scott thinks you owe him

13:55:02  6     something because he pleaded guilty to that crime.

13:55:04  7          **MR. BRUSTIN:**  Objection to form.

13:55:05  8          **THE WITNESS:**  Well, he had to plead guilty.

13:55:07  9     They realized after 27 years that he really did the

13:55:10 10     crime.  He knew he had to plea to it.

13:55:12 11          But they gave him a sweet deal.  He didn't

13:55:15 12     get any time for it.  He's on the streets right

13:55:17 13     now.

13:55:17 14          **BY MS. PERSICO:**

13:55:20 15          **Q.**   Funny how that works, isn't it?

13:55:21 16          **A.**   Yes, that's the system.

13:55:23 17          **Q.**   Okay.  But -- but -- so you indicated

13:55:31 18     that Jabril -- did --

13:55:33 19          **MR. BRUSTIN:**  You know what?  It's not funny

13:55:35 20     how that works, and I don't appreciate that

13:55:37 21     question.

13:55:37 22          **MS. PERSICO:**  That wasn't a question.

13:55:39 23          **MR. BRUSTIN:**  Well, it was a snide comment,

*Valentino Dixon - Ms. Persico - 06/07/2022*

139

13:55:40  1  and I don't like it.  Don't like it at all.

13:55:43  2       But you -- you do what you have to do.  You

13:55:46  3  keep asking the questions you're asking.  He'll

13:55:51  4  keep answering honestly and forthrightly like he's

13:55:54  5  been.

13:55:55  6       **MS. PERSICO:**  All right, Mr. Brustin.

13:55:56  7       **MR. BRUSTIN:**  I don't appreciate those

13:55:57  8  comments.

13:55:57  9       **MR. SAHASRABUDHE:**  What comment are you

13:55:59  10  referring to, for the record?

13:56:00  11       **MR. BRUSTIN:**  "It's funny how that -- how

13:56:02  12  that goes."

13:56:03  13       **MR. SAHASRABUDHE:**  Okay.

13:56:08  14       **BY MS. PERSICO:**

13:56:09  15       Q.   Okay.  So you indicated that -- we've

13:56:18  16  lost our thread here, so let me see if I can sort

13:56:21  17  of get us back on track.

13:56:25  18       So did Jabril say to you, "Lamarr Scott

13:56:34  19  wants money from you"?

13:56:35  20       **MR. BRUSTIN:**  Objection to form.

13:56:36  21       **THE WITNESS:**  Yes, and he put it in a text.

13:56:36  22       **BY MS. PERSICO:**

13:56:38  23       Q.   Okay.  And you said a couple of people

*Valentino Dixon - Ms. Persico - 06/07/2022*

140

13:56:43  1  were trying to reach out to you on behalf of Lamarr

13:56:46  2  Scott; is that right?

13:56:47  3      **A.**    Yes.

13:56:47  4      **Q.**    Do you know who those other people are?

13:56:51  5      **A.**    My ex-sister-in-law.  She's one.

13:56:54  6      **Q.**    And that's Lynette Ridgeway?

13:56:56  7      **A.**    Yes.

13:56:58  8      **Q.**    Okay.

13:56:59  9      **A.**    A guy from the mosque -- Muslim guy

13:57:09 10  from the mosque reached out.  His name is Baba Ing,

13:57:15 11  B-A-B-A, I-N-G.  He reached out.

13:57:24 12      Who else?  There was several people.  You

13:57:26 13  know, it was a few people.  It was even more.  If

13:57:29 14  you give me a minute, I'll think of it, but --

13:57:31 15      **Q.**    Take your time.

13:57:43 16      **A.**    Yes, that's it for now.  I can't wrack

13:57:46 17  my brain.  There's too much stuff going on, you

13:57:49 18  know, when it come to this thing with him, so I

13:57:52 19  can't think of anybody else right off bat, but

13:57:55 20  he -- yes.

13:57:56 21      **Q.**    What did -- what did the guy from the

13:57:59 22  mosque say to you?

13:58:01 23      **A.**    He said that Lamarr asked about me and

*Valentino Dixon - Ms. Persico - 06/07/2022*

13:58:10  1  wanted to have a sit-down.

13:58:18  2       **Q.**   Any --

13:58:19  3       **A.**   And one more person now.  Pastor

13:58:22  4  Kenny -- Kenneth Simmons reached out.

13:58:29  5       **Q.**   About --

13:58:30  6       **A.**   About Lamarr Scott, yes.

13:58:32  7       **Q.**   When -- when, approximately, did that

13:58:34  8  happen?

13:58:34  9       **A.**   I don't know.  Nine months ago, maybe.

13:58:37 10       **Q.**   And what did Pastor Simmons say?

13:58:41 11       **A.**   That he wanted to have a sit-down with

13:58:45 12  me and Lamarr, and I said no.

13:58:48 13       **Q.**   Did he tell you what the sit-down was

13:58:51 14  supposed to be about?

13:58:52 15       **A.**   Well, he -- Pastor Simmons is more of a

13:58:55 16  peacemaker, you know, to make sure that, you know,

13:58:57 17  people in -- in inner cities, you know --

13:59:04 18       **MR. BRUSTIN:**   She's just asking what he

13:59:10 19  said.

13:59:10 20       **THE WITNESS:**   Yes, yes, just a peacemaker.

13:59:11 21  He didn't get into specifics.  He just said that he

13:59:14 22  wanted to have a sit-down with the two of us, you

13:59:14 23  know.

*Valentino Dixon - Ms. Persico - 06/07/2022*

142

13:59:17  1          And I know Lamarr was hanging out with

13:59:21  2   Kenny, you know, so he was around Pastor Simmons.

13:59:21  3          **BY MS. PERSICO:**

13:59:24  4          **Q.**   And you declined that.

13:59:25  5          **A.**   Of course.  Yes.

13:59:26  6          **Q.**   Why are you so adamantly opposed to

13:59:33  7   talking to Lamarr Scott?

13:59:34  8          **MR. BRUSTIN:**  Well, first of all, don't --

13:59:35  9   don't disclose anything that -- that you've talked

13:59:39 10   about with your attorneys, but if there's other

13:59:42 11   reasons apart from that, you can raise them.

13:59:45 12          **THE WITNESS:**  Well, it's -- it's the

13:59:50 13   principle of the thing.  You know, it's the

13:59:53 14   principle.

13:59:54 15          You know, I got arrested for something he

13:59:58 16   did, and I didn't tell the police anything, because

14:00:00 17   we just in the neighborhood.  I mean, in the inner

14:00:04 18   city, you just don't speak about these type of

14:00:06 19   things, because it can be harmful to you.

14:00:09 20          You know, I mean, I have a different mind

14:00:12 21   state now, but as a kid, I'm not going to run my

14:00:15 22   mouth and say somebody did something.  You know,

14:00:17 23   just don't do it, and it just makes your life

*Valentino Dixon - Ms. Persico - 06/07/2022*

143

14:00:21  1    horrible.  Like it travels with you for the rest of

14:00:23  2    your life, you know.  You know, unless you move

14:00:25  3    into the Arizona desert somewhere away from the

14:00:28  4    whole, you know, environment.

14:00:29  5         But, you know, he went to the Grand Jury and

14:00:34  6    said I committed this crime, so every time I try to

14:00:37  7    file an appeal, every court, you know, in the

14:00:41  8    justice system said I don't have any credible merit

14:00:44  9    to my case, you know.

14:00:45 10         And how do you think I felt about that?  For

14:00:48 11    17 years, this confession didn't mean anything.

14:00:51 12    Every justice, every magistrate wrote an opinion

14:00:56 13    that my case is not credible, okay?  They

14:00:58 14    disregarded the seven witnesses.  They were not

14:01:00 15    credible.  You know, and I forgave him for that.

14:01:03 16         And then, you know, he turned around and

14:01:06 17    left Attica and said he couldn't have anything to

14:01:08 18    do with me.  Imagine me ever speaking to this guy

14:01:11 19    again.

14:01:11 20         BY MS. PERSICO:

14:01:12 21         Q.   Is there a reason that -- during all of

14:01:17 22    that time prior to 2018, why didn't you come

14:01:21 23    forward and admit that you brought the gun, but

*Valentino Dixon - Ms. Persico - 06/07/2022*

144

14:01:24  1  Lamarr did the shooting?

14:01:25  2      **MR. BRUSTIN:**  Objection to form.

14:01:27  3      **THE WITNESS:**  I mean, why would I?  The

14:01:28  4  prosecutor is trying to say that Torri and Aaron

14:01:32  5  didn't have a gun.  Nobody's being honest here, so

14:01:35  6  why should I just be the one that -- and I'm -- I'm

14:01:37  7  an honest person, so why should I just come out and

14:01:40  8  say every little detail when the prosecutor's not

14:01:44  9  admitting to anything?

14:01:44 10      Belling's not going to admit to anything

14:01:45 11  that he did here.  The police is not going to admit

14:01:47 12  that they coerced witnesses or said, "Hey, say that

14:01:50 13  this is the guy that did this crime."

14:01:52 14      Nobody's going to do that, but I should say

14:01:55 15  every little thing that I can think of in the case.

14:01:57 16  That makes absolute no sense.

14:02:00 17      **BY MS. PERSICO:**

14:02:00 18      Q.   Well, so do you remember having an

14:02:04 19  interview with the District Attorney's office prior

14:02:08 20  to the one we looked at in -- on August 17th of

14:02:12 21  2018?

14:02:12 22      A.   Possibly.

14:02:16 23      Q.   Do you recall at that interview saying

*Valentino Dixon - Ms. Persico - 06/07/2022*

145

| | | |
|---|---|---|
| 14:02:20 | 1 | that you didn't know anything about the -- you |
| 14:02:24 | 2 | know, you were there, and you said you were going |
| 14:02:25 | 3 | to tell the truth, and do you remember saying -- |
| 14:02:30 | 4 | sticking to the same story and saying, "I -- I knew |
| 14:02:33 | 5 | nothing about the gun; I knew nothing about |
| 14:02:34 | 6 | anything"? |
| 14:02:35 | 7 | **A.**   Of course. |
| 14:02:36 | 8 | **Q.**   You remember saying that. |
| 14:02:37 | 9 | **A.**   Yes, I didn't trust him. |
| 14:02:38 | 10 | **Q.**   Okay.  But that was a lie, right? |
| 14:02:40 | 11 | **A.**   It was a lie, yes. |
| 14:02:42 | 12 | **Q.**   But you told them you were telling the |
| 14:02:44 | 13 | truth. |
| 14:02:44 | 14 | **A.**   I did. |
| 14:02:46 | 15 | **Q.**   Okay.  And then you took a polygraph |
| 14:02:48 | 16 | test and failed it. |
| 14:02:49 | 17 | **A.**   Yes. |
| 14:02:49 | 18 | **Q.**   Okay. |
| 14:03:01 | 19 | **MS. PERSICO:**  You're up. |
| 14:03:13 | 20 | **MR. BRUSTIN:**  Why don't we just take a |
| 14:03:14 | 21 | minute or two. |
| 14:03:20 | 22 | **MR. SAHASRABUDHE:**  Yes, do whatever you need |
| 14:03:27 | 23 | to do. |

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

146

14:03:28  1            (A recess was then taken at 2:03 p.m.)

14:03:28  2                       **EXAMINATION**

14:03:28  3        **BY MR. SAHASRABUDHE:**

14:08:15  4        **Q.**   Good afternoon, Mr. Dixon.  We met off

14:08:17  5   the record.  My name's Peter Sahasrabudhe.  I'm an

14:08:20  6   attorney here at Hodgson Russ, and I represent the

14:08:22  7   City of Buffalo and a lot of other former police

14:08:27  8   detectives in connection with the lawsuit that

14:08:29  9   you've brought.

14:08:30 10        Do you recall at the beginning of your

14:08:31 11   testimony Ms. Persico went over some ground rules

14:08:34 12   with you?

14:08:35 13        **A.**   Yes.

14:08:35 14        **Q.**   Do you -- do you need me to repeat

14:08:37 15   those?

14:08:38 16        **A.**   Not at all.

14:08:38 17        **Q.**   Okay.  Do you understand that those

14:08:40 18   ground rules apply equally to the questioning that

14:08:42 19   I'm about to go through?

14:08:43 20        **A.**   Yes.

14:08:43 21        **Q.**   Okay.  Mr. Dixon, so you strike me as a

14:08:48 22   pretty intelligent guy, but I just want to ask:

14:08:51 23        You understand the difference between

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

147

| | | |
|---|---|---|
| 14:08:53 | 1 | firsthand knowledge and secondhand knowledge, |
| 14:08:55 | 2 | correct? |
| 14:08:55 | 3 | **A.**   No, explain it to me. |
| 14:08:56 | 4 | **Q.**   Okay.  So firsthand knowledge would be |
| 14:08:59 | 5 | something that you actually observed or saw, and |
| 14:09:02 | 6 | then secondhand knowledge is something that you |
| 14:09:04 | 7 | read about later on based on an account from |
| 14:09:07 | 8 | someone else or hear about. |
| 14:09:08 | 9 | Do you understand that distinction? |
| 14:09:09 | 10 | **A.**   I understand now, yes. |
| 14:09:10 | 11 | **Q.**   Okay.  So I'm going to ask you a couple |
| 14:09:12 | 12 | questions about your -- your firsthand knowledge of |
| 14:09:15 | 13 | some of the actions taken by my clients in this -- |
| 14:09:19 | 14 | in this matter, okay? |
| 14:09:20 | 15 | **A.**   Okay. |
| 14:09:21 | 16 | **Q.**   Ms. Persico went over in great detail |
| 14:09:26 | 17 | some prior run-ins, arrests you've had with the |
| 14:09:28 | 18 | Buffalo Police Department, correct? |
| 14:09:30 | 19 | **A.**   Yes. |
| 14:09:30 | 20 | **Q.**   Would it be fair to say that none of |
| 14:09:32 | 21 | those involved arrests or charges for homicide? |
| 14:09:37 | 22 | **A.**   None of them. |
| 14:09:38 | 23 | **Q.**   Okay.  And you yourself, before |

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

148

14:09:40   1   August 10th, 1991, as far as you know, were never

14:09:43   2   implicated or investigated for a homicide, correct?

14:09:47   3   **A.**   Never.

14:09:48   4   **Q.**   And you've never committed a homicide,

14:09:50   5   have you?

14:09:50   6   **A.**   Never.

14:09:51   7   **Q.**   Okay.  And even though you had a fair

14:09:53   8   amount of run-ins with the Buffalo Police

14:09:57   9   Department, would it be fair to say that you don't

14:10:00   10   have a firsthand knowledge or independent

14:10:02   11   understanding of the structure of the various

14:10:05   12   departments within the Buffalo Police Department?

14:10:06   13   **A.**   No.

14:10:07   14   **Q.**   Okay.  So I want to ask you:

14:10:14   15   Either in connection with your arrest on

14:10:17   16   August 10th, 1991, or ever before that, have you

14:10:21   17   had any interactions with Jim Lonergan?

14:10:25   18   **A.**   Not that I know of.

14:10:26   19   **Q.**   Okay.  As far as you know, you --

14:10:28   20   you've never even been in the same vicinity as

14:10:31   21   Jim -- Jim Lonergan before your trial, correct?

14:10:34   22   **A.**   I'm not familiar with the name.

14:10:36   23   **Q.**   Okay.  So you don't know one way or the

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

149

14:10:37  1  other --

14:10:38  2          A.   I don't know.

14:10:38  3          Q.   -- as you sit here today.

14:10:39  4          A.   No.

14:10:39  5          Q.   How about -- how about John Vickerd?

14:10:41  6  Same question with respect to him.

14:10:43  7          A.   I know who they are because of the

14:10:45  8  trial.

14:10:45  9          Q.   Okay.

14:10:46 10          A.   But not prior to the trial.

14:10:47 11          Q.   Okay.  You never had any interaction --

14:10:49 12          A.   Not that I remember, no.

14:10:50 13      MR. BRUSTIN:  You've got to let him finish.

14:10:50 14      BY MR. SAHASRABUDHE:

14:10:52 15          Q.   Never had any interactions or

14:10:54 16  involvement with John Vickerd at all, right?

14:10:56 17          A.   Not that I recall.

14:10:56 18          Q.   And you're not aware of John Vickerd

14:10:58 19  ever being involved in any of your prior arrests or

14:11:01 20  criminal charges, correct?

14:11:02 21          A.   Not that I recall, no.

14:11:03 22          Q.   And I guess that same question applies

14:11:05 23  equally to Jim Lonergan.  Are you aware of him

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

150

14:11:08  1  being involved at all in any of your prior arrests,

14:11:11  2  charges, or conviction?

14:11:13  3        **A.**   I'm not aware of it.

14:11:14  4        **Q.**   Okay.  Same question with respect to

14:11:16  5  Raniero Masecchia.  Did you have any interaction or

14:11:21  6  involvement with Raniero Masecchia prior to

14:11:23  7  August 10th, 1991?

14:11:24  8        **A.**   I don't recall any.

14:11:25  9        **Q.**   Okay.  Do you know at all whether you

14:11:28  10  were ever with or in the same room as Raniero

14:11:31  11  Masecchia after or during August 10th, 1991?

14:11:37  12        **A.**   I don't recall.  I don't recall ever

14:11:41  13  being in a room with him or any prior anything with

14:11:44  14  him.

14:11:45  15        **Q.**   Let me ask you this:

14:11:45  16        As you sit there today do you know who

14:11:47  17  Raniero Masecchia is?

14:11:48  18        **A.**   I've seen his name in the police

14:11:50  19  reports.

14:11:50  20        **Q.**   Okay.  But you don't have an

14:11:51  21  independent -- independent memory of him, do you,

14:11:55  22  besides -- besides his name appearing in the police

14:11:57  23  reports?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

151

14:11:58  1          A.    I don't.

14:11:58  2          Q.    You wouldn't be able to tell us what he

14:12:00  3   looks like?

14:12:01  4          A.    I wouldn't.

14:12:01  5          Q.    Okay.  Same question with respect to

14:12:04  6   Richard Donovan.  Any knowledge or information that

14:12:09  7   you have or that -- sorry, strike that.

14:12:11  8          Did you have any -- do you know of any

14:12:13  9   involvement you had with Richard Donovan prior to

14:12:16 10   or during your arrest on August 10th, 1991?

14:12:20 11          A.    Secondhand knowledge, but not --

14:12:21 12          Q.    Not firsthand.

14:12:38 13          A.    -- firsthand, no.

14:12:40 14          Q.    And I appreciate you making that

14:12:41 15   distinction.  I'm asking -- all of these questions

14:12:43 16   are about your firsthand knowledge.

14:12:45 17          A.    Okay.

14:12:47 18          Q.    How about Mark Stambach?  Prior to --

14:12:51 19   and this question is with respect to before

14:12:54 20   August 10th, 1991.  Did you have any involvement

14:12:56 21   with Mark Stambach at all?

14:12:58 22          A.    Not to my knowledge.

14:12:58 23          Q.    Okay.  As far as you know, were you

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

152

14:13:00  1  ever within a hundred yards of Mark Stambach?

14:13:03  2       A.   Not to my -- not to my knowledge.

14:13:05  3       Q.   And as you sit there today, do you have

14:13:07  4  an independent recollection of Mark Stambach on

14:13:10  5  August 10th, 1991?

14:13:12  6       A.   Okay, repeat that again.

14:13:16  7       MR. BRUSTIN:  Are you asking if he remembers

14:13:17  8  what he looks like?

14:13:18  9       MR. SAHASRABUDHE:  No, sorry.  Strike that.

14:13:21 10  Strike that.

14:13:22 11       BY MR. SAHASRABUDHE:

14:13:22 12       Q.   Do you remember Mark Stambach from your

14:13:24 13  arrest on August 10th, 1991?

14:13:27 14       A.   Yes.

14:13:27 15       Q.   Okay.  And can you tell me what your

14:13:30 16  independent recollection is of your interactions

14:13:32 17  with Mark Stambach?

14:13:34 18       MR. BRUSTIN:  Objection to form.  You can

14:13:34 19  answer.

14:13:35 20       THE WITNESS:  He told me if I didn't know

14:13:37 21  who committed the crime or tell him who committed

14:13:41 22  the crime, that I would be going to prison for the

14:13:43 23  crime.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

153

14:13:44  1          BY MR. SAHASRABUDHE:

14:13:44  2          Q.    Okay.  So would it be fair to say that

14:13:46  3   you remember your interview with Mark Stambach

14:13:48  4   after you were arrested in the afternoon of

14:13:51  5   August 10th, 1991?

14:13:52  6          A.    Most --

14:13:52  7          MR. BRUSTIN:  Objection.

14:13:54  8          THE WITNESS:  Most definitely.

14:13:54  9          BY MR. SAHASRABUDHE:

14:13:55 10          Q.    You remember that?

14:13:56 11          A.    Yes.

14:13:56 12          Q.    Okay.  And do you -- do you recall:

14:14:01 13   Was it Mark Stambach who arrested you, I believe

14:14:04 14   near the corner of Bailey and Delavan?

14:14:06 15          A.    He didn't arrest me.

14:14:08 16          Q.    Okay.  It was other officers who

14:14:09 17   arrested you.

14:14:10 18          A.    Yes.

14:14:10 19          Q.    Okay.  And you didn't see Mark Stambach

14:14:13 20   at that time, correct?

14:14:15 21          A.    No.

14:14:15 22          Q.    As far as you know, was the first time

14:14:18 23   you ever saw Mark Stambach in an interview room at

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

154

14:14:21  1   the Buffalo Police Department headquarters on

14:14:22  2   August 10th, 1991?

14:14:24  3        A.   That would be my recollection.

14:14:26  4        Q.   Okay.  And that was shortly after your

14:14:28  5   arrest?

14:14:28  6        A.   Yes.

14:14:29  7        Q.   Okay.  I want to -- do you have -- do

14:14:33  8   you have the Exhibits in front of you still?

14:14:35  9        A.   Um-hum.

14:14:36 10        Q.   So if you could just pull out -- I

14:14:42 11   believe we marked it as County Exhibit 1.

14:15:04 12        And we reviewed this previously with -- with

14:15:07 13   Ms. Persico, correct?

14:15:08 14        A.   Yes.

14:15:09 15        Q.   And this appears to be a statement you

14:15:10 16   gave to Mark Stambach on August 10th, 1991,

14:15:14 17   correct?

14:15:15 18        A.   Yes.

14:15:15 19        Q.   And during that time, you told Mark

14:15:18 20   Stambach that you didn't commit the crime, correct?

14:15:19 21        A.   Yes.

14:15:20 22        Q.   And that's reflected in -- in this

14:15:23 23   statement on County Exhibit 1, correct?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

155

14:15:26  1          **MR. BRUSTIN:**  Objection to form.

14:15:27  2          **THE WITNESS:**  Yes.

14:15:29  3          **BY MR. SAHASRABUDHE:**

14:15:29  4          **Q.**   It is?  And as far as you know, is this

14:15:33  5   an accurate reflection of what you said to Mark

14:15:37  6   Stambach during that interview?

14:15:38  7          **MR. BRUSTIN:**  Objection to form.  Are you

14:15:39  8   asking -- well, you can answer.  Objection to form.

14:15:45  9          **THE WITNESS:**  Yes.

14:15:45  10         **BY MR. SAHASRABUDHE:**

14:15:49  11         **Q.**   There's nothing fabricated or made up

14:15:51  12   about -- about what's typed here, correct?

14:15:53  13         **A.**   Not that I see.

14:15:56  14         **Q.**   Not that you see?

14:15:57  15         **A.**   Yes.

14:15:59  16         **Q.**   And it's my understanding that -- and

14:16:02  17   you can correct me if I'm wrong -- shortly after

14:16:05  18   this statement was given, you were arrested,

14:16:09  19   correct?

14:16:09  20         **A.**   Yes.

14:16:10  21         **Q.**   Okay.  And you were taken to the county

14:16:13  22   holding center?

14:16:14  23         **A.**   Yes.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

156

14:16:14   1        Q.    Did you ever see Mark Stambach again?

14:16:18   2        A.    No.

14:16:19   3        Q.    Have you ever seen Mark Stambach again?

14:16:22   4        A.    No.

14:16:23   5        Q.    So would it be fair to say, then, that

14:16:29   6   with respect to the -- the -- one, two, three,

14:16:34   7   four -- five names that I kind of just went

14:16:37   8   through, other than that initial interview, if --

14:16:39   9   if we wanted to get information about what they did

14:16:43  10   in connection with the investigation of the murder

14:16:45  11   of Torriano Jackson, if we wanted to hear firsthand

14:16:50  12   knowledge, we'd have to talk to other witnesses; is

14:16:52  13   that correct?

14:16:53  14        MR. BRUSTIN:  Objection to form.  You can

14:16:53  15   answer.

14:16:53  16        THE WITNESS:  Yes.

14:16:54  17        BY MR. SAHASRABUDHE:

14:16:54  18        Q.    You can't provide us with any firsthand

14:16:56  19   information other than what you just testified to,

14:16:58  20   correct?

14:16:59  21        MR. BRUSTIN:  Objection to form.

14:17:00  22        THE WITNESS:  Other than the police

14:17:01  23   statements, which I'm very familiar with.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

157

14:17:01  1          BY MR. SAHASRABUDHE:

14:17:04  2          Q.   Sure, but you didn't give those

14:17:06  3   statements, correct?

14:17:07  4          A.   No.

14:17:07  5          Q.   You weren't present for those

14:17:08  6   statements.

14:17:09  7          A.   No.

14:17:09  8          Q.   Okay.  So Mr. Dixon, you don't dispute

14:17:26  9   that you -- you were, in fact, a drug dealer,

14:17:30  10  correct?

14:17:30  11         A.   No.

14:17:30  12         Q.   You sold cocaine, right?

14:17:32  13         A.   Yes.

14:17:35  14         Q.   Did you sell weed as well?

14:17:36  15         A.   No.

14:17:36  16         Q.   Just cocaine?

14:17:37  17         A.   Yes.

14:17:39  18         Q.   My understanding is that you didn't do

14:17:40  19  cocaine, though, correct?

14:17:42  20         A.   No.

14:17:43  21         Q.   Would it be fair to say, though, that

14:17:44  22  back in 1991 and in and -- in and around that time,

14:17:50  23  you were a heavy drinker?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

158

14:17:51 1          MR. BRUSTIN:  Objection to form.

14:17:53 2          THE WITNESS:  Yes.

14:17:53 3          BY MR. SAHASRABUDHE:

14:17:54 4          Q.   Would you say you drank daily?

14:17:56 5          A.   Yes.

14:17:59 6          Q.   How much would you drink on a daily

14:18:00 7    basis?

14:18:04 8          A.   Six beers, eight beers, maybe.

14:18:08 9          Q.   And that was essentially every day.

14:18:11 10         A.   Yes.  It was recreational.  It's what

14:18:15 11   we did.

14:18:16 12         Q.   Sure.  Hanging out on the streets,

14:18:22 13   people drink beer, correct?

14:18:24 14         A.   Yes, that's what we did.

14:18:25 15         Q.   Okay.  Would you get intoxicated after

14:18:30 16   the six to eight beers that you -- that you had on

14:18:33 17   a daily basis?

14:18:34 18         MR. BRUSTIN:  Objection to form.

14:18:34 19         THE WITNESS:  Sometimes.

14:18:36 20         BY MR. SAHASRABUDHE:

14:18:36 21         Q.   And would you drive around after --

14:18:39 22   after having the six to eight beers?

14:18:41 23         MR. BRUSTIN:  Objection to form.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

159

14:18:41   1     **THE WITNESS:** Sometimes.

14:18:42   2     **BY MR. SAHASRABUDHE:**

14:18:43   3     **Q.** And you used the money that you -- that

14:18:50   4   you earned from drug dealing just to buy some cars

14:18:53   5   from time to time, correct?

14:18:55   6     **A.** Yes.

14:18:55   7     **Q.** Would it be fair to say that they were

14:18:57   8   considered nice cars by people -- people you were

14:18:59   9   with?

14:18:59 10     **A.** Yes.

14:19:02 11     **Q.** And -- okay. Is it fair to say that

14:19:06 12   that might stand out to a patrolman who regularly

14:19:09 13   patrolled the neighborhood that you lived in?

14:19:10 14     **A.** Big time.

14:19:12 15     **Q.** But do you have any firsthand knowledge

14:19:14 16   of any of my clients being patrolmen assigned to

14:19:19 17   the neighborhood that you lived in?

14:19:21 18     **A.** No.

14:19:21 19     **Q.** Did Lamarr Scott deal drugs for you?

14:19:29 20     **A.** No.

14:19:32 21     **Q.** So if he -- if he told us at his

14:19:34 22   deposition that he did deal cocaine for you, he'd

14:19:36 23   be lying.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

160

| | | |
|---|---|---|
| 14:19:37 | 1 | **A.**    Yes. |
| 14:19:38 | 2 | **Q.**    Did other people deal drugs for you? |
| 14:19:40 | 3 | **A.**    Yes. |
| 14:19:41 | 4 | **Q.**    About how many other people did you |
| 14:19:43 | 5 | have dealing drugs for you? |
| 14:19:43 | 6 | **A.**    Seven, eight people. |
| 14:19:49 | 7 | **Q.**    Would it be fair to say that you kind |
| 14:19:51 | 8 | of directed or controlled them in -- in terms of |
| 14:19:53 | 9 | their drug dealing? |
| 14:19:56 | 10 | **MR. BRUSTIN:**  Objection to form. |
| 14:19:56 | 11 | **THE WITNESS:**  No. |
| 14:19:57 | 12 | **BY MR. SAHASRABUDHE:** |
| 14:19:58 | 13 | **Q.**    Did they get their drugs from you to |
| 14:19:59 | 14 | sell? |
| 14:20:00 | 15 | **A.**    Yes. |
| 14:20:00 | 16 | **Q.**    Would they have to give you a cut of |
| 14:20:01 | 17 | whatever they earned? |
| 14:20:02 | 18 | **A.**    Yes. |
| 14:20:05 | 19 | **Q.**    Were you in a gang, Mr. Dixon? |
| 14:20:07 | 20 | **A.**    Never. |
| 14:20:08 | 21 | **Q.**    Never?  Was -- were either Leonard |
| 14:20:14 | 22 | Brown or Antoine Shannon in gangs? |
| 14:20:17 | 23 | **A.**    No. |

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

161

14:20:17  1        Q.   As far as you know, were Aaron Jackson

14:20:19  2   or Torriano Jackson in gangs?

14:20:21  3        A.   I don't know, because I didn't know

14:20:22  4   them.

14:20:23  5        Q.   Okay.  They could have been, but you

14:20:24  6   don't know one way or the other.

14:20:25  7        A.   They could have been, but I don't know.

14:20:26  8        Q.   Okay.  How about Mario Jarmon?  Was he

14:20:29  9   ever in a gang?

14:20:30 10        A.   No.

14:20:31 11        Q.   So -- so your understanding of this --

14:20:32 12   this dispute is that it's not gang related in any

14:20:36 13   way.

14:20:37 14        A.   Not at all.

14:20:39 15        Q.   Now, I -- I believe you testified

14:20:40 16   earlier that you drove Lamarr Scott in your red --

14:20:46 17   red Mazda to Mario Jarmon's house at around 8 p.m.?

14:20:52 18        A.   Yes.

14:20:53 19        Q.   Is it your testimony that that was your

14:20:54 20   first interaction with him on August 10th, 1991?

14:20:57 21        MR. BRUSTIN:  Objection to form.  With who?

14:20:57 22        BY MR. SAHASRABUDHE:

14:20:59 23        Q.   With Lamarr Scott.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

162

14:21:00   1        A.   I believe it was, you know.  I'm -- I'm

14:21:02   2   not certain, though.

14:21:04   3        Q.   Okay.  So you can't rule out the

14:21:08   4   possibility that you might have talked to him

14:21:09   5   earlier in the day.

14:21:10   6        A.   I can't, no.

14:21:11   7        Q.   You don't remember earlier in the day,

14:21:17   8   after getting a page -- the page from Leonard

14:21:21   9   Brown, driving by Lamarr on the street and saying,

14:21:24  10   "I might need you later today"?

14:21:25  11        A.   I don't remember that.

14:21:26  12        Q.   Okay.  But it's possible that that did

14:21:28  13   happen?

14:21:29  14        MR. BRUSTIN:  Objection to form.

14:21:30  15        THE WITNESS:  No, that's not possible.

14:21:32  16        BY MR. SAHASRABUDHE:

14:21:33  17        Q.   Okay.

14:21:33  18        A.   I wouldn't have said that.

14:21:34  19        Q.   All right.  You're -- you're saying

14:21:36  20   that that did not happen.

14:21:37  21        A.   No.

14:21:38  22        Q.   So if Lamarr Scott told us that that

14:21:39  23   happened, he would be lying.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

163

14:21:42  1          MR. BRUSTIN:  Objection to form.  You have

14:21:43  2  to answer.

14:21:43  3          THE WITNESS:  Yes.  Yes, he would be lying

14:21:45  4  if he said that.

14:21:46  5          BY MR. SAHASRABUDHE:

14:21:47  6          Q.   Okay.  You didn't tell him, "I might --

14:21:48  7  I might need you later today; be ready"?

14:21:51  8          A.   Not at all.

14:21:51  9          MR. BRUSTIN:  Objection to form.

14:21:51 10          THE WITNESS:  Not at all.

14:21:53 11          BY MR. SAHASRABUDHE:

14:21:54 12          Q.   When you picked him up, whose house did

14:21:56 13  you pick up Lamarr Scott from?

14:21:58 14          A.   Rich -- Richard Jarrett.

14:22:02 15          Q.   When you got into the car, do you

14:22:04 16  remember saying anything to Lamarr Scott?

14:22:05 17          A.   No.  I believe I said something to him

14:22:08 18  in the house, up in Richard's apartment.

14:22:11 19          Q.   So -- so if you got in the car -- when

14:22:13 20  you got in the car, you didn't say, "We have some

14:22:16 21  business to handle"?

14:22:17 22          A.   Not at all.

14:22:17 23          Q.   You deny saying that to Lamarr Scott?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

164

14:22:19　1　　　　**A.**　　Definitely.

14:22:20　2　　　　**Q.**　　Where was the TEC-9 when you guys got

14:22:22　3　in the car?

14:22:23　4　　　　**A.**　　It was in the back seat.  Well, at the

14:22:25　5　bottom of the back part of the Mazda RX-7.

14:22:30　6　　　　**Q.**　　Okay.  So would it have been visible to

14:22:32　7　Lamarr Scott, as far as you know, when he got in

14:22:34　8　the car?

14:22:35　9　　　　**A.**　　Possibly.  Possibly.

14:22:36　10　　　　**Q.**　　Okay.  Did you tell him that there was

14:22:38　11　a gun in the car when you got in the car?

14:22:40　12　　　　**A.**　　Yes.

14:22:43　13　　　　**Q.**　　Do you remember the words or substance

14:22:44　14　of what you said to him?

14:22:47　15　　　　**A.**　　Not verbatim, you know.

14:22:49　16　　　　**MR. BRUSTIN:**　　Best you can recall.

14:22:50　17　　　　**THE WITNESS:**　　I can say that I said that my

14:22:54　18　brothers have some problems and I'm going to go

14:22:57　19　over there, you know, and see if everything is okay

14:22:59　20　with them, you know.  That's about it.

14:23:03　21　　　　**BY MR. SAHASRABUDHE:**

14:23:03　22　　　　**Q.**　　Okay.  Did you -- when you got out of

14:23:08　23　the car, who had the gun?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

165

14:23:13  1          **A.**   Well --

14:23:13  2          **MR. BRUSTIN:**  Objection to form.  When?

14:23:15  3          **BY MR. SAHASRABUDHE:**

14:23:15  4          **Q.**   When you got out of the car at Mario

14:23:17  5    Jarmon's house -- so yes, sorry.  Thank you, Nick.

14:23:22  6          You picked him up at Richard Jarrett's

14:23:24  7    house, correct?

14:23:25  8          **A.**   Yes.  Yes.

14:23:25  9          **Q.**   And I believe your testimony was at

14:23:26 10    around 8 p.m. --

14:23:28 11          **A.**   Yes.

14:23:28 12          **Q.**   -- that was, correct?

14:23:28 13          **A.**   Yes.

14:23:28 14          **Q.**   Okay.  And you drove to Mario Jarmon's

14:23:30 15    house, and that's fairly close to where Richard

14:23:34 16    Jarrett's house was, correct?

14:23:35 17          **A.**   Yes, a ten-minute drive.

14:23:36 18          **Q.**   Yes.

14:23:37 19          **A.**   Yes.

14:23:37 20          **Q.**   So when you parked at Mario Jarmon's

14:23:42 21    house, which is near the corner of Bailey and

14:23:45 22    Delavan --

14:23:46 23          **A.**   Yes.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

166

14:23:46  1          Q.    -- who took the gun out of the car?

14:23:48  2          A.    The gun stayed in the car at that time,

14:23:51  3    okay?  I just got out the car and hung out for a

14:23:54  4    few minutes with them, then I left.  Me and the gun

14:23:56  5    left.

14:23:58  6          I came back, you know, hour and a half, two

14:24:02  7    hours later, you know.  I came back, and I put the

14:24:06  8    gun in the hallway myself.

14:24:07  9          Q.    Okay.  So -- so you -- you take -- you

14:24:10 10    take Lamarr Scott to Mario Jarmon's house at around

14:24:15 11    8 p.m.

14:24:16 12          A.    Yes.

14:24:16 13          Q.    And you drop him off there.

14:24:18 14          A.    Well, I actually got out, and I hung

14:24:20 15    out for a few minutes.

14:24:21 16          Q.    Okay.

14:24:21 17          A.    Okay?  And then he said he was going to

14:24:24 18    hang out with them, and I left myself, because I

14:24:28 19    had some errands to run.

14:24:30 20          Q.    Okay.  And then you came back around

14:24:31 21    two hours later, was your testimony.

14:24:33 22          A.    Yes, maybe two or three hours later.

14:24:35 23    It had to be after midnight, because I took my

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

167

14:24:35  1   friend Shelly to the airport, and she worked that

14:24:38  2   midnight shift, so I dropped her off at the airport

14:24:40  3   and then headed back to Bailey and Delavan.

14:24:43  4        **Q.**   And it's at that time that you claim

14:24:46  5   you brought the gun into Mario Jarmon's house,

14:24:50  6   correct?

14:24:50  7        **A.**   I brought it, and I put it in the back

14:24:54  8   hallway.

14:24:54  9        **Q.**   Did -- did Lamarr Scott see you bring

14:24:55 10   the gun into Mario Jarmon's house?

14:24:57 11        **MR. BRUSTIN:**  Objection to form.

14:24:57 12        **THE WITNESS:**  I -- I -- I don't know, but I

14:25:01 13   believe it's possible that all of them did, because

14:25:03 14   they were sitting on the porch.  When I say all of

14:25:06 15   them, Antoine, Leonard, Mario, and Lamarr.

14:25:06 16        **BY MR. SAHASRABUDHE:**

14:25:12 17        **Q.**   And so your testimony -- your version

14:25:14 18   of events is that until the Jackson brothers and

14:25:18 19   Travis Powell showed up, the gun remained in Mario

14:25:22 20   Jarmon's home, correct?

14:25:23 21        **MR. BRUSTIN:**  Objection to form.

14:25:24 22        **THE WITNESS:**  Well, when I left,

14:25:28 23   apparently -- and this is -- through investigations

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

168

14:25:31  1  you will see that everybody's saying the same

14:25:33  2  thing, that this is when Aaron showed up with

14:25:35  3  Travis, and they was making some threats.  I wasn't

14:25:37  4  there for that, okay?

14:25:39  5      And when I came back, this is when they told

14:25:41  6  me that they made the threats and said they'll be

14:25:44  7  back, and I had the gun, and I put it in the

14:25:46  8  hallway.

14:25:46  9      **BY MR. SAHASRABUDHE:**

14:25:47  10     **Q.**  So I understand.  My question wasn't a

14:25:49  11  good question.  I apologize.

14:25:50  12     The second time you got to Mario Jarmon's

14:25:54  13  house that evening and you brought the gun in the

14:25:57  14  hallway --

14:25:57  15     **A.**  Yes.

14:25:58  16     **Q.**  -- in between that time and the Jackson

14:26:02  17  brothers and Travis Powell showing up, the gun --

14:26:04  18  it's your testimony that the gun remained in the

14:26:07  19  hallway.

14:26:08  20     **MR. THOMPSON:**  Objection to form.

14:26:09  21     **THE WITNESS:**  No, the gun remained with me

14:26:11  22  in my car.

14:26:13  23     **MR. BRUSTIN:**  He's asking about after you

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

169

14:26:14  1  put it in the hallway.

14:26:15  2      **THE WITNESS:**  Oh, yes, it remained in the

14:26:18  3  hallway the whole time, yes.

14:26:20  4      **BY MR. SAHASRABUDHE:**

14:26:21  5      **Q.**  And it's your testimony that after the

14:26:24  6  altercation ensued, you ran away with Toine, and

14:26:32  7  Lamarr ran to Mario Jarmon's house, correct?

14:26:36  8      **A.**  Yes.  Yes.

14:26:37  9      **Q.**  You saw Lamarr running to Mario

14:26:41 10  Jarmon's house?

14:26:41 11      **A.**  I saw him running towards us.  You

14:26:43 12  know, I was already in the car, you know, and he

14:26:45 13  was running towards us after the shooting.

14:26:46 14      **Q.**  Did -- did Toine get in your car?

14:26:49 15      **A.**  No.

14:26:49 16      **Q.**  Where -- what direction did Toine go

14:26:49 17  in?

14:26:51 18      **A.**  He ran in Mario Jarmon's yard.

14:26:54 19      **Q.**  Do you recall Lamarr Scott trying to

14:26:55 20  get in your car after the shooting?

14:26:58 21      **A.**  He was running towards it, and I was

14:27:00 22  looking like, "It's not going to happen," and I

14:27:02 23  pulled off on him.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

170

14:27:03  1        **Q.**    Did you say, "You're not getting in my

14:27:05  2    fucking car"?

14:27:05  3        **A.**    No, I didn't say that.

14:27:07  4        **Q.**    Okay.  So if he told us that's what you

14:27:12  5    said to him, he'd be wrong.

14:27:14  6        **MR. BRUSTIN:**  Objection to form.

14:27:14  7        **THE WITNESS:**  Yes, he would be lying.

14:27:15  8        **BY MR. SAHASRABUDHE:**

14:27:23  9        **Q.**    You and Antoine Shannon are

14:27:26 10    half-brothers, correct?

14:27:27 11        **A.**    We have the same father.

14:27:28 12        **Q.**    Would you say that you and Antoine

14:27:29 13    Shannon look alike?

14:27:31 14        **A.**    Not really, no.

14:27:32 15        **Q.**    How tall is Antoine Shannon?

14:27:35 16        **A.**    Well, I'm five nine, so he'll be about

14:27:39 17    five eight.

14:27:40 18        **Q.**    Okay.  So you're around the same

14:27:43 19    height, then --

14:27:43 20        **A.**    Yes.

14:27:43 21        **Q.**    -- fair to say?

14:27:44 22        **A.**    Yes.

14:27:44 23        **Q.**    Is Antoine Shannon skinny?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

171

14:27:46  1          A.    Not at all.

14:27:47  2          Q.    He's a big dude?

14:27:48  3          A.    Yes, I mean, he had a scholarship for

14:27:51  4     Louisville.  Linebacker, you know.

14:27:52  5          Q.    So he's short, but he's strong.

14:27:54  6          A.    Yes, he's a middle linebacker, yes.

14:27:57  7          Q.    How much would you say Antoine Shannon

14:27:59  8     weighed?

14:27:59  9          A.    Back then?

14:28:00 10          Q.    Yes.

14:28:00 11          A.    Five eight, I'm going to say he weighed

14:28:06 12     about two -- maybe 220.

14:28:08 13          Q.    Where did he have a scholarship come

14:28:08 14     from?

14:28:10 15          A.    Louisville.

14:28:11 16          Q.    Like the Cardinals?

14:28:12 17          A.    Yes.

14:28:13 18          Q.    Oh, wow.  Okay.  Did he end up playing

14:28:17 19     for Louisville?

14:28:18 20          A.    A year, and actually he was home on

14:28:20 21     break when this incident occurred.

14:28:23 22          Q.    Did he play after that one year?

14:28:24 23          A.    Yes, he went back, and he played a

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

172

14:28:26  1    year, and then he -- he dropped out, I believe, and

14:28:31  2    I went to prison.  I was in prison.

14:28:34  3         Q.    And I believe your testimony was

14:28:35  4    earlier that you and Leonard Brown are not

14:28:38  5    biologically related, correct?

14:28:40  6         A.    No.

14:28:40  7         Q.    Okay.  How tall is Leonard Brown?

14:28:42  8         A.    He's five eleven.  He was five eleven

14:28:45  9    then.  He's about six one now, so he grew a few

14:28:48 10    inches after the shooting.

14:28:50 11         Q.    Is Leonard Brown skinny?

14:28:53 12         A.    He was then.  He's not now.

14:28:54 13         Q.    Okay.  But -- but back then he was

14:28:57 14    skinny, correct?

14:28:57 15         A.    Yes.

14:28:57 16         Q.    Okay.  Do you know one way or the other

14:29:00 17    whether Leonard had a gun that evening?

14:29:02 18         A.    He didn't have a gun.

14:29:03 19         Q.    How do you know?

14:29:04 20         A.    Because none of us had a gun but my gun

14:29:08 21    that was put in the hallway.  None of them had a

14:29:11 22    gun.

14:29:11 23         Q.    You're sure about that.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

173

14:29:12  1          **A.**    Positive.

14:29:14  2          **Q.**    Did Leonard do cocaine back then?

14:29:19  3          **A.**    Not back then, but -- possibly years

14:29:24  4  later after I went to prison, but not back then.

14:29:26  5          **Q.**    How old was Lamarr Scott, if you know,

14:29:35  6  when is this all happened?

14:29:36  7          **A.**    19.

14:29:37  8          **Q.**    How old were you?

14:29:38  9          **A.**    21.

14:29:41  10          **Q.**    Did you get the sense at all that

14:29:43  11  Lamarr Scott looked up to you before the incident?

14:29:45  12          **A.**    Yes.

14:29:46  13          **Q.**    Did you get the sense that you were

14:29:49  14  someone that he trusted?

14:29:51  15          **A.**    Yes.

14:29:52  16          **Q.**    Do you feel at all bad about bringing

14:29:56  17  him to the scene with the gun?

14:29:57  18          **A.**    Horrible.

14:29:59  19          **Q.**    Do you wish you would have made a

14:30:01  20  different decision?

14:30:02  21          **A.**    Of course.

14:30:03  22          **Q.**    What decision do you wish you would

14:30:04  23  have made?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

174

14:30:05  1          **A.**   I would have never went on the corner.

14:30:08  2    I would have never went there, period.

14:30:14  3          **Q.**   As you sit there today, can you tell us

14:30:17  4    why you chose to respond to Leonard's page the way

14:30:20  5    you did?

14:30:21  6          **MR. BRUSTIN:**  Objection to form.

14:30:22  7          **THE WITNESS:**  Foolishness.  I -- worst

14:30:33  8    mistake of my life.

14:30:38  9          **BY MR. SAHASRABUDHE:**

14:30:39  10          **Q.**   And I understand that it's tough,

14:30:40  11   Mr. Dixon, but -- but would it -- this is tough to

14:30:42  12   talk about, but would it be fair to say that

14:30:45  13   decision was yours?

14:30:46  14          **A.**   Yes.

14:30:47  15          **MR. BRUSTIN:**  Which decision?  To bring the

14:30:48  16   gun?

14:30:48  17          **BY MR. SAHASRABUDHE:**

14:30:49  18          **Q.**   The decision to bring the gun to the

14:30:50  19   corner.

14:30:50  20          **A.**   Yes.

14:30:51  21          **Q.**   That decision was yours, correct?

14:30:52  22          **MR. BRUSTIN:**  Whoa, whoa.  The decision --

14:30:55  23   you just said to bring the gun to the corner.  I

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

175

14:30:58  1  think you meant to say bring it into the house.

14:30:58  2        **BY MR. SAHASRABUDHE:**

14:31:00  3        **Q.**   To bring the gun to Mario Jarmon's

14:31:03  4  house, that was your decision.

14:31:04  5        **A.**   Yes, it was.

14:31:05  6        **Q.**   And to bring Lamarr Scott, that was

14:31:09  7  your decision, correct?

14:31:10  8        **A.**   Yes.

14:31:11  9        **Q.**   And none of my clients had anything to

14:31:13 10  do with that decision, correct?

14:31:15 11        **A.**   No.

14:31:15 12        **Q.**   Okay.  You mentioned earlier -- I think

14:31:43 13  you said this all -- this whole thing started with

14:31:45 14  a girl.  Do you remember that?

14:31:47 15        **A.**   Yes.

14:31:48 16        **Q.**   Do you know who that girl was?  Have

14:31:50 17  you come to -- sorry, strike that.

14:31:52 18        Have you come to learn who that girl was?

14:31:53 19        **A.**   Yes, Heather Smith.

14:31:56 20        **Q.**   So her name -- so the girl who the

14:31:59 21  dispute started over, her name was, in fact,

14:32:02 22  Heather Smith.

14:32:03 23        **A.**   Yes.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

176

14:32:03  1          Q.    And Heather Smith was involved with

14:32:08  2   your half-brother Antoine Shannon, correct?

14:32:11  3          A.    No.

14:32:11  4          Q.    She was not.

14:32:12  5          A.    No.

14:32:12  6          Q.    Was Heather Smith involved with Leonard

14:32:14  7   Brown?

14:32:14  8          A.    No.

14:32:15  9          Q.    So can you -- I guess why don't you

14:32:17 10   describe what your understanding of the initial

14:32:19 11   dispute was.

14:32:20 12          A.    Heather Smith was involved with a guy

14:32:23 13   named Peanut, who was Antoine's friend, my

14:32:27 14   brother's friend.

14:32:28 15          And for the first time, I seen on the

14:32:32 16   tape -- even though you didn't see Antoine's face,

14:32:35 17   he was explaining that they left a party.  Him and

14:32:37 18   Peanut left a party.

14:32:39 19          And when Aaron and Torri rolled up on them,

14:32:42 20   they were rolling down on Peanut, because Peanut

14:32:45 21   was messing around with Torri -- Aaron's

14:32:47 22   girlfriend.

14:32:47 23          Q.    Who was Heather Smith.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

177

14:32:48  1          **A.**    Yes.

14:32:50  2          **Q.**    Got it.

14:32:50  3          **A.**    And he was questioning him about his

14:32:51  4    girlfriend, and so Antoine just happened to be with

14:32:54  5    Peanut, okay?  Peanut took off running, which,

14:32:59  6    explained there, left Antoine standing there like.

14:33:01  7          And then they jumped out on the car and told

14:33:04  8    Antoine to get on his knees, and this is when Torri

14:33:07  9    pulled out the gun.

14:33:08  10          This is how this whole thing started.

14:33:10  11          **Q.**    And do you have an understanding of

14:33:11  12    when this happened?

14:33:13  13          **A.**    I'm going to say two weeks prior to the

14:33:15  14    shooting, to August 10th.  Two weeks prior to

14:33:18  15    August 10th.

14:33:19  16          **Q.**    But nonetheless, the dispute started

14:33:21  17    over a girl named Heather Smith.

14:33:24  18          **A.**    Yes.

14:33:24  19          **Q.**    Okay.  I want to talk to you a little

14:33:31  20    bit about Anthony Wright.  Do you recall being

14:33:34  21    asked questions about Anthony Wright in your

14:33:37  22    interview with the Assistant District Attorneys?

14:33:41  23          **A.**    Yes.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

178

| | | |
|---|---|---|
| 14:33:42 | 1 | **Q.**   And I believe you said he was at one |
| 14:33:44 | 2 | point the neighborhood bully, correct? |
| 14:33:46 | 3 | **A.**   Yes. |
| 14:33:46 | 4 | **Q.**   But -- but at a certain point, he -- he |
| 14:33:49 | 5 | became a drug addict, right? |
| 14:33:51 | 6 | **A.**   Yes. |
| 14:33:52 | 7 | **Q.**   And he kind of stopped being the |
| 14:33:53 | 8 | neighborhood bully at that point, correct? |
| 14:33:55 | 9 | **A.**   No, he was always the neighborhood |
| 14:33:57 | 10 | bully.  Even as a drug addict. |
| 14:33:59 | 11 | **Q.**   No matter what? |
| 14:34:00 | 12 | **A.**   Yes, he -- he still had his size, and |
| 14:34:03 | 13 | he still intimidated everybody. |
| 14:34:05 | 14 | **Q.**   So my understanding of the incident |
| 14:34:06 | 15 | with -- with you and Anthony Wright is he came to |
| 14:34:10 | 16 | you looking for drugs multiple times on that |
| 14:34:14 | 17 | particular evening, correct? |
| 14:34:14 | 18 | **A.**   Yes. |
| 14:34:15 | 19 | **Q.**   And he didn't have any money, right? |
| 14:34:17 | 20 | **A.**   No. |
| 14:34:17 | 21 | **Q.**   He was broke? |
| 14:34:18 | 22 | **A.**   Yes. |
| 14:34:19 | 23 | **Q.**   And you gave him drugs for free a |

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

179

14:34:22   1  couple times?

14:34:22   2      **A.**   Couple times, yes.

14:34:23   3      **Q.**   And the last time you told him, "Don't

14:34:24   4  come back here," right?

14:34:26   5      **A.**   Yes.

14:34:26   6      **Q.**   And -- and he came back, right?  Even

14:34:29   7  though he had been told not to?

14:34:30   8      **A.**   Yes.

14:34:31   9      **Q.**   And he was knocking on the door,

14:34:32  10  yelling, correct?

14:34:34  11      **A.**   Yes, he was yelling outside.

14:34:36  12      **Q.**   And -- and at that point, you -- you

14:34:37  13  shot near him, correct?

14:34:40  14      **MR. BRUSTIN:**  Objection to form.

14:34:41  15      **THE WITNESS:**  No, that didn't happen.

14:34:41  16      **BY MR. SAHASRABUDHE:**

14:34:42  17      **Q.**   You never shot near him?

14:34:45  18      **A.**   He tossed a brick through the window,

14:34:47  19  and then I grabbed my rifle and shot near him.

14:34:49  20      **Q.**   Okay.  So -- so after he broke your

14:34:51  21  window, you grabbed the gun?

14:34:53  22      **A.**   Yes.

14:34:53  23      **Q.**   And shot in his direction?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

180

14:34:57  1       **A.**   Yes.

14:34:58  2       **Q.**   And I believe in the interview, you --

14:35:01  3  is it fair to say you -- you were yelling things to

14:35:03  4  him afterwards, after you shot in his direction?

14:35:06  5       **A.**   Oh, yes.

14:35:07  6       **Q.**   Fair to say that some people might have

14:35:10  7  witnessed or observed that in the neighborhood?

14:35:12  8       **MR. BRUSTIN:**  Objection to form.

14:35:13  9       **THE WITNESS:**  I don't know.  Possibly.

14:35:16 10       **BY MR. SAHASRABUDHE:**

14:35:17 11       **Q.**   Fair to say that as a drug dealer,

14:35:20 12  you'd be foolish not to own guns, correct?

14:35:24 13       **MR. BRUSTIN:**  Objection to form.

14:35:24 14       **THE WITNESS:**  Well, I learned the hard way.

14:35:26 15  You know, I got robbed a few times, and --

14:35:27 16       **BY MR. SAHASRABUDHE:**

14:35:28 17       **Q.**   Sure.

14:35:28 18       **A.**   -- you know, now you got to get you

14:35:30 19  some protection.

14:35:31 20       **Q.**   And if you're a drug dealer, you don't

14:35:32 21  want to be seen as someone who can be easily taken

14:35:35 22  advantage of, right?

14:35:36 23       **MR. BRUSTIN:**  Objection to form.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

181

14:35:36   1        **THE WITNESS:**  Definitely not.

14:35:37   2        **BY MR. SAHASRABUDHE:**

14:35:38   3        **Q.**   Okay.  Fair to say, then, that it's

14:35:40   4   beneficial as a drug dealer to -- to have a

14:35:44   5   reputation as someone who's tough.

14:35:47   6        **MR. BRUSTIN:**  Objection to form.

14:35:47   7        **THE WITNESS:**  Yes.

14:35:48   8        **BY MR. SAHASRABUDHE:**

14:35:50   9        **Q.**   Someone who might shoot you if -- if

14:35:55  10   you crossed them, correct?

14:35:56  11        **MR. BRUSTIN:**  Objection to form.

14:35:57  12        **THE WITNESS:**  No.  Someone that's tough and

14:36:02  13   that's going to, you know, protect themselves.

14:36:07  14        **BY MR. SAHASRABUDHE:**

14:36:08  15        **Q.**   And -- and how would you protect

14:36:09  16   yourself?  What do you mean by protect yourself?

14:36:12  17        **A.**   Well --

14:36:13  18        **MR. BRUSTIN:**  Objection to form.

14:36:14  19        **THE WITNESS:**  Well, what I learned, you

14:36:15  20   know, friends of mine's were getting killed, and,

14:36:18  21   you know, I was targeted, and, you know, none of us

14:36:22  22   were tough guys, but in that life, you're selling

14:36:27  23   drugs, you know, you have to stand up for yourself

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

182

14:36:29  1   or somebody's going to come and kill you and rob

14:36:32  2   you and, you know, do whatever they want to do to

14:36:35  3   you.

14:36:35  4          So you don't have to be a killer or a tough

14:36:37  5   guy, but you have to be able to hold your ground.

14:36:42  6          BY MR. SAHASRABUDHE:

14:36:42  7     Q.   And -- and how would you say you

14:36:46  8   portray to other people that you hold -- you can

14:36:49  9   hold your ground?

14:36:50  10         MR. BRUSTIN:  Objection to form.

14:36:50  11         THE WITNESS:  Well, one thing I learned as a

14:36:52  12  kid is that you don't start trouble with people.

14:36:55  13  You don't violate people.  You don't do these

14:36:58  14  things.

14:36:58  15         But, you know, living in that neighborhood,

14:37:00  16  if someone comes to you, they chase you home a

14:37:03  17  couple times, you know, you get to the point where

14:37:05  18  you can't be chased home anymore.  You have to

14:37:07  19  fight them.  You have to stand up for yourself, you

14:37:10  20  know.  And, you know, that's the type of person I

14:37:13  21  was.

14:37:13  22         BY MR. SAHASRABUDHE:

14:37:14  23    Q.    You were the kind of person who you

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

183

14:37:16  1  wouldn't want to mess with, correct?

14:37:18  2       **MR. BRUSTIN:**  Objection to form.

14:37:19  3       **THE WITNESS:**  That's not true, you know,

14:37:21  4  because to say that would mean that if you mess

14:37:23  5  with me, I'm capable of murdering you or killing

14:37:27  6  you.

14:37:28  7       And there were plenty of killers in my

14:37:31  8  neighborhood, and we all knew who they were, but

14:37:34  9  there were plenty of guys who weren't killers, but

14:37:34 10  they were selling drugs.  Plenty of guys who were

14:37:41 11  not killers but lived in the neighborhood and was

14:37:42 12  just trying to survive, you know.

14:37:44 13       But they wasn't killers.  These guys

14:37:47 14  wouldn't bother nobody.  They was just trying to

14:37:50 15  make some money.

14:37:51 16       **BY MR. SAHASRABUDHE:**

14:37:56 17       **Q.**   So one thing -- one thing I want to

14:37:58 18  clear up on your version of events:

14:38:01 19       How far away from you -- from Lamarr Scott

14:38:05 20  were you when the actual shooting occurred?

14:38:08 21       **MR. BRUSTIN:**  Objection to form.

14:38:10 22       **THE WITNESS:**  I would say about, I don't

14:38:16 23  know, 50 yards.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

184

14:38:18  1          BY MR. SAHASRABUDHE:

14:38:18  2          Q.    Before the shooting occurred, did you

14:38:20  3    say anything to Lamarr Scott?

14:38:22  4          MR. BRUSTIN:  Objection to form.

14:38:23  5          THE WITNESS:  No.  No.

14:38:24  6          BY MR. SAHASRABUDHE:

14:38:24  7          Q.    You didn't say, "They're shooting over

14:38:26  8    there"?

14:38:27  9          A.    No.

14:38:27 10          Q.    You didn't say any words at all to him?

14:38:30 11          A.    Nothing.

14:38:31 12          Q.    And so again, if he told us that you

14:38:33 13    pointed out Torriano Jackson and directed him that

14:38:40 14    that's the person he should be going after, he'd be

14:38:42 15    lying to us, correct?

14:38:43 16          A.    Absolutely.

14:38:44 17          Q.    That's a complete lie and fabrication

14:38:44 18    by --

14:38:48 19          MR. BRUSTIN:  Objection to form.

14:38:49 20          THE WITNESS:  Complete, made-up lie.

14:38:49 21          BY MS. PERSICO:

14:38:50 22          Q.    -- Lamarr Scott?

14:38:54 23          A.    That's a complete lie.  It's made up.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

185

14:38:57  1  That didn't happen.

14:38:59  2  　　　　Q.　Okay.　What reason does Lamarr Scott

14:39:02  3  have to lie?

14:39:03  4  　　　　**A.**　He's protecting --

14:39:05  5  　　　　**MR. BRUSTIN:**　Objection to form.　Go ahead.

14:39:07  6  　　　　**THE WITNESS:**　I believe he's protecting

14:39:08  7  himself.　He's looking out for the people that gave

14:39:11  8  him a sweet deal.

14:39:11  9  　　　　**BY MS. PERSICO:**

14:39:12  10  　　　　Q.　Well, explain that to me.　Who gave him

14:39:14  11  the sweet deal?

14:39:16  12  　　　　**A.**　The prosecutors, you know.　The City of

14:39:18  13  Buffalo gave him a sweet deal.　He took a plea

14:39:20  14  bargain for killing a guy and shooting three people

14:39:24  15  and didn't receive no time.　That's a sweet deal.

14:39:26  16  　　　　Q.　And you would think that he's making

14:39:27  17  this all up to benefit the City of Buffalo and --

14:39:32  18  and the County of Erie in some way.

14:39:35  19  　　　　**MR. BRUSTIN:**　Objection to form.

14:39:35  20  　　　　**THE WITNESS:**　Most definitely.　Yes, of

14:39:37  21  course.

14:39:37  22  　　　　**BY MS. PERSICO:**

14:39:41  23  　　　　Q.　You drove to the scene in a -- in a red

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

186

14:39:44  1  Mazda, right?

14:39:46  2        **A.**   Yes.

14:39:48  3        **Q.**   So one thing that in reviewing the case

14:39:51  4  file, there's also a white Cadillac involved.

14:39:55  5        Where was the white Cadillac parked when you

14:39:59  6  got to Mario Jarmon's house the second time?

14:40:03  7        **A.**   Well, I'm not sure of that, okay?  I

14:40:07  8  knew where I was going to pick it up at, okay, but

14:40:10  9  I believe the detectives had already tooken that

14:40:13 10  car and towed it away before I got there.

14:40:16 11        **Q.**   The white Cadillac?

14:40:17 12        **A.**   The white Cadillac.

14:40:18 13        **Q.**   Okay.  Did -- the night before, did you

14:40:21 14  give the keys of the white Cadillac to one of your

14:40:24 15  friends?

14:40:25 16        **A.**   One of my high school friends.  Two of

14:40:27 17  them, actually, I went to school with at Performing

14:40:30 18  Arts, Lee Matthews and Julius Beckham.

14:40:37 19        **Q.**   And where -- where was the white

14:40:41 20  Cadillac at that point?

14:40:43 21        **A.**   When I came to get it?

14:40:44 22        **Q.**   No, when -- when you gave them the

14:40:46 23  keys, where was it?

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

187

14:40:47  1          **A.**   Oh, it was on Lisbon.

14:40:49  2          **Q.**   How far away from Mario Jarmon's house

14:40:51  3  is that?

14:40:51  4          **A.**   I don't know.  Seven-, eight-minute

14:40:54  5  drive.

14:40:55  6          **Q.**   Okay.  So you're claiming it was in a

14:40:56  7  completely different neighborhood.

14:40:58  8          **A.**   Yes.

14:40:58  9          **Q.**   Okay.  And you -- you gave them the

14:41:01 10  keys.  How were they going to get to the car, did

14:41:03 11  you know?

14:41:03 12          **A.**   I don't know.  They just liked the car,

14:41:05 13  and they -- we ran into each other on the corner.

14:41:08 14  I hadn't seen these kids since high school, and

14:41:10 15  both of them did good for themselves, went to --

14:41:13 16  played college over -- basketball overseas, and

14:41:17 17  they were living a totally different life, and we

14:41:20 18  were talking and catching up.

14:41:21 19          I had split up from Mario and Leonard and

14:41:23 20  all of them, and I was talking to my old, you know,

14:41:25 21  high school classmates.  And they were asking me

14:41:27 22  about the white Cadillac, and I said, "Hey, you

14:41:29 23  want to drive it tonight?"

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

188

14:41:31  1          You know, that's how I was.

14:41:32  2          Q.    So you gave them the keys to the car

14:41:35  3   even though it was a seven- to eight-minute drive

14:41:39  4   away from where you were talking.

14:41:40  5          A.    Yes, I couldn't take them in my Mazda,

14:41:42  6   so -- these guys are six eight, six -- six six.

14:41:46  7          Q.    So -- okay.  But you told them to bring

14:41:49  8   the car back to Delavan and Bailey.

14:41:53  9          A.    In the morning, because Lee Matthews

14:41:55  10  lived three doors from Mario Jarmon.  He lived

14:41:57  11  right there.  So I'm going to pick my car up.

14:41:59  12         Q.    So it's your testimony that that white

14:42:01  13  Cadillac was not in the area of the -- of the

14:42:03  14  shooting.

14:42:04  15         A.    Yes, when I arrived, I don't -- to get

14:42:06  16  it, I don't remember seeing it.  I just remember

14:42:09  17  detectives and police officers swarming my red

14:42:11  18  Mazda RX-7.  I never seen the white Cadillac after

14:42:16  19  that.

14:42:16  20         Q.    All right.  So the Cadillac, according

14:42:21  21  to you, was not anywhere nearby the shooting.

14:42:23  22         MR. BRUSTIN:  Objection to form.  Answer if

14:42:25  23  you know.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

189

14:42:25  1          **THE WITNESS:**  No, I don't -- I don't know,

14:42:26  2   because I didn't see it anymore.

14:42:29  3          **BY MS. PERSICO:**

14:42:29  4      **Q.**    Can I ask you:  Do you recall, on -- on

14:42:31  5   the day of the shooting, did you have six to eight

14:42:35  6   beers?

14:42:36  7      **A.**    No, I don't remember drinking a lot

14:42:38  8   that day, and I didn't drink six to eight beers

14:42:41  9   every single day, you know, so I don't remember

14:42:43 10   being drunk like that.

14:42:44 11      **Q.**    Do you remember drinking beer with

14:42:47 12   Mario, Lamarr, Leonard, and Toine before the

14:42:54 13   incident?

14:42:54 14      **A.**    No, because I didn't get a chance to.

14:42:56 15   I was in the store when the shots were going.  I

14:42:59 16   was going to get a beer when the shots rang out.

14:43:00 17      **Q.**    So there was no point where you were

14:43:02 18   sitting with them drinking beer?

14:43:02 19          **MR. BRUSTIN:**  Objection to form.

14:43:04 20          **THE WITNESS:**  I don't remember that, no.

14:43:04 21          **BY MR. SAHASRABUDHE:**

14:43:06 22      **Q.**    One final question:

14:43:07 23          Do you ever remember talking to Lamarr Scott

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

190

| | | |
|---|---|---|
| 14:43:12 | 1 | about how to use the TEC-9? |
| 14:43:15 | 2 | **A.**    No, I don't remember that. |
| 14:43:17 | 3 | **Q.**    Okay.  So -- is that a no or just that |
| 14:43:20 | 4 | you don't remember? |
| 14:43:21 | 5 | **MR. BRUSTIN:**  Objection to form. |
| 14:43:21 | 6 | **THE WITNESS:**  Well, I don't remember, |
| 14:43:22 | 7 | because I didn't know how to use it.  I never fired |
| 14:43:24 | 8 | it. |
| 14:43:24 | 9 | **BY MR. SAHASRABUDHE:** |
| 14:43:25 | 10 | **Q.**    So did the -- was there a point where |
| 14:43:28 | 11 | you had the understanding that the S on the TEC-9 |
| 14:43:32 | 12 | stood for safety and the F stood for fire? |
| 14:43:35 | 13 | **A.**    I've heard that before, and it's just |
| 14:43:37 | 14 | plain foolishness, because I never used it.  So if |
| 14:43:39 | 15 | you got a gun like that you bought off the street, |
| 14:43:42 | 16 | you can only assume that it may be safety or fire. |
| 14:43:44 | 17 | You don't know, because I never fired it. |
| 14:43:46 | 18 | **Q.**    Do you remember telling Lamarr Scott |
| 14:43:48 | 19 | that the S stood for safety and the F stood for |
| 14:43:51 | 20 | fire? |
| 14:43:52 | 21 | **MR. BRUSTIN:**  Objection to form. |
| 14:43:53 | 22 | **THE WITNESS:**  No, I don't remember that. |
| 14:43:53 | 23 | **BY MR. SAHASRABUDHE:** |

*Valentino Dixon - Mr. Brustin - 06/07/2022*

191

| | | |
|---|---|---|
| 14:43:55 | 1 | **Q.**    You have no -- |
| 14:43:55 | 2 | **A.**    No. |
| 14:43:56 | 3 | **Q.**    You have no independent recollection of |
| 14:43:57 | 4 | that. |
| 14:43:58 | 5 | **A.**    None.  None. |
| 14:43:59 | 6 | **Q.**    Okay. |
| 14:44:00 | 7 | **MR. SAHASRABUDHE:**  That's all I have for the |
| 14:44:01 | 8 | time being.  Do you have any more? |
| 14:44:03 | 9 | **MR. BRUSTIN:**  Well, I have some follow-up. |
| 14:44:06 | 10 | **MS. PERSICO:**  I was just going to say:  Can |
| 14:44:08 | 11 | we take a break for two seconds? |
| 14:44:12 | 12 | **MR. BRUSTIN:**  Of course. |
| 14:44:17 | 13 | (A recess was then taken at 2:44 p.m.) |
| 14:44:17 | 14 | **EXAMINATION** |
| 14:44:17 | 15 | **BY MR. BRUSTIN:** |
| 14:47:32 | 16 | **Q.**    Mr. Dixon, I just have a few follow-up |
| 14:47:34 | 17 | questions for you. |
| 14:47:35 | 18 | So you were asked some questions about what, |
| 14:47:40 | 19 | if anything, you could have said at the time of the |
| 14:47:43 | 20 | shooting that Lamarr Scott may have overheard, and |
| 14:47:48 | 21 | I want to refer you to something that you said to |
| 14:47:51 | 22 | the DA in 2018 when you were interviewed. |
| 14:47:58 | 23 | You were asked some questions, and this |

*Valentino Dixon - Mr. Brustin - 06/07/2022*

192

14:48:01  1   is -- I'll just read the transcript that I have.

14:48:06  2          From first Sara Dee:  Did you say something

14:48:09  3   to him about go get the gun, grab the gun?

14:48:12  4          And you said:  No, I didn't, no.

14:48:13  5          And then she said:  What?

14:48:14  6          And you said:  None of that.  You know, I

14:48:16  7   just -- what I said was, "They're shooting down

14:48:22  8   there," okay?  I said, "Yo, they're shooting down

14:48:25  9   there."

14:48:25 10          Now, first of all, do you remember at some

14:48:27 11   point saying something like that?

14:48:28 12      A.   That could be possible.

14:48:30 13      Q.   Okay.  Do you -- when you said it, do

14:48:33 14   you have any idea where Lamarr Scott was?

14:48:34 15      A.   No.

14:48:34 16      Q.   Do you have any idea if he was -- if --

14:48:38 17   first of all, were you speaking to him?

14:48:39 18      A.   No.

14:48:39 19      Q.   Do you have any idea if he heard that?

14:48:41 20      A.   I don't know.

14:48:42 21      Q.   Did you ever intend for Lamarr Scott to

14:48:46 22   shoot Torri Jackson and Aaron Jackson?

14:48:49 23      A.   Never.

*Valentino Dixon - Mr. Brustin - 06/07/2022*

193

14:48:50  1        **Q.**   All right.

14:48:51  2        **MS. PERSICO:**  Can I just interrupt and ask

14:48:54  3   you which interview that transcript was from?

14:48:55  4        **MR. BRUSTIN:**  This is the transcript of the

14:48:57  5   December -- I'm sorry., it's the 2018 interview

14:49:02  6   that's on the tape.

14:49:03  7        **MS. PERSICO:**  There's -- there's three

14:49:05  8   different dates.  There's the 18th, the 30th, and

14:49:10  9   the 31st.

14:49:11 10        **MR. BRUSTIN:**  That's a good question.  I

14:49:14 11   have an excerpt from it.  I -- it's the -- I think

14:49:21 12   it's the final interview.

14:49:24 13        **MS. PERSICO:**  That was what was produced to

14:49:26 14   us in connection with the last round of

14:49:30 15   depositions, or --

14:49:30 16        **MR. BRUSTIN:**  I believe so.

14:49:31 17        **MS. PERSICO:**  Okay.  Do you -- do you have

14:49:35 18   a -- your Bates stamp on there that we might be

14:49:37 19   able to --

14:49:38 20        **MR. BRUSTIN:**  It's not Bates stamped, but

14:49:39 21   it's marked -- what I just read from is page 2

14:49:43 22   of 4.

14:49:45 23        **MS. PERSICO:**  Not to be knit-picky about it.

*Valentino Dixon - Mr. Brustin - 06/07/2022*

194

14:49:48 1  I'm just trying to figure out how we can --

14:49:50 2      MR. BRUSTIN:  No, that's fair.  I can show

14:49:52 3  it to you afterward if you want.  You can try to

14:49:54 4  find your version of it.  It says on top

14:50:02 5  2018/08/31, 095700.

14:50:06 6      MS. PERSICO:  Okay.  So that's the -- that's

14:50:08 7  the 8/31.

14:50:09 8      MR. BRUSTIN:  Yes, 8/31, yes, I'm sorry.

14:50:13 9      MS. PERSICO:  Okay.

14:50:14 10     BY MR. BRUSTIN:

14:50:14 11     Q.  Okay.  Just a few more questions,

14:50:16 12 Mr. Dixon.

14:50:18 13     So first of all, in response to questions

14:50:22 14 from the attorney for the city Defendants, you

14:50:26 15 mentioned that one of the things Detective Stambach

14:50:30 16 said to you was that either you were going to tell

14:50:35 17 him you did it or who did it or you were going down

14:50:37 18 for it.  Do you remember that?

14:50:38 19     A.  Yes.

14:50:39 20     MR. SAHASRABUDHE:  Form.

14:50:40 21     BY MR. BRUSTIN:

14:50:40 22     Q.  And did you see that anywhere in the

14:50:42 23 interview?

*Valentino Dixon - Mr. Brustin - 06/07/2022*

195

| | | |
|---|---|---|
| 14:50:43 | 1 | **A.**   No. |
| 14:50:43 | 2 | **Q.**   Okay.  Do you remember if that happened |
| 14:50:45 | 3 | before or after the actual interview that he |
| 14:50:48 | 4 | documented? |
| 14:50:50 | 5 | **A.**   I don't know if it was before or after. |
| 14:50:52 | 6 | **Q.**   Okay.  Do you remember if he said other |
| 14:50:53 | 7 | things to you before or after the documented |
| 14:50:57 | 8 | interview? |
| 14:50:59 | 9 | **A.**   He also mentioned Sly Green, and he |
| 14:51:05 | 10 | says, "Do you know Sly Green?" |
| 14:51:07 | 11 | And I says, "I heard of him." |
| 14:51:08 | 12 | And he says, "Well, you're going to prison |
| 14:51:10 | 13 | like Sly Green." |
| 14:51:11 | 14 | **Q.**   Okay.  Now, you were asked some |
| 14:51:16 | 15 | questions by the attorney for the county Defendants |
| 14:51:21 | 16 | about whether or not Lamarr Scott used your gun. |
| 14:51:28 | 17 | Do you recall those questions? |
| 14:51:29 | 18 | **A.**   Yes. |
| 14:51:29 | 19 | **Q.**   Okay.  So first of all, were you able |
| 14:51:32 | 20 | to see with your own eyes whether or not Lamarr |
| 14:51:39 | 21 | Scott killed Torri Jackson with your gun? |
| 14:51:42 | 22 | **A.**   Well, yes and no, I mean, you know. |
| 14:51:45 | 23 | **Q.**   Well, first of all, have you always |

*Valentino Dixon - Mr. Brustin - 06/07/2022*

196

14:51:46  1  understood and assumed that Lamarr Scott used your

14:51:52  2  gun, the TEC-9, the gun you brought, to kill Torri

14:51:55  3  Jackson?

14:51:55  4       **A.**   Yes.

14:51:56  5       **Q.**   Do you have any actual evidence that

14:51:58  6  you're aware of to suggest that it wasn't your gun?

14:52:01  7       **A.**   No.

14:52:01  8       **Q.**   Okay.  You just -- you -- was -- is it

14:52:05  9  your testimony that you were just too far to

14:52:07 10  actually see with your eyes whether it was, in

14:52:10 11  fact, your gun?

14:52:11 12       **A.**   Yes, it was dark.

14:52:15 13       **Q.**   Okay.  But as you sit here today, you

14:52:18 14  don't dispute that -- that Lamarr Scott shot Torri

14:52:23 15  Jackson with the gun that you brought.

14:52:25 16       **A.**   I don't dispute it.

14:52:26 17       **Q.**   Okay.

14:52:28 18       **MR. BRUSTIN:**  Why don't you give me just 30

14:52:31 19  seconds.  I think I'm done.

14:52:33 20           (A recess was then taken at 2:52 p.m.)

14:53:08 21       **MR. BRUSTIN:**  Just one more question.

14:53:09 22       **BY MR. BRUSTIN:**

14:53:15 23       **Q.**   At the time of the homicide in '91,

*Valentino Dixon - Mr. Brustin - 06/07/2022*

197

14:53:25  1  Detective Stambach was in the homicide unit.  Prior

14:53:28  2  to that, he had served in the narcotics unit.

14:53:31  3       Do you --

14:53:32  4       **MR. SAHASRABUDHE:**  Object to the form.

14:53:33  5       **BY MR. BRUSTIN:**

14:53:35  6       Q.   Do you recall one way or another

14:53:36  7  whether or not you ever interacted with him in that

14:53:38  8  capacity?

14:53:39  9       A.   I don't recall.

14:53:39 10       Q.   You don't recall one way or another?

14:53:41 11       A.   Yes, I don't recall one way or another.

14:53:42 12       Q.   Do you recall all of the narcotics

14:53:45 13  police officers and detectives that you interacted

14:53:48 14  with on the street?

14:53:49 15       A.   Oh, yes.

14:53:49 16       Q.   You -- as you -- do you recall all of

14:53:51 17  them or --

14:53:52 18       A.   Most of them.

14:53:53 19       Q.   Okay.  Fair enough.

14:53:54 20       A.   Yes.

14:53:54 21       Q.   Fair enough.

14:53:57 22       **MR. BRUSTIN:**  I think that's all I have.

14:54:09 23       **MS. PERSICO:**  Just give me one second.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

198

14:54:15  1         **MR. SAHASRABUDHE:**  Can I ask one follow-up

14:54:16  2  question?

14:54:16  3         **MR. BRUSTIN:**  Sure.  Why don't we go in

14:54:21  4  order, though, if you don't mind.

14:54:21  5         **MR. SAHASRABUDHE:**  Oh, yes, okay.

14:54:21  6         **MS. PERSICO:**  Oh, well --

14:54:21  7         **MR. SAHASRABUDHE:**  Doesn't matter.  I mean,

14:54:21  8  it doesn't matter.

14:54:25  9         **MS. PERSICO:**  Let him go.

14:54:25  10                     **FURTHER EXAMINATION**

14:54:25  11        **BY MR. SAHASRABUDHE:**

14:54:26  12        **Q.**   Do you recall around -- or the year or

14:54:27  13  the approximate time that you started dealing

14:54:29  14  drugs?

14:54:29  15        **A.**   Yes.

14:54:30  16        **Q.**   And my understanding is it wasn't that

14:54:32  17  long before the 1991 shooting, correct?

14:54:35  18        **A.**   No, 1989.

14:54:36  19        **Q.**   Okay.

14:54:37  20        **MR. SAHASRABUDHE:**  I have nothing further.

14:54:39  21        **MR. BRUSTIN:**  I'm -- I'm fine with that.

14:54:42  22  That should be redirect, though.  Should be limited

14:54:45  23  to what I asked.

*Valentino Dixon - Ms. Persico - 06/07/2022*

199

14:54:47  1          **MS. PERSICO:**  It kind of was.

14:54:47  2                    **FURTHER EXAMINATION**

14:54:47  3          **BY MS. PERSICO:**

14:54:56  4          **Q.**   Mr. Dixon, I just want to follow up on

14:54:58  5   a -- on a question that I asked you previously.

14:55:03  6          I think you said to me in response to one of

14:55:18  7   my questions -- and I apologize, it's been a long

14:55:21  8   day, so if I've -- if I get this wrong, you can

14:55:24  9   tell me, but that -- that you spoke to your parents

14:55:30 10   from the holding center like on the 11th or

14:55:39 11   something?

14:55:41 12          **MR. BRUSTIN:**  Objection to form.  Go ahead.

14:55:42 13          **THE WITNESS:**  It was either the 11th or the

14:55:50 14   12th.

14:55:50 15          **BY MS. PERSICO:**

14:55:51 16          **Q.**   Okay.  And I'm just going to ask you to

14:55:53 17   look at Leonard Brown's statement to the police.

14:56:02 18   It's County 2, I think.

14:56:07 19          **MR. BRUSTIN:**  I think that's right.

14:56:09 20          **MS. PERSICO:**  Thank you.

14:56:10 21          **MR. BRUSTIN:**  Yes.

14:56:11 22          **BY MS. PERSICO:**

14:56:11 23          **Q.**   And I'll -- and -- and that date is

*Valentino Dixon - Ms. Persico - 06/07/2022*

200

14:56:16  1  August 12th, 1991, correct?

14:56:18  2        **A.**    Yes.

14:56:19  3        **Q.**    And that's the same date that Lamarr

14:56:26  4  Scott's televised confession was made, right?

14:56:31  5        **A.**    Yes.

14:56:31  6        **Q.**    And at the scene of the televised

14:56:41  7  confession, you indicated that your dad was there.

14:56:43  8        **A.**    Yes.

14:56:44  9        **Q.**    Lamarr Scott, obviously.

14:56:46  10        **A.**    Yes.

14:56:46  11        **Q.**    And then I just wanted to clarify this:

14:56:53  12        The voice that you identified, who was that

14:56:56  13  again?

14:56:57  14        **A.**    Antoine Shannon.

14:56:58  15        **Q.**    Antoine Shannon.  Okay.

14:57:04  16        Do you know if Leonard Brown was also at the

14:57:09  17  scene of the confession?

14:57:10  18        **A.**    I don't know.

14:57:11  19        **Q.**    Okay.

14:57:12  20        **A.**    I didn't see him in the video, so --

14:57:14  21        **Q.**    And was -- was it at your suggestion

14:57:24  22  that everybody get on the same page with regard to

14:57:31  23  Lamarr Scott coming to the shooting with a gun on

*Valentino Dixon - Ms. Persico - 06/07/2022*

201

| | | |
|---|---|---|
| 14:57:37 | 1 | his bicycle? |
| 14:57:39 | 2 | **MR. BRUSTIN:**  Objection to form. |
| 14:57:39 | 3 | **THE WITNESS:**  No. |
| 14:57:40 | 4 | **BY MS. PERSICO:** |
| 14:57:40 | 5 | **Q.**  Okay.  Did you -- did you talk about |
| 14:57:46 | 6 | that type of scenario with your father? |
| 14:57:51 | 7 | **MR. BRUSTIN:**  Objection to form. |
| 14:57:52 | 8 | **THE WITNESS:**  Yes. |
| 14:57:52 | 9 | **BY MS. PERSICO:** |
| 14:57:53 | 10 | **Q.**  Okay.  Can you tell me about that |
| 14:57:55 | 11 | conversation? |
| 14:57:55 | 12 | **A.**  Yes.  When my parents visited me, like |
| 14:58:00 | 13 | I said, either the 11th or the 12th, my father |
| 14:58:05 | 14 | said, you know, "I met the guy who did this." |
| 14:58:07 | 15 | Antoine pointed him out, because Lamarr was hanging |
| 14:58:11 | 16 | out on the corner in the neighborhood. |
| 14:58:12 | 17 | And my dad approached him and says, "Hey, |
| 14:58:14 | 18 | can you tell me what happened?  My son is in |
| 14:58:16 | 19 | prison." |
| 14:58:16 | 20 | And Lamarr told him what happened, and my |
| 14:58:18 | 21 | dad says, "I think you should go to the police and |
| 14:58:21 | 22 | tell them what happened," you know. |
| 14:58:23 | 23 | And Lamarr went to the police station, and |

*Valentino Dixon - Ms. Persico - 06/07/2022*

202

14:58:27   1   they kicked him out of the police station.  They

14:58:29   2   told him they had who they wanted and they didn't

14:58:32   3   care -- they told Lamarr that they had who they

14:58:38   4   wanted and told him to get his lie straight.  Okay?

14:58:42   5        This is when, I believe, Antoine's mom

14:58:44   6   called the Channel 2 news and says the news needs

14:58:47   7   to, you know, hear this, you know.  And this is

14:58:51   8   when Lamarr spoke to the news.

14:58:53   9        I believe this is what I was told over the

14:58:54 10   years.

14:58:55 11        **Q.**  Okay.  I'm going to ask you -- so let

14:59:01 12   me back up.  So you -- you have a conversation with

14:59:06 13   your father on -- either --

14:59:09 14        **A.**  My parents, yes, my mom and my father,

14:59:12 15   yes.

14:59:12 16        **Q.**  On the 11th.

14:59:14 17        **A.**  In the county jail.

14:59:15 18        **Q.**  Okay.  And at that time, did you

14:59:19 19   discuss with your father the idea that Lamarr Scott

14:59:25 20   would get -- get on TV and confess and say that he

14:59:33 21   rode his bicycle with the gun to the scene?

14:59:37 22        **MR. BRUSTIN:**  Objection to form.

14:59:38 23        **THE WITNESS:**  Absolutely not.  No.

*Valentino Dixon - Ms. Persico - 06/07/2022*

203

14:59:40  1        **BY MS. PERSICO:**

14:59:41  2        **Q.**    Okay.  So I'm going to ask you to turn

14:59:52  3    to the second page of County 2, which is COE1561.

15:00:01  4        **MR. BRUSTIN:**  Just want to object for the

15:00:03  5    record.  This is well beyond the scope of the

15:00:06  6    questions I asked.  You don't get a second chance

15:00:09  7    for a deposition, but I'll let you do what you

15:00:11  8    want.

15:00:12  9        **BY MS. PERSICO:**

15:00:12  10       **Q.**    And so Mr. Dixon, do you see on the

15:00:17  11   second Q there, it says:  How did -- and -- and

15:00:21  12   just so that the record is clear, this is the

15:00:23  13   statement of Leonard Brown given on August 12th,

15:00:28  14   1991.

15:00:32  15       Page 2, the question:  How did you and

15:00:35  16   Lamarr happen to come here together?

15:00:38  17       The answer:  My father, stepfather had

15:00:41  18   talked to Tino in jail, and he got us all together

15:00:44  19   and had us call the news.

15:00:46  20       Do you see that?

15:00:47  21       **A.**    I see it.

15:00:47  22       **Q.**    Okay.  Do you have -- can you expand

15:00:54  23   any more on what -- what is written there on the

*Valentino Dixon - Ms. Persico - 06/07/2022*

204

15:00:56  1  page?

15:00:57  2      **MR. BRUSTIN:**  Objection to form.  Tell her

15:00:58  3  again what happened.

15:00:59  4      **THE WITNESS:**  That didn't happen there, you

15:01:02  5  know.

15:01:02  6      **BY MS. PERSICO:**

15:01:02  7      **Q.**  Okay.  So -- so -- so you're -- so

15:01:05  8  Leonard was lying when he said that.

15:01:06  9      **MR. BRUSTIN:**  Objection to form.

15:01:07 10      **THE WITNESS:**  Definitely.  Definitely.  I

15:01:09 11  mean, it wouldn't have been a bad idea, but it

15:01:11 12  didn't come from me.

15:01:12 13      I mean, you know, that's the right thing to

15:01:14 14  do.  If the police is not going to take his

15:01:16 15  confession, then, you know, call the news.

15:01:18 16      But that didn't come from me.  I mean, if

15:01:22 17  I'd have thought of it, I would have definitely

15:01:24 18  told them, "Yes, call the news, bring the news in."

15:01:28 19      **BY MS. PERSICO:**

15:01:28 20      **Q.**  Okay.  And when -- when did you first

15:01:31 21  find out that Lamarr Scott testified in the Grand

15:01:37 22  Jury that -- that you were the shooter?

15:01:39 23      **A.**  I don't know, six months later.

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

205

15:01:48  1          **MS. PERSICO:**  That's all I have.

15:01:51  2          **MR. BRUSTIN:**  Anything else?  I've got a

15:01:52  3   couple follow-up if you don't.

15:01:55  4          **MR. SAHASRABUDHE:**  I -- I guess I do want to

15:01:56  5   ask just one question.

15:01:56  6                   **FURTHER EXAMINATION**

15:01:56  7          **BY MR. SAHASRABUDHE:**

15:02:00  8          Q.   Is it fair to say you don't know

15:02:04  9   through firsthand knowledge when the Buffalo Police

15:02:07 10   Department's first interview was with Lamarr Scott?

15:02:13 11          A.   I guess so, yes.

15:02:14 12          Q.   In other words, you weren't present

15:02:17 13   for -- for that interview.

15:02:18 14          A.   No, I just knew it happened on

15:02:21 15   August 12th.

15:02:21 16          Q.   Okay.  And do you know whether that

15:02:24 17   happened before or after the Channel 2 News report?

15:02:28 18          A.   It happened before.

15:02:29 19          Q.   What makes you say that?

15:02:33 20          A.   Throughout all the paperwork, it's

15:02:36 21   somewhere in a couple statements somewhere that he

15:02:39 22   was in the police station first, and they kicked

15:02:40 23   him out of the police station, and then that's when

*Valentino Dixon - Mr. Sahasrabudhe - 06/07/2022*

206

15:02:42　1　the news was called.

15:02:43　2　　　　And then when the news was called, then they

15:02:47　3　handcuffed him and drove him away, but then they

15:02:50　4　released him.  So it looked like they were taking

15:02:52　5　him into custody, but then they released him.

15:02:56　6　　　　Q.　And all of that you claim you've

15:02:58　7　gathered through the police reports in this case?

15:02:59　8　　　　A.　Yes, it's somewhere that made me draw

15:03:02　9　that conclusion that he was -- he went to the

15:03:06　10　police station first, and then they disregarded

15:03:09　11　him, told him they had who they wanted, kicked him

15:03:12　12　out the police station, and this is when Channel 2

15:03:14　13　News was called, and the police arrived on the

15:03:16　14　scene, you know, and handcuffed him, but then they

15:03:19　15　released him that night.

15:03:21　16　　　　Q.　And you claim that that's reflected in

15:03:23　17　the police reports.

15:03:23　18　　　　A.　It's reflected in -- you know, from

15:03:25　19　what I've read in all the paperwork over the years.

15:03:27　20　This is my conclusion.  I could be wrong.

15:03:29　21　　　　Q.　Okay.  You could -- you could be wrong

15:03:31　22　about that.

15:03:31　23　　　　A.　Yes, I could be wrong, but through

*Valentino Dixon - Mr. Brustin - 06/07/2022*

207

15:03:33  1  reading everything, this is what I concluded.

15:03:35  2      **Q.**   That's your -- that's your

15:03:37  3  understanding as you sit there today, but you could

15:03:39  4  be wrong about it.

15:03:40  5      **A.**   Yes, I could be wrong.

15:03:40  6      **Q.**   Okay.

15:03:42  7      **MR. SAHASRABUDHE:**  I have nothing further.

15:03:43  8      **MR. BRUSTIN:**  Just a couple follow-up.  I'm

15:03:43  9  just going to follow up on that.

15:03:43 10              **FURTHER EXAMINATION**

15:03:43 11      **BY MR. BRUSTIN:**

15:03:46 12      **Q.**   You've now acknowledged your memory

15:03:48 13  today -- withdrawn.  You've gone through the

15:03:50 14  paperwork many times over the years.

15:03:52 15      **A.**   Yes.

15:03:53 16      **Q.**   And as you sit here today, you seem to

15:03:55 17  recall seeing something that suggested that Lamarr

15:03:59 18  Scott was interviewed by the police before he was

15:04:02 19  tape-recorded, correct?

15:04:03 20      **A.**   Yes.

15:04:03 21      **Q.**   But you're not certain of that,

15:04:05 22  correct?

15:04:05 23      **A.**   I'm not certain.

*Valentino Dixon - Mr. Brustin - 06/07/2022*

208

15:04:06  1        Q.    All right.  Now, I want to go back to
15:04:08  2    the statement that Leonard Brown gave, page 2.
15:04:12  3    Now, first of all, you were asked some questions
15:04:14  4    about this.
15:04:15  5        How did you and Lamarr happen to come
15:04:17  6    together?
15:04:18  7        My father, stepfather had talked to Tino in
15:04:20  8    jail, and he got all -- us all together and had us
15:04:23  9    call the news.
15:04:24 10        Now, first of all, you did talk to your
15:04:25 11    stepfather in jail, right?
15:04:27 12        A.    My father.  My father and mom.
15:04:29 13        Q.    Right.  You talked to your father.
15:04:34 14        A.    Yes, and mom in the county jail.
15:04:35 15        Q.    All right.  And do you have any idea --
15:04:38 16    first of all, did you talk with your father about
15:04:40 17    getting everyone together?
15:04:41 18        A.    Never.
15:04:42 19        Q.    All right.  And do you have any idea
15:04:43 20    whether or not your father, after that
15:04:46 21    conversation, decided on his own to get everybody
15:04:48 22    together?
15:04:49 23        A.    I believe that's what happened.

**APPENDIX 1042**

*Valentino Dixon - Mr. Brustin - 06/07/2022*

209

15:04:50  1         **Q.**   Okay.

15:04:50  2         **A.**   I believe he took charge.

15:04:51  3         **Q.**   All right.  Did you and your father

15:04:53  4    have any discussion whatsoever about who brought

15:04:56  5    the gun to the scene?

15:04:57  6         **A.**   Never.

15:04:58  7         **Q.**   Did you have any discussion whatsoever

15:05:00  8    with your father about the details of what happened

15:05:02  9    during the shooting?

15:05:03  10        **A.**   Never.

15:05:07  11        **Q.**   Other than him telling you that Lamarr

15:05:10  12   Scott had admitted that he committed the crime, did

15:05:12  13   you speak about the details any more than that?

15:05:14  14        **A.**   No.  He just said, "Son, I know you're

15:05:17  15   innocent.  I spoke to the guy that committed the

15:05:19  16   crime, and, you know, I'm going to get you out of

15:05:21  17   here."

15:05:22  18        **Q.**   But you never spoke with him about any

15:05:23  19   details or any plans.

15:05:25  20        **A.**   Never.

15:05:25  21        **Q.**   Okay.

15:05:26  22        **MR. BRUSTIN:**  That's all I have.

          23

*Valentino Dixon - Ms. Persico - 06/07/2022*

210

15:05:28  1        **MS. PERSICO:**  That leads me to one more.

15:05:28  2                      **FURTHER EXAMINATION**

15:05:28  3        **BY MS. PERSICO:**

15:05:33  4        **Q.**   How did you find out about Lamarr

15:05:37  5   Scott's Grand Jury testimony?  Was that through

15:05:39  6   your dad?

15:05:39  7        **A.**   It was through an attorney that I had.

15:05:42  8   They gave me a copy of it, yes.

15:05:45  9        **Q.**   And did you speak with your dad about

15:05:48 10   that testimony?

15:05:50 11        **A.**   Yes, it was -- yes, because he said my

15:05:52 12   dad put him up to confessing.  Like that didn't

15:05:56 13   happen.  You committed the crime, you know.  My dad

15:06:00 14   did what any father would do.  "Hey, you did the

15:06:03 15   crime; go tell the police what happened."  What's

15:06:05 16   bad about that?

15:06:06 17        But it made my dad look like a horrible

15:06:08 18   person.  And then he said my dad put him up to it,

15:06:11 19   which it didn't come from him.  It came from the

15:06:14 20   prosecutor, Belling, you know.

15:06:16 21        So he just assassinated my father's

15:06:19 22   character.  He made up a lie.

15:06:21 23        **Q.**   Well, you -- you don't have any

*Valentino Dixon - Ms. Persico - 06/07/2022*

211

15:06:23  1  firsthand knowledge about the conversations between

15:06:27  2  the prosecutor and Lamarr Scott.

15:06:30  3      **A.**   Well, secondhand knowledge, because

15:06:35  4  Lamarr Scott told me in Attica this is what

15:06:37  5  happened.

15:06:38  6      **Q.**   But my question was you don't have any

15:06:39  7  firsthand knowledge of that.

15:06:41  8      **A.**   I don't.

15:06:44  9  **MS. PERSICO:**  That's all I have.

15:06:45  10  **MR. BRUSTIN:**  Okay.

15:06:46  11  **MR. SAHASRABUDHE:**  Thank you, Mr. Dixon.

15:06:47  12  **THE WITNESS:**  Thank you.

15:06:50  13      (Deposition concluded at 3:06:50 p.m.)

15:07:57  14              *   *   *

15

16

17

18

19

20

21

22

23

212

1        I hereby CERTIFY that I have read the

2   foregoing 211 pages, and that except as to those

3   changes (if any) as set forth in an attached errata

4   sheet, they are a true and accurate transcript of

5   the testimony given by me in the above entitled

6   action on June 7, 2022.

7

8

9                            ------------------------
                             VALENTINO DIXON
10

11  Sworn to before me this

12

13  -------- day of  ---------, 20__.

14

15  -------------------------

16  NOTARY PUBLIC.

17

18

19

20

21

22

23

213

1  STATE OF NEW YORK )

2                       ss:

3  COUNTY OF ERIE     )

4

5       I DO HEREBY CERTIFY as a Notary Public in and

6  for the State of New York, that I did attend and

7  report the foregoing deposition, which was taken

8  down by me in a verbatim manner by means of machine

9  shorthand.  Further, that the deposition was then

10 reduced to writing in my presence and under my

11 direction.  That the deposition was taken to be

12 used in the foregoing entitled action.  That the

13 said deponent, before examination, was duly sworn

14 to testify to the truth, the whole truth and

15 nothing but the truth, relative to said action.

16

17

18                        _____

19                        LORI K. BECK,
                           CSR, CM,
20                        Notary Public.

21

22

23

214

1                              INDEX TO EXHIBITS

2     Exhibit              Description                Page

3       COUNTY EXH. 1      document dated                    25
                           August 10th, 1991, Bates
4                          numbers COE001524 through
                           COE001526
5
        COUNTY EXH. 2      document dated 8-12-91,           43
6                          Bates numbers COE001560
                           through COE001561
7
        COUNTY EXH. 3      videotaped interview of           52
8                          Valentino Dixon dated
                           8/31/2018, Bates number
9                          COE002556

10      COUNTY EXH. 4      videotaped interview of           57
                           Lamarr Scott dated
11                         August 12, 1991, Bates
                           number COE003997
12
        COUNTY EXH. 5      Buffalo Police Department         64
13                         Intra-Departmental
                           Correspondence dated
14                         8/20/91, Bates number
                           COE001571
15
        COUNTY EXH. 6      Erie County Central               86
16                         Police Services
                           Arrest/Booking Form,
17                         various Bates numbers,
                           HR-Dixon-0001446 through
18                         HR-Dixon-0001531

19

20

21    * Exhibits 3 and 4 retained by Ms. Persico.
        Copies of all exhibits supplied to all counsel.
22

23

215

1                          INDEX TO WITNESSES

2    Witness                    Examination                    Page

3     VALENTINO DIXON      BY MS. PERSICO                 4

4                          BY MR. SAHASRABUDHE           146

5                          BY MR. BRUSTIN                191

6                          BY MR. SAHASRABUDHE           198

7                          BY MS. PERSICO                199

8                          BY MR. SAHASRABUDHE           205

9                          BY MS. PERSICO                210

10

11

12

13

14

15

16

17

18

19

20

21

22

23

*DOCUMENT PRODUCTION REQUESTS*

216

**Request**                                                    **Page**

1   **MR. SAHASRABUDHE:**  Going to index a demand   129

2   for any audio-recorded messages left by

3   Lamarr Scott or any text messages received

4   by Lamarr Scott from Mr. Dixon or a third

5   party, and I'll put that in writing

6   following the deposition.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## $

**$50,000** [1] - 129:14

## '

**'90** [1] - 88:6
**'91** [1] - 196:23

## 0

**095700** [1] - 194:5

## 1

**1** [6] - 25:15, 25:20, 42:9, 154:11, 154:23, 214:3
**10** [1] - 88:8
**100** [2] - 1:20, 2:13
**10013** [1] - 2:4
**10:03:25** [1] - 111:13
**10:14** [1] - 18:13
**10:15** [1] - 18:15
**10:19** [1] - 23:4
**10:30:31** [1] - 54:1
**10:31:41** [1] - 54:9
**10:49** [1] - 42:5
**10th** [38] - 12:16, 12:22, 15:1, 15:16, 24:11, 25:15, 26:10, 31:21, 36:15, 38:16, 39:4, 59:23, 62:20, 65:6, 76:4, 77:19, 102:12, 103:4, 116:5, 117:5, 118:20, 119:8, 148:1, 148:16, 150:7, 150:11, 151:10, 151:20, 152:5, 152:13, 153:5, 154:2, 154:16, 161:20, 177:14, 177:15, 214:3
**11/9/90** [1] - 106:20
**11:12** [1] - 51:14
**11:13** [1] - 51:15
**11:22** [1] - 57:8
**11:23** [1] - 57:9
**11:56** [2] - 75:17, 76:1
**11th** [9] - 63:3, 63:15, 63:18, 63:21, 118:16, 199:10, 199:13, 201:13, 202:16
**12** [2] - 57:17, 214:11
**12-gauge** [1] - 101:7
**12-ounce** [1] - 97:1
**129** [1] - 216:1
**12th** [14] - 43:11, 55:18, 56:16, 57:13,

62:16, 62:19, 62:20, 63:21, 69:15, 199:14, 200:1, 201:13, 203:13, 205:15
**140** [2] - 1:20, 2:13
**14202** [2] - 2:14, 3:2
**14211** [1] - 4:13
**1450** [2] - 86:17, 89:15
**1452** [1] - 86:17, 91:6
**1454** [2] - 86:17, 94:1
**146** [1] - 215:4
**14614** [1] - 2:8
**1462** [1] - 86:18
**1472** [1] - 86:18
**1481** [3] - 86:17, 94:10, 95:14
**1483** [2] - 86:17, 96:17
**1497** [3] - 86:17, 97:15, 97:23
**1498** [2] - 86:17, 99:13
**15** [3] - 46:22, 47:2, 47:7
**1500** [1] - 86:17
**1502** [2] - 86:18, 99:8
**1506** [2] - 86:18, 101:1
**1508** [2] - 86:18, 101:16
**1510** [2] - 86:18, 104:21
**1512** [2] - 86:18, 106:19
**1526** [1] - 26:17
**1530** [1] - 86:19
**1531** [1] - 86:19
**1561** [1] - 44:6
**16** [1] - 2:7
**17** [1] - 143:11
**1700** [1] - 3:2
**17th** [2] - 10:20, 144:20
**18th** [1] - 193:8
**19** [1] - 173:7
**191** [1] - 215:5
**198** [1] - 215:6
**1989** [2] - 94:3, 198:18
**199** [1] - 215:7
**1990** [13] - 33:15, 33:18, 34:4, 34:7, 34:11, 35:11, 35:23, 88:8, 99:16, 101:18, 102:23, 104:10, 112:3
**1990-1991** [1] - 112:6
**1991** [54] - 12:16, 12:21, 15:2, 15:16, 24:11, 25:16, 26:10,

28:4, 31:21, 37:12, 38:16, 39:4, 43:11, 45:6, 55:19, 56:16, 57:13, 57:17, 62:16, 65:6, 67:9, 69:15, 76:5, 77:19, 88:23, 90:3, 94:10, 96:18, 101:2, 102:12, 103:4, 103:23, 104:23, 112:2, 115:8, 116:5, 148:1, 148:16, 150:7, 150:11, 151:10, 151:20, 152:5, 152:13, 153:5, 154:2, 154:16, 157:22, 161:20, 198:17, 200:1, 203:14, 214:3, 214:11
**1992** [2] - 67:6, 69:18
**1999** [3] - 79:6, 79:7, 79:19
**19th** [2] - 76:6, 94:3
**1:01** [1] - 100:21
**1:16** [1] - 110:7
**1:17** [1] - 110:8
**1:19-cv-01678-WMS** [1] - 1:8
**1:24** [1] - 113:12

## 2

**2** [15] - 43:14, 43:15, 43:23, 44:5, 68:21, 69:14, 193:21, 199:18, 202:6, 203:3, 203:15, 205:17, 206:12, 208:2, 214:5
**2000** [1] - 79:22
**2009** [1] - 79:20
**2012** [1] - 79:22
**2018** [12] - 10:13, 10:20, 11:1, 11:23, 12:14, 51:5, 68:3, 76:6, 143:22, 144:21, 191:22, 193:5
**2018/08/31** [1] - 194:5
**2019** [1] - 6:10
**2022** [2] - 1:21, 212:6
**205** [1] - 215:8
**20__** [1] - 212:13
**20th** [1] - 67:9
**21** [1] - 173:9
**210** [1] - 215:9
**211** [1] - 212:2
**212** [1] - 2:5
**22** [17] - 34:2, 34:4, 35:7, 101:23, 104:19, 105:4, 105:19, 105:21, 106:21,

108:16, 108:19, 109:5, 109:7, 109:8, 109:19, 112:6
**220** [1] - 171:12
**23** [2] - 78:23, 79:4
**23rd** [1] - 88:8
**243** [1] - 2:7
**25** [7] - 34:2, 34:5, 102:1, 104:19, 109:19, 112:7, 214:3
**2556** [1] - 51:20
**26th** [2] - 88:23, 90:3
**27** [3] - 83:1, 123:6, 138:9
**28th** [1] - 99:16
**2:03** [1] - 146:1
**2:44** [1] - 191:13
**2:52** [1] - 196:20

## 3

**3** [6] - 52:8, 52:10, 111:6, 111:9, 214:7, 214:21
**30** [8] - 9:13, 10:7, 23:1, 42:11, 91:1, 123:4, 125:14, 196:18
**30-second** [1] - 75:4
**30th** [3] - 101:2, 104:23, 193:8
**31st** [3] - 11:23, 12:14, 193:9
**32** [3] - 91:2, 109:18, 112:7
**338** [1] - 89:7
**38** [1] - 100:3
**3:06:50** [1] - 211:13

## 4

**4** [6] - 57:11, 57:15, 193:22, 214:10, 214:21, 215:3
**40** [1] - 122:22
**423-8290** [1] - 2:8
**43** [1] - 214:5
**440** [7] - 9:18, 9:22, 10:10, 10:17, 53:9, 80:6, 126:12
**45** [4] - 48:3, 48:20, 49:2, 97:2

## 5

**5** [5] - 63:22, 64:1, 64:8, 67:8, 214:12
**50** [3] - 3:2, 75:20, 183:23
**52** [1] - 214:7
**57** [1] - 214:10

**585** [1] - 2:8
**5th** [2] - 76:10, 76:11

## 6

**6** [4] - 86:5, 86:7, 86:14, 214:15
**61** [1] - 115:15
**64** [1] - 214:12
**6th** [3] - 76:10, 76:11, 94:10

## 7

**7** [4] - 1:21, 94:16, 95:1, 212:6
**7/28/90** [1] - 99:9
**716** [2] - 2:14, 3:3

## 8

**8** [3] - 161:17, 165:10, 166:11
**8-12-91** [2] - 43:23, 214:5
**8/12/91** [1] - 44:8
**8/20/91** [3] - 64:4, 64:16, 214:14
**8/31** [2] - 194:7, 194:8
**8/31/18** [2] - 111:5, 111:9
**8/31/2018** [2] - 52:12, 214:8
**853-5100** [1] - 3:3
**856-4000** [1] - 2:14
**86** [1] - 214:15
**87** [1] - 4:12
**8th** [2] - 2:4, 96:18

## 9

**965-9081** [1] - 2:5
**99** [1] - 2:3
**9:58** [1] - 1:21
**9th** [5] - 12:16, 12:21, 17:12, 101:18, 119:8

## A

**a.m** [12] - 1:21, 18:13, 18:15, 23:4, 42:5, 51:14, 51:15, 54:1, 57:8, 57:9, 76:1, 111:13
**Aaron** [7] - 122:5, 123:20, 144:4, 161:1, 168:2, 176:19, 192:22
**Aaron's** [1] - 176:21

**able** [7] - 59:9, 122:18, 122:23, 151:2, 182:5, 193:19, 195:19
**absolute** [1] - 144:16
**absolutely** [2] - 184:16, 202:23
**abusive** [1] - 96:22
**accommodate** [1] - 6:3
**according** [1] - 188:20
**account** [5] - 114:23, 115:3, 129:13, 129:16, 147:7
**accurate** [6] - 29:1, 48:11, 77:14, 87:15, 155:5, 212:4
**achieved** [1] - 20:7
**acknowledged** [1] - 207:12
**action** [3] - 212:6, 213:12, 213:15
**actions** [1] - 147:13
**actual** [4] - 20:2, 183:20, 195:3, 196:5
**adamantly** [1] - 142:6
**ADAs** [2] - 51:5, 70:5
**add** [1] - 30:19
**addict** [2] - 178:5, 178:10
**adding** [1] - 103:21
**addition** [2] - 77:18, 109:22
**additional** [1] - 21:15
**address** [8] - 27:3, 96:23, 98:22, 106:8, 106:16, 115:11, 115:13
**admissible** [1] - 93:15
**admit** [3] - 143:23, 144:10, 144:11
**admitted** [1] - 209:12
**admitting** [1] - 144:9
**advantage** [1] - 180:22
**advised** [4] - 25:9, 27:9, 29:8, 67:11
**affirmatively** [1] - 98:2
**afford** [1] - 76:18
**afternoon** [2] - 146:4, 153:4
**afterwards** [2] - 91:22, 180:4
**ago** [12] - 35:14, 43:12, 43:18, 55:19, 56:3, 70:20, 127:23,

130:14, 131:5, 134:18, 134:20, 141:9
**agree** [1] - 20:19
**agreed** [2] - 50:8, 50:10
**agreeing** [3] - 134:7, 134:8, 134:9
**agreement** [1] - 48:8
**ahead** [8] - 13:11, 13:16, 34:22, 75:12, 75:13, 84:6, 185:5, 199:12
**aimed** [1] - 108:2
**airport** [2] - 167:1, 167:2
**alias** [1] - 94:7
**alike** [1] - 170:13
**allegation** [6] - 15:13, 87:7, 94:14, 101:8, 102:3, 107:2
**allegations** [3] - 6:9, 82:5, 82:9
**allegedly** [1] - 88:12
**alleges** [7] - 85:20, 89:5, 89:9, 89:11, 101:5, 101:20, 106:21
**alleging** [1] - 6:10
**allergy** [1] - 14:10
**almost** [1] - 17:18
**altercation** [1] - 169:6
**ammunition** [1] - 109:6
**amount** [2] - 94:15, 148:8
**Anderson** [7] - 87:22, 91:8, 94:7, 97:16, 97:23, 98:5, 98:7
**answer** [47] - 5:14, 7:7, 9:6, 10:3, 12:10, 16:15, 21:3, 21:8, 21:14, 21:18, 21:19, 22:6, 22:7, 28:14, 30:2, 31:4, 32:12, 46:12, 46:16, 68:8, 73:12, 73:17, 73:21, 74:1, 74:6, 74:16, 74:22, 75:1, 82:14, 84:7, 84:23, 85:11, 96:2, 99:5, 110:2, 119:22, 122:1, 124:5, 124:7, 124:16, 124:17, 152:19, 155:8, 156:15, 163:2, 188:22, 203:17
**answered** [6] - 5:23, 12:9, 19:13, 30:23, 97:19, 110:2
**answering** [3] -

49:22, 93:21, 139:4
**answers** [1] - 5:6
**Anthony** [8] - 107:9, 107:12, 107:16, 107:17, 107:20, 177:20, 177:21, 178:15
**Antoine** [19] - 8:22, 48:13, 59:8, 59:20, 122:21, 160:22, 167:15, 170:9, 170:12, 170:15, 170:23, 171:7, 176:2, 177:4, 177:6, 177:8, 200:14, 200:15, 201:15
**Antoine's** [3] - 176:13, 176:16, 202:5
**anyway** [1] - 75:15
**anyways** [1] - 75:6
**apart** [1] - 142:11
**apartment** [1] - 163:18
**apologize** [6] - 26:16, 100:15, 126:4, 133:9, 168:11, 199:7
**appeal** [2] - 113:1, 143:7
**APPEARANCES** [1] - 2:1
**appeared** [1] - 121:10
**Appearing** [3] - 2:9, 2:15, 3:4
**appearing** [1] - 150:22
**application** [2] - 37:4, 38:4
**applies** [1] - 149:22
**apply** [1] - 146:18
**appreciate** [5] - 23:2, 75:13, 138:20, 139:7, 151:14
**approached** [1] - 201:17
**appropriate** [1] - 21:19
**approximate** [2] - 17:8, 198:13
**April** [4] - 94:10, 101:18, 134:21, 134:22
**area** [2] - 35:1, 188:13
**argue** [1] - 85:12
**arguing** [1] - 85:13
**argument** [1] - 113:6
**argumentive** [1] - 19:13
**Arizona** [1] - 143:3

**Arniece** [7] - 115:23, 117:4, 119:12, 125:19, 125:20, 126:1, 126:5
**Arniece's** [1] - 116:5
**arraigned** [1] - 63:4
**arrangement** [1] - 127:13
**arrest** [1] - 35:22, 36:23, 91:10, 94:21, 100:2, 102:23, 103:3, 103:23, 105:6, 107:1, 148:15, 151:10, 152:13, 153:15, 154:5
**Arrest/Booking** [3] - 86:8, 87:1, 214:16
**arrest/booking** [9] - 87:8, 88:17, 91:6, 96:17, 99:8, 101:1, 101:17, 104:22, 106:19
**arrested** [27] - 24:11, 24:17, 25:4, 31:20, 33:10, 34:8, 34:11, 34:19, 36:16, 37:12, 37:22, 62:17, 63:2, 76:13, 88:11, 95:3, 95:15, 97:3, 102:12, 104:3, 106:10, 120:19, 142:15, 153:4, 153:13, 153:17, 155:18
**arrests** [8] - 34:16, 35:11, 77:5, 98:6, 147:17, 147:21, 149:19, 150:1
**arrived** [13] - 18:17, 18:21, 32:7, 49:8, 50:23, 54:20, 54:22, 56:20, 69:6, 69:20, 79:7, 188:15, 206:13
**Arts** [1] - 186:18
**assassinated** [1] - 210:21
**assault** [7] - 33:1, 33:4, 34:19, 78:1, 107:7, 107:8, 108:8
**assigned** [1] - 159:16
**assist** [1] - 12:6
**assistance** [1] - 10:6
**ASSISTANT** [1] - 1:12
**Assistant** [6] - 3:5, 10:11, 12:2, 52:17, 54:14, 177:22
**associate** [1] - 135:19
**associated** [1] - 135:11

**assume** [2] - 5:15, 190:16
**assumed** [1] - 196:1
**assuming** [1] - 111:22
**attach** [1] - 52:1
**attached** [1] - 212:3
**attend** [1] - 213:6
**attention** [1] - 35:20
**Attica** [11] - 78:21, 79:1, 79:9, 79:19, 127:7, 127:8, 129:5, 136:17, 136:21, 143:17, 211:4
**Attorney** [2] - 3:5, 4:21
**attorney** [15] - 6:7, 6:14, 7:5, 11:19, 29:6, 32:7, 32:15, 52:19, 76:15, 77:5, 127:2, 146:6, 194:14, 195:15, 210:7
**ATTORNEY** [1] - 1:12
**Attorney's** [5] - 10:23, 12:7, 53:8, 126:11, 144:19
**attorneys** [4] - 9:16, 74:8, 80:13, 142:10
**Attorneys** [5] - 10:12, 12:3, 52:17, 54:15, 177:22
**audio** [2] - 129:19, 216:2
**audio-recorded** [2] - 129:19, 216:2
**August** [61] - 10:13, 10:20, 11:23, 12:14, 12:16, 12:21, 12:22, 15:1, 15:16, 17:12, 24:11, 25:15, 26:10, 31:21, 36:15, 38:16, 39:4, 43:11, 51:5, 55:18, 56:16, 57:13, 57:17, 59:23, 62:16, 62:19, 62:20, 63:3, 63:15, 65:6, 67:9, 69:15, 76:5, 77:19, 102:12, 103:4, 115:8, 116:5, 117:5, 118:20, 144:20, 148:1, 148:16, 150:7, 150:11, 151:10, 151:20, 152:5, 152:13, 153:5, 154:2, 154:16, 161:20, 177:14, 177:15, 200:1, 203:13, 205:15, 214:3, 214:11
**aunt** [7] - 80:17,

80:18, 80:20, 81:3, 81:4, 81:12

**auntie** [4] - 80:20, 80:23, 81:9, 81:10

**automatic** [1] - 102:1

**Avenue** [1] - 14:6

**aware** [7] - 11:10, 15:12, 15:15, 149:18, 149:23, 150:3, 196:6

## B

**Baba** [1] - 140:10

**BABA** [1] - 140:11

**baby** [1] - 81:9

**bad** [5] - 20:19, 120:16, 173:16, 204:11, 210:16

**bail** [9] - 37:3, 37:7, 37:8, 37:9, 37:13, 38:4, 38:8, 38:11, 38:13

**Bailey** [4] - 153:14, 165:21, 167:3, 188:8

**bargain** [7] - 78:2, 94:22, 102:6, 102:23, 104:2, 107:5, 185:14

**based** [2] - 83:6, 147:7

**basic** [1] - 6:20

**basis** [2] - 158:7, 158:17

**basketball** [1] - 187:16

**bat** [1] - 140:19

**Bates** [20] - 25:16, 26:22, 44:1, 44:5, 51:20, 52:12, 57:11, 57:17, 64:4, 64:9, 86:9, 86:16, 193:18, 193:20, 214:3, 214:6, 214:8, 214:11, 214:14, 214:17

**Bates-stamped** [1] - 57:11

**became** [2] - 76:14, 178:5

**BECK** [2] - 1:22, 213:19

**Beckham** [1] - 186:18

**beer** [6] - 97:2, 105:5, 158:13, 189:11, 189:16, 189:18

**beers** [6] - 158:8, 158:16, 158:22, 189:6, 189:8

**began** [1] - 77:8

**beginning** [1] -

146:10

**behalf** [4] - 38:5, 128:7, 137:12, 140:1

**BELLING** [1] - 1:12

**Belling** [2] - 3:5, 210:20

**Belling's** [1] - 144:10

**belonged** [1] - 91:3

**beneficial** [1] - 181:4

**benefit** [1] - 185:17

**best** [7] - 51:21, 99:2, 105:12, 108:22, 137:7, 164:16

**better** [2] - 13:10, 119:18

**between** [8] - 50:17, 62:19, 130:4, 133:13, 133:22, 146:23, 168:16, 211:1

**beyond** [2] - 93:4, 203:5

**bicycle** [8] - 49:12, 56:20, 61:1, 67:20, 69:21, 71:8, 201:1, 202:21

**big** [2] - 159:14, 171:2

**bike** [11] - 19:4, 19:11, 20:13, 22:19, 22:20, 23:8, 50:7, 54:22, 61:15, 66:21, 70:17

**biological** [1] - 45:1

**biologically** [1] - 172:5

**birth** [2] - 27:3, 98:21

**bit** [6] - 41:10, 71:14, 87:21, 109:15, 130:11, 177:20

**block** [1] - 136:22

**bodyguard** [1] - 114:4

**booked** [1] - 31:22

**booking** [2] - 31:22, 87:4

**books** [1] - 114:21

**booth** [1] - 16:11

**booths** [3] - 16:12, 16:19, 16:22

**bother** [1] - 183:14

**bottle** [1] - 105:5

**bottom** [10] - 26:18, 30:8, 30:9, 46:23, 47:2, 47:7, 47:8, 65:13, 99:12, 164:5

**bought** [2] - 15:2, 190:15

**boys** [1] - 92:20

**BPD** [1] - 42:10

**Brady** [1] - 10:5

**brain** [1] - 140:17

**break** [14] - 5:18, 5:23, 6:2, 22:23, 25:12, 42:3, 71:16, 75:4, 75:8, 75:15, 100:17, 113:8, 171:21, 191:11

**brick** [1] - 179:18

**briefly** [3] - 55:16, 114:1, 120:9

**bring** [11] - 35:19, 40:22, 167:9, 174:15, 174:18, 174:23, 175:1, 175:3, 175:6, 188:7, 204:18

**bringing** [1] - 173:16

**broke** [2] - 178:21, 179:20

**brother** [13] - 12:23, 15:6, 40:16, 44:18, 46:19, 47:2, 47:4, 48:2, 59:8, 123:17, 123:23, 124:20, 176:2

**brother's** [1] - 176:14

**brothers** [8] - 14:2, 15:5, 31:16, 40:15, 164:18, 167:18, 168:17, 170:10

**brought** [26] - 31:11, 39:14, 39:18, 41:1, 49:16, 50:11, 61:19, 65:19, 67:12, 67:19, 72:7, 72:14, 73:1, 83:17, 84:9, 84:15, 84:18, 114:7, 143:23, 146:9, 167:5, 167:7, 168:13, 196:2, 196:15, 209:4

**Brown** [25] - 8:22, 12:23, 23:7, 23:14, 24:1, 31:14, 39:1, 43:3, 44:7, 44:16, 45:7, 49:10, 50:22, 69:2, 69:11, 69:18, 160:22, 162:9, 172:4, 172:7, 172:11, 176:7, 200:16, 203:13, 208:22

**brown** [1] - 69:22

**Brown's** [3] - 45:4, 68:18, 199:17

**Brustin** [12] - 4:6, 9:17, 19:14, 64:9, 77:13, 85:16, 93:7, 93:18, 124:13, 132:8, 133:5, 139:6

**BRUSTIN** [298] - 2:1, 2:1, 4:3, 6:15, 6:20, 7:6, 8:3, 9:5, 10:2, 12:9, 12:17, 13:2,

13:6, 13:9, 13:15, 15:8, 16:14, 17:1, 18:10, 18:23, 19:6, 19:12, 19:19, 20:1, 20:6, 20:10, 20:14, 21:2, 21:5, 21:8, 21:17, 21:22, 22:4, 22:12, 23:1, 23:10, 23:18, 23:21, 24:7, 24:23, 25:5, 25:23, 26:11, 27:14, 28:17, 28:23, 29:9, 31:17, 32:11, 34:13, 34:18, 34:22, 36:4, 36:8, 39:6, 39:10, 39:17, 39:23, 40:6, 40:11, 40:18, 41:6, 42:4, 42:15, 42:22, 45:16, 46:7, 46:9, 46:20, 47:1, 47:6, 47:10, 47:12, 47:15, 47:18, 47:20, 48:10, 48:23, 49:15, 49:22, 50:9, 51:2, 51:18, 51:23, 52:4, 52:7, 53:11, 53:21, 54:6, 54:23, 56:8, 56:12, 56:23, 57:19, 57:22, 58:3, 58:8, 59:11, 60:2, 60:15, 62:3, 62:9, 66:10, 66:14, 67:2, 67:15, 67:23, 68:6, 68:13, 68:23, 69:8, 70:1, 70:6, 70:10, 70:22, 71:9, 71:18, 72:1, 73:11, 73:14, 73:17, 73:20, 74:1, 74:7, 74:13, 74:21, 75:3, 75:6, 75:11, 75:16, 75:19, 77:7, 79:14, 82:13, 83:11, 83:19, 83:22, 84:3, 84:6, 84:23, 85:9, 85:15, 85:17, 87:17, 88:6, 89:14, 89:16, 89:19, 89:21, 92:21, 93:3, 93:9, 93:19, 95:7, 96:2, 96:7, 97:18, 98:17, 99:4, 100:15, 100:19, 103:12, 103:15, 103:18, 105:10, 106:1, 106:6, 108:3, 108:15, 108:21, 109:4, 109:12, 110:1, 110:21, 112:9, 112:16, 112:20, 112:23, 113:5, 113:10, 114:9, 114:11, 116:16,

117:6, 119:3, 119:16, 119:21, 120:20, 121:7, 121:23, 124:4, 124:11, 124:15, 125:23, 126:7, 130:6, 131:3, 131:6, 131:14, 132:1, 132:6, 132:9, 132:15, 132:20, 132:22, 133:4, 133:7, 133:23, 137:23, 138:7, 138:19, 138:23, 139:7, 139:11, 139:20, 141:18, 142:8, 144:2, 145:20, 149:13, 152:7, 152:18, 153:7, 155:1, 155:7, 156:14, 156:21, 158:1, 158:18, 158:23, 160:10, 161:21, 162:14, 163:1, 163:9, 164:16, 165:2, 167:11, 167:21, 168:23, 170:6, 174:6, 174:15, 174:22, 179:14, 180:8, 180:13, 180:23, 181:6, 181:11, 181:18, 182:10, 183:2, 183:21, 184:4, 184:19, 185:5, 185:19, 188:22, 189:19, 190:5, 190:21, 191:9, 191:12, 191:15, 193:4, 193:10, 193:16, 193:20, 194:2, 194:8, 194:10, 194:21, 196:18, 196:21, 196:22, 197:5, 197:22, 198:3, 198:21, 199:12, 199:19, 199:21, 201:2, 201:7, 202:22, 203:4, 204:2, 204:9, 205:2, 207:8, 207:11, 209:22, 211:10, 215:5

**buddy** [1] - 99:2

**BUFFALO** [1] - 1:9

**Buffalo** [25] - 1:11, 1:20, 2:14, 2:15, 2:18, 3:2, 4:7, 4:12, 24:11, 26:10, 33:19, 44:8, 46:3, 64:1, 64:12, 81:23, 146:7, 147:18, 148:8, 148:12, 154:1, 185:13, 185:17, 205:9, 214:12

**Building** [2] - 1:19, 2:13

**bullets** [3] - 15:2, 123:3
**bully** [4] - 107:21, 178:2, 178:8, 178:10
**business** [3] - 22:1, 128:21, 163:21
**buy** [1] - 159:4
**BY** [225] - 4:16, 7:1, 7:9, 8:9, 9:10, 10:9, 12:12, 12:19, 13:4, 13:18, 15:11, 16:17, 17:4, 18:16, 19:2, 19:8, 20:12, 20:16, 21:10, 22:17, 23:5, 23:13, 23:19, 23:23, 24:9, 25:2, 25:7, 25:18, 26:2, 26:13, 27:18, 28:19, 29:2, 29:12, 31:19, 32:16, 33:12, 34:20, 35:2, 36:5, 36:12, 39:8, 39:12, 39:20, 40:3, 40:8, 40:13, 40:20, 41:8, 42:6, 42:18, 43:1, 44:3, 45:21, 46:10, 47:22, 48:14, 49:4, 49:18, 50:4, 50:12, 51:3, 52:14, 53:13, 54:4, 54:10, 55:2, 55:8, 55:15, 55:22, 56:13, 57:3, 58:10, 58:21, 59:13, 60:5, 60:12, 60:20, 61:8, 62:5, 62:11, 64:6, 66:16, 67:4, 67:17, 68:2, 68:11, 68:16, 69:1, 69:10, 70:3, 70:8, 70:13, 71:3, 71:11, 71:19, 72:3, 74:17, 76:2, 77:12, 79:15, 82:18, 83:14, 84:11, 85:5, 85:19, 86:12, 87:20, 88:7, 89:23, 93:23, 95:12, 96:12, 97:21, 98:19, 99:6, 100:22, 104:6, 105:15, 106:13, 107:15, 108:7, 109:2, 109:16, 110:9, 111:2, 111:8, 111:15, 112:11, 112:17, 113:13, 114:18, 116:18, 117:8, 119:4, 119:17, 120:2, 121:4, 121:14, 122:13, 125:9, 126:3, 126:9, 130:1, 130:10, 131:9, 131:18, 133:10, 134:2, 138:3, 138:14, 139:14,

139:22, 142:3, 143:20, 144:17, 146:3, 149:14, 152:11, 153:1, 153:9, 155:3, 155:10, 156:17, 157:1, 158:3, 158:20, 159:2, 160:12, 161:22, 162:16, 163:5, 163:11, 164:21, 165:3, 167:16, 168:9, 169:4, 170:8, 174:9, 174:17, 175:2, 179:16, 180:10, 180:16, 181:2, 181:8, 181:14, 182:6, 182:22, 183:16, 184:1, 184:6, 184:21, 185:9, 185:22, 189:3, 189:21, 190:9, 190:23, 191:15, 194:10, 194:21, 196:22, 197:5, 198:11, 199:3, 199:15, 199:22, 201:4, 201:9, 203:1, 203:9, 204:6, 204:19, 205:7, 207:11, 210:3, 215:3, 215:4, 215:5, 215:6, 215:7, 215:8, 215:9

**C**

**Cadillac** [11] - 101:21, 186:4, 186:5, 186:11, 186:12, 186:14, 186:20, 187:22, 188:13, 188:18, 188:20
**caliber** [20] - 34:2, 34:3, 34:4, 34:5, 100:3, 101:23, 102:1, 104:19, 105:4, 105:19, 105:21, 106:21, 109:19, 111:22, 112:7
**Calvin** [2] - 113:20, 113:21
**camera** [1] - 11:12
**capable** [1] - 183:5
**capacities** [1] - 1:12
**capacity** [1] - 197:8
**car** [47] - 14:12, 14:16, 19:9, 25:4, 33:21, 34:1, 36:7, 36:10, 37:21, 41:19, 49:17, 50:11, 61:20, 72:22, 116:13, 116:14, 116:19, 119:11, 122:17,

122:22, 125:2, 125:5, 125:6, 163:15, 163:19, 163:20, 164:3, 164:8, 164:11, 164:23, 165:4, 166:1, 166:2, 166:3, 168:22, 169:12, 169:14, 169:20, 170:2, 177:7, 186:10, 187:10, 187:12, 188:2, 188:8, 188:11
**Cardinals** [1] - 171:16
**care** [2] - 13:8, 202:3
**cars** [3] - 24:22, 159:4, 159:8
**cartridge** [2] - 109:9, 109:11
**Case** [1] - 1:7
**case** [21] - 8:15, 12:8, 33:2, 33:4, 42:13, 43:7, 66:2, 77:10, 85:21, 91:13, 113:14, 121:13, 127:5, 127:8, 132:2, 136:13, 143:9, 143:13, 144:15, 186:3, 206:7
**cases** [4] - 33:5, 34:15, 78:3, 102:12
**catching** [1] - 187:18
**Cayuga** [1] - 80:2
**cell** [1] - 16:3
**Center** [1] - 36:20
**center** [11] - 32:2, 36:23, 38:15, 38:17, 38:19, 63:11, 63:13, 76:4, 78:6, 155:22, 199:10
**Central** [3] - 86:7, 86:23, 214:15
**central** [1] - 31:21
**certain** [11] - 10:21, 11:2, 17:7, 70:7, 70:12, 72:2, 112:19, 162:2, 178:4, 207:21, 207:23
**certainly** [1] - 66:17
**CERTIFY** [2] - 212:1, 213:5
**cetera** [2] - 29:7, 88:14
**chance** [5] - 26:4, 42:19, 71:2, 189:14, 203:6
**change** [4] - 28:12, 54:19, 55:11, 68:5
**changed** [6] - 53:18, 54:16, 55:4, 67:22, 69:12, 69:22

**changes** [1] - 212:3
**changing** [1] - 51:6
**Channel** [5] - 43:14, 43:15, 202:6, 205:17, 206:12
**character** [1] - 210:22
**charge** [11] - 33:17, 35:9, 37:14, 37:16, 37:17, 37:19, 75:12, 90:6, 90:9, 95:4, 209:2
**charges** [1] - 95:13, 97:3, 100:7, 101:10, 102:5, 103:4, 103:22, 108:11, 147:21, 149:20, 150:2
**chase** [1] - 182:16
**chased** [1] - 182:18
**CHIEF** [1] - 1:11
**Chief** [1] - 2:17
**chose** [2] - 18:3, 174:4
**Christopher** [1] - 3:5
**CHRISTOPHER** [1] - 1:12
**circumstances** [3] - 34:21, 91:17, 93:14
**cities** [1] - 141:17
**CITY** [1] - 1:9
**city** [3] - 107:22, 142:18, 194:14
**City** [4] - 2:15, 146:7, 185:12, 185:17
**civil** [1] - 132:2
**Civil** [1] - 1:18
**claim** [3] - 167:4, 206:6, 206:16
**claiming** [1] - 187:6
**Claims** [1] - 112:13
**clarification** [1] - 84:8
**clarify** [1] - 200:11
**clarity** [1] - 132:18
**classmates** [1] - 187:21
**clear** [12] - 6:20, 8:3, 9:5, 27:19, 34:13, 77:7, 102:11, 103:12, 132:16, 133:1, 183:18, 203:12
**clearly** [3] - 13:17, 132:11, 132:12
**clients** [3] - 147:13, 159:16, 175:9
**Clinton** [1] - 78:13
**clip** [3] - 54:9, 102:1, 102:2
**close** [2] - 45:6, 165:15

**clothing** [1] - 128:12
**CM** [2] - 1:22, 213:19
**coaching** [1] - 22:10
**cocaine** [12] - 87:10, 88:13, 94:16, 94:18, 100:4, 101:6, 114:3, 157:12, 157:16, 157:19, 159:22, 173:2
**COE001524** [2] - 25:17, 214:4
**COE001526** [2] - 25:17, 214:4
**COE001560** [2] - 44:1, 214:6
**COE001561** [2] - 44:2, 214:6
**COE001571** [2] - 64:5, 214:14
**COE002556** [2] - 52:13, 214:9
**COE003997** [2] - 57:18, 214:11
**COE1524** [1] - 26:17
**COE1525** [1] - 29:14
**COE1526** [2] - 27:21, 28:7
**COE1560** [2] - 44:6, 45:23
**COE1561** [1] - 203:3
**COE1571** [1] - 64:10
**COE3997** [1] - 57:12
**coerced** [1] - 144:12
**colleagues** [4] - 14:1
**college** [1] - 187:16
**Colt** [1] - 97:2
**comfortable** [1] - 64:20
**coming** [2] - 113:6, 200:23
**comma** [1] - 87:23
**commencing** [1] - 1:21
**comment** [3] - 132:14, 138:23, 139:9
**comments** [2] - 133:6, 139:8
**commissary** [2] - 114:23, 115:3
**commit** [1] - 154:20
**committed** [7] - 143:6, 148:4, 152:21, 209:12, 209:15, 210:13
**commonly** [1] - 9:18
**communication** [1] - 63:1
**communications** [1] - 62:21
**compartment** [3] - 36:7, 36:11

**compensation** [1] - 112:13
**complainant** [2] - 89:6, 106:22
**Complaint** [6] - 6:9, 9:15, 82:9, 83:8, 83:15, 85:20
**complete** [4] - 9:6, 184:17, 184:20, 184:23
**completely** [1] - 187:7
**conceivably** [1] - 93:4
**concerned** [1] - 133:1
**concluded** [2] - 207:1, 211:13
**conclusion** [3] - 10:3, 206:9, 206:20
**conditions** [1] - 38:11
**confess** [1] - 202:20
**confessed** [1] - 71:13
**confessing** [1] - 210:12
**confession** [18] - 43:10, 43:18, 55:18, 56:2, 56:15, 56:19, 57:12, 61:10, 61:23, 62:7, 70:17, 70:21, 71:21, 143:11, 200:4, 200:7, 200:17, 204:15
**confuse** [1] - 109:10
**confused** [1] - 81:5
**confusing** [2] - 106:3, 108:18
**connection** [17] - 10:16, 25:20, 32:23, 35:9, 73:4, 76:22, 77:4, 90:11, 95:15, 97:12, 100:13, 126:12, 132:2, 146:8, 148:15, 156:10, 193:14
**conscious** [1] - 41:17
**consciously** [1] - 41:9
**considered** [1] - 159:8
**console** [1] - 36:10
**constitute** [1] - 36:10
**contact** [2] - 126:23, 127:3
**contained** [4] - 6:9, 82:9, 87:7, 101:8
**contents** [1] - 71:5
**continue** [2] - 60:6,

124:8
**continuously** [1] - 36:23
**control** [2] - 87:10, 105:19
**controlled** [1] - 160:8
**conversation** [16] - 13:22, 41:22, 63:9, 74:8, 120:10, 120:13, 130:13, 130:23, 131:4, 134:12, 134:16, 134:23, 135:5, 201:11, 202:12, 208:21
**conversations** [6] - 32:12, 32:14, 32:18, 95:9, 131:10, 211:1
**convicted** [4] - 6:11, 90:10, 90:15, 90:16
**conviction** [4] - 53:10, 80:7, 112:14, 150:2
**Copies** [1] - 214:21
**copy** [5] - 26:9, 82:17, 82:19, 210:8
**corner** [7] - 153:14, 165:21, 174:1, 174:19, 174:23, 187:13, 201:16
**correct** [109] - 10:17, 12:16, 13:1, 14:2, 15:7, 16:6, 17:13, 23:9, 23:20, 24:6, 24:15, 24:22, 25:10, 28:12, 29:8, 29:23, 30:3, 30:5, 30:13, 31:4, 31:8, 31:22, 32:8, 37:23, 38:2, 38:17, 40:5, 41:2, 42:14, 61:11, 61:17, 62:17, 62:18, 65:6, 66:3, 67:14, 69:15, 72:5, 72:8, 72:14, 77:15, 77:20, 79:2, 87:5, 87:14, 88:9, 88:18, 89:7, 89:12, 91:8, 94:10, 94:12, 96:19, 99:10, 100:4, 101:3, 101:18, 103:6, 104:23, 109:20, 116:22, 130:5, 133:14, 147:2, 147:18, 148:2, 148:21, 149:20, 153:20, 154:13, 154:17, 154:20, 154:23, 155:12, 155:17, 155:19, 156:13, 156:20,

157:3, 157:10, 157:19, 158:13, 159:5, 165:7, 165:12, 165:16, 167:6, 167:20, 169:7, 170:10, 172:5, 172:14, 174:21, 175:7, 175:10, 176:2, 178:2, 178:8, 178:17, 179:10, 179:13, 180:12, 181:10, 183:1, 184:15, 198:17, 200:1, 207:19, 207:22
**Correctional** [3] - 78:13, 78:17, 78:21
**correctional** [1] - 80:1
**Correspondence** [3] - 64:3, 64:13, 214:13
**counsel** [2] - 10:6, 214:21
**counselor** [1] - 21:18
**count** [1] - 90:18
**COUNTY** [14] - 1:9, 25:15, 43:23, 52:10, 57:15, 64:1, 86:7, 213:3, 214:3, 214:5, 214:7, 214:10, 214:12, 214:15
**County** [27] - 3:4, 25:20, 27:21, 36:19, 42:9, 44:5, 51:17, 51:20, 52:8, 57:11, 63:22, 64:8, 67:8, 68:21, 69:14, 86:5, 86:7, 86:14, 86:23, 111:9, 154:11, 154:23, 185:18, 199:18, 203:3, 214:15
**county** [7] - 4:20, 114:21, 155:21, 195:15, 202:17, 208:14
**couple** [25] - 5:1, 10:4, 53:16, 56:6, 71:16, 81:19, 85:2, 86:21, 91:21, 98:10, 98:11, 98:19, 98:18, 99:23, 103:18, 115:5, 128:8, 139:23, 147:11, 179:1, 179:2, 182:17, 205:3, 205:21, 207:8
**course** [7] - 61:23, 107:19, 142:5, 145:7, 173:21, 185:21, 191:12
**court** [3] - 27:12, 63:4, 143:7

**Court** [1] - 112:13
**COURT** [1] - 1:3
**cover** [1] - 112:5
**coverage** [1] - 120:23
**covered** [1] - 15:19
**crazy** [2] - 136:16, 137:19
**credible** [3] - 143:8, 143:13, 143:15
**crime** [14] - 91:20, 137:21, 138:6, 138:10, 143:6, 144:13, 152:21, 152:22, 152:23, 154:20, 209:12, 209:16, 210:13, 210:15
**criminal** [1] - 149:20
**crossed** [1] - 181:10
**CSR** [2] - 1:22, 213:19
**custody** [1] - 206:5
**cut** [10] - 93:3, 124:1, 124:6, 124:15, 126:22, 127:1, 127:9, 135:12, 136:18, 160:16

# D

**DA** [1] - 191:22
**dad** [10] - 63:6, 200:7, 201:17, 201:21, 210:6, 210:9, 210:12, 210:13, 210:17, 210:18
**daily** [3] - 158:4, 158:6, 158:17
**dangerous** [1] - 92:2
**dark** [2] - 72:17, 196:12
**date** [13] - 10:21, 14:18, 27:3, 64:15, 67:7, 69:14, 88:5, 88:12, 98:21, 99:9, 134:19, 199:23, 200:3
**dated** [16] - 25:15, 43:23, 52:11, 57:16, 64:3, 88:22, 99:15, 101:2, 101:18, 104:22, 106:20, 214:3, 214:5, 214:8, 214:10, 214:13
**dates** [1] - 193:8
**dating** [1] - 115:22
**daughter** [1] - 80:18
**daughter's** [2] - 80:17
**David** [2] - 10:12,

52:17
**days** [5] - 16:2, 62:16, 67:10, 99:18, 99:23
**deal** [8] - 138:11, 159:19, 159:22, 160:2, 185:8, 185:11, 185:13, 185:15
**dealer** [4] - 157:9, 180:11, 180:20, 181:4
**dealing** [4] - 159:4, 160:5, 160:9, 198:13
**December** [1] - 193:5
**decided** [1] - 208:21
**decision** [11] - 41:18, 173:20, 173:22, 174:13, 174:15, 174:18, 174:21, 174:22, 175:4, 175:7, 175:10
**declined** [1] - 142:4
**Dee** [3] - 10:12, 52:17, 192:2
**Defendant** [3] - 4:20, 97:2, 106:23
**Defendants** [8] - 1:13, 2:15, 3:4, 4:21, 85:21, 194:14, 195:15
**defense** [2] - 122:10, 122:15
**definitely** [7] - 153:8, 164:1, 181:1, 185:20, 204:10, 204:17
**Delavan** [9] - 18:8, 24:18, 24:21, 116:20, 117:1, 153:14, 165:22, 167:3, 188:8
**delay** [1] - 35:23
**demand** [2] - 129:18, 216:1
**demonstrate** [1] - 105:17
**denied** [2] - 37:8, 37:10
**deny** [1] - 163:23
**department** [1] - 113:4
**Department** [10] - 1:11, 2:18, 64:1, 64:13, 113:5, 147:18, 148:9, 148:12, 154:1, 214:12
**Department's** [1] - 205:10
**Departmental** [3] - 64:2, 64:13, 214:13
**departments** [1] - 148:12
**deponent** [1] -

213:13

**deposition** [16] - 6:13, 7:4, 13:13, 18:14, 25:21, 33:11, 73:6, 73:10, 74:19, 129:22, 159:22, 203:7, 213:7, 213:9, 213:11, 216:6

**Deposition** [1] - 211:13

**depositions** [1] - 193:15

**describe** [1] - 176:10

**describes** [1] - 65:17

**describing** [1] - 59:22

**description** [2] - 48:8, 105:16

**Description** [1] - 214:2

**desert** [1] - 143:3

**detail** [3] - 82:22, 144:8, 147:16

**details** [3] - 209:8, 209:13, 209:19

**Detective** [6] - 2:15, 2:16, 2:16, 2:17, 194:15, 197:1

**detective** [1] - 29:23

**DETECTIVE** [4] - 1:9, 1:10, 1:10

**detectives** [4] - 146:8, 186:9, 188:17, 197:13

**difference** [2] - 85:4, 146:23

**different** [12] - 19:17, 33:5, 78:6, 84:13, 105:23, 108:19, 109:8, 142:20, 173:20, 187:7, 187:17, 193:8

**difficult** [2] - 46:1, 69:5

**Dillard** [1] - 65:2

**directed** [2] - 160:8, 184:13

**direction** [5] - 125:8, 169:16, 179:23, 180:4, 213:11

**disagree** [2] - 74:13, 74:15

**disclose** [1] - 142:9

**discovered** [1] - 36:2

**discuss** [2] - 122:14, 202:19

**discussed** [2] - 127:5, 127:8

**discussing** [1] - 103:5

**discussion** [4] - 74:12, 127:17, 209:4, 209:7

**dismissed** [6] - 90:18, 97:10, 100:8, 100:11, 101:11, 113:1

**disposition** [1] - 100:6

**dispute** [7] - 157:8, 161:12, 175:21, 176:11, 177:16, 196:14, 196:16

**disregarded** [2] - 143:14, 206:10

**distance** [2] - 72:12, 72:20

**distinction** [2] - 147:9, 151:15

**DISTRICT** [3] - 1:3, 1:4, 1:12

**District** [12] - 3:5, 4:21, 10:12, 10:23, 12:3, 12:7, 52:17, 53:7, 54:14, 126:11, 144:19, 177:22

**DIXON** [6] - 1:1, 1:5, 1:17, 4:12, 212:9, 215:3

**Dixon** [39] - 4:17, 7:3, 25:19, 32:17, 42:7, 44:4, 46:19, 47:5, 48:2, 52:11, 52:15, 54:11, 61:11, 64:7, 65:19, 74:18, 76:3, 86:13, 86:20, 94:1, 98:1, 100:23, 109:14, 109:17, 124:1, 129:21, 133:11, 146:4, 146:21, 157:8, 160:19, 174:11, 191:16, 194:12, 199:4, 203:10, 211:11, 214:8, 216:4

**dmthompson@ etksdefense.com** [1] - 2:9

**DO** [1] - 213:5

**document** [20] - 25:15, 27:1, 27:2, 27:15, 27:21, 28:4, 42:11, 43:23, 64:9, 64:12, 64:15, 65:1, 67:7, 87:16, 87:18, 94:19, 97:6, 101:8, 214:3, 214:5

**documented** [2] - 195:4, 195:7

**documents** [10] - 7:23, 8:11, 8:13, 9:4,

9:11, 9:13, 26:22, 42:12, 83:1, 86:21

**DOES** [1] - 1:11

**Don** [2] - 11:20, 18:11

**DONALD** [1] - 2:7

**done** [4] - 45:20, 49:22, 121:16, 196:19

**Donovan** [3] - 2:18, 151:6, 151:9

**DONOVAN** [1] - 1:11

**door** [2] - 106:23, 179:9

**doors** [1] - 188:10

**doorway** [1] - 123:18

**down** [17] - 5:3, 5:4, 29:18, 46:21, 65:12, 72:22, 87:22, 108:4, 141:1, 141:11, 141:13, 141:22, 176:20, 192:7, 192:8, 194:17, 213:8

**drank** [1] - 158:4

**draw** [1] - 206:8

**drink** [4] - 97:1, 158:6, 158:13, 189:8

**drinker** [1] - 157:23

**drinking** [3] - 189:7, 189:11, 189:18

**drive** [7] - 41:4, 119:11, 158:21, 165:17, 187:5, 187:23, 188:3

**driving** [2] - 101:21, 162:9

**drop** [1] - 166:13

**dropped** [3] - 49:23, 167:2, 172:1

**drove** [6] - 14:5, 14:15, 18:6, 24:4, 161:16, 165:14, 185:23, 206:3

**drug** [8] - 157:9, 159:4, 160:9, 178:5, 178:10, 180:11, 180:20, 181:4

**drugs** [11] - 85:23, 86:2, 159:19, 160:2, 160:5, 160:13, 178:16, 178:23, 181:23, 183:10, 198:14

**drunk** [1] - 189:10

**dude** [1] - 171:2

**duly** [3] - 4:13, 27:5, 213:13

**during** [11] - 8:14, 12:3, 13:22, 38:12, 59:20, 143:21, 150:11, 151:10,

154:19, 155:6, 209:9

**E**

**early** [3] - 75:22, 112:2, 118:15

**earned** [2] - 159:4, 160:17

**easily** [1] - 180:21

**EASTON** [1] - 2:6

**ECMC** [1] - 65:8

**eight** [12] - 17:10, 158:8, 158:16, 158:22, 160:6, 170:17, 171:11, 187:4, 188:3, 188:6, 189:5, 189:8

**eight-minute** [2] - 187:4, 188:3

**eight-minute-21-second-mark** [1] - 58:12

**either** [9] - 17:23, 41:17, 109:13, 148:15, 160:21, 194:16, 199:13, 201:13, 202:13

**eleven** [2] - 172:8

**Elmira** [1] - 78:9

**end** [4] - 30:18, 53:22, 130:22, 171:18

**endangerment** [1] - 104:17

**ended** [1] - 54:8

**enemy** [1] - 136:23

**ensued** [1] - 169:6

**entered** [2] - 18:14, 33:11

**entitled** [3] - 86:23, 212:5, 213:12

**envelopes** [1] - 87:11

**environment** [1] - 143:4

**equally** [2] - 146:18, 149:23

**ERIE** [2] - 1:9, 213:3

**Erie** [9] - 3:4, 36:19, 51:17, 51:20, 57:11, 86:7, 86:23, 185:18, 214:15

**errands** [1] - 166:19

**errata** [1] - 212:3

**ESQ** [6] - 2:1, 2:2, 2:7, 2:11, 2:12, 3:1

**essentially** [1] - 29:5, 158:9

**established** [4] - 12:5, 49:13, 83:17, 109:17

**estimation** [1] - 119:15

**et** [2] - 29:7, 88:14

**evening** [6] - 17:11, 63:12, 120:8, 168:13, 172:17, 178:17

**event** [1] - 48:17

**events** [7] - 15:18, 48:9, 116:4, 117:5, 120:8, 167:18, 183:18

**eventually** [3] - 80:6, 92:14, 99:3

**everywhere** [1] - 16:12

**evidence** [5] - 93:1, 93:5, 93:11, 93:15, 196:5

**ex** [5] - 81:8, 81:9, 128:11, 128:14, 140:5

**ex-girlfriend's** [1] - 81:8

**ex-sister-in-law** [3] - 128:11, 128:14, 140:5

**exact** [1] - 120:17

**exactly** [1] - 39:3

**EXAMINATION** [8] - 4:15, 146:2, 191:14, 198:10, 199:2, 205:6, 207:10, 210:2

**examination** [4] - 11:5, 11:6, 53:4, 213:13

**Examination** [2] - 1:16, 215:2

**example** [1] - 43:2

**except** [1] - 212:2

**excerpt** [1] - 193:11

**exchange** [2] - 94:16

**exciting** [2] - 92:23, 110:23

**excuse** [1] - 69:3

**executed** [1] - 87:12

**EXH** [12] - 25:15, 43:23, 52:10, 57:15, 64:1, 86:7, 214:3, 214:5, 214:7, 214:10, 214:12, 214:15

**Exhibit** [11] - 26:15, 30:17, 52:1, 52:5, 67:8, 111:4, 111:6, 111:9, 154:11, 154:23, 214:2

**EXHIBITS** [1] - 214:1

**Exhibits** [2] - 154:8, 214:21

**exhibits** [1] - 214:21

**expand** [1] - 203:22

**explain** [12] - 21:2, 21:4, 35:20, 50:3, 92:23, 93:5, 93:8,

93:18, 134:1, 137:14, 147:3, 185:10

**explained** [2] - 136:12, 177:6

**explaining** [1] - 176:17

**explanation** [1] - 20:21

**expressing** [1] - 136:7

**extent** [1] - 59:12

**eyes** [3] - 89:9, 195:20, 196:10

## F

**fabricated** [2] - 85:21, 155:11

**fabrication** [1] - 184:17

**face** [1] - 176:16

**Facebook** [2] - 135:16, 135:18

**facilities** [1] - 6:2

**facility** [2] - 78:6, 80:1

**Facility** [3] - 78:13, 78:17, 78:21

**fact** [11] - 36:18, 54:15, 62:13, 74:11, 82:14, 86:1, 86:4, 111:17, 157:9, 175:21, 196:11

**factory** [1] - 36:11

**facts** [1] - 62:1

**failed** [1] - 145:16

**fair** [25] - 5:16, 35:21, 75:16, 113:2, 120:3, 132:20, 147:20, 148:7, 148:9, 153:2, 156:5, 157:21, 159:7, 159:11, 160:7, 170:21, 174:12, 180:3, 180:6, 180:11, 181:3, 194:2, 197:19, 197:21, 205:8

**fairly** [1] - 165:15

**false** [6] - 19:5, 19:7, 23:9, 23:12, 23:17, 23:22

**familiar** [5] - 26:6, 82:8, 125:12, 148:22, 156:23

**family** [2] - 40:10, 81:13

**far** [12] - 15:19, 103:11, 148:1, 148:19, 151:23, 153:22, 155:4, 161:1, 164:7, 183:19, 187:2,

196:9

**fashion** [1] - 80:16

**fast** [2] - 31:1, 64:23

**father** [25] - 44:21, 44:23, 45:1, 45:3, 55:10, 58:18, 62:6, 68:5, 70:5, 170:11, 201:6, 201:13, 202:13, 202:14, 202:19, 203:17, 208:7, 208:12, 208:13, 208:16, 208:20, 209:3, 209:8, 210:14

**father's** [1] - 210:21

**February** [1] - 96:18

**Federal** [1] - 1:17

**felt** [3] - 137:17, 137:18, 143:10

**few** [9] - 82:4, 125:13, 140:13, 166:4, 166:15, 172:9, 180:15, 191:16, 194:11

**fight** [4] - 73:22, 97:4, 123:21, 182:19

**fighting** [2] - 42:16, 73:23

**figure** [3] - 55:4, 134:15, 194:1

**figured** [1] - 9:8

**file** [3] - 112:12, 143:7, 186:4

**filed** [5] - 6:10, 9:17, 80:6, 82:12, 82:16

**filing** [1] - 9:15

**Fillmore** [1] - 101:22

**final** [2] - 189:22, 193:12

**fine** [6] - 4:10, 20:1, 51:23, 105:11, 106:18, 198:21

**finish** [6] - 119:3, 124:5, 124:7, 124:12, 124:17, 149:13

**fire** [3] - 190:12, 190:16, 190:20

**firearms** [1] - 38:12

**fired** [6] - 121:11, 123:3, 123:11, 123:12, 190:7, 190:17

**first** [37] - 21:6, 35:22, 38:20, 43:13, 43:16, 45:23, 62:14, 62:23, 76:13, 77:2, 86:22, 114:7, 123:12, 123:20, 128:4, 128:5, 128:8, 134:16, 135:7, 142:8, 153:22, 161:20, 176:15,

192:2, 192:10, 192:17, 194:13, 195:19, 195:23, 204:20, 205:10, 205:22, 206:10, 208:3, 208:10, 208:16

**firsthand** [13] - 147:1, 147:4, 147:12, 148:10, 151:12, 151:13, 151:16, 156:11, 156:18, 159:15, 205:9, 211:1, 211:7

**fit** [3] - 21:9, 22:8, 71:17

**five** [9] - 7:22, 42:3, 125:17, 156:7, 170:16, 170:17, 171:11, 172:8

**Floor** [1] - 2:4

**follow** [9] - 21:12, 21:15, 191:9, 191:16, 198:1, 199:4, 205:3, 207:8, 207:9

**follow-up** [6] - 21:12, 191:9, 191:16, 198:1, 205:3, 207:8

**following** [8] - 25:14, 43:22, 52:9, 57:14, 63:23, 86:6, 129:22, 216:6

**follows** [1] - 4:14

**foolish** [1] - 180:12

**foolishness** [2] - 174:7, 190:14

**foot** [3] - 35:1, 106:22, 108:1

**forcibly** [1] - 97:4

**foregoing** [3] - 212:2, 213:7, 213:12

**forgave** [2] - 136:16, 143:15

**forget** [1] - 22:14

**forgot** [1] - 20:8

**forgotten** [1] - 111:3

**Form** [3] - 86:9, 87:1, 214:16

**form** [148] - 6:15, 6:17, 7:6, 10:2, 12:17, 13:2, 15:8, 18:23, 19:6, 19:12, 19:19, 19:22, 20:3, 20:14, 23:10, 23:21, 24:7, 24:23, 25:5, 26:11, 27:14, 28:17, 28:23, 29:9, 31:17, 34:22, 36:4, 36:8, 39:6, 39:10, 39:17, 39:23, 40:6, 40:11, 40:18, 41:6, 42:15, 42:22,

48:10, 48:23, 49:15, 50:9, 51:2, 53:11, 54:23, 55:6, 55:13, 55:21, 56:23, 59:11, 60:2, 62:3, 62:9, 67:2, 67:15, 67:23, 68:6, 68:13, 69:8, 70:1, 70:6, 70:22, 71:9, 72:1, 73:11, 74:21, 79:14, 82:13, 83:11, 84:7, 84:23, 87:4, 87:8, 88:17, 91:6, 96:2, 96:17, 97:18, 99:9, 101:1, 101:17, 104:22, 106:1, 106:19, 110:1, 112:9, 114:9, 116:16, 117:6, 119:21, 120:20, 121:7, 121:23, 126:7, 130:6, 131:14, 132:1, 133:23, 137:23, 138:7, 139:20, 144:2, 152:18, 155:1, 155:7, 155:8, 156:14, 156:21, 158:1, 158:18, 158:23, 160:10, 161:21, 162:14, 163:1, 163:9, 165:2, 167:11, 167:21, 168:20, 170:6, 174:6, 179:14, 180:8, 180:13, 180:23, 181:6, 181:11, 181:18, 182:10, 183:2, 183:21, 184:4, 184:19, 185:5, 185:19, 188:22, 189:19, 190:5, 190:21, 194:20, 197:4, 199:12, 201:2, 201:7, 202:22, 204:2, 204:9

**former** [1] - 146:7

**forth** [3] - 85:10, 85:11, 212:3

**forthrightly** [1] - 139:4

**forward** [1] - 143:23

**Foster** [2] - 89:11, 90:1

**Fountain** [1] - 3:2

**four** [4] - 7:22, 58:23, 60:19, 156:7

**Fourth** [1] - 113:5

**frame** [1] - 112:6

**Frank** [1] - 101:21

**free** [1] - 178:23

**freedom** [1] - 42:17

**French** [1] - 101:22

**FRIEDMAN** [1] - 3:1

**friend** [5] - 98:8, 99:2, 167:1, 176:13, 176:14

**friends** [3] - 181:20, 186:15, 186:16

**front** [3] - 68:19, 89:7, 154:8

**fucking** [1] - 170:2

**fun** [1] - 92:23

**funny** [3] - 138:15, 138:19, 139:11

**FURTHER** [5] - 198:10, 199:2, 205:6, 207:10, 210:2

**furtherance** [1] - 53:8

## G

**gang** [3] - 160:19, 161:9, 161:12

**gangs** [2] - 160:22, 161:2

**gathered** [1] - 206:7

**general** [1] - 46:21

**generally** [2] - 34:16, 56:1

**Genesee** [2] - 106:11, 106:17

**GERARDO** [1] - 2:2

**gerardo@ nsbcivilrights.com** [1] - 2:3

**girl** [7] - 59:18, 59:19, 175:14, 175:16, 175:18, 175:20, 177:17

**girlfriend** [2] - 176:22, 177:4

**girlfriend's** [1] - 81:8

**given** [11] - 9:6, 37:8, 44:7, 50:22, 54:19, 64:7, 69:17, 121:1, 155:18, 203:13, 212:5

**glance** [1] - 31:2

**glanced** [4] - 82:21, 82:23, 83:2, 83:6

**glassine** [1] - 87:11

**goal** [2] - 20:7, 20:10

**God** [1] - 123:16

**Goodyear** [4] - 106:10, 106:11, 106:17, 116:3

**grab** [1] - 192:3

**grabbed** [3] - 122:21, 179:19, 179:21

**grand** [1] - 81:2

**Grand** [26] - 18:21, 19:4, 23:8, 23:15,

24:2, 24:3, 43:7,
49:11, 51:6, 53:19,
54:16, 54:21, 66:1,
66:6, 66:18, 66:20,
67:5, 67:19, 69:11,
69:17, 69:18, 70:15,
136:15, 143:5,
204:21, 210:5
**great** [6] - 22:12,
58:5, 81:3, 81:4,
81:12, 147:16
**great-aunt** [3] - 81:3,
81:4, 81:12
**Green** [3] - 195:9,
195:10, 195:13
**grew** [1] - 172:9
**grip** [1] - 101:7
**ground** [6] - 5:1,
108:5, 146:11,
146:18, 182:5, 182:9
**grounds** [1] - 83:5
**Guaranty** [2] - 1:19,
2:13
**guess** [7] - 46:16,
49:7, 114:15, 149:22,
176:9, 205:4, 205:11
**guilty** [8] - 90:9,
131:1, 131:12,
131:23, 137:21,
138:1, 138:6, 138:8
**gun** [74] - 15:2, 15:6,
31:11, 33:1, 33:3,
33:10, 33:17, 33:21,
33:23, 35:4, 35:21,
37:14, 37:16, 40:15,
59:17, 65:17, 66:22,
69:20, 70:17, 72:13,
83:18, 84:10, 90:23,
100:3, 105:23,
109:10, 109:19,
109:20, 111:20,
118:5, 123:3, 143:23,
144:5, 145:5, 164:11,
164:23, 166:1, 166:2,
166:4, 166:8, 167:5,
167:10, 167:19,
168:7, 168:13,
168:17, 168:18,
168:21, 172:17,
172:18, 172:20,
172:22, 173:17,
174:16, 174:18,
174:23, 175:3, 177:9,
179:21, 190:15,
192:3, 195:16,
195:21, 196:2, 196:6,
196:11, 196:15,
200:23, 202:21, 209:5
**guns** [11] - 36:2,
36:6, 37:21, 105:18,

109:13, 109:15,
110:10, 110:13,
111:23, 112:5, 180:12
**gunshot** [1] - 65:6
**guy** [16] - 34:23,
90:2, 91:19, 113:16,
121:16, 140:9,
140:21, 143:18,
144:13, 146:22,
176:12, 182:5,
183:14, 201:14,
209:15
**guys** [15] - 59:15,
122:2, 122:14,
124:19, 124:20,
135:9, 135:13,
135:14, 135:19,
164:2, 181:22, 183:9,
183:10, 183:13, 188:6

## H

**habit** [1] - 33:20
**Hagen** [1] - 4:12
**half** [11] - 12:23,
31:1, 44:18, 127:23,
130:13, 131:5,
134:18, 134:20,
166:6, 170:10, 176:2
**half-brother** [3] -
12:23, 44:18, 176:2
**half-brothers** [1] -
170:10
**hallway** [9] - 65:20,
166:8, 167:8, 168:8,
168:14, 168:19,
169:1, 169:3, 172:21
**hand** [3] - 25:19,
26:19, 60:22
**handcuffed** [3] -
97:5, 206:3, 206:14
**handed** [2] - 44:4,
86:13
**handgun** [13] - 91:1,
91:2, 102:1, 105:4,
105:19, 123:21,
123:22, 124:8,
124:20, 124:23,
125:10, 125:14,
125:16
**handguns** [1] -
125:12
**handle** [1] - 163:21
**hang** [1] - 166:18
**hanging** [3] - 142:1,
158:12, 201:15
**happy** [3] - 5:12, 6:3,
112:20
**harassing** [1] - 93:10
**hard** [3] - 47:20,

119:9, 180:14
**harmful** [1] - 142:19
**Harold** [2] - 89:11,
90:1
**head** [4] - 5:5, 15:6,
40:16
**headed** [1] - 167:3
**headquarters** [1] -
154:1
**hear** [11] - 54:11,
54:14, 59:2, 59:3,
60:8, 123:11, 124:2,
147:8, 156:11, 202:7
**heard** [11] - 40:4,
40:9, 59:21, 61:13,
61:15, 70:23, 123:12,
190:13, 192:19,
195:11
**hearing** [1] - 63:4
**Heather** [7] - 175:19,
175:22, 176:1, 176:6,
176:12, 176:23,
177:17
**heavy** [1] - 157:23
**height** [1] - 170:19
**held** [1] - 15:5
**help** [3] - 30:20,
124:21
**Heraty** [2] - 10:12,
52:18
**HEREBY** [1] - 213:5
**hereby** [1] - 212:1
**hidden** [1] - 36:6
**high** [4] - 98:8,
186:16, 187:14,
187:21
**highest** [1] - 90:17
**Hill** [8] - 32:7, 34:15,
77:5, 97:13, 100:14,
101:15, 108:12,
108:13
**hill** [6] - 32:19, 35:8,
37:3, 38:1, 76:12,
76:23
**hill's** [1] - 76:19
**himself** [3] - 77:1,
185:7
**history** [1] - 112:21
**Hodgson** [1] - 146:6
**HODGSON** [2] -
1:19, 2:10
**hold** [7] - 85:18,
123:3, 125:14,
125:17, 182:5, 182:8,
182:9
**holding** [13] - 32:2,
36:22, 38:15, 38:16,
38:19, 40:15, 63:11,
63:13, 76:4, 78:6,
123:22, 155:22,

199:10
**Holding** [1] - 36:20
**home** [7] - 61:14,
81:20, 116:8, 167:20,
171:20, 182:16,
182:18
**homicide** [5] -
147:21, 148:2, 148:4,
196:23, 197:1
**Homicide** [1] - 46:3
**honest** [2] - 144:5,
144:7
**honestly** [1] - 139:4
**hope** [1] - 121:9,
121:12
**horrible** [4] - 120:16,
143:1, 173:18, 210:17
**hospital** [1] - 67:11
**hour** [4] - 49:3,
50:15, 75:19, 166:6
**hours** [5] - 49:3,
85:3, 166:7, 166:21,
166:22
**house** [60] - 14:7,
14:15, 14:21, 17:6,
17:15, 17:18, 18:7,
18:18, 18:21, 19:4,
23:16, 24:4, 31:11,
31:15, 39:19, 39:22,
41:15, 41:18, 46:18,
47:3, 47:12, 48:1,
50:23, 61:14, 65:19,
67:13, 69:6, 84:10,
84:16, 84:18, 115:9,
116:5, 117:2, 117:16,
117:17, 118:11,
119:1, 119:2, 119:11,
119:19, 121:16,
125:19, 161:17,
163:12, 163:18,
165:5, 165:7, 165:15,
165:16, 165:21,
166:10, 167:5,
167:10, 168:13,
169:7, 169:10, 175:1,
175:4, 186:6, 187:2
**housed** [1] - 79:10
**HR-Dixon-0001446**
[2] - 86:10, 214:17
**HR-Dixon-0001531**
[2] - 86:11, 214:18
**HR-Dixon-1446** [1] -
86:16
**HR-Dixon-1450** [1] -
88:17
**HR1502** [1] - 99:12
**hruss@**
**hodgsonruss.com** [1]
- 2:11
**Hudson** [1] - 2:3

**HUGH** [1] - 2:11
**hum** [2] - 68:22,
154:9
**hundred** [1] - 152:1
**hung** [4] - 17:17,
115:20, 166:3, 166:14
**hungry** [1] - 75:18

## I

**I-N-G** [1] - 140:11
**idea** [8] - 92:13,
192:14, 192:16,
192:19, 202:19,
204:11, 208:15,
208:19
**Identification** [6] -
25:14, 43:22, 52:9,
57:14, 63:23, 86:6
**identified** [2] - 64:12,
200:12
**identify** [3] - 26:22,
51:22, 86:15
**ignorance** [1] -
105:18
**ignored** [1] - 129:3
**III** [1] - 2:11
**image** [1] - 58:23
**imagine** [1] - 143:18
**implicated** [1] -
148:2
**imply** [1] - 130:19
**impression** [2] -
42:11, 42:14
**inaccurate** [1] -
83:10
**inches** [1] - 172:10
**incident** [11] - 33:22,
59:22, 60:1, 60:4,
67:10, 79:16, 125:4,
171:21, 173:11,
178:14, 189:13
**incompetence** [1] -
98:4
**inconsistent** [1] -
66:22
**incorrect** [3] - 28:22,
49:14, 50:8
**independent** [6] -
148:10, 150:21,
152:4, 152:16, 191:3
**INDEX** [2] - 214:1,
215:1
**index** [2] - 129:18,
216:1
**indicate** [2] - 57:19,
133:21
**indicated** [14] - 12:1,
12:14, 12:20, 55:9,
55:17, 56:19, 66:20,

68:3, 69:3, 70:4, 83:9, 138:17, 139:15, 200:7
**indicates** [3] - 50:22, 65:1, 105:3
**indictment** [1] - 77:18
**individual** [2] - 1:12, 60:23
**ineffective** [1] - 10:6
**information** [5] - 105:12, 108:23, 151:6, 156:9, 156:19
**informed** [1] - 29:5
**lng** [1] - 140:10
**initial** [4] - 10:19, 130:12, 156:8, 176:10
**inner** [2] - 141:17, 142:17
**innocent** [1] - 209:15
**inside** [1] - 123:13
**instance** [1] - 136:14
**instruct** [1] - 22:6
**intelligent** [1] - 146:22
**intend** [1] - 192:21
**intended** [1] - 12:6
**interacted** [2] - 197:7, 197:13
**interaction** [3] - 149:11, 150:5, 161:20
**interactions** [3] - 148:17, 149:15, 152:16
**intermediary** [2] - 131:11, 133:13
**interrupt** [2] - 18:10, 193:2
**interrupting** [1] - 133:3
**interview** [29] - 51:4, 52:10, 52:16, 52:22, 53:2, 53:15, 57:15, 68:4, 111:10, 126:16, 126:21, 144:19, 144:23, 153:3, 153:23, 155:6, 156:8, 177:22, 180:2, 193:3, 193:5, 193:12, 194:23, 195:3, 195:8, 205:10, 205:13, 214:7, 214:10
**interviewed** [5] - 65:2, 65:8, 126:11, 191:22, 207:18
**interviews** [1] - 53:7
**intimidated** [1] - 178:13
**intoxicated** [1] - 158:15
**Intra** [3] - 64:2,

64:13, 214:13
**Intra-Departmental** [3] - 64:2, 64:13, 214:13
**inventory** [1] - 112:5
**investigated** [1] - 148:2
**investigating** [1] - 46:4
**investigation** [3] - 8:15, 30:20, 156:10
**investigations** [1] - 167:23
**investigator** [1] - 52:18
**involved** [13] - 40:9, 83:9, 83:16, 83:19, 85:22, 86:1, 147:21, 149:19, 150:1, 176:1, 176:6, 176:12, 186:4
**involvement** [4] - 149:16, 150:6, 151:9, 151:20
**issue** [2] - 16:23, 134:17
**issues** [2] - 10:5, 10:7
**itself** [1] - 27:1

## J

**J-22** [1] - 101:23
**J-A-B-R-I-L** [1] - 128:2
**Jabril** [21] - 128:2, 128:5, 128:6, 129:4, 129:6, 129:8, 129:12, 130:3, 130:8, 130:13, 130:15, 131:19, 133:13, 133:21, 134:10, 134:17, 135:3, 137:11, 138:18, 139:18
**Jackson** [25] - 14:2, 15:5, 31:16, 40:10, 40:15, 59:16, 62:2, 95:16, 95:20, 96:6, 99:19, 122:5, 131:2, 131:13, 156:11, 161:1, 161:2, 167:18, 168:16, 184:13, 192:22, 195:21, 196:3, 196:15
**jail** [14] - 76:7, 96:13, 102:17, 103:9, 108:9, 114:21, 127:2, 127:11, 135:13, 202:17, 203:18, 208:8, 208:11, 208:14
**Jamar** [2] - 65:13,

65:17
**JAMES** [1] - 1:10
**James** [1] - 2:17
**January** [2] - 67:6, 101:2
**Jarman's** [2] - 14:15, 18:7
**Jarmon** [11] - 18:20, 19:3, 38:22, 65:2, 65:14, 66:7, 66:20, 67:11, 67:21, 161:8, 188:10
**Jarmon's** [19] - 31:11, 61:20, 69:6, 69:19, 161:17, 165:5, 165:14, 165:20, 166:10, 167:5, 167:10, 167:20, 168:12, 169:7, 169:10, 169:18, 175:3, 186:6, 187:2
**Jarrett** [1] - 163:14
**Jarrett's** [6] - 14:7, 17:6, 17:15, 17:18, 165:6, 165:16
**Jen** [2] - 4:19, 100:15
**JENNIFER** [1] - 3:1
**Jennings** [1] - 101:23
**Jim** [4] - 148:17, 148:21, 149:23
**JOHN** [2] - 1:10, 1:11
**John** [3] - 2:18, 149:5, 149:16, 149:18
**Joseph** [3] - 52:18, 90:13, 95:6
**jpersico@lippes.com** [1] - 3:3
**judge** [3] - 73:21, 74:14, 93:20
**Julius** [1] - 186:18
**July** [1] - 99:16
**jumped** [2] - 122:17, 177:7
**June** [5] - 1:21, 76:10, 76:11, 134:21, 212:6
**Jury** [26] - 18:21, 19:4, 23:8, 23:15, 24:2, 24:4, 43:7, 49:11, 51:6, 53:19, 54:16, 54:21, 66:1, 66:6, 66:18, 66:20, 67:5, 67:19, 69:12, 69:17, 69:19, 70:15, 136:15, 143:5, 204:22, 210:5
**justice** [2] - 143:8, 143:12

## K

**KASPEREK** [1] - 2:6
**keep** [4] - 80:3, 93:21, 139:3, 139:4
**keeping** [3] - 23:6, 48:21, 70:16
**keeps** [1] - 82:1
**Kenneth** [1] - 141:4
**Kenny** [2] - 141:4, 142:2
**kept** [1] - 14:21
**keys** [4] - 186:14, 186:23, 187:10, 188:2
**kicked** [3] - 202:1, 205:22, 206:11
**kid** [2] - 142:21, 182:12
**kids** [1] - 187:14
**kill** [3] - 92:17, 182:1, 196:2
**killed** [3] - 92:5, 181:20, 195:21
**killer** [1] - 182:4
**killers** [4] - 183:7, 183:9, 183:11, 183:13
**killing** [2] - 183:5, 185:14
**kind** [12] - 33:23, 35:6, 59:2, 90:22, 119:14, 123:18, 156:7, 160:7, 178:7, 182:23, 199:1
**knees** [1] - 177:8
**knit** [1] - 193:23
**knit-picky** [1] - 193:23
**knocking** [1] - 179:9
**knowledge** [17] - 147:1, 147:4, 147:6, 147:12, 148:10, 151:6, 151:11, 151:16, 151:22, 152:2, 156:12, 159:15, 205:9, 211:1, 211:3, 211:7
**known** [2] - 9:18, 39:3
**knows** [2] - 107:23, 109:14
**Koons** [3] - 14:6, 14:12, 17:6

## L

**LA** [1] - 92:20
**Lamarr** [147] - 14:6, 14:11, 14:14, 15:4, 17:6, 17:14, 18:3, 18:7, 18:17, 18:22,

19:4, 23:8, 23:16, 31:7, 31:11, 39:15, 43:10, 48:4, 48:21, 49:8, 49:12, 50:7, 50:11, 50:23, 54:20, 54:22, 55:17, 56:14, 56:19, 57:12, 57:16, 61:13, 61:23, 65:18, 65:19, 67:12, 67:19, 69:6, 69:20, 70:15, 70:20, 71:7, 72:10, 73:2, 73:7, 73:10, 79:1, 79:5, 84:15, 113:15, 114:6, 116:14, 118:2, 118:8, 118:10, 120:4, 120:7, 121:15, 122:18, 125:2, 125:7, 125:19, 126:6, 126:10, 126:18, 127:6, 128:9, 129:7, 129:12, 129:19, 129:20, 130:4, 131:11, 131:20, 133:14, 133:22, 135:12, 135:16, 135:17, 136:11, 136:14, 137:12, 137:14, 137:16, 138:5, 139:18, 140:1, 140:23, 141:6, 141:12, 142:1, 142:7, 144:1, 159:19, 161:16, 161:23, 162:9, 162:22, 163:13, 163:16, 163:23, 164:7, 166:10, 167:9, 167:15, 169:7, 169:9, 169:19, 173:5, 173:11, 175:6, 183:19, 184:3, 184:22, 185:2, 189:12, 189:23, 190:18, 191:20, 192:14, 192:21, 195:16, 195:20, 196:1, 196:14, 200:3, 200:9, 200:23, 201:15, 201:20, 201:23, 202:3, 202:8, 202:19, 203:16, 204:21, 205:10, 207:17, 208:5, 209:11, 210:4, 211:2, 211:4, 214:10, 216:3, 216:4
**Lamarr's** [3] - 71:20, 128:7
**language** [1] - 96:22
**last** [11] - 8:8, 11:22,

12:13, 27:20, 28:7, 28:9, 30:17, 81:19, 128:4, 179:3, 193:14
**late** [1] - 112:3
**law** [5] - 1:18, 27:12, 128:11, 128:14, 140:5
**lawsuit** [7] - 4:22, 16:23, 80:10, 82:6, 83:6, 112:12, 146:8
**lawyer** [2] - 21:11, 21:14
**lead** [3] - 93:1, 93:5, 93:10
**leading** [1] - 62:1
**leads** [1] - 210:1
**learn** [4] - 74:7, 113:15, 123:5, 175:18
**learned** [7] - 13:23, 114:6, 114:12, 114:14, 180:14, 181:19, 182:11
**least** [2] - 84:4, 103:18
**leave** [1] - 6:18
**Lee** [3] - 52:18, 186:18, 188:9
**left** [21] - 50:1, 50:14, 50:15, 79:22, 127:7, 127:8, 128:16, 128:19, 128:23, 129:19, 136:18, 137:2, 143:17, 166:4, 166:5, 166:18, 167:22, 176:17, 176:18, 177:6, 216:2
**leg** [1] - 91:20
**legal** [1] - 10:3
**length** [1] - 58:2
**lengthy** [1] - 83:4
**Leonard** [43] - 8:22, 12:23, 13:20, 15:22, 23:7, 23:14, 24:1, 31:14, 39:1, 40:5, 41:12, 41:22, 43:3, 44:7, 44:16, 45:4, 45:7, 48:12, 49:10, 50:7, 50:22, 51:6, 53:18, 54:16, 55:4, 55:11, 68:18, 160:21, 162:8, 167:15, 172:4, 172:7, 172:11, 172:17, 173:2, 176:6, 187:19, 189:12, 199:17, 200:16, 203:13, 204:8, 208:2
**Leonard's** [2] - 15:19, 174:4
**less** [1] - 73:16
**letter** [1] - 127:3
**license** [3] - 98:9,

98:16, 98:20
**lie** [9] - 56:22, 145:10, 145:11, 184:17, 184:20, 184:23, 185:3, 202:4, 210:22
**life** [5] - 142:23, 143:2, 174:8, 181:22, 187:17
**limited** [1] - 198:22
**Linebacker** [1] - 171:4
**linebacker** [1] - 171:6
**lines** [2] - 46:21, 47:2
**LIPPES** [1] - 3:1
**Lisbon** [13] - 14:22, 41:15, 41:18, 115:9, 115:17, 116:9, 117:2, 117:16, 119:1, 119:12, 119:19, 125:20, 187:1
**list** [1] - 97:23
**listed** [2] - 95:14, 97:3
**listen** [3] - 13:12, 21:13, 59:21
**lists** [1] - 97:16
**live** [4] - 81:21, 101:23, 102:2, 116:2
**lived** [5] - 115:8, 115:14, 115:16, 116:3, 159:13, 159:17, 183:11, 188:10
**lives** [2] - 81:22
**living** [2] - 182:15, 187:17
**LLP** [5] - 1:19, 2:1, 2:6, 2:10, 3:1
**loaded** [2] - 105:4, 105:19
**locally** [1] - 81:21
**location** [4] - 87:9, 87:13, 94:17, 106:9
**logged** [1] - 129:15
**Lonergan** [4] - 2:17, 148:17, 148:21, 149:23
**LONERGAN** [1] - 1:10
**longest** [1] - 136:4
**Look** [1] - 129:13
**look** [19] - 25:22, 26:3, 26:5, 42:19, 51:11, 57:5, 66:18, 75:3, 82:20, 82:22, 110:4, 110:5, 111:10, 129:9, 129:10, 136:1, 170:13, 199:17,

210:17
**looked** [9] - 50:21, 68:4, 68:17, 69:4, 123:1, 123:19, 144:20, 173:11, 206:4
**looking** [8] - 18:11, 26:16, 67:7, 106:7, 110:13, 169:22, 178:16, 185:7
**looks** [2] - 151:3, 152:8
**LORI** [2] - 1:22, 213:19
**lost** [1] - 139:16
**loud** [3] - 45:17, 84:5, 96:22
**Louisville** [3] - 171:4, 171:15, 171:19
**Love** [1] - 101:21
**lunch** [3] - 71:16, 75:21, 75:22
**luncheon** [1] - 75:23
**lying** [6] - 159:23, 162:23, 163:3, 170:7, 184:15, 204:8
**Lynette** [2] - 128:15, 140:6
**Lynnette** [1] - 128:19

## M

**ma'am** [1] - 104:20
**machine** [4] - 29:19, 128:16, 128:23, 213:8
**made-up** [1] - 184:20
**Mag-10** [5] - 110:17, 111:19, 111:21, 111:23, 112:7
**magistrate** [1] - 143:12
**Main** [1] - 2:7
**manner** [1] - 213:8
**marathon** [1] - 5:19
**March** [3] - 88:23, 90:3, 104:23
**marijuana** [1] - 87:12
**Mario** [36] - 14:15, 18:7, 18:20, 19:3, 31:11, 38:22, 53:17, 54:15, 55:4, 55:11, 61:19, 65:2, 66:7, 69:6, 123:19, 124:21, 161:8, 161:17, 165:4, 165:14, 165:20, 166:10, 167:5, 167:10, 167:15, 167:19, 168:12, 169:7, 169:9, 169:18, 175:3, 186:6, 187:2, 187:19, 188:10,

189:12
**Mario's** [11] - 18:18, 23:16, 24:4, 31:15, 39:18, 39:22, 50:23, 54:20, 84:10, 84:15, 84:18
**MARK** [1] - 1:9
**Mark** [16] - 2:16, 151:18, 151:21, 152:1, 152:4, 152:12, 152:17, 153:3, 153:13, 153:19, 153:23, 154:16, 154:19, 155:5, 156:1, 156:3
**mark** [9] - 25:13, 43:21, 51:18, 54:2, 57:10, 60:19, 63:22, 66:18, 86:5
**marked** [14] - 25:14, 25:20, 26:15, 42:9, 43:22, 44:5, 52:9, 57:14, 63:23, 64:8, 86:6, 86:14, 154:11, 193:21
**marking** [1] - 51:21
**Masecchia** [5] - 2:16, 150:5, 150:6, 150:11, 150:17
**MASECCHIA** [1] - 1:10
**match** [1] - 106:8
**material** [3] - 91:11, 91:13, 93:14
**MATHIAS** [1] - 3:1
**matter** [11] - 42:21, 78:4, 86:1, 95:14, 95:20, 96:14, 97:9, 147:14, 178:11, 198:7, 198:8
**matters** [2] - 76:22, 77:22
**Matthews** [2] - 186:18, 188:9
**Maverick** [1] - 101:7
**Mazda** [9] - 14:5, 18:2, 24:5, 116:22, 161:17, 164:5, 186:1, 188:5, 188:18
**mean** [34] - 7:12, 8:17, 18:7, 66:10, 76:6, 98:14, 107:19, 109:6, 117:6, 120:12, 120:15, 120:16, 120:18, 122:2, 122:5, 125:13, 125:16, 133:8, 134:5, 136:21, 138:4, 142:17, 142:20, 143:11, 144:3, 171:3, 181:16,

183:4, 195:22, 198:7, 204:11, 204:13, 204:16
**means** [3] - 8:4, 134:7, 213:8
**meant** [2] - 114:22, 175:1
**mediator** [8] - 129:5, 130:4, 133:21, 134:4, 134:6, 134:8, 134:9
**medium** [1] - 80:1
**meet** [3] - 6:14, 7:5, 7:15
**meeting** [7] - 10:11, 10:15, 10:19, 11:7, 11:22, 12:13, 13:7
**meetings** [11] - 6:16, 10:16, 10:23, 11:3, 11:5, 11:10, 11:11, 11:15, 11:17, 12:3, 12:6
**memory** [3] - 108:22, 150:21, 207:12
**mention** [2] - 35:19, 60:8
**mentioned** [9] - 60:7, 60:8, 103:16, 115:8, 136:12, 137:11, 175:12, 194:15, 195:9
**Mercedes** [1] - 97:2
**merit** [1] - 143:8
**mess** [2] - 183:1, 183:4
**message** [7] - 114:7, 114:19, 128:16, 128:18, 128:19, 128:23, 129:3
**messages** [4] - 129:19, 129:20, 216:2, 216:3
**messing** [1] - 176:21
**met** [4] - 113:15, 114:8, 146:4, 201:14
**meter** [1] - 37:1
**middle** [13] - 5:21, 28:7, 31:2, 36:9, 45:22, 75:7, 75:9, 89:2, 89:17, 94:14, 118:21, 119:14, 171:6
**midnight** [1] - 119:7, 166:23, 167:2
**midst** [1] - 103:5
**midway** [1] - 46:16
**might** [13] - 17:2, 51:12, 75:14, 93:19, 93:20, 159:12, 162:4, 162:10, 163:6, 163:7, 180:6, 181:9, 193:18
**million** [1] - 26:7
**mind** [10] - 23:2,

42:2, 53:21, 57:20, 75:4, 75:5, 122:8, 122:9, 142:20, 198:4
**mine's** [1] - 181:20
**minute** [14] - 36:14, 45:10, 51:10, 57:7, 60:18, 64:19, 113:7, 113:9, 132:9, 140:14, 145:21, 165:17, 187:4, 188:3
**minutes** [11] - 42:3, 48:3, 48:20, 49:2, 56:6, 58:22, 75:20, 82:5, 83:7, 166:4, 166:15
**mischaracterizes** [1] - 68:7
**misconduct** [1] - 10:5
**misdemeanor** [3] - 90:10, 90:15, 90:17
**misrepresent** [1] - 132:23
**missing** [2] - 85:4, 85:6
**misspoke** [1] - 133:20
**mistake** [1] - 174:8
**mom** [6] - 38:21, 115:14, 202:5, 202:14, 208:12, 208:14
**mom's** [3] - 80:19, 80:20, 80:23
**moment** [1] - 85:2
**money** [9] - 114:20, 114:22, 115:2, 137:17, 137:18, 139:19, 159:3, 178:19, 183:15
**Montana** [1] - 61:14
**month** [11] - 43:12, 43:17, 55:19, 56:3, 70:19, 104:2, 127:23, 130:13, 131:5, 134:17, 134:20
**months** [11] - 14:19, 76:7, 76:8, 76:9, 78:11, 78:15, 96:5, 96:6, 104:12, 141:9, 204:23
**Moped** [1] - 19:5
**morning** [6] - 4:17, 4:18, 118:15, 120:1, 120:6, 188:9
**mosque** [3] - 140:9, 140:10, 140:22
**most** [5] - 10:10, 153:6, 153:8, 185:20, 197:18

**mother** [1] - 45:4
**mother's** [1] - 115:13
**motion** [7] - 9:18, 9:22, 10:11, 10:17, 53:9, 80:6, 126:12
**mouth** [2] - 133:19, 142:22
**move** [4] - 22:9, 73:18, 106:18, 143:2
**moved** [1] - 78:5
**MR** [365] - 4:3, 4:10, 6:15, 6:20, 7:6, 8:3, 9:5, 10:2, 12:9, 12:17, 13:2, 13:6, 13:9, 13:15, 15:8, 16:14, 16:22, 17:1, 17:2, 18:10, 18:23, 19:6, 19:12, 19:19, 20:1, 20:6, 20:10, 20:14, 21:2, 21:5, 21:8, 21:17, 21:22, 22:4, 22:12, 23:1, 23:10, 23:18, 23:21, 24:7, 24:23, 25:5, 25:23, 26:11, 27:14, 28:17, 28:23, 29:9, 31:17, 32:11, 34:13, 34:18, 34:22, 36:4, 36:8, 39:6, 39:10, 39:17, 39:23, 40:6, 40:11, 40:18, 41:6, 42:4, 42:15, 42:22, 45:16, 46:7, 46:9, 46:20, 47:1, 47:6, 47:10, 47:12, 47:15, 47:18, 47:20, 48:10, 48:23, 49:15, 49:22, 50:9, 51:2, 51:18, 51:23, 52:4, 52:7, 53:11, 53:21, 54:6, 54:23, 55:6, 55:13, 55:21, 56:8, 56:12, 56:23, 57:19, 57:22, 58:3, 58:8, 59:11, 60:2, 60:15, 62:3, 62:9, 66:10, 66:14, 67:2, 67:15, 67:23, 68:6, 68:13, 68:23, 69:8, 70:1, 70:6, 70:10, 70:22, 71:9, 71:18, 72:1, 73:11, 73:14, 73:17, 73:20, 74:1, 74:7, 74:13, 74:21, 75:3, 75:6, 75:11, 75:16, 75:19, 77:7, 79:14, 82:13, 83:11, 83:19, 83:22, 84:3, 84:6, 84:23, 85:9, 85:15, 85:17, 87:17, 88:6, 89:14, 89:16,

89:19, 89:21, 92:21, 93:3, 93:9, 93:19, 95:7, 96:2, 96:7, 97:18, 98:17, 99:4, 100:15, 100:19, 103:12, 103:15, 103:18, 105:10, 106:1, 106:6, 107:12, 108:3, 108:15, 108:21, 109:4, 109:5, 109:12, 110:1, 110:21, 111:6, 112:9, 112:16, 112:20, 112:23, 113:4, 113:5, 113:10, 114:9, 114:11, 116:16, 117:6, 119:3, 119:16, 119:21, 120:20, 121:7, 121:23, 124:4, 124:11, 124:15, 125:23, 126:7, 129:18, 130:6, 131:3, 131:6, 131:14, 132:1, 132:6, 132:9, 132:15, 132:20, 132:22, 133:4, 133:7, 133:23, 137:23, 138:7, 138:19, 138:23, 139:7, 139:9, 139:11, 139:13, 139:20, 141:18, 142:8, 144:2, 145:20, 145:22, 146:3, 149:13, 149:14, 152:7, 152:9, 152:11, 152:18, 153:1, 153:7, 153:9, 155:1, 155:3, 155:7, 155:10, 156:14, 156:17, 156:21, 157:1, 158:1, 158:3, 158:18, 158:20, 158:23, 159:2, 160:10, 160:12, 161:21, 161:22, 162:14, 162:16, 163:1, 163:5, 163:9, 163:11, 164:16, 164:21, 165:2, 165:3, 167:11, 167:16, 167:21, 168:9, 168:20, 168:23, 169:4, 170:6, 170:8, 174:6, 174:9, 174:15, 174:17, 174:22, 175:2, 179:14, 179:16, 180:8, 180:10, 180:13, 180:16, 180:23, 181:2, 181:6, 181:8, 181:11, 181:14, 181:18, 182:6,

182:10, 182:22, 183:2, 183:16, 183:21, 184:1, 184:4, 184:6, 184:19, 185:5, 185:19, 188:22, 189:19, 189:21, 190:5, 190:9, 190:21, 190:23, 191:7, 191:9, 191:12, 191:15, 193:4, 193:10, 193:16, 193:20, 194:2, 194:8, 194:10, 194:20, 194:21, 196:18, 196:21, 196:22, 197:4, 197:5, 197:22, 198:1, 198:3, 198:5, 198:7, 198:11, 198:20, 198:21, 199:12, 199:19, 199:21, 201:2, 201:7, 202:22, 203:4, 204:2, 204:9, 205:2, 205:4, 205:7, 207:7, 207:8, 207:11, 209:22, 211:10, 211:11, 215:4, 215:5, 215:6, 215:8, 216:1
**MS** [294] - 4:9, 4:16, 6:17, 6:22, 7:1, 7:9, 8:9, 9:8, 9:10, 10:9, 12:12, 12:19, 13:4, 13:8, 13:12, 13:17, 13:18, 15:11, 16:17, 17:3, 17:4, 18:12, 18:16, 19:2, 19:8, 19:14, 19:21, 20:4, 20:7, 20:12, 20:16, 21:10, 21:21, 22:2, 22:10, 22:13, 22:17, 22:22, 23:3, 23:5, 23:13, 23:19, 23:23, 24:9, 25:2, 25:7, 25:12, 25:18, 26:2, 26:13, 27:16, 27:18, 28:19, 29:2, 29:12, 31:19, 32:16, 33:12, 34:17, 34:20, 35:2, 36:5, 36:12, 39:8, 39:12, 39:20, 40:3, 40:8, 40:13, 40:20, 41:8, 42:2, 42:6, 42:18, 43:1, 43:21, 44:3, 45:17, 45:21, 46:8, 46:10, 46:22, 47:3, 47:8, 47:11, 47:16, 47:19, 47:21, 47:22, 48:14, 49:4, 49:18, 50:4, 50:12, 51:3, 51:12, 51:16, 51:19, 52:3, 52:6, 52:8, 52:14, 53:13,

53:23, 54:4, 54:8, 54:10, 55:2, 55:8, 55:15, 55:22, 56:11, 56:13, 57:3, 57:6, 57:10, 57:21, 57:23, 58:7, 58:10, 58:21, 59:13, 60:5, 60:12, 60:16, 60:20, 61:8, 62:5, 62:11, 63:22, 64:6, 66:16, 67:4, 67:17, 68:2, 68:11, 68:16, 69:1, 69:10, 70:3, 70:8, 70:13, 71:3, 71:11, 71:19, 72:3, 73:13, 73:15, 73:19, 73:23, 74:4, 74:11, 74:17, 75:2, 75:5, 75:9, 75:14, 75:17, 76:2, 77:11, 77:12, 79:15, 82:18, 83:13, 83:14, 83:21, 84:1, 84:4, 84:11, 85:5, 85:13, 85:16, 85:18, 85:19, 86:5, 86:12, 87:20, 88:7, 89:15, 89:17, 89:20, 89:23, 93:2, 93:7, 93:17, 93:23, 95:12, 96:12, 97:21, 98:19, 99:6, 100:18, 100:20, 100:22, 103:14, 103:17, 103:19, 104:6, 105:15, 106:5, 106:13, 107:14, 107:15, 108:7, 109:2, 109:14, 109:16, 110:4, 110:9, 110:23, 111:2, 111:7, 111:8, 111:15, 112:11, 112:17, 112:22, 113:2, 113:7, 113:11, 113:13, 114:14, 114:18, 116:18, 117:8, 119:4, 119:17, 120:2, 121:4, 121:14, 122:13, 124:10, 124:13, 125:9, 126:3, 126:9, 129:23, 130:1, 130:10, 131:9, 131:16, 131:18, 132:4, 132:8, 132:13, 132:17, 132:21, 133:2, 133:5, 133:10, 134:2, 138:3, 138:14, 138:22, 139:6, 139:14, 139:22, 142:3, 143:20, 144:17, 145:19, 184:21, 185:9, 185:22, 189:3, 191:10, 193:2, 193:7,

193:13, 193:17, 193:23, 194:6, 194:9, 197:23, 198:6, 198:9, 199:1, 199:3, 199:15, 199:20, 199:22, 201:4, 201:9, 203:1, 203:9, 204:6, 204:19, 205:1, 210:1, 210:3, 211:9, 215:3, 215:7, 215:9

**multimedia** [1] - 110:21

**multiple** [1] - 178:16

**murder** [4] - 95:4, 131:1, 131:12, 156:10

**murdering** [1] - 183:5

**Muslim** [1] - 140:9

**must** [1] - 5:6

## N

**name** [19] - 4:19, 27:3, 88:2, 89:21, 98:3, 98:16, 110:12, 113:18, 113:19, 128:2, 128:4, 128:5, 128:15, 140:10, 148:22, 150:18, 150:22, 175:20, 175:21

**name's** [1] - 146:5

**named** [4] - 4:22, 115:23, 176:13, 177:17

**names** [2] - 59:16, 156:7

**narcotics** [2] - 197:2, 197:12

**narrative** [2] - 96:21, 105:2

**near** [5] - 153:14, 165:21, 179:13, 179:17, 179:19

**nearby** [1] - 188:21

**necessarily** [2] - 26:23, 49:1

**need** [13] - 6:2, 13:16, 21:4, 45:13, 93:17, 111:10, 129:2, 129:14, 134:4, 145:22, 146:14, 162:10, 163:7

**needed** [2] - 114:20, 114:22

**needs** [2] - 5:3, 202:6

**neighborhood** [15] - 91:19, 107:22, 113:22, 142:17,

159:13, 159:17, 178:2, 178:8, 178:9, 180:7, 182:15, 183:8, 183:11, 187:7, 201:16

**NEUFELD** [1] - 2:1

**never** [37] - 43:17, 43:18, 55:17, 71:1, 73:3, 77:3, 81:13, 100:10, 102:13, 102:18, 111:21, 127:8, 127:17, 127:18, 129:17, 148:1, 148:3, 148:4, 148:6, 148:20, 149:11, 149:15, 160:20, 160:21, 174:1, 174:2, 179:17, 188:18, 190:7, 190:14, 190:17, 192:23, 208:18, 209:6, 209:10, 209:18, 209:20

**NEW** [2] - 1:4, 213:1

**New** [11] - 1:20, 2:4, 2:8, 2:14, 3:2, 4:12, 113:16, 114:7, 114:20, 213:6

**news** [13] - 43:15, 61:10, 120:22, 202:6, 202:8, 203:19, 204:15, 204:18, 206:1, 206:2, 208:9

**News** [3] - 43:15, 205:17, 206:13

**next** [9] - 63:8, 63:11, 88:16, 91:5, 94:2, 94:9, 96:16, 97:14, 106:18

**nice** [1] - 159:8

**NICK** [1] - 2:1

**Nick** [1] - 165:5

**nick@ nsbcivilrights.com** [1] - 2:2

**nicknamed** [1] - 113:16

**night** [16] - 15:16, 24:5, 36:15, 39:4, 58:1, 63:10, 65:20, 67:13, 76:4, 117:7, 117:9, 118:15, 118:22, 119:15, 186:13, 206:15

**night's** [1] - 48:8

**nine** [4] - 17:10, 58:22, 141:9, 170:16

**nobody** [1] - 183:14

**nobody's** [3] - 122:11, 144:5, 144:14

**none** [10] - 135:19,

147:20, 147:22, 172:20, 172:21, 175:9, 181:21, 191:5, 192:6

**nonetheless** [1] - 177:16

**nonviolent** [1] - 104:17

**Notary** [3] - 1:22, 213:5, 213:20

**NOTARY** [1] - 212:16

**notes** [3] - 110:4, 110:6, 110:14

**nothing** [11] - 122:10, 135:22, 136:11, 137:9, 145:5, 155:11, 184:11, 198:20, 207:7, 213:15

**November** [1] - 69:18

**number** [13] - 52:12, 53:14, 57:18, 64:4, 106:15, 106:16, 111:4, 128:23, 129:13, 135:4, 214:8, 214:11, 214:14

**Number** [2] - 69:14, 111:9

**numbers** [8] - 25:16, 26:18, 44:1, 86:9, 129:16, 214:4, 214:6, 214:17

## O

**o'clock** [1] - 120:1

**object** [7] - 6:17, 32:11, 32:14, 84:7, 126:7, 197:4, 203:4

**Objection** [2] - 12:9, 19:21

**objection** [145] - 6:15, 7:6, 10:2, 12:17, 13:2, 13:16, 15:8, 18:23, 19:6, 19:12, 19:20, 20:2, 20:3, 20:14, 23:10, 23:18, 23:21, 24:7, 24:23, 25:5, 26:11, 27:14, 28:17, 28:23, 29:9, 31:17, 34:22, 36:4, 36:8, 39:6, 39:10, 39:17, 39:23, 40:6, 40:11, 40:18, 41:6, 42:15, 42:22, 48:10, 48:23, 49:15, 50:9, 51:2, 53:11, 54:23, 55:6, 55:13, 55:21, 56:23, 59:11, 60:2, 62:3, 62:9, 67:2,

67:15, 67:23, 68:6, 68:13, 69:8, 70:1, 70:6, 70:10, 70:22, 71:9, 72:1, 73:11, 74:21, 74:23, 79:14, 82:13, 83:11, 83:19, 84:1, 84:23, 93:11, 96:2, 97:18, 98:17, 106:1, 110:1, 112:9, 114:9, 116:16, 117:6, 119:21, 120:20, 121:7, 121:23, 126:7, 130:6, 131:3, 131:14, 132:1, 133:23, 137:23, 138:7, 139:20, 144:2, 152:18, 153:7, 155:1, 155:7, 155:8, 156:14, 156:21, 158:1, 158:18, 158:23, 160:10, 161:21, 162:14, 163:1, 163:9, 165:2, 167:11, 167:21, 168:20, 170:6, 174:6, 179:14, 180:8, 180:13, 180:23, 181:6, 181:11, 181:18, 182:10, 183:2, 183:21, 184:4, 184:19, 185:5, 185:19, 188:22, 189:19, 190:5, 190:21, 199:12, 201:2, 201:7, 202:22, 204:2, 204:9

**objections** [2] - 19:15, 19:18

**obscene** [1] - 96:22

**observed** [2] - 147:5, 180:7

**obtain** [2] - 9:3, 9:11

**obvious** [2] - 122:16, 138:2

**obviously** [1] - 200:9

**occurred** [7] - 59:23, 117:21, 117:23, 136:13, 171:21, 183:20, 184:2

**occurring** [1] - 125:5

**October** [3] - 56:16, 88:6, 88:8

**OF** [5] - 1:4, 1:9, 213:1, 213:3

**office** [5] - 10:23, 12:7, 53:8, 126:11, 144:19

**Officer** [4] - 107:8, 107:10, 107:13, 107:16

**officer** [1] - 87:12

**officers** [5] - 65:2, 106:23, 153:16, 188:17, 197:13

**offices** [1] - 1:18

**often** [1] - 79:12

**old** [3] - 173:5, 173:8, 187:20

**older** [1] - 19:16

**once** [8] - 13:19, 36:20, 77:1, 77:8, 82:19, 98:5, 136:17, 137:9

**one** [80] - 7:17, 11:5, 13:14, 18:5, 24:21, 29:17, 31:7, 33:7, 35:23, 38:10, 40:15, 44:10, 46:8, 47:10, 48:17, 66:5, 74:4, 74:5, 78:19, 86:22, 88:22, 89:5, 91:7, 94:10, 94:22, 94:23, 95:11, 95:18, 96:16, 96:18, 96:19, 97:16, 98:1, 98:5, 101:6, 101:20, 103:20, 104:9, 106:2, 106:3, 106:18, 110:5, 119:23, 121:1, 121:9, 123:22, 124:18, 124:19, 127:7, 134:5, 138:2, 140:5, 141:3, 144:6, 144:20, 148:23, 156:6, 161:6, 171:22, 172:9, 172:16, 178:1, 182:11, 183:17, 186:3, 186:14, 186:16, 189:22, 194:15, 196:21, 197:6, 197:10, 197:11, 197:23, 198:1, 199:6, 205:5, 210:1

**ones** [2] - 8:21, 103:15

**open** [3] - 105:5, 106:23, 134:11

**opinion** [1] - 143:12

**opportunity** [10] - 28:3, 43:6, 43:9, 44:12, 45:15, 61:9, 66:1, 66:6, 73:6, 82:11

**opposed** [1] - 142:6

**opposite** [1] - 125:8

**order** [3] - 91:11, 93:15, 198:4

**orient** [1] - 46:14

**ounce** [1] - 101:6

**outcome** [5] - 90:8, 94:21, 97:8, 101:10, 103:20
**outset** [1] - 76:13
**outside** [1] - 179:11
**overheard** [1] - 191:20
**overseas** [1] - 187:16
**owe** [1] - 138:5
**owed** [1] - 137:17
**own** [9] - 9:1, 34:4, 104:19, 110:11, 110:15, 110:17, 180:12, 195:20, 208:21
**owned** [6] - 14:18, 105:22, 106:3, 109:18, 109:23, 112:5

**P**

**p.m** [11] - 100:21, 110:7, 110:8, 113:12, 146:1, 161:17, 165:10, 166:11, 191:13, 196:20, 211:13
**Page** [2] - 214:2, 215:2
**page** [41] - 12:22, 13:19, 14:5, 15:20, 15:21, 16:4, 16:10, 26:19, 27:20, 28:1, 28:7, 28:22, 29:14, 29:15, 30:7, 30:17, 41:22, 45:23, 64:8, 87:22, 88:16, 89:3, 89:14, 91:6, 94:2, 94:9, 94:15, 97:14, 99:8, 99:11, 100:23, 162:8, 174:4, 193:21, 200:22, 203:3, 203:15, 204:1, 208:2
**paged** [2] - 31:14, 41:11
**pages** [2] - 86:15, 212:2
**Pamela** [2] - 80:15, 81:15
**paper** [1] - 105:3
**papers** [1] - 8:4
**paperwork** [4] - 123:8, 205:20, 206:19, 207:14
**paragraph** [2] - 47:9, 65:12
**pardon** [2] - 14:9, 35:23
**parents** [5] - 62:21,

63:13, 199:9, 201:12, 202:14
**parked** [3] - 116:19, 165:20, 186:5
**part** [2] - 60:22, 164:5
**particular** [5] - 26:15, 33:22, 54:1, 90:5, 178:17
**party** [9] - 60:7, 60:8, 60:9, 127:21, 128:1, 129:21, 176:17, 176:18, 216:5
**passed** [6] - 117:22, 121:1, 121:2, 121:6, 121:9, 121:11
**past** [1] - 125:3
**Pastor** [4] - 141:3, 141:10, 141:15, 142:2
**paternal** [1] - 44:19
**patrolled** [1] - 159:13
**patrolman** [1] - 159:12
**patrolmen** [1] - 159:16
**pay** [2] - 76:18, 130:16
**peacemaker** [2] - 141:16, 141:20
**Peanut** [6] - 176:13, 176:18, 176:20, 177:5
**Pearl** [1] - 1:20, 2:13
**pending** [5] - 95:4, 95:15, 102:13, 103:5, 112:18
**people** [21] - 30:9, 31:2, 128:8, 135:2, 139:23, 140:4, 140:12, 140:13, 141:17, 158:13, 159:8, 160:2, 160:4, 160:6, 180:6, 182:8, 182:12, 182:13, 185:7, 185:14
**Performing** [1] - 186:17
**perhaps** [5] - 9:17, 12:22, 68:4, 133:11, 133:20
**period** [4] - 38:12, 115:7, 133:22, 174:2
**PERSICO** [295] - 3:1, 4:9, 4:16, 6:17, 6:22, 7:1, 7:9, 8:9, 9:8, 9:10, 10:9, 12:12, 12:19, 13:4, 13:8, 13:12, 13:17, 13:18, 15:11, 16:17, 17:3, 17:4, 18:12, 18:16, 19:2, 19:8, 19:14,

19:21, 20:4, 20:7, 20:12, 20:16, 21:10, 21:21, 22:2, 22:10, 22:13, 22:17, 22:22, 23:3, 23:5, 23:13, 23:19, 23:23, 24:9, 25:2, 25:7, 25:12, 25:18, 26:2, 26:13, 27:16, 27:18, 28:19, 29:2, 29:12, 31:19, 32:16, 33:12, 34:17, 34:20, 35:2, 36:5, 36:12, 39:8, 39:12, 39:20, 40:3, 40:8, 40:13, 40:20, 41:8, 42:2, 42:6, 42:18, 43:1, 43:21, 44:3, 45:17, 45:21, 46:8, 46:10, 46:22, 47:3, 47:8, 47:11, 47:16, 47:19, 47:21, 47:22, 48:14, 49:4, 49:18, 50:4, 50:12, 51:3, 51:12, 51:16, 51:19, 52:3, 52:6, 52:8, 52:14, 53:13, 53:23, 54:4, 54:8, 54:10, 55:2, 55:8, 55:15, 55:22, 56:11, 56:13, 57:3, 57:6, 57:10, 57:21, 57:23, 58:7, 58:10, 58:21, 59:13, 60:5, 60:12, 60:16, 60:20, 61:8, 62:5, 62:11, 63:22, 64:6, 66:16, 67:4, 67:17, 68:2, 68:11, 68:16, 69:1, 69:10, 70:3, 70:8, 70:13, 71:3, 71:11, 71:19, 72:3, 73:13, 73:15, 73:19, 73:23, 74:4, 74:11, 74:17, 75:2, 75:5, 75:9, 75:14, 75:17, 76:2, 77:11, 77:12, 79:15, 82:18, 83:13, 83:14, 83:21, 84:1, 84:4, 84:11, 85:5, 85:13, 85:16, 85:18, 85:19, 86:5, 86:12, 87:20, 88:7, 89:15, 89:17, 89:20, 89:23, 93:2, 93:7, 93:17, 93:23, 95:12, 96:12, 97:21, 98:19, 99:6, 100:18, 100:20, 100:22, 103:14, 103:17, 103:19, 104:6, 105:15, 106:5, 106:13, 107:14, 107:15, 108:7, 109:2,

109:14, 109:16, 110:4, 110:9, 110:23, 111:2, 111:7, 111:8, 111:15, 112:11, 112:17, 112:22, 113:2, 113:7, 113:11, 113:13, 114:14, 114:18, 116:18, 117:8, 119:4, 119:17, 120:2, 121:4, 121:14, 122:13, 124:10, 124:13, 125:9, 126:3, 126:9, 129:23, 130:1, 130:10, 131:9, 131:16, 131:18, 132:4, 132:8, 132:13, 132:17, 132:21, 133:2, 133:5, 133:10, 134:2, 138:3, 138:14, 138:22, 139:6, 139:14, 139:22, 142:3, 143:20, 144:17, 145:19, 184:21, 185:9, 185:22, 189:3, 191:10, 193:2, 193:7, 193:13, 193:17, 193:23, 194:6, 194:9, 197:23, 198:6, 198:9, 199:1, 199:3, 199:15, 199:20, 199:22, 201:4, 201:9, 203:1, 203:9, 204:6, 204:19, 205:1, 210:1, 210:3, 211:9, 215:3, 215:7, 215:9
**Persico** [5] - 4:19, 146:11, 147:16, 154:13, 214:21
**person** [13] - 6:16, 7:13, 7:16, 39:14, 58:15, 60:23, 97:17, 141:3, 144:7, 182:20, 182:23, 184:14, 210:18
**personal** [2] - 133:6, 133:8
**personally** [1] - 124:19
**Peter** [2] - 113:8, 146:5
**PETER** [1] - 2:12
**phone** [13] - 6:15, 7:10, 7:12, 7:21, 16:5, 16:9, 16:11, 16:12, 16:18, 16:22, 117:12, 129:15, 130:9
**phones** [1] - 16:3
**pick** [8] - 14:5, 14:11, 15:4, 24:21, 117:15,

163:13, 186:8, 188:11
**picked** [6] - 14:9, 14:14, 17:5, 91:16, 163:12, 165:6
**picky** [1] - 193:23
**picture** [3] - 58:13, 58:15, 135:17
**pictures** [1] - 135:15
**pistol** [2] - 29:19, 101:7
**place** [10] - 16:5, 17:17, 52:23, 60:16, 84:13, 96:1, 116:13, 130:23, 131:5, 135:5
**places** [1] - 115:20
**plain** [1] - 190:14
**Plaintiff** [3] - 1:6, 1:17, 2:9
**plans** [1] - 209:19
**play** [3] - 53:20, 111:13, 171:22
**played** [8] - 54:3, 58:9, 58:20, 60:11, 61:7, 111:14, 171:23, 187:16
**playing** [2] - 57:20, 171:18
**Plaza** [1] - 3:2
**plea** [19] - 78:2, 90:15, 90:20, 90:21, 94:22, 95:11, 95:18, 96:4, 102:6, 102:7, 102:23, 104:2, 104:10, 104:13, 107:5, 107:6, 131:15, 138:10, 185:13
**plead** [1] - 138:8
**pleaded** [4] - 131:23, 137:21, 138:1, 138:6
**pleading** [2] - 104:16, 131:12
**pled** [3] - 104:15, 108:8, 131:1
**plenty** [3] - 71:18, 183:7, 183:9
**Plenty** [1] - 183:10
**point** [20] - 6:1, 14:4, 24:10, 49:7, 50:1, 50:14, 76:14, 84:22, 93:9, 108:13, 116:19, 178:2, 178:4, 178:8, 179:12, 182:17, 186:20, 189:17, 190:10, 192:11
**pointed** [2] - 184:13, 201:15
**pointer** [1] - 85:7
**pointing** [1] - 108:4
**Police** [14] - 1:11, 2:18, 46:3, 64:1,

64:12, 86:7, 86:23, 147:18, 148:8, 148:12, 154:1, 205:9, 214:12, 214:16

**police** [49] - 8:14, 8:16, 8:17, 8:18, 8:19, 24:12, 24:14, 25:9, 26:10, 31:7, 32:5, 32:8, 33:19, 36:1, 37:20, 43:4, 44:8, 54:20, 67:12, 68:18, 91:21, 92:6, 92:7, 97:22, 121:20, 122:4, 122:11, 142:16, 144:11, 146:7, 150:18, 150:22, 156:22, 188:17, 197:13, 199:17, 201:21, 201:23, 202:1, 204:14, 205:22, 205:23, 206:7, 206:10, 206:12, 206:13, 206:17, 207:18, 210:15

**polite** [1] - 84:4
**polygraph** [4] - 11:5, 11:6, 53:3, 145:15
**pop** [2] - 123:15
**porch** [1] - 167:14
**portion** [4] - 54:1, 59:21, 69:4, 127:19
**portray** [1] - 182:8
**position** [3] - 39:14, 135:20, 135:22
**positive** [1] - 173:1
**possess** [1] - 38:12
**possessed** [1] - 101:22
**possessing** [1] - 94:18
**possession** [11] - 33:10, 33:17, 35:22, 78:2, 87:9, 88:13, 97:1, 100:3, 100:11, 101:6, 105:3
**possessions** [2] - 33:1, 33:3
**possibility** [2] - 68:9, 162:4
**possible** [10] - 55:9, 55:14, 68:12, 70:4, 70:9, 70:11, 162:12, 162:15, 167:13, 192:12
**possibly** [9] - 28:15, 93:1, 93:15, 118:23, 144:22, 164:9, 173:3, 180:9
**Powell** - 167:19,

168:17
**preceding** [1] - 15:6
**preparation** [5] - 6:13, 7:4, 8:1, 8:5, 8:11
**preparing** [1] - 73:4
**presence** [1] - 213:10
**present** [2] - 157:5, 205:12
**presentation** [1] - 110:22
**presently** [1] - 46:4
**preserved** [1] - 19:22
**pretty** [2] - 39:7, 146:22
**previously** [4] - 32:21, 68:18, 154:12, 199:5
**principle** [2] - 142:13, 142:14
**prison** [14] - 66:15, 71:1, 134:11, 135:14, 135:18, 137:5, 137:9, 137:22, 152:22, 172:2, 173:4, 195:12, 201:19
**privilege** [1] - 32:15
**privileged** [8] - 73:14, 73:18, 74:2, 74:9, 74:10, 74:12, 74:13, 74:23
**problem** [4] - 82:7, 133:12, 137:6, 137:7
**problems** [1] - 164:18
**Procedure** [1] - 1:18
**proceeding** [3] - 8:1, 8:11, 73:5
**proceeds** [2] - 127:14, 127:20
**processed** [1] - 36:20
**produced** [1] - 193:13
**prohibit** [1] - 20:5
**proper** [1] - 13:10
**prosecutor** [3] - 144:4, 210:20, 211:2
**prosecutor's** [1] - 144:8
**prosecutors** [1] - 185:12
**prosecutory** [1] - 10:5
**protect** [7] - 55:10, 68:14, 92:6, 135:23, 181:13, 181:15, 181:16
**protecting** [1] -

185:4, 185:6
**protection** [1] - 180:19
**provide** [1] - 156:18
**provided** [1] - 48:9
**providing** [1] - 4:7
psahasra@ hodgsonruss.com [1] - 2:12
**PUBLIC** [1] - 212:16
**public** [1] - 121:2
**Public** [3] - 1:22, 213:5, 213:20
**pull** [1] - 154:10
**pulled** [12] - 33:9, 36:1, 37:20, 59:15, 59:17, 98:9, 98:14, 122:6, 125:1, 125:5, 169:23, 177:9
**pulling** [1] - 33:20
**purpose** [9] - 9:21, 53:6, 94:17
**pursuant** [1] - 1:17
**put** [15] - 41:19, 65:20, 115:2, 129:21, 133:19, 136:21, 139:21, 166:7, 167:7, 168:7, 169:1, 172:21, 210:12, 210:18, 216:5
**putting** [1] - 98:6

**Q**

**Q&A** [1] - 28:22
**quantity** [3] - 87:10, 87:11
**question's** [1] - 132:11
**questioned** [1] - 91:21
**questioning** [3] - 23:7, 146:18, 177:3
**questions** [36] - 5:11, 5:14, 13:11, 20:22, 21:12, 21:14, 21:15, 21:23, 22:1, 22:3, 22:5, 22:9, 22:21, 26:4, 45:11, 64:21, 71:16, 85:11, 86:21, 92:22, 115:5, 119:3, 139:3, 147:12, 151:15, 177:21, 191:17, 191:18, 191:23, 194:11, 194:13, 195:15, 195:17, 199:7, 203:6, 208:3
**queued** [1] - 53:17
**quick** [4] - 25:12, 25:22, 71:16, 100:16

**quickly** [1] - 122:7
**quite** [1] - 109:14

**R**

**raise** [1] - 142:11
**raised** [1] - 10:7
**ran** [14] - 108:10, 122:20, 122:21, 123:16, 125:1, 125:2, 125:4, 125:5, 125:6, 169:6, 169:7, 169:18, 187:13
**rang** [1] - 189:16
**RANIERO** [1] - 1:10
**Raniero** [5] - 2:16, 150:5, 150:6, 150:10, 150:17
**rap** [1] - 107:20
**Raven** [1] - 102:1
**reach** [5] - 135:2, 135:8, 135:9, 136:3, 140:1
**reached** [3] - 140:10, 140:11, 141:4
**reaches** [1] - 129:4
**read** [34] - 4:2, 4:4, 8:4, 8:5, 8:6, 8:7, 8:10, 20:9, 20:11, 22:15, 22:16, 25:23, 26:7, 28:3, 28:11, 28:16, 29:5, 43:3, 43:7, 45:10, 45:13, 45:16, 45:18, 46:15, 47:20, 64:19, 65:14, 66:23, 88:13, 147:7, 192:1, 193:21, 206:19, 212:1
**reader** [1] - 64:23
**reading** [3] - 28:18, 83:1, 207:1
**ready** [1] - 163:7
**real** [3] - 83:4, 113:18, 113:19
**reality** [1] - 91:8
**realize** [1] - 45:14
**realized** [1] - 138:9
**really** [16] - 18:3, 19:17, 20:10, 75:19, 75:20, 83:11, 97:17, 99:19, 105:8, 129:1, 131:22, 133:8, 135:22, 136:11, 138:9, 170:14
**reason** [7] - 28:15, 28:20, 70:14, 72:23, 107:19, 143:21, 185:2
**reasonable** [1] - 100:16
**reasons** [1] - 142:11

**receive** [1] - 185:15
**received** [13] - 12:21, 12:22, 13:19, 15:21, 16:4, 82:15, 82:16, 82:19, 123:8, 129:20, 138:1, 138:2, 216:3
**recent** [1] - 10:10
**recently** [2] - 43:8, 66:8
**reception** [1] - 78:9
**recess** [8] - 23:4, 42:5, 75:23, 100:21, 113:12, 146:1, 191:13, 196:20
**reckless** [1] - 104:17
**recognize** [1] - 59:5
**recollect** [1] - 105:8
**recollection** [6] - 111:16, 119:18, 154:2, 152:16, 154:3, 191:3
**record** [25] - 13:6, 13:9, 18:13, 18:15, 20:11, 22:16, 26:14, 44:6, 51:14, 51:15, 51:16, 57:8, 57:9, 57:20, 86:15, 93:13, 108:3, 108:4, 110:7, 110:8, 112:21, 139:10, 146:5, 203:5, 203:12
**recorded** [3] - 129:19, 207:19, 216:2
**recovered** [2] - 73:3, 123:6
**recovery** [1] - 127:14
**recreational** [1] - 158:10
**red** [6] - 24:5, 116:22, 161:16, 161:17, 185:23, 188:17
**redirect** [1] - 198:22
**reduced** [1] - 213:10
**refer** [2] - 110:19, 191:21
**reference** [1] - 109:11
**referring** [1] - 139:10
**reflected** [3] - 154:22, 206:16, 206:18
**reflection** [1] - 155:5
**refresh** [1] - 111:16
**refuse** [1] - 106:23
**refused** [3] - 91:23, 92:10, 128:22
**regard** [1] - 200:22
**regular** [1] - 109:8
**regularly** [1] - 159:12

**reinvestigation** [1] - 12:7

**related** [4] - 91:7, 100:2, 161:12, 172:5

**relates** [4] - 87:4, 94:12, 96:19, 99:15

**relating** [4] - 88:20, 101:2, 101:17, 104:22

**relation** [1] - 44:16

**relationship** [1] - 45:3

**relative** [6] - 39:5, 77:19, 80:15, 99:9, 106:20, 213:15

**relay** [1] - 62:1

**released** [4] - 135:14, 206:4, 206:5, 206:15

**relevant** [4] - 42:12, 93:1, 93:5, 93:10

**relieved** [2] - 76:23, 77:1

**remain** [2] - 27:9, 36:22

**remained** [5] - 94:16, 167:19, 168:18, 168:21, 169:2

**remember** [53] - 15:23, 16:2, 16:8, 16:13, 16:14, 28:5, 28:18, 38:21, 51:7, 51:9, 55:23, 56:5, 57:1, 66:12, 104:14, 104:16, 105:10, 105:13, 120:11, 120:13, 120:14, 120:17, 120:22, 126:1, 126:2, 144:18, 145:3, 145:8, 149:12, 152:12, 153:3, 153:10, 162:7, 162:11, 163:16, 164:13, 175:14, 188:16, 189:7, 189:9, 189:11, 189:20, 189:23, 190:2, 190:4, 190:6, 190:18, 190:22, 192:10, 194:18, 195:2, 195:6

**remembering** [1] - 110:12

**remembers** [1] - 152:7

**repeat** [2] - 146:14, 152:6

**repeatedly** [1] - 110:2

**rephrase** [1] - 5:12

**report** [2] - 205:17, 213:7

**reporter** [1] - 58:14

**REPORTER** [2] - 4:1, 4:5

**reports** [5] - 108:19, 150:19, 150:23, 206:7, 206:17

**represent** [6] - 4:19, 11:23, 35:8, 77:23, 97:11, 146:6

**represented** [14] - 32:21, 34:15, 38:1, 76:12, 76:21, 77:2, 77:3, 77:9, 77:20, 90:11, 95:8, 95:10, 100:12, 101:14

**representing** [1] - 77:9

**reputation** [1] - 181:5

**request** [1] - 70:5

**requested** [2] - 20:11, 22:16

**resembled** [1] - 111:21

**reserve** [1] - 4:3

**residences** [1] - 115:19

**resolution** [3] - 10:16, 53:8, 126:12

**resolved** [5] - 102:5, 103:22, 104:1, 105:6, 107:4

**respect** [5] - 149:6, 150:4, 151:5, 151:19, 156:6

**respected** [2] - 134:10, 137:2

**respond** [1] - 174:4

**responded** [1] - 30:13

**response** [4] - 15:19, 41:21, 194:13, 199:6

**responsive** [1] - 108:15

**rest** [4] - 6:18, 59:22, 128:12, 143:1

**restroom** [1] - 100:17

**retained** [1] - 214:21

**retribution** [1] - 92:16

**retrieve** [1] - 25:4

**returned** [1] - 24:21

**review** [10] - 7:23, 9:1, 11:14, 44:12, 45:15, 45:18, 66:1, 66:6, 73:6, 82:11

**reviewed** [4] - 9:7, 9:12, 42:12, 55:17, 66:11, 154:12

**reviewing** [1] - 186:3

**rewind** [1] - 60:13

**Rich** [1] - 18:4

**rich** [1] - 163:14

**Richard** [9] - 2:17, 14:6, 17:18, 18:1, 151:6, 151:9, 163:14, 165:6, 165:15

**RICHARD** [1] - 1:11

**Richard's** [1] - 163:18

**Richardson** [1] - 81:15

**rid** [2] - 111:23, 112:1

**Ridgeway** [2] - 128:15, 140:6

**ridiculous** [3] - 83:22, 84:2, 95:1

**rifle** [12] - 35:5, 35:6, 35:7, 105:4, 105:20, 106:22, 108:17, 108:20, 109:5, 109:6, 179:19

**right-hand** [2] - 26:19, 60:22

**rights** [2] - 25:10, 29:5

**rob** [2] - 90:3, 182:1

**robbed** [3] - 34:23, 90:2, 180:15

**Rochester** [1] - 2:8

**rode** [1] - 202:21

**rolled** [1] - 176:19

**rolling** [1] - 176:20

**ROMO** [2] - 2:2, 111:6

**room** [3] - 150:10, 150:13, 153:23

**round** [1] - 193:14

**Rounds** [2] - 115:12, 115:15

**rounds** [5] - 101:23, 102:2, 121:11, 125:15, 125:17

**rule** [1] - 162:3

**Rules** [1] - 1:18

**rules** [6] - 5:1, 19:16, 20:4, 146:11, 146:18

**run** [8] - 13:12, 13:13, 13:14, 116:13, 142:21, 147:17, 148:8, 166:19

**run-ins** [2] - 147:17, 148:8

**running** [10] - 31:1, 96:11, 122:8, 125:3, 125:7, 169:9, 169:11, 169:13, 169:21, 177:5

**RUSS** [3] - 1:19,

2:10, 2:11

**Russ** [2] - 33:11, 146:6

**RX-7** [4] - 14:5, 18:2, 24:5, 41:5, 164:5, 188:18

**S**

**safety** [3] - 190:12, 190:16, 190:19

**Sahasrabudhe** [1] - 146:5

**SAHASRABUDHE** [67] - 2:12, 4:10, 16:22, 17:2, 107:12, 113:4, 129:18, 139:9, 139:13, 145:22, 146:3, 149:14, 152:9, 152:11, 153:1, 153:9, 155:3, 155:10, 156:17, 157:1, 158:3, 158:20, 159:2, 160:12, 161:22, 162:16, 163:5, 163:11, 164:21, 165:3, 167:16, 168:9, 169:4, 170:8, 174:9, 174:17, 175:2, 179:16, 180:10, 180:16, 181:2, 181:8, 181:14, 182:6, 182:22, 183:16, 184:1, 184:6, 189:21, 190:9, 190:23, 191:7, 194:20, 197:4, 198:1, 198:5, 198:7, 198:11, 198:20, 205:4, 205:7, 207:7, 211:11, 215:4, 215:6, 215:8, 216:1

**Sara** [2] - 10:12, 192:2

**Sarah** [1] - 52:17

**satisfaction** [1] - 26:5

**saw** [17] - 11:12, 61:11, 61:23, 62:14, 70:19, 72:10, 72:20, 123:19, 123:21, 124:7, 124:18, 125:10, 125:14, 147:5, 153:23, 169:9, 169:11

**scenario** [1] - 201:6

**scene** [22] - 39:15, 50:2, 56:20, 57:2, 62:7, 66:21, 71:8, 72:8, 73:2, 83:18, 84:13, 84:21, 91:20, 123:7, 125:7, 173:17,

185:23, 200:6, 200:17, 202:21, 206:14, 209:5

**SCHECK** [1] - 2:1

**SCHIFFRIN** [1] - 2:6

**scholarship** [2] - 171:3, 171:13

**school** [5] - 98:8, 186:16, 186:17, 187:14, 187:21

**scope** [1] - 203:5

**Scott** [34] - 14:6, 14:11, 14:14, 18:22, 24:3, 31:7, 39:15, 43:11, 55:17, 56:14, 56:19, 57:12, 57:16, 62:1, 66:21, 67:19, 69:20, 70:15, 72:10, 73:2, 73:7, 74:20, 79:1, 79:5, 79:17, 79:19, 80:5, 80:9, 84:15, 118:2, 122:18, 126:6, 126:10, 126:18, 127:13, 129:7, 129:20, 130:4, 131:1, 131:11, 131:20, 133:14, 133:22, 135:12, 135:16, 135:18, 136:11, 136:14, 137:12, 138:5, 139:18, 140:2, 141:6, 142:7, 159:19, 161:16, 161:23, 162:22, 163:13, 163:16, 163:23, 164:7, 166:10, 167:9, 169:19, 173:5, 173:11, 175:6, 183:19, 184:3, 184:22, 185:2, 189:23, 190:18, 191:20, 192:14, 192:21, 195:16, 195:21, 196:1, 196:14, 200:9, 200:23, 202:19, 204:21, 205:10, 207:18, 209:12, 211:2, 211:4, 214:10, 216:3, 216:4

**Scott's** [4] - 80:12, 131:12, 200:4, 210:5

**screen** [4] - 52:15, 58:17, 59:1, 60:22

**screenshotted** [1] - 129:16

**Sean** [5] - 32:7, 77:5, 97:13, 100:14, 101:15

**search** [1] - 87:12

**season** [1] - 14:10
**seat** [1] - 164:4
**seated** [1] - 97:2
**seater** [1] - 18:2
**second** [16] - 28:9, 29:14, 30:7, 30:8, 36:1, 51:13, 60:19, 105:7, 110:5, 168:12, 186:6, 197:23, 203:3, 203:6, 203:11
**secondhand** [4] - 147:1, 147:6, 151:11, 211:3
**seconds** [4] - 23:1, 58:23, 191:11, 196:19
**secret** [2] - 36:7, 36:10
**section** [1] - 79:10
**Section** [1] - 46:3
**see** [60] - 21:9, 26:18, 27:2, 27:5, 27:8, 27:23, 28:9, 29:17, 29:20, 29:21, 30:11, 30:21, 44:8, 46:1, 46:5, 46:12, 46:17, 47:10, 47:13, 47:23, 48:5, 52:20, 60:21, 61:3, 64:11, 64:16, 65:3, 65:15, 65:21, 72:19, 87:2, 87:23, 89:2, 89:4, 89:16, 89:21, 91:11, 94:4, 102:14, 102:21, 107:2, 122:18, 122:23, 139:16, 153:19, 155:13, 155:14, 156:1, 164:19, 167:9, 168:1, 176:16, 189:2, 194:22, 195:20, 196:10, 200:20, 203:10, 203:20, 203:21
**seeing** [2] - 188:16, 207:17
**seeking** [2] - 53:9, 112:13
**seem** [1] - 207:16
**sees** [1] - 22:8
**self** [2] - 122:10, 122:15
**self-defense** [2] - 122:10, 122:15
**sell** [2] - 157:14, 160:14
**selling** [4] - 85:23, 86:2, 181:22, 183:10
**sense** [3] - 144:16, 173:10, 173:13
**sent** [2] - 129:12

**sentence** [2] - 46:17, 104:4
**sentenced** [4] - 103:8, 104:5, 104:11, 108:9
**sentencing** [1] - 78:5
**September** [1] - 76:6
**serious** [5] - 21:23, 22:1, 40:2, 40:22, 90:9
**serve** [1] - 102:10
**served** [1] - 197:2
**Services** [3] - 86:8, 86:23, 214:16
**services** [1] - 76:19
**serving** [2] - 95:22, 96:8
**set** [1] - 212:3
**seven** [6] - 102:2, 125:17, 143:14, 160:6, 187:4, 188:3
**several** [4] - 33:4, 70:23, 135:2, 140:12
**shakes** [1] - 5:5
**Shannon** [10] - 8:22, 160:22, 170:9, 170:13, 170:15, 170:23, 171:7, 176:2, 200:14, 200:15
**share** [1] - 127:13
**Shawn** [8] - 87:23, 91:7, 94:6, 97:16, 97:23, 98:5, 98:7, 98:23
**Shawn's** [1] - 98:16
**sheet** [2] - 107:21, 212:4
**shells** [1] - 123:6
**Shelly** [1] - 167:1
**shift** [1] - 167:2
**shoot** [6] - 89:6, 106:22, 109:7, 181:9, 192:22
**shooter** [3] - 83:18, 84:9, 204:22
**shooting** [54] - 30:10, 31:8, 39:5, 39:16, 46:4, 62:2, 65:18, 67:13, 72:5, 72:11, 72:19, 77:19, 83:10, 83:16, 83:20, 90:23, 91:15, 91:18, 92:8, 95:16, 99:19, 104:11, 104:13, 109:18, 109:23, 116:13, 117:21, 117:23, 119:6, 121:17, 122:6, 122:17, 122:19, 122:23, 125:22,

136:15, 144:1, 169:13, 169:20, 172:10, 177:14, 183:20, 184:2, 184:7, 185:14, 188:14, 188:21, 189:5, 191:20, 192:7, 192:8, 198:17, 200:23, 209:9
**short** [1] - 171:5
**shorthand** [1] - 213:9
**shortly** [3] - 104:10, 154:4, 155:17
**shot** [12] - 35:1, 35:3, 89:11, 91:19, 101:21, 108:1, 179:13, 179:17, 179:19, 179:23, 180:4, 196:14
**shotgun** [1] - 101:7
**shots** [5] - 123:11, 123:12, 124:3, 189:15, 189:16
**show** [1] - 194:2
**showed** [2] - 167:19, 168:2
**showing** [1] - 168:17
**side** [3] - 26:19, 108:4, 123:19
**sign** [2] - 4:2, 4:4
**signature** [2] - 27:23, 28:6
**signed** [1] - 28:4
**silent** [1] - 27:9
**silver** [1] - 125:11
**similarly** [1] - 24:1
**Simmons** [4] - 141:4, 141:10, 141:15, 142:2
**simply** [1] - 51:22
**single** [3] - 45:14, 64:8, 189:9
**single-page** [1] - 64:8
**single-spaced** [1] - 45:14
**sister** [4] - 80:19, 128:11, 128:14, 140:5
**sit** [11] - 141:1, 141:11, 141:13, 141:22, 149:3, 150:16, 152:3, 174:3, 196:13, 207:3, 207:16
**sit-down** [4] - 141:1, 141:11, 141:13, 141:22
**sitting** [2] - 167:14, 189:18
**situation** [1] - 125:2
**six** [16] - 14:19, 31:2, 101:23, 102:9, 104:12, 158:8,

158:16, 158:22, 172:9, 188:6, 189:5, 189:8, 204:23
**size** [1] - 178:12
**skinny** [3] - 170:23, 172:11, 172:14
**skip** [2] - 65:11, 99:7
**Sly** [3] - 195:9, 195:10, 195:13
**small** [5] - 46:2, 87:10, 87:11, 94:15, 125:16
**Smith** [7] - 175:19, 175:22, 176:1, 176:6, 176:12, 176:23, 177:17
**snide** [1] - 138:23
**sold** [3] - 94:15, 114:3, 157:12
**someone** [11] - 117:22, 121:2, 121:10, 134:10, 147:8, 173:14, 180:21, 181:5, 181:9, 181:12, 182:16
**sometime** [6] - 12:21, 15:1, 103:1, 112:2, 129:1, 134:21
**sometimes** [2] - 158:19, 159:1
**somewhat** [1] - 82:10
**somewhere** [6] - 16:11, 33:15, 143:3, 205:21, 206:8
**son** [1] - 201:18
**Son** [1] - 209:14
**soon** [3] - 93:3, 93:19, 113:6
**sorry** [19] - 8:4, 18:10, 23:21, 36:17, 47:6, 47:19, 54:8, 62:19, 74:23, 99:13, 110:5, 124:1, 128:14, 151:7, 152:9, 165:5, 175:17, 193:5, 194:8
**sort** [4] - 15:18, 45:8, 118:21, 139:16
**source** [1] - 108:23
**sources** [1] - 105:11
**spaced** [1] - 45:14
**speaking** [5] - 6:18, 12:2, 19:18, 143:18, 192:17
**specifically** [1] - 17:16
**specifics** [1] - 141:21
**speculate** [1] - 35:14
**speculation** [1] -

15:9
**split** [1] - 187:19
**Splitting** [1] - 4:6
**spoken** [3] - 6:6, 80:12, 129:17
**spot** [1] - 75:15
**Sr** [1] - 101:22
**ss** [1] - 213:2
**STAMBACH** [1] - 1:9
**Stambach** [18] - 2:16, 151:18, 151:21, 152:1, 152:4, 152:12, 152:17, 153:3, 153:13, 153:19, 153:23, 154:16, 154:20, 155:6, 156:1, 156:3, 194:15, 197:1
**stamp** [3] - 51:20, 64:10, 193:18
**stamped** [3] - 44:5, 57:11, 193:20
**stamps** [2] - 26:22, 86:16
**stand** [3] - 159:12, 181:23, 182:19
**standing** [2] - 123:18, 177:6
**Stark** [2] - 56:15, 58:14
**start** [8] - 53:22, 54:1, 58:5, 86:22, 98:7, 117:9, 133:11, 182:12
**started** [14] - 5:2, 59:19, 76:9, 96:5, 96:14, 98:6, 104:4, 122:6, 122:17, 175:13, 175:21, 177:10, 177:16, 198:13
**starting** [1] - 128:11
**starts** [1] - 65:13
**state** [2] - 93:13, 142:21
**STATE** [1] - 213:1
**State** [1] - 213:6
**statement** [29] - 9:1, 24:15, 25:8, 26:6, 26:8, 26:9, 28:11, 28:16, 29:4, 29:13, 32:6, 42:10, 43:3, 44:7, 45:10, 45:19, 48:7, 50:16, 50:21, 66:23, 68:7, 68:18, 69:2, 154:15, 154:23, 155:18, 199:17, 203:13, 208:2
**statements** [13] - 8:14, 8:16, 8:17, 8:19, 42:20, 44:10, 54:19,

126:21, 156:23, 157:3, 157:6, 205:21
**STATES** [1] - 1:3
**states** [1] - 96:21
**stating** [2] - 19:19, 53:21
**station** [10] - 24:15, 25:9, 32:5, 32:8, 201:23, 202:1, 205:22, 205:23, 206:10, 206:12
**stayed** [5] - 76:7, 79:7, 102:13, 102:17, 166:2
**stemmed** [1] - 40:14
**stepfather** [4] - 44:21, 203:17, 208:7, 208:11
**sticking** [1] - 145:4
**still** [8] - 67:11, 112:18, 118:19, 118:20, 121:12, 154:8, 178:12, 178:13
**stipulations** [1] - 4:1
**stood** [4] - 190:12, 190:19
**stop** [12] - 16:11, 22:3, 22:10, 33:13, 54:6, 58:6, 60:15, 60:17, 93:12, 93:21, 132:9
**stopped** [5] - 58:11, 58:22, 60:18, 133:3, 178:7
**store** [4] - 122:20, 123:13, 128:13, 189:15
**stories** [2] - 53:18, 55:12
**story** [7] - 12:15, 51:6, 55:5, 67:22, 68:5, 69:23, 145:4
**straight** [2] - 119:2, 202:4
**strange** [1] - 105:14
**Stratford** [1] - 113:20
**stray** [1] - 115:5
**Street** [6] - 1:20, 2:3, 2:7, 2:13, 4:12, 61:14
**street** [7] - 31:3, 72:22, 122:3, 125:6, 162:9, 190:15, 197:14
**streets** [3] - 92:5, 138:12, 158:12
**Streets** [1] - 101:22
**strike** [8] - 12:1, 24:2, 84:14, 146:21, 151:7, 152:9, 152:10, 175:17
**strong** [1] - 171:5

**structure** [1] - 148:11
**struggle** [1] - 97:4
**stuff** [4] - 6:21, 43:15, 81:14, 140:17
**subdued** [1] - 97:5
**subsequent** [2] - 41:22, 54:21
**substance** [6] - 56:1, 64:20, 69:3, 74:19, 126:20, 164:13
**suffered** [1] - 65:5
**suggest** [1] - 196:6
**suggested** [1] - 207:17
**suggestion** [1] - 200:21
**suit** [1] - 127:14
**Suite** [4] - 1:20, 2:7, 2:13, 3:2
**sum** [4] - 15:18, 69:3, 74:19, 126:20
**Supervisors** [2] - 1:11, 2:19
**supplied** [1] - 214:21
**supplying** [2] - 4:5, 4:7
**supposed** [2] - 136:22, 141:14
**survive** [1] - 183:12
**survived** [2] - 136:20, 136:21
**suspected** [1] - 85:22
**suspended** [1] - 98:10
**swarming** [1] - 188:17
**sweet** [5] - 138:11, 185:8, 185:11, 185:13, 185:15
**sworn** [3] - 4:13, 27:6, 213:13
**Sworn** [1] - 212:11
**system** [2] - 138:16, 143:8

## T

**tall** [2] - 170:15, 172:7
**tape** [3] - 176:16, 193:6, 207:19
**tape-recorded** [1] - 207:19
**targeted** [1] - 181:21
**TEC-9** [19] - 14:12, 14:15, 14:19, 29:19, 41:5, 41:18, 61:20, 65:18, 67:13, 72:4,

72:7, 73:1, 84:18, 109:23, 112:8, 164:2, 190:1, 190:11, 196:2
**technology** [1] - 111:1
**telephone** [3] - 13:22, 14:4, 128:23
**televised** [5] - 56:10, 56:15, 70:16, 200:4, 200:6
**television** [1] - 56:9
**ten** [11] - 60:18, 67:10, 76:7, 76:8, 76:9, 78:15, 79:6, 79:7, 83:7, 137:1, 165:17
**ten-minute** [1] - 165:17
**term** [1] - 134:5
**terms** [2] - 51:21, 160:8
**Terranova** [10] - 76:14, 76:20, 76:21, 77:2, 77:20, 77:23, 90:13, 95:6, 97:11, 108:12
**terrible** [1] - 14:10
**test** [1] - 145:16
**testified** [12] - 4:13, 18:20, 19:3, 23:7, 24:1, 24:3, 49:11, 67:19, 156:19, 161:15, 204:21
**testify** [7] - 23:15, 70:16, 91:16, 91:22, 92:7, 92:14, 213:14
**testifying** [4] - 22:3, 22:5, 92:6, 93:14
**testimony** [31] - 24:20, 43:7, 51:7, 54:16, 54:21, 66:1, 66:7, 66:18, 66:20, 67:5, 69:12, 69:17, 69:19, 73:10, 74:19, 83:16, 92:16, 113:14, 146:11, 161:19, 165:9, 166:21, 167:17, 168:18, 169:5, 172:3, 188:12, 196:9, 210:5, 210:10, 212:5
**text** [5] - 129:12, 129:15, 129:20, 139:21, 216:3
**THE** [156] - 4:1, 4:5, 7:8, 8:6, 10:4, 12:11, 12:18, 13:3, 15:10, 16:16, 19:1, 19:7, 20:15, 21:4, 21:7, 21:20, 23:11, 23:22,

24:8, 25:1, 25:6, 26:12, 27:17, 28:18, 29:1, 29:10, 31:18, 34:19, 34:23, 36:9, 39:7, 39:11, 39:18, 40:1, 40:7, 40:12, 40:19, 41:7, 42:16, 42:23, 45:20, 47:14, 48:11, 49:1, 49:16, 49:23, 50:10, 53:12, 55:1, 55:7, 55:14, 57:1, 59:12, 60:3, 62:4, 62:10, 66:13, 66:15, 67:3, 67:16, 68:1, 68:9, 68:14, 69:9, 70:2, 70:7, 70:11, 70:23, 71:10, 72:2, 82:15, 84:9, 85:2, 87:19, 89:18, 95:10, 96:4, 96:10, 97:20, 98:18, 103:22, 105:13, 106:2, 106:7, 108:6, 108:16, 109:1, 110:3, 112:10, 114:10, 114:17, 116:17, 119:23, 120:21, 121:8, 122:2, 124:9, 124:18, 126:2, 126:8, 130:8, 131:4, 131:7, 131:17, 134:1, 138:1, 138:8, 139:21, 141:20, 142:12, 144:3, 152:20, 153:8, 155:2, 155:9, 156:16, 156:22, 158:2, 158:19, 159:1, 160:11, 162:15, 163:3, 163:10, 164:17, 167:12, 167:22, 168:21, 169:2, 170:7, 174:7, 179:15, 180:9, 180:14, 181:1, 181:7, 181:12, 181:19, 182:11, 183:3, 183:22, 184:5, 184:20, 185:6, 185:20, 189:1, 189:20, 190:6, 190:22, 199:13, 201:3, 201:8, 202:23, 204:4, 204:10, 211:12
**themselves** [2] - 181:13, 187:15
**thinking** [2] - 123:17, 130:19
**thinks** [1] - 138:5
**third** [7] - 29:18, 30:17, 65:12, 127:21, 128:1, 129:21, 216:4

**Thompson** [4] - 9:17, 11:20, 18:14, 52:19
**THOMPSON** [4] - 2:6, 2:7, 109:5, 168:20
**thread** [1] - 139:16
**threats** [2] - 168:3, 168:6
**three** [16] - 10:22, 11:3, 18:1, 65:5, 94:22, 94:23, 95:11, 95:19, 120:5, 131:7, 132:11, 156:6, 166:22, 185:14, 188:10, 193:7
**throughout** [1] - 205:20
**throwing** [1] - 106:11
**ties** [1] - 136:18
**timeframes** [1] - 132:23
**timestamp** [2] - 51:22, 111:13
**timing** [5] - 119:5, 132:3, 132:7, 132:10
**Tino** [7] - 46:19, 47:4, 48:2, 48:3, 65:19, 203:18, 208:7
**TO** [2] - 214:1, 215:1
**today** [16] - 8:5, 8:7, 9:16, 56:2, 66:12, 83:17, 149:3, 150:16, 152:3, 162:10, 163:7, 174:3, 196:13, 207:3, 207:13, 207:16
**today's** [7] - 6:13, 7:4, 8:1, 8:11, 25:21, 73:5
**together** [11] - 18:1, 18:18, 50:23, 69:7, 79:9, 203:16, 203:18, 208:6, 208:8, 208:17, 208:22
**Toine** [4] - 169:6, 169:14, 169:16, 189:12
**Toine's** [2] - 15:6, 40:16
**tongue** [1] - 85:18
**tonight** [1] - 187:23
**took** [20] - 35:1, 35:3, 48:3, 48:19, 53:3, 76:20, 83:7, 94:22, 96:1, 96:4, 104:13, 131:4, 135:5, 135:21, 145:15, 166:1, 166:23, 177:5, 185:13, 209:2
**tooken** [1] - 186:9

**top** [3] - 27:2, 64:11, 194:4
**Torri** [12] - 39:5, 95:16, 123:20, 124:7, 144:4, 176:19, 176:21, 177:8, 192:22, 195:21, 196:2, 196:14
**Torriano** [12] - 59:16, 62:2, 95:19, 96:6, 99:19, 104:3, 122:5, 131:2, 131:12, 156:11, 161:2, 184:13
**tossed** [1] - 179:18
**totally** [1] - 187:17
**touch** [2] - 80:3, 82:1
**tough** [6] - 174:10, 174:11, 181:5, 181:12, 181:22, 182:4
**toward** [1] - 122:21
**towards** [4] - 35:1, 125:2, 125:5, 125:6, 125:7, 169:11, 169:13, 169:21
**towed** [1] - 186:10
**track** [2] - 36:17, 139:17
**traffic** [2] - 33:19, 97:3
**transcript** [8] - 4:6, 13:7, 52:2, 73:6, 192:1, 193:3, 193:4, 212:4
**transcripts** [1] - 4:8
**transferred** [1] - 32:1
**travels** [1] - 143:1
**Travis** [3] - 167:19, 168:3, 168:17
**tree** [1] - 81:14
**trial** [20] - 1:16, 10:6, 37:1, 76:9, 78:4, 90:6, 90:14, 91:22, 93:16, 95:19, 96:1, 96:5, 96:14, 100:9, 100:10, 101:12, 101:13, 148:21, 149:8, 149:10
**tried** [1] - 92:17
**tries** [1] - 116:14
**trouble** [9] - 14:1, 31:15, 40:1, 40:5, 40:9, 40:14, 40:21, 110:11, 182:12
**true** [12] - 17:3, 18:22, 19:1, 24:6, 24:8, 30:5, 30:6, 30:15, 30:16, 71:23, 183:3, 212:4
**trust** [1] - 145:9
**trusted** [1] - 173:14
**truth** [6] - 130:17,

145:3, 145:13, 213:14, 213:15
**truthfully** [1] - 62:1
**try** [2] - 143:6, 194:3
**trying** [29] - 46:14, 50:2, 55:4, 55:10, 59:18, 60:16, 68:14, 103:19, 105:7, 106:8, 119:5, 124:20, 127:2, 127:11, 130:19, 132:12, 132:17, 134:15, 135:2, 135:8, 135:9, 136:3, 137:4, 140:1, 144:4, 169:19, 183:12, 183:14, 194:1
**turn** [10] - 27:20, 91:5, 94:1, 94:9, 96:16, 97:14, 100:23, 101:16, 104:21, 203:2
**turned** [2] - 122:22, 143:16
**turning** [1] - 120:22
**tussling** [1] - 123:20
**TV** [2] - 120:22, 202:20
**twice** [1] - 92:17
**two** [26] - 8:23, 11:2, 11:4, 18:2, 29:17, 37:21, 49:3, 50:15, 62:16, 78:11, 96:5, 96:6, 102:8, 108:19, 113:7, 141:22, 141:22, 156:6, 166:6, 166:21, 166:22, 171:12, 177:13, 177:14, 186:16, 191:11
**two-minute** [1] - 113:7
**two-seater** [1] - 18:2
**type** [8] - 46:1, 105:23, 109:5, 109:8, 109:10, 142:18, 182:20, 201:6
**typed** [1] - 155:12
**typo** [1] - 28:15

**U**

**um-hum** [2] - 68:22, 154:9
**unable** [1] - 72:19
**under** [4] - 87:9, 105:19, 107:1, 213:10
**understood** [5] - 5:15, 12:5, 27:13, 130:2, 196:1
**unfamiliar** [1] - 110:13
**unforgiveable** [1] -

136:19
**unique** [1] - 39:13
**unit** [2] - 197:1, 197:2
**UNITED** [1] - 1:3
**unknown** [1] - 89:6
**Unknown** [2] - 1:11, 2:18
**unless** [3] - 75:7, 93:5, 143:2
**unreachable** [2] - 135:10, 136:5
**unsure** [1] - 102:16
**up** [65] - 11:9, 12:1, 14:6, 14:9, 14:11, 14:14, 15:4, 15:18, 15:20, 17:5, 21:12, 21:15, 24:21, 27:19, 32:4, 41:10, 44:15, 52:15, 53:17, 59:15, 62:1, 69:13, 84:21, 91:16, 108:17, 113:6, 115:6, 117:11, 117:15, 122:6, 125:6, 135:4, 145:19, 155:11, 163:12, 163:13, 163:18, 165:6, 167:19, 168:2, 168:17, 171:18, 173:11, 176:19, 181:23, 182:19, 183:18, 184:20, 184:23, 185:17, 186:8, 187:18, 187:19, 188:11, 191:9, 191:16, 198:1, 199:4, 202:12, 205:3, 207:8, 207:9, 210:12, 210:18, 210:22
**upset** [4] - 135:7, 135:21, 136:2, 136:7
**usual** [1] - 4:1
**Uzi** [6] - 61:15, 71:22, 110:15, 111:19, 111:20, 112:7

**V**

**vacate** [1] - 53:9
**vacated** [1] - 80:6
**vague** [3] - 12:17, 106:17, 120:11
**Val** [2] - 80:21
**Valentina** [2] - 80:18, 82:1
**Valentina's** [4] - 80:19, 80:20, 80:22, 81:1
**Valentino** [8] - 46:19, 47:4, 48:2, 52:11,

60:21, 98:1, 128:17, 214:8
**VALENTINO** [6] - 1:1, 1:5, 1:16, 4:12, 212:9, 215:3
**Valentino's** [1] - 134:8
**valid** [1] - 98:15
**various** [4] - 86:9, 103:4, 148:11, 214:17
**verbal** [1] - 5:6
**verbatim** [2] - 164:15, 213:8
**verdict** [1] - 90:17
**version** [3] - 167:17, 183:18, 194:4
**vicinity** [1] - 148:20
**Vickerd** [4] - 2:17, 149:5, 149:16, 149:18
**VICKERD** [1] - 1:10
**Video** [3] - 58:9, 60:11, 61:7
**video** [8] - 51:11, 54:3, 57:11, 58:2, 58:20, 70:19, 111:14, 200:20
**videos** [1] - 11:14
**videotape** [3] - 52:16, 54:12, 57:5
**videotaped** [11] - 11:11, 43:10, 43:18, 52:10, 55:18, 56:1, 57:15, 61:10, 71:21, 214:7, 214:10
**view** [2] - 43:10, 71:2
**violate** [1] - 182:13
**violation** [1] - 10:5
**visible** [1] - 164:6
**visit** [2] - 63:13, 63:17
**visited** [1] - 201:12
**voice** [4] - 59:1, 59:3, 59:5, 200:12
**vs** [1] - 1:7

**W**

**wait** [1] - 119:16
**waiting** [1] - 104:4
**waived** [1] - 32:15
**Walden** [1] - 89:7
**walked** [1] - 84:21
**Wanda** [2] - 56:15, 58:14
**wants** [4] - 21:12, 21:14, 129:8, 139:19
**warrant** [2] - 87:12, 91:11
**watch** [2] - 61:10, 120:22

**weapon** [7] - 34:3, 34:5, 39:15, 40:22, 41:1, 67:20, 89:6
**weapons** [1] - 78:1
**weed** [1] - 157:14
**week** [1] - 8:8
**weeks** [4] - 15:7, 40:16, 177:13, 177:14
**weighed** [2] - 171:8, 171:11
**Wende** [1] - 78:17
**West** [1] - 2:7
**WESTERN** [1] - 1:4
**WEXLER** [1] - 3:1
**whatsoever** [2] - 209:4, 209:7
**white** [9] - 186:4, 186:5, 186:11, 186:12, 186:14, 186:19, 187:22, 188:12, 188:18
**whoa** [5] - 73:20, 174:22
**Whoa** [1] - 123:1
**whole** [8] - 46:15, 59:19, 102:17, 143:4, 169:3, 175:13, 177:10, 213:14
**willing** [1] - 130:3
**window** [2] - 179:18, 179:21
**wish** [4] - 127:4, 137:7, 173:19, 173:22
**withdrawn** [1] - 207:13
**Witness** [1] - 215:2
**witness** [10] - 6:19, 22:6, 85:12, 85:14, 91:11, 91:14, 91:15, 93:15, 132:4, 132:18
**WITNESS** [154] - 7:8, 8:6, 10:4, 12:11, 12:18, 13:3, 15:10, 16:16, 19:1, 19:7, 20:15, 21:4, 21:7, 21:20, 23:11, 23:22, 24:8, 25:1, 25:6, 26:12, 27:17, 28:18, 29:1, 29:10, 31:18, 34:19, 34:23, 36:9, 39:7, 39:11, 39:18, 40:1, 40:7, 40:12, 40:19, 41:7, 42:16, 42:23, 45:20, 47:14, 48:11, 49:1, 49:16, 49:23, 50:10, 53:12, 55:1, 55:7, 55:14, 57:1, 59:12, 60:3, 62:4, 62:10, 66:13, 66:15, 67:3, 67:16,

68:1, 68:9, 68:14,
69:9, 70:2, 70:7,
70:11, 70:23, 71:10,
72:2, 82:15, 84:9,
85:2, 87:19, 89:18,
95:10, 96:4, 96:10,
97:20, 98:18, 103:22,
105:13, 106:2, 106:7,
108:6, 108:16, 109:1,
110:3, 112:10,
114:10, 114:17,
116:17, 119:23,
120:21, 121:8, 122:2,
124:9, 124:18, 126:2,
126:8, 130:8, 131:4,
131:7, 131:17, 134:1,
138:1, 138:8, 139:21,
141:20, 142:12,
144:3, 152:20, 153:8,
155:2, 155:9, 156:16,
156:22, 158:2,
158:19, 159:1,
160:11, 162:15,
163:3, 163:10,
164:17, 167:12,
167:22, 168:21,
169:2, 170:7, 174:7,
179:15, 180:9,
180:14, 181:1, 181:7,
181:12, 181:19,
182:11, 183:3,
183:22, 184:5,
184:20, 185:6,
185:20, 189:1,
189:20, 190:6,
190:22, 199:13,
201:3, 201:8, 202:23,
204:4, 204:10, 211:12
  **witnessed** [1] -
180:7
  **witnesses** [6] - 8:20,
42:20, 66:2, 143:14,
144:12, 156:12
  **WITNESSES** [1] -
215:1
  **woman** [2] - 5:3,
115:23
  **wonderful** [1] - 5:3
  **wonders** [1] - 111:1
  **word** [1] - 133:18
  **words** [5] - 120:17,
133:19, 164:13,
184:10, 205:12
  **works** [2] - 138:15,
138:20
  **worried** [1] - 120:19
  **worse** [1] - 89:10
  **worst** [1] - 174:7
  **worth** [1] - 95:1
  **wounds** [1] - 65:6

  **wow** [1] - 171:18
  **wrack** [1] - 140:16
  **wrap** [1] - 115:6
  **Wright** [8] - 107:9,
107:13, 107:17,
107:20, 177:20,
177:21, 178:15
  **write** [1] - 126:23
  **writing** [3] - 129:22,
213:10, 216:5
  **written** [2] - 28:21,
203:23
  **wrongful** [1] - 112:14
  **wrongfully** [1] - 6:11
  **wrote** [2] - 127:3,
143:12

## Y

  **yard** [1] - 169:18
  **yards** [3] - 122:22,
152:1, 183:23
  **Yates** [2] - 80:15,
81:15
  **year** [13] - 67:18,
73:7, 78:19, 80:4,
99:22, 99:23, 108:10,
127:9, 136:4, 171:20,
171:22, 172:1, 198:12
  **years** [26] - 9:14,
10:8, 42:11, 42:13,
43:8, 66:13, 78:23,
79:4, 79:6, 79:7,
81:19, 83:1, 94:23,
95:19, 102:9, 126:22,
129:17, 131:7,
132:11, 137:2, 138:9,
143:11, 173:3,
202:10, 206:19,
207:14
  **yelling** [3] - 179:10,
179:11, 180:3
  **yesterday** [2] - 7:19,
8:7
  **Yo** [1] - 192:8
  **YORK** [2] - 1:4,
213:1
  **York** [11] - 1:20, 2:4,
2:8, 2:14, 3:2, 4:12,
113:16, 114:7,
114:20, 213:6
  **yourself** [6] - 52:19,
147:23, 181:16,
181:23, 182:19

## Z

  **zero** [1] - 58:5

2                    VIDEO DEPOSITION
                       LaMARR SCOTT
3


4

5    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF NEW YORK
6
     ----------------------------------------
7    VALENTINO DIXON,

8                            Plaintiff,

9              - vs -        Case No.
                             1:19-cv-01678-WMS
10
     CITY OF BUFFALO and COUNTY OF ERIE;
11   and DETECTIVE MARK R. STAMBACH,
     DETECTIVE RANIERO MASECCHIA, DETECTIVE
12   JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
     CHIEF RICHARD T. DONOVAN, JOHN DOES,
13   Unknown Buffalo Police Department Supervisors,
     and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
14   BELLING, in their individual capacities,

15                           Defendants.
     ----------------------------------------
16

17            Video recorded deposition of LaMARR

18   SCOTT, taken pursuant to the Federal Rules of Civil

19   Procedure, in the law offices of HARRINGTON &

20   MAHONEY, 70 Niagara Street, 3rd Floor, Buffalo, New

21   York, on March 14, 2022, commencing at 10:02 a.m.,

22   before DANIELLE M. FETZER, Notary Public.

23

24

25



LAMARR SCOTT                                          March 14, 2022
DIXON V. CITY OF BUFFALO                                          2

```
 1

 2  APPEARANCES:        NEUFELD SCHECK & BRUSTIN, LLP,
                        By NICK J. BRUSTIN, ESQ.,
 3                      nick@nsbcivilrights.com, and
                        GERARDO ROMO, ESQ.,
 4                      gerardo@nsbcivilrights.com,
                        99 Hudson Street,
 5                      8th Floor,
                        New York, New York  10013,
 6                      (212) 965-9081,
                             and
 7                      EASTON THOMSON KASPEREK SHIFFRIN, LLP,
                        By DONALD M. THOMPSON, ESQ.,
 8                      The Powers Building,
                        16 West Main Street, Suite 243,
 9                      Rochester, New York  14614,
                        (585) 423-8290,
10                      dmthompson@etksdefense.com,
                        Appearing for the Plaintiff.
11
                        HODGSON RUSS LLP,
12                      By HUGH M. RUSS, III, ESQ.,
                        hruss@hodgsonruss.com, and,
13                      PETER A. SAHASRABUDHE, ESQ.,
                        psarasa@hodgsonruss.com,
14                      The Guaranty Building,
                        140 Pearl Street, Suite 100,
15                      Buffalo, New York  14202,
                        (716) 856-4000,
16                      Appearing for the Defendants,
                        City of Buffalo, Detective
17                      Mark R. Stambach, Detective
                        Raniero Masecchia, Detective
18                      James P. Lonergan, Detective
                        John Vickerd, Chief Richard T.
19                      Donovan, and John Does, Unknown
                        Buffalo Police Department
20                      Supervisors.

21

22

23

24

25
```



LAMARR SCOTT                                              March 14, 2022
DIXON V. CITY OF BUFFALO                                            3

```
 1

 2                    LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                      By ERIC M. SOEHNLEIN, ESQ.,
 3                    esoehnlein@lippes.com, and
                      JENNIFER C. PERSICO, ESQ.,
 4                    jpersico@lippes.com,
                      50 Fountain Plaza, Suite 1700,
 5                    Buffalo, New York  14202,
                      (716) 853-5100,
 6                    Appearing for the Defendants,
                      County of Erie and
 7                    Assistant District Attorney
                      Christopher Belling.
 8
     PRESENT:         PAMELA YATES RICHARDSON
 9                    TYLER Z. RAHNER, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                     LaMarr Scott

 2          THE REPORTER:  Are there any stipulations?

 3          MR. BRUSTIN:  No.

 4          THE REPORTER:  And is anyone supplied a copy

 5   of the transcript?

 6          MR. BRUSTIN:  Yeah.  We could -- could we

 7   deal with all that afterwards?  Is that okay?

 8          THE REPORTER:  Sure.

 9          THE VIDEOGRAPHER:  Okay.  This will begin

10   the video-recorded testimony of LaMarr Scott, taken

11   for a case to be tried in the United States

12   District Court, Western District of New York, to be

13   used in the matter of Valentino Dixon v. City of

14   Buffalo and County of Erie, et al.

15          This testimony is being taken at the offices

16   of Harrington & Mahoney, 70 Niagara Street,

17   Buffalo, New York, on March 14th, 2022, and is

18   commencing at the time of 10:02, as indicated on

19   the video screen.

20          The court reporter and notary public, who is

21   from the firm of Esquire Depositions Solutions, is

22   Danielle Fetzer.  My name is Tyler Rahner; I'm the

23   video technician, and I'm with the same firm.

24          Counsel for the plaintiff will now introduce

25   themselves, followed by counsel for the defendants,
```



```
 1                      LaMarr Scott

 2   the reporter will then swear in the witness.

 3        MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &

 4   Brustin, for the plaintiff, Valentino Dixon.

 5        MR. ROMO:  Gerardo Romo, plaintiff --

 6   attorney for the plaintiff, Valentino Dixon.

 7        MR. SOEHNLEIN:  Eric Soehnlein for Assistant

 8   District Attorney Belling and the County of Erie.

 9        MS. PERSICO:  Jennifer Persico for Assistant

10   District Attorney Christopher Belling and the

11   County of Erie.

12        MR. SAHASRABUDHE:  Peter Sahasrabudhe on

13   behalf of the City of Buffalo and all City-related

14   defendants.

15        MR. RUSS:  Hugh Russ from Hodgson Russ, and

16   I'm here with Peter to represent all the City

17   defendants.

18

19   LaMARR SCOTT, 160 Brinkman Avenue, Buffalo, New

20   York  14211, after being duly called and sworn,

21   testified as follows:

22                      EXAMINATION

23        BY MR. BRUSTIN:

24        Q.   Good morning, Mr. Scott.  We met off

25   the record.  My name -- my name is Nick Brustin.
```



LAMARR SCOTT                                          March 14, 2022
DIXON V. CITY OF BUFFALO                                         6

```
 1                     LaMarr Scott
 2   I'm -- I'm one of Valentino Dixon's lawyers in this
 3   civil rights action against the City of Buffalo,
 4   the county, and certain individual defendant police
 5   officers and district attorneys who we allege
 6   committed civil rights violations against
 7   Mr. Dixon.
 8          As -- as we discussed off the record, you
 9   are only a witness in this case, although as I told
10   you an important witness, and we all -- I certainly
11   appreciate you being here today and answering --
12   answering questions pursuant to the subpoena.
13          You are testifying here pursuant to a
14   subpoena; is that correct, sir?
15          A.   Yes, it is.
16          Q.   All right.  Have you ever had your
17   deposition taken before?
18          A.   No, I don't think I -- no, I know I
19   haven't.
20          Q.   Okay.  So let me just tell you real
21   briefly what's going to happen today.  So I -- I
22   will be asking you a series of questions, you'll be
23   answering them under oath.
24          There's no judge here, but there is a court
25   reporter who will be taking down your answers.
```



```
 1                       LaMarr Scott

 2          You'll also hear from time to time lawyers

 3   making objections; that's just for the record.  You

 4   can always answer the question even though there's

 5   an objection.

 6          The other thing to remember is if you could

 7   please listen to the question, wait -- wait for me

 8   to ask it, wait for them to make objections before

 9   you answer it.

10          If you don't understand any part of my

11   question or all of it, please tell me and I'll

12   rephrase it for you.  If you do answer it, I'm

13   going to assume that you understood it; is that

14   fair?

15          A.   Fair.

16          Q.   Also, any time you want to take a

17   break, please tell me.  The only thing I would ask

18   is that you answer the question pending before

19   taking a break.  Okay?

20          THE REPORTER:  And I'm sorry, is that a yes?

21          THE WITNESS:  Yes, it is.  Yes.

22          BY MR. BRUSTIN:

23          Q.   Yeah.  The other thing is that the

24   court reporter can't take down nods --

25          A.   Right.
```



 1                        LaMarr Scott

 2        Q.    -- you just have to answer verbally.

 3        Okay.  So let me start with just a few -- a

 4   few background questions.  You currently live here

 5   in Buffalo; is that right, sir?

 6        A.    Yes, I do.

 7        Q.    And how old are you, sir?

 8        A.    49.

 9        Q.    Okay.  And are you currently employed?

10        A.    Yes, I am.

11        Q.    What kind of work are you doing?

12        A.    Custodian at Community Health Center in

13   Buffalo on Benwood.

14        Q.    Okay.  And how long have you -- have

15   you done that work?

16        A.    I've done it for the last several

17   months.  It's part-time.

18        Q.    Okay.  And were you born in Buffalo?

19        A.    Yes, I was.

20        Q.    And what part of -- where were you

21   raised?

22        A.    I was raised in the foster system on

23   the East Side of Buffalo.

24        Q.    Okay.  And could you just give me a

25   real brief rundown of your educational background?



```
 1                    LaMarr Scott
 2   Just high school I think is fine.
 3          A.   GED.
 4          Q.   Okay.  And any -- any higher
 5   education --
 6          A.   No.
 7          Q.   -- after that?
 8          A.   No.
 9          Q.   Okay.
10          A.   None documented.
11          Q.   All right.  Where did you go to high
12   school?
13          A.   Riverside.
14          Q.   All right.  I understand you were also
15   a ball player there?
16          A.   Yes, I played football and basketball.
17          Q.   Okay.  Did -- did you consider playing
18   in college?
19          A.   Alfred State, but I went to prison.
20          Q.   But that had been something you were
21   thinking about?
22          A.   Well, I was going to go, but I went to
23   prison.
24          Q.   For football?
25          A.   Yeah.
```



```
 1                     LaMarr Scott

 2        Q.    What'd you play?

 3        A.    Defensive end.

 4        Q.    And I'm sorry, could you -- your date

 5   of birth is 9/19/72; is that right?

 6        A.    Yes, it is.

 7        Q.    Okay.  And could you just tell me in --

 8   you mentioned you were a defensive end being

 9   recruited -- you were being recruited to play

10   defensive end?

11        A.    Yes.

12        Q.    You were a big guy?

13        A.    Yes, I was.

14        Q.    All right.  What was your height and

15   weight in -- in 2000 -- I'm sorry -- in 1991?

16        A.    6',1".  Maybe 185, 190.

17        Q.    I thought you were a little bigger than

18   that.  Are you sure you weren't --

19        A.    Yeah, maybe --

20        Q.    Maybe 210?

21        A.    -- maybe 2, 205 --

22        MR. SOEHNLEIN:  Objection.

23        THE WITNESS:  -- something similar to that.

24        BY MR. BRUSTIN:

25        Q.    Okay.  But -- but you were a big guy;
```



```
 1                    LaMarr Scott
 2  fair to say?
 3          A.   Yeah.
 4          Q.   And back then, Valentino Dixon was a
 5  very small guy; is that fair to say?  Skinny?
 6          A.   Well, he was slim.
 7          Q.   Probably 150, 160, something like that?
 8          A.   I'm not sure.  Maybe.  A possibility.
 9          Q.   But slim?
10          A.   Yes.
11          Q.   Back in 1991, nobody would ever mistake
12  you for Valentino Dixon --
13          MR. SOEHNLEIN:  Form.
14          BY MR. BRUSTIN:
15          Q.   -- in terms of size --
16          MR. RUSS:  Object to the form.
17          BY MR. BRUSTIN:
18          Q.   -- would that be fair to say?
19          A.   No, they wouldn't.  They wouldn't do it
20  now.  We're totally two -- we're totally different
21  people.
22          Q.   Okay.  And you're a much bigger man?
23          A.   Yes.
24          Q.   Now, I want to try to make this as
25  simple for you as you can -- as I can.  I
```



1                    LaMarr Scott

2  understand you have concerns, and I recognize those

3  and I want to try to be cognizant of them.

4        So let me show you -- and we'll mark this as

5  Plaintiff's Exhibit 1.

6        MS. PERSICO:  Is that premarked?

7        MR. BRUSTIN:  Nope.

8        MS. PERSICO:  Do you have a copy?

9        MR. BRUSTIN:  We have two copies, one for

10 each group.

11       Here you go, guys.

12       BY MR. BRUSTIN:

13       Q.  I'm sorry.  Did I give you the right

14 one?  Can I have that back, please, just for a

15 second?  I may have given you the wrong document.

16       Nope, that was right.

17 The following was marked for Identification:

18  PLF.'S EXH. 1        plea from 2018

19       BY MR. BRUSTIN:

20       Q.  I'm showing you what's been marked for

21 identification, Mr. Scott, as Plaintiff's

22 Exhibit 1.  And I'll represent to you that this is

23 the plea that you gave in connection with the

24 Jackson homicide in 2018.  Okay?

25       Do you recall ever receiving a copy of this



```
 1                   LaMarr Scott

 2  before, sir?

 3         A.   No, I haven't.

 4         Q.   All right.  Why don't you take a minute

 5  and just make sure that you recognize this as the

 6  plea that you gave on -- on that date.  Look long

 7  enough so you can tell me that, please, sir.

 8         MR. BRUSTIN:  And I just would -- if you

 9  don't mind, sir, I just want to state for the

10  record what -- your name, ma'am, is?

11         MS. YATES RICHARDSON:  Pamela Yates

12  Richardson.

13         MR. BRUSTIN:  Pamela Yates Richardson.  And

14  your relationship -- just so we can have it on the

15  record, your relationship to Mr. Scott?

16         MS. YATES RICHARDSON:  Mr. Scott is a good

17  friend of mine.  I am the one who kept him from the

18  police killing him back in '77.

19         And you want to know something else?

20  Valentino Dixon is my great-niece's father.

21         MR. BRUSTIN:  Okay.  Okay.  Just wanted to

22  get that -- get that on the record.  Thank you.

23  Thank you, ma'am.

24         MS. YATES RICHARDSON:  You're welcome.

25         THE WITNESS:  Okay.
```



LAMARR SCOTT                                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                                    14

```
 1                    LaMarr Scott

 2         BY MR. BRUSTIN:

 3         Q.   Is this in fact the plea that you gave?

 4         A.   Yes.

 5         Q.   Okay.  And is this an accurate account

 6    that you gave here of what transpired on

 7    August 10th of 1991?

 8         A.   Yes.

 9         Q.   Okay.  And could you just briefly

10    describe what happened between you and Mr. Jackson

11    on that night?

12         I don't need you to give me the whole -- the

13    whole rundown, but the actual shooting itself, sir.

14         A.   Well, the beef wasn't with me, the beef

15    was with Valentino Dixon and his -- his brothers.

16    Basically to alleviate any intricate -- any

17    intricate details, Torriano Jackson and his family,

18    you know, they pulled up in a yellow Dodge Shadow,

19    I think it was, and they commenced to fight with

20    Mario Jarmon and shots were fired.

21         Unfortunately, Torriano Jackson ended up

22    dying because I was supplied a weapon by Valentino,

23    and shot Torri, Mario Jarmon in the process of that

24    and, you know, destroyed some lives.  So that's the

25    basic synopsis of it.
```



```
 1                    LaMarr Scott
 2        Q.   All right.  Well, let me ask you some
 3   more specific questions.  My understanding, sir,
 4   and you correct me if I'm wrong, is that Mr. Dixon
 5   had brought a -- the TEC-9 to Mr. Jarmon's house,
 6   and then you took it from the house and that is
 7   when you ended up tragically killing Mr. Jackson;
 8   is that correct?
 9        MR. RUSS:  Object --
10        THE WITNESS:  Yes.
11        MR. SOEHNLEIN:  Form.
12        MR. RUSS:  -- to the form.
13        THE REPORTER:  And just real quick:  Can we
14   do an objection by one is an objection by all?
15        MR. RUSS:  That's fine with me.
16        MR. SOEHNLEIN:  Yeah, that makes sense.
17        THE WITNESS:  No, that's incorrect.  He
18   brought the gun to me personally --
19        BY MR. BRUSTIN:
20        Q.   Okay.
21        A.   -- on Goodyear Street and we drove --
22        Q.   Okay.
23        A.   -- from Goodyear to Delevan to
24   Mario's --
25        Q.   Okay.
```



```
 1                      LaMarr Scott

 2          A.   -- home.

 3          Q.   Okay.  And then just before the

 4   shooting, where was the gun?

 5          A.   The gun was up under the seat of the --

 6   the bus stop.

 7          Q.   Okay.  Is that where you placed the

 8   gun?

 9          A.   Yes.

10          Q.   Okay.  And where -- so you -- you --

11   you had gotten the gun sometime earlier from

12   Mr. Dixon; is that your recollection?

13          A.   Well, it was maybe 45 minutes earlier.

14          Q.   Okay.  And then you had it under your

15   seat?

16          A.   I had -- no, I didn't have it under my

17   seat.  It was on the floor of the car.

18          Q.   Okay.  And just before the shooting,

19   could you describe what happened starting with --

20   starting with when you retrieved the weapon?

21          A.   I retrieved the weapon.  I didn't touch

22   the weapon until -- until we got to Mario Jarmon's

23   house and it was still in the big.

24          Mr. Dixon told me that in order to keep the

25   gun on safety, which is the S on the gun, and the F
```



1                          LaMarr Scott

2    means to fire.  So he says, well, you click the

3    button back, and that'll be fire, and the S is

4    safety.

5         Later on I would find out that the F means

6    fully automatic; the S means semiautomatic.  I

7    didn't find that out until we reached the plea

8    agreement and that was explained to me.

9         Q.   In other words, you didn't -- you

10   didn't understand that you -- that when you were

11   firing the gun it was on automatic?

12        A.   Yes, I had no clue of that.  I was only

13   going on what he told me.

14        Q.   Okay.  But you did intentionally fire

15   the weapon?

16        A.   Yes, I intentionally fired.  Yes, I

17   did.

18        Q.   Okay.  Could you describe what happened

19   from the time that you -- you picked up the weapon

20   just before the shooting and through the shooting,

21   can you just give us your -- your best description,

22   sir?

23        A.   Well, I really don't -- I don't

24   remember all of it, man.  The only thing is it's a

25   blur.  The only thing I can remember is getting



1                    LaMarr Scott

2  over there, getting to his -- getting to Mario's

3  home and, you know, going to the store to get some

4  beers, and then the shooting happened.

5        Q.   Okay.  But as you pled to, at

6  approximately 1:15 a.m., you used the weapon in an

7  automatic mode and you shot Torriano Jackson; is

8  that correct?

9        A.   Yes.

10       Q.   And you also shot Aaron Jackson and

11  John Sullivan?

12       A.   Yes.

13       Q.   And at the time that you shot

14  Torriano Jackson, did you see Torriano Jackson with

15  a weapon?

16       A.   I didn't see -- I didn't see Torri with

17  the weapon after he got shot, but I did see him

18  with a weapon prior to that because he was shooting

19  Mario.

20       Q.   Okay.  So you did see Torri Jackson

21  shoot Mario Joiner?

22       A.   Yeah, Mario --

23       (Objections to the form.)

24       BY MR. BRUSTIN:

25       Q.   Mario Jarmon.



```
 1                      LaMarr Scott

 2          A.    -- Jarmon, yeah.

 3          Q.    I'm sorry.  I apologize.

 4          A.    Yeah.

 5          Q.    And what kind of weapon did Torri have?

 6          A.    I don't know.  I don't know.  It was --

 7    it was a handgun.  I'm not sure what kind it was.

 8          Q.    Okay.  And what kind of weapon did you

 9    have?

10          A.    A TEC-9, semi -- a TEC-9 machine gun.

11    I guess that's what it's called.

12          Q.    And as you had acknowledged both in

13    your plea and other places, Valentino Dixon did not

14    fire any weapons that night; is that correct?

15          A.    No, he didn't.

16          Q.    And my understanding, sir, is that the

17    reason that you pled guilty to this crime in 2018

18    and the reason why -- well, let's start with the

19    reason why you pled guilty in 2018.

20          My understanding is that as a man with a

21    strong spiritual connection, at that time you

22    recognized that you could not continue to allow an

23    innocent man to be in prison; is that correct?

24          (Objections to the form.)

25          THE WITNESS:  At that time and this time.
```



```
1                      LaMarr Scott

2         BY MR. BRUSTIN:

3         Q.   Okay.  So why don't you --

4         A.   That's -- that's not something that I

5    felt momentarily.  It's something I've always felt.

6         Q.   Well, let's -- let me -- I don't mean

7    to put words in your mouth.  Why don't you explain

8    to me -- and let's start with the reasons why you

9    pled -- why -- the reasons why you began --

10   beginning the day after the crime, why you have

11   taken responsibility for this crime.  Can you tell

12   us why?

13        A.   Because he didn't do it.

14        Q.   Okay.

15        A.   You know, Valentino Dixon, he was a --

16   he was a drug dealer and, you know, a conniving

17   person in some aspects now that I see as an adult,

18   but we were all doing those things and we were

19   children, but he didn't take a human being's life.

20        He gave me the weapon to do so, but he

21   didn't take another man's life.  I did that.  So

22   the responsibility was on me.

23        Q.   Okay.  And you're not suggesting

24   that -- you're not suggesting that Valentino Dixon

25   directed you to kill anybody, only that he gave you
```



```
 1                    LaMarr Scott
 2   the weapon, correct?
 3        A.   I'm not suggesting or not suggesting.
 4   I'm just -- you know, I'm saying that he gave me a
 5   weapon and the weapon was used unfortunately to
 6   take a human being's life.
 7        Q.   Okay.  And you mentioned -- okay.  And
 8   the reason -- can you tell us any additional
 9   reasons why you pled guilty in 2018?
10        (Objections to the form.)
11        THE WITNESS:  Why would there be additional
12   reasons?  I just gave you the reasons that I
13   told -- I told you here that, you know, as a man of
14   God, you have to take responsibility for your
15   actions.
16        And he was an innocent man in that
17   particular aspect.  You know, he wasn't innocent of
18   the crime itself, but he was innocent in that
19   particular aspect.
20        So anybody shouldn't allow an individual to
21   be punished for something that they didn't do in
22   that aspect.  So ...
23        BY MR. BRUSTIN:
24        Q.   Now, you understood, sir, that -- you
25   said -- you mentioned that you are on parole; is
```



```
 1                      LaMarr Scott

 2   that right?

 3          A.   Yes, I am.

 4          Q.   And is it your understanding that given

 5   the murder conviction that you pled guilty to in

 6   2018, how does that affect your parole, to your

 7   knowledge?

 8          (Objections to the form.)

 9          THE WITNESS:  It affects it in the sense

10   that I -- I still have 20 years left on parole, and

11   if I sneeze wrong, there's a strong possibility

12   that that could be violated because it's a violent

13   crime.

14          BY MR. BRUSTIN:

15          Q.   And that's as a result of your pleading

16   guilty to the murder of Torri Jackson?

17          A.   Yes.

18          Q.   And you knew that when you pled guilty;

19   is that correct, sir?

20          A.   I was aware of it, yes.

21          Q.   Okay.  But you did it, nonetheless,

22   because it was the right thing to do?

23          (Objections to the form.)

24          BY MR. BRUSTIN:

25          Q.   You tell me.  Why did you do it,
```



```
 1                   LaMarr Scott

 2   nonetheless, knowing that you could face these

 3   additional restrictions on parole, why did you

 4   still choose to plead guilty?

 5         (Objections to the form.)

 6         THE WITNESS:  Because an individual is not

 7   responsible -- you know, I understand that you're a

 8   lawyer and you have to ask these questions, but one

 9   thing I want you all to understand is, is that when

10   a man is innocent of a crime -- if he's innocent of

11   a particular crime and someone can -- that's

12   responsible for it, you have to stand up and say,

13   I'm -- I'm responsible for this.

14         You can't allow another human being to

15   continue to be punished for something that they

16   didn't do, no matter how you feel about them

17   personally, no matter what they've done in their

18   past personally.  If you have the opportunity to do

19   so, do so.  It relieves you spiritually of the

20   burden.

21         BY MR. BRUSTIN:

22         Q.  All right.  Now, take a look at page 12

23   of the plea here if you -- if you don't mind, sir.

24         MR. RUSS:  Exhibit 1.

25         MS. PERSICO:  Sorry --
```



LAMARR SCOTT                                          March 14, 2022
DIXON V. CITY OF BUFFALO                                        24

```
 1                   LaMarr Scott

 2         MR. BRUSTIN:  Exhibit 1.

 3         MS. PERSICO:  -- did we mark this?

 4         MR. BRUSTIN:  We did.  Plaintiff's 1.

 5         BY MR. BRUSTIN:

 6         Q.   Now, take a look at -- at page 12, and

 7    if you could read to yourself lines 10 to line 17.

 8         A.   Okay.

 9         Q.   And are 10 -- are 10 -- are lines 10

10    through 17 an accurate description of what happened

11    the night of August 10th, 1991?

12         A.   Yes.

13         Q.   Okay.  And sometime earlier in the day,

14    Valentino had brought -- had brought the gun?

15         A.   Yes.

16         Q.   All right.  And my understanding from

17    looking -- you've also spoken to other sources, as

18    you told us before the deposition, about what

19    happened and your role in it?  You've been open and

20    honest about that over the years, correct?

21         A.   Yes.

22         Q.   And my understanding, and you tell me

23    if I'm wrong, is that you retrieved the gun at some

24    point earlier after Valentino brought it to the

25    house from a -- from a gym bag; is that correct?
```



```
 1                      LaMarr Scott

 2           (Objections to the form.)

 3           THE WITNESS:  No, it wasn't a gym bag.  It

 4      was a United Men's clothing store bag --

 5           BY MR. BRUSTIN:

 6           Q.   Okay.

 7           A.   -- plastic bag.

 8           Q.   Okay.  And that's when you brought the

 9      weapon and you put it under the bus stop -- it was

10      under the bus stop -- was it in the bag under

11      the -- under the bus stop --

12           A.   Yes.

13           Q.   -- bench?

14           A.   It was in the bag, yes.

15           Q.   Okay.

16           (Objections to the form.)

17           BY MR. BRUSTIN:

18           Q.   All right.  And another thing I noticed

19      from another statement that you had made was that

20      although Mr. Dixon had brought the gun, you made

21      the decision to go and retrieve the gun based on

22      threats that you had heard; is that fair --

23           (Objections to the form.)

24           BY MR. BRUSTIN:

25           Q.   -- to say, sir?
```



```
 1                    LaMarr Scott

 2        A.   No, I don't think that -- I don't think

 3   that's fair.  I don't think that's fair.  You know,

 4   no, I don't think that's even a fair question to

 5   ask me.

 6        Q.   Okay.

 7        A.   I don't think that's a fair question to

 8   ask.

 9        Q.   But the only people at the scene that

10   you observed that night with -- with weapons at the

11   time of the shooting were you and Torri Jackson; is

12   that correct, sir?

13        (Objections to the form.)

14        THE WITNESS:  I don't -- I don't know if

15   that's correct or not because I'm not sure who had

16   guns or not.  I know that I had one, I know that

17   Torri had one.  Anybody else, I don't -- I can't --

18   I can't answer that question for you.  I don't

19   know.

20        BY MR. BRUSTIN:

21        Q.   Those are the only guns that you saw

22   that evening?

23        A.   I really can't -- I really don't know.

24        Q.   Okay.

25        A.   It -- it seems as though you want to
```



```
 1                    LaMarr Scott

 2   retry the case again.

 3        Q.   We're not.  We're not.  Well, to

 4   some -- to some degree --

 5        A.   Because -- because the questions you're

 6   asking me -- you're asking me questions that we

 7   already took a plea agreement to, and you're asking

 8   me about the particular situation and you're saying

 9   nothing about what his -- what his accusations is

10   for.  This is -- this is --

11        Q.   I'm going to get to that very quickly.

12   I'm almost done with this part, I really am.

13        A.   All right.  Because I don't -- I

14   don't -- I don't feel that this is even necessary

15   for you to be asking me about this.  This has, you

16   know --

17        Q.   I need to get the basics.  I really do.

18        Okay.  Could you just tell us a little bit

19   about -- can you just -- and like I said, I'm

20   almost done with this part of it.

21        What was -- to your knowledge, what was

22   Torri Jackson's reputation and Aaron Jackson's

23   reputation at the time of the shooting?

24        (Objections to the form.)

25        THE WITNESS:  I don't -- I don't know about
```



LAMARR SCOTT                                     March 14, 2022
DIXON V. CITY OF BUFFALO                                    28

```
 1                     LaMarr Scott
 2   their -- their reputations.  We was just -- just
 3   kids.
 4          BY MR. BRUSTIN:
 5          Q.   What did you -- what did you know of
 6   them?
 7          A.   We all went to school together.
 8          (Objections to the form.)
 9          THE WITNESS:  I knew Aaron from Riverside
10   High School.  Troubled kid just like me.
11          BY MR. BRUSTIN:
12          Q.   Okay.  And did you have an
13   understanding as to the altercation between Mario
14   and Antoine and Torri earlier in the day?
15          A.   Do I have -- did I have a what?
16          Q.   Did you have an understanding as to
17   the -- the altercation they had earlier in the day?
18          A.   I don't know what you mean by
19   understanding.
20          Q.   Did -- did you know what had happened?
21   Did you heard what had happened?
22          A.   No.  I don't.
23          Q.   What were you wearing at the time of
24   the shooting, sir?
25          A.   I remember a baseball cap with some
```



```
1                        LaMarr Scott

2    shorts.

3         Q.   Okay.  Do you remember the cap being

4    white?

5         A.   No, I don't remember the specific

6    colors.

7         Q.   Fair enough.  Certainly your memory

8    would have been much better back -- back at the

9    time of what you were wearing --

10        A.   Of course --

11        Q.   -- fair to say?

12        A.   -- it was.  Of course it was.  It

13   happened -- it was right away.

14        Q.   Okay.  So I now want to get to the

15   heart of this, which is your interaction with the

16   police.

17        And I want to start with your going to the

18   television cameras and confessing to the crime on

19   the 11th.  Okay?

20        So, first of all, can you tell me how you

21   came to confess to this crime on television?

22        A.   What do you mean?  How I came -- I

23   don't understand.

24        Q.   How did you decide to do that?

25        A.   It was a decision that I made so I
```



LAMARR SCOTT                                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                                    30

```
 1                    LaMarr Scott
 2  called the Channel 4, Wanda Starkeson, turned
 3  myself in.
 4       Q.   Okay.  Did -- did anybody force you to
 5  do that?
 6       A.   No, nobody forced me to.  Nobody forced
 7  me to.
 8       Q.   Did anybody offer you anything for
 9  doing that?
10       A.   Nobody offered me anything.
11       Q.   Why did you -- why did you decide to do
12  that at that time, sir?
13       A.   Because it was important to do so.  I
14  mean, you know, more of a protective thing than
15  anything else.  I was a child --
16       Q.   Okay.
17       A.   -- you know.
18       Q.   You mentioned it was a protective
19  thing.  Did you have concerns about going to the
20  police before making your statement public?
21       A.   Well, being in the system and being
22  abused on a consistent basis by authority figures,
23  there's an ingrained fear of authority figures.
24       So regardless of whether it's a police
25  officer or a judge, it's still an authority figure.
```



```
 1                      LaMarr Scott

 2   There's a fear there.

 3        Q.   Okay.  And so I think I understand.  It

 4   sounds like what you did was you went -- you went

 5   first to confess on television as a matter of

 6   protecting yourself; is that fair to say, sir?

 7        A.   Yes, it is.

 8        (Objections to the form.)

 9        BY MR. BRUSTIN:

10        Q.   Were you concerned when you went on

11   television as to what the police would do to you if

12   in fact you went and confessed to them first?

13        A.   No, I -- I really don't remember if I

14   was concerned in that aspect.  The only thing I

15   knew was that it was best to turn myself in and,

16   you know, hopefully Mr. Dixon didn't go to jail for

17   it, but unfortunately these things happen.

18        Q.   Okay.  And I think I've already -- I've

19   already asked you this, but I just want to make it

20   crystal clear.

21        Did anybody offer you anything for coming

22   forward at that time --

23        A.   You just asked me that two minutes ago.

24        (Objections to the form.)

25        BY MR. BRUSTIN:
```



```
 1                    LaMarr Scott

 2        Q.   Okay.  All right.  I want to ask you

 3   some questions about your interactions with the

 4   police, but first I want to mark as an exhibit --

 5   and we've -- we sent this to you guys so we don't

 6   have extra copies.

 7        MR. BRUSTIN:  We'll mark this as Plaintiff's

 8   Exhibit 2.

 9        MS. PERSICO:  What is it?

10        MR. RUSS:  Do you want to say what it is?

11        MR. BRUSTIN:  I'm going to do that.  You

12   want to wait?  You think I forgot?

13        Plaintiff's Exhibit 2 is a compilation

14   exhibit of the police file that we've marked, and

15   it's Bates Stamped pages 1 through 303.

16        BY MR. BRUSTIN:

17        Q.   I'll put that in front of you, sir.

18        MR. BRUSTIN:  Where's my copy?

19        Can I have that back for just a minute,

20   please?  Let me give him the other copy.  Yeah, let

21   me give you this copy.

22        Let's mark this, please, as Plaintiff's 2.

23   The following was marked for Identification:

24    PLF.'S EXH. 2       black binder of police file

25        BY MR. BRUSTIN:
```



LAMARR SCOTT                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                    33

```
 1                      LaMarr Scott

 2        Q.   All right.  Take a look -- so I'm going

 3   to have you refer to the -- the Bates stamped

 4   pages, and they're on the bottom in the middle, the

 5   BPD numbers.

 6        Take a look at page -- let's start with

 7   page 198.  Actually, let's start with page 196.

 8   That's the beginning of the statement, actually.

 9        MS. PERSICO:  Can you give us all a second

10   to catch up since you didn't --

11        MR. BRUSTIN:  I can.

12        MS. PERSICO:  -- give us copies.

13        MR. BRUSTIN:  I sent you copies.

14        MS. PERSICO:  Well, we're downloading them

15   now.  Didn't anticipate the need to do that.

16   So ...

17        MR. BRUSTIN:  I came from New York so I

18   wasn't going to carry -- that's why I sent them to

19   you.

20        MR. RUSS:  Well, you've got to give us a

21   chance to pull them up.

22        MR. BRUSTIN:  Okay.

23        MR. RUSS:  That's all.

24        MR. BRUSTIN:  You want to take five minutes?

25        MS. PERSICO:  No.
```



```
 1                    LaMarr Scott

 2        MR. RUSS:  No.

 3        MR. SOEHNLEIN:  It's going to take

 4   30 seconds.

 5        MS. PERSICO:  Right.

 6        MR. SOEHNLEIN:  Just relax.

 7        MS. PERSICO:  What page number are you

 8   looking at?

 9        MR. BRUSTIN:  196.  I'm going by the Bates

10   Stamps in the bottom, BPD Bates Stamps that we

11   made.

12        MS. PERSICO:  Okay.  There's no plug.

13        MR. SAHASRABUDHE:  There's no plugs at all?

14        MS. PERSICO:  Well, there's, like, one over

15   there by that.

16        THE REPORTER:  Do you want to go off the

17   record?

18        MS. PERSICO:  Just for a second.

19        MR. BRUSTIN:  Yeah.  So I've got to --

20        THE VIDEOGRAPHER:  Going off the record.

21   Time is 10:32.

22        (Off the record at 10:32 a.m.)

23        THE VIDEOGRAPHER:  We're going back on the

24   record.  Time is 10:36.

25        BY MR. BRUSTIN:
```



1                        LaMarr Scott

2          Q.    Okay.    Mr. Scott, if you could take a

3    look at -- beginning on page 196.    And this is a

4    statement that was allegedly taken from -- from you

5    August 12th, 1991.    There's no time here.

6          A couple of questions I want to ask you

7    about it, though, and then I want to ask you some

8    more questions about your interactions with the

9    police.

10         First of all, do you remember a detective

11   named Mark Stambach?

12         A.    Vaguely.

13         Q.    Do you remember him -- do you remember

14   him being the detective that you were primarily

15   interacting with when you were being interviewed

16   back in 1991?

17         (Objections to the form.)

18         THE WITNESS:    I didn't -- I didn't know that

19   the -- his name.    I remember the name Stalbach, but

20   I didn't -- I didn't --

21         BY MR. BRUSTIN:

22         Q.    Okay.

23         A.    -- remember who he was.

24         BY MR. BRUSTIN:

25         Q.    Okay.    Do you remember him taking a



```
 1                      LaMarr Scott
 2   statement from you?
 3            A.   I remember there was a statement taken.
 4            Q.   Okay.  I'm going to ask you some
 5   questions about some statements you made and some
 6   offers that you made at that time, and then some
 7   statements you made since -- since that time about
 8   your interactions with the police.  Okay?
 9            A.   Mm-hmm.
10            Q.   So, first of all, what was the police
11   reaction when you told them that you had -- that
12   you had in fact committed this crime, that you were
13   the shooter?
14            (Objections to the form.)
15            THE WITNESS:  I don't -- I don't remember
16   their reaction.  They just -- you know, sit down,
17   that's it.
18            BY MR. BRUSTIN:
19            Q.   Okay.  Well, for example, do you
20   recall -- you do recall being interviewed by
21   investigators for the district attorney's office in
22   2018, correct?
23            (Objections to the form.)
24            THE WITNESS:  Yes.
25            BY MR. BRUSTIN:
```



1                          LaMarr Scott

2          Q.   All right.  And one of the things that

3    you told them is that the detectives, and

4    Mr. Stambach in particular, told you that they

5    had -- they had their guy and it wasn't you; do you

6    recall that?

7          A.   Yes, I recall that.

8          Q.   Okay.  You recall Detective Stambach

9    telling you that, correct?

10         A.   I remember there was a detective that

11   said that.  I don't know if he was Stalbach or

12   Stalbach.  I don't -- I don't know the guy's name

13   particularly.

14         Q.   Okay.  But it was the guy who did

15   the inter -- the interview with you, correct?

16         A.   Yes.  But, again, how does -- how does

17   the police officer's actions with me have to do

18   with his accusations with the -- you know,

19   the harassment with him?  That -- I don't -- I want

20   you to explain that to me.

21         Q.   Sure.  So any type of misconduct with

22   you, whether it's coercion or -- or failing to

23   disclose information that you provided to them is

24   information that Mr. Dixon also had a right to

25   receive and has a -- has that right to use now in



LAMARR SCOTT                                          March 14, 2022
DIXON V. CITY OF BUFFALO                                        38

```
 1                      LaMarr Scott
 2   alleging that Stambach engaged in widespread
 3   misconduct in this case, not just with him, but
 4   with you and with others.
 5          A.   But I'm not -- I'm not --
 6          MR. RUSS:  Just note I disagree with that
 7   characterization of the law.
 8          THE WITNESS:  I'm not -- I'm not -- I'm not
 9   suing anybody.  I don't have any suit.
10          BY MR. BRUSTIN:
11          Q.   I understand, sir.
12          A.   But it's his right.
13          Q.   Right.  But you have an obligation to
14   answer these questions honestly like you've always
15   done in the past for all the right reasons and I --
16   and I have to ask them of you.  Okay?  And I
17   apologize for that, but I have to.
18          A.   You don't have to apologize, man.
19   You're here to represent Mr. Dixon.
20          Q.   Okay.  So in addition to -- did you in
21   fact offer to take a polygraph test?
22          A.   Years ago, yes, I did.
23          Q.   Okay.  When you --
24          A.   Stress test and a polygraph test.
25          Q.   Okay.  And you did that that first
```



1              LaMarr Scott

2  night when you came in, correct?

3         A.   Yes.

4         Q.   And did you also offer to give them the

5  clothing that you had on the night of the shooting?

6         A.   Yes, I did.

7         Q.   Okay.  And did you in fact tell them

8  that you believe there might even be blood from the

9  shooting on your shoes?

10        A.   There was blood on my shoes.

11        Q.   Okay.  And when you told the police

12  officers that night that you were willing to give

13  them your shoes with blood on them, what did they

14  say to you, sir?

15        A.   I don't remember exactly what was said

16  to me.  I just know that nobody ever took anything

17  that I offered.

18        Q.   Now, do you recall also telling the

19  district attorney and being told by Stambach and

20  other detectives that until you and Leonard Brown

21  get your statements together, you had to -- you had

22  to leave?

23        (Objections to the form.)

24        THE WITNESS:  I remember they were talking

25  to Leonard pertaining to a statement and -- but I



LAMARR SCOTT                                              March 14, 2022
DIXON V. CITY OF BUFFALO                                              40

```
 1                    LaMarr Scott
 2  don't remember them telling me to -- that we have
 3  to leave until we get it together.
 4       I know that Leonard said something out the
 5  way.  So, you know, I was just happy to be up out
 6  of there.
 7       BY MR. BRUSTIN:
 8       Q.   Okay.  But the police officers made it
 9  clear to you they didn't believe your story,
10  correct?
11       A.   Yes.
12       (Objections to the form.)
13       BY MR. BRUSTIN:
14       Q.   And they also made it clear to you --
15  well, they certainly didn't take you up on your
16  offer to give them -- to take your clothes with
17  blood on them, correct?
18       A.   No, they didn't take me up on them.
19       Q.   And do you remember telling others --
20  withdrawn.
21       Do you recall one of the things that
22  Stambach said to you was, "well, we got who we
23  want"?
24       (Objections to the form.)
25       THE WITNESS:  I don't -- again, I don't
```



```
 1                    LaMarr Scott

 2   remember Stalbach.  I wouldn't -- he could be

 3   sitting here now and I wouldn't know what he looked

 4   like.

 5           BY MR. BRUSTIN:

 6           Q.   I'm sorry.  Do you remember the

 7   detective who you spoke to telling you we've got

 8   who you want -- "we've got who we want"?

 9           (Objections to the form.)

10           THE WITNESS:  No, I don't remember.

11           BY MR. BRUSTIN:

12           Q.   Now, one of the things -- one of the

13   things that -- withdrawn.

14           At the grand jury, you ended up testifying

15   that Valentino Dixon was the shooter, correct?

16           A.   I don't remember anything about a grand

17   jury.

18           Q.   Sir, you do remember that you -- you

19   ultimately went to -- you ultimately did state,

20   after you confessed, you did state under oath that

21   Valentino Dixon was the shooter, correct?

22           A.   I don't remember.

23           (Objections to the form.)

24           MR. SOEHNLEIN:  I'm sorry.  I didn't get his

25   answer on that one.
```



```
 1                    LaMarr Scott

 2          THE WITNESS:  I don't remember.  I don't

 3   remember any of it.

 4          MR. SOEHNLEIN:  Thank you.

 5          BY MR. BRUSTIN:

 6          Q.   Okay.  You have no recollection today

 7   of doing that?

 8          A.   No, I don't have a recollection of

 9   that.

10          Q.   Okay.  Well, let's try it this way:

11   One of the things you told the DA investigators --

12          A.   Right.

13          Q.   -- in 2018 was that the detectives who

14   were interviewing you told you to say that

15   Valentino's father forced you to come in, correct?

16          A.   No, I don't --

17          (Objections to the form.)

18          THE WITNESS:  I don't remember that, either.

19          BY MR. BRUSTIN:

20          Q.   Okay.  Let's do this ...

21          MR. BRUSTIN:  Can you give me that other

22   binder?  So take out the 8/15 reinvestigation part

23   one, 8/15/18, 22.

24          MR. SOEHNLEIN:  For those of us playing at

25   home, what -- what is that?
```



```
 1                     LaMarr Scott

 2          MR. BRUSTIN:  Do they have a copy of this

 3  yet?  Why don't you e-mail this to them.

 4          MS. PERSICO:  Can you tell us what it is?

 5          MR. BRUSTIN:  Yeah.  So this is an interview

 6  with -- from 8/15/18 with Joe Riga, Sara Dee, David

 7  Heraty, and Mr. Scott.

 8          MS. PERSICO:  Is it -- is it the video?

 9          MR. BRUSTIN:  It may be the -- it's a

10  transcription of the video, I believe.

11          MR. SOEHNLEIN:  Okay.

12          MS. PERSICO:  Who -- who transcribed it?

13  Have you given it to us?

14          MR. BRUSTIN:  I don't know yet.  You haven't

15  requested anything, so probably not.

16          MS. PERSICO:  Well --

17          MR. BRUSTIN:  So we're giving it to you now.

18          MS. PERSICO:  Did you create that document?

19          MR. ROMO:  We --

20          MR. BRUSTIN:  We transcribed it, but you

21  have -- you have the video.

22          MS. PERSICO:  Well, how are we supposed to

23  verify that that's what the video says?

24          MR. BRUSTIN:  Well, you can do it afterward,

25  and if -- if --
```



```
 1                    LaMarr Scott

 2         MS. PERSICO:  Well --

 3         MR. BRUSTIN:  If it's not, then I did on my

 4  own peril.

 5         MS. PERSICO:  I'm not sure that I'm willing

 6  to take that chance.

 7         MR. BRUSTIN:  Well, I don't think you have

 8  any choice, but let's go ahead and e-mail it.

 9         MS. PERSICO:  We note our objection to the

10  use of this exhibit given that we have never seen

11  it and we don't know where it came from or who made

12  it.

13         MR. BRUSTIN:  Okay.  So let's mark this as

14  Plaintiff's 3.

15         THE REPORTER:  Do you want a sticker on it?

16         MR. BRUSTIN:  Yes, please.

17  The following was marked for Identification:

18   PLF.'S EXH. 3      transcript of video

19         MS. PERSICO:  Can you wait until we get it

20  and --

21         MR. BRUSTIN:  I will.  Of course.

22         MR. SAHASRABUDHE:  Gerardo --

23         MR. ROMO:  Yeah?

24         MR. SAHASRABUDHE:  -- can you please send

25  that to not my Hodgson Russ e-mail address but
```



```
 1                      LaMarr Scott

 2  B-U-D-H-E, zero-five, at Gmail.  I can write it

 3  down for you.

 4          MR. ROMO:  Yeah.

 5          MR. SAHASRABUDHE:  Just because our -- it

 6  won't allow me to access e-mail away from --

 7          MR. ROMO:  Oh, okay.

 8          MR. SAHASRABUDHE:  -- from the firm.

 9          MR. ROMO:  Got it.  Yeah.

10          THE REPORTER:  Do you want to go off the

11  record?

12          MR. BRUSTIN:  Sure.

13          THE VIDEOGRAPHER:  Okay.  Going off the

14  record.  Time is 10:47.

15          (Off the record at 10:47 a.m.)

16          THE VIDEOGRAPHER:  Going back on the record.

17  Time is 10:51.

18          BY MR. BRUSTIN:

19          Q.   Okay.  Mr. Scott, I'm going to show you

20  what's been marked for identification as

21  Plaintiff's Exhibit 3.  This is a transcript that

22  we made of a videotaped interview that was

23  conducted with you, and Joe Riga, and Sara Dee, and

24  David Heraty.  I'm not sure if I'm pronouncing that

25  right --
```



```
 1                     LaMarr Scott

 2          MR. THOMPSON:  Heraty.

 3          BY MR. BRUSTIN:

 4          Q.   -- prior to your plea agreement; do you

 5   recall that interview, sir?

 6          A.   Yeah.

 7          Q.   Okay.  And, obviously, during that

 8   interview, Mr. Scott, you did your very best to

 9   tell the truth, correct?

10          A.   Yes.

11          Q.   As you always do, correct?

12          A.   Yes.

13          Q.   All right.  And take a look, if you

14   would, sir, at -- let's begin on page 13.  And I

15   will represent to you this is you speaking -- wait

16   until you get there and you tell me when you're

17   there.

18          Okay.  And I'll represent to you -- if you

19   look back a page, you'll see that this is you

20   describing what happened to the DAs with the --

21   what happened with you -- you're describing to the

22   DAs what happened with the police when you went

23   there in August of 1991.  Okay?

24          (Objections to the form.)

25          MR. RUSS:  I don't know who he's --
```



```
 1                    LaMarr Scott

 2          THE WITNESS:  Is it --

 3          MR. RUSS:  -- talking to in this statement.

 4          BY MR. BRUSTIN:

 5          Q.   All right.  So if you take a look at

 6   page 13, I'm looking at the bottom pages.

 7          All right.  If you could start reading where

 8   you describe what happened with the police, the

 9   third paragraph from the bottom, "I got into the

10   car," okay?

11          A.   I got into the car --

12          Q.   Just not -- I don't need you to read

13   out loud.  What I want you to do is I want you to

14   read that, and then I want you to read all the way

15   to the bottom of the page.

16          A.   Bottom of the page of what?

17          Q.   To yourself.  Just read it, the bottom

18   of page 13, read those -- those four paragraphs to

19   yourself and let me know when you're done.

20          A.   Have you read this?

21          Q.   I have, sir.

22          A.   Okay.

23          Okay.

24          Q.   Okay.  And does this page accurately

25   describe, sir, what happened with the police when
```



```
 1                    LaMarr Scott
 2  you went there on August 11th of 1991?
 3         A.   I don't know if it --
 4         (Objections to the form.)
 5         THE WITNESS:  -- accurately describes it,
 6  but it's accurately described of what I said on
 7  the -- in 2018.
 8         BY MR. BRUSTIN:
 9         Q.   Okay.  And you were telling the truth
10  when you spoke to her in 2018?
11         A.   Why do --
12         (Objections to the form.)
13         THE WITNESS:  Why do you keep asking me if
14  I'm telling the truth, man?
15         BY MR. BRUSTIN:
16         Q.   I am, sir.
17         THE REPORTER:  Just -- I'm sorry.  You guys
18  got to talk one at a time.  There was a --
19         THE WITNESS:  Okay.
20         THE REPORTER:  -- couple people talking over
21  each other there.
22         THE WITNESS:  All right.  Well, why do you
23  keep asking me that, man?  It's --
24         BY MR. BRUSTIN:
25         Q.   Because I want to make sure that it's
```



LAMARR SCOTT                                          March 14, 2022
DIXON V. CITY OF BUFFALO                                          49

```
 1                    LaMarr Scott
 2   an accurate recount of what happened.  That's why,
 3   sir.
 4         A.   But we're under oath here.
 5         Q.   That's right.
 6         A.   So I'll the truth, I've been telling
 7   the truth.  So for you to ask me that is -- is kind
 8   of disrespectful to say --
 9         Q.   I don't mean to be disrespectful.
10         A.   Well --
11         Q.   I just --
12         A.   -- that's what you're doing.
13         Q.   I don't mean to be, sir.  But I need to
14   make sure that this is in fact what happened with
15   the police.
16         A.   Well, it's here on record.
17         Q.   Okay.  And in fact, that's what
18   actually happened with the police, correct, what's
19   described here?
20         A.   If this is here on the record, this is
21   what's going on.  This is what happened.
22         Q.   Okay.
23         A.   You're asking me the same questions
24   over and over --
25         Q.   Okay.
```



```
 1                    LaMarr Scott

 2        A.   -- again.

 3        Q.   And in fact, as you describe to these

 4   investigators, the police said to you, well, Tino's

 5   father had you come in -- had you come down and

 6   turn yourself in, correct?

 7        (Objections to the form.)

 8        THE WITNESS:  This is what's here on tape,

 9   man.  I don't remember anything about Tino's father

10   having me come down to turn myself in, but this is

11   what's here.  This is what it is.

12        If you -- if you read this and you

13   transcribed this, this is what it is.  This is the

14   evidence that you have.

15        BY MR. BRUSTIN:

16        Q.   Okay.

17        A.   You don't need me to say this,

18   reiterate -- reiterate everything over and over

19   again because you have this here.

20        Q.   I do, sir.  I need you to say that it's

21   the truth.

22        (Objections to the form.)

23        MR. RUSS:  Come on, you know better than

24   that.

25        THE WITNESS:  Come on, man.
```



```
 1                    LaMarr Scott
 2          MR. BRUSTIN:  Is this -- this is -- what are
 3   you talking about?  Is this in fact what --
 4          MR. RUSS:  You cannot --
 5          MR. BRUSTIN:  Is this --
 6          MR. RUSS:  -- ask a witness to say that
 7   something that is sworn testimony is truthful or
 8   not.  That's --
 9          MR. BRUSTIN:  This is not --
10          MR. RUSS:  -- objectionable.
11          MR. BRUSTIN:  This is not -- this is not --
12          MR. SAHASRABUDHE:  If he wasn't under oath,
13   you're directing --
14          MR. BRUSTIN:  He wasn't under oath.
15          MR. SAHASRABUDHE:  -- him to just --
16          MR. BRUSTIN:  It's not sworn.
17          MR. SAHASRABUDHE:  You basically just
18   instructed --
19          THE REPORTER:  Just one at a time.
20          MR. SAHASRABUDHE:  -- the witness how to
21   testify.
22          THE WITNESS:  This is --
23          MR. SAHASRABUDHE:  It's improper.
24          THE WITNESS:  This is --
25          MR. BRUSTIN:  First of all, one of you makes
```



```
 1                    LaMarr Scott
 2   an objection, not both of you.
 3          MR. RUSS:  Fine.
 4          THE WITNESS:  This is --
 5          MR. RUSS:  Move on.
 6          THE WITNESS:  -- something -- this is
 7   something --
 8          MR. BRUSTIN:  Let me --
 9          THE WITNESS:  -- that was under --
10          MR. BRUSTIN:  Let me withdraw --
11          THE WITNESS:  -- oath because I --
12          MR. BRUSTIN:  Let me withdraw --
13          THE WITNESS:  -- because I --
14          THE REPORTER:  You guys got to talk --
15          MR. BRUSTIN:  Let me withdraw --
16          THE REPORTER:  -- one at a time.
17          MR. BRUSTIN:  -- the question.
18          BY MR. BRUSTIN:
19          Q.  First of all, is what's -- is what you
20   described here on the video actually what happened
21   with the police?  That's my question, sir.
22          (Objections to the form.)
23          THE WITNESS:  Again, man, this is what --
24   this is the statement that I made according to
25   taking the plea agreement to free Mr. Dixon and
```



```
 1                    LaMarr Scott
 2   also for me to receive eight and a third to
 3   25 years.
 4        You know, I was under oath in that aspect,
 5   and even if -- I'm under oath now.  So this is what
 6   it is, man.  For you to continue to ask me this,
 7   it's like -- it's very irritating for me.
 8        BY MR. BRUSTIN:
 9        Q.   Okay.  Well, that's not my intention to
10   irritate you.
11        A.   It's all about intentions.  Your
12   intentions here is to build a -- is to build your
13   case to make it stronger, so don't say that it's
14   not your intentions because this is what your
15   intentions is.
16        Q.   All right.  Take a look at page 14.  If
17   you could read the top where it says, LaMarr Scott,
18   stand back, yeah, I wanted to say it was him.  If
19   you could read those three paragraphs to yourself,
20   please.
21        A.   Okay.
22        Q.   Did you make those statements on the
23   video to Mr. Riga, Ms. Dee, and Mr. Heraty?
24        (Objections to the form.)
25        THE WITNESS:  Is this -- is this -- is this
```



```
 1                     LaMarr Scott

 2   statement -- everything that you say here is --

 3   this is what was transcribed from Mr. Riga?

 4         BY MR. BRUSTIN:

 5         Q.   Yes, sir.

 6         A.   Okay.  And this was recorded and

 7   transcribed by you all --

 8         Q.   Yes, sir.

 9         A.   -- correct?

10         Q.   It wasn't recorded, it was just

11   transcribed.

12         A.   Transcribed, okay.  So you're asking me

13   that and you already know the answers to that.

14         Q.   So I'm asking you whether or not in

15   fact that was true, that that's what in fact the

16   police said to you, what Stambach said to you.

17         (Objections to the form.)

18         THE WITNESS:  Why would ask me that when

19   it's here?  Again, you keep asking me the same

20   questions over and over again.  And I told you

21   before, man, I'm not here to --

22         BY MR. BRUSTIN:

23         Q.   So --

24         A.   -- enhance the situation.  I really

25   don't want to be here.
```



```
 1                    LaMarr Scott

 2        Q.   What I don't want to have to do is get

 3   you back here with a court order.  I don't -- I

 4   need you to answer my questions, and the question

 5   is, did --

 6        A.   What do you -- what do you mean a court

 7   order?  I don't understand that.  What do you mean?

 8        Q.   Sir, you -- I have the right to ask you

 9   questions.  You have to answer them.  That's --

10   that's all I can tell you.

11        A.   But I also have a right not to answer

12   them.

13        Q.   You don't.  You're here by subpoena and

14   you have to answer my questions and you have to

15   answer them honestly, and I know you're trying to

16   do that, but that -- that is what you have to do,

17   sir.

18        And in fact, when you told these

19   investigators that -- I'm going to read it to

20   you -- you know, and I said, you want my coat?  I

21   took my coat off.  I was giving him the coat that I

22   had on and I had wiped my sneakers off at the time,

23   but I had white Nikes but there was still small

24   speckles of blood on the bottom of the sneaker and

25   I wanted to give him the sneakers.  He says, no,
```



1                          LaMarr Scott

2  when you guys get your statements together, you

3  bring all of that back.  Is that in fact what

4  Stambach said to you, sir?

5          A.   This is what --

6          (Objections to the form.)

7          THE WITNESS:  This is in fact what's said

8  right here.  This is exactly what I said on -- in

9  2018.

10          BY MR. BRUSTIN:

11          Q.   And was it truthful when you said it,

12  sir?

13          (Objections to the form.)

14          THE WITNESS:  Of course.  I was under oath

15  and was truthful.  Everything that I've been saying

16  is truthful.  For you to continue to ask me the

17  same questions is extremely irritating, man.

18          So, please, man, don't continue to ask me if

19  it's truthful because I'm not a liar and I haven't

20  been lying.

21          BY MR. BRUSTIN:

22          Q.   Sir, I just need you to confirm that

23  it's true.  That's -- I'm not trying to suggest

24  you're a liar.  I need to confirm it for the

25  record.  That's all I'm doing, sir.



 1                      LaMarr Scott

 2          A.    But you have it here on record.

 3          Q.    I don't believe this was under oath,

 4     sir.  That's why I'm asking.

 5          A.    But I took a plea agreement to all of

 6     these things.  So in order to take the plea

 7     agreement, you took a plea agreement to everything

 8     that's being said here.

 9          So if I said something totally different,

10     then there's a strong possibility that I could go

11     back to prison once again.

12          Q.    All right.

13          MS. YATES RICHARDSON:  Calm down.

14          THE WITNESS:  And I'm calm, Pam.  I'm cool.

15          MS. YATES RICHARDSON:  Okay.  Okay.

16          THE WITNESS:  No, I understand.  I just know

17     this is not --

18          MS. YATES RICHARDSON:  I know, but just --

19          THE WITNESS:  This is -- I understand.  I

20     get it.  I ain't tripping.

21          MS. YATES RICHARDSON:  Okay.

22          BY MR. BRUSTIN:

23          Q.    Okay.  Could you read to yourself on

24     page 14 -- read from where it says, "Leonard

25     Brown," all the way to the bottom of the page --



1                        LaMarr Scott

2   actually, read -- if you could read to the middle

3   of the page where you stop talking on the -- on

4   page -- so read from page 14 in the middle of the

5   page to where it says "Sara Dee" on page 15.  Okay?

6   And let me know when you're done, sir.

7          A.   I don't need to read it.  I know what's

8   here.

9          Q.   Okay.  And could you describe for us

10  today, sir, did Detective Stambach, after you came

11  down and tried to confess, come and speak to you a

12  few days later as you describe here?

13         A.   On a few occasions I've seen him.

14         Q.   Okay.  And what did he say to you, in

15  substance?

16         A.   Asking me was I coming to take a

17  polygraph test.

18         Q.   Okay.  And he also showed up, you said,

19  at places where he was unexpected?

20         A.   Well --

21         (Objections to the form.)

22         THE WITNESS:  -- now that I think of it, of

23  course.  He's a police officer.  So, you know,

24  there's not much investigation you have to do when

25  you're dealing with a kid that goes to the same



```
 1                      LaMarr Scott
 2   places all the time.
 3          BY MR. BRUSTIN:
 4          Q.   Okay.  And as you told the
 5   investigators, you felt harassed by Detective
 6   Stambach, correct?
 7          (Objections to the form.)
 8          THE WITNESS:  Yes, I did.
 9          BY MR. BRUSTIN:
10          Q.   Okay.  And what specifically did
11   Detective Stambach do that caused you to feel
12   harassed as a young man at the time trying to do
13   the right thing?
14          (Objections to the form.)
15          THE WITNESS:  Well, he -- the showing up
16   himself was a form of harassment, as far as I
17   understood.  You know, just showing up in places
18   that I didn't think anybody should -- should know
19   about and/or show up.
20          BY MR. BRUSTIN:
21          Q.   Okay.  What else?
22          A.   Basically that's it, and asking the
23   question of whether I was going to take a polygraph
24   test or not.
25          Q.   Take a look at page 21.
```



```
 1                      LaMarr Scott

 2          MR. BRUSTIN:  Let's take a couple-minute

 3   break and I'm just about done.

 4          THE VIDEOGRAPHER:  Okay.  Going off the

 5   record.  Time is 11:07.

 6          (A recess was then taken at 11:07 a.m.)

 7          THE VIDEOGRAPHER:  Okay.  We're going back

 8   on the record.  Time is 11:13.

 9          BY MR. BRUSTIN:

10          Q.   Okay.  Just a couple more questions,

11   Mr. Scott, and I'll be done.

12          If you could just take a look at -- I'm

13   going to take this one from you.  Thank you.

14          If you could take a look in Exhibit

15   Number 2, the police file, page 267.

16          MS. PERSICO:  I'm sorry.

17          MR. SAHASRABUDHE:  It's 267 of the PDF, the

18   first --

19          MR. ROMO:  Exhibit 2.

20          MR. SOEHNLEIN:  Yeah.  We're back to ...

21          MR. BRUSTIN:  Plaintiff's 2.

22          BY MR. BRUSTIN:

23          Q.   Do you recognize the handwriting on

24   this document, Mr. Scott?

25          A.   Yes.
```



```
 1                     LaMarr Scott
 2        Q.   Okay.  And did you write this letter?
 3        A.   I wrote several letters.  As a matter
 4   of fact, I wrote maybe a couple hundred letters.  I
 5   don't remember specifically this one, but this is
 6   my handwriting.
 7        Q.   Okay.  So then since you don't
 8   remember, can I ask you to take a minute and read
 9   it, please?
10        A.   This is just like -- this is a
11   letter -- the same way to so many other ones that I
12   wrote.
13        Q.   Okay.
14        A.   Okay.
15        Q.   You had a chance to read it?
16        A.   Yeah, I gazed through it.  I get it.  I
17   get it.
18        Q.   Okay.  And is this an accurate
19   description of -- is this an accurate description
20   of what happened with -- with the police when you
21   tried to confess?
22        A.   Yes.
23        (Objections to the form.)
24        THE WITNESS:  According to -- according to
25   this, yes, it is.
```



```
 1                        LaMarr Scott

 2          BY MR. BRUSTIN:

 3          Q.   Okay.  Is there anything in here that's

 4   inaccurate in this letter?

 5          (Objections to the form.)

 6          THE WITNESS:  No, I can't say anything is

 7   inaccurate or accurate.  I know that this is --

 8   these are the letters that I wrote while I was in

 9   Attica --

10          BY MR. BRUSTIN:

11          Q.   Okay.

12          A.   -- and --

13          Q.   And what's -- what's in here is what --

14   what was truthful to the best of your recollection

15   at that time, correct?

16          A.   Yes, it was.

17          MR. BRUSTIN:  Okay.  I think that's all I

18   have right now, Mr. Scott.  Thank you very much --

19          THE WITNESS:  All right.

20          MR. BRUSTIN:  -- for your time.

21          THE WITNESS:  This is Mario.

22                        EXAMINATION

23          BY MR. SOEHNLEIN:

24          Q.   Mr. Scott, I have a few follow-up

25   questions for you.
```



```
 1                      LaMarr Scott

 2          A.    Sure.

 3          Q.    And I'm going to try to be quick.

 4   Okay?  I really am.

 5          A.    Appreciate it.

 6          Q.    If -- if I ask you something and you

 7   don't understand it, just tell me and I'll try to

 8   rephrase it.  Okay?

 9          You've provided some testimony earlier

10   today, and I think you said that -- that you did

11   not recall your interactions, I think originally

12   you said, with the police; is that correct?

13          MR. BRUSTIN:  Objection to the form.

14          BY MR. SOEHNLEIN:

15          Q.    You don't have an independent

16   recollection of these things?

17          MR. BRUSTIN:  Objection to form.

18          THE WITNESS:  Say the question again.

19          BY MR. SOEHNLEIN:

20          Q.    I was asking about your recollection,

21   and you said earlier that you didn't remember

22   certain things.

23          A.    Mm-hmm.

24          Q.    What I'm -- what I'm interested in most

25   is do you remember anything about going to the
```



1                        LaMarr Scott

2   grand jury in Mr. Dixon's case?

3          A.   No, it's a blur.  The only thing I

4   really remember pertaining to that is that my

5   adopted parents showed up and I felt ashamed there.

6          Q.   Okay.  So you recall that your adopted

7   parents, they were there the day of the grand jury?

8          A.   Yes, they were there.

9          Q.   Okay.  Now, where were they?

10         A.   I don't know where they were.  They

11  came into the office and I was sitting down with my

12  head down.  When I looked up, my adapted parents

13  was there and I remember feeling like a little kid

14  all over again.  That's basically -- and it stuck

15  with me for all those years.

16         Q.   Right.

17         A.   Anything else about it is a blur.

18         Q.   Okay.  It made you feel bad because you

19  felt poorly for being involved in the situation?

20         A.   Well, I wasn't --

21         MR. BRUSTIN:  Objection.

22         THE WITNESS:  Well, I wasn't raised that

23  way, in that aspect --

24         BY MR. SOEHNLEIN:

25         Q.   Okay.



```
 1                      LaMarr Scott

 2          A.   -- you know what I mean?  A kid with --

 3     a kid with his parents.

 4          Q.   Okay.

 5          A.   You're going to feel bad.

 6          Q.   Right.

 7          A.   Whether you feel bad when you're

 8     walking out the door, or tomorrow or the next day,

 9     you're going to feel bad.

10          Q.   Okay.  Now, you said in the office, do

11     you know what office you were in?

12          A.   No, I'm not sure what office I was in.

13          Q.   Okay.  Okay.  Now, do you recall that

14     in connection with the grand jury, you had an

15     attorney assigned to you name Mr. Molloy; do you

16     recall that?

17          A.   No.

18          Q.   You don't --

19          A.   The only attorneys I remember is

20     Katherine Bestine.  She was one of the ones that I

21     had for a plea agreement, which was a paper felony,

22     and she had me plea down, I think it was, to some

23     county time.

24          Q.   Okay.  Well, I want to show you

25     something real quick.
```



```
 1                     LaMarr Scott

 2          MR. RUSS:  Red head?  She's a red head?

 3          THE WITNESS:  I'm not sure if it was red.  I

 4   think it was blonde, maybe.

 5          MS. PERSICO:  We change them from time to

 6   time.

 7          THE WITNESS:  Yeah, I know, I know.

 8          MR. SOEHNLEIN:  Can you mark this, please?

 9          THE REPORTER:  Mm-hmm.  What do you want it

10   marked as?

11          MR. SOEHNLEIN:  Oh, are you doing

12   Plaintiff's Exhibits or are you doing Scott number

13   whatever?

14          MR. BRUSTIN:  We have these already.

15          MR. SOEHNLEIN:  How are you guys marking

16   exhibits?

17          MR. BRUSTIN:  Why don't you guys do -- I

18   like to do all the way through, Plaintiff's 1.  Why

19   don't you guys do Defendant's A through --

20          MR. SOEHNLEIN:  Let's do County 1.

21          MR. BRUSTIN:  Okay.  Do you think it's

22   easier if you guys do letters?

23          MR. SOEHNLEIN:  No, because we'll get AA.

24          MR. BRUSTIN:  Okay.

25          MR. SOEHNLEIN:  I want to do numbers.
```



```
 1                   LaMarr Scott

 2        MR. SAHASRABUDHE:  We could County 1,

 3   City 1.

 4        MR. SOEHNLEIN:  I'm a big fan of the number

 5   system.

 6   The following was marked for Identification:

 7    COUNTY EXH. 1         Mr. Scott's grand jury

 8                          testimony from January 13th,

 9                          1992

10        BY MR. SOEHNLEIN:

11        Q.   Okay.  Take a -- you can just look at

12   that and let me know when you -- just glance it,

13   really just the first couple of lines there.

14        And just to make the record clear, what I've

15   shown Mr. Scott is the transcript of his grand jury

16   testimony that was taken on January 13th, 1992, in

17   the Valentino Dixon case.

18        A.   Okay.

19        Q.   Okay.  Mr. Scott, have you had a chance

20   to review that document?

21        A.   Yes, I see it in front of me.

22        Q.   Okay.  And do you see at the top where

23   it says John J. Molloy representing the --

24        THE REPORTER:  I'm sorry.  "And do you see

25   at the top" ...
```



```
 1                    LaMarr Scott
 2         BY MR. SOEHNLEIN:
 3         Q.    Sure.   Where is says John J. Molloy --
 4         A.    Yes.
 5         Q.    -- Esquire, representing the witness;
 6   do you see that?
 7         A.    Yes.
 8         Q.    Does that refresh your memory that you
 9   had Mr. Molloy with you on the grand jury?
10         A.    No, it doesn't.
11         Q.    It doesn't bring any independent
12   recollection?
13         A.    No.
14         Q.    Okay.   Do you have any recollection of
15   being served with a grand jury subpoena to go to
16   the grand jury?
17         A.    No, I don't.
18         Q.    Okay.   Do you have any recollection of
19   meeting with any attorney prior to the grand jury?
20         A.    No.
21         Q.    Okay.   Now, have you -- have you
22   reviewed any documents or any materials to prepare
23   for today?
24         A.    No.
25         Q.    No.
```



1                       LaMarr Scott

2          A.    No, I haven't read anything.  I

3    received this in the mail.  I know I received this

4    at work, and that's the extent that I spoke to him

5    briefly, and that's it.

6          Q.    How would you characterize your

7    recollection of the grand jury?  How would you

8    describe it?

9          A.    The only thing that, again, that I can

10   remember is my adopted parents being there.

11         Q.    Okay.

12         A.    And Mario Jarmon, me and Mario leaving

13   and, you know, Mario's going -- dropping Mario off

14   and my dad taking me -- taking me to church, that's

15   it.

16         Q.    Okay.  After the grand jury you went to

17   church?

18         A.    Yeah.  After that I went to -- he was

19   going to prayer services or something, and I rode

20   along with him because I wasn't living at home.

21         Q.    Okay.  All right.  Now, your

22   recollection of your parents being there, they were

23   in the office, they did not go into the grand jury

24   with you?

25         A.    No, not -- no, the only thing -- only



```
 1                    LaMarr Scott

 2  thing -- the only time I did see them is when they

 3  came into the office and I looked at them and they

 4  sat down, and I don't even remember the

 5  conversation --

 6         Q.   Okay.

 7         A.    -- you know, and maybe a few minutes

 8  later, it was -- everything happened so fast.  I

 9  got a ride out of there and we were going home.

10         Q.   Okay.  I want to show you one more

11  document, okay, just to see.

12         MR. SOEHNLEIN:  Would you mark this

13  County 2, please?

14         And there's a copy for you, and you, as

15  well.

16  The following was marked for Identification:

17   COUNTY EXH. 2      letter dated January 9th,

18                      1992

19         BY MR. SOEHNLEIN:

20         Q.   Do you have that document in front of

21  you, Mr. Molloy -- or I'm sorry -- Mr. Scott?  I

22  apologize.

23         A.   Yes.  Yes.

24         Q.   Okay.  What I've shown you is a letter

25  dated January 9th, 1992, that's addressed to
```



```
 1                        LaMarr Scott
 2   John J. Molloy.
 3            A.    Mm-hmm.
 4            Q.    And you'd agree with me that the letter
 5   memorializes Mr. Molloy being assigned to represent
 6   you in connection with the grand jury; do you see
 7   that?
 8            A.    Yes, I see it.
 9            Q.    Okay.  And you'd agree with me that
10   January 9th, 1992, is a few days before
11   January 13th, 1992, correct?
12            A.    Yes, it is.
13            Q.    Okay.  Do you have any recollection of
14   speaking with Mr. Molloy before the grand jury?
15            A.    No, I don't.
16            Q.    Okay.  All right.  I want you to go
17   back to that other exhibit that we had, the first
18   one that I showed you.  If you could just go to the
19   numbered page 59 on that exhibit.
20            MR. BRUSTIN:  Can you identify what this is
21   for the record?
22            MR. SOEHNLEIN:  I did.  I'll do it again if
23   you want me to.  It's the grand -- it's his grand
24   jury transcript.
25            MR. BRUSTIN:  I didn't hear you say that.
```



LAMARR SCOTT                                      March 14, 2022
DIXON V. CITY OF BUFFALO                                      72

```
 1                    LaMarr Scott
 2   Thank you.
 3          MR. SOEHNLEIN:  Yeah, no problem.  I'll do
 4   it as many times as you want.
 5          MR. BRUSTIN:  What page?
 6          MR. SOEHNLEIN:  59, please.
 7          BY MR. SOEHNLEIN:
 8          Q.   Actually, starting at the bottom of
 9   page 58.  I'm sorry.  Take just an opportunity to
10   read that.
11          A.   Okay.
12          Q.   Okay.  So you'd agree with me that that
13   part of the transcript memorializes that you had
14   met with Mr. Molloy before the grand jury?
15          A.   Yeah, according to this.  Yes.
16          Q.   According to that, yeah, you'd agree
17   with me.  Now, you said you have no recollection --
18          A.   No, I don't.  Honestly, I really don't.
19          Q.   Okay.  That's okay.  But you'd also
20   agree with me that that characterizes that no one
21   made any threats or promises to you?
22          A.   Yes.
23          MR. BRUSTIN:  Object to the form.
24          THE WITNESS:  According to this, yes.
25          BY MR. SOEHNLEIN:
```



LAMARR SCOTT                                         March 14, 2022
DIXON V. CITY OF BUFFALO                                          73

```
 1                     LaMarr Scott

 2          Q.   Okay.  According to that.  Now, I want

 3   to ask you a couple of questions.  Before the grand

 4   jury, you rode down to the grand jury with Mario

 5   and someone else, correct?  Do you recall?

 6          A.   Yes.  Yes.  I know that Leonard --

 7   Leonard Brown or Leonard Shannon, because we were

 8   all going to the grand jury.

 9          Q.   All right.  And did you ride together?

10          A.   Yes, we were in a taxi.

11          Q.   Okay.  Now, who told you about the

12   grand jury?

13          A.   If I'm correct, I think Leonard had

14   spoke to me about a grand jury.

15          Q.   Okay.  Now --

16          A.   As a matter of fact, I -- I think

17   Tino's father --

18          Q.   Mm-hmm.

19          A.   -- because he would always -- he would

20   ask me if I was okay.  He's a caring dude.  He'd

21   ask me if I was okay.

22          Q.   Yeah.  What was --

23          A.   So --

24          Q.   Oh, I'm sorry.

25          A.   -- I think he -- I think he reminded me
```



```
1                    LaMarr Scott
2  or something.  I'm not -- I'm not sure.  It was a
3  brief conversation, but I wanted to say that, but I
4  don't know.
5         Q.   Okay.  Now, what was your relationship
6  like with Mr. Dixon's family in the time between
7  the shooting and the time you appeared for the
8  grand jury?
9         A.   No, we didn't have a relationship.  I
10 didn't know any of them.  I did -- I knew Antoine
11 from playing football at Grover Cleveland, but
12 anybody else, I didn't know anything about him or
13 his family.
14        Q.   Okay.  So Mr. Dixon's dad wouldn't take
15 you out for hamburgers or anything like that?
16        A.   No, I don't -- you know, I don't know
17 anything about his family.
18        Q.   Okay.  But I'm just asking the
19 question, you didn't see them in that time period?
20        MR. BRUSTIN:  Objection to the form.
21        THE WITNESS:  Yes, I seen them on quite a
22 few occasions because of the neighborhood, he had a
23 store down the street.  And at the time I was on
24 Langmeyer and Bailey, so I would always see the
25 father.
```



```
 1                      LaMarr Scott

 2         BY MR. SOEHNLEIN:

 3         Q.   Mm-hmm.

 4         A.   You know, he -- you know, he had

 5  different stores and stuff like that so knowing

 6  that -- knowing what my situation was, he -- am I

 7  hungry?  Am I okay?  It had nothing to do with

 8  anything else, you know, just being a concerned

 9  father.

10         Q.   Okay.  He was -- he was making sure

11  that you were doing all right in that time period?

12         A.   Yeah, just making sure that I was okay.

13  Very rarely did we -- did the conversation that I

14  do remember, which weren't many at all, you know,

15  they weren't conversations talking about his son.

16  He just asked me how I was doing.

17         Q.   Had he asked that before the shooting,

18  had he asked those questions of you before the

19  shooting?

20         MR. BRUSTIN:  Objection to form.

21         THE WITNESS:  Prior to the shooting, I had

22  no -- I had no reason to even of communicate with

23  him.

24         BY MR. SOEHNLEIN:

25         Q.   Now, when you said that you, Mario, and
```



 1                        LaMarr Scott

 2   Leonard went to the grand jury together in a taxi,

 3   correct?

 4          A.    Yeah.

 5          Q.    Did you -- do you have any recollection

 6   of discussing your testimony on the way?

 7          A.    I don't have any recollection of the

 8   ride.  I just know we were in the taxi and we got

 9   there and that was it.

10          I can't tell you, you know, what -- what way

11   we went, I can't tell you directions or anything.

12   You know, I only remember those -- those particular

13   things.  Anything else, it's a blur.  Again, I

14   don't remember anything else about it.

15          Q.    Okay.  And no other pertinent facts

16   that you can recall that you haven't shared with us

17   yet today?

18          A.    No.  No, it's -- it's not something

19   that I think about.

20          MR. SOEHNLEIN:  Okay.  I think that's all

21   that we have, Mr. Scott.

22          THE WITNESS:  You're welcome.  You're

23   welcome.

24                        EXAMINATION

25          BY MR. RUSS:



```
 1                  LaMarr Scott

 2         Q.   Mr. Scott, I have a few questions for

 3    you.  I promise I won't repeat what's been done and

 4    I'll do my best to be fast.  Okay?

 5         A.   Thank you.

 6         Q.   Okay.  When -- back on Goodyear when

 7    Valentino Dixon gave you the gun, what, if

 8    anything, did he say?

 9         MR. BRUSTIN:  Objection to the form.

10    Mischaracterizes his testimony.

11         THE WITNESS:  He never -- he didn't give it

12    to me like a piece of paper, here, take this.  When

13    I got into the vehicle on the passenger side, the

14    gun was in the bag on the passenger side floor and,

15    you know, it was -- really wasn't no conversation

16    that I can --

17         BY MR. RUSS:

18         Q.   Did he say anything to you?

19         A.   He said we got some business to handle.

20         Q.   And did he say anything else?

21         A.   I said, what business?  What do you

22    mean?

23         Q.   Okay.

24         A.   That was it.  Anything -- I really

25    can't remember too much else pertaining to that.
```



LAMARR SCOTT                                      March 14, 2022
DIXON V. CITY OF BUFFALO                                      78

```
 1                    LaMarr Scott
 2         Q.   And did you drive somewhere?
 3         A.   I never knew -- I never drove a car in
 4    my life.  I don't know how to drive.
 5         Q.   Did you ride somewhere with him?
 6         A.   To Bailey and Delevan, Mario's house.
 7         Q.   At the time, did you work for Valentino
 8    Dixon?
 9         A.   Well --
10         MR. BRUSTIN:  Objection to form.
11         THE WITNESS:  -- I don't -- I don't consider
12    it working now, but in the grand scheme of things,
13    yeah.
14         BY MR. RUSS:
15         Q.   What did you do for him?
16         A.   I sold drugs, a small amount of drugs.
17         Q.   Did you also help him with other things
18    that he -- he would do?
19         A.   No.  No, I was just a regular kid in
20    the neighborhood and, you know, at the time he
21    looked out for, in that sense, if you want to call
22    it looking out.
23         Q.   Now, you've told us that you pulled the
24    trigger that night?
25         A.   Yes.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                       LaMarr Scott

 2          Q.   But Valentino Dixon took you there in

 3     the car?

 4          A.   Yes.  I wouldn't have been there if it

 5     wasn't for him.

 6          Q.   And gave you the gun?

 7          A.   Yes.

 8          Q.   Did he point anyone out?

 9          A.   No, Leonard did.

10          Q.   Was Leonard with you in the car?

11          A.   No, Leonard wasn't in the car, but

12     Leonard was on the corner that night.

13          Q.   When you and Valentino Dixon arrived

14     that night, did you meet up with Leonard?

15          A.   Yeah, we met with Leonard, Mario,

16     Walter Dennis, and Antoine.  We were all there.

17          Q.   After you pulled the trigger, what did

18     you do?

19          A.   I ran to the right, which is past Mario

20     Jarmon's house, a couple of yards, and I went to

21     get into Valentino's car but he told me I couldn't

22     get into his car and drove off, so I dumped the gun

23     a couple houses down.

24          MR. RUSS:  That's all I have.  Thank you.

25          THE WITNESS:  You're welcome.
```



LAMARR SCOTT                                               March 14, 2022
DIXON V. CITY OF BUFFALO                                             80

```
 1                      LaMarr Scott

 2          MR. BRUSTIN:  I have just a couple more

 3   questions for you, Mr. Scott.

 4          THE WITNESS:  All right.

 5                   FURTHER EXAMINATION

 6          BY MR. BRUSTIN:

 7          Q.   First of all, Valentino Dixon did not

 8   ask you or direct you to shoot anyone, correct?

 9          A.   No.

10          (Objections to the form.)

11          THE WITNESS:  No, he just told us we had

12   some business to handle.  He didn't tell me to go

13   kill somebody or anything like that.

14          He didn't do that, but you know, when you're

15   looking at the scenarios and what it was, you know,

16   you don't take a guy and give him a gun and then

17   say we have business to handle.  You don't do that.

18          BY MR. BRUSTIN:

19          Q.   And as you told -- as you said, he

20   didn't give you any more specifics other than we

21   have business to handle?  That's your recollection?

22          A.   Yes.

23          Q.   And Mr. Dixon did not say anything to

24   you about shooting anybody, correct?

25          (Objections to the form.)
```



```
 1                    LaMarr Scott

 2        THE WITNESS:  No, he didn't specifically say

 3   we've got to shoot this guy or anything like that.

 4   He just said we've got business to handle.

 5        BY MR. BRUSTIN:

 6        Q.   And as you consistently said, beginning

 7   in 1991, you made the decision to pull the trigger

 8   and to shoot Torri Jackson, correct?

 9        (Objections to the form.)

10        THE WITNESS:  It wasn't a decision.  I don't

11   call it a decision, I call it acting on.

12        BY MR. BRUSTIN:

13        Q.   You've certainly taken responsibility

14   for that, correct, sir?

15        A.   Yeah, I took responsibility for that.

16   Yeah.  I mean ... all right.  We're trying the case

17   all over again, but here's -- Valentino Dixon told

18   me specifically, they're shooting my brother.  I

19   said this before, and I'll say it again.  He said,

20   they're shooting my brother, and stop them from

21   shooting my brother.

22        Leonard pointed to Torriano Jackson, and

23   that's when the beginning of all of this stuff

24   that's happening now began to happen.  So --

25        Q.   All right.
```



LAMARR SCOTT                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                    82

```
 1                    LaMarr Scott

 2        A.   -- that's it, man.

 3        Q.   The conversation you had with Valentino

 4   Dixon about the gun, you've already told us was

 5   more than 45 minutes before you actually shot him,

 6   correct?

 7            (Objections to the form.)

 8            THE WITNESS:  Yes.  Maybe.  Maybe 45.

 9   Maybe.

10            BY MR. BRUSTIN:

11        Q.   And Valentino Dixon never said to you

12   in words or substance to shoot anybody, correct?

13            (Objections to the form.)

14            THE WITNESS:  I just answered the question.

15   Come on, man.  Don't do that, man.  I just answered

16   that.

17            BY MR. BRUSTIN:

18        Q.   You understood that -- at the time, you

19   understood that the concern was that there could be

20   a gun fight and it might -- you might need to

21   protect yourself; is that fair to say?

22            (Objections to the form.)

23            THE WITNESS:  I can't say it's fair.  I

24   can't say it's fair to say.  I just know that it

25   was an issue.  You know, I can't say it was fair.
```



```
 1                      LaMarr Scott

 2    It was an issue.

 3           BY MR. BRUSTIN:

 4           Q.   And the reason that you -- the reason

 5    that you shot Torri Jackson is because you were

 6    concerned that he was going to kill Mario, correct?

 7           (Objections to the form.)

 8           THE WITNESS:  I just looked at it as being

 9    instinctive, man, being a protector basically.

10           BY MR. BRUSTIN:

11           Q.   All right.

12           A.    It was instinctive.  I can't tell you

13    what my mindset was, what my thoughts were, and who

14    said -- you know, situations like that, there's

15    really no conversation.

16           I don't know if you've ever been in war or

17    anything like that or any of that, but this is just

18    what it is.

19           BY MR. BRUSTIN:

20           Q.   I haven't at all.  I have not, anything

21    like it.  And I'll acknowledge that to you, sir.

22    But my understanding, based on what you

23    described --

24           A.   Right.

25           Q.   -- in the past --
```



```
 1                        LaMarr Scott

 2          A.   Right.

 3          Q.   -- is that when you -- when you brought

 4    that weapon and you shot Torri Jackson, it was

 5    because you were concerned that Torri Jackson was

 6    going to kill Mario; is that fair to say?

 7          (Objections to the form.)

 8          THE WITNESS:  Well, I can't say it's fair to

 9    say he was going to kill Mario.  We were all

10    together.  I didn't know Mario.  I wasn't concerned

11    about Mario.  It's just that we were all there and

12    that was the situation.

13          BY MR. BRUSTIN:

14          Q.   Okay.

15          A.   I can't say one person specifically,

16    but what I will say is that if Valentino wouldn't

17    have brought me there that day, we wouldn't be here

18    now.

19          Q.   That's fair.

20          A.   You know.

21          Q.   But the only reason that you brought

22    the gun out when you did --

23          A.   Right.

24          Q.   -- is because you were concerned that

25    Mario or somebody else was going to be killed by
```



1                       LaMarr Scott

2   Torri Jackson, correct?

3           (Objections to the form.)

4           THE WITNESS:  Well, again, I can just say

5   that -- I can't say it was a concern, concern.  I

6   just know that, you know, we had to stop the

7   situation and that was the only way that I knew to

8   stop it at that time with -- with the gun, which he

9   provided.

10          BY MR. BRUSTIN:

11          Q.   Okay.

12          A.   So that's the only way I knew to stop

13  it, you know.

14          Q.   You didn't -- you didn't bring the gun

15  out from beneath the bench --

16          A.   Right.

17          Q.   -- until after you saw Torri Jackson

18  brandishing a weapon, correct?

19          (Objections to the form.)

20          THE WITNESS:  After they -- it was after the

21  fighting, the shooting, and Tino said, "they're

22  killing my brother."  That's when that was brought

23  up.

24          BY MR. BRUSTIN:

25          Q.   Okay.  But you hadn't talked -- you



```
 1                      LaMarr Scott

 2  hadn't talked to Valentino for more than 45 minutes

 3  before that, correct?

 4          (Objections to the form.)

 5          THE WITNESS:  We were on the corner talking.

 6  We were drinking beer.  We were having conversation

 7  the whole time.  We were laughing and joking.

 8          MR. BRUSTIN:  All right.  Just give me a

 9  one-minute break.  I think we're about done.

10          THE VIDEOGRAPHER:  Going off the record.

11  Time is 11:38.

12          (A recess was then taken at 11:38 a.m.)

13          THE VIDEOGRAPHER:  Going back on the record.

14  Time is 11:39.

15          MR. BRUSTIN:  Okay.  Thank you, Mr. Scott.

16  That's all I have right now.

17          THE WITNESS:  All right.  You guys have a

18  good day.

19          MR. SOEHNLEIN:  Thank you, Mr. Scott.

20          MS. PERSICO:  Thank you.

21          MR. SAHASRABUDHE:  Thanks for your time.

22          THE VIDEOGRAPHER:  Okay.  This concludes

23  today's deposition.  Time is 11:39.  Thank you very

24  much.

25          (Deposition concluded at 11:39 a.m.)
```



```
1

2   STATE OF NEW YORK )

3                     ss:

4   COUNTY OF ERIE    )

5

6       I DO HEREBY CERTIFY as a Notary Public in and

7   for the State of New York, that I did attend and

8   report the foregoing deposition, which was taken

9   down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18

19

20          ---------------

21          DANIELLE FETZER,
            Notary Public.

22

23

24

25
```



1

2                    INDEX TO EXHIBITS

3    Exhibit              Description              Page

4     PLF.'S EXH. 1    plea from 2018                    12

5     PLF.'S EXH. 2    black binder of police           32
                       file
6
      PLF.'S EXH. 3    transcript of video              44
7
      COUNTY EXH. 1    Mr. Scott's grand jury           67
8                      testimony from
                       January 13th, 1992
9
      COUNTY EXH. 2    letter dated January 9th,        70
10                     1992

11

12

13    *Copies of exhibits supplied to all counsel.

14

15

16

17

18

19

20

21

22

23

24

25



1

2                    INDEX TO WITNESSES

3    Witness              Examination              Page

4     LaMARR SCOTT          BY MR. BRUSTIN              5

5                          BY MR. SOEHNLEIN            62

6                          BY MR. RUSS                76

7                          BY MR. BRUSTIN             80

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



LAMARR SCOTT                                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                                    90

```
1   Reference No.: 7935397

2

3   Case:  DIXON V. CITY OF BUFFALO

4
         DECLARATION UNDER PENALTY OF PERJURY
5
         I declare under penalty of perjury that
6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the
7   same has been read to me, and the same is
    true and accurate, save and except for
8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET
9   hereof, with the understanding that I offer
    these changes as if still under oath.

10

11       _____

12       LaMarr Scott

13

14          NOTARIZATION OF CHANGES

15             (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20_____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)                    Notary Public,

24

25  in and for the State of _____
```



```
 1    Reference No.: 7935397
      Case:  DIXON V. CITY OF BUFFALO
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25    LaMarr Scott
```



LAMARR SCOTT                                          March 14, 2022
DIXON V. CITY OF BUFFALO                                        92

```
 1    Reference No.: 7935397
      Case:  DIXON V. CITY OF BUFFALO
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25    LaMarr Scott
```



**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**

```
 1              UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NEW YORK
 2
      VALENTINO DIXON,
 3
                   Plaintiff,
 4
        vs.            Civil Action No. 19-CV-01678
 5
      CITY OF BUFFALO, et al.,
 6
                   Defendants.
 7

 8    VIDEOTAPED        TAMARA L. FRIDA

 9    DEPOSITION OF:

10    DATE:            October 19, 2022

11    TIME:            10:27 a.m.

12    LOCATION:        Offices of
                       HUSEBY GLOBAL LITIGATION
13                     1230 West Morehead Street
                       Suite 104
14                     Charlotte, North Carolina

15    TAKEN BY:        Counsel for the Plaintiff

16    REPORTED BY:     MINDY VISLAY

17    _____

18

19

20

21

22

23

24

25
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**                                    **Page 2**

```
 1   APPEARANCES OF COUNSEL:

 2           ATTORNEYS FOR PLAINTIFF VALENTINO DIXON:

 3                   NEUFELD SCHECK & BRUSTIN, LLP
                     BY:  NICK JOEL BRUSTIN
 4                   99 Hudson Street
                     Eight Floor
 5                   New York, New York  10013
                     212-965-9081
 6                   nick@nsbcivilrights.com

 7           ATTORNEYS FOR DEFENDANT CITY OF BUFFALO:

 8                   HODGSON RUSS, LLP
                     BY:  PETER SAHASRABUDHE
 9                   605 3rd Avenue
                     Suite 2300
10                   New York, New York  10158
                     212-751-4300
11                   psahasra@hodgsonruss.com

12           ATTORNEYS FOR THE DEFENDANT COUNTY OF ERIE:

13                   LIPPES MATHIAS, LLP
                     BY:  MARGARET A. HURLEY
14                   50 Fountain Plaza
                     Suite 1700
15                   Buffalo, New York  14202
                     716-853-5100
16                   mhurley@lippes.com

17           ATTORNEYS FOR THE DEFENDANT COUNTY OF
                 ERIE (via Zoom):
18
                     LIPPES MATHIAS, LLP
19                   BY:  JENNIFER C. PERSICO
                     50 Fountain Plaza
20                   Suite 1700
                     Buffalo, New York  14202
21                   716-853-5100
                     jpersico@lippes.com
22

23           ALSO PRESENT:Sona Shah (via Zoom)
                         Gerardo Romo (via Zoom)
24                       Moises Soto-Brito (via Zoom)
                         Darren Carreras, Videographer
25
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**                          **Page 3**

```
 1                    I N D E X

 2                                    Page      Line

 3    TAMARA L. FRIDA                   4         23

 4    DIRECT EXAMINATION

 5    BY MR. BRUSTIN                    4         25

 6    CROSS-EXAMINATION

 7    BY MR. SAHASRABUDHE              51          8

 8    CROSS-EXAMINATION

 9    BY MS. HURLEY                    76         14

10    REDIRECT EXAMINATION

11    BY MR. BRUSTIN                   82          6

12    RECROSS-EXAMINATION

13    BY MR. SAHASRABUDHE             86          1

14    RECROSS-EXAMINATION

15    BY MS. HURLEY                    87          2

16    CERTIFICATE OF REPORTER         89          1

17

18                  E X H I B I T S

19                                    Page      Line

20    EXHIBIT 21, Affidavit of        47          1

21    Tamara L. Frida

22

23

24

25
```

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 4

```
 1                    P R O C E E D I N G S

 2           VIDEOGRAPHER:  This is the beginning of

 3   Media No. 1 in the deposition of Tamara L. Frida in

 4   the matter of Valentino Dixon versus The City of

 5   Buffalo, et al, Case No. 19-CV-01678.

 6      Today's date is October 19th, 2022.  The time on

 7   the monitor is approximately 10:27 a.m.  My name is

 8   Darren Carreras, and I'm the videographer.  The court

 9   reporter is Mindy Vislay.  We are here with Huseby

10   Global Litigation.

11      Counsel, please introduce yourselves, after which

12   the court reporter will swear in the witness.

13           MR. BRUSTIN:  Nick Brustin, Neufeld Scheck

14   & Brustin, for the plaintiff Valentino Dixon.

15           MR. SAHASRABUDHE:  Peter Sahasrabudhe from

16   Hodgson Russ, LLP, here on behalf of the City of

17   Buffalo and the city defendants.

18           MS. HURLEY:  Margaret Hurley with Lippes

19   Mathias for the County of Erie defendants.

20           MS. PERSICO:  Jen Persico also from Lippes

21   Mathias here on behalf of the County defendants as

22   well.

23                    TAMARA L. FRIDA,

24      being first duly sworn, testified as follows:

25                    DIRECT EXAMINATION
```

```
 1  BY MR. BRUSTIN:

 2        Q.   Good morning, Ms. Frida.

 3        A.   Good morning.

 4        Q.   We've met before; my name is Nick Brustin,

 5  but this is the first time we've met in person --

 6        A.   Right.

 7        Q.   -- is that right?

 8        A.   That's correct.

 9        Q.   We've spoken a few times on the phone?

10        A.   Yes.

11        Q.   And you've also spoken to a couple of my

12  colleagues at my office?

13        A.   Yes.

14        Q.   I'll ask you a little bit more about that

15  later, but before that let's just go over some basics.

16  Have you ever had a deposition taken before?

17        A.   No.

18        Q.   Okay.

19        A.   Not --

20        Q.   Okay.  No problem.  So have you ever been

21  in a room like this with a court reporter and had to

22  answer questions in connection with a lawsuit?

23        A.   No.

24        Q.   Okay.  So there's a number of lawyers here,

25  and there's also some lawyers on Zoom --
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                              Page 6

```
 1          A.   Okay.

 2          Q.   -- and I'm going to be starting by asking

 3  you some questions in connection with this lawsuit,

 4  and the other lawyers will follow up with questions,

 5  too.

 6          A.   Okay.

 7          Q.   If at any time you don't understand my

 8  question, or any of the questions today, please let us

 9  know.

10          A.   Okay.

11          Q.   And if you don't understand it, just tell

12  me, and I'll rephrase it.

13          A.   Okay.

14          Q.   If you want to take a break, that's fine.

15  Just let me know, and we'll do that.  Okay?

16          A.   Okay.

17          Q.   The other thing that you may hear from time

18  to time is some of the lawyers making objections to

19  questions.

20          A.   Okay.

21          Q.   There's no judge here --

22          A.   Right.

23          Q.   -- but that's for later on for potentially

24  some judge to rule on down the road --

25          A.   Okay.
```

1         Q.   -- not for you to worry about.  Unless we

2  go to the judge or something like that, you just

3  answer the question if you understand it.  Okay?

4         A.   Yes.

5         Q.   Great.  Okay.  So let's start with some

6  basics.  First of all, you're testifying here pursuant

7  to a subpoena from the plaintiff; is that right?

8         A.   That's correct.

9         Q.   All right.  And where do you currently

10 live?

11        A.   I live in Charlotte, North Carolina.

12        Q.   Okay.  And how old are you, ma'am?

13        A.   Fifty-one.

14        Q.   And what kind of work do you do?

15        A.   I'm a social worker.

16        Q.   All right.  Let's -- let's start with that.

17 Where are you currently employed?

18        A.   YMCA of Greater Charlotte.

19        Q.   Okay.  And, more specifically, what kind of

20 social work do you do for the YMCA?

21        A.   For the YMCA, my position is called a

22 community navigator, and I find and secure resources

23 for our members as well as people in the community,

24 and those resources could be anything related to

25 housing, mental health support, medical support,

 1  insurance, food.  Any type of resources that our

 2  members may need.

 3      Q.   Terrific.  How long have you been working

 4  there?

 5      A.   I've been working for the YMCA since 2019.

 6      Q.   2019.  Okay.  Let's back up a little bit,

 7  and if you could just give us a rundown of your

 8  educational background --

 9      A.   Okay.

10      Q.   -- beginning with where you graduated from

11  high school.

12      A.   I graduated high school in Buffalo from

13  Hutchinson Central Technical High School.

14      Q.   Okay.

15      A.   I then went on to Alfred University, and

16  that is in Alfred, New York, and then I left there,

17  stayed out of school a couple of years, and then I

18  went back to Buffalo State College and obtained a

19  degree in social work.  That was my bachelor's degree.

20  And then I followed up with pursuing my master's in

21  social work at SUNY Buffalo, the Amherst campus, and

22  obtained my master's degree there.

23      Q.   Okay.  In addition to the work you

24  described at the YMCA have you done other types of

25  social work or therapy?

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 9

1        A.    Yes.

2        Q.    **Could you describe that for us, please?**

3        A.    I have -- I'll give you a rundown.

4        Q.    **Sure.**

5        A.    All right.  I've done foster care social

6   work.  I have done mental health therapy.  I've worked

7   in group homes where the specialty was mental health.

8   I have worked in the State of North Carolina for the

9   State of North Carolina.  I worked for Mecklenburg

10  County doing child protective services.  Gosh -- I've

11  done mental health therapy in the State of North

12  Carolina with children and families.  So, in home

13  services.  Oh, gosh.  Community support work as far

14  as -- basically the same thing, case management.  You

15  name it, I've probably done it.

16       Q.    **Okay.  You mentioned you've also done some**

17  **therapy.  Do you have any therapy licenses?**

18       A.    I did have a license.  I was a licensed

19  clinical social worker associate which they give you

20  prior to you taking the clinical exam and passing it,

21  and I did not pass the exam on my two tries within

22  that trial period, so I am now considered -- I'm

23  considered by the social work board as exam eligible.

24       Q.    **Okay.  Do you have a private -- do you see**

25  **any private patients?**

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 10

```
 1          A.    No.
 2          Q.    Okay.  All right.  Let's go back to --
 3   first of all, how long have you lived in North
 4   Carolina?
 5          A.    It's 18 years now.  Yeah.  Eighteen.  I
 6   moved here in 2006.
 7          Q.    2006.  Okay.
 8          A.    Yeah.
 9          Q.    Do you have family here?
10          A.    Yes, I do.
11          Q.    Are you married?
12          A.    No, I'm not.
13          Q.    Children?
14          A.    Yes.
15          Q.    How old are they?
16          A.    I just have one son, and he is 28 years
17   old.
18          Q.    Okay.  Great.  How old were you in August
19   of 1991 at the time of the shooting that we're here to
20   talk about today?
21          A.    I was 20 years old.
22          Q.    And in August of 1991 what were you doing?
23          A.    At that time I was employed at Buffalo
24   General Hospital, and I also -- I believe I was
25   working two jobs.  Gosh, I've always worked like two
```

1  or three jobs.  I think I was working, too, at either

2  Super Duper or either Sears Service Center, one of

3  those two -- somewhere in between those two, but my

4  main job was at Buffalo General Hospital at that time.

5          **Q.   Okay.  And were you also a student at that**

6  **time or not yet?**

7          A.   No.  I was -- well, I was in transition at

8  that time.  I wasn't -- I had unenrolled from Alfred

9  University, and I was pursuing -- thinking about going

10 to Buff State.

11         **Q.   Okay.  And then you went back to Alfred and**

12 **graduated?**

13         A.   No.  I graduated from Buff State.

14         **Q.   Oh.  I apologize.  Thank you.**

15     **Okay.  So let's get right to it.  Were you present**

16 **in the area of Louie's restaurant in Buffalo on**

17 **August 10th, 1991, when Torriano Jackson was shot and**

18 **killed?**

19         A.   Yes, I was.

20         **Q.   Where were you?**

21         A.   I was in the parking lot of Louie's,

22 Louie's parking lot, and I was inside of my vehicle.

23         **Q.   Okay.  And can you describe your vehicle?**

24         A.   It was a red 1990 Geo Tracker convertible.

25 It was red with a white convertible top.

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 12

1        Q.    Okay.  And who were you with?

2        A.    I was with LaSandra Smith and Jacqueline

3   Parks.

4        Q.    Okay.  And did you see who shot and killed

5   Torriano Jackson?

6        A.    Yes, I did.

7        Q.    And who shot and killed Torriano Jackson?

8              MR. SAHASRABUDHE:  Form.

9   BY MR. BRUSTIN:

10       Q.    Let me ask it a different way.

11       A.    Okay.

12       Q.    Who did you see -- do you know the person

13  today who shot and killed Torriano Jackson?

14       A.    I know the person today.

15             MR. SAHASRABUDHE:  Form.

16  BY MR. BRUSTIN:

17       Q.    Who did you see shoot and kill Torriano

18  Jackson?

19       A.    Lamar Scott.

20       Q.    All right.  Do you have any doubt in your

21  mind that Lamar Scott is the person that shot and

22  killed Torriano Jackson?

23       A.    There is no doubt in my mind.

24       Q.    Did you know Lamar Scott at that time?

25       A.    At that time I did not know him when he was

 1  shooting, but later on I found out that he was the

 2  same person that I went to grammar school with and --

 3  so if you want to kind of divulge from there.

 4        Q.   Okay.  Did you see Valentino Dixon at any

 5  time the night that Torriano Jackson was shot?

 6        A.   No, I did not.

 7        Q.   Was he present in the vicinity, to your

 8  knowledge, of where Torriano Jackson was shot?  Did

 9  you see him at all?

10        A.   I did not see him at all.

11        Q.   Did you know Valentino Dixon personally at

12  that time?

13        A.   No, I did not.

14        Q.   Did you know Valentino Dixon by sight and

15  reputation at that time?

16        A.   Yes, I did.

17        Q.   So, in other words, if you had seen him,

18  you would have recognized him?

19        A.   Yes.

20        Q.   And would it be fair to say as a general

21  matter you knew Valentino Dixon as somebody who dealt

22  drugs and also drove nice cars?

23        A.   Yes.

24        Q.   Was he known that way in the community to

25  your knowledge?

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                  Page 14

1        A.   Yes.

2        **Q.   Can you just briefly describe what you saw**

3   **Lamar Scott do in the moments leading up to and**

4   **including the shooting?**

5        A.   Okay.  Of course, there was a fight

6   involving a lot of individuals.  We were watching the

7   fight.  We were all inside of the car watching the

8   fight, and I saw Lamar Scott run down East Delavan

9   headed towards Bailey, and he had a gun in his hand.

10  He started shooting into the crowd before he got all

11  the way to the crowd, and he started shooting into the

12  crowd.  Mario Jarmon kind of ran out of the crowd, and

13  it was almost simultaneously that Torri started

14  running out of the crowd, but he was coming directly

15  towards my truck, and Lamar Scott was right behind

16  him, and he was shooting.  Torri fell face forward

17  onto the ground -- onto the street on Delavan, and

18  Lamar stood up over him and continued to shoot.

19       **Q.   Okay.  Were you able to see Lamar Scott**

20  **both from the front and the back?**

21            MR. SAHASRABUDHE:  Form.

22  BY MR. BRUSTIN:

23       **Q.   Were you able to see Lamar Scott's face?**

24            MR. SAHASRABUDHE:  Form.

25            THE WITNESS:  Yes.

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                              Page 15

```
 1  BY MR. BRUSTIN:
 2        Q.   For approximately how long?
 3        A.   I would say the entire time when he was
 4  running face forward towards -- you know, he was
 5  chasing behind Torri.
 6        Q.   Okay.  Do you have any doubt in your mind
 7  that it was Lamar Scott who shot Torriano Jackson as
 8  opposed to Valentino Dixon?
 9        A.   No.  There's no doubt in my mind.
10        Q.   Do you have any doubt in your mind you
11  would have recognized Valentino Dixon that night if
12  you had seen him?
13        A.   Yes.
14        Q.   In other words, you don't have any doubt in
15  your mind?
16        A.   Oh.  No.  I'm sorry.  Yes.  I don't have
17  any doubt.
18        Q.   It was a bad question.
19        A.   Okay.
20        Q.   Now, had you ever witnessed a shooting of
21  any kind up to that point in your life?
22        A.   No.
23        Q.   Can you describe how it was for you
24  emotionally to observe that shooting?
25        A.   I was very, very scared, very, very shaken
```

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 16

```
 1  up to the point where while I was observing it I
 2  froze, and I just had to tell myself to get out of the
 3  vehicle and kind of take cover.  I was -- I was
 4  nervous.  I was scared because I didn't know where it
 5  came from.  It was a fight that was from what I could
 6  see just a regular fistfight.  So to have the gunman
 7  just kind of run and start shooting, that was just
 8  like, oh, gosh, where did that come from?  And during
 9  that time, too, there was a lot of drive-by shootings,
10  a lot of stuff going on with different people that may
11  have been from outside of Buffalo and people that may
12  have been in prison.  I don't want to stay any names
13  because I don't want to -- that's kind of -- but there
14  was a lot of people getting killed and shootings and
15  all of that, so I didn't know if that was something,
16  but it was traumatizing.
17          Q.   Okay.  And by the way, did witnessing that
18  event in any way affect your choice of careers?
19          A.   It did.
20          Q.   Can you explain that?
21          A.   It made me go towards the therapy part of
22  social work as well and be -- I wanted to know why
23  would someone be that upset that you could actually
24  shoot somebody.  The other part of it on the community
25  side of it, I just saw -- it was just like a major
```

1  change in the community, and that kind of pointed me

2  in a direction of, you know, it's getting worse, and

3  we need some people out there that may be able to help

4  with whatever's going on, and apparently not all of it

5  went for the worst.

6        **Q.   And how about your own trauma that you**

7  **experienced, did that affect your career choice at**

8  **all?**

9        A.   Yes.  Absolutely.  And I would say because

10  the therapist that I had was a good therapist.  I did

11  seek therapy after seeing this because I had

12  nightmares.  I was traumatized.  It led me to smoke

13  cigarettes, but -- no, really.  Like, I wasn't a

14  smoker until then, but -- and I just thought that

15  maybe, you know, with my experience and having a good

16  therapist that maybe one day I would be able to help

17  people, too.

18        **Q.   Gotcha.  All right.  Let's go back to the**

19  **night of the shooting.  Immediately after the shooting**

20  **what did you do?**

21        A.    Immediately after we got back in my car.

22  We were driving off because we wanted to get out of

23  there because we didn't know what else was coming up

24  next.  And I had some mechanical difficulties because

25  apparently I had bullet holes or whatever in my

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 18

```
 1  radiator.  So my radiator fluid leaked out into the
 2  compartment, and my vehicle started smoking.  So then
 3  I'm like -- you know, like, oh, God.  We didn't know,
 4  but, we -- the first thing was, like, we didn't want
 5  to catch on fire or anything like that.  So there were
 6  two friends of ours who were driving, and they were
 7  coming off -- we were on East Ferry.  They were coming
 8  off of I want to say maybe Goodyear or Bissell, and we
 9  told them what happened, and they drove us -- well, he
10  drove.  His brother drove us in his car to the Mobile
11  station, and he drove my car because I was scared to
12  drive.  We made it to the Mobile station on Ferry and
13  Fillmore, and while we were there somebody pulled up.
14  I don't know who it was.  He pulled up and told us
15  that the police were looking for my vehicle, so they
16  took us back to the police.
17       Q.   Okay.  How many minutes after the shooting
18  would you say you made it back to the scene, was it
19  15 minutes, less than that, more than that?
20       A.   Around about 15 minutes.
21       Q.   Fifteen minutes?
22       A.   Uh-huh.
23       Q.   So, within 15 minutes after the shooting
24  you had come back to the scene of the shooting?
25       A.   Yes.
```

1        Q.    Okay.  And what happened when you got back
2   to the scene of the shooting?  Who if anyone did you
3   speak to?
4        A.    I spoke to one of the detectives.  I gave
5   him my name and address, phone number information --
6        Q.    Okay.
7        A.    -- and that was it.
8        Q.    All right.  And at that time did you tell
9   the police that you had seen the shooter?
10       A.    No.
11       Q.    Why?
12       A.    I was scared.
13       Q.    Scared of what at that time?
14       A.    At that time I was scared, too, because I
15  had heard over the mic -- or I mean the walkie that
16  they were looking for Valentino Dixon, and they had
17  said that he was the shooter, and we were all like,
18  well, no, because we knew that he wasn't, but it was
19  like we didn't want to, you know, get involved because
20  we didn't know what it was about.
21       Q.    Right.  In other words, were you scared of
22  the person you later learned to be Lamar Scott?
23       A.    That, too, yes.
24       Q.    And at that time would you say that,
25  generally, in the community where you were living,

 1  providing information in a crime like that could be

 2  dangerous?

 3              MR. SAHASRABUDHE:  Form.

 4              THE WITNESS:  Uh-huh.  Yes.

 5  BY MR. BRUSTIN:

 6      Q.   All right.  A little more specifically, can

 7  you tell us at that time -- because I'm going to ask

 8  you about questions about what you were concerned

 9  about later, but at that time were you concerned for

10  your physical safety if you provided information?

11      A.   Yes.

12      Q.   At that time did you have any idea why

13  Lamar Scott shot and killed Torriano Jackson?

14      A.   No.

15      Q.   Did you observe it to be a brutal crime?

16      A.   Yes.

17      Q.   Had you ever seen anything like that in

18  your life?

19      A.   Never.

20      Q.   Now, you mentioned that you heard Valentino

21  Dixon's name over the radio.  Do you remember exactly

22  what you heard?

23      A.   I just heard that they had put out an all

24  points -- APB for Valentino Dixon as being the

25  shooter.

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                        Page 21

```
 1        Q.   You heard something about him being the
 2   shooter over the radio?
 3        A.   Uh-huh.
 4        Q.   And that was over the police radio --
 5        A.   Yes.
 6        Q.   -- that you overheard?
 7        A.   Yes.
 8        Q.   And that was approximately within 15 or
 9   20 minutes of the shooting?
10        A.   Yes.
11             MR. SAHASRABUDHE:  Form.
12   BY MR. BRUSTIN:
13        Q.   Now, you mentioned that you sought
14   counseling after the shooting.  Who did you go to see
15   at that time or where did you go?
16        A.   I went to at that time it was Buffalo
17   General's community mental health center.  I believe
18   the address was 80 Goodrich.  I cannot remember the
19   counselor's name.  He was a male at that time.  A
20   white male.  I can't remember his name.
21        Q.   Okay.  And do you remember how many times
22   you saw that counselor?
23        A.   I believe it may have been two times.
24        Q.   Okay.  And I think you told us this, but
25   that was because you were having nightmares after the
```

 1  shooting?

 2       A.   Yes.

 3       Q.   Any other trauma symptoms that you had at

 4  that time other than nightmares?

 5       A.   Just a general sense of not feeling safe,

 6  not feeling comfortable, just a little -- if you want

 7  to call it anxiety.

 8       Q.   Okay.  I'm going to show you now just a

 9  police report that is part of Exhibit -- do you guys

10  remember what exhibit is the police report?

11            MR. SAHASRABUDHE:  I never can -- it's

12  like --

13            MR. BRUSTIN:  Gerardo, do you remember what

14  exhibit the police report is?

15            MR. SAHASRABUDHE:  The Comp?

16            MR. BRUSTIN:  The Comp.

17            MR. ROMO:  It's 2, I believe.

18            MR. BRUSTIN:  Thank you.

19  BY MR. BRUSTIN:

20       Q.   So these are pages from Exhibit 2, which

21  has already been marked, which I'm going to ask you

22  some questions about.

23            MR. BRUSTIN:  And I've got copies for you

24  guys if you want.  You already have it?

25            MR. SAHASRABUDHE:  Yeah.  You can -- thank

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 23

```
 1  you.  I think I know which ones you're --
 2  BY MR. BRUSTIN:
 3       Q.  So why don't you take a minute and look,
 4  first of all, at the page -- and I'm going to go by
 5  the Bates stamped pages on the bottom middle, the BPD
 6  Comp.  Let's start with the first page, and just take
 7  a minute and read this report.
 8       A.  Okay.
 9       Q.  Let me know when you're done.  Just read it
10  to yourself.
11            MR. SAHASRABUDHE:  Are we just on the first
12  page?
13            MR. BRUSTIN:  Yes.
14            MR. SAHASRABUDHE:  So, she flipped to the
15  second.
16  BY MR. BRUSTIN:
17       Q.  Oh, no.  Just the first page.
18       A.  Oh.  Okay.
19       Q.  All right.  So, first of all, does this
20  report describe the car that you were driving that
21  night?
22       A.  Yes.
23       Q.  Okay.  And I take it from reading this
24  report, and you tell me if I'm understanding this
25  correctly, that when you spoke to the police -- when
```

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 24

```
 1   you came back to the scene and spoke to the police you
 2   told them where your car was, and they went and --
 3          A.   Yes.
 4          Q.   They went and processed it?
 5          A.   Yes.
 6          Q.   Okay.  All right.  So now let's take a look
 7   at the next report which is page 203.  Okay?
 8          A.   Uh-huh.
 9          Q.   And this is a report that was created by
10   Detective Stambach and Detective Grabowski on
11   August 14th a few days after the shooting.
12          A.   Yes.
13          Q.   Okay?  And obviously you didn't create this
14   report --
15          A.   Right.
16          Q.   -- but I want you to read it, and then I'm
17   going to ask you some questions about the information
18   in it.  Okay?
19          A.   Okay.
20          Q.   All right.  Do you know from reading this
21   report what this is referring to?
22          A.   Yes.
23          Q.   Can you describe it for us, please, or can
24   you tell us what it is?
25          A.   It's a phone call that I made from the
```

 1  therapist's office.  As a part of the therapy the

 2  therapist asked if there was anything I felt like I

 3  could do to kind of make it better or -- you know, and

 4  let the police know, and I opted to call.  He asked

 5  me -- he did ask me if I wanted to call from my house,

 6  and I said no, and he allowed me to make the call from

 7  his office, and that's what I did.

 8      Q.   Does this report accurately describe what

 9  you said to Detective Stambach?

10      A.   From what I can remember, yes.

11      Q.   Okay.  So I take it you don't remember the

12  exact words you said --

13      A.   Right.

14      Q.   -- but this is more or less what you

15  remember saying?

16      A.   Yes.

17      Q.   All right.  And you told him that you had

18  seen the shooting?

19      A.   Yes.

20      Q.   You told him that you were afraid?

21      A.   Yes.

22      Q.   You told him that Valentino Dixon was not

23  the person who shot Torriano Jackson, correct?

24      A.   Yes, I did.

25      Q.   And you also told him that you might be

 1  able to identify pictures, correct?

 2      A.  Yes.

 3      Q.  And although you didn't identify yourself

 4  by name, you told them that in fact you were the

 5  person from the red Tracker, correct?

 6      A.  Yes.

 7      Q.  And you understood when you did that that

 8  you were telling him who you were?

 9          MR. SAHASRABUDHE:  Form.

10          THE WITNESS:  Yes.

11  BY MR. BRUSTIN:

12      Q.  Your understanding was that the police knew

13  you because you talked to them about being in the red

14  Tracker which was shot by one of the bullets, correct?

15      A.  Yes.

16      Q.  And, so, although you didn't give him your

17  name, you understood that you were identifying

18  yourself to this officer?

19          MR. SAHASRABUDHE:  Form.

20          THE WITNESS:  Yes.

21  BY MR. BRUSTIN:

22      Q.  Even though you were scared?

23      A.  Yes.

24      Q.  All right.  After this time did any police

25  officer, Detective Stambach or anybody else, ever come

```
 1  and show you pictures?

 2        A.   No.

 3        Q.   And if they had come to your house at this

 4  time and shown you pictures, including a picture of

 5  Lamar Scott, do you think you would have had the

 6  courage at that time to identify him?

 7             MR. SAHASRABUDHE:  Form.

 8             THE WITNESS:  At that time, yes, with

 9  reservation.

10  BY MR. BRUSTIN:

11        Q.   Okay.  And by the way, I'm asking you about

12  before people were prosecuted for telling the truth

13  about Lamar Scott being the shooter.  Before that

14  time.

15             MR. SAHASRABUDHE:  Form.

16             THE WITNESS:  Yes.  It would have been with

17  reservation still, yes.

18  BY MR. BRUSTIN:

19        Q.   But you think you would have done it?

20        A.   Yes.

21             MR. SAHASRABUDHE:  Form.

22  BY MR. BRUSTIN:

23        Q.   And did you understand when you told them

24  that you were the girl from the red Tracker that they

25  would likely come and visit you?
```

```
 1                  MR. SAHASRABUDHE:  Form.

 2                  THE WITNESS:  At that time I did not know

 3     because it was three of us.  So it could have been any

 4     three of us.

 5     BY MR. BRUSTIN:

 6          Q.    Okay.

 7          A.    And to my understanding -- well, I won't

 8     even say to my understanding.  They did contact the

 9     other two young ladies as well.  So --

10          Q.    Okay.  All right.  Do you know whether they

11     showed them pictures?

12          A.    I do not believe that they showed them

13     pictures.  It was just a contact.  No one was, you

14     know, ever -- neither one of the girls ever went

15     down --

16          Q.    Okay.

17          A.    -- to talk to them.

18          Q.    All right.  But no question that when you

19     spoke to the police on August 10th you told them that

20     the red Tracker was yours, correct?

21          A.    That's correct.

22          Q.    And was it registered in your name, the

23     car?

24          A.    Yes.

25          Q.    Okay.  Now, I want to know -- I want to ask
```

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                   Page 29

1  you some questions about some of the other people that

2  were involved in the shooting and the altercation.

3          A.   Okay.

4          Q.   First of all, did you know Mario Jarmon?

5          A.   Yes.

6          Q.   How did you know him?

7          A.   I've probably been knowing Mario since --

8  probably I was about 12 or 13 years old.

9          Q.   Okay.

10         A.   There was a skating rink at that time

11 called The Arena, and everybody went there.  There was

12 another place called -- well, at Mount St. Joseph's

13 they used to have discos on Friday nights.  The Arena

14 was Saturday nights.  So everybody in that age group

15 would go there just to hang out, you know, have fun,

16 dance.

17         Q.   Okay.  Did you also know Emil Adams after

18 the shooting?

19         A.   It wasn't until after --

20         Q.   Okay.

21         A.   -- the shooting.

22         Q.   But you spoke to Emil Adams a few times

23 after the shooting?

24         A.   Yes.

25         Q.   All right.  I'm going to get to that in a

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 30

 1  second.

 2          A.   Okay.

 3          Q.   Did you know the Jacksons, Torriano and

 4  Aaron Jackson?

 5          A.   I did not know them personally.  I just

 6  knew who they were from just hanging out.

 7          Q.   Did you know them by reputation?  Did they

 8  have any reputation, to your knowledge?

 9               MR. SAHASRABUDHE:  Form.

10               THE WITNESS:  No.

11  BY MR. BRUSTIN:

12          Q.   Okay.  You just knew them from the

13  community?

14          A.   Uh-huh.

15          Q.   You didn't know much about them?

16          A.   No.

17          Q.   All right.  In the days following this

18  shooting what was the discussion in the community

19  among you and your peers about who shot Torriano

20  Jackson?

21               MR. SAHASRABUDHE:  Form.

22  BY MR. BRUSTIN:

23          Q.   If any?

24          A.   Okay.  The discussion was -- I think

25  everybody who was there knew that it was not

1  Valentino.  That was definitely the discussion.  The

2  other discussion was why was 'Tino targeted, you know,

3  as being the shooter when everybody who witnessed it

4  visually knew that he was not.

5       Q.   Okay.  Now, did there come a point in time

6  when you learned that Lamar Scott had actually

7  confessed to the crime?

8       A.   Yes.  I did hear about that.

9       Q.   Do you remember how long after -- how many

10  days after the shooting you had learned that,

11  approximately?

12       A.   I would -- I would be moved to say maybe

13  about two to three days that I had heard about that he

14  had made the confession on the news, but I didn't see

15  it myself.

16       Q.   But you heard about it?

17       A.   Yes.

18       Q.   All right.  And the discussion in the

19  community was that -- for people who had been there

20  was that that was actually the person who had shot

21  Torriano Jackson?

22       A.   Yes.

23            MR. SAHASRABUDHE:  Form.

24  BY MR. BRUSTIN:

25       Q.   Did you discuss that with your friends?

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                    Page 32

```
 1        A.   Yes.
 2        Q.   Did you also in the days and months
 3   following the shooting have discussions with Emil
 4   Adams about what he saw and heard?
 5             MR. SAHASRABUDHE:  Form.
 6             THE WITNESS:  It was actually well after.
 7   It was probably --
 8   BY MR. BRUSTIN:
 9        Q.   Let me ask you this:  Were the discussions
10   that you had with Emil Adams about what he saw and
11   heard before or after you learned about the perjury
12   charges?
13        A.   It was after the perjury charges.
14        Q.   Okay.  And did you -- so more than a year
15   later it sounds like?
16        A.   Uh-huh.
17        Q.   Did you speak to Emil Adams about what he
18   saw and heard?
19        A.   Yes.
20        Q.   And just generally what did Emil Adams tell
21   you, if anything, about who the shooter was?
22             MR. SAHASRABUDHE:  Form.
23             THE WITNESS:  He told me, of course, what
24   we had saw, because he was standing right there as
25   well.  He was standing right next to my truck.  And he
```

```
 1  said that the reason why he had to say that 'Tino was

 2  the shooter was because the police department was

 3  threatening him with some charges he had in Michigan.

 4  BY MR. BRUSTIN:

 5        Q.   Okay.  I think you skipped the first part.

 6        A.   Oh.  Okay.

 7        Q.   But that was the second part of the

 8  question.

 9        A.   Okay.

10        Q.   The first part of the question is did he

11  tell you who the shooter was?

12             MS. HURLEY:  Form.

13             THE WITNESS:  No, he didn't tell me who the

14  shooter was.  By name, when you say --

15  BY MR. BRUSTIN:

16        Q.   It was a bad question.

17        A.   Okay.

18        Q.   Did you talk to Emil Adams about whether or

19  not Valentino Dixon was in fact the shooter?

20        A.   Yes.

21        Q.   And what did he tell you, if anything?

22        A.   He told me that he knew that Valentino was

23  not the shooter.  He knew that.

24        Q.   Okay.

25        A.   And then he went on to explain why he said
```

 1  Valentino was the shooter.

 2        Q.   Okay.  Other than pending charges that he
 3  had did he give you any other reasons as to why --
 4  withdrawn.  Did he give you any other information
 5  about any pressure that the police or the prosecutors
 6  put on him to state that Valentino Dixon was the
 7  shooter even when he knew that he wasn't?

 8               MR. SAHASRABUDHE:  Form.

 9               MS. HURLEY:  Form.

10               THE WITNESS:  The only thing he told me was
11  that they were threatening to actually send him back
12  to Michigan to face the charges.  That was it.

13  BY MR. BRUSTIN:

14        Q.   Do you remember how many times you talked
15  to Emil Adams about the shooting?

16        A.   I would say maybe two -- about two times.

17        Q.   Okay.  Did you talk to any other people?
18  Did you talk to -- first of all, did you talk to your
19  two friends about what they saw?

20        A.   Yes.  Absolutely.

21        Q.   Okay.  And did they also see the shooting?

22        A.   Yes.

23        Q.   And did they also tell you that it was not
24  Valentino Dixon who was the shooter but Lamar Scott?

25        A.   Yes.  Well, they didn't say Lamar Scott,

 1  but they said Valentino Dixon -- it was not Valentino

 2  Dixon.

 3          Q.   All right.  At that time, by the way, did

 4  everybody you knew know Valentino Dixon?

 5          A.   I would say yes, pretty much.

 6          Q.   He drove flashy cars, right?

 7          A.   Yes.

 8          Q.   Good looking guy?

 9          A.   Yes.

10          Q.   Okay.  And did you speak to any other

11  witnesses at the scene other than your two friends and

12  Emil Adams about the fact that it was Lamar Scott

13  either by name or description and not Valentino Dixon

14  who shot and killed Torriano Jackson?

15          A.   Yes.

16          Q.   Who else did you speak to?

17          A.   Travis Powell and Fred Stencil.

18          Q.   Did Travis Powell or Fred Stencil talk to

19  you about any pressure the police tried to put on

20  them?

21               MR. SAHASRABUDHE:  Form.

22               MS. HURLEY:  Form.

23               THE WITNESS:  No, they did not.

24  BY MR. BRUSTIN:

25          Q.   What was the discussion in the community --

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 36

1   withdrawn.  So after Lamar Scott confessed on
2   television to being the shooter, as you saw, knowing
3   he was in fact the shooter --
4         A.   Uh-huh.
5         Q.   Withdrawn.  After Lamar Scott confessed on
6   television about being the shooter did you then make
7   the connection about who he was in your mind?
8              MR. SAHASRABUDHE:  Form.
9              MS. HURLEY:  Form.
10             THE WITNESS:  No.
11  BY MR. BRUSTIN:
12        Q.   That was sometime later?
13        A.   Yeah.  It was sometime later.
14        Q.   Okay.  So after Lamar Scott confessed on
15  television to being the shooter, you mentioned there
16  was discussion in the community as to why the police
17  were continuing to go after Valentino Dixon.
18        A.   Uh-huh.
19        Q.   What were some of the things that you heard
20  as to why the police were going after Valentino Dixon?
21             MR. SAHASRABUDHE:  Objection to form.
22             THE WITNESS:  At that time they were saying
23  because he was a drug dealer allegedly, and also they
24  were saying at that time, too, he had a gun charge
25  already that he was facing, and they really wanted to

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 37

1  get him on the gun charge because they couldn't really

2  pin a drug case on him.  So that was what the

3  discussion was in the community.

4  BY MR. BRUSTIN:

5         Q.   Okay.  Now, did you come to learn some time

6  after January of 1992 that two men were indicted for

7  perjury for claiming that Lamar Scott was the shooter?

8         A.   Yes.

9         Q.   Do you remember when exactly you learned

10 that?

11        A.   Probably around January, February.  I want

12 to say -- if I'm not mistaken, I want to say I was

13 contacted by the District Attorney's office.  I think

14 they gave a phone call maybe to my mom, or they may

15 have stopped by, but I wound up getting subpoenaed to

16 come down and talk to the District Attorney.

17        Q.   Okay.  And, in fact, you did -- you did --

18 you did actually meet with -- withdrawn.  Do you

19 remember -- do you remember what you learned or how

20 you learned about the perjury charges?

21        A.   The only thing I learned, and I'm sure

22 there was probably some talk about it in -- you know,

23 within the community, and I want to say through maybe

24 a phone call, you know, somebody -- I can't remember

25 exactly who, but I do remember formally finding out

 1  once I was contacted by the District Attorney's

 2  office.

 3       **Q.   Okay.  And, in fact, do you remember that**

 4  **there came a point when the police came to your house**

 5  **and spoke to your mother?**

 6            MR. SAHASRABUDHE:  Form.

 7            MS. HURLEY:  Form.

 8            THE WITNESS:  I do not remember exactly,

 9  but I know my mom did tell me that they came.

10  BY MR. BRUSTIN:

11       **Q.   Okay.  Was your mom also afraid for your**

12  **safety, to your knowledge?**

13       A.   Yes.  Absolutely.

14       **Q.   All right.  So you were contacted by the**

15  **D.A.  Did there come a point in time when you actually**

16  **met with District Attorney Belling and another**

17  **detective?**

18       A.   Yes.

19            MR. SAHASRABUDHE:  Form.

20  BY MR. BRUSTIN:

21       **Q.   And by that time you had learned about the**

22  **perjury charges; is that right?**

23       A.   Yes.

24       **Q.   Where did you meet with Detective**

25  **Belling -- withdrawn.  Where did you meet with ADA**

 1   Belling and the other gentleman?

 2         A.   It was at the I guess county hall or -- you

 3   know, where the court is down there on Delaware.

 4         Q.   Okay.  And do you remember what ADA Belling

 5   was wearing?

 6         A.   No.  I don't remember.  I know -- I would

 7   say definitely a shirt with a collar and slacks, but I

 8   can't --

 9         Q.   Do you remember him carrying a gun?

10         A.   No, I don't remember that.

11         Q.   Did ADA Belling threaten you physically or

12   in any other way at the meeting?

13         A.   No.

14         Q.   Did you feel threatened nonetheless about

15   telling him the truth about what you saw?

16              MR. SAHASRABUDHE:  Form.

17              MS. HURLEY:  Form.

18              THE WITNESS:  I felt uncomfortable about it

19   because I knew that Mario was there and he was telling

20   the truth, and I knew that they were on trial for

21   perjury, or going to be on trial for perjury.  So it

22   kind of -- I felt uncomfortable about, yeah, telling

23   the truth.

24   BY MR. BRUSTIN:

25         Q.   What did you think might happen to you if

1  you told them the truth about what you saw?

2              MR. SAHASRABUDHE:  Form.

3              MS. HURLEY:  Form.

4              THE WITNESS:  I thought that I could go to

5  jail if I told them the truth, or they would have me

6  on trial.

7  BY MR. BRUSTIN:

8       Q.  Okay.  When you met with ADA Belling, and

9  he asked you what if anything you saw on the night of

10  the shooting, did you tell him the truth?

11       A.  No.  I told him I didn't see anything.  I

12  just heard the gunshots.

13       Q.  Okay.  Did you subsequently testify at that

14  perjury trial?

15       A.  I did.

16       Q.  And did you choose to testify or were you

17  subpoenaed to testify?

18       A.  I was subpoenaed to testify.

19       Q.  And did you tell the truth about what you

20  saw and heard on August 10th at the perjury trial?

21       A.  I told the truth about what I heard.

22       Q.  How about about what you saw?

23       A.  No.

24       Q.  Why not?

25       A.  I was still afraid.