UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

VALENTINO DIXON,

                     Plaintiff,

      v.                                    Civil No.: 1:19-cv-01678

CITY OF BUFFALO and COUNTY OF ERIE, and
DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA,
DETECTIVE JAMES P. LONERGAN,
DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN,
JOHN DOES, Unknown Buffalo Police Department
Supervisors, and ASSISTANT DISTRICT
ATTORNEY CHRISTOPHER BELLING,
in their individual capacities,

                     Defendants.

---

# CITY DEFENDANTS' MEMORANDUM OF LAW
# IN SUPPORT OF MOTION SUMMARY JUDGMENT

**HODGSON RUSS LLP**
*Attorneys for City of Buffalo*
*and other City Defendants*
*Hugh M. Russ III, of counsel*
*Peter A. Sahasrabudhe, of counsel*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................3

    A.    The Events Leading up to the Shooting of Torriano Jackson ...................................3

    B.    The Shooting of Torriano Jackson in the Early Morning Hours of August 10, 1991 ...................................................6

    C.    John Sullivan Implicates Valentino Dixon as the Perpetrator of the Crime ...........8

    D.    Emil Adams Identifies Dixon as the Shooter ...........................................9

    E.    Valentino Dixon is Arrested ...........................................................11

    F.    Lamar Scott Confesses to the Shooting ...............................................12

    G.    Aaron Jackson Tentatively Identifies Dixon as the Shooter ...............................15

    H.    Sullivan, Adams, and Jackson Identify Dixon as the Shooter During Grand Jury Proceedings ...................................................16

    I.    A Jury Convicts Dixon Based on the Testimony of Sullivan, Adams, and Jackson ...................................................17

    J.    In 2018 Dixon's Murder and Assault Convictions were Vacated, but his Criminal Possession of a Weapon Charge was not Dismissed ...................18

    K.    Dixon's Causes of Action ...........................................................19

ARGUMENT ...................................................................................20

POINT I. DIXON'S MALICIOUS PROSECUTION AND FABRICATION OF EVIDENCE CLAIMS ARE NOT VIABLE SINCE THE INDICTMNET AGAINST HIM DID NOT TERMINATE IN HIS FAVOR ...................................................20

    A.    Dixon Cannot Demonstrate the Favorable Termination Element of his Malicious Prosecution Claim ...................................................22

    B.    Dixon Cannot Demonstrate the Favorable Termination Element of his Due Process Fabrication of Evidence Claim ...................................................24

POINT II. DIXON CANNOT ESTABLISH OTHER ESSENTIAL ELEMENTS OF HIS MALICIOUS PROSEUCTION CLAIM ...................................................25

i

## TABLE OF CONTENTS - cont'd

PAGE

    A.     Summary Judgment is Warranted as to Detective Lonergan ...............................25

    B.     Dixon Cannot Overcome the Presumption of Probable Cause Created by the Grand Jury Indictment ............................................................26

    C.     Independent Probable Cause Existed for Dixon's Prosecution, Even if he Could Show Bad Faith Misconduct ........................................................28

    D.     Dixon's Malicious Prosecution Clam Fails Because Charges Were Pursued Due to the Independent Judgment of ADA Belling ...............................................29

POINT III. DIXON CANNOT MAINTAIN HIS FABRICATION OF EVIDENCE CLAIM BECAUSE THE EYEWITNESS ACCOUNTS IMPLICATING HIM WERE NOT FABRICATED OR MADE UP ..............................................................30

POINT IV. DIXON CANNOT MAINTAIN HIS *BRADY* CLAIM BECAUSE THE INDISPUTABLE EVIDENCE SHOWS THAT THE DETECTIVES TURNED OVER FAVORABLE EVIDENCE TO ADA BELLING ..............................................31

POINT V. DIXON'S § 1983 CONSPIRACY CLAIM FAILS AS A MATTER OF LAW .........................................................................................................33

POINT VI. DIXON'S § 1983 FAILURE TO INTERCEDE CLAIM FAILS .............................34

POINT VII. DIXON'S § 1983 SUPERVISORY LIABILITY CLAIM FAILS ...........................35

POINT VIII. DIXON'S *MONELL* CLAIM MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF ANY UNDERLYING CONSTITUTIONAL VIOLATION ...........................................................................................................35

POINT IX. THE INDIVIUDAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ............................................................................................36

POINT X. DIXON NEVER IDENTIFIED  OR NAMED THE JOHNDOES/UNKONW SUPERVISORS ...................................................................37

POINT XI. THE COURT SHOULD DECLINE TO RETAIN SUPPLEMENTAL JURISDICTION OVER DIXON'S STATE LAW CLAIMS ........................................38

POINT XII. DIXON'S STATE LAW MALICIOUS PROSECUTION CLAIM FAILS ............................................................................................................38

POINT XIII. DIXON'S STATE LAW INFLICTION OF EMOTIONAL DISTRESS CLAIMS FAIL AS A MATTER OF LAW ...............................................38

## TABLE OF CONTENTS - cont'd

PAGE

POINT XIV. DIXON'S STATE LAW NEGLIGENCE CLAIM FAILS .....................................39

POINT XV. DIXON'S STATE LAW RESPONDEAT SUPERIOR CLAIM FAILS.................39

POINT XVI. DIXON'S STATE LAW NEGLIGENT HIRING CLAIM FAILS ........................39

CONCLUSION.........................................................................................................................40

# TABLE OF AUTHORITIES

PAGE

**Federal Cases**

*Alcantara v. City of New York*,
  646 F. Supp. 2d 449 (S.D.N.Y. 2009)........................................................................29

*Bermudez v. City of New York*,
  790 F.3d 368 (2d Cir. 2015)......................................................................................29

*Biton v. City of New York*,
  2022 WL 1448207 (2d Cir. 2022)..............................................................................28

*Bonds v. City of New York*,
  No. 12-cv-1772, 2014 WL 2440542 (E.D.N.Y. May 2014).......................................26

*Boyd v. City of New York*,
  336 F.3d 72 (2d Cir. 2003).........................................................................................26

*Brady v. Maryland*,
  373 U.S. 83 (1963).............................................................19, 21, 31, 32, 33, 36

*Burgess v. Dejoseph*,
  14-CV-1371, 2017 WL 1066662 (N.D.N.Y. Mar. 2017) ..........................................25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................20

*Coleman v. City of Rochester*,
  No. 16-CV-6179, 2018 WL 6727535 (W.D.N.Y. Dec. 2018)....................................39

*Conway v. Vill. of Mount Kisco*,
  750 F.2d 205 (2d Cir. 1984).......................................................................................38

*Curley v. Village of Suffern*,
  268 F.3d 65 (2d Cir. 2001).........................................................................................35

*Druschke v. Banana Republic*,
  359 F. Supp. 2d 308 (S.D.N.Y. 2005).......................................................................39

*Epps v. City of Buffalo*,
  1:19-cv-00281 (W.D.N.Y. 2019) (Decl. Ex. 50) ......................................................33

*Forney v. Forney*,
  96 F.Supp.3d 7 (E.D.N.Y. 2015) ...............................................................................34

## TABLE OF AUTHORITIES - cont'd

PAGE

*Garnett v. Undercover Officer, C0039*,
   838 F.3d 265 (2d Cir. 2016)..........................................................................21, 30

*Gondola v. City of New York*,
   16-cv-369, 2020 WL 1433874 (E.D.N.Y. Mar. 2020) ...............................21, 22, 24

*Greene v. City of New York*,
   No. 08-cv-243, 2017 WL 1030707 (E.D.N.Y. Mar. 15, 2017)...............................30

*Haley v. City of Boston*,
   657 F.3d 39 (1st Cir. 2011)...........................................................................37

*Harig v. City of Buffalo*,
   574 F.Supp.3d 163 (W.D.N.Y. 2021) ............................................................34

*Jackson v. City of New York*,
   939 F. Supp. 2d 219 (E.D.N.Y. 2013) ...........................................................35

*Jackson v. Nassau Cnty.*,
   552 F. Supp. 3d 350 (E.D.N.Y. 2021) ...........................................................35

*Janekta v. Dabe*,
   892 F.2d 187 (2d Cir. 1989).........................................................................23

*Jeanty v. City of Utica*,
   16-cv-00966, 2021 WL 149051 (N.D.N.Y. Jan. 2021) ..............................24, 34

*Estate of King v. Annucci*,
   20-cv-1413, 2023 WL 6122868 (N.D.N.Y. Sep. 2023).......................................35

*Kolari v. New York–Presbyterian Hosp.*,
   455 F.3d 118 (2d Cir. 2006)..........................................................................38

*Luna v. Pico*,
   356 F.3d 481 (2d Cir. 2004).....................................................................36, 37

*Malley v. Briggs*,
   475 U.S. 335 (1986).....................................................................................36

*McClennon v. City of New York*,
   13-CV-128, 2018 WL 2943565 (E.D.N.Y. Jun 2018)...........................................25

## TABLE OF AUTHORITIES - cont'd

PAGE

*McDonough v. Smith,*
  139 S. Ct. 2149 (2019).......................................................................................24

*Monell v. Department of Social Services of the City of New York,*
  436 U.S. 658 (1978)............................................................................20, 35, 36

*Ortiz v. Wagstaff,*
  523 F. Supp. 3d 347 (W.D.N.Y. 2021)...........................................21, 33, 37

*Posr v. Doherty,*
  944 F.2d 91 (2d Cir. 1991).............................................................................22

*Poulos v. City of New York,*
  14-CV-3023, 2015 WL 5707496 (S.D.N.Y.2015).....................................38

*Rentas v. Ruffin,*
  816 F. 3d 214 (2d. Cir. 2016)........................................................................28

*Rizk v. City of New York,*
  462 F.Supp. 3d 203 (S.D.N.Y. 2020)...........................................................33

*Romer v. Morgenthau,*
  119 F.Supp.2d 346 (S.D.N.Y. 2000)............................................................34

*Saucier v. Katz,*
  533 U.S. 194, 121 S.Ct. 2151 (2001).........................................................36

*Savino v. City of New York,*
  331 F.3d 63 (2d Cir. 2003)......................................................................20, 25

*Simon v. City of New York,*
  No. 16-cv-1017, 2020 WL 1323114 (E.D.N.Y. Mar. 19, 2020)............24

*Smith v. Cnty. of Nassau,*
  2015 WL 1507767 (E.D.N.Y. Mar. 2015)..................................................23

*Tangreti v. Bachmann,*
  983 F.3d 609 (2d Cir. 2020).........................................................................35

*Tortora v. City of New York,*
  15-CV-3717, 2019 WL 9100369 (E.D.N.Y. Mar. 2019).........................33

**TABLE OF AUTHORITIES - cont'd**

PAGE

*U.S. v. McGee,*
  99–CR–150, 2000 WL 1520957 (W.D.N.Y. Oct. 2000) ........................................26

*U.S. v. Morgan,*
  690 F. Supp. 2d 274 (S.D.N.Y. 2010)................................................................26

*U.S. v. Wagner,*
  20-CR-410, 2022 WL 19181 (S.D.N.Y. 2022)....................................................26

*Valentin v. City of Rochester,*
  11-CV-6238, 2018 WL 5281799 (W.D.N.Y. Oct. 2018) ..................................31, 32

*Vasquez v. City of New York,*
  14-CV-491, 2014 WL 5810111 (S.D.N.Y. Nov 2014)..............................26, 27, 28

*Walker v. City of New York,*
  974 F.2d 293 (2d Cir. 1992)...........................................................................32

*Warren v. Fischl,*
  15–CV–2829, 2015 WL 6760230 (E.D.N.Y. Mar. 2015) ....................................23

*West v. Goord,*
  2017 WL 3251253 (W.D.N.Y. Jul. 31, 2017).....................................................34

*Wood v. Town of East Hampton,*
  08–CV–4197, 2010 WL 3924847 (E.D.N.Y. Sep. 2010) ......................................23

**State Cases**

*Antonious v. Muhammad,*
  250 A.D.2d 559 (2d Dep't 1998) .......................................................................39

*Medina v. City of New York,*
  102 A.D.3d 101 (1st Dep't 2012) ......................................................................40

*People v. Montanez,*
  135 A.D.3d 528 (1st Dep't 2016) ......................................................................29

*People v. Perez,*
  128 A.D.3d 465 (1st Dep't 2015) ......................................................................29

*Thomsen v. City of New York,*
  50 Misc. 3d 1037 (Sup Ct. Bronx Cnty. 2015) ..............................................39, 40

vii

## PRELIMINARY STATEMENT

Even if Valentino Dixon did not pull the trigger of the gun that killed Torriano Jackson, he is not innocent.  As Lamar Scott aptly put it during his deposition testimony, were it not for the criminal conduct of Mr. Dixon in August of 1991, the tragic death of Torriano Jackson would not have occurred.  In Scott's words, were it not for Dixon's unlawful conduct, "we wouldn't even be here." Indeed, although there are many different accounts of what occurred on August 10, 1991, the most favorable version for Dixon involves him providing the shooter (Scott) with the murder weapon and driving him and the weapon to the scene of the crime.  In other words, the evidence, even when viewed in a light most favorable to Dixon, shows that he provided the killer with the means and opportunity to commit the murder.  As such, the portion of the indictment which charged Dixon with unlawfully possessing a weapon has not finally terminated in his favor –that portion of the indictment remains valid and on the books.  This fact alone is enough to dispose of the two main claims brought by Dixon in his complaint -malicious prosecution and due process fabrication of evidence.

But even leaving aside the fact that the indictment issued against Dixon has not finally terminated in his favor, the facts adduced through discovery fail to support his claims. The tale Dixon tells in his complaint of the evil and corrupt homicide division of the Buffalo Police Department has not just been greatly exaggerated.  For all relevant purposes, the tale is completely fabricated.  Contrary to what Dixon's complaint speculates, there is zero evidence that Dixon was on a list of individuals whom the homicide division attempted to get off the streets by making "colorable charges stick" to them.  No such list ever existed.  In fact, all credible evidence shows that, prior to their investigation of the Torriano Jackson murder, the individual City defendants in this case had no idea who Dixon was.  By Dixon's own admission,

he had absolutely no involvement with any of the detectives prior to his arrest. There is simply no evidence that any of the detectives had it out for Dixon or were hell-bent on getting him off the streets.

Most importantly, it has never been a secret that there were differing accounts of who shot Torriano Jackson –and the police detectives involved in the investigation never tried to conceal the differing accounts from Christopher Belling, the Assistant District Attorney handling Dixon's prosecution. When witnesses identified Dixon as the shooter, Dixon was arrested and charged. When Lamar Scott confessed to the crime on television days later, he was placed in handcuffs, put into a police car, and taken into custody for questioning. When Scott gave a sworn confession to the police, they recorded the statement and showed it to Belling –who instructed them to let Scott go. The detectives also showed Belling the statement of Leonard Brown, who similarly claimed that Scott was the shooter. This is not a case where police avoided evaluating evidence favorable to the accused – in fact the record shows that the detectives actively pursued and recorded evidence favorable to Dixon even though he had already been arrested.

The underlying crime for which Dixon was convicted involved an ongoing dispute between two groups of young people –a dispute that culminated with a chaotic crime scene with dozens of people present and bullets spraying the crowd. Three individuals identified Dixon as the perpetrator –which is not surprising because he was admittedly at the crime scene and involved in the conflict. Other evidence uncovered through the detectives' investigation pointed to Scott as the perpetrator. That there was conflicting evidence as to who pulled the trigger does not compel a finding of bad faith misconduct on the part of the retired detectives

2

sued in this case.  Significantly, the three individuals who identified Dixon as the shooter and

testified against him at his trial have stuck by their identifications –  they have never recanted,

and they have never stated that they identified Dixon due to coercive or suggestive conduct by

the police.  Those three individuals' accounts of the shooting provided probable cause for

Dixon's arrest and prosecution, even though there was also evidence implicating another suspect.

These three eyewitness accounts also were not fabricated or coerced by the police, they were

legitimate eyewitness accounts by three individuals who were present when Torriano Jackson

was killed.  Given this reality, the defendant detectives cannot, as a matter of law, be held liable

simply because ADA Belling credited these three eyewitness accounts over other conflicting

evidence revealed by the murder investigation.

    For these simple but compelling reasons, the Court should grant summary

judgment as to the City-defendants on each of the causes of action asserted by Dixon in his

complaint.

## STATEMENT OF FACTS[1]

### A.    The Events Leading up to the Shooting of Torriano Jackson

    The feud leading up to the shooting in this case started over a girl named Heather

Smith.[2]  Aaron Jackson, the brother of the deceased, Torriano Jackson, dated Heather Smith in or

around the time of the shooting.[3]  An individual who was a friend of Dixon's half-brother,

---

[1]    The City defendants respectfully refer the Court to Part II of their Statement of Undisputed Facts, which has a breakdown of the investigative activities taken by each individual City-defendant.  The break-down could not be included in this brief due to page limitations.

[2]    Declaration of Peter A. Sahasrabudhe, dated December 15, 2023 ("Decl."), Ex. 6 ("Dixon Dep") at p. 175.

[3]    Decl. Ex. 6 (Dixon Dep.) at p. 176;

Antoine Shannon, allegedly pursued Ms. Smith, which led to an altercation. Shannon alleged that one of the Jackson brothers put a gun to his head as a result of this initial altercation.[4]

After the initial altercation, there was a continuing disagreement between two groups of young men. One group included Aaron Jackson, Torriano Jackson, and Travis Powell. The other group included Antoine Shannon, Leonard Brown, and Mario Jarmon.[5] Brown is Dixon's stepbrother, Shannon is his half-brother, and Jarmon was Dixon's friend.[6] In the afternoon of August 9, 1991, Jarmon, Brown and Shannon confronted Aaron Jackson in a parking lot near the corner of Bailey and Delavan Avenue in the City of Buffalo.[7] Jackson ultimately drove away accompanied by Powell, and stated that he would return later with this brother, Torriano.[8]

Realizing that there may be further conflict, Brown and Shannon called their older brother a known drug dealer with an extensive criminal record – Valentino Dixon.[9] Brown and Shannon asked Dixon if he could provide them with protection in the form of a weapon, to which Dixon agreed. Dixon, however, was out on bail on unrelated charges.[10] Because Dixon did not

---

[4]    Decl. Ex. 6 (Dixon Dep.) at p. 176; Decl. Ex. 36 ("Brown Statement") at p. 1.

[5]    Decl. Ex. 36 (Brown Statement) at p. 1; Decl. Ex. 11 ("Jackson Dep.") at p. 90-94.

[6]    Decl. Ex. 6 (Dixon Dep.) at p. 44, 170; Decl. Ex. 17 ("Jarmon Testimony") at p. 3.

[7]    Decl. Ex. 11 (Jackson Dep.) at p. 90-94.

[8]    (*Id.*).

[9]    Decl. Ex. 6 (Dixon Dep). at p. 13-14.

[10]   (*Id.*). at p. 37.

want to risk further criminal liability, he enlisted the help of his confederate, Lamar Scott, a young impressionable teenager who dealt drugs for Dixon and looked up to him as well.[11]

After receiving the call from his brothers on August 9, 1991, Dixon drove to a house which Scott frequented.[12]  Dixon eventually requested that Scott come with him in his vehicle to assist his brothers. When Scott sat down on the passenger seat of Dixon's car, he saw a bag on the passenger side floor containing a Tech 9 automatic weapon, similar to an Uzi.[13] When Scott viewed the weapon, Dixon told Scott that they had some "business to handle."[14] Dixon then showed Scott how to use the weapon.  Dixon told Scott that the "S" on the gun stood for "safety" and the "F" stood for "fire."[15]  This turned out to be incorrect –as the "S" stood for semi and the "F" stood for full.[16]

Dixon then drove Scott and the automatic weapon to the house of Mario Jarmon, where Jarmon was waiting with Brown and Shannon.[17]   In the early morning hours of August 10, 1991, the five young men -Dixon, Scott, Jarmon, Brown, and Shannon then proceeded to the corner of Bailey and Delavan Avenue.[18]  In his deposition, Scott testified that, when the five

---

[11]     Decl. Ex. 6 (Dixon Dep.) at p. 14; 173; Decl. Ex. 3 ("Scott Dep.") at p. 78.

[12]     Decl. Ex. 6 (Dixon Dep.) at p. 14.

[13]     Decl. Ex. 3 (Scott Dep.) at p. 77.

[14]     (*Id.*).

[15]     (*Id.*). at p. 16-17.

[16]     (*Id.*).

[17]     (*Id.*). at p. 79.

[18]     Decl Ex. 17 (Jarmon Testimony) at p. 8.

young men left Jarmon's home, Scott brought with him the automatic weapon given to him by Valentino Dixon.[19]

**B.    The Shooting of Torriano Jackson in the Early Morning Hours of August 10, 1991**

The corner of Bailey and Delavan Avenue was a popular spot for young adults in the City of Buffalo in the early 1990's.[20]    There was a corner store nearby and Louis Texas Red Hots, which stayed open late at night. In the early morning of August 10, 1991, there were many young people out socializing on this street corner.[21] Sometime after Dixon, Scott, Jarmon, Brown, and Shannon arrived at the corner of Bailey and Delavan, Aaron Jackson and Torriano Jackson arrived at the corner in the vehicle of their friend, Travis Powell.[22]

Driving by the corner of Bailey and Delavan, Aaron Jackson began to exchange words with Mario Jarmon –who had previously confronted him earlier in the day.[23]  A fight broke out between Jarmon and the Jackson brothers.[24]  Scott, who viewed himself as a protector, retrieved the weapon which he had been given by Dixon.[25]  Scott knew that he was there to protect someone involved in the fight, but he did not know exactly who, because he did not know Jarmon and the Jacksons.  Seeking direction, Scott looked to Dixon and his step-brother,

---

[19]    (*Id.*). at p. 16.

[20]    Decl. Ex. 8 ("Lonergan Dep.") at p. 128-129.

[21]    *See* Decl. Ex. 12 at p. 87.

[22]    Decl. Ex. 11 (Jackson Dep.) at p. 95-97.

[23]    (*Id.*). at p. 111.

[24]    Decl. Ex. 3 (Scott Dep.) at p. 14.

[25]    (*Id.*). at p. 14; 83.

Leonard Brown.[26]  Dixon yelled to Scott "they are killing my brother," while Leonard Brown

pointed to Torriano Jackson as the individual Scott should target.[27]  Scott followed the

instructions.

Scott, switching back and forth between the "F" to "S" setting on the automatic

weapon, just as he had been taught to do by Dixon, emptied the clip of the weapon.[28]  He shot

Torriano Jackson multiple times, which resulted in Torriano Jackson's death.[29]  He also shot

Aaron Jackson and John Sullivan, another bystander who knew both Mr. Jarmon and the Jackson

brothers.[30]  Mario Jarmon was also shot and injured.[31]  After the shooting, Lamar Scott dropped

the murder weapon.[32] The gun was later retrieved by Leonard Brown and was not recovered by

authorities.  Before he fled the scene, Scott attempted to get into Valentino Dixon's car to flee.

Dixon, who was driving a red Mazda, told Scott that he was not allowed in his car.[33]  Dixon

waived Scott off and said "it's not going to happen."[34]  Dixon then sped away from the murder

scene.[35]

---

[26]    (Id.). at p. 81.

[27]    (*Id.*).

[28]    (*Id.*) at p. 17-18.

[29]    (*Id.*). at p. 14.

[30]    (*Id.*).

[31]    (*Id.*). at p. 18-19.

[32]    (*Id.*). at p. 79.

[33]    (*Id.*).

[34]    Decl. Ex. 6 (Dixon Dep.)  at p. 169.

[35]    (*Id.*).

**C.**     **John Sullivan Implicates Valentino Dixon as the Perpetrator of the Crime**

An ambulance transported John Sullivan to Sister's Hospital in the City of Buffalo after the shooting.  There, Sullivan received treatment for his injuries.[36]  Later, on August 10, 1991, while still admitted to Sister's Hospital, Sullivan answered questions posed to him by Buffalo Police Department ("BPD") Detective John Vickerd in an unsworn interview.[37] Sullivan told Detective Vickerd that he observed a man known to him as "Tino" grab a gun which Sullivan believed to be an "Uzi."[38] Sullivan told Detective Vickerd that the person known to him as "Tino" was the individual who shot him and Torriano Jackson.[39]  Sullivan did not see whether Aaron Jackson was also shot.

Mr. Sullivan described Tino as a black male, age 21, approximately six feet tall, and weighing around one hundred sixty pounds. Sullivan told Detective Vickerd that "Tino's" real name was Valentino, and that he knew this individual as someone from around his neighborhood in the Genesee/Moselle area.[40]  Sullivan told Detective Vickerd that, after the shooting, he observed "Tino" and another black male run west on Delavan towards Olympic Avenue.[41]

Later in the day on August 10, 1991, after he was released from the hospital, John Sullivan gave a formal sworn statement to Detective Raniero Masecchia at the homicide

---

[36]    Decl. Ex. 25.

[37]    (*Id.*).

[38]    (*Id.*).

[39]    (*Id.*).

[40]    (*Id.*).

[41]    (*Id.*).

division's offices.[42]  In the sworn interview, Sullivan gave an account of the shooting similar to what he had relayed to Detective Vickerd.  He told Detective Masecchia that an individual known to him as "Tino" was the person who shot and killed Torriano Jackson.[43]  Detective Masecchia then prepared a six-person photo array with Dixon's photo as part of the display.  The photo array prepared by Detective Masecchia contained five fillers of individuals who were of the same age and general appearance as Mr. Dixon.[44]  After viewing the photo array, Mr. Sullivan picked out Dixon's photo and positively identified his photograph as depicting the individual who shot and killed Torriano Jackson.[45]  This identification occurred on August 10, 1991, the day of the shooting.[46]

Sullivan has never ~~doubted~~ recanted his identification of Dixon.[47]  Nor has Sullivan ever testified or even suggested that his identification was brought about by police coercion or suggestion.

**D.    Emil Adams Identifies Dixon as the Shooter**

Emil Adams was at the corner of Bailey and Delavan when the fight broke out between the Jackson brothers and Mario Jarmon.[48]  Adams knew both the Jackson brothers and

---

[42]    Decl. Ex. 26 ("Sullivan Statement").

[43]    (*Id.*).

[44]    Decl Ex. 27.

[45]    Decl. Ex. 26 (Sullivan Statement).

[46]    (*Id.*).

[47]    Decl. Ex. 51 ("Reinvestigation Memo").

[48]    Decl. Ex. 28 ("Adams Statement").

Jarmon.[49]  He was a witness to the shooting.  As such, a patrol officer (ironically the future

Commissioner of Police, Byron Lockwood) took Adams to the homicide division's office to give

a formal statement in the early morning hours of August 10, 1991.[50]  There, Detective Mark

Stambach met with Adams and took a statement from him.[51]  Adams gave a description of the

shooting suggesting there were two shooters present.  He gave a description of one shooter that

was not entirely consistent with Valentino Dixon's appearance in that he described the shooter as

a heavy-set male who was over six feet tall.[52]  Detective Stambach did not attempt to hide or

omit this part of  Adams's account -the detail was included in Adams's sworn statement.[53]

Adams told Detective Stambach that he did not know the name of the shooters that he had

observed.[54]

       Later, on August 10, 1991, Detective Vickerd, who arrived back at headquarters

after interviewing Sullivan, prepared a photo array with Dixon's photo present.[55]  The five fillers

in the photo array were of five males who were of the same relative age and appearance as Mr.

---

[49]      Decl. Ex. 12 (Adams Dep.) at p. 43; 78

[50]      Decl. Ex. 32.

[51]      Decl. Ex. 28 (Adams Statement).

[52]      The parties don't dispute that Dixon is less than six feet tall and is skinny.

[53]      Decl. Ex. 28 (Adams Statement).

[54]      (*Id.*).

[55]      Decl. Ex. 29, 30.

Dixon.[56]  Upon being shown the photo array, Adams identified Mr. Dixon as the individual who shot and killed Torriano Jackson with a Tec-9 machine gun.[57]

Although various unsworn statements have been attributed to him by third parties throughout the years, every time  Adams has given a sworn account of what took place on August 10, 1991, he has stated that his identification was not brought about by any police coercion or suggestion.[58]  In other words, there is no admissible evidence suggesting that Adams identified Dixon based on any improper police practices.  Mr. Adams sticks by his identification of Dixon to this day.[59]

### E.    Valentino Dixon is Arrested

After two witnesses identified Dixon as the perpetrator of the Jackson homicide, BPD sought him. When Dixon was seen returning to the crime scene on August 10, 1991, two officers arrested him.[60]  He was taken to the homicide division's offices to be interviewed. There, Dixon met with Detective Stambach.  After being read his *Miranda* rights, Dixon gave a sworn statement to Detective Stambach.[61]  Dixon denied involvement in the crime.  He did not tell Detective Stambach that Scott was the shooter or that he had provided Scott with the murder weapon.  His statement, therefore, was not truthful.  Dixon denied any invovlement.[62] After his

---

[56]    Decl. Ex. 30.

[57]    Decl. Ex. 31.

[58]    Decl. Ex. 12 (Adams Dep.) at p. 52, 142.

[59]    (*Id.*).

[60]    Decl. Ex. 33.

[61]    Decl. Ex. 34.

[62]    (*Id.*).

sworn statement was taken, the detectives booked Dixon and he was sent to the Erie County Holding Center.[63]  Thereafter, none of the detectives sued had any interaction with Dixon ever again.[64]

### F.    Lamar Scott Confesses to the Shooting

Two days later, Lamar Scott had a discussion with Dixon's father, Robert Bryant. During this discussion, Scott told Bryant that he was the shooter.[65]  Bryant encouraged Scott to come forward and admit that he was the shooter –but he chose an unconventional approach. Instead of encouraging Scott to contact the police, Bryant approached Wanda Stark, a reporter for Local Channel 2 News in Buffalo.[66]  Thereafter, Scott went on camera and confessed to the crime.[67]  Standing behind Scott when he made this video-taped confession were Dixon's father, half-brother, and stepbrother.[68]

While Scott was confessing to the murder on camera, Detective Stambach and other police personnel arrived.[69]  Stambach placed Scott in handcuffs and put him in the back of a police car immediately.[70]  Other potential witnesses were taken to headquarters for further

---

[63]    *See* Decl. Ex. 6 (Dixon Dep.) at p. 155-156.

[64]    (*Id.*).

[65]    Decl. Ex. 14 (Bryant Dep.) at p. 22-24.

[66]    (*Id.*). at 26-30.

[67]    (*Id.*). at 34.

[68]    (*Id.*). at 32.

[69]    (*Id.*). at 33.

[70]    (*Id.*). at 187.

questioning–but Scott was the only individual placed in handcuffs.  Leonard Brown, Dixon's stepbrother, was driven to give a statement, but he, unlike Scott, was not placed in handcuffs.[71]

At the homicide office, Scott gave a sworn confession, taken by Detective Stambach after he read Scott his *Miranda* warnings.[72]  Scott admitted that he used a Tec 9 to shoot and kill Torriano Jackson.[73]  He claimed that he shot Torriano Jackson in self-defense because Jackson also had a gun and was shooting at his group of friends.  Scott stated, untruthfully, that the gun he used to kill Torriano Jackson belonged to him.[74]  Stambach asked Scott if he was willing to take a lie detector test, to which Scott replied that he would be. [75]  Scott also allegedly told Stambach before or after the sworn interview that there was blood on his shoes and that the police could take his clothing for testing.[76]

As Scott confessed, Leonard Brown gave a statement to Detective Masecchia.[77]  Brown also stated that it was Scott who killed Torriano Jackson.  Brown stated that Scott killed Torriano Jackson in self-defense.[78]  However, there were inconsistencies between Scott's sworn statement and Brown's.  For example, Brown stated that he did not know where the murder

---

[71]    (*Id.*).

[72]    Decl. Ex. 35 ("Confession").

[73]    (*Id.*).

[74]    (*Id.*).

[75]    (*Id.*).

[76]    Decl Ex. 3 (Scott Dep.) at p. 39.

[77]    Decl Ex. 36 (Brown Statement).

[78]    (*Id.*).

weapon was, whereas Scott stated that Brown had the gun. Brown also did not tell Detective Masecchia that Dixon had provided Scott with the murder weapon.[79]

        After Scott and Brown gave their sworn statements, Detective Stambach showed the statements to ADA Belling.[80] Detective Stambach never tried to hide or conceal the fact that Lamar Scott had confessed to being the killer. ADA Belling reviewed Scott and Brown's statements. He also reviewed the video taped confession Scott gave to Channel 2. After reviewing those materials, ADA Belling instructed that Scott be released but that a lie detector test be scheduled for him.[81] Detective Masecchia thereafter attempted to have Scott appear for a lie detector test, but Scott never did so.[82] During his deposition testimony, Scott confirmed that detectives asked him to come back to take a lie detector test.[83] He also confirmed that this was the sum and substance of all interactions he had with the police after the day he gave his sworn confession.[84] In other words, no detective threatened or coerced Scott to change his story after he confessed. Scott, not wanting to further involve himself, did not take the lie detector test and eventually recanted his confession when he testified in front of a grand jury.[85]

---

[79]     (*Id.*).

[80]     Decl Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374.

[81]     Decl. Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374.

[82]     Decl. Ex. 38.

[83]     Decl Ex. 3 (Scott Dep.) at p. 58-59.

[84]     (*Id.*).

[85]     Decl. Ex. 19 ("Scott Grand Jury Testimony").

### G.    Aaron Jackson Tentatively Identifies Dixon as the Shooter

Although he was seriously injured from gunshot wounds, Aaron Jackson participated in an unsworn interview with Detective Stambach on August 12, 1991, at Erie County Medical Center in the City of Buffalo.[86]  During that interview, Aaron Jackson was shown a photo array by Detective Stambach.[87]  The photo array contained a photo of Dixon.  The five fillers in the photo array were of the same general age and appearance as Dixon.  Jackson tentatively identified Dixon as the individual who shot him and his brother, Torriano.[88]  Jackson signed a sworn affidavit to this effect.  Jackson stated, at the time, that events occurred so quickly that he could not be absolutely positive that Dixon was in fact the shooter.  But Jackson did state that Dixon's photo looked like the shooter.[89]

Later, after independent discussions with ADA Belling, Jackson's identification of Dixon went from tentative to positive.[90]  Jackson has never recanted his identification of Dixon.  Nor has Jackson ever stated, under oath or otherwise, that his identification of Dixon was brought about by coercive or suggestive law enforcement practices.[91]

---

[86]     Decl. Ex. 39.

[87]     Decl. Ex. 40.

[88]     Decl. Ex. 40, 41.

[89]     (*Id.*).

[90]     Decl. Ex. 15  ("Jackson Trial Testimony") at p. 227-228.

[91]     Ex. 11 ("Jackson Dep.") at p. 135-136.

**H.    Sullivan, Adams, and Jackson Identify Dixon as the Shooter During Grand Jury Proceedings**

At the grand jury in November of 1991, months after they had any interaction with the police, both John Sullivan and Aaron Jackson positively identified Valentino Dixon as the individual who shot and killed Torriano Jackson.[92]  During the grand jury proceedings, neither Aaron Jackson nor Sullivan testified about their interactions with the police.  They independently told the grand jury, based on their own recollection of events, that Dixon was in the shooter.[93]

In January of 1992, Emil Adams testified in front of a grand jury that Dixon was the shooter.[94]  Adams had not interacted with the Buffalo Police for months when he testified at the grand jury.  Adams testified that he picked Dixon's photo out from a group of photos–which is consistent with the police reports stating that Adams picked Dixon's photo out from a six-person photo array.[95]

Based on the testimony of these three (and other) witnesses, the grand jury issued an indictment against Valentino Dixon in January of 1992.[96]  Dixon was charged with murder in the second degree, attempted murder in the second degree, assault in the third degree, and criminal possession of a weapon in the second degree.[97]  Notably, as part of the grand jury

---

[92]    Decl. Ex. 15 ("Jackson Grand Jury") at p. 15; Decl. Ex. 16 ("Sullivan Grand Jury") at p. 23-24.

[93]    (*Id.*).

[94]    Decl. Ex. 20 at p. 76-77.

[95]    (*Id.*).

[96]    Decl. Ex. 46.

[97]    Decl. Ex. 47 ("Heraty Aff.") at ¶ 5.

proceedings, Lamar Scott recanted his confession and testified that Dixon was in fact the shooter.[98]  There is no credible evidence that any Buffalo police detective influenced or caused Mr. Scott to recant his confession.

I.    **A Jury Convicts Dixon Based on the Testimony of Sullivan, Adams, and Jackson**

ADA Belling, acting on behalf of the State of New York, prosecuted Dixon in the summer of 1992.  The People's three key witnesses were Adams, Sullivan, and Aaron Jackson. Each of these three witnesses, again without having spoken to any Buffalo police detective in months, testified that Dixon was the shooter.[99]  Each of the three witnesses made in court identifications of Dixon as the shooter.  They were not asked any questions regarding the photo identification procedures implemented by the defendant detectives.

Each of the key witnesses for the People were vigorously cross-examined.  For example, Dixon's defense counsel cross-examined Aaron Jackson on the fact that his initial identification of Dixon was tentative– a fact that was neither concealed nor hidden by Detective Stambach.[100]  Defense counsel cross-examined Adams based on the fact that his initial description of the shooter did not match up with the physical characteristics of Dixon–again a fact not withheld or concealed by Detective Stambach.[101]  Defense counsel cross-examined Sullivan based on the fact that he had consumed drugs and alcohol before the shooting.  This fact was also not withheld from defense counsel.  Despite defense counsel's opportunity to

---

[98]    Decl. Ex. 19 ("Scott Grand Jury") at p. 64-68.

[99]    Decl. Ex. 21 ("Sullivan Trial Testimony") at p. 83-84; Decl. Ex. 22 ("Adams Trial Testimony) at p. 151-153; Decl. Ex. 23 ("Jackson Trial Testimony") at p. 225-228.

[100]    Decl. Ex. 23 ("Jackson Trial Testimony") at p. 244-247.

[101]    Decl. Ex. 22 (Adams Trial Testimony) at p. 204-207.

vigorously cross-examine the three witnesses, the jury still convicted Dixon of murder, assault, and criminal possession of a weapon.[102]

Dixon's defense counsel also knew about the identity of Lamar Scott as well as Mr. Scott's confession prior to Dixon's trial.[103]  Counsel nonetheless chose not to call Lamar Scott as a witness.  He did not attempt to introduce Scott's confession at all.  Nor did counsel attempt to call Leonard Brown or Mario Jarmon, both of whom had testified during grand jury proceedings that Scott, not Dixon, was the shooter.[104]  After these two witnesses testified to the grand jury, the District Attorney's Office charged them with perjury, which made it difficult for counsel to utilize these witnesses on Dixon's behalf.[105]  There is no evidence that any Buffalo police detective played any role in charging Brown and Jarmon with perjury.

### J.     In 2018 Dixon's Murder and Assault Convictions were Vacated, but his Criminal Possession of a Weapon Charge was not Dismissed

In 2018, the Erie County District Attorney's Office conducted a re-investigation into the murder of Torriano Jackson.[106]  After years of claiming that he had no involvement with the crime, Dixon admitted that he was the one who armed Scott before the shooting and he was the one who drove Scott to the scene of the crime.[107]  Based on this account given by Dixon, and based on Scott pleading guilty to the Jackson murder, the District Attorney's Office agreed to

---

[102]     Decl. Ex. 24 ("Jury Verdict Reading")

[103]     Decl. Ex. 14 (Bryant Dep.) at p. 175.

[104]     Decl. Ex. 17; 18

[105]     Decl. Ex. 13 ("Belling Dep.") at p. 278; Decl. Ex. 52 ("Grand Jury Excerpt")

[106]     Decl. Ex. Decl. Ex. 47 ("Heraty Aff.") at ¶ 4.

[107]     (*Id.*). at ¶ 14; Dec. Ex. 6 (Dixon Dep.) at p. 12-14.

dismiss Dixon's murder and assault convictions.  Dixon's conviction for criminal possession of a weapon in the second degree, however, was not dismissed.[108]

After being released from incarceration, Dixon separately challenged his criminal possession of a weapon conviction.  Although Erie County Judge Susan Eagan vacated the conviction–she did not rule that Dixon was actually innocent of the charge.[109]  Instead, Judge Eagan ruled only that Dixon was entitled to a new trial on his criminal possession of a weapon charge.[110]  The Erie County District Attorneys' Office is appealing Judge Eagan's decision.[111]  Further, if the District Attorney's Office so chooses, it may  re-try Dixon for criminal possession of a weapon in the second degree.  That part of the indictment which charged Dixon with criminal possession of a weapon has not reached a final termination.

## K.    Dixon's Causes of Action

Not based on these facts, but instead on speculation, Dixon's complaint contains six federal causes of action against the City-related defendants: (**Count I**) a claim brought pursuant to 42 U.S.C. § 1983 for an alleged due process violation of the right to a fair trial based fabrication of inculpatory evidence and withholding of exculpatory or impeachment evidence under *Brady*; (**Count II**) a 42 U.S.C. § 1983 malicious prosecution claim; (**Count III**) a civil rights conspiracy claim brought pursuant to 42 U.S.C. § 1983; (**Count IV**) a failure to intercede claim brought pursuant to 42 U.S.C. § 1983; (**Count V**) a supervisory liability claim brought

---

[108]    Decl. Ex. Decl. Ex. 47 ("Heraty Aff.") at p. 7 (WHEREFORE clause).

[109]    Decl. Ex. 48 ("Eagan Decision").

[110]    (*Id.*).

[111]    Decl.  Ex. 49 ("Notice of Appeal").

pursuant to 42 U.S.C. § 1983; and (**Count VI**) a claim against the City of Buffalo only brought

pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658

(1978).

Dixon's complaint also contains five state law causes of action against the City-

related defendants: (**Count VIII**) malicious prosecution; (**Count IX**) intentional, reckless, or

negligent infliction of emotional distress; (**Count X**) negligence; (**Count XI**) respondeat superior

against the City of Buffalo; and (**Count XII**) negligent hiring, supervision, and training.

The evidence adduced throughout discovery in this matter confirms that each of

the causes of action asserted against the City-related defendants fails as a matter of law.

## ARGUMENT[112]

### POINT I.  DIXON'S MALICIOUS PROSECUTION AND FABRICATION OF EVIDENCE CLAIMS ARE NOT VIABLE SINCE THE INDICTMNET AGAINST HIM DID NOT TERMINATE IN HIS FAVOR

Count II of Dixon's complaint alleges that the individual City Defendants

maliciously prosecuted him.  To prove malicious prosecution, a plaintiff must establish that:

(1) the defendants initiated a criminal proceeding against him; (2) the criminal proceeding

terminated in his favor; (3) there was a lack of probable cause to initiate the proceeding; and

(4) the defendants acted with malice in initiating the proceeding.  *Savino v. City of New York*,

331 F.3d 63, 72 (2d Cir. 2003).  Dixon's malicious prosecution claim fails, among other reasons,

---

[112]    The standard applied by the Court on a motion for summary judgment is well-established. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986) (discussing standard to be applied to motions brought pursuant to Fed. R. Civ. P. 56).

because he cannot establish the indictment against him fully terminated in his favor.  His criminal possession of a weapon charge has not been dismissed. [113]

For this same reason, the portions of Count I which allege a violation of Dixon's right to a fair trial through fabrication of evidence also fail.[114]  Generally, to prevail on a due process/fair trial fabrication of evidence claim, a plaintiff must show that: (1) an investigating official (2) fabricated information; (3) that was likely to influence a jury's verdict; (4) the investigating official forwarded that information to prosecutors; and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer, C0039*, 838 F.3d 265, 279 (2d Cir. 2016).  Courts within this Circuit have also uniformly required that a plaintiff must also show that criminal proceedings terminated in his favor in order to recover under a theory of due process fabrication of evidence.  *Gondola v. City of New York*, 16-cv-369, 2020 WL 1433874, at *4 (E.D.N.Y. Mar. 2020) (collecting cases).  Again, Dixon's failure to establish favorable termination obligated the Court to grant summary judgment on his due process fabrication of evidence claim.[115]

---

[113]    Count II is asserted against Detectives Stambach, Lonergan, Vickerd, and Masecchia.  Because Dixon cannot establish favorable termination, he cannot prevail against any of these defendants on Count II.

[114]    Count I of the complaint, although stated as one cause of action, really has two claims which need to be analyzed separately.  The first is the defendants' alleged fabrication of evidence and the second is the defendants' alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  *See Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 367 (W.D.N.Y. 2021) (discussing separate nature of fabrication of claims)

[115]    Count I is also asserted against Detectives Stambach, Lonergan, Vickerd, and Masecchia.  Dixon's inability to establish favorable termination warrants dismissal as to Count I against all of these defendants.

A.    **Dixon Cannot Demonstrate the Favorable Termination Element of his Malicious Prosecution Claim**

   *DiBlasio v. City of New York* bears on Dixon's failure to meet the "favorable termination" element of his malicious prosecution claim.  102 F.3d 654, 658-659 (2d Cir. 1996). There, the plaintiff was convicted following a jury trial for sale of cocaine and related charges. *Id.* at 655.  He successfully secured vacatur of his convictions through a habeas suit.  *Id.*  On retrial, the plaintiff was convicted of only one of the lesser offenses included in the indictment issued against him.  *Id.*  He then brought a claim for malicious prosecution against the police officers who had arrested him, even though he was not convicted of the most serious offenses listed in the indictment.  *Id.* Because the plaintiff had been convicted of a lesser, the Second Circuit held that he did not satisfy the favorable termination element of his malicious prosecution claim.  *Id.* at 659.

   In dismissing the plaintiff's malicious prosecution claim, the Second Circuit in *DiBlasio* recognized the concern of a prosecutor seeking to avoid  liability by adding easily provable, unrelated offenses to an indictment with more serious charges.  *Id.* at 658 (citing *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991)).  However, the Court found that this manipulation had not occurred in the plaintiff's criminal prosecution.  The malicious prosecution claim, therefore, could not be maintained.  *Id.*  The Court noted that the offense for which the plaintiff had been convicted was not an easily provable misdemeanor offense–it was a felony.  *Id.* Moreover, the multiple charges listed in the indictment against the plaintiff were all part of the same related criminal conduct or transaction.  *Id.*  Accordingly, there was no concern that plaintiff had been charged with an unrelated lesser offense simply insulate law enforcement from liability.  *Id.*

That is the case here. Dixon was charged with murder, assault, and criminal possession of a weapon. All of these charges stemmed from the same criminal transaction which ultimately led to the death of Torriano Jackson and the wounding of other victims. The offenses charged were inextricably intertwined. Further, the charge which still remains against Dixon, criminal possession of a weapon in the second degree, is a felony, not an easy to prove misdemeanor. Dixon was not charged with two distinct defenses with no overlapping allegations simply to shield law enforcement from liability. *Cf. Janekta v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989). Just like the plaintiff in *DiBlasio*, therefore, Dixon cannot maintain his federal malicious prosecution claim in this case, because the indictment issued against him has not entirely terminated in his favor. 102 F.3d at 658-659; *see also Warren v. Fischl*, 15–CV–2829, 2015 WL 6760230, at *6 (E.D.N.Y. Mar. 2015) (holding that civil rights claims could not be maintained where only some counts of a multi-count indictment had terminated in Plaintiff's favor).

Nor can Dixon argue that Judge Eagen's decision to grant him a new trial on the criminal possession of a weapon charge constitutes a "favorable termination." "Any disposition of a criminal action which does not terminate it but permits it to be renewed cannot serve as a foundation for a malicious prosecution action." *Wood v. Town of East Hampton*, 08–CV–4197, 2010 WL 3924847 (E.D.N.Y. Sep. 2010); *see also Smith v. Cnty. of Nassau*, 2015 WL 1507767, at *15 (E.D.N.Y. Mar. 2015) (collecting cases). The Erie County District Attorneys' Office is appealing Judge Eagen's decision, which could result in Dixon's conviction being reinstated. Dixon admittedly brought the murder weapon to the murder scene. And, if the appeal is unsuccessful, the Distrist Attorney's Office may still re-try Dixon for criminal possession of a weapon in the second degree. The indictment issued against Dixon thus remains–it has not

23

finally terminated in his favor.  For this simple but powerful reason, the Court should grant summary judgment to defendants as to Count II of Dixon's complaint.

**B.**     **Dixon Cannot Demonstrate the Favorable Termination Element of his Due Process Fabrication of Evidence Claim**

As with malicious prosecution claims, due process claims based upon alleged fabrication of evidence require a plaintiff to show that criminal proceedings terminated in his favor.  *Gondola*, 2020 WL 1433874, at *4 (analyzing *McDonough v. Smith*, 139 S. Ct. 2149 (2019)).  There is disagreement among district courts within this Circuit as to whether the standard for favorable termination is the same for malicious prosecution claims and due process fabrication of evidence claims.  *Compare Gondola*, 2020 WL 1433874, at *5 (holding that standard is the same for both claims) *with Jeanty v. City of Utica*, 16-cv-00966, 2021 WL 149051, at *24-*26 (N.D.N.Y. Jan. 2021) (holding that different standard of favorable termination applies to two claims).  Regardless of which standard is used, Dixon clearly cannot demonstrate favorable termination.

If the same standard for favorable termination applies to both claims, then Dixon's fabrication of evidence claim fails for the same reasons discussed in Point I.A., *supra*. Even if the Court were to adopt the alternative standard for favorable termination applied by some district courts, Dixon still would fail.  *See Jeanty*, 2021 WL 149051, at *24-*26; *Simon v. City of New York*, No. 16-cv-1017, 2020 WL 1323114, at *3-6, (E.D.N.Y. Mar. 19, 2020). Under this alternative standard, the Court evaluates whether a potential for conflicting judgments resulting from parallel civil and criminal litigation exists.  *See Jeanty*, 2021 WL 149051 at *26. If there is a potential for conflicting judgments, then a plaintiff cannot demonstrate favorable termination.  *Id*.

A clear potential for conflicting judgments here. It would be absurd and inconsistent if Dixon were permitted to recover substantial damages in relation to his prosecution while also being found guilty of possessing a weapon with the intent to cause harm to Torriano Jackson. Because the potential for inconsistent judgments still remains given the status of Dixon's criminal possession of a weapon charge, he cannot prove favorable termination. Under this analysis, Count I of the complaint must be dismissed to the extent it alleges that the City defendants violated Dixon's right to a fair trial though fabricating evidence.

## POINT II.  DIXON CANNOT ESTABLISH OTHER ESSENTIAL ELEMENTS OF HIS MALICIOUS PROSEUCTION CLAIM

Besides his failure to establish favorable termination, Dixon cannot establish other essential elements of his malicious prosecution claim. *Savino*, 331 F.3d at 72. These failures constitute independent grounds upon which the Court should grant summary judgment.

### A.    Summary Judgment is Warranted as to Detective Lonergan

As an initial matter, Dixon's malicious prosecution claim must, at the very least, be dismissed as to Detective Lonergan. Because none of Detective Lonergan's investigative activities caused or contributed to Dixon's indictment in any way, Detective Lonergan cannot be held liable for malicious prosecution. *See McClennon v. City of New York*, 13-CV-128, 2018 WL 2943565, *15 (E.D.N.Y. Jun 2018); *Burgess v. Dejoseph*, 14-CV-1371, 2017 WL 1066662, at *7 (N.D.N.Y. Mar. 2017) (explaining that malicious prosecution claim must be based on steps taken before an indictment has been issued).

The only potentially inculpatory piece of evidence involving Detective Lonergan which came about pre-indictment, was the anonymous call he received. But this call was not a

basis for the grand jury's indictment. As such, Count II of the complaint should be dismissed as against Detective Lonergan.

**B.    Dixon Cannot Overcome the Presumption of Probable Cause Created by the Grand Jury Indictment**

The Court must also dismiss Dixon's malicious prosecution claim as to Detectives Vickerd, Masecchia, and Stambach. Where, as here, a grand jury has indicted Dixon, there is a presumption of probable cause for purposes of his malicious prosecution claim. *Bonds v. City of New York*, No. 12-cv-1772, 2014 WL 2440542, at *7 (E.D.N.Y. May 2014) (citing *Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003)). To overcome the presumption of probable cause created by the grand jury indictment, Dixon is required to prove that the indictment was secured by fraud, perjury, or other bad faith police conduct. *Id.* at 77. Because the indictment was brought as a result of independent identifications developed through legitimate identification procedures, Dixon cannot overcome the presumption of probable cause.

The photo arrays which led to witnesses identifying Dixon contained six photographs with fillers that were of the same relative appearance as Dixon. Courts continually hold that similar photo arrays are constitutionally permissible and constitute appropriate police procedure. *See, e.g., U.S. v. McGee*, 99–CR–150, 2000 WL 1520957, at *16 (W.D.N.Y. Oct. 2000); *U.S. v. Wagner*, 20-CR-410, 2022 WL 19181, at *3 (S.D.N.Y. 2022); *U.S. v. Morgan*, 690 F. Supp. 2d 274, 283 (S.D.N.Y. 2010) ("Courts in this Circuit have held that a photo array containing six or more photographs is sufficiently large so as not to be unduly suggestive"). As such, Dixon cannot overcome the presumption of probable cause and his malicious prosecution claim fails as a matter of law. *See, e.g., Vasquez v. City of New York*, 14-CV-491, 2014 WL 5810111, at *10 (S.D.N.Y. Nov 2014) (holding that plaintiff failed to overcome presumption of

probable cause because he failed to show that identification was the result of unduly suggestive procedures).

*Debrosse v. City of New York*, illustrates the point. 739 Fed App'x 48, 50 (2d Cir. 2018). There, an indictment was secured through an eyewitness picking a suspect out of a properly created photo array. *See id* at 50. During deposition testimony given in connection with the suspect's subsequent malicious prosecution claim, the eyewitness confirmed that the police officers followed appropriate police procedure in showing her the photo array. *Id.* In an effort to rebut the presumption of probable cause, the suspect introduced hearsay evidence recounting what the eyewitness had allegedly said about the identification procedures in a private, unsworn conversation. *Id.* The Second Circuit held that this inadmissible hearsay evidence was insufficient to rebut the presumption of probable cause. Because all of the admissible evidence showed that the eyewitness identification was legitimate, the presumption of probable cause was not rebutted, and the suspect's malicious prosecution claim was dismissed. *Id.*

This case closely resembles *Debrosse*. As in *Debrosse*, all of the admissible evidence before the Court shows that John Sullivan, Emil Adams, and Aaron Jackson identified Dixon as the shooter through acceptable police procedure. Most significantly, Adams's deposition testimony, like the deposition testimony of the eyewitness in *Debrosse*, confirms that appropriate police procedure was used when he was shown a six-person photo array. Dixon, like the plaintiff in *Debrosse*, seeks to create an issue of fact by relying on an inadmissible hearsay statement attributed to Adams when he was not under oath. *See generally*, Decl. Ex. 12, (Adams Dep.). But *Debrosse* teaches that such inadmissible, hearsay evidence is insufficient to

overcome the presumption of probable cause. The Court should reach the same holding here. Because the admissible evidence shows only that the detectives appropriate non-suggestive identification procedures, Dixon cannot overcome the presumption of probable cause. *Vasquez*, 2014 WL 5810111, at *10. Accordingly, Count II of the complaint should be dismissed against Detectives Vickerd, Stambach, and Masecchia.

### C.    Independent Probable Cause Existed for Dixon's Prosecution, Even if he Could Show Bad Faith Misconduct

Dixon cannot establish that Adams's identification was brought about by suggestive identification procedures or through police misconduct. But even if he could, the record still demonstrates sufficient probable cause for Dixon's prosecution. Where a police officer provides false or misleading information to a prosecutor, or where a police officer engages in tortious behavior, if there is an independent, untainted source of probable cause, a claim for malicious prosecution will not lie. *Biton v. City of New York*, 2022 WL 1448207, at *2 (2d Cir. 2022) (citing *Rentas v. Ruffin*, 816 F. 3d 214, 220-221 (2d. Cir. 2016)). Notwithstanding any perceived problems with Adams's identification, which there were not, there is absolutely no evidence police used any improper suggestion or other misconduct leading to the positive identification made by John Sullivan. Sullivan's untainted identification provides independent probable cause, barring Dixon's malicious prosecution claim, regardless of what occurred with Adams's identification. *Vasquez*, 2014 WL 5810111, at *10.

Further, independent probable cause was fostered by the testimony of Sullivan, Jackson, and Adams identifying Dixon as the shooter during their grand jury testimony. Where witnesses identify a suspect independent of any questioning or procedures implemented by police officers, independent probable cause exists, regardless of whether police officers have

committed misconduct. *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (holding that subsequent identification fostered probable cause despite initially suggestive procedures used by police). That Sullivan, Adams, and Jackson identified Dixon as the shooter months after they had any interaction with police demonstrates that there was probable cause to prosecute Dixon–even if Dixon could show that the police engaged in some form of misconduct months earlier. *Id.*[116] For these reasons, as well, Detectives Vickerd, Stambach, and Masecchia should be granted summary judgment on Count II of the complaint.

**D.    Dixon's Malicious Prosecution Clam Fails Because Charges Were Pursued Due to the Independent Judgment of ADA Belling**

Count II of the complaint must also be dismissed because the record shows that ADA Belling brought charges against Dixon independent of any pressure exerted by the individual City-defendants. "A malicious prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by the police." *Alcantara v. City of New York*, 646 F. Supp. 2d 449, 457 (S.D.N.Y. 2009). Because ADA Belling chose to proceed with charges against Dixon despite knowing that Lamar Scott had confessed, and because there is no evidence of any BPD detective encouraging Belling to proceed with charges against Dixon over Scott, Dixon's malicious prosecution claim fails against all of the defendant detectives. *Id.*

---

[116]    Dixon cannot argue that the witness's identification of him during their grand jury testimony were tainted by the initial identification procedures because months had elapsed between their initial interview with the police. *People v. Perez*, 128 A.D.3d 465, 465 (1st Dep't 2015) (twenty-day interval between suggestive photo identification and lineup sufficient for finding of attenuation); *People v. Montanez*, 135 A.D.3d 528, 529 (1st Dep't 2016) (passage of nineteen days sufficient to remove taint from suggestive identification procedures).

**POINT III.  DIXON CANNOT MAINTAIN HIS FABRICATION OF EVIDENCE CLAIM
BECAUSE THE EYEWITNESS ACCOUNTS IMPLICATING HIM WERE NOT
FABRICATED OR MADE UP**

In addition to his failure to prove favorable termination, Dixon's fair trial claim premised upon fabrication of evidence also fails for other reasons.  Dixon cannot show that any of the inculpatory evidence forwarded to prosecutors was invented by the defendant detectives. *Greene v. City of New York*, No. 08-cv-243, 2017 WL 1030707, at *25 (E.D.N.Y. Mar. 15, 2017) (granting summary judgment on a denial of the right to a fair trial claim because the contention that officers deliberately falsified evidence was based on "sheer speculation, and [did] not create a material issue of fact").  This is also a necessary element of Dixon's fabrication of evidence claim.  *Garnett*, 838 F.3d 265, 279.

Dixon presents no evidence that Detective Masecchia fabricated John Sullivan's identification of Dixon through a six-person photo array.  Mr. Sullivan has never recanted his identification of Dixon nor claimed that he identified Dixon due to suggestive identification procedures.  Under the circumstances, Dixon has no basis to hold Detective Masecchia liable for fabrication of evidence.

Nor is there is any admissible evidence demonstrating that Detective Vickerd fabricated Emil Adams's identification of Dixon through a six-person photo array.  Adams testified at his deposition that he identified Dixon after looking at multiple pictures, thus corroborating Detective Vickerd's report regarding the photo array procedures.  The only evidence of potential suggestion during Adams's identification is inadmissible hearsay, which is insufficient to create a triable issue of fact.  *Debrosse*, 739 Fed App'x at 50.  Likewise, there is no admissible evidence suggesting that Vickerd fabricated or made up his account of the

informal interview with John Sullivan at Sister's Hospital. All credible evidence supports a finding that the interview was accurately recorded.  With no evidence, Detective Vickerd cannot be said to have forwarded false or fabricated information to ADA Belling.

Detective Stambach did not fabricate any evidence likely to be used at Dixon's criminal trial, either.  Emil Adams does not claim that the sworn statement he gave to Detective Stambach was fabricated.  Nor does Aaron Jackson claim that his tentative identification of Mr. Dixon at ECMC was fabricated.  As such, Detective Stambach did not fabricate any of the inculpatory evidence that he was responsible for developing during the investigation.

Finally, there is no credible evidence suggesting that Detective Lonergan invented the anonymous call he received on August 10, 1991.  Moreover, the anonymous call was unlikely be used against Dixon at his prosecution.  So Detective Lonergan cannot be said to have forwarded false information apt to influence a jury's decision.

For these compelling reasons, Dixon's fabrication of evidence claim fails as to all of the defendant detectives, and the Court should grant summary judgment to the defendant detectives as to Count I of the complaint.


### POINT IV.  DIXON CANNOT MAINTAIN HIS *BRADY* CLAIM BECAUSE THE INDISPUTABLE EVIDENCE SHOWS THAT THE DETECTIVES TURNED OVER EXCULPATORY EVIDENCE TO ADA BELLING

To establish liability for a 42 U.S.C. 1983 claim premised upon a *Brady* violation, a plaintiff must prove three elements: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was intentionally suppressed; and (3) prejudice ensued because of the material nature of the evidence. *Valentin v. City of*

31

*Rochester*, 11-CV-6238, 2018 WL 5281799, at \*12-\*13 (W.D.N.Y. Oct. 2018).  Police officers

may be held liable for *Brady v*iolations only when they ***intentionally*** suppress favorable

evidence.  *Id.* (emphasis added).  On the contrary, police officers satisfy their obligations under

*Brady* when favorable evidence is made available for prosecutors to review.  Prosecutors, in turn,

have an obligation to turn over favorable evidence to defense counsel. *Walker v. City of New*

*York*, 974 F.2d 293, 299 (2d Cir. 1992).

      In this case, the record demonstrates that the police provided all potential *Brady*

evidence for ADA Belling's review.  For example, Detective Stambach showed ADA Belling

Scott's confession.  Stambach also turned over evidence which was ultimately used to impeach

both Emil Adams and Aaron Jackson at Dixon's criminal trial.  Stambach also did not withhold

evidence that Mario Jarmon claimed to be shot by Torriano Jackson and that Tamara Frida

claimed that Dixon was not the shooter.  In short, all exculpatory and impeachment evidence that

Stambach developed was made available to ADA Belling.

      The same can be said of Detective Masecchia.  The exculpatory statement

Detective Masecchia took from Leonard Brown was preserved and shown to ADA Belling.

There is simply no evidence that Masecchia intentionally withheld or concealed any *Brady*

evidence.

      Finally, the record fails to show that Detectives Vickerd and Lonergan came

across materials which were subject to disclosure under *Brady*.  Without any evidence,

Detectives Vickerd and Lonergan cannot be held liable for intentionally suppressing *Brady*

material.

Dixon will likely argue that Detective Stambach's failure to write down everything that witnesses told him, such as Lamar Scott claiming that he had blood on his shoes, constitutes a *Brady* violation.  Dixon will be wrong  As set forth in Magistrate Judge Foschio's Report and Recommendation in *Epps v. City of Buffalo*, 1:19-cv-00281 (W.D.N.Y. 2019) (Decl. Ex. 50), a mere failure to take notes as to everything a witness says is not violation of *Brady*. Further, police officers are under no obligation to track down every lead which may produce evidence favorable to a criminal defendant. *See Tortora v. City of New York*, 15-CV-3717,  2019 WL 9100369, at *21 (E.D.N.Y. Mar. 2019).  The fact simple fact is that Detective Stambach did not take steps to conceal or hide known or existing *Brady* evidence from ADA Belling.  Neither did any other detective.  Dixon simply cannot establish any detective committed a *Brady* violation. *Ortiz*, 523 F.Supp.3d at 367.

For all of these reasons, the Court should grant the City-defendants summary judgment on the portions of Count I of the complainant premised upon alleged *Brady* violations.

**POINT V.  DIXON'S § 1983 CONSPIRACY CLAIM FAILS AS A MATTER OF LAW**

For multiple reasons, Dixon cannot maintain his 42 U.S.C. § 1983 conspiracy claim.  Initially, the conspiracy claim is barred by the intra-corporate conspiracy doctrine to the extent Dixon theorizes that members for the Buffalo Police Department conspired together to violate his rights.  *Rizk v. City of New York*, 462 F.Supp. 3d 203, 225 (S.D.N.Y. 2020) (explaining that intra-corporate conspiracy doctrine barred conspiracy claim against NYPD officers) (collecting cases).  To suceeed, Dixon must show that one or more of the detective defendants conspired with ADA Belling, the only relevant player from outside of the police department.  But there is no evidence that any of the defendant detectives conspired with ADA

Belling. There is no evidence that Detectives Masecchia, Vickerd, and Lonergan even spoke with ADA Belling –let alone conspired with him. And the brief record of Detective Stambach's conversation with ADA Belling, during which he showed Belling Lamar Scott's confession, does not reflect any type of conspiracy. Dixon's conspiracy claim therefore fails as matter of law.

At the most fundamental level, Dixon's conspiracy claim fails because he cannot show that his constitutional rights were violated in the first instance. "A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such a right." *Romer v. Morgenthau*, 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000); *see also West v. Goord*, 2017 WL 3251253, at *16 (W.D.N.Y. Jul. 31, 2017). Because there is no proof of an underlying constitutional violation, the Court should grant the City-defendants summary judgment as to Count III of the complaint.

### POINT VI.   DIXON'S § 1983 FAILURE TO INTERCEDE CLAIM FAILS

Dixon's 42 U.S.C § 1983 failure to intercede claim fails for similar reasons. A plaintiff must first show a primary constitutional violation to support a failure to intercede claim. *Harig v. City of Buffalo*, 574 F.Supp.3d 163, 198 (W.D.N.Y. 2021) (dismissing plaintiff's failure to intervene claim where plaintiff could not establish that his constitutional rights were violated); *Forney v. Forney*, 96 F.Supp.3d 7, 13 (E.D.N.Y. 2015). Because Dixon cannot establish an underlying constitutional violation, his failure to intercede claim must be dismissed.

Further, none of the defendant detectives were present or aware of any constitutional violations for which they had a "realistic opportunity to intervene to prevent harm from occurring." *Jeanty*, 2021 WL 149051, at *31. For this additional reason, the Court should grant summary judgment in favor of the City-defendants as to Count IV of the complaint.

Moreover, Dixon cannot simultaneously maintain a theory that the defendant detectives were directly involved in constitutional violations while also seeking to hold them liable for failing to intervene, which is additional reason to dismiss the failure to intervene claim. *Jackson v. City of New York*, 939 F. Supp. 2d 219, 232 (E.D.N.Y. 2013).

### POINT VII.  DIXON'S § 1983 SUPERVISORY LIABILITY CLAIM FAILS

The Second Circuit no longer recognizes a special rule for supervisory liability in 42 U.S.C. § 1983 cases. *Estate of King v. Annucci*, 20-cv-1413, 2023 WL 6122868, at *10 (N.D.N.Y. Sep. 2023) (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)).  Instead, to hold a supervisor liable under § 1983, a plaintiff must show that a supervisor directly participated in the constitutional violation at issue. *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 376 (E.D.N.Y. 2021).  Thus, Dixon cannot maintain a separate supervisory liability claim against Chief Donovan, and Count V of the complaint must be dismissed. *Id.*  To pursue Donovan, Dixon would have to show that he was directly involved in any alleged constitutional violation. *Id.*  Chief Donovan had no direct involvement in the Torriano Jackson murder investigation: Necessarily, he cannot have directly violated Dixon's constitutional rights.  Chief Donovan should be dismissed from the case.

### POINT VIII.  DIXON'S *MONELL* CLAIM MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF ANY UNDERLYING CONSTITUTIONAL VIOLATION

The record shows that Dixon did not suffer constitutional deprivation.  Without this predicate, the Court must grant summary judgment in favor of the City-defendants as to Dixon's *Monell* claim asserted in Count VI of the complaint. *Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001) (explaining that *Monell* claims cannot survive where plaintiff does not

35

first show that he suffered a constitutional injury). Because Dixon has failed to show an underlying constitutional violation, no need arises to conduct *Monell* discovery and the *Monell* claim should be dismissed.

### POINT IX. THE INDIVIUDAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Even if the Court does find that there is an issue of fact as to whether Dixon's federal constitutional rights have been violated, summary judgment should still be granted to the individual defendants on qualified immunity grounds. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In keeping with this principle, federal courts hold that police officers are entitled to qualified immunity and are thus shielded from individual liability, unless they violate a plaintiff's clearly established constitutional right. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156 (2001). To determine whether a right is clearly established, the Court must look to whether, in 1991, there was sufficiently clear Supreme Court or Second Circuit authority establishing that the defendants' conduct was unconstitutional. *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004).

Dixon will inevitably make various fact specific arguments related to the detectives' conduct to oppose to this motion. For example, he is likely to argue that Detective Stambach is liable for malicious prosecution because, in addition to taking a sworn confession from Lamar Scott, Stambach also should have tested Scott's clothes for blood and gunshot residue. Dixon will contend that Detective Stambach committed *Brady* violations by failing to note absolutely everything that witnesses said to him during unsworn, unrecorded portions of his

interviews.  But established Supreme Court or Second Circuit case-law pre-dating 1991 would have put Detective Stambach on notice that failure to test Lamar Scott's clothing or failure to write down stray comments made by witnesses constituted a federal constitutional violation.[117] Even if the Court were to find that Detective Stambach's conduct may have run afoul of the Constitution under today's standards, which it should not, Detective Stambach would nonetheless be entitled to qualified immunity.  *Luna*, 356 F.3d at 490.

In short, even were the Court to determine that the defendant detectives committed a constitutional violation, the legal precedent, as it existed in 1991, did not serve to put the detectives on notice that their conduct would run afoul of the Constitution.  Without that precedent, summary judgment should be granted to the individual City defendants on Dixon's federal claims based on qualified immunity.  The City defendants will discuss how their qualified immunity defense applies to Dixon's fact-specific arguments in their reply papers in further support of this motion, if necessary.

**POINT X.  DIXON NEVER IDENTIFIED OR NAMED THE JOHNDOES/UNKONWN SUPERVISORS**

Dixon has not identified any of the John Does/Unknown Supervisors named as parties in the complaint: nor has he amended his complaint to identify those individuals. The John Does/Unknown Supervisors should thus be dismissed.  *Ortiz*, 523 F. Supp. 3d 347, 361.

---

[117]    Some courts have gone so far as to say that *Brady*'s application  to police officers was not clearly established until as late as 1995.  *See Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011).

**POINT XI.  THE COURT SHOULD DECLINE TO RETAIN SUPPLEMENTAL JURISDICTION OVER DIXON'S STATE LAW CLAIMS**

When the Court grants summary judgment to the City defendants on Dixon's federal claims, it should decline to retain supplemental jurisdiction over Dixon's remaining state-law claims. *Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims").  Even if the Court does retain jurisdiction over the state-law claims, however, those claims should be dismissed on their merits.

**POINT XII.  DIXON'S STATE LAW MALICIOUS PROSECUTION CLAIM FAILS**

Under these circumstances, the elements of Dixon's state-law and federal malicious prosecution claims are identical.[118] Thus, Dixon's state law malicious prosecution claim asserted in Count VIII must be dismissed for the reasons articulated in Point I and II, *supra*.

**POINT XIII.  DIXON'S STATE LAW INFLICTION OF EMOTIONAL DISTRESS CLAIMS FAIL AS A MATTER OF LAW**

New York law specifically bars recovery for negligent or intentional infliction of emotional distress claims where such claims fall within the ambit of other traditional tort liability.  *Poulos v. City of New York*, 14-CV-3023,  2015 WL 5707496, at *10 (S.D.N.Y.2015).

---

[118]    A § 1983 malicious prosecution claim requires that each of the New York State law elements of the tort are met in addition to a showing that the individuals being sued were acting under the color of state law. *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984).  Here, there is no real dispute that the individual defendants were acting under the color of state law, so there is no real difference between the analysis of the state and federal malicious prosecution claims.

Because Dixon's negligent and intentional infliction of emotional distress claims encompass the exact same conduct as his malicious prosecution claim and other constitutional claims, the claims fail as a matter of law. *Druschke v. Banana Republic*, 359 F. Supp. 2d 308, 315-316 (S.D.N.Y. 2005). The City defendants are entitled to summary judgment on Count IX of the complaint.

### POINT XIV.  DIXON'S STATE LAW NEGLIGENCE CLAIM FAILS

New York law does not recognize a cause of action for general negligence in cases arising out of alleged police misconduct. *Thomsen v. City of New York*, 50 Misc. 3d 1037, 1053 (Sup Ct. Bronx Cnty. 2015) (citing *Antonious v. Muhammad*, 250 A.D.2d 559 (2d Dep't 1998)). Because of this rule, the Court should grant summary judgment as to Count XI of the complaint.

### POINT XV.  DIXON'S STATE LAW RESPONDEAT SUPERIOR CLAIM FAILS

Dixon predicates his *respondeat superior* claim against the City of Buffalo (Count XI) on alleged state law torts committed by the City's employees and agents. However, the Court should summarily dismiss this claim because the record does not establish that any City agent or employee committed a tort against Dixon. *See Coleman v. City of Rochester*, No. 16-CV-6179, 2018 WL 6727535 at *6 (W.D.N.Y. Dec. 2018) (dismissing plaintiff's respondent superior claim where he had "not demonstrated any basis for liability on the part of any of the City's agents or employees"). Count XI of the complaint should thus be dismissed.

### POINT XVI.  DIXON'S STATE LAW NEGLIGENT HIRING CLAIM FAILS

Because it is undisputed that the individual defendants were acting within the scope of their employment during all relevant times, Dixon cannot maintain an action for

negligent hiring, training, and supervision under New York law.  *Thompson*, 50 Misc. 3d at 1054

(collecting cases).  Further, because no cause of action lies for a negligent investigation under

New York law, New York law also does not recognize a negligent hiring, training, and

supervision claim is also barred under the circumstances presented by this case. *See Medina v.

City of New York*, 102 A.D.3d 101, 108 (1st Dep't 2012).  Also, Dixon has adduced no evidence

that the City's hiring, training, and supervision was inadequate.  For these simple reasons, the

Court should grant summary judgment as to Count XIII of the complaint.

## <u>CONCLUSION</u>

For the forgoing reasons, the Court should grant the City-defendants motion for

summary judgment in its entirety, and grant such further and additional relief as the Court may

deem just and proper.

Dated:        Buffalo, New York
              December 15, 2023


                              **HODGSON RUSS LLP**
                              *Attorneys for City of Buffalo*
                              *and other City Defendants*


                              By:  <u>//s Peter A. Sahasrabudhe</u>
                                      Hugh M. Russ III, of counsel
                                      Peter A. Sahasrabudhe, of counsel
                              The Guaranty Building
                              140 Pearl Street, Suite 100
                              Buffalo, NY  14202-4040
                              716.856.4000