UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

VALENTINO DIXON,

                              Plaintiff,

v.                                                    Case No. 19-cv-01678

CITY OF BUFFALO, et al.,

                              Defendants.

---

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
## <u>CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

      Defendants the City of Buffalo, (hereinafter "the City"), Mark Stambach, Raniero Masecchia, James Lonergan, John Vickerd, Richard Donovan, and various John Does identified as Unknown Buffalo Police Department Supervisors (collectively referred to hereinafter as "the City Defendants"), by their attorneys, Hodgson Russ LLP, submit the following Statement of Undisputed Facts pursuant to Local Rule of Civil Procedure 56(a)(2).

      The facts stated herein are "undisputed" for purposes of this motion only, and defendants reserve the right to dispute and/or contradict any of these facts at any subsequent trial of this action or in any other proceeding which is unrelated to the current motion.

- 2 -

## PART 1: NARRATIVE ACCOUNT

### The Events Leading up to the Shooting of Torriano Jackson

1.      The feud leading up to the shooting in this case started over a girl named Heather Smith.[1]

2.      Aaron Jackson, the brother of the deceased, Torriano Jackson, dated Heather Smith in or around the time of the shooting.[2]

3.      After an initial altercation relating to Ms. Smith, there was a continuing disagreement between two groups of young men.  One group included Aaron Jackson, Torriano Jackson, and Travis Powell, and the other group included Antoine Shannon, Leonard Brown, and Mario Jarmon.[3]

4.       Brown is  the step brother of plaintiff, Valentino Dixon. Shannon is Dixon's half-brother, and Jarmon was Dixon's friend.[4]

5.      In the afternoon of August 9, 1991, Jarmon, Brown and Shannon confronted Aaron Jackson in a parking lot near the corner of Bailey and Delavan Avenue in the City of Buffalo.[5]

---

[1]      Declaration of Peter A. Sahasrabudhe, dated December 15, 2023 ("Decl."), Ex. 6 ("Dixon Dep") at p. 175.

[2]      Decl. Ex. 6 (Dixon Dep.) at p. 176.

[3]      Decl. Ex. 36 (Brown Statement) at p. 1; Decl. Ex. 11 ("Jackson Dep.") at p. 90-94.

[4]      Decl. Ex. 6 (Dixon Dep.) at p. 44, 170; Decl. Ex. 17 ("Jarmon Testimony") at p. 3.

[5]      Decl. Ex. 11 (Jackson Dep.) at p. 90-94.

- 3 -

6.      Jackson ultimately drove away accompanied by Powell, and stated that he would be back later with this brother, Torriano.[6]

7.      Realizing that there may be further conflict, Brown and Shannon called their older brother Valentino Dixon for help.[7]

8.      Dixon then enlisted the help of his confederate, Lamar Scott, a young impressionable teenager who dealt drugs for Dixon and looked up to him as well.[8]

9.      Dixon armed Scott with an automatic weapon.[9]

10.     Dixon then drove Scott and the automatic weapon to the house of Mario Jarmon, where Jarmon was waiting with Brown and Shannon.[10]

11.      In the early morning hours of August 10, 1991, the five young men - Dixon, Scott, Jarmon, Brown, and Shannon then proceeded to the corner of Bailey and Delavan Avenue, which is in very close proximity to Jarmon's home.[11]

---

[6]      (*Id.*).

[7]      Decl. Ex. 6 (Dixon Dep). at p. 12-14.

[8]      Decl. Ex. 6 (Dixon Dep.) at p. 14; 173; Decl. Ex. 3 ("Scott Dep.") at p. 78.

[9]      Decl. Ex. 3 (Scott Dep.) at p. 77-79.

[10]      (*Id.*). at p. 78.

[11]      Decl Ex. 17 (Jarmon Testimony) at p. 8.

- 4 -

**The Shooting of Torriano Jackson in the Early Morning Hours of August 10, 1991**

12.    Sometime after Dixon, Scott, Jarmon, Brown, and Shannon arrived at the corner of Bailey and Delavan, Aaron Jackson and Torriano Jackson arrived at the same corner in the vehicle of their friend, Travis Powell.[12]

13.    A fight broke out between Jarmon and the Jackson brothers.[13]

14.    Scott then retrieved the weapon which he had been given by Dixon.[14]

15.    Using Dixon's gun, Scott shot Torriano Jackson multiple times, which resulted in Torriano Jackson's death.[15]

16.    Using Dixon's gun, Scott also shot Aaron Jackson as well as John Sullivan.[16]

17.    Using Dixon's gun, Scott also shot and injured Mario Jarmon.[17]

18.    After the shooting, Lamar Scott dropped the murder weapon a couple houses away, and the gun was never recovered by law enforcement.[18]

---

[12]    Decl. Ex. 11 (Jackson Dep.) at p. 95-97.

[13]    Decl. Ex. 3 (Scott Dep.) at p. 14.

[14]    (*Id.*). at p. 14; 83-85.

[15]    (*Id.*). at p. 14.

[16]    (*Id.*). at  p.18-19.

[17]    (*Id.*).

[18]    Decl. Ex. 3 (Scott Dep.) at p. 79; Decl. Ex. 6 (Dixon Dep.) at p. 73.

- 5 -

19.    Dixon sped away from the murder scene and did allow Scott in his car.[19]

**John Sullivan Implicates Valentino Dixon as the Perpetrator of the Crime**

20.    An ambulance took John Sullivan to Sister's Hospital in the City of Buffalo after the shooting.  There, Mr. Sullivan received treatment for his injuries.[20]

21.    Later, on August 10, 1991, while still admitted to Sister's Hospital, Mr. Sullivan answered questions posed to him by Buffalo Police Department ("BPD") Detective John Vickerd in an unsworn interview.[21]

22.     Mr. Sullivan told Detective Vickerd that he observed a man known to him as "Tino" grab a gun which Sullivan believed to be an "Uzi."[22]

23.    Sullivan told Detective Vickerd that the person known to him as "Tino" was the individual who shot him and Torriano Jackson.[23]

24.    Mr. Sullivan described Tino as a black male, age 21, approximately six feet tall, and weighing around one hundred sixty pounds.[24]

---

[19]    Decl. Ex. 6 (Dixon Dep.)  at p. 169.

[20]    Decl. Ex. 25.

[21]    (*Id.*).

[22]    (*Id.*).

[23]    (*Id.*).

[24]    (Id.).

- 6 -

25.     Sullivan told Detective Vickerd that "Tino's" real name was Valentino, and that he knew this individual as someone from around his neighborhood and the Genesee/Moselle area.[25]

26.     Mr. Sullivan told Detective Vickerd that, after the shooting, he observed "Tino" and another black male run west on Delavan towards Olympic Avenue.[26]

27.     Later in the day on August 10, 1991, after he was released from the hospital, John Sullivan gave a formal sworn statement to Detective Raniero Masecchia at the homicide division's offices.[27]

28.     In the sworn interview, Sullivan gave an account of the shooting similar to what he had relayed to Detective Vickerd.  He told Detective Masecchia that an individual known to him as "Tino" was the person who shot and killed Torriano Jackson.[28]

29.     Detective Masecchia then prepared a six-person photo array with Dixon's photo present.  The photo array prepared by Detective Masecchia contained five fillers of individuals who were of the same age and general appearance as Mr. Dixon.[29]

---

[25]     (*Id.*).

[26]     (*Id.*).

[27]     Decl. Ex. 26 ("Sullivan Statement").

[28]     (*Id.*).

[29]     Decl Ex. 27.

- 7 -

30.    After viewing the photo array, Mr. Sullivan picked out Dixon's photo and positively identified his photograph as depicting the individual who shot and killed Torriano Jackson.[30]

31.    This identification occurred on August 10, 1991, the day of the shooting.[31]

32.    Sullivan has never recanted his identification of Dixon.[32]

**Emil Adams Identifies Dixon as the Shooter**

33.    Emil Adams was at the corner of Bailey and Delavan when the fight broke out between the Jackson brothers and Mario Jarmon.[33]

34.    Detective Mark Stambach met with Mr. Adams and took a statement from him.[34]

35.    Mr. Adams gave a description of the shooting, which suggested there were two shooters present.  He gave a description of one shooter that was not entirely consistent with Valentino Dixon's appearance in that he described the shooter as a heavy-set male who was over six feet tall.[35]

---

[30]    Decl. Ex. 26 (Sullivan Statement).

[31]    (*Id.*).

[32]    Decl. Ex. 51 ("Reinvestigation Memo") (to be filed under seal).

[33]    Decl. Ex. 28 ("Adams Statement").

[34]    (*Id.*).

[35]    (*Id.*).

- 8 -

36.     Detective Stambach did not attempt to hide or omit this part of Mr. Adams's account -the detail was included in Adams's sworn statement.[36]

37.     Mr. Adams told Detective Stambach that he did not know the name of the shooter or shooters that he had observed.[37]

38.     Later, on August 10, 1991, Detective Vickerd, who presumably arrived back at headquarters after interviewing Mr. Sullivan, prepared a photo array with Dixon's photo present.[38]

39.     The fillers in the photo array contained pictures of five males who were of the same relative age and appearance as Mr. Dixon.[39]

40.     Upon being shown the photo array, Mr. Adams identified Mr. Dixon as the individual who shot and killed Torriano Jackson with a Tec-9 machine gun.[40]

41.     Mr. Adams sticks by his identification of Dixon to this day and has never given sworn, admissible testimony suggesting that his identification was illegitimate or the result of police coercion.[41]

---

[36]     (*Id.*).

[37]     (*Id.*).

[38]     Decl. Ex. 29, 30.

[39]     Decl. Ex. 30.

[40]     Decl. Ex. 31.

[41]     Decl. Ex. 12 (Adams Dep.) at p. 52, 142.

- 9 -

**Valentino Dixon is Arrested**

42.     After two witnesses identified Dixon as the perpetrator of the Jackson homicide, the Buffalo Police Department arrested him.[42]

43.     Thereafter, Dixon gave a sworn *Mirandized* statement to Detective Stambach.[43]

44.     In his statement, Dixon denied involvement in the crime.  He did not tell Detective Stambach that Scott was the shooter or that he had provided Scott with the murder weapon.[44]

**Lamar Scott Comes Forward and Confesses to the Shooting**

45.     Two days later, Lamar Scott had a discussion with Dixon's father, Robert Bryant.  During this discussion, Scott told Mr. Bryant that he was the shooter.[45]

46.     Bryant encouraged Scott to come forward and admit that he was the shooter –but he chose an unconventional approach.  Instead of encouraging Scott to go to the police, Bryant contacted Wanda Stark, a reporter for Local Channel 2 News in the Buffalo area.[46]

---

[42]     Decl. Ex. 33.

[43]     Decl. Ex. 34.

[44]     (*Id.*).

[45]     Decl. Ex. 14 (Bryant Dep.) at p. 22-24.

[46]     (*Id.*). at 26-30.

- 10 -

47.     Thereafter, Scott went on camera and confessed to the crime.[47]

48.     While Scott was confessing to the murder on camera, Detective Stambach and other police personnel arrived.[48]

49.     Stambach placed Scott in handcuffs and put him in the back of a police car immediately.[49]

50.     At the homicide office, Scott gave a sworn confession, which was extracted by Detective Stambach after he read Scott his *Miranda* warnings.[50]

51.     Scott admitted that he used a Tec 9 to shoot and kill Torriano Jackson.[51]

52.     In his sworn confession Scott also stated, untruthfully, that the gun he used to kill Torriano Jackson belonged to him.[52]

53.     At the same time that Scott confessed, Leonard Brown gave a statement to Detective Masecchia.[53]

---

[47]     (*Id.*). at p. 34.

[48]     (*Id.*). at 33.

[49]     (*Id.*). at 187.

[50]     Decl. Ex. 35 ("Confession").

[51]     (*Id.*).

[52]     (*Id.*).

[53]     Decl Ex. 36 (Brown Statement).

- 11 -

54.    Brown also stated that it was Scott who killed Torriano Jackson.[54]

55.    Brown also did not tell Detective Masecchia that Dixon had provided Scott with the murder weapon.[55]

56.    After Scott and Brown gave their sworn statements, Detective Stambach showed the statements to Assistant District Attorney Chris Belling.[56] .

57.    ADA Belling reviewed Scott and Brown's statements.  He also reviewed the videotaped confession Scott gave to Channel 2.  After reviewing those materials, ADA Belling instructed that Scott be released but that a lie detector test be set up for him.[57]

58.    Detective Masecchia thereafter attempted to have Scott come in for a lie detector test, but Scott never did so.[58]

59.    During his deposition testimony, Scott confirmed that detectives asked him to come back to take a lie detector test.[59]

---

[54]    (*Id.*).

[55]    (*Id.*).

[56]    Decl Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374.

[57]    Decl. Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374.

[58]    Decl. Ex. 38.

[59]    Decl Ex. 3 (Scott Dep.) at p. 58-59.

- 12 -

60.    He also confirmed that this was the sum and substance of all interactions he had with the police after the day he gave his sworn confession.[60]

61.    In other words, no detective threatened or coerced Scott to change his story after he confessed.[61]

62.    Scott, not wanting to further involve himself, did not take the lie detector test and eventually recanted his confession when he testified in front of a grand jury.[62]

**Aaron Jackson Tentatively Identifies Dixon as the Shooter**

63.    Although he was seriously injured from gunshot wounds, Aaron Jackson was able to participate in an unsworn interview with Detective Stambach on August 12, 1991, at Erie County Medical Center in the City of Buffalo.[63]

64.    During that interview, Detective Stambach showed Aaron Jackson a non-suggestive photo array with Dixon's picture present.[64]

65.    After viewing the photo array, Jackson tentatively identified Dixon as the individual who shot him and his brother, Torriano.[65]

---

[60]      (*Id.*).

[61]      (*Id.*).

[62]      Decl. Ex. 19 ("Scott Grand Jury Testimony") at p. 66-67.

[63]      Decl. Ex. 39.

[64]      Decl. Ex. 40.

[65]      Decl. Ex. 40, 41.

- 13 -

66.     Jackson signed a sworn affidavit to this effect.  Jackson stated, at the time, that events occurred so quickly that he could not be absolutely positive that Dixon was in fact the shooter.  But Jackson did state that Dixon's photo looked like the shooter.[66]

67.     Later, after independent discussions with ADA Belling, Jackson's identification of Dixon went from tentative to positive.[67]

68.     Jackson has never recanted his identification of Dixon.  Nor has Jackson ever stated, under oath or otherwise, that his identification of Dixon was brought about by coercive or suggestive law enforcement practices.[68]

**Sullivan, Adams, and Jackson Identify Dixon as the Shooter During Grand Jury Proceedings**

69.     In November of 1991, months after they had any interaction with the police, both John Sullivan and Aaron Jackson positively identified Valentino Dixon as the individual who shot and killed Torriano Jackson when they testified in front of a grand jury.[69]

70.     During the grand jury proceedings, neither Aaron Jackson nor Sullivan testified about their interactions with the police.  They independently told the grand jury, based on their own recollection of events, that Dixon was in fact the shooter.[70]

---

[66]     (*Id.*).

[67]     Decl. Ex. 15  ("Jackson Trial Testimony") at p. 227-228.

[68]     Ex. 11 ("Jackson Dep.") at p. 135-136.

[69]      Decl. Ex. 15 ("Jackson Grand Jury") at p. 15; Decl. Ex. 16  ("Sullivan Grand Jury") at p. 23-24.

[70]     (*Id.*).

71.     In January of 1992, Emil Adams testified in front of a grand jury that Dixon was the shooter.[71]

72.     Adams testified that he picked Dixon's photo out from a group of photos–which is consistent with the police reports stating that Adams picked Dixon's photo out from a six-person photo array.[72]

73.     Based on the testimony of these three (and other) witnesses, a grand jury issued an indictment against Valentino Dixon in January of 1992.[73]

74.     Dixon was charged with murder in the second degree, attempted murder in the second degree, assault in the third degree, and criminal possession of a weapon in the second degree.[74]

75.     Notably, as part of the grand jury proceedings, Lamar Scott recanted his confession and testified that Dixon was in fact the shooter.[75]

**A Jury Convicts Dixon Based on the Testimony of Sullivan, Adams, and Jackson**

76.     ADA Belling, acting on behalf of the State of New York, tried Dixon in the summer of 1992.  The People's three key witnesses were Adams, Sullivan, and Aaron

---

[71]     Decl. Ex. 20 at p. 76-77.

[72]     (*Id.*).

[73]     Decl. Ex. 46.

[74]     Decl. Ex. 47 ("Heraty Aff.") at ¶ 5.

[75]     Decl. Ex. 19 ("Scott Grand Jury") at p. 64-68.

- 15 -

Jackson. Each of these three witnesses, testified that Dixon was the shooter and identified him in court as such.[76]

77.    Each of the key People's witnesses were vigorously cross-examined. For example, Dixon's defense counsel cross-examined Aaron Jackson on the fact that his initial identification of Dixon was tentative– a fact that was neither concealed nor hidden by Detective Stambach.[77]

78.    Defense counsel cross-examined Adams based on the fact that his initial description of the shooter did not match up with the physical characteristics of Dixon–again a fact not withheld or concealed by Detective Stambach.[78]

79.    Despite defense counsel's ability to vigorously cross-examine the three witnesses, the jury still convicted Dixon of murder, assault, and criminal possession of a weapon.[79]

80.    Dixon's defense counsel also knew about the identity of Lamar Scott as well as Mr. Scott's confession prior to Dixon's trial.[80]  Counsel nonetheless chose not to call Lamar Scott as a witness.

---

[76]    Decl. Ex. 21 ("Sullivan Trial Testimony") at p. 83-84; Decl. Ex. 22 ("Adams Trial Testimony) at p. 151-153; Decl. Ex. 23 ("Jackson Trial Testimony") at p. 225-228.

[77]    Decl. Ex. 23 ("Jackson Trial Testimony") at p. 244-247.

[78]    Decl. Ex. 22 (Adams Trial Testimony) at p. 204-207.

[79]    Decl. Ex. 24 ("Jury Verdict Reading")

[80]    Decl. Ex. 14 (Bryant Dep.) at p. 175.

- 16 -

81.     Nor did counsel attempt to call Leonard Brown or Mario Jarmon, all of whom had testified during grand jury proceedings that Scott, not Dixon, was the shooter.[81]

82.     After these two witnesses testified to the grand jury, the District Attorney's Office charged them with perjury.[82]

**In 2018 Dixon's Murder and Assault Convictions are Vacated, but his Criminal Possession of a Weapon Charge is not Dismissed**

83.     In 2018, the Erie County District Attorney's Office conducted a re-investigation into the murder of Torriano Jackson.[83]

84.     Finally, after years of claiming that he had no involvement with the crime, Dixon admitted that he was the one who armed Scott before the shooting and he was the one who drove Scott to the scene of the crime.[84]

85.      Based on this account given by Dixon, and based on Scott pleading guilty to the Jackson murder, the District Attorney's Office agreed to dismiss Dixon's murder and assault convictions.  Dixon's conviction for criminal possession of a weapon in the second degree, however, was not dismissed.[85]

---

[81]     Decl. Ex. 17; 18

[82]     Decl. Ex. 13 ("Belling Dep.") at p. 278; Decl. Ex. 52 ("Grand Jury Excerpt")

[83]     Decl. Ex. Decl. Ex. 47 ("Heraty Aff.") at ¶ 4.

[84]     (*Id.*). at ¶ 14; Dec. Ex. 6 (Dixon Dep.) at p. 12-14.

[85]     Decl. Ex. Decl. Ex. 47 ("Heraty Aff.") at p. 7 (WHEREFORE clause).

- 17 -

86.     After being released from incarceration, Dixon separately challenged his criminal possession of a weapon conviction.  Although Erie County Judge Susan Eagan vacated the conviction–she did not rule that Dixon was actually innocent of the charge.[86]

87.     Instead, Judge Eagan ruled only that Dixon was entitled to a new trial on his criminal possession of a weapon charge.[87]

88.     The Erie County District Attorneys' Office is appealing Judge Eagan's decision.[88]  Further, if the District Attorney's Office so chooses, they are entitled to re-try Dixon for criminal possession of a weapon in the second degree.  Thus, the portion of the indictment issued against Dixon in 1992 which charged him with criminal possession of a weapon in the second degree has not reached a final termination.

### PART II: FACTUAL ACCOUNT BOKEN DOWN BY INDIVIDUAL DEFENDANT
### The Investigative Activities of Detective James Lonergan

89.     Detective James Lonergan was  first the detective of BPD's homicide division to arrive at the Torriano Jackson murder scene.  He thereafter took control of the scene. None of the physical evidence gathered at the scene was ultimately used to tie Valentino Dixon to the shooting.[89]

---

[86]     Decl. Ex. 48 ("Eagan Decision").

[87]     (*Id.*).

[88]     Decl.  Ex. 49 ("Notice of Appeal").

[89]     Decl. Ex. 44.

- 18 -

90.    After securing the scene, Detective Lonergan did note that a gun, separate from the murder weapon, a .32 caliber revolver, was collected at the scene of the crime. Neither Detective Lonergan nor any other member of the homicide division concealed the fact that a second gun was recovered from the crime scene.[90]

91.    Detective Lonergan also received an anonymous call during the late afternoon of August 10, 1991.[91]

92.    The anonymous caller stated that the perpetrator of the Torriano Jackson murder was Valentino Dixon.[92]

93.    The caller further stated that the dispute leading to the shooting started over a girl by the name of Heather Smith, which is the actual name of the individual over whom the underlying dispute started.[93]

94.    The anonymous call taken by Detective Lonergan is not admissible evidence and was not used as a basis to prosecute Valentino Dixon.[94]

---

[90]    (*Id.*).

[91]    Decl. Ex. 45.

[92]    (*Id.*).

[93]    (*Id.*).

[94]    (*Id.*).

- 19 -

95.    Detective Lonergan also took witness statements during the investigation of the Jackson murder, but none of the statements taken by Detective Lonergan were used in Dixon's prosecution.[95]

a.    **The Investigative Activities of Detective John Vickerd**

96.    Detective John Vickerd conducted an initial interview with John Sullivan at Sister's Hospital on August 10, 1991.[96]

97.    During this interview, Mr. Sullivan told Detective Vickerd that the shooter was an individual who went by the nickname "Tino."[97]

98.    Sullivan further told Vickerd that "Tino's" real name was Valentino.[98]

99.    Detective Vickerd also prepared a non-suggestive photo array containing Valentino Dixon's photograph on August 10, 1991.[99]

100.    Detective Vickerd showed this photo array to Emil Adams, who ultimately identified Dixon's photo as depicting the individual who shot Torriano Jackson.[100]

101.    Detective Vickerd took no other relevant investigative steps.

---

[95]    Decl. Ex. 8 ("Lonergan Dep.") at p. 85-88.

[96]    Decl. Ex. 25

[97]    (*Id.*).

[98]    (*Id.*).

[99]    Decl. Ex. 29, 30.

[100]    Decl. Ex. 29, 30, 31.

- 20 -

## The Investigative Activities of Detective Raniero Masecchia

102.    Detective Raniero Masecchia took a sworn statement from John Sullivan on August 10, 1991, after Mr. Sullivan was released from Sister's Hospital.[101]

103.    During this interview, Detective Masecchia showed Mr. Sullivan a six-person photo array containing Valentino Dixon's mug shot.[102]

104.    Mr. Sullivan identified Mr. Dixon's photo as depicting the individual who shot Torriano Jackson.[103]

105.    The photo array prepared by Detective Masecchia was non-suggestive –it contained five filler mug shots of individuals who were of the same relative age and appearance as Mr. Dixon.[104]

106.    Detective Masecchia also took a sworn statement from Leonard Brown wherein Brown identified Lamar Scott as the perpetrator of the Torriano Jackson homicide.[105]

107.    Detective Masecchia did not conceal Brown's statement from ADA Belling–the statement was shown to Belling within hours after it was taken.[106]

---

[101]    Decl. Ex. 26.

[102]    Decl. Ex. 26, 27.

[103]    Decl. Ex. 26.

[104]    Decl. Ex. 27.

[105]    Decl. Ex. 36.

[106]    Decl Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374.

- 21 -

108.    Detective Masecchia also spoke with Lamar Scott after his confession about taking a lie detector test.[107]

109.    In other words, Detective Masecchia tried to get Lamar Scott to further participate in the investigation after he confessed–despite the fact that Valentino Dixon had already been arrested.[108]

**The Investigative Activities of Detective Mark Stambach**

110.    Detective Stambach took a sworn statement from Emil Adams the morning of the shooting.[109]

111.    Mr. Adams description of the shooter's appearance was somewhat inconsistent with Dixon's appearance– a fact that Stambach never tried to conceal and was a subject of cross-examination at Dixon's trial.[110]

112.    Thereafter, Stambach took a sworn, *Mirandized* statement from Dixon after Dixon was arrested.[111]

113.    In the sworn statement, Dixon denied any involvement in the crime and did not reveal that he provided Scott with the murder weapon.[112]

---

[107]    Decl. Ex. 38.

[108]    (*Id.*).

[109]    Decl. Ex. 28 (Adams Statement).

[110]    Decl. Ex. 28; Decl. Ex. 22 (Adams Trial Testimony) at p. 204-207.

[111]    Decl. Ex. 34.

[112]    (*Id.*).

- 22 -

114.    Stambach accurately transcribed Dixon's statement.[113]

115.    When Lamar Scott began confessing to the Jackson homicide on Channel 2 News, Stambach placed Scott in handcuffs and put him in the back of a police car.[114]

116.    Stambach thereafter took a sworn confession from Scott after reading Scott his *Miranda* rights on August 12, 1991.[115]

117.    Stambach showed Scott's sworn confession to ADA Belling, who reviewed the confession and instructed that Scott be released.[116]

118.    Detective Stambach also showed Aaron Jackson a photo array with Dixon's photograph and five fillers on August 12, 1991.[117]

119.    Stambach recorded, accurately, that Jackson only tentatively identified Dixon's photo as depicting the individual who shot and killed his brother.[118]

120.    Jackson was later cross-examined on his tentative identification at Dixon's criminal trial.[119]

---

[113]    Decl. Ex. 6 (Dixon Dep.) at p. 153-155.

[114]    Decl. Ex. 14 (Bryant Dep.) at p. 187-188.

[115]    Decl. Ex. 35.

[116]    Decl Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374

[117]    Decl. Ex. 39-40.

[118]    Decl. Ex. 39, 41.

[119]    Decl. Ex. 23 ("Jackson Trial Testimony") at p. 244-247

- 23 -

121.    Detective Stambach also conducted an interview of Mario Jarmon while Mr. Jarmon was hospitalized from his gun wounds.[120]

122.    During this interview, Jarmon indicated that Torriano Jackson, not Dixon, was responsible for shooting him and that Dixon did not have a gun.[121]

123.    Stambach did not conceal or hide this interview from ADA Belling.[122]

124.    Detective Stambach also took a call from Tamara Frida, who at the time was unwilling to identify herself.[123]

125.    Ms. Frida told Stambach that Valentino Dixon was not the shooter.[124]

126.    Stambach accurately recorded this conversation with Ms. Frida and did not conceal or hide the conversation from ADA Belling.[125]

**Chief Richard Donovan had no Direct Involvement with the Investigation**

127.    Richard Donovan was the chief of BPD's homicide division when the Jackson murder was being investigated.[126]

---

[120]    Decl. Ex. 42.

[121]    (*Id.*).

[122]    (*Id.*).

[123]    Decl. Ex. 43; Decl. Ex. 10 ("Frida Dep.") at p. 24-25; 61.

[124]    (*Id.*).

[125]    (*Id.*).

[126]    Decl. Ex. 9 ("Donovan Dep.") at p. 24.

- 24 -

128.    There is no evidence that Chief Donovan had any interaction with any witness to the Torriano Jackson murder, or that he that he played any meaningful role in the investigation of the murder.[127]

Dated:        Buffalo, New York
              December 15, 2023

                            **HODGSON RUSS** LLP
                            *Attorneys for Defendants*

                            By:  //s Peter A. Sahasrabudhe
                                 Peter Sahasrabudhe
                             The Guaranty Building
                             140 Pearl Street – Suite 100
                             Buffalo, New York 14202-4040
                             Telephone: 716-848-1508
                             Email:  psahasra@hodgsonruss.com

---

[127]    *See generally*, Decl. Ex. 9 (Donovan Dep.).