# EXHIBIT  3

VIDEO DEPOSITION
LaMARR SCOTT


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

----------------------------------------
VALENTINO DIXON,

                              Plaintiff,

            — vs —          Case No.
                            1:19—cv—01678—WMS

CITY OF BUFFALO and COUNTY OF ERIE;
and DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA, DETECTIVE
JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN, JOHN DOES,
Unknown Buffalo Police Department Supervisors,
and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
BELLING, in their individual capacities,

                              Defendants.
----------------------------------------

        Video recorded deposition of LaMARR

SCOTT, taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of HARRINGTON &

MAHONEY, 70 Niagara Street, 3rd Floor, Buffalo, New

York, on March 14, 2022, commencing at 10:02 a.m.,

before DANIELLE M. FETZER, Notary Public.



LAMARR SCOTT                                         March 14, 2022
DIXON V. CITY OF BUFFALO                                        2

```
 1

 2  APPEARANCES:          NEUFELD SCHECK & BRUSTIN, LLP,
                          By NICK J. BRUSTIN, ESQ.,
 3                        nick@nsbcivilrights.com, and
                          GERARDO ROMO, ESQ.,
 4                        gerardo@nsbcivilrights.com,
                          99 Hudson Street,
 5                        8th Floor,
                          New York, New York  10013,
 6                        (212) 965-9081,
                              and
 7                        EASTON THOMSON KASPEREK SHIFFRIN, LLP,
                          By DONALD M. THOMPSON, ESQ.,
 8                        The Powers Building,
                          16 West Main Street, Suite 243,
 9                        Rochester, New York  14614,
                          (585) 423-8290,
10                        dmthompson@etksdefense.com,
                          Appearing for the Plaintiff.
11
                          HODGSON RUSS LLP,
12                        By HUGH M. RUSS, III, ESQ.,
                          hruss@hodgsonruss.com, and,
13                        PETER A. SAHASRABUDHE, ESQ.,
                          psarasa@hodgsonruss.com,
14                        The Guaranty Building,
                          140 Pearl Street, Suite 100,
15                        Buffalo, New York  14202,
                          (716) 856-4000,
16                        Appearing for the Defendants,
                          City of Buffalo, Detective
17                        Mark R. Stambach, Detective
                          Raniero Masecchia, Detective
18                        James P. Lonergan, Detective
                          John Vickerd, Chief Richard T.
19                        Donovan, and John Does, Unknown
                          Buffalo Police Department
20                        Supervisors.

21

22

23

24

25
```



```
 1

 2                         LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                           By ERIC M. SOEHNLEIN, ESQ.,
 3                         esoehnlein@lippes.com, and
                           JENNIFER C. PERSICO, ESQ.,
 4                         jpersico@lippes.com,
                           50 Fountain Plaza, Suite 1700,
 5                         Buffalo, New York  14202,
                           (716) 853-5100,
 6                         Appearing for the Defendants,
                           County of Erie and
 7                         Assistant District Attorney
                           Christopher Belling.
 8
      PRESENT:             PAMELA YATES RICHARDSON
 9                         TYLER Z. RAHNER, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                         LaMarr Scott
 2          THE REPORTER:  Are there any stipulations?
 3          MR. BRUSTIN:  No.
 4          THE REPORTER:  And is anyone supplied a copy
 5     of the transcript?
 6          MR. BRUSTIN:  Yeah.  We could -- could we
 7     deal with all that afterwards?  Is that okay?
 8          THE REPORTER:  Sure.
 9          THE VIDEOGRAPHER:  Okay.  This will begin
10     the video-recorded testimony of LaMarr Scott, taken
11     for a case to be tried in the United States
12     District Court, Western District of New York, to be
13     used in the matter of Valentino Dixon v. City of
14     Buffalo and County of Erie, et al.
15          This testimony is being taken at the offices
16     of Harrington & Mahoney, 70 Niagara Street,
17     Buffalo, New York, on March 14th, 2022, and is
18     commencing at the time of 10:02, as indicated on
19     the video screen.
20          The court reporter and notary public, who is
21     from the firm of Esquire Depositions Solutions, is
22     Danielle Fetzer.  My name is Tyler Rahner; I'm the
23     video technician, and I'm with the same firm.
24          Counsel for the plaintiff will now introduce
25     themselves, followed by counsel for the defendants,
```



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
5

```
 1                    LaMarr Scott
 2   the reporter will then swear in the witness.
 3          MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &
 4   Brustin, for the plaintiff, Valentino Dixon.
 5          MR. ROMO:  Gerardo Romo, plaintiff --
 6   attorney for the plaintiff, Valentino Dixon.
 7          MR. SOEHNLEIN:  Eric Soehnlein for Assistant
 8   District Attorney Belling and the County of Erie.
 9          MS. PERSICO:  Jennifer Persico for Assistant
10   District Attorney Christopher Belling and the
11   County of Erie.
12          MR. SAHASRABUDHE:  Peter Sahasrabudhe on
13   behalf of the City of Buffalo and all City-related
14   defendants.
15          MR. RUSS:  Hugh Russ from Hodgson Russ, and
16   I'm here with Peter to represent all the City
17   defendants.
18
19   LaMARR SCOTT, 160 Brinkman Avenue, Buffalo, New
20   York  14211, after being duly called and sworn,
21   testified as follows:
22                    EXAMINATION
23          BY MR. BRUSTIN:
24          Q.   Good morning, Mr. Scott.  We met off
25   the record.  My name -- my name is Nick Brustin.
```



```
 1                    LaMarr Scott
 2   I'm -- I'm one of Valentino Dixon's lawyers in this
 3   civil rights action against the City of Buffalo,
 4   the county, and certain individual defendant police
 5   officers and district attorneys who we allege
 6   committed civil rights violations against
 7   Mr. Dixon.
 8           As -- as we discussed off the record, you
 9   are only a witness in this case, although as I told
10   you an important witness, and we all -- I certainly
11   appreciate you being here today and answering --
12   answering questions pursuant to the subpoena.
13           You are testifying here pursuant to a
14   subpoena; is that correct, sir?
15           A.    Yes, it is.
16           Q.    All right.  Have you ever had your
17   deposition taken before?
18           A.    No, I don't think I -- no, I know I
19   haven't.
20           Q.    Okay.  So let me just tell you real
21   briefly what's going to happen today.  So I -- I
22   will be asking you a series of questions, you'll be
23   answering them under oath.
24           There's no judge here, but there is a court
25   reporter who will be taking down your answers.
```



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
7

```
 1                      LaMarr Scott
 2          You'll also hear from time to time lawyers
 3   making objections; that's just for the record.  You
 4   can always answer the question even though there's
 5   an objection.
 6          The other thing to remember is if you could
 7   please listen to the question, wait -- wait for me
 8   to ask it, wait for them to make objections before
 9   you answer it.
10          If you don't understand any part of my
11   question or all of it, please tell me and I'll
12   rephrase it for you.  If you do answer it, I'm
13   going to assume that you understood it; is that
14   fair?
15          A.   Fair.
16          Q.   Also, any time you want to take a
17   break, please tell me.  The only thing I would ask
18   is that you answer the question pending before
19   taking a break.  Okay?
20          THE REPORTER:  And I'm sorry, is that a yes?
21          THE WITNESS:  Yes, it is.  Yes.
22          BY MR. BRUSTIN:
23          Q.   Yeah.  The other thing is that the
24   court reporter can't take down nods --
25          A.   Right.
```



```
 1                       LaMarr Scott

 2          Q.    -- you just have to answer verbally.

 3          Okay.  So let me start with just a few -- a

 4   few background questions.  You currently live here

 5   in Buffalo; is that right, sir?

 6          A.    Yes, I do.

 7          Q.    And how old are you, sir?

 8          A.    49.

 9          Q.    Okay.  And are you currently employed?

10          A.    Yes, I am.

11          Q.    What kind of work are you doing?

12          A.    Custodian at Community Health Center in

13   Buffalo on Benwood.

14          Q.    Okay.  And how long have you -- have

15   you done that work?

16          A.    I've done it for the last several

17   months.  It's part-time.

18          Q.    Okay.  And were you born in Buffalo?

19          A.    Yes, I was.

20          Q.    And what part of -- where were you

21   raised?

22          A.    I was raised in the foster system on

23   the East Side of Buffalo.

24          Q.    Okay.  And could you just give me a

25   real brief rundown of your educational background?
```



```
 1                    LaMarr Scott
 2   Just high school I think is fine.
 3          A.    GED.
 4          Q.    Okay.  And any -- any higher
 5   education --
 6          A.    No.
 7          Q.    -- after that?
 8          A.    No.
 9          Q.    Okay.
10          A.    None documented.
11          Q.    All right.  Where did you go to high
12   school?
13          A.    Riverside.
14          Q.    All right.  I understand you were also
15   a ball player there?
16          A.    Yes, I played football and basketball.
17          Q.    Okay.  Did -- did you consider playing
18   in college?
19          A.    Alfred State, but I went to prison.
20          Q.    But that had been something you were
21   thinking about?
22          A.    Well, I was going to go, but I went to
23   prison.
24          Q.    For football?
25          A.    Yeah.
```



```
 1                    LaMarr Scott

 2      Q.    What'd you play?

 3      A.    Defensive end.

 4      Q.    And I'm sorry, could you -- your date

 5  of birth is 9/19/72; is that right?

 6      A.    Yes, it is.

 7      Q.    Okay.  And could you just tell me in --

 8  you mentioned you were a defensive end being

 9  recruited -- you were being recruited to play

10  defensive end?

11      A.    Yes.

12      Q.    You were a big guy?

13      A.    Yes, I was.

14      Q.    All right.  What was your height and

15  weight in -- in 2000 -- I'm sorry -- in 1991?

16      A.    6',1".  Maybe 185, 190.

17      Q.    I thought you were a little bigger than

18  that.  Are you sure you weren't --

19      A.    Yeah, maybe --

20      Q.    Maybe 210?

21      A.    -- maybe 2, 205 --

22      MR. SOEHNLEIN:  Objection.

23      THE WITNESS:  -- something similar to that.

24      BY MR. BRUSTIN:

25      Q.    Okay.  But -- but you were a big guy;
```



```
 1                    LaMarr Scott

 2   fair to say?

 3         A.    Yeah.

 4         Q.    And back then, Valentino Dixon was a

 5   very small guy; is that fair to say?  Skinny?

 6         A.    Well, he was slim.

 7         Q.    Probably 150, 160, something like that?

 8         A.    I'm not sure.  Maybe.  A possibility.

 9         Q.    But slim?

10         A.    Yes.

11         Q.    Back in 1991, nobody would ever mistake

12   you for Valentino Dixon --

13         MR. SOEHNLEIN:  Form.

14         BY MR. BRUSTIN:

15         Q.    -- in terms of size --

16         MR. RUSS:  Object to the form.

17         BY MR. BRUSTIN:

18         Q.    -- would that be fair to say?

19         A.    No, they wouldn't.  They wouldn't do it

20   now.  We're totally two -- we're totally different

21   people.

22         Q.    Okay.  And you're a much bigger man?

23         A.    Yes.

24         Q.    Now, I want to try to make this as

25   simple for you as you can -- as I can.  I
```



```
 1                      LaMarr Scott
 2   understand you have concerns, and I recognize those
 3   and I want to try to be cognizant of them.
 4         So let me show you -- and we'll mark this as
 5   Plaintiff's Exhibit 1.
 6         MS. PERSICO:  Is that premarked?
 7         MR. BRUSTIN:  Nope.
 8         MS. PERSICO:  Do you have a copy?
 9         MR. BRUSTIN:  We have two copies, one for
10   each group.
11         Here you go, guys.
12         BY MR. BRUSTIN:
13         Q.   I'm sorry.  Did I give you the right
14   one?  Can I have that back, please, just for a
15   second?  I may have given you the wrong document.
16         Nope, that was right.
17   The following was marked for Identification:
18    PLF.'S EXH. 1        plea from 2018
19         BY MR. BRUSTIN:
20         Q.   I'm showing you what's been marked for
21   identification, Mr. Scott, as Plaintiff's
22   Exhibit 1.  And I'll represent to you that this is
23   the plea that you gave in connection with the
24   Jackson homicide in 2018.  Okay?
25         Do you recall ever receiving a copy of this
```



```
 1                      LaMarr Scott
 2  before, sir?
 3        A.   No, I haven't.
 4        Q.   All right.  Why don't you take a minute
 5  and just make sure that you recognize this as the
 6  plea that you gave on -- on that date.  Look long
 7  enough so you can tell me that, please, sir.
 8        MR. BRUSTIN:  And I just would -- if you
 9  don't mind, sir, I just want to state for the
10  record what -- your name, ma'am, is?
11        MS. YATES RICHARDSON:  Pamela Yates
12  Richardson.
13        MR. BRUSTIN:  Pamela Yates Richardson.  And
14  your relationship -- just so we can have it on the
15  record, your relationship to Mr. Scott?
16        MS. YATES RICHARDSON:  Mr. Scott is a good
17  friend of mine.  I am the one who kept him from the
18  police killing him back in '77.
19        And you want to know something else?
20  Valentino Dixon is my great-niece's father.
21        MR. BRUSTIN:  Okay.  Okay.  Just wanted to
22  get that -- get that on the record.  Thank you.
23  Thank you, ma'am.
24        MS. YATES RICHARDSON:  You're welcome.
25        THE WITNESS:  Okay.
```



```
 1                          LaMarr Scott

 2          BY MR. BRUSTIN:

 3          Q.    Is this in fact the plea that you gave?

 4          A.    Yes.

 5          Q.    Okay.  And is this an accurate account

 6     that you gave here of what transpired on

 7     August 10th of 1991?

 8          A.    Yes.

 9          Q.    Okay.  And could you just briefly

10     describe what happened between you and Mr. Jackson

11     on that night?

12          I don't need you to give me the whole -- the

13     whole rundown, but the actual shooting itself, sir.

14          A.    Well, the beef wasn't with me, the beef

15     was with Valentino Dixon and his -- his brothers.

16     Basically to alleviate any intricate -- any

17     intricate details, Torriano Jackson and his family,

18     you know, they pulled up in a yellow Dodge Shadow,

19     I think it was, and they commenced to fight with

20     Mario Jarmon and shots were fired.

21          Unfortunately, Torriano Jackson ended up

22     dying because I was supplied a weapon by Valentino,

23     and shot Torri, Mario Jarmon in the process of that

24     and, you know, destroyed some lives.  So that's the

25     basic synopsis of it.
```



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
15

```
 1                      LaMarr Scott
 2        Q.   All right.  Well, let me ask you some
 3   more specific questions.  My understanding, sir,
 4   and you correct me if I'm wrong, is that Mr. Dixon
 5   had brought a -- the TEC-9 to Mr. Jarmon's house,
 6   and then you took it from the house and that is
 7   when you ended up tragically killing Mr. Jackson;
 8   is that correct?
 9        MR. RUSS:  Object --
10        THE WITNESS:  Yes.
11        MR. SOEHNLEIN:  Form.
12        MR. RUSS:  -- to the form.
13        THE REPORTER:  And just real quick:  Can we
14   do an objection by one is an objection by all?
15        MR. RUSS:  That's fine with me.
16        MR. SOEHNLEIN:  Yeah, that makes sense.
17        THE WITNESS:  No, that's incorrect.  He
18   brought the gun to me personally --
19        BY MR. BRUSTIN:
20        Q.   Okay.
21        A.   -- on Goodyear Street and we drove --
22        Q.   Okay.
23        A.   -- from Goodyear to Delevan to
24   Mario's --
25        Q.   Okay.
```



LAMARR SCOTT                                               March 14, 2022
DIXON V. CITY OF BUFFALO                                                16

```
 1                        LaMarr Scott
 2        A.     -- home.
 3        Q.     Okay.  And then just before the
 4   shooting, where was the gun?
 5        A.     The gun was up under the seat of the --
 6   the bus stop.
 7        Q.     Okay.  Is that where you placed the
 8   gun?
 9        A.     Yes.
10        Q.     Okay.  And where -- so you -- you --
11   you had gotten the gun sometime earlier from
12   Mr. Dixon; is that your recollection?
13        A.     Well, it was maybe 45 minutes earlier.
14        Q.     Okay.  And then you had it under your
15   seat?
16        A.     I had -- no, I didn't have it under my
17   seat.  It was on the floor of the car.
18        Q.     Okay.  And just before the shooting,
19   could you describe what happened starting with --
20   starting with when you retrieved the weapon?
21        A.     I retrieved the weapon.  I didn't touch
22   the weapon until -- until we got to Mario Jarmon's
23   house and it was still in the big.
24        Mr. Dixon told me that in order to keep the
25   gun on safety, which is the S on the gun, and the F
```



```
 1                      LaMarr Scott

 2   means to fire.  So he says, well, you click the

 3   button back, and that'll be fire, and the S is

 4   safety.

 5          Later on I would find out that the F means

 6   fully automatic; the S means semiautomatic.  I

 7   didn't find that out until we reached the plea

 8   agreement and that was explained to me.

 9          Q.   In other words, you didn't -- you

10   didn't understand that you -- that when you were

11   firing the gun it was on automatic?

12          A.   Yes, I had no clue of that.  I was only

13   going on what he told me.

14          Q.   Okay.  But you did intentionally fire

15   the weapon?

16          A.   Yes, I intentionally fired.  Yes, I

17   did.

18          Q.   Okay.  Could you describe what happened

19   from the time that you -- you picked up the weapon

20   just before the shooting and through the shooting,

21   can you just give us your -- your best description,

22   sir?

23          A.   Well, I really don't -- I don't

24   remember all of it, man.  The only thing is it's a

25   blur.  The only thing I can remember is getting
```



LAMARR SCOTT                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                      18

```
 1                    LaMarr Scott
 2    over there, getting to his -- getting to Mario's
 3    home and, you know, going to the store to get some
 4    beers, and then the shooting happened.
 5         Q.   Okay.  But as you pled to, at
 6    approximately 1:15 a.m., you used the weapon in an
 7    automatic mode and you shot Torriano Jackson; is
 8    that correct?
 9         A.   Yes.
10         Q.   And you also shot Aaron Jackson and
11    John Sullivan?
12         A.   Yes.
13         Q.   And at the time that you shot
14    Torriano Jackson, did you see Torriano Jackson with
15    a weapon?
16         A.   I didn't see -- I didn't see Torri with
17    the weapon after he got shot, but I did see him
18    with a weapon prior to that because he was shooting
19    Mario.
20         Q.   Okay.  So you did see Torri Jackson
21    shoot Mario Joiner?
22         A.   Yeah, Mario --
23         (Objections to the form.)
24    BY MR. BRUSTIN:
25         Q.   Mario Jarmon.
```



```
 1                    LaMarr Scott
 2        A.    -- Jarmon, yeah.
 3        Q.    I'm sorry.  I apologize.
 4        A.    Yeah.
 5        Q.    And what kind of weapon did Torri have?
 6        A.    I don't know.  I don't know.  It was --
 7   it was a handgun.  I'm not sure what kind it was.
 8        Q.    Okay.  And what kind of weapon did you
 9   have?
10        A.    A TEC-9, semi -- a TEC-9 machine gun.
11   I guess that's what it's called.
12        Q.    And as you had acknowledged both in
13   your plea and other places, Valentino Dixon did not
14   fire any weapons that night; is that correct?
15        A.    No, he didn't.
16        Q.    And my understanding, sir, is that the
17   reason that you pled guilty to this crime in 2018
18   and the reason why -- well, let's start with the
19   reason why you pled guilty in 2018.
20        My understanding is that as a man with a
21   strong spiritual connection, at that time you
22   recognized that you could not continue to allow an
23   innocent man to be in prison; is that correct?
24        (Objections to the form.)
25        THE WITNESS:  At that time and this time.
```



```
 1                    LaMarr Scott
 2       BY MR. BRUSTIN:
 3       Q.   Okay.  So why don't you --
 4       A.   That's -- that's not something that I
 5  felt momentarily.  It's something I've always felt.
 6       Q.   Well, let's -- let me -- I don't mean
 7  to put words in your mouth.  Why don't you explain
 8  to me -- and let's start with the reasons why you
 9  pled -- why -- the reasons why you began --
10  beginning the day after the crime, why you have
11  taken responsibility for this crime.  Can you tell
12  us why?
13       A.   Because he didn't do it.
14       Q.   Okay.
15       A.   You know, Valentino Dixon, he was a --
16  he was a drug dealer and, you know, a conniving
17  person in some aspects now that I see as an adult,
18  but we were all doing those things and we were
19  children, but he didn't take a human being's life.
20       He gave me the weapon to do so, but he
21  didn't take another man's life.  I did that.  So
22  the responsibility was on me.
23       Q.   Okay.  And you're not suggesting
24  that -- you're not suggesting that Valentino Dixon
25  directed you to kill anybody, only that he gave you
```



LAMARR SCOTT                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                      21

1                    LaMarr Scott

2    the weapon, correct?

3         A.   I'm not suggesting or not suggesting.

4    I'm just -- you know, I'm saying that he gave me a

5    weapon and the weapon was used unfortunately to

6    take a human being's life.

7         Q.   Okay.  And you mentioned -- okay.  And

8    the reason -- can you tell us any additional

9    reasons why you pled guilty in 2018?

10        (Objections to the form.)

11        THE WITNESS:  Why would there be additional

12   reasons?  I just gave you the reasons that I

13   told -- I told you here that, you know, as a man of

14   God, you have to take responsibility for your

15   actions.

16        And he was an innocent man in that

17   particular aspect.  You know, he wasn't innocent of

18   the crime itself, but he was innocent in that

19   particular aspect.

20        So anybody shouldn't allow an individual to

21   be punished for something that they didn't do in

22   that aspect.  So ...

23        BY MR. BRUSTIN:

24        Q.   Now, you understood, sir, that -- you

25   said -- you mentioned that you are on parole; is



```
 1                    LaMarr Scott
 2   that right?
 3        A.    Yes, I am.
 4        Q.    And is it your understanding that given
 5   the murder conviction that you pled guilty to in
 6   2018, how does that affect your parole, to your
 7   knowledge?
 8        (Objections to the form.)
 9        THE WITNESS:  It affects it in the sense
10   that I -- I still have 20 years left on parole, and
11   if I sneeze wrong, there's a strong possibility
12   that that could be violated because it's a violent
13   crime.
14        BY MR. BRUSTIN:
15        Q.    And that's as a result of your pleading
16   guilty to the murder of Torri Jackson?
17        A.    Yes.
18        Q.    And you knew that when you pled guilty;
19   is that correct, sir?
20        A.    I was aware of it, yes.
21        Q.    Okay.  But you did it, nonetheless,
22   because it was the right thing to do?
23        (Objections to the form.)
24        BY MR. BRUSTIN:
25        Q.    You tell me.  Why did you do it,
```



```
 1                    LaMarr Scott
 2  nonetheless, knowing that you could face these
 3  additional restrictions on parole, why did you
 4  still choose to plead guilty?
 5          (Objections to the form.)
 6          THE WITNESS:  Because an individual is not
 7  responsible -- you know, I understand that you're a
 8  lawyer and you have to ask these questions, but one
 9  thing I want you all to understand is, is that when
10  a man is innocent of a crime -- if he's innocent of
11  a particular crime and someone can -- that's
12  responsible for it, you have to stand up and say,
13  I'm -- I'm responsible for this.
14          You can't allow another human being to
15  continue to be punished for something that they
16  didn't do, no matter how you feel about them
17  personally, no matter what they've done in their
18  past personally.  If you have the opportunity to do
19  so, do so.  It relieves you spiritually of the
20  burden.
21          BY MR. BRUSTIN:
22          Q.   All right.  Now, take a look at page 12
23  of the plea here if you -- if you don't mind, sir.
24          MR. RUSS:  Exhibit 1.
25          MS. PERSICO:  Sorry --
```



```
 1                      LaMarr Scott

 2          MR. BRUSTIN:  Exhibit 1.

 3          MS. PERSICO:  -- did we mark this?

 4          MR. BRUSTIN:  We did.  Plaintiff's 1.

 5          BY MR. BRUSTIN:

 6          Q.    Now, take a look at -- at page 12, and

 7   if you could read to yourself lines 10 to line 17.

 8          A.    Okay.

 9          Q.    And are 10 -- are 10 -- are lines 10

10   through 17 an accurate description of what happened

11   the night of August 10th, 1991?

12          A.    Yes.

13          Q.    Okay.  And sometime earlier in the day,

14   Valentino had brought -- had brought the gun?

15          A.    Yes.

16          Q.    All right.  And my understanding from

17   looking -- you've also spoken to other sources, as

18   you told us before the deposition, about what

19   happened and your role in it?  You've been open and

20   honest about that over the years, correct?

21          A.    Yes.

22          Q.    And my understanding, and you tell me

23   if I'm wrong, is that you retrieved the gun at some

24   point earlier after Valentino brought it to the

25   house from a -- from a gym bag; is that correct?
```



```
 1                        LaMarr Scott
 2            (Objections to the form.)
 3            THE WITNESS:  No, it wasn't a gym bag.  It
 4    was a United Men's clothing store bag --
 5            BY MR. BRUSTIN:
 6            Q.   Okay.
 7            A.   -- plastic bag.
 8            Q.   Okay.  And that's when you brought the
 9    weapon and you put it under the bus stop -- it was
10    under the bus stop -- was it in the bag under
11    the -- under the bus stop --
12            A.   Yes.
13            Q.   -- bench?
14            A.   It was in the bag, yes.
15            Q.   Okay.
16            (Objections to the form.)
17            BY MR. BRUSTIN:
18            Q.   All right.  And another thing I noticed
19    from another statement that you had made was that
20    although Mr. Dixon had brought the gun, you made
21    the decision to go and retrieve the gun based on
22    threats that you had heard; is that fair --
23            (Objections to the form.)
24            BY MR. BRUSTIN:
25            Q.   -- to say, sir?
```



```
 1                      LaMarr Scott
 2        A.   No, I don't think that -- I don't think
 3   that's fair.  I don't think that's fair.  You know,
 4   no, I don't think that's even a fair question to
 5   ask me.
 6        Q.   Okay.
 7        A.   I don't think that's a fair question to
 8   ask.
 9        Q.   But the only people at the scene that
10   you observed that night with -- with weapons at the
11   time of the shooting were you and Torri Jackson; is
12   that correct, sir?
13        (Objections to the form.)
14        THE WITNESS:  I don't -- I don't know if
15   that's correct or not because I'm not sure who had
16   guns or not.  I know that I had one, I know that
17   Torri had one.  Anybody else, I don't -- I can't --
18   I can't answer that question for you.  I don't
19   know.
20        BY MR. BRUSTIN:
21        Q.   Those are the only guns that you saw
22   that evening?
23        A.   I really can't -- I really don't know.
24        Q.   Okay.
25        A.   It -- it seems as though you want to
```



```
 1                    LaMarr Scott
 2   retry the case again.
 3        Q.   We're not.  We're not.  Well, to
 4   some -- to some degree --
 5        A.   Because -- because the questions you're
 6   asking me -- you're asking me questions that we
 7   already took a plea agreement to, and you're asking
 8   me about the particular situation and you're saying
 9   nothing about what his -- what his accusations is
10   for.  This is -- this is --
11        Q.   I'm going to get to that very quickly.
12   I'm almost done with this part, I really am.
13        A.   All right.  Because I don't -- I
14   don't -- I don't feel that this is even necessary
15   for you to be asking me about this.  This has, you
16   know --
17        Q.   I need to get the basics.  I really do.
18        Okay.  Could you just tell us a little bit
19   about -- can you just -- and like I said, I'm
20   almost done with this part of it.
21        What was -- to your knowledge, what was
22   Torri Jackson's reputation and Aaron Jackson's
23   reputation at the time of the shooting?
24        (Objections to the form.)
25        THE WITNESS:  I don't -- I don't know about
```



```
 1                    LaMarr Scott
 2   their -- their reputations.  We was just -- just
 3   kids.
 4          BY MR. BRUSTIN:
 5          Q.   What did you -- what did you know of
 6   them?
 7          A.   We all went to school together.
 8          (Objections to the form.)
 9          THE WITNESS:  I knew Aaron from Riverside
10   High School.  Troubled kid just like me.
11          BY MR. BRUSTIN:
12          Q.   Okay.  And did you have an
13   understanding as to the altercation between Mario
14   and Antoine and Torri earlier in the day?
15          A.   Do I have -- did I have a what?
16          Q.   Did you have an understanding as to
17   the -- the altercation they had earlier in the day?
18          A.   I don't know what you mean by
19   understanding.
20          Q.   Did -- did you know what had happened?
21   Did you heard what had happened?
22          A.   No.  I don't.
23          Q.   What were you wearing at the time of
24   the shooting, sir?
25          A.   I remember a baseball cap with some
```



                       LaMarr Scott

1

2    shorts.

3         Q.   Okay.  Do you remember the cap being

4    white?

5         A.   No, I don't remember the specific

6    colors.

7         Q.   Fair enough.  Certainly your memory

8    would have been much better back -- back at the

9    time of what you were wearing --

10        A.   Of course --

11        Q.   -- fair to say?

12        A.   -- it was.  Of course it was.  It

13   happened -- it was right away.

14        Q.   Okay.  So I now want to get to the

15   heart of this, which is your interaction with the

16   police.

17        And I want to start with your going to the

18   television cameras and confessing to the crime on

19   the 11th.  Okay?

20        So, first of all, can you tell me how you

21   came to confess to this crime on television?

22        A.   What do you mean?  How I came -- I

23   don't understand.

24        Q.   How did you decide to do that?

25        A.   It was a decision that I made so I



LAMARR SCOTT                                    March 14, 2022
DIXON V. CITY OF BUFFALO                                    30

```
 1                    LaMarr Scott
 2   called the Channel 4, Wanda Starkeson, turned
 3   myself in.
 4          Q.    Okay.  Did -- did anybody force you to
 5   do that?
 6          A.    No, nobody forced me to.  Nobody forced
 7   me to.
 8          Q.    Did anybody offer you anything for
 9   doing that?
10          A.    Nobody offered me anything.
11          Q.    Why did you -- why did you decide to do
12   that at that time, sir?
13          A.    Because it was important to do so.  I
14   mean, you know, more of a protective thing than
15   anything else.  I was a child --
16          Q.    Okay.
17          A.    -- you know.
18          Q.    You mentioned it was a protective
19   thing.  Did you have concerns about going to the
20   police before making your statement public?
21          A.    Well, being in the system and being
22   abused on a consistent basis by authority figures,
23   there's an ingrained fear of authority figures.
24          So regardless of whether it's a police
25   officer or a judge, it's still an authority figure.
```



1                    LaMarr Scott

2    There's a fear there.

3         Q.   Okay.  And so I think I understand.  It

4    sounds like what you did was you went -- you went

5    first to confess on television as a matter of

6    protecting yourself; is that fair to say, sir?

7         A.   Yes, it is.

8         (Objections to the form.)

9         BY MR. BRUSTIN:

10        Q.   Were you concerned when you went on

11   television as to what the police would do to you if

12   in fact you went and confessed to them first?

13        A.   No, I -- I really don't remember if I

14   was concerned in that aspect.  The only thing I

15   knew was that it was best to turn myself in and,

16   you know, hopefully Mr. Dixon didn't go to jail for

17   it, but unfortunately these things happen.

18        Q.   Okay.  And I think I've already -- I've

19   already asked you this, but I just want to make it

20   crystal clear.

21        Did anybody offer you anything for coming

22   forward at that time --

23        A.   You just asked me that two minutes ago.

24        (Objections to the form.)

25        BY MR. BRUSTIN:



```
 1                        LaMarr Scott
 2        Q.   Okay.  All right.  I want to ask you
 3   some questions about your interactions with the
 4   police, but first I want to mark as an exhibit --
 5   and we've -- we sent this to you guys so we don't
 6   have extra copies.
 7        MR. BRUSTIN:  We'll mark this as Plaintiff's
 8   Exhibit 2.
 9        MS. PERSICO:  What is it?
10        MR. RUSS:  Do you want to say what it is?
11        MR. BRUSTIN:  I'm going to do that.  You
12   want to wait?  You think I forgot?
13        Plaintiff's Exhibit 2 is a compilation
14   exhibit of the police file that we've marked, and
15   it's Bates Stamped pages 1 through 303.
16        BY MR. BRUSTIN:
17        Q.   I'll put that in front of you, sir.
18        MR. BRUSTIN:  Where's my copy?
19        Can I have that back for just a minute,
20   please?  Let me give him the other copy.  Yeah, let
21   me give you this copy.
22        Let's mark this, please, as Plaintiff's 2.
23   The following was marked for Identification:
24    PLF.'S EXH. 2        black binder of police file
25        BY MR. BRUSTIN:
```



```
 1                    LaMarr Scott
 2        Q.   All right.  Take a look -- so I'm going
 3   to have you refer to the -- the Bates stamped
 4   pages, and they're on the bottom in the middle, the
 5   BPD numbers.
 6        Take a look at page -- let's start with
 7   page 198.  Actually, let's start with page 196.
 8   That's the beginning of the statement, actually.
 9        MS. PERSICO:  Can you give us all a second
10   to catch up since you didn't --
11        MR. BRUSTIN:  I can.
12        MS. PERSICO:  -- give us copies.
13        MR. BRUSTIN:  I sent you copies.
14        MS. PERSICO:  Well, we're downloading them
15   now.  Didn't anticipate the need to do that.
16   So ...
17        MR. BRUSTIN:  I came from New York so I
18   wasn't going to carry -- that's why I sent them to
19   you.
20        MR. RUSS:  Well, you've got to give us a
21   chance to pull them up.
22        MR. BRUSTIN:  Okay.
23        MR. RUSS:  That's all.
24        MR. BRUSTIN:  You want to take five minutes?
25        MS. PERSICO:  No.
```



1                        LaMarr Scott

2            MR. RUSS:  No.

3            MR. SOEHNLEIN:  It's going to take

4    30 seconds.

5            MS. PERSICO:  Right.

6            MR. SOEHNLEIN:  Just relax.

7            MS. PERSICO:  What page number are you

8    looking at?

9            MR. BRUSTIN:  196.  I'm going by the Bates

10   Stamps in the bottom, BPD Bates Stamps that we

11   made.

12           MS. PERSICO:  Okay.  There's no plug.

13           MR. SAHASRABUDHE:  There's no plugs at all?

14           MS. PERSICO:  Well, there's, like, one over

15   there by that.

16           THE REPORTER:  Do you want to go off the

17   record?

18           MS. PERSICO:  Just for a second.

19           MR. BRUSTIN:  Yeah.  So I've got to --

20           THE VIDEOGRAPHER:  Going off the record.

21   Time is 10:32.

22           (Off the record at 10:32 a.m.)

23           THE VIDEOGRAPHER:  We're going back on the

24   record.  Time is 10:36.

25           BY MR. BRUSTIN:



```
 1                     LaMarr Scott
 2        Q.   Okay.  Mr. Scott, if you could take a
 3  look at -- beginning on page 196.  And this is a
 4  statement that was allegedly taken from -- from you
 5  August 12th, 1991.  There's no time here.
 6        A couple of questions I want to ask you
 7  about it, though, and then I want to ask you some
 8  more questions about your interactions with the
 9  police.
10        First of all, do you remember a detective
11  named Mark Stambach?
12        A.   Vaguely.
13        Q.   Do you remember him -- do you remember
14  him being the detective that you were primarily
15  interacting with when you were being interviewed
16  back in 1991?
17        (Objections to the form.)
18        THE WITNESS:  I didn't -- I didn't know that
19  the -- his name.  I remember the name Stalbach, but
20  I didn't -- I didn't --
21        BY MR. BRUSTIN:
22        Q.   Okay.
23        A.   -- remember who he was.
24        BY MR. BRUSTIN:
25        Q.   Okay.  Do you remember him taking a
```



```
 1                    LaMarr Scott
 2   statement from you?
 3        A.    I remember there was a statement taken.
 4        Q.    Okay.  I'm going to ask you some
 5   questions about some statements you made and some
 6   offers that you made at that time, and then some
 7   statements you made since -- since that time about
 8   your interactions with the police.  Okay?
 9        A.    Mm-hmm.
10        Q.    So, first of all, what was the police
11   reaction when you told them that you had -- that
12   you had in fact committed this crime, that you were
13   the shooter?
14        (Objections to the form.)
15        THE WITNESS:  I don't -- I don't remember
16   their reaction.  They just -- you know, sit down,
17   that's it.
18        BY MR. BRUSTIN:
19        Q.    Okay.  Well, for example, do you
20   recall -- you do recall being interviewed by
21   investigators for the district attorney's office in
22   2018, correct?
23        (Objections to the form.)
24        THE WITNESS:  Yes.
25        BY MR. BRUSTIN:
```



```
 1                          LaMarr Scott
 2           Q.    All right.  And one of the things that
 3      you told them is that the detectives, and
 4      Mr. Stambach in particular, told you that they
 5      had -- they had their guy and it wasn't you; do you
 6      recall that?
 7           A.    Yes, I recall that.
 8           Q.    Okay.  You recall Detective Stambach
 9      telling you that, correct?
10           A.    I remember there was a detective that
11      said that.  I don't know if he was Stalbach or
12      Stalbach.  I don't -- I don't know the guy's name
13      particularly.
14           Q.    Okay.  But it was the guy who did
15      the inter -- the interview with you, correct?
16           A.    Yes.  But, again, how does -- how does
17      the police officer's actions with me have to do
18      with his accusations with the -- you know,
19      the harassment with him?  That -- I don't -- I want
20      you to explain that to me.
21           Q.    Sure.  So any type of misconduct with
22      you, whether it's coercion or -- or failing to
23      disclose information that you provided to them is
24      information that Mr. Dixon also had a right to
25      receive and has a -- has that right to use now in
```



```
 1                    LaMarr Scott
 2  alleging that Stambach engaged in widespread
 3  misconduct in this case, not just with him, but
 4  with you and with others.
 5       A.   But I'm not -- I'm not --
 6       MR. RUSS:   Just note I disagree with that
 7  characterization of the law.
 8       THE WITNESS:   I'm not -- I'm not -- I'm not
 9  suing anybody.  I don't have any suit.
10       BY MR. BRUSTIN:
11       Q.   I understand, sir.
12       A.   But it's his right.
13       Q.   Right.  But you have an obligation to
14  answer these questions honestly like you've always
15  done in the past for all the right reasons and I --
16  and I have to ask them of you.  Okay?  And I
17  apologize for that, but I have to.
18       A.   You don't have to apologize, man.
19  You're here to represent Mr. Dixon.
20       Q.   Okay.  So in addition to -- did you in
21  fact offer to take a polygraph test?
22       A.   Years ago, yes, I did.
23       Q.   Okay.  When you --
24       A.   Stress test and a polygraph test.
25       Q.   Okay.  And you did that that first
```



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
39

```
1                      LaMarr Scott
2    night when you came in, correct?
3         A.   Yes.
4         Q.   And did you also offer to give them the
5    clothing that you had on the night of the shooting?
6         A.   Yes, I did.
7         Q.   Okay.  And did you in fact tell them
8    that you believe there might even be blood from the
9    shooting on your shoes?
10        A.   There was blood on my shoes.
11        Q.   Okay.  And when you told the police
12   officers that night that you were willing to give
13   them your shoes with blood on them, what did they
14   say to you, sir?
15        A.   I don't remember exactly what was said
16   to me.  I just know that nobody ever took anything
17   that I offered.
18        Q.   Now, do you recall also telling the
19   district attorney and being told by Stambach and
20   other detectives that until you and Leonard Brown
21   get your statements together, you had to -- you had
22   to leave?
23        (Objections to the form.)
24        THE WITNESS:  I remember they were talking
25   to Leonard pertaining to a statement and -- but I
```



```
 1                     LaMarr Scott
 2   don't remember them telling me to -- that we have
 3   to leave until we get it together.
 4         I know that Leonard said something out the
 5   way.  So, you know, I was just happy to be up out
 6   of there.
 7         BY MR. BRUSTIN:
 8         Q.   Okay.  But the police officers made it
 9   clear to you they didn't believe your story,
10   correct?
11         A.   Yes.
12         (Objections to the form.)
13         BY MR. BRUSTIN:
14         Q.   And they also made it clear to you --
15   well, they certainly didn't take you up on your
16   offer to give them -- to take your clothes with
17   blood on them, correct?
18         A.   No, they didn't take me up on them.
19         Q.   And do you remember telling others --
20   withdrawn.
21         Do you recall one of the things that
22   Stambach said to you was, "well, we got who we
23   want"?
24         (Objections to the form.)
25         THE WITNESS:  I don't -- again, I don't
```



```
1                         LaMarr Scott
2    remember Stalbach.  I wouldn't -- he could be
3    sitting here now and I wouldn't know what he looked
4    like.
5         BY MR. BRUSTIN:
6         Q.   I'm sorry.  Do you remember the
7    detective who you spoke to telling you we've got
8    who you want -- "we've got who we want"?
9         (Objections to the form.)
10        THE WITNESS:  No, I don't remember.
11        BY MR. BRUSTIN:
12        Q.   Now, one of the things -- one of the
13   things that -- withdrawn.
14        At the grand jury, you ended up testifying
15   that Valentino Dixon was the shooter, correct?
16        A.   I don't remember anything about a grand
17   jury.
18        Q.   Sir, you do remember that you -- you
19   ultimately went to -- you ultimately did state,
20   after you confessed, you did state under oath that
21   Valentino Dixon was the shooter, correct?
22        A.   I don't remember.
23        (Objections to the form.)
24        MR. SOEHNLEIN:  I'm sorry.  I didn't get his
25   answer on that one.
```

