1                        LaMarr Scott

2          THE WITNESS:  I don't remember.  I don't

3     remember any of it.

4          MR. SOEHNLEIN:  Thank you.

5          BY MR. BRUSTIN:

6          Q.    Okay.  You have no recollection today

7     of doing that?

8          A.    No, I don't have a recollection of

9     that.

10         Q.    Okay.  Well, let's try it this way:

11    One of the things you told the DA investigators --

12         A.    Right.

13         Q.    -- in 2018 was that the detectives who

14    were interviewing you told you to say that

15    Valentino's father forced you to come in, correct?

16         A.    No, I don't --

17         (Objections to the form.)

18         THE WITNESS:  I don't remember that, either.

19         BY MR. BRUSTIN:

20         Q.    Okay.  Let's do this ...

21         MR. BRUSTIN:  Can you give me that other

22    binder?  So take out the 8/15 reinvestigation part

23    one, 8/15/18, 22.

24         MR. SOEHNLEIN:  For those of us playing at

25    home, what -- what is that?



```
 1                    LaMarr Scott
 2         MR. BRUSTIN:  Do they have a copy of this
 3  yet?  Why don't you e-mail this to them.
 4         MS. PERSICO:  Can you tell us what it is?
 5         MR. BRUSTIN:  Yeah.  So this is an interview
 6  with -- from 8/15/18 with Joe Riga, Sara Dee, David
 7  Heraty, and Mr. Scott.
 8         MS. PERSICO:  Is it -- is it the video?
 9         MR. BRUSTIN:  It may be the -- it's a
10  transcription of the video, I believe.
11         MR. SOEHNLEIN:  Okay.
12         MS. PERSICO:  Who -- who transcribed it?
13  Have you given it to us?
14         MR. BRUSTIN:  I don't know yet.  You haven't
15  requested anything, so probably not.
16         MS. PERSICO:  Well --
17         MR. BRUSTIN:  So we're giving it to you now.
18         MS. PERSICO:  Did you create that document?
19         MR. ROMO:  We --
20         MR. BRUSTIN:  We transcribed it, but you
21  have -- you have the video.
22         MS. PERSICO:  Well, how are we supposed to
23  verify that that's what the video says?
24         MR. BRUSTIN:  Well, you can do it afterward,
25  and if -- if --
```



```
 1                    LaMarr Scott

 2          MS. PERSICO:  Well --

 3          MR. BRUSTIN:  If it's not, then I did on my

 4   own peril.

 5          MS. PERSICO:  I'm not sure that I'm willing

 6   to take that chance.

 7          MR. BRUSTIN:  Well, I don't think you have

 8   any choice, but let's go ahead and e-mail it.

 9          MS. PERSICO:  We note our objection to the

10   use of this exhibit given that we have never seen

11   it and we don't know where it came from or who made

12   it.

13          MR. BRUSTIN:  Okay.  So let's mark this as

14   Plaintiff's 3.

15          THE REPORTER:  Do you want a sticker on it?

16          MR. BRUSTIN:  Yes, please.

17   The following was marked for Identification:

18    PLF.'S EXH. 3      transcript of video

19          MS. PERSICO:  Can you wait until we get it

20   and --

21          MR. BRUSTIN:  I will.  Of course.

22          MR. SAHASRABUDHE:  Gerardo --

23          MR. ROMO:  Yeah?

24          MR. SAHASRABUDHE:  -- can you please send

25   that to not my Hodgson Russ e-mail address but
```



```
 1                      LaMarr Scott
 2    B-U-D-H-E, zero-five, at Gmail.  I can write it
 3    down for you.
 4            MR. ROMO:  Yeah.
 5            MR. SAHASRABUDHE:  Just because our -- it
 6    won't allow me to access e-mail away from --
 7            MR. ROMO:  Oh, okay.
 8            MR. SAHASRABUDHE:  -- from the firm.
 9            MR. ROMO:  Got it.  Yeah.
10            THE REPORTER:  Do you want to go off the
11    record?
12            MR. BRUSTIN:  Sure.
13            THE VIDEOGRAPHER:  Okay.  Going off the
14    record.  Time is 10:47.
15            (Off the record at 10:47 a.m.)
16            THE VIDEOGRAPHER:  Going back on the record.
17    Time is 10:51.
18            BY MR. BRUSTIN:
19        Q.   Okay.  Mr. Scott, I'm going to show you
20    what's been marked for identification as
21    Plaintiff's Exhibit 3.  This is a transcript that
22    we made of a videotaped interview that was
23    conducted with you, and Joe Riga, and Sara Dee, and
24    David Heraty.  I'm not sure if I'm pronouncing that
25    right --
```



```
 1                    LaMarr Scott

 2        MR. THOMPSON:  Heraty.

 3        BY MR. BRUSTIN:

 4        Q.    -- prior to your plea agreement; do you

 5   recall that interview, sir?

 6        A.    Yeah.

 7        Q.    Okay.  And, obviously, during that

 8   interview, Mr. Scott, you did your very best to

 9   tell the truth, correct?

10        A.    Yes.

11        Q.    As you always do, correct?

12        A.    Yes.

13        Q.    All right.  And take a look, if you

14   would, sir, at -- let's begin on page 13.  And I

15   will represent to you this is you speaking -- wait

16   until you get there and you tell me when you're

17   there.

18        Okay.  And I'll represent to you -- if you

19   look back a page, you'll see that this is you

20   describing what happened to the DAs with the --

21   what happened with you -- you're describing to the

22   DAs what happened with the police when you went

23   there in August of 1991.  Okay?

24        (Objections to the form.)

25        MR. RUSS:  I don't know who he's --
```



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
47

```
 1                        LaMarr Scott
 2          THE WITNESS:  Is it --
 3          MR. RUSS:  -- talking to in this statement.
 4          BY MR. BRUSTIN:
 5          Q.   All right.  So if you take a look at
 6    page 13, I'm looking at the bottom pages.
 7          All right.  If you could start reading where
 8    you describe what happened with the police, the
 9    third paragraph from the bottom, "I got into the
10    car," okay?
11          A.   I got into the car --
12          Q.   Just not -- I don't need you to read
13    out loud.  What I want you to do is I want you to
14    read that, and then I want you to read all the way
15    to the bottom of the page.
16          A.   Bottom of the page of what?
17          Q.   To yourself.  Just read it, the bottom
18    of page 13, read those -- those four paragraphs to
19    yourself and let me know when you're done.
20          A.   Have you read this?
21          Q.   I have, sir.
22          A.   Okay.
23          Okay.
24          Q.   Okay.  And does this page accurately
25    describe, sir, what happened with the police when
```



```
 1                      LaMarr Scott

 2   you went there on August 11th of 1991?

 3          A.   I don't know if it --

 4          (Objections to the form.)

 5          THE WITNESS:  -- accurately describes it,

 6   but it's accurately described of what I said on

 7   the -- in 2018.

 8          BY MR. BRUSTIN:

 9          Q.   Okay.  And you were telling the truth

10   when you spoke to her in 2018?

11          A.   Why do --

12          (Objections to the form.)

13          THE WITNESS:  Why do you keep asking me if

14   I'm telling the truth, man?

15          BY MR. BRUSTIN:

16          Q.   I am, sir.

17          THE REPORTER:  Just -- I'm sorry.  You guys

18   got to talk one at a time.  There was a --

19          THE WITNESS:  Okay.

20          THE REPORTER:  -- couple people talking over

21   each other there.

22          THE WITNESS:  All right.  Well, why do you

23   keep asking me that, man?  It's --

24          BY MR. BRUSTIN:

25          Q.   Because I want to make sure that it's
```



```
 1                    LaMarr Scott
 2   an accurate recount of what happened.  That's why,
 3   sir.
 4         A.    But we're under oath here.
 5         Q.    That's right.
 6         A.    So I'll the truth, I've been telling
 7   the truth.  So for you to ask me that is -- is kind
 8   of disrespectful to say --
 9         Q.    I don't mean to be disrespectful.
10         A.    Well --
11         Q.    I just --
12         A.    -- that's what you're doing.
13         Q.    I don't mean to be, sir.  But I need to
14   make sure that this is in fact what happened with
15   the police.
16         A.    Well, it's here on record.
17         Q.    Okay.  And in fact, that's what
18   actually happened with the police, correct, what's
19   described here?
20         A.    If this is here on the record, this is
21   what's going on.  This is what happened.
22         Q.    Okay.
23         A.    You're asking me the same questions
24   over and over --
25         Q.    Okay.
```



1                          LaMarr Scott

2          A.    -- again.

3          Q.    And in fact, as you describe to these

4    investigators, the police said to you, well, Tino's

5    father had you come in -- had you come down and

6    turn yourself in, correct?

7          (Objections to the form.)

8          THE WITNESS:   This is what's here on tape,

9    man.  I don't remember anything about Tino's father

10   having me come down to turn myself in, but this is

11   what's here.  This is what it is.

12         If you -- if you read this and you

13   transcribed this, this is what it is.  This is the

14   evidence that you have.

15         BY MR. BRUSTIN:

16         Q.    Okay.

17         A.    You don't need me to say this,

18   reiterate -- reiterate everything over and over

19   again because you have this here.

20         Q.    I do, sir.  I need you to say that it's

21   the truth.

22         (Objections to the form.)

23         MR. RUSS:   Come on, you know better than

24   that.

25         THE WITNESS:   Come on, man.



```
 1                    LaMarr Scott
 2         MR. BRUSTIN:  Is this -- this is -- what are
 3   you talking about?  Is this in fact what --
 4         MR. RUSS:  You cannot --
 5         MR. BRUSTIN:  Is this --
 6         MR. RUSS:  -- ask a witness to say that
 7   something that is sworn testimony is truthful or
 8   not.  That's --
 9         MR. BRUSTIN:  This is not --
10         MR. RUSS:  -- objectionable.
11         MR. BRUSTIN:  This is not -- this is not --
12         MR. SAHASRABUDHE:  If he wasn't under oath,
13   you're directing --
14         MR. BRUSTIN:  He wasn't under oath.
15         MR. SAHASRABUDHE:  -- him to just --
16         MR. BRUSTIN:  It's not sworn.
17         MR. SAHASRABUDHE:  You basically just
18   instructed --
19         THE REPORTER:  Just one at a time.
20         MR. SAHASRABUDHE:  -- the witness how to
21   testify.
22         THE WITNESS:  This is --
23         MR. SAHASRABUDHE:  It's improper.
24         THE WITNESS:  This is --
25         MR. BRUSTIN:  First of all, one of you makes
```



```
 1                    LaMarr Scott
 2   an objection, not both of you.
 3        MR. RUSS:  Fine.
 4        THE WITNESS:  This is --
 5        MR. RUSS:  Move on.
 6        THE WITNESS:  -- something -- this is
 7   something --
 8        MR. BRUSTIN:  Let me --
 9        THE WITNESS:  -- that was under --
10        MR. BRUSTIN:  Let me withdraw --
11        THE WITNESS:  -- oath because I --
12        MR. BRUSTIN:  Let me withdraw --
13        THE WITNESS:  -- because I --
14        THE REPORTER:  You guys got to talk --
15        MR. BRUSTIN:  Let me withdraw --
16        THE REPORTER:  -- one at a time.
17        MR. BRUSTIN:  -- the question.
18        BY MR. BRUSTIN:
19        Q.   First of all, is what's -- is what you
20   described here on the video actually what happened
21   with the police?  That's my question, sir.
22        (Objections to the form.)
23        THE WITNESS:  Again, man, this is what --
24   this is the statement that I made according to
25   taking the plea agreement to free Mr. Dixon and
```



1                         LaMarr Scott

2    also for me to receive eight and a third to

3    25 years.

4          You know, I was under oath in that aspect,

5    and even if -- I'm under oath now.  So this is what

6    it is, man.  For you to continue to ask me this,

7    it's like -- it's very irritating for me.

8          BY MR. BRUSTIN:

9          Q.   Okay.  Well, that's not my intention to

10   irritate you.

11         A.   It's all about intentions.  Your

12   intentions here is to build a -- is to build your

13   case to make it stronger, so don't say that it's

14   not your intentions because this is what your

15   intentions is.

16         Q.   All right.  Take a look at page 14.  If

17   you could read the top where it says, LaMarr Scott,

18   stand back, yeah, I wanted to say it was him.  If

19   you could read those three paragraphs to yourself,

20   please.

21         A.   Okay.

22         Q.   Did you make those statements on the

23   video to Mr. Riga, Ms. Dee, and Mr. Heraty?

24         (Objections to the form.)

25         THE WITNESS:  Is this -- is this -- is this



```
 1                     LaMarr Scott
 2    statement -- everything that you say here is --
 3    this is what was transcribed from Mr. Riga?
 4           BY MR. BRUSTIN:
 5           Q.   Yes, sir.
 6           A.   Okay.  And this was recorded and
 7    transcribed by you all --
 8           Q.   Yes, sir.
 9           A.   -- correct?
10           Q.   It wasn't recorded, it was just
11    transcribed.
12           A.   Transcribed, okay.  So you're asking me
13    that and you already know the answers to that.
14           Q.   So I'm asking you whether or not in
15    fact that was true, that that's what in fact the
16    police said to you, what Stambach said to you.
17           (Objections to the form.)
18           THE WITNESS:  Why would ask me that when
19    it's here?  Again, you keep asking me the same
20    questions over and over again.  And I told you
21    before, man, I'm not here to --
22           BY MR. BRUSTIN:
23           Q.   So --
24           A.   -- enhance the situation.  I really
25    don't want to be here.
```



```
 1                       LaMarr Scott
 2          Q.    What I don't want to have to do is get
 3    you back here with a court order.  I don't -- I
 4    need you to answer my questions, and the question
 5    is, did --
 6          A.    What do you -- what do you mean a court
 7    order?  I don't understand that.  What do you mean?
 8          Q.    Sir, you -- I have the right to ask you
 9    questions.  You have to answer them.  That's --
10    that's all I can tell you.
11          A.    But I also have a right not to answer
12    them.
13          Q.    You don't.  You're here by subpoena and
14    you have to answer my questions and you have to
15    answer them honestly, and I know you're trying to
16    do that, but that -- that is what you have to do,
17    sir.
18          And in fact, when you told these
19    investigators that -- I'm going to read it to
20    you -- you know, and I said, you want my coat?  I
21    took my coat off.  I was giving him the coat that I
22    had on and I had wiped my sneakers off at the time,
23    but I had white Nikes but there was still small
24    speckles of blood on the bottom of the sneaker and
25    I wanted to give him the sneakers.  He says, no,
```



1                    LaMarr Scott

2     when you guys get your statements together, you

3     bring all of that back.  Is that in fact what

4     Stambach said to you, sir?

5          A.    This is what --

6          (Objections to the form.)

7          THE WITNESS:  This is in fact what's said

8     right here.  This is exactly what I said on -- in

9     2018.

10         BY MR. BRUSTIN:

11         Q.   And was it truthful when you said it,

12    sir?

13         (Objections to the form.)

14         THE WITNESS:  Of course.  I was under oath

15    and was truthful.  Everything that I've been saying

16    is truthful.  For you to continue to ask me the

17    same questions is extremely irritating, man.

18         So, please, man, don't continue to ask me if

19    it's truthful because I'm not a liar and I haven't

20    been lying.

21         BY MR. BRUSTIN:

22         Q.   Sir, I just need you to confirm that

23    it's true.  That's -- I'm not trying to suggest

24    you're a liar.  I need to confirm it for the

25    record.  That's all I'm doing, sir.



                          LaMarr Scott

1
2        A.    But you have it here on record.

3        Q.    I don't believe this was under oath,

4   sir.  That's why I'm asking.

5        A.    But I took a plea agreement to all of

6   these things.  So in order to take the plea

7   agreement, you took a plea agreement to everything

8   that's being said here.

9        So if I said something totally different,

10  then there's a strong possibility that I could go

11  back to prison once again.

12       Q.    All right.

13       MS. YATES RICHARDSON:  Calm down.

14       THE WITNESS:  And I'm calm, Pam.  I'm cool.

15       MS. YATES RICHARDSON:  Okay.  Okay.

16       THE WITNESS:  No, I understand.  I just know

17  this is not --

18       MS. YATES RICHARDSON:  I know, but just --

19       THE WITNESS:  This is -- I understand.  I

20  get it.  I ain't tripping.

21       MS. YATES RICHARDSON:  Okay.

22       BY MR. BRUSTIN:

23       Q.    Okay.  Could you read to yourself on

24  page 14 -- read from where it says, "Leonard

25  Brown," all the way to the bottom of the page --



LAMARR SCOTT                                          March 14, 2022
DIXON V. CITY OF BUFFALO                                          58

```
 1                    LaMarr Scott
 2   actually, read -- if you could read to the middle
 3   of the page where you stop talking on the -- on
 4   page -- so read from page 14 in the middle of the
 5   page to where it says "Sara Dee" on page 15.  Okay?
 6   And let me know when you're done, sir.
 7          A.   I don't need to read it.  I know what's
 8   here.
 9          Q.   Okay.  And could you describe for us
10   today, sir, did Detective Stambach, after you came
11   down and tried to confess, come and speak to you a
12   few days later as you describe here?
13          A.   On a few occasions I've seen him.
14          Q.   Okay.  And what did he say to you, in
15   substance?
16          A.   Asking me was I coming to take a
17   polygraph test.
18          Q.   Okay.  And he also showed up, you said,
19   at places where he was unexpected?
20          A.   Well --
21          (Objections to the form.)
22          THE WITNESS:  -- now that I think of it, of
23   course.  He's a police officer.  So, you know,
24   there's not much investigation you have to do when
25   you're dealing with a kid that goes to the same
```



```
 1                    LaMarr Scott

 2   places all the time.

 3        BY MR. BRUSTIN:

 4        Q.   Okay.  And as you told the

 5   investigators, you felt harassed by Detective

 6   Stambach, correct?

 7        (Objections to the form.)

 8        THE WITNESS:  Yes, I did.

 9        BY MR. BRUSTIN:

10        Q.   Okay.  And what specifically did

11   Detective Stambach do that caused you to feel

12   harassed as a young man at the time trying to do

13   the right thing?

14        (Objections to the form.)

15        THE WITNESS:  Well, he -- the showing up

16   himself was a form of harassment, as far as I

17   understood.  You know, just showing up in places

18   that I didn't think anybody should -- should know

19   about and/or show up.

20        BY MR. BRUSTIN:

21        Q.   Okay.  What else?

22        A.   Basically that's it, and asking the

23   question of whether I was going to take a polygraph

24   test or not.

25        Q.   Take a look at page 21.
```



```
 1                       LaMarr Scott

 2          MR. BRUSTIN:  Let's take a couple-minute

 3   break and I'm just about done.

 4          THE VIDEOGRAPHER:  Okay.  Going off the

 5   record.  Time is 11:07.

 6          (A recess was then taken at 11:07 a.m.)

 7          THE VIDEOGRAPHER:  Okay.  We're going back

 8   on the record.  Time is 11:13.

 9          BY MR. BRUSTIN:

10          Q.   Okay.  Just a couple more questions,

11   Mr. Scott, and I'll be done.

12          If you could just take a look at -- I'm

13   going to take this one from you.  Thank you.

14          If you could take a look in Exhibit

15   Number 2, the police file, page 267.

16          MS. PERSICO:  I'm sorry.

17          MR. SAHASRABUDHE:  It's 267 of the PDF, the

18   first --

19          MR. ROMO:  Exhibit 2.

20          MR. SOEHNLEIN:  Yeah.  We're back to ...

21          MR. BRUSTIN:  Plaintiff's 2.

22          BY MR. BRUSTIN:

23          Q.   Do you recognize the handwriting on

24   this document, Mr. Scott?

25          A.   Yes.
```



```
 1                     LaMarr Scott
 2         Q.    Okay.  And did you write this letter?
 3         A.    I wrote several letters.  As a matter
 4    of fact, I wrote maybe a couple hundred letters.  I
 5    don't remember specifically this one, but this is
 6    my handwriting.
 7         Q.    Okay.  So then since you don't
 8    remember, can I ask you to take a minute and read
 9    it, please?
10         A.    This is just like -- this is a
11    letter -- the same way to so many other ones that I
12    wrote.
13         Q.    Okay.
14         A.    Okay.
15         Q.    You had a chance to read it?
16         A.    Yeah, I gazed through it.  I get it.  I
17    get it.
18         Q.    Okay.  And is this an accurate
19    description of -- is this an accurate description
20    of what happened with -- with the police when you
21    tried to confess?
22         A.    Yes.
23         (Objections to the form.)
24         THE WITNESS:  According to -- according to
25    this, yes, it is.
```



LAMARR SCOTT                                      March 14, 2022
DIXON V. CITY OF BUFFALO                                      62

```
 1                      LaMarr Scott
 2          BY MR. BRUSTIN:
 3          Q.   Okay.  Is there anything in here that's
 4   inaccurate in this letter?
 5          (Objections to the form.)
 6          THE WITNESS:  No, I can't say anything is
 7   inaccurate or accurate.  I know that this is --
 8   these are the letters that I wrote while I was in
 9   Attica --
10          BY MR. BRUSTIN:
11          Q.   Okay.
12          A.   -- and --
13          Q.   And what's -- what's in here is what --
14   what was truthful to the best of your recollection
15   at that time, correct?
16          A.   Yes, it was.
17          MR. BRUSTIN:  Okay.  I think that's all I
18   have right now, Mr. Scott.  Thank you very much --
19          THE WITNESS:  All right.
20          MR. BRUSTIN:  -- for your time.
21          THE WITNESS:  This is Mario.
22                         EXAMINATION
23          BY MR. SOEHNLEIN:
24          Q.   Mr. Scott, I have a few follow-up
25   questions for you.
```



1                      LaMarr Scott

2          A.    Sure.

3          Q.    And I'm going to try to be quick.

4    Okay?  I really am.

5          A.    Appreciate it.

6          Q.    If -- if I ask you something and you

7    don't understand it, just tell me and I'll try to

8    rephrase it.  Okay?

9          You've provided some testimony earlier

10   today, and I think you said that -- that you did

11   not recall your interactions, I think originally

12   you said, with the police; is that correct?

13         MR. BRUSTIN:  Objection to the form.

14         BY MR. SOEHNLEIN:

15         Q.    You don't have an independent

16   recollection of these things?

17         MR. BRUSTIN:  Objection to form.

18         THE WITNESS:  Say the question again.

19         BY MR. SOEHNLEIN:

20         Q.    I was asking about your recollection,

21   and you said earlier that you didn't remember

22   certain things.

23         A.    Mm-hmm.

24         Q.    What I'm -- what I'm interested in most

25   is do you remember anything about going to the



```
 1                    LaMarr Scott
 2  grand jury in Mr. Dixon's case?
 3        A.    No, it's a blur.  The only thing I
 4  really remember pertaining to that is that my
 5  adopted parents showed up and I felt ashamed there.
 6        Q.    Okay.  So you recall that your adopted
 7  parents, they were there the day of the grand jury?
 8        A.    Yes, they were there.
 9        Q.    Okay.  Now, where were they?
10        A.    I don't know where they were.  They
11  came into the office and I was sitting down with my
12  head down.  When I looked up, my adapted parents
13  was there and I remember feeling like a little kid
14  all over again.  That's basically -- and it stuck
15  with me for all those years.
16        Q.    Right.
17        A.    Anything else about it is a blur.
18        Q.    Okay.  It made you feel bad because you
19  felt poorly for being involved in the situation?
20        A.    Well, I wasn't --
21        MR. BRUSTIN:  Objection.
22        THE WITNESS:  Well, I wasn't raised that
23  way, in that aspect --
24        BY MR. SOEHNLEIN:
25        Q.    Okay.
```



```
 1                         LaMarr Scott
 2          A.    -- you know what I mean?  A kid with --
 3    a kid with his parents.
 4          Q.    Okay.
 5          A.    You're going to feel bad.
 6          Q.    Right.
 7          A.    Whether you feel bad when you're
 8    walking out the door, or tomorrow or the next day,
 9    you're going to feel bad.
10          Q.    Okay.  Now, you said in the office, do
11    you know what office you were in?
12          A.    No, I'm not sure what office I was in.
13          Q.    Okay.  Okay.  Now, do you recall that
14    in connection with the grand jury, you had an
15    attorney assigned to you name Mr. Molloy; do you
16    recall that?
17          A.    No.
18          Q.    You don't --
19          A.    The only attorneys I remember is
20    Katherine Bestine.  She was one of the ones that I
21    had for a plea agreement, which was a paper felony,
22    and she had me plea down, I think it was, to some
23    county time.
24          Q.    Okay.  Well, I want to show you
25    something real quick.
```



```
 1                    LaMarr Scott
 2        MR. RUSS:  Red head?  She's a red head?
 3        THE WITNESS:  I'm not sure if it was red.  I
 4   think it was blonde, maybe.
 5        MS. PERSICO:  We change them from time to
 6   time.
 7        THE WITNESS:  Yeah, I know, I know.
 8        MR. SOEHNLEIN:  Can you mark this, please?
 9        THE REPORTER:  Mm-hmm.  What do you want it
10   marked as?
11        MR. SOEHNLEIN:  Oh, are you doing
12   Plaintiff's Exhibits or are you doing Scott number
13   whatever?
14        MR. BRUSTIN:  We have these already.
15        MR. SOEHNLEIN:  How are you guys marking
16   exhibits?
17        MR. BRUSTIN:  Why don't you guys do -- I
18   like to do all the way through, Plaintiff's 1.  Why
19   don't you guys do Defendant's A through --
20        MR. SOEHNLEIN:  Let's do County 1.
21        MR. BRUSTIN:  Okay.  Do you think it's
22   easier if you guys do letters?
23        MR. SOEHNLEIN:  No, because we'll get AA.
24        MR. BRUSTIN:  Okay.
25        MR. SOEHNLEIN:  I want to do numbers.
```



```
 1                     LaMarr Scott
 2         MR. SAHASRABUDHE:  We could County 1,
 3  City 1.
 4         MR. SOEHNLEIN:  I'm a big fan of the number
 5  system.
 6  The following was marked for Identification:
 7   COUNTY EXH. 1        Mr. Scott's grand jury
 8                        testimony from January 13th,
 9                        1992
10         BY MR. SOEHNLEIN:
11         Q.   Okay.  Take a -- you can just look at
12  that and let me know when you -- just glance it,
13  really just the first couple of lines there.
14         And just to make the record clear, what I've
15  shown Mr. Scott is the transcript of his grand jury
16  testimony that was taken on January 13th, 1992, in
17  the Valentino Dixon case.
18         A.   Okay.
19         Q.   Okay.  Mr. Scott, have you had a chance
20  to review that document?
21         A.   Yes, I see it in front of me.
22         Q.   Okay.  And do you see at the top where
23  it says John J. Molloy representing the --
24         THE REPORTER:  I'm sorry.  "And do you see
25  at the top" ...
```



```
 1                      LaMarr Scott

 2          BY MR. SOEHNLEIN:

 3          Q.    Sure.  Where is says John J. Molloy --

 4          A.    Yes.

 5          Q.    -- Esquire, representing the witness;

 6   do you see that?

 7          A.    Yes.

 8          Q.    Does that refresh your memory that you

 9   had Mr. Molloy with you on the grand jury?

10          A.    No, it doesn't.

11          Q.    It doesn't bring any independent

12   recollection?

13          A.    No.

14          Q.    Okay.  Do you have any recollection of

15   being served with a grand jury subpoena to go to

16   the grand jury?

17          A.    No, I don't.

18          Q.    Okay.  Do you have any recollection of

19   meeting with any attorney prior to the grand jury?

20          A.    No.

21          Q.    Okay.  Now, have you -- have you

22   reviewed any documents or any materials to prepare

23   for today?

24          A.    No.

25          Q.    No.
```



```
 1                      LaMarr Scott
 2         A.    No, I haven't read anything.  I
 3   received this in the mail.  I know I received this
 4   at work, and that's the extent that I spoke to him
 5   briefly, and that's it.
 6         Q.    How would you characterize your
 7   recollection of the grand jury?  How would you
 8   describe it?
 9         A.    The only thing that, again, that I can
10   remember is my adopted parents being there.
11         Q.    Okay.
12         A.    And Mario Jarmon, me and Mario leaving
13   and, you know, Mario's going -- dropping Mario off
14   and my dad taking me -- taking me to church, that's
15   it.
16         Q.    Okay.  After the grand jury you went to
17   church?
18         A.    Yeah.  After that I went to -- he was
19   going to prayer services or something, and I rode
20   along with him because I wasn't living at home.
21         Q.    Okay.  All right.  Now, your
22   recollection of your parents being there, they were
23   in the office, they did not go into the grand jury
24   with you?
25         A.    No, not -- no, the only thing -- only
```



```
 1                    LaMarr Scott
 2  thing -- the only time I did see them is when they
 3  came into the office and I looked at them and they
 4  sat down, and I don't even remember the
 5  conversation --
 6       Q.   Okay.
 7       A.   -- you know, and maybe a few minutes
 8  later, it was -- everything happened so fast.  I
 9  got a ride out of there and we were going home.
10       Q.   Okay.  I want to show you one more
11  document, okay, just to see.
12       MR. SOEHNLEIN:  Would you mark this
13  County 2, please?
14       And there's a copy for you, and you, as
15  well.
16  The following was marked for Identification:
17   COUNTY EXH. 2        letter dated January 9th,
18                        1992
19       BY MR. SOEHNLEIN:
20       Q.   Do you have that document in front of
21  you, Mr. Molloy -- or I'm sorry -- Mr. Scott?  I
22  apologize.
23       A.   Yes.  Yes.
24       Q.   Okay.  What I've shown you is a letter
25  dated January 9th, 1992, that's addressed to
```



```
 1                        LaMarr Scott
 2   John J. Molloy.
 3          A.    Mm-hmm.
 4          Q.    And you'd agree with me that the letter
 5   memorializes Mr. Molloy being assigned to represent
 6   you in connection with the grand jury; do you see
 7   that?
 8          A.    Yes, I see it.
 9          Q.    Okay.  And you'd agree with me that
10   January 9th, 1992, is a few days before
11   January 13th, 1992, correct?
12          A.    Yes, it is.
13          Q.    Okay.  Do you have any recollection of
14   speaking with Mr. Molloy before the grand jury?
15          A.    No, I don't.
16          Q.    Okay.  All right.  I want you to go
17   back to that other exhibit that we had, the first
18   one that I showed you.  If you could just go to the
19   numbered page 59 on that exhibit.
20          MR. BRUSTIN:  Can you identify what this is
21   for the record?
22          MR. SOEHNLEIN:  I did.  I'll do it again if
23   you want me to.  It's the grand -- it's his grand
24   jury transcript.
25          MR. BRUSTIN:  I didn't hear you say that.
```



 1                      LaMarr Scott

 2   Thank you.

 3           MR. SOEHNLEIN:  Yeah, no problem.  I'll do

 4   it as many times as you want.

 5           MR. BRUSTIN:  What page?

 6           MR. SOEHNLEIN:  59, please.

 7           BY MR. SOEHNLEIN:

 8           Q.   Actually, starting at the bottom of

 9   page 58.  I'm sorry.  Take just an opportunity to

10   read that.

11           A.   Okay.

12           Q.   Okay.  So you'd agree with me that that

13   part of the transcript memorializes that you had

14   met with Mr. Molloy before the grand jury?

15           A.   Yeah, according to this.  Yes.

16           Q.   According to that, yeah, you'd agree

17   with me.  Now, you said you have no recollection --

18           A.   No, I don't.  Honestly, I really don't.

19           Q.   Okay.  That's okay.  But you'd also

20   agree with me that that characterizes that no one

21   made any threats or promises to you?

22           A.   Yes.

23           MR. BRUSTIN:  Object to the form.

24           THE WITNESS:  According to this, yes.

25           BY MR. SOEHNLEIN:



```
 1                          LaMarr Scott
 2          Q.    Okay.   According to that.   Now, I want
 3    to ask you a couple of questions.   Before the grand
 4    jury, you rode down to the grand jury with Mario
 5    and someone else, correct?   Do you recall?
 6          A.    Yes.   Yes.   I know that Leonard --
 7    Leonard Brown or Leonard Shannon, because we were
 8    all going to the grand jury.
 9          Q.    All right.   And did you ride together?
10          A.    Yes, we were in a taxi.
11          Q.    Okay.   Now, who told you about the
12    grand jury?
13          A.    If I'm correct, I think Leonard had
14    spoke to me about a grand jury.
15          Q.    Okay.   Now --
16          A.    As a matter of fact, I -- I think
17    Tino's father --
18          Q.    Mm-hmm.
19          A.    -- because he would always -- he would
20    ask me if I was okay.   He's a caring dude.   He'd
21    ask me if I was okay.
22          Q.    Yeah.   What was --
23          A.    So --
24          Q.    Oh, I'm sorry.
25          A.    -- I think he -- I think he reminded me
```



1                         LaMarr Scott

2    or something.  I'm not -- I'm not sure.  It was a

3    brief conversation, but I wanted to say that, but I

4    don't know.

5          Q.    Okay.  Now, what was your relationship

6    like with Mr. Dixon's family in the time between

7    the shooting and the time you appeared for the

8    grand jury?

9          A.    No, we didn't have a relationship.  I

10   didn't know any of them.  I did -- I knew Antoine

11   from playing football at Grover Cleveland, but

12   anybody else, I didn't know anything about him or

13   his family.

14         Q.    Okay.  So Mr. Dixon's dad wouldn't take

15   you out for hamburgers or anything like that?

16         A.    No, I don't -- you know, I don't know

17   anything about his family.

18         Q.    Okay.  But I'm just asking the

19   question, you didn't see them in that time period?

20         MR. BRUSTIN:  Objection to the form.

21         THE WITNESS:  Yes, I seen them on quite a

22   few occasions because of the neighborhood, he had a

23   store down the street.  And at the time I was on

24   Langmeyer and Bailey, so I would always see the

25   father.



```
 1                       LaMarr Scott
 2          BY MR. SOEHNLEIN:
 3          Q.    Mm-hmm.
 4          A.    You know, he -- you know, he had
 5  different stores and stuff like that so knowing
 6  that -- knowing what my situation was, he -- am I
 7  hungry?  Am I okay?  It had nothing to do with
 8  anything else, you know, just being a concerned
 9  father.
10          Q.    Okay.  He was -- he was making sure
11  that you were doing all right in that time period?
12          A.    Yeah, just making sure that I was okay.
13  Very rarely did we -- did the conversation that I
14  do remember, which weren't many at all, you know,
15  they weren't conversations talking about his son.
16  He just asked me how I was doing.
17          Q.    Had he asked that before the shooting,
18  had he asked those questions of you before the
19  shooting?
20          MR. BRUSTIN:  Objection to form.
21          THE WITNESS:  Prior to the shooting, I had
22  no -- I had no reason to even of communicate with
23  him.
24          BY MR. SOEHNLEIN:
25          Q.    Now, when you said that you, Mario, and
```



LaMarr Scott

1
2  Leonard went to the grand jury together in a taxi,
3  correct?
4       A.    Yeah.
5       Q.    Did you -- do you have any recollection
6  of discussing your testimony on the way?
7       A.    I don't have any recollection of the
8  ride.  I just know we were in the taxi and we got
9  there and that was it.
10       I can't tell you, you know, what -- what way
11  we went, I can't tell you directions or anything.
12  You know, I only remember those -- those particular
13  things.  Anything else, it's a blur.  Again, I
14  don't remember anything else about it.
15       Q.    Okay.  And no other pertinent facts
16  that you can recall that you haven't shared with us
17  yet today?
18       A.    No.  No, it's -- it's not something
19  that I think about.
20       MR. SOEHNLEIN:  Okay.  I think that's all
21  that we have, Mr. Scott.
22       THE WITNESS:  You're welcome.  You're
23  welcome.
24                    EXAMINATION
25       BY MR. RUSS:



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
77

```
 1                    LaMarr Scott
 2         Q.   Mr. Scott, I have a few questions for
 3    you.  I promise I won't repeat what's been done and
 4    I'll do my best to be fast.  Okay?
 5         A.   Thank you.
 6         Q.   Okay.  When -- back on Goodyear when
 7    Valentino Dixon gave you the gun, what, if
 8    anything, did he say?
 9         MR. BRUSTIN:  Objection to the form.
10    Mischaracterizes his testimony.
11         THE WITNESS:  He never -- he didn't give it
12    to me like a piece of paper, here, take this.  When
13    I got into the vehicle on the passenger side, the
14    gun was in the bag on the passenger side floor and,
15    you know, it was -- really wasn't no conversation
16    that I can --
17         BY MR. RUSS:
18         Q.   Did he say anything to you?
19         A.   He said we got some business to handle.
20         Q.   And did he say anything else?
21         A.   I said, what business?  What do you
22    mean?
23         Q.   Okay.
24         A.   That was it.  Anything -- I really
25    can't remember too much else pertaining to that.
```



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
78

| | |
|---|---|
| 1 | LaMarr Scott |
| 2 | Q.    And did you drive somewhere? |
| 3 | A.    I never knew -- I never drove a car in |
| 4 | my life.  I don't know how to drive. |
| 5 | Q.    Did you ride somewhere with him? |
| 6 | A.    To Bailey and Delevan, Mario's house. |
| 7 | Q.    At the time, did you work for Valentino |
| 8 | Dixon? |
| 9 | A.    Well -- |
| 10 | MR. BRUSTIN:  Objection to form. |
| 11 | THE WITNESS:  -- I don't -- I don't consider |
| 12 | it working now, but in the grand scheme of things, |
| 13 | yeah. |
| 14 | BY MR. RUSS: |
| 15 | Q.    What did you do for him? |
| 16 | A.    I sold drugs, a small amount of drugs. |
| 17 | Q.    Did you also help him with other things |
| 18 | that he -- he would do? |
| 19 | A.    No.  No, I was just a regular kid in |
| 20 | the neighborhood and, you know, at the time he |
| 21 | looked out for, in that sense, if you want to call |
| 22 | it looking out. |
| 23 | Q.    Now, you've told us that you pulled the |
| 24 | trigger that night? |
| 25 | A.    Yes. |



```
 1                        LaMarr Scott
 2          Q.    But Valentino Dixon took you there in
 3    the car?
 4          A.    Yes.   I wouldn't have been there if it
 5    wasn't for him.
 6          Q.    And gave you the gun?
 7          A.    Yes.
 8          Q.    Did he point anyone out?
 9          A.    No, Leonard did.
10          Q.    Was Leonard with you in the car?
11          A.    No, Leonard wasn't in the car, but
12    Leonard was on the corner that night.
13          Q.    When you and Valentino Dixon arrived
14    that night, did you meet up with Leonard?
15          A.    Yeah, we met with Leonard, Mario,
16    Walter Dennis, and Antoine.  We were all there.
17          Q.    After you pulled the trigger, what did
18    you do?
19          A.    I ran to the right, which is past Mario
20    Jarmon's house, a couple of yards, and I went to
21    get into Valentino's car but he told me I couldn't
22    get into his car and drove off, so I dumped the gun
23    a couple houses down.
24          MR. RUSS:  That's all I have.  Thank you.
25          THE WITNESS:  You're welcome.
```



| | |
|---|---|
| 1 | LaMarr Scott |
| 2 | MR. BRUSTIN:  I have just a couple more |
| 3 | questions for you, Mr. Scott. |
| 4 | THE WITNESS:  All right. |
| 5 | FURTHER EXAMINATION |
| 6 | BY MR. BRUSTIN: |
| 7 | Q.   First of all, Valentino Dixon did not |
| 8 | ask you or direct you to shoot anyone, correct? |
| 9 | A.   No. |
| 10 | (Objections to the form.) |
| 11 | THE WITNESS:  No, he just told us we had |
| 12 | some business to handle.  He didn't tell me to go |
| 13 | kill somebody or anything like that. |
| 14 | He didn't do that, but you know, when you're |
| 15 | looking at the scenarios and what it was, you know, |
| 16 | you don't take a guy and give him a gun and then |
| 17 | say we have business to handle.  You don't do that. |
| 18 | BY MR. BRUSTIN: |
| 19 | Q.   And as you told -- as you said, he |
| 20 | didn't give you any more specifics other than we |
| 21 | have business to handle?  That's your recollection? |
| 22 | A.   Yes. |
| 23 | Q.   And Mr. Dixon did not say anything to |
| 24 | you about shooting anybody, correct? |
| 25 | (Objections to the form.) |



LAMARR SCOTT
DIXON V. CITY OF BUFFALO

March 14, 2022
81

1                          LaMarr Scott

2          THE WITNESS:  No, he didn't specifically say

3    we've got to shoot this guy or anything like that.

4    He just said we've got business to handle.

5          BY MR. BRUSTIN:

6          Q.   And as you consistently said, beginning

7    in 1991, you made the decision to pull the trigger

8    and to shoot Torri Jackson, correct?

9          (Objections to the form.)

10         THE WITNESS:  It wasn't a decision.  I don't

11   call it a decision, I call it acting on.

12         BY MR. BRUSTIN:

13         Q.   You've certainly taken responsibility

14   for that, correct, sir?

15         A.   Yeah, I took responsibility for that.

16   Yeah.  I mean ... all right.  We're trying the case

17   all over again, but here's -- Valentino Dixon told

18   me specifically, they're shooting my brother.  I

19   said this before, and I'll say it again.  He said,

20   they're shooting my brother, and stop them from

21   shooting my brother.

22         Leonard pointed to Torriano Jackson, and

23   that's when the beginning of all of this stuff

24   that's happening now began to happen.  So --

25         Q.   All right.



1                          LaMarr Scott

2          A.     -- that's it, man.

3          Q.     The conversation you had with Valentino

4     Dixon about the gun, you've already told us was

5     more than 45 minutes before you actually shot him,

6     correct?

7               (Objections to the form.)

8          THE WITNESS:  Yes.  Maybe.  Maybe 45.

9     Maybe.

10         BY MR. BRUSTIN:

11         Q.     And Valentino Dixon never said to you

12    in words or substance to shoot anybody, correct?

13              (Objections to the form.)

14         THE WITNESS:  I just answered the question.

15    Come on, man.  Don't do that, man.  I just answered

16    that.

17         BY MR. BRUSTIN:

18         Q.     You understood that -- at the time, you

19    understood that the concern was that there could be

20    a gun fight and it might -- you might need to

21    protect yourself; is that fair to say?

22              (Objections to the form.)

23         THE WITNESS:  I can't say it's fair.  I

24    can't say it's fair to say.  I just know that it

25    was an issue.  You know, I can't say it was fair.



```
 1                      LaMarr Scott
 2   It was an issue.
 3           BY MR. BRUSTIN:
 4           Q.   And the reason that you -- the reason
 5   that you shot Torri Jackson is because you were
 6   concerned that he was going to kill Mario, correct?
 7           (Objections to the form.)
 8           THE WITNESS:  I just looked at it as being
 9   instinctive, man, being a protector basically.
10           BY MR. BRUSTIN:
11           Q.   All right.
12           A.   It was instinctive.  I can't tell you
13   what my mindset was, what my thoughts were, and who
14   said -- you know, situations like that, there's
15   really no conversation.
16           I don't know if you've ever been in war or
17   anything like that or any of that, but this is just
18   what it is.
19           BY MR. BRUSTIN:
20           Q.   I haven't at all.  I have not, anything
21   like it.  And I'll acknowledge that to you, sir.
22   But my understanding, based on what you
23   described --
24           A.   Right.
25           Q.   -- in the past --
```

