# EXHIBIT  4

COPY

**In the Matter Of:**

DIXON vs CITY OF BUFFALO

1:19-cv-01678-WMS

---

**RANIERO MASECCHIA**

*March 15, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

VIDEO DEPOSITION
RANIERO MASECCHIA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------
VALENTINO DIXON,

                              Plaintiff,

              — vs —        Case No.
                            1:19-cv-01678-WMS

CITY OF BUFFALO and COUNTY OF ERIE;
and DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA, DETECTIVE
JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN, JOHN DOES,
Unknown Buffalo Police Department Supervisors,
and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
BELLING, in their individual capacities,

                              Defendants.
------------------------------------------

        Video recorded deposition of RANIERO

MASECCHIA, Defendant, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of

HARRINGTON & MAHONEY, 70 Niagara Street, Buffalo,

New York, on March 15, 2022, commencing at

9:59 a.m., before DANIELLE M. FETZER, Notary

Public.



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                         2

```
 1

 2   APPEARANCES:        NEUFELD SCHECK & BRUSTIN, LLP,
                         By NICK J. BRUSTIN, ESQ.,
 3                       nick@nsbcivilrights.com, and
                         GERARDO ROMO, ESQ.,
 4                       gerardo@nsbcivilrights.com,
                         99 Hudson Street,
 5                       8th Floor,
                         New York, New York  10013,
 6                       (212) 965-9081,
                         Appearing for the Plaintiff.
 7
                         HODGSON RUSS LLP,
 8                       By HUGH M. RUSS, III, ESQ.,
                         hruss@hodgsonruss.com, and
 9                       PETER A. SAHASRABUDHE, ESQ.,
                         psarasra@hodgsonruss.com,
10                       The Guaranty Building,
                         140 Pearl Street, Suite 100,
11                       Buffalo, New York  14202,
                         (716) 856-4000,
12                       Appearing for the Defendants,
                         City of Buffalo, Detective Mark R.
13                       Stambach, Detective Raniero
                         Masecchia, Detective James P.
14                       Lonergan, Detective John Vickerd,
                         Chief Richard T. Donovan, and
15                       John Does, Unknown Buffalo Police
                         Department Supervisors.
16
                         LIPPES MATHIAS WEXLER FRIEDMAN LLP,
17                       By ERIC M. SOEHNLEIN, ESQ.,
                         esoehnlein@lippes.com,
18                       50 Fountain Plaza, Suite 1700,
                         Buffalo, New York  14202,
19                       (716) 853-5100,
                         Appearing for the Defendants,
20                       County of Erie and Assistant
                         District Attorney Christopher
21                       Belling.

22

23   PRESENT:           TYLER Z. RAHNER, Videographer

24

25
```



```
 1                    Raniero Masecchia

 2

 3         THE REPORTER:  Are there any stipulations?

 4         MR. BRUSTIN:  No.

 5         THE REPORTER:  And is it split and supply to

 6   Mr. Russ?

 7         MR. BRUSTIN:  I don't know what that is.

 8         MR. RUSS:  That means that you have to pay

 9   since he's my witness.  You have to send us a

10   transcript.

11         MR. BRUSTIN:  Yes.

12         MR. SOEHNLEIN:  Yep.

13         THE VIDEOGRAPHER:  Okay.  This will begin

14   the video-recorded testimony of Raniero Masecchia,

15   taken for a case to be tried in the United States

16   District Court, Western District of New York, to be

17   used in the matter of Valentino Dixon v. City of

18   Buffalo and County of Erie, et al.

19         This testimony is being taken at the office

20   of Harrington & Mahoney, 70 Niagara Street,

21   Buffalo, New York, on March 15th, 2022, and is

22   commencing at the time of 9:59, as indicated on the

23   video screen.

24         The court reporter and notary public, who is

25   from the firm of Esquire Deposition Solutions, is
```



```
 1                    Raniero Masecchia
 2   Danielle Fetzer.  My name is Tyler Rahner; I'm the
 3   video technician, and I'm with the same firm.
 4        Counsel for the plaintiff will now introduce
 5   themselves, followed by counsel for the defendants,
 6   and the reporter will then swear in the witness.
 7        MR. BRUSTIN:  Nick Brustin.  Neufeld,
 8   Scheck & Brustin for the plaintiff, Valentino
 9   Dixon.
10        MR. ROMO:  Gerardo Romo, attorney for
11   plaintiff Valentino Dixon.
12        MR. RUSS:  I'm Hugh Russ from Hodgson Russ;
13   I represent the witness and all of the city
14   defendants.
15        MR. SAHASRABUDHE:  Peter Sahasrabudhe, also
16   from Hodgson Russ representing the same parties as
17   Mr. Russ.
18        MR. SOEHNLEIN:  Eric Soehnlein from Lippes
19   Mathias; we represent the County of Erie and
20   Assistant District Attorney Christopher Belling.
21
22
23
24
25
```



```
 1                    Raniero Masecchia
 2   RANIERO MASECCHIA, 6917 Kimberly Drive, Lockport,
 3   New York  14094, after being duly called and sworn,
 4   testified as follows:
 5                    EXAMINATION
 6        BY MR. BRUSTIN:
 7        Q.   It's pronounced Masecchia?
 8        A.   Masecchia.
 9        Q.   Okay.  Mr. Masecchia, good morning.  We
10   met off the record.  I'm Nick Brustin, one of the
11   attorneys for the plaintiff in this case, Valentino
12   Dixon.
13        Have you ever had your deposition taken
14   before?
15        A.   Yes.
16        Q.   Okay.  So -- and I'm sure you've met
17   with your attorney, you understand how this goes,
18   but let me just tell you very briefly from my
19   perspective.
20        I'm going to be answering -- asking you a
21   series of questions, you'll be answering them under
22   oath, just like you were in a courtroom; do you
23   understand that?
24        A.   Yes.
25        Q.   Same penalty of perjury?
```



1                      Raniero Masecchia

2          A.    Yes.

3          Q.    If at any time you don't understand my

4    question or any part of my question, please tell me

5    and I'll rephrase it.  If you do answer the

6    question, I'm going to assume that you understood

7    it; is that fair?

8          A.    Yes.

9          Q.    If you want to take a break, that's

10   fine.  The only thing I would ask is that you

11   answer the question pending before taking a break.

12   Okay?

13         A.    Sure.

14         Q.    All right.  First of all, do you have

15   any health issues that you believe would in any way

16   affect your ability to testify here today?

17         A.    I have health issues.  I'm 72 years

18   old.

19         Q.    So I don't need to get into your health

20   issues --

21         A.    I think I -- I think I could handle

22   this.

23         Q.    Okay.  Do you have any health issues

24   that you believe in any way affect your memory?

25         A.    I've had a few brain aneurysms, but



1                   Raniero Masecchia

2   yes.

3          Q.   Okay.  And, again, I don't want to pry

4   too much into your medical situation, but is it

5   your understanding, either from experience or from

6   talking to medical professionals, that your brain

7   aneurysms have affected your short or long-term

8   memory?

9          A.   No, not that I know of.

10         Q.   Okay.  Are you taking any medications

11  that you believe in any way affect your ability to

12  testify here today, including your memory?

13         A.   No.

14         Q.   All right.  Are you currently employed?

15         A.   No, I'm retired.

16         Q.   When did you retire?

17         A.   From the police department?

18         Q.   Well, let's -- why don't we just go

19  through your career.  So let's start with where you

20  graduated from high school.

21         A.   Graduated from high school, Grover

22  Cleveland, but I got my GED in Chu Lai, Vietnam.

23         Q.   Okay.

24         A.   1970 -- 1970.

25         Q.   Okay.  And when were you in the



                        Raniero Masecchia

 1

 2   service?

 3        A.    Buffalo Police service or the military?

 4        Q.    Military.

 5        A.    '69 through '71.

 6        Q.    Okay.  And it sounds like you -- you

 7   were actually deployed?

 8        A.    Yeah.

 9        Q.    Okay.  Any -- honorably discharged,

10   obviously?

11        A.    Yes.

12        Q.    Any medals or honors, anything like

13   that?

14        A.    A few.

15        Q.    What did you get?

16        A.    Combat Infantry Badge, Air Medal, Army

17   Commendation, four Bronze Stars.  A few.

18        Q.    And you -- you retired at what rank --

19   you were discharged at what rank from the service?

20        A.    Specialist 4th Class.

21        Q.    Okay.  You went there right from high

22   school it sounds like?

23        A.    Right.

24        Q.    All right.  And any other -- any other

25   higher education?



1                Raniero Masecchia

2        A.    I had -- I got an associate's degree

3    from Bryant & Stratton, but I also had two years at

4    Hilbert College --

5        Q.    Okay.

6        A.    -- and then switched over to Bryant &

7    Stratton for business management.  Figured I'm not

8    going to be a policeman forever so I graduated and

9    got an associate's degree from there.

10       Q.    Okay.  Anything else?

11       A.    No.

12       Q.    And Grover Cleveland is a high school

13   here in Buffalo?

14       A.    Yes.

15       Q.    You grew up here?

16       A.    Yes.

17       Q.    Okay.  Any other family in policing?

18       A.    No.

19       Q.    Parents, uncles, sons, daughters,

20   nothing?  Nobody?

21       A.    My father was a policeman in Italy.

22       Q.    Okay.

23       A.    We came over, I was 3 years old, and

24   that's about it.

25       Q.    All right.  When did you join the



```
 1                    Raniero Masecchia
 2   Buffalo Police Department?
 3        A.    December of '71.
 4        Q.    That was your first job out of the
 5   service?
 6        A.    No.
 7        Q.    What did you do before that?
 8        A.    I worked at a place called Loblaws, it
 9   was a supermarket chain.  I worked at their
10   warehouse.
11        Q.    Okay.  And then soon after, you joined
12   the force?
13        A.    I took the exam and became a community
14   police officer, they called it, I think.
15        Q.    Why don't you take me through your
16   career with the Buffalo Police Department.
17        A.    Like I said, I was a community peace
18   officer it was called.  It was a program trying to
19   recruit inner city people at the time.  It was a
20   new program during the '70s.  It was peace, love.
21        So they recruited inner city people, which I
22   was one of them.  There was, like, 50 of us in this
23   pilot program.  You take the exam, they take you,
24   and then after a year, they were supposed to
25   promote us as police officers.
```

Raniero Masecchia

1

2    We would work one year on the street, no

3 guns, no nothing, with police officers and -- like,

4 on-the-job training almost.

5    Then after the year, we had to sue the city

6 to get -- get promoted.  The union was against it.

7 We had to take another exam, and then went through

8 the academy, and sworn in as a police officer.  I

9 believe it was June of '72 or '73.

10    Q.   Okay.  What's next?

11    A.   I was assigned Precinct Number 10 at

12 the time, which was on Niagara Street, about two

13 blocks from where I grew up.  I was assigned there

14 from 1973 till '86.

15    Q.   Okay.

16    A.   And I worked there as a police officer

17 until '79, was promoted to detective in '79.

18    Q.   All right.  Let me stop you there.

19 What was the process in 1979 to become a detective?

20 Did you take a test?  Were you just asked?  Did you

21 apply?  How did it happen?

22    A.   You're asked and -- by either your --

23 the commissioner at the time was Cunningham, I

24 believe, and he was my captain at Precinct 10.

25 When he became commissioner, apparently he liked



1               Raniero Masecchia

2    the work I did and asked if I would accept a

3    promotion to plainclothes, acting detective they

4    called it.

5          Q.    That was '79?

6          A.    That was in '79, and I worked out right

7    of Precinct 10 as a precinct detective they called

8    it.

9          Q.    Okay.  And had you done any -- any

10   undercover work or anything like that --

11         A.    No.

12         Q.    -- leading towards detective?

13         A.    No.

14         Q.    Okay.  And I take it that the precinct

15   level detectives investigated all crimes short of,

16   say, homicides, things like that; is that right?

17         A.    Yes.

18         Q.    Was there a homicide unit at that

19   time --

20         A.    Oh, yes.

21         Q.    -- in '79?

22         Okay.  So you're -- you're 10th precinct

23   detective.  How long did you remain in that

24   position?

25         A.    From '79 to '86, at which time I was



1                    Raniero Masecchia

2   called and asked if I would consider working in the

3   homicide squad.

4           Q.    Okay.   And where was that, the homicide

5   squad?

6           A.    74 Franklin Street, right across the

7   street here.   Police headquarters on the 3rd floor.

8           Q.    Okay.   Did you have the whole third

9   floor or just a part of the third floor?

10          A.    Just part of the third floor.

11          Q.    How many total -- in 1986, how many

12  total homicide detectives were there?   About 20?

13          A.    No.

14          Q.    Less?

15          A.    I'm trying to think.   Maybe 15, 14.   I

16  don't know.

17          Q.    Two shifts?   Three shifts?

18          A.    It was two shifts plus overlapping

19  shifts where only two detectives worked.   You know,

20  you had 8:00 to 4:00, 4:00 to 12:00, and then you

21  had a group that worked from, like, 10:00 to 6:00

22  in the morning, two guys, and then two guys would

23  work from 6:00 in the morning till 2:00 a.m. --

24          Q.    Okay.

25          A.    -- 2:00 p.m.



```
 1                    Raniero Masecchia
 2          Q.    And I take it the room was an open
 3   room, nobody had offices; is that right?
 4          A.    At that time, it was one open room.
 5   The lieutenant had his own office, I believe, and
 6   the chief of homicide had his own office.
 7          Q.    Okay.
 8          A.    The other one was -- was a big room.
 9          Q.    And did at some point in time, did
10   that -- did that physical setup change?
11          A.    Oh, yeah.  We --
12          Q.    When?
13          A.    -- moved over -- they remodelled.  I
14   don't remember what year it was.
15          Q.    Was it -- was it before or after 1991,
16   the time of this case?
17          A.    Before.
18          Q.    Okay.  So by the time of this case,
19   where were you, the homicide unit?
20          A.    They moved our office to the -- which
21   would be what?  The east side of the building and
22   set up our own office where we had one main room
23   again, the office for the lieutenant, an interview
24   room, and the office of Donovan who was the chief
25   of homicide at the time.
```



```
 1                    Raniero Masecchia
 2          Q.   And who was the lieutenant in '91?
 3          A.   I believe it was Rautenstrauch, James
 4   Rautenstrauch.
 5          Q.   Okay.  And did he have an office, or
 6   just Donovan?
 7          A.   No, they both had separate offices.
 8          Q.   All right.  And then there was -- it
 9   was an open room, I take it, with desks?
10          A.   Yes.
11          Q.   Bigger than this room?
12          A.   Yes.
13          Q.   Approximately how big?  Like, the size
14   of a classroom or bigger than that?
15          A.   Smaller than a classroom, but enough to
16   fit, like, maybe eight, nine desks separated
17   pretty --
18          Q.   Okay.
19          A.   -- evenly.
20          Q.   But you were all together, there was no
21   privacy?  It was a --
22          A.   Yes.
23          Q.   Okay.  And I take it that the interview
24   room was a room that you could all see into; is
25   that correct?
```



1                    Raniero Masecchia

2        A.    No.

3        Q.    Okay.   There was no windows in the

4    interview room?

5        A.    No.

6        Q.    You could certainly, from the room, see

7    people coming in and out of the interview room,

8    fair to say?

9        A.    Yes.

10       Q.    It was within feet of where you were

11   sitting?

12       A.    Yeah.

13       Q.    Did you have -- and I'm going to go

14   back to your career in just a minute, but while

15   we're talking about it, by 1991, did you have a

16   regular partner or did you -- did you work with

17   different people?

18       A.    No, I worked with Sergeant Mel Loubit

19   most of the time, but on days off or you'd get

20   called in, you could work with anybody in the

21   squad.

22       Q.    Did you consider him your partner?

23       A.    Yeah, he was my partner.

24       Q.    So people had -- homicide detectives

25   had -- generally had partners?



```
 1                    Raniero Masecchia
 2          A.    Yes.
 3          Q.    Who was Stambach's partner in 1991?
 4          A.    I have no clue.
 5          Q.    You don't remember?
 6          A.    I don't.
 7          Q.    Okay.  I take it the homicide
 8    detectives were a pretty -- pretty tight-knit --
 9    pretty tight-knit bunch?
10          A.    I would hope so.
11          MR. RUSS:  Objection to form.
12          BY MR. BRUSTIN:
13          Q.    Okay.  You got to -- you got to know --
14    certainly by 1991, five years in, you -- you got to
15    know each other pretty well, fair to say?
16          A.    Yes.
17          Q.    And in Buffalo, I take it, like other
18    police departments, the -- the homicide detectives
19    were, at least among nonsupervisory personnel, the
20    highest level of police officers in the department;
21    would that be fair to say?
22          A.    Yes.
23          Q.    Okay.  Certainly, if a homicide
24    detective wanted to get something done, you get --
25    you were able to get things done, fair to say?
```



```
 1                    Raniero Masecchia

 2          MR. RUSS:  Objection to form.

 3          THE WITNESS:  In -- in what means?

 4     BY MR. BRUSTIN:

 5          Q.   It wasn't a good question.

 6          Would it be fair to say, though, that as a

 7     homicide detective, you had a lot of clout among

 8     the patrol officers?

 9          MR. SOEHNLEIN:  Objection to form.

10          MR. RUSS:  Objection to form.

11          THE WITNESS:  I --

12     BY MR. BRUSTIN:

13          Q.   So unless your lawyer tells you not to

14     answer or you don't understand my question, tell

15     me.  But, otherwise, you can answer.

16          A.   I don't know what you mean by clout.

17          Q.   Okay.  Well, people had a lot of

18     respect --

19          A.   Did we --

20          Q.   -- for --

21          A.   Did we have -- if we went to a homicide

22     scene, the homicide officer was the person in

23     charge at the scene.

24          Q.   Right.  And if you told a police

25     officer what to do, they would pretty much jump and
```



```
 1                    Raniero Masecchia
 2   do it, fair to say?
 3           MR. SOEHNLEIN:  Objection to form.
 4           MR. RUSS:  Objection to form.
 5           THE WITNESS:  I would hope they would do it.
 6           BY MR. BRUSTIN:
 7           Q.   Okay.  So back to -- so in general,
 8   though, you've already told us that you were --
 9   that you were a close-knit group, the homicide
10   detectives, correct?
11           MR. RUSS:  Objection to form.
12           THE WITNESS:  Yeah.
13           BY MR. BRUSTIN:
14           Q.   You socialized with one another, during
15   your shift you shared meals together, fair to say?
16           A.   Well, with the four guys that I usually
17   work with, yes.
18           Q.   Who were the four guys that you were
19   working with in '91?
20           A.   All right.  That's a little tricky.
21   Mel Loubit, Detective DiPirro, and I believe it was
22   Detective Grabowski was still working.  I'm not
23   sure if he had retired by then.
24           Q.   Okay.  I just saw --
25           A.   We --
```



```
 1                     Raniero Masecchia
 2          Q.    I saw from the paperwork a lot of times
 3    you were working with Stambach.  Is he -- he wasn't
 4    one of the people that was in your group?
 5          MR. RUSS:  Objection to form.
 6          THE WITNESS:  I don't recall if he was -- he
 7    worked -- he usually worked -- I think he was one
 8    of the guys that worked, like, 6:00 p.m. to
 9    2:00 a.m. at the time.  I'm not sure.  He might
10    have been in our group for a little while, but not
11    long.
12          BY MR. BRUSTIN:
13          Q.    Was he younger or older than you?
14          A.    Who?
15          Q.    Stambach.
16          A.    He came in after.  He might have just
17    got into homicide around that time --
18          Q.    Okay.
19          A.    -- I'm not sure, but I was there --
20          Q.    You were senior to him?
21          A.    Well, I wasn't a senior.  We both came
22    on the department the same time --
23          Q.    Okay.
24          A.    -- you know, and I might have made
25    detective a few months before him or something, but
```



1                    Raniero Masecchia

2    I think he worked narcotic squad, he worked

3    different squads that I recall --

4         Q.    Okay.

5         A.    -- and there was only one -- we had our

6    sergeant, everyone else was equal, and even the

7    sergeant was equal.  He did his share of the work.

8         Q.    Okay.  Was the Buffalo Police

9    Department small enough so that you knew generally

10   everybody on the job?

11        A.    I would hope so.  There were, at the

12   time, probably -- when I got on the job, there was

13   probably 1,500 guys so I'd doubt if I knew

14   everybody on the job.

15        Q.    Okay.  Was -- was Stambach -- you

16   mentioned that you started around the same time.

17   Was Stambach a friend of yours when you were on the

18   job?  Did you socialize with him?

19        A.    He was a fellow worker.  I'd hopefully

20   consider him a friend after a time, but we both got

21   appointed at the same time, too.

22        Q.    Okay.  Did you ever socialize with him

23   off the job?  Share a meal, have a beer, anything

24   like that?

25        A.    Yes.  Sure.



1                     Raniero Masecchia

2          Q.    Okay.  Was he one of your friends on

3     the job, someone you would go out with after work?

4          MR. RUSS:  Objection to form.

5          THE WITNESS:  Once in a while, I would

6     assume.  I've never been to his house.

7          BY MR. BRUSTIN:

8          Q.    Okay.  Did you -- do you know his

9     family?

10         A.    I've met them --

11         Q.    Okay.

12         A.    -- at functions or at retirement

13    parties, things like that.

14         Q.    How often would you socialize with one

15    another?

16         A.    With Mark?

17         Q.    Yeah.

18         A.    Once a month, twice a month.

19         Q.    Okay.  Who were your other -- who --

20    who were your other good friends in the homicide

21    division?

22         MR. RUSS:  Objection to form.

23         THE WITNESS:  Mel Loubit, Angelo Cannizzaro.

24    I considered them all good friends, but the one I

25    would socialize with the most was probably



```
 1              Raniero Masecchia
 2   Detective Cannizzaro.
 3          BY MR. BRUSTIN:
 4          Q.   Okay.  By the way, in 1991, were there
 5   any black detectives in homicide?
 6          A.   I don't know.  Mike Lyons maybe and
 7   Reggie Minor.  I don't know when they came there.
 8          Q.   Okay.  All right.  So 1986 you become a
 9   homicide detective?
10          A.   Yeah.
11          Q.   Any other transfers, promotions,
12   anything like that?
13          A.   For me?
14          Q.   Yeah.
15          A.   No.
16          Q.   When did -- so you -- you remained a
17   homicide detective through the rest of your career?
18          A.   Right.
19          Q.   No supervisory positions?
20          A.   No --
21          Q.   Did you --
22          A.   -- I was offered to be a detective
23   sergeant, but I would have had to leave homicide
24   and go to a precinct, and I decided to turn it
25   down.
```



1                    Raniero Masecchia

2        Q.    Okay.  When did you retire?

3        A.    2002.

4        Q.    Okay.  Is that just after you had

5   enough time in, or what was -- what caused your

6   decision to retire?

7        A.    I was being treated for something and I

8   was taking interferon and ribavirin for

9   Hepatitis C --

10       Q.    Okay.

11       A.    -- and it knocked the hell out of me

12  and lost, like, 30 pounds.  I couldn't function.  I

13  just -- I knew it was going to wear off after a few

14  years, but I just couldn't do the work.  Felt like

15  I was a burden more than a help --

16       Q.    Okay.

17       A.    -- so I retired.

18       Q.    Okay.  And since that time, have you

19  had any other employment?

20       A.    Yes.  When I retired, I had started a

21  private investigation with my partner Angelo

22  Cannizzaro who became my partner after Mel Loubit

23  retired.

24            And then when he retired in '96, we opened

25  up the business, and strictly doing civil cases and



```
 1                    Raniero Masecchia
 2   security and stuff like that, you know.
 3           And then when I retired in 2002, we expanded
 4   it a little and did some security, civil cases, but
 5   we also were asked by several attorneys if we would
 6   do criminal cases, and since I retired, I did.  I
 7   worked for three or four different attorneys in the
 8   City of Buffalo.
 9           Q.   Okay.  And when did you -- did you do
10   investigation work full-time?
11           A.   I would say three quarters.  You know,
12   it wasn't a -- it wasn't a 40-hour week.  Some --
13   some weeks we'd work, some weeks we decided not to
14   take cases and take off.  It was at our -- I was
15   retired.  It was at my discretion.
16           Q.   Right.  When did you retire from doing
17   investigation work?
18           A.   I believe it was after I -- my brain
19   aneurysms.  Probably 65, I want to say.  You know,
20   65 years old.
21           Q.   So about seven years ago?
22           A.   Yeah.
23           Q.   And you haven't worked since then?
24           A.   No.
25           Q.   Okay.  By the way, it sounds like you
```



```
1                    Raniero Masecchia
2    were doing investigation work while you were still
3    a detective, is that correct, for a period of time?
4         A.    No.
5         Q.    You said you started -- maybe I
6    misunderstood.
7         Did you -- did you start doing investigation
8    work -- outside investigation work in '96?
9         A.    No, we opened up the business, but we
10   were doing civil cases and security.
11        Q.    While you were still a police officer?
12        A.    The company was.  90 percent of the
13   work was being done by Angelo Cannizzaro who
14   retired, you know, and we just -- I took the exam,
15   got the license, and did it.
16        Q.    Were you --
17        A.    I --
18        Q.    -- moonlighting doing that work, too,
19   or no?
20        A.    I did -- yeah, I did some cases here
21   and there, set up security or something like that,
22   but not much --
23        Q.    Okay.  You --
24        A.    -- not until I retired.
25        Q.    You were allowed to moonlight, though,
```



                    Raniero Masecchia

1                   Raniero Masecchia
2    on the job?
3         A.    Sure.
4         Q.    Yeah.  Did you have any other jobs as a
5    police officer other than being a police officer
6    during your career?
7         A.    I worked security at UPS.  I worked
8    security at Bells Markets.  Mostly security jobs.
9         Q.    And beginning in '86 when you were a
10   homicide detective, would it be fair to say that
11   any time you needed to work overtime, you were able
12   to get overtime for homicide cases?
13        A.    We tried.  Sometimes we were -- we were
14   allowed, sometimes we weren't.
15        Q.    Okay.
16        A.    But for the most part, if we were
17   already working the case -- say we got a case, we
18   got a shooting at 2:00 in the afternoon, our
19   schedule is 8:00 to 4:00, you worked through until
20   everything was exhausted up until that time, and
21   then you'd go home.  So it was never turned down at
22   that point.
23        Q.    Okay.  So I want to ask you some
24   questions now about your preparation for today, but
25   before I do, I just want to make sure that we're



```
1                   Raniero Masecchia

2     all starting from the same place.

3          My understanding, and you correct me if I'm

4     wrong, is that you and all the defendants concede

5     today that Valentino Dixon did not shoot Torri

6     Jackson on August 10th, 1991, and that LaMarr

7     Scott -- Scott did --

8          MR. SOEHNLEIN:  Objection.

9          BY MR. BRUSTIN:

10         Q.   -- do you -- do you agree with that,

11    sir?

12         MR. SOEHNLEIN:  Form.

13         MR. RUSS:  Object to the form.

14         THE WITNESS:  I don't agree or disagree.  I

15    don't know.

16         BY MR. BRUSTIN:

17         Q.   You don't have a position on that?

18         A.   No.

19         Q.   Okay.  You don't concede for purposes

20    of this case that, in fact, LaMarr Scott, who pled

21    guilty to that -- to that crime, in fact, committed

22    that crime?

23         MR. RUSS:  Objection to form.

24         THE WITNESS:  I don't -- I didn't know he

25    pled -- pled guilty until just now.  I mean, I was
```



```
 1              Raniero Masecchia
 2  informed that someone else came forward, came
 3  forward back then also, apparently.
 4       But, no, I don't -- I don't know.  If I have
 5  to concede to something like that that I don't know
 6  about, no, I don't know.
 7       BY MR. BRUSTIN:
 8       Q.   So the first you're ever hearing that
 9  LaMarr Scott or anybody pled guilty to the murder
10  that Valentino Dixon was convicted of is me telling
11  you that this morning?
12       A.   Yeah, I don't -- I don't think I was
13  informed that he pled guilty.  I know that he -- he
14  came forward as -- and this is what this hearing is
15  about.
16       Q.   Okay.
17       A.   I just assumed that it -- the plea
18  wasn't -- wasn't done yet.
19       Q.   Okay.  But as you sit here today, you
20  don't have an opinion one way or another whether or
21  not Valentino Dixon actually committed the murder
22  for which he was convicted?
23       A.   No.
24       Q.   All right.  You understand, sir, that
25  Valentino Dixon has sued you and a number of
```





1                    Raniero Masecchia

2    detectives in connection with what he claims is a

3    wrongful conviction and claiming that his civil

4    rights were violated; you understand that, correct?

5         A.    Yes.

6         Q.    And you understand that that -- those

7    are extraordinarily serious allegations, that a man

8    spent more than two decades in prison for crimes he

9    didn't commit based on alleged misconduct by police

10   officers?

11        MR. RUSS:  Objection to form.

12        THE WITNESS:  Yes.

13        BY MR. BRUSTIN:

14        Q.    I take it you -- you take those

15   allegations very seriously?

16        A.    Yes.

17        Q.    Would it be fair to say that as a

18   result, you've done everything possible to prepare

19   yourself to answer questions about this case?

20        A.    I reviewed whatever papers the

21   counselors gave me, the attorneys gave me, and I

22   reviewed them for several days now, and that's it.

23        Q.    Okay.  But it was your goal to refresh

24   your recollection as much as possible --

25        A.    As much as I could.



```
 1                    Raniero Masecchia
 2         Q.   So here's the thing.  I actually speak
 3    quickly and the court reporter's got to write
 4    everything down --
 5         A.   Right.
 6         Q.   -- sometimes there's going to be
 7    objections.  So if you could just pause for just a
 8    beat after I ask a question, it'll be much easier,
 9    if you don't mind.
10         A.   Okay.
11         Q.   So would it be fair to say that it was
12    your goal in reviewing documents and meeting with
13    your attorney to prepare yourself as much as
14    possible and to refresh your recollection as much
15    as possible to answer questions about events that
16    happened long ago?
17         A.   Yes.
18         Q.   And, by the way, this is not the first
19    time that you've been a defendant in a civil rights
20    case alleging a wrongful conviction, correct?
21         A.   One other time, yes.
22         Q.   And that would be the Epps case,
23    correct?
24         A.   Yes.
25         Q.   All right.  So I take it that when you
```



```
 1                   Raniero Masecchia
 2   received the complaint in this case, you read it,
 3   the civil complaint that laid out the
 4   allegations --
 5           A.   I don't recall.
 6           Q.   -- against you?
 7       Do you recall ever reading a complaint that
 8   laid out the allegations against you and the other
 9   officers and the DA in this case?
10           A.   I don't know if I got it when I got the
11   Cory Epps one.  I think I read that one.  I don't
12   recall the Valentino Dixon one.
13           Q.   Okay.  Let's --
14           A.   I might have, but I don't recall.
15           Q.   That's fine.  Let's do it this way,
16   since you were named as a defendant in this case,
17   why don't you start by telling me every piece of
18   paper that you can remember reading.
19           MR. RUSS:  Objection to form.
20           BY MR. BRUSTIN:
21           Q.   About the case.
22           A.   Oh, about the case.
23           Q.   Yeah.  Not -- yes.
24           A.   I don't know if I got something in the
25   mail, I really don't --
```



```
1                    Raniero Masecchia
2         Q.    Okay.
3         A.    -- remember how I was informed about
4    Cory Epps or Valentino Dixon, whether it was
5    through a phone call or through the mail.
6         Q.    All right.  So let's take it a step at
7    a time.  So, first of all, this is what we've
8    already marked as Plaintiff's 2, and it's our best
9    effort to put together the police file in the case.
10   Okay?  And I'm going to be using that today with
11   you.
12        A.    Okay.
13        Q.    But, first of all, have you read any of
14   the police -- any documents you believe were in the
15   police file since you were named as a defendant in
16   the case?
17        A.    Yes.
18        Q.    Okay.  What have you read?
19        A.    I believe there were three or four P73s
20   they call them, you know, departmental
21   correspondence, and two statements that I had
22   taken, and a photo array that I had shown.
23        Q.    Okay.  Did you -- other than -- other
24   than statements that mention you by name,
25   statements you either took or were present for, to
```



```
 1                    Raniero Masecchia
 2    your knowledge, did you read any other parts of the
 3    file, any statements taken by any other officers?
 4         A.    No.
 5         Q.    By the way, did reading those
 6    statements refresh your recollection about the
 7    case?
 8         A.    Not at all.
 9         Q.    All right.  Well, first of all, I take
10    it one reason you remember the case is because at
11    least in 1991, everybody knew who Valentino Dixon
12    was, right?
13         MR. RUSS:  Objection to form.
14         BY MR. BRUSTIN:
15         Q.    He was pretty -- a pretty flamboyant
16    drug dealer at the time who people knew?
17         MR. RUSS:  Objection to form.
18         MR. SOEHNLEIN:  Objection to form.
19         THE WITNESS:  I -- I recall the name because
20    it's a -- Valentino Dixon, it's just a catchy name,
21    you know, but to say he was well known to me?  No,
22    not at all.
23         BY MR. BRUSTIN:
24         Q.    Well, he was well known -- you -- you
25    came to learn that he was well known in the
```



| 1 | Raniero Masecchia |
| 2 | department as kind of a flashy drug dealer, drove a |
| 3 | big white Cadillac, had a lot of run-ins, was |
| 4 | believed to be an up and coming drug dealer; you |
| 5 | recall that generally? |
| 6 | MR. RUSS:  Objection to form. |
| 7 | THE WITNESS:  No, I don't. |
| 8 | BY MR. BRUSTIN: |
| 9 | Q.   No memory of that whatsoever as you sit |
| 10 | here today? |
| 11 | A.   No, sir. |
| 12 | Q.   And it's not just you have no memory of |
| 13 | it today, it's your belief that you did not know it |
| 14 | at the time; is that correct? |
| 15 | A.   I don't know.  I don't recall. |
| 16 | Q.   So you may have known at the time, you |
| 17 | just don't recall it today is what you're saying? |
| 18 | A.   That's correct. |
| 19 | Q.   Okay.  But you have no recollection |
| 20 | today of any of the things I just said of Valentino |
| 21 | being a well known up and coming drug dealer in |
| 22 | Buffalo who police officers knew quite well? |
| 23 | A.   No. |
| 24 | MR. RUSS:  Objection to form. |
| 25 | BY MR. BRUSTIN: |



```
 1                    Raniero Masecchia

 2         Q.   If you knew it, you forgot it?

 3         MR. RUSS:  Objection to form.

 4         MR. SOEHNLEIN:  Objection to form.

 5         THE WITNESS:  Yes.

 6         BY MR. BRUSTIN:

 7         Q.   And nothing you reviewed refreshed your

 8    recollection in that regard?

 9         MR. RUSS:  Objection to form.

10         MR. SOEHNLEIN:  Objection to form.

11         THE WITNESS:  That's correct.

12         BY MR. BRUSTIN:

13         Q.   All right.  Now, in addition --

14         THE REPORTER:  Hold on, hold on.  You've got

15    to slow down a little bit --

16         MR. BRUSTIN:  Okay.

17         THE REPORTER:  -- for me.

18         MR. BRUSTIN:  I will.

19         THE REPORTER:  Thank you.

20         BY MR. BRUSTIN:

21         Q.   In addition to reviewing policed

22    reports, your police reports --

23         A.   Yes.

24         Q.   -- did you review any testimony, either

25    your testimony or anybody else's testimony?
```



```
 1                  Raniero Masecchia
 2        A.   No.
 3        Q.   No trial testimony?
 4        A.   No.
 5        Q.   No testimony from any depositions?
 6        A.   No.
 7        Q.   You didn't review your testimony from
 8   the perjury trial?
 9        A.   What perjury trial?
10        Q.   Do you remember -- do you remember a
11   perjury trial in connection with the prosecution of
12   Valentino Dixon?
13        A.   No.
14        Q.   You don't remember two of the witnesses
15   in the case were charged with perjury in connection
16   with their testimony that LaMarr Scott was the
17   shooter and not Valentino Dixon?
18        A.   No.
19        Q.   Okay.  You don't remember testifying in
20   that proceeding?
21        A.   No.
22        Q.   And you certainly didn't review your
23   testimony from that proceeding in preparation for
24   today?
25        A.   No.
```



```
 1                    Raniero Masecchia
 2          Q.   Other than the police statements that
 3     you reviewed, any other pieces of paper that you
 4     reviewed in connection with this case?
 5          A.   No.
 6          Q.   All right.  How much time in total
 7     would you spent -- would you say you spent
 8     reviewing documents in preparation for today?
 9          A.   About -- maybe three, four hours.
10          Q.   Okay.  And all you -- and in that time,
11     all you reviewed was the police documents you just
12     described?
13          A.   Yeah, there were six, seven pieces of
14     paper.
15          Q.   By the way, if at any time -- I know
16     we're talking about events that happened a long
17     time ago.  If at any time today you remember
18     something else, feel free to put that on the record
19     and -- interrupt me and put it on the record.
20     Okay?
21          A.   Yes.
22          Q.   All right.  In addition to reviewing
23     the documents you just described, did you meet with
24     your attorneys in preparation for today?
25          A.   Yes.
```



```
 1                    Raniero Masecchia
 2         Q.   All right.  So excluding phone calls
 3    about scheduling or anything like that, how many
 4    substantive meetings, either by phone or in person,
 5    did you have with any attorneys on the case?
 6         A.   One.
 7         Q.   When was that meeting?
 8         A.   Several days ago.  Several days ago.
 9         MR. BRUSTIN:  Okay.  And for this, if you
10    want to -- if you remember anything else, you can
11    tell me, too.  I just want to get it right.
12         BY MR. BRUSTIN:
13         Q.   Any other meetings --
14         MR. RUSS:  I believe it was Friday.
15         BY MR. BRUSTIN:
16         Q.   Okay.  Any other meetings since you
17    were -- since -- so you believe the only meeting
18    you had with your attorneys about this case since
19    you were named as a defendant was a few days ago?
20         A.   Yes.
21         MR. BRUSTIN:  That's accurate?
22         MR. RUSS:  He's the witness.
23         MR. BRUSTIN:  If --
24         MR. RUSS:  You can ask him questions and
25    he'll answer.
```



```
 1                    Raniero Masecchia
 2          MR. BRUSTIN:  I just thought you might want
 3   to make it easier because obviously you don't want
 4   him talking about things -- you don't want him --
 5          MR. RUSS:  I'm not going to talk about --
 6          MR. BRUSTIN:  That's fine.
 7          MR. RUSS:  -- when I talked to him --
 8          MR. BRUSTIN:  I just thought make it easier
 9   for you.
10          THE REPORTER:  Just one --
11          MR. BRUSTIN:  You do --
12          THE REPORTER:  -- at a --
13          MR. BRUSTIN:  -- it your way.
14          THE REPORTER:  -- time.
15          THE WITNESS:  One time.
16          BY MR. BRUSTIN:
17          Q.   One time.  How long was that meeting
18   for?
19          A.   Well, twice.  I met this morning and
20   walked over here with them.
21          Q.   Okay.  How long was the meeting on
22   Friday?
23          A.   I don't recall.  Maybe an hour, an hour
24   and a half.
25          Q.   Okay.  So -- and you understand that we
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                          41

```
 1                Raniero Masecchia
 2   are suing you and the city for many million of
 3   dollars based on the fact that Valentino Dixon
 4   spent more than 25 years in prison for a crime he
 5   didn't commit, right?
 6        A.   Yes.
 7        Q.   And you spent an hour meeting with your
 8   attorneys?
 9        A.   Yes.
10        Q.   And a couple of hours reading
11   documents?
12        A.   Yes.
13        Q.   And that would be the sum total of your
14   preparation for today?
15        A.   Yes.
16        Q.   And nothing that you read or nothing
17   that you discussed refreshed your -- refreshed your
18   memory about what happened in the case?
19        A.   Correct.
20        Q.   Your memory of the case is a blank; is
21   that right?
22        MR. SOEHNLEIN:  Objection to form.
23        MR. RUSS:  Same objection.
24        THE WITNESS:  Yes.
25        BY MR. BRUSTIN:
```



                        Raniero Masecchia

1

2          Q.    Okay.  And you've already told us you

3    don't have any memory issues, correct?

4          A.    No.

5          Q.    Do you remember this being a

6    high-profile murder case, a lot of publicity?

7          A.    They were all high-profile to me.

8          Q.    Do you remember -- do you remember

9    reviewing -- do you remember hearing anything at

10   the time that Mr. Dixon was exonerated for the

11   crime, reading anything in the papers or anything

12   like that?

13         MR. RUSS:  Objection to form.

14         THE WITNESS:  I may have.

15         BY MR. BRUSTIN:

16         Q.    All right.  Now, since Mr. Dixon was

17   convicted back in '92 --

18         A.    Okay.

19         Q.    -- have you had any communications with

20   any of the defendant police officers in this case

21   about this case?

22         A.    No.

23         Q.    Since you were named -- so just to be

24   clear, and I think you've answered this, but just

25   to be clear, so since you were named as a defendant



RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
43

```
 1                  Raniero Masecchia
 2    in this case, you haven't had any conversations
 3    with any officers about the case?
 4         A.    I don't recall.  I may have.  You know,
 5    I'm sure that once you get something like this, you
 6    know, you run into the other officers, but Dan
 7    DiPirro has passed away, Grabowski has passed away,
 8    guys I worked with.  I might have talked, Hey,
 9    Mark, did you get one of these, too?
10         You know, and my recollection when I did
11    talk to -- I never talked to Lonergan or Vickerd I
12    believe, you know, not that close with them.  I
13    mean, good friends, but since I retired, I
14    haven't -- I don't think I ever talked to them
15    outside of a retirement party or something.
16         So I think the only one I might have spoken
17    to about it was Mark Stambach.  I can't think of
18    anyone else, you know --
19         Q.    Okay.
20         A.    -- other than when I did talk to him, I
21    don't know how many years ago, whenever the first
22    thing came out --
23         Q.    Okay.
24         A.    -- and it's like what I'm trying to
25    tell you today, I didn't remember anything about it
```



1                    Raniero Masecchia

2    then.

3         Q.    Gotcha.   So you believe that you spoke

4    to Stambach about the case a couple years ago?

5         A.    Spoke to him about it just to know if

6    he got the same letter or something that I got.   I

7    really don't recall.   I didn't think it was that

8    much to do with me because I didn't know anything

9    or recall anything about the case.   I didn't even

10   know I did as much as the attorney showed me when I

11   went to their office the other day.

12        Q.    Gotcha.   By the way, are these the same

13   attorneys representing you in the Epps case?

14        A.    No.

15        Q.    Who represents you there?

16        A.    I don't recall their name.   She was

17   with the Corporation Counsel, I believe, at City

18   Hall.

19        Q.    Gotcha.

20   MR. RUSS:   Maeve.

21   THE WITNESS:   Maeve.

22   BY MR. BRUSTIN:

23        Q.    Okay.

24        A.    Maeve Huggins, is that it?   Maeve

25   Huggins.



```
 1                    Raniero Masecchia
 2          Q.   So, first of all, how often do you
 3   currently talk to Mark Stambach?  How often do you
 4   see each other, talk to each other?
 5          A.   A couple of times a year maybe.
 6          Q.   Okay.  And so you spoke to him soon
 7   after you got the complaint.  The best you can
 8   recall, what did you say to him and what did he say
 9   to you about the case?
10          A.   Other than what's this about, you know,
11   maybe me asking him -- because like I said, I was
12   so -- my recollection was I was not involved in it
13   at all, you know, until just recently I found out
14   to what extent that was.
15          Q.   Gotcha.
16          A.   So I wasn't really too concerned about
17   it because I didn't think my involvement in the
18   case was relevant.
19          Q.   Okay.  Okay.  And what about Stambach,
20   what did he say to you?  He told you -- you --
21   he -- I take it he -- he remembered more given he
22   was the lead detective, correct?
23          MR. RUSS:  Objection to form.
24          THE WITNESS:  Again, that's just an
25   assume -- that would be an assumption on my part,
```



```
1                    Raniero Masecchia

2    but --

3         BY MR. BRUSTIN:

4         Q.    Well, I'm sorry.  I'm asking you about

5    that conversation you had.

6         A.    Well, I don't recall what he said or

7    what -- even what I said.  I'm just assuming what

8    we talked about.

9         Q.    All right.  But you certainly

10   understand from reviewing documents in this case

11   and what little you do recollect that Mark Stambach

12   was lead detective, correct?

13        A.    From what I read, it was more like

14   Lonergan and Vickerd were the lead detectives --

15        Q.    Is that --

16        A.    -- on the case.

17        Q.    Is that your understanding?

18        A.    That's my -- I don't -- I don't know.

19        Q.    All right.  Well, let me ask you this:

20   In 1991 -- withdrawn.

21        Before I get to that, when you met with your

22   attorneys in preparation for today --

23        A.    Yes.

24        Q.    -- were any other officers present?

25        A.    No.
```



```
 1                   Raniero Masecchia
 2         Q.    It was just you and the attorneys?
 3         A.    Yes.
 4         Q.    Okay.  So you haven't had any meetings
 5   with any attorneys and any of the other officers
 6   involved in the case?
 7         A.    No.
 8         Q.    And I take it the only -- the only --
 9   the only attorneys present for that meeting were
10   these two attorneys with you today?
11         A.    Yes.
12         Q.    Okay.  Peter and Hugh?
13         A.    Yes.
14         Q.    Okay.  Back in August of 1991 when this
15   homicide occurred, how were detectives -- homicide
16   detectives assigned to a case?
17         A.    If you were working -- you were
18   assigned a car --
19         Q.    Was it rotating?
20         A.    No, no.  If you were working and you
21   caught the case, it's your case.
22         Q.    Well, my question is how did -- how did
23   you catch a case?  Who made the decision as to
24   which detectives would investigate a case
25   primarily?
```



1                    Raniero Masecchia

2          A.    If you were assigned the car 271 and it

3    was a homicide response car, 272 would be like the

4    backup car --

5          Q.    Okay.

6          A.    -- if 271 was busy on something and

7    they called for a homicide car, whoever answered

8    the call, was the first detective on the scene,

9    that's your case.

10         Q.    All right.  So the first detective that

11   gets to the scene -- in 1991, your understanding is

12   that the first detective that got to the scene of a

13   homicide would remain the lead detective throughout

14   the investigation?

15         A.    It's your case.  You caught it.

16         Q.    Am I -- am I describing it accurately?

17         A.    Yes.

18         Q.    Okay.  And what does -- what did it

19   mean to be the lead detective in a homicide case in

20   1991?  What were your duties and responsibilities?

21         A.    Well, the crime scene investigation,

22   number one.  Make sure the crime scene and the

23   integrity of the crime scene is there.

24         Talk to the police officers at the scene,

25   made sure who entered, who didn't enter, or if it



1                      Raniero Masecchia

2    was an outside scene that the area was secured, and

3    you document the scene and document the body if the

4    body is still at the scene.

5          You know, your partner would do -- begin to

6    do a canvas, make sure the patrolman were out there

7    canvassing the neighborhood, trying to locate any

8    witnesses, determining if you need the evidence

9    unit called in, the photographer called in.  It was

10   your case.

11         Q.   Okay.  So let me -- let me go a little

12   further than that, and I will tell you I haven't

13   had a case in Buffalo, but I've done a lot of cases

14   involving homicide units.

15         So let me -- let me ask you some questions

16   about other duties and responsibilities for the

17   lead detective, and you tell me if it's accurate.

18         Would it be fair to say that the lead

19   detective was responsible for ensuring that all

20   relevant evidence was gathered in connection with

21   the investigation?

22         A.   Whatever evidence was collected in my

23   presence if I was the lead detective, yes --

24         Q.   Okay.

25         A.   -- I would record or refer to the



```
 1                    Raniero Masecchia
 2   evidence collection unit.
 3           Q.    I'm -- I'm speaking more broadly.  For
 4   example, it was the lead detective's responsibility
 5   to ensure that either that lead detective or
 6   somebody else interviewed all relevant witnesses,
 7   correct?
 8           A.    It's -- it's a group effort, yes.
 9           Q.    Well, I want -- right now I'm focusing
10   on the lead detective --
11           A.    Right.
12           Q.    -- and the lead detective's
13   responsibility.
14           My understanding from other police
15   departments is that the lead detective is
16   responsible for ensuring, along with the
17   supervisors, that all relevant witnesses are
18   interviewed; is that accurate?
19           A.    Yes, I would say so --
20           Q.    Okay.
21           A.    -- and -- but the person in charge to
22   make sure that all -- all the checkmarks were
23   checked would be the lieutenant --
24           Q.    Okay.
25           A.    -- and tell you, Hey, did you finish
```



```
 1                    Raniero Masecchia
 2   your canvas?  Did you have any witnesses?
 3           Q.    Okay.
 4           A.    Was it -- you know, it's the
 5   lieutenant, but the lead detective is the person
 6   you're going to go to.  If you have pertinent
 7   information, you go to the lead detective.  If it's
 8   irrelevant, continue on with it.
 9           Q.    Okay.  So would it be fair to say that
10   the lead detective, as a -- as a matter of practice
11   in 1991, all of the other homicide detectives would
12   understand that any potentially relevant
13   information they gathered had to be brought to the
14   attention of both the lead detective and the
15   supervisor?
16           MR. RUSS:  Objection to form.
17           THE WITNESS:  Well, the two detectives who
18   caught the case are probably the lead detectives.
19           BY MR. BRUSTIN:
20           Q.    Okay.  And did I describe the process
21   accurately, that any relevant evidence that any
22   homicide detective gathered in connection with the
23   case, they would make sure that the lead detectives
24   were in the loop?
25           A.    I would hope so, yes.
```



| | |
|---|---|
| 1 | Raniero Masecchia |
| 2 | Q.    Okay.  And one of the jobs of the lead |
| 3 | detectives, along with the supervisor, was to |
| 4 | ensure that any potentially relevant evidence was |
| 5 | properly documented in a P73 or another form? |
| 6 | A.    Yes. |
| 7 | MR. RUSS:  Objection to form. |
| 8 | BY MR. BRUSTIN: |
| 9 | Q.    Documentation was an extremely |
| 10 | important part of your job as a homicide detective, |
| 11 | correct? |
| 12 | A.    Yes. |
| 13 | Q.    The saying goes, if it's not written |
| 14 | down, it doesn't happen.  Have you heard that |
| 15 | before? |
| 16 | A.    No. |
| 17 | MR. RUSS:  Objection to form. |
| 18 | MR. SOEHNLEIN:  Form. |
| 19 | BY MR. BRUSTIN: |
| 20 | Q.    But in any case, you understood that it |
| 21 | was critically important as a homicide detective |
| 22 | when collecting any relevant evidence, whether it's |
| 23 | a witness interview or some other form of evidence |
| 24 | gathering, to document what you did? |
| 25 | MR. RUSS:  Objection to form. |



```
 1                   Raniero Masecchia

 2        THE WITNESS:  Yes.

 3        MR. SOEHNLEIN:  Objection to form.

 4        BY MR. BRUSTIN:

 5        Q.   Based on your review of your reports in

 6   this case, do you believe that you did anything,

 7   even inadvertently, to cause the conviction of an

 8   innocent man?

 9        MR. RUSS:  Objection to form.

10        MR. SOEHNLEIN:  Objection to form.

11        MR. RUSS:  Don't answer that.

12        MR. BRUSTIN:  What are you talking about?

13   You can't instruct him not to answer.

14        MR. RUSS:  The conviction of an innocent

15   man?  No way.

16        MR. BRUSTIN:  What is your --

17        MR. RUSS:  That is the legal --

18        MR. BRUSTIN:  What --

19        THE REPORTER:  Hold on.  Hold on.

20        MR. BRUSTIN:  You don't get to tell him not

21   to answer questions.

22        MR. RUSS:  I certainly do.

23        MR. BRUSTIN:  Under what authority?

24        MR. RUSS:  Under -- when you ask a blatantly

25   improper question that asks him the ultimate issue
```



```
 1                  Raniero Masecchia
 2   in the case, I'm going to tell him not to answer.
 3        MR. BRUSTIN:   You've conceded the ultimate
 4   issue in the case.
 5        MR. RUSS:   I have not conceded anything.
 6        MR. BRUSTIN:   You told the judge you're --
 7   there's -- you have no question that LaMarr Scott
 8   was the shooter.
 9        MR. SAHASRABUDHE:   No one from our office
10   ever said that.
11        MR. BRUSTIN:   Okay.
12        MR. RUSS:   He's not answering it.   If you
13   want to call the judge, call the judge.
14        MR. BRUSTIN:   We won't call the judge, but I
15   will -- I'll get him back here and you'll pay for
16   it.   That's how we'll do it.
17        MR. SOEHNLEIN:   Just note -- can you note
18   that I join in his objection?
19        MR. BRUSTIN:   All right.   You were the one
20   who said it then.   Somebody said it.
21        MR. SOEHNLEIN:   I -- I wasn't on a call, I
22   never said that --
23        MR. BRUSTIN:   All right.   In any case --
24        MR. SOEHNLEIN:   -- but I'm kind of new to
25   the case.   So I'm trying my best.
```

RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
55

```
 1                    Raniero Masecchia
 2         BY MR. BRUSTIN:
 3         Q.   Have you done anything -- withdrawn.
 4         Did you see anything in the documents that
 5    you reviewed that cause you to believe you -- you
 6    may have done something inappropriate in this case
 7    that caused Mr. Dixon to be convicted?
 8         A.   No.
 9         Q.   Even inadvertently?
10         A.   From the documents I read, no.
11         Q.   Okay.  Fair to say that based on the
12    documents you read, you did everything properly in
13    this case?
14         A.   Yes.
15         Q.   You did it by the book?
16         A.   Yes.
17         Q.   You followed your training and
18    procedure and policy?
19         A.   Yes.
20         Q.   Would it be fair to say that you hold
21    this case out as an example of good police work?
22         MR. RUSS:  Objection to form.
23         MR. SOEHNLEIN:  Objection as to form.
24         THE WITNESS:  All I could talk to is what I
25    read --
```



```
 1                  Raniero Masecchia
 2         BY MR. BRUSTIN:
 3         Q.    Okay.  And --
 4         A.    -- and what procedure was done on my
 5  end.
 6         Q.    Okay.
 7         A.    And I always did it --
 8         Q.    The right way?
 9         A.    -- the right way.
10         Q.    You always followed your training?
11         A.    Yes.
12         Q.    You always followed the rules and
13  regulations?
14         A.    Yes.
15         Q.    Without exception?
16         A.    Yes.
17         Q.    Okay.  And would it be fair to say that
18  you understood that as a police officer if you
19  observed any misconduct by your fellow officers,
20  you had an obligation to report it?
21         A.    Absolutely.
22         Q.    All right.  And you understood that as
23  a police officer, observing misconduct by a fellow
24  officer in your presence was equally serious -- and
25  not reporting it, was equally serious to doing it
```



1              Raniero Masecchia

2    yourself?

3         A.   Yes.

4         Q.   Okay.  Did you ever report an officer

5    engaging in misconduct during your career?

6         A.   My whole career?

7         Q.   Yes, sir.

8         A.   Report?  I don't recall.

9         Q.   Okay.  Would it be fair to say to the

10   best of your recollection, you never reported an

11   officer engaging in misconduct?

12        A.   I don't recall.

13        Q.   As you sit here today, you don't recall

14   a single instance?

15        MR. RUSS:  Objection to form.

16        THE WITNESS:  Of reporting --

17        BY MR. BRUSTIN:

18        Q.   Yes, sir.

19        A.   -- someone?  Talking to the lieutenant

20   about someone?

21        Q.   Reporting --

22        A.   Talking to --

23        Q.   Let me -- I'll make it clear.

24        MR. RUSS:  He's trying to answer --

25        THE WITNESS:  Well, I'm trying to answer --



```
 1                        Raniero Masecchia
 2           MR. RUSS:  -- your question.
 3           THE WITNESS:  -- the question.
 4           MR. BRUSTIN:  He seems like he's asking for
 5    a clarification, so I'm going to give you one.
 6           BY MR. BRUSTIN:
 7           Q.   Did you ever raise through the chain of
 8    command an officer engaging in misconduct in your
 9    presence?
10           A.   I don't recall.
11           Q.   Okay.  So as you sit here today, you
12    have no -- you have no recollection of ever doing
13    that?
14           A.   Right.
15           MR. RUSS:  Objection to form.
16           BY MR. BRUSTIN:
17           Q.   All right.  And is it your -- so, for
18    example, would it be fair to say that during the
19    entire time, beginning in 1971 when you were --
20    became a police officer, you never saw a police
21    officer use a racial slur against a suspect?
22           A.   No, I didn't say that.
23           Q.   Well, you would -- you would agree that
24    a police officer who, for example, used the N word
25    with a suspect, that would be a serious violation
```



                            Raniero Masecchia

 1

 2    of policy and procedure, correct?

 3          A.    In what way?

 4          Q.    Well, maybe it's not.  So was it -- in

 5    your view, was it permissible when you were a

 6    police officer to use racial slurs against

 7    suspects?

 8          A.    No.

 9          Q.    So that's my question, sir.  I'm asking

10    you about reporting violations of policy and

11    procedure.

12          Did you ever -- would it have been a

13    violation of policy and procedure in 1991 for a --

14    for a police officer to refer to a suspect using

15    the N word?

16          A.    I don't know.

17          Q.    Okay.

18          A.    I never seen anything in writing where

19    saying you couldn't use that word or whatever, but

20    it wasn't right to use it --

21          Q.    Okay.

22          A.    -- and if somebody was to use it in my

23    presence, I think I would have said something.

24          Q.    Okay.  But you wouldn't have reported

25    them?



```
 1                    Raniero Masecchia

 2        A.    But I doubt I would have reported them

 3   for using that word.

 4        Q.    Okay.  And, obviously, that was a word

 5   that from time to time homicide detectives would

 6   use, fair to say?

 7        A.    I would assume that they -- it came to

 8   the conversation back then in the '80s, the '90s,

 9   yes.

10        Q.    Okay.  That was especially in a

11   predominantly -- predominantly white homicide unit,

12   that word and other racial slurs were sometimes

13   used by officers?

14        A.    I'd say 70, 80 percent of the people

15   who worked in the homicide office were probably

16   white.  You know, we had Hispanic, we had black

17   detectives, we had black that were -- who worked in

18   the office assisting with the paperwork and that.

19   So I would say 75 percent were white, yes.

20        Q.    And from time to time during that time

21   period, certainly the white homicide detectives

22   would use racial slurs like the N word?

23        MR. RUSS:  Objection to form.

24        THE WITNESS:  I'm sure they did.

25        BY MR. BRUSTIN:
```



```
 1                    Raniero Masecchia
 2          Q.    Okay.  And you might say, don't say
 3    that, but you wouldn't report them?
 4          A.    That's correct.
 5          Q.    Okay.  And I take it -- is it your
 6    testimony that beginning in 1972 when you became a
 7    police officer through your retirement, you never
 8    saw an officer use excessive force?
 9          A.    I'm sure I have.
10          Q.    Okay.  And would it be fair to say that
11    there were multiple times when you saw police
12    officers lay their hands on suspects in ways that
13    you knew were excessive?
14          MR. RUSS:  Objection to form.
15          THE WITNESS:  Yes.
16          BY MR. BRUSTIN:
17          Q.    And not one of those times did you ever
18    report that conduct, fair to say?
19          A.    I don't recall.
20          Q.    Well, do you think that if you reported
21    a fellow officer for striking a suspect, that's
22    probably something you'd remember?
23          A.    Well, for me to report it, it probably
24    would have been to my lieutenant --
25          Q.    Okay.
```



1                    Raniero Masecchia

2          A.    -- and there were instances where I did

3    go to the lieutenant --

4          Q.    And report --

5          A.    -- I just -- I just don't recall the

6    instances.

7          Q.    All right.  Would it be fair to say

8    that there were multiple times when you observed

9    officers engaging in excessive force when you

10   didn't report it?

11         A.    Multiple --

12         MR. RUSS:  Objection to form.

13         THE WITNESS:  -- times.

14         MR. SOEHNLEIN:  Objection to form.

15         THE WITNESS:  Two, three, four times

16   possibly, yes.

17         BY MR. BRUSTIN:

18         Q.    And that's because as a general matter

19   as a police officer in Buffalo, like police

20   officers in many metropolitan areas, reporting

21   fellow officers for misconduct was frowned upon?

22         MR. RUSS:  Objection to form.

23         MR. SOEHNLEIN:  Objection to form.

24         THE WITNESS:  Yes, I would -- I would assume

25   so.



```
 1                    Raniero Masecchia
 2          BY MR. BRUSTIN:
 3          Q.    All right.  You don't have to assume
 4  so.  Based on your experience -- and I appreciate
 5  your honesty and candor about it -- the blue wall
 6  of silence is a real thing?
 7          MR. RUSS:  Objection to form.
 8          MR. SOEHNLEIN:  Objection to form.
 9          THE WITNESS:  I don't know if we called it a
10  blue wall of silence, or you don't -- just wasn't
11  there like the prevalence you're trying to make it
12  as.  It wasn't like that.
13          BY MR. BRUSTIN:
14          Q.    Okay.  But --
15          A.    I didn't experience that.
16          Q.    All right.
17          A.    The guys in the homicide squad were the
18  most professional guys I ever worked with when I
19  got up there.
20          Q.    Including Stambach?
21          A.    I worked with Stambach on numerous
22  occasions throughout the 17 years that I was
23  there --
24          Q.    Well --
25          A.    -- and I never seen him, never
```



1              Raniero Masecchia

2   personally, and I -- when he worked with me, act

3   excessively with anybody.

4         Q.   All right.  Is it your testimony that

5   you never saw Stambach violate the rules or

6   regulations or training of the department?

7         A.   Not that I recall.

8         Q.   All right.  In any case, you do agree

9   that when you were a -- when you were a police

10  officer, including when you were a homicide

11  detective, it was disfavored to report a fellow

12  officer for misconduct?

13        MR. RUSS:  Objection to form.

14        MR. SOEHNLEIN:  Form.

15        THE WITNESS:  Dependent on what the

16  misconduct was.  For someone swearing, for someone

17  using the N word, for someone being a wise guy or

18  something.

19        BY MR. BRUSTIN:

20        Q.   Okay.

21        A.   Yeah, it was frowned upon.

22        Q.   All right.  Do you remember -- and also

23  maybe for -- for smacking a suspect when you didn't

24  necessarily need to?  You wouldn't report that --

25        MR. RUSS:  Objection to form.



```
 1                    Raniero Masecchia

 2          BY MR. BRUSTIN:

 3          Q.    -- fair to say?

 4          MR. SOEHNLEIN:  Objection to form.

 5          THE WITNESS:  And like I said, when I worked

 6   with Mark Stambach or any of the detectives I

 7   worked with, I never seen that.

 8          BY MR. BRUSTIN:

 9          Q.    All right.  Do you recall any officer

10   in homicide ever reporting another officer for

11   misconduct, ever?

12          A.    I don't recall, no.  I don't know.

13          Q.    Now, you recall testifying in the Epps

14   case in a deposition, correct?

15          A.    Yes.

16          Q.    And that wasn't too long ago, that was

17   a couple years ago?

18          A.    Yeah, a little over a year at least.

19          Q.    And did you have an opportunity to

20   review your testimony after that case?  Did you

21   review the transcript?

22          A.    Not yet, no.

23          Q.    But you certainly did your best to tell

24   the truth in that --

25          A.    Absolutely.
```



Raniero Masecchia

1

2     Q.   -- in that hearing, correct?

3     A.   Yes.

4     Q.   All right.  I'm going to go over just a

5 few things that you talked about there because

6 hopefully we won't need to do it again here.

7     But one of the things you talked about there

8 was your familiarity with the term Brady material;

9 do you recall that?

10    A.   Yes.

11    Q.   All right.  And you understood,

12 certainly by 1991, the time of this investigation,

13 what Brady material was?

14    A.   Yes.

15    Q.   All right.  And so as a general matter,

16 you understood that Brady material for police

17 officers meant any evidence that could be used to

18 prove somebody's innocence, correct?

19    MR. RUSS:  Objection to form.

20    MR. SOEHNLEIN:  Objection as to form.

21    THE WITNESS:  Correct.

22    BY MR. BRUSTIN:

23    Q.   Or any evidence that could be utilized

24 to impeach the credibility of a witness for the

25 prosecution, correct?



```
 1                    Raniero Masecchia
 2          MR. RUSS:  Objection to form.
 3          THE WITNESS:  Yes.
 4          MR. SOEHNLEIN:  Also objection to form.
 5          BY MR. BRUSTIN:
 6          Q.   All right.  And you understood as a
 7    homicide detective in 1991, that any time you
 8    became of any Brady material, whether it be
 9    exculpatory evidence or impeachment evidence, you
10    had an absolute obligation to document that
11    evidence and make sure that it was put into the
12    file, correct?
13          A.   Yes.
14          MR. SOEHNLEIN:  Objection as to form.
15          BY MR. BRUSTIN:
16          Q.   No gray area on that requirement, that
17    was an absolute obligation, correct?
18          MR. SOEHNLEIN:  Same objection.
19          THE WITNESS:  Yes.
20          BY MR. BRUSTIN:
21          Q.   And you understood -- you understood as
22    a homicide detective in 1991 that it was as
23    important, or even more important, to document
24    Brady material, exculpatory evidence or impeachment
25    evidence, as it was to document evidence indicating
```



                           Raniero Masecchia

1
2    guilt?
3          A.    Just as important.
4          Q.    And as a -- as a homicide detective,
5    you were not a lawyer, you did not have formal
6    legal training, correct?
7          A.    Yes.
8          Q.    And so your understanding and the
9    training that you received was that you had to take
10   a broad view of what constituted Brady material so
11   that somebody else could sort it out?
12         Your job was simply to document it and to
13   put it into the file and made sure it made its way
14   to the prosecutor, correct?
15         MR. RUSS:  Objection to form.
16         MR. SOEHNLEIN:  Objection to form.
17         THE WITNESS:  Yes.
18         BY MR. BRUSTIN:
19         Q.    In other words, if you had any doubt in
20   your mind as to whether a certain piece of evidence
21   constituted Brady material, it was your -- it was
22   your obligation to write it down and provide it to
23   the DA?
24         A.    If I felt it was Brady material, yes.
25         Q.    Well, my question is if you had any



```
1                    Raniero Masecchia
2    doubt in your mind as to whether it might be Brady
3    material --
4         A.    What do you mean?
5         Q.    -- you would err -- in other words, if
6    you weren't sure but you thought it could be, you
7    would err on the side of writing it down so that
8    somebody else could make that decision?
9         A.    If I was even thinking it was Brady
10   material, yes.
11        Q.    Okay.  In other words, if you had any
12   thought that the evidence you had gathered could be
13   used to question the reliability or the credibility
14   of a prosecution witness, you would write --
15        THE REPORTER:  I'm sorry.  You've got to
16   slow down.  Could be used to question the
17   reliability ...
18        BY MR. BRUSTIN:
19        Q.    Or the credibility of a
20   prosecution's -- prosecution witness, you would
21   write that down in a report, correct?
22        A.    I would hope so.
23        Q.    All right.  And that's what your
24   training was, correct?
25        A.    Yes.
```



1                    Raniero Masecchia

2          Q.    And you understood that your fellow

3    detectives understood that obligation?

4          A.    I would hope so.

5          Q.    And as a general matter, you understood

6    there -- in addition to documenting Brady material,

7    there were a number of reasons why it was important

8    to document statements or evidence that you

9    received from witnesses, correct?

10         A.    Yes.

11         MR. RUSS:   Objection to form.

12         BY MR. BRUSTIN:

13         Q.    For example, you understood that

14   oftentimes in a homicide case, the information that

15   you were gathering in a case might not be utilized

16   at trial for years?

17         A.    Yes.

18         Q.    And you would never be able to remember

19   the information that you gathered unless you write

20   it down?

21         A.    Correct.

22         Q.    And you also understood through your

23   experience as a homicide detective that oftentimes

24   you don't know what information is going to be

25   important down the road when you're gathering it,



1                    Raniero Masecchia

2    fair to say?

3          A.   Yes.

4          Q.   And so you take a broad view as to what

5    information might be important, and you write that

6    down in a police report, correct?

7          MR. RUSS:  Objection to form.

8          THE WITNESS:  In an interdepartmental

9    correspondence, yes, a P73.

10         BY MR. BRUSTIN:

11         Q.   Some -- some -- some documentation that

12   makes -- that stays in the file so people can see

13   it down the road?

14         A.   Yes.

15         Q.   And the way that you documented

16   evidence is that you had a notebook or something to

17   take notes in the field.  You would take notes and

18   any information you were gathering, you'd go back

19   to the homicide unit and you would put it into a

20   report, correct?

21         A.   Yes.

22         Q.   Without exception?

23         A.   Without exception?

24         Q.   In other words, that was your process

25   without exception?  You always did that?



1                    Raniero Masecchia

2          A.    Depending on how intricate it was.  If

3    it was something like, Meet you at the corner and

4    bring you to headquarters, I wouldn't document it

5    down.  I would get back to headquarters and I would

6    write it down then.

7          Q.    Fair enough.  But, for example, any

8    time you met with a witness to a crime and that

9    witness gave you any substantive information --

10         A.    We would --

11         Q.    -- about what they -- you'd write it

12   down?

13         A.    Yes.

14         Q.    You'd write it in your notes and then

15   you put it in a report?

16         A.    Yes --

17         Q.    And if --

18         A.    -- or we take a statement.

19         Q.    Okay.  And if you speak to a witness

20   two or three times, which often happens, about a

21   crime, it's equally important to document each of

22   those conversations to the extent you receive

23   additional or different information, right?

24         A.    Yes.

25         Q.    It's -- it's critically important when



1                     Raniero Masecchia

2    you're interviewing eyewitnesses, for example, to

3    document any differences in versions of events they

4    give you about what they saw or heard, correct?

5          A.    Any what?

6          Q.    Any differences in what they saw or

7    heard from interview to interview.

8          A.    Yes.

9          Q.    That, in and of itself, could

10   constitute impeachment evidence, a witness who

11   gives you different versions of events over time?

12         A.    Yes.

13         Q.    Could be an innocent mistake, or it

14   could suggest that they're actually not credible or

15   reliable, correct?

16         A.    Or remembered something they didn't

17   remember earlier.

18         Q.    Right.  But your job is to write it all

19   down and put it into a report, correct?

20         A.    Yes.

21         Q.    The last thing you'd ever want to do as

22   a homicide detective, pursuant to training, is to

23   hide inconsistencies between statements, correct?

24         A.    Yes.

25         Q.    And, in fact, when you get



1                    Raniero Masecchia
2    inconsistencies in statements from an eyewitness,
3    it's your job to explore the basis for those
4    inconsistencies, correct?
5          A.    In what manner?
6          Q.    So, for example, if you -- if you're
7    talking to a witness and on day one that witness
8    tells you that a perpetrator was wearing a blue
9    coat, and on day two, that witness tells you that
10   the perpetrator was wearing a white coat, you're
11   going to want to ask questions about that
12   inconsistency, correct?
13         A.    Yes.
14         Q.    For example, you might say, Well,
15   yesterday you told me that he was wearing a white
16   coat, can you explain that?
17         A.    Yes.
18         Q.    It's the kind of question a trained
19   homicide detective asks?
20         A.    Yes.
21         MR. SOEHNLEIN:  Objection as to form.
22         BY MR. BRUSTIN:
23         Q.    The last thing you want to do as a
24   homicide detective is cover up inconsistencies, you
25   want to explore them --



| | |
|---|---|
| 1 | Raniero Masecchia |
| 2 | A.    Yes. |
| 3 | Q.    -- correct? |
| 4 | That's as basic as it gets for a homicide |
| 5 | detective, right? |
| 6 | A.    Yes. |
| 7 | Q.    And each of the homicide detectives |
| 8 | that you worked with understood that rule, correct? |
| 9 | A.    I would hope so. |
| 10 | Q.    And based on your experience with them, |
| 11 | they did? |
| 12 | A.    The guys I worked with, yes. |
| 13 | Q.    Including Mark Stambach? |
| 14 | A.    I believe so. |
| 15 | Q.    One of the worst things that you could |
| 16 | do as a homicide detective is to receive a piece of |
| 17 | information that doesn't fit your theory of the |
| 18 | case and then fail to report and document it, |
| 19 | correct? |
| 20 | A.    Yes. |
| 21 | Q.    And would it be fair to say that -- |
| 22 | that your practice and the practice of all the |
| 23 | homicide detectives you worked with was to either |
| 24 | dictate or write reports concerning evidence they |
| 25 | received within a day of receiving it? |



1                    Raniero Masecchia

2         MR. RUSS:  Objection to form.

3         MR. SOEHNLEIN:  Objection to form.

4         THE WITNESS:  Yeah.  You would try to, yes.

5         BY MR. BRUSTIN:

6         Q.   If possible, you'd try to do it before

7    the end of your shift?

8         A.   Yes.

9         Q.   And when taking a statement or

10   interviewing a witness, there are a variety of --

11   there's a variety of basic information that -- from

12   witness to witness you always want to document;

13   would that be fair to say?

14        A.   Yes.

15        Q.   So, for example, you always want to

16   document the time that that -- that that witness

17   interview is taking place, correct?

18        A.   Yes.

19        Q.   That could be important for a variety

20   of reasons?

21        A.   Yes.

22        Q.   What -- what a witness knows at a

23   certain period of time, who they've had access to

24   before that and after that, could be important?

25        A.   Yes.



```
 1                    Raniero Masecchia
 2        Q.    Okay.  So basic rule for homicide
 3   detectives in Buffalo, you write down the time of
 4   the interview?
 5        A.    Correct.
 6        Q.    And you write down the time the
 7   interview ends?
 8        A.    Correct, or you take a picture in front
 9   of a clock.
10        Q.    Okay.  But it's important to know how
11   long an interview lasted?
12        A.    Yes.
13        Q.    For a variety of reasons, including
14   defending against accusations that the meeting was
15   coercive, for example?
16        A.    You're talking about with a suspect or
17   with a witness or ...
18        Q.    Either, potentially, right?
19        A.    Yes.
20        Q.    For a variety of reasons, it's
21   important to write both the start and the end time?
22        MR. RUSS:  Objection to form.
23        THE WITNESS:  Yes, for the most part you
24   should do that.
25        BY MR. BRUSTIN:
```



```
 1                    Raniero Masecchia

 2          Q.    Okay.  Any exceptions --

 3          A.    You --

 4          Q.    -- to that rule?

 5          A.    You forget.

 6          Q.    Okay.  Other than forgetting, any

 7   exceptions to that rule?

 8          A.    No.

 9          Q.    And all your fellow detectives

10   understood that rule, fair to say?

11          MR. RUSS:  Objection to form.

12          THE WITNESS:  I hope so.

13          BY MR. BRUSTIN:

14          Q.    And, obviously, it's important when

15   interviewing a witness, for example, to document

16   all of the information that they provide to you

17   which could be relevant to the case, correct?

18          A.    Yes.

19          Q.    And also to document any information

20   about the case that you may have given to them?

21          A.    Could you repeat that?

22          Q.    Yes.  To the extent -- first of all, as

23   a general matter when you are interviewing an

24   eyewitness, you don't want to provide them any

25   information that --
```



```
 1                  Raniero Masecchia
 2         A.    None.
 3         Q.    -- you gathered from the case, right?
 4         A.    Right.
 5         Q.    But to the extent that you do that, you
 6   provide them information about the case, like a
 7   suspect you may have, if you do that, even
 8   inadvertently, you have an obligation to write it
 9   down, correct?
10         A.    I would hope, yes.
11         Q.    Well, you don't hope so, you had an
12   obligation to do it, correct?
13         A.    I would hope so, yes.  I'm just talking
14   for me.
15         Q.    Well, and you understood that your
16   fellow officers understood that obligation, as
17   well, correct?
18         MR. RUSS:  Objection to form.
19         THE WITNESS:  That's what I would hope so,
20   yes.
21         BY MR. BRUSTIN:
22         Q.    Okay.  And based on your experience
23   with them, they did?
24         A.    Yes.
25         MR. RUSS:  Objection to form.
```



1                      Raniero Masecchia

2           BY MR. BRUSTIN:

3           Q.    And, by the way, you had an obligation,

4    and you fulfilled this obligation, even after you

5    did a report, you would put your handwritten notes

6    in the file?

7           A.    We had three files:  We had one with

8    the original handwritten notes, then the

9    transcribed notes, you know, and then the copy of

10   those for the DA's office.

11          Q.    Okay.

12          A.    To the best of my recollection, we put

13   everything in the original file.

14          Q.    All right.

15          A.    I didn't handle the file, but ...

16          Q.    Now, by the way, would it be fair to

17   say that by 1991, you -- you were a very

18   experienced police officer?

19          A.    Excuse me?

20          Q.    You were a very experienced police

21   officer?

22          MR. SOEHNLEIN:  Objection as to form.

23          THE WITNESS:  Yeah.  18 years on the job, I

24   would say.

25          BY MR. BRUSTIN:



```
 1                  Raniero Masecchia
 2        Q.    Okay.   And everybody in homicide was an
 3   experienced police officer?
 4        A.    You became one, yes.
 5        Q.    All right.   And would it be fair to say
 6   that the -- that the lieutenant and the chief in
 7   homicide didn't micromanage what the detectives did
 8   from day-to-day, they trusted you to do your jobs?
 9        MR. RUSS:   Objection to form.
10        THE WITNESS:   Yes.
11        BY MR. BRUSTIN:
12        Q.    And they were there more as a resource
13   for you than anything else?
14        A.    For the most part, yes.
15        Q.    They didn't micromanage how you
16   conducted witness interviews, for example?
17        MR. RUSS:   Objection to form.
18        THE WITNESS:   For the most part, no, but I'm
19   sure there were instances where the lieutenant came
20   out or the chief came out.
21        They basically should have been reading all
22   the reports that were directed to them and come out
23   and say, You might have missed this.   Did you do
24   this?
25        BY MR. BRUSTIN:
```



```
 1                    Raniero Masecchia
 2           Q.    Okay.
 3           A.    You know, they didn't micromanage, but
 4   they managed.
 5           Q.    All right.  But as a homicide detective
 6   by 1991, you felt like you had a lot of discretion
 7   to do the job as you saw fit?
 8           A.    With me and my partner, yes.
 9           Q.    Now, one of the things that you
10   describe during the Epps deposition was that during
11   the course of an investigation where multiple
12   detectives were involved, detectives would
13   routinely talk with one another about the evidence
14   that they had gathered and what it meant?
15           MR. RUSS:  Objection to form.  You may
16   answer.
17           THE WITNESS:  Yes.
18           BY MR. BRUSTIN:
19           Q.    And would it be fair to say that
20   detectives in the homicide unit were constantly
21   talking about the cases that -- when they were
22   investigating with one another?
23           A.    Yes.
24           MR. SOEHNLEIN:  Objection to form.
25           BY MR. BRUSTIN:
```



                    Raniero Masecchia

1          Q.    Talking about theories of how and why a

3    crime occurred, for example?

4          A.    It's one example.

5          Q.    Talking about what different witnesses

6    had reported?

7          A.    Yes.

8          Q.    Talking about holes in cases, strengths

9    of cases?

10         A.    Yes.

11         Q.    It was a constant conversation in the

12   homicide unit about the cases that you were

13   investigating?

14         MR. SOEHNLEIN:  Form.

15         MR. RUSS:  Objection to form.

16         THE WITNESS:  Yes.

17         BY MR. BRUSTIN:

18         Q.    In fact, that was one of the most

19   important tools in solving crimes in a homicide was

20   homicide detectives talking to one another about

21   what evidence they gathered?

22         A.    Or reading --

23         MR. RUSS:  Objection as to form.

24         THE WITNESS:  -- the file.

25         BY MR. BRUSTIN:



1                    Raniero Masecchia

2        Q.    And -- okay.   And in fact, reading the

3    file was an incredibly important aspect of homicide

4    work, correct?

5        A.    If you were going to do work on it, you

6    should read the file.

7        Q.    All right.   So, for example, if you

8    were going to do -- let me talk about basics.

9        If you were going to do a witness interview

10   of a -- of a potentially important witness in a

11   homicide --

12       A.    Yes.

13       Q.    -- the first and most important thing

14   you have to do is read any information that has

15   already been gathered from that witness, correct?

16       MR. RUSS:   Objection to form.

17       THE WITNESS:   Or familiarize yourself with

18   the case.

19       BY MR. BRUSTIN:

20       Q.    Okay.   But if -- if you -- if you were

21   interviewing a witness who has already had

22   interaction with the police, you either want to

23   read the report of that interaction or you want to

24   talk to the officer that spoke to him, correct?

25       A.    Correct.



```
 1                    Raniero Masecchia
 2          Q.   You would never want to interview an
 3   important witness in a case without first
 4   ascertaining what that witness has already reported
 5   to the police, correct?
 6          A.   Yes and no.  I mean, there's been times
 7   where a police officer just brings a witness in,
 8   they were told to pick them up, and I talk to -- he
 9   might be -- I might be the first person he talks
10   to.
11          Q.   Oh, of course.  But I'm saying in a --
12          A.   But that's -- you know, I mean, these
13   cases are fluent.  They run.
14          Q.   Of course.  But in a situation where
15   a -- where a witness has in fact had a -- an
16   important witness has had a substantive
17   conversation with other officers before you
18   interview them, for a variety of reasons, you want
19   to know what that witness has said to them,
20   correct?
21          A.   Right, or I would ask them to put down
22   on a P73 whatever they talked about with the
23   witness.
24          Q.   Right.  Because one of the reasons is
25   you're going to want to know, is anything he's
```



1                    Raniero Masecchia

2    telling you different or additional than what he's

3    reported before?

4          A.    I guess every case is different, yes.

5    If that'd be the case on this, yeah, I would want

6    to know.

7          Q.    So if have an eyewitness to a murder,

8    and that -- and that eyewitness is giving you

9    information that contradicts something they said a

10   day before to another officer, you're going to want

11   to know about that so you can question them about

12   it, correct?

13         A.    Well, I'll take my statement and the

14   other officers did their interview.  If they're

15   contradicting, then we'll discuss it with the

16   witness after.

17         Q.    Right.

18         A.    That's the way I would do it.

19         Q.    Okay.  But you want to -- fair enough.

20   But to the extent you can, you want to have the

21   information that that witness has already provided

22   before you question it so you -- question him so

23   you know what he's already said?

24         MR. RUSS:  Objection to form.

25         THE WITNESS:  If -- if that's available to



```
 1                    Raniero Masecchia
 2   me, yes.
 3            BY MR. BRUSTIN:
 4            Q.   Okay.  And it may be available in
 5   writing or it just may be available through
 6   conversation in the homicide unit, correct?
 7            A.   Correct.
 8            Q.   That's the kind of thing you talk
 9   about, what did that witness say?
10            A.   Yes.
11            Q.   Okay.  And the other thing you just
12   mentioned is that after a witness -- you take a
13   statement from a witness, again, you're looking at
14   whether or not what that witness told you
15   contradicts what they told other people?
16            A.   If he's consistent.
17            Q.   Right.  That's a basic thing you're
18   looking for with witnesses --
19            A.   Correct.
20            Q.   -- is that witness consistent --
21            THE REPORTER:  Hang on.  You've got to slow
22   down.  You are going way too fast.
23            MR. BRUSTIN:  Okay.
24            THE REPORTER:  Way too fast.
25            MR. BRUSTIN:  Is -- I apologize.
```



```
 1                    Raniero Masecchia
 2         BY MR. BRUSTIN:
 3         Q.    Is that witness giving you consistent
 4    information, right?
 5         A.    Yes.
 6         Q.    And that's the kind of thing that
 7    you're constantly talking about with other homicide
 8    detectives, correct?
 9         MR. RUSS:   Objection to form.
10         THE WITNESS:   Yes.   Yes, it's -- it comes up
11    in conversation I'm sure.
12         BY MR. BRUSTIN:
13         Q.    So I think I understand, but let me
14    just make sure.   It sounds like as a general matter
15    at any given time in 1991, there were about five or
16    six homicide detectives on duty at the same time?
17         A.    At certain times of the day there would
18    be.   Most of the time it would be just us four --
19         Q.    Four.
20         A.    -- us four, maybe five.   I don't
21    recall.   Like I said, sometimes there were
22    overlapping shifts for a couple hours.
23         MR. RUSS:   Are you switching topics?
24         MR. BRUSTIN:   I'm not, but it's a fine time
25    to take a short break.
```



1                    Raniero Masecchia

2          MR. RUSS:  All right.

3          THE VIDEOGRAPHER:  Okay.  Going off the

4    record.  Time is 11:13.

5          (A recess was then taken at 11:13 a.m.)

6          THE VIDEOGRAPHER:  All right.  We're going

7    back on the record.  Time is 11:24.

8          BY MR. BRUSTIN:

9          Q.   Now, I think you've already told me

10   this, but I just want to make it -- make sure, one

11   of the things that you would typically do in a

12   homicide investigation is --

13         MR. RUSS:  Excuse me.

14         BY MR. BRUSTIN:

15         Q.   -- to -- to the extent that an

16   eyewitness gave multiple statements to different

17   officers, you would both review the documentation

18   of those interviews, either before or after, or

19   both, and discuss those interviews with the

20   officers who were involved --

21         MR. RUSS:  Objection to form.

22         BY MR. BRUSTIN:

23         Q.   -- fair to say?

24         A.   If it was my witness, I would probably

25   just take their P73 or their notes on what he told



1                     Raniero Masecchia

2    them --

3          Q.    Right.

4          A.    -- tell them to memorialize what

5    they -- what he said to them, I'll memorialize what

6    he's telling me in a statement, and turn them over

7    to the DA's office.

8          Q.    I'm sorry.  And I'm talking about the

9    situation that you described earlier.  To the

10   extent that there are in fact contradictions,

11   that's something that you would discuss with the

12   officer and then make sure that one or both of you

13   would follow-up with on that witness, correct?

14         MR. RUSS:  Objection --

15         THE WITNESS:  Yes.

16         MR. RUSS:  Objection to form.

17   BY MR. BRUSTIN:

18         Q.    And you understood, for example, that

19   to the extent an eyewitness gives different

20   versions of events to more than one officer, that

21   can be impeachment evidence down the road?

22         MR. RUSS:  Objection to form.

23         THE WITNESS:  Yes.

24   BY MR. BRUSTIN:

25         Q.    So, for example, if a witness says, I



1                    Raniero Masecchia

2    didn't see a suspect -- I didn't see the shooter,

3    for example, during the first statement, and then

4    during the second statement says, I did see the

5    shooter.  That's the kind of contradiction that you

6    have to both document and explore, correct?

7         A.   And then turn over to the DA's office,

8    yeah.

9         Q.   But also investigate?  It's a

10   critical -- it's a critical contradiction that you

11   have to explore, why did this happen?  Was it an

12   innocent mistake or there's some other reason?

13        A.   Right.

14        Q.   It could be that during the first

15   statement, the -- the witness was afraid, right?

16        A.   Yes.

17        Q.   Or could be something -- something

18   different, it could be that they received

19   additional information from another source that

20   caused them to change their story, correct?

21        A.   Yes.

22        Q.   Your job as a detective is to

23   investigate why the story changed?

24        A.   Yes.

25        Q.   And to write it down?



1                      Raniero Masecchia

2          A.    Yes.

3          Q.    And to let the chips fall where they

4    may?

5          A.    Yes.

6          Q.    And obviously any time a suspect -- a

7    potential suspect is interviewed, it's critically

8    important to document what they say to you and what

9    you say to them, correct?

10         A.    Yes.

11         Q.    And it's critically important as a

12   homicide detective to investigate what a

13   potential suspect -- what information a potential

14   suspect provides to you, to the extent that it can

15   be investigated?

16         A.    Yes.

17         Q.    If a -- if a potential suspect gives

18   you an alibi, it's critically important to

19   investigate that alibi, correct?

20         A.    Yes.

21         Q.    Oftentimes an alibi could be false and

22   you can prove it false and that could be evidence

23   of guilt, correct?

24         A.    Yes.

25         Q.    And sometimes an alibi could be true



1                  Raniero Masecchia

2    and it could prove that someone actually didn't

3    commit the crime?

4         A.    Yes.

5         Q.    What's important from the perspective

6    of a homicide detective is to investigate that

7    evidence, to the extent practical, as soon as

8    possible after you get it, correct?

9         A.    Yes.

10        Q.    Before -- before -- before, for

11   example, a witness has an opportunity to tamper

12   with other witnesses?

13        A.    Yes.

14        Q.    And the same is true when a suspect

15   provides you admissions about a crime?

16        A.    Yes.

17        Q.    It's critically important to

18   investigate, to the extent you can, the reliability

19   of those admissions?

20        A.    Yes.

21        Q.    So, for example, if a suspect makes

22   confessions or admissions to a crime and tells you

23   that other people witness that crime, it's

24   critically important to interview those other

25   witnesses as soon as possible after you receive



                        Raniero Masecchia
1
2   that information?
3        A.    Yes.
4        Q.    Whether or not those witnesses had been
5   interviewed before or not?
6        A.    For the most part if they've already
7   been interviewed and statements taken from them, I
8   would assume the job is already done --
9        Q.    Well, if --
10       A.    -- if it wasn't, then I would do it.
11       Q.    That's fair.  Let me -- let me add
12   another factor to it.  If you receive admissions
13   from a suspect --
14       A.    Yes.
15       Q.    -- that con -- about witnesses,
16  including about witnesses, and those witnesses have
17  already given interviews contradicting that
18  information, you're going to want to re-interview
19  those witnesses, correct, with the new information?
20       A.    Somewhere down the road I would assume
21  they -- either through the DA's office they would
22  be brought in to -- to testify and everything would
23  be reviewed.
24       Q.    Well, as a homicide detective, to the
25  extent you can, you want to re-interview those



1                       Raniero Masecchia

2    witnesses, correct --

3           MR. RUSS:  Objection to form.

4           BY MR. BRUSTIN:

5           Q.    -- that's your job, pre-arrest?

6           A.    Pre-arrest, while the investigation is

7    still going on, yes.

8           Q.    Okay.

9           A.    After the arrest, if statements are

10   already taken, the DA's office should handle that.

11          Q.    Okay.  Well, certainly, you continue to

12   investigate -- even after an arrest, you continue

13   to investigate crimes routinely, correct?

14          MR. RUSS:  Objection to form.

15          THE WITNESS:  Other crimes?

16          BY MR. BRUSTIN:

17          Q.    Same crime even after an arrest is

18   made, if you receive additional information --

19          A.    Yes.

20          Q.    -- you investigate?

21          A.    Yes.

22          Q.    Your job doesn't end with an arrest?

23          A.    No.

24          Q.    And, certainly, if you receive

25   information after an arrest that caused you to



```
 1                    Raniero Masecchia
 2   question the reliability of that arrest, it's even
 3   more important that you investigate, correct?
 4        A.    Yes, and I've done so.
 5        Q.    Now, how was the homicide file kept in
 6   1991 in the homicide unit?
 7        MR. RUSS:  In general?
 8        MR. BRUSTIN:  Yeah.
 9        THE WITNESS:  It was being -- folders, not
10   like that, but manilla folders in the cabinet and
11   you'd -- like I said, you had the DA's copy in
12   there, the DA folder, the court folder, as we would
13   call it, the original file, and the work folder in
14   case there's anything added on to it, you know, if
15   you -- there's something you wanted to work with,
16   you take the work folder out with you and you had
17   to bring it out -- out of the office --
18        BY MR. BRUSTIN:
19        Q.    Okay.
20        A.    -- but the files never left the office
21   unless they were requested by the DA's office or by
22   a judge.
23        Q.    And then presumably there would be
24   copies maintained in the file, fair to say?  Or the
25   originals would stay in the file?
```



1              Raniero Masecchia
2        A.    The original would stay in the file,
3   plus the copies.
4        Q.    Okay.  And so was that file cabinet in
5   the supervisor's office or was it out in the main
6   room?
7        A.    Main room.
8        Q.    All right.  And I take it it was the
9   lead detective's responsibility to maintain that
10  file; is that correct?
11       A.    No.
12       Q.    Was it the supervisor's responsibility?
13       A.    No, it was our report technician's
14  responsibility.
15       Q.    Okay.  But to the extent -- so to the
16  extent that you were gathering evidence in a
17  homicide case that you weren't lead detective on,
18  you would take your notes and your P73 or
19  whatever -- whatever you used to document it, and
20  you'd put it into the file physically, or you'd
21  give it to somebody?
22       A.    Right.
23       Q.    Okay.
24       A.    Or I would -- no, that's not true.  I
25  would put them on the report technician's desk



```
 1                    Raniero Masecchia
 2   where she makes sure the lieutenant or the chief
 3   read them, he either initialed them or whatever he
 4   had to do, give them back to her, and she made sure
 5   they went in the folders --
 6          Q.    Gotcha.
 7          A.    -- in the proper folders.
 8          Q.    And then any time that you wanted to
 9   look at reports in the file for background
10   information or compare statements, you had -- as a
11   homicide detective, you had easy and complete
12   access to the homicide file?
13          A.    Yes.
14          Q.    You could just go there, look at it --
15          A.    Right.
16          Q.    -- and I take it the rule was you could
17   look, but you would never take anything out and not
18   replace -- not put it back?
19          A.    No, you could take anything out of the
20   file.
21          Q.    Okay.  And I take it --
22          A.    That's why you had a work folder.
23          Q.    All right.  And I take it that the --
24   your understanding in -- in a homicide case is that
25   the homicide file should remain intact in
```

```
 1                    Raniero Masecchia
 2   perpetuity forever?
 3        A.   Yes.
 4        Q.   So any -- if I -- if I were to go back
 5   and look at a homicide file from 1990, everything
 6   that was in the homicide file in 1990 should still
 7   be there today?
 8        A.   I would hope so, yes.
 9        Q.   That was the rule?
10        A.   Yes.
11        Q.   And all detectives understood that?
12        A.   Yes.
13        MR. RUSS:   Objection to form on the last
14   one.
15        MR. BRUSTIN:   Too late.
16        BY MR. BRUSTIN:
17        Q.   All right.   So I want to ask you some
18   questions about how statements were taken from
19   witnesses and suspects.
20        So I understand that certainly you had
21   Dictaphones in the office that you could use for
22   dictating your reports from your notes, right?
23        A.   We wrote them out and then sometimes
24   typed it out --
25        Q.   Okay.
```



1                      Raniero Masecchia

2          A.      -- sometimes wrote it out.  If I typed

3    it out, I wouldn't use a Dictaphone, I just typed

4    it.

5          Q.      Okay.

6          A.      If it was a short one, not too

7    involved.  If it's a long one, we had what they

8    call Nymatic, I don't know if you've ever -- it was

9    a telephone number.  You called the girl in the

10   office, it would go on a recording.

11         She would type it up for you, bring it back

12   to our office that day, the next day, I would read

13   it and make sure it was what I dictated.  Any

14   mistakes had to be made, I'd bring them back to

15   her, and then if everything looked right, I would

16   put it in the file.

17         Q.      I'm asking actually for a different

18   reason.  You did have -- did you -- you did have

19   tape recording devices in the homicide unit, right?

20   Like, handheld-type recorders?

21         MR. RUSS:  In 1991?

22         MR. BRUSTIN:  Yes, sir.

23         THE WITNESS:  No, not that I -- I didn't.

24         BY MR. BRUSTIN:

25         Q.      You didn't?



```
 1                    Raniero Masecchia
 2          A.    No.
 3          Q.    Did you -- do you know if they were in
 4   the office?
 5          A.    I'm sure there were.
 6          Q.    I could have sworn in the Epps case you
 7   testified about having handheld tape recorders.
 8   I'm misremembering?
 9          A.    I don't think so.
10          MR. RUSS:  Objection to form.
11          THE WITNESS:  I mean, there probably were --
12          BY MR. BRUSTIN:
13          Q.    Okay.
14          A.    -- but I don't recall ever using --
15          Q.    All right.  Here's why I'm asking,
16   where -- did you have the ability in 1991 to tape
17   record witness interviews if you wanted to?
18          A.    I believe so.  We could have got one,
19   yes.
20          Q.    Okay.  And was there a practice of tape
21   recording important witness or suspect interviews?
22          A.    I don't know what year it was, whether
23   it was '91 or just after or before where they --
24   they tried it, interviewing, setting up a camera
25   and stuff in the interview room at the time, and
```



```
 1                    Raniero Masecchia
 2   either there was too many malfunctions --
 3          Q.   Okay.
 4          A.   -- either they weren't working
 5   correctly, or our witnesses and including our
 6   suspects, it seemed like a lot of them were
 7   intimidated by that.
 8          Q.   Gotcha.  So --
 9          A.   To make them feel more comfortable, we
10   would do it the way I was taught when I first got
11   up to homicide.  I continued that practice.
12          Q.   Okay.  And the way you were taught was
13   to write down what they told you and then
14   transcribe it?
15          A.   Yeah, and then do a typewritten as --
16   those statements, you typed them like I'm talking
17   to you right now.
18          Q.   Gotcha.
19          A.   Sometimes they would sit right next to
20   me while I'm typing it --
21          Q.   Okay.
22          A.   -- and reading it along with me.
23          Q.   All right.
24          A.   Two, three words at a time because I
25   wasn't a -- like her, you know.
```



1                Raniero Masecchia

2      Q.  Okay.  So -- so you've told me now that

3  at some point either just before or just after,

4  there was a formal process of taping some

5  statements, right?

6      A.  I think they tried.

7      Q.  All right.

8      A.  If it was available or someone had a

9  tape recorder available.  I don't know when they

10  put the camera in and tried that for a while.  I

11  think they used it --

12      Q.  Okay.

13      A.  -- on some occasions.  I might have

14  even had a typed interview done.

15      Q.  Well, first of all, you understood that

16  the best way to document a witness or a suspect

17  interview if the suspect or witness was willing,

18  was to have it on tape, correct?

19      MR. RUSS:  Objection to form.

20      THE WITNESS:  Sure.

21      MR. SOEHNLEIN:  Objection to form.

22      BY MR. BRUSTIN:

23      Q.  The only way you could know for sure

24  that you are accurately reporting what happened is

25  if it's on a tape recorder, right?



1                    Raniero Masecchia

2          A.    Yes.

3          MR. RUSS:  Objection to form.

4          BY MR. BRUSTIN:

5          Q.    All right.  And did you have the

6    ability prior to or by 1991 to tape record

7    conversations in any other way other than that

8    formal process you just described?

9          A.    I'm sure there was.

10         Q.    All right.  And did you ever tape

11   record conversations?

12         A.    I may have.

13         Q.    All right.  You don't remember as you

14   sit here today?

15         A.    No.  On what specific case?  No.

16         Q.    All right.  You certainly knew you had

17   the right to, for example, tape record a

18   conversation with a witness with a handheld tape

19   recorder without telling that witness, correct?

20         A.    Yes.

21         Q.    That was -- you understood in 1991 you

22   could do that if you wanted to?

23         A.    Yes.

24         Q.    And would it be fair to say that your

25   understanding was that some detectives did in fact



1                    Raniero Masecchia

2    do that?

3         A.   Not to my recollection, anybody used

4    them.  Like I said, I never used them.  We had a

5    big tape recorder, like a cassette type, if

6    somebody wanted to use that, but I don't recall

7    anybody ever using --

8         Q.   Fair enough.  So -- and let me make

9    sure I understand the situation.  You understood by

10   '91 that you had the ability, if you wanted to, to

11   secretly tape record conversations with important

12   witnesses?

13        MR. RUSS:  Objection to form.  You added the

14   word secretly.

15        BY MR. BRUSTIN:

16        Q.   Well, without them knowing.  You could

17   use a handheld -- you could have a handheld

18   recorder in your pocket, for example, and tape

19   record conversations?

20        MR. RUSS:  Objection to form.

21        THE WITNESS:  I would have to -- if I was to

22   do something like that, I would probably go to the

23   DA's office, ask their permission to do something

24   like that --

25        BY MR. BRUSTIN:



1                     Raniero Masecchia

2           Q.    Okay.

3           A.    -- before I did, but I don't recall

4    ever doing that --

5           Q.    All right.  Fair enough.

6           A.    -- ever.

7           Q.    So that's one -- that's one way to

8    secretly tape.  Did you understand in 1991 that you

9    had the ability and the right to ask important

10   witnesses and suspects if they were willing to be

11   taped?

12          A.    Yes.

13          Q.    Okay.  Did you do that from time to

14   time?

15          A.    Yes.

16          Q.    All right.  So, in other words, if you

17   had a statement that you knew was important, you

18   might ask a witness if they'd be willing to give

19   that statement on tape?

20          A.    That's when the cameras came in --

21          Q.    Right.

22          A.    -- into the room, the camera and the

23   tape recorders --

24          Q.    You didn't --

25          A.    -- that's when I recall asking someone,



1              Raniero Masecchia

2    you know, if they'd be willing to go on tape with

3    this.

4         Q.   You don't -- you don't recall using

5    other tape recording devices to do that --

6         A.   No.

7         Q.   -- in that day?

8         You certainly knew you had the right to do

9    it if you wanted to?

10        A.   I'm sure I did.

11        Q.   And to your -- best of your

12   recollection, you never did that?

13        A.   No.

14        Q.   And to the best of your recollection,

15   other detectives in homicide didn't do that?

16        MR. RUSS:  Objection to form.

17        THE WITNESS:  I don't know.  To the best of

18   my recollection, I was never with anyone who -- who

19   did that.

20        BY MR. BRUSTIN:

21        Q.   Okay.  And you just can't remember

22   whether or not that process of formally tape

23   recording -- formally video recording statements

24   began before or after 1991?

25        A.   Right.



```
 1                     Raniero Masecchia

 2         Q.    Do you remember how long it lasted?

 3         A.    I don't.

 4         Q.    Do you remember if it was pursuant to a

 5   formal policy, a memo or anything you received?

 6         A.    No.

 7         Q.    All right.  But certainly by 1991, you

 8   understood as a general matter that the best way to

 9   make sure you are accurately describing what a

10   witness or a suspect tells you is to tape record

11   it?

12         MR. RUSS:  Objection to form.

13         THE WITNESS:  I would think so, yes.

14         BY MR. BRUSTIN:

15         Q.    And to your knowledge, by 1991, there

16   was no formal practice of asking witnesses or

17   suspects if they were willing to be taped?

18         A.    No, I don't recall that.

19         Q.    Now, would it be fair to say that as a

20   general matter, you understood by 1991 that, to the

21   extent you are aware of eyewitnesses to a homicide,

22   you want to do a formal interview of that

23   eyewitness as soon as practicable after the

24   homicide?

25         A.    Yes.
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                      109

```
 1                    Raniero Masecchia
 2          MR. SOEHNLEIN:  Objection as to form.
 3          BY MR. BRUSTIN:
 4          Q.   There may be reasons why you have to
 5     wait, but as soon as it's reasonable to do so, you
 6     want to do so?
 7          A.   Yes.
 8          MR. SOEHNLEIN:  Form.
 9          MR. RUSS:  Objection to form.
10          BY MR. BRUSTIN:
11          Q.   In other words, you want to ask the
12     suspects question -- withdrawn.
13          You want to ask the witnesses questions
14     about what they saw and heard as soon in time as
15     possible after the crime while the crime is still
16     fresh in their memory?
17          MR. SOEHNLEIN:  Objection to form.
18          THE WITNESS:  Yes.
19          MR. RUSS:  Objection to form.
20          BY MR. BRUSTIN:
21          Q.   And absent an extenuating circumstance,
22     like an injury or not being able to find someone,
23     you want to question them the same day or the next
24     day, correct?
25          MR. RUSS:  Objection to form.
```



1                    Raniero Masecchia

2          MR. SOEHNLEIN:  Objection to the form.

3          THE WITNESS:  As soon as possible, yes.

4          BY MR. BRUSTIN:

5          Q.    And you mentioned that there is a

6    process of taking a formal Q and A that you either

7    type as they're speaking to you or you write down

8    and then read it into the phone afterward, correct?

9          A.    Well, not the formal -- if it's a

10   witness statement, it would always be on a long

11   white sheet, typewritten and that.

12         Q.    Okay.  And, by the way, you understood

13   any time you're taking a witness statement, whether

14   it's from a suspect or an eyewitness, to the extent

15   that the witness provides you any information about

16   the crime before the formal statement or after the

17   formal statement, you have to document that

18   information in some form, correct?

19         MR. RUSS:  Objection to form.

20         THE WITNESS:  I would think so, yes.

21         BY MR. BRUSTIN:

22         Q.    And to the extent that you provide

23   the -- the witness any information about the crime

24   before or after the statement, you have an

25   obligation to document that as well, correct?



```
 1                    Raniero Masecchia
 2         MR. RUSS:  Objection to form.
 3         THE WITNESS:  It depends on what
 4   circumstances.  I don't -- let's say I take a
 5   statement, I'm going to take a statement from you.
 6   I come in, introduce myself if I didn't meet you
 7   before.  I write down your name, your address, tell
 8   me what you seen.  He tells me, he talks to me.
 9   Okay, I want to take a typewritten statement.  You
10   don't memorialize it for two hours and then take
11   another two-hour statement.
12         BY MR. BRUSTIN:
13         Q.    Right.
14         A.    You know, he tells me the story, what
15   he seen, what he heard, any description, and I'll
16   say, Can I take a statement from you in regards to
17   what we talked about?
18         Q.    Right.
19         A.    That's not always memorialized.
20         Q.    All right.  Now, to the extent that you
21   receive -- and I agree, I understand that any --
22   you know, how are you doing, are you willing to
23   give me a statement, no need to write that down.
24         But to the extent that the witness gives you
25   any substantive information about the crime,
```



```
 1              Raniero Masecchia
 2   particularly substantive information that may
 3   differ from what's on the formal statement, you
 4   have an absolute obligation to document that,
 5   correct?
 6          MR. RUSS:  Objection to form.
 7          THE WITNESS:  Yes, if it --
 8          MR. SOEHNLEIN:  Objection to form.
 9          THE WITNESS:  -- was different, yes.
10          BY MR. BRUSTIN:
11          Q.   And to the extent you provide that
12   witness any substantive information about the
13   crime, for example, We think that person did it,
14   before the statement, of course you'd have to write
15   that down?
16          MR. RUSS:  Objection to form.
17          THE WITNESS:  Yes, if you were to do
18   something like that.
19          BY MR. BRUSTIN:
20          Q.   Okay.  And to the extent that you're
21   asking the witness questions about -- substantive
22   questions about what happened before you take the
23   formal statement, you have to document that
24   process, correct?
25          A.   If it was a Q and A type thing, but if
```



RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
113

1                     Raniero Masecchia

2    you're just -- like I said, if you're sitting in

3    the interview room, let's say -- and, again, I take

4    his name down and that because I know if there's

5    going to be a statement I need that information at

6    the top of the statement.

7          I would ask him, What happened?  What did

8    you see?  He would tell me.  99 percent of the

9    time, I'm not going to memorialize that.

10         Q.   Okay.  But obviously --

11         A.   Then if it's pertinent and he did see

12   what happened and he's willing to give a statement,

13   we'll make that statement together.

14         Q.   All right.  And, obviously, to the

15   extent that any information he provided you before

16   the formal statement was different in any way, you

17   would have to document that?

18         MR. RUSS:  Objection to form.

19         THE WITNESS:  Yes.

20         BY MR. BRUSTIN:

21         Q.   Okay.

22         A.   I mean, if he's to say the shooter was

23   so-and-so, and then while I'm taking the statement

24   he says the shooter is so-and-so, I would have to

25   document he said one thing prior to the statement.



```
 1                    Raniero Masecchia
 2        Q.    Okay.  And you understood any time you
 3   were interviewing an eyewitness to a crime who
 4   potentially saw a perpetrator, one important
 5   question -- series of questions to ask them is to
 6   get as -- get as detailed a description of the
 7   perpetrator as they can get?
 8        A.    Yes.
 9        Q.    And you're looking for distinguishing
10   characteristics, for example?  One thing you're
11   looking for are distinguishing characteristics --
12        A.    Yes.
13        Q.    -- right?
14        A specific hair style, tattoos, specific
15   clothing items, those kinds of things?
16        A.    Yes.
17        Q.    And as a detective, you know how to ask
18   questions that get at that information?
19        A.    Yes.
20        Q.    But you want as detailed a description
21   as you can get from a witness, correct?
22        MR. RUSS:  Objection to form.  You may
23   answer.
24        THE WITNESS:  Yes.
25        BY MR. BRUSTIN:
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                          115

```
 1                    Raniero Masecchia
 2        Q.   All right.   And that's important for a
 3   variety of reasons, correct?
 4        MR. RUSS:  Objection to form.
 5        THE WITNESS:  Yes.
 6        MR. RUSS:  You may answer.
 7        BY MR. BRUSTIN:
 8        Q.   One reason is you want to ascertain as
 9   a detective whether or not this witness had
10   sufficient ability to see the suspect to make a
11   subsequent ID?
12        A.   Yes.
13        Q.   Another reason is you're going to want
14   to ascertain whether or not to the extent they make
15   any kind of identification later on, whether that
16   identification is consistent with the person they
17   described?
18        A.   Yes.
19        Q.   Those are basic things that you're
20   looking for as a homicide detective, correct?
21        A.   Yes.
22        Q.   Another basic question you want to ask
23   any eyewitness to a crime is whether or not is
24   there -- you want to ask them questions that are
25   geared towards ascertaining their ability to see
```



```
 1                    Raniero Masecchia
 2   the crime?
 3          A.    To what?
 4          Q.    To ascertain their ability to see the
 5   crime.
 6          A.    See it?
 7          Q.    Yes.
 8          A.    Yeah.
 9          Q.    And hear it potentially?
10          A.    Right.
11          Q.    Where were they standing, for example,
12   right?
13          A.    Yeah.
14          Q.    Were they under the influence of drugs
15   or alcohol at the time?
16          A.    If -- yeah, that's a good question to
17   ask, but sometimes you don't ask it if the person
18   seems coherent, lucid, and -- you know.
19          Q.    Okay.  But if you got a -- if you got
20   a --
21          A.    I don't -- I don't ask that all the
22   time --
23          Q.    Okay.
24          A.    -- were you drunk, were you under the
25   influence, unless the person was at a bar.  You
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                          117

```
 1                    Raniero Masecchia
 2   know, every -- every one is different --
 3           Q.    Sure.
 4           A.    -- every interview, every statement is
 5   different.
 6           Q.    But you understood that whether or not
 7   a witness was drinking or doing drugs could affect
 8   their ability to make a reliable identification?
 9           A.    Yes.
10           Q.    And so, for example, if you have -- if
11   you have a school teacher who witnessed a crime in
12   their classroom, you might not ask that person --
13           A.    Right.
14           Q.    -- whether they were drunk?
15           A.    That's correct.
16           Q.    But if you have a witness who was
17   hanging out with his friends --
18           A.    But today, you never know.  They might
19   be high while they're doing --
20           MR. SAHASRABUDHE:  I was going to say, I
21   know some teachers.
22           BY MR. BRUSTIN:
23           Q.    But if you have a --
24           A.    No, but I understand.  And that's what
25   I'm saying.  There's -- in a statement, you could
```



1                    Raniero Masecchia
2    ask -- after I take a statement, I could go over my
3    own statement and say --
4          BY MR. BRUSTIN:
5          Q.    All right.
6          A.    -- there's 22 more questions I could
7    have asked.
8          Q.    Okay.
9          A.    All right?  It's on every one.  There's
10   10,000 questions you could --
11         Q.    Right.
12         A.    -- ask, but you're limited in your
13   time, the case is ongoing, you want to get the most
14   accurate description you can of the incident, and
15   that person later on is going to be able to testify
16   in court as to his statement and expand on it if
17   necessary.  That's the way I always --
18         Q.    All right.  But as a homicide
19   detective, if you're interviewing an eyewitness to
20   a murder --
21         A.    Correct.
22         Q.    -- you take generally as much time as
23   you need to get the information you need, correct?
24         A.    That's correct.
25         Q.    If it takes two hours, you take two

```
 1                  Raniero Masecchia
 2   hours?
 3          A.    Right.
 4          Q.    All right.  And --
 5          A.    And most of them do.
 6          Q.    All right.  And if you have a -- if you
 7   have a witness who is hanging out with his friends
 8   at 1:00 in the morning in front of a hotdog joint
 9   when they see a homicide, one of the questions
10   you're going to ask is, Had you been drinking?
11   Right?
12          A.    I guess, yes.  It would be a good
13   question.
14          Q.    All right.  But one of your jobs as a
15   homicide detective is to evaluate the credibility
16   and reliability of the witnesses that you come into
17   contact with, correct?
18          A.    In what way?
19          Q.    You're -- you're constantly assessing
20   in your own mind and in conversations --
21          A.    If he's being truthful, if he's lying.
22          Q.    That's right.  Something you're always
23   assessing?
24          A.    You might have an opinion on that, but
25   if he's willing to swear to it and testify in
```



```
 1                    Raniero Masecchia
 2   court, that's going to be up to the witness.
 3        Q.   Of course.  But you're -- as a
 4   detective in investigating a case and trying to
 5   solve a crime, you're always in your mind and in
 6   your conversations with other detectives, talking
 7   about is this witness reliable, is what this
 8   witness -- is what this witness is telling us
 9   consistent with the physical evidence?
10        A.   I'm sure that's been done.
11        Q.   Okay.  That's a basic thing you do as a
12   homicide detective --
13        A.   I'm sure it's --
14        Q.   -- right?
15        A.   -- been done.
16        Q.   And one very basic rule in interviewing
17   eyewitnesses, and you've already touched on this,
18   is to never provide that eyewitness information
19   about the crime that you think is accurate,
20   correct?
21        A.   That's correct.
22        MR. RUSS:  Objection to form.  You may
23   answer.
24        BY MR. BRUSTIN:
25        Q.   You always want to get the information
```



```
 1                    Raniero Masecchia
 2   from the witness, not provide it to the witness,
 3   correct?
 4         MR. RUSS:  Objection to form.
 5         THE WITNESS:  Yes.
 6         BY MR. BRUSTIN:
 7         Q.   You never want to tell a witness, for
 8   example, who you think the suspect is, correct?
 9         A.   Correct.
10         Q.   You never want to tell a witness what
11   you think the suspect looks like, correct?
12         A.   Correct.
13         Q.   You never want to tell a witness why
14   you think a suspect may have committed the crime?
15         A.   Correct.
16         Q.   All of those things are statements that
17   you would never make to a witness if you're acting
18   in good faith because that could affect -- it could
19   be suggested to them as to who they should pick and
20   what they should say, correct?
21         A.   Correct.
22         Q.   And all homicide detectives in Buffalo
23   understood that by 1991?
24         A.   Yes.
25         MR. RUSS:  Objection to form.
```



```
 1                    Raniero Masecchia

 2          MR. SOEHNLEIN:  Objection to form.

 3          BY MR. BRUSTIN:

 4          Q.   All homicide detectives, based on your

 5   experience, understood that you would never give a

 6   witness details about how you think a crime

 7   occurred?

 8          MR. RUSS:  Objection to form.

 9          MR. SOEHNLEIN:  Objection to form.

10          THE WITNESS:  Right.  Intentionally, anyway.

11          BY MR. BRUSTIN:

12          Q.   And all homicide detectives, based on

13   your experience, in 1991 understood that you would

14   never give a witness theories as to why you think a

15   crime occurred?

16          MR. RUSS:  Objection to form.

17          THE WITNESS:  Yes.

18          BY MR. BRUSTIN:

19          Q.   Another -- another way of saying it is

20   you always want to get a sterile version of events

21   from a witness?

22          A.   Correct.

23          Q.   You never want to provide them

24   information that will get them to say what you want

25   to hear?
```



```
 1                    Raniero Masecchia
 2         A.   Correct.
 3         Q.   You never want to try to change their
 4  mind or their perspective on what they saw or
 5  heard?
 6         A.   Correct.
 7         Q.   You never want to contaminate a
 8  witness's memory even after they give you a
 9  statement by telling them, yeah, you gave us the
10  right person?
11         A.   Yes.  If they identify someone, we tell
12  them who that person is that they identified.
13         Q.   Okay.  But you wouldn't give them
14  information as to other reasons why you think that
15  person committed the crime --
16         A.   No.
17         Q.   -- for example?
18         A.   No.
19         Q.   You would never do that, correct?
20         A.   No.
21         Q.   Another way of saying it is, you never
22  want to provide a witness information that might
23  cause that witness's perception to change?
24         A.   Right.
25         MR. RUSS:  Objection to form.
```



1                   Raniero Masecchia

2          BY MR. BRUSTIN:

3          Q.    And if you do that by accident, you

4     have to write it down?

5          A.    I would hope so --

6          MR. RUSS:  Objection to form.

7          THE WITNESS:  -- yes.

8          BY MR. BRUSTIN:

9          Q.    And it's particularly dangerous with an

10    eyewitness.  You never want to provide information

11    to an eyewitness that will -- that will strengthen

12    their identification apart from their actual

13    memory, correct?

14         MR. RUSS:  Objection to form.

15         THE WITNESS:  Yes.

16         BY MR. BRUSTIN:

17         Q.    All right.  I want to ask you some

18    questions about photo identification procedures in

19    Buffalo in 1991.  Okay?

20         Now, you understood by 1991 -- and I know

21    it's clearer today than it was then, but even in

22    1991, you understood that there was a danger of a

23    misidentification in any identification procedure

24    you were conducting with witnesses, correct?

25         A.    There's always a chance.



RANIERO MASECCHIA                                     March 15, 2022
DIXON vs CITY OF BUFFALO                                          125

```
 1                    Raniero Masecchia
 2          Q.    And so you understood that there were
 3    important safeguards in place to make sure, to the
 4    extent possible, you avoided misidentifications
 5    during line-ups or photo arrays or other
 6    identification procedures, correct?
 7          A.    I don't know what you mean by
 8    misidentification.
 9          Q.    Identifying someone who didn't commit
10    the crime, making a mistake?
11          A.    You want to avoid that?
12          Q.    Yes.
13          It's obvious, right?
14          A.    No.  I mean, if they can't identify the
15    person who is in there --
16          Q.    I'm not being -- I'm not being clear.
17    I apologize.
18          What you want to avoid is a witness
19    identifying someone who didn't actually commit the
20    crime, making an identification of the wrong
21    person?
22          A.    I didn't try to avoid -- no.  See, I
23    disagree with you on that.
24          Q.    Okay.
25          A.    I put the photo array together, or we
```



1                      Raniero Masecchia

2    put a line-up together, if the person misidentifies

3    someone and picks the wrong person, it's normal.

4           Q.    Okay.

5           A.    It could happen.

6           Q.    No, of course.  I think you're

7    misunderstanding me.

8           You understood that there were rules and

9    regulations and training in place that were

10   designed to prevent a witness from making a mistake

11   to the extent possible?

12          A.    The only thing I'm preventing is to

13   taint it in any way.

14          Q.    That's another way of saying the same

15   thing I think.

16          A.    Making sure they -- they don't see the

17   person before the line-up, making sure they don't

18   see us putting the photo array together or in what

19   position we put the suspect in.  Everything is done

20   in a --

21          Q.    Right.

22          A.    I don't care who he picks out.

23          Q.    Okay.

24          A.    I do care, because I want to solve the

25   murder, but if he picks out the wrong person, he



1                     Raniero Masecchia

2    picks out the wrong person.

3         Q.    Right.    Another way of saying it is you

4    want to avoid any suggestion -- suggestions

5    whatsoever in the process?

6         A.    Right.

7         Q.    And you want to avoid any suggestion

8    before, during, or after the ID procedure, correct?

9         A.    Yes, except after the ID procedure if

10   he picked out the correct person, I have to have

11   him sign a document relating to that and telling

12   them who he picked out.

13        Q.    Right.    But you would never say to

14   them, You picked out Joe Brown and, by the way, Joe

15   Brown is the person we suspected, we think you got

16   the right guy?

17        A.    No.

18        Q.    That would be suggestive?

19        A.    Right.

20        Q.    Or, Joe Brown committed other crimes in

21   the area, we think he did this.    You would never

22   say that?

23        A.    No.

24        Q.    Because that would improperly

25   strengthen their ID potentially?



1                     Raniero Masecchia

2          A.    It would taint it --

3          Q.    Yes.

4          A.    -- very much so.

5          Q.    Now, in Buffalo in 1991, I take it

6    there were three separate ways you could do

7    identifications.  You could do a photo array,

8    correct, that's one?

9          A.    Yes.

10         Q.    You could do an in-person physical

11   line-up?

12         A.    Yes.

13         Q.    And under a very limited set of

14   circumstances, you could show a witness the actual

15   suspect one-on-one or a picture of the suspect?

16         A.    I've never done that.

17         Q.    Okay.  Maybe they didn't do that in

18   Buffalo.  Some places, what they were allowed to

19   do, is within minutes of the crime --

20         A.    Within minutes of the crime if the

21   suspect was there, I believe we could do a

22   one-on-one person --

23         Q.    Okay.

24         A.    -- at the time --

25         Q.    All right.



RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
129

| 1 | Raniero Masecchia |
|---|---|

1                    Raniero Masecchia

2         A.    -- within minutes of the crime.

3         Q.    All right.  But other than that, your

4    understanding is certainly by 1991 in Buffalo, you

5    could never show a witness an individual photo or

6    the suspect one-on-one other than minutes after the

7    crime?

8         A.    Right.

9         Q.    Okay.  And the only way you could do an

10   identification procedure with an eyewitness in

11   Buffalo was either you could show them a six-person

12   photo array --

13        A.    Correct.

14        Q.    -- with one suspect in the photo array?

15        A.    Yes.

16        Q.    Or you could show them a six-person

17   in-person line-up --

18        A.    Yes.

19        Q.    -- with one suspect?

20        A.    Yes.

21        Q.    And in both instances, it was your job

22   to ensure that you had fillers that either

23   looked -- either looked consistent with the suspect

24   or looked consistent with the description of the

25   suspect?



```
 1                       Raniero Masecchia

 2          A.    Yeah, you tried your best.

 3          Q.    Okay.  And I guess another way that you

 4   would be able to show photos to witnesses would be

 5   through mug books; is that correct?

 6          A.    We didn't use mug books.

 7          Q.    You didn't use mug books?

 8          A.    We had them, but in '86 when I got up

 9   there, they didn't -- they didn't use mug -- mug

10   books anymore.

11          Q.    Okay.

12          A.    They were strictly with the folder.

13   I -- folder six.

14          Q.    All right.  So just so I'm clear now,

15   because I want to make sure I understand all the

16   different possibilities in 1991.

17          In 1991, other than a few minutes after the

18   crime, there would never be a reason to show a

19   witness an individual photo of a suspect, correct?

20          A.    Right.

21          Q.    The only permissible way to show them a

22   photograph of a suspect or that suspect in person

23   would be through a six-person photo array or a

24   six-person line-up?

25          A.    Right.
```



1                   Raniero Masecchia

2          Q.    There would never be a reason -- a

3    legitimate law enforcement reason to show witnesses

4    pictures for any -- in any other way, correct, of

5    individuals?

6          A.    Correct.

7          Q.    The only legitimate way to show

8    eyewitnesses photos in Buffalo in 1991 in homicide

9    investigation was through those two mechanisms,

10   photo array or a line-up?

11         A.    To the best of my recollection, that's

12   all we used.

13         Q.    And that was clear through training and

14   policy?

15         A.    Right.

16         Q.    Without exception?

17         A.    Correct.

18         Q.    And any time that you were conducting a

19   photo array --

20         A.    Right.

21         Q.    -- you've already told us how important

22   it was not to provide any suggestion to the witness

23   before, during, or after the array, correct?

24         A.    Correct.

25         Q.    And would you also agree that it was




```
 1                  Raniero Masecchia
 2   critically important any time you were showing a
 3   witness photographs to ensure that anything that
 4   witness said about the photographs was documented?
 5           A.    Yes.
 6           Q.    Whether they made a tentative ID, or a
 7   positive ID, or no ID at all?
 8           A.    Correct.
 9           Q.    And, by the way, you understand when I
10   say positive versus tentative, that's a term of art
11   in policing, correct?  It's something that police
12   officers -- it's a term that you used as a
13   detective, correct?
14           A.    Yes, because a witness could say, He
15   looks like the guy.
16           Q.    Okay.  So --
17           A.    I'm positive that's the guy.  Yes,
18   that's the guy.  Yeah, that's so-and-so.  Yeah,
19   that's --
20           Q.    Okay.
21           A.    -- those are positive, the other one
22   would be he's unsure --
23           Q.    Okay.
24           A.    -- and the other one was couldn't
25   identify anyone.
```



1                    Raniero Masecchia
2         Q.    Okay.   And any time you get an ID
3    that's -- and it's important for legal reasons,
4    correct?
5         In other words, you understood that a
6    positive ID -- That's the guy.   Yes, that's him.
7    That's the guy I saw do the crime --
8         A.    Right.
9         Q.    -- that gives you probable cause to
10   make an arrest?
11        A.    Yes.
12        Q.    Okay.   Anything tentative, it looks
13   like the guy, it may be the guy but I'm not sure.
14   Anything less than positive, no probable cause,
15   correct?
16        A.    Correct.
17        Q.    And it's critically important to write
18   that down in your report?
19        A.    Absolutely.
20        Q.    And if, for example, a witness in
21   looking at a photo array makes comments about other
22   pictures, This picture looks like the suspect, this
23   picture doesn't, that information has to be written
24   down?
25        A.    Yeah.



```
 1                    Raniero Masecchia
 2        Q.    That can all be used down the road to
 3   question the reliability of that witness?
 4        A.    Yes.
 5        Q.    Okay.  Basic training, experience, you
 6   understood, 1991, anything a witness says about a
 7   photo array substantively, you've got to write it
 8   down?
 9        MR. RUSS:  Objection to form.
10        THE WITNESS:  Yes.
11        BY MR. BRUSTIN:
12        Q.    And that's because both the DA and
13   later a defense lawyer has the right to have that
14   information, correct?
15        A.    Correct.
16        Q.    And as you told us, the only thing
17   you're permitted to say in Buffalo in 1991 to a
18   witness about their selection is the name of the
19   person they selected and then have them sign it?
20        A.    Yes.
21        Q.    Nothing more?
22        A.    Nothing more.
23        Q.    And that was pursuant to training,
24   correct?
25        A.    Yeah.
```



```
 1                    Raniero Masecchia
 2        Q.   All right.  Let's take a look at
 3   Exhibit 2, so right in front of you --
 4        A.   This one?
 5        Q.   Yeah.  So I will represent to you that
 6   this is our best effort to put together in
 7   chronological order, not perfect, but our best
 8   effort to put together in chronological order all
 9   of the police reports and police file documents
10   that we received from the city.  Okay?
11        A.   Yes.
12        Q.   And what we did is we then Bates
13   stamped it again with the Bates Stamps from the
14   bottom in the middle.  BPD comp 1, do you see
15   those?
16        MR. RUSS:  The numbers on the bottom.
17        THE WITNESS:  Yeah.
18        BY MR. BRUSTIN:
19        Q.   And those are the numbers that I'm
20   going to refer to when I ask you questions about
21   this document.
22        A.   Okay.
23        Q.   And you've already told us that you
24   reviewed some of -- some of the reports in here,
25   but not all of them.  Okay?
```



```
 1                       Raniero Masecchia

 2          A.    I'm sorry?

 3          Q.    You've already told us -- you've

 4    already mentioned that you reviewed some of the

 5    reports that are actually in this exhibit.

 6          MR. RUSS:  No, he said he reviewed six or

 7    seven pages.  We don't know whether they're in --

 8          MR. BRUSTIN:  I'm representing to you based

 9    on what you described they're in here.

10          THE WITNESS:  Six or seven pages I reviewed.

11          BY MR. BRUSTIN:

12          Q.    Yeah.  And we're going to get into

13    those, but there's other things I'm going to ask

14    you about, too, and see if you know anything about

15    them.

16          A.    Okay.

17          Q.    Okay?

18          All right.  Now -- and, by the way, now

19    we're getting into the portion of the deposition

20    where I want you to be clear about what you

21    remember and what you don't, and I am going to --

22          A.    Yeah.

23          Q.    -- but I am going to ask you questions

24    about your understanding of how things worked --

25          A.    Right.
```



```
 1                    Raniero Masecchia
 2        Q.    -- and have you draw some potential
 3   conclusions from that.  Okay?
 4        A.    Okay.
 5        MR. RUSS:  He has been very clear about what
 6   he remembers and what he doesn't.
 7        MR. BRUSTIN:  I think he has, and I want to
 8   continue -- I want you to continue to do that, and
 9   I want you to feel free to tell me that, but I am
10   still going to -- even when you don't remember, I'm
11   going to ask you questions about how things worked.
12        THE WITNESS:  That's fair.
13        BY MR. BRUSTIN:
14        Q.    So let's take a look first at page 11.
15        Okay.  Now, I take it this is not a -- this
16   is not a report that you reviewed in preparation
17   for today?
18        A.    No, I did not.
19        Q.    All right.  Take a look at this.  If
20   you do me a favor, just -- just take a look at this
21   long enough so you can tell me whether or not this
22   appears to be the type of report that a -- that a
23   PO officer who responds to a homicide would
24   typically fill out.
25        A.    That's -- yes, it is.
```



```
 1                    Raniero Masecchia
 2          Q.    Is that -- that's how I read this.
 3     Does that -- does that sound --
 4          A.    Fairly --
 5          Q.    -- about right to you?
 6          A.    Fairly -- dependent on the officers.
 7     Some are more detailed, some are less detailed --
 8          Q.    Okay.
 9          A.    -- but for the most part, this is how
10     we -- we get our information.
11          Q.    So this appears to be one of, if not
12     the first officer at the scene?
13          MR. RUSS:  Objection to form.
14          THE WITNESS:  No, it doesn't seem like that.
15          BY MR. BRUSTIN:
16          Q.    Well, I can tell you that the
17     shooting happened at 1 -- the call came in at
18     1:25 --
19          A.    Yeah.
20          Q.    -- and this -- this person appears to
21     be at the scene within minutes, correct?
22          A.    About 15 minutes.  That's pretty long.
23          Q.    Okay.  Well, soon after the crime
24     occurred?
25          A.    Yeah.  Soon after the crime for me is
```



RANIERO MASECCHIA                              March 15, 2022
DIXON vs CITY OF BUFFALO                                    139

```
 1                    Raniero Masecchia
 2   two, three minutes because most of the time the
 3   cars respond in that time.
 4             Q.    Okay.
 5             A.    So he might have been called in to
 6   assist in securing the scene, making sure that --
 7             Q.    Okay.
 8             A.    -- the scene wasn't disturbed --
 9             Q.    Sure.
10             A.    Because apparently it was an outside
11   scene --
12             Q.    That's right.
13             A.    -- from what I remember so they
14   probably needed some help, had more cars come to
15   control --
16             Q.    Okay.  And, by the way --
17             A.    -- the scene.
18             Q.    -- do you remember going to the scene
19   today?
20             A.    No.
21             Q.    Okay.  But you remember from looking at
22   documents, you can picture the scene in your mind?
23             A.    No.  I mean, I know the area, Bailey
24   and Delevan, Louie's Hot Dog stand was a well
25   known -- everybody went to Louise whether you were
```



```
 1                  Raniero Masecchia
 2    a policeman --
 3         MR. RUSS:  A civilian.
 4         THE WITNESS:  Civilian, whatever.  It was a
 5    well-known spot.  But, no, I didn't go to the scene
 6    at all --
 7         BY MR. BRUSTIN:
 8         Q.   Okay.
 9         A.   -- on this case --
10         Q.   Okay.
11         A.   -- I don't believe so, or I would have
12    had it documented somewhere.
13         Q.   Fair enough.  But do you know -- by the
14    way, do you know Joe Cerwin?
15         A.   Probably if I seen him, I would know
16    him.  It looks like he worked for the housing
17    authority at the time.  He was an officer for the
18    Buffalo Municipal Housing Authority.  They had,
19    like, a little police department at the time.
20         Q.   Okay.  Actually, did you read the
21    whole -- this whole -- it's pretty short.  I want
22    you to read the whole thing because I want to ask
23    you some questions about my understanding of this
24    to see if it's consistent with yours.
25         A.   Okay.
```



```
 1                    Raniero Masecchia
 2        Q.   All right.  So, first of all, does --
 3   does reading this refresh your recollection of
 4   anything --
 5        A.   No.
 6        Q.   -- to do with the shooting?
 7        Okay.  Now, first of all, would it be fair
 8   to say -- we've talked a bit this morning about --
 9   about report writing procedures?
10        A.   Right.
11        Q.   Does it appear that Officer Cerwin
12   properly documented the witness statement he took
13   from Ms. James?
14        MR. RUSS:  Hold on.  Objection to form.
15   Don't answer.  I allowed you great latitude in
16   talking about procedures including the writing of
17   reports.
18        He says he doesn't remember this, he never
19   saw this report before today, he doesn't remember
20   the thing.  He's not going to give his opinion on
21   whether some other officer did something correctly
22   or not.
23        MR. BRUSTIN:  There's nothing wrong with me
24   asking that question.  I do --
25        MR. RUSS:  You can take --
```



```
 1              Raniero Masecchia
 2         MR. BRUSTIN:  -- depositions --
 3         MR. RUSS:  -- that to the judge.
 4         THE REPORTER:  Hang --
 5         MR. BRUSTIN:  You don't have a right -- you
 6    have a very limited right to instruct a witness not
 7    to answer because you believe -- you feel like it's
 8    harassing him or because you feel like it's
 9    privileged.  You do not have a right to have him
10    not answer opinion questions.  It may not be
11    admissible, but it's certainly --
12         MR. RUSS:  Let's call the judge.  If you
13    think you're right, call the judge.
14         MR. BRUSTIN:  You don't have a right to do
15    that.
16         MR. RUSS:  He's not answering it.
17         MR. BRUSTIN:  Look, I promise you if I have
18    to -- if I have to do it, I will get -- I will make
19    a motion for you to pay for this.  This is not
20    appropriate.
21         MR. RUSS:  Go for it.
22         MR. BRUSTIN:  All right.  So I'm going to
23    keep asking questions, I'm not going to waste my --
24         MR. RUSS:  And I'm going --
25         MR. BRUSTIN:  -- time going to --
```



```
 1                   Raniero Masecchia
 2         MR. RUSS:  -- to keep --
 3         MR. BRUSTIN:  -- the judge.
 4         MR. RUSS:  -- instructing him not to answer.
 5         MR. BRUSTIN:  Okay.  You do that.
 6         BY MR. BRUSTIN:
 7         Q.   First of all, would you agree that
 8  based on -- first of all, this report has the time
 9  when the interview started, correct?  Time -- I'm
10  sorry.  The time you got to the scene?
11         A.   Right.
12         Q.   And that's consistent with appropriate
13  practice, correct?
14         MR. RUSS:  Objection to --
15         THE WITNESS:  Yes.
16         MR. RUSS:  -- form.  Don't answer.
17         BY MR. BRUSTIN:
18         Q.   Does this report appear to have the
19  time when he got to the scene and was interacting
20  with this witness?
21         You can answer unless --
22         MR. RUSS:  You can answer that.
23         BY MR. BRUSTIN:
24         Q.   -- he tells you not to.
25         A.   Yes.
```



| | |
|---|---|
| 1 | Raniero Masecchia |
| 2 | Q.   Okay.  And it appears from this |
| 3 | report -- by the way, one of your jobs as a |
| 4 | detective, including in this case, would be to read |
| 5 | reports like this and ascertain what happened, |
| 6 | correct? |
| 7 | MR. RUSS:  Objection to form.  You may |
| 8 | answer. |
| 9 | THE WITNESS:  If -- if this was my case, |
| 10 | yes. |
| 11 | BY MR. BRUSTIN: |
| 12 | Q.   Or if you were working on this case, |
| 13 | you might -- this is the kind of -- typically, |
| 14 | you'd read a report like this to get information |
| 15 | and understanding, correct? |
| 16 | A.   This report might not get to me two, |
| 17 | three days later. |
| 18 | Q.   Okay.  But it's some -- |
| 19 | A.   Eventually, did I read it?  Maybe. |
| 20 | Q.   Okay.  I'm not asking if you read it, |
| 21 | I'm asking a different question.  This is the kind |
| 22 | of report that, in your experience, as you said, |
| 23 | even as a lead detective, that you would typically |
| 24 | read to find out what happened at a scene, correct? |
| 25 | A.   If you were the lead detective, I would |



RANIERO MASECCHIA                                March 15, 2022
DIXON vs CITY OF BUFFALO                                      145

```
 1                    Raniero Masecchia
 2  say yes.
 3         Q.    Okay.  And sometimes even if you were
 4  not the lead detective but it related to a witness
 5  you were interviewing, you might read it?
 6         A.    Yes.
 7         Q.    And you would -- if there wasn't
 8  sufficient information in the report, you might go
 9  to that officer and ask them questions?
10         A.    It depends.  Yes, no.  Why not just go
11  to the person who you interviewed --
12         Q.    Okay.
13         A.    -- and get the -- get the answers.
14         Q.    All right.  Well, what it appears
15  happened from this report is that within less than
16  15 minutes after the crime, this officer
17  interviewed a woman named Sonja James, correct?
18         A.    Right.
19         Q.    That's what this report describes,
20  right?
21         A.    Yes.
22         Q.    And it appears that while he was
23  interviewing this witness within minutes of the
24  crime, Valentino Dixon, his name was mentioned on
25  the radio as a possible suspect in this homicide,
```



                          Raniero Masecchia

1                          Raniero Masecchia

2    correct?

3         A.    Yes.

4         MR. RUSS:   Is that what the report says?

5         THE WITNESS:   That's what it says.

6         BY MR. BRUSTIN:

7         Q.    Okay.  And so it appears -- assuming

8    this report is an accurate description, it appears

9    that very soon after the crime, Valentino Dixon's

10   name was mentioned as a suspect to the dispatcher,

11   such that the dispatcher put his name out over the

12   radio?

13        MR. RUSS:   Objection to form.  You may

14   answer.

15        THE WITNESS:   Yes.

16        BY MR. BRUSTIN:

17        Q.    Okay.  And it appears that this officer

18   accurately documented that?

19        A.    Yes.

20        MR. RUSS:   Does the report say that Dixon's

21   name was mentioned over the radio?

22        BY MR. BRUSTIN:

23        Q.    So I don't care about the question he's

24   asking you.  I don't want you to answer his

25   questions.  I want you to --



```
 1                    Raniero Masecchia
 2          MR. RUSS:  Objection to form.
 3          BY MR. BRUSTIN:
 4          Q.    -- answer my questions.
 5          MR. RUSS:  Don't answer.
 6          MR. BRUSTIN:  You can -- you can tell him --
 7    you can tell him not to answer, but don't answer
 8    his questions.  I don't care about them.  You just
 9    answer my questions.
10          MR. RUSS:  He's not answering that one.
11          MR. BRUSTIN:  All right.  We'll deal with
12    that down the road.
13          MR. RUSS:  I can't wait.
14          BY MR. BRUSTIN:
15          Q.   All right.  So this report doesn't say
16    how Valentino Dixon became a suspect, correct?
17          A.    No.
18          Q.    Okay.  What this report indicates is
19    that sometime around 1:39 in the -- 1:39 in the
20    morning, he was mentioned over the radio as a
21    potential suspect, correct?
22          A.    After some time of 1:39, yes.
23          Q.    And that's the time that's here, 1:39.
24    So some time soon after 1:39 when he's talking to
25    this witness?
```



1                      Raniero Masecchia

2        A.    Yeah, it could have been an hour after.

3        Q.    Well, he's describing talking to this

4   witness --

5        A.    No, I know that, but he doesn't

6   describe what -- what time he -- he was asked to

7   secure the scene apparently.  That was his job, to

8   secure the scene.

9        While he was securing the scene, and you

10  don't know if that was an hour later, two hours

11  later, that Ms. Sonja James showed up to tell him

12  that she witnessed the incident.

13       Q.    Well --

14       A.    I'm not going to assume it happened all

15  at 1:39.

16       Q.    Sure.  Fair enough.

17       A.    It could have been two hours later.

18       Q.    Fair enough.

19       A.    That's all I'm saying.

20       Q.    All right.

21       A.    I'm not --

22       Q.    No, of course.  So I'm going to ask you

23  some more questions about that.  If it was two

24  hours later, you would expect that to be in the

25  report, correct?



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                        149

```
 1                   Raniero Masecchia
 2         A.    Not -- I would --
 3         Q.    Okay.
 4         A.    -- but a patrolman is -- no, I wouldn't
 5    expect that to be in the report.
 6         Q.    All right.  And, certainly, I've spoken
 7    to Ms. James and she told us that right after the
 8    shooting, she went down the street to speak to the
 9    police officers.
10         A.    Okay.
11         Q.    You certainly have no reason to dispute
12    that, correct?
13         A.    No.
14         Q.    And there's nothing inconsistent with
15    this report about her talking to the police right
16    after the shooting?
17         A.    Right.
18         Q.    And the most reasonable reading of this
19    report is that soon after they arrived, she
20    approached them, correct?
21         A.    Yes.
22         MR. RUSS:  Objection to form.
23         BY MR. BRUSTIN:
24         Q.    All right.  And so you don't -- there's
25    nothing in this -- and it appears that if she -- if
```



```
 1                    Raniero Masecchia
 2    she heard Valentino's Dixon -- Valentino Dixon's
 3    name over the dispatch radio in the car, that would
 4    mean that someone before that had to have provided
 5    that information to the dispatcher, correct?
 6         MR. RUSS:  Objection to form.
 7         THE WITNESS:  Yeah.  You would have to
 8    assume that, yes.
 9         BY MR. BRUSTIN:
10         Q.   The dispatcher wasn't making up
11    suspects on their own, right?
12         A.   No.
13         Q.   Okay.  Somebody had to have provided
14    that information to the dispatcher sometime before?
15         A.   Correct.
16         MR. RUSS:  Objection to form.
17         BY MR. BRUSTIN:
18         Q.   All right.  And so there is nothing in
19    this report about how Valentino Dixon became a
20    suspect sometime likely soon after 1:39 in the
21    morning, correct?
22         A.   That's correct.
23         Q.   Only that he was?
24         A.   Correct.
25         Q.   All right.  So what you would expect to
```



```
 1                    Raniero Masecchia
 2    see in the file is another document indicating how
 3    and why Valentino Dixon became a suspect, correct?
 4            MR. RUSS:  Objection to form.  You may
 5    answer.
 6            THE WITNESS:  I'm assuming there should be a
 7    P73 somewhere how Valentino Dixon became the
 8    suspect.
 9            BY MR. BRUSTIN:
10            Q.   Right.  Why was Valentino's Dixon's
11    name -- in other words, a document explaining why
12    Valentino Dixon's name was mentioned by the
13    dispatcher sometime soon after 1:39 in the morning,
14    correct?
15            A.   Correct.
16            Q.   It would be particularly -- given that
17    Valentino Dixon was arrested, prosecuted, and
18    convicted of this crime, it would be particularly
19    important to know how he first became a suspect,
20    correct?
21            MR. RUSS:  Objection to form.  You may
22    answer.
23            THE WITNESS:  Yes.
24            BY MR. BRUSTIN:
25            Q.   Any information provided from any
```



1                         Raniero Masecchia

2    source as -- that put him on the police radar as a

3    suspect, that's critically important information to

4    document?

5         A.    Yes.

6         MR. RUSS:  Objection to form.

7         BY MR. BRUSTIN:

8         Q.    And if, for example, that information

9    came from a witness who didn't want to be

10   identified or a confidential source, the

11   information would still have to be documented, it

12   would just have to say witness doesn't want to be

13   identified, correct?

14        A.    Yes.

15        Q.    Can you think of any exception to the

16   rule that the -- that the basis for how a homicide

17   suspect became a suspect has to be documented?

18        A.    I'm sure it's happened.

19        Q.    Okay.

20        A.    You know, police versus police officers

21   on the scene, maybe someone came up to him and

22   said, Valentino Dixon is the shooter.

23        Q.    Okay.

24        A.    Boom.  He puts that out over the air.

25   It's documented, but it's documented through the



```
1                    Raniero Masecchia
2   radio transmission.  Those are all recorded.
3           Q.   All right.  But what's --
4           A.   So those are documented --
5           Q.   Okay.  What's really --
6           A.   -- did he -- should he have written a
7   report on that?  Yeah, he should have documented
8   it.
9           Q.   All right.
10          A.   Does it happen that they don't?
11  That's --
12          Q.   Okay.  But what you want to know as a
13  homicide detective investigating this case --
14          A.   Yeah.  How did the name came up?
15          Q.   How did the name came up?  That's a
16  very basic important question you're going to want
17  to get an answer to.
18          A.   Yes.
19          Q.   And even if that information hadn't
20  been properly documented before, if you're a
21  detective asking that question, you document it
22  after the fact, correct?
23          MR. RUSS:  Objection to form.  You may
24  answer.
25          THE WITNESS:  I don't understand.
```



```
1                    Raniero Masecchia
2         BY MR. BRUSTIN:
3         Q.    Sure.  So one of the basic questions
4    you have, if you're a lead investigator on the
5    case, or you're an investigator who is very
6    involved in the case, is how did this person become
7    on the radar?  You're going to try to ascertain
8    that, correct?
9         A.    Yes.
10        Q.    And if you ascertain how he became a
11   suspect, you're going to write it down, correct?
12        A.    Or I would tell the person, if he's a
13   police officer, to memorialize that --
14        Q.    Okay.
15        A.    -- for him to document it.
16        Q.    Either you write it down or they write
17   it down?
18        A.    Right.
19        Q.    Okay.  It's important information to
20   have in the file?
21        A.    Yeah, of course.
22        Q.    And if you can't find that information,
23   you don't know how he became a suspect, that's
24   important to write down?
25             In other words, for some reason, he was
```



```
 1                    Raniero Masecchia
 2   mentioned over the radio as a suspect, we don't
 3   know how that happened --
 4         A.    Well --
 5         Q.    -- that would be important to document?
 6         A.    I would think so.
 7         Q.    Take a look at page 113.
 8         MR. SOEHNLEIN:  I'm sorry.  Could you say
 9   the page again?
10         MR. BRUSTIN:  113.
11         MR. SOEHNLEIN:  Thank you.
12         BY MR. BRUSTIN:
13         Q.    I will represent to you that this is a
14   photograph of Valentino Dixon's -- of the white
15   Cadillac that Valentino Dixon drove during that
16   time period, which is parked within a block of the
17   crime scene.
18         A.    Okay.
19         Q.    Does that refresh your recollection --
20         A.    No.
21         Q.    -- about Valentino Dixon driving a
22   Cadillac, first of all?
23         A.    No.
24         Q.    Or his car being seen at the crime
25   scene?
```



RANIERO MASECCHIA                                              March 15, 2022
DIXON vs CITY OF BUFFALO                                             156

1                        Raniero Masecchia

2          A.    No.

3          Q.    Okay.  Now, take a look at page 15,

4     please.  Is this a report that you -- this is a

5     P73, by the way, right?

6          A.    Yes.

7          Q.    And this is a P73 that's done by -- it

8     looks like written by Vickerd but who is working

9     with Lonergan, correct?

10         A.    It appears so, yes.

11         Q.    Okay.  And I think you told us it's

12    your belief that Vickerd and Lonergan were the lead

13    detectives on this case?

14         A.    I believe so.  I have no recollection

15    of it.  It's either what I heard when we discussed

16    the case.  I --

17         Q.    Okay.

18         A.    That's my understanding, they were the

19    lead detectives.

20         Q.    All right.  Is there anything you've

21    seen in any documents you reviewed suggesting

22    they're the lead detectives?

23         A.    This is the first one.

24         Q.    Okay.  Anything on this document

25    suggesting they're the lead detectives?



```
 1              Raniero Masecchia

 2       A.    I do.  I believe that they got the

 3  original call at 1:45 in the morning and that

 4  Vickerd was told to go to the hospital while I'm

 5  assuming -- I don't want to assume anything, but

 6  his partner was probably sent to the scene.

 7       Q.    Okay.

 8       A.    That's the way it usually works.

 9       Q.    Okay.  Now, one of the things I noticed

10  then, and this is unusual, at least in my

11  experience from looking at homicide investigations,

12  it appears that -- assuming that Vickerd and

13  Lonergan were the lead detectives, there's nothing

14  in this file that suggests that they did any more

15  police work on the case than other detectives.

16       Is that how things worked in Buffalo, even

17  though you were the lead detective, you basically

18  worked together with other detectives on a homicide

19  case like this?

20       MR. RUSS:  Objection to form.

21       THE WITNESS:  If you could.

22       MR. RUSS:  You may answer.

23       THE WITNESS:  If you could, yes.

24       BY MR. BRUSTIN:

25       Q.    Okay.  So, in other words, being the
```



1                    Raniero Masecchia
2    lead detective on a homicide case didn't
3    necessarily mean that you were conducting the
4    majority of the interviews in the case, for
5    example?
6          A.   No, I'm sure him and his partner and
7    his other two members, usually there were four to
8    a -- when they came to work, or a day group came
9    into work, or if they needed more people you would
10   call them in.  You all worked together.
11         Q.   Okay.  But as the lead detectives,
12   assuming Vickerd and Lonergan were the lead
13   detectives, that would mean that any relevant
14   information that was gathered from other detectives
15   had to go through them -- go back to them, correct?
16         A.   Not necessarily.  I mean, they could
17   have been home and more evidence comes in or
18   witnesses come in and, you know, you familiarize
19   yourself with the case --
20         Q.   Sure.
21         A.   -- even though you weren't there, you
22   go pick up the witnesses and do your job.  I
23   mean --
24         Q.   Sure.
25         A.   -- when they came to work later, they



```
 1                 Raniero Masecchia
 2   should familiarize themselves with it.
 3         Q.    All right.
 4         A.    If it was my case, I would.
 5         Q.    All right.  And, certainly, your
 6   experience with Lonergan -- Lonergan and Vickerd is
 7   they would do the same thing?
 8         A.    Yes.
 9         Q.    And so, for example, to the extent that
10   you did a relevant investigative activity on this
11   case, but Vickerd or Lonergan --
12         THE REPORTER:  Hang on.  For example, to the
13   extent you did ...
14         BY MR. BRUSTIN:
15         Q.    You conducted a relevant investigative
16   activity on this case and Vickerd or Lonergan were
17   not on duty, when they got back, anything important
18   you would tell them about, correct?
19         A.    If I seen them, yes.
20         Q.    Okay.
21         A.    If not, they would read about it.
22         Q.    All right.  But their job as lead
23   detectives in a case was to stay apprised of all
24   relevant evidence that was gathered?
25         A.    Yes.  You would try to, yes.
```



1              Raniero Masecchia

2       Q.   All right.  So, for example, if you're

3  lead investigator in a homicide, you come in --

4       THE REPORTER:  Hang on.  You're --

5  you're starting to pick up speed again.

6       MR. BRUSTIN:  All right.

7       THE REPORTER:  Start -- start that question

8  over.

9       BY MR. BRUSTIN:

10      Q.   If you're lead investigator in a

11 homicide investigation, you come in -- you come in

12 the next day, the first thing you do is you read

13 any reports that were created while you were gone

14 on that case?

15      A.   You would hope so, yes.

16      Q.   All right.  And I will represent to

17 you -- and you can take a look -- it looks like

18 you -- if you keep -- if you keep open to page 15

19 but then also turn to page 74 ...

20      A.   Where am I going?  16 first?

21      Q.   So keep -- keep open 16 -- 15 --

22      MR. RUSS:  So here.  Now go find --

23      MR. BRUSTIN:  That's an even better idea.

24      THE WITNESS:  Now what?

25      BY MR. BRUSTIN:



```
 1                      Raniero Masecchia

 2          Q.    Now go to 74.

 3          A.    One more.   Oops.   74, okay.

 4          Q.    Okay.   And this is a document that

 5   you've reviewed, correct?

 6          A.    Yes.

 7          Q.    Okay.   And as you described on this

 8   document, you put down that the -- the time of this

 9   interview, correct?

10          A.    Yes, sir.

11          Q.    And you mentioned that -- you mentioned

12   that a witness interview could take up to two

13   hours, correct?

14          A.    Yes.

15          Q.    All right.   And it would be fair to say

16   that obviously this witness interview that you

17   documented here didn't take two hours, it's a

18   two-page -- one-and-a-half-page interview, correct?

19          A.    Yeah, it could have taken an hour and a

20   half.   You ever see me type?

21          Q.    Okay.   All right.   In any case, you --

22   as you described, you put down the time you did

23   this interview?

24          A.    Right.

25          Q.    Okay.
```

 

1                    Raniero Masecchia

2         A.    And at the end there should be -- there

3    should be a picture of him standing by a clock or

4    something after the interview --

5         Q.    All right.

6         A.    -- but I don't see it.

7         Q.    You may have just forgotten to do that

8    here?

9         A.    I might not have been available.  I

10   might have been in -- this might not have been done

11   in the interview room.  This might have done right

12   in the homicide office.

13        Q.    And that's what it says here, right?

14        A.    Yeah.

15        Q.    That's where you were?

16        A.    Room 304.  So --

17        Q.    Okay.  But it looks like that -- one

18   thing that's not here is the time this ended,

19   correct?

20        A.    Yes.

21        Q.    And that should be there, right?

22        A.    Yes.

23        Q.    Nothing you did on purpose, but it's

24   not there?

25        A.    Right.



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                        163

```
 1                    Raniero Masecchia
 2          Q.   Okay.
 3          MR. SAHASRABUDHE:   Can we go off the
 4     record just for one --
 5          MR. BRUSTIN:   Sure.
 6          MR. SAHASRABUDHE:   -- quick second?
 7          THE VIDEOGRAPHER:   Sure.   Going off the
 8     record.   Time is 12:32.
 9          (Off the record at 12:32 p.m.)
10          THE VIDEOGRAPHER:   Going back on the record.
11     Time is 12:33.
12          BY MR. BRUSTIN:
13          Q.   Okay.   In any case -- so keep this
14     open.   So at 1430 hours, so that's 2:30, right, in
15     the afternoon?
16          A.   Yes.
17          Q.   2:30 in the afternoon, you're doing a Q
18     and A with John Sullivan?
19          A.   That's the time it started.
20          Q.   In the homicide unit?
21          A.   Yeah.
22          Q.   Okay.   And no mention of any witness
23     present with you, correct?
24          A.   What do you mean?
25          Q.   There's no other -- there's no other --
```



```
 1                    Raniero Masecchia
 2    if you had been doing this with another detective,
 3    it would be mentioned here, correct?
 4           A.    It would be mentioned, yes.
 5           Q.    That's always important to write down,
 6    correct?
 7           A.    Yes.
 8           Q.    It might be important for that -- for
 9    that detective to be a witness to what happened?
10           A.    Yes.
11           Q.    Okay.  So the fact that there is no
12    other detective mentioned here, it means you
13    conducted this interview alone?
14           A.    Correct.
15           Q.    All right.  Now go back to page 15.
16    MR. RUSS:  Okay.
17    THE WITNESS:  16 or 15?
18    BY MR. BRUSTIN:
19           Q.    15.
20           A.    Okay.
21           Q.    And, here, it appears if you look at
22    the bottom of the page, your writer Ben Spoke, do
23    you see that?
24           A.    Yes.
25           Q.    So it appears -- and you can read
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                        165

```
 1                     Raniero Masecchia
 2    this -- this paragraph to yourself if you -- if
 3    you --
 4           A.    Where, down here, or the next page?
 5           Q.    Yeah, it goes to the next page.  It's
 6    just -- read that paragraph to yourself.
 7           MR. RUSS:  I forget.  Did we establish
 8    whether he had reviewed this one?
 9           MR. BRUSTIN:  We did.  He didn't.
10           THE WITNESS:  I didn't.
11           MR. RUSS:  Did not?
12           THE WITNESS:  No.
13           MR. RUSS:  Right.
14           MR. BRUSTIN:  And correct me if you think
15    that's wrong.
16           THE WITNESS:  I don't know.
17           MR. RUSS:  No, no, no.  I just -- in my
18    advanced age, I couldn't remember.
19           THE WITNESS:  You want me to read the whole
20    thing?
21           BY MR. BRUSTIN:
22           Q.    Nope, just that paragraph.  I'm going
23    to ask you a quick question about it.
24           A.    Okay.
25           Q.    All right.  So it appears that sometime
```



1                    Raniero Masecchia

2    in the early morning hours of August 10th, Vickerd

3    and Lonergan -- I'm sorry -- Vickerd, the writer --

4            A.    Right.

5            Q.    -- interviewed John Sullivan in a

6    hospital, correct?

7            A.    Right.

8            Q.    All right.  And that was many hours

9    before you did your Q and A later that day,

10   correct?

11           A.    That was at what time?

12           Q.    So if you -- you know what I'm going to

13   have you do -- so what I wanted to establish first

14   is obviously you would have either read this report

15   or talked to Vickerd and Lonergan before you did a

16   Q and A of someone they interviewed, correct?

17           MR. RUSS:  Objection to form.  You may

18   answer.

19           THE WITNESS:  Yes.

20           BY MR. BRUSTIN:

21           Q.    Okay.

22           A.    If at all possible --

23           Q.    Okay.

24           A.    -- yes.

25           Q.    So now I want you to read this entire



1                    Raniero Masecchia

2    document and I'm going to ask you some questions

3    about it.  It's a two-page document.

4            MR. RUSS:  Pages 15 and 16?

5            MR. BRUSTIN:  Yes, sir.

6            THE WITNESS:  Okay.

7            BY MR. BRUSTIN:

8            Q.   All right.  So, as you've told us, to

9    the extent it was available, this is a report you

10   would have read before you did your Q and A,

11   correct?

12           MR. RUSS:  Objection to form.

13           THE WITNESS:  No, it might not have been

14   back --

15           BY MR. BRUSTIN:

16           Q.   I said, to the extent it was done, you

17   would have read it, correct, or you might have read

18   the notes?

19           MR. RUSS:  Objection.

20           THE WITNESS:  If I had the opportunity to,

21   yes, I would have.

22           BY MR. BRUSTIN:

23           Q.   Okay.  And in fact, among other things,

24   this report, and presumably -- thanks -- is that

25   the time there?



1                    Raniero Masecchia

2           THE WITNESS:  Is that the Sullivan one?

3           MR. ROMO:  There's a clock.

4           MR. BRUSTIN:  Can you see the time?  My eyes

5   aren't --

6           MR. SAHASRABUDHE:  It might not be in a

7   color copy.

8           MR. RUSS:  He just walks around with stuff

9   in his --

10          MR. ROMO:  Looks like 4:30.  Around 4:30.

11          THE WITNESS:  That makes sense.  4:30 would

12  be about right.  It would take about two hours.

13          MR. BRUSTIN:  Okay.

14          MR. ROMO:  Yeah, 4:45.

15          MR. RUSS:  Danielle, you okay?

16          THE REPORTER:  Yep.

17          MR. BRUSTIN:  I think that says 3:40, but --

18  let's mark this.  Let's mark this, please, as

19  Plaintiff's -- what number are we on?

20          THE REPORTER:  4.

21          MR. BRUSTIN:  Plaintiff's 4, please.

22          THE WITNESS:  Probably that.

23          MR. BRUSTIN:  We'll stop for lunch at 1:00

24  if that's okay with you guys.

25          THE WITNESS:  Huh?



RANIERO MASECCHIA                                      March 15, 2022
DIXON vs CITY OF BUFFALO                                          169

```
 1                  Raniero Masecchia
 2         MR. BRUSTIN:  We'll stop for lunch at 1:00.
 3         MR. SAHASRABUDHE:  That's fine with us.
 4         MR. RUSS:  Mm-hmm.
 5  The following was marked for Identification:
 6   PLF.'S EXH. 4        interview with photo
 7         BY MR. BRUSTIN:
 8         Q.   All right.  At your counsel's
 9  suggestion, we now have what I think you described
10  as the version with the picture of the witness,
11  John Sullivan, on the report.  We've now marked
12  this as Plaintiffs 4, it's the page with the
13  picture.
14         And it appears to me that this interview
15  with John Sullivan ended at -- at 3:40, but you
16  tell me if that appears right to you.
17         A.   Yes.  An hour, 10 minutes, that's
18  about --
19         Q.   Okay.  And I think you've already said
20  this, but I want to make sure, you think that the
21  reason why this page and a half document took an
22  hour and ten minutes is simply because you're a
23  slow typist?
24         A.   Well, I'm having them -- sometimes I
25  have the witness sit right next to me as I'm typing
```



```
 1                    Raniero Masecchia
 2   it, reading it along with me.
 3        Q.   Okay.
 4        A.   And then after the statement's
 5   complete, I have them read it again --
 6        Q.   Okay.
 7        A.   -- and then sign it.
 8        Q.   All right.  But your -- your -- so this
 9   is after he signed it?
10        A.   Yes.
11        Q.   Okay.  And your testimony is, though,
12   that any -- any substantive information that you
13   gave to him or that he gave to you during that time
14   period, it would be in this report?
15        A.   Yes.
16        Q.   Okay.  Without exception?
17        A.   Yes.
18        Q.   All right.  Now, let's go back to
19   page 15 where you already were, I think.
20        MR. RUSS:  Yep.
21        BY MR. BRUSTIN:
22        Q.   All right.  So you've had a chance to
23   read this report?
24        MR. RUSS:  You still want us to save 75 or
25   whatever?
```



```
 1                    Raniero Masecchia

 2        MR. BRUSTIN:  Yeah, we -- you don't have

 3   to save it.  We can find it.

 4        BY MR. BRUSTIN:

 5        Q.   All right.  So I want to ask you -- so

 6   I want to ask you some questions --

 7        A.   Thank you.

 8        Q.   -- about your understanding of what

 9   happened before you interviewed John Sullivan.

10        It would be important for you to ascertain,

11   to the extent you could, what happened with John

12   Sullivan before you interviewed him, correct?

13        A.   Yes.

14        Q.   And so, for example, one of the things

15   that's important about this report is that at the

16   bottom of page 15 through page 16, John Sullivan,

17   according to Vickerd's report, is giving him

18   information about what he saw during the crime,

19   correct?

20        A.   Yes.

21        Q.   And who he saw committing it, according

22   to this report?

23        A.   Yes.

24        Q.   And, obviously, you understood that any

25   information that John Sullivan gave to these
```



1              Raniero Masecchia

2   officers about what he saw during the crime had to

3   be in this report, correct?

4          MR. RUSS:  Objection to form.

5          THE WITNESS:  I would hope so.

6          BY MR. BRUSTIN:

7          Q.   And any information that Vickerd or

8   Lonergan gave to John Sullivan about the crime had

9   to also be in this report, correct?

10         A.   I don't understand.

11         MR. RUSS:  Objection to form.

12         BY MR. BRUSTIN:

13         Q.   If, for example, Vickerd or Lonergan

14  said anything about a suspect to Sullivan, they

15  would have to write it down in this report,

16  correct?

17         A.   I would hope so.

18         Q.   Well, you wouldn't hope so.  They had

19  an obligation to do that --

20         A.   Yeah, I would --

21         Q.   -- correct?

22         A.   -- hope so.

23         Q.   All right.  If, for example, they

24  suggested to John Sullivan that Valentino Dixon may

25  have been the person that committed this crime, it



```
 1                  Raniero Masecchia
 2   would be critically important for them to document
 3   that here, correct?
 4        A.   Yes.
 5        Q.   And it would be completely
 6   inappropriate for them to have done that, correct?
 7        A.   Correct.
 8        MR. RUSS:  Objection to form.
 9        BY MR. BRUSTIN:
10        Q.   All right.  Now, based on this report,
11   it appears that Vickerd gets the call at 1:45 in
12   the morning --
13        MR. RUSS:  Excuse me.
14        BY MR. BRUSTIN:
15        Q.   -- right?
16        MR. RUSS:  The first line.
17        THE WITNESS:  Yes.
18        BY MR. BRUSTIN:
19        Q.   And then he goes -- then he goes --
20        A.   Thank you.
21        Q.   -- to headquarters?
22        A.   Yes.
23        Q.   And then he goes to the hospital,
24   correct?
25        A.   Yes.
```



```
1                      Raniero Masecchia
2          Q.    Speaks to some people at the hospital,
3    it looks like, right?
4          A.    Yes.
5          Q.    And then he goes to the crime scene?
6          A.    Yes.
7          Q.    And then he goes back to the hospital?
8          A.    A different hospital.
9          Q.    Okay.  Presumably, that must have taken
10   at least an hour or two, fair to say?
11         A.    Or longer.
12         Q.    Or longer.  But at least an hour or
13   two, had to, right?
14         A.    Yes.
15         Q.    So -- and, by the way, one thing that's
16   missing here which should be here is what time --
17         A.    They arrived.
18         Q.    Well, and what time -- most
19   importantly, what time they interviewed John
20   Sullivan, correct?
21         MR. RUSS:  Objection to form.
22         THE WITNESS:  Yes.
23         BY MR. BRUSTIN:
24         Q.    Okay.
25         A.    Yes.
```



Raniero Masecchia

1

2    Q.    But it appears from this report that

3  Vickerd couldn't have interviewed John Sullivan,

4  given all the things he's described before that,

5  until about 4:00 in the morning, fair to say?

6        MR. RUSS:  Objection to form.

7        THE WITNESS:  Yes.

8        BY MR. BRUSTIN:

9        Q.    That certainly would --

10       A.    Or later.

11       Q.    Okay.  That certainly would have been

12  your understanding if you read this report at the

13  time?

14       MR. RUSS:  Objection to form.

15       THE WITNESS:  Yes --

16       BY MR. BRUSTIN:

17       Q.    Okay.

18       A.    -- if I read it.

19       Q.    Okay.  So it appears from this report

20  that sometime at 4:00 in the morning or later, John

21  Sullivan is being interviewed at the hospital?

22       A.    Yes, I would assume so.  I don't know.

23       Q.    That's what this report suggests?

24       A.    After --

25       Q.    Correct?



```
1                    Raniero Masecchia
2          A.    After 1:40 -- the only time I see
3    written on here is 1:45, so it had to happen after
4    1:45.
5          Q.    Well, he's describing going back and
6    forth a bunch of different places.  It has to be
7    later than that, correct?
8          A.    Yeah, sure.  Sure.  But I can't tell
9    you it's after 4:00 or after 5:00 or after 6:00.
10         Q.    But it appears that what he's
11   describing --
12         A.    Or later that morning.
13         Q.    Let me finish.  It appears that what
14   he's describing is a couple of hours of work at
15   least, correct?
16         A.    At least.
17         Q.    Before he -- it appeared from what
18   he's --
19         A.    At least.
20         Q.    -- describing, that before he gets to
21   John Sullivan, he's done a couple of hours of work?
22         A.    Yes.
23         Q.    Now, one of the things that John
24   Sullivan mentions, according to Vickerd in his
25   report, is that he was with -- he was standing on
```



```
 1                    Raniero Masecchia
 2   the corner with his friend Fred Stencil, correct?
 3            At the bottom of the page --
 4            A.   Yes.
 5            Q.   -- page 15.  Page 15, you're on 16.
 6            MR. RUSS:  One page back.
 7            THE WITNESS:  15?
 8            BY MR. BRUSTIN:
 9            Q.   Bottom of 15.
10            A.   Yeah.
11            Q.   Okay.  And so the first thing,
12   according to this report, that John Sullivan is
13   mentioning is that there's another potential
14   eyewitness, correct?
15            A.   Yes.
16            Q.   And so one basic investigative task in
17   this case would have been to locate and interview
18   Fred Stencil, correct?
19            A.   Yes.
20            Q.   And ask him the same questions that
21   were asked of John Sullivan, correct?
22            A.   Yes.
23            Q.   Any exception to that rule?
24            A.   Not that I could think of.
25            Q.   Basic investigative task --
```



1                      Raniero Masecchia

2          A.    Yes.

3          Q.    -- find Fred Stencil, write down what

4    he tells you, whether it helps or hurts your case,

5    right?

6          A.    Yes.

7          Q.    All right.  Now, obviously to the

8    extent that you've reviewed this report or the

9    notes or you spoke to Vickerd about what John

10   Sullivan told him before you did your Q and A --

11         A.    Assuming that.  That's a big

12   assumption.

13         Q.    Well, you would have want -- you've

14   already told us -- this happened many hours before

15   you, correct?

16         A.    This is the same day, right?  Now it's

17   2:30 in the afternoon.

18         Q.    Yeah.

19         A.    Assuming that, I don't recall --

20         Q.    Okay.

21         A.    -- I would have.

22         Q.    All right.  So assuming you did -- and

23   I hear you saying you don't know -- assuming you

24   did, the most important information you want to

25   know about John Sullivan is what he told you about

