1                    Raniero Masecchia

2    what he saw at the crime, correct?

3         MR. RUSS:  What he told the former officers.

4         MR. BRUSTIN:  What he told their -- yes.

5         THE WITNESS:  I -- I don't know.

6         BY MR. BRUSTIN:

7         Q.   Okay.  Well, if you take a look at

8    page 16, he's describing -- Vickerd is describing

9    what John Sullivan allegedly told him about the

10   crime?

11        A.   I understand.  Where are we?  16?

12        Q.   Yeah.

13        Fight broke out --

14        A.   Right.

15        Q.   -- that's where it starts.

16        A.   Right.

17        Q.   Okay.  And according to Vickerd, John

18   Sullivan, on his own, mentions that he saw a black

19   male known to him as Tino go behind the van and

20   come out with a black Uzi.  Okay?  A very -- very

21   specific description of seeing someone he knows as

22   Tino walk to a van, come out from behind the van

23   carrying a specific type of weapon, correct?

24        A.   Correct.

25        Q.   That's a very specific recollection,



```
 1                     Raniero Masecchia
 2   correct?
 3          A.    Yes.
 4          Q.    And from this description, it appears
 5   that John Sullivan knows the person who committed
 6   this crime by name, Tino, right?
 7          A.    Yes.
 8          Q.    And he had an opportunity to not only
 9   see him do the shooting, but to watch him walk and
10   get the weapon, come back and then do the shooting,
11   right?
12          A.    That's what it says.
13          Q.    Suggests that he had a long opportunity
14   to see the suspect?
15          A.    Yes.
16          Q.    Okay.  Very important information to
17   follow up on or to be aware of, correct?
18          A.    Correct.
19          Q.    Then he goes on to say after going
20   behind the van getting the black Uzi, walking back
21   towards Torri, the person who died, he pointed it
22   and started firing, and that's when he was shot in
23   the leg.
24          A.    Okay.
25          Q.    Okay.  And then he gives a description
```



1              Raniero Masecchia

2    of the person he knows as Tino, right?

3         A.    Yes.

4         Q.    And then he gives his real name,

5    Valentino?

6         A.    Yes.

7         Q.    And according to this report, all of

8    that information is volunteered by John Sullivan

9    without any suggestion or any help from the police

10   officers whatsoever, correct?

11        A.    Yes.

12        Q.    And he goes further and says that after

13   observing the person he knows as Tino walk behind a

14   van, get a gun, walk up to Torri and shoot him, he

15   saw him continue to stand over Torri and keep

16   firing, correct?

17        A.    Yes.

18        Q.    And he is saying here that he saw all

19   of those things?

20        A.    Yes.

21        Q.    And at the bottom, it says, Subsequent

22   developments will be reported via additional P73s?

23        A.    That's a normal ending to all --

24        Q.    Okay.

25        A.    -- the P73s.



```
1                    Raniero Masecchia
2         Q.    And particularly with someone like
3    this, this is obviously an important witness,
4    right?
5         A.    Excuse me?
6         Q.    This is obviously an important witness
7    in a homicide case?
8         A.    Yes.
9         Q.    Okay.  Now -- now, one important
10   information -- one important piece of information
11   that you're going want to follow up on -- or
12   anybody would want to follow up on here is the van
13   where he allegedly got the gun, right?
14        A.    Okay.
15        Q.    You agree, right?
16        A.    Yes.
17        Q.    Can you give me any more information
18   about the van?  Do you know who owned the van?  Did
19   you see a license plate number?  Did you see
20   anybody else in the van?  Those are the kinds of
21   questions that any -- any competent homicide
22   detective would want to follow up on, correct?
23   Right?
24        MR. SOEHNLEIN:  Objection to form.
25        THE WITNESS:  I don't know.  I don't
```



```
 1                   Raniero Masecchia
 2   remember the situation.
 3           BY MR. BRUSTIN:
 4           Q.   I'm not asking you what you did, I'm
 5   asking you about --
 6           A.   Well, I don't know.  Did he go to the
 7   van?  Did het get it from behind the van?  It
 8   didn't say he went in the van.
 9           Q.   Okay.
10           A.   It said he went behind the van.
11           Q.   Right.  So the implement -- the
12   implication -- let me finish.  The implication from
13   this report is that Valentino or Tino, the person
14   he's describing here --
15           A.   Right.
16           Q.   -- may have gotten the black Uzi from a
17   van, correct?
18           MR. RUSS:  Objection to form.
19           THE WITNESS:  No.
20           MR. RUSS:  That's not what it says.
21           BY MR. BRUSTIN:
22           Q.   Okay.  So one of the things that you do
23   as a homicide detective is you put one and one
24   together and see if it adds up to two, right?
25   You're looking at pieces of the puzzle?
```



                    Raniero Masecchia

1

2        A.    Yes.

3        Q.    And one possibility from this

4   description in this report is that maybe Valentino

5   Dixon got the Uzi from that van, right?

6        A.    Yes.

7        Q.    And that's the kind of question you'd

8   want to follow up on, right?

9        A.    If you had --

10       Q.    Tell me about the van.

11       A.    Right.

12       Q.    Basic homicide 101, right?

13       MR. RUSS:  Objection to form.

14       THE WITNESS:  Every case is different.  I

15   don't remember the case --

16       BY MR. BRUSTIN:

17       Q.    Okay.

18       A.    -- but if you're -- you know, you're

19   insinuating or you're talking that all these things

20   come together so -- so quickly.

21       This report from Vickerd might -- might not

22   have been -- this is the original report.  Might

23   not have seen this until two, three days later.

24       Vickerd might have went home after and get

25   some sleep.  He might have went to the autopsy.  I



```
 1                    Raniero Masecchia
 2   don't know.  I -- I don't recall it.
 3        Q.   Fair enough.  So one important --
 4   because -- for the reasons you just described, one
 5   very important thing to do down the road --
 6        A.   Yeah, you could always come back to
 7   that.
 8        Q.   Let me finish.
 9        A.   You're right.
10        Q.   One very important thing down the road
11   to do by the detectives is to look at the two
12   statements and make sure there aren't any big
13   inconsistencies or gaps in information, correct?
14        A.   We let --
15        MR. RUSS:  Objection to form.
16        THE WITNESS:  -- the DA's office handle
17   that.
18        BY MR. BRUSTIN:
19        Q.   Well, the DA's office is not involved
20   until after the arrest, correct?
21        A.   Yes.
22        Q.   All right.  And so one of -- you've
23   already told us under oath that one of your jobs is
24   to follow up on inconsistencies.  Remember that?
25        A.   Yes.
```



```
 1                    Raniero Masecchia
 2         Q.    Okay.
 3         MR. RUSS:  You've asked the question 12
 4  times --
 5         MR. BRUSTIN:  All right.
 6         MR. RUSS:   -- if you've asked it once.
 7         BY MR. BRUSTIN:
 8         Q.   And so to the extent that there are
 9  inconsistencies or gaps in information for an
10  important -- important witness like John Sullivan,
11  you have to follow up on it, correct?
12         MR. RUSS:  Objection to form.
13         THE WITNESS:  Yes.  If you see the
14  inconsistencies, yes.
15         BY MR. BRUSTIN:
16         Q.   All right.  And, by the way, as you --
17  as you're -- what you've -- what happened in this
18  case, like all cases --
19         A.    Right.
20         Q.    -- is as these witnesses are being
21  interviewed, especially in the homicide unit,
22  detectives are sitting outside the interview room
23  and they're talking about what's happening on the
24  case, right?
25         MR. RUSS:  Objection to form.
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                          187

```
 1                    Raniero Masecchia
 2          THE WITNESS:  To?
 3          BY MR. BRUSTIN:
 4          Q.   To each other.  Homicide detectives, as
 5   you're writing your reports, you're talking to
 6   other officers about what they're finding on the
 7   case?
 8          A.   Possible.
 9          Q.   That's generally what you do?
10          A.   It's possible.
11          Q.   All right.  Now take a look at page 74.
12          A.   Yes, sir.
13          Q.   All right.  And this is a document you
14   have reviewed in preparation for today?
15          A.   Yes, I've gone over it.
16          Q.   All right.
17          MR. BRUSTIN:  And -- is that mine or yours?
18          MR. ROMO:  Yours.
19          BY MR. BRUSTIN:
20          Q.   You -- early in the interview, you
21   ask -- oh, by the way, this witness is 17 years
22   old, correct?
23          A.   Yes.
24          Q.   Any obligation in 1991 to get
25   permission from his parents or --
```



```
 1                    Raniero Masecchia
 2         A.    If he was a suspect I believe, but I
 3  don't think as a witness.
 4         Q.    Okay.  But obviously as a 17 year old,
 5  you have to be a little careful, correct?
 6         A.    Well, maybe 16, 15, 14.  17 is -- could
 7  be charged as an adult if he were a suspect in
 8  anything.
 9         Q.    Okay.  And, again, one of the first
10  things that he mentions to you when you ask him
11  what happened that night is that he's with his
12  friend, Fred Stencil?
13         A.    Where's that?  Yes.
14         Q.    Another mention of someone who
15  obviously has to be spoken to and interviewed,
16  correct?
17         A.    Yes.
18         Q.    All right.  And read this description
19  to yourself of the shooting.  Let me know when
20  you're done.
21         MR. RUSS:  Which description?
22         MR. BRUSTIN:  Just -- just -- just the first
23  Q --
24         THE WITNESS:  The first paragraph here?
25         MR. BRUSTIN:  -- substantive -- yeah, the
```



```
 1              Raniero Masecchia
 2   big Q and A.  The first -- when he describes the
 3   crime in the top of the page.
 4         MR. RUSS:  It begins, I was with my friend?
 5         MR. BRUSTIN:  Yeah, I'm sorry.  So it
 6   begins, I was with my friend, and ends, They let me
 7   go home about 7:00.
 8         MR. RUSS:  Okay.
 9         THE WITNESS:  Okay.
10         BY MR. BRUSTIN:
11         Q.   So in this description that he gives to
12   you later that day, according to this description,
13   he specifically tells you that he did not see
14   anybody with a gun until somebody hollered, gun,
15   correct?
16         A.   Right.
17         Q.   Right?
18         MR. RUSS:  That's what it says.
19         THE WITNESS:  That's what it says.
20         BY MR. BRUSTIN:
21         Q.   And so the first time he's telling you
22   he saw someone with a gun was when the person he
23   knew to be Tino was standing over the victim,
24   correct?
25         A.   Right.
```



```
 1                      Raniero Masecchia
 2           Q.    In other words, directly contradicting
 3    the statement he gave earlier where he said that he
 4    saw the person he knew as Tino go and retrieve a
 5    gun from behind a van, correct?
 6           A.    Okay.
 7           Q.    Completely different story, correct?
 8           A.    Yes.
 9           Q.    It can't both be true, correct?
10           A.    Yes.
11           Q.    In the version he gives to you, he
12    doesn't see him retrieve a gun, he doesn't even see
13    a gun until he's standing over the victim, correct?
14           A.    He heard the gun, he didn't see it
15    until he turned around and seen him standing
16    over --
17           Q.    All right.   And that's the kind of
18    contradiction that any homicide detective would
19    want to explore because it suggests that this
20    witness may not be reliable, correct?
21           MR. RUSS:   Objection to form.   You may
22    answer.
23           THE WITNESS:   I -- I would think so if you
24    had both things in front of you --
25           BY MR. BRUSTIN:
```



```
 1                    Raniero Masecchia
 2         Q.   Okay.
 3         A.   -- you would question that.
 4         Q.   Okay.  There -- there -- it's a
 5  critical inconsistency about the most important
 6  event in the case, correct?
 7         MR. RUSS:  Objection to form.  You may
 8  answer.
 9         THE WITNESS:  Yes.
10         BY MR. BRUSTIN:
11         Q.   So to the extent that you are aware of
12  it during your interview, it would have been
13  important for you to question him about it,
14  correct?
15         A.   That --
16         MR. RUSS:  Objection to form.
17         THE WITNESS:  If I was --
18         MR. RUSS:  You may answer.
19         THE WITNESS:  -- aware of it.
20         BY MR. BRUSTIN:
21         Q.   And to -- and, obviously, as soon as a
22  detective became aware of it when they looked at
23  the reports, he had to be questioned about it?
24         MR. RUSS:  Objection --
25         THE WITNESS:  Yes, but I --
```



1                    Raniero Masecchia

2          MR. RUSS:  -- to form.

3          THE WITNESS:  -- wouldn't want --

4          MR. RUSS:  You may answer.

5          THE WITNESS:  -- to put any words --

6          THE REPORTER:  Hang on.

7          THE WITNESS:  -- into his mouth.

8          THE REPORTER:  Hang on.  Just talk one at a

9    time.

10          THE WITNESS:  Oh, I'm sorry.

11          THE REPORTER:  So if he's making an

12    objection, just wait to answer until afterwards.

13          MR. RUSS:  Danielle is good, but she's not

14    that good.

15          THE WITNESS:  Excuse me?

16          MR. RUSS:  She's good, but she's not that

17    good.

18          THE WITNESS:  I know, I know.  I'm sorry.

19          I mean, I wouldn't want to put any words

20    into the witness's mouth.  I just let them tell me

21    what they saw.  That's always been my routine.

22          I can't tell you what happened that night if

23    I seen that report before I typed this, or after I

24    typed this, but I want hear what the witness had to

25    say.



1                    Raniero Masecchia

2          I put down what he said, he signs to it,

3    he's going to have to testify in court to it.   If

4    there's any discrepancies, it's going to come out.

5          BY MR. BRUSTIN:

6          Q.   And obviously to the extent that any

7    arrest is made based on statements from John

8    Sullivan, in other words, probable cause to make an

9    arrest --

10         A.   Right.

11         Q.   -- it is important for the detectives

12   in seeking that arrest to make clear important

13   contradictions like that, correct?

14         MR. RUSS:   Objection to form.   You may

15   answer.

16         MR. SOEHNLEIN:   Objection to form.

17         THE WITNESS:   Yes.

18         BY MR. BRUSTIN:

19         Q.   Okay.   And --

20         A.   One contradiction that isn't is he had

21   a gun and he fired.

22         Q.   Right.

23         A.   Whether it was from behind the van or

24   standing over him, that's something the DA and the

25   witness discuss.



```
 1                     Raniero Masecchia

 2          Q.    Okay.

 3          A.    I mean, I just put down what they tell

 4    you.

 5          Q.    All right.

 6          A.    If I was the lead investigator, maybe I

 7    would have done it different --

 8          Q.    All right.

 9          A.    -- but I don't recall any of this.

10          MR. BRUSTIN:  Okay.  I think this is a

11    reasonable time to break for lunch.  How long do

12    you all need?

13          THE VIDEOGRAPHER:  Do you want to go off?

14          MR. BRUSTIN:  Yes, please.

15          THE VIDEOGRAPHER:  Okay.  Going off the

16    record.  Time is 1302.

17          (A recess was then taken at 1:03 p.m.)

18          THE VIDEOGRAPHER:  All right.  We are going

19    back on the record.  Time is 1354.

20          MR. BRUSTIN:  I apologize.  Can you tell me

21    how much time is on the record before we start?

22          THE VIDEOGRAPHER:  Sure.  Two hours,

23    53 minutes.

24          MR. BRUSTIN:  Thanks.

25          THE VIDEOGRAPHER:  Sure.
```



```
 1                     Raniero Masecchia

 2          BY MR. BRUSTIN:

 3          Q.   Okay.  Let's continue talking about

 4    your Q and A with John Sullivan.  Okay?

 5          A.   Yes.

 6          Q.   Now, if you take a look at page 75 --

 7          A.   Okay.

 8          Q.   -- at the top of the page, you ask him,

 9    do you recall what Tino was wearing at the time of

10    the shooting?

11          A.   Yes.

12          Q.   And he says, all he knows is he had on

13    something dark, maybe black or blue, I don't

14    remember?

15          A.   Okay.

16          Q.   And, here, you ask him an open-ended

17    question about what he was wearing and he's able to

18    give you very little information, correct?

19          A.   Yes.

20          Q.   And if you take a look at page --

21          A.   16?

22          Q.   Yeah.  15 or 16.  Let's see which one.

23    Some hours earlier -- yeah, 16, it is, actually.

24    Second paragraph.

25          A.   Second paragraph.
```



 1                    Raniero Masecchia

 2         Q.    On page 16.

 3         A.    Oh, I'm sorry.

 4         Q.    Beginning with, John describes.

 5         A.    Right.

 6         Q.    And here when he's speaking to Vickerd,

 7    for some reason he's able to give a much more

 8    specific description of what he was wearing,

 9    correct?

10         A.    I see that, yes.

11         Q.    No explanation for why that is,

12    correct?

13         A.    No.

14         Q.    Certainly not something that you

15    followed up on?

16         A.    Not that I recall, no.

17         Q.    And no idea if anybody else followed up

18    on that?

19         A.    I don't.

20         Q.    Obviously important to follow up on

21    that, though, correct?

22         A.    I would think so.

23         Q.    Now, on page 75, it indicates that

24    during this interview, you also showed him a

25    six-person array, correct?



```
 1                   Raniero Masecchia
 2         A.   Yes, sir.
 3         Q.   And even though this witness had
 4   already identified Valentino Dixon as somebody he
 5   knew and somebody he, according to Vickerd, he
 6   claimed did the shooting, you still were careful to
 7   only show him a picture of Valentino Dixon among a
 8   six-person photo array, correct?
 9         A.   Yes.
10         Q.   Because you understood, even under
11   these circumstances, it would have been
12   inappropriate to show him an individual mug shot,
13   correct?
14         A.   Yes.
15         Q.   Of Valentino Dixon or anybody else?
16         A.   Yes.
17         Q.   And you didn't do that?
18         A.   No.
19         Q.   And, to your knowledge, nobody else
20   did?
21         A.   No.
22         Q.   Because that would have been totally
23   contrary to procedure?
24         A.   That's something I would never do.
25         Q.   Okay.  That would be highly suggestive,
```



```
 1                    Raniero Masecchia

 2    correct?

 3         A.    Very.

 4         Q.    Okay.  Now, you did not ask

 5    Mr. Sullivan any questions about whether he was

 6    drinking or doing drugs that evening, correct?

 7         A.    Not that I can see here, no.

 8         Q.    All right.  Now, at the -- at the

 9    trial, Sullivan testified, I'll represent to you,

10    that that night he had been drinking malt liquor,

11    he had a couple of beers, and that he had earlier

12    in the day smoked marijuana with cocaine.

13         A.    Okay.

14         Q.    And you would agree, I take it, that

15    that's -- that's a question you probably should

16    have asked him?

17         MR. RUSS:  Objection to form.

18         THE WITNESS:  I guess.  I didn't.

19         BY MR. BRUSTIN:

20         Q.    Okay.  That's something you probably

21    should have --

22         A.    I didn't.

23         Q.    -- asked, right?

24         A.    Yes.

25         Q.    Okay.  And -- now, another thing that
```



```
 1                    Raniero Masecchia

 2   John Sullivan testified at the trial, and this is

 3   on the stand on page 220 -- at page 222.

 4          He testified that he told the police that

 5   Valentino was between 5-foot and 10 and 6 feet

 6   tall, that the police typed a statement, but

 7   there's a lot of things that were typed that he

 8   didn't really put in.  That's what John Sullivan

 9   testified to.

10          A.   Okay.

11          Q.   Now, I take it that you deny typing any

12   words or statements from -- from John Sullivan that

13   he didn't actually state, correct?

14          A.   That's correct.

15          Q.   And you deny failing to document any

16   information that John Sullivan gave you during this

17   statement, correct?

18          A.   Yes.

19          Q.   In other words, you didn't stop typing

20   and fail to put in information that you didn't want

21   to put in, correct?

22          A.   Correct.

23          Q.   You typed everything that he said and

24   everything --

25          A.   Correct.
```



                        Raniero Masecchia

1

2      Q.   -- you said?

3      And that was the procedure, correct?

4      A.   Yes.

5      Q.   Not just for you, but for any officer?

6      A.   Yes.

7      Q.   In 1991 and at all times when you were

8 a homicide detective?

9      A.   Yes.

10     Q.   Again, a very basic rule?

11     A.   Yes.

12     Q.   Okay.  Now, you would agree -- I think

13 you told us earlier that to the best of your

14 recollection, you don't remember ever showing

15 witnesses, in this case or any case as a homicide

16 detective, mug books; is that right?

17     A.   Yeah, I don't.

18     Q.   Okay.  Is it possible that you've done

19 it and don't remember it?

20     A.   No.

21     Q.   You don't think that happened?

22     A.   No.

23     Q.   All right.  But you would agree,

24 though, that to the extent you ever showed a

25 suspect mug books or mug photos of any kind, that



```
1                    Raniero Masecchia
2    photo-showing process would have to be carefully
3    documented?
4         MR. RUSS:  Objection to form.
5         MR. SOEHNLEIN:  Objection to form.
6         THE WITNESS:  Yes.
7         BY MR. BRUSTIN:
8         Q.   Same as any photo array?
9         A.   Right.  It's --
10        Q.   In other words, if --
11        A.   -- if I used -- let's say a high school
12   yearbook --
13        Q.   Yep.
14        A.   -- I document that I used a high school
15   yearbook.
16        Q.   Okay.  You would document what the year
17   was --
18        A.   Right.
19        Q.   -- so that you could determine what
20   photos were in that yearbook, correct?
21        A.   Right.
22        Q.   That's important because it's possible,
23   for example, that a photo of a suspect that was
24   later identified was in that yearbook, correct?
25        A.   Correct.
```



```
 1                    Raniero Masecchia

 2         Q.    And the fact that they saw it in the

 3   yearbook could have been suggestive?

 4         A.    Yes.

 5         Q.    So for a variety of reasons, any time

 6   you show a photo -- any kind of photo is shown,

 7   whether it's a mug book or a photo array --

 8         A.    Should be documented.

 9         Q.    -- has to be documented, and you have

10   to include which documents were shown?

11         A.    Yes.

12         Q.    And any kind of identification that was

13   made of any kind?

14         A.    Yes, sir.

15         Q.    Okay.  Without exception?

16         A.    Yes.

17         Q.    All right.  And, for example, if in a

18   case, even after an arrest, for whatever reason a

19   witness is shown a photo array, there needs to be a

20   copy of that photo array in the file, correct?

21         A.    Right.

22         Q.    And a detailed account of any

23   statements that were made in connection with that

24   photo array?

25         A.    Yes.
```



1                          Raniero Masecchia

2          Q.    No matter when it was shown?

3          A.    I would believe so, unless sometimes

4    there's an affidavit that goes along with photo

5    arrays --

6          Q.    Fair enough.

7          A.    -- and that's all that's used and not a

8    detailed statement, and they would use that photo

9    array knowing that the person tomorrow or the next

10   day is going to have to go testify in a grand jury

11   if a grand jury is ongoing or something.

12         Q.    So --

13         A.    We would just have them sign the

14   document after he identifies or she identifies the

15   person.

16         So not everything is completely

17   memorialized, sometimes it's just that sheet of

18   paper, but it's documented.

19         Q.    All right.  I think what you're saying

20   is the form of the documentation doesn't

21   necessarily matter, what matters is that it's

22   documented?

23         A.    Documented.

24         Q.    And kept in the file?

25         A.    Yes.



```
1                      Raniero Masecchia
2          Q.    So if you show a -- if a witness is
3    shown a photo array and makes an identification on
4    day one of the investigation --
5          A.    Or day --
6          Q.    -- and then on day 30 or 50 is shown a
7    different photo array, that process has to be fully
8    documented, both of them?
9          A.    Yes, if that's done.  Absolutely.
10         Q.    And that photo array, if there were
11   different photo arrays shown, that photo array with
12   a date and time of when it was shown has to be put
13   into the file?
14         A.    Yes.
15         Q.    Now, are you familiar -- and, also, to
16   the extent that there is any interview conducted in
17   connection with that photo array, that interview of
18   a witness has to be documented, correct?
19         A.    You mean like a statement taken?
20         Q.    Yes.
21         A.    Yes.
22         Q.    Even if it's not a formal statement,
23   any information about what that --
24         A.    Yes.
25         Q.    -- witness saw or heard has to be
```



                            Raniero Masecchia

1

2    documented?

3          A.   Yes.

4          Q.   No matter when that statement is taken

5    in the investigation?

6          A.   It should be, yes.

7          Q.   Are you familiar with an officer named

8    H. Frank?

9          A.   Harold Frank, yes.

10         Q.   Who is that?

11         A.   He was a homicide detective, worked the

12   opposite shift.  I think he worked with Vickerd and

13   Lonergan and that crew there.

14         Q.   Okay.

15         A.   Carl Lipinczyk I think was also in that

16   crew at that time.

17         Q.   All right.  And you've worked with

18   Mr. Frank before, correct?

19         A.   Very rarely but, yes, I've worked with

20   him.

21         Q.   All right.  Any -- any doubt that

22   Detective Frank understood the rules and

23   regulations and the training regarding documenting

24   photo procedures?

25         A.   Yes, I thought --



```
 1                    Raniero Masecchia
 2          MR. RUSS:  Objection to form.
 3          THE WITNESS:  -- he was a very good
 4    detective, yes.
 5          BY MR. BRUSTIN:
 6          Q.    And obviously the same with Lonergan --
 7          A.    Yes.
 8          Q.    -- Lonergan and Vickerd?
 9          A.    Yes.
10          MR. RUSS:  Objection to form.
11          BY MR. BRUSTIN:
12          Q.    And the same with Stambach?
13          MR. RUSS:  Objection to form.
14          THE WITNESS:  Yes.
15          BY MR. BRUSTIN:
16          Q.    And you would agree that an eyewitness
17    who was in a position to see a crime and is unable
18    to make an identification of a suspect, that
19    information in and of itself is important
20    information to document?
21          A.    Absolutely.
22          Q.    As important as an ID?
23          A.    Yes.
24          MR. BRUSTIN:  Let's mark this as
25    Plaintiff's -- where's the perjury?
```



```
 1                  Raniero Masecchia
 2         MR. ROMO:  This.
 3         MR. BRUSTIN:  Yeah.  Let's mark this,
 4  please, as Plaintiff's 5, is it?
 5         THE REPORTER:  Yes.
 6         MR. BRUSTIN:  Thank you.
 7         Oh.  Can I have one back?  Sorry.  Sorry.
 8         MR. SAHASRABUDHE:  No, that's fine.
 9         MR. SOEHNLEIN:  No, that's all right.
10         MR. SAHASRABUDHE:  We'll look together.
11         MR. SOEHNLEIN:  We'll play together.
12  The following was marked for Identification:
13   PLF.'S EXH. 5       warrant investigation report
14         MR. BRUSTIN:  And let's mark this as 6.
15         MR. SOEHNLEIN:  6?  Exhibit 6?
16  The following was marked for Identification:
17   PLF.'S EXH. 6        testimony from November 10,
18                        1992
19         MR. ROMO:  6.
20         MR. BRUSTIN:  I've got an extra one of these
21  if you want it.
22         MR. RUSS:  So much for the sandbox.
23         BY MR. BRUSTIN:
24         Q.   Okay.  So let's start with what I
25  marked as Plaintiff's 6.
```



```
 1                    Raniero Masecchia

 2          A.    6?

 3          Q.    Yes, Plaintiff's 6.

 4     MR. RUSS:    This one.

 5     BY MR. BRUSTIN:

 6          Q.    So what I've shown you is --

 7     THE WITNESS:    This one here?

 8     MR. RUSS:    Yep.

 9     BY MR. BRUSTIN:

10          Q.    -- your testimony from a perjury trial

11     that was conducted in connection with this case.

12     And I know you've already told us that you don't

13     remember --

14          A.    I don't.

15          Q.    -- testifying in a perjury trial

16     against Leonard Brown and Mario Jarmon.

17          So, first of all, take a minute and look at

18     this and see if it refreshes your recollection at

19     all.  I don't want you to read the whole thing.

20          A.    Huh?

21          Q.    You don't -- you have no recollection

22     of testifying even after seeing this?   No

23     recollection of testifying?

24          A.    No, I've testified so many times I --

25     no, I don't remember.
```



```
 1                    Raniero Masecchia
 2          Q.   Well, let me ask you this:  Do you
 3   remember ever testifying -- or do you remember any
 4   case where there were perjury charges brought
 5   against witnesses in a case you were investigating?
 6          A.   I really don't.
 7          Q.   Okay.  You --
 8          A.   Apparently I did.
 9          Q.   And you don't remember it happening
10   here?
11          A.   No.
12          Q.   All right.  Would it be -- you do agree
13   this appears to be your testimony from
14   November 10th of 1992, correct?
15          A.   1992?
16          Q.   Yeah, look at --
17          A.   I was looking for --
18          Q.   -- the first page.
19          A.   -- the date on when it was.  Oh, yeah,
20   there it is.
21          Well, my name is mentioned in here, so I
22   must have testified in this case.
23          Q.   You see -- you see it's actually -- you
24   can see it's you testifying at the bottom of
25   page 455 and 456, right?  That's you?
```



```
 1                    Raniero Masecchia
 2         A.    Yeah, yeah.  Masecchia, Sedita, direct.
 3         Q.    You just don't remember it?
 4         A.    I don't remember.
 5         Q.    Fair enough.  All right.  Now take a
 6  look at -- and this is from -- this date here is
 7  November 10th, 1992.
 8         A.    Right.
 9         Q.    And the other document I had given you
10  is a document we received from the county.
11         MR. RUSS:  Right here.
12         BY MR. BRUSTIN:
13         Q.    And it says --
14         A.    Which one, Number 5?
15         Q.    Yeah.
16         MR. RUSS:  Yeah.
17         THE WITNESS:  Oh, okay.
18         BY MR. BRUSTIN:
19         Q.    For -- it says, for defendant Emil
20  Adams, and then it says 11/5/92 material witness --
21         A.    Right.
22         Q.    -- under charges?
23         A.    Right.
24         Q.    And then it's got -- it looks like you
25  and Masecchia on or about --
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                        211

```
 1                  Raniero Masecchia
 2         A.   I am Masecchia.
 3         MR. RUSS:  He is Masecchia.
 4         BY MR. BRUSTIN:
 5         Q.   I'm sorry.  You -- you and Stambach on
 6   or about 11/7, 11/8, and 11 -- well, you and
 7   Stambach 11/7, 11/8 attempting to serve this
 8   material witness order; is that right?
 9         A.   Yes.
10         Q.   Did I read this correctly?
11         A.   Yes.
12         Q.   All right.  So it appears that in
13   connection with this perjury proceeding, which was
14   11/10/1992, you're also attempting to serve a
15   material witness warrant; is that right?
16         A.   Yeah, that's what it --
17         Q.   All right.
18         A.   -- looks like.
19         Q.   And seeing this doesn't -- doesn't
20   refresh your recollection about it?
21         A.   No.
22         Q.   But it does indicate that you were
23   conducting --
24         A.   Yes.
25         Q.   -- investigative activities on this
```



```
 1                    Raniero Masecchia
 2    case on 11/7, 11/8, 11/9/1992?
 3         A.    Yes.  And -- yeah.
 4         Q.    In connection with Emil Adams, correct?
 5         A.    I don't remember -- know who Emil Adams
 6    was --
 7         Q.    Well, I will represent --
 8         A.    -- or why we had the warrant.  I don't
 9    know --
10         Q.    Fair enough.
11         A.    -- but that's me --
12         Q.    And I will represent --
13         A.    -- and that's my writing.
14         Q.    Okay.  I will represent to you that
15    Emil Adams is a -- is a witness who testified
16    against Valentino Dixon, an eyewitness who
17    testified against Valentino Dixon, and was
18    interviewed by the police in connection with the
19    investigation.
20         A.    Okay.
21         Q.    Would it be fair to say that to the
22    extent you served Emil Adams with a material
23    witness warrant in connection with this case, you
24    likely would have looked at police reports about
25    Emil Adams?
```



```
 1                    Raniero Masecchia
 2         A.    I don't know.
 3         Q.    You're not sure one way or the other?
 4  You might have, you might not have?
 5         A.    Right.
 6         Q.    Fair enough.  All right.  Now -- sorry.
 7  Let's go to -- back to -- you can put those aside
 8  for now.  You can just give those to me.  Thank you
 9  very much.
10         Now -- now let's go back to the police
11  reports.  Now --
12         MR. RUSS:  Are you talking about Exhibit 2,
13  page --
14         THE WITNESS:  Sullivan.
15         MR. RUSS:  -- 74?
16         MR. BRUSTIN:  No, I'm going to go to a
17  different report now.
18         MR. RUSS:  Okay.
19         BY MR. BRUSTIN:
20         Q.    Now, if you take a look at page 64 and
21  65, first question is, is this a report that you
22  reviewed in preparation for today because you are
23  mentioned here?
24         A.    Yes, I looked at it.
25         Q.    Okay.  And you -- this is a report that
```



```
 1                    Raniero Masecchia
 2   is -- looks like it's -- the date on top is when
 3   the report was created, correct?
 4          A.    Yes.
 5          Q.    All right.  And it appears that you --
 6   it appears this report is written by you, correct?
 7          A.    No.  It was prepared by --
 8          Q.    No, you're right.  I apologize.
 9          A.    -- Mark Stambach.
10          Q.    By Stambach.  But it's concerning an
11   investigative activity that you and Stambach were
12   conducting together?
13          A.    Right.  Our paths crossed -- it appears
14   that our paths crossed that day.
15          Q.    Okay.  But you weren't acting as
16   partners that day?
17          A.    No, I don't think so, at least I don't
18   remember working with him that often as a partner.
19   I could have been.  I don't -- I don't remember.
20          Q.    You don't remember.  Fair enough.  And
21   in any case, one of the things you are working on
22   together that day was the arrest of Valentino
23   Dixon, correct?
24          A.    I don't recall that at all.
25          Q.    I'm asking --
```



```
 1                    Raniero Masecchia
 2          A.   It doesn't seem like it, though, from
 3    what I read.
 4          Q.   Well, that's what I'm asking.   I
 5    understand how you told me you have no memory of
 6    that, correct?
 7          A.   Yeah, but --
 8          Q.   Well, let me start with that.   Do you
 9    have any memory whatsoever --
10          A.   No.
11          Q.   -- of the arrest of Valentino Dixon or
12    your involvement in it?
13          A.   No.
14          Q.   All right.   So let's look at the
15    report.   It appears from this report that Valentino
16    Dixon is arrested and brought to the homicide
17    office, correct?
18          A.   Correct.
19          Q.   And that you are present in the
20    homicide office at that time?
21          A.   Yes, that's the way I read it.
22          Q.   Okay.   And that after, it appears that
23    Stambach conducted an interview with Valentino
24    Dixon while you were in the homicide office but not
25    in the room with them, correct?
```



1                        Raniero Masecchia

2          A.    Correct.

3          Q.    And then afterward, you were tasked

4     with -- you -- you had a conversation with Stambach

5     about a phone call you received?

6          A.    Right.

7          Q.    All right.  So, in other words, you

8     were certainly in the loop about what was happening

9     with Valentino Dixon at that time, correct?

10         MR. RUSS:  Objection to form.

11         THE WITNESS:  I believe so, yeah.

12         BY MR. BRUSTIN:

13         Q.    You knew he was in there, officers were

14    talking about it, presumably you were talking to

15    Stambach about it, correct?

16         A.    I don't recall.

17         Q.    Well, that's what this report suggests,

18    correct?

19         A.    Well, I've had -- we had reference, I

20    don't know what we were talking about other than I

21    received a phone call from an attorney to tell Mark

22    Stambach to the fact that Valentino Dixon was being

23    represented by an attorney and that he should know

24    about it.  And at that point in time, all

25    questioning should be stopped until the attorney



1                    Raniero Masecchia

2  comes in.

3          Q.   Okay.

4          MR. RUSS:  I have to make a quick phone

5  call, but keep going.  Peter is going to --

6          THE WITNESS:  That was my involvement

7  with --

8          MR. RUSS:  -- object.

9          THE WITNESS:  -- Mark Stambach that day is

10  if you see the writing earlier, it says, your

11  writer.  To me, that indicates that he was alone in

12  the car --

13          (Mr. Russ left the deposition room.)

14          BY MR. BRUSTIN:

15          Q.   Okay.

16          A.   -- and met other officers there from

17  one of the squads in precinct.

18          Q.   All right.  But you're not suggesting,

19  sir, that you didn't have communication with

20  Stambach about what information you got or anything

21  like that, correct?

22          A.   I don't recall.

23          Q.   You don't recall one way or the other?

24          A.   Right.

25          Q.   But obviously you would have been



```
 1                    Raniero Masecchia
 2   interested in what was happening, fair to say?
 3        A.    Of course.
 4        Q.    Of course.
 5        A.    But for me to recollect what we talked
 6   about or who we talked about, I don't -- I don't --
 7        Q.    Okay.
 8        A.    -- remember.  I'm just going from what
 9   I'm reading here.
10        Q.    Okay.  Take a look at page 82.
11        A.    Okay.
12        Q.    Now, you see that same day after
13   Valentino's arrested --
14        A.    Okay.
15        Q.    -- this -- this report is created,
16   correct?
17        A.    Yes.
18        Q.    And what is this report called?
19        A.    I can't remember what they called it,
20   but this is when you place somebody under arrest,
21   you bring them down to central booking --
22        Q.    Okay.
23        A.    -- and this report is made out by the
24   report technicians in central booking.
25        Q.    Okay.  Based on information from the
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                        219

```
 1                   Raniero Masecchia
 2   arresting officer --
 3         A.    Correct.
 4         Q.    -- correct?
 5         Okay.  And so presumably, this information
 6   that's contained in here, it says it was provided
 7   by Detective Stambach, correct?
 8         A.    Yes.
 9         Q.    And so even though Detective Stambach
10   wasn't the lead detective in this case, he filled
11   out the affidavit for the arrest?
12         A.    Yes.
13         Q.    And obviously in this affidavit, like
14   any affidavit for an arrest, what's most important
15   is to, among other things, provide the basis for
16   probable cause?
17         A.    Right.
18         MR. SAHASRABUDHE:  Object to form.
19         BY MR. BRUSTIN:
20         Q.    And obviously any evidence that would
21   contradict or run against probable cause, right?
22         MR. SAHASRABUDHE:  Objection to form.
23         MR. SOEHNLEIN:  Objection to form.
24         THE WITNESS:  What does that mean?
25         BY MR. BRUSTIN:
```



```
 1                    Raniero Masecchia
 2          Q.   It was a bad question.  Any evidence
 3   that would -- if you're making an arrest and
 4   there's information suggesting that this may not be
 5   the perpetrator, you have --
 6          A.   It would be on this form?
 7          Q.   -- it's got to be on this form as well?
 8          MR. SAHASRABUDHE:  Object to the form.
 9          THE WITNESS:  I don't know.  I don't think
10   so.
11          BY MR. BRUSTIN:
12          Q.   All right.  In any case, if you take a
13   look at this form, it's clear that this arrest is
14   based on the fact that there is a dead victim,
15   number one?
16          MR. SAHASRABUDHE:  Object to form.
17          THE WITNESS:  Yes.
18          BY MR. BRUSTIN:
19          Q.   And the statement from John Sullivan
20   that you took?
21          MR. SAHASRABUDHE:  Object to form.
22          THE WITNESS:  Yes, one of them.
23          BY MR. BRUSTIN:
24          Q.   That's the evidentiary basis --
25          A.   Yes.
```



RANIERO MASECCHIA                                          March 15, 2022
DIXON vs CITY OF BUFFALO                                              221

```
 1                      Raniero Masecchia
 2         Q.    -- other than the dead victim is the
 3    statement you took from John Sullivan?
 4         MR. SAHASRABUDHE:  Object to form.
 5         THE WITNESS:  That's what this -- yes.
 6         BY MR. BRUSTIN:
 7         Q.    Okay.  After he had already been
 8    interviewed by Vickerd in the hospital?
 9         A.    Yes.
10         Q.    Okay.  And so, obviously, this -- this
11    series of events would be something that you would
12    be very interested in, the fact that this homicide
13    arrest was made based on a statement you took?
14         MR. SAHASRABUDHE:  Object to form.
15         THE WITNESS:  That I would be very --
16         BY MR. BRUSTIN:
17         Q.    Yes, sir.
18         A.    -- interested in?
19         Q.    The arrest was made of a homicide
20    suspect based on --
21         A.    I don't recall --
22         Q.    -- a statement --
23         THE REPORTER:  Hang on.
24         BY MR. BRUSTIN:
25         Q.    -- you took?
```



```
 1                      Raniero Masecchia
 2          A.    -- if I was there.
 3          THE REPORTER:  Hang on.  The arrest would be
 4     made --
 5          MR. SAHASRABUDHE:  Let him finish.
 6          THE REPORTER:  -- based on ...
 7          BY MR. BRUSTIN:
 8          Q.   So you've already told us this is the
 9     day you're in the homicide office, you're taking
10     calls from his lawyer, you're talking to Stambach.
11     Obviously, you would be interested in this arrest
12     given you were the person who took the statement
13     that led to probable cause for the arrest?
14          MR. SAHASRABUDHE:  Object to the form of the
15     question.
16          THE WITNESS:  I don't know how interested I
17     would have been, you know.
18          BY MR. BRUSTIN:
19          Q.   Okay.  Fair enough.  But you would
20     agree that based on this report, it's clear that
21     probable cause was reported based on a statement
22     you took?
23          (Mr. Russ entered the deposition room.)
24          MR. SAHASRABUDHE:  Object to the form of the
25     question.  I also think that calls for a legal
```



```
 1                      Raniero Masecchia
 2    conclusion.
 3            THE WITNESS:   I'm -- I'm sure it was one of
 4    the things that was taken into consideration was my
 5    statement --
 6            BY MR. BRUSTIN:
 7            Q.    I'm sorry.
 8            A.    -- that was taken --
 9            Q.    The only --
10            A.    -- not the only thing.
11            Q.    Well, the only thing that's mentioned
12    is the John Sullivan statement here, correct?
13            A.    Well, that's whoever made this report
14    out --
15            Q.    Right.
16            A.    -- but I don't know if that's the only
17    basis, or if it was, so be it.
18            Q.    Fair enough.  The only basis stated on
19    this arrest affidavit from Stambach is the
20    statement you took from John Sullivan, correct?
21            A.    That's --
22            MR. SAHASRABUDHE:  Object to the form of the
23    question.
24            BY MR. BRUSTIN:
25            Q.    You agree, sir?
```



```
 1                    Raniero Masecchia

 2         A.    I -- yeah.  What I read in this

 3   statement, yes.

 4         Q.    Okay.  And so this is August 10th.

 5   Now, if you take a look -- page 158 and 159.

 6         And this is the statement that you took a

 7   little more than a day later at 1:30 in the morning

 8   of a man named Leonard Brown, correct?

 9         A.    Yes.

10         Q.    And I take it this is a statement that

11   you reviewed in preparation for today?

12         A.    Yes.

13         Q.    And you understand, I take it, today

14   that around the same time that you were taking a

15   statement from Leonard Brown, Stambach was taking a

16   statement from LaMarr Scott, correct?

17         MR. SAHASRABUDHE:   Object to form.

18         THE WITNESS:  I don't know, but I'll agree

19   with it if it's in there.

20         BY MR. BRUSTIN:

21         Q.    You didn't see any -- you haven't seen

22   any --

23         A.    I don't remember that.

24         Q.    Okay.  And you haven't reviewed any

25   documents suggesting that?
```



1                    Raniero Masecchia

2          A.   No.

3          Q.   All right.

4          A.   I might have but -- you know, it might

5    have been in the P73 form, but I don't recall it.

6          Q.   Take a look at page 161.  Keep this

7    page, but it's a few pages forward, take a look at

8    page 161.

9          Have you reviewed this report?

10         A.   Yes.  Yes.

11         Q.   Okay.  And you would agree, based on

12   this report, it appears that at around the same

13   time, you were taking a statement of Leonard Brown

14   while -- while Stambach -- withdrawn.

15         Take a look at the last paragraph.

16         A.   Yes.  Okay.

17         Q.   It appears that you were interviewing

18   Leonard Brown around the same time that Stambach

19   was interviewing LaMarr Scott?

20         A.   That's correct.

21         MR. SAHASRABUDHE:  Object to form.  Where on

22   this report does it say --

23         MR. BRUSTIN:  Don't make speaking

24   objections.  Just make object to form.

25         BY MR. BRUSTIN:



1                    Raniero Masecchia

2        Q.   So you would agree that based on the

3    last -- last paragraph, that's -- that's what it

4    suggests to you --

5        A.   Yes.

6        Q.   -- correct?

7        Okay.  And, obviously -- and you understand

8    today that what happened is that after Valentino

9    Dixon was arrested for being the shooter, the

10   person who shot and killed Torri Jackson and shot

11   and injured other people, a day later, LaMarr Scott

12   came in and said that, no, in fact, he was the

13   person who shot Torri Jackson and the others,

14   correct?

15       MR. SOEHNLEIN:  Object to form.

16       MR. SAHASRABUDHE:  Object to form.

17       THE WITNESS:  Yes.  From what I read here,

18   yes.

19       BY MR. BRUSTIN:

20       Q.   Okay.  And I take it that today, you

21   don't have any memory of that happening?

22       A.   No.

23       Q.   All right.  Now --

24       A.   I wish I did, but --

25       Q.   Okay.  That's fair.  By the way, have



1                    Raniero Masecchia

2    you -- do you recall any other case you were ever

3    involved in in your career where after you arrested

4    the suspect in a homicide, another person came in

5    and said, You got the wrong person?

6          A.    Several times.

7          Q.    Okay.  Other than the Epps case, when

8    else has that happened?

9          A.    The Epps case it didn't happen until

10   much later.  The only one who kept an eye on it was

11   Epps --

12         Q.    Well --

13         A.    -- as far as I recall.  Even during the

14   trial, the attorney didn't -- told me after the

15   trial.

16         Q.    Well, you understand that Wymiko

17   Anderson claims that she told the police long

18   before the trial?

19         MR. SAHASRABUDHE:  Object to the form.

20         THE WITNESS:  No, I -- I didn't know.

21         BY MR. BRUSTIN:

22         Q.    Sir, you understand that Wymiko

23   Anderson claims that she told the police long

24   before the trial --

25         A.    Yes.



1                    Raniero Masecchia

2        Q.    -- that they had the wrong person?

3        MR. SAHASRABUDHE:  Object to form or --

4        THE WITNESS:  I don't recall when --

5        MR. SAHASRABUDHE:  -- if we're going to --

6        THE REPORTER:  Hang on.  Hang on.

7        MR. SAHASRABUDHE:  -- get into intricate

8   details --

9        THE WITNESS:  -- but I --

10       THE REPORTER:  One at a time.

11       MR. SAHASRABUDHE:  -- so I'm going to --

12       THE REPORTER:  One at a time.

13       MR. SAHASRABUDHE:  -- instruct him not to

14   answer.

15       THE REPORTER:  Hold on.

16       THE WITNESS:  Oh, I'm sorry.

17       BY MR. BRUSTIN:

18       Q.   Okay.  I'm going to go through --

19       THE REPORTER:  Hold on.  I'm not on the

20   record right now.

21       You guys have got to talk one at a time.

22       MR. SAHASRABUDHE:  Sorry.

23       THE REPORTER:  Okay.  Go ahead and make your

24   objection, please.

25       THE WITNESS:  Can you repeat the question?



```
 1                    Raniero Masecchia

 2          BY MR. BRUSTIN:

 3          Q.   Sure.  I'm going to go through every

 4    detail of the Epps case a little later, but right

 5    now, all I'm asking is you understand as a general

 6    matter from your testifying in that deposition,

 7    your knowledge of the case, that according to

 8    Wymiko Anderson, whether she's telling the truth or

 9    not --

10          A.   Right.

11          Q.   -- she reported to the police long

12    before you claim to have learned of it that they

13    had the wrong person?

14          A.   Yes.

15          MR. SAHASRABUDHE:  Object to the form of the

16    question.

17          BY MR. BRUSTIN:

18          Q.   All right.  Any other situations where

19    somebody came forward, to your recollection, after

20    a homicide and said, You've got the wrong person, I

21    actually committed this crime?

22          A.   Yeah.

23          Q.   Tell me the other cases.

24          A.   I don't know exactly when it was again,

25    it was in the '90s, had a security guard shot
```



```
 1                    Raniero Masecchia

 2   outside of -- of a nightclub on the lower West

 3   Side.

 4        The person was arrested from our eyewitness

 5   who testified that the shooter was so-and-so, took

 6   the statements, photo arrays, and he was positively

 7   identified by the witness.

 8        A few days later or a week later after the

 9   person was indicted, we found out that through an

10   informant or through another officer, I don't

11   recall exactly, that this guy was lying, that he

12   was forced to give this statement by the real

13   shooter in the gang that did the shooting.

14        Went back, picked up the witness, talked to

15   him, he recanted his statement, told us who the

16   true shooter was.

17        We had -- we had the man unarrested,

18   uncharged, case was dropped, the real person was

19   arrested and convicted.

20        Q.   Okay.  Were you the lead investigator

21   in that case?

22        A.   Yes.

23        Q.   What case -- do you remember any of the

24   names of the people in the case?

25        A.   I don't.
```



```
 1                  Raniero Masecchia
 2       Q.    All right.  But it sounds like --
 3       A.    I have a certificate from the Erie
 4  County Bar Association, an award for that --
 5       Q.    Okay.
 6       A.    -- for myself and -- I think it was an
 7  attorney, Larry Schwegler, who also got the award
 8  for following up on that information.
 9       Q.    Do you have that award in your home?
10       A.    I believe I still have it.  I don't --
11       Q.    Okay.
12       A.    You know, I threw out all my Army stuff
13  and I threw out a lot of my police stuff.  I don't
14  even --
15       Q.    Okay.  I'd like ask on the record, and
16  your attorney can address this, but on the record,
17  do you think that that -- that certificate would
18  have the name of the person involved?
19       A.    I believe so.  I'm not sure.
20       Q.    All right.  And can I --
21       A.    I know I got the plaque somewhere.
22       MR. BRUSTIN:  Can I ask you to take a look
23  when you get home for that --
24       THE WITNESS:  Sure.
25       MR. BRUSTIN:  -- and provide that
```



```
 1                    Raniero Masecchia
 2   information to your attorney and we'll request it
 3   through your attorney.
 4        THE WITNESS:  Okay.
 5        MR. RUSS:  Yes, we will get that
 6   information.  If for some reason we can't get that
 7   information from the detective, then I will get it
 8   from the Bar Association.
 9        MR. BRUSTIN:  Great.
10        BY MR. BRUSTIN:
11        Q.    And it sounds like -- you think that
12   case was sometime in the '90s?
13        A.    Yes.
14        Q.    All right.  And it sounds like you have
15   a much better recollection of that case than you do
16   of this case?
17        A.    I was involved more with it.
18        Q.    Okay.
19        A.    I was very peripheral, I could tell,
20   with this case or I would have more recollection to
21   it.
22        Q.    All right.  It sounds like what you're
23   describing, though, with that other case -- you
24   said it was sometime in the '90s?
25        A.    Yes.
```



| | |
|---|---|
| 1 | Raniero Masecchia |
| 2 | Q.   Can't remember if it was early '90s, |
| 3 | late '90s? |
| 4 | A.   I'd have to look at the plaque. |
| 5 | Q.   Okay.  Would it be fair to say it was |
| 6 | sometime after this case, the '91 shooting of -- |
| 7 | A.   Yes. |
| 8 | Q.   Okay.  And it sounds like what you're |
| 9 | describing is that as soon as you received |
| 10 | information that you might have the wrong person in |
| 11 | custody, you did a full and complete investigation |
| 12 | of that evidence? |
| 13 | A.   As much as I could do, yes. |
| 14 | Q.   Okay.  And you didn't make any |
| 15 | credibility determinations about the evidence that |
| 16 | was being reported to you?  As soon as you got it, |
| 17 | that you might have the wrong person, you did |
| 18 | everything in your power to investigate the |
| 19 | reliability of that information? |
| 20 | MR. RUSS:  Objection to form.  You may |
| 21 | answer. |
| 22 | THE WITNESS:  As far as I remember, I did |
| 23 | whatever I could do. |
| 24 | BY MR. BRUSTIN: |
| 25 | Q.   Okay.  You fully -- you fully |



1                    Raniero Masecchia

2    interviewed the witness that came in?

3         A.    Right.

4         Q.    You interviewed any -- you went back

5    and re-interviewed witnesses who had given you

6    information that contradicted it?

7         A.    I don't recall all that, but ...

8         Q.    But that's a basic step that you would

9    have taken?

10        A.    Whatever we had to do, what the DA's

11   office recommended that we would do after, we did.

12        Q.    All right.  But it sounds like -- and

13   you got an award for this.  You understood as a

14   homicide detective, separate and apart from

15   anything that a DA told you to do, once you

16   received information indicating that you had

17   arrested the wrong person, you had an obligation to

18   fully investigate that information to the extent

19   you could, correct?

20        A.    To the extent --

21        MR. RUSS:  Objection to form.

22        THE WITNESS:  To the extent that I could,

23   yes.

24        BY MR. BRUSTIN:

25        Q.    Including re-interview --



1                    Raniero Masecchia

2      re-interviewing witnesses who might have

3      information on that topic?

4           MR. RUSS:  Objection to form.

5           THE WITNESS:  Whatever I had to do or

6      whatever needed to be done, I did.

7           BY MR. BRUSTIN:

8           Q.   And it sounds like you in fact

9      conducted a comprehensive investigation on that new

10     information that proved you had arrested the wrong

11     person?

12          MR. RUSS:  Objection to form.

13          THE WITNESS:  Apparently it did --

14          BY MR. BRUSTIN:

15          Q.   Okay.

16          A.   -- because he was unarrested, but I

17     don't recall all the steps I took to do that.

18          Q.   Fair enough.  But you understood as

19     soon as you received information suggesting that

20     you might have arrested the wrong person in a

21     homicide, you wanted to do everything in your power

22     to make sure that if an innocent man was arrested,

23     that would be rectified?

24          MR. RUSS:  Objection to form.  You may

25     answer.



1                    Raniero Masecchia

2         THE WITNESS:  That the DA's office would be

3    notified.

4         BY MR. BRUSTIN:

5         Q.   Well, and that you would do everything

6    in your power to investigate it?

7         MR. RUSS:  Objection to form.  You may

8    answer.

9         THE WITNESS:  Whatever I was instructed to

10   do, I would do.

11        BY MR. BRUSTIN:

12        Q.   All right.  And it sounds like the

13   reason why you remember that case so well and don't

14   remember this case at all is because you weren't

15   calling the shots in this case, fair to say?

16        MR. RUSS:  Objection to form.

17        BY MR. BRUSTIN:

18        Q.   One reason.

19        A.   Right.  I just came in, it looks like

20   most of the time from home, called in from my house

21   to take a statement, take the statement, turn it

22   over to the file and move on.  I have my own cases

23   to work.

24        Q.   All right.  And based on documents that

25   you reviewed, including the arrest report from



```
 1                  Raniero Masecchia

 2   Stambach --

 3          A.   Yes.

 4          Q.   -- it appears that Mark Stambach played

 5   a much more integral role in this investigation

 6   than you did; is that fair to say?

 7          A.   Yes.

 8          Q.   Whether he was a lead detective or not,

 9   it looks like he was involved in many important

10   investigative activities, fair to say?

11          MR. RUSS:  Objection to form.  You may

12   answer.

13          THE WITNESS:  Yes, it appears so from what I

14   read up to now.

15          BY MR. BRUSTIN:

16          Q.   Okay.  So now if you take a look at

17   page 158 again, this is the statement that you took

18   from Leonard Brown?

19          A.   Yes, sir.

20          Q.   And this is a statement, you put down

21   the time that you took it, correct?

22          A.   Yes, sir.

23          Q.   And if you could hold on to this and

24   just take a look at page 196.

25          A.   Excuse me?
```



1                      Raniero Masecchia

2          Q.    196, please.

3          A.    196?  Okay.

4          Q.    And it appears that this is the

5    statement that Mark Stambach was taking of LaMarr

6    Scott at or around the time you were interviewing

7    Mr. Brown, correct?

8          A.    What time was that?  I don't see it.

9          Q.    Well, there's no time here.  There

10   should be, right?

11         A.    Well, I don't see a time so I don't

12   know.

13         Q.    Well, my first question is, there's no

14   time here, correct?

15         A.    I don't see one.

16         Q.    And there should be, correct?

17         A.    Yes, somewhere.

18         Q.    Okay.  Okay.  And -- but you know from

19   the memo that it appears that you and Mark

20   Stambach --

21         A.    Right.

22         Q.    -- were doing these interviews around

23   the same time?

24         A.    Right.

25         Q.    Okay.  And you -- you've told us that



1                    Raniero Masecchia

2    you have reviewed pages 158 through 159 in

3    preparation for today?

4          A.    I read them, yes.

5          Q.    And you know -- although you don't

6    remember it, you know from reading the statement

7    that two days after Valentino Dixon was arrested

8    for committing the murder, Leonard Brown came in

9    along with Mr. Scott and told you that you had

10   arrested the wrong person, in fact it was LaMarr

11   Scott who had committed the murder, correct?

12         MR. RUSS:   Objection to form.   You may

13   answer.

14         THE WITNESS:   Yes.

15         BY MR. BRUSTIN:

16         Q.    And although you weren't running this

17   investigation, I take it that your understanding

18   was that just like in the case where you won the

19   award, as soon as you got this information, there

20   would be a full investigation to determine whether

21   or not Valentino Dixon was in fact innocent?

22         MR. RUSS:   Objection to form.   You may

23   answer.

24         THE WITNESS:   I'm assuming from this that

25   this was something we were going to have to turn



```
 1                    Raniero Masecchia
 2    over to the DA's office.
 3          BY MR. BRUSTIN:
 4          Q.    Well, I'm asking you a different
 5    question, and I think it's about as basic as it
 6    gets.  You tell me if you can answer it or not.
 7          A.    Yeah.
 8          Q.    You understood, although you weren't in
 9    charge, that when Leonard Brown and LaMarr Scott
10    came in and said, LaMarr Scott was the shooter, not
11    the person you arrested, your understanding was
12    that whoever directed it, there would in fact be a
13    full investigation to determine whether or not
14    Valentino Dixon was innocent, correct?
15          MR. SOEHNLEIN:  Objection to form.
16          MR. RUSS:  Objection to form.
17          THE WITNESS:  I don't know.
18          MR. RUSS:  You can answer.
19          BY MR. BRUSTIN:
20          Q.    Did you have an expectation that that
21    would happen?
22          A.    I mean, I would think the DA's office
23    would look at this and say, Let's get to the bottom
24    of it.  And an investigation would continue from
25    there.
```



1                    Raniero Masecchia

2         That's not like to say some people don't

3    come in just to lie.  I don't know that, I don't

4    know if he's telling the truth.  I'll take your

5    statement.  He's going to have to testify in court,

6    but I'm not going to assume immediately that this

7    guy is telling the truth and Sullivan was lying.

8         Q.    Right.

9         A.    You know, so I'm not going to assume

10   anything --

11        Q.    Right.

12        A.    -- I'll turn it over to the DA and let

13   them do the follow-up investigation.  If I'm part

14   of it, I will be.

15        Q.    Wait a minute.  First of all, what

16   homicide investigators do is they investigate to

17   determine what's reliable and what's not, right?

18   That's what homicide investigators do?

19        MR. RUSS:  Objection to form.  You may

20   answer.

21        THE WITNESS:  You're right.

22        BY MR. BRUSTIN:

23        Q.    Okay.  And so the issue is -- you

24   don't -- it doesn't matter whether you believe what

25   this person is saying --



1                      Raniero Masecchia

2          A.    Right.

3          Q.    -- what matters is whether you're

4    investigating what he tells you, right?

5          A.    That's why we took the statement.

6          Q.    Okay.  And it sounds like in your

7    case -- are you telling me that in the case where

8    you won the award, you won an award just because

9    you followed the directions of the DA, or is it

10   because when you got information, exculpatory

11   evidence --

12         A.    We took it --

13         Q.    -- you investigated it?

14         A.    I'm sorry.

15         MR. RUSS:  Objection to form.  You may

16   answer.

17         THE WITNESS:  We took it over to the DA.  I

18   had no idea I was getting an award.  Did I deserve

19   an award?  That's something the Erie County Bar

20   Association has to decide.

21         BY MR. BRUSTIN:

22         Q.    All right.

23         A.    I was just doing my job --

24         Q.    Now --

25         A.    -- and I was doing my job here.



1                     Raniero Masecchia

2          Q.   Now, obviously, independent from the

3   district attorney, if you received information

4   suggesting -- withdrawn.

5          If you're the lead detective on a case and

6   you receive information suggesting that you

7   arrested the wrong person --

8          A.   Right.

9          Q.   -- you have an independent obligation

10  to investigate that, fair to say?

11         A.   Yes, and it was done right here.

12         Q.   Well, this isn't an investigation.

13  This is taking a statement.

14         A.   It's part --

15         MR. RUSS:  Objection to form.

16         THE WITNESS:  -- of the investigation.

17         BY MR. BRUSTIN:

18         Q.   Okay.  And another part of the

19  investigation would be to interview other witnesses

20  at the scene about what this person is reporting;

21  that would be another part, correct?

22         A.   That would be up to the DA's --

23         Q.   So I'm --

24         A.   -- office.

25         Q.   -- not asking who makes the decision.



1                    Raniero Masecchia

2   I'm just asking you what the investigation would

3   include.

4          MR. RUSS:  He's trying to answer your

5   questions as best he can.

6          BY MR. BRUSTIN:

7          Q.   All right.  So let me be clear.  I'm

8   now not asking you a question about who would

9   determine what steps would be taken, I'm asking you

10  what a proper investigation would include.

11         A.   I would -- I would hope that the

12  follow-up would be done.

13         Q.   Okay.  Now I'm asking you -- I'm not

14  asking you about who would direct the follow-up --

15         A.   Right.

16         Q.   -- I'm asking you what an appropriate

17  follow-up investigation would include based on your

18  experience.  Okay?

19         A.   Okay.

20         Q.   All right.  You would agree one thing

21  an appropriate follow-up investigation would

22  include would be interviewing witnesses at the

23  scene?

24         MR. RUSS:  Objection to form.

25         THE WITNESS:  All of them?



```
 1                    Raniero Masecchia

 2          MR. RUSS:  You may answer.

 3          BY MR. BRUSTIN:

 4          Q.    People who might have relevant

 5   information about --

 6          A.    Yes.

 7          Q.    -- this.

 8          MR. RUSS:  Objection to form.  You may

 9   answer.

10          BY MR. BRUSTIN:

11          Q.    It would include potentially showing

12   photo arrays to witnesses of this new potential

13   suspect?

14          A.    Yes.

15          Q.    And obviously documenting whatever you

16   did?

17          A.    Yes.

18          Q.    Now, you would agree that the last

19   thing you would ever want to do when -- and --

20   withdrawn.

21          Did you also in preparation for today read

22   the statement that LaMarr Scott gave --

23          A.    No.

24          Q.    -- at the same time?

25          A.    No.  I just -- they just gave me
```



```
 1                    Raniero Masecchia
 2    whatever my name was on.
 3         Q.   All right.  Now, no question that one
 4    of the things that you and Stambach would have been
 5    doing as you were doing these interviews is either
 6    during the interviews or before the interviews or
 7    after the interviews, or all three, you would have
 8    been talking about what you were learning?
 9         MR. RUSS:  Objection to form.  You may
10    answer.
11         THE WITNESS:  I don't recall.
12         BY MR. BRUSTIN:
13         Q.   All right.  I understand you don't
14    recall.  You don't recall any of it, but would
15    you -- you would agree at a minimum, you and
16    Stambach would have been discussing what you
17    learned from these witnesses after the interviews?
18         MR. RUSS:  Objection to form.  You may
19    answer.
20         BY MR. BRUSTIN:
21         Q.   Pursuant to your practices.
22         A.   I'm sure we --
23         MR. RUSS:  Objection to form.
24         THE WITNESS:  I'm sure we --
25         MR. RUSS:  You may answer.
```



```
 1                    Raniero Masecchia

 2          THE WITNESS:  -- did.

 3          THE REPORTER:  Hold on.  Just -- sir,

 4   please, if somebody else is talking --

 5          THE WITNESS:  Oh, I didn't --

 6          THE REPORTER:  -- I really need --

 7          THE WITNESS:  -- hear him.

 8          MR. RUSS:  Sorry.

 9          THE REPORTER:  -- you to just wait.

10          Go ahead.

11          THE WITNESS:  I'm sure at some point we did.

12          BY MR. BRUSTIN:

13          Q.   Now, you would agree that the last

14   thing a homicide detective acting in good faith

15   would ever want to do when interviewing a witness

16   like Leonard Brown or LaMarr Scott claiming that

17   you have the wrong person would be to try to coerce

18   them into changing their story, correct?

19          A.   Yes.

20          Q.   To threaten them --

21          A.   Yes.

22          Q.   -- with repercussions if they continue

23   to tell the story?

24          A.   Yes.

25          Q.   You might question the veracity of the
```



                        Raniero Masecchia

1

2  story, right?

3       A.   Yes.

4       Q.   But you would never try to strong-arm

5  them into changing it, correct?

6       A.   Correct.

7       Q.   And you would -- like any witness, you

8  would want to ask them open-ended questions about

9  the information they were providing you?

10      A.   Yes.

11      Q.   And other witnesses who could

12 corroborate it?

13      A.   Yes.

14      Q.   And for any physical evidence that they

15 might be able to provide you?

16      A.   Okay.

17      Q.   You agree, right?

18      A.   I agree.

19      Q.   And so if, for example, LaMarr Scott

20 came in and said, I committed this murder, and in

21 fact, when I committed the murder, I got blood on

22 my shoes and it's the shoes I'm wearing now.  Would

23 you like to have those shoes --

24      A.   Yes.

25      Q.   -- if something like that happened --



```
 1                    Raniero Masecchia
 2         A.    Sure.
 3         Q.    -- any detective acting in good faith
 4   would of course take those shoes and have them
 5   tested, correct?
 6         MR. RUSS:  Objection --
 7         THE WITNESS:  Yes.
 8         MR. RUSS:  -- to form.  You may answer.
 9         BY MR. BRUSTIN:
10         Q.    And, by the way, one of the things that
11   detectives would routinely do in 1991, although it
12   didn't always pan out, is if you had a suspect at a
13   shooting who was willing to give you the clothes
14   that they wore at the time of the shooting, you
15   would take those clothes and potentially test them
16   for fibers or for gunshot residue or other
17   biological material, correct?
18         A.    Makes sense, yeah.
19         Q.    That was a basic thing that detectives
20   would do?
21         A.    Or their hands.
22         Q.    But, certainly, blood on someone's
23   shoes, that would be something you'd be very
24   interested in if you were acting in good faith,
25   correct?
```



1                    Raniero Masecchia

2        A.    Yes.

3        Q.    And another tool -- withdrawn.

4        In 1991, you understood that polygraphs were

5   never admissible at a trial, or at least for the

6   most part would never be admissible, right?

7        A.    Yeah, I would gather they were used as

8   an investigative tool.

9        Q.    Okay.  But it was an important

10  investigative tool in Buffalo that you utilized

11  routinely as a homicide detective, correct?

12       A.    On occasions we would use it, yes.

13       Q.    And one occasion you might use it is if

14  you had witnesses telling varying versions of who

15  committed a crime?

16       A.    Yes.

17       Q.    And as a tool, you would -- you

18  couldn't make someone take a polygraph, correct?

19       A.    Correct.

20       Q.    But you would offer it?

21       A.    Yes.

22       Q.    And you would do your very best to try

23  to get a polygraph exam of a witness if they were

24  willing?

25       A.    If they were willing.



```
 1                     Raniero Masecchia
 2          Q.   And if it was an important witness, if
 3   they didn't show up the first time, you might go
 4   back and ask them again, right?
 5          A.   Yes.
 6          Q.   All right.  And you would document all
 7   those efforts, correct?
 8          A.   Yes.
 9          Q.   And if you had a suspect like Valentino
10   Dixon who offered to take a polygraph exam, of
11   course you would try to accommodate that and get it
12   done, correct?
13          A.   Yes.
14          Q.   Not because it would be admissible at
15   trial, but because it's an important investigative
16   tool?
17          A.   I believe so, yes.
18          Q.   That any -- again, any homicide
19   detective acting in good faith would attempt to do
20   if you could?
21          A.   Yes.
22          MR. BRUSTIN:  Do you mind if we just take a
23   one-minute restroom break?
24          MR. RUSS:  Sure.
25          MR. SOEHNLEIN:  Sure.
```



```
 1                    Raniero Masecchia
 2           THE VIDEOGRAPHER:  Okay.  Going off the
 3    record.  Time is 1446.
 4           (A recess was then taken at 2:46 p.m.)
 5           THE VIDEOGRAPHER:  All right.  We're going
 6    back on the record.  Time is 1454.
 7           BY MR. BRUSTIN:
 8           Q.   Going back to the case where you won
 9    the award, you arrested the wrong person and you
10    rectified the situation.  To your knowledge, in
11    that case were any of the witnesses charged with
12    perjury?
13           A.   Not that I recall.
14           Q.   And I may have asked you this, but I
15    just want to make sure, would it be fair to say
16    that you don't recall that ever happening,
17    witnesses in your case being charged with perjury?
18           A.   I don't recall that, but apparently
19    there was.  I seen some papers on that.
20           Q.   This case is the only -- based on --
21    you don't even remember this case, but it's the
22    only case that it appears that happened?
23           A.   As far as I recall, yes.
24           Q.   You may have -- you may have seen
25    threats like that made, but never actually followed
```



1                    Raniero Masecchia

2    through like in this case?

3              A.    Yes.

4              Q.    Now, you would agree that -- would it

5    be fair to say that there is -- although you don't

6    remember it, there's no question that you would

7    have actually physically seen LaMarr Scott and

8    Leonard Brown when they were brought into the

9    homicide office?

10             A.    Quite possibly, yes.

11             Q.    Okay.  And you've already told us how

12   important it is to do an objective investigation

13   into information, including information that you

14   have the wrong person, correct?

15             A.    Correct, yes.

16             Q.    And in some ways, that's even more

17   important to carefully investigate that type of

18   information as compared to innocent -- evidence of

19   guilt, correct?

20             A.    Yes.

21             Q.    All right.  And you would agree that

22   the last thing a detective would ever do acting in

23   good faith is to tell a witness who came in and

24   said, You have the wrong person, No, we've got who

25   we want, we don't want to hear it, that's the last



```
 1                      Raniero Masecchia
 2   thing you would do, correct?
 3            A.    Yes.
 4            Q.    You wouldn't want to make any kind of
 5   statement to that witness that could seem coercive
 6   or threatening, correct?
 7            A.    Correct.
 8            Q.    Even -- even a subtle threat would be
 9   completely inappropriate, correct?
10            A.    A what threat?
11            Q.    A subtle threat.
12            A.    Yes.
13            Q.    Your only job is to get their
14   information and to follow up on it, correct?
15            A.    Yes.
16            Q.    You would never say something like, Get
17   your story -- get your story straight and then come
18   back.  That would never be something you would
19   say --
20            A.    No.
21            Q.    -- to witnesses?
22   That would never be appropriate, correct?
23            A.    Correct.
24            Q.    Now, you would agree that based -- one
25   of the things you became good at as a homicide
```



1                        Raniero Masecchia
2    detective is -- is dealing with descriptions of
3    size and height, fair to say?
4            MR. RUSS:  Objection to form.
5            MR. SOEHNLEIN:  Objection to form.
6            THE WITNESS:  I don't understand.
7            BY MR. BRUSTIN:
8            Q.   So when taking -- when taking
9    statements from witnesses and suspects, you were
10   always asking people how tall was somebody, how
11   much did they weigh, what did they weigh, questions
12   like that?
13           A.   Yes.
14           Q.   And oftentimes witnesses would be poor
15   at describing sizes, correct?
16           MR. RUSS:  Objection to form.
17           THE WITNESS:  Sometimes, yes.
18           BY MR. BRUSTIN:
19           Q.   Okay.  What you were looking for,
20   frankly, is general -- you were -- you would rely
21   on descriptions of height and weight, but not
22   specifically, fair to say?
23           A.   Correct.
24           Q.   You're looking for things like the
25   difference between somebody who weighs 150 pounds,



```
 1                    Raniero Masecchia
 2   say, for example, and somebody who weighs 210 or
 3   220 pounds?  You're looking for those kinds of
 4   differences?
 5          A.    It's fair to say, yes.
 6          Q.    People don't usually -- people who
 7   actually are reliable witnesses don't make those
 8   kinds of mistakes, correct?
 9          MR. RUSS:  Objection to form.
10          THE WITNESS:  They could unintentionally.
11   I've taken statements from witnesses that five
12   people were there and seen five different things
13   and describe them five different ways.
14          BY MR. BRUSTIN:
15          Q.    Right.  But the reliable witnesses, a
16   witness who is actually able to make an
17   identification -- a reliable identification,
18   usually can't maybe guess somebody's weight by five
19   pounds or 10 pounds but knows the difference
20   between someone who is 220 pounds as opposed to
21   150 pounds, right?
22          A.    You --
23          MR. RUSS:  Objection to form.  You may
24   answer.
25          THE WITNESS:  -- would think so.
```



```
 1                    Raniero Masecchia
 2          Oh.  I'm sorry.
 3          MR. RUSS:  Go ahead.
 4          THE WITNESS:  Yes.
 5          BY MR. BRUSTIN:
 6          Q.   And those are the kinds of differences
 7    in descriptions you're looking for as a detective,
 8    right?
 9          MR. RUSS:  Objection to form.
10          THE WITNESS:  Yes.
11          BY MR. BRUSTIN:
12          Q.   Somebody who's described -- someone who
13    actually is, say, 6-foot tall and weighs 150 or 160
14    pounds, that person is quite thin, correct?
15          A.   Yes.
16          Q.   And, frankly, if you take a look at --
17    I don't know if you remember this, you probably
18    don't, but take a look at page 150.
19          MR. RUSS:  150.
20          THE WITNESS:  Okay.
21          BY MR. BRUSTIN:
22          Q.   And 150 is the photo array that you
23    showed to John Sullivan, correct?
24          A.   Yes.
25          Q.   Properly documented, correct?
```



1                    Raniero Masecchia

2        A.    Yes.

3        Q.    Signed by John Sullivan?

4        A.    Yes.

5        Q.    And I will represent to you, and you

6   can see it here actually, that Valentino Dixon is

7   in position number six, correct?

8        A.    It appears so, yes.

9        Q.    And Valentino Dixon is a very thin

10  individual, correct?  Thin -- thin build?

11       A.    Thin build, yes.

12       Q.    He's -- he appears to be thin, correct?

13       A.    Yes.

14       Q.    And, in fact, on page -- take a look at

15  page 156 -- I'm sorry, I apologize -- 56.

16       MR. RUSS:  Do you want us to save this?

17       MR. BRUSTIN:  No.  Thanks.

18       Five, six.

19       THE WITNESS:  Okay.

20       BY MR. BRUSTIN:

21       Q.    And this is a description of Valentino

22  Dixon, describing him as slight build, 160 pounds,

23  correct?

24       MR. RUSS:  Objection to form.  Has this been

25  identified or has he indicated whether he's seen



```
 1                    Raniero Masecchia
 2   this or not?
 3          MR. BRUSTIN:  He has not.
 4          BY MR. BRUSTIN:
 5          Q.   This is -- you tell me.  Can you tell
 6   what this is?
 7          A.   To be honest, no.
 8          Q.   Okay.  But in any case, it's in the
 9   police file --
10          A.   Okay.
11          Q.   -- at least the police file we
12   received, and it describes -- it looks like a note
13   to pick up Valentino Dixon, correct?
14          A.   Correct.
15          Q.   And it describes him as having a slight
16   build, right?
17          A.   Slight build, yes.
18          Q.   Means he's a very skinny guy, right?
19          A.   Yes.
20          Q.   Okay.
21          MR. RUSS:  It says slight build, 160 pounds.
22          THE WITNESS:  Right.  Not a very skinny guy.
23          BY MR. BRUSTIN:
24          Q.   Well, slight build means skinny guy,
25   right?
```



```
 1                    Raniero Masecchia
 2        A.    Yeah.
 3        Q.    Okay.  You're a thin man?
 4        A.    I'm 5',10", 150 pounds.
 5        Q.    Okay.  You -- you have a thin build,
 6   fair to say?
 7        A.    Yeah.
 8        Q.    Okay.  You wouldn't describe me as
 9   having a thin build, right?
10        A.    Medium build.
11        Q.    All right.  And then someone who is
12   210 pounds, they have a bigger build, right?
13        A.    Right.
14        Q.    Okay.  Now, take a look at page 25,
15   please.  Now, I know that you weren't involved
16   directly in interacting, at least from the reports,
17   with Emil Adams until later in the case.  Okay?
18        A.    With who?
19        Q.    Emil -- I think it's pronounced Emil --
20   Emil Adams, one of --
21        A.    Yeah, I'm not --
22        Q.    -- the witnesses.
23        A.    I don't know.
24        Q.    That's the person who you attempted to
25   serve a warrant on; do you remember that document
```



```
 1                    Raniero Masecchia
 2  you saw?
 3           A.   Yes --
 4           Q.   Okay.
 5           A.   -- I do.
 6           Q.   So there was some earlier interaction
 7  with him.  I'm going to show you some reports and
 8  ask you some questions about it.  Okay?
 9           A.   Okay.
10           Q.   All right.  So let's start with
11  page 25.  And you've not reviewed this document,
12  correct?
13           A.   Correct.
14           Q.   Now, it appears from this -- it's
15  short.  Why don't you take a minute and read it and
16  let me know when you're done.
17           A.   Okay.
18           Q.   So it appears that on this date, first
19  day of the case, August 10th, 1991, this witness,
20  Emil Adams, was brought to the homicide office,
21  correct?
22           A.   Yes.
23           Q.   And it appears that he was initially
24  interviewed by a detective named Lockwood; is that
25  right?
```



```
 1                    Raniero Masecchia
 2          A.   Yes.
 3          Q.   Do you know who Lockwood is?
 4          A.   Yeah, he's the ex-commissioner of
 5   police.
 6          Q.   Okay.
 7          MR. SAHASRABUDHE:  He just -- recently.
 8          THE WITNESS:  Byron Lockwood --
 9          MR. SAHASRABUDHE:  2021.
10          MR. BRUSTIN:  Oh, okay.  That's why.
11          MR. SAHASRABUDHE:  I don't know the -- yeah.
12          BY MR. BRUSTIN:
13          Q.   So presumably at this time he wasn't
14   the commissioner of police, right?
15          A.   Yeah.
16          Q.   Is -- do you remember was he a homicide
17   detective at this time?
18          A.   No.
19          Q.   Do you remember what he was?  He was
20   just a -- he was a precinct level detective?
21          A.    He either was a narcotics -- working
22   the narcotics squad or working major crime unit.
23   He was working on the same floor as us, but with
24   squad.
25          Q.    Okay.
```



```
 1                    Raniero Masecchia
 2        A.    I know he worked narcotics for a while,
 3   he worked major case for a while.
 4        Q.    Gotcha.  Okay.  But in any case, it
 5   appears that he -- he met with Emil Adams before
 6   Stambach, correct?
 7        A.    It appears to, yes.
 8        Q.    And so there should in the file be some
 9   time of report from Lockwood about what information
10   he got from Emil Adams, correct?
11        A.    I would hope so.
12        Q.    Yeah.  And then according to this
13   report, although there's not a time listed, a sworn
14   statement was taken from Adams; that's what this
15   report says?
16        A.    Yes.
17        Q.    Now, if you hold this page and you go
18   to page 30 --
19        A.    Yes, I see it.
20        Q.    -- this appears to be the statement of
21   Emil Adams, correct?
22        A.    Yes.
23        Q.    No time listed here again, correct?
24        A.    Well, this is the one -- you showed me
25   this before I think.  There's no time on this one.
```



1                     Raniero Masecchia

2         Q.    Well, I think I showed you a different

3    one.   There's no time on any -- on any of his

4    reports.   Were you aware that Stambach didn't put

5    times on his reports?

6         A.    No, I don't know why it isn't on here.

7    I have no answer for that.

8         Q.    Okay.   But this does appears to be --

9    this appears to be the interview he's referencing?

10        A.    Yes.

11        Q.    Okay.   And then if you go back, it

12   references, After the statement was taken, a photo

13   array was shown to Emil Adams, correct -- no, I'm

14   sorry.   I -- I'm going back to page 25 now.

15        A.    Where are you going?

16        Q.    Page 25, the other -- the other -- the

17   memo.   It says, After the statement was taken, a

18   photo array --

19        A.    Yes.

20        Q.    -- was shown, correct?

21        A.    Yes, sir.

22        Q.    And you can see then -- keep this page,

23   too -- well, this references a photo array and a

24   positive ID of Valentino Dixon, correct?

25        A.    Yes, sir.



```
 1                    Raniero Masecchia

 2          Q.    All right.  And that's on page 47.

 3   Take a look at that.

 4          A.    47?

 5          Q.    Yep.

 6          A.    48, 47.  There we go.

 7          Q.    And this report indicates that at

 8   445 hours, a photo array was shown to Emil Adams,

 9   correct?

10          A.    Yes.

11          Q.    Actually, I'm sorry.  If you go down

12   further, it says at 505 hours, the photo array was

13   shown?

14          A.    Yes.

15          Q.    He prepared the photo array at 4:45?

16          A.    Yes.

17          Q.    Okay.  And then he made a positive ID

18   of Valentino Dixon?

19          A.    Yes.

20          Q.    Okay.  So going back to page 25 again

21   just to summarize.  It appears from this report and

22   from the documents you just looked at that from

23   2:20 in the morning through 5:00 in the morning,

24   Emil Adams is in police custody being interviewed

25   by a number of detectives and then shown a photo
```



```
 1                    Raniero Masecchia
 2    array, correct?
 3         A.    In custody?  I don't think he was in
 4    custody.
 5         Q.    Wrong word.  He's in the homicide
 6    office with police from 2:20 in the morning through
 7    being shown photo arrays; that's what it appears in
 8    this memo, correct?
 9         A.    Yes.
10         Q.    Okay.  Now, if you take a look now at
11    page 197, which is the --
12         A.    197?
13         Q.    Yeah, 197.  No, I'm wrong.  I
14    apologize.  Let's start with page 31.
15         MR. RUSS:  Okay.  Should we save this one
16    still or are we done?
17         MR. BRUSTIN:  I think we're done with that
18    for now, so let's go to page 31.
19         THE WITNESS:  Yes, sir.
20         BY MR. BRUSTIN:
21         Q.    And we're now back to the statement of
22    Stambach of Emil Adams, right?
23         A.    Correct.
24         Q.    And you see on page 31 about 12 lines
25    down, you see where it says, Can you tell me what
```



```
 1                    Raniero Masecchia
 2   the person who had the TEC-9 looked like?
 3          MR. RUSS:  Wait a minute.  We have to find
 4   that.
 5          THE WITNESS:  I've got it.
 6          MR. RUSS:  Okay.
 7          BY MR. BRUSTIN:
 8          Q.   And read that Q and A and the next Q
 9   and A, through, That's about it.
10          MR. RUSS:  Out loud or to himself?
11          MR. BRUSTIN:  To yourself, please.
12          THE WITNESS:  Okay.
13          BY MR. BRUSTIN:
14          Q.   Okay.  And, here, according to this Q
15   and A, at around -- sometime after 2:20 in the
16   morning, Emil Adams is giving a -- a pretty
17   detailed description of the shooter that he saw,
18   correct?
19          A.   Yes.
20          MR. RUSS:  Objection to form.  You may
21   answer.
22          THE WITNESS:  I'm sorry.
23          MR. RUSS:  Go ahead.
24          BY MR. BRUSTIN:
25          Q.   And he describes the shooter as
```



```
 1                     Raniero Masecchia
 2    heavyset, correct?
 3         A.   Yes.
 4         Q.   And, by the way, you don't know if he
 5    said the word heavyset or that's what Stambach
 6    interpreted from his description, fair to say?
 7         A.   No.
 8    MR. RUSS:  Objection to form.
 9    MR. SOEHNLEIN:  Objection to form.
10    BY MR. BRUSTIN:
11         Q.   You think he said heavyset?  Okay.
12         A.   No, it says he said heavyset.
13         Q.   All right.  So he's describing a big
14    man, someone who is heavyset?
15         A.   Yeah.
16         Q.   And he also describes the person as
17    wearing a white T-shirt, among other things, right?
18         A.   That's in the next question --
19         Q.   Yep.
20         A.   -- right?
21    Yes.
22         Q.   And a white hat?
23         A.   Yes.
24         Q.   And those are the kind of details as a
25    homicide detective you're looking for, specific
```



1                     Raniero Masecchia
2    details, right?
3          A.    It helps, yes.
4          Q.    Like, you know, it's -- if you get
5    something like, I remember he had on a white hat,
6    that's a specific detail, right?
7          A.    Yes.
8          Q.    Or, I remember him being heavyset.  He
9    was a big man.  That's an important detail, right?
10         A.    Yes.
11         Q.    That's the kind of thing you're looking
12   for?
13         A.    Correct.
14         Q.    All right.  He also describes the
15   person as being about the same age as Mario; do you
16   see that?
17         A.    No.
18         Q.    The question above it, Heavyset, maybe
19   about 20, the same age as Mario?
20         A.    Yes.
21         Q.    And I will represent to you that Mario
22   was 18 years old at the time.
23         Another thing you're looking for, he looks
24   about the same as one of the other victims?
25         A.    Okay.



```
 1                      Raniero Masecchia
 2          Q.   Right?  Important detail to pay
 3   attention to?
 4          MR. RUSS:  How old someone is --
 5          MR. BRUSTIN:  Yeah.
 6          MR. RUSS:   -- that's what you're asking?
 7          BY MR. BRUSTIN:
 8          Q.   And, frankly, it's more important to
 9   you as a detective to have somebody give you an age
10   description based on comparing them to how somebody
11   else looked as opposed to giving a specific age,
12   right?
13          MR. RUSS:  Objection to form.
14          BY MR. BRUSTIN:
15          Q.   That's usually more accurate?
16          MR. RUSS:  Objection to --
17          THE WITNESS:  Okay.
18          MR. RUSS:   -- form.
19          BY MR. BRUSTIN:
20          Q.   Do you agree?
21          A.   I would -- I don't understand the
22   correlation here.  I --
23          Q.   In other words, sometimes people --
24   people are probably better at saying, This person
25   looked to be the same age as this person, as
```



1              Raniero Masecchia

2    opposed to saying, this person looked to be

3    20 years old?

4           MR. RUSS:  Objection to form.  You may

5    answer.

6           THE WITNESS:  I'll agree with you on that.

7           BY MR. BRUSTIN:

8           Q.   Okay.  Now, take a look at page 197.

9           A.   97?

10          MR. RUSS:  197.

11          THE WITNESS:  Okay.

12          BY MR. BRUSTIN:

13          Q.   Now, I will represent to you that

14   according to multiple sources, LaMarr Scott was a

15   big man, as big as 210 or 220 pounds at the time;

16   do you recall reading that or learning that?

17          A.   No, I --

18          Q.   Any reason to dispute that?

19          A.   No.

20          Q.   Okay.  Do you understand, at least as a

21   basic matter, that LaMarr Scott was a much heavier

22   man than Valentino Dixon?

23          A.   I'll concede to that.  I don't know.

24          Q.   All right.  But, certainly, you

25   understand from looking at documents that Valentino



1                    Raniero Masecchia

2    Dixon was thin?

3         A.    Yes.

4         Q.    All right.  Now, take a look --

5         MR. RUSS:  The documents say that Valentino

6    Dixon was thin, not -- not that he knew.

7         MR. BRUSTIN:  That's correct.  That's what I

8    meant to say.

9         BY MR. BRUSTIN:

10        Q.    Take a look at page -- you may have

11   known at the time, you don't remember now?

12        You probably knew it at the time, but you

13   don't remember it today?

14        A.    Yeah, I don't recall any of that today.

15        Q.    All right.  Take a look at page 197.

16        A.    I am, sir.

17        Q.    All right.  And this is the interview

18   of LaMarr Scott a day later who claims he did the

19   shooting, right?

20        A.    Yes.

21        Q.    The same time you're interviewing

22   Leonard Brown, right?

23        A.    I believe so, yes.

24        Q.    And we know that Stambach did the

25   interview of Emil Adams a day before, you just saw



1                    Raniero Masecchia

2    that, right?

3         A.    Yes.

4         Q.    And take a look at -- and we know that

5    LaMarr Scott is a heavyset man, correct?

6         A.    Yes.

7         MR. RUSS:  You've represented that, yes.

8         BY MR. BRUSTIN:

9         Q.    All right.  And if you take a look,

10   what it says here about eight Q and As down on

11   page 197 beginning with, what were you wearing that

12   night?

13        MR. RUSS:  Right here.

14        THE WITNESS:  Yes.

15        BY MR. BRUSTIN:

16        Q.    Okay.  And he's describing that he was

17   wearing a white T-shirt and a white hat, right?

18        A.    Yes.

19        Q.    Those are two distinct descriptive

20   pieces of clothing?

21        A.    Excuse me?

22        Q.    They're distinct descriptive pieces of

23   clothing, correct?

24        A.    Yes.

25        Q.    And they track what Emil Adams says he



```
 1                    Raniero Masecchia
 2   saw the shooter wearing?
 3         MR. RUSS:  Objection to form.  You may
 4   answer.
 5         THE WITNESS:  From what I read, yes.
 6         BY MR. BRUSTIN:
 7         Q.   And he -- and Emil Adams also describes
 8   seeing a heavyset man, not a thin man, right?
 9         A.   Yes.
10         Q.   Yet, somehow -- withdrawn.
11         So, first of all, when LaMarr Scott comes in
12   and says -- and is obviously a heavyset man, big
13   man --
14         A.   Okay.
15         Q.   -- and says he was wearing a white hat
16   and a white T-shirt, one of the most important
17   things to do would be to go back to Emil Adams and
18   say, Wait a minute.  Has there been a terrible
19   mistake here?  Did you actually see LaMarr Scott,
20   the person who was wearing a white hat, a white
21   shirt, and was heavyset?
22         MR. RUSS:  Objection.
23         BY MR. BRUSTIN:
24         Q.   That'd be the first thing any homicide
25   detective would want to do, correct?
```



1                    Raniero Masecchia

2          MR. RUSS:  Objection to form.

3          THE WITNESS:  I don't know.

4          BY MR. BRUSTIN:

5          Q.   Well, you would presume, would you not,

6     that -- withdrawn.

7          You understood Stambach to be a competent

8     detective, correct?

9          A.   Yes.

10         Q.   And if Stambach interviewed Emil Adams

11    a day before and Emil Adams told him that the

12    shooter was a heavyset man wearing a white hat and

13    a white T-shirt, LaMarr Scott comes in and says,

14    Valentino Dixon wasn't the shooter, I was the

15    shooter.

16         He's a heavyset man and he describes wearing

17    a white hat and a white T-shirt, you would expect

18    Stambach to make the connection, right?

19         MR. RUSS:  Objection to form.  Don't answer

20    that.  You can't -- you can't get him to opine

21    on --

22         MR. BRUSTIN:  Well --

23         MR. RUSS:  -- what Stambach --

24         MR. BRUSTIN:  -- fair enough.

25         BY MR. BRUSTIN:



```
 1                    Raniero Masecchia
 2         Q.    Certainly, you would have made the
 3    connection if you had read the reports, correct?
 4         A.    If I had taken the original Emil
 5    Adams --
 6         Q.    Yes.
 7         A.    -- statement and then this came up, I
 8    think I would have done what I read later in the --
 9    in the papers you gave me was that Mark Stambach
10    called ADA Bellings to inform him of what was going
11    on --
12         Q.    Okay.
13         A.    -- and --
14         Q.    But the people that were closest to
15    this homicide investigation were the homicide
16    investigators, they had interviewed the witnesses,
17    they knew what they said, right?
18         A.    We don't make decisions like that until
19    we confer with the DA's office.  I mean --
20         Q.    Okay.
21         A.    -- I don't know what you're trying to
22    get at.  I mean, yeah, the connection with Emil
23    Adams's statement and this statement --
24         Q.    It was obvious, right?
25         MR. RUSS:  Objection to form.
```



```
 1                    Raniero Masecchia
 2          THE WITNESS:  It should be followed up, and
 3    I think it was.
 4          BY MR. BRUSTIN:
 5          Q.   Okay.  Oh, you do?  When was it
 6    followed up?
 7          A.   I don't know when or what.  I -- that's
 8    what I would do --
 9          Q.   Okay.
10          A.   -- and I think it would have been
11    followed up.
12          Q.   And one question you -- if you're a
13    detective acting in good faith, when Emil Adams
14    describes the shooter as being heavyset and then
15    identifies Valentino Dixon who is a very thin
16    build, that's a red flag, right?
17          MR. RUSS:  Objection to form.
18          MR. SOEHNLEIN:  Objection to form.
19          MR. RUSS:  Go ahead.
20          THE WITNESS:  To certain people it would be
21    a red flag.
22          BY MR. BRUSTIN:
23          Q.   And it's really a red flag when LaMarr
24    Scott comes in a day later who is heavyset and
25    says, I was the shooter, right?
```



```
 1                    Raniero Masecchia

 2          MR. RUSS:  Objection to form.

 3          MR. SOEHNLEIN:  Objection to form.

 4          THE WITNESS:  That's why the statement was

 5   taken, I'm assuming.

 6          BY MR. BRUSTIN:

 7          Q.   And, obviously, all of those things had

 8   to be followed up on, regardless of who did it,

 9   correct?

10          A.   And I'm sure they were, one way or the

11   other.

12          Q.   Well, first of all, you agree that

13   those are critically important issues to follow up

14   on, correct?

15          A.   Yes.

16          Q.   And regardless of who directed it, you

17   would have expected to see a re-interview of Emil

18   Adams soon after that statement was taken, correct?

19          A.   I don't know.

20          Q.   Well, my -- my question is not whether

21   it happened.

22          A.   You're asking me what steps should be

23   taken --

24          Q.   That's correct.

25          A.   -- or should have been taken --
```



```
 1                    Raniero Masecchia
 2         Q.    That's correct.
 3         A.    -- is that what you're saying?
 4         Q.    Yes, sir.
 5         A.    Okay.
 6         Q.    And I'm only asking you about one
 7    issue.  All I'm asking you is based on the
 8    information you just saw, one of the first things
 9    that should have happened is Emil Adams should have
10    been re-interviewed, correct?
11         A.    Yes, but the re -- if I could go a
12    little further.
13         MR. SAHASRABUDHE:  By all means.
14         THE WITNESS:  You know he's going to
15    re-interviewed.  He gave a statement.  You know
16    he's going to appear before a grand jury, you know
17    he's going to be interviewed again at the DA's
18    office, you know he's got to testify to the case,
19    so it's going to be done.
20         BY MR. BRUSTIN:
21         Q.    So maybe you just let Valentino Dixon
22    stay in jail until then?
23         MR. RUSS:  Objection to form.
24         MR. SOEHNLEIN:  Objection to form.
25         MR. RUSS:  Don't answer.
```



```
 1                   Raniero Masecchia
 2            THE WITNESS:  He also --
 3            MR. RUSS:  Don't -- don't answer.
 4       BY MR. BRUSTIN:
 5            Q.   So let me ask you a different way.  You
 6       would agree that as a detective acting in good
 7       faith, as soon as you receive information that you
 8       might have the wrong person, you want to do
 9       everything in your power to investigate that
10       information, correct?
11            MR. RUSS:  Objection to form.  You may
12       answer.
13            THE WITNESS:  And I believe it was.  I mean,
14       in my head, I -- yeah, it was.
15       BY MR. BRUSTIN:
16            Q.   Okay.  Well, you have no memory or
17       understanding as to anything that happened here,
18       correct?
19            A.   Well, I have no memory that it didn't
20       happen.
21            Q.   All right.  Now, obviously it would
22       have been completely inappropriate -- withdrawn.
23            You saw a document representing -- Stambach
24       representing that Emil Adams was shown a photo
25       array with Valentino Dixon in the photo array,
```



1                    Raniero Masecchia

2    correct?

3            MR. RUSS:  He saw --

4            THE WITNESS:  Yes.

5            MR. RUSS:  -- today?

6            MR. BRUSTIN:  Today.

7            THE WITNESS:  Today.

8            BY MR. BRUSTIN:

9        Q.    Okay.  And based on that document, it

10   appears that -- that was -- it was a properly

11   conducted photo array?

12       A.    It appears so, yes.

13       Q.    In other words, that there was no

14   suggestion before, during, or after based on that

15   document, correct?

16       A.    Yes.

17       Q.    And based on that document, it suggests

18   that the only photos shown to Emil Adams were --

19   was that six-person array?

20       A.    Yes.

21       Q.    And to the extent there were any other

22   photos shown to Emil Adams at that time or any

23   time, that had to be documented, correct?

24       A.    Yes.

25       Q.    And it would never have been



1                    Raniero Masecchia

2   appropriate to show Emil Adams either -- at that

3   time before LaMarr Scott came forward, an

4   individual photo of Valentino Dixon, correct?

5        A.    Yes.

6        MR. RUSS:  Objection to form.  No, don't

7   answer that.  You already did, but don't answer

8   that.

9        He's not here to testify as to what someone

10  else did was appropriate or not.  And if you want

11  to talk to Judge McCarthy, I welcome you doing

12  that.

13       BY MR. BRUSTIN:

14       Q.    Okay.  I want to ask you some questions

15  about the Epps case.  Okay?

16       A.    About who?

17       Q.    The Epps case.

18       A.    Oh, Cory.  Yeah.

19       Q.    And, actually, I want to ask you

20  questions about both the Cory Epps case and the

21  Pope case.

22       A.    I don't know anything about --

23       MR. RUSS:  Okay.  I'm -- at this point, I

24  will listen to your questions individually, but I

25  am stating for the record, to the extent that your



```
 1              Raniero Masecchia
 2   questions violate Judge McCarthy's order on Monell,
 3   I'm not going to let him answer.
 4        MR. BRUSTIN:  So --
 5        MR. SOEHNLEIN:  And I -- I just join in the
 6   objection.
 7        MR. BRUSTIN:  Let me make a record before
 8   you -- I don't intend to ask Monell questions.  My
 9   only questions are geared at gathering 404(b)
10   evidence that could potentially be admissible
11   concerning Detective Masecchia, that's it.  I'm
12   only going to be asking you about his involvement
13   in those cases as they relate to this case under
14   404(b), not Monell.
15        MR. RUSS:  We'll take -- we'll take your
16   questions one at a time.
17        MR. BRUSTIN:  And there's been no ruling
18   that we are not entitled to gather 404(b) evidence,
19   only that our request was overbroad.
20        MR. RUSS:  We'll take your questions one at
21   a time.
22        MR. BRUSTIN:  All right.
23        BY MR. BRUSTIN:
24        Q.   So, first of all, you were the
25   assigned -- the lead investigator in the murder of
```



```
 1                  Raniero Masecchia

 2    Tameka Means, correct?

 3         A.    Yeah, I -- I believe I got the original

 4    call.

 5         Q.    Okay.  And just as a general matter,

 6    you recall that in that case, the perpetrator

 7    pulled up next to Ms. Means with another passenger

 8    in their car, there was a road rage incident, that

 9    person ended up shooting Ms. Means, who was

10    driving, in the head through the car window,

11    correct?

12         A.    The facts are right.  The person from

13    the one car got out and shot her while Jacqueline

14    Bradley was sitting in the passenger seat, I

15    believe --

16         Q.    And there was also --

17         A.    -- and he reached through, and I don't

18    know if any road rage was involved in it or not.

19         Q.    Fair enough.  But that -- generally,

20    that's -- that's how the shooting occurred, to your

21    understanding?

22         A.    Right.

23         Q.    And there was also evidence that there

24    was a female passenger in the car that the shooter

25    was driving?
```



RANIERO MASECCHIA                                        March 15, 2022
DIXON vs CITY OF BUFFALO                                              285

```
 1                    Raniero Masecchia
 2         A.    I believe so.
 3         Q.    And as you mentioned, Jacqueline
 4  Bradley was the eyewitness in the passenger seat of
 5  the victim's car?
 6         A.    Yes.
 7         Q.    Now, I can show you these documents if
 8  I need to, but I think none of this is too
 9  controversial.  Hopefully I can just get through it
10  without doing that.
11         But one of the things that you did in the
12  Epps case is you went to the Town of Tonawanda to
13  have a composite sketch drawn, correct?
14         A.    We did, and I don't recall that.  That
15  part of the case, I really --
16         Q.    But you know from looking at
17  documents --
18         A.    Yeah.
19         Q.    -- that you did that?
20         A.    Yeah, that was done.
21         Q.    All right.  And the reason you did that
22  is because you didn't have a composite sketch
23  artist --
24         A.    That's correct.
25         Q.    -- in Buffalo?
```



```
 1                     Raniero Masecchia
 2        Okay.  And you thought that would be
 3   something that might assist in the investigation?
 4        A.   We had no inkling on who might have did
 5   it.
 6        Q.   Right.  But you had a witness who was
 7   able to give a detailed description of the shooter?
 8        A.   Correct.
 9        Q.   And so you thought that might be an
10   aid --
11        A.   Yes.
12        Q.   -- in finding the perpetrator?
13        A.   Yes.
14        Q.   And, first of all, although you don't
15   remember it at the -- although you may not remember
16   it today, at the time you guys were investigating
17   homicides in 1991 or thereafter --
18        A.   Okay.
19        Q.   -- it would be clear to the detectives
20   you were working with who was the lead detective on
21   a particular case, fair to say?
22        MR. RUSS:  I'm going to instruct him not to
23   answer.  That's Monell stuff.  You can ask him what
24   he did, what he saw, not what procedures were --
25        MR. BRUSTIN:  I'm -- I'm just asking
```



RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
287

1          Raniero Masecchia

2    generally.

3          MR. RUSS:  Well, he's not answering that

4    one.

5          BY MR. BRUSTIN:

6          Q.    So here's the question:  Would it be

7    fair to say that, for example, in the Dixon case,

8    although you may not remember today who was the

9    lead detective, based on how things worked at the

10   time, you would have known then who the lead

11   detective was?

12         MR. RUSS:  You may answer.

13         THE WITNESS:  Yes.

14         BY MR. BRUSTIN:

15         Q.    Okay.  And that was true in any case,

16   right, that you worked on?  You would know who the

17   lead detective on a case you were working on?

18         A.    Or detectives.

19         Q.    Right.  There was either one or two?

20         A.    Right.

21         Q.    Okay.  But you would know that if you

22   did work on a case?

23         A.    Right.

24         Q.    Okay.  And so, for example, you would

25   expect that the other homicide detectives would



```
 1                    Raniero Masecchia
 2    have known at the time that you were the lead
 3    investigator on the Epps case?
 4            MR. RUSS:  Objection to form.
 5            BY MR. BRUSTIN:
 6            Q.   Based on how things worked.
 7            MR. RUSS:  Objection to form.
 8            MR. SOEHNLEIN:  Objection to form.
 9            MR. RUSS:  You may answer.
10            THE WITNESS:  I would assume so, yes.
11            BY MR. BRUSTIN:
12            Q.   So if Masecchia got -- I'm sorry -- if
13    Stambach got information on the Epps case, he would
14    know you were the person to talk to because you
15    were the lead detective, right?
16            MR. RUSS:  Objection to form.  Don't answer.
17    That's Monell.
18            BY MR. BRUSTIN:
19            Q.   All right.  Now, I think you told me
20    this, that you don't actually have a recollection
21    today of going to Tonawanda and getting the --
22    the --
23            A.   No, I don't, but I -- we probably did.
24            Q.   Okay.  And one of the things you
25    testified to at the Epps deposition was that you
```



RANIERO MASECCHIA                          March 15, 2022
DIXON vs CITY OF BUFFALO                              289

```
 1                Raniero Masecchia
 2   believe Bradley had provided a description of both
 3   the shooter and the female driver; do you recall
 4   that?
 5         A.   I --
 6         MR. RUSS:  Does he recall his testimony?
 7         THE WITNESS:  I recall it now that you told
 8   me that, but I -- I haven't really reviewed my
 9   testimony --
10         BY MR. BRUSTIN:
11         Q.   Okay.
12         A.   -- since I gave it.
13         Q.   But my saying it reminds you that, in
14   fact, Bradley had described both?
15         A.   If that's what I said in my statement,
16   yes.
17         Q.   I'll represent to you that's what you
18   said in your deposition.
19         A.   Okay.
20         Q.   That was your recollection at the time?
21         A.   Yes.
22         Q.   And, certainly, you recall that Cory
23   Epps was in fact identified by Ms. Bradley as the
24   shooter?
25         A.   Yes.
```



```
 1                    Raniero Masecchia
 2        Q.    And that formed the basis of the
 3   prosecution of Cory Epps?
 4        A.    Yes.
 5        Q.    And Cory Epps was subsequently
 6   convicted based on the testimony of Ms. Bradley?
 7        A.    Yes.
 8        Q.    And in fact, that was really the only
 9   evidence against Epps?  There was no physical
10   evidence, no other evidence of any kind, correct?
11        A.    Yes.
12        MR. RUSS:  Objection to form.
13        THE WITNESS:  Oh, I'm sorry.
14        BY MR. BRUSTIN:
15        Q.    Yes, in that you agree with me,
16   correct?
17        A.    Yes.
18        Q.    It was a single witness ID, nothing
19   more?
20        A.    Yes.
21        Q.    And you understood by -- certainly by
22   the time of the Epps case -- what was that '98?
23   '97?
24        A.    I don't recall the exact date.  It
25   could have been '97.
```



RANIERO MASECCHIA                                           March 15, 2022
DIXON vs CITY OF BUFFALO                                              291

```
 1                    Raniero Masecchia
 2          Q.    Okay.
 3          A.    That sounds familiar.
 4          Q.    All right.  But certainly by 1997, you
 5   understood that single witness identification cases
 6   were frowned upon?
 7          A.    Yes.
 8          MR. RUSS:  Objection to form.
 9          MR. SOEHNLEIN:  Objection to form.
10          THE WITNESS:  Oh, sorry.
11          BY MR. BRUSTIN:
12          Q.    In fact, I can represent to you I know
13   many police departments now won't permit -- or many
14   prosecuting offices won't permit a case to go
15   forward based on a single witness identification.
16          MR. RUSS:  Is there a question?
17          MR. BRUSTIN:  Not yet.  You've got to let me
18   finish.
19          BY MR. BRUSTIN:
20          Q.    Do you know whether that's the case in
21   Buffalo?
22          MR. RUSS:  Objection to form.
23          THE WITNESS:  I don't.
24          BY MR. BRUSTIN:
25          Q.    All right.  But you did know by -- by
```



|    |                                                          |
|----|----------------------------------------------------------|
| 1  |                  Raniero Masecchia                       |
| 2  | that time that single witness ID cases were -- were      |
| 3  | frowned upon?                                            |
| 4  |         MR. RUSS:  Objection to form.                    |
| 5  |         THE WITNESS:  I don't believe so at that        |
| 6  | time they were frowned upon, but I think they           |
| 7  | were --                                                 |
| 8  |         BY MR. BRUSTIN:                                  |
| 9  |         Q.   It was a bad question.  Let me             |
| 10 | withdrawn the question.                                 |
| 11 |         A.   -- tough ones to bring to trial --        |
| 12 |         Q.   All right.                                 |
| 13 |         A.   -- you know.                               |
| 14 |         Q.   You understood as a -- as a detective     |
| 15 | by 1997 or 1998 that if all you had was a single        |
| 16 | witness identification, that could be problematic       |
| 17 | and you wanted to gather more evidence if you           |
| 18 | could?                                                  |
| 19 |         A.   Yes.                                       |
| 20 |         Q.   Because for the simple reason that         |
| 21 | sometimes eyewitnesses make mistakes?                   |
| 22 |         A.   Yes.                                       |
| 23 |         Q.   You always wanted to have more than a      |
| 24 | single witness ID?                                      |
| 25 |         A.   Yes.                                       |



RANIERO MASECCHIA                                      March 15, 2022
DIXON vs CITY OF BUFFALO                                          293

```
 1                  Raniero Masecchia
 2        Q.   And so you knew that as lead
 3   investigator in the Epps case --
 4        A.   I did.
 5        Q.   -- that's all the evidence you had?
 6        A.   Yes.
 7        Q.   And did that cause you to have some
 8   question, not about probable cause, but about
 9   whether or not Cory Epps was actually the
10   perpetrator?
11        A.   Some question?
12        Q.   Yeah, in your mind, did you have -- I'm
13   sure -- you have cases -- let me ask you this way:
14   I'm sure you had cases in your career where you
15   were certain you had the right guy and other
16   cases --
17        THE REPORTER:  Hang on.  Slow down.  I'm
18   sure you had cases in your ...
19        BY MR. BRUSTIN:
20        Q.   I'm sure you had cases in your career
21   where you felt very confident that you had the
22   right perpetrator and other cases where you felt
23   less certain.  Was Cory Epps a case where you felt
24   less certain?
25        A.   Probably on the lesser side, yes.
```



```
 1                    Raniero Masecchia
 2        Q.    And you actually -- you know from
 3   your -- your being refreshed at the Epps -- at the
 4   Epps deposition that you also conducted the line-up
 5   procedure with Cory Epps, correct?
 6        A.    I was there for it, yes.
 7        Q.    And, in fact, in that case, there was
 8   an in-person line-up, correct?
 9        A.    Both, I believe.
10        Q.    There was a photo array and an
11   in-person line-up?
12        A.    Yes.
13        Q.    Is that because there was only a single
14   witness?  Do you know why that happened, why there
15   were both?
16        A.    I'm sure it was done at the request of
17   the DA's office.  The photo array had been done
18   prior to that, I believe, if my recollection is
19   correct, and I believe he also came in and gave a
20   statement, and then he was asked if he wanted to
21   stand in the line-up -- if he'd be willing to stand
22   in the line-up, he would.  A line-up was arranged.
23   I believe it was run by Henry Smardz, though.
24        Q.    Another homicide detective?
25        A.    No, he was --
```



```
 1                    Raniero Masecchia
 2        Q.    Crime scene detective?
 3        A.    Yeah, they were the evidence unit and
 4   they were also in charge of line-ups.
 5        Q.    Now, Ms. Bradley testified in her
 6   deposition that she recalled during the
 7   investigation being shown photo books in addition
 8   to being shown the photo array.
 9        MR. RUSS:   You're representing that to him?
10        MR. BRUSTIN:   I am, and that's at page 6
11   and 7 of her deposition of the Epps case.
12        THE WITNESS:   Photo books?
13        BY MR. BRUSTIN:
14        Q.    Photo books.  In other words, books
15   containing photos, like mug book books.  Do you
16   recall ever doing that with her?
17        A.    No.
18        Q.    All right.  Would it be fair to say,
19   though, to the extent that you were lead detective
20   on the case, if that happened, either by you or by
21   another detective, it had to be documented?
22        A.    Yes.
23        Q.    And you also recall from the Epps
24   deposition that in addition to doing both the photo
25   array and the line-up, you also interviewed
```



1                     Raniero Masecchia

2    Mr. Epps?

3         MR. RUSS:  I'm sorry.  I'm not understanding

4    you.  He recalls from his testimony in the Epps

5    deposition?

6         MR. BRUSTIN:  It was a bad question.

7         BY MR. BRUSTIN:

8         Q.   First of all, do you recall today that

9    one of the things you did in the Epps investigation

10   was you interviewed Cory Epps in the homicide

11   office?

12        A.   Yes.

13        Q.   Okay.  And he agreed to speak to you?

14        A.   Yes.

15        Q.   And he denied committing the crime?

16        A.   Yes.

17        Q.   By the way, was that unusual in your

18   experience as a homicide investigator that suspects

19   would waive their rights and speak to you, or was

20   it kind of a mixed bag?

21        MR. RUSS:  Objection to form.

22        THE WITNESS:  It wasn't extremely unusual,

23   but it's happened on many occasions.

24        BY MR. BRUSTIN:

25        Q.   All right.  But certainly any time a



```
 1                    Raniero Masecchia
 2   criminal suspect like Mr. Epps would agree to speak
 3   to you, you wanted to take advantage of that and
 4   ask as many questions --
 5          A.    Yes.
 6          Q.    -- to get information as you can?
 7          A.    Yes.
 8          Q.    Including asking questions about
 9   potential physical evidence?
10          A.    Yes.
11          Q.    And I also note from the records I've
12   looked at, and you tell me if you remember, you
13   also testified at the trial of Cory Epps as the
14   lead detective?
15          A.    Yes.
16          Q.    And you also attended the autopsy of
17   Tameka Means?
18          A.    Yes.
19          Q.    And those are typical activities that a
20   lead investigator would participate in?
21          A.    Yes.
22          Q.    And it's at least your understanding
23   that if things worked as they should, any
24   information which was gathered on the Epps case --
25   or I'm sorry -- any information which was gathered
```



```
 1                    Raniero Masecchia
 2    on the Means investigation should have been
 3    provided to you, correct?
 4          MR. SOEHNLEIN:  Objection to form.
 5          THE WITNESS:  Or to --
 6          MR. RUSS:  Objection to form.
 7          THE WITNESS:  -- the squad.
 8          I'm sorry.
 9          MR. RUSS:  You're fine.
10          BY MR. BRUSTIN:
11          Q.   All right.  But it sounds like there
12    are some cases, like potentially the Dixon case, or
13    the -- the Torri Jackson case where the lead
14    investigator may not play a much bigger role than
15    the other detectives, correct?
16          MR. RUSS:  Objection to form.
17          THE WITNESS:  Could you repeat that?
18          BY MR. BRUSTIN:
19          Q.   Sure.  It was a bad question.
20          I think you told me you thought Lonergan
21    and --
22          A.   Vickerd.
23          Q.   -- Vickerd may have been the actual
24    lead detectives in the Jackson murder
25    investigation, correct?
```



RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
299

```
 1                    Raniero Masecchia
 2         A.    They caught the case, yes.
 3         Q.    Right.  But it appears that other
 4  detectives on the case, including Stambach in
 5  particular, conducted a lot of the investigative
 6  activities?
 7         A.    Yes.
 8         Q.    And that was different than the Epps
 9  case where you actually caught the case and did
10  most of the investigative activities?
11         A.    In that case, yes.  They're all
12  different.
13         Q.    But in the Epps case, you were the lead
14  investigator and you were a true lead investigator,
15  you really did the work?
16         MR. RUSS:  Objection to form.  You may
17  answer.
18         THE WITNESS:  Whatever work needed to be
19  done that could have been done, I did, but there
20  were other detectives also involved in the case.
21         BY MR. BRUSTIN:
22         Q.    Okay.  But most -- just from what we've
23  talked about already --
24         A.    Yeah.
25         Q.    -- most of the key investigative
```



```
 1                    Raniero Masecchia
 2    activities, the line-up, the photo array, the
 3    investigation of -- the interview of Epps, you
 4    conducted those yourself?
 5           A.   I was involved in -- in most of that,
 6    yes.
 7           Q.   Okay.  Now, at the time you were
 8    deposed in the Epps case, you -- you acknowledged
 9    that you were familiar with the name Wymiko
10    Anderson?
11           A.   I became familiar with it later --
12           Q.   Okay.
13           A.    -- not at the time of the
14    investigation.
15           Q.   Okay.  And you understood -- whenever
16    you became aware of it, you understood that she was
17    part of a separate investigation from Means
18    involving the murder of a man named Paul Pope?
19           A.   Yes.
20           Q.   All right.  And you came to learn,
21    according to you, that Ms. Anderson had provided a
22    statement in regard to the Paul Pope murder on or
23    about April 17th of 1998, correct?
24           A.   She gave that statement in April of
25    1998?
```



RANIERO MASECCHIA                          March 15, 2022
DIXON vs CITY OF BUFFALO                          301

```
 1                    Raniero Masecchia
 2        Q.   Yes.
 3        A.   I came to learn of that later on, yes.
 4        Q.   Okay.  Now, do you recall who the lead
 5   investigator was in the Paul Pope murder?
 6        A.   I don't.
 7        Q.   Is it your testimony that you were not
 8   the lead investigator in that case, or you don't
 9   recall one way or the other?
10        A.   I don't recall, but I don't think I --
11   I was.  I don't recall.
12        Q.   Okay.  You recall -- do you recall that
13   Ms. Anderson was sometimes referred to as Pumpkin?
14   Do you recall her referred --
15        A.   I heard that after.
16        Q.   Okay.  And you did, in fact, have some
17   interaction with Ms. Anderson in 1998, correct?
18        A.   I don't know.  I --
19        Q.   Well, you recall --
20        A.   If I testified to that --
21        Q.   You recall --
22        A.   -- I don't recall.
23        Q.   Let me see if I can refresh your
24   recollection without having to show you.
25            Do you recall that at some point
```



```
 1              Raniero Masecchia
 2   Ms. Anderson sent a -- sent an anonymous letter to
 3   Mr. Epps' lawyer stating that Epps had not
 4   committed that crime and that somebody else had,
 5   her boyfriend, and during the course of the
 6   investigation into the anonymous letter, you ended
 7   up showing a photo array of the -- of Mr. Epps'
 8   companion to Ms. Anderson?
 9         MR. RUSS:  Objection to form.
10         THE WITNESS:  If -- if I said I did it, I
11   did it.  I don't recall it, but ...
12         BY MR. BRUSTIN:
13         Q.   You do recall, though, as a general
14   matter, that shortly after the Paul Pope murder,
15   Ms. Anderson was in the homicide office, you saw
16   her there, but you were not present for the
17   interview; do you recall that?
18         A.   No.
19         MR. BRUSTIN:  All right.  So let's mark the
20   Masecchia Epps dep.
21         What number are we on.
22         THE REPORTER:  7.
23         MR. RUSS:  7.
24         MR. BRUSTIN:  7, please.
25   The following was marked for Identification:
```



```
 1                      Raniero Masecchia
 2    PLF.'S EXH. 7              transcript of Raniero
 3                              Masecchia's testimony from
 4                              February 17, 2021
 5          MR. ROMO:  You guys need a copy?
 6          MR. SAHASRABUDHE:  I don't need one.
 7          MR. SOEHNLEIN:  We'll play along together.
 8          MR. BRUSTIN:  So here's -- you can have this
 9    copy.
10          BY MR. BRUSTIN:
11          Q.   Take a look at page 73 and 74.
12          MR. RUSS:  Of the testimony --
13          MR. BRUSTIN:  So --
14          MR. RUSS:  -- or of the --
15          MR. BRUSTIN:  -- I'm sorry.
16          MR. RUSS:  -- Bates numbers?
17          BY MR. BRUSTIN:
18          Q.   What I've now shown -- what I've shown
19    you as Plaintiff's 7, for identification, which is
20    the deposition that was conducted of you in the
21    Epps case on February 17th of last year.  Okay?
22    And now I'm looking at page --
23          MR. RUSS:  And the reason I said that was
24    because you referred to numbers, but there's two
25    sets of numbers --
```



1                     Raniero Masecchia

2          MR. BRUSTIN:  There are.

3          MR. RUSS:  -- on each page.

4          MR. BRUSTIN:  I'm referring to the numbers

5    in the top right corner.

6          MR. RUSS:  Thank you.

7          MR. BRUSTIN:  The actual transcript numbers.

8          BY MR. BRUSTIN:

9          Q.   So if you could read to yourself

10   page 73, line 20, to page 74, line 10.  Read that

11   to yourself and let me know when you're done.

12         A.   I'm sorry.  What number is that?

13         Q.   So page 73, line 20 --

14         A.   73.

15         Q.   -- to page 74, line 10.

16         A.   Right.

17         Okay.

18         Q.   Actually, if you could read to

19   yourself -- yeah, so all the way -- you know what,

20   read to yourself all the way through line 14 -- or

21   line 13.

22         MR. RUSS:  What page?

23         MR. BRUSTIN:  Page 74.

24         THE WITNESS:  From line 20?

25         BY MR. BRUSTIN:



1                  Raniero Masecchia

2        Q.    Just a couple more lines is all I'm

3   asking you to read.

4        So, sir, does that refresh your recollection

5   that you learned soon -- although you weren't

6   present for the interview, you were in the homicide

7   office when Ms. Anderson was interviewed by other

8   detectives soon after the Pope murder?

9        A.    I recall that at the time of this

10  statement when I read the P73s, that brought some

11  recollection back to me.

12       Q.    Okay.  And so --

13       A.    So --

14       Q.    -- what Ms. Anderson described in her

15  deposition was that she was interviewed by two

16  detectives in the office --

17       A.    Okay.

18       Q.    -- but that there were other detectives

19  that were in the homicide office outside of where

20  she was interviewed.

21       A.    Right.

22       Q.    And it sounds like you were one of

23  those detectives, correct?

24       A.    Correct.

25       Q.    Okay.  And at least at the time of the



```
 1              Raniero Masecchia
 2  Epps dep, you couldn't remember what, if anything,
 3  she told those detectives, correct?
 4       A.    Right.
 5       Q.    And it sounds like --
 6       MR. RUSS:  When you say Epps dep, you mean
 7  his testimony in the Epps case?
 8       MR. BRUSTIN:  Yes, sir.
 9       BY MR. BRUSTIN:
10       Q.    And it sounds like you can't remember
11  what role -- what specific role you had in the Pope
12  murder investigation, correct?
13       A.    No.
14       Q.    But you would agree that any
15  investigative activities that you conducted in the
16  Pope murder investigation, you would have -- you
17  would have created a P73 or similar documentation?
18       A.    In what regards?  In regards to --
19       Q.    If you did a -- if you did a witness
20  interview or if you did a photo array, if you
21  conducted any type of meaningful substantive
22  investigative activity, there would be some type of
23  report on it in the file --
24       A.    There should --
25       Q.    -- correct?
```



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                        307

```
 1                   Raniero Masecchia
 2       A.    -- be, yes.
 3       Q.    So if we were to go back to that file
 4  and look for reports you created, that would give
 5  us a better understanding as to the extent of your
 6  role in the Pope murder investigation, correct?
 7       A.    Yes, it would help me.
 8       Q.    That would be -- that would help you to
 9  answer those questions --
10       A.    Yes.
11       Q.    -- what role, if any, you played?
12       Now, you understand -- do you know anything
13  about Wymiko Anderson?
14       A.    Who?
15       Q.    Wymiko Anderson, Pumpkin Anderson.
16       A.    Just what I've been told prior to my
17  testimony and after my testimony.
18       Q.    You don't remember anything about her?
19       A.    Not really, no.
20       Q.    Fair enough.  Now, based on your
21  involvement in the Epps case, I take it you
22  understand today Ms. Anderson has made a number of
23  allegations that you claim not to have knowledge
24  of, correct?
25       A.    I --
```



```
 1                    Raniero Masecchia
 2         MR. RUSS:  Objection to form.  I don't
 3    understand that myself.
 4         MR. BRUSTIN:  It was a bad question.  Let
 5    me -- let me go a step at a time.
 6         BY MR. BRUSTIN:
 7         Q.   You understand that -- today you
 8    understand that according to Ms. Anderson, her
 9    boyfriend Russell Montgomery --
10         MR. SOEHNLEIN:  Object --
11         BY MR. BRUSTIN:
12         Q.   -- killed -- killed Mr. Pope, correct?
13         A.   I do now.
14         Q.   You do now?
15         A.   Yes.
16         Q.   And you also understand that according
17    to Ms. Anderson, Russell Montgomery also killed
18    Tameka Means?
19         A.   Yes, I do that now.
20         Q.   Okay.  And according to Ms. Anderson,
21    you know today that she claims in 1997 she learned
22    that Russell killed Tameka Means?
23         MR. RUSS:  Objection to form.  I don't -- I
24    can't follow these multiple people --
25    multiple-party questions about who knew what or who
```



```
 1                    Raniero Masecchia
 2    said what, so that's why I'm objecting.
 3          BY MR. BRUSTIN:
 4          Q.   Okay.  So Paul Pope, you understand
 5    that Paul Pope is the murder -- is one murder
 6    victim, right?
 7          A.   Yes.
 8          Q.   And you remember that case, at least
 9    generally?
10          A.   Generally.
11          Q.   Okay.  And Tameka Means --
12          A.   I remember the name.
13          Q.   And Tameka Means was another murder
14    victim?
15          A.   Yes.
16          Q.   Tameka Means was killed approximately a
17    year before Paul Pope?
18          A.   Okay.
19          Q.   You were the lead investigator in the
20    Tameka Means investigation?
21          A.   One of them, yes.
22          Q.   All right.  And you understand today
23    that Wymiko -- Wymiko Anderson came in after Epps
24    had been convicted?
25          A.   Okay.
```



```
1                   Raniero Masecchia

2          MR. ROMO:  Wymiko.

3          BY MR. BRUSTIN:

4          Q.   Wymiko, I'm sorry.  Wymiko Anderson

5     came in after Epps had been convicted --

6          A.   Okay.

7          Q.   -- and claimed that her boyfriend,

8     Russell Montgomery, killed Paul Pope.

9          A.   I do -- I know that now, yes.

10         Q.   Okay.  And you understand that

11    according to Wymiko Anderson, Paul Pope, her

12    boyfriend, told her in 1997 that Russell Montgomery

13    actually killed Tameka Means, that's what she's

14    claiming today.

15         A.   That's what she's claiming?

16         Q.   Yes.

17         A.   Okay.

18         Q.   And according to Wymiko Anderson, you

19    know that today, she claims that when she came to

20    the precinct, the homicide office, in April of 1998

21    and reported that Russell Montgomery killed Paul

22    Pope, she claims that she also told the detectives

23    who interviewed her that Russell Montgomery killed

24    Tameka Means, correct?  You know that's what she

25    claims today?
```



1                        Raniero Masecchia

2          A.    That that's what she claims?

3          Q.    Right.

4          A.    Yes.

5          Q.    And it's your testimony that you never

6    learned that information at that time, correct?

7          A.    Correct.

8          Q.    Either she's lying and never provided

9    that information to the detectives, or she provided

10   that information to the detectives and they never

11   told you, correct?

12         A.    Correct.

13         MR. RUSS:   Objection to form.

14   BY MR. BRUSTIN:

15         Q.    One or the other, correct?

16         A.    Correct.

17         Q.    But what you're certain about is that

18   that information was never provided to you?

19         A.    Correct.

20         Q.    And we also know that although you

21   weren't present for the interview, you were outside

22   the interview room when she was being interviewed,

23   correct?

24         MR. RUSS:   Objection to --

25         THE WITNESS:   Probably at --



```
 1                    Raniero Masecchia

 2          MR. RUSS:  -- form.

 3          THE WITNESS:  -- my desk is outside the

 4   interview room.

 5          BY MR. BRUSTIN:

 6          Q.   You, along with a few other detectives?

 7          MR. RUSS:  Objection to form.

 8          MR. BRUSTIN:  Now, let's take a look at --

 9   let's mark these two exhibits.  So I want to mark

10   as exhibit -- what number are we on, please?

11          THE REPORTER:  8.

12          MR. RUSS:  8.

13          MR. BRUSTIN:  Give me 43 first.  43 and 107.

14          So let's -- let's mark for identification as

15   Plaintiff's 8 and Plaintiff's 9 these two

16   documents.

17          This is Plaintiff's 8 and this is

18   Plaintiff's 9.  That's 8, that's 9.

19          MR. SOEHNLEIN:  I'm sorry.  This one's 9?

20          MR. BRUSTIN:  Yep, this is 8.

21          MR. SOEHNLEIN:  Okay.

22          MR. BRUSTIN:  There we go.

23          THE REPORTER:  And do you think we could

24   take a break?

25          MR. BRUSTIN:  Sure.  Why don't we take a
```



1              Raniero Masecchia

2    break right now and you can mark these and we'll

3    come back.

4         THE VIDEOGRAPHER:  Okay.  Going off the

5    record.  Time is 1556.

6         (A recess was then taken at 3:56 p.m.)

7    The following were marked for Identification:

8    PLF.'S EXH. 8        statement of Ms. Anderson

9    PLF.'S EXH. 9        handwritten notes

10        THE VIDEOGRAPHER:  All right.  Going back on

11   the record.  Time is 1604.

12        BY MR. BRUSTIN:

13        Q.   Okay.  I'm now showing you what's been

14   marked for identification as Plaintiff's 8 and

15   Plaintiff's 9, and these were formerly --

16   Plaintiff's 8 was formerly Exhibit 43 in the Epps

17   depositions, and exhibit -- Exhibit 9 was formerly

18   Exhibit 107 -- or is also Exhibit 107 in the Epps

19   deposition.  Okay?

20        A.   Okay.

21        Q.   So you were shown these documents --

22        A.   Okay.

23        Q.   -- these documents are part of the Epps

24   case.  Okay?

25        So, first of all, if you take a look at --



1                   Raniero Masecchia
2          MR. RUSS:  So just so I'm clear, are you
3     representing that he was shown these exhibits
4     during his testimony in the Epps case?
5          MR. BRUSTIN:  I'm pretty sure.  I'll have to
6     double-check.  I think at least one or -- maybe
7     both, but I think both.  It's in my notes
8     somewhere.
9          MR. RUSS:  Well, I'd ask you to check
10    because it makes a difference.  I mean, if this is
11    something --
12         MR. BRUSTIN:  I don't --
13         MR. RUSS:  -- that he testified --
14         MR. BRUSTIN:  If it --
15         MR. RUSS:  -- about --
16         THE REPORTER:  Hang --
17         MR. RUSS:  -- you're entitled to ask him
18    about it.
19         MR. BRUSTIN:  If it makes --
20         MR. RUSS:  If this is something that is
21    Monell evidence on -- something from that case that
22    he didn't do, I'm not --
23         MR. BRUSTIN:  This is exactly --
24         MR. RUSS:  -- going to let him answer.
25         MR. BRUSTIN:  -- what we just talked about.



```
1                     Raniero Masecchia
2    So exhibit -- exhibit -- so Exhibit 8 is the
3    written statement that was in the file.
4            THE WITNESS:  The written one?
5            BY MR. BRUSTIN:
6            Q.    Exhibit 8.
7            A.    Oh, the typed one?
8            Q.    Yes.  This is the April 17th, 1998
9    statement that I was just asking you about.  This
10   is the Q and A that was conducted by Stambach and
11   Giardina when you were outside in the homicide
12   office.  Okay?
13           A.    Okay.
14           Q.    And do you recall reviewing this in
15   connection with the Epps case?
16           A.    I don't.
17           Q.    All right.  But you do recognize that
18   as what I just described, it's the April 17th
19   interview where you were present in the office but
20   not in the room?
21           A.    I believe so, but I really don't recall
22   this.
23           Q.    Okay.  In any case, you would agree
24   that there's no mention in this document of --
25   of -- I'll represent to you that this is in fact
```



1                    Raniero Masecchia

2    what was produced as the Q and A for the event you

3    described.  This is the April 17th statement that

4    was in the file.  Okay?

5            A.    Okay.

6            Q.    Where you said you were not in the room

7    but you were in fact in the office, this is when

8    she came in and talked about Paul Pope -- the Paul

9    Pope murder and it was done by Russell Montgomery,

10   her boyfriend.  Okay?

11           A.    Okay.

12           Q.    And if you take a look at this, you can

13   see that there is absolutely no mention of Russell

14   Montgomery committing the Tameka Means murder,

15   correct?

16           MR. RUSS:  Okay.  Don't answer that.  He

17   also said that he didn't review this for the Epps

18   testimony and that he doesn't remember it.  I think

19   now you're asking him --

20           MR. BRUSTIN:  So take --

21           MR. RUSS:  -- stuff that --

22           MR. BRUSTIN:  -- a minute --

23           MR. RUSS:  -- takes him beyond his own

24   involvement into the Monell --

25           MR. BRUSTIN:  So let me --



```
 1                    Raniero Masecchia
 2          MR. RUSS:  -- territory so he's not going to
 3   answer anything --
 4          MR. BRUSTIN:  You know what?
 5          MR. RUSS:  -- about that.
 6          MR. BRUSTIN:  You need to -- to slow down.
 7   First of all, review this and tell me if you think
 8   it's -- I've accurately described it, if this is in
 9   fact -- because you were present for this.
10          THE WITNESS:  I wasn't.  I wasn't in the
11   room.
12          MR. RUSS:  He was not.
13          BY MR. BRUSTIN:
14          Q.  Sir, I think you've --
15          MR. RUSS:  You've asked him eight times.
16          MR. BRUSTIN:  Hold on.  Let me finish.
17          BY MR. BRUSTIN:
18          Q.  You've told us already that you were in
19   the homicide office when she was being interviewed
20   in the room, correct?
21          A.  Correct.
22          Q.  All right.  Now, just review this and
23   see if you believe this is the statement that they
24   took when you were in the homicide office?
25          MR. RUSS:  Objection to form.  You can do
```



```
 1                    Raniero Masecchia
 2    that.
 3         MR. BRUSTIN:  That's all I'm asking.
 4         MR. RUSS:  It's a yes-or-no question.
 5         THE WITNESS:  I don't recall.
 6         BY MR. BRUSTIN:
 7         Q.   Well, look at it.
 8         A.   I don't know.
 9         MR. RUSS:  He doesn't know.
10         BY MR. BRUSTIN:
11         Q.   Have you looked at it?
12         MR. RUSS:  Move on.
13         THE WITNESS:  I did.
14         BY MR. BRUSTIN:
15         Q.   Okay.  So you can't -- you can't tell
16    me despite your involvement in the Epps -- in
17    the -- as a defendant in the Epps case, you can't
18    tell me --
19         MR. RUSS:  He wasn't a defendant in -- oh.
20    In the new case, okay.
21         BY MR. BRUSTIN:
22         Q.   You can't tell me whether or not this
23    was the purported statement from Stambach the day
24    you were in the outside office?
25         A.   There's no time on it.  I don't know.
```



```
 1                      Raniero Masecchia
 2   I mean, was I in the office that day?  Quite
 3   possibly, yes.
 4        Q.   All right.  According to
 5   Ms. Anderson --
 6        A.   Okay.
 7        Q.   -- during that interview when she began
 8   talking to the detectives about Russell
 9   Montgomery's involvement in the Means murder --
10        A.   Okay.
11        Q.   -- they left the room for a number of
12   minutes and came back with photographs.
13        First of all, I take it that you deny any
14   knowledge of that; is that -- is that correct?
15        A.   I deny any recollection of that.
16        Q.   All right.  Now, certainly, you would
17   agree that to the -- well, I thought you denied and
18   now -- let me make sure I understand.
19        You deny Stambach or Giardina reporting to
20   you that day that Ms. Anderson had provided
21   information on the -- on the Meaks murder, correct?
22        A.   I have no recollection of that at all.
23        Q.   All right.  So I want to make sure I
24   understand.  Are you saying that didn't happen or
25   you don't remember whether that happened or not?
```



1                    Raniero Masecchia

2          A.    I do not recall that at all.

3          Q.    So that's a little different.  I want

4    to make sure I'm giving you -- I want to make sure

5    I'm giving you the chance to answer this properly.

6          MR. RUSS:  He's answered it five times the

7    same way.

8          BY MR. BRUSTIN:

9          Q.    Are you telling me that it may have

10   happened and you don't remember it, or are you

11   saying it never happened?

12         MR. RUSS:  Objection to form.

13         THE WITNESS:  I do not recall that at all.

14         BY MR. BRUSTIN:

15         Q.    All right.  Well, first of all, to the

16   extent that you were made aware that Ms. Anderson

17   had provided information that Cory -- that Russell

18   Montgomery and not Cory Epps committed the Meaks

19   murder, you had an obligation to ensure that that

20   information was investigated, correct?

21         MR. RUSS:  Objection to form.  You may

22   answer.

23         THE WITNESS:  At that time --

24         BY MR. BRUSTIN:

25         Q.    Yes, sir.



RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
321

```
 1                    Raniero Masecchia
 2         A.    -- if that were to --
 3         Q.    Yes, sir.
 4         A.    -- if that were to happen, yes, I
 5   believe so.
 6         Q.    Are you not certain?
 7         A.    I said yes.
 8         Q.    Well, you said you believe so, that
 9   suggests you weren't certain.  Would you agree --
10         MR. RUSS:  Objection to form.
11         THE WITNESS:  Yes.
12         BY MR. BRUSTIN:
13         Q.    Okay.  You would have an obligation to
14   document it and make sure that it was fully
15   investigated, correct?
16         MR. RUSS:  Objection to form.  Go ahead.
17         THE WITNESS:  Yes.
18         BY MR. BRUSTIN:
19         Q.    Now, according to Ms. Anderson, when
20   she began talking about Russell Montgomery's
21   involvement in the Meaks homicide, the officers
22   stopped typing and failed to write down the
23   information she provided to them.
24         Now, first of all, you claim not to have any
25   knowledge of that happening, correct?
```



1                     Raniero Masecchia

2          A.    Yes.

3          Q.    But you would agree that at that time

4    the process by which statements were taken would be

5    that the officers would be typing the statement as

6    she was reporting it to them?

7          A.    Correct.

8          MR. SOEHNLEIN:  Objection as to --

9          MR. RUSS:  All right.  That's it.

10         MR. SOEHNLEIN:  -- form.

11         MR. RUSS:  All right.  I object to the form.

12   You answered.  Move on.

13         BY MR. BRUSTIN:

14         Q.    Now --

15         MR. RUSS:  You're pretty close to the line.

16         BY MR. BRUSTIN:

17         Q.    -- according to -- now, by the way,

18   based on your understanding of the Pope -- you

19   understand that Pope was convicted based on, among

20   other things, the testimony of -- I'm sorry.

21         You understand that Russell Montgomery was

22   convicted for killing Pope based on large part on

23   the testimony of Wymiko Anderson, correct?

24         A.    I am now.

25         Q.    Okay.  And would it be fair to say



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                      323

```
 1                    Raniero Masecchia
 2   that, to your knowledge, nobody questioned the
 3   veracity -- withdrawn.
 4            To your knowledge, when Ms. Anderson
 5   provided a statement indicating that her boyfriend
 6   killed Pope, there was no reason to believe that
 7   that information was false?
 8            MR. RUSS:  Objection to the form.  Don't
 9   answer it.  You can ask him what he did, what he
10   saw, who he spoke to, what he was told, but you
11   can't ask him about what other people did.  That's
12   Monell and I feel very confident in my objection.
13            BY MR. BRUSTIN:
14            Q.   All right.  Now, according to
15   Ms. Anderson, she was asked during that interview
16   to take a polygraph exam when she provided
17   information about the Means murder; I take it that
18   you deny any knowledge of that, correct?
19            A.   Yes.
20            Q.   So, in other words, to the extent that
21   she said that in that room, Stambach and the other
22   officer never -- never told you about it?
23            A.   No.
24            Q.   All right.  But you do agree that that
25   was a tool at the time that was used when witnesses
```



 1                    Raniero Masecchia

 2   provided information that officers had questions

 3   about?

 4           MR. RUSS:  Objection to form.  Go ahead.

 5           THE WITNESS:  One of the tools that could be

 6   used, yes.

 7           BY MR. BRUSTIN:

 8           Q.   All right.  Let's take a look at what

 9   we marked as -- did we mark -- did we mark the --

10   his Epps deposition?

11           MR. ROMO:  Yeah.

12           MR. RUSS:  7.

13           MR. ROMO:  7.

14           MR. BRUSTIN:  Do you have my copy of it?  I

15   have it here.

16           BY MR. BRUSTIN:

17           Q.   So take a look at Exhibit 7, if you

18   would, and take a look at page 62.  I'm going by

19   the page numbers on the right top corner.

20           A.   52?

21           Q.   62.

22           A.   Okay.

23           MR. BRUSTIN:  That's the wrong document.

24   Where's 85?

25           Let's mark this as Exhibit 10.  Thank you.



1                    Raniero Masecchia

2    The following was marked for Identification:

3     PLF.'S EXH. 10        Raniero Masecchia's

4                          testimony post-trial

5         MR. RUSS:  Thank you.

6         BY MR. BRUSTIN:

7         Q.    Here you go.

8         Mr. Masecchia?

9         A.    Oh, I'm sorry.

10        Q.    Now, I will represent to you that this

11   is testimony that you gave in post-trial

12   proceedings in the Epps case --

13        A.    Post?

14        Q.    -- so after --

15        A.    Post?

16        Q.    Post, post-trial.

17        MR. SAHASRABUDHE:  Do we have a date?

18        MR. BRUSTIN:  The date's not on here.  I

19   don't have the date.

20        MR. SAHASRABUDHE:  Okay.  I think there were

21   three -- there was a 330 and a 440.  So --

22        MR. BRUSTIN:  I just can't remember which

23   one it is.  I don't have it.

24        BY MR. BRUSTIN:

25        Q.    But do you recall giving testimony in



```
 1                    Raniero Masecchia
 2  the Epps case post-conviction?
 3          A.    No.
 4          Q.    Does this appear to be your testimony?
 5          A.    Yes.
 6          Q.    Take a look at page -- you know what,
 7  why don't you do this:  Why don't you read to
 8  yourself, beginning on line 23 on page 60 through
 9  page 62, line 8.  Okay?  Let me know when you're
10  done.
11          A.    Number 8?
12          Q.    So page 60, line 23, to page 62,
13  line 8.  About a page and a half.
14          A.    Okay.
15          I'm sorry.  I might be on the wrong page.
16  60?
17          Q.    60.
18          MR. RUSS:  60.  So read from the bottom --
19  60.
20          THE WITNESS:  I just want to make --
21          BY MR. BRUSTIN:
22          Q.    60, line 23.
23          A.    60.
24          MR. RUSS:  Down here at the bottom.
25          THE WITNESS:  Line 23.
```



RANIERO MASECCHIA                          March 15, 2022
DIXON vs CITY OF BUFFALO                              327

```
 1                    Raniero Masecchia

 2          BY MR. BRUSTIN:

 3          Q.   To page 62, line 8.

 4          A.   Okay.

 5          Q.   All right.  Now, does -- this is your

 6   testimony, correct?

 7          A.   Yes.

 8          Q.   And does this refresh your recollection

 9   about testifying in post-conviction proceedings

10   regarding Cory Epps?

11          A.   I don't recall.

12          Q.   Okay.

13          A.   I don't recall.

14          Q.   Fair enough.

15          A.   But it's in here.  I testified and

16   that's what I said.

17          Q.   Okay.  And you -- obviously, when you

18   testified you were doing your best to tell the

19   truth?

20          A.   Absolutely.

21          Q.   Okay.  And according to this

22   testimony -- well, does this refresh your

23   recollection that in fact sometime after April 7th

24   you had interaction with Ms. Anderson concerning

25   the Epps case?
```



1                      Raniero Masecchia

2          MR. RUSS:  Objection to form.  You may

3    answer.

4          THE WITNESS:  Okay.  This refreshes my

5    memory to the fact that I must have talked to her.

6          BY MR. BRUSTIN:

7          Q.    Okay.

8          A.    Because I stated this.  This had to be,

9    what, a year or two after the homicide?

10         Q.    Yes.

11         A.    I had a better recollection back

12   then --

13         Q.    Okay.

14         A.    -- than 25 years later.

15         Q.    Okay.

16         MR. RUSS:  So did I.

17         BY MR. BRUSTIN:

18         Q.    So pursuant to this document, this

19   testimony --

20         A.    Yeah.

21         Q.    -- in fact, you did at a later date

22   after April 17th, the date I showed you on that

23   report, sometime later after the anonymous letter

24   came out, you did speak to Ms. Anderson in

25   courtroom number 10, in part 10, and you told her



RANIERO MASECCHIA
DIXON vs CITY OF BUFFALO

March 15, 2022
329

```
 1              Raniero Masecchia
 2    that the admission from Pope -- that Russell
 3    Montgomery killed Tameka Meaks was hearsay,
 4    correct?
 5         MR. RUSS:  Does that refresh your
 6    recollection; is that what you're asking him?
 7         MR. BRUSTIN:  Yeah.
 8         THE WITNESS:  It doesn't, but it had to
 9    happen.
10         BY MR. BRUSTIN:
11         Q.    Okay.  So in other words, you don't
12    dispute that based on this testimony --
13         A.    Right.
14         Q.    -- you don't dispute that sometime
15    after April 17th when you became aware of the
16    anonymous letter and that Ms. Anderson wrote it,
17    you did speak to her outside a courtroom and you
18    told her that the admission from Pope was hearsay
19    and couldn't be used, correct?
20         A.    If that's what I said in here, that's
21    correct.
22         Q.    Okay.  Any idea why you would have said
23    that to her?
24         MR. RUSS:  Objection to form.
25         THE WITNESS:  Maybe because it was
```



```
 1                    Raniero Masecchia
 2    hearsay --
 3         BY MR. BRUSTIN:
 4         Q.    Okay.
 5         A.    -- and it probably couldn't be used.
 6         Q.    Okay.  Certainly --
 7         A.    I might have talked to the DA.
 8         Q.    Okay.  Certainly --
 9         A.    I know I talked to her defense
10    attorney.
11         Q.    All right.  The fact that it was
12    hearsay and couldn't be used on its own didn't mean
13    it wasn't important information to investigate,
14    correct?
15         MR. RUSS:  Objection to form.
16         THE WITNESS:  No, that's correct.
17         MR. SOEHNLEIN:  Objection to form.
18         BY MR. BRUSTIN:
19         Q.    Okay.
20         A.    Excuse me.
21         Q.    Now, I take it that once you did learn
22    that Ms. Anderson was claiming that Russell
23    Montgomery killed Tameka Means and not Epps, the
24    person being convicted, that must have caused you
25    great concern?
```

