# EXHIBIT  5

VIDEO DEPOSITION
JOHN THOMAS VICKERD


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------
VALENTINO DIXON,

                         Plaintiff,

                - vs -       Case No.
                             1:19-cv-01678-WMS

CITY OF BUFFALO and COUNTY OF ERIE;
and DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA, DETECTIVE
JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN, JOHN DOES,
Unknown Buffalo Police Department Supervisors,
and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
BELLING, in their individual capacities,

                         Defendants.
-----------------------------------------


        Video recorded deposition of JOHN THOMAS

VICKERD Defendant, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of

HODGSON RUSS LLP, The Guaranty Building, 140 Pearl

Street, Suite 100, Buffalo, New York, on March 24,

2022, commencing at 10:08 a.m., before ANDREA J.

HOBBS, Notary Public.



```
 1

 2   APPEARANCES:        NEUFELD SCHECK & BRUSTIN, LLP,
                         By NICK BRUSTIN, ESQ.,
 3                       nick@nsbcivilrights.com,
                         GERARDO ROMO, ESQ.,
 4                       gerardo@nsbcivilrights.com,
                         SONA H. SHAH, ESQ., and
 5                       sona@nsbcivilrights.com,
                         99 Hudson Street,
 6                       8th Floor,
                         New York, New York  10013,
 7                       (212) 965-9081,
                         Appearing for the Plaintiff,
 8                       via Zoom.

 9                       HODGSON RUSS LLP,
                         By HUGH M. RUSS, III, ESQ.,
10                       The Guaranty Building,
                         140 Pearl Street, Suite 100,
11                       Buffalo, New York  14202,
                         (716) 856-4000,
12                       hruss@hodgsonruss.com,
                         Appearing for the Defendants,
13                       City of Buffalo; Detective
                         Mark R. Stambach, Detective
14                       Raniero Masecchia, Detective
                         James P. Lonergan, Detective
15                       John Vickerd, Chief Richard T.
                         Donovan, and John Does, Unknown
16                       Buffalo Police Department
                         Supervisors.
17
                         LIPPES MATHIAS WEXLER FRIEDMAN LLP,
18                       By JENNIFER C. PERSICO, ESQ.,
                         50 Fountain Plaza, Suite 1700,
19                       Buffalo, New York  14202,
                         (716) 853-5100,
20                       jpersico@lippes.com,
                         Appearing for the Defendants,
21                       County of Erie and
                         Assistant District Attorney
22                       Christopher Belling.

23   PRESENT:            MOISES SOTO-BRITO, Paralegal,
                         Neufeld Scheck & Brustin, LLP
24
                         TYLER Z. RAHNER, Videographer
25
```



```
 1                       John Vickerd

 2           THE VIDEOGRAPHER:  This will begin the

 3   video-recorded testimony of John Vickerd, taken for

 4   a case to be tried in the United States District

 5   Court, Western District of New York, to be used in

 6   the matter of Valentino Dixon versus City of

 7   Buffalo and County of Erie, et al.

 8           This testimony is taking place at the office

 9   of Hodgson Russ LLP, 140 Pearl Street, Buffalo, New

10   York, on March 24th, 2022, and is commencing at the

11   time of 10:08, as indicated on the video screen.

12           The court reporter and notary public, who is

13   from Esquire Deposition Solutions is Andrea Hobbs.

14   My name is Tyler Rahner, I'm the video technician,

15   and I am with the same firm.

16           Counsel for the plaintiff will now introduce

17   themself, followed by counsel for the defendants,

18   and the reporter will then swear in the witness.

19           MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &

20   Brustin for the plaintiff, Valentino Dixon.  I'm in

21   New York City.

22           MR. RUSS:  Hugh Russ from Hodgson Russ.  We

23   represent the witness today and the City of Buffalo

24   defendants in the case.

25           MS. PERSICO:  Jennifer Persico from Lippes
```



```
 1                     John Vickerd
 2   Mathias.  We represent the county defendants in
 3   this case.
 4        THE REPORTER:  Will the billing be the same
 5   as the previous depositions?
 6        MR. RUSS:  Yes, please.
 7        MS. PERSICO:  Yes.
 8        THE REPORTER:  Okay.  Any stipulations?
 9        MR. BRUSTIN:  No.
10        MR. RUSS:  I think Nick chooses not.
11        THE REPORTER:  Okay.
12
13   JOHN THOMAS VICKERD, 195 Roycroft Circle, East
14   Aurora, New York  14052, after being duly called
15   and sworn, testified as follows:
16                     EXAMINATION
17        BY MR. BRUSTIN:
18        Q.   Good morning, sir.
19        A.   Good morning.
20        Q.   Can you see me okay?
21        A.   Yes.
22        Q.   Okay.  Do you -- do you prefer
23   Mr. Vickerd or do you prefer Detective Vickerd?
24        A.   You can call me Jack if you want.
25        Q.   Can't do that.  Do you have a
```



```
 1                      John Vickerd
 2  preference or no?
 3          A.   No, not really.
 4          Q.   All right.  I'll go with Mr. Vickerd.
 5  You are retired, correct?
 6          A.   Yes.
 7          Q.   Okay.  Mr. Vickerd, have you ever had
 8  your deposition taken before?
 9          A.   Not that I'm aware of, no.
10          Q.   Have you ever been named as a defendant
11  in a civil lawsuit like this?
12          A.   No.
13          Q.   You do understand that you are a
14  defendant in this case, correct?
15          A.   Yes.
16          Q.   All right.  I'm sure that you've spoken
17  to your attorneys about the process here, but let
18  me just explain it from my perspective.
19          I'm going to be asking you a series of
20  questions today and you're going to be answering
21  them under oath.  Do you understand that?
22          A.   Yes.
23          Q.   And do you understand that the oath
24  you've taken here today is the same oath, you're
25  testifying of the same penalty of perjury as if you
```



```
 1                     John Vickerd
 2   were in a courtroom?
 3        A.   Yes.
 4        Q.   If -- if at any time, sir, you don't
 5   understand my question or any part of my question,
 6   please tell me and I will rephrase it.
 7        If you do answer my question, I'm going to
 8   assume you understood it.  Is that fair?
 9        A.   Yes.
10        Q.   If you want to take a break, that's
11   fine, any time you want.  I would just ask that you
12   please answer the question pending before taking a
13   break.  Okay?
14        A.   Yes.
15        Q.   The other thing is, from time to time
16   you're going to hear some objections from your
17   attorney and some of the other attorneys.  That is
18   just for the record.
19        But what I would ask you to do is to please
20   pause after I asked a question so to give an
21   opportunity to object if they want, make sure the
22   court reporter can get it down before you answer.
23   Okay?
24        A.   Yes.
25        Q.   Unless your attorney instructs you not
```



```
 1                    John Vickerd
 2   to answer, you can also answer my question despite
 3   the objection.  Okay?
 4        A.   Yes.
 5        Q.   All right.  Let's start with some basic
 6   stuff.  Why don't we start with what you did to
 7   prepare yourself for this deposition.
 8        First of all, do you remember when you
 9   received the -- the complaint laying out the
10   allegations in this case against you and other
11   defendants?
12        A.   I do.
13        Q.   Okay.  And I take it you read that?
14        A.   Yes, I did.
15        Q.   And obviously you told us you've never
16   been a defendant in a civil case so obviously when
17   you read it, you saw that the -- there were very
18   serious allegations against you and other -- and
19   other detectives, correct?
20        A.   Yes.
21        Q.   And since that time, have you met with
22   your attorneys to prepare for today?
23        A.   Just today.
24        Q.   Okay.  So -- and by the way, when I say
25   meeting, what I mean by that is either meeting in
```

1                   John Vickerd

2    person and discussing things in person or also a

3    telephone call where you discuss something more

4    substantive than just things like scheduling.

5    Okay?

6          A.   Yes.  Okay.

7          Q.   Okay.  So first of all, did -- did

8    you -- did you meet with -- the first time you --

9    you spoke to your attorneys about the case

10   substantively was today?

11         A.   Mr. Peter Sahasra would call me from

12   this firm and set up an appointment for -- and I

13   told him I was going on vacation and that we would

14   set up a time that I would be available and that's

15   today.

16         Q.   Okay.  So I'm not -- I'm not allowed to

17   ask you about the conversations you had with your

18   attorney.

19         But I am allowed to ask you questions around

20   it.  How long they -- how long it took, who was

21   there, things like that.

22         So have you had any talks with any -- any of

23   your attorneys, with Peter or with you or anybody

24   else, more than just about scheduling prior to

25   today?



1                         John Vickerd

2          A.    No.   I would -- I would refer to Peter

3    and I told him that I have a short-term memory,

4    possibly some dementia, and that I don't know

5    what -- how I could help.

6          Q.   I'm sorry about that, sir.   I wish I

7    had known that before today.   So let's -- let's

8    talk about that for me.

9          I -- because I don't want to do anything

10   that's not going to be -- well, let's -- let's take

11   it a step at a time.

12         First of all -- and I should have started

13   with this, I apologize.   Tell me about your health

14   issues.

15         You said that you believe that you -- you

16   suffer from dementia, you've been diagnosed with

17   that?

18         A.    I haven't been diagnosed.   We're trying

19   to set up an appointment with John Hopkins

20   University, my wife and I, and for me to go there.

21         It could be vertigo, it could be my general

22   practitioner tells me that I have possibly anxiety

23   and depression and we're still working on that.   I

24   get dizzy spells every once in a while and I'm

25   here.



```
 1                      John Vickerd
 2         Q.    Okay.  So and I -- I got to ask you a
 3   few more questions about it.  So first of all, do
 4   you have any diagnoses right now of -- of any kind?
 5         A.    Only that I know what happens to
 6   myself.  I do -- I do get dizzy on a daily basis,
 7   lightheaded, and I have very short-term memory.
 8         Q.    Okay.  When you say you have short term
 9   memory, does that mean that you have problems with
10   your short-term memory or does that mean you have
11   problems with your long-term memory or both?
12         A.    No, my long-term memory seems fine.
13   And it's within the last several years is -- is
14   what I'm talking about with my short-term memory.
15         Q.    Okay.  So you're not able to remember
16   things from up to a couple of years ago; is that
17   right?
18         A.    Oh, more than that.
19         Q.    Okay.  But you are able to remember
20   things from more than, say, five years ago?
21         A.    It depends.  Some -- some things I
22   remember and some -- some -- some things stick and
23   some things don't.
24         Q.    Okay.  When did your memory problems
25   begin?
```



```
 1                       John Vickerd
 2        A.    Probably a few years ago that I really
 3   noticed it.
 4        Q.    Okay.  And just -- if you could just
 5   generally tell me what you've noticed about how
 6   your memory has changed in the last couple of
 7   years.  What kinds of things are happening?
 8        A.    The things that are happening are I
 9   would be places that I've been to before that I
10   have no recollection of being.
11        Different restaurants, different
12   sightseeing, different interviews or conversations
13   with my friends or family.  And I don't have any
14   recollection of a lot of it and some of it sticks.
15        Q.    Okay.  Are you -- are you -- have you
16   been diagnosed with any -- with any type -- with
17   depression or any related issues, anxiety, anything
18   like that?
19        A.    Just from my family doctor which I told
20   you he -- he mentioned that he thinks I have
21   anxiety and depression.
22        Q.    Okay.  And how old are you, sir?
23        A.    I'm 76.
24        Q.    Have you taken any medications for your
25   memory issues or for your depression?
```



```
 1                    John Vickerd
 2        A.   No.  I take a multivitamin and B12
 3   folate and D3.
 4        Q.   Okay.  And you mentioned that you're --
 5   you're scheduled to get an examination, a
 6   neurologist examination at Johns Hopkins?
 7        A.   At what -- what campus?
 8        Q.   I -- I thought you said you're --
 9   you're going to Johns Hopkins for a neurological
10   assessment?
11        A.   We're trying to set up an appointment
12   with John Hopkins.  Hopefully -- I know they were
13   at least a month out and I haven't set up a
14   specific date yet.
15        Q.   But you have a referral there?
16        A.   Yes.
17        Q.   Do you know the doctor you're going to
18   be seeing there?
19        A.   No, I don't.
20        Q.   But it's specifically to assess your
21   memory issues?
22        A.   Yes.
23        Q.   Okay.  Any other health issues that you
24   think in any way might affect your ability to
25   testify here today?
```



```
 1                    John Vickerd
 2        A.   No.
 3        Q.   Are you taking any other kinds of
 4  medications other than a multivitamin?
 5        A.   No, I'm not.
 6        Q.   Okay.  So if you can, and you may not
 7  be able to do this, if you think you are having a
 8  memory issue and you're -- and are just not sure
 9  about something, if you could tell me that, that
10  would be much appreciated.
11        A.   Thank you.
12        Q.   So, for example, when I asked -- when I
13  ask you whether or not you met with your attorneys,
14  if you think you met with them but you don't
15  remember, please tell me that.
16        Does that make sense?
17        A.   Yes.
18        Q.   Okay.  So prior to today, have you met
19  with your attorneys to talk about the issues in
20  this case and the allegations against you?
21        A.   No.
22        Q.   Okay.  You believe the first meeting
23  that you had with them to talk substantively was
24  today?
25        A.   Yes.
```



```
 1                     John Vickerd
 2        Q.   Okay.  And who was present for that
 3   meeting?
 4        A.   Myself, Peter Sahasra, and Mr. Russ.
 5   Yes.
 6        Q.   Okay.  And is that the first time you
 7   discussed your memory issues was today?
 8        A.   No.  I've discussed them with
 9   Mr. Sahasra on the phone.
10        Q.   How long ago?
11        A.   Several times.
12        Q.   Within the last -- perhaps as long as a
13   year ago?
14        A.   Less than a year ago.  Since I was
15   notified that this case was going to be going on.
16        Q.   Okay.  And would it be fair to say that
17   one of the things that sometimes helps with your
18   memory issues is to look at things that help your
19   memory like pictures or documents, writings,
20   things -- things like that?  Does that sometimes
21   help your memory?
22        A.   Sometimes.
23        Q.   Okay.  And the only way you know that
24   is to take a look at it and see if it helps your
25   memory, right?
```



```
 1                    John Vickerd
 2          A.    Correct.
 3          Q.    And so let's talk about what you did
 4   to -- first of all, you -- I take it that you take
 5   this matter very seriously.  Is that fair to say?
 6          A.    Yes.
 7          Q.    You've been accused of engaging in
 8   intentional misconduct that caused an innocent man
 9   to go to prison, correct, that's the allegation?
10          A.    That's the allegation, yes.
11          Q.    Okay.  And you understand now as you
12   sit here today -- I take it you follow the news.
13   Do you live in Buffalo?
14          A.    I live in south of Buffalo in East
15   Aurora.
16          Q.    But you watch the Buffalo news and
17   you -- and you get Buffalo papers, that kind of
18   thing?
19          A.    Yes.
20          Q.    And I take it you followed the news
21   when Mr. Val -- when Mr. Dixon was exonerated?
22          A.    Not really, no.
23          Q.    No?
24          A.    I pick up a Sunday paper and I don't
25   think I've ever seen his name mentioned in the
```



```
 1                      John Vickerd

 2   paper.

 3          Q.   You don't remember learning that

 4   Mr. Dixon was exonerated after spending more than

 5   20 years in prison?

 6          MR. RUSS:  Objection to form.  You may

 7   answer.

 8          THE WITNESS:  No.

 9          BY MR. BRUSTIN:

10          Q.   You don't remember ever learning that?

11          A.   No.

12          MR. RUSS:  Objection to form.  You may

13   answer.

14          THE WITNESS:  No.

15          BY MR. BRUSTIN:

16          Q.   Am I the first person to tell you that

17   Mr. Dixon was -- his conviction was reversed and he

18   was released from prison?

19          A.   From other detectives that I used to

20   work with many years ago, I -- I learned that.

21          Q.   Okay.  And which detectives are those?

22          A.   Mr. Mark Stambach.

23          Q.   Who else?

24          A.   That would be about it.

25          Q.   Well, you said -- I thought I heard you
```



1                      John Vickerd

2  say detectives as opposed to detective plural.

3        Did you -- did you just mean -- just mean

4  one or were there others?

5        A.   Well, I know some of the detectives

6  that I worked with, but the person that would

7  mention that his conviction was overturned would

8  have been Mark Stambach.

9        Q.   All right.  And you also understand

10  today that LaMarr Scott has been convicted of the

11  murder for which Mr. Dixon served more than

12  20 years in prison, correct?

13        A.   I am aware of that today, yes.

14        Q.   Okay.  And you have no basis to

15  question that in fact LaMarr Scott who was

16  convicted of that crime, was in fact the person who

17  killed Torriano Jackson as opposed to Mr. Dixon,

18  correct?

19        MR. RUSS:  Objection to form.

20        MS. PERSICO:  Objection.

21        MR. RUSS:  You may answer.

22        THE WITNESS:  Not really, no.

23        BY MR. BRUSTIN:

24        Q.   In other words, you accept that

25  Valentino Dixon is innocent of that crime and



1                      John Vickerd

2    LaMarr Scott is guilty, correct?

3          MS. PERSICO:  Objection.

4          MR. RUSS:  Objection to form.  You may

5    answer.

6          THE WITNESS:  No.

7          BY MR. BRUSTIN.

8          Q.   You don't?

9          A.   No.

10         Q.   You think -- is it your position that

11   Valentino Dixon is guilty of killing -- of shooting

12   Torriano Jackson despite the fact that he is -- his

13   conviction was overturned, he was exonerated, and

14   LaMarr Scott was convicted of committing that

15   crime?

16         MS. PERSICO:  Objection.

17         MR. RUSS:  Objection to form.  You may

18   answer.

19         THE WITNESS:  There could have been variable

20   circumstances.  To whether they were the truth or

21   not the truth, I have no idea.  I know that he was

22   probably convicted under the -- the original

23   charges.

24         BY MR. BRUSTIN:

25         Q.   So as you sit here today, you believe



 1                    John Vickerd

 2   that in fact Valentino Dixon -- despite the fact

 3   that LaMarr Scott was convicted of the crime,

 4   despite the fact that Valentino Dixon was -- was --

 5   his conviction was reversed and he was exonerated

 6   for committing that -- of committing that murder,

 7   it's your position that Valentino Dixon shot and

 8   killed Torriano Jackson; is that correct, sir?

 9          MS. PERSICO:  Objection.

10          MR. RUSS:  Objection to form.  You may

11   answer.

12          THE WITNESS:  That, again, it was -- when --

13   when their conviction was -- not the conviction,

14   but the charges were originally brought forward, it

15   was back then that I -- I was told that Valentino

16   Dixon was the -- the shooter.

17          BY MR. BRUSTIN:

18          Q.   I'm -- I'm sorry, sir.  I'm -- and

19   maybe I wasn't being clear.  I'm asking you about

20   your view today.

21          Today do you accept as you sit here today --

22   not what you thought then, what you think today.

23   Do you accept that Valentino Dixon is innocent of

24   murdering Torriano Jackson and in fact LaMarr Scott

25   committed that murder?



```
 1                     John Vickerd

 2          MS. PERSICO:  Objection to form.

 3          MR. RUSS:  Objection to form.  You may

 4   answer.

 5          THE WITNESS:  No.  I -- I don't -- I don't

 6   know who did the shooting, what was -- my

 7   involvement in the -- in the conviction, and what I

 8   did during this investigation.

 9          BY MR. BRUSTIN:

10          Q.   What is your basis as you sit here

11   today to question whether or not LaMarr Scott is in

12   fact the shooter, the person who shot and killed

13   Torriano Jackson and wounded others, in light of

14   his criminal conviction for that crime?

15          A.   What I'm aware of is the first time I

16   remember hearing LaMarr Scott's name is today.

17          Q.   Okay.  And do you believe that that

18   is -- I'm going to ask you this, you do the best

19   you can with it.

20          Do you believe that is because of your

21   memory issues or do you believe that you in fact

22   never heard his name?

23          A.   I believe it was -- it's because of my

24   memory issues.

25          Q.   Fair enough.  What documents have you
```



1                      John Vickerd

2   reviewed in preparation for today?

3        A.   I didn't review any documents in

4   preparation for today.

5        Q.   Okay.  And when you came here today,

6   you under -- do you have any problems with -- given

7   your health conditions, do you have any problems

8   with reading?

9        A.   No, I can read.  Whether I remember and

10  memorize what I read would be another story, yes.

11       Q.   Okay.  But you have no problem reading,

12  right?

13       A.   No.

14       Q.   You -- what do you -- what kinds of

15  things do you read on a day-to-day basis?

16       A.   Basically a lot of -- a lot of

17  paperback books on Alzheimer's and dementia and a

18  couple short stories when I just came back from a

19  vacation and I would read short stories, fictitious

20  short -- short stories.

21       Q.   Do you read -- do you -- do you read

22  Outbreak News?

23       A.   I'll -- I'll get the Sunday paper and

24  I'll flick through it and basically what I'll do is

25  I'll go under where the obituaries are to see if



```
1                    John Vickerd

2   anybody has possibly passed away that I remember

3   the name and recollect the name and -- and I go

4   from there.

5           Q.   Okay.  And had you chosen to, sir,

6   would you have been capable of reviewing police

7   reports in this case to see if in fact it refreshed

8   your recollection?

9           A.   I believe that this was so long ago

10  that nothing could have refreshed my recollection

11  on this case.

12          Q.   Maybe I misunderstood, but I thought

13  what you told me earlier was that sometimes when

14  you review things from the past, it refreshes your

15  recollection and sometimes it doesn't.

16          Did I understand you correctly, sir?

17          A.   First of all, this is the first case to

18  get brought up since I've retired.  I spent

19  15 years with the district attorney's office after

20  my homicide, nine years in homicide.

21          And it was so long ago that I -- I haven't

22  recalled or looked at other -- any other cases or

23  brought -- brought forth any other cases to my

24  recollection, no.

25          Q.   And that's not what I've asked you,
```



1                         John Vickerd

2   sir.  Maybe I wasn't clear.  When I was asking you

3   general questions about your memory, one of the

4   things you told me is that sometimes when you look

5   at pictures or you look at writings from the past,

6   it sometimes refreshes your recollection about

7   things that happened long ago.

8          Didn't you tell me that, sir?

9          A.   Yes, I did.  But I didn't know you were

10  referring to specific cases or any other -- any

11  cases because they -- they were so long ago that

12  I -- I -- I wouldn't possibly be remembering.

13         Q.   All right.  Well, what -- what I think

14  you're telling me is, you haven't reviewed any old

15  cases in a long time.  Is that fair to say?

16         A.   That I can remember, no, I haven't.

17         Q.   All right.  And you -- and you don't

18  know one way or another whether reviewing an old

19  case, would refresh your recollection about what

20  happened during that case, correct?

21         A.   As my thought is as of today, no.

22  Because I can be shown pictures from a couple years

23  ago on a vacation or something and I don't remember

24  being in -- in a certain time and a certain place

25  ever.



```
 1                      John Vickerd

 2        Q.   Well, you correct me if I'm wrong.  But

 3   what it sounds like to me what you're describing as

 4   your memory issues, is that sometimes you remember

 5   things from years ago and sometimes you don't.  Is

 6   that accurate or not?

 7        A.   Yes.  But not in specific cases, no.  I

 8   haven't reviewed any of those or been --

 9        Q.   Okay.

10        A.    -- brought.

11        Q.   And my question is why didn't you do

12   that.  That's really what I'm asking.

13        MR. RUSS:  Objection to form.

14        BY MR. BRUSTIN:

15        Q.   The question is, do you think that if

16   you had reviewed police reports, news reports,

17   things like that, that might have refreshed your

18   recollection about this case?

19        MR. RUSS:  Objection to form.

20        MS. PERSICO:  Objection to form.

21        MR. RUSS:  You may answer.

22        THE WITNESS:  No.

23        BY MR. BRUSTIN:

24        Q.   All right.  And so you decided not to

25   even try?
```



```
 1                       John Vickerd
 2          MS. PERSICO:  Objection to form.
 3          MR. RUSS:  Objection to form.  You may
 4   answer.
 5          THE WITNESS:  You -- you're saying that --
 6   that I wouldn't even try because I would expect
 7   that -- that nothing would be brought forward
 8   that --
 9          BY MR. BRUSTIN:
10      Q.   Is that why you didn't try?
11      A.   -- to make my recollection --
12      Q.   I'm asking -- I guess I'm asking why
13   you haven't looked at any documents in this case.
14   You understand that we're suing you for many
15   millions of dollars, correct?
16      A.   Evidently, yes.
17      Q.   Okay.  And we're claiming that you
18   engaged in intentional misconduct?
19      A.   From 30 years ago, yes.
20      Q.   And are you offended by that, by those
21   allegations?
22      A.   Am I offended by it?  Yes, I am.
23      Q.   Okay.  And are you -- is it your goal
24   to do everything you can to defend yourself against
25   those allegations?
```



```
 1                   John Vickerd
 2        A.   From 30 years ago, I don't remember
 3   anything about any of the cases I worked back at
 4   that -- in the -- in the day.
 5        Q.   All right.  Let's take a break.  You
 6   know, actually, would you mind -- would you mind,
 7   Mr. Vickerd, leaving the room so we can talk on the
 8   record amongst the attorneys?
 9        A.   Sure.
10        MR. RUSS:  Yeah, I'll just -- I'll show you.
11        THE VIDEOGRAPHER:  Would you like this on
12   the video record still?
13        MR. BRUSTIN:  It doesn't matter.
14        THE VIDEOGRAPHER:  Okay.
15        MR. BRUSTIN:  Are we back?
16        MS. PERSICO:  Not yet.
17        MR. RUSS:  All right.  I'm back.
18        MR. BRUSTIN:  So I -- I assume this is
19   completely inadvertent, but, you know, I think one
20   of the things we've been asking for a long time is
21   whether any of the witnesses had any memory issues.
22        I know I asked it as recently as this week
23   about this witness.  It's clear that at least
24   according to him and I don't doubt him, hat he has
25   some pretty severe memory issues.
```



1                     John Vickerd

2          It would have been good to have known that

3   before today.  It would have been good to have

4   known that six months ago when he reported it to

5   you, but we are where we are.

6          Do you have an understanding as to when he

7   is scheduled to get his medical exam?

8          MR. RUSS:  Let me say a couple things.  One,

9   I don't know that our office hasn't discussed this

10  issue with your office.  I -- I -- I believe that

11  Peter did discuss it with your office.  Maybe I'm

12  wrong.

13         Two, we didn't appreciate the full nature

14  and extent of his issues until this morning when he

15  showed up.

16         Three, as he told you at least twice, he is

17  trying to get scheduled at Johns Hopkins.  He has

18  not yet gotten it scheduled.

19         MR. BRUSTIN:  Right.  Well, I think you

20  should help him get it scheduled because we need to

21  know the extent of his problems as quickly as

22  possible given that it sounds like he's

23  deteriorating.

24         And I -- you know, it would be nice if we

25  don't have to -- I'm sure he's going to be getting



1                    John Vickerd

2  a proper exam.  One of the things he should be

3  tested for is -- is his ability -- his actual

4  ability to participate in this process.

5       That's something that those doctors should

6  be made aware of so we don't have to do a second

7  evaluation.

8       So we can put this in writing, but I'm going

9  to continue on with him.  But, you know, I -- I'm

10 guessing this is going to be a waste of time both

11 because of his memory issues and -- and it sounds

12 like there was no even effort to prepare him to try

13 to testify here today.  He hasn't reviewed a single

14 document.

15      MR. RUSS:  Well -- well, first of all, what

16 I do with my witnesses is none of your business.

17      MR. BRUSTIN:  That's not -- that's actually

18 not true, Hugh.  It's my business --

19      MR. RUSS:  It is true.

20      MR. BRUSTIN:  -- when he's not prepared to

21 testify.

22      THE REPORTER:  Wait, I can't take you -- I

23 can't take you both at the same time, please.

24      MR. RUSS:  It is true.

25      MR. BRUSTIN:  You can do whatever the -- you



1                     John Vickerd

2  can do whatever you want with your witness, but it

3  sure is my business.

4         MR. RUSS:  So I am under no obligation to

5  ask him anything, show him anything, have him read

6  anything, talk to him about any subject.

7         MR. BRUSTIN:  Do you want us to put in

8  writing what we'd like to have happen with his --

9  well, we'll do it anyways.

10        But are you -- were you -- were you -- are

11 you -- are you going to get involved in making sure

12 that he is evaluated?  Do we need to --

13        MS. PERSICO:  I don't think that --

14        MR. RUSS:  No, I'm not.

15        MS. PERSICO:  I don't think that's any --

16        MR. RUSS:  I'm not.

17        MS. PERSICO:  -- of your concern.

18        MR. RUSS:  No, I'm not.

19        MR. BRUSTIN:  You're not?  Okay.  We'll just

20 go -- we'll go to the court about that and we'll

21 get a -- we'll make him go through a separate

22 evaluation.

23        Because if -- if you were to cooperate and

24 make sure that whatever he's doing will satisfy our

25 needs so we can assess his memory, we won't have to



1                        John Vickerd

2    do that.  If you're not committing to that, happy

3    to do it ourselves.

4         MR. RUSS:  I'm not committing to that.  I'm

5    fully cooperating.  In any case where there are --

6    that is 30 years old, everyone in the case has had

7    problems with remembering.

8         You spent eight hours last week refreshing

9    the recollection of someone.  You can do that

10   today.  Maybe it works, maybe it doesn't.

11        MR. BRUSTIN:  You -- do you think this is

12   the first time I've done this?  You probably don't,

13   right?

14        MR. RUSS:  Do I think this is the first time

15   you've done it?  No.  Do you think this is the

16   first time I've done this?

17        MR. BRUSTIN:  I think it's probably the

18   first time you've done a wrongful conviction case

19   or one of the first.

20        I don't think that's -- it's pretty

21   unusual -- they're pretty unusual cases.  Maybe

22   you've done a few.

23        But oftentimes what happens is when

24   witnesses are provided documents to read, they

25   remember things.



```
 1                        John Vickerd
 2           And sometimes witnesses pretend they don't
 3    remember things when they really do.  There's all
 4    kinds of things that happen.  So let's get him back
 5    in the room.
 6           MR. RUSS:  And sometimes --
 7           MR. BRUSTIN:  I thought maybe --
 8           MR. RUSS:  -- sometimes lawyers send e-mails
 9    to other lawyers saying print out a whole 300 pages
10    of stuff to show to the witness when he's
11    testifying today and sometimes they actually follow
12    those directions.  So if there's something that you
13    want to show him, show him.
14           BY MR. BRUSTIN:
15           Q.   That was -- that was -- yeah, that was
16    really terrific of you to do that for us.  We
17    really, really, really appreciate it.  Let's get
18    him back in the room and we'll keep going.
19           Okay.  So Mr. Vickerd, just a couple more
20    questions about your preparation.  How long did you
21    meet with the attorneys this morning?
22           A.   Probably about a little over an hour.
23           Q.   Okay.  So your -- your -- the -- the
24    entirety of your preparation for this deposition
25    was to meet with the attorneys for an hour this
```



1                        John Vickerd

2    morning?

3         A.    Yeah.    Well, I was supposed to come in

4    at 8:30.    I was a little late and I thought this

5    was going to resume around 10 o'clock.

6         Q.    All right.

7         A.    But did we talk all that time, no, we

8    didn't.

9         Q.    And you haven't looked at a single

10   document relating to this case other than the

11   complaint?

12        A.    Correct.

13        Q.    And you have no recollection of

14   Valentino -- do you have -- do you have any

15   recollection of the murder that Valentino Dixon

16   was -- was convicted of committing, the shooting

17   outside of Louie's where Torriano Jackson was

18   murdered and others were injured?

19        A.    After talking to Peter, he told me who

20   this case was about.    As far as any recollection of

21   what happened and who was shot and if there was

22   more than one person shot and who it was or that

23   there was somebody else convicted of this crime or

24   accused of this crime, I have no idea.

25        Q.    All right.    Do you have any



```
 1                    John Vickerd
 2    recollection of the case at all?
 3         A.   Not really, no.
 4         Q.   You say not really.  What do you
 5    remember?
 6         A.   I remember being in homicide.  Once I
 7    was told the name Valentino Dixon, I remembered the
 8    name, what happened.
 9         There was hundreds and hundreds of shootings
10    for several years back when I was in homicide and
11    no, I do not remember his -- his -- who he is, what
12    he looks like, or who was involved.
13         Q.   All right.  It sounds like you don't
14    remember this case, but you do remember generally
15    Valentino Dixon; is that correct?
16         A.   I remember hearing the name before.
17         Q.   Okay.
18         A.   And that was through talking with
19    Mark Stambach.
20         Q.   All right.  And you remember that
21    Valentino -- from talking to Mark Stambach and from
22    your memory back then, you remember that
23    Valentino Dixon at the time was a relatively
24    well-known drug dealer, correct?
25         A.   No.
```



1                        John Vickerd

2          Q.    Okay.    What do you remember

3    Valentino Dixon as?

4          A.    I remember Mark mentioning his name to

5    me and I told him that I don't even recollect

6    anything that I was even involved in the case.

7          And I know I didn't work with Mark.    Mark

8    was in a total different division or shift than --

9    than I was on in homicide.

10         Q.    Okay.    But you remember Mark Stambach

11   telling you that he remembered Valentino Dixon as a

12   drug dealer from the time, correct?

13         MR. RUSS:    Objection to form.    You may

14   answer.

15         THE WITNESS:    I don't believe he -- he

16   mentioned -- he just knew that this case was coming

17   forward and that I was going to be talked to by

18   one -- by an attorney for this -- for the -- for

19   the city.

20         BY MR. BRUSTIN:

21         Q.    And when did you have that conversation

22   with -- with Mark Stambach?

23         A.    Months ago.

24         Q.    Okay.    And where was that -- was it on

25   the phone?



```
 1                     John Vickerd
 2        A.   It was either at a golf club or on the
 3   phone.
 4        Q.   Are you -- are you and Mark still
 5   friends?
 6        A.   Been longtime friends for -- since
 7   1970, '71.
 8        Q.   Okay.  Is he -- was he -- would you say
 9   that he's one of your -- he's one of your best
10   friends from the job?
11        A.   No.
12        Q.   But he's been a good friend since then?
13        A.   He's been a friend of mine and
14   affiliated with the same type of work that I did
15   back from uniform into the detective division, yes.
16        Q.   Was he someone that you socialized with
17   from time to time with when you were on the job?
18        A.   Not really, no.  He would be at a
19   function that we would have that that group or
20   whatever group was -- he was working for and I was
21   working for at the time was -- was invited to then
22   I would see him.
23        And maybe once in a while we'd meet at a
24   police function for golf and -- and play some golf
25   together.  But do I see him --
```



```
 1                    John Vickerd
 2        Q.   Have you been to his home?
 3        A.   Pardon?
 4        Q.   Sorry, I interrupted -- I interrupted
 5   you.  I'm sorry.
 6        A.   Go ahead.
 7        Q.   Have you been to his home, do you know
 8   his family?
 9        A.   No.
10        Q.   How often do you see him now?
11        A.   I don't.
12        Q.   Okay.  You just -- when you -- when you
13   spoke about the case, did you just happen to see
14   him or did you get in contact with him or did he
15   get in contact with you about the case?
16        A.   I -- I would be assuming, but I believe
17   that he called me or talked to me at one of the
18   functions that this case was going to get -- be
19   brought forward.
20        Q.   Okay.  And how long was that
21   conversation you had about this case, more than a
22   half an hour?
23        A.   No.
24        Q.   More than 15 minutes?
25        A.   No, because I would have told him that
```



1                    John Vickerd

2  I remembered the name, but I don't remember that I

3  was even involved in the case.

4          Q.    Okay.  What did he tell you about his

5  memory of the case?

6          A.    He didn't.

7          Q.    What did he say to you?

8          A.    He just said that this case was going

9  to be pending and it would be coming up that I was

10  going to be notified.

11          Q.    Did he say anything about the

12  allegations and what you were accused of doing and

13  whether you'd done anything wrong, anything like

14  that?

15          A.    No.  First of all, we didn't do

16  anything wrong back in the day because we had so

17  many homicides going on and we did everything by

18  the book all the time.

19          Q.    In every case?

20          A.    Every case.

21          Q.    You followed all the rules and

22  regulations of the department?

23          A.    Always.

24          Q.    All of your training?

25          A.    Yes.



```
 1                      John Vickerd

 2         Q.    Same with Mark Stambach?

 3         A.    As far as I know.

 4         Q.    Same with Lonergan?

 5         A.    Lonergan and I went through uniform

 6   together and different functions and he would be of

 7   a little more of a friend of mine than -- than

 8   Detective Stambach.  He worked in the same unit and

 9   at the -- on the same shift that I did in homicide.

10         Q.    Okay.  But in -- in -- in this case,

11   like every case, you did everything by the book,

12   correct?

13         A.    Always.

14         Q.    Would it be fair to say that you prided

15   yourself on being a careful, meticulous detective?

16         A.    Yes.

17         Q.    You followed up on all leads?

18         A.    Back -- back then, yes.

19         Q.    You documented any relevant evidence

20   that you gather?

21         A.    We always did, yes.

22         Q.    Whether it helped or hurt your case?

23         A.    Yes.

24         Q.    And you were meticulous about that,

25   correct?
```



```
 1                      John Vickerd

 2          A.    Yes.

 3          Q.    In this case and every case?

 4          A.    Yes.

 5          Q.    You were very careful to follow all the

 6   rules and regulations and all of your training in

 7   regard to how conduct identification procedures

 8   like photo arrays?

 9          A.    Always.

10          Q.    You never violated that -- those rules?

11          A.    I never did what?

12          Q.    You never violated those rules?

13          A.    I didn't violate any rules back then,

14   no.

15          Q.    Nor did Stambach?

16          A.    I don't know anything about him.  He

17   worked a different shift and he was a good police

18   officer from what I understand.

19          Q.    All right.  And I take it that you

20   understood certainly by the time of this case 1991,

21   that to the extent you observed any officer

22   engaging in any kind of misconduct, you had an

23   obligation to report it, correct?

24          A.    Correct.

25          Q.    That would include using excessive
```



```
 1                      John Vickerd
 2   force, correct?
 3          A.   Yes.
 4          Q.   That would include misconduct during
 5   criminal investigation?
 6          A.   Anything that I was aware of, yes.
 7          Q.   All right.  And that would include
 8   using a racial slur against a suspect?
 9          A.   Yes.
10          Q.   All right.  Tell me all the times that
11   you reported an officer engaging in misconduct
12   during your career.
13          A.   I don't think that ever happened.
14          Q.   All right.  Let's go -- what -- what --
15   what year did you join the department?
16          A.   1970.
17          Q.   And what year did you retire?
18          A.   I believe 1994 or '5.
19          Q.   Okay.  And between 1970 and 1994, you
20   never -- you never observed an officer using
21   excessive force?
22          A.   No, I did not.
23          Q.   In other words, you never observed an
24   officer using more force than was necessary under
25   the circumstances, correct?
```



```
 1                    John Vickerd

 2         MR. RUSS:  Objection to form.  You may

 3    answer.

 4         THE WITNESS:  No.

 5         BY MR. BRUSTIN:

 6         Q.   Because if you had, you would have

 7    reported it, correct?

 8         A.   Yes, I would have.

 9         Q.   And in 1970 in Buffalo to 1994, you

10    never heard any officer use a racial slur like the

11    N word in connection -- in -- in regard to a

12    suspect, correct?

13         A.   I would not have recalled using any

14    verbal language, no.

15         Q.   Oh, I didn't ask you that, sir.  My

16    question is, if you had heard -- you under -- you

17    understood that if a -- if an officer used a racial

18    slur against a suspect, that would be misconduct,

19    correct?

20         A.   That -- that's a gray area that --

21    that -- that question doesn't even make sense to

22    me.

23         Q.   So if -- if during an interrogation --

24    I'll -- I'll help you make sense of it.  If during

25    an -- during an interrogation, a -- a detective
```



```
1                    John Vickerd

2   referred to a black suspect using the N word, would

3   that be appropriate?

4        A.   Are you saying that this person used

5   this -- this racial slur in front of me to the

6   suspect?

7        Q.   Yes, sir.

8        A.   No.

9        Q.   That would be misconduct, correct?

10       A.   Yes.

11       Q.   And that never happened?

12       A.   Not that I recall, no.

13       Q.   And if it had, you'd report it, right?

14       A.   Yes.  But I've -- never did that happen

15   that I recall.

16       Q.   Okay.  And you never saw -- you never

17   saw any type of misconduct during the criminal

18   investigation by any detective?

19       A.   Not -- not that I'm aware of, no.

20       Q.   All right.  So during your 24 years on

21   the job, you never reported any misconduct by

22   another officer, correct?

23       A.   Correct.

24       Q.   Because you never observed any

25   misconduct, correct?
```



1                      John Vickerd

2          A.   Not that I recall, no.

3          Q.   In every case that you worked, the

4    officers followed the rules and regulations of the

5    department and the training on every single issue,

6    correct?

7          A.   For working 24 years, five days, seven

8    days a week, that's what you're asking me?  I

9    don't --

10         Q.   Yes, sir.

11         A.   I don't possibly recall that.

12         Q.   Well, we know that you -- we know that

13   must have happened because if they had engaged in

14   any misconduct, you would have reported it,

15   correct?

16         MR. RUSS:  Objection to form.  You may

17   answer.

18         THE WITNESS:  According to you, yes.  Do I

19   recall any of that, no.

20         BY MR. BRUSTIN:

21         Q.   No, no.  Not according to me, sir.

22   What you've told me is you had an obligation to

23   report officer misconduct, correct?

24         A.   Yes.  I also said that I worked five to

25   seven days a week overtime and I worked for 24 to



1                    John Vickerd

2    25 years.  25 years actually.

3         Q.   Okay.

4         A.   And no, I don't recall any of that.

5         Q.   All right.  And you don't recall during

6    those 25 years, ever reporting an officer engaging

7    in misconduct, right?

8         A.   On conversation that I had for -- for

9    every year of -- of my life in 24 years, no, I

10   don't.

11        Q.   You're missing my point, sir.  If

12   reporting misconduct means going through the chain

13   of command and saying this officer engaged in this

14   misconduct, he should be investigated and

15   disciplined, did you ever do that in your career?

16        A.   No.

17        Q.   Okay.  And so in other words, what

18   you're saying is you never observed any officer

19   engage in any misconduct during your career; is

20   that right?

21        MS. PERSICO:  Form.

22        THE WITNESS:  Not that would have been

23   reportable, no.

24        MR. RUSS:  Objection to form.  You may

25   answer.



```
 1                     John Vickerd

 2          BY MR. BRUSTIN:

 3          Q.   Well, excessive --

 4          MR. RUSS:  You did answer.

 5          BY MR. BRUSTIN:

 6          Q.   -- force would have been reportable,

 7   right?

 8          A.   Yes.

 9          Q.   Using a racial slur in an interrogation

10   against a suspect would have been reportable,

11   right?

12          A.   Yes.

13          Q.   Withholding Brady material would have

14   been reportable, right?

15          A.   Brady material, no.  That -- first of

16   all, that didn't go on.

17          Q.   Well, if it -- if it did, if you

18   learned -- if you learned of exculpatory evidence

19   during an investigation and failed to document it,

20   that would be misconduct, correct?

21          A.   Correct.

22          Q.   And that never happened --

23          A.   Not --

24          Q.   -- in your presence, right?

25          A.   Not that I'm aware of, no.
```



1                      John Vickerd

2          Q.    If you were aware of it, you had to

3     report it, right?

4          A.    That would have been the assumption,

5     yes.

6          Q.    And you never did, right?

7          A.    Correct.

8          Q.    So it never happened, right?

9          A.    That I recall, no.

10         Q.    And you never observed a detective

11    misrepresent what happened during an interview,

12    correct?

13         MR. RUSS:  Objection to form.  You may

14    answer.

15         THE WITNESS:  Yes.

16         BY MR. BRUSTIN:

17         Q.    Because if you had, you would have

18    corrected it and you would have reported it,

19    correct?

20         A.    First of all, I don't recall it because

21    it never happened.

22         Q.    It sounds like what you're describing

23    is that from the time you joined the force in 1970

24    until you retired, it was your view that the police

25    officers and the detectives that you worked with



```
 1                    John Vickerd
 2    were all honest, careful, and conscientious; is
 3    that right?
 4          A.    The officers that I worked with, yes.
 5          Q.    Without exception?
 6          A.    Yes.
 7          Q.    All right.  Now take a look at -- do
 8    you remember Mr. Vickerd, back in the -- the early
 9    '90s and the late '80s, how did the detectives keep
10    track of career criminals in Buffalo?
11          Was there a process by which you would track
12    people that you knew were engaged in criminal
13    activity?
14          MS. PERSICO:  Objection to the form.
15          THE WITNESS:  No.
16          BY MR. BRUSTIN:
17          Q.    Was it just word-of-mouth --
18          MR. RUSS:  Objection to form.
19          BY MR. BRUSTIN:
20          Q.    -- talking about -- amongst your fellow
21    officers who -- who you thought was engaged?  I
22    mean, Buffalo is a small enough town where you
23    generally would know who was -- who were the major
24    criminal players in town.  Fair to say?
25          MR. RUSS:  Objection to form.
```



1                    John Vickerd

2          MS. PERSICO:  Objection to form.

3          MR. RUSS:  You may answer.

4          THE WITNESS:  We had several large gangs

5    going on, we had a lot of shootings going on.  Are

6    you talking about when I was in homicide?

7          BY MR. BRUSTIN:

8          Q.   Well, I'm talking about in -- in 1991

9    you were in homicide, correct?

10         A.   Yes.

11         Q.   And in order to solve homicides in

12   1991, one of the things that you were interested in

13   learning about, was organized criminal activities

14   that were going on in Buffalo because that was

15   often what caused homicides, right?

16         MR. RUSS:  Objection to form.

17         MS. PERSICO:  Form.

18         MR. RUSS:  You may answer.

19         THE WITNESS:  Yes.

20         BY MR. BRUSTIN:

21         Q.   So as you mentioned, there were a

22   couple of gangs that you were always interested in,

23   right?

24         A.   There were several gangs, yes.

25         Q.   Which were the gangs that you were



1                          John Vickerd

2    interested in primarily at that time?

3         A.   I remember there was a Perry Project

4    gang, there was Talbert and Ellicott Mall gangs,

5    there was the Sycamore Street Matadors.

6         Them are the only ones that I can -- that

7    I'm familiar with or that I recollect because they

8    were always so active.

9         Q.   Okay.  And I take it in addition to

10   those gangs, there were also other -- other groups

11   engaging in -- in illegal activities that you were

12   monitoring in the event that they led to homicides,

13   correct?

14        MR. RUSS:  Objection to form.

15        MS. PERSICO:  Form.

16        MR. RUSS:  You may answer.

17        THE WITNESS:  We worked specifically with

18   homicides and attempted murders and that's what we

19   worked with.

20        BY MR. BRUSTIN:

21        Q.   Right.  But you were also I -- I assume

22   in close contact with the gang unit and the

23   narcotics unit to -- in connection with homicides

24   to learn, for example, who were -- who were the

25   active gang members, who were the active gang



1                      John Vickerd

2    leaders, who were the big drug dealers in town, who

3    was -- where -- where were their turf wars.

4          Those are the kinds of questions you would

5    be asking of your fellow detectives.  Fair to say?

6          MR. RUSS:  Objection to form.

7          MS. PERSICO:  Form.

8          MR. RUSS:  You may answer.

9          THE WITNESS:  First of all, the only

10   person -- people I was familiar with back then were

11   the homicide detectives and we always specifically

12   worked on the cases that we were assigned to

13   because there was so many.

14         BY MR. BRUSTIN:

15         Q.   Okay.  Were you -- did you -- at that

16   time, were you generally familiar -- and I know you

17   don't remember today necessarily.

18         But at that time, were you generally

19   familiar with who the -- who the -- the drug

20   dealers were in Buffalo, the -- the more major drug

21   dealers?

22         A.   No.  I had nothing to do with drugs.

23         Q.   All right.  Let's take a look at --

24   take a look at Exhibit 2 which is in front of you

25   and I'm going to refer to the Bates stamp pages on



 1                    John Vickerd

 2   the bottom middle.  And I first want you to look at

 3   page 21.

 4         MR. RUSS:  Just so I can make sure that

 5   we're on the same page, literally and figuratively,

 6   that would be BPD comp 0021?

 7         MR. BRUSTIN:  Yes, which is also COE1608.

 8         MR. RUSS:  Thank you.

 9         BY MR. BRUSTIN?

10         Q.   Okay.  And this is a fingerprint report

11   that was created -- I will represent to you the

12   crime occurred on 8/10/91.  Do you recall that

13   today?

14         A.   No, I don't.

15         Q.   Okay.  But you see it on this report,

16   right?

17         A.   Yes.

18         Q.   And you were a homicide detective at

19   that time, correct?

20         A.   Yes.

21         Q.   And you see it lists the investigating

22   officers here?

23         A.   Can I borrow your glasses?

24         MR. RUSS:  Yeah, sure.

25         THE WITNESS:  Yes, I do.



```
 1                      John Vickerd

 2           BY MR. BRUSTIN:

 3           Q.   It says Lonergan, Vickerd, Suszek,

 4      Stambach.  Do you see that?

 5           A.   Correct.  Yes.

 6           Q.   And were you the -- does that mean that

 7      you were the -- the four officers assigned to this

 8      case?

 9           A.   According to this, as far as being

10      assigned to the case, no, I don't know what that

11      would mean.

12           Q.   You don't know what it means?

13           A.   They've got Lonergan slash Vickerd,

14      Suszek, and Stambach.  First of all, Suszek was

15      a -- I believe was -- was an older -- older

16      gentleman and he was a straight day investigator.

17           Stambach was younger than me, but he was in

18      a total different group than I was and I normally

19      would -- would work with -- with Lonergan.

20           Q.   Lonergan was your partner at the time?

21           A.   Well, he was partner if we were working

22      the same shift together if he didn't have different

23      days off.

24           Q.   All right.  And Stambach was working a

25      different shift?
```



1                        John Vickerd

2          A.   Yes.

3          Q.   All right.  And so -- all right.  Let's

4    take a look at another page.  Maybe this will help.

5    Take a look at -- well, let's start with -- let's

6    start right from the beginning.  Start with page --

7    page 1.

8          MR. RUSS:  I think this is 1.

9          THE WITNESS:  Oh.

10         BY MR. BRUSTIN:

11         Q.   And you see from page -- page 1 appears

12   to be a report from the police officers who first

13   reported to the scene of this homicide; is that

14   correct?

15         A.   Yes.  There's -- there's a person by

16   the name of Diegelman and Brown from 16 North that

17   are mentioned right on the first -- first sentence.

18         Q.   Okay.  And do you remember them?

19         A.   No, I don't.

20         Q.   All right.  But this -- did I

21   accurately describe this?  This appears to be an

22   initial police report from police officers who were

23   to respond to the scene of this homicide?

24         A.   Neither one of those were on homicide

25   at that time.



1                    John Vickerd

2         Q.    Well, but typically what happens in a

3    homicide is before the detectives get there, often

4    police officers will respond to the scene, correct?

5         A.    Correct.

6         Q.    And it appears that this homicide

7    occurred at 129 hours, correct, 1:00 in the

8    morning -- 1:30 in the morning?

9         A.    Okay.  1150 -- 11 -- no.  The

10   address --

11        Q.    Look at the first line.  Sir, at

12   129 hours on 8/10/91 a call was received?

13        A.    Right.  Okay, I see.  0129 hours,

14   right.  8/10/21 [sic].

15        Q.    Am I reading it right?

16        A.    Yes.

17        Q.    All right.  And then now take a look at

18   page 2.  Do you recall these officers, Officers

19   Makowski and Lopez?

20        A.    No.

21        Q.    Read this -- read this report to

22   yourself then I'm going to ask you some questions

23   about it.

24        Actually, you know what, we'll come back to

25   this.  Let's go -- first I want you to take a look



1                        John Vickerd

2    at -- let's first take a look at page 13.

3           Have you reviewed page -- have you reviewed

4    the report on page 13?

5           A.   I just got to it and no.

6           Q.   All right.  So what I want you to do

7    for now, is I want you to read Lonergan's report on

8    page 13 and 14 and then I want to read -- I want

9    you to read your report on page 15 and 16.  Okay?

10          A.   Okay.

11          Q.   And let me know when you're done.

12          MR. RUSS:  I'll tell you what, since it's

13   going to take him a few minutes, let me run

14   upstairs and get another pair of glasses.

15          MR. BRUSTIN:  All right.

16          THE WITNESS:  Thank you.

17          MR. BRUSTIN:  And I'm going to step out for

18   just a minute too while you're reading.

19          THE VIDEOGRAPHER:  Would we like to go off

20   the record then?

21          MR. RUSS:  Sure.

22          THE VIDEOGRAPHER:  Okay.  Going off the

23   record, time's 11 o'clock.

24              (A recess was then taken at 11:00 a.m.)

25          THE VIDEOGRAPHER:  Going back on the record,



1                          John Vickerd

2    time is 11:08.

3            BY MR. BRUSTIN:

4            Q.    Okay.   Mr. Vickerd, you've had a chance

5    to review one of Detective Lonergan's reports and

6    one of your reports from -- from the night of the

7    shooting, correct?

8            A.    Yes.

9            Q.    And first of all, does reviewing these

10   reports refresh your recollection about your

11   involvement in the case?

12           A.    No.

13           Q.    Not at all?

14           A.    No.

15           Q.    You have -- you have no actual

16   recollection of being involved in this case?

17           A.    No, I don't.   I've got my report right

18   in front of me on page 16 with my signature.

19   Lonergan evidently I was working with that night.

20           Q.    So, sir, it -- it will go much -- right

21   now if you could just answer the questions I'm

22   asking you, that -- that -- I'd appreciate it.

23           A.    Okay.

24           Q.    Right now --

25           A.    No, I don't recollect.



```
 1                     John Vickerd
 2        Q.   So that's fine.  I want to -- and I
 3   want to make sure that we understand the difference
 4   between what you remember and what you think
 5   happened based on reports.  I'm going to ask you
 6   both.
 7        But first of all, what you're telling me is
 8   you have absolutely no recollection of your
 9   involvement in this case whatsoever, correct?
10        A.   Correct.
11        Q.   All right.  But you do recognize that
12   these are reports that you wrote and your partner
13   wrote, correct?
14        A.   Yes.
15        Q.   And -- all right.  And based on
16   reviewing these reports -- well, first of all,
17   these reports indicate that both you and your
18   partner were involved in this case in the first few
19   hours of the investigation, correct?
20        A.   Yes.
21        Q.   All right.  And do these reports
22   indicate whether or not you -- and you can answer
23   this in conjunction with the other document I just
24   showed you.
25        Does this indicate whether or not you were
```



1                          John Vickerd

2    the assigned detectives on the case or just

3    detectives working on the case?

4          A.    I believe it would have been that I was

5    just a detective working on the case.

6          Q.    All right.  And the same with Lonergan?

7          A.    Lonergan at that time I believe was --

8    was a detective sergeant and he would have been --

9    he would have been directing me to go to the

10   different hospitals.

11         Q.    So he outranked you at the time is what

12   you're saying?

13         A.    Yes.

14         Q.    All right.  But you were both -- but

15   you said you were working as partners, correct?

16         A.    Yes.

17         Q.    All right.  And I take it there were a

18   time -- well, you tell me.  In 1991 when -- would

19   there be times when you were assigned as lead

20   detective or assigned detective and Lonergan would

21   be assisting you and vice versa or no?

22         A.    No.

23         Q.    That never happened?

24         A.    No.

25         Q.    Any time that you worked with Lonergan,



```
 1                    John Vickerd

 2   he was the lead detective and you were just

 3   assisting; is that right?

 4        A.   Yes, it would have been at that time.

 5   Yes.

 6        Q.   So any time in 1991 when you were

 7   working with Lonergan, he was in charge and you

 8   were assisting?

 9        MR. RUSS:  Objection to form.  You may

10   answer.

11        THE WITNESS:  I would believe so, yes.

12        BY MR. BRUSTIN:

13        Q.   All right.  And what would have been --

14   Stambach conducted many of the interviews in this

15   case.  Was he the assigned detective, do you know?

16        A.   He did not work in my group so I

17   wouldn't know what he did and who he worked with.

18        Q.   Is there any way to tell from police

19   reports -- is there any way to tell from these

20   police reports, whether or not you or Lonergan were

21   the assigned detectives on the case?

22        A.   Just from on Lonergan's report that he

23   advised me to go to the hospitals to check on the

24   victims.

25        Q.   So does it appear that Lonergan was the
```



1                        John Vickerd

2    assigned detective?

3          A.   That I'm not aware of.  I know that we

4    were working together that day and he outranked me.

5          Q.   All right.  I'm going to show you a --

6    a -- a policy in just a minute, but generally -- I

7    know in different police departments around the

8    country they refer to who's in charge of -- of an

9    investigation in different ways.

10         Sometimes they call it the assigned

11   investigator, sometimes they call it the lead

12   investigator.  What do they do in Buffalo?

13         A.   You're going to have to repeat that.

14         Q.   Sure.  Different police departments

15   refer to the investigator in charge of a case in

16   different ways.  How did Buffalo refer to the lead

17   investigator -- the investigator who was in charge,

18   was it assigned investigator, was it lead

19   investigator?

20         A.   That, again, I don't recall, but I

21   would believe that it would have been the lead --

22   the assigned investigator.

23         Q.   Okay.  Well, I take it that there were

24   cases that you had as a homicide investigator in

25   1991.  Some of which you were the actual assigned



 1                    John Vickerd

 2   investigator and some of which you were just

 3   assisting; is that correct or no?

 4        A.   I don't know if I had enough time at

 5   that time that I would have been assigned as the

 6   investigator.

 7        Q.   All right.  Well, let's -- let's go to

 8   that for a minute.  Take -- so in 19 -- you said

 9   you started on the department in 1970?

10        A.   Yes.

11        Q.   Take me really quickly, if you don't

12   mind, just your different -- your different

13   promotions and transfers.

14        A.   You're going to have to repeat that

15   again.

16        Q.   Yeah.  Take me through your promotions

17   and transfers in the department beginning in 1970.

18        A.   I was a patrol officer until I went to

19   homicide and I believe I went to homicide in around

20   '83, '84.

21        Q.   Okay.  So by 1991, you were an

22   experienced homicide investigator?

23        A.   Yes.

24        Q.   And --

25        MR. RUSS:  By investigator, do you mean



1                     John Vickerd

2    detective?

3         BY MR. BRUSTIN:

4         Q.   I do.  Do -- did you -- do you -- you

5    didn't refer to one another as investigators too?

6         A.   No.

7         Q.   It was detectives?

8         A.   Yes.

9         Q.   Okay.  So by 1990 -- by 1980 -- by

10   1991, you were an experienced homicide detective?

11        A.   Yes.

12        Q.   Okay.  And from 1970 to '83, what

13   different units did you work with?

14        A.   I could have worked with anybody in my

15   group.  There was several -- several officers in my

16   group at that time.

17        Q.   What -- what units were you assigned to

18   between 1970 and '83?  Did you work narcotics, did

19   you -- were you a beat officer, what -- what were

20   your different assignments?

21        A.   I was always in patrol.  I was in

22   uniform and I worked everything from tactical

23   patrol unit to motorcycle to canine to mounted

24   division.

25        Q.   Okay.  And then in 1983 you -- you went



1                     John Vickerd

2   right to homicide; is that right?

3         A.    Around '83, '84, yes.

4         Q.    What was your assignment just before

5   that?

6         A.    The last one before homicide would have

7   been I believe motorcycle, but I'm not sure.

8         Q.    Okay.  And had you -- had you applied

9   to be a detective prior to 1983, was that the first

10  time you applied?

11        A.    Usually you're requested because of

12  your conduct as a patrol officer.

13        Q.    Okay.  And so was that the first time

14  you were offered the role as a detective, 1983?

15        A.    Yes.

16        Q.    And in Buffalo, was it fair to say that

17  the homicide unit was the most prestigious unit

18  among the detectives?

19        A.    It was to me.

20        Q.    And was it unusual in your experience

21  to go right from being a patrol officer to the

22  homicide unit before being a precinct level

23  detective?

24        A.    From what I remember, that anybody that

25  was in my group or Stambach's group, came from the



```
 1                    John Vickerd
 2   patrol division.  Didn't come from another --
 3   another detective agency that I remember.
 4        Q.   Okay.  Your understanding was that
 5   everybody went straight -- everyone in homicide
 6   came straight to homicide from being a patrol
 7   officer?
 8        A.   Yes.
 9        Q.   Other detectives weren't promoted to
10   homicide detectives to your knowledge?
11        A.   There were detectives in homicide when
12   I was pushed -- put into there, but I'm not sure
13   where they came from and what they did.
14        Q.   All right.  And -- all right.  So and
15   any other promotions other than promotion to
16   detective?
17        A.   Detective, detective sergeant.
18        Q.   When did you become a detective
19   sergeant?
20        A.   I didn't.
21        Q.   Okay.  Your only promotion was from
22   patrol officer to detective?
23        A.   Yes.
24        Q.   And you retired as a detective?
25        A.   Yes.
```



1                          John Vickerd

2          Q.    And then I think you mentioned you said

3    you worked for the DA after that?

4          A.    I worked 15 years at the district

5    attorney's office.

6          Q.    And what did you do there?

7          A.    I was assigned to cases that were

8    already convicted and after the fact and followed

9    up on cases.

10         Q.    I'm sorry, you worked on cases where

11   there were already arrests or already convictions?

12         A.    Well, it was for the Erie County

13   district attorney's office and mostly there was an

14   attorney assigned to the case and I would be under

15   them and I would do what they told me to do.

16         Q.    So is it -- is it -- is it accurate to

17   say that you were doing investigations

18   post-indictment, but before trial on behalf of

19   assistant district attorneys?

20         A.    It would be before or during the trial,

21   yes.

22         Q.    Okay.  And did you have an opportunity

23   during those 15 years to work with ADA Belling?

24         A.    Yes.

25         Q.    How many times?



```
 1                     John Vickerd

 2        A.    Many times.

 3        Q.    More than 10?

 4        A.    Oh, yes.

 5        Q.    And was it your understanding that

 6   typically -- and did you work -- I take it you

 7   worked homicides, investigating homicides when you

 8   were with the DA's office?

 9        A.    It could have been any case.  It didn't

10   have to be homicides.

11        Q.    All right.  When you were working with

12   Belling, was he typically doing homicides?

13        A.    Possibly.

14        Q.    You don't remember?

15        A.    No.

16        Q.    If you don't remember, please tell me.

17        A.    Yes.  I don't remember.

18        Q.    In 1994 when you began working at the

19   DA's office, at that time, were you -- I take it

20   that you became aware of how the DA's office kept

21   track of career criminals in Buffalo.  Fair to say?

22        MR. RUSS:  Objection to form.

23        MS. PERSICO:  Form.

24        MR. RUSS:  You may answer.

25        THE WITNESS:  I would be aware of that, yes.
```



1              John Vickerd

2         BY MR. BRUSTIN:

3         Q.   And what was the process by which --

4    you know what, let me show you something.  I want

5    to show you -- we'll mark this -- what exhibit

6    number are we on, Mo?

7         A.   16 I believe was my -- my report on

8    this case.

9         Q.   No, I'm sorry.  Mo, do you know --

10        MR. SOTO-BRITO:  Yeah, we're on 11.  11.

11        THE WITNESS:  11?

12        MR. BRUSTIN:  So let's -- let's mark this

13   11.  One second.  Let's mark as 11 what's Bates

14   stamped number COE1716 through 1720.

15        Which -- which is an affidavit from

16   Christopher Belling in connection with this case

17   from 1982.  Okay?  We're going to mark this as

18   Plaintiff's 11.

19        MS. PERSICO:  Can you tell us the Bates

20   stamped numbers again?  Oh, sorry.

21        MR. BRUSTIN:  Yeah.  It's -- sure, sure.

22   COE1716 through COE1720.

23        MR. RUSS:  I don't know if it's easier to

24   look up there.

25        THE WITNESS:  I've got 1716 in front of me.



```
1                      John Vickerd

2          BY MR. BRUSTIN:

3          Q.   Yeah.   So -- and I can show you the

4    last page.   Let's go right to 1720.   And this is --

5    you see it's signed and notarized.

6          You recognize Christopher Belling's name as

7    the person you worked for when you were in the DA's

8    office, correct?

9          A.   I do, yes.

10         Q.   And you said you -- you were an

11   investigator for him on many cases, correct?

12         A.   Yes.   It didn't have to be a homicide.

13         Q.   Okay.   But you came to learn how he

14   worked and you worked with him on many cases.   Fair

15   to say?

16         A.   Yes.

17         Q.   All right.   And would it be -- would it

18   be fair to say that typically in, for example, a

19   homicide case, the DA -- the DA and the DA

20   investigators would only get involved in the case

21   sometime after an arrest was made?

22         A.   Yes.

23         Q.   And then at that point after an arrest

24   was made, you would conduct investigative

25   activities as directed by the ADA assigned to the
```



```
 1                      John Vickerd
 2  case, correct?
 3          A.   Correct.
 4          Q.   But oftentimes, your -- your former
 5  colleagues in the homicide case, for example, in
 6  the homicide unit, would also continue conducting
 7  investigative activities as needed, correct?
 8          MR. RUSS:  Objection to form.
 9          MS. PERSICO:  Form.
10          MR. RUSS:  Just who do you mean by former
11  colleagues?
12          BY MR. BRUSTIN:
13          Q.   So I'll -- I'll rephrase it.  Would --
14  let's say in 1994 when you were at the DA's office
15  and you were investigating a homicide on behalf of
16  an ADA, oftentimes the Buffalo homicide detectives
17  would also be conducting that -- investigative
18  activities at the same time, correct?
19          A.   First of all, I don't think I was with
20  the DA's office in 1994.  I didn't go directly to
21  the DA's office.
22          Q.   When did you go there?  I apologize.
23          A.   I retired at age 70 and that would have
24  been --
25          MR. RUSS:  Well, you're 76 now.
```



JOHN THOMAS VICKERD                                    March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                    70

```
 1                      John Vickerd

 2          THE WITNESS:  About 1995 or --

 3          BY MR. BRUSTIN:

 4          Q.   So '95?  Okay.

 5          A.   20 -- yeah.  Or 1990 -- yeah, I

 6    believe.

 7          Q.   What do you do -- I apologize, sir.

 8          A.   Go ahead.

 9          Q.   Are you done?

10          A.   Go ahead, I'm listening.

11          Q.   What did you do for that approximately

12    a year between your retirement and going to the

13    DA's office?

14          A.   I did a lot of carpenter work.

15          Q.   Okay.  And how did you come to be hired

16    at the DA's office?  Was there -- was there a

17    particular ADA that you were friendly with or that

18    helped you get the job, anything like that?

19          A.   Well, first of all, Chris Belling was

20    also -- when I was in homicide, he was also a DA

21    attorney at that time.

22          Q.   Okay.  And you worked closely with him

23    as a homicide detective?

24          A.   Yes.

25          Q.   And then he helped you get the job at
```



1                       John Vickerd

2    the DA's office afterward?

3          A.   Whether he helped me or not, I do not

4    know that.

5          Q.   All right.  In any case, when you were

6    a homicide -- when you were working in the DA's

7    office as an investigator in 1995 and when you were

8    investigating homicide post -- post-arrest,

9    post-indictment, would this be fair to say that

10   oftentimes you would be conducting investigative

11   activities as the -- at the same time as Buffalo

12   homicide detectives were conducting investigative

13   activities?

14         A.   No.  They would have -- they would have

15   made the arrest and it would have been turned over

16   to the district attorney's office for prosecution.

17         And then I would follow the attorney

18   assigned from the district attorney's office, I

19   would have -- I would be told what to do from him

20   or her.

21         Q.   Okay.  So was it your understanding

22   that once -- once a -- once an arrest was made, the

23   homicide investigators in Buffalo stopped

24   investigating and it was only the DA and the DA

25   investigators who investigated?



1                    John Vickerd

2         A.    That I'm aware of, yes.

3         Q.    And was that -- was that always the

4    rule?

5         A.    It's not a rule.  It's if somebody came

6    with some information after an arrest to the

7    homicide, they would either do it themselves or

8    they would turn it over to the district attorney's

9    office.  That was -- the attorney that was assigned

10   to the case.

11        Q.    Okay.  So -- okay.  So this is an

12   affidavit that was submitted by Mr. Belling in

13   connection with this case requesting to protect the

14   identity of -- of some witnesses in the case.

15   Okay?

16        And I want you to take a look specifically

17   and read to yourself, if you would, beginning on

18   page 1717.

19        MR. RUSS:  Paragraph 4?

20        MR. BRUSTIN:  Read on page -- paragraph 5

21   all the way through page 1719.  The first two --

22   the first two lines on 1719.

23        MR. RUSS:  Okay.  So --

24        MR. BRUSTIN:  Let me know when you're ready

25   for the next page by the way.



1                    John Vickerd

2          MR. RUSS:  Right.  So he's going to start at

3    paragraph 5 and he'll tell you when he's done with

4    this page.

5          MR. BRUSTIN:  You know what, I apologize.

6    I'm going to make it a little easier.  Let's --

7    let's actually start -- let's start on page 1718.

8    I apologize.  Okay?

9          And I want you to read -- I want you to read

10   paragraph 8 and paragraph 9 all the way to A.

11   Okay?  So just the -- just the top of the page.

12   Let me know when you're done.

13         MR. RUSS:  Okay.  So he's going to start at

14   paragraph 8 and read through 9A, correct?

15         BY MR. BRUSTIN:

16         Q.   Just read up to 9A.  Have you had a

17   chance to read that?

18         A.   Yes.  I finished with page 718 I

19   believe it is.

20         MR. RUSS:  Okay.

21         THE WITNESS:  1718.

22         BY MR. BRUSTIN:

23         Q.   Okay.  That's fine.  I'm going to ask

24   about all that anyways.

25         A.   Okay.



```
 1                      John Vickerd
 2        Q.   So first -- first of all, I take it
 3   that what he's describing here is the criminal --
 4   the alleged criminal activities for Valentino Dixon
 5   here?
 6        A.   Yes.
 7        MR. RUSS:  Objection to form.
 8        BY MR. BRUSTIN:
 9        Q.   I take it -- I take it that as a --
10        A.    Sorry.
11        Q.    -- DA investigator, that's the type of
12   information that you might gather in a case at the
13   request of a DA.  Is that fair to say?
14        MS. PERSICO:  Objection to form.
15        MR. RUSS:  Objection to form.  You may
16   answer.
17        THE WITNESS:  Yes.
18        BY MR. BRUSTIN:
19        Q.   Okay.  This is one of the types of
20   things that you would do?
21        A.    Yes.
22        Q.    All right.  And tell me about -- and I
23   take it that one way you would gather this
24   information is that you would go to the Buffalo
25   Police Department intelligence section to -- to
```



```
 1                    John Vickerd

 2   gather surveillance on a particular suspect,

 3   correct?

 4         A.   No, not that I'm aware of.  I did

 5   everything through what the -- the attorney for the

 6   DA's office and for -- asked me to do.  And most of

 7   it wouldn't have been going back to homicide that I

 8   already left and retired from.

 9         Q.   All right.  Well, let me ask it that

10   way then.  Certainly as a homicide detective, you

11   were familiar with the Buffalo Police Department

12   intelligence section, correct?

13         A.   I didn't even know we had an

14   intelligence squad that I'm aware of.

15         Q.   Okay.  So you -- you -- when you were a

16   homicide detective, you had no idea that there was

17   a unit that kept surveillance on -- on different

18   individuals in Buffalo?

19         A.   No.

20         MR. RUSS:  Objection to form.  You may

21   answer.

22         THE WITNESS:  No.

23         BY MR. BRUSTIN:

24         Q.   Do you have an understanding today

25   where in 1992, Mr. Belling would have been able to
```



1                    John Vickerd

2    get this information from the Buffalo Police

3    Department as described here?

4          A.    From what I'm aware of,

5    Attorney Belling would have been working on active

6    cases that yet -- before they were even started to

7    be prosecuted.

8          He would also be assigned and following

9    information given to him by the -- the homicide

10   squad or whatever other detective division that he

11   was working with.

12         Q.    So I'm asking you something a little

13   different.  I'm looking at this paragraph.  This is

14   a sworn statement from Belling.

15         Where he's saying that Valentino Dixon was

16   under surveillance by the Buffalo Police Department

17   intelligence section which noted that he operated

18   at least four different vehicles and was active in

19   narcotic transactions.

20         A.    I see that.

21         Q.    And then according to Belling in this

22   sworn affidavit, the records, pieces of paper,

23   documents, indicated that he was involved in these

24   other shootings.

25         So my -- I'm trying to get at where in the



1                      John Vickerd

2    Buffalo Police Department he would have gotten this

3    information.

4          MS. PERSICO:   Form.

5          BY MR. BRUSTIN:

6          Q.   That's my question to you.

7          MR. RUSS:   Objection to form.   You may

8    answer.

9          THE WITNESS:   You would have to ask somebody

10   from the intelligence squad which I have no idea

11   that we even had one at that time.

12         BY MR. BRUSTIN:

13         Q.   Okay.   So as far as you understood it,

14   there was no such thing as the Buffalo Police

15   Department intelligence section?

16         A.   That I'm aware of, yes.

17         Q.   You certainly never utilized their

18   services if they existed?

19         A.   No, I didn't.

20         Q.   And you -- you -- you never heard

21   about -- you've never heard of them until I

22   mention -- until you saw it in this document today?

23         A.   That I recall from back in those days,

24   no, I don't.

25         Q.   All right.   But you would agree that



1                    John Vickerd

2  this -- this document suggests that there's a unit

3  in the Buffalo Police Department which was tracking

4  the activities of individuals including

5  Valentino Dixon, correct?

6          MR. RUSS:  Objection to form.

7          MS. PERSICO:  Form.

8          MR. RUSS:  You may answer.

9          THE WITNESS:  According to -- according to

10  the attorney, yes.

11          BY MR. BRUSTIN:

12          Q.  According to one of the attorneys you

13  worked for?

14          A.  Christopher Belling?

15          Q.  Yes.

16          A.  Yes.  This -- this -- this report is

17  from him, correct?

18          Q.  Yes.  So just to be clear, when you

19  were in homicide between 1983 and 1994, no

20  knowledge whatsoever of the intelligence section?

21          MR. RUSS:  Objection to form.  You may

22  answer.

23          THE WITNESS:  Not that I remember that I'm

24  aware of right now, no.

25          BY MR. BRUSTIN:



```
 1                    John Vickerd
 2        Q.   Now, obviously to the extent that you
 3   had a criminal suspect in mind in a homicide case,
 4   the first thing you'd want to do is ascertain what
 5   information the department has on an individual,
 6   correct?
 7        A.   That would be correct, yes.
 8        Q.   Okay.  And so would it be fair to say
 9   that to the extent there was a -- there was in fact
10   a Buffalo Police Department intelligence section in
11   1991, you would have been aware of it then?
12        MS. PERSICO:  Form.
13        MR. RUSS:  Objection to form.  You may
14   answer.
15        THE WITNESS:  I -- I believe I would have
16   been, yes.
17        BY MR. BRUSTIN:
18        Q.   Okay.  And to the extent they had
19   information about a suspect that you were
20   investigating for a homicide, you would have of
21   course requested information on that suspect,
22   correct?
23        MR. RUSS:  Objection to the form.
24        MS. PERSICO:  Objection to form.
25        MR. RUSS:  You may answer.
```



```
 1                   John Vickerd
 2         THE WITNESS:  I didn't understand the
 3   question.
 4         BY MR. BRUSTIN:
 5         Q.   To the extent you had a suspect that
 6   was under surveillance by the intelligence section,
 7   you would have -- and you were investigating that
 8   suspect in a homicide, you would have -- you would
 9   have of course requested information on that
10   suspect, correct?
11         MS. PERSICO:  Objection to form.
12         MR. RUSS:  Objection to form.  You may
13   answer.
14         THE WITNESS:  Not that I'm aware.  I wasn't
15   even aware that there was an intelligence unit back
16   then.
17         BY MR. BRUSTIN:
18         Q.   Okay.  And none of this refreshes your
19   recollection about any knowledge of Valentino Dixon
20   and his alleged criminal activities back prior to
21   his arrest for this case?
22         A.   No.
23         Q.   Okay.  So let's go back to those -- we
24   can take this off now.  Thanks.  Let's go back
25   to -- we were looking at your report and
```



```
 1                    John Vickerd

 2   Vickerd's -- your report and Lonergan's report,

 3   correct?

 4        A.   Yes.

 5        Q.   And you can't tell, according to you,

 6   from the reports whether or not you or -- you or

 7   Lonergan were the assigned detective on the case,

 8   correct?

 9        MR. RUSS:  Objection to form.  You may

10   answer.

11        THE WITNESS:  Correct.

12        BY MR. BRUSTIN:

13        Q.   Now, would it be fair to say that in a

14   case like this where there was a shooting in a --

15   in a public location, police, uniform police, would

16   be the first to respond to the scene?

17        MR. RUSS:  Objection to form.  You may

18   answer.

19        THE WITNESS:  Yes.  That's what I'm aware

20   of.

21        BY MR. BRUSTIN:

22        Q.   And that's -- and that's in fact, based

23   on the documents you've reviewed this morning, what

24   happened in this case?

25        A.   Yes.
```



1                         John Vickerd

2          Q.    It appeared from the reports that

3    Lonergan didn't get to the scene until 1:45

4    approximately 15 minutes after the shooting,

5    correct?

6          A.    I'm just pushing back to his page.

7          Q.    That's page 13.

8          A.    Yeah.   1 -- 0145, yes.

9          Q.    Okay.   And that's -- that was -- that

10   was not unusual.   Oftentimes there would be the

11   police -- a number of police officers would get

12   there first, correct?

13         A.    Correct.

14         Q.    It -- it would often take a few minutes

15   or even longer for a homicide detective to get to

16   the scene?

17         A.    Yes.   It looks like he was called in by

18   Lieutenant William Smith from the shift office.   So

19   in other words, I -- I must have been called in on

20   this too.

21         Q.    Okay.   Because you were his partner?

22         A.    Correct.   Well, I was that day.

23         Q.    And you said most days when you were

24   working the shame shift you were partners?

25         A.    We were on -- in this -- on the same



```
 1                    John Vickerd
 2   schedule most of the time.
 3        Q.   And you often worked as partners,
 4   correct, unofficially?
 5        A.   A lot of times, yes.
 6        Q.   All right.  And so here you're
 7   responding to the scene -- he's responding to the
 8   scene at 145 hours and at that point, he's in
 9   charge of the scene, correct?
10        A.   I believe he would have been assigned
11   to that and given the case because he was the lead
12   detective.
13        Q.   So you --
14        A.   But again --
15        Q.   -- you believe now that based on this,
16   that James Lonergan was the lead detective in this
17   case?
18        A.   That's basically what I'm reading here
19   in front of me, yes.
20        Q.   Where does it say that's he's the lead
21   detective, where are you reading that from?
22        A.   It doesn't, but I remember he was a
23   sergeant in -- in homicide.
24        Q.   So my -- my question, sir, is what have
25   you read or what has caused you to conclude that
```



1                    John Vickerd

2     James Lonergan was the lead detective in this case?

3           MR. RUSS:  Objection to form.  You may

4     answer.

5           THE WITNESS:  Basically by reading his

6     report, that he also requested me to go to the

7     hospitals.

8           If I was the lead detective, I would have

9     been requesting him to go to the hospitals and that

10    wasn't the case.

11          BY MR. BRUSTIN:

12          Q.   Now, I thought you told me that you had

13    never -- you were never -- when you were working

14    with him, you would never be lead detective because

15    he outranked you.  Did I misunderstand that?

16          A.   Well, it wouldn't have been him.  It

17    would have been somebody else that had less time or

18    less time and grade or just a plain detective as I

19    was.

20          Q.   Okay.  All right.  So -- so it's -- so

21    back to the process.  So in this case, for example,

22    Lonergan gets to the scene approximately 15 minutes

23    after the shooting, correct?

24          A.   According to the report here, yes.

25          Q.   And you saw another report just a



1                      John Vickerd

2   minute ago indicating that the police officers

3   start arriving at -- started arriving at the scene

4   soon after 1:29?

5         A.   Yes.

6         Q.   And you would agree that one of the

7   most basic things you do as a homicide detective

8   when you get to the scene of a homicide, is you

9   talk to the police officers about what they may

10  have learned, correct?

11        A.   I would have either talked to

12  Detective Lonergan or Sergeant Lonergan or if I

13  would have to talk to the officers, yes.  That

14  would be --

15        Q.   So --

16        A.   -- normal procedure.

17        Q.   All right.  But here, you didn't

18  actually respond to the scene initially.  You

19  responded to the hospital, correct?

20        MS. PERSICO:  Form.

21        MR. RUSS:  Objection to form.

22        BY MR. BRUSTIN:

23        Q.   So what I read from these reports --

24  and you can -- you can look in just a minute.  I'll

25  refer you to it.



```
 1                     John Vickerd

 2         But my understanding of this report is that

 3   Lonergan responded to the scene and then as you

 4   mention in your report, you got a call -- you got a

 5   call, you went to HQ, and then you went to the

 6   hospital; is that right?

 7         A.    I'm looking at my report now, 17.

 8         Q.    Page 15.  Top of page 15.

 9         A.    Oh, okay.

10         MR. RUSS:  Top of page --

11         THE WITNESS:  This has got to be --

12         MR. RUSS:  Where are you looking?

13         MR. BRUSTIN:  15.

14         THE WITNESS:  This has got to be it.

15         MR. BRUSTIN:  BPD15.  Top of page 15.

16         THE WITNESS:  Okay.  0145, yeah.  This

17   reporter received a call from Police Officer

18   Lieutenant William Smith.

19         BY MR. BRUSTIN:

20         Q.    This is a report you wrote, correct?

21         A.    This is the report that I -- that

22   evidently I -- I wrote, yes.

23         Q.    And so what you're indicating here is

24   that you got a call also 1:45?

25         A.    Right.
```



1                      John Vickerd

2          Q.   You went to HQ, you went to

3    headquarters, and Lonergan went to the scene,

4    correct?

5          A.   According to this, yes.  Lieutenant

6    Smith -- yeah, I went to ECMC.  Yes.

7          Q.   Okay.  You went to the headquarters and

8    then you went to the hospital, correct?

9          A.   Yes.

10         Q.   All right.  So let's -- so first of

11   all, back at the scene with Lonergan, the first

12   thing you would expect based on your working with

13   Lonergan, what you would do certainly, is you would

14   want to talk to the police officers at the scene

15   about what they'd learned, correct?

16         MR. RUSS:  Objection to form.

17         MS. PERSICO:  Objection to form.

18         MR. RUSS:  You may answer.

19         THE WITNESS:  I believe I would have went --

20   I -- I was told by Lieutenant Smith to go to ECMC.

21         BY MR. BRUSTIN:

22         Q.   So you're not -- you're -- you need to

23   listen to my question, sir.

24         A.   I -- I --

25         Q.   -- and just try to answer my question.



1                         John Vickerd

2    So you -- you worked closely with Lonergan on many

3    cases, correct?

4         A.    Yes.

5         Q.    Okay.  And what you would -- what you

6    would have done if you went to the scene and what

7    you would have expected Lonergan to do, is to talk

8    to the police officers who had gotten them -- who

9    had gotten there before him to ask them questions

10   about what they had learned, correct?

11        MR. RUSS:  Objection to form.

12        MS. PERSICO:  Form.

13        MR. RUSS:  You may answer.

14        THE WITNESS:  I would believe so.  Yes.

15        BY MR. BRUSTIN:

16        Q.    Okay.  That's certainly what you would

17   have done when you got to the scene of a homicide

18   when a police officer had -- when police officers

19   had been there for some minutes before you got

20   there, correct?

21        A.    That's --

22        MR. RUSS:  Objection to form.  You may

23   answer.

24        THE WITNESS:  That's what I would -- that's

25   what I would have done, yes.



 1                    John Vickerd

 2         BY MR. BRUSTIN:

 3         Q.    Okay.  And what you'd be looking for is

 4    potential witnesses, correct?

 5         A.    Depends on the circumstances.

 6         Q.    If there's a shooting with 100 people

 7    there, one of the things you're going to be asking

 8    the police officers who respond to the scene is are

 9    there any potential witnesses, right?

10         A.    Yes, because they -- they should

11    have -- did they or did they not approach the

12    police officers before I got there, yes.

13         Q.    And you're going to want to know has

14    anyone mentioned any suspects, are there any

15    suspects in mind, correct?

16         A.    Yep.  That would be the general

17    knowledge, yes.

18         Q.    That's a basic question that any

19    homicide detective would ask the police officers

20    when they get to the scene of a crime?

21         A.    Correct.

22         Q.    And as soon as a suspect is mentioned,

23    you're going to want to ascertain who that suspect

24    is, correct?

25         A.    If a suspect was mentioned to them,



                         John Vickerd

1

2   yes.

3         Q.    Okay.   And -- and start investigating?

4         A.    If the subject was under investigation,

5   then yes.

6         Q.    All right.  But that's the basic --

7   that's the kind of basic question you ask police

8   officers at the scene of a homicide when you get

9   there?

10        A.    Correct.

11        MR. RUSS:   Objection to form.  You may

12   answer.

13        BY MR. BRUSTIN:

14        Q.    Now, so just based on -- you mentioned

15   you -- you had a chance to read your report,

16   correct?

17        A.    I did.

18        Q.    All right.  And it looks like so you

19   get -- you get to headquarters at -- at

20   approximately 1:45 in the morning?

21        A.    Correct.

22        Q.    And then you go to -- you're directed

23   at some point thereafter, probably within 15,

24   20 minutes, you're directed to go to the hospital.

25   Does that sound about right?



```
 1                      John Vickerd

 2           MS. PERSICO:  Form.

 3           THE WITNESS:  According to this report, yes.

 4           BY MR. BRUSTIN:

 5           Q.   And then you go to the ECMC, right?

 6           A.   Yes.

 7           Q.   How far is that from headquarters?

 8           A.   Oh, by car in the middle of the night,

 9    probably no more than 10 minutes.

10           Q.   Okay.  So you're probably at ECMC by

11    2:30, 3:00, something like that?

12           A.   According to this report, yes.

13           Q.   And then you -- you talk to some people

14    there?

15           A.   I would imagine I would have.

16           Q.   Okay.  And then you go back -- and then

17    you drive from ECMC to the crime scene, correct?

18           MS. PERSICO:  Form.

19           THE WITNESS:  I thought that it said that I

20    went to another hospital.

21           BY MR. BRUSTIN:

22           Q.   Well --

23           MR. RUSS:  Yeah, first you went back to the

24    scene.

25           BY MR. BRUSTIN:
```



 1                   John Vickerd

 2          Q.   -- take a look at the -- the -- the

 3   third -- the -- on page 15 after you describe

 4   people you spoke to.

 5          A.   Okay.  At this time your writer --

 6   okay.  It said sent me -- right, then I proceeded

 7   to -- to the scene at Bailey and East Delavan.  You

 8   were right.

 9          Q.   Okay.  And see where it says PO --

10   right above that it says PO O'Neill -- PO O'Neill

11   informed your writer that the mother had several

12   other family members.

13          Do you see that right above it?

14          MR. RUSS:  Yeah.

15          THE WITNESS:  Present, yeah.  Mother, yeah,

16   of Mario Jackson.  Yes.

17          BY MR. BRUSTIN:

18          Q.   Okay.  And that would be an example of

19   you talking to a police officer about what they may

20   have learned, correct?

21          A.   I must have talked to Police Officer

22   O'Neill.

23          Q.   Right.  Because that's the kind of

24   thing that you did as a homicide detective, you

25   would talk to police officers who were at crime



```
 1                    John Vickerd
 2  scenes or at hospitals with victims and you would
 3  want to know what, if anything, they learned that
 4  could help your case, right?
 5        MR. RUSS:  Objection to form.  You may
 6  answer.
 7        THE WITNESS:  Yes.
 8        BY MR. BRUSTIN:
 9        Q.  All right.  And so you spoke to PO --
10  PO O'Neill and then you went back -- then you went
11  for the first time to the crime scene, correct?
12        A.  Bailey and East Delavan, yes.
13        Q.  And how far is that from the hospital?
14        A.  That was from ECMC, no more than like
15  five minutes.
16        Q.  Okay.  So probably at this point you've
17  done all the things you've done, going to
18  headquarters, going to ECMC, going to the crime
19  scene.  Probably something like 3:00 or so in the
20  morning, sound right, maybe a little later?
21        A.  I believe so, yes.
22        Q.  Okay.  And then you go from -- after
23  you go to the crime scene, you speak to Lonergan?
24        A.  Correct.
25        Q.  And you -- and you -- you fill him in
```



1                        John Vickerd

2    on the information you've gathered, right?

3          A.    Yes.

4          Q.    Okay.  And, again, this would be the

5    time when you'd be talking to Lonergan, you'd be

6    talking to police officers about what information

7    they've gathered.

8          Are there any witnesses, are there any

9    suspects, those are the kinds of questions you're

10   asking, right?

11         A.    I -- I would -- I would not recollect,

12   but I would reason that that would be the case,

13   yes.

14         Q.    Okay.  And then after that, you go --

15   you learn about another victim and -- in the

16   hospital, John Sullivan, correct?

17         A.    Yes.  That would be at Sisters

18   Hospital.

19         Q.    Okay.  And how far is Sisters Hospital

20   from the scene?

21         A.    Probably another 10 minutes.

22         Q.    Okay.  So it was sometime 3:30, 4:00

23   you're at Sisters Hospital, sound about right?

24         A.    About right, yes.

25         Q.    All right.  And you're going there --



```
 1                    John Vickerd
 2  presumably, correct me if I'm wrong, but based on
 3  this report, you're going there to interview a
 4  victim in an effort to try to determine who
 5  committed this crime, correct?
 6       A.   Yes.
 7       Q.   And then you describe an interview that
 8  you had at that hospital with John Sullivan,
 9  correct?
10       A.   Yes.
11       Q.   And you don't put a time, but it has to
12  be sometime after 3:00, 3:30 in the morning, right?
13       A.   I would assume so, yes.
14       Q.   And I take it you understood you were
15  obligated to document all the information that he
16  provided to you, correct?
17       A.   Yes.
18       Q.   And all the information you provided to
19  him, correct?
20       A.   Correct.
21       Q.   And I take it -- you mentioned what a
22  careful and meticulous detective you were.  I take
23  it that within -- withdrawn.
24            Later that evening, John Sullivan is
25  questioned by Detective Masecchia in a formal Q&A.
```



1                    John Vickerd

2    Okay?

3           MR. RUSS:  Are you asking him if he

4    remembers that, he knows that --

5           MR. BRUSTIN:  No.

6           MR. RUSS:  -- what are you asking?

7           MR. BRUSTIN:  I'm -- I'm representing that

8    to you.

9           MR. RUSS:  Okay.

10          BY MR. BRUSTIN:

11          Q.   I'm not showing it to you yet.  I want

12    you to -- first of all, do you remember that?

13          A.   No.

14          Q.   Okay.  Would it be fair to say though,

15    based on the information that John Sullivan

16    provided to you, you would have ensured that either

17    Masecchia had your notes of the interview before he

18    re-interviewed John Sullivan or you at least

19    briefed him on what you learned?

20          A.   You would have to take that up with

21    him.  I wouldn't have -- I wouldn't be aware of

22    what he --

23          Q.   So --

24          A.   -- who he talked to --

25          Q.   Sir --



1                     John Vickerd

2          A.    -- what he read or if he talked to me.

3     I don't know.

4          Q.   So I'm not asking you -- I -- you've

5     already told me you don't remember.  I'm asking you

6     now about process.  Okay?

7          You -- you -- you obviously learned

8     important information from John Sullivan according

9     to your report, correct?

10         A.   Yes.

11         Q.   And so you would have made sure to the

12    extent John Sullivan was being re-interviewed that

13    night, as a matter of process, you would have made

14    sure that the officer who interviewed

15    John Sullivan, again, in a formal Q&A, would have

16    received the information that you got from

17    John Sullivan, correct?

18         A.   I would assume so, yes.

19         Q.    All right.  Now, I want to -- let's

20    mark as Exhibit 12 -- withdrawn.

21         First of all, have you -- have you heard the

22    term -- withdrawn.

23         Typically what a homicide detective would do

24    in 1991, is they would conduct follow-up

25    investigations on cases that became homicides after



1                    John Vickerd

2  the initial police officers went to the scene,

3  correct?

4          MS. PERSICO:  Objection to form.

5          MR. RUSS:  Yeah.  I -- I don't know what

6  that means.  Objection to form.  You may answer.

7          THE WITNESS:  I believe that the information

8  that I had would have been handwritten and I would

9  have taken it back to the homicide office and any

10  one of the other officers in homicide could have

11  followed up on this.

12          BY MR. BRUSTIN:

13          Q.  All right.  Well, let's -- let's mark

14  as -- let's mark for identification -- let's mark

15  as an exhibit Bates stamp page HR-Dixon 2212 and

16  2213.

17          MR. RUSS:  Is this Exhibit 12?

18          BY MR. BRUSTIN:

19          Q.  We'll mark this as 12, yes.

20          We'll put it on the screen for you and I'll

21  represent to you that these are policy -- this is a

22  portion of a policy and procedure that was provided

23  to us by the Buffalo Police Department.  Okay?

24          A.  Okay.

25          Q.  So I want you to read, first of all,



1                      John Vickerd

2    1.12 assigning cases.

3          MR. RUSS:  1.12?

4          MR. BRUSTIN:  Yes.  It's on page 2212.  It

5    says 1.12 assigning cases.  Just that -- just that

6    paragraph A.

7          THE WITNESS:  Okay.

8          BY MR. BRUSTIN:

9          Q.   Now, is the -- would the -- to your

10   knowledge, would the -- would the homicide -- would

11   the Torriano Jackson homicide and related shootings

12   be a follow-up investigation as -- as referred to

13   in this policy?

14         A.   I didn't understand that question

15   again.

16         Q.   Sure.  Would the shooting that

17   you've -- you've read documents concerning -- you

18   know you were involved in the shooting

19   investigation, the homicide investigation of the

20   death of Torriano Jackson, correct?

21         A.   Yes.

22         Q.   Does this policy describe that

23   investigation, was that a follow-up investigation

24   by homicide detectives that you were conducting

25   as -- as described in this policy?



```
 1                     John Vickerd

 2          MS. PERSICO:  Form.

 3          THE WITNESS:  Do you know who wrote -- wrote

 4   this report?

 5          BY MR. BRUSTIN:

 6          Q.   This is not a report.  It's a policy

 7   from the department --

 8          A.   Okay.  So that's --

 9          Q.   -- that we were provided.

10          A.   That's a picture of the policy

11   provided.  Okay.

12          Q.   Yes.

13          A.   Go ahead.

14          Q.   So my question is, does this policy

15   apply to this case?  Is that what was happening,

16   was this a follow-up investigation that you were

17   doing along with other detectives in this case?

18          A.   Again, I would not have recalled any of

19   this back then --

20          Q.   Okay.

21          A.   -- or even now.

22          Q.   I'm asking you about now.  Do you

23   remember if this was -- was it in fact -- I know

24   you don't remember the investigation.

25          But is it -- was it a follow-up
```



 1                      John Vickerd

 2  investigation as described in this policy, do you

 3  remember -- do you remember -- do you know that?

 4        A.   As usual, this should have been, yes.

 5        Q.   Well, was the follow-up

 6  investigation -- I'm trying to understand what

 7  the -- what the terminology means in Buffalo.

 8        Was the investigation that you began at 1:45

 9  in the morning along with Lonergan, a follow-up

10  investigation of the shooting?

11        A.   I can't say yes or no to that.  I don't

12  recall.

13        Q.   Fair enough.  Take a look at 1.15.

14        MR. RUSS:  Follow-up investigations?

15        BY MR. BRUSTIN:

16        Q.   Yes.  And if you -- maybe this will

17  help, maybe it won't.  Just -- just read this and

18  see if this refreshes your recollection about

19  whether or not your involvement in this case was a

20  follow-up investigation.

21        MR. RUSS:  So from the beginning of the

22  section to the bottom of the page, is that what

23  you're saying?

24        BY MR. BRUSTIN:

25        Q.   Yeah, that -- that -- try that.  See if



1                        John Vickerd

2  that helps.

3         A.   No.  I wasn't even aware of the -- the

4  whole page here that I'd read.  I wasn't even aware

5  and I'm not even aware of it now that that was in

6  existence.

7         Q.   Well, it sounds like you just don't --

8  it sounds like you don't remember whether that

9  was -- withdrawn.

10        A.   Correct.

11        Q.   All right.  Let -- let's mark -- let's

12  mark as Plaintiff's 13 HR-Dixon 2219 which are some

13  other policies.  And I want you to read to yourself

14  what's under 2.15 daily activity reports.

15        A.   Yeah.

16        Q.   Just read that section and let me know

17  when you're done.

18        A.   Okay.  I'm finished reading it.

19        Q.   Okay.  When you were in homicide from

20  1983 into '94, did you fill out daily activity

21  reports as described here?

22        A.    I would fill out a daily activity

23  report if -- if I was assigned to a case, yes.

24  Otherwise, if there was no cases involved the

25  day -- the day I was working, there would be no



JOHN THOMAS VICKERD                          March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                        103

```
 1                    John Vickerd

 2  report.

 3         Q.   So I'm sorry, I'm going to be -- I want

 4  to make sure I understand what you're saying.  Are

 5  you saying that you would only do daily activity

 6  reports if you were the assigned detective or if

 7  you were working on a case that was assigned that

 8  day?

 9         MS. PERSICO:  Form.

10         MR. RUSS:  Objection to form.

11         BY MR. BRUSTIN:

12         Q.   Or something else.

13         MR. RUSS:  You may answer.

14         THE WITNESS:  If there was some pertinent

15  information that I obtained during my tour of duty,

16  I would -- I would put it on a P73, yes.

17         BY MR. BRUSTIN:

18         Q.   Well -- okay.  So my understanding --

19  and I know what a P73 is now from asking -- from --

20  from ask -- talking to other witnesses, but this

21  appears to be describing something else.

22         This appears to be describing the daily

23  activity report as something that homicide -- that

24  detectives would fill out on a daily basis.

25         Do you remember doing anything like what's
```



1                        John Vickerd

2     described here aside from P73s?

3          A.    No.

4          Q.    Okay.  Is it fair to say you don't

5     remember one way or another or you don't think you

6     did?

7          A.    I would say I don't remember one way or

8     the other.

9          MR. BRUSTIN:  Okay.  So I want to just

10    request on the record and we'll -- we'll follow up

11    in writing, any -- any daily activity reports for

12    any of the homicide detectives involved in this

13    investigation during -- during the course of this

14    investigation.  We'll follow up in writing.

15         MR. RUSS:  I acknowledge your request.  I do

16    appreciate your putting it in writing.  And it

17    seems to me that this specific request would have

18    been included in much more general requests that

19    you made, but we will take a look.

20         MR. BRUSTIN:  I think -- I think that's

21    absolutely right.  So I'm asking -- I'm asking you

22    to go back and take a look and see if in fact any

23    of the homicide detectives or any -- any of the

24    officers involved -- any of the detectives involved

25    in investigating this case, actually filled out



```
 1                      John Vickerd
 2   daily activity reports during this investigation.
 3          MR. RUSS:  I understand your request.
 4          MR. BRUSTIN:  Okay.  So let's take a look
 5   now at page 11 of Exhibit 2.
 6          MR. RUSS:  17, 16, 15, 14 -- all right.  We
 7   got it.
 8          BY MR. BRUSTIN:
 9          Q.   First of all, so you would agree this
10   appears to be a report from -- you know what,
11   before I ask you about this.
12          Would it be fair to say, Mr. Vickerd, that
13   within minutes or certainly hours of when you took
14   a statement, you would create your report?
15          A.   A report of -- of what?
16          Q.   Of what you learned from -- from a --
17   so, for example, when you interviewed
18   John Sullivan, would it be fair to say that you
19   would have created the report or dictated the
20   report within minutes or hours of -- of doing that
21   task?
22          A.   Probably by the end of my shift, yes.
23          Q.   Okay.  And you would have put your
24   notes and the report when it was done in the file,
25   correct?
```



```
 1                      John Vickerd
 2          A.   I would have handed it to the secretary
 3   and the secretary would have put it legibly in
 4   typed print.
 5          Q.   And what would you have done with your
 6   notes?
 7          A.   I would have handed them to her and I
 8   noticed obviously you have them in this file here.
 9          Q.   Okay.  Now, let's go back to page 11.
10   First of all, do you know -- do you know an officer
11   Joe Serwon?
12          A.   No.
13          Q.   Do you know what BMHA stands for?
14          A.   Buffalo Municipal Housing Authority.
15          Q.   Okay.  And is that a -- is that a
16   separate police department in Buffalo?
17          A.   Yes.  They would -- that would be
18   assigned to one of the projects probably or a unit
19   of projects.
20          Q.   All right.  Would it be fair to say
21   though that you -- you -- you often worked with
22   housing authority police in connection with
23   homicide investigations --
24          A.   No.
25          Q.   -- they would often be at the scene?
```



1                    John Vickerd

2        A.   It depends if -- if -- if there was a

3   suspect or witnesses that were from that housing

4   authority I would have conferred with the housing

5   authority, yes.

6        But that's not always the case.  If they

7   came from individual homes or streets or addresses,

8   that would be something different.

9        Q.   Okay.  But when you -- but -- but you

10  worked cooperatively with housing police, correct?

11       A.   Always.

12       Q.   And so when you got to the scene of a

13  homicide, you were interested in information from

14  Buffalo police officers, housing authority

15  officers, anybody who had information, correct?

16       A.   I would have been, yes.

17       Q.   And based on your experience working

18  with Lonergan, he was the same way?

19       A.   Yes.

20       Q.   All right.  So it appears that -- that

21  this officer, Serwon, was one of the early officers

22  at the scene, correct?

23       A.   According to this.  I don't recognize

24  the name at all, but according to this report, yes.

25       Q.   Okay.  And it looks like based on --



1                    John Vickerd

2   have you read this report?

3        A.    This report?  No, I just got -- we just

4   turned to that page.

5        Q.    Okay.  So take a minute and read it.

6   Let me know when you're done.

7        A.    Okay.

8        Q.    All right.  So based on this report,

9   you correct me if I'm wrong -- by the way, you're

10  used to reading police officer reports in

11  connection with your homicide investigations,

12  correct?

13        MR. RUSS:  30 years ago?

14        THE WITNESS:  Normally, I --

15        BY MR. BRUSTIN:

16        Q.    Exactly.

17        A.    I don't recognize this report

18  whatsoever.

19        Q.    So I'm not asking you that.  I'm asking

20  you something a little different.  As a homicide

21  detective in 1991, for example, you would routinely

22  read police officer reports like this one to gather

23  information about your case, correct?

24        A.    If I was going to continue on to the

25  same case, yes.



1                        John Vickerd

2        Q.    Okay.  All right.  And you understand

3   that you conducted -- you understand today that you

4   conducted a number of investigative activities in

5   this case, correct?

6        A.    Yes.

7        Q.    All right.  So you did continue on in

8   this case, correct?

9        A.    I don't know if I did or not.

10       Q.    All right.

11       A.    I don't, again, remember -- I remember

12  the name Valentino Dixon and I was told that by

13  Detective Stambach which I already told you.

14       Q.    Fair enough.

15       A.    Other than that, I don't remember

16  anything about this case.

17       Q.    Okay.  Well, I'm still going to ask you

18  questions about what happened based on the things

19  you wrote down.  Okay?

20       A.    But I'm not going to recollect what I

21  wrote down so go ahead.

22       Q.    Okay.  Well, we're going to -- we're

23  going to -- we're going to -- we're going to try to

24  muddle through.

25            So first of all, let's go to this report.



```
 1                      John Vickerd
 2   You just read it, correct?
 3           A.   I did.
 4           Q.   And it appears according to this report
 5   that soon after this officer responded to the scene
 6   at 1:39, Ms. Sonya James approached him and
 7   volunteered herself as a witness, correct?
 8           MS. PERSICO:  Form.
 9           THE WITNESS:  According to this report, yes.
10           BY MR. BRUSTIN:
11           Q.   Okay.  And according to this report,
12   while she was talking to this officer, she heard
13   over the radio, mention of Valentino Dixon as a
14   possible suspect, correct?
15           MS. PERSICO:  Form.
16           MR. RUSS:  Objection to form.  You may
17   answer.
18           THE WITNESS:  And he was the father of one
19   of the children.  Is that the part you're talking
20   about?
21           BY MR. BRUSTIN:
22           Q.   Yes.  So while she was talking -- it
23   appears in this report that while she was talking
24   to officer Serwon over the radio, Valentino Dixon
25   was mentioned as a possible suspect, correct?
```



1                    John Vickerd

2         A.   According to this, yes.

3         Q.   Okay.  And then she mentioned -- and

4    then she told the officer that he was the father of

5    one of her children, correct?

6         MS. PERSICO:  Form.

7         THE WITNESS:  I believe so, yes.

8         BY MR. BRUSTIN:

9         Q.   Okay.  So it appears that what this --

10   what this means to you as a trained homicide

11   detective, is that at some point prior to this,

12   somebody else mentioned Valentino Dixon as a

13   suspect such that he could be broadcast over the

14   radio?

15        MS. PERSICO:  Form.

16        MR. RUSS:  Objection to form.  You may

17   answer.

18        THE WITNESS:  I would not know that for a

19   fact.  First of all, we didn't really work with

20   Buffalo Municipal Housing Authority officers.

21        Whether this report was in -- back then in

22   '91 were part of the file, I have no idea and I --

23        BY MR. BRUSTIN:

24        Q.   So --

25        A.   -- don't recognize it.



JOHN THOMAS VICKERD                                      March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                      112

1                      John Vickerd

2          Q.    I'm not asking you about whether it's

3    -- I'm not asking you anything about the report.

4    I'm asking you about what happened according to the

5    report.

6          Do you think that Officer -- do you have any

7    reason to believe that Officer Serwon lied about

8    what happened?

9          A.    I didn't say that.

10         Q.    Okay.  So according to this report, it

11   suggestions that Valentino Dixon was mentioned as a

12   suspect prior to Ms. James speaking to this officer

13   because his name was broadcast over the radio,

14   correct?

15         MS. PERSICO:  Objection to form.

16         MR. RUSS:  Objection to form.  You may

17   answer.

18         THE WITNESS:  According to this report, she

19   described him, his height, weight.

20         BY MR. BRUSTIN:

21         Q.    Well, she heard his name on the radio

22   is what this report says, right?  I'll read it to

23   you.

24         After she heard on the radio that a possible

25   suspect was Valentino Dixon.  That means the radio



JOHN THOMAS VICKERD                                      March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                      113

```
 1                    John Vickerd
 2  said Valentino Dixon was a suspect, correct?
 3         A.   According --
 4         MR. RUSS:  Objection to form.  You may
 5  answer.
 6         THE WITNESS:  According to this report, yes.
 7         BY MR. BRUSTIN:
 8         Q.   According to Officer Serwon, correct?
 9         MR. RUSS:  Objection to form.  You may
10  answer.
11         THE WITNESS:  According to this report, yes.
12         BY MR. BRUSTIN:
13         Q.   By Officer Serwon, correct?
14         A.   His name's on top, yes.
15         Q.   All right.  And certainly you would
16  expect any -- any housing authority officer who
17  received information about a potential suspect, to
18  immediately provide that to homicide detectives at
19  the scene, correct?
20         MS. PERSICO:  Form.
21         MR. RUSS:  Objection to form.  You may
22  answer.
23         THE WITNESS:  I wouldn't know how they work
24  personally, no, I wouldn't.
25         BY MR. BRUSTIN:
```



1                        John Vickerd

2         Q.   Well, let me ask you how generally

3    police officers anywhere in the world would work.

4    If you're a police officer at a homicide scene and

5    you receive information from a witness about a

6    possible suspect, would you expect that that police

7    officer might tell the homicide detective?

8         MR. RUSS:  Objection to form.  Don't answer.

9    A police officer anywhere in the world?  Even you

10   can't believe that's an appropriate question.

11        MR. BRUSTIN:  So -- so --

12        THE WITNESS:  Thank you.

13        BY MR. BRUSTIN:

14        Q.   -- what I'm suggesting is that your

15   answer is -- is ridiculous.  So let me ask it a

16   different way.

17        A.   I think the question --

18        Q.   Any --

19        A.   -- was ridiculous.

20        Q.   Any --

21        THE REPORTER:  Wait, I can only take one at

22   a time, please.

23        BY MR. BRUSTIN:

24        Q.   Any police officer -- any police

25   officer working in Buffalo at a homicide scene who



1                    John Vickerd

2  received information about a suspect in a homicide,

3  you would expect that police officer to seek out a

4  homicide detective to provide that information to

5  them at the scene, correct, sir?

6        MR. RUSS:  Objection to form.  You may

7  answer.

8        THE WITNESS:  I would stipulate that

9  officers that I work with, I would know that they

10  would do something like that, yes.  Other officers

11  that I did not know, I -- I have no idea.

12        BY MR. BRUSTIN:

13        Q.   Okay.  So you wouldn't think that a

14  homicide -- you wouldn't think that a housing

15  authority police officer in Buffalo would know that

16  when you receive information at a homicide scene

17  about a suspect, you should provide that to the

18  detectives?

19        MS. PERSICO:  Objection to form.

20        MR. RUSS:  Objection to form.  You may

21  answer.

22        THE WITNESS:  I have no idea what they would

23  do and how they would react, no.

24        BY MR. BRUSTIN:

25        Q.   All right.  But you would agree that



```
 1                    John Vickerd
 2   this indicates that aside from Ms. James, somebody
 3   else must have provided information that
 4   Valentino Dixon was a suspect because his name was
 5   on the radio as a suspect?
 6           MR. RUSS:  Objection to form.
 7           MS. PERSICO:  Objection to form.
 8           MR. RUSS:  You may answer.
 9           THE WITNESS:  If his name was on the radio,
10   I would imagine if that's what they said about him,
11   yes.
12           BY MR. BRUSTIN:
13           Q.  Okay.  And so there should be
14   documentation somewhere in this file about who
15   first mentioned Valentino Dixon as a suspect prior
16   to Ms. James being interviewed soon after 1:39 in
17   the morning, correct?
18           MS. PERSICO:  Objection to form.
19           MR. RUSS:  Objection to form.  You may
20   answer.
21           THE WITNESS:  You are asking of me of my
22   opinion and I have no idea who you're talking about
23   or what officer you're talking about.
24           Some officers could have sluffed this off.
25   I have no idea.  Nobody that I ever worked with
```



```
 1                      John Vickerd
 2   would do that, no.
 3        BY MR. BRUSTIN:
 4        Q.   Okay.  Well, I'm asking you something
 5   different and I would really ask that you try to
 6   focus on my question.
 7        This report indicates that somebody besides
 8   Sonya James mentioned or provided information that
 9   Valentino Dixon was a suspect because his name was
10   put out over the police radio as a suspect,
11   correct?
12        A.   According to this report, yes.
13        Q.   That means somebody else had to provide
14   information to the police such that it made its way
15   onto the police radio, correct?
16        MR. RUSS:  Object -- objection to form.  You
17   may answer.
18        THE WITNESS:  I have no idea where it would
19   have come from.  I have no idea.
20        BY MR. BRUSTIN:
21        Q.   Well, it had to come from somewhere,
22   right?
23        MR. RUSS:  Objection to form.
24        MS. PERSICO:  Objection to form.
25        MR. RUSS:  You may answer.
```



```
 1                      John Vickerd

 2          THE WITNESS:  It could have been a phone

 3   call, it could have been somebody with a -- I don't

 4   know, a difference of opinion.  I have no idea.

 5          BY MR. BRUSTIN:

 6          Q.   Wherever it came from, it would be

 7   important that that information be documented,

 8   correct?

 9          MR. RUSS:  Objection to form.  You may

10   answer.

11          THE WITNESS:  I never worked in another

12   squad besides what I told you.

13          BY MR. BRUSTIN:

14          Q.   Okay.  Now, so it sounds like you have

15   no idea if you knew by the time that you got to

16   John Sullivan in the hospital, as to whether or not

17   Valentino Dixon was a suspect, correct?

18          MS. PERSICO:  Objection to form.

19          MR. RUSS:  Objection to form.  You may

20   answer.

21          THE WITNESS:  According to my report, he

22   mentioned somebody by the name of Tino and said

23   that the first name was Valentino.

24          He did not report that the name was Dixon

25   and that's just what I wrote and do I remember
```



1                          John Vickerd

2    writing it, no.

3          BY MR. BRUSTIN:

4          Q.    So I'm asking you a totally different

5    question than the one you just answered so I want

6    you to answer my question.

7          My question is, when you went to the

8    hospital to visit with John Sullivan, you don't

9    recall today one way or another whether you had

10   learned by that point in time that Valentino Dixon

11   was a suspect in the case, correct?

12         MS. PERSICO:   Form.

13         THE WITNESS:   Do I remember?   No, I don't.

14         BY MR. BRUSTIN:

15         Q.    You don't know one way or the other,

16   correct?

17         A.    Correct.

18         Q.    And you can't tell from the report

19   whether or not you asked John Sullivan whether he

20   knew Valentino Dixon before he told you that he was

21   the shooter, correct?

22         MS. PERSICO:   Objection to form.

23         MR. RUSS:   Objection to form.   You may

24   answer.

25         THE WITNESS:   No, I don't.



```
 1                    John Vickerd

 2        BY MR. BRUSTIN:

 3        Q.   You don't know one way or another

 4   whether or not you talked to him about

 5   Valentino Dixon before he said Valentino Dixon was

 6   the shooter, correct?

 7        MR. RUSS:  Objection to form.  You may

 8   answer.

 9        MS. PERSICO:  Form.

10        THE WITNESS:  No.

11        BY MR. BRUSTIN:

12        Q.   And obviously this reports is not a

13   verbatim account, not an exact account of

14   everything you said to John Sullivan and everything

15   John Sullivan said to you, correct?

16        A.   If I wrote it back 28, 30 years ago and

17   it was typed the way I wrote it, yes, it would be

18   exact.

19        Q.   All right.  Well, let me try it a

20   different way.  So take a look at page -- your

21   report's on page 15 and 16.  Okay?  Let me know

22   when you're there.

23        A.   I've got 15 and 16.

24        Q.   All right.  Look at the bottom of

25   page 15 where it says your writer.  Do you see
```



```
 1                    John Vickerd
 2  that?
 3        A.   Your writer then proceeded to Sisters
 4  Hospital.
 5        Q.   No.
 6        A.   That area?
 7        Q.   Your writer then spoke with
 8  John Sullivan.  The bottom of the page.
 9        A.   With John Sullivan, yeah.
10        Q.   Okay.  Read that all the way through
11  the next page.  Let me know when you're done.
12        MR. RUSS:  The whole next page?
13        MR. BRUSTIN:  Yeah.
14        THE WITNESS:  It's just short.
15        MR. RUSS:  Okay.
16        THE WITNESS:  Well, kind of short.
17        MR. BRUSTIN:  If you need to.  You've read
18  it just a moment ago, but if you want to refresh
19  your recollection, that's fine.
20        THE WITNESS:  Yeah.  This is where he
21  mentioned Tino.
22        BY MR. BRUSTIN:
23        Q.   Yes, sir.
24        A.   Last name unknown.  And what he was
25  wearing.  Okay.
```



                          John Vickerd

 1          Q.    All right.  And so -- and by the way,

 2   you never reviewed even this report prior to today,

 3   you haven't looked at this report for many years,

 4   correct?

 5          A.    Correct.

 6          Q.    But you would agree that what you're

 7   attempting to do here is you're attempting to

 8   summarize the important information that

 9   John Sullivan provided to you, correct?

10          MR. RUSS:  Objection to form.  You may

11   answer.

12          THE WITNESS:  I would have back at that

13   time, yes.

14          BY MR. BRUSTIN:

15          Q.    You're not writing down every word you

16   said to him and every word that he said to you,

17   correct?

18          A.    No.  I've got -- my next page is 17 and

19   it's got handwritten notes by me.

20          Q.    Okay.  The handwritten notes I will

21   represent to you almost directly track what --

22   what's in this report.

23          Was it your process to simply read that into

24   a -- a Dictaphone and have it typed up?



JOHN THOMAS VICKERD                          March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                        123

```
 1                    John Vickerd

 2         A.    No.   I would have handed it to the

 3   secretary and she would have typed it up for me.

 4         Q.    Okay.  So when you were taking notes of

 5   your meeting with John Sullivan, you did not

 6   include in your notes every word that you said to

 7   him and every word that he said to you, you tried

 8   to summarize what you thought was important,

 9   correct?

10         MR. RUSS:  Objection to form.  You may

11   answer.

12         THE WITNESS:  I believe so, yes.

13         BY MR. BRUSTIN:

14         Q.    All right.  For example, you -- you

15   don't -- you haven't written any of the questions

16   that you asked him in this report, correct?

17         A.    Correct.

18         Q.    And there's nothing in this report that

19   describes what information, if any, you had about

20   Valentino Dixon prior to this meeting, correct?

21         MR. RUSS:  Objection to form.

22         MS. PERSICO:  Form.

23         MR. RUSS:  You may answer.

24         THE WITNESS:  I didn't read my handwritten

25   notes, but I would believe so, yes.
```



```
 1                    John Vickerd

 2        BY MR. BRUSTIN:

 3        Q.   I mean, it was a little tough to read

 4   for me.  But it appears to me when you look at

 5   them, that they almost directly track your report.

 6        And is that -- is that the process, you

 7   would hand your notes to the secretary and she

 8   would type them up?

 9        MS. PERSICO:  Form.

10        MR. RUSS:  Objection to form.  You may

11   answer.

12        THE WITNESS:  Yes.  It would have been the

13   secretary in the office and she would have typed it

14   up and I would have reread it at that time.

15        BY MR. BRUSTIN:

16        Q.   Okay.  In any case, you would agree

17   though that based on your review of this report

18   today, there's nothing in this report indicating

19   what, if anything, you knew about Valentino Dixon

20   prior to this interview, correct?

21        MR. RUSS:  Objection to form.

22        MS. PERSICO:  Form.

23        MR. RUSS:  You may answer.

24        MS. PERSICO:  How many times are you going

25   to ask this question?
```



1                     John Vickerd

2          THE WITNESS:  According to this report, yes.

3          BY MR. BRUSTIN:

4          Q.   According to this report, there's no

5    information about it, it doesn't say anything about

6    it, correct?

7          A.    Correct.

8          MR. RUSS:  Objection to form.

9          MS. PERSICO:  Form.

10          MR. RUSS:  You may answer.

11          BY MR. BRUSTIN:

12          Q.   You don't know, for example --

13    withdrawn.

14          And you can't tell from this report whether

15    or not you spoke -- you spoke to John Sullivan

16    about Valentino Dixon prior to him telling you that

17    Valentino Dixon or Tino was the shooter, correct?

18          MS. PERSICO:  Form.

19          MR. RUSS:  Objection to form.  You may

20    answer.

21          THE WITNESS:  By reading --

22          BY MR. BRUSTIN:

23          Q.   I didn't hear you.

24          A.    -- this report from this many years

25    ago, no.



1                          John Vickerd

2          Q.   All right.  And by the way, you don't

3   know, for example, whether or not prior to this

4   interview, you knew that Valentino Dixon's nickname

5   was Tino, correct?

6          A.   I did not know, no.

7          Q.   Well, are you telling me you remember

8   you didn't know?

9          A.   No.

10         Q.   How could you -- how could you remember

11  that today?

12         A.   Because I'm reading this report and it

13  says that he gave me that information and that's

14  the first time I've heard Tino mentioned.

15         Q.   Where does it say that, that that's the

16  first time you heard Tino mentioned?

17         A.   Let me get back to the page that was

18  typewritten.  It's easier to read.  It's actually

19  not Torri, it's Tino -- it's Torri, not Tino

20  fighting Mario and his name is Mario last name

21  unknown.

22         MR. RUSS:  Yeah.  No, I think --

23         THE WITNESS:  And here's Tino.  Is -- is --

24  is -- yeah, Tino is -- name is Valentino, last name

25  unknown.



```
 1                   John Vickerd

 2          BY MR. BRUSTIN:

 3          Q.   But he doesn't know the last name.  It

 4   doesn't mean you don't know the last name, right?

 5          A.   Do --

 6          MR. RUSS:  Objection to form.

 7          THE WITNESS:  Do I recall back from then, no

 8   I don't.

 9          BY MR. BRUSTIN:

10          Q.   This report doesn't indicate -- this

11   report indicates that he doesn't known the name

12   Tino.  He doesn't know Valentino's last name,

13   correct?

14          In other words, let me -- let me ask you a

15   better question.  Okay?  There's nothing in this

16   report that indicates whether or not you had heard

17   the name Tino prior to this interview, correct?

18          MS. PERSICO:  Form.

19          THE WITNESS:  Yes.

20          BY MR. BRUSTIN:

21          Q.   You don't know one way or the other

22   whether you did or didn't, correct?

23          MR. RUSS:  Objection to form.  You may

24   answer.

25          THE WITNESS:  I don't remember Tino being
```



```
 1                    John Vickerd
 2   mentioned and I don't remember anything about this
 3   case as I've been telling you.  So --
 4          BY MR. BRUSTIN:
 5          Q.   Right.  So you don't know one way or
 6   another whether or not you knew the name Tino
 7   before you interviewed John Sullivan in the
 8   hospital, correct?
 9          MS. PERSICO:  Form.
10          MR. RUSS:  Objection to form.  You may
11   answer.
12          THE WITNESS:  If I was told back 28,
13   30 years ago, then no, I don't remember that, no.
14          BY MR. BRUSTIN:
15          Q.   And you don't know whether or not you
16   knew how tall Valentino Dixon was and how much he
17   weighed prior to your interviewing John Sullivan,
18   correct?
19          MS. PERSICO:  Form.
20          THE WITNESS:  At this time and date right
21   now, I don't remember even what he looked like or
22   size-wise, weight-wise, anything.
23          BY MR. BRUSTIN:
24          Q.   So I'm not asking you what he looked
25   like size-wise or weight-wise.  I'm asking you a
```



```
 1                      John Vickerd

 2   very specific question.

 3        Because you don't remember and it doesn't

 4   say in the report, you don't know whether you had

 5   that information before this interview, correct?

 6        A.   Correct.

 7        Q.   All right.  Now, if you take a look at

 8   page 15, the bottom of the page, the last two

 9   sentences, your writer then spoke with

10   John Sullivan.

11        A.   I see that.

12        Q.   And it says he informed me that he was

13   on the corner of Bailey and Delavan with his

14   friend -- with his friend, Fred Stencil, right?

15        A.   That's what it says, yes.

16        Q.   In other words, he says at the time of

17   the shooting when he was shot and he allegedly

18   observed the perpetrator, he was standing next to

19   Fred Stencil, right?

20        MR. RUSS:  Objection to form.

21        MS. PERSICO:  Form.

22        MR. RUSS:  You may answer.

23        THE WITNESS:  He just said he was with his

24   friend, Fred Stencil.

25        BY MR. BRUSTIN:
```



```
 1                    John Vickerd
 2        Q.   Well, he was on the corner with his
 3   friend, Fred Stencil, right?
 4        MR. RUSS:  Objection to form.
 5        MS. PERSICO:  Form.
 6        MR. RUSS:  You may answer.
 7        THE WITNESS:  Yes.
 8        BY MR. BRUSTIN:
 9        Q.   What does that tell you potentially
10   about Fred Stencil --
11        MR. RUSS:  Objection to form.
12        THE WITNESS:  That --
13        BY MR. BRUSTIN:
14        Q.   -- if anything?
15        A.   If -- if anything just reading this
16   report like this, it would imagine that he was
17   there with Fred Stencil at this -- at the time that
18   the report was written.
19        Q.   And what does that make Fred Stencil
20   potentially?
21        MR. RUSS:  Objection to form.
22        MS. PERSICO:  Form.
23        THE WITNESS:  Well, it depends on what he
24   saw.
25        BY MR. BRUSTIN:
```



```
 1                     John Vickerd
 2         Q.   Well, so potentially he's a witness,
 3    right?
 4         A.   Well, he could have been looking in
 5    another direction.
 6         Q.   How do you figure out if he's looking
 7    in another direction?
 8         A.    I didn't figure out.  I said maybe he
 9    could have been looking in another direction.
10         Q.   Right.  How do you find out if
11    Fred Stencil was looking in another direction?
12         A.   Well, I guess I'd have to contact him
13    after 28 years.
14         Q.   Well, I'm talking about now what --
15         A.   Which I won't do.
16         Q.   I'm -- I'm talking about the time of
17    the investigation and what should have happened
18    then.
19         A.   Yeah.
20         Q.   So would it be fair to say that based
21    on this report --
22         A.   Somebody -- somebody should have --
23         THE REPORTER:  Can you just try and wait
24    until he finishes his question before you answer?
25         THE WITNESS:  Go ahead.
```



```
 1                      John Vickerd

 2           BY MR. BRUSTIN:

 3           Q.   Based on this report, it's clear that

 4      Fred Stencil is a potential witness, correct?

 5           A.   Potential.

 6           Q.   And Fred Stencil needs to be

 7      questioned, correct?

 8           A.   I would assume so.

 9           Q.   You would assume so or pursuant --

10      pursuant -- pursuant to policy and practice,

11      Fred Stencil needs to be questioned as soon as

12      possible after John Sullivan was interviewed,

13      correct?

14           MS. PERSICO:  Objection.

15           MR. RUSS:  Objection to form.  You may

16      answer.

17           THE WITNESS:  According to the report, this

18      is the first I'm aware of that name and that would

19      have been the procedure, yes.

20           BY MR. BRUSTIN:

21           Q.   Okay.  And potentially, Fred Stencil

22      was even a better witness because John Sullivan was

23      shot during the incident and the trauma could have

24      affected -- could have affected Sullivan's ability

25      to make an identification, correct?
```



1                    John Vickerd

2          MS. PERSICO:  Objection to form.

3          MR. RUSS:  Nice try.  Objection to form.

4   You may answer.

5          THE WITNESS:  I would have no idea what

6   trauma he was in.

7          BY MR. BRUSTIN:

8          Q.   That's fair.  You would certainly want

9   to talk to a witness who was -- who was potentially

10  standing next to this victim, John Sullivan, to see

11  what he remembered about what he saw and what he

12  heard, correct?

13         MS. PERSICO:  Objection.

14         MR. RUSS:  Objection to form.  You may

15  answer.

16         THE WITNESS:  With his name in this report,

17  I would imagine somebody from the homicide squad

18  would be following up and talking to Fred Stencil.

19         BY MR. BRUSTIN:

20         Q.   Okay.  And obviously you'd want to talk

21  to Fred Stencil as soon as possible after you

22  receive the information from John Sullivan,

23  correct?

24         MS. PERSICO:  Objection.

25         THE WITNESS:  Myself, I don't recall what I



```
 1                   John Vickerd

 2   went on from after this report.

 3        BY MR. BRUSTIN:

 4        Q.   I already know you don't remember

 5   anything you did in this case.  You don't remember

 6   a single thing.  That's clear.  My question is

 7   pursuant to -- to policy and practice.

 8        Pursuant to policy and practice in the

 9   homicide division, when you receive this

10   information you put in this report, somebody needed

11   to follow up with Fred Stencil as soon as possible

12   after this interview?

13        MS. PERSICO:  Objection.

14        MR. RUSS:  Objection to form.  You may

15   answer.

16        THE WITNESS:  Somebody from the homicide

17   squad should have picked up on his name and looked

18   him -- looked him up.

19        BY MR. BRUSTIN:

20        Q.   And based on the documentation that you

21   reviewed, is it your -- is it your understanding

22   that it would have been Lonergan as the lead -- as

23   the assigned detective to ensure that somebody

24   followed up with Fred Stencil?

25        MS. PERSICO:  Objection to form.
```



```
 1                      John Vickerd

 2          MR. RUSS:  Objection to form.  You may

 3   answer.

 4          THE WITNESS:  We had several detectives in

 5   homicide at the time.  It could been anybody.

 6   Because evidently both -- both divisions or both

 7   parts of the homicide squad were looking into this

 8   with -- with Stambach being involved and Masecchia

 9   being involved.

10          BY MR. BRUSTIN:

11          Q.   Was anybody -- so was anybody in

12   charge?

13          MR. RUSS:  Objection to form.

14          MS. PERSICO:  Form.

15          MR. RUSS:  Don't answer.

16          BY MR. BRUSTIN:

17          Q.   Was anybody -- was there anybody

18   responsible for ensuring that all investigative

19   activities were conducted?

20          MS. PERSICO:  Objection to form.  Are you

21   talking about in this investigation or in general

22   now?

23          THE WITNESS:  Are you talking about --

24          BY MR. BRUSTIN:

25          Q.   In this investigation.
```



```
 1                     John Vickerd

 2         A.   -- a chief of homicide?

 3         Q.   So in this investigation to the death

 4    of Torri Jackson, you've mentioned that -- you've

 5    mentioned at least three detectives that were

 6    involved in conducting interviews, correct,

 7    Lonergan --

 8         A.   According to --

 9         Q.   -- Stambach, and yourself?

10         A.   That I'm aware of now, yes.

11         Q.   Were -- were any of you or anybody else

12    responsible in this case for ensuring that all

13    appropriate investigative activities were

14    conducted?

15         MR. RUSS:  Objection to form.

16         MS. PERSICO:  Form.

17         MR. RUSS:  You may answer.

18         BY MR. BRUSTIN:

19         Q.   Was there any one person responsible

20    for that?

21         MR. RUSS:  Objection to form.  You may

22    answer.

23         THE WITNESS:  I'm not aware of that.  That I

24    would not know.

25         BY MR. BRUSTIN:
```



1                      John Vickerd

2           Q.    Was there any supervisor that was

3    responsible for that, was Donovan responsible for

4    that?

5           MR. RUSS:  Objection to form.

6           MS. PERSICO:  Objection.

7           MR. RUSS:  You may answer.

8           THE WITNESS:  Donovan was the chief of

9    homicide at the time for both -- both units and

10   there was several -- more than several detectives

11   involved.

12          BY MR. BRUSTIN:

13          Q.    All right.  But today, as you sit here

14   today, you don't know who, if anybody, would have

15   been responsible for ensuring that all

16   investigative activities were conducted and

17   documented, correct?

18          MS. PERSICO:  Objection.

19          MR. RUSS:  Objection to form.  You may

20   answer.

21          THE WITNESS:  No, I don't.

22          BY MR. BRUSTIN:

23          Q.    Now, is it important to ascertain from

24   a witness to a homicide, whether or not they had

25   consumed any drugs or alcohol at the time that they



```
 1                     John Vickerd

 2   observed the crime?

 3         MS. PERSICO:  Objection.

 4         MR. RUSS:  Objection to form.  You may

 5   answer.

 6         THE WITNESS:  At the time, they -- somebody

 7   should have been aware of that I would imagine

 8   talking to -- to an individual that was a witness.

 9         BY MR. BRUSTIN:

10         Q.   Well, so this is your report of your

11   interview with John Sullivan.  There's no mention

12   of drugs or alcohol in this -- in this report,

13   correct?

14         A.   Correct.

15         Q.   Is it your testimony though that you

16   may have talked with him about that and it just

17   didn't make its way into the report?

18         MS. PERSICO:  Objection.

19         MR. RUSS:  Objection to form.  You may

20   answer.

21         THE WITNESS:  If I would have noted that

22   back at that time, it would have been in my report.

23         BY MR. BRUSTIN:

24         Q.   All right.  But I -- I think what you

25   just told me -- and you correct me if I'm wrong.
```



1                    John Vickerd

2   So this is a -- this is -- this is a crime that

3   occurs in the early morning hours in front of

4   Louie's Hot Dogs, right?

5         A.   Yes.

6         Q.   And would it be fair to say that one of

7   the questions you would want to ask any witness to

8   this crime, is whether or not they consumed drugs

9   or alcohol which might have affected -- might

10  affect their reliability in being a witness,

11  correct?

12        MS. PERSICO:  Objection to form.

13        THE WITNESS:  If -- if it wasn't obvious,

14  that would maybe and maybe not been one of my

15  questions.

16        BY MR. BRUSTIN:

17        Q.   So you can't tell one way or another

18  from this report -- withdrawn.

19        Is it fair to say that it's -- it's -- it's

20  possible that you did ask John Sullivan questions

21  about whether he consumed drugs and alcohol and

22  that just didn't make its way into the report.

23        MS. PERSICO:  Objection to form.

24        MR. RUSS:  Objection to form.

25        BY MR. BRUSTIN:



1                      John Vickerd

2          Q.   Is that possible?

3          MR. RUSS:  You may answer.

4          THE WITNESS:  I couldn't -- I'm not aware of

5     that to be able to answer that, no.

6          BY MR. BRUSTIN:

7          Q.   Well, you can answer is it possible

8     that that happened.  That's what I'm asking you.

9          MR. RUSS:  Objection to form.

10         MS. PERSICO:  Form.

11         MR. RUSS:  You may answer.

12         THE WITNESS:  That's -- that's general

13    knowledge.  No, I have no idea.  I don't even

14    remember the person John Sullivan.

15         BY MR. BRUSTIN:

16         Q.   So I'm asking you about process again.

17    Is that -- is that the kind of question that you

18    would ask --

19         MS. PERSICO:  Well, you're asking him about

20    every possibility --

21         THE WITNESS:  Exactly.

22         MS. PERSICO:  -- in the whole world is what

23    you're asking him.

24         BY MR. BRUSTIN:

25         Q.   Let me -- let me -- let me finish the



1                    John Vickerd

2    question.  Based on how you conducted yourself as a

3    detective, a homicide detective in 1991, if you had

4    asked John Sullivan questions about whether he

5    consumed drugs or alcohol, would you necessarily

6    have put that information in your report?

7         MS. PERSICO:  Objection.

8         MR. RUSS:  Objection to form.  You may

9    answer.

10        THE WITNESS:  I'm not aware of that.

11        BY MR. BRUSTIN:

12        Q.   I don't even know what that means.

13   What do you mean you're not aware of that?

14        A.   I don't remember how I would have asked

15   or how I wouldn't have asked back 28 years ago.

16        Q.   That's fair.  That's -- that's --

17   that's what I'm looking for.  Okay.

18        MR. RUSS:  31 years.

19        THE WITNESS:  30 years ago.

20        BY MR. BRUSTIN:

21        Q.   Now, can you tell, Detective -- or

22   Mr. -- Mr. Vickerd, can you tell from the fact that

23   you responded to the scene at -- at 1:00 -- you

24   responded to the headquarters at 1:45 in the

25   morning, what your shift was that you were working



```
 1                    John Vickerd
 2   at this time?
 3            MS. PERSICO:  Form.
 4            THE WITNESS:  According to the report, it
 5   said that I was called in by the shift officer.
 6   Which there was an office for the shift officer on
 7   the third floor of police headquarters.
 8            And there was always there -- 24/7 there was
 9   always somebody there.  And if there was somebody
10   to be called in, a detective that was off, he would
11   have made the call.
12            BY MR. BRUSTIN:
13       Q.   So you -- so your understanding based
14   on the reports is that -- well, can you -- can you
15   tell from the reports what shift you typically
16   worked in August of 1991?
17       A.   It would have started --
18            MS. PERSICO:  Form.
19            THE WITNESS:  -- when the report started.
20   When he called me.
21            BY MR. BRUSTIN:
22       Q.   So you think that typically your shift
23   started at 2:00 in the morning?
24            MS. PERSICO:  Form.
25            MR. RUSS:  No, he's asking you what your
```



1                     John Vickerd

2    standard shift was in August of 1991.

3         THE WITNESS:  Oh, before --

4         BY MR. BRUSTIN:

5         Q.   Do you remember?

6         A.   -- before this shooting?

7         Q.   So yeah.  I'm not talking about the day

8    of the shooting.  I'm talking about what your

9    typical shift was during your time -- during this

10   time.

11        A.   I don't know if it was a day or an

12   afternoon because they --

13        Q.   Well, what is -- what -- what were the

14   shifts at that time in homicide?

15        A.   Again, from recalling -- trying to

16   recall, I would imagine they were 7:00 to 3:00 and

17   8:00 -- 8:00 to midnight or -- no.  Oh, I'm sorry.

18   And -- and 3:00 to midnight or 4:00 to midnight.

19        And I'm a day shift and an afternoon shift.

20   And anybody called in in the evening, would have

21   been called in once the afternoon shift ended.

22        Q.   Okay.  But you can't tell from anything

23   you looked at, what time your shift typically

24   started during this time period?

25        A.   I don't remember, no.



```
 1                        John Vickerd

 2         Q.   Would it be fair to say that when

 3   investigating a homicide certainly in the first few

 4   days of the investigation, if you needed to work

 5   overtime, it was routinely granted?

 6         A.   It would have to be approved by

 7   somebody and I --

 8         Q.   Who had to approve it?  Like, for

 9   example, could Lonergan approve it or did you need

10   somebody higher up?

11         A.   No, it would be higher.  It would be

12   some -- probably the chief of homicide.

13         Q.   Okay.

14         A.   Or one of the lieutenants.

15         Q.   Okay.  And is -- is that -- and I take

16   it you're talking about getting paid for overtime,

17   correct?

18         A.   Correct.

19         Q.   Would you sometimes simply keep working

20   and then after the fact see if you could get paid

21   for it or would you check before?

22         A.   You would have to be authorized.

23         Q.   So if you weren't authorized -- if you

24   weren't auth -- if you weren't authorized to

25   continue working overtime in a homicide, you went
```



1                        John Vickerd

2    home?

3          A.   Again, I don't recall back then, but I

4    would imagine that's the way it was.

5          Q.   Do you recall back then whether or not

6    in the first few days of a homicide, it was routine

7    to get overtime authorized?

8          MS. PERSICO:   Form.

9          THE WITNESS:   No, I don't.

10         BY MR. BRUSTIN:

11         Q.   Do you recall being -- ever being

12    turned down for an overtime request?

13         A.   No.

14         Q.   So typically if you requested overtime,

15    you were granted it in a homicide?

16         MR. RUSS:   Objection to form.   You may

17    answer.

18         THE WITNESS:   Most of the time as -- as long

19    as it was legitimate.   And of course it would be

20    legitimate if you requested it.

21         BY MR. BRUSTIN:

22         Q.   Now, going back to your report on

23    page 16.   Would it be fair to say that, and I know

24    you don't remember it, but the most important

25    information in the report is the description of --



1                    John Vickerd

2  that John Sullivan allegedly gave you concerning

3  the shooting, correct?

4        MS. PERSICO:  Objection to form.

5        MR. RUSS:  Objection to form.  You may

6  answer.

7        THE WITNESS:  According to this, I wouldn't

8  have wrote it in and had it typed if it wasn't

9  important.  I put in here what I felt was important

10  at the time.

11        BY MR. BRUSTIN:

12        Q.   Okay.  And would it be fair to say that

13  the most important information you received from

14  John Sullivan here according to this report, is the

15  information about what he saw and heard during the

16  shooting?

17        MS. PERSICO:  Objection to form.

18        MR. RUSS:  Objection to form.  You may

19  answer.

20        THE WITNESS:  Again, I thought -- I'm

21  thinking back 30 years ago or 28 years ago.  I

22  would imagine that I would think it was important

23  back then.  Do I remember writing it, no.

24        BY MR. BRUSTIN:

25        Q.   I'm not asking about what you're --



1                    John Vickerd

2  I'm -- I'm asking about process.  This is -- this

3  is a homicide --

4          MS. PERSICO:  He's answered the question.

5          THE WITNESS:  I answered -- I answered --

6          MR. RUSS:  No, you're qualifying --

7          THE WITNESS:  I answered that.

8          MR. RUSS:  -- some text.

9          THE REPORTER:  Wait.  I just need one at a

10  time, please.

11          MR. RUSS:  You're -- you're qualifying some

12  text in an exhibit, putting your own qualification

13  on it --

14          THE WITNESS:  Exactly.

15          MR. RUSS:  -- and asking him to agree with

16  you.

17          THE WITNESS:  Exactly.

18          MR. RUSS:  Every time you do that, I'm going

19  to object.

20          THE WITNESS:  Thank you.

21          BY MR. BRUSTIN:

22          Q.   That's fine.  When you read your own

23  report if you're in homicide investigation, would

24  you agree based on your report, the most important

25  information in this report is the description of



```
 1                    John Vickerd
 2   what he saw during the homicide?
 3        MS. PERSICO:  Objection to form.
 4        MR. RUSS:  Objection to form.  You may
 5   answer.
 6        THE WITNESS:  How I remember the type of
 7   detective work I did back then, yes.
 8        BY MR. BRUSTIN:
 9        Q.   And would it be fair to say that you
10   were attempting to carefully and meticulously
11   document what he told you about what he saw and
12   heard during the homicide?
13        MS. PERSICO:  Objection to form.
14        THE WITNESS:  According to this report, it's
15   what he -- how he described Tino.
16        BY MR. BRUSTIN:
17        Q.   So my question is at the time, was it
18   your process to carefully and meticulously document
19   what a witness to a homicide told you about what
20   they saw and heard during the homicide?
21        A.   According to back that date, yes.
22        Q.   And you would agree that there's
23   nothing in this report indicating that
24   Valentino Dixon's last name is unknown to you,
25   correct?
```



```
 1                    John Vickerd

 2          MR. RUSS:  Objection to form.  You may

 3   answer.

 4          THE WITNESS:  Not that I have read, no.

 5          BY MR. BRUSTIN:

 6          Q.   Well, it says on page -- if you look at

 7   page 16, it says John states Tino's real name is

 8   Valentino, last name -- LNU, meaning last name

 9   unknown, correct?

10          A.   Correct.

11          Q.   In other words, what you're writing

12   here is that John Sullivan did not know Valentino's

13   last name, correct?

14          MR. RUSS:  Objection to form.  You may

15   answer.

16          THE WITNESS:  That would be up to him to

17   answer that.  I wouldn't know.

18          BY MR. BRUSTIN:

19          Q.   Well, I'm asking you -- I'm asking you

20   about what you wrote in your report.  Is that what

21   that means based on how you wrote reports --

22          A.   It says that --

23          Q.   -- that he didn't know his last name?

24          A.   He said that he knew him from around

25   the neighborhood.
```



1                    John Vickerd

2        Q.   I'm asking you if that line here that

3   you wrote, indicates that John Sullivan didn't know

4   his last name.

5        A.   I believe so, yes.  Last name unknown,

6   LNU, yes.

7        Q.   Does that mean it's unknown to you or

8   unknown to John Sullivan, can you tell?

9        MS. PERSICO:  Objection to form.

10       MR. RUSS:  Objection to form.  You may

11   answer.

12       THE WITNESS:  He did not know his last name.

13   He just knew him from around the neighborhood.

14       BY MR. BRUSTIN:

15       Q.   Take a look at page 12, please.

16       MR. RUSS:  Of Exhibit 2?

17       MR. BRUSTIN:  Yes.

18       THE WITNESS:  That's that botched up one I

19   think.  No?  Okay.  I have 12.

20       BY MR. BRUSTIN:

21       Q.   If you could just read to yourself

22   page 12 and let me know when you're done.

23       MR. RUSS:  The entire document?

24       MR. BRUSTIN:  The -- the -- yeah, the three

25   paragraphs or four.  Just page 12.



```
 1                    John Vickerd

 2          THE WITNESS:  Okay.

 3          BY MR. BRUSTIN:

 4          Q.   So this indicates that this is another

 5   report from another housing police officer,

 6   correct?

 7          A.   Correct.

 8          Q.   Referencing the earlier interview of

 9   Sonya James, correct?

10          A.   Yes.

11          Q.   And indicating that these witnesses

12   were brought to the attention of a homicide

13   detective at the scene, correct?

14          A.   According to this, yes.

15          Q.   That's what you would expect, right?

16          A.   Pardon?

17          Q.   That's what you would expect, right?

18          A.   Normally, yes.

19          Q.   And obviously you and Lonergan work

20   closely with one another, correct?

21          MR. RUSS:  Objection to form.  You may

22   answer.

23          THE WITNESS:  Yes.

24          BY MR. BRUSTIN:

25          Q.   You were -- you were informal partners
```



```
 1                  John Vickerd

 2   on many cases?

 3        MR. RUSS:  Objection to form.  You may

 4   answer.

 5        THE WITNESS:  Correct.

 6        BY MR. BRUSTIN:

 7        Q.   You were also friends, right?

 8        A.   Yes.

 9        MS. PERSICO:  Objection to form.

10        MR. RUSS:  Objection to form.  You may

11   answer.

12        BY MR. BRUSTIN:

13        Q.   And you would expect that if you were

14   investigating the case together and either you or

15   he received any relevant information, you would

16   expect that to be passed on as soon as possible,

17   correct?

18        MR. RUSS:  Objection to form.  You may

19   answer.

20        THE WITNESS:  I would believe so, yes.

21        BY MR. BRUSTIN:

22        Q.   Now, how were you and -- how would you

23   and -- I'm trying to remember what was going on

24   back then.

25        How would you and Lonergan in 1991, would
```



1                     John Vickerd

2    communicate with -- how would you communicate with

3    one another when you weren't together?

4         MR. RUSS:  Objection to form.  You may

5    answer.

6         THE WITNESS:  A lot of different ways

7    back -- back in them days.  Informal ways off-duty

8    could have been --

9         BY MR. BRUSTIN:

10        Q.   I'm talking about on the job.  Like did

11   you have -- I -- I can't remember if we had -- I

12   don't even think we -- did you have a cell phone in

13   1991?  I don't remember.

14        A.   No.

15        Q.   As a detective, did you have any other

16   means of communicating?  Could you communicate

17   through radio with Lonergan when you were

18   investigating a homicide?

19        A.    Portable radios I believe we had.

20        Q.    Okay.  And so you -- and if you were

21   investigating a homicide with -- with Lonergan,

22   particularly in the first few hours, you and he

23   would often be communicating by radio; is that

24   right?

25        MS. PERSICO:  Objection to form.



```
 1                     John Vickerd

 2          THE WITNESS:  Yes.

 3          MR. RUSS:  Objection to form.  You may

 4   answer.

 5          BY MR. BRUSTIN:

 6          Q.   And I take it any -- you were -- you

 7   were -- you would communicate with other homicide

 8   detectives involved in the case as needed by radio

 9   as well.  Fair to say?

10          A.   That would be fair to say, yes.

11          Q.   And it sounds like from

12   Detective Masecchia who we spoke to last week, that

13   the homicide groups were a tight-knit group who

14   worked in a relatively small environment and would

15   talk with one another about cases as they were

16   being investigated.  Would you agree with that?

17          MS. PERSICO:  Objection.

18          MR. RUSS:  Objection to form.  You may

19   answer.

20          THE WITNESS:  If we were working the same

21   case, yes.  But a lot of times you'd come in during

22   a shift and every -- every investigator would be

23   working with somebody and the other group would be

24   going on to something else.

25          BY MR. BRUSTIN:
```



```
 1                      John Vickerd
 2          Q.    Okay.   Would you just take a look at
 3    page 82?
 4          MR. RUSS:  Of Exhibit 2?
 5          MS. PERSICO:  Mr. Brustin, can I -- can I
 6    just inquire, do you think you have a long time
 7    left?   I think we might need to take a break for
 8    lunch or at least a facility.
 9          MR. BRUSTIN:  Yeah.   I was thinking in five
10    or 10 minutes and then I -- what I'm going to do is
11    over lunch, I'm going to try to reassess.  Not sure
12    how much more time, but we definitely should take a
13    lunch break.
14          MS. PERSICO:  Okay.
15          MR. BRUSTIN:  So let's go for just a few
16    more minutes and then we can take a lunch break.
17          MS. PERSICO:  Good.   Thanks.
18          MR. BRUSTIN:  If that's okay with everybody.
19          MR. RUSS:  Page 82?
20          MS. PERSICO:  Yep.
21          BY MR. BRUSTIN:
22          Q.    Yeah.   Plaintiff's 2, Exhibit --
23    Exhibit 2, page 82.
24          A.    I don't know where this page is.   21.
25          MR. RUSS:  Yeah, let's see.   30.
```



```
 1                      John Vickerd

 2           MR. BRUSTIN:  It's also 1495.

 3           THE WITNESS:  That's 1544.

 4           MR. RUSS:  Yeah.  I'm just trying to get it.

 5           MR. BRUSTIN:  I can put it up if it's not

 6    there.

 7           MR. RUSS:  Put it up because this -- I'm not

 8    sure this is in the exact same order.

 9           BY MR. BRUSTIN:

10           Q.   Mo, could you put up page 82 and 83?

11    Thanks.

12           So this is a two-page document.  I'm showing

13    you the first page.  This is the criminal complaint

14    that was filled out in this case by Stambach.

15           A.   I see that.

16           Q.   Okay.  And I -- I -- I -- I assume you

17    don't remember this, correct?

18           A.   Correct.

19           Q.   And you haven't reviewed this in

20    preparation for today?

21           A.   Not at all.

22           Q.   Okay.  But you do -- you are -- you are

23    familiar with criminal complaints from being a

24    homicide investigator, correct?

25           A.   I -- yes, I believe so.  Yes.
```



1                    John Vickerd

2         Q.    Okay.  And I take it that you filled

3    out a number of criminal complaints in your career?

4         A.    Back in the day, I'm sure I did.

5         Q.    Okay.  Now, here's why I'm showing this

6    to you.  So this criminal complaint, you can see

7    it's -- it's filled out by Mark Stambach?

8         A.    Correct.

9         Q.    And it's -- you can see that the -- you

10   see the paragraph, in that defendant, right above

11   it?

12        A.    Oh, under Mark's name, is

13   Valentino Dixon?

14        Q.    No.  I'm sorry, let me go to the next

15   page.

16        MR. RUSS:  Here.  I found it.

17        THE WITNESS:  Okay.  The assault in the

18   first degree.

19        MR. RUSS:  Here, this might be easier.

20        BY MR. BRUSTIN:

21        Q.    Let me go back up again.  Sorry, I

22   apologize.  Okay.  I'm sorry.  Yeah, so take a

23   look, if you would, in the middle of the page where

24   it says the above information is based on one, your

25   deponent personally knowing.  Do you see that?



```
 1                    John Vickerd

 2         MS. PERSICO:  Which page are you on?

 3         BY MR. BRUSTIN:

 4         Q.   Page 82 in the middle -- right in the

 5    middle of the page.  The above information.

 6         A.   Right, I see that.

 7         Q.   Okay.  And then it says it's based on

 8    one, the fact that Torri -- Torriano Jackson

 9    expired and then two, the statement from

10    John Sullivan, correct?

11         A.   Was stated that the above named

12    defendant did -- did shoot the deceased.

13         Q.   So here's the question.  If -- if you

14    took the statement from John Sullivan and Lonergan

15    was the first detective at the scene, why did

16    Mark -- to your knowledge, why would Mark Stambach

17    be filling out the arrest affidavit, arrest

18    warrant?

19         MR. RUSS:  Objection --

20         MS. PERSICO:  Objection to form.

21         MR. RUSS:  Objection to form.  You may

22    answer.

23         THE WITNESS:  Okay.  This was done on

24    August 10th.

25         BY MR. BRUSTIN:
```



1                    John Vickerd

2         Q.   Yeah.  Well, it says -- yep.

3         A.   I have no -- I have no idea where he

4    got information to put onto this.  No, I have no

5    idea.

6         Q.   Well, let me ask it -- that was not a

7    great question.  Let me ask a different question.

8    Does -- does the fact that Mark Stambach signed

9    this document, indicate that by this time he's the

10   assigned detective on the case?

11        A.   All this tells me is that he would

12   possibly be the detective to make the arrest.

13        Q.   So the assigned detective doesn't

14   necessarily make the arrest?  I'm sorry, let me

15   withdraw the question.

16        The assigned detective doesn't necessarily

17   fill out the arrest documentation?

18        A.   According to this report, yes.

19        MR. BRUSTIN:  Okay.  All right.  I think

20   now's a good time to take a break.  Can we shoot to

21   come back if -- if it works for -- you can take

22   this down, Mo.  Thanks.

23        Can we shoot to come back -- can we try for

24   1:30?

25        MR. RUSS:  Let me just ask one question



1                      John Vickerd

2   first.  If -- if you're going to take a whole half

3   an hour and then say you don't have any more

4   questions, I'd rather you take five minutes and say

5   that.

6          MR. BRUSTIN:  That's -- that's definitely

7   not happening.  The question is do I have an hour

8   or three hours.

9          MR. RUSS:  Okay.  We'll be back by 1:30.

10          THE VIDEOGRAPHER:  Okay.  Going off the

11  record, time is 12:52.

12            (A recess was then taken at 12:52 p.m.)

13          THE VIDEOGRAPHER:  We are going back on the

14  record, time is 13:34.

15          BY MR. BRUSTIN:

16          Q.   Okay.  Let's take a look at Exhibit 2,

17  page 74.

18          A.   Okay.

19          MR. RUSS:  Do you have a question or do you

20  want him to read it or what?

21          BY MR. BRUSTIN:

22          Q.   Nope.  Mr. Vickerd, have you reviewed

23  this document?  I will represent to you that this

24  is a statement that was taken -- allegedly taken

25  from John Sullivan by Detective Masecchia at



```
 1                     John Vickerd
 2   2:30 in the afternoon on August 10th, 1991.
 3        Have you reviewed it?
 4        A.   Yes.  I -- I have it in front of me
 5   now.
 6        Q.   Have you reviewed it prior to -- prior
 7   to just now?
 8        A.   No, I haven't.
 9        Q.   Okay.  Did I accurately describe what
10   this appears to be?
11        A.   This is a sworn statement by
12   John Sullivan and signed by Raniero Masecchia.  And
13   this is the way we used to do our statements, the
14   question and answer forum, if we had a witness that
15   we wanted to get information from.
16        Q.   All right.  And this appears to be the
17   follow-up interview that Masecchia did with
18   John Sullivan after you interviewed him in the
19   early morning hours of the 10th, correct?
20        A.   Yes.
21        Q.   And I take it -- and by the way, it
22   lists -- it lists the time that this interview was
23   conducted, correct?
24        A.   Yeah.  1430 hours would be 2:30 in the
25   afternoon.
```



1                        John Vickerd

2          Q.   And then although this copy doesn't

3    have it, I think there's another copy of this

4    interview that has a picture with the time when it

5    ended.

6          And it -- and it -- and would it be fair to

7    say that that was standard practice when you

8    interview a witness, it's important to tell -- to

9    put down the times when you start and finish the

10   interview?

11         A.   Yes.

12         Q.   And can you explain why you didn't put

13   down the time in your report as to why -- as to

14   when you interviewed John Sullivan?

15         MS. PERSICO:  Object to form.

16         MR. RUSS:  Objection to form.

17         MS. PERSICO:  Are you talking about -- are

18   you talking about the document we're looking at now

19   or are you talking about a different document?

20         BY MR. BRUSTIN:

21         Q.   Well, he didn't create this document.

22   I'm talking about the document we looked at earlier

23   today, the report he created for his interview of

24   John Sullivan.

25         Can you explain why you didn't put a time on



1                   John Vickerd

2  that report?

3        MR. RUSS:  Objection to form.  You may

4  answer.

5        THE WITNESS:  Well, first of all, the

6  question and answer forum is a sworn statement

7  taken by John -- from John Sullivan.

8        And mine is just a P73 of my interpretation

9  or what I learned from John Sullivan at that time

10  and they're two totally different documents.  And

11  we -- you didn't used to do that on the P73s.

12        BY MR. BRUSTIN:

13        Q.   So would a -- fair enough.  So it's

14  your testimony that on a P73, you don't need to put

15  the time when you interview a witness?

16        A.   No.

17        Q.   Okay.  And you never did?

18        A.   I didn't.

19        Q.   And that was your understanding as the

20  practice, nobody put times when they interviewed

21  witnesses in a P73?

22        MS. PERSICO:  Objection to form.

23        THE WITNESS:  I would believe by looking at

24  the P73 that I wrote, that that wasn't my

25  procedure, but I can't answer for other detectives.



1                      John Vickerd

2           BY MR. BRUSTIN:

3           Q.   Okay.  But your understanding was that

4    was consistent with what was expected of you by the

5    department, not to write the time?

6           MS. PERSICO:  Objection to form.

7           MR. RUSS:  Objection to form.  You may

8    answer.

9           THE WITNESS:  I don't -- I don't remember if

10   that was expected of me or not.  I --

11          BY MR. BRUSTIN:

12          Q.   Well, certainly not --

13          A.    -- never got questioned.

14          Q.   It's what you did typically, correct?

15   You typically would not put the time on a P73?

16          MS. PERSICO:  Objection to form.

17          MR. RUSS:  Objection to form.  You may

18   answer.

19          THE WITNESS:  At that time, I believe not.

20          BY MR. BRUSTIN:

21          Q.   Okay.  And I take it do you have an --

22   do you have a -- do you have an understanding as to

23   why Masecchia did the formal Q&A as opposed to you?

24          MS. PERSICO:  Objection to form.

25          MR. RUSS:  Objection to form.  You may



```
 1                    John Vickerd
 2  answer.
 3        THE WITNESS:  Basically he was working with
 4  Detective Stambach, I believe, in a totally
 5  different context and different group than I did.
 6        And I used to work with Lonergan and other
 7  people in my group so they made John Sullivan
 8  available to them and continued on this --
 9        BY MR. BRUSTIN:
10        Q.   So my question is a little different.
11  Maybe it's not, but -- but I'm going to ask it a
12  little differently.
13        You conducted the first interview in the
14  early morning hours of John Sullivan at the
15  hospital.
16        Do you have an understanding as to why
17  Masecchia as opposed to you, conducted the
18  interview at 1430 hours?
19        MR. RUSS:  Objection to form.
20        MS. PERSICO:  Objection to form.
21        MR. RUSS:  You may answer.
22        THE WITNESS:  It would be a conjecture on my
23  part to say that they picked up John Sullivan's
24  name from me going to the hospital and they decided
25  to bring him in during a day shift and take a
```



```
 1                   John Vickerd
 2   question and answer forum from him, a sworn
 3   statement.
 4        BY MR. BRUSTIN:
 5        Q.   Okay.  And would it be fair to say that
 6   you have no -- no recollection today of discussing
 7   the information you received from John Sullivan
 8   with Masecchia before he conducted this interview?
 9        A.   Not that I'm aware of, no.
10        Q.   Well, not that you're aware of.  As you
11   sit here today, you don't remember --
12        A.   I --
13        Q.   -- one way or another whether you did,
14   right?
15        A.   I don't remember one way or the other
16   what I did, no.
17        Q.   Okay.  And you don't remember one way
18   or another whether or not you discussed the
19   information that John Sullivan provided to
20   Masecchia in this interview as compared to what he
21   provided to you during your interview after this
22   interview, correct?
23        MS. PERSICO:  Objection to form.
24        MR. RUSS:  Objection to form.  You may
25   answer.
```



```
 1                   John Vickerd

 2          THE WITNESS:  I have no way of saying one

 3  way or the other.

 4          BY MR. BRUSTIN:

 5          Q.   You don't know -- you don't remember,

 6  for example, whether or not you and Masecchia

 7  discussed any inconsistencies between what

 8  John Sullivan reported to you and what

 9  John Sullivan reported to Masecchia?

10          MR. RUSS:  Objection to form.  You may

11  answer.

12          MS. PERSICO:  Objection.

13          THE WITNESS:  I think we stipulated before

14  that I don't remember anything about this case

15  besides being -- the name being mentioned to me by

16  Mark Stambach.

17          BY MR. BRUSTIN:

18          Q.   Well, I -- unfortunately I have to ask

19  you specific questions about it, but I -- I

20  appreciate that's your position.

21          Would it be fair to say though that to the

22  extent there were inconsistencies between what

23  John Sullivan reported to you and what

24  John Sullivan reported to Masecchia about his

25  observations of the murder, it would be important
```



1                          John Vickerd

2    to re-interview John Sullivan to explore those

3    inconsistencies?

4          MS. PERSICO:  Objection to form.

5          MR. RUSS:  Objection to form.  You may

6    answer.

7          THE WITNESS:  I think you'd have to talk to

8    Raniero Masecchia again about that if that's what

9    you want an answer for.  Because I have --

10         BY MR. BRUSTIN:

11         Q.   Well, you --

12         A.   -- nothing to --

13         Q.   You would have given him the -- by the

14   way, Masecchia said that you were the assigned

15   detective on the case.  Was he mistaken about that?

16         MR. RUSS:  Objection to form.

17         MS. PERSICO:  Objection to form.

18         MR. RUSS:  You may answer.

19         THE WITNESS:  I didn't make -- make -- know

20   if he said that or not and I'm not aware of it.

21         BY MR. BRUSTIN:

22         Q.   All right.  But your position here

23   today is that to the extent there were

24   contradictions between what John Sullivan told you

25   and what John Sullivan told Masecchia, it was



```
 1                     John Vickerd
 2   Masecchia's obligation to follow up on those,
 3   correct?
 4         MR. RUSS:  Objection to form.
 5         MS. PERSICO:  Objection to form.
 6         MR. RUSS:  You may answer.
 7         THE WITNESS:  I'm not aware of any
 8   inconsistencies whatsoever until I saw these
 9   reports today.
10         BY MR. BRUSTIN:
11         Q.   So I didn't ask you anything about what
12   you noticed today.  I'm asking you hypothetically
13   to the extent there were inconsistencies between
14   the reports and what -- inconsistencies as to what
15   John Sullivan reported to you that he saw and heard
16   and what John Sullivan reported to Masecchia.
17         Is it your testimony that it would have been
18   Masecchia's responsibility to follow up on those
19   inconsistencies, not yours?
20         MS. PERSICO:  Objection.
21         MR. RUSS:  Objection to form.  You may
22   answer.
23         THE WITNESS:  I can't say what Masecchia's
24   things -- problems would have been back then,
25   whether he would have looked up on it or not.
```



```
 1                      John Vickerd

 2          BY MR. BRUSTIN:

 3          Q.   But it certainly wasn't your job to do

 4   that, correct?

 5          MS. PERSICO:  Objection to form.

 6          MR. RUSS:  Objection to form.  You may

 7   answer.

 8          THE WITNESS:  Not that I'm aware of, no.

 9          BY MR. BRUSTIN:

10          Q.   Now, when you -- I asked you earlier

11   about daily field activity reports and -- and you

12   told me you couldn't remember whether you filled

13   them out as a detective.

14          Do you recall any type of timekeeping

15   documentation that you did on a daily basis

16   concerning where you were during your shift, when

17   your shift -- when you began your shift, when you

18   left your shift?

19          MR. RUSS:  Objection to form.  You may

20   answer.

21          THE WITNESS:  No, I'm not aware of that.  I

22   don't remember.

23          BY MR. BRUSTIN:

24          Q.   Okay.  Take a look at page 20, please.

25          MR. RUSS:  Of Exhibit 2?
```



1                    John Vickerd

2          MR. BRUSTIN:  Yes, please.

3          MR. RUSS:  Okay.  We have it.

4          BY MR. BRUSTIN:

5          Q.   Okay.  Take a minute and read this

6    short report, please.

7          A.   Okay.

8          Q.   Does this memo provide you any

9    additional information as to whether or not you

10   were the assigned detective on the case?

11         A.   Only that I was called in by the shift

12   officer and Detective Lonergan was aware of it and

13   that I was supposed to go to the hospital.

14         Q.   So there's nothing in this memo to your

15   knowledge indicates who, if anybody, was the

16   assigned detective on the case?

17         A.   No.

18         Q.   Okay.  Take a look at page 47.

19         MR. RUSS:  Okay.  We have it.  Do you want

20   him to read it or what?

21         BY MR. BRUSTIN:

22         Q.   Have you reviewed this document before

23   today?

24         A.   No.

25         Q.   This is a document that you created,



1                    John Vickerd

2    correct?

3         A.   It's got my signature on it, yes.

4         Q.   Any reason to dispute that this is a

5    document you created?

6         A.   No, not if I signed it.

7         Q.   Is that your signature?

8         A.   That's my signature.

9         Q.   Okay.  Take a minute and review it,

10   please.

11        A.   Okay.

12        Q.   This is a P73 that you created,

13   correct?

14        A.   Yes.

15        Q.   And here in this P73, you indicate that

16   at approximately 445 hours you created a photo

17   array, correct?

18        A.   Yes.

19        Q.   And then it says at approximately

20   505 hours, you showed the photo array to

21   Emil Adams, correct?

22        A.   Time-wise, yes.  505 hours.

23        Q.   And this is an example of you putting

24   into your P73, the times when you are conducting

25   investigative activities, correct?



```
 1                     John Vickerd

 2          A.    I'm looking for a P73.  I see the --

 3          Q.    This is a P73, correct?

 4          A.    This is a P73, yes.

 5          Q.    Okay.  And this is an example of you

 6   filling out a P73 and putting in the precise times

 7   when you are conducting investigative activities,

 8   correct?

 9          A.    Oh, yes, it is.  Yes.

10          Q.    Okay.  And so when you just told us

11   that you didn't put times in your P73, that was a

12   mistake, correct?

13          MS. PERSICO:  Objection to form.

14          MR. RUSS:  Objection to form.  You may

15   answer.

16          THE WITNESS:  I'm not aware of that.

17          BY MR. BRUSTIN:

18          Q.    Well, here it says a sworn statement

19   was taken this date from Emil Adams.  Do you see

20   that?

21          A.    Yes.

22          Q.    And there's no time listed and that's

23   because you didn't take that sworn statement,

24   correct?

25          MS. PERSICO:  Objection to form.
```



```
 1                    John Vickerd

 2         BY MR. BRUSTIN:

 3         Q.   Well, while we're talking -- here, I'll

 4    show -- keep this page, but take a look, if you

 5    would, at page 30.

 6         A.   I believe it says that

 7    Detective Stambach took the statement.

 8         Q.   Right.  And the reason you don't have

 9    the time is because you didn't do it, someone else

10    did, correct?

11         A.   Evidently, yes.

12         Q.   You put the times down for activities

13    that you conduct, correct?

14         MS. PERSICO:  Objection to form.

15         THE WITNESS:  That's what's in this

16    statement.

17         BY MR. BRUSTIN:

18         Q.   And it's important to put down the

19    times when you conduct activities for a variety of

20    reasons, correct?

21         MS. PERSICO:  Objection to form.

22         THE WITNESS:  I believe so.

23         BY MR. BRUSTIN:

24         Q.   That's why you put the -- that's why

25    you put the precise times here when you prepared
```



JOHN THOMAS VICKERD                                    March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                     175

```
1                      John Vickerd

2   the photo array and when you showed the photo

3   array, correct?

4          MR. RUSS:  Objection to form.  You may

5   answer.

6          THE WITNESS:  According to this P73, yes.

7          BY MR. BRUSTIN:

8          Q.   Meaning the P73 that you -- that you

9   wrote?

10         A.   The P73 that I had typed for me.

11         MR. RUSS:  Yes, he admitted that he wrote it

12  and he signed it.

13         THE WITNESS:  Yes.

14         BY MR. BRUSTIN:

15         Q.   Okay.  Now take a look at page 30.

16         MR. RUSS:  Over here.

17         THE WITNESS:  That's 50.

18         MR. RUSS:  Yeah, here you go.

19         THE WITNESS:  You got it back there?  Hold

20  on.  I'm only on 47.

21         MR. RUSS:  Yep.  We're going to put my pen

22  in there so -- he's going to come back probably.

23         THE WITNESS:  Okay.  Okay.

24         BY MR. BRUSTIN:

25         Q.   And this appears -- you haven't
```



JOHN THOMAS VICKERD                                    March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                    176

```
 1                      John Vickerd

 2  reviewed this document in preparation for today,

 3  correct?

 4          A.   No, I haven't.

 5          Q.   But this appears to be an interview

 6  that Detective Stambach conducted with Emil Adams,

 7  correct?

 8          A.   It's a sworn statement question and

 9  answer statement take -- taken by

10  Detective Stambach, I believe.

11          Q.   Okay.  And on August 10th at some

12  unknown time, correct?

13          A.   Yes.

14          Q.   Now -- okay.  So it appears at some --

15  do -- do you know whether or not you conducted the

16  photo array with Emil Adams before or after the

17  statement based on this document?

18          A.   I don't remember.

19          Q.   Well, I'm ask -- I'm not asking if you

20  remember.  I know -- you've told us you don't

21  remember.  I'm asking you based on this document,

22  can you tell?

23          A.   Based by the photo array document or my

24  P73 --

25          MR. RUSS:  Based on your P73.
```



1                   John Vickerd

2          THE WITNESS:  -- versus Detective Stambach's

3    statement?

4          BY MR. BRUSTIN:

5          Q.    Yes.

6          A.    It says his statement was terminated at

7    0415 hours and it shows that the photo array was at

8    0505 hours.

9          Q.    Take a look at page 25.

10         A.    Okay.

11         Q.    And this is a -- this is a memo from --

12   this is a P73 from Mark Stambach, correct?

13         A.    Correct.

14         Q.    Could you read this, please?

15         MR. RUSS:  To himself?

16         MR. BRUSTIN:  Yes.

17         THE WITNESS:  Okay.

18         BY MR. BRUSTIN:

19         Q.    So this report, this P73, indicates

20   that at the end of the statement that Stambach

21   took, the photo array was conducted, correct?

22         A.    That's what this says, yes.

23         Q.    And you know from your P73, that you

24   conducted that photo array, correct?

25         A.    According to my signature on there,



1                        John Vickerd

2    yes.

3            Q.   Does this indicate that Stambach was --

4    does this suggest that Stambach was present for the

5    photo array, this P73, page 25?

6            MR. RUSS:  Objection to form.  You may

7    answer.

8            BY MR. BRUSTIN:

9            Q.   I think you're on the wrong page, sir.

10           MR. RUSS:  Well, when you say --

11           THE WITNESS:  I went back to my --

12           MR. RUSS:  -- this P73, you've got --

13   we've -- you've got us looking at two or three of

14   them.  So which one?

15           BY MR. BRUSTIN:

16           Q.   Well, I said page 25.  Page 25, please.

17           A.   Okay.  He took the -- received a call,

18   220 hours --

19           Q.   It says at the end of the statement a

20   photo array was then shown to witness, Emil Adams.

21   Does that suggest to you that Stambach was present

22   for the photo array?

23           A.   I'm -- I'm not aware of that.

24           Q.   I'm not -- I know you don't remember

25   it.  I'm asking if this report indicates he was



1                      John Vickerd

2   there.

3          MR. RUSS:  Objection to form.  You may

4   answer.

5          THE WITNESS:  It still doesn't say if

6   Detective Stambach was present during the showing

7   of the photo array.

8          BY MR. BRUSTIN:

9          Q.   Well, he's describing what happened

10  during the photo array, right?

11         MS. PERSICO:  Objection to form.

12         BY MR. BRUSTIN:

13         Q.   Fair to say, sir, either Stambach was

14  present for the photo array or you told him what

15  happened?

16         MR. RUSS:  Objection to form.

17         MS. PERSICO:  Objection to form.

18         MR. RUSS:  You may answer.

19         THE WITNESS:  I don't see anywhere in his

20  P73 or in mine that he was present.

21         BY MR. BRUSTIN:

22         Q.   Okay.  And obviously it's important if

23  you are conducting a photo array and you have a

24  witness to that photo array, another officer, it's

25  important to document that, correct?



```
 1                    John Vickerd

 2          MR. RUSS:  Objection to form.

 3          MS. PERSICO:  Objection to form.

 4          MR. RUSS:  You may answer.

 5          THE WITNESS:  I don't remember if we needed

 6    somebody there or not.

 7          BY MR. BRUSTIN:

 8          Q.   Okay.  Do you remember if it was

 9    important to have a witness when you took a -- a

10    sworn statement of an eyewitness?

11          A.   No, I do not.

12          Q.   You don't remember one way or another

13    whether or not you were supposed to do that?

14          A.   Correct.

15          MR. RUSS:  Objection to form.  You may

16    answer.

17          BY MR. BRUSTIN:

18          Q.   Okay.  Let's go back to page 47, your

19    P73.

20          A.   I'm -- I'm on it.  I'm on 47.

21          Q.   Okay.  And your -- your P73 indicates

22    that at 5:05 in the morning, you got a positive ID

23    from Emil Adams of Valentino Dixon through a photo

24    array showing, correct?

25          A.   Correct.
```

1                      John Vickerd

2          Q.    Now, one of the things that Emil Adams

3     has reported over the years is that while he was

4     with the police, he was shown three pictures.  A

5     picture of Mario Joiner, of Valentino Dixon, and a

6     third person who he doesn't know.

7          Now, do you recall one way or another,

8     whether or not you were the person who showed him

9     those three photos?

10         MS. PERSICO:  Objection to form.

11         MR. RUSS:  Objection to the form of the

12    question.  You may answer.

13         THE WITNESS:  Following the page on page 48,

14    I have my signature on a photo array where he

15    identified Valentino.

16         BY MR. BRUSTIN:

17         Q.    So the signature on the photo array is

18    indicating that he identified Valentino Dixon

19    through a photo array, a six-person photo array

20    that you created, correct?

21         A.    Yes.

22         Q.    Now I'm asking you something different.

23    He has reported to at least one source that when he

24    was with the police, he was shown three individual

25    photos.



1                      John Vickerd

2          One of Valentino Dixon, one of Mario Joiner,

3    and another of a third person who he did not know.

4    And my question, is were you the person who showed

5    him those three photos?

6          MS. PERSICO:  Objection to form.

7          MR. RUSS:  Objection to the form of the

8    question.  You may answer.

9          THE WITNESS:  The only one I'm aware of is

10   I'm -- the one I'm looking at today and it had six

11   photo arrays in it and they're all documented by

12   mug numbers.

13         BY MR. BRUSTIN:

14         Q.   Do you deny showing Emil Adams three

15   individual photos including a photo of

16   Valentino Dixon?

17         MR. RUSS:  Objection to form.

18         MS. PERSICO:  Objection to form.

19         MR. RUSS:  You may answer.

20         THE WITNESS:  Besides this photo array, I

21   have no idea if I showed him any other photo

22   arrays.

23         BY MR. BRUSTIN:

24         Q.   So you can't say one way or another

25   whether or not you showed him three photos in



```
 1                    John Vickerd
 2   addition to this photo array including a photograph
 3   of Valentino Dixon, correct?
 4          MR. RUSS:  Objection to form.
 5          MS. PERSICO:  Objection to form.
 6          MR. RUSS:  You may answer.
 7          THE WITNESS:  No.  All -- all our photo
 8   arrays from what I remember always were the same.
 9   They had six photos in there and I don't remember
10   showing him any other photo arrays.
11          BY MR. BRUSTIN:
12          Q.   Okay.  But you -- you can't deny that
13   you didn't, correct?
14          MR. RUSS:  Objection to form.  You may
15   answer.
16          THE WITNESS:  I don't remember.
17          BY MR. BRUSTIN:
18          Q.   And I take it you don't remember one
19   way or another whether you received information
20   from anybody, including Detective Stambach, that --
21   that another detective had shown Emil Adams
22   individual photos -- three individual photos
23   including a photo of Valentino Dixon, correct?
24          MR. RUSS:  Objection to form.
25          MS. PERSICO:  Objection to form.
```



```
 1                    John Vickerd

 2          MR. RUSS:  You may answer.

 3          THE WITNESS:  I don't remember getting any

 4   other information from Detective Stambach over this

 5   case.

 6          BY MR. BRUSTIN:

 7          Q.   Now, if you had -- if you had shown --

 8   if -- first of all, if you had shown Emil Adams

 9   individual photos of one of the victims and

10   Valentino Dixon and the third person, would you

11   have had an obligation to document that?

12          A.   From what I'm seeing here, right beyond

13   that is the photo array that he signed and he

14   identified if the photo in slot number two.

15          Q.   So I'm now ask --

16          A.   Do I remember doing it?  No, I don't

17   remember doing it.

18          Q.   I'm asking you something different.

19   I'm asking you if you had done another procedure

20   with him where you showed him three individual

21   photos including a photo of Valentino Dixon, would

22   you have had an obligation to document that?

23          A.   First of all --

24          MR. RUSS:  Objection to form.

25          MS. PERSICO:  Form.
```



```
 1                      John Vickerd

 2          MR. RUSS:  You may answer.

 3          THE WITNESS:  First of all, I would never

 4   show anybody three individuals together without

 5   making it a six documented like -- like on page 47.

 6   No, I don't and I would never have shown him three.

 7          BY MR. BRUSTIN:

 8          Q.   That would have been completely

 9   inappropriate, correct?

10          MR. RUSS:  Objection to form.  You may

11   answer.

12          MS. PERSICO:  Form.

13          THE WITNESS:  Yes.

14          BY MR. BRUSTIN:

15          Q.   That would have been contrary to the

16   policies and procedures of the department, correct?

17          MS. PERSICO:  Objection to form.

18          MR. RUSS:  Objection to form.  You may

19   answer.

20          THE WITNESS:  Yes.

21          BY MR. BRUSTIN:

22          Q.   That would have been highly suggestive,

23   correct?

24          MR. RUSS:  Objection to form.  You may

25   answer.
```



1              John Vickerd

2         MS. PERSICO:  Object to the form.  I think

3    that calls for a legal conclusion and is a highly

4    improper question, Mr. Brustin.

5         MR. RUSS:  And it's the fourth time you

6    asked it.

7         BY MR. BRUSTIN:

8         Q.   I haven't asked it at all.

9         That would be highly suggestive, correct?

10        MR. RUSS:  Objection to form.  You may

11   answer.

12        THE WITNESS:  We had a standard form to fill

13   out six photo arrays and I don't remember ever

14   doing anything else than but six photo arrays.

15        BY MR. BRUSTIN:

16        Q.   So you're answering a different

17   question now.  You received training in your career

18   as a detective in regard to eliminating

19   suggestiveness in identification procedures,

20   correct?

21        MS. PERSICO:  Objection to form.

22        THE WITNESS:  I don't remember getting any

23   training about how to do it.  It was standard

24   procedure.

25        BY MR. BRUSTIN:



 1                        John Vickerd

 2        Q.    All right.  You understood as a matter

 3   of standard procedure, that you were prohibited

 4   from using any suggestion in an -- in an

 5   identification procedure, correct?

 6        A.    We did everything by the book and that

 7   would not have been in the book.

 8        Q.    And you would agree that showing three

 9   individual photos including a photo of the suspect,

10   Valentino Dixon, would have been suggestive?

11        MR. RUSS:  Objection to form.

12        MS. PERSICO:  Objection to form.

13        MR. RUSS:  You may answer.

14        MS. PERSICO:  And now you have asked it

15   twice.

16        THE WITNESS:  That's hypothetical and that

17   would have never happened that I -- I'm aware of.

18        BY MR. BRUSTIN:

19        Q.    So you would have never done it,

20   correct?

21        MR. RUSS:  Objection to form.  You may

22   answer.

23        THE WITNESS:  Absolutely not.

24        BY MR. BRUSTIN:

25        Q.    And if you had learned anybody else did



1                      John Vickerd

2  it, you would have reported it, correct?

3          MR. RUSS:  Objection to form.  You may

4  answer.

5          THE WITNESS:  I don't remember if I learned

6  anybody else did it and I would say the people that

7  I worked with always did it correctly.

8          BY MR. BRUSTIN:

9          Q.   Including Stambach?

10         MR. RUSS:  Objection to form.  You may

11  answer.

12         THE WITNESS:  I didn't work with Stambach.

13  He worked with the other group.

14         BY MR. BRUSTIN:

15         Q.   Okay.  So I'll ask you that.  If you

16  had learned that Detective Stambach engaged in that

17  conduct, would you have reported it?

18         MS. PERSICO:  Objection to form.

19         MR. RUSS:  Objection to form.  You may

20  answer.

21         THE WITNESS:  I wouldn't been aware of it

22  and it should have been reported immediately by

23  somebody.

24         BY MR. BRUSTIN:

25         Q.   Okay.  Now, going back to your memo at



JOHN THOMAS VICKERD                          March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                          189

```
 1                  John Vickerd
 2  47.
 3          A.    Yes.
 4          Q.    Do you have an understanding based on
 5  this memo, as to -- as to how you came to create
 6  the photo array?
 7          A.    No.
 8          Q.    Would it be fair to say that based on
 9  the documents you reviewed, it appears that
10  Detective Stambach requested you to do it?
11          A.    I would not be aware of that and I
12  wouldn't have known that.
13          Q.    You would agree though that somebody
14  had to request that you do it, right?
15          A.    Evidently if he was brought in and I
16  was brought in to show him a photo array, yes, I
17  would have documented, which I did, on page 47.
18          Q.    I'm just trying to get at -- and it
19  sounds like you don't remember and you don't know
20  from this document who, if anybody, directed you to
21  create the photo array?
22          A.    I wouldn't know that.
23          Q.    Okay.  And I think you've already told
24  us, but I just want to make sure.  Page 48, that's
25  your handwriting on this document?
```



```
 1                    John Vickerd

 2        A.   Yes, it is.

 3        Q.   Okay.  Let's take a look at page 89.

 4        MR. RUSS:  In Exhibit 2?

 5        MR. BRUSTIN:  Yes, please.  Are you there?

 6        MR. RUSS:  We're here.  He's still trying to

 7   locate the page.  Hold on.

 8        THE WITNESS:  This is it right here, right?

 9        MR. BRUSTIN:  The middle page -- the middle

10   number on the bottom, 89.  It's also 1499.

11        MR. RUSS:  We got it.

12        BY MR. BRUSTIN:

13        Q.   Okay.  Is this -- is this a report that

14   you filled out or a memo?

15        A.   Yeah.  This is my signature and it

16   looks like my handwriting.

17        Q.   Okay.  So this is -- this is the actual

18   form that you used to request that a photo array be

19   put together; is that right?

20        A.   Yes.

21        Q.   Is this -- this the process of how it

22   worked in '91, you didn't actually put it together,

23   you request that it be put together?

24        A.   I don't remember the procedure, but

25   evidently if it was done and it has my -- my
```



1                      John Vickerd

2   writing on it and a signature, I did it.

3        Q.   Okay.  And it's not clear what time you

4   requested this, only that it all happened on

5   August 10th, correct?

6        A.   Yes.

7        Q.   If you can please take a look at 145

8   and 146, same exhibit.

9        MR. RUSS:  Let's use this one.  This one's

10  easier.

11       THE WITNESS:  That one's easier?

12       MR. RUSS:  Yeah.  All right.  We're there.

13       BY MR. BRUSTIN:

14       Q.   Take a look at the -- why don't you

15  start with 146, second page.

16       A.   Okay.

17       Q.   Is this -- this is the -- does this

18  appear to be the photo array that you -- the color

19  version of the photo array that you showed to

20  Emil Adams on the 10th of August?

21       A.   Yes.  There's six photos and that's my

22  writing on it and that's a cover sheet.  And then

23  on the actual photo array, it's got his signature

24  and my initials that he identified slot number two.

25       Q.   So it appears to be what I just



```
 1                     John Vickerd
 2   described to you?
 3        A.   Yes.
 4        Q.   Okay.  Take a look at page 84.
 5        MR. RUSS:  We got it.  Here, use this.  It's
 6   easier.
 7        THE WITNESS:  Okay.  Okay.
 8        BY MR. BRUSTIN:
 9        Q.   And this appears to be a -- would you
10   agree this appears to be a memo from Lonergan to
11   Donovan concerning his activities in this case
12   later in the day on the 10th?
13        A.   Yes.
14        Q.   Okay.  And it appears that at this
15   time, he was in the homicide office, correct?
16        A.   I would -- he -- he didn't have to make
17   it out in the homicide office, but I would imagine
18   that he did and it went to Lieutenant
19   Rautenstrauch.
20        Q.   Well, if he received a call, that --
21   does that -- does that mean to you it had to be in
22   the homicide office?
23        A.   1645 hours I received a call from black
24   male -- that would have had to be by a -- a
25   landline phone I'm sure.
```



1                       John Vickerd

2          Q.   Okay.  And you don't recall whether or

3   not you were working with Lonergan at this time in

4   the day, do you?

5          A.   No, I don't.

6          Q.   But typically as you told us during

7   this time period, you'd be working as partners

8   unofficially, correct?

9          MS. PERSICO:  Objection to form.

10         MR. RUSS:  Yeah, I -- objection to form.

11  You may answer.

12         THE WITNESS:  We worked out of the same

13  group and I didn't always work just with Lonergan.

14  And if --

15         BY MR. BRUSTIN:

16         Q.   But you -- I think you told us --

17         A.    -- whether I was off that day, I don't

18  know.

19         Q.   Yeah.  I thought you told us that on

20  the days when you were both working, you worked

21  together?

22         MS. PERSICO:  No, that's not what he said.

23         MR. RUSS:  Objection to form.  You may

24  answer.

25         THE WITNESS:  That's not what I said.



```
 1                     John Vickerd
 2          BY MR. BRUSTIN:
 3          Q.   I misunderstood.  I'm sorry.  When
 4    would you work with Lonergan as an unofficial
 5    partner and when would you not?
 6          MS. PERSICO:  Objection to form.
 7          THE WITNESS:  We worked out of the same
 8    group.  If he took a personal leave day or a
 9    vacation day and I did or he did and I was assigned
10    by the lieutenant or the chief of homicide to
11    something else, I would be working with the other
12    person.
13          BY MR. BRUSTIN:
14          Q.   Okay.  But generally when you were
15    working the same case on the same days, you'd work
16    together unofficially as partners, correct?
17          MS. PERSICO:  Objection to form.
18          MR. RUSS:  Objection to form.
19          THE WITNESS:  Generally, yes.
20          MR. RUSS:  You may answer.
21          BY MR. BRUSTIN:
22          Q.   Okay.  Any reason to believe that this
23    case was different from that general practice?
24          MR. RUSS:  Objection to form.  You may
25    answer.
```



1                    John Vickerd

2          THE WITNESS:  I don't remember the date and

3    if I was working or not that day.

4          BY MR. BRUSTIN:

5          Q.   But we know you were working that day

6    because we have reports from you --

7          A.   Okay.

8          Q.   -- conducting activities that day.

9          A.   Right.  All right.  The -- yeah, on

10   8/10.  Okay.  But he might --

11         Q.   So would it be fair --

12         A.   Pardon?

13         Q.   I'm sorry, I interrupted you.

14         A.   Go ahead.

15         Q.   So would it be fair to say -- I take it

16   you don't remember discussing this anonymous call

17   with Lonergan today, correct?

18         A.   I don't remember, no.

19         Q.   Would it be fair to say that based on

20   your working relationship with Lonergan as an

21   unofficial partner, you would have likely been

22   aware of this information on August 10th?

23         MR. RUSS:  Objection to form.  You may

24   answer.

25         THE WITNESS:  I have no idea.



1              John Vickerd

2         MR. BRUSTIN:  Okay.

3         THE REPORTER:  Could you spell that

4    lieutenant's last name that you said?

5         THE WITNESS:  Rautenstrauch?

6         MR. RUSS:  R-A-U-T-E-N-S-T-R-A-U-C-H.

7         THE REPORTER:  Thank you.

8         BY MR. BRUSTIN:

9         Q.   Now, take a look at page 165 in

10   Exhibit 2.  Is this a P73 that you filled out?

11        A.   Yes, it's got my signature on it.

12        Q.   And I take it you -- you haven't

13   reviewed this in preparation for today, correct?

14        A.   I -- I didn't catch that.

15        Q.   You did not review this in preparation

16   for today?

17        A.   No.  No, I didn't.

18        Q.   But you recognize your signature on it?

19        A.   I do.

20        Q.   Take a minute and review it, please.

21        A.   Okay.

22        Q.   Now, first of all, this is concerning

23   an anonymous call that you received in the office

24   at 1300 hours, correct?

25        A.   Yeah, 1300 hours.  Yes.



1                        John Vickerd

2         Q.   And you're writing the time that you

3    received the call because that's important, right?

4         A.   At 1 o'clock, yes.  1:00 in the

5    afternoon.

6         Q.   But it's important to write the time

7    when -- when the event happens, correct?

8         A.    Well, because it was a phone call, yes.

9         Q.   And this anonymous caller allegedly

10   provided incriminating evidence against

11   Valentino Dixon --

12        A.   Yes.

13        Q.   -- correct?

14        A.   Yes, seems to be.

15        Q.   And she gave you -- and she --

16   apparently she wouldn't give you her name, correct?

17        A.   Yes, anonymous caller.

18        Q.   But she did give you names of other

19   people that may have information, correct?

20        A.   Yes.

21        Q.   And obviously it would have been

22   important for you or others to follow up on trying

23   to locate those persons, correct?

24        A.   Myself or others I would assume so,

25   yes.



```
 1                       John Vickerd
 2         Q.   And so we -- there should be
 3  documentation in the file of those efforts,
 4  correct?
 5         A.   That would have been a procedure, yes.
 6         Q.   And by the way, this is two days after
 7  Valentino Dixon was arrested.  So this would be an
 8  example of homicide detectives continuing to
 9  investigate a homicide even after an arrest was
10  made, correct?
11         A.   Was he arrested on -- on that date?
12         Q.   Yes, sir.
13         A.   Okay.  I -- I wasn't aware of that.
14         Q.   So you would agree this is an example
15  of -- of you conducting investigative activities in
16  a homicide even after an arrest was made, correct?
17         A.    If he was arrested before 8/12, yes.
18  There was, again, a phone call coming to the
19  homicide office.
20         Q.   Okay.  Take a look at page 256.
21         MR. RUSS:  Okay.  We have it.
22         BY MR. BRUSTIN:
23         Q.   And actually, you know what, well, you
24  mine as well take a minute and review page 256 and
25  257.  I'm going to ask you about both.
```



1                    John Vickerd

2          MR. RUSS:  So you want him to read those two

3    pages to himself?

4          MR. BRUSTIN:  I do, please.

5          THE WITNESS:  Okay.

6          BY MR. BRUSTIN:

7          Q.   Okay.  Take a look -- I'm sorry.  Do --

8    do these -- these are P73s that are prepared by

9    Lonergan, correct?

10         A.   Yes, the one is.  Let's see the first

11   one.  Yes, both of them were repaired -- prepared

12   by Lonergan.

13         Q.   And we know that because he signed it,

14   correct?

15         A.   Yes.

16         Q.   But it lists you as a -- it lists you

17   as the investigating -- as the detective as well,

18   correct?

19         A.   It's got my name on that we were

20   working the same shift that day.

21         Q.   In other words, you were working as

22   partners on this day?

23         A.   Well, if -- if we were partners or not,

24   I don't know.

25         Q.   Okay.  But it appears that you and



```
 1                      John Vickerd
 2   Detective Lonergan are in -- are continuing to
 3   investigate this homicide more than eight months
 4   after Valentino Dixon was arrested, correct?
 5          A.   Yes.
 6          MS. PERSICO:  I object to the form of that.
 7          THE WITNESS:  One's --
 8          MS. PERSICO:  There's not -- there's not
 9   eight months between --
10          THE WITNESS:  No.
11          MS. PERSICO:  -- August.
12          THE WITNESS:  12/4 and 12/8 -- or 12/5.
13          BY MR. BRUSTIN:
14          Q.   I -- I added it wrong.  I'm sorry.
15          A.    Four months.
16          Q.    Four months; is that correct, sir?
17          A.    Working the same day, yes.
18          Q.    Okay.  But this is an example of you
19   and Lonergan investigating a homicide months after
20   an arrest has been made, correct?
21          A.   I believe so according to Lonergan's
22   report.
23          Q.   And this is different than what you
24   told us earlier about homicide detectives not
25   investigating homicides after an arrest, correct?
```



```
 1                    John Vickerd
 2         MS. PERSICO:  Objection to form.
 3         MR. RUSS:  Objection to form.  You may
 4   answer.
 5         THE WITNESS:  Yes.  This would have been a
 6   follow-up after the arrest.
 7         BY MR. BRUSTIN:
 8         Q.   And do you have an understanding as to
 9   why you and Lonergan waited four months to
10   interview Heather Smith?
11         A.   No idea.
12         MR. RUSS:  Objection to form.  You may
13   answer.
14         BY MR. BRUSTIN:
15         Q.   Can you think of any legitimate police
16   reasons to wait four months to interview
17   Heather Smith?
18         MS. PERSICO:  Objection to form.
19         MR. RUSS:  Objection to form.  You may
20   answer.
21         THE WITNESS:  That's a general question and
22   I have -- again, have no recollection, no idea.
23         BY MR. BRUSTIN:
24         Q.   Okay.  Well, if you go back to page 84.
25         MR. RUSS:  Okay.  We have 84.
```



```
 1                     John Vickerd

 2          BY MR. BRUSTIN:

 3          Q.   You would agree that based on this

 4   memo, what should have happened is that Lonergan or

 5   another detective should have made an effort to

 6   find Heather Smith and interview her, correct?

 7          MR. RUSS:  Objection to form.  You may

 8   answer.

 9          THE WITNESS:  According to Lonergan's report

10   on that date, yes.

11          BY MR. BRUSTIN:

12          Q.   Okay.  And according to custom

13   practice -- custom and practice as a homicide

14   detective in 1991, that -- that -- those efforts

15   should have taken place as soon as possible after

16   this interview on August 10th, correct?

17          MR. RUSS:  Objection to form.

18          MS. PERSICO:  Objection to form.

19          MR. RUSS:  You may answer.

20          MS. PERSICO:  And what interview are you

21   talking about?

22          BY MR. BRUSTIN:

23          Q.   I'm sorry, that's fair.  As soon as

24   this -- as soon as Heather Smith's name was

25   mentioned on August 10th, as soon as practicable
```



1                         John Vickerd

2  afterward, an effort should have been made to find

3  her, correct?

4          MR. RUSS:  Objection to form.  You may

5  answer.

6          THE WITNESS:  I don't remember what happened

7  this date, but I noticed on top of this P73 by

8  Lonergan, his name is on there alone.  And if he

9  was working with me, my name would be under his.

10         BY MR. BRUSTIN:

11         Q.  Okay.  All right.  Going back to 256

12  and 257.

13         MR. RUSS:  Okay.

14         BY MR. BRUSTIN:

15         Q.  On 257 on the next -- on -- on -- so on

16  December 4th, 1991, you are interviewing

17  Heather Smith, correct?

18         MR. RUSS:  256?

19         MR. BRUSTIN:  Yep.

20         THE WITNESS:  Yes, he's got my name.  Also,

21  it was his P73, but he's got my name on it and he's

22  got my name on the one on 12/5 also.

23         BY MR. BRUSTIN:

24         Q.  And then on December 5th, it appears

25  from this P73 that you and Detective Lonergan are



1                    John Vickerd

2    interviewing someone named Jeffrey Shelton,

3    correct?

4         A.   Well, I'm present that day, yes,

5    Jeffrey Shelton.

6         Q.   Well, based on this -- based on the way

7    he created this P73, does this indicate to you that

8    you were present for the interview?

9         MR. RUSS:  Objection to form.  You may

10   answer.

11        THE WITNESS:  No idea.

12        BY MR. BRUSTIN:

13        Q.   Okay.  Take a look at page 263.  Oh,

14   before we get to that.  Do you have any

15   understanding based on this memo or your memory, as

16   to how and why you came to be conducting these

17   interviews in December of 1991?

18        MR. RUSS:  Objection to form.  You may

19   answer.

20        THE WITNESS:  I don't even remember the

21   case.

22        BY MR. BRUSTIN:

23        Q.   Okay.  Take a look at page 263.

24        A.   Okay.

25        MR. RUSS:  Okay.  We have it.



1                       John Vickerd

2          BY MR. BRUSTIN:

3          Q.   Take a minute and review this.

4          A.   Okay.

5          Q.   Do you know whether or not you were

6     working with Detective Lonergan on this project

7     in -- in November of '92?

8          A.   Again, I would not know that.  The only

9     way I would know that if my name was put under his

10    from detective that filled out the report and

11    signed it.

12         Q.   Okay.

13         A.   And my name is not there.

14         Q.   Okay.  Back in '91 and '92 though, did

15    you understand the process for how you would obtain

16    radio dispatch information?

17         A.   How I would obtain radio dispatch

18    information?

19         Q.   Yes, sir.

20         A.   As soon as we were working the shift,

21    they would give each individual a portable.  That's

22    all we had --

23         Q.   So, I'm sorry.

24         A.   -- was portables.

25         Q.   I think I'm asking -- I think I'm



```
 1                      John Vickerd
 2   asking something different.  This is a request for
 3   tapes of radio calls at a certain time concerning a
 4   certain event, correct?
 5           A.   This report?
 6           Q.   Yes.  That's what this memo is about,
 7   it's asking for 911 and radio dispatch information
 8   from the events at this location?
 9           A.   It's -- it sounds by reading this --
10   I'm reading the one on 11/2 signed by Lonergan and
11   Lieutenant Rautenstrauch and my name's not on it.
12   I'm not aware of the -- the event whatsoever.  And
13   if it's --
14           Q.   I'm not --
15           A.   -- standard procedure --
16           Q.   I'm not asking you that, sir.
17           A.   -- I'm not aware.  I'm not aware of --
18           Q.   I'm just asking about what's in it.
19           A.   -- standard procedure.
20           THE REPORTER:  I can only take one at a
21   time, please.
22           MR. RUSS:  He's trying to answer your
23   question.
24           BY MR. BRUSTIN:
25           Q.   Sir, I'm not -- I'm not -- you made it
```



1                          John Vickerd

2  clear you don't remember.  I understand that, sir.

3  I'm asking about the substance of this and as a

4  matter of process.

5          A.    I don't remember if it was a matter --

6          Q.    This memo describes Lonergan attempting

7  to get radio dispatch information, correct?

8          A.    So this says.

9          Q.    Okay.  And I'm just trying to

10 understand if you have an understanding of how that

11 process would work.

12         A.    No, I do --

13         Q.    So --

14         A.    -- I do not.

15         Q.    Do you recall in 1991 or 1992 in

16 connection with any homicide you investigated, ever

17 attempting to get radio run information, tapes of

18 radio runs?

19         A.    No.

20         Q.    Okay.  Now, if you could please take a

21 look -- sorry, just give me one second.  Okay.

22 Page 196.

23         And you would agree that it appears that at

24 some unknown time on August 12th, LaMarr Scott was

25 interviewed by Mark Stambach, correct?



1                        John Vickerd

2          A.   So this report you're showing us shows

3    that, yes.

4          Q.   Okay.  Now, we -- keep this page open

5    and then take a look at 165.

6          MR. RUSS:  Okay.

7          BY MR. BRUSTIN:

8          Q.   And you would agree that 165 makes

9    clear that at least at 1300 hours on August 12th,

10   1991, you were in the homicide office?

11         A.   Yes.

12         Q.   So you were working that day and you

13   were in the homicide office, correct?

14         A.   Yes.

15         Q.   All right.  Now let's go back to 196.

16   And I want you to take a few minutes and I want you

17   to read this statement from LaMarr Scott on

18   August 12th.

19         MR. RUSS:  You want Detective Vickerd to --

20   to read the entire statement?

21         MR. BRUSTIN:  I do.

22         THE WITNESS:  Oh, God.  Okay.

23         MR. BRUSTIN:  And I'm almost done, by the

24   way.  I'm almost done for today.  I'll explain that

25   in a minute.



1                    John Vickerd

2         MR. RUSS:  This little toy that's supposed

3    to make our life easier.

4         MS. PERSICO:  I know.  It does the exact

5    opposite, doesn't it?

6         THE WITNESS:  Okay.

7         BY MR. BRUSTIN:

8         Q.    Did you get a chance to read it?

9         A.    Yep.

10        Q.    Now, I take it you -- well, first of

11   all, you have no recollection of learning this

12   information prior to today, correct?

13        A.    First time I saw it.

14        Q.    All right.  And you would agree that

15   based -- that based on this document, on

16   August 12th, 1991, LaMarr Scott came in and

17   confessed to committing the crime that

18   Valentino Dixon was arrested for and later

19   convicted of, correct?

20        A.    Correct.

21        Q.    And you have -- you have absolutely no

22   recollection of learning about this at the time,

23   correct?

24        A.    I didn't until right now.

25        Q.    Well, I -- well, let me be clear about



JOHN THOMAS VICKERD                         March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                          210

```
 1                    John Vickerd
 2   that.  As you sit here today, you have no
 3   recollection of it, you don't know whether or not
 4   you learned about it at the time, correct?
 5        A.   Correct.
 6        Q.   All right.  And would it be fair to say
 7   that -- well, first of all, can you remember any
 8   other case that you were involved in or even heard
 9   about in the Buffalo Police Department where
10   somebody was arrested for a homicide and somebody
11   else came in and confessed to the crime?
12        MR. RUSS:  Objection to form.  You may
13   answer.
14        THE WITNESS:  I wish I could tell you I did,
15   but I haven't and I don't remember and no, not --
16   not once.  Not once that I recall.
17        BY MR. BRUSTIN:
18        Q.   Okay.  Now, is that something you think
19   is an issue of memory or you think that's probably
20   never happened before?
21        A.   That could be part of both.
22        Q.   Okay.  Fair enough.  In any case, you
23   have no memory of it today?
24        A.   Correct.
25        Q.   Would it be fair to say though that to
```



JOHN THOMAS VICKERD                                    March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                     211

```
 1                    John Vickerd
 2  the extent you were working in the homicide office
 3  on -- on this day or the day after or the day after
 4  that, you certainly would have learned of this
 5  information given your involvement in the case?
 6          MS. PERSICO:  Objection to form.
 7          MR. RUSS:  Objection to form.  You may
 8  answer.
 9          THE WITNESS:  I could have possibly been
10  told about this, but, again, if it was taken by
11  Detective Stambach, it would have been taken in a
12  different shift than I worked.
13          BY MR. BRUSTIN:
14          Q.   Okay.  So what you're telling us is,
15  it's possible that you never learned that
16  LaMarr Scott came in and confessed to the crime
17  which Valentino Dixon was arrested for, correct?
18          A.   I didn't recollect -- I -- I didn't
19  remember whatsoever if he did or not, no.  I
20  didn't --
21          Q.   So I --
22          A.   -- even remember the name.
23          Q.   I know you don't remember today.  I'm
24  asking you something a little different.  Is it
25  possible that you did learn about this at the time
```



```
 1                    John Vickerd
 2  given how significant this information?  That's
 3  what I'm really asking.
 4          MS. PERSICO:  Objection to form.
 5          MR. RUSS:  Objection to form.  You may
 6  answer.
 7          THE WITNESS:  Again, my memory's not going
 8  to -- not going to help me because I don't remember
 9  anything about this case.  And I --
10          BY MR. BRUSTIN:
11          Q.   All right.
12          A.   -- definitely -- definitely don't
13  remember this.
14          Q.   Let me try it a different way.  Would
15  it be fair to say that although you don't remember
16  it, this is something that you would have learned
17  about based on how you understood things to have
18  worked in the homicide division in August of 1991?
19          MS. PERSICO:  Objection to form.
20          MR. RUSS:  Objection to form.  You may
21  answer.
22          THE WITNESS:  Back then it would have been
23  possible.  Do I remember it, no.
24          BY MR. BRUSTIN:
25          Q.   Also possible you didn't?
```



```
 1                    John Vickerd

 2         A.    It's possible.

 3         MR. RUSS:  Objection to form.  You may

 4   answer.

 5         BY MR. BRUSTIN:

 6         Q.    Now, you would agree that there is a

 7   lot of information in this statement that needs to

 8   be followed up on, correct?

 9         MR. RUSS:  Objection to form.  You may

10   answer.

11         THE WITNESS:  Yes.

12         BY MR. BRUSTIN:

13         Q.    For example, there needs to be an

14   investigation into trying to locate the gun,

15   correct?

16         A.    I saw in this question and answer sworn

17   statement that he threw it away.

18         Q.    Right.  So there needs to be a search

19   for where he claims to have thrown the gun, right?

20         A.    That would have -- that would have been

21   normal procedure.

22         Q.    And -- and that -- and that

23   investigation needs to be documented, correct?

24         A.    If it was found, it should have been,

25   yes.
```



 1                       John Vickerd

 2        Q.   Or if it wasn't found, it had to be

 3   documented that it was searched for and not found,

 4   correct?

 5        A.    It should have been back then, yes.

 6        Q.   And the statement that he fired at

 7   Torriano Jackson because Torriano Jackson was

 8   firing at him, that also -- that information had to

 9   be investigated, correct?

10        MR. RUSS:  Objection to form.  You may

11   answer.

12        THE WITNESS:  That would have been

13   advisable, yes.

14        BY MR. BRUSTIN:

15        Q.   And that -- and that investigation had

16   to be documented?

17        A.    Correct.

18        MS. PERSICO:  My fuse is like this short

19   right now.

20        BY MR. BRUSTIN:

21        Q.    Now, if you take a look at -- you

22   see -- do you recall from reading this just a

23   moment ago that there are questions about any

24   threats or promises that were made to him including

25   by Valentino's family?



```
 1                    John Vickerd
 2        MR. RUSS:  Does he remember reading that
 3   today?
 4        MR. BRUSTIN:  Yes.
 5        THE WITNESS:  No, I didn't.
 6        BY MR. BRUSTIN:
 7        Q.   Take a look at page 198 at the top.
 8   About five lines down, have there been any threats
 9   or promises made to you.
10        A.   No was the answer.
11        Q.   Yeah.  And then take a look at
12   page 199.
13        A.   Yeah.  He said he got --
14        Q.   About middle of the page, did Tino's
15   mother make you turn yourself in.  Do you see that?
16        A.   Yes, I did.
17        Q.   Another important area to follow up on
18   and investigate based on this information is what,
19   if any, interaction he had with -- with Valentino's
20   family, correct?
21        MR. RUSS:  Objection to form.  You may
22   answer.
23        THE WITNESS:  Yes.
24        BY MR. BRUSTIN:
25        Q.   Take a look at page 207 and just read
```



```
1                      John Vickerd

2   this report and let me know when you're done,

3   please.

4          A.    Okay.

5          Q.    According to this P73,

6   Detective Lonergan was involved in attempting to

7   get a polygraph of LaMarr Scott on August 15th,

8   correct?

9          A.    That's what it says, yes.

10         Q.    And I take it you have no idea whether

11  or not you were working with Detective Lonergan on

12  this -- on this issue?

13         A.    I have no idea.

14         Q.    Okay.  Now, just -- just -- I -- I

15  think I may have asked you this, but I just want to

16  make sure.

17         It's -- it was -- it was your understanding

18  that in 1991, any time any photographs were shown

19  to a witness, that process had to be documented,

20  correct?

21         A.    If a photo array was shown to somebody?

22         Q.    A photo array or any photos were shown.

23  Individual photos, a photo array, any photos shown.

24         A.    I'm not possibly aware of that.  If it

25  was -- if it was maybe on -- nobody was pointed
```

1                        John Vickerd

2    out, maybe the photo array was scrapped.  I

3    don't -- I don't remember.

4          Q.   Okay.  So then it's your testimony that

5    if individual photos were shown to a witness and no

6    identification was made, that process didn't

7    necessarily need to be documented?

8          MS. PERSICO:  Objection to form.

9          MR. RUSS:  Objection to form.

10         MS. PERSICO:  That's not --

11         MR. RUSS:  That's not what he said.  You may

12   answer.

13         THE WITNESS:  I don't recall whether it was

14   or not, but I know that if it was documented, that

15   a person was picked out, then it -- then it would

16   be recorded.

17         BY MR. BRUSTIN:

18         Q.   All right.  But any time a -- so is it

19   your testimony -- and separate question.  Assuming

20   that a photo array was shown, a six-person photo

21   array, was -- was it required in 1991 that a P73 be

22   filled out any time a photo array was shown?

23         A.   I don't remember.

24         MR. BRUSTIN:  Okay.  I am going to stop the

25   deposition for today.  I'm not going to close it



1                     John Vickerd

2   pending more information about some of the memory

3   issues that were discussed today.

4           Which either we can come to agreement on or

5   we will be raising with -- with the court, but I'm

6   going to leave the deposition open with that

7   caveat.

8           MR. RUSS:  I understand that you have

9   reserved your rights.  On behalf of the witness and

10  on behalf of all of our clients, I reserve our

11  rights as well.

12          If you want to show me some second circuit

13  authority that enables you to do what you say you

14  can do, I'm happy to review it.  Otherwise, I feel

15  like we're aiming for Judge McCarthy.

16          MR. BRUSTIN:  Fine.

17          MS. PERSICO:  I -- I concur with

18  Mr. Scott -- with Mr. Russ.

19          MR. BRUSTIN:  We'll -- we'll -- we'll --

20  we'll -- we'll -- we'll make a proposal.  You'll

21  either accept it or reject it and we'll deal with

22  it from there.

23          THE VIDEOGRAPHER:  Okay.  This concludes

24  today's testimony, the time is 14:50.  Thank you

25  very much.



```
 1                    John Vickerd
 2   The following were marked for Identification after
 3   the close of proceedings:
 4    EXH. 11              1992_01_30 Belling Affidavit
 5                         [COE 1716-1720].
 6    EXH. 12              Follow-Up Investigation
 7                         Policy [HR-Dixon 2212-2213].
 8    EXH. 13              Daily Activity Policy
 9                         [HR-Dixon 2219].
10            (Deposition concluded at 2:50 p.m.)
11                       *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



JOHN THOMAS VICKERD                                    March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                    220

1

2  STATE OF NEW YORK   )

3                            ss:

4  COUNTY OF ERIE)

5

6       I DO HEREBY CERTIFY as a Notary Public in and

7  for the State of New York, that I did attend and

8  report the foregoing deposition, which was taken

9  down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18  _____

19

20  ANDREA J. HOBBS,
   Notary Public.

21

22

23

24

25



JOHN THOMAS VICKERD                                    March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                              221

```
 1

 2                    INDEX TO EXHIBITS

 3   Exhibit              Description              Page

 4    EXH. 11        1992_01_30 Belling              219
                     Affidavit [COE 1716-1720].
 5
      EXH. 12        Follow-Up Investigation         219
 6                   Policy [HR-Dixon
                     2212-2213].
 7
      EXH. 13        Daily Activity Policy           219
 8                   [HR-Dixon 2219].

 9

10

11   *Copies of exhibits supplied to all counsel.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1
 2                        INDEX TO WITNESSES
 3   Witness                 Examination                  Page
 4    JOHN THOMAS          BY MR. BRUSTIN                     4
      VICKERD
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



DOCUMENT PRODUCTION REQUEST

Request                                                     Page

1

2    MR. BRUSTIN:  Okay.  So I want to just        104

3    request on the record and we'll -- we'll

4    follow up in writing, any -- any daily

5    activity reports for any of the homicide

6    detectives involved in this investigation

7    during -- during the course of this

8    investigation.  We'll follow up in

9    writing.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   Reference No.: 8058246

 2

 3   Case:  DIXON vs BUFFALO & ERIE COUNTY

 4

          DECLARATION UNDER PENALTY OF PERJURY
 5
          I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10

11   _____

12          John Thomas Vickerd

13

14          NOTARIZATION OF CHANGES

15               (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____
```



JOHN THOMAS VICKERD                                                March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                                225

1  Reference No.: 8058246
   Case:  DIXON vs BUFFALO & ERIE COUNTY
2

3  Page No._____Line No._____Change to:_____

4  _____

5  Reason for change:_____

6  Page No._____Line No._____Change to:_____

7  _____

8  Reason for change:_____

9  Page No._____Line No._____Change to:_____

10 _____

11 Reason for change:_____

12 Page No._____Line No._____Change to:_____

13 _____

14 Reason for change:_____

15 Page No._____Line No._____Change to:_____

16 _____

17 Reason for change:_____

18 Page No._____Line No._____Change to:_____

19 _____

20 Reason for change:_____

21 Page No._____Line No._____Change to:_____

22 _____

23 Reason for change:_____

24
   SIGNATURE:_____DATE:_____
25 John Thomas Vickerd



JOHN THOMAS VICKERD                                    March 24, 2022
DIXON vs BUFFALO & ERIE COUNTY                                    226

```
 1    Reference No.: 8058246
      Case:  DIXON vs BUFFALO & ERIE COUNTY
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25    John Thomas Vickerd
```

