**In the Matter Of:**

VALENTINO DIXON vs CITY OF BUFFALO

1:19-cv-01678-WMS

**MARK R. STAMBACH**

*June 08, 2022*



800.211.DEPO (3376)
*EsquireSolutions.com*

```
 1                    VIDEO DEPOSITION
                      MARK R. STAMBACH
 2


 3
     UNITED STATES DISTRICT COURT
 4   WESTERN DISTRICT OF NEW YORK

 5   ----------------------------------------
     VALENTINO DIXON,
 6
                          Plaintiff,
 7
                 - vs -        Case No.
 8                             1:19-cv-01678-WMS

 9   CITY OF BUFFALO and COUNTY OF ERIE;
     and DETECTIVE MARK R. STAMBACH,
10   DETECTIVE RANIERO MASECCHIA, DETECTIVE
     JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
11   CHIEF RICHARD T. DONOVAN, JOHN DOES,
     Unknown Buffalo Police Department Supervisors,
12   and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
     BELLING, in their individual capacities,
13
                          Defendants.
14   ----------------------------------------

15

16           Video recorded deposition of MARK R.

17   STAMBACH Defendant, taken pursuant to the Federal

18   Rules of Civil Procedure, in the law offices of

19   HARRINGTON & MAHONEY, 70 Niagara Street, Third

20   Floor, Buffalo, New York, on June 8, 2022,

21   commencing at 10:01 a.m., before LORI K. BECK, CSR,

22   CM, Notary Public.

23

24

25
```



```
 1   APPEARANCES:        NEUFELD SCHECK & BRUSTIN, LLP,
                         By NICK BRUSTIN, ESQ.,
 2                       nick@nsbcivilrights.com,
                         GERARDO ROMO, ESQ.,
 3                       gerardo@nsbcivilrights.com,
                         99 Hudson Street,
 4                       8th Floor,
                         New York, New York  10013,
 5                       (212) 965-9081,
                              and
 6                       EASTON THOMPSON KASPEREK
                         SCHIFFRIN, LLP,
 7                       By DONALD M. THOMPSON, ESQ.,
                         16 West Main Street, Suite 243,
 8                       Rochester, New York  14614,
                         (585) 423-8290,
 9                       dmthompson@etksdefense.com,
                         Appearing for the Plaintiff,
10                       via Zoom.

11                       HODGSON RUSS LLP,
                         By HUGH M. RUSS, III, ESQ.,
12                       hruss@hodgsonruss.com and
                         PETER A. SAHASRABUDHE, ESQ.,
13                       psahasra@hodgsonruss.com,
                         The Guaranty Building,
14                       140 Pearl Street, Suite 100,
                         Buffalo, New York  14202,
15                       (716) 856-4000,
                         Appearing for the Defendants,
16                       City of Buffalo; Detective
                         Mark R. Stambach, Detective
17                       Raniero Masecchia, Detective
                         James P. Lonergan, Detective
18                       John Vickerd, Chief Richard T.
                         Donovan, and John Does, Unknown
19                       Buffalo Police Department
                         Supervisors.
20

21

22

23

24

25
```



```
 1                    LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                      By JAMES P. BLENK, ESQ.,
 2                    50 Fountain Plaza, Suite 1700,
                      Buffalo, New York  14202,
 3                    (716) 853-5100,
                      jblenk@lippes.com,
 4                    Appearing for the Defendants,
                      County of Erie and
 5                    Assistant District Attorney
                      Christopher Belling.
 6
     PRESENT          SONA R. SHAH, ESQ.,
 7   VIA ZOOM:        GRACE PARAS, ESQ.,
                      AKOSUA OPONG-WIREDU, ESQ.
 8                    Neufeld Scheck & Brustin, LLP

 9                    TYLER Z. RAHNER, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                   (The following portion of the
2    proceedings were not videotaped.)
3          THE REPORTER:  So Mr. Brustin and Mr. Blenk,
4    are you supplying Mr. Russ with the transcript?
5          MR. BRUSTIN:  Sure.
6          MR. BLENK:  No.
7          MR. BRUSTIN:  Whatever we've been doing.  I
8    don't know how we've been doing it.
9          MR. BLENK:  I didn't notice this deposition.
10         THE REPORTER:  Okay.  So are you each buying
11   your own copies?
12         MR. BRUSTIN:  We're buying ours.  I don't
13   know what we've been getting.
14         We don't need this on the record.  Let's do
15   this afterward.
16         THE REPORTER:  Well, okay, we -- we can do
17   that.
18         MR. RUSS:  The convention here, whether you
19   want to agree or not, is that you -- you supply us.
20         MR. BRUSTIN:  If that's what we've been
21   doing, that's fine.
22         MR. RUSS:  Yes, that's what we've been
23   doing.
24         THE REPORTER:  Okay.  So Mr. Blenk, are you
25   agreeable to that?



1          MR. BLENK:  To be supplied by the -- by the

2     Plaintiff, yes.

3          MR. BRUSTIN:  It's our deposition.  We're

4     taking the deposition.

5          THE REPORTER:  So you're willing to supply

6     Mr. Blenk as well.

7          MR. BRUSTIN:  Sure.

8                    (Videotaping of the following

9     proceedings commenced at 10:01 a.m.)

10         THE VIDEOGRAPHER:  This will begin the video

11    recorded testimony of Mark Stambach taken for a

12    case to be tried in the United States District

13    Court, Western District of New York, to be used in

14    the matter of Valentino Dixon versus City of

15    Buffalo and County of Erie, et al.

16         This testimony is being taken at the office

17    of Harrington & Mahoney, 70 Niagara Street,

18    Buffalo, New York, on June 8th, 2022, and is

19    commencing at the time of 10:01 as indicated on the

20    video screen.

21         The court reporter and notary public, who is

22    from the firm of Esquire Deposition Services, is

23    Lori Beck.  My name is Tyler Rahner.  I am the

24    video technician, and I am with the same firm.

25         Counsel for the Plaintiff will now introduce



1  themselves, followed by counsel for the Defendants,

2  and the reporter will then swear in the witness.

3        MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &

4  Brustin for the Plaintiff, Valentino Dixon.

5        MR. ROMO:  Gerardo Romo, counsel for the

6  Plaintiff, Valentino Dixon.

7        MR. BLENK:  James P. Blenk, counsel to the

8  county -- the county Defendants.

9        MR. RUSS:  I'm Hugh Russ from Hodgson Russ.

10 With me is Peter Sahasrabudhe, and we represent

11 Detective Stambach.

12

13 MARK R. STAMBACH, 25 Delaware Avenue, Buffalo, New

14 York 14202, after being duly called and sworn,

15 testified as follows:

16                  EXAMINATION

17       BY MR. BRUSTIN:

18       Q.   Good morning, Detective Stambach.

19       A.   Good morning, sir.

20       Q.   How are you?

21       A.   Good.

22       Q.   I saw you -- you stood to take the

23 oath; is that right?

24       A.   That is correct.

25       Q.   You take your oath very seriously?



1            A.   Yes, I do.

2            Q.   Is that why you stood?

3            A.   Yes.

4            Q.   And you take it seriously in this case,

5    right?

6            A.   That is correct.

7            Q.   And in every case, correct?

8            A.   That is correct.

9            Q.   Every time you've testified under oath,

10   you make it your business to always tell the truth,

11   right?

12           A.   That is correct.

13           Q.   Including in the Ortiz case, correct?

14           A.   That is correct.

15           Q.   Are you armed today?

16           A.   Yes, I am.

17           Q.   Why are you armed?

18           A.   I'm on duty.

19           Q.   What -- what duty are you on?

20           A.   I'm on duty.

21           Q.   Where do you work?

22           A.   I work with the Erie County District

23   Attorney's office.

24           Q.   What do you do there, sir?

25           A.   I'm a criminal confidential



1   investigator.

2          Q.   What does that entail?

3          A.   Serving subpoenas, locating witnesses,

4   taking sworn statements.

5          Collecting evidence, transporting witnesses,

6   transporting Defendants, doing conferences after

7   arrests, doing pleas.

8          Taking DNA -- DNA samples from people that

9   have been convicted of crimes, sitting in on

10  proffers at the District Attorney's office.

11         Just a bunch of things.

12         Q.   Have you worked closely with DA Belling

13  in -- in that context?

14         A.   No.  DA Belling does not -- no longer

15  works at the Erie County District Attorney's

16  office.

17         Q.   Did you overlap when you were there?

18         A.   No, I did not.

19         Q.   How old are you, sir?

20         A.   I am 72 years old.

21         Q.   I don't want to pry into your health

22  issues, but do you have any health issues?  Are you

23  taking any medications that would in any way affect

24  your ability to testify here today?

25         A.   I'm taking medication, but it wouldn't



 1  affect my ability.

 2        Q.   All right.  You've had your deposition

 3  taken before, correct?

 4        A.   That is correct.

 5        Q.   You've testified hundreds of times,

 6  correct?

 7        A.   That is correct.

 8        Q.   I'll just generally tell you a few

 9  rules.  I'm sure you know them, but just in case.

10        I'm going to be answering them a series --

11  I'm going to be asking you a series of questions;

12  you'll be answering them under oath.

13        You understand that, correct?

14        A.   Yes, sir.

15        Q.   Same oath you take in court.

16        A.   Yes, sir.

17        Q.   If at any time you don't understand my

18  question or any part of my question, please let me

19  know, and I will change it, okay?

20        A.   That would be fine.

21        Q.   If you do answer, then I'm going to

22  assume you understood it; is that fair?

23        A.   Yes, sir.

24        Q.   If you want to take a break at any

25  time, you just let me know.  The only thing I would



1   ask is that you please answer the question pending

2   before taking the break, okay?

3        A.   That would be fine.

4        Q.   All right.  Why don't we start with

5   just some -- a little bit of background.

6        So first of all, when did you -- when did

7   you start in law enforcement?

8        A.   1971.

9        Q.   And what's your highest level of

10  education?

11       A.   I went to Seneca Vocational High

12  School, received a diploma in technical services,

13  draftsman.  I was a draftsman.

14       And then I went to about a year of college

15  at Millard Fillmore.  It's closed.  It's a

16  division at the State University of Buffalo.

17       And then I've had -- that would -- that

18  would be about it for my education.

19       Q.   When did you graduate high school?

20       A.   That would be in 1969.

21       Q.   Okay.  Any military service?

22       A.   No, sir.

23       Q.   All right.  And your first -- and

24  Seneca High School is here in Buffalo?

25       A.   It is.



1          Q.   19 -- in 1971, you started with the
2     Buffalo Police Department?

3          A.   That is correct.

4          Q.   Why don't you just take me through very
5     briefly your career in the Buffalo Police
6     Department.  Promotions, transfers, that kind of
7     thing, if you can.

8          A.   I came onto the police department, and
9     I was assigned to precinct number 16.  During that
10    time I was at 16, I -- I served as a patrolman.

11         I then later went for a very short, brief
12    time as a young patrolman to the narcotics squad.

13         Q.   What year was that, sir?

14         A.   Probably '71, '72.

15         Q.   Okay.

16         A.   I went back to the -- to a precinct to
17    do precinct work, but I was assigned to precinct
18    number 8 at that time.

19         Q.   Okay.

20         A.   While at number 8, I -- I was there for
21    a couple years.  I then went back -- I'm not sure
22    whether I went to the burglary task force or I went
23    to a brief stint again in the narcotics squad.

24         Q.   What year are we on now?

25         A.   I would have to say about '75, '76.



1          Q.   Okay.

2          A.   Served in the narcotics squad, then I

3    was sent back as a patrolman to precinct number 4.

4    I served as a patrolman in number 4, went back as a

5    detective, then went back to precinct number 16.

6          And -- and while I was at precinct 16, I was

7    finally promoted to full detective at the homicide

8    bureau.

9          Q.   And that was?

10         A.   In 1986.

11         Q.   So your first -- okay.  So 1986 was

12   your -- was your first detective post, and it was

13   in homicide.

14         A.   I served as an acting detective.  We'd

15   had a position in the Buffalo Police Department.

16   You could serve undercover, plainclothes.  They

17   would give you the pay of a detective, but at the

18   time, the position could not be filled because

19   there was not a vacancy for a full detective, and I

20   went back to precinct number 16.

21         After being at 16 for a year or two, I was

22   then promoted to full detective.

23         Q.   Okay.  When's the last time before 1986

24   when you worked in narcotics?

25         A.   I would not be able to say, but it was



1  during the '70s.

2        Q.   Okay.  But from 1986, you -- in 1986,

3  you got into homicide.  What's next?

4        A.   I retired in 2006.

5        Q.   Okay.

6        A.   I served in the homicide squad for 20

7  years.

8        Q.   Any -- any other promotions within

9  homicide?

10        A.   No.

11        Q.   Did you seek any promotions?

12        A.   No, I did not.

13        Q.   Okay.  And by the way, do you have any

14  children in law enforcement?

15        A.   No, I do not.

16        Q.   So by 1992 -- well, first of all, you

17  correct me if I'm wrong, but it sounds like you

18  have quite a good memory.

19        A.   I have a fair memory.

20        Q.   By 1992, you were an experienced, fully

21  trained homicide detective, fair to say?

22        A.   I was trained.  I was learning the

23  ropes in 1992.  '91, '92, yes.

24        Q.   Well, you'd been a homicide detective

25  for six years.



1          A.   '91 or '92, sir?

2          Q.   By '92.

3          A.   By '92, I would say about five and a

4   half, six years, yes.  You are correct.

5          Q.   You were an experienced homicide

6   detective by then, correct?

7          A.   I didn't consider it to be -- I did not

8   consider it to be experienced.  I was learning the

9   job from other senior, old detectives that were

10  there for a long time.

11         Q.   Okay.  So by 19 -- so in 1992, you were

12  still learning the ropes, correct?

13         A.   That is correct.

14         (Mr. Thompson entered the deposition.)

15    BY MR. BRUSTIN:

16         Q.   And you were being very careful to make

17  sure that -- because you were -- didn't feel fully

18  experienced, you were very careful to make sure

19  that you were following all the rules and

20  regulations and all of your training, correct?

21         A.   I tried to, yes.

22         Q.   Well, you made it your business to do

23  that; is that correct, sir?

24         A.   I tried to, yes.

25         Q.   Because you were learning the ropes.



1        A.   Well, I was learning, yes, that's
2   correct.
3        Q.   Now, certainly by 1992, one of the
4   things that you would do as a homicide detective --
5   first of all, could you tell me -- I know a little
6   bit about the layout of the Buffalo Police
7   Department in '92, but I want to ask you just a few
8   more question, okay?
9        A.   That would be fine.
10        Q.   So my understanding, for example, is
11   that the homicide unit at that time was one big,
12   open office with a couple of -- with a -- with an
13   interview room and a couple of other offices.
14        Does that sound right?
15        A.   It was always located on the third
16   floor, but we were moved three separate times.
17        Q.   All right.  But each time it was still
18   an open room with some -- with some -- with some
19   offices for the supervisors and an interview room,
20   correct?
21        A.   There would be two interview rooms, two
22   command officers' rooms, a large, open room for all
23   the detectives that were assigned there, and that
24   would be about it.
25        Q.   All right.  And all the detectives



1  worked in the large, open room, correct?

2          A.    That is correct.

3          Q.    Bigger than this room we're in now?

4          A.    Oh, much bigger.

5          Q.    Okay.  But big enough -- but small

6  enough so that everybody knew everybody else's

7  business, fair to say?

8          A.    Well, we all had separate desks that we

9  worked from.

10         Q.    Right.  But like any -- like any city

11 homicide unit with desks, you all spent a lot of

12 time talking to one another about what you were

13 doing, fair to say?

14         A.    That is correct.

15         Q.    That's what detectives do, correct?

16         A.    You are correct.

17         Q.    And where was the narcotics unit in

18 relation to homicide in '92?

19         A.    The narcotics squad at that time was

20 located on the third floor.  You would have to go

21 down a complete long corridor, past the women's

22 cell block, and they were kept in a corner --

23 corner office on the third floor all by themselves.

24         Q.    All right.  Same floor as you, though.

25         A.    Same floor.



 1          Q.   Same building.

 2          A.   And -- and with a different exit and

 3    entrance.

 4          Q.   Okay.

 5          A.   We had an elevator in the front of the

 6    building that we used specifically for our -- our

 7    duties and our business and our witnesses and

 8    victims and complainants --

 9          Q.   Okay.

10          A.   -- and they were down at the bottom --

11    or the end of the hallway, which is where the

12    prisoners went in and out at the corner of the

13    building, and then down a long hole -- a hall,

14    excuse me, not hole, but a hall, and they were in a

15    separate office all by themselves.

16          Q.   Got you.  And could you walk from the

17    homicide office on the third floor to the narcotics

18    office?

19          A.   Oh, absolutely.

20          Q.   Okay.  And my understanding is there

21    was less than -- less than 25 total homicide

22    detectives in '92; is that right?

23          A.   We were diminishing in size, but -- it

24    might be about 20 or -- I -- we had command

25    officers.  We had a chief of homicide.  We had an



 1  assistant chief of homicide.  We had a lieutenant.

 2  We had four or five detective sergeants and then

 3  the specific groups, but I think at that time, we

 4  were down to about 20 -- 22 detectives, maybe less.

 5  I'm --

 6        Q.  Okay.

 7        A.  I could -- you could check by checking

 8  the rosters.

 9        Q.  I'm just looking for rough.

10        A.  Okay.

11        Q.  But certainly -- the reason I'm asking

12  is because certainly, there were few enough

13  homicide detectives that all of the detectives knew

14  one another, correct?

15        A.  We did know each other, yes.

16        Q.  You went out to lunch together; you

17  went out for meals together; you had drinks

18  together.  You were a tight bunch.

19        A.  Everything but drinks.  I -- I don't

20  drink.

21        Q.  Ah.  You didn't go with them when they

22  had drinks?

23        A.  Yes, I went with them for dinner, but

24  I -- I wasn't going out specifically to drink after

25  the shift.



1          Q.    And did you -- did you stop drinking,

2    or you never drank?

3          A.    I stopped drinking.

4          Q.    Did you have a drinking problem that

5    caused you to stop?

6          A.    Not at all, no.

7          Q.    All right.   But certainly by 1992, you

8    didn't drink.

9          A.    That's correct.

10         Q.    But you certainly socialized with the

11   other homicide detectives.

12         A.    Correct.

13         Q.    You knew them all.

14         A.    Every single one of them.

15         Q.    Knew their families?

16         A.    Most of them, yes.

17         Q.    By the way, how many detectives of

18   color were there in 1992?

19         A.    There would be Detective Reginald

20   Minor, that's M-I-N-O-R; Detective Michael D., like

21   in David, middle initial, Lyons, L-Y-O-N-S.

22         I'm not sure when I -- when I arrived if

23   Detective Alois Williams, W-I-L-L-I-A-M-S, was

24   there, but I think he had retired just before I

25   arrived.



```
 1            Q.    All right.

 2            A.    Alois, A-L-O-I-S.  I believe he retired

 3    prior to me arriving.

 4            Q.    Okay.  So about three -- two or three.

 5            A.    Two or three, yes.  Oh, excuse me.

 6    I -- I -- I missed one.  Detective Sergeant James

 7    Murphy, M-U-R-P-H-Y.

 8            Q.    All right.  And by the way, I take

 9    it that -- so there was the -- the narcotics unit

10    was on the third floor.  Where was the surveillance

11    or the intelligence unit?

12            A.    I have no idea.

13            Q.    Never heard of that?

14            A.    I have heard of it, but I don't know

15    where they were located in our headquarters.  Never

16    went there.

17            Q.    Not once.

18            A.    Not once.

19            Q.    Why not?

20            A.    I was in the homicide squad.  I had --

21    I had no opportunity or no means for me to go down

22    there and ask them for any intelligence or any

23    information when I was there.

24            Q.    Never spoke to them about a suspect

25    or --
```



1        A.   No, sir.

2        Q.   So it's not that you don't remember

3    whether you did or not.  You're telling me you

4    never did.

5        A.   I never did.

6        Q.   You're confident in your memory enough

7    to say, "I never went to the surveillance unit."

8        A.   I never went through a surveillance

9    unit.  I don't even think the Buffalo Police

10   Department had a surveillance unit.

11       Q.   Well, I've seen it called surveillance

12   unit; I've seen it called intelligence unit.  Do

13   you -- do you know of -- do you have any idea what

14   I'm talking about?

15       A.   Yes, I do.

16       Q.   Okay.

17       A.   You said intelligence unit.  That's

18   something that I know existed for a short period of

19   time, but I don't know what their functions or --

20   or what their duties were.

21       Q.   Okay.  And it's -- it's your -- it's

22   your recollection you never went there or spoke to

23   them.

24       A.   I did not.

25       Q.   All right.  In any case, I take it that



 1  the narcotics unit was also small, less than 20

 2  detectives, something like that?

 3        A.   They were running pretty good.  They

 4  had a lot of manpower back there.

 5        Q.   All right.  And I take it that

 6  certainly in Buffalo, like -- I guess like any

 7  major city in the '90s, a good deal of the -- of

 8  your homicide work involved drug activity, fair to

 9  say?

10        A.   You are correct.

11        Q.   Maybe 75 percent?

12        A.   Maybe a little bit more.

13        Q.   Okay.  Lots of drug homicides,

14  drug-related homicides.

15        A.   Yes, sir.

16        Q.   And so you ended up having a close --

17  you -- in order to do your job effectively, you had

18  to have a close working relationship with the

19  narcotics officers and the narcotics detectives,

20  correct?

21        A.   I don't think it was close, but I know

22  that there are occasions when we needed something,

23  we would talk to several of the officers from the

24  narcotics squad.

25        Q.   All right.  Well, in order -- certainly



1  you understood that a lot of the homicides in

2  Buffalo at that time were -- were in connection

3  with drug operations, correct?

4         A.    Correct.

5         Q.    So in order to do your job effectively

6  as a -- especially as a young homicide detective,

7  it was important for you to know the different drug

8  operations, right?

9         A.    No, that's incorrect.

10         Q.    Oh.  No need -- no need for you to know

11  the drug operations that accounted for more than

12  75 percent of the murders in Buffalo?

13         A.    That's correct.

14         Q.    Can you explain that to me, sir?

15         A.    Absolutely.  Most of our cases were not

16  whodunit cases.  They were cases that were done

17  with -- with witnesses, with things that happened

18  where we would -- we wouldn't have to use the

19  narcotics squad to enhance a whodunit.

20         In other words, we don't know why someone

21  was in a house, why someone was killed.  Most of

22  our witnesses were on the street.  We developed

23  very strong information from tips from people that

24  would call in, from witnesses.

25         That information would be worked on, but I



```
 1  don't -- I don't recall us on a -- a daily basis
 2  getting involved with the narcotics squad.  It just
 3  wasn't happening.
 4        Q.   All right.  So just to be clear, it's
 5  your testimony that although more than 75 percent
 6  of the homicides in Buffalo were narcotics related,
 7  it wasn't important for you to have relationships
 8  with the narcotics detectives and officers
 9  concerning drug operations.
10        MR. RUSS:  Objection to form.  You may
11  answer.
12        THE WITNESS:  No, you're using one word,
13  important.  Of course it would be important for all
14  of us to talk to the narcotics --
15        BY MR. BRUSTIN:
16        Q.   Okay.
17        A.   -- the narcotics squad.  It just wasn't
18  needed on a -- on a base -- a daily basis for our
19  shootings and our stabbings.  It just wasn't
20  needed.
21        Q.   Fair enough.  But certainly you did it
22  enough to know who the wit -- certainly you had a
23  good working knowledge by 1992 -- withdrawn.
24        First of all, you seem like a very sharp
25  guy.  Do you consider yourself a sharp guy?
```



1        A.   No.

2        Q.   You were able to spell the names of --

3   of all of the -- all of the -- all of the

4   detectives of color from 1992.  Sounds like you

5   have a memory like a steel trap.  Would that be

6   fair to say?

7        A.   That's something that I learned from

8   testifying for 50 years.

9        Q.   All right.  We're talking about many,

10  many years ago.

11       A.   1991.

12       Q.   And you remember it clearly, correct?

13       A.   I remember a lot of things from 1991.

14       Q.   And in 1991, when you received

15  information about what was going on on the street,

16  you remembered that, fair to say?

17       A.   Yes, sir.

18       Q.   And would it be fair to say that as a

19  general matter, you acquired a good working

20  knowledge of the drug operations in Buffalo in 1991

21  and 1992?

22       A.   I would have to say no again.  My job

23  focussed on homicides.  Sometimes it would lead me

24  down a path where I went to the narcotics aspect of

25  it, but I had a working relationship with the



1  narcotics squad.  We would ask questions.  If we

2  had a case that we -- we found dope in a house,

3  someone was deceased in the house, obviously they

4  were involved in drugs.

5        Q.   Okay.  So although -- although 80 --

6  although more than 75 percent of the homicides in

7  Buffalo were drug-dealing related, by 1991 and

8  1992, you're telling me you did not have a good

9  working knowledge of the drug-dealing operations in

10 Buffalo.

11        A.   That is correct.  Very accurate.

12        Q.   And is it going to be your position

13 today that you had no idea who Valentino Dixon was

14 prior to his arrest for this murder?

15        A.   That is correct.

16        Q.   It's not that you don't remember if you

17 knew who Valentino Dixon was.  It's your testimony

18 under oath today that you had no idea who Valentino

19 Dixon was, correct?

20        A.   I never knew his name until that night

21 of the homicide.

22        Q.   Well, that's -- that's different.  I

23 want to make sure I understand that.

24        You didn't know Valentino Dixon by name?

25        A.   No.



1      Q.   By description?

2      A.   No.

3      Q.   By what he drove?

4      A.   No.

5      Q.   Never heard about a drug dealer who

6   drove a big white Cadillac?

7      A.   No, sir.

8      Q.   Or a -- or a fancy RX Mazda?

9      A.   No, sir.

10      Q.   Or a drug dealer who drove a fancy car,

11   a young drug dealer who drove a fancy car?

12      A.   No, sir.

13      Q.   Your knowledge of Valentino Dixon was

14   zero up until you arrested him, correct?

15      A.   You are 100 percent correct.

16      Q.   All right.  Let's take a -- let's take

17   a step back.  I want to talk to you just a little

18   bit about your preparation for today, okay?

19      So you were served with a Complaint in this

20   case, correct?

21      A.   I was not served.

22      Q.   You received a Complaint in this case.

23      A.   I did.

24      Q.   And I appreciate you -- at any time I

25   am not asking you an appropriate question, you --

1   you please correct me and make sure I understand

2   it, and if at any time you want to change an answer

3   or add something, you do that, okay?

4           A.    Thank you.

5           Q.    One thing that became -- that's

6   becoming very clear to me, though, in connection

7   with you just correcting that answer is that you

8   are a very good listener.  Would that be fair to

9   say?

10          A.    I try to.

11          Q.    And you are -- you -- you -- when you

12  want to be, you can be very careful and

13  conscientious.

14          A.    I try to.

15          Q.    You have great attention to detail;

16  would that be fair to say?

17          A.    I try to make it my -- my -- my

18  business, yes.

19          Q.    Not a lot gets past you.

20          A.    Things get past me.

21          Q.    In any case, as a detective, you prided

22  yourself on being careful and conscientious; is

23  that fair to say?

24          A.    Try to make it my job, yes.

25          Q.    Listening carefully to what people say



1  to you.

2          A.   Yes.

3          Q.   Noticing differences in what people say

4  to you over time.

5          A.   That's correct.

6          Q.   That's what a good detective does,

7  correct?

8          A.   Yes, sir.

9          Q.   And you believe you were quite

10  effective at that, fair to say?

11          A.   Tried to be, yes.

12          Q.   When you wanted to be.

13          A.   I tried to maintain a very

14  professional, ethical balance.

15          Q.   Well, that's -- that's a totally

16  different thing.  I'm only asking you about being a

17  careful, conscientious listener.

18          I'm going to ask you lots of questions about

19  your ethics later, but first of all, I want to

20  focus on you being careful and conscientious, okay?

21          A.   Correct.

22          Q.   If you -- when you wanted to be in 1991

23  and 1992, you were a very effective listener when

24  you were talking to witnesses and suspects, fair to

25  say?



1          A.    That would be fair to say.

2          Q.    And not just -- and you didn't just

3    develop that skill on your own.  You received

4    high-level training on that, correct?

5          A.    I did.

6          Q.    You went to the Reid school of

7    training, correct?

8          A.    That's one of the schools that I

9    attended, yes.

10          Q.    All right.  And you went to the

11    three-day Reid course?

12          A.    I did.

13          Q.    What -- when -- what year was that?

14          A.    I have no idea.

15          Q.    I'm going to ask you some questions

16    about your Reid training later, but I take it that

17    that was a -- an important training in your career.

18          A.    It was important, yes.

19          Q.    Something that you took and attempted

20    to implement -- implement in your police work going

21    forward?

22          A.    Correct.

23          Q.    Certainly you had your Reid training

24    before '92, correct?

25          A.    I would say that's correct.



1          Q.   I believe you testified to that in

2    Ortiz, but you -- you correct me if I'm wrong.

3          A.   I would have to say you are correct.

4          Q.   Any other high-level training on

5    interrogations or witness interviews other than the

6    Reid training?

7          A.   Yes.

8          Q.   What else?

9          A.   I went to the New York State Police

10   Department.  They have what they call the Henry

11   Williams.  It's an association.  They run a

12   five-day seminar, and they teach young detectives

13   how to handle major crimes, how to handle

14   homicides, how to take statements, how to collect

15   evidence.

16          Medical examiners that I -- I had, I studied

17   with Dr. Michael Baden, B-A-D-E-N; Dr. Henry Lee,

18   L-E-E; Dr. Werner, which is W-E-R-N-E-R, Spitzer,

19   S-P-I-T-Z-E-R.  He was in regards to contact wounds

20   from a deceased.

21          Q.   All the big hitters.

22          A.   Yes.  It was an interesting -- very

23   interesting seminar.

24          Q.   Okay.  So -- and based on that

25   training -- for example, let's start with the Reid



1   training and the state training on -- on

2   interviews.

3        You learned important techniques that you

4   carried forward with you in your career in terms of

5   interviewing witnesses and suspects, correct?

6        A.   Yes.

7        Q.   Documenting witness interviews and

8   suspect interviews, correct?

9        A.   Yes.

10       Q.   Following up on witness interviews and

11  suspects, correct?

12       A.   Correct.

13       Q.   All those -- particularly in connection

14  with the Reid training, those were all very

15  important components.  How to conduct an interview,

16  how to document an interview, how to follow up on

17  an interview, correct?

18       A.   No, the Reid training was more narrow

19  in aspect, and what I mean by that is they were

20  trying to teach us, when interviewing a person that

21  had committed a crime, how to get that person so

22  that they would finally tell you what they actually

23  did.

24       Q.   Okay.

25       A.   I can give you an example.



1          Q.   I -- I know exactly what the Reid

2    training is.  I know exactly what they do in that

3    three-day training, and I know the training you had

4    because I've done it in 30 cases.

5          So in addition to what you just described,

6    the three-day Reid training course that you took

7    also taught you how to document witness interviews,

8    correct?

9          A.   That would be part of the training,

10   yes.

11         Q.   And in addition to training you how

12   to -- how to interrogate suspects, they also gave

13   you more general rules about interviews generally,

14   correct?

15         A.   Correct.

16         Q.   And they also gave you training during

17   those three days on how to follow up on admissions,

18   correct?

19         A.   Correct.

20         Q.   In fact, one of the most important

21   components of the Reid training was you need to

22   follow up on any admissions you receive, correct?

23         A.   I don't think that's -- that's correct.

24         Q.   Don't remember that part of it?

25         A.   No, I don't.



1          Q.   So it's not that -- so what you're

2    telling me is the three-day Reid training that you

3    took did not teach you that part about following up

4    on admissions?

5          A.   I don't remember it.

6          Q.   All right.  So this is -- so this is

7    something that you're not saying it didn't happen.

8    You just don't remember it today; is that correct,

9    sir?

10         A.   You are correct.

11         Q.   All right.  Let's talk about your

12   preparation for today.

13         So you told us that you received the

14   Complaint.

15         A.   Correct.

16         Q.   Did you read the Complaint?

17         A.   I'm not sure.

18         Q.   What aren't you sure about?

19         A.   I'm not sure if I read the whole thing

20   in -- in its entirety, but I know I read the cover

21   sheet and a page or two of it.

22         Q.   Why didn't you read the rest?

23         A.   I'm a little bit biased on this entire

24   aspect of it, because it's almost like the

25   Complaint sounded like it was accusatory in nature,



1  and believe me, that's not in my -- my -- my makeup

2  of who I am.

3       I try to do a good job.  I try to help out

4  everybody, whether it's a Defendant or it's a

5  person that's a witness, and it just didn't sit

6  well with me personally.

7       Q.   No, I get it.  So when you read the

8  first couple pages, it didn't sit well with you

9  because we were -- you thought we were being a

10 little accusatory, right?

11      A.   Yes.  You know, I mean, you -- we all

12 have our jobs to do, and that's why we're here

13 today.

14      Q.   Yes.  So you decided to stop reading

15 after -- well, did you get sad?  Is that what

16 happened?

17      A.   I'm sorry?

18      Q.   Did you get sad when you read it, or

19 what happened?  Did you get angry?

20      A.   No, I just didn't -- I just didn't want

21 to keep on reading it.  It just -- it just upset

22 me.

23      Q.   Do you -- you understand that we're

24 suing you for many millions of dollars, right?

25      A.   I understand that.



```
 1          Q.    And we're accusing you of engaging in

 2   intentional misconduct.

 3          A.    That's correct.

 4          Q.    We're accusing you of framing an

 5   innocent man.  You understand that, correct?

 6          A.    That's correct.

 7          Q.    Did you think it might be important to

 8   get an understanding of what we're alleging you

 9   did?

10          A.    Well, there -- there's a reason for

11   that, because I didn't do anything that was wrong,

12   in my -- my feelings.  I really feel that I didn't

13   do anything wrong.

14          Q.    And you felt the same way in Ortiz,

15   right?

16          A.    I do.

17          Q.    You feel the same way in Epps, right?

18          A.    Epps?

19          Q.    The Epps case, Cory Epps?

20          A.    That's coming up.

21          Q.    You didn't do anything wrong there

22   either, right?

23          A.    No, I don't believe so.

24          Q.    Same thing in DeJac, right?

25          A.    That's correct.
```



1          Q.     Nothing wrong there.

2          A.     That's correct.

3          Q.     Did you read the Complaints in those

4     cases?

5          A.     On DeJac, I did.

6          Q.     All right.  But in our case, because --

7     because we were a little accusatory towards you,

8     you decided after reading the cover page to stop

9     reading.

10         A.     And several --

11         MR. RUSS:  Objection to form.  You may

12    answer.

13         THE WITNESS:  And several pages.

14         BY MR. BRUSTIN:

15         Q.     Okay.

16         A.     I didn't read the whole thing.

17         Q.     Okay.  So I take it that as you sit

18    here today, you don't actually know what we -- even

19    what we're accusing you of doing wrong.

20         A.     That would be fair to say.

21         Q.     You don't have any idea.

22         A.     That would be fair to say.

23         Q.     But what you do know is that you have a

24    very clear memory of the case, and you know you did

25    nothing wrong, fair to say?

1        A.    That's correct.

2        Q.    What -- other than the first couple

3    pages of the Complaint, what -- what else have you

4    read in connection with this case in between the

5    time you got the Complaint and today?

6        A.    That would be my P73s.

7        Q.    The ones you wrote.

8        A.    The ones I wrote.  The ones I was the

9    author to.  And also the sworn statements that I

10   took.

11       Q.    Okay.  Anything else?

12       A.    That's it.

13       Q.    Did you read anybody else's testimony?

14       A.    No, I did not.

15       Q.    Okay.  Did you have any meetings with

16   your attorneys?

17       A.    I did.

18       Q.    Okay.  And when I say meetings, I

19   mean -- these days I mean phone, in person, Zoom,

20   whatever, whatever it may be that you're

21   communicating.

22       A.    Yes, I did.

23       Q.    How many meetings did you have since

24   you got the Complaint?

25       A.    I would have to say two or three.



 1          Q.    Two or three?  How many were in person?

 2          A.    Three.  Two or three.

 3          Q.    Okay.  No phone meetings, then?  They

 4   were all --

 5          A.    Well, I had a phone call last night

 6   from Mr. Sahasrabudhe.

 7          Q.    Okay.

 8          A.    I don't know if you would consider that

 9   a conference or a meeting.

10          Q.    Okay.  So I'm not allowed to ask you

11   what you talked about, but I'm allowed to ask you

12   some questions around it.

13          A.    Sure.

14          Q.    So how long was that conversation last

15   night?

16          A.    About five minutes.

17          Q.    Okay.  So it wasn't substantive.

18          A.    It was about being here today.

19          Q.    Okay.  How many substantive meetings

20   have you had with counsel concerning this case

21   where you talked about the facts of the case?

22          A.    I would have to say three.

23          Q.    Three, okay.  When was the first

24   meeting?

25          A.    I don't know.



1        Q.    How long ago, approximately?

2        A.    I have no idea.

3        Q.    When's the most -- let's go -- let's go

4   back in time.  Let's go start -- let's start more

5   recent.  When's the -- when's the last meeting you

6   had?

7        A.    Several months ago.

8        Q.    So you haven't had a meeting with

9   counsel to talk about the substance of this case --

10       A.    Oh, excuse me, just recently for --

11  just recently I was handed my sworn statements, my

12  P73s, at the office of Hodgson & Russ.

13       Q.    Okay.  When was that?

14       A.    Within a few days.

15       Q.    All right.  So -- so the only time

16  you've read anything in connection with this case

17  since you were involved in it back in the '90s is

18  the P73s and the statements you took the last -- in

19  the last couple of days.

20       A.    Correct.

21       Q.    And what -- did you have a meeting with

22  counsel when you came to get those documents?

23       A.    Yes, I did.

24       Q.    How long was that meeting?

25       A.    I don't know.  We were up there for



1  maybe an hour or two.

2        Q.   Okay.  And who was there?

3        A.   Mr. Sahasrabudhe was there on the most

4  recent one to hand me the documents.

5        Q.   Okay.

6        A.   And then before that would be Mr. Russ

7  and Mr. Sahasrabudhe.

8        Q.   How long ago was that one?

9        A.   I couldn't say.  I want -- I'm trying

10 to --

11       Q.   More than a year?

12       A.   I could not say.  It was less than a

13 year.

14       Q.   So this is my fault, but let me just

15 say for the record:

16       It's going to be a long day, and I think

17 it's going to be tough for the court reporter to

18 get everything down, so if you could just take a

19 beat when I ask a question.

20       Sometimes your attorney may -- may make an

21 objection, but if you could take a beat, it would

22 be easier for her to get everything down.

23       MR. RUSS:  I think, just so the record's

24 clear, the record will reflect you're the one that

25 didn't take a beat, so I would ask also that you

1  wait for him to answer before you ask the next

2  question.

3        MR. BRUSTIN:  Totally agree with you.  That

4  is an ongoing problem for me, so I will -- I will

5  make an effort.

6        THE WITNESS:  That's why we're here.

7        BY MR. BRUSTIN:

8        Q.   Okay.  Was that meeting with Mr. Russ

9  more than six months ago?

10       A.   No.

11       Q.   Okay.  How long was that meeting?

12       A.   A matter of hours.

13       Q.   More than two?

14       A.   Yes.

15       Q.   More than four?

16       A.   No.

17       Q.   And how about the meeting before that?

18       A.   Just briefly in regards to that --

19  that -- that they would be representing me.

20       Q.   All right.  Anybody else present for

21  any of those meetings other than the three of you?

22       A.   No.

23       Q.   Have you had any discussions with any

24  of the Defendants in this case since you were named

25  as a Defendant?  About anything, first of all.



1        A.    Yes.

2        Q.    Who?

3        A.    Detective James Lonergan,

4   L-O-N-E-R-G-A-N.

5        Q.    Is he still a buddy of yours?

6        A.    He's still a friend of mine, yes.

7        Q.    And you've spoken to him since you were

8   served as a Defendant?

9        A.    At their office.

10       Q.    You were -- you spoke to him together.

11       A.    Yes.

12       Q.    I'm -- I'm sorry, I thought -- that's

13  what I was trying to ask.

14       MR. SAHASRABUDHE:  Yes.

15       MR. BRUSTIN:  I didn't ask if the --

16       MR. SAHASRABUDHE:  To the extent it's a

17  private conversation.  Sorry.

18       BY MR. BRUSTIN:

19       Q.    Was -- was Detective Lonergan present

20  for one of the meetings you had with your

21  attorneys?

22       A.    Correct.

23       Q.    Okay.  That's -- that's what I meant to

24  ask.  I didn't do it clearly.

25       Which meetings -- how many meetings was he



1   present for with you?

2          A.    Just one.

3          Q.    And was that the most recent meeting?

4          A.    It was.

5          Q.    So that was the -- how long was that

6   meeting?

7          A.    About two hours.

8          Q.    All right.  And did you speak to

9   Detective Lonergan before or after that meeting --

10         A.    No.

11         Q.    Let me finish the question.

12         Did you speak to him before or after that

13  meeting at any time about this case?

14         A.    No.

15         Q.    So the only discussion that you ever

16  had with Detective Lonergan about this case since

17  the '90s was when you were meeting with your

18  attorneys with him.

19         A.    That's correct.

20         Q.    Do you have any understanding as you

21  sit here today as what the -- as to what other

22  Defendants or witnesses testified to in this civil

23  action so far?

24         A.    No.

25         Q.    So other than your memory of what



1    happened in this case and the few reports that you

2    reviewed, your -- your understanding as to this

3    civil -- civil litigation is a blank slate, fair to

4    say?

5            A.    Yes.

6            Q.    After you were found liable in Ortiz,

7    including a million and a half dollars in punitive

8    damages, did you think at that time it might be

9    important to do a more careful review of the

10   allegations against you in this case?

11           A.    No.

12           Q.    All right.  You understand today that

13   Valentino Dixon was exonerated for shooting Antoine

14   Joiner (sic) -- I'm sorry, Antoine -- Torriano

15   Jackson, Aaron Jackson, and John Sullivan, correct?

16           A.    Correct.

17           Q.    And you understand that Lamarr Scott

18   was convicted of actually committing those crimes

19   since that time.

20           A.    Correct.

21           Q.    And I take it that your position here

22   today is that despite the fact that Valentino Dixon

23   was exonerated for that shooting and Lamarr Scott

24   was convicted of that shooting, it's your brief

25   that Valentino Dixon shot and killed those -- shot



1   and killed Torri Jackson and the others, correct?

2          A.   I did feel that way, yes.

3          Q.   I'm not asking if you did feel that

4   way.  I'm asking if you feel that way today.

5          A.   Yes.

6          Q.   So your position here today is that

7   Valentino Dixon is guilty of shooting Torri

8   Jackson, Aaron Jackson, and John Sullivan, correct?

9          A.   I feel that way, yes.

10         Q.   That's what you believe based on your

11  careful investigation, correct?

12         A.   Correct.

13         Q.   The same way you believe that Mr. Ortiz

14  had to be involved in the killings for which he was

15  convicted?

16         A.   Correct.

17         Q.   By the way, do you believe that Lynn

18  DeJac is guilty of killing her daughter?  Possibly?

19         A.   Yes.

20         Q.   She may well -- she may well be, right?

21         A.   Very strongly, yes.

22         Q.   So in other words, you believe Lynn

23  DeJac killed her daughter, too.

24         A.   That's correct.

25         Q.   All right.  And -- and you believe



1  that -- withdrawn.

2        In fact, in the Ortiz case, there was a

3  stipulation that was entered at the trial by your

4  attorneys that Mr. Ortiz was innocent.  You recall

5  that, right?

6        A.   I do recall that, yes.

7        Q.   But despite your attorneys entering a

8  stipulation on your behalf, you testified that you

9  firmly believed he was guilty, correct?

10       A.   Correct.

11       Q.   And that would be equally true here

12  with Valentino Dixon.  Despite the fact that -- and

13  it's a similar situation, correct?

14       In other words, Valentino Dixon was

15  exonerated for the shooting, and Lamarr Scott was

16  convicted, correct?

17       A.   Yes, sir.

18       Q.   Nevertheless, despite those judicial

19  proceedings, including the investigation by the

20  county attorney's office, it's your belief that

21  Valentino Dixon was indeed the shooter, correct?

22       A.   Correct.

23       Q.   And one of the reasons -- and we're

24  going to go into Ortiz a little bit more in detail

25  later, but one of the reasons why you feel so



1  strongly that Ortiz was involved in the murders is

2  because you understand that the only explanation

3  for Ortiz giving the admissions you claim that he

4  gave is either he was present for the murders or

5  you provided him that information, correct?

6          A.   No.

7          MR. RUSS:  Objection to form.  You answered.

8          BY MR. BRUSTIN:

9          Q.   All right.  We'll come back to that.

10         In any case, your position in this case,

11  this civil action, is that Valentino Dixon, in cold

12  blood, shot and killed one man and wounded two

13  others, correct?

14         MR. RUSS:  Objection to form.  You may

15  answer.

16         THE WITNESS:  I'm sorry?

17         MR. RUSS:  Objection to form.  You may

18  answer.

19         THE WITNESS:  I do believe he was involved

20  in that homicide, yes.

21         BY MR. BRUSTIN:

22         Q.   So I asked you a different question.  I

23  want to make sure you can answer it.  If you can't

24  answer my question, you tell me, but -- but I

25  want -- but you need to -- you need to answer the



 1  question I'm asking.

 2       And I want to -- did I accurately describe

 3  your view, that Valentino Dixon shot in cold blood

 4  and killed one man and wounded two others?

 5       MR. RUSS:  Objection to form.  You may

 6  answer.

 7       THE WITNESS:  I am not sure on that.

 8       BY MR. BRUSTIN:

 9       Q.   In any case, the -- the reason that you

10  believe that Valentino Dixon shot and killed

11  those -- shot and killed one man and wounded two

12  others is because you -- you believe that you and

13  the other detectives conducted a careful,

14  conscientious, ethical investigation, correct?

15       A.   I do.

16       Q.   Now, let's take a look at page -- so

17  one of the things I'm going to be referring to -- I

18  don't know if you've seen this.  You probably have

19  seen parts of it, but this is the police file that

20  we've put together based on documents that were

21  produced to us from the city.

22       First of all, you understand that -- that

23  according to policy and procedure, police

24  reports -- a police file from a homicide case is

25  supposed to be kept in perpetuity, correct?



1        A.    That is correct.

2        Q.    In other words, the -- the file that we

3  received should be exactly the file as it existed

4  in 1992.

5        A.    It should be.

6        Q.    Unless something got lost.  And you

7  certainly have no reason to believe anything got

8  lost, correct?

9        A.    I wouldn't be able to say.

10        Q.    So let me ask you to take a look -- I'm

11  going to refer to this quite a bit today.  This is

12  Plaintiff's Exhibit 2, which is the police file

13  that we attempted to put together.

14        And there's -- there's Bates-stamp pages on

15  the bottom right that I'm going to be referring to,

16  and so I'm going to look at the -- if you could,

17  look at the ones -- I'm sorry, I -- I -- I

18  misspoke.

19        I want you to look --

20        MR. BRUSTIN:  We've got some extras if you

21  guys want.

22        BY MR. BRUSTIN:

23        Q.    I'm going to refer to the pages in the

24  middle where the BPD page is.  Do you see those

25  Bates stamps?



1          A.    Yes.
2          Q.    Those are the ones I'm going to refer
3    to.
4          A.    Okay.
5          Q.    So first of all, take a look at page
6    80.
7          MR. RUSS:    Okay.  While Detective Stambach
8    is taking a look at that page, I just want to say
9    for the record that I don't agree that this
10   Exhibit is the exact police file, and I would -- I
11   would never so stipulate.
12          I'm not saying it's not.  I just -- we don't
13   know.
14          MR. BRUSTIN:    Okay.  I -- all I'm
15   representing is it was our best effort to put
16   together based on what we received from -- from the
17   city -- the police file, okay?
18          THE WITNESS:    Yes, sir.
19          BY MR. BRUSTIN:
20          Q.    So take a look at page 80, please.
21          A.    What number?  I'm sorry.
22          Q.    Eight zero.  BPD eight zero.
23          Now, first of all, this is the
24   arrest/booking form that you filled out in this
25   case, correct?



1          A.    I did not fill it out.

2          Q.    How do you know that?

3          A.    It's prepared by a report technician in

4   central booking.

5          Q.    All right.  The information comes from

6   you.

7          A.    It does.

8          Q.    You're responsible for the information

9   on this document, correct?

10         A.    Yes, sir.

11         Q.    You're listed as a detective here,

12  correct?

13         A.    Yes, sir.

14         Q.    And -- and I'm going to get to this

15  again a little more specifically based on what

16  other people have told me, but as a general matter,

17  my understanding of how things worked in homicide

18  in 1992 was that -- I'm sorry.  I don't know why I

19  keep saying '92.

20         A.    It's '91.

21         Q.    It's 1991.

22         A.    Correct.

23         Q.    In 1991, was that a lead detective was

24  assigned, but that wasn't necessarily the primary

25  investigator in the case.  Would that be fair to

1 | say, sir?

2 |       A.   That's correct.

3 |       Q.   So for example, it's clear from just

4 | looking through the reports in this case that you

5 | conducted more interviews than anybody else.  Would

6 | that be a fair characterization?

7 |       A.   I'm not sure.

8 |       Q.   Okay.  But certainly you were -- you --

9 | you understand, based on your review of -- of the

10 | documents that you created, that you were

11 | integral -- integrally involved in this case.

12 |       A.   I was.

13 |       Q.   And that's one of the reasons why you

14 | were the person who did the arrest report.

15 |       A.   I would say yes.

16 |       Q.   All right.

17 |       A.   Can I take one second, please?

18 |       Q.   Sure.

19 |       A.   I'm going to put a jacket on.

20 |       MR. BRUSTIN:  Sure.  You know, why don't we

21 | take a 30-second -- or a one-minute restroom break,

22 | actually, while you're doing that.

23 |            (Off the record: 10:46 a.m.)

24 |            (On the record: 10:56 a.m.)

25 |            BY MR. BRUSTIN:



1        Q.    Okay, Detective.  We were talking about

2   the arrest documentation, and I see it -- it starts

3   on page 80, and it goes all the way to page 82,

4   correct?  83.

5        Well, you know what?  Let me be more

6   specific.  The arrest/booking form that you filled

7   out, the information you -- you've provided, is on

8   page 80, correct?

9        A.    That's prepared for me, yes.

10       Q.    Okay.  And then on page 82 and 83 is

11   the criminal complaint, for which you provided the

12   substantive information, correct?

13       A.    Correct.

14       Q.    Okay.  And you signed the complaint,

15   correct?

16       A.    Yes, sir.

17       Q.    That's an important document.

18       A.    It is.

19       Q.    It's the document that is used to

20   charge someone, in this case, with second degree

21   homicide, correct?

22       A.    That's correct.

23       Q.    All right.  And as this document makes

24   clear, the theory of the case and the basis for the

25   arrest -- well, first of all, Mr. Dixon was



1  arrested for murder and possession of a weapon in

2  the second degree, correct?

3          A.    And assault.

4          Q.    And assault.  And as stated in the

5  complaint, the supporting evidence for the weapons

6  charge, the intent to kill, is that he did, in

7  fact, shoot them, correct?

8          A.    That's correct.

9          Q.    That's the sole supporting evidence in

10  the complaint, correct?

11          A.    That is it.

12          Q.    And that's your understanding as to the

13  theory of prosecution.

14          I know you didn't do it, but you understand

15  what the theory of prosecution was, correct?

16          A.    Correct.

17          Q.    Your understanding was that Mr. Dixon

18  was charged with murder in the second degree and

19  then second-degree possession of a weapon based on

20  him actually doing the shooting, correct?

21          A.    Correct.

22          Q.    And it's your position that you never

23  received any credible evidence whatsoever during

24  the course of your investigation to suggest that

25  somebody other than Valentino Dixon committed the



1  shooting, correct?

2          A.   No, that's incorrect.

3          Q.   Well, my question is -- I -- I -- maybe

4  you misunderstood my question.

5          A.   Okay.

6          Q.   You did not receive what you believed

7  to be credible evidence suggesting that anybody

8  other than Valentino Dixon committed the shooting

9  during the investigation, correct?

10         A.   Well, I did take a statement from

11 Lamarr Scott.

12         Q.   Do you understand what the word

13 credible means?

14         A.   Yes, I do.

15         Q.   Okay.  And you determined that that

16 information was not credible, correct?

17         A.   I would say you are correct.

18         Q.   Okay.  That's what I'm asking you.

19         A.   I -- I missed that word.

20         Q.   That's fine.

21         A.   It was a long -- it was a long

22 question.

23         Q.   That's why I'm repeating it, and any

24 time you're not sure, you just tell me.

25         During the course of this investigation, you



1  did not receive what you believed to be any

2  credible or reliable information suggesting that

3  anyone other than Valentino Dixon shot those men.

4         A.    You are correct.

5         Q.    And nothing has changed your mind since

6  then.

7         A.    Correct.

8         Q.    And just to be clear, in reviewing the

9  file in this case to the extent that you did, you

10  did not see anything that you did, even

11  inadvertently, to cause an innocent man to be

12  convicted, correct?

13         A.    That's correct.

14         Q.    No deviations from procedure, correct?

15         A.    I believe so, yes, that's correct.

16         Q.    No -- no deviations from your training?

17         A.    I believe so.

18         Q.    No misrepresentations even

19  unintentionally?

20         A.    I would not do that, no.  You are

21  correct.

22         Q.    So when you say you would not do that,

23  you mean you did not -- you did not make any

24  misrepresentations in this case based on your

25  memory of this case as well as your knowledge that



1   you never made misrepresentations in any case,

2   correct?  Is that a fair statement?

3        MR. RUSS:  Objection to form.  You may

4   answer.

5        THE WITNESS:  You're -- that's a long

6   question.

7        BY MR. BRUSTIN:

8        Q.   So I'll --

9        MR. RUSS:  Break it up.

10       BY MR. BRUSTIN:

11       Q.   I'll shorten it for you.

12       A.   Okay.

13       Q.   One of the reasons why you're so sure

14   that you didn't make any misrepresents in this case

15   is because you remember your actions in this case

16   and you know you didn't do that, correct?

17       A.   Correct.

18       Q.   Another reason why you know you didn't

19   make any misrepresentations in this case is because

20   you were a highly ethical detective who never made

21   misrepresentations in any case, correct?

22       A.   I feel I was pretty good at what I did.

23       Q.   So that's a different question.  This

24   should be an easy one for you.  My question was:

25       One of the reasons you know you didn't make



1   any misrepresentations in this case is because you

2   know you didn't make misrepresentations

3   intentionally in any case, correct?

4        A.   Correct.

5        Q.   You didn't misrepresent any statements

6   from witnesses or suspects, correct?

7        A.   Yes.

8        Q.   You did not fail to document important

9   impeachment evidence or exculpatory evidence,

10  correct?

11       A.   That's correct.

12       Q.   Not in your reports, correct?

13       A.   Correct.

14       Q.   Not in your communications with the

15  District Attorney, correct?

16       A.   Correct.

17       Q.   You did not misrepresent the

18  circumstances of any of the interviews you

19  conducted, either in writing or in your

20  conversations with the DA or at trial?

21       A.   Correct.

22       Q.   You didn't testify at trial.

23       A.   I did not testify -- I was not at the

24  scene.  I only took brief statements.

25       Q.   Okay.  And you understood that if you



1  made any kinds of misrepresentations like the ones

2  I just described, those would be serious violations

3  of policy and procedure.

4       A.   You are correct.

5       Q.   They would also violate the

6  Constitutional rights of Mr. Dixon.

7       A.   Correct.

8       Q.   And they would constitute serious

9  misconduct as a detective, correct?

10      A.   Yes, sir.

11      Q.   And you did none of those things in

12  this case.

13      A.   No.

14      Q.   For example, you were careful to

15  document all substantive information that you

16  received from any witnesses, correct?

17      A.   I was careful, yes.

18      Q.   For example, to the extent that you

19  received substantive information from a witness in

20  a preinterview before you took a written statement,

21  you would make sure to document that information,

22  correct?

23      A.   No.

24      Q.   Well, to the extent that you --

25  maybe -- let me be clear.  It was a bad question.



1          To the extent that you received any

2    substantive information from a witness prior to

3    taking a written statement that might be relevant

4    to the case that was in any way different or

5    additional to the written statement, you would

6    certainly document that, correct?

7          MR. RUSS:  Objection to form.  You may

8    answer.

9          THE WITNESS:  I would try, yes.

10         BY MR. BRUSTIN:

11         Q.   What do you mean you would try?  That's

12    your job, right?

13         A.   I do make mistakes, sir.

14         Q.   Okay.  Other than a mistake, you would

15    document it, correct?

16         A.   I would document most of what they told

17    me, yes.

18         Q.   And you certainly have no reason to

19    believe you made any mistakes in documentation in

20    this case based on your review, correct?

21         A.   That's correct.

22         Q.   Or on your memory, correct?

23         A.   That's correct.

24         Q.   Oh, I meant to ask you, and I'm sorry,

25    just a few questions about your investigation



1  business, Amherst.

2          A.    Yes.

3          Q.    When -- when did that start?

4          A.    Over 30 years ago.

5          Q.    And so you -- so that would be what

6  year?

7          A.    It's on the license.  I -- I would have

8  to say 30 years prior to this.

9          Q.    So certainly by the time of this case?

10         A.    My -- my agency was investigating, and

11  the security business was open, yes.

12         Q.    Is sounds like -- based on that, it

13  sounds like this was the start of your security --

14  security and investigation business.

15         A.    No, no, it -- it started a long time

16  before that.  My son had just graduated from high

17  school, and it was already started at that point.

18         Q.    When did he graduate from high school?

19         A.    Oh, God.  That's a good question.  Give

20  me a second.  '86.

21         Q.    '86?

22         A.    1986.  He graduated from St. Joe's, and

23  I -- I started the business to earn extra money.

24         Q.    Okay.  And can you -- can you just give

25  me -- and I don't need specifics right now.  I may



 1  ask for more later in writing, but can you just

 2  give me generally what -- what were you drawing on

 3  an annual basis in profits for yourself from

 4  Amherst Investigations from the start through

 5  the -- through the -- through your -- through the

 6  next 30 years?

 7        How much on average were you making?

 8        MR. RUSS:  Objection to form.  You may

 9  answer.

10        THE WITNESS:  I have no idea.

11        BY MR. BRUSTIN:

12        Q.   Well, you must have had tax returns.

13        A.   Absolutely do have tax returns.

14        Q.   Okay.  Can you just approximate?  Was

15  it -- were you making a hundred grand a year?  50?

16  200?

17        A.   I have no idea.

18        Q.   Okay.  Well, is it still in business?

19        A.   Yes, it is.

20        Q.   What did you make from it last year?

21        A.   My son is running the business right

22  now, and you'd have to ask him.

23        Q.   Are you being paid for anything?

24        A.   No, I am not getting paid.

25        Q.   When did you stop being paid for



1   Amherst Investigations?

2          A.    I'd say about 12 years ago, 11 years

3   ago.  I'm the licensee.  I took the exam; I became

4   the licensee.  The business has been open; my son

5   has been running it.

6          Q.    Were you being -- would there -- was

7   there a period of time when you were being paid

8   some of the profit?

9          A.    Oh, sure.

10         Q.    Okay.  And you -- you -- you don't have

11  it handy today, but you have access to paperwork

12  that would tell you how much money you made.

13         A.    Yes, I do.

14         Q.    All right.  And I want to just ask you

15  a couple of questions about your assets.

16         Do you own any real property?

17         A.    Yes, I do.

18         Q.    How many homes do you own?

19         A.    Three.

20         Q.    All right.  And was your -- your

21  primary residence is in Buffalo?

22         A.    That's correct.

23         Q.    What is the approximate value of your

24  home?

25         A.    I would say about 5- or $600,000.



1          Q.    Okay.  Is there a mortgage on it?

2          A.    Yes, there is.

3          Q.    What is the mortgage?

4          A.    What is it?

5          Q.    Yes, how much is left on it?

6          A.    I have no idea.

7          Q.    Okay.  What other homes do you own?

8          A.    I own a property up in Carlton Beach.

9          Q.    What's the approximate value of that?

10         A.    Maybe $200,000.

11         Q.    Okay.  And what's your third property?

12         A.    Down in Ellicottville, New York, and

13   that's about $175,000.

14         Q.    Are those rental properties or vacation

15   properties?

16         A.    No, my son uses the place in

17   Ellicottville, and I use the place up in Carlton.

18         Q.    Any other assets in excess of $50,000?

19         A.    Not that I'm aware of, no.

20         Q.    And you receive a pension?

21         A.    Yes, I do.

22         Q.    And do you also have a -- what's your

23   current salary?

24         A.    I believe it's about 65,000, maybe

25   $70,000 at the tops.  I couldn't say.



1          Q.    Now, some of the questions I'm going to

2    ask you today are questions that other officers

3    have already been asked, other Defendants in this

4    case, like Detective Masecchia, Detective Vickerd,

5    and I'm going to ask you some of those same

6    questions, okay?

7          A.    Sure.

8          Q.    And so I may refer to things they said

9    and see if you agree with them.

10         A.    Okay.

11         Q.    Is that fair?

12         A.    That would be fair.

13         Q.    So for example, one of the things

14   Detective -- and am I pronouncing it right?

15   Masecchia?

16         A.    That's right on -- spot on.

17         Q.    All right.  I -- I think I got it wrong

18   initially.

19         One of the things that Detective Masecchia

20   told us is that he understood certainly by 1991

21   that he had an absolute obligation as a detective

22   to report any misconduct by a fellow officer that

23   he observed.

24         Do you agree with that?

25         A.    I do.



1          Q.   And that wasn't -- that -- withdrawn.

2          Would it be fair to say that based on

3     your -- your training outside of Buffalo, you --

4     you got a general understanding of how detectives

5     operate in other major departments like New York

6     City and other places?

7          A.   Correct.

8          Q.   And you understood, for example, that

9     there are basic rules in policing that apply to all

10    police departments, correct?

11         A.   Correct.

12         Q.   For -- we talked about say few of them

13    already.  For example, in Buffalo, like any other

14    police department, you understood you had an

15    absolute obligation to document any potentially --

16    any potential exculpatory or impeachment evidence,

17    correct?

18         A.   Correct.

19         Q.   Very basic detective obligation,

20    correct?

21         A.   Correct.

22         Q.   Another very basic obligation is the

23    obligation to report any misconduct that you

24    observe from a fellow officer, correct?

25         A.   Correct.



1          MR. RUSS:  From a federal or fellow?

2          MR. BRUSTIN:  Fellow.

3          BY MR. BRUSTIN:

4          Q.   In other words, you understood that if

5     you observe misconduct by a fellow officer in your

6     presence and you fail to report it, that was an

7     equally serious violation as if you committed

8     the -- as if you committed the misconduct yourself.

9          A.   Correct.

10         Q.   Now, one of the things that Detective

11    Masecchia also told us is that he did not, to his

12    recollection, ever report an officer engaging in

13    misconduct during his entire career.

14         A.   I don't know.  You'd have to talk to

15    Detective Masecchia.

16         Q.   Did you ever report an officer engaging

17    in misconduct during your career?

18         A.   No.

19         Q.   Now, Detective Masecchia was quite

20    candid with us, and he told us that, for example,

21    he did on multiple occasions observe police

22    officers lay their hands on suspects in ways that

23    he knew were excessive, not -- not justified under

24    the circumstances, and he failed to report it.

25         And he told us that that was due to what's



1   commonly referred to as the blue wall of silence.

2         So my question to you, sir, is:  Did you

3   also, during your career, observe officers using

4   what -- what would be considered excessive force?

5   In other words, force that was not justified under

6   the circumstances?

7         MR. RUSS:  Objection to form, mostly because

8   I do not agree with your characterization of the

9   testimony.

10        With that objection on the record, you may

11  answer.

12        THE WITNESS:  I -- I didn't see it that way.

13  I didn't consider myself having to report someone

14  using excessive force.  I always thought that they

15  were pretty good arrests.

16        Some guys were a little bit stronger in

17  their use of force; some guys were a little weaker

18  in their use of force; but I didn't see anything

19  that crossed the line.

20        MR. BRUSTIN:  Okay.  So just one -- one

21  thing, Hugh, and I -- I was reminded of this

22  yesterday, and I -- and I -- I changed what I was

23  doing.

24        I forgot that the rules had changed and that

25  the only objections we're allowed to make here are



1  objections to form.  I would appreciate if you

2  would just make your objections to form.

3      MR. RUSS:  Are you saying I shouldn't make

4  speaking objections?

5      MR. BRUSTIN:  Yes.

6      MR. RUSS:  Is that what you're saying?

7      MR. BRUSTIN:  Yes.

8      MR. RUSS:  I will make the objections I

9  make, and if you don't like them, you can do

10  whatever you want.

11      MR. BRUSTIN:  It's not that I don't like

12  them.  It's just that you're violating the rules,

13  and that's what I'm pointing out to you.  The rules

14  say --

15      MR. RUSS:  Well, I was trying to explain to

16  you why I was objecting to the form.

17      MR. BRUSTIN:  I don't need your explanation.

18      MR. RUSS:  If you don't want that --

19      MR. BRUSTIN:  No.

20      MR. RUSS:  -- fine.

21      MR. BRUSTIN:  Yes, please don't do it for me.

22  Thank you.

23      BY MR. BRUSTIN:

24      Q.  All right.  So I think you answered my

25  question, but I want to make sure.



1          A.   I did.

2          Q.   During your -- how many years on the

3   force?

4          A.   In the Buffalo Police Department?

5          Q.   Yes.

6          A.   35.

7          Q.   All right.  During your 35 years in the

8   Buffalo Police Department beginning in 1971, you

9   never observed an officer using excessive force,

10  correct?

11         A.   That's correct.

12         Q.   And by the way, you were trained on

13  what excessive force means.

14         A.   Correct.

15         Q.   In other words, you understood that

16  excessive force means using any force that's not

17  justified under the circumstances.

18         A.   Correct.

19         Q.   So, for example, you never saw a

20  detective or an officer slap or strike -- strike a

21  suspect for reasons other than self-defense.

22         A.   .well, for resisting arrest they were

23  struck.

24         Q.   Well, that would be self-defense.

25         A.   Well, no, I think they were effecting



1  an arrest.  I don't think they were defending
2  themselves.
3        Q.   All right.  In other case -- in any
4  case, you never saw anybody strike or hit a suspect
5  that wasn't justified pursuant to your training.
6        A.   Correct.
7        Q.   Because you would have reported it,
8  right?
9        A.   I -- that is correct.
10        Q.   Because you're such an ethical,
11  conscientious detective.
12        A.   I'm a good detective.
13        Q.   Well, there's -- there's -- that's --
14  that's a different word than I used.  The words I
15  use, and I want to make sure you agree with them,
16  are ethical and conscientious.
17        Do you agree with those words?
18        MR. RUSS:  Objection to form.  You may
19  answer.
20        THE WITNESS:  I do.
21        BY MR. BRUSTIN:
22        Q.   All right.  So you never saw anyone use
23  excessive force during your 30 -- 30 -- 30 or more
24  years on the force.
25        MR. RUSS:  Objection to form.  You may



```
 1  answer.
 2         THE WITNESS:  35.
 3         BY MR. BRUSTIN:
 4         Q.   The only correction to that question is
 5  the number of years on the force.
 6         A.   That's correct.
 7         MR. RUSS:  Objection to form.  You may
 8  answer.
 9         BY MR. BRUSTIN:
10         Q.   Another thing that Detective Masecchia
11  told us that he observed during his career,
12  including in the '90s, were -- were detectives and
13  police officers using racial slurs like the N word
14  with witnesses and suspects.
15         First of all, you would agree that using a
16  racial slur with a witness or a suspect is a
17  serious violation of policy and procedure, correct?
18         MR. RUSS:  Objection to form.  You may
19  answer.
20         THE WITNESS:  Correct.
21         BY MR. BRUSTIN:
22         Q.   All right.  And is it your -- and if
23  you observed an officer using those words with a
24  witness or a suspect, you had an absolute
25  obligation to report it.
```



```
 1          A.   No, I don't believe I did.

 2          Q.   But if it's a serious violation of

 3   policy and procedure and you've already told us you

 4   had an obligation to report any violations of

 5   policy and procedure, why wouldn't you have to

 6   report it?

 7          A.   You're asking about physical abuse, the

 8   first portion.  Now you're asking about someone

 9   saying the N word.

10          Q.   Yes.

11          A.   The several times that I heard it, it

12   was said by a black officer to a black suspect.

13          Q.   Oh, that's --

14          A.   I -- I did not do it or I did not

15   observe any of the white officers do it that --

16   that I worked with.  I -- I wouldn't work with guys

17   that I didn't feel comfortable with.

18          Q.   Fair enough.  So I think you've

19   answered my question, but I want to make sure.

20          A.   I did.

21          Q.   You've never, in -- in -- since 1971 in

22   Buffalo when you became a police officer, what you

23   would tell the jury -- there's a jury trial here --

24   is that you never saw any white police officer use

25   the N word on the job.
```



1          A.    That's correct.

2          Q.    Because if you had, you would have

3    reported it.

4          A.    Correct.

5          Q.    And you never saw any officer engage --

6    any detective engage in any misconduct during a

7    criminal investigation, correct?

8          A.    That's correct.

9          Q.    You never saw anybody use coercive

10   measures during an interrogation?

11         A.    Correct.

12         Q.    You never saw anybody using any

13   improper suggestion during an identification

14   procedure?

15         A.    Correct.

16         Q.    You never saw anybody misrepresent

17   information they received from a witness in a

18   report or to the DA.

19         A.    Correct.

20         Q.    Because if you had, you would have

21   reported it.

22         A.    You are correct.

23         Q.    So fair to say -- and you've told us a

24   little bit about this, but I want to go a little

25   bit further.



1          You've already told us that you prided
2     yourself on being a careful and meticulous
3     detective, correct?
4          A.   Yes.
5          Q.   You always attempted, to the extent
6     practicable under the circumstance, to follow up on
7     all leads that you received.
8          A.   Yes.
9          Q.   You always documented any relevant
10    evidence, whether it helped or hurt your theory of
11    the case.
12         A.   That's correct.
13         Q.   And by the way, when I say theory of
14    the case, you know what that means, right?
15         A.   Yes, I do.
16         Q.   As a detective, certainly by 1991,
17    you -- you -- in any investigation, you would
18    develop theories -- not certainties but theories --
19    as to how and why and who committed a crime,
20    correct?
21         A.   Yes.
22         Q.   And you would follow up on those
23    theories.
24         A.   Yes.
25         Q.   Sometimes they would prove right;



1   sometimes they would prove wrong.

2          A.   Correct.

3          Q.   But any -- any good detective has

4   theories of the case, right?

5          A.   Yes, sir.

6          Q.   And in addition to that, you were also

7   meticulous in the sense that you were careful to

8   follow all of the rules and regulations and all of

9   the training on conducting identification

10  procedures like photo arrays, correct?

11         A.   Yes.

12         Q.   So in Buffalo, I take it, like most

13  police -- major police departments, you -- the

14  identification procedures that you typically

15  conducted were either photo arrays or live lineups.

16         A.   Correct.

17         Q.   There were some very unusual

18  circumstances when you could show a suspect a

19  one-on -- a one-on-one viewing, correct?

20         A.   Correct.

21         Q.   Like within minutes or seconds of the

22  crime.

23         A.   Correct.

24         Q.   Otherwise, you understood it was

25  strictly prohibited from showing suspects to a



1   witness in any form other than through a six-person

2   photo array or a six-person lineup, correct?

3          A.   Well, there was an exception, and what

4   I mean by that is if someone indicated that someone

5   was there.  We didn't know that identity, but we

6   believed it to be a specific person.  That might

7   turn out to be a witness.  Not a participant in the

8   crime but a witness, someone that was there.

9          If we knew who that person was, there were

10  occasions when we would show a single photo and

11  say, "Is this the person that you're referring to?"

12         Q.   All right.

13         A.   That was a witness or was there.

14         Q.   I understand.

15         A.   That's the only reason we would ever

16  show a single photo.

17         Q.   No, I appreciate that clarification.

18         So in other words, you would never show a

19  single photo to a witness of a potential suspect,

20  correct?

21         A.   Correct.

22         Q.   The only time you might, under limited

23  circumstances, show a single photograph to a

24  witness is if the photo was of someone who was just

25  present, but there was no suggestion they were



1   involved.

2          A.   Correct.  In other words, they -- they

3   would identify them so that we could go and follow

4   up and interview that person.

5          Q.   All right.  But -- but you -- you're

6   clear you would never show -- you would -- you --

7   the only time you would ever show a suspect to any

8   witness is either through a six-person array or a

9   six-person lineup.

10         A.   Correct.  Sometimes -- sometimes I

11  think the lineups were more than six.  I'm trying

12  to remember.  Sometimes I think the lineups were

13  more than six.  I'm trying to remember.

14         Q.   But a minimum of six.

15         A.   Minimum of six, yes.

16         Q.   No exceptions to that rule, correct?

17         A.   None.

18         Q.   And you also understood that, for

19  example, you were not permitted to provide the

20  witness any suggestion before, during, or after an

21  identification procedure about who they should

22  pick.

23         A.   You are correct.

24         Q.   In other words, you would never say who

25  you think the suspect is before the ID procedure.



1        A.   Correct.

2        Q.   And you would never tell a suspect

3   after an identification procedure, "By the way, the

4   person you picked is the person we think did this."

5        A.   Correct.

6        Q.   Or that "We have other evidence

7   suggesting that this person did this."

8        Even worse, right?

9        A.   I wouldn't -- I wouldn't say anything

10  like that, no.

11       Q.   You would never want to do anything to

12  strengthen a person's recollection improperly with

13  suggestion, correct?

14       A.   Correct.

15       Q.   And those kinds of statements would --

16  would -- through your training, you understand that

17  those kind of statements would do that, correct?

18       A.   They do.

19       Q.   That's why you never did it, correct?

20       A.   I did not.

21       Q.   And that's why you understood the rules

22  and regulations prohibited any suggestion like

23  that.

24       A.   Correct.

25       Q.   And you understood that any suggestion



1   to a witness before, during, or after an

2   identification procedure also potentially violated

3   the Constitutional rights of any suspect they

4   identified.

5        MR. RUSS:  Objection to form.  You may

6   answer.

7        THE WITNESS:  You are correct, yes.

8        BY MR. BRUSTIN:

9        Q.   That's why you weren't allowed to do

10  it.

11       A.   Correct.

12       Q.   Now, I mentioned earlier the term

13  exculpatory evidence.  You've also heard that

14  referred in your career to -- as Brady material,

15  correct?

16       A.   You are correct.

17       Q.   And you understood Brady material to

18  mean any evidence that was potentially exculpatory

19  that could tend to prove innocence, correct?

20       A.   Anything and all.  You are correct.

21       Q.   Okay.  And it also includes impeachment

22  evidence.  In other words, evidence that could be

23  used to challenge the reliability or credibility of

24  a witness.

25       A.   Correct.



1        Q.   And obviously, as a detective -- you

2   know, one of the things I've heard detectives

3   sometimes describe themselves as is -- in terms of

4   evidence gathering, is almost like a vacuum

5   cleaner.  They gather it all up; they run it all

6   down; and then they let the DA sort it out.

7        Is that a fair characterization?

8        MR. RUSS:  Objection to form.  You may

9   answer.

10        MR. BLENK:  Form.

11        THE WITNESS:  It all depends on the

12   investigation.

13        BY MR. BRUSTIN:

14        Q.   All right.

15        A.   But sometimes that does happen, yes.

16        Q.   All right.  I'll be more specific,

17   then.

18        A.   Please.

19        Q.   I will.  You understood, for example,

20   that as a detective in a homicide investigation --

21   withdrawn.

22        You understood it was even more important to

23   follow all of the rules and regulations and your

24   training on homicide investigations given the

25   penalties there were for homicides, what was at



```
 1   stake.

 2          A.    Yes.

 3          Q.    Both for the -- the assailant, the

 4   suspect, and the -- and the victims.

 5          A.    Correct.

 6          Q.    So as a general matter, you understood

 7   that you had an obligation to take a broad view of

 8   what might constitute Brady material.

 9          In other words, if you had any doubt in your

10   mind about whether a piece of evidence could be

11   Brady material, you would write it down and make

12   sure the DA got to determine that, correct?

13          MR. RUSS:  Objection to form.  You may

14   answer.

15          THE WITNESS:  Correct.

16          BY MR. BRUSTIN:

17          Q.    You understood, for example, that your

18   job was simply to document it and turn it over to

19   the defense lawyer so they can make a determine --

20   withdrawn.

21          You understood that your job was simply to

22   document potential Brady material and turn it over

23   to the prosecutor so they could determine whether

24   or not it had to be disclosed to the defense

25   attorney, correct?
```



1        A.   You are correct.

2        Q.   And the way that you would -- first of

3    all, you understood that obviously, the best way to

4    document any interview to make sure that it's

5    accurate is to tape-record it, correct?

6        A.   Correct.

7        Q.   And in 1991, you had access to

8    tape-recorders if you wanted them, correct?

9        A.   Correct.

10       Q.   You had the ability to tape-record a

11   witness or a suspect, correct?

12       A.   Correct.

13       Q.   And in fact, you understood that you

14   had the ability to surreptitiously, secretly,

15   tape-record a witness or a suspect if you wanted

16   to.

17       A.   Yes.

18       Q.   And you did that from time to time,

19   correct?

20       A.   No, I did not.

21       Q.   Why not?

22       A.   I relied on my notes and what the

23   person told me.

24       Q.   All right.  So in other words, despite

25   the fact that you had the -- you had -- you



1  certainly had access to pocket tape-recorders,

2  correct?

3        A.   Correct.

4        Q.   And larger tape-recorders in the

5  homicide unit.

6        A.   Correct.

7        Q.   It was your choice that despite the

8  fact that tape-recorders were the most effective

9  means of -- of documenting what was actually said

10 by you and the witness -- it was your preference to

11 use your notes.

12       A.   It was my preference to use my notes.

13       Q.   All right.  And why was that?

14       A.   It was my preference.

15       Q.   My question is why.

16       A.   I don't know.

17       Q.   Okay.  And so I take it that, given

18 that you had access to tape-recorders and chose not

19 to use them, you must have been quite confident in

20 your ability to take good notes.

21       A.   Yes.

22       Q.   In other words, you were confident by

23 1991 that when you were doing a witness interview,

24 either during the interview or soon after, you were

25 able to write down any relevant information that



1   they provided to you, correct?

2          A.   Yes, sir.

3          Q.   I assume that's also based on what

4   you've exhibited today, the fact that you have

5   quite a good memory.

6          MR. RUSS:  Objection to form.  You may

7   answer.

8          THE WITNESS:  I believe I have a good

9   memory.

10         BY MR. BRUSTIN:

11         Q.   So one of the reasons that you did not

12  tape-record is that you were confident in your

13  ability to get any relevant information in your

14  notes and then onto a report, correct?

15         A.   Yes, sir.

16         Q.   And my understanding -- you correct me

17  if I'm wrong -- as to how -- first of all, you made

18  an effort, I take it like all homicide detectives,

19  to transfer the information in your notes to

20  reports, whether it be a P73 or a written

21  statement, as -- as soon in time as possible after

22  the event, fair to say?

23         A.   Yes.

24         Q.   If you could do it within minutes,

25  you'd try to, correct?



1          A.    I would try to.

2          Q.    And my understanding of the process of

3    doing a witness statement in Buffalo in 1991 is

4    that you would take careful notes, and then you

5    would read it into -- you tell me.

6          How did it work?

7          A.    I'd take notes, and then I would

8    handwrite a report on a P-1302.  That's the yellow

9    long paper that you sometimes see in the homicide

10   squad.  Then call the Nymatic typing system, that's

11   N-Y-M-A-T-I-C, transcribe it into that system.

12         That transcription of me, what I'm talking

13   about, would come back.  I would read it, look at

14   my notes, sign that copy, and get rid of my notes.

15         Q.    Okay.  So let me make sure I

16   understand.

17         So typically what would happen, you would

18   conduct a witness interview.  It's an hour,

19   whatever it takes.

20         After the interview's concluded, you

21   would -- you would -- you would -- you would

22   write -- you would take your notes and you would

23   write a handwritten report of what you were told.

24         A.    Correct.

25         Q.    And then right after that, you would



1  call the -- what was it called?  The --

2          A.   Nymatic typing.

3          Q.   Nymatic typing service, and you would

4  speak -- you would read your report into -- into

5  the phone, and they would type it up.

6          A.   Yes.

7          Q.   And that would be almost instantaneous?

8          A.   Well, it would sometimes be a day

9  later.

10         Q.   But your practice, if possible, would

11  be to do it immediately, correct?  When it's fresh

12  in your mind.

13         A.   Usually it was not done immediately.

14         Q.   Would you -- well, which part wasn't

15  done immediately?  Would you -- I take it the first

16  thing you would want to do, if you could, is

17  transfer your notes to a written report, correct?

18         A.   That was done, yes.

19         Q.   You want to do that as quickly as you

20  can so you don't forget.

21         A.   Yes.

22         Q.   And then I think you're telling me that

23  you may or may not read -- read it into the phone

24  for a day or so?

25         A.   It might be eight hours.  It might be a



1  different tour of duty.

2          Q.   Okay.

3          A.   Might be upon our completion of the

4  day.

5          Q.   Okay.  I would take it in the meantime

6  what you would do is you would put a copy of the

7  written statement in the file so anybody who needed

8  to see it could see it, correct?

9          A.   Correct.

10         Q.   And when you read the statement into

11  the phone, how long after that until you got the --

12  the typed report back?

13         A.   It would be on the next business day or

14  the day after that.

15         Q.   Got you.  So what would be relied on in

16  the interim would be the -- the copy of the

17  handwritten portion.

18         A.   That's correct.

19         Q.   By the way, did those handwritten --

20  and -- and by the way, I -- I think I know this.

21         Those handwritten portions stay in the file

22  in perpetuity as well, correct?

23         A.   They also do, yes.

24         Q.   All right.  So the -- what's in the

25  file within -- typically within minutes of a



1   witness interview is that handwritten portion.

2         A.   Usually after we're done with the

3   interview or the statement.

4         Q.   But for example, the time on a witness

5   statement when it starts and when it ends, that

6   doesn't include the time when you transfer the

7   notes to the statement, does it?

8         A.   Sometimes that's in the previous

9   report.  In other words, "I met with someone at two

10  o'clock, interviewed them, and started the

11  statement at 2:30."

12        Q.   Okay.

13        A.   "See their attached statement."

14        Q.   Now, in Buffalo, like any metropolitan

15  police department -- and I -- and the police

16  reports in this case bear this out -- a homicide

17  investigation doesn't -- doesn't necessarily stop

18  when an arrest is made, correct?

19        A.   That's correct.

20        Q.   Oftentimes there is numerous follow-up

21  activities that detectives conduct in a homicide

22  investigation after an arrest is made, correct?

23        A.   Correct.

24        Q.   And your obligation to investigate a

25  homicide certainly doesn't end with an arrest,



1  correct?

2        A.    Correct.

3        Q.    You were obligated, as a homicide

4  detective in 1991, to follow up on any leads or any

5  relevant information that you obtain, correct?

6        A.    Correct.

7        Q.    Whether it helps or hurts your case.

8        A.    You are correct.

9        Q.    And I take it that any -- by the way,

10  in 1991, you've told us that it was your practice

11  not to tape-record any interviews.

12        Which detectives -- I take it there were

13  detectives that taped interviews at that time?

14        A.    I do not know of any.

15        Q.    So the practice in Buffalo was,

16  although tape-recorders were available, nobody

17  tape-recorded interviews.

18        A.    I don't know of anybody that did it.

19        Q.    So I've -- I've accurate -- I've

20  accurately stated the practice.  Nobody

21  tape-recorded interviews, to your knowledge.

22        A.    To my knowledge.

23        Q.    And nobody told you you should.

24        A.    No one did.

25        Q.    You understood through your outside

