1 | training, obviously through Reid training and

2 | through -- withdrawn.

3 |     You understood through your outside training

4 | that obviously, the -- the best way to document an

5 | interview with a witness who's willing to be taped

6 | is to tape-record it.

7 |     MR. RUSS:  Objection to form.  You may

8 | answer.

9 |     THE WITNESS:  I don't remember that from the

10 | Reid training at all.

11 |     BY MR. BRUSTIN:

12 |     Q.   Well, I -- I -- I changed it from the

13 | Reid training.  You're right.  The Reid training

14 | doesn't teach that.

15 |     A.   Correct.

16 |     Q.   But other training does, right?

17 |     A.   I don't remember that from the Henry

18 | Williams association.  I went to a homicide seminar

19 | in New York City my first or my second year with

20 | Detective Vickerd, and there was no discussion

21 | about tape-recording.

22 |     Q.   Okay.  But certainly you understood as

23 | a matter of common sense that the best way to

24 | accurately -- accurately document what you said and

25 | what a witness said is to tape-record it, correct?



1          MR. RUSS:  Objection to form.  You may

2    answer.

3          THE WITNESS:  That would be a good -- good

4    practice.

5          BY MR. BRUSTIN:

6          Q.   All right.  And could you think of any

7    reasons in -- in 1991 not to do that?

8          I know you chose not to do it, but any

9    reasons you can think of as to why you wouldn't do

10   it?

11         A.   No.

12         Q.   You just didn't.

13         A.   We just didn't.  I wasn't trained to do

14   it, and I didn't do it.

15         Q.   Okay.  Now, I asked you some questions

16   about the layout of the homicide unit, and I want

17   to ask you just a few more questions.

18         The way that Masecchia described the

19   homicide unit in '91 was that it was probably

20   smaller than a classroom, the main room big enough

21   to fit eight or nine desks.

22         Does that sound about right?

23         A.   Little bit larger.

24         MR. RUSS:  Objection to form.  You answered.

25         BY MR. BRUSTIN:



```
 1          Q.   Larger than a typical classroom or a
 2    size of a typical classroom?
 3          Was it -- in your view, was it larger than a
 4    typical classroom, the size of a typical classroom?
 5          A.   I thought it was --
 6          MR. RUSS:  Objection to form.  You may
 7    answer.
 8          THE WITNESS:  I thought it was larger.
 9          BY MR. BRUSTIN:
10          Q.   Okay.  But certainly there was no
11    privacy in that main room, fair to say?
12          A.   You are correct.
13          Q.   In other words, if you wanted to have
14    any privacy, you had to either -- you could go
15    into -- in -- in the interview room, correct?
16          A.   Yes.
17          Q.   Or sometimes you could borrow one of
18    the supervisors' offices for an interview.
19          A.   Yes.
20          Q.   Otherwise, there was no privacy.
21          A.   Well, you could go out into the hall,
22    too.
23          Q.   Okay.  But in -- in that room, there
24    was no privacy.
25          A.   No.
```



1        Q.   And you certainly -- withdrawn.

2        And certainly as a detective -- homicide

3   detective sitting in the homicide office, to the

4   extent any witness or suspect ever was brought into

5   the interview room, you would obviously be able to

6   see that.

7        A.   Sometimes yes and sometimes no.

8        Q.   Well, how would you not see it?

9        A.   If you were in a different room.  You

10  could be in a command officer's room.  There were

11  other interview rooms.  There was more than one

12  interview room.

13       Q.   Okay.

14       A.   You could have your head down answering

15  a phone.

16       Q.   Right.  Certainly within view if you're

17  in that office.

18       A.   Absolutely.

19       Q.   All right.  And one of the things that

20  stuck out to me about how homicides were

21  investigated in Buffalo is that multiple detectives

22  would be involved in each homicide investigation.

23       Is that a fair characterization?

24       A.   It is.

25       MR. RUSS:  Objection to form.  You may



1   answer.

2          THE WITNESS:  It is.

3          BY MR. BRUSTIN:

4          Q.   And so that suggests to me that

5   multiple detectives would have knowledge about all

6   of the homicides they were working on, fair to say?

7          MR. RUSS:  Objection to form.  You may

8   answer.

9          THE WITNESS:  That became a little bit

10  difficult in that -- in that -- that time period.

11  There was a lot going on.

12         BY MR. BRUSTIN:

13         Q.   .okay.

14         A.   Our homicides were almost tripled in

15  the amount.

16         Q.   In what year?

17         A.   '91.

18         Q.   Okay.  So '91 was a busy year?

19         A.   Oh, yes, it was a real big year.

20         Q.   But certainly because you were all

21  working on cases, you would all -- as friends and

22  colleagues, would be discussing the various work

23  you were doing on different cases with one another.

24         A.   Sometimes yes and sometimes --

25  sometimes no.



1        Q.   And one of the things that you would do

2    in Buffalo, like any police department, is when you

3    were sitting in the homicide office with other

4    detectives, you would discuss with them, for

5    example, what you were learning on particular

6    cases, correct?

7        MR. RUSS:  Objection to form.  You may

8    answer.

9        THE WITNESS:  Yes.

10       BY MR. BRUSTIN:

11       Q.   You would get their takes on your

12   theories of the case and their theories of the

13   case, correct?

14       A.   Yes.

15       Q.   Sharing information with other homicide

16   detectives and police officers was a critical part

17   of your job as a homicide detective, correct?

18       A.   Yes.

19       Q.   Now, is it also true that although they

20   weren't official, homicide detectives also

21   unofficially worked with partners?

22       MR. RUSS:  Objection to form.  You may

23   answer.

24       THE WITNESS:  Sometimes you would; sometimes

25   you would not.



1        BY MR. BRUSTIN:

2        Q.   So for example, I understood that in

3   this case, like many cases, Lonergan and Vickerd

4   were working unofficially as partners.

5        Was that your understanding?

6        A.   Correct.

7        Q.   And that Lonergan was higher ranked.

8        A.   He was a sergeant.

9        Q.   And so in actuality, Lonergan was

10  actually a supervisor of all of the detectives

11  working on the case.

12       A.   On that particular tour of duty.

13       Q.   And on this particular case.

14       A.   That's not the chain of command as I --

15  as I understand it.

16       Q.   Well, let me ask you this:

17       Was -- was Lonergan in the same supervisory

18  role in Dixon as he was in Ortiz?

19       A.   He was --

20       MR. RUSS:  Objection to form.  You may

21  answer.

22       THE WITNESS:  He was a sergeant.

23       BY MR. BRUSTIN:

24       Q.   So you reported to Lonergan in Ortiz,

25  correct?



1          A.    I reported to him, yes.

2          Q.    Did you report to Lonergan in Dixon?

3          A.    In -- in which case?

4          Q.    This case.

5          A.    Yes.

6          Q.    Okay.  So in other words, Lonergan had

7     the same supervisory responsibilities over you in

8     the Jackson investigation as he did in the Ortiz

9     investigation.

10          A.    Correct.

11          MR. RUSS:  Objection to form.  You may

12     answer.

13          BY MR. BRUSTIN:

14          Q.    Who was your partner in 1991, if you

15     had one?

16          A.    I had five or six of them.

17          Q.    Who were you working as a partner, if

18     anybody, on this case?

19          A.    I would not be able to remember who

20     that I could say.  It was ad hoc.  It all depended

21     on what came in and what manpower was available.

22          Q.    How old were you in -- strike that.  I

23     can figure it out, too, but maybe you remember.

24          How old were you in 1991?

25          A.    I was born in 1950, so I was 41 years



1  old.

2       Q.   Okay.  Had you started applying to be a

3  detective or -- or seeking to be a detective before

4  1986 when you were promoted?

5       When did you first start applying to be a

6  detective?

7       A.   I didn't apply.  I was promoted to be a

8  detective from an arrest that I made.

9       Q.   Was -- was detective always one of your

10 goals when you joined the force?

11      A.   It was one of my goals, yes.

12      Q.   And my understanding as to how things

13 worked in this case and all cases in 1991 was that

14 the first detective at the scene would be

15 designated the lead detective.  Is that right?

16      A.   We don't have lead detectives, or I

17 don't think that they do.

18      Q.   Okay.  So --

19      A.   A supervisor would arrive --

20      Q.   Okay.

21      A.   -- and direct the detectives as to what

22 their duties are.

23      Q.   Okay.  So, for example, in this case,

24 to your knowledge, there was no lead detective.

25      A.   I don't think so.  I -- I did not



1   respond to the scene.  I -- I received a -- a call

2   from the shift officer, who was Lieutenant William

3   Smith, to report to the homicide bureau to take

4   statements from witnesses.

5          We had multiple witnesses that night.  A

6   lot.

7          Q.   I understand.  I'm asking a different

8   question, I think.

9          A.   I -- I can't answer your question.  I

10  wouldn't --

11         Q.   I -- I think you can.

12         MR. RUSS:  Let him try again.

13         THE WITNESS:  All right.

14         BY MR. BRUSTIN:

15         Q.   Let me try it again.

16         A.   Go ahead.

17         Q.   As far as you understand it, based on

18  your memory --

19         A.   All right.

20         Q.   -- and your review of documents, you

21  don't believe there was any lead -- there was any

22  detective assigned as lead detective in this case,

23  correct?

24         A.   I would be -- I would have to say it

25  would be Detective Sergeant Lonergan.



1        Q.   Okay.  But that was -- that -- if there

2   was -- to the extent there was any designation,

3   it -- it didn't -- it didn't add any additional

4   responsibility on Detective Lonergan; is that fair

5   to say?

6        A.   Correct.

7        Q.   In other words, you had, to your

8   knowledge, the same obligation to investigate this

9   case as he did.

10       A.   Correct.

11       Q.   And so the way it worked in Buffalo is

12  that, whether you were designated lead detective or

13  you were just a detective like you who was

14  conducting investigative activities, you had the

15  same obligation to, for example, ensure that you

16  were documenting any possibly exculpatory evidence,

17  correct?

18       MR. RUSS:  Objection to form.  You may

19  answer.

20       THE WITNESS:  Correct.

21       BY MR. BRUSTIN:

22       Q.   And that that information made its way

23  to the file, correct?

24       A.   Correct.

25       Q.   And that that information -- withdrawn.



```
 1          And you had the same obligation as -- as a
 2    lead detective to make sure that any relevant
 3    information that you gathered in the case was
 4    provided expeditiously to other detectives
 5    investigating the case.
 6          A.    Correct.
 7          Q.    And you would agree that in a homicide
 8    investigation, knowledge about what's been gathered
 9    thus far is key.
10          A.    It's very important.
11          Q.    You want to -- when you're conducting
12    any meaningful part of a homicide investigation,
13    you want to have as much knowledge as you can about
14    what's been gathered before that time, correct?
15          A.    Correct.
16          Q.    Particularly in regard to the subject
17    matter that you're investigating.
18          A.    Correct.
19          Q.    So for example, if you are interviewing
20    a witness, an eyewitness, potential eyewitness in a
21    homicide, you make it your business to learn as
22    much as you can about what information that witness
23    has already provided before your meeting with them,
24    correct?
25          A.    Sometimes you do it cold.  I mean, I'd
```



1   just meet with a person, and they tell me what they

2   viewed --

3          Q.   Right.

4          A.   -- what they saw.

5          Q.   Well, certainly as a -- if you're

6   taking a statement from a witness, you understood

7   through training and procedure that it was

8   important, if you could, to ascertain what

9   information that witness has provided before in the

10  case.

11         MR. RUSS:  Objection to form.  You may

12  answer.

13         THE WITNESS:  Sometimes it happened after

14  the statement was taken, because there were

15  detectives at the scene.

16         BY MR. BRUSTIN:

17         Q.   All right.  But certainly you

18  understood it was your obligation to learn it as

19  soon as you could.

20         A.   Correct.

21         MR. RUSS:  Objection to form.  You may

22  answer.

23         THE WITNESS:  Correct.

24         BY MR. BRUSTIN:

25         Q.   That's just a basic detective duty,



 1  correct?

 2       A.   Correct.

 3       Q.   And because there were these sort of

 4  group investigations in Buffalo in homicide in

 5  1991, one of the things that homicide detectives

 6  did is you made it your business to know which

 7  other detectives were working on the case you were

 8  working on, correct?

 9       MR. RUSS:  Objection to form.  You may

10  answer.

11       THE WITNESS:  Correct.

12       BY MR. BRUSTIN:

13       Q.   Because those are the detectives that

14  you wanted to be discussing the evidence that you

15  were gathering and they were gathering, correct?

16       A.   Yes.

17       Q.   That's how you solve crimes, correct?

18       A.   Yes.

19       Q.   And there are a variety of ways that

20  you -- that you communicated with fellow homicide

21  detectives during the course of an investigation,

22  correct?

23       A.   Yes.

24       Q.   One way was -- probably the -- the --

25  the largest way were the informal communications



1 that you had in the office and -- and on the street
2 about what you were gathering, correct?
3          A.   Yes, sir.
4          Q.   Another way would be through
5 comprehensive and expeditious P73s.
6          A.   Yes.
7          Q.   Another way would be through
8 comprehensive and expeditious witness statements.
9          A.   Yes.
10          Q.   Making sure that those things made
11 their way to the file so that officers working on a
12 homicide could learn about them, correct?
13          A.   Yes.
14          Q.   And it was particularly important to
15 make sure, if possible, that that information that
16 you were gathering made its way into the file or to
17 other officers on shift changes, correct?
18          A.   If they were present, yes.
19          Q.   You understood that it was very
20 important for you to make sure that, to the extent
21 a detective came on the next shift that was
22 investigating a homicide you were working on, they
23 were up to speed on the information that had been
24 gathered on your shift.
25          A.   Yes.



1        Q.   And oftentimes in Buffalo, I take it,

2   like other police departments, if that meant

3   staying a little later, you would do that.

4        A.   Yes.

5        Q.   Was it easy to get overtime, by the

6   way, in '91 in the homicide unit if you needed it?

7        A.   There was always overtime in the

8   homicide squad.

9        Q.   Never a problem getting -- getting

10  overtime?

11       A.   Well, not -- not getting it.  It was --

12  you were ordered to come in and take statements.

13       We went into an on-call system.  We weren't

14  happy about it.  We wanted more manpower, but they

15  gave us that -- it wasn't our decision.  If the

16  homicide happened after two o'clock in the morning,

17  we were called in.

18       Q.   Got you.  But there are some police

19  departments I know that -- that the brass pushes

20  back on detectives working overtime.  I take it

21  that wasn't the situation in Buffalo.

22       A.   Sometimes -- it -- it ran into periods,

23  and I think it was all because of a budget.

24       Q.   Okay.

25       A.   Sometimes they would say you're not



1  working overtime, and sometimes they would want you

2  in.  It all depended on who the commissioner was at

3  that time also.

4        Q.   Fair enough.  In '91, it sounds like

5  overtime wasn't a problem.  You -- you were

6  often -- you were often ordered to do it, and if

7  you needed to do it, you could get permission to do

8  it.

9        A.   We did -- yes, you are correct.

10       Q.   Did you work a lot of overtime in '91?

11       A.   No.

12       Q.   I take it one of the reasons is you had

13  other responsibilities.

14       A.   I did have other responsibilities, yes.

15       Q.   Including your investigations business.

16       A.   I had a personal life, yes, and a

17  business.

18       Q.   Did you have any other outside

19  employment in 1991 other than your investigation

20  business?

21       A.   In '91, I would say no.

22       Q.   Now, one of the things that Detective

23  Masecchia told us is that the supervisors in

24  homicide didn't micromanage the detectives day to

25  day.  They trusted you to do your jobs by 1991.



1        Would you agree with that characterization?

2        A.   I do.

3        MR. RUSS:  Objection to form.  You may

4   answer.

5        THE WITNESS:  I do.

6        BY MR. BRUSTIN:

7        Q.   And in fact, would it be fair to say

8   that the -- that the supervisors, including

9   Sergeant Lonergan, were more resources for you than

10  micromanagers?

11       A.   I -- I don't understand resources.

12  I'm -- I'm -- I'm not following --

13       Q.   Sure.

14       A.   -- your question.

15       Q.   That they were there to help you and

16  support you in your investigations as opposed to

17  look over your shoulder as to what you were doing.

18       A.   Again, I go back to the chain of

19  command.  We had a sergeant; we had a -- a chief;

20  we had an assistant chief, a lieutenant, and a

21  captain assigned there.

22       Not only would we go to the sergeant, we had

23  an opportunity to go to a -- a lieutenant, a chief,

24  an assistant chief, or the actual chief.

25       Q.   I think you're answering my question.



1        A.   I -- I am, but I'm -- I'm not answering
2   exactly the way you're -- you're asking it, I'm
3   sorry.
4        Q.   No, that's fair, but -- but the -- the
5   counter to that is that although you could go to
6   all those people as a resource to ask for help, to
7   ask questions, they weren't micromanaging what you
8   were doing on a day-to-day basis, correct?
9        A.   No, they did not.
10       Q.   They trusted you to do your job.
11       A.   You are correct.
12       Q.   You had a great deal of discretion as
13   to how to do your job.
14       A.   Correct.
15       Q.   Nobody was watching your witness
16   interviews, for example.
17       A.   No.
18       Q.   Nobody was watching your
19   interrogations, correct?
20       A.   No.
21       Q.   Nobody was watching to make sure that
22   you were accurately writing down the words that you
23   spoke to a witness and the words that a witness
24   spoke to you.
25       A.   You are correct.



1          Q.   That was left to your good discretion.

2          MR. RUSS:  Objection to form.  You may

3    answer.

4          THE WITNESS:  Yes.

5          BY MR. BRUSTIN:

6          Q.   And during the time that you were a

7    police detect -- during the time that you were a

8    homicide detective, nobody, no supervisor, ever

9    criticized you in connection with how you were

10   conducting, for example, witness interviews,

11   correct?

12         A.   On interviews?

13         Q.   Yes.

14         A.   No.

15         Q.   And nobody ever provided any criticism

16   to you about how you were documenting interviews,

17   correct?

18         A.   The -- the people that I learned from,

19   the old detective sergeant and the old homicide

20   detectives that were tenured, we learned from them,

21   and sometimes they would say you might want to ask

22   a question in a different manner.

23         Q.   Okay.

24         A.   As a teaching matter.

25         Q.   That's fair.  Certainly by 1991 when



```
 1   you were an experienced police officer, from that
 2   time on, nobody ever criticized how you were
 3   documenting interviews, correct?
 4          A.   That's correct.
 5          Q.   And nobody ever criticized how you were
 6   conducting interrogations.
 7          A.   Correct.
 8          Q.   Or how you were documenting
 9   interrogations.
10          A.   Correct.
11          Q.   You received nothing but positive
12   feedback from your supervisors concerning those
13   activities.
14          A.   Correct.
15          Q.   That would include in this case, the
16   Dixon case?
17          A.   Correct.
18          Q.   That would include the Epps case?
19          A.   Correct.
20          Q.   That would include the DeJac case?
21          A.   Correct.
22          Q.   That would include the Ortiz case.
23          A.   Correct.
24          Q.   In fact, it's your understanding that
25   to this day, your supervisors, including Lonergan,
```



1  believe that you conducted those -- all four of

2  these investigations conscientiously and ethically,

3  correct?

4          MR. RUSS:  Objection to form.  You may

5  answer.

6          THE WITNESS:  Well, I did not -- I did not

7  go to the scene on Epps.  I was not assigned to

8  Epps.  I believe I took one statement from a

9  witness on Epps.

10         The other three I was active in.

11         BY MR. BRUSTIN:

12         Q.   Okay.

13         A.   But Epps I had no -- to this day I'm

14  still kind of in a fog as to what's going on

15  with -- with Mr. Epps.

16         Q.   Maybe I can clear it up for you today.

17  I've got a bunch of questions for you.

18         Let me ask you a little bit about the role

19  of the District Attorney in criminal

20  investigations.  First of all, typically in a

21  homicide -- withdrawn.

22         I take it that in '90 -- 1991, you said the

23  homicide unit was very busy.

24         A.   We were.

25         Q.   And I take it that the homicide



1  prosecutors were also very busy.

2          A.   They were.

3          Q.   The homicide prosecutors didn't have

4  the time or the resources to micromanage your

5  investigations, fair to say?

6          A.   I would say that's accurate.

7          Q.   And typically in a homicide case, the

8  DA's office wouldn't even get involved until after

9  an arrest was made.

10         A.   No.

11         Q.   Well, that's -- that was -- that was

12 true in this case, correct?

13         A.   No.  Before we -- we charged anybody or

14 before we let anybody go, they came over and

15 reviewed the file.  The District Attorney did.

16         Q.   Before an arrest was made?

17         A.   Before an arrest was made.

18         Q.   Okay.  Do you remember that happening

19 in this case?

20         A.   Absolutely.

21         Q.   Who was the DA that came?

22         A.   That's -- that's the only thing I'm not

23 sure.  It had to be one of two people.  It had to

24 be Detect -- Acting Detective (sic) Christopher J.

25 Belling, B-E-L-L-I-N-G, or it would be Judge now



1   Frank Sedita, S-E-D-I-T-A.

2          But they would come over before we made an

3   arrest and then advise us you have enough to arrest

4   or you have to let him go, and not only would they

5   advise us that we had enough to make the arrest,

6   they would tell us specifically what charge to put

7   on the person.

8          In other words, whether it be manslaughter,

9   murder, murder one, murder two, assault.

10         Q.   Okay.

11         A.   But they would review the file.  If

12   they gave us the okay, instruct us to make the

13   arrest, we would then make the arrest.

14         Q.   All right.  So you --

15         A.   In 1991.

16         Q.   Okay.  So you -- do you recall sitting

17   in a room today with a DA in connection with this

18   case at the time of the arrest?

19         A.   At the time of the arrest, there was a

20   DA that -- that reviewed -- yes.

21         Q.   I want to -- I want to be very clear.

22         A.   Okay.

23         Q.   Some of the things -- you have a very

24   good memory, but I want you to be clear as to what

25   you actually remember and what you understand to



1  have happened because that's how things worked.

2         A.   Correct.

3         Q.   So my first question is:

4         Do you remember today sitting in a room with

5  a DA in connection with the arrest in this case?

6         A.   Yes.

7         Q.   Who did you -- who were you sitting

8  with?

9         A.   I'm not sure.

10        Q.   All right.  And I take it at that time,

11  you -- at that time, you would make sure, in order

12  to talk to the DA about the arrest, to familiarize

13  yourself with all the evidence that was gathered in

14  the case.

15        A.   You are correct.  We did not make any

16  arrest during this time period unless the District

17  Attorney gave us permission.

18        Q.   So --

19        A.   You are correct.

20        Q.   So -- you've been good about this, but

21  I just want to tell you:

22        Please, if you can, because we've got a lot

23  to do today, if you could just try to answer the

24  question I'm asking.

25        MR. RUSS:  He's doing the best he can.



```
 1        BY MR. BRUSTIN:

 2        Q.   I think you are.  All I'm asking you

 3   is:  From -- before you met with the DA, in order

 4   to properly advise the DA, you familiarized

 5   yourself with all the evidence that had been

 6   gathered in the case, correct?

 7        A.   No.

 8        Q.   You didn't read the file before you met

 9   with the DA?

10        A.   I went on what the information was that

11   was presented to me at the time on this particular

12   case.

13        Q.   That's what -- that's what I'm asking

14   you, sir.  You would look at the evidence that had

15   been gathered up to the point in time of the

16   arrest, correct?

17        A.   Correct.

18        Q.   Because you knew that when the -- the

19   busy DA came to authorize the arrest, they were

20   going to be asking you questions about what the

21   evidence was that was gathered, correct?

22        A.   Yes.

23        Q.   And so you made sure that before you

24   met with the DA concerning the arrest, you were

25   fully familiar with all of the evidence that had
```



1  been gathered to that point in time.

2          A.   Correct.

3          Q.   And you understood it was your

4  obligation, when meeting with the DA in connection

5  with the arrest, to tell them the good and the bad,

6  right?

7          A.   Correct.

8          Q.   So in other words, if you had any -- if

9  you had gathered any evidence suggesting that a

10 witness was unreliable or that you may have the

11 wrong suspect, you had an absolute obligation to

12 provide that information to the DA, correct?

13         MR. BLENK:  Form.

14         THE WITNESS:  Yes, sir.

15         BY MR. RUSS:

16         Q.   And you took that obligation very

17 seriously, correct?

18         A.   I do.

19         Q.   You didn't just rely on the DA to

20 ascertain that in the 10 or 15 minutes they were

21 there from reading reports.  If you knew there were

22 problems, you had an obligation to tell them about

23 it, correct?

24         MR. BLENK:  Form.

25         THE WITNESS:  Yes, that's correct.



```
 1          BY MR. BRUSTIN:
 2          Q.   Now, would it be fair to say that you
 3    had a -- you were friends in 1991 with Lonergan and
 4    Vickerd and Masecchia?
 5          A.   Yes, that's accurate.
 6          Q.   And you worked many cases together.
 7          A.   Yes.
 8          Q.   And you were very comfortable talking
 9    to one another about evidence that you were
10    gathering and thoughts you had on a case, correct?
11          A.   Yes.
12          Q.   There was no ego involved.  You shared
13    information openly.
14          A.   Yes.
15          Q.   What was -- in 1991, what was the form
16    of communication you used with those officers when
17    you were in different places?
18          Was it radio?  You didn't have cell phones
19    then, right?
20          A.   We had cell phones and pagers.
21          Q.   Okay.
22          A.   And communications face-to-face,
23    talking on a telephone, or meeting with them.
24          Q.   Now, I asked you some questions earlier
25    about policies and procedures relating to
```



1   identification procedures.  Do you recall that?

2          A.   Yes.

3          Q.   Do you recall that?

4          A.   Yes.

5          Q.   Just want to ask you a few more

6   questions about it.

7          A.   That would be fine.

8          Q.   In addition to the rules regarding no

9   suggestion in ID procedures, you also understood in

10  1991 that you had an absolute obligation to write

11  down any comments or statements that the witness

12  made in connection with their ID, correct?

13         A.   Yes, sir.

14         Q.   So --

15         MR. RUSS:  In -- in a -- in a lineup or

16  something?

17         MR. BRUSTIN:  Either a lineup or a photo

18  array.

19         BY MR. BRUSTIN:

20         Q.   That's what we're talking about now.

21         A.   Yes, sir.

22         Q.   Okay.  You've already told us those are

23  the ones you can only -- you can only use those two

24  except for very limited circumstances, right?

25         A.   Correct.



1          Q.   All right.  So when you're doing a

2    lineup or an ID -- or a photo array, a live lineup

3    or a photo array, you understood that it was

4    critically important for you to document the words

5    they spoke in connection with the ID, correct?

6          A.   Yes.

7          Q.   So for example, if a witness says,

8    "That's the guy that shot," you write that down.

9          A.   You are correct.

10         Q.   But if the witness says, "I'm not sure

11   if that's the person," you have to write that down,

12   too.

13         A.   That's correct.

14         Q.   And it's never permissible to try to

15   encourage them -- withdrawn.

16         Saying -- a witness saying, "That looks like

17   the guy" is what's called a tentative

18   identification, correct?

19         A.   You are correct.

20         Q.   "That is the guy" is a positive

21   identification.

22         A.   You are correct.

23         Q.   A positive identification provides

24   probable cause for arrest.

25         A.   Correct.



1          Q.   A tentative identification is just a

2     lead, nothing more.

3          A.   Strong lead, I believe.  Yes, you are

4     correct.

5          Q.   It's -- it's not probable cause.

6          A.   Combined with other things, it could

7     be.

8          Q.   Are you sure about that?

9          A.   No, I'm not.

10         Q.   In any case, as -- you're strictly

11    prohibited as a detective from attempting to

12    convince a person who makes a tentative

13    identification that it should be a positive

14    identification, correct?

15         A.   You are correct.

16         Q.   That's about as basic as it gets for a

17    detective, right?

18         A.   That is basic.  You are -- you are

19    correct.

20         Q.   Now, I think you've also told us this,

21    but I want to make sure:

22         Prior to -- prior to Emil Adams identifying

23    Valentino Dixon in the photo array procedure that

24    you were present for, you had never heard the name

25    Valentino Dixon before.



1          A.    I had never heard his name ever before

2     that happened.

3          Q.    Okay.  And the first -- the -- the

4     first time you learned of Valentino Dixon's name is

5     when Vickerd -- Vickerd came back after you had

6     interviewed Emil Adams and put together a photo

7     array with Valentino Dixon in it, correct?

8          A.    I don't know who put the photo array

9     together.

10         Q.    I can represent to you that he -- that

11    he testified that -- that's in the record.

12         A.    Okay.  I -- I would have to say you're

13    correct, but I don't know who put the array

14    together.

15         Q.    All right.  But the first knowledge

16    that Valentino Dixon was a suspect and the first

17    knowledge of him as a person was when the photo

18    array was shown to Emil Adams, correct?

19         A.    You are correct.

20         Q.    Now, at that time, you obviously,

21    either you or somebody else, did a -- a check into

22    Valentino Dixon and who he was, correct?

23         A.    I believe a check was done.  You are

24    correct.

25         Q.    All right.  And you came to learn that



1   Mr. Dixon had some prior arrests.

2          A.   He did have multiple arrests, yes.

3          Q.   And you learned that that night.

4          A.   I don't know if I learned it that

5   night.  I don't think that was in the file at that

6   point.  I don't know when that was done, but it --

7          Q.   Well --

8          A.   -- it became apparent that it -- it was

9   into the file.

10         Q.   All right.  So even after -- let me be

11  clear.  Even after Valentino Dixon was -- well, let

12  me -- let me start this way:

13         Fair to say that you did not know anything

14  about Valentino Dixon's drug dealing or prior

15  arrests until after he was arrested.

16         A.   I did not know about his drug dealing;

17  however, I did learn about his arrests.

18         Q.   Okay.  So sometime after he was

19  identified but before he was arrested, you learned

20  about his prior arrests.

21         A.   I don't know if it was before the

22  arrest.

23         Q.   That's what I'm asking.

24         A.   Yes, I'm -- I'm not sure on that.

25         Q.   Okay.



 1          A.    I am 100 percent not sure on that.
 2          Q.    All right.  But what you are sure of is
 3    that you didn't know anything about Valentino Dixon
 4    being a drug dealer until after he was arrested.
 5          A.    That is correct.
 6          Q.    And you don't even know -- you don't
 7    know one way or another whether you learned
 8    anything about his prior arrests until after he was
 9    arrested.
10          A.    You are correct.
11          Q.    So your knowledge of Valentino Dixon at
12    the time he was identified by Emil Adams was a
13    blank slate.
14          A.    At that point, yes.
15          Q.    And you believe your knowledge of
16    Valentino Dixon at the time he was arrested may
17    have been a blank slate.  It was only after that
18    you learned about his criminal history.
19          A.    Correct.
20          Q.    And when you first learned the name
21    Valentino Dixon, you'd never heard of him before.
22          A.    No.
23          Q.    And certainly not until the time of
24    arrest did anybody else describe any interaction
25    with him on the street or who he was?



1        A.   No.

2        Q.   Just another guy who was a suspect in

3    this case.

4        A.   Correct.

5        Q.   What did you learn about Valentino

6    Dixon after he was arrested?

7        A.   Just that he was involved in drugs and

8    that he was arrested for either weapons or a

9    shooting offense.

10        Q.   Okay.

11        A.   That was it.

12        Q.   You didn't learn anything else about

13   what kind of drug dealer he was, where he operated,

14   anything like that.  What kind of a drug dealer he

15   was, what kind of quantities he -- he was involved

16   with, where he dealt from.

17        A.   Well, my focus was on homicide, not on

18   his background.

19        Q.   I'm just asking what you knew.

20        A.   I did not know anything.

21        Q.   Okay.  And the reason is because your

22   focus was on the homicide.

23        A.   Correct.

24        Q.   Not on who Valentino Dixon was or

25   anything about him.



```
 1          A.   I wanted to know about him, but no,
 2   I -- I just didn't focus in on what you're talking
 3   about.
 4          Q.   Okay.  Frankly never, right?
 5          A.   Well, I knew about him, but I never
 6   focussed in on him.
 7          Q.   Okay.  So throughout your involvement
 8   in this investigation even after the arrest, you
 9   knew generally that he was some kind of a drug
10   dealer, right?
11          A.   Yes.
12          Q.   No idea where he operated from.
13          A.   No.
14          Q.   No idea what kind of quantity he dealt
15   with.
16          A.   No.
17          Q.   No idea who he worked with.
18          A.   No.
19          Q.   You knew generally that he had some
20   prior arrests for assault and weapons charges.
21          A.   And a weapon also, yes.
22          Q.   Nothing more specific than that about
23   who was involved or anything like that.  Nothing
24   more specific about the -- nothing more specific
25   about those charges.
```



1          A.   I think there were some marijuana

2     charges in there, like a possession, like being on

3     the street or some other possession charges, but I

4     don't -- I don't -- I don't specifically --

5     specifically recall what they were.

6          Q.   Okay.  And so throughout your time in

7     this investigation, you never learned from any

8     source that Valentino Dixon was a target of the

9     Buffalo police for his drug-dealing activities.

10         A.   I did not learn that.

11         MR. BRUSTIN:  All right.  Let's take a --

12    just a couple-minute break.

13         MR. RUSS:  Sure.  Whatever you want.

14         MR. BRUSTIN:  I think we'll take a lunch at

15    one, if that's okay with you guys.

16              (Off the record: 12:09 p.m.)

17              (On the record: 12:17 p.m.)

18         BY MR. BRUSTIN:

19         Q.   Okay.  Detective, let's take -- let's

20    start with -- I'm going to now talk about your

21    involvement in the case.

22         A.   I'm sorry?

23         Q.   I'm going to -- I want to start talking

24    about your involvement in the case.

25         A.   Okay.



1        Q.   So let's take a look at Exhibit 2, page

2    25.

3        MR. RUSS:  Same thing, BPD?

4        MR. BRUSTIN:  Yes, please.

5        BY MR. BRUSTIN:

6        Q.   Okay.  And I take it that this is a

7    document that you -- you reviewed in preparation

8    for today?

9        A.   Yes, sir.

10       Q.   And this is your first P73 in the case,

11   correct?

12       A.   It is.

13       Q.   And as this indicates, you didn't get

14   the call on this case until more than an hour after

15   the shooting, correct?

16       A.   I believe so, yes.  An hour after.

17       Q.   And the first thing you did is you

18   reported to the homicide office.

19       A.   You are correct.

20       Q.   And the first thing that you did was

21   you took a statement from a witness.

22       A.   Correct.

23       Q.   And it appears from this -- from this

24   document -- you tell me if I'm wrong -- that you

25   were brought Emil Adams by Detective Lockwood,



 1  correct?  The second paragraph.

 2       A.   Commissioner Lock -- he was an acting

 3  detective at the time.  He retired as our

 4  commissioner.

 5       Q.   Okay.  And so -- but I'm -- reading

 6  into this document, my understanding of it is that

 7  given that there's no report in the file from the

 8  Detective Lockwood interviewing Emil Adams, he

 9  simply brought him to you.

10       A.   He transported him, yes.

11       Q.   Okay.

12       A.   You are correct.

13       Q.   So you were the first person to

14  interview Emil Adams.

15       A.   Correct.

16       Q.   And that was your first action on the

17  case.

18       A.   Correct.

19       Q.   And it was before you had probably any

20  information about what had transpired other than

21  there was a shooting, correct?

22       A.   I had a shooting, and I had knowledge

23  that there were multiple people shot at the scene

24  and that one was deceased.

25       Q.   All right.  No idea whatsoever that --



 1 who the suspects were, nothing like that, correct?

 2        A.    None whatsoever.

 3        Q.    All right.  So this is -- your first

 4 activity is to take a statement from Emil Adams

 5 with very little information about what's

 6 transpired in the investigation to that point in

 7 time, correct?

 8        A.    You are correct.

 9        Q.    And then the next thing that you did

10 after you took a -- after you took a sworn

11 statement from -- with -- withdrawn.

12        This P73 is detailing your activities the

13 morning of the homicide investigation, correct?

14        A.    It is.

15        Q.    That's the purpose of this P73.

16        A.    You are correct.

17        Q.    And so after you interviewed Emil Adams

18 and took his statement, presumably you -- you took

19 your notes and you -- and you put it into a written

20 statement.

21        A.    Correct.

22        Q.    Probably can't remember today whether

23 or not you actually called it in immediately or

24 not, right?

25        A.    Oh, I called it in.  I didn't do too



1   good with the -- I would be good with typing

2   statements.  I wasn't good with punching out

3   paragraphs for this.

4        Q.   Okay.  So the -- the -- the order of

5   events:  You took Emil Adams' statement --

6        A.   Correct.

7        Q.   -- with very little information about

8   the case.  You -- you wrote it -- you took your

9   notes and you wrote the written statement.  Then

10  you called it in and transcribed it.

11       A.   Correct.

12       Q.   Then you learned that a suspect had

13  been found and a photo array was being put together

14  by somebody else, correct?

15       A.   Again, this is quite a few years ago.

16  Just recently going through this, I do see mention

17  that there was a photo array and there was a photo

18  array that was made.

19       Q.   Okay.  And pursuant to your report, you

20  and Detective -- I can represent to you it was

21  Detective Vickerd did the photo array with Emil

22  Adams, correct?

23       A.   I didn't make it.

24       Q.   I understand.  You -- I'm sorry.

25       A.   Okay.



1          Q.   According to the reports, Detective

2    Vickerd created the photo array.

3          A.   Okay.

4          Q.   And then according to this P73, you

5    showed that photo array to Emil Adams, correct?

6          A.   I believe it was Detective Vickerd.

7          Q.   You don't believe you were even

8    present?

9          A.   I'd have to see the documents.  There's

10   a separate report for that.

11         Q.   There is.

12         A.   If I could see the document, I could

13   tell you --

14         Q.   Well, I can show you in a minute, but

15   are you -- are you --

16         A.   I don't remember.  I would -- if I

17   could look at the document, I'd be able to --

18         Q.   Hold -- hold on.

19         A.   Okay.

20         Q.   This says at the end of the statement a

21   photo array was shown to the witness.

22         Does that suggest to you, based on this

23   report, that you were present for that photo array?

24         A.   I don't -- I would have to -- to be 100

25   percent sure for you, I would -- all I have to do



1  is look at that form and I could tell you I'm a
2  hundred percent sure.
3        Q.   Well, I will represent to you you're
4  not mentioned in that form.  Does that mean that
5  you were not present, or it doesn't -- or it
6  doesn't suggest -- doesn't definitively state one
7  way or the other?
8        A.   It doesn't -- I -- it would not
9  definitively say whether or not I was there.
10       Q.   All right.  But certainly this report
11 suggests you were involved in the process, correct?
12       A.   Correct.
13       Q.   All right.  So whether you were present
14 for the entire photo array or not, you were
15 certainly involved.
16       A.   Correct.
17       Q.   And all of this is being done in the
18 homicide office, correct?
19       A.   I don't know.  Again, I didn't make the
20 photo array.
21       Q.   All right.
22       A.   I believe Detective Vickerd would be
23 the best one to answer that question.
24       Q.   All right.  Now, one basic -- so you
25 did know enough about the crime when you met with



 1   Emil Adams to know that it was a late-night

 2   shooting at -- at a location you were aware of,

 3   correct?

 4        A.   I worked in that precinct, yes.

 5        Q.   Okay.  And that there were a number of

 6   potential witnesses.

 7        A.   Correct.

 8        Q.   Now, one basic function -- withdrawn.

 9        One basic task for a homicide detective,

10   when dealing with a homicide where there are

11   multiple witnesses, is to make sure that you are

12   segregating the witnesses when you're interacting

13   with them, correct?

14        A.   Correct.

15        Q.   So for example, there is no question,

16   although you probably don't remember it, that when

17   Emil Adams was -- between the time when Emil Adams

18   was being interviewed and when he was being shown a

19   photo array, he was segregated in the homicide

20   office.

21        A.   He was.

22        Q.   That would be a very important thing to

23   make sure happened, correct?

24        A.   It did happen.

25        Q.   Okay.  No doubt in your mind.



1          A.    No doubt in my mind.

2          Q.    There is no way that Emil Adams -- you

3    would allow Emil Adams to be contaminated, for

4    example, by other witnesses.

5          A.    Correct.

6          Q.    Now, if you'd take a look at page 47.

7          So this is Vickerd's P73.

8          A.    All right.

9          Q.    Basically that Vickerd -- you haven't

10   reviewed this in preparation for today?

11         A.    I have never seen this until now.

12         Q.    Okay.  And it makes clear that Vickerd

13   put the photo array together, correct?

14         Just read the first paragraph, first

15   sentence.

16         A.    I'm --

17         Q.    I'm just asking you -- I'm asking --

18         A.    I'm --

19         Q.    Sir, I'm not asking you to read it.

20   I'm not going to -- I'm not going to prevent you

21   from reading it.

22         MR. RUSS:  He's entitled to read it if he

23   wants to read it.

24         BY MR. BRUSTIN:

25         Q.    All I'm asking you right now is whether



1  or not this report indicates that Detective Vickerd

2  put the photo array together.  First sentence.

3          MR. RUSS:  Right, but he wants to review the

4  entire report, and that's his right.

5          MR. BRUSTIN:  Well, it's actually -- he

6  should have reviewed it before, and it's going to

7  take my time for -- for him to review it, but

8  you're right.

9          BY MR. BRUSTIN:

10         Q.  If you need to review it, go ahead and

11  review it.

12         MR. RUSS:  Why should he have reviewed it

13  before?

14         MR. BRUSTIN:  Because that's what -- I'm not

15  going to fight with you.

16         THE WITNESS:  Detective Vickerd did make

17  this photo array.

18         BY MR. BRUSTIN:

19         Q.  Okay.  And it doesn't -- it doesn't

20  indicate one way or another whether or not you were

21  present for the photo array.

22         A.  You are correct.

23         Q.  You may have been; you may not have

24  been.

25         A.  Correct.



1          Q.   What you know for sure is that in

2     between the time you -- you interviewed Adams and

3     this photo array, he would have been segregated,

4     correct?

5          A.   Correct.

6          Q.   And it appears that -- obviously, in

7     order to create a photo array, Vickerd must have

8     developed a suspect.

9          A.   Absolutely.

10         Q.   But you just didn't know anything about

11    it.

12         A.   Correct.

13         Q.   All right.  And in fact, if you look at

14    your report, the statement, page 30 to 32 -- which

15    you did review for today, correct?

16         A.   Yes, sir, I'm looking at it.

17         Q.   Now, this is the -- this is your --

18    this is the statement you took from Emil Adams.

19         A.   Yes, sir.

20         Q.   And by the way, it looks like it's a

21    verbatim transcript.

22         A.   What -- what do you mean by verbatim?

23    I'm sorry.

24         Q.   It looks like you're -- it looks like

25    you're writing down all the words you asked him --



1   all the questions you asked him and everything he

2   said, correct?

3          A.   I typed it.  I -- I would -- I would

4   formulate the sentence in my mind, type it, and

5   then ask it to him.

6          Q.   Okay.  And obviously, you had some

7   discussion with Emil Adams before and after this

8   statement was taken, correct?

9          A.   Yes.

10         Q.   Okay.  And you understood, as you told

11  us, that to the extent there was anything

12  substantive or -- anything substantive that was

13  different or additional as to what he reported

14  here, you had an obligation to put it down,

15  correct?

16         A.   You are correct.

17         Q.   So, for example, if you provided him

18  any additional information about this crime or a

19  suspect either before or after, you, of course, had

20  an obligation to document that.

21         A.   You are correct.

22         Q.   And one of the things we've been told

23  is that it's very important -- by a detective --

24  it's very important to put the time when an

25  interview starts and the time when it ends,



1  correct?

2        A.   You are correct.

3        Q.   And sometimes you did that, and

4  sometimes didn't, right?

5        A.   You are correct.

6        Q.   Is -- was that just -- is the absence

7  of a starting time here just an error?

8        A.   It is an error.  I was woke up.  You

9  know, I -- I reported to the homicide squad at

10 two -- two o'clock in the morning.

11       Q.   Okay.  Well, I would -- I can represent

12 to you that the -- that almost all of your

13 interviews don't have a start time.  Is there a

14 reason for that?

15       A.   I have no idea.

16       Q.   Okay.  Now, my understanding -- correct

17 me if I'm wrong -- is that there -- there should be

18 a -- another version -- and Peter, maybe you can

19 help me with this.

20       Is -- there should be another version of

21 this report where there's an end time with a

22 picture of a clock on it?

23       A.   I have no idea what you're talking

24 about.

25       Q.   All right.  So -- all right.  Fair



1  enough.  So it's your understanding that there's no

2  start time and no end time on this report.

3        A.   Yes.

4        Q.   And that's just a mistake on your part.

5        A.   It would be, yes.

6        Q.   And you understand there's a variety of

7  reasons why it's important to put down the times

8  when an interview starts and ends, correct?

9        A.   It's very important.

10        Q.   And as you -- as you sit here today,

11  you have no explanation other than you just forgot

12  to do it.

13        A.   That's correct.

14        Q.   Because you had been woken up.

15        A.   That's correct.

16        Q.   Now, to the extent that you were -- I

17  take it that pursuant to the strict letter of the

18  rules and regulations as you understood it and your

19  training, to the extent that you were present for

20  the photo array, that should be in the report,

21  correct?

22        A.   It was shown after the statement.  It

23  should be in the report, yes.

24        Q.   But sometimes that didn't happen.  In

25  other words, there were times, as you recognize,



1  where you might be present and it just wouldn't

2  make its way into the report, correct?

3      A.  I -- I don't think on my particular way

4  I did things that that would happen, but on this

5  one, it was noted that he was shown the photo

6  array.

7      Q.  And so -- but you understand the --

8  that the ID reports here -- and I can show them to

9  you -- were created by Vickerd.

10      A.  Well, I -- I understand that, and I

11  agree with you.

12      Q.  All right.  But you're -- you recognize

13  that it's quite possible that although you don't

14  appear in that report, you could have been present.

15      A.  That's correct.

16      Q.  And certainly you were -- you were the

17  primary detective interacting with Emil Adams that

18  night, correct?

19      A.  I was the detective interviewing him.

20      Q.  And you understood, in reviewing your

21  report, that from the moment you interviewed him,

22  he was a potentially very important witness.

23      A.  He was an important witness.

24      Q.  All right.  And it's clear from looking

25  through your Q&A that you don't know at this --



1  withdrawn.  Now, it's clear from your questions

2  and answers -- withdrawn.

3         It's clear from your questions here that you

4  do know some information about the crime, correct?

5         A.   Yes.

6         Q.   But as you've told us, you have no idea

7  at this point that Valentino Dixon is a suspect or

8  any suspect, correct?

9         A.   You are correct.

10         Q.   Now, as a trained, experienced

11  detective -- withdrawn.

12         As a trained, careful detective by 1991, one

13  of the things you're looking for when determining

14  the reliability and the credibility of an

15  eyewitness is their ability to describe what they

16  saw and heard.

17         A.   You're correct.

18         Q.   And you know from experience that

19  oftentimes witnesses are not perfect in their

20  descriptions, what they saw and heard.

21         A.   You are correct.

22         Q.   And you also knew by 1991 that

23  oftentimes or sometimes witnesses make mistakes

24  about what they think they saw.

25         A.   Correct.



1        Q.    And so it was critically important to
2   vet them for their reliability.
3        A.    Before they make their statement or
4   after their statement?
5        Q.    After the statement.
6        A.    It would -- it would be good to know
7   who they were and what they were involved with,
8   yes.
9        Q.    And also what -- whether what they were
10  reporting to you -- withdrawn.
11        As you've told us already, you understand
12  that oftentimes witnesses don't give perfect
13  descriptions.
14        A.    You are correct.
15        Q.    What you're looking for, though, as a
16  detective in terms of determining reliability are
17  major differences in their descriptions as compared
18  to a suspect, correct?
19        A.    Correct.
20        Q.    So, for example, if you have a suspect
21  who is six foot six and the witness describes the
22  suspect as being five eight, that's the kind of
23  discrepancy that suggests they may not be reliable.
24        A.    Again, it's all in the context of the
25  statement or the -- or the question.  You know, it



1  could be.

2         Q.    That's the kind of -- maybe a fair way

3  to look at that is a red flag.  Fair to say?

4         A.    If it would present itself and it

5  pertained to the case, it would be, yes.

6         Q.    People are not good at saying somebody

7  is six two as opposed to six foot, but usually

8  people are able to -- if they have a good

9  opportunity to see, they can tell the difference

10  between someone who's very tall and very short.

11         MR. RUSS:  Objection to form.  You may

12  answer.

13         THE WITNESS:  Yes, you are correct.

14         BY MR. BRUSTIN:

15         Q.    Same with size.  If you have a suspect

16  who is extremely slender, 150 pounds, compared to

17  somebody who is 210 pounds, for example, those are

18  the kinds of differences you're looking for in

19  determining reliability, correct?

20         MR. RUSS:  Objection to form.  You may

21  answer.

22         THE WITNESS:  Correct.

23         BY MR. BRUSTIN:

24         Q.    If, for example, someone describes to

25  you, "The person who I saw committing this crime



1  was a big, stocky person" and you know that the

2  person who you suspect to have committed the crime

3  was extremely slim, that's a red flag.

4       A.    It would give me doubt, yes.

5       Q.    That's the kind of thing you're looking

6  for as a detective when you're evaluating the

7  reliability of witnesses, correct?

8       A.    Correct.

9       Q.    Now, do you recall today -- withdrawn.

10      One of the things that Emil Adams has stated

11 in the past is that he was held at -- in the

12 homicide office for many hours that night.

13      Do you recall that?

14      MR. RUSS:  Objection to form.  You may

15 answer.

16      THE WITNESS:  Well, obviously he was with us

17 for several hours, yes.

18      BY MR. BRUSTIN:

19      Q.    Okay.  Do you remember him being with

20 you for many hours even after the photo array?

21      A.    No.

22      Q.    Do you have an independent recollection

23 today, by the way, of interviewing Emil Adams?

24      A.    Of interviewing him?  Yes.

25      Q.    You do.  Okay.  Not just from reading



1  your report.  You actually remember it.

2          A.   I remember interviewing Emil Adams.

3          Q.   Okay.  You remember him --

4          A.   And -- and then I also took a sworn

5  statement that he signed.

6          Q.   I understand, but -- so just to be

7  clear --

8          A.   Sure.

9          Q.   -- you took a sworn statement.  You

10  know how you did things, so that means that you're

11  telling us that's what -- that's how it happened,

12  but you actually, as you sit here today, can

13  picture in your mind sitting in a room with him.

14          A.   Yes.

15          Q.   Okay.  Now, you would agree that, to

16  the extent Emil Adams gave any substantive

17  information about what he saw or heard to Detective

18  Lockwood or any other officer, there should be a

19  report in the file.

20          A.   There should be.

21          Q.   And by the way -- withdrawn.

22          Now, going back to your report on page 30,

23  although you -- you may have been a little tired,

24  you were doing your very best to get as detailed an

25  account of what Emil Adams saw and heard as you



1   could, correct?

2          A.   Yes.

3          Q.   And in particular, you were -- you

4   were -- you were looking for things like as

5   detailed a description as possible about the

6   perpetrator that he saw, correct?

7          A.   Yes.

8          Q.   And you're looking for specific

9   characteristics, correct?

10         A.   Yes.

11         Q.   And I take it that you did a -- I think

12  you've already told us this, but you would have

13  done a preinterview before this, correct?

14         A.   Correct.

15         Q.   Where you talked generally about --

16  about what he saw and heard, correct?

17         A.   Yes, sir.

18         Q.   And the fact that there's no report of

19  that preinterview indicates that there was nothing

20  in that preinterview that you provided to him or

21  that he provided to you that was not part of this

22  statement, correct?  Nothing substantive.

23         A.   No.

24         Q.   You agree with me.

25         A.   I do.



1          Q.   All right.  And you see on page 31
2    the -- about ten lines down:  Can you tell me what
3    the person that had the TEC-9 looked like?
4          A.   I see it.
5          Q.   This is where he's describing the
6    person that he claims he saw commit the homicide,
7    correct?
8          A.   Correct.
9          Q.   One of the most important questions
10   you're asking.
11         A.   Correct.
12         Q.   And he gives a pretty detailed
13   description of the shooter, correct?
14         A.   He does.
15         Q.   Black male, heavyset, maybe about 20,
16   about six feet tall, correct?
17         A.   Correct.
18         Q.   Describing a -- he's describing a big
19   guy as the shooter, correct?
20         MR. RUSS:  Objection to form.  You may
21   answer.
22         THE WITNESS:  I don't think he's a big guy.
23         BY MR. BRUSTIN:
24         Q.   A black male, heavyset, right?  He's
25   describing a -- by the way, heavyset is probably



1  your interpretation of what he's telling you,

2  correct?

3          A.   It's his -- it's his words.

4          Q.   Oh, he used heavyset.

5          A.   Yes.

6          Q.   Okay.

7          A.   I mean, this -- this is his response.

8          Q.   Right.  What does heavyset mean?

9          A.   That he thought --

10         MR. RUSS:  Objection to form.  You may

11  answer.

12         THE WITNESS:  That he thought the guy was

13  heavyset.

14         BY MR. BRUSTIN:

15         Q.   What does heavyset mean?

16         MR. RUSS:  Objection to form.  You may

17  answer.

18         THE WITNESS:  That he's not skinny.

19         BY MR. BRUSTIN:

20         Q.   Yes, he's a big guy.

21         A.   I don't think he's big.

22         MR. RUSS:  Objection to form.  You may

23  answer.

24         BY MR. BRUSTIN:

25         Q.   It's the -- it's -- it's the opposite



1   of skinny, right?

2         A.    It is the opposite --

3         MR. RUSS:  Objection to form.  You may

4   answer.

5         THE WITNESS:  It is the opposite of skinny.

6         BY MR. BRUSTIN:

7         Q.    And if you didn't understand what he

8   meant, you would have asked a follow-up question,

9   right?

10        A.    I would have done so, yes.

11        Q.    By the way, there was no time limit on

12   this interview, was there?

13        A.    No.

14        Q.    You had plenty of time to ask all the

15   questions that you thought were important to --

16   that you thought were important to ask to help

17   identify the suspect, correct?

18        A.    That's correct.

19        Q.    And there's a -- there's a number of

20   reasons for this interview.  You're -- one thing is

21   you're trying to identify a suspect, correct?

22        A.    Yes.

23        Q.    Another reason, though, is that you

24   understand this is a person who's saying he's an

25   eyewitness.



 1          A.   Correct.

 2          Q.   And you are doing everything in your

 3   power to ascertain his reliability as an

 4   eyewitness, correct?

 5          MR. RUSS:   Objection to form, you may

 6   answer.

 7          THE WITNESS:   Correct.

 8          BY MR. BRUSTIN:

 9          Q.   Because the -- ultimately, any criminal

10   suspect has a right to that, correct?

11          A.   Correct.

12          Q.   It's your job to ascertain whether the

13   description he gives, for example, actually matches

14   the suspect, correct?

15          A.   Correct.

16          Q.   And it's your job to ascertain whether

17   or not this eyewitness actually was in a position

18   to observe the suspect, correct?

19          A.   Correct.

20          Q.   And it's your job to ascertain whether

21   or not this witness had anything that would impede

22   his ability to make an identification, correct?

23          A.   Correct.

24          Q.   Was he drunk, was he high, right?

25          A.   Correct.



1          Q.   And by the way, one of the basic things
2     you expect when you have young eyewitnesses for a
3     shooting that happened late at night at a popular
4     restaurant where everyone goes after partying all
5     night is whether or not they're under the influence
6     of drugs or alcohol, correct?
7          A.   Correct.
8          Q.   That's about as basic as it gets,
9     right?
10         A.   Yes.
11         Q.   And you understood that depending on
12    how much alcohol or drugs a witness consumed, that
13    could affect their ability to make an
14    identification, a reliable identification.
15         A.   Correct.
16         Q.   Why didn't you ask him any questions
17    about what he drank or smoked or took?
18         A.    I didn't think that he was intoxicated
19    or high.  He appeared in a normal fashion.  He
20    spoke like we're -- we're talking today.
21          He seemed like a pretty credible young kid.
22    I did not think -- I couldn't smell any marijuana.
23    I didn't think he was intoxicated, and I didn't
24    think he was high at all.
25         Q.   Okay.  By the way, do you remember all



 1 | this today?

 2 |        A.   Yes, I do.

 3 |        Q.   You're not just making it up?

 4 |        MR. RUSS:  Objection to form.  Don't answer.

 5 |        BY MR. BRUSTIN:

 6 |        Q.   You know we're accusing you of lying,

 7 | right?  I mean, there's no bones about it.  I -- we

 8 | are claiming that you fabricated evidence in this

 9 | case, right?

10 |        A.   That I fabricated his words?

11 |        Q.   We're -- we're claiming that you

12 | fabricated evidence in the case.  You understand

13 | that, right?

14 |        A.   I -- I do understand that, yes.

15 |        Q.   All right.  And as you sit here under

16 | oath, you're telling me you remember observing that

17 | this person, Emil Adams, in 1991 didn't seem drunk

18 | or high to you.

19 |        A.   There's a reason for that.  I don't

20 | take statements from people that are intoxicated or

21 | high.  I don't do that.  So he would not have

22 | appeared that way.

23 |        Q.   Well, one way -- one way to ascertain

24 | whether somebody's intoxicated or high is to ask

25 | them, "Have you done any -- have you -- have you



1  had anything to drink," right?

2         A.    That's one of the ways.

3         Q.    And sometimes people are honest about

4  it, right?

5         A.    Yes.

6         Q.    By the way, you know from your work as

7  a police officer, as a homicide detective in -- in

8  Buffalo, that as a general matter, particularly in

9  communities of color, there was not a lot of trust

10 in police officers.  Is that fair to say?

11        A.    It is.

12        Q.    And that -- whether they were witnesses

13 or suspects, oftentimes you understood that the

14 people you came into contact with didn't trust you.

15        A.    You're correct.

16        Q.    And that for that -- and for that

17 reason and others, they didn't always tell you the

18 truth.

19        A.    You're correct.

20        Q.    And you understood that one reason is

21 that because they didn't believe you were actually

22 looking out for their best interests, right?

23        A.    It's one of the reasons.

24        Q.    In other words, you understood that

25 oftentimes even witnesses who wanted to tell the



1  truth were afraid to tell you the truth because

2  they didn't trust you.

3          A.    That's sometimes one of the reasons.

4          Q.    Now, you arrested Valentino Dixon,

5  right?

6          A.    Yes, sir, I did.

7          Q.    Fair to say at the time -- at the time

8  when you arrested him, Valentino Dixon could only

9  be described as extremely thin.

10         A.    He's thin.

11         Q.    150 pounds soaking wet, fair to say?

12         A.    That's -- that's about his weight, yes.

13         Q.    He was a very thin-framed man.

14         A.    He would be thin.

15         Q.    Skin and bones, right?

16         A.    I don't think he was skin and bones,

17  but he was thin.

18         Q.    And you also interviewed Lamarr Scott.

19         A.    Correct.

20         Q.    And you understand that Lamarr Scott

21  played linebacker for his high school football

22  team, right?

23         A.    No, I don't --

24         MR. RUSS:  Defensive end.

25         BY MR. BRUSTIN:



1          Q.    Defensive end.

2          A.    No, I don't know that.

3          Q.    All right.

4          A.    That's the first I've heard of it.

5          Q.    And you heard it wrong from me.  You --

6    he was a defensive end.  Claimed to be -- claimed

7    to be pretty good.

8          In any case, you remember him as a tall,

9    heavyset man, correct?

10         A.    I remember he was about six foot and

11   stocky.

12         Q.    Big guy.  Could have been 220.

13         A.    I don't know about that.  I may --

14   might say about 190, 195, but not -- not 220.

15         Q.    No?

16         A.    I'm just guessing.

17         Q.    All right.  But certainly he fit the

18   bill as a big, heavyset guy, fair to say?

19         A.    You are correct.

20         Q.    And you can -- and you can tell from

21   the picture of Valentino Dixon -- I can show it to

22   you, but I don't think I need to.

23         He looks extremely thin in the picture.

24         A.    You keep on --

25         MR. RUSS:  Objection to form.  You may



```
 1   answer.
 2        THE WITNESS:  I don't think he's extremely
 3   thin.  I think he's thin.
 4        BY MR. BRUSTIN:
 5        Q.  All right.  You can tell that from his
 6   picture.  He has a thin face.
 7        A.  He's thin.
 8        MR. RUSS:  Objection to form.  You may
 9   answer.
10        BY MR. BRUSTIN:
11        Q.  Now, another thing that you always want
12   to do when you're interviewing an eyewitness is to
13   ascertain and then to follow up with other
14   potential eyewitnesses, correct?
15        A.  We try to, yes.
16        Q.  That's one of your main jobs, correct?
17        A.  It's one of our jobs, yes.
18        Q.  All right.  And if you take a look at
19   page 30 -- first of all, why didn't you attempt to
20   ascertain exactly where Emil Adams was standing and
21   whether or not he had a good opportunity to view?
22        MR. RUSS:  Objection to form.  You may
23   answer.
24        THE WITNESS:  I just didn't ask that
25   question.
```



1          BY MR. BRUSTIN:
2          Q.   Well, we've already established that
3     that's a basic question that a conscientious,
4     careful investigator like you would ask, correct?
5          MR. RUSS:  Objection to form.  You may
6     answer.
7          THE WITNESS:  Correct.  I made a mistake.
8          BY MR. BRUSTIN:
9          Q.   All right.  So you -- by the way, as
10    far as you understood at the time you were
11    interviewing Emil Adams, he was the first
12    eyewitness being interviewed in this homicide,
13    correct?
14         A.   I thought he was, yes.
15         Q.   All right.  And yet you made a mistake
16    by not asking where he was standing at the time he
17    allegedly observed the killer?
18         A.   I think in his statement, he mentions
19    what side of the street he was on.
20         Q.   Well, as a trained homicide
21    investigator, you understand that there are many
22    more questions you need to ask to ascertain whether
23    he had a good opportunity to view, correct?
24         A.   I could have, yes.
25         Q.   Well, you understand that that's



1   important, right?

2           A.   It is important, counselor.

3           Q.   It's important to know how far away he

4   is, right?

5           A.   Yes, that's correct.

6           Q.   It's important to know what is in

7   between him and the crime that's being committed?

8           A.   That's correct.

9           Q.   It's important to know where his focus

10  is?

11          A.   You're correct.

12          Q.   It's important to know what the

13  lighting is like?

14          A.   You're correct.

15          Q.   It's important to know if there are

16  cars in the way?

17          A.   Yes.

18          Q.   Basic things that any trained homicide

19  investigator should ask, correct?

20          A.   Correct.

21          Q.   That you forgot to ask.

22          A.   I did.

23          Q.   Now take a look at -- all right.

24          If you look at the middle of the page where

25  his -- his -- there's a big paragraph with his



1   answer.  Do you see that?

2           A.    On page 30?

3           Q.    Yes.

4           A.    Yes, I see that.

5           Q.    Then it says:  Then I was standing by a

6   truck talking with some girls.

7           A.    Correct.

8           Q.    And for a trained detective, what that

9   screams to you is more witnesses, right?

10          A.    Could have been a car that was parked

11  there.  I don't know.  These are his words.

12          Q.    Oh, I understand they're his words, but

13  when he -- when he says, "When I observed the

14  crime, I was standing talking with some girls,"

15  what that says to a trained detective is perhaps

16  those girls are also witnesses, right?

17          A.    You said truck just a few minutes ago,

18  I'm sorry.  "I was standing by a truck."

19          Q.    "Talking with some girls."

20          A.    Okay, but that's not the way you

21  first --

22          Q.    Sir.

23          A.    -- framed the question.

24          MR. RUSS:  Okay.  Try again.

25          BY MR. BRUSTIN:



1        Q.   If you read this, what he's suggesting

2   here -- you don't know, because you didn't ask, but

3   what he's suggesting is those girls might be

4   witnesses, too, right?

5        A.   I believe he mentions the girls' names

6   somewhere in the statement.

7        Q.   Okay.  And so it would be very -- very

8   important to follow up with those girls, correct?

9        A.   Yes.

10       Q.   And it would be your job, since you

11  took this statement, to either follow up with those

12  girls yourself or ensure that somebody else did,

13  correct?

14       A.   Correct.

15       Q.   Any explanation why that never

16  happened?

17       A.   No.

18       Q.   Just another mistake?

19       A.   No.  On follow-up investigations, we

20  were a little bit overwhelmed.  I mean, we were

21  getting two, three shootings a night that we

22  responded to.

23       Q.   Were there two or three shootings that

24  night?

25       A.   I'm trying to explain to you exactly



1  why on -- on -- on the follow-ups.

2      Sometimes we would get a suicide that we had

3  to investigate, a lawful death that someone became

4  deceased, an industrial accident.  We have to

5  investigate those.

6      But most of the time then when we responded,

7  sometimes our follow-up wasn't perfect.

8      Q.   Got you.

9      A.   We did the best we could with the

10  manpower that we had.

11      And don't forget, this was turned over to

12  the District Attorney's office, and they also

13  enhance investigations.

14      Q.   Okay.  So you remember Emil Adams not

15  being high, but I take it you don't remember there

16  being any other shootings that night, right?

17      A.   I was called in on one.  I was asleep.

18  This was the one that I responded to.

19      Q.   Okay.

20      A.   I can't answer that question for you.

21      Q.   So any mistakes that you made in the

22  Emil Adams interview we can chalk up to you being

23  sleepy.

24      MR. RUSS:  Objection to form.

25      THE WITNESS:  That's --



```
 1          MR. RUSS:  You may answer.
 2          THE WITNESS:  That's not fair to say.
 3          BY MR. BRUSTIN:
 4          Q.   Okay.  So -- all right.  Take a look at
 5   page -- the first page again, 30, and he is
 6   mentioning somebody named Mario to you, correct?
 7          A.   Yes, sir.
 8          Q.   As being involved in the altercation.
 9          And then you ask him:  Do you know Mario?
10          And he says:  Yes, I do.
11          What should the next question have been?
12          A.   What does Mario look like?
13          Q.   How do you know Mario?  What's your
14   relationship with him?
15          A.   I didn't ask him that.
16          Q.   I know you didn't.  My question is why
17   not.
18          A.   I have no idea.
19          Q.   And by the way, what I'm talking about
20   right now are very basic questions for a detective,
21   right?
22          A.   Yes.
23          Q.   How do you know the person that was
24   involved in the shooting, right?  Was he your
25   friend?  Did you go to school with him?  Did he
```



1  carry a gun?

2       Basic questions any trained homicide

3  investigator asks, right?

4       MR. RUSS:  Objection to form.  You may

5  answer.

6       THE WITNESS:  Yes, I would.

7       BY MR. BRUSTIN:

8       Q.   Okay.  And by the way, you had plenty

9  of time to do this interview.  Nobody was standing

10 over your shoulder saying you got to hurry, right?

11      A.   That's correct.

12      Q.   Nobody -- you have as much time as you

13 need to do this interview.

14      A.   Correct.

15      Q.   All right.  Now, he describes the

16 shooter at page 31 as black male, heavyset, six

17 foot tall, maybe about 20 years old, had a white

18 shirt and a white hat on, right?

19      A.   Where are we in the statement, please?

20      Q.   31.

21      A.   I'm on 31.  Where -- whereabouts?

22      Q.   About eight lines down.

23      A.   Okay.  I see that.

24      Q.   That's what he describes, right?

25      A.   Yes.



1          Q.   As you've already told us, one of the
2    most important questions you ask in the interview,
3    correct?
4          A.   Correct.
5          Q.   And as you already told us, you had a
6    very good memory at the time, correct?
7          A.   Correct.
8          Q.   Now take a look at page 197.
9          A.   197.
10         Q.   Yes.
11         MR. RUSS:  Same prefix?  BPD?
12         MR. BRUSTIN:  Yes, please.
13         THE WITNESS:  I'm on 197.
14         BY MR. BRUSTIN:
15         Q.   All right.  Now, 197 is your interview
16    of Lamarr -- so it starts on 196, actually.
17         A.   That's not an interview.
18         MR. RUSS:  It's not -- we don't have it.
19         THE WITNESS:  197 is a sworn statement.
20    197.  I think you're on a different page.  Excuse
21    me.
22         MR. BRUSTIN:  Maybe we've got a -- you've
23    got a bad -- we have another one if you want to
24    check it out.
25         MR. RUSS:  196.  Go ahead.  I'll look on.



 1          BY MR. BRUSTIN:
 2          Q.   Okay.  We'll see if we can find you
 3    one.  In any case, this is the sworn statement that
 4    you took from Lamarr Scott, correct?
 5          A.   Yes, sir.
 6          Q.   And again, the same -- we're going to
 7    go over this a little bit later, but the same rules
 8    to the extent you -- you obviously did a
 9    preinterview with Lamarr Scott, correct?
10          A.   Yes.
11          Q.   To the extent that you said anything to
12    him or he said anything to you before or after this
13    sworn statement, you had an obligation to document
14    it, correct?
15          A.   You're correct.
16          Q.   So every -- every piece of relevant
17    information that you provided to him and that he
18    provided to you is contained in this sworn
19    statement, correct?
20          A.   Correct.
21          Q.   And if you'd take a look on the second
22    page --
23          A.   197?
24          Q.   Yes.
25          A.   Okay.



1         Q.   You've already told us that when you
2    saw him, you recognized that he was six foot or
3    taller and heavyset, correct?
4         A.   Correct.
5         Q.   And you asked him what he was wearing
6    that night, and he said, about five lines down,
7    white tee shirt, white hat, right?
8         A.   Yes.
9         Q.   And obviously, as soon as you -- when
10   you interviewed Lamarr Scott, you recognized at
11   some point -- withdrawn.
12        Certainly when Emil Adams identified
13   Valentino Dixon, within hours of him describing the
14   shooter as being heavyset, you recognized as a
15   trained detective that Valentino Dixon was thin and
16   not heavyset, correct?
17        A.   Yes.
18        Q.   And that, obviously, was a red flag for
19   you, correct?
20        A.   It was.
21        Q.   And obviously, that was something that
22   you were discussing with other officers at the
23   time.
24        A.   I didn't discuss that with other
25   officers at the time.



1        Q.   It was in your mind, but you didn't
2   tell anybody.
3        A.   That's correct.
4        Q.   All right.  And so -- but it was -- it
5   was something that you noticed.
6        A.   Correct.
7        Q.   All right.  And so when Lamarr Scott
8   came in four days later and not only was he -- did
9   he fit the physical description that Emil -- Emil
10  Adams had given of being -- about how tall he was
11  and being heavyset, he was wearing the same clothes
12  that Emil Adams described, correct?
13       A.   I don't know.
14       Q.   Well, I just -- you just -- you just --
15  I just showed you the two.
16       A.   I -- I know that, but you're showing me
17  Scott's.  I'll go back and look at --
18       Q.   Well, what was --
19       A.   -- Emil Adams where he -- he gives the
20  clothing.
21       Q.   Well, what he said was a white tee
22  shirt and white hat.
23       A.   Correct.
24       Q.   And so obviously, as a trained
25  detective, when Lamarr Scott came in and told you,



1  "It was me who did the shooting and not Valentino

2  Dixon," you made the connection, "Holy cow, he fits

3  the description that the eyewitness I interviewed

4  gave me."

5           A.    There's one --

6           MR. RUSS:  Objection to form.  You may

7  answer.

8           THE WITNESS:  Okay.  There's one small

9  portion that you're missing.

10          The white hat that you're talking about I

11 don't remember him wearing when he came in or when

12 he was brought in; however, the white hat that --

13 that the witness described had a blue or a black

14 rim around it.  It wasn't a white hat.

15          I don't know what -- I can't remember what

16 hat, but I didn't think that they were the same.

17          BY MR. BRUSTIN:

18          Q.    Okay.  So in other words, you went

19 through the process that I'm just describing to you

20 in your head.

21          In other words, you recognized -- you

22 recognized, "Yes, in fact, Emil Adams described the

23 guy I'm looking at except for the difference in the

24 hat," correct?

25          A.    Correct.

1        Q.   And so the combination of Valentino

2    Dixon -- withdrawn.

3        The combination of Emil Adams describing

4    someone who was much smaller (sic) than Valentino

5    Dixon, which you noticed, you said, at the time --

6        A.   Correct.

7        Q.   That combined with Emil Adams

8    describing even more precisely Lamarr Scott --

9    Lamarr Scott, who was coming in and confessing, was

10   an even bigger red flag, correct?

11       MR. RUSS:  Objection to form.  You may

12   answer.

13       THE WITNESS:  It was a flag, yes.

14       BY MR. BRUSTIN:

15       Q.   All right.  So in other words, when you

16   interviewed Emil -- when you interviewed Lamarr

17   Scott, you recognized in your mind, "Wow, I had a

18   concern that his description didn't match Valentino

19   Dixon when he ID'd him in the photo array, and now

20   I see that Emil Adams was actually describing, in

21   many respects, the person who's confessing in front

22   of me," correct?

23       MR. RUSS:  Objection to form.  You may

24   answer.

25       THE WITNESS:  I had some reason.



 1        BY MR. BRUSTIN:
 2        Q.   All right.  And before we take a lunch
 3   break, you -- please explain to us why those
 4   concerns and -- and that -- those observations
 5   appear nowhere in the police file.
 6        A.   That's because of the fact that
 7   Assistant District Attorney Christopher Belling
 8   came over, reviewed all the file at that particular
 9   time.  He looked at all the evidence that we had
10   collected, and he had discussed with us to -- to
11   let him go and that he had more information that he
12   was working on.
13        I don't know whether it was in the Grand
14   Jury or not, but it was the District Attorney's
15   request that we not arrest him for it, but he knew
16   about it.  There is -- there is no doubt in my mind
17   that he would have to know about that -- that white
18   hat and the description would match the description
19   prior and also the white hat.
20        But the white hat wasn't definitive.  It's
21   not a real big -- it's a big thing now --
22        Q.   All right.
23        A.   -- but it wasn't definitive.
24        Q.   Yes, I don't know what you're talking
25   about, but in any case, the --



1          A.   It wasn't the same type of hat.

2          Q.   Sure.

3          MR. RUSS:  Wait for the question.

4          BY MR. BRUSTIN:

5          Q.   So first of all, you understand that

6     you were the person in this case, of everybody else

7     in the case, who was in the very best position to

8     make the connection between Emil Adams and the

9     description of Lamarr Scott, correct?

10         A.   Correct.

11         MR. RUSS:  Objection to form.  You may

12    answer.

13         THE WITNESS:  Correct.

14         MR. RUSS:  You did answer.

15         BY MR. BRUSTIN:

16         Q.   You interviewed Emil Adams.

17         A.   Correct.

18         Q.   You interviewed Lamarr Scott.

19         A.   Correct.

20         Q.   You observed the photo array of

21    Valentino Dixon.

22         A.   I don't remember that.

23         Q.   You -- you at least saw the picture of

24    Valentino Dixon.

25         A.   I don't remember that.



1        Q.   You just told us that you made the

2    connection at the time.  You just -- under oath you

3    just told us that you recognized --

4        MR. RUSS:  You never asked him if he saw the

5    picture of Valentino Dixon.

6        MR. BRUSTIN:  Let me finish the question.

7        BY MR. BRUSTIN:

8        Q.   You just told us that you remember, at

9    the time you were interviewing Emil Adams and the

10   time of the photo array, you made the connection

11   that Emil Adams' description didn't match Valentino

12   Dixon in size, correct?

13       MR. RUSS:  Objection to form.  You may

14   answer.

15       THE WITNESS:  I -- I'm very confused by your

16   whole entire question.

17       BY MR. BRUSTIN:

18       Q.   All right.

19       A.   You're talking about a photo array.  I

20   did not see the photo array.  I do know that there

21   was a photo array shown --

22       Q.   All right.

23       A.   -- by Detective Vickerd.

24       Q.   Okay.  So now you're testifying that

25   you didn't see the photo array.



1          A.   I'm -- I'm not following you at all,

2    and I -- I hate to say this again, but when you say

3    if I saw the photo array, there's two parts to the

4    photo array.  There's the actual affidavit and the

5    physical photo array itself.

6          I don't ever remember seeing the photo

7    array.  That would be the pictures.

8          Q.   All right.  You just told us, sir,

9    under oath that you may well have been present when

10   that photo array was shown --

11         A.   I may have been.

12         Q.   I'm not done with my question.

13         A.   Well, then, you can finish your

14   question.

15         Q.   So you may -- you may well -- this is

16   better.

17         A.   It's really good for you.

18         Q.   This is the real -- the real -- the

19   real Detective Stambach.

20         MR. RUSS:  All right, look.  If you want to

21   ask a question, ask a question.  If you want to

22   argue, we're not doing that.

23         BY MR. BRUSTIN:

24         Q.   Is this how you -- okay.  Is this how

25   you react when you get angry?



1          MR. RUSS:  Objection to form.  Don't answer.

2          BY MR. BRUSTIN:

3          Q.   All right.  You just told us that you

4    may well have been present when the photo array was

5    shown to Mr. -- Mr. Adams, correct?

6          A.   Could you repeat that question for me?

7          Q.   You've told us repeatedly under oath --

8          A.   Could she repeat the question to me,

9    please?

10         Q.   I'm repeating it to you.

11         A.   Please do so.

12         Q.   You just told us that you may well have

13   been present when the photo array of -- of

14   Mr. Dixon, including Mr. Dixon, was shown to

15   Mr. Adams.  Do you recall that?

16         A.   I do recall that, yes.

17         Q.   Are you now changing that testimony and

18   claiming that you never saw that photo array?

19         A.   No, I'm not changing it.  It's

20   different.

21         Q.   All right.  You've also told us that

22   the night of the 10th, you made the connection in

23   your mind that Valentino Dixon did not match the

24   description that Emil Adams had given in terms of

25   size, correct?



1        A.   You're correct.

2        Q.   And you've also told us that you

3   recognized even further, when you interviewed

4   Lamarr Scott, that in many respects, the

5   description Emil Adams gave matched Lamarr Scott,

6   correct?

7        A.   Correct.

8        Q.   And you were in the best position to

9   make those observations of all of the detectives on

10  the case, correct?

11       MR. RUSS:  Objection to form.  You may

12  answer.

13       THE WITNESS:  I would have an opinion on it,

14  yes.

15       BY MR. BLENK:

16       Q.   All right.  And as you sit here today,

17  you have no recollection of raising that issue with

18  DA Belling, correct?

19       MR. RUSS:  Objection to form.  You may

20  answer.

21       THE WITNESS:  I don't remember.

22       BY MR. BRUSTIN:

23       Q.   Fair to say that to the best of your

24  recollection, you never discussed that with DA

25  Belling.



 1          A.   I don't remember.

 2          Q.   You certainly have no memory of doing

 3   it, correct?

 4          A.   I don't remember.

 5          Q.   Okay.

 6          MR. BRUSTIN:  I think now is a good time for

 7   a lunch break.

 8              (A luncheon recess was then taken at

 9   1:08 p.m.)

10              (On the record: 2:07 p.m.)

11          BY MR. BRUSTIN:

12          Q.   Okay.  Detective Stambach, you've

13   already told us that you were responsible for Emil

14   Adams during the early morning hours of the night

15   of the shooting, the morning after the shooting,

16   correct?

17          A.   Yes, sir.

18          Q.   And at all times, he was segregated in

19   the homicide office, correct?

20          A.   That's correct.

21          Q.   And at all times, you had eyes on him

22   during those hours when you were interviewing him

23   and when he was shown photo arrays, correct?

24          A.   No, I would say when he was discharged

25   from either the photo array or the sworn statement,



1  he was placed somewhere for transport.

2        I don't know who transported him, and I

3  don't know what time he left.

4        Q.  All right.  Take a look at page 25 of

5  your report.  Page 25 of your report.

6        MR. RUSS:  Of Exhibit 2?

7        MR. BRUSTIN:  Yes, please.

8        THE WITNESS:  I'm -- I'm sorry, what page

9  are you --

10        BY MR. BRUSTIN:

11        Q.  Page 25.

12        A.  All right.

13        Q.  And you see the paragraph beginning at

14  the end of the statement?

15        A.  Yes, sir.

16        Q.  Okay.  And with this statement here,

17  you are describing the exact words that Emil Adams

18  spoke when he made the identifications, correct?

19        You quote him.

20        A.  That is correct.

21        Q.  All right.  And that suggests that you

22  at least were close enough to hear those words,

23  correct?

24        A.  Yes, sir.

25        Q.  Another indication that you were



 1  present for the photo array, correct?

 2       A.   Well, again, it could have been from

 3  the writing on the photo array.  He might have --

 4  that would be his response that's in the affidavit,

 5  I believe.

 6       Q.   All right.  But the photo array surely

 7  would have taken place in the homicide office,

 8  correct?

 9       A.   Oh, yes, it would have.

10       Q.   And you were right there.

11       A.   I was there that day.

12       Q.   All right.  And you were responsible --

13  you were obviously interested in what Emil Adams

14  was doing, the person you just interviewed,

15  correct?

16       A.   Yes, sir.

17       Q.   So certainly either -- whether you

18  were -- lots of reason to believe that you observed

19  the photo array, correct?

20       A.   I -- again, I'm not 100 percent sure on

21  that.  I'm sorry.

22       Q.   But lots of evidence suggesting that

23  you did, correct?

24       A.   Yes, sir.

25       Q.   And one of the reasons -- by the way,



 1  Emil Adams, you understood, both based on your

 2  interview and what you learned afterward, was an

 3  important witness in this case, correct?

 4          A.   Yes, he was.

 5          Q.   He didn't have any direct ties to -- or

 6  any -- any familial ties to any of -- either of the

 7  groups involved in the shooting, correct?

 8          A.   I don't know that.

 9          Q.   You told us he appeared to be not

10  intoxicated.

11          A.   Yes, sir.

12          Q.   Appeared to be a credible eyewitness.

13          A.   Yes, sir.

14          Q.   As important a witness as there was in

15  this case, correct?

16          A.   Yes, sir.

17          Q.   And so one of the reasons why -- one of

18  the reasons why you are convinced that Emil

19  Adams -- withdrawn.

20          One of the reasons why you are convinced

21  today that Valentino Dixon shot and killed Torri

22  Jackson is because of the positive ID that Emil

23  Adams made, correct?

24          A.   Yes, sir.

25          Q.   And you understand that, assuming

 1  Lamarr Jackson shot -- let me make some assumptions
 2  here.  Assume for a minute that Lamarr Scott
 3  shot -- was the shooter here.
 4          A.   I'm sorry, I didn't want to correct
 5  you.  It is Lamarr Scott.
 6          Q.   Yes, I'm terrible with names, but now I
 7  got it.
 8          A.   That's okay.
 9          Q.   Lamarr Scott.  Assume for a minute that
10  Lamarr Scott was the actually the shooter, okay?
11          A.   One of the shooters.
12          Q.   Well, your investigation uncovered
13  there was only one shooter, correct?
14          A.   I think in Mr. Emil Adams, there's a
15  mention of a -- a second shooter in the middle of
16  my page.
17          Q.   Well, you understand that the
18  prosecution went forward on the theory that the
19  only person who shot was Valentino Dixon.
20          A.   I don't know that, I'm sorry.
21          Q.   As you sit here today, you don't even
22  know that.
23          A.   I do not -- I didn't -- I didn't
24  testify in the trial.  I don't know what the
25  prosecution did.



1      Q.   Fair to say that you are aware of
2  absolutely zero follow-up of a second person being
3  the shooter.
4      MR. RUSS:  Objection to form.  You may
5  answer.
6      THE WITNESS:  I -- I'm not sure.  I -- I
7  don't know --
8      BY MR. BRUSTIN:
9      Q.   Sir, as you sit here --
10     A.   -- what the DA did -- I don't know what
11 the DA did after we arrested Valentino Dixon.
12     Q.   As -- as you sit here today -- well,
13 you did a number of investigative steps after you
14 investigated Valentino Dixon, correct?
15     A.   There were several things that I did
16 several days after.
17     Q.   All right.  You -- you -- as far as you
18 know, no steps were taken to investigate whether
19 either of the Jackson brothers had a gun or whether
20 there was a -- withdrawn.
21     As far as you know as you sit here today,
22 you are not aware of any steps that were taken to
23 follow up on the information that Adams gave you of
24 a second gun by the group of people who were
25 shooting, correct?

