1      A.   From my vantage point, you are correct.

2      Q.   You're not aware of a single thing that

3  happened.

4      A.   No, sir.

5      Q.   All right.  You certainly didn't take

6  any steps to follow up on that.

7      A.   No, I did not.

8      Q.   And in fact, you're not aware of any

9  steps that were taken to investigate whether, in

10  fact, as certain witnesses reported, Torri Jackson

11  had a gun, correct?

12      A.   You are correct.

13      Q.   You do agree, though, that numerous

14  witnesses reported that, correct?

15      A.   Not -- no, I'm not aware of that.

16  You've got to -- you're talking about Torri Jackson

17  having a gun.

18      Q.   Yes, sir.

19      A.   I was not aware of that.

20      Q.   Well, as a general matter, you were

21  aware of a number -- you were aware that there were

22  a number of witnesses who reported that the

23  shooting took place because the Jackson brothers

24  had a gun.

25      A.   I'm not aware of that.



 1        Q.   The first you're hearing of that is me
 2   telling it to you.
 3        A.   No.  I've heard that after the arrest
 4   was made.
 5        Q.   Okay.
 6        A.   I don't know if it's contained in
 7   another statement --
 8        Q.   Right.
 9        A.   -- but I -- I know there was talk of a
10   second gun.  I believe it started with this witness
11   that I had.
12        Q.   All right.  And you -- and as -- as
13   you -- and as you sit here today, you're not aware
14   of any investigation that was conducted into
15   whether or not the Jackson brothers had a gun,
16   correct?
17        A.   Correct.
18        Q.   And you do understand that a second
19   weapon, a -- a handgun, was found at the scene.
20        A.   I'm aware of that now, yes.
21        Q.   Okay.  And you're not aware of any
22   investigation as to whether that handgun was
23   connected to the Jackson brothers.
24        A.   You are correct.
25        Q.   As far as you know, no investigation



1  was done in that regard.

2          A.   As far as I know, yes.

3          Q.   You certainly didn't do anything.

4          A.   No.

5          Q.   All right.  So -- and by the way,

6  the -- the consistent testimony from every witness

7  was that the -- Aaron Jackson -- withdrawn.

8          The consistent testimony from every witness

9  was that Aaron Jackson, Torri Jackson, and John

10 Sullivan were shot by the TEC-9, correct?

11         A.   I don't know that, I'm sorry.

12         Q.   Are you aware of any contrary evidence?

13         A.   No, I am not.

14         Q.   That was -- that was your understanding

15 as to what happened here, correct?

16         A.   Correct.

17         Q.   And that that was Valentino Dixon who

18 did it.

19         A.   It was Valentino -- at the time, yes.

20         Q.   All right.  Now -- so going back to my

21 hypothetical, assuming that Lamarr Scott was the

22 person who shot the TEC-9, you understand that the

23 only explanation -- the only reasonable explanation

24 for Emil Adams picking out Valentino Dixon

25 definitively as the shooter of the -- with the



1   TEC-9 would be if there was some suggestion by

2   police, correct?

3           MR. RUSS:  Objection to form.

4           MR. BLENK:  Form.

5           THE WITNESS:  No.

6           BY MR. BRUSTIN:

7           Q.   What other explanation could there be

8   for -- and again, assuming that Lamarr Scott was

9   actually the shooter of the TEC-9 --

10          A.   Okay.

11          Q.   -- and assuming that Emil Adams

12  definitively picked out Valentino Dixon as the

13  person who was firing the TEC-9, what other

14  explanation could there be?

15          MR. RUSS:  Objection to form.  You may

16  answer.

17          BY MR. BRUSTIN:

18          Q.   Other than police suggestion?

19          MR. RUSS:  Objection to form.  You may

20  answer.

21          THE WITNESS:  Well, the very easy one, that

22  the gentleman that witnessed it, Emil, made his

23  mistake in who was actually firing the gun.

24          That's an explanation.

25          BY MR. BRUSTIN:



```
1          Q.   Okay.
2          A.   I don't think that the police suggested
3    that in any way.
4          Q.   Okay.  So you would agree, though, that
5    one way that -- one explanation for Emil Adams
6    describing Lamarr Scott --
7          A.   Right.
8          Q.   -- Lamarr Scott being the shooter and
9    him identifying Valentino Dixon would be,
10   hypothetically, if there was police suggestion.
11         MR. RUSS:  Objection to form.  You may
12   answer.
13         THE WITNESS:  I -- I would not be able to
14   say.
15         BY MR. BRUSTIN:
16         Q.   You can't even -- you can't even say
17   hypothetically because it's so abhorrent --
18   abhorrent to you, right?
19         A.   No, I -- I believe that a mistake was
20   made.  I don't know what the -- you'd have to talk
21   to the witness.  I mean, I wasn't there.  I mean,
22   he's suggesting things that -- I ask a question, he
23   gives me an answer, and I type it.
24         Q.   Okay.
25         A.   That's it.
```



1          Q.   So let's -- let's be a little more

2    specific.

3          A.   Okay.

4          Q.   So first of all, to the extent that

5    anybody showed photographs to Emil Adams that night

6    in the homicide office, you would have been in a

7    position to see it, correct?

8          A.   I would have, yes.

9          Q.   All right.  And so -- first of all, I

10   take it that you deny showing Emil Adams three

11   individual photographs of Mario Jarmon, Valentino

12   Dixon, and a third person from the scene that

13   night, correct?

14         A.   I deny that.

15         Q.   And if Emil Adams said that, he is

16   either lying or mistaken.

17         MR. RUSS:  Objection to form.  You may

18   answer.

19         THE WITNESS:  He would be lying.

20         BY MR. BRUSTIN:

21         Q.   Okay.  And if anybody had shown Emil

22   Adams that early -- in the early morning hours a

23   picture of Mario Jarmon, Valentino Dixon, and a

24   third person at the scene, you would have been in a

25   position to see it, correct?



1          A.   Yes, sir.

2          Q.   And if you failed -- if you saw it and

3     failed to report it, that would be exactly as -- it

4     would be the same level of seriousness as if you

5     did it yourself, correct?

6          A.   It would be horrible.  It wouldn't be

7     done.

8          Q.   Because you would never -- you would

9     never fabricate evidence, correct?

10         A.   That is correct.

11         Q.   You would never use that kind of

12    suggestion.

13         A.   No, I would not.

14         Q.   And you would agree that whether --

15    whether Emil Adams was shown those three individual

16    photographs before or after the identification

17    procedure, it would be severe misconduct.

18         A.   It would be.

19         MR. RUSS:  Objection to form.  You may

20    answer.

21         THE WITNESS:  It would be.  It would.

22         BY MR. BRUSTIN:

23         Q.   It would be highly suggestive?

24         A.   It would be horrible.  It would be

25    illegal.



1           Q.    Okay.

2           A.    It would be suggestive, yes.

3           Q.    Okay.  And it would be a Constitutional

4    violation?

5           A.    Yes, sir.

6           Q.    It would be Brady material?

7           A.    Yes, sir.

8           Q.    All of those things, correct?

9           A.    Correct.

10          Q.    And that never happened.

11          A.    It did not happen.

12          Q.    And you do -- you recall -- you recall

13   seeing some questioning earlier that I showed you

14   regarding Mario Jarmon, correct?

15          A.    Mario Jarmon.

16          Q.    I asked you -- asked you why you hadn't

17   followed up with him --

18          A.    Yes.

19          Q.    -- about that?

20          A.    Yes.

21          Q.    How they knew each other?

22          A.    Yes.

23          Q.    Okay.  If -- if Emil Adams were to

24   testify that you told him that Mario Jarmon was a

25   criminal, he would be lying about that, too,



1  correct?

2       MR. RUSS:  Objection to form.  You may

3  answer.

4       THE WITNESS:  I don't know what I told him.

5  I don't even think I mentioned anything about Mario

6  Jarmon.

7       BY MR. BRUSTIN:

8       Q.   Okay.

9       A.   I'm not sure.

10      Q.   And it would never be appropriate, for

11 example, for you to be showing him a picture of

12 Mario Jarmon, a picture of Valentino Dixon, and a

13 picture of a third person and to suggest to him

14 that Mario Jarmon was a criminal, correct?

15      A.   I've --

16      MR. RUSS:  Objection to form.  You may

17 answer.

18      THE WITNESS:  I've answered that.  I would

19 not do it, and it didn't -- it didn't happen.

20      BY MR. BRUSTIN:

21      Q.   That would be inappropriate for many

22 reasons, correct?

23      A.   You are --

24      MR. RUSS:  Objection to form.  You may

25 answer.



 1        THE WITNESS:  My answer is yes, it would be

 2    inappropriate.

 3        BY MR. BRUSTIN:

 4        Q.   And you deny doing that?

 5        A.   I did not do that.

 6        Q.   You deny hearing it?

 7        A.   I deny hearing it.

 8        Q.   And if that happened in the early

 9    morning hours during the interview or the photo

10    array procedures, you would have been in a position

11    to hear it, correct?

12        A.   Yes, sir.

13        Q.   Now, you would agree, though, that to

14    the extent, hypothetically, Emil Adams was shown

15    an -- an individual picture of Mario Jarmon, an

16    individual picture of Valentino Dixon, and an

17    individual picture of a third person, that would be

18    an explanation as to why he would have identified

19    Valentino Dixon even if he was not the shooter,

20    correct?

21        MR. RUSS:  Objection to form.  You may

22    answer.

23        THE WITNESS:  He was only shown, I believe,

24    a picture of who Mario was by me.

25        BY MR. BRUSTIN:



 1        Q.    Sir, I'm -- I'm suggesting you're

 2    lying, okay?  Emil Adams -- Emil Adams has stated

 3    on record that he was shown three photos.  That's

 4    why I'm reading you that information.

 5        A.    I understand.

 6        Q.    So now I'm asking you to assume that

 7    Emil Adams is telling the truth, okay?  I know you

 8    deny it, but I'm asking you to assume it's true.

 9        You with me?

10        A.    I am with you.

11        Q.    All right.  Assuming Emil Adams is

12    telling the truth and he was shown a picture of

13    Valentino Dixon along with two other people from

14    the scene before the photo array, that would be the

15    kind of suggestion that could lead to a false

16    identification, correct?

17        A.    Yes.

18        MR. RUSS:  Objection to form.

19        THE WITNESS:  Yes.

20        BY MR. BRUSTIN:

21        Q.    Now, remember when I showed you the

22    question -- take a look at page 30, and you see the

23    questions:

24        Do you know Mario?

25        Answer:  Yes, I do.



1          Question:  Where does -- where does Mario

2    live?

3          On Delavan.

4          Do you see that?

5          A.   Yes, sir.

6          Q.   And so -- I know you don't recall it,

7    but one of the things that would have been

8    reasonable for you to do after this interview is to

9    do a record search on Mario Jarmon, see if he has a

10   criminal record, correct?

11         Would that have been a reasonable step to

12   take?

13         A.   Record check would have been requested.

14         Q.   That would have been a reasonable step

15   for you to take, right?

16         A.   I don't know who would have -- I would

17   have taken it, yes.

18         Q.   It would have been a reasonable step to

19   take whether you did or you didn't, right?

20         A.   Yes.

21         Q.   All right.  Now, you've already told us

22   you didn't testify at the trial or the pretrial

23   hearings, correct?

24         A.   I don't believe I did.

25         Q.   But you were still involved in the



1    case.  You were meeting with witnesses even through

2    the trial, correct?

3          A.   No, I did not.

4          Q.   Don't remember seeing any paperwork on

5    that?

6          A.   No, I didn't deliver any subpoenas for

7    the District Attorney's office.  I didn't pick up

8    any witnesses for this particular case or work with

9    the District Attorney's case.  They -- they did

10   almost everything for the prosecution.

11         Q.   So your testimony here today is that

12   your involvement in the case ended after -- within

13   days of the arrest of Valentino Dixon?

14         A.   It went about four or five days, yes.

15         Q.   And then that's all you did.

16         A.   That's it.  Oh, excuse me, in

17   December there was one other thing that I did.

18         I talked to someone.  I don't know whether

19   it was a parent, but there was some indication that

20   maybe a girl had witnessed something.  I believe

21   there's a P73 to that, but it's in December.

22         That was my only other involvement.  I made

23   a report on that.  Could have been a parent, or it

24   could have been a girl, it could have been an

25   independent witness, but nothing came -- came of



```
 1   it.
 2        Q.   You did an investigation into a woman
 3   named Tamara Frieda, correct?
 4        A.   If I could see that report, I would be
 5   able to tell you.  That's -- it should be in
 6   December.
 7        Q.   Okay.  That's -- that's the one I'm
 8   referring to, from December.
 9        A.   Okay.
10        Q.   And that was a follow-up from an
11   investigation that you had conducted in August,
12   correct?
13        A.   That would be the same case, yes.
14        Q.   Is there any reason why you waited
15   until December to follow up on that?
16        A.   I found out about it in December.  If I
17   can just take a look at that, I can read it and
18   give you a better -- better answer.
19        Q.   Sure.  Why don't -- why don't we do it
20   now.  So let's start with the initial report.
21        A.   Okay.
22        Q.   Take a look at page 203.
23        MR. RUSS:  Same prefix, BPD?
24        MR. BRUSTIN:  Yes, please.
25        BY MR. BRUSTIN:
```



 1          Q.   203 is you conducting an investigation
 2   on this case, correct?
 3          A.   Yes, it refers back to Torriano
 4   Jackson.
 5          Q.   Okay.  And this is you doing what
 6   homicide detectives often do, receiving information
 7   in a homicide case and following up on it, correct?
 8          A.   Correct.
 9          Q.   Don't need a DA to tell you to do it.
10   You do it on your own.  That's what -- that's what
11   homicide detectives do, correct?
12          A.   Yes, sir.
13          Q.   And that's what this report indicates,
14   correct?
15          A.   Yes.
16          Q.   And you got an anonymous -- you got an
17   anonymous call suggesting that she had -- that she
18   was an eyewitness, correct?
19          A.   Yes, sir.
20          Q.   And that Valentino was not the shooter.
21          A.   Correct.
22          Q.   And claiming that she was with two
23   other girls.
24          A.   Correct.
25          Q.   And then you asked her if she was the



 1  girl from the red Tracker, correct?

 2        A.   Yes.

 3        Q.   In other words, you recognized -- you

 4  remembered from seeing prior reports or receiving

 5  information about girls who were at a red Tracker.

 6        A.   Yes.

 7        Q.   And you had the names of those girls in

 8  the report.

 9        A.   Yes.

10        Q.   And so if she was one of three girls in

11  the red Tracker in August of 1991, as a homicide

12  detective, it would be very easy for you to find

13  out who that girl was, correct?

14        A.   Correct.

15        Q.   And you took no steps to do that,

16  correct?

17        A.   That's correct.

18        Q.   Why not?

19        A.   I have no idea.

20        Q.   Is that a -- obviously, when you --

21  after you had Lamarr Scott confessing to the crime

22  and you have a new witness who claims she was an

23  eyewitness to the scene, a girl who you hadn't

24  heard of before, what could be more important than

25  trying to find her?



```
 1          A.   Well --
 2          MR. RUSS:  Objection to form.  You may
 3   answer.
 4          THE WITNESS:  The first thing is to issue
 5   this report and give this report to the District
 6   Attorney.
 7          BY MR. BRUSTIN:
 8          Q.   Well --
 9          A.   I don't know when the trial was, if
10   they were preparing for the trial, but I did not do
11   anything further on it.
12          Q.   Do you think they were preparing for
13   the trial on August 14th?
14          A.   I have no --
15          Q.   The trial was a -- more than a year
16   later.
17          A.   I have no idea.
18          Q.   Obviously, this is something you should
19   have followed up on, correct?
20          A.   You are correct.
21          MR. RUSS:  Objection to form.  You may
22   answer.
23          BY MR. BRUSTIN:
24          Q.   If you were -- if you were acting in
25   accordance with your practices, a conscientious,
```



 1  careful detective, you would have followed up on

 2  this, correct?

 3         A.   Yes, sir.

 4         Q.   You didn't need anybody to tell you to

 5  do that.  It's very basic as a detective, correct?

 6         A.   Yes, sir.

 7         Q.   Can you think of any legitimate police

 8  reason in August of 1991 why you wouldn't have

 9  followed up with an eyewitness who says -- who

10  said -- says you have the wrong witness?

11         MR. RUSS:  So I thought we were talking

12  about the December report.

13         MR. BRUSTIN:  We're not.  We're talking

14  about page 203.

15         THE WITNESS:  Yes, this is in -- this is in

16  August.

17         MR. RUSS:  Okay.  I'm sorry.

18         BY MR. BRUSTIN:

19         Q.   We haven't gotten there yet.

20         A.   Yes.  I have no idea.

21         Q.   Okay.

22         A.   I'm -- I'm very sorry.  I don't know if

23  we were extremely busy; we had new cases; we were

24  busy running around taking statements, going to

25  crime screens.  I have no idea why we didn't follow

 1  up on this.

 2          Q.    You said you're very sorry.  Who are

 3  you -- who are you apologizing to?

 4          A.    Well, the victim.

 5          Q.    Ah.  Not to Mr. Val -- not to Mr.

 6  Dixon.

 7          A.    Well, I -- I would do the best job I

 8  could, and if Mr. Dixon did not do this shooting, I

 9  would say so.

10          Q.    Okay.  And this is an eyewitness --

11          A.    Yes.

12          Q.    -- who -- who you know from prior

13  reports -- listen to my question -- who you know

14  from prior reports has allegedly no connection to

15  either group involved in this case, who's calling

16  you on her own, correct?

17          A.    Correct.

18          Q.    And you have an -- you have many easy

19  avenues to find her, correct?

20          A.    Correct.

21          Q.    And as you've already told us,

22  oftentimes witnesses are reluctant to come forward,

23  correct?

24          A.    You are correct.

25          Q.    And they need to be -- they need to be



1  handled gently and over time to give them the

2  confidence to tell the truth, correct?

3          That's the job of a detective.

4          A.    That would be accurate, yes.

5          Q.    And you know that she wants to do the

6  right thing here because she called, correct?

7          A.    Correct.

8          Q.    And first of all, the first thing you

9  say to her -- and you write it in your report --

10  was that you told her that if she witnessed the

11  crime, she would have to come in and identify

12  herself, correct?

13          A.    Yes.

14          Q.    That's a surefire way of getting her

15  not to talk anymore, isn't it?

16          MR. RUSS:  Objection to form.  You may

17  answer.

18          THE WITNESS:  No, that's not -- not -- I was

19  telling her the truth.

20          BY MR. BRUSTIN:

21          Q.    Okay.  In any case, what a competent

22  detective would do here, which you claim you are,

23  would be to find this woman, correct?

24          A.    Correct.

25          Q.    And to try to develop a rapport with



1  her, correct?

2          A.    Correct.

3          Q.    Try to make her comfortable that you

4  could protect her and she should come in and tell

5  the truth, correct?

6          A.    Yes.

7          Q.    You took zero of those steps, correct?

8          A.    I did not follow up.

9          Q.    And this is only four days after the

10 crime.

11         A.    You are correct.

12         Q.    And two days after Lamarr Scott

13 confessed to the crime.

14         A.    You are correct.

15         Q.    The reason you didn't follow up with

16 this woman is because you understood that you had

17 engaged in misconduct with Emil Adams; you

18 understood that Lamarr Scott was the shooter; and

19 you did not want to do anything to upset the arrest

20 of Valentino Dixon.

21         Isn't that true, sir?

22         A.    No.

23         MR. RUSS:  Objection to form.

24         THE WITNESS:  No.

25         MR. RUSS:  You may answer.



1          THE WITNESS:  No, it's not.

2          BY MR. BRUSTIN:

3          Q.   So I'm just trying to get my head

4   around.  Four days later -- four days later, you're

5   writing this report --

6          A.   Yes.

7          Q.   -- right?  Just a couple days after

8   Lamarr Scott.

9          A.   Yes.

10          Q.   And at least on this page, this appears

11   to be a credible witness, correct?

12          A.   Appears, yes.

13          Q.   All right.  And the only way to -- and

14   by the way, you have a number of witnesses in the

15   case, including John Sullivan, the person that you

16   base the arrest on, with serious criminal

17   histories, right?

18          A.   I would not -- I -- I don't recall all

19   that.  I'm sorry.

20          Q.   All right.  Well, you do recall that

21   there was a dispute between the two groups --

22   between the two groups, correct?

23          A.   There was a -- there was a dispute

24   somewhere, yes.

25          Q.   Okay.  And it's clear from this



1  report -- at least it appears from this report that

2  this woman has nothing to do with that dispute.

3        A.   I don't know that.

4        Q.   Well, there's nothing suggesting here

5  that she does, correct?

6        A.   I don't know that.

7        Q.   Right.  But this -- this person has the

8  potential to be a very reliable, credible

9  eyewitness, correct?

10       A.   Correct.

11       MR. BLENK:  Form.

12       BY MR. BRUSTIN:

13       Q.   And by the way, have you ever had a

14 case before this one where you made an arrest based

15 on an eyewitness identification, and then two days

16 later, somebody else came in and confessed to doing

17 the crime?

18       A.   Could you repeat that question again?

19       Q.   Sure.  Other than this case, have you

20 had any other case where you made an arrest based

21 on eyewitness identifications, and then within a

22 day or two, another person came in and voluntarily

23 confessed that they were the person who committed

24 the crime?

25       A.   No.



1        Q.   It's an extraordinarily unusual

2   situation, correct?

3        MR. RUSS:  Objection to form.  You may

4   answer.

5        BY MR. BRUSTIN:

6        Q.   In your experience.

7        A.   It would be.

8        Q.   In all of your time in the police

9   department, has it ever happened again?

10       A.   It's hypothetical.  I don't know.

11       Q.   It's not hypothetical.  Have you ever

12  seen it happen?

13       A.   No.

14       Q.   And obviously, there are a lot of

15  possibilities as to why somebody might confess to a

16  crime they didn't commit, correct?

17       A.   Correct.

18       Q.   But absent mental illness or --

19  withdrawn.  People don't typically come in and

20  confess to murders they don't -- they didn't commit

21  if though don't have some type of mental

22  impairment, correct?

23       MR. BLENK:  Form.

24       MR. RUSS:  Objection to form.  You may

25  answer.



 1        THE WITNESS:  I'd have to have that read
 2   back to me again.
 3        BY MR. BRUSTIN:
 4        Q.   You don't have to have it read back.
 5   I'll -- if you want --
 6        A.   I believe I do.  Please.
 7        Q.   No, I'm going to -- I'm going to
 8   rephrase it for you.
 9        Typically, in your experience, people don't
10   come in and voluntarily confess to committing
11   murders that they didn't commit unless they have
12   some type of mental impairment.
13        MR. RUSS:  Objection to form.
14        MR. BLENK:  Form.
15        MR. RUSS:  You may answer.
16        THE WITNESS:  I don't know.
17        BY MR. BRUSTIN:
18        Q.   Okay.  Have you had -- in your entire
19   career, have you had anybody come in and confess to
20   a murder that wasn't the result of some type of
21   mental illness?
22        MR. RUSS:  Objection to form.
23        MR. BLENK:  Form.
24        MR. RUSS:  You may answer.
25        BY MR. BRUSTIN:



1          Q.   I'm sorry.  Let me rephrase the

2    question.

3          In your experience as a detective, in your

4    30 years -- 30 or more years as a -- 35 years as a

5    police officer, do you recall anybody coming in

6    and -- and confessing to a homicide that they

7    didn't commit for reasons other than mental

8    illness?

9          MR. BLENK:  Form.

10         MR. RUSS:  Go ahead.

11         THE WITNESS:  No.

12         BY MR. BRUSTIN:

13         Q.   Okay.  It's an extraordinary, unusual

14   situation, correct?

15         A.   Yes.

16         Q.   And when somebody comes in and

17   confesses to a murder after you've arrested

18   somebody else for that murder -- you with me?

19         A.   Yes.

20         Q.   This case.  That's what happened,

21   right?

22         A.   Okay.  I'm listening to you.

23         Q.   That confection requires the most

24   stringent follow-up investigation, correct?

25         MR. RUSS:  Objection to form.  You may



 1  answer.

 2          THE WITNESS:  Again, I -- I met someone who

 3  was a witness.  It was presented to the Grand -- to

 4  the District Attorney.  They handle the case.

 5          If they would want to enhance or they wanted

 6  to go and find further information, they would do

 7  so.

 8          BY MR. BRUSTIN:

 9          Q.   So two days later, you're on your own

10  conducting follow-up investigation of this woman in

11  the red Tracker, correct?

12          A.   At that time I was with Detective

13  Robert M. Grabowski -- that's G-A-R-B-O-W-S-K-I

14  (sic) -- for this phone call.

15          Is that what we're talking about?

16          Q.   I'm not sure what that has to do with

17  anything, but in four -- two days after Lamarr

18  Scott comes --

19          MR. RUSS:  You said he was on his own.

20          THE WITNESS:  I was on my own.

21          MR. RUSS:  He said he was with --

22          THE WITNESS:  I'm answering your question.

23          BY MR. BRUSTIN:

24          Q.   I misspoke.  You were, of your own

25  volition, not directed by the DA -- of your own

1   volition, you are investigating this homicide,

2   correct?

3           A.    Two days after, yes.

4           Q.    Two days after.  Two days after Lamarr

5   Scott said, "You arrested the wrong person; I shot

6   them," right?

7           A.    Correct.

8           Q.    All right.  So you understood that when

9   Lamarr Scott came in and confessed to this crime --

10  first time in your career that's ever happened,

11  somebody else said, "You got the wrong guy; I did

12  it" -- that confession required you, as a homicide

13  detective, to do a careful follow-up investigation

14  to see if what he was saying was true or not,

15  correct?

16          MR. RUSS:  Objection to form.  You may

17  answer.

18          THE WITNESS:  No.

19          BY MR. BRUSTIN:

20          Q.    All right.  Now, when you -- when --

21  two days later, when you received this information

22  from -- I'm going to go back to this now.  We're

23  now back on 203, okay?

24          And by the way, you, as opposed to

25  Grabowski, were the person who was most in the know



1  on what happened with Valentino Dixon and what

2  happened with Lamarr Scott and what happened with

3  the witnesses, right?

4       MR. RUSS:  Objection to form.  You may

5  answer.

6       THE WITNESS:  I was one of the detectives,

7  yes.

8       BY MR. BRUSTIN:

9       Q.  Okay.  And so when you got this piece

10  of information about this woman and you've just,

11  for the first time in your career, learned that

12  somebody else confessed to the crime and she's

13  telling you that that person was telling the truth,

14  that Valentino Dixon was not the shooter, any

15  competent detective acting in good faith would take

16  every step possible to find that woman, correct?

17       MR. RUSS:  Objection to form.

18       MR. BLENK:  Form.

19       MR. RUSS:  You may answer.

20       THE WITNESS:  No.  It was our policy to give

21  that information, this information, to the District

22  Attorney, and they would either have their

23  investigators go out to enhance it or to disprove

24  it, either way, or they would request us to go out

25  and do a follow-up.  We never --



```
 1          BY MR. BRUSTIN:

 2          Q.   Okay.

 3          A.   We never received a request.

 4          Q.   You understand, by the way, that the

 5   words you speak are being written down?

 6          A.   Absolutely, sir.

 7          Q.   And you understand that you're being

 8   tape-recorded, right?

 9          A.   Absolutely.

10          Q.   Just four minutes ago, you told me that

11   it was an error on your part not to follow up on

12   this witness.  Do you remember that, sir?

13          A.   I do, and --

14          Q.   And now you're --

15          A.   -- I'm giving you a reason.

16          Q.   Okay.  Now you're telling me that there

17   was, in fact, a policy that prevented you from

18   following up on your own; is that true, sir?

19          MR. BLENK:  Form.

20          MR. RUSS:  Objection to form.

21          THE WITNESS:  You're using the wrong word.

22          MR. RUSS:  You can answer.

23          THE WITNESS:  Again, you're using preventing

24   me from, okay?  I'm trying to tell you that that is

25   what we did.  There was nothing from -- preventing
```



1  me from doing it.  It was just that what -- that

2  was our policy of what we did.

3        BY MR. BRUSTIN:

4        Q.   Okay.  So you understand policy is a --

5  is -- means what you're supposed to do, right?  You

6  understand that.

7        A.   I understand that.

8        Q.   Okay.  And what you're telling -- are

9  you telling me now -- I'm going to give you an

10  opportunity to change it.

11        Are you telling me -- telling me now that it

12  was the policy in the Buffalo Police homicide

13  division that two days after somebody came in and

14  confessed to the crime, it was the policy that you

15  were not going to follow up on this kind of a lead

16  unless you were to -- directed to do so by the DA?

17        MR. RUSS:  Objection.

18        BY MR. BRUSTIN:

19        Q.   Is that what you're telling me?

20        MR. RUSS:  Objection to form.  You may

21  answer.

22        THE WITNESS:  That's incorrect.  No.

23        BY MR. BRUSTIN:

24        Q.   Okay.  And let's go -- let's go back to

25  the real reasons why you didn't do this.  Either



1  you are the most incompetent detective in the --

2  in -- in history, or you didn't want to know the

3  answer.  Would that be fair to say?

4        MR. RUSS:  Objection to form.  You may

5  answer.

6        THE WITNESS:  No, it is not.

7        BY MR. BRUSTIN:

8        Q.   There's no more basic step, under the

9  circumstances you faced on August 14th, having just

10  heard a confession from Lamarr Scott -- nothing

11  more basic than trying to find this woman; isn't

12  that true, sir?

13        MR. RUSS:  Objection to form.  You may

14  answer.

15        THE WITNESS:  That's not true.

16        BY MR. BRUSTIN:

17        Q.   Let's take a look at page 203.  I

18  apologize, 2 -- 258.

19        Have you reviewed this in preparation for

20  today?

21        A.   Yes, I did.

22        Q.   And you understand that Tamara Frieda

23  is the woman from the red Tracker, correct?

24        A.   We talked with a Ms. Frieda.

25        Q.   Not my question, sir.  My question is:



 1        As you sit here today, do you understand as
 2   I do from speaking with her that Tamara Frieda was
 3   the woman in the red Tracker?
 4        MR. RUSS:  Objection to form.  You may
 5   answer.
 6        THE WITNESS:  We did go there for that
 7   reason, yes.
 8        BY MR. BRUSTIN:
 9        Q.   In other words -- I'll ask it again:
10        You understand that Tamara Frieda is the
11   woman from the red Tracker, correct?
12        MR. RUSS:  Objection to form.  You may
13   answer.  The reason I'm objecting, and I know you
14   don't want me to say anything, but it never says
15   Tamara.  It says Ms. Frieda or her mother, Brenda
16   Frieda.  So the Tamara Frieda is coming from you.
17        MR. BRUSTIN:  Okay.
18        BY MR. BRUSTIN:
19        Q.   You -- you understand that the woman in
20   this report -- fair -- fair objection.
21        You understand the woman in this report is
22   the woman that you were looking for on August 14th,
23   correct?
24        A.   We talked to a Ms. Frieda, a Brenda
25   Frieda, and she indicated that it was her daughter.



1          Q.   Well, let me tell you how I know.  I
2     know because when I spoke to her, she told me that
3     she made the anonymous call, and she also told us
4     that she was in the red Tracker.
5          Are you telling me you didn't know that?
6          MR. RUSS:  Objection to form.  You may
7     answer.
8          THE WITNESS:  I did not know that.
9          BY MR. BRUSTIN:
10         Q.   All right.  So would it be fair to say
11    that the December 5th P73 is your effort, your
12    documented effort, to follow up on the woman from
13    the red Tracker who called in?
14         A.   Correct.
15         Q.   All right.  And please explain why you
16    waited four months to follow up on this.
17         A.   I have no idea.
18         Q.   All right.  And there's no suggestion
19    in this report that any -- anybody from the
20    District Attorney's office asked you to follow up,
21    correct?
22         A.   I don't think so, no.
23         Q.   Well, you -- not that you don't think
24    so.  There's no indication in this report that
25    anyone did, correct?



1          A.    That's correct, counselor.

2          Q.    And if anyone from the District

3    Attorney's office asked to you follow up, that

4    would be important to document in your report,

5    correct?

6          A.    It would be important.

7          Q.    So in other words, you were doing this

8    investigation for some other reason, correct?

9          A.    As a follow-up to this case.

10         Q.    Okay.  And you have no memory as to why

11   you did this, correct?

12         A.    No.

13         Q.    Was it just that you were busy between

14   August 14th and December 5th?  This is the first

15   time you got an opportunity to follow up?

16         A.    We were very busy.  That could be one

17   of the explanations.

18         Q.    Okay.  So probably the best explanation

19   is that the only reason you didn't follow up for

20   four months is because you were really busy.

21         MR. BLENK:  Form.

22         MR. RUSS:  Objection to form.  You may

23   answer.

24         BY MR. BRUSTIN:

25         Q.    The only reason you didn't follow up



1  with this alleged eyewitness for four months in a

2  homicide case is because you were really busy.

3        MR. RUSS:  Objection to form.  You may

4  answer.

5        THE WITNESS:  That's correct.

6        BY MR. BRUSTIN:

7        Q.   All right.  That's your testimony under

8  oath.

9        A.   It is.

10        Q.   All right.  Now, you understand how

11  absurd that is, right?

12        MR. RUSS:  Objection to form.  Don't answer.

13        BY MR. BRUSTIN:

14        Q.   You understand how important it is to

15  find and interview an eyewitness as soon as

16  possible after the crime, correct?

17        MR. RUSS:  Objection to form.  You may

18  answer.

19        THE WITNESS:  It is important.

20        BY MR. BRUSTIN:

21        Q.   And you understand how important it is,

22  to the extent that a witness can make an ID, to

23  show that witness photographs or a live lineup as

24  soon as practicable after you become aware of that

25  witness, correct?



 1        A.   Yes.

 2        MR. RUSS:  Objection to form.  You may

 3   answer.

 4        BY MR. BRUSTIN:

 5        Q.   Again, as basic as it gets for a

 6   detective, right?

 7        MR. RUSS:  Objection to form.  You may

 8   answer.

 9        THE WITNESS:  You are correct.

10        BY MR. BRUSTIN:

11        Q.   The last thing you would ever do as a

12   detective acting in good faith is wait four months

13   to interview an eyewitness and attempt to make an

14   ID, correct?

15        MR. RUSS:  Objection to form.  You may

16   answer.

17        THE WITNESS:  It was a mistake, and I admit

18   it.

19        BY MR. BRUSTIN:

20        Q.   Do you have any recollection of how you

21   noticed this mistake or who -- who -- who brought

22   it to your attention?

23        A.   You just did.

24        Q.   Well, the -- somehow you came to go

25   find her, or try to find her, four months later,



1    correct?

2         A.    Yes.

3         Q.    And that was long after it was

4    public -- it was made public that despite Lamarr

5    Scott coming in and confessing, the prosecution was

6    going forward against Valentino Dixon, correct?

7         MR. RUSS:  Objection to form.  You may

8    answer.

9         THE WITNESS:  That would be correct.

10        BY MR. BRUSTIN:

11        Q.    It was all over the papers, right?  Big

12   news.

13        A.    I don't know.

14        Q.    You remember it being in the newspapers

15   and on the news about the -- about the -- about

16   Lamarr Scott's confession and about this case?

17        A.    I remember a photo clip.  A television

18   reporter was interviewing Mr. Lamarr Scott when we

19   picked him up and placed him into a police car.

20        Q.    Okay.  And do you remember whether or

21   not indictments had gone down against people for

22   allegedly lying about Lamarr Scott being the

23   shooter?

24        A.    No.

25        Q.    One of the things that Emil Adams



1   testified to at the Grand Jury was that he observed

2   the shooting from across the street behind a metal

3   barrier -- barrier around the parking lot.  Okay?

4          A.    All right.

5          Q.    And would you agree that -- that that

6   type of description as to where he was standing

7   might suggest that there was -- that he not might

8   not have a good ability to see?

9          A.    You have a good view of everything that

10  happens at that -- you have a good view of

11  everything that happens at that corner.

12         Q.    If he was standing behind a metal

13  barrier in the parking lot, that's the kind of

14  information that might suggest his view was

15  blocked, correct?

16         A.    His view was not blocked.

17         Q.    Well, you never asked him that, right?

18         A.    I -- I've lived next to that parish,

19  that priest -- I mean, that -- that church.  I went

20  to school in that neighborhood.  I know that

21  parking lot.

22         I know that he would not be obscured from

23  witnessing anything by a barrier.  The barrier is

24  six to 12 inches high.  It's to keep cars from

25  running out of the parking lot.



1         Q.   Right.  Another thing he testified to

2    is that once the shooting started, he jumped behind

3    a car.

4         A.   I don't know that.

5         Q.   I -- I know you don't know that.

6    That's because you didn't ask him what he did when

7    the shooting started, correct?

8         A.   You are correct again.

9         Q.   All right.  And when you hear -- when

10   you receive information, for example, that

11   somebody -- somebody jumped behind the car when the

12   shooting started, what does that suggest to you?

13        A.   Those are his words.

14        Q.   What kind of follow-up question would

15   you want to ask to determine whether or not they

16   really saw the shooting?

17        A.   I was not asking those questions in the

18   Grand Jury.

19        Q.   Sir, I understand you weren't asking

20   them in the Grand Jury.  Your time to ask questions

21   was when you interviewed him the night of the

22   shooting, correct?

23        A.   And I testified that I did not ask him

24   that before.

25        Q.   All right.



1          A.   With you.

2          Q.   All right.  And you would agree that

3    if, in fact, he jumped behind the car, what you'd

4    want to know is whether or not he was able to

5    observe the shooter before he jumped behind the

6    car, correct?

7          A.   That's correct.

8          Q.   And you'd want to know what his view

9    was like from behind the car, correct?

10         A.   That's correct.

11         Q.   That would -- that would let you know

12   whether or not he was actually a reliable

13   eyewitness, correct?

14         A.   Correct.

15         Q.   Again, basic questions that a homicide

16   detective would want to ask of an eyewitness,

17   correct?

18         A.   Yes.

19         Q.   And that was again just a mistake,

20   right?

21         A.   That was a mistake.

22         Q.   Just like not interviewing Tamara

23   Frieda for four months, correct?

24         MR. RUSS:  Objection to form.

25         THE WITNESS:  That's correct.



1          BY MR. BRUSTIN:

2          Q.    Now, another important question to ask

3    an eyewitness at some point when they make an ID of

4    a suspect is whether or not they knew the suspect

5    from any other context, correct?

6          A.    Yes.

7          Q.    That's again a very basic question to

8    ask.

9          A.    Correct.

10         Q.    Can you explain why Emil Adams was not

11   asked that?

12         A.    No, I cannot.

13         Q.    Again just another mistake?  Just

14   another mistake?

15         A.    Well, once again, I'm not familiar with

16   that photo array.  I know that Detective Vickerd

17   generated it.  I don't know if Detective Vickerd

18   asked him that question, but I did not ask him that

19   question.

20         Q.    Well, you were the person who

21   documented in your report what happened during that

22   photo array, correct?

23         A.    I documented that it was done.

24         Q.    And you've already told us -- too late.

25   You've already told us that you would have seen



1  what happened during that photo array, because you

2  were in the room, remember?

3        MR. RUSS:  Objection to form.  That's not

4  what he testified.  You asked him five times if he

5  was available, if he was in the room, if he could

6  have seen it, but you didn't ask and he didn't

7  testify that he did see it.

8        BY MR. BRUSTIN:

9        Q.   You were -- whether you were standing

10 with them when he was shown the photo array or you

11 were somewhere else in the room, you would have

12 been able to see and hear what happened, correct?

13       A.   I don't think so.  You would have to

14 ask Detective Vickerd.

15       Q.   You understand that that's different

16 testimony than you give earlier, correct?

17       A.    No, that's not.  It's a different way

18 that you asked it.

19       You can point to the camera all that you

20 want.  I'm speaking of the truth.  Detective

21 Vickerd showed that photo array.  I don't know very

22 much about it.  I placed it into my notes, which

23 was in my report.

24       Q.   I understand.  So now -- I understand.

25 Now, let me -- let me make sure I understand.



1         What you're saying is now you weren't

2    present for the photo array; you didn't see it; and

3    you didn't hear what happened.

4         Is that correct, sir?

5         A.   I cannot say whether I was or I wasn't.

6    I've repeated that several times in several

7    different ways that you've asked that question.

8    You would have to ask Detective Vickerd.

9         Q.   In any case, it would have been

10   important for you -- you or Detective Vickerd to

11   ascertain whether or not Emil Adams knew the

12   person -- knew the person he picked out from any

13   other place other than the shooting, correct?

14        A.   You are correct.

15        Q.   Basic investigation work.

16        A.   Correct.

17        Q.   That either you or Detective Vickerd

18   was responsible for doing, correct?

19        A.   Correct.

20        Q.   That never happened, correct?

21        A.   It did not.

22        Q.   Just another mistake.

23        A.   Yes, sir.

24        Q.   Got a lot of mistakes so far, right?

25        MR. RUSS:  Objection to form.  Don't answer.



1          BY MR. BRUSTIN:

2          Q.   Today we've gone through a number of

3    what you -- what you have characterized as mistakes

4    in the investigation, correct?

5          A.   Yes, sir.

6          Q.   Remember when you told me at the

7    beginning of the deposition that you did absolutely

8    nothing wrong in this case?

9          A.   I feel I did not.

10         Q.   You still feel that way despite the

11   mistakes.

12         A.   I made mistakes.

13         Q.   Now, take a look at -- at page 82 of

14   Exhibit 2, please.  BPD 82.

15         A.   Page 82?

16         Q.   Yes, sir.  Your -- your complaint.

17         Okay.  Now, you've already told us that

18   you -- the process that you went through here was

19   that you would have met with the DA -- can't

20   remember which one, one of two -- and you would

21   have provided them all of the information that

22   supported probable cause, correct?

23         A.   And they would have read what was in

24   the file.

25         Q.   Okay.  Again, though, they were relying



1  on you to tell them about any problems, correct?

2         A.   We called them and asked them to come

3  to the office.

4         Q.   Okay.  And you understood it was your

5  job, as you told us earlier, to tell them about any

6  problems in the case, correct?

7         A.   It would be, yes.

8         Q.   All right.  And the basis for the

9  complaint here -- the entire basis for the

10  complaint here is John Sullivan, correct?

11        The fact that you know there was a shooting

12  and a death and John Sullivan.

13        MR. BLENK:  Form.

14        BY MR. BRUSTIN:

15        Q.   Did I accurately describe it?

16        A.   It's in -- it's in the section under

17  murder in the second degree.

18        Q.   So the only evidence that you put in

19  support of the arrest is John Sullivan, correct?

20        A.   Yes.

21        Q.   No mention of Emil Adams.

22        A.   There is no mention.

23        Q.   Okay.  And is that because you

24  understood at the time that there were problems

25  with Emil Adams' ID, including that you had



1  utilized suggestion and coercion with him?

2        MR. RUSS:  Objection to form.  You may

3  answer.

4        THE WITNESS:  No, that's incorrect.

5        BY MR. BRUSTIN:

6        Q.   So why didn't you put in this arrest

7  complaint the positive identification from Emil

8  Adams?

9        A.   This was the information I was given

10  for -- by the District Attorney, Mr. Belling, to

11  place into the -- to the information that we were

12  charging with.

13        Q.   You -- you don't even remember if you

14  met with Belling.  How do you know Belling told you

15  to do that?

16        A.   Because that's our -- that was my

17  procedure.  When I charged someone, Mr. Belling

18  would have told me what section of -- how to charge

19  him and what the narrative would be.

20        Q.   You've already told us you're not sure

21  if you met with Belling.  Why do you keep saying

22  Belling?

23        A.   Because Belling was there on this

24  particular day.  I'm not sure as to the very first

25  conversation or who was around for --



1       Q.    This -- this document --

2       A.    Hang -- hang on one second, please.

3       Q.    Look at the date on the document.

4       A.    Okay.  I am -- you're -- you're a

5  hundred percent right.  I'm getting a little

6  confused here.

7       On this particular one, I'm not sure which

8  District Attorney told me to use this narrative,

9  whether it would be Mr. Sedita or Mr. Belling.

10      Q.    So one of them told you.  Obviously you

11 would have informed them about the positive

12 identification you claim from Emil Adams, correct?

13      A.    They would have known about it because

14 they would have read the file before we got to this

15 portion.

16      Q.    Well, whether they would have read the

17 file or not, you would have told them about it.

18 You'd just done it, correct?

19      A.    I wouldn't have told them.  I asked

20 them to read his statement.  They would read the

21 statement.  They'd say, "You have enough.  Do

22 this."

23      Q.    Detective Stambach, you've already told

24 us that the process was you would meet with the

25 busy District Attorney who came down to authorize



1  the arrest, and you would give them a summary of
2  the evidence you had gathered.
3          Do you remember saying that?
4          A.   Yes.
5          MR. RUSS:  Objection to form.  You may
6  answer.
7          BY MR. BRUSTIN:
8          Q.   And so you would have mentioned --
9          A.   Stop.  Can I answer that?
10         I know exactly what you're saying.  The
11  summary that I gave him was "Here is the statement
12  that I took.  There's the file.  What do you want
13  us to do?"
14         BY MR. BRUSTIN:
15         Q.   And so for whatever reason, they --
16  they instructed you not to put in the Emil Adams
17  positive ID.
18         A.   They did not do that.
19         Q.   Why is it in here?
20         A.   I have no idea.  You would have to ask
21  Mr. Belling or Mr. Sedita.
22         Q.   Okay.  But it wasn't your decision, is
23  what you're saying.
24         A.   Oh, absolutely not.
25         Q.   All right.  Now, in order for you to



1  meet with the DAs about an arrest and to base it on

2  John Sullivan's statement, you would have, of

3  course, had to have read any statement from John

4  Sullivan, correct?

5      A.   I'd have to look at his statement.  If

6  you could give me just one minute.

7      Q.   Well, I'm just asking you generally.

8  In order --

9      A.   I don't know is my answer.  I would

10 have to look at Mr. Sullivan's statement so I could

11 refresh my recollection.

12     Q.   All right.  So let's take a look, then.

13     A.   This is 21 years ago.

14     Q.   Well, but I'm -- I'm not asking you

15 what the content was.  I'm asking --

16     MR. RUSS:  31.

17     (Mr. Thompson entered the deposition.)

18     BY MR. BRUSTIN:

19     Q.   We'll do it -- we'll do it your way.

20 Let's take a look at -- let's take a look at

21 page 16, report from Vickerd and Lonergan.

22     A.   Okay.

23     Q.   I represent to you this -- this --

24 they're describing evidence they gathered in the --

25 the early morning hours in the case.



 1        A.    You're talking 15 and 16, correct?

 2        Q.    Yes, sir.  If you take a look,

 3   though -- you don't need to read -- read -- you can

 4   read beginning on the bottom of page 15 where it

 5   says:  At this time, your writer.

 6        That's where it gets to John Sullivan.

 7        MR. RUSS:  Third paragraph from the bottom?

 8        BY MR. BRUSTIN:

 9        Q.    That's where it gets to John Sullivan.

10   Do you see that, sir?

11        MR. RUSS:  Third paragraph from the bottom?

12        THE WITNESS:  I do, but I -- I really would

13   like to --

14        BY MR. BRUSTIN:

15        Q.    Yes, I don't care.  I don't want you to

16   read it.  I have limited time.  I have lots to ask

17   you.

18        MR. RUSS:  No, he's allowed --

19        MR. BRUSTIN:  It's not about this.  I can

20   instruct --

21        MR. RUSS:  Don't answer.

22        MR. BRUSTIN:  I can instruct him not to read

23   the rest of the report.  It's not in there.

24        MR. RUSS:  Don't answer.

25        BY MR. BRUSTIN:



1          Q.   I'm going to ask one more time.  Do you

2    want to go read it?  Go ahead and read it.  It has

3    nothing to do with John Sullivan.  I'm representing

4    that to you.  Your counsel can tell you the same

5    thing.

6          A.   Thank you.

7          MR. RUSS:  If you show a document to a

8    witness and you want him to answer questions about

9    the document, he's allowed to read it.

10         MR. BRUSTIN:  All right.  Go ahead and read

11   it.  Let me know when you're done.

12         THE WITNESS:  Thank you.

13         BY MR. BRUSTIN:

14         Q.   Okay.  Do you have that in mind?

15         A.   Yes, sir.

16         Q.   Take a look at page 76 now.

17         A.   All right.

18         Q.   Q&A.  You don't have to read it.  I

19   just want to make sure you see it.  It says Q&A

20   with John Sullivan, do you see, at 1430 hours?

21         Sir?

22         A.   Yes, I do.

23         Q.   Not going to read it now.  Not going to

24   ask you about it right now.

25         A.   All right.



1        Q.   If you need to read -- I can show you

2   portions.  If you need to read it, you can do it

3   later.

4        So you see that there are two statements

5   taken from John Sullivan that are -- that are --

6   that are -- must be the basis for the arrest report

7   complaint based on John Sullivan, correct?

8        A.   One's an interview, and one's a sworn

9   statement.

10       Q.   All right.  And obviously, before

11   meeting with the DA and asking to authorize an

12   arrest based on John Sullivan, you would have read

13   these reports, correct?

14       A.   No.

15       Q.   No?  So it's your testimony that you

16   did not read these reports before you met with the

17   DA at 4:30 p.m. on the 10th to get an arrest

18   authorized.

19       A.   I'm taking a statement, and Detective

20   Masecchia is taking a statement at the same time.

21       Q.   I'm not asking if you were at the

22   interview.  I'm asking if you would have read the

23   statement.

24       A.   I'm not sure.

25       Q.   Can you think of a legitimate police



1    reason why you wouldn't have read it?

2         A.   I'm not sure about this particular

3    interview or statement.

4         Q.   That's not my question.  My question

5    was:  This is a statement.

6         (Mr. Sahasrabudhe entered the deposition.)

7         BY MR. BRUSTIN:

8         Q.   The first -- there's an initial

9    statement taken at the hospital.  You saw that,

10   right?

11        A.   An -- an interview.

12        Q.   An interview at the hospital.

13        A.   Yes, sir.

14        Q.   And then there's a statement taken in

15   the precinct.

16        A.   At the --

17        Q.   There's an initial statement taken at

18   the hospital -- initial interview at the hospital.

19        A.   Correct.

20        Q.   You're being precise.  I appreciate

21   that.  Then there's a -- then there's a statement

22   taken some hours later at the precinct, correct?

23        A.   Correct.

24        Q.   While you're at the precinct doing

25   another interview, correct?



1          A.   Correct.

2          Q.   All happening at the same time.

3          A.   Correct.

4          Q.   All talking to one another about what's

5    going on.

6          A.   Correct.

7          Q.   Very interested in what they're finding

8    out, right?

9          A.   Correct.

10          Q.   Explain to me any legitimate police

11   reason for not reading the statements concerning

12   John Sullivan, either the interview statement or

13   the statement itself, prior to asking that

14   Valentino Dixon be arrested for murder.

15          MR. RUSS:  Objection to form.  You may

16   answer.

17          THE WITNESS:  I -- I don't know.

18          BY MR. BRUSTIN:

19          Q.   All right.  In other words, if you were

20   doing your job, what would be very important for

21   you to do before asking that an arrest be

22   authorized is to read these statements of John

23   Sullivan, correct?

24          A.   Correct.

25          Q.   That would be, again, a very basic step



1  for a homicide detective before asking for an

2  arrest, correct?

3       A.   You are correct.

4       Q.   All right.  And so if you were doing

5  your job, you would have read these statements,

6  correct?

7       MR. RUSS:  Objection to form.  You may

8  answer.

9       THE WITNESS:  Correct.

10      BY MR. BRUSTIN:

11      Q.   Do you have any reason to believe that

12  you -- that you didn't read these statements?

13      A.   No.

14      Q.   And one of the things you would be

15  reading these statements for were -- would be to

16  see whether or not John Sullivan was a reliable

17  witness, correct?

18      A.   Correct.

19      Q.   Because, as you told us, it's very

20  important, when you're assessing whether somebody

21  should be arrested for a murder, to critically

22  review the evidence before asking the DA for an

23  arrest, correct?

24      A.   Yes.

25      MR. RUSS:  Objection to form.



```
 1          BY MR. BRUSTIN:

 2          Q.   Now, if you'll go back to page 16 --

 3     well, let's start actually on the bottom of 15, all

 4     right?  It says:

 5          Your writer then spoke with John Sullivan.

 6     He informed me that he was on the corner of Bailey

 7     and Delavan with his friend, Fred Stencil.

 8          A.   Can you -- okay.

 9          Q.   Now, what does that sentence suggest to

10     you about Fred Stencil?

11          A.   That he was there.

12          MR. RUSS:  Objection to form.  You may

13     answer.

14          BY MR. BRUSTIN:

15          Q.   What could he be, maybe?

16          A.   A witness.

17          Q.   Okay.  What should have happened with

18     Fred Stencil?

19          A.   Picked up and taken an interview or

20     a -- a sworn statement from him.

21          Q.   Okay.  And if he says he saw anything,

22     ID procedure, correct?

23          A.   Correct.

24          Q.   All documented, if it happened,

25     correct?
```



```
 1          A.   Correct.

 2          Q.   All right.  Then it says a detailed

 3   description of what he saw, beginning with:  A

 4   fight broke out.

 5          Do you see that -- that paragraph on

 6   page 16, top of 16?

 7          A.   Okay.

 8          Q.   He's describing very clearly seeing the

 9   person he identifies as Tino, according to this

10   report, go to -- behind a van and come out with a

11   black Uzi, right?

12          A.   Yes.

13          Q.   In other words, this witness is

14   describing seeing someone named Tino, who he knows,

15   according to this, go -- retrieve a weapon from a

16   van, correct?

17          A.   Yes.

18          MR. BLENK:  Form.

19          BY MR. BRUSTIN:

20          Q.   All right.  A very specific description

21   of what he saw, correct?

22          A.   Yes.

23          Q.   And obviously, there's all kinds of

24   follow-up to do with that information, if it's

25   true, correct?
```



1       A.   Yes.

2       Q.   You want to find the van, right?

3       A.   Yes.

4       Q.   Want to find out whether or not other

5  people can corroborate -- corroborate that version

6  of events.

7       A.   Correct.

8       Q.   All right.  Now let's take a look at

9  page 76.  Okay.  Are you there?

10      A.   Yes.

11      Q.   Read the -- read the Q&A on the top of

12  the page, the substantive Q&A beginning with:  The

13  Buffalo Police Homicide Bureau.  Okay?

14      MR. RUSS:  Read it to himself?

15      MR. BRUSTIN:  Yes, please.

16      BY MR. BRUSTIN:

17      Q.   Okay.  Have you had a chance to read

18  that -- that -- just that Q&A?

19      A.   I'm -- I'm halfway through it.

20      Q.   Just the two questions.  The one

21  question, sorry.

22      A.   Which one do you want me to --

23      Q.   All I want is the -- the -- the Q&A at

24  the top, the --

25      MR. RUSS:  The long question and the long



 1  answer.

 2          THE WITNESS:  Sure.  I've read it.

 3          BY MR. BRUSTIN:

 4          Q.   Okay.  So you would agree that the

 5  description here is radically different than what

 6  he describes in the interview, correct?

 7          MR. RUSS:  Objection.

 8          BY MR. BRUSTIN:

 9          Q.   No mention of a van, no mention of

10  seeing him get the gun, correct?

11          MR. RUSS:  Objection to form.  You may

12  answer.

13          THE WITNESS:  I don't think it's radical,

14  but I think that it's different.

15          BY MR. BRUSTIN:

16          Q.   Okay.  In other words, he is here

17  describing in the Q&A not seeing the person he

18  identifies as Valentino Dixon and not seeing the

19  gun until just before the shooting, correct?

20          A.   You are correct.

21          Q.   That is a -- a major inconsistency;

22  would you agree, sir?

23          A.   It's an inconsistency.

24          Q.   All right.  And obviously something

25  that, had you read these, as a trained detective,



 1  you would have noticed.

 2         A.    You are correct.

 3         Q.    And so presumably, this is something

 4  you raised with the DA when you met with them,

 5  correct?

 6         MR. RUSS:  Objection to form.  You may

 7  answer.

 8         THE WITNESS:  I don't know if I did that or

 9  not.

10         BY MR. BRUSTIN:

11         Q.    Maybe just a mistake?  You didn't

12  notice it?

13         MR. RUSS:  Objection to form.  You may

14  answer.

15         THE WITNESS:  I don't know if I did that or

16  not.

17         BY MR. BRUSTIN:

18         Q.    Now, by the way, if you take a look at

19  the second part of this, this statement includes

20  the ID procedure that was done with John Sullivan,

21  correct?

22         MR. RUSS:  What's the second part?

23         MR. BRUSTIN:  Page 77.  The second part

24  of the -- second page of the statement.

25         BY MR. BRUSTIN:



 1          Q.   It documents the actual ID procedure,
 2   correct?
 3          A.   In other words, it -- it describes?
 4          Q.   It actually does a Q&A during the ID
 5   procedure, correct?
 6          A.   It would be an ID procedure in the
 7   sworn statement, yes.
 8          Q.   Okay.  And why wasn't that done -- why
 9   wasn't there a sworn statement done in connection
10   with the Emil Adams ID procedure like this?
11          A.   He did describe -- Emil Adams did
12   describe two people.
13          Q.   My question is why isn't there a Q&A
14   for the actual ID procedure as there is here, a
15   sworn statement for the ID procedure.
16          A.   It's -- it's in his statement.
17          Q.   The actual ID procedure is not.
18          A.   Not that specific way, but he does
19   describe the two people.
20          Q.   No, my question is why isn't the ID
21   procedure --
22          A.   It didn't have to be done.  He had
23   already done it.
24          Q.   All right.  Now, obviously, that's the
25   kind of contradiction that you, as a homicide



1  detective, would want to explore with the witness,

2  correct?

3        A.   Yes.

4        Q.   You want to know whether that was an

5  innocent mistake or whether or not it actually

6  indicates that he was unreliable.

7        A.   Yes.

8        Q.   In other words, John Sullivan should

9  have been interviewed again and questioned about

10  these inconsistencies, correct?

11        A.   Yes.

12        Q.   And as the person who was responsible

13  for presenting information to the DA on the arrest,

14  including about John Sullivan, you would have

15  shared responsibility for doing that, correct?

16        A.   I would be one of the members, yes.

17        Q.   And the failure to do that in this

18  case, again, just another mistake.

19        A.   Have to ask Detective Masecchia about

20  that.

21        Q.   Well, if you were aware of it because

22  you were presenting it to the DA, you had an equal

23  obligation to follow up on it, correct?

24        A.   I'm not the presenter.  I -- I know

25  that he -- he arrived at our office.  We don't



 1    present things as whole.  We just --
 2          Q.   You -- you discuss them.
 3          A.   We discuss it, but I -- I'm not the
 4    presenter saying, "Here's what we got.  Should we
 5    lock him up?"  I wasn't the presenter.
 6          Q.   You asked them to come --
 7          A.   I asked them to come.
 8          Q.   Hold on.  Hold on.  You asked them to
 9    come because you believed you had probable cause to
10    make an arrest, correct?
11          A.   Yes.
12          Q.   And you wanted them to okay that.
13          A.   No, I didn't want them to okay it.  I
14    wanted them to look at it and make a determination.
15          Q.   You wanted them -- I -- that's a better
16    way of saying it.
17          What you really wanted, because you're such
18    a conscientious detective, is you wanted them to
19    come in and make an objective assessment about
20    whether or not he should be arrested, correct?
21          A.   That's correct.
22          Q.   And in order for them to make that
23    objective assessment, you understood it was your
24    responsibility to provide them all the information
25    and all the observations you made, correct?



1          A.    That I made, yes.

2          Q.    Including your review of reports about

3    John Sullivan, correct?

4          A.    Again, that would be Detective

5    Masecchia.

6          Q.    Was Masecchia with you when you were

7    meeting with the DA?

8          A.    I believe he was there.

9          Q.    Do you remember that?

10         A.    No, I don't.

11         Q.    So how could you remember -- by the

12   way, how could you remember Masecchia being there

13   if you don't even remember which DA you met with?

14         A.    Because he took the statement.  It's

15   clearly marked.  It's in the file.

16         Q.    You have no memory what -- the only

17   person who's mentioned on the complaint or the

18   arrest report is you, correct?

19         A.    You're correct.

20         Q.    You were the person who was taking

21   responsibility for the arrest, correct?

22         A.    I was the one that made the arrest.

23         Q.    How was that determined?

24         A.    I have no idea.

25         Q.    Regardless, it became your



1  responsibility, correct?

2      A.   Correct.

3      Q.   And you took that responsibility

4  seriously.

5      A.   I do.

6      MR. BRUSTIN:  Can we take a five-minute

7  break?

8      MR. RUSS:  Sure.

9          (A recess was then taken at 3:18 p.m.)

10         (Mr. Russ left the deposition.)

11         (On the record: 3:26 p.m.)

12     BY MR. BRUSTIN:

13     Q.   Okay.  Detective, I want you to take a

14 look at -- these are -- what I've just handed you

15 is a binder of Exhibits that have been marked in

16 previous depositions.

17     A.   Sure.

18     Q.   So I want you to take a look at Exhibit

19 Number 5.

20     MR. SAHASRABUDHE:  Is this the same binder,

21 based on the label?

22     (Discussion off the record.)

23     BY MR. BRUSTIN:

24     Q.   And this indicates that in November of

25 '92, on November 7th, November 8th -- and



1   November 8th, you are making efforts to find Emil

2   Adams, correct?

3        A.   Yes.

4        MR. SAHASRABUDHE:  Object to the form of the

5   question.  You can answer.  If you know.

6        THE WITNESS:  Yes.

7        BY MR. BRUSTIN:

8        Q.   Okay.  And that's another action you

9   were taking in connection with this case, correct?

10       A.   Yes, sir.

11       Q.   And at whose direction were you doing

12  that?

13       A.   It -- as -- as it's listed, I would

14  believe that it would have to be from the District

15  Attorney's office.

16       Q.   Okay.  And did you have any contact

17  with Emil Adams at that time?

18       A.   On the 7th and the 8th, I did not.

19       Q.   At any time around that time period in

20  connection with the material witness order?

21       A.   No, I did not.

22       Q.   Do you deny making any threats to Emil

23  Adams around this time?

24       A.   No, I did not.

25       Q.   In other words, you deny it.



1         A.    I deny it.

2         Q.    This is another step that you had

3   forgotten that you took in this case, correct?

4         A.    Absolutely.  I didn't even realize

5   this -- this was a generated report.

6         Q.    Okay.  You can put that aside for now.

7         A.    Shut this up?

8         Q.    Please.  Now, you understand -- you

9   said you know the scene of the crime very well

10  from -- from working in that area, correct?

11        A.    I grew up there.

12        MR. SAHASRABUDHE:  Object to the form.

13        THE WITNESS:  I grew up there.

14        BY MR. BRUSTIN:

15        Q.    And you understand that if you're

16  standing at the church across the street, you'd be

17  more than a hundred feet away from where the

18  shooting occurred, correct?

19        MR. SAHASRABUDHE:  Object to the form.

20        THE WITNESS:  That's St. Gerard's.  You are

21  correct.

22        BY MR. BRUSTIN:

23        Q.    Okay.  And you would also -- if it was

24  nighttime, you'd be looking into -- in order to see

25  the scene of the shooting, you would be looking at



1   traffic and headlights in your direction, correct?

2        MR. SAHASRABUDHE:  Object to the form.

3        THE WITNESS:  I don't know.

4        BY MR. BRUSTIN:

5        Q.   Well, you're -- you -- you'd be

6   looking -- you'd certainly be looking at -- there'd

7   be cars in front of you across --

8        MR. SAHASRABUDHE:  Object to the form of the

9   question.  You can answer if you know.

10       THE WITNESS:  At two or three o'clock in the

11  morning, I don't know the traffic there.

12       BY MR. BRUSTIN:

13       Q.   Well, it wasn't two or three in the

14  morning.  It was closer --

15       A.   Or one o'clock in the morning.

16       Q.   One o'clock in the morning.

17       A.   Yes.  I don't think the traffic was

18  heavy at that intersection at that time.

19       Q.   And that restaurant is a popular

20  late-night restaurant, correct?

21       A.   The restaurant isn't at -- exactly at

22  the corner, but it is very popular.

23       Q.   Okay.  But you would agree, though,

24  that somebody who's standing a hundred -- more than

25  a hundred feet away at the church looking across



1  the street in the dark towards the shooting, that

2  would suggest somebody who might not be -- have a

3  good opportunity to view.

4          MR. SAHASRABUDHE:  Object to the form of the

5  question.

6          THE WITNESS:  That -- that area is very well

7  lit.  We have streetlights; we have lights for the

8  church it itself.  They're high vapor lights.

9          There is a drugstore on the corner that's

10  fully illuminated.  You know, the parking lot is

11  fully illuminated.

12          I mean, you could read a newspaper.  I don't

13  think you would have any problem at all.

14          BY MR. BRUSTIN:

15      Q.    From a hundred feet away.

16      A.    Absolutely.

17      Q.    Okay.  So that wouldn't even cause you

18  to -- to question a witness about their ability to

19  see.

20      A.    I -- I would question the distance, but

21  I wouldn't question the lighting conditions.

22      Q.    Okay.  Certainly -- and you would also

23  question whether there was traffic, correct?

24      A.    I would.

25      Q.    Whether the -- whether the -- they were



1  able to see the front or back of the shooter,

2  correct?

3          A.   Correct.

4          Q.   All kinds of questions that have to be

5  asked when you're that far away, correct?

6          MR. SAHASRABUDHE:  Object to the form of the

7  question.

8          THE WITNESS:  You're -- you're correct.

9          BY MR. BRUSTIN:

10         Q.   And all things you would have noticed

11  if you read the reports, correct?

12         MR. SAHASRABUDHE:  Object to the form of the

13  question.

14         THE WITNESS:  You are correct.

15         BY MR. BRUSTIN:

16         Q.   And obviously, to the extent that --

17  one of the things that John Sullivan testified to

18  at the trial is that he was both drinking and

19  smoking marijuana laced with cocaine that day.

20         That would be important information to learn

21  from John Sullivan, correct?

22         A.   It would be important, but again, I did

23  not interview Mr. Sullivan, and I didn't know about

24  his testimony in the trial.

25         Q.   Right.  But obviously that's -- those

1  are questions that should have been asked of him,

2  correct?

3        A.    They should have been.

4        Q.    All right.  So now I want to ask you

5  some questions about your interaction with Lamarr

6  Scott.  You recall your interview with Lamarr

7  Scott, correct?

8        A.    Yes, I do.

9        Q.    You've already told us that was the

10  only time in your career when you'd arrested

11  somebody else and a person came in and said, "I

12  committed the crime, not them"; correct?

13        A.    Correct.

14        Q.    So it was memorable for that reason.

15        A.    Correct.

16        Q.    And obviously, you understood when you

17  were interviewing Lamarr Scott that you had an

18  obligation to do a careful and comprehensive

19  interview.

20        A.    Correct.

21        Q.    Particularly -- by the time he came in,

22  you already knew he was confessing to the crime,

23  because he had done so on TV, correct?

24        MR. SAHASRABUDHE:  Object to the form.

25        THE WITNESS:  I did not know he did it on



1  TV.  I knew there was a TV channel there at the

2  time.

3       BY MR. BRUSTIN:

4       Q.   You knew before you interviewed him.

5       A.   That there was a TV camera there, yes.

6       Q.   And that he had confessed.

7       A.   That he was talking to them.  I don't

8  know if he confessed.

9       Q.   So as you -- is it your testimony when

10 you took Lamarr's -- when you took Lamarr Scott's

11 statement, you didn't know that he was taking

12 responsibility for the shooting before you started

13 talking to him?

14      A.   I believe he was, but I don't know if

15 he confessed to it.

16      Q.   Okay.

17      A.   Just a matter of words.

18      Q.   All right.  But you understood before

19 you interviewed him that he was taking

20 responsibility for the shooting despite the fact

21 that you'd arrested somebody else, correct?

22      A.   Yes.

23      Q.   So it was an extremely important

24 interview, correct?

25      A.   Yes.



1        Q.    It was important for you to be careful

2   and comprehensive in the interview you conducted,

3   correct?

4        A.    Yes.

5        Q.    And to develop information that you

6   could follow up on, correct?

7        A.    Yes.

8        Q.    Now, by the way, one of the things that

9   you learned through your Inbau and Reid training --

10  withdrawn.

11       Did you get the Inbau and Reid book along

12  with the training?

13       A.    I don't recall.

14       Q.    Okay.  Do you remember getting the

15  manual?

16       A.    No, I don't.

17       Q.    All right.  But the training that you

18  received from them was a very intensive, three-day

19  course, correct?

20       MR. SAHASRABUDHE:  Object to the form.

21       THE WITNESS:  It was two or three days, and

22  I don't think it was intense.  Very informal.

23       BY MR. BRUSTIN:

24       Q.    A lot of information, though.

25       A.    Oh, yes.



 1        Q.   And they have a whole -- they -- they

 2   teach you a process for interviewing witnesses and

 3   suspects, correct?

 4        A.   Yes, they do.

 5        Q.   And your department paid for you to go

 6   there.

 7        A.   They did.

 8        Q.   I take it --

 9        A.   Excuse me.  I don't know if we were

10   granted exemption or they paid.

11        Q.   Okay.  One of the big things that you

12   learned in the Reid training -- and I can show you

13   an example.  We'll mark it.

14        MR. BRUSTIN:  Anybody know what

15   Exhibit we're on?

16        MR. SAHASRABUDHE:  I couldn't tell you,

17   sorry.

18        (Discussion off the record.)

19        MR. SAHASRABUDHE:  Should we do Stambach 1?

20        MR. BRUSTIN:  No, I don't want to do that.

21   That's just going to confuse us all.

22        Sorry, let's just go off the record for one

23   second.  I apologize.

24             (Off the record: 3:34 p.m.)

25             (On the record: 3:35 p.m.)



1  The following was marked for Identification:

2   PLF. EXH. 14          excerpt of Criminal

3                         Interrogation and

4                         Confessions, Third Edition,

5                         seven pages

6       BY MR. BRUSTIN:

7       Q.   Okay.  Detective, I'm showing you

8  what's marked for identification as Plaintiff's 14,

9  and what -- what this is, is the -- the index and

10  the cover page for a version of the Inbau and Reid

11  training book.

12      And this is copyrighted in 1986, so it

13  certainly covers -- it's certainly before you were

14  trained, and I want to just show you a -- a couple

15  of passages from this, okay?

16      A.   Sure.

17      Q.   So, for example, if you'd take a look

18  at the last page in this book, read the sentence on

19  the top of page 173, the interrogator -- no, I'll

20  read it to you:

21      The interrogator should attempt to develop

22  information that can be corroborated by further

23  investigation, and he should seek from the suspect

24  full details of the crime and also about his

25  subsequent activities.  What should be sought



1  particularly are facts that would only be known by

2  the guilty person, e.g., information regarding the

3  location of the murder weapon or the stolen goods,

4  the means of entry into the building, the type of

5  accelerant used to start a fire, the type of

6  clothing on the victim.

7        Okay?

8        A.   Yes.

9        Q.   And so you recall that -- there's two

10 concepts in here that were -- that were critical to

11 the Reid theory of interrogations.

12       MR. SAHASRABUDHE:  Object to the form of the

13 question.

14       BY MR. BRUSTIN:

15       Q.   One -- one of -- one of them is that as

16 an interrogator, the way you determine whether or

17 not a confession is reliable is whether or not the

18 person is able to provide to you on their own

19 nonpublic information about the crime, correct?

20       MR. SAHASRABUDHE:  Object to the form.  You

21 can answer.

22       THE WITNESS:  Yes.

23       BY MR. BRUSTIN:

24       Q.   In other words, they trained you in --

25 in the Reid training that oftentime -- oftentimes,



1  for a variety of reasons, people may lie to you

2  about a crime, but the way to tell whether or not

3  it's reliable is to learn yourself about nonpublic

4  information about the crime and then see if they

5  volunteer that information, correct?

6          A.   Correct.

7          MR. SAHASRABUDHE:  Object to the form.

8          THE WITNESS:  Correct.

9          BY MR. BRUSTIN:

10         Q.   The most effective way to determine

11  whether or not a confession is reliable is whether

12  or not the -- the suspect provides to you nonpublic

13  information about how the crime was committed that

14  only the police and the real perpetrator would

15  know, correct?

16         MR. SAHASRABUDHE:  Object to the form.  Are

17  you asking about Reid or his view?

18         MR. BRUSTIN:  Reid.

19         THE WITNESS:  Reid, yes.

20         BY MR. RUSS:

21         Q.   Okay.  And along with determining

22  whether or not a confession is reliable, the other

23  benefit of getting nonpublic information from a

24  suspect during an admission is powerful evidence in

25  front of a jury that they actually committed the



 1    crime, correct?

 2           A.    Yes.

 3           Q.    And so what you were trained to do in

 4    Reid is to, first of all, ascertain as much -- as

 5    much information about the crime as you could,

 6    correct?

 7           A.    Yes.

 8           Q.    So that you could determine whether or

 9    not a witness or a suspect was providing you

10    nonpublic information, correct?

11           A.    Correct.

12           Q.    And secondly, to make sure that you

13    never provided that information to the witness.

14    You simply got it from them in non-leading

15    questions, correct?

16           A.    Correct.

17           Q.    And they trained you to -- to recognize

18    how powerful an admission can be when it contains

19    information, for example, about what was stolen

20    from the victim or what the victim was wearing, if

21    that information isn't public, correct?

22           A.    Correct.

23           Q.    And you took that training, and you

24    used it in your police work, correct?

25           MR. SAHASRABUDHE:    Object to the form.



```
 1          THE WITNESS:  Yes, sir.
 2          BY MR. RUSS:
 3          Q.   It was good -- in your view, it was
 4     good common sense training that you tried to
 5     implement in your work going forward, correct?
 6          A.   It was good training.
 7          Q.   And the second -- another -- another
 8     basic concept that you learned through your Reid
 9     training, and probably other training as well, is
10     that it is very important to follow up on
11     information you receive during an admission to
12     determine whether or not it's reliable, correct?
13          A.   I don't remember follow-up, but it's
14     very important.
15          Q.   Okay.  You knew that anyways.
16          A.   I knew that.
17          Q.   All right.  But where it says -- so
18     when it says the interrogator should attempt to
19     develop information that can be corroborated by
20     further investigation, although you don't recall
21     learning that in Reid training, that was something
22     you understood by 1991 was important to do.
23          MR. SAHASRABUDHE:  Object to the form.
24          BY MR. BRUSTIN:
25          Q.   Correct?
```



1        A.   Yes.

2        Q.   In other words, to try to develop --

3   and by the way, you understood by 1991 that

4   oftentimes people confess to crimes or give you

5   incriminating information that's only partially

6   true.

7        A.   Sometimes they do that, yes.

8        Q.   Doesn't mean that they don't -- they're

9   not accurately confessing to committing the crime.

10  They don't always give the police all the

11  information, correct?

12       A.   You're correct.

13       Q.   For all the reasons -- for a lot of

14  reasons, including the reasons we discussed

15  earlier, which they don't trust the police, right?

16       A.   That's correct.

17       Q.   And one of your jobs as a detective by

18  1991 was to ask questions that would give you

19  information that you could follow up on to

20  determine if it was reliable, correct?

21       A.   Yes.

22       Q.   And one of the things, for example,

23  you're always looking for in a case -- in a -- in a

24  homicide case is physical evidence that can be

25  connected to the shooter, correct?



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   Witnesses make mistakes, right?

5          A.   Yes.

6          Q.   If you can get hard, scientific

7     evidence, you always want that, correct?

8          A.   Correct.

9          Q.   And you understood in 1991 --

10    withdrawn.  This case in particular was a brutal

11    shooting, correct?

12         MR. SAHASRABUDHE:  Form.

13         THE WITNESS:  It was a bad shooting.

14         BY MR. BRUSTIN:

15         Q.   Torri Jackson was hit multiple times

16    with a -- with a -- with an automatic weapon,

17    correct?

18         A.   You're correct.

19         Q.   There was blood everywhere.

20         A.   I don't know.  I wasn't at the scene,

21    but there would be.

22         Q.   You would expect there to be blood

23    everywhere.

24         A.   Four victims, yes.

25         Q.   With -- with more than 30 shots fired,



```
 1  right?

 2       A.   Yes.

 3       Q.   And so one of the things as a trained

 4  detective you would be looking for is whether or

 5  not the shooter -- withdrawn.

 6       You also understood that the shooter was

 7  standing directly over the victim when he was

 8  shooting him.

 9       MR. SAHASRABUDHE:  I object to the form.

10       THE WITNESS:  I'm not sure of that.

11       BY MR. BRUSTIN:

12       Q.   Well, if the reports say that, you

13  would have known it then, correct?

14       MR. SAHASRABUDHE:  Object to the form.

15       THE WITNESS:  Known it when, sir?

16       BY MR. BRUSTIN:

17       Q.   By the time you interviewed Lamarr

18  Scott four days after the shooting and you had

19  Valentino Dixon arrested, you would have known what

20  was described about how the shooting occurred from

21  reports, correct?

22       A.   Yes.

23       Q.   All right.  And so if the shooting was

24  described as the shooter standing over the victim

25  and firing even more shots from an automatic rifle,
```



1   you would know that, correct -- or that -- a

2   pistol, you would know that, correct?

3          MR. SAHASRABUDHE:  Object to the form.

4          THE WITNESS:  I'm -- I'm not sure of that.

5   I'm -- I'm -- I'm trying to remember --

6          MR. SAHASRABUDHE:  Just answer -- just

7   answer the question you're asked.

8          THE WITNESS:  I'm not sure.

9          BY MR. BRUSTIN:

10         Q.   I'm not asking you if you remember it

11  factually.  I'm saying if that's what the reports

12  indicate, you would have known, correct?

13         A.   Correct.

14         MR. SAHASRABUDHE:  Object to the form.

15         BY MR. BRUSTIN:

16         Q.   And you would expect that if the

17  victims, and especially the victim who died, was

18  shot at close range with an automatic weapon -- you

19  would expect that there might be, for example,

20  blood splatter on the shooter.

21         MR. SAHASRABUDHE:  Object to the form of the

22  question.

23         THE WITNESS:  You are correct.

24         BY MR. BRUSTIN:

25         Q.   All right.  And so one of the things



1  you would be interested in gathering, if possible,

2  is any -- is clothing from the suspect to see if

3  there was physical evidence you could connect to

4  the shooting, correct?

5          A.   Yes, sir.

6          MR. SAHASRABUDHE:  Object to the form.

7          BY MR. BRUSTIN:

8          Q.   If, for example, you were able -- you

9  found blood -- in 1991, you understood, although

10  you weren't a forensic expert -- you understood

11  that if Torri Jackson's blood was, for example, on

12  Valentino Dixon's clothing, that would be

13  information that a forensic analyst would be able

14  to determine.

15          MR. SAHASRABUDHE:  Object to the form.

16          THE WITNESS:  Yes.

17          BY MR. BRUSTIN:

18          Q.   And you understood that that could be

19  powerful incriminating evidence, correct?

20          MR. SAHASRABUDHE:  Object to the form.

21          THE WITNESS:  Yes.

22          BY MR. BRUSTIN:

23          Q.   And in the same way, you understood

24  that the absence of blood from clothing that a

25  suspect was wearing would be perhaps not quite as



1  powerful, but would be -- the absence of blood

2  could be exculpatory evidence.

3         A.   Correct.

4         Q.   All right.  And the same is true for

5  Lamarr Scott.  If Lamarr Scott was the shooter and

6  he shot, as I described to you, in close range with

7  the victim, you would expect there's a good

8  likelihood there could be blood.

9         MR. SAHASRABUDHE:  Object to the form.

10        THE WITNESS:  Correct.

11        BY MR. BRUSTIN:

12        Q.   And so a very basic question for a

13 detective to ask somebody who is confessing to a

14 crime is whether they would agree to give you the

15 clothing they wore on the night of the shooting.

16        MR. SAHASRABUDHE:  Object to the form.

17        THE WITNESS:  Correct.

18        BY MR. BRUSTIN:

19        Q.   Particularly if you had doubts about

20 whether they were telling you the truth.

21        A.   Correct.

22        Q.   And in addition to checking for blood,

23 you understood in 1991 that you could check for

24 gunpowder residue on clothing.

25        A.   Correct.



1          MR. SAHASRABUDHE:  Object to the form.

2          BY MR. BRUSTIN:

3          Q.   And you understood that gun -- that

4     when somebody shoots a gun, especially when they

5     shoot it repeatedly, they necessarily get gunpowder

6     residue on their hands and -- and on their

7     clothing.

8          MR. SAHASRABUDHE:  I object to the form of

9     the question.

10         THE WITNESS:  That's correct.

11         BY MR. BRUSTIN:

12         Q.   And you understand that gunpowder

13    residue on hands could be washed away or could

14    be -- dissipate after a -- a relatively short

15    period of time, correct?

16         A.   Correct.

17         Q.   But gunpowder residue on clothing could

18    last much longer.

19         MR. SAHASRABUDHE:  Object to the form.

20         THE WITNESS:  I'm not sure on that.

21         BY MR. BRUSTIN:

22         Q.   But certainly you understood that that

23    was the kind of thing you would want to check for,

24    if you could.

25         MR. SAHASRABUDHE:  Object to the form.



 1          THE WITNESS:  You're correct.

 2          BY MR. BRUSTIN:

 3          Q.    You knew that in 1991.

 4          A.    Correct.

 5          Q.    And that's a base -- when -- and so

 6    when Lamarr Jackson came in --

 7          A.    Lamarr Scott.

 8          Q.    -- Lamarr Scott came in --

 9          MR. SAHASRABUDHE:  The Ravens.  He was

10    playing for the Ravens.

11          MR. BRUSTIN:  Oh, my God.

12          MR. SAHASRABUDHE:  I was making a joke that

13    he's the quarterback for the Baltimore Ravens.

14          BY MR. BRUSTIN:

15          Q.    When Lamarr Scott came in and confessed

16    to you that he committed the murder, that he shot

17    that weapon, automatic weapon, at -- and -- and

18    killed Torri Jackson, one of the most basic

19    questions you would ask him would be "What were you

20    wearing," correct?

21          A.    Correct.

22          MR. SAHASRABUDHE:  Object to the form.

23          BY MR. BRUSTIN:

24          Q.    And "Would you be willing to give us

25    those clothes?"



1          MR. SAHASRABUDHE:  Object to the form.

2          THE WITNESS:  That would be one of the

3   questions, yes.

4          BY MR. BRUSTIN:

5          Q.   Okay.  And you'd -- the things that

6   you'd be looking for in particular would be shoes.

7   That's one thing, right?

8          A.   Yes.

9          Q.   That's a likely place there may be

10  blood.

11         MR. SAHASRABUDHE:  Object to the form.

12         THE WITNESS:  Correct.

13         BY MR. BRUSTIN:

14         Q.   And then whatever outer clothing he was

15  wearing near the gun.

16         A.   Correct.

17         Q.   Because you'd want to -- you'd want to

18  at least try to get that evidence tested to see

19  whether or not there was blood or gunpowder

20  residue, correct?

21         A.   Correct.

22         Q.   And frankly, at that range, there could

23  be skin, there could be all kinds of things, right?

24         MR. SAHASRABUDHE:  Object to the form.

25         THE WITNESS:  There might be, yes.



1        BY MR. BRUSTIN:

2        Q.   And that's the kind of evidence that

3   could be powerful inculpatory evidence or

4   exculpatory evidence, right?

5        A.   Yes.

6        Q.   In any -- in any case, though, a very

7   basic question that you would want to ask somebody

8   confessing to a crime, correct?

9        A.   Yes.

10        Q.   All right.  And so you've already told

11   us that all the information that Lamarr Scott gave

12   to you was contained in this Q&A, correct?

13        A.   Yes.

14        MR. SAHASRABUDHE:  Object to the form.

15        BY MR. BRUSTIN:

16        Q.   And can you explain why, when this man

17   voluntarily came in, confessed to the murder,

18   according to you, you never asked him whether or

19   not he'd be willing to give you his clothing?

20        A.   It was several days later.  I didn't

21   consider him to be wearing the same clothing that

22   he did when he perpetrated the -- the crime.  I

23   don't know whether it was two or three days later.

24        I didn't do it.  I didn't ask him for his

25   clothing, but -- I didn't do it.

