```
 1          Q.    Okay.  So you -- first of all, he is
 2   coming in and voluntarily confessing, correct?
 3          A.    Yes.
 4          Q.    So one strong possibility, if he
 5   committed this crime and it's a true confession, is
 6   that he would tell you what clothes he was wearing
 7   and bring them to you, correct?
 8          MR. SAHASRABUDHE:  Object to the form.
 9          THE WITNESS:  I don't know if he would bring
10   them to me.
11          BY MR. BRUSTIN:
12          Q.    Well --
13          A.    But I -- I know he would tell me.
14          Q.    If he was -- if he was -- if he was
15   willing to confess to the murder, that would
16   suggest he might be willing to give you the clothes
17   he was wearing that night, correct?
18          A.    Might, yes.
19          Q.    All right.  And the only way you would
20   learn that is by asking, correct?
21          A.    Correct.
22          Q.    It doesn't matter how much -- it
23   doesn't matter that there's four days that have
24   passed, right?
25          MR. SAHASRABUDHE:  Object to the form.
```



1       THE WITNESS:  Four days is a very long time.

2       BY MR. BRUSTIN:

3       Q.   So certainly if there was blood on the

4  clothes and it hadn't been washed, you'd expect it

5  to be there, correct?

6       A.   Correct.

7       MR. SAHASRABUDHE:  Object to the form.

8       BY MR. BRUSTIN:

9       Q.   For example, people don't typically

10  wash their shoes, right?

11      A.   You can wash your shoes.  The sneakers

12  that they have these days, you can wash them and

13  make them so that they're more white than they

14  usually are.

15      Q.   Right.  But you determined that --

16  according to you, you determined, based on your

17  investigation, that Lamarr Scott's confession

18  wasn't reliable.  Remember telling us that earlier?

19      MR. SAHASRABUDHE:  Object to the form.

20      THE WITNESS:  I don't think I said it was

21  reliable.

22      BY MR. BRUSTIN:

23      Q.   You said it was unreliable.

24      A.   I don't remember that.  I'm sorry.

25      Q.   Okay.  Well, you did.  In any case --



1          A.    Today I said that?

2          Q.    Yes.   The way that you would determine

3    whether it was reliable -- one way to determine

4    whether it was reliable would be whether --

5    withdrawn.

6          One way to determine that it was, in fact,

7    reliable would be if you have the clothes tested

8    and there was blood on it, correct?

9          A.    Yes.

10         MR. SAHASRABUDHE:  Object to the form.

11         BY MR. BRUSTIN:

12         Q.    That would be powerful incriminating

13   evidence that would support his confession,

14   correct?

15         A.    Yes.

16         Q.    And that would be a very basic,

17   important question to ask a person confessing,

18   particularly if you doubted the reliability of what

19   they were telling you, correct?

20         MR. SAHASRABUDHE:  Object to the form.

21         THE WITNESS:  I did ask him that, I believe,

22   in his sworn statement.

23         BY MR. BRUSTIN:

24         Q.    Yes?  Show me.

25         MR. SAHASRABUDHE:  Sorry, sorry, can we just



 1  clear up?  Did ask him --

 2        THE WITNESS:  Lamarr Scott.

 3        MR. SAHASRABUDHE:  Did ask him what?

 4        MR. BRUSTIN:  Well, let's take a look at it.

 5        MR. SAHASRABUDHE:  Well, sorry.  Can -- can

 6  you read the question back, please, for me?  I just

 7  want to make sure that we're clear on what --

 8        MR. BRUSTIN:  I -- I will admit we're not

 9  clear.

10        MR. SAHASRABUDHE:  Okay.

11        MR. BRUSTIN:  Let's get clear.  We're going

12  to get clear.  We're not clear about anything right

13  now.

14        BY MR. BRUSTIN:

15        Q.   I think what you told me is you

16  believed you asked him during the interview to give

17  you his clothing; is that right?

18        A.   No.  I -- I don't remember if I asked

19  him if he would -- what clothes he was wearing, but

20  I thought I did.

21        Q.   All right.  I think you did, too, so

22  let's -- what page are you on?  Can you tell me?

23        A.   I'm on 196, Lamarr Scott, but I'd have

24  to read the whole thing, please.

25        Q.   Well, I'm going to find it for you so



1  you don't have to read the whole thing, because

2  obviously you reviewed this before today, correct?

3        Sir?

4        A.    Yes, I did.

5        Q.    Not going to waste an hour of you

6  reading this.  Just look up, please, and listen to

7  me.

8        A.    It won't -- it won't take an hour.

9        Q.    Yes, you've already read this.  I'm

10 going to show you where you asked him.

11        So if you'd take a look at page 197, about

12 eight lines down:  What were you wearing that

13 night?  Right?

14        A.    Yes.

15        Q.    And what does he say?

16        A.    Black jacket, white tee shirt,

17 checkered shorts, white Nike sneakers, and a white

18 hat.

19        Q.    Okay.  And if you were a competent

20 detective acting in good faith, what would be the

21 next question you should ask?

22        MR. SAHASRABUDHE:  Object to the form of the

23 question.

24        THE WITNESS:  I'm sorry?

25        BY MR. BRUSTIN:



1        Q.   If you -- you've already told us what a

2   careful, conscientious detective you were.

3        If you were acting in a careful,

4   conscientious manner to solve this crime, what

5   would be the next reasonable question to ask?

6        MR. SAHASRABUDHE:  Object to the form of the

7   question.  That's -- if -- if you know, try to

8   answer.  That's what --

9        THE WITNESS:  I -- I don't know.

10       BY MR. BRUSTIN:

11       Q.   No ideas?  How about "Are you wearing

12   the same white sneakers now?"

13       A.   I -- that's not in the statement.  I

14   don't know.

15       Q.   Okay.  But I'm -- I know it's not in

16   the statement.  I can read.  My question is:

17       What you should have asked him is "Do you --

18   are you wearing any of those clothes now, and if

19   you're not, would you be willing to give them to

20   me," correct?

21       MR. BLENK:  Form.

22       MR. SAHASRABUDHE:  Object to the form of the

23   question.

24       THE WITNESS:  I did not ask that.

25       BY MR. BRUSTIN:



1        Q.   I -- I know you didn't ask it, sir.  My
2    question is why didn't you ask it.
3        A.   I don't -- I don't --
4        MR. SAHASRABUDHE:  Object to the form.  You
5    can answer.
6        THE WITNESS:  I don't -- I don't remember
7    how he appeared at the office.  I don't know if he
8    was wearing that type of clothing which would make
9    me indicate "I want your clothing."
10        BY MR. BRUSTIN:
11        Q.   Okay.
12        A.   I don't remember.
13        Q.   Well, he described to you shooting, at
14    close range, Torri Jackson, correct?
15        A.   That's how he described it to me.
16        Q.   Okay.
17        A.   You're saying close range.  I don't
18    know what he means by that.
19        I don't know if there's transfer of blood,
20    is what I'm trying to say to you.  I don't know.
21        Q.   Well, of course you don't know.  That's
22    why you do the testing, correct?
23        MR. SAHASRABUDHE:  Object to the form.
24        THE WITNESS:  Again, I don't know how he --
25    I don't remember how he appeared at the office.



1          BY MR. BRUSTIN:

2          Q.    Okay.  So presumably, he may have been

3    wearing the same -- you don't know.  He may have

4    been wearing the same shoes as the night of the

5    murder, correct?

6          A.    He might have been.

7          MR. SAHASRABUDHE:  Object to the form.

8          BY MR. BRUSTIN:

9          Q.    All right.

10         A.    Yes.

11         Q.    And the way to determine if he was

12   wearing the same shoes would be -- would be to ask

13   him.

14         A.    You are correct.

15         Q.    And presumably, he was -- he was

16   probably not wearing the same clothing, right?

17         A.    I don't think so, no.

18         MR. SAHASRABUDHE:  Object to the form.

19         BY MR. BRUSTIN:

20         Q.    But the -- the basic questions you

21   would be asking him are "Are you wearing any of the

22   same clothes now, and if you're not, have you

23   washed those clothes?  Would you be willing to give

24   me those clothes for analysis?"

25         MR. SAHASRABUDHE:  Object to the form.



1          BY MR. BRUSTIN:

2          Q.   Correct?

3          A.   I would have asked those questions if I

4    had belief that he was wearing the same clothes,

5    but I don't remember what he was wearing.

6          Q.   Well, it doesn't matter if he's wearing

7    the same clothes.

8          A.   But I would have asked that question.

9          Q.   Sir, listen to what I'm saying to you.

10         A.   All right.

11         Q.   It's just common sense.  Basic common

12   sense.

13         A.   Your sentences are pretty long.

14         Q.   Okay.  Well, I'll try to shorten them

15   for you.

16         A.   Thanks.  Appreciate it.

17         Q.   Once he confessed to this crime, one of

18   your basic goals would be to try to test the

19   clothing he wore the night of the murder, correct?

20         MR. SAHASRABUDHE:  Object to the form.

21         THE WITNESS:  Correct.

22         BY MR. BRUSTIN:

23         Q.   And the way to determine that would be

24   to ask him what clothes he was wearing the night of

25   the murder, correct?



 1          A.    Correct.

 2          Q.    And then the next question would be

 3   "Since you're confessing to this crime, would you

 4   mind giving us those clothes," correct?

 5          MR. SAHASRABUDHE:  Object to the form.

 6          THE WITNESS:  Correct.

 7          BY MR. BRUSTIN:

 8          Q.    And you claim you did neither of those

 9   things, correct?

10          A.    I did not.

11          Q.    But you agree that those would be basic

12   steps that should have been taken, correct?

13          MR. SAHASRABUDHE:  I object to the form.

14          THE WITNESS:  Correct.

15          BY MR. BRUSTIN:

16          Q.    And you just forgot to ask.

17          A.    No, I don't think I forgot.  I just

18   wasn't convinced that those were the clothes that

19   he was wearing the night of the shooting.

20          Q.    Well, we just established that it

21   doesn't matter if he was wearing the clothes.  The

22   reasonable --

23          A.    Well, I -- I didn't do it.

24          MR. SAHASRABUDHE:  Wait for the question.

25   There was no question.



1         THE WITNESS:  Okay.

2         BY MR. BRUSTIN:

3         Q.   Because you just made a mistake, is

4    what you're saying, correct?

5         A.   You're correct.

6         Q.   All right.  Now, what Lamarr Scott has

7    said under oath is that he offered to give you his

8    clothes; that he told you there was blood on his

9    white sneakers; and that you said, "I don't want

10   them until you get your story straight."

11        I take it you deny doing that, correct?

12        MR. SAHASRABUDHE:  I object to the form of

13   the question.

14        THE WITNESS:  I do deny that.

15        BY MR. BRUSTIN:

16        Q.   All right.  And it's just a coincidence

17   that although you understood a basic investigative

18   task would have been to try to get his clothes, you

19   deny any discussion whatsoever about obtaining his

20   clothes for testing, correct?

21        MR. SAHASRABUDHE:  Object to the form.

22        THE WITNESS:  You're correct.

23        BY MR. BRUSTIN:

24        Q.   Another thing -- let's take a look --

25   let's go back to the first page.



```
 1            (Discussion off the record.)
 2            MR. SAHASRABUDHE:  The first page of the
 3    whole Exhibit?
 4            BY MR. BRUSTIN:
 5            Q.   And I -- I take it, sir, you deny
 6    making any threats of any kind to him either before
 7    or after this statement, correct?
 8            A.   That's correct.
 9            Q.   You never told him anything like "I
10    don't believe you.  Get your story straight or --
11    or -- and get out of here."
12            Nothing like that, correct?
13            A.   I did not.
14            Q.   That would have been totally
15    inappropriate, and you didn't do it.
16            A.   I --
17            MR. SAHASRABUDHE:  Object to the form.
18            THE WITNESS:  I did not.
19            BY MR. BRUSTIN:
20            Q.   And to the extent Lamarr Scott is
21    saying that, he's lying, correct?
22            MR. SAHASRABUDHE:  Object to the form.
23            THE WITNESS:  I believe he would be lying,
24    yes.
25            BY MR. BRUSTIN:
```



1        Q.   All right.  Now, you're on -- you've

2   got 196 open, right?

3        A.   I do.

4        Q.   All right.  Now, just for a second,

5   keep that page, but take a look at page 161.

6        Have you reviewed this report before?

7        A.   Never.

8        Q.   Take a minute and read this.  Let me

9   know when you're done.

10       Actually, you know what?  Just read the

11  second paragraph.  And the third paragraph, sorry.

12       A.   Okay.

13       Q.   So no question that before you took the

14  statement from Lamarr Scott, not only did you know

15  that he was allegedly confessing to the crime, you

16  gave a briefing on the matter to other detectives,

17  correct?

18       MR. SAHASRABUDHE:  Object to the form.

19       THE WITNESS:  That's Detective DiPirro's

20  words that I -- or that your writer met Detective

21  Masecchia and we were briefed by Detective

22  Stambach, meeting and filming by Channel 2.

23       Just -- I'm -- I'm stating to Detective

24  DiPirro that that happened.

25       BY MR. BRUSTIN:



 1        Q.   Well, look at the next paragraph:

 2        They stated they would make a copy of the

 3   confession taped by them.

 4        You're in the know here.  You understand

 5   that he's confessing, correct?

 6        MR. SAHASRABUDHE:  Object to the form.

 7        THE WITNESS:  The people who are stating

 8   that they make a copy are people from the TV

 9   channel, not from me.

10        BY MR. BRUSTIN:

11        Q.   Detective, I'm -- I'm asking you

12   something very simple.

13        A.   You did.

14        Q.   This report makes clear -- you see the

15   last paragraph here?

16        A.   Yes.

17        Q.   So after you're learning about what's

18   happening on TV and after you're briefing the

19   detectives, then you take a statement from Lamarr

20   Scott, correct?

21        A.   Well, again, these are Detective

22   DiPirro's words.  I don't know the sequence of

23   events.

24        Q.   No doubt in your mind that you fully

25   understood that Lamarr Scott was coming in to give



1   a formal confession before you took the statement,

2   correct?

3           MR. SAHASRABUDHE:  Object to the form of the

4   question.

5           THE WITNESS:  There's no doubt in my mind.

6           BY MR. BRUSTIN:

7           Q.   All right.  Let's go to page 196.

8           Again, no time listed for when this

9   interview started, correct?

10          A.   Correct.

11          Q.   No time listed for when it ended,

12  correct, on page 199?

13          A.   Correct.

14          Q.   Again just forgot to do it?

15          A.   It was forgotten, yes.

16          MR. SAHASRABUDHE:  And I -- I would note for

17  the record here that some of the -- some of the

18  documents that have been supplied in discovery do

19  actually contain a picture of witnesses with

20  clocks.

21          To the extent this does, I'll --

22          MR. BRUSTIN:  If you -- if you have it, I

23  would appreciate it.

24          MR. SAHASRABUDHE:  Yes.

25          MR. BRUSTIN:  And I would have appreciated



1  it before this, but please give it to us now if you

2  have it.

3          MR. SAHASRABUDHE:  Yes.

4          BY MR. BRUSTIN:

5          Q.   All right.  Now, one of the things he's

6  providing on page 196 --

7          A.   All right.

8          Q.   I'm sorry.  Take a look -- keep page

9  196 open and look at page 158.

10         A.   158?

11         Q.   Yes.  Just keep it open.

12         A.   Okay.

13         Q.   It appears that around the same time

14  that you're interviewing -- although you don't put

15  your time down, around the same time you're

16  interviewing Lamarr Scott, Masecchia is

17  interviewing Leonard Brown, correct?

18         A.   Yes, sir.

19         Q.   And obviously you're communicating with

20  one another, correct?  All happening in the

21  homicide office.

22         A.   Correct.

23         Q.   All right.  Now let's go back to page

24  196.

25         A.   Okay.



1          Q.    And you see about eight lines down:
2     You were advised of your rights by me at Genesee
3     and Bailey.  Do you remember that?
4          A.    Yes.
5          Q.    Yes?  In other words, you interacted --
6     this is making clear that you interacted with
7     Lamarr Scott previously, correct?
8          A.    Yes.
9          Q.    And you deny any substantive
10    communication with him about the case other than
11    what's contained in this report, correct?
12         A.    Correct.
13         Q.    You deny threatening him at that time,
14    correct?
15         A.    I did not threaten him.
16         Q.    You deny telling him you didn't want to
17    see his clothing, correct?
18         A.    Correct.
19         Q.    You deny telling him to get his story
20    straight before he comes back.
21         A.    You are correct.
22         Q.    And then do you see the question and
23    answer beginning with:  The Buffalo Police Homicide
24    Squad?
25         A.    Which page, please?



```
 1          Q.    Same page, 196.

 2          A.    Okay.

 3          Q.    Middle of the page.

 4          A.    Yes.

 5          Q.    He's describing that he -- he shot

 6   these men in self-defense, correct?

 7          A.    Correct.

 8          Q.    And obviously, it would be important,

 9   once you get that information, to follow up to

10   investigate whether or not Aaron Jackson or Torri

11   Jackson or both had weapons, correct?

12          MR. SAHASRABUDHE:  Object to the form.

13          THE WITNESS:  Correct.

14          BY MR. BRUSTIN:

15          Q.    For a lot of reasons, correct?

16          A.    For a lot of reasons, yes.

17          Q.    One reason would be that if Aaron

18   Jackson had a weapon or he brought Torri Jackson

19   knowing that he had a weapon, Aaron Jackson

20   committed a crime.

21          MR. SAHASRABUDHE:  Object to the form.

22          THE WITNESS:  Correct.

23          BY MR. BRUSTIN:

24          Q.    Another reason would be that if they

25   actually -- if Lamarr Scott actually shot in
```



1  self-defense as described, it would be a different

2  charge than second-degree murder, correct?

3         A.   You are correct.

4         Q.   Variety of reasons, critically

5  important to follow up with whether or not Torri

6  Jackson or Aaron Jackson had guns, correct?

7         MR. SAHASRABUDHE:  Object to the form.

8         THE WITNESS:  You are correct.

9         BY MR. BRUSTIN:

10        Q.   And, in fact, the handgun by this time

11  you know was found -- and you -- and you know by

12  this time that, in fact, a handgun was found at the

13  scene.

14        A.   There was.

15        Q.   Consistent -- that would be consistent

16  with Lamarr Scott telling you that they fired at

17  him first, correct?

18        MR. SAHASRABUDHE:  Object to the form.

19  Fired at who?

20        THE WITNESS:  No, that there was someone

21  with a gun.

22        BY MR. BRUSTIN:

23        Q.   So --

24        A.   Someone else could have had --

25  Valentino Dixon could have had a gun.



```
 1        Q.   I didn't say it necessarily meant they
 2   had a gun, but finding a gun at the scene would be
 3   consistent with Lamarr Scott telling you that they
 4   shot at him, correct?
 5        MR. SAHASRABUDHE:  Object to the form.
 6        THE WITNESS:  Yes.
 7        BY MR. BRUSTIN:
 8        Q.   Certainly need to follow up on it,
 9   correct?
10        A.   Yes.
11        Q.   And you did absolutely nothing to
12   follow up on that, correct?
13        MR. SAHASRABUDHE:  Object to the form.
14        THE WITNESS:  No, I did not.
15        BY MR. BRUSTIN:
16        Q.   Again just a mistake, correct?
17        A.   That's not a mistake.
18        Q.   You -- you made a conscious decision
19   not to do that.
20        A.   I did not make a conscious decision to
21   do that.
22        Q.   Okay.  Now, another question you're
23   asking -- you ask here a little further down the
24   page is:  Where did you get the gun?
25        A.   Yes.
```



1          Q.   He says:  I bought it off the street.

2          And then you ask him on page 197 -- by the

3    way, do you know whether or not the gun he

4    described, a .38 silver gun with a nickel plate,

5    generally matched the description of the gun found

6    at the scene?

7          MR. SAHASRABUDHE:  Object to the form.

8          THE WITNESS:  I do know that a weapon was

9    recovered that was nickel plated at the scene.

10         BY MR. BRUSTIN:

11         Q.   Okay.  So that's another -- another --

12   another fact indicating reliability, correct?

13         MR. SAHASRABUDHE:  Object to the form.

14         MR. BLENK:  Form.

15         THE WITNESS:  Correct.

16         BY MR. BRUSTIN:

17         Q.   Question:  How many shots did you fire

18   with the TEC-9?  He says:  I emptied the clip.

19         Correct?

20         A.   Yes.

21         Q.   That's -- that's also consistent with

22   the forensic evidence developed from the scene?

23         A.   Correct.

24         Q.   Something you would expect other people

25   could know, but certainly the shooter would know,



1  correct?

2         MR. SAHASRABUDHE:  Object to the form.

3         MR. BLENK:  Form.

4         THE WITNESS:  I believe a lot of people knew

5  about it.

6         BY MR. BRUSTIN:

7         Q.   Lot of people knew that the clip was

8  emptied?  How would they know that?

9         MR. SAHASRABUDHE:  Object to the form.

10        THE WITNESS:  Just by seeing what -- what

11 had transpired at that scene and watching our

12 evidence collection unit.  I mean, there were a lot

13 of people that were there.

14        BY MR. BRUSTIN:

15        Q.   What they would know is that a lot of

16 shots were fired.  They wouldn't know that the --

17 they wouldn't know the clip was emptied, correct?

18        MR. BLENK:  Form.

19        MR. SAHASRABUDHE:  Object to the form.

20        THE WITNESS:  I -- I can't say.

21        BY MR. BRUSTIN:

22        Q.   Well, the way you know a clip is

23 emptied -- I don't know much about guns, but I know

24 that the way you know a clip is empty is because

25 when you pull the trigger, it stops shooting,



```
 1   correct?

 2          MR. SAHASRABUDHE:  Object to the form.

 3          THE WITNESS:  One of the reasons, yes.

 4          BY MR. BRUSTIN:

 5          Q.   Another indication of reliability,

 6   correct?

 7          MR. SAHASRABUDHE:  Object to the form.

 8          THE WITNESS:  Correct.

 9          BY MR. BRUSTIN:

10          Q.   Looking down further on the page -- and

11   by the way, certainly when he says the clip is

12   emptied, that's another reminder that there may be

13   blood on his clothes, correct?

14          MR. SAHASRABUDHE:  Object to the form.

15          THE WITNESS:  Again, I don't know the

16   distances, but I -- I wouldn't be able to say.  I'm

17   sorry.

18          BY MR. BRUSTIN:

19          Q.   Well, you did know the distances from

20   other reports.  You've already told us that.  You

21   would have known it at the time.

22          You did know the distances from other

23   reports, if they were there, correct?

24          A.   Correct.

25          Q.   And another way to -- to learn the
```



1  distance would be to ask him, "How close were you

2  to Torri Jackson when you shot the weapon,"

3  correct?

4        A.   There are other -- there are other

5  ways, yes.

6        Q.   Take a look at the -- the bottom of the

7  page on page 197.

8        Why are you asking questions about Mike

9  Bland being on the corner?

10       A.   I have no idea.

11       MR. SAHASRABUDHE:  Object to the form.

12       THE WITNESS:  I have no idea.

13       BY MR. BRUSTIN:

14       Q.   Certainly suggests that Mike Bland may

15  have been a witness, correct?

16       A.   I -- I don't remember.  I don't recall.

17       Q.   Question:  Where did you throw the gun?

18  In a backyard.

19       Do you see that?

20       A.   Yes.

21       Q.   And were any efforts made to locate

22  that gun?

23       MR. SAHASRABUDHE:  Object to the form.

24       THE WITNESS:  Well, I know that the crime

25  scene unit that was there would probably have

1  canvassed that area, so I think that was an effort,

2  but I did not make any efforts, no.

3        BY MR. BRUSTIN:

4        Q.   He -- he gave you a specific

5  description of where that gun was thrown, correct?

6        A.   Yes.

7        Q.   Within a -- within a -- it's certainly

8  within a number of houses --

9        A.   Yes.

10       Q.   -- that could have been checked,

11 correct?

12       A.   Yes.

13       Q.   And that was new information, correct?

14       A.   It was new to me.

15       Q.   And so why wasn't that followed up on?

16       A.   I don't know what the --

17       MR. SAHASRABUDHE:  Object to the form.

18       THE WITNESS:  I don't know what the crime

19 scene unit did at that particular scene.

20       BY MR. BRUSTIN:

21       Q.   I'm not asking you that, sir.  I'm

22 asking you:  When he told you where he threw the

23 weapon --

24       A.   And my answer again is that I --

25       Q.   -- why didn't you follow up?



1          A.    I didn't do it.

2          Q.    Just a mistake.

3          A.    It would be a mistake, yes.

4          Q.    Okay.  Another basic investigative task

5    that should have been done if you're acting in good

6    faith, correct?

7          MR. SAHASRABUDHE:  Object to the form.  You

8    can answer.

9          THE WITNESS:  That's correct.

10         BY MR. BRUSTIN:

11         Q.    Correct?

12         A.    That's correct.

13         Q.    If you weren't just trying to protect

14   your bad arrest of Valentino Dixon, correct?

15         MR. SAHASRABUDHE:  Object to the form of the

16   question.  Don't -- Mark, don't answer that.  Come

17   on.

18         BY MR. BRUSTIN:

19         Q.    Okay.  All right.  Another question

20   that you've asked -- asked him on page 198 is:

21   Have there been any threats or promises made to

22   you?  Do you see that?

23         A.    198?

24         Q.    Yes.

25         A.    Whereabouts are you, sir?

1          Q.    About eight lines down.

2          A.    That's correct.

3          Q.    And the reason you're asking that

4    question is because one of your theories here is

5    that he is confessing based on threats or promises

6    from Valentino or his family, correct?

7          A.    No.

8          Q.    Never heard that allegation?

9          A.    This question was asked because I'm

10   asking questions.  He's confessing to a murder.

11   "Have any threats or promises been made to you from

12   me?"

13         Q.    Okay.

14         A.    That day.

15         Q.    But you certainly do remember there

16   being discussion amongst the homicide detectives --

17   part of your determination -- withdrawn.

18         Part of your determination that Lamarr

19   Scott's confession was unreliable was your theory

20   that he had either received threats or promises

21   from Valentino or people on Valentino's behalf,

22   correct?

23         MR. SAHASRABUDHE:  Object to the form.

24         THE WITNESS:  I thought there was some

25   threat -- or some promises, monetary promises, made



1   to Lamarr Scott.

2          BY MR. BRUSTIN:

3          Q.   Okay.  And so if that was your theory

4   as to what happened, one basic investigative task

5   would have been to talk to Valentino Dixon's

6   family, correct?

7          MR. SAHASRABUDHE:  Object to the form.

8          THE WITNESS:  Correct.

9          BY MR. BRUSTIN:

10         Q.   Talk to mom.  "Can I ask you some

11  questions about your interactions with Lamarr

12  Scott," correct?

13         MR. SAHASRABUDHE:  Object to the form.

14         THE WITNESS:  We didn't do that.

15         BY MR. BRUSTIN:

16         Q.   I know you didn't do it.  The question

17  is:  If you were a -- if you were conducting a

18  conscientious, good-faith investigation, you would

19  have done it, correct?

20         MR. SAHASRABUDHE:  Object to the form.

21         THE WITNESS:  Correct.

22         BY MR. BRUSTIN:

23         Q.   You would have talked to the father,

24  correct?

25         MR. SAHASRABUDHE:  Object to the form.



1          THE WITNESS:  I didn't know his father was

2    in the picture.

3          BY MR. BRUSTIN:

4          Q.   Well -- and by the way, the time to

5    interview those kinds of witnesses is as soon as

6    possible after you learn of the information to

7    avoid the problem of them potentially working

8    together to get their stories straight, correct?

9          A.   Correct.

10          Q.   So if you're a conscientious detective

11    acting in good faith, as soon as you learn about

12    the potential for threats or promises, you want to

13    attempt to talk to the people who may have made

14    those threats or promises, correct?

15          MR. SAHASRABUDHE:  Object to the form.

16          THE WITNESS:  Correct.

17          BY MR. BRUSTIN:

18          Q.   And you don't need -- you don't need

19    anybody to tell you that.  That's just basic

20    investigative work, correct?

21          A.   It is.

22          Q.   And by the way, it's a pretty heavy

23    deal for a 19-year-old kid to admit to shooting in

24    cold blood and murdering a man on the street if he

25    didn't do it, correct?



 1          MR. SAHASRABUDHE:  Form.

 2          THE WITNESS:  I would not be able to give an

 3  opinion on that.

 4          BY MR. BRUSTIN:

 5          Q.   Really?

 6          A.   Correct.

 7          Q.   That's not -- you don't -- you don't

 8  find that a pretty heavy admission?

 9          MR. SAHASRABUDHE:  Object to the form.

10          THE WITNESS:  I get a lot of young people

11  that admit to murder.

12          BY MR. BRUSTIN:

13          Q.   Who didn't commit the crime?

14          A.   That's unique.

15          Q.   Well, that's the part I'm focussing on.

16  Committing to a crime if he didn't -- if he didn't

17  do it.

18          A.   I don't know what his motivation was.

19          Q.   You'd expect for someone to come in and

20  confess to murder, there'd have to be a pretty good

21  reason, correct?

22          MR. SAHASRABUDHE:  Form.

23          THE WITNESS:  I don't know what his

24  motivation was.

25          BY MR. BRUSTIN:



1          Q.   As a detective, you would expect
2    that -- if he was coming in to confess to a murder
3    he didn't commit, you would expect there should be
4    a good reason, correct?
5          MR. SAHASRABUDHE:  Form.
6          THE WITNESS:  Correct.
7          BY MR. BRUSTIN:
8          Q.   One reason could be mental illness.
9          MR. SAHASRABUDHE:  Form.
10         THE WITNESS:  Correct.
11         BY MR. BRUSTIN:
12         Q.   Another reason could be, I guess,
13   money.
14         A.   Correct.
15         MR. SAHASRABUDHE:  Form.
16         BY MR. BRUSTIN:
17         Q.   You'd certainly expect -- somebody
18   confessing to a murder, you'd expect them to demand
19   a lot of money to do that, right?
20         MR. SAHASRABUDHE:  Form.
21         THE WITNESS:  Correct.
22         BY MR. BRUSTIN:
23         Q.   And if that's -- something like that
24   happened, that's the kind of thing that a homicide
25   detective should be able to figure out, right?



1          MR. SAHASRABUDHE:  Object to the form.

2          THE WITNESS:  Correct.

3          BY MR. BRUSTIN:

4          Q.   It's not rocket science, right?

5          MR. SAHASRABUDHE:  Object to the form.  I

6     mean, Nick, come on.  It's not rocket science?

7          BY MR. BRUSTIN:

8          Q.   It should be pretty basic.  There are a

9     number of basic investigative steps that you could

10    take as a detective to -- to determine whether

11    somebody was given promises that caused them to

12    confess to a crime they didn't commit, correct?

13         MR. SAHASRABUDHE:  Object to the form.

14         THE WITNESS:  That's correct.

15         BY MR. BRUSTIN:

16         Q.   And that investigation should have been

17    conducted immediately, correct?

18         MR. SAHASRABUDHE:  Object to the form.

19         THE WITNESS:  Should have been.

20         BY MR. BRUSTIN:

21         Q.   Another mistake.

22         A.   You keep on getting back to the

23    mistakes.  There's also manpower.  I mean, I've

24    discussed this with you since we started this

25    today.



1    Q.   I'm going to be clear, then.

2    A.   There's manpower issues.

3    Q.   All right.  So was the failure to

4  follow up on Lamarr Scott's -- was the failure to

5  follow up on Lamarr Scott's clothing and Lamarr

6  Scott's motive for giving you a false confession a

7  manpower issue or something else?

8    A.   No.  It was a mistake.

9    Q.   Okay.

10    A.   That one issue.

11    Q.   Well, the clothes was a mistake?

12    A.   That's correct.

13    Q.   How about following up on his motive to

14  confess to committing a murder?  Was that a

15  mistake, or was that a manpower issue?

16    A.   Little bit of both.

17    Q.   Take a look at page 199.  You asked

18  Lamarr Scott whether he'd be willing to take a lie

19  detector test, correct?

20    A.   Yes.

21    Q.   And you understood in 1991 that lie

22  detectors were inadmissible in court, correct?

23    A.   That's correct.

24    Q.   But you also understood that lie

25  detectors were an important investigative tool.



 1          A.    They're -- they're very valuable.

 2          Q.    And if you have a suspect who is

 3   willing to give you a lie detector -- to take a lie

 4   detector test, you -- you would always attempt to

 5   do that if you could, correct?

 6          A.    Correct.

 7          MR. SAHASRABUDHE:  Object to the form.

 8          BY MR. BRUSTIN:

 9          Q.    And according -- withdrawn.

10          And based on the paperwork, it appears that

11   Lamarr Scott didn't show up for his scheduled lie

12   detector appointment.

13          A.    He didn't show up for the appointment.

14   You are correct.

15          Q.    Okay.  And when you have somebody

16   confessing to murder who's 19 -- 19 years old,

17   obviously what you'd want to do is you'd want to

18   attempt to get him to come to a second appointment,

19   correct?

20          A.    Correct.

21          Q.    You don't give up in a homicide

22   detective -- in a homicide investigation, right?

23          MR. SAHASRABUDHE:  Object to the form.

24          THE WITNESS:  I know a second attempt was

25   made to get him to come in.



 1          BY MR. BRUSTIN:
 2          Q.   And can you explain why that second
 3   attempt wasn't documented?
 4          A.   It was documented.
 5          MR. SAHASRABUDHE:  Object to the form.
 6          THE WITNESS:  I believe it was documented.
 7          BY MR. BRUSTIN:
 8          Q.   I -- I could be wrong, but I -- I know
 9   this file pretty well.  Do you remember seeing that
10   when you went through the file?
11          A.   I believe that Detective Masecchia and
12   Detective Sergeant Melvin Lobbett went to meet him,
13   talked to him, and told him he had to come in, and
14   he -- he didn't come in.
15          Q.   That was --
16          A.   I don't know if that's the first one.
17          Q.   I believe that was the first time.
18          A.   Well, then I stand directed and I made
19   a mistake.
20          Q.   All right.  So another mistake in this
21   investigation was --
22          MR. SAHASRABUDHE:  Object to the --
23          BY MR. BRUSTIN:
24          Q.   So another mistake in this
25   investigation was not following up with Lamarr



1   Scott to get him to come in for a second polygraph,

2   correct?

3        A.   We --

4        MR. SAHASRABUDHE:  Object to the form.

5        THE WITNESS:  We couldn't find him.

6        BY MR. BRUSTIN:

7        Q.   So -- so after -- after Lamarr Scott --

8   after Lamarr Scott didn't come in for the first

9   polygraph, your testimony is that the reason you

10  didn't attempt to bring him in for a second

11  polygraph was because he disappeared.

12       MR. SAHASRABUDHE:  Object to the form.

13       THE WITNESS:  No.

14       MR. SAHASRABUDHE:  If you --

15       THE WITNESS:  No.

16       BY MR. BRUSTIN:

17       Q.   What's the reason why there wasn't an

18  attempt for a second time to get him to take a

19  polygraph?

20       A.   I didn't follow up intensely, as you're

21  suggesting, and I didn't see him nor none of the

22  members that had contact with him saw him out at

23  that time and requested him to come in to --

24       Q.   All right.  Now, you also interviewed

25  Valentino Dixon, correct?



1          A.   Yes, I did.

2          Q.   Valentino Dixon claims that he also

3    offered to provide you clothing and to take a

4    polygraph.

5          A.   I don't know if that's true or not.

6    I'd have to look at --

7          Q.   Well, I can tell you it's not in the

8    report.

9          A.   Okay.

10         Q.   He claims he told you that, though.

11         A.   That's --

12    MR. SAHASRABUDHE:  Form.

13    THE WITNESS:  That's not correct.

14    MR. BLENK:  Form.

15    BY MR. BRUSTIN:

16         Q.   So he's lying about that.

17         A.   Yes, he is.

18         Q.   All right.  Because obviously, if

19    Valentino Dixon told you he was willing to take a

20    polygraph, you would have attempted to do that,

21    correct?

22         A.   Correct.

23         Q.   And obviously, if Valentino Dixon

24    volunteered to take a polygraph, that would be

25    important information for you to document, correct?



1        A.    Correct.

2        MR. SAHASRABUDHE:  Form.

3        BY MR. BRUSTIN:

4        Q.    That's -- that's a statement consistent

5   with innocence, correct?

6        MR. SAHASRABUDHE:  Form.

7        THE WITNESS:  It would be.

8        BY MR. BRUSTIN:

9        Q.    Now, why did you ask Lamarr Scott on

10  page 199 if he went to a bar and bragged about this

11  shooting?

12       A.    Because -- because we developed

13  information from the deceased's mother and father

14  that he did do it.  One of the shooters had done

15  that.

16       Q.    You -- your -- your theory was that

17  there was only one shooter, remember?

18       A.    Not my theory.  I still think that

19  there were two people with guns there.  I don't

20  know who was doing the shooting.

21       Q.    So now your theory -- your theory then

22  was that two people had guns and were shooting?

23       A.    No, I believe that one person was doing

24  the shooting with a TEC-9.

25       Q.    Okay.



1        A.    There was another gun.  I don't know

2   whether -- whether it was a revolver.  Revolvers

3   don't eject casings.  I don't remember.

4        Q.    And you don't know whether or not that

5   was, as many witnesses stated, the weapon that

6   Torri Jackson brought to the gunfight, right?

7        A.    I don't know.

8        Q.    All right.  In any case, by all

9   accounts, the weapon that killed Torri Jackson and

10  shot Aaron Jackson was the TEC-9, correct?

11       A.    I believe so, yes.

12       Q.    What follow-up did you do on statements

13  allegedly made at a bar?

14       A.    None.

15       MR. SAHASRABUDHE:  I object to the form.

16       THE WITNESS:  None.  We didn't have the name

17  of the bar.  It was just a -- the mother or father

18  called in and said that the -- the shooter who did

19  this went to a bar and bragged about doing the

20  shooting.

21       BY MR. BRUSTIN:

22       Q.    All right.  And then you ask the

23  question at the end:  Did you talk to Tino -- did

24  Tino's mother make you turn yourself in?

25       A.    Correct.



1        Q.   In other words, indicating that you had
2    a theory that Tino's mother was somehow involved in
3    getting him to falsely confess, correct?
4        A.   I believe I saw her at the scene of
5    that -- when he was confessing.
6        Q.   Well, the theory was -- the reason you
7    asked the question --
8        A.   It's a theory.  Yes, it's a theory.
9        Q.   -- was that perhaps she was involved.
10       A.   Yes.
11       Q.   And so the next logical step would be
12   to talk to her, correct?
13       MR. SAHASRABUDHE:  Object to the form.
14       THE WITNESS:  Correct.
15       BY MR. BRUSTIN:
16       Q.   And I take it that you deny, after you
17   took the statement from Lamarr Scott, showing up at
18   different locations in town where he was and trying
19   to convince him to recant and testify that
20   Valentino Dixon was the shooter, correct?
21       A.   I never saw Lamarr Scott after I took
22   that statement.  I deny it.
23       Q.   Oh, you deny it.  So to the extent he's
24   saying that, that would be a lie, correct?
25       A.   That is correct.



1          MR. SAHASRABUDHE:  Object to the form.

2          BY MR. BRUSTIN:

3          Q.   And to the extent you didn't --

4          MR. SAHASRABUDHE:  Not saying that.  Sorry,

5    I shouldn't have said that.  Go ahead, Nick.  I

6    apologize.

7          BY MR. BRUSTIN:

8          Q.   And to the extent that that happened,

9    if it was true, that would be completely improper,

10   correct?

11         A.   It is improper.

12         Q.   And that contact would have to be

13   documented, if it happened, correct?

14         A.   You are correct.

15         Q.   And so to the extent Lamarr Scott is

16   saying that you contacted him -- you contacted him

17   after that documented interview, he would be lying,

18   correct?

19         A.   He would be.

20         MR. SAHASRABUDHE:  You okay?  You need --

21         THE WITNESS:  Yes, tired.  This medicine

22   wears me out.

23         BY MR. BRUSTIN:

24         Q.   Do you need a break?

25         A.   No.  Can I ask what time -- how far

1  we're going on this, if you don't mind?

2         MR. BRUSTIN:  So we have seven hours.

3  Let's -- let's check on that.  Let's go off the

4  record for a minute.

5         MR. SAHASRABUDHE:  Yes, off the record.

6            (Off the record: 4:27 p.m.)

7            (On the record: 4:35 p.m.)

8         BY MR. BRUSTIN:

9         Q.   All right.  I'm going to now ask you

10  some questions about some other cases you were

11  involved in, okay?

12        A.   Sure.

13        Q.   And I want to start with the Ortiz

14  case.

15        A.   Sure.

16        Q.   I take it that the Ortiz case is fresh

17  in your mind.

18        A.   Very much so.

19        Q.   You were a Defendant in that case.

20        A.   I was.

21        Q.   You sat -- you sat with -- with a

22  couple of exceptions, you sat with counsel for the

23  entire trial.

24        A.   No.  I was only in for the presentation

25  of my testimony and cross-examination.

1         Q.    Why?

2         A.    Decision was made that I didn't want to

3    look like I was influencing the witnesses.  They

4    were police officers.

5         Q.    Well, that didn't work out too well,

6    right?

7         MR. SAHASRABUDHE:  Form.  Don't answer that.

8         BY MR. BRUSTIN:

9         Q.    Were you in the -- when you -- were you

10   in the courtroom from the verdict was read?

11        A.    I was.

12        Q.    And I take it that although you weren't

13   in the courtroom, you were participating in your

14   own defense, correct?

15        A.    I did.

16        Q.    You were careful to prepare yourself to

17   testify.

18        A.    I did prepare myself.

19        Q.    You were -- you were updating yourself

20   on the testimony of other witnesses.

21        A.    Updating myself?

22        Q.    Yes.  Learning about it.

23        A.    No.  I went back to work on the days

24   that I was not requested.  I don't know what Mary

25   Evans is doing anymore.



1        Q.    Okay.

2        A.    She was one of the witnesses.  I don't

3    know what Raniero Masecchia is doing.

4        MR. SAHASRABUDHE:  So he -- he's asking if

5    you -- if you kept in -- if you kept up to date

6    with how the trial was going, the testimony was

7    going.

8        THE WITNESS:  Oh, yes.  Yes, I did.  I -- I

9    learned that -- who -- who the witnesses were for

10   that particular day.

11       BY MR. BRUSTIN:

12       Q.    Okay.  You learned in general -- you

13   learned generally what they said, correct?

14       A.    Yes.

15       Q.    All right.  It was important to you to

16   know how the trial was going, obviously.

17       A.    You're correct.

18       Q.    All right.  And you also understood by

19   the time of trial the claims that were being made

20   against you, correct?

21       A.    Correct.

22       Q.    You understood that one of the claims

23   is that you maliciously prosecuted Mr. Ortiz,

24   correct?

25       A.    Correct.



1          Q.   In other words, that you engaged in

2    misconduct that caused him to be convicted without

3    probable cause, correct?

4          MR. BLENK:  Form.

5          THE WITNESS:  Correct.

6          MR. SAHASRABUDHE:  Form.

7          BY MR. BRUSTIN:

8          Q.   And you also understood that you were

9    accused of fabricating evidence against Mr. Ortiz.

10         A.   There was no fabrication of any

11   evidence.

12         Q.   Sir, I'm not asking you -- I'm going to

13   give you a chance to tell me whether you think you

14   did anything wrong or not, but right now you

15   understood that the claim against you was that you

16   fabricated evidence in the case, correct?

17         A.   Correct.

18         Q.   That you fabricated a police report,

19   correct?

20         A.   A statement.

21         Q.   A statement.  And that you fabricated

22   information that Mr. Ortiz provided to you and what

23   you provided to him, correct?

24         A.   Correct.

25         Q.   And you also understood that you were



1   accused of coercing a confession with Mr. Ortiz,

2   correct?

3          A.   I do understand that, yes.

4          Q.   All right.  And the jury found you

5   liable on all three of those counts, correct?

6          A.   Yes, sir.

7          Q.   And in addition to that, you also were

8   found responsible for punitive damages.

9          A.   You're correct.

10         Q.   And you understood that what the jury

11  found, in substance, in layman's terms, was that

12  your conduct was so egregious that they awarded

13  additional damages to punish you, correct?

14         A.   Yes.

15         MR. SAHASRABUDHE:  Form.

16         BY MR. BRUSTIN:

17         Q.   And you understood that the jury

18  awarded $5 million in compensation to Mr. Ortiz.

19         A.   Correct.

20         Q.   And by the way, you under -- you

21  understand that the jury awarded more money than

22  Mr. Ortiz's attorney even asked for.

23         A.   Correct.

24         Q.   And you also understand that -- by the

25  way, are you -- are you going to be responsible for

1   paying that $1.5 million, to your knowledge?

2        A.    To my knowledge, no.

3        Q.    To your knowledge, you'll be

4   indemnified for the punitive damage as well?

5        A.    Yes.

6        Q.    Okay.  Now, I take it -- you've --

7   you've told us already this morning that you

8   believe Mr. Ortiz was somehow involved in the

9   crime.  That's how he knew that nonpublic

10  information, correct?

11       A.    Correct.

12       Q.    And you've also told us that you deny

13  any wrongdoing in the case, correct?

14       A.    Correct.

15       Q.    All right.  And I accept that.

16  That's -- that that's your position.

17       Obviously, the jury disagreed, correct?

18       A.    Correct.

19       Q.    They determined that you engaged in all

20  that misconduct, correct?

21       MR. SAHASRABUDHE:  Form.

22       THE WITNESS:  Correct.

23       BY MR. BRUSTIN:

24       Q.    Now, first of all -- now, in the same

25  way that you deny the allegations in the Dixon



 1  case, this case, you deny all of the allegations in
 2  the Ortiz case, correct?
 3          A.    Correct.
 4          Q.    But you understand in this case that we
 5  have claims against you for fabricating evidence.
 6          A.    Correct.
 7          Q.    And you understood that we have claims
 8  against you for malicious prosecution.
 9          A.    Correct.
10          Q.    You understand that we have claims
11  against you for coercing witnesses, correct?
12          A.    Correct.
13          Q.    All right.  So although you deny the
14  claims in both cases, you would agree that they are
15  the same claims in both cases.
16          MR. SAHASRABUDHE:  Form.
17          THE WITNESS:  Yes.
18          BY MR. BRUSTIN:
19          Q.    And more specifically, in the same way
20  that you were accused of using suggestion and
21  coercion against Mr. Ortiz, you understand that we
22  are claiming that you used the same type of
23  suggestion and coercion with Lamarr Scott, Emil
24  Adams, and others, correct?
25          MR. SAHASRABUDHE:  Object to the form.



 1          THE WITNESS:  Yes.

 2          BY MR. BRUSTIN:

 3          Q.   And in the same way that you were

 4  accused of fabricating the interactions that you

 5  had with Mr. Ortiz, what he said to you and what

 6  you said to him, you understand that we are

 7  alleging here that you fabricated what information

 8  witnesses in this case gave to you and what

 9  information you gave to them, correct?

10          A.   Correct.

11          Q.   You deny them both but admit they're

12  the same allegations.

13          A.   They are.

14          Q.   And you -- and you agree that in both

15  cases, you're being accused of making material

16  misrepresentations with -- which caused an innocent

17  man to go to prison, correct?

18          A.   Correct.

19          MR. SAHASRABUDHE:  Form.

20          BY MR. BRUSTIN:

21          Q.   Same allegations.

22          A.   Correct.

23          MR. SAHASRABUDHE:  Form.

24          BY MR. BRUSTIN:

25          Q.   And you agree -- and I'm going to get



1  to it in a minute, but you would agree that

2  although you deny engaging in any misconduct in

3  connection with the interview you conducted in Epps

4  with Ms. Anderson and -- and although you deny any

5  misconduct in the DeJac case, you would agree that

6  the allegations are the same.

7        You are being accused of misrepresenting

8  what information you provided to witnesses and what

9  information they provided to you.

10        A.   Correct.

11        MR. BLENK:   Form.

12        MR. SAHASRABUDHE:   Form.

13        THE WITNESS:   Correct.

14        BY MR. BRUSTIN:

15        Q.   In your written reports, correct?

16        A.   Correct.

17        Q.   In your communication -- and in -- in

18  your communications with the DA concerning those

19  written reports.

20        MR. SAHASRABUDHE:   Form.

21        THE WITNESS:   Correct.

22        BY MR. BRUSTIN:

23        Q.   Same allegations of misconduct in

24  Dixon, in Epps, in DeJac, in Ortiz, correct?

25        MR. SAHASRABUDHE:   Form.



1          THE WITNESS:  You mentioned DeJac.  I -- I

2    seriously was not accused of that, I don't believe.

3          BY MR. BRUSTIN:

4          Q.   Well, in -- in DeJac -- and I'll get to

5    that in a minute, but in the DeJac case, you were

6    accused of --

7          MR. SAHASRABUDHE:  Accused or -- like was it

8    in -- in the Complaint?  What are we talking about?

9          MR. BRUSTIN:  It was -- it was alleged.

10         MR. SAHASRABUDHE:  Alleged.  Thank you.

11         BY MR. BRUSTIN:

12         Q.   It was alleged in DeJac that you

13    pressured a witness named Wayne Hudson to recant

14    his statement.  Do you recall learning that?

15         A.   No, I did not make him recant or talk

16    to him.

17         Q.   I'm not -- I'm not quibbling with that

18    now.

19         A.   Okay.

20         Q.   But you understand that was the

21    allegation.

22         A.   No, I do not.

23         Q.   You don't even know that.

24         A.   I don't remember that, no, sir.

25         Q.   Do you recall the allegation of using



1  suggestion and coercion in connection with the

2  interview of Keith Cramer?

3         A.   No.

4         Q.   You don't recall that allegation.

5         A.   No.

6         MR. SAHASRABUDHE:  And can we make clear for

7  the record what investigation we're talking about?

8         MR. BRUSTIN:  DeJac.

9         THE WITNESS:  I don't remember that name at

10 all.

11        BY MR. BRUSTIN:

12        Q.   Okay.  So let's put DeJac aside for a

13 minute.  Maybe we'll come back to it if we have

14 time.

15        A.   Sure.

16        Q.   But certainly you would agree that the

17 allegations in Epps and in Dixon and in Ortiz are

18 the same allegations of misconduct.

19        MR. SAHASRABUDHE:  Object to the form.

20        THE WITNESS:  They're similar, yes.

21        BY MR. BRUSTIN:

22        Q.   And you deny them all.

23        A.   Correct.

24        Q.   And the other similarity in all of

25 those cases is that all three -- in all three of

1  those cases, convictions were overturned.

2          A.    Correct.

3          Q.    There were findings that the men and

4  women that were initially convicted of those crimes

5  were innocent.

6          A.    Correct.

7          Q.    And you -- in all three of those cases,

8  you maintain your belief that all three of those

9  persons were guilty or somehow involved in the

10  crimes, correct?

11          A.    I am, but I'm -- I'm very not sure on

12  Cory Epps.  You know, I was pretty positive with

13  Josue Ortiz, and I was very positive in regards to

14  Valentino Dixon.

15          Q.    And DeJac.

16          A.    And DeJac, but on Cory Epps, I really

17  didn't have that much involvement other than taking

18  his statement.

19          Q.    All right.  So you maintain your belief

20  that in the DeJac case, in the Dixon case, in the

21  Ortiz case, those -- those men and women are

22  guilty, correct?

23          MR. SAHASRABUDHE:  Form.

24          THE WITNESS:  I believe they were guilty of

25  a crime.



1          BY MR. BRUSTIN:

2          Q.   And you're just not sure about Epps.

3          A.   Correct.

4          Q.   Okay.  And you understand -- you -- you

5     were in the courtroom when the jury charge was read

6     to the jury, correct?

7          A.   Yes, I was.

8          Q.   You were in the courtroom when closing

9     arguments were made, correct?

10         A.   Yes, I was.

11         Q.   You were in the courtroom when opening

12    arguments were made.

13         A.   Yes.

14         Q.   And you heard -- you -- you're not a

15    lawyer, correct?

16         A.   Yes.

17         Q.   But you are an educated man, and you

18    are familiar with -- you -- you are not

19    uncomfortable with the law, correct?

20         A.   Correct.

21         Q.   And so you at least understood that you

22    were accused and found liable of multiple acts of

23    intentional misconduct, correct?

24         A.   On -- are we talking about Josue Ortiz?

25         Q.   Yes, we are.

1        A.   Yes.

2        Q.   And in that case, like this case, you

3   maintain that any deficiencies in the investigation

4   were just mistakes and not intentional misconduct,

5   correct?

6        A.   I do.

7        Q.   And the jury disagreed.

8        MR. SAHASRABUDHE:   Form.

9        THE WITNESS:   That's correct.

10        BY MR. BRUSTIN:

11        Q.   Now, one of the things your attorneys

12   argued in their closing statements was that

13   Mr. Ortiz had experienced challenges in his life,

14   had made poor decisions in his life and suffered

15   the consequences, and they argued that he was a

16   drug dealer.

17        Do you remember hearing those arguments?

18        A.   I do.

19        Q.   And I take it that you approved of your

20   lawyers arguing on your behalf --

21        MR. SAHASRABUDHE:   Object to the form.

22        BY MR. BRUSTIN:

23        Q.   Let me ask the question.

24        You -- you approved of your lawyers arguing

25   on your behalf that Mr. Ortiz caused his own



1  problems in life and it had nothing to do with you,

2  correct?

3         MR. SAHASRABUDHE:  Object to the form.

4  Don't answer.  To the extent that question's

5  calling for attorney-client privilege, don't answer

6  that question.

7         BY MR. BRUSTIN:

8         Q.  But certainly you understood that that

9  was what the argument that was made in court,

10  correct?

11        A.  It was the argument.

12        Q.  Is that your belief?

13        A.  I believe that he was associated with

14  that crime, that he had something to do with it,

15  yes.

16        Q.  Okay.  And that because Mr. Ortiz was a

17  drug dealer, his life wasn't worth as much, fair to

18  say?

19        MR. SAHASRABUDHE:  Object to the form.

20        THE WITNESS:  That's not fair to say.

21        BY MR. BRUSTIN:

22        Q.  I agree.  I agree completely.

23        MR. SAHASRABUDHE:  All right.  Nick, stop

24  the editorializing.  You can ask questions.

25        BY MR. BRUSTIN:



 1         Q.    Now, Mr. Ortiz was convicted of being

 2    one of three men who committed multiple homicides

 3    on November 11th, 2004, on Niagara Street, correct?

 4         A.    Yes.

 5         Q.    Believed to be a drug dispute.

 6         MR. SAHASRABUDHE:  Object to the form.

 7         THE WITNESS:  There was some drug

 8    involvement in that case, yes.

 9         BY MR. BRUSTIN:

10         Q.    And you were not the lead investigator

11    in the case, correct?

12         A.    No, I was not.

13         Q.    But like Dixon, you played a key -- you

14    played -- withdrawn.

15         You conducted the interview of Mr. Ortiz in

16    which he confessed, correct?

17         A.    Correct.

18         Q.    And you understand that the prosecution

19    was based almost entirely on that confession,

20    correct?

21         A.    Yes, sir, you're correct.

22         Q.    There was no forensic evidence tying

23    Mr. Ortiz to the crime, correct?

24         A.    Correct.

25         Q.    It was the -- the conviction was based



1  solely on the substance of his admission and your

2  reporting of that admission, correct?

3          A.   Yes, sir.

4          Q.   And even more specifically, it was

5  based on your reporting that he provided to you,

6  without any suggestion whatsoever, nonpublic

7  information about the crime that only was known to

8  the police and to the perpetrators, correct?

9          MR. SAHASRABUDHE:  Object to the form.

10         THE WITNESS:  Correct.

11         BY MR. BRUSTIN:

12         Q.   Now, would it be fair to say -- now,

13 you understand today and you understand based on

14 the trial that on November 15th, the day before you

15 met with Mr. Ortiz, he was interviewed in the

16 psychiatric unit of a Buffalo hospital by Buffalo

17 detectives, correct?

18         A.   Correct.

19         Q.   And you understand that earlier that

20 day on the 15th, Detective Lauber was called to the

21 scene to talk to Mr. Ortiz --

22         MR. SAHASRABUDHE:  To the scene?

23         MR. BRUSTIN:  Let me withdraw the question.

24         BY MR. BRUSTIN:

25         Q.   You understand that earlier in the day



 1  on the 15th, Detective Lauber was called to a

 2  location where Mr. Ortiz was present and that he

 3  called an ambulance to take Mr. Ortiz to a

 4  psychiatric hospital.

 5          MR. SAHASRABUDHE:  Form.

 6          THE WITNESS:  Yes.

 7          BY MR. BRUSTIN:

 8      Q.   And subsequently, Detective Vaughn,

 9  Detective Lonergan, Detective Lima, and Officer

10  Torres interviewed Mr. Ortiz at the hospital.

11      A.   Correct.

12      Q.   And they ruled him out as both a

13  suspect in the Niagara Street murders and as having

14  any relevant information about the Niagara Street

15  murders, correct?

16          MR. SAHASRABUDHE:  Object to the form.

17          THE WITNESS:  He didn't provide any

18  information at all.

19          BY MR. BRUSTIN:

20      Q.   If you -- if you could answer my -- I

21  think --

22      A.   Sure.

23      Q.   I think you're answering my question.

24  I want to make sure, though.

25      A.   Yes.

1          Q.   You understand today that it's
2    uncontroverted that when they met with him in the
3    psychiatric unit of the hospital, they determined
4    that he was not a suspect, correct?
5          A.   That he had no information and he was
6    not a suspect.
7          Q.   Okay.  Now, were you in the -- in the
8    courtroom when Dr. Coggins, the psychiatrist,
9    testified about Mr. Ortiz's condition?
10         A.   No, I was not.
11         Q.   You certainly heard the closing
12   arguments about Dr. Coggins, correct?
13         A.   Correct.  I did.
14         Q.   And you understand that Dr. Coggins
15   testified, in substance, that Mr. Ortiz was one of
16   the most severely ill people she had ever treated.
17         MR. SAHASRABUDHE:  Form.
18         THE WITNESS:  I did hear that, yes.
19         BY MR. BRUSTIN:
20         Q.   And that when he was -- including
21   during the time when he was meeting with you on the
22   16th --
23         MR. SAHASRABUDHE:  Object to the form.
24         BY MR. BRUSTIN:
25         Q.   -- he was in the midst of a full



 1  psychotic break.

 2          MR. SAHASRABUDHE:  Object to the form.

 3          BY MR. BRUSTIN:

 4          Q.   Did you understand that that was her

 5  testimony?

 6          A.   It was.

 7          MR. SAHASRABUDHE:  Object.  It wasn't her

 8  testimony.

 9          THE WITNESS:  I believed it to be.

10          MR. RUSS:  I -- I may have got it wrong.  I

11  didn't read it.  I read it quick.

12          MR. SAHASRABUDHE:  She said that she

13  could -- I mean --

14          MR. BRUSTIN:  Okay.

15          MR. SAHASRABUDHE:  -- we filed our Rule

16  50(b) motion yesterday, so you --

17          THE WITNESS:  Again, I'm not clear -- okay.

18  I am not clear as to what Dr. Coggins said.

19          BY MR. BRUSTIN:

20          Q.   All right.

21          A.   So I -- I wouldn't be able to answer

22  that.  I'm sorry.

23          Q.   All right.  Did you understand at your

24  trial that there was some medical evidence

25  suggesting that Mr. Ortiz was severely mentally



1  ill, including during the time when you were

2  meeting with him?

3         MR. SAHASRABUDHE:  Form.

4         THE WITNESS:  I did learn that, yes.

5         BY MR. BRUSTIN:

6         Q.   Do you have any basis today -- do

7  you -- are you aware of any contrary evidence,

8  medical evidence?

9         A.   No.

10        Q.   In other words, you don't dispute that,

11  in fact, although you may not have known it,

12  Mr. Ortiz was severely mentally ill when he met

13  with you.

14        MR. SAHASRABUDHE:  Object to the form.

15        BY MR. BRUSTIN:

16        Q.   Is that correct?

17        A.   I do not know that.

18        Q.   You don't dispute it today, correct?

19        MR. SAHASRABUDHE:  Object to the form.

20        THE WITNESS:  Again, I -- I'm not a medical

21  doctor.  I really don't know what their opinion is.

22        BY MR. BRUSTIN:

23        Q.   All right.  But in any case, when you

24  met with -- when you met with Mr. Ortiz --

25        A.   Correct.



1        Q.   -- you had no knowledge whatsoever that

2   he had any psychiatric issues, correct?

3        A.   Correct.

4        Q.   You didn't know he had been in a

5   psychiatric hospital.

6        A.   I don't believe he was.

7        MR. SAHASRABUDHE:  Form.

8        BY MR. BRUSTIN:

9        Q.   You didn't have any information -- you

10  didn't see any signs from him that he was in

11  psychiatric distress.

12       A.   None whatsoever.

13       Q.   It was just a normal, typical interview

14  where he volunteered numerous pieces of nonpublic

15  information about how that murder was committed,

16  correct?

17       A.   You are correct.

18       Q.   Now, you understand from the trial that

19  Officer Torres -- withdrawn.

20       You under -- you understand from the trial

21  that according -- that Officer Torres testified at

22  the Huntley hearing in connection with the

23  prosecution of Mr. Ortiz that you were, in fact, at

24  the hospital on the 15th, correct?

25       MR. SAHASRABUDHE:  Object to the form.



1        THE WITNESS:  I can answer that.  There's a

2   mistake on that.

3        BY MR. BRUSTIN:

4        Q.   So you made a mistake when you said

5   that.

6        A.   No, absolutely not.  He made the

7   right -- right -- when he said Mark, there were

8   four Marks that worked at the homicide squad.

9        I was not at the hospital.

10       Q.   Okay.

11       A.   I never interviewed him.

12       Q.   I actually -- I understand that you're

13  saying that.  I actually read his testimony on

14  this.

15       A.   Right.

16       Q.   In the Huntley hearing, he testified

17  that he believed you were there, correct?

18       A.   He believed.

19       MR. SAHASRABUDHE:  Yes.

20       THE WITNESS:  But I was not.

21       BY MR. BRUSTIN:

22       Q.   Okay.  So your testimony is he made a

23  mistake.

24       A.   He made a mistake, yes.

25       Q.   Okay.  And it appears from the verdict



1  that the jury didn't believe that, correct?

2       MR. SAHASRABUDHE:  Object to the form.

3       THE WITNESS:  I don't know what the jury

4  believed, but I know that he gave testimony during

5  the trial that I interviewed him and gave a sworn

6  statement, and he said I didn't do anything that

7  was wrong, threatening or anything of that nature,

8  but I don't know what he said in regards to the

9  first encounter.

10       I know for a fact that it was not me.  In

11  fact, another detective testified in the trial that

12  it was him that met him.

13       BY MR. BRUSTIN:

14       Q.  Sir, all I want to get out is what the

15  evidence was.

16       A.  Absolutely.

17       Q.  We're not -- we're not going to --

18  we're not going to agree on whether you -- whether

19  you committed the misconduct, okay?  We're going

20  to -- we're going to disagree on that.

21       But what I do want to make clear is:  At the

22  trial -- and you claim it was a mistake -- Officer

23  Torres admitted that during the Huntley hearing, he

24  testified that he thought you were at the hospital

25  on the 15th, correct?



1         A.    Thought, correct.

2         Q.    Okay.  And you claim that that's a

3   mistake.

4         A.    It is a mistake.

5         Q.    All right.  Now -- and more

6   specifically, he testified at the Huntley hearing

7   that the reason he didn't tell you when he saw you

8   about what happened at the hospital the day before

9   is because he knew you had been there.

10        MR. SAHASRABUDHE:  Object to the form.

11        BY MR. BRUSTIN:

12        Q.   Do you recall that testimony?

13        A.   I don't know --

14        MR. SAHASRABUDHE:  Are we talking about the

15   Huntley hearing?

16        MR. BRUSTIN:  The Huntley hearing.

17        THE WITNESS:  I don't know what he testified

18   in the Huntley hearing about.

19        BY MR. BRUSTIN:

20        Q.   Didn't read it?

21        A.    Before the preparation of this trial,

22   no.  Josue Ortiz's trial, no.

23        Q.    And certainly you saw testimony from

24   Torres -- you heard testimony from Torres and

25   others at the trial that based on their interaction

 1   with Mr. Ortiz on the 15th, they fully expected

 2   that Mr. Ortiz would receive more psychiatric care.

 3          MR. SAHASRABUDHE:  Object to the form.

 4          THE WITNESS:  I -- I don't know what they

 5   testified to.

 6          BY MR. BRUSTIN:

 7          Q.   Okay.  All you know is when you saw him

 8   on the 16th, you saw no signs whatsoever of any

 9   psychiatric issues.

10          A.   That's correct.

11          Q.   Now, you testified in the Ortiz case in

12   your deposition that you had no involvement in the

13   criminal investigation of Ortiz before 7:15 p.m. on

14   November 16th, correct?

15          A.   Is that when I met him?

16          Q.   Yes, sir.

17          A.   That's correct.

18          Q.   And that you didn't contribute to the

19   investigation in any way after he was arrested.

20   You testified to that in your deposition, correct?

21          A.   Correct.

22          Q.   That your only involvement in the case

23   was the interview and confession of Mr. Ortiz.

24          A.   Correct.

25          Q.   And you understand that that testimony



```
 1   was in error, correct?
 2         A.   In error?
 3         Q.   Yes, sir.  You understand that you,
 4   many months later, interviewed a snitch in jail,
 5   somebody you knew well --
 6         A.   Ronny Williams.
 7         Q.   -- who you claim told you that he heard
 8   a confession from Mr. Ortiz in jail.
 9         A.   Correct.
10         Q.   And Ronny Williams was a well-known
11   drug dealer, correct?
12         A.   He was.
13         Q.   Someone you had arrested a number of
14   times.
15         A.   I did arrest him.
16         Q.   Okay.  He was -- he was a drug dealer
17   who you did know, right?
18         A.   Correct.
19         Q.   Okay.  Unlike Valentino Dixon.
20         A.   Correct.
21         Q.   In any case, you did participate after
22   the arrest in that you took a statement from
23   somebody who you'd arrested before allegedly taking
24   a confession from Mr. Ortiz.
25         MR. SAHASRABUDHE:  Form.
```



1          THE WITNESS:  Again, I believe it was not a

2     sworn statement.  I believe it was an interview in

3     the lockup.  He just indicated that he did confess

4     to him that he was playing a game and he was going

5     to try to play like he was crazy.

6          BY MR. BRUSTIN:

7          Q.   Okay.

8          A.   That's it.

9          Q.   All right.  And so it's your

10    position -- and -- it's your position that what

11    happened is that, without any suggestion or

12    influence from you whatsoever, Mr. Williams reached

13    out to you --

14         A.   He did.

15         Q.   -- and he told you that Mr. Ortiz was

16    pretending to be psychotic and had actually

17    admitted to committing the crime.

18         A.   Correct.

19         Q.   And you deny any misconduct in

20    connection with Mr. Williams.

21         A.   I do.

22         Q.   And you would agree that that statement

23    would be inconsistent with the stipulation that you

24    entered into at trial that Mr. Ortiz was innocent,

25    correct?



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  I'm not following you on

3   stipulation.

4          BY MR. BRUSTIN:

5          Q.   Well, you -- do you want to see the

6   stipulation?  Do you want to get into it?  Do you

7   remember it?

8          A.   No, I -- I'd like you to clarify your

9   question, please.

10          Q.   You understand that during the trial,

11   your counsel on your behalf stipulated that there

12   was a finding that Mr. Ortiz was innocent, correct?

13          A.   That's correct.

14          Q.   And you would agree that if --

15   assuming, as that stipulation states, that

16   Mr. Ortiz was, in fact, innocent --

17          MR. SAHASRABUDHE:  Form.

18          BY MR. BRUSTIN:

19          Q.   -- him admitting to committing the

20   crime in jail and faking psychosis would be

21   inconsistent with his innocence.

22          MR. BLENK:  Form.

23          MR. SAHASRABUDHE:  Form.  Do you understand

24   the question?

25          THE WITNESS:  No, I'm -- I'm -- you're --



1  you're throwing a lot of things at me.  If you'd

2  break it down a little bit, please.

3          BY MR. BRUSTIN:

4          Q.   Sure.  What I'm suggesting to you is

5  that, in fact, what happened was that you

6  approached Mr. Williams and you got him to lie and

7  to say that Mr. Ortiz confessed.

8          MR. SAHASRABUDHE:  Object to the form.

9          BY MR. BRUSTIN:

10         Q.   You deny that, correct?

11         A.   I do deny that.

12         Q.   What you're saying is -- what you're

13 saying happened is that innocent Mr. Ortiz, while

14 he was in jail for a crime he didn't commit,

15 confessed to Mr. Williams and admitted that he was

16 making up his mental illness, correct?

17         MR. SAHASRABUDHE:  Form.

18         THE WITNESS:  Correct.

19         BY MR. BRUSTIN:

20         Q.   Now, remember you telling us earlier

21 today how important it is to corroborate

22 confessions?

23         A.   It is.

24         Q.   You learned that from your Reid

25 training, right?



 1          A.   Yes.

 2          Q.   And other training, right?

 3          A.   Correct.

 4          Q.   And certainly after you took

 5   Mr. Ortiz's confession, later that day, you

 6   learned -- or within the following days, you

 7   learned that he had been in a psychiatric hospital,

 8   correct?

 9          A.   You're correct.

10          Q.   And so once you learned that, you

11   understood it was even more important to

12   corroborate, if you could, the information that

13   Mr. Ortiz allegedly volunteered to you in his

14   confession, correct?

15          A.   Correct.

16          MR. SAHASRABUDHE:  I object to the form.

17          BY MR. BRUSTIN:

18          Q.   And as you testified to in Ortiz --

19          MR. SAHASRABUDHE:  What testimony?

20          BY MR. BRUSTIN:

21          Q.   I think all the testimony, but as

22   you -- withdrawn.  Let me ask it a different way.

23          You admit that you took no steps whatsoever

24   to corroborate Mr. Ortiz's confession, correct?

25          MR. SAHASRABUDHE:  Form.



1          THE WITNESS:  That's correct.  There were no
2    new leads.  Nothing.  No anonymous calls, no
3    independent witnesses that came forward.
4          Mr. Ortiz came in and gave a statement.
5    That was it.  There was nothing further.
6          BY MR. BRUSTIN:
7          Q.   You misunderstood my question.  You
8    were trained, as -- as I just read to you from
9    Reid, that you needed to follow up on the
10   information that was provided to you by the suspect
11   to determine whether it was accurate.
12         A.   What could I follow up on?
13         Q.   So your --
14         A.   He gave me specifics about the crime
15   scene.
16         Q.   So your testimony is that there was no
17   information that Mr. Ortiz provided to you that you
18   could follow up on.
19         A.   He gave me specifics about the crime
20   scene that were true.
21         Q.   Okay.  There was no other information
22   that you could follow up on.
23         A.   I don't believe so, no.
24         Q.   Okay.  Did you ask him any questions
25   geared towards information you could follow up on?



1        A.   I asked him the state -- the questions
2   that were in the statement.  I thought that was
3   sufficient.
4        Q.   Okay.  Why didn't you ask him where the
5   murder weapon was?
6        A.   I don't know.
7        Q.   A mistake?
8        A.   Yes.
9        Q.   Okay.  Now, that crime was a brutal
10  crime, correct?
11       A.   It was.
12       Q.   Any questions of Mr. Ortiz about what
13  he was wearing that night and whether you could
14  test his clothing?
15       A.   No.
16       Q.   Mistake?
17       A.   Yes.
18       MR. SAHASRABUDHE:  Form.
19       BY MR. BRUSTIN:
20       Q.   Now, the night that the -- Mr. Ortiz
21  came to -- so first of all, you testified in your
22  deposition that you thought the reason Mr. Ortiz
23  was brought to the station was because he claimed
24  two people were trying to kill him, correct?
25       A.   Correct.



1        Q.   In other words, you had no knowledge
2   whatsoever that he was coming in to confess to the
3   Niagara Street murders.
4        A.   Correct.
5        MR. SAHASRABUDHE:  Object to the form.
6        BY MR. BRUSTIN:
7        Q.   You understand at your trial, there was
8   testimony -- at your trial and at the Huntley
9   hearing, there was testimony from a number of
10  people, including Mr. Lonergan, or Sergeant
11  Lonergan, that over the radio it was made clear
12  that Mr. Ortiz was being brought to the station
13  because he had information on the Niagara Street
14  homicide.
15       A.   I didn't hear that transmission.  I'm
16  sorry.
17       Q.   You understand there was testimony
18  about that, correct?
19       A.   That's good, but I did not hear that
20  transmission.
21       Q.   So you understand that Lonergan knew it
22  and other officers knew it.  You just didn't know
23  it.
24       A.   Lonergan took --
25       MR. SAHASRABUDHE:  Form.  Form.



1          THE WITNESS:  Lonergan took the statement

2    with me.

3          BY MR. BRUSTIN:

4          Q.   Well, we know that Lonergan didn't take

5    the statement with you in -- when you were -- when

6    you were in the closed office without the windows,

7    right?

8          MR. SAHASRABUDHE:  Object to the form.

9          THE WITNESS:  There is a window in that

10   office, and I was alone with him for about 20

11   minutes.

12         BY MR. BRUSTIN:

13         Q.   Well, actually, you were alone with him

14   for 45 minutes, correct?

15         MR. SAHASRABUDHE:  Object to the form.

16         THE WITNESS:  I guess.

17         BY MR. BRUSTIN:

18         Q.   Okay.  So you were alone with Mr. Ortiz

19   for 45 minutes, correct?

20         A.   I still think it was 20 or 25.

21         Q.   Okay.  I'll give you -- I'll give you

22   the benefit of the doubt.  Let's say it was 20 or

23   25 minutes.

24         You were alone with him in a room for 20 or

25   25 minutes.



1        A.   Correct.

2        Q.   And you brought him into that room,

3   right, yourself?

4        A.   Correct.

5        MR. SAHASRABUDHE:  Form.

6        BY MR. BRUSTIN:

7        Q.   No other witnesses, correct?

8        MR. SAHASRABUDHE:  Form.

9        THE WITNESS:  Correct.

10        BY MR. BRUSTIN:

11        Q.   And it's your testimony that when you

12   brought him to that room, you thought you were

13   talking to him about threats that had been made on

14   his life, correct?

15        MR. SAHASRABUDHE:  Form.

16        THE WITNESS:  Correct.

17        BY MR. BRUSTIN:

18        Q.   And at the time when you brought him

19   into that office, you understood that the interview

20   room with the two-way mirror was vacant.

21        MR. SAHASRABUDHE:  Form.

22        THE WITNESS:  There was an interview room

23   with a two-way mirror.

24        BY MR. BRUSTIN:

25        Q.   That was vacant.



 1          A.    Sure.

 2          MR. SAHASRABUDHE:  Form.

 3          BY MR. BRUSTIN:

 4          Q.    And in fact, that's where you took

 5    Mr. Ortiz after you interviewed him alone in that

 6    room for a formal statement, correct?

 7          A.    No.

 8          MR. SAHASRABUDHE:  Form.

 9          THE WITNESS:  No, the formal statement was

10    taken in Detective Sergeant Vivian's office.  It

11    does not have a two-way mirror.

12          BY MR. BRUSTIN:

13          Q.    Are you sure about that?

14          A.    Yes, I am.

15          Q.    You're sure that -- where was the

16    initial interview?

17          A.    In Detective Sergeant Vivian's office.

18          Q.    So when Mr. Ortiz testified that you

19    were in the interview room for the statement, that

20    would be wrong?

21          A.    No, he -- he could consider it to be an

22    interview room.  It was an office.  But it -- that

23    office belonged to Detective Sergeant Thomas

24    Vivian.

25          Q.    All right.  In any case, the -- there



 1  was a 25- to 40-minute interview in that office

 2  with the door closed alone, correct?

 3        MR. SAHASRABUDHE:  Form.

 4        THE WITNESS:  Door's not closed.  I'm just

 5  sitting there waiting for the Spanish-speaking

 6  officer to arrive.

 7        BY MR. BRUSTIN:

 8        Q.   You were alone with him in the room for

 9  25 to 40 minutes.

10        A.   I was, but I -- I didn't have a door

11  closed.

12        Q.   By the way, I'm not asking you

13  ridiculous questions.  You were found liable for

14  lying about what happened in that room, correct?

15        A.   I'm giving you the testimony to be the

16  truth.

17        Q.   Okay.  You were in that room alone for

18  25 to 40 minutes with the witness, correct?

19        A.   Correct.

20        Q.   All right.  And it was only when you

21  started -- when you -- it was only at the time you

22  started to take the formal statement when

23  Detective -- when Officer Torres and Sergeant

24  Lonergan were present, correct?

25        MR. SAHASRABUDHE:  Form.



1          THE WITNESS:  Correct.

2          BY MR. BRUSTIN:

3          Q.   And at the time, you were taking -- at

4    the time you met with Mr. Ortiz in the office

5    through the time you took his formal statement, you

6    had no idea that he had met with officers --

7    officers at a psychiatric hospital the day before,

8    correct?

9          MR. SAHASRABUDHE:  Object to the form.

10         THE WITNESS:  That's correct.

11         BY MR. BRUSTIN:

12         Q.   Nobody told you.  You had no knowledge

13   about it whatsoever.

14         A.   When Patrolman Torres arrived, he never

15   told me.  When Detective Sergeant Lonergan arrived,

16   he indicated that we had spoke to him before.

17         Q.   Okay.  But no indication whatsoever

18   that they had spoken to him in a psychiatric

19   hospital.

20         A.   No.

21         Q.   No -- no description of what they said

22   to him or what he said to them.

23         A.   Just that they had spoken to him

24   before.

25         Q.   And you never asked.



1          A.   No, I did not.

2          Q.   Even after you knew that he was

3   confessing to a murder, according to you, you never

4   asked, "Hey, by the way, what did he say to you

5   yesterday," right?

6          MR. SAHASRABUDHE:  Form.

7          THE WITNESS:  I did learn later that he was

8   interviewed at a hospital.

9          BY MR. BRUSTIN:

10         Q.   But not before.

11         A.   Not before.

12         Q.   You learned -- you learned that there

13  was an interview, but you didn't learn anything

14  about what was said or where it was at.

15         A.   Correct.

16         Q.   Not until after you took the -- the

17  sworn statement.

18         A.   Correct.

19         Q.   And you admitted during your deposition

20  that Lonergan was present from the time -- in the

21  homicide office, he was there -- from the time that

22  Ortiz was brought to the station through the formal

23  interview, correct?

24         A.   He was.

25         Q.   You've already described what that



 1  office was like, the size of a classroom with some

 2  private offices, right?

 3          A.   Correct.

 4          Q.   And you testified in your deposition --

 5  and I think you've just told us this -- there was

 6  absolutely no conversation with Lonergan prior to

 7  your questioning about Lonergan being at the

 8  hospital with Ortiz the day before, correct?

 9          A.   Correct.

10          Q.   And you understand that in his

11  deposition, which he was cross-examined with at

12  trial, Lonergan testified -- withdrawn.

13          You understand that at the Huntley hearing,

14  Lonergan testified that he was sure that, in fact,

15  he did speak to you on the 16th before the

16  interview about being at the hospital, correct?

17          MR. SAHASRABUDHE:  Object to the form.  If

18  you know.

19          THE WITNESS:  I don't know.

20          BY MR. BRUSTIN:

21          Q.   First you're hearing of that?

22          A.   No, I -- I -- I've already stated that

23  Detective Lonergan told me that we had talked to

24  him.  You know, I mean, you're stretching it.

25          I'm not trying to -- to say anything.



 1  You're asking me a specific question, and I'm

 2  trying to answer it as correctly as I can.

 3        Q.   Sir, what he testified to at the

 4  Huntley hearing at page 137 is that he provided

 5  Stambach with the details of the meeting on the

 6  15th prior to taking the statement on the 16th.

 7        And what you're telling us is that's not

 8  true, correct?

 9        MR. SAHASRABUDHE:  Object to the form.

10        THE WITNESS:  It is not true.

11        BY MR. BRUSTIN:

12        Q.   Either Lonergan is lying or mistaken,

13  correct?

14        MR. SAHASRABUDHE:  Object to the form.

15        Nick, it's supposed to be 404(b).  It's

16  supposed to be about what he did.  We're -- these

17  questions should be related to 404(b) evidence.

18  You're asking him about Jim Lonergan.

19        MR. BRUSTIN:  He's testifying tomorrow.

20        MR. SAHASRABUDHE:  You can ask Jim when he's

21  here.

22        BY MR. BRUSTIN:

23        Q.   That -- that -- that testimony is

24  wrong, correct?

25        MR. SAHASRABUDHE:  Object to the form.



```
 1          BY MR. BRUSTIN:

 2          Q.   You -- you deny it.

 3          A.   I've -- I've stated what Detective

 4   Lonergan told me.

 5          Q.   Sure.  You deny that he told you what

 6   happened at the hospital on the 15th, correct?

 7          A.   No, that's incorrect.  He told me --

 8          Q.   Let me strike -- let me -- let me

 9   restate the question.

10          You deny Detective Lonergan telling you,

11   before you took the statement -- him providing you

12   the details of his meeting with Ortiz on the 15th,

13   correct?

14          MR. SAHASRABUDHE:  He's answered this

15   question.

16          THE WITNESS:  You'd have to ask Detective

17   Lonergan.  All I can say is that he said we spoke

18   to him already.  That's it.

19          BY MR. BRUSTIN:

20          Q.   All right.  Now, when he came in, you

21   brought him to Detective Vivian's office, correct?

22          A.   Yes.

23          Q.   And you testified at the trial that

24   there was no translator in the -- in the -- in the

25   room with Ortiz for 30 to 40 minutes, correct?
```



1          A.    Correct.

2          Q.    And that during that time, you spoke

3     with him in English, correct?

4          A.    Yes.

5          Q.    And he understood English.

6          A.    He does.

7          Q.    And you admitted to asking questions

8     about -- and details about the crime and his

9     familiarity with the victims, correct?

10         A.    Correct.

11         Q.    And there was no one in the room with

12    you and Ortiz between 7:25 and 8:05, correct?

13         A.    Correct.

14         Q.    And at the trial, Officer Torres

15    testified that when he got to major crimes on the

16    16th, you were, in fact, in the inter -- in the

17    interview room, not the detective's office.

18         Was he mistaken about that?

19         MR. SAHASRABUDHE:  Form.

20         THE WITNESS:  You'd have to ask Patrolman

21    Torres.  It's not an interview room.  It's a

22    separate room, Detective Sergeant Thomas Vivian.

23    We can use it as an interview room.

24         BY MR. BRUSTIN:

25         Q.    And he further testified Ortiz was in



```
 1   an interview room with double mirrors.
 2          There was only one room like that, correct?
 3          A.   There was only one room like that, and
 4   he was not in that room.
 5          Q.   So Mr. -- so Officer Torres was
 6   mistaken about that.
 7          A.   He was mistaken about that, yes.
 8          Q.   And when you interviewed Mr. Ortiz, at
 9   some point during -- certainly -- certainly if you
10   didn't learn it -- that he was coming in to confess
11   about the Niagara Street murders before he got
12   there, you learned it soon after he arrived,
13   correct?
14          A.   Correct.
15          Q.   And you were well aware of that case.
16   It was a -- a high-profile murder case, correct?
17          MR. BLENK:  Form.
18          THE WITNESS:  It was.
19          BY MR. BRUSTIN:
20          Q.   And when you were -- when you
21   interviewed Mr. Ortiz, you had, of course, had
22   access to the entire case file, correct?
23          MR. SAHASRABUDHE:  Form.
24          THE WITNESS:  Correct.
25          BY MR. BRUSTIN:
```



1          Q.    You knew that there were notes and

2     photos and reports in that file.

3          A.    Correct.

4          Q.    And as you've already told us, you

5     understood at that time, certainly by 2000 -- you

6     understood by 1991 how important it was to

7     ascertain any information in the case -- relevant

8     information in the case that was gathered before

9     conducting an important interview, correct?

10         A.    Correct.

11         Q.    That would obviously include any

12    documentation of an interview the day before,

13    correct?

14         A.    Correct.

15         Q.    That would include crime scene photos

16    and crime scene reports, correct?

17         A.    Correct.

18         Q.    And you admit that you asked Mr. Ortiz,

19    during that -- during that 25 to 40 minutes, about

20    his familiarity with the crime, correct?

21         A.    Correct.

22         Q.    And details that he knew about the

23    crime, correct?

24         A.    Correct.

25         Q.    And you testified at the trial that you



1  did not review any evidence from the file -- photos

2  or reports -- until after Mr. Ortiz made admissions

3  to you, correct?

4          MR. SAHASRABUDHE:  Form.

5          THE WITNESS:  That day that he was with me,

6  that's correct.

7          BY MR. BRUSTIN:

8          Q.  In other -- in other words, you made it

9  clear that you did not have any photos or reports

10 with you when you were questioning Ortiz alone in

11 the room, correct?

12         A.  Correct.

13         Q.  What you testified to was that you only

14 went to the file and got reports and photos to

15 confirm the information that he had volunteered to

16 you, correct?

17         A.  Correct.

18         Q.  And that you did not -- and your

19 argument was -- or your testimony was that you were

20 not even capable of providing him nonpublic

21 information before he volunteered it to you because

22 you had not yet reviewed the file, correct?

23         A.  I would not provide it to him, no.

24         Q.  So the jury found that you did.  I

25 understand you're saying you didn't.

