1          MR. SAHASRABUDHE:  Nick, ask a question.
 2     Ask a question.
 3          BY MR. BRUSTIN:
 4          Q.   I'm asking you something different.
 5          A.   Sure.
 6          Q.   Your testimony was that you wouldn't
 7     have been capable, even hypothetically, of
 8     providing him nonpublic information before he
 9     volunteered it to you, because you had not yet
10     looked at the file, correct?
11          MR. SAHASRABUDHE:  Object -- object to the
12     form.  If you remember your testimony.
13          THE WITNESS:  I -- I don't remember.  I'm
14     sorry.
15          BY MR. BRUSTIN:
16          Q.   This is weeks ago when you testified in
17     a multimillion-dollar trial.  You don't remember
18     it?
19          A.   Some of these things are 21 years old,
20     and I'm being questioned on very small, minute
21     items of every single thing that I've done.
22          Q.   Well, I'll read your testimony to you.
23          A.   Okay.
24          Q.   When -- when you -- when you became
25     aware Ortiz was making admissions about the crime,



1  you tried to corroborate Ortiz's statements with

2  the evidence file.

3        Do you remember giving that testimony?

4        MR. SAHASRABUDHE:  I object to the form.  I

5  mean, who's asking the question?  Do you have a --

6        BY MR. BRUSTIN:

7        Q.   Page 57, lines 12 to 18.  Do you

8  remember that?

9        A.   I don't -- I -- I can't see it.  I

10 don't recall that.

11       Q.   Do you remember generally testifying

12 that you only went to the file to corroborate what

13 he was saying to you?

14       A.   Absolutely.

15       Q.   Okay.  That's all I'm asking you.

16       A.   But you added a couple words to that

17 first statement that you asked.

18       Q.   And I appreciate you being precise

19 again.

20       A.   I'm trying to be.

21       Q.   I know you are.

22       A.   I'm getting a little tired here.

23       Q.   All right.  Are you -- are you feeling

24 that this is oppressive?

25       A.   No.



1        Q.   In any case, your position, your
2   testimony was that you were not capable of
3   providing -- withdrawn.
4        In -- in substance, because you had not
5   looked at -- according to you, had not looked at
6   the file before he made admissions, you would not
7   have been capable of providing him nonpublic
8   information, correct?
9        A.   That's hypothetical.  I -- I really
10  couldn't answer that.  I'm sorry.
11       Q.   All right.  In any case, you denied at
12  trial looking at the file before he volunteered
13  information to you, correct?
14       A.   Correct.
15       Q.   And obviously, the jury rejected that,
16  correct?
17       MR. SAHASRABUDHE:  Object to the form.
18       THE WITNESS:  I don't know what they found.
19  I'm very confused about their verdict.
20       BY MR. BRUSTIN:
21       Q.   What's confusing about it?
22       MR. SAHASRABUDHE:  Don't answer that.
23       MR. BRUSTIN:  What -- what do you mean don't
24  answer it?
25       MR. SAHASRABUDHE:  Wait for the next



```
 1   question.
 2           BY MR. BRUSTIN:
 3           Q.   I want to know what you're confused
 4   about.
 5           MR. SAHASRABUDHE:  Mark, don't answer that.
 6   Next question.  Move on.
 7           MR. BRUSTIN:  You can't tell him not to
 8   answer that.  On what basis?
 9           MR. SAHASRABUDHE:  What -- what's the point
10   of the question?  How is this relevant?
11           MR. BRUSTIN:  I want to understand --
12           MR. SAHASRABUDHE:  How -- how does this have
13   anything to do with 404(b) evidence?
14           MR. BRUSTIN:  Well, it may or --
15           MR. SAHASRABUDHE:  Your questions are
16   supposed to be about 404(b) exceptions.
17           MR. BRUSTIN:  I agree.
18           MR. SAHASRABUDHE:  That has nothing to do
19   with a 404(b) exception.
20           MR. BRUSTIN:  We don't know that.
21           MR. SAHASRABUDHE:  What the jury found?
22           MR. BRUSTIN:  No.
23           MR. SAHASRABUDHE:  Has there ever been case
24   law where someone could ask a question about an
25   opinion on what the jury found --
```



1          MR. BRUSTIN:  I'm just trying to find out --

2          MR. SAHASRABUDHE:  -- that comes in evidence

3    through a 404(b) exception?

4          MR. BRUSTIN:  Don't get upset.

5          MR. SAHASRABUDHE:  Move on.

6          MR. BRUSTIN:  Hold on.  I'm just trying to

7    bind out what the basis for his confusion was.  You

8    are confused.

9          MR. SAHASRABUDHE:  And I'm telling him not

10   to answer the question.  Move on.

11         BY MR. BRUSTIN:

12         Q.   All right.  Now, you understand that,

13   contrary to what you said at trial, in your

14   deposition, you admitted that at the time of

15   questioning of Mr. Ortiz, you knew about the photos

16   and the layout of the crime scene, correct?

17         A.   Correct.

18         Q.   That was a contradiction between your

19   deposition testimony and your trial testimony,

20   correct?

21         A.   Correct.

22         Q.   And you testified, for example, in your

23   deposition that you knew the victim had been found

24   with a phone -- had a phone and a gun in his hand

25   from photos, correct?



1          A.    Correct.

2          Q.    And one of the key nonpublic facts that

3    Mr. Ortiz allegedly volunteered to you was that the

4    victim had a phone in the specific hand where the

5    phone was found, correct?

6          A.    And a gun.

7          MR. SAHASRABUDHE:  Object to the form.

8          BY MR. BRUSTIN:

9          Q.    And a gun.

10         A.    And a gun, yes.

11         Q.    All right.  And so the contradiction

12   between the deposition testimony and the trial

13   testimony was at the deposition, you admitted that

14   you knew that information before you questioned

15   him, and then at the trial, you testified that you

16   did not know that information at the time you

17   questioned him, correct?

18         MR. SAHASRABUDHE:  Object to the form.  If

19   you remember that that's --

20         THE WITNESS:  I don't remember that, no.

21         MR. SAHASRABUDHE:  -- the specifics of your

22   testimony.

23         BY MR. BRUSTIN:

24         Q.    Now --

25         MR. SAHASRABUDHE:  Also like to state for



1  the record I've read that transcript pretty

2  thoroughly now, and I don't think that was his

3  testimony at the trial.

4         BY MR. BRUSTIN:

5         Q.   As you acknowledged in your deposition

6  in Ortiz, your notes that you took during that

7  private interview that you conducted contained

8  information allegedly volunteered by Mr. Ortiz

9  about how the crime was committed, correct?

10        A.   Yes.

11        Q.   How the victims were found.

12        A.   Yes.

13        Q.   Including the fact that there was a

14 cell phone in one hand and a pistol in the other.

15        A.   Yes.

16        Q.   And it was your testimony, both at

17 deposition and trial, that he volunteered that

18 information as opposed to you putting that

19 information into your notes from the file to feed

20 to him, correct?

21        A.   That's incorrect.

22        Q.   In other words, it's incorrect you

23 didn't do that.

24        A.   Well, once again, I asked a simple

25 question, and I typed his response, and that would



1  | go into my notes.

2  |     Q.   Okay.  And he also volunteered the name

3  | Udha.

4  |     A.   U-D-H-A.

5  |     Q.   U-D-H-A or U-D-A-H?

6  |     MR. SAHASRABUDHE:  I think it's A -- it's

7  | in --

8  |     THE WITNESS:  I believe it's -- I believe

9  | it's U-D-H-A, Udha.

10 |     BY MR. BRUSTIN:

11 |     Q.   According to you, he volunteered a

12 | nickname for one of the suspects.

13 |     A.   Correct.

14 |     Q.   You didn't provide it to him, correct?

15 |     A.   That is correct.

16 |     Q.   But you -- you acknowledge that in the

17 | file, there was information that prior to Mr. Ortiz

18 | allegedly volunteering that information, an

19 | anonymous call had come in indicating that -- that

20 | Udha was there.

21 |     A.   Correct.

22 |     Q.   The notes also contained information

23 | that one of the victims was in the rear of the

24 | house; another was in the front of the house; the

25 | TV was on, and that it was big, correct?

```
 1          A.   Yes.
 2          Q.   And that there were three perps in
 3   the -- in the crime.
 4          A.   Correct.
 5          Q.   And by the way, that's the kind of
 6   nonpublic information that you learned in your Reid
 7   training was important to make a confession look
 8   reliable, correct?
 9          A.   Correct.
10          MR. BLENK:  Form.
11          MR. SAHASRABUDHE:  Object to the form of the
12   question.
13          BY MR. BRUSTIN:
14          Q.   And you admitted at trial that there
15   was no reason or way that Ortiz could have known
16   the specific type of items that he described to you
17   in his sworn statement unless he was actually
18   there, correct?
19          MR. SAHASRABUDHE:  Object to the form.
20          THE WITNESS:  I did.
21          BY MR. BRUSTIN:
22          Q.   And you stand by that.
23          A.   I do.
24          Q.   And another thing that Ortiz allegedly
25   volunteered to you that was consistent with
```



1    information in the file was that a detached chain

2    from one of the victims was laying on the ground,

3    correct?

4          A.    Correct.

5          Q.    Another -- another piece of nonpublic

6    information that only somebody who committed the

7    crime or somebody with access to the file would

8    have known, correct?

9          A.    Correct.

10         MR. SAHASRABUDHE:  I object to the form of

11   that question.

12         BY MR. BRUSTIN:

13         Q.    And just to be clear, what you made --

14   what you made clear in your P73 and your notes and

15   your communications with the DA in Ortiz is that

16   Mr. Ortiz volunteered that information without any

17   suggestion or coercion from you whatsoever,

18   correct?

19         THE WITNESS:  You are correct.

20         BY MR. BRUSTIN:

21         Q.    In the same way that you made those

22   representations to the DA and in your reports in

23   Dixon, correct?

24         MR. SAHASRABUDHE:  Object to the form.

25         THE WITNESS:  Correct.



1          BY MR. BRUSTIN:

2          Q.   And you made clear in your reports and

3     you made clear in your conversations to the DA that

4     what made his confession reliable, even after you

5     learned he'd been in a psychiatric hospital, was

6     the fact that he knew nonpublic information,

7     correct?

8          MR. SAHASRABUDHE:  Object to the form.

9          THE WITNESS:  You are correct.

10         BY MR. BRUSTIN:

11         Q.   Now, you understand today that at the

12    time that you took the formal statement with

13    Mr. Ortiz sometime after 8 p.m., another witness

14    named Osario (phonetic) was being questioned in

15    another room, correct?

16         MR. SAHASRABUDHE:  Object to the form.

17         THE WITNESS:  Correct.

18         BY MR. BRUSTIN:

19         Q.   And it's -- it was your testimony in

20    your deposition and at trial that you never learned

21    that night or in the days following that -- that

22    Osario was interviewed or the substance of what he

23    said, correct?

24         MR. SAHASRABUDHE:  Object to the form.

25         THE WITNESS:  That's correct.



1        BY MR. BRUSTIN:

2        Q.   You never learned, for example, that

3    Osario came in -- and by the way, you know -- you

4    know today that Osario had come -- had provided

5    information before that day, correct?

6        MR. SAHASRABUDHE:  Object to the form.

7        THE WITNESS:  I'm not following you in that

8    question, I'm sorry.

9        BY MR. BRUSTIN:

10       Q.   Okay.  That's fine.  You understand

11   that when Osario came in -- you understand today

12   that when Osario came in on the 16th, he

13   volunteered that he knew -- that -- that he

14   observed three perpetrators, correct?

15       MR. SAHASRABUDHE:  Object to the form.  If

16   you know.

17       THE WITNESS:  I'm not sure of that.

18       BY MR. BRUSTIN:

19       Q.   You don't remember learning that at the

20   trial?

21       MR. SAHASRABUDHE:  Never came out at trial.

22       BY MR. BRUSTIN:

23       Q.   Do you -- that may be.

24       Do you remember learning that Mr. Osario --

25   you know today, based on your review of the case,



1  that on the 16th, Osario described seeing three

2  perpetrators who were approximately five foot seven

3  inches tall.

4          A.    I'm not 100 percent sure when I learned

5  that, but it was after -- after Mr. Ortiz's sworn

6  statement.

7          Q.    Okay.

8          A.    Not sure when it was.

9          Q.    Okay.  But sometime only after that.

10         A.    Yes, that --

11         Q.    Did you --

12         A.    -- that several gentlemen were seen

13  running away.  Not that they were committing a

14  crime.  That they were seen running away from the

15  crime scene.

16         Q.    Okay.

17         A.    That's it.

18         Q.    And you had -- and the theory of the

19  case was that three people committed this crime.

20         A.    Correct.

21         Q.    And he described seeing three people

22  running away from the crime scene -- three men

23  running away from the crime scene at or about the

24  time the crime occurred.

25         A.    I think his statement -- and I could be



1  wrong on this -- was he saw two people running away

2  from the crime scene.

3       Q.   What you testified to at the trial,

4  when you looked at the P73, was that Osario was

5  taken to an interview room, there to tell

6  detectives that he could more accurately describe

7  three individuals he saw running from the crime

8  scene.  That's your deposition at page 236.

9       MR. SAHASRABUDHE:  His deposition testimony.

10      MR. BRUSTIN:  Yes, sir.

11      MR. SAHASRABUDHE:  Do you recall that

12 testimony?

13      THE WITNESS:  No, I do not.

14      BY MR. BRUSTIN:

15      Q.   Certainly you don't dispute it if you

16 gave it, right?

17      A.   I would not dispute that, no.

18      Q.   And that he -- and you also

19 acknowledged in your deposition that he described

20 all of the perpetrators as five foot seven inches

21 tall.

22      A.   Yes.

23      Q.   All right.  And you understand that

24 Mr. Ortiz is approximately six foot six inches

25 tall, correct?



1          A.    I'm well aware of that, yes.

2          Q.    He's a very big man, correct?

3          A.    He's a tall -- he's a very tall man.

4          Q.    Nobody could ever mistake Mr. Ortiz for

5    being five seven, right?

6          MR. SAHASRABUDHE:  Object to the form.

7          THE WITNESS:  Correct.

8          BY MR. BRUSTIN:

9          Q.    And you would agree that this is a

10   similar inconsistency to what Emil Adams described

11   as -- as to Valentino Dixon, that he described a

12   stocky man, and then he identified a very thin man,

13   correct?

14         MR. SAHASRABUDHE:  Object to the form.  If

15   you -- you can answer if you agree or disagree.

16   It's similar.

17         THE WITNESS:  They were similar, yes.

18         BY MR. BRUSTIN:

19         Q.    All right.  And so obviously, it's your

20   testimony that you couldn't have known that

21   Mr. Osario was describing three -- three potential

22   perpetrators being five foot seven inches tall,

23   because you would have immediately recognized that

24   couldn't include Mr. Ortiz, correct?

25         A.    Mr. Osario's statement is not a



```
 1  witness -- a fact witness that he witnessed a

 2  homicide.  His -- his statement is that he saw

 3  someone running away --

 4         Q.   All right.

 5         A.   -- and that they were not the height of

 6  Mr. Ortiz.  Mr. Ortiz was never identified as

 7  running away --

 8         Q.   Okay.

 9         A.   -- or seen at the scene.

10         Q.   All right.

11         A.   The only information that we got --

12  again, that I received -- was that he confessed to

13  me on that particular day.

14         Q.   All right.  But certainly if you had --

15  you recognized that Mr. Osario describing three

16  people running from the crime scene at or about the

17  time of the crime, a crime you believed to have

18  been committed by three people, that may well have

19  been the perpetrators, right?

20         A.   Could have been, yes.

21         Q.   And if you had -- if you had learned

22  that night that he was describing all of them as

23  being five foot seven inches tall, that would have

24  been a red flag for you that it couldn't have been

25  Mr. Ortiz, correct?
```



1          MR. SAHASRABUDHE:  Object to the form.

2          THE WITNESS:  I firmly believed at the time

3    that it was Mr. Ortiz that committed the crime.

4          BY MR. BRUSTIN:

5          Q.   So is it your testimony that you didn't

6    know about that discrepancy or you knew about it

7    and didn't think it was significant?

8          A.   Neither.

9          MR. SAHASRABUDHE:  You doing all right?

10         THE WITNESS:  Yes.  Wish I had some more

11   water.

12         MR. BRUSTIN:  All right.  Let's take another

13   five-minute break.

14              (A recess was then taken at 5:34 p.m.)

15              (On the record: 5:42 p.m.)

16         BY MR. BRUSTIN:

17         Q.   Okay.  I want to ask you some

18   questions, Detective, about the DeJac case, okay?

19         A.   Sure.

20         Q.   You understand that -- that -- you were

21   involved to some degree in the DeJac investigation,

22   correct?

23         A.   Yes, some degree.

24         Q.   And that case involved a murder of a

25   13-year-old girl in February of 1993, correct?



1          A.   Crystallynn Girard.

2          Q.   And the -- the little girl's mother,

3     Lynn DeJac, was convicted of committing that crime,

4     correct?

5          A.   She was.

6          Q.   And she was subsequently exonerated

7     based on DNA evidence.

8          A.   Correct.

9          Q.   DNA evidence indicating that one of the

10    initial suspects, her boyfriend Donohue -- that

11    his -- his DNA was found in the 13-year-old's

12    vagina, correct?

13         A.   Correct.

14         Q.   Pretty powerful evidence that Donohue

15    committed the crime, correct?

16         MR. SAHASRABUDHE:  Object to the form.

17         THE WITNESS:  Pretty powerful evidence that

18    he was having sex with the girl or he touched her

19    in that area.

20         BY MR. BRUSTIN:

21         Q.   All right.  So in your view, not

22    powerful evidence that he --

23         A.   It's power -- it's powerful evidence.

24    Cuts many ways.

25         Q.   Let me finish my question.



```
 1          A.   Sure.
 2          Q.   In your view, would you agree that
 3   Donohue, who was a suspect in this murder along
 4   with another murder years before -- the fact that
 5   his semen was found in the 13-year-old vagina of
 6   his girlfriend (sic) would be powerful evidence
 7   indicating that he is, in fact, the person that
 8   killed her?
 9          A.   It is powerful, but I thought it was
10   DNA.  I did not know it was semen.
11          Q.   I don't know if it's semen.  His DNA
12   being in her vagina, would that be powerful
13   evidence?
14          A.   It would be.
15          Q.   And in fact, she was found -- you
16   understand that Donohue was previously a suspect in
17   a 1977 unsolved murder of a woman named Carol Reed,
18   who was found raped and naked.
19          A.   I was not aware of the victim's name.
20          Q.   But you knew that there was -- that he
21   was a suspect in a case with those allegations.
22          A.   Correct.
23          Q.   Could you please tell me all the
24   investigative activities that you remember
25   conducting in that case?
```



1          MR. SAHASRABUDHE:  Object to the form.  You

2     can ask him about specific things that might relate

3     to 404(b).

4          MR. BRUSTIN:  I'm honestly trying to cut to

5     it.  I want to see if -- if -- I have limited

6     information on the case.

7          BY MR. BRUSTIN:

8          Q.   I'm just trying to find out if you

9     recall generally which activities you participated

10    in.

11         A.   I do know that I went to the scene with

12    my partner, Michael D. Lyons, L-Y-O-N-S.  Detective

13    Lyons is now deceased.

14         I don't recall all the rest of what -- what

15    was done.  I do believe that I took one statement

16    in regards to the case itself.

17         Q.   Okay.  And do you remember --

18    certainly the -- you remember taking a statement of

19    a person named Keith Cramer, correct?

20         A.   I don't know if I took that statement

21    or someone else did.

22         Q.   Okay.  Which statement do you recall

23    taking?

24         A.   I thought I took a statement from

25    Ms. DeJac, where she was that night.



1        Q.   All right.  You don't deny taking a

2   statement from -- or interviewing Keith Cramer.

3   You just don't recall it today.

4        A.   I don't recall it, I'm sorry.

5        Q.   And -- all right.  So first of all, you

6   deny any type of coercion or suggestion with

7   Mr. Cramer in connection with his statement in the

8   case.

9        A.   I don't recall his statement at all.

10       Q.   All right.  But certainly you deny

11  engaging in any misconduct with Mr. Cramer.

12       A.   I do.

13       MR. SAHASRABUDHE:  Object to the form.

14       BY MR. BRUSTIN:

15       Q.   And you deny any coercion or misconduct

16  with Wayne Hudson, correct?

17       MR. SAHASRABUDHE:  Object to the form.

18       THE WITNESS:  I'm trying to -- Wayne --

19  Wayne Hudson's a familiar name.

20       BY MR. BRUSTIN:

21       Q.   So let me read -- let me -- let me give

22  you a description of what I understand him to --

23  how -- his involvement.

24       Wayne Hudson, in October of 1993, while he

25  was facing a 25-year sentence, reported to



1   Detective Lonergan that Ms. DeJac admitted to

2   killing her daughter.

3          MR. SAHASRABUDHE:  Is this an allegation

4   from the Complaint?

5          MR. BRUSTIN:  It's an allegation, yes, from

6   the Complaint.

7          BY MR. BRUSTIN:

8          Q.   Do you recall that?

9          A.   You have your answer.  It's Detective

10  Lonergan.  I did not have any interaction -- I

11  don't believe I had interaction with him.

12         Q.   All right.  And that there was -- there

13  was an allegation that you were involved in

14  coercing him after the fact to maintain his false

15  testimony.

16         Do you deny doing that?

17         A.   I do.

18         MR. SAHASRABUDHE:  Object to the form.  And

19  that again is an allegation from the Complaint.

20         MR. BRUSTIN:  Yes.

21         BY MR. BRUSTIN:

22         Q.   A more specific allegation is that you

23  pressured Wayne Hudson not to recant his false

24  statement regarding DeJac's confession.

25         I take it you deny that.



1          A.   I deny it, and I don't remember it.

2          MR. SAHASRABUDHE:  Don't remember having

3   involvement with Wayne Hudson.

4          THE WITNESS:  I -- I certainly do not

5   remember.

6          BY MR. BRUSTIN:

7          Q.   And you don't recall one way or another

8   whether or not you also interviewed Keith Cramer,

9   but you certainly deny any coercion or suggestion

10  with him.

11         A.   I don't recall.

12         MR. SAHASRABUDHE:  You don't recall

13  interacting with him.

14         THE WITNESS:  Not at all.  I'm sorry.  It

15  was quite a while ago.

16         MR. SAHASRABUDHE:  Just don't want to --

17         BY MR. BRUSTIN:

18         Q.   So the final question on this is, just

19  to be clear, that the allegation is that although

20  Lonergan took the false statement from Mr. Hudson,

21  it was alleged that you -- when -- when Mr. Hudson

22  later tried to recant, you pressured him not to.

23         And I take it you deny doing that.

24         MR. SAHASRABUDHE:  Object to the form.

25         THE WITNESS:  I do deny it.



1          BY MR. BRUSTIN:

2          Q.   All right.  Let's talk about the

3    Epps -- Epps case, okay?

4          So according to Detective Masecchia, he

5    was -- he was assigned to investigate the murder of

6    Tameka Means, the case that -- that -- that

7    Mr. Epps was convicted of committing.

8          Do you remember that case?

9          A.   Yes, I do.

10         Q.   Okay.  And he also testified that he

11   was involved in the Pope investigation as well.

12         Do you remember that case?

13         A.   I do, yes.

14         MR. SAHASRABUDHE:  Paul -- and for the

15   record, we're talking about Paul Pope.

16         THE WITNESS:  Paul Pope.

17         BY MR. BRUSTIN:

18         Q.   Paul Pope, yes.  And just a little more

19   specifics on the facts of the Means -- of the Means

20   murder.

21         What -- what generally happened, to my

22   understanding, is that a car pulled alongside

23   Ms. Means and her passenger.  There was an

24   incident, and she was shot in the head.

25         Do you recall that?



```
 1          MR. SAHASRABUDHE:  Do you recall it?

 2          THE WITNESS:  I do.

 3          BY MR. BRUSTIN:

 4          Q.   And that was the crime that Cory Epps

 5   was convicted of.

 6          A.   I believe so, yes.

 7          Q.   And he was -- and he was convicted

 8   based on an identification by the passenger in

 9   Ms. Means' car, a woman named Bradley.

10          A.   I believe -- I believe you are correct.

11          Q.   Okay.  And that investigation was in

12   1997.  Do you recall that?

13          A.   That's about the right time.

14          Q.   All right.  Now, you were involved in

15   the Pope investigation, correct?

16          A.   Correct.

17          Q.   And there came a time when you took a

18   statement from a woman named Wymoko (phonetic)

19   Anderson.

20          A.   Wymika (phonetic) Anderson.

21          Q.   Is it Wymiko?

22          A.   Wymika.

23          Q.   I think it's --

24          A.   I'll try it for you.  W-Y-O-M-K-A

25   (sic), Anderson.  I think she's known as Pumpkin.
```

MARK R. STAMBACH                                    June 08, 2022
VALENTINO DIXON vs CITY OF BUFFALO                           387

1          Q.   Yes.  The way I have it written is

2    W-Y-M-I-K-O, but I don't know what's correct.

3          MR. SAHASRABUDHE:  I think it appears

4    differently in different documents.

5          BY MR. BRUSTIN:

6          Q.   You knew her as Pumpkin Anderson.

7          A.   I knew her as Pumpkin.

8          Q.   All right.  In any case, when you were

9    investigating the Paul Pope murder in 1998, you and

10   another detective took a statement from

11   Ms. Anderson in the interview room in the homicide

12   office, correct?

13         A.   Correct.

14         Q.   And according to Detective Masecchia,

15   he was likely one of the officers that was sitting

16   in the outer office during that time.

17         Any reason to dispute that?

18         A.   I don't know.

19         Q.   Okay.

20         A.   You know, I don't even know who I took

21   the statement with.

22         Q.   Okay.  But you do know you took the

23   statement.

24         A.   I believe I did.

25         Q.   All right.  And you do know there were



1    other officers in the outer office.

2         A.    There would be, yes.

3         Q.    And at the time that you interviewed

4    Ms. Anderson in connection with the Pope case, you

5    knew that Masecchia was the most involved officer

6    on the Means case.

7         MR. SAHASRABUDHE:  Object to the form.

8         THE WITNESS:  I knew that he was involved in

9    the case.

10        BY MR. BRUSTIN:

11        Q.    To the extent there was a lead

12   detective on that case, you understood it was

13   Masecchia.

14        A.    I would go to him, yes.

15        Q.    Now, you understand that

16   Ms. Anderson -- withdrawn.

17        The only time you ever interacted with

18   Ms. Anderson is when you interviewed her -- you

19   took a statement from her in the interview room in

20   the homicide office in April of 1998, correct?

21        A.    I believe you're correct.

22        Q.    And do you agree that one of the things

23   that Ms. -- and I'm hoping we can do this without

24   looking at the documents, but if we have to, we

25   will.  Pretty -- pretty -- I'm going to keep it



1  pretty broad.

2        One of the things that Ms. Anderson claims

3  that she told you -- and I don't think you dispute

4  this -- is that Russell Montgomery killed her

5  boyfriend, Paul Pope.

6        A.   I don't recall that.  I -- I believe

7  that to be true, but you're like refreshing my

8  memory.  I believe that to be true.

9        Q.   Okay.  And according to --

10        A.   She was not a witness to that, by the

11  way.

12        Q.   That's right.  That her -- that -- that

13  it was reported to her.

14        A.   Yes.  Yes.

15        Q.   All right.  Now --

16        A.   She -- it's a surmised -- she surmised

17  that it was him.

18        Q.   Okay.  And according to her -- and I

19  will represent to you this does not appear anywhere

20  in your interview.

21        A.   Okay.

22        Q.   According to her, she also reported to

23  you during that interview that Montgomery also

24  killed Tameka Means.  That she had information

25  suggesting that Montgomery killed Tameka Means.



1          MR. SAHASRABUDHE:  Object to the form,

2    mischaracterizes the testimony.

3          THE WITNESS:  I don't remember that, and I

4    don't think that's true.

5          BY MR. BRUSTIN:

6          Q.   All right.  And she claims that --

7    according to her, she claims that when she tried to

8    tell you that Russell killed Ms. Means, you told

9    her that Cory Epps did it; that you had evidence

10   against him; and that she was wrong.

11         MR. SAHASRABUDHE:  Object to the form.

12         THE WITNESS:  I don't believe so, no.

13         BY MR. BRUSTIN:

14         Q.   All right.  And obviously -- well, you

15   deny that happening during the interview, because

16   if it happened, you would obviously have to

17   document that, correct?

18         A.   Correct.

19         MR. SAHASRABUDHE:  Object to the form.

20         BY MR. BRUSTIN:

21         Q.   And you also deny saying that to her,

22   because if a woman came in and told you she had

23   information about somebody committing a murder for

24   which you had another suspect, the last thing you

25   would do appropriately as a detective would be to



 1  tell her she was wrong, correct?

 2          MR. SAHASRABUDHE:  Object to the form.

 3          THE WITNESS:  You're correct.  I mean, she

 4  is a good person.  She was very distraught when she

 5  came in.

 6          BY MR. BRUSTIN:

 7          Q.   All right.

 8          A.   And --

 9          Q.   In any case, whether she's -- so you

10  believe her to be a good, honest person.

11          A.   I do.

12          Q.   All right.  And so when she claims that

13  during that interview, she told you that Montgomery

14  also killed Ms. Means, she's lying about that.

15          MR. SAHASRABUDHE:  I object to the form.

16  That's not what she claims.  You can answer if you

17  want.

18          THE WITNESS:  No, she did not tell me that.

19          BY MR. BRUSTIN:

20          Q.   All right.  So let's take a look at --

21  I think we should do a little bit with the

22  Exhibits, so take a look at the marked

23  Exhibit binder.

24          A.   Which case?

25          MR. SAHASRABUDHE:  Dixon Deposition Marked



 1    Exhibits.

 2             (Discussion off the record.)

 3        MR. BRUSTIN:  Let's go off the record just a

 4    minute.

 5             (Off the record: 5:58 p.m.)

 6             (On the record: 5:59 p.m.)

 7        BY MR. BRUSTIN:

 8        Q.   Now, take a -- take a look at

 9    Exhibit 9.  It's the written -- hand -- handwritten

10    statement from Ms. Anderson.

11        See it says in the middle -- about the fifth

12    line:  On the 17th of April, 1998, the Buffalo

13    Police homicide detectives came to my house?

14        A.   Hang on one second, please.  On which

15    line?  On which page?

16        Q.   Page -- first page.

17        A.   Yes.

18        Q.   About seven lines downs.

19        A.   Yes.

20        Q.   On the 17th of April, 1998.

21        A.   Okay.

22        Q.   Do you see that?

23        A.   Yes, I do.

24        Q.   All right.  And keep -- keep -- keep

25    your hand on that and take a look at Exhibit 8 just



1  before it.

2        A.    8.  Are we in a different file?

3        Q.    Same -- same -- it's one -- it's the

4  same file, one -- one tab back.

5        A.    One tab back.

6        Q.    The other way.

7        A.    This way?

8        MR. SAHASRABUDHE:  This one.  So just --

9  here, I'll hold it.

10       BY MR. BRUSTIN:

11       Q.    Yes, it's just one tab, you don't have

12  to hold it.  It's okay.

13       A.    Okay.

14       Q.    And you see that, in fact, April 17th,

15  which she references, is when you took a statement

16  from her, correct?

17       A.    Yes.

18       Q.    All right.  So now let's go back to

19  what she says happened.

20       MR. SAHASRABUDHE:  Object to the form.

21       BY MR. BRUSTIN:

22       Q.    So this is a -- you -- you recognize

23  this as a sworn statement allegedly signed by

24  Ms. Anderson, correct?

25       A.    I do.



```
 1          Q.   All right.

 2          A.   Both of them are.

 3          Q.   Have you ever seen this before?

 4          A.   I have never seen this article -- this

 5     sworn statement, handwritten one, before.

 6          Q.   Okay.  And you -- you did know -- you

 7     did know before today that Ms. Anderson is claiming

 8     that you -- you misrepresented what happened during

 9     the interview with her on the 17th, correct?

10          A.   Again, those are your words.  I -- I

11     didn't misrepresent myself to her.

12          Q.   You understand that she's alleged that,

13     correct?

14          A.   She's alleged what?

15          MR. SAHASRABUDHE:  I -- I object to the form

16     of that question.

17          BY MR. BRUSTIN:

18          Q.   So let's take a look.  Let's look down

19     the page.

20          MR. SAHASRABUDHE:  Cory Epps might have

21     alleged it.

22          BY MR. BRUSTIN:

23          Q.   All right.  So take a look in the

24     middle of the page where it says:

25          They asked what was his occupation and who
```



1  his friends were.

2         Do you see that?

3         A.   Where -- where are you?

4         Q.   Middle of the page.

5         A.   Okay.

6         Q.   Right in the middle.  Last word in

7  the --

8         A.   Okay.

9         Q.   They asked what -- what was his

10  occupation and who his friends were.

11         A.   Okay.

12         Q.   I answered all their questions, which

13  included whether Paul sold drugs to Russell

14  Montgomery.

15         A.   Okay.

16         Q.   They asked me what he looked like.  I

17  answered, "You know the sketch you all made of the

18  guy who killed Tameka Means?  That's him.  That's

19  Russell Montgomery."

20         Now, first of all, that doesn't appear

21  anywhere in your interview.  You deny her stating

22  that to you, correct?

23         A.   Correct.

24         Q.   And then she goes on and says:

25         They told me they do look alike but that's



1  not enough.  I told them that Paul told me that

2  Russell Montgomery told him that he did kill

3  Tameka.

4        A.    Okay.

5        Q.    They told me that this is hearsay.

6  They asked me if I would take a lie detector test,

7  and I said yes.  They never called me back.

8        So first of all, you deny, during that

9  interview, her telling you that she understood

10  Paul -- that Russell Montgomery confessed to

11  somebody else about killing Tameka Means, correct?

12        MR. SAHASRABUDHE:  Form.

13        BY MR. BRUSTIN:

14        Q.    You deny her telling you that, correct?

15        A.    I -- you would have -- I'm -- I'm

16  confused about this.  I would like to read the

17  statement.

18        Q.    You don't need to read the statement.

19  It's very straightforward.  She is claiming that

20  during the interview with you, she told you that

21  she believed that she was told that Russell

22  Montgomery confessed to her boyfriend that he

23  killed Tameka Means, okay?

24        A.    I would have to look at the statement

25  to see if that's accurate.



 1        Q.   Well, there's nothing in it -- in your
 2   statement about that.
 3        A.   Well, I don't recall.
 4        Q.   I'm telling you -- I'm representing to
 5   you --
 6        A.   I know you're telling me, but I'm
 7   looking right now.
 8        Q.   I'm representing to you there's nothing
 9   about Tameka Means in there.
10        Do you recall her telling you that --
11        A.   I -- I remember making this sworn
12   statement.
13        Q.   Okay.  And I take it that given the
14   fact that there's no mention in here of Russell
15   Montgomery -- of evidence concerning Russell
16   Montgomery killing Tameka Means, she must not have
17   told you that, correct?
18        A.   Correct.
19        Q.   Because if she told you that, it would
20   be in the statement, correct?
21        MR. SAHASRABUDHE:  Object to the form.
22        THE WITNESS:  Correct.
23        BY MR. BRUSTIN:
24        Q.   You wouldn't hide it, right?
25        A.   Correct.



1          Q.   So you deny that she told you that.

2          A.   Correct.

3          Q.   Ms. Anderson is lying about that.

4          A.   Again, she's identifying me, as telling

5    me that.  She did not tell me that.  I don't

6    believe it happened.  It's not in my report.

7          I was with Detective Giardina.  You can even

8    ask Giardina.  I -- she did not mention it to me or

9    Giardina.

10         Q.   All right.

11         A.   I know that for a fact.  And this

12   statement was taken four years after the homicide.

13         Q.   Regardless of when it was taken, if she

14   gave you information that you had the wrong person

15   being prosecuted --

16         A.   Okay.

17         Q.   -- for the Tameka Means case, you would

18   have documented that and --

19         A.   Correct.

20         Q.   -- provided it to the DA, correct?

21         MR. SAHASRABUDHE:  Object to the form of the

22   question.

23         THE WITNESS:  I would --

24         MR. SAHASRABUDHE:  You can answer if you

25   know.



1          THE WITNESS:  If I -- if -- once again, I

2    would have -- I would have notified somebody.

3          BY MR. BRUSTIN:

4          Q.   Okay.  Otherwise, it would have been --

5    it would have been a fabrication of her statement

6    to you, correct?

7          MR. SAHASRABUDHE:  Object to the form of the

8    question.

9          BY MR. BRUSTIN:

10         Q.   If you left that out.

11         A.   Again, she did not state that to me.

12         Q.   Right.  If -- because you -- in other

13   words, you -- your -- it's your position that she's

14   lying about making that statement to you, correct?

15         A.   I -- I don't want to call her a liar.

16         Q.   All right.

17         MR. BRUSTIN:  Let's mark this as Exhibit --

18   what number are we on?  Exhibit 15, please.

19         (Discussion off the record.)

20   The following was marked for Identification:

21    PLF. EXH. 15        excerpt of trial testimony,

22                        83 pages

23         BY MR. BRUSTIN:

24         Q.   Okay.  So Detective, I'm showing you

25   what's been marked for identification as



 1  Plaintiff's 15, and it was formerly marked as

 2  Exhibit 105 in connection with the Epps case, and

 3  it's the -- it's the -- it's testimony -- prior

 4  testimony from Wymiko Anderson, I believe in

 5  post-trial proceedings in the Epps case.

 6          Now, if you'd take a look at page 25, this

 7  is Ms. Anderson describing what happened with the

 8  Buffalo police on April 17th when you interviewed

 9  her, okay?

10          A.   Yes, sir.

11          Q.   All right.  If you could read to

12  yourself -- read to yourself on page 27, lines

13  12 --

14          A.   Okay.

15          Q.   -- to page 29, line 6.  Let me know

16  when you're done.

17          Actually, if you could read all the way

18  through page 31, line 25.

19          A.   Okay.

20          Q.   Now, you would agree that what

21  Ms. Anderson is describing here is that she

22  provided you information about the Means murder,

23  correct?

24          A.   Correct.

25          Q.   That you failed to write it down in



1  your statement, correct?

2       A.   It does not appear in my statement,

3  you're correct.

4       Q.   And that you left the room --

5       A.   Correct.

6       Q.   -- for a period of time, that you came

7  back, and that you told her in substance that she

8  was wrong; you had the right person for that crime.

9       A.   No, I did not.

10      Q.   That's what she's claiming, correct?

11      A.   Correct.

12      Q.   All right.  In other words, she is

13 making up a series of lies about what happened

14 during that interview, correct?

15      A.   Correct.

16      Q.   To the extent that she provided you any

17 information about the Means murder, the last thing

18 that you were supposed to do, if you were following

19 accepted practice, would be to stop typing,

20 correct?

21      A.   Correct.

22      MR. SAHASRABUDHE:  Object to the form.

23      BY MR. BRUSTIN:

24      Q.   You had an obligation to document the

25 information she provided to you if she provided it



```
 1   to you.
 2          A.   You are correct.
 3          MR. SAHASRABUDHE:  Form.
 4          BY MR. BRUSTIN:
 5          Q.   And it would be completely improper for
 6   you to have told her that she was wrong and not to
 7   document that evidence, correct?
 8          A.   Correct.
 9          MR. SAHASRABUDHE:  Form.
10          BY MR. BRUSTIN:
11          Q.   For whatever reason, Ms. Anderson made
12   that up.
13          MR. SAHASRABUDHE:  Form.
14          THE WITNESS:  Correct.
15          BY MR. BRUSTIN:
16          Q.   And by the way, the information that
17   she -- assuming what she's saying is true, that her
18   boyfriend told her Russell Montgomery agreed to --
19   withdrawn.
20          To the extent that she was telling you that
21   Russell Montgomery told her boyfriend that he
22   killed Tameka Means, that would, in fact, be a
23   hearsay statement, correct?
24          A.   It certainly would.
25          Q.   And that would be something that you
```



1   would be aware of based on your law enforcement

2   experience at the time, correct?

3          MR. SAHASRABUDHE:  Form.

4          THE WITNESS:  You are correct.

5          BY MR. BRUSTIN:

6          Q.   And you -- you said you knew -- you

7   knew Ms. Anderson a bit, correct?

8          A.   No, I -- I just met her on this

9   particular statement, but she was very overwhelmed.

10         She seemed sincere.  She didn't seem to be

11  evasive whatsoever, and I really did not leave the

12  interview room during her sworn statement.  I know

13  that for a fact.

14         Q.   All right.  And obviously, if she had

15  provided you any information whatsoever about the

16  Means murder, you had an obligation to document

17  that and provide it to Masecchia, correct?

18         MR. SAHASRABUDHE:  Object to the form.

19         THE WITNESS:  I would have certainly, yes.

20  You are correct.

21         BY MR. BRUSTIN:

22         Q.   And would you agree, though, that based

23  on your interaction with Ms. Anderson, she was not

24  a particularly sophisticated witness?

25         A.   No, she's not sophisticated.



1        Q.   And so you wouldn't expect that she
2   would understand the difference between hearsay
3   evidence and other kinds of evidence.
4        A.   I don't believe so.
5        MR. SAHASRABUDHE:  Form.
6        BY MR. BRUSTIN:
7        Q.   That's not the kind of thing you would
8   think she would understand, correct?
9        A.   No.
10       Q.   So it's just a coincidence that she
11  represented that you told her what she was
12  providing to you was hearsay evidence when, in
13  fact, it really was hearsay evidence, correct?
14       MR. SAHASRABUDHE:  Form.
15       THE WITNESS:  That's confusing.
16       BY MR. BRUSTIN:
17       Q.   All right.  So -- it was confusing.
18  Bad question.
19       According to her, she told you about a
20  confession that was, in fact, a hearsay confession,
21  correct?
22       A.   That's correct.
23       Q.   And --
24       A.   That's what she stated.
25       Q.   That's what she stated.  And based on



1  your interaction with her, you don't think she was

2  sophisticated to know the difference between a

3  hearsay statement and a non-hearsay statement,

4  correct?

5        A.   I would say that's correct.

6        Q.   And she claims that you told her it was

7  a hearsay statement, correct?

8        MR. SAHASRABUDHE:  Form.

9        THE WITNESS:  I -- I did not say that.

10       BY MR. BRUSTIN:

11       Q.   I know.  She claims you did.

12       A.    That's fine.  Okay.

13       Q.   And if she had made that statement to

14  you, you would have, in fact, understood -- in

15  other words, if she told you that "My boyfriend

16  told me that Russell Means (sic) confessed to him

17  about committing the murder," you would understand

18  that that's a hearsay statement.

19       MR. SAHASRABUDHE:  Form.

20       THE WITNESS:  Correct.

21       BY MR. BRUSTIN:

22       Q.   And you would understand that there

23  would be problems using that statement as

24  affirmative evidence.

25       A.   Correct.



1          Q.   So in fact, that's the kind of thing

2    you might have said -- said to her --

3          MR. SAHASRABUDHE:  Object to the form.

4          BY MR. BRUSTIN:

5          Q.   -- and properly documented it, correct?

6          MR. SAHASRABUDHE:  Object to the form.

7          THE WITNESS:  I -- I really would not have

8    said something like that to her, and if she would

9    have mentioned it to me, that would have been in

10   the statement, and that would have been in my P73.

11         BY MR. BRUSTIN:

12         Q.   All right.  So just a couple --

13         MR. BRUSTIN:  How much time do we have left?

14         THE VIDEOGRAPHER:  Six hours 33 minutes.

15         BY MR. BRUSTIN:

16         Q.   All right.  I want to ask you just a

17   couple of questions about your interactions with

18   Aaron Jackson, okay?

19         A.   Aaron Jackson.  We're going back to

20   another case.

21         MR. SAHASRABUDHE:  Dixon.

22         THE WITNESS:  Dixon case.

23         (Discussion off the record.)

24         BY MR. BRUSTIN:

25         Q.   Now, you interviewed -- if you'd take a



 1  look at the file, let's start with page 185.

 2          A.   That's it.  Okay.

 3          Q.   Now, you interviewed Mr. Jackson at the

 4  hospital on August 12th, 1991?

 5          A.   Correct.

 6          Q.   And that was a day after Lamarr Scott

 7  and Leonard Brown told you that they, in fact, shot

 8  Aaron -- that Lamarr Scott, in fact, shot Torri

 9  Jackson and Aaron Jackson, correct?

10          MR. SAHASRABUDHE:  Object to the form.

11          THE WITNESS:  I'm not sure on the date.

12  Once again, you're saying that I did the interview

13  after I received a confession?

14          BY MR. BRUSTIN:

15          Q.   So look at the dates on here.  Very

16  simple.

17          A.   I see it.

18          Q.   8/12/91 is when you're doing this

19  interview, correct?

20          A.   And Lamarr Scott came in when?

21          Q.   Lamarr Scott came in on 8 -- on 8/10.

22          A.   Okay.

23          Q.   Right?  Do you remember that?

24          A.   Yes.

25          Q.   Okay.  So two days --



 1          MR. SAHASRABUDHE:  Is that -- are we right

 2     on that?  I don't --

 3          MR. BRUSTIN:  Let me just double-check.

 4          MR. SAHASRABUDHE:  I think it's the 12th in

 5     Lamarr Scott's interview.

 6          MR. BRUSTIN:  Hold on.

 7          BY MR. BRUSTIN:

 8          Q.   Sorry.  Yes, Lamarr Scott is also on

 9     8/12.  That's correct.

10          A.   Okay.

11          Q.   And -- but certainly you understand

12     that in the early morning of -- of August 11th,

13     you're learning about the Lamarr Scott admissions,

14     correct?

15          MR. SAHASRABUDHE:  Object to the form.  I

16     don't --

17          THE WITNESS:  Lamarr Scott, once again, was

18     on what date?  I'm -- I'm getting confused here.

19          BY MR. BRUSTIN:

20          Q.   So you interviewed Lamarr Scott the day

21     of the 12th.

22          A.   Okay.

23          Q.   But in the early morning hours, that's

24     when he gave the statement on television, correct?

25     The day before, on the 11th into the morning of the



 1  12th.
 2          A.    It was in -- in the nighttime.
 3          Q.    All right.  So before you met with --
 4  before you met with Aaron Jackson on the 12th, you
 5  knew, at least generally, about the Lamarr Scott
 6  confession, correct?
 7          A.    No.
 8          Q.    You -- you -- you knew about it the
 9  night before on TV.
10          A.    Once again, you're --
11          Q.    Do you know -- I'm going to let you go
12  with that.  So is it your testimony --
13          A.    Slow down, please.
14          Q.    No, no, no, no, no.  I'm going to --
15  I'm going to let you do it.
16          Is it your testimony that when you met with
17  Aaron Jackson, you had no idea that Lamarr Scott
18  had confessed?
19          MR. SAHASRABUDHE:  Do you know one way or
20  the other?
21          THE WITNESS:  I'm a little bit confused on
22  that, I'm sorry.
23          BY MR. BRUSTIN:
24          Q.    All right.  So you would agree,
25  though -- so let's go -- let's go to the report on



 1  8/12/91, so that's page 185.

 2          You would agree that one of the important

 3  things to -- according to you in this report, Aaron

 4  Jackson made a tentative identification, correct?

 5          A.    Correct.

 6          Q.    And -- of -- of Valentino Dixon.

 7          A.    Correct.

 8          Q.    And either on this day or in the

 9  following days, you understood it would be

10  important to show a photo array of Lamarr Scott to

11  Aaron Jackson, correct?

12          A.    Correct.

13          Q.    And can you explain why that never

14  happened?

15          MR. SAHASRABUDHE:  Object to the form.

16          THE WITNESS:  No, I cannot.

17          BY MR. BRUSTIN:

18          Q.    And obviously, given the information

19  that Lamarr Scott gave, it would have been

20  important to do an investigation and -- including

21  an interview of Aaron Jackson, about whether or not

22  he had a gun or Torri Jackson had a gun.

23          A.    It would have been important.

24          Q.    And there's absolutely no questions

25  whatsoever here, correct?



```
 1          A.    Correct.

 2          Q.    And if you'd take a look at page 216.

 3          MR. SAHASRABUDHE:  I don't understand this

 4   page numbering.

 5          THE WITNESS:  I'm on page 216 with DiPirro

 6   and Grabowski.

 7          BY MR. BRUSTIN:

 8          Q.    And on 8/21, more than a week later --

 9          A.    Okay.

10          Q.    -- DiPirro and Grabowski are doing a

11   follow-up interview of Aaron Jackson, correct?

12          A.    Correct.

13          Q.    And obviously, you would have expected

14   DiPirro and Grabowski -- Grabowski to talk to you

15   before doing a follow-up investigation of a man you

16   interviewed, right?

17          MR. SAHASRABUDHE:  Object to the form.

18          THE WITNESS:  I don't -- I don't recall

19   that.  Both the Detectives Grabowski and DiPirro

20   are deceased, and I -- this is their -- I don't

21   remember this form or this report at all.

22          BY MR. BRUSTIN:

23          Q.    You certainly would have known about it

24   at the time.

25          MR. SAHASRABUDHE:  Object to the form.
```



1          THE WITNESS:  I might have, yes.

2          BY MR. BRUSTIN:

3          Q.   Well, certainly no indication in this

4     report that they did any investigation to determine

5     whether or not Aaron Jackson or Torri Jackson had

6     weapons, correct?

7          A.   Correct.

8          Q.   And nothing in this report indicating

9     that a photo array was shown to them with Lamarr

10    Scott.

11         MR. SAHASRABUDHE:  Object to the form.

12         THE WITNESS:  That is correct.

13         BY MR. BRUSTIN:

14         Q.   So it appears as to Aaron Jackson,

15    there was no investigation whatsoever to determine

16    whether or not the allegations that Lamarr Scott

17    confessed to were true.

18         MR. SAHASRABUDHE:  Object to the form.

19         THE WITNESS:  Correct.

20         MR. SAHASRABUDHE:  From -- from this report.

21         THE WITNESS:  From this report.

22         BY MR. BRUSTIN:

23         Q.   From this report or your report.

24         A.   From this report.

25         Q.   Or your report.



1          A.   I did not generate a report to that,

2    no.

3          Q.   You generated a -- you generated a

4    report from August 12th.  Do you remember we just

5    looked at that?

6          A.   I do.

7          Q.   And no indication there of any

8    questions about whether he had a gun, correct?

9          A.   Correct.

10         Q.   And no indication there about whether

11   or not you -- and you didn't -- you did not show

12   him a photo array of Lamarr Scott that day,

13   correct?

14         A.   Correct.

15         Q.   And by the way, the reason there's

16   confusion about whether or not this was before or

17   after you interviewed Lamarr Scott is because, once

18   again, you did not put the time in your report as

19   to when you interviewed him, correct?

20         A.   Correct.

21         Q.   If you had put the time in your report

22   as to when you interviewed him, we would have known

23   whether or not it was before or after Lamarr Scott,

24   correct?

25         A.   Before -- run -- run that by me again.



1        Q.   If you had put the time that you

2   interviewed Aaron Jackson in your report, then we

3   would know whether or not you -- you interviewed

4   Aaron Jackson before you took the statement from

5   Lamarr Scott or after, correct?

6        A.   I had to interview --

7        MR. SAHASRABUDHE:  Form.

8        THE WITNESS:  Again, I had to interview

9   Aaron Jackson during the daytime of the 12th.  It's

10  in a hospital.  I mean, that's when we go to the

11  hospital to visit people.

12       So with Mr. Scott coming in, he came in at

13  night on the 12th.

14       So again, I would not have shown him a photo

15  array of Lamarr Scott, because we didn't get to

16  that point at that time.  Just --

17       BY MR. BRUSTIN:

18       Q.   Actually --

19       MR. SAHASRABUDHE:  Answer what you know.

20       MR. BRUSTIN:  Yes.

21       MR. SAHASRABUDHE:  Just answer what you

22  know.  Don't --

23       BY MR. BRUSTIN:

24       Q.   Right, because what you just did is you

25  just made that up.



1          You understand --

2          A.    I didn't make up anything.

3          Q.    -- Lamarr -- Lamarr Scott actually was

4    on television in the early morning hours of the

5    12th, and he was interviewed the day of the 12th.

6          You understand that, correct?

7          A.    I'm not clear on that.

8          Q.    All right.  So let me try my original

9    question again.

10         A.    Sure.

11         Q.    The reason you don't know whether or

12   not you interviewed Aaron Jackson before or after

13   Lamarr Scott is because you did not write down the

14   time you interviewed him, correct?

15         A.    But I believe that's on the P73, what

16   time we brought him to the office.  If I could look

17   at the P73, it might be --

18         Q.    Which P73?

19         A.    In regards to Lamarr Scott.

20         Q.    Sure, let's take a look at it.

21         So let's take a look at page --

22         A.    Do you have a -- a reference number in

23   this book?

24         Q.    I'll find it for you.  Just give me a

25   minute.  So first of all -- take a look at



1    page 154.

2         A.    Okay.

3         Q.    So first of all, on August 11th, the

4    day before you interviewed Aaron Jackson, you

5    interviewed Mario Jarmon in the hospital.

6         A.    Correct.

7         Q.    And he indicated that Torri Jackson was

8    the person that shot him, correct?

9         A.    Correct.

10        Q.    So you have information before you

11   interview Aaron Jackson the next day that his

12   brother actually brought a gun and shot at Mario

13   Jarmon, correct?

14        A.    I -- I don't recall that.

15        Q.    Well, you don't have to recall it.

16   It's in your memo.  That's what it says in the

17   document, right?

18        A.    That's correct.

19        Q.    How do you explain not asking Aaron

20   Jackson a single question the next day about what

21   Mario Jarmon reported to you, that his brother shot

22   him?

23        MR. SAHASRABUDHE:  Object to the form.

24        THE WITNESS:  I don't know.  I can't answer

25   that.



```
 1          BY MR. BRUSTIN:

 2          Q.   Would you -- can you think of any --

 3    any legitimate police reason not to ask him that

 4    question?

 5          MR. SAHASRABUDHE:  Object to the form.

 6          THE WITNESS:  No, I cannot.

 7          BY MR. BRUSTIN:

 8          Q.   Would you agree that that would be a

 9    basic question that any officer acting in good

10    faith would ask?

11          MR. SAHASRABUDHE:  Object to the form.

12          THE WITNESS:  No, I cannot.

13          BY MR. BRUSTIN:

14          Q.   You agree with me, right?

15          A.   I do.

16          Q.   Another mistake.

17          A.   That's correct.

18          Q.   All right.  Now, take a look at --

19          MR. BRUSTIN:  Go off the record for just a

20    minute.

21               (Off the record: 6:29 p.m.)

22               (On the record: 6:30 p.m.)

23          BY MR. BRUSTIN:

24          Q.   Take a look at page 161, and look at

25    the second and third paragraphs beginning with
```



1  "Upon arrival at the homicide office" --

2         A.   Okay.

3         Q.   -- through the next paragraph.

4         A.   Okay.

5         Q.   And you would agree it appears that in

6  the early morning hours, about 1 a.m. on the 12th,

7  that's when the confession was made to the TV

8  station, correct?

9         A.   Correct.

10        Q.   So you certainly knew, before you

11 interviewed Aaron Jackson, about the confession of

12 Lamarr Scott.

13        A.   I would say that's correct.

14        Q.   And so that would make it even -- so

15 the most basic investigative task at that point,

16 particularly when you have a suspect --

17 withdrawn -- particularly when you have a witness

18 who's only made a tentative identification, would

19 be to show that witness a photo array containing

20 Lamarr Scott, correct?

21        MR. SAHASRABUDHE:  Object to the form.

22        THE WITNESS:  We could have.

23        BY MR. BRUSTIN:

24        Q.   That would have been a basic

25 investigative task that any officer acting in good



1    faith would have conducted, correct?

2         MR. SAHASRABUDHE:  Object to the form of the

3    question.

4         THE WITNESS:  We could have.

5         BY MR. BRUSTIN:

6         Q.   All right.  In fact, not only did you

7    not show a photo array to Aaron Jackson on the

8    12th, not a single question concerning any of the

9    information Lamarr Scott gave to you, correct?

10        MR. SAHASRABUDHE:  Object to the form.

11        THE WITNESS:  You're correct.

12        BY MR. BRUSTIN:

13        Q.   But that had nothing to do with your

14   trying to cover up your misconduct.

15        MR. SAHASRABUDHE:  Object to the form.

16   Don't answer that question.

17        MR. BRUSTIN:  This is exactly what we're

18   alleging.  I want him to answer it.

19        BY MR. BRUSTIN:

20        Q.   That had nothing to do with our

21   allegation that you were covering up misconduct

22   regarding Valentino Dixon.

23        MR. SAHASRABUDHE:  Object to the form.  That

24   calls for an ultimate issue.  It's a palpably

25   improper question.  Don't answer it.



```
 1          BY MR. BRUSTIN:

 2          Q.   Don't want to defend yourself on that

 3    one?

 4          A.   I certainly do.

 5          Q.   Now, according to Aaron's testimony at

 6    the trial, he had an altercation with Mario Jarmon

 7    and the others earlier in the evening, at which

 8    time they were threatened with what they believed

 9    to be were guns, and they left.

10          Do you remember learning that?

11          MR. SAHASRABUDHE:  Object to the form.

12          THE WITNESS:  No, I do not.

13          BY MR. BRUSTIN:

14          Q.   And he claims that they went back and

15    got their brother Torri Jackson, who was a

16    teenager, small in stature, because they felt safer

17    with Torri with them.

18          Do you recall learning that?

19          MR. SAHASRABUDHE:  Object to the form.

20          THE WITNESS:  No, I do not.

21          MR. SAHASRABUDHE:  And I want to be clear.

22    Are you asking does he recall Aaron saying that to

23    him?

24          MR. BRUSTIN:  Yes.

25          BY MR. BRUSTIN:
```



1          Q.   Do you recall learning that

2     information?

3          A.   No, I do not.

4          Q.   Certainly don't dispute it if he

5     testified at trial.  You just don't remember

6     learning it from him.

7          A.   No, I do not.

8          Q.   And would you agree -- and then he

9     testified that they went around looking for the

10    guys who allegedly threatened them with what they

11    believed to be guns.

12         Do you remember learning that?

13         A.   No, I do not.

14         Q.   Would you believe -- would you agree

15    that as a trained homicide detective, one of the

16    things that that scenario suggests to you is they

17    went back to get Torri Jackson because he had a

18    gun?

19         MR. SAHASRABUDHE:  Object to the form, calls

20    for speculation.  If you think you can answer it,

21    answer it.  I --

22         THE WITNESS:  I would not be able to answer

23    that.  I'm sorry.

24         BY MR. BRUSTIN:

25         Q.   No?  Wouldn't be something you'd want



1  to investigate?

2       Whether they went back -- whether they went

3  home to get their 17-year-old brother because they

4  felt safer with him or because he had a gun, that

5  wouldn't be something to investigate based on

6  information you had?

7       MR. SAHASRABUDHE:  Object to the form.

8       THE WITNESS:  On the information I had?

9       BY MR. BRUSTIN:

10      Q.   Yes.

11      MR. SAHASRABUDHE:  Do you understand the

12 question?

13      BY MR. BRUSTIN:

14      Q.   The information you had was

15 that Torri --

16      A.   It's a beauty.

17      Q.   The information you had is that Torri

18 Jackson shot Mario Jarmon, correct?

19      MR. SAHASRABUDHE:  Object to the form.

20      THE WITNESS:  The information that I had,

21 yes.

22      BY MR. BRUSTIN:

23      Q.   All right.  Now, you would agree

24 another important question to ask Aaron Jackson

25 when he made a tentative identification was whether



```
 1   or not he knew the person he tentatively identified
 2   from any other source, correct?
 3         A.   Correct.
 4         Q.   And can you explain why you didn't ask
 5   that question?
 6         MR. SAHASRABUDHE:  Object to the form.
 7         THE WITNESS:  I cannot.
 8         BY MR. BRUSTIN:
 9         Q.   Just another mistake?
10         A.   I cannot answer that.  I -- I don't
11   know why I didn't do it.
12         Q.   You should have, right?
13         A.   One of the things I could have done,
14   yes.
15         Q.   Well, it's one of the things you should
16   have done, right?
17         MR. SAHASRABUDHE:  Object to the form.
18         THE WITNESS:  Yes.
19         BY MR. BRUSTIN:
20         Q.   So I think that's about all I have.  I
21   just want to make sure I'm clear.
22         Is it still your position after this
23   deposition that you did not engage in any conduct
24   that in any way caused Mr. Dixon's wrongful
25   conviction?
```



1          MR. SAHASRABUDHE:  Object to the form.  You

2    can answer.

3          THE WITNESS:  I'm -- I'm very emphatic I did

4    not.  He had a -- he had a trial, a jury trial.  I

5    wasn't involved in the jury trial.

6          BY MR. BRUSTIN:

7          Q.   And do you maintain --

8          A.   The District Attorney's office

9    prosecuted him.  I had other cases.  We were

10   overwhelmed at the homicide squad.

11         Again, I didn't participate in this trial.

12   I tried to do the very best job that I could.

13   There are mistakes that I made, which makes me look

14   like I'm not a very good detective, which I'm not

15   proud of, but I did not do anything against

16   Mr. Dixon.

17         If I would have learned certain things, I

18   would have been an advocate for Mr. Dixon.

19         Q.   Got you.  So it sounds like that's a

20   little different than what you started your

21   deposition with.

22         What you told us at the beginning of your

23   deposition was that you did not -- not only did you

24   not engage in intentional misconduct, you told us

25   that in this case, you conducted the same careful,



 1  conscientious investigation that you do in every

 2  case.

 3          Do you remember that, sir?

 4          MR. SAHASRABUDHE:  Object to the form.

 5          THE WITNESS:  I -- I -- I feel that I do a

 6  good job.

 7          BY MR. BRUSTIN:

 8          Q.   All right.  And now you've seen -- at a

 9  minimum, you've seen evidence of lots of mistakes,

10  right?

11          MR. SAHASRABUDHE:  Object to the form.

12          THE WITNESS:  I did make a lot of mistakes.

13          MR. BRUSTIN:  Okay.

14          THE WITNESS:  And I admitted to them.

15          MR. SAHASRABUDHE:  Object to the form.

16          BY MR. BRUSTIN:

17          Q.   Well, what choice did you have?

18          MR. SAHASRABUDHE:  Object to the form.

19  Don't answer that.

20          BY MR. BRUSTIN:

21          Q.   Is there anything you'd like to say to

22  Mr. Dixon?

23          A.   Not at this point, no.

24          Q.   Do you still maintain that Mr. Dixon is

25  guilty of this crime?



1        A.    I -- I firmly believe that he was

2   involved in this crime and that he was guilty of

3   some of the aspects of this murder.

4        Q.    Well, the only charge that -- as we --

5   as I -- as we carefully established at the

6   beginning of the case, the only charge that you

7   investigated him for and that he was arrested for

8   and that he was convicted for was shooting and

9   killing Torri -- Torri Jackson and shooting Aaron

10  Jackson with a gun that he brought, correct?

11       MR. BLENK:  Form.

12       MR. SAHASRABUDHE:  Form.  I don't think

13  that's what we established.

14       THE WITNESS:  Once again, I firmly believe

15  he was involved in this crime.

16       BY MR. BRUSTIN:

17       Q.    All right.  So are you now

18  acknowledging that he didn't shoot Torri Jackson or

19  Aaron Jackson?

20       A.    I'm not clear on that.  I'm sorry.

21       Q.    All right.

22       MR. BRUSTIN:  I think that's all I have.

23       THE WITNESS:  Thank you.

24       MR. SAHASRABUDHE:  He's -- he's going to

25  have a couple.



Mark R. Stambach - Mr. Blenk - 06/08/2022427

1          MR. BLENK:  What are we at for time?

2          THE VIDEOGRAPHER:  Six minutes -- or six

3    hours 56 minutes.

4                        EXAMINATION

5          BY MR. BLENK:

6          Q.   Mr. Stambach, I'm J.P. Blenk.  We met

7    off the record.

8          A.   Yes, sir.

9          Q.   I represent Chris Belling --

10         A.   Okay.

11         Q.   -- and the -- and Erie County in

12   this -- in this litigation.  I just have a couple

13   questions.  I don't think it will take more than a

14   couple minutes here.

15         A.   All right.

16         Q.   We just went through the time frame --

17   this tight window after the -- the -- the murder

18   occurred.  Do you -- do you recall the date on

19   which the -- the murder took place?

20         MR. BRUSTIN:  Objection to form.

21         THE WITNESS:  The date?  I believe it was

22   the 11th.  I believe.  I could be wrong.

23         BY MR. BLENK:

24         Q.   Can we take a -- let's take a look at

25   Exhibit -- Plaintiff's Exhibit 2.



Mark R. Stambach - Mr. Blenk - 06/08/2022428

1        MR. SAHASRABUDHE:  Can -- can we just say on

2   the record no one disputes that it was the early

3   morning hours of August 10th, 2011, so we don't

4   have to -- I know you're pressed for time.  Or

5   sorry, 1991.  I don't why I said 2011.

6        No one disputes that the -- that the

7   shooting took place in the early morning hours of

8   August 10th, 1991.

9        MR. BLENK:  Thank you.

10        THE WITNESS:  Again, I apologize.  I'm

11   getting a little confused.  There's a lot I've

12   been --

13        BY MR. BLENK:

14        Q.   I'm not here --

15        A.   -- talking about today.

16        Q.   I'm not trying to quiz you.  I'm

17   just --

18        A.   All right.

19        Q.   -- trying to make sure that we get

20   these timelines.  I don't want to feed this

21   information to you, so that's -- I'm just being

22   careful with that, but I'm good with a stipulation

23   to that effect.

24        Do you remember when Valentino Dixon was

25   arrested?



Mark R. Stambach - Mr. Blenk - 06/08/2022429

1      A.    Yes, I do.

2      Q.    What day was that?

3      A.    Again, I'm going to believe it was the

4   11th.

5      Q.    You -- you think it was the day

6   following the --

7      A.    Yes.

8      Q.    -- the murder -- the shooting.  Okay.

9      MR. BRUSTIN:  Do you want -- do you want --

10  I can clear it up for the record if you'd like.

11      The -- the -- he was -- it was the morning

12  of the shooting -- the early morning of the

13  shoot -- was the shooting.  Later in the day on the

14  10th is when he was arrested.

15      BY MR. BLENK:

16      Q.    Okay.  That's -- that was my

17  understanding as well.

18      A.    Okay.  Then I'm wrong on that end also.

19  It was on the 10th.

20      Q.    Okay.  And at that time, did you --

21  were you involved with the -- with the booking and

22  the actual -- did you just do the paperwork, or did

23  you -- were you actually involved in the actual

24  physical seizure of Mr. Dixon?

25      MR. BRUSTIN:  Objection to form.



Mark R. Stambach - Mr. Blenk - 06/08/2022430

1        THE WITNESS:  I took him downstairs for the

2   booking, yes.

3        BY MR. BLENK:

4        Q.   Great.  And then we just discussed

5   the -- the fact that Lamarr Scott came forward.  Do

6   you remember what date we just agreed that

7   occurred?

8        A.   11th or the 12th.

9        Q.   Okay.  The early morning -- does the

10  early morning of the 12th -- does that --

11       A.   Pretty accurate.

12       Q.   -- refresh your recollection that's

13  when he -- that's when he came in?

14       A.   I do.

15       Q.   Okay.  And so at the time that you

16  interacted with Lamarr Scott on the 12th, Mr. Dixon

17  was already arrested.

18       A.   Correct.

19       Q.   And he was already arrested for the

20  same crime that he would ultimately be convicted

21  of.

22       A.   Correct.

23       Q.   We -- we spoke about a few events that

24  occurred in the days subsequent to Lamarr

25  Scott's -- Lamarr Scott coming in, including you --



Mark R. Stambach - Mr. Blenk - 06/08/2022431

1    you -- you had P73s from the 14th.

2        Do you recall that?

3        A.    Yes.

4        Q.    Days after?

5        A.    Yes.

6        Q.    And then we looked at a document -- we

7    looked at a material witness warrant that you were

8    involved in?

9        A.    It was a form, yes.

10       Q.    Yes.  And then months later, in -- even

11   in December, you were still generating

12   investigatory records --

13       A.    Correct.

14       Q.    -- pertaining to this case.

15       You've also testified that Mr. Belling had a

16   role in the decision to let Mr. Scott go on -- on

17   August 12th, 1991, correct?

18       A.    He did.

19       MR. BRUSTIN:  Objection to form.

20       THE WITNESS:  He did.

21       BY MR. BLENK:

22       Q.    Did Mr. Belling tell you to stand down

23   on the investigation?

24       MR. BRUSTIN:  Objection to form.

25       THE WITNESS:  No.



Mark R. Stambach - Mr. Blenk - 06/08/2022432

1      MR. SAHASRABUDHE:  Object to the form.

2      BY MR. BLENK:

3      Q.   He didn't tell you to do anything

4  differently than you would do in any other case?

5      A.   He didn't give us any instructions

6  whatsoever.

7      Q.   Okay.

8      MR. BLENK:  Thank you.  That's all I have.

9      MR. BRUSTIN:  And I will withdraw my last

10  objection.

11          (Deposition concluded at 6:44:16 p.m.)

12                  *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   STATE OF NEW YORK)

 2                      ss:

 3   COUNTY OF ERIE   )

 4

 5        I DO HEREBY CERTIFY as a Notary Public in and

 6   for the State of New York, that I did attend and

 7   report the foregoing deposition, which was taken

 8   down by me in a verbatim manner by means of machine

 9   shorthand.  Further, that the deposition was then

10   reduced to writing in my presence and under my

11   direction.  That the deposition was taken to be

12   used in the foregoing entitled action.  That the

13   said deponent, before examination, was duly sworn

14   to testify to the truth, the whole truth and

15   nothing but the truth, relative to said action.

16

17

18                      _____

19                      LORI K. BECK, CSR, CM,
                        Notary Public.
20

21

22

23

24

25
```



```
 1
 2                          INDEX TO EXHIBITS
 3    Exhibit              Description                   Page
 4     PLF. EXH. 14     excerpt of Criminal              259
                        Interrogation and
 5                      Confessions, Third Edition,
                        seven pages
 6
       PLF. EXH. 15     excerpt of trial testimony,      399
 7                      83 pages
 8
 9
10    * Exhibits returned to Mr. Brustin.
        Copies of exhibits supplied to all counsel.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



1
2                        INDEX TO WITNESSES
3    Witness                 Examination                  Page
4     MARK R. STAMBACH      BY MR. BRUSTIN                  6
5                           BY MR. BLENK                  427
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MARK R. STAMBACH
VALENTINO DIXON vs CITY OF BUFFALO

June 08, 2022
Index: $1.5..1991

**$**

**$1.5**
  320:1

**$175,000**
  65:13

**$200,000**
  65:10

**$5**
  319:18

**$50,000**
  65:18

**$600,000**
  64:25

**$70,000**
  65:25

**1**

**1**
  258:19
  418:6

**10**
  118:20

**100**
  27:15
  125:1
  133:24
  180:20
  374:4

**105**
  400:2

**10:01**
  5:9,19

**10:46**
  53:23

**10:56**
  53:24

**10th**
  176:22
  236:17
  428:3,8
  429:14,19

**11**
  64:2

**11th**
  330:3
  408:12,25
  416:3
  427:22
  429:4
  430:8

**12**
  64:2
  222:24
  363:7
  400:13

**12:09**
  128:16

**12:17**
  128:17

**12th**
  407:4
  408:4,21
  409:1,4
  413:4
  414:9,13
  415:5
  418:6
  419:8
  430:8,10,
  16 431:17

**13-year-old**
  378:25
  380:5

**13-year-
old's**
  379:11

**137**
  356:4

**14**
  259:2,8

**14202**
  6:14

**1430**
  235:20

**14th**
  200:13
  215:9
  216:22
  218:14
  431:1

**15**
  118:20
  234:1,4
  240:3
  399:18,21
  400:1

**150**
  145:16
  156:11

**154**
  416:1

**158**
  289:9,10

**15th**
  331:14,20
  332:1
  336:24
  338:25
  340:1
  356:6
  357:6,12

**16**
  11:9,10
  12:5,6,
  20,21
  233:21
  234:1
  240:2
  241:6

**161**

**286:5**
  417:24

**16th**
  333:22
  340:8,14
  355:15
  356:6
  358:16
  373:12
  374:1

**17-year-old**
  422:3

**173**
  259:19

**17th**
  392:12,20
  393:14
  394:9
  400:8

**18**
  363:7

**185**
  407:1
  410:1

**19**
  11:1
  14:11
  307:16

**19-year-old**
  302:23

**190**
  157:14

**195**
  157:14

**1950**
  99:25

**196**
  166:16,25
  277:23
  286:2
  288:7

**289:6,9,
24 291:1**

**1969**
  10:20

**197**
  166:8,9,
  13,15,19,
  20 167:23
  278:11
  294:2
  297:7

**1971**
  10:8 11:1
  71:8
  74:21

**1977**
  380:17

**198**
  299:20,23

**1986**
  12:10,11,
  23 13:2
  62:22
  100:4
  259:12

**199**
  288:12
  306:17
  311:10

**1991**
  25:11,13,
  14,20
  26:7
  29:22
  52:21,23
  66:20
  76:16
  84:7
  85:23
  87:3
  91:4,10
  93:7
  99:14,24



100:13
105:5
108:19,25
111:25
113:22
115:15
119:3,15
120:10
143:12,22
154:17
199:11
201:8
263:22
264:3,18
265:9
268:9
269:23
271:3
306:21
360:6
407:4
428:5,8
431:17

**1992**
13:16,20,
23 14:11
15:3
19:7,18
24:23
25:4,21
26:8
29:23
50:4
52:18

**1993**
378:25
382:24

**1997**
386:12

**1998**
387:9
388:20
392:12,20

**1:08**

178:9

_____

**2**

_____

**2**
50:12
129:1
179:6
215:18
228:14
286:22
427:25

**20**
13:6
17:24
18:4 22:1
149:15
165:17
349:10,
20,22,24

**200**
63:16

**2000**
360:5

**2004**
330:3

**2006**
13:4

**2011**
428:3,5

**2022**
5:18

**203**
197:22
198:1
201:14
211:23
215:17

**21**
233:13
362:19

**210**
145:17

**216**
411:2,5

**22**
18:4

**220**
157:12,14

**236**
375:8

**25**
6:13
17:21
129:2
179:4,5,
11
349:20,
23,25
352:9,18
360:19
400:6,18

**25-**
352:1

**25-year**
382:25

**258**
215:18

**27**
400:12

**29**
400:15

**2:07**
178:10

**2:30**
90:11

_____

**3**

_____

**30**
33:4

62:4,8
63:6
72:23
138:14
147:22
158:19
161:2
164:5
194:22
209:4
265:25
357:25

**30-second**
53:21

**31**
149:1
165:16,
20,21
233:16
400:18

**32**
138:14

**33**
406:14

**35**
71:6,7
73:2
209:4

**38**
294:4

**3:18**
249:9

**3:26**
249:11

**3:34**
258:24

**3:35**
258:25

_____

**4**

_____

**4**

12:3,4

**40**
352:9,18
357:25
360:19

**40-minute**
352:1

**404(b)**
356:15,17
365:13,
16,19
366:3
381:3

**41**
99:25

**45**
349:14,19

**47**
136:6

**4:27**
315:6

**4:30**
236:17

**4:35**
315:7

_____

**5**

_____

**5**
249:19

**5-**
64:25

**50**
25:8
63:15

**50(b)**
334:16

**56**
427:3



**57**
  363:7

**5:34**
  378:14

**5:42**
  378:15

**5:58**
  392:5

**5:59**
  392:6

**5th**
  217:11
  218:14

**6**

**6**
  400:15

**65,000**
  65:24

**6:29**
  417:21

**6:30**
  417:22

**6:44:16**
  432:11

**7**

**70**
  5:17

**70s**
  13:1

**71**
  11:14

**72**
  8:20
  11:14

**75**

11:25
22:11
23:12
24:5 26:6

**76**
  11:25
  235:16
  242:9

**77**
  244:23

**7:15**
  340:13

**7:25**
  358:12

**7th**
  249:25
  250:18

**8**

**8**
  11:18,20
  372:13
  392:25
  393:2
  407:21

**8/10**
  407:21

**8/12**
  408:9

**8/12/91**
  407:18
  410:1

**8/21**
  411:8

**80**
  26:5
  51:6,20
  54:3,8

**82**
  54:3,10

228:13,
14,15

**83**
  54:4,10
  399:22

**86**
  62:20,21

**8:05**
  358:12

**8th**
  5:18
  249:25
  250:1,18

**9**

**9**
  392:9

**90**
  113:22

**90s**
  22:7
  40:17
  44:17
  73:12

**91**
  13:23
  14:1
  52:20
  93:19
  96:17,18
  107:6
  108:4,10,
  21

**92**
  13:23
  14:1,2,3
  15:7
  16:18
  17:22
  30:24
  52:19

249:25

**A**

**A-L-O-I-S**
  20:2

**a.m.**
  5:9
  53:23,24
  418:6

**Aaron**
  45:15
  46:8
  186:7,9
  291:10,
  17,19
  292:6
  312:10
  406:18,19
  407:8,9
  409:4,17
  410:3,11,
  21 411:11
  412:5,14
  414:2,4,9
  415:12
  416:4,11,
  19 418:11
  419:7
  420:22
  422:24
  426:9,19

**Aaron's**
  420:5

**abhorrent**
  188:17,18

**ability**
  8:24 9:1
  84:10,14
  85:20
  86:13
  143:15
  152:22
  153:13

**222:8**
  253:18

**absence**
  140:6
  268:24
  269:1

**absent**
  207:18

**absolute**
  66:21
  67:15
  73:24
  118:11
  120:10

**absolutely**
  17:19
  23:15
  63:13
  95:18
  114:20
  138:9
  183:2
  213:6,9
  228:7
  232:24
  251:4
  253:16
  293:11
  337:6
  338:16
  355:6
  363:14
  410:24

**absurd**
  219:11

**abuse**
  74:7

**accelerant**
  260:5

**accept**
  320:15

**accepted**
  401:19



access
   64:11
   84:7
   85:1,18
   359:22
   371:7

accident
   163:4

accordance
   200:25

account
   147:25

accounted
   23:11

accounts
   312:9

accurate
   26:11
   84:5
   91:19
   114:6
   119:5
   203:4
   346:11
   396:25
   430:11

accurately
   49:2
   91:20
   92:24
   110:22
   229:15
   264:9
   375:6

accusatory
   34:25
   35:10
   37:7

accused
   318:9
   319:1
   321:20
   322:4,15

   323:7
   324:2,6,7
   327:22

accusing
   36:1,4
   37:19
   154:6

acknowledge
   369:16

acknowledged
   368:5
   375:19

acknowledging
   426:18

acquired
   25:19

acting
   12:14
   114:24
   130:2
   200:24
   212:15
   220:12
   278:20
   279:3
   299:5
   302:11
   417:9
   418:25

action
   44:23
   48:11
   130:16
   250:8

actions
   58:15

active
   113:10

activities
   90:21

   102:14
   112:13
   128:9
   131:12
   259:25
   380:24
   381:9

activity
   22:8
   131:4

acts
   327:22

actual
   109:24
   175:4
   245:1,14,
   17
   429:22,23

actuality
   98:9

ad
   99:20

Adams
   122:22
   123:6,18
   125:12
   129:25
   130:8,14
   131:4,17
   132:22
   133:5
   135:1,17
   136:2,3
   138:2,18
   139:7
   142:17
   146:10,23
   147:2,16,
   25 154:17
   158:20
   159:11
   163:14,22
   168:12
   169:10,

   12,19
   170:22
   171:3,7,
   20 173:8,
   16 174:9
   176:5,15,
   24 177:5
   178:14
   179:17
   180:13
   181:1,19,
   23 182:14
   183:23
   186:24
   187:11
   188:5
   189:5,10,
   15,22
   190:15
   191:23
   193:14
   194:2,7,
   11 204:17
   221:25
   225:10
   227:11
   229:21
   230:8
   231:12
   232:16
   245:10,11
   250:2,17,
   23 321:24
   376:10

Adams'
   132:5
   174:11
   229:25

add
   28:3
   102:3

added
   363:16

addition
   33:5,11

   77:6
   120:8
   269:22
   319:7

additional
   61:5
   102:3
   139:13,18
   319:13

admission
   261:24
   262:18
   263:11
   303:8
   331:1,2

admissions
   33:17,22
   34:4 48:3
   361:2
   362:25
   364:6
   408:13

admit
   220:17
   277:8
   302:23
   303:11
   322:11
   345:23
   360:18

admitted
   338:23
   342:17
   344:15
   354:19
   358:7
   366:14
   367:13
   370:14
   383:1
   425:14

admitting
   343:19



advise
   115:3,5
   117:4

advised
   290:2

advocate
   424:18

affect
   8:23  9:1
   153:13

affidavit
   175:4
   180:4

affirmative
   405:24

afraid
   156:1

afterward
   4:15
   181:2

agency
   62:10

agree
   4:19  42:3
   51:9
   66:9,24
   69:8
   72:15,17
   73:15
   103:7
   109:1
   142:11
   147:15
   148:24
   184:13
   188:4
   190:14
   193:13
   222:5
   224:2
   243:4,22
   252:23
   269:14

   283:11
   321:14
   322:14,25
   323:1,5
   325:16
   329:22
   338:18
   342:22
   343:14
   365:17
   376:9,15
   380:2
   388:22
   400:20
   403:22
   409:24
   410:2
   417:8,14
   418:5
   421:8,14
   422:23

agreeable
   4:25

agreed
   402:18
   430:6

ahead
   101:16
   137:10
   166:25
   209:10
   235:2,10
   314:5

alcohol
   153:6,12

alike
   395:25

allegation
   300:8
   324:21,25
   325:4
   383:3,5,
   13,19,22
   384:19

   419:21

allegations
   45:10
   320:25
   321:1
   322:12,21
   323:6,23
   325:17,18
   380:21
   412:16

alleged
   219:1
   324:9,10,
   12 384:21
   394:12,
   14,21

allegedly
   159:17
   202:14
   221:22
   286:15
   312:13
   341:23
   345:13
   367:3
   368:8
   369:18
   370:24
   393:23
   421:10

alleging
   36:8
   322:7
   419:18

allowed
   39:10,11
   69:25
   81:9
   234:18
   235:9

Alois
   19:23
   20:2

alongside
   385:22

altercation
   164:8
   420:6

ambulance
   332:3

Amherst
   62:1  63:4
   64:1

amount
   96:15

analysis
   281:24

analyst
   268:13

Anderson
   323:4
   386:19,
   20,25
   387:6,11
   388:4,16,
   18 389:2
   392:10
   393:24
   394:7
   398:3
   400:4,7,
   21 402:11
   403:7,23

angry
   35:19
   175:25

annual
   63:3

anonymous
   198:16,17
   217:3
   346:2
   369:19

answering
   9:10,12

   95:14
   109:25
   110:1
   210:22
   332:23

answers
   143:2

Antoine
   45:13,14

anymore
   203:15
   316:25

apologize
   215:18
   258:23
   314:6
   428:10

apologizing
   202:3

apparent
   124:8

appeared
   153:19
   154:22
   181:9,12
   280:7,25

appears
   129:23
   138:6
   205:10,12
   206:1
   289:13
   307:10
   337:25
   387:3
   412:14
   418:5

apply
   67:9
   100:7

applying
   100:2,5



appointment
  307:12,
  13,18

appreciated
  288:25

approached
  344:6

appropriate
ly
  390:25

approved
  328:19,24

approximate
  63:14
  64:23
  65:9

approximate
ly
  40:1
  374:2
  375:24

April
  388:20
  392:12,20
  393:14
  400:8

area
  251:10
  253:6
  298:1
  379:19

argue
  175:22

argued
  328:12,15

arguing
  328:20,24

argument
  329:9,11
  361:19

arguments

327:9,12
328:17
333:12

armed
  7:15,17

array
  78:2 79:8
  120:18
  121:2,3
  122:23
  123:7,8,
  13,18
  132:13,
  17,18,21
  133:2,5,
  21,23
  134:14,20
  135:19
  136:13
  137:2,17,
  21 138:3,
  7 141:20
  142:6
  146:20
  171:19
  173:20
  174:10,
  19,20,21,
  25 175:3,
  4,5,7,10
  176:4,13,
  18 178:25
  180:1,3,
  6,19
  193:10
  194:14
  225:16,22
  226:1,10,
  21 227:2
  410:10
  412:9
  413:12
  414:15
  418:19
  419:7

arrays
  77:10,15
  178:23

arrest
  26:14
  53:14
  54:2,25
  71:22
  72:1
  90:18,22,
  25 100:8
  114:9,16,
  17 115:3,
  5,13,18,
  19 116:5,
  12,16
  117:16,
  19,24
  118:5
  121:24
  124:22
  125:24
  127:8
  172:15
  185:3
  196:13
  204:19
  205:16
  206:14,20
  229:19
  230:6
  232:1
  233:1
  236:6,12,
  17 238:21
  239:2,23
  246:13
  247:10
  248:18,
  21,22
  299:14
  341:15,22

arrest/
booking
  51:24
  54:6

arrested
  27:14
  55:1
  124:15,19
  125:4,9,
  16 126:6,
  8 156:4,8
  183:11
  209:17
  211:5
  238:14
  239:21
  247:20
  255:10
  256:21
  266:19
  340:19
  341:13,23
  426:7
  428:25
  429:14
  430:17,19

arrests
  8:7 69:15
  124:1,2,
  15,17,20
  125:8
  127:20

arrival
  418:1

arrive
  100:19
  352:6

arrived
  19:22,25
  246:25
  353:14,15
  359:12

arriving
  20:3

article
  394:4

ascertain
  104:8

118:20
152:3,12,
16,20
154:23
158:13,20
159:22
227:11
262:4
360:7

asks
  165:3

asleep
  163:17

aspect
  25:24
  32:19
  34:24

aspects
  426:3

assailant
  83:3

assault
  55:3,4
  115:9
  127:20

assessing
  239:20

assessment
  247:19,23

assets
  64:15
  65:18

assigned
  11:9,17
  15:23
  52:24
  101:22
  109:21
  113:7
  385:5

assistant
  18:1



109:20,24
172:7

**association**
31:11
92:18

**assume**
9:22 86:3
182:2,9
194:6,8

**assuming**
181:25
186:21
187:8,11
194:11
343:15
402:17

**assumptions**
182:1

**attached**
90:13

**attempt**
158:19
220:13
259:21
263:18
302:13
307:4,18,
24 308:3
309:10,18

**attempted**
30:19
50:13
76:5
310:20

**attempting**
122:11

**attended**
30:9

**attention**
28:15
220:22

**attorney**
41:20
59:15
83:25
113:19
114:15
116:17
172:7
200:6
210:4
212:22
230:10
231:8,25
319:22

**attorney's**
7:23
8:10,15
47:20
163:12
172:14
196:7,9
217:20
218:3
250:15
424:8

**attorney-
client**
329:5

**attorneys**
38:16
43:21
44:18
47:4,7
328:11

**August**
197:11
199:11
200:13
201:8,16
215:9
216:22
218:14
407:4
408:12
413:4

416:3
428:3,8
431:17

**author**
38:9

**authorize**
117:19
231:25
236:11

**authorized**
236:18
238:22

**automatic**
265:16
266:25
267:18
271:17

**Avenue**
6:13

**avenues**
202:19

**average**
63:7

**avoid**
302:7

**awarded**
319:12,
18,21

**aware**
65:19
135:2
183:1,22
184:2,8,
15,19,21,
25
185:13,
20,21
186:12
219:24
246:21
335:7
359:15

362:25
376:1
380:19
403:1

_____

**B**

**B-A-D-E-N**
31:17

**B-E-L-L-I-
N-G**
114:25

**back**
11:16,21
12:3,4,5,
20 22:4
27:17
40:4,17
48:9
87:13
89:12
107:20
109:18
123:5
147:22
169:17
186:20
198:3
208:2,4
211:22,23
214:24
240:2
254:1
277:6
284:25
289:23
290:20
305:22
316:23
325:13
393:4,5,
18 396:7
401:7
406:19
420:14

421:17
422:2

**background**
10:5
126:18

**backyard**
297:18

**bad**
60:25
118:5
166:23
265:13
299:14
404:18

**Baden**
31:17

**Bailey**
240:6
290:3

**balance**
29:14

**Baltimore**
271:13

**bar**
311:10
312:13,
17,19

**barrier**
222:3,13,
23

**base**
24:18
205:16
233:1
271:5

**based**
31:24
46:10
49:20
51:16
52:15
53:9



55:19
57:24
61:20
62:12
67:2 86:3
101:17
133:22
181:1
206:14,20
236:7,12
249:21
275:16
300:5
307:10
330:19,25
331:5,13
339:25
373:25
379:7
386:8
403:1,22
404:25
422:5

**basic**
67:9,19,
22 104:25
122:16,18
134:24
135:8,9
153:1,8
159:3
160:18
164:20
165:2
201:5
215:8,11
220:5
224:15
225:7
227:15
238:25
263:8
269:12
271:18
273:7
276:16

281:20
282:11,18
283:11
284:17
299:4
301:4
302:19
305:8,9
417:9
418:15,24

**Basically**
136:9

**basis**
24:1,18
54:24
63:3
110:8
229:8,9
236:6
335:6
365:8
366:7

**Bates**
50:25

**Bates-stamp**
50:14

**Beach**
65:8

**bear**
90:16

**beat**
41:19,21,
25

**beauty**
422:16

**Beck**
5:23

**begin**
5:10

**beginning**
71:8
179:13

228:7
234:4
241:3
242:12
290:23
417:25
424:22
426:6

**behalf**
47:8
300:21
328:20,25
343:11

**belief**
47:20
282:4
326:8,19
329:12

**believed**
47:9 56:6
57:1 78:6
247:9
277:16
330:5
334:9
337:17,18
338:4
377:17
378:2
396:21
420:8
421:11

**Belling**
8:12,14
114:25
172:7
177:18,25
230:10,
14,17,21,
22,23
231:9
232:21
427:9
431:15,22

**belonged**
351:23

**benefit**
261:23
349:22

**biased**
34:23

**big**
15:11
16:5 27:6
31:21
93:20
96:19
146:1
149:18,22
150:20,21
157:12,18
160:25
172:21
221:11
258:11
369:25
376:2

**bigger**
16:3,4
171:10

**bill**
157:18

**bind**
366:7

**binder**
249:15,20
391:23

**bit**
10:5 15:6
22:12
27:18
34:23
47:24
50:11
69:16
75:24,25
93:23

96:9
113:18
162:20
167:7
306:16
344:2
391:21
403:7
409:21

**black**
74:12
149:15,24
165:16
170:13
241:11
278:16

**Bland**
297:9,14

**blank**
45:3
125:13,17

**Blenk**
4:3,6,9,
24 5:1,6
6:7 82:10
118:13,24
177:15
187:4
206:11
207:23
208:14,23
209:9
212:18
213:19
218:21
229:13
241:18
279:21
294:14
295:3,18
310:14
318:4
323:11
343:22
359:17



370:10
426:11
427:1,5,
6,23
428:9,13
429:15
430:3
431:21
432:2,8

**block**
16:22

**blocked**
222:15,16

**blood**
48:12
49:3
265:19,22
267:20
268:9,11,
24 269:1,
8,22
272:10,19
275:3
276:8
280:19
284:8
296:13
302:24

**blue**
69:1
170:13

**bones**
154:7
156:15,16

**book**
257:11
259:11,18
415:23

**booking**
52:4
429:21
430:2

**born**

99:25

**borrow**
94:17

**bottom**
17:10
50:15
234:4,7,
11 240:3
297:6

**bought**
294:1

**boyfriend**
379:10
389:5
396:22
402:18,21
405:15

**BPD**
50:24
51:22
129:3
166:11
197:23
228:14

**Bradley**
386:9

**Brady**
81:14,17
83:8,11,
22 191:6

**bragged**
311:10
312:19

**brass**
107:19

**break**
9:24 10:2
53:21
58:9
128:12
172:3
178:7

249:7
314:24
334:1
344:2
378:13

**Brenda**
216:15,24

**briefed**
286:21

**briefing**
286:16
287:18

**briefly**
11:5
42:18

**bring**
274:7,9
309:10

**broad**
83:7
389:1

**broke**
241:4

**brother**
416:12,21
420:15
422:3

**brothers**
183:19
184:23
185:15,23

**brought**
95:4
129:25
130:9
170:12
220:21
291:18
312:6
347:23
348:12
350:2,12,

18 354:22
357:21
415:16
416:12
426:10

**Brown**
289:17
407:7

**Brustin**
4:3,5,7,
12,20
5:3,7
6:3,4,17
14:15
24:15
37:14
42:3,7
43:15,18
48:8,21
49:8
50:20,22
51:14,19
53:20,25
58:7,10
61:10
63:11
68:2,3
69:20
70:5,7,
11,17,19,
21,23
72:21
73:3,9,21
81:8
82:13
83:16
86:10
92:11
93:5,25
94:9
96:3,12
97:10
98:1,23
99:13
101:14
102:21

104:16,24
105:12
109:6
111:5
113:11
117:1
119:1
120:17,19
128:11,
14,18
129:4,5
136:24
137:5,9,
14,18
145:14,23
146:18
149:23
150:14,
19,24
151:6
152:8
154:5
156:25
158:4,10
159:1,8
161:25
164:3
165:7
166:12,
14,22
167:1
170:17
171:14
172:1
173:4,15
174:6,7,
17 175:23
176:2
177:22
178:6,11
179:7,10
183:8
187:6,17,
25 188:15
189:20
190:22
192:7,20



193:3,25
194:20
197:24,25
200:7,23
201:13,18
203:20
205:2
206:12
207:5
208:3,17,
25 209:12
210:8,23
211:19
212:8
213:1
214:3,18,
23 215:7,
16 216:8,
17,18
217:9
218:24
219:6,13,
20 220:4,
10,19
221:10
225:1
226:8
228:1
229:14
230:5
232:7,14
233:18
234:8,14,
19,22,25
235:10,13
237:7
238:18
239:10
240:1,14
241:19
242:15,16
243:3,8,
15
244:10,
17,23,25
249:6,12,
23 250:7

251:14,22
252:4,12
253:14
254:9,15
256:3
257:23
258:14,20
259:6
260:14,23
261:9,18
263:24
265:3,14
266:11,16
267:9,15,
24 268:7,
17,22
269:11,18
270:2,11,
21 271:2,
11,14,23
272:4,13
273:1,15
274:11
275:2,8,
22
276:11,23
277:4,8,
11,14
278:25
279:10,25
280:10
281:1,8,
19 282:1,
22 283:7,
15 284:2,
15,23
285:4,19,
25 286:25
287:10
288:6,22,
25 289:4
291:14,23
292:9,22
293:7,15
294:10,16
295:6,14,
21 296:4,

9,18
297:13
298:3,20
299:10,18
301:2,9,
15,22
302:3,17
303:4,12,
25 304:7,
11,16,22
305:3,7,
15,20
307:8
308:1,7,
23 309:6,
16 310:15
311:3,8
312:21
313:15
314:2,7,
23 315:2,
8 316:8
317:11
318:7
319:16
320:23
321:18
322:2,20,
24
323:14,22
324:3,9,
11 325:8,
11,21
327:1
328:10,22
329:7,21,
25 330:9
331:11,
23,24
332:7,19
333:19,24
334:3,14,
19 335:5,
15,22
336:8
337:3,21
338:13

339:11,
16,19
340:6
342:6
343:4,18
344:3,9,
19
345:17,20
346:6
347:19
348:6
349:3,12,
17 350:6,
10,17,24
351:3,12
352:7
353:2,11
354:9
355:20
356:11,
19,22
357:1,19
358:24
359:19,25
361:7
362:3,15
363:6
364:20,23
365:2,7,
11,14,17,
20,22
366:1,4,
6,11
367:8,23
368:4
369:10
370:13,21
371:12,20
372:1,10,
18 373:1,
9,18,22
375:10,14
376:8,18
378:4,12,
16 379:20
381:4,7
382:14,20

383:5,7,
20,21
384:6,17
385:1,17
386:3
387:5
388:10
390:5,13,
20 391:6,
19 392:3,
7 393:10,
21
394:17,22
396:13
397:23
399:3,9,
17,23
401:23
402:4,10,
15 403:5,
21 404:6,
16
405:10,21
406:4,11,
13,15,24
407:14
408:3,6,
7,19
409:23
410:17
411:7,22
412:2,13,
22
414:17,
20,23
417:1,7,
13,19,23
418:23
419:5,12,
17,19
420:1,13,
24,25
421:24
422:9,13,
22 423:8,
19 424:6
425:7,13,



16,20
426:16,22
427:20
429:9,25
431:19,24
432:9

brutal
265:10
347:9

buddy
43:5

budget
107:23

Buffalo
5:15,18
6:13
10:16,24
11:2,5
12:15
15:6 21:9
22:6
23:2,12
24:6
25:20
26:7,10
64:21
67:3,13
71:4,8
74:22
77:12
87:3
90:14
91:15
95:21
97:2
102:11
105:4
107:1,21
128:9
155:8
214:12
242:13
290:23
331:16
392:12

400:8

building
17:1,6,13
260:4

bunch
8:11
18:18
113:17

bureau
12:8
101:3
242:13

burglary
11:22

business
7:10
14:22
16:7 17:7
28:18
62:1,11,
14,23
63:18,21
64:4
89:13
103:21
105:6
108:15,
17,20

busy
96:18
113:23
114:1
117:19
201:23,24
218:13,
16,20
219:2
231:25

buying
4:10,12

——————
C
——————

Cadillac
27:6

call
23:24
31:10
39:5
87:10
88:1
101:1
129:14
198:17
210:14
217:3
369:19
399:15

called
6:14
21:11,12
88:1
107:17
121:17
131:23,25
132:10
163:17
203:6
217:13
229:2
312:18
331:20
332:1,3
396:7

calling
202:15
329:5

calls
346:2
419:24
421:19

camera
226:19
256:5

candid
68:20

canvassed
298:1

capable
361:20
362:7
364:2,7

captain
109:21

car
27:10,11
161:10
221:19
223:3,11
224:3,6,9
385:22
386:9

care
234:15
340:2

career
11:5
30:17
32:4
68:13,17
69:3
73:11
81:14
208:19
211:10
212:11
255:10

careful
14:16,18
28:12,22
29:17,20
45:9
46:11
49:13
60:14,17
76:2 77:7
87:4
143:12

159:4
201:1
211:13
255:18
257:1
279:2,3
316:16
424:25
428:22

carefully
28:25
426:5

Carlton
65:8,17

Carol
380:17

carried
32:4

carry
165:1

cars
160:16
222:24
252:7

case
5:12 7:4,
7,13 9:9
21:25
26:2
27:20,22
28:21
36:19
37:6,24
38:4
39:20,21
40:9,16
42:24
44:13,16
45:1,10
47:2
48:10
49:9,24
51:25
52:25



53:4,11
54:20,24
57:9,24,
25 58:1,
14,15,19,
21 59:1,3
60:12
61:4,20
62:9 66:4
72:3,4
76:11,14
77:4
90:16
91:7
97:12,13
98:3,11,
13 99:3,
4,18
100:13,23
101:22
102:9
103:3,5
104:10
105:7
112:15,
16,18,20,
22 114:7,
12,19
115:18
116:5,14
117:6,12
119:10
122:10
126:3
128:21,24
129:10,14
130:17
132:8
145:5
154:9,12
157:8
167:3
172:25
173:6,7
177:10
181:3,15
196:1,8,

9,12
197:13
198:2,7
202:15
203:21
205:15
206:14,
19,20
209:20
210:4
218:9
219:2
221:16
227:9
228:8
229:6
233:25
246:18
250:9
251:3
264:23,24
265:10
273:6
275:25
290:10
312:8
315:14,
16,19
318:16
320:13
321:1,2,4
322:8
323:5
324:5
326:20,21
328:2
330:8,11
335:23
340:11,22
341:21
351:25
359:15,
16,22
360:7,8
364:1,11
365:23
373:25

374:19
378:18,24
380:21,25
381:6,16
382:8
385:3,6,
8,12
387:8
388:4,6,
9,12
391:9,24
398:17
400:2,5
406:20,22
424:25
425:2
426:6
431:14
432:4

cases
  23:15,16
  33:4 37:4
  96:21,23
  97:6 98:3
  100:13
  119:6
  201:23
  315:10
  321:14,15
  322:15
  325:25
  326:1,7
  424:9

casings
  312:3

caused
  19:5
  305:11
  318:2
  322:16
  328:25
  423:24

cell
  16:22
  119:18,20

368:14

central
  52:4

certainties
  76:18

chain
  98:14
  109:18
  371:1

chalk
  163:22

challenge
  81:23

challenges
  328:13

chance
  242:17
  318:13

change
  9:19 28:2
  214:10

changed
  57:5
  69:22,24
  92:12

changing
  176:17,19

channel
  256:1
  286:22
  287:9

characteris
tics
  148:9

characteriz
ation
  53:6 69:8
  82:7
  95:23
  109:1

characteriz
ed
  228:3

charge
  54:20
  55:6
  115:6
  230:18
  292:2
  327:5
  426:4,6

charged
  55:18
  114:13
  230:17

charges
  127:20,25
  128:2,3

charging
  230:12

check
  18:7
  123:21,23
  166:24
  195:13
  269:23
  270:23
  315:3

checked
  298:10

checkered
  278:17

checking
  18:7
  269:22

chief
  17:25
  18:1
  109:19,
  20,23,24

children
  13:14



choice
  85:7
  425:17

chose
  85:18
  93:8

Chris
  427:9

Christopher
  114:24
  172:7

church
  222:19
  251:16
  252:25
  253:8

circumstance
  76:6

circumstances
  59:18
  68:24
  69:6
  71:17
  77:18
  78:23
  120:24
  215:9

city
  5:14
  16:10
  22:7
  49:21
  51:17
  67:6
  92:19

civil
  44:22
  45:3
  48:11

claim
  48:3

203:22
231:12
283:8
318:15
338:22
339:2
341:7

claimed
  157:6
  347:23

claiming
  154:8,11
  176:18
  198:22
  321:22
  394:7
  396:19
  401:10

claims
  149:6
  199:22
  310:2,10
  317:19,22
  321:5,7,
  10,14,15
  389:2
  390:6,7
  391:12,16
  405:6,11
  420:14

clarificati
on
  78:17

clarify
  343:8

classroom
  93:20
  94:1,2,4
  355:1

cleaner
  82:5

clear
  24:4  28:6

37:24
41:24
53:3
54:24
57:8
60:25
79:6
113:16
115:21,24
124:11
136:12
142:24
143:1,3
147:7
205:25
277:1,7,
9,11,12
287:14
290:6
306:1
325:6
334:17,18
338:21
348:11
361:9
371:13,14
372:2,3
384:19
415:7
420:21
423:21
426:20
429:10

clip
  221:17
  294:18
  295:7,17,
  22,24
  296:11

clock
  140:22

clocks
  288:20

close
  22:16,18,

21 179:22
267:18
269:6
280:14,17
297:1

closed
  10:15
  349:6
  352:2,4,
  11

closely
  8:12

closer
  252:14

closing
  327:8
  328:12
  333:11

clothes
  169:11
  271:25
  274:6,16
  275:4
  276:7
  277:19
  279:18
  281:22,
  23,24
  282:4,7,
  24 283:4,
  18,21
  284:8,18,
  20 296:13
  306:11

clothing
  169:20
  260:6
  268:2,12,
  24
  269:15,24
  270:7,17
  272:14
  273:19,
  21,25

277:17
280:8,9
281:16
282:19
290:17
306:5
310:3
347:14

cocaine
  254:19

coercing
  319:1
  321:11
  383:14

coercion
  230:1
  321:21,23
  325:1
  371:17
  382:6,15
  384:9

coercive
  75:9

Coggins
  333:8,12,
  14  334:18

coincidence
  284:16
  404:10

cold
  48:11
  49:3
  103:25
  302:24

colleagues
  96:22

collect
  31:14

collected
  172:10

Collecting
  8:5



collection
  295:12

college
  10:14

color
  19:18
  25:4
  155:9

combination
  171:1,3

combined
  122:6
  171:7

comfortable
  74:17
  119:8
  204:3

command
  15:22
  17:24
  95:10
  98:14
  109:19

commenced
  5:9

commencing
  5:19

comments
  120:11

commissione
r
  108:2
  130:2,4

commit
  149:6
  207:16,20
  208:11
  209:7
  303:13
  304:3
  305:12
  344:14

committed
  32:21
  55:25
  56:8
  68:7,8
  76:19
  146:2
  160:7
  206:23
  255:12
  261:13,25
  271:16
  274:5
  291:20
  330:2
  336:15
  338:19
  368:9
  371:6
  374:19
  377:18
  378:3
  379:15

committing
  45:18
  145:25
  208:10
  264:9
  303:16
  306:14
  342:17
  343:19
  374:13
  379:3
  385:7
  390:23
  405:17

common
  92:23
  263:4
  282:11

commonly
  69:1

communicate
d

  105:20

communicati
ng
  38:21
  289:19

communicati
on
  119:16
  290:10
  323:17

communicati
ons
  59:14
  105:25
  119:22
  323:18
  371:15

communities
  155:9

compared
  144:17
  145:16

compensatio
n
  319:18

competent
  203:21
  212:15
  278:19

complainant
s
  17:8

complaint
  27:19,22
  34:14,16,
  25 38:3,
  5,24
  54:11,14
  55:5,10
  228:16
  229:9,10
  230:7
  236:7

248:17
  324:8
  383:4,6,
  19

Complaints
  37:3

complete
  16:21

completely
  314:9
  329:22
  402:5

completion
  89:3

components
  32:15
  33:21

comprehensi
ve
  106:5,8
  255:18
  257:2

concept
  263:8

concepts
  260:10

concern
  171:18

concerns
  172:4

concluded
  87:20
  432:11

condition
  333:9

conditions
  253:21

conduct
  32:15
  87:18

90:21
  319:12
  423:23

conducted
  49:13
  53:5
  59:19
  77:15
  113:1
  185:14
  197:11
  257:2
  305:17
  323:3
  330:15
  368:7
  419:1
  424:25

conducting
  77:9
  102:14
  103:11
  111:10
  112:6
  198:1
  210:10
  301:17
  360:9
  380:25

confection
  209:23

conference
  39:9

conferences
  8:6

confess
  207:15,20
  208:10,19
  264:4
  274:15
  303:20
  304:2
  305:12
  306:14



313:3
342:3
348:2
359:10

confessed
204:13
206:16,23
211:9
212:12
214:14
256:6,8,
15  271:15
273:17
282:17
330:16
344:7,15
377:12
396:10,22
405:16
409:18
412:17

confesses
209:17

confessing
171:9,21
199:21
209:6
221:5
255:22
264:9
269:13
273:8
274:2
276:17
283:3
286:15
287:5
300:5,10
304:18
307:16
313:5
354:3

confession
211:12
215:10

221:16
260:17
261:11,22
274:5
275:17
276:13
287:3
288:1
300:19
306:6
319:1
330:19
340:23
341:8,24
345:5,14,
24  370:7
372:4
383:24
404:20
407:13
409:6
418:7,11

confessions
259:4
344:22

confidence
203:2

confident
21:6
85:19,22
86:12

confidentia
l
7:25

confirm
361:15

confuse
258:21

confused
174:15
231:6
364:19
365:3
366:8

396:16
408:18
409:21
428:11

confusing
364:21
404:15,17

confusion
366:7
413:16

connect
268:3

connected
185:23
264:25

connection
23:2  28:6
32:13
38:4
40:16
111:9
115:17
116:5
118:4
120:12
121:5
170:2
173:8
174:2,10
176:22
202:14
245:9
250:9,20
323:3
325:1
336:22
342:20
382:7
388:4
400:2

conscientio
us
28:13,22
29:17,20

49:14
72:11,16
159:3
200:25
247:18
279:2,4
301:18
302:10
425:1

conscientio
usly
113:2

conscious
293:18,20

consequence
s
328:15

considered
69:4

consistent
186:6,8
292:15
293:3
294:21
311:4
370:25

constitute
60:8  83:8

Constitutio
nal
60:6  81:3
191:3

consumed
153:12

contact
31:19
155:14
250:16
309:22
314:12

contacted
314:16

contained
167:18
185:6
273:12
290:11
368:7
369:22

contaminate
d
136:3

content
233:15

context
8:13
144:24
225:5

contradicti
on
245:25
366:18
367:11

contrary
186:12
335:7
366:13

contribute
340:18

convention
4:18

conversatio
n
39:14
43:17
230:25
355:6

conversatio
ns
59:20
372:3

convicted
8:9
45:18,24



46:15                7,13 11:3          55:2,7,8,         85:2,3,6          15,19
47:16                13:17              10,15,16,         86:1,14,          123:7,13,
57:12                14:4,6,            20,21             16,25             18,19,22,
318:2                12,13,20,          56:1,9,           87:24             24 125:5,
326:4                23 15:2,           16,17             88:11,17          10,19
330:1                20 16:1,           57:4,7,           89:8,9,           126:4,23
379:3                2,14,15,           12,13,14,         18,22             129:11,
385:7                16 18:14           15,21             90:18,19,         15,19,22
386:5,7              19:9,12            58:2,16,          22,23             130:1,12,
426:8                22:10,20           17,21             91:1,2,5,         15,18,21
430:20               23:3,4,13          59:3,4,6,         6,8               131:1,7,
                     25:12              10,11,12,         92:15,25          8,13,16,
**conviction**       26:11,15,          13,15,16,         94:12,15          21 132:6,
330:25               19 27:14,          21 60:4,          97:6,13,          11,14,22
423:25               15,20              7,9,16,22         17 98:6,          133:5
                     28:1               61:6,15,          25 99:10          134:11,
**convictions**      29:5,7,21          20,21,22,         101:23            12,16,18
326:1                30:4,7,            23 64:22          102:6,10,         135:3,7,
                     22,24,25           67:7,10,          17,20,23          13,14,23
**convince**         31:2,3             11,17,18,         24 103:6,         136:5,13
122:12               32:5,8,            20,21,24,         14,15,18,         137:22,25
313:19               11,12,17           25 68:9           24                138:4,5,
                     33:8,14,           71:10,11,         104:20,23         12,15
**convinced**        15,18,19,          14,18             105:1,2,          139:2,8,
181:18,20            22,23              72:6,9            8,11,15,          15,16,21
283:18               34:8,10,          73:6,17,          17,22             140:1,2,
                     15 36:3,           20 75:1,          106:2,12,         5,16
**copies**           5,6,25            4,7,8,11,          17 108:9          141:8,13,
4:11                 37:2 38:1          15,19,22          110:8,11,         15,21
                     40:20              76:3,12,          14,19,25          142:2,15,
**copy**             43:22              20 77:2,          111:11,17         18 143:4,
87:14                44:19              10,16,19,         112:3,4,          8,9,17,
89:6,16              45:15,16,          20,23             7,10,14,          21,25
287:2,8              20 46:1,           78:2,20,          17,19,21,         144:14,
                     8,11,12,           21 79:2,          23 113:3          18,19
**copyrighted**      16,24              10,16,23          114:12            145:13,
259:12               47:9,10,          80:1,5,           116:2,15,         19,22
                     13,16,21,          13,14,17,         19 117:6,         146:7,8
**corner**           22 48:5,           19,24             16,17,21          148:1,6,
16:22,23             13 49:14,          81:7,11,          118:2,7,          9,13,14,
17:12                25 50:1,8          15,16,19,         12,17,23,         16,22
222:11               51:25              20,25             25 119:10         149:7,8,
240:6                52:9,12,           83:5,12,          120:12,25         11,13,16,
252:22               22 53:2            15,25             121:5,9,          17,19
253:9                54:4,8,            84:1,5,6,         13,18,19,         150:2
297:9                12,13,15,          8,9,11,           22,25             151:17,
                     21,22              12,19             122:4,14,         18,21
**correct**
6:24 7:6,
7,8,12,
13,14
9:3,4,6,



MARK R. STAMBACH
VALENTINO DIXON vs CITY OF BUFFALO

June 08, 2022
Index: ..correct

152:1,4,
7,10,11,
14,15,18,
19,22,23,
25 153:6,
7,15
155:15,19
156:19
157:9,19
158:14,16
159:4,7,
13,23
160:5,8,
11,14,19,
20 161:7
162:8,13,
14 164:6
165:11,14
166:3,4,
6,7
167:4,9,
14,15,19,
20 168:3,
4,16,19
169:3,6,
12,23
170:24,25
171:6,10,
22 173:9,
10,13,17,
19 174:12
176:5,25
177:1,6,
7,10,18
178:3,16,
19,20,23
179:18,
20,23
180:1,8,
15,19,23
181:3,7,
15,23
182:4,13
183:14,25
184:1,11,
12,14
185:16,

17,24
186:10,
15,16
187:2
189:7,13,
25 190:5,
9,10
191:8,9,
14 192:1,
14,22
193:11,20
194:16
195:10,23
196:2
197:3,12
198:2,7,
8,11,14,
18,21,24
199:1,13,
14,16,17
200:19,20
201:2,5
202:16,
17,19,20,
23,24
203:2,6,
7,12,23,
24 204:1,
2,5,7,11,
14
205:11,22
206:5,9,
10 207:2,
16,17,22
209:14,24
210:11
211:2,7,
15 212:16
215:23
216:11,23
217:14,
21,25
218:1,5,
8,11
219:5,16,
25 220:9,
14 221:1,

6,9
222:15
223:7,8,
22 224:6,
7,9,10,
13,14,17,
23,25
225:5,9,
22
226:12,16
227:4,13,
14,16,18,
19,20
228:4,22
229:1,6,
10,19
231:12,18
233:4
234:1
236:7,13
237:19,
22,23,25
238:1,3,
6,9,23,24
239:2,3,
6,9,17,
18,23
240:22,
23,25
241:1,16,
21,25
242:7
243:6,10,
19,20
244:2,5,
21 245:2,
5 246:2,
10,15,23
247:10,
20,21,25
248:3,18,
19,21
249:1,2
250:2,9
251:3,10,
18,21
252:1,20

253:23
254:2,3,
5,8,11,
14,21
255:2,7,
12,13,15,
20,23
256:21,24
257:3,6,
19 258:3
260:19
261:5,6,
8,15
262:1,6,
10,11,15,
16,21,22,
24 263:5,
12,25
264:11,
12,16,20,
25 265:7,
8,11,17,
18
266:13,21
267:1,2,
12,13,23
268:4,19
269:3,10,
17,21,25
270:10,
15,16
271:1,4,
20,21
272:12,
16,20,21
273:8,12
274:2,7,
17,20,21
275:5,6
276:8,14,
19 278:2
279:20
280:14,22
281:5,14
282:2,19,
21,25
283:1,4,

6,9,12,14
284:4,5,
11,20,22
285:7,8,
12,21
286:17
287:5,20
288:2,9,
10,12,13
289:17,
20,22
290:7,11,
12,14,17,
18,21
291:6,7,
11,13,15,
22 292:2,
3,6,8,17
293:4,9,
12,16
294:12,
15,19,23
295:1,17
296:1,6,
8,13,23,
24 297:3,
15 298:5,
11,13
299:6,9,
11,12,14
300:2,6,
22 301:6,
8,12,19,
21,24
302:8,9,
14,16,20,
25 303:6,
21 304:4,
6,10,14,
21 305:2,
12,14,17
306:12,
19,22,23
307:5,6,
14,19,20
309:2,25
310:13,

