# EXHIBIT  8

COPY

## In the Matter Of:

## DIXON V. CITY OF BUFFALO

1:19-cv-01678-WMS

---

## JAMES LONERGAN

*June 09, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                      VIDEO DEPOSITION
                        JAMES LONERGAN
 2


 3
     UNITED STATES DISTRICT COURT
 4   WESTERN DISTRICT OF NEW YORK

 5   ----------------------------------------
     VALENTINO DIXON,
 6
                             Plaintiff,
 7
                   - vs -      Case No.
 8                            1:19-cv-01678-WMS

 9   CITY OF BUFFALO and COUNTY OF ERIE;
     and DETECTIVE MARK R. STAMBACH,
10   DETECTIVE RANIERO MASECCHIA, DETECTIVE
     JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
11   CHIEF RICHARD T. DONOVAN, JOHN DOES,
     Unknown Buffalo Police Department Supervisors,
12   and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
     BELLING, in their individual capacities,
13
                             Defendants.
14   ----------------------------------------

15

16            Video recorded deposition of JAMES

17   LONERGAN Defendant, taken pursuant to the Federal

18   Rules of Civil Procedure, in the law offices of

19   HARRINGTON & MAHONEY, 70 Niagara Street, Third

20   Floor, Buffalo, New York, on June 9, 2022,

21   commencing at 10:06 a.m., before LORI K. BECK, CSR,

22   CM, Notary Public.

23

24

25
```



```
 1   APPEARANCES:        NEUFELD SCHECK & BRUSTIN, LLP,
                         By NICK BRUSTIN, ESQ.,
 2                       nick@nsbcivilrights.com,
                         GERARDO ROMO, ESQ.,
 3                       gerardo@nsbcivilrights.com,
                         99 Hudson Street,
 4                       8th Floor,
                         New York, New York  10013,
 5                       (212) 965-9081,
                         Appearing for the Plaintiff.
 6
                         HODGSON RUSS LLP,
 7                       By HUGH M. RUSS, III, ESQ.,
                         hruss@hodgsonruss.com and
 8                       PETER A. SAHASRABUDHE, ESQ.,
                         psahasra@hodgsonruss.com,
 9                       The Guaranty Building,
                         140 Pearl Street, Suite 100,
10                       Buffalo, New York  14202,
                         (716) 856-4000,
11                       hruss@hodgsonruss.com,
                         Appearing for the Defendants,
12                       City of Buffalo; Detective
                         Mark R. Stambach, Detective
13                       Raniero Masecchia, Detective
                         James P. Lonergan, Detective
14                       John Vickerd, Chief Richard T.
                         Donovan, and John Does, Unknown
15                       Buffalo Police Department
                         Supervisors.
16
                         LIPPES MATHIAS WEXLER FRIEDMAN LLP,
17                       By JAMES P. BLENK, ESQ.,
                         50 Fountain Plaza, Suite 1700,
18                       Buffalo, New York  14202,
                         (716) 853-5100,
19                       jblenk@lippes.com,
                         Appearing for the Defendants,
20                       County of Erie and
                         Assistant District Attorney
21                       Christopher Belling.

22   PRESENT             SONA R. SHAH, ESQ.,
     VIA ZOOM:           AKOSUA OPONG-WIREDU, ESQ.
23                       Neufeld Scheck & Brustin, LLP

24                       TYLER Z. RAHNER, Videographer

25
```



1          (The following portion of the proceedings

2  were not videotaped.)

3          THE REPORTER:  Mr. Brustin, are you

4  supplying both counsel like yesterday?

5          MR. BRUSTIN:  Sure.

6          THE REPORTER:  All right.  And are usual

7  stips okay, or do you want him to read and sign?

8          MR. SAHASRABUDHE:  No, we don't need to read

9  and sign.

10          (Videotaping of the following

11  proceedings commenced at 10:06 a.m.)

12          THE VIDEOGRAPHER:  This will begin the video

13  recorded testimony of James Lonergan taken for a

14  case to be tried in the United States District

15  Court, Western District of New York, to be used in

16  the matter of Valentino Dixon versus City of

17  Buffalo and County of Erie, et al.

18          This testimony is being taken in the office

19  of Harrington & Mahoney, 70 Niagara Street,

20  Buffalo, New York, on June 9th, 2022, and is

21  commencing at the time of 10:06 as indicated on the

22  video screen.

23          The court reporter and notary public, who is

24  from the firm of Esquire Deposition Services, is

25  Lori Beck.  My name is Tyler Rahner.  I am the



1  video technician, and I am with the same firm.

2        Counsel for the Plaintiff will now introduce

3  themselves, followed by counsel for the Defendants,

4  and the reporter will then swear in the witness.

5        MR. BRUSTIN:  Nick Brustin, Neufeld,

6  Scheck & Brustin, for the Plaintiff, Valentino

7  Dixon.

8        MR. ROMO:  Gerardo Romo from Neufeld, Scheck

9  & Brustin for the Plaintiff, Valentino Dixon.

10        MR. BLENK:  James P. Blenk of Lippes Mathias

11  for the county Defendants.

12        MR. SAHASRABUDHE:  Peter Sahasrabudhe from

13  Hodgson Russ on behalf of the City of Buffalo and

14  all police officer Defendants.

15

16  JAMES LONERGAN, Orchard Park, New York, after being

17  duly called and sworn, testified as follows:

18                    EXAMINATION

19        BY MR. BRUSTIN:

20        Q.   Good morning, sir.

21        A.   Morning.

22        Q.   We met off the record.  My name is Nick

23  Brustin.  I'm one of the attorneys for the

24  Plaintiff, Valentino Dixon, in this civil rights

25  action.



```
 1          First of all, your -- your title when you
 2    retired was sergeant; is that right?
 3          A.    Yes.
 4          Q.    Do you -- should I refer to you as
 5    Sergeant or Mister?  What do you prefer?
 6          A.    You can call me Jim, any -- whatever.
 7          Q.    Can't do that, unfortunately.
 8          A.    Okay.  Sergeant's good.
 9          Q.    Okay.
10          A.    Whatever you'd like.
11          Q.    Fine.  I know that you've had some
12    health issues.  I don't want to pry.  The only
13    reason I'm going to ask you a couple of questions
14    is to determine whether or not it affects your
15    testimony here today.
16          A.    Okay.
17          Q.    So first of all, do you have any health
18    issues, are you taking any medications that you
19    believe would affect your ability to testify here
20    today?
21          A.    No, sir.
22          Q.    Okay.  Nothing that's affecting your
23    memory?  Nothing -- no -- no drugs or no -- no
24    medications or -- or conditions that affect your
25    memory, to your knowledge?
```



1        A.    No.

2        Q.    Okay.  If there's any -- anything that

3    you need today, take a break or anything like that,

4    any special -- anything that you need to -- to

5    address any health issues, you just let me know.

6    Feel free to take a break any time you want.

7        The only thing I would ask is that you

8    answer the question pending before taking a break,

9    okay?

10       A.    Of course.

11       Q.    I'm going to be asking you a bunch of

12   questions today.  You'll be answering them under

13   oath.  You understand it's the same oath you would

14   take in a courtroom.

15       A.    Yes.

16       Q.    And if you -- if you don't understand a

17   question, just tell me.  I'll -- I'll change it.

18       A.    Okay.

19       Q.    If you do answer it, though, I'm going

20   to assume you understood it; is that fair?

21       A.    Fair.

22       MR. SAHASRABUDHE:  Object to the form.

23       BY MR. BRUSTIN:

24       Q.    And then -- I think that's -- that's

25   the only instruction.  So let me just get into it.



```
 1            So let's start with your -- your preparation

 2    for today.  So you understand that you are named as

 3    a Defendant in this lawsuit, correct?

 4        A.    Correct.

 5        Q.    And at some point, you received a

 6    Complaint, a few years -- probably a few years back

 7    now, the -- the civil Complaint that we filed in

 8    the case that alleged -- that laid out the

 9    allegations --

10        A.    Yes.

11        Q.    -- against the officers?

12            And it was a pretty long document, right?

13        A.    Yes.

14        Q.    Did you read that document?

15        A.    Not recently, no, sir.

16        Q.    Have you ever read it?

17        A.    I believe so, yes.

18        Q.    Okay.  And so you generally understand

19    the allegations in the case?

20        A.    Yes.

21        Q.    You know, we're -- we're alleging that

22    the police misrepresented evidence and used

23    suggestion with witnesses and used coercion with

24    witnesses.

25            You understand generally that's what we are
```



1  claiming?

2          A.   Yes.

3          Q.   All right.  And I -- I take it that

4  given the seriousness of the allegations, you did

5  everything in your power to prepare yourself to

6  testify here today as a Defendant?

7          MR. SAHASRABUDHE:  Object to the form.  You

8  may answer.

9          THE WITNESS:  Oh.

10         BY MR. BRUSTIN:

11         Q.   Another rule --

12         A.   Okay.

13         Q.   -- and I'm sure they told you, but --

14         A.   Yes.

15         Q.   -- unless your attorney -- so from time

16  to time, your attorney is going to be making

17  objections for the record for --

18         A.   Okay.

19         Q.   Sometime down the road somebody may

20  rule on that.

21         You can answer all of my questions unless

22  your attorney tells you not to.

23         A.   Okay.

24         Q.   Okay?  And to make it easier for the

25  court reporter -- and I'm more guilty of this than



1   anybody, but to make it easier for the court

2   reporter, if you could take a beat after I ask a

3   question in case your attorney wants to make an

4   objection, I'd appreciate it.

5           A.    Okay.  So would she.

6           Q.    Okay.  So let's talk about what you did

7   to prepare for today.

8           So since you learned that you were named as

9   a Defendant in this case, when you got the

10  Complaint, have you met with the attorneys for the

11  city, with Peter and you?

12          A.    Yes.

13          Q.    Okay.  How many times have you met with

14  them?

15          A.    Once.

16          Q.    All right.  So once in person?

17          A.    Yes.

18          Q.    And in addition to meeting with him

19  once in person, did you have any -- and I'm not

20  allowed to ask you what you talked about, but I can

21  ask you questions around it.

22          So did -- did you have -- in addition to

23  that one meeting in person, did you have any phone

24  calls with them where you discussed things other

25  than scheduling?



```
 1        A.    No.

 2        Q.    Okay.  So the only substantive meeting

 3  where you talked about the case was one meeting.

 4        A.    Correct.

 5        Q.    And when was that meeting?

 6        A.    This past Monday.

 7        Q.    Past Monday.  Okay.  And who was

 8  present for that meeting?

 9        A.    Myself, Detective Stambach, and Pete.

10        Q.    Okay.  Anybody else?

11        A.    No.

12        Q.    Hugh wasn't there?

13        A.    Pardon?

14        Q.    Hugh was not there?

15        A.    No.  No, he wasn't.

16        Q.    All right.  And how long was that

17  meeting?

18        A.    About an hour.  Approximately an hour.

19        Q.    Okay.  Do you remember what time you

20  got there?

21        A.    Yes.  Ten o'clock.

22        Q.    Did you go with -- with Detective

23  Stambach or go on your own?

24        A.    My own.

25        Q.    Okay.  And before or after that meeting
```



```
 1  that day, did you talk to Detective Stambach about
 2  this case at all?
 3          A.   No.
 4          Q.   Why not?
 5          A.   I haven't talked to him in a few years.
 6  Since I retired, we kind of lost -- lost touch.
 7          Q.   Okay.  When did you retire?
 8          A.   2014.
 9          Q.   Okay.
10          A.   October of '14.
11          Q.   So you haven't -- you haven't talked to
12  Detective Stambach since you were named as a
13  Defendant in this case?
14          A.   No, I have not.
15          Q.   You haven't talked to him about this
16  case at all?
17          A.   No.
18          Q.   Other than being -- other than when you
19  were meeting --
20          A.   Other -- yes.
21          Q.   Okay.  Other than your attorneys and
22  Stambach during that meeting, have you talked to
23  anybody else in the world about this case since you
24  were named as a Defendant?
25          A.   No.
```



1          MR. SAHASRABUDHE:  You can answer.  Sorry.

2          THE WITNESS:  Maybe at home.  Maybe at home,

3     my girlfriend, that I had to come here, but, I

4     mean, as far as discussing the case, no.

5          BY MR. BRUSTIN:

6          Q.   Okay.  All right.  Let's talk about

7     what you -- what you did to -- to prepare other

8     than the meetings.

9          So did you have any -- did you -- did you

10    read any -- any documents, any pieces of paper --

11         A.   Yes.

12         Q.   -- whether it's testimony, reports,

13    anything to do with this case since you were named

14    as a Defendant?

15         A.   Yes.

16         Q.   All right.  So let's go through it.  So

17    first of all, let's start with reports.

18         Did you did read -- from the police file.

19    Did you read any reports?

20         A.   Yes.

21         Q.   What did you read?

22         A.   My -- it's called a P73.  My P73.

23         Q.   And I've -- by the way, I've done some

24    depositions of detectives, so I kind of -- I know a

25    little bit about how you guys do it, so I -- I

 1  am -- I'm familiar with the P73, for example.

 2          A.    Okay.

 3          Q.    So -- all right.  So you read your

 4  P73s.

 5          A.    Yes.

 6          Q.    Did you read anything else?

 7          A.    I read briefly a transcript of my court

 8  testimony.

 9          Q.    From this case?

10          A.    Yes.

11          Q.    Okay.  Did you read -- did you read --

12  did you read, for example, a transcript of your

13  court testimony from the Ortiz case?

14          A.    Regarding this case?

15          Q.    Yes.

16          A.    No.

17          Q.    Okay.  Anything else that you read?

18          A.    No.  No.

19          Q.    Okay.  So you read your P73s.  Did you

20  read anybody else's P73s?

21          A.    Yes.

22          Q.    Who -- who else's P73s?

23          A.    Detective Vickerd.

24          Q.    Okay.  You read all of his P73s, to

25  your knowledge?



1          A.    Just --

2          MR. SAHASRABUDHE:  Form.

3          THE WITNESS:  Just one.

4          BY MR. BRUSTIN:

5          Q.    Just one.  How many total P73s did you

6    read, if you recall?

7          A.    Two.

8          Q.    And was that all in the last week?

9          A.    Yes.

10         Q.    Okay.  Other than the P73s, what other

11   pieces of paper -- other than the P73s and your

12   testimony, what other pieces of paper did you read

13   to do with this case?

14         A.    None.

15         Q.    All right.  Why don't we -- no

16   testimony of anybody else?

17         A.    No, sir.

18         Q.    No reports from anybody else?

19         A.    No.

20         Q.    As you sit here today, do you have an

21   understanding, even generally, about what other

22   people have testified to in this case?

23         A.    No.

24         Q.    Okay.

25         A.    I can only assume.  No.



```
 1        Q.   Did -- did you -- have you had any

 2   conversations with your attorneys since yesterday?

 3        Let me rephrase the question.  Have you --

 4   have you had any meetings, either by phone or in

 5   person, with your attorneys between yesterday and

 6   today where you discussed the substance of the

 7   case?

 8        A.   No, not the substance, no.

 9        Q.   In between yesterday and today, have

10   you had any communications whatsoever with your

11   attorneys?

12        A.   Yes.

13        Q.   Okay.  When was that?

14        A.   Last night.

15        Q.   Okay.  And was that a telephone call?

16        A.   No, text message.

17        Q.   Text message.

18        A.   Or excuse me.  Both.

19        Q.   Was it -- did you discuss anything

20   other than scheduling?

21        A.   No.

22        Q.   Have you spoken to Detective Stambach

23   since yesterday?

24        A.   No, sir.

25        Q.   Since you were named as a Defendant in
```



1    this lawsuit, have you talked to any other of the

2    Defendants that are named in the case?

3            A.    No.

4            Q.    All right.  Do you -- do you have a

5    continuing relationship with any of the Defendants

6    in the case?

7            Do you still -- are you still friends with

8    any that you see on a regular basis?

9            A.    No.

10           Q.    All right.  Let's talk a little bit

11   about your career with the Buffalo Police

12   Department.  Let's actually start with your

13   educational background.

14           So first of all, where did you graduate from

15   high school?

16           A.    Bishop Timon High School, South

17   Buffalo.

18           Q.    What year?

19           A.    '70.  1970.

20           Q.    And how old are you, sir?

21           A.    70 years old.

22           Q.    And what did you do after you

23   graduated?

24           A.    I worked as a manager at a hamburger

25   stand, and then at age 19, I became a civilian



 1 | employee of the Buffalo Police Department.  At
 2 | age 20, I was sworn in as a police officer.
 3 |      Q.   Detective Masecchia, I think, described
 4 | a process where, back then, you could -- you
 5 | could -- you could -- was he -- was he with you
 6 | when you did the civilian program?
 7 |      A.   I don't recall Detective Masecchia
 8 | being on that program, but --
 9 |      Q.   Okay.  In any case, it sounds like
10 | your -- your -- your first job after high school --
11 | your first full-time job after high school --
12 | withdrawn.
13 |      How many years after high school did you
14 | join -- did you start in law enforcement?
15 |      A.   About a year and a half, maybe.
16 |      Q.   Okay.  Any higher education?
17 |      A.   No.
18 |      Q.   All right.  So in about '71, '72, you
19 | were -- you were -- you started with the Buffalo
20 | Police Department?
21 |      A.   February of 1971, yes, sir, as a
22 | civilian.
23 |      Q.   Okay.  That's around the same time that
24 | Detective Stambach started; is that right?
25 |      A.   I believe so, yes.



```
 1          Q.    Were you guys friends from the
 2    beginning in -- in --
 3          A.    No.
 4          Q.    -- on the force?
 5          A.    No, I didn't know him back then, no.
 6          Q.    Did you become friends later on?
 7          A.    Yes.
 8          Q.    When did you start becoming friends?
 9          A.    When -- when we were on the homicide
10    squad.
11          Q.    So beginning in 1986 when he joined?
12          A.    Yes.   Yes.
13          Q.    And was he someone you socialized with
14    outside of work?
15          A.    No.
16          Q.    Never?
17          A.    Maybe a homicide picnic or something
18    like that, but no.
19          Q.    Did you know his family, for example?
20          A.    No, I did not.
21          Q.    Who were your other friends in
22    homicide?   I -- I understand -- you correct me if
23    I'm wrong.
24          My understanding is that you were informal
25    partners with Detective Vickerd during the time of
```



1  this case; is that accurate?

2       A.    Yes.

3       Q.    Someone you -- you would routinely work

4  with on cases?

5       A.    Yes, among others, yes.

6       Q.    Who -- who else were you partnering

7  with around that time?  In '90 -- in '91.

8       Let me ask a better question.  Did you

9  ever -- at any time in homicide, did you ever

10 partner with Detective Masecchia?

11      A.    No.

12      Q.    At any time in homicide, did you ever

13 partner with Detective Stambach?

14      A.    I don't believe so, no.

15      Q.    Okay.  All right.  So you joined the

16 force in -- in '71.  Why don't you just take me

17 through your -- your career, where -- where you

18 were, any promotions, where you were stationed,

19 that kind of thing.

20      A.    Okay.  I was -- I was sworn in as a

21 police officer in May of 1972.  I went to the 7th

22 precinct, which is on Louisiana Street in the city,

23 obviously.  I was there for several years.

24      From there I went to the street crime unit,

25 which was a plainclothes detail in the high-crime



1  areas, so on.

2      Q.    What year was that?

3      A.    Late '70s.  I'm not sure exactly when.

4      Q.    Got you.  Okay.

5      A.    From there I went to the 12th precinct

6  at Fillmore and Genesee, and then I went to

7  homicide in -- I believe around '86.

8      Q.    So you -- did you go to -- was that

9  your first posting as a detective?

10     A.    Yes.  Yes.

11     Q.    You were promoted to detective and

12 brought right to homicide.

13     A.    Well, back then, it was -- you weren't

14 a detective.  They could just put you in a

15 detective position, but without naming you a

16 detective.

17     Q.    Okay.  So in 1986, you were working as

18 a detective in homicide, but you didn't have the

19 title of detective; is that accurate?

20     A.    I would say yes.  Yes.

21     Q.    When did you achieve the title of

22 detective?

23     A.    I believe it was '88, 1988.

24     Q.    Okay.  And it sounds like the -- it

25 sounds like -- Stambach also came in '96.  Did he

1    come under the same circumstances?

2         A.    I believe so, yes.

3         Q.    Okay.  And was there a number of people

4    that were brought in '86?  Did something happen in

5    '86?

6         A.    No.  Just routine transfers, I guess.

7         Q.    Okay.  And there's no -- there was

8    no -- it just happened to be that you and Stambach

9    came at the same time?  There was no other --

10        A.    Yes.

11        Q.    Okay.  Did anybody else become a

12   homicide detective in '86?

13        A.    I don't recall.

14        Q.    You don't recall.  Okay.  But you

15   believe you were both promoted -- you both received

16   the title of detective by '88.

17        A.    I did, yes.

18        Q.    Okay.  Did you and Stambach have any

19   other overlap -- have any other overlap in -- in

20   any other assignments prior to '86?

21        A.    No.

22        Q.    How about you and Vickerd?

23        A.    Yes.

24        Q.    Where did you guys overlap?

25        A.    We were on a mounted division for a



1  couple years together.

2          Q.    Okay.  Did you ever work narcotics

3  before '86?

4          A.    Not before, I don't believe, no, sir.

5          Q.    Did you work narcotics after?

6          A.    Yes.

7          Q.    What years?

8          A.    Oh, let's see here.  Around '94, 1994,

9  I -- I guess.

10         Q.    All right.  Sorry.  I -- I should have

11 just let you go through.

12         So '86 you get to homicide, and you become

13 a -- and you formally receive the title of

14 detective in '88.

15         What's the next -- what's the next promotion

16 or transfer?

17         A.    The next promotion would have been

18 1994.  I was promoted to a detective sergeant.

19         Q.    All right.  My understanding -- I -- I

20 maybe misunderstood this.

21         I thought you were already a sergeant, at

22 least an acting sergeant or an acting supervisor,

23 by the time of the Jackson murder.

24         Am I wrong about that?

25         A.    Yes, I was -- I was a detective at that



1   time, not a supervisor.

2          Q.    You were not a supervisor of any kind.

3          A.    No, sir.

4          Q.    Because Vickerd -- Vickerd testified

5   that he believed you outranked him.  Any -- any

6   understanding --

7          A.    I -- I don't believe at --

8          Q.    -- as to why he would think that?

9          A.    I don't believe at that point.  When I

10  was promoted sergeant, then I would have outranked

11  him, but not -- not in '91.

12         Q.    All right.  So the best of your

13  recollection, you weren't even acting as a

14  supervisor in 1991.  You were no different than any

15  other homicide detective in terms of supervisory

16  responsibilities; is that correct?

17         A.    That's correct.

18         Q.    Are you pretty sure about that?

19         A.    Pretty sure, yes.

20         Q.    Okay.  You didn't become a sergeant

21  until '94.

22         A.    Correct.

23         Q.    Okay.  So in '94, you became a

24  sergeant -- a sergeant -- detective sergeant, and

25  then I take it you were transferred to narcotics?



```
 1          A.    Yes.

 2          Q.    How long did you remain there?

 3          A.    Couple years.

 4          Q.    Okay.  And then what happened?

 5          A.    Then I came back to homicide.

 6          Q.    That was about '96?

 7          A.    '96, '97, I would say.

 8          Q.    Okay.  And then what?

 9          A.    Then I stayed there until I retired.

10          Q.    In 2014?

11          A.    Yes.

12          Q.    And did you retire just based on time

13   in, just time to -- you had enough years, or why

14   did you retire in 2014?

15          A.    Yes, I had -- I had -- I had 40 years

16   in, so -- actually 42, I believe.

17          Q.    Okay.  And since 2014, have you worked?

18          A.    No.

19          Q.    You've -- you've been fully retired

20   since 2014.

21          A.    That's correct.

22          Q.    All right.  Now, while you were in

23   the -- the department, did you have any other jobs

24   outside of the department?  Security, anything like

25   that?
```



```
 1          A.   Yes.  Many years ago, we worked
 2    security at the Buffalo Bills football games.
 3          Q.   Okay.  What years was -- were -- was
 4    that?
 5          A.   Late '70s, I would say.
 6          Q.   Okay.
 7          A.   I don't know the exact years.
 8          Q.   Were you doing any moonlight in the
 9    early '90 -- any moonlighting in the early '90s?
10          A.   I don't believe so, no.
11          Q.   Did you ever work for Amherst
12    Investigations, Stambach's investigation agency?
13          A.   Yes.
14          Q.   When did you work for them?
15          A.   I don't know -- I don't know the year,
16    but I worked a security job at a building in
17    Downtown Buffalo that was under construction.
18          Q.   Okay.  Approximately when was that?
19          A.   Well, '90s.  Maybe late -- early '90s,
20    I would say.
21          Q.   So it could have been '91.
22          MR. SAHASRABUDHE:  Form.  You can answer.
23          THE WITNESS:  Could have been, yes, I guess.
24    Right.
25          BY MR. BRUSTIN:
```



```
 1        Q.    Okay.  And you were working for
 2   Stambach at that time?
 3        A.    Yes, Amherst Investigations.
 4        Q.    Okay.  And how much work were you -- so
 5   Stambach was paying your salary.
 6        MR. SAHASRABUDHE:  Form.
 7        THE WITNESS:  Company was, yes.
 8        BY MR. BRUSTIN:
 9        Q.    That he ran.
10        A.    Yes.
11        Q.    Okay.  How much -- how many -- how
12   much -- how much time did you -- when you --
13   withdrawn, sorry.
14        When you worked at Amherst Investigations in
15   the early '90s, approximately how many hours a week
16   were you working?
17        A.    I believe six.
18        Q.    Okay.  And how much were you being
19   paid?
20        A.    I don't recall.
21        Q.    All right.  And how long did you have
22   that job?
23        A.    Just a couple weeks.
24        Q.    Oh, okay.  That's it?
25        A.    Yes.
```



1          Q.    No other times that you worked with
2    Amherst Investigations?
3          A.    No, sir.
4          Q.    Did you work for any other detectives
5    during your time as a police officer?
6          A.    No.
7          Q.    Just that one time for Stambach.
8          A.    Yes.
9          Q.    Okay.  Let's talk generally about your
10   role in this case.  So first of all, you do
11   remember this case, fair to say?
12         A.    Yes.
13         Q.    This was a relatively high-profile
14   shooting in 1991, fair to say?
15         MR. SAHASRABUDHE:  Form.  You may answer.
16         THE WITNESS:  Actually, they all were back
17   then, to be honest with you.
18         BY MR. BRUSTIN:
19         Q.    Okay.  And I only want you to be honest
20   with me.
21         So first of all, one of the reasons, I take
22   it, that this case stands out in your mind is this
23   is -- tell me if I'm wrong, but probably the only
24   case in your career where you arrested somebody and
25   then a second person came in and said, "It wasn't



1  him; it was me."  Fair to say?

2         MR. BLENK:  Form.

3         MR. SAHASRABUDHE:  Form.  You may answer.

4         THE WITNESS:  I didn't arrest Valentino

5  Dixon.

6         BY MR. BRUSTIN:

7         Q.   I'm not suggesting you did.  The

8  Buffalo -- during the course of the investigation,

9  he was arrested, and then after that, Lamarr Scott

10  came forward and said, "I was the shooter, not

11  Valentino Dixon," correct?

12         A.   Correct.

13         Q.   And so have you ever seen that scenario

14  happen any other time in your career?

15         A.   Where an individual came forward, you

16  mean?

17         Q.   Where -- where somebody was arrested

18  for a homicide --

19         A.   Yes.

20         Q.   -- and then another individual came

21  forward and said, "It wasn't him; it was me."

22         A.   No, there were -- there was another

23  case where individuals were arrested other than the

24  Defendant, but they didn't come forward.

25         Q.   Okay.  So -- so this is the only case



1  you can remember in your 40-year career where that

2  happened.

3        A.   Correct.

4        Q.   So it stands out in your mind for that

5  reason, correct?

6        MR. SAHASRABUDHE:   Form.   You may answer.

7        THE WITNESS:   Yes.

8        BY MR. BRUSTIN:

9        Q.   It was an extraordinarily unusual

10 circumstance.

11       A.   Yes.

12       Q.   Not every day when you arrest somebody

13 for murder and then somebody else comes in and

14 says, "No, it wasn't him; it was me."

15       A.   Correct.

16       Q.   All right.   Now, my understanding --

17 and you correct me if I'm wrong -- is that in 1991

18 in the homicide unit, the first person that got to

19 the scene of a homicide, the first homicide

20 detective, would be designated lead detective, but

21 in -- in function, it didn't mean very much.   It

22 didn't mean that they were taking the lead in the

23 investigation.

24       Is that accurate?

25       A.   Yes, that's accurate, yes.



JAMES LONERGAN                                          June 09, 2022
DIXON V. CITY OF BUFFALO                                        30

1        Q.   By the way, I don't think I've ever

2   seen that in any other police department.  Do you

3   know why it was done that way in Buffalo?

4        MR. SAHASRABUDHE:  Object to the form.  You

5   may answer if you know.

6        THE WITNESS:  To be honest with you, I -- I

7   think it boiled down to overtime where when your

8   shift was up, you would hand off to the shift

9   coming in rather than they pay you to stay.

10       BY MR. BRUSTIN:

11       Q.   Okay.  Now, one of the things Detective

12  Stambach told us yesterday was that in a homicide,

13  if -- if he -- if a detective needed to stay

14  through their shift, they were able to get

15  overtime.  Is that -- is that not how you recollect

16  it?

17       MR. SAHASRABUDHE:  Form.

18       THE WITNESS:  Yes, but very limited back

19  then.

20       BY MR. BRUSTIN:

21       Q.   So the -- the -- your -- your memory is

22  that the -- is that the department was tough on

23  overtime.

24       A.   Yes.

25       Q.   Okay.  In any case, fair to say that in



```
 1  1991, at the time of the Jackson murder, your

 2  understanding was that the lead -- that -- that the

 3  lead detective didn't necessarily mean that that

 4  detective did the bulk of the work on the case; is

 5  that accurate?

 6          A.    Yes.

 7          MR. SAHASRABUDHE:  Form.

 8          BY MR. BRUSTIN:

 9          Q.    All right.  And in fact, on this case,

10  the Dixon case, you were the -- you were, in form,

11  the lead detective because you were the first on

12  the scene, correct?

13          MR. SAHASRABUDHE:  Form.  You can answer.

14          THE WITNESS:  Correct.

15          BY MR. BRUSTIN:

16          Q.    But other detectives actually did

17  significantly more work than you did on the case.

18          MR. SAHASRABUDHE:  Form.  You can answer.

19          THE WITNESS:  Correct.

20          BY MR. BRUSTIN:

21          Q.    And in fact, the officer who did the --

22  the bulk of the work on this case was Detective

23  Stambach.

24          MR. SAHASRABUDHE:  Form.

25          THE WITNESS:  Yes.
```



```
 1            BY MR. BRUSTIN:

 2            Q.   Do you -- do you know how -- was there

 3     any -- what was the reason, if there was one, as to

 4     why Detective Stambach ended up doing the bulk of

 5     the work on this case?

 6            MR. SAHASRABUDHE:  Form.

 7            THE WITNESS:  The only thing I could say was

 8     that --

 9            MR. SAHASRABUDHE:  Just -- just what you

10     know.  Don't -- we don't need you to guess or

11     speculate.

12            BY MR. BRUSTIN:

13            Q.   I don't want you to guess, but if

14     you -- if you have a -- if you have -- I want you

15     to be clear about what -- what -- what the basis is

16     for what you're telling me.

17            But if you have an educated guess, you can

18     tell me.

19            A.   Actually I -- I don't know why Stambach

20     became the -- like the -- very involved in the

21     case.  I don't know what the circumstances were

22     back then.

23            Q.   Okay.  So this is a good time for me to

24     remind you.  So today I'm going to be asking you

25     about events that happened a long time ago.
```



1        A.    Right.

2        Q.    And I assume that some things you will

3    actually remember, but other things you may be able

4    to give me information even if you don't remember

5    exactly how it happened in this case but based

6    on -- based on your understanding as to how things

7    typically worked or a report that you might see,

8    okay?

9        And I want you to try to differentiate

10   between those two things when you're answering my

11   questions.  Is that fair?

12       A.    Okay, fair.

13       Q.    So based on how things worked back in

14   1991, do you have any understanding as to why

15   Detective Stambach ended up doing the bulk of the

16   work in this investigation?

17       A.    No.

18   MR. SAHASRABUDHE:   Form.

19   BY MR. BRUSTIN:

20       Q.    Okay.  Can you tell me, the best that

21   you recall, what investigative activities you

22   participated in in this case beginning with when

23   you -- and -- and I'm just asking you broadly --

24   what investigative activities you participated in

25   beginning with when you responded to the scene of



JAMES LONERGAN                                    June 09, 2022
DIXON V. CITY OF BUFFALO                                      34

1    the homicide?

2         A.   I responded to the scene.  I -- I

3    documented the scene.

4         I also -- I received an anonymous phone call

5    regarding information on this case, and I followed

6    up on that a month or two later.  I spoke to the

7    individual who was named in the phone call.

8         Q.   Okay.  Have you now described to me, to

9    the best of your recollection, all of the

10   activities you participated in in this case?

11        A.   I believe so, yes.

12        Q.   Okay.  And that's based on both your

13   memory and your reviewing reports that you

14   described, correct?

15        A.   Correct.

16        Q.   Who was the supervisor -- the

17   line-level supervisor of the detectives in this

18   case?

19        MR. SAHASRABUDHE:  Form.

20        THE WITNESS:  There was Lieutenant James

21   Rautenstrauch.  He was obviously our lieutenant,

22   R-A-U-T-E-N-S-T-R-A-U-C-H.

23        Then there was the chief, Dick -- Richard

24   Donovan, and I don't recall who the sergeants were

25   back then.



```
 1         BY MR. BRUSTIN:
 2         Q.    Okay.  So one of the things that I --
 3   that the detectives who have testified so far have
 4   consistently told me is that in the homicide unit,
 5   homicide detectives were given a great deal of
 6   discretion to do their jobs as they saw fit.
 7         Do you agree with that?
 8         A.    I do.
 9         Q.    In other words, there wasn't a lot
10   of -- of close supervision by sergeants or
11   lieutenants in the homicide division.  They were
12   more there as a resource for you when you needed
13   them.
14         MR. SAHASRABUDHE:  Form.
15         BY MR. BRUSTIN:
16         Q.    Is that an accurate description?
17         A.    Other than sergeants -- sergeants were
18   more hands-on, but a lieutenant, no.  They were for
19   resources.
20         Q.    Okay.  But even sergeants weren't, for
21   example, monitoring how you were doing witness
22   interviews or suspect interviews, correct?
23         A.    They would read all the reports with
24   all of our activities.  They would monitor our --
25   all our reports as far as who you interviewed, what
```



```
 1    they said, so on and so forth.
 2          Q.    But they would give you discretion to
 3    determine how to conduct an interview, how to do an
 4    interrogation, those kinds of things --
 5          A.    Yes.
 6          Q.    -- correct?
 7          A.    Correct.
 8          Q.    And I take it you were the same --
 9    you -- you did the same as a supervisor?  You
10    were -- you were there -- when you became a
11    supervisor in '94 and then you came back to
12    homicide, you saw yourself as more of a resource
13    for the officers to help them solve their cases,
14    fair to say?
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  Actually, I was more of a
17    hands-on supervisor.
18          BY MR. BRUSTIN:
19          Q.    Yes?
20          A.    Yes, I was very active.
21          Q.    Okay.  Including in the Ortiz case?
22          A.    The Ortiz case?  Yes, I was -- yes, I
23    was at the -- at the scene of the Ortiz house, I
24    guess.
25          Q.    So the -- the -- the victims in that
```

1  case were -- what are the names?

2      MR. SAHASRABUDHE:  Nelson and Miguel

3  Camacho.

4      THE WITNESS:  Yes.

5      BY MR. BRUSTIN:

6      Q.   The Camacho murders.

7      A.   Correct.

8      Q.   The more -- I asked a bad question.

9  The more specific question I meant to ask -- and

10 I'm going to go into the Ortiz case a little later,

11 but the more specific --

12     A.   All right.

13     Q.   -- question I wanted to ask is that in

14 the Ortiz case, in the Camacho murder

15 investigation, you were, in your view, a very

16 hands-on supervisor; is that correct?

17     A.   Yes.

18     MR. SAHASRABUDHE:  Form.

19     BY MR. BRUSTIN:

20     Q.   All right.  Now -- so I take it, then,

21 that you played no role in the -- you've already

22 told us, I think, you played no role in the arrest

23 of Mr. Dixon; is that right?

24     A.   Yes.

25     Q.   So from time to time today, I'm going



 1   to refer you to documents in our effort to recreate

 2   the police file, and I'm going to refer to -- to

 3   the pages in the middle of the bottom that says

 4   BPD.  Do you see those page numbers in the bottom?

 5        A.   BPD where?

 6        MR. SAHASRABUDHE:  Yes, right here.

 7        BY MR. BRUSTIN:

 8        Q.   And I want to start on -- on page --

 9        A.   Oh, BPD.  I thought he said E.  Okay.

10        Q.   Do you know what?

11        MR. BRUSTIN:  Can we take a -- just a

12   30-second break?

13        THE WITNESS:  Sure.

14             (A recess was then taken at 10:39 a.m.)

15             (On the record: 10:41 a.m.)

16        BY MR. BRUSTIN:

17        Q.   All right.  Sergeant, could you take a

18   look at page 82, please?

19        A.   Yes.

20        Q.   Actually, you know what?  Start on

21   page 80.

22        So this is -- this is -- my understanding of

23   these documents is these are the -- these are the

24   arrest forms and the complaint in this case for

25   Valentino Dixon.



1          Have you reviewed these before today?

2          A.    No.

3          Q.    Okay.  Am I accurately describing what

4    these documents are?

5          A.    Yes.

6          Q.    All right.  And I want to ask you some

7    questions.

8          So Detective Stambach testified about these

9    documents yesterday, and it's clear from these

10   reports, and he acknowledged, that he's -- he was

11   the arresting officer, correct?

12         A.    Correct.

13         Q.    By the way, is there -- is there any

14   detective supervisor listed on these documents that

15   you see?

16         A.    Just this page, or how -- how far do

17   you want me to --

18         Q.    Just to page 82.  That's -- that's

19   my -- or 83, actually.

20         A.    No.

21         Q.    Okay.  So let me tell you my

22   understanding, based on Detective Stambach, how the

23   process worked, and you tell me if -- if I'm

24   accurately describing it, okay?

25         Obviously by 1991, at the time of this case,



 1  you had yourself made a number of homicide arrests
 2  and had done this type of paperwork, correct?
 3          A.    Yes.
 4          Q.    Okay.  So my understanding of the
 5  process is that as the arresting officer, Detective
 6  Stambach would have met with an Assistant District
 7  Attorney to brief them on the basis for the belief
 8  that there was probable cause to make a homicide
 9  arrest; is that accurate?
10          MR. SAHASRABUDHE:  Form.
11          THE WITNESS:  Yes.
12          BY MR. BRUSTIN:
13          Q.    All right.  And in order to do that
14  properly, Detective Stambach, like any detective,
15  would have had to have reviewed all of the evidence
16  in the file gathered to that point in time so that
17  he could give that information to the prosecutor,
18  correct?
19          MR. SAHASRABUDHE:  Form.
20          THE WITNESS:  Correct.
21          BY MR. BRUSTIN:
22          Q.    And it was the obligation of the
23  arresting officer to provide the prosecutor with
24  all of the relevant evidence concerning the arrest,
25  whether or not it supported arrest or went against



1    arrest, correct?

2        MR. BLENK:  Form.

3        MR. SAHASRABUDHE:  Form.

4        THE WITNESS:  Well, actually, the -- the

5    District Attorney, upon an arrest, would go through

6    the homicide file, and they would determine at that

7    point what was necessary like immediately.

8        BY MR. BRUSTIN:

9        Q.    Okay.

10        A.    And they would get copies of those

11    reports.

12        Q.    Okay.  But obviously, I take it that

13    the Assistant District Attorneys -- police

14    officer -- the -- the detectives were responsible

15    for investigating the case, correct?

16        A.    Correct.

17        Q.    And the Assistant District Attorneys

18    were -- were -- were responsible for prosecuting

19    the case, correct?

20        A.    Yes.

21        Q.    And it was your understanding that the

22    Assistant District Attorneys were relying on you to

23    investigate the case and report your findings in

24    good faith, fair to say?

25        MR. BLENK:  Form.



1           MR. SAHASRABUDHE:  Form.

2           THE WITNESS:  Yes.

3           BY MR. BRUSTIN:

4           Q.   And when an arrest was made, an

5    Assistant -- first of all, the Assistant District

6    Attorneys were quite busy, right?

7           MR. SAHASRABUDHE:  Form.

8           THE WITNESS:  Oh, yes.

9           BY MR. BRUSTIN:

10           Q.   And when they came to meet about an

11   arrest, they were obviously interested in getting

12   information -- in addition to looking at the file

13   themselves, they were interested in getting

14   information from the experienced homicide detective

15   who was making the arrest about the strength of the

16   case; fair to say?

17           MR. BLENK:  Form.

18           MR. SAHASRABUDHE:  Form.

19           THE WITNESS:  No.  I would say that the

20   District Attorney would determine the strength of

21   the case.

22           BY MR. BRUSTIN:

23           Q.   Well, the person who'd investigate it

24   was the detective, correct?

25           A.   Correct.



1          Q.   And so certainly, to the extent that

2    the detective had any information that went --

3    that -- that suggested probable cause was not

4    strong, they would an obligation to report that to

5    the District Attorney, correct?

6          MR. BLENK:  Form.

7          MR. SAHASRABUDHE:  Form.  You may answer if

8    you know.

9          THE WITNESS:  Well, in my experience, I

10   wouldn't notify the District Attorney if there

11   wasn't reasonable cause to make an arrest.

12         BY MR. BRUSTIN:

13         Q.   Okay.  But obviously, any time there's

14   an investigation, there is -- oftentimes there's

15   evidence supporting -- there's evidence suggesting

16   that a particular suspect committed the crime and

17   there may be some evidence which puts that into

18   doubt, correct?

19         MR. BLENK:  Form.

20         MR. SAHASRABUDHE:  Form.

21         BY MR. BRUSTIN:

22         Q.   Witness -- problems with witnesses, for

23   example.  Credibility problems, thing like that --

24         MR. BLENK:  Form.

25         BY MR. BRUSTIN:



```
 1          Q.   -- right?
 2          A.   If -- if there was a credibility
 3   problem -- again, I wouldn't contact the District
 4   Attorney until I was ready to make an arrest, which
 5   I --
 6          Q.   All right.  That makes sense.
 7          So the job of a detective -- before calling
 8   the District Attorney and attempting to make an
 9   arrest, it was the -- the job of the arresting
10   detective to ensure that they reviewed the evidence
11   and that all of the evidence supported probable
12   cause; is that correct?
13          MR. SAHASRABUDHE:  Form.
14          MR. BLENK:  Form.
15          THE WITNESS:  Correct.
16          BY MR. BRUSTIN:
17          Q.   And in order to do that properly, the
18   detective would have to read all of the reports in
19   the case.
20          MR. SAHASRABUDHE:  Form.
21          THE WITNESS:  Yes.
22          BY MR. BRUSTIN:
23          Q.   Would have to speak to the other
24   officers who were involved in the investigation to
25   that point in time.
```



```
 1          MR. SAHASRABUDHE:  Form.
 2          THE WITNESS:  Yes.
 3          BY MR. BRUSTIN:
 4          Q.   And to do a full assessment of the
 5   evidence that was gathered up to that point in
 6   time, correct?
 7          MR. SAHASRABUDHE:  Form.
 8          THE WITNESS:  I would say the District
 9   Attorney would do the full assessment --
10          BY MR. BRUSTIN:
11          Q.   Well, you --
12          A.   -- of the evidence.
13          Q.   Okay.  But before you call the District
14   Attorney, you have to do enough assessment for you
15   to believe that, in fact, there is sufficient
16   probable cause for an arrest, correct?
17          A.   Yes.
18          Q.   Otherwise, you don't call the District
19   Attorney, correct?
20          A.   I don't, no.
21          Q.   And your understanding is that was how
22   things were supposed to work in the homicide
23   division, correct?
24          A.   That's how I did it.
25          Q.   And based on -- based on your working
```

```
 1   with other officers, including Detective Stambach,

 2   that's how they did it, correct?

 3        A.   Correct.

 4        Q.   All right.  Now, as you can see from

 5   the -- page 82 -- look at the -- the basis for

 6   probable cause beginning with, in the middle of the

 7   page, "The above information."

 8        Do you see that?

 9        A.   Yes.

10        Q.   That is -- that is the -- that is the

11   statement as to the basis for probable cause,

12   correct?

13        A.   Yes.

14        Q.   All right.  And so the probable cause

15   in this case was based on a statement from John

16   Sullivan, correct?

17        MR. SAHASRABUDHE:  Form.  You may answer.

18        THE WITNESS:  For the booking report, yes.

19        BY MR. BRUSTIN:

20        Q.   Well, the -- the -- the only

21   evidence -- other than the fact that the person was

22   shot and died, the only evidence indicating that --

23   that it was -- that it was Valentino Dixon that's

24   mentioned in the report is John Sullivan, correct?

25        A.   It's mentioned in the report is
```

 1  correct, yes.

 2          Q.   The only piece of evidence connecting

 3  Valentino Dixon in the arrest report is John

 4  Sullivan, correct?

 5          A.   In the arrest report, correct.

 6          Q.   In any of the arrest documents, if you

 7  look on page 80 to 82, correct?

 8          A.   Correct.

 9          Q.   And you recall that, although you

10  didn't conduct any interview of John Sullivan, at

11  your direction, Detective Vickerd, who was working

12  as your partner, interviewed him in the hospital,

13  correct?

14          A.   Yes.

15          Q.   And he was reporting to you what he was

16  finding, correct?

17          A.   Yes.

18          Q.   All right.  Now, at the time -- at the

19  time -- I'm going to go into it more specifically,

20  but I just want to ask you some general questions

21  about it.

22          One of the things you recall is that

23  according to Vickerd, John Sullivan, one of the

24  shooting victims, volunteered without any

25  suggestion or influence whatsoever that Valentino



```
 1  Dixon was the shooter, correct?

 2       A.    Correct.

 3       Q.    And one of the reasons why you, in

 4  particular, found that to be compelling evidence at

 5  the time is because at the time he made that

 6  statement, you had never heard the name Valentino

 7  Dixon in connection with this case.

 8       MR. BLENK:  Form.

 9       THE WITNESS:  I had never ever heard that

10  name.

11       BY MR. BRUSTIN:

12       Q.    Okay.  In other words, the first person

13  in this case to mention Valentino Dixon was John

14  Sullivan in the early morning hours after the

15  shooting, correct?

16       MR. SAHASRABUDHE:  Form.

17       MR. BLENK:  Form.

18       THE WITNESS:  I don't -- I don't -- I don't

19  know if he said his full name or he called him

20  Tino.

21       BY MR. BRUSTIN:

22       Q.    I -- I think your memory's good on

23  this.  According to the report from Detective

24  Vickerd, he said Tino.

25       A.    Okay.
```



```
 1          Q.   Okay.  And so the first mention of

 2    Tino, which we know is Valentino Dixon, according

 3    to you, was in the early morning hours, a few hours

 4    after the shooting by John Sullivan, correct?

 5          MR. SAHASRABUDHE:  Form.

 6          THE WITNESS:  Correct.

 7          BY MR. BRUSTIN:

 8          Q.   In other words, nobody -- to your

 9    knowledge, nobody else in the world had mentioned

10    Valentino Dixon either by name or nickname prior to

11    that, correct?

12          MR. SAHASRABUDHE:  Form.

13          THE WITNESS:  To my knowledge, no.

14          BY MR. BRUSTIN:

15          Q.   And that you're certain about,

16    correct?  Withdrawn.

17          One of the -- one of the reasons why you

18    believed that -- that John Sullivan mentioning Tino

19    was so -- was such important evidence is because

20    that name was not even on anybody's radar, correct?

21          MR. SAHASRABUDHE:  Form.

22          THE WITNESS:  Correct.

23          BY MR. BRUSTIN:

24          Q.   Now, one of your jobs and the jobs of

25    any detective working a homicide case early on, in
```



```
 1   the first few hours -- withdrawn.
 2           The first few hours of a homicide
 3   investigation are very important, correct?
 4           A.   All minutes, actually, are very
 5   important.
 6           Q.   Okay.  But the -- the first couple of
 7   hours are when you are doing your best to do a few
 8   different things, and let me go through them with
 9   you.
10           One would be to make sure that you're
11   securing the crime scene.
12           A.   Correct.
13           Q.   Very important, right?
14           A.   Yes.
15           Q.   To make sure that, to the extent
16   there's any physical evidence at the crime scene,
17   you are securing the scene so that that can be
18   properly gathered and evaluated.
19           A.   Yes.
20           Q.   And that was your job.
21           A.   Yes.
22           Q.   Another very important job early on, in
23   the minutes and hours following a shooting, is to
24   try to ascertain any witnesses to the shooting.
25           A.   Correct.
```



 1          Q.    And -- and even -- and most importantly
 2   to ascertain any persons of interest or potential
 3   suspects, correct?
 4          A.    Yes.
 5          Q.    One of the main things you're doing at
 6   the scene of a crime is trying to ascertain
 7   potential suspects, correct?
 8          A.    Yes.
 9          Q.    And that's probably the -- the most
10   important thing you're doing, fair to say?
11          MR. SAHASRABUDHE:   Form.   You may answer.
12          THE WITNESS:   Yes.
13          BY MR. BRUSTIN:
14          Q.    And you are -- and -- and the same for
15   any homicide detective that's working on the case
16   at that time, correct?
17          A.    Yes.
18          Q.    One of the things you're all doing --
19   and there's a variety of ways to learn about
20   potential suspects in the early morning hours of a
21   shooting, correct?
22          A.    Yes.
23          Q.    In the early hours of a shooting.
24          You are talking informally to people at the
25   scene, correct?



1         A.    Yes.

2         Q.    You are talking to patrol officers who

3    may know the area who were at the scene.

4         A.    Yes.

5         Q.    You are talking to housing officers and

6    other types of officers who may be working at the

7    scene.

8         MR. SAHASRABUDHE:   Form.

9         THE WITNESS:   Whatever officers were there,

10   yes.

11        BY MR. BRUSTIN:

12        Q.    Okay.   You are monitoring the -- the

13   radio for any announcements about any potential

14   suspects.

15        A.    No.   I shut the radio off when I get to

16   the scene.

17        Q.    Okay.

18        A.    It's so hectic.

19        Q.    All right.   But you --

20   your understanding -- withdrawn.

21        The way things worked in 1991 was that it

22   was your goal to get, as quickly as possible, any

23   potential suspects, correct?

24        A.    Yes.

25        Q.    Some -- some pan out, some don't, but



1   you want to know them all, right?

2          A.   All information, yes.

3          Q.   All right.  But particularly

4   information about who did the crime.

5          A.   Of course, yes.

6          Q.   And so fair to say that Buffalo police

7   officers, and based on your experience, understood

8   that to the extent there was any information about

9   a potential suspect, you needed to provide that

10  information to the lead detective at the scene.

11         MR. SAHASRABUDHE:  Form.

12         THE WITNESS:  Yes.

13         BY MR. BRUSTIN:

14         Q.   That was understood by the Buffalo

15  Police Department officers, correct?

16         A.   I would say yes.

17         Q.   They -- and -- and it was clear that

18  when you -- when you were at the scene of this

19  homicide, you were in charge, correct?

20         MR. SAHASRABUDHE:  Form.

21         THE WITNESS:  There were several lieutenants

22  there who outranked me.

23         BY MR. BRUSTIN:

24         Q.   Okay.

25         A.   As far as the homicide squad, yes, I



```
 1   agree.
 2        Q.   All right.  But to the extent that
 3   anybody -- any police officer had received
 4   information of a potential suspect, you would
 5   expect that information to make its way to you
 6   immediately, correct?
 7        MR. SAHASRABUDHE:  Form.
 8        THE WITNESS:  Yes.
 9        BY MR. BRUSTIN:
10        Q.   All right.  I want to the ask you some
11   questions about something called tunnel vision.
12   Are you familiar with that term -- term in
13   policing?  Have you ever heard that?
14        A.   In life.  I don't know about policing.
15        Q.   Well, let me -- let me -- let me give
16   it a shot and see if you -- if it makes sense to
17   you.
18        So have you ever received any training,
19   whether it be in Buffalo or in -- outside of
20   Buffalo, out -- outside training, that, in
21   substance, taught that detectives, in particular,
22   have to be very careful not to engage in tunnel
23   vision in their criminal investigations?
24        And what I mean by that is to lock on to a
25   suspect or a theory of the case that you have
```



1    initially to the exclusion of other evidence as it

2    comes out.

3         Have you ever received training like that?

4         A.   I don't know if I've ever received

5    formal training, but it's -- it was common sense

6    with me, and you look at the broad picture, not

7    just --

8         Q.   Okay.

9         A.   -- look at one person, if -- if that's

10   the case.

11        Q.   Would it be fair to say that you

12   understood that one of the dangers for a homicide

13   detective, for example -- experienced homicide

14   detective -- is locking on to an initial theory of

15   the case and making the evidence fit that theory?

16        That's a danger you had to try to avoid.

17        MR. SAHASRABUDHE:   Form.   You may answer.

18        THE WITNESS:   I would never make evidence

19   try to fit the case.   You go where the evidence

20   takes you.   I wouldn't -- I wouldn't make it fit

21   the case.

22        BY MR. BRUSTIN:

23        Q.   Okay.   So -- now, you understand that

24   there was a reinvestigation in this case by the

25   District Attorney's office that determined that



1    Valentino Dixon did not commit the crimes for which
2    he was charged.
3         In other words, that he did not -- he did
4    not shoot Torri Jackson, Aaron Jackson, or the
5    others.
6         MR. BLENK:  Form.
7         MR. SAHASRABUDHE:  Form.
8         BY MR. BRUSTIN:
9         Q.   You understand that, correct?
10        MR. BLENK:  Form.
11        MR. SAHASRABUDHE:  Form.
12        THE WITNESS:  I don't know who did the
13   investigation --
14        BY MR. BRUSTIN:
15        Q.   Okay.
16        A.   -- to be honest with you.
17        Q.   Fair enough.  But you understand that
18   there was a judicial finding that -- that Valentino
19   Dixon did not commit -- did not commit the
20   shooting.
21        MR. SAHASRABUDHE:  Form.  Answer if you can.
22        MR. BLENK:  Form.
23        THE WITNESS:  Well, I know he was released
24   from jail.  I don't know if they said he did not do
25   it.



 1          BY MR. BRUSTIN:

 2          Q.    Well, so prior to today, did you know,

 3   for example, that Lamarr Scott -- after -- after

 4   Mr. Dixon was exonerated, Lamarr -- from the

 5   shooting, Lamarr Scott pled guilty to the shooting?

 6          Did you know that?

 7          A.    Yes.

 8          Q.    And Lamarr Scott today stands convicted

 9   of being the person that shot the TEC-9 that killed

10   Torri Jackson and wounded others.

11          Did you know that?

12          A.    No.

13          Q.    The first you're hearing of that is me

14   telling it to you.

15          A.    Correct.

16          Q.    Okay.  That's important information,

17   right?

18          MR. SAHASRABUDHE:  Form.

19          THE WITNESS:  Not if you're retired.

20          BY MR. BRUSTIN:

21          Q.    Well, you -- you participated in this

22   investigation, correct?

23          A.    Right.

24          Q.    And there's now -- there's now a

25   judicial finding that the person that was -- that



1   was arrested and prosecuted and spent many years in

2   prison on a case you investigated wasn't actually

3   the person that committed the crime.

4          Does that concern you at all?

5          MR. SAHASRABUDHE:  Form.

6          BY MR. BRUSTIN:

7          Q.   Despite your retirement?

8          A.   Well, I don't know if I believe he

9   didn't do it.

10         Q.   I think -- that's my next question.

11         So fair to say that you believe Valentino

12   Dixon shot and killed Torri Jackson.

13         A.   I do.

14         MR. SAHASRABUDHE:  Form.

15         BY MR. BRUSTIN:

16         Q.   You believe it as firmly today as you

17   did back then.

18         A.   Yes.

19         Q.   And that's based on your -- the

20   investigative activities you described conducting

21   in this case?

22         MR. SAHASRABUDHE:  Form.

23         THE WITNESS:  Yes.

24         BY MR. BRUSTIN:

25         Q.   Okay.  Why don't you tell me in your



1   own words.

2         Despite the judicial findings and Lamarr

3   Scott's guilty plea, can you explain to me why you

4   believe today, as strongly as you did then, that

5   Valentino Dixon fired the TEC-9 that killed Torri

6   Jackson?

7         MR. SAHASRABUDHE:  Form.

8         THE WITNESS:  He was identified by several

9   witnesses, and if I recall correctly, Lamarr Scott

10  was confessing to this crime from the day it

11  happened, and it was disproved that -- well, that

12  he did not commit the crime back then.

13        BY MR. BRUSTIN:

14        Q.    Sure.

15        A.    As far as I recall.

16        Q.    Tell me how it was disproved that

17  Lamarr Scott -- so after -- tell me -- tell me your

18  recollection of how it was disproved -- withdrawn.

19        After Lamarr Scott came forward and

20  confessed to being the shooter --

21        A.    Right.

22        Q.    -- how was it disproved that he was the

23  shooter, to your recollection?

24        A.    I believe through the District

25  Attorney's office.



```
 1          Q.   Okay.  Do you remember anything that
 2    happened to disprove it?
 3          A.   I don't recall, no, sir.
 4          Q.   Any other basis for your belief today
 5    that Valentino Dixon was, in fact, the shooter
 6    despite the fact that he was exonerated and Lamarr
 7    Scott pled guilty?
 8          MR. SAHASRABUDHE:  Form.
 9          THE WITNESS:  No.
10          BY MR. BRUSTIN:
11          Q.   Would you agree that -- would you
12    agree, sir, that what you just described is an
13    example of tunnel vision?
14          MR. SAHASRABUDHE:  Form.
15          THE WITNESS:  No.
16          BY MR. BRUSTIN:
17          Q.   In other words, there's been an
18    independent investigation that found that Valentino
19    Dixon wasn't the shooter.  You know that, right?
20          A.   Yes.
21          MR. SAHASRABUDHE:  Form.
22          BY MR. BRUSTIN:
23          Q.   You accept my representation on that.
24          MR. SAHASRABUDHE:  Form.
25          THE WITNESS:  Correct.
```



```
 1          BY MR. BRUSTIN:
 2          Q.    Lamarr Scott has actually pled guilty
 3   as being the shooter, correct?
 4          A.    Correct.
 5          Q.    You've done no independent
 6   investigation of that new evidence, correct?
 7          A.    Correct.
 8          Q.    You had very limited involvement in
 9   this case.
10          A.    Correct.
11          Q.    Yet you are willing to say that you are
12   convinced that Valentino Dixon was the shooter,
13   correct?
14          A.    That's correct.
15          MR. SAHASRABUDHE:  Form.
16          BY MR. BRUSTIN:
17          Q.    That -- that is the definition of
18   tunnel vision, isn't it, sir?
19          MR. SAHASRABUDHE:  Form.
20          THE WITNESS:  No.
21          BY MR. BRUSTIN:
22          Q.    Explain why -- how I'm wrong.
23          MR. SAHASRABUDHE:  Form.
24          THE WITNESS:  Well, all the evidence pointed
25   to Valentino Dixon.  My mind was still wide open at
```



1  that point.  Lamarr Scott has been confessing to

2  this murder since day one, and the District

3  Attorney's office disproved that confession,

4  however they did it through their investigation.

5        That's not tunnel vision.  It's -- it's the

6  end of the -- the case where the evidence said

7  definitely he did it.

8        BY MR. BRUSTIN:

9        Q.   Who told you they disproved that he did

10  it?

11       A.   I don't recall.

12       Q.   And you have no understanding

13  whatsoever as you sit here today how they did that?

14       A.   Today, no.

15       MR. BLENK:  Form.

16       THE WITNESS:  I don't recall, no.

17       BY MR. BRUSTIN:

18       Q.   Okay.  You're just sure that they did.

19       A.   Yes.

20       MR. BLENK:  Form.

21       BY MR. BRUSTIN:

22       Q.   Somebody tell you that they did?

23       MR. BLENK:  Form.

24       THE WITNESS:  I would assume so.  I'm aware

25  of it.  I had to be told at some point.



1          BY MR. BRUSTIN:

2          Q.   Do you remember who told you that they

3    disproved that Lamarr Scott committed the crime?

4          A.   Back -- no, I don't.

5          Q.   All right.  So -- now, you were working

6    closely with -- well, before I get to that, have

7    you had any outside training on interviewing,

8    interrogations, or any other specific homicide

9    functions when you were -- when you were a

10   detective?

11         A.   Yes.

12         Q.   What -- what training did you receive?

13         A.   I don't remember the -- it was like --

14   I want to say Reid.  Reid seminars.

15         Q.   You did the Reid three-day training?

16         A.   Is that what it is?  Reid, right?  Yes.

17         Q.   Okay.

18         A.   I went to a supervisors' school for two

19   weeks.  I'm sure there was more departmental

20   training, which --

21         Q.   Okay.

22         A.   -- you know, one day here, one --

23         Q.   All right.  And I've actually --

24   through other cases, have become familiar with some

25   of the Reid training and how it works.



1          A.    Yes.

2          Q.    So I want to ask you a couple of more

3    specific questions about that.

4          A.    Okay.

5          Q.    Now, do you remember that the way the

6    Reid training worked is you went to a three-day

7    seminar with a number of detectives?

8          A.    That's correct.

9          Q.    It's a pretty intensive seminar, right?

10         MR. SAHASRABUDHE:    Form.

11         THE WITNESS:    Yes.

12         BY MR. BRUSTIN:

13         Q.    A lot of information about how you

14   handle interrogations and interviews, correct?

15         A.    There was, yes.

16         Q.    And based on my understanding of it,

17   there are some very key concepts to the Reid

18   training that I want to go through with you, okay?

19         A.    Okay.

20         Q.    Tell me if you remember them.

21         One key concept is that oftentimes, people

22   confessing to crimes don't tell the complete truth,

23   and the way to assess whether a confession or an

24   admission is reliable is to learn whether they have

25   nonpublic information about the crime that only the



```
 1   police or the perpetrator would know.
 2          Do you recall that training?
 3          MR. BLENK:  Form.
 4          MR. SAHASRABUDHE:  Do you recall receiving
 5   that training in the Reid training is the question.
 6          THE WITNESS:  I don't recall that, no.
 7          BY MR. BRUSTIN:
 8          Q.   Okay.  Do you recall generally the Reid
 9   training providing -- providing you training about
10   the importance of learning non -- of learning
11   whether a confessor knows nonpublic information
12   about a crime?  Do you recall that generally?
13          MR. SAHASRABUDHE:  Form.
14          THE WITNESS:  Well, I don't recall being --
15   being taught that, but that would make common sense
16   to me.
17          BY MR. BRUSTIN:
18          Q.   So you knew it.
19          A.   Yes.
20          Q.   You knew that the -- the one way --
21   that probably the best way to determine whether or
22   not a confession was reliable was whether it
23   contained information that only the real
24   perpetrator would know.
25          MR. BLENK:  Form.
```



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   And also, although you may not remember

5    it from your Reid training, you also understood

6    that oftentimes, people confessing to crimes don't

7    tell the complete truth.

8          A.   Yes.

9          Q.   And fair to say, though, back in --

10   back when you were a police officer, you would have

11   been -- you would have had a much better memory of

12   your Reid training at that time.

13         A.   Yes, back when I had the training, of

14   course, yes.

15         Q.   And certainly you would have remembered

16   it better in, say, 2002 or 1991 than you do today.

17         A.   Yes.

18         Q.   And do you recall, through your Reid

19   training or from any training, being taught the

20   importance of following up on information you

21   receive in confessions?

22         MR. SAHASRABUDHE:  Form.

23         BY MR. BRUSTIN:

24         Q.   In other words, doing continuing

25   investigations based on information you receive



1  from a confession.

2      A.   Yes.

3      Q.   The importance of, for example,

4  following up with witnesses that are mentioned

5  during a confession.

6      A.   Yes.

7      Q.   The importance of attempting to get

8  to -- to get information about and then follow up

9  on any physical evidence you can get through a

10  confession.

11     A.   Yes.

12     Q.   All very basic tasks for a detective in

13  homicide, correct?

14     A.    Correct.

15     MR. SAHASRABUDHE:  Form.

16     BY MR. BRUSTIN:

17     Q.   In other words, you understood that a

18  confession is really the start of an investigation,

19  not the end, correct?

20     MR. SAHASRABUDHE:  Form.

21     THE WITNESS:  Well, I would say it's nearing

22  the end, but it's not over.

23     BY MR. BRUSTIN:

24     Q.   Okay.  You need to follow up and -- on

25  every aspect of that -- of that confession that is



1  practicable either to prove it true or not true,

2  correct?

3          MR. BLENK:  Form.

4          MR. SAHASRABUDHE:  Form.

5          THE WITNESS:  Correct.

6          BY MR. BRUSTIN:

7          Q.   And so, for example, when you say that

8  Lamarr Scott's confession was disproved, it would

9  be your understanding that somebody -- not you, but

10 somebody went through all of the steps necessary to

11 investigate it and then proved it was false,

12 correct?

13         MR. BLENK:  Form.

14         MR. SAHASRABUDHE:  Form.

15         THE WITNESS:  I couldn't say the steps they

16 went through, no.

17         BY MR. BRUSTIN:

18         Q.   But when you say it was disproved, that

19 necessarily means they must have gone through those

20 steps, right?

21         MR. SAHASRABUDHE:  Form.

22         MR. BLENK:  Form.

23         THE WITNESS:  I don't know how they

24 disproved it, to be honest with you.

25         BY MR. BRUSTIN:



1          Q.   Well, is there any other legitimate way

2    to disprove it other than going through those

3    steps?

4          MR. SAHASRABUDHE:   Form.

5          MR. BLENK:   Form.

6          THE WITNESS:   You'd have to ask the District

7    Attorney.   I -- I don't know how they came to that

8    conclusion.

9          BY MR. BRUSTIN:

10         Q.   Now, did you understand, as a police

11   officer, that you had an obligation to report

12   misconduct if you observed it among your fellow

13   officers?

14         A.   Yes.

15         Q.   Have you ever reported a fellow officer

16   for engaging in misconduct?

17         A.   No.

18         Q.   So in other words, during your 40 years

19   on the force, you never observed another fellow

20   officer engage in misconduct.

21         MR. SAHASRABUDHE:   Form.

22         THE WITNESS:   I've had the pleasure of

23   working with all excellent, excellent people, and

24   no, I have not.

25         BY MR. BRUSTIN:



1        Q.    Okay.  So in 40 years on the job, you

2  never observed an officer using excessive force.

3        A.    I've observed officers in fights where

4  the other party was using excessive force.

5        Q.    So that's what I'm asking, sir.  You

6  never -- you never observed a fellow officer use

7  more force than was necessary under the

8  circumstance.

9        A.    That's correct.

10        Q.    You never saw, for example, an officer

11  at any time in your 40 years punch or strike or hit

12  a suspect when it wasn't in self-defense.

13        MR. BLENK:  Form.

14        MR. SAHASRABUDHE:  Form.

15        THE WITNESS:  No, I have not.

16        BY MR. BRUSTIN:

17        Q.    40 years, huh?

18        A.    That's right.

19        Q.    And in the 40 years beginning in 1970,

20  I take it that you never saw a white police officer

21  use a racial slur like the N word with a suspect.

22        A.    I didn't say that.  I may have.

23        Q.    Okay.  Well, would that be misconduct?

24        A.    Well, it would certainly be

25  inappropriate, yes.

1        Q.   Do you have some doubt as to whether or

2   not using an N word with a -- a white officer using

3   the N word with a suspect would be misconduct?

4        MR. SAHASRABUDHE:  Form.

5        THE WITNESS:  No, I would say it is.

6        BY MR. BRUSTIN:

7        Q.   Okay.

8        A.   I don't have any doubt about that.

9        Q.   And you've heard that before, correct?

10       MR. SAHASRABUDHE:  Form.

11       THE WITNESS:  Heard --

12       BY MR. BRUSTIN:

13       Q.   You've heard white officers use the N

14  word with suspects, correct?

15       MR. SAHASRABUDHE:  Form.

16       THE WITNESS:  Not that I recall, no.

17       BY MR. BRUSTIN:

18       Q.   Well, you just told me that you did.

19  Are you changing your testimony?

20       MR. BLENK:  Form.

21       MR. SAHASRABUDHE:  Form.  That's not what he

22  said.

23       THE WITNESS:  I don't -- did I -- what

24  exactly did I say?

25       BY MR. BRUSTIN:



```
 1              Q.   So you know what?  I don't -- I
 2    don't -- you can say whatever you want.  Let's just
 3    start again.
 4              Did you know officers -- white officers,
 5    beginning in 1970, who used the N word in everyday
 6    conversation?
 7              A.   I don't recall.
 8              Q.   So to the best of your recollection,
 9    nobody did.
10              A.   As far as I recall, yes.
11              Q.   And to the best of your recollection,
12    nobody ever used the N word with a suspect.
13              A.   True.
14              Q.   In 40 years --
15              A.   42.
16              Q.   -- in Buffalo.
17              A.   That's correct.
18              Q.   Okay.  And so if anybody had used the N
19    word with a suspect, you would have reported it.
20              MR. SAHASRABUDHE:  Form.
21              THE WITNESS:  I certainly would have talked
22    to him about it.
23              BY MR. BRUSTIN:
24              Q.   And it never happened.
25              A.   No.
```

1        Q.   Now, one of the things that Officer

2   Masecchia told us is that there were multiple times

3   when he observed officers engaging in what would be

4   classified as excessive force, force that wasn't

5   justified under the circumstances, and he didn't

6   report it because officers in Buffalo didn't report

7   misconduct of fellow officers.

8        Do you dispute that?

9        MR. SAHASRABUDHE:   Form, mischaracterizes

10   the testimony.   You may answer.

11        THE WITNESS:   It's been done before where

12   officers came forward.

13        BY MR. BRUSTIN:

14        Q.   Do you know what the blue wall of

15   silence is?

16        A.   Of course.

17        Q.   And did the blue wall of -- is the blue

18   wall of silence, in your view, a real thing?

19        A.   Yes.

20        Q.   Does the blue wall of silence exist in

21   Buffalo?

22        MR. SAHASRABUDHE:   Form.

23        THE WITNESS:   It did.

24        BY MR. BRUSTIN:

25        Q.   Did it exist in Buffalo in 1991?



JAMES LONERGAN                                      June 09, 2022
DIXON V. CITY OF BUFFALO                                      74

1          A.   I would say so.

2          Q.   In other words, in 1991, there was

3    pressure among police officers not to report

4    misconduct when they observed it, correct?

5          MR. SAHASRABUDHE:  Form.

6          THE WITNESS:  Yes.

7          BY MR. BRUSTIN:

8          Q.   And you were a detective in 1991,

9    correct?

10         A.   Yes.

11         Q.   And you felt that same pressure in 1991

12   as other officers, based on the blue wall of

13   silence, not to report misconduct when you observed

14   it, correct?

15         MR. SAHASRABUDHE:  Form.

16         THE WITNESS:  I don't recall observing any

17   misconduct that should have been reported.

18         BY MR. BRUSTIN:

19         Q.   So I'm asking something a little

20   different.  And I know these are hard questions.

21         In 1991, as a general matter, you felt

22   pressure not to report misconduct by fellow

23   officers even if you observed it, fair to say?

24         MR. SAHASRABUDHE:  Form.

25         THE WITNESS:  Fair.



 1          BY MR. BRUSTIN:

 2          Q.   And although you might not remember a

 3   specific incident of an officer slapping a suspect

 4   or punching a suspect or pushing a suspect, of

 5   course that happened in your career, right?

 6          MR. SAHASRABUDHE:  Form.

 7          THE WITNESS:  Yes, maybe to get him to drop

 8   a weapon or something.  Of course.  Things like

 9   that happen.

10          BY MR. BRUSTIN:

11          Q.   Not what I'm talking about.

12          A.   Oh.

13          Q.   I'm talking about a police officer

14   using more force than was necessary under the

15   circumstances.

16          A.   No.

17          Q.   Because they were angry or upset, they

18   struck a suspect.  Are you telling me you never saw

19   that?

20          A.   Correct.

21          Q.   All right.  In any case, you in your 40

22   years on the job, including decades -- more than a

23   decade as a supervisor, never reported an officer

24   engaging in any type of misconduct whatsoever,

25   correct?



```
 1        A.    Correct.

 2        Q.    Now, one of the things that's clear

 3  from the police file is that there were a number of

 4  investigative activities that were conducted in

 5  this case after Valentino Dixon was arrested.

 6        Did you -- did you notice that, too, when

 7  you reviewed the file to the extent you did?

 8        A.    I didn't review the file.  I just

 9  reviewed my report and Vickerd's, so I'm not aware

10  of what was actually done.

11        Q.    All right.  You know, for example, that

12  one of the activities you describe was long after

13  Valentino Dixon was arrested, correct?

14        A.    What activity was that?

15        Q.    When you -- when you interviewed the

16  witness in December, Heather Smith.

17        A.    Oh, yes.  Yes.

18        Q.    That was long after the arrest,

19  correct?

20        A.    I believe it was a couple months, yes.

21        Q.    All right.  And so you understood, for

22  example, that in this case, like -- like any other,

23  to the extent that there is a -- there is often a

24  great deal of investigation that's conducted in a

25  homicide case after an arrest, correct?
```



JAMES LONERGAN
DIXON V. CITY OF BUFFALO

```
 1           A.    Yes.

 2           Q.    And you have -- as a homicide

 3    detective, you have the same exact obligation to

 4    investigate evidence as it comes to you after an

 5    arrest as you do before an arrest, correct?

 6           A.    Yes.

 7           MR. SAHASRABUDHE:    Form.

 8           BY MR. BRUSTIN:

 9           Q.    As you said, you have to follow the

10    evidence wherever it takes you, correct?

11           A.    Yes.

12           Q.    Whether it's before or after an arrest.

13           A.    Correct.

14           Q.    And whether it supports the arrest or

15    suggests that the arrest was invalid.

16           A.    Yes.

17           Q.    Now, one of the things that Detective

18    Vickerd told us is that at the time of this

19    investigation, not only was he working with you

20    closely as a partner, you were also good friends.

21           Is that an accurate description?

22           A.    Yes.

23           Q.    And I take it you said -- I think you

24    told us this, but I want to make sure.

25           You've never talked about this case with
```



1  Vickerd in the last few year?

2      A.    That's correct.

3      Q.    One of the things that Vickerd told us

4  is that during his involvement in this

5  investigation, given your close working

6  relationship as informal partners, he would have

7  been communicating with you constantly about his

8  activities and vice versa.

9      Do you agree with that?

10     A.    Yes.

11     Q.    And the way you would communicate with

12  one another would either be in person or over your

13  radios.

14     A.    It would be in person.  We didn't

15  communicate over radios much.

16     Q.    Okay.  He said you had portable radios

17  to communicate when you weren't on the scene

18  together.  Is that -- is that wrong?

19     A.    Yes, but we -- we really didn't get

20  into the case over radios.

21     Q.    All right.  In any case, when you were

22  working on a case like this with Vickerd, you were

23  constantly communicating about what you were

24  finding and what he was finding, correct?

25     MR. SAHASRABUDHE:  Form.



1        THE WITNESS:  Not constantly, no.  I believe

2   he showed up on the scene and then briefed me what

3   he had found at the hospitals.

4        BY MR. BRUSTIN:

5        Q.   Okay.  But you -- in any case,

6   including this one, you were regularly talking with

7   him about anything you found and anything he found,

8   correct?

9        A.   Yes.

10       Q.   Including in this case.

11       A.   Yes.

12       MR. SAHASRABUDHE:  Doing okay?

13       THE WITNESS:  Yes, I'm okay.

14       BY MR. BRUSTIN:

15       Q.   I want to ask you a couple of

16  questions -- couple more questions about policies

17  and procedures and training, okay?

18       A.   All right.

19       Q.   So my understanding is that when an

20  interview was conducted by a homicide detective,

21  the homicide detective would take notes, correct?

22       A.   Yes.

23       Q.   And the homicide detective was

24  obligated -- in other words, required -- to

25  document any potentially relevant evidence that the



 1  witness provided to them.

 2       MR. SAHASRABUDHE:  Form.  You may answer.

 3       THE WITNESS:  Yes.

 4       BY MR. BRUSTIN:

 5       Q.   And then put that into a P73 report,

 6  correct?

 7       A.   Correct.

 8       Q.   And the -- the P73 report had to be

 9  done as soon as possible after the interview,

10  correct?

11       A.   Yes.

12       Q.   Typically it was done right away,

13  correct?

14       MR. SAHASRABUDHE:  Form.  You may answer.

15       THE WITNESS:  Yes.

16       BY MR. BRUSTIN:

17       Q.   Because one of the -- one of the -- one

18  of the most important things about a P73 report is

19  that it was the way -- withdrawn.

20       Given that there wasn't a -- a -- an actual

21  lead detective in Buffalo, it was even more

22  important that any homicide detective working on a

23  case familiarize themselves with the reports in the

24  file about what had happened before, correct?

25       A.   Yes.



 1        Q.    The way you solve crimes is by having a
 2   good understanding of all of the evidence that was
 3   gathered, correct?
 4        A.    Yes.
 5        Q.    And so it was very important that
 6   whenever you take a statement from a witness, you
 7   take notes of everything they told you that's
 8   relevant, correct?
 9        MR. SAHASRABUDHE:    Form.
10        THE WITNESS:    Yes.
11        BY MR. BRUSTIN:
12        Q.    Anything you may have told the witness,
13   right?
14        MR. SAHASRABUDHE:    Form.    You may answer.
15        THE WITNESS:    Yes.
16        BY MR. BRUSTIN:
17        Q.    And then make sure that, as quickly as
18   possible, that gets put into a P73 and put into the
19   file, correct?
20        A.    Yes.
21        Q.    And in addition to the P73 in the file,
22   officers were routinely talking to one another on
23   shifts about what they were finding, correct?
24        A.    Yes.
25        Q.    And that might take place at the scene



JAMES LONERGAN                                          June 09, 2022
DIXON V. CITY OF BUFFALO                                          82

1   of the crime, right?

2          A.    Could, yes.

3          Q.    But it -- it often took place in the

4   homicide unit, right?

5          A.    Yes.

6          Q.    And the homicide unit in 1991 was a --

7   was a big, open office, right?

8          A.    Yes.

9          Q.    With some desks.

10         A.    Correct.

11         Q.    Maybe as big as a classroom.  Does that

12  sound about right, a high school classroom?

13         A.    That would be about right, I guess,

14  yes.

15         Q.    With a couple of private office --

16  offices for the supervisors, right?

17         A.    Correct.

18         Q.    And an interview room, right?

19         A.    Yes.

20         Q.    But it was one big, open room with

21  desks where homicide detectives worked with one

22  another to solve crimes.

23         A.    Yes.

24         Q.    Constantly communicating about what

25  evidence you were finding and what you were



 1  hearing, correct?

 2       A.   Correct.

 3       Q.   In fact, that was one of the most

 4  effective tools for solving crimes.

 5       A.   I would say yes.

 6       Q.   For officers working on a particular

 7  homicide, there were no secrets about what officers

 8  were finding.  There was constant communication.

 9       A.   Yes.

10       MR. SAHASRABUDHE:  Form.

11       BY MR. BRUSTIN:

12       Q.   And one of the things that Detective

13  Stambach described to us yesterday was that he

14  considered himself to be a very careful and

15  conscientious detective.

16       Was that your experience with Detective

17  Stambach?

18       A.   Yes.

19       MR. SAHASRABUDHE:  Form.

20       THE WITNESS:  Yes.

21       MR. SAHASRABUDHE:  You can answer.

22       THE WITNESS:  Yes.

23       BY MR. BRUSTIN:

24       Q.   In other words, based on your

25  experience, Detective Stambach fully understood the



1  rules and regulations of the department.

2       MR. SAHASRABUDHE:  Form.

3       THE WITNESS:  As far as I was aware, yes.

4       BY MR. BRUSTIN:

5       Q.   He fully understood the importance of

6  documenting any evidence that he received, correct?

7       MR. SAHASRABUDHE:  Form.

8       THE WITNESS:  Believe so.

9       BY MR. BRUSTIN:

10       Q.   He fully understood the importance

11  of -- of following up on any evidence that he

12  received that required follow-up.

13       MR. SAHASRABUDHE:  Form.

14       THE WITNESS:  I believe so.

15       BY MR. BRUSTIN:

16       Q.   He understood how important all those

17  things were, correct?

18       MR. SAHASRABUDHE:  Form.

19       THE WITNESS:  He should have, yes.

20       BY MR. BRUSTIN:

21       Q.   Now, before I get into more specifics

22  about this case, would it be fair to say that the

23  only events of this investigation that you have

24  actual knowledge of, firsthand knowledge of, would

25  be the -- what happened at the crime scene when you



```
 1   were there --
 2           A.   Correct.
 3           Q.   -- would be one thing.
 4           A.   Yes.
 5           Q.   Your interview later on of Heather
 6   Smith.
 7           A.   Yes.
 8           Q.   Your taking an anonymous phone call at
 9   some point, correct?
10           A.   That was before I interviewed Heather
11   Smith, yes.
12           Q.   Just trying to look and see if I'm
13   missing anything.
14           Oh, you -- I also saw a document that you
15   interviewed someone named Jeffrey Shelton.  Do you
16   remember that?
17           A.   No, I don't.
18           Q.   Okay.  Well, why don't we take a look
19   at that real quick.
20           A.   Okay.
21           Q.   Page 257.
22           (Discussion off the record.)
23           BY MR. BRUSTIN:
24           Q.   Two five seven.  Take a minute and read
25   it.  Let me know when you're done.
```



1     A.    All right.  Oh, yes, he was sitting on

2  the porch.  Yes, I do recall now, yes.

3     Q.    You said he was sitting on the porch?

4     A.    Yes, I believe so.

5     Q.    Okay.  So this is another interview

6  that you conducted -- a follow-up interview you

7  conducted in December of 1991?

8     A.    Yes.

9     Q.    Four months after the homicide?

10    A.    Yes.

11    Q.    So this is another example of a piece

12  of evidence that you have firsthand information

13  about, correct?

14    A.    Yes.

15    Q.    You were there.

16    A.    Yes.

17    Q.    And now take a look also at 263.

18    A.    Okay.

19    Q.    Take a -- take a minute to read this.

20    A.    Okay.

21    Q.    Do you remember this activity?

22    A.    Yes, just preserving the tapes, yes.

23    Q.    Why were you doing this?

24    A.    We do it on all cases.

25    Q.    You're certain of that?  This is --



1  there was nothing particular about this case that

2  caused you to take this action in November of '92?

3  Take a minute and read it.

4         A.    No, that's routine.

5         Q.    Okay.  All right.  So have I now gone

6  through the sum total of activities you

7  participated in in this case for which you have

8  firsthand knowledge?

9         A.    Far as I recall, yes.

10         Q.    All right.  In other words, to the

11  extent you have information about this case other

12  than what you've just described, it would all be

13  secondhand knowledge, things people -- things other

14  officers reported to you.

15         A.    Yes.

16         Q.    And so any -- any -- any testimony --

17  withdrawn.

18         Any opinions you have about other evidence

19  that would gather -- that would -- that were --

20  that was gathered in this case would be based on

21  your belief that they reported it to you in good

22  faith; fair to say?

23         A.    Yes.

24         Q.    You don't have any firsthand knowledge

25  of it, right?



```
 1         A.    Correct.
 2         Q.    You don't have any firsthand knowledge,
 3   for example, of the meetings that Vickerd had with
 4   Sullivan, correct?
 5         A.    Correct.
 6         Q.    Or that Stambach had with Emil Adams.
 7         A.    Correct.
 8         Q.    Or Aaron Jackson.
 9         A.    Correct.
10         Q.    Or Lamarr Scott, correct?
11         A.    Yes.
12         Q.    Now, one of the -- one of the important
13   rules back in 1991 in Buffalo, and I think most
14   places, was that when you're conducting an
15   interview of a witness or a suspect, you always
16   want to have two officers present.
17         Was that the rule in Buffalo?
18         MR. SAHASRABUDHE:  Form.
19         THE WITNESS:  No.
20         BY MR. BRUSTIN:
21         Q.    So in Buffalo, it was -- it was
22   permissible to only have one officer present?
23         A.    Correct.
24         Q.    Okay.  Did you understand by 1991 why
25   it would be preferable to have two officers
```



1  present?

2          MR. SAHASRABUDHE:  Form.

3          THE WITNESS:  Yes.

4          BY MR. BRUSTIN:

5          Q.   What would be the reason?

6          A.   Well, I would say for -- especially

7   with a suspect, for court purposes, in case

8   somebody had a health issue or something, you would

9   have another witness, and also to describe

10  accurately what occurred during that interview.

11         Q.   In other words, the -- the reason --

12  one reason why you want to have two officers

13  present is so that there is a -- there is a second

14  witness to any either improper conduct by the

15  officer or any change in testimony from the

16  witness.

17         A.   Well, there wasn't going to be --

18         MR. SAHASRABUDHE:  Form.

19         THE WITNESS:  -- any improper conduct by a

20  homicide detective, and it was mostly -- if you had

21  manpower, there would be two.

22         BY MR. BRUSTIN:

23         Q.   Okay.

24         A.   But many, many times --

25         Q.   But a homicide -- go ahead, sorry.



JAMES LONERGAN                                          June 09, 2022
DIXON V. CITY OF BUFFALO                                          90

1          A.    -- it was done by one because of

2     manpower restraints.

3          Q.    Manpower.   Okay.   And so it's your

4     testimony that you -- you knew by 1991 that there

5     was no danger of any Buffalo homicide detective

6     engaging in any misconduct whatsoever, right?

7          A.    Correct, with a suspect or a witness.

8          Q.    The homicide detectives in Buffalo --

9     Buffalo to a man did everything by the book, right?

10         MR. SAHASRABUDHE:   Form.

11         THE WITNESS:   As far as I've -- I've ever

12    known, yes.

13         BY MR. BRUSTIN:

14         Q.    All right.   By the way, do you -- do

15    you believe that there are some homicide detectives

16    in other places who may have engaged in misconduct,

17    or generally is your belief that homicide

18    detectives around the country always do the right

19    thing?

20         MR. SAHASRABUDHE:   Form.

21         THE WITNESS:   I have read about cases of

22    misconduct in other places, but never in Buffalo.

23         BY MR. BRUSTIN:

24         Q.    Okay.   So it's been your experience in

25    40 years that homicide detectives in Buffalo always

1    do the right thing.

2          MR. SAHASRABUDHE:  Form.

3          THE WITNESS:  My experience, absolutely,

4    yes.

5          BY MR. BRUSTIN:

6          Q.   All right.  Now -- so for that reason,

7    there was not -- there wasn't a need to have two

8    officers present for interviews, correct?

9          A.   Well, ideally you would like to, but

10   again, manpower.  Manpower was a major issue back

11   in those days.

12         Q.   Which days?

13         A.   In the '90s.

14         Q.   Okay.  Now, in 1991 in the homicide

15   division, you certainly had -- there -- there was

16   no -- there were no -- withdrawn.

17         Although you were busy in 1991, I take it

18   that any evidence that needed to be followed up on

19   in a homicide was always followed up on, correct?

20         MR. SAHASRABUDHE:  Form.

21         THE WITNESS:  As far as I know, yes.

22         BY MR. BRUSTIN:

23         Q.   In other words, you weren't so busy

24   that you weren't able to do a proper investigation

25   in a homicide case, correct?



```
 1              MR. SAHASRABUDHE:  Form.

 2              THE WITNESS:  Correct.  It just took time.

 3   Yes.

 4              BY MR. BRUSTIN:

 5         Q.   In other words, sometimes you might not

 6   get -- even in a homicide case, it might take a few

 7   days to get to a witness, for example, correct?

 8              MR. SAHASRABUDHE:  Form.

 9              THE WITNESS:  Could take longer than that.

10   Yes.

11              BY MR. BRUSTIN:

12         Q.   Well, you -- you understood as a

13   homicide detective in 1991 that if you were

14   interviewing, for example, an eyewitness, that it

15   was extraordinarily important to interview them as

16   close in time to when they observed the events in

17   question, correct?

18         A.   An eyewitness, yes.

19         Q.   You would never want to wait more than

20   a few days to interview an eye -- a potential

21   eyewitness, correct?

22              MR. SAHASRABUDHE:  Form.  You can answer.

23              THE WITNESS:  You wouldn't want to wait, but

24   sometimes it happens.

25              BY MR. BRUSTIN:
```

1          Q.    So sometimes in Buffalo in the homicide
2    division, you would -- you would wait months or
3    weeks to interview potential eyewitnesses?
4          MR. SAHASRABUDHE:   Form.  You may answer.
5          THE WITNESS:  It could be a period of time,
6    yes.  The workload was incredible back then.
7          BY MR. BRUSTIN:
8          Q.    In -- particularly in 1991?
9          A.    Early '90s, yes.  There was a nasty
10   gang that was terrorizing the city.
11         Q.    What was the nasty gang that was
12   terrorizing the city?
13         A.    Sly Green.
14         Q.    Now, Sly -- Sly Green ran a drug
15   operation?
16         A.    Yes.
17         Q.    Okay.  Now, fair to say that in the
18   early '90s, most of the homicides in Buffalo were
19   somehow narcotics related?
20         MR. SAHASRABUDHE:   Form.  You may answer.
21         THE WITNESS:  Fair to say.
22         BY MR. BRUSTIN:
23         Q.    And so one of the -- and -- and for a
24   homicide detective, it was important to have a good
25   understanding of the communities that you were



```
 1   serving, correct?
 2          A.    Yes.
 3          Q.    Important to have informal -- to have
 4   informants in the community, correct?
 5          MR. SAHASRABUDHE:  Form.
 6          THE WITNESS:  Yes.
 7          BY MR. BRUSTIN:
 8          Q.    Important to have a good understanding
 9   as to the various players in organized crime in the
10   communities?
11          MR. SAHASRABUDHE:  Form.
12          THE WITNESS:  To some degree, yes.
13          BY MR. BRUSTIN:
14          Q.    Well, what do you mean to some degree?
15   Isn't it important when you're --
16          A.    Well, you couldn't know them all.
17          Q.    Couldn't know them all, but the best
18   you could, you wanted to -- you wanted to know the
19   players, right?
20          A.    Not necessarily as a homicide
21   detective.
22          Q.    No?  It wasn't -- wasn't helpful as a
23   homicide detective when you had primarily
24   drug-related crimes to know the players in the --
25   in the drug trade?
```



1        A.    After the homicide, it was very

2    important, yes.

3        Q.    Well, in order to help you solve a

4    homicide, it's important to have a good working

5    knowledge of who the drug players are, correct?

6        MR. BLENK:  Form.

7        THE WITNESS:  No.

8        BY MR. BRUSTIN:

9        Q.    That wasn't a helpful tool for you?

10       A.    Not for me, no.

11       Q.    Okay.  So is it your testimony that you

12   did not have a working knowledge of the players in

13   the -- in the drug trade in Buffalo in the early

14   '90s?

15       MR. SAHASRABUDHE:  Form.

16       THE WITNESS:  I knew some of the killers who

17   were in the drug trade.

18       BY MR. BRUSTIN:

19       Q.    Okay.

20       A.    But I -- I didn't get into the drug

21   trade.  That was narcotics.

22       Q.    You said you knew Sly Green?

23       A.    Yes.

24       Q.    All right.  So at --

25       MR. SAHASRABUDHE:  Did you know of Sly



JAMES LONERGAN                                         June 09, 2022
DIXON V. CITY OF BUFFALO                                         96

```
 1   Green, or did you know Sly Green, I guess?

 2              THE WITNESS:  I knew of him.

 3              MR. SAHASRABUDHE:  Yes.

 4   BY MR. BRUSTIN:

 5         Q.   All right.  And I take it you knew

 6   other -- other drug dealers at that time, correct?

 7         A.   Yes.

 8         Q.   Now, you've already made clear that you

 9   didn't -- you didn't hear the name Valentino Dixon

10   until it was mentioned in the hospital by John

11   Sullivan, correct?

12         A.   He mentioned --

13              MR. SAHASRABUDHE:  Form.

14              THE WITNESS:  -- Tino, not Val --

15   BY MR. BRUSTIN:

16         Q.   Tino, right.  But at that time, once

17   that name was mentioned, you knew who Valentino

18   Dixon was from the community, correct?

19         A.   Not based on Tino, no.

20         Q.   Well, once you heard the name Val --

21   once the connection -- so how was the name Tino

22   connected to Valentino Dixon?

23         A.   That I don't recall.

24         Q.   All right.  But once you heard the name

25   Valentino Dixon, you knew who that was.
```



1          A.    No.

2          Q.    All right.  So your testimony is that

3    when you learned -- when you learned the name

4    Valentino Dixon in connection with this case --

5          A.    Yes.

6          Q.    -- you had no knowledge of him

7    whatsoever, either by name or description.

8          A.    Correct.

9          Q.    So in other words, you had never heard

10   or learned of a person named Valentino Dixon who

11   was dealing drugs in Buffalo who drove a white

12   Cadillac and other fancy cars.

13         A.    Never.

14         Q.    The first you heard about that was when

15   he was a suspect in this case.

16         A.    Correct.

17         Q.    And that was only some time after he

18   was mentioned by John Sullivan by the nickname

19   Tino.

20         A.    Correct.

21         Q.    But your -- but your knowledge of

22   Valentino Dixon at the time he was arrested was

23   zero, correct?

24         A.    Correct.

25         Q.    .now, based on your communications with

