```
 1   other officers in this case, were there other

 2   officers who knew Valentino Dixon by reputation?

 3        A.   Not that I recall.

 4        Q.   All right.  So to the best of your

 5   recollection, you did not speak to any police

 6   officer or detective in this case who knew

 7   Valentino Dixon by reputation prior to his arrest.

 8        A.   Correct.

 9        Q.   But the best of your understanding is

10   that none of the police officers involved in this

11   case, POs or detectives, had any prior knowledge of

12   Valentino Dixon prior to this case.

13        A.   I --

14        MR. SAHASRABUDHE:  Your understanding.

15        THE WITNESS:  I can't speak for knowledge

16   other officers had.

17        BY MR. BRUSTIN:

18        Q.   Well, you were the conduit of

19   information at the scene in the first hours of the

20   crime, correct?  Everyone was coming to you.

21        A.   Correct.

22        Q.   All right.  And so at -- but in any

23   case, after Valentino was mentioned as a suspect --

24        A.   Yes.

25        Q.   -- nobody said to you, "By the way,
```



1   this is the Valentino Dixon I know.  He's a drug

2   dealer who drives a white Cadillac."

3        Nobody said anything like that to you.

4        A.    Not that I recall, no.

5        Q.    As far as you knew it and as far as you

6   heard it, he was just some guy who was identified

7   as the shooter.  You knew nothing else about him.

8        A.    True.

9        Q.    And as far as you knew, none of the

10  other officers did either.

11       A.    I don't know what they knew.

12       Q.    They didn't -- they didn't suggest to

13  you they knew anything more.

14       A.    Nobody did, no.

15       Q.    And by the way, to the extent that any

16  police officer or detective had any information

17  about criminal activities about Valentino Dixon or

18  any suspect on your radar, it would be important

19  for them to bring that to you, correct?

20       A.    Yes.

21       Q.    And nobody did, is your testimony.

22       MR. SAHASRABUDHE:  Form.

23       THE WITNESS:  To me, no.

24       BY MR. BRUSTIN:

25       Q.    Or to anybody else, to your knowledge.

1        A.    Not that I recall.

2        Q.    And in fact, during your entire time on

3   this case through today, you never learned anything

4   about Valentino Dixon and his prior criminal

5   activity; fair to say?

6        MR. SAHASRABUDHE:   Form.   To the extent of

7   your knowledge.

8        THE WITNESS:   Fair to say.

9        BY MR. BRUSTIN:

10       Q.    Valentino Dixon, as far as you know,

11  could have been a high school teacher, right?

12       MR. SAHASRABUDHE:   Form.   What -- what time

13  frame are we talking about?

14       MR. BRUSTIN:   Today.

15       MR. SAHASRABUDHE:   From what he -- from what

16  he knows and understands today?

17       MR. BRUSTIN:   Yes.

18       BY MR. BRUSTIN:

19       Q.    What do you know about Valentino

20  Dixon's prior criminal conduct?   Anything?

21       A.    I don't recall if I knew about his

22  criminal conduct, but no, I don't remember learning

23  about his criminal history.

24       Q.    Do you know anything today?

25       A.    I know he paints golf courses.



1      Q.   How do you know that?

2      A.   Saw it in the paper or on the news,

3 something.

4      Q.   So have you -- have you done some

5 searches about Valentino Dixon on the computer or

6 other places?

7      A.   No, I don't search for Valentino Dixon.

8 I was probably watching the news and it -- or read

9 the paper, but I wasn't searching.

10      Q.   Okay.  So even today, do you even know

11 that Valentino Dixon was dealing drugs at the time

12 he was arrested here?

13      A.   No.

14      MR. BRUSTIN:  Why don't we take a

15 five-minute break.

16      MR. SAHASRABUDHE:  Okay.

17          (A recess was then taken at 11:42 a.m.)

18          (On the record: 11:53 a.m.)

19      BY MR. BRUSTIN:

20      Q.   Sergeant, just a couple of more policy

21 and procedure questions, and I think I've asked

22 this, but I just want to be crystal clear.

23          You've already told me that because of the

24 way homicide detectives work with -- worked with

25 one another on cases, how -- how important it was



1    to familiarize yourself with the file when

2    conducting investigative activities, correct?

3        A.    Yes.

4        Q.    So for example, any time a homicide

5    detective was working on a homicide in Buffalo, it

6    was important to ascertain what information was

7    available concerning that witness prior to speaking

8    with them, correct?

9        MR. SAHASRABUDHE:    Form.

10       BY MR. BRUSTIN:

11       Q.    In the file.

12       A.    Yes.

13       Q.    And obviously to talk to any officers

14   who had previously spoken to that witness, correct?

15       MR. SAHASRABUDHE:    Form.

16       THE WITNESS:    Yes.

17       BY MR. BRUSTIN:

18       Q.    What's -- what's -- what's important

19   when interviewing any witness, or a suspect in

20   particular, would be you want to have all of the

21   information available about that suspect or witness

22   at your fingertips so when you're interviewing that

23   witness, you can ascertain the reliability and the

24   credibility of the information they're providing to

25   you, correct?



 1          MR. SAHASRABUDHE:  Form.
 2          THE WITNESS:  I don't know if knowing about
 3   the witness would prove their reliability.
 4          BY MR. BRUSTIN:
 5          Q.   Well, you'd want to know what the
 6   witness has said to other officers before you meet
 7   with them, right?  See if it contradicts or if it's
 8   the same?
 9          A.   Well, normally if a witness talked to
10   other officers, then I wouldn't be speaking to
11   the -- to a witness.
12          Q.   Oftentimes, including in this case,
13   witnesses are interviewed repeatedly, correct?
14          A.   It happens when --
15          Q.   Right.  And so any time you interview a
16   witness, if that witness has been interviewed by
17   somebody else previously, you want to know what
18   that witness said to the officer, correct?
19          A.   Yes.
20          Q.   That's just basic detective work,
21   correct?
22          A.   Common sense, yes.
23          Q.   You wouldn't want to talk to a witness
24   who's talked to another officer and not know what
25   that witness has already said, correct?



 1          MR. BLENK:  Form.

 2          THE WITNESS:  Correct.

 3     BY MR. BRUSTIN:

 4          Q.   That was true in 1991, correct?

 5          A.   Yes.

 6          Q.   True in 2002, right?

 7          A.    Correct.

 8          Q.   All right.  Let's go back to the police

 9     file.

10          Now, one of the things that's important to

11     do -- I think you just told us this, but one basic

12     detective function when interviewing a witness,

13     particularly a witness who has been -- who has been

14     interviewed by more than one officer, is to observe

15     and then explore any contradictions that that

16     witness is providing, correct?

17          MR. SAHASRABUDHE:  Form.

18          THE WITNESS:  Yes.

19     BY MR. BRUSTIN:

20          Q.   That's about as basic as it gets,

21     right?

22          MR. SAHASRABUDHE:  Form.

23          THE WITNESS:  Yes.

24     BY MR. BRUSTIN:

25          Q.   And Vickerd certainly understood how to



```
 1  do that, correct?
 2         MR. SAHASRABUDHE:  Form.
 3         THE WITNESS:  I would assume.
 4         BY MR. BRUSTIN:
 5         Q.   And Stambach certainly understood how
 6  to do that, correct?
 7         MR. SAHASRABUDHE:  Form.
 8         THE WITNESS:  I would assume.
 9         BY MR. BRUSTIN:
10         Q.   And the same way that you assume they
11  were acting in good faith and weren't engaging in
12  misconduct, you assume they understood how to
13  follow up with witnesses who gave contradictions,
14  correct?
15         MR. SAHASRABUDHE:  Form.
16         THE WITNESS:  Correct.
17         BY MR. BRUSTIN:
18         Q.   Certainly based on your experience with
19  them and your experience in the department, they
20  surely -- they certainly should have understood how
21  important that was, correct?
22         MR. SAHASRABUDHE:  Form.
23         THE WITNESS:  Yes.
24         BY MR. BRUSTIN:
25         Q.   All right.  So now let's take a look
```



1  first at the police file, page 15 and 16.

2       A.    Way back.    What, are you on strike?    I

3  thought you were going this for me.

4       (Discussion off the record.)

5       THE WITNESS:    Okay.

6  BY MR. BRUSTIN:

7       Q.    Now, this is a -- this is the P70 --

8  one of the P73s you -- you reviewed today -- you've

9  reviewed for today, correct?

10       A.    Yes.

11       Q.    Okay.    And you are the co-author --

12  co-author of this P73, correct?

13       Actually, I -- I -- I apologize.    My

14  understanding of this is that Vickerd wrote it, but

15  you were -- you were involved in some of the

16  activities contained herein, so you're mentioned,

17  correct?

18       A.    Correct.

19       Q.    And because you were involved in some

20  of the activities described in this P73, it was

21  even more important that you review it to make sure

22  it was accurate, correct?

23       A.    For today's --

24       Q.    No, at the time of the investigation.

25       A.    Oh, yes.    Yes.



1          Q.    Okay.  And so the information that's

2    contained in here includes the interview of John

3    Sullivan by Vickerd, correct?

4          A.    Yes.

5          Q.    And you weren't present for that

6    interview, correct?

7          A.    No, I was not.

8          MR. SAHASRABUDHE:  Note my objection to the

9    form.  Sorry.

10         BY MR. BRUSTIN:

11         Q.    You weren't in the hospital with -- you

12   weren't in the hospital with John Vickerd when he

13   interviewed Sullivan, correct?

14         A.    I was not.

15         Q.    But as you told us, you would have

16   reviewed this report, and you would have been

17   talking to him about the information he was

18   receiving, correct?

19         A.    Yes.

20         Q.    Now, you see here -- well, before I get

21   to this, just back -- keep this page open, but just

22   a couple -- one other thing about your work at the

23   crime scene.

24         A number of -- a number of witnesses --

25   there are -- were -- there were a few witnesses



1  that were rounded up at the crime scene that

2  potentially had relevant information, correct?

3        A.    Yes.

4        Q.    And some of them, like Emil Adams,

5  were -- were brought to the precinct to be

6  interviewed, correct?

7        A.    Homicide squad.

8        Q.    Homicide squad.

9        A.    Correct.

10       Q.    And you were involved in coordinating

11  and ensuring that all of those things happened,

12  correct?

13       A.    That they were escorted to homicide?

14       Q.    Yes.

15       A.    Yes.

16       Q.    Everybody was reporting to you who

17  the -- who the potential witnesses were, and you

18  were ensuring they were brought to the right place.

19       A.    We would instruct the officers to take

20  them to the homicide office.

21       Q.    You were instructing officers to speak

22  to witnesses, to bring them places.  You were

23  coordinating all of those activities.

24       A.    Yes.

25       Q.    And everybody knew it.

1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  I believe so.

3          BY MR. BRUSTIN:

4          Q.   They should have, right?

5          MR. SAHASRABUDHE:  Form.

6          THE WITNESS:  Well, it was kind of hectic,

7     so it's possible some people may not have.

8          BY MR. BRUSTIN:

9          Q.   Okay.  But people -- everybody knew who

10    you were, right?

11         A.   Oh, yes.

12         Q.   And they knew you were -- you -- it was

13    your crime scene.

14         A.   Yes.

15         Q.   All right.  Now, back to the Sullivan

16    report.

17         A.   Okay.

18         Q.   I'm sorry, back to the Vickerd report.

19         So -- and again, this -- this P73 -- it

20    doesn't have -- it has the times when things were

21    happening -- at least some of the times when things

22    were happening, but --

23         MR. SAHASRABUDHE:  Still on Vickerd, right?

24         MR. BRUSTIN:  Yes, still on Vickerd.

25         BY MR. BRUSTIN:



1          Q.    But certainly you would have expected

2    that this P73 would have been created before the

3    end of the shift, correct?

4          MR. SAHASRABUDHE:  Form.

5          THE WITNESS:  No.

6          BY MR. BRUSTIN:

7          Q.    Certainly the -- you wouldn't have

8    expected that to happen?

9          A.    No.

10         Q.    Okay.  Certainly you would have

11   expected the -- the notes to be in the file --

12   withdrawn.

13         To the extent that any officer was doing any

14   follow-up investigation of John Sullivan, it would

15   be critically important that they have information

16   about this interview, correct?

17         A.    Yes.

18         MR. SAHASRABUDHE:  Form.

19         BY MR. BRUSTIN:

20         Q.    And that would be either by reading

21   this P73, right?

22         A.    Right.

23         Q.    Reading the notes of the P73 if it

24   wasn't done yet, right?

25         A.    Yes.



1      Q.   Or speaking to Vickerd, who did the

2  interview.

3      A.   Correct.

4      Q.   One of those things -- three things

5  would have to happen before a second officer

6  interviewed Sullivan, correct?

7      MR. SAHASRABUDHE:  Form.

8      THE WITNESS:  I would say yes.

9      BY MR. BRUSTIN:

10     Q.   All right.  Now let's take a look at

11 the interview itself and what information.  I think

12 it starts -- the information starts really at --

13 the interview information starts at the bottom of

14 page 15.  "Your writer then spoke with John

15 Sullivan."  Do you see that?

16     A.   Yes.

17     Q.   And the first thing he tells him --

18 withdrawn.

19     The reasons he's speaking to John Sullivan

20 is because John Sullivan is a potential eyewitness,

21 correct?

22     A.   Yes.

23     Q.   And he went there at your suggestion,

24 correct?

25     A.   I believe so, yes.



```
 1        Q.   And the first thing that John Sullivan
 2   tells him is that he was with his friend on the
 3   corner of Bailey and Delavan, Fred Stencil,
 4   correct?
 5        A.   Yes, sir.
 6        Q.   And Bailey and Delavan is the corner
 7   where the shooting took place, correct?
 8        A.   Yes.
 9        Q.   And so obviously, the first piece of
10   information that Vickerd received is that Fred
11   Stencil might also be an eyewitness, correct?
12        MR. SAHASRABUDHE:  Form.
13        THE WITNESS:  Possibly.
14        BY MR. BRUSTIN:
15        Q.   That's what it suggests to you, right?
16        A.   It said --
17        MR. SAHASRABUDHE:  Form.
18        THE WITNESS:  It said he was with him.  It
19   didn't say he was a witness.
20        BY MR. BRUSTIN:
21        Q.   Right.  And so it would have been
22   important for Detective Vickerd -- obviously, as
23   you've told us, the most important thing in the
24   hour -- in the hours -- one of the most important
25   things in the hours after the crime is to identify
```



```
 1  all eyewitnesses, correct?
 2          A.    Correct.
 3          Q.    And so what should have happened here
 4  is that Detective Vickerd should have been asking
 5  whether or not Fred Stencil was also a witness,
 6  correct?
 7          MR. SAHASRABUDHE:  Form.
 8          (Mr. Russ entered the deposition.)
 9          THE WITNESS:  Asking who?
10          BY MR. BRUSTIN:
11          Q.    Asking Sullivan whether Fred Stencil
12  was also a witness.
13          A.    No.
14          MR. SAHASRABUDHE:  Form.
15          THE WITNESS:  I wouldn't ask him.
16          BY MR. BRUSTIN:
17          Q.    No need to ask that?
18          A.    No, I'd ask Stencil.
19          Q.    Okay.  So what should have happened
20  here is as soon as possible, Fred Stencil should
21  have been interviewed, correct?
22          MR. SAHASRABUDHE:  Form.
23          THE WITNESS:  Possibly.  I don't -- I don't
24  know what was said between Sullivan and Vickerd
25  about Stencil, if anything was said.
```



1         BY MR. BRUSTIN:

2         Q.   Well, if anything was said between

3    Sullivan and Vickerd about Fred Stencil, it should

4    be in this report, right?

5         MR. SAHASRABUDHE:   Form.

6         THE WITNESS:   Well, Stencil may have told

7    him that I showed up after the shooting, so no need

8    to report on that.

9         BY MR. BRUSTIN:

10        Q.   So if -- if -- if Sullivan told -- if

11   Sullivan told -- your testimony is that if Sullivan

12   told Vickerd that Fred Stencil showed up after the

13   shooting, he didn't need to put that in his report?

14        A.   No.

15        MR. SAHASRABUDHE:   Form.

16        BY MR. BRUSTIN:

17        Q.   Okay.  What -- what's the basis for

18   that?

19        A.   Well, what's the basis for putting it

20   in the report?  That he's a non-witness?  We could

21   have millions of names in here who did not witness

22   the crime.

23        Q.   Okay.  So in other words, it's -- it

24   was perfectly appropriate, in your view, for there

25   to be no follow-up interview of Fred Stencil based



 1  on this report.

 2          MR. SAHASRABUDHE:  Form.

 3          THE WITNESS:  I don't know what was said by

 4  Sullivan to Vickerd, so I can't answer that.

 5          BY MR. BRUSTIN:

 6          Q.  Well, I will represent to you that in

 7  the following days, there's no report of an

 8  interview of Fred Stencil.  Do you have any

 9  understanding as to why that is?

10          MR. SAHASRABUDHE:  Form.

11          THE WITNESS:  I don't know what was said

12  between Stencil -- or Sullivan and Vickerd, so I --

13          BY MR. BRUSTIN:

14          Q.  Well, do you know what was said between

15  Sullivan and Vickerd, because you've already told

16  us you reviewed the report and you were speaking --

17  you were speaking to Vickerd about what he learned,

18  correct?

19          MR. SAHASRABUDHE:  Form.

20          THE WITNESS:  I don't know what was said

21  between Vickerd and Sullivan regarding Stencil.

22          BY MR. BRUSTIN:

23          Q.  All right.  And as soon as you saw this

24  report, as a trained homicide detective, wouldn't

25  your first question to be Vickerd -- to Vickerd be



1    "What about Fred Stencil?  Is he a witness, too?"

2         MR. SAHASRABUDHE:  Form.

3         THE WITNESS:  I may have asked that

4    question.  I don't recall.

5         BY MR. BRUSTIN:

6         Q.   Okay.  No documentation of any of that

7    anywhere, correct?

8         A.   Not that I'm aware.

9         MR. SAHASRABUDHE:  Documentation of a

10   question that he asked to John Vickerd?

11        BY MR. BRUSTIN:

12        Q.   Document of any follow-up information

13   about Fred Stencil as an eyewitness.

14        A.   Not to my knowledge.

15        Q.   Okay.  But your testimony here today is

16   that there was nothing wrong with not following up

17   with Fred Stencil.

18        MR. SAHASRABUDHE:  Form.  That's not what he

19   said.

20        THE WITNESS:  Again, I don't know what was

21   said between Sullivan and Detective Vickerd.  I

22   wasn't present.

23        BY MR. BRUSTIN:

24        Q.   Okay.  All right.  Then the next thing

25   it says:  A fight broke out, and he saw he was



1  between Torri and Aaron Jackson fighting with

2  Mario -- what does LNU mean?

3       A.   Last name unknown.

4       Q.   Last name unknown at this time.  He

5  knew all three persons and went over to try and

6  break it up.  He noticed a black male known to him

7  as Tino go behind a van and come out with a black

8  Uzi.  He pointed it at Torri and started firing,

9  and that is when John states he was hit in the leg.

10       Now, first of all, he told him that,

11  according to this report, he saw the person he knew

12  from before as Tino go behind a van and come out

13  with a black Uzi, correct?

14       A.   Yes.

15       Q.   In other words, according to this

16  report, it appears that he got a black Uzi from the

17  van, correct?

18       MR. SAHASRABUDHE:  Form.

19       THE WITNESS:  No.

20       BY MR. BRUSTIN:

21       Q.   No?

22       A.   He went behind a van.  It doesn't say

23  anything about entering a van.

24       Q.   Well, one of the jobs -- one of the

25  jobs of a detective is to put -- put pieces of a



```
 1   puzzle together and see how it fits, right?

 2        A.   If it fits correctly, yes.

 3        Q.   All right.  So when you -- as a trained

 4   detective, when you hear -- when you hear that

 5   somebody went behind a van and then came from

 6   behind the van with an Uzi, one of the basic

 7   questions you're going to have as a detective is

 8   did they get that Uzi from the van, right?

 9        MR. SAHASRABUDHE:  Form.

10        THE WITNESS:  Or was it hidden in a bush, or

11   was there another car behind the van?  There's many

12   things that could have occurred.  I don't assume

13   anything until I know.

14        BY MR. BRUSTIN:

15        Q.   Right.  And that's the kinds of

16   questions that any trained detective would be

17   asking an eyewitness, right?

18        MR. SAHASRABUDHE:  Form.

19        THE WITNESS:  I don't know if the eyewitness

20   would know what he did behind the van.

21        BY MR. BRUSTIN:

22        Q.   So no need to ask those questions, is

23   your testimony.

24        A.   Well, you could ask all --

25        MR. SAHASRABUDHE:  Form.
```



```
 1          THE WITNESS:  -- the questions you want,
 2    yes, but --
 3          BY MR. BRUSTIN:
 4          Q.   One -- one -- one -- this is a clue
 5    that perhaps that van is relevant to this crime,
 6    correct?
 7          MR. SAHASRABUDHE:  Form.
 8          THE WITNESS:  Nobody saw him enter the van.
 9          BY MR. BRUSTIN:
10          Q.   He saw him go behind a van.
11          A.   Okay.
12          Q.   And then come from behind the van with
13    an Uzi.
14          A.   If I see somebody go behind a building,
15    does that mean they came in this building and got
16    something?
17          Q.   Good point.  So there's no reason, in
18    your view, to follow up on that van.
19          A.   No.
20          Q.   All right.  In any case, what this
21    witness is clearly reporting is that they saw this
22    person they know as Tino go and retrieve a weapon,
23    correct?
24          A.   Correct.
25          Q.   No gray area about that, right?
```



1           A.    No, sir.

2           Q.    Clear as day in this report.

3           A.    Yes.

4           Q.    And that's -- and that's the same thing

5      that Vickerd reported to you when he told you what

6      John Sullivan said, correct?

7           MR. SAHASRABUDHE:    Form.

8           THE WITNESS:    I believe he would have, yes.

9           BY MR. BRUSTIN:

10          Q.    And he reports that after he got the --

11     he got -- he went behind the van, got the -- got

12     the gun, and then came from behind the van -- it's

13     at that point that he -- when he went up to Torri

14     and started shooting him, correct?

15          A.    Yes.

16          Q.    And another thing he says here is that

17     he saw --

18          A.    Yes.  I get it.

19          Q.    He -- he saw the shooter, who he

20     identifies, according to this report, as Tino,

21     stand over the victim and kept firing at him,

22     right?

23          A.    Yes.

24          Q.    In other words -- and by the way, you

25     were at the crime scene, right?

1      A.    Yes.

2      Q.    It was a brutal crime scene, correct?

3      MR. SAHASRABUDHE:  Form.

4      THE WITNESS:  Yes.

5      BY MR. BRUSTIN:

6      Q.    Blood everywhere, right?

7      A.    Blood, yes.

8      MR. SAHASRABUDHE:  Form.

9      BY MR. BRUSTIN:

10     Q.    The -- the TEC-9, you understand, which

11   carried 30 rounds, was emptied, right?

12     MR. SAHASRABUDHE:  Form.

13     THE WITNESS:  I don't recall knowing that.

14     BY MR. BRUSTIN:

15     Q.    All right.  You do recall knowing from

16   the crime scene that Torri Jackson was hit multiple

17   times, which caused his death.

18     A.    Yes.

19     Q.    And so here, as a trained homicide

20   detective, when you read that, according to this

21   witness, the shooter was standing over the victim

22   with what you know to be now -- with what you knew

23   to be an automatic weapon firing at him at close

24   range, that suggests to you that there could be

25   forensic evidence on the shooter, correct?



```
 1          MR. SAHASRABUDHE:  Form.

 2          THE WITNESS:  Correct.

 3          BY MR. BRUSTIN:

 4          Q.    There could be blood, right?

 5          A.    Yes.

 6          Q.    When you fire a TEC-9 multiple times,

 7   you would expect gunpowder residue both on your

 8   hands and your clothing, correct?

 9          MR. SAHASRABUDHE:  Form.

10          THE WITNESS:  Correct.

11          BY MR. BRUSTIN:

12          Q.    At that close range, you might even

13   have skin or other pieces -- just to be graphic,

14   you might -- you might -- you might -- you might

15   even have skin or other -- other parts of the

16   victim's body on the shooter.

17          MR. SAHASRABUDHE:  Form.  Answer if you

18   know.

19          THE WITNESS:  It's a reach, but it -- I

20   guess it would be possible.

21          BY MR. BRUSTIN:

22          Q.    The primary thing you're looking for as

23   a trained homicide detective in the situation that

24   he's describing is blood or gunpowder residue,

25   correct?
```



 1          MR. SAHASRABUDHE:  Form.

 2          THE WITNESS:  Blood, I would say, yes.

 3          BY MR. BRUSTIN:

 4          Q.   Well, you understood -- you're not a

 5     forensic analyst, right?

 6          A.   No.

 7          Q.   But you understood, for example, that

 8     when you fire a TEC-9 30 times, gunpowder residue

 9     will likely be on the clothing that you wore.

10          MR. SAHASRABUDHE:  Form.

11          THE WITNESS:  I don't know when they

12     implemented this, but the District Attorney's

13     office would not consent to gunshot residue tests.

14     They -- they -- they didn't want us doing them.

15          BY MR. BRUSTIN:

16          Q.   So my understanding -- you tell me if

17     I'm wrong -- was that there were some limitations

18     placed on gunshot residue tests on people's hands

19     as opposed to their clothing.

20          Am I misunderstanding it?

21          A.   I'm not quite certain if it was both or

22     just one.

23          Q.   Okay.

24          A.   I'm not certain.

25          Q.   Okay.  In any case, you -- you'd agree



JAMES LONERGAN                                    June 09, 2022
DIXON V. CITY OF BUFFALO                                      124

 1   that that kind of a close-range shooting, violent

 2   shooting, suggests there may be forensic --

 3   forensic evidence on the shooter's clothing.

 4          MR. SAHASRABUDHE:  Form.

 5          THE WITNESS:  There may be.

 6          BY MR. BRUSTIN:

 7          Q.   And in particular, what you would be

 8   looking for as a trained detective would be blood

 9   splatter on their outerwear or their shoes.

10          MR. SAHASRABUDHE:  Form.

11          THE WITNESS:  Yes, depending on how close

12   they were to the victim.

13          BY MR. BRUSTIN:

14          Q.   Well, this description is standing over

15   the victim and shooting them, correct?

16          A.   Correct, but when someone's firing --

17   firing an automatic weapon standing over him, to

18   him he could have been ten feet away.

19          Everything's exploding.  It's chaotic.  I

20   don't -- I don't know if he was actually standing

21   over him.

22          Q.   Well, that's why you investigate,

23   right?

24          MR. SAHASRABUDHE:  Form.

25          THE WITNESS:  Investigate if he was standing



 1   over him?

 2          BY MR. BRUSTIN:

 3          Q.   Well, he said --

 4          A.   You have to go by what you tells you.

 5          Q.   Right.  He said he was standing over

 6   him.

 7          A.   That's what he said.

 8          Q.   That's a clue for a homicide detective

 9   that he may have blood on his shoes or his jacket,

10   correct?

11          A.   He may.

12          MR. SAHASRABUDHE:  Form.

13          BY MR. BRUSTIN:

14          Q.   And that's what you want -- and

15   obviously, you want to investigate that, correct?

16          MR. SAHASRABUDHE:  Form.

17          THE WITNESS:  Correct, if the witness was

18   accurate.

19          BY MR. BRUSTIN:

20          Q.   So going forward, as a homicide

21   detective, you understand in this case, from

22   reading this report and speaking to Vickerd about

23   it, that there could be forensic evidence on the

24   shooter, correct?

25          MR. SAHASRABUDHE:  Form.



```
 1            THE WITNESS:  Could be.

 2            BY MR. BRUSTIN:

 3            Q.    Basic stuff for a homicide detective,

 4   right?

 5            MR. SAHASRABUDHE:  Form.

 6            THE WITNESS:  I would say.

 7            BY MR. BRUSTIN:

 8            Q.   All right.  Now, let's take a look at

 9   page --

10            A.   Yes.

11            Q.   So page 17 to 19 are the handwritten

12   notes for the P73, correct?

13            A.   Those are --

14            MR. SAHASRABUDHE:  Well --

15            THE WITNESS:  -- Detective -- want me to

16   wait?

17            MR. SAHASRABUDHE:  No, no, no.  Just --

18            THE WITNESS:  Detective Vickerd's

19   handwritten notes, yes.

20            BY MR. BRUSTIN:

21            Q.   That were subsequently put into the

22   P73, correct?

23            A.   Yes.

24            Q.   And so until the P73 was done, these

25   notes would be in the file, correct?
```



```
 1         A.   Yes.
 2         Q.   In fact, these notes stay in the file,
 3   right?
 4         A.   Yes.
 5         Q.   So any detective who is going to be
 6   interviewing John Sullivan knows that if the P73's
 7   not done, you look at the notes of his prior
 8   interview, correct?
 9         A.   Correct.
10         MR. SAHASRABUDHE:   Form.
11         THE WITNESS:   Correct.
12         BY MR. BRUSTIN:
13         Q.   All right.   Take a look at page 74.
14         By the way, any problem with Detective
15   Vickerd not putting the times that he interviewed
16   John Sullivan in the hospital?
17         MR. SAHASRABUDHE:   Form.
18         THE WITNESS:   Do I have a problem with that?
19         BY MR. BRUSTIN:
20         Q.   Yes.
21         A.   No.
22         Q.   No problem?   You don't -- no need for a
23   detective to put the time they began an interview
24   and the time they ended an -- ended an interview?
25         MR. SAHASRABUDHE:   Form.
```



1      THE WITNESS:  Not on a witness, no.

2      BY MR. BRUSTIN:

3      Q.   Not on an eyewitness?

4      A.   I don't see a problem, no.

5      Q.   In fact, not on an eyewitness who was

6  the sole witness that formed the basis for probable

7  cause?

8      MR. SAHASRABUDHE:  Form.

9      THE WITNESS:  No, I don't think the time he

10 interviewed him is important.

11     BY MR. BRUSTIN:

12     Q.   Okay.  So let's take a look at page --

13 and by the way, nobody ever told you otherwise,

14 correct, that the time of an interview was

15 important?

16     MR. SAHASRABUDHE:  Form.

17     THE WITNESS:  No.

18     BY MR. BRUSTIN:

19     Q.   All right.  So take a look at page --

20 well, before we get there, is it important -- so

21 based on -- based on being at the scene of the

22 crime, this was a late-night shooting, early

23 morning shooting, at a -- at a popular restaurant

24 that people often went to after being out for the

25 evening, correct?



```
 1          A.    Yes.

 2          MR. SAHASRABUDHE:   Form.

 3          BY MR. BRUSTIN:

 4          Q.    Did I describe it accurately?

 5          A.    Yes.

 6          Q.    In other words, you understood that

 7     when people went there, they often went there after

 8     a night of partying.

 9          A.    Yes.

10          Q.    And so you understood that one of the

11     concerns about witnesses at the scene would be

12     their level of intoxication or drug use, correct?

13          MR. SAHASRABUDHE:   Form.

14          THE WITNESS:   No, I didn't consider that.

15     Unless they showed me they were intoxicated, I

16     wouldn't assume that.

17          BY MR. BRUSTIN:

18          Q.    Okay.  Well, you understand that being

19     intoxicated or being high are things that can

20     affect your ability to reliably make

21     identifications, correct?

22          A.    Yes, I guess.

23          Q.    You guess or you knew?

24          A.    I'd say yes.

25          Q.    Okay.  Was it important to ask the
```



```
 1   witnesses who were present at the scene of the
 2   crime how much they had to drink or other drugs
 3   they'd used?
 4          A.   No.
 5          MR. SAHASRABUDHE:  Form.
 6          BY MR. BRUSTIN:
 7          Q.   No need to ask, right?
 8          A.   Correct.
 9          Q.   Unless they appeared to you to be
10   visibly drunk at the time you interviewed them, no
11   need to ask them about whether they had -- were
12   drunk at the time they observed the incident.
13          MR. SAHASRABUDHE:  Form.
14          THE WITNESS:  Correct.
15          BY MR. BRUSTIN:
16          Q.   Even if they were interviewed many
17   hours later.
18          A.   Correct.
19          Q.   So in -- okay.  So now let's take a
20   look at page 74.
21          A.   All right.
22          Q.   So that same day, at 2:30 p.m., Officer
23   Masecchia is doing the sworn statement for John --
24   doing -- taking the statement from John Sullivan,
25   correct?
```

```
 1        A.    Correct.
 2        Q.    And here he puts the time of the
 3   interview, right?
 4        A.    Yes.
 5        Q.    Kind of going beyond -- going -- going
 6   above and beyond the call of duty, right?
 7        MR. SAHASRABUDHE:  Form.  Stop the
 8   editorializing.
 9        THE WITNESS:  It's a formal statement.  I
10   would put the time on it.  It's not an interview.
11        BY MR. BRUSTIN:
12        Q.    Okay.  So in any formal statement,
13   it's -- is it important to put the time you start
14   and finish?
15        MR. SAHASRABUDHE:  Form.
16        THE WITNESS:  I -- I always would, yes.
17        BY MR. BRUSTIN:
18        Q.    So when I'm asking you questions, I'm
19   not asking about what you would do.  The -- the
20   Buffalo Police Department, like any police
21   department, is a paramilitary organization,
22   correct?
23        MR. BLENK:  Form.
24        MR. SAHASRABUDHE:  Form.  Answer if you
25   understand the question.
```



```
 1            THE WITNESS:  Correct.

 2            BY MR. BRUSTIN:

 3            Q.   It's a -- there's a chain of command,

 4   correct?

 5            A.   Yes.

 6            Q.   And there are very strict rules and

 7   regulations that are in place to both protect the

 8   citizens that -- to protect all of the citizens of

 9   Buffalo, correct?

10            MR. BLENK:  Form.

11            MR. SAHASRABUDHE:  Form.

12            THE WITNESS:  Yes.

13            BY MR. BRUSTIN:

14            Q.   Including the suspects that you

15   interact with, correct?

16            A.   Yes.

17            MR. BLENK:  Form.

18            MR. SAHASRABUDHE:  Form.

19            BY MR. BRUSTIN:

20            Q.   There are very strict rules and

21   regulations that govern how you conduct

22   investigations, correct?

23            MR. SAHASRABUDHE:  Form.

24            THE WITNESS:  Correct.

25            BY MR. BRUSTIN:
```



```
1          Q.   And many of the rules that you operate
2    under are geared towards preventing Constitutional
3    violations of suspects you come into contact with,
4    correct?
5          MR. SAHASRABUDHE:   Form.
6          MR. BLENK:   Form.
7          THE WITNESS:   The Miranda warnings?  I would
8    say yes.
9          BY MR. BRUSTIN:
10         Q.   Well, many of the rules that you have
11   to follow.  How you -- documenting the exculpatory
12   evidence, for example.  That's -- you don't have
13   discretion about that.  You have to write down it
14   all, correct?
15         MR. BLENK:   Form.
16         MR. SAHASRABUDHE:   Form.
17         THE WITNESS:   Yes.
18         BY MR. BRUSTIN:
19         Q.   It's not how you do things.  It's how
20   you're required to do things, correct?
21         A.   Yes.
22         Q.   So were you required, as a Buffalo
23   detective, to write down the time that you started
24   a formal interview and the time you ended it?
25         MR. SAHASRABUDHE:   Form.
```



1        BY MR. BRUSTIN:

2        Q.   Or was it left to your discretion?

3        MR. SAHASRABUDHE:  Form.

4        THE WITNESS:  My discretion.

5        BY MR. BRUSTIN:

6        Q.   All right.  So let's take a look at the

7    interview of John Sullivan.

8        A.   All right.

9        Q.   So John Sullivan is formally

10   interviewed at 2:30 p.m., later in the day, right?

11       A.   Yes.  Yes.

12       Q.   And as you already told us, before

13   conducting this interview, you would have expected

14   Masecchia to have either reviewed the P73, if it

15   was done, or the notes that made it -- that became

16   the P73, correct?

17       MR. SAHASRABUDHE:  Form.

18       THE WITNESS:  Correct.

19       BY MR. BRUSTIN:

20       Q.   And probably also talk to Vickerd.

21       MR. SAHASRABUDHE:  Form.

22       THE WITNESS:  I can't -- I wouldn't know

23   that, because it happened the same day, and there

24   was just so much going on.  I -- I don't know if he

25   would have had the time.



```
 1          BY MR. BRUSTIN:
 2          Q.   All right.  But certainly by the --
 3  by -- by the time -- it was clear by the time
 4  Valentino Dixon was arrested that John Sullivan, to
 5  that point in time, was the most important witness
 6  in the case.  He was the only witness mentioned in
 7  the arrest affidavit, correct?
 8          MR. SAHASRABUDHE:  Object to the form of the
 9  question.  Answer if you know.
10          THE WITNESS:  Correct.
11          BY MR. BRUSTIN:
12          Q.   All right.  So let's take a look at
13  this -- at this document.
14          Now, could you read to yourself -- you
15  reviewed this in preparation for today?
16          A.   No, I did not.
17          Q.   All right.  So why don't you take a
18  minute and review the question and the answer --
19  the big question and answer on the first page --
20          A.   Yes.
21          Q.   -- where he describes what happened,
22  okay?  Just read it to yourself.
23          Had a chance to read it?
24          A.   Yes.
25          Q.   And do you notice any contradictions
```



1   between this statement and the prior statement?

2          MR. SAHASRABUDHE:  Form.

3          THE WITNESS:  As far as what?

4          BY MR. BRUSTIN:

5          Q.   Well, for example, what John Sullivan

6   says is:

7          We got there, and I heard someone holler,

8   "Look out, he's got a gun."  So I didn't look to

9   see who had the gun.  I just ran behind the car,

10  and I heard and felt the shot in my right leg.  I

11  turned around to see who shot -- to who (sic) shot

12  me, and I saw Tino.

13         So what he's describing here is not seeing

14  Tino get the gun.  He's describing only seeing the

15  gun at the time the shooting occurred, correct?

16         A.   That's what he's saying, yes.

17         Q.   Completely different version of events,

18  correct?

19         MR. SAHASRABUDHE:  Form.

20         MR. BLENK:  Form.

21         THE WITNESS:  Yes.

22         BY MR. BRUSTIN:

23         Q.   That's a massive contradiction as to

24  how things occurred, correct?

25         MR. BLENK:  Form.



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  It's a contradiction.

3     BY MR. BRUSTIN:

4          Q.   Any detective with a pulse who saw the

5     first statement would notice this contradiction,

6     correct?

7          MR. SAHASRABUDHE:  Form.

8          MR. BLENK:  Form.

9          THE WITNESS:  He should.

10    BY MR. BRUSTIN:

11         Q.   It's -- it -- how and when the suspect

12    got the gun is a critical part of the interaction,

13    correct?

14         A.   Correct.

15         Q.   And here he's giving a diametrically

16    opposed version of what happened, correct?

17         MR. SAHASRABUDHE:  Form.

18         THE WITNESS:  But I can't say Masecchia knew

19    about his other version.

20         BY MR. BRUSTIN:

21         Q.   Well, the reason I asked you all those

22    questions about how important it would be to review

23    reports before you interview a witness for the

24    second time was for just this reason.  So you -- so

25    you couldn't say what you're saying now.



```
 1         A.    Okay.

 2         MR. SAHASRABUDHE:  Well, is that a -- is

 3    that a question?

 4         BY MR. BRUSTIN:

 5         Q.    It -- it is.  So in other words, you've

 6    already told me, sir, how important it would be to

 7    review a prior statement from a witness before

 8    interviewing a witness for a second time.

 9         Do you remember that, sir?

10         A.    Yes, and I also told you, sir, that I

11    don't know if Masecchia was aware of what was said,

12    because it's the same day as the murder, and all

13    hell breaks loose when you have that many

14    witnesses, that big of a scene.

15         There's a good possibility he didn't even

16    see Vickerd at that time.

17         Q.    All right.  So let's assume -- well, he

18    didn't have to see Vickerd.  His notes were in the

19    file, right?

20         MR. SAHASRABUDHE:  Form.

21         THE WITNESS:  Not at that point, no.

22         BY MR. BRUSTIN:

23         Q.    Well, the notes would be in the file as

24    soon as he took them.  You've already told us that.

25         MR. SAHASRABUDHE:  Form.
```



1          THE WITNESS:  As soon -- no, not as soon as
2    he -- they'd be on his clipboard.  As soon as he
3    could get in the file.
4          BY MR. BRUSTIN:
5          Q.   Before he left his shift, correct?
6          A.   I don't know when he left.
7          Q.   All right.  So let's assume that
8    Masecchia didn't read it -- did not read it --
9          A.   Okay.
10          Q.   -- okay, and didn't notice it.
11          Certainly when Stambach was basing an arrest
12    on John Sullivan later that day, you would have
13    expected him to read both reports, correct?
14          MR. BLENK:  Form.
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  It's up to him.  I don't
17    expect -- I didn't expect him to do --
18          BY MR. BRUSTIN:
19          Q.   So it would have been perfectly
20    permissible for Stambach, consistent with policy
21    and practice, to not read those reports before --
22    before suggesting that -- to the DA that there was
23    probable cause to arrest Valentino Dixon based on
24    John Sullivan.
25          MR. BLENK:  Form.



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  I'm sure the District Attorney

3    read the statements from --

4          BY MR. BRUSTIN:

5          Q.   You -- you're not answering my

6    question.

7          A.   Well --

8          Q.   You've already told us --

9          A.   I don't understand your question, then.

10         Q.   I -- I think you do.  You've already

11   told us, sir, that the detective makes a decision

12   to call the DA based on their review of the

13   evidence if they believe there's probable cause.

14         Do you remember telling us that?

15         A.   Yes.

16         Q.   And the only way to make a decision

17   about whether or not they believe there is probable

18   cause, as you've already told us, is to review the

19   evidence in the file, correct?

20         MR. BLENK:  Form.

21         MR. SAHASRABUDHE:  Form.

22         THE WITNESS:  Correct.

23         BY MR. BRUSTIN:

24         Q.   So the only way that Stambach could

25   have properly determined in his mind that there was

1  probable cause such that he would recommend it to

2  the DA would have been for him to review the

3  reports concerning John Sullivan, correct?

4        MR. SAHASRABUDHE:   Object to the form of the

5  question.

6        MR. BLENK:   Form.

7        MR. SAHASRABUDHE:   Goes to an ultimate issue

8  in the case.   If you understand the question, you

9  can try to answer.

10       THE WITNESS:   The District Attorney may very

11 possibly have read what the witnesses said and told

12 Stambach to arrest him, which happens many, many

13 times on murder cases.

14       BY MR. BRUSTIN:

15       Q.   Okay.   Except that's not what Stambach

16 said happened here.

17       A.   I don't know what Stambach said.   I

18 wasn't here.

19       Q.   Okay.   So your -- your explanation is

20 that it was the District Attorney -- the District

21 Attorney came to the office on their own; they read

22 the file; and they told Stambach he should make an

23 arrest.

24       MR. BLENK:   Form.

25       THE WITNESS:   I don't know if that's the



1  case, but it happens an awful lot.

2      BY MR. BRUSTIN:

3      Q.   All right.  Would you agree that

4  assuming Stambach recommended that there be an

5  arrest here and contacted the DA, the only way he

6  could have properly done that based on John

7  Sullivan would have been to read the reports

8  concerning John Sullivan?

9      MR. SAHASRABUDHE:  Form.

10     THE WITNESS:  I recall Belling was in our

11  office for many hours after this murder.  He may

12  have very possibly been there at that time, and --

13     BY MR. BRUSTIN:

14     Q.   Sir, you're not answering my question,

15  sir.  My question is -- I'm asking you to make an

16  assumption, okay?  A hypothetical question.

17     Assuming that, in fact, Stambach was the one

18  who reached out to the DA and said, "We should make

19  an arrest; I believe we have probable cause based

20  on John Sullivan," the only way he could have

21  properly made that recommendation, if he did it,

22  would have -- would have been to read the reports

23  of John Sullivan, correct?

24     MR. SAHASRABUDHE:  Note my objection for the

25  record.



1          MR. BLENK:  Form.

2          THE WITNESS:  I'm not going to assume what

3    Stambach did.  I wasn't there.

4          BY MR. BRUSTIN:

5          Q.   You -- are you refusing to answer my

6    question, sir?

7          A.   I just answered it.  I'm not going to

8    assume what somebody did if I wasn't present.

9          Q.   So I have a right to ask you a

10   hypothetical question, and you have -- and you --

11   and if you understand it, you actually have to

12   answer it, okay?

13         A.   I can't answer for Stambach.  I wasn't

14   there.

15         Q.   I'm asking you about how things worked

16   at the time.

17         A.   Okay.

18         Q.   And it doesn't have to be Stambach.

19   Let's talk about a hypothetical police officer,

20   okay?

21         A hypothetical police officer calls the DA

22   and recommends that Valentino Dixon should be

23   arrested based on evidence from John Sullivan.

24         Are you with me?

25         A.   Yes, I'm with you.



1      Q.    The only way to make that

2    recommendation properly to the DA would be if you

3    read the reports concerning interviews of John

4    Sullivan, correct?

5          MR. SAHASRABUDHE:    Form.

6          MR. BLENK:    Form.

7          THE WITNESS:    Read them with the -- the

8    District Attorney may have read them before.

9          BY MR. BRUSTIN:

10     Q.    All right.

11     A.    It happens all the time.

12     Q.    By the way, what does your bracelet

13   say?

14     A.    Why?  Blue Lives Matter.

15     Q.    What does that mean?

16     A.    It means police lives matter.

17     Q.    Okay.  And why are you wearing that?

18     A.    Because I was a policeman my whole

19   life.

20     Q.    And is that in protest to the Black

21   Lives Matter movement?

22     A.    Not at all.

23     Q.    How do you believe -- in your view, how

24   does that wristband that you're wearing relate to

25   the Black Lives Matter movement?



1          MR. SAHASRABUDHE:  I'm just going to object.

2   What -- what are -- what are we doing?

3          MR. BRUSTIN:  He's wearing it at his

4   deposition.  I can ask about it.

5          THE WITNESS:  I'm just proud to be a police

6   officer.  There's nothing to it, black, brown,

7   purple.

8          BY MR. BRUSTIN:

9          Q.   So the -- the --

10         A.   I'm proud to be a police officer.

11         Q.   The -- the -- the term Blue Lives

12  Matter, in your view, is not a criticism of the

13  Black Lives Matter movement.

14         A.   No.

15         Q.   Do you wear that every day, or did you

16  choose to wear that today?

17         A.   Every day.

18         Q.   Not only are you proud of being a

19  police officer, you're -- you're -- you feel a very

20  close affinity -- affinity to the men and women you

21  serve with, fair to say?

22         A.   Sure.

23         Q.   Other than family, you have no stronger

24  bond.

25         MR. SAHASRABUDHE:  Form.

1        THE WITNESS:  It's a strong bond.  I -- I

2   don't know if I -- yes.

3        BY MR. BRUSTIN:

4        Q.   All right.  Let's take a look at

5   page 11.  I want you to take a minute -- this is

6   not a document you've reviewed, correct?

7        A.   Tell you in a minute.  Hang on.

8        I have not.

9        Q.   Please review it.  Let me know when

10  you're done, sir.

11       Have you had a chance to read it?

12       A.   Yes.

13       Q.   All right.  And what this report is

14  describing is that in -- in the -- soon after

15  arriving at the crime scene, a woman named Sonya

16  James is -- soon -- soon after the shooting when

17  the crime scene is set off, a woman named Sonya

18  James is interviewed, correct?

19       A.   Yes.

20       Q.   It appears from this report it's within

21  minutes, right?

22       A.   Yes.

23       Q.   And while Sonya James is being

24  interviewed, there's a broadcast over the radio,

25  the police radio, with the name Valentino Dixon,

1  correct?

2       A.   I'm not aware of that.  I don't know.

3       Q.   Sir, I'm not asking if you're aware of

4  it.  I'm asking if this is what -- if that's what

5  this report indicates.

6       MR. SAHASRABUDHE:   I object to the question.

7       MR. BLENK:   Form.

8       BY MR. BRUSTIN:

9       Q.   You know what?  It was not a good

10 question.  I apologize, sir.

11      This report indicates that during the

12 interview with Sonya James in the minutes after the

13 shooting, Valentino Dixon's name was -- was put out

14 over the radio.

15      A.   Yes.

16      Q.   All right.  And then this officer is

17 asking questions about Valentino Dixon, correct?

18      A.   Yes.

19      Q.   And -- well, you've -- and I -- I take

20 it that despite the fact that Valentino --

21 withdrawn.

22      You don't have any reason to dispute that,

23 in fact, Valentino Dixon's name was mentioned over

24 the radio in the minutes following the shooting or

25 that Sonya James was interviewed about that, do



1  you?

2          A.    No.

3          Q.    All right.  What you're telling us,

4  though, is that that information never made its way

5  to you, correct?

6          A.    At that time, no.

7          Q.    All right.  So although it appears that

8  Valentino Dixon's name was mentioned in the moments

9  after the shooting as a potential suspect, and

10 despite the fact that you've -- as you've already

11 told us, everybody at the scene would have

12 understood that any such information should have

13 been provided to you, your testimony here today is

14 that you didn't hear it, correct?

15         A.    I don't recall hearing it.

16         Q.    Well, you've already told us under oath

17 that one of the reasons why John Sullivan's

18 statement was so powerful to you is because the

19 name Valentino Dixon had never been mentioned

20 before in connection with this crime.

21         Do you remember that, sir?

22         A.    Yes.

23 MR. SAHASRABUDHE:  Object to the form.

24 BY MR. BRUSTIN:

25         Q.    So in order for that to be true, that



1   would mean that this information would have never

2   made its way to you, because this all happened

3   before John Sullivan was interviewed in the

4   hospital, correct?

5            A.    Yes.

6            Q.    So your testimony is that although

7   Valentino Dixon was mentioned over the radio and

8   although Sonya James was interviewed about

9   Valentino Dixon and although you were in charge of

10  the scene of the crime, your testimony is that

11  information never made its way to you.

12           A.    At that point, no.

13           Q.    Any explanation for that?

14           A.    I -- I don't know why.  I mean, it was

15  a hectic scene.

16           Q.    All right.

17           A.    My thing is preserving evidence,

18  keeping the scene clean.  There's -- there's just a

19  million things going on at a crime scene.

20           Q.    I know, and one of the things you've

21  already told us, which was your primary

22  responsibility at the scene -- and again, I asked

23  you questions earlier knowing I was going to show

24  you this.

25           A.    Of course.



1        Q.    And -- and the reason I did -- the

2    reason I asked you what was important at the --

3    withdrawn.

4        What you told me earlier was most important

5    at the scene was to ascertain potential suspects.

6    Do you remember that?

7        A.    It's important, not most important.

8        Q.    All right.  And so now you're changing

9    your testimony and you're telling me that because

10   you were so busy, you weren't trying to ascertain

11   potential suspects; is that right?

12       MR. SAHASRABUDHE:  Object to the form.

13   That's not what he said.  Go ahead.

14       THE WITNESS:  We will do that time

15   permitting.  There are so many things at a crime

16   scene that have to be taken care of before I worry

17   about what people outside the tape are doing.  I --

18       BY MR. BRUSTIN:

19       Q.    All right.  The truth, sir, is that you

20   understood that Valentino Dixon was a suspect long

21   before John Sullivan was interviewed at the

22   hospital, and when you said you didn't, that was a

23   lie.

24       MR. SAHASRABUDHE:  Object to the form.

25       BY MR. BRUSTIN:



```
 1           Q.   Isn't that true, sir?

 2           A.   False.  Absolutely false.

 3           Q.   And the reason you said you didn't know

 4     Valentino Dixon's name is because you understand

 5     that Vickerd, when he was at the hospital with John

 6     Sullivan, was the first person to raise the name

 7     Valentino Dixon as opposed to John Sullivan

 8     volunteering it; isn't that true, sir?

 9           MR. SAHASRABUDHE:  Object to the form.  It's

10     a ridiculous question.  Don't even answer the

11     question.

12           MR. BRUSTIN:  That's our claim here.  What

13     do you mean it's a ridiculous --

14           MR. SAHASRABUDHE:  You're asking him to

15     admit the -- the claim you make in your Complaint

16     about why Vickerd lied.

17           MR. BRUSTIN:  You know what?  It's -- it

18     is -- I can ask a better question.

19           BY MR. BRUSTIN:

20           Q.   Do you -- you learned -- you understand

21     from speaking with Vickerd that John Sullivan

22     didn't volunteer Valentino Dixon.  That information

23     was provided to John Sullivan.

24           Isn't that true, sir?

25           MR. SAHASRABUDHE:  Object to the form.
```



```
 1          THE WITNESS:  Provided to John Sullivan by
 2   whom?
 3          BY MR. BRUSTIN:
 4          Q.   Well, first of all, would there have
 5   been -- in your view, would there have been
 6   anything wrong -- let me ask it this way:
 7          Let's assume -- let's assume that you did
 8   know -- just hypothetically, let's assume that you
 9   did know about Valentino Dixon in the minutes after
10   the crime as a potential suspect.
11          A.   I did not.
12          Q.   I'm asking -- I'm asking you
13   hypothetically.  I understand your position.  I'm
14   asking you a hypothetical question now, okay?
15          Hypothetically, let's say you learned that.
16   Would there have been anything wrong, in your view,
17   with -- with Vickerd asking John Sullivan, "Hey, we
18   heard that a guy named Valentino Dixon was at the
19   scene.  Did you see him?"
20          Would there have been anything wrong with
21   that?
22          A.   Of course.
23          Q.   All right.
24          MR. BRUSTIN:  You know what?  Why don't
25   we -- I think this is a good time.  Why don't we
```



```
 1   take a lunch break now.
 2          MR. SAHASRABUDHE:   Okay.
 3             (A luncheon recess was then taken at
 4   12:41 p.m.)
 5             (On the record: 1:24 p.m.)
 6          BY MR. BRUSTIN:
 7          Q.   All right, Sergeant.  You understand --
 8   I think you've already told us this.
 9          You understand that Emil Adams was another
10   witness in the case; is that right?
11          A.   Yes.
12          Q.   And I take it that you had no direct
13   involvement with Emil Adams, correct?
14          A.   Correct.
15          Q.   No knowledge of what -- no -- no actual
16   firsthand knowledge of what transpired with him?
17          A.   That's correct.
18          Q.   You weren't present for his interview,
19   correct?
20          A.   I was not.
21          Q.   You weren't present for any of the
22   photo arrays that were shown to him?
23          A.   No, I was not.
24          Q.   Okay.  Let's take a look at the police
25   file on page 196.
```



1          Now, I will represent to you that this is

2     the -- this is a statement that was taken,

3     according to Stambach, of Lamarr Scott on

4     August 12th, 1991.

5          A.   Yes, sir.

6          Q.   And as you've already told us, you were

7     not involved in any of the Lamarr Scott

8     interviewing or investigation, correct?

9          A.   Correct.

10         Q.   And you've never reviewed this

11    statement before, correct?

12         A.   I have not.

13         Q.   Fair to say even at the time that it

14    was taken, you wouldn't have read it, because you

15    were not involved in this part of the

16    investigation?

17         A.   True.

18         Q.   Now, another thing you told us today is

19    that you believe that -- the primary reason why you

20    believe Valentino Dixon shot and killed Torri

21    Jackson is because you believe that the

22    statement -- the confession that Lamarr Scott gave

23    was proven false, correct?

24         MR. BLENK:  Form.

25         THE WITNESS:  Well, that's part of it, yes.



 1  Part of it.

 2        BY MR. BRUSTIN:

 3        Q.   What other part is there?  Oh, and the

 4  eyewitnesses, you said.

 5        A.   Correct, eyewitnesses.

 6        Q.   What you learned about the

 7  eyewitnesses.

 8        A.   Correct.

 9        Q.   Okay.  But one -- one -- one -- one

10  major reason was your belief that the confession by

11  Lamarr Scott was proven to be false, correct?

12        A.   Yes.

13        Q.   All right.  Now, I understand you

14  played no role in that investigation, to the extent

15  it occurred, but certainly you have investigated

16  many confessions in your career, correct?

17        A.   Yes.

18        Q.   So you -- you know how to do it.

19        A.   Yes.

20        Q.   All right.  So I'm going to ask you

21  some questions about what you would have expected

22  to have been done here based on this statement,

23  okay?

24        A.   Based on Stambach's statement?

25        Q.   Based on the statement that Lamarr



1   Scott give -- gave, I want to ask you some

2   questions about what you would have expected

3   competent detectives acting in good faith to do in

4   order to investigate the statement, okay?

5           A.    Okay.

6           Q.    Is that a fair -- is that a fair thing

7   to do, based on your experience?

8           A.    I don't -- everybody does --

9       MR. BLENK:  Form.

10      THE WITNESS:  Everybody asks different

11  questions different ways.

12      BY MR. BRUSTIN:

13          Q.    So I'm going to ask you about some of

14  your ways --

15          A.    Oh, I see.  Okay.

16          Q.    -- all right?  So you've already told

17  us how unusual it is for a -- a suspect --

18  withdrawn.

19          You've already told us that the only time in

20  your career when a person has come in and claimed

21  to have committed a crime that somebody else

22  committed was this case, correct?

23          A.    No.  Where somebody else came in and

24  said they did it.

25          Q.    That's right.

```
 1          A.    Okay.   That's what you're -- yes,
 2   that's correct.
 3          Q.    Only time.
 4          A.    As far as I recall, yes.
 5          Q.    In 40 years.
 6          A.    Yes.
 7          Q.    Okay.   And so -- and by the way, other
 8   than for reasons of mental illness, are you aware
 9   of any suspect -- withdrawn.   Put mental -- mental
10   illness aside.
11          In your career, have you had anybody in your
12   career voluntarily come in -- withdrawn again.
13          You understand that even before Lamarr Scott
14   was interviewed by Stambach, he confessed to this
15   crime, to being the shooter, on television.
16          A.    Yes.
17          MR. SAHASRABUDHE:   Form.
18          THE WITNESS:   Yes.
19          BY MR. BRUSTIN:
20          Q.    Okay.   Do you remember seeing it on
21   television?
22          A.    I don't recall if I saw it or not.
23          Q.    You remember that was big news in the
24   department, though, right?
25          A.    I don't know so much in the department,
```



```
 1  but it was big on the news, yes.

 2        Q.   Well, it was big in the homicide unit.

 3  Nothing like that had ever happened before, right?

 4        A.   Well, you -- the homicide unit, not the

 5  whole department.

 6        Q.   Okay.

 7        A.   You said department.

 8        Q.   Fair enough.  In the homicide unit, it

 9  was big news, right?

10        A.   I would say, yes.

11        Q.   Everybody was talking about it.

12        MR. SAHASRABUDHE:  Form.

13        THE WITNESS:  I would assume, yes.

14        BY MR. BRUSTIN:

15        Q.   And so have you ever in your career had

16  another situation where a person voluntarily

17  confessed, say on the news or somewhere even before

18  they came to you, to a crime that they didn't

19  commit?

20        A.   Yes.

21        Q.   When did that happen?

22        A.   Josue -- Josue -- Josue Ortiz.

23        Q.   The Ortiz case.

24        A.   Ortiz, yes.

25        Q.   Okay.  So the only other example is the
```



1   Ortiz case that just went to trial.

2        A.    That's correct.

3        Q.    Now, by the way, I'm going to ask you

4   some more questions about Ortiz a little later,

5   because you were -- you were involved in that

6   investigation, correct?

7        A.    Yes.  Yes.

8        Q.    And maybe Peter has to answer this

9   question, but --

10       MR. SAHASRABUDHE:  Form already.

11       MR. BRUSTIN:  Listen to the question.

12       BY MR. BRUSTIN:

13       Q.    Were you ever a Defendant in that case?

14       MR. SAHASRABUDHE:  The answer is no.  Sorry.

15       THE WITNESS:  No.

16       MR. SAHASRABUDHE:  Sorry.

17       BY MR. BRUSTIN:

18       Q.    Okay.  In any case, the only other

19   example you can think of in your career when an

20   innocent man confessed to a crime is in the Ortiz

21   case, correct?

22       MR. SAHASRABUDHE:  Form.

23       THE WITNESS:  Yes.

24       BY MR. BRUSTIN:

25       Q.    Or an allegedly innocent man, correct?



```
 1          A.    Correct.

 2          Q.    You -- you remember that at the -- you

 3   just testified in that trial a few weeks ago,

 4   correct?

 5          A.    Yes.

 6          Q.    And do you remember testifying in that

 7   trial that despite the fact that Ortiz was found to

 8   have been innocent through an independent

 9   investigation, you still believed he was guilty?

10          A.    I did.

11          Q.    And you still do.

12          A.    I do.

13          Q.    Okay.  But the only -- the -- the only

14   two cases you can think of where -- withdrawn.

15          There was -- you -- you recognize that there

16   is certainly evidence in both Ortiz and in Dixon

17   that the wrong man was convicted, correct?

18          MR. SAHASRABUDHE:   Form.

19          THE WITNESS:   Must be, but I'm not aware of

20   it.

21          BY MR. BRUSTIN:

22          Q.    Right.  The only other example you can

23   think of where an innocent man may have

24   committed -- may have confessed to a crime he

25   didn't commit was Ortiz, correct?
```

JAMES LONERGAN
DIXON V. CITY OF BUFFALO

```
 1           A.   Yes.

 2           Q.   All right.  So typically people don't

 3   confess to homicides they don't -- they didn't

 4   commit, in your experience, correct?

 5           A.   Yes.

 6           Q.   And certainly in Ortiz, you understand

 7   that Mr. Ortiz suffered from mental illness,

 8   correct?

 9           MR. SAHASRABUDHE:  Form.

10           THE WITNESS:  I'm aware of that now, yes.

11           BY MR. BRUSTIN:

12           Q.   Okay.  And you were aware of that when

13   you interviewed him in a mental health hospital,

14   correct?

15           MR. SAHASRABUDHE:  Form.

16           THE WITNESS:  It was a clinic in a -- in

17   a -- in a regular hospital.

18           BY MR. BRUSTIN:

19           Q.   It was a mental --

20           A.   In a regular hospital, Buffalo General

21   Hospital.

22           Q.   So is it your testimony that when you

23   interviewed Mr. Ortiz on November 15th in the

24   hospital, you didn't understand he was there for a

25   psychiatric evaluation?
```



1        A.   Oh, I knew that.

2        Q.   Okay.  So certainly -- in any case, you

3   know today that the reason -- to the extent that

4   you -- you've already told us you don't think Ortiz

5   is innocent, but to the extent -- or you're not

6   sure about it.

7        A.   No, I'm positive.

8        Q.   You're positive he's guilty.

9        A.   Yes.

10       Q.   Okay.  Okay.  And the -- and the reason

11  that you're positive Ortiz is guilty is because

12  he -- he could not have volunteered the nonpublic

13  information about the crime that he volunteered in

14  Stambach's alleged confession unless he committed

15  the crime, correct?

16       A.   Correct.

17       MR. SAHASRABUDHE:  Object to the form of the

18  question.

19       THE WITNESS:  Correct.

20       BY MR. BRUSTIN:

21       Q.   And so you understand that the only

22  alternative in the Ortiz case is either Ortiz

23  committed the crime or Stambach provided him that

24  information and lied about it, correct?

25       MR. SAHASRABUDHE:  Object to the form.



```
 1          THE WITNESS:   No.   Ortiz committed the

 2   crime.

 3          BY MR. BRUSTIN:

 4          Q.   I -- I understand.   The only other

 5   alternative would be that Stambach gave him that

 6   information, and you know Stambach would never do

 7   that.   That's your position, correct?

 8          A.    That's correct.

 9          Q.    So the reason that you are so sure that

10   Ortiz is guilty is because of your position that

11   Stambach would never fabricate evidence.

12          MR. SAHASRABUDHE:   Form.

13          BY MR. BRUSTIN:

14          Q.    Correct?

15          A.    Well, it's -- the reason I believe is

16   because, first of all, he confessed to the murder,

17   and second of all, he knew things that only the

18   killer or killers would have known.

19          Q.    Right.   And the reason you're so sure

20   that he knew those things as opposed to -- as

21   opposed to Stambach providing him that information

22   is because you can't believe, as you sit here

23   today, that Stambach would fabricate evidence like

24   that, correct?

25          A.    That's correct.
```



```
 1          MR. SAHASRABUDHE:  Form.
 2          BY MR. BRUSTIN:
 3          Q.    You're certain of it, correct?
 4          A.    Yes.
 5          Q.    You're certain he didn't fabricate
 6    evidence in the Ortiz case, correct?
 7          A.    Correct.
 8          Q.    And you're certain he didn't fabricate
 9    evidence in the Dixon case.
10          A.    Correct.
11          Q.    Equally certain, fair to say?
12          A.    Yes.
13          Q.    And you understand that the jury found
14    against Detective Stambach in the Ortiz case.
15          A.    Yes.
16          Q.    And it's -- it's your position that
17    that jury was just wrong.
18          A.    Happens all the time.  Yes.
19          Q.    Okay.  That jury verdict and the
20    evidence that you reviewed in the Ortiz case in --
21    in preparation for that trial didn't in any way
22    change your view that Stambach fabricated evidence.
23    You -- you're convinced he didn't, correct?
24          MR. SAHASRABUDHE:  Form.
25          THE WITNESS:  I am.
```

```
 1          BY MR. BRUSTIN:
 2          Q.   All right.  So let's go back to the
 3   Lamarr Scott statement that's in front of you.
 4          Now, you see where it says, about halfway
 5   down -- about a third of the way down the page:
 6          You were advised of your -- of your rights
 7   by me at Genesee and Bailey.
 8          A.   Yes.
 9          Q.   So this indicates that Detective
10   Stambach had a conversation -- or was with -- at
11   least with Lamarr Scott at Genesee and Bailey.
12          A.   Yes.
13          Q.   And to the extent that Detective
14   Stambach asked any questions of Lamarr Scott at
15   that time, did he have -- did he have an obligation
16   to document that interview?
17          MR. SAHASRABUDHE:  Form.
18          THE WITNESS:  Yes.
19          BY MR. BRUSTIN:
20          Q.   Okay.  And do you have any
21   explanation -- do you have any explanation as to
22   why there's no documentation of that in the file?
23          MR. SAHASRABUDHE:  Form.
24          THE WITNESS:  I don't know there's no
25   documentation.
```



1          BY MR. BRUSTIN:

2          Q.   Well, let me ask you this:

3          To the extent that -- that Detective

4    Stambach had any interview -- any interview of any

5    kind with Lamarr Scott prior to this sworn

6    statement -- sworn?  Prior to this sworn statement,

7    did he have -- did he have an obligation to

8    document the substance of that interview?

9          MR. SAHASRABUDHE:  Form.

10          THE WITNESS:  I'm not aware if he even

11    talked to him other than give him his rights.

12          BY MR. BRUSTIN:

13          Q.   You're missing my point.  To the extent

14    that he did.  Assume that he did.

15          If he did, hypothetically, if he had a

16    conversation with him about the -- about what

17    knowledge he had prior to this taped statement --

18    withdrawn.

19          If he had a conversation with him about what

20    happened during the shooting prior to this sworn

21    statement, did he have an obligation to document

22    that conversation?

23          MR. SAHASRABUDHE:  Form.

24          THE WITNESS:  Hypothetically, yes.

25          BY MR. BRUSTIN:



1          Q.    Now, one of the things that -- take a
2    look in the middle of the page.  It says:   The
3    Buffalo Police Homicide Squad is investigating.
4          Do you see that?
5          A.    Yes.
6          Q.    And do you see his answer?
7          A.    Let me read the question.   Yes.
8          Q.    So what Lamarr Scott is reporting is
9    that he fired at Torri and Aaron Jackson in
10   self-defense after they fired at him, correct?
11         MR. SAHASRABUDHE:  Form.
12         THE WITNESS:  It says the guys.  It doesn't
13   name individuals.
14         BY MR. BRUSTIN:
15         Q.    Do you -- do you -- would you -- would
16   you suspect that what he's talking about is the
17   people that he shot?
18         MR. SAHASRABUDHE:  Form.
19         MR. BLENK:  Form.
20         BY MR. BRUSTIN:
21         Q.    Does this -- does this indicate that
22   the people that he shot, shot at him first?  He
23   says he shot in self-defense.
24         MR. BLENK:  Form.
25         THE WITNESS:  Doesn't say he shot anybody.



1   He said he fired at them -- at people.

2          BY MR. BRUSTIN:

3          Q.   "I shot back in self-defense."

4          A.   "I shot back."  Doesn't say "I shot

5   them."

6          Q.   Next question:  Who shot and killed

7   Torriano Jackson?  I did.

8          He's admitting to -- to doing the shooting.

9          A.   There he is, not in the other

10  paragraph, yes.

11         Q.   And he's claiming that he did it in

12  self-defense, correct?

13         A.   Well, that's what he's saying here,

14  yes.

15         Q.   Right.  And so that's all I'm asking

16  you.  He's saying he shot in self-defense.  In

17  other words, that Torri or Aaron Jackson shot at

18  him first, correct?  That's what he's saying.

19         That's what he's suggesting?

20         A.   Correct.

21         Q.   And so what kind of investigation would

22  have to happen based on that?

23         MR. SAHASRABUDHE:  Object to the form.

24         BY MR. BRUSTIN:

25         Q.   If any.



1        A.    Just what he says.  That's good enough

2   for me.

3        Q.    Good enough for you, no reason to

4   follow up on this?

5        A.    On what?

6        Q.    On whether or not Torri or Aaron

7   Jackson had a weapon?

8        A.    I'm sure that was done.

9        Q.    By who?

10       A.    I don't know.

11       Q.    You didn't do it, right?

12       A.    Oh, no.

13       Q.    And by the way, this story -- this

14  statement that Aaron Jackson or Torri Jackson fired

15  back at him -- fired at him first is consistent

16  with you finding a second handgun at the scene,

17  correct?

18       MR. SAHASRABUDHE:  Form.

19       THE WITNESS:  Not necessarily.

20       BY MR. BRUSTIN:

21       Q.    I didn't say it was necessarily the

22  gun.  It's consistent with this, correct?

23       A.    It's possible.

24       Q.    You found a handgun that you know --

25  and you knew by this time -- was not the gun that



```
 1   was used to kill Torri Jackson, correct?
 2        A.   I -- I didn't know what actually killed
 3   him.  I didn't know what weapon actually
 4   killed him.
 5        Q.   So by the 12th, you didn't -- you
 6   didn't --
 7        A.   Oh, by the 12th, okay, yes.
 8        Q.   By the 12th, you were aware --
 9        A.   I knew it then, yes.
10        Q.   You knew that the gun that was found at
11   the scene, the handgun at the scene --
12        A.   The .32.
13        MR. SAHASRABUDHE:  Let him finish.
14        THE WITNESS:  All right, yes.
15        BY MR. BRUSTIN:
16        Q.   -- the -- the .32 --
17        A.   Yes.
18        Q.   -- was not the gun that was used to
19   kill Torri Jackson, correct?
20        A.   Correct.
21        Q.   It was a second gun that was left at
22   the scene.
23        A.   Yes.
24        Q.   And so his -- his story here that he
25   shot in self-defense would be consistent with a gun
```



```
 1  being found at the location of the actual shooting,
 2  correct?
 3         A.   If he'd left that gun, yes.
 4         Q.   Okay.  And that would be something that
 5  would need to be investigated, correct?
 6         MR. SAHASRABUDHE:  Form.
 7         THE WITNESS:  Yes, correct.
 8         BY MR. BRUSTIN:
 9         Q.   You'd want to the interview Aaron
10  Jackson, for example, and question him about
11  whether or not he had a weapon that night, correct?
12         MR. SAHASRABUDHE:  Form.
13         THE WITNESS:  Correct.
14         BY MR. BRUSTIN:
15         Q.   You'd want to question other people at
16  the scene about whether or not they saw Aaron
17  Jackson or Torri Jackson with a weapon, correct?
18         A.   Yes.
19         MR. SAHASRABUDHE:  Form.
20         BY MR. BRUSTIN:
21         Q.   You'd want to find out whether or
22  not -- from other people who weren't even there
23  whether or not Torri Jackson was known to carry a
24  weapon, correct?
25         MR. SAHASRABUDHE:  Form.
```



```
 1            THE WITNESS:  No, I wouldn't go that far,

 2  no.

 3            BY MR. BRUSTIN:

 4            Q.   Well, it's an incredibly important

 5  issue in the case, because if, in fact, Torri

 6  Jackson and/or Aaron Jackson had a gun and were

 7  shooting first -- first of all, they would have

 8  been committing a crime, correct?

 9            MR. SAHASRABUDHE:  Form.

10            THE WITNESS:  Yes.

11            BY MR. BRUSTIN:

12            Q.   And secondly, it would mean, if, in

13  fact, Lamarr Scott fired in self-defense, that

14  would mean that it wasn't second-degree murder,

15  correct?

16            MR. BLENK:  Form.

17            MR. SAHASRABUDHE:  Form.

18            THE WITNESS:  That's not up to me to decide.

19            BY MR. BRUSTIN:

20            Q.   Well, you -- you're not a lawyer, but

21  you understood that self -- that shooting someone

22  in response to them shooting you is different than

23  shooting somebody in cold blood, correct?

24            MR. SAHASRABUDHE:  Form.

25            THE WITNESS:  If that's proven in the case,
```



 1  yes.

 2          BY MR. BRUSTIN:

 3          Q.   Okay.  So in other words, it's -- you

 4  would agree that that issue, that fact issue, is

 5  important for a lot of reasons.

 6          MR. SAHASRABUDHE:  Form.

 7          THE WITNESS:  Yes.

 8          BY MR. BRUSTIN:

 9          Q.   And you would expect there to be a full

10  investigation by somebody into whether or not Torri

11  or Aaron Jackson had a weapon and shot that weapon,

12  correct?

13          MR. SAHASRABUDHE:  Form.

14          MR. BLENK:  Form.

15          THE WITNESS:  District Attorney's office.

16          BY MR. BRUSTIN:

17          Q.   So -- I didn't ask -- so you didn't

18  answer my question.

19          A.   Yes, I did.

20          Q.   All right.  First of all, the -- I --

21  the -- the file is filled with follow-up

22  investigation that was done by police officers

23  after this date.  You're aware of that, correct?

24          A.   Of course.

25          Q.   The prosecutor's office was not



1    directing -- homicide -- withdrawn.

2          Stambach made it clear yesterday that he had

3    an independent obligation to follow up on any

4    evidence that was important regardless of what the

5    District Attorneys said or didn't say.

6          Do you disagree with that?

7          A.    Well, in a case if somebody's claiming

8    self-defense, I would leave that up to the District

9    Attorney and the lawyers.

10         Q.    All right.  So you're saying that the

11   detectives had no obligation to investigate, based

12   on this statement, whether or not Torri or Aaron

13   Jackson had a weapon and fired it.

14         MR. SAHASRABUDHE:  Form.

15         THE WITNESS:  In self-defense, it -- it's

16   not up to me.  It's up to the District --

17         BY MR. BRUSTIN:

18         Q.    Sir, I'm just asking you whether they

19   have the obligation or not.  It's an easy question.

20         A.    The District Attorney's office would

21   have, yes.

22         Q.    Okay.  So you've answered it.

23         A.    Okay.

24         Q.    The detective had no -- had no

25   obligation, in your view, to follow up on this.



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  Not in my view.

3     BY MR. BRUSTIN:

4          Q.    All right.

5          A.    No, sir.

6          Q.    And by the way, it would be -- another

7     reason why you'd want to follow up on that

8     information would be to determine whether or not

9     the version of events that Lamarr -- Lamarr Scott

10    is giving you is credible, right?

11         A.    Right.

12         Q.    If, in fact, you could prove that Torri

13    Jackson and Aaron Jackson had a weapon or even

14    fired a weapon, that would be evidence suggesting

15    that Lamarr Scott was telling the truth, right?

16         MR. SAHASRABUDHE:  Form.

17         THE WITNESS:  Yes.

18    BY MR. BRUSTIN:

19         Q.    It would be important to investigate it

20    for that reason, too, correct?

21         A.    Yes.

22         Q.    Yet it's your testimony that Stambach

23    and, frankly, no detective had an obligation to

24    investigate that on their own, correct?

25         MR. SAHASRABUDHE:  Form.



1        THE WITNESS:  Again, it's -- to me it's the

2   District Attorney's job to prove self-defense, not

3   mine.

4        BY MR. BRUSTIN:

5        Q.   Take a look at page 197.

6        A.   Okay.

7        Q.   Fourth line down:  Why did you shot

8   Torriano Jackson?

9        I shot him in self-defense.

10       Question:  Why did you shot him?

11       Question -- I mean answer:  Because he came

12   back and opened fire on us.

13       Question:  What did he shoot with?

14       Answer:  A .38, a silver gun with a nickel

15   plate.

16       And you would agree that a .38 silver gun

17   with a nickel plate was found at the scene,

18   correct?

19       A.   No.

20       MR. SAHASRABUDHE:  Form.

21       THE WITNESS:  I believe it was a .32

22   caliber.

23       BY MR. BRUSTIN:

24       Q.   Okay.  But it was a -- it certainly had

25   a nickel plate, correct?



```
 1          A.    I don't recall.
 2          Q.    Okay.  In your -- I don't know much
 3   about guns.  Maybe you do.
 4          Does a .38 and a .32 look similar?
 5          A.    They could.
 6          Q.    Is a nickel plate a distinctive feature
 7   of a gun?
 8          A.    Many guns are nickel plated.
 9          Q.    Okay.  But if, in fact -- if, in fact,
10   at the scene was a .32 nickel-plated gun, that
11   would be a piece of evidence suggesting that this
12   might be accurate, correct?
13          A.    Could be, yes.
14          MR. SAHASRABUDHE:  Form.
15          BY MR. BRUSTIN:
16          Q.    Next question:  How many shots did you
17   fire with the TEC-9?
18          Answer:  I emptied the clip.
19          And by this time, on August 12th, you knew,
20   based on your investigation of the crime scene,
21   that, in fact -- and based on the shells
22   recovered -- that the TEC-9 which was used to
23   commit this murder -- the clip had been emptied,
24   correct?
25          MR. SAHASRABUDHE:  Form.
```



1          THE WITNESS:  I believe so, yes.

2          BY MR. BRUSTIN:

3          Q.   And you would agree that the -- the

4    only way you know a clip has been emptied is -- is

5    if either you're counting the bullets or the -- or

6    the gun stops firing when you pull the trigger,

7    correct?

8          MR. SAHASRABUDHE:  Form.

9          THE WITNESS:  The only way you know a clip

10   is empty?

11         BY MR. BRUSTIN:

12         Q.   Yes.

13         A.   Yes, is when it stops firing or you

14   knew what was in it when you started.

15         Q.   Okay.  So you -- you would agree that

16   you would expect the person who was shooting the

17   gun to know that the clip was empty if it was

18   empty, correct?

19         MR. SAHASRABUDHE:  Form.

20         THE WITNESS:  Oh, yes.

21         BY MR. BRUSTIN:

22         Q.   But that's not something you would

23   expect other people to know, correct?

24         MR. SAHASRABUDHE:  Form.

25         THE WITNESS:  Other than the shooter?



1        BY MR. BRUSTIN:

2        Q.    Yes.

3        A.    Correct.

4        Q.    You might expect other people to know

5    that a lot of shots were fired.

6        A.    Yes.

7        Q.    But you wouldn't expect them to know

8    that the clip was emptied, correct?

9        MR. SAHASRABUDHE:    Form.

10       THE WITNESS:    Unless they're close by.    They

11   would clear the click, click.    I mean, they would

12   know.

13       BY MR. BRUSTIN:

14       Q.    If you were standing right there, you

15   might hear it if you knew what it was.

16       A.    That's right.

17       Q.    But otherwise -- but -- but it's --

18   again, it's a piece of evidence suggesting that his

19   story is reliable, correct?

20       MR. SAHASRABUDHE:    Form.

21       THE WITNESS:    Yes.

22       BY MR. BRUSTIN:

23       Q.    And it's -- again, based on your

24   training -- based on your training as a detective,

25   it's a piece of evidence that's not necessarily



 1   shared with the public.  It's something the police

 2   know, but the shooter might not.

 3        I'm sorry.  It's something that the police

 4   and the shooter would know, but other people might

 5   not, correct?

 6        MR. SAHASRABUDHE:  Form.

 7        THE WITNESS:  It's possible.

 8        BY MR. BRUSTIN:

 9        Q.   Now, one of the questions he asks next

10   is:  What were you -- what were you wearing that

11   night?

12        And he says:  A black jacket and a white tee

13   shirt, checkered shorts, white Nike sneakers, and a

14   white hat.

15        Now, this is April 12th, only two days --

16   August 12th, only two days after the shooting,

17   correct?

18        A.   Yes.

19        Q.   And there's a number of reasons why you

20   want to ask what the -- what the person was

21   wearing, correct?

22        A.   Yes.

23        Q.   One reason is -- is in -- in

24   determining whether it's reliable, you want to see

25   if it matches up with other witnesses -- with what



1   other witnesses say they saw the shooter wearing,

2   correct?

3        A.    Correct.

4        Q.    And another reason, as you've already

5   told us this morning, would be potentially to get

6   that clothing so it could be tested for forensics,

7   correct?

8        A.    Possibly --

9        MR. SAHASRABUDHE:   Form.

10       THE WITNESS:   -- yes.

11       BY MR. BRUSTIN:

12       Q.    Well, under what circumstances would

13  you not attempt to gather the clothing?

14       A.    May have been destroyed and thrown out.

15  May have been washed.

16       Q.    Right.  So -- I think I understand what

17  you're saying.

18       So what you would do -- what any

19  conscientious detective acting in good faith would

20  do would be to attempt to get the clothing,

21  assuming it wasn't washed or thrown out or things

22  of that nature, correct?

23       MR. SAHASRABUDHE:   Object to the form of the

24  question.

25       THE WITNESS:   Correct.



```
 1          BY MR. BRUSTIN:
 2          Q.   And it's particularly important when
 3   you have someone who's coming in to voluntarily
 4   confess, right?
 5          MR. SAHASRABUDHE:   Object to the form of the
 6   question.
 7          THE WITNESS:   Yes.
 8          BY MR. BRUSTIN:
 9          Q.   If you have someone who's willing to go
10   on TV and say they committed the crime and then
11   tell that to a police officer under oath, that may
12   well be a person who didn't wash their clothes and
13   is willing to give you forensic evidence indicating
14   they committed the crime, correct?
15          MR. SAHASRABUDHE:   Form.
16          THE WITNESS:   I -- could be.
17          BY MR. BRUSTIN:
18          Q.   So one of the most basic things a
19   detective would want to ask a person like this is
20   "Are you willing to give us the clothes that you
21   were wearing so we can test it" or "Are you willing
22   to give us the clothes?"
23          MR. BLENK:   Form.
24          MR. SAHASRABUDHE:   Form.
25          BY MR. BRUSTIN:
```



1        Q.    Right?

2        A.    I would personally, yes.

3        Q.    Can you think of any legitimate reason

4   not to ask those questions?

5        MR. SAHASRABUDHE:  Form.

6        THE WITNESS:  If I -- if I knew that they

7   had been destroyed, then I wouldn't ask the

8   question.

9        BY MR. BRUSTIN:

10       Q.    Okay.  The only way you would know that

11  is if he told you.

12       MR. SAHASRABUDHE:  Form.

13       THE WITNESS:  True.

14       BY MR. BRUSTIN:

15       Q.    And so one of the basic things you

16  would be doing if you were trying to determine

17  whether this -- whether this confession was true

18  would be to attempt to test the clothing that he

19  was wearing, correct?

20       MR. SAHASRABUDHE:  Form.

21       THE WITNESS:  Attempt to locate the

22  clothing, yes.

23       BY MR. BRUSTIN:

24       Q.    Right.  Now, you would agree -- now,

25  according to Lamarr Scott, he offered -- he told --



1   he told Detective Stambach that he had blood on his

2   shoes, and he offered -- he offered to give him his

3   clothing, and Detective Stambach refused him.

4           MR. SAHASRABUDHE:  Form.

5           BY MR. BRUSTIN:

6           Q.   Now, assuming that Lamarr Scott is

7   telling the truth about that, that would be serious

8   police misconduct, correct?

9           MR. SAHASRABUDHE:  Form.

10          MR. BLENK:  Form.

11          THE WITNESS:  Lamarr Scott told Stambach his

12   clothing had blood on it.

13          BY MR. BRUSTIN:

14          Q.   That's what he's claimed.

15          A.   Who's claimed?

16          Q.   Lamarr Scott.

17          A.   I've never -- this is the first I've

18   ever heard of that.

19          Q.   I understand that, sir, but if he -- if

20   that actually happened, that would be serious

21   misconduct by Detective Stambach --

22          MR. SAHASRABUDHE:  Object to the form.

23          BY MR. BRUSTIN:

24          Q.   -- correct?

25          MR. BLENK:  Form.



```
 1        BY MR. BRUSTIN:
 2        Q.   I -- I'll -- Detective Stambach denies
 3   that happening.
 4        A.   So do I.  I don't -- I don't know
 5   anything about it.
 6        Q.   Okay.  But you deny it happening, too,
 7   because if Stambach says it didn't happen, that's
 8   good enough for you, right?
 9        MR. SAHASRABUDHE:  Form.
10        THE WITNESS:  It would have been documented.
11   I mean --
12        BY MR. BRUSTIN:
13        Q.   That would be something you would
14   obviously have to document, correct?
15        MR. SAHASRABUDHE:  Form.
16        THE WITNESS:  Correct.
17        BY MR. BRUSTIN:
18        Q.   But you would agree that this is the
19   kind of crime where you would expect there might
20   well be drops of blood on somebody's -- on the
21   shooter's shoes, correct?
22        MR. SAHASRABUDHE:  Form.
23        MR. BLENK:  Form.
24        THE WITNESS:  Correct.
25        BY MR. BRUSTIN:
```



1          Q.    That's consistent with the crime scene
2     that you observed, correct?
3          A.    Not necessarily.
4          Q.    Well, it's consistent with the
5     description of the shooter standing over the
6     victim, correct?
7          A.    If, in fact, he was, yes.
8          Q.    It's consistent with the description of
9     at least some witnesses saying he was standing over
10    the victim, correct?
11         A.    One witness that I'm aware of, yes.
12         Q.    All right.  Well, every witness claims
13    that the shooting was at close range, correct?
14         MR. SAHASRABUDHE:  Form.
15         THE WITNESS:  I believe so.
16         BY MR. BRUSTIN:
17         Q.    So all of that evidence is consistent
18    with there being blood on the shooter's shoes.
19         MR. SAHASRABUDHE:  Form.
20         THE WITNESS:  It depends what the witnesses
21    mean by close range.
22         BY MR. BRUSTIN:
23         Q.    Well, it doesn't -- let me be clear.
24         It doesn't necessarily mean there'd be blood
25    on his shoes.



1          A.    Correct.

2          Q.    But it suggests there might be blood on

3    his shoes, correct?

4          A.    Again, it depends.

5          MR. SAHASRABUDHE:    Form.

6          THE WITNESS:    What is close range?

7          BY MR. BRUSTIN:

8          Q.    You -- in a shooting like this, you

9    would expect that there could be blood on his shoes

10   from as close as ten feet away, right?

11         MR. SAHASRABUDHE:    Form.

12         THE WITNESS:    That's stretching it.    I'd

13   have to say no.

14         BY MR. BRUSTIN:

15         Q.    Five feet?

16         A.    Yes.

17         MR. SAHASRABUDHE:    Form.

18         BY MR. BRUSTIN:

19         Q.    All right.    Now, one of the things you

20   would want to ascertain in determining whether or

21   not this confession was true was all of the people

22   at the scene who would have seen him do the

23   shooting, correct?

24         A.    Yes.

25         Q.    And so you'd want to ascertain from



 1  this person any witnesses that weren't already

 2  identified that could confirm that he was the

 3  shooter, correct?

 4         A.   Yes.

 5         Q.   And then what you -- what you'd want to

 6  do immediately is interview those people, correct?

 7         MR. SAHASRABUDHE:   Form.

 8         THE WITNESS:   As soon as possible, yes.

 9         BY MR. BRUSTIN:

10         Q.   And you want to do that as soon as --

11  you can't wait on that, because you want to

12  eliminate the possibility of contamination,

13  correct?

14         MR. SAHASRABUDHE:   Form.

15         THE WITNESS:   As far as a witness?

16         BY MR. BRUSTIN:

17         Q.   Yes.

18         A.   Sometimes you have to wait.

19         Q.   All right.   But it would -- you would

20  agree that it -- it would be extraordinarily

21  important to interview any new eyewitnesses that he

22  raised who saw him do the shooting as quickly as

23  possible, correct?

24         A.   Right.   I agree.

25         Q.   And that it would also be important to



1    go back and interview all of the old witnesses who

2    had been -- who had been interviewed before to see

3    if they -- to see if they had information

4    indicating that either Lamarr Scott was the shooter

5    or was not the shooter, correct?

6          MR. SAHASRABUDHE:  Form.

7          THE WITNESS:  To go back to --

8          BY MR. BRUSTIN:

9          Q.    Eyewitnesses and see if -- if they

10   could -- whether or not they had information

11   suggesting that Lamarr Scott was or was not the

12   shooter.

13         MR. SAHASRABUDHE:  Form.

14         THE WITNESS:  Well, it depends on what they

15   initially said.  Maybe they couldn't identify him.

16         BY MR. BRUSTIN:

17         Q.    All right.

18         A.    Maybe they didn't see him, the shooter.

19         Q.    So if you have -- for example, if you

20   have a witness who make -- who made a tentative

21   identification of, let's say, Valentino Dixon but

22   not a positive identification, that would be the

23   kind of person you'd want to show a photo array

24   with Lamarr Scott, correct?

25         MR. SAHASRABUDHE:  Form.



1          THE WITNESS:  After he confessed?

2     BY MR. BRUSTIN:

3          Q.   Yes, sir.

4          A.   Again, I -- I would consult the

5     District Attorney on that, what they -- what

6     direction they wanted us to go.

7          Q.   All right.  And -- but if you were in

8     charge and you were doing it on your own, that's

9     something you would do, correct?

10         MR. SAHASRABUDHE:  Form.

11         THE WITNESS:  I would contact the District

12    Attorney, correct.

13    BY MR. BRUSTIN:

14         Q.   No, if you had your -- if you were in

15    charge of the investigation and you were

16    investigating the accuracy of a confession, one

17    thing you would do is you would show a photo array

18    of that suspect to witnesses, correct?

19         MR. SAHASRABUDHE:  Form.

20         THE WITNESS:  Of which suspect?

21    BY MR. BRUSTIN:

22         Q.   The suspect confessing.  Lamarr Scott.

23         A.   Again --

24         MR. SAHASRABUDHE:  Form.

25         THE WITNESS:  -- I would -- I would go



```
 1   wherever the District Attorney -- whatever

 2   direction they told me to go.

 3        BY MR. BRUSTIN:

 4        Q.   So --

 5        A.   If they told me to show a photo array,

 6   I certainly would.

 7        Q.   All right.  So now I'm asking -- I'm

 8   asking you to assume.  I hear -- I hear that

 9   position.

10        I'm asking you to assume that there's no

11   District Attorney involved.  You're in charge.  I

12   just want to know what you would do as part of a --

13   an investigation, okay?

14        A.   I would have to know what the witnesses

15   said exactly.  I mean, every case is different.

16        Q.   All right.  Well, let's take about this

17   case.  So let's go a little further down the page.

18        Where did you throw the gun?  Do you see

19   that?

20        A.   Yes.

21        Q.   All right.  And he is describing within

22   a house or two where he threw the gun, correct?

23        A.   Yes.

24        Q.   Okay.  And what should have happened

25   after he described where he threw the gun?
```



1          MR. SAHASRABUDHE:  Object to the form.

2          BY MR. BRUSTIN:

3          Q.   In a competent investigation.

4          MR. SAHASRABUDHE:  Object to the form.

5          THE WITNESS:  Well, I'm sure the area was

6     searched.

7          BY MR. BRUSTIN:

8          Q.   You are?

9          A.   Yes.

10         Q.   If there was an area -- if -- so if --

11    if the area was searched after this admission for

12    the gun and the gun wasn't found, that would be

13    very important to document, correct?

14         It would suggest that his -- his admission

15    wasn't true, correct?

16         MR. SAHASRABUDHE:  Form.

17         THE WITNESS:  Or somebody picked up the gun

18    and took it.

19         BY MR. BRUSTIN:

20         Q.   But it would be important to document

21    for all those reasons, correct?

22         MR. SAHASRABUDHE:  Form.

23         THE WITNESS:  Yes.

24         BY MR. BRUSTIN:

25         Q.   Okay.  So you would expect to see



1  documentation in the file about their efforts to

2  locate the gun based on his description, correct?

3          A.    Normally, yes.

4          MR. SAHASRABUDHE:  Form.

5          BY MR. BRUSTIN:

6          Q.    Now, do you remember hearing, in

7  conversation in the homicide office back at this

8  time when Lamarr Scott came in and confessed to

9  being the shooter, discussion about Valentino or

10 his parents providing pressure or incentives for

11 Lamarr Scott -- Lamarr Scott to falsely confess?

12         A.    Yes.

13         Q.    Okay.  And so certainly, although you

14 didn't do it, you would have expected there to be a

15 full investigation into those allegations, correct?

16         MR. SAHASRABUDHE:  Form.

17         THE WITNESS:  Yes.

18         BY MR. BRUSTIN:

19         Q.    For example, some of the basic things

20 you would want to do would be to interview the

21 mother and father, if they were willing, correct?

22         MR. SAHASRABUDHE:  Form.

23         THE WITNESS:  Yes.

24         BY MR. BRUSTIN:

25         Q.    And obviously, it would be important to



1  document whether they -- if they -- if they agreed

2  to speak to the police, it would be important to

3  document what they said, correct?

4          MR. SAHASRABUDHE:  Form.

5          THE WITNESS:  If they agreed to speak, yes.

6          BY MR. BRUSTIN:

7          Q.   And if they didn't agree to speak to

8  the police, that would be important to document,

9  because it might suggest that they had something to

10  hide, right?

11          MR. SAHASRABUDHE:  Form.

12          THE WITNESS:  Yes.  Yes.

13          BY MR. BRUSTIN:

14          Q.   Either way, you'd have to write it

15  down.

16          MR. SAHASRABUDHE:  Form.

17          THE WITNESS:  If my memory serves me

18  correct, I believe Chris Belling was involved in

19  the -- the initial confession of Lamarr Scott on TV

20  or wherever it was.

21          BY MR. BRUSTIN:

22          Q.   Well, this --

23          A.   I believe.

24          Q.   Well, this report makes clear that the

25  only person in the room -- and I -- I will



1  represent to you that the only person in the room

2  on this report is -- is Mark Stambach, correct?

3       A.   I was talking about the initial

4  confession.

5       Q.   Well, let's take a look at that.

6       A.   On TV.

7       Q.   Well, if you'll take a look at page --

8            (Discussion off the record.)

9       MR. BRUSTIN:  Let's go off the record for a

10  minute.

11           (Off the record: 2:03 p.m.)

12           (On the record: 2:07 p.m.)

13       BY MR. BRUSTIN:

14       Q.   So first of all, you didn't have any

15  communication with ADA Belling about Lamarr Scott,

16  correct?

17       A.   Correct.

18       Q.   You're just going by what you heard in

19  the office, correct?

20       A.   I believe so.

21       Q.   Take a look at page 200.  Take a minute

22  to read it.  Let me know when you're done.

23       A.   Okay.

24       Q.   So this report makes clear that ADA

25  Belling was not called in until after the



1  interviews of Lamarr Scott and Leonard Brown,

2  correct?

3        A.    No.   Not necessarily.

4        He was brought up to date.   He may have been

5  briefed earlier in the evening.

6        Q.    "ADA Belling told you -- told you

7  writer he would respond to the homicide office.   He

8  arrived and read both statements that were

9  obtained."

10       According to this report, he wasn't

11 contacted until after the statements were taken,

12 correct?

13       A.    He may have been contacted by

14 telephone.

15       Q.    According to this report -- this report

16 says nothing about that, correct?   This report

17 indicates he came in after the statements were

18 taken, correct?

19       MR. SAHASRABUDHE:   Form.

20       BY MR. BRUSTIN:

21       Q.    That's what the words of this report

22 say, correct?

23       MR. SAHASRABUDHE:   Form.

24       THE WITNESS:   That's what the words say,

25 yes.

