```
 1          BY MR. BRUSTIN:
 2          Q.    Okay.  You're saying it may mean
 3   something else, but that's what the words say,
 4   correct?
 5          A.    I'm saying I believe he was talked to
 6   during the night on the telephone.
 7          Q.    Well, how would you know that if you
 8   had no involvement with it?
 9          A.    Because I was in the homicide office.
10          Q.    Oh.  So you remember -- you -- you
11   actually remember --
12          A.    No.  He may have been.
13          Q.    Okay.
14          A.    I'm not a hundred percent certain.
15          Q.    You have no memory of it whatsoever.
16   You just think that may have happened, correct?
17          MR. SAHASRABUDHE:  Form.
18          THE WITNESS:  Yes.
19          BY MR. BRUSTIN:
20          Q.    All right.  But this report indicates
21   that he wasn't contacted until after the statements
22   were taken, correct?
23          A.    This report indicates he came in the
24   homicide office after it was taken.
25          Q.    No, it says:  Continuing the above
```



1    investigation, your writer did notify ADA Chris

2    Belling at 300 hours this date.  He was brought up

3    to date about recent developments in the case.  ADA

4    Belling told the writer he would respond to the

5    homicide office.  He arrived and read both

6    statements.

7         A.    At 3 a.m., correct.

8         Q.    Okay.  So that's after the statements

9    were taken, correct?

10        A.    That I don't -- after what statements?

11   Which statement?

12        Q.    Well, first of all, take a look at

13   page 196.

14        A.    196.

15        Q.    No time for the statement when -- no

16   time as to when the statement was taken.

17        A.    Okay.

18        Q.    Any problem with that?

19        A.    No.

20        Q.    No -- no time when the statement was

21   ended.  Any problem with that?

22        A.    No.

23        Q.    All right.  You did understand, though,

24   that Leonard Scott and Lamarr -- you -- you

25   understood that Leonard Brown and -- and Lamarr



 1  Scott were being interviewed at approximately the

 2  same time, correct?

 3          MR. SAHASRABUDHE:  Form.

 4          THE WITNESS:  Yes.

 5          BY MR. BRUSTIN:

 6          Q.   Take a look at page 58.  Sorry, 158.  I

 7  apologize.

 8          A.   All right.

 9          Q.   This is the interview of Leonard Brown

10  that you say was happening at about the same time

11  as the interview with Lamarr Scott, correct?

12          A.   Yes.

13          Q.   Before 3 a.m., correct?

14          A.   Yes.

15          Q.   Indicating that Lamarr Scott and

16  Leonard Brown were interviewed prior to

17  Detective -- ADA Belling being contacted, correct?

18          MR. SAHASRABUDHE:  Form.

19          THE WITNESS:  Yes.

20          BY MR. BRUSTIN:

21          Q.   All right.  Let's go back to -- by the

22  way, based on going through this and potentially

23  refreshing your memory, do you have any further

24  recollection of anything that any officer or

25  Assistant District Attorney did to disprove Lamarr



```
 1   Scott's confession?

 2          MR. BLENK:  Form.

 3          MR. SAHASRABUDHE:  Form.

 4          THE WITNESS:  I know Belling was very active

 5   in Lamarr Scott's confession.

 6          BY MR. BRUSTIN:

 7          Q.    How do you know that?

 8          A.    Pardon?  He was in the homicide

 9   office --

10          Q.    How do you know that?

11          A.    -- and they were consulting him after

12   the interview on TV, and what steps he -- he may

13   have taken, I -- I wouldn't know.

14          Q.    All right.  Do you remember ever seeing

15   Belling in the homicide office concerning Lamarr

16   Scott other than the night he confessed?

17          A.    Other than the night?  No.

18          Q.    All right.  So your understanding was

19   that the investigation which disproved that Lamarr

20   Scott was the shooter took place that night.

21          A.    As far as I know.

22          MR. SAHASRABUDHE:  Form.

23          BY MR. BRUSTIN:

24          Q.    And it was determined that night that

25   Lamarr Scott was, in fact, not the shooter,
```



 1   correct?

 2          MR. SAHASRABUDHE:  Form.

 3          BY MR. BRUSTIN:

 4          Q.   That's your understanding.

 5          A.   My understanding.

 6          Q.   And that's good enough for you.

 7          A.   Of course.

 8          Q.   You believe it.

 9          A.   Yes.

10          Q.   And you have no idea what was done that

11   night to determine that Lamarr Scott wasn't the

12   shooter, correct?

13          MR. SAHASRABUDHE:  Form.

14          THE WITNESS:  Correct.

15          BY MR. BRUSTIN:

16          Q.   And by the way, I -- I asked you a

17   little bit about this, but I want to get a little

18   more specific.

19          You've taken many confessions in your life,

20   correct?

21          A.   Yes.

22          Q.   And you've told us that the only false

23   confession -- in other words, confession from

24   someone who didn't actually commit the crime -- was

25   Lamarr Scott, correct?



```
 1          MR. SAHASRABUDHE:  Form.

 2          BY MR. BRUSTIN:

 3          Q.    That you're aware of.

 4          A.    And Ortiz.  Mr. Ortiz.

 5          Q.    Mr. Ortiz.  Okay.  But you told us you

 6     think Ortiz actually committed the crime, remember?

 7          A.    Yes, I do remember.

 8          Q.    So then it was not a false confession

 9     if he had committed the crime, right?

10          A.    Well, according to me, yes.

11          Q.    Okay.  So in any case, putting aside

12     Ortiz for now --

13          A.    Okay.

14          Q.    -- Lamarr Scott's the only time,

15     correct?

16          A.    Yes.

17          Q.    All right.  And you've taken many other

18     confessions where people confessed to crimes and

19     they were prosecuted, correct?

20          A.    Oh, yes.

21          Q.    Now, would it be fair to say that in

22     many, if not most of those confessions, the

23     confessor did not tell the truth about all the

24     circumstances of the crime?

25          A.    Correct.
```

1            MR. SAHASRABUDHE:  Form.

2            BY MR. BRUSTIN:

3            Q.   Routinely, for example, a suspect might

4    admit to committing a crime and then -- withdrawn.

5            Routinely, a suspect might -- might admit to

6    committing a shooting but lie about circumstances

7    around the shooting --

8            MR. BLENK:  Form.

9            BY MR. BRUSTIN:

10           Q.   -- correct?

11           MR. SAHASRABUDHE:  Form.

12           THE WITNESS:  Yes.

13           BY MR. BRUSTIN:

14           Q.   For example, where they got the gun.

15           MR. SAHASRABUDHE:  Form.

16           THE WITNESS:  It's possible.

17           BY MR. BRUSTIN:

18           Q.   Routinely happens, correct?

19           MR. SAHASRABUDHE:  Form.

20           MR. BLENK:  Form.

21           THE WITNESS:  It happens.

22           BY MR. BRUSTIN:

23           Q.   It doesn't make you question whether or

24    not, when someone comes in and confesses to being

25    the shooter -- whether or not they were, in fact,



```
 1  the shooter just because they give you

 2  information -- other information that may not be

 3  true, correct?

 4          MR. SAHASRABUDHE:  Form.

 5          MR. BLENK:  Form.

 6          THE WITNESS:  At that point, correct.

 7          BY MR. BRUSTIN:

 8          Q.   That's a common -- frankly, with

 9  witnesses in Buffalo, with suspects in Buffalo,

10  Detective Stambach told us yesterday it was his

11  experience that routinely, people didn't tell the

12  full truth when being interviewed.

13          Do you agree with that?

14          MR. BLENK:  Form.

15          MR. SAHASRABUDHE:  Form.

16          THE WITNESS:  It happens, yes.

17          BY MR. BRUSTIN:

18          Q.   And one of the reasons he told us was

19  because it was his understanding that people in

20  Buffalo, particularly people -- people in

21  communities of color, had trust issues with the

22  police.  Do you agree with that?

23          MR. BLENK:  Form.

24          MR. SAHASRABUDHE:  Form.

25          THE WITNESS:  They just don't want to get
```



1  involved, is -- is what I've always run into.

2        BY MR. BRUSTIN:

3        Q.   Okay.  So your -- your experience was

4  that people of color just didn't want to get

5  involved, not that they didn't -- not that they

6  didn't trust the police.

7        A.   They may --

8        MR. SAHASRABUDHE:  Form.

9        THE WITNESS:  I don't know how they feel

10 about the police, but I know many, many times,

11 there was numerous people who were there, and not

12 one person would cooperate with us.

13       BY MR. BRUSTIN:

14       Q.   All right.  But in your 40 years on the

15 force, you never came to believe that there might

16 be some trust issues between the communities of

17 color and the police.

18       MR. SAHASRABUDHE:  Form.

19       MR. BLENK:  Form.

20       THE WITNESS:  Of course there was.

21       BY MR. BRUSTIN:

22       Q.   Of course there was, right?

23       A.   That's what I just said.

24       Q.   Yes.  And so you knew that, right?

25       A.   Yes.



1          Q.   And you knew that was one of the

2     reasons why sometimes witnesses weren't completely

3     candid with the police, correct?

4          A.   I guess.

5          Q.   And in any case, for a variety of

6     reasons, when someone -- when someone confessed to

7     a crime to you, the fact that some of the details

8     may have been false did not cause you to question

9     whether they committed the crime, correct?

10         MR. SAHASRABUDHE:  Form.

11         MR. BLENK:  Form.

12         THE WITNESS:  Repeat that again.

13         BY MR. BRUSTIN:

14         Q.   Sure.  You've told us that routinely,

15    when -- when people confessed to crimes to you --

16         A.   Yes.

17         Q.   -- they often misrepresented certain

18    facts in connection with the crime, correct?

19         A.   Okay.

20         Q.   You agree, right?

21         A.   Yes.

22         Q.   That didn't cause you to question

23    whether or not they actually committed the crime,

24    correct?

25         MR. BLENK:  Form.



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  Correct.

3          BY MR. BRUSTIN:

4          Q.   And in your experience, that didn't --

5     that didn't cause Assistant District Attorneys to

6     question whether they committed the crime.

7          A.   Repeat that?

8          Q.   In your experience working with

9     Assistant District Attorneys on homicide cases, the

10    fact that a suspect confessing to a crime might

11    misrepresent certain facts didn't cause the

12    Assistant District Attorneys to conclude that they

13    didn't commit the crime, correct?

14         MR. SAHASRABUDHE:  Form.

15         THE WITNESS:  Correct.

16         MR. BLENK:  Form.

17         BY MR. BRUSTIN:

18         Q.   All right.  I want to ask you some

19    questions about the Ortiz case.

20         Who was the lead investigator in the Ortiz

21    case, if there was one?

22         A.   It may have been Stambach, but I'm not

23    certain.

24         Q.   Okay.

25         MR. SAHASRABUDHE:  Don't -- don't guess or



```
 1  speculate.  If you don't know, just say --
 2         THE WITNESS:  I don't recall.  I don't
 3  recall.
 4         BY MR. BRUSTIN:
 5         Q.   All right.  But you do remember that
 6  investigation.
 7         A.   Parts of it, yes.
 8         Q.   And you did your best to refresh your
 9  recollection about that investigation prior to
10  testifying at the recent civil rights trial,
11  correct?
12         A.   Correct.
13         Q.   Now, you understand that in this case,
14  we are alleging, alleging, that you engaged in
15  misconduct, including knowing that Detective
16  Vickerd misrepresented in his report that -- that
17  John Sullivan volunteered the name Valentino Dixon.
18         You understand that's our allegation,
19  correct?
20         MR. SAHASRABUDHE:  Form.
21         THE WITNESS:  That's an allegation.
22         BY MR. BRUSTIN:
23         Q.   Yes.
24         A.   I understand that.
25         Q.   Okay.  And you also understand that in
```



1  the Ortiz case, the allegation was that -- was that

2  Detective Stambach misrepresented in his report the

3  information that Ortiz volunteered -- volunteered

4  nonpublic facts when, in fact, Stambach provided

5  them to him, correct?

6          MR. SAHASRABUDHE:  Form.

7          THE WITNESS:  That's an allegation.

8          BY MR. BRUSTIN:

9          Q.   That's the -- that was the allegation

10  that the jury actually found true, right?

11          MR. SAHASRABUDHE:  Form.

12          THE WITNESS:  Yes.

13          BY MR. BRUSTIN:

14          Q.   Okay.  You would agree that -- that

15  those are the same allegations.

16          In other words, that -- that Vickerd --

17  Vickerd misrepresented what Sullivan told him; that

18  Stambach misrepresented what Ortiz told him,

19  correct?

20          MR. BLENK:  Form.

21          MR. SAHASRABUDHE:  Form.

22          THE WITNESS:  Well, one was a suspect, and

23  one was a witness, so it's different.

24          BY MR. BRUSTIN:

25          Q.   Is fabricating evidence different if



```
 1  it's a suspect or a witness?
 2         MR. SAHASRABUDHE:  Form.
 3         THE WITNESS:  I didn't say they fabricated
 4  evidence.  You did.
 5         BY MR. BRUSTIN:
 6         Q.   Okay.  Well, and -- and the jury found
 7  that he did, correct?
 8         MR. SAHASRABUDHE:  Form.
 9         THE WITNESS:  In one case.
10         BY MR. BRUSTIN:
11         Q.   In one case.  So far.
12         MR. SAHASRABUDHE:  Form.
13         THE WITNESS:  In one case.
14         BY MR. BRUSTIN:
15         Q.   Now, by that time, the time of the
16  Ortiz investigation in 2000 and -- what is it?
17         MR. ROMO:  2004.
18         BY MR. BRUSTIN:
19         Q.   In 2004.  By that time you were
20  actually Stambach's supervisor, correct?
21         A.   I believe so.
22         Q.   In other words, one of your jobs at
23  that time was to ensure that officers that you
24  supervised, like Stambach, were not engaging in
25  misconduct, correct?
```



```
 1          MR. SAHASRABUDHE:  Form.
 2          THE WITNESS:  Correct.
 3          BY MR. BRUSTIN:
 4          Q.   That they were following the rules and
 5     regulations of the department.
 6          A.   Yes.
 7          MR. SAHASRABUDHE:  Form.
 8          BY MR. BRUSTIN:
 9          Q.   That was one of your primary jobs,
10     right?
11          MR. SAHASRABUDHE:  Form.
12          THE WITNESS:  That was one of my jobs.
13          BY MR. BRUSTIN:
14          Q.   Okay.  Was it an important part of your
15     job to make sure the detectives in your chain of
16     command weren't fabricating evidence?
17          A.   Of course.
18          Q.   Now, you participated in an interview
19     with Mr. Ortiz on November 15th, 2004, in the psych
20     unit of a Buffalo hospital, correct?
21          A.   Yes.
22          Q.   And you were there with -- you
23     understand -- you understood then that the reason
24     that -- withdrawn.
25          You -- you interviewed Ortiz with Detective
```



1  Vaughn, Lima, and also Torres, correct?

2          MR. SAHASRABUDHE:  Form.

3          THE WITNESS:  Yes.

4          BY MR. BRUSTIN:

5          Q.   And you understood that -- you knew

6  Detective Lauber at that time, correct?

7          A.   Yes.

8          Q.   Did you supervise Lauber?

9          A.   I don't know if he was a member of my

10  crew or not, to be honest with you.

11          Q.   All right.  But you understand that the

12  reason that Ortiz was in a psychiatric unit on

13  November 15th was because Detective Lauber had

14  called an ambulance to bring him there, correct?

15          MR. SAHASRABUDHE:  Form.

16          THE WITNESS:  Yes.

17          BY MR. BRUSTIN:

18          Q.   Because he was -- he was exhibiting

19  psychiatric issues, correct?

20          A.   Apparent --

21          MR. SAHASRABUDHE:  Form.

22          THE WITNESS:  Yes, apparently.

23          BY MR. BRUSTIN:

24          Q.   And you knew that -- you knew that on

25  November 15th, correct?



```
 1              MR. SAHASRABUDHE:  Form.

 2              THE WITNESS:  Yes.

 3              BY MR. BRUSTIN:

 4              Q.   Now, Detective Torres -- withdrawn.

 5              Officer Torres testified in the Huntley

 6      hearing in the --

 7              (Discussion off the record.)

 8              BY MR. BRUSTIN:

 9              Q.   Detective -- Officer Torres testified

10      in the Huntley hearing in Ortiz that he believed

11      that Stambach was present at the hospital on

12      November 15th and that's why he didn't talk to him

13      about that interview on the 16th when he saw him.

14              Do you recall Detective Stambach being

15      present at the hospital on the 15th?

16              A.   I do not.

17              Q.   Now, would it be fair to say that you

18      can't say one way or another whether he was there?

19      You just don't recall it today?

20              MR. SAHASRABUDHE:  Form.

21              THE WITNESS:  He wasn't there.

22              BY MR. BRUSTIN:

23              Q.   You're sure of that.

24              A.   Yes.

25              Q.   So Officer Torres was either mistaken
```



```
 1   or lying.

 2          MR. SAHASRABUDHE:  Form.

 3          THE WITNESS:  Mistaken.

 4          MR. SAHASRABUDHE:  He said, "I believe."

 5          BY MR. BRUSTIN:

 6          Q.   So is it -- is it your testimony that

 7   when an officer -- an officer states a fact that's

 8   not true, that's a mistake, but when a witness or a

 9   suspect states a fact that's not true, that's

10   lying?

11          MR. SAHASRABUDHE:  Form.

12          THE WITNESS:  I would say everybody at times

13   makes mistakes when they speak.  It doesn't mean

14   that they were lying.

15          BY MR. BRUSTIN:

16          Q.   Okay.  Now -- now, based on the

17   interaction that you had with Mr. Ortiz at the

18   hospital on November 15th, you would agree it was

19   clear that not only was he not a suspect after that

20   interview, it was your opinion and the opinion of

21   the other detectives that he had no reliable

22   information about the crime, correct?

23          A.   Correct.

24          MR. SAHASRABUDHE:  Form.

25          BY MR. BRUSTIN:
```

1          Q.   And it was clear, although you're not a

2    psychiatrist or a mental health professional, that

3    he was in some type of psychiatic distress, fair

4    to say?

5          MR. SAHASRABUDHE:   Form.

6          THE WITNESS:   I don't know if he was or not.

7          BY MR. BRUSTIN:

8          Q.   He didn't seem all there, fair to say?

9          MR. SAHASRABUDHE:   Form.

10         THE WITNESS:   What's all there mean?

11         BY MR. BRUSTIN:

12         Q.   Did it -- did he -- you've -- you've

13   dealt with a lot of emotionally disturbed persons,

14   correct?

15         A.   Yes.

16         Q.   Did he -- would it be fair to say that

17   he appeared to be somebody who might be exhibiting

18   symptoms of being emotionally disturbed?

19         MR. SAHASRABUDHE:   Form.

20         THE WITNESS:   I guess you could say that.

21         BY MR. BRUSTIN:

22         Q.   So by the time that Detective Stambach

23   was interviewing Ortiz on the 16th, you knew that

24   Ortiz had been, on the 15th, in a psychiatric unit

25   of a hospital, correct?



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   You knew that he was brought there by

5     ambulance, correct?

6          MR. SAHASRABUDHE:  Form.

7          THE WITNESS:  Yes.

8          BY MR. BRUSTIN:

9          Q.   At the direction of one of your

10    detectives.

11         MR. SAHASRABUDHE:  Form.

12         THE WITNESS:  Correct.

13         BY MR. BRUSTIN:

14         Q.   And you knew that he was exhibiting

15    symptoms that at least could be suggestive of being

16    emotionally disturbed.

17         MR. SAHASRABUDHE:  Form.

18         THE WITNESS:  Correct.

19         BY MR. BRUSTIN:

20         Q.   And obviously, that would be critically

21    important information to provide to Detective

22    Stambach prior to his interviewing this witness

23    again in the homicide unit, correct?

24         MR. SAHASRABUDHE:  Form.

25         THE WITNESS:  Correct.



1          BY MR. BRUSTIN:

2          Q.    And you testified at the Huntley -- you

3    testified at the trial that you firmly believed

4    that that's information -- withdrawn.  Fair to say

5    there's no question in your mind -- withdrawn

6    again.

7          It's also clear that you were at -- you were

8    in the homicide office, that -- that -- that small,

9    open office, at 7:15 when Mr. Ortiz was brought in,

10   correct?

11         A.    Yes.

12         Q.    And there's no question that you were

13   aware that he was being brought in allegedly to

14   provide information about the Niagara Street

15   homicides, correct?

16         A.    Yes.  He was confessing.

17         Q.    And you knew at that time that just the

18   day before, he had provided you what you believed

19   to be unreliable information, correct?

20         MR. SAHASRABUDHE:  Form.

21         THE WITNESS:  Correct.

22         BY MR. BRUSTIN:

23         Q.    And obviously, the first thing you

24   would have done, when you learned that he was

25   coming in and that Stambach was meeting with him,



```
 1   would be to provide that information about what you

 2   knew of this witness to Stambach, correct?

 3        A.   Yes.

 4        MR. SAHASRABUDHE:  Form.

 5        BY MR. BRUSTIN:

 6        Q.   There's no doubt in your mind that you

 7   spoke to Stambach before he interviewed this

 8   witness and -- and told him what you knew, correct?

 9        MR. SAHASRABUDHE:  Form.

10        THE WITNESS:  I don't recall what I told

11   Stambach.

12        BY MR. BRUSTIN:

13        Q.   Well, based on -- based on how you

14   operated and the circumstances as you know them,

15   there is no question you would have made it your

16   business to make sure Stambach was informed of what

17   you knew about Ortiz, correct?

18        MR. SAHASRABUDHE:  Form.

19        THE WITNESS:  That I saw him at the

20   hospital?  Yes.

21        BY MR. BRUSTIN:

22        Q.   In a psych unit and that he gave you

23   unreliable information the day before, correct?

24        MR. SAHASRABUDHE:  Form.

25        THE WITNESS:  I don't think he gave us any
```

```
 1   information.
 2          BY MR. BRUSTIN:
 3          Q.   There's a P73.  Do you want to see it?
 4          A.   Yes.  I don't recall what the
 5   information was.
 6          MR. BRUSTIN:  What number are we on, please?
 7          (Discussion off the record.)
 8   The following was marked for Identification:
 9    PLF. EXH. 16        P73 report, one page
10          MR. BLENK:  Do you have one for me?  Thank
11   you.
12          BY MR. BRUSTIN:
13          Q.   This is the P73 that was created by
14   Detective Vaughn, correct?
15          A.   Yes.
16          Q.   Indicates he was in the psychiatric
17   services at the -- at the hospital, correct?
18          A.   Yes.
19          MR. SAHASRABUDHE:  Who?
20          MR. BRUSTIN:  Ortiz.
21          MR. SAHASRABUDHE:  Ortiz.  Thank you.
22          THE WITNESS:  Yes.
23          BY MR. BRUSTIN:
24          Q.   And obviously, you would have, at a
25   minimum, made sure that he had the information
```



1  complained in this -- contained in this P73,

2  correct?

3         A.   Yes.

4         MR. SAHASRABUDHE:  Form.  Who?

5         BY MR. BRUSTIN:

6         Q.   You would have made sure that before

7  Stambach interviewed this person who you had ruled

8  out as a suspect the night before -- you would have

9  ensured he had this information before he

10  interviewed him, correct?

11        A.   Yes.

12        MR. SAHASRABUDHE:  Form.

13        BY MR. BRUSTIN:

14        Q.   Okay.  You can give it back.  Thanks.

15        One of the things that Ortiz was telling you

16  when you were in the hospital was that he believed

17  there were people trying to kill him, correct?

18        MR. SAHASRABUDHE:  Form.

19        THE WITNESS:  Yes.

20        BY MR. BRUSTIN:

21        Q.   And that's a common thing that you hear

22  from people who are suffering from mental illness,

23  correct?

24        MR. SAHASRABUDHE:  Form.  Also, this -- how

25  is this 404(b)?  In what way does this relate to



1   404(b) evidence?

2         MR. BRUSTIN:  Well, I -- give me a little

3   leeway.

4         MR. SAHASRABUDHE:  I've -- I've given you

5   enough leeway.

6         MR. BRUSTIN:  Sure.  All right.  I'll --

7   I'll move on.

8         BY MR. BRUSTIN:

9         Q.    You testified at the Huntley hearing

10  that you met with Mr. Ortiz for about 30 minutes.

11  Does that sound about right?

12        A.    Yes.

13        Q.    And that he appeared to be very

14  frightened.

15        A.    Yes.

16        Q.    And you also testified at the trial

17  just a couple of weeks ago that after speaking with

18  Mr. Ortiz on the 15th, you dismissed the idea that

19  he had any credible information on the murders,

20  correct?

21        MR. SAHASRABUDHE:  Form.

22        THE WITNESS:  Yes.

23        BY MR. BRUSTIN:

24        Q.    And that's true, right?

25        A.    Yes.



1    Q.   In other words, he was not a suspect or

2    even a credible witness at the time that he left

3    the hospital, correct?

4    A.   Yes.

5    Q.   And that's the -- withdrawn.

6    Now, you've already told us you were -- you

7    were Detective Stambach's supervisor at the time he

8    interviewed Ortiz, correct?

9    A.   I believe so.

10   Q.   And it was clear that when Ortiz came

11   in, he was allegedly coming in to confess to the

12   homicide, correct?

13   A.   Correct.

14   Q.   And you've already told us that you

15   would have informed Detective Stambach about what

16   you learned at the hospital, correct?

17   A.   Yes.

18   MR. SAHASRABUDHE:   Form.

19   BY MR. BRUSTIN:

20   Q.   And obviously, as you've already told

21   us, one of the most basic things for Detective

22   Stambach to do, before interviewing a suspect who

23   is coming in to allegedly confess to a crime, would

24   be to review the file, correct?

25   MR. SAHASRABUDHE:   Form.



```
 1           MR. BLENK:  Form.

 2           THE WITNESS:  Correct.

 3           BY MR. BRUSTIN:

 4           Q.   For a whole variety of reasons.  One

 5    reason is you would want to make sure that you --

 6    you -- that you learn, as -- as -- as you

 7    described, about any prior interaction with this

 8    witness, right?

 9           MR. SAHASRABUDHE:  Form.

10           THE WITNESS:  Yes.

11           BY MR. BRUSTIN:

12           Q.   Another reason would be you'd want to

13    know whether or not what this witness was telling

14    you matched up or was -- or disputed other evidence

15    in the case, correct?

16           A.   Correct.

17           MR. SAHASRABUDHE:  Form.

18           BY MR. BRUSTIN:

19           Q.   For all of those reasons, it would be

20    critically important to review the file before you

21    interviewed this witness, correct?

22           MR. SAHASRABUDHE:  Form.

23           THE WITNESS:  If -- if you weren't up to

24    date, yes, on the file.

25           BY MR. BRUSTIN:
```



1       Q.  Now, at the time that Detective

2  Stambach interviewed -- you understand -- you --

3  and you knew at the time that Detective Stambach

4  interviewed Mr. Ortiz from a -- from -- withdrawn.

5       You understand -- and you understood at the

6  time -- that Detective Stambach was alone with

7  Mr. Ortiz in the supervisor's office between 7:15

8  and 8 p.m., correct?

9       MR. SAHASRABUDHE:  Form.

10      THE WITNESS:  I don't recall the times.

11      BY MR. BRUSTIN:

12      Q.  Well, if that's what -- if -- if --

13  certainly if that's what -- if -- you don't dispute

14  that, fair to say?

15      MR. SAHASRABUDHE:  Form.

16      MR. BRUSTIN:  I'll withdraw the question.

17      BY MR. BRUSTIN:

18      Q.  You understood that Detective Stambach

19  was alone in the supervisor's office with Ortiz for

20  a period of time before the sworn statement was

21  taken, correct?

22      A.  Correct.

23      Q.  And you understood -- and nobody was

24  monitoring that interview, correct?

25      A.  Correct.



1      Q.    He was alone.

2      A.    Correct.

3            MR. SAHASRABUDHE:   Form.

4      BY MR. BRUSTIN:

5      Q.    And by the way, at the time, there was

6   an -- there was actually an interview room that was

7   open that had a two-way mirror, correct?

8            MR. SAHASRABUDHE:   Form.

9            THE WITNESS:   There is such a room; however,

10  I don't know if it was open at that time or not.

11           BY MR. BRUSTIN:

12     Q.    Well, we know that Osario was

13  interviewed -- withdrawn.

14           Any reason to believe there was somebody in

15  that interview room?

16           MR. SAHASRABUDHE:   Form.

17           THE WITNESS:   Could very well have been.

18           BY MR. BRUSTIN:

19     Q.    All right.   Now, you -- you learned

20  sometime around 8 p.m. that Ortiz had allegedly

21  given Detective Stambach a full confession,

22  correct?

23           MR. SAHASRABUDHE:   Form.

24           THE WITNESS:   I knew he had given a

25  confession.   I don't recall the time.



```
 1          BY MR. BRUSTIN:

 2          Q.   All right.  And then you were -- you

 3     were a -- at least on the report, a witness to his

 4     sworn statement, correct?

 5          A.   I don't believe so.

 6          Q.   Did you -- did you --

 7          A.   Oh, the -- the typewritten sworn

 8     statement?

 9          Q.   Yes, sir.

10          A.   Yes.

11          Q.   Okay.  And my understanding is that you

12     weren't -- you weren't present for the entire

13     statement, or you were standing in the doorway; is

14     that accurate?

15          MR. SAHASRABUDHE:  Form.

16          THE WITNESS:  I would have been in the other

17     room.  I -- I wouldn't stand in the doorway.  I

18     would have made sure the door was closed.

19          BY MR. BRUSTIN:

20          Q.   All right.  So you weren't actually

21     observing all of that interview, or you were?

22          MR. SAHASRABUDHE:  Form.

23          THE WITNESS:  I don't believe I was.

24          BY MR. BRUSTIN:

25          Q.   All right.  In any case, you came to
```



1  learn that night that the person who gave you no

2  credible information whatsoever the night before

3  from the psychiatric unit had allegedly confessed

4  with nonpublic information to the crime to

5  Stambach, correct?

6        MR. SAHASRABUDHE:  Form.

7        THE WITNESS:  Yes.

8        BY MR. BRUSTIN:

9        Q.   And let's -- and obviously, given those

10  circumstances, it was important to investigate

11  whether or not that confession was, in fact,

12  reliable, correct?

13        MR. SAHASRABUDHE:  Form.

14        THE WITNESS:  I already knew it was

15  reliable.

16        BY MR. BRUSTIN:

17        Q.   And I think I know how.  The reason you

18  knew it was reliable was because, despite

19  everything else, every -- every other fact you

20  knew, including where he was the day before --

21  withdrawn.

22        The reason you knew it was reliable was

23  because Stambach told you that he volunteered

24  nonpublic information that only the perpetrator

25  could have known, correct?



```
 1              MR. SAHASRABUDHE:  Form.

 2              THE WITNESS:  Correct.

 3              BY MR. BRUSTIN:

 4         Q.    And you believed Detective Stambach.

 5         A.    Yes, I did.

 6         Q.    You never questioned that statement

 7    from Detective Stambach.

 8         A.    No.

 9         Q.    You never investigated that statement

10    from Detective Stambach.

11              MR. SAHASRABUDHE:  Form.

12              THE WITNESS:  No.

13              BY MR. BRUSTIN:

14         Q.    You never took any steps to ensure that

15    that confession was investigated to determine if it

16    was reliable otherwise --

17              MR. SAHASRABUDHE:  Form.

18              BY MR. BRUSTIN:

19         Q.    -- correct?

20         A.    I believed it was reliable.

21         Q.    Sir, you -- for that reason, you never

22    took any steps to ensure that that confession was

23    further investigated, correct?

24              MR. SAHASRABUDHE:  Form.

25              THE WITNESS:  I don't know that there was
```



1   any steps that could be taken.  A man comes in and

2   confesses, tells us several things that nobody else

3   would know.  I don't know what further steps we

4   would take.

5          BY MR. BRUSTIN:

6          Q.   All right.  So let's start a step at a

7   time.  First of all, you didn't -- you didn't

8   direct that any further steps be taken, correct?

9          A.   Correct.

10         MR. SAHASRABUDHE:  Form.

11         BY MR. BRUSTIN:

12         Q.   And you had authority to do that,

13  correct?  You were a supervisor.

14         A.   If I felt the need, yes.

15         Q.   You had authority to do it yourself or

16  to direct Stambach to do it, correct?

17         A.   Yes.

18         Q.   And you chose not to.

19         MR. SAHASRABUDHE:  Form.

20         THE WITNESS:  There were no steps at that

21  point that I thought should be taken.

22         BY MR. BRUSTIN:

23         Q.   Okay.  Now, at the same time that

24  Detective Stambach was taking a statement --

25  withdrawn.



1       At the time, November 16th, you were fully

2   familiar with the facts and circumstances of the

3   Niagara Street murders, correct?

4       MR. SAHASRABUDHE:  Form.

5       THE WITNESS:  Correct.

6       BY MR. BRUSTIN:

7       Q.   You were quite involved in that

8   investigation.

9       A.   Initially, yes.

10      Q.   And -- and on November 16th, you were

11  quite involved.

12      A.   I was in the office, yes.

13      Q.   You'd interviewed Ortiz the day before,

14  right?

15      A.   On the 15th.

16      Q.   The 15th.

17      A.   Okay.  Yes.

18      Q.   So you were still involved in that

19  investigation.

20      A.   Yes.

21      Q.   It was fresh in your mind, the things

22  that were happening, correct?

23      A.   I would say.

24      Q.   And you understand that another witness

25  was being interviewed in the homicide office,



1    that -- that small, open office, concerning his

2    knowledge of the Niagara Street murders at the same

3    time that Ortiz was giving his sworn statement,

4    correct?

5         A.   Yes.

6         MR. SAHASRABUDHE:   Form.

7         BY MR. BRUSTIN:

8         Q.   And that witness was named Osario.

9         MR. SAHASRABUDHE:   Form.   Are -- I'm -- I'm

10   giving you leeway, but, I mean, this is -- we're

11   running pretty far afield here.

12        MR. BRUSTIN:   We're not.   Now -- now we're

13   not.

14        BY MR. BRUSTIN:

15        Q.   Now, Osario -- you knew Osario as a

16   witness who had come in previously, correct?

17        MR. SAHASRABUDHE:   Form.

18        THE WITNESS:   I don't recall that.

19        BY MR. BRUSTIN:

20        Q.   But you do recall that on

21   November 16th, Osario was being interviewed in --

22   in the homicide office about three people that he

23   saw running from the scene of the homicide,

24   correct?

25        MR. SAHASRABUDHE:   Form.



1         THE WITNESS:  There was a witness being

2    interviewed at that time; however, I don't recall

3    the witness's name.

4         BY MR. BRUSTIN:

5         Q.   Okay.  I will represent to you that

6    it's Osario.  Do you have any reason to dispute

7    that?

8         A.   No.

9         Q.   Okay.  And according to reports and

10   testimony, Osario reported that around the time of

11   the crime, he saw three suspects -- withdrawn.

12        Osario reported that around the time of the

13   crime, he saw three men running from the crime

14   scene.  Do you recall that?

15        A.   Yes.

16        Q.   And at that time you believed that

17   there might well be three perpetrators, correct?

18        A.   That's correct.

19        Q.   So it was -- it -- it stood to reason

20   that Osario might be describing the actual

21   perpetrators of the crime, correct?

22        MR. SAHASRABUDHE:  Form.

23        THE WITNESS:  Correct.

24        BY MR. BRUSTIN:

25        Q.   And you understand that -- that Osario



1    described the perpetrators as all being five seven

2    or shorter, correct?

3          MR. SAHASRABUDHE:  Form.

4          THE WITNESS:  I don't recall the description

5    he gave.

6          BY MR. BRUSTIN:

7          Q.   Any reason to dispute that?

8          MR. SAHASRABUDHE:  Form.

9          THE WITNESS:  I just don't know.  I don't

10   know what he --

11         BY MR. BRUSTIN:

12         Q.   Do you remember that -- you -- you

13   remember -- you remember Mr. Ortiz, correct?

14         A.   Yes.

15         Q.   He was an enormous man, fair to say?

16         MR. SAHASRABUDHE:  Form.

17         THE WITNESS:  He was a big man, yes.

18         BY MR. BRUSTIN:

19         Q.   He was probably -- he -- he -- he was

20   clearly over six foot six inches tall, correct?

21         MR. SAHASRABUDHE:  Form.

22         THE WITNESS:  I guess, correct.

23         BY MR. BRUSTIN:

24         Q.   He would be the opposite of five seven,

25   right?



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  To be honest with you, I never

3   put any faith in witnesses' height descriptions

4   on --

5          BY MR. BRUSTIN:

6          Q.   Even -- even a witness who described

7   suspects as five seven or shorter as compared to

8   six foot six?

9          A.   Well, they're jumping off a porch;

10   they're running; they could be hunched.

11          I don't put much credibility in witnesses'

12   heights.

13          Q.   In -- in any case, you would have been

14   far more -- at the -- at the time on November 16th,

15   as the supervisor involved in the Niagara Street

16   murders, you would have been much -- you would

17   have -- you would have been paying close attention

18   to what witnesses were reporting in the homicide

19   office that night, correct?

20          MR. SAHASRABUDHE:  Form.

21          THE WITNESS:  The night of the murder?

22          BY MR. BRUSTIN:

23          Q.   Yes, sir.

24          A.   Yes.

25          Q.   No, the night of the 16th,



 1  November 16th, when there were witnesses in the

 2  homicide office about the murder.

 3          MR. SAHASRABUDHE:  Form.

 4          THE WITNESS:  When they were done, I'm sure

 5  I would have read any reports.

 6          BY MR. BRUSTIN:

 7          Q.   All right.  So you would have known at

 8  the time what description Osario gave of the

 9  potential perpetrators, correct?

10          A.   Correct.

11          Q.   And you would have known exactly

12  whether or not that description matched Ortiz,

13  correct?

14          MR. SAHASRABUDHE:  Form.

15          THE WITNESS:  Yes.

16          BY MR. BRUSTIN:

17          Q.   Do you remember connecting in your mind

18  at that time the fact that what Osario was

19  describing he was nothing like what Ortiz looked

20  like?

21          MR. SAHASRABUDHE:  Form.

22          THE WITNESS:  Again, I wouldn't make that

23  connection, because I never, ever put any faith in

24  witnesses' height description.

25          BY MR. BRUSTIN:



1         Q.    Okay.

2         A.    There's too much going on.  They're

3   slouched; they're jumping off the porch; maybe

4   they're dropping guns.  I don't know.

5         Q.    All right.

6         A.    I never put any faith in heights.

7         Q.    You put more faith in identification

8   procedures, fair to say?

9         A.    Yes.

10        MR. SAHASRABUDHE:  Form.

11        BY MR. BRUSTIN:

12        Q.    And so one of the things you had

13  authority to do on November 16th would be to have

14  shown a photo array to Mr. Osario which included

15  Mr. Ortiz, correct?

16        MR. SAHASRABUDHE:  Form.

17        THE WITNESS:  Yes.

18        BY MR. BRUSTIN:

19        Q.    Why did you decide not to do that?

20        A.    We were waiting to consult with the

21  District Attorney's office.

22        Q.    So did you -- did you consult with the

23  District Attorney's office about whether or not

24  Osario should have a -- should be involved in an

25  identification procedure?



```
 1          A.   I'm sure we did.

 2          Q.   You don't remember one way or another

 3   whether you did that, correct?

 4          A.   No, but I -- I'm sure we did.

 5          Q.   So let me -- let me -- let's back up a

 6   bit.  Certainly before recommending that Ortiz be

 7   arrested, you had the authority to show an

 8   identification procedure to Osario, correct?

 9          MR. SAHASRABUDHE:  Form.

10          THE WITNESS:  With the permission of the

11   District Attorney's office, yes.

12          BY MR. BRUSTIN:

13          Q.   All right.  So you're telling me that

14   in order to show Osario a photo array with

15   Mr. Ortiz prior to arresting Mr. Ortiz, you would

16   have had to have gotten permission from the DA?

17          A.   Whether they wanted a photo lineup or

18   an in-person lineup.  That's their decision to

19   make.

20          Q.   Okay.  And so what must have happened

21   here, although you don't remember it, is you -- you

22   made sure that the DA understood that you had

23   interviewed this person in a psych ward the day

24   before, and then on the 16th he confessed, and so

25   maybe it's a good idea to have Ortiz do an
```



1  identification procedure, and they said no.

2          MR. BLENK:  Form.

3          MR. SAHASRABUDHE:  Form.

4          THE WITNESS:  I know in many of my cases,

5  the District Attorney always wanted us to hold off

6  until we could do an in-person lineup.

7          BY MR. BRUSTIN:

8          Q.  Okay.  So --

9          A.   They didn't like the photo lineups on

10  someone.  They just wanted in-person lineup.

11          Q.  Okay.  So what must have happened here,

12  although you don't remember it, is that you

13  suggested to the DA or discussed with the DA the

14  fact that there should be an in-person lineup with

15  Osario, and they said no.

16          MR. SAHASRABUDHE:  Form.

17          MR. BLENK:  Form.

18          THE WITNESS:  I don't know that happened.  I

19  know we would have discussed the case with the

20  District Attorney.  As far as a lineup, that's up

21  to them what they want to do with a lineup.

22          BY MR. BRUSTIN:

23          Q.  There -- there was a civil rights

24  trial, and -- with a verdict for many millions of

25  dollars against Detective Stambach.

1        Are you telling me as you sit here today you

2    have no idea whether or not there was a lineup

3    conducted with Osario?

4        MR. SAHASRABUDHE:  Form.

5        THE WITNESS:  Well, that -- that wasn't

6    yesterday.  That was quite a while ago.

7        BY MR. BRUSTIN:

8        Q.    It was weeks ago.

9        A.    The lineup?

10       Q.    So as you sit here today, you have no

11   idea whether or not you requested a lineup,

12   correct?

13       A.    Correct.

14       Q.    You have no idea whether or not there

15   was a lineup?

16       A.    Correct.

17       Q.    You would agree, though, that based on

18   the circumstances as you knew them, there should

19   have been a lineup, right?

20       MR. SAHASRABUDHE:  Form.

21       THE WITNESS:  There could have been.

22       BY MR. BRUSTIN:

23       Q.    There should have been, correct?

24       MR. SAHASRABUDHE:  Form.

25       THE WITNESS:  I don't -- there could have



```
 1  been.
 2          BY MR. BRUSTIN:
 3          Q.   All right.  But it's your testimony
 4  that you recognized the discrepancy between what
 5  Osario described and Ortiz's actual height, and you
 6  determined that because witnesses are so bad at
 7  describing height, it didn't matter, correct?
 8          MR. SAHASRABUDHE:  Form.
 9          THE WITNESS:  Probably would have rathered
10  the witnesses view him in person.
11          BY MR. BRUSTIN:
12          Q.   Now, you testified at the trial --
13  withdrawn.
14          Now, Torres testified at the trial that when
15  he got to the major crimes unit on the 16th,
16  Detective Stambach was in an interview room with
17  Ortiz and not the detectives office.
18          Is that consistent with your memory?
19          MR. SAHASRABUDHE:  Form.
20          BY MR. BRUSTIN:
21          Q.   At first he interviewed him in the
22  interview room, and then he was in -- first he
23  interviewed him in the detectives office, and then
24  he went to the interview room for the formal
25  statement?
```



1        MR. SAHASRABUDHE:  Where -- what -- what

2   does this have to do with 404(b) evidence?

3        BY MR. BRUSTIN:

4        Q.   So -- is that consistent with your

5   memory?

6        A.   The interview room actually is part of

7   the detective room.  It's right connected to the

8   detective room.

9        Q.   Do you remember that Ortiz was moved

10  from where -- where Stambach was initially speaking

11  to him to the interview room with the two-way

12  mirror?

13       A.   I do not.

14       Q.   And you testified at the trial that you

15  stayed in -- you state you were in the homicide

16  office until 2 a.m. that morning, the -- the end of

17  your shift; is that correct?

18       A.   Yes.

19       Q.   And that you agreed with the arrest of

20  Mr. Ortiz based on Stambach's -- the alleged

21  confession he gave to Stambach, correct?

22       MR. SAHASRABUDHE:  Form.

23       THE WITNESS:  Yes.

24       BY MR. BRUSTIN:

25       Q.   Now, you testified at the trial that



1  you went to Mr. Ortiz's apartment early in the

2  morning after he was arrested.

3      A.   Yes.

4      Q.   And you recall doing that?

5      A.   Yes.

6      Q.   And that was -- that was one of the

7  follow-up steps that you took in connection with

8  the investigation, correct?

9      A.   Yes.

10     Q.   You weren't directed to do it by a DA.

11 You did it because that's what homicide detectives

12 do, correct?

13     MR. SAHASRABUDHE:   Form.

14     THE WITNESS:   Sometimes, yes.

15     BY MR. BRUSTIN:

16     Q.   And Mr. Ortiz gave you permission to

17 enter his apartment.

18     A.   He did.

19     Q.   And you found no incriminating evidence

20 whatsoever in Mr. Ortiz's apartment, correct?

21     A.   Correct.

22     Q.   Now, according to the report by

23 Stambach, Mr. Ortiz, without any coercion or

24 suggestion whatsoever, volunteered to committing

25 this murder, correct?



1          A.    Yes.

2          MR. BLENK:   Form.

3          BY MR. BRUSTIN:

4          Q.    In other words, he -- according to

5    Detective Stambach's report, he was a completely

6    compliant witness.

7          MR. SAHASRABUDHE:   Form.

8          THE WITNESS:   And according to the police

9    officers that brought him to our office.

10         BY MR. BRUSTIN:

11         Q.    Okay.  And can -- so assuming that to

12   be true and assuming that Osario -- you -- and by

13   the -- by the way, you -- as you told us, you

14   believed that there were three people who committed

15   this murder, correct?

16         MR. SAHASRABUDHE:   Form.

17         THE WITNESS:   A witness told us they saw

18   three people running, they said.

19         BY MR. BRUSTIN:

20         Q.    Yes.

21         A.    At that time I didn't know for sure how

22   many.

23         Q.    The same night that Ortiz was giving

24   you -- the same time Ortiz was giving you his

25   state -- was giving Stambach his statement, Osario



1  was saying he saw three people running from the

2  scene, correct?

3       MR. SAHASRABUDHE:  Form.

4       THE WITNESS:  Yes.

5       BY MR. BRUSTIN:

6       Q.   So obviously, one important question to

7  ask a witness who's confessing is "Who were the

8  other two people," right?

9       MR. SAHASRABUDHE:  Form.

10      THE WITNESS:  Well, Stambach was in one room

11 with him.  The other witness was in this room.

12 Stambach didn't know at that time what he's saying.

13      BY MR. BRUSTIN:

14      Q.   Well, he was -- he remained in custody.

15 Did anyone go back and ask him?

16      MR. SAHASRABUDHE:  Form.

17      THE WITNESS:  Once the statement was over?

18 No.  I did not.

19      BY MR. BRUSTIN:

20      Q.   Okay.  Obviously, that's a question

21 that Mr. Ortiz should have been asked, right?

22      MR. SAHASRABUDHE:  Form.

23      THE WITNESS:  At some point, yes.

24      BY MR. BRUSTIN:

25      Q.   Maybe, maybe not?



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  It could have been asked, yes.

3          BY MR. BRUSTIN:

4          Q.   But maybe not?  Maybe not so important?

5          MR. SAHASRABUDHE:  Form.

6          THE WITNESS:  Depends how the investigation

7    plays out if it's important or not.

8          BY MR. BRUSTIN:

9          Q.   Right.  It may not be important to ask

10   the person confessing to the crime -- it may not be

11   important to ask the person confessing to -- to the

12   crime -- to ask about the other two people who also

13   committed a brutal homicide?

14         MR. SAHASRABUDHE:  Form.

15         THE WITNESS:  I didn't know they committed a

16   brutal homicide.

17         BY MR. BRUSTIN:

18         Q.   Well, you knew what the -- you knew

19   what the crime -- you knew that there was a brutal

20   homicide committed, correct?

21         A.   Yes.

22         Q.   And you knew you had a witness

23   suggesting three people did it, correct?

24         MR. SAHASRABUDHE:  Form.

25         THE WITNESS:  Three people running away from



1  a house.

2        BY MR. BRUSTIN:

3        Q.   Does that suggest that maybe three

4  people did it?

5        MR. SAHASRABUDHE:   Form.

6        THE WITNESS:  No.

7        BY MR. BRUSTIN:

8        Q.   Oh, my God.  Is that a clue that might

9  suggest to you you should ask the person confessing

10  whether he did it with anybody else?

11        MR. SAHASRABUDHE:   Form.

12        THE WITNESS:  I would have, yes.

13        BY MR. BRUSTIN:

14        Q.   And if a person is confessing to a

15  crime voluntarily, that's the kind of person who

16  might tell you who else did it with him.

17        MR. SAHASRABUDHE:   Form.

18        THE WITNESS:  Might.

19        BY MR. BRUSTIN:

20        Q.   And if you believe that that person is

21  telling you the truth, like you claim you did and

22  Stambach did, of course that's a question you want

23  to ask him, right?

24        MR. SAHASRABUDHE:   Form.

25        THE WITNESS:  Once I -- once you're aware of



```
 1  what the witness said, yes, there would be a
 2  follow-up question.
 3          BY MR. BRUSTIN:
 4          Q.   Well, you were aware -- you -- we know
 5  from the records that Osario was being interviewed
 6  at the same time as Ortiz, correct?
 7          A.   Yes.
 8          Q.   So you would have been made aware by
 9  the officers interviewing Osario that Osario was
10  reporting that there were -- withdrawn.
11          You would have known, as the -- as the
12  supervisor of these detectives, that two witnesses
13  on the -- regarding the Camacho murders were being
14  interviewed at the same time, correct?
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  A witness and a suspect.
17          BY MR. BRUSTIN:
18          Q.   Okay.  And of course, you would have
19  been interested about what each was saying,
20  correct?
21          MR. SAHASRABUDHE:  Form.
22          THE WITNESS:  I was more interested what the
23  suspect was saying.
24          BY MR. BRUSTIN:
25          Q.   You weren't interested what the alleged
```



```
 1   eyewitness was saying and how that might affect how
 2   this suspect was questioned?
 3          A.   No.
 4          MR. SAHASRABUDHE:  Form.  That's not what he
 5   said.
 6          THE WITNESS:  I would at some point, but I
 7   wasn't at that point, no.
 8          BY MR. BRUSTIN:
 9          Q.   All right.  So it's your testimony that
10   you weren't aware that Osario reported seeing three
11   people fleeing from the scene until after the
12   interview with Ortiz was done?
13          MR. SAHASRABUDHE:  Form.
14          THE WITNESS:  Yes.
15          BY MR. BRUSTIN:
16          Q.   You remember that?
17          A.   Yes.
18          Q.   Okay.  And that's why Mr. Ortiz was
19   never asked about "Were there other people who
20   committed this murder with you?"
21          MR. SAHASRABUDHE:  Form.  He was.
22          THE WITNESS:  That's why he was never asked
23   by me.
24          BY MR. BRUSTIN:
25          Q.   Or Stambach.
```



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  I believe, correct.

3          BY MR. BRUSTIN:

4          Q.    Were you still supervising the case

5     when Ronny Williams allegedly came forward and

6     claimed that Ortiz confessed to him in jail?

7          MR. SAHASRABUDHE:  Form.  Don't guess or

8     speculate.

9          THE WITNESS:  Yes, I don't recall.  I don't

10    recall.

11         BY MR. BRUSTIN:

12         Q.    Do you remember Ronny Williams as a --

13    as a drug dealer from Buffalo?

14         A.    No.

15         Q.    You don't remember anything about Ronny

16    Williams coming --

17         A.    I --

18         Q.    Let me just finish the question.

19         A.    All right.

20         Q.    You don't remember Ronny Williams

21    coming forward in connection with the Ortiz

22    prosecution and claiming to Stambach that Ortiz

23    confessed to the crime.

24         A.    I do not.

25         Q.    All right.  I want to ask you a few



1    questions about your role in the DeJac case, okay?

2         A.    The what case?

3         Q.    DeJac.

4         A.    Oh, DeJac, okay.

5         Q.    It's pronounced DeJac?

6         A.    Yes.

7         Q.    Okay.  You remember that case well.

8         A.    I remember it vaguely, not well.

9         Q.    Well, fair to say that any time a

10   13-year-old girl is murdered, that's the kind of

11   thing you remember?

12        A.    Of course.

13        Q.    All right.  This was a horrible crime,

14   right?

15        A.    Yes.

16        Q.    And what was your role in the case?

17   Were you the lead investigator?  Were you an

18   investigator?

19        MR. SAHASRABUDHE:  Form.

20        THE WITNESS:  I was --

21        BY MR. BRUSTIN:

22        Q.    You tell me.

23        A.    What's the date you have there?

24        Q.    The date of the case is -- the date of

25   the murder is February 1993.



1          A.    I was a detective at the homicide

2    office.

3          Q.    And --

4          A.    And if I --

5          Q.    Go ahead.

6          A.    I -- my involvement was minimal.

7          Q.    Okay.  I'm going to tell you my

8    understanding of your involvement, and you tell me

9    if you agree with it, okay?

10         A.    Okay.

11         Q.    My understanding is that you took a

12   statement from a person named Wayne Hudson about an

13   alleged admission that Lynn DeJac made to him.

14         Do you recall that?

15         A.    I do.

16         Q.    And I take it that you deny

17   misrepresenting what you said to Wayne Hudson and

18   what -- what Wayne Hudson said to you.

19         A.    I what?

20         Q.    You deny misrepresenting in your report

21   what Wayne Hudson said to you and what you said to

22   him, correct?

23         A.    It's -- what he --

24         MR. SAHASRABUDHE:  Form.

25         THE WITNESS:  What was said is true in my



1  report.

2       BY MR. BRUSTIN:

3       Q.   Okay.  And you understand that after

4  Wayne Hudson reported that Ms. DeJac made

5  admissions, he later recanted that statement.

6       Do you recall that?

7       MR. SAHASRABUDHE:  Form.

8       THE WITNESS:  At some point he did, yes.

9       BY MR. BRUSTIN:

10      Q.   And the statement -- according to you,

11  the statement he gave to you was that DeJac

12  confessed to him that she committed the murder,

13  correct?

14      A.   Yes.

15      Q.   And later he recanted that statement,

16  correct?

17      A.   I believe so.

18      Q.   And at the time that he gave that

19  statement, you understood that he was facing up to

20  25 years in prison, correct?

21      MR. SAHASRABUDHE:  Form.

22      THE WITNESS:  I don't recall that.

23      BY MR. BRUSTIN:

24      Q.   Do you remember Mr. Hudson receiving

25  any favors or any benefits for his testimony?



```
 1        A.   Not --
 2        MR. SAHASRABUDHE:  Form.
 3        THE WITNESS:  Not from me.
 4        BY MR. BRUSTIN:
 5        Q.   Did you have any knowledge of him
 6   receiving any favors or any benefits?
 7        A.   I did not.
 8        Q.   Now, do you recall -- do you recall in
 9   this case Dennis Donohue being a suspect early on?
10        MR. SAHASRABUDHE:  Form.
11        THE WITNESS:  I don't recall at what point
12   he became a suspect.
13        BY MR. BRUSTIN:
14        Q.   Okay.  Do you recall that he was a
15   suspect in a much older rape and murder?
16        MR. SAHASRABUDHE:  Form.
17        THE WITNESS:  I do.
18        BY MR. BRUSTIN:
19        Q.   All right.  And do you recall that
20   Dennis Donohue was a bartender at a bar that was
21   frequented by Buffalo police officers?
22        MR. SAHASRABUDHE:  Form.
23        THE WITNESS:  I knew he was a bartender;
24   however, I wasn't aware that it was frequented by
25   Buffalo police officers.
```



```
 1          BY MR. BRUSTIN:

 2          Q.   Do you remember ever being at the -- at

 3    the bar where Dennis Donohue worked?

 4          MR. SAHASRABUDHE:   Form.

 5          BY MR. BRUSTIN:

 6          Q.   Not -- not -- not as part of an

 7    investigation, but there to drink.

 8          A.   Oh, never.

 9          Q.   Okay.   Let's go back to -- I'm -- I'm

10    getting ready to -- to wrap things up.

11          MR. BRUSTIN:   In fact, let's -- let's take

12    five.

13               (A recess was then taken at 3:06 p.m.)

14               (On the record: 3:21 p.m.)

15          BY MR. BRUSTIN:

16          Q.   Sergeant, just a couple of more

17    questions about DeJac.

18          Do you recall being tasked in DeJac -- DeJac

19    to interview Wayne Hudson and determine whether or

20    not he was reliable based on his criminal history?

21          A.    I was tasked to interview him.

22          Q.   All right.   And were you further tasked

23    with -- did you know when you interviewed him

24    that -- that he was someone who might have a motive

25    to be -- to be less than truthful?
```

```
 1          A.   I don't believe so.
 2          Q.   You don't -- you don't recall
 3  learning -- knowing that he was facing 25 years or
 4  more in prison at the time?
 5          A.   I don't recall that.
 6          Q.   He never asked you for any favors or
 7  any benefits for his testimony?
 8          A.   No, sir.
 9          Q.   Seemed like a perfectly credible
10  witness to you?
11          A.   At that time, yes.
12          Q.   By the way, do you believe that he's
13  still a credible witness?
14          MR. SAHASRABUDHE:  Form.
15          BY MR. BRUSTIN:
16          Q.   Do you -- withdraw the question.
17          Despite what happened following your
18  interview, do you believe that the information he
19  gave you was, in fact, true and accurate?
20          A.   No.
21          Q.   All right.  So you testified in
22  connection with Dixon in two different proceedings.
23          You testified in the trial of Mr. Dixon in
24  June of 1992, correct?
25          A.   Yes.
```



1        Q.    And you also testified in a perjury
2  prosecution against Leonard Brown and Mario Jarmon
3  on November 5th, 1992, correct?
4        A.    I don't recall that, but --
5        Q.    Certainly don't dispute it.
6        A.    No, sir.
7        Q.    Now, one of the things you testified to
8  in the perjury trial was that when you got to the
9  scene, you reported that there were housing
10  authority officers who were also present.
11        Do you recall that?
12        A.    No, I don't, but if -- that's in my
13  report.
14        Q.    Okay.  In other words, you certainly --
15  you -- you -- do you recall today that, in fact,
16  there were housing authority officers who were
17  present?
18        A.    I do not.
19        Q.    All right.  But what does BM -- BMHA
20  stand for?
21        A.    Buffalo Municipal Housing Authority.
22        Q.    Okay.  And you testified that you
23  recalled at least one Buffalo -- BM -- BMHA car at
24  the scene.
25        A.    Okay.



1          Q.    In any case, you don't remember that

2     today, which makes sense.

3          A.    No, I do not.

4          Q.    But certainly if you testified to it,

5     that was true, correct?

6          A.    Yes.

7          Q.    And you would have understood at the

8     time that the Buffalo Municipal Housing Authority

9     officers were potentially valuable resources for

10    potential witnesses, given their familiarity with

11    the neighborhood, correct?

12         MR. BLENK:  Form.

13         MR. SAHASRABUDHE:  Form.

14         THE WITNESS:  Actually, they were a little

15    bit out of their turf, but I certainly would have

16    used them if I thought it was necessary.

17         BY MR. BRUSTIN:

18         Q.    You certainly would have made it clear

19    to -- you certainly would have been interested in

20    any information they had to offer, correct?

21         A.    Yes, if they had any.

22         Q.    They would be one of your sources of

23    information at that scene on that night, correct?

24         A.    Could be.

25         MR. BLENK:  Form.



1          MR. SAHASRABUDHE:  Form.

2          BY MR. BRUSTIN:

3          Q.    Now --

4          A.    Sorry.

5          Q.    -- another thing you testified to, you

6    were -- one of the things you did in both the --

7    the perjury trial and the actual trial of

8    Mr. Dixon, you were -- you were called to the

9    stand -- you recall you were called to the stand to

10   talk about crime scene evidence, what you observed

11   at the scene.  Do you recall that?

12         A.    Yes.

13         Q.    And that's because you were the -- you

14   were the -- you were the ranking detective at the

15   crime scene, correct?

16         A.    I was the first detective at the crime

17   scene.

18         Q.    Okay.  And one of the things you

19   testified to -- you were shown pictures on the

20   stand, and you described what you saw were large

21   amount of wet red stain in the pictures.

22         A.    Yes.

23         Q.    And you testified that you believed

24   that that was blood, correct?

25         A.    Yes.



```
 1            Q.   In other words, you believe -- when you
 2   were at the scene, do you recall seeing large
 3   patches of blood near the victims?
 4            A.   Yes.
 5            Q.   And you understood at the time that in
 6   addition to blood splatter, another way that the
 7   shooter may have gotten blood on their clothing
 8   would be to step in it, correct?
 9            MR. SAHASRABUDHE:  Form.
10            THE WITNESS:  On their footwear.
11            BY MR. BRUSTIN:
12            Q.   Yes.
13            A.   Possible.
14            Q.   Okay.  I just want to go through a
15   couple of other reports that you created, and then
16   I'll be done.
17            So the first report you created was page 13
18   and 14.  This is your P73 from the scene, right?
19            A.   It is.
20            Q.   And you did -- you did one interview at
21   the scene yourself.  You interviewed Travis Powell,
22   correct?
23            A.   Yes.
24            Q.   And based on the information that he
25   gave to you, you directed that he be one of the
```



```
 1   witnesses brought to the homicide office, correct?

 2           A.    That's correct.

 3           Q.    Okay.   And then -- and by the way, this

 4   report's making clear that you are at the scene

 5   within about ten minutes of the shooting, correct?

 6           A.    10, 15 minutes, yes.

 7           Q.    You're the first detective on the

 8   scene, not the first officer on the scene.

 9           A.    Yes, correct.

10           Q.    And take a look at page 20.

11           A.    Okay.

12           Q.    And this is not a report you created,

13   correct?

14           A.    Correct.

15           Q.    But it's a -- it's an example of you

16   communicating with other officers at the scene

17   about what you were finding and what they were

18   finding, correct?

19           MR. BLENK:  Form.

20           MR. SAHASRABUDHE:  Same objection for me,

21   too.

22           BY MR. BRUSTIN:

23           Q.    You're communicating with Detective

24   Suszek, according to this memo, correct?

25           A.    I don't know if I'm communicating.  He
```

1  knew I was at the scene.  I was taking care of the

2  scene.

3       Q.    Information from Detective Lonergan was

4  that additional help was en route, with Detective

5  Vickerd going to the hospital.

6       A.    Right.

7       Q.    Which means you're -- you're updating

8  Suszek on what you're doing and what's happening,

9  right?  You're communicating.

10      A.    Yes.

11      Q.    That's -- that's what you do at a crime

12  scene, right?

13      A.    Or via the phone.  I'm not sure how

14  that's transpired.

15      Q.    But you're talking to people about what

16  you're finding and what they're finding.

17      A.    Or what their -- what their duties --

18  what I need them to do, I guess.

19      Q.    Right.

20      A.    Go to the office.

21      Q.    Take a look at page 1645 -- I'm sorry,

22  that's wrong.  Page 80 -- 84.

23      Have you reviewed this in preparation for

24  today?

25      A.    I did.



JAMES LONERGAN                                    June 09, 2022
DIXON V. CITY OF BUFFALO                                      262

1          Q.    Now, you would agree that based on this
2    report, which was done late in the day, 1645 hours,
3    you received information -- you received
4    information that a girl named Heather Smith, who
5    attends City Honors School, might have information
6    about the crime, correct?
7          MR. SAHASRABUDHE:    Form.
8          THE WITNESS:    That he may have been -- she
9    may have been dating Valentino Dixon.
10         BY MR. BRUSTIN:
11         Q.    So she potentially had information
12   about a motive.
13         A.    Could be.
14         Q.    And obviously, this is someone that
15   needed to be followed up on, correct?
16         A.    Yes.
17         Q.    Shouldn't be hard to find.  You have
18   the name, Heather Smith, who goes to a high school
19   in town, right?
20         A.    Yes.
21         Q.    She'd be very easy to find, right?
22         A.    Yes.
23         MR. SAHASRABUDHE:    Form.
24         BY MR. BRUSTIN:
25         Q.    And can you explain why you took no



 1   steps to interview this witness for four months?

 2          A.    Probably extremely busy.  That would be

 3   the only answer I would have.

 4          Q.    Just busy -- busy with more important

 5   homicide investigations?

 6          A.    Not more --

 7          MR. SAHASRABUDHE:    Form.

 8          THE WITNESS:    Not more important, but more

 9   homicides.

10          BY MR. BRUSTIN:

11          Q.    Okay.  So the only reason you can think

12   of is that you were -- you were busy for four

13   months.  That's why you didn't interview her.

14          A.    Extremely busy at that time, yes.

15          Q.    Okay.  And obviously, another --

16   another alternative that you had in -- in -- in

17   addition to interviewing this witness yourself

18   would be to ask another detective to do it,

19   correct?

20          A.    That's possible, yes.

21          Q.    All right.  Take a look at page 256.

22          Now, what happened four months later on

23   December 4th, 1991, to cause you to finally find

24   and interview Heather Smith?

25          MR. SAHASRABUDHE:    Form.



1           THE WITNESS:  It was probably on my to-do

2    list.  That's the first chance I got.

3           BY MR. BRUSTIN:

4           Q.   Okay.  That -- that's the reason for

5    the four-month delay?

6           A.   I would believe.

7           Q.   It had nothing to do with concerns

8    about the fact that you might have had the wrong

9    person -- withdrawn.

10        It had nothing to do with attempting to

11   shore up evidence against Valentino Dixon, given

12   Lamarr Scott's confession?

13          MR. BLENK:  Form.

14          MR. SAHASRABUDHE:  Form.

15          THE WITNESS:  No.

16          BY MR. BRUSTIN:

17          Q.   It just -- it was just -- it just --

18   it's just when you got to this on your to-do list,

19   correct?

20          A.   Yes, it was a follow-up on an anonymous

21   tip I received.

22          Q.   And it's -- the fact that it took four

23   months is just that's when you got to it on your

24   to-do list.  That's how busy you were.

25          A.   Yes, sir.



1          Q.    You took four months to follow up with

2    a witness in a homicide investigation.

3          A.    Who knew nothing, yes, sir.

4          Q.    Well, you didn't know she knew nothing

5    until you met with her four months later, correct?

6          A.    I could assume, but yes.

7          Q.    And according to your report, she

8    claimed to have heard that Tino was the shooter,

9    right?

10         A.    Yes.  Tino, yes.

11         Q.    Take a look at page 165.

12         Do you recall receiving this phone call?

13         A.    It's Detective Vickerd.  Right?  Yes.

14         Q.    Okay.  So you were -- you -- you --

15    although you were partners with Detective Vickerd,

16    you don't remember this call at all.

17         A.    No, not at all.

18         Q.    Now take a look at page 257.

19         How did you come to be interviewing Jeffrey

20    Shelton on December 5th, the day after you

21    interviewed Heather Smith?

22         A.    I don't recall.

23         Q.    I don't recall seeing any mention of

24    him earlier in the case.  Do you have any

25    recollection whatsoever as to why you were



                James Lonergan - Mr. Blenk - 06/09/2022

1    interviewing him in December of 1991?

2        A.    I do not.

3        MR. BRUSTIN:    I think that's all I have.

4        THE WITNESS:    Pardon?

5        MR. BRUSTIN:    I think that's all I have.

6        THE WITNESS:    Oh.

7        MR. SAHASRABUDHE:    Now -- now J.P.'s going

8    to have some questions for you.

9        THE WITNESS:    I don't want to answer them.

10                    EXAMINATION

11       BY MR. BLENK:

12       Q.    Detective Lonergan, we've met off the

13   record.    My name is J.P. Blenk, and I represent the

14   county Defendants in this case.    I just have a

15   couple follow-up questions.

16       A.    Sure.

17       Q.    It should only take a couple minutes.

18       You testified earlier that you couldn't rule

19   out that you had seen Lamarr Scott's taped

20   confession on the news -- you couldn't rule out

21   that you'd actually seen it while watching the

22   news.    Do you recall that?

23       A.    Yes.

24       Q.    Were you present that evening at the

25   homicide -- at the homicide unit on the evening



James Lonergan - Mr. Blenk - 06/09/2022

1   that Lamarr Scott came in?

2           MR. SAHASRABUDHE:  If you remember.

3           MR. BRUSTIN:  Object to the form.

4           THE WITNESS:  I don't recall.

5           BY MR. BLENK:

6           Q.   You don't recall that you were there,

7   but you -- but you still can't rule out that you

8   were just watching his confession on the news.

9           MR. BRUSTIN:  Object to the form.

10          THE WITNESS:  I know I saw it on the news.

11  At one point I saw it.  I -- I don't recall.

12          BY MR. BLENK:

13          Q.   Okay.  You testified earlier -- or do

14  you ever -- do you ever recall -- you reviewed

15  paperwork in advance of coming here today?

16          A.   Some, yes.

17          Q.   Yes.  Do you -- do you recall any

18  paperwork that suggested that you were present

19  on -- at the time that Lamarr Scott was at the --

20  the Buffalo police station?

21          A.   I do not.

22          Q.   Do you have any reason -- is there any

23  basis for the possibility that you could have been

24  there that evening?

25          MR. SAHASRABUDHE:  Form.



JAMES LONERGAN                                June 09, 2022
DIXON V. CITY OF BUFFALO                                  268

James Lonergan - Mr. Blenk - 06/09/2022

1        MR. BRUSTIN:   Object.

2        THE WITNESS:   It's possible.  I just don't

3   recall.

4        BY MR. BLENK:

5        Q.   Okay.  You testified about gunshot

6   residue testing.

7        A.   Yes.

8        Q.   And you -- you made a reference to

9   the -- the involvement of the District Attorney's

10  office --

11       A.   Yes.

12       Q.   -- in gunshot residue testing.

13       What was your understanding of the District

14  Attorney's position on gunshot residue testing?

15       A.   Their belief was --

16       MR. SAHASRABUDHE:  Form.  Go ahead.  I'm

17  sorry.

18       THE WITNESS:  Their belief was it was

19  inconclusive.  They just weren't interested in us

20  doing that --

21       BY MR. BLENK:

22       Q.   Okay.

23       A.   -- type of testing.

24       Q.   All types of gunshot residue testing?

25       A.   As far as I know, yes.

JAMES LONERGAN
DIXON V. CITY OF BUFFALO

June 09, 2022
269

James Lonergan - Mr. Blenk - 06/09/2022

1    Q.    What was the basis for that -- or

2  who -- who communicated that policy to you?

3    A.    I don't recall.  It was from the

4  District Attorney's office at some point, but I

5  don't recall who -- who relayed that message to the

6  homicide office.

7    Q.    Do you remember if that policy was in

8  existence before the time that you were transferred

9  to narcotics?

10    A.    It was.

11    Q.    Okay.  Do you recall if that policy was

12  in place after you returned from narcotics?

13    A.    As far as I know, it had not changed.

14    Q.    Was the -- the rule that gunshot

15  residue testing was not authorized under any

16  circumstances?

17    A.    I believe it -- it was, but I'm not

18  a -- I'm not sure.  I just -- I know we weren't --

19  they didn't want us to do it.

20    Q.    Okay.  But sometimes gunshot residue

21  testing did take place.

22    MR. SAHASRABUDHE:  Form.

23    MR. BRUSTIN:  Object to the form.  Can you

24  put a time on it?

25    BY MR. BLENK:



James Lonergan - Mr. Blenk - 06/09/2022

1    Q.    At some time between the time you

2  became an -- between the time you became an -- a

3  detective in the homicide unit and the time that

4  you left for narcotics, at some time in that -- or

5  there were occasions on which there was gunshot

6  residue testing.

7    A.    There may have been, but not on any

8  case that I was on.

9    Q.    Okay.  Do you know of it ever

10  occurring -- do you know of the Buffalo Police

11  Department ever conducting gunshot residue testing

12  in that period of time from 1986 until 1994?

13    A.    I do not.

14    Q.    Was there any ever -- was there ever

15  any specific instance where an employee of the

16  District Attorney's office specifically instructed

17  you to refrain from gunshot residue testing?

18    A.    Somebody in our office was informed by

19  the District Attorney's office to -- to not do

20  them, the test.

21    Q.    Who in your office was --

22    A.    I have no idea.

23    MR. SAHASRABUDHE:  Let him finish the

24  question.

25    THE WITNESS:  Yes, I'm sorry.



                James Lonergan - Mr. Blenk - 06/09/2022
1        BY MR. BLENK:

2            Q.    Who -- who in your office was informed

3        of that?

4            A.    I have -- I have no idea who.

5            Q.    Okay.  Do you recall any specific

6        conversation with anybody in the Erie County

7        District Attorney's office or the Buffalo Police

8        Department about this policy?

9            A.    I'm sure there was.  I know I was told

10       to -- to not do the test, so somebody had to tell

11       me.  I don't recall who.

12           Q.    Okay.  Did anybody -- are you aware of

13       anybody requesting -- strike that.

14           In the investigation of Torriano Jackson's

15       murder, are you aware of anybody from the Erie

16       County District Attorney's office instructing the

17       Buffalo Police Department to refrain from testing

18       someone's clothes for gunpowder residue?

19           A.    No.

20           MR. SAHASRABUDHE:   Form.

21           THE WITNESS:  No.

22           BY MR. BLENK:

23           Q.    Did the -- did the Erie County District

24       Attorney's office have a policy instructing Buffalo

25       Police Department detectives to refrain from



James Lonergan - Mr. Blenk - 06/09/2022

1    collecting clothes that had blood on them?

2         A.    No.

3         Q.    Or shoes that had blood on them?

4         A.    No.

5         MR. BLENK:   That's all I have.

6         THE WITNESS:   I don't have any questions.

7         MR. BRUSTIN:   You're done.

8              (Deposition concluded at 3:44:09 p.m.)

9                        *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1   STATE OF NEW YORK)

2                          ss:

3   COUNTY OF ERIE    )

4

5       I DO HEREBY CERTIFY as a Notary Public in and

6   for the State of New York, that I did attend and

7   report the foregoing deposition, which was taken

8   down by me in a verbatim manner by means of machine

9   shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18                     _____

19                     LORI K. BECK, CSR, CM,
                       Notary Public.

20

21

22

23

24

25



JAMES LONERGAN                                      June 09, 2022
DIXON V. CITY OF BUFFALO                                     274

 1

 2                    INDEX TO EXHIBITS

 3    Exhibit              Description              Page

 4     PLF. EXH. 16    P73 report, one page              219

 5

 6

 7   * Exhibit returned to Mr. Bruskin.
       Copies of exhibit supplied to all counsel.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2                          INDEX TO WITNESSES

3     Witness                    Examination                Page

4      JAMES LONERGAN          BY MR. BRUSTIN                4

5                              BY MR. BLENK                 266

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**1**

**10**
  260:6
**10:06**
  3:11,21
**10:39**
  38:14
**10:41**
  38:15
**11**
  146:5
**11:42**
  101:17
**11:53**
  101:18
**12:41**
  153:4
**12th**
  20:5
  154:4
  170:5,7,8
  177:19
  180:15,16
**13**
  259:17
**13-year-old**
  250:10
**14**
  11:10
  259:18
**15**
  106:1
  111:14
  260:6
**158**
  199:6
**15th**
  161:23

211:19
212:13,25
213:12,15
214:18
215:24
221:18
230:15,16
**16**
  106:1
  219:9
**1645**
  261:21
  262:2
**165**
  265:11
**16th**
  213:13
  215:23
  230:1,10
  231:21
  234:14,25
  235:1
  236:13
  237:24
  240:15
**17**
  126:11
**19**
  16:25
  126:11
**196**
  153:25
  198:13,14
**197**
  176:5
**1970**
  16:19
  70:19
  72:5
**1971**
  17:21

**1972**
  19:21
**1986**
  18:11
  20:17
  270:12
**1988**
  20:23
**1991**
  23:14
  27:14
  29:17
  31:1
  33:14
  39:25
  52:21
  66:16
  73:25
  74:2,8,
  11,21
  82:6 86:7
  88:13,24
  90:4
  91:14,17
  92:13
  93:8
  104:4
  154:4
  263:23
  266:1
**1992**
  255:24
  256:3
**1993**
  250:25
**1994**
  22:8,18
  270:12
**1:24**
  153:5

**2**

**2**
  241:16
**20**
  17:2
  260:10
**200**
  195:21
**2000**
  210:16
**2002**
  66:16
  104:6
**2004**
  210:17,19
  211:19
**2014**
  11:8
  24:10,14,
  17,20
**2022**
  3:20
**25**
  252:20
  255:3
**256**
  263:21
**257**
  85:21
  265:18
**263**
  86:17
**2:03**
  195:11
**2:07**
  195:12
**2:30**
  130:22

134:10

**3**

**3**
  198:7
  199:13
**30**
  121:11
  123:8
  221:10
**30-second**
  38:12
**300**
  198:2
**32**
  170:12,16
  176:21
  177:4,10
**38**
  176:14,16
  177:4
**3:06**
  254:13
**3:21**
  254:14
**3:44:09**
  272:8

**4**

**40**
  24:15
  69:18
  70:1,11,
  17,19
  72:14
  75:21
  90:25
  157:5
  205:14



**40-year**
29:1

**404(b)**
220:25
221:1
241:2

**42**
24:16
72:15

**4th**
263:23

---

**5**

**58**
199:6

**5th**
256:3
265:20

---

**7**

**70**
3:19
16:19,21

**70s**
20:3 25:5

**71**
17:18
19:16

**72**
17:18

**74**
127:13
130:20

**7:15**
217:9
224:7

**7th**
19:21

---

**8**

**8**
224:8
225:20

**80**
38:21
47:7
261:22

**82**
38:18
39:18
46:5 47:7

**83**
39:19

**84**
261:22

**86**
20:7
21:4,5,
12,20
22:3,12

**88**
20:23
21:16
22:14

---

**9**

**90**
19:7 25:9

**90s**
25:9,19
26:15
91:13
93:9,18
95:14

**91**
19:7
23:11
25:21

**92**
87:2

**94**
22:8
23:21,23
36:11

**96**
20:25
24:6,7

**97**
24:7

**9th**
3:20

---

**A**

**a.m.**
3:11
38:14,15
101:17,18
198:7
199:13
241:16

**Aaron**
56:4 88:8
117:1
167:9
168:17
169:6,14
171:9,16
172:6
173:11
174:12
175:13

**ability**
5:19
129:20

**absolutely**
91:3
151:2

**accept**
60:23

**accuracy**
190:16

**accurate**
19:1
20:19
29:24,25
31:5
35:16
40:9
77:21
106:22
125:18
177:12
226:14
255:19

**accurately**
39:3,24
89:10
129:4

**achieve**
20:21

**acknowledged**
39:10

**acting**
22:22
23:13
105:11
156:3
181:19

**action**
4:25 87:2

**active**
36:20
200:4

**activities**
33:21,24
34:10
35:24
58:20
76:4,12
78:8 87:6
99:17

**accuracy**
102:2
106:16,20
108:23

**activity**
76:14
86:21
100:5

**actual**
80:20
84:24
153:15
171:1
232:20
240:5
258:7

**ADA**
195:15,24
196:6
198:1,3
199:17

**Adams**
88:6
108:4
153:9,13

**addition**
9:18,22
42:12
81:21
259:6
263:17

**additional**
261:4

**address**
6:5

**admission**
64:24
192:11,14
251:13

**admissions**
252:5

**admit**
151:15



203:4,5

**admitting**
168:8

**advance**
267:15

**advised**
165:6

**affect**
5:19,24
129:20
248:1

**affecting**
5:22

**affects**
5:14

**affidavit**
135:7

**affinity**
145:20

**afield**
231:11

**age**
16:25
17:2

**agency**
25:12

**agree**
35:7 54:1
60:11,12
78:9
123:25
142:3
173:4
176:16
178:3,15
183:24
185:18
188:20,24
194:7
204:13,22
206:20

209:14
214:18
239:17
251:9
262:1

**agreed**
194:1,5
241:19

**ahead**
89:25
150:13
251:5
268:16

**allegation**
208:18,21
209:1,7,9

**allegations**
7:9,19
8:4
193:15
209:15

**alleged**
7:8
162:14
241:20
247:25
251:13

**allegedly**
159:25
217:13
222:11,23
225:20
227:3
249:5

**alleging**
7:21
208:14

**allowed**
9:20

**alternative**
162:22
163:5
263:16

**ambulance**
212:14
216:5

**Amherst**
25:11
26:3,14
27:2

**amount**
258:21

**analyst**
123:5

**and/or**
172:6

**angry**
75:17

**announcemen
ts**
52:13

**anonymous**
34:4 85:8
264:20

**answering**
6:12
33:10
140:5
142:14

**anybody's**
49:20

**apartment**
242:1,17,
20

**apologize**
106:13
147:10
199:7

**Apparent**
212:20

**apparently**
212:22

**appeared**

130:9
215:17
221:13

**appears**
117:16
146:20
148:7

**approximate
ly**
10:18
25:18
26:15
199:1

**April**
180:15

**area**
52:3
119:25
192:5,10,
11

**areas**
20:1

**array**
189:23
190:17
191:5
236:14
237:14

**arrays**
153:22

**arrest**
28:4
29:12
37:22
38:24
40:9,24,
25 41:1,5
42:4,11,
15 43:11
44:4,9
45:16
47:3,5,6
76:18,25

77:5,12,
14,15
98:7
135:7
139:11,23
141:12,23
142:5,19
241:19

**arrested**
27:24
28:9,17,
23 58:1
76:5,13
97:22
101:12
135:4
143:23
237:7
242:2

**arresting**
39:11
40:5,23
44:9
237:15

**arrests**
40:1

**arrived**
196:8
198:5

**arriving**
146:15

**ascertain**
50:24
51:2,6
102:6,23
150:5,10
187:20,25

**asks**
156:10
180:9

**aspect**
67:25



**assess**
64:23

**assessment**
45:4,9,14

**assignments**
21:20

**Assistant**
40:6
41:13,17,
22 42:5
199:25
207:5,9,
12

**assume**
6:20
14:25
33:2
62:24
105:3,8,
10,12
118:12
129:16
138:17
139:7
143:2,8
152:7,8
158:13
166:14
191:8,10
265:6

**assuming**
142:4,17
181:21
184:6
243:11,12

**assumption**
142:16

**attempt**
181:13,20
183:18,21

**attempting**
44:8 67:7
264:10

**attends**
262:5

**attention**
234:17

**attorney**
8:15,16,
22 9:3
40:7 41:5
42:20
43:5,10
44:4,8
45:9,14,
19 69:7
140:2
141:10,
20,21
144:8
174:9
190:5,12
191:1,11
199:25
238:5,20

**Attorney's**
55:25
59:25
62:3
123:12
173:15
174:20
176:2
236:21,23
237:11
268:9,14
269:4
270:16,19
271:7,16,
24

**attorneys**
4:23 9:10
11:21
15:2,5,11
41:13,17,
22 42:6
174:5
207:5,9,

**12**
262:5

**August**
154:4
177:19
180:16

**authority**
229:12,15
236:13
237:7
256:10,
16,21
257:8

**authorized**
269:15

**automatic**
121:23
124:17

**avoid**
55:16

**aware**
62:24
76:9 84:3
116:8
138:11
147:2,3
157:8
160:19
161:10,12
166:10
170:8
173:23
186:11
202:3
217:13
246:25
247:4,8
248:10
253:24
271:12,15

**awful**
142:1

— — — — — — —
            **B**
— — — — — — —

**back**
7:6 17:4
18:5
20:13
24:5
27:16
30:18
32:22
33:13
34:25
36:11
58:17
59:12
63:4
66:9,10,
13 88:13
91:10
93:6
104:8
106:2
107:21
109:15,18
165:2
168:3,4
169:15
176:12
189:1,7
193:7
199:21
220:14
237:5
244:15
254:9

**background**
16:13

**bad**
37:8
240:6

**Bailey**
112:3,6
165:7,11

**bar**
253:20
254:3

**bartender**
253:20,23

**based**
24:12
33:5,6,13
34:12
39:22
45:25
46:15
53:7
58:19
64:16
66:25
74:12
83:24
87:20
96:19
97:25
105:18
114:25
128:21
139:23
140:12
142:6,19
143:23
155:22,
24,25
156:7
168:22
174:11
177:20,21
179:23,24
193:2
199:22
214:16
218:13
239:17
241:20
254:20
259:24
262:1

**basic**



67:12
103:20
104:11,20
118:6
126:3
182:18
183:15
193:19
222:21

**basing**
139:11

**basis**
16:8
32:15
40:7
46:5,11
60:4
114:17,19
128:6
267:23
269:1

**beat**
9:2

**Beck**
3:25

**began**
127:23

**begin**
3:12

**beginning**
18:2,11
33:22,25
46:6
70:19
72:5

**behalf**
4:13

**belief**
40:7 60:4
87:21
90:17
155:10
268:15,18

**believed**
23:5
49:18
160:9
213:10
217:3,18
220:16
228:4,20
232:16
243:14
258:23

**Belling**
142:10
194:18
195:15,25
196:6
198:2,4
199:17
200:4,15

**benefits**
252:25
253:6
255:7

**big**
82:7,11,
20 135:19
138:14
157:23
158:1,2,9
233:17

**Bills**
25:2

**Bishop**
16:16

**bit**
12:25
16:10
201:17
237:6
257:15

**black**
117:6,7,
13,16
144:20,25

145:6,13
180:12

**Blenk**
4:10 28:2
41:2,25
42:17
43:6,19,
24 44:14
48:8,17
56:6,10,
22 62:15,
20,23
65:3,25
68:3,13,
22 69:5
70:13
71:20
95:6
104:1
131:23
132:10,17
133:6,15
136:20,25
137:8
139:14,25
140:20
141:6,24
143:1
144:6
147:7
154:24
156:9
167:19,24
172:16
173:14
182:23
184:10,25
185:23
200:2
203:8,20
204:5,14,
23 205:19
206:11,25
207:16
209:20
219:10

223:1
238:2,17
243:2
257:12,25
260:19
264:13
266:11,13
267:5,12
268:4,21
269:25
271:1,22
272:5

**blood**
121:6,7
122:4,24
123:2
124:8
125:9
172:23
184:1,12
185:20
186:18,24
187:2,9
·258:24
259:3,6,7
272:1,3

**blue**
73:14,17,
20 74:12
144:14
145:11

**BM**
256:19,23

**BMHA**
256:19,23

**body**
122:16

**boiled**
30:7

**bond**
145:24
146:1

**book**

90:9

**booking**
46:18

**bottom**
38:3,4
111:13

**BPD**
38:4,5,9

**bracelet**
144:12

**break**
6:3,6,8
38:12
101:15
117:6
153:1

**breaks**
138:13

**briefed**
79:2
196:5

**briefly**
13:7

**bring**
99:19
108:22
212:14

**broad**
55:6

**broadcast**
146:24

**broadly**
33:23

**broke**
116:25

**brought**
20:12
21:4
108:5,18
196:4



198:2
216:4
217:9,13
243:9
260:1

**brown**
145:6
196:1
198:25
199:9,16
256:2

**Brustin**
3:3,5
4:5,6,9,
19,23
6:23 8:10
12:5 14:4
25:25
26:8
27:18
28:6 29:8
30:10,20
31:8,15,
20 32:1,
12 33:19
35:1,15
36:18
37:5,19
38:7,11,
16 40:12,
21 41:8
42:3,9,22
43:12,21,
25 44:16,
22 45:3,
10 46:19
48:11,21
49:7,14,
23 51:13
52:11
53:13,23
54:9
55:22
56:8,14
57:1,20
58:6,15,

24 59:13
60:10,16,
22 61:1,
16,21
62:8,17,
21 63:1
64:12
65:7,17
66:3,23
67:16,23
68:6,17,
25 69:9,
25 70:16
71:6,12,
17,25
72:23
73:13,24
74:7,18
75:1,10
77:8
79:4,14
80:4,16
81:11,16
83:11,23
84:4,9,
15,20
85:23
88:20
89:4,22
90:13,23
91:5,22
92:4,11,
25 93:7,
22 94:7,
13 95:8,
18 96:4,
15 98:17
99:24
100:9,14,
17,18
101:14,19
102:10,17
103:4
104:3,19,
24 105:4,
9,17,24
106:6

107:10
109:3,8,
24,25
110:6,19
111:9
112:14,20
113:10,16
114:1,9,
16 115:5,
13,22
116:5,11,
23 117:20
118:14,21
119:3,9
120:9
121:5,9,
14 122:3,
11,21
123:3,15
124:6,13
125:2,13,
19 126:2,
7,20
127:12,19
128:2,11,
18 129:3,
17 130:6,
15
131:11,17
132:2,13,
19,25
133:9,18
134:1,5,
19 135:1,
11 136:4,
22 137:3,
10,20
138:4,22
139:4,18
140:4,23
141:14
142:2,13
143:4
144:9
145:3,8
146:3
147:8

148:24
150:18,25
151:12,
17,19
152:3,24
153:6
155:2
156:12
157:19
158:14
159:11,
12,17,24
160:21
161:11,18
162:20
163:3,13
164:2
165:1,19
166:1,12,
25
167:14,20
168:2,24
169:20
170:15
171:8,14,
20 172:3,
11,19
173:2,8,
16 174:17
175:3,18
176:4,23
177:15
178:2,11,
21 179:1,
13,22
180:8
181:11
182:1,8,
17,25
183:9,14,
23 184:5,
13,23
185:1,12,
17,25
186:16,22
187:7,14,
18 188:9,

16 189:8,
16 190:2,
13,21
191:3
192:2,7,
19,24
193:5,18,
24 194:6,
13,21
195:9,13
196:20
197:1,19
199:5,20
200:6,23
201:3,15
202:2
203:2,9,
13,17,22
204:7,17
205:2,13,
21 206:13
207:3,17
208:4,22
209:8,13,
24 210:5,
10,14,18
211:3,8,
13 212:4,
17,23
213:3,8,
22 214:5,
15,25
215:7,11,
21 216:3,
8,13,19
217:1,22
218:5,12,
21 219:2,
6,12,20,
23 220:5,
13,20
221:2,6,
8,23
222:19
223:3,11,
18,25
224:11,



16,17
225:4,11,
18 226:1,
19,24
227:8,16
228:3,13,
18 229:5,
11,22
230:6
231:7,12,
14,19
232:4,24
233:6,11,
18,23
234:5,22
235:6,16,
25
236:11,18
237:12
238:7,22
239:7,22
240:2,11,
20 241:3,
24 242:15
243:3,10,
19 244:5,
13,19,24
245:3,8,
17 246:2,
7,13,24
247:3,17,
24 248:8,
15,24
249:3,11
250:21
252:2,9,
23 253:4,
13,18
254:1,5,
11,15
255:15
257:17
258:2
259:11
260:22
262:10,24
263:10

264:3,16
266:3,5
267:3,9
268:1
269:23
272:7

**brutal**
121:2
245:13,
16,19

**Buffalo**
3:17,20
4:13
16:11,17
17:1,19
25:2,17
28:8 30:3
53:6,14
54:19,20
72:16
73:6,21,
25 80:21
88:13,17,
21 90:5,
8,9,22,25
93:1,18
95:13
97:11
102:5
131:20
132:9
133:22
161:20
167:3
204:9,20
211:20
249:13
253:21,25
256:21,23
257:8
267:20
270:10
271:7,17,
24

**building**

25:16
119:14,15

**bulk**
31:4,22
32:4
33:15

**bullets**
178:5

**bunch**
6:11

**bush**
118:10

**business**
218:16

**busy**
42:6
91:17,23
150:10
263:2,4,
12,14
264:24

───────────

───────────
C
───────────

**Cadillac**
97:12
99:2

**caliber**
176:22

**call**
5:6 15:15
34:4,7
45:13,18
85:8
131:6
140:12
265:12,16

**called**
4:17
12:22
48:19
54:11

195:25
212:14
258:8,9

**calling**
44:7

**calls**
9:24
143:21

**Camacho**
37:3,6,14
247:13

**candid**
206:3

**car**
118:11
136:9
256:23

**care**
150:16
261:1

**career**
16:11
19:17
27:24
28:14
29:1 75:5
155:16
156:20
157:11,12
158:15
159:19

**careful**
54:22
83:14

**carried**
121:11

**carry**
171:23

**cars**
97:12

**case**

3:14 7:8,
19 9:3,9
10:3
11:2,13,
16,23
12:4,13
13:9,13,
14 14:13,
22 15:7
16:2,6
17:9 19:1
27:10,11,
22,24
28:23,25
30:25
31:4,9,
10,17,22
32:5,21
33:5,22
34:5,10,
18 36:21,
22 37:1,
10,14
38:24
39:25
41:15,19,
23 42:16,
21 44:19
46:15
48:7,13
49:25
51:15
54:25
55:10,15,
19,21,24
58:2,21
61:9 62:6
75:21
76:5,22,
25 77:25
78:20,21,
22 79:5,
10 80:23
84:22
87:1,7,
11,20
89:7



91:25
92:6
97:4,15
98:1,6,
11,12,23
100:3
103:12
119:20
123:25
125:21
135:6
141:8
142:1
153:10
156:22
158:23
159:1,13,
18,21
162:2,22
164:6,9,
14,20
172:5,25
174:7
191:15,17
198:3
202:11
206:5
207:19,21
208:13
209:1
210:9,11,
13 223:15
226:25
234:13
238:19
249:4
250:1,2,
7,16,24
253:9
257:1
265:24
266:14
270:8

**cases**
19:4
36:13

63:24
86:24
90:21
101:25
141:13
160:14
207:9
238:4

**caused**
87:2
121:17

**chain**
132:3
211:15

**chance**
135:23
146:11
264:2

**change**
6:17
89:15
164:22

**changed**
269:13

**changing**
71:19
150:8

**chaotic**
124:19

**charge**
53:19
149:9
190:8,15
191:11

**charged**
56:2

**checkered**
180:13

**chief**
34:23

**choose**

145:16

**chose**
229:18

**Chris**
194:18
198:1

**circumstanc
e**
29:10
70:8

**circumstanc
es**
21:1
32:21
73:5
75:15
181:12
202:24
203:6
218:14
227:10
230:2
239:18
269:16

**citizens**
132:8

**city**
3:16 4:13
9:11
19:22
93:10,12
262:5

**civil**
4:24 7:7
208:10
238:23

**civilian**
16:25
17:6,22

**claim**
151:12,15
246:21

**claimed**
156:20
184:14,15
249:6
265:8

**claiming**
8:1
168:11
174:7
249:22

**claims**
186:12

**classified**
73:4

**classroom**
82:11,12

**clean**
149:18

**clear**
32:15
39:9
53:17
76:2 96:8
101:22
120:2
135:3
174:2
179:11
186:23
194:24
195:24
214:19
215:1
217:7
222:10
257:18
260:4

**click**
179:11

**clinic**
161:16

**clip**
177:18,23

178:4,9,
17 179:8

**clipboard**
139:2

**close**
35:10
78:5
92:16
121:23
122:12
124:11
145:20
179:10
186:13,21
187:6,10
234:17

**close-range**
124:1

**closed**
226:18

**closely**
63:6
77:20

**clothes**
182:12,
20,22
271:18
272:1

**clothing**
122:8
123:9,19
124:3
181:6,13,
20
183:18,22
184:3,12
259:7

**clue**
119:4
125:8
246:8

**co-author**
106:11,12



coercion
  7:23
  242:23

cold
  172:23

collecting
  272:1

color
  204:21
  205:4,17

command
  132:3
  211:16

commenced
  3:11

commencing
  3:21

commit
  56:1,19
  59:12
  158:19
  160:25
  161:4
  177:23
  201:24
  207:13

committed
  43:16
  58:3 63:3
  156:21,22
  160:24
  162:14,23
  163:1
  182:10,14
  202:6,9
  206:9,23
  207:6
  243:14
  245:13,
  15,20
  248:20
  252:12

committing
  172:8
  203:4,6
  242:24

common
  55:5
  65:15
  103:22
  204:8
  220:21

communicate
  78:11,15,
  17

communicated
  269:2

communicating
  78:7,23
  82:24
  260:16,
  23,25
  261:9

communication
  83:8
  195:15

communications
  15:10
  97:25

communities
  93:25
  94:10
  204:21
  205:16

community
  94:4
  96:18

Company
  26:7

compared

234:7

compelling
  48:4

competent
  156:3
  192:3

complained
  220:1

complaint
  7:6,7
  9:10
  38:24
  151:15

complete
  64:22
  66:7

completely
  136:17
  206:2
  243:5

compliant
  243:6

computer
  101:5

concept
  64:21

concepts
  64:17

concern
  58:4

concerns
  129:11
  264:7

conclude
  207:12

concluded
  272:8

conclusion
  69:8

conditions
  5:24

conduct
  36:3
  47:10
  89:14,19
  100:20,22
  132:21

conducted
  76:4,24
  79:20
  86:6,7
  239:3

conducting
  58:20
  88:14
  102:2
  134:13
  270:11

conduit
  98:18

confess
  161:3
  182:4
  193:11
  222:11,23

confessed
  59:20
  157:14
  158:17
  159:20
  160:24
  163:16
  190:1
  193:8
  200:16
  202:18
  206:6,15
  227:3
  237:24
  249:6,23
  252:12

confesses
  203:24

229:2

confessing
  59:10
  62:1
  64:22
  66:6
  190:22
  207:10
  217:16
  244:7
  245:10,11
  246:9,14

confession
  62:3
  64:23
  65:22
  67:1,5,
  10,18,25
  68:8
  154:22
  155:10
  162:14
  183:17
  187:21
  190:16
  194:19
  195:4
  200:1,5
  201:23
  202:8
  225:21,25
  227:11
  228:15,22
  241:21
  264:12
  266:20
  267:8

confessions
  66:21
  155:16
  201:19
  202:18,22

confessor
  65:11
  202:23



**confirm**
    188:2

**connected**
    96:22
    241:7

**connecting**
    47:2
    235:17

**connection**
    48:7
    96:21
    97:4
    148:20
    206:18
    235:23
    242:7
    249:21
    255:22

**conscientious**
    83:15
    181:19

**consent**
    123:13

**considered**
    83:14

**consistent**
    139:20
    169:15,22
    170:25
    186:1,4,
    8,17
    240:18
    241:4

**consistently**
    35:4

**constant**
    83:8

**constantly**
    78:7,23
    79:1

    82:24

**Constitutional**
    133:2

**construction**
    25:17

**consult**
    190:4
    236:20,22

**consulting**
    200:11

**contact**
    44:3
    133:3
    190:11

**contacted**
    142:5
    196:11,13
    197:21
    199:17

**contained**
    65:23
    106:16
    107:2
    220:1

**contamination**
    188:12

**continuing**
    16:5
    66:24
    197:25

**contradiction**
    136:23
    137:2,5

**contradictions**
    104:15
    105:13
    135:25

**contradicts**
    103:7

**conversation**
    72:6
    165:10
    166:16,
    19,22
    193:7
    271:6

**conversations**
    15:2

**convicted**
    57:8
    160:17

**convinced**
    61:12
    164:23

**cooperate**
    205:12

**coordinating**
    108:10,23

**copies**
    41:10

**corner**
    112:3,6

**correct**
    7:3,4
    10:4
    18:22
    23:16,17,
    22 24:21
    28:11,12
    29:3,5,
    15,17
    31:12,14,
    19 34:14,
    15 35:22
    36:6,7
    37:7,16
    39:11,12

    40:2,18,
    20 41:1,
    15,16,19
    42:24,25
    43:5,18
    44:12,15
    45:6,16,
    19,23
    46:2,3,
    12,16,24
    47:1,4,5,
    7,8,13,16
    48:1,2,15
    49:4,6,
    11,16,20,
    22 50:3,
    12,25
    51:3,7,
    16,21,25
    52:23
    53:15,19
    54:6 56:9
    57:15,22
    60:25
    61:3,4,6,
    7,10,13,
    14 64:8,
    14 67:13,
    14,19
    68:2,5,12
    70:9
    71:9,14
    72:17
    74:4,9,14
    75:20,25
    76:1,13,
    19,25
    77:5,10,
    13 78:2,
    24 79:8,
    21 80:6,
    7,10,13,
    24 81:3,
    8,19,23
    82:10,17
    83:1,2
    84:6,17

    85:2,9
    86:13
    88:1,4,5,
    7,9,10,23
    90:7
    91:8,19,
    25 92:2,
    7,17,21
    94:1,4
    95:5
    96:6,11,
    18 97:8,
    16,20,23,
    24 98:8,
    20,21
    99:19
    102:2,8,
    14,25
    103:13,
    18,21,25
    104:2,4,
    7,16
    105:1,6,
    14,16,21
    106:9,12,
    17,18,22
    107:3,6,
    13,18
    108:2,6,
    9,12
    110:3,16
    111:3,6,
    21,24
    112:4,7,
    11 113:1,
    2,6,21
    115:18
    116:7
    117:13,17
    119:6,23,
    24 120:6,
    14 121:2,
    25 122:2,
    8,10,25
    124:15,16
    125:10,
    15,17,24



126:12,
22,25
127:8,9,
11
128:14,25
129:12,21
130:8,14,
18,25
131:1,22
132:1,4,
9,15,22,
24 133:4,
14,20
134:16,18
135:7,10
136:15,
18,24
137:6,13,
14,16
139:5,13
140:19,22
141:3
142:23
144:4
146:6,18
147:1,17
148:5,14
149:4
153:13,
14,17,19
154:8,9,
11,23
155:5,8,
11,16
156:22
157:2
159:2,6,
21,25
160:1,4,
17,25
161:4,8,
14
162:15,
16,19,24
163:7,8,
14,24,25
164:3,6,

7,10,23
167:10
168:12,
18,20
169:17,22
170:1,19,
20 171:2,
5,7,11,
13,17,24
172:8,15,
23
173:12,23
175:20,24
176:18,25
177:12,24
178:7,18,
23 179:3,
8,19
180:5,17,
21 181:2,
3,7,22,25
182:14
183:19
184:8,24
185:14,
16,21,24
186:2,6,
10,13
187:1,3,
23 188:3,
6,13,23
189:5,24
190:9,12,
18 191:22
192:13,
15,21
193:2,15,
21 194:3,
18 195:2,
16,17,19
196:2,12,
16,18,22
197:4,16,
22 198:7,
9 199:2,
11,13,17
201:1,12,

14,20,25
202:15,
19,25
203:10,18
204:3,6
206:3,9,
18,24
207:2,13,
15
208:11,
12,19
209:5,19
210:7,20,
25 211:2,
20 212:1,
6,14,19,
25
214:22,23
215:14,25
216:5,12,
18,23,25
217:10,
15,19,21
218:2,8,
17,23
219:14,17
220:2,10,
17,23
221:20
222:3,8,
12,13,16,
24 223:2,
15,16,21
224:8,21,
22,24,25
225:2,7,
22 226:4
227:5,12,
25 228:2,
19,23
229:8,9,
13,16
230:3,5,
22 231:4,
16,24
232:17,
18,21,23

233:2,13,
20,22
234:19
235:9,10,
13 236:15
237:3,8
239:12,
13,16,23
240:7
241:17,21
242:8,12,
20,21,25
243:15
244:2
245:20,23
247:6,14,
20 249:2
251:22
252:13,
16,20
255:24
256:3
257:5,11,
20,23
258:15,24
259:8,22
260:1,2,
5,9,13,
14,18,24
262:6,15
263:19
264:19
265:5

**correctly**
59:9
118:2

**counsel**
3:4 4:2,3

**counting**
178:5

**country**
90:18

**county**
3:17 4:11

266:14
271:6,16,
23

**couple**
5:13 22:1
24:3
26:23
50:6 64:2
76:20
79:15,16
82:15
101:20
107:22
221:17
254:16
259:15
266:15,17

**courses**
100:25

**court**
3:15,23
8:25 9:1
13:7,13
89:7

**courtroom**
6:14

**created**
110:2
219:13
259:15,17
260:12

**credibility**
43:23
44:2
102:24
234:11

**credible**
175:10
221:19
222:2
227:2
255:9,13

**crew**



212:10

**crime**
19:24
43:16
50:11,16
51:6 53:4
58:3
59:10,12
63:3
64:25
65:12
82:1
84:25
94:9
98:20
107:23
108:1
109:13
112:25
114:22
119:5
120:25
121:2,16
128:22
130:2
146:15,17
148:20
149:10,19
150:15
152:10
156:21
157:15
158:18
159:20
160:24
162:13,
15,23
163:2
172:8
177:20
182:10,14
185:19
186:1
201:24
202:6,9,
24 203:4

206:7,9,
18,23
207:6,10,
13 214:22
222:23
227:4
232:11,
13,21
245:10,
12,19
246:15
249:23
250:13
258:10,
15,16
261:11
262:6

**crimes**
56:1
64:22
66:6 81:1
82:22
83:4
94:24
202:18
206:15
240:15

**criminal**
54:23
99:17
100:4,20,
22,23
254:20

**critical**
137:12

**critically**
110:15
216:20
223:20

**criticism**
145:12

**crystal**
101:22

**custody**
244:14

————————

————————

**D**

**DA**
139:22
140:12
141:2
142:5,18
143:21
144:2
237:16,22
238:13
242:10

**danger**
55:16
90:5

**dangers**
55:12

**date**
173:23
196:4
198:2,3
223:24
250:23,24

**dating**
262:9

**day**
11:1
29:12
59:10
62:2
63:22
120:2
130:22
134:10,23
138:12
139:12
145:15,17
217:18
218:23
227:20
230:13

237:23
262:2
265:20

**days**
91:11,12
92:7,20
115:7
180:15,16

**deal**
35:5
76:24

**dealer**
99:2
249:13

**dealers**
96:6

**dealing**
97:11
101:11

**dealt**
215:13

**death**
121:17

**decade**
75:23

**decades**
75:22

**December**
76:16
86:7
263:23
265:20
266:1

**decide**
172:18
236:19

**decision**
140:11,16
237:18

**Defendant**
7:3 8:6

9:9
11:13,24
12:14
15:25
28:24
159:13

**Defendants**
4:3,11,14
16:2,5
266:14

**definition**
61:17

**degree**
94:12,14

**Dejac**
250:1,3,
4,5
251:13
252:4,11
254:17,18

**Delavan**
112:3,6

**delay**
264:5

**denies**
185:2

**Dennis**
253:9,20
254:3

**deny**
185:6
251:16,20

**department**
16:12
17:1,20
24:23,24
30:2,22
53:15
84:1
105:19
131:20,21
157:24,25



158:5,7
211:5
270:11
271:8,17,
25

departmenta
l
  63:19

depending
  124:11

depends
  186:20
  187:4
  189:14
  245:6

deposition
  3:24
  113:8
  145:4
  272:8

depositions
  12:24

describe
  76:12
  89:9
  129:4

describes
  135:21

describing
  39:3,24
  122:24
  136:13,14
  146:14
  191:21
  232:20
  235:19
  240:7

description
  35:16
  77:21
  97:7
  124:14
  186:5,8

193:2
233:4
235:8,12,
24

descriptions
  234:3

designated
  29:20

desks
  82:9,21

destroyed
  181:14
  183:7

detail
  19:25

details
  206:7

detective
  10:9,22
  11:1,12
  13:23
  15:22
  17:3,7,24
  18:25
  19:10,13
  20:9,11,
  14,15,16,
  18,19,22
  21:12,16
  22:14,18,
  25 23:15,
  24 29:20
  30:11,13
  31:3,4,
  11,22
  32:4
  33:15
  39:8,14,
  22 40:5,
  14 42:14,
  24 43:2
  44:7,10,
  18 46:1

47:11
48:23
49:25
51:15
53:10
55:13,14
63:10
67:12
74:8
77:3,17
79:20,21,
23 80:21,
22 83:12,
15,16,25
89:20
90:5
92:13
93:24
94:21,23
98:6
99:16
102:5
103:20
104:12
112:22
113:4
115:24
116:21
117:25
118:4,7,
16 121:20
122:23
124:8
125:8,21
126:3,15,
18 127:5,
14,23
133:23
137:4
140:11
164:14
165:9,13
166:3
174:24
175:23
179:24
181:19

182:19
184:1,3,
21 185:2
199:17
204:10
208:15
209:2
211:25
212:6,13
213:4,9,
14 215:22
216:21
219:14
222:7,15,
21 224:1,
3,6,18
225:21
228:4,7,
10 229:24
238:25
240:16
241:7,8
243:5
251:1
258:14,16
260:7,23
261:3,4
263:18
265:13,15
266:12
270:3

detectives
  12:24
  27:4
  31:16
  34:17
  35:3,5
  41:14
  54:21
  64:7
  82:21
  90:8,15,
  18,25
  98:11
  101:24
  156:3

174:11
211:15
214:21
216:10
240:17,23
242:11
247:12
271:25

determine
  5:14 36:3
  41:6
  42:20
  65:21
  175:8
  183:16
  201:11
  228:15
  254:19

determined
  55:25
  140:25
  200:24
  240:6

determining
  180:24
  187:20

developments
  198:3

diametrically
  137:15

Dick
  34:23

died
  46:22

differentiate
  33:9

direct
  153:12
  229:8,16



**directed**
242:10
259:25

**directing**
174:1

**direction**
47:11
190:6
191:2
216:9

**disagree**
174:6

**discrepancy**
240:4

**discretion**
35:6 36:2
133:13
134:2,4

**discuss**
15:19

**discussed**
9:24 15:6
238:13,19

**discussing**
12:4

**discussion**
85:22
106:4
193:9
195:8
213:7
219:7

**dismissed**
221:18

**disprove**
60:2 69:2
199:25

**disproved**
59:11,16,
18,22
62:3,9

63:3
68:8,18,
24 200:19

**dispute**
73:8
147:22
224:13
232:6
233:7
256:5

**disputed**
223:14

**distinctive**
177:6

**distress**
215:3

**District**
3:14,15
40:6
41:5,13,
17,22
42:5,20
43:5,10
44:3,8
45:8,13,
18 55:25
59:24
62:2 69:6
123:12
140:2
141:10,20
144:8
173:15
174:5,8,
16,20
176:2
190:5,11
191:1,11
199:25
207:5,9,
12
236:21,23
237:11
238:5,20

268:9,13
269:4
270:16,19
271:7,16,
23

**disturbed**
215:13,18
216:16

**division**
21:25
35:11
45:23
91:15
93:2

**Dixon**
3:16 4:7,
9,24
28:5,11
31:10
37:23
38:25
46:23
47:3
48:1,7,13
49:2,10
56:1,19
57:4
58:12
59:5
60:5,19
61:12,25
76:5,13
96:9,18,
22,25
97:4,10,
22 98:2,
7,12
99:1,17
100:4,10
101:5,7,
11 135:4
139:23
143:22
146:25
147:17

148:19
149:7,9
150:20
151:7,22
152:9,18
154:20
160:16
164:9
189:21
208:17
255:22,23
258:8
262:9
264:11

**Dixon's**
100:20
147:13,23
148:8
151:4

**document**
7:12,14
79:25
85:14
116:12
135:13
146:6
165:16
166:8,21
185:14
192:13,20
194:1,3,8

**documentati
on**
116:6,9
165:22,25
193:1

**documented**
34:3
185:10

**documenting**
84:6
133:11

**documents**
12:10

38:1,23
39:4,9,14
47:6

**dollars**
238:25

**Donohue**
253:9,20
254:3

**Donovan**
34:24

**door**
226:18

**doorway**
226:13,17

**doubt**
43:18
71:1,8
218:6

**Downtown**
25:17

**drink**
130:2
254:7

**drives**
99:2

**drop**
75:7

**dropping**
236:4

**drops**
185:20

**drove**
97:11

**drug**
93:14
94:25
95:5,13,
17,20
96:6 99:1
129:12



249:13

**drug-related**
94:24

**drugs**
5:23
97:11
101:11
130:2

**drunk**
130:10,12

**duly**
4:17

**duties**
261:17

**duty**
131:6

---

**E**

**earlier**
149:23
150:4
196:5
265:24
266:18
267:13

**early**
25:9,19
26:15
48:14
49:3,25
50:22
51:20,23
93:9,18
95:13
128:22
242:1
253:9

**easier**
8:24 9:1

**easy**
174:19
262:21

**editorializing**
131:8

**educated**
32:17

**education**
17:16

**educational**
16:13

**effective**
83:4

**effort**
38:1

**efforts**
193:1

**eliminate**
188:12

**else's**
13:20,22

**Emil**
88:6
108:4
153:9,13

**emotionally**
215:13,18
216:16

**employee**
17:1
270:15

**emptied**
121:11
177:18,23
178:4
179:8

**empty**
178:10,
17,18

**en**
261:4

**end**
62:6
67:19,22
110:3
241:16

**ended**
32:4
33:15
127:24
133:24
198:21

**enforcement**
17:14

**engage**
54:22
69:20

**engaged**
90:16
208:14

**engaging**
69:16
73:3
75:24
90:6
105:11
210:24

**enormous**
233:15

**ensure**
44:10
210:23
228:14,22

**ensured**
220:9

**ensuring**
108:11,18

**enter**
119:8
242:17

**entered**
113:8

**entering**
117:23

**entire**
100:2
226:12

**Equally**
164:11

**Erie**
3:17
271:6,15,
23

**escorted**
108:13

**Esquire**
3:24

**et al**
3:17

**evaluated**
50:18

**evaluation**
161:25

**evening**
128:25
196:5
266:24,25
267:24

**events**
32:25
84:23
92:16
136:17
175:9

**everyday**
72:5

**Everything's**
124:19

**evidence**

7:22
40:15,24
43:15,17
44:10,11
45:5,12
46:21,22
47:2 48:4
49:19
50:16
55:1,15,
18,19
61:6,24
62:6 67:9
77:4,10
79:25
81:2
82:25
84:6,11
86:12
87:18
91:18
121:25
124:3
125:23
133:12
140:13,19
143:23
149:17
160:16
163:11,23
164:6,9,
20,22
174:4
175:14
177:11
179:18,25
182:13
186:17
209:25
210:4
211:16
221:1
223:14
241:2
242:19
258:10
264:11



**exact**
25:7 77:3

**EXAMINATION**
4:18
266:10

**excellent**
69:23

**excessive**
70:2,4
73:4

**exclusion**
55:1

**exculpatory**
133:11

**excuse**
15:18

**EXH**
219:9

**exhibiting**
212:18
215:17
216:14

**exist**
73:20,25

**existence**
269:8

**exonerated**
57:4 60:6

**expect**
54:5
122:7
139:17
173:9
178:16,23
179:4,7
185:19
187:9
192:25

**expected**
110:1,8,
11 134:13

139:13
155:21
156:2
193:14

**experience**
43:9 53:7
83:16,25
90:24
91:3
105:18,19
156:7
161:4
204:11
205:3
207:4,8

**experienced**
42:14
55:13

**explain**
59:3
61:22
262:25

**explanation**
141:19
149:13
165:21

**exploding**
124:19

**explore**
104:15

**extent**
43:1
50:15
53:8 54:2
76:7,23
87:11
99:15
100:6
110:13
155:14
162:3,5
165:13
166:3,13

**extraordina**
**rily**
29:9
92:15
188:20

**extremely**
263:2,14

**eye**
92:20

**eyewitness**
92:14,18,
21 111:20
112:11
116:13
118:17,19
128:3,5
248:1

**eyewitnesse**
**s**
93:3
113:1
155:4,5,7
188:21
189:9

———————

**F**

———————

**fabricate**
163:11,23
164:5,8

**fabricated**
164:22
210:3

**fabricating**
209:25
211:16

**facing**
252:19
255:3

**fact**
31:9,21
45:15

46:21
60:5,6
83:3
100:2
127:2
128:5
142:17
147:20,23
148:10
160:7
172:5,13
173:4
175:12
177:9,21
186:7
200:25
203:25
206:7
207:10
209:4
214:7,9
227:11,19
235:18
238:14
254:11
255:19
256:15
264:8,22

**facts**
206:18
207:11
209:4
230:2

**fair**
6:20,21
27:11,14
28:1
30:25
33:11,12
36:14
41:24
42:16
51:10
53:6
55:11
56:17

58:11
66:9
74:23,25
84:22
87:22
93:17,21
100:5,8
145:21
154:13
156:6
158:8
164:11
202:21
213:17
215:3,8,
16 217:4
224:14
233:15
236:8
250:9

**faith**
41:24
87:22
105:11
156:3
181:19
234:3
235:23
236:6,7

**false**
68:11
151:2
154:23
155:11
201:22
202:8
206:8

**falsely**
193:11

**familiar**
13:1
54:12
63:24
230:2



**familiarity**
257:10

**familiarize**
80:23
102:1

**family**
18:19
145:23

**fancy**
97:12

**father**
193:21

**favors**
252:25
253:6
255:6

**feature**
177:6

**February**
17:21
250:25

**feel**
6:6
145:19
205:9

**feet**
.124:18
187:10,15

**fellow**
69:12,15,
19 70:6
73:7
74:22

**felt**
74:11,21
136:10
229:14

**fight**
116:25

**fighting**
117:1

**fights**
70:3

**file**
12:18
38:2
40:16
41:6
42:12
76:3,7,8
80:24
81:19,21
102:1,11
104:9
106:1
110:11
126:25
127:2
138:19,23
139:3
140:19
141:22
153:25
165:22
173:21
193:1
222:24
223:20,24

**filed**
7:7

**filled**
173:21

**Fillmore**
20:6

**finally**
263:23

**find**
171:21
262:17,21
263:23

**finding**
47:16
56:18
57:25
78:24

81:23
82:25
83:8
169:16
260:17,18
261:16

**findings**
41:23
59:2

**Fine**
5:11

**fingertips**
102:22

**finish**
131:14
170:13
249:18
270:23

**fire**
122:6
123:8
176:12
177:17

**fired**
59:5
167:9,10
168:1
169:14,15
172:13
174:13
175:14
179:5

**firing**
117:8
120:21
121:23
124:16,17
178:6,13

**firm**
3:24 4:1

**firmly**
58:16
217:3

**firsthand**
84:24
86:12
87:8,24
88:2
153:16

**fit**
35:6
55:15,19,
20

**fits**
118:1,2

**five-minute**
101:15

**fleeing**
248:11

**follow**
67:8,24
77:9
105:13
119:18
133:11
169:4
174:3,25
175:7
265:1

**follow-up**
84:12
86:6
110:14
114:25
116:12
173:21
242:7
247:2
264:20
266:15

**foot**
233:20
234:8

**football**
25:2

**footwear**
259:10

**force**
18:4
19:16
69:19
70:2,4,7
73:4
75:14
205:15

**forensic**
121:25
123:5
124:2,3
125:23
182:13

**forensics**
181:6

**form**
6:22 8:7
14:2
25:22
26:6
27:15
28:2,3
29:6
30:4,17
31:7,10,
13,18,24
32:6
33:18
34:19
35:14
36:15
37:18
40:10,19
41:2,3,25
42:1,7,
17,18
43:6,7,
19,20,24
44:13,14,
20 45:1,7
46:17
48:8,16,

