# EXHIBIT  9

**In the Matter Of:**

DIXON V CITY OF BUFFALO

1:19-cv-01678-WMS

---

**RICHARD T. DONOVAN**

*September 15, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    RICHARD T. DONOVAN

 2

 3

 4   UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF NEW YORK
 5

 6   ----------------------------------------
     VALENTINO DIXON,
 7
                              Plaintiff,
 8
                     - vs -       Case No.
 9                               1:19-cv-01678-WMS

10   CITY OF BUFFALO and COUNTY OF ERIE;
     and DETECTIVE MARK R. STAMBACH,
11   DETECTIVE RANIERO MASECCHIA, DETECTIVE
     JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
12   CHIEF RICHARD T. DONOVAN, JOHN DOES,
     Unknown Buffalo Police Department Supervisors,
13   and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
     BELLING, in their individual capacities,
14
                              Defendants.
15   ----------------------------------------

16

17           Examination before trial of RICHARD T.

18   DONOVAN, Defendant, taken pursuant to the Federal

19   Rules of Civil Procedure, in the law offices of

20   HARRINGTON & MAHONEY, 70 Niagara Street, Buffalo,

21   New York, on September 15, 2022, commencing at

22   10:23 a.m., before LORI K. BECK, CSR, CM, Notary

23   Public.

24

25
```



```
 1   APPEARANCES:      NEUFELD SCHECK & BRUSTIN, LLP,
                       By NICK J. BRUSTIN, ESQ.,
 2                     nick@nsbcivilrights.com,
                       via Zoom,
 3                         and
                       GERARDO ROMO, ESQ.,
 4                     gerardo@nsbcivilrights.com
                       99 Hudson Street,
 5                     8th Floor,
                       New York, New York  10013,
 6                     (212) 965-9081,
                       Appearing for the Plaintiff.
 7
                       HODGSON RUSS LLP,
 8                     By PETER A. SAHASRABUDHE, ESQ.,
                       The Guaranty Building,
 9                     140 Pearl Street, Suite 100,
                       Buffalo, New York  14202,
10                     (716) 856-4000,
                       psahasra@hodgsonruss.com,
11                     Appearing for the Defendants,
                       City of Buffalo; Detective
12                     Mark R. Stambach, Detective
                       Raniero Masecchia, Detective
13                     James P. Lonergan, Detective
                       John Vickerd, Chief Richard T.
14                     Donovan, and John Does, Unknown
                       Buffalo Police Department
15                     Supervisors.

16                     LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                       By JENNIFER C. PERSICO, ESQ.,
17                     50 Fountain Plaza, Suite 1700,
                       Buffalo, New York  14202,
18                     (716) 853-5100,
                       jpersico@lippes.com,
19                     Appearing for the Defendants,
                       County of Erie and
20                     Assistant District Attorney
                       Christopher Belling.
21

22

23

24

25
```



```
 1        THE REPORTER:  First off, for Esquire
 2  Deposition Services, who is buying a copy of the
 3  transcript?
 4        Mr. Brustin, are you deferring to Mr. Romo?
 5        MR. BRUSTIN:  Yes.
 6        MR. ROMO:  Yes, each party will be
 7  purchasing their own transcript.
 8        THE REPORTER:  And that's okay,
 9  Mr. Sahasrabudhe?
10        MR. SAHASRABUDHE:  That's fine.
11        THE REPORTER:  And Ms. Persico?
12        MS. PERSICO:  Yes.
13        THE REPORTER:  Thank you very much.
14        And Mr. Sahasrabudhe, do you want him to
15  read and sign the transcript?
16        MR. SAHASRABUDHE:  We'll reserve the right
17  to have the witness read and sign, yes.
18
19  RICHARD T. DONOVAN, 57 Susan Lane, Buffalo, New
20  York 14220, after being duly called and sworn,
21  testified as follows:
22                    EXAMINATION
23        BY MR. BRUSTIN:
24        Q.   All right.  Mr. Donovan, my name is
25  Nick Brustin.  I'm one of the attorneys for
```



1 Valentino Dixon.  I'll be taking part of your

2 deposition today, your deposition as a Defendant in

3 this case, and then Mr. Romo will be taking your

4 30(b)(6) deposition.

5       So first of all, have you ever had your

6 deposition taken before, Mr. Donovan?

7       A.   Yes.

8       Q.   How many times?

9       A.   Couple.  At least a couple, you know.

10      Q.   Have you been a Defendant in a lawsuit?

11      A.   Yes, and they were -- I think they were

12 dropped.

13      Q.   Okay.  So you understand how the

14 process works.  I'm going to be asking you a series

15 of questions.  You'll be answering them under oath.

16      If you don't understand my question, you

17 just tell me, and I'll rephrase it.  If you do

18 answer it, I'm going to assume you understood it.

19      Is that fair?

20      A.   Yes.

21      Q.   If you want to take a break, that's

22 fine.  The only thing I would ask is that you

23 answer the question pending before taking a break,

24 okay?

25      A.   Okay.



1        Q.   Do you have any health conditions or

2   are you taking any medications that affect your

3   ability to testify here today?

4        A.   I'm taking a lot of medications, but

5   no, I don't think so.

6        Q.   Okay.  As far as you know, you don't

7   have any health conditions that would affect your

8   ability to give truthful and accurate testimony

9   here?

10       A.   No.

11       Q.   How old are you, sir?

12       A.   Five ten.

13       MR. SAHASRABUDHE:  How old.

14       THE WITNESS:  How old, oh, I'm sorry.  72.

15       BY MR. BRUSTIN:

16       Q.   72.  All right.  So first of all, why

17   don't we talk -- I want to talk about your career a

18   bit, but let's start with what you did to prepare

19   for this deposition.

20       So first of all, what documents have you

21   read in connection with this case since you were

22   named as a Defendant some years ago?

23       A.   Nothing until yesterday.  I reviewed a

24   few documents.

25       Q.   Did you read the Complaint in the case



1  naming you as a Defendant?

2       A.    No.

3       Q.    Why not?

4       A.    I was never, you know -- I never

5  thought I -- I had to read it.

6       Q.    Okay.  So you've not read the Complaint

7  at all?  You don't know what the allegations are

8  against you or the other officers in this case?

9       A.    Well, I know that -- you know, that

10  he's -- there's a claim by Mr. Dixon that, you

11  know, he was, you know, falsely prosecuted and that

12  I was named probably in my duties.

13       I've been named in lawsuits as Commissioner.

14  I've been named in lawsuits as Chief.  I've never

15  been personally sued by anybody, but I have done a

16  couple of them.

17       Q.    But you have no idea what the specific

18  allegations are against the officers you

19  supervised, because you didn't read the Complaint,

20  correct?

21       A.    That's correct.

22       Q.    No curiosity as to -- you understand

23  that Mr. Dixon is claiming he spent many years in

24  prison for a crime he didn't commit, correct?

25       A.    Yes.



1        Q.    And is there a reason why you

2   weren't -- you weren't curious enough to read the

3   Complaint laying out the allegations against the

4   officers?

5        MR. SAHASRABUDHE:  Object to the form.

6        MS. PERSICO:  Object to the form.

7        MR. SAHASRABUDHE:  You -- you may answer.

8        THE WITNESS:  I -- I don't remember anything

9   about the case, so that's pretty much it.  You

10  know, I -- I know I was named.  I waited for the

11  deposition, and I'm here.

12       BY MR. BRUSTIN:

13       Q.    Okay.  So your testimony is you don't

14  remember a single thing about the -- this -- this

15  case, the Jackson murder?

16       A.    I remember -- I remember the incident.

17  I don't remember -- it was in -- you know, it was

18  in 1991, and I don't remember much about it.

19       Q.    Okay.  So you do remember it.  You just

20  don't remember much about it.

21       A.    Yes.

22       Q.    Okay.  And do you remember Valentino

23  Dixon?

24       A.    No.

25       MR. SAHASRABUDHE:  Form.



```
 1        BY MR. BRUSTIN:
 2        Q.   Do you remember knowing Valentino Dixon
 3   before -- do you remember knowing of Valentino
 4   Dixon before his arrest in this case?
 5        A.   No.
 6        Q.   Did you ever have any interactions with
 7   Valentino Dixon ever in your career?
 8        A.   No.
 9        Q.   As you sit here today, do you know
10   anything about Valentino Dixon?
11        A.   I know he's an artist, and he did golf
12   course paintings.  I read that.
13        Q.   Okay.  Let's -- let's start with:
14        What do you remember about this case?  Tell
15   me everything you remember.
16        MS. PERSICO:  Form.
17        MR. SAHASRABUDHE:  Form.  Do you -- I
18   mean --
19        BY MR. BRUSTIN:
20        Q.   So when he -- so when he objects to
21   form, that's for the record and for the judge.
22   Unless he tells you not to answer, you actually
23   have to answer, unless you don't understand what
24   I'm asking you, and then tell me, and I'll rephrase
25   it, okay?
```



1         A.   Well, I understand what you're saying.

2         I was chief of homicide at the time of that

3    incident, but at the time, I had three other

4    bureaus.  When I started in homicide, the chief of

5    homicide went to every scene, and he was in charge

6    of --

7         MR. BRUSTIN:  I'm sorry.  I'm sorry, stop.

8         Something is screwed up with the connection.

9    I can barely here him.  I don't know what's going

10   on.  Can you call Esquire and find out what's going

11   on?

12           (Off the record: 10:31 a.m.)

13           (On the record: 10:46 a.m.)

14      MR. BRUSTIN:  All right.  So can you read

15   back the last question I asked, please?

16           (The record was read as requested.)

17      BY MR. BRUSTIN:

18      Q.   Mr. Donovan, you mentioned that you --

19   you didn't know anything about Mr. Dixon other than

20   he did some artwork in prison; is that right?

21      A.   I couldn't -- I can't remember anything

22   about that case, you know.  It was too long ago.

23         And I started to explain to you that when I

24   was made chief of homicide, it was a position where

25   the chief of homicide went to every scene and



1  supervised every homicide.  Between then -- that

2  was in 1987.

3       In 1991 when this homicide occurred, we had

4  reorganized.  The police department had

5  reorganized, and it became Homicide and Crimes

6  Against Persons Bureau, and I had two other

7  divisions reporting to me.  I had robbery reporting

8  to me, and I had juvenile sex offenses reporting to

9  me, and I had homicide reporting to me.

10      And homicide, when it -- when it first

11  started, I had an assistant chief of detectives,

12  and then I had a lieutenant in robbery and a

13  lieutenant in Crimes Against Persons Bureau.

14      Subsequently, I didn't go to scenes unless,

15  you know, there was a reason.  You know, the

16  lieutenant wasn't available or whatever reason.  So

17  I never responded to the homicide scene.

18      I still was in charge of homicide.  I was

19  the commanding officer of homicide.  I was the rank

20  of captain, and chief of homicide was an appointed

21  position.

22      And so I -- I didn't go to the scene.  When

23  I was told I was being sued in this case, I did not

24  remember very much about it at all.  I mean, I -- I

25  remembered where --



```
1          Q.   Okay.

2          A.   -- the location, so I just -- that's --

3   I wanted to, you know, just answer your question

4   why I said I -- I --

5          Q.   Yes.

6          A.   Okay.

7          Q.   All right.  So what -- what, if

8   anything, do you remember about your -- your

9   involvement in the -- in the investigation?

10         A.   I didn't remember anything.

11         Q.   Well, what do you remember today?  Do

12  you have any memory whatsoever of having any role,

13  either in conducting any investigative activities

14  or in supervising any investigative activities?

15         A.   Well, I would have reviewed reports,

16  but I don't remember specifically doing anything.

17  You know, if I remembered a meeting or I

18  remembered, you know, being part of the interview

19  or, you know, anything, I don't remember.  I don't

20  remember it.

21         Q.   All right.  So -- and I want you to be

22  able to answer the questions as you see fit, but

23  please just make sure you're listening to my

24  question and answering it, if you can.

25         A.   I did.
```



RICHARD T. DONOVAN                              September 15, 2022
DIXON V CITY OF BUFFALO                                        12

1        Q.   You can explain any way you want.  So

2    all I'm trying to figure out now is:

3        As you sit here today, do you have any

4    actual memory of conducting any investigative

5    activities in this case or of any supervisory

6    activities?

7        A.   No.

8        Q.   You remember nothing.

9        A.   No.

10       Q.   Okay.  What have you done to refresh

11   your -- your recollection since you were named as a

12   Defendant in this lawsuit?  What documents have you

13   reviewed?

14       A.   I just -- yesterday was the first time

15   I reviewed any documents.  I looked at a couple of

16   correspondences that had my name on them, which

17   every inter-department correspondence is directed

18   to me, and I --

19       Q.   Right.

20       A.   -- and then I review them and --

21       Q.   So again, Mr. Donovan, I'm not asking

22   you about what you did.  I'm just asking about what

23   documents you reviewed.

24       We'll be here for two days if you're not

25   answering my questions.  I promise I'll let you



```
 1  answer any way you see fit, but all I'm asking now
 2  is what documents did you review.
 3          MR. SAHASRABUDHE:  He's answering the
 4  question.
 5          THE WITNESS:  I answered the question.
 6          MR. BRUSTIN:  He's not answering anything
 7  like the question.
 8          BY MR. BRUSTIN:
 9          Q.   I just want to know what you reviewed.
10  Not why you reviewed it, just what you reviewed.
11  Just tell me what documents you read.
12          A.   I read a couple statements yesterday.
13  I read a couple P73s that had my name on it.
14          Q.   Okay.  What P73s did you read?
15          A.   There was about four or five.  They
16  were directed to me from -- one was from Ray
17  Masecchia.  One was from Danny DiPirro.
18          I read the statement of the -- the guy who
19  confessed to it afterwards, you know, the -- the
20  day after the homicide.
21          I don't remember any of them until
22  yesterday.
23          Q.   Okay.  So -- so that's -- all right.
24  So you read some -- it sounds like -- and we'll get
25  to the actual P73s, but it sounds like you read
```



1  some P73s concerning witnesses in the case,

2  including Lamarr Scott, including Sullivan,

3  including Jackson, including Adams; is that

4  correct?

5         A.   Yes, about five or six, yes.

6         Q.   Okay.

7         MS. PERSICO:  Object to the form.

8         BY MR. BRUSTIN:

9         Q.   What else -- so you read about five or

10 six P73s.  What else did you -- what else did

11 you -- you mentioned some other kinds of

12 communication.  What else?

13        A.   I think I read two statements.

14        Q.   Two witness statements.

15        A.   Yes.

16        Q.   What else?

17        A.   That was about it.

18        Q.   Okay.  So the -- the sum total of

19 documents you've reviewed in preparation for today

20 since you were named -- withdrawn.

21        The sum total of documents you've reviewed

22 since you were named as a Defendant in this lawsuit

23 are five or six P73s and a few -- and a few witness

24 statements; is that correct?

25        A.   Yes.



1          Q.   And how much time would you say you
2     spent reading those documents?  About half hour?
3          A.   About an hour.
4          MR. SAHASRABUDHE:  Form.
5          BY MR. BRUSTIN:
6          Q.   About an hour?
7          A.   Can I --
8          MR. SAHASRABUDHE:  You can answer.
9          THE WITNESS:  An hour, yes.
10         BY MR. BRUSTIN:
11         Q.   Okay.  And how much time did you spend
12    meeting with attorneys yesterday?
13         MR. SAHASRABUDHE:  Form.
14         MS. PERSICO:  Form.  I don't think he needs
15    to answer that.
16         MR. SAHASRABUDHE:  Yes, I mean, solely with
17    respect to the time, I'll allow him to answer.
18         Do you --
19         MR. BRUSTIN:  That's all I'm asking.
20         THE WITNESS:  About an hour and a half,
21    because I got a parking ticket for -- oh.  Yes.
22         BY MR. BRUSTIN:
23         Q.   Who did you meet with?
24         A.   Met with Peter.
25         Q.   Just Peter?



1       A.   Yes.

2       Q.   And that was in person in his office?

3       A.   Yes.

4       Q.   And that was the first time you met in

5   person with Peter --

6       MS. PERSICO:  Form.

7       BY MR. BRUSTIN:

8       Q.   -- or any lawyers for the city?

9       MS. PERSICO:  I don't think he should be

10  allowed to answer that.

11      MR. SAHASRABUDHE:  Yes, Nick, why -- like

12  the amount of time he's spoken with us?  Form.

13      MR. BRUSTIN:  I can ask about all his

14  meetings with you.  I just can't ask about the

15  substance.

16      BY MR. BRUSTIN:

17      Q.   Mr. Donovan, how many meetings have you

18  had with lawyers for the city since you were named

19  as a Defendant?

20      MR. SAHASRABUDHE:  Form.

21      MS. PERSICO:  Form.

22      THE WITNESS:  I talked to Peter about six,

23  seven times on the phone.

24      BY MR. BRUSTIN:

25      Q.   On the phone.  Okay.  And how long were



 1 | those conversations?

 2 |        MS. PERSICO:  Form.

 3 |        MR. SAHASRABUDHE:  Form.  I'll let him

 4 | answer that question, but we've got like -- we're

 5 | going to have to move on soon.

 6 |        You can answer if you know.

 7 |        MR. BRUSTIN:  What are you talking about?

 8 | I'm asking about how many times he met with you.

 9 | These are completely legitimate questions.

10 |        BY MR. BRUSTIN:

11 |        Q.   How much time did you spend on the

12 | phone talking to attorneys for the city?  This is

13 | as basic as it gets.

14 |        A.   I -- the only one I talked to was

15 | Peter, who's representing the city, right?  He

16 | doesn't work for the city.

17 |        Q.   And I'm not allowed to ask you what you

18 | said to him or what he said to you, but I am

19 | allowed to ask you how much time you spent talking

20 | to him.

21 |        MR. SAHASRABUDHE:  If you remember.

22 |        BY MR. BRUSTIN:

23 |        Q.   How long were those conversations?

24 |        A.   I remember talking to him.  I don't --

25 | time, you know, probably 20 minutes, half hour.  I



1  mean, I -- I'm 72 years old.  My memory is not

2  great.  You know, I can't -- I -- you know, I --

3  I -- I remember talking to him.  I can't tell you

4  one was, you know, 22 minutes and one was 30

5  minutes.  I can't tell you that.

6        Q.   All right.  Have you talked to anybody

7  else in the world about this case since you were

8  named as a Defendant?

9        MR. SAHASRABUDHE:  Form.

10        THE WITNESS:  I -- I think I mentioned I'm

11  getting deposed in something.  That's all.  Yes.  I

12  haven't -- I haven't reached out to my colleagues

13  or anything, no.

14        MR. BRUSTIN:  Unfortunately -- unfortunately,

15  my -- my sound's going out again.  Let me try

16  calling the number that's on this list.  Hold on

17  one second.

18             (Off the record: 10:56 a.m.)

19             (On the record: 10:59 a.m.)

20        BY MR. BRUSTIN:

21        Q.   Mr. Donovan, you mentioned that you

22  spoke to somebody about taking your deposition, but

23  I didn't hear who it was.

24        A.   I don't remember.  I mentioned to a

25  couple people that I was going to be deposed in the



1  case, and I didn't have any more discussion than

2  that.  I didn't go back and review any files.  I --

3  I -- I don't remember much about it.  I'm just

4  being honest.

5        Q.   Okay.  Just -- just answer my question.

6  So who -- have you spoken to any of the Defendants

7  in the case?  Masecchia, Stambach, Vickerd, any of

8  those people?

9        A.   I ran into Stambach once, and I -- he

10 said -- I said, "I'm being deposed in that, too,"

11 and he said, "Yeah," and that was it.  I never

12 discussed the case with him.

13       Q.   Didn't talk about it at all?  Whether

14 you remembered it, what he did, what you did?

15 Nothing about that?

16       A.   Nothing at all.

17       Q.   Okay.  And so you were telling me about

18 reviewing some -- reviewing some P73s and some

19 witness statements.

20       Did reviewing those P73s or witness

21 statements refresh your recollection about anything

22 that you did in the case?

23       A.   No.

24       MR. SAHASRABUDHE:  Form.

25       THE WITNESS:  Sorry.



1          MR. SAHASRABUDHE:  That's okay.

2          THE WITNESS:  No.

3          BY MR. BRUSTIN:

4          Q.   So for example, when you read -- when

5   you read Lamarr Scott's witness statement

6   confessing to the crime, you don't have any memory

7   of that happening or learning about it; is that

8   correct?

9          A.   That's correct, yes.

10          Q.   Nothing whatsoever.

11          A.   None whatsoever.

12          Q.   Do you believe that you learned about

13   it at the time and don't remember it, or you don't

14   know?

15          MR. SAHASRABUDHE:  Form.

16          MS. PERSICO:  Form.

17          THE WITNESS:  That probably could be true,

18   yes.  Yes.

19          BY MR. BRUSTIN:

20          Q.   Well, would it be fair to say you have

21   no doubt in your mind that as chief of homicide in

22   1992, you would have learned that someone other

23   than the person arrested confessed to the crime?

24          MR. SAHASRABUDHE:  I object to the form of

25   the question.  You may answer.



1           THE WITNESS:  Okay.  I -- anything I would

2    have known, I would have read in the paper.

3           BY MR. BRUSTIN:

4           Q.   Okay.  So your belief is that to the

5    extent that you learned about somebody else

6    confessing to the crime, it would have come from

7    reading the newspaper, not from talking to

8    detectives.

9           MR. SAHASRABUDHE:  Object to the form.  Are

10   you talking about in 1991, Nick?

11          MR. BRUSTIN:  So -- yes.

12          BY MR. BRUSTIN:

13          Q.   So I'm talking about back at the time

14   of -- this time, back in 1991.

15          Is it your testimony that the way you would

16   have learned about Lamarr Scott confessing to this

17   crime would have been reading it in the newspapers?

18          A.   Yes.

19          Q.   All right.  And so to the best of

20   your -- so to the best of your knowledge, you never

21   discussed Lamarr Scott confessing to this crime

22   with any of the officers or supervisors involved in

23   the day-to-day investigation; is that correct?

24          A.   I don't remember that.

25          Q.   I know you don't remember, but based on



1  how you did things at the time -- you just told us

2  you believe you learned of it reading it in the

3  newspaper.  Is it your -- is it your testimony that

4  you likely never spoke to the detectives involved

5  in the case about Lamarr Scott?

6          MS. PERSICO:  Form.

7          MR. SAHASRABUDHE:  Form.

8          THE WITNESS:  No.  It's not.  I -- I -- I

9  may have at the time.  I just don't remember any of

10  it.

11          BY MR. BRUSTIN:

12          Q.   All right.  So what's going to happen

13  today is I'm going to be asking you -- and it

14  sounds like you don't remember anything.

15          So I'm going to be asking you some questions

16  about what you actually remember, but I'm also

17  going to be asking you questions about what you

18  think happened based on how you did things and how

19  the department did things back in 1991.

20          A.   Sure, yes.

21          Q.   Do you see the kind of difference?

22          A.   Yes, definitely.  Definitely.  I

23  understand that.

24          Q.   Since you don't remember very much,

25  that's mostly what I'm going to have to do today,



```
 1  okay?

 2         A.    Sure.

 3         Q.    Okay.  So let's start with this:

 4         Mr. Donovan, tell me the best you could,

 5  please, just a general description of your career

 6  with the Buffalo Police Department beginning with

 7  when you joined the force.

 8         A.    Well, I joined in 1971 as a community

 9  peace officer, was the title, and it was a new

10  program that you worked like a cadet.  It actually

11  was to get more minorities in the department, but

12  it was open to everybody, so that's how I got on.

13         I became a patrolman in 1994 (sic), worked

14  the streets of the City of Buffalo.  I became a

15  lieutenant in 1979.  I became a captain in 1986.

16         In between those two, I was an assistant

17  chief of detectives in charge of -- of special

18  frauds for a short period of time.  Then I made

19  captain, and I commanded one of the precincts.

20         And then I became chief of homicide in 1987,

21  and then there -- because my recollection of things

22  isn't what it used to be, I became deputy

23  commissioner right around the time of this

24  homicide, and I was deputy commissioner for about

25  two years.
```



```
 1        And I became commissioner of police, and
 2   then I retired in 1994.
 3        So that was -- that's basically my career.
 4        Q.   All right.  So were you, in fact, chief
 5   of homicide during the investigation into the --
 6   into the Jackson homicide and the -- and the
 7   shooting?
 8        A.   Yes, I was chief of homicide, yes.
 9   Yes.  I wasn't sure.  I thought I might have
10   been -- I didn't recall anything about this, and
11   I'm not -- you know, I'm one of the most honest
12   people you're going to meet, and I -- I just don't
13   remember anything about this particular incident.
14        But I was chief of homicide.  I -- I checked
15   that.  I checked my dates to see -- make sure I was
16   there, because I couldn't remember anything about
17   this case.
18        Q.   Okay.  And I -- you've made that very
19   clear, but now you understand, based on going back
20   and checking, that in fact, during this
21   investigation, you were chief of homicide; is that
22   correct?
23        A.   Yes, sir.
24        Q.   Okay.  The entire investigation.
25        MR. SAHASRABUDHE:   Form.
```



1          THE WITNESS:  Yes.

2          BY MR. BRUSTIN:

3          Q.   Okay.  Now, you mentioned that you were

4     chief of homicide beginning in 1987.  Did you have

5     any -- in any of your other -- any of your other

6     jobs before that, did you have any role over

7     homicide?

8          A.   Before that?

9          Q.   Yes.

10         A.   Yes, I -- I made an arrest for homicide

11    during my first year, yes, but that's --

12         Q.   Let me be more -- I'm sorry, let me be

13    more specific.

14         A.   Okay.

15         Q.   Did you work as a detective at any time

16    during your career?

17         A.   No.  I became an assistant chief of

18    detectives, but I was never a detective.  I was

19    always on the -- on the street until -- until that

20    appointment.  I was a road lieutenant.

21         Q.   Okay.  And -- okay.  And so when you

22    were made chief of homicide in 1987, you'd never

23    actually worked as a detective; is that correct?

24         A.   Well, as I said, I was assistant chief

25    of detectives, so it technically is a detective



1  position, but I was never a detective.

2      Q.   When did you work as assistant chief of

3  detectives?

4      A.   We got laid off, had some -- it was in

5  1980 -- right before I made captain, so it would

6  have been 1980 -- '85 for about a year and a half.

7      Q.   Okay.  And then you were made chief of

8  homicide.

9      A.   No, then I was made captain, and from

10  captain, I was made chief of homicide.  That's an

11  appointed position.

12      Q.   Okay.

13      A.   Captain is a Civil Service position.

14      Q.   Okay.  Between 1985 and 1987 when you

15  became chief of homicide, did you conduct any

16  investigations yourself?

17      MR. SAHASRABUDHE:  Form.

18      BY MR. BRUSTIN:

19      Q.   That was a bad question.  Let me

20  withdraw the question.

21      Between 1985 and 1987, did you -- did you

22  participate in any homicide investigations?

23      MS. PERSICO:  Form.

24      THE WITNESS:  No.

25      MR. SAHASRABUDHE:  Form.



1          THE WITNESS:  Sorry.

2          MR. SAHASRABUDHE:  That's all right.

3          BY MR. BRUSTIN:

4          Q.   In other words, there was never a time

5    in your career when you were conducting witness

6    interviews in a homicide or interrogations of

7    homicide suspects, correct?

8          A.   Not that I recall.

9          Q.   And -- okay.  So when you were chief of

10   homicide -- withdrawn.

11         You mentioned that you came on in 1971, and

12   I think I remember that Masecchia came in on the

13   same program at the same time.  Is that correct?

14         A.   Yes, Masecchia?  Yes.

15         Q.   You guys came in the same year in the

16   same program; is that right?

17         A.   Yes.

18         Q.   And did you remain friends on the job?

19         A.   Yes.

20         Q.   Was he one of your closest friends on

21   the job?

22         MR. SAHASRABUDHE:  Form.

23         THE WITNESS:  No.

24         BY MR. BRUSTIN:

25         Q.   Were you also friends with Detective



1  Stambach?  You mentioned you saw him recently.

2          MR. SAHASRABUDHE:  Form.

3          THE WITNESS:  I don't know if I'd call it

4  friends, but we worked together.

5          BY MR. BRUSTIN:

6          Q.  But he wasn't -- he wasn't a personal

7  friend, wasn't someone you shared a meal with

8  outside of work or had a drink with?  Nothing like

9  that?

10          MR. SAHASRABUDHE:  Form.

11          THE WITNESS:  I'm sure I had beer with him,

12  yes.  I might have shared a couple meals with him,

13  but we weren't -- you know, we weren't close

14  friends.

15          BY MR. BRUSTIN:

16          Q.  Do you know his family, does he know

17  your family, for example?

18          MS. PERSICO:  Form.

19          MR. SAHASRABUDHE:  Form.

20          THE WITNESS:  We -- our wives -- he -- he

21  got divorced.  I never got divorced, but my wife

22  and I would, you know, see him and his wife at

23  affairs, but it wasn't somebody I would call up and

24  say, "Hey, let's have dinner Wednesday."

25          You know, I'd run into him at different



 1  things, yes.  I've known Mark Stambach since the
 2  academy.  I know Masecchia was mentioned.  He was a
 3  CPO.  Mark Stambach was a community peace officer,
 4  too.
 5       MR. SAHASRABUDHE:  Just -- just answer the
 6  question.
 7       THE WITNESS:  Sorry.  Yes.
 8       BY MR. BRUSTIN:
 9       Q.   And by the way, do you have any family
10  in law enforcement, either currently or before?
11       MS. PERSICO:  Form.
12       THE WITNESS:  Yes.
13       MR. SAHASRABUDHE:  Form.
14       THE WITNESS:  Well -- yes.  Quite a few.
15       BY MR. BRUSTIN:
16       Q.   Tell me about that.
17       MS. PERSICO:  Form.
18       THE WITNESS:  Well, my -- my father was a
19  police officer.  My wife's father was a police
20  officer.  My sister-in-law was a police officer.
21  My brother-in-law was a police officer.
22       My son is a police officer, and my brother
23  is a police officer, now is a DA.
24       None of them are currently working, but --
25  active police officers, but they were in law



 1  enforcement.

 2        BY MR. BRUSTIN:

 3        Q.   Okay.  And your son and your brother,

 4  were they -- well, withdrawn.

 5        Were all of them police officers in Buffalo?

 6        A.   No.

 7        Q.   Were your son and brother police

 8  officers in Buffalo?

 9        A.   No.  My -- my -- my brother-in-law and

10  sister-in-law were Buffalo police officers.  My son

11  is an Erie County sheriff.

12        Q.   Okay.

13        A.   But they were police officers.

14        Q.   Okay.  So let me ask you a few

15  questions about your duties and responsibilities as

16  chief of homicide.

17        Would it be fair to say that as chief of

18  homicide, including in 1991, you did not

19  participate in any day-to-day supervision of

20  detectives on their homicide cases?

21        MR. SAHASRABUDHE:  Form.

22        THE WITNESS:  I don't -- I can't answer that

23  with a yes or no.

24        BY MR. BRUSTIN:

25        Q.   Answer it the best you can.  Did you --



1  did you supervise -- did you supervise detectives

2  in their homicide cases as chief of homicide?

3        A.   Yes.

4        Q.   How did you supervise them?  What was

5  your role -- what was your role and responsibility

6  in regard to supervising the detectives in your

7  chain of command in homicide?

8        A.   Well, I had a lieutenant -- as I

9  explained before, I had an assistant chief of

10  detectives, and then he retired.  Then it became a

11  lieutenant, so the lieutenant would be the -- and

12  we had detective sergeants and -- couple detective

13  sergeants, so there was, you know, the chain of

14  command.

15        I had overall for three bureaus at the time,

16  so I would get involved in cases in sex offenses,

17  and I would get involved in cases in robbery, and I

18  would get involved in homicides.

19        So I had -- I had this wide range of things,

20  but I still -- if I saw something that didn't seem

21  right, I would take action.  Talk to the lieutenant

22  or maybe talk to the -- the detective on the case.

23        Q.   Okay.  Do you remember seeing any -- do

24  you -- so let's go to 1991.  Who -- who were -- who

25  were the supervisors, the lieutenant and the



1  detective sergeant, that were supervising

2  homicide -- homicide detectives in 1991 and 1992?

3       A.   To my best of my recollection, because

4  I could get things -- you know, it's been a long

5  time.  It's been a long time.

6       The lieutenant was James Rautenstrauch.  The

7  one detective sergeant was Carl Lipinczyk,

8  L-I-P-I-N-C-Z-Y-K, and the other one was Jim --

9  James Lonergan.  He was a detective sergeant.

10      Q.   Okay.  And I take it you don't remember

11 having any communications with any of them in

12 connection with this case, correct?

13      A.   Not that I can recall.  I don't

14 remember.

15      Q.   All right.  And would it be fair to say

16 that because, as you said, you had multiple

17 responsibilities, you generally entrusted those

18 supervisors to conduct the day-to-day supervision

19 in homicides like this one?

20      A.   Yes.

21      MR. SAHASRABUDHE:  Form.

22      BY MR. BRUSTIN:

23      Q.   And you mentioned there were times, if

24 you saw something wrong, where you would talk to

25 them; is that right?



1          A.    Yes.

2          Q.    And can you -- can you think of any

3    examples where that happened in homicide cases?

4          MS. PERSICO:    Form.

5          MR. SAHASRABUDHE:    Object to the form.

6          THE WITNESS:    I can -- I -- I know there

7    were -- were -- were quite a few.    You know,

8    something would come up that it would be brought to

9    my attention.    I would maybe have to meet with the

10   homicide chief of the DA's office or with another

11   police agency, you know, or, you know, try and get

12   extra stuff.

13         So, you know, there -- there -- there were

14   quite a few where that would happen.    I just

15   like -- yes.

16         BY MR. BRUSTIN:

17         Q.    I'm trying to get a sense of what --

18   what kinds of things would cause you to get

19   involved.    Can you give me some examples?

20         MR. SAHASRABUDHE:    Object to the form.

21         THE WITNESS:    I would review on a regular

22   basis -- and in this case, I don't recall anything

23   specific about this case, but if there was

24   something that came through to me and I saw that

25   there -- it needed to be investigated further or I



1  didn't like the way it was investigated, I would

2  get involved.

3       I was active.  I was active in -- I was an

4  active supervisor.  Or administrator, in this case,

5  not supervisor.  I was a very, you know -- I was

6  hands-on, and I -- I probably did stuff in this

7  case, but I cannot recall anything at all about

8  this particular case.

9       BY MR. BRUSTIN:

10      Q.   Right.  So if something unusual

11  happened in a case, that might cause you to get

12  involved; is that fair to say?

13      A.   Yes.

14      MS. PERSICO:  Form.

15      THE WITNESS:  Yes.

16      BY MR. BRUSTIN:

17      Q.   I didn't hear you, I'm sorry.

18      A.   Yes.

19      MR. SAHASRABUDHE:  Note my objection as

20  well.

21      BY MR. BRUSTIN:

22      Q.   So I -- I think we said that if

23  something unusual happened in a homicide

24  investigation, that's one of the reasons why you

25  might have been involved; is that correct?



```
 1          A.   Yes.

 2          MR. SAHASRABUDHE:   Form.

 3          BY MR. BRUSTIN:

 4          Q.   Okay.  And so for example, we know in

 5     this case, after Mr. Dixon was arrested and after

 6     he was allegedly identified by eyewitnesses,

 7     another person -- another person confessed to doing

 8     the shooting.

 9          You understand that today, correct?

10          A.   Yes.

11          MS. PERSICO:   Form.

12          BY MR. BRUSTIN:

13          Q.   Based on the documents you reviewed in

14     preparation for today, you understand that that

15     happened, correct?

16          MS. PERSICO:   Form.

17          MR. SAHASRABUDHE:   Form.  You may answer.

18          THE WITNESS:   Yesterday and I remember

19     reading in the paper about this case.

20          BY MR. BRUSTIN:

21          Q.   You mean back when it happened or -- or

22     since that time?

23          A.   Since then.

24          Q.   Okay.  I'm not asking about your memory

25     now.  I'm asking you would an example of -- you
```



1  would agree that based on your having reviewed

2  documents in preparation for today yesterday, you

3  understand today that what happened was Mr. Dixon

4  was arrested after allegedly being identified by

5  eyewitnesses, and within days somebody else

6  confessed to the crime.

7        You understand that's what happened,

8  correct?

9        A.   Yes.

10       MS. PERSICO:  Form.

11       THE WITNESS:  Sorry.

12       MR. SAHASRABUDHE:  That's okay.

13       BY MR. BRUSTIN:

14       Q.   Okay.  And that would be an extremely

15  unusual circumstance; would you agree, sir?

16       MS. PERSICO:  Form.

17       MR. SAHASRABUDHE:  Form.  You may answer.

18       THE WITNESS:  Yes.

19       BY MR. BRUSTIN:

20       Q.   Can you think of any other case in your

21  career where somebody else confessed to a crime

22  after someone was allegedly identified --

23  withdrawn.

24       Can you think of any other homicide in your

25  career where somebody confessed to a crime after a



1   different person had been arrested and allegedly

2   identified?

3        A.   I remember -- I -- there were, but I

4   can't recall a specific case, so I have to say, you

5   know, I -- no.  No to it.  No.

6        Q.   All right.  So that would be -- that

7   would be a very unusual circumstances (sic) based

8   on -- unusual circumstance based on your

9   experience; would you agree, sir?

10       A.   Yes.

11       MR. SAHASRABUDHE:  Form.

12       MS. PERSICO:  Form.

13       THE WITNESS:  Oops.  Sorry.

14       BY MR. BRUSTIN:

15       Q.   And that would be the kind of situation

16  where -- even if you don't remember it, that would

17  be the kind of situation where you would be asked

18  to get involved.

19       MR. SAHASRABUDHE:  Form.

20       BY MR. BRUSTIN:

21       Q.   Would you agree with that?

22       A.   Yes.

23       Q.   Okay.  So even though you don't

24  remember being involved in this case, based on what

25  you learned to have happened, you would believe



1  that you were involved, because it was an unusual

2  situation, correct?

3          MR. SAHASRABUDHE:  Object to the form.

4          MS. PERSICO:  Form.

5          THE WITNESS:  Yes.

6          BY MR. BRUSTIN:

7          Q.   So in other words, even though you

8  don't remember Lamarr Scott confessing to this

9  crime that Valentino Dixon was arrested for, you

10 have no doubt that you would have been made aware

11 of it and had been in the loop at the time it

12 happened, correct?

13         MR. SAHASRABUDHE:  Form.

14         MS. PERSICO:  Form.

15         THE WITNESS:  Yes.

16         BY MR. BRUSTIN:

17         Q.   And obviously, as the chief of

18 homicide, you would have ensured that the officers

19 in your chain of command did a full investigation

20 of Lamarr Scott's confession to determine whether

21 or not he was the murderer and you had arrested the

22 wrong person, correct?

23         A.   Yes.

24         MR. SAHASRABUDHE:  Form.

25         MS. PERSICO:  Form.



RICHARD T. DONOVAN                                      September 15, 2022
DIXON V CITY OF BUFFALO                                                39

```
 1          THE WITNESS:  Yes.
 2          BY MR. BRUSTIN:
 3          Q.   There would have been nothing more
 4  important than ensuring that happened, correct?
 5          MR. SAHASRABUDHE:  Form.
 6          MS. PERSICO:  Form.
 7          THE WITNESS:  Yes.
 8          BY MR. BRUSTIN:
 9          Q.   And as chief of homicide, it would have
10  been your job -- withdrawn.
11          Can you explain how the chain of command
12  works?  There's a -- you're -- you're ultimately in
13  charge of the division, but there are supervisors
14  beneath you, correct?
15          A.   Yes.
16          Q.   But the buck stopped with you, correct?
17          MR. SAHASRABUDHE:  Form.
18          MS. PERSICO:  Form.
19          THE WITNESS:  Yes.
20          BY MR. BRUSTIN:
21          Q.   In other words, it was your job -- once
22  Lamarr Scott came forward and claimed that he was
23  the -- was the shooter and not Valentino Dixon, it
24  was your job, through the chain of command, to
25  ensure that that was fully investigated, correct?
```



1              MR. SAHASRABUDHE:  Form.

2              MS. PERSICO:  Form.

3              THE WITNESS:  Yes.

4              BY MR. BRUSTIN:

5              Q.   Now, let's talk about where you were

6      physically as chief of detectives in 1991.

7              I've had other detectives describe the

8      homicide office.  Where was your office in 1991 in

9      relation to the homicide office?  Was it in the

10     homicide office?

11             A.   It was a separate office in the

12     homicide office.  We didn't have separate rooms for

13     everybody, but I had an office, and the lieutenant

14     had an office.

15             Q.   Okay.  And then there was a -- so there

16     was a big room with two offices for the -- for

17     the -- for the -- for you, the chief, and for the

18     second-in-command.

19             A.   Yes.

20             Q.   But you were able to see and hear

21     everything that was happening in the homicide unit

22     in 1991, correct?

23             MR. SAHASRABUDHE:  Form.

24             MS. PERSICO:  Form.

25             THE WITNESS:  No.  No.  I had -- usually had



1  my -- you know, I had an office, but it wasn't

2  there.  I didn't hear -- you know, I mean, I must

3  have heard something, but, you know, I -- I

4  wouldn't hear everybody talking and discussing

5  things, you know, unless I was out there.  You

6  know, I would be out there, sit with the detective

7  or something like that, yes.

8          BY MR. BRUSTIN:

9          Q.  All right.  So it's fair to say that

10 you spent a lot of time in the outer office when

11 you were in the homicide unit.

12          (Technical difficulty.)

13          BY MR. BRUSTIN:

14          Q.  Mr. Donovan, in 1991, would it be fair

15 to say that when you were in the homicide unit, you

16 spent most of your time in the outer office?

17          A.  No.

18          Q.  All right.  When you were in your

19 office, were you able to see the outer office?

20          A.  I don't remember.  I -- I saw a little

21 bit.  I don't remember what I could see from there,

22 but I said no because I told you earlier I had two

23 other bureaus that I ran, and they were in separate

24 offices down the hall.

25          So I may be in robbery for half a day.  The



1  other half of the day, I might be in juvenile

2  offense, and then I'm back to my office.

3        And as chief of homicide, I reviewed all the

4  reports for homicide, or most of them, you know.  I

5  can't say I -- I did all of them, but I would

6  review the homicides and then go to -- to different

7  offices.

8        That -- you know.

9        Q.   Okay.

10       A.   Yes.

11       Q.   All right.  And -- and so I -- I take

12 it, though, you only had one office, right?

13       A.   Yes, in homicide.

14       Q.   Okay.  And you didn't have an office in

15 the robbery unit, did you?

16       A.   No.

17       Q.   But you would go there to talk to

18 officers and supervise there, but your office was

19 in homicide.

20       A.   Yes.

21       Q.   Okay.  And you mentioned that one of

22 your jobs was to look at reports, right?

23       A.   In homicides.  I was chief of homicide.

24 That was a specific position, yes.  With a

25 lieutenant.



1        Q.   Okay.  And I've gone through the
2   reports, and I've seen that many of them are
3   addressed to you.
4        A.   Yes.
5        Q.   Okay.  But your role, I take it, was
6   simply to ensure that the reports were completed.
7   You didn't review them for substance, because you
8   weren't involved in the interviews, for example,
9   correct?
10       MR. SAHASRABUDHE:  Form.
11       MS. PERSICO:  Form.
12       THE WITNESS:  I would review them to -- you
13  know, I would review them, and if you -- I think
14  that you were provided paperwork.  If I
15  specifically read that report, my initial is on
16  there.  It's RTD and a little loop.  That one --
17  that would mean I -- I -- I reviewed that report
18  and signed it.
19       Now, you know, were there other copies?  I
20  don't know that.  Maybe I did, but I reviewed -- I
21  tried to review every report that was generated in
22  homicide on every case.
23       BY MR. BRUSTIN:
24       Q.   Okay.  Fair enough.  So let's -- let's
25  take this case as an example.

1        So yesterday you told us that you reviewed

2    some P73s.  You told us you reviewed some witness

3    statements, correct?

4        A.    Yes.

5        Q.    And those -- those would be the kinds

6    of documents that you would have reviewed back in

7    1991, correct?

8        A.    In homicide, yes.

9        Q.    Okay.  I'm only talking about homicide

10   now.

11       A.    Okay.

12       Q.    So when you reviewed those documents,

13   what were you -- what were you reviewing them for?

14       Were you reviewing them just to make sure

15   that they were completed or for some other purpose?

16       MR. SAHASRABUDHE:  And you're talking about

17   in 1991, not yesterday.

18       BY MR. BRUSTIN:

19       Q.    Yes.

20       A.    In 1991, yes, I would review them, and

21   if I -- it was acceptable to me, I would just okay

22   it, or I -- if it wasn't, I would address it to the

23   lieutenant or to maybe the detective that was

24   investigating.  I might ask him a question, "What

25   did" -- "Did you do this, you know, on it," stuff



1  like that.

2       I -- I was -- I was active.  I was active.

3  I just -- you know.

4       Q.  My question is what were you looking

5  for in reports.  Were you looking -- were you

6  looking as to whether or not they asked the right

7  questions?  Were you looking as to whether the

8  reports were substantive enough?

9       What were you looking for when you read the

10 reports?

11      MR. SAHASRABUDHE:  Form.  Answer if you can.

12      THE WITNESS:  I can.  Both of them.  I mean,

13 for everything.  You know, I was seeing the report,

14 you know, see if there's something that needed to

15 be done or that it was completed properly.

16      Sometimes you sent it back.  "I don't like

17 this, redo it," you know.  I mean, that -- that's

18 what a boss does.

19      BY MR. BRUSTIN:

20      Q.  Well, I've been trying to figure out

21 why you would do it.  What would be the reason why

22 you might send a report back to be redone?

23      MR. SAHASRABUDHE:  Form.

24      MS. PERSICO:  Form.

25      THE WITNESS:  Well, I said it.  I was chief



1  of Homicide and Crimes Against Persons Bureau, so I

2  had other duties, but I was chief of homicide.

3          BY MR. BRUSTIN:

4          Q.   Right, but you've also told us you

5  never investigated a homicide yourself, correct?

6          A.   No, I didn't say that.

7          Q.   How many homicides did you investigate

8  yourself?

9          A.   That I participated in?

10         Q.   Yes.

11         A.   Quite a few.  I used to go to the

12 scene.  In 1991, I -- I wasn't going to the scene,

13 because we reorganized.

14         So I was a -- direct in charge of homicide

15 when I took over, so -- I mean, if you're talking

16 in 1991, by that time, you know, I -- I can't

17 remember the exact date that we changed, but my

18 duties were expanded, and I had other

19 responsibilities, but I always was chief of

20 homicide.

21         Q.   Okay.  So in 1991 in a case like this,

22 although you don't remember reviewing -- withdrawn.

23         So you -- you told us you looked at a bunch

24 of reports yesterday, and although you don't

25 remember looking at those reports in 1991, you have



1   no doubt that you did, correct?

2          A.    Correct.

3          MR. SAHASRABUDHE:  Form.

4          THE WITNESS:  Oh, sorry.  Correct.

5          BY MR. BRUSTIN:

6          Q.    Yes?

7          A.    Yes.

8          Q.    And you have no -- you have no doubt

9   that you reviewed them carefully to make sure that

10  they were properly completed, correct?

11         MR. SAHASRABUDHE:  Form.

12         MS. PERSICO:  Form.

13         THE WITNESS:  Yes.

14         BY MR. BRUSTIN:

15         Q.    And you have no doubt that you properly

16  reviewed them to ensure that the officers conducted

17  the activities that were documented in those

18  reports pursuant to policy and procedure, correct?

19         MR. SAHASRABUDHE:  Form.

20         MS. PERSICO:  Form.

21         THE WITNESS:  Yes.

22         BY MR. BRUSTIN:

23         Q.    That they did all that was necessary to

24  follow up, correct?

25         MS. PERSICO:  Form.



```
 1              MR. SAHASRABUDHE:  Form.

 2              THE WITNESS:  Yes.

 3              BY MR. BRUSTIN:

 4         Q.   That they -- that they -- they followed

 5    all the rules and regulations regarding -- in

 6    regard to interviewing witnesses and suspects.

 7              MR. SAHASRABUDHE:  Form.

 8              THE WITNESS:  Yes.

 9              BY MR. BRUSTIN:

10         Q.   And in regard to conducting

11    identification procedures.

12              MR. SAHASRABUDHE:  Form.

13              THE WITNESS:  Yes.

14              BY MR. BRUSTIN:

15         Q.   And in regard to conducting follow-up

16    investigative activities as necessary based on what

17    they were finding.

18              MS. PERSICO:  Form.

19              MR. SAHASRABUDHE:  Form.

20              THE WITNESS:  Yes.

21              BY MR. BRUSTIN:

22         Q.   Because you were a very hands-on

23    supervisor, correct?

24              MS. PERSICO:  Form.

25              MR. SAHASRABUDHE:  Form.
```



1          THE WITNESS:  Yes.

2          BY MR. BRUSTIN:

3          Q.   And although you don't remember doing

4   it in this case, you have no doubt that, in fact,

5   you did, correct?

6          MR. SAHASRABUDHE:  Form.

7          MS. PERSICO:  Form.

8          THE WITNESS:  Yes.

9          BY MR. BRUSTIN:

10         Q.   Now, as you sit here today,

11   Mr. Donovan, do you have an opinion one way or

12   another as to whether or not Valentino Dixon

13   committed the murder for which he was convicted of?

14         MS. PERSICO:  Form.

15         MR. SAHASRABUDHE:  Form.

16         THE WITNESS:  I -- I don't have an opinion,

17   no.

18         BY MR. BRUSTIN:

19         Q.   Do you understand that Lamarr Scott

20   pled guilty and was convicted of committing those

21   murders -- of committing the murder -- of

22   committing the murder and the shooting?

23         MR. SAHASRABUDHE:  Form.

24         MS. PERSICO:  Form.

25         THE WITNESS:  I'm aware of that now, yes.



1          BY MR. BRUSTIN:

2          Q.   Do you have any reason to dispute today

3    that, in fact, Lamarr Scott was the shooter and not

4    Valentino Dixon?

5          MR. SAHASRABUDHE:   Form.

6          MS. PERSICO:   Form.

7          THE WITNESS:   I have some questions on that,

8    yes.

9          BY MR. BRUSTIN:

10         Q.   Sure.  So what are your questions?

11         A.   I don't know.  I -- I had remembered in

12   there that there was -- and this I don't remember

13   from '91.  I remember subsequent to it, that, you

14   know -- and -- and I -- I don't want to testify to,

15   you know, what my opinion is from reading it.

16         I think there -- there was some doubt, that

17   maybe Lamarr was not -- you know, he was not

18   telling the complete truth.  I don't know.  I

19   just -- that's my opinion.  That's all.  That's --

20   I don't -- I don't have any -- what do you call it?

21         I don't have any -- any -- I don't have any

22   doubt on it that -- you know, that there was a

23   court case and -- and Valentino Dixon was

24   exonerated, you know.  That's -- I -- I know that.

25         I mean, that's my only opinion.  I don't



1   know -- I don't know what I don't know.

2        Q.   I do want to hear your opinion, and I

3   want to know what the basis is for your opinion.

4        You said your opinion is that -- that based

5   on what you've read since that time, you think

6   there may be some doubt as to whether or not Lamarr

7   Scott was actually the shooter.

8        What did you read that caused you to have

9   that doubt?

10        MR. SAHASRABUDHE:   Form.

11        MS. PERSICO:   I'm going to object to that

12   question.   This witness is a fact witness today

13   for -- for things that happened in the

14   investigation, and his opinion -- with all due

15   respect, Chief -- is irrelevant.

16        BY MR. BRUSTIN:

17        Q.   Just make form objections, but you can

18   go ahead and answer.

19        A.   Well, throughout my career, especially

20   in homicides, I always worried that we had enough

21   evidence and the evidence was -- was good, and, you

22   know, I -- I consider all things, and I don't --

23   you know, I don't have any question.   I mean, he

24   was -- he was found not guilty of the crime.

25   That's a fact.   I go with that fact.



1        You know, do I believe everything is what --
2  what people say or even how Courts decide?  No, but
3  I don't have a personal opinion on it.  I -- I
4  have, you know, really nothing on it.  That's my
5  opinion, that's all.
6        Q.   Okay.  So -- and that -- that's
7  helpful.  So one of the things that you -- one of
8  the things that -- one of the reasons you say that
9  is because, as you told us, you were very careful
10 back in 1991 to ensure that you always had enough
11 evidence to arrest someone on a homicide, correct?
12       MR. SAHASRABUDHE:  Form.
13       MS. PERSICO:  Form.
14       THE WITNESS:  Yes.
15       BY MR. BRUSTIN:
16       Q.   And so, for example, although you don't
17 remember it, there's no doubt in your mind that
18 when Lamarr Scott came forward and said, "No, I was
19 the shooter and not Valentino Dixon," you did
20 everything in your power to make sure that that was
21 fully investigated, correct?
22       MS. PERSICO:  Form.
23       MR. SAHASRABUDHE:  Object to the form.
24       THE WITNESS:  Yes.
25       BY MR. BRUSTIN:



1        Q.    In other words, you made sure that all

2   of the witnesses who allegedly identified Valentino

3   Dixon were re-interviewed.

4        MS. PERSICO:  Form.

5        MR. SAHASRABUDHE:  Object to the form.  If

6   you remember.

7        THE WITNESS:  I don't remember, but yes, I

8   would have, yes.  Yes.

9        BY MR. BRUSTIN:

10       Q.    Okay.  And you would have ensured that

11  any forensic evidence that could be tested to

12  determine whether or not Valentino Dixon or Lamarr

13  Scott was the shooter would have been fully tested,

14  correct?

15       MR. SAHASRABUDHE:  Object to the form.

16       MS. PERSICO:  Form.

17       THE WITNESS:  Yes.

18       BY MR. BRUSTIN:

19       Q.    One of the things you were doing back

20  in 1991 -- withdrawn.

21       You obviously weren't a forensic examiner,

22  correct?

23       A.    Correct.

24       Q.    But you were -- but you -- oftentimes

25  in -- in homicide cases, forensic testing would be



1  an important issue, correct?

2          MS. PERSICO:  Form.

3          MR. SAHASRABUDHE:  Form.

4          THE WITNESS:  Yes.

5          BY MR. BRUSTIN:

6          Q.   And you would communicate with -- you

7  would communicate with the forensic people about

8  what they were doing and what they were finding,

9  correct?

10         MR. SAHASRABUDHE:  Form.

11         THE WITNESS:  Yes.

12         MR. SAHASRABUDHE:  Do you mean him

13 personally?

14         BY MR. BRUSTIN:

15         Q.   And one of the --

16         MR. SAHASRABUDHE:  Sorry, just -- his unit

17 or him?

18         MR. BRUSTIN:  Him.

19         MR. SAHASRABUDHE:  Okay.  Do you -- were you

20 personally communicating with the evidence

21 collection unit?

22         THE WITNESS:  At times, yes.

23         MR. SAHASRABUDHE:  Okay.

24         BY MR. BRUSTIN:

25         Q.   All right.  That's a good point that



 1  Peter makes.

 2       So there were times when you would

 3  communicate with the collection -- with the

 4  evidence collection and people who were testing the

 5  evidence, correct?

 6       A.   Yes, because, you know, we -- we'd

 7  have -- sometimes have to move their, you know,

 8  examination along, so there would be times.

 9       And, you know, if -- if I -- if I was at the

10  scene -- like I said, I wasn't at scenes later on,

11  but if I was at the scene, if I saw something that

12  I thought might be pertinent, I'd tell the evidence

13  to collect that piece of evidence, you know, yes.

14  So yes.

15       Q.   All right.  And one of the things that

16  you would also do -- withdrawn.

17       Do you recall that back in 1991, one of the

18  types of forensic testing that could be done in a

19  homicide case was gunpowder residue testing on

20  either a victim or alleged perpetrator's clothing,

21  correct?

22       MR. SAHASRABUDHE:  Object to the form.

23       MS. PERSICO:  Object to the form.

24       THE WITNESS:  I'm aware of it, yes.

25       BY MR. BRUSTIN:



1        Q.   Do you remember that happening in 1991?

2        MR. SAHASRABUDHE:  Form.

3        THE WITNESS:  I don't.

4        BY MR. BRUSTIN:

5        Q.   You don't?

6        A.   I don't.  I don't remember.

7        Q.   You don't remember one way or the

8   other.

9        A.   Right.

10       Q.   Okay.  So you do remember at some point

11  during your career, though, that was -- that was --

12  that was a form of forensic testing that was being

13  completed, gunshot residue testing on clothing.

14       MS. PERSICO:  Form.

15       MR. SAHASRABUDHE:  Form.

16       MS. PERSICO:  Mr. Brustin, can you clarify

17  whether you're talking about this particular case?

18       MR. BRUSTIN:  I'm -- I think my question was

19  clear that I wasn't, but I'll be clear if I wasn't.

20       BY MR. BRUSTIN:

21       Q.   In general, do you remember during your

22  career there being forensic testing on clothing to

23  determine whether or not there was gunshot residue?

24       MS. PERSICO:  Form.

25       MR. SAHASRABUDHE:  Form.



1        THE WITNESS:  Yes.

2        BY MR. BRUSTIN:

3        Q.   You remember that being one of the

4   forensic tools that were available.

5        MR. SAHASRABUDHE:  Form.

6        THE WITNESS:  Yes.

7        BY MR. BRUSTIN:

8        Q.   And I take it you don't remember

9   whether or not that testing was done in this case?

10       MR. SAHASRABUDHE:  Form.

11       THE WITNESS:  I can't recall.

12       BY MR. BRUSTIN:

13       Q.   But certainly if that was -- if that

14  was available -- that testing was available at the

15  time of this case and there was clothing to be

16  tested, you would have ensured that it was tested,

17  correct?

18       MR. SAHASRABUDHE:  Object to the form.

19       MS. PERSICO:  Form.

20       THE WITNESS:  Yes.

21       MR. BRUSTIN:  Gerardo, can you give

22  Mr. Donovan the police file, which has been marked

23  as Plaintiff's 2?

24       MR. ROMO:  He has it in front of him.

25       BY MR. BRUSTIN:



1        Q.    Now, one of the things that you

2   mentioned that you've read was the interview of

3   Lamarr Scott; is that correct, sir?

4        A.    Yes.

5        Q.    And you would agree that Lamarr Scott

6   gave a detailed description of him shooting

7   Torriano Jackson and the other people that were

8   shot, correct?

9        MS. PERSICO:  Form.

10       MR. SAHASRABUDHE:  Form.  Don't worry about

11  the page right now.  Just --

12       THE WITNESS:  Yes.

13       MR. SAHASRABUDHE:  -- listen to the

14  question.

15       BY MR. BRUSTIN:

16       Q.    Yes, I'm just asking about what you

17  read yesterday.

18       And you would agree that that type of

19  confession would require the most careful

20  investigation given that someone else had already

21  been arrested, correct?

22       MS. PERSICO:  Form.

23       MR. SAHASRABUDHE:  Form.

24       THE WITNESS:  Yes.

25       BY MR. BRUSTIN:



1        Q.   And once Lamarr Scott came forward and

2    gave that confession, it was your job through the

3    chain of command to ensure that that confession was

4    fully investigated in every conceivable way to

5    determine whether or not the wrong person had been

6    arrested, correct?

7          MR. SAHASRABUDHE:  Object to the form.

8          MS. PERSICO:  Form.

9          MR. SAHASRABUDHE:  In every conceivable way.

10   I don't know what that means, but answer -- answer

11   if you can.

12         MR. BRUSTIN:  You know what?  That's a --

13   that's a fair objection.

14         BY MR. BRUSTIN:

15         Q.   Once -- once Lamarr Scott came forward

16   and gave that detailed confession, it was your job

17   through the chain of command to ensure that that

18   confession was fully investigated in all -- in all

19   reasonable ways, that all reasonable investigative

20   steps would be taken.

21         MR. SAHASRABUDHE:  Object to the form.

22         MS. PERSICO:  Form.

23         THE WITNESS:  Yes.

24         BY MR. BRUSTIN:

25         Q.   That would include, as you just



1  mentioned, forensic testing, correct, if it was

2  available?

3          MR. SAHASRABUDHE:  Form.

4          MS. PERSICO:  Form.

5          THE WITNESS:  Yes.

6          BY MR. BRUSTIN:

7          Q.   That would include interviewing any

8  witnesses who could corroborate or contradict what

9  he was saying.

10         MR. SAHASRABUDHE:  Form.

11         MS. PERSICO:  Form.

12         THE WITNESS:  Yes.

13         BY MR. BRUSTIN:

14         Q.   In other words, would it be fair to say

15 that once Lamarr Scott comes forward with that kind

16 of unusual confession, basically the investigation

17 starts over?

18         MR. SAHASRABUDHE:  Object to the form.

19         MS. PERSICO:  Form.

20         THE WITNESS:  Not necessarily, no.

21         BY MR. BRUSTIN:

22         Q.   Well, you would want to do -- you would

23 want to treat it as if that was the -- withdrawn.

24 Withdrawn.

25         Now, let's talk a little bit about the chain



1  of command.  Now, you did not report to the DA in

2  1991.  You reported to the chief of police,

3  correct?

4          A.   Well --

5          MR. SAHASRABUDHE:  Form.

6          THE WITNESS:  -- I reported to the chief of

7  detectives, who reported to the chief of police.

8          BY MR. BRUSTIN:

9          Q.   Well, you were the chief of detectives

10 in '91, correct?

11         A.   No.

12         Q.   Oh, I'm sorry.  You were chief of

13 homicide.  I apologize.

14         A.   Correct.

15         Q.   You -- you reported to the chief of

16 detectives.  Who was that, by the way?

17         A.   Angelo Alessandro.

18         Q.   Okay.  But -- but in the chain of

19 command, you reported to police supervisors, not

20 the DA's office, correct?

21         MR. SAHASRABUDHE:  Form.

22         MS. PERSICO:  Form.

23         THE WITNESS:  Well, I didn't report with

24 them.  I worked with the DA's office closely.

25         BY MR. BRUSTIN:



1        Q.   Right.  But if you determined that in

2   order to determine whether or not there was enough

3   evidence to arrest somebody, you -- it was your job

4   independently to ensure that the police department

5   conducted investigative activities that were

6   necessary, correct?

7        MR. SAHASRABUDHE:  Form.

8        THE WITNESS:  Yes.

9        BY MR. BRUSTIN:

10       Q.   You had an independent responsibility,

11  separate and apart from the DA's office, to ensure

12  that all reasonable investigative steps were taken

13  in a case that you're -- that you were supervising,

14  correct?

15       MR. SAHASRABUDHE:  Object to the form.

16       MS. PERSICO:  Object to the form.  Are

17  you -- clarify, please, whether you're talking

18  about in this Valentino Dixon case or whether you

19  are talking in a more --

20       MR. BRUSTIN:  I'm first talking general.

21       MS. PERSICO:  I'm going to object to the

22  form of that question.

23       BY MR. BRUSTIN:

24       Q.   You can answer.

25       A.   Yes.



1          Q.    Okay.  And in this case specifically,

2     although you don't remember it, once Lamarr Scott

3     came forward and confessed to this crime, you had

4     an independent obligation, separate and apart from

5     the DA, to ensure that that confession was fully

6     investigated, correct?

7          MR. SAHASRABUDHE:  Form.

8          MS. PERSICO:  Form.

9          MR. SAHASRABUDHE:  Answer if you can.

10         THE WITNESS:  Yes.

11         BY MR. BRUSTIN:

12         Q.    I'm sorry, what -- what year did you

13    retire?

14         A.    Well, in 1994.

15         Q.    Have you worked in law enforcement

16    since then?

17         A.    Yes.

18         Q.    What other jobs in law enforcement have

19    you had?

20         A.    I went to the U.S. Attorney's Office

21    for four years as an investigator.

22         Then I went over to the sheriff's office in

23    1998, and I was chief deputy and undersheriff of

24    the sheriff's office for about 12 more years.

25         And then I retired from the sheriffs in 2000



1  I think, '9 or '10, somewhere there.

2        Q.   Why did you leave the Buffalo Police

3  Department in '94?

4        MS. PERSICO:  Form.  Go ahead.

5        THE WITNESS:  Well, I got fired.  No, I --

6  I'm -- actually, it was a Mayoral appointment like

7  it is in New York City, and the new Mayor came in,

8  and he replaced me.

9        BY MR. BRUSTIN:

10       Q.   Okay.  Got it.  Any other full-time

11  employment other than what you just described since

12  your retirement from the Buffalo Police Department?

13       A.   Not full-time, but I -- I worked until

14  just -- I'm --

15       Q.   What kind of work?

16       A.   I started a private investigation form

17  with the former sheriff and a couple other people,

18  and I'm still a -- an owner of the company.

19       Q.   What's the company called?

20       A.   716 Security & Investigations.

21       Q.   Is it based in Buffalo?

22       A.   Yes.

23       Q.   Are there any other -- are any of the

24  Defendant officers in this case involved with that

25  enterprise?



1        A.   No.

2        Q.   Who are the other Buffalo Police

3   Department officers who are involved in that

4   enterprise?

5        MR. SAHASRABUDHE:  Form.

6        MS. PERSICO:  Form.

7        THE WITNESS:  In my business?

8        BY MR. BRUSTIN:

9        Q.   Yes.

10        A.   Now, none.

11        Q.   All right.  Let me make it easier for

12   you.  Have there been any homicide detectives from

13   Buffalo that have been involved in that business?

14        A.   Yes.

15        Q.   Which ones?

16        A.   A detective sergeant -- I never worked

17   with him in homicide -- by the name of William

18   Cooley, who is now undersheriff of Erie County, and

19   John Garcia, who is the Erie County Sheriff, but

20   they just got elected, and they left the business,

21   so they're legally off the books of the business.

22        Q.   All right.  Let's take a look at the

23   police file.

24        MR. SAHASRABUDHE:  Nick, do you mind -- can

25   we take just a two-minute break?



1          MR. BRUSTIN:  Sure.

2          MR. SAHASRABUDHE:  Okay.

3             (A recess was then taken at 11:47 a.m.)

4          BY MR. BRUSTIN:

5          Q.   All right.  Let's go back on the

6    record, please, and you have what we marked as

7    Plaintiff's Exhibit 2 in front of you?

8          A.   Yes.

9          Q.   Okay.  And I'm going to refer to the

10   page numbers on the bottom middle of the page, the

11   ones that start with BPD.

12         A.   Yes.

13         Q.   And if you could first look at page --

14   page 31.

15         MR. SAHASRABUDHE:  BPD 31 at the bottom

16   center.

17         THE WITNESS:  Yes, I got it.

18         BY MR. BRUSTIN:

19         Q.   Okay.  Are you there?

20         A.   Yes.

21         Q.   Is this one of the -- is this one of

22   the interviews that you reviewed yesterday?  It

23   starts on the page before.

24         A.   Yes.  Yes, no, I got it.  Yes.

25         Q.   Okay.  And you read this carefully?



1          A.   Yes, sir.  Yes.

2          Q.   All right.  And do you see on

3   page 31 -- do you see about seven lines down it

4   says:  Can you tell me what the person that had the

5   TEC-9 looked like?

6          MR. ROMO:  It's in the middle.

7          THE WITNESS:  In the middle, okay.  Oh, I

8   got it now, yes.

9          BY MR. BRUSTIN:

10          Q.   Just read that question and answer to

11   yourself.

12          A.   Yes, okay.

13          Q.   And he's clearly describing the shooter

14   as a heavyset man who's about six feet tall, right?

15          MR. SAHASRABUDHE:  Object to the form.

16          MS. PERSICO:  Objection.

17          THE WITNESS:  Heavyset -- yes.

18          BY MR. BRUSTIN:

19          Q.   Okay.  And you know from reviewing

20   other -- I know you don't remember it, but you know

21   from reviewing other documents that Valentino Dixon

22   was very thin, correct?

23          MR. SAHASRABUDHE:  Form.

24          MS. PERSICO:  I'm going to object to the

25   form.  You need to lay a foundation.



1          THE WITNESS:  I don't remember knowing --
2          BY MR. BRUSTIN:
3          Q.   Well, let me make it simple for you.
4     That's fine.  Let me make it simple for you.
5          Do you know from reviewing documents whether
6     Lamarr Scott was a heavyset man who was six feet or
7     taller?
8          MR. SAHASRABUDHE:  Form.
9          THE WITNESS:  I'd -- I'd -- I guess, yes.  I
10    don't know.  I wouldn't disagree.  I don't -- I
11    don't know what Lamarr Scott looks like.
12         BY MR. BRUSTIN:
13         Q.   Well, I didn't ask you that.  So you
14    would agree, though -- withdrawn.
15         You understand that Emil Adams, after giving
16    this description, based on your reviewing reports,
17    allegedly identified Valentino Dixon in a properly
18    conducted photo array later that night, correct?
19         MR. SAHASRABUDHE:  Form.  What did you say?
20         BY MR. BRUSTIN:
21         Q.   You understand, sir, based on reports
22    you've reviewed, that Emil Adams, the person who
23    gave this description, allegedly identified
24    Valentino Dixon in a properly conducted photo array
25    later that night.



```
 1          MR. SAHASRABUDHE:  Form.
 2          THE WITNESS:  I remember that -- in
 3  reviewing stuff, that Valentino Dixon was
 4  identified.  I thought twice I saw somewhere, yes.
 5          BY MR. BRUSTIN:
 6     Q.   I -- I will represent to you that Emil
 7  Adams is one of the people who reports indicate
 8  identified Valentino Dixon, okay?
 9          MS. PERSICO:  No, I'm going to object to
10  that.  Why are you -- why are you representing that
11  to this witness?
12          MR. BRUSTIN:  It's foundation to ask
13  questions, and please just object to form.
14          MS. PERSICO:  Well, please ask questions
15  that are relevant to this witness.
16          MR. BRUSTIN:  Oh, my God.  I'm not going to
17  play this game with you.  Please -- just please
18  object to form.  You're not going to bother me or
19  anything.  Just object to form.
20          MS. PERSICO:  I'm not trying to bother you,
21  but I'm asking you a question, Mr. Brustin, and
22  I -- I do believe that I'm entitled to ask this
23  question, because I want to understand whether or
24  not this type of questioning, in my opinion, can go
25  on or whether we need to call the Court.
```



RICHARD T. DONOVAN                                    September 15, 2022
DIXON V CITY OF BUFFALO                                               70

1        So I'm asking you as a matter of efficiency
2    why it is that you are asking this witness about
3    documents that are -- that speak for themselves.
4        MR. BRUSTIN:  So I have no interest in
5    discussing this with you.  If you want to call the
6    Court, please feel free to go ahead.  Otherwise,
7    please -- everyone please make form objections and
8    stop talking during my deposition.
9        BY MR. BRUSTIN:
10       Q.   Mr. Donovan, you've already told us
11   that you were responsible for reviewing all of
12   these reports.  You just don't remember doing it,
13   right?
14       MR. SAHASRABUDHE:  Object to the form.
15       MS. PERSICO:  Form.
16       THE WITNESS:  Yes.
17       BY MR. BRUSTIN:
18       Q.   Okay.  So I'm going to ask you some
19   questions about reports that you would have
20   reviewed at the time, okay?
21       MR. SAHASRABUDHE:  Form.
22       THE WITNESS:  Yes.
23       BY MR. BRUSTIN:
24       Q.   And page 30 and 31 is a -- is a Q&A
25   that you would have reviewed in 1991.  You just



1   don't remember doing it today, correct?

2         MR. SAHASRABUDHE:  Object to the form.  He's

3   never testified to that.

4         THE WITNESS:  Well, I can't -- I can't

5   answer that way, because as I said, every report

6   and statement that I reviewed would contain my

7   initials, and my initials are not on this.

8         So I can't say I reviewed this report.

9         BY MR. BRUSTIN:

10        Q.    Okay.

11        A.    If my initials are on it, I definitely

12  reviewed that report.  This one doesn't have it, so

13  I can't testify I reviewed this report.

14        Q.    All right.  Let me ask you this:

15        Would it -- would it have been your

16  obligation to review this report, assuming that I'm

17  describing it accurately?  Emil Adams is an alleged

18  eyewitness who made an identification of Valentino

19  Dixon later that night.

20        MR. SAHASRABUDHE:  Form.

21        MS. PERSICO:  Form.

22        BY MR. BRUSTIN:

23        Q.    According to the report.

24        A.    I would have -- I would have liked to.

25  Yes, I should review that report.  I would have



1  reviewed that report, but if my initial's not on

2  that, I'm saying I don't know if I ever reviewed

3  this report at that time.  I can't recall.  I

4  can't -- I can't remember.

5          Q.   All right.  But you would agree:  Given

6  how important it was and how unusual it was, when

7  Lamarr Scott confessed to being the shooter a day

8  later, there's no doubt in your mind that although

9  you don't remember it, you would have reviewed all

10 of the witness statements for people who allegedly

11 identified Valentino Dixon, correct?

12         MR. SAHASRABUDHE:  Object to the form.

13         MS. PERSICO:  Object to the form.  Asked and

14 answered.

15         MR. SAHASRABUDHE:  I don't think that is a

16 proper characterization of his testimony.

17         THE WITNESS:  Do I answer?

18         MR. SAHASRABUDHE:  Yes.

19         THE WITNESS:  Oh, okay.  Yes.

20         BY MR. BRUSTIN:

21         Q.   Okay.  And so for example, to the

22 extent that there were inconsistencies between --

23 withdrawn.

24         And I know you don't remember it, so I'm

25 asking you to -- I'm asking you to answer this



1  question based on how you operated in 1991, okay?

2          A.    Yes.

3          Q.    All right.  And you've reviewed Lamarr

4  Scott's confession, correct?

5          A.    Yes.

6          Q.    And so you would agree that one of the

7  things you would have made sure you did after that

8  confession was to determine whether or not there

9  were inconsistencies between what alleged

10  eyewitnesses described and Valentino Dixon,

11  correct?

12         MR. SAHASRABUDHE:  Object to the form.

13         MS. PERSICO:  Form.

14         MR. SAHASRABUDHE:  Whether he would do that?

15         MR. BRUSTIN:  Yes, sir.

16         BY MR. BRUSTIN:

17         Q.    Would you have ensured that that

18  happened as the chief of -- as the chief of

19  homicide?

20         MS. PERSICO:  Objection to the form of that

21  question.

22         BY MR. SAHASRABUDHE:

23         Q.    I'll make it clear.  Actually, let me

24  ask a different question.

25         To the extent that someone like Emil Adams,



 1 | an eyewitness, gave a description of the shooter
 2 | that was different than Valentino Dixon and was
 3 | consistent with Lamarr Scott, you would have
 4 | ensured that that was fully investigated, correct?
 5 |         MR. SAHASRABUDHE:  Object to the form.
 6 |         MS. PERSICO:  Form.
 7 |         MR. SAHASRABUDHE:  Also, I mean -- you can
 8 | answer, but I think it would be helpful if we
 9 | establish a timeline of what had occurred, what
10 | hadn't occurred, but go ahead.
11 |         THE WITNESS:  If -- if I had been aware of
12 | it, yes, I would have -- you know, I -- I was a
13 | thorough administrator.  Yes, I would have -- I
14 | would have -- you know, that would be something I
15 | would definitely want to look into, yes.
16 |         BY MR. BRUSTIN:
17 |         Q.   And no question.  You've already told
18 | us how unusual it was for someone to confess to a
19 | crime after somebody else was arrested for it.
20 |         So once Lamarr Scott --
21 |         MS. PERSICO:  I'm going to object to the
22 | form.  That was not --
23 |         BY MR. BRUSTIN:
24 |         Q.   Once Lamarr Scott confessed to --
25 | sorry?



1          MS. PERSICO:  That is not what he testified

2  to, that this was --

3          MR. BRUSTIN:  Are you interrupting my

4  question?  I'm in the middle of a question.

5          MR. SAHASRABUDHE:  Well, you -- it paused

6  and you went -- went silent, to be fair to Jen.

7          BY MR. BRUSTIN:

8          Q.  Mr. Donovan, once you learned that

9  Lamarr Scott was confessing to a crime for which

10 somebody else was arrested, you would have ensured

11 that you carefully reviewed all of the witness

12 statements, correct?

13         MR. SAHASRABUDHE:  Form.

14         MS. PERSICO:  Form.

15         THE WITNESS:  I'm certain at the time, if --

16 if I was aware of Lamarr Scott confessing to it,

17 that we would have investigated it.  We would have

18 referred it to the DA's office.  We would have done

19 a bunch of different things in this investigation,

20 you know.

21         We -- in homicide, we didn't arrest without

22 the DA approving it and, you know, making sure

23 we're going, so -- but as far as your -- your

24 question, yes, if -- if I was aware somebody

25 confessed to it, I'm going to do a thorough



1  investigation into that, and I'm sure we did.

2       BY MR. BRUSTIN:

3       Q.   And you would have wanted -- okay.

4  And -- and by the way, I think you told me this,

5  but I want to make sure:

6       Although you don't remember learning about

7  Lamarr Scott confessing to this crime after

8  Valentino Dixon's arrest, there's no doubt in your

9  mind as chief of homicide you would have learned

10  about it at that time.

11       MR. SAHASRABUDHE:  Form.

12       MS. PERSICO:  Form.

13       THE WITNESS:  Yes.

14       BY MR. BRUSTIN:

15       Q.   Okay.  And one of the things that you

16  would have ensured is that there was a full

17  investigation to determine whether or not the --

18  the witnesses were properly investigated, correct?

19       MR. SAHASRABUDHE:  Form.  I don't -- I don't

20  understand the question, but --

21       THE WITNESS:  Yes.  I think I do.  Yes.

22  Yes.

23       BY MR. BRUSTIN:

24       Q.   Okay.  And for example, you would have

25  wanted to have looked at the witness statements



1  from people like Emil Adams, the person I'm showing
2  you, to determine whether or not his statement was
3  consistent with Valentino Dixon, correct?
4        MS. PERSICO:  Form.
5        MR. SAHASRABUDHE:  Form.
6        MS. PERSICO:  No.
7        MR. SAHASRABUDHE:  After Lamarr Scott
8  confessed?  That's what we're talking about?
9  That's the time frame?
10       MR. BRUSTIN:  That's what I'm talking about.
11       MR. SAHASRABUDHE:  Form.  You can answer.
12       THE WITNESS:  Yes.  He -- I -- from what
13  I -- from my recollection and my recall from
14  reviewing the documents, it was after the homicide.
15       So I know you asked earlier about like --
16  like gunshot residue testing.  You know, we
17  didn't -- if we didn't do that right at the time of
18  the shooting, you know, then -- you know, that's
19  when it would have been done, you know what I mean?
20  I don't have a lot of confidence in -- in gunshot
21  residue, but yes.
22       But I -- in answering your question, yes, if
23  I -- you know, if he comes in, it's cause for
24  concern.  I never want -- you never want to, you
25  know, arrest the wrong person, and, you know, I --



 1  I left -- I don't know exactly when, but I left as

 2  chief of homicide somewhere between the time of

 3  this shooting and when I became deputy

 4  commissioner, so somebody else took over, but, you

 5  know, that's -- as far as time frames and stuff,

 6  you know.

 7        BY MR. BRUSTIN:

 8        Q.   You just volunteered some information

 9  about gunshot testing.

10        MR. SAHASRABUDHE:  And by the way --

11        BY MR. BRUSTIN:

12        Q.   Is that because you discussed your

13  prior answers --

14        MR. SAHASRABUDHE:  He's not answering that

15  question, so move on.

16        BY MR. BRUSTIN:

17        Q.   Is that --

18        MR. BRUSTIN:  Well, I'm going to ask it, and

19  you can --

20        MR. SAHASRABUDHE:  Yes, and I'm directing

21  him not to answer, so go ahead and ask it.

22        MR. BRUSTIN:  Peter, don't interrupt me.

23  You can tell him not to answer when I'm done with

24  the question.

25        MR. SAHASRABUDHE:  Okay.  We'll wait for the



1    question.  Sorry.

2          BY MR. BRUSTIN:

3          Q.   Mr. Donovan, is the reason why you just

4    volunteered information about gunshot residue

5    testing is because you discussed that issue with

6    your attorney during the break?

7          MR. SAHASRABUDHE:  Don't answer the

8    question.  Happy to call the judge on that, but --

9          BY MR. BRUSTIN:

10         Q.   Mr. Donovan, when you -- you mentioned

11   that gunshot residue testing has to be done at the

12   time of the murder?  Is that what you said, I

13   thought?

14         A.   Close to the time, you know, yes.  You

15   know, but it -- it -- I never had a lot of

16   confidence in -- in gunshot residue, you know.

17         Q.   And let me distinguish between gunshot

18   residue testing on someone's body as compared to

19   gunshot residue testing on someone's clothing.

20         Is what you meant to say, that gunshot

21   residue testing on someone's hand, for example, has

22   to be done close in time to the homicide?

23         MR. SAHASRABUDHE:  Form.

24         THE WITNESS:  Well, any clothes you -- you

25   enter into evidence is going to be tested, yes.



```
 1          BY MR. BRUSTIN:
 2          Q.   So you understood that gunshot residue
 3   could remain on clothing for a number of days,
 4   correct?
 5          MR. SAHASRABUDHE:  Form.  Are we talking in
 6   1991 or ever?
 7          MR. BRUSTIN:  I'm talking about in 1991.
 8          BY MR. BRUSTIN:
 9          Q.   You understood that.
10          A.   I -- I don't know.  I can't remember.
11   You know, that's -- something about gunshot
12   residue, yes, it's just that -- I had a hang-up
13   about it, you know.  It never really helped me in a
14   lot of cases, so -- but yes, I'm -- I'm sure it can
15   be, yes.
16          Q.   It sounds like your position -- you
17   correct me if I'm wrong, but it sounds like your
18   position on gunshot residue testing was it should
19   be done, but you didn't have a lot of confidence in
20   it; is that correct?
21          MR. SAHASRABUDHE:  Object to the form.
22          MS. PERSICO:  Form.
23          THE WITNESS:  Yes.
24          BY MR. BRUSTIN:
25          Q.   All right.  Now -- and it was one of
```



1  the tools that could be used to help solve crimes.

2  You just didn't place a lot of weight on it; is

3  that fair to say?

4        MR. SAHASRABUDHE:  Form.

5        THE WITNESS:  The evidence people, you know,

6  the people we had at Central Police Services lab,

7  the laboratory people tested for a lot of things,

8  you know, and I can't recall at the time, but I'm

9  sure they -- you know, that was something they

10 tested for.

11       BY MR. BRUSTIN:

12       Q.   Okay.  So now I want to go back to

13 page 31, okay?

14       A.   Okay.

15       Q.   And this is the report you told us that

16 you would have reviewed, although you don't

17 remember it today, right?

18       A.   Yes.

19       MR. SAHASRABUDHE:  Form.

20       BY MR. BRUSTIN:

21       Q.   You would have reviewed it -- you would

22 have reviewed it even more carefully after Lamarr

23 Scott came forward and confessed to being the

24 shooter, correct?

25       MS. PERSICO:  Form.



1              MR. SAHASRABUDHE:  Form.

2              THE WITNESS:  Well, one of my investigators

3     would do it.  I might instruct them to do it.

4              You know, I probably would have done it

5     myself, you know, if -- and -- and that's why I say

6     I review reports, and if I see something that they

7     didn't pick up on, then yes, I -- yes.

8              It would be something, though, that, you

9     know, the investigators would do.

10             BY MR. BRUSTIN:

11             Q.   Right.  But this was a situation where

12     somebody -- you understand in this case someone

13     other than the person arrested and identified

14     confessed to the crime that they did it, correct?

15             MR. SAHASRABUDHE:  Form.

16             THE WITNESS:  Yes.

17             BY MR. BRUSTIN:

18             Q.   And so this was the kind of case where

19     you would want to get much more directly involved

20     in reviewing -- reviewing reports and in making

21     sure that everything was done properly, correct?

22             MR. SAHASRABUDHE:  Form.

23             MS. PERSICO:  Form.

24             THE WITNESS:  I -- I can't answer that with

25     a yes or no.



1          BY MR. BRUSTIN:

2          Q.   Why not?

3          A.   Well, because I -- as I said before, I

4    had other things going.  We had a rapist -- a

5    serial rapist case going over in robbery -- or in

6    juvenile sex offenses.  We had a string of

7    robberies.  You know, so I -- I couldn't take every

8    case.

9          I said in my testimony that I reviewed every

10   homicide case, but, you know, I couldn't be

11   directly involved in every one, I guess is what

12   I'm --

13         Q.   You -- you understand, Mr. Donovan,

14   today, although you may not remember it, that when

15   Lamarr Scott came forward and confessed, that was

16   all over the news, correct?

17         MR. SAHASRABUDHE:  Form.

18         MS. PERSICO:  Form.  Why don't you ask him

19   whether that's what he remembers.

20         THE WITNESS:  I -- I don't remember that.

21         MR. BRUSTIN:  I'm going to ask -- I'm going

22   to ask it, Jen, just the way I want to ask it.

23         BY MR. BRUSTIN:

24         Q.   I know you don't remember it today,

25   Mr. Donovan, but -- but do you -- have you learned



RICHARD T. DONOVAN                                    September 15, 2022
DIXON V CITY OF BUFFALO                                            84

1  since 1991 that, in fact, there was a lot of press

2  around Lamarr Scott confessing?  Do you understand

3  that to be true, even if you don't remember it?

4          MR. SAHASRABUDHE:  Form.

5          MS. PERSICO:  Form.

6          THE WITNESS:  Yes.

7          BY MR. BRUSTIN:

8          Q.   All right.  And that would be another

9  reason why you would become more directly involved,

10  if it was all over the press, correct?

11          MR. SAHASRABUDHE:  Object to the form.

12          MS. PERSICO:  Form.

13          THE WITNESS:  Yes, I would -- you know, I --

14  I paid attention to every case, but like I said, I

15  wasn't the investigator on every case.  We had --

16  we had two primary investigators that respond to

17  the scene, and then homicide detectives pass on

18  things, because they're not working 24/7.

19          So a new case comes in, somebody -- somebody

20  takes a statement, somebody does this and that, so

21  they would be more -- but if I reviewed it, yes, I

22  would have -- I would have -- I would have taken

23  action, knowing how I operated.

24          BY MR. BRUSTIN:

25          Q.   All right.  Let's take a look at --



1          MR. SAHASRABUDHE:  Just wait for him to give

2     you a page.

3          THE WITNESS:  Yes, I'm just looking.

4          BY MR. BRUSTIN:

5          Q.   Would it be fair to say that one of the

6     things that you would have wanted to ensure

7     happened after Lamarr Scott came forward, even

8     though you may not remember it today, is to ensure

9     that the witnesses who identified Valentino Dixon

10    were, in fact, reliable?

11         MR. SAHASRABUDHE:  Form.

12         MS. PERSICO:  Form.

13         THE WITNESS:  Yes.

14         BY MR. BRUSTIN:

15         Q.   And there's a bunch of different things

16    that you would want, through the chain of command,

17    to ensure happened.

18         You would all of the witnesses -- you would

19    want the reports of all of those witness statements

20    scrutinized to see if they were consistent,

21    correct?

22         MR. SAHASRABUDHE:  Form.

23         MS. PERSICO:  Form.

24         THE WITNESS:  Yes.

25         BY MR. BRUSTIN:



```
1        Q.   You would want -- you would want to see
2   whether or not the descriptions, for example, that
3   they gave were consistent with Valentino Dixon
4   being the shooter, correct?
5        MS. PERSICO:  Form.
6        MR. SAHASRABUDHE:  Form.
7        THE WITNESS:  Yes.
8        BY MR. BRUSTIN:
9        Q.   You'd want to determine whether or not
10  their statements were consistent with one another.
11       MR. SAHASRABUDHE:  Form.
12       MS. PERSICO:  Form.
13       THE WITNESS:  Yes.
14       BY MR. BRUSTIN:
15       Q.   You'd want to determine whether or not
16  the descriptions they gave were more consistent
17  with Lamarr Scott.  That would be important to
18  know.
19       MR. SAHASRABUDHE:  Form.
20       MS. PERSICO:  Form.
21       THE WITNESS:  Yes.
22       BY MR. BRUSTIN:
23       Q.   And by the way, you understand that
24  when witnesses are interviewed, they often give --
25  there are often small inconsistencies between what
```



1  they say with one another and even when they give

2  multiple interviews, correct?

3          MR. SAHASRABUDHE:  Form.

4          MS. PERSICO:  Form.

5          THE WITNESS:  That and sometimes they lie.

6          BY MR. BRUSTIN:

7          Q.    Right.  What you are looking for,

8  though, are big contradictions, correct?

9          MR. SAHASRABUDHE:  Form.

10          THE WITNESS:  Yes.

11          BY MR. BRUSTIN:

12          Q.    That's the kind of investigation you

13  would have ensured happened after Lamarr Scott came

14  forward, correct?

15          MR. SAHASRABUDHE:  Form.

16          THE WITNESS:  Yes.

17          BY MR. BRUSTIN:

18          Q.    Another thing you'd be looking for as a

19  conscientious supervisor once Lamarr Scott came

20  forward were other witnesses who saw the shooting

21  who could be identified and interviewed, correct?

22          MR. SAHASRABUDHE:  Form.

23          MS. PERSICO:  Form.

24          THE WITNESS:  Yes.

25          BY MR. BRUSTIN:



1          Q.   So for example, to the extent that

2    there were witnesses who hadn't yet been

3    interviewed before Valentino Dixon was arrested,

4    once Lamarr Scott came forward and said, "No, it

5    was me who committed this crime," it would be very

6    important to interview those other witnesses if you

7    could find them, correct?

8          MR. SAHASRABUDHE:  Form.

9          MS. PERSICO:  Form.

10         THE WITNESS:  Yes.

11         BY MR. BRUSTIN:

12         Q.   And it would be important, to the

13   extent that those witnesses had an opportunity to

14   see the shooting, to show them photo arrays of both

15   Valentino Dixon and Lamarr Scott.

16         MR. SAHASRABUDHE:  Form.

17         MS. PERSICO:  Form.

18         THE WITNESS:  Yes.

19         BY MR. BRUSTIN:

20         Q.   That's just basic investigative steps

21   that would have needed to have been taken once

22   Lamarr Scott came forward, correct?

23         MR. SAHASRABUDHE:  Object to the form.

24         MS. PERSICO:  I didn't hear that question.

25   I apologize.



1          MR. BRUSTIN:  Yes.

2          BY MR. BRUSTIN:

3          Q.   Those are just basic investigative

4    steps that needed to take place once Lamarr Scott

5    came forward and said he was the shooter, correct?

6          MR. SAHASRABUDHE:  Object to the form.

7          MS. PERSICO:  What were the basic

8    investigative steps?  That's the part --

9          MR. BRUSTIN:  Re-interviewing --

10   interviewing witnesses who had been identified but

11   hadn't yet been interviewed.

12         MR. SAHASRABUDHE:  Object to the form.

13         MS. PERSICO:  Okay.  Form objection.

14         THE WITNESS:  Yes.

15         BY MR. BRUSTIN:

16         Q.   And those are the kind of steps that

17   any detective acting in good faith would take,

18   correct?

19         MR. SAHASRABUDHE:  Object to the form.

20         MS. PERSICO:  Object to the form.

21         MR. SAHASRABUDHE:  That's a legal

22   conclusion.  Don't -- don't opine -- I'm

23   instructing him not to opine on another detective's

24   good faith.

25         THE WITNESS:  Yes.



RICHARD T. DONOVAN                                    September 15, 2022
DIXON V CITY OF BUFFALO                                              90

1        BY MR. BRUSTIN:

2        Q.   I'm sorry, let me ask it a better way.

3        As the chief of detectives, in your chain of

4   command, you would expect any detective acting in

5   good faith to interview additional witnesses once

6   Lamarr Scott confessed to the crime, correct?

7        MR. SAHASRABUDHE:  And I would -- I would

8   again instruct him not to opine on anyone's good

9   faith.

10       BY MR. BRUSTIN:

11       Q.   You can answer.

12       MS. PERSICO:  No, he's telling him not to

13  opine.

14       MR. SAHASRABUDHE:  Yes, don't opine on

15  anyone's good or bad faith.

16       You can ask him if he would have --

17       MR. BRUSTIN:  I don't want to fight with

18  you, so I'm going to ask a different question.

19       BY MR. BRUSTIN:

20       Q.   You would have expected any -- any

21  officer in your chain of command who was following

22  the rules and regulations of the department and his

23  training to conduct those basic -- basic

24  investigative steps, correct?

25       MR. SAHASRABUDHE:  Object to the form.



RICHARD T. DONOVAN                                September 15, 2022
DIXON V CITY OF BUFFALO                                          91

1          THE WITNESS:  Well, I wasn't chief of
2    detectives.  I was chief of homicide.  That's okay,
3    but I'm just --
4          BY MR. BRUSTIN:
5          Q.   No problem.
6          A.   Well, I just want to -- you know, I
7    don't want to -- you know, as --
8          Q.   Let me ask it right.
9          A.   Yes.
10         Q.   As chief of homicide in 1991, once
11   Lamarr Scott came forward and confessed, you would
12   have expected any detective who was following the
13   rules and regulations of the department and his
14   training to conduct those basic investigative
15   steps, correct?
16         MR. SAHASRABUDHE:  I object to the form of
17   the question.
18         MS. PERSICO:  Form.
19         THE WITNESS:  Anything that needs to be
20   investigated, should be investigated, yes.
21         BY MR. BRUSTIN:
22         Q.   And you've already told us that needs
23   to be investigated, correct?
24         MR. SAHASRABUDHE:  Object to the form.
25         MS. PERSICO:  Form.



```
 1          THE WITNESS:  Well, I have to go back,
 2  because -- just a little bit on it, because let
 3  me -- wait a minute.  I got confused -- little
 4  confused.
 5          No.  Could you just re -- ask the question
 6  again, please?
 7          BY MR. BRUSTIN:
 8          Q.  Sure.  I think you've already told us,
 9  but I'll ask it again.
10          It would -- once Lamarr Scott confessed --
11  confessed to the shooting that Valentino Dixon was
12  arrested for, it would be very important to
13  interview any alleged eyewitnesses who hadn't been
14  interviewed, correct?
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  Yes, that's -- now I get to
17  what I was thinking, because it gets back to -- you
18  said that I testified that like false confessions
19  were really rare, and I don't think I said that,
20  but if I did, they weren't completely that rare.
21  We -- I had cases where people confessed, and they
22  said they shot them and the person was stabbed, and
23  that could put, you know, an investigation, you
24  know, on hold to do that.
25          Now in -- in answer to that question, if,
```



1  you know, Lamarr Scott confessed to it, yes, we

2  would do everything within our power to, you

3  know -- we -- we had Valentino Dixon arrested, and,

4  you know, if somebody said they did it, of course

5  you want to get to the -- you know, that would be a

6  priority, and as chief of homicide at that point, I

7  don't remember doing it, but I -- I would

8  definitely be -- be -- you know, would be doing

9  everything we could, you know.

10        Now, you have to remember, in 1991, I think

11  we had 92 homicides and a limited amount of

12  investigators, and, you know, it was just a -- a

13  very troubling time, you know, for stuff like that.

14        But, you know, we would -- as -- as -- as

15  supervisor and a hands-on administrator, I would

16  personally -- you know, I don't want somebody

17  falsely accused.  That's one of the gravest

18  mistakes you could make, so in my -- I would have

19  been doing everything I could.  I don't know what I

20  did at the time, but that was my philosophy on it,

21  and there -- there -- you know.

22        So I -- I just couldn't answer that with a

23  yes or no.  I don't -- I don't know the answer.

24        BY MR. BRUSTIN:

25        Q.   That's fair.  I just want to clarify



1 one thing you just said, though.

2        You mentioned that there were times when

3 people would falsely confess to crimes.

4        A.  Yes, I -- because you said later on

5 that I -- I -- I don't -- it wasn't infrequent.  It

6 happened.  It happens.

7        Q.  Okay.  Okay.  But this is a little

8 different.  I want to make sure we're on the same

9 page.

10       Do you remember any other case where

11 somebody was identified allegedly by a number of

12 eyewitnesses and arrested and then someone came

13 forward after that and confessed to being the

14 shooter?

15       Do you remember any other case like that?

16       A.  I can't remember any.  There may have

17 been, but I can't remember any, no.  I -- I do

18 not -- I -- I do not personally remember any, yes.

19 Yes, for sure.

20       Q.  All right.  That's a very unusual

21 situation in your experience, correct?

22       A.  Yes.

23       MR. SAHASRABUDHE:  Form.

24       MS. PERSICO:  Form.

25       THE WITNESS:  Oh, sorry.  Yes.



RICHARD T. DONOVAN                          September 15, 2022
DIXON V CITY OF BUFFALO                                      95

1          MR. BRUSTIN:  Okay.  So what I think -- can

2    we go off the record for a minute?

3          (Off the record: 12:25 p.m.)

4          (A luncheon recess was then taken at

5    12:26 p.m.)

6          (On the record: 1:23 p.m.)

7          BY MR. BRUSTIN:

8          Q.   Okay.  Mr. Donovan, earlier today I was

9    asking you some questions about officers acting in

10   good faith when your attorney instructed you not to

11   answer.  Do you remember those questions?

12         A.   Yes.

13         Q.   So would it be fair to say that one of

14   your jobs -- in fact, maybe your most important

15   job -- as chief of homicide in 1991 was to ensure

16   that the officers in your chain of command were

17   acting in good faith?

18         MR. SAHASRABUDHE:  I object to the form.

19         MS. PERSICO:  Yes, form.

20         MR. SAHASRABUDHE:  And if you understand, I

21   guess, answer it.

22         THE WITNESS:  Yes.

23         BY MR. BRUSTIN:

24         Q.   In other words, to make sure that they

25   were following the rules and regulations of the



```
 1  department.
 2         MR. SAHASRABUDHE:  Form.
 3         THE WITNESS:  Yes.
 4         BY MR. BRUSTIN:
 5         Q.   To make sure that they weren't engaging
 6  in any intentional misconduct.
 7         MS. PERSICO:  Form.
 8         MR. SAHASRABUDHE:  Form.
 9         THE WITNESS:  Yes.
10         BY MR. BRUSTIN:
11         Q.   To make sure that they were
12  conscientiously conducting their investigative
13  duties and responsibilities.
14         MR. SAHASRABUDHE:  Form.
15         MS. PERSICO:  Form.
16         THE WITNESS:  Yes.
17         BY MR. BRUSTIN:
18         Q.   Make sure that they were -- that they
19  weren't ignoring evidence of innocence.
20         MR. SAHASRABUDHE:  Form.
21         MS. PERSICO:  Form.
22         THE WITNESS:  Yes.
23         BY MR. BRUSTIN:
24         Q.   To make sure that they were documenting
25  all relevant evidence in their case, whether it
```



1  helped or hurt their -- their case?

2        MR. SAHASRABUDHE:  Form.

3        MS. PERSICO:  Form.

4        THE WITNESS:  Yes.

5        BY MR. BRUSTIN:

6        Q.   And it was your job through the chain

7  of command to make sure all those things happened,

8  correct?

9        MR. SAHASRABUDHE:  Form.

10       MS. PERSICO:  Form.

11       THE WITNESS:  Yes, I was the boss.  Yes.

12       BY MR. BRUSTIN:

13       Q.   And when -- when Lamarr Scott came

14  forward and confessed to committing this crime

15  within days of Valentino Dixon being arrested,

16  you've already told us that one of your jobs was to

17  determine whether or not you had arrested the right

18  person, correct?

19       MR. SAHASRABUDHE:  Object to the form.

20       MS. PERSICO:  Form.

21       THE WITNESS:  Yes.

22       BY MR. BRUSTIN:

23       Q.   And another one of your jobs -- if --

24  if, in fact, you determined through your

25  investigation that you had arrested the wrong



1  person, it would have been your job to ensure that

2  you understood how that happened, correct?

3          MR. SAHASRABUDHE:  Object to the form.

4          MS. PERSICO:  Form.

5          THE WITNESS:  Yes.

6          BY MR. BRUSTIN:

7          Q.   In other words, if, for example, you

8  learned -- you developed evidence in 1991 that, in

9  fact -- that Lamarr Scott committed this crime as

10 opposed to Valentino Dixon as Lamarr Scott claimed,

11 it would have been your obligation to determine

12 whether the detectives who investigated this case

13 acted in good faith when they arrested Valentino

14 Dixon, correct?

15         MR. SAHASRABUDHE:  I object to the form of

16 the question.

17         MS. PERSICO:  Form.

18         MR. SAHASRABUDHE:  And also I instruct the

19 witness not to opine on whether or not anything

20 done by any of the detectives constituted good or

21 bad faith.

22         MR. BRUSTIN:  Obviously, I didn't ask that,

23 and you know it, so please make appropriate

24 objections.

25         BY MR. BRUSTIN:



1      Q.   It would have been your job to ensure,

2  through investigation, whether or not they acted in

3  good faith, correct?

4      MR. SAHASRABUDHE:  I object to the form.  At

5  what -- at what point in the investigation are we

6  talking about?

7      BY MR. BRUSTIN:

8      Q.   I'm asking you if you determined -- if

9  you had determined in 1991 that, in fact, Lamarr

10  Scott committed this crime and not Valentino Dixon,

11  one of the things you would be required to do is to

12  determine whether or not your officers acted in

13  good faith when they arrested Valentino Dixon,

14  correct?

15      MS. PERSICO:  What?

16      MR. SAHASRABUDHE:  Object to the form.

17      MS. PERSICO:  Yes, I --

18      MR. SAHASRABUDHE:  So it's a -- it's a

19  hypothetical.

20      MR. BRUSTIN:  Yes.

21      MR. SAHASRABUDHE:  If it were conclusively

22  determined in 1991 that Lamarr Scott --

23      MR. BRUSTIN:  Don't change my question.

24  It's hypothetical.  I didn't say conclusively.

25      BY MR. BRUSTIN:



1        Q.   If you determined that, in fact, Lamarr
2   Scott committed this crime and he was arrested and
3   that Valentino Dixon was mistakenly arrested as
4   being the shooter, it would have been your job to
5   ensure that when they arrested Valentino Dixon,
6   they had been acting in good faith.  In other
7   words, that they hadn't engaged in any intentional
8   misconduct.  Do you agree with that?
9        MR. SAHASRABUDHE:  Object to form.
10       MS. PERSICO:  I'm going to -- yes.  You're
11   asking him to characterize like prior behavior in
12   that case and asking him to make a conclusion
13   essentially of law in this case, and I -- that is
14   inappropriate.
15       BY MR. BRUSTIN:
16       Q.   I'm asking if you had an obligation to
17   investigate that.  Did you or not, sir?
18       MR. SAHASRABUDHE:  Form.
19       MS. PERSICO:  Same objection.
20       BY MR. BRUSTIN:
21       Q.   Very simple question.  Let me ask it
22   again, because you're getting a lot of ridiculous
23   objections.  Let me just ask it in a clear way.
24       One of your main jobs, if you determined
25   that the wrong person had been arrested, would be



1  to determine whether or not that was an innocent --

2  innocent mistake or whether your officers had

3  engaged in some type of misconduct that caused that

4  arrest, correct, sir?

5       MR. SAHASRABUDHE:  Form.

6       THE WITNESS:  Not necessarily, no, because

7  I -- I take what they develop, and you have to

8  consult with the DA.  We -- you know, there's --

9  there's -- you know, so if -- if -- it would be my

10 responsibility to -- if an innocent man was

11 connect -- you know, convicted or arrested, you

12 know, it wouldn't be -- you know, we had the

13 evidence that we had and we developed, and I -- I

14 just can't answer that with a yes or no, you know,

15 yes.

16      BY MR. BRUSTIN:

17      Q.  Yes, I'm going to ask you -- well, if

18 you determined that the wrong person had been

19 arrested in 1991 like happened more recently -- if

20 you had determined that at the time, it would have

21 been your obligation to determine how that

22 happened, how did an innocent man get wrongfully

23 arrested, correct?

24      MS. PERSICO:  Form.

25      MR. SAHASRABUDHE:  I object to the form.



 1        THE WITNESS:  Well, that's -- I'm going to
 2   answer it the same way.  I -- you know, I can't --
 3   I would take the evidence that we had at the time
 4   and present it to the DA, so --
 5        BY MR. BRUSTIN:
 6        Q.  Sir, as the chief of homicide, if two
 7   separate people identified the wrong person, would
 8   you have a concern about whether or not your
 9   officers acted in good faith?
10        MR. SAHASRABUDHE:  I object to the form.
11        MS. PERSICO:  Form.
12        MR. SAHASRABUDHE:  Don't opine on someone's
13   good faith.
14        BY MR. BRUSTIN:
15        Q.  Would you have an obligation to
16   investigate that, sir?
17        MR. SAHASRABUDHE:  Object to the form.
18        MS. PERSICO:  Form.
19        THE WITNESS:  Yes.
20        BY MR. BRUSTIN:
21        Q.  All right.  Now, I want you to take a
22   look at page 197 -- let's start at page 196 of
23   Exhibit 2.  This is the Lamarr Scott interview.
24   Let me know when you're there.
25        MR. SAHASRABUDHE:  He's there.



1          THE WITNESS:  Yes.

2          BY MR. BRUSTIN:

3          Q.   This is one of the statements that you

4    reviewed in preparation for today, correct?

5          A.   Yes.

6          Q.   You read it carefully, correct?

7          A.   Yes.

8          Q.   And again, although you don't remember

9    reading it at the time, there's no question that

10   you would have, correct?

11         MR. SAHASRABUDHE:  Object to the form.

12         THE WITNESS:  Whether I did at that -- like

13   I said, if I did, yes.  I should have, you know.  I

14   can't remember if I did.

15         BY MR. BRUSTIN:

16         Q.   All right.  Well, let's take a look at

17   it.  You -- you've already talked a little bit

18   about some of the general follow-up steps that

19   should happen when somebody confesses to a crime

20   that somebody else is already arrested for.

21         Do you remember those --

22         MR. SAHASRABUDHE:  Form.

23         BY MR. BRUSTIN:

24         Q.   -- questions and answers this morning?

25         A.   Yes.



```
 1        Q.   So let's take a look at some specific
 2   things in here.
 3        So --
 4        MS. PERSICO:  I'm sorry, what page are we
 5   looking at?
 6        MR. ROMO:  196.
 7        MR. BRUSTIN:  We're starting at page 196.
 8        BY MR. BRUSTIN:
 9        Q.   Let's take a look at 196.  Do you see
10   where it says the Buffalo Police homicide squad is
11   investigating the shooting about two-thirds of the
12   way down the page?
13        A.   Yes.
14        Q.   Could you read that question and answer
15   to yourself, please.
16        A.   Okay.
17        Q.   Now, you see it says, according to
18   Lamarr Scott, the reason that he shot Torriano
19   Jackson is because they pulled out a gun and shot
20   at him first, correct?  That's what he's saying
21   here.
22        A.   Yes.
23        Q.   And obviously, you don't know whether
24   or not that's true or not, correct?
25        A.   No.  Yes, yes.
```



1          Q.    Is that correct?

2          A.    Yes, I don't know.  I don't know.  Yes.

3          Q.    Okay.  But that's a -- that's a --

4    that's a critically important piece of information

5    to investigate to the extent possible, correct?

6          MR. SAHASRABUDHE:  Form.

7          MS. PERSICO:  Form.

8          THE WITNESS:  Yes.

9          BY MR. BRUSTIN:

10         Q.    In other words, once Lamarr Scott comes

11   forward and says that Torri Jackson or someone in

12   that car shot at him, it would be important to

13   investigate that fact for a number of reasons; fair

14   to say?

15         MR. SAHASRABUDHE:  Form.

16         MS. PERSICO:  Form.

17         THE WITNESS:  Yes.  Important, yes.

18         BY MR. BRUSTIN:

19         Q.    One -- one reason would be -- would be

20   to determine whether or not his story is factually

21   accurate, whether it's -- it's true.

22         MR. SAHASRABUDHE:  Form.

23         THE WITNESS:  Yes.

24         BY MR. BRUSTIN:

25         Q.    Another reason would be if, in fact,



1   Torri Jackson or someone in the car fired at the

2   shooter before they shot him, that might change the

3   crime.

4           MR. SAHASRABUDHE:  Form.

5           MS. PERSICO:  Form.

6           THE WITNESS:  Well, he's claiming he shot in

7   self-defense.  From -- it would be whether -- you

8   know, the gun he had, how -- you know, we wouldn't

9   know.  There's a lot -- yes, there's a lot you'd

10  want to know, yes.

11          BY MR. BRUSTIN:

12          Q.  That's another reason why you'd want to

13  carefully investigate, though, correct?

14          MR. SAHASRABUDHE:  Form.

15          THE WITNESS:  Yes.

16          BY MR. BRUSTIN:

17          Q.  And there's a lot of ways to

18  investigate whether or not the victim had a gun,

19  correct?

20          MR. SAHASRABUDHE:  Form.

21          MS. PERSICO:  Form.

22          THE WITNESS:  Yes.

23          BY MR. BRUSTIN:

24          Q.  So, for example, to the extent that

25  there was a gun found -- found at the crime scene,



1  it would be important to do all possible

2  investigation into that gun to determine whether or

3  not it could be connected to Torriano Jackson or

4  anybody in his car, correct?

5          MR. SAHASRABUDHE:  Form.

6          MS. PERSICO:  I'm going to object to the

7  form of all possible investigation.

8          BY MR. BRUSTIN:

9          Q.   All reasonable investigation.

10         A.   Well, just to clarify it, my officers,

11 my detectives, wouldn't take the gun into custody.

12 We changed those procedures a while before -- you

13 know, before this where we had evidence

14 technicians.  They collected the evidence.

15         So yes, I mean, if you got a gun at the

16 scene, certainly you take it.  You're going to test

17 it, you know, you're going to see if it was the gun

18 that, you know, was used, yes.  Of course, yes.

19         Q.   That's an important clarification you

20 made.  The responsibility of the detective and in

21 particular Detective Stambach, who took this

22 statement, would be to make sure that the forensic

23 people were aware of this information and did that

24 testing, correct?

25         MR. SAHASRABUDHE:  Form.



```
 1        THE WITNESS:  He -- yes.  Yes, he -- I mean,
 2   I don't know if a gun was taken into evidence,
 3   so --
 4        BY MR. BRUSTIN:
 5        Q.   It was.  I can represent to you that
 6   there was a gun from the scene --
 7        A.   Okay.  Yes, thank you for that.  If
 8   there was, yes, he would check with them, you know.
 9        Q.   Okay.
10        A.   Ballistics is important.  That's -- you
11   know, it helps us in a lot of cases, you know.
12   Mostly they're unregistered guns, but yes, it's
13   still important, yes.
14        Q.   And another basic investigative step
15   you would want to take in regard to whether or not
16   Torriano Jackson or anybody associated with him had
17   or fired a gun would be to interview witnesses at
18   the scene and ask them about it, correct?
19        MR. SAHASRABUDHE:  Form.
20        MS. PERSICO:  Form.
21        THE WITNESS:  Yes.
22        BY MR. BRUSTIN:
23        Q.   That's a basic investigative step you
24   would take, correct?
25        MR. SAHASRABUDHE:  Form.
```



1         MS. PERSICO:  Form.

2         THE WITNESS:  Witnesses at the scene are,

3   yes.  Yes, it's very important.

4         BY MR. BRUSTIN:

5         Q.   Can you think of any legitimate reason,

6   if you received this kind of information from

7   Lamarr Scott, that the -- that the -- that the

8   person who was killed -- that his -- he or someone

9   in his car had a weapon, a -- a gun that was

10  shot -- can you think of any legitimate reason not

11  to question witnesses about that?

12        MR. SAHASRABUDHE:  Object to the form.

13        MS. PERSICO:  Form.

14        THE WITNESS:  I -- I don't know.  I mean,

15  I'd have to have the scene.

16        Normally, yes.  I'd say yes.  Yes.  Yes, I

17  mean --

18        BY MR. BRUSTIN:

19        Q.   Okay.

20        A.   I mean, everything's important.  We --

21  we never -- our philosophy was everything is

22  important, and, you know, it can be nothing, but we

23  did -- we tended to take in everything we could.

24        I mean, a lot of times, yes, it's work, but,

25  you know, you kind of eliminate that it was



1  involved, yes.

2        Q.   Right.  Now, another basic

3  investigative step you'd want to take in regard to

4  this kind of statement from Lamarr Scott confessing

5  to being the shooter that Valentino Dixon was

6  arrested for would be whether or not Lamarr Scott

7  has any kind of motive to lie, correct?

8        MR. SAHASRABUDHE:  Object to the form.

9        THE WITNESS:  Yes, if -- you know, you'd

10  want to know if he's telling the truth.  Yes,

11  obviously, yes.

12        BY MR. BRUSTIN:

13        Q.   So for example, you'd want to

14  investigate whether or not there was anybody who

15  offered him any money or any other type of benefit

16  for telling this false story, assuming it's false,

17  right?

18        MR. SAHASRABUDHE:  Form.

19        THE WITNESS:  Well, in -- in this particular

20  case -- like I said, I don't remember a lot about

21  it, but from what we went over, Valentino Dixon was

22  already in custody for this, and then --

23        BY MR. BRUSTIN:

24        Q.   Right.

25        A.   -- you know, Lamarr Scott, so you have



 1  to -- yes, I mean, you have to look at everything.

 2  There's nothing you -- you -- you don't look at.

 3         I mean, is it always done?  Sometimes

 4  it's -- you know, but yes.  I'd say yes.  I mean,

 5  there's nothing -- no piece of evidence that's not

 6  important.

 7         Q.   Well, you said sometimes it's not done.

 8  If you have evidence that you may have arrested the

 9  wrong person for a homicide, it has to be done,

10  correct?

11         MR. SAHASRABUDHE:  Object to the form.

12         MS. PERSICO:  Object to the form.  I'm

13  sorry, can you clarify what is -- what has to be

14  done?

15         MR. SAHASRABUDHE:  Yes, what has to be done?

16         MR. BRUSTIN:  Yes, sir.

17         BY MR. BRUSTIN:

18         Q.   If -- if you have evidence that the

19  wrong person has been arrested for a homicide, you

20  have an obligation to conduct all reasonable

21  investigative steps, regardless of how busy you

22  are, for example, correct?

23         MR. SAHASRABUDHE:  Object to the form.

24         MS. PERSICO:  Form.

25         THE WITNESS:  I'd say yes.



```
1          BY MR. BRUSTIN:

2          Q.    There is no more important

3   investigation as a homicide detective than when you

4   receive evidence that you may have arrested the

5   wrong person, correct?

6          MR. SAHASRABUDHE:  Object to the form.

7          MS. PERSICO:  Form.  This witness is not and

8   never has been a homicide detective.

9          BY MR. BRUSTIN:

10         Q.    Sir, as the chief of -- of homicide in

11  1991, would you agree that you understood there was

12  no more important investigative task to conduct

13  than when you received evidence that you may have

14  arrested the wrong person?

15         MR. SAHASRABUDHE:  Object to the form.

16         THE WITNESS:  Yes, I -- I don't know if I

17  can say yes to that, because, you know, the most

18  important thing is getting the person who did it,

19  you know, and if -- if -- whether it was Valentino

20  Dixon or Lamarr Scott, you know, you'd pursue that.

21  That's the most important thing, yes.  Yes.

22         BY MR. BRUSTIN:

23         Q.    Well, you would agree it's critically

24  important to make sure you don't have the wrong

25  person in custody, correct?
```



```
 1          MR. SAHASRABUDHE:  Form.

 2          THE WITNESS:  Definitely, yes.

 3          BY MR. BRUSTIN:

 4          Q.   Not even for an hour, right?

 5          MR. SAHASRABUDHE:  Form.

 6          MS. PERSICO:  Form.

 7          THE WITNESS:  Any amount of time.  You don't

 8   want to -- you know, you want to arrest the right

 9   person.  That's -- that's your duties and

10   responsibility.

11          That's why I didn't stop at chief of

12   homicide.  I kept going up and up in different

13   things, and, you know, I always went for the best

14   in law enforcement.

15          And that is -- I would never -- I never

16   would say that, you know -- not -- if I know

17   somebody else did it, you get that person.

18   That's -- that's the most important thing, of

19   course.

20          BY MR. BRUSTIN:

21          Q.   Well, it's not if you know somebody

22   else did it.  If you have evidence that somebody

23   else did it, you have an obligation to carefully

24   and comprehensively investigate it, correct?

25          MR. SAHASRABUDHE:  Form.
```



1          MS. PERSICO:  Form.

2          THE WITNESS:  Depends on what you're

3    talking.  You -- you know as well as I do there's

4    all kinds of different evidence, you know, and, you

5    know, that, you know, it's -- but yes, it's -- yes,

6    I think we're just bouncing around, but I'm saying

7    of course you want to get the right person.  Person

8    who committed the crime is the most important thing

9    for -- as far as my responsibilities, yes.

10          BY MR. BRUSTIN:

11          Q.   Let's be specific.  Let's -- let's now

12   talk about this detailed, four-page statement from

13   Lamarr Scott confessing to the crime.

14          MR. SAHASRABUDHE:  Object to form.

15          BY MR. BRUSTIN:

16          Q.   This is a critically important piece of

17   evidence to investigate, correct?

18          MR. SAHASRABUDHE:  Form.

19          MS. PERSICO:  Form.

20          THE WITNESS:  Yes.  Of course.

21          BY MR. BRUSTIN:

22          Q.   Now, to the extent that you have reason

23   to believe that somebody on Valentino's behalf,

24   like his mother or his father or a friend, may have

25   offered an inducement to Lamarr Scott to make this



```
1  confession, you had an obligation to ensure that
2  those allegations were investigated, correct?
3       MR. SAHASRABUDHE:  Form.
4       MS. PERSICO:  Form.
5       THE WITNESS:  I'm not sure they weren't.
6       BY MR. BRUSTIN:
7       Q.  I'm just asking about your obligations,
8  sir, not whether they were or they weren't.
9       You had an obligation to ensure they were
10  investigated, correct?
11       MR. SAHASRABUDHE:  Form.
12       MS. PERSICO:  Form.
13       THE WITNESS:  Yes.
14       BY MR. BRUSTIN:
15       Q.  And the time to investigate those kinds
16  of allegations are as soon as practicable after
17  they are made, correct?
18       MR. SAHASRABUDHE:  Object to the form.
19       THE WITNESS:  Yes.
20       BY MR. BRUSTIN:
21       Q.  Now, another important thing in regard
22  to Lamarr Scott and this -- and this confession
23  would be to determine whether there was any
24  physical evidence from Lamarr Scott that could be
25  tested, correct?
```



```
 1              MR. SAHASRABUDHE:  Form.

 2              THE WITNESS:  Yes.

 3              BY MR. BRUSTIN:

 4         Q.   That would confirm or contradict his

 5    story, correct?

 6         A.   Yes.

 7              MS. PERSICO:  Form.

 8              BY MR. BRUSTIN:

 9         Q.   So for example, if -- if -- in a -- in

10    a crime like this, a brutal shooting at close

11    range, one of the things you would want to do in a

12    case like this, when Lamarr Scott is confessing to

13    the crime, is to try to obtain any clothing that he

14    was wearing at the time of the shooting to

15    determine whether or not he could be connected to

16    the crime, correct?

17              MR. SAHASRABUDHE:  Form.

18              THE WITNESS:  Yes.

19              BY MR. BRUSTIN:

20         Q.   You'd want to be looking for whether or

21    not any of his clothes have, for example, blood on

22    it.

23              MR. SAHASRABUDHE:  Form.

24              MS. PERSICO:  Form.

25              THE WITNESS:  Yes.
```



```
1         BY MR. BRUSTIN:

2         Q.   Or gunpowder residue.

3         MS. PERSICO:  Form.

4         MR. SAHASRABUDHE:  Form.

5         THE WITNESS:  Yes.

6         BY MR. BRUSTIN:

7         Q.   Again, very basic investigative steps

8    for -- for a homicide detective, correct?

9         MR. SAHASRABUDHE:  Object to the form.

10        MS. PERSICO:  Form.

11        THE WITNESS:  Yes.

12        BY MR. BRUSTIN:

13        Q.   That would --

14        A.   Yes.

15        Q.   Obtaining -- or attempting to obtain

16   that kind of evidence -- clothing, shoes, things

17   like that -- so they could be tested by somebody

18   else is basic investigative steps for a homicide

19   detective, correct?

20        MR. SAHASRABUDHE:  Form.

21        THE WITNESS:  Yes, but if -- if he came in

22   after -- after, you'd probably need warrants or --

23   you know, search warrants and different things, so

24   it would be between us and the DA's office to get

25   that stuff, unless he voluntarily gave it up.
```



 1        So I -- I -- I -- I can't say what happened

 2   at that point, so -- and -- and we -- we ask for

 3   permission first.  Most times you don't get it, and

 4   then you go through the other -- other avenues, so

 5   it's not, you know, always -- but in essence, yes.

 6   I mean, in theory, yes, for sure.  I mean, you want

 7   to do all those things, yes.

 8        BY MR. BRUSTIN:

 9        Q.   Okay.  That's a good point.  What you

10   want to do is you want to ask.

11        MR. SAHASRABUDHE:  Form.

12        THE WITNESS:  Yes.

13        BY MR. BRUSTIN:

14        Q.   In other words, if you have a person

15   that's coming in confessing to a crime, that's the

16   kind of person who might very well tell you,

17   "Here's what I was wearing, go ahead and check it,"

18   right?

19        MR. SAHASRABUDHE:  Form.

20        MS. PERSICO:  Form.

21        THE WITNESS:  Well, if we're talking

22   specifically about this, you know, I -- I don't

23   know if that was done, but I know they asked for a

24   polygraph, from reviewing the stuff, and he didn't

25   show up for that, which he doesn't have to, you



```
 1  know, but that's -- you know, but yes.  Yes, you
 2  normally would, you know -- would ask.  I don't
 3  know if that was done or not.  I mean, I can't say.
 4          I would -- I would say yes to your question.
 5  Yes.  Yes.  To your question of would you want
 6  that, yes, if he said, you know, there might be
 7  some -- any kind of physical evidence you can get,
 8  you always try to get, yes.
 9          BY MR. BRUSTIN:
10          Q.  And if he offered to provide his
11  clothing -- shoes, clothes that he was wearing --
12  of course you would take it so you could ensure
13  that it was tested, correct?
14          MR. SAHASRABUDHE:  Form.
15          THE WITNESS:  Yes.
16          BY MR. BRUSTIN:
17          Q.  A very important way to determine
18  whether or not the version of events he was giving
19  you was true or false, correct?
20          MR. SAHASRABUDHE:  Form.
21          MS. PERSICO:  Form.
22          THE WITNESS:  Yes.
23          BY MR. BRUSTIN:
24          Q.  I didn't hear an answer.
25          A.  Oh, I said yes.
```



1          Q.    Am I breaking up?

2          A.    Yes.

3          MR. SAHASRABUDHE:   You're delayed.   It's a

4    big delay.   We're hearing you, but it's very

5    delayed.

6          MR. BRUSTIN:   Okay.

7          BY MR. BRUSTIN:

8          Q.    Let's take a look at page 197.   Are you

9    there?

10         A.    Yes, I'm here.

11         Q.    Okay.   If you look about a third of the

12   way down the page, he's asked what was he wearing

13   that night.   Do you see that?

14         A.    Yes.

15         Q.    And one of the things you would expect

16   a homicide detective to do is to determine whether

17   or not what he was describing wearing matched what

18   any of the eyewitnesses described the shooter to be

19   wearing, correct?

20         MS. PERSICO:   Form.

21         MR. SAHASRABUDHE:   Form.

22         THE WITNESS:   Yes.

23         BY MR. BRUSTIN:

24         Q.    Again, a very basic investigative task,

25   correct?



```
 1          MR. SAHASRABUDHE:  Form.

 2          MS. PERSICO:  Form.

 3          THE WITNESS:  I'm sorry, you have to repeat

 4   that.  I didn't --

 5          BY MR. BRUSTIN:

 6          Q.  A very basic investigative task.

 7          MR. SAHASRABUDHE:  Form.

 8          THE WITNESS:  Yes, it -- yes, for sure.

 9   Yes.  Yes.

10          BY MR. BRUSTIN:

11          Q.  Okay.  A little further down --

12   withdrawn.

13          Okay.  If you could take a look at --

14          MR. BRUSTIN:  Hey, Gerardo, what page is

15   that -- is that report on, do you know?

16          MR. ROMO:  87.

17          MR. BRUSTIN:  87?

18          MR. ROMO:  Yes.

19          BY MR. BRUSTIN:

20          Q.  Can you take a look at page 87,

21   Mr. Donovan?

22          A.  Okay, yes.

23          Q.  Now, this is -- is this from you or a

24   different -- is this from you?

25          A.  No.  That's my brother.
```



1        Q.   Oh, your brother.  Got you.  Was he a

2   homicide detective at the time?

3        A.   No.

4        Q.   Was your brother involved in this

5   investigation, to your knowledge?

6        A.   No.  My brother at the time --

7        Q.   Did you ever talk to your brother about

8   the investigation?

9        A.   No, I didn't.

10       MR. SAHASRABUDHE:  Did you want to finish

11  what --

12       BY MR. BRUSTIN:

13       Q.   And this is not your -- this is not

14  your -- he's not your brother-in-law.  He's

15  actually your brother.

16       A.   He's my brother, yes.  He was young --

17  very young at the time, and he was a detective in

18  that district, and until seeing this, I -- I -- I

19  don't know why -- I know Tim Scioli, but he -- he

20  was doing -- he did gang stuff out there at the

21  time, yes.

22       Q.   Special services and intelligence was a

23  unit that homicide detectives would routinely

24  utilize, correct?

25       MR. SAHASRABUDHE:  Form.



1          THE WITNESS:  No.  Not really.  We never

2    really worked with -- with intelligence.  I didn't

3    even know who was in -- in intelligence when I was

4    chief of homicide.  I knew who they were, but we --

5    we didn't do anything with them really.

6          BY MR. BRUSTIN:

7          Q.   Do you have an understanding as to why

8    special services and intelligence was involved in

9    this request on page 87?

10         MR. SAHASRABUDHE:  Form, request.

11         THE WITNESS:  Yes, they -- they -- radio put

12   out a pickup for -- for Valentino.  Communications.

13         BY MR. BRUSTIN:

14         Q.   What does that have to do with -- why

15   are special services and intelligence involved?

16         MS. PERSICO:  I'm sorry, there's a lot of

17   background noise.

18         MR. BRUSTIN:  Let me withdraw the question.

19   Hold on.

20            (Technical difficulty.)

21         BY MR. BRUSTIN:

22         Q.   Okay.  Let's try it again.

23         Mr. Donovan, in reading this memo, this

24   interdepartmental correspondence, do you have an

25   understanding as to what the role of special



1   services and intelligence was here?

2          MR. SAHASRABUDHE:  Form.

3          THE WITNESS:  Yes, I understand what the

4   intelligence squad was.  What I answered was --

5   okay.

6          BY MR. BRUSTIN:

7          Q.   I'm not asking you that.  I'm asking

8   you what -- why -- why are they mentioned in this

9   memo.  What -- how were they involved in this

10  description in this memo?

11         A.   It -- it -- as I -- I don't remember

12  this memo until, you know, looking at it.  A pickup

13  was put out over the communications system for

14  Valentino Dixon, which meant there was, you know,

15  warrant or enough for -- to arrest him.

16         And my brother worked in that area.  He was

17  assigned to precinct -- it was precincts at the

18  time, but the precinct where this incident

19  occurred, he was a detective over there, and they

20  put it out on the communications.

21         He -- he must have known him.  My brother

22  knew him.  I never knew who he was.  I answered to

23  that before, but my brother obviously knew him.  He

24  was -- he did narcotics and intelligence for a lot

25  of years, and, you know, he was -- he was working



1  in that -- at least knew Valentino Dixon, so when

2  they put it out -- I didn't ask him to go do it.

3  I -- I would have remembered that.  I -- you know,

4  "Go pick up Valentino."  My detectives usually made

5  the arrests, but if they were having trouble

6  finding somebody at the time, they -- they would --

7  they were active street cops.

8        He's a very good detective.  He's over at

9  the DA's office now.  He's an investigator, yes.

10       Q.   So -- so your -- your brother knew of

11  Valentino Dixon from -- based on his work on the

12  street with -- with drug crimes, correct?

13       MR. SAHASRABUDHE:  Form, and --

14       MS. PERSICO:  Form.

15       MR. SAHASRABUDHE:  -- please clarify.

16       THE WITNESS:  Yes, I don't -- I don't know

17  that he did, but I'm -- you know, he probably did,

18  yes.  Yes.  Yes.

19       MR. SAHASRABUDHE:  You --

20       BY MR. BRUSTIN:

21       Q.   He probably did.  All right.

22       A.   Yes.

23       Q.   And it -- it appears from this memo

24  that they were working with special services and

25  intelligence to get more information concerning



 1  Valentino Dixon, correct?

 2        MR. SAHASRABUDHE:  Form.

 3        MS. PERSICO:  Form.

 4        MR. SAHASRABUDHE:  Who's they?

 5        THE WITNESS:  They were not working with my

 6  homicide bureau.

 7        BY MR. BRUSTIN:

 8        Q.   Your brother --

 9        A.   My brother was working with narcotics

10  and intelligence, which were, you know, together,

11  and they -- I -- I don't know this.  I'm saying

12  that --

13        MR. SAHASRABUDHE:  Well, don't -- don't

14  assume or speculate.

15        THE WITNESS:  Yes, I don't know.  I don't

16  know.  I don't know, yes, you know.

17        BY MR. BRUSTIN:

18        Q.   Okay.  I understand you don't remember.

19  I'm asking you to look at this document and

20  interpret it if you can.

21        Does it appear what's happening, based on

22  this document, is that your brother is requesting

23  more information from special services and

24  intelligence concerning Valentino Dixon?

25        MS. PERSICO:  Object to the form.



 1              MR. SAHASRABUDHE:  Form.

 2              MS. PERSICO:  That is the opposite of what

 3     the witness has been saying three times now,

 4     that -- that because -- because his brother was on

 5     that squad and they sent a -- a bulletin out to

 6     pick up Valentino Dixon --

 7              MR. BRUSTIN:  Please can you stop making

 8     speaking objections.

 9              MS. PERSICO:  I'm not.  I'm just trying to

10     move --

11              MR. BRUSTIN:  You are not allowed to do

12     that.  You are not allowed to instruct the

13     witnesses with your speaking.

14              MS. PERSICO:  I'm not.

15              MR. BRUSTIN:  You're not helping anything,

16     and you know it.

17              BY MR. BRUSTIN:

18         Q.   Mr. Donovan -- Mr. Donovan --

19         A.   Yes.

20         Q.    -- do you have an understanding as

21     to -- it appears what you're suggesting is it

22     appears that your brother knew Valentino Dixon from

23     before and he is obtaining additional information

24     from special services and intelligence, correct?

25              MR. SAHASRABUDHE:  Form.



1          MS. PERSICO:  Form.

2          THE WITNESS:  From reviewing this document,

3   he arrested Valentino Dixon on a BOLO or a bulletin

4   or a pickup order that was put over communications,

5   so it could have been patrol, it could have been

6   anybody that knew Valentino Dixon.

7          So he's -- his partner's listed.  I don't

8   know.  I don't know if my brother knew him.  I

9   don't know that, and -- and -- but we did not -- we

10  did not use intelligence for our -- unless, you

11  know -- we conferred on some stuff, my -- my

12  detectives investigating this, and this -- I don't

13  know that.  They might have asked about Valentino,

14  but I don't know that.

15         I don't -- I don't know.  I don't have --

16  you know, other than seeing this -- I can tell you

17  that this meant there was a pickup put out for

18  Valentino Dixon.  My brother and his partner

19  arrested him and brought him in.

20         BY MR. BRUSTIN:

21         Q.   I -- I understand.  My question is --

22  and maybe I haven't asked this clearly.  My

23  question is:

24         Why is this memo going to special services

25  and intelligence?  Do you have an understanding



1  about that?

2        MR. SAHASRABUDHE:  Form.

3        THE WITNESS:  Yes, I can tell you that.

4  That's who they worked for.

5        BY MR. BRUSTIN:

6        Q.   Your brother worked for special

7  services and intelligence.  Okay.

8        A.   Which was not in the --

9        Q.   By the way, what is your brother doing

10 now?

11       A.   He's a DA's investigator for Erie

12 County.

13       Q.   Okay.  And you've never talked to your

14 brother about this case?

15       A.   No.  I mean, no, that I remember.  I --

16 maybe at the time.  You know, going back to it,

17 like I said, I don't -- I don't remember a lot

18 about this, but I probably -- you know, I probably

19 discussed it with him at the time, but I don't

20 remember any -- any specific conversations with

21 him.

22       And they did not work for me.  They -- they

23 worked separately.

24       Q.   Okay.

25       A.   That's why it's -- but that -- their



1  boss -- this is just police stuff.  Their boss got
2  this information and sent it over to homicide, and
3  my initials are on it, so I read this at the time,
4  so I -- I can tell you that for sure.  I reviewed
5  this, and it's in the file, so -- but --
6        Q.   Okay.  But since -- since -- since this
7  lawsuit was filed, you have not spoken to your
8  brother about this case.
9        A.   Not that I remember.  I might have.
10 You know, it was in the papers.  You know, there
11 was a lot of stuff, but I don't -- I don't
12 remember -- I mean, I -- I didn't know who
13 Valentino Dixon was.  I -- you know.
14        You know, other people I knew.  I was active
15 in the streets, but I never worked over in that
16 area, and he was -- you know, it's a whole
17 different area.  I worked parts of the city that
18 were pretty tough, but I didn't work over there, so
19 I -- I --
20        Q.   All right.  As you're suggesting,
21 you -- you -- you learned at the time that he was a
22 well-known drug dealer, correct?
23        MR. SAHASRABUDHE:  Form.
24        THE WITNESS:  Not sure, but yes, I probably
25 did.  Yes.  Yes.  I may have.  I -- yes, I was -- I



1  was an active cop, and, you know, this would -- I

2  would have known he -- you know, obviously,

3  narcotics were interested in him.  I don't know.

4         BY MR. BRUSTIN:

5         Q.   Okay.  And you would agree that as soon

6  as a suspect in a homicide case comes to the

7  attention of investigating detectives, it's

8  important to ascertain what other law enforcement

9  involvement that suspect had had, correct?

10        MR. SAHASRABUDHE:  Object to the form.

11        MS. PERSICO:  Form.

12        THE WITNESS:  Yes.  Yes.

13        BY MR. BRUSTIN:

14        Q.   So in other words, if you get the name

15 early on in a case -- for example, if you get the

16 name Valentino Dixon, you're going to want to do a

17 check to see whether or not Valentino Dixon is

18 known to the department for crimes that could be

19 related to this case, right?

20        MR. SAHASRABUDHE:  Form.

21        THE WITNESS:  Yes.

22        BY MR. BRUSTIN:

23        Q.   That's a basic investigative task,

24 correct?

25        MR. SAHASRABUDHE:  Form.



1              THE WITNESS:  Yes.

2              BY MR. BRUSTIN:

3              Q.   And one of the sources of that

4     information was special services and intelligence,

5     correct?

6              MR. SAHASRABUDHE:  Object to the form.

7              MS. PERSICO:  Form.

8              THE WITNESS:  From this memo, yes.  Yes.

9              BY MR. BRUSTIN:

10             Q.   And at the time, your brother was

11    working there.

12             MR. SAHASRABUDHE:  Form.

13             THE WITNESS:  Yes.

14             BY MR. BRUSTIN:

15             Q.   And I take it that your brother was

16    somebody you would talk to when you had suspects --

17    withdrawn.

18             I take it that your brother was someone that

19    either you talked to or you would have your

20    detectives talk to when you had suspects in

21    homicide -- suspects in homicides who may have

22    information about them at special services and

23    intelligence, correct?

24             MR. SAHASRABUDHE:  Form.

25             MS. PERSICO:  Form.



1          THE WITNESS:  We -- we could have, yes.  I
2  don't remember -- you know, like I said, I don't --
3  I -- I --
4          BY MR. BRUSTIN:
5          Q.   So for example, you might -- any
6  time -- any time you -- in a homicide case, if you
7  got wind of a potential suspect, you would
8  routinely pick up the phone, call your brother, and
9  say, "Do you know this guy over in special --
10  special services," right?
11          MS. PERSICO:  Form.
12          MR. SAHASRABUDHE:  Form.
13          MS. PERSICO:  You need to lay a foundation
14  for that, big boy.
15          MR. SAHASRABUDHE:  Answer the question if
16  you can.
17          MS. PERSICO:  Lot of stuff in there.
18          THE WITNESS:  If -- if I felt -- yes, I
19  mean --
20          MR. SAHASRABUDHE:  Did you routinely do
21  that?
22          THE WITNESS:  No, I did not routinely do
23  that.
24          MR. SAHASRABUDHE:  Listen to what he's
25  asking.  He's not asking could you.  He's asking



RICHARD T. DONOVAN                                September 15, 2022
DIXON V CITY OF BUFFALO                                         134

1   did you do that.

2           THE WITNESS:  Yes, no.

3           MR. SAHASRABUDHE:  Did you ever do that?

4           THE WITNESS:  I may have.

5           MR. SAHASRABUDHE:  Okay.

6           THE WITNESS:  Yes, I don't --

7           BY MR. BRUSTIN:

8           Q.   If you receive information about a

9   suspect who may have been -- may have been involved

10  in drug crimes, one source of information that you

11  would utilize from time to time was your brother in

12  special services, correct?

13          MR. SAHASRABUDHE:  Object to the form.

14          THE WITNESS:  Not necessarily.  I -- I -- I

15  probably would have went to his boss, you know, and

16  found out what he had.  I mean, I wouldn't -- you

17  know.  I -- I -- my brother and I are -- you know,

18  we're close, but --

19          BY MR. BRUSTIN:

20          Q.   Okay.  By the way, did you -- when you

21  looked through the -- the documents that you looked

22  through, did you see any evidence that you had

23  signed them?

24          A.   That I had what?

25          MR. SAHASRABUDHE:  Form.



1          BY MR. BRUSTIN:

2          Q.    Yes, you mentioned that when you would

3     review documents, sometimes you would sign them; is

4     that right?  Or initial them?

5          A.    Yes.

6          Q.    Did you see any documents that you had

7     initialled in this case?

8          A.    Yes, the one you just referred to.

9     That's my initials on the bottom.

10         Q.    Tell me where that -- show me where

11    that is.  So we're on page 197.

12         A.    No, 87.

13         Q.    Oh, 87.  How about the reports?  Any of

14    the witness interviews or the P73s that you

15    reviewed, any of those have your initials?

16         A.    Some did and some didn't.

17         Q.    Did Lamarr Scott have your initials?

18    Let's take a look at 197.  Give me an example of

19    your initials so I can see it, if you don't mind.

20         A.    It's lower left corner right at the

21    bottom with the RTD with the little loop.

22         Q.    Did you see it on -- take a look at

23    196.  Do you see it there?

24         A.    No.  I -- I remember I looked for it.

25    There's initials at the bottom, but those are



1  usually the person giving -- taking the statement

2  and the person -- I don't know whose, but --

3  there's a lot of initials, but they're not mine.

4        Q.   To make this faster, if you don't mind,

5  can you show me an example of where you signed it?

6  Do you remember noticing any specific interview or

7  P73?

8        A.   There was a couple, yes, yesterday.

9  Yes.  That one in particular, 87.

10       MR. SAHASRABUDHE:  I think I know what -- I

11 mean, there's a -- a P73 from Vickerd that

12 definitely has one.

13       BY MR. BRUSTIN:

14       Q.   Look at 185.  Is that yours on 185?

15       A.   Actually number one.  Number one.  Look

16 at number 1.

17       Q.   Okay.

18       A.   And that's my initial right next to

19 respectfully.

20       Q.   Okay.  How about 185?

21       A.   185, yes.

22       Q.   Okay.  How about --

23       A.   186.

24       MR. SAHASRABUDHE:  Just let him ask the

25 question.



```
1        BY MR. BRUSTIN:
2        Q.   186?  Did you notice any initials on
3   any of the witness statements?
4        A.   I don't.
5        Q.   Just the P73s.
6        A.   That I've -- that I've reviewed.  I --
7   I've -- I've -- if I -- I would put my initial on
8   if I reviewed it.
9        Q.   Okay.
10       A.   And I -- I --
11       MR. BRUSTIN:  I think that's all I have.
12       THE WITNESS:  I have to be -- oh, okay.
13  That's good.
14       MR. BRUSTIN:  Did you --
15       MR. SAHASRABUDHE:  That's okay.
16       THE WITNESS:  No, I'm --
17           (Off the record: 2:10 p.m.)
18           (On the record: 2:10 p.m.)
19                    EXAMINATION
20       BY MR. SAHASRABUDHE:
21       Q.   I just want to clarify a couple things
22  that we -- that we talked about.
23       A.   Yes.
24       Q.   Could you go to page 85?  Or sorry, 87
25  I think it is.
```



RICHARD T. DONOVAN                                    September 15, 2022
DIXON V CITY OF BUFFALO                                              138

1        A.    87?  Yes, okay.

2        MR. BRUSTIN:  Sorry, let me get there.  Hold

3   on.  Okay.

4        BY MR. SAHASRABUDHE:

5        Q.    Yes, page 87.  Okay.  So Chief Donovan,

6   you recall being asked some questions about a P73

7   that your brother authored, right?

8        A.    Yes.

9        Q.    And it's directed to the head of the

10  special services and intelligence unit, correct?

11       A.    Correct.

12       Q.    Okay.  Can -- can you tell us:

13       In your time as chief of homicide, were you

14  aware of the investigative activities of the

15  special services and intelligence unit at all?

16       A.    Not that I can --

17       MR. BRUSTIN:  Object to the form.

18       THE WITNESS:  Not that I can recall, no.

19       BY MR. SAHASRABUDHE:

20       Q.    Okay.

21       A.    I mean, we never -- we didn't utilize

22  them in our investigations.

23       Q.    Okay.  Were you aware of any people

24  of -- persons of interest that they may have been

25  investigating?



1          A.    No.

2          Q.    Did that ever influence any homicide

3    investigation while you were chief of homicide?

4          A.    Not that I can --

5          MR. BRUSTIN:  Object to form.

6          THE WITNESS:  Not -- not that I can recall.

7          BY MR. SAHASRABUDHE:

8          Q.    Would you have expected any of your

9    detectives to have been aware of any persons of

10   interest for the special services and intelligence

11   unit?

12         A.    I -- I don't know.

13         MR. BRUSTIN:  Object to the form.

14         BY MR. SAHASRABUDHE:

15         Q.    Certainly it wasn't something that the

16   detectives talked about all the time, people of

17   interest of the special services and intelligence.

18         A.    No, we -- when -- when I moved --

19         MR. BRUSTIN:  Object to the form.

20         THE WITNESS:  When I moved up the ranks,

21   we -- we kind of made it a little bit more, you

22   know -- back -- back at the time, narcotics did

23   their thing, homicide did their thing.  You talked

24   if there was, you know, a need to be, but I

25   don't -- you know, like I never -- they never did



1  specific tasks on my -- you know, for -- you know,

2  that I can recall.

3       I mean, I can't say it never happened, but,

4  you know, it's like you -- you call other

5  departments, you know, you -- you do a lot of that

6  stuff, you know, and -- yes, but --

7       BY MR. SAHASRABUDHE:

8       Q.   But -- but your detectives certainly

9  were never instructed to target or investigate

10 people who were persons of interest for the special

11 services and intelligence unit.

12      A.   No.

13      Q.   Okay.

14      A.   No.

15      MR. SAHASRABUDHE:  Nothing further.

16                  FURTHER EXAMINATION

17      BY MR. BRUSTIN:

18      Q.   Just one follow-up on that,

19 Mr. Donovan.

20      So certainly in 1991, a high percentage of

21 homicides were drug related, correct?

22      A.   Yes, correct.  The crack epidemic came

23 in around '91, '90.  That year was the highest we

24 ever had.  I think it was 90 -- 92 homicides, which

25 was a lot for the City of Buffalo.  Not a lot for



1  New York, but it's a lot for the City of Buffalo.

2       So it was the highest of my five years of

3  doing that kind of work, and it was -- it was

4  because of drugs, yes.  Yes.

5       Q.   And that's why you understood in 1991

6  that if you had a person of interest in a homicide

7  case that you thought could be drug related, you

8  understood that if you wanted information about

9  that potential suspect, special services and

10 intelligence was a good place to call, correct?

11      MR. SAHASRABUDHE:  Form.

12      MS. PERSICO:  Form.

13      THE WITNESS:  Best I recall during that

14 time, it wasn't a close, you know -- real close

15 relationship, but if -- if it warranted it, you

16 would do it, yes.  Of course.

17      I mean, that's -- that's why this came on my

18 file, because they got information, and -- and if

19 they got information, they passed it on.  If I had

20 a question on something, I -- I might have went

21 through the chief of detectives or I went through

22 whoever was in charge of narcotics at the time, you

23 know.  They -- they had captains and lieutenants.

24      It all changed, but Tim Scioli was a

25 lieutenant at the time running that particular



1  bureau.

2       MR. BRUSTIN:  Okay.  I think that's all I

3  have.  Let's take a five-minute break and Gerardo

4  can get set up and we can start the 30(b)(6).

5       MR. SAHASRABUDHE:  Jen, do you have

6  anything?

7       MS. PERSICO:  No, nothing.

8         (Deposition concluded at 2:14:49 p.m.)

9                    *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              DEPOSITION ERRATA SHEET
 2  Our Assignment No.  J8517526
 3  Case Caption:  Valentino Dixon
 4  vs.  City of Buffalo, et al.
 5     DECLARATION UNDER PENALTY OF PERJURY
 6       I declare under penalty of perjury
 7  that I have read the entire transcript of
 8  my Deposition taken in the captioned matter
 9  or the same has been read to me, and
10  the same is true and accurate, save and
11  except for changes and/or corrections, if
12  any, as indicated by me on the DEPOSITION
13  ERRATA SHEET hereof, with the understanding
14  that I offer these changes as if still under
15  oath.
16  _____
17            RICHARD T. DONOVAN
18  Subscribed and sworn to on the _____ day of
19  _____, 20____ before me,
20  _____
21  Notary Public,
22  in and for the State of _____
23
24
25
```



RICHARD T. DONOVAN                                September 15, 2022
DIXON V CITY OF BUFFALO                                          144

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24              RICHARD T. DONOVAN
25
```



RICHARD T. DONOVAN                                    September 15, 2022
DIXON V CITY OF BUFFALO                                              145

```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24          RICHARD T. DONOVAN

25
```



RICHARD T. DONOVAN                          September 15, 2022
DIXON V CITY OF BUFFALO                                    146

1  STATE OF NEW YORK)

2                   ss:

3  COUNTY OF ERIE   )

4

5       I DO HEREBY CERTIFY as a Notary Public in and

6  for the State of New York, that I did attend and

7  report the foregoing deposition, which was taken

8  down by me in a verbatim manner by means of machine

9  shorthand.  Further, that the deposition was then

10 reduced to writing in my presence and under my

11 direction.  That the deposition was taken to be

12 used in the foregoing entitled action.  That the

13 said deponent, before examination, was duly sworn

14 to testify to the truth, the whole truth and

15 nothing but the truth, relative to said action.

16

17

18         --------------------------

19         LORI K. BECK, CSR, CM,
           Notary Public.

20

21

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

RICHARD T. DONOVAN                                September 15, 2022
DIXON V CITY OF BUFFALO                                        147

```
 1              INDEX TO WITNESSES

 2  Witness              Examination              Page

 3   RICHARD T. DONOVAN    BY MR. BRUSTIN              3

 4                        BY MR. SAHASRABUDHE      137

 5                        BY MR. BRUSTIN           140

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

─────────
        1
─────────

1
    136:16

10
    64:1

10:31
    9:12

10:46
    9:13

10:56
    18:18

10:59
    18:19

11:47
    66:3

12
    63:24

12:25
    95:3

12:26
    95:5

14220
    3:20

185
    136:14,
    20,21

186
    136:23
    137:2

196
    102:22
    104:6,7,9
    135:23

197
    102:22
    120:8
    135:11,18

1971
    23:8
    27:11

1992
    20:22
    32:2

1994
    23:13
    24:2
    63:14

1998
    63:23

1:23
    95:6

─────────
        2
─────────

2
    57:23
    66:7
    102:23

20
    17:25

2000
    63:25

22
    18:4

24/7
    84:18

2:10
    137:17,18

2:14:49
    142:8

─────────
        3
─────────

30
    18:4
    70:24

30(b)(6)
    4:4  142:4

1979
    23:15

1980
    26:5,6

1985
    26:14,21

1986
    23:15

1987
    10:2
    23:20
    25:4,22
    26:14,21

1991
    7:18 10:3
    21:10,14
    22:19
    30:18
    31:24
    32:2
    40:6,8,22
    41:14
    44:7,17,
    20 46:12,
    16,21,25
    52:10
    53:20
    55:17
    56:1 61:2
    70:25
    73:1
    80:6,7
    84:1
    91:10
    93:10
    95:15
    98:8
    99:9,22
    101:19
    112:11
    140:20

    141:5

31
    66:14,15
    67:3
    70:24
    81:13

─────────
        5
─────────

57
    3:19

─────────
        7
─────────

716
    64:20

72
    5:14,16
    18:1

─────────
        8
─────────

85
    26:6
    137:24

87
    121:16,
    17,20
    123:9
    135:12,13
    136:9
    137:24
    138:1,5

─────────
        9
─────────

9
    64:1

90
    140:23,24

91
    50:13

61:10
    140:23

92
    93:11
    140:24

94
    64:3

─────────
        A
─────────

a.m.
    9:12,13
    18:18,19
    66:3

ability
    5:3,8

academy
    29:2

acceptable
    44:21

accurate
    5:8
    105:21

accurately
    71:17

accused
    93:17

acted
    98:13
    99:2,12
    102:9

acting
    89:17
    90:4
    95:9,17
    100:6

action
    31:21
    84:23

active



29:25
34:3, 4
45:2
125:7
130:14
131:1

**activities**
11:13, 14
12:5, 6
47:17
48:16
62:5
138:14

**actual**
12:4
13:25

**Adams**
14:3
68:15, 22
69:7
71:17
73:25
77:1

**additional**
90:5
127:23

**address**
44:22

**addressed**
43:3

**administrat
or**
34:4
74:13
93:15

**affairs**
28:23

**affect**
5:2, 7

**agency**
33:11

**agree**
36:1, 15
37:9, 21
58:5, 18
68:14
72:5 73:6
100:8
112:11, 23
131:5

**ahead**
51:18
64:4 70:6
74:10
78:21
118:17

**Alessandro**
61:17

**allegations**
6:7, 18
7:3
115:2, 16

**alleged**
55:20
71:17
73:9
92:13

**allegedly**
35:6
36:4, 22
37:1 53:2
68:17, 23
72:10
94:11

**allowed**
16:10
17:17, 19
127:11, 12

**amount**
16:12
93:11
113:7

**Angelo**
61:17

**answering**
4:15
11:24
12:25
13:3, 6
77:22
78:14

**answers**
78:13
103:24

**anyone's**
90:8, 15

**apologize**
61:13
88:25

**appears**
125:23
127:21, 22

**appointed**
10:20
26:11

**appointment**
25:20
64:6

**approving**
75:22

**area**
124:16
130:16, 17

**array**
68:18, 24

**arrays**
88:14

**arrest**
8:4 25:10
52:11
62:3
75:21
76:8
77:25
101:4
113:8

124:15

**arrested**
20:23
35:5 36:4
37:1
38:9, 21
58:21
59:6
74:19
75:10
82:13
88:3
92:12
93:3
94:12
97:15, 17,
25 98:13
99:13
100:2, 3,
5, 25
101:11,
19, 23
103:20
110:6
111:8, 19
112:4, 14
128:3, 19

**arrests**
125:5

**artist**
8:11

**artwork**
9:20

**ascertain**
131:8

**assigned**
124:17

**assistant**
10:11
23:16
25:17, 24
26:2 31:9

**assume**

4:18
126:14

**assuming**
71:16
110:16

**attempting**
117:15

**attention**
33:9
84:14
131:7

**attorney**
79:6
95:10

**Attorney's**
63:20

**attorneys**
3:25
15:12
17:12

**authored**
138:7

**avenues**
118:4

**aware**
38:10
49:25
55:24
74:11
75:16, 24
107:23
138:14, 23
139:9

———————

B

———————

**back**
9:15 19:2
21:13, 14
22:19
24:19
35:21



42:2 44:6
45:16,22
52:10
53:19
55:17
66:5
81:12
92:1,17
129:16
139:22

**background**
123:17

**bad**
26:19
90:15
98:21

**Ballistics**
108:10

**barely**
9:9

**based**
21:25
22:18
24:19
35:13
36:1
37:7,8,24
48:16
51:4
64:21
68:16,21
73:1
125:11
126:21

**basic**
17:13
88:20
89:3,7
90:23
91:14
108:14,23
110:2
117:7,18
120:24

121:6
131:23

**basically**
24:3
60:16

**basis**
33:22
51:3

**beer**
28:11

**beginning**
23:6 25:4

**behalf**
114:23

**behavior**
100:11

**belief**
21:4

**beneath**
39:14

**benefit**
110:15

**big**
40:16
87:8
120:4
133:14

**bit**
5:18
41:21
60:25
92:2
103:17
139:21

**blood**
116:21

**body**
79:18

**BOLO**
128:3

**books**
65:21

**boss**
45:18
97:11
130:1
134:15

**bother**
69:18,20

**bottom**
66:10,15
135:9,21,
25

**bouncing**
114:6

**boy**
133:14

**BPD**
66:11,15

**break**
4:21,23
65:25
79:6
142:3

**breaking**
120:1

**brother**
29:22
30:3,7
121:25
122:1,4,
6,7,15,16
124:16,
21,23
125:10
126:8,9,
22 127:4,
22 128:8,
18 129:6,
9,14
130:8
132:10,
15,18

133:8
134:11,17
138:7

**brother-in-
law**
29:21
30:9
122:14

**brought**
33:8
128:19

**Brustin**
3:4,5,23,
25 5:15
7:12 8:1,
19 9:7,
14,17
13:6,8
14:8
15:5,10,
19,22
16:7,13,
16,24
17:7,10,
22 18:14,
20 20:3,
19 21:3,
11,12
22:11
25:2
26:18
27:3,24
28:5,15
29:8,15
30:2,24
32:22
33:16
34:9,16,
21 35:3,
12,20
36:13,19
37:14,20
38:6,16
39:2,8,20
40:4

41:8,13
43:23
44:18
45:19
46:3
47:5,14,
22 48:3,
9,14,21
49:2,9,18
50:1,9
51:16
52:15,25
53:9,18
54:5,14,
18,24
55:25
56:4,16,
18,20
57:2,7,
12,21,25
58:15,25
59:12,14,
24 60:6,
13,21
61:8,25
62:9,20,
23 63:11
64:9 65:8
66:1,4,18
67:9,18
68:2,12,
20 69:5,
12,16,21
70:4,9,
17,23
71:9,22
72:20
73:15,16
74:16,23
75:3,7
76:2,14,
23 77:10
78:7,11,
16,18,22
79:2,9
80:1,7,8,
24 81:11,



20 82:10,
17 83:1,
21,23
84:7,24
85:4,14,
25 86:8,
14,22
87:6,11,
17,25
88:11,19
89:1,2,9,
15 90:1,
10,17,19
91:4,21
92:7
93:24
95:1,7,23
96:4,10,
17,23
97:5,12,
22 98:6,
22,25
99:7,20,
23,25
100:15,20
101:16
102:5,14,
20 103:2,
15,23
104:7,8
105:9,18,
24
106:11,
16,23
107:8
108:4,22
109:4,18
110:12,23
111:16,17
112:1,9,
22 113:3,
20
114:10,
15,21
115:6,14,
20 116:3,
8,19

117:1,6,
12 118:8,
13 119:9,
16,23
120:6,7,
23 121:5,
10,14,17,
19 122:12
123:6,13,
18,21
124:6
125:20
126:7,17
127:7,11,
15,17
128:20
129:5
131:4,13,
22 132:2,
9,14
133:4
134:7,19
135:1
136:13
137:1,11,
14 138:2,
17 139:5,
13,19
140:17
142:2

brutal
116:10

buck
39:16

Buffalo
3:19
23:6,14
30:5,8,10
64:2,12,
21 65:2,
13 104:10
140:25
141:1

bulletin
127:5

128:3

bunch
46:23
75:19
85:15

bureau
10:6,13
46:1
126:6
142:1

bureaus
9:4 31:15
41:23

business
65:7,13,
20,21

busy
111:21

buying
3:2

_____

C

_____

cadet
23:10

call
9:10
28:3,23
50:20
69:25
70:5 79:8
133:8
140:4
141:10

called
3:20
64:19

calling
18:16

captain
10:20

23:15,19
26:5,9,
10,13

captains
141:23

car
105:12
106:1
107:4
109:9

career
5:17 8:7
23:5 24:3
25:16
27:5
36:21,25
51:19
56:11,22

careful
52:9
58:19

carefully
47:9
66:25
75:11
81:22
103:6
106:13
113:23

Carl
32:7

case
4:3 5:21,
25 6:8
7:9,15
8:4,14
9:22
10:23
12:5 14:1
18:7
19:1,7,
12,22
22:5
24:17

31:22
32:12
33:22,23
34:4,7,8,
11 35:5,
19 36:20
37:4,24
43:22,25
46:21
49:4
50:23
55:19
56:17
57:9,15
62:13,18
63:1
64:24
82:12,18
83:5,8,10
84:14,15,
19 94:10,
15 96:25
97:1
98:12
100:12,13
110:20
116:12
129:14
130:8
131:6,15,
19 133:6
135:7
141:7

cases
30:20
31:2,16,
17 33:3
53:25
80:14
92:21
108:11

caused
51:8
101:3

center



66:16

**Central**
81:6

**chain**
31:7,13
38:19
39:11,24
59:3,17
60:25
61:18
85:16
90:3,21
95:16
97:6

**change**
99:23
106:2

**changed**
46:17
107:12
141:24

**characterization**
72:16

**characterize**
100:11

**charge**
9:5 10:18
23:17
39:13
46:14
141:22

**check**
108:8
118:17
131:17

**checked**
24:14,15

**checking**
24:20

**chief**
6:14 9:2,
4,24,25
10:11,20
20:21
23:17,20
24:4,8,
14,21
25:4,17,
22,24
26:2,7,
10,15
27:9
30:16,17
31:2,9
33:10
38:17
39:9
40:6,17
42:3,23
45:25
46:2,19
51:15
61:2,6,7,
9,12,15
63:23
73:18
76:9 78:2
90:3
91:1,2,10
93:6
95:15
102:6
112:10
113:11
123:4
138:5,13
139:3
141:21

**circumstance**
36:15
37:8

**circumstances**
37:7

**city**
16:8,18
17:12,15,
16 23:14
64:7
130:17
140:25
141:1

**Civil**
26:13

**claim**
6:10

**claimed**
39:22
98:10

**claiming**
6:23
106:6

**clarification**
107:19

**clarify**
56:16
62:17
93:25
107:10
111:13
125:15
137:21

**clear**
24:19
56:19
73:23
100:23

**close**
28:13
79:14,22
116:10
134:18
141:14

**closely**
61:24

**closest**
27:20

**clothes**
79:24
116:21
119:11

**clothing**
55:20
56:13,22
57:15
79:19
80:3
116:13
117:16
119:11

**colleagues**
18:12

**collect**
55:13

**collected**
107:14

**collection**
54:21
55:3,4

**command**
31:7,14
38:19
39:11,24
59:3,17
61:1,19
85:16
90:4,21
95:16
97:7

**commanded**
23:19

**commanding**
10:19

**commissioner**
6:13
23:23,24

**commit**
6:24

**committed**
49:13
88:5 98:9
99:10
100:2
114:8

**committing**
49:20,21,
22 97:14

**communicate**
54:6,7
55:3

**communicating**
54:20

**communication**
14:12

**communications**
32:11
123:12
124:13,20
128:4

**community**
23:8 29:3

**company**
64:18,19

**compared**
79:18

**Complaint**
5:25 6:6,
19 7:3

**complete**
50:18

**completed**
43:6
44:15

24:1 78:4



45:15
47:10
56:13

completely
17:9
92:20

comprehensi
vely
113:24

conceivable
59:4,9

concern
77:24
102:8

concluded
142:8

conclusion
89:22
100:12

conclusivel
y
99:21,24

conditions
5:1,7

conduct
26:15
32:18
90:23
91:14
111:20
112:12

conducted
47:16
62:5
68:18,24

conducting
11:13
12:4 27:5
48:10,15
96:12

conferred

128:11

confess
74:18
94:3

confessed
13:19
20:23
35:7
36:6,21,
25 63:3
72:7
74:24
75:25
77:8
81:23
82:14
83:15
90:6
91:11
92:10,11,
21 93:1
94:13
97:14

confesses
103:19

confessing
20:6
21:6,16,
21 38:8
75:9,16
76:7 84:2
110:4
114:13
116:12
118:15

confession
38:20
58:19
59:2,3,
16,18
60:16
63:5
73:4,8
115:1,22

confessions
92:18

confidence
77:20
79:16
80:19

confirm
116:4

confused
92:3,4

connect
101:11

connected
107:3
116:15

connection
5:21 9:8
32:12

conscientio
us
87:19

conscientio
usly
96:12

consistent
74:3 77:3
85:20
86:3,10,
16

constituted
98:20

consult
101:8

contradict
60:8
116:4

contradicti
ons
87:8

conversatio
ns
17:1,23
129:20

convicted
49:13,20
101:11

Cooley
65:18

cop
131:1

copies
43:19

cops
125:7

copy
3:2

corner
135:20

correct
6:20,21,
24 14:4,
24 20:8,9
21:23
24:22
25:23
27:7,13
32:12
34:25
35:9,15
36:8
38:2,12,
22 39:4,
14,16,25
40:22
43:9
44:3,7
46:5
47:1,2,4,
10,18,24
48:23
49:5
52:11,21

53:14,22,
23 54:1,9
55:5,21
57:17
58:3,8,21
59:6 60:1
61:3,10,
14,20
62:6,14
63:6
67:22
68:18
71:1
72:11
73:4,11
74:4
75:12
76:18
77:3
80:4,17,
20 81:24
82:14,21
83:16
84:10
85:21
86:4
87:2,8,
14,21
88:7,22
89:5,18
90:6,24
91:15,23
92:14
94:21
97:8,18
98:2,14
99:3,14
101:4,23
103:4,6,
10
104:20,24
105:1,5
106:13,19
107:4,24
108:18,24
110:7
111:10,22



112:5,25
113:24
114:17
115:2,10,
17,25
116:5,16
117:8,19
119:13,19
120:19,25
122:24
125:12
126:1
127:24
130:22
131:9,24
132:5,23
134:12
138:10,11
140:21,22
141:10

correspondence
12:17
123:24

correspondences
12:16

corroborate
60:8

County
30:11
65:18,19
129:12

couple
4:9 6:16
12:15
13:12,13
18:25
28:12
31:12
64:17
136:8
137:21

court

50:23
69:25
70:6

Courts
52:2

CPO
29:3

crack
140:22

crime
6:24
20:6,23
21:6,17,
21 36:6,
21,25
38:9
51:24
63:3
74:19
75:9 76:7
82:14
88:5 90:6
97:14
98:9
99:10
100:2
103:19
106:3,25
114:8,13
116:10,
13,16
118:15

crimes
10:5,13
46:1 81:1
94:3
125:12
131:18
134:10

critically
105:4
112:23
114:16

curiosity
6:22

curious
7:2

custody
107:11
110:22
112:25

————————————

D

————————————

DA
29:23
61:1 63:5
75:22
101:8
102:4

DA's
33:10
61:20,24
62:11
75:18
117:24
125:9
129:11

Danny
13:17

date
46:17

dates
24:15

day
13:20
41:25
42:1 72:7

day-to-day
21:23
30:19
32:18

days
12:24
36:5 80:3

97:15

dealer
130:22

decide
52:2

Defendant
4:2,10
5:22 6:1
12:12
14:22
16:19
18:8
64:24

Defendants
19:6

deferring
3:4

delay
120:4

delayed
120:3,5

department
10:4
22:19
23:6,11
62:4
64:3,12
65:3
90:22
91:13
96:1
131:18

departments
140:5

Depends
114:2

deposed
18:11,25
19:10

deposition
3:2 4:2,

4,6 5:19
7:11
18:22
70:8
142:8

deputy
23:22,24
63:23
78:3

describe
40:7

describing
67:13
71:17
120:17

description
23:5 58:6
68:16,23
74:1
124:10

descriptions
86:2,16

detailed
58:6
59:16
114:12

detective
25:15,18,
23,25
26:1
27:25
31:12,22
32:1,7,9
41:6
44:23
65:16
89:17
90:4
91:12
107:20,21
112:3,8
117:8,19
120:16



122:2,17
124:19
125:8

detective's
89:23

detectives
10:11
21:8 22:4
23:17
25:18,25
26:3
30:20
31:1,6,10
32:2
40:6,7
61:7,9,16
65:12
84:17
90:3 91:2
98:12,20
107:11
122:23
125:4
128:12
131:7
132:20
139:9,16
140:8
141:21

determine
38:20
53:12
56:23
59:5 62:2
73:8
76:17
77:2
86:9,15
97:17
98:11
99:12
101:1,21
105:20
107:2
115:23

116:15
119:17
120:16

determined
62:1
97:24
99:8,9,22
100:1,24
101:18,20

develop
101:7

developed
98:8
101:13

difference
22:21

difficulty
41:12
123:20

dinner
28:24

Dipirro
13:17

direct
46:14

directed
12:17
13:16
138:9

directing
78:20

directly
82:19
83:11
84:9

disagree
68:10

discussed
19:12
21:21
78:12

79:5
129:19

discussing
41:4 70:5

discussion
19:1

dispute
50:2

distinguish
79:17

district
122:18

division
39:13

divisions
10:7

divorced
28:21

Dixon
4:1 6:10,
23 7:23
8:2,4,7,
10 9:19
35:5 36:3
38:9
39:23
49:12
50:4,23
52:19
53:3,12
62:18
67:21
68:17,24
69:3,8
71:19
72:11
73:10
74:2 77:3
85:9 86:3
88:3,15
92:11
93:3
97:15

98:10,14
99:10,13
100:3,5
110:5,21
112:20
124:14
125:1,11
126:1,24
127:6,22
128:3,6,
18 130:13
131:16,17

Dixon's
76:8

document
126:19,22
128:2

documented
47:17

documenting
96:24

documents
5:20,24
12:12,15,
23 13:2,
11 14:19,
21 15:2
35:13
36:2
44:6,12
67:21
68:5 70:3
77:14
134:21
135:3,6

Donovan
3:19,24
4:6 9:18
12:21
16:17
18:21
23:4
41:14
49:11

57:22
70:10
75:8
79:3,10
83:13,25
95:8
121:21
123:23
127:18
138:5
140:19

doubt
20:21
38:10
47:1,8,15
49:4
50:16,22
51:6,9
52:17
72:8 76:8

drink
28:8

dropped
4:12

drug
125:12
130:22
134:10
140:21
141:7

drugs
141:4

due
51:14

duly
3:20

duties
6:12
30:15
46:2,18
96:13
113:9



**E**

earlier
41:22
77:15
95:8

early
131:15

easier
65:11

efficiency
70:1

elected
65:20

eliminate
109:25

Emil
68:15,22
69:6
71:17
73:25
77:1

employment
64:11

enforcement
29:10
30:1
63:15,18
113:14
131:8

engaged
100:7
101:3

engaging
96:5

ensure
39:25
43:6
47:16
52:10

59:3,17
62:4,11
63:5
85:6,8,17
95:15
98:1 99:1
100:5
115:1,9
119:12

ensured
38:18
53:10
57:16
73:17
74:4
75:10
76:16
87:13

ensuring
39:4

enter
79:25

enterprise
64:25
65:4

entire
24:24

entitled
69:22

entrusted
32:17

epidemic
140:22

Erie
30:11
65:18,19
129:11

Esquire
3:1 9:10

essence
118:5

essentially
100:13

establish
74:9

events
119:18

everything'
s
109:20

evidence
51:21
52:11
53:11
54:20
55:4,5,
12,13
62:3
79:25
81:5
96:19,25
98:8
101:13
102:3
107:13,14
108:2
111:5,8,
18 112:4,
13 113:22
114:4,17
115:24
117:16
119:7
134:22

exact
46:17

examination
3:22 55:8
137:19
140:16

examiner
53:21

examples
33:3,19

Exhibit
66:7
102:23

exonerated
50:24

expanded
46:18

expect
90:4
120:15

expected
90:20
91:12
139:8

experience
37:9
94:21

explain
9:23 12:1
39:11

explained
31:9

extent
21:5
72:22
73:25
88:1,13
105:5
106:24
114:22

extra
33:12

extremely
36:14

eyewitness
71:18
74:1

eyewitnesse
s
35:6 36:5
73:10

92:13
94:12
120:18

**F**

fact
24:4,20
49:4 50:3
51:12,25
84:1
85:10
95:14
97:24
98:9 99:9
100:1
105:13,25

factually
105:20

fair
4:19
20:20
30:17
32:15
34:12
41:9,14
43:24
59:13
60:14
75:6 81:3
85:5
93:25
95:13
105:13

faith
89:17,24
90:5,9,15
95:10,17
98:13,21
99:3,13
100:6
102:9,13

false
92:18



110:16
119:19

**falsely**
  6:11
  93:17
  94:3

**family**
  28:16,17
  29:9

**faster**
  136:4

**father**
  29:18,19
  114:24

**feel**
  70:6

**feet**
  67:14
  68:6

**felt**
  133:18

**fight**
  90:17

**figure**
  12:2
  45:20

**file**
  57:22
  65:23
  130:5
  141:18

**filed**
  130:7

**files**
  19:2

**find**
  9:10 88:7

**finding**
  48:17
  54:8

125:6

**fine**
  3:10 4:22
  68:4

**finish**
  122:10

**fired**
  64:5
  106:1
  108:17

**fit**
  11:22
  13:1

**five-minute**
  142:3

**follow**
  47:24

**follow-up**
  48:15
  103:18
  140:18

**force**
  23:7

**forensic**
  53:11,21,
  25 54:7
  55:18
  56:12,22
  57:4 60:1
  107:22

**form**
  7:5,6,25
  8:16,17,
  21 14:7
  15:4,13,
  14 16:6,
  12,20,21
  17:2,3
  18:9
  19:24
  20:15,16,
  24 21:9

22:6,7
24:25
26:17,23,
25 27:22
28:2,10,
18,19
29:11,13,
17 30:21
32:21
33:4,5,20
34:14
35:2,11,
16,17
36:10,16,
17 37:11,
12,19
38:3,4,
13,14,24,
25 39:5,
6,17,18
40:1,2,
23,24
43:10,11
45:11,23,
24 47:3,
11,12,19,
20,25
48:1,7,
12,18,19,
24,25
49:6,7,
14,15,23,
24 50:5,6
51:10,17
52:12,13,
22,23
53:4,5,
15,16
54:2,3,10
55:22,23
56:2,12,
14,15,24,
25 57:5,
10,18,19
58:9,10,
22,23
59:7,8,

21,22
60:3,4,
10,11,18,
19 61:5,
21,22
62:7,15,
16,22
63:7,8
64:4,16
65:5,6
67:15,23,
25 68:8,
19 69:1,
13,18,19
70:7,14,
15,21
71:2,20,
21 72:12,
13 73:12,
13,20
74:5,6,22
75:13,14
76:11,12,
19 77:4,
5,11
79:23
80:5,21,
22 81:4,
19,25
82:1,15,
22,23
83:17,18
84:4,5,
11,12
85:11,12,
22,23
86:5,6,
11,12,19,
20 87:3,
4,9,15,
22,23
88:8,9,
16,17,23
89:6,12,
13,19,20
90:25
91:16,18,

24,25
92:15
94:23,24
95:18,19
96:2,7,8,
14,15,20,
21 97:2,
3,9,10,
19,20
98:3,4,
15,17
99:4,16
100:9,18
101:5,24,
25
102:10,
11,17,18
103:11,22
105:6,7,
15,16,22
106:4,5,
14,20,21
107:5,7,
25
108:19,
20,25
109:1,12,
13 110:8,
18
111:11,
12,23,24
112:6,7,
15 113:1,
5,6,25
114:1,14,
18,19
115:3,4,
11,12,18
116:1,7,
17,23,24
117:3,4,
9,10,20
118:11,
19,20
119:14,
20,21
120:20,21


121:1,2,7
122:25
123:10
124:2
125:13,14
126:2,3,
25 127:1,
25 128:1
129:2
130:23
131:10,
11,20,25
132:6,7,
12,24,25
133:11,12
134:13,25
138:17
139:5,13,
19
141:11,12

forward
39:22
52:18
59:1,15
60:15
63:3
81:23
83:15
85:7
87:14,20
88:4,22
89:5
91:11
94:13
97:14
105:11

found
51:24
106:25
134:16

foundation
67:25
69:12
133:13

four-page
114:12

frame
77:9

frames
78:5

frauds
23:18

free
70:6

friend
28:7
114:24

friends
27:18,20,
25 28:4,
14

front
57:24
66:7

full
38:19
76:16

full-time
64:10,13

fully
39:25
52:21
53:13
59:4,18
63:5 74:4

— G —

game
69:17

gang
122:20

Garcia
65:19

gave
58:6
59:2,16
68:23
74:1
86:3,16
117:25

general
23:5
56:21
62:20
103:18

generally
32:17

generated
43:21

Gerardo
57:21
121:14
142:3

give
5:8 33:19
57:21
85:1
86:24
87:1
135:18

giving
68:15
119:18
136:1

God
69:16

golf
8:11

good
51:21
54:25
89:17,24
90:5,8,15
95:10,17
98:13,20
99:3,13

100:6
102:9,13
118:9
125:8
137:13
141:10

gravest
93:17

great
18:2

guess
68:9
83:11
95:21

guilty
49:20
51:24

gun
104:19
106:8,18,
25 107:2,
11,15,17
108:2,6,
17 109:9

gunpowder
55:19
117:2

guns
108:12

gunshot
56:13,23
77:16,20
78:9
79:4,11,
16,17,19,
20 80:2,
11,18

guy
13:18
133:9

guys
27:15

— H —

half
15:2,20
17:25
26:6
41:25
42:1

hall
41:24

hand
79:21

hands-on
34:6
48:22
93:15

hang-up
80:12

happen
22:12
33:14
103:19

happened
22:18
33:3
34:11,23
35:15,21
36:3,7
37:25
38:12
39:4
51:13
73:18
85:7,17
87:13
94:6 97:7
98:2
101:19,22
118:1
140:3

happening
20:7



40:21
56:1
126:21

Happy
  79:8

head
  138:9

health
  5:1,7

hear
  18:23
  34:17
  40:20
  41:2,4
  51:2
  88:24
  119:24

heard
  41:3

hearing
  120:4

heavyset
  67:14,17
  68:6

helped
  80:13
  97:1

helpful
  52:7 74:8

helping
  127:15

helps
  108:11

Hey
  28:24
  121:14

high
  140:20

highest
  140:23

141:2

hold
  18:16
  92:24
  123:19
  138:2

homicide
  9:2,4,5,
  24,25
  10:1,3,5,
  9,10,17,
  18,19,20
  13:20
  20:21
  23:20,24
  24:5,6,8,
  14,21
  25:4,7,
  10,22
  26:8,10,
  15,22
  27:6,7,10
  30:16,18,
  20 31:2,7
  32:2
  33:3,10
  34:23
  36:24
  38:18
  39:9
  40:8,9,
  10,12,21
  41:11,15
  42:3,4,
  13,19,23
  43:22
  44:8,9
  46:1,2,5,
  14,20
  52:11
  53:25
  55:19
  61:13
  65:12,17
  73:19
  75:21

76:9
77:14
78:2
79:22
83:10
84:17
91:2,10
93:6
95:15
102:6
104:10
111:9,19
112:3,8,
10 113:12
117:8,18
120:16
122:2,23
123:4
126:6
130:2
131:6
132:21
133:6
138:13
139:2,3,
23 141:6

homicides
  31:18
  32:19
  42:6,23
  46:7
  51:20
  93:11
  132:21
  140:21,24

honest
  19:4
  24:11

hour
  15:2,3,6,
  9,20
  17:25
  113:4

hurt
  97:1

hypothetica
l
  99:19,24

————————
      I
————————

idea
  6:17

identificat
ion
  48:11
  71:18

identified
  35:6
  36:4,22
  37:2 53:2
  68:17,23
  69:4,8
  72:11
  82:13
  85:9
  87:21
  89:10
  94:11
  102:7

ignoring
  96:19

important
  39:4 54:1
  72:6
  86:17
  88:6,12
  92:12
  95:14
  105:4,12,
  17 107:1,
  19
  108:10,13
  109:3,20,
  22 111:6
  112:2,12,
  18,21,24
  113:18
  114:8,16

115:21
119:17
131:8

inappropria
te
  100:14

incident
  7:16 9:3
  24:13
  124:18

include
  59:25
  60:7

including
  14:2,3
  30:18

inconsisten
cies
  72:22
  73:9
  86:25

independent
  62:10
  63:4

independent
ly
  62:4

inducement
  114:25

influence
  139:2

information
  78:8 79:4
  105:4
  107:23
  109:6
  125:25
  126:23
  127:23
  130:2
  132:4,22
  134:8,10



141:8,18,
19

infrequent
94:5

initial
43:15
135:4
136:18
137:7

initial's
72:1

initialled
135:7

initials
71:7,11
130:3
135:9,15,
17,19,25
136:3
137:2

innocence
96:19

innocent
101:1,2,
10,22

instruct
82:3 90:8
98:18
127:12

instructed
95:10
140:9

instructing
89:23

intelligenc
e
122:22
123:2,3,
8,15
124:1,4,
24 125:25
126:10,24

127:24
128:10,25
129:7
132:4,23
138:10,15
139:10,17
140:11
141:10

intentional
96:6
100:7

inter-
department
12:17

interaction
s
8:6

interdepart
mental
123:24

interest
70:4
138:24
139:10,17
140:10
141:6

interested
131:3

interpret
126:20

interrogati
ons
27:6

interrupt
78:22

interruptin
g
75:3

interview
11:18
58:2 88:6
90:5

92:13
102:23
108:17
136:6

interviewed
86:24
87:21
88:3
89:11
92:14

interviewin
g
48:6 60:7
89:10

interviews
27:6 43:8
66:22
87:2
135:14

investigate
46:7
100:17
102:16
105:5,13
106:13,18
110:14
113:24
114:17
115:15
140:9

investigate
d
33:25
34:1
39:25
46:5
52:21
59:4,18
63:6 74:4
75:17
76:18
91:20,23
98:12
115:2,10

investigati
ng
44:24
104:11
128:12
131:7
138:25

investigati
on
11:9
21:23
24:5,21,
24 34:24
38:19
51:14
58:20
60:16
64:16
75:19
76:1,17
87:12
92:23
97:25
99:2,5
107:2,7,9
112:3
122:5,8
139:3

investigati
ons
26:16,22
64:20
138:22

investigati
ve
11:13,14
12:4
48:16
59:19
62:5,12
88:20
89:3,8
90:24
91:14
96:12

108:14,23
110:3
111:21
112:12
117:7,18
120:24
121:6
131:23
138:14

investigato
r
63:21
84:15
125:9
129:11

investigato
rs
82:2,9
84:16
93:12

involved
21:22
22:4
31:16,17,
18 33:19
34:2,12,
25 37:18,
24 38:1
43:8
64:24
65:3,13
82:19
83:11
84:9
110:1
122:4
123:8,15
124:9
134:9

involvement
11:9
131:9

irrelevant
51:15



issue
   54:1 79:5

_____

**J**
_____

Jackson
   7:15 14:3
   24:6 58:7
   104:19
   105:11
   106:1
   107:3
   108:16

James
   32:6,9

Jen
   75:6
   83:22
   142:5

Jim
   32:8

job
   27:18,21
   39:10,21,
   24 59:2,
   16 62:3
   95:15
   97:6 98:1
   99:1
   100:4

jobs
   25:6
   42:22
   63:18
   95:14
   97:16,23
   100:24

John
   65:19

joined
   23:7,8

judge

8:21 79:8

juvenile
   10:8 42:1
   83:6

_____

**K**
_____

killed
   109:8

kind
   22:21
   37:15,17
   60:15
   64:15
   82:18
   87:12
   89:16
   109:6,25
   110:4,7
   117:16
   118:16
   119:7
   139:21
   141:3

kinds
   14:11
   33:18
   44:5
   114:4
   115:15

knew
   123:4
   124:22,23
   125:1,10
   127:22
   128:6,8
   130:14

knowing
   8:2,3
   68:1
   84:23

knowledge
   21:20

122:5

_____

**L**
_____

L-I-P-I-N-
C-Z-Y-K
   32:8

lab
   81:6

laboratory
   81:7

laid
   26:4

Lamarr
   14:2 20:5
   21:16,21
   22:5
   38:8,20
   39:22
   49:19
   50:3,17
   51:6
   52:18
   53:12
   58:3,5
   59:1,15
   60:15
   63:2
   68:6,11
   72:7 73:3
   74:3,20,
   24 75:9,
   16 76:7
   77:7
   81:22
   83:15
   84:2 85:7
   86:17
   87:13,19
   88:4,15,
   22 89:4
   90:6
   91:11
   92:10

93:1
   97:13
   98:9,10
   99:9,22
   100:1
   102:23
   104:18
   105:10
   109:7
   110:4,6,
   25 112:20
   114:13,25
   115:22,24
   116:12
   135:17

Lane
   3:19

law
   29:10,25
   63:15,18
   100:13
   113:14
   131:8

lawsuit
   4:10
   12:12
   14:22
   130:7

lawsuits
   6:13,14

lawyers
   16:8,18

lay
   67:25
   133:13

laying
   7:3

learned
   20:12,22
   21:5,16
   22:2
   37:25
   75:8 76:9

83:25
   98:8
   130:21

learning
   20:7 76:6

leave
   64:2

left
   65:20
   78:1
   135:20

legal
   89:21

legally
   65:21

legitimate
   17:9
   109:5,10

lie
   87:5
   110:7

lieutenant
   10:12,13,
   16 23:15
   25:20
   31:8,11,
   21,25
   32:6
   40:13
   42:25
   44:23
   141:25

lieutenants
   141:23

limited
   93:11

lines
   67:3

Lipinczyk
   32:7

list



18:16

**listed**
  128:7

**listen**
  58:13
  133:24

**listening**
  11:23

**location**
  11:2

**Lonergan**
  32:9

**long**
  9:22
  16:25
  17:23
  32:4,5

**looked**
  12:15
  46:23
  67:5
  76:25
  134:21
  135:24

**loop**
  38:11
  43:16
  135:21

**lot**
  5:4 41:10
  77:20
  79:15
  80:14,19
  81:2,7
  84:1
  100:22
  106:9,17
  108:11
  109:24
  110:20
  123:16
  124:24
  129:17

130:11
133:17
136:3
140:5,25
141:1

**lower**
  135:20

**luncheon**
  95:4

---

## M

**made**
  9:24
  23:18
  24:18
  25:10,22
  26:5,7,9,
  10 38:10
  53:1
  71:18
  73:7
  107:20
  115:17
  125:4
  139:21

**main**
  100:24

**make**
  11:23
  24:15
  44:14
  47:9
  51:17
  52:20
  65:11
  68:3,4
  70:7
  73:23
  76:5
  93:18
  94:8
  95:24
  96:5,11,

18,24
97:7
98:23
100:12
107:22
112:24
114:25
136:4

**makes**
  55:1

**making**
  75:22
  82:20
  127:7

**man**
  67:14
  68:6
  101:10,22

**Mark**
  29:1,3

**marked**
  57:22
  66:6

**Masecchia**
  13:17
  19:7
  27:12,14
  29:2

**matched**
  120:17

**matter**
  70:1

**Mayor**
  64:7

**Mayoral**
  64:6

**meal**
  28:7

**meals**
  28:12

**means**

59:10

**meant**
  79:20
  124:14
  128:17

**medications**
  5:2,4

**meet**
  15:23
  24:12
  33:9

**meeting**
  11:17
  15:12

**meetings**
  16:14,17

**memo**
  123:23
  124:9,10,
  12 125:23
  128:24
  132:8

**memory**
  11:12
  12:4 18:1
  20:6
  35:24

**mentioned**
  9:18
  14:11
  18:10,21,
  24 25:3
  27:11
  28:1 29:2
  32:23
  42:21
  58:2 60:1
  79:10
  94:2
  124:8
  135:2

**met**
  15:24

16:4 17:8

**middle**
  66:10
  67:6,7
  75:4

**mind**
  20:21
  52:17
  65:24
  72:8 76:9
  135:19
  136:4

**mine**
  136:3

**minorities**
  23:11

**minute**
  92:3 95:2

**minutes**
  17:25
  18:4,5

**misconduct**
  96:6
  100:8
  101:3

**mistake**
  101:2

**mistakenly**
  100:3

**mistakes**
  93:18

**money**
  110:15

**morning**
  103:24

**mother**
  114:24

**motive**
  110:7

**move**



17:5 55:7
78:15
127:10

moved
  139:18,20

multiple
  32:16
  87:2

murder
  7:15
  49:13,21,
  22 79:12

murderer
  38:21

murders
  49:21

————————
        N
————————

named
  5:22
  6:12,13,
  14 7:10
  12:11
  14:20,22
  16:18
  18:8

naming
  6:1

narcotics
  124:24
  126:9
  131:3
  139:22
  141:22

necessarily
  60:20
  101:6
  134:14

needed
  33:25
  45:14

88:21
89:4

news
  83:16

newspaper
  21:7 22:3

newspapers
  21:17

Nick
  3:25
  16:11
  21:10
  65:24

night
  68:18,25
  71:19
  120:13

noise
  123:17

Note
  34:19

notice
  137:2

noticing
  136:6

number
  18:16
  80:3
  94:11
  105:13
  136:15,16

numbers
  66:10

————————
        O
————————

oath
  4:15

object
  7:5,6

14:7
20:24
21:9
33:5,20
38:3
51:11
52:23
53:5,15
55:22,23
57:18
59:7,21
60:18
62:15,16,
21 67:15,
24 69:9,
13,18,19
70:14
71:2
72:12,13
73:12
74:5,21
80:21
84:11
88:23
89:6,12,
19,20
90:25
91:16,24
95:18
97:19
98:3,15
99:4,16
100:9
101:25
102:10,17
103:11
107:6
109:12
110:8
111:11,
12,23
112:6,15
114:14
115:18
117:9
126:25
131:10

132:6
134:13
138:17
139:5,13,
19

objection
  34:19
  59:13
  67:16
  73:20
  89:13
  100:19

objections
  51:17
  70:7
  98:24
  100:23
  127:8

objects
  8:20

obligation
  63:4
  71:16
  98:11
  100:16
  101:21
  102:15
  111:20
  113:23
  115:1,9

obligations
  115:7

obtain
  116:13
  117:15

obtaining
  117:15
  127:23

occurred
  10:3
  74:9,10
  124:19

offense
  42:2

offenses
  10:8
  31:16
  83:6

offered
  110:15
  114:25
  119:10

office
  16:2
  33:10
  40:8,9,
  10,11,12,
  13,14
  41:1,10,
  16,19
  42:2,12,
  14,18
  61:20,24
  62:11
  63:20,22,
  24 75:18
  117:24
  125:9

officer
  10:19
  23:9
  29:3,19,
  20,21,22,
  23 90:21

officers
  6:8,18
  7:4 21:22
  29:25
  30:5,8,
  10,13
  38:18
  42:18
  47:16
  64:24
  65:3
  95:9,16



99:12
101:2
102:9
107:10

offices
40:16
41:24
42:7

oftentimes
53:24

Oops
37:13

open
23:12

operated
73:1
84:23

opine
89:22,23
90:8,13,
14 98:19
102:12

opinion
49:11,16
50:15,19,
25 51:2,
3,4,14
52:3,5
69:24

opportunity
88:13

opposed
98:10

opposite
127:2

order
62:2
128:4

outer
41:10,16,
19

owner
64:18

_____

P

_____

p.m.
95:3,5,6
137:17,18
142:8

P73
136:7,11
138:6

P73s
13:13,14,
25 14:1,
10,23
19:18,20
44:2
135:14
137:5

paid
84:14

paintings
8:12

paper
21:2
35:19

papers
130:10

paperwork
43:14

parking
15:21

part
4:1 11:18
89:8

participate
26:22
30:19

participate
d

46:9

partner
128:18

partner's
128:7

parts
130:17

party
3:6

pass
84:17

passed
141:19

patrol
128:5

patrolman
23:13

paused
75:5

peace
23:9 29:3

pending
4:23

people
18:25
19:8
24:12
52:2 54:7
55:4 58:7
64:17
69:7
72:10
77:1
81:5,6,7
92:21
94:3
102:7
107:23
130:14
138:23
139:16

140:10

percentage
140:20

period
23:18

permission
118:3

perpetrator
's
55:20

Persico
3:11,12
7:6 8:16
14:7
15:14
16:6,9,21
17:2
20:16
22:6
26:23
28:18
29:11,17
33:4
34:14
35:11,16
36:10,16
37:12
38:4,14,
25 39:6,
18 40:2,
24 43:11
45:24
47:12,20,
25 48:18,
24 49:7,
14,24
50:6
51:11
52:13,22
53:4,16
54:2
55:23
56:14,16,
24 57:19

58:9,22
59:8,22
60:4,11,
19 61:22
62:16,21
63:8 64:4
65:6
67:16,24
69:9,14,
20 70:15
71:21
72:13
73:13,20
74:6,21
75:1,14
76:12
77:4,6
80:22
81:25
82:23
83:18
84:5,12
85:12,23
86:5,12,
20 87:4,
23 88:9,
17,24
89:7,13,
20 90:12
91:18,25
94:24
95:19
96:7,15,
21 97:3,
10,20
98:4,17
99:15,17
100:10,19
101:24
102:11,18
104:4
105:7,16
106:5,21
107:6
108:20
109:1,13
111:12,24



112:7
113:6
114:1,19
115:4,12
116:7,24
117:3,10
118:20
119:21
120:20
121:2
123:16
125:14
126:3,25
127:2,9,
14 128:1
131:11
132:7,25
133:11,
13,17
141:12
142:7

**person**
16:2,5
20:23
35:7 37:1
38:22
59:5 67:4
68:22
77:1,25
82:13
92:22
97:18
98:1
100:25
101:18
102:7
109:8
111:9,19
112:5,14,
18,25
113:9,17
114:7
118:14,16
136:1,2
141:6

**personal**
28:6 52:3

**personally**
6:15
54:13,20
93:16
94:18

**persons**
10:6,13
46:1
138:24
139:9
140:10

**pertinent**
55:12

**Peter**
15:24,25
16:5,22
17:15
55:1
78:22

**philosophy**
93:20
109:21

**phone**
16:23,25
17:12
133:8

**photo**
68:18,24
88:14

**physical**
115:24
119:7

**physically**
40:6

**pick**
82:7
125:4
127:6
133:8

**pickup**
123:12
124:12
128:4,17

**piece**
55:13
105:4
111:5
114:16

**place**
81:2 89:4
141:10

**Plaintiff's**
57:23
66:7

**play**
69:17

**pled**
49:20

**point**
54:25
56:10
93:6 99:5
118:2,9

**police**
10:4 23:6
24:1
29:19,20,
21,22,23,
25 30:5,
7,10,13
33:11
57:22
61:2,7,19
62:4
64:2,12
65:2,23
81:6
104:10
130:1

**policy**
47:18

**polygraph**
118:24

**position**
9:24
10:21
26:1,11,
13 42:24
80:16,18

**potential**
133:7
141:9

**power**
52:20
93:2

**practicable**
115:16

**precinct**
124:17,18

**precincts**
23:19
124:17

**preparation**
14:19
35:14
36:2
103:4

**prepare**
5:18

**present**
102:4

**press**
84:1,10

**pretty**
7:9
130:18

**primary**
84:16

**prior**
78:13
100:11

**priority**
93:6

**prison**
6:24 9:20

**private**
64:16

**problem**
91:5

**procedure**
47:18

**procedures**
48:11
107:12

**process**
4:14

**program**
23:10
27:13,16

**promise**
12:25

**proper**
72:16

**properly**
45:15
47:10,15
68:17,24
76:18
82:21

**prosecuted**
6:11

**provide**
119:10

**provided**
43:14

**pulled**
104:19

**purchasing**
3:7

**purpose**
44:15



pursuant
  47:18

pursue
  112:20

put
  92:23
  123:11
  124:13,20
  125:2
  128:4,17
  137:7

——————————

          Q

Q&a
  70:24

question
  4:16,23
  9:15
  11:3,24
  13:4,5,7
  17:4 19:5
  20:25
  26:19,20
  29:6
  44:24
  45:4
  51:12,23
  56:18
  58:14
  62:22
  67:10
  69:21,23
  73:1,21,
  24 74:17
  75:4,24
  76:20
  77:22
  78:15,24
  79:1,8
  88:24
  90:18
  91:17
  92:5,25

98:16
99:23
100:21
103:9
104:14
109:11
119:4,5
123:18
128:21,23
133:15
136:25
141:20

questioning
  69:24

questions
  4:15
  11:22
  12:25
  17:9
  22:15,17
  30:15
  45:7
  50:7,10
  69:13,14
  70:19
  95:9,11
  103:24
  138:6

——————————

          R

——————————

radio
  123:11

ran
  19:9
  41:23

range
  31:19
  116:11

rank
  10:19

ranks
  139:20

rapist
  83:4,5

rare
  92:19,20

Rautenstrau
ch
  32:6

Ray
  13:16

re-
interviewed
  53:3

Re-
interviewing
  89:9

reached
  18:12

read
  3:15,17
  5:21,25
  6:5,6,19
  7:2 8:12
  9:14,16
  13:11,12,
  13,14,18,
  24,25
  14:9,13
  20:4,5
  21:2
  43:15
  45:9
  51:5,8
  58:2,17
  66:25
  67:10
  103:6
  104:14
  130:3

reading
  15:2
  21:7,17
  22:2

35:19
50:15
103:9
123:23

real
  141:14

reason
  7:1
  10:15,16
  45:21
  50:2 79:3
  84:9
  104:18
  105:19,25
  106:12
  109:5,10
  114:22

reasonable
  59:19
  62:12
  107:9
  111:20

reasons
  34:24
  52:8
  105:13

recall
  24:10
  27:8
  32:13
  33:22
  34:7 37:4
  55:17
  57:11
  72:3
  77:13
  81:8
  138:6,18
  139:6
  140:2
  141:13

receive
  112:4
  134:8

received
  109:6
  112:13

recently
  28:1
  101:19

recess
  66:3 95:4

recollectio
n
  12:11
  19:21
  23:21
  32:3
  77:13

record
  8:21
  9:12,13,
  16 18:18,
  19 66:6
  95:2,3,6
  137:17,18

redo
  45:17

redone
  45:22

refer
  66:9

referred
  75:18
  135:8

refresh
  12:10
  19:21

regard
  31:6
  48:6,10,
  15 108:15
  110:3
  115:21

regular
  33:21



regulations
  48:5
  90:22
  91:13
  95:25
related
  131:19
  140:21
  141:7
relation
  40:9
relationshi
p
  141:15
relevant
  69:15
  96:25
reliable
  85:10
remain
  27:18
  80:3
remember
  7:8,14,
  16,17,18,
  19,20,22
  8:2,3,14,
  15 9:21
  10:24
  11:8,10,
  11,16,19,
  20 12:8
  13:21
  17:21,24
  18:3,24
  19:3
  20:13
  21:24,25
  22:9,14,
  16,24
  24:13,16
  27:12
  31:23
  32:10,14

35:18
37:3,16,
24 38:8
41:20,21
46:17,22,
25 49:3
50:12,13
52:17
53:6,7
56:1,6,7,
10,21
57:3,8
63:2
67:20
68:1 69:2
70:12
71:1
72:4,9,24
76:6
80:10
81:17
83:14,20,
24 84:3
85:8
93:7,10
94:10,15,
16,17,18
95:11
103:8,14,
21 110:20
124:11
126:18
129:15,
17,20
130:9,12
133:2
135:24
136:6
remembered
10:25
11:17,18
19:14
50:11
125:3
remembers
83:19

reorganized
10:4,5
46:13
repeat
121:3
rephrase
4:17 8:24
replaced
64:8
report
43:15,17,
21 45:13,
22 61:1,
23 71:5,
8,12,13,
16,23,25
72:1,3
81:15
121:15
reported
61:2,6,7,
15,19
REPORTER
3:1,8,11,
13
reporting
10:7,8,9
reports
11:15
42:4,22
43:2,6
45:5,8,10
46:24,25
47:18
68:16,21
69:7
70:12,19
82:6,20
85:19
135:13
represent
69:6
108:5

representin
g
17:15
69:10
request
123:9,10
requested
9:16
requesting
126:22
require
58:19
required
99:11
reserve
3:16
residue
55:19
56:13,23
77:16,21
79:4,11,
16,18,19,
21 80:2,
12,18
117:2
respect
15:17
51:15
respectfull
y
136:19
respond
84:16
responded
10:17
responsibil
ities
30:15
32:17
46:19
96:13

114:9
responsibil
ity
31:5
62:10
101:10
107:20
113:10
responsible
70:11
retire
63:13
retired
24:2
31:10
63:25
retirement
64:12
review
12:20
13:2 19:2
33:21
42:6
43:7,12,
13,21
44:20
71:16,25
82:6
135:3
reviewed
5:23
11:15
12:13,15,
23 13:9,
10 14:19,
21 35:13
36:1 42:3
43:17,20
44:1,2,6,
12 47:9,
16 66:22
68:22
70:20,25
71:6,8,



12,13
72:1,2,9
73:3
75:11
81:16,21,
22 83:9
84:21
103:4
130:4
135:15
137:6,8

**reviewing**
19:18,20
44:13,14
46:22
67:19,21
68:5,16
69:3
70:11
77:14
82:20
118:24
128:2

**RICHARD**
3:19

**ridiculous**
100:22

**road**
25:20

**robberies**
83:7

**robbery**
10:7,12
31:17
41:25
42:15
83:5

**role**
11:12
25:6 31:5
43:5
123:25

**Romo**

3:4,6 4:3
57:24
67:6
104:6
121:16,18

**room**
40:16

**rooms**
40:12

**routinely**
122:23
133:8,20,
22

**RTD**
43:16
135:21

**rules**
48:5
90:22
91:13
95:25

**run**
28:25

**running**
141:25

———————

——— S ———

**Sahasrabudh
e**
3:9,10,
14,16
5:13 7:5,
7,25 8:17
13:3
15:4,8,
13,16
16:11,20
17:3,21
18:9
19:24
20:1,15,
24 21:9

22:7
24:25
26:17,25
27:2,22
28:2,10,
19 29:5,
13 30:21
32:21
33:5,20
34:19
35:2,17
36:12,17
37:11,19
38:3,13,
24 39:5,
17 40:1,
23 43:10
44:16
45:11,23
47:3,11,
19 48:1,
7,12,19,
25 49:6,
15,23
50:5
51:10
52:12,23
53:5,15
54:3,10,
12,16,19,
23 55:22
56:2,15,
25 57:5,
10,18
58:10,13,
23 59:7,
9,21
60:3,10,
18 61:5,
21 62:7,
15 63:7,9
65:5,24
66:2,15
67:15,23
68:8,19
69:1
70:14,21

71:2,20
72:12,15,
18 73:12,
14,22
74:5,7
75:5,13
76:11,19
77:5,7,11
78:10,14,
20,25
79:7,23
80:5,21
81:4,19
82:1,15,
22 83:17
84:4,11
85:1,11,
22 86:6,
11,19
87:3,9,
15,22
88:8,16,
23 89:6,
12,19,21
90:7,14,
25 91:16,
24 92:15
94:23
95:18,20
96:2,8,
14,20
97:2,9,19
98:3,15,
18 99:4,
16,18,21
100:9,18
101:5,25
102:10,
12,17,25
103:11,22
105:6,15,
22 106:4,
14,20
107:5,25
108:19,25
109:12
110:8,18

111:11,
15,23
112:6,15
113:1,5,
25
114:14,18
115:3,11,
18 116:1,
17,23
117:4,9,
20
118:11,19
119:14,20
120:3,21
121:1,7
122:10,25
123:10
124:2
125:13,
15,19
126:2,4,
13 127:1,
25 129:2
130:23
131:10,
20,25
132:6,12,
24
133:12,
15,20,24
134:3,5,
13,25
136:10,24
137:15,20
138:4,19
139:7,14
140:7,15
141:11
142:5

**scene**
9:5,25
10:17,22
46:12
55:10,11
84:17
106:25



RICHARD T. DONOVAN
DIXON V CITY OF BUFFALO

September 15, 2022
Index: scenes..situation

107:16
108:6,18
109:2,15

scenes
10:14
55:10

Scioli
122:19
141:24

Scott
14:2
21:16,21
22:5 38:8
39:22
49:19
50:3 51:7
52:18
53:13
58:3,5
59:1,15
60:15
63:2
68:6,11
72:7
74:3,20,
24 75:9,
16 76:7
77:7
81:23
83:15
84:2 85:7
86:17
87:13,19
88:4,15,
22 89:4
90:6
91:11
92:10
93:1
97:13
98:9,10
99:10,22
100:2
102:23
104:18

105:10
109:7
110:4,6,
25 112:20
114:13,25
115:22,24
116:12
135:17

Scott's
20:5
38:20
73:4

screwed
9:8

scrutinized
85:20

search
117:23

second-in-
command
40:18

Security
64:20

self-
defense
106:7

send
45:22

sense
33:17

separate
40:11,12
41:23
62:11
63:4
102:7

separately
129:23

sergeant
32:1,7,9
65:16

sergeants
31:12,13

serial
83:5

series
4:14

Service
26:13

services
3:2 81:6
122:22
123:8,15
124:1
125:24
126:23
127:24
128:24
129:7
132:4,22
133:10
134:12
138:10,15
139:10,17
140:11
141:9

set
142:4

sex
10:8
31:16
83:6

shared
28:7,12

sheriff
30:11
64:17
65:19

sheriff's
63:22,24

sheriffs
63:25

shoes
117:16
119:11

shooter
39:23
50:3 51:7
52:19
53:13
67:13
72:7 74:1
81:24
86:4 89:5
94:14
100:4
106:2
110:5
120:18

shooting
24:7 35:8
49:22
58:6
77:18
78:3
87:20
88:14
92:11
104:11
116:10,14

short
23:18

shot
58:8
92:22
104:18,19
105:12
106:2,6
109:10

show
88:14
118:25
135:10
136:5

showing
77:1

sic
23:13
37:7

sign
3:15,17
135:3

signed
43:18
134:23
136:5

silent
75:6

simple
68:3,4
100:21

simply
43:6

single
7:14

sir
5:11
24:23
36:15
37:9 58:3
67:1
68:21
73:15
100:17
101:4
102:6,16
111:16
112:10
115:8

sister-in-
law
29:20
30:10

sit
8:9 12:3
41:6
49:10

situation



37:15,17
38:2
82:11
94:21

small
86:25

solely
15:16

solve
81:1

someone's
79:18,19,
21 102:12

son
29:22
30:3,7,10

sound's
18:15

sounds
13:24,25
22:14
80:16,17

source
134:10

sources
132:3

speak
70:3

speaking
127:8,13

special
23:17
122:22
123:8,15,
25 125:24
126:23
127:24
128:24
129:6
132:4,22
133:9,10

134:12
138:10,15
139:10,17
140:10
141:9

specific
6:17
25:13
33:23
37:4
42:24
104:1
114:11
129:20
136:6
140:1

specifically
11:16
43:15
63:1
118:22

speculate
126:14

spend
15:11
17:11

spent
6:23 15:2
17:19
41:10,16

spoke
18:22
22:4

spoken
16:12
19:6
130:7

squad
104:10
124:4
127:5

stabbed
92:22

Stambach
19:7,9
28:1
29:1,3
107:21

start
5:18 8:13
23:3
66:11
102:22
142:4

started
9:4,23
10:11
64:16

starting
104:7

starts
60:17
66:23

statement
13:18
20:5 71:6
77:2
84:20
107:22
110:4
114:12
136:1

statements
13:12
14:13,14,
24 19:19,
21 44:3
72:10
75:12
76:25
85:19
86:10
103:3
137:3

step
108:14,23
110:3

steps
59:20
62:12
88:20
89:4,8,16
90:24
91:15
103:18
111:21
117:7,18

stop
9:7 70:8
113:11
127:7

stopped
39:16

story
105:20
110:16
116:5

street
25:19
125:7,12

streets
23:14
130:15

string
83:6

stuff
33:12
34:6
44:25
69:3 78:5
93:13
117:25
118:24
122:20
128:11
130:1,11
133:17

140:6

subsequent
50:13

Subsequently
10:14

substance
16:15
43:7

substantive
45:8

sued
6:15
10:23

suggesting
127:21
130:20

Sullivan
14:2

sum
14:18,21

supervise
31:1,4
42:18

supervised
6:19 10:1

supervising
11:14
31:6 32:1
62:13

supervision
30:19
32:18

supervisor
34:4,5
48:23
87:19
93:15

supervisors
21:22



31:25
32:18
39:13
61:19

**supervisory**
12:5

**Susan**
3:19

**suspect**
131:6,9
133:7
134:9
141:9

**suspects**
27:7 48:6
132:16,
20,21

**sworn**
3:20

**system**
124:13

————————

**T**

**takes**
84:20

**taking**
4:1,3,23
5:2,4
18:22
136:1

**talk**
5:17
19:13
31:21,22
32:24
40:5
42:17
60:25
114:12
122:7
132:16,20

**talked**
16:22
17:14
18:6
103:17
129:13
132:19
137:22
139:16,23

**talking**
17:7,12,
19,24
18:3
21:7,10,
13 41:4
44:9,16
46:15
56:17
62:17,19,
20 70:8
77:8,10
80:5,7
99:6
114:3
118:21

**tall**
67:14

**taller**
68:7

**target**
140:9

**task**
112:12
120:24
121:6
131:23

**tasks**
140:1

**TEC-9**
67:5

**technical**
41:12
123:20

**technically**
25:25

**technicians**
107:14

**telling**
19:17
50:18
90:12
110:10,16

**tells**
8:22

**ten**
5:12

**tended**
109:23

**test**
107:16

**tested**
53:11,13
57:16
79:25
81:7,10
115:25
117:17
119:13

**testified**
3:21 71:3
75:1
92:18

**testify**
5:3 50:14
71:13

**testimony**
5:8 7:13
21:15
22:3
72:16
83:9

**testing**
53:25
55:4,18,
19 56:12,

13,22
57:9,14
60:1
77:16
78:9
79:5,11,
18,19,21
80:18
107:24

**theory**
118:6

**thin**
67:22

**thing**
4:22 7:14
87:18
94:1
112:18,21
113:18
114:8
115:21
139:23

**things**
22:1,18,
19 23:21
29:1
31:19
32:4
33:18
41:5
51:13,22
52:7,8
53:19
55:15
58:1 73:7
75:19
76:15
81:7 83:4
84:18
85:6,15
97:7
99:11
104:2
113:13
116:11

117:16,23
118:7
120:15
137:21

**thinking**
92:17

**thought**
6:5 24:9
55:12
69:4
79:13
141:7

**ticket**
15:21

**Tim**
122:19
141:24

**time**
9:2,3
12:14
15:1,11,
17 16:4,
12 17:11,
19,25
20:13
21:13,14
22:1,9
23:18,23
25:15
27:4,13
31:15
32:5
35:22
38:11
41:10,16
46:16
51:5
57:15
70:20
72:3
75:15
76:10
77:9,17
78:2,5



RICHARD T. DONOVAN
DIXON V CITY OF BUFFALO

79:12,14,
22 81:8
93:13,20
101:20
102:3
103:9
113:7
115:15
116:14
122:2,6,
17,21
124:18
125:6
129:16,19
130:3,21
132:10
133:6
134:11
138:13
139:16,22
141:14,
22,25

timeline
74:9

times
4:8 16:23
17:8
32:23
54:22
55:2,8
94:2
109:24
118:3
127:3

title
23:9

today
4:2 5:3
8:9 11:11
12:3
14:19
22:13,25
35:9,14
36:2,3
49:10

50:2
51:12
71:1
81:17
83:14,24
85:8 95:8
103:4

told
10:23
22:1
41:22
44:1,2
46:4,23
52:9
70:10
74:17
76:4
81:15
91:22
92:8
97:16

tools
57:4 81:1

Torri
105:11
106:1

Torriano
58:7
104:18
107:3
108:16

total
14:18,21

tough
130:18

training
90:23
91:14

transcript
3:3,7,15

treat
60:23

trouble
125:5

troubling
93:13

true
20:17
84:3
104:24
105:21
119:19

truth
50:18
110:10

truthful
5:8

two-minute
65:25

two-thirds
104:11

type
58:18
69:24
101:3
110:15

types
55:18

_____

U

U.S.
63:20

ultimately
39:12

undersherif
f
63:23
65:18

understand
4:13,16
6:22 8:23
9:1 22:23

24:19
35:9,14
36:3,7
49:19
68:15,21
69:23
76:20
82:12
83:13
84:2
86:23
95:20
124:3
126:18
128:21

understandi
ng
123:7,25
127:20
128:25

understood
4:18
80:2,9
98:2
112:11
141:5,8

unit
40:21
41:11,15
42:15
54:16,21
122:23
138:10,15
139:11
140:11

unregistere
d
108:12

unusual
34:10,23
36:15
37:7,8
38:1
60:16

72:6
74:18
94:20

utilize
122:24
134:11
138:21

_____

V

_____

Valentino
4:1 7:22
8:2,3,7,
10 38:9
39:23
49:12
50:4,23
52:19
53:2,12
62:18
67:21
68:17,24
69:3,8
71:18
72:11
73:10
74:2 76:8
77:3 85:9
86:3
88:3,15
92:11
93:3
97:15
98:10,13
99:10,13
100:3,5
110:5,21
112:19
123:12
124:14
125:1,4,
11 126:1,
24 127:6,
22 128:3,
6,13,18



130:13
131:16,17

**Valentino's**
114:23

**version**
119:18

**Vickerd**
19:7
136:11

**victim**
55:20
106:18

**voluntarily**
117:25

**volunteered**
78:8 79:4

———————

**W**

**wait**
78:25
85:1 92:3

**waited**
7:10

**wanted**
11:3
76:3,25
85:6
141:8

**warrant**
124:15

**warranted**
141:15

**warrants**
117:22,23

**ways**
59:19
106:17

**weapon**
109:9

**wearing**
116:14
118:17
119:11
120:12,
17,19

**Wednesday**
28:24

**weight**
81:2

**well-known**
130:22

**whatsoever**
11:12
20:10,11

**wide**
31:19

**wife**
28:21,22

**wife's**
29:19

**William**
65:17

**wind**
133:7

**withdraw**
26:20
123:18

**withdrawn**
14:20
27:10
30:4
36:23
39:10
46:22
53:20
55:16
60:23,24
68:14
72:23
121:12
132:17

**witnesses**
14:1 48:6
53:2 60:8
76:18
85:9,18
86:24
87:20
88:2,6,13
89:10
90:5
108:17
109:2,11
127:13

**wives**
28:20

**words**
27:4 38:7
39:21
53:1
60:14
95:24
98:7
100:7
105:10
118:14
131:14

**work**
17:16
25:15
26:2 28:8
64:15
109:24
125:11
129:22
130:18
141:3

**worked**
23:10,13
25:23
28:4
61:24
63:15
64:13
65:16
123:2

124:16
129:4,6,
23
130:15,17

**working**
29:24
84:18
124:25
125:24
126:5,9
132:11

**works**
4:14
39:12

**world**
18:7

**worried**
51:20

**worry**
58:10

**wrong**
32:24
38:22
59:5
77:25
80:17
97:25
100:25
101:18
102:7
111:9,19
112:5,14,
24

**wrongfully**
101:22

———————

**Y**

**year**
25:11
26:6
27:15
63:12

140:23

**years**
5:22 6:23
18:1
23:25
63:21,24
124:25
141:2

**yesterday**
5:23
12:14
13:12,22
15:12
35:18
36:2
44:1,17
46:24
58:17
66:22
136:8

**York**
3:20 64:7
141:1

**young**
122:16,17

