# EXHIBIT 10

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**

```
 1                 UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF NEW YORK
 2
       VALENTINO DIXON,
 3
                      Plaintiff,
 4
          vs.          Civil Action No. 19-CV-01678
 5
       CITY OF BUFFALO, et al.,
 6
                      Defendants.
 7

 8     VIDEOTAPED           TAMARA L. FRIDA

 9     DEPOSITION OF:

10     DATE:              October 19, 2022

11     TIME:              10:27 a.m.

12     LOCATION:          Offices of
                          HUSEBY GLOBAL LITIGATION
13                        1230 West Morehead Street
                          Suite 104
14                        Charlotte, North Carolina

15     TAKEN BY:          Counsel for the Plaintiff

16     REPORTED BY:       MINDY VISLAY

17     _____

18

19

20

21

22

23

24

25
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 2

```
 1   APPEARANCES OF COUNSEL:

 2          ATTORNEYS FOR PLAINTIFF VALENTINO DIXON:

 3                  NEUFELD SCHECK & BRUSTIN, LLP
                    BY:  NICK JOEL BRUSTIN
 4                  99 Hudson Street
                    Eight Floor
 5                  New York, New York  10013
                    212-965-9081
 6                  nick@nsbcivilrights.com

 7          ATTORNEYS FOR DEFENDANT CITY OF BUFFALO:

 8                  HODGSON RUSS, LLP
                    BY:  PETER SAHASRABUDHE
 9                  605 3rd Avenue
                    Suite 2300
10                  New York, New York  10158
                    212-751-4300
11                  psahasra@hodgsonruss.com

12          ATTORNEYS FOR THE DEFENDANT COUNTY OF ERIE:

13                  LIPPES MATHIAS, LLP
                    BY:  MARGARET A. HURLEY
14                  50 Fountain Plaza
                    Suite 1700
15                  Buffalo, New York  14202
                    716-853-5100
16                  mhurley@lippes.com

17          ATTORNEYS FOR THE DEFENDANT COUNTY OF
               ERIE (via Zoom):
18
                    LIPPES MATHIAS, LLP
19                  BY:  JENNIFER C. PERSICO
                    50 Fountain Plaza
20                  Suite 1700
                    Buffalo, New York  14202
21                  716-853-5100
                    jpersico@lippes.com
22

23          ALSO PRESENT:Sona Shah (via Zoom)
                         Gerardo Romo (via Zoom)
24                       Moises Soto-Brito (via Zoom)
                         Darren Carreras, Videographer
25
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**                    Page 3

```
 1                    I N D E X

 2                                  Page        Line

 3    TAMARA L. FRIDA                 4          23

 4    DIRECT EXAMINATION

 5    BY MR. BRUSTIN                  4          25

 6    CROSS-EXAMINATION

 7    BY MR. SAHASRABUDHE            51           8

 8    CROSS-EXAMINATION

 9    BY MS. HURLEY                  76          14

10    REDIRECT EXAMINATION

11    BY MR. BRUSTIN                 82           6

12    RECROSS-EXAMINATION

13    BY MR. SAHASRABUDHE            86           1

14    RECROSS-EXAMINATION

15    BY MS. HURLEY                  87           2

16    CERTIFICATE OF REPORTER        89           1

17

18                   E X H I B I T S

19                                  Page        Line

20    EXHIBIT 21, Affidavit of       47           1

21    Tamara L. Frida

22

23

24

25
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**                                    Page 4

```
 1                    P R O C E E D I N G S
 2             VIDEOGRAPHER:  This is the beginning of
 3   Media No. 1 in the deposition of Tamara L. Frida in
 4   the matter of Valentino Dixon versus The City of
 5   Buffalo, et al, Case No. 19-CV-01678.
 6        Today's date is October 19th, 2022.  The time on
 7   the monitor is approximately 10:27 a.m.  My name is
 8   Darren Carreras, and I'm the videographer.  The court
 9   reporter is Mindy Vislay.  We are here with Huseby
10   Global Litigation.
11        Counsel, please introduce yourselves, after which
12   the court reporter will swear in the witness.
13             MR. BRUSTIN:  Nick Brustin, Neufeld Scheck
14   & Brustin, for the plaintiff Valentino Dixon.
15             MR. SAHASRABUDHE:  Peter Sahasrabudhe from
16   Hodgson Russ, LLP, here on behalf of the City of
17   Buffalo and the city defendants.
18             MS. HURLEY:  Margaret Hurley with Lippes
19   Mathias for the County of Erie defendants.
20             MS. PERSICO:  Jen Persico also from Lippes
21   Mathias here on behalf of the County defendants as
22   well.
23                  TAMARA L. FRIDA,
24      being first duly sworn, testified as follows:
25                  DIRECT EXAMINATION
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**                        Page 5

```
 1   BY MR. BRUSTIN:

 2          Q.   Good morning, Ms. Frida.

 3          A.   Good morning.

 4          Q.   We've met before; my name is Nick Brustin,

 5   but this is the first time we've met in person --

 6          A.   Right.

 7          Q.   -- is that right?

 8          A.   That's correct.

 9          Q.   We've spoken a few times on the phone?

10          A.   Yes.

11          Q.   And you've also spoken to a couple of my

12   colleagues at my office?

13          A.   Yes.

14          Q.   I'll ask you a little bit more about that

15   later, but before that let's just go over some basics.

16   Have you ever had a deposition taken before?

17          A.   No.

18          Q.   Okay.

19          A.   Not --

20          Q.   Okay.  No problem.  So have you ever been

21   in a room like this with a court reporter and had to

22   answer questions in connection with a lawsuit?

23          A.   No.

24          Q.   Okay.  So there's a number of lawyers here,

25   and there's also some lawyers on Zoom --
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                      Page 6

```
 1         A.   Okay.
 2         Q.   -- and I'm going to be starting by asking
 3    you some questions in connection with this lawsuit,
 4    and the other lawyers will follow up with questions,
 5    too.
 6         A.   Okay.
 7         Q.   If at any time you don't understand my
 8    question, or any of the questions today, please let us
 9    know.
10         A.   Okay.
11         Q.   And if you don't understand it, just tell
12    me, and I'll rephrase it.
13         A.   Okay.
14         Q.   If you want to take a break, that's fine.
15    Just let me know, and we'll do that.  Okay?
16         A.   Okay.
17         Q.   The other thing that you may hear from time
18    to time is some of the lawyers making objections to
19    questions.
20         A.   Okay.
21         Q.   There's no judge here --
22         A.   Right.
23         Q.   -- but that's for later on for potentially
24    some judge to rule on down the road --
25         A.   Okay.
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                          Page 7

```
 1        Q.   -- not for you to worry about.  Unless we
 2   go to the judge or something like that, you just
 3   answer the question if you understand it.  Okay?
 4        A.   Yes.
 5        Q.   Great.  Okay.  So let's start with some
 6   basics.  First of all, you're testifying here pursuant
 7   to a subpoena from the plaintiff; is that right?
 8        A.   That's correct.
 9        Q.   All right.  And where do you currently
10   live?
11        A.   I live in Charlotte, North Carolina.
12        Q.   Okay.  And how old are you, ma'am?
13        A.   Fifty-one.
14        Q.   And what kind of work do you do?
15        A.   I'm a social worker.
16        Q.   All right.  Let's -- let's start with that.
17   Where are you currently employed?
18        A.   YMCA of Greater Charlotte.
19        Q.   Okay.  And, more specifically, what kind of
20   social work do you do for the YMCA?
21        A.   For the YMCA, my position is called a
22   community navigator, and I find and secure resources
23   for our members as well as people in the community,
24   and those resources could be anything related to
25   housing, mental health support, medical support,
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**                                    Page 8

 1  insurance, food.  Any type of resources that our

 2  members may need.

 3       **Q.   Terrific.  How long have you been working**

 4  **there?**

 5       A.   I've been working for the YMCA since 2019.

 6       **Q.   2019.  Okay.  Let's back up a little bit,**

 7  **and if you could just give us a rundown of your**

 8  **educational background --**

 9       A.   Okay.

10       **Q.   -- beginning with where you graduated from**

11  **high school.**

12       A.   I graduated high school in Buffalo from

13  Hutchinson Central Technical High School.

14       **Q.   Okay.**

15       A.   I then went on to Alfred University, and

16  that is in Alfred, New York, and then I left there,

17  stayed out of school a couple of years, and then I

18  went back to Buffalo State College and obtained a

19  degree in social work.  That was my bachelor's degree.

20  And then I followed up with pursuing my master's in

21  social work at SUNY Buffalo, the Amherst campus, and

22  obtained my master's degree there.

23       **Q.   Okay.  In addition to the work you**

24  **described at the YMCA have you done other types of**

25  **social work or therapy?**

1      A.   Yes.

2      **Q.   Could you describe that for us, please?**

3      A.   I have -- I'll give you a rundown.

4      **Q.   Sure.**

5      A.   All right.  I've done foster care social

6  work.  I have done mental health therapy.  I've worked

7  in group homes where the specialty was mental health.

8  I have worked in the State of North Carolina for the

9  State of North Carolina.  I worked for Mecklenburg

10  County doing child protective services.  Gosh -- I've

11  done mental health therapy in the State of North

12  Carolina with children and families.  So, in home

13  services.  Oh, gosh.  Community support work as far

14  as -- basically the same thing, case management.  You

15  name it, I've probably done it.

16      **Q.   Okay.  You mentioned you've also done some**

17  **therapy.  Do you have any therapy licenses?**

18      A.   I did have a license.  I was a licensed

19  clinical social worker associate which they give you

20  prior to you taking the clinical exam and passing it,

21  and I did not pass the exam on my two tries within

22  that trial period, so I am now considered -- I'm

23  considered by the social work board as exam eligible.

24      **Q.   Okay.  Do you have a private -- do you see**

25  **any private patients?**

 1        A.   No.
 2        Q.   Okay.  All right.  Let's go back to --
 3   first of all, how long have you lived in North
 4   Carolina?
 5        A.   It's 18 years now.  Yeah.  Eighteen.  I
 6   moved here in 2006.
 7        Q.   2006.  Okay.
 8        A.   Yeah.
 9        Q.   Do you have family here?
10        A.   Yes, I do.
11        Q.   Are you married?
12        A.   No, I'm not.
13        Q.   Children?
14        A.   Yes.
15        Q.   How old are they?
16        A.   I just have one son, and he is 28 years
17   old.
18        Q.   Okay.  Great.  How old were you in August
19   of 1991 at the time of the shooting that we're here to
20   talk about today?
21        A.   I was 20 years old.
22        Q.   And in August of 1991 what were you doing?
23        A.   At that time I was employed at Buffalo
24   General Hospital, and I also -- I believe I was
25   working two jobs.  Gosh, I've always worked like two

1  or three jobs.  I think I was working, too, at either

2  Super Duper or either Sears Service Center, one of

3  those two -- somewhere in between those two, but my

4  main job was at Buffalo General Hospital at that time.

5          **Q.   Okay.  And were you also a student at that**

6  **time or not yet?**

7          A.   No.  I was -- well, I was in transition at

8  that time.  I wasn't -- I had unenrolled from Alfred

9  University, and I was pursuing -- thinking about going

10  to Buff State.

11         **Q.   Okay.  And then you went back to Alfred and**

12  **graduated?**

13         A.   No.  I graduated from Buff State.

14         **Q.   Oh.  I apologize.  Thank you.**

15     **Okay.  So let's get right to it.  Were you present**

16  **in the area of Louie's restaurant in Buffalo on**

17  **August 10th, 1991, when Torriano Jackson was shot and**

18  **killed?**

19         A.   Yes, I was.

20         **Q.   Where were you?**

21         A.   I was in the parking lot of Louie's,

22  Louie's parking lot, and I was inside of my vehicle.

23         **Q.   Okay.  And can you describe your vehicle?**

24         A.   It was a red 1990 Geo Tracker convertible.

25  It was red with a white convertible top.

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 12

```
 1          Q.   Okay.  And who were you with?

 2          A.   I was with LaSandra Smith and Jacqueline

 3   Parks.

 4          Q.   Okay.  And did you see who shot and killed

 5   Torriano Jackson?

 6          A.   Yes, I did.

 7          Q.   And who shot and killed Torriano Jackson?

 8               MR. SAHASRABUDHE:  Form.

 9   BY MR. BRUSTIN:

10          Q.   Let me ask it a different way.

11          A.   Okay.

12          Q.   Who did you see -- do you know the person

13   today who shot and killed Torriano Jackson?

14          A.   I know the person today.

15               MR. SAHASRABUDHE:  Form.

16   BY MR. BRUSTIN:

17          Q.   Who did you see shoot and kill Torriano

18   Jackson?

19          A.   Lamar Scott.

20          Q.   All right.  Do you have any doubt in your

21   mind that Lamar Scott is the person that shot and

22   killed Torriano Jackson?

23          A.   There is no doubt in my mind.

24          Q.   Did you know Lamar Scott at that time?

25          A.   At that time I did not know him when he was
```

 1  shooting, but later on I found out that he was the

 2  same person that I went to grammar school with and --

 3  so if you want to kind of divulge from there.

 4       Q.   Okay.  Did you see Valentino Dixon at any

 5  time the night that Torriano Jackson was shot?

 6       A.   No, I did not.

 7       Q.   Was he present in the vicinity, to your

 8  knowledge, of where Torriano Jackson was shot?  Did

 9  you see him at all?

10       A.   I did not see him at all.

11       Q.   Did you know Valentino Dixon personally at

12  that time?

13       A.   No, I did not.

14       Q.   Did you know Valentino Dixon by sight and

15  reputation at that time?

16       A.   Yes, I did.

17       Q.   So, in other words, if you had seen him,

18  you would have recognized him?

19       A.   Yes.

20       Q.   And would it be fair to say as a general

21  matter you knew Valentino Dixon as somebody who dealt

22  drugs and also drove nice cars?

23       A.   Yes.

24       Q.   Was he known that way in the community to

25  your knowledge?

```
 1        A.   Yes.

 2        Q.   Can you just briefly describe what you saw

 3   Lamar Scott do in the moments leading up to and

 4   including the shooting?

 5        A.   Okay.  Of course, there was a fight

 6   involving a lot of individuals.  We were watching the

 7   fight.  We were all inside of the car watching the

 8   fight, and I saw Lamar Scott run down East Delavan

 9   headed towards Bailey, and he had a gun in his hand.

10   He started shooting into the crowd before he got all

11   the way to the crowd, and he started shooting into the

12   crowd.  Mario Jarmon kind of ran out of the crowd, and

13   it was almost simultaneously that Torri started

14   running out of the crowd, but he was coming directly

15   towards my truck, and Lamar Scott was right behind

16   him, and he was shooting.  Torri fell face forward

17   onto the ground -- onto the street on Delavan, and

18   Lamar stood up over him and continued to shoot.

19        Q.   Okay.  Were you able to see Lamar Scott

20   both from the front and the back?

21             MR. SAHASRABUDHE:  Form.

22   BY MR. BRUSTIN:

23        Q.   Were you able to see Lamar Scott's face?

24             MR. SAHASRABUDHE:  Form.

25             THE WITNESS:  Yes.
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 15

```
 1  BY MR. BRUSTIN:
 2        Q.   For approximately how long?
 3        A.   I would say the entire time when he was
 4  running face forward towards -- you know, he was
 5  chasing behind Torri.
 6        Q.   Okay.  Do you have any doubt in your mind
 7  that it was Lamar Scott who shot Torriano Jackson as
 8  opposed to Valentino Dixon?
 9        A.   No.  There's no doubt in my mind.
10        Q.   Do you have any doubt in your mind you
11  would have recognized Valentino Dixon that night if
12  you had seen him?
13        A.   Yes.
14        Q.   In other words, you don't have any doubt in
15  your mind?
16        A.   Oh.  No.  I'm sorry.  Yes.  I don't have
17  any doubt.
18        Q.   It was a bad question.
19        A.   Okay.
20        Q.   Now, had you ever witnessed a shooting of
21  any kind up to that point in your life?
22        A.   No.
23        Q.   Can you describe how it was for you
24  emotionally to observe that shooting?
25        A.   I was very, very scared, very, very shaken
```

1  up to the point where while I was observing it I
2  froze, and I just had to tell myself to get out of the
3  vehicle and kind of take cover.  I was -- I was
4  nervous.  I was scared because I didn't know where it
5  came from.  It was a fight that was from what I could
6  see just a regular fistfight.  So to have the gunman
7  just kind of run and start shooting, that was just
8  like, oh, gosh, where did that come from?  And during
9  that time, too, there was a lot of drive-by shootings,
10  a lot of stuff going on with different people that may
11  have been from outside of Buffalo and people that may
12  have been in prison.  I don't want to stay any names
13  because I don't want to -- that's kind of -- but there
14  was a lot of people getting killed and shootings and
15  all of that, so I didn't know if that was something,
16  but it was traumatizing.
17      **Q.   Okay.  And by the way, did witnessing that**
18  **event in any way affect your choice of careers?**
19      A.   It did.
20      **Q.   Can you explain that?**
21      A.   It made me go towards the therapy part of
22  social work as well and be -- I wanted to know why
23  would someone be that upset that you could actually
24  shoot somebody.  The other part of it on the community
25  side of it, I just saw -- it was just like a major

1  change in the community, and that kind of pointed me

2  in a direction of, you know, it's getting worse, and

3  we need some people out there that may be able to help

4  with whatever's going on, and apparently not all of it

5  went for the worst.

6        **Q.   And how about your own trauma that you**

7  **experienced, did that affect your career choice at**

8  **all?**

9        A.   Yes.  Absolutely.  And I would say because

10 the therapist that I had was a good therapist.  I did

11 seek therapy after seeing this because I had

12 nightmares.  I was traumatized.  It led me to smoke

13 cigarettes, but -- no, really.  Like, I wasn't a

14 smoker until then, but -- and I just thought that

15 maybe, you know, with my experience and having a good

16 therapist that maybe one day I would be able to help

17 people, too.

18       **Q.   Gotcha.  All right.  Let's go back to the**

19 **night of the shooting.  Immediately after the shooting**

20 **what did you do?**

21       A.   Immediately after we got back in my car.

22 We were driving off because we wanted to get out of

23 there because we didn't know what else was coming up

24 next.  And I had some mechanical difficulties because

25 apparently I had bullet holes or whatever in my

 1  radiator.  So my radiator fluid leaked out into the

 2  compartment, and my vehicle started smoking.  So then

 3  I'm like -- you know, like, oh, God.  We didn't know,

 4  but, we -- the first thing was, like, we didn't want

 5  to catch on fire or anything like that.  So there were

 6  two friends of ours who were driving, and they were

 7  coming off -- we were on East Ferry.  They were coming

 8  off of I want to say maybe Goodyear or Bissell, and we

 9  told them what happened, and they drove us -- well, he

10  drove.  His brother drove us in his car to the Mobile

11  station, and he drove my car because I was scared to

12  drive.  We made it to the Mobile station on Ferry and

13  Fillmore, and while we were there somebody pulled up.

14  I don't know who it was.  He pulled up and told us

15  that the police were looking for my vehicle, so they

16  took us back to the police.

17       Q.    Okay.  How many minutes after the shooting

18  would you say you made it back to the scene, was it

19  15 minutes, less than that, more than that?

20       A.    Around about 15 minutes.

21       Q.    Fifteen minutes?

22       A.    Uh-huh.

23       Q.    So, within 15 minutes after the shooting

24  you had come back to the scene of the shooting?

25       A.    Yes.

```
 1          Q.    Okay.  And what happened when you got back
 2    to the scene of the shooting?  Who if anyone did you
 3    speak to?
 4          A.    I spoke to one of the detectives.  I gave
 5    him my name and address, phone number information --
 6          Q.    Okay.
 7          A.    -- and that was it.
 8          Q.    All right.  And at that time did you tell
 9    the police that you had seen the shooter?
10          A.    No.
11          Q.    Why?
12          A.    I was scared.
13          Q.    Scared of what at that time?
14          A.    At that time I was scared, too, because I
15    had heard over the mic -- or I mean the walkie that
16    they were looking for Valentino Dixon, and they had
17    said that he was the shooter, and we were all like,
18    well, no, because we knew that he wasn't, but it was
19    like we didn't want to, you know, get involved because
20    we didn't know what it was about.
21          Q.    Right.  In other words, were you scared of
22    the person you later learned to be Lamar Scott?
23          A.    That, too, yes.
24          Q.    And at that time would you say that,
25    generally, in the community where you were living,
```

```
 1  providing information in a crime like that could be

 2  dangerous?

 3              MR. SAHASRABUDHE:  Form.

 4              THE WITNESS:  Uh-huh.  Yes.

 5  BY MR. BRUSTIN:

 6       Q.   All right.  A little more specifically, can

 7  you tell us at that time -- because I'm going to ask

 8  you about questions about what you were concerned

 9  about later, but at that time were you concerned for

10  your physical safety if you provided information?

11       A.   Yes.

12       Q.   At that time did you have any idea why

13  Lamar Scott shot and killed Torriano Jackson?

14       A.   No.

15       Q.   Did you observe it to be a brutal crime?

16       A.   Yes.

17       Q.   Had you ever seen anything like that in

18  your life?

19       A.   Never.

20       Q.   Now, you mentioned that you heard Valentino

21  Dixon's name over the radio.  Do you remember exactly

22  what you heard?

23       A.   I just heard that they had put out an all

24  points -- APB for Valentino Dixon as being the

25  shooter.
```

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 21

1          Q.    You heard something about him being the

2    shooter over the radio?

3          A.    Uh-huh.

4          Q.    And that was over the police radio --

5          A.    Yes.

6          Q.    -- that you overheard?

7          A.    Yes.

8          Q.    And that was approximately within 15 or

9    20 minutes of the shooting?

10         A.    Yes.

11               MR. SAHASRABUDHE:  Form.

12   BY MR. BRUSTIN:

13         Q.    Now, you mentioned that you sought

14   counseling after the shooting.  Who did you go to see

15   at that time or where did you go?

16         A.    I went to at that time it was Buffalo

17   General's community mental health center.  I believe

18   the address was 80 Goodrich.  I cannot remember the

19   counselor's name.  He was a male at that time.  A

20   white male.  I can't remember his name.

21         Q.    Okay.  And do you remember how many times

22   you saw that counselor?

23         A.    I believe it may have been two times.

24         Q.    Okay.  And I think you told us this, but

25   that was because you were having nightmares after the

 1  shooting?

 2        A.   Yes.

 3        Q.   **Any other trauma symptoms that you had at**

 4  **that time other than nightmares?**

 5        A.   Just a general sense of not feeling safe,

 6  not feeling comfortable, just a little -- if you want

 7  to call it anxiety.

 8        Q.   **Okay.  I'm going to show you now just a**

 9  **police report that is part of Exhibit -- do you guys**

10  **remember what exhibit is the police report?**

11             MR. SAHASRABUDHE:  I never can -- it's

12  like --

13             MR. BRUSTIN:  Gerardo, do you remember what

14  exhibit the police report is?

15             MR. SAHASRABUDHE:  The Comp?

16             MR. BRUSTIN:  The Comp.

17             MR. ROMO:  It's 2, I believe.

18             MR. BRUSTIN:  Thank you.

19  BY MR. BRUSTIN:

20        Q.   **So these are pages from Exhibit 2, which**

21  **has already been marked, which I'm going to ask you**

22  **some questions about.**

23             MR. BRUSTIN:  And I've got copies for you

24  guys if you want.  You already have it?

25             MR. SAHASRABUDHE:  Yeah.  You can -- thank

1  you.  I think I know which ones you're --

2  BY MR. BRUSTIN:

3       Q.  So why don't you take a minute and look,

4  first of all, at the page -- and I'm going to go by

5  the Bates stamped pages on the bottom middle, the BPD

6  Comp.  Let's start with the first page, and just take

7  a minute and read this report.

8       A.  Okay.

9       Q.  Let me know when you're done.  Just read it

10  to yourself.

11             MR. SAHASRABUDHE:  Are we just on the first

12  page?

13             MR. BRUSTIN:  Yes.

14             MR. SAHASRABUDHE:  So, she flipped to the

15  second.

16  BY MR. BRUSTIN:

17       Q.  Oh, no.  Just the first page.

18       A.  Oh.  Okay.

19       Q.  All right.  So, first of all, does this

20  report describe the car that you were driving that

21  night?

22       A.  Yes.

23       Q.  Okay.  And I take it from reading this

24  report, and you tell me if I'm understanding this

25  correctly, that when you spoke to the police -- when

1  you came back to the scene and spoke to the police you

2  told them where your car was, and they went and --

3          A.   Yes.

4          Q.   They went and processed it?

5          A.   Yes.

6          Q.   Okay.  All right.  So now let's take a look

7  at the next report which is page 203.  Okay?

8          A.   Uh-huh.

9          Q.   And this is a report that was created by

10  Detective Stambach and Detective Grabowski on

11  August 14th a few days after the shooting.

12          A.   Yes.

13          Q.   Okay?  And obviously you didn't create this

14  report --

15          A.   Right.

16          Q.   -- but I want you to read it, and then I'm

17  going to ask you some questions about the information

18  in it.  Okay?

19          A.   Okay.

20          Q.   All right.  Do you know from reading this

21  report what this is referring to?

22          A.   Yes.

23          Q.   Can you describe it for us, please, or can

24  you tell us what it is?

25          A.   It's a phone call that I made from the

 1  therapist's office.  As a part of the therapy the

 2  therapist asked if there was anything I felt like I

 3  could do to kind of make it better or -- you know, and

 4  let the police know, and I opted to call.  He asked

 5  me -- he did ask me if I wanted to call from my house,

 6  and I said no, and he allowed me to make the call from

 7  his office, and that's what I did.

 8       Q.   Does this report accurately describe what

 9  you said to Detective Stambach?

10       A.   From what I can remember, yes.

11       Q.   Okay.  So I take it you don't remember the

12  exact words you said --

13       A.   Right.

14       Q.   -- but this is more or less what you

15  remember saying?

16       A.   Yes.

17       Q.   All right.  And you told him that you had

18  seen the shooting?

19       A.   Yes.

20       Q.   You told him that you were afraid?

21       A.   Yes.

22       Q.   You told him that Valentino Dixon was not

23  the person who shot Torriano Jackson, correct?

24       A.   Yes, I did.

25       Q.   And you also told him that you might be

```
 1  able to identify pictures, correct?
 2        A.   Yes.
 3        Q.   And although you didn't identify yourself
 4  by name, you told them that in fact you were the
 5  person from the red Tracker, correct?
 6        A.   Yes.
 7        Q.   And you understood when you did that that
 8  you were telling him who you were?
 9             MR. SAHASRABUDHE:  Form.
10             THE WITNESS:  Yes.
11  BY MR. BRUSTIN:
12        Q.   Your understanding was that the police knew
13  you because you talked to them about being in the red
14  Tracker which was shot by one of the bullets, correct?
15        A.   Yes.
16        Q.   And, so, although you didn't give him your
17  name, you understood that you were identifying
18  yourself to this officer?
19             MR. SAHASRABUDHE:  Form.
20             THE WITNESS:  Yes.
21  BY MR. BRUSTIN:
22        Q.   Even though you were scared?
23        A.   Yes.
24        Q.   All right.  After this time did any police
25  officer, Detective Stambach or anybody else, ever come
```

```
 1  and show you pictures?

 2       A.   No.

 3       Q.   And if they had come to your house at this

 4  time and shown you pictures, including a picture of

 5  Lamar Scott, do you think you would have had the

 6  courage at that time to identify him?

 7            MR. SAHASRABUDHE:  Form.

 8            THE WITNESS:  At that time, yes, with

 9  reservation.

10  BY MR. BRUSTIN:

11       Q.   Okay.  And by the way, I'm asking you about

12  before people were prosecuted for telling the truth

13  about Lamar Scott being the shooter.  Before that

14  time.

15            MR. SAHASRABUDHE:  Form.

16            THE WITNESS:  Yes.  It would have been with

17  reservation still, yes.

18  BY MR. BRUSTIN:

19       Q.   But you think you would have done it?

20       A.   Yes.

21            MR. SAHASRABUDHE:  Form.

22  BY MR. BRUSTIN:

23       Q.   And did you understand when you told them

24  that you were the girl from the red Tracker that they

25  would likely come and visit you?
```

1              MR. SAHASRABUDHE:  Form.

2              THE WITNESS:  At that time I did not know

3    because it was three of us.  So it could have been any

4    three of us.

5    BY MR. BRUSTIN:

6         Q.  Okay.

7         A.  And to my understanding -- well, I won't

8    even say to my understanding.  They did contact the

9    other two young ladies as well.  So --

10        Q.  Okay.  All right.  Do you know whether they

11   showed them pictures?

12        A.  I do not believe that they showed them

13   pictures.  It was just a contact.  No one was, you

14   know, ever -- neither one of the girls ever went

15   down --

16        Q.  Okay.

17        A.  -- to talk to them.

18        Q.  All right.  But no question that when you

19   spoke to the police on August 10th you told them that

20   the red Tracker was yours, correct?

21        A.  That's correct.

22        Q.  And was it registered in your name, the

23   car?

24        A.  Yes.

25        Q.  Okay.  Now, I want to know -- I want to ask

1  you some questions about some of the other people that

2  were involved in the shooting and the altercation.

3          A.   Okay.

4          Q.   First of all, did you know Mario Jarmon?

5          A.   Yes.

6          Q.   How did you know him?

7          A.   I've probably been knowing Mario since --

8  probably I was about 12 or 13 years old.

9          Q.   Okay.

10         A.   There was a skating rink at that time

11 called The Arena, and everybody went there.  There was

12 another place called -- well, at Mount St. Joseph's

13 they used to have discos on Friday nights.  The Arena

14 was Saturday nights.  So everybody in that age group

15 would go there just to hang out, you know, have fun,

16 dance.

17         Q.   Okay.  Did you also know Emil Adams after

18 the shooting?

19         A.   It wasn't until after --

20         Q.   Okay.

21         A.   -- the shooting.

22         Q.   But you spoke to Emil Adams a few times

23 after the shooting?

24         A.   Yes.

25         Q.   All right.  I'm going to get to that in a

 1  second.

 2        A.   Okay.

 3        Q.   Did you know the Jacksons, Torriano and

 4  Aaron Jackson?

 5        A.   I did not know them personally.  I just

 6  knew who they were from just hanging out.

 7        Q.   Did you know them by reputation?  Did they

 8  have any reputation, to your knowledge?

 9              MR. SAHASRABUDHE:  Form.

10              THE WITNESS:  No.

11  BY MR. BRUSTIN:

12        Q.   Okay.  You just knew them from the

13  community?

14        A.   Uh-huh.

15        Q.   You didn't know much about them?

16        A.   No.

17        Q.   All right.  In the days following this

18  shooting what was the discussion in the community

19  among you and your peers about who shot Torriano

20  Jackson?

21              MR. SAHASRABUDHE:  Form.

22  BY MR. BRUSTIN:

23        Q.   If any?

24        A.   Okay.  The discussion was -- I think

25  everybody who was there knew that it was not

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                   Page 31

```
 1  Valentino.  That was definitely the discussion.  The
 2  other discussion was why was 'Tino targeted, you know,
 3  as being the shooter when everybody who witnessed it
 4  visually knew that he was not.
 5        Q.   Okay.  Now, did there come a point in time
 6  when you learned that Lamar Scott had actually
 7  confessed to the crime?
 8        A.   Yes.  I did hear about that.
 9        Q.   Do you remember how long after -- how many
10  days after the shooting you had learned that,
11  approximately?
12        A.   I would -- I would be moved to say maybe
13  about two to three days that I had heard about that he
14  had made the confession on the news, but I didn't see
15  it myself.
16        Q.   But you heard about it?
17        A.   Yes.
18        Q.   All right.  And the discussion in the
19  community was that -- for people who had been there
20  was that that was actually the person who had shot
21  Torriano Jackson?
22        A.   Yes.
23             MR. SAHASRABUDHE:  Form.
24  BY MR. BRUSTIN:
25        Q.   Did you discuss that with your friends?
```

```
 1          A.   Yes.

 2          Q.   Did you also in the days and months

 3   following the shooting have discussions with Emil

 4   Adams about what he saw and heard?

 5               MR. SAHASRABUDHE:  Form.

 6               THE WITNESS:  It was actually well after.

 7   It was probably --

 8   BY MR. BRUSTIN:

 9          Q.   Let me ask you this:  Were the discussions

10   that you had with Emil Adams about what he saw and

11   heard before or after you learned about the perjury

12   charges?

13          A.   It was after the perjury charges.

14          Q.   Okay.  And did you -- so more than a year

15   later it sounds like?

16          A.   Uh-huh.

17          Q.   Did you speak to Emil Adams about what he

18   saw and heard?

19          A.   Yes.

20          Q.   And just generally what did Emil Adams tell

21   you, if anything, about who the shooter was?

22               MR. SAHASRABUDHE:  Form.

23               THE WITNESS:  He told me, of course, what

24   we had saw, because he was standing right there as

25   well.  He was standing right next to my truck.  And he
```

```
 1  said that the reason why he had to say that 'Tino was

 2  the shooter was because the police department was

 3  threatening him with some charges he had in Michigan.

 4  BY MR. BRUSTIN:

 5        Q.   Okay.  I think you skipped the first part.

 6        A.   Oh.  Okay.

 7        Q.   But that was the second part of the

 8  question.

 9        A.   Okay.

10        Q.   The first part of the question is did he

11  tell you who the shooter was?

12             MS. HURLEY:  Form.

13             THE WITNESS:  No, he didn't tell me who the

14  shooter was.  By name, when you say --

15  BY MR. BRUSTIN:

16        Q.   It was a bad question.

17        A.   Okay.

18        Q.   Did you talk to Emil Adams about whether or

19  not Valentino Dixon was in fact the shooter?

20        A.   Yes.

21        Q.   And what did he tell you, if anything?

22        A.   He told me that he knew that Valentino was

23  not the shooter.  He knew that.

24        Q.   Okay.

25        A.   And then he went on to explain why he said
```

```
 1  Valentino was the shooter.
 2         Q.   Okay.  Other than pending charges that he
 3  had did he give you any other reasons as to why --
 4  withdrawn.  Did he give you any other information
 5  about any pressure that the police or the prosecutors
 6  put on him to state that Valentino Dixon was the
 7  shooter even when he knew that he wasn't?
 8              MR. SAHASRABUDHE:  Form.
 9              MS. HURLEY:  Form.
10              THE WITNESS:  The only thing he told me was
11  that they were threatening to actually send him back
12  to Michigan to face the charges.  That was it.
13  BY MR. BRUSTIN:
14         Q.   Do you remember how many times you talked
15  to Emil Adams about the shooting?
16         A.   I would say maybe two -- about two times.
17         Q.   Okay.  Did you talk to any other people?
18  Did you talk to -- first of all, did you talk to your
19  two friends about what they saw?
20         A.   Yes.  Absolutely.
21         Q.   Okay.  And did they also see the shooting?
22         A.   Yes.
23         Q.   And did they also tell you that it was not
24  Valentino Dixon who was the shooter but Lamar Scott?
25         A.   Yes.  Well, they didn't say Lamar Scott,
```

```
 1  but they said Valentino Dixon -- it was not Valentino

 2  Dixon.

 3          Q.   All right.  At that time, by the way, did

 4  everybody you knew know Valentino Dixon?

 5          A.   I would say yes, pretty much.

 6          Q.   He drove flashy cars, right?

 7          A.   Yes.

 8          Q.   Good looking guy?

 9          A.   Yes.

10          Q.   Okay.  And did you speak to any other

11  witnesses at the scene other than your two friends and

12  Emil Adams about the fact that it was Lamar Scott

13  either by name or description and not Valentino Dixon

14  who shot and killed Torriano Jackson?

15          A.   Yes.

16          Q.   Who else did you speak to?

17          A.   Travis Powell and Fred Stencil.

18          Q.   Did Travis Powell or Fred Stencil talk to

19  you about any pressure the police tried to put on

20  them?

21               MR. SAHASRABUDHE:  Form.

22               MS. HURLEY:  Form.

23               THE WITNESS:  No, they did not.

24  BY MR. BRUSTIN:

25          Q.   What was the discussion in the community --
```

 1  withdrawn.  So after Lamar Scott confessed on

 2  television to being the shooter, as you saw, knowing

 3  he was in fact the shooter --

 4       A.   Uh-huh.

 5       Q.   Withdrawn.  After Lamar Scott confessed on

 6  television about being the shooter did you then make

 7  the connection about who he was in your mind?

 8            MR. SAHASRABUDHE:  Form.

 9            MS. HURLEY:  Form.

10            THE WITNESS:  No.

11  BY MR. BRUSTIN:

12       Q.   That was sometime later?

13       A.   Yeah.  It was sometime later.

14       Q.   Okay.  So after Lamar Scott confessed on

15  television to being the shooter, you mentioned there

16  was discussion in the community as to why the police

17  were continuing to go after Valentino Dixon.

18       A.   Uh-huh.

19       Q.   What were some of the things that you heard

20  as to why the police were going after Valentino Dixon?

21            MR. SAHASRABUDHE:  Objection to form.

22            THE WITNESS:  At that time they were saying

23  because he was a drug dealer allegedly, and also they

24  were saying at that time, too, he had a gun charge

25  already that he was facing, and they really wanted to

1  get him on the gun charge because they couldn't really

2  pin a drug case on him.  So that was what the

3  discussion was in the community.

4  BY MR. BRUSTIN:

5      Q.   Okay.  Now, did you come to learn some time

6  after January of 1992 that two men were indicted for

7  perjury for claiming that Lamar Scott was the shooter?

8      A.   Yes.

9      Q.   Do you remember when exactly you learned

10 that?

11     A.   Probably around January, February.  I want

12 to say -- if I'm not mistaken, I want to say I was

13 contacted by the District Attorney's office.  I think

14 they gave a phone call maybe to my mom, or they may

15 have stopped by, but I wound up getting subpoenaed to

16 come down and talk to the District Attorney.

17     Q.   Okay.  And, in fact, you did -- you did --

18 you did actually meet with -- withdrawn.  Do you

19 remember -- do you remember what you learned or how

20 you learned about the perjury charges?

21     A.   The only thing I learned, and I'm sure

22 there was probably some talk about it in -- you know,

23 within the community, and I want to say through maybe

24 a phone call, you know, somebody -- I can't remember

25 exactly who, but I do remember formally finding out

 1  once I was contacted by the District Attorney's

 2  office.

 3        Q.   Okay.  And, in fact, do you remember that

 4  there came a point when the police came to your house

 5  and spoke to your mother?

 6             MR. SAHASRABUDHE:  Form.

 7             MS. HURLEY:  Form.

 8             THE WITNESS:  I do not remember exactly,

 9  but I know my mom did tell me that they came.

10  BY MR. BRUSTIN:

11        Q.   Okay.  Was your mom also afraid for your

12  safety, to your knowledge?

13        A.   Yes.  Absolutely.

14        Q.   All right.  So you were contacted by the

15  D.A.  Did there come a point in time when you actually

16  met with District Attorney Belling and another

17  detective?

18        A.   Yes.

19             MR. SAHASRABUDHE:  Form.

20  BY MR. BRUSTIN:

21        Q.   And by that time you had learned about the

22  perjury charges; is that right?

23        A.   Yes.

24        Q.   Where did you meet with Detective

25  Belling -- withdrawn.  Where did you meet with ADA

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 39

```
 1  Belling and the other gentleman?

 2         A.   It was at the I guess county hall or -- you

 3  know, where the court is down there on Delaware.

 4         Q.   Okay.  And do you remember what ADA Belling

 5  was wearing?

 6         A.   No.  I don't remember.  I know -- I would

 7  say definitely a shirt with a collar and slacks, but I

 8  can't --

 9         Q.   Do you remember him carrying a gun?

10         A.   No, I don't remember that.

11         Q.   Did ADA Belling threaten you physically or

12  in any other way at the meeting?

13         A.   No.

14         Q.   Did you feel threatened nonetheless about

15  telling him the truth about what you saw?

16              MR. SAHASRABUDHE:  Form.

17              MS. HURLEY:  Form.

18              THE WITNESS:  I felt uncomfortable about it

19  because I knew that Mario was there and he was telling

20  the truth, and I knew that they were on trial for

21  perjury, or going to be on trial for perjury.  So it

22  kind of -- I felt uncomfortable about, yeah, telling

23  the truth.

24  BY MR. BRUSTIN:

25         Q.   What did you think might happen to you if
```

 1  you told them the truth about what you saw?

 2              MR. SAHASRABUDHE:  Form.

 3              MS. HURLEY:  Form.

 4              THE WITNESS:  I thought that I could go to

 5  jail if I told them the truth, or they would have me

 6  on trial.

 7  BY MR. BRUSTIN:

 8       Q.   Okay.  When you met with ADA Belling, and

 9  he asked you what if anything you saw on the night of

10  the shooting, did you tell him the truth?

11       A.   No.  I told him I didn't see anything.  I

12  just heard the gunshots.

13       Q.   Okay.  Did you subsequently testify at that

14  perjury trial?

15       A.   I did.

16       Q.   And did you choose to testify or were you

17  subpoenaed to testify?

18       A.   I was subpoenaed to testify.

19       Q.   And did you tell the truth about what you

20  saw and heard on August 10th at the perjury trial?

21       A.   I told the truth about what I heard.

22       Q.   How about about what you saw?

23       A.   No.

24       Q.   Why not?

25       A.   I was still afraid.

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                                Page 41

```
 1          Q.   All right.

 2          A.   I was afraid of going to jail or being

 3   tried.

 4          Q.   All right.  And you understood that the

 5   testimony you were giving at that trial under oath was

 6   not true?

 7          A.   Absolutely.

 8          Q.   By the way, do you regret that decision

 9   today?

10          A.   No.

11          Q.   And that's because you thought that if you

12   told the truth you might be prosecuted yourself?

13          A.   Absolutely.

14          Q.   Okay.  Now, you mentioned that at the time

15   of the shooting you had never met Valentino Dixon,

16   never spoken to him; is that right?

17          A.   That's correct.

18          Q.   Okay.  Have you met him since?

19          A.   Actually, we have not met face-to-face, but

20   we have talked on the telephone several times.

21          Q.   Okay.  When's the first time you spoke to

22   Valentino Dixon?

23          A.   It would have been probably about maybe a

24   week or so maybe after he was released.

25          Q.   Okay.  And just generally what did you talk
```

1  about?

2       A.   We just talked about him being out.  Of

3  course I verbally apologized to him for, you know, all

4  those years, but he said he understood.  We talked

5  about religion, God, and just his experience and being

6  out, you know, in the world.

7       Q.   Okay.  And you said -- you mentioned you've

8  spoken to him a couple times since?

9       A.   Oh, yeah.

10       Q.   Okay.  Has Valentino Dixon ever asked you

11  to say anything that wasn't true about what you saw or

12  heard or your interactions with the police?

13       A.   Never.

14       Q.   Has anybody from my office ever asked you

15  to say or do anything that wasn't true?

16       A.   Never.

17       Q.   Would you do it if we had?

18       A.   No.  No.

19       Q.   Now, did there come a point in time when

20  you were interviewed in connection with a

21  reinvestigation of Valentino Dixon's conviction?

22       A.   Yes.  Quite a few times.

23       Q.   Do you remember how many times you were

24  interviewed?  I know you were interviewed by some

25  private investigators.  Were you also interviewed by

```
 1  the District Attorney reinvestigating the case?
 2         A.   Yes.
 3         Q.   And during all of those interviews did you
 4  do your best to tell them the best you could remember
 5  what happened?
 6         A.   Yes.
 7         Q.   Now, over time have some of the details
 8  about what you saw and heard faded a bit from your
 9  memory?
10         A.   Yes.
11         Q.   Now, did you also volunteer to take a
12  polygraph examination?
13              MR. SAHASRABUDHE:  Form.
14              MS. HURLEY:  Form.
15              THE WITNESS:  I did not --
16  BY MR. BRUSTIN:
17         Q.   Let me withdraw.
18         A.   Okay.
19         Q.   Were you asked to take a polygraph?
20         A.   I was asked.
21         Q.   Okay.  And did you in fact take a polygraph
22  examination?
23         A.   I did.
24              MR. SAHASRABUDHE:  And can we -- when?
25  BY MR. BRUSTIN:
```

1        Q.    Yeah.  Do you remember exactly when it was?

2              MR. SAHASRABUDHE:  I'll tell you --

3              THE WITNESS:  Okay.  I was going to say

4    maybe 20 -- it's been so many.

5    BY MR. BRUSTIN:

6        Q.    I think I have it.  So let me see if this

7    refreshes your recollection.  Do you remember in 2012?

8        A.    Yes.

9        Q.    Okay.  And do you remember who requested

10   it?

11       A.    I want to say it was the investigator.  I

12   know at that time I was talking to Max Adler, the

13   reporter Jimmy and whoever the lawyer was maybe at

14   that time.  I remember him being out of New York City.

15   I don't remember exact names.

16       Q.    And you mentioned that you told Valentino

17   Dixon when you spoke to him about how badly you felt?

18       A.    Uh-huh.

19       Q.    And it sounds like, and you tell me if I'm

20   wrong, but because of -- because of your inability to

21   say that Lamar Scott -- withdrawn.  Have you -- over

22   the years have you attempted to cooperate and tell the

23   truth about what happened?

24       A.    Yes.

25       Q.    And is part of that a result of you feeling

 1  badly about not giving that information at the time?

 2       A.   Yes.

 3       Q.   And when you took that polygraph exam were

 4  you asked questions about whether or not Valentino

 5  Dixon was the person who shot and killed Torriano

 6  Jackson?

 7       A.   Yes.

 8       Q.   And did you answer those questions

 9  truthfully?

10       A.   Yes.

11       Q.   And were you asked questions about whether

12  Lamar Scott was the shooter?

13       A.   Yes.

14       Q.   And you answered those questions

15  truthfully?

16       A.   Yes.

17       Q.   Were you told whether or not you passed

18  that polygraph exam?

19       A.   It wasn't until much later, not like right

20  then and there.

21       Q.   But eventually were you told?

22       A.   Yes.

23       Q.   What were you told?

24       A.   That my polygraph exam, it was -- I was

25  found to be truthful.

1        Q.    Okay.  Do you remember whether you were

2   told that by the District Attorney reinvestigating the

3   case?

4        A.    No.  It was actually the lawyer who was I

5   guess a part of the reinvestigation.  Yeah.

6        Q.    Okay.  And I think you also met with a --

7   you met with an investigator, and you signed an

8   affidavit; is that right?

9        A.    Yes.

10        Q.    Did you write that affidavit?

11        A.    No, I did not write it.

12        Q.    Did you do your best to make sure that it

13   was accurate to the best of your recollection at that

14   time?

15        A.    Yes.

16              MR. SAHASRABUDHE:  And are we talking about

17   1998 or --

18              MR. BRUSTIN:  You know what?  Let's just --

19   we might as well just mark it.  Do you know what

20   exhibit number we're on?  Mo, do you know what exhibit

21   number we're on?

22              MR. SOTO-BRITO:  Yeah.  Give me one second.

23   21.

24              MR. BRUSTIN:  21.  Let's mark this as

25   Plaintiff's 21, please.

 1                    (EXHIBIT 21, Affidavit of Tamara Frida, was
 2    marked for identification.)
 3    BY MR. BRUSTIN:
 4         Q.    Is this the -- is this an affidavit that
 5    you signed in November of 1998?
 6         A.    Yes.
 7         Q.    Okay.  And did you do your best to -- can
 8    you describe the process of how this affidavit was
 9    created?
10         A.    Yes.  I met with Roger Putnam, and he just
11    asked me to talk and tell my story as to what
12    happened, and he was writing as I was talking.
13         Q.    Okay.  And did you do your best to tell him
14    a number of years later what you remembered?
15         A.    Yes.
16         Q.    Do you think you got every single detail
17    exactly as it happened?
18         A.    It may not be exactly as it happened, but
19    it was very close.
20         Q.    All right.  You did the best you could?
21         A.    Uh-huh.  Yes.
22         Q.    You certainly were attempting to tell him
23    the truth?
24         A.    Yes.
25         Q.    And then you signed it?

```
 1          A.   Yes.

 2          Q.   Okay.  I think I asked this, but I just

 3    want to make sure.  To the best of your recollection

 4    no police officer or person from the District

 5    Attorney's office ever showed you any photographs in

 6    connection with the shooting; is that correct?

 7          A.   No.  The only photographs I saw were the

 8    photos of my vehicle, and that was at the trial.

 9          Q.   Okay.

10          A.   And they just asked me during that to

11    verify that that was my vehicle.  And that was the

12    perjury trial.  I'm sorry.

13          Q.   And, by the way, would it be fair to say

14    that when you spoke to Mr. Belling he never asked you

15    any questions about your call to the police department

16    in the days following the shooting, correct?

17               MS. HURLEY:  Form.

18               THE WITNESS:  No, he did not.

19    BY MR. BRUSTIN:

20          Q.   And would it be fair to say if Mr. Belling

21    had asked you if you called the police in the days

22    following the shooting and reported that Valentino

23    Dixon was not the shooter you would have told him you

24    made that call?

25          A.   At that time, no.
```

```
 1        Q.   Okay.  Because -- so after the -- even
 2   after the perjury charges you knew about, at that time
 3   you wouldn't tell him?
 4        A.   Yeah.  I wouldn't have at that time, no.
 5        Q.   If they had come to you before the perjury
 6   charges would you have told them you were the person
 7   that made that call?
 8             MR. SAHASRABUDHE:  Form.
 9             MS. HURLEY:  Form.
10             THE WITNESS:  Yes, I would have.
11   BY MR. BRUSTIN:
12        Q.   All right.  Let me take just a couple
13   minute break, and I may be just about done, but let me
14   look through my notes.
15        A.   Okay.
16        Q.   And I'm sure these folks are going to have
17   some questions for you, but let me make sure I don't.
18             VIDEOGRAPHER:  The time is 11:19 a.m.
19   We're going off the record.
20             (A short recess was taken.)
21             VIDEOGRAPHER:  The time is 11:26 a.m.
22   We're back on the record.
23   BY MR. BRUSTIN:
24        Q.   Just a couple more questions, Ms. Frida.
25   Did you -- during the times that we spoke on the phone
```

1  did you request to review documents to refresh your

2  recollection in the case?

3       A.   Yes.

4       Q.   And did you in fact review some documents

5  that we sent to you?

6       A.   Yes.

7       Q.   What did you review?

8       A.   It would have been the -- my statement to

9  Roger Putnam, the police statement or the police's

10 correspondence here, and as well as the perjury trial,

11 the --

12            MR. SAHASRABUDHE:  Transcript.

13            THE WITNESS:  The transcript.  I'm sorry.

14 BY MR. BRUSTIN:

15       Q.   And did you have a chance to review that?

16       A.   Yes.

17       Q.   Okay.  Do you recall, Ms. Frida, when you

18 were meeting with the D.A.'s office in connection with

19 the reinvestigation whether or not any of your

20 statements were tape-recorded?

21       A.   I believe they were tape-recorded.

22       Q.   Do you remember seeing a tape recorder?

23       A.   Yes.

24       Q.   Okay.  I think that's all I have right now.

25 I may have some follow-up questions, but I'm going to

```
 1   turn it over to these other attorneys that are going

 2   to ask you some questions --

 3          A.   Okay.

 4          Q.   -- on behalf of the defendants.

 5          A.   All right.

 6          Q.   Thank you.

 7          A.   You're welcome.

 8                    CROSS-EXAMINATION

 9   BY MR. SAHASRABUDHE:

10          Q.   Good morning, Ms. Frida.  How are you?

11          A.   Good morning.  I'm well.  Thank you.

12          Q.   My name is Peter Sahasrabudhe.  I

13   introduced myself informally off the record, but I'm

14   an attorney from Buffalo.  I represent the City of

15   Buffalo and some retired homicide detectives in

16   connection with the lawsuit brought by Mr. Dixon.

17      Before I get started, do you recall kind of the

18   ground rules that Nick went over with you before you

19   started your testimony today?

20          A.   Yeah.  A little bit.

21          Q.   Okay.

22          A.   If you want to review them you can.

23          Q.   Well, my question to you is do you remember

24   them?

25          A.   Yes.
```

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 52

```
 1          Q.    Do you feel like you need me to repeat them
 2   or --
 3          A.    You can repeat them.
 4          Q.    Okay.  Well, do you understand that those
 5   ground rules apply equally to the questions I'm about
 6   to ask you?
 7          A.    Yes.
 8          Q.    Okay.  And if don't need me to repeat them
 9   I don't want to waste any more time.
10          A.    Okay.  Yes.
11          Q.    So if you remember them --
12          A.    All right.
13          Q.    -- I'll just get into it.
14          A.    Okay.
15          Q.    If that's okay with you?
16          A.    Yes.
17          Q.    All right.  So I want to start if we could
18   with Emil Adams.
19          A.    Uh-huh.
20          Q.    So, prior to August 10th, 1991, did you
21   know Emil Adams?
22          A.    No.
23          Q.    Okay.  So had you ever seen him or spoken
24   to him before that evening?
25          A.    No.  That was the first time.
```

1        Q.    And my understanding is prior to the

2   shooting you were speaking to Emil Adams?

3        A.    Yes.

4        Q.    And that was when the two of you became

5   introduced to each other?

6        A.    Yes.

7        Q.    Okay.  After the evening of the shooting

8   when was the next time that you spoke to Emil Adams?

9        A.    The next time that I spoke to him was

10  probably -- it might have been about maybe two, three

11  months after the shooting.

12       Q.    Okay.  And two, three months after the

13  shooting do you recall where that took place?

14       A.    I can't recall exactly.

15       Q.    Would it have been an in person

16  conversation?

17       A.    Yes.

18       Q.    And would it have been a meeting through

19  happenstance?

20             MR. BRUSTIN:  Objection to form and

21  foundation.

22             THE WITNESS:  I would say it would have

23  been like maybe out in the community somewhere.  It

24  might have been out -- like, at that time, going out

25  to like a club or something like that.  Yeah.

```
 1  BY MR. SAHASRABUDHE:

 2        Q.   Okay.  In other words, you hadn't planned

 3  to meet up with him --

 4        A.   No.

 5        Q.   -- you ran into him out in public?

 6        A.   Exactly.

 7        Q.   Okay.  And I believe you said it was about

 8  two to three months after the shooting?

 9        A.   Uh-huh.

10        Q.   Is this an instance where Emil Adams

11  relayed to you why he was identifying Valentino Dixon

12  as the shooter?

13             MR. BRUSTIN:  Objection to form.

14             THE WITNESS:  This is one of them.

15  BY MR. SAHASRABUDHE:

16        Q.   One of the two that we talked about

17  earlier?

18        A.   Yes.

19        Q.   Okay.  And you mentioned that he had said

20  something about being threatened with charges that

21  were pending against him in Michigan, correct?

22        A.   Yes.

23             MR. BRUSTIN:  Objection to form.

24  MR. SAHASRABUDHE:

25        Q.   Did he tell you when those threats had been
```

1  made?

2         A.   No.  He didn't tell me when.  He just told

3  me just in general --

4         Q.   Okay.

5         A.   -- that that was why.

6         Q.   Did he go into any detail as to who had

7  made those threats?

8         A.   He just said that the police were saying

9  that they were going to bring up those charges in

10 Michigan or call Michigan and have him arrested or

11 whatever on those charges.

12        Q.   But he never mentioned the name of an

13 individual detective or police officer --

14        A.   No, he did not.

15        Q.   And did he specify -- do you know for a

16 fact that he's testified that it was a Buffalo Police

17 Department employee or individual?

18        A.   He said it was the police.  He just said

19 the police, so I'm assuming Buffalo police.  He said

20 the police and the District Attorney.  He just said

21 the District Attorney.  He didn't say like ADA or

22 specific, he just said like their office pretty much.

23        Q.   Okay.  And besides saying that charges in

24 Michigan were being -- potentially going to be used

25 against him he didn't go into any further detail; is

1  that correct?

2        A.    No.

3              MR. BRUSTIN:   Object to form.

4  BY MR. SAHASRABUDHE:

5        Q.    And you of course were not present for any

6  conversations or interviews that Emil Adams did

7  with --

8        A.    No.

9        Q.    -- the Buffalo Police Department or the

10 Erie County District Attorney's office's --

11       A.    No.

12       Q.    -- is that correct?  So you have no

13 firsthand knowledge other than what was relayed to you

14 by Emil Adams as to what may have been communicated to

15 him or what was not communicated to him?

16       A.    Right.  That's correct.

17       Q.    And I don't want to belabor the point, but

18 that's the second conversation you had with him that

19 we talked about earlier.  When approximately was that

20 conversation, if you remember?

21       A.    The second conversation would have been

22 maybe -- I want to say maybe 2002/2003.  I think it

23 was around the time when I did the interview with the

24 Buffalo News.  So, we had ran into each other.  It was

25 in public.  We were both at a store, and we had that

1  discussion --

2        Q.   Okay.

3        A.   -- and he said it again.  He reiterated

4  that, you know, he said Valentino was the shooter

5  because of the charges in Michigan.

6        Q.   Did he go into any further detail in the

7  second conversation as he did in the first

8  conversation?

9        A.   No.  Not really.  No.

10        Q.   So, again, just generally a claim that

11  charges may have been used against him if he didn't

12  identify Valentino Dixon --

13        A.   Yes.

14        Q.   -- as the shooter?  But nothing further?

15        A.   Nothing further.

16        Q.   And no information as to who the individual

17  was that made those threats or when those threats may

18  have been --

19        A.   No.

20        Q.   -- made?  Okay.  Have you spoken with Emil

21  Adams since that conversation you had with him?

22        A.   No.

23        Q.   Okay.  And that would have been the last

24  time you spoke to him, in 2002?

25        A.   Yes.  I would say 2002.  Somewhere around

1  there.  Yes.

2          Q.   So, fair to say that those three kind of

3  meetings that we talked about, those are the only

4  three times you've ever spoken with Emil Adams?

5          A.   Yes.

6          Q.   Okay.  Did you know John Sullivan?

7          A.   No.

8          Q.   Okay.  Have you ever spoken to him?

9          A.   No.  I would not know him if I saw him

10  today.  I don't even know what he looks like.

11          Q.   Okay.  You don't even know who -- you

12  didn't know who he was back in 1991?

13          A.   No.

14          Q.   Okay.  One thing I want to get clear on

15  is -- so the night of the shooting you didn't know

16  Lamar Scott by name; is that correct?

17          A.   That's correct.

18          Q.   Okay.  Is it your testimony that the night

19  of the shooting you knew Lamar Scott by sight though?

20          A.   Yes.  I would definitely be able to -- have

21  been able to identify him again.

22          Q.   So you recognized his face, but you didn't

23  know his identity?  You wouldn't have been able to say

24  what his name was?

25                  MR. BRUSTIN:  I don't think she's

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 59

1  understanding your question.  I'm going to object to

2  the form.

3             MR. SAHASRABUDHE:  Okay.

4             MR. BRUSTIN:  I think what she's telling

5  you is that she could have identified him based on

6  seeing him.  I don't think she's answering your

7  question about whether she identified him from knowing

8  him before.

9  BY MR. SAHASRABUDHE:

10       **Q.   Yeah.  So, when you saw him, did you make**

11  **the connection that you may have seen him from before**

12  **in your life at any time?**

13       A.   When I saw him the night of the shooting?

14       **Q.   On August 10th.**

15       A.   No.

16       **Q.   Okay.  When was it that you made that**

17  **connection?**

18       A.   The actual connection was made -- and I'm

19  going to say it was November of 1991.  Lamar Scott was

20  in my kitchen.  At this time I was living with my --

21  well, my son's father at that time, and I came in from

22  work, and Lamar Scott was sitting at my kitchen table,

23  and I looked, and I had just a like -- and my son's

24  father took me into the bedroom, and he said, well,

25  you know that's -- he called him Sport -- that's

1  Sport, and I said you better get him out of here right

2  now, and I put it together then.

3       Q.   Understood.

4       A.   Yes.

5       Q.   So he went by a nickname --

6       A.   Uh-huh.

7       Q.   -- when he was young --

8       A.   Uh-huh.

9       Q.   -- and you knew him as Sport --

10      A.   Yes.

11      Q.   -- but you didn't know his name was Lamar

12  Scott until approximately November 1991?

13      A.   Right.  And then, when I looked at him,

14  then too was when it connected, too, we went to

15  grammar school together, and the Lamar Scott, grammar

16  school, Sport, shooter, it all just came together.

17      Q.   Understood.  So, again, that was

18  November 1991?

19      A.   Uh-huh.  Yes.

20      Q.   All right.  So would it be fair to say that

21  prior to your testimony at the trial for perjury

22  charges brought against Mario Jarmon and Leonard Brown

23  you only had two interactions with the Buffalo Police

24  Department as it relates to this shooting, this case?

25      A.   Yes.

```
 1          Q.   Okay.  And that would have been the night
 2   of the shooting, correct?
 3          A.   Correct.
 4          Q.   And that would have been your phone call
 5   that you placed a couple days later?
 6          A.   Right.  That's correct.
 7          Q.   And, so, you never spoke with any police
 8   officer after that?
 9          A.   No.
10          Q.   All right.  If you could, the kind of
11   packet of police reports that Nick went over for
12   you --
13          A.   Uh-huh.
14          Q.   -- the one at the bottom that says BPD Comp
15   203.
16          A.   Uh-huh.
17          Q.   I just want to confirm.  This report
18   appears to in some substance accurately reflect what
19   you communicated on the call?
20          A.   Yes.
21          Q.   Okay.  And as far as you know this was
22   never withheld or hidden from prosecutors, correct?
23               MR. BRUSTIN:  Objection to form and
24   speculation.
25               THE WITNESS:  I don't know because I didn't
```

```
 1  participate in Valentino's trial.  Yeah.  So I don't
 2  know --
 3  BY MR. SAHASRABUDHE:
 4      Q.  Did Valentino -- were you ever contacted by
 5  a defense attorney representing Valentino Dixon prior
 6  to his conviction?
 7      A.  No.
 8      Q.  Okay.  My understanding is that you were
 9  issued a subpoena in connection with Valentino Dixon's
10  criminal charges; is that incorrect?
11      A.  No.  I was not -- not for Valentino's
12  charges, no.
13      Q.  Okay.  So the only subpoena you remember
14  ever getting was in connection with the perjury?
15      A.  Yes.
16      Q.  All right.  Did there ever come a time
17  where you communicated to the Erie County District
18  Attorney's office in connection with Valentino's
19  charges that you didn't have information to give?
20      A.  Okay.  Can you repeat that for me?
21      Q.  Right.  So I'm distinguishing between the
22  perjury charges --
23      A.  Okay.
24      Q.  -- and Valentino's charges.
25      A.  Uh-huh.
```

1        Q.   Did there ever come a time where you talked

2   to any Assistant District Attorney or any

3   representative of the Erie County District Attorney's

4   office in relation to criminal charges pending against

5   Valentino Dixon?

6        A.   No.

7        Q.   Never?

8        A.   No.

9        Q.   Okay.  So any time you spoke to a District

10  Attorney it would have been in connection with the

11  perjury charges?

12       A.   That's correct.

13       Q.   Okay.  Do you recall the police officer or

14  the detective that you spoke with at the scene of the

15  crime the night of the shooting, do you recall was he

16  in uniform or plain clothes?

17       A.   Plain clothes.

18       Q.   Okay.  Was he wearing a tie?

19       A.   No.  I want to say it would have been more

20  like jeans and a T-shirt or something.  Like it wasn't

21  like a shirt and tie, slacks.

22       Q.   Okay.  Do you recall his name?

23       A.   No, I do not.

24       Q.   Do you recall his approximate appearance?

25  Could you give us a general description?

1        A.    It was a white male.  If I can recall, like

2   I said, it was maybe a T-shirt -- he would have been

3   older.  I would say maybe like -- maybe mid to late

4   30s.  Maybe early 40s.

5        Q.    Okay.  And the sum and substance of your

6   conversation with him was that your car had been

7   hit --

8        A.    Yes.

9        Q.    -- but you did not see who had committed

10  the shooting?

11       A.    Right.

12       Q.    Do you recall approximately when it was

13  that you spoke with district attorneys in connection

14  with the perjury case?

15       A.    It would have been prior to the perjury

16  trial, and I want to say, if I'm recalling right,

17  maybe -- it might have been January or February of

18  1992, but I know it was prior to the trial.

19       Q.    Okay.  So, sometime in early 1992?

20       A.    Yes.

21       Q.    Do you recall your mother ever telling you

22  that police detectives had come by and were looking

23  for you and wanted to speak to you?

24       A.    Yes.

25       Q.    Do you recall what she said to you about

 1  what they said?

 2       A.   No.  She just told me that the detectives

 3  had came by, and she gave me the number to contact.

 4       Q.   And you never reached out to the

 5  detectives, would that be fair to say, at that time?

 6       A.   No.  I believe that I reached out, and I

 7  want to say it might have been just to the District

 8  Attorney's office.  The number I can't remember

 9  exactly, but I know I called.  That was how I wound up

10  having to get -- well, find out I was going to be

11  subpoenaed for the meeting.  I mean -- well, to come

12  down and talk to Christopher Belling.

13       Q.   So, as far as you understand, the number

14  you were given, regardless of who gave it, was to the

15  District Attorney's office?

16       A.   Yes.

17       Q.   Okay.  At any point did any police officer

18  threaten you or expressly dissuade you from going in

19  and giving further information?

20       A.   No.

21       Q.   And although you probably reasonably were

22  reluctant to speak to anyone about what had happened,

23  no one ever expressly threatened you or told you not

24  to go give full information?

25       A.   No.

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 66

```
 1            Q.   Okay.  I want to talk a little bit about

 2   your 1998 statement to Roger Putnam.

 3            A.   Uh-huh.

 4            Q.   My understanding is that he prepared the

 5   affidavit for you after he was driving you to a class

 6   you were taking at Buff State at the time you relayed

 7   to him what you knew and what you saw about that night

 8   in 1991; is that correct?

 9            A.   Yes.  But as far as the affidavit, we did

10   that together.

11            Q.   Understood.  Understood.

12            A.   Okay.

13            Q.   I'm not trying to -- you prepared it with

14   him, and it's your statement --

15            A.   Yes.

16            Q.   -- it's not his words.  I'm not trying to

17   intimate that it's not.

18            A.   Okay.

19            Q.   And my understanding is that you were

20   coming from a trial where your boyfriend at the time

21   was being tried?

22            A.   Yes.

23            Q.   Okay.  Was Roger Putnam working for your

24   boyfriend's attorney?

25            A.   Yes.
```

1          Q.   Okay.  And that's how it came to be that he

2    was driving you to Buffalo State?

3          A.   Yes.  Because they subpoenaed me as well.

4          Q.   Okay.

5          A.   And I told him if they were going to

6    subpoena me and everything he needed to provide me

7    transportation to and from and all of that.

8          Q.   Okay.  Do you recall who your

9    ex-boyfriend's attorney was?

10          A.   I do not --

11          Q.   Okay.

12          A.   -- recall.

13          Q.   I want to talk a little bit about the night

14    in question.  So we're talking about the early morning

15    hours of August 10th, 1991.

16          A.   Yes.

17          Q.   What had you done prior to coming to

18    Louie's that evening?

19          A.   Oh.  We went to Niagara Falls.  There was a

20    party at Niagara Falls that we went to I want to say

21    for Eminem at Niagara Falls.  We had rode around

22    Niagara Falls a little bit -- Niagara Falls, New York,

23    I should say.  We came back to Buffalo, kind of rode

24    around, and then we went up to Louie's to get food.

25          Q.   Okay.  Had you been partying that evening?

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 68

```
 1        A.   Not as far as like drinking or smoking or
 2   anything like that.  Just hanging out and dancing.
 3   That kind of thing.
 4        Q.   Got it.  So you weren't under the influence
 5   of any --
 6        A.   No.
 7        Q.   -- alcohol or drugs or anything?
 8        A.   No.
 9        Q.   Okay.  So prior to the fight breaking out
10   how far away were you from the people who were
11   involved in the fight?
12        A.   I would say maybe, at the most, maybe about
13   50, 60 feet from prior to the fight breaking out the
14   people who got out of the car, and then they went
15   across the street.  So, not far at all.
16        Q.   Okay.  Is it fair to say that prior to the
17   fight breaking out you did not have continuous vision
18   or observance of what was going on across the street?
19        A.   Okay.  Prior to the fight what you're
20   asking me is continuous observance as to --
21        Q.   The individuals who were across the street
22   and what they were doing.
23        A.   I observed, yes, but I couldn't tell you
24   exactly, like, what was happening, because everybody
25   just kind of gathered into a large crowd.
```

1          Q.   Okay.  I guess -- I can ask this better.

2          A.   Okay.

3          Q.   So there's a point at which a car pulls

4    up --

5          A.   Right.

6          Q.   -- people get out, and that's where the

7    fight breaks out; is that correct?

8          A.   They get out and gather into the large

9    crowd and then fight.

10         Q.   So my question specifically is about before

11   the car pulls up.  Were you continuously observing --

12   because it's a crowded area, correct?

13         A.   Uh-huh.

14         Q.   Were you continuously observing the people

15   who were across the street?

16              MR. BRUSTIN:  Objection to form.

17              THE WITNESS:  I was observing them, yes.

18   It was -- because it was relatively open.  It was only

19   like about four or five people standing over there.

20         Q.   Okay.

21              MR. BRUSTIN:  Are you asking if she was

22   focusing on it?

23              MR. SAHASRABUDHE:  Yes.

24              THE WITNESS:  Okay.  If I was focusing on

25   it, I would say no.  I was not focusing on it.  I

```
 1  didn't -- my attention came when the car pulled up and

 2  all those people got out and they walked across the

 3  street.

 4  BY MR. SAHASRABUDHE:

 5          Q.   Okay.

 6          A.   So that's when I -- oh, you know, what is

 7  that all about?

 8          Q.   Is it fair to say that prior to the car

 9  pulling up your focus was at least partially on the

10  people you were speaking to --

11          A.   Yes.

12          Q.   -- who were in your car and around your

13  car?

14          A.   Yes.

15          Q.   Okay.  Now, when the car pulled up, how

16  many people did you observe get out of the car?

17          A.   I wasn't counting, but it was a lot.

18          Q.   Okay.

19          A.   Yeah.

20          Q.   And did all of those individuals as far as

21  you could tell participate in the fight?

22          A.   I don't know if everybody in the car

23  participated in the fight, and the reason why I don't

24  know is because when the fight broke out, by that time

25  the crowd had gathered.  So, I don't know.  I just
```

```
 1  know -- what I can tell you that is a fact is that the

 2  fight started with Mario and the Jackson brothers, and

 3  then that crowd just like swooped in, you know, like

 4  really big.  So if any of the other people who were in

 5  the car aside from the Jackson brothers were involved

 6  in the actual fight, I don't know.

 7         Q.   Okay.  So the car pulls up, and people get

 8  out of the car.  Is there a certain time that passes

 9  in between the fight breaking out and the car pulling

10  up?

11              MR. BRUSTIN:  Objection to form.

12              THE WITNESS:  Maybe about a minute.

13  BY MR. SAHASRABUDHE:

14         Q.   Okay.

15         A.   Yeah.

16         Q.   So it wasn't an instantaneous fight?

17         A.   No.  It wasn't instantaneous.  There were

18  some words said.

19         Q.   And then I believe you said that a crowd

20  formed around the people involved in the fight?

21         A.   Yes.

22              MR. BRUSTIN:  Objection to form.

23  BY MR. SAHASRABUDHE:

24         Q.   Did you ever see Torriano Jackson with a

25  gun?
```

```
 1        A.    No.

 2        Q.    The only person that you saw that evening

 3   with a gun was Lamar Scott?

 4        A.    That's correct.

 5        Q.    And you only saw one gun that evening?

 6        A.    That's correct.

 7        Q.    Okay.  How long in between -- if you

 8   remember -- the fight breaking out and you hearing

 9   gunshots?  Can you give us an approximate guess as to

10   how long -- or an approximate estimate as to how long

11   that would have been?

12        A.    I would say -- I would guesstimate maybe

13   about two minutes, maybe three.

14        Q.    And when you first heard gunshots did

15   you -- were you able to tell where the gunshots were

16   coming from?

17        A.    From what I heard and what I saw, the

18   gunshots were from coming from Lamar when he was

19   running into the crowd.

20        Q.    Okay.

21        A.    So --

22        Q.    I guess that was a bad question.  Did it

23   take some time from when you first heard gunshots to

24   the point where you were observing Lamar Scott with

25   the gun?
```

 1         A.   No.

 2         Q.   Okay.

 3         A.   There was no time in between because I saw

 4    Lamar Scott with the gun when he raised the gun.  To

 5    me, that was when the shooting started.

 6         Q.   All right.  And prior to Lamar Scott

 7    raising a gun and shooting, you had heard no gunshots?

 8         A.   No.

 9         Q.   Okay.  At some point you do get behind your

10    car and duck for cover, right?

11         A.   Yes.

12         Q.   Okay.  Is that almost immediately after

13    seeing Lamar Scott?

14         A.   No.

15         Q.   About how much time elapsed in between you

16    seeing Lamar Scott and you getting behind your car for

17    cover?

18         A.   Probably about a minute.  I didn't get out

19    until I saw Torri running towards me, and Lamar was

20    behind him.  So this was after Lamar started shooting.

21         Q.   I see.  So the shooting went on for

22    approximately a minute, correct?

23              MR. BRUSTIN:  Objection to form.

24              THE WITNESS:  I would guesstimate a minute.

25    BY MR. SAHASRABUDHE:

```
 1          Q.   And then you saw the incident with Torri
 2    Jackson lying on the ground?
 3          A.   That's when I got out.
 4          Q.   And that's when you got out?
 5          A.   Uh-huh.
 6          Q.   Okay.  And at no point did you see
 7    Valentino Dixon?
 8          A.   No.
 9          Q.   Okay.  Have you ever spoken with anyone who
10    is a family member of Valentino Dixon since his arrest
11    and incarceration?
12          A.   No.
13          Q.   So the only person in the Dixon family
14    generally that you've spoken to is Valentino himself?
15          A.   That's correct.
16          Q.   Have you ever spoken to anyone in the
17    Jackson family?
18          A.   No.
19          Q.   Have you ever spoken to the two people you
20    were with that evening about what you observed and
21    your interactions with, you know, police and
22    prosecutors?
23          A.   Yes.
24               MR. BRUSTIN:  Objection to form.
25    BY MR. SAHASRABUDHE:
```

1         Q.    Okay.  And have they ever spoken to you

2   about their interactions with police and prosecutors?

3         A.    Yes.

4         Q.    What have they told you?

5         A.    Both of them had no -- the only

6   conversations that they had with the police were, to

7   my knowledge, from what they told me, was that night.

8   We had actually made an agreement that night that we

9   were not going to talk or anything.  So that was --

10  they didn't talk to me.  They didn't tell me at least

11  anyway that they talked to the police.

12              MR. BRUSTIN:  I'm sorry.  Just to be clear,

13  when you say that night you mean the night of the

14  shooting?

15              THE WITNESS:  The night of the shooting.

16  BY MR. SAHASRABUDHE:

17        Q.    Okay.  So, as far as you're aware, the only

18  two -- the only interactions they had with the police

19  were that evening?

20        A.    That's correct.

21        Q.    And as far as you're aware the only thing

22  that they would have relayed is they did not --

23        A.    Right.

24        Q.    -- observe the shooting?

25              MR. BRUSTIN:  Object to the form.

 1              THE WITNESS:  That's right.
 2  BY MR. SAHASRABUDHE:
 3       Q.   Okay.  And do you know if they did in fact
 4  observe the shooting?
 5       A.   Yes, I do know that --
 6       Q.   Okay.
 7       A.   -- they observed the shooting.
 8       Q.   But they nonetheless told the police that
 9  they had not?
10       A.   That's correct.
11              MR. SAHASRABUDHE:  That's all I have for
12  the time being.
13              MS. HURLEY:  Thank you.
14                   CROSS-EXAMINATION
15  BY MS. HURLEY:
16       Q.   Are you good or do you need a break or
17  anything?
18       A.   I'm good.  Thank you.
19       Q.   Okay.  I know we met.  I introduced myself
20  at least off the record, but, for the record, Margaret
21  Hurley.  I'm from Lippes Mathias, and I represent the
22  County defendants in this case.
23       First of all, I also have my MSW from UB.
24       A.   Okay.
25       Q.   So I also want to say that what you

 1   experienced and witnessed must have been very

 2   traumatizing, and I can appreciate that, and I'm very

 3   sorry that you experienced that.

 4           A.   Thank you.

 5           Q.   And I applaud your work with the community,

 6   and especially here in North Carolina with the YMCA.

 7   That's wonderful.

 8           All right.  A lot of this has already been

 9   covered --

10           A.   Okay.

11           Q.   -- but here's my chance.

12           A.   All right.

13                (Request for attorney to move closer to the

14   court reporter and speak louder.)

15   BY MS. HURLEY:

16           Q.   You made the anonymous call to the BPD on

17   August 14, 1991; is that correct?

18           A.   Correct.

19           Q.   During that call you did not identify Lamar

20   Scott as the shooter; is that correct?

21           A.   That's correct.

22           Q.   From the date of the shooting through

23   Dixon's trial you never gave a statement to the police

24   saying that Dixon was not the shooter, correct?

25           A.   That's correct.

```
 1                 MR. BRUSTIN:  Objection to form.
 2  BY MS. HURLEY:
 3        Q.   I'm sorry.  What was your answer?
 4        A.   That's correct.
 5        Q.   Thank you.
 6                 MR. BRUSTIN:  If you could just do me a
 7  favor.  If you could just pause before -- after she
 8  asks the questions, give me a chance to object, and
 9  then you can answer.
10                 THE WITNESS:  Okay.
11  BY MS. HURLEY:
12        Q.   You also never testified at the grand jury;
13  is that correct?
14        A.   That's correct.
15        Q.   One of the exhibits here today is the
16  police memo of your anonymous phone call.  I think
17  it's probably right before you.  Let's see -- on the
18  bottom it should be COE1567.  This one on the top.
19                 MR. BRUSTIN:  If you don't mind, we've been
20  going by the -- it's in order by the bottom Bates
21  stamp.  It's 203.
22                 MS. HURLEY:  203.  Thank you very much,
23  Nick.
24  BY MS. HURLEY:
25        Q.   And we established with Mr. Burstin [sic]
```

```
 1  that this document accurately reflects the substance
 2  of what you said in that anonymous call, correct?
 3             MR. BRUSTIN:  Objection to form.
 4             THE WITNESS:  Correct.
 5  BY MS. HURLEY:
 6       Q.   And in this call you said that Dixon was
 7  not the shooter, correct?
 8       A.   Correct.
 9       Q.   It says that you would think about it and
10  call back later, but you never called back, correct?
11       A.   Correct.
12       Q.   It says that you could identify people
13  there, correct?
14       A.   Correct.
15       Q.   You would not say if you could identify the
16  shooter, correct?
17             MR. BRUSTIN:  Objection to form.
18             THE WITNESS:  Correct.
19  BY MS. HURLEY:
20       Q.   You testified earlier that you would have
21  told the police or ADA Belling that Scott was the
22  shooter but for the fear of a perjury charge, correct?
23             MR. BRUSTIN:  Objection to form.  I think
24  you misstated the question.  You didn't mean to say
25  that I don't think.  You meant to say Lamar, right?
```

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                                    Page 80

```
 1              MS. HURLEY:  Lamar Scott.

 2              MR. BRUSTIN:  You said -- oh.

 3              MS. HURLEY:  I'm sorry.  Lamar Scott.

 4              MR. BRUSTIN:  I'm sorry.

 5              MS. HURLEY:  Can I say it again?

 6              MR. BRUSTIN:  I apologize.

 7              MS. HURLEY:  It's okay, Nick.

 8   BY MS. HURLEY:

 9        Q.   You testified earlier that you would have

10   told the police or ADA Belling that Lamar Scott was

11   the shooter but for the fear of a perjury charge; is

12   that correct?

13              MR. BRUSTIN:  Objection to form.

14              THE WITNESS:  That's correct.

15   BY MS. HURLEY:

16        Q.   Even though Brown and Jarmon were not

17   charged with perjury until January of 1992, correct?

18              MR. BRUSTIN:  Objection to form.

19              THE WITNESS:  That's correct.

20   BY MS. HURLEY:

21        Q.   Despite the fact that you knew Lamar Scott

22   was the shooter in November of 1991 you never told the

23   police that Lamar Scott was the shooter, correct?

24              MR. BRUSTIN:  Objection to form.

25              THE WITNESS:  That's correct.
```

```
 1  BY MS. HURLEY:

 2        Q.   In advance of today's date how many times

 3  did you speak with Mr. Burstin [sic] or anyone from

 4  his office?

 5        A.   Oh, gosh.  Quite a few times.

 6        Q.   Quite a few times?

 7        A.   Yes.

 8        Q.   When did you speak to Mr. Burstin or

 9  anybody from his office?  Recently?  Over the course

10  of a couple months?

11        A.   I would say probably over the course of the

12  last maybe year, year-and-a-half or so.

13        Q.   Okay.

14        A.   Yeah.

15        Q.   Okay.  What did you guys talk about?

16        A.   We talked about this case.

17        Q.   Did you guys talk about what you were going

18  to talk about today here at this deposition?

19        A.   Yes, we did.  We talked about the forms and

20  that and what was contained in the forms --

21        Q.   Okay.

22        A.   -- and my review of them.

23        Q.   Okay.  How long were the conversations do

24  you think?  Just your guesstimate.

25        A.   Maybe about 15 minutes maybe at the most.
```

```
 1  One may have been 30.

 2        Q.   Okay.  That's it for me.  Thank you very

 3  much.

 4             MR. BRUSTIN:  I have a couple of follow-up

 5  questions.

 6                    REDIRECT EXAMINATION

 7  BY MR. BRUSTIN:

 8        Q.   First of all, just to be clear about our

 9  communications, I think you and I -- to my

10  recollection, you and I spoke on the phone twice about

11  the substance of what you remembered.  Is that

12  consistent with your recollection?

13        A.   That's correct.  Uh-huh.

14        Q.   And did you also speak to my colleague

15  Gerardo Romo about similar issues?

16        A.   Yes.

17        Q.   And did you also have some other

18  discussions -- brief discussions with people in my

19  office about scheduling the deposition?

20        A.   Yes.

21        Q.   And just to be clear, and I think you

22  already said this, did anybody from my office ever

23  suggest that you do anything other than tell the truth

24  and tell us what you remember?

25        A.   No.
```

1        Q.   All right.  I want to go back to -- you

2   were asked some questions about your interactions with

3   Putnam, the investigator.

4        A.   Yes.

5        Q.   Did the statement that you gave to Putnam

6   about what you saw and heard on August 10th have

7   anything to do whatsoever with your boyfriend or his

8   criminal charges?

9        A.   No.

10       Q.   Now, you were asked some questions about

11  whether or not Torriano Jackson had a gun.  Would it

12  be fair to say that you don't know one way or --

13  withdrawn.  You didn't see Torriano Jackson with a

14  gun, correct?

15       A.   I did not.

16       Q.   Would it be fair to say that you don't know

17  one way or another whether or not he was carrying a

18  gun?

19       A.   Yes --

20            MR. SAHASRABUDHE:  Form.

21            MS. HURLEY:  Object to form.

22            THE WITNESS:  -- that's fair.

23  BY MR. BRUSTIN:

24       Q.   Okay.  And the only thing that you can say

25  is that you didn't observe him with a gun, correct?

```
 1          A.   I did not observe him with a gun.

 2               MR. SAHASRABUDHE:  Form.

 3   BY MR. BRUSTIN:

 4          Q.   And you also told us that during the fight

 5   before the shooting there were times when there was a

 6   crowd around the fight, correct?

 7          A.   That's correct.

 8          Q.   And you don't know, for example, whether or

 9   not Torri Jackson pulled out a gun during the fight,

10   you just know you didn't observe it, correct?

11               MR. SAHASRABUDHE:  Form.

12               MS. HURLEY:  Form.

13               THE WITNESS:  That's correct.

14   BY MR. BRUSTIN:

15          Q.   And you don't know whether or not anybody

16   else involved -- withdrawn.  Would it be fair to say

17   that you don't recall seeing anybody -- withdrawn.

18   You don't know whether or not anybody else in the car

19   had or brandished a weapon?

20          A.   That's correct.

21          Q.   You just don't remember seeing it?

22          A.   No, I did not see it.

23          Q.   And there were numerous times during the

24   fight where you were not able to see Torri Jackson,

25   Aaron Jackson and the other people -- withdrawn.
```

```
 1   During the fight prior to the shooting would it be

 2   fair to say that there were points in time during that

 3   fight where you were not able to see the individuals

 4   who came out of that car, including Torri Jackson and

 5   Aaron Jackson, because of the crowd around them?

 6        A.   That's correct.

 7        Q.   And the best you can recall is that the

 8   first shot that you heard came from Lamar Scott,

 9   correct?

10        A.   That's correct.

11        Q.   But you're not a gun expert, correct?

12        A.   I'm not a gun expert.

13        Q.   Would it be fair to say that you can't say

14   with certainty whether a shot came from another gun?

15             MR. SAHASRABUDHE:  Form.

16             MS. HURLEY:  Object to form.

17             THE WITNESS:  Yes, that's fair.

18   BY MR. BRUSTIN:

19        Q.   I think that's all I have.

20        A.   Okay.

21        Q.   Thank you very much.

22        A.   All right.

23             MR. SAHASRABUDHE:  I'm going to ask -- very

24   quick.

25
```

```
 1                    RECROSS-EXAMINATION

 2  BY MR. SAHASRABUDHE:

 3       Q.   So, you're not a gun expert, but you

 4  observed loud noises that evening that you associated

 5  with gunshots; is that correct?

 6       A.   Yes.

 7       Q.   And is it fair to say that your memory of

 8  that evening is such that the first loud noise that

 9  you associated with a gunshot came when Lamar Scott

10  started firing?

11       A.   That's correct.

12            MR. SAHASRABUDHE:  Okay.  I have nothing

13  further.

14            MR. BRUSTIN:  So before we go off the

15  record, you have the -- oh, do you have questions?

16            MS. HURLEY:  I was just going to ask if we

17  could take a five minute break so that Peter and I

18  could discuss before we --

19            MR. BRUSTIN:  Before we end?

20            MS. HURLEY:  -- before we end?

21            MR. BRUSTIN:  Sure.

22            VIDEOGRAPHER:  The time is 12:02 p.m.

23  We're going off the record.

24            (A short recess was taken.)

25            VIDEOGRAPHER:  The time is 12:16 p.m.
```

1  We're back on the record.

2                         RECROSS-EXAMINATION

3  BY MS. HURLEY:

4          Q.   **Ms. Frida?**

5          A.   Yes.

6          Q.   **The night of the shooting were you facing**

7  **the direction of the car?  I'm sorry.  Were you**

8  **facing -- strike that.  The night of the shooting were**

9  **you facing the direction of the fight?**

10         A.   Yes.

11              MR. BRUSTIN:  Objection to form.

12              MS. HURLEY:  That's it.

13              MR. BRUSTIN:  Nothing?

14              MR. SAHASRABUDHE:  No.

15              MR. BRUSTIN:  So, Ms. Frida, you have the

16  right if you would like to read and review and sign

17  the deposition.  You also don't have to do that.  It's

18  up to you.  What do you prefer?

19              THE WITNESS:  I can sign it.  Yes.

20              MR. BRUSTIN:  So you want to review it and

21  sign it?

22              THE WITNESS:  Yes.

23              MR. BRUSTIN:  Okay.  So we'll send you a

24  copy of it.

25              THE WITNESS:  Okay.

1            MR. BRUSTIN:  Great.  That's it.  Thank you

2  so much for your time.  I really appreciate it.

3            THE WITNESS:  Thank you.

4            MR. SAHASRABUDHE:  Thank you, Ms. Frida.

5            MS. HURLEY:  Thank you very much.

6            MR. BRUSTIN:  It's been really nice meeting

7  you in person.

8            THE WITNESS:  Same here.

9            VIDEOGRAPHER:  The time is 12:16 p.m.  this

10  concludes today's testimony.  We are off the record.

11            COURT REPORTER:  Pete, will you be ordering

12  a copy of the transcript?

13            MR. SAHASRABUDHE:  I think we'll all be

14  ordering.

15            COURT REPORTER:  Will you be ordering a

16  copy --

17            MR. SAHASRABUDHE:  Oh, absolutely.  Yeah,

18  yeah, yeah.  Electronic is fine for us.

19            COURT REPORTER:  And Ms. Hurley?

20            MS. HURLEY:  Yes, please.  Electronic.

21            (The witness, after having been advised of

22  her right to read and sign this transcript, does not

23  waive that right.)

24            (Deposition was concluded at 12:16 p.m.)

25

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 89

```
 1   STATE OF NORTH CAROLINA

 2   COUNTY OF MECKLENBURG

 3

 4              CERTIFICATE OF VERBATIM TRANSCRIPT

 5

 6              I, Mindy Vislay, Court Reporter and Notary

 7   Public for the State of North Carolina at Large, do

 8   hereby certify that the foregoing transcript of TAMARA

 9   L. FRIDA was taken by me and transcribed by me and is

10   a true, accurate, and complete record.

11              I further certify that I am neither related

12   to nor counsel for any party to the cause pending or

13   interested in the events thereof.

14              In witness whereof, I have hereunto set my

15   hand this 1st day of November, 2022 at Charlotte,

16   North Carolina.

17

18

19

20              _____

21              Mindy Lynn Vislay
                #200926400076
22

23

24

25
```

```
 1                   CHANGES AND SIGNATURE

 2   WITNESS NAME: Tamara L. Frida, 10/19/2022

 3   PAGE    LINE    CHANGE              REASON

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16       I, Tamara L. Frida, have read the foregoing

17   transcript and hereby affix my signature that same is

18   true and correct, except as noted above.

19

20                  _____

21                      Tamara L. Frida

22       Sworn to and Subscribed before me

23   _____, Notary Public.

24   This_____day of _____, 20____.

25   My Commission Expires:
```

### Exhibits

**FridaT 21**
  3:20  47:1

---

### 1

**1**  4:3

**10:27**  4:7

**10th**  11:17
  28:19
  40:20
  52:20
  59:14
  67:15 83:6

**11:19**  49:18

**11:26**  49:21

**12**  29:8

**12:02**  86:22

**12:16**  86:25
  88:9,24

**13**  29:8

**14**  77:17

**14th**  24:11

**15**  18:19,
  20,23 21:8
  81:25

**18**  10:5

**19-CV-01678**
  4:5

**1990**  11:24

**1991**  10:19,

**22**  11:17
  52:20
  58:12
  59:19
  60:12,18
  66:8 67:15
  77:17
  80:22

**1992**  37:6
  64:18,19
  80:17

**1998**  46:17
  47:5 66:2

**19th**  4:6

---

### 2

**2**  22:17,20

**20**  10:21
  21:9 44:4

**2002**  57:24,
  25

**2002/2003**
  56:22

**2006**  10:6,7

**2012**  44:7

**2019**  8:5,6

**2022**  4:6

**203**  24:7
  61:15
  78:21,22

**21**  46:23,
  24,25 47:1

**28**  10:16

---

### 3

**30**  82:1

**30s**  64:4

---

### 4

**40s**  64:4

---

### 5

**50**  68:13

---

### 6

**60**  68:13

---

### 8

**80**  21:18

---

### A

**a.m.**  4:7
  49:18,21

**Aaron**  30:4
  84:25 85:5

**absolutely**
  17:9 34:20
  38:13
  41:7,13
  88:17

**accurate**
  46:13

**accurately**

**25:8** 61:18
  79:1

**actual**  59:18
  71:6

**ADA**  38:25
  39:4,11
  40:8 55:21
  79:21
  80:10

**Adams**  29:17,
  22 32:4,
  10,17,20
  33:18
  34:15
  35:12
  52:18,21
  53:2,8
  54:10
  56:6,14
  57:21 58:4

**addition**
  8:23

**address**  19:5
  21:18

**Adler**  44:12

**advance**  81:2

**advised**
  88:21

**affect**  16:18
  17:7

**affidavit**
  46:8,10
  47:1,4,8
  66:5,9

afraid  25:20
  38:11
  40:25 41:2

age  29:14

agreement
  75:8

alcohol  68:7

Alfred  8:15,
  16 11:8,11

allegedly
  36:23

allowed  25:6

altercation
  29:2

Amherst  8:21

anonymous
  77:16
  78:16 79:2

answering
  59:6

anxiety  22:7

APB  20:24

apologize
  11:14 80:6

apologized
  42:3

apparently
  17:4,25

appearance
  63:24

appears
  61:18

applaud  77:5

apply  52:5

approximate
  63:24
  72:9,10

approximately
  4:7 15:2
  21:8 31:11
  56:19
  60:12
  64:12
  73:22

area  11:16
  69:12

Arena  29:11,
  13

arrest  74:10

arrested
  55:10

asks  78:8

Assistant
  63:2

associate
  9:19

assuming
  55:19

attempted
  44:22

attempting
  47:22

attention
  70:1

attorney
  37:16
  38:16 43:1
  46:2 51:14
  55:20,21
  62:5 63:2,
  10 66:24
  67:9 77:13

Attorney's
  37:13 38:1
  48:5 56:10
  62:18 63:3
  65:8,15

attorneys
  51:1 64:13

August
  10:18,22
  11:17
  24:11
  28:19
  40:20
  52:20
  59:14
  67:15
  77:17 83:6

aware  75:17,
  21

─────────────
─────────────
           B
─────────────

bachelor's
  8:19

back  8:6,18
  10:2 11:11
  14:20
  17:18,21

18:16,18,
  24 19:1
  24:1 34:11
  49:22
  58:12
  67:23
  79:10 83:1
  87:1

background
  8:8

bad  15:18
  33:16
  72:22

badly  44:17
  45:1

Bailey  14:9

based  59:5

basically
  9:14

basics  5:15
  7:6

Bates  23:5
  78:20

bedroom
  59:24

beginning
  4:2 8:10

behalf  4:16,
  21 51:4

belabor
  56:17

Belling
  38:16,25

39:1,4,11
40:8
48:14,20
65:12
79:21
80:10

big   71:4

Bissell   18:8

bit   5:14
8:6 43:8
51:20 66:1
67:13,22

board   9:23

bottom   23:5
61:14
78:18,20

boyfriend
66:20 83:7

boyfriend's
66:24

BPD   23:5
61:14
77:16

brandished
84:19

break   6:14
49:13
76:16
86:17

breaking
68:9,13,17
71:9 72:8

breaks   69:7

briefly   14:2

bring   55:9

broke   70:24

brother
18:10

brothers
71:2,5

brought
51:16
60:22

Brown   60:22
80:16

Brustin
4:13,14
5:1,4
12:9,16
14:22 15:1
20:5 21:12
22:13,16,
18,19,23
23:2,13,16
26:11,21
27:10,18,
22 28:5
30:11,22
31:24 32:8
33:4,15
34:13
35:24
36:11 37:4
38:10,20
39:24 40:7
43:16,25
44:5
46:18,24

47:3 48:19
49:11,23
50:14
53:20
54:13,23
56:3 58:25
59:4 61:23
69:16,21
71:11,22
73:23
74:24
75:12,25
78:1,6,19
79:3,17,23
80:2,4,6,
13,18,24
82:4,7
83:23
84:3,14
85:18
86:14,19,
21 87:11,
13,15,20,
23 88:1,6

brutal   20:15

Buff   11:10,
13 66:6

Buffalo   4:5,
17 8:12,
18,21
10:23
11:4,16
16:11
21:16
51:14,15
55:16,19
56:9,24

60:23
67:2,23

bullet   17:25

bullets
26:14

Burstin
78:25
81:3,8

―――――――――

C

call   22:7
24:25
25:4,5,6
37:14,24
48:15,24
49:7 55:10
61:4,19
77:16,19
78:16
79:2,6,10

called   7:21
29:11,12
48:21
59:25 65:9
79:10

campus   8:21

car   14:7
17:21
18:10,11
23:20 24:2
28:23 64:6
68:14
69:3,11
70:1,8,12,
13,15,16,

22 71:5,7,
8,9 73:10,
16 84:18
85:4 87:7

care 9:5

career 17:7

careers
16:18

Carolina
7:11 9:8,
9,12 10:4
77:6

Carreras 4:8

carrying
39:9 83:17

cars 13:22
35:6

case 4:5
9:14 37:2
43:1 46:3
50:2 60:24
64:14
76:22
81:16

catch 18:5

center 11:2
21:17

Central 8:13

certainty
85:14

chance 50:15
77:11 78:8

change 17:1

charge 36:24
37:1 79:22
80:11

charged
80:17

charges
32:12,13
33:3 34:2,
12 37:20
38:22
49:2,6
54:20
55:9,11,23
57:5,11
60:22
62:10,12,
19,22,24
63:4,11
83:8

Charlotte
7:11,18

chasing 15:5

child 9:10

children
9:12 10:13

choice 16:18
17:7

choose 40:16

Christopher
65:12

cigarettes
17:13

city 4:4,
16,17

44:14
51:14

claim 57:10

claiming
37:7

class 66:5

clear 58:14
75:12
82:8,21

clinical
9:19,20

close 47:19

closer 77:13

clothes
63:16,17

club 53:25

COE1567
78:18

collar 39:7

colleague
82:14

colleagues
5:12

College 8:18

comfortable
22:6

committed
64:9

communicated
56:14,15
61:19
62:17

communications
82:9

community
7:22,23
9:13 13:24
16:24 17:1
19:25
21:17
30:13,18
31:19
35:25
36:16
37:3,23
53:23 77:5

Comp 22:15,
16 23:6
61:14

compartment
18:2

concerned
20:8,9

concluded
88:24

concludes
88:10

confessed
31:7 36:1,
5,14

confession
31:14

confirm
61:17

connected
60:14

Case 1:19-cv-01678-MAV-JJM    Document 174-22    Filed 12/18/23    Page 96 of 113

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022    Index: connection..D.A.

connection
5:22 6:3
36:7 42:20
48:6 50:18
51:16
59:11,17,
18 62:9,
14,18
63:10
64:13

considered
9:22,23

consistent
82:12

contact
28:8,13
65:3

contacted
37:13
38:1,14
62:4

contained
81:20

continued
14:18

continuing
36:17

continuous
68:17,20

continuously
69:11,14

conversation
53:16
56:18,20,

21 57:7,8,
21 64:6

conversations
56:6 75:6
81:23

convertible
11:24,25

conviction
42:21 62:6

cooperate
44:22

copies  22:23

copy  87:24
88:12,16

correct  5:8
7:8 25:23
26:1,5,14
28:20,21
41:17
48:6,16
54:21
56:1,12,16
58:16,17
61:2,3,6,
22 63:12
66:8 69:7,
12 72:4,6
73:22
74:15
75:20
76:10
77:17,18,
20,21,24,
25 78:4,
13,14

79:2,4,7,
8,10,11,
13,14,16,
18,22
80:12,14,
17,19,23,
25 82:13
83:14,25
84:6,7,10,
13,20
85:6,9,10,
11 86:5,11

correctly
23:25

correspondence
50:10

Counsel  4:11

counseling
21:14

counselor
21:22

counselor's
21:19

counting
70:17

county  4:19,
21 9:10
39:2 56:10
62:17 63:3
76:22

couple  5:11
8:17 42:8
49:12,24
61:5 81:10
82:4

courage  27:6

court  4:8,12
5:21 39:3
77:14
88:11,15,
19

cover  16:3
73:10,17

covered  77:9

create  24:13

created  24:9
47:9

crime  20:1,
15 31:7
63:15

criminal
62:10 63:4
83:8

CROSS-
EXAMINATION
51:8 76:14

crowd  14:10,
11,12,14
68:25 69:9
70:25
71:3,19
72:19 84:6
85:5

crowded
69:12

D

D.A.  38:15

D.a.'s  50:18

dance  29:16

dancing  68:2

dangerous
  20:2

Darren  4:8

date  4:6
  77:22 81:2

day  17:16

days  24:11
  30:17
  31:10,13
  32:2
  48:16,21
  61:5

dealer  36:23

dealt  13:21

decision
  41:8

defendants
  4:17,19,21
  51:4 76:22

defense  62:5

degree  8:19,
  22

Delavan
  14:8,17

Delaware
  39:3

department
  33:2 48:15
  55:17 56:9

60:24

deposition
  4:3 5:16
  81:18
  82:19
  87:17
  88:24

describe  9:2
  11:23 14:2
  15:23
  23:20
  24:23 25:8
  47:8

description
  35:13
  63:25

detail  47:16
  55:6,25
  57:6

details  43:7

detective
  24:10 25:9
  26:25
  38:17,24
  55:13
  63:14

detectives
  19:4 51:15
  64:22
  65:2,5

difficulties
  17:24

DIRECT  4:25

direction

17:2 87:7,
9

directly
  14:14

discos  29:13

discuss
  31:25
  86:18

discussion
  30:18,24
  31:1,2,18
  35:25
  36:16 37:3
  57:1

discussions
  32:3,9
  82:18

dissuade
  65:18

distinguishing
  62:21

district
  37:13,16
  38:1,16
  43:1 46:2
  48:4
  55:20,21
  56:10
  62:17
  63:2,3,9
  64:13
  65:7,15

divulge  13:3

Dixon  4:4,14

13:4,11,
14,21
15:8,11
19:16
20:24
25:22
33:19
34:6,24
35:1,2,4,
13 36:17,
20 41:15,
22 42:10
44:17 45:5
48:23
51:16
54:11
57:12 62:5
63:5 74:7,
10,13
77:24 79:6

Dixon's
  20:21
  42:21 62:9
  77:23

document
  79:1

documents
  50:1,4

doubt  12:20,
  23 15:6,9,
  10,14,17

drinking
  68:1

drive  18:12

drive-by
  16:9

**driving**
17:22 18:6
23:20 66:5
67:2

**drove** 13:22
18:9,10,11
35:6

**drug** 36:23
37:2

**drugs** 13:22
68:7

**duck** 73:10

**duly** 4:24

**Duper** 11:2

---

**E**

**earlier**
54:17
56:19
79:20 80:9

**early** 64:4,
19 67:14

**East** 14:8
18:7

**educational**
8:8

**Eighteen**
10:5

**elapsed**
73:15

**Electronic**
88:18,20

**eligible**
9:23

**Emil** 29:17,
22 32:3,
10,17,20
33:18
34:15
35:12
52:18,21
53:2,8
54:10
56:6,14
57:20 58:4

**Eminem** 67:21

**emotionally**
15:24

**employed**
7:17 10:23

**employee**
55:17

**end** 86:19,
20

**entire** 15:3

**equally** 52:5

**Erie** 4:19
56:10
62:17 63:3

**established**
78:25

**estimate**
72:10

**et al** 4:5

**evening**

52:24 53:7
67:18,25
72:2,5
74:20
75:19
86:4,8

**event** 16:18

**eventually**
45:21

**ex-boyfriend's**
67:9

**exact** 25:12
44:15

**exam** 9:20,
21,23
45:3,18,24

**examination**
4:25
43:12,22
82:6

**exhibit**
22:9,10,
14,20
46:20 47:1

**exhibits**
78:15

**experience**
17:15 42:5

**experienced**
17:7 77:1,
3

**expert**
85:11,12
86:3

**explain**
16:20
33:25

**expressly**
65:18,23

---

**F**

**face** 14:16,
23 15:4
34:12
58:22

**face-to-face**
41:19

**facing** 36:25
87:6,8,9

**fact** 26:4
33:19
35:12 36:3
37:17 38:3
43:21 50:4
55:16 71:1
76:3 80:21

**faded** 43:8

**fair** 13:20
48:13,20
58:2 60:20
65:5 68:16
70:8
83:12,16,
22 84:16
85:2,13,17
86:7

**Falls** 67:19,
20,21,22

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**                    Index: families..fun

families
  9:12

family  10:9
  74:10,13,
  17

father
  59:21,24

favor  78:7

fear  79:22
  80:11

February
  37:11
  64:17

feel  39:14
  52:1

feeling
  22:5,6
  44:25

feet  68:13

fell  14:16

felt  25:2
  39:18,22
  44:17

Ferry  18:7,
  12

Fifteen
  18:21

Fifty-one
  7:13

fight  14:5,
  7,8 16:5
  68:9,11,
  13,17,19

69:7,9
70:21,23,
24 71:2,6,
9,16,20
72:8 84:4,
6,9,24
85:1,3
87:9

Fillmore
  18:13

find  7:22
  65:10

finding
  37:25

fine  6:14
  88:18

fire  18:5

firing  86:10

firsthand
  56:13

fistfight
  16:6

flashy  35:6

flipped
  23:14

fluid  18:1

focus  70:9

focusing
  69:22,24,
  25

folks  49:16

follow  6:4

follow-up
  50:25 82:4

food  8:1
  67:24

form  12:8,
  15 14:21,
  24 20:3
  21:11
  26:9,19
  27:7,15,21
  28:1 30:9,
  21 31:23
  32:5,22
  33:12
  34:8,9
  35:21,22
  36:8,9,21
  38:6,7,19
  39:16,17
  40:2,3
  43:13,14
  48:17
  49:8,9
  53:20
  54:13,23
  56:3 59:2
  61:23
  69:16
  71:11,22
  73:23
  74:24
  75:25 78:1
  79:3,17,23
  80:13,18,
  24 83:20,
  21 84:2,
  11,12

85:15,16
87:11

formally
  37:25

formed  71:20

forms  81:19,
  20

forward
  14:16 15:4

foster  9:5

found  13:1
  45:25

foundation
  53:21

Fred  35:17,
  18

Frida  4:3,23
  5:2 47:1
  49:24
  50:17
  51:10
  87:4,15
  88:4

Friday  29:13

friends  18:6
  31:25
  34:19
  35:11

front  14:20

froze  16:2

full  65:24

fun  29:15

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                    Index: gather..heard

---

**G**

gather   69:8

gathered
 68:25
 70:25

gave   19:4
 37:14
 65:3,14
 77:23  83:5

general
 10:24  11:4
 13:20  22:5
 55:3  63:25

General's
 21:17

generally
 19:25
 32:20
 41:25
 57:10
 74:14

gentleman
 39:1

Geo   11:24

Gerardo
 22:13
 82:15

girl   27:24

girls   28:14

give   8:7
 9:3,19
 26:16
 34:3,4

---

46:22
62:19
63:25
65:24  72:9
78:8

giving   41:5
 45:1  65:19

Global   4:10

God   18:3
 42:5

good   5:2,3
 17:10,15
 35:8
 51:10,11
 76:16,18

Goodrich
 21:18

Goodyear
 18:8

gosh   9:10,
 13  10:25
 16:8  81:5

Gotcha   17:18

Grabowski
 24:10

graduated
 8:10,12
 11:12,13

grammar   13:2
 60:15

grand   78:12

Great   7:5
 10:18  88:1

---

Greater   7:18

ground   14:17
 51:18  52:5
 74:2

group   9:7
 29:14

guess   39:2
 46:5  69:1
 72:9,22

guesstimate
 72:12
 73:24
 81:24

gun   14:9
 36:24  37:1
 39:9  71:25
 72:3,5,25
 73:4,7
 83:11,14,
 18,25
 84:1,9
 85:11,12,
 14  86:3

gunman   16:6

gunshot   86:9

gunshots
 40:12
 72:9,14,
 15,18,23
 73:7  86:5

guy   35:8

guys   22:9,
 24  81:15,
 17

---

**H**

hall   39:2

hand   14:9

hang   29:15

hanging   30:6
 68:2

happen   39:25

happened
 18:9  19:1
 43:5  44:23
 47:12,17,
 18  65:22

happening
 68:24

happenstance
 53:19

headed   14:9

health   7:25
 9:6,7,11
 21:17

hear   6:17
 31:8

heard   19:15
 20:20,22,
 23  21:1
 31:13,16
 32:4,11,18
 36:19
 40:12,20,
 21  42:12
 43:8
 72:14,17,
 23  73:7

---

83:6 85:8

**hearing** 72:8

**hidden** 61:22

**high** 8:11,
12,13

**hit** 64:7

**Hodgson** 4:16

**holes** 17:25

**home** 9:12

**homes** 9:7

**homicide**
51:15

**Hospital**
10:24 11:4

**hours** 67:15

**house** 25:5
27:3 38:4

**housing** 7:25

**Hurley** 4:18
33:12 34:9
35:22 36:9
38:7 39:17
40:3 43:14
48:17 49:9
76:13,15,
21 77:15
78:2,11,
22,24
79:5,19
80:1,3,5,
7,8,15,20
81:1 83:21
84:12

85:16
86:16,20
87:3,12
88:5,19,20

**Huseby** 4:9

**Hutchinson**
8:13

---

**I**

---

**idea** 20:12

**identification**
47:2

**identified**
59:5,7

**identify**
26:1,3
27:6 57:12
58:21
77:19
79:12,15

**identifying**
26:17
54:11

**identity**
58:23

**immediately**
17:19,21
73:12

**inability**
44:20

**incarceration**
74:11

**incident**

74:1

**including**
14:4 27:4
85:4

**incorrect**
62:10

**indicted**
37:6

**individual**
55:13,17
57:16

**individuals**
14:6 68:21
70:20 85:3

**influence**
68:4

**informally**
51:13

**information**
19:5 20:1,
10 24:17
34:4 45:1
57:16
62:19
65:19,24

**inside** 11:22
14:7

**instance**
54:10

**instantaneous**
71:16,17

**insurance**
8:1

**interactions**
42:12
60:23
74:21
75:2,18
83:2

**interview**
56:23

**interviewed**
42:20,24,
25

**interviews**
43:3 56:6

**intimate**
66:17

**introduce**
4:11

**introduced**
51:13 53:5
76:19

**investigator**
44:11 46:7
83:3

**investigators**
42:25

**involved**
19:19 29:2
68:11
71:5,20
84:16

**involving**
14:6

**issued** 62:9

| | | | |
|---|---|---|---|
| issues  82:15 | job  11:4 | 31:4 | 79:25 |
| | jobs  10:25 | 33:22,23 | 80:1,3,10, |
| **J** | 11:1 | 34:7 35:4 | 21,23 85:8 |
| | John  58:6 | 39:19,20 | 86:9 |
| Jackson | | 49:2 58:19 | |
| 11:17 | Joseph's | 60:9 66:7 | large  68:25 |
| 12:5,7,13, | 29:12 | 80:21 | 69:8 |
| 18,22 | judge  6:21, | | Lasandra |
| 13:5,8 | 24 7:2 | knowing  29:7 | 12:2 |
| 15:7 20:13 | jury  78:12 | 36:2 59:7 | late  64:3 |
| 25:23 | | knowledge | |
| 30:4,20 | **K** | 13:8,25 | lawsuit  5:22 |
| 31:21 | | 30:8 38:12 | 6:3 51:16 |
| 35:14 45:6 | kill  12:17 | 56:13 75:7 | lawyer  44:13 |
| 71:2,5,24 | killed  11:18 | | 46:4 |
| 74:2,17 | 12:4,7,13, | **L** | lawyers |
| 83:11,13 | 22 16:14 | | 5:24,25 |
| 84:9,24,25 | 20:13 | ladies  28:9 | 6:4,18 |
| 85:4,5 | 35:14 45:5 | Lamar  12:19, | leading  14:3 |
| Jacksons | kind  7:14, | 21,24 | |
| 30:3 | 19 13:3 | 14:3,8,15, | leaked  18:1 |
| Jacqueline | 14:12 | 18,19,23 | learn  37:5 |
| 12:2 | 15:21 | 15:7 19:22 | learned |
| jail  40:5 | 16:3,7,13 | 20:13 | 19:22 |
| 41:2 | 17:1 25:3 | 27:5,13 | 31:6,10 |
| January | 39:22 | 31:6 | 32:11 |
| 37:6,11 | 51:17 58:2 | 34:24,25 | 37:9,19, |
| 64:17 | 61:10 | 35:12 | 20,21 |
| 80:17 | 67:23 | 36:1,5,14 | 38:21 |
| Jarmon  14:12 | 68:3,25 | 37:7 44:21 | led  17:12 |
| 29:4 60:22 | kitchen | 45:12 | left  8:16 |
| 80:16 | 59:20,22 | 58:16,19 | Leonard |
| jeans  63:20 | knew  13:21 | 59:19,22 | 60:22 |
| Jen  4:20 | 19:18 | 60:11,15 | license  9:18 |
| Jimmy  44:13 | 26:12 | 72:3,18,24 | licensed |
| | 30:6,12,25 | 73:4,6,13, | 9:18 |
| | | 16,19,20 | |
| | | 77:19 | |

licenses
  9:17

life  15:21
  20:18
  59:12

Lippes  4:18,
  20 76:21

Litigation
  4:10

live  7:10,
  11

lived  10:3

living  19:25
  59:20

LLP  4:16

long  8:3
  10:3 15:2
  31:9 72:7,
  10 81:23

looked  59:23
  60:13

lot  11:21,
  22 14:6
  16:9,10,14
  70:17 77:8

loud  86:4,8

louder  77:14

Louie's
  11:16,21,
  22 67:18,
  24

lying  74:2

**M**

made  16:21
  18:12,18
  24:25
  31:14
  48:24 49:7
  55:1,7
  57:17,20
  59:16,18
  75:8 77:16

main  11:4

major  16:25

make  25:3,6
  36:6 46:12
  48:3 49:17
  59:10

making  6:18

male  21:19,
  20 64:1

management
  9:14

Margaret
  4:18 76:20

Mario  14:12
  29:4,7
  39:19
  60:22 71:2

mark  46:19,
  24

marked  22:21
  47:2

married
  10:11

master's
  8:20,22

Mathias
  4:19,21
  76:21

matter  4:4
  13:21

Max  44:12

meant  79:25

mechanical
  17:24

Mecklenburg
  9:9

Media  4:3

medical  7:25

meet  37:18
  38:24,25
  54:3

meeting
  39:12
  50:18
  53:18
  65:11 88:6

meetings
  58:3

member  74:10

members  7:23
  8:2

memo  78:16

memory  43:9
  86:7

men  37:6

mental  7:25
  9:6,7,11
  21:17

mentioned
  9:16 20:20
  21:13
  36:15
  41:14 42:7
  44:16
  54:19
  55:12

met  5:4,5
  38:16 40:8
  41:15,18,
  19 46:6,7
  47:10
  76:19

mic  19:15

Michigan
  33:3 34:12
  54:21
  55:10,24
  57:5

mid  64:3

middle  23:5

mind  12:21,
  23 15:6,9,
  10,15 36:7
  78:19

Mindy  4:9

minute  23:3,
  7 49:13
  71:12
  73:18,22,
  24 86:17

minutes
  18:17,19,
  20,21,23
  21:9 72:13
  81:25

misstated
  79:24

mistaken
  37:12

Mo  46:20

Mobile
  18:10,12

mom  37:14
  38:9,11

moments  14:3

monitor  4:7

months  32:2
  53:11,12
  54:8 81:10

morning  5:2,
  3 51:10,11
  67:14

mother  38:5
  64:21

Mount  29:12

move  77:13

moved  10:6
  31:12

MSW  76:23

        N

names  16:12

44:15

navigator
  7:22

needed  67:6

nervous  16:4

Neufeld  4:13

news  31:14
  56:24

Niagara
  67:19,20,
  21,22

nice  13:22
  88:6

Nick  4:13
  5:4 51:18
  61:11
  78:23 80:7

nickname
  60:5

night  13:5
  15:11
  17:19
  23:21 40:9
  58:15,18
  59:13 61:1
  63:15 66:7
  67:13
  75:7,8,13,
  15 87:6,8

nightmares
  17:12
  21:25 22:4

nights
  29:13,14

noise  86:8

noises  86:4

nonetheless
  39:14 76:8

North  7:11
  9:8,9,11
  10:3 77:6

notes  49:14

November
  47:5 59:19
  60:12,18
  80:22

number  5:24
  19:5
  46:20,21
  47:14
  65:3,8,13

numerous
  84:23

        O

oath  41:5

object  56:3
  59:1 75:25
  78:8 83:21
  85:16

Objection
  36:21
  53:20
  54:13,23
  61:23
  69:16
  71:11,22
  73:23

74:24 78:1
  79:3,17,23
  80:13,18,
  24 87:11

objections
  6:18

observance
  68:18,20

observe
  15:24
  20:15
  70:16
  75:24 76:4
  83:25
  84:1,10

observed
  68:23
  74:20 76:7
  86:4

observing
  16:1
  69:11,14,
  17 72:24

obtained
  8:18,22

October  4:6

office  5:12
  25:1,7
  37:13 38:2
  42:14 48:5
  50:18
  55:22
  62:18 63:4
  65:8,15
  81:4,9

82:19,22

**office's**
56:10

**officer**
26:18,25
48:4 55:13
61:8 63:13
65:17

**older** 64:3

**open** 69:18

**opposed** 15:8

**opted** 25:4

**order** 78:20

**ordering**
88:11,14,
15

**overheard**
21:6

---

**P**

**p.m.** 86:22,
25 88:9,24

**packet** 61:11

**pages** 22:20
23:5

**parking**
11:21,22

**Parks** 12:3

**part** 16:21,
24 22:9
25:1 33:5,
7,10 44:25

46:5

**partially**
70:9

**participate**
62:1 70:21

**participated**
70:23

**party** 67:20

**partying**
67:25

**pass** 9:21

**passed** 45:17

**passes** 71:8

**passing** 9:20

**patients**
9:25

**pause** 78:7

**peers** 30:19

**pending** 34:2
54:21 63:4

**people** 7:23
16:10,11,
14 17:3,17
27:12 29:1
31:19
34:17
68:10,14
69:6,14,19
70:2,10,16
71:4,7,20
74:19
79:12
82:18

84:25

**period** 9:22

**perjury**
32:11,13
37:7,20
38:22
39:21
40:14,20
48:12
49:2,5
50:10
60:21
62:14,22
63:11
64:14,15
79:22
80:11,17

**Persico** 4:20

**person** 5:5
12:12,14,
21 13:2
19:22
25:23 26:5
31:20 45:5
48:4 49:6
53:15 72:2
74:13 88:7

**personally**
13:11 30:5

**Pete** 88:11

**Peter** 4:15
51:12
86:17

**phone** 5:9
19:5 24:25

37:14,24
49:25 61:4
78:16
82:10

**photographs**
48:5,7

**photos** 48:8

**physical**
20:10

**physically**
39:11

**picture** 27:4

**pictures**
26:1 27:1,
4 28:11,13

**pin** 37:2

**place** 29:12
53:13

**plain** 63:16,
17

**plaintiff**
4:14 7:7

**Plaintiff's**
46:25

**planned** 54:2

**point** 15:21
16:1 31:5
38:4,15
42:19
56:17
65:17 69:3
72:24 73:9
74:6

pointed   17:1

points   20:24
 85:2

police
 18:15,16
 19:9 21:4
 22:9,10,14
 23:25 24:1
 25:4
 26:12,24
 28:19 33:2
 34:5 35:19
 36:16,20
 38:4 42:12
 48:4,15,21
 50:9 55:8,
 13,16,18,
 19,20 56:9
 60:23
 61:7,11
 63:13
 64:22
 65:17
 74:21
 75:2,6,11,
 18 76:8
 77:23
 78:16
 79:21
 80:10,23

police's
 50:9

polygraph
 43:12,19,
 21 45:3,
 18,24

position
 7:21

potentially
 6:23 55:24

Powell
 35:17,18

prefer  87:18

prepared
 66:4,13

present
 11:15 13:7
 56:5

pressure
 34:5 35:19

pretty  35:5
 55:22

prior  9:20
 52:20 53:1
 60:21 62:5
 64:15,18
 67:17
 68:9,13,
 16,19 70:8
 73:6 85:1

prison  16:12

private
 9:24,25
 42:25

problem  5:20

process  47:8

processed
 24:4

prosecuted

27:12
41:12

prosecutors
 34:5 61:22
 74:22 75:2

protective
 9:10

provide  67:6

provided
 20:10

providing
 20:1

public  54:5
 56:25

pulled
 18:13,14
 70:1,15
 84:9

pulling  70:9
 71:9

pulls  69:3,
 11 71:7

pursuant  7:6

pursuing
 8:20 11:9

put  20:23
 34:6 35:19
 60:2

Putnam  47:10
 50:9 66:2,
 23 83:3,5

_____

Q

question  6:8
 7:3 15:18
 28:18
 33:8,10,16
 51:23
 59:1,7
 67:14
 69:10
 72:22
 79:24

questions
 5:22 6:3,
 4,8,19
 20:8 22:22
 24:17 29:1
 45:4,8,11,
 14 48:15
 49:17,24
 50:25 51:2
 52:5 78:8
 82:5 83:2,
 10 86:15

quick  85:24

_____

R

radiator
 18:1

radio  20:21
 21:2,4

raised  73:4

raising  73:7

ran  14:12

54:5 56:24

reached
  65:4,6

read  23:7,9
  24:16
  87:16
  88:22

reading
  23:23
  24:20

reason  33:1
  70:23

reasons  34:3

recall  50:17
  51:17
  53:13,14
  63:13,15,
  22,24
  64:1,12,
  21,25
  67:8,12
  84:17 85:7

recalling
  64:16

Recently
  81:9

recess  49:20
  86:24

recognized
  13:18
  15:11
  58:22

recollection
  44:7 46:13

48:3 50:2
82:10,12

record
  49:19,22
  51:13
  76:20
  86:15,23
  87:1 88:10

recorder
  50:22

RECROSS-
EXAMINATION
  86:1 87:2

red  11:24,
  25 26:5,13
  27:24
  28:20

REDIRECT
  82:6

referring
  24:21

reflect
  61:18

reflects
  79:1

refresh  50:1

refreshes
  44:7

registered
  28:22

regret  41:8

regular  16:6

reinvestigatin
g  43:1 46:2

reinvestigatio
n  42:21
  46:5 50:19

reiterated
  57:3

related  7:24

relates
  60:24

relation
  63:4

relayed
  54:11
  56:13 66:6
  75:22

released
  41:24

religion
  42:5

reluctant
  65:22

remember
  20:21
  21:18,20,
  21 22:10,
  13 25:10,
  11,15 31:9
  34:14
  37:9,19,
  24,25
  38:3,8
  39:4,6,9,
  10 42:23
  43:4 44:1,

7,9,14,15
46:1 50:22
51:23
52:11
56:20
62:13 65:8
72:8 82:24
84:21

remembered
  47:14
  82:11

repeat  52:1,
  3,8 62:20

rephrase
  6:12

report  22:9,
  10,14
  23:7,20,24
  24:7,9,14,
  21 25:8
  61:17

reported
  48:22

reporter
  4:9,12
  5:21 44:13
  77:14
  88:11,15,
  19

reports
  61:11

represent
  51:14
  76:21

representative

63:3

representing
62:5

reputation
13:15
30:7,8

request  50:1
77:13

requested
44:9

reservation
27:9,17

resources
7:22,24
8:1

restaurant
11:16

result  44:25

retired
51:15

review  50:1,
4,7,15
51:22
81:22
87:16,20

rink  29:10

road  6:24

rode  67:21,
23

Roger  47:10
50:9 66:2,
23

Romo  22:17
82:15

room  5:21

rule  6:24

rules  51:18
52:5

run  14:8
16:7

rundown  8:7
9:3

running
14:14 15:4
72:19
73:19

Russ  4:16

———————

S

safe  22:5

safety  20:10
38:12

Sahasrabudhe
4:15 12:8,
15 14:21,
24 20:3
21:11
22:11,15,
25 23:11,
14 26:9,19
27:7,15,21
28:1 30:9,
21 31:23
32:5,22
34:8 35:21
36:8,21

38:6,19
39:16 40:2
43:13,24
44:2 46:16
49:8 50:12
51:9,12
54:1,15,24
56:4 59:3,
9 62:3
69:23 70:4
71:13,23
73:25
74:25
75:16
76:2,11
83:20
84:2,11
85:15,23
86:2,12
87:14
88:4,13,17

Saturday
29:14

scared  15:25
16:4 18:11
19:12,13,
14,21
26:22

scene  18:18,
24 19:2
24:1 35:11
63:14

Scheck  4:13

scheduling
82:19

school  8:11,

12,13,17
13:2
60:15,16

Scott  12:19,
21,24
14:3,8,15,
19 15:7
19:22
20:13
27:5,13
31:6
34:24,25
35:12
36:1,5,14
37:7 44:21
45:12
58:16,19
59:19,22
60:12,15
72:3,24
73:4,6,13,
16 77:20
79:21
80:1,3,10,
21,23 85:8
86:9

Scott's
14:23

Sears  11:2

secure  7:22

seek  17:11

send  34:11
87:23

sense  22:5

Service  11:2

services
   9:10,13

shaken   15:25

shirt   39:7
   63:21

shoot   12:17
   14:18
   16:24

shooter
   19:9,17
   20:25 21:2
   27:13 31:3
   32:21
   33:2,11,
   14,19,23
   34:1,7,24
   36:2,3,6,
   15 37:7
   45:12
   48:23
   54:12
   57:4,14
   60:16
   77:20,24
   79:7,16,22
   80:11,22,
   23

shooting
   10:19 13:1
   14:4,10,
   11,16
   15:20,24
   16:7 17:19
   18:17,23,
   24 19:2
   21:9,14

22:1 24:11
25:18
29:2,18,
21,23
30:18
31:10 32:3
34:15,21
40:10
41:15
48:6,16,22
53:2,7,11,
13 54:8
58:15,19
59:13
60:24 61:2
63:15
64:10
73:5,7,20,
21 75:14,
15,24
76:4,7
77:22 84:5
85:1 87:6,
8

shootings
   16:9,14

short   49:20
   86:24

shot   11:17
   12:4,7,13,
   21 13:5,8
   15:7 20:13
   25:23
   26:14
   30:19
   31:20
   35:14 45:5

85:8,14

show   22:8
   27:1

showed
   28:11,12
   48:5

shown   27:4

sic   78:25
   81:3

side   16:25

sight   13:14
   58:19

sign   87:16,
   19,21
   88:22

signed   46:7
   47:5,25

similar
   82:15

simultaneously
   14:13

single   47:16

sitting
   59:22

skating
   29:10

skipped   33:5

slacks   39:7
   63:21

Smith   12:2

smoke   17:12

smoker   17:14

smoking   18:2
   68:1

social   7:15,
   20 8:19,
   21,25 9:5,
   19,23
   16:22

son   10:16

son's   59:21,
   23

SOTO-BRITO
   46:22

sought   21:13

sounds   32:15
   44:19

speak   19:3
   32:17
   35:10,16
   64:23
   65:22
   77:14
   81:3,8
   82:14

speaking
   53:2 70:10

specialty
   9:7

specific
   55:22

specifically
   7:19 20:6
   69:10

speculation
  61:24

spoke  19:4
  23:25 24:1
  28:19
  29:22 38:5
  41:21
  44:17
  48:14
  49:25
  53:8,9
  57:24 61:7
  63:9,14
  64:13
  82:10

spoken  5:9,
  11 41:16
  42:8 52:23
  57:20
  58:4,8
  74:9,14,
  16,19 75:1

Sport  59:25
  60:1,9,16

St  29:12

Stambach
  24:10 25:9
  26:25

stamp  78:21

stamped  23:5

standing
  32:24,25
  69:19

start  7:5,16
  16:7 23:6

52:17

started
  14:10,11,
  13 18:2
  51:17,19
  71:2 73:5,
  20 86:10

starting  6:2

state  8:18
  9:8,9,11
  11:10,13
  34:6 66:6
  67:2

statement
  50:8,9
  66:2,14
  77:23 83:5

statements
  50:20

station
  18:11,12

stay  16:12

stayed  8:17

Stencil
  35:17,18

stood  14:18

stopped
  37:15

store  56:25

story  47:11

street  14:17
  68:15,18,
  21 69:15

70:3

strike  87:8

student  11:5

stuff  16:10

subpoena  7:7
  62:9,13
  67:6

subpoenaed
  37:15
  40:17,18
  65:11 67:3

subsequently
  40:13

substance
  61:18 64:5
  79:1 82:11

suggest
  82:23

Sullivan
  58:6

sum  64:5

SUNY  8:21

Super  11:2

support  7:25
  9:13

swear  4:12

swooped  71:3

sworn  4:24

symptoms
  22:3

_____

          T
_____

T-SHIRT
  63:20 64:2

table  59:22

taking  9:20
  66:6

talk  10:20
  28:17
  33:18
  34:17,18
  35:18
  37:16,22
  41:25
  47:11
  65:12 66:1
  67:13
  75:9,10
  81:15,17,
  18

talked  26:13
  34:14
  41:20
  42:2,4
  54:16
  56:19 58:3
  63:1 75:11
  81:16,19

talking
  44:12
  46:16
  47:12
  67:14

Tamara  4:3,
  23 47:1

tape  50:22

tape-recorded
  50:20,21

targeted
  31:2

Technical
  8:13

telephone
  41:20

television
  36:2,6,15

telling  26:8
  27:12
  39:15,19,
  22 59:4
  64:21

Terrific  8:3

testified
  4:24 55:16
  78:12
  79:20 80:9

testify
  40:13,16,
  17,18

testifying
  7:6

testimony
  41:5 51:19
  58:18
  60:21
  88:10

therapist
  17:10,16
  25:2

therapist's
  25:1

therapy  8:25
  9:6,11,17
  16:21
  17:11 25:1

thing  6:17
  9:14 18:4
  34:10
  37:21
  58:14 68:3
  75:21
  83:24

things  36:19

thinking
  11:9

thought
  17:14 40:4
  41:11

threaten
  39:11
  65:18

threatened
  39:14
  54:20
  65:23

threatening
  33:3 34:11

threats
  54:25 55:7
  57:17

tie  63:18,
  21

time  4:6

5:5 6:7,
  17,18
  10:19,23
  11:4,6,8
  12:24,25
  13:5,12,15
  15:3 16:9
  19:8,13,
  14,24
  20:7,9,12
  21:15,16,
  19 22:4
  26:24
  27:4,6,8,
  14 28:2
  29:10 31:5
  35:3
  36:22,24
  37:5
  38:15,21
  41:14,21
  42:19 43:7
  44:12,14
  45:1 46:14
  48:25
  49:2,4,18,
  21 52:9,25
  53:8,9,24
  56:23
  57:24
  59:12,20,
  21 62:16
  63:1,9
  65:5 66:6,
  20 70:24
  71:8 72:23
  73:3,15
  76:12 85:2

86:22,25
  88:2,9

times  5:9
  21:21,23
  29:22
  34:14,16
  41:20
  42:8,22,23
  49:25 58:4
  81:2,5,6
  84:5,23

Tino  31:2
  33:1

today  6:8
  10:20
  12:13,14
  41:9 51:19
  58:10
  78:15
  81:18

today's  4:6
  81:2 88:10

told  18:9,
  14 21:24
  24:2
  25:17,20,
  22,25 26:4
  27:23
  28:19
  32:23
  33:22
  34:10
  40:1,5,11,
  21 41:12
  44:16
  45:17,21,

23 46:2
48:23 49:6
55:2 65:2,
23 67:5
75:4,7
76:8 79:21
80:10,22
84:4

**top** 11:25
78:18

**Torri** 14:13,
16 15:5
73:19 74:1
84:9,24
85:4

**Torriano**
11:17
12:5,7,13,
17,22
13:5,8
15:7 20:13
25:23
30:3,19
31:21
35:14 45:5
71:24
83:11,13

**Tracker**
11:24
26:5,14
27:24
28:20

**transcript**
50:12,13
88:12,22

**transition**

11:7

**transportation**
67:7

**trauma** 17:6
22:3

**traumatized**
17:12

**traumatizing**
16:16 77:2

**Travis**
35:17,18

**trial** 9:22
39:20,21
40:6,14,20
41:5 48:8,
12 50:10
60:21 62:1
64:16,18
66:20
77:23

**truck** 14:15
32:25

**true** 41:6
42:11,15

**truth** 27:12
39:15,20,
23 40:1,5,
10,19,21
41:12
44:23
47:23
82:23

**truthful**
45:25

**truthfully**
45:9,15

**turn** 51:1

**type** 8:1

**types** 8:24

_____

**U**
_____

**UB** 76:23

**Uh-huh** 18:22
20:4 21:3
24:8 30:14
32:16
36:4,18
44:18
47:21
52:19 54:9
60:6,8,19
61:13,16
62:25 66:3
69:13 74:5
82:13

**uncomfortable**
39:18,22

**understand**
6:7,11 7:3
27:23 52:4
65:13

**understanding**
23:24
26:12
28:7,8
53:1 59:1
62:8 66:4,
19

**understood**
26:7,17
41:4 42:4
60:3,17
66:11

**unenrolled**
11:8

**uniform**
63:16

**University**
8:15 11:9

**upset** 16:23

_____

**V**
_____

**Valentino**
4:4,14
13:4,11,
14,21
15:8,11
19:16
20:20,24
25:22 31:1
33:19,22
34:1,6,24
35:1,4,13
36:17,20
41:15,22
42:10,21
44:16 45:4
48:22
54:11
57:4,12
62:4,5,9
63:5 74:7,
10,14

Valentino's
  62:1,11,
  18,24

vehicle
  11:22,23
  16:3 18:2,
  15 48:8,11

verbally
  42:3

verify  48:11

versus  4:4

vicinity
  13:7

vision  68:17

visit  27:25

Vislay  4:9

visually
  31:4

volunteer
  43:11

W

waive  88:23

walked  70:2

walkie  19:15

wanted  16:22
  17:22 25:5
  36:25
  64:23

waste  52:9

watching
  14:6,7

weapon  84:19

wearing  39:5
  63:18

week  41:24

whatever's
  17:4

whatsoever
  83:7

When's  41:21

white  11:25
  21:20 64:1

withdraw
  43:17

withdrawn
  34:4 36:1,
  5 37:18
  38:25
  44:21
  83:13
  84:16,17,
  25

withheld
  61:22

witnessed
  15:20 31:3
  77:1

witnesses
  35:11

witnessing
  16:17

wonderful
  77:7

words  13:17

15:14
19:21
25:12 54:2
66:16
71:18

work  7:14,
  20 8:19,
  21,23,25
  9:6,13,23
  16:22
  59:22 77:5

worked  9:6,
  8,9 10:25

worker  7:15
  9:19

working  8:3,
  5 10:25
  11:1 66:23

world  42:6

worry  7:1

worse  17:2

worst  17:5

wound  37:15
  65:9

write  46:10,
  11

writing
  47:12

wrong  44:20

Y

year  32:14
  81:12

year-and-a-
half  81:12

years  8:17
  10:5,16,21
  29:8 42:4
  44:22
  47:14

YMCA  7:18,
  20,21 8:5,
  24 77:6

York  8:16
  44:14
  67:22

young  28:9
  60:7

Z

Zoom  5:25