# EXHIBIT  12

```
            UNITED STATE DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NEW YORK


_____
                                |
VALENTINO DIXON,                |
                                |
     Plaintiff,                 |   Civil Action No. 19-cv-01678
                                |
     v.                         |
                                |
CITY OF BUFFALO et al.,         |
                                |
     Defendants.                |
_____|


                 DEPOSITION OF

              EMIL TOUSSAINT ADAMS

                January 17, 2023

                   10:00 a.m.




            (Via Hybrid Videoconference.)

              75 Ted Turner Drive SW

                  Room 2221

              Atlanta, GA 30303-3309




        Lisa L. Sims, CCR #5072-0730-2093-2096

Videographer:  Norman Andrews, AVS - Affordable Video Solutions
```



```
1                    A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3         NICK JOEL BRUSTIN, ESQ.
          SONA R. SHAH, ESQ.
4         GERARDO ROMO, ESQ.
          NEUFELD SCHECK & BRUSTIN LLP
5         99 Hudson Street, Eighth Floor
          New York, NY 10013
6         Office: (212) 965-9081
          Email:  nick@nsbcivilrights.com

7

8    ON BEHALF OF THE DEFENDANT(S)

9         JAMES P. BLENK, ESQ.
          LIPPES MATHIAS WEXLER FRIEDMAN, LLP
10        50 Fountain Plaza, Suite 1700
          Buffalo, New York 14202
11        Office: (716)853-5100
          Email:  jblenk@lippes.com

12

13        JENNIFER C. PERSICO, ESQ.
          LIPPES MATHIAS WEXLER FRIEDMAN, LLP
14        50 Fountain Plaza, Suite 1700
          Buffalo, New York 14202
15        Office: (716)853-5100
          Email: jpersico@lippes.com

16

17        Attorneys for Defendants, County of Erie and Assistant
          District Attorney Christopher Belling in his individual

18        capacity

19        Hugh M. Russ III, Esq.
          Hodgson and Russ LLP
20        140 Pearl Street
          Buffalo, New York 14202
21        Office:  (716)856-4000
          Email:  HRuss@hodgsonruss.com

22        Attorneys for Defendants City of Buffalo,
          Detective Mark R. Stambach, Detective Raniero
23        Masecchia, Detective James P. Lonergan, Detective John
          Vickerd; Chief Richard T. Donovan, John Does, and
24        Unknown Buffalo Police Department Supervisors

25
```



```
 1                A P P E A R A N C E S - CONT'D

 2    ON BEHALF OF THE WITNESS, EMIL ADAMS:

 3
          AVERWICK WALKER, ESQ.
 4        WALKER LAW OFFICE
          P.O. Box 414
 5        Redan, GA 30074
          Office: (404) 405-7790
 6        Email:  averickwalker@gmail.com

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1                        INDEX TO EXAMINATIONS

2    WITNESS: EMIL ADAMS

3    EXAMINATIONS
                        CROSS   DIRECT   RE-X   RE-D   FRE-X   FRE-D
4    By Mr. Brustin      --       7       --    145     --      --
     By Mr. Blenk       144      --       --     --     --      --
5    By Mr. Russ        141      --       --     --     --      --

6                        INDEX OF EXHIBITS

7    PLTFF          DESCRIPTION                  MARKED/IDENTIFIED

8    P-1    Notice of Deposition For Emil Adams             --

9    P-2    Compilation Exhibit of Police File             111

10   P-5    11/5/92 Adams Warrant Investigation Report      84

11   P-23   3/7/1993 Interview of Emil Adams by Robert Bryant

12          Transcript [Dixon 9601-9633]                    15

13   P-24   3/7/1993 Interview of Emil Adams Audio Dixon 8876]   15

14   P-25   Emil Adams Grand Jury Testimony [Dixon 1615-23]  53

15   P-26   Emil Adams Trial Testimony [Dixon 144-213]       61

16   P-27   6/5/1992 Letter from DA Dillion and Belling to Adams

17          [COE 1769-70]                                    79

18   P-28   6/5/1992 Letter from DA Dillion and Belling

19          to Saginaw APA Gave [COE 1784-85]                79

20   P-29   7/11/2005 Affidavit of Daniel Dill [Dixon 5973-76]   101

21              (All original Plaintiff's Exhibits Nos. 1, 2, 5, 23,
          24, 25, 26, 27, 28, 29 are attached to the original
22        transcript.)

23
     DEFENDANT(S)      DESCRIPTION              MARKED/IDENTIFIED
24   P-29   7/11/2005 Affidavit of Daniel Dill [Dixon 5973-76]   145

25              (All original Defendants's Exhibits Nos.
            are attached to the original transcript.)
```



```
1              DEPOSITION OF EMIL ADAMS

2                  January 17, 2023

3       (Whereupon, the court reporter complied with the

4    requirements of O.C.G.A. §9-11-28(d).)

5       THE VIDEOGRAPHER:  Standby, please.  One more moment.

6    This begins the video recorded deposition of

7    Emil Toussaint Adams in the matter of

8    Valentino Dixon v. City of Buffalo, et al.  Today's date

9    is January 17th, 2023.  The time is 11:04 a.m.  Would

10   counsel present, please, state your name and affiliation,

11   for the record.

12      MR. BRUSTIN:  Nick Brustin.  Neufeld Scheck &

13   Brustin, LLP, for the plaintiff, Valentino Dixon.

14      MR. BLENK:  James P. Blenk of Lippes Mathias for the

15   County defendant's, Christopher Belling and Erie County.

16   And I'm joined by Jennifer Persico; who may participate at

17   some point.

18      MR. RUSS:  My name is Hugh Russ.  Our firm is Hodgson

19   and Russ LLP.  We represent the city of Buffalo, the

20   police department and various Buffalo police officers.

21      THE VIDEOGRAPHER:  Is that all of the attorneys?

22   Mr. Walker, do want to put your appearance on, or no?

23      MR. WALKER:  Yes.  My name is Averick Walker.  I'm an

24   attorney here in Atlanta.  My role, today, it was very

25   limited.  It was to assure that Mr. Adams understands that
```



1  he had to be at this deposition.  My understanding from

2  the firm, is that they were trying to contact him.  And

3  they told me that they had -- that they were not able to

4  contact him, but alleged that he had been served.

5        Mr. Adams said that he wasn't served all the

6  paperwork.  But I made sure that he was able to make it

7  here today, so that I explained the deposition.  Also, I

8  let him know that the City of Buffalo had their own

9  attorney and all those persons that are, you know -- are

10  opposing whatever is going on.  So, I have a hearing at

11  10:30 a.m.  So, I'm going to have to leave you guys in

12  about another 20 minutes, but I'm going to stay for the

13  beginning.

14        THE VIDEOGRAPHER:  Okay.  But you're not here

15  representing Mr. Adams as his attorney?

16        MR. WALKER:  No, I'm not.  I'm not.  I have nothing

17  to do with this case.

18        THE VIDEOGRAPHER:  Okay.  Okay.  Thank you.

19        MR. WALKER:  I just wanted to make sure that he

20  wasn't arrested.  I just wanted to make sure that he

21  understood that he had to be here, because I was told that

22  y'all had in contempt order for his arrest.  So I had to

23  impress upon him that he had to be here.  You all

24  impressed upon me that he had to be here -- to make sure

25  that he would be arrested -- or held in contempt.



1          THE VIDEOGRAPHER:  Thank you.  If that's all, would

2      the Court Reporter please swear in the witness.

3          THE COURT REPORTER:  Mr. Adams, would you raise your

4      right hand, please, sir.

5                      EMIL TOUSSAINT ADAMS,

6        having been duly sworn, the witness hereby

7      testifies as follows:

8                      DIRECT EXAMINATION

9  BY MR. BRUSTIN:

10     Q    Good morning, Mr. Adams.

11     A    Good morning.

12     Q    My name is Nick Brustin, we met off the record.  I'm

13 one of the attorneys for Valentino Dixon.  You and I have never

14 met in person before; is that correct?

15     A    Correct.

16     Q    We've spoken on the phone a few times --

17     A    (Indicating.)

18     Q    -- trying to get a deposition scheduled; is that

19 right?

20     A    (Indicating.)

21     Q    So, have you ever had a deposition taken before?

22     A    No.

23     Q    Okay.  So, it's just like being in court, except

24 there is no judge here.  You are going to be asked a series of

25 questions, you'll be under oath, the same oath that you would



1    take in a courtroom.  If you want to take a break at any time,

2    that's fine, you just let us know; there's a bathroom here,

3    we'll give you water, or whatever you need.

4            If you don't understand one of my questions or

5    anybody questions, some of the other lawyers will probably ask

6    you questions, too.  Just please let me know and I'll change it

7    for you.  But if you do answer it, I'm going to assume that you

8    understood it; is that fair?

9        A    Fair.

10       Q    The other thing I want to tell you, I know it's been

11   very difficult to get you here.  I know you don't want to be

12   here?

13       A    (Indicating.)

14       Q    I can tell you -- I'm -- I'm guessing that you

15   probably spoke to Mr. Walker about this, but --?

16       A    Well, once the judge -- I didn't even know if it was

17   a judge that called me.  I thought you might have had somebody

18   call me trying to manipulate me to come down here, because I

19   was never served no papers.

20       Q    Okay?

21       A    But was he found out it was an actual judge, I said

22   okay, I'll come.

23       Q    So your position here, under oath, is that you were

24   never served with papers?

25       A    No.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              9

```
1        Q    Never?  Not once?

2        A    Not once.

3        Q    Not one of the four times, when --?

4        A    Not one of the four times.

5        Q    Okay.  Nobody came to your house and delivered

6   papers?

7        A    Not to me.

8        Q    All right.  So let me stop you right now, because I

9   think this is really important.  Any testimony that you gave --

10       A    (Indicating.)

11       Q    -- back at the time of the criminal proceedings in

12  this case --

13       A    (Indicating.)

14       Q    -- to the extent that you did not tell the truth, the

15  statute of limitations on that have run.  In other words, you

16  can't get in trouble for that.

17       A    Okay.

18       Q    But you are here testifying, under oath, in federal

19  court and you have an obligation to tell the truth.  The same

20  as if you were in -- the same as if you were in a courtroom; do

21  you understand that?

22       A    (Indicating.)

23       Q    And you're testifying under penalty of perjury?

24       A    Okay.

25       Q    And that means that, for example, if you tell me you
```



 1  don't remember something or you don't understand something,

 2  when you do; that's not the truth --

 3      A    (Indicating.)

 4      Q    -- that -- that can be a problem; do you understand

 5  that?

 6      A    (Indicating.)

 7      Q    Okay.  You also have to answer all the questions

 8  verbally, because the Court Reporter has to write them down.

 9  So, if you could say, "yes, or no" --

10      A    Yes.

11      Q    -- I appreciate it.  Okay.  The first thing I want to

12  ask you about, Mr. Adams, is the -- first of all, you were --

13  you were a witness to a shooting back in 1996; correct?

14      A    Yes.

15          MR. BLENK:  1991.

16          MR. BRUSTIN:  1991.  I apologize.  Thanks.

17  BY MR. BRUSTIN:

18      Q    Back in 1991, and you testified in court, a couple of

19  times; correct?

20      A    (Indicating.)  Yes.

21      Q    And you also, you recall, there was a time a couple

22  of years after the shooting, in March 1993, when -- withdrawn.

23  Do you remember Antwon -- Antwon Shannon?

24      A    Yeah, vaguely.  Yeah.

25      Q    How did you know -- how did you know Antwon?



1    A    Is that Valentino's brother.

2    Q    His stepbrother.

3    A    I went to school with him.

4    Q    Okay.  A friendly guy?

5    A    Yeah.

6    Q    A nice guy?

7    A    To my knowledge.

8    Q    You were never afraid of him?

9    A    Never.

10   Q    But it was someone you knew, but not a close friend,

11   but a friend from school; would that be fair?

12   A    (Indicating.)  (Crosstalk.)

13        MR. RUSS:  Form.

14   BY MR. BRUSTIN:

15   Q    Is that a fair way to characterize it?

16   A    Yeah.

17   Q    Okay.  Someone you liked?

18   A    Yeah.

19   Q    Okay.  Never threatened you or anything like that?

20   A    No.

21   Q    All right.  And do you recall there was a time in

22   March of 1993, a couple of years after the -- after the

23   shooting, when Mr. Shannon came to talk to you at your house

24   with Valentino Dixon's parents, Robert Bryant and Barbara

25   Dixon?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                                12

1      A    Yes.

2      Q    Okay.  And before they came to your house,

3   Mr. Shannon had talked to you about the shooting privately; do

4   you recall that?

5      A    No.

6      Q    Okay.  Well, do you remember that when they came to

7   your house, it wasn't out of the blue, that you knew they were

8   coming?  You'd said it was okay for them to come?

9      A    No.

10     Q    You don't remember that?

11     A    No.

12     Q    Are you saying you don't remember, one way or the

13  other?  Or you don't think you did?

14     A    I don't believe I talked to him and told him it was

15  okay for anybody to come by my house.

16     Q    Okay.  But you do remember that --?

17     A    I know they came by my house.

18     Q    Okay.  And -- and, by the way, when they came by your

19  house, you were polite to them and you spoke to them; correct?

20     A    (Indicating.)

21     Q    Yes?

22     A    Yes.

23     Q    Maybe for 10 -- 15 minutes?

24     A    Probably, yes.

25     Q    Okay.  Nobody -- none -- none -- none of the three



1   people -- Mr. Shannon -- you remember Valentino Dixon's dad's
2   name was Robert Bryant?
3        A    I don't remember that name.
4        Q    Okay.  Seemed like a nice, older guy when he came to
5   see you?
6        A    It was -- actually, I believe it was his dad and --
7   (crosstalk) --
8        Q    His mom, Barbara Dixon?
9        A    -- and some other guy.
10       Q    And Antwon Shannon; right?
11       A    No, Antwon wasn't there.
12       Q    You don't remember him being there?
13       A    No.
14       Q    Okay.  But you remember they were both polite and
15   nice to you; right?
16       A    Yeah.  No one threatened me -- no one threatened me.
17       Q    No, no threat.  Nothing even like that; right?
18       A    No.
19       Q    They were -- they were nice, nice older people that
20   came to speak to you?
21       A    Yes.
22            MR. BLENK:  Form.
23   BY MR. BRUSTIN:
24       Q    Okay.  Now, did you know that they were
25   tape-recording that conversation?



1      A    No.

2      Q    They didn't tell you they were tape-recording it?

3      A    No.

4      Q    Okay.  So, but you do remember that it was about

5  sometime in March 1993; right?

6      A    I don't remember the year or time.  It was, you

7  know -- if it was around that time, yeah --  (Crosstalk.)

8      Q    About -- (crosstalk)?

9      A    -- and I now they came.

10     Q    And you knew it was at nighttime; right?

11     A    No, I don't remember the time of day it was.

12     Q    Okay.  So, here's what I want to start with on.  I'm

13  going to give you this binder (handing).  And I want you to

14  turn -- so this binder, I want you to turn to the third tab in

15  this binder (indicating).  And this is -- this tab is a

16  transcription --

17     A    (Indicating.)

18     Q    -- that we made from a tape-recording that Robert

19  Bryant made, when he went to your house and talked to you.

20  Robert Bryant is Valentino's dad; okay?

21     A    Okay.

22     Q    And I'm going to ask you some questions about it;

23  okay?

24     A    Go right ahead.

25     Q    So here's what I want you to do, I want you to --



1  unfortunately, the tape-recording is a little fuzzy, so we're

2  going to play as loud as I can.  But I want you to follow along

3  as we do it, with the transcript, so that it's easier to

4  follow; okay?

5      A    (Indicating.)

6      Q    All right so, the first thing that I want to do is --

7           MR. BLENK:  Nick, sorry to interrupt, but are you

8      going to mark either of these?

9           MR. BRUSTIN:  I am.  I'm going to mark both.

10     Thank -- thank you.  I'm going to mark the transcript as

11     Plaintiff's 23.

12          (Whereupon, Plaintiff's Exhibit No. 23 was marked and

13     identified.)

14          THE WITNESS:  So they recorded me?

15          MR. BRUSTIN:  Yes.

16          THE WITNESS:  Back when we were talking?

17          MR. BRUSTIN:  Yes.

18          THE WITNESS:  Okay.

19          MR. BRUSTIN:  And I'm going to mark the -- and I want

20     to mark the tape-recording -- the audio recording -- as

21     Plaintiff's 24; this is just for the record.

22          (Whereupon, Plaintiff's Exhibit No. 24 was marked and

23     identified.)

24  BY MR. BRUSTIN:

25     Q    So, I want you to start by -- so,  I want to start --



 1  look on Page 2, you see where it starts (indicating).  I'm

 2  going to use the page numbers on the top.  So, you were right.

 3  I'm using the page numbers in the top right corner.  The next

 4  page.  Page 2 at the top right corner; do you see that?

 5      A    (Indicating.)

 6      Q    Gotcha.

 7           MR. BRUSTIN:  So, what I'd like you to do is I'd like

 8      you to play from the start and I'll tell when to stop, Mo.

 9      And then, if that doesn't work, I can play it from my --

10      my computer, too.  But I want to try this first.  And, Mo,

11      when I tell you to stop, if you could announce the time on

12      the tape, that will be great; okay?

13           MR. BLENK:  Is this -- can you just confirm the Bates

14      number on the audio, because I don't think the audio was

15      circulated this morning.

16           MR. BRUSTIN:  What's the Bates number on the audio,

17      Mo?

18           MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Give me

19      one second.

20           MR. BRUSTIN:  That's probably right, I don't -- yeah,

21      that's probably right.

22           MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  It might

23      take me an extra second to find it.  I could just send it

24      (inaudible).

25           MR. BRUSTIN:  Yeah.  Why don't you just do that, just



1   send it.

2       THE VIDEOGRAPHER:  Question -- question from the

3   videographer.  Should we go off the record for a minute to

4   take care details, or --?

5       MR. BRUSTIN:  I think we're okay.  Do you mind,

6   James?  Should we keep going or do you want to wait?

7       MR. BLENK:  Well, I don't know if I'm going to have

8   the same -- I guess, if I could -- as long as I could hear

9   it, I guess I could follow along for now.  But I want to

10  make sure that it's the same -- ultimately, it's the same

11  audio recording that was -- that has been reproduced and

12  not a version that's shorter or longer or whatever.

13      MR. BRUSTIN:  Well, you're going to -- you can do

14  that afterwards, but we're going to send it to you.

15  You're not going to listen to it at the same time, there's

16  no way you could do that.

17      MR. BLENK:  No, I mean -- yeah, but  want to be able

18  to hear it -- (crosstalk) --

19      MR. BRUSTIN:  Yeah.

20      MR. BLENK:  -- through the way you're present it to

21  him; right?

22      MR. BRUSTIN:  Yes.

23      MR. BLENK:  Yeah, Okay.

24      MR. BRUSTIN:  Okay.  So -- so, let's start -- let's

25  start from the beginning on Page 2, if you could, Mo, and



1  just -- I'll tell you when to stop.

2       MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Okay.

3  One second.

4       MR. BRUSTIN:  And you don't have to write down this

5  (indicating).

6       THE COURT REPORTER:  (Complies.)

7       (Whereupon, Plaintiff's Exhibit No. 24 audio was

8  played.)

9       MR. BRUSTIN:  Can you stop for a minute, please?  Can

10  someone turn off -- why are we getting the background

11  feedback?

12       (Whereupon, Plaintiff's Exhibit No. 24 audio

13  recording was paused.)

14       THE VIDEOGRAPHER:  Good question.  I don't know if

15  it's coming through from their end or our end.  Is

16  computer muted all the way around?

17       MR. BRUSTIN:  It's not coming for me.

18       THE VIDEOGRAPHER:  Okay.  I suspect if there are two

19  computers -- (crosstalk) --

20       MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  I fixed

21  it.

22       MR. BRUSTIN:  You fixed it?  Okay.  Thank you.  Let's

23  try it again, right from the beginning.

24       (Whereupon, Plaintiff's Exhibit No. 24 audio

25  recording was played, again, from the beginning.)



```
 1   BY MR. BRUSTIN:
 2       Q    Go to Page 3 (indicating).  Look at the page, at the
 3   same time.
 4           MR. BRUSTIN:  Let me stop it there.  Can you give us
 5       the time?  Mo?  Can you give us the time?
 6           MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yes, time
 7       is 535 [00hrs:5mins:35secs].
 8           MR. BRUSTIN:  Okay.  So --
 9           MR. RUSS:  So, did you -- so, did you play from first
10       second to 535?
11           MR. BRUSTIN:  We did.
12           MR. RUSS:  Okay.  Thank you.
13   BY MR. BRUSTIN:
14       Q    Okay.  Ms. Adams, you recognize that as a
15   conversation had in March -- (crosstalk) --
16       A    I couldn't even you hear.
17       Q    We're going to -- well, we're going to follow along
18   exactly with the words in the transcript.  You heard them and
19   you recognize that from the men that came to your house that
20   night; right?
21           MR. BLENK:  Form. (Crosstalk.)
22           THE WITNESS:  If you say so.  I can't hear it.  It
23       sounds --(crosstalk)--
24   BY MR. BRUSTIN:
25       Q    Do you -- (crosstalk) --?
```



1        A    -- distorted to me.  I know somebody came to my house

2   to talk to me with his parents, so.

3        Q    Okay.  Okay.  And you just heard your voice on the

4   tape; correct?

5        A    If you say so.

6        Q    Do -- do you dispute that that was your voice?

7        A    I -- I can't hear it to dispute it.

8        Q    Okay.  Well, let's -- let's -- there's some better

9   parts.  We're going to make it as loud as we possible can.

10  We'll try it a couple of different ways, if we have to.  But

11  what I want to do, so you can make sure that you're following

12  this, I want you to follow the transcript.  So, what we did --

13  what we did is that we had a court reporter -- (crosstalk) --

14       A    If I can't hear -- (crosstalk) --

15       Q    (Crosstalk.)  Let -- let me finish.

16       A    -- (crosstalk) I can't follow here.

17       Q    Let me finish, sir.  What I what you to do is I want

18  you to listen and I want you try to follow with the transcript,

19  if you can -- the best you can; okay? So let's start with that.

20  Let's go to -- first of all, do you remember, in fact, that a

21  man and a woman came to your house; correct?

22       A    Correct.

23       Q    And you -- and you understood it to be Valentino

24  Dixon's parents; correct?

25       A    Correct.



1    Q    And you her their voices on the tape; correct?

2    A    I don't know if the voice --

3         MR. BLENK:  Form.

4         THE WITNESS:  -- (crosstalk) -- I keep telling you.

5    I don't know.  I can't hear that audio.

6  BY MR. BRUSTIN:

7    Q    All right.  But you certainly know that you lived at

8  65 Hastings; correct?

9    A    Yes.

10   Q    And you do remember opening the door -- (crosstalk)

11 --

12   A    Yes.

13   Q    -- and speaking to them?  And so far you weren't able

14 to recognize your voice; is that what you're saying?

15   A    Yes.

16   Q    Okay.  So, now what I want you to do [sic], is I want

17 to play --

18        MR. BRUSTIN:  So, Mo, I want you to play -- I want

19    you to play -- let me see if this is -- we'll try this one

20    more time.  Let's play this, again.  Is this as loud as it

21    will go?

22        THE VIDEOGRAPHER:  Yes.

23        MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, it

24    is.

25        MR. BRUSTIN:  Okay.  So, I want to -- let's play it,



 1          again, right from where we left off.  And tell us what we

 2          are starting, again?

 3                MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Were

 4          starting at 535 [00hrs:5mins:35secs].

 5     BY MR. BRUSTIN:

 6          Q    Okay.  And I want you to -- I want you to follow

 7     along, starting at Line 15; do you see that on your page?  Page

 8     3, Line 15.

 9          A    Okay.

10          Q    Okay.  And I want you to following along as you're

11     listening; okay?  This is -- this is you talking on the tape.

12                MR. BLENK:  Form.

13                MR. BRUSTIN:  Okay.  Go ahead.

14                MR. RUSS:  Objection to form.

15                (Whereupon, (Whereupon, Plaintiff's Exhibit No. 24

16          audio recording was played from 535 [00hrs:5mins:35secs].)

17                MR. BRUSTIN:  Can -- can you go -- can you go back a

18          little further?  Go back a little further, Mo, to line --

19          to Line 11.

20                THE WITNESS:  I was never on bail.

21     BY MR. BRUSTIN:

22          Q    Okay.  Go back.  You know what, let's -- let's come

23     back to this.  Let's go to Page 4 (indicating).  And I want you

24     to look at -- I want you to look at Line 9; okay?

25                MR. BRUSTIN:  And I want you to play, Mo, from 621 to



1        631.

2    BY MR. BRUSTIN:

3        Q    Look on line on Page 4 (indicating).

4        A    I'm here.

5             (Whereupon, Plaintiff's Exhibit No. 24 audio

6        recording was played from  621 to 631

7        [00hrs:06mins:21secs] to [00hrs:06mins:31secs].)

8    BY MR. BRUSTIN:

9        Q    Look at the page (indicating). Okay.  Do you

10   recognize your voice there?

11       A    Yeah.

12       Q    Okay.  And that's -- you heard yourself say, "they

13   locked me up threw -- no, they did not let me go home.  They

14   locked me up threw me out that night"?

15       A    They didn't let me go home.

16            MR. RUSS:  Objection to form.

17   BY MR. BRUSTIN:

18       Q    That's what you said to him on the tape?

19       A    Yeah.  I had to stay there until, like, six in the

20   morning.  It was like -- (crosstalk) --

21       Q    I'm going to get into the specifics.  Right now, I'm

22   just trying to confirm that's what you said to Mr. Bryant on

23   tape.  That's all I'm doing right now.

24       A    Okay.

25       Q    We're going to take it one step at a time, okay?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              24

1       A    (Indicating.)

2       Q    But you did say those words to him; correct?

3       A    That they didn't let me out?

4       Q    Yes?

5       A    Yes.

6       Q    Okay.  So, now, what I want to do -- that's all I'm

7   doing right now is confirming they're your words.  Let's go to

8   Page 12 (indicating).  And I want to play -- I want you to

9   start looking from Line 14 on Page 12, where it says, "it

10  seemed" (reading); do you see that?

11      A    (Indicating.)

12          MR. BRUSTIN:  Okay.  And I want to -- Mo, I want you

13      to start playing 1513 to 1522.

14  BY MR. BRUSTIN:

15      Q    And just read it and listen (indicating).

16          (Whereupon, Plaintiff's Exhibit No. 24 audio

17      recording was played from [00hrs:15mins:13secs] to

18      [00hrs:15mins:22secs].)

19  BY MR. BRUSTIN:

20      Q    Okay.  So you heard yourself on the tape; right?

21      A    Yeah, but I'm not sure.

22      Q    Okay.  But -- just -- I'm going to get to all of

23  that.  I just want to ask you what you said on the tape.

24      A    (Indicating.)

25      Q    So you -- you heard yourself on the tape; right?



1      A    If that's me; yes.

2      Q    Okay.  And you saw that -- and you're looking at

3   transcription on Page 12, Lines 13 to Page 14 -- page --

4   line -- I'm sorry.  Page 12, Line 13 to Page 13, Line 3.  And

5   that accurately -- it accurately -- the words are the words

6   that you spoke on the tape on these pages; correct?

7      A    Not -- no, because I've never been on bail.

8      Q    I'm asking you right about just the sections that

9   you've just heard?

10     A    Right, but if that's the same thing -- (crosstalk) --

11     Q    So I'm going to -- (crosstalk) --

12     A    -- (crosstalk) how am I going to say that's me --

13   (crosstalk)--

14     Q    -- (crosstalk) here's what I'm going to do --

15   (crosstalk)--

16     A    -- (crosstalk) saying what I'm saying.  And I've --

17   I've never been on bail.

18     Q    Okay?

19     A    I'm never had a charge in Michigan.

20     Q    Okay.  So, I'm just asking you to confirm -- so,

21   they're going to come in and testify that they made this tape.

22     A    That's fine.

23     Q    Okay.  Are you -- are you denying that this is --

24   this you on the tape?

25     A    I didn't know they had a tape -- (crosstalk) --



1      Q    I -- I know you don't.

2      A    -- (crosstalk) for me to be on.  So, I can -- I'm

3  going to deny that I was on tape.  Yes, because I didn't know I

4  was on tape, until you playing it right here, right now.

5      Q    Sir, I'm going to -- we're going to go step at a

6  time.  Are you denying that was you speaking on the tape?

7      A    It could have been.  But I don't -- I've never been

8  on bail.  So, if I said that I was on bail, then that's not me.

9      Q    Okay.  Is it possible you said you were bail and you

10  weren't telling them the truth?

11      A    No.  Why would I say that I was on bail.

12      Q    All right.  But you do remember the conversation;

13  they came to your house?

14      A    Somewhat.

15      Q    Okay.  I want to play the same section I just played

16  you, again.

17      A    (Indicating.)

18      Q    And I want you to read -- I want you to read along

19  with it.  And I want you to tell me if this transcription, on

20  Pages 12 and 13, accurately documents the words that you spoke;

21  okay?

22      A    (Indicating.)

23           MR. BRUSTIN:  Okay.  Play it again, Mo.

24           MR. BLENK:  What's the timestamps?  (Crosstalk.)

25           MR. RUSS:  (Inaudible).



1          MR. BRUSTIN:  The timestamps are 1513 --

2          (Whereupon, audio began to play.)

3          MR. BRUSTIN:  Stop, stop it, please.  Sorry.  So we

4       are, now, going to play, again, 1513 to 1552.  While

5       Mr. ADAMS is reading, finds 13 on Page 12 to Lines 3 on

6       Page 13; okay?  Go ahead, Mo.  Thanks.

7          (Whereupon, Plaintiff's Exhibit No. 24 audio

8       recording was played, again, from [00hrs:15mins:13secs] to

9       [00hrs:15mins:22secs].)

10   BY MR. BRUSTIN:

11      Q    Okay.  So, you hear yourself on the tape and you

12   spoke those words; correct?

13      A    I don't know.

14          MR. RUSS:  Objection to form.

15   BY MR. BRUSTIN:

16      Q    The words that are transcribed here, are the words

17   that you spoke on the tape; correct?

18          MR. RUSS:  Objection form.

19          THE WITNESS:  I don't know about that.

20   BY MR. BRUSTIN:

21      Q    Let's do it the -- did you hear yourself saying --

22   did you hear yourself saying on the tape,(reading), "It seemed,

23   you know what I'm saying, Tino would have did it."  Did you

24   hear yourself say that?

25      A    I heard the tape say that.



1    Q    Okay.  So, you don't believe that's you on the tape?

2    A    It -- no, because I've never been on bail.  That's

3  where it's like a lot of things being said on there that had

4  nothing to do with me.

5    Q    Okay.  So, I -- I just want to make sure that you're

6  telling me, under oath, that's not you speaking?

7    A    I'm not telling you anything.  But I don't know if

8  that's me, because that audio I can't really hear.  I hear some

9  pieces.  But I've never been on bail.  So, right there, I'm

10  going to tell you that's not me.

11    Q    All right.  Let's go back to that, because you seem

12  caught up with that.

13    A    You want me to admit to some tape that somebody said

14  they was on bail.  I haven't been on bail.  Then, you said,

15  "they locked me up."  They didn't lock me up.  They kept me

16  down there for questioning.

17    Q    Right.  And that's what you said.

18    A    You said they locked me up and threw away the key.

19    Q    This is -- sir, I'm going to have three people come

20  into to court and swear that this is you on the tape.

21    A    You can have ten.  They've never -- Buffalo police

22  never locked me up and threw away the key.  I've never been on

23  bail -- (crosstalk) --

24    Q    Are you -- (crosstalk) --

25    A    -- in Michigan.



 1      Q    -- (crosstalk) are you denying that was -- that's you

 2   speaking on the tape, under oath, here today?

 3           MR. RUSS:  Objection form.  You can answer.

 4           THE WITNESS:  Listen -- I don't know if that's me on

 5      the tape.

 6   BY MR. BRUSTIN:

 7      Q    Okay.  Keep going.  So let's take a look at -- let's

 8   look at Page 16.  Now you were -- you had been arrested in

 9   Michigan; correct?

10      A    For?

11      Q    Had you been arrested in Michigan anytime in between

12   1990 and 1993?

13      A    No.

14      Q    You're sure about that?

15      A    100 percent positive.

16      Q    Okay.  You weren't -- you weren't in illegal trouble

17   in trouble Michigan -- (crosstalk) --

18      A    (Crosstalk.) Never day of my life.

19      Q    -- (crosstalk) in 1991?

20      A    Never a day in my life.

21      Q    All right.  Now, take a look at Page 16.  Were you

22   living in Michigan at the time?

23      A    I was living in Michigan, yes; Saginaw, Michigan.

24      Q    But no legal trouble Michigan -- (crosstalk) --

25      A    No -- (crosstalk) --



1      Q    -- (crosstalk) in your entire life?

2      A    -- (crosstalk) never.  Never seen the courtroom, any

3    altercations with any police.

4      Q    Let's take a look at Page 16.  Sorry.  Page 13.

5           THE VIDEOGRAPHER:  And one note from the

6      Videographer, we may be able to try something to try to

7      get the sound a little clearer.  Although, the main

8      problem is the recording.  If you wanted to try that, I

9      would have to go off the record and take two to five

10     minutes.

11          MR. BRUSTIN:  All right.  Well, let's take a -- let's

12     take a minute to try that.

13          THE VIDEOGRAPHER:  Okay.  We're going off the record

14     at 11:35 a.m.

15          (Whereupon, a brief break was taken at 11:35 a.m.)

16          THE VIDEOGRAPHER:  We're going back on the record at

17     11:40 a.m.

18          (Whereupon, the deposition resumed at 11:40 a.m.)

19   BY MR. BRUSTIN:  (Resumed.)

20     Q    So I want you -- I want you to look at Page 13

21   (indicating) --

22     A    (Indicating)

23     Q    -- Line 8; okay?  And I'm going to play you some more

24   statements that you made on the tape; okay?  And I want you to

25   follow along and tell me if you recognize it.



 1              MR. BRUSTIN:  And I want to play from 1604, Mo, to

 2       1734.

 3              (Whereupon, Plaintiff's Exhibit No. 24 audio

 4       recording was played from 1604 to  1734

 5       [00hrs:16mins:04secs] to [00hrs:07mins:34secs].)

 6              THE WITNESS:  No, absolutely not.

 7   BY MR. BRUSTIN:

 8       Q    Okay.  Were you living in Saginaw, Michigan at the

 9   time?

10       A    Yes.

11       Q    Okay?

12       A    I have never been on bail.

13       Q    Okay.  And whether you were on bail or not, you're

14   sure you didn't tell them that you were on bail on the tape,

15   when you -- (crosstalk) --

16       A    Why would I tell them I'm on bail, if I'm not on

17   bail.

18       Q    First of all, you heard your voice on the tape.  You

19   hear yourself talking; right?

20       A    No.

21       Q    That wasn't you?

22       A    I don't know if that's me or not.  That's -- that --

23   that don't sound like me.

24       Q    You didn't recognize your voice there?

25       A    It does not sound like me.



1    Q    Okay?

2    A    I do remember a conversation with his mother  and

3    father and some guy.

4    Q    Okay?

5    A    But -- (crosstalk) --

6    Q    So -- (crosstalk) --

7    A    -- I can't tell you that's me.

8    Q    Okay.  So, the words that -- the words that you just

9    heard, from 1604 to 1734 -- (crosstalk) --

10    A    So me and you talking right now, do that sound like

11    me; right now?

12    Q    Please, stop.  -- when you were a much younger man.

13    Let me.  But look, let me -- I -- I want to make sure I

14    understand your testimony, under oath.  Are you saying that you

15    did not provide any of the information you just heard to them?

16         MR. BLENK:  Form.

17         THE WITNESS:  Provide any information?

18    BY MR. BRUSTIN:

19    Q    Are you telling me that you did not say the words

20    that wee just heard on the tape to them?

21    A    I've never been on bail, no.  So, no, I wouldn't have

22    said I was on bail.

23    Q    So putting aside the bail issue, did you say any of

24    the other things about being shown three pictures?

25    A    I was shown pictures, yes.



1      Q    Do you remember telling them that you were shown

2  three, just like it says on Page 13?

3      A    I don't know if it was just three pictures, but I

4  remember pictures being shown.

5      Q    All right.  Well, let's take a look -- let's take a

6  look at -- you tell me what you do remember saying to them;

7  let's do it that way.  So, let's go to the transcript.  First

8  of all, you -- you -- you were able to follow the transcript

9  along with the audio; right?

10          MR. BLENK:  Form.

11          THE WITNESS:  Somewhat, yeah.

12  BY MR. BRUSTIN:

13      Q    Okay.  So, now, I want you to go to the top of

14  page -- to Page 13, Line 12; okay? Actually, let's start on the

15  starting Line 4.  This is -- this is -- this is the person they

16  are claiming as you on tape at Line 4; okay?  Are you there?

17          (Atty. Brustin read from Plaintiff's Exhibit No. 23.)

18      "And I thought if just said," and then there is an

19  "(inaudible)" part.  "I'm not really sure, he said if I just

20  show you a picture.  You know, if he's in or not.  They brought

21  me three pictures."  The question is: "So?"  And the answer is:

22  "I saw the three pictures first and they showed me Mario, Tino

23  and somebody else.  And they said were they there?"

24          So, first of all, did you say that to Valentino

25  Dixon's father, when he came to your house?



 1      A    I could have, because they did ask me about some
 2  pictures --
 3      Q    Okay.  And so you -- (crosstalk) --
 4      A    -- and how -- and how I was able to --
 5      Q    Okay?
 6      A    -- point them out.
 7      Q    And by the way, when -- when Valentino Dixon's father
 8  came to your house --
 9      A    (Indicating.)
10      Q    -- with his wife --
11      A    (Indicating.)
12      Q    -- you attempted to tell them the truth the best that
13  you could; correct?
14          MR. BLENK:  Form.
15          THE WITNESS:  I told them everything that they asked
16      me.
17  BY MR. BRUSTIN:
18      Q    You didn't lie to them, did you?
19      A    No.
20      Q    Okay.  And so, one of the things you said, you tell
21  me if I'm wrong, is that you saw three pictures:  Mario, Tino,
22  and somebody else; right?
23      A    Yeah, but it wasn't only three pictures.  It was
24  pictures and they were in the pictures, yes.
25      Q    Okay.  And -- well, you said that they showed you



1  Mario's picture --

2      A    Yes --

3      Q    -- and Tino's picture and one other picture?

4      A    -- because it was in, like. groups of people these --

5  the pictures they showed me.  So, Mario was in the picture and

6  Valentino was in picture.

7      Q    Okay.  And you recognized both of them?

8      A    Yes.

9      Q    And they asked you if they were there; correct?

10     A    Yeah.

11     Q    Okay.  And now, let's go back to Page 12

12 (indicating).  And you've already told me you don't ever

13 remember saying anything about bail; I got that.  I want to ask

14 you something else though.

15     A    I'm never been on bail.

16     Q    I -- I understand.  I understand.

17     A    Pull my record up.

18     Q    I understand.

19     A    I don't have legal issues.

20     Q    I understand.  Take a look at page -- well, let's go

21 back to -- let's start with Page 4, again.  Let's go back to

22 Page 4 and I want you to look at Lines 9 to 11.

23     (Atty. Brustin read from Plaintiff's Exhibit No 23.)

24     (Reading) "So, when you went down to the police station,

25 they kept you, they didn't let you come back home?  Answer: No,



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              36

1  they did not let me come home."

2      A    (Indicating.)

3      Q    And that's true, you did tell them that; correct?

4      A    Yeah.  They kept everybody down there.

5      Q    Right.  But that -- that is in fact true, that's what

6  happened; right?

7      A    Yeah.

8      Q    And that's what you told them happened.  Once you got

9  to the precinct, you were -- you were placed by yourself until

10  you met with the police; correct?

11     A    No.  We were sitting in the hallway.

12     Q    Okay.  Who were you with?

13     A    Who?  A bunch of people that was there as witnesses.

14  I don't remember their names it was, like, a bunch of people in

15  the little hallway and they called us in individually.

16     Q    Okay.  And then, but once they brought you to the

17  station after the shooting, you weren't allowed to go home

18  until they were done with you; correct?

19         MR. BLENK:  Form.

20         THE WITNESS:  Yeah, to my knowledge.  Yeah

21  BY MR. BRUSTIN:

22     Q    Okay.  So, this accurately describes what happened on

23  page -- on 9 to 12; that's really what happened?

24     A    Yeah.  They wouldn't --

25     Q    So let's look at Line 14 --



1      A    -- they would let me go home.

2      Q    -- look at Lines 14 to 15 -- 14 to 17?

3      A    (Indicating.)

4      Q    (Reading continued.) "Okay. Okay, so then you went

5    back to Michigan?  And then you didn't come back --  Answer:

6    "They kept flying me back.  And I think I flew back here about

7    three times."  Did you tell them that?

8      A    (Indicating.)

9      Q    Because you did fly back three times; right?

10     A    (Indicating.)

11     Q    Yes?

12     A    Yes.

13     Q    Okay.  That's -- that's -- that's you telling them on

14   the tape; correct?

15     A    It could be.

16     Q    All right.  Now, I want you to look --

17     A    But if this audio is the same audio that say I had

18   bail and I had legal issues in Michigan; then, no.

19     Q    You don't remember ever telling them anything about

20   bail, because you didn't have -- (crosstalk)?

21     A    I didn't have bail.  I don't have legal issues

22   anywhere in any State.

23     Q    Okay.  Fine and I accept that.

24     A    Any.

25     Q    Fair enough.  Now, let's take a look at -- let's take



1    a look at Page 12.  Now, I want you to look at Line 14; okay?

2        A    (Indicating.)

3        Q    And you heard the tape I just played, where it said

4    (reading continued) "It seemed -- it seemed, you know what I'm

5    saying, Tino would have did it, but no, what I'm saying in

6    front the police lieutenant was I can't really just point the

7    finger, you know what I mean?  I can't do that.  I don't want

8    to lock an innocent man, you know what I'm saying.  Question:

9    "Yeah.  It's not about being scare or nothing like that.  It

10   just don't seem, you know what I'm saying, right.  And if

11   Jackson say he did it, you know what I'm saying, it would be

12   wrong to say he's not.  That's the beginning a heavy set guy

13   with a hat and I kind of saw the guy.  And so I never said who

14   it were, because I wasn't really sure."  Do remember hearing

15   yourself saying that?

16       A    No.

17       Q    Okay?

18            MR. BLENK:  Form.

19            MR. RUSS:  Objection to form.

20            MR. BRUSTIN:  You just heard it on the tape, you say

21       that; right?

22       A    I guess -- (crosstalk) --

23            MR. BLENK:  Form.

24            MR. RUSS:  Objection to form.

25            THE WITNESS:  -- if that's what you say.



 1   BY MR. BRUSTIN:

 2        Q    Is it your testimony that you never said that to Mr.

 3   Adams [sic]?

 4        A    I've never said --

 5        Q    I mean -- I'm sorry.  Let me finish that.  I withdraw

 6   the question.  Is it your testimony that you never said that to

 7   Valentino Dixon's father?

 8        A    Yes.

 9        Q    You never said those words.

10        A    Nah, no.

11        Q    You never said you weren't sure?

12        A    That -- that Tino wasn't the person that shot him.

13        Q    That you weren't sure if he was the person?

14        A    No.

15        Q    You never said that?

16        A    No.

17        Q    Because you were always sure?

18        A    That Tino shot him, yes.

19        Q    Okay.  Now, just to be clear, your recollection is

20   that you were doing your best, when you spoke to Valentino

21   Dixon's parents at your house that night to tell them what you

22   truthfully recalled; correct?

23             MR. BLENK:  Form.

24             MR. RUSS:  Object to the form.

25             THE WITNESS:  Yeah.



1   BY MR. BRUSTIN:

2        Q    You weren't afraid of them?

3        A    I'm not afraid of anybody.

4        Q    You -- including them?

5        A    Yeah.

6        Q    They never threatened you?

7        A    No.  I mean, they threatened people, you know, in the

8   neighborhood, you know, Travis and a couple of other people.

9   But they never threatened me.

10       Q    Who -- who -- who threatened -- who threatened

11  Travis?

12       A    I'm not sure.  It's been 30 years ago.  I don't

13  remember who it was.  But who ever was around, you know,

14  running around with Tino and, you know, and that -- those

15  people, I don't -- you know what I mean?  I don't know to tell

16  you, specifically, this person of that person.  But I know

17  Travis was having issues with someone connected to him.  But

18  that never happened to me.

19       Q    All right.  But you certainly were not threatened at

20  all by Valentino Dixon's parents, when his mom and dad came to

21  your house; correct?  You didn't feel threatened?

22       A    I wasn't threatened --

23            MR. BLENK:  Form.

24            THE WITNESS:  -- but for them to be at my house that

25       was kind of alarming.



1    BY MR. BRUSTIN:

2        Q    Well, but they didn't threaten you in any way;

3    correct?

4        A    They don't have to.

5        Q    And you were not afraid of them in any way; correct?

6        A    I'm not afraid of anybody, but --

7        Q    Okay?

8        A    -- even if you're not afraid, that doesn't mean that

9    the situation isn't alarming to you.

10       Q    Fair enough.  Nevertheless, you did your best to tell

11   them the truth; correct?

12       A    Yes.

13       Q    All right.  Now, let's take a look at --  let's take

14   a look at -- let's go back to Page 16 -- back to Page 13 in

15   this transcript; okay? this is another part you just heard.  So

16   back to Page 13, Lines 4 through 11; okay?  Well, here you're

17   saying on your own, "they brought me three pictures;" right?

18   Remember hearing that on the tape?

19              MR. BLENK:  Form.

20              THE WITNESS:  I (crosstalk) --

21              MR. RUSS:  Objection to form

22              THE WITNESS:  -- (crosstalk) I don't know.

23   BY MR. BRUSTIN:

24       Q    Do you remember -- (crosstalk) --

25       A    Yeah.



1    Q    -- (crosstalk) -- initially being -- initially being

2  shown three separate pictures.  One of Mario, one of Tino, and

3  one of somebody else?

4    A    About themselves?

5         MR. RUSS:  Objection to form.

6  BY MR. BLENK:

7    Q    Yes, by the police?

8    A    No.  I mean, just those people -- (crosstalk)

9    Q    Yes?

10   A    -- (crosstalk) in the picture?

11   Q    Yes?

12   A    No.

13   Q    You don't ever remember being shown three pictures?

14   A    I remember being shown groups of pictures of people.

15   Q    How many groups of pictures of people were you shown?

16   A    That was years ago.  I don't know, but I had to pick

17  the guy out at the pictures.  It wasn't just his picture, his

18  picture, and his picture.

19   Q    All right?

20   A    It was pictures.

21   Q    All right.  But you remember two of the pictures you

22  saw, one was of -- one was of -- you remember -- you remember

23  one of the pictures was of Mario and one was a Valentino Dixon?

24   A    (Indicating.)

25   Q    Yes?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              43

1       A    Yes.

2       Q    And do you recognized them both and you told them

3   that?

4       A    Yes.

5       Q    Person that you also recognized?

6       A    No.

7       Q    Okay?

8       A    I don't remember if I recognized the other guy.

9       Q    The only two people who do you recognized in the

10  pictures that you saw were Mario and Valentino?

11      A    (Indicating.)

12      Q    Yes?

13      A    Yes.  I knew Mario, so I automatically recognized

14  him.  And I knew of Tino.  I don't know Tino, but I knew of

15  Tino.

16      Q    Okay.  Everybody.  Everybody knew Valentino Dixon at

17  that time; right?  They knew he was?

18      A    I couldn't tell you.

19           MR. RUSS:  Objection to form.

20           MR. BLENK:  Form.

21  BY MR. BRUSTIN:

22      Q    All right?

23      A    I didn't know him.

24      Q    Okay.  Well, I'm going to tell you a testimony about

25  that in just a minute.  But is it your testimony today that you



1  have never seen Valentino Dixon before?

2      A    In the neighborhood -- (crosstalk)

3           MR. BLENK:  Form.

4           THE WITNESS:  -- (crosstalk) maybe.  Buffalo is not a

5      big place, so, you know, I may have saw him in the city.

6      But to say that I know him --

7  BY MR. BRUSTIN:

8      Q    Okay?

9      A    -- and that he knows me.  We don't know each other.

10     Q    That's fair. all right.  Let's -- let's go to -- so,

11 is it your testimony -- we'll go back to Page 12.  Is it your

12 testimony that you didn't say any of the words, on page 12, to

13 Mr. Bryant?

14          MR. BLENK:  Form.

15          THE WITNESS:  Any of these words?

16 BY MR. BRUSTIN:

17     Q    Yeah.  Well, let me go specifically.  Is it your

18 testimony that you didn't say to him (reading continued), "It

19 seemed, you know what I'm saying, Tino would have did it, but

20 know, what I'm saying in front of the police you lieutenant was

21 I can't really just point the finger, you know what, I mean?"

22 Is it your testimony that you never said those words to

23 Mr. Bryant?

24     A    No.

25          MR. RUSS:  Objection to form.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                                45

1  BY MR. BRUSTIN:

2      Q    (Crosstalk.) You didn't -- (crosstalk) --

3      A    I don't believe I did, no.

4      Q    And is it your testimony that you never said the

5  words (reading) "I can't do that.  I don't want to lock an

6  innocent man, you know what I'm saying."

7           MR. RUSS:  Objection to form.

8           THE WITNESS:  No.

9  BY MR. BRUSTIN:

10     Q    You never said that to him?

11     A    Not to my knowledge, no.

12     Q    Even though you heard is on the tape?

13     A    (Indicating.)

14          MR. RUSS:  Objection to form.

15          THE WITNESS:  I still can't -- I don't believe that's

16     me on that tape.

17  BY MR. BRUSTIN:

18     Q    And when you said, (reading), "And it is Jackson's

19  say he did it, you know what I'm saying, it would be wrong to

20  say he's not."  Did you say those words to him on that tape?

21     A    I don't remember.

22          MR. RUSS:  Objection to form.

23  BY MR. BRUSTIN:

24     Q    Is it possible you said those words to him, when he

25  came to see you that night?



1      A    I don't know.

2           MR. RUSS:  Objection to form.

3           THE WITNESS:  I doubt it, but, you know, anything is

4      possible.  But I don't recall saying that.

5  BY MR. BRUSTIN:

6      Q    And you heard on the tape it said that's at the

7  beginning, a heavyset guy with the hat and I kind of saw, and I

8  kind of saw.  Did you hear that on the tape?

9           MR. RUSS:  Objection to form.

10          THE WITNESS:  (Inaudible from crosstalk.)

11  BY MR. BRUSTIN:

12     Q    Did you say that to him?

13     A    I don't remember.

14     Q    You may have, you just can't remember today?

15     A    That was 30 years ago, man.

16     Q    And Dennis says (reading), "I never said who it was

17  because I wasn't really sure."  Did you hear yourself say that

18  on the tape?

19     A    (Inaudible from crosstalk.)

20          MR. RUSS:  Objection to form.

21          MR. BRUSTIN:  Form.

22  BY MR. BRUSTIN:

23     Q    You didn't hear that, and we just played it?

24     A    I keep telling you, I don't believe that's myself.

25     Q    Okay?



1        A    A lot of things being said on that tape have zero to

2   with at me.

3        Q    Okay.  But the thing we know for sure is that you do

4   remember a conversation that when mister -- when Valentino

5   Dixon's parents, both, came to your house that night --

6   (crosstalk) --

7        A    I remember they came.  I can't remember every detail

8   or a conversation for 30 years ago.

9        Q    Okay.  But they only came one time; right?

10       A    Yeah, but still it's not going to make me remember --

11   (crosstalk) --

12       Q    I understand.

13       A    Can you remember a conversation you had with one

14   person 30 years ago?

15       Q    Of course not.

16       A    Okay.  So why -- what are you -- what are we -- why

17   do you keep trying to make me say that, yeah, I said that.

18   Yeah, that's me in the tape.  Like, I keep telling you, you

19   look at my record, I don't have a bail.  I've never had bail.

20            I've never had legal issues in any state in the

21   United States of America.  So, if someone is saying that I have

22   bail issues or legal issues and this is why I'm doing this or

23   whatever it is.  Okay, right there, that's not me.  I don't

24   have those issues.  Never had.

25       Q    Okay?



1      A    But you keep trying to lock me down to make me say,

2   yes.  And is not going to happen, because I never had these

3   issues.

4      Q    That's fair.

5      A    And you want me to remember specific things about

6   this conversation.  I can't.  I know the lady and the man came

7   to my house with another guy.  What was said, I can't remember

8   all that.

9      Q    Okay.  But you do remember that they came to your

10  house and it was 65 Hastings; right?

11     A    Yeah.

12     Q    And they -- you -- you invited them in?

13     A    Yeah.

14     Q    And you spoke to them in your house for more than a

15  few minutes?

16     A    Yeah.

17     Q    And it may well have been at night?

18     A    I don't remember time of day.

19     Q    Okay.  But it was sometime after you had testified at

20  the trials; correct?  It was '93?

21     A    I believe, yeah.

22     Q    And you certainly did know you're being

23  tape-recorded?

24     A    No.

25     Q    But there was only one conversation that you had with



1   Valentino Dixon's parents at your house at 65 Hastings;

2   correct?

3        A    Yeah.

4        Q    And you do remember that they introduce themselves as

5   his parents; they didn't hide that from you?

6        A    No, they didn't hide it.

7        Q    And you remember it was mostly, in fact, it was only

8   Valentino's father, Mr. Bryant, that was asking you questions?

9        A    I don't remember.  Maybe both of them.  I don't

10  remember.

11       Q    But do remember that it was mostly Mr. Bryant that

12  was leading -- leading the interview?

13       A    I don't remember from 30 years ago who was leading.

14  I don't remember that.

15       Q    Okay.

16            MR. BRUSTIN:  Okay.  But if you could just play, Mo,

17       just one more time.  And I want you to go to page -- Page

18       13.  I'm sorry.  Page 12, line 21.  And if you could just

19       play, again, Mo, from 1540 to 1552.

20            (Whereupon, Plaintiff's Exhibit No. 24 audio

21       recording was played from 1540 to 1552

22       [00hrs:15mins:40secs] to [00hrs:15mins:52secs].)

23  BY MR. BRUSTIN:

24       Q    You hear -- you hear on the tape it said, "Never said

25  who it was, because I wasn't really sure."  Did you hear that?



1      A    (Indicating.)

2           MR. RUSS:  I -- I object to the form.  First of all,

3      is the third time you done this.  And I object to the form

4      of the specific question.

5  BY MR. BRUSTIN:

6      Q    Did you hear the person on the tape saying that

7  (reading),"And so, I never said who it was, because I wasn't

8  really sure"?

9      A    Did I hear them say that?

10          MR. RUSS:  Objection to form.

11  BY MR. BRUSTIN:

12     Q    Do you remember hearing on the tape somebody say

13  that?

14     A    Yeah.

15     Q    And you deny that was you?

16     A    Yeah, because I was sure about who did it.

17     Q    So you deny that was you on the tape saying

18  (reading), "So I never said who it was, because I wasn't really

19  sure."  You deny under oath, today?

20     A    That was -- that it was me on that tape?

21     Q    Yes?

22     A    I very seriously doubt it.  Because I don't have any

23  of these issues that they're saying that I have.

24     Q    Okay.  So, now, I want to go to Page 19, Line 13.

25  Approximately line 13; okay?



1              MR. BRUSTIN:  And I want you to play, Mo, from 2256

2       to 2308.

3              (Whereupon, Plaintiff's Exhibit No. 24 audio

4       recording was played from 2256 to 2308

5       [00hrs:22mins:56secs] to [00hrs:23mins:08secs].)

6   BY MR. BRUSTIN:

7       Q    Was that your voice on the tape?

8       A    I couldn't even hear that.

9       Q    Okay.

10             MR. BRUSTIN:  You can keep playing.  Let's play --

11      hold on just a second, Mo.

12             MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, got

13      it.

14  BY MR. BRUSTIN:

15      Q    Okay.  So now let's look at Page 8, Line 17.  Let me

16  know when you are there.

17      A    I'm there.

18      Q    Okay.

19             MR. BRUSTIN:  And then, if you could play, Mo, 1057

20      to 1135.

21             (Whereupon, Plaintiff's Exhibit No. 24 audio

22      recording was played from 1057 to 1135

23      [00hrs:10mins:57secs] to [00hrs:11mins:35secs].)

24  BY MR. BRUSTIN:

25      Q    Did you -- did you say those things, Mr. Adams?



1    A    Nah.  I don't have any legal issues, no, sir.

2    Q    So that wasn't your voice on the tape?

3    A    No.

4    Q    It must have been somebody else?

5    A    It could've been.

6    Q    Okay?

7    A    It wouldn't be me saying that, because I don't have

8  those types of issues.  No one scared me, put pressure, or

9  whatever.

10   Q    So no -- no police officer, no DA --

11   A    No.

12   Q    -- ever put any pressure on you to come testify?

13   A    For what they were saying on that tape, because of

14 something in Michigan?

15   Q    For any reason.  Did they put pressure on you to come

16 and testify, when you didn't want to testify?

17   A    No.

18        MR. BLENK:  Form.

19        THE WITNESS:  No, they didn't pressure me into

20    anything.

21 BY MR. BRUSTIN:

22   Q    Okay.  Nobody tried to scare you to come and testify?

23   A    No.

24   Q    No police officer, no DA?

25   A    No.



1      Q    And you never said that to Mr. Bryant?

2      A    Not to my -- no, I never said that to Mr. Bryant.

3  I've never had a legal issue, so why -- what would I say for

4  that someone put pressure on me about something, legal issues

5  in Michigan to -- to testify in this case here?

6      Q    Okay.  So, now, what I want to do is, I want you to

7  look at the same binder and I want you to go to the first tab,

8  the grand jury tab.  Do you remember testifying in the grand

9  jury, before the trial?

10     A    No.

11     Q    Have you ever --

12     A    I remember testifying (inaudible).

13     Q    -- let me ask you this:  Other than testifying in

14  this case, have you ever testified in any other cases?

15     A    No.

16     Q    Take a look at Page 75.

17          MR. BLENK:  Are you going to mark this?

18          MR. BRUSTIN:  Yeah, I think we -- did we already mark

19     the entire thing?  I guess we haven't.  We can mark this.

20     Let's mark this as 25.  This is Emil Adams's Grand Jury

21     Testimony.  It is Bates stamped [Dixon 1484 to 1623].

22          (Whereupon, Plaintiff's Exhibit No. 25 was marked and

23     identified.)

24          THE WITNESS:  What page am I going to here?

25  BY MR. BRUSTIN:



1      Q    So, it's this first tab.  And I'm using -- and I'm

2    using the page numbers on the top, on the bottom, and the

3    middle.  And I want you to go to Page 75.

4      A    Okay.

5      Q    But before I do, this is the only -- was this the

6    only case where you testified in court?

7      A    (Indicating.)

8      Q    Is this the only case where you ever testified in

9    court?

10     A    Yes.

11     Q    Okay.  Take a look at Page 75.  And you were asked on

12   Line 14.  Read to yourself Line 14 to Line 21 and let me know

13   you're done.?

14     A    (Indicating.)

15     Q    Now, how did you know Torriano?  Do you recognize

16   that as your testimony?

17     A    Tori?

18     Q    First of all, do you recognize that as your testimony

19   and was that truthful testimony?

20     A    Yes.

21     Q    Okay.  First of all, how did you know Tori and Aaron?

22     A    Oh, we grew up in the same neighborhood and went to

23   school together.

24     Q    Were your friends with both?

25     A    (Indicating.)



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                                55

1      Q    Who were you better friends with, if -- if there was

2  one?

3      A    I don't really have a better friend out of them.  I

4  know them, all of the brothers and sisters.  You know, it

5  wasn't -- I just knew them all.

6      Q    What was the last time you spoke to Aaron Jackson?

7      A    A few days ago, actually.

8      Q    Yeah?

9      A    Yeah.

10     Q    What did you guys talk about a few days ago?

11     A    Nothing.  I told him I had to do a deposition.

12     Q    And did you call from your cell phone?

13     A    Yeah.

14     Q    Did you call his cell phone?

15     A    Yeah.

16     Q    How long was that conversation?

17     A    Not long.

18     Q    Do you and Mr. Jackson, also, text one another; is

19  that how you communicate?

20     A    No.

21     Q    You never texted Jackson?

22     A    No.  I actually haven't talked to him in years.  It's

23  been years, since I've talked to him.

24     Q    Okay?

25     A    And then, when this came back out, I reached out to



1   him about, you know, I had to come down here.  And he just

2   said, hey, just go in there and tell the truth.  I said all

3   right.

4       Q    So when this came up, you that we have been trying to

5   get you to come to this deposition for many months; right?

6       A    Yeah.

7       Q    You and I have talked on the phone before, and you've

8   told me that you weren't going to come; right?

9       A    (Indicating.)

10      Q    You said, "I don't care what you do, I'm not coming;"

11  right?

12      A    (Indicating.)

13      Q    Yes?

14      A    Yes.

15      Q    Okay.  And that started many months ago; right?

16      A    Not many months, a couple of months ago.

17      Q    All right.  And when that happened, that's when you

18  first reached out to Aaron Jackson; correct?

19      A    No.

20      Q    Well, you said what this also the happening, you

21  called Mr. Jackson.  When did that happen?

22      A    I just told you, I talked to him yesterday.

23      Q    And you can?

24      A    Before that, is been years.

25      Q    Okay.  So the first time you talked to him was



1  yesterday?

2       A    Yeah, in years.

3       Q    And you call him?

4       A    Yes.

5       Q    Okay.  And what did you say to him and what did he

6  say to you?

7       A    He asked me how the family was doing.  I asked him

8  how his family was doing.  I told him that they have been

9  harassing me, you know, trying to serve the papers.  He said,

10  "yeah, I know, they did the same thing to me."  He just, you

11  know, go in there and tell the truth of whatever.  And I'm

12  like, yeah, I'm praying for you.  Pray for me and we hung up.

13      Q    So if we were to subpoena your phone records?

14      A    (Indicating.)

15      Q    There will be no calls to Aaron Jackson --

16      A    (Indicating.)

17      Q    Let me finish, sir -- there would be no calls to

18  Aaron Jackson, other than yesterday in the last two years?

19      A    You can go back further than that.

20      Q    Okay.  So the only time you ever talk to him was

21  yesterday?

22      A    Yes.

23      Q    No texting him back and forth, no emails?

24      A    No.  I meant, -- I post, said things, you know,

25  commented on pictures on Facebook or Instagram.  But no



1   conversation -- like a picture, you know.

2        Q     Okay?

3        A     Hey, praying for you or whatever.  But no, you know,

4   communication between us in years.

5        Q     And certainly not about this case?

6        A     No, definitely not about -- there's no case.  It was

7   no case to talk about.

8        Q     What else did you say to him yesterday?

9        A     Nothing.

10       Q     Okay.  What else did he say to you?  He tell you

11  anything about his deposition?

12       A     No.

13       Q     Did he tell you that he had -- he had his deposition?

14       A     No.

15       Q     He didn't even say that?

16       A     No.  He said that they were doing the same thing to

17  him, trying to serve papers or something.  But we really didn't

18  touch on the subject of, hey, do this or do; no.

19       Q     What time did you talk to him yesterday?

20       A     Yesterday afternoon.  I don't remember the time.

21       Q     Okay.  Sometime in the afternoon?

22       A     (Indicating.)

23       Q     So very recently.  Just a matter of hours ago?

24       A     Yesterday.

25       Q     And you called him?  You reached out to him?



1     A    Yes.

2     Q    And before that you hadn't called him in two years?

3     A    More than two years.

4     Q    Okay.  All right.  So back to this testimony on Page

5  75.  You said (reading), "I didn't really know no Valentino

6  Dixon.  I just knew him like hi and bye."

7     A    (Indicating).

8     Q    And that's truthful full testimony; right?

9     A    (Indicating.)

10    Q    You knew him from seeing him before on the street;

11 right?

12    A    Yeah --

13    Q    You knew what he looked like --

14    A    -- periodically.

15    Q    -- you knew what he looked like; right?

16    A    (Indicating.)  Didn't know his name.

17    Q    Okay.  But you knew his name Tino.  Everybody called

18 him "Tino"?

19    A    I didn't know him.

20    Q    But you knew him -- you knew him by face and

21 reputation; fair to say?

22    A    He didn't have a reputation.

23    Q    So when you said," I knew him like hi and bye," what

24 did you mean by that?

25    A    Meeting that someone that you would see,



1  periodically, and you recognize that you've seen him before.
2  And that was it, like --
3       Q    You might nod in and say hello?
4       A    Maybe.
5       Q    Okay?
6       A    You know.
7       Q    Do you remember the kind of car that he drove?  Do
8  you remember him driving a fancy car?
9       A    No.
10      Q    And seeing him in a car?
11      A    No.
12      Q    No?
13      A    No.
14      Q    All right.  So, now, let's take a look at --
15      A    When he was driving, I was in Michigan.  So I
16  wouldn't know his cars.
17      Q    -- take a look at the trial, which is the second tab,
18  Page 153.
19           MR. BLENK:  Are you going to mark it?
20           MR. BRUSTIN:  Yeah.  So what are we on now, Mo, 26?
21           MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah.
22      Q    Let's mark this as 26.  This is your testimony from
23  the criminal trial.  It's Bates stamped [Dixon 1 through 690].
24  And the date is June 8th, 1992.
25           (Whereupon, Plaintiff's Exhibit No. 26 was



1    marked and identified.)

2    BY MR. BRUSTIN:

3        Q    Okay.  Let's take a look at 153.  Read it to

4    yourself, Line 11 through Line 25; okay?  Let me know when you

5    are done?

6        A    Okay.

7        Q    And does this refresh your recollection that you also

8    knew him from knowing his brothers grew up by your

9    grandmother's house.

10       A    I didn't know that --

11            MR. RUSS:  Objection to form.

12            THE WITNESS:  -- it was his -- Antwon's brother,

13       until all of this happened.

14   BY MR. BRUSTIN:

15       Q    All right.  But when you said (reading), "I had seen

16   him a few times, but I didn't really know him personally."  Was

17   that truthful?

18       A    I've been saying that a hundred times.

19       Q    Okay.  So, on August 10th of 1991, you knew who

20   Valentino Dixon was by sight, because you has seen it a few

21   times; correct?

22       A    Not like that.  Not like that.  It would be like if I

23   had come to this court in a couple times and she seen me

24   (indicating).  Would she know me?

25       Q    But you said you knew him Hi and Bye; you had seen



 1  him before?

 2      A    I said that we grew up in the same city.  I've seen

 3  him in the city.

 4      Q    And you knew it was.  So you said, "Hi and Bye," what

 5  did you mean by that?

 6      A    Okay.  Let me clear it up for you.  I moved to

 7  Michigan in the 6th of February, didn't come back until after

 8  high school.  So, if you're asking me, how many times I've seen

 9  him before that day, it would be almost none.  I have seen him.

10  But I -- -- I lived in Michigan.

11      Q    So why --?

12      A    So -- so for you to keep trying to make me know this

13  guy, I'm never going to know him.

14      Q    So then why --?

15      A    He doesn't know me.

16      Q    Then why did you testify?

17      A    I've seen him.  That does not mean I know him.

18      Q    All right.  So you had seen him to recognize him

19  before August 10th; correct?

20      A    No, I seen him.  I don't recognize him as being Tino

21  or Valentino or --

22      Q    You just don't know his name?

23      A    -- or big guy, or whatever you want to say.

24      Q    But you knew what he looked like before August

25  10th?



1      A    Okay.

2      Q    I'm asking you, sir?

3      A    That's kind of shaky right there.  I can just say I

4  knew him, because I didn't.

5      Q    You knew what he looked like, before August 10th;

6  correct?

7      A    Not really.

8      Q    Than how could you have known him Hi and Bye?

9      A    I didn't say I knew him Hi and Bye.  I said I saw him

10  in the city.  You keep saying I knew him Hi and Bye.  And maybe

11  it was just a phrase that you use by saying, you know, if you

12  give them a, you know, what's up.  That's not saying you know

13  them.

14      Q    Go back to grand jury testimony, Page 75.

15      A    What page; 75?

16      Q    Seventy-five?

17      A    Grand jury (mumbling).

18      Q    Line 17.

19      A    (Indicating.)

20      Q    Are you on Page 75?

21      A    (Indicating.)

22      Q    Line 17.  (Reading), "I knew the other kid that they

23  were fighting Mario, but I didn't really know no Valentino

24  Dixon.  I just knew him like Hi and Bye."  Question:  "You had

25  seen him before hand?"  Answer:  "Yeah."



1      A    So, I told you, I seen in the city before, maybe once

2    or twice.  And then, if I see somebody, you know, you go like

3    that (indicating).  But that's not knowing him.

4      Q    Okay.  But you knew what he looked like?

5      A    I can't believe you, man.

6      Q    Correct?

7      A    I knew like I seen him before, but not to say that I

8    knew him.

9      Q    All right?

10     A    I don't know what you -- you crazy, man.

11     Q    Take a look at page the trial?

12     A    Go to trial?

13     Q    You have seen him before, but you didn't know him;

14   correct?  Is that what you're saying?

15     A    I saw him --

16          MR. BLENK:  Form.

17          THE WITNESS:  -- but I don't know him.

18   BY MR. BRUSTIN:

19     Q    But you had seen him before?

20     A    If see anybody once or twice I would waive and say,

21   hi, what's up.  That's not saying that I know him.  Or can just

22   saying, like, yeah, I know this guy.  Or any type way you're

23   trying to make it seem.

24     Q    Okay?

25     A    Ask him.  He don't know me.



1    Q    Okay.  You knew him well enough that if you saw him,

2  you might say Hi and Bye --

3    A    No.

4    Q    -- you might not; is that fair to say?

5    A    No, we never spoke to each other.  To me and Tino

6  have never spoken to each other in our life.  Now, if you're

7  saying his brother Twon, yes.  I went to school with him, I

8  played football with them, I played with him.  Yes, I did not

9  know he had a brother.

10   Q    Okay.  Now, let's take a look at your trial testimony

11 Page 153.?

12   A    153, okay.

13   Q    And Line 3.  Read to yourself, lines three withdrawn.

14 Let's do this --

15   A    I see Line 3.

16   Q    Let's -- let's skip that for now.  I want to go

17 somewhere else for now.

18   A    (Reading.)

19   Q    I want to skip that and go somewhere else.  Let's

20 take a look at -- I'm going to give you a portion of the police

21 file and ask you some questions about it.  This is an exhibit

22 that has already been marked as Exhibit No. 2.  And the first

23 thing I want you to look at -- well, first of all, let's go

24 back to keep -- keep that right there.  Let's go to your --

25 let's go to your trial testimony, again.  I want to go to Page



1  204.  Actually, 205.  Go to Page 205 and let me know when you

2  are there?

3       A    Here.

4       Q    Take a look at Line 10.  This is cross-examination.

5  Do you remember being cross-examination by Mr. Dixon's attorney

6  at the trial?

7       A    Kind of.

8       Q    Okay?

9       A    But not really.

10       Q    Okay.  I refresh your recollection then.  (Reading),

11  "So, Line 10, question: "Okay.  Mr. Dixon, will you stand up,

12  please.  Does Mr. Dixon look heavyset to you?"  Answer: "No,

13  not really."  Question:  "No he doesn't it, does he?"  Answer:

14  "No."  Do you remember giving that testimony?

15       A    (Indicating.)

16       Q    You do?

17       A    Somewhat.

18       Q    And you remember --?

19       A    Somewhat.

20       Q    Okay.  You do remember Valentino Dixon was a very

21  skinny guy; right?

22       A    Not really.  But we wore extremely baggy and big

23  clothes back then, so to give a -- his weight, like, you

24  know -- it may be off.

25       Q    Do you remember him being skinny?



1        A    No.

2        Q    You don't remember him being skinny?

3        A    No.

4        Q    You don't remember him saying --?

5        A    No, I don't know him.  So you want --

6        Q    Okay?

7        A    -- me to tell you someone's weight, height, that I

8    don't know.

9        Q    All right.  Let's take a look at -- let's go back to

10   the police reports and if you take a look at --?

11       A    If I put on oversized clothes right now and stand up

12   you couldn't -- do you think you could guess my weight.

13       Q    Take a look at -- in this packet of documents right

14   here (indicating), look at the second page, which is Page 30

15   Okay.  Now, do you remember sometime early in the morning the

16   night of -- the morning of the shooting, being interviewed by a

17   detective named Mark Staumbach [phonetically spelled] at the

18   precinct?

19       A    I remember being interviewed, but I don't remember

20   names or.

21       Q    Okay.  You'd, certainly, if he remember he created a

22   report saying he interviewed you, you'd have no reason to

23   dispute that it was Mark Staumbach [phonetically spelled] that

24   interviewed you?

25       A    No.  Like I said, I don't it was 30 years ago, man.



1   So you are asking me to recall who the names was not.  I

2   don't -- I don't -- I can't do that.

3        Q    You remember --?

4        A    I remember being interviewed after the shooting, yes.

5        Q    Do you remember that it was a plainclothes detective

6   that interviewed you?

7        A    I don't remember.  I remember going into a room that

8   had a typewriter and was asking questions and was shown

9   pictures.

10        Q    Okay.  And how many times that night were you shown

11   pictures?  You mentioned that you were shown a number of sets

12   of pictures; correct?

13        A    I don't remember how many times.

14        Q    Okay.  Was it more than three?

15        A    I don't remember.

16        Q    Okay.  You remember being shown pictures -- do you

17   remember talking to the detectives before they tape-recorded

18   your statement?

19        A    At the scene.

20        Q    Okay.  How about at the station?

21        A    No.  We were sitting in the hallway.  They never

22   talked to me before that.

23        Q    Were you talking to anybody in the hallway?

24        A    No.  They had us, like, separate, but, you know, like

25   around.  And they said we couldn't talk and blah, blah, blah



1   so, you know.

2        Q    Did you follow that rule?

3        A    Yes.

4        Q    Okay.  Now, take a look at the -- you do remember --

5   do you remember knowing that they were taping your statement in

6   the precinct?

7        A    Like, you know, I'm pretty sure they were.

8             MR. RUSS:  Objection to form.  You have a tape?

9             MR. BRUSTIN:  We have a transcription.

10            MR. RUSS:  He said it was the guy sitting with a

11       typewriter; is not a tape.

12            MR. BRUSTIN:  That's right.  I forgot how they do it.

13       That's -- that's correct.

14   BY MR. BRUSTIN:

15       Q    Do you remember -- do you remember him sitting by

16   typewriter and typing what you are saying?

17       A    I remember a guy typing as I was talking, yes.

18       Q    Okay.  And do you remember what he looked like?

19       A    No.

20       Q    Okay.  Do you remember before you started typing, you

21   talked to him saw him before that?

22       A    No.

23       Q    Do you remember whether you'd seen any pictures

24   before you started -- before he started typing?

25       A    I don't know what came first.  Pictures, talk.  I --



1  no, that was 30 years ago.  I don't know.

2      Q    Okay.  But you do remember, at some point, early in

3  the morning that he started typing up a statement from you?

4      A    Yeah.

5      Q    I will represent to you that Page 30 through 32; BPD

6  30 through 32 has been represented as the statement that he

7  took from you; okay?

8      A    Okay.

9      Q    Now, take a look at Page 31.  Now, do you see the

10 question beginning (reading), "Can you tell me what the person

11 who had the TEC-9 look like," about eight lines down?

12     A    (Indicating.)

13     Q    Okay.  So I'm going to read it to you.  (Reading),

14 "Can you tell me what the person who had the TEC-9 look like?"

15 Answer:  "A black male, heavyset, maybe about 20, the same age

16 as Mario, about 6 feet tall.  And I did not see any hair, he

17 had a hat on."  Question:  "The shooter with the TEC-9, what

18 was you wearing at the time?  He was wearing some blue jeans

19 cut offs, like I have on, a white T-shirt with something on the

20 front, a hat white with a black or blue brim, that's about it."

21 Right?  Did you say that to him?

22     A    Yeah.

23     Q    Okay.  And --?

24     A    If I said -- I -- I can't remember what the people

25 had on.



1      Q    Okay.  But you -- but you -- you appeared to
2  remember, at that time, what they had on; correct?
3      A    At that time, yes.
4      Q    Okay.  And you are also were able to describe that
5  the person was heavyset; correct?
6      A    Well, appeared.
7      Q    And the person was wearing baggy clothes, the person
8  was wearing cut up blue jeans and a T-shirt; correct?
9      A    Oversized, though, we were oversized clothes.
10     Q    Do you remember that -- do you remember that the
11  person was wearing oversized clothes?
12     A    Okay --
13     Q    I --
14     A    -- like in the 80s, with polkadots, right?  Things
15  like that.  So it is like a generalization of saying we all
16  wore baggy close, we all we're oversized clothes.
17     Q    Okay?
18     A    The whole genre of people were over size clothes, so
19  this is why I may have said he was heavyset, because of the
20  clothing he was wearing --
21     Q    When did you --
22     A    -- you can't get your description.
23     Q    When did you think of that?  Because that's never --
24  that doesn't appear anywhere in any report.  Doesn't appear in
25  any testimony?



1    A    That's because your --

2    Q    Sir?  Sir, you need to let me finish my question.

3  When is the first time you thought in your mind that the reason

4  that you described him as heavyset, was because he was wearing

5  baggy clothes?  When did that first occur to you?

6    A    Just now.

7         MR. RUSS:  Objection to form.

8         MR. BLENK:  Form.

9  BY MR. BRUSTIN:

10    Q    Okay.  All right.  You --

11    A    Because that could have been the reason why I said he

12  may have looked heavyset.

13    Q    All right?

14    A    Because of his oversized clothes.

15    Q    Do you have any -- but there's nothing here about him

16  having oversized clothes; correct?

17    A    They never asked me if you had over size clothes.

18    Q    All right.  Do you remember him having oversized

19  clothes?

20    A    I remember everybody wearing oversized clothes.

21    Q    Okay?

22    A    Everyone.

23    Q    Even --

24    A    Everyone.

25    Q    -- even with oversized clothes, when you saw someone,



```
 1  were you able to tell they were fat or skinny, generally?

 2       A    No.

 3            MR. BLENK:  Form.

 4  BY MR. BRUSTIN:

 5       Q    All right.  So, in any case, these are -- do you have

 6  any reason to dispute that these are the words you spoke and

 7  that this detective typed down?

 8       A    No.

 9       Q    In other words, you agree, you did say those words?

10       A    Yes.

11       Q    Now, take a look at further down in this page.  Do

12  you see where it says, (reading), "I am now going to show you a

13  mug shot, Number 162576"?

14       A    Indicating.

15       Q    Do you see that?  You have to say, yes?

16       A    Yes.

17       Q    Okay.  Is says (reading), "I am now going to show you

18  a mug shot, Number 162576.  Can you tell me what that is?"

19  Answer:  "That's Mario."

20       A    (Indicating.)

21       Q    Right?

22       A    Yes.

23       Q    That's what you say; right?

24       A    Yes.

25       Q    Okay.  Now, do you remember when I played the tape
```



1  recording, you -- the person on the tape, who you say you're

2  not sure that is you saying they were shown three photos.  A

3  photo of Mario, a photo of Tino, and a photo of someone else?

4       A    Yes.

5       Q    Does this refresh your recollection that this is when

6  you were shown the photo of Mario and then the photo of Tino?

7       A    No, it doesn't.

8            MR. BLENK:  Form.

9            MR. BRUSTIN:  Okay.  But --

10           MR. RUSS:  Objection to form.

11 BY MR. BRUSTIN:

12      Q    -- you're describing here being shown an individual

13 photo of Mario; correct?

14      A    I'm not saying it's an individual, but --

15      Q    It's saying (reading), "I am now going to show you a

16 mug shot, Number 162576.  Can you tell me what that is?"

17 Answer:  "That's Mario."

18      A    Okay.

19      Q    Do you remember him showing you an individual mug

20 shot photo of Mario?

21      A    I don't remember him showing me an individual picture

22 of him.  I don't remember any individual pictures.

23      Q    Okay.  But he remember hearing on the tape, the

24 person you're saying is that you, saying that they were shown

25 three pictures.  A picture of Mario --



1              MR. RUSS:  Objection to form.

2              MR. BRUSTIN:  -- a picture of Tino and another

3        picture; right?

4              MR. RUSS:  Objection to form.

5              THE WITNESS:  Yeah, yeah.

6    BY MR. BRUSTIN:

7        Q    Do you deny being shown a picture of Tino at the same

8    time you're being shown a picture of Mario?

9        A    No, I can't recall.

10             MR. BLENK:  Form.

11             THE WITNESS:  I can't remember all of the specific

12        details of 30 years ago.

13   BY MR. BRUSTIN:

14       Q    Okay.  Do you remember now that I shown you this

15   document, do you remember being shown some individual photos,

16   just like was described on this tape, before you saw the array

17   of photos?

18       A    No.

19       Q    You don't remember that?

20       A    No.

21       Q    Now, you do remember at some point -- was it that --

22   you remember at some point, after your interview.  Let me go

23   right to it actually.  Take a look at page -- take a look at

24   Page 47, which is the next page to your document?

25       A    In this (indicating)?



1            MR. RUSS:  Which Exhibit are you in now?

2            MR. BRUSTIN:  It's still -- this is still from the

3      police report, Exhibit 2, BPD 47.

4            THE WITNESS:  32, Page 32?

5  BY MR. BRUSTIN:

6      Q    Page 47, Exhibit 2.

7      A    Okay.

8      Q    And according to this report, after your interview

9  with Detective Staumbach [phonetically spelled], you were shown

10  a photo array of six different photographs.  Do you remember

11  being shown a folder all right?

12      A    I remember being shown pictures, yes.

13      Q    Okay.  Well, do you remember being shown a group of

14  six photos together?

15      A    I don't remember how many it was, but it was a few

16  pictures; yeah.

17      Q    And do you remember if you selected a photograph of

18  Valentino Dixon's from those six photos?

19      A    Yes.

20      Q    Okay.  Now, I will represent to you that the photo of

21  Mario was not in those photos.  And as you saw from the

22  statement you just gave, you saw a picture of Mario before you

23  were shown that six person folder all right; Okay?

24      A    Okay, if you say so.

25      Q    Now my question is --



EMIL TOUSSAINT ADAMS                            January 17, 2023
DIXON V CITY OF BUFFALO                                        77

1        A    I don't remember that.

2             MR. BLENK:  Form.

3    BY MR. BRUSTIN:

4        Q    Do you remember that as he heard on that video --

5    that audiotape, do you remember in addition to be showing an

6    individual photo of Mario, being shown an individual photo of

7    Tino -- or Valentino -- and somebody else?

8        A    No.

9        Q    Okay.  But you certainly don't deny that you were

10   shown individual photos of Valentino; do you?

11       A    I am denying, because I don't remember that.

12       Q    Okay.  You also don't remember, today, being shown a

13   picture of Mario; correct?

14       A    No.

15       Q    But it's clear from the -- it's clear from the

16   statement that you were; correct?

17       A    Yes.

18            MR. BLENK:  Form.

19            MR. RUSS:  Objection to form.

20   BY MR. BRUSTIN:

21       Q    And you just don't remember one way --

22            MR. RUSS:  Objection to form.

23   BY MR. BRUSTIN:

24       Q    -- you don't remember one way or another whether or

25   not you were shown an individual photo of Valentino Dixon;



1   correct?

2        A    Not from 30 years ago, man, no.

3             MR. BRUSTIN:  Okay.  Let's take a five-minute break.

4             THE VIDEOGRAPHER:  We are going off the record at

5        12:35 p.m.

6             (Whereupon, a brief break was taken at 12:35 p.m.)

7             THE VIDEOGRAPHER:  We are going back on the record at

8        1:09 p.m.

9             (Whereupon, the deposition resumed at 1:09 p.m.)

10  BY MR. BRUSTIN:  (Resumed.)

11       Q    Okay.  Mr. Adams, one of the things you told us this

12  morning was that you were friends with, both, Aaron and Tori

13  Jackson?

14       A    (Indicating.)

15       Q    Yes?

16       A    Yes.

17       Q    Friends growing up?

18       A    Yes.

19       Q    Close friends?

20       A    Yeah, pretty close.

21       Q    And you -- you would want to do anything you can to

22  honestly help them; correct?

23       A    Yeah.

24             MR. BLENK:  Form.

25  BY MR. BRUSTIN:



1      Q     And that was same back in 1991?

2      A     Yeah.  I would do the same thing for Mario.

3      Q     And you also told us that you never -- you never had

4   to be pressured by the police or the DA to do anything in this

5   case; correct?

6      A     Correct.

7      Q     All right.  I want to show you what we'll mark --

8            MR. BRUSTIN:  What number are we on, Mo, 27 or 28?

9      Let's mark as --

10           MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):

11     (Indiscernible.)

12           MR. BRUSTIN:  Let's mark as 27, the letter -- a June

13     5th letter from Chris Belling to you, Bates stamped [COE

14     1769].  And as 28, a letter dated June 5th, 1992 from

15     Belling to Mr. Gave., which is [COE 1784]; okay?  And

16     let's start with 27 (handing).

17           (Whereupon, Plaintiff's Exhibit Nos. 27 and 28 were

18     marked and identified.)

19   BY MR. BRUSTIN:

20     Q     Okay.  Take a minute to review this and tell me if

21   you recollect receiving this.

22     A     I don't.

23     Q     You've got to read it first and then you can tell me

24   after you've read it.

25     A     I was in high school.  I received no mail, while I



```
 1   was in high school --

 2        Q    So--

 3        A    So, how much mail do you get, when you were in high

 4   school?

 5        Q    -- so --

 6        A    My mom and dad checks the mailbox, not you.

 7        Q    -- so, I want to  know if anyone gave you this letter

 8   read it.  And the only way you can tell that for sure is if you

 9   read it.  So, are you refusing to read it, sir?

10        A    No, I'm not refusing to.

11        Q    So, then, read it, please.

12        A    (Complies.)

13             MR. BLENK:  Nick, your video is not on (indicating)?

14             MR. BRUSTIN:  Sorry.  Thank you.

15             MR. BLENK:  Thank you.

16             THE WITNESS:  N,o, I don't remember this.

17   BY MR. BRUSTIN:

18        Q    Does this refresh your recollection about receiving a

19   letter from DA Belling?

20        A    No, sir.

21        Q    Okay.  And, in this letter, DA Belling is telling you

22   unless you cooperate in the case and voluntarily come, you are

23   going to be arrested; correct?

24        A    Yes.

25             MR. RUSS:  Objection to form.
```



1 | BY MR. BRUSTIN:

2 |    Q   And that's because, prior to this, you had refused to

3 | cooperate; correct?

4 |    A   No.

5 |      MR. BLENK:  Form.

6 | BY MR. BRUSTIN:

7 |    Q   So, DA Belling was mistaken, when he said that you

8 | had not been cooperative?

9 |    A   I believe what this (crosstalk) --

10 |      MR. BLENK:  Form.

11 |      THE WITNESS:  -- letter was referring to is that they

12 |      wanted me to testify about Mario Germany.  And I could not

13 |      do that, because whatever happened, I could not see that.

14 |      So, therefore, there was nothing for me to say.  They

15 |      actually did put a warrant out.  I went and turned myself

16 |      in.

17 |      They called the judge and said, no.  They killed the

18 |      warrant.  I never was booked.  I never was anything.  So,

19 |      I believe that's what this letter is, because the trial I

20 |      was always cooperative and willing.  And I flew there a

21 |      few times to do it.

22 |    Q   Okay.  So, you understand -- you understand that this

23 | is all in connection with the criminal trial of Valentino

24 | Dixon?

25 |    A   Yeah, I'm assuming -- (crosstalk).



```
 1              MR. BLENK:  Form.

 2              THE WITNESS:  But there was no pressure on me about

 3         cooperating --

 4    BY MR. BRUSTIN:

 5         Q    (Crosstalk.)  Sure --

 6         A    -- other than when it had pertained to Mario, I

 7    didn't see what took place with him.

 8         Q    Right.  And you understand that the -- that the trial

 9    regarding Mario, also had to do with who the shooter was;

10    correct?

11         A    I don't know.

12         Q    Al right.  Is it your testimony here, under oath

13    today, that you would never, as described in this letter,

14    uncooperative with DA Belling?

15         A    No.  Other than the time I said I won't show to

16    testify in Mario's situation, because I had nothing to say

17    there.  I didn't witness it, so.

18         Q    You'd always been -- and you never testified in that

19    situation; correct?

20         A    No.

21         Q    Okay.  And you'd always been cooperative in regard to

22    testifying in the Jackson -- in the Valentino Dixon case;

23    correct?

24         A    Correct.

25         Q    You'd always answered calls from the DA or the
```



1  police?

2      A    I don't remember.  That might have been my parents

3  answering calls, at the time, and telling me what I had to do.

4      Q    No one --

5      A    (Indiscernible.)

6      Q    -- and you wanted to help.  No one ever threatened

7  you to come and help; right?

8      A    No.

9      Q    You -- you were always open and willing to come court

10 to testify about Valentino Dixon being the shooter?

11     A    Because that's what I witnessed.

12     Q    And it's true, though.  No one had to ever -- you

13 were never uncooperative, you always willing to do it?

14     A    Yes.

15          MR. BLENK:  Form.

16 BY MR. BRUSTIN:

17     Q    And you'll see that this is -- now, take a look at --

18 take a look at 28.

19     A    Take a look at what?

20     Q    We marked as 28, which is this the letter that they

21 wrote to have you served with an arrest warrant for not

22 cooperating.  In fact, what he writes -- what Mr. Belling

23 writes here at the bottom of the page is (reading), "he had to

24 request a continuance of the trial in hopes of securing you as

25 a witness."  You don't remember anything like that happening?



1            MR. RUSS:  Objection to form.

2            THE WITNESS:  No.

3    BY MR. BRUSTIN:

4        Q    You don't remember ever failing to operate with

5    Mr. Belling in connection with Valentino Dixon's trial?

6        A    Not -- no.

7        Q    Okay.  Now, take a look at -- look at what's already

8    been marked as Exhibit 5 in this case, which is [COE 2934].

9    Now, when you lived at 65 Hastings, in 1992, who did you live

10   with?

11           (Whereupon, Plaintiff's Exhibit No. 5, previously

12        marked, was identified.)

13       A    When?  My parents.

14       Q    Okay?

15       A    I've always lived with my parents, until after high

16   school.

17       Q    And this is a record of -- withdrawn.  So you're

18   telling me that the reason why you refused -- are you -- do

19   remember refusing to testifying in the perjury trial?

20           MR. BLENK:  Form.

21           THE WITNESS:  I don't remember if it was perjury or

22        whatever.  I know it had something to do with Mario and it

23        wasn't -- I think we had already did the -- Tino's trial.

24        I think I'd already did that.  And I think after that --

25        after I did that, I had to testify there.  They asked me



1          to come and testify in the Mario; something that had to do

2          with him.  And I couldn't do that, because I didn't know

3          anything, I didn't see that, so.

4    BY MR. BRUSTIN:

5          Q    Okay.  Now, do you recall that at the time the

6    shooting happened, just before that you had been talking to

7    some girls by a car?

8          A    I was talking to a group of people.  I don't know

9    what girls.

10         Q    Do you remember --

11         A    It was girls and guys.

12         Q    -- do you remember talking, in particular, to a group

13   of girls who were in a small car?

14         A    I don't know what car they were in or what they were

15   or who they were.

16         Q    All right.  I'm going to show you do remember that

17   there was a car there were some bullets went into their car, do

18   you remember noting -- knowing that?

19         A    Vaguely.

20         Q    Well, let me ask you this.  All right.  Do you

21   remember talking to a girl named Tamara Freida [phonetically

22   spelled] the night of the shooting?

23         A    No.

24         Q    Do you remember a witness, a girl, who was another

25   witness to the shooting, who was also talking to the police



1  around the time you were talking to them?

2      A    No.

3      Q    Do you remember talking to a girl, who was a witness

4  to the case, a few months later at a club?

5      A    No.

6      Q    All right.  Sp, let me show you some testimony from

7  Ms. Freida; I would ask about it, okay?  This is a woman, who

8  was at the scene at Louie's, as well, who testified in this

9  case a few months back.  She actually lives in North Carolina

10 now.  She's a social worker.

11         MR. RUSS:  Nick, have you marked this Exhibit?

12         MR. BRUSTIN:  I haven't.  It's a deposition

13     transcript.  I -- I -- I don't think I need to.  I'm just

14     going to read to you from the deposition transcript.

15         MR. RUSS:  It's the deposition transcript of Tamara?

16         MR. BRUSTIN:  Let me -- yeah, I'm going to describe

17     it.

18 BY MR. BRUSTIN:

19     Q    I'm going to show you some portions of her testimony.

20 This is a deposition taken on October 19th, 2022 in this case,

21 as well, just like you.  And according to Ms. Freida, she was

22 talking to you at Louie's that night.  Just flirting, talking

23 to you and a couple of her friends.  Does that jog your memory,

24 at all, about talking to some girls?

25     A    No.



EMIL TOUSSAINT ADAMS                                January 17, 2023
DIXON V CITY OF BUFFALO                                          87

1        Q     Okay?

2        A     I mean, like I said, there was a bunch of people

3   there.  So I'm not saying that I didn't talk to her, but to

4   specifically remember this conversation with this young lady

5   about whatever it is?  No, I'm not -- I don't remember that.

6        Q     Okay.  This is Page 33.  You can read along with me,

7   if you want, of her transcript.  Let me know when you're there.

8   It's not all of the pages.  I just brought some.

9        A     (Indicating.)

10       Q     So let's start on Page 33, and I want to start on

11  Line 18.  This is -- these are the questions that I asked her

12  and the answers she gave.  (Reading) Question:  "Did you talk

13  to Emil Adams about whether or not Valentino Dixon was, in

14  fact, the shooter?"  Withdrawn.  Let me just give you a little

15  framework.  She mentioned that she had a couple of

16  conversations with you in the months following the shooting and

17  this is what I'm asking her about; okay?

18       A     Okay.

19       Q     All right?  (Reading.) Question --

20             MR. BRUSTIN:  Form.

21  BY MR. BRUSTIN:

22       Q     -- (Reading.)  Question: "Did you talk to Emil Adams

23  about whether or not Valentino Dixon was the shooter?" Answer:

24  "Yes."  Question: "And what did he tell you, if anything?"

25  Answer: "He told me that he knew that Valentino was not the



1   shooter; he knew that.  Question: "Okay. And then, he went on

2   to explain why he said Valentino was the shooter.  Okay.  Other

3   pending charges that he had, did he give you any other reasons

4   as to why" -- withdrawn.

5           "Did he give you any other information about any

6   pressure that the police of the prosecutors put on him to state

7   that Valentino Dixon was the shooter, even when he knew that he

8   wasn't?"  Answer:  "The only thing that he told me that they

9   were threatening to actually send him back to Michigan to face

10  charges.  That was it."  Question:  "Do you remember how many

11  times you talked to Emil Adams about the shooting?"  Answer:

12  "I would say, maybe, two.  About two times."  And then, on Page

13  53 --

14          MR. RUSS:  Are you going to as a question, or are you

15      just reading that transcript?

16          MR. BRUSTIN:  I'm going ask a question in just a

17      minute Hugh.  Thanks, Hugh.

18  BY MR. BRUSTIN:

19      Q    And then, she's asked the same question --a similar

20  question on Page 53, Line 7.  Question:  "Okay.  And after the

21  evening of the shooting, when was the next time that you talked

22  to Emil Adams?"  Answer:  "The next time that I spoke to him it

23  was probably, it might have been about two- three months after

24  the shooting."  Question:  "Okay.  And two- three months after

25  the shooting, do you recall where that took place?"  Answer: "I



1  can't recall exactly."

2          Question:  "Would it have been an in-person

3  conversation?" Answer:  "Yes.  And would it have been a meeting

4  through happenstance?  I would say it would have been, like,

5  maybe out in the community somewhere. It might have been out,

6  like, at that time going out to the club or something like

7  that, yeah."

8          Question:  "Okay.  In other words, you hadn't planned

9  to meet up with him?"  Answer:  "No."  "You ran into him out in

10  public?"  Answer: "Exactly."  Okay.  And I believe you said it

11  was about two to three months after the shooting?  Answer:

12  "Uh-huh."  Questions: "Is this an instance where Emil Adams

13  relayed to you why he was identifying Valentino Dixon as the

14  shooter?"

15          Question:  "One of the two that we talked about

16  earlier?"  Answer:  "Yes."  Question:  "Okay.  And you had

17  mentioned that he said something about being threatened with

18  charges that were pending against him Michigan; correct?"

19  Answer:  "Yes."  Question:  "Did he tell you when those threats

20  had been made?"  Answer:  "He didn't tell me when.  He just

21  some told me just in general."  Now, first of all, do you deny

22  having those conversations with Tamara Freida?

23          MR. BLENK:  Form.

24          MR. RUSS:  Objection to form.

25          THE WITNESS:  I don't even recall the conversation,



```
 1      so.
 2   BY MR. BRUSTIN:
 3      Q    Do you deny telling someone, who you learned was
 4   another witness at the scene, when you spoke months after the
 5   shooting that, in fact, you knew Valentino Dixon wasn't the
 6   shooter?
 7      A    No, I deny it.  (Crosstalk.)
 8           MR. RUSS:  Objection to form.
 9   BY MR. BRUSTIN:
10      Q    You never said that to her?
11      A    No.
12      Q    She's either mistaken or lying?
13      A    You'll have to ask her.  (Crosstalk.)
14           MR. RUSS:  Objection to form.
15           MR. BLENK:  Form.
16   BY MR. BRUSTIN:
17      Q    Okay.  And you never told her that the reason you
18   said those reason were that there was charges pending against
19   you in Michigan?
20      A    I don't have charges in -- (crosstalk) --
21           MR. RUSS:  Objection to form.
22           THE WITNESS:  -- or in any other state; so, no.
23   BY MR. BRUSTIN:
24      Q    Sir, to be clear, I'm suggesting to you that you're
25   not telling the truth about Valentino Dixon so, perhaps --
```



1    withdrawn.  Are you -- were you -- were you always honest with

2    people, at that time?

3         A    I'm always honest now.

4              MR. RUSS:  Objection to form.

5    BY MR. BRUSTIN:

6         Q    Okay.  And so, you never would have told Tamara

7    Freida or anybody that you were afraid of charges in Michigan

8    to cover up the fact that you did not want to say who the real

9    shooter was?

10        A    No.

11        Q    Okay?

12             MR. BLENK:  Form.

13             MR. RUSS:  Objection to form.

14   BY MR. BRUSTIN:

15        Q    In any case, you deny telling Tamara Freida at any

16   time -- withdrawn.  You deny telling any woman?

17        A    Any person that I ever had a charges in Michigan.

18   And I was worried anything that could happen to me with law,

19   there or in Buffalo.

20        Q    Okay.  And you certainly deny telling anybody that

21   you knew Valentino Dixon wasn't the shooter?

22        A    No, I never said that he wasn't the shooter.

23        Q    You never said that anybody?

24        A    Anybody.

25        Q    Certainly not the woman, who was the scene, that



1  night?

2      A    No, I wouldn't have said that he wasn't the shooter

3  that night.  I wouldn't have said that at any time.

4      Q    Let me read one more portion and see if it jogs your

5  memory at all.  Take a look at Page 56 (indicating). First of

6  all, were you in Buffalo in 2002 -- 2003?

7      A    Living there?

8      Q    Yeah?

9      A    I don't remember the year that I moved back.

10     Q    Okay?

11     A    But I may have been; yeah.

12     Q    But you sometimes go out to clubs in Buffalo?

13     A    At that age?  I -- I may have.

14     Q    Do you ever remember anybody, who was present --

15  withdrawn.  Do you remember ever meeting any other women, who

16  were present at the night of the shooting, in the months or the

17  years following the shooting?

18     A    Like I said, we're in a small city.  So, I ran into

19  people that had -- who were there; yeah.

20     Q    In 1991, were you living in Buffalo?

21     A    When -- when it happened?

22     Q    Yes?

23     A    No.

24     Q    Were you coming back and forth?

25     A    Yes, I was there visiting for the summer.



1      Q      Okay.  You were there for the whole summer?

2      A      (Indicating.)

3             MR. RUSS:  I'm sorry.  I didn't hear the whole -- the

4      last response.

5             MR. BRUSTIN:  He was visiting for the summer.

6             MR. RUSS:  Thank you.

7   BY MR. BRUSTIN:

8      Q      And when did you go back to Michigan?

9      A      Shortly after the incident happened.

10     Q      And when is the next time you came back to Buffalo?

11     A      When they flew me back for the trial.

12     Q      And when is the next time you came back, after the

13  trial?

14     A      When they flew me back, again.

15     Q      About how after that?  When did you move back?

16     A      Shortly after I got out of high school.

17     Q      So '92, '93?

18     A      Yeah, maybe.  I don't remember the year, but it was

19  shortly after I got out of school.

20     Q      And do you remember ever meeting anybody -- any

21  women -- who were present at the scene of the shooting in the

22  months or the years after the shooting?

23     A      It's possible.  I mean, we're in a small place.  I,

24  probably, ran into someone that was there.

25     Q      I'm asking you if remember it today?



1     A    No, not specifically to say, you know, yes, or no.

2   I'm not going to say I didn't.  But I don't recall meeting

3   anyone and talking about -- especially, this Michigan stuff.  I

4   don't have cases.

5     Q    Okay?

6     A    So, no.

7     Q    All right?

8     A    I can tell you this conversation didn't happen.

9     Q    All right.  But do you remember, generally, speaking

10  to a woman in the months or the years after the shooting?

11    A    I spoke to a lot of people, generally speaking, and

12  after that time.

13    Q    Well, do you remember speaking to any women, who were

14   present at the shooting?

15    A    No.

16    Q    Okay.  You certainly don't deny talking to Tamara

17  Freida; do you?

18    A    No.

19    Q    Okay.  And if you look at now on Page 56, Line 17

20  (reading), Question:  "And I don't want to belabor the point,

21  but that's the second conversation you've had with him that

22  we've talked about earlier.  When, approximately, was that

23  conversation, if you remember?"  Answer:  "The second

24  conversation would have been, maybe, I want to say maybe 2002

25  to 2003.  I think it was around time when I did the interview



1   with the Buffalo News.  So we had ran into each other; it was

2   in public.  We were both at a store.  And we had, at that time,

3   a discussion.  Okay.  And he said it, again.  And he reiterated

4   that, you know, he said that Valentino was the shooter, because

5   of the charges in Michigan."

6          Question:  "Did he go into any further detail on the

7   second conversation as he did in the first conversation?"

8   Answer: "No, not really."  Question:  "So, again, just

9   generally a claim that charges may have been used against him

10  if he didn't identify Valentino Dixon?  Answer:  "Yes."

11  Question:  "As a shooter, but nothing further?"  Answer:

12  "Nothing further."  Question:  "And no information as to who

13  the individual was that made those threats or when those

14  threats may have been made?" Answer: "No."

15         Okay.  Now, do you recall seeing a woman on TV in or

16  around 2002 or 2003, in Buffalo, saying that Valentino Dixon

17  was not the shooter?

18     A    No.

19         MR. RUSS:  Objection to form.

20  BY THE WITNESS:

21     Q    Do you remember -- does this refresh your

22  recollection about, during that time period, meeting a woman

23  named Tamara Freida or a woman, in a store, who was present the

24  night of the shooting and talking to her about the shooting?

25     A    No.



1      Q     You don't deny it, but you don't remember it?

2      A     I definitely don't remember.

3      Q     And it is possible that you told people that you were

4   facing charges in Michigan, and that's why you testified as you

5   did?  Not because you were facing charges, because you didn't

6   want to tell the truth about what happened?

7          MR. BLENK:  Form.

8          MR. RUSS:  Objection to form.

9   BY MR. BRUSTIN:

10     Q     Has anyone from the DAs office come to speak -- has

11  anyone -- has anyone from the District Attorney's Office or the

12  City come to speak to you, since the criminal proceedings

13  involving Valentino Dixon, after say, 1995?

14     A     No --

15         MR. BLENK:  Form.

16         THE WITNESS:  (Crosstalk) -- not that I can recall.

17  BY MR. BRUSTIN:

18     Q     You don't remember having -- being interviewed by

19  anybody from the District Attorney's office, before Valentino's

20  release?

21     A     No.

22     Q     Okay.  Do you remember in, approximately, 2000 --

23  withdrawn.  In 2000, did you use to work or hang out at a place

24  called Uncle Johnny's Hair Company?

25     A     Yeah, I used to cut hair there.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              97

1      Q     Okay.  And did you getting hair there in,

2   approximately, 2000?

3      A     I believe that was around that time, yeah.

4      Q     Okay.  Do you remember meeting with an Investigator

5   named Roger Putnam, who was working for the Dixon family, who

6   came to see you in the shop.  He claims he saw you there on

7   seven different occasions?

8           MR. RUSS:  Objection to form.

9           THE WITNESS:  No.

10  BY MR. BRUSTIN:

11     Q     You have no memory of meeting with an Investigator

12  for Mr. Dixon at Uncle Johnny's Hair Company in, approximately,

13  2000 even once?

14     A     I don't remember that at all.

15     Q     Do you deny telling Mr. Putnam -- withdrawn.  Do you

16  deny telling an Investigator for Mr. Dixon at Uncle Johnny's

17  Hair Company that you did not tell the truth at the trial, when

18  you testified that Valentino Dixon was the shooter?

19          MR. BLENK:  Form.

20          THE WITNESS:  I don't remember talking to this

21      person, so, yeah, I would deny that conversation.

22  BY MR. BRUSTIN:

23     Q     All right.  You never told -- you never had any

24  conversation at Johnny's at --  at --  at Johnny's Hair Company

25  or anything like that; is that what you're saying?



1        A    No, not that I can recall.

2             MR. BLENK:  Form.

3    BY MR. BRUSTIN:

4        Q    Well, you told us already that you never told anybody

5    that Valentino Dixon wasn't the shooter; correct?

6        A    I never told anyone that he was not the shooter.

7        Q    Okay.  So, if Roger Putnam says that you told him

8    that seven times in 2000, at Uncle Johnny's Hair Company, he

9    would be a liar; correct?

10            MR. RUSS:  Objection to form.

11            THE WITNESS:  Uh -- yeah.

12   BY MR. BRUSTIN:

13       Q    The same with Tamara Freida; she's lying, as well;

14   right?  You never told her --

15       A    I never said she was lying.  I said I don't recall

16   the conversation.

17       Q    Well --

18       A    You're asking me -- you asking me to give you a

19   specific on something that I can't remember.  So, how can I do

20   that?

21       Q    Well, you heard her testimony, which said that you

22   told her twice that Valentino Dixon wasn't the shooter;

23   correct?

24       A    Okay.  Well, you have to ask her if she's lying or

25   not.  I wasn't there, when she gave that testimony.  When it



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              99

1  comes to me, I never talked to her.  I can never recall talking

2  to her about anything that had to do with me in Michigan --

3       Q    Okay?

4       A    -- and Tino and whoever else you want to say.

5       Q    Okay.  So it's possible then that you just don't

6  remember telling her twice that Valentino Dixon wasn't the

7  shooter; is that right?

8       A    Is it possible that they talked to you about it?

9            MR. RUSS:  Objection to form.

10 BY MR. BRUSTIN:

11      Q    I wasn't a witness to the shooting?

12      A    But is it possible?  I know, but is it possible?

13      Q    So you don't deny telling her that Valentino Dixon

14 wasn't the shooter?

15      A    I deny telling her that Valentino wasn't the shooter.

16 (Crosstalk.)

17           MR. RUSS:  Objection to form. (Crosstalk.)

18 BY MR. BRUSTIN:

19      Q    So, she's either mistaken or lying?

20      A    You'll have to ask her.  (Crosstalk.)

21           MR. RUSS:  Objection to form.  (Crosstalk.)

22           THE WITNESS:  I can only speak on me.  I never said

23      these words, so.

24 BY MR. BRUSTIN:

25      Q    And you never said those words to Roger Putnam?



1      A    No.

2      Q    Mr. Putnam also claims that you agreed to go to his

3   office, on 484 Delaware Avenue, and give a sworn statement to

4   that effect.  But that you never came and told him tat you were

5   afraid of retaliation for doing so?

6      A    No.

7      Q    Do you deny doing that?

8           MR. RUSS:  Object to form.

9           THE WITNESS:  I definitely deny doing that.

10  BY MR. BRUSTIN:

11     Q    Okay?

12     A    I was never afraid.

13     Q    And us talking about an investigator coming to see

14  you at Johnny's Haircut -- at Uncle Johnny's Hair Company --

15     A    (Indicating.)

16     Q    -- that doesn't refresh your recollection, by ever

17  having any conversation with anyone claiming to be an

18  investigator for Valentino Dixon?

19     A    Correct.

20          MR. RUSS:  Objection to form.

21  BY MR. BRUSTIN:

22     Q    It's your belief that Roger Putnam just made those

23  interactions up?

24     A    I don't have any belief.

25          MR. RUSS:  Objection to form.



1              THE WITNESS:  I don't know.

2              MR. BRUSTIN:  Now, let's mark this as -- 29 are we

3         on?

4              THE COURT REPORTER:  (Indicating.)

5              MR. BRUSTIN:  And, Mo, will you send around the Dill

6         Affidavit.

7              MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Will do.

8              MR. BRUSTIN:  Thanks.

9    BY MR. BRUSTIN:

10        Q    So what I'm showing you, Ms. Adams, is a document --

11   it's a two-page affidavit -- three pages -- affidavit from

12   someone named Daniel Dill; which is Bates stamped [Dixon 5973

13   through 5975].  And, according to this affidavit, Mr. Dill, who

14   is an investigator for the Erie County District Attorney's

15   Office, came to you in 2005 -- July 10th, 2005 to talk to you

16   about your identification at the trial.  Do you remember that

17   at all?

18             (Whereupon, Plaintiff's Exhibit No. 29 was

19        marked and identified.)

20        A    No.

21             MR. RUSS:  Objection to form.

22   BY MR. BRUSTIN:

23        Q    You have no memory of meeting with the investigator

24   from the Erie County District Attorney's Office, in or around,

25   July 2005?



1      A    No.

2           MR. BLENK:  Form.

3           MR. BRUSTIN:  All right.  Let's take a look at the

4      next page; it's his affidavit.  Take a minute and read

5      Page 5974 to 5975.  Let me know when you're done.

6      A    I remember something about the newspaper.

7      Q    Do you remember anything about what's contained in

8  this affidavit?

9      A    No.

10     Q    You don't remember meeting with Mr. Dill?  No?

11     A    (Indicating.)

12     Q    You don't remember him showing a photo array, in

13  2005?

14     A    No.

15     Q    Do you remember telling he you had called newspaper,

16  being upset?

17          MR. BLENK:  Form.

18          THE WITNESS:  I did call the reporter, who had put a

19     story out.  And I can't be remember what it was about.

20     But -- but it wasn't good for me.  So, that's why I was,

21     like, well, where you get this from?

22  BY MR. BRUSTIN:

23     Q    What were you upset about?

24     A    Whatever he was saying, it was like I was supposed to

25  have did something or said something or something like that.



1  All I know it wasn't a true statement by that reporter.

2      Q    Okay.  You don't remember anything else about?

3      A    No.

4      Q    You have no memory of being shown a photo array?

5      A    Other than, when everything happened.  Like I said,

6  it's 30 years ago.  I can't -- I don't remember.

7      Q    Well, this is actually less than 30 years ago, this

8  is 2005, when it said this happened.  That's only 17 years ago.

9      A    Okay.  Seventy years ago.

10     Q    Okay.  You don't remember it?

11     A    No.

12     Q    Okay.  You don't remember at any time after -- you

13 don't remember anything that's contained in this affidavit?

14 Other than, calling the newspaper reporter, for some reason,

15 about something he said about you?

16     A    (Indicating.)

17     Q    Yes?

18     A    Correct.  And they actually came to -- that reporter

19 came to Aaron -- Aaron's house.  And I voiced my opinion there

20 about why I was upset with them at that interview there.  I

21 don't know what happened after that or what.  You know, that's

22 pretty much the last thing I heard about that until, I believe,

23 recently.  Because I don't remember anything other than that.

24     Q    Okay.  What kind of work are you currently doing?

25     A    I work at the airport.



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              104

1      Q    Okay.  What kind of work do you do there?

2      A    General maintenance.

3      Q    Full time?

4      A    Yeah.

5      Q    And I think you told us that you've never been in

6   trouble with the law?

7      A    Other than,  minor traffic are, you know, small

8   marijuana possession.

9      Q    Okay.  But nothing more serious is that?

10     A    No.

11     Q    Not even -- you haven't been arrested for anything

12   more serious and that?

13     A    One-time, yes.  But it was the individual, whose car

14   and he took the blame and set me -- and I didn't have to go to

15   court or anything it.

16     Q    When was that?

17     A    I was working at Uncle Johnny's, so I don't remember

18   the year.

19     Q    Okay.  Do you remember what -- were you in charged

20   with any crime?

21     A    I was charged with the same thing he was.  Possession

22   of --

23     Q    Stolen vehicle?

24     A    No.

25     Q    Oh.



1       A    I've never been in trouble for a stolen vehicle.

2       Q    I was just asking.  I thought that's what you were

3   describing.

4       A    No.

5       Q    But what was -- what were you charged with?

6       A    No.  He had drugs in his car.  It was his car, his

7   drugs.  Somewhere in there they found it.  He was literally

8   giving me a ride home --

9       Q    Okay?

10      A    -- because I had just cut his hair.  So, we went to

11  jail that night; got bail Bill.  He took the charges.  They

12  told me I was fine; I didn't have to show up to court or

13  anything.  They dropped the charges.  That's the only other

14  thing in my life that I have been arrested for, outside of a

15  misdemeanor or traffic or small marijuana possession.

16      Q    Okay.  So, let's go back -- you can put those away.

17  So, what's on top there, you can give that back to me.  Thank

18  you.

19          MR. BLENK:  Are you going to mark that?

20          MR. BRUSTIN:  Mark what?

21          MR. BLENK:  The Dill Affidavit?

22          MR. BRUSTIN:  I did; it's 29.  Can I have that back?

23          THE WITNESS:  (Handing.)

24          MR. BRUSTIN:  That one, too; I'm done with that too.

25      Any small ones.  Yeah.  Thank you.



1  BY MR. BRUSTIN:

2      Q    All right.  I want to go back to your testimony.

3  So --

4      A    (Handing.)

5      Q    Thanks.  What you have in front of you, so, if you

6  can probably to the first tab.  And maybe I won't even need

7  this.  Today -- let's take a look at Page 79 of the Grand Jury,

8  the first tab.

9      A    (Indicating.)

10     Q    All right.  Line 14, Page 79 to Line 19.  Read that

11 to yourself -- or to Line 22.

12     A    (Complies.)

13     Q    Just to Line 22.

14     A    Okay.

15     Q    First of all, you told us you were, in fact, close

16 friends with the Jackson brothers; correct?

17     A    (Indicating.)

18     Q    Yes?

19     A    Yes.

20     Q    Okay.  And after the shooting, you stuck -- you

21 stuck -- you stuck around and you spoke with some police at the

22 scene; is that right?

23     A    Yes.

24     Q    Do you remember how many police officers you spoke to

25 at the scene?



1        A    No.

2        Q    Do you remember where you spoke to them?  Was it in a

3    police car, was it out of a car; do you remember where?

4             MR. BLENK:  Form.

5             THE WITNESS:  I was never in a car, so it was outside

6        of the car.

7        Q    Did you approach them?

8        A    No, they approached me.

9        Q    Okay.  And how long did you speak with that officer,

10   before they brought you down to the precinct?

11       A    I don't remember how long.  It wasn't a super long

12   time, but a few -- a few minutes, I guess.

13       Q    Okay.  And I can represent to you that at time --

14   around that time same, Valentino Dixon's name was put out over

15   the radio.  Do you remember either hearing Valentino Dixon's

16   name of the radio or discussing Valentino Dixon with those

17   officers, at the scene?

18       A    No.

19            MR. BLENK:  Form.

20            MR. RUSS:  Object to form.

21   BY MR. BRUSTIN:

22       Q    No memory of that?

23       A    No, I wouldn't have spoken to them about him.

24            MR. BLENK:  Form.

25            THE WITNESS:  Because, like I said, I did not know



1     his name.

2   BY MR. BRUSTIN:

3       Q    Okay?

4       A    I did not know him.  So, if they're saying his name,

5   I wouldn't know.

6       Q    Okay?

7       A    No more that I know her name (indicating).  If you

8   started telling me, remember Mrs. Johnson.  I don't know this

9   to be Mrs. Johnson.

10      Q    Okay.  So, you don't know one way or another whether

11  or not they were asking about Valentina Dixon; fair to say?

12           MR. BLENK:  Form.

13           THE WITNESS:  No, they didn't ask me about any

14      specific name or person.

15  BY MR. BRUSTIN:

16      Q    Okay.  Do you remember what you told those officers

17  at the scene?

18      A    I told them what happened that night.

19      Q    Okay.  And did you tell them -- did you describe to

20  them the person that you saw?

21      A    Yes.

22      Q    Okay.  And were they taking notes, as you were

23  describing it?

24      A    Yes --

25      Q    Okay?



 1       A    -- to my knowledge, I believe; yeah.

 2       Q    Okay.  But that was the first description that you

 3  gave of what you saw?

 4       A    Yes.

 5       Q    Okay.  And that was before you were brought down to

 6  the precinct?

 7       A    Yes.

 8       Q    And you -- can you estimate if you spoke to them for

 9  10 minutes, 15 minutes; how long?

10       A    No.

11       Q    Was anybody else present, when you speaking with

12  them, other than the officers?

13       A    Ms. Jackson might have been -- Ms. Jackson.  Yeah,

14  Ms. Jackson was there.

15       Q    Okay.  And did she -- do you remember talking to her

16  at scene?

17       A    Vaguely, yes.

18       Q    Did she mention any names or ask you about any names

19  about who could have done it?

20       A    No.

21       Q    By the way, did you know who Lamar Scott was, at that

22  point in time?

23       A    Not --

24       Q    Have you ever met him before?

25       A    -- like I said, I've seen him --



```
1              MR. BLENK:  Form.

2              THE WITNESS:  -- because, you know, he be around the

3         neighborhood.  But I don't -- I never knew him.

4    BY MR. BRUSTIN:

5         Q    Okay.  Did you -- did you know -- did you know Lamar

6    Scott in the same way that you knew Valentina Dixon?  In other

7    words, that you had seen him somewhere around the neighborhood?

8         A    Yea.

9              MR. RUSS:  Object to the form.

10   BY MR. BRUSTIN:

11        Q    You knew him -- you knew him similarly to Valentino.

12   That same -- does that describe it accurately?

13        A    Just -- yeah.

14             MR. RUSS:  Objection to form.

15   BY MR. BRUSTIN:

16        Q    Someone you would recognize as just having seen him

17   around the neighborhood?

18        A    Yes.

19        Q    So, for example, if you had been shown a

20   photograph -- if you had been shown a photograph of Lamar

21   Scott, at the time, you might recognize him as somebody you

22   knew from around the neighborhood; fair to say?

23             MR. BLENK:  Form.

24             THE WITNESS:  Not really -- no.

25   BY MR. BRUSTIN:
```



1    Q    Now, according to the police reports, it was a

2    detective -- let me go back to the photos -- that group of

3    reports that I had before.  This is Plaintiff's 2.  Let me give

4    it to you, again  (handing).

5             (Whereupon, Plaintiff's Exhibit No. 2, previously

6        marked, was reviewed.)

7    A    This is Page 25?

8    Q    Yeah, the first page of this.  The very first page.

9    This is a report that Detective Staumbach [phonetically

10   spelled] did and he references a detective named Lockwood, who

11   had brought you -- it says said (reading) that he "had met with

12   you a witness at the shooting."  Do you remember the name

13   Lockwood is the person you had spoken to at the scene of the

14   crime?

15   A    No.

16   Q    Now, do you remember the same person, who did -- who

17   was typing the statement that you gave, being the same person

18   that was present when you saw the photo array with Valentino

19   Dixon in it?

20   A    No, I don't remember who was in there -- (crosstalk)

21   --

22   Q    You don't remember -- (crosstalk) --

23   A    -- who drove me to the police station.  None of that,

24   no.

25   Q    Now, do you have any reason to believe that you gave



1    a description that was any different at the scene of the crime

2    of the person that you saw as the shooter, than you gave your

3    typed statement?

4         A    Say that again?

5         Q    Sure.  Was -- to your recollection, was there any

6    differences between the description you gave -- (crosstalk) --

7         A    Not that I can recall.

8         Q    -- none that you recall; fair to say?

9         A    No.

10        Q    This report also says that you taken home by

11   detective Lockwood.  Do you remember if it was the same person

12   who spoke to you a the scene, that night, or that morning?

13        A    I don't even remember them taking me home.  If they

14   say they took me home, I don't remember.

15        Q    You were just leaving?

16        A    Yes, it was like 6:00 in the morning or something

17   like that, by the time I got home.  The sun was about to come

18   up.  It was -- I don't remember that.

19        Q    Okay.  Do you remember how many hours you actually

20   spent talking to police that night?

21        A    All night.  I don't remember the amount of time.  But

22   I know it was very, very late.

23        Q    Okay.  Do you remember being brought in to speak --

24   so, you told us that they brought you down to the police

25   station?



1        A    (Indicating.)

2        Q    Do you remember -- and you told us you remember that

3   there was an interview, where the detective was typing?

4        A    (Indicating.)

5        Q    And there was also a time you shown an array that

6   included Valentino Dixon?

7        A    (Indicating.)

8        Q    How many other times where you meeting with the

9   police that night; do you recall?

10       A    Just at night.

11       Q    How may any other means that night?  Like, how often

12  were you being brought back and forth, from where you were

13  sitting, to talk to the police?

14       A    I think it was only one time -- maybe twice.  I'm not

15  sure.

16       Q    Okay.  Now, you mentioned, I think at that time, that

17  you knew Mario pretty, as well?

18       A    (Indicating.)

19       Q    And he was about 20 years old; is that right?

20       A    Somewhere around there.

21       Q    Okay?

22       A    I don't know if he was that old.  He might have been.

23       Q    I'm sorry; 19?

24       A    Yeah, something like that.  Yeah.

25       Q    How old were you in -- how -- how old are you now?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                                114

1      A    I just turned 50.

2      Q    So 1991, you were how old?

3      A    Ninety-one?

4      Q    Yes?

5      A    Jesus -- 17, 18.

6      Q    Okay.  Do you remember what year you were going into

7   school?  Were going to be a senior or were a junior?

8      A    I think it was a junior, maybe a senior.  Because

9   this happened, like, right at the end of school.  So it was,

10  either, a junior or senior.

11          MR. RUSS:  I didn't hear the response.  I'm sorry.

12          MR. BRUSTIN:  I think he said, "junior or senior."

13          MR. RUSS:  All right.

14  BY MR. BRUSTIN:

15     Q    Do you remember if -- was your sister was still

16  living in Buffalo, when you were living in Michigan?

17     A    My sister?

18     Q    Yes?

19     A    When I was in Buffalo, she was living in Michigan?

20     Q    No.  When you were living in Michigan, was your

21  sister still in Buffalo?

22     A    Yes.

23     Q    And you flew back to Michigan, for the criminal

24  proceedings, do you remember seeing your sister?

25     A    Yes.



1      Q     How old was she?

2      A     She's three -- well, I've got two sisters.  Three

3   years and six years apart from me.  So if I was 17, she was 20.

4      Q     Is -- does your mother have a brother?

5      A     Yes.

6      Q     What's his name?

7      A     Skipper.

8      Q     Is it -- is it also Ron?

9      A     No.

10      Q     Does she have a brother named Ron?

11      A     No.

12      Q     Back in Michigan, was there anyone in your house

13   named Ron?

14      A     Just me, my mother, and my father.

15      Q     What's your father's name?

16      A     Ernest.

17      Q     Now, at the time the shooting occurred, you were in

18   the parking lot of Louie's; is that correct?

19      A     Correct.

20            MR. BLENK:  Form.

21   BY MR. BRUSTIN:

22      Q     And you were standing behind a metal barriers; is

23   that right?

24      A     Yes.

25      Q     And at the time, you were with -- you were standing



1   with a guy named Mark, is that right?

2            MR. BLENK:  Form.

3            THE WITNESS:  I don't remember.

4   BY MR. BRUSTIN:

5       Q    Okay.  Well, let's take a look at -- let's take a

6   look at the statement on Page 31; the police reports, again.

7   Exhibit 2, look at Page 31.  Right -- see about eight lines

8   from the bottom (indicating).  It says (reading), "Who were you

9   standing with, at the time of the shooting"?

10      A    (Indicating.)

11      Q    (Reading.)  It says, "Who were you standing with, at

12  the time of the shooting?"  Answer:  "A guy named Mark and

13  those three girls".  Who is Mark?  A guy I know that lives a

14  couple of doors down from my cousin.  My cousin is Joseph

15  Bernard Washington, he lives at 18 Humber Street [sp?]."

16  Question:  "Who --

17      A    Oh, that Mark.  Okay?

18      Q    (Reading) -- who are those girls?"  Answer:  "I don't

19  know them.  I was just getting to meet them."  Question:  "What

20  kind of a car were they in?  A Geo tracker, red, with a

21  white-soft top.  Their truck got shot and the police have their

22  names.  They are three girls."  Okay.  Now, does that refresh

23  your -- I will represent to you --

24      A    (Indicating.)

25      Q    -- that Tamara Freida has testified that she was



1  the -- she was the owner of the car and one of those three

2  girls -- (crosstalk.)

3       A    (Crosstalk.)  Yeah, I remember that.

4       Q    Do you now remember Tamara Freida, the woman, who was

5  driving the car?

6       A    I always remember -- (crosstalk) --

7            MR. BLENK:  Form.

8            THE WITNESS:  -- I know her.  I was saying I don't

9       recall talking to her about -- I know I didn't talk

10      about -- I know that I didn't talk about anything that I'm

11      supposed to be in trouble in Michigan to anybody, because

12      that's false.

13 BY MR. BRUSTIN:

14      Q    Okay?

15      A    That's untrue.

16      Q    Okay.  You would never say anything untrue to

17 anybody?

18      A    No.

19      Q    Okay.  So, first of all, you do know who Tamara

20 Freida is now?

21      A    I didn't say that I didn't know her.  You asked me

22 about something that is said to her.

23      Q    You know who tamara Freida is?

24      A    Yes.

25      Q    She was the girl -- at that time, the young girl --



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              118

1        A     (Indicating.)

2        Q     -- who was driving the tracker; right?

3        A     (Indicating)  Well, yeah -- yeah, yeah, yeah.

4        Q     Okay.  It's also clear that you knew they were

5    witnesses to the shooting.  You said, "the police had their

6    names"?

7        A     Because her car had gotten hit.

8        Q     Okay.  And how did you know that the police had their

9    names?

10       A     Because the car got shot and I remember them talking

11   to the police.

12       Q     You remember them talking to the police?

13       A     (Indicating.)

14       Q     Okay.  Now, and do you remember, specifically,

15   Tamara, the one who was driving?

16       A     (Indicating.)

17       Q     Yes?  You have to answer, yes or no.

18       A     Yes.

19       Q     That's why I keep doing that.  And was she one of the

20   girls that you were flirting with?

21             MR. BLENK:  Form.

22             THE WITNESS:  You're saying flirting?  I probably was

23       talking to her.

24   BY MR. BRUSTIN:

25       Q     Withdrawn.



1        A    I'm not going to say --

2        Q    Let me -- let me withdraw the question.  You -- you

3   were -- you tell me; were you flirting with those girls?

4             MR. BLENK:  Form.

5             THE WITNESS:  Well, to be perfectly honest, I don't

6        remember, specifically, talking to her that night.  I

7        remember some girls we were talking to.

8   BY MR. BRUSTIN:

9        Q    Okay.  And you certainly don't dispute that it was

10  Tamara Freida?

11       A    I know.

12       Q    Okay?

13       A    I never have.  I just said, I never said --

14       Q    Okay?

15       A    -- that I had any issues with police of any kind in

16  any State --

17       Q    Okay?

18       A    -- including Michigan --

19       Q    All right?

20       A    -- and in Buffalo, New York --

21       Q    Okay?

22       A    -- is what I said.

23       Q    Fair enough?

24       A    I do know her.

25       Q    Okay.  You do know her?



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                          120

1        A    And I don't know her well, but I do know her.

2        Q    Okay.  And you do remember speaking to her, not about

3   legal problems in Michigan, but you do remember speaking to

4   her?

5        A    I -- no --

6        Q    Let me finish.  -- in the months and the years after

7   the shooting; correct?

8             MR. BLENK:  Form.

9             MR. RUSS:  Objection to form.

10            THE WITNESS:  No, I can't recall a conversation that

11       me and her had.

12   BY MR. BRUSTIN:

13       Q    I'm -- I'm not asking that.  I'm asking if you did,

14   in fact, have a conversation with her?

15       A    That's what I said, I don't recall having a

16   conversation with her.

17       Q    All right?

18       A    I'm not talking about specific.  I said, I don't

19   remember having a conversation.  I'm not saying it didn't --

20   that I didn't have a conversation with her, because I probably

21   seen her in the city somewhere and said, Hi, or something like

22   that.  But to remember a conversation?  No.  Me and her never

23   talked on the phone.  I can't recall me and her conversing

24   about nothing.

25       Q    Okay.  Do you remember -- do you have any



```
 1  recollection or seeing her in a club?
 2       A    I probably did see her at the club.  We don't have
 3  but -- back then, it may have been two -- two or two clubs in
 4  the City of Buffalo --
 5       Q    Okay?
 6       A    -- so, everybody attended.
 7       Q    Okay?
 8       A    I wouldn't say that she didn't see me in the club, or
 9  I didn't see her in the club, but --
10       Q    Do you remember talking to her, generally, about how
11  traumatic --
12       A    No.
13       Q    -- the shooting was?
14            MR. BLENK:  Form.
15            MR. RUSS:  Objection to form.
16            THE WITNESS:  No.
17  BY MR. BRUSTIN:
18       Q    No?  I mean, it was traumatic; right?
19       A    Yes.
20            MR. BLENK:  Form.
21  BY MR. BRUSTIN:
22       Q    Did you ever see anything like that before?
23       A    Yeah.
24       Q    You have?
25       A    It happens all the time in city, in our neighborhood.
```



1      Q    Okay.  In any case, it was still traumatic; fair to

2  say?

3      A    Yes.

4      Q    All right.  And so, you made it clear that you never

5  told Tamara Freida that you were in trouble in Michigan, and

6  that's why they pressured you?

7      A    I've never told anyone.

8           MR. BLENK:  Form.

9           MR. BRUSTIN:  Okay?

10          MR. RUSS:  Objection to form.

11 BY MR. BRUSTIN:

12     Q    Would it be fair to say that it's possible though,

13 now that you remember this is or now that you know who this is,

14 that you may have told her that Valentino Dixon was not the

15 shooter?

16     A    No.

17          MR. RUSS:  Objection to form.

18 BY MR. BRUSTIN:

19     Q    She's either mistaken or lying about that?

20     A    You have to talk to her about that --

21          MR. BLENK:  Form.

22          MR. RUSS:  Objection to form.

23          THE WITNESS:  -- I can't on, but what I say.

24 BY MR. BRUSTIN:

25     Q    Those words never came out of your mouth?



1      A     No.

2      Q     Not once, let alone twice?

3      A     No.

4      Q     Did you ever talk to Aaron about whether or not he

5   and Tori, or the other gentlemen that was with them, had guns

6   that night?

7      A     No.

8            MR. BLENK:  Form.

9   BY MR. BRUSTIN:

10     Q     To your knowledge, have Aaron or Tori ever been

11  arrested prior to that night?

12     A     Not to my knowledge.  Like I said, I was in Michigan.

13  So when, you know -- when they were old enough to be arrested,

14  I was living in Michigan.

15           So, I wouldn't know their day-to-day and what they

16  were into or what happened.  You know, I'd just see them when I

17  come home.  We'd play basketball, you know, something like

18  that.  But I have never known them to be in any kind of

19  trouble.

20     Q     Okay.  Can you take a look at your testimony.  You

21  can put the report away for now.  Thank you.  You can keep it

22  there, just in the case.  So, now, I want you to look at --

23           MR. RUSS:  While you're searching for it, Nick, which

24       testimony, grand jury, trial?

25           MR. BRUSTIN:  Yeah.  I'm trying to figure out which



1        one I'm going to start with.

2   BY MR. BRUSTIN:

3        Q    Let's start with trial.  Let's start with the trial,

4   Page 154, the second tab?

5        A    You said, "154"?

6        Q    Yeah.  Okay.  Now, you testified here on Page 154.

7   Look at lines -- read Lines 5 to 24?

8             MR. RUSS:  I'm sorry.  I missed the page, Nick?

9             MR. BRUSTIN:  Page 154, Lines 5 to 24.

10            MR. RUSS:  Thank you.

11  BY MR. BRUSTIN:

12       Q    Just 5 to 24.

13       A    Okay.

14       Q    Do you remember now, as you sit here today,

15  Mr. Jackson falling as he was running towards the car?

16       A    (Indicating.)

17       Q    Yes?

18       A    He was running towards the car?

19       Q    And you saw him fall?

20       A    Yes.

21       Q    After he was shot?

22       A    Yes.

23       Q    And you understand, today, that Mr. Jackson -- Aaron

24  Jackson -- was also seriously injured?

25       A    Yes.



1      Q    Okay.  And do you remember how far he was from the

2  car, approximately?

3      A    No, he was pretty much right at the car.

4      Q    Okay.  And then --

5           MR. RUSS:  I'm sorry.  I didn't catch that response.

6  BY MR. BRUSTIN:

7      Q    He was right behind the car.

8      A    He was -- he fell just about at the car --

9           MR. BLENK:  You said, "right at the car."

10          THE WITNESS:  -- because he came running to get in

11       the car and fell.  Yeah, that's how the girl's car end up

12       being shot and the bullet hole that was in Louie's door,

13       because they started shooting at him -- that way.

14  BY MR. BRUSTIN:

15      Q    Okay.  But you never saw him, actually, get into the

16  car.  You only saw him fall, because he was shot; correct?

17      A    Right.

18      Q    Okay?

19      A    I jumped behind the car, you know, at that time.

20      Q    And you testified more specifically,  both -- let's

21  look at Page 139?

22      A    (Indicating). 169?

23      Q    199.  Okay.  So, look at Line 13.  Read Line 13 to

24  Line 25.

25      A    (Indicating.)



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                               126

1      Q    So what happened was you saw Aaron Jackson get shot
2  and fall by the side of the car; correct?
3      A    (Indicating.)
4      Q    Yes?
5      A    Yes.
6      Q    And you were at the back of the car; correct?
7      A    Yes.
8      Q    Ducking?
9      A    Yes.
10     Q    And then, if you take a look at Page 156 of the trial
11  (indicating)?
12     A    (Indicating.)
13     Q    Look at Lines 17, on Page 156, to Line 25.
14     A    (Indicating.)
15     Q    So after the bullet stop, you got up and you saw
16  Aaron lying in the spot where he had fallen, before -- when he
17  was shot; correct?
18     A    Yeah.
19     Q    He was too injured to move?
20     A    (Indicating.)
21     Q    Yes?
22     A    Yes.
23     Q    And you had to move him behind the car --
24     A    Behind the car, yes.
25     Q    -- because he wasn't able to move?



1    A    Correct.

2    Q    So, in other words -- to -- to your knowledge, from

3  the time that he was shot, until the shooting stopped, he

4  remained on the ground, where he had been shot?

5         MR. BLENK:  Form.

6         THE WITNESS:  No.  He stumbled, after he got shot,

7     and got up and tried to make to the car to get into the

8     car, it seemed; and that's when he fell by the car.

9  BY MR. BRUSTIN:

10    Q    Okay.  So, he never made it to the car?

11    A    He made it to the car, but he never made it in the

12  car.

13    Q    Okay.  He fell next to the car?

14    A    Yes.

15    Q    He was up for a few seconds and then fell?

16    A    (Indicating.)

17    Q    Yes?

18    A    Yes.

19    Q    And that's when you helped him?

20    A    Behind the car.

21    Q    Behind the car.  And, to your knowledge, he didn't

22  move, until the ambulance took him?

23         MR. BRUSTIN:  Form.

24         THE WITNESS:  Yes.

25  BY MR. BRUSTIN:



1      Q    Okay.  I want to go back, for a minute, about your

2  opportunity you -- you mentioned your opportunity to see the

3  shooting?

4      A    (Indicating.)

5      Q    You mentioned that, at the time of the shooting, you

6  were standing wit those girls by their car; correct?

7      A    No.

8           MR. BLENK:  Form.

9           MR. RUSS:  Object to form.

10          THE WITNESS:  By the time that happened, I was done

11     -- I was done talking to the females, you know, because it

12     was about to happen.

13  BY MR. BRUSTIN:

14     Q    How far away were you from them?

15     A    From who?

16     Q    The females, when the shooting started?

17     A    It's a -- it's a small parking lot --

18          MR. BLENK:  Form.

19          THE WITNESS:  -- so it's not far.  So, they may have

20     been where the door is maybe (indicating).  I'm not sure.

21  BY MR. BRUSTIN:

22     Q    Okay.

23     A    Probably, at least that far.

24     Q    And once the shooting started, you jumped behind the

25  car; is that right?



1    A    Yeah, I ran and jumped behind the car.

2    Q    Okay.  At what point were you able to see the

3  shooter?

4    A    As soon as it happened.  I was standing at middle

5  barrier, when it all went down.

6    Q    And how far -- how far away were you, approximately?

7    A    From?

8    Q    The shooter?

9    A    Maybe, the wall (indicating).

10   Q    So, 20 -- 20- 30-feet?

11        MR. BLENK:  Form.

12        THE WITNESS:  If that's 20 feet, yeah.

13        MR. BRUSTIN:  Okay?

14        THE VIDEOGRAPHER:  And just to note, we can't see in

15     the video how far the wall is; for the record.

16  BY MR. BRUSTIN:

17   Q    And so --?

18   A    Two car lengths.

19   Q    Okay.  And, certainly, close enough to describe what

20  that person was wearing; correct?

21   A    Yeah.

22   Q    And what the -- and what the persons build was like;

23  correct?

24   A    Yeah.  Remember, I told you about the clothes.  So,

25  the description may be -- well, go back and look at a Hip Hop



1  video from 1991.  You can't tell me the actual size of the

2  people; that's how they wore clothes.  It's not if I can look

3  at you and the clothes you're wearing now and see your

4  physique.  It may have been that.

5       Q    (Indicating.)

6       A    So, you know, that maybe why I said, he may have been

7  heavyset, you know?

8       Q    So it may -- it may have been the reason -- the

9  reason you say he was heavy set, because the cut-off shorts --

10      A    The baggy --

11      Q    Let me -- let me -- the cut-off shorts?

12      A    -- baggy clothes is the reason.  You keep --

13      Q    Hold on a second.  Let me -- let me finish the

14  question.  The shorts and the T-shirt he was wearing may have

15  been baggy; correct?

16      A    Correct.

17      Q    Okay.  And you would agree that you don't ever

18  remember describing the clothes as being baggy?

19      A    No one asked me.

20           MR. RUSS:  Objection to form.

21           MR. BLENK:  Form.

22  BY MR. BRUSTIN:

23      Q    Okay.  But, by the way, have you ever talked Aaron

24  Jackson about the fact that the reason you may have said he was

25  heavyset, was because of baggy clothes?



1    A    No --

2         MR. RUSS:  Objection to form.

3         THE WITNESS:  -- I never talked to anyone about the

4    reason why I describe him that way.

5    Q    Okay.

6         MR. BRUSTIN:  Well, let's do this, let's take a five

7    minute break.  I'm pretty close to done.  Let's just take

8    five minutes.

9         THE VIDEOGRAPHER:  We are going off the record at

10   2:16 p.m.

11        (Whereupon, a brief break was taken.)

12        THE VIDOEGRAPHER:  We are going back on the record at

13   2:28 p.m.

14        MR. BRUSTIN:  Actually, I probably should check.  Is

15   someone there from each side?  James, are you there?

16   Hugh?

17        MR. BLENK:  Yes.

18        MR. RUSS:  Yes.

19        MR. BRUSTIN:  Okay.  Great.

20   BY MR. BRUSTIN:

21   Q    So, what I want you to do now, I want you to take a

22   look, first, at the transcript on page, so it's the third tab

23   and look at Page 22.  Third tab, there you go and Page 22,

24   right-hand numbers, top -- numbers on the right-hand side,

25   right-hand top Okay.  And what I want you to do is I want you



1    to read from new Line 4 on Page 22 to Line 2 on Page 23; okay?

2         A    Okay?

3         Q    Did you read all the way -- all the way to Line 2 on

4    Page 23?

5         A    (Indicating.)

6         Q    Yes?

7         A    Yes.

8         Q    And go to play the part of the tape in just a minute.

9    But do you remember telling this to Valentino Dixon's father?

10        A    No.

11        Q    Okay.  Do you remember --

12             MR. RUSS:  Objection to form.

13             MR. BRUSTIN:  -- do you remember telling Valentino

14        Dixon's father, for example, that you left -- you left

15        Michigan, because you had to watch your back?

16             MR. BLENK:  Form.

17             THE WITNESS:  No.

18    BY MR. BRUSTIN:

19        Q    Do you remember telling him that (reading),  "every

20    time it down here every time I turned around, I got to look

21    over my back now."  Do you remember telling him that?

22        A    No.

23             MR. BLENK:  Form.

24    BY MR. BRUSTIN:

25        Q    Do you deny telling him that?



1    A    I don't recall it, so, yeah.

2    Q    And do you remember saying Mr. Dixon's girlfriend and

3  court?

4    A    No.

5    Q    Do you remember expressing any remorse to Valentino

6  Dixon's dad about your role in his son being convicted?

7    A    I may have said that I feel bad for him.  You know,

8  nobody won on -- on either side.

9    Q    But never -- you never said to him anything like, I

10  know your son didn't do it?

11    A    No.

12    Q    Okay.  If -- if that must have been somebody else and

13  he spoke to and it wasn't you?

14    A    I don't know.

15         MR. BLENK:  Form.

16         MR. RUSS:  Object to form.

17         MR. BRUSTIN:  Okay.  Are you ready to play this, Mo?

18         MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, I'm

19     all set.

20         MR. BRUSTIN:  So give me -- I want you to give me the

21     timestamp -- the time number, please, of where we're

22     starting and where we've stopped.  Just (crosstalk) --

23         MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  -- yeah,

24     (crosstalk) --

25         MR. BRUSTIN:  -- I'm sorry.  Just do it where we



1    start and I'll tell you when to stop.

2         MR. BLENK:  What time is it?

3         MR. BRUSTIN:  It's two --

4         MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  It's

5    2618.

6         MR. BLENK:  Thank you.

7         MR. BRUSTIN:  Okay. go ahead and play it.

8         (Whereupon, Plaintiff's Exhibit No. 24 audio

9    recording was played from 2618 [00hrs:26mins:18secs].)

10   BY MR. BRUSTIN:

11   Q    Can you follow along with page (indicating)?

12        MR. BRUSTIN:  Stop.  Stop.  Mo?  Mo, can you stop it,

13   please?  Guys?  Mo, can we stop it and start it, again,

14   please?

15        (Whereupon, the audio was paused.)

16        THE WITNESS:  Where am I starting from?

17        MR. BRUSTIN:  Can you hear me?

18        MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yes, I

19   can hear you.

20        MR. BRUSTIN:  Let's go ahead and start it, again.

21   BY MR. BRUSTIN:

22   Q    And I want you to start at Line 3 and read it with it

23   (indicating).

24        MR. BRUSTIN:  Okay.  Go ahead.

25        (Whereupon, Plaintiff's Exhibit No. 24 audio



```
 1        recording was played, again, from 2618
 2        [00hrs:26mins:18secs].)
 3              MR. BRUSTIN:  Okay.  You can stop it now, Mo.
 4              MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Okay.
 5        Stopping it 2733.
 6   BY MR. BRUSTIN:
 7        Q    Okay.  And if he recognize that is you speaking on
 8   the tape; correct?
 9        A    If you say so, but I didn't have to watch my back.
10        Q    Okay.  But you recognize that you speak you; right?
11   That's your voice?
12              MR. RUSS:  Objection to form.
13              MR. BLENK:  Form.
14              THE WITNESS:  No, I can't say that's me.
15   BY MR. BRUSTIN:
16        Q    Okay.  So you think that's someone else --
17        A    Do that sound like me to you?
18        Q    -- so you think that's someone else, not you?
19        A    It could be, yeah.  It could be anybody you don't
20   sound like me.
21        Q    Do you deny -- do you deny saying those words --
22        A    Yes.
23        Q    -- to Mr. Bryant?
24        A    Yes.
25        Q    That's not you?
```



1        A    I deny saying those words.  I told you, I don't --

2   that tape, it doesn't sound like me.

3        Q    Okay?

4        A    It doesn't sound like anything that I would say.

5   What am I watching my back in Michigan about?

6        Q    Okay.  So just to be clear, you deny that that's you

7   on the tape?

8        A    Yeah.

9        Q    Okay.  Last thing.

10            MR. BRUSTIN:  Mo, do you know on Page 9, where that

11       starts?  Somewhere around 1130, Line 14?

12            MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah, let

13       me look for it.

14   BY MR. BRUSTIN:

15        Q    So while he's looking, can you take a look,

16   Mr. Adams, at Page 9 of the same transcript.  If you could read

17   to yourself Page 9, Line 14 to Page 10, Line 6.

18        A    You said read this page to this page to Line 6

19   (indicating)?

20        Q    Yeah.  You know what, read all the way through --

21   sorry -- all the way through to line -- to the bottom of

22   page -- of Page 10.

23            MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  And Page

24       line -- Page 9 to Line 14, you said, until when?

25            MR. BRUSTIN:  To Page 10, Line 25.



1          MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  I'm ready

2      whenever.

3          MR. BRUSTIN:  No, I just want him to read it.  I'll

4      let you know.  Thanks.  Thanks, Mo.

5          THE WITNESS:  Okay.

6   BY MR. BRUSTIN:

7      Q    Now, I want him to play this and I want you to read

8   it, again, with the -- with the -- listening -- I want you to

9   read it listening to the tape.

10         MR. BRUSTIN:  Okay.  Go ahead and play, Mo.  Give the

11     time, please?

12         MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Yeah,

13     it's starting at 1150.  And then, what line did you want

14     to stop at, again?

15         MR. BRUSTIN:  I'll tell you when to stop?

16         MR. SOTO-BRITO (PARALEGAL TO MR. BRUSTIN):  Okay.

17         MR. BRUSTIN:  And then, you can announce what the

18     time is.  Thanks.

19         (Whereupon, Plaintiff's Exhibit No. 24 audio

20     recording was played, again, from 1150

21     [00hrs:11mins:50secs].)

22         MR. BRUSTIN:  Mo, you can't stop now, Mo.

23         (Whereupon, the audio was stopped.

24   BY MR. BRUSTIN:

25     Q    So, first of all, do you remember the police coming



 1  to your house, as you just -- as described here on the tape, in
 2  Michigan?
 3          MR. RUSS:  Objection to form.
 4          THE WITNESS:  No.
 5  BY MR. BRUSTIN:
 6     Q    Do you remember spending the night until, as a result
 7  of not showing up to testify, as you -- as described here on
 8  the tape?
 9     A    No.
10          MR. BLENK:  Form.
11          THE WITNESS:  I never spent the night in jail.
12  BY MR. BRUSTIN:
13     Q    Did you spend any time in jail as a result of not?
14     A    When I came and turn myself in for the warrant they
15  said I had.  But I was immediately released.
16     Q    Okay.  And that's what you're describing here; right?
17     A    Okay, if you're telling me --
18          MR. BLENK:  Form.
19          THE WITNESS:  -- that I spent the night or that I
20      turn myself in, I sat office and I was never in a jail
21      cell.
22     Q    Well, what you said here -- I'm sorry -- what you
23  said here is they said you want to turn yourself in, if you're
24  just 16.  Is that something you said?
25          MR. BLENK:  Form.



EMIL TOUSSAINT ADAMS                                  January 17, 2023
DIXON V CITY OF BUFFALO                                          139

```
1              MR. RUSS:  Objection to form.
2    BY MR. BRUSTIN:
3         Q    Is that true?
4         A    I don't even recall that.  But.
5         Q    Do you remember calling your mother and telling her
6    to come up for a couple of weeks.  You need to show up for
7    court and there was a warrant in the mailbox?
8         A    I was living with my mother.
9         Q    Okay.  So that's true, you did do that?
10        A    No.
11             MR. BLENK:  Form.
12             THE WITNESS:  I can't call my mother, if I'm living
13        with my mother.
14             MR. RUSS:  Objection to form.
15   BY MR. BRUSTIN:
16        Q    Okay.  Was there a warrant in your mailbox?
17        A    Again, I don't check the mail.  My mother, gets the
18   mail.
19        Q    It say here (reading) "I was in jail for that
20   morning, and they let me right out, because they won't charge."
21   Is that true, were you in jail for the morning?
22        A    I was held in an office.
23             MR. RUSS:  Objection to form.
24             THE WITNESS:  I was never in a jail cell, take my
25        shoes, all this other stuff that comes with it.  No, they
```



1          help me to see if I had a -- if they were going to press

2          charges or whatever and they let me right out.

3    BY MR. BRUSTIN:

4          Q    Okay?

5          A    Right away.

6          Q    So this is you describing that in this tape; right?

7          A    If you say so.

8               MR. BLENK:  Form.

9               MR. RUSS:  Objection to form.

10              THE WITNESS:  But, like I said, I don't recall any of

11         that.

12   BY MR. BRUSTIN:

13         Q    Do you deny -- do you deny that what you just heard

14   on the tape your reading in this transcript, is you?

15              MR. BLENK:  Form.

16              MR. RUSS:  Objection to form.

17              THE WITNESS:  Well, I -- I don't remember anything

18         tape recording of me and me saying these things.

19   BY MR. BRUSTIN:

20         Q    I know you don't remember saying any of these things

21   on tape.  But do you deny that -- you've already told us that

22   much of this -- withdrawn.  You've already told us to some of

23   this is true.  You did turn yourself in and you were at the

24   jail for the morning; correct?

25         A    Well, that's public knowledge that I turn myself in



EMIL TOUSSAINT ADAMS                                         January 17, 2023
DIXON V CITY OF BUFFALO                                                  141

```
 1   for a warrant.
 2           MR. BLENK:  Form.
 3           MR. RUSS:  Objection to form.
 4   BY MR. BRUSTIN:
 5       Q    Is the conversation that's described at the bottom of
 6   Page 10, a conversation that you had with Belling?
 7       A    I don't remember.
 8           MR. RUSS:  Objection to form.
 9   BY MR. BRUSTIN:
10       Q    Do you remember the police ever coming to the house
11   in Michigan and you answering the door?
12       A    No.
13           MR. BRUSTIN:  Okay.  I think that's all I have right
14       now.  I may have some other questions after these lawyers
15       ask you questions.  Who's up?
16           MR. RUSS:  My turn, I guess?
17           MR. BRUSTIN:  Yeah.
18                     CROSS-EXAMINATION
19   BY MR. RUSS:
20       Q    Mr. Adams, I know that we introduced ourselves, sort
21   of, earlier on this morning, but my name is Hugh Russ.  And I
22   represent the city of Buffalo, Buffalo Police Department, and
23   various police officers in this case.  I just have a few
24   questions for you.  I'm not going to try to go for everything
25   that you were asked, I just want to fill in a couple of holes;
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              142

1   okay?

2        A    Yes, sir.

3        Q    We spent a fair time, this morning and this

4   afternoon, talking about this tape and listening to the tape

5   and looking at the transcript from the tape.  Do you recall

6   those questions?

7        A    Yes.

8        Q    Did you know you were being taped?

9        A    No.

10       Q    Did they ever tell you that they were going to tape

11  you?

12       A    No, sir.

13       Q    Did they ever ask your permission?

14       A    No, sir.

15       Q    You were asked some questions about whether you were

16  sure that Valentino Dixon was a shooter; do you remember those

17  questions?

18       A    Yes.

19       Q    As you sit here today, 30 plus years later, are you

20  still sure that Valentino Dixon was the shooter?

21       A    Yes.

22       Q    You were asked a number of questions about how you

23  knew and if you knew Valentino Dixon; do you remember some of

24  those?

25       A    Yes.



1     Q    Did you know him to be a drug dealer?

2     A    No.  Like I said, I was living at Michigan at the

3  time.  So any -- any person that you would ask me about there

4  day to day and what they do, I wouldn't know.  Because I was

5  living in Michigan and in high school and at my parents home.

6  So, I didn't have time to know what these gentlemen were doing

7  or into.

8     Q    Okay.  Thank you.  Did anyone, whether from the

9  Buffalo Police Department or the District Attorney's Office,

10  ever force you to testify?

11     A    No, sir.

12     Q    Did they ever tell you what you should say?

13     A    No, sir.

14     Q    Did they ever threaten you?

15     A    No, sir.

16     Q    On the night of the shooting, you said you were

17  behind a metal barrier.  Is that just like a bumper in a

18  parking lot?

19     A    Yeah.

20     Q    It's not a fence; is it?

21     A    No, it's like the metal guard rails that be along the

22  Expressway or something like that -- that was in the parking

23  lot.

24     Q    So you could see the intersection?

25     A    I was standing at it, at the barrier, literally.



1            MR. RUSS:  That's all I have.  Thank you.

2                      CROSS-EXAMINATION

3    BY MR. BLENK:

4       Q    Hi, Mr. Adams.  My name is J.P. Blenk.  I think I

5    mentioned that earlier, but thank you for being here today.  I

6    represent Erie County and Christopher Belling in this case.

7    Just like Mr. Ross, just one or two clean up questions to

8    clarify your prior testimony; okay?

9       A    Yes.

10      Q    You testified earlier about interaction with the

11   investigator named Mr. Dill from the Erie County District

12   Attorney's Office.  Do you remember that?

13      A    Yes.

14      Q    And there was what -- what we've marked as Exhibit 29

15   was placed in front of you?

16      A    (Indicating.)  Yes.

17      Q    Do you still have access to Exhibit 29 there?

18      A    No.  Is this it hear (indicating)?

19           MR. BRUSTIN:  Hold on.  I'll give it to him.  The

20      Dill Affidavit, is that what you want?

21           MR. BLENK:  Yes.

22           MR. BRUSTIN:  Here you go (handing).  He's got it.

23   BY MR. BLENK:

24      Q    How many pages is that document?

25      A    Two.



1          MR. BRUSTIN:  It's three, actually it is four pages.

2          THE WITNESS:  Oh, back?

3          MR. BRUSTIN:  It's four pages back and front.  It's

4     four pages back and front.

5   BY MR. BLENK:

6     Q    Did you -- did you see I'm talking numbers here, I'm

7   talking about the number in the bottom right corner

8   (indicating).  Did you see the page that's marked [Dixon

9   005976]?  It's probably the last page?

10         (Whereupon, Plaintiff's Exhibit No. 2 was reviewed.)

11    A    Yeah.

12    Q    Had you been given the opportunity to review that,

13  before answering questions?  Did you -- did you review that

14  portion of the document, before answering about your

15  interactions with Mr. Dill?

16    A    Today, you mean?

17    Q    Yes?

18    A    No, this is my first time ever seeing the back of

19  this.

20    Q    Is that your signature at the bottom of that page?

21    A    The first -- the first name, yeah, but the last name

22  is kind of sketchy.  But you could say, yeah.  Yeah, I might

23  have bad handwriting right there, yeah.

24    Q    But you -- you would have signed the first name --

25    A    Yeah.



1      Q     -- so you can infer from that day, you must have

2    signed the whole name?

3      A     (Indicating.)

4      Q     Okay.

5            MR. BRUSTIN:  Objection to form.

6            MR. BLENK:  I don't have any further questions.

7            MR. BRUSTIN:  So, I just have a few followup.

8                        REDIRECT EXAMINATION

9    BY MR. BRUSTIN:

10     Q     So, let's start with this document, 5976.  So, first

11   of all, is this your handwriting in the body of this document?

12   (Reading), "I was shown an affidavit by Investigator Dill;" is

13   that your handwriting?

14     A     Yeah.

15     Q     It is.  Okay.  And, does this refresh your -- okay.

16   So -- so, this was in 2005, much closer in time to when

17   Mr. Putnam said he met with you; correct?

18     A     I guess.  See, I don't remember.  Like I said, you're

19   asking me things from 17 years.  That's a long time.

20     Q     I understand. (Crosstalk.)

21     A     Seven months ago is a long time, let alone 17 years.

22     Q     But that's what I'm getting at; this is 2005.  And in

23   2005, you're claiming that Roger Putnam lied, when he said he

24   even met with you; right?

25     A     No, I said I don't recall.



1    Q    Well, that's not what you wrote here.  You said

2  (reading), "I do not know a Roger Putnam."

3    A    I don't know Roger Putnam.

4    Q    "I never talked to Roger Putnam."

5    A    How -- how would I know him or remember talking to

6  him, if I don't remember talking to him.

7    Q    Right.  So, you're saying you never talked to him;

8  correct?

9    A    I said I don't remember.

10    Q    Well, no.  Here you write, "I never talked to him."

11  Not that you don't remember what I'm trying to get that is, is

12  if Roger Putnam come to the court and testifies that he met

13  with you seven times --

14    A    (Indicating.)

15    Q    -- you're telling me -- about this case, you're

16  telling me he's lying; right?

17    A    I do not remember a gentleman coming into Uncle

18  Johnny's to talk to me.

19    Q    Okay.  But you're not saying that didn't happen, now,

20  you're just saying you don't remember.  Is that what you're

21  telling me?

22         MR. BLENK:  Form.

23         THE WITNESS:  What did you get out of that?

24  BY MR. BRUSTIN:

25    Q    It's two different things.



1    A    It's one thing I said, and one thing only.  I told

2  you I do not recall talking to this man.

3    Q    Is it possible --?

4    A    You keep trying to ask the question a different way

5  --

6    Q    Nope.

7    A    -- and I am telling you the same answer.  I don't

8  recall a gentleman coming to Uncle Johnny's to talk to me about

9  whatever -- about this here.  Now, could it have happened?

10 Yeah.  But, do I remember that it happened?  No.

11   Q    Okay.  So, it is possible that, in fact, Roger Putnam

12 came and talk to you inside uncle Johnny's --

13   A    It's possible.

14   Q    You just don't remember today?

15   A    It's possible.

16       MR. BLENK:  Form.

17   Q    Okay.  Now, another thing you were asked questions

18 from Mr. Russ about whether or not you are certain, today, that

19 Valentino Dixon was a shooter and you said you were?

20   A    And who was I talking to?

21   Q    Mr. Ross.  One of the attorneys -- the first attorney

22 that was questioning you after me.

23   A    Okay?

24   Q    And you told him that you're certain -- as certain

25 today as you were then that Valentino Dixon was the shooter;



1  correct?

2      A    Yeah.

3      Q    And you also deny ever telling anybody in the world

4  that Valentino Dixon was not the shooter; correct?

5      A    Correct.

6      Q    And you deny telling anyone in the world that you

7  were threatened to say that Valentino Dixon was a shooter;

8  correct?

9      A    Correct.

10     Q    In fact, your answer today that you never told

11  anybody that you -- that Valentino Dixon was not the shooter,

12  as you are that you saw him doing the shooting; correct?

13     A    Correct.

14          MR. BLENK:  Form.

15  BY MR. BRUSTIN:

16     Q    And anybody who says that you told them that

17  Valentino Dixon was not the shooter, is lying, or mistaken

18  correct?

19     A    Correct.

20          MR. BLENK:  Form.

21          MR. RUSS:  Objection to form.

22  BY MR. BRUSTIN:

23     Q    And anybody that says the words that came out of your

24  mouth that you were threatened by the DA or the police, is

25  lying or mistaken; correct?



1    A    Correct.

2         MR. BLENK:  Form.

3  BY MR. BRUSTIN:

4    Q    And you are as certain about that, as you are that

5  Valentino Dixon was the shooter?

6    A    Correct.

7         MR. BLENK:  Form.

8  BY MR. BRUSTIN:

9    Q    You never told anybody that you knew Lamar Scott was

10  the shooter; correct?

11    A    Never.

12    Q    Not Tamara Freida?

13    A    No one.

14    Q    And you never told anybody that you where never sure

15  that Valentino Dixon was the shooter; correct?

16    A    Correct.

17         MR. BLENK:  Form.

18  BY MR. BRUSTIN:

19    Q    Not Tamara Freida?

20    A    No one.

21    Q    Not Roger Putnam?

22    A    I said no one.

23    Q    Not Valentino Dixon's mother or father?  Please

24  answer.

25         MR. BLENK:  Form.



1          THE WITNESS:  No one.

2     Q    Now, you -- I think I heard you say earlier today

3 that you deny that anybody on behalf of Mr. Dixon ever served

4 you with a subpoena for a deposition or a notice for you to

5 appear in court at your home; correct?

6     A    Correct.

7          MR. BLENK:  Form.

8          MR. RUSS:  Objection to form.

9          THE WITNESS:  No one gave me papers. him.

10 BY MR. BRUSTIN:

11    Q    Okay.  Now, where do you live?

12    A    They had gave me -- my wife told me they left a paper

13 outside the house.

14    Q    Okay.  Is it your testimony that your wife never

15 opened the door and never spoke to any investigator that we

16 hired?

17    A    I never asked her.

18         MR. BLENK:  Form.

19 BY MR. BRUSTIN:

20    Q    In fact, what -- I don't -- what's your address?

21    A    3321 Beulah Ridge Court.

22    Q    Do you live with your wife?

23    A    Yes.

24    Q    Okay.  And do you deny on multiple occasions you were

25 served at your home, your wife was handed a given a subpoena on



1  multiple occasions for you to testify in a deposition?

2       A    I don't know --

3            MR. BLENK:  Form.

4            THE WITNESS:  -- what's handed to my wife, when I'm

5       not home.

6  BY MR. BRUSTIN:

7       Q    Okay.  And you also received a notice that you were

8  being -- that you were facing possible contempt charges in

9  court; correct?

10      A    No.

11      Q    You never saw that?

12           MR. BLENK:  Form.

13           THE WITNESS:  The only thing I knew about a content

14      was with the judge called me and said that I had two weeks

15      and he is going to start finding me 250 bucks a day, the

16      400 bucks a day --

17  BY MR. BRUSTIN:

18      Q    Okay?

19      A    -- and jail, if I don't.

20      Q    In fact, there were many -- a number times --

21           MR. RUSS:  What's the relevance -- what's the

22      relevance of this whole line of questioning?

23           MR. BRUSTIN:  It goes to state of mind, but I don't

24      need to show you relevance.  But I -- I -- but that's the

25      point.



```
 1                MR. RUSS:  State of mind, as he sits here today?

 2                MR. BRUSTIN:  Yes, his credibility.

 3     BY MR. BRUSTIN:

 4        Q    And, in fact, you spoke to him in the phone number

 5     times; correct?

 6        A    (Indicating.)

 7        Q    At each time you told me a substance, that I could do

 8     whatever I wanted to do, but you weren't coming to testify;

 9     correct?

10        A    Correct.

11                MR. RUSS:  Objection to form.

12     BY MR. RUSS:

13        Q    Now, you told me in substance, that I can have you

14     arrested, I could fine you, but you're never showing up; right

15     him?

16                MR. RUSS:  Objection to form.

17                THE WITNESS:  I didn't think that you could.

18     BY MR. BRUSTIN:

19        Q    All right.  And then, I texted you a number times,

20     you didn't respond; correct?

21        A    Yeah, I guess that was your number.

22        Q    And I texted you -- well, you know it was my number,

23     because you spoke to you on the phone; right?

24        A    I don't have your number in my phone.

25        Q    Well --
```



1       A    Without looking at them papers, tell me my phone

2   number.  You texted me, you called me, tell me my phone number.

3       Q    Do you remember when I texted you from the courtroom?

4       A    See what I mean, you don't know my phone number?

5       Q    I don't.

6       A    But you want me to know yours.

7       Q    I don't.

8       A    But you expect me to know yours?

9       Q    I'm not asking to know what the numbers -- what the

10  digits were.  You knew that when you looked at the phone, that

11  it came from me in New York; correct?

12      A    Correct.

13      Q    All right.  And when I -- and when I -- I didn't ask

14  if you memorized the digits.  When I --

15      A    But you said I knew your number.

16      Q    You knew it was from me, the lawyer in New York City;

17  right?

18      A    Okay?

19      Q    And when I texted you, in court, because you didn't

20  want to pick up the phone, and I texted you that I was sitting

21  in the courtroom and the judge wanted to talk to you, finally

22  you picked up the phone; right?

23      A    No, you called me.

24      Q    The judge called you; right?

25      A    Right.  I didn't respond to any text or whatever it



1  was.  I called -- you called me with a guy saying he was a

2  judge.  I didn't believe that.  But was you started telling me

3  he was this judge and I can get find and blah, blah, blah and

4  jail.

5            I contacted my lawyer, because he gave you two

6  weeks -- that he was going to give me two weeks.  And after the

7  two weeks, he was going to start fining me, every day.  And

8  then, after that it was going to be jail time.  So I contacted

9  my lawyer.  In about five days later, he got in contact with

10  you, after that phone call.

11      Q    So he is a question for you, why -- you already told

12  us that the Jackson Brothers are good friend of yours; correct?

13      A    (Indicating.)

14      Q    And you wanted to help them any way you could; right?

15           MR. BLENK:

16           THE WITNESS:  No, not them in any way, you know, that

17      I can.  It was not about them.

18  BY MR. BRUSTIN:

19      Q    And so, you said you've always told the truth at

20  trial?

21      A    Correct.

22      Q    You always came voluntarily?

23      A    Correct.

24      Q    And you've told the truth, today, according to you?

25      A    Correct.



EMIL TOUSSAINT ADAMS                          January 17, 2023
DIXON V CITY OF BUFFALO                                     156

1      Q    So why do we have to get a court order and threatened

2   you with arrest to get you to come here testify?

3           MR. BLENK:  Form.

4           MR. RUSS:  Objection to form.

5           THE WITNESS:  One, I did not know what this is about.

6       In the grand scheme of things, I thought that the guy

7       Valentino Dixon was trying to use me, somehow or way to

8       help them get money from the State.  So that's what I told

9       you, specifically on the phone, I do remember our call

10      from a couple weeks ago; okay.  He found a loophole.  God

11      bless him.  He should be happy with his freedom.  But to

12      help them in any shape form or fashion to get money for

13      what he did, is absolutely ridiculous.  And I won't help

14      him.

15      Q    Right.  But you told us all -- all you ever intended

16   to say was that he was a shooter; correct?

17      A    No, I did not say, all that I intended to say him.

18      Q    But you're --?

19      A    I intended to tell the truth.  I didn't intend to say

20   anything specific to just -- killed this guy.  If he's getting

21   money out of the State, then God bless him, he gets money.  He

22   found a loophole out of the damn jail cell, God bless him.  He

23   did it --

24      Q    So --

25      A    -- so.



1    Q    -- and you never -- you never had, just to -- just to

2    close the loop.  You never any communications with Aaron

3    Jackson or anybody else about statements that you had me in the

4    past suggested that Valentino Dixon was not t]he shooter?

5        A    Correct.

6        MR. BLENK:  Form.

7    BY MR. BRUSTIN:

8        Q    And that had nothing to do with your reluctance to

9    testify here, today?

10       A    No.

11       MR. BRUSTIN:  Okay.  That's all I have.

12       THE VIDEOGRAPHER:  Anything further from other

13       counsel?

14       MR. BLENK:  No.

15       THE VIDEOGRAPHER:  We are going to present.  Wait --

16       staying on the record.

17       MR. BRUSTIN:  You have the option if you want.  You

18       can -- you can look at the transcript and read it to make

19       sure it's accurate, if you want to.

20       THE WITNESS:  I don't want to keep reliving that.

21       MR. BRUSTIN:  Okay.  Do you want a copy of it?

22       THE WITNESS:  No.

23       MR. BRUSTIN:  Okay.  Then you're done.  Thank you.

24       We're done.

25       THE VIDEOGRAPHER:  We're going off the record at 3:02



```
 1   p.m.  This includes today's testimony of the Emil

 2   Toussaint Adams.

 3          (Pursuant to Rule 30(e) of the Federal Rules of Civil

 4   Procedure and/or O.C.G.A. 9-11-30(e), signature of the

 5   witness has been waived.)

 6          (Whereupon the deposition concluded at 3:02 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    DISCLOSURE OF NO CONTRACT

2

3           Pursuant to Article 8.B of the Rules and Regulations

4    of the Board of Court Reporting of the Judicial Council of

5    Georgia which states: "Each court reporter shall tender a

6    disclosure form at the time of the taking of the deposition

7    stating the arrangements made for the reporting services of the

8    certified  court reporter, by the certified court reporter, the

9    court reporter's employer, or the referral source for the

10   deposition, with any party to the litigation,counsel to the

11   parties or other entity.  Such form shall be attached to the

12   deposition transcript," I make the following disclosure:

13   I am a certified Georgia Certified Court Reporter.  I am here

14   as a representative of Esquire Deposition Solutions.

15

16           Esquire Deposition Solutions was contacted to provide

17   court reporting services for the deposition.  Esquire

18   Deposition Solutions will not be taking this deposition under

19   any contract that is prohibited by O.C.G.A 15-13-37(a) and (b).

20   Esquire Deposition Solutions has no contract/agreement to

21   provide reporting services with any party to the case, any

22   counsel in the case, or any reporter or reporting agency from

23   whom a referral might have been made to cover this deposition.

24   Esquire Deposition Solutions will charge its usual and

25   customary rates to all parties to all parties in the case,and a



1  financial discount will not be given too any party to this

2  litigation.

3

4          This, the 17th day of January 2023.

5                        _Lisa Sims_____

6                        Lisa L. Sims

7                        Certified Court Reporter

8                        #5072-0730-2093-2096

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    C E R T I F I C A T E

2    STATE OF GEORGIA

3    COUNTY OF DEKALB

4

5        I hereby certify that the foregoing transcript was

6    reported, as stated in the caption, and the questions, and

7    answers thereto were reduced to typewriting under my direction;

8    that the foregoing pages represent a true, complete and correct

9    transcript of the evidence given upon said hearing, and I

10   further certify that I am not of kin or counsel to the parties

11   in the case; am not in the employ of counsel for any of said

12   parties; nor am I in any way interested in the result of said

13   case.

14                        This, the 17th day of January 2023.

15

16

17                        Lisa L. Sims

18                        Certified Court Reporter

19                        #5072-0730-2093-2096

20

21

22

23

24

25



```
1                      DEPOSITION ERRATA SHEET

2

3    Our Assignment No. [J9079557]

4    Case Caption: [VALENTINO DIXON V. CITY OF BUFFALO ET AL]

5

6                 DECLARATION UNDER PENALTY OF PERJURY

7

8        I declare under penalty of perjury that I have read the

9    entire transcript of my deposition taken in the above-captioned

10   matter or the same has been read to me, and the same is true

11   and accurate, save and except for changes and/or corrections,

12   if any, as indicated by me on the DEPOSITION ERRATA SHEET

13   hereof, with the understanding that I offer these changes as if

14   still under oath.

15

16   Signed on the _____ day of _____, 20___.

17   _____

18   [EMIL TOUSSAINT ADAMS]

19

20

21

22

23

24

25
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              163

```
 1              DEPOSITION ERRATA SHEET

 2

 3   Page No._____Line No._____Change to:_____

 4   _____ Reason for

 5   change:_____ Page No._____Line

 6   No._____Change to:_____

 7   _____ Reason for

 8   change:_____ Page No._____Line

 9   No._____Change to:_____

10   _____ Reason for

11   change:_____ Page No._____Line

12   No._____Change to:_____

13   _____ Reason for

14   change:_____ Page No._____Line

15   No._____Change to:_____

16   _____ Reason for

17   change:_____ Page No._____Line

18   No._____Change to:_____

19   _____ Reason for

20   change:_____ Page No._____Line

21   No._____Change to:_____

22   _____ Reason for

23   change:_____

24   SIGNATURE:_____DATE:_____

25   [EMIL TOUSSAINT ADAMS]
```



EMIL TOUSSAINT ADAMS                                    January 17, 2023
DIXON V CITY OF BUFFALO                                              164

```
 1                 DEPOSITION ERRATA SHEET

 2

 3   Page No._____Line No._____Change to:_____

 4   _____ Reason for

 5   change:_____ Page No._____Line

 6   No._____Change to:_____

 7   _____ Reason for

 8   change:_____ Page No._____Line

 9   No._____Change to:_____

10   _____ Reason for

11   change:_____ Page No._____Line

12   No._____Change to:_____

13   _____ Reason for

14   change:_____ Page No._____Line

15   No._____Change to:_____

16   _____ Reason for

17   change:_____ Page No._____Line

18   No._____Change to:_____

19   _____ Reason for

20   change:_____ Page No._____Line

21   No._____Change to:_____

22   _____ Reason for

23   change:_____

24   SIGNATURE:_____DATE:_____

25   [EMIL TOUSSAINT ADAMS]
```

