# EXHIBIT  13

2                        VIDEO DEPOSITION
                      CHRISTOPHER J. BELLING
3


4
    UNITED STATES DISTRICT COURT
5   WESTERN DISTRICT OF NEW YORK

6
    ----------------------------------------
7   VALENTINO DIXON,

8                              Plaintiff,

9                - vs -        Case No.
                              1:19-cv-01678-WMS
10
    CITY OF BUFFALO and COUNTY OF ERIE;
11  and DETECTIVE MARK R. STAMBACH,
    DETECTIVE RANIERO MASECCHIA, DETECTIVE
12  JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
    CHIEF RICHARD T. DONOVAN, JOHN DOES,
13  Unknown Buffalo Police Department Supervisors,
    and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
14  BELLING, in their individual capacities,

15                             Defendants.
    ----------------------------------------
16

17         Video recorded deposition of CHRISTOPHER

18  J. BELLING Defendant, taken pursuant to the Federal

19  Rules of Civil Procedure, in the law offices of

20  HARRINGTON & MAHONEY, 70 Niagara Street, Third

21  Floor, Buffalo, New York, on April 11, 2023,

22  commencing at 10:18 a.m., before JOAN M.

23  METZGER-HUBBELL, CM, Realtime Reporter, Notary

24  Public.

25



```
 1
 2   APPEARANCES:      NEUFELD SCHECK & BRUSTIN, LLP,
                       By NICK J. BRUSTIN, ESQ.,
 3                     nick@nsbcivilrights.com,
                       GERARDO ROMO, ESQ.,
 4                     gerardo@nsbcivilrights.com,
                       via Zoom,
 5                     KATIE McCARTHY, ESQ.,
                       katie@nsbcivilrights.com,
 6                     via Zoom,
                       99 Hudson Street,
 7                     8th Floor,
                       New York, New York  10013,
 8                     (212) 965-9081,
                       Appearing for the Plaintiff.
 9
                       HODGSON RUSS LLP,
10                     By HUGH M. RUSS, III, ESQ.,
                       The Guaranty Building,
11                     140 Pearl Street, Suite 100,
                       Buffalo, New York  14202,
12                     (716) 856-4000,
                       hruss@hodgsonruss.com,
13                     Appearing for the Defendants,
                       City of Buffalo; Detective
14                     Mark R. Stambach, Detective
                       Raniero Masecchia, Detective
15                     James P. Lonergan, Detective
                       John Vickerd, Chief Richard T.
16                     Donovan, and John Does, Unknown
                       Buffalo Police Department
17                     Supervisors, via Zoom.

18                     LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                       By JAMES P. BLENK, ESQ.,
19                     jblenk@lippes.com and
                       JENNIFER C. PERSICO, ESQ.,
20                     jpersico@lippes.com,
                       50 Fountain Plaza, Suite 1700,
21                     Buffalo, New York  14202,
                       (716) 853-5100,
22                     Appearing for the Defendants,
                       County of Erie and
23                     Assistant District Attorney
                       Christopher Belling.
24
     PRESENT:          MOISES SOTO-BRITO
25                     JEFFREY J. LOFTUS, Videographer
```



```
 1              Christopher J. Belling
 2         (The following discussion was held before
 3    videotaping commenced.)
 4         THE REPORTER:  Do counsel stipulate that I
 5    may swear in the witness without him showing me
 6    photo ID?
 7         MR. BRUSTIN:  Yes.
 8         MR. BLENK:  Yes.
 9         MR. RUSS:  Yes.
10         (Off the record at 10:07 a.m.)
11         THE REPORTER:  Is everyone ordering a copy
12    of the transcript and paying for their own copy?
13         MR. BRUSTIN:  Yes.
14         MR. BLENK:  Yes.
15         MR. RUSS:  Yes.
16         (Off the record at 10:07 a.m.)
17         (Videotaping commenced at 10:18 a.m.)
18         THE VIDEOGRAPHER:  This will begin the
19    video-recorded testimony of Christopher Belling
20    taken for a case to be tried in the United States
21    District Court, Western District of New York, and
22    to be used in the matter of Valentino Dixon versus
23    City of Buffalo, et al.
24         The testimony is being taken in the office
25    of Harrington & Mahoney, 70 Niagara Street, 4th
```



CHRISTOPHER J. BELLING                                          April 11, 2023
DIXON V. CITY OF BUFFALO                                                    4

```
 1                  Christopher J. Belling
 2   Floor, Buffalo, New York, on 4/11/2023 and
 3   commencing at a time of 10:18 as indicated on the
 4   video screen.
 5          The court reporter and notary public from
 6   Esquire Deposition Services is Joan
 7   Metzger-Hubbell.  My name is Jeffrey J. Loftus.
 8   I'm the video technician also from the same
 9   company.  Counsel for the plaintiff ill introduce
10   themselves followed by counsel for the defendants,
11   and the reporter will then swear in the witness.
12          MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &
13   Brustin, for the plaintiff, Valentino Dixon.  By
14   video is Katie McCarthy and Gerardo Romo.
15          MR. BLENK:  James P. Blenk of Lippes Mathias
16   for Christopher Belling and County of Erie.
17          MR. RUSS:  Good morning.  Hugh Russ from
18   Hodgson Russ.  We represent the city and police
19   defendants.
20   CHRISTOPHER J. BELLING, 212 Woodbury Drive,
21   Amherst, New York 14226, after being duly called
22   and sworn, whose identity was confirmed by
23   stipulation by all counsel, testified as follows:
24                  EXAMINATION
25          BY MR. BRUSTIN:
```



1              Christopher J. Belling
2         Q.   Mr. Belling, what's your date of birth?
3         A.              1949.
4         Q.   Are you currently employed?
5         A.   No.
6         Q.   All right.  Before I get rolling, I'm
7    sure that you've spoken to your attorney about the
8    process.  Have you had your deposition taken
9    before?
10        A.   Not in this case.
11        Q.   In other cases?
12        A.   I have been deposed once in a federal
13   case, yes.
14        Q.   Okay.  Have you ever taken a
15   deposition?
16        A.   No.
17        Q.   Okay.  So I'm sure you understand the
18   rules.  Just the important ones from my
19   perspective, I'm going to be asking you a series of
20   questions.  You'll be answering them under oath.
21   If at any time you don't understand any part of my
22   question or the entire question, please let me know
23   and I'll rephrase it.  If you do answer it, I'm
24   going to assume you understood it.
25        Is that fair enough?



```
 1                    Christopher J. Belling
 2          A.   I think so.
 3          Q.   If you want to take a break at any
 4  time, that's fine.  The only thing I would ask is
 5  that you answer the question pending before taking
 6  a break, okay?
 7          A.   Sure.
 8          Q.   Do you have any health conditions or
 9  are you taking any medication that you think in any
10  way affect your memory or your ability to testify
11  here today?
12          A.   No.
13          Q.   All right.  Let's start with your
14  career, and I think let's start with where you
15  graduated from high school and then take me up
16  through -- through college and law school to the
17  DA's office.
18          A.   High school, 1967, graduate of
19  Williamsville Central High School.
20          Q.   I'm sorry, where's that?
21          A.   Williamsville Central High School.
22          Q.   Is that nearby?
23          A.   It's in Williamsville, New York, which
24  is right out Main Street.
25          Q.   Gotcha.
```



1                   Christopher J. Belling

2          A.   And then I started college at the

3  University of California in Santa Barbara, came

4  back to the State University of New York at

5  Buffalo, received my bachelor's degree magna cum

6  laude from the University of Buffalo.  Then went to

7  University of Buffalo Law School.

8          Q.   Straight from college?

9          A.   Yes.  And from -- yeah, got my JD, and

10  then I went to work in the DA's office.

11          Q.   Right off the bat?

12          A.   Yes.

13          Q.   Erie County?

14          A.   Yes.

15          Q.   Okay.  And why don't you take me

16  through your career in Erie County as a prosecutor.

17  And what year did you start?

18          A.   March of 1975 I started in the DA's

19  office in Erie County.  I was hired by Edward

20  Cosgrove, who was the DA at the time.  I started in

21  the so-called Administrative Bureau.  By June of

22  '75 I was transferred to the Buffalo City Court

23  Bureau.  August of '75 I was transferred to the

24  Town Court Bureau, worked mainly in the Town of

25  Cheektowaga, until August of '77.



1                Christopher J. Belling

2          In August of '77 I was transferred to the

3     Felony Trial Bureau and stayed in the Felony Trial

4     Bureau until around '79, I think.  We got some

5     grant funding.  That's when the legislature passed

6     the violent offense laws, and we got some funding.

7     I first went to the Violent Offender Bureau, and

8     then we got some more grant funding and created

9     what was called the Career Criminal Prosecution

10    Unit.

11          Q.   Let me stop you for a minute.  I

12    apologize for interrupting, and I may do it from

13    time to time.  So up to '79 you're in felony

14    trial -- felony trial unit.

15          A.   Correct.

16          Q.   What crimes does that include?  Does

17    that include homicides, rapes?

18          A.   Yeah, it includes everything, rapes,

19    anything that's a felony.

20          Q.   Gotcha, okay.  All right.

21          A.   Okay.  So 1979, '80, we received some

22    more grant funding, and we created the Career

23    Criminal Prosecution Bureau.  I was assigned to

24    that bureau with two other assistant DA's.

25    Eventually I became chief of that bureau.  Towards



```
 1                 Christopher J. Belling
 2   the end of 1981, I would say, DA's election end of
 3   '81 Richard Arcara became the District Attorney.
 4   He kept me as chief of Career Criminal until there
 5   was an office-wide restructuring at which point --
 6        Q.   When was that, approximately?
 7        A.   When was that?  '82, '83.
 8        Q.   Okay.
 9        A.   I don't know exactly.  There was a
10   restructuring at that point, and I became chief of
11   the major Violent Offender Bureau, that I may not
12   be the accurate name, but it was dealing with --
13   actually, it was dealing with career criminals,
14   violent felonies, and at that point also some sex
15   crimes was under my bureau at that point.
16        And then another office restructuring, and
17   we divided up the responsibilities somewhat
18   differently.  I became chief of one of three felony
19   trial bureaus and --
20        Q.   Approximately when is that?
21        A.   '85, '86 maybe.
22        Q.   Okay.  And which trial bureau?
23        A.   I think -- I think I was chief of
24   felony trial bureau three, but there's only three.
25   There's one, two, and three.
```



1                      Christopher J. Belling

2           Q.    Okay.

3           A.    And 1988 Kevin Dillon became the

4    District Attorney, and when Kevin Dillon became the

5    District Attorney, he instituted for the first time

6    a homicide bureau within the DA's office, and that

7    would have been early in his era.  He started June

8    1st, 1988, so by the fall of '88 he had created a

9    homicide bureau, and I was designated as the

10   co-chief of that bureau, and I stayed there with a

11   different co-chief.  There was a co-chief switch in

12   there, but I stayed, until 1997.  When Kevin Dillon

13   left, Frank Clark was elected DA.  Frank Clark made

14   me the deputy --

15          Q.    What year?

16          A.    I think the election was '97, and Frank

17   Clark was sworn in '98.

18          Q.    All right.  Just before you get to '97,

19   1988, is that around the same time when the

20   Intelligence Task Force -- Intelligence Task Force

21   started, in 1988 when Dillon came in?

22          MR. BLENK:  Form.

23          THE WITNESS:  I have no idea what the

24   Intelligence Task Force is, sorry.

25          BY MR. BRUSTIN:



1                  Christopher J. Belling

2          Q.   Or the Anti-Drug Task Force.

3          MR. BLENK:   Form.

4          THE WITNESS:   Not a clue.   I don't know what

5   you're talking about.

6          BY MR. BRUSTIN:

7          Q.   Okay.   We'll get to it in a little bit.

8   1997 you --

9          A.   Okay.   1997 Frank Clark's elected.

10  When he takes office, he makes me Deputy District

11  Attorney in charge of the investigation division,

12  which had white collar crime, vehicular crimes,

13  narcotics actually was under my supervision at that

14  point, sex crimes.   Although, at some point that

15  sort of drifted away.

16          But I was there until the fall of 1999 when

17  I was transferred to be the chief of the Buffalo

18  City Court bureau where I was until 2003.   And in

19  2003 I came back as a slightly different title,

20  Chief Assistant District Attorney in the homicide

21  bureau.   I was in the homicide bureau as a chief

22  assistant until November 2007.

23          In November of 2007 I was recruited by and

24  went to the New York Prosecutors Training Institute

25  where I worked for three years until December of



```
1                 Christopher J. Belling

2   2010.

3        By December 2010 Frank Sedita had been

4   elected District Attorney in Erie County.  He asked

5   me to come back to the DA's office, which I did,

6   end of 2010, beginning of 2011.  I was delayed a

7   little bit.  I was tied up in a murder case in

8   St. Lawrence County at that point in time.

9        Came back to the DA's office around the

10  first of the year 2011.  Stayed through Frank

11  Sedita's -- came back, by the way, as what was

12  called senior trial counsel.  Stayed through

13  Sedita's era.  Sedita left.  He was elected to

14  Supreme Court in 2015, took the bench in '16.

15       In '16 Michael Flaherty became the acting

16  DA.  Michael changed my title and the pecking order

17  a little bit, and I moved up and I was then called

18  the chief trial counsel where I stayed until the

19  end of 2016.  And then I left the Erie County

20  District Attorney's office and --

21       Q.   In 2016?

22       A.   End of 2016.  December 31st, 2016, was

23  my resignation effective day.

24       Q.   And what were the circumstances of your

25  resignation?
```



```
1                    Christopher J. Belling
2         A.    John Flynn was elected District
3    Attorney, and he demoted the number 2 person and
4    fired the number 3 and 4, and I was number 3.
5         Q.    Okay.  Any -- were you given any reason
6    for your firing?
7         A.    No.
8         Q.    Do you have any understanding as you
9    sit here today the basis for your firing?
10        A.    Yes.
11        Q.    What is it?
12        A.    Flynn was upset with the fact that I
13   had been quoted in the media as saying that Michael
14   Flaherty, who was his opponent in the election, was
15   a superior candidate.  I had also given Flaherty
16   significant money in the campaign that year, and
17   Flynn had made a determination that he wanted to
18   have his own people in his administration, the
19   higher-ups, so that's why he told me he didn't need
20   me back after the first of the year.
21        Q.    So your view it was solely political,
22   nothing to do with performance?
23             MR. BLENK:  Form.
24             THE WITNESS:  I believe that to be true,
25   yes.
```



1                    Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.    All right.  So you retire in 2016 from

4    the DA's office?

5         A.    Not exactly.  I stopped working at the

6    Erie County DA's office.  Didn't work for a while,

7    and then the spring of 2017 the District Attorney

8    in Chautauqua County contacted me, asked me if I

9    would come down and be his counsel, counsel to the

10   District Attorney of Chautauqua County.  I did that

11   until the end of 2018.

12        At the end of 2018 I thought I was going to

13   retire, but then the DA from Genesee County called

14   me, and he asked me to please, please come to work

15   for him.  He had a personnel issue, he couldn't

16   fill his slots, and he needed somebody who knew

17   what they were doing.

18        So I went to Genesee County with the

19   understanding that as soon as he could fill the

20   slot, I would then retire, and that was probably

21   July of 2018 when I stopped working at the Genesee

22   County DA's office.  No, July of 2019, I'm sorry.

23        Q.    And you've been retired since then?

24        A.    Yeah.  Do a little special DA work in

25   surrounding counties doing some consulting, expert



1                    Christopher J. Belling
2    witness stuff, and training.
3            Q.    What kind of expert witness work have
4    you done?
5            A.    I am presently an expert witness in a
6    case pending in the Southern District of New York.
7    My topic of expertise is prosecutorial procedure
8    and ethics.
9            Q.    What kind of case is it?
10           A.    It's a case entitled Galgano versus
11   Putnam County, et al., where the DA's office,
12   individual assistant DAs, the county, some police
13   are being sued by a guy with the name George
14   Galgano for wrongful arrest, alleged inadequacies
15   of search warrant applications, et cetera,
16   et cetera, et cetera.
17           Q.    Were you hired by Putnam County?
18           A.    Yes.
19           Q.    And who -- which attorneys are you
20   working with there?
21           A.    My contact guy is a guy name Maurizio
22   Savoiardo, and he works out of Mineola, New York.
23           Q.    Okay.  Do you know what firm?
24           A.    I do.  If I could check on my phone.
25   It's SSV, and I don't know what that --



```
1                      Christopher J. Belling
2           Q.   Maybe at a break if you wouldn't mind.
3           A.   Sure, whatever.
4           Q.   And who -- do you know who the
5    plaintiff's counsel is?
6           A.   Plaintiff's counsel is Boies Schechter?
7           Q.   Boies Schiller?
8           A.   Yeah, Boies Schiller, yeah.  Galgano's
9    wife is a partner at Boies Schiller, and that's why
10   Galgano has got Boies Schiller.
11          Q.   Gotcha.  Okay.  Have you issued a
12   report in that case?
13          A.   Yes.
14          Q.   A Rule 26 report, federal report?
15          A.   I issued a report, and they did
16   something with it, filed it with the court, and I
17   testified about it.
18          Q.   Oh, you testified in court?  Did it go
19   to trial?
20          A.   No, testified in deposition.
21          Q.   Deposition, okay.  But it's in Federal
22   Court?
23          A.   Correct, Southern District.
24          Q.   Gotcha.  What other expert work have
25   you done?
```



 1                    Christopher J. Belling
 2          A.    I think that's probably about it.  I've
 3   done some CLEs, some trainings and stuff, but I
 4   can't think of other specific expert stuff.
 5          Q.    Okay.  By the way, have you ever
 6   been -- I may have asked you this.  I don't think I
 7   did.  Have you ever been named as a defendant in a
 8   lawsuit as a -- as a prosecutor?
 9          A.    No.
10          Q.    The depositions that you sat for were
11   depositions that you were not actually a defendant?
12          A.    Right.  It was Galgano.  There's only
13   once, and it was Galgano.
14          Q.    Gotcha.  Okay.  Back to your career,
15   when you became head of the homicide bureau in
16   1988, what percentage of your time was spent
17   supervising and what percentage of your time was
18   spent prosecuting cases?
19          MR. BLENK:  Form.
20          BY MR. BRUSTIN:
21          Q.    I mean, I think to the better question,
22   I can get right to it.  By the time of this case in
23   1991 to '92 or so, what percentage of your time was
24   spent prosecuting cases yourself and what
25   percentage of your time was spent supervising other



```
 1                  Christopher J. Belling
 2   district attorneys, assistant district attorneys?
 3          MR. BLENK:  Form.
 4          THE WITNESS:  It's hard to say.  I would say
 5   certainly probably two-thirds of my time was
 6   prosecuting cases and maybe one-third of my time
 7   was supervising other prosecutions.  The homicide
 8   bureau was small, so I -- and the people were
 9   competent, so I didn't really have to do much in
10   terms of supervising them other than assigning
11   cases.
12          BY MR. BRUSTIN:
13          Q.   And what were your supervisory
14   responsibilities at that time?
15          A.   Assigning cases --
16          MR. BLENK:  Form.
17          THE WITNESS:  Assigning cases, dividing them
18   up, and just anything that anybody needed, to try
19   and, you know, help out.
20          BY MR. BRUSTIN:
21          Q.   Did -- were you also responsible for
22   ensuring that the assistant DAs in your chain of
23   command were fulfilling their ethical obligations
24   and constitutional obligations?  Was that your
25   role?
```



1                     Christopher J. Belling

2          A.    I would say no.

3          Q.    Okay.  Now, in preparation for this

4    deposition, have you reviewed any documents?

5          A.    Yes.

6          Q.    All right.  And what have you reviewed?

7          A.    Various documents from the Buffalo

8    police homicide file, from the Erie County DA's

9    office file, notes that I took that are in those

10   files, the DA file.  I have reviewed some of the

11   depositions of other people who have already been

12   deposed in this case.  I reviewed a transcript of

13   something that appeared to be an interview that I

14   did with some I believe it was Georgetown

15   University students, and that's -- in general terms

16   that's about it.

17         Q.    So let me go a little deeper on some of

18   that, and let's take it by topic area.  First of

19   all, can you estimate how much time in total you

20   spent reviewing documents, estimate?

21         MR. BLENK:  Form.

22         THE WITNESS:  Not really.

23         BY MR. BRUSTIN:

24         Q.    Was it more than 50?

25         A.    Excuse me?



```
 1                    Christopher J. Belling
 2          Q.    More than 50 hours?
 3          A.    Oh, no, nowhere near 50 hours.
 4          Q.    Okay.  More than ten?
 5          A.    Ballpark, could be around ten.  I don't
 6   know.
 7          Q.    Okay.  So let's start with the -- so,
 8   first of all, is it your belief that you reviewed
 9   the entire homicide file in this case from the
10   police department?
11          A.    No.
12          Q.    Okay.  Were you given the entire
13   homicide file?
14          A.    No.
15          Q.    What portion did you review?
16          A.    The portions that were called to my
17   attention.
18          Q.    Okay.  Do you remember what those were
19   generally?
20          A.    No.  They were officers' notes.  They
21   were police reports, various what Buffalo calls
22   P-73s and various other P-88s, which are
23   identification forms.  P-10s, which are evidence
24   collection forms.
25          Q.    Sure.  Did you review, for example,
```



1                    Christopher J. Belling

2    P-73s and P-88s for -- in relation to Emil Adams?

3           A.    I think I did see the P-88 on Emil

4    Adams.

5           Q.    And how about Sullivan?

6           A.    I don't remember Sullivan, whether I

7    did or not.

8           Q.    How about Jackson, Aaron Jackson?

9           A.    I do not remember that one either.

10          Q.    Okay.  Lamarr Scott?

11          A.    Well, there's no P-88 on Lamarr Scott

12   as far as I know.  I read a P-73 about his being --

13   coming into contact with Buffalo police.

14          Q.    Okay.  How about your DA file?  Did you

15   review the entire DA file on this case on the

16   perjury case?

17          A.    No.

18          Q.    You just reviewed portions?

19          A.    Correct.

20          Q.    And did you decide what portions to

21   review, or were they given to you?

22          A.    They were given to me.

23          Q.    Okay.  And what about testimony?  You

24   mentioned you read some testimony.  Whose testimony

25   did you read?  Was it deposition testimony or trial



1                    Christopher J. Belling
2    testimony?
3         MR. BLENK:  Form.
4         THE WITNESS:  I read some trial testimony
5    from the perjury case.  Actually mostly my trial
6    testimony from the perjury case.  I saw, if I'm not
7    mistaken, Ray Masecchia's deposition in this case.
8    I saw part of Mark Stambach's deposition in this
9    case.  I believe I read Jack Vickerd's deposition
10   in this case.  I saw some of Valentino Dixon's
11   recorded testimony, and I saw Lamarr Scott's
12   deposition in this case.
13        BY MR. BRUSTIN:
14        Q.   Okay.  You read -- did you read Lamarr
15   Scott's deposition in its entirety?
16        A.   I honestly don't remember.  I have some
17   memories of the high points, if you will, of that,
18   but I don't remember if I read the whole thing.
19        Q.   Okay.  Did you read Valentino Dixon's
20   in its entirety?
21        A.   I don't think so, no.
22        Q.   Okay.  How about Masecchia and Vickerd?
23   Did you read them in their entirety?
24        A.   I believe so, yes.
25        Q.   And Stambach, you said you read



```
 1                    Christopher J. Belling
 2   portions of it?
 3          A.    I actually saw the video of it.
 4          Q.    You watched the entire video?
 5          A.    No, portions of the video.
 6          Q.    How did you determine which portions to
 7   watch?
 8          A.    I didn't determine.  It was just
 9   playing, and we were doing other things and it was
10   playing and, you know --
11          Q.    Okay.  Any other documents you
12   reviewed?
13          A.    Not that I have specific recollection
14   of.
15          Q.    All right.  How about meeting with your
16   attorneys?  How many meetings have you had either
17   in person or by phone or video that addressed more
18   than just scheduling?
19          A.    Five.
20          Q.    Five.  And when were those meetings?
21          A.    One was yesterday, two were the last
22   week in March of this year, and then two were
23   pre-pandemic.
24          Q.    Okay.  And how long were those
25   meetings?
```



1              Christopher J. Belling

2        A.    Three, four hours.

3        Q.    Each one?

4        A.    Yes.

5        Q.    Okay.  And, by the way, just from your

6   going through your career history, it sounds like

7   you have an excellent memory.  Would that be fair

8   to say?

9        MR. BLENK:  Form.

10       THE WITNESS:  It has been said.

11       BY MR. BRUSTIN:

12       Q.    Okay.  And I take it that your

13  reviewing documents in this case has also assisted

14  you in remembering at least your activities in this

15  case; fair to say?

16       MR. BLENK:  Form.

17       THE WITNESS:  Yes.

18       BY MR. BRUSTIN:

19       Q.    All right.  Now, in addition to your --

20  your three-year stint as a trainer of assistant

21  district attorneys, did you also do other training

22  of district attorneys during your career?

23       A.    Yes.

24       Q.    Okay.  Tell me about that.

25       A.    I did my first presentation for the



 1                    Christopher J. Belling
 2   National College of District Attorneys at the
 3   University of Houston facility in 1986.
 4   Thereafter, I travelled to many different locations
 5   on behalf of the National College of District
 6   Attorneys doing presentations on various topics
 7   over the years.
 8        And then eventually, I want to say in the
 9   late '90s, the National District Attorneys
10   Association moved to Columbia, South Carolina, with
11   the advent of the National Advocacy Center, and I
12   taught at the National Advocacy Center many times
13   until the advocacy center was taken over by federal
14   prosecutors, and state prosecutors were eliminated
15   from the plate there.
16        Q.   Okay.  So it sounds like you've done
17   quite a bit of training of assistant district
18   attorneys throughout your career; fair to say?
19        A.   Yes.
20        Q.   And I take it that as -- in conjunction
21   with that, you -- you have a very clear
22   understanding and you had a very clear
23   understanding for a long time of your ethical
24   obligations as an Assistant District Attorney; fair
25   to say?



```
 1                    Christopher J. Belling
 2          MR. BLENK:  Form.
 3          THE WITNESS:  I have a clear understanding
 4   of my ethical obligations.
 5          BY MR. BRUSTIN:
 6          Q.   Both the ethical obligations under
 7   state law, federal law, correct?
 8          MR. BLENK:  Form.
 9          THE WITNESS:  Well, I understand my ethical
10   obligations.
11          BY MR. BRUSTIN:
12          Q.   And your constitutional obligations?
13          A.   Certainly.
14          Q.   And you take them extremely seriously?
15          A.   I take them seriously.
16          Q.   And do you consider yourself -- you
17   consider yourself to be a -- you were a very
18   conscientious hard-working Assistant District
19   Attorney; fair to say?
20          MR. BLENK:  Form.
21          THE WITNESS:  I was a conscientious
22   hard-working Assistant District Attorney.
23          BY MR. BRUSTIN:
24          Q.   And you made it your business, for
25   example, to review all relevant documents in a case
```



```
 1                   Christopher J. Belling
 2   before making important decisions in a case; fair
 3   to say?
 4          MR. BLENK:  Form.
 5          THE WITNESS:  No, I don't think that's fair
 6   to say.
 7          BY MR. BRUSTIN:
 8          Q.   All right.  We'll get to that a little
 9   bit later.
10          In terms of your ethical obligations, you've
11   already told us how seriously you took them, and
12   you would agree that there's no more important
13   ethical obligation as a prosecutor than your
14   obligation in regard to Brady, correct?
15          MR. BLENK:  Form.
16          THE WITNESS:  I'm having problems with your
17   hyperbolic use of adjectives and adverbs, so the
18   answer is no.
19          BY MR. BRUSTIN:
20          Q.   If we're going to be cute, that's fine.
21   Do you understand your Brady obligations?
22          A.   Yes.
23          Q.   And did you take them seriously?
24          A.   Yes.
25          Q.   And when you trained on them, did you
```



```
 1                  Christopher J. Belling
 2    try to instill that in the prosecutors that you
 3    trained that they should take their Brady
 4    obligations seriously?
 5          A.   Yes.
 6          Q.   And you understood that Brady
 7    obligation was an important obligation for an
 8    Assistant District Attorney?
 9          A.   Yes.
10          Q.   And it included both evidence tending
11    to -- that might tend to suggest innocence, and it
12    included evidence that might be used to impeach a
13    prosecution witness?
14          MR. BLENK:  Form.  Calls for a legal
15    conclusion.
16          THE WITNESS:  Yes.
17          BY MR. BRUSTIN:
18          Q.   All right.  You also understood
19    obviously, it was never -- it would never be
20    appropriate as an Assistant District Attorney to
21    coerce a witness?
22          MR. BLENK:  Form.
23          THE WITNESS:  That's correct.
24          BY MR. BRUSTIN:
25          Q.   Or to threaten a witness?
```



1              Christopher J. Belling

2        A.   Correct.

3        Q.   Subtly or overtly.

4        MR. BLENK:  Form.  Calls for a legal

5   conclusion.

6        THE WITNESS:  Subtly or what?

7        MR. BRUSTIN:  Overtly.

8        MR. BLENK:  Same objection.

9        THE WITNESS:  Yeah, I agree with that.

10       BY MR. BRUSTIN:

11       Q.   You understood that as an Assistant

12   District Attorney you were not acting as an

13   advocate; you were acting on behalf of the People

14   of the State of New York?

15       MR. BLENK:  Form.  Calls for a legal

16   conclusion.

17       THE WITNESS:  The answer to that is no.

18       BY MR. BRUSTIN:

19       Q.   Interesting.  How did I misstate your

20   obligation?

21       A.   I was acting as an advocate on behalf

22   of the People of the State of New York.

23       Q.   Okay.  You understood your role as a DA

24   to be an advocate?

25       A.   Correct.  In the adversarial system I



```
 1                  Christopher J. Belling
 2   was an advocate for one side, and there were
 3   advocates on the other side.
 4         Q.   And you're sure that that's -- that's
 5   how it's described in the ethical rules?
 6         MR. BLENK:  Form.
 7         THE WITNESS:  I haven't read the ethical
 8   rules specifically in regard to that.
 9         BY MR. BRUSTIN:
10         Q.   You were supposed to be an objective
11   enforcer of the criminal law, correct?
12         MR. BLENK:  Form.  Calls for a legal
13   conclusion.
14         THE WITNESS:  Yeah, I -- that question's too
15   loaded.  I can't really answer it.
16         BY MR. BRUSTIN:
17         Q.   You understood that your job as a
18   prosecutor was to objectively search for the truth
19   on behalf of the People of the State of New York,
20   correct?
21         MR. BLENK:  Form.  Calls for a legal
22   conclusion.
23         THE WITNESS:  That's true.
24         BY MR. BRUSTIN:
25         Q.   And your job was to handle cases
```



```
 1                  Christopher J. Belling
 2   without regard to who you were prosecuting in an
 3   objective manner, correct?
 4        MR. BLENK:  Form.
 5        THE WITNESS:  Oh, true.
 6        BY MR. BRUSTIN:
 7        Q.   And to go wherever the evidence leads
 8   you?
 9        MR. BLENK:  Form.
10        THE WITNESS:  True.
11        BY MR. BRUSTIN:
12        Q.   Regardless of whether it helped or hurt
13   your case against a particular defendant?
14        MR. BLENK:  Form.
15        THE WITNESS:  True.
16        BY MR. BRUSTIN:
17        Q.   And you understood that obviously you
18   couldn't prosecute a person for a crime without
19   having sufficient evidence of probable cause?
20        MR. BLENK:  Form.
21        THE WITNESS:  A prima facie case is what we
22   would call it, but yes.
23        BY MR. BRUSTIN:
24        Q.   You can't prosecute a person for
25   motives unrelated to the crime in question.  For
```



1                   Christopher J. Belling

2  example, you can't prosecute them because you think

3  they were a bad person who's done other bad things;

4  fair to say?

5          MR. BLENK:  Form.

6          THE WITNESS:  Oh, that's fair to say, yes.

7          BY MR. BRUSTIN:

8          Q.   That would be unethical?

9          MR. BLENK:  Form.

10         THE WITNESS:  It would be inappropriate.

11         BY MR. BRUSTIN:

12         Q.   Another way of saying that is you have

13  an obvious obligation to only bring charges and

14  prosecute in good faith, not for any ulterior

15  motive.

16         MR. BLENK:  Form.

17         BY MR. BRUSTIN:

18         Q.   Fair to say?

19         A.   Yes, I'd say that's fair to say.

20         Q.   You always need objective proof for the

21  crime that's being charged, correct?

22         MR. BLENK:  Form.

23         THE WITNESS:  You need admissible proof

24  that's going to be admissible in a court of law to

25  support the crime charge.  That's what a prima



1              Christopher J. Belling

2    facie case is.

3         BY MR. BRUSTIN:

4         Q.   Okay.  And if at any time during the

5    process of an investigation or prosecution that

6    calculation changes because of new evidence, you

7    have an obligation to carefully investigate that

8    new evidence, correct?

9         MR. BLENK:  Form.  Calls for a legal

10   conclusion.

11        THE WITNESS:  Certainly you have the

12   obligation to investigate that, yes.

13        BY MR. BRUSTIN:

14        Q.   In fact, there are many times during

15   cases you're involved in when you are acting as an

16   investigator as opposed to a prosecutor, or at

17   least you're doing both at the same time; fair to

18   say?

19        MR. BLENK:  Form.

20        THE WITNESS:  Well, in the context of --

21   when there's a charged case in existence or when

22   there's a case that is an investigation-type file,

23   yeah, you do both.

24        BY MR. BRUSTIN:

25        Q.   So, for example, in this case, when



1              Christopher J. Belling

2    Lamarr Scott came forward and said he was the

3    shooter and not Valentino Dixon, at that point part

4    of your role became the role of an investigator,

5    correct?

6         MR. BLENK:  Form.

7         THE WITNESS:  Well, part of my role became

8    the person that asked the Buffalo police to do some

9    investigating, and in the context of preparation of

10   the case for Grand Jury, I had to certainly look at

11   a bigger picture than I would have had to look at

12   beforehand.

13        BY MR. BRUSTIN:

14        Q.   Right, because once, as you've said --

15   I'm going to show you some letters you wrote, but

16   once Lamarr Scott came forward, there was a

17   question about whether there was still probable

18   cause to prosecute Valentino Dixon that needed to

19   be investigated, correct?

20        MR. BLENK:  Form.

21        THE WITNESS:  No.

22        BY MR. BRUSTIN:

23        Q.   At no time did you ever question

24   whether there was probable cause to prosecute

25   Valentino Dixon after Lamarr Scott came forward?



```
 1                     Christopher J. Belling
 2          MR. BLENK:  Form.
 3          THE WITNESS:  Well, that was the issue.  The
 4   issue is to determine who did it.
 5          MR. BRUSTIN:  Right.
 6          THE WITNESS:  And it was probable cause to
 7   establish that Valentino Dixon did it.  That
 8   existed.  That didn't change.
 9          MR. BRUSTIN:  Okay.
10          THE WITNESS:  But there also became at least
11   potential probable cause that he didn't.
12          BY MR. BRUSTIN:
13          Q.  Okay.  And so at that point in time
14   when Lamarr Scott came forward you -- part of your
15   role was to ensure that the case was properly
16   investigated in regard to Lamarr Scott's
17   confession?
18          MR. BLENK:  Form.
19          THE WITNESS:  Yes.
20          BY MR. BRUSTIN:
21          Q.  And I think I heard you right, but I
22   think what you said is your only role in that
23   regard was to direct the Buffalo police to do it.
24   You didn't do any of it yourself.  Did I understand
25   you correctly, sir?
```



```
 1                   Christopher J. Belling
 2          A.    You did not.
 3          Q.    Okay.  You also conducted some
 4   independent investigation, speaking to witnesses,
 5   including Lamarr Scott, in regard to that
 6   confession, correct?
 7          MR. BLENK:  Form.
 8          THE WITNESS:  No.
 9          BY MR. BRUSTIN:
10          Q.    Okay.  Is it your testimony that you
11   never spoke to Lamarr Scott?
12          A.    It is not my testimony.  I did talk to
13   him.
14          Q.    Okay.  And, in fact, you talked to him
15   soon after he came forward in --
16          A.    It was August 12th of 2000 -- or 1991.
17          Q.    My memory's not so good.  So soon after
18   he came forward on August 12th of 1991 you spoke to
19   him, correct?
20          A.    Yes.
21          Q.    And you also spoke to him in the
22   presence of his foster parents, correct?
23          A.    I do not remember that, no.
24          Q.    Okay.  Is it your testimony that you
25   did not speak to him in the presence of his foster
```



```
 1                  Christopher J. Belling
 2   parents, or you don't recall one way or another
 3   whether you spoke to him with his foster parents
 4   present?
 5         A.   I don't recall whether or not I spoke
 6   to him with his foster parents.
 7         Q.   Do you remember ever speaking to his
 8   foster parents or anybody associated with him as
 9   family?
10         MR. BLENK:  Form.
11         THE WITNESS:  I do not remember that.
12         BY MR. BRUSTIN:
13         Q.   Sounds like what you're saying is it's
14   possible you spoke to -- with him with his foster
15   parents.  You just don't recall one way or another?
16         MR. BLENK:  Form.
17         THE WITNESS:  No, I'm saying I don't recall
18   whether or not I did.
19         BY MR. BRUSTIN:
20         Q.   Okay.  But you certainly may have?
21         MR. BLENK:  Form.
22         THE WITNESS:  I just don't remember doing
23   it.
24         BY MR. BRUSTIN:
25         Q.   Now, I take it -- and this I think is
```



1                  Christopher J. Belling

2   going to be easier since you've reviewed a lot of

3   this already, but you let me know if you need to

4   see anything specifically, but one of the things

5   that Detective Stambach testified as to the other

6   officers is that they understood that the basic

7   role in policing that applies to them, that they

8   had an absolute obligation to document any

9   potentially exculpatory or impeachment evidence and

10  provide it in writing to the prosecutor.

11        Do you agree with that?

12        MR. BLENK:  Form.

13        THE WITNESS:  No, not exactly.

14        BY MR. BRUSTIN:

15        Q.   Tell me how you disagree with that.

16        A.   Well, there was an evolution in case

17  law between exculpatory evidence and impeachment

18  evidence, and their obligation sort of evolved in

19  there, and the whole hard-and-fast and document it

20  in writing in front of the prosecutor, I think

21  that's also a little bit too specific, so to speak.

22        Q.   So let me make it specific for you.

23  You understood certainly by 1991 based on Brady and

24  Kyle's that by that time certainly you understood

25  that police officers, your expectation of police



1                    Christopher J. Belling
2    officers, was that they would document any
3    potentially exculpatory or impeachment evidence and
4    provide it to you so you could determine whether it
5    had to be disclosed, correct?
6           MR. BLENK:  Form.
7           THE WITNESS:  Oh, definitely.
8           BY MR. BRUSTIN:
9           Q.    And you understood that that was a
10   basic function of the Buffalo Police Department
11   homicide division?
12          MR. BLENK:  Form.
13          THE WITNESS:  I don't know if it's a basic
14   function, but they were supposed to do it.
15          BY MR. BRUSTIN:
16          Q.   Okay.  Did you ever have any reason to
17   question whether they were doing it?
18          A.    I don't recollect any time that I did.
19          Q.    Okay.  So certainly -- and in this case
20   your understanding with your expectation is that
21   they were -- they were documenting and providing to
22   you any potential exculpatory or impeachment
23   evidence, correct?
24          A.    Yes.
25          Q.    And you had no reason to question



1                    Christopher J. Belling

2    whether or not they were fulfilling that

3    obligation.  You believe they did?

4           MR. BLENK:  Form.

5           THE WITNESS:  I didn't have any reason to

6    doubt that they would.

7           BY MR. BRUSTIN:

8           Q.   Okay.  And obviously you didn't have

9    the time or the role of supervising directly

10   Buffalo Police Department homicide detectives,

11   correct?

12          A.    Correct.

13          MR. BLENK:  Form.

14          BY MR. BRUSTIN:

15          Q.   You made it clear what your

16   expectations were, and you assumed that through

17   their supervisors they would follow those rules,

18   correct?

19          MR. BLENK:  Form.

20          THE WITNESS:  In general terms, yes.

21          BY MR. BRUSTIN:

22          Q.   And I take it you made it clear that to

23   the extent of homicide detectives who typically

24   weren't lawyers had any questions about whether a

25   particular piece of evidence was Brady material,



1              Christopher J. Belling
2   they should err in documenting it so you could
3   determine it, correct?
4        MR. BLENK:  Form.
5        THE WITNESS:  Again, I don't think it was
6   anywhere near that specific.  It was if they found
7   anything that was Brady material, let us know about
8   it.
9        BY MR. BRUSTIN:
10       Q.   Okay.  But if they were on the fence,
11  you expected that they would document it because
12  you were the lawyer who would make the decision,
13  correct?
14       MR. BLENK:  Form.
15       THE WITNESS:  I would hope they would
16  document it.
17       BY MR. BRUSTIN:
18       Q.   All right.  Did you ever -- and I think
19  you've told us this already, but you never had any
20  reason to question whether or not homicide
21  detectives in the Buffalo Police Department were
22  properly documenting Brady material, correct?
23       MR. BLENK:  Form.
24       THE WITNESS:  I never had any issue with
25  that.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.    Certainly not on this case.

4          A.    Not on this case.

5          Q.    If, for example, you understood, for

6    example, a homicide detective spoke to an

7    eyewitness two or three times and that eyewitness

8    provided contradictory statements, you expected

9    that that -- those contradictory statements would

10   be documented so you could evaluate them, correct?

11         MR. BLENK:  Form.

12         THE WITNESS:  It would have been standard

13   procedure that whatever they talked to anybody

14   about would have been the subject of a police

15   report, and I would have gotten those police

16   reports and been able to compare them.

17         BY MR. BRUSTIN:

18         Q.    So your answer is yes, you would have

19   expected that to be documented, any contradictions,

20   including any contradictions?

21         MR. BLENK:  Form.

22         THE WITNESS:  I would expect that it would

23   be documented.

24         MR. BRUSTIN:  Okay.  Let's mark -- let's mark

25   this as -- what number are we on, Mo?



1              Christopher J. Belling

2         MR. SOTO-BRITO:  I want to say 30.

3         MR. BRUSTIN:  So what we did, while he's

4    looking, is we took some portions from the DA's

5    file and put it in a binder.  It's not -- it's in

6    Bates stamp chronological order, but there are a

7    number of pages that are missing, but I'm going to

8    use that to refer to certain pages for you.

9         THE WITNESS:  Dixon DA file.

10        MR. BRUSTIN:  Yeah.  And we're going to mark

11   this as 30, please.

12   The following was marked for Identification:

13    EXH. 30              excerpt of Dixon DA file

14        MR. BLENK:  Excerpt of the Dixon DA file?

15        MR. BRUSTIN:  Yeah.  And I'll refer to

16   specific Bates stamps as I'm going through it.

17        MR. RUSS:  While he's looking at that, is

18   that one of the documents that you produced

19   yesterday?

20        MR. BRUSTIN:  Mo?

21        MR. SOTO-BRITO:  I just put the whole DA

22   file, but I can put the -- it's just pages out of

23   it.

24        MR. BRUSTIN:  It's just pages out of the

25   whole DA file, but I'm going to refer by Bates



 1                  Christopher J. Belling

 2   stamps.  It's what we sent around on Friday.

 3          MR. RUSS:  Okay.

 4          BY MR. BRUSTIN:

 5          Q.  If you could take a look at page

 6   COE1768, and I'll represent to you that Exhibit 30

 7   are portions of the file that was produced to us by

 8   Erie County as the DA file in this case, okay?  But

 9   take a look at page 1768.

10          A.   68, okay.

11          MR. BLENK:  Please review the whole --

12   review the whole letter.

13          THE WITNESS:  Okay.

14          MR. BRUSTIN:  It's just one page.

15          THE WITNESS:  Okay.

16          MR. BRUSTIN:  And this is --

17          MR. BLENK:  Could you give him a second to

18   read it?

19          THE WITNESS:  I read it, because I think

20   it's also the same letter that's in here with the

21   attachments.

22          MR. BRUSTIN:  Yeah, probably.

23          THE WITNESS:  Okay.

24          BY MR. BRUSTIN:

25          Q.  Okay.  You've had a chance to read it?



```
 1                  Christopher J. Belling

 2         A.   Yes.

 3         Q.   Okay.  And this is an example of you

 4    fulfilling your Brady obligations as a prosecutor,

 5    correct?

 6         MR. BLENK:  Form.

 7         THE WITNESS:  Yes.

 8         BY MR. BRUSTIN:

 9         Q.   You received what you believe would

10    arguably be Brady material and you turned it over,

11    correct?

12         A.    Correct.

13         Q.   And when you say arguably Brady

14    material here, I take it that it was your practice

15    certainly by June of 1992 that if you received

16    information that you thought was even arguably

17    Brady material, whether because it tended to show

18    innocence or because it was impeachment, you would

19    disclose it.

20         MR. BLENK:  Form.

21         THE WITNESS:  Yes.

22         BY MR. BRUSTIN:

23         Q.   And that's why you used the word

24    arguably in here, correct?

25         MR. BLENK:  Form.
```



1                    Christopher J. Belling

2          THE WITNESS:  I don't know why I used the

3    word arguably.

4          BY MR. BRUSTIN:

5          Q.   Well, that's what arguably means.  It

6    means it may or may not be Brady material, correct?

7          MR. BLENK:  Form.

8          THE WITNESS:  That's probably true.

9          BY MR. BRUSTIN:

10         Q.   So you took a broad view in your

11   disclosure obligations as to what constitutes

12   Brady, correct?

13         MR. BLENK:  Form.

14         THE WITNESS:  I took the view that if I

15   found something that I thought could be either

16   exculpatory or impeachment, I turned it over.

17         BY MR. BRUSTIN:

18         Q.   So let me -- let me try it a different

19   way.  If I'm Mr. Terranova and I'm reading this

20   article -- reading this letter as a lawyer, I can

21   glean from this that what you're telling me is you

22   take a broad view of Brady.  You've given me what's

23   arguably Brady may not even be, correct?

24         MR. BLENK:  Form.

25         THE WITNESS:  I can't say what Joe was



1              Christopher J. Belling
2  thinking, but -- yeah, there you go.
3         BY MR. BRUSTIN:
4         Q.   Okay.  Well, it's really what you're
5  thinking.  Again, you're -- you are -- you've
6  discovered evidence that arguably could be Brady,
7  meaning it may or may not be Brady, and you're
8  disclosing it in an abundance of caution, correct?
9         A.   Correct.
10        MR. BLENK:  Form.
11        BY MR. BRUSTIN:
12        Q.   And that was your practice, correct?
13        MR. BLENK:  Form.
14        THE WITNESS:  Yes.
15        BY MR. BRUSTIN:
16        Q.   And you understood that that was
17  supposed to be the practice of the Buffalo Police
18  Department?
19        MR. BLENK:  Form.
20        THE WITNESS:  No.
21        BY MR. BRUSTIN:
22        Q.   You just told us it was.
23        MR. BLENK:  Form.
24        BY MR. BRUSTIN:
25        Q.   You just told us that you understood



1                    Christopher J. Belling

2    that they were documenting any evidence that could

3    potentially be Brady material, correct?

4            MR. BLENK:  Form.

5            THE WITNESS:  I told you they were doing

6    police reports and they were turning them over and

7    that the police reports should have been accurate,

8    and once I got them, I would determine whether

9    there was Brady material in them.

10           BY MR. BRUSTIN:

11           Q.   But your expectation was that those

12   reports would include any potential Brady material,

13   correct, from the case?

14           A.   They would include anything that came

15   up at the time of the report.

16           Q.   But I'm not asking about other things

17   in the report.  I'm asking about Brady material.

18   One of your expectations would be, so that you

19   could fulfill your Brady obligation, was that the

20   reports you received from police officers who

21   interviewed witnesses that you didn't would include

22   any potential Brady material, correct?

23           MR. BLENK:  Form.

24           THE WITNESS:  Yes.

25           BY MR. BRUSTIN:



1                  Christopher J. Belling

2            Q.   You couldn't possibly fulfill your role

3    in disclosing Brady material if the police

4    department is not fulfilling their role in

5    documenting it and providing it to you, correct?

6            MR. BLENK:  Form.

7            THE WITNESS:  Yes, I think that's right.

8            BY MR. BRUSTIN:

9            Q.   You didn't have the time to

10   reinvestigate cases yourself and interview every

11   witness about everything in the case, correct?

12           MR. BLENK:  Form.

13           THE WITNESS:  Well, I think that's, again,

14   investigate cases, interview every witness, they

15   did reports, they sent me the reports.  I evaluated

16   the reports.  That's what I can tell you.

17           BY MR. BRUSTIN:

18           Q.   My understanding of how you operated as

19   a prosecutor, and you correct me if I'm wrong, was

20   that you were certainly not shy about telling

21   people what you wanted; is that fair to say?

22           MR. BLENK:  Form.

23           THE WITNESS:  No, it's not.

24           BY MR. BRUSTIN:

25           Q.   Okay.  Did you have any trouble telling



```
 1                    Christopher J. Belling
 2   homicide detectives what you needed to be done in a
 3   case?
 4        A.   I often trod fairly lightly in regard
 5   to telling homicide detectives what I wanted them
 6   to do.
 7        Q.   Would you be surprised to learn, you
 8   probably read this, that many of the homicide
 9   detectives in this case, I don't know if it's fair
10   to say were scared of you but certainly were
11   respectful of your authority?
12        MR. BLENK:  Form.
13        MR. RUSS:  Objection to form.
14        THE WITNESS:  I would be surprised, yeah.
15        BY MR. BRUSTIN:
16        Q.   Now, although you weren't a police
17   officer, you were a DA, you understood a number of
18   basics about police procedure, particularly police
19   procedure that implicated constitutional rights?
20        MR. BLENK:  Form.
21        BY MR. BRUSTIN:
22        Q.   Fair to say?
23        A.   Yes, in general.
24        Q.   So, for example, you had a good working
25   knowledge of permissible identification procedures,
```



1              Christopher J. Belling

2    correct?

3         MR. BLENK:  Form.

4         THE WITNESS:  Insofar as when I was

5    preparing to run a Wade hearing, I knew what I was

6    looking for, yeah.

7         BY MR. BRUSTIN:

8         Q.   So you understood, for example, that

9    there were permissible ways to conduct

10   identification procedures and ways that were not

11   permissible for a variety of reasons?

12        MR. BLENK:  Form.

13        THE WITNESS:  Ways that were less

14   permissible, yeah.

15        BY MR. BRUSTIN:

16        Q.   And that could be unduly suggestive?

17        MR. BLENK:  Form.

18        THE WITNESS:  A court makes that

19   determination but, yeah, if it was, I suppose that

20   could be the case.

21        BY MR. BRUSTIN:

22        Q.   You understood that there were

23   procedures in place in the Buffalo Police

24   Department, like any police department, that were

25   designed to eliminate suggestiveness in



1              Christopher J. Belling

2   identification procedures?

3         MR. BLENK:  Form.

4         THE WITNESS:  No, I didn't know what their

5   procedures were about identification.  It was --

6   we'd run Wade hearings, and we'd figure out what

7   they did.

8         BY MR. BRUSTIN:

9         Q.   Maybe -- maybe I'm not being specific

10  enough.  You understood a as general matter, for

11  example, that any time an eyewitness was shown

12  photos, for example, any time more than a few

13  minutes after the crime, it was in the context of a

14  six-person photo array with one suspect and five

15  fill-ins?

16        MR. BLENK:  Form.

17        THE WITNESS:  Yeah, that's true.

18        MR. RUSS:  Objection to form.

19        BY MR. BRUSTIN:

20        Q.   Same as the lineup, a live lineup?

21        MR. BLENK:  Form.

22        THE WITNESS:  Correct.

23        BY MR. BRUSTIN:

24        Q.   And you understood, for example, that

25  it would never be permissible for reasons,



```
 1                Christopher J. Belling
 2   including constitutional reasons, to show
 3   individual photos to an eyewitness of a suspect or
 4   more than one suspect, correct?
 5            MR. BLENK:  Form.
 6            THE WITNESS:  It could generate problems if
 7   that occurred.
 8            BY MR. BRUSTIN:
 9            Q.   And it could be a constitutional issue,
10   correct?
11            MR. BLENK:  Form.
12            THE WITNESS:  That would be the problem,
13   yes.
14            BY MR. BRUSTIN:
15            Q.   Okay.  And so certainly if anything
16   like that happened, you expected to be told about
17   it, correct?
18            MR. BLENK:  Form.
19            THE WITNESS:  I would have hoped to find out
20   about it, yeah.
21            BY MR. BRUSTIN:
22            Q.   Well, it's more than hoping to find out
23   about it.  If a witness was shown individual photos
24   of a suspect, that would, among other things, be
25   Brady material that would have to be disclosed to
```



1                    Christopher J. Belling

2    the defense, correct?

3            MR. BLENK:  Form.

4            MR. RUSS:  Objection to form.

5            THE WITNESS:  I'm trying to -- that just is

6    so far out there, I -- I don't think anything like

7    that ever happened in a case that I worked, so

8    that's why I'm sort of -- don't know how to answer

9    that.

10           BY MR. BRUSTIN:

11           Q.  Well, I'll be more specific.  If, for

12   example, a witness was shown an individual photo or

13   two photos of potential suspects as opposed to a

14   photo array with fillers in a case and then that

15   witness testified at trial that the defendant was,

16   in fact, the perpetrator, you would understand that

17   the defense would have a right to know that -- that

18   that suspect wasn't selected in a properly

19   conducted photo array, correct?

20           MR. BLENK:  Form.

21           MR. RUSS:  Objection to form.

22           THE WITNESS:  Right.  That's what the Wade

23   hearing's for.  That's when that information comes

24   out, and that's litigated.

25           BY MR. BRUSTIN:



1                    Christopher J. Belling

2          Q.   But you can only litigate it if you

3    have full information about what actually

4    transpired, correct?

5          MR. BLENK:  Form.

6          THE WITNESS:  True.

7          BY MR. BRUSTIN:

8          Q.   So, again, you were reliant on the

9    police to accurately and completely describe to you

10   what happened during identification procedures so

11   you could properly conduct Wade hearings, correct?

12         MR. BLENK:  Form.

13         THE WITNESS:  Yes.

14         BY MR. BRUSTIN:

15         Q.   And the form for that was as you

16   described, in P-73s and P-88s, correct?

17         A.   Correct.

18         Q.   And you were relying on those P-73s and

19   P-88s to be accurate in regard to identification

20   procedures, correct?

21         A.   Yes.

22         Q.   Including how many photos were shown to

23   a witness?

24         A.   Yes.

25         Q.   Which photos were shown to a witness?



1                    Christopher J. Belling

2          A.    Yes.

3          Q.    What, if anything, was said to the

4    witness during the photo array?

5          MR. BLENK:  Form.

6          THE WITNESS:  I'm trying to remember what

7    the P-88 looks like.  There's a narrative part in

8    there, but I think the -- the blank is what did the

9    witness say after they saw the photos.  I don't

10   know if there's a blank or what the officers said

11   to the witness.

12         BY MR. BRUSTIN:

13         Q.    Well, obviously you understood that to

14   the extent that the police officers said anything

15   suggestive about who to pick before, during, or

16   after a photo array, that had to be documented so

17   that you could properly litigate that in a Wade

18   hearing?

19         MR. BLENK:  Form.

20         THE WITNESS:  Sure.

21         BY MR. BRUSTIN:

22         Q.    Basic as it gets, right?

23         MR. BLENK:  Form.

24         THE WITNESS:  I would say that's pretty

25   basic, yeah.



1                      Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   And you understood, for example, that

4    it would never be inappropriate for a police

5    officer to tell a witness that -- after an

6    identification procedure that the suspect they

7    picked is the person that they believe did it

8    because of other evidence?

9          MR. BLENK:  Form.

10         MR. RUSS:  Objection to form.

11         THE WITNESS:  Again, that's a whole body of

12   case law that developed during my career as a

13   prosecutor, and in the later years, yeah, there

14   was -- that was litigated a lot and, you know --

15         BY MR. BRUSTIN:

16         Q.   Well, certainly by 1991 -- and I'm

17   reading to you right from testimony from the

18   officers in this case telling us that they clearly

19   understood that obligation in 1991.  Do you have

20   any reason to dispute that?

21         MR. BLENK:  Form.

22         MR. RUSS:  Objection to form.

23         THE WITNESS:  I just don't know what stage

24   of the drift we were at at that point in time.

25         BY MR. BRUSTIN:



1                   Christopher J. Belling

2          Q.   Okay.  So is it your testimony that

3    you're not sure as you sit here today whether or

4    not officers were responsible for documenting if

5    they told a witness after a photo ID that they had

6    picked the right person because there's other

7    evidence implicating that person?

8          MR. BLENK:  Form.

9          MR. RUSS:  Objection to form.

10         THE WITNESS:  Yeah, I -- I don't understand

11   the question.  The form is a problem.  There's too

12   much there.

13         BY MR. BRUSTIN:

14         Q.   Okay.  I'll give you a hypothetical.

15   If, for example, a photo array is conducted with an

16   eyewitness and the witness makes the selection and

17   the police officer says to that witness, you've

18   picked the right guy, we know he did it from three

19   other witnesses.  Would that information have to be

20   documented and disclosed to you?

21         MR. BLENK:  Form.

22         THE WITNESS:  In the current state of the

23   law, yes.

24         BY MR. BRUSTIN:

25         Q.   But perhaps not in 1991?



1                    Christopher J. Belling

2          A.    I -- I think that that might be where

3      the situation is, yeah.

4          Q.    You certainly understood the difference

5      between a tentative ID and a positive ID, correct?

6          MR. BLENK:  Form.

7          THE WITNESS:  Yeah.

8          BY MR. BRUSTIN:

9          Q.    A tentative ID -- a positive ID is

10     that's the guy or that's the person that shot --

11     that shot me, something like that, correct?

12         MR. BLENK:  Form.

13         THE WITNESS:  Yeah, I would say so.

14         BY MR. BRUSTIN:

15         Q.    And a tentative ID is anything that

16     expresses any uncertainty about the identification,

17     correct?  It may be him, it looks like him.  Those

18     are tentative IDs, correct?

19         MR. BLENK:  Form.

20         THE WITNESS:  A less than positive ID is

21     what that would be, yes.

22         BY MR. BRUSTIN:

23         Q.    And a positive ID provides probable

24     cause, and a tentative ID does not, correct?

25         MR. BLENK:  Form.  Calls for a legal



1                        Christopher J. Belling
2     conclusion.
3            THE WITNESS:  I suppose it would depend on
4     what the so-called tentative ID was, what was said.
5            BY MR. BRUSTIN:
6            Q.   So you think there are circumstances
7     where a tentative ID expressing uncertainty could
8     provide probable cause inside a homicide?
9            MR. BLENK:  Form.
10           THE WITNESS:  I think it could contribute to
11    probable cause.  It might not establish probable
12    cause.
13           BY MR. BRUSTIN:
14           Q.   Okay.  But a positive ID could
15    establish probable cause?
16           A.   True.
17           Q.   A confession could establish probable
18    cause?
19           A.   Possibly, yes.
20           Q.   Now, I take it that you -- tell me
21    about your process for meeting with detectives in a
22    homicide case.  At what points in time in the case
23    would you meet with them, and which would you meet
24    with?
25           MR. BLENK:  Form.



1                    Christopher J. Belling

2          THE WITNESS:  The second part of the

3    question was which would you meet?

4          BY MR. BRUSTIN:

5          Q.   Which detective.  Would it be a lead

6    detective?  Would it be any -- would it be more

7    than that?  Would it vary from case to case?

8          MR. BLENK:  Form.

9          THE WITNESS:  It varied from case to case.

10         BY MR. BRUSTIN:

11         Q.   Did you have a general process in a

12   homicide case for when you would first meet with

13   the homicide detectives?

14         MR. BLENK:  Form.

15         THE WITNESS:  No.  It was ad hoc.

16         BY MR. BRUSTIN:

17         Q.   Okay.  Let's talk about this case just

18   broadly.  Would it be fair to say that the first

19   time you became involved in this case was when

20   Lamarr Scott came in?

21         MR. BLENK:  Form.

22         THE WITNESS:  I would say that the first

23   time I was actually at the homicide office in

24   regard to this case was when Lamarr Scott came in,

25   yes.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Okay.  Had you had discussions, to your

4    recollection, did you have discussions with anybody

5    from the BPD concerning this case prior to that?

6          A.   I do not recollect any.

7          Q.   Okay.  Do you think you would recollect

8    that today?

9          A.   Not necessarily.

10         Q.   All right.  But your first recollection

11   is coming to the homicide office in regard to

12   Lamarr Scott?

13         A.   My first recollection of actually

14   talking face to face with homicide detectives would

15   be that -- the middle of the night visit to

16   homicide on the 12th of August.

17         Q.   And you came that night or the next

18   morning?

19         MR. BLENK:  Form.

20         THE WITNESS:  It was about 3 in the morning

21   on the 12th of August.

22         BY MR. BRUSTIN:

23         Q.   Okay.  And how many hours did you spend

24   in the homicide division at that time?

25         A.   Probably an hour.



1                    Christopher J. Belling

2          Q.    Did you speak to Lamarr Scott at that

3    time?

4          A.    Yes, I did.

5          Q.    For how long?

6          A.    Five minutes.

7          Q.    Did you speak to Leonard Brown at that

8    time?

9          A.    I don't recall talking to Leonard

10   Brown.

11         Q.    And I take it you spoke to Lamarr Scott

12   after the police had already taken a statement from

13   him, correct?

14         A.    Yes.

15         Q.    When did you speak to Lamarr Scott

16   next, after that five-minute conversation that

17   night, or that morning?

18         A.    Probably in December of 1991.

19         Q.    You're sure about that?

20         A.    No, I'm not.  I said probably.  I don't

21   know if I talked to him in between.

22         Q.    Well, let me do it this way, then.  In

23   those first few days after Lamarr Scott came

24   forward, is it your testimony that you only spoke

25   to him for five minutes, or is it possible you



1                    Christopher J. Belling

2     spoke to him more than that?

3          A.   My recollection is I only spoke to him

4     at the homicide office for about five minutes.

5          Q.   Okay.  And not again for months?

6          A.   Again, that's my recollection, yes.

7          Q.   Okay.  But it sounds like, unlike some

8     other things, you're not certain about that; is

9     that fair?

10              MR. BLENK:  Form.

11              THE WITNESS:  I just -- I jump from talking

12     to him in the homicide office establishing that he

13     existed and then went on to the whole process of

14     getting him a lawyer and when Jack Molloy was

15     assigned to represent him.  I don't remember

16     contact with him in between those two times.

17              BY MR. BRUSTIN:

18          Q.   Okay.  And when you -- when you -- when

19     you spoke to -- withdrawn.

20              I take it it wasn't unusual for you to be

21     called down to -- requested to come to the precinct

22     in a homicide case.  That was something -- that was

23     one of your responsibilities, to give assistance to

24     the homicide detectives when needed, correct?

25              MR. BLENK:  Form.



1                    Christopher J. Belling
2          THE WITNESS:  It was, but it didn't happen
3    that often.
4          BY MR. BRUSTIN:
5          Q.   Okay.  So this was -- so this was
6    somewhat unusual?
7          A.    Relatively speaking, yes.
8          Q.   Okay.  And certainly it was unusual
9    after a person had been arrested for a homicide for
10   somebody else to come forward and say, no, they
11   were the person who actually committed the crime,
12   correct?
13         A.    That was unusual, yes.
14         Q.    In fact, would it be fair to say that
15   absent clear mental illness, this was the only time
16   in your career when that's ever happened?
17         MR. BLENK:  Form.
18         THE WITNESS:  Yes.
19         BY MR. BRUSTIN:
20         Q.   Okay.  It was an extraordinary event?
21         A.   Very unusual.
22         Q.    And as a result of this happening, you
23   took a more substantial role in directing the
24   investigation after that point in time than you
25   otherwise would have in a typical homicide



1                    Christopher J. Belling

2    investigation; fair to say?

3         MR. BLENK:  Form.

4         THE WITNESS:  Yes.

5         BY MR. BRUSTIN:

6         Q.   Fair to say that you took over the

7    direction of the investigation at that point in

8    time?

9         A.   No.

10        MR. BLENK:  Form.

11        BY MR. BRUSTIN:

12        Q.   You were certainly an integral part of

13   directing the investigation after he came forward;

14   fair to say?

15        MR. BLENK:  Form.

16        THE WITNESS:  No.

17        BY MR. BRUSTIN:

18        Q.   How did I get that wrong?

19        A.   Well, the investigation was ongoing.  I

20   had my concerns.  I told the chief of homicide.  I

21   told the individual detectives, and they went out

22   and did whatever they did to deal with the issues.

23        Q.   But you told them what you wanted?

24        MR. BLENK:  Form.

25        THE WITNESS:  I told them what I was



```
 1                  Christopher J. Belling
 2   concerned about.
 3          BY MR. BRUSTIN:
 4          Q.   Okay.  Now, when you spoke to -- and I
 5   take it that that conversation concerning what you
 6   were concerned about was an ongoing conversation.
 7   You had a conversation -- you had conversations
 8   beginning the night Lamarr Scott came forward,
 9   correct?
10          A.   Yes.
11          Q.   Then you had ongoing conversations as
12   they conducted the investigative tasks that you
13   suggested?
14          MR. BLENK:  Form.
15          THE WITNESS:  Yes, in general.
16          BY MR. BRUSTIN:
17          Q.   And that went on for months?
18          A.   Yes.
19          MR. BLENK:  Form.
20          BY MR. BRUSTIN:
21          Q.   What did you say to -- withdrawn.
22          Who was present for your conversation with
23   Lamarr Scott?
24          A.   I don't recollect if any detectives
25   were in the room with me or not.  It could have
```



1                    Christopher J. Belling

2  been me and Lamarr Scott alone.  It could have been

3  Stambach there, or it could have been whoever was

4  with Stambach that night.  I think it was DiPirro.

5        Q.   Okay.  And what did you say to Lamarr

6  Scott and what did he say to you during that

7  five-minute conversation?

8        A.   I asked him to identify himself, and I

9  asked if he had just given a statement implicating

10 himself in a homicide.  And I told him that given

11 that set of circumstances, I felt that it would be

12 appropriate for arrangements to be made to get him

13 a lawyer.  And that if he needed a lawyer, he

14 should contact the DA's office and we'd take him to

15 criminal special term and get him an assigned

16 lawyer.

17       Q.   Okay.  And what did he say to you?

18       A.   I don't recollect exactly what he said.

19 I don't think he was particularly talkative.  He

20 told me he was Lamarr Scott.  I think I asked him

21 his age.  I may have asked him about Valentino

22 Dixon's parents having brought him to the scene of

23 the videotape with Wanda Starke, but I tried to

24 stay away from substantive information about what

25 he said, because I felt that that would be -- you



1                  Christopher J. Belling
2    know, I didn't want to end up a witness at my own
3    Huntley hearing, so to speak.
4         Q.   Okay.  So you made it your business not
5    to speak to him about any substance?
6         A.   I tried to avoid the substance of what
7    was going on and tried to get the context.
8         Q.   The only substantive question you asked
9    him was about Valentino Dixon's parents bringing
10   him to the interview?
11        MR. BLENK:  Form.
12        THE WITNESS:  If I asked that, and I don't
13   remember specifically, but it's possible.
14        BY MR. BRUSTIN:
15        Q.   And what did he say about that?
16        A.   I believe he said they had.
17        Q.   What information, if any, without --
18   tell me everything you remember him telling you in
19   substance.
20        A.   That he had given the police a
21   statement, his name, his age.
22        Q.   So he told you he was 18?
23        A.   Yeah, I thought he was 19, but
24   whatever.  And that he told me he had talked to
25   Wanda Starke on TV and that the events that got him



1                    Christopher J. Belling

2   there involved Robert Bryant and Annie Shannon.

3          Q.   So you knew he was an adult when you

4   met with him?

5          A.   Oh, yeah.

6          Q.   That was never a question?

7          A.   Well, not once I got his date of birth

8   or his age.

9          Q.   So why did you tell the Georgetown

10  students that you thought he was a minor?

11         A.   Because that's what he had been told by

12  Annie Shannon and Robert Bryant.

13         Q.   But that's not what you said to the

14  Georgetown students.  You said he was a minor.

15         A.   That's because that's what I believed

16  was the situation why he was -- why they got him to

17  confess was because they told him he was a minor.

18         Q.   You knew he wasn't a minor, right?

19         A.   I knew it that night, yes.

20         Q.   But the tape -- the tape says you

21  thought he was a minor.

22         MR. BLENK:  Form.

23         BY MR. BRUSTIN:

24         Q.   Just a mistake you made?

25         A.   Could be.



```
 1                   Christopher J. Belling
 2          Q.   Were you showing off a little bit for
 3   the Georgetown students?
 4          A.   Yes.
 5          MR. BLENK:   Form.
 6          BY MR. BRUSTIN:
 7          Q.   Feel like a bit of a big shot talking
 8   to the law students?
 9          MR. BLENK:   Okay.  That's -- don't respond
10   to that.
11          BY MR. BRUSTIN:
12          Q.   But you were showing off, right?
13          MR. BLENK:   Asked and answered.  Move on.
14          BY MR. BRUSTIN:
15          Q.   You were proud of your conviction even
16   then, right?
17          A.   I don't think a conviction is proud of.
18   You know, it was a conviction.  It was legally
19   based.  It was properly obtained, and it was a
20   conviction.
21          Q.   Well, let me ask you this:  If I were
22   to play portions of that video to a jury, do you
23   think they would glean from that that you seemed
24   really proud of your conviction?
25          MR. BLENK:   Argumentative.  Asked and
```



 1              Christopher J. Belling

 2   answered.  Don't respond to that.  Calls for

 3   speculation.

 4        MR. BRUSTIN:  That's not appropriate.

 5   That's not appropriate.  I'm not going to fight you

 6   on that, but that's not an appropriate instruction.

 7   You don't get to instruct him not to answer

 8   questions, not unless it's privileged or something

 9   like that.  You know that.  Please don't do that.

10        MR. BLENK:  I can instruct him not to

11   answer.  Let's move on.

12        BY MR. BRUSTIN:

13        Q.   All right.  In any case, you spoke to

14   him for, according to you, five minutes.  Could it

15   have been a little bit more than that?

16        A.   I don't recollect it being much longer

17   than that but, you know, anything's possible, I

18   suppose.

19        Q.   Did you make any notes of your

20   conversation?

21        A.   Yes.

22        Q.   What did you do with those notes?

23        A.   I presume I put them in the file.

24        Q.   Have you seen -- I didn't notice them.

25   Have you seen those notes in preparation for today?



1                  Christopher J. Belling

2        A.    Yes.

3        Q.    You don't recall where they are or what

4   they said?

5        A.    There's one page of notes, and it

6   points out a couple of the issues.  It says Lamarr

7   Scott, and then it points out a couple of the

8   issues in his statement.  There's an issue of what

9   kind of a weapon it was.  There's the issue of the

10  bicycle and those things.

11       Q.    I think I do know what you're talking

12  about.  So the notes -- the notes -- I assume those

13  were notes of you reviewing -- you reviewing his

14  statement, but you're telling me that in addition

15  to notes of reviewing his statement, it also was

16  notes of your brief conversation with him; is that

17  correct?

18       A.    It was notes of that whole night when I

19  went down there.

20       Q.    Gotcha.

21       A.    I don't know actually if -- if you had

22  those notes, I couldn't tell you, you know, that

23  was from reviewing his statement, that was from

24  talking to him, I don't know that, but --

25       Q.    You have notes from that night?



```
1                   Christopher J. Belling
2          A.   Yes.
3          Q.   All right.  And when's the next time --
4   I know eventually Mr. Scott got an attorney that
5   you arranged, at least you had a role in arranging.
6   When's the next time you spoke to Mr. Scott before
7   he got an attorney?
8          MR. BLENK:  Form.
9          THE WITNESS:  Before he got an attorney?  I
10  sent out a subpoena to him with a letter saying
11  call in.  He called in.  I'm sure I talked to him
12  on the phone and told him to come to criminal
13  special term to get a lawyer, and so I had that
14  conversation with him.
15         The morning he came into criminal special
16  term, I probably met him at the DA's front desk and
17  took him to criminal special term, so there was a
18  brief conversation there, and then he had a lawyer
19  and I didn't speak to him again.
20         BY MR. BRUSTIN:
21         Q.   Okay.  So your testimony here today is
22  that you never spoke to him about the substance of
23  his confession -- withdrawn.
24         You never spoke to him about the substance
25  of anything he was saying during that phone call
```



1                    Christopher J. Belling

2    when he called you or during the brief meeting

3    after he received a subpoena, correct?

4              MR. BLENK:  Form.

5              THE WITNESS:  I don't have a recollection of

6    talking to him about anything other than that.

7              BY MR. BRUSTIN:

8         Q.   Is it possible you did?

9         A.   I just don't recollect whether I did or

10   not.

11        Q.   How long was the phone call?

12        A.   No clue.

13        Q.   How long was the meeting with him?

14             MR. BLENK:  Form.

15             THE WITNESS:  Again, I can sort of

16   reconstruct how it would have occurred.

17             MR. BRUSTIN:  Okay.

18             THE WITNESS:  But I have no idea how long it

19   took.

20             BY MR. BRUSTIN:

21        Q.   Your testimony here is you don't have

22   an independent recollection -- let's go through the

23   three times you believe you met with him before the

24   attorney.

25             You spoke to him for approximately five



```
 1                  Christopher J. Belling
 2    minutes the night he came in and confessed,
 3    correct?
 4          A.    Correct.
 5          Q.    You're not sure who was present.
 6          A.    Correct.
 7          Q.    You spoke to him again on the phone
 8    after he was subpoenaed for the Grand Jury?
 9          A.    I assume I did, because he would have
10    called in.  That's how we arranged him to get
11    assigned counsel.
12          Q.    Okay.  But your testimony is you have
13    no recollection of that phone call?
14          A.    Correct.
15          Q.    And then you spoke to him again when he
16    came in in connection with the subpoena?
17          A.    Again, exactly the same.  He would have
18    come in, and we would have gone down to special
19    term.
20          Q.    Okay.  And that was the last
21    conversation you ever had with him without --
22    without having an attorney present?
23          A.    Correct.
24          Q.    Did you have any conversations with him
25    with an attorney present, his attorney present?
```



1              Christopher J. Belling

2         A.    Yes.

3         Q.    Okay.

4         A.    I had a conversation with him in terms

5    of, you know, actual Grand Jury preparation with

6    his attorney present, and we talked about the facts

7    of the event, how it occurred, what happened, what

8    he saw, what he did, and then, of course, he

9    testified in Grand Jury.

10        Q.    All right.  Now, one of the things that

11   Mr. Stambach testified to, and you might recall

12   this from reading it, is that before they charged

13   anyone with a homicide, somebody from the DA's

14   office would come over and review the file before

15   an arrest.  This was in -- describing what happened

16   in 1991.

17        Is that your recollection of the process?

18        MR. BLENK:  Form.

19        THE WITNESS:  No.

20        BY MR. BRUSTIN:

21        Q.    Okay.  And I will represent to you that

22   Masecchia testified that, in fact, the DA didn't

23   get involved until after an arrest was made.  Is

24   that your understanding of the process?

25        MR. RUSS:  Objection to form.



1                     Christopher J. Belling

2          THE WITNESS:  That was more often the case

3     than not.

4          BY MR. BRUSTIN:

5          Q.   It wasn't a hard-and-fast rule I guess

6     is what you're describing?

7          A.    Not at that point in time, it was not.

8          Q.    Was there any involvement of you or any

9     other Assistant District Attorney in this case

10    prior to Valentino Dixon being arrested?

11         A.    Not that I know of.

12         Q.    And that would be something given your

13    involvement in this case you likely would have

14    known, correct, you would have expected to have

15    known about?

16         MR. BLENK:  Form.

17         THE WITNESS:  Maybe.  I don't know.  I

18    just -- there wasn't any that I'm aware of.

19         BY MR. BRUSTIN:

20         Q.   All right.  But you do agree with

21    Mr. Stambach that certainly in this case after an

22    arrest was made and after Lamarr Scott came

23    forward, you did a careful review of the file,

24    correct?

25         MR. BLENK:  Form.



1              Christopher J. Belling

2        THE WITNESS:  I did review the file, yes.

3        BY MR. BRUSTIN:

4        Q.   And that would have been certainly

5   within a week or so of Lamarr Scott coming in?

6        A.   Yes.

7        Q.   And when you say review the file, you

8   would have reviewed every page in the homicide

9   file, correct?

10       MR. BLENK:  Form.

11       THE WITNESS:  Yes, every page as it came

12  into existence, yes.

13       BY MR. BRUSTIN:

14       Q.   And that was -- and given the

15  extraordinary circumstance of this case, Lamarr

16  Scott coming forward and saying he confessed to a

17  crime -- him confessing to a crime that Valentino

18  Dixon was being charged with, I take it that going

19  forward you reviewed every report or document in

20  the file that in any way went to the issue of who

21  the shooter was.

22       MR. BLENK:  Form.

23       THE WITNESS:  I reviewed everything that was

24  in the file as it came into existence, yes.

25       BY MR. BRUSTIN:



1              Christopher J. Belling

2        Q.   And you reviewed it carefully.

3        MR. BLENK:  Form.

4        THE WITNESS:  I reviewed it in the normal

5   practice of my business.

6        BY MR. BRUSTIN:

7        Q.   All right.  And certainly by 1991 you

8   were very experienced at reviewing homicide files;

9   fair to say?

10       A.   I was experienced, yes.

11       Q.   You knew how to read P-73s, you knew

12   how to read P-88s, and know exactly what was

13   happening pretty quickly.

14       MR. BLENK:  Form.

15       THE WITNESS:  In general I had that

16   experience, yes.

17       BY MR. BRUSTIN:

18       Q.   And I take it you even -- you probably

19   by that time were -- understood how particular

20   homicide detectives documented cases?

21       MR. BLENK:  Form.

22       MR. BRUSTIN:  As a general matter.

23       MR. BLENK:  Form.

24       THE WITNESS:  Yeah.

25       BY MR. BRUSTIN:



1              Christopher J. Belling

2        Q.   It wasn't the first time you looked at

3   a Stambach P-73 in this case, right?

4        A.   Correct.

5        Q.   Or a Masecchia P-73, right?

6        A.   Correct.

7        Q.   You saw them all the time.

8        A.   Yes.

9        Q.   And I take it that one of the

10  discussions that was going on around the time that

11  Lamarr Scott came in was whether there was

12  sufficient evidence to continue prosecuting

13  Valentino Dixon, correct?

14        MR. BLENK:  Form.

15        THE WITNESS:  No.

16        BY MR. BRUSTIN:

17        Q.   Explain.

18        A.   There already was sufficient evidence

19  to prosecute Valentino Dixon.  The issue became,

20  was that evidence reliable vis-a-vis Lamarr Scott

21  coming out of the woodwork and saying he did it.

22        Q.   Okay.  All right.  Now -- and I take it

23  that given Lamarr Scott coming forward, you

24  interviewed the detectives or you spoke to the

25  detectives on that day and the days following



1                Christopher J. Belling

2    concerning the quality of the evidence that they

3    had against Valentino Dixon?

4           MR. BLENK:  Form.

5           THE WITNESS:  Not in particular.  I knew

6    that there were three eyewitnesses who were

7    identified, and I knew that they had a little of

8    the background story and, you know --

9           BY MR. BRUSTIN:

10          Q.   Well, you knew there were two

11   eyewitnesses who identified.  You understood that

12   Mr. Jackson's identification was tentative,

13   correct?

14          MR. BLENK:  Form.

15          THE WITNESS:  I don't recollect that, no.

16          BY MR. BRUSTIN:

17          Q.   You thought it was positive, his first

18   ID?

19          MR. BLENK:  Form.

20          THE WITNESS:  I remember that there was --

21   somebody made -- maybe Joe Terranova or someone had

22   mentioned something about it, but I don't remember

23   what -- what it was.

24          BY MR. BRUSTIN:

25          Q.   Now, one of the things -- I just want



1                    Christopher J. Belling
2  to get a sense, I think I understand, but I want to
3  make sure I have a good understanding of your
4  process for reviewing the file, and it sounds like
5  in any case, but certainly this case, you were
6  reviewing police records, reports, as they came in.
7          A.    Yes.
8          MR. BLENK:   Form.
9          BY MR. BRUSTIN:
10         Q.    And in addition to that, you did
11  another review of the entire file before you made a
12  presentation to the Grand Jury?
13         MR. BLENK:   Form.
14         THE WITNESS:   It -- it's an ongoing process.
15  You're looking at the stuff as it comes in, and
16  then you determine what you need for Grand Jury.
17         BY MR. BRUSTIN:
18         Q.    I'm actually reading -- well, what you
19  testified to at the perjury trial was that you
20  review all available evidence before the
21  presentation to the Grand Jury.  You know
22  everything that has been reported.
23         Is that consistent with your practice?
24         A.    I would say so.
25         Q.    And you made it your business in any



1              Christopher J. Belling

2   case, but certainly this case, to know every piece

3   of evidence before you went to the Grand Jury,

4   correct?

5          MR. BLENK:  Form.

6          MR. BRUSTIN:  If you could.

7          MR. BLENK:  Form.

8          THE WITNESS:  I think that's overstating it.

9   I made a determination of what elements were needed

10  for a prima facie case and, you know, that's --

11  that's where we are.

12         BY MR. BRUSTIN:

13         Q.   Just so we're clear, I'm reading to you

14  from your -- from the perjury testimony on

15  cross-examination, perjury trial testimony, page

16  47.

17         MR. BLENK:  Is that in the --

18         MR. BRUSTIN:  It's in this one, I believe.

19  Yeah, it's the -- it's the final -- the final tab.

20         MR. BLENK:  Grand Jury or perjury?

21         MR. BRUSTIN:  Sorry, this is the perjury

22  trial, your testimony in the perjury trial.  And by

23  the way --

24         MR. BLENK:  Is it this?

25         MR. BRUSTIN:  No, it's the one he's got.



1                    Christopher J. Belling

2          THE WITNESS:  Okay.  Page you said?

3          MR. BRUSTIN:  So, first of all, before you --

4    before you --

5          MR. BLENK:  Is this marked?

6          MR. BRUSTIN:  It's not.  I don't think we

7    need to mark the testimony, but we can.  Would you

8    prefer it?

9          MR. BLENK:  Why does the binders --

10         MR. BRUSTIN:  The binder is just a

11   compilation of documents, so we're not going to

12   mark the binder, but we can mark -- we can mark his

13   perjury trial testimony as Exhibit 31.

14         MR. RUSS:  31?

15         MR. BRUSTIN:  31.

16         MR. BLENK:  So are these not -- these are

17   not --

18         MR. BRUSTIN:  That's a different document.

19         MR. BLENK:  So this is not including --

20   okay.  So this includes Grand Jury -- the document

21   we're marking as 31 --

22         MR. BRUSTIN:  All we're marking -- all we're

23   marking is his testimony, which is the tab that

24   he's looking at right now.

25         MR. BLENK:  Okay.  Do you want to remove it



1                   Christopher J. Belling

2   from the --

3        MR. BRUSTIN:  No, we're just going to mark

4   it.  We'll deal with it later.  Just put a tab --

5   just put a sticker on 31.

6   The following was marked for Identification:

7    EXH. 31                  excerpt of Christopher

8                             Belling perjury testimony

9        MR. BRUSTIN:  It's testimony from the --

10  it's testimony from the perjury trial on November

11  10th, 1992, page 425 to page 568.

12       MR. BLENK:  But it's not -- it's not all the

13  pages within that range.

14       MR. BRUSTIN:  It's all of his testimony.  So

15  I think there's some -- there's some other parts

16  that are missing.  This is his entire testimony.

17       MR. BLENK:  I'm not saying you're doing

18  anything wrong.  I just want to make sure that the

19  record reflects what he's actually looking at.

20       MR. BRUSTIN:  Okay.  He's looking at his

21  entire testimony from the perjury trial, okay?  So,

22  first of all, this is --

23       MR. BLENK:  So do you want him to -- do you

24  want him to read his entire testimony?

25       MR. BRUSTIN:  Of course not.



1                    Christopher J. Belling

2          MR. BLENK:  Okay.

3          MR. BRUSTIN:  Why would I want him to do

4    that?

5          MR. BLENK:  So that's not what he's looking

6    at.  He's look --

7          MR. BRUSTIN:  Because you took it from him.

8          MS. PERSICO:  We're just trying to make sure

9    that the record is clear.

10         MR. BLENK:  This is really -- does not have

11   to be confrontational.

12         MR. BRUSTIN:  We don't need -- we're doing

13   fine without you.  We don't need two people

14   talking.  One person talks during the deposition,

15   not you.  You can choose, you can switch seats, but

16   one person talks.

17         MR. BLENK:  What page -- what page do you

18   want him to look at?

19         MR. BRUSTIN:  I'm going to give it to him in

20   a minute.  Can you put it in front of him?  So

21   let's mark it first as 31.

22         BY MR. BRUSTIN:

23         Q.   So, Mr. Belling, first of all, my

24   understanding is this is the only testimony you've

25   given in connection with this case; is that



1              Christopher J. Belling

2   correct?

3        A.   As far as I know, yes.

4        Q.   All right.  So take a look at page 487.

5        A.   47?

6        Q.   487.

7        A.   Oh, 487.

8        Q.   Yeah.

9        A.   487, yes.

10        Q.   And line 15.

11        "Question:  Okay.  And prior to the formal

12   presentation of anything to a Grand Jury, you

13   review all the available investigation, don't you?

14        "Answer:  Yes.

15        "Question:  So that even before you walk

16   into a Grand Jury for the first time you know

17   everything that has been reported.

18        "Answer:  I would say that's a fair

19   statement."

20        A.   Okay.

21        Q.   Okay.  And that's an accurate

22   description of what you knew by the time of the

23   Grand Jury, correct?

24        A.   I would say that's a fair statement.

25        MR. BLENK:  Form.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   And, in fact, you knew all of that

4    information long before the Grand Jury, because you

5    were reviewing the file and the reports as they

6    came in, correct?

7          A.   Correct.

8          Q.   Okay.  Now, you mention that -- I'm

9    going to get more specifically to Lamarr Scott a

10   little bit later, but you mention that when Lamarr

11   Scott came in, you provided input to the homicide

12   detectives about what issues you believe needed to

13   be followed up on, correct?

14         MR. BLENK:  Form.

15         THE WITNESS:  Yes, in general.

16         BY MR. BRUSTIN:

17         Q.   All right.  And in addition to that,

18   did you conduct any independent investigation on

19   your own?

20         MR. BLENK:  Form.

21         THE WITNESS:  I don't know what you mean by

22   independent investigation.

23         MR. RUSS:  I'm sorry, could you ask that

24   again?  The connection was kind of garbled.  Could

25   you ask the question again?



```
 1                   Christopher J. Belling
 2         MR. BRUSTIN:  Yeah.  It wasn't a good
 3   question, so I'm going to change it.
 4         BY MR. BRUSTIN:
 5         Q.   Prior to the Grand Jury proceedings,
 6   did you conduct any investigation yourself?  Did
 7   you interview any witnesses yourself, for example?
 8         MR. BLENK:  Form.
 9         THE WITNESS:  I presume you're talking about
10   Antoine Shannon and, yes, obviously I did.
11         BY MR. BRUSTIN:
12         Q.   Okay.  Anybody else?
13         A.   I also talked to Tamara Frieda and
14   various witnesses.  Robert Lewis, Fred Stencil,
15   people whose names were in the file, people who
16   were witnesses.
17         Q.   Anybody else?
18         A.   I don't remember.  Those are the people
19   that I just happened to remember their names from
20   the file.
21         Q.   Now, you weren't present for the
22   interviews of Robert Lewis and Fred Stencil when
23   they were shown photo arrays, were you?
24         A.   No.
25         Q.   That was a separate interview of Robert
```



1                    Christopher J. Belling

2   Lewis and Fred Stencil?

3        A.   Well, they weren't shown photo arrays

4   in my presence, I can tell you that.

5        Q.   Okay.  And when you interviewed those

6   witnesses, were you interviewing them with a

7   homicide detective or a DA investigator?

8        MR. BLENK:  Which one are you talking about?

9        BY MR. BRUSTIN:

10       Q.   Well, let's start with Antoine Shannon.

11  That was alone, correct?

12       A.   No, Antoine Shannon was with a DA's

13  investigator.

14       Q.   DA investigator, that's right.  And

15  Tamara Frieda, DA investigator?

16       A.   No.  I recollect -- I thought it was a

17  homicide detective.  It could have been a DA's

18  investigator, but I think it was a homicide

19  detective.

20       Q.   How about Robert Lewis and Fred

21  Stencil?

22       A.   I think those were just in my office,

23  and there was nobody there other than me.

24       Q.   Okay.  And --

25       A.   Although, at one -- I think that's



1              Christopher J. Belling

2  accurate, yeah.

3       Q.   Okay.  And anybody else you remember

4  interviewing?

5       A.   Well, Emil Adams, Travis Powell, Aaron

6  Jackson, John Sullivan III, certainly them.

7       Q.   And you would agree that certainly Emil

8  Adams and John Sullivan took a great deal of effort

9  to get them to proceedings, correct?

10      MR. BLENK:  Form.

11      THE WITNESS:  At various points in the

12  proceedings, yes.  Sometimes they were around.

13  Sometimes they weren't.

14      BY MR. BRUSTIN:

15      Q.   All right.  And your communications

16  with them was limited as a result?

17      A.   It was.

18      Q.   And -- okay.  So in addition to your

19  interviews that you conducted, what direction or

20  what recommendation, you tell me the right word,

21  what did you tell the homicide detectives that you

22  wanted done in connection with Lamarr Scott

23  confessing?

24      A.   Well, I wrote a letter to Chief

25  Donovan, and I indicated some things in there, and



1                Christopher J. Belling

2  other than that, I honestly don't recollect

3  anything specific.

4        Q.   Why did you wait three months to write

5  that letter to Chief Donovan?

6        A.   Because we were getting ready to wind

7  up the Grand Jury presentation, and I wanted to

8  make sure that we at least attempted to address

9  loose ends.

10        Q.   So my question is a different one then,

11  because we're going to get to that letter, but you

12  told us that when this extraordinary event

13  happened, Lamarr Scott came forward and confessed,

14  what that night and the days following did you

15  direct the homicide detectives to do in regard to

16  that statement?

17        MR. BLENK:  Form.

18        THE WITNESS:  I don't remember.

19        BY MR. BRUSTIN:

20        Q.   So would it be fair to say the best of

21  your recollection is you didn't direct them or ask

22  them to do anything?

23        A.   No, I don't think that would be fair.

24        MR. RUSS:  Objection to form.

25        THE WITNESS:  I think the answer is I don't



```
 1                   Christopher J. Belling
 2   remember what I did with them at that point.
 3         BY MR. BRUSTIN:
 4         Q.   Do you remember anything that you did,
 5   even generally?
 6         MR. BLENK:  Form.
 7         BY MR. BRUSTIN:
 8         Q.   Let me be more specific.  Do you
 9   remember anything that you did in regard to
10   directing or recommending investigation concerning
11   the Lamarr Scott confession in the days following
12   that confession?
13         A.   I don't remember anything specific that
14   I told them to do.
15         Q.   Do you remember anything general at
16   all?
17         A.   Well, I told them to get some
18   background on Robert Bryant and Annie Shannon, and
19   make sure they got the tape from Wanda Starke.
20   Other than that, I don't have any specific recall
21   of things I told them to do.
22         Q.   Why did you want background on Robert
23   Bryant and his mother?
24         A.   Because I was told and then I saw on
25   video that they were the people that were
```



1                    Christopher J. Belling

2    responsible for getting Lamarr Scott to the

3    original TV confession.

4         Q.   They drove him there?

5         A.   Excuse me?

6         Q.   They drove him there is what you mean?

7         MR. BLENK:  I didn't hear that.

8         BY MR. BRUSTIN:

9         Q.   They drove him there is what you mean?

10        A.   No, that's not what I mean.

11        Q.   What do you mean?

12        A.   I mean, they put him up to going there

13   and doing that.

14        Q.   Ah, and where did that information come

15   from?

16        A.   Well --

17        Q.   Other than in your head?

18        A.   It came from the homicide detectives,

19   and it came from my looking at the video.

20        Q.   Okay.  So you learned from the homicide

21   detectives that night that they had determined that

22   the only reason Lamarr Scott came forward was

23   because Valentino Dixon's parents had put him up to

24   it?

25        MR. BLENK:  Form.  Argumentative.



1                    Christopher J. Belling

2         THE WITNESS:  That was information that I

3   got at some point right in there time-wise, yes.

4         BY MR. BRUSTIN:

5         Q.   All right.  So, in other words, what

6   you learned was from the homicide detectives -- and

7   I take it you were dealing mostly with Stambach at

8   that point, correct?

9         MR. BLENK:  Form.

10        THE WITNESS:  Yes, my recollection.

11        BY MR. BRUSTIN:

12        Q.   All right.  And so what you learned

13  from Stambach that night or the next day is that

14  they had determined that the reason that -- through

15  their investigation they had determined that the

16  reason Lamarr Scott came forward and confessed was

17  because Valentino Dixon's parents made him do it?

18        MR. BLENK:  Form.

19        THE WITNESS:  That was the undercurrent,

20  that was the tenor of what was operating at that

21  point, yes.

22        BY MR. BRUSTIN:

23        Q.   Well, DA's don't work with

24  undercurrents.  They work with evidence, right?

25        A.   When we have it.



1                 Christopher J. Belling

2         Q.   Well, if you don't have it, then you --

3    then you have nothing, right?

4         MR. BLENK:   Form.

5         MR. BRUSTIN:   You can't prosecute someone

6    based on an undercurrent.

7         MR. BLENK:   Form.

8         THE WITNESS:   That's true.

9         BY MR. BRUSTIN:

10        Q.   All right.  So what evidence did they

11   describe to you in those following days, the day

12   after he came in and confessed to committing a

13   murder, what evidence did they provide to you that

14   made it clear to them that Valentino Dixon's

15   parents had made Lamarr Scott confess to a crime

16   that Valentino Dixon committed?

17        MR. BLENK:   Form.

18        THE WITNESS:   I don't recall any specific,

19   you know, individual points of evidence other than

20   their presence on the video, their -- the fact that

21   they brought him there.  Other than that, I don't

22   recall specifically what was discussed at that

23   point.

24        BY MR. BRUSTIN:

25        Q.   Well, you understood that the most



1                    Christopher J. Belling
2    important issue when this extraordinary event
3    happened, Lamarr Scott said I committed this
4    murder, the most important issue was, was it true,
5    right?
6              MR. BLENK:  Form.
7              THE WITNESS:  That was an issue, sure.
8              BY MR. BRUSTIN:
9         Q.   And if it wasn't true, then why would
10   he say something crazy like that, right?
11        A.   True.
12        Q.   And that required a full and careful
13   investigation, correct?
14             MR. BLENK:  Form.
15             THE WITNESS:  It required some
16   investigation, yes.
17             BY MR. BRUSTIN:
18        Q.   Just some?
19        A.   Well, I think some was done, and I
20   think that it was clear where the situation was
21   going.
22        Q.   Okay.  What investigation was done?
23   Because I haven't seen any documentation of any of
24   it.
25             MR. BLENK:  Form.



1                 Christopher J. Belling

2          THE WITNESS:  I don't know what they did.

3   The information they gave me was what I just told

4   you.

5          MR. BRUSTIN:  Okay.

6          THE WITNESS:  Then I viewed the video of his

7   supposed confession to Wanda Starke and, you know,

8   that that was the tenor of the situation.

9          BY MR. BRUSTIN:

10         Q.   The undercurrent, so to speak?

11         A.   That's what I said.

12         Q.   And so I think I understand.  Your

13  understanding, you expressed your concern to the

14  police that you wanted to make sure that it was

15  investigated as to whether or not what he said was

16  true and, if not, why he made it, correct?

17         MR. BLENK:  Form.

18         MR. BRUSTIN:  In substance.

19         THE WITNESS:  It's a little -- that's a

20  little broken down.  The bottom line is, is he a

21  false confessor because he was put up to it or not.

22         BY MR. BRUSTIN:

23         Q.   Did you start with the premise that he

24  was a false confessor?

25         MR. BLENK:  Form.



```
 1                  Christopher J. Belling
 2          THE WITNESS:  After viewing the video, I
 3   certainly was inclined to believe that.  After
 4   viewing his statement, I saw significant
 5   discrepancies in it, and then having heard the
 6   circumstances of how it came about, that was the
 7   undercurrent.  And the total unusualness, as you
 8   point out, of the situation.  People just don't
 9   come in and confess to a murder unless they're put
10   up to it.  That's what investigations are for.
11          BY MR. BRUSTIN:
12          Q.   Or unless they committed it.
13          A.   I suppose --
14          MR. BLENK:  Form.
15          THE WITNESS:  -- that's one possibility.
16          BY MR. BRUSTIN:
17          Q.   So it's not been your experience that
18   in -- routinely in your cases people who commit
19   murders sometimes confess to them?
20          MR. BLENK:  Form.
21          THE WITNESS:  In my experience, not sua
22   sponte.
23          BY MR. BRUSTIN:
24          Q.   You don't recall cases in your career
25   where, when -- where people come forward and
```



1                    Christopher J. Belling

2    confess to murders?

3         A.   Not where somebody walks into a TV

4    station on a street corner and confesses to a

5    murder, no.

6         Q.   All right.  But certainly in your

7    experience, I take it you've had lots of experience

8    where when someone -- well, withdrawn.

9         You certainly have lots of experience when

10   someone is arrested and agrees to speak they

11   confess to a murder?

12        A.   Either arrested or questioned and

13   speaks, yeah.

14        Q.   That happens all the time, right?

15        A.   It does.

16        Q.   And routinely, when murderers confess

17   to murders, they often are not honest about every

18   aspect of the event, correct?

19        MR. BLENK:  Form.

20        THE WITNESS:  Yes, that's true.

21        BY MR. BRUSTIN:

22        Q.   That maybe happens in 75 percent of

23   confessions; fair to say?

24        MR. BLENK:  Form.

25        MR. RUSS:  Objection to form.



1                    Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   You know what?  Let me withdraw the

4    question.

5         You would agree that it was -- it was

6    routine or common for people who commit homicides

7    to confess to parts of the crime but not others?

8         MR. BLENK:  Form.

9         THE WITNESS:  No, I wouldn't agree with

10   that.

11        BY MR. BRUSTIN:

12        Q.   You would agree that it was common for

13   people confessing to homicides not to be truthful

14   about all aspects of their confession?

15        MR. BLENK:  Form.

16        THE WITNESS:  Again, too broad a statement.

17   No, I can't agree with that.

18        BY MR. BRUSTIN:

19        Q.   Would you agree -- I think it's a

20   pretty common occurrence, but would you agree that

21   as a general matter oftentimes -- withdrawn.

22        Would you agree that sometimes in your

23   experience people confess to murders and are not

24   completely accurate or reliable as to all aspects

25   of their confession?



1                    Christopher J. Belling

2              MR. BLENK:   Form.

3              THE WITNESS:   Sometimes that's true.

4              BY MR. BRUSTIN:

5         Q.   And that doesn't cause you to believe

6    that they didn't commit the crime necessarily,

7    correct?

8              MR. BLENK:   Form.

9              THE WITNESS:   Correct.

10             BY MR. BRUSTIN:

11        Q.   In fact, oftentimes it makes it seem

12   like they're more guilty?

13             MR. BLENK:   Form.

14             THE WITNESS:   Sometimes it does, I suppose.

15             BY MR. BRUSTIN:

16        Q.   And what -- we're going to get to it

17   more specifically, but what were some of the

18   significant discrepancies that you saw in Lamarr

19   Scott's television statement and his statement to

20   Stambach that caused you to believe he was not, in

21   fact, the shooter in this case?

22        A.   Well, first, there was some discrepancy

23   between the gun.  At some point he says it's an

24   Uzi.  At some point he says it's a TEC-9 or a

25   MAC-10 or something like that.  Nobody in the other



1              Christopher J. Belling

2  statements that I saw had anybody coming to the

3  scene on a bicycle, particularly not the shooter.

4  And I think Leonard Brown's statement also, when

5  you compare it with Lamarr Scott's statement,

6  there's some discrepancies between those two as

7  well, which was concerning.

8        And then just the fact that it occurred

9  where -- how it occurred and how he looked on the

10 video.

11        Q.   How did he look that made you believe

12 he wasn't the shooter?

13        A.   He looked like someone who had been

14 dressed up and brought to the street corner by

15 Valentino Dixon's parents to tell a story to the

16 media so that the media could assist Valentino

17 Dixon's parents in compromising the investigation

18 of a murder committed by their son.

19        Q.   What I'm asking you is:  How did that

20 conclusion that you just gave me, what evidence did

21 you see of that?  How did you form that opinion in

22 your mind, that the evidence proved that?

23        MR. BLENK:  Form.

24        THE WITNESS:  I formed the opinion based on

25 having seen a lot of people confess to murders on



1                    Christopher J. Belling

2  video.

3          BY MR. BRUSTIN:

4          Q.   And he just didn't seem like someone

5  who was confessing to a murder he really committed?

6          A.   Yes, to me.

7          Q.   And that was really the most compelling

8  part for you.

9          MR. BLENK:   Form.

10         BY MR. BRUSTIN:

11         Q.   He just didn't seem like someone who --

12  even though he confessed to committing this crime,

13  he just didn't seem like he did it.

14         MR. BLENK:   Form.

15         THE WITNESS:   His retelling of the event was

16  not consistent with his having done it.

17         BY MR. BRUSTIN:

18         Q.   All right.   And you would agree that

19  countless times you had major discrepancies between

20  witnesses providing admissions concerning crimes?

21         MR. BLENK:   Form.

22         THE WITNESS:   Discrepancies among witnesses?

23         MR. BRUSTIN:   Yes.

24         THE WITNESS:   Oh, sure.

25         BY MR. BRUSTIN:



```
 1              Christopher J. Belling
 2       Q.   And oftentimes people who commit crimes
 3  try to tell the story in ways that minimize their
 4  culpability?
 5       MR. BLENK:  Form.
 6       THE WITNESS:  Right.
 7       BY MR. BRUSTIN:
 8       Q.   Even when they really committed the
 9  crime.
10       A.   True.
11       Q.   And you saw evidence of that in Lamarr
12  Scott's statement, correct?
13       MR. BLENK:  Form.
14       THE WITNESS:  To a degree.
15       BY MR. BRUSTIN:
16       Q.   But, in any case, it sounds like you
17  determined just that night that based on how he
18  looked to you on TV and how he looked to you when
19  you spoke to him and the discrepancies you saw
20  between the statements between Leonard Brown and
21  Lamarr Scott that he didn't really commit this
22  murder?
23       MR. BLENK:  Form.
24       THE WITNESS:  At that point in time I didn't
25  reach my conclusion, but there was certainly
```



1            Christopher J. Belling
2  indicia that there was an issue there.
3        MR. BRUSTIN:  Okay.
4        THE WITNESS:  He looked to me like someone
5  who was, in fact, attempting to exonerate Valentino
6  Dixon rather than soft pedal his own involvement.
7        BY MR. BRUSTIN:
8        Q.   Gotcha.  What about him made him look
9  that way to you?  Was it what he was wearing?  Was
10 it the way he spoke?  What was it?
11       MR. BLENK:  I'd ask you to stop raising your
12 voice, okay?  You could just ask the questions.
13       THE WITNESS:  It was his appearance.
14       MR. BLENK:  Form.
15       THE WITNESS:  It was his lack of --
16       BY MR. BRUSTIN:
17       Q.   Well, let's take them one at a time.
18 I'm sorry, I don't mean to interrupt you.  What
19 about his appearance made it seem like he was
20 covering for Valentino Dixon?  Was it the clothes
21 that he was wearing?
22       MR. BLENK:  Form.
23       THE WITNESS:  Brand new -- brand new
24 flat-brimmed baseball hat, completely scrubbed and
25 washed clean white T-shirt, no indication that he



1              Christopher J. Belling

2  had any level of remorse or had been in any

3  stressful situation, under any pressure, and then

4  the content when he continues to say, I'm just here

5  because Valentino didn't do it, I'm just here

6  because Valentino didn't do it.  Those things and

7  the fact that this comes out of the blue and the

8  fact that it comes to the media were all

9  suspicious.

10        BY MR. BRUSTIN:

11        Q.   Okay.  And did you consider the

12  possibility that somebody who emptied a TEC-9 as

13  they stood over a person might not have actual

14  remorse for doing it?

15        MR. BLENK:  Form.

16        THE WITNESS:  I don't know what actual

17  remorse is.

18        BY MR. BRUSTIN:

19        Q.   Feelings of remorse, feeling bad about

20  having shot someone 20 times.

21        MR. BLENK:  Form.

22        THE WITNESS:  If you could do it, you'd feel

23  remorseful.

24        BY MR. BRUSTIN:

25        Q.   Okay.  And did you consider the



1              Christopher J. Belling
2    possibility that -- withdrawn.
3          So -- all right.  So it sounds like you
4    formed some pretty strong beliefs based on your
5    impression of him that night, and you said that you
6    learned that, among other things, the -- the
7    homicide detectives checked the background of
8    Robert Bryant and Valentino Dixon's mother,
9    correct?
10          MR. BLENK:  Form.
11          THE WITNESS:  I think I asked them to do
12    that.  I don't know that they had done that at that
13    point in time.
14          BY MR. BRUSTIN:
15          Q.  Do you remember seeing any paperwork on
16    that?  Because I don't.
17          A.  No, I don't remember seeing any
18    paperwork.
19          Q.  What else did -- other than -- other
20    than asking them to check the background, what else
21    did you ask them to check, if anything?
22          MR. BLENK:  Form.  Asked and answered.
23          BY MR. BRUSTIN:
24          Q.  Withdrawn.  It sounds like that's the
25    sum total of what you asked them to do; is that



 1                  Christopher J. Belling

 2   fair to say?

 3        MR. BLENK:  Form.

 4        THE WITNESS:  No, I actually had them show

 5   photo arrays to some witnesses, particularly Fred

 6   Stencil and Robert Lewis, who were purportedly

 7   there to see if they could identify Lamarr Scott.

 8        BY MR. BRUSTIN:

 9        Q.   Sorry, I'm not talking about what you

10   did three months later.  I'm talking about what you

11   did before the -- before you sent that letter three

12   months later, or maybe it was more than three

13   months.  I think it was November, it was August,

14   September, October.  Three months.

15        A.   I don't know when the Fred Stencil and

16   Robert Lewis photo arrays were done.

17        Q.   Well, your letter was in November.  You

18   think you might have asked before that?

19        A.   I think it might have happened before

20   that.  I just don't know.

21        Q.   All right.  Do you remember anything

22   else you asked in the first few days?  You would

23   agree that the -- withdrawn.

24        You would agree that the investigation into

25   whether or not Lamarr Scott's confession was true



1                   Christopher J. Belling

2    or was fabricated, the most important time to

3    investigate that was in the days following that --

4    those statements, correct?

5              MR. BLENK:  Form.

6              THE WITNESS:  I would not agree with that.

7              BY MR. BRUSTIN:

8         Q.   No?  It wouldn't be important, for

9    example, to interview Valentino Dixon's parents or

10   other people who may have information about some

11   bribe potentially as soon as -- as soon as possible

12   after the statements were made?

13             MR. BLENK:  Form.

14             THE WITNESS:  It certainly could have been

15   helpful.

16             BY MR. BRUSTIN:

17        Q.   Those are some of the basic things you

18   would expect would be done by homicide detectives

19   to determine whether or not Lamarr Scott's

20   confession was true or not, correct?

21             MR. BLENK:  Form.

22             THE WITNESS:  It would have been helpful.

23             BY MR. BRUSTIN:

24        Q.   Were you -- by the way, is it possible

25   that maybe you shared your view with the homicide



1              Christopher J. Belling

2   detectives and you told them, you know what, I just

3   don't think he's telling the truth, no need to

4   investigate?

5         MR. BLENK:  Form.

6         THE WITNESS:  No.

7         BY MR. BRUSTIN:

8         Q.   You expected them to do a full

9   investigation into the reliability and the accuracy

10  of Lamarr Scott's admissions, correct?

11        MR. BLENK:  Form.

12        THE WITNESS:  I expected them to continue

13  investigating.

14        BY MR. BRUSTIN:

15        Q.   All right.  Did you notice that in the

16  days following Lamarr Scott's confession no reports

17  were generated concerning an investigation into

18  whether Lamarr Scott was the shooter?

19        MR. BLENK:  Form.

20        MR. RUSS:  Objection to form.

21        THE WITNESS:  And I don't recollect that.

22        BY MR. BRUSTIN:

23        Q.   Did you notice when you looked at

24  police reports, which you said you were reviewing

25  as they came in, that nobody showed Lamarr Scott's



1                    Christopher J. Belling
2   picture to anybody for months?
3           MR. BLENK:  Form.
4           MR. RUSS:  Objection to form.
5           THE WITNESS:  Again, I don't know that
6   that's the case.
7           BY MR. BRUSTIN:
8           Q.   Well, we have the police file here.
9   There's no reports of it.  You would certainly
10  expect if pictures of Lamarr Scott were shown in a
11  photo array to any witness, there would be a report
12  on that, correct?
13          MR. BLENK:  Form.
14          MR. RUSS:  Objection to form.
15          THE WITNESS:  I would expect there should be
16  a report.
17          BY MR. BRUSTIN:
18          Q.   And although you don't remember it
19  today, you know, 30 years, more -- more than 30
20  years later, certainly at the time you would have
21  recognized it, correct?
22          MR. BLENK:  Form.
23          THE WITNESS:  There's no way to answer that.
24          BY MR. BRUSTIN:
25          Q.   Well, foremost in your mind from the



1                    Christopher J. Belling

2   time that Lamarr Scott came in through this trial

3   was whether or not Lamarr Scott was the shooter or

4   Valentino Dixon was the shooter, correct?

5              MR. BLENK:  Form.

6              THE WITNESS:  That was the significant issue

7   in the case.

8              BY MR. BRUSTIN:

9              Q.   And it remained the significant issue

10  in the case through the trial and the perjury

11  trial, right?

12             A.   Actually, it didn't seem to be much of

13  an issue in the homicide trial itself, but it was a

14  big issue in the perjury trial.

15             BY MR. BRUSTIN:

16             Q.   Well, the reason it wasn't a big issue

17  in the homicide trial is because you -- you charged

18  Leonard Brown and Mario Jarmon with perjury,

19  correct?

20             MR. BLENK:  Form.

21             THE WITNESS:  No.

22             MR. BRUSTIN:  All right.  Let's take a

23  five-minute break.

24             THE VIDEOGRAPHER:  Going off the record.

25  The time is 12:01.



1                    Christopher J. Belling

2          (A recess was then taken at 12:01 p.m.)

3          THE VIDEOGRAPHER:  Back on the record at a

4   time of 12:12.

5          BY MR. BRUSTIN:

6          Q.   Mr. Belling, just a couple of

7   follow-ups before I move on.  If you could just

8   switch the -- if you put that forward, the

9   testimony forward, I want to go back to the DA

10  file.

11         A.   Okay.

12         Q.   Thank you.  If you could take -- let's

13  start with page 1686.

14         A.   1686.  1686, okay.

15         Q.   Yeah.  This is the letter you're

16  referring to, correct?

17         A.   Yes, it is.

18         Q.   And this letter was written November

19  22nd, 1991?

20         A.   Correct.

21         Q.   More than three months after the

22  shooting?

23         A.   Correct.

24         Q.   And more than two weeks after the Grand

25  Jury had started on November 9th?



```
 1                    Christopher J. Belling

 2          A.    Correct.

 3          Q.    And it was written one day after you

 4    met with Antoine Shannon?

 5          A.    That's what it says in the letter,

 6    yeah.

 7          Q.    And you remember your meeting with

 8    Antoine Shannon, correct?

 9          A.    I do.

10          Q.    In fact, you wrote a letter to his

11    school saying that you didn't think he -- that he

12    wasn't a suspect and in your view had done nothing

13    wrong, correct?

14          A.    I might have.  I don't remember the

15    letter, but that makes sense.

16          Q.    Why didn't you charge Antoine Shannon

17    with perjury given that he claimed Lamarr Scott

18    committed the shooting?

19          A.    Because he didn't commit perjury.

20          Q.    Got it.  Otherwise, you would have?

21          A.    It depends on the circumstances, but he

22    gave a sworn statement.  The sworn statement was

23    not in the context where it was clearly, you know,

24    true or not true.

25          Q.    Gotcha.  There was enough gray area
```



1                 Christopher J. Belling

2    there where you felt comfortable not charging him?

3         A.    No.  I didn't charge him because I

4    didn't perceive he did any crime.

5         Q.    All right.  And was there something

6    about the interview with Antoine Shannon that

7    caused you to write this letter suggesting that

8    there be follow-up investigation into whether

9    Lamarr Scott was the shooter?

10        A.    I would presume that there probably

11   was.  I got back from Kentucky, and I sat down with

12   the District Attorney and we probably said, you

13   know, there's still some things that need to be

14   looked at here, and the letter was then generated.

15        Q.    Because Antoine Shannon seemed pretty

16   credible and reliable to you, right?

17        A.    No.

18        Q.    Then why did you write a letter on his

19   behalf to the school?

20        A.    I didn't want him to get in trouble at

21   school.

22        Q.    But you didn't believe him any more

23   than you believed Leonard Brown or Lamarr Scott or

24   Mario Jarmon, right?

25        MS. PERSICO:  Form.



```
 1                  Christopher J. Belling
 2         THE WITNESS:  I did not believe his version
 3    of the events, that's correct.
 4         BY MR. BRUSTIN:
 5         Q.   Was there something about the way he
 6    looked or was dressed?
 7         MS. PERSICO:  Form.
 8         THE WITNESS:  No.
 9         BY MR. BRUSTIN:
10         Q.   His mannerisms?
11         A.   No.
12         Q.   What was it about what Mario Jarmon
13    told you that caused you to believe he was lying?
14         MS. PERSICO:  Form.
15         THE WITNESS:  The content.
16         BY MR. BRUSTIN:
17         Q.   In other words, the contents saying
18    that Valentino Dixon wasn't the shooter and Lamarr
19    Scott was?
20         MS. PERSICO:  Form.
21         THE WITNESS:  Well, his biggest issue was
22    the inconsistencies within his statement.
23         BY MR. BRUSTIN:
24         Q.   Okay.  But as you've already told us,
25    oftentimes you get inconsistencies among witnesses
```



1                    Christopher J. Belling
2  telling the truth about who committed a crime,
3  correct?
4          MS. PERSICO:  Form.
5          THE WITNESS:  I haven't said that.
6          MR. BRUSTIN:  You did actually.
7          MS. PERSICO:  Form.
8          THE WITNESS:  I didn't.
9          BY MR. BRUSTIN:
10         Q.   Oh.  Well, let me ask you again.  Would
11 it be fair to say that on almost every case you try
12 as a homicide DA, there are large -- especially in
13 drug crimes, there are large discrepancies between
14 prosecution witnesses that you call?
15         MS. PERSICO:  Form.
16         MR. RUSS:  Objection to form.
17         THE WITNESS:  I never tried any drug cases.
18 I did try one.
19         BY MR. BRUSTIN:
20         Q.   You didn't try any homicides that were
21 related to drugs in Buffalo?
22         A.   I thought of one as I was driving down
23 here today, but, yeah, not -- not that many.
24         Q.   How is that possible?
25         MS. PERSICO:  Form.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Weren't the majority of homicides in

4    Buffalo related to -- related to the sale of drugs?

5          MS. PERSICO:  Form.

6          THE WITNESS:  No.

7          BY MR. BRUSTIN:

8          Q.   Okay.  Not in the '90s?

9          MS. PERSICO:  Form.

10         THE WITNESS:  Not to my recollection.

11         BY MR. BRUSTIN:

12         Q.   All right.  In any case, this appears

13   that -- it says:  Obviously after review of the

14   statement it becomes apparent that we have major

15   discrepancies in regard to who committed the murder

16   of Torriano Jackson, right, that's what you write?

17         A.    Okay.

18         Q.   You had major discrepancies on

19   October -- on August 12th when Lamarr Scott and

20   Leonard Brown came in, right?

21         MS. PERSICO:  Form.

22         THE WITNESS:  We had the same discrepancies.

23         BY MR. BRUSTIN:

24         Q.   And what caused you to decide that on

25   November 22nd, three months later, it was time to



1                    Christopher J. Belling

2    investigate those discrepancies?

3            MS. PERSICO:  Form.

4            THE WITNESS:  I have no idea.

5            BY MR. BRUSTIN:

6            Q.   All right.  Does this -- does the

7    timing of this letter and the content of this

8    letter jog your memory in any way as to any other

9    investigation that you suggested in between August

10   12th and this time?

11           A.   No.

12           Q.   The only thing you remember is --

13   withdrawn.

14           Now, it appears from this letter that by

15   this time you knew Tamara Frieda as the person who

16   owned the red Tracker who was -- whose car was hit

17   by a bullet, correct?

18           A.   Correct.

19           Q.   And so it appears that -- explain this

20   to me.  Maybe I'm just confused.  It certainly

21   appears that you met with Tamara Frieda sometime

22   after this letter, correct?

23           MS. PERSICO:  Form.

24           THE WITNESS:  It does appear that way, yes.

25           BY MR. BRUSTIN:



1                    Christopher J. Belling

2          Q.    Okay.   Now, one of the things -- so one

3   of the things we have, we have some rough

4   transcripts of the statements that you made to the

5   Georgetown students, which we can use if we need

6   to, but hopefully we won't need to.   I don't think

7   there's anything too precise, but if we need to, we

8   can, and if we need to play something, we can, too,

9   but let's try without it first.

10         MS. PERSICO:   I'm sorry, what are we trying

11  without?

12         MR. BRUSTIN:   We're going to try to do it

13  without -- without showing him the documents.   I'm

14  just going to ask him some questions about what he

15  said, because he's told us he has a very good

16  memory, and if -- if we don't need to and waste

17  time with it, I'm not going to do it.

18         BY MR. BRUSTIN:

19         Q.    So one of the things in general that

20  you talked to the students about was that you

21  remember being in an interview with Miss Frieda and

22  another detective.   Do you recall telling them

23  that?

24         A.    There was one detective and me.

25         Q.    Right.



1                 Christopher J. Belling

2         A.   Right.

3         Q.   Good enough.

4         A.   Okay.

5         Q.   And you got to her because you had

6   traced her plate, and that's how you got to her

7   house, license plate?

8         A.   That's correct.

9         MS. PERSICO:  Form.  Can we -- are you

10  asking -- I want to be clear.

11        MR. BRUSTIN:  I'll clarify.

12        BY MR. BRUSTIN:

13        Q.   So now I'm -- let me do -- let me do it

14  a better way, because it wasn't clear.  Let me

15  first ask you straight.  So, first of all, you went

16  to Tamara Frieda's house with another detective,

17  correct?

18        A.   With a detective.

19        Q.   Sorry, with a detective, one detective.

20        A.   Correct.

21        Q.   And you got there because you had

22  traced her plate and learned where she lived?

23        A.   Police traced the plate, yes.

24        Q.   Okay.  And she said that she didn't --

25  when you met with her, she was a nice young women,



```
 1                 Christopher J. Belling
 2  right?
 3          MS. PERSICO:  Form.
 4          THE WITNESS:  I don't know.  She seemed like
 5  a person.  I don't know if she was a nice young
 6  woman.  She was a person.
 7          BY MR. BRUSTIN:
 8          Q.  Didn't seem like a drug dealer or
 9  anything like that, right?
10          A.  No.
11          MS. PERSICO:  Form.
12          BY MR. BRUSTIN:
13          Q.  All right.  In fact, I can tell you
14  that she's actually gone on to become a
15  decades-long social worker.  Does that surprise
16  you?
17          MS. PERSICO:  Form.
18          THE WITNESS:  That -- I don't know.  It
19  doesn't mean anything to me.
20          BY MR. BRUSTIN:
21          Q.  Doesn't mean a thing to you?
22          A.  No.
23          Q.  All right.  And she told you she didn't
24  know anything?
25          A.  I think she told us actually that she
```



1                 Christopher J. Belling

2    somehow left before it ever happened.

3         Q.    Okay.

4         A.    That she didn't -- but she didn't know

5    anything, that's correct.

6         Q.    And one of the things that you told the

7    students and you also testified to at the perjury

8    trial, but one of the things you told the students

9    was that you believe that there was a large

10   credibility gap, that's the term you used, in

11   regard to Miss Frieda because she didn't come

12   forward with the fact that Lamarr Scott was

13   actually the shooter until many years later,

14   correct?

15        MS. PERSICO:  Form.

16        THE WITNESS:  Yes, that's true.

17        BY MR. BRUSTIN:

18        Q.    And you told the students that that was

19   one of the reasons why you found her to be an

20   uncredible witness, correct?

21        MS. PERSICO:  Form.

22        MR. BRUSTIN:  When she came -- when she

23   finally came forward later on.

24        MS. PERSICO:  Mr. Brustin, could you ask the

25   question and wait for him to answer before asking



1                   Christopher J. Belling

2    the next one.

3         MR. BRUSTIN:  I'll ask the questions the way

4    I want.

5         MS. PERSICO:  Well, if you're not going to

6    let him answer, then why are you asking the

7    question?

8         MR. BRUSTIN:  All right.  I'm not going to

9    sit here and argue with you.

10        BY MR. BRUSTIN:

11        Q.   So one of the things that you told the

12   students, because you believed it, was that she was

13   not credible when she said Lamarr Scott was the

14   shooter years later because there was such a long

15   gap as to when she came forward?

16        MS. PERSICO:  Form.

17        THE WITNESS:  What I said was that in

18   practical terms 25 years didn't help her

19   credibility any.

20        BY MR. BRUSTIN:

21        Q.   But the point was that she didn't --

22   she didn't come forward and say that Lamarr Scott

23   was the shooter for many years, correct?

24        MS. PERSICO:  Form.

25        THE WITNESS:  True.



1                        Christopher J. Belling

2            BY MR. BRUSTIN:

3            Q.   That's what caused you to question her

4      credibility.

5            MS. PERSICO:   Form.

6            THE WITNESS:   25 years later, yes.

7            BY MR. BRUSTIN:

8            Q.   And that's what cause -- and that's

9      what you told the students?

10           A.    Yes.

11           Q.    And -- and certainly by the time that

12     you had met Tamara Frieda -- withdrawn.

13           Another thing that you told the students,

14     and maybe you were just showing off as you told us,

15     but another thing you told the students was that

16     you believed that she conformed her recollection

17     out of convenience years later due to community

18     ground swell?

19           MS. PERSICO:   Form.

20           THE WITNESS:   I think that's out of context,

21     but -- yeah, that's out of context.

22           BY MR. BRUSTIN:

23           Q.    Is that generally what you thought and

24     what you told the students, that you thought that

25     she came forward because other people had come



1              Christopher J. Belling

2    forward later and she wanted to join with them?

3         MS. PERSICO:  Form.

4         THE WITNESS:  That was one explanation for

5    her coming forward at that point.

6         BY MR. BRUSTIN:

7         Q.   Another explanation you gave to the

8    students was that maybe she just wanted to be on

9    TV.

10        MS. PERSICO:  Form.

11        THE WITNESS:  I do remember saying that.

12        BY MR. BRUSTIN:

13        Q.   And you thought that, right?

14        MS. PERSICO:  Form.

15        THE WITNESS:  It's certainly a possibility.

16        BY MR. BRUSTIN:

17        Q.   Were you telling -- when you were

18   talking to the students, were you trying to tell

19   them the truth?

20        MS. PERSICO:  Form.

21        THE WITNESS:  There was no truth issue

22   involved.  They were asking me about an event in

23   the past, and I told them what I knew about it.

24        BY MR. BRUSTIN:

25        Q.   Well, when you speak to someone about



```
 1                  Christopher J. Belling
 2    events, were you attempting to accurately and
 3    credibly relay what happened and what -- and what
 4    you actually thought?
 5            MS. PERSICO:  Form.
 6            BY MR. BRUSTIN:
 7            Q.   That was a bad question.  When I say
 8    were you telling them the truth, what I mean was:
 9    Were you accurately portraying to them the best you
10    could what you thought about the case?
11            MS. PERSICO:  Form.
12            THE WITNESS:  I was answering their
13    questions.
14            BY MR. BRUSTIN:
15            Q.   Were you trying to do it honestly?
16            MS. PERSICO:  Form.  You don't need to
17    answer that.
18            BY MR. BRUSTIN:
19            Q.   Were you trying to tell them the truth?
20            MS. PERSICO:  What does that have to do with
21    this?
22            MR. BRUSTIN:  It has to do with the
23    reliability of what he's told them.
24            MS. PERSICO:  Well, why don't we --
25            MR. BRUSTIN:  I'm not going to do it your
```



1                   Christopher J. Belling
2    way.  I'm going to do it my way.  And don't
3    instruct him not to answer.  You're already making
4    improper speaking objections.  Please, just object
5    to form.
6          MS. PERSICO:  Well, if you start asking more
7    proper questions, then I'll stop --
8          MR. BRUSTIN:  I'm going to ask the questions
9    the way I want.  You make form objections.  Go
10   ahead.
11         THE WITNESS:  What was the question?
12         BY MR. BRUSTIN:
13         Q.   When you answered the questions that
14   the students asked you, were you trying to tell
15   them the truth?
16         A.   I was trying to tell them the story.
17         Q.   Truthfully?
18         MS. PERSICO:  Form.
19         THE WITNESS:  As I remembered it.
20         BY MR. BRUSTIN:
21         Q.   All right.  Now -- and I think another
22   term that you used on the tape was that she had a
23   come to Jesus moment much later.  Do you remember
24   saying that?
25         A.   I do.



1                    Christopher J. Belling

2          MS. PERSICO:  Form.

3          BY MR. BRUSTIN:

4          Q.   And you meant that, right?  That's what

5     you thought?

6          MS. PERSICO:  Form.

7          THE WITNESS:  Well, it was an expression,

8     and I used it.

9          BY MR. BRUSTIN:

10         Q.   Do you stand by it?

11         MS. PERSICO:  Form.

12         THE WITNESS:  I don't even know what it

13    means really.

14         BY MR. BRUSTIN:

15         Q.   Why did you say it then?

16         MS. PERSICO:  Form.

17         THE WITNESS:  Because it's an expression

18    that explains someone coming out of the woodwork in

19    the future or at a later time talking about an

20    event that was in the past.

21         BY MR. BRUSTIN:

22         Q.   And you reiterated to the students that

23    you thought she did it to get on TV, right?

24         MS. PERSICO:  Form.

25         THE WITNESS:  I did say that.



1                    Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   That's not a very nice thing to say

4    about somebody, is it?

5         MS. PERSICO:   Form.

6         THE WITNESS:   I think it's neutral.  I don't

7    know whether it's bad or good.

8         BY MR. BRUSTIN:

9         Q.   In any case, back to your interview of

10   her --

11        A.   Right.

12        Q.   -- you and another -- you and a

13   detective --

14        A.   Correct.

15        Q.   -- went and interviewed her, and you

16   determined that she had seen nothing, correct?

17        A.   No.

18        Q.   What did you determine?

19        A.   I determined that she wasn't going to

20   tell us anything.

21        Q.   Okay.  You asked her, you gave her an

22   opportunity to tell you, and she didn't.  That was

23   your view.

24        A.   Correct.

25        Q.   In other words, you thought that she



1               Christopher J. Belling

2  had seen the shooting and just wasn't willing to

3  tell you what she saw?

4         MS. PERSICO:  Form.

5         THE WITNESS:  Correct.

6         BY MR. BRUSTIN:

7         Q.   And what, if anything, did you do

8  during that interview to -- withdrawn.

9         You understood through your many years as a

10 homicide DA that oftentimes in Buffalo for a

11 variety of reasons witnesses are reluctant to say

12 what they saw?

13        MS. PERSICO:  Form.

14        THE WITNESS:  Oftentimes witnesses are

15 reluctant to speak, yes.

16        BY MR. BRUSTIN:

17        Q.   For all kinds of reasons, right?

18        A.   I don't know what the reasons are.

19        Q.   Really?  In your experience --

20        MS. PERSICO:  Form.

21        BY MR. BRUSTIN:

22        Q.   -- you don't know that the reasons

23 include things like being afraid?

24        A.   I do not know what the reasons are.

25        Q.   Do you suspect that that might be one



```
 1                Christopher J. Belling
 2   reason based on your experience?
 3          MS. PERSICO:  Form.
 4          THE WITNESS:  I don't suspect.
 5          BY MR. BRUSTIN:
 6          Q.   You only deal with facts, right?
 7          MS. PERSICO:  Form.
 8          MR. BRUSTIN:  And evidence.
 9          THE WITNESS:  I try to.
10          MS. PERSICO:  Form.
11          BY MR. BRUSTIN:
12          Q.   What, if anything, did you say to Miss
13   Frieda to try to make her comfortable to tell you
14   the truth?
15          A.   As I recall, we thought that Tamara
16   Frieda was the anonymous phone caller, the person
17   that called into the police department and said
18   Valentino Dixon didn't do it.  So we approached it
19   from that.  You know, we -- she said, I'm not -- I
20   wasn't there.  I said, well, your car was there
21   with a bullet hole in it.  I wasn't there.  Well,
22   aren't you the person that called in and said this.
23   No, I'm not that person, I wasn't there, I left
24   early.  And she just continued to deny, deny, deny
25   that she knew anything about it, and that was where
```



 1                 Christopher J. Belling

 2   it ended up, where it went.

 3        Q.   So you understood -- withdrawn.

 4        You understand that Tamara Frieda --

 5   withdrawn again.

 6        There's not a single record anywhere in any

 7   of your testimony about Tamara Frieda or in your

 8   statement to the students or in any reports of your

 9   asking her a single question about her being the

10   anonymous caller.

11        MS. PERSICO:  Form.

12        MR. RUSS:  Objection to form.

13        BY MR. BRUSTIN:

14        Q.   Can you explain that?

15        A.   I have no idea why there's no record of

16   that.

17        Q.   And she doesn't remember you asking her

18   anything about the anonymous call.  Is she lying or

19   mistaken?

20        MS. PERSICO:  Form.

21        MR. RUSS:  Objection to form.

22        THE WITNESS:  Either perhaps.  I don't know.

23        BY MR. BRUSTIN:

24        Q.   But you're certain that you said to

25   her, aren't you the anonymous caller?



1                     Christopher J. Belling

2          A.    No, I'm not certain of that, but I

3    think that that was part of the conversation.  You

4    asked me what the conversation was, and I think

5    that was part it.

6          Q.    All right.  So, in other words, when

7    you spoke to the students and when you spoke to

8    Tamara Frieda, you understood that she was likely

9    the person who had called the police on her own and

10   said that Valentino Dixon wasn't the shooter?

11         MS. PERSICO:  Form.

12         THE WITNESS:  It's a compound question.  I,

13   you know --

14         BY MR. BRUSTIN:

15         Q.    You don't understand the question?

16         A.    No, which one do you want me to answer?

17         Q.    You understood when you talked to

18   Tamara Frieda that she was likely the person who

19   had called the police on her own and said Valentino

20   Dixon wasn't the shooter?

21         MS. PERSICO:  Form.

22         THE WITNESS:  There was that possibility,

23   yes.

24         BY MR. BRUSTIN:

25         Q.    Well, Stambach testified that he had



1                    Christopher J. Belling
2    determined she was that person.
3          MS. PERSICO:  Form.
4          BY MR. BRUSTIN:
5          Q.   Do you dispute that?
6          A.   I have no idea what Stambach
7    determined.
8          Q.   All right.  But you had -- you just had
9    an inkling.  You weren't certain of it?
10         MS. PERSICO:  Form.
11         THE WITNESS:  I don't think anybody was
12   certain of it.
13         BY MR. BRUSTIN:
14         Q.   All right.  In any case, you understood
15   that it was likely that she was the person who made
16   that call?
17         MS. PERSICO:  Form.
18         THE WITNESS:  My understanding was that the
19   police thought she might have been the person that
20   made the call.
21         BY MR. BRUSTIN:
22         Q.   Okay.  And you went into the interview
23   knowing that this person may have actually tried
24   months before to tell her story about Valentino
25   Dixon not being the shooter?



1              Christopher J. Belling

2         MS. PERSICO:  Form.

3         THE WITNESS:  And that's why we wanted to

4    talk to her, because we wanted to determine whether

5    Lamarr Scott was the shooter or whether Valentino

6    was the shooter.

7         BY MR. BRUSTIN:

8         Q.   Three months later.

9         MS. PERSICO:  Form.

10        THE WITNESS:  When we came to it, sure.

11        BY MR. BRUSTIN:

12        Q.   Three months later.

13        A.   When we were in the Grand Jury, yeah.

14        Q.   Did you ask any of the police officers

15   why they didn't go and follow up with her knowing

16   who she was in the days after she claimed that

17   Valentino Dixon wasn't the shooter within days of

18   Lamarr Scott confessing?

19        MS. PERSICO:  Form.

20        MR. RUSS:  Objection to form.

21        MS. PERSICO:  You're being very

22   argumentative.

23        THE WITNESS:  Well, plus, it was compound.

24   The answer is no.

25        MR. BRUSTIN:  Ah, thank you, sir.  It's a



1                    Christopher J. Belling

2    good objection.  I'll make it a not compound

3    question.

4           THE WITNESS:  Okay.

5           BY MR. BRUSTIN:

6           Q.   Did you ask the police why they didn't

7    follow up for three months on Tamara Frieda?

8           A.   No.

9           Q.   Would it be fair to say that if you're

10   being honest, you don't recall one way or another

11   whether or not you mentioned to Tamara Frieda when

12   you met with her that she was the person who made

13   that call?

14          MS. PERSICO:  Form.

15          THE WITNESS:  My recollection is that we

16   thought she was and that it was mentioned at that

17   time, because that would be the inducement for her

18   to talk to us.  She had already called in and said

19   Valentino didn't do it, and we said, okay, if he

20   didn't do it, tell us he didn't do it, here we are.

21          BY MR. BRUSTIN:

22          Q.   So there's no mention of that anywhere.

23   Why didn't you mention that in the perjury trial

24   when you testified about why she wasn't reliable?

25          MS. PERSICO:  Form.



1                    Christopher J. Belling

2           THE WITNESS:  I don't recall testifying in

3     the perjury trial about her reliability or not

4     other than the fact that she has admitted since

5     then that she lied at the perjury trial, too.

6           BY MR. BRUSTIN:

7           Q.   Fair to say you're making up today for

8     the first time that you talked to Tamara Frieda

9     about that call after having reviewed her

10    testimony?

11          MS. PERSICO:  Form.

12          THE WITNESS:  No.

13          BY MR. BRUSTIN:

14          Q.   All right.  Sir, take a look at your

15    testimony on page 561 and 562.

16          A.   Okay.  So we're in a different book

17    here, I think.

18          Q.   Testimony.

19          A.   Perjury trial testimony?

20          Q.   Yes, please.

21          A.   Exhibit 31, I think?

22          Q.   There it is.

23          A.   Okay.

24          Q.   Last tab.

25          A.   Oh, there we go.  Okay.



1                    Christopher J. Belling

2          Q.   561.

3          A.   561.  Okay.  561.  I'm there.

4          Q.   By the way, when you spoke to Tamara

5   Frieda, did she tell you -- did you ask her whether

6   or not she was the person who made the call?

7          MS. PERSICO:  Form.

8          THE WITNESS:  I don't recollect her response

9   to that specifically, no.

10         BY MR. BRUSTIN:

11         Q.   The question is did you ask her.

12         A.    That's what I just said.  I think -- I

13  think we did ask her.  I think we confronted her

14  with it.  Said, look, you already called up and

15  said that it wasn't him so what do you know.

16         Q.   So you knew that she had called, and

17  you believe that she had called and said it wasn't

18  him?

19         MS. PERSICO:  Form.

20         THE WITNESS:  I knew there was an anonymous

21  call, and I was operating under the assumption

22  while interviewing her that it was her that made

23  it.

24         BY MR. BRUSTIN:

25         Q.   And you confronted her with it?



```
 1                 Christopher J. Belling
 2        A.   Yes.
 3        Q.   And, by the way, by that point in time
 4   it was well known that -- by the time you met with
 5   her in late November, it was well known that Mario
 6   Jarmon and Leonard Brown were being prosecuted for
 7   perjury, correct?
 8        A.   No, absolutely not.
 9        Q.   Nobody knew about that?
10        A.   Nobody knew about that.
11        Q.   Nobody knew that they were being
12   accused of perjury?
13        A.   No.
14        Q.   She says she knew.  Is she lying?
15        A.   Yes.  I think she's confabulating, but
16   she's not telling the truth.
17        Q.   All right.  So there was no -- by that
18   point in time nobody had been -- you threatened
19   Mario Jarmon with perjury during the Grand Jury
20   proceedings.
21        MS. PERSICO:  Form.
22        THE WITNESS:  I don't recall that.
23        BY MR. BRUSTIN:
24        Q.   It's on the transcript.
25        A.   I thought the Grand Jury proceeding was
```



CHRISTOPHER J. BELLING                                          April 11, 2023
DIXON V. CITY OF BUFFALO                                                   143

1                    Christopher J. Belling
2    fairly even-handed.
3         Q.   You testified in the perjury trial
4    about reading him a charge of perjury.
5         A.   I think that was Leonard Brown that I
6    read it to.
7         Q.   Ah, Leonard Brown.  But it was a great
8    big secret that they were going to be charged with
9    perjury?
10        MS. PERSICO:  Form.
11        THE WITNESS:  It was unknown to anybody
12   until January of 1992.
13        BY MR. BRUSTIN:
14        Q.   And, by the way, you don't know whether
15   or not you spoke to Miss Frieda before --
16   withdrawn.
17        Take a look at page 561 and page 562.
18        A.   Okay.
19        Q.   Line 17.
20        A.   17.
21        Q.   Through page 562, line 10.
22        A.   Okay.
23        Q.   Why no mention that Tamara Frieda you
24   believe was the person who called -- called the
25   department and said that Valentino Dixon wasn't the



1                    Christopher J. Belling

2    shooter?

3          MS. PERSICO:  Form.

4          THE WITNESS:  Because my suspicion is not

5    something I can testify to in a trial.

6          BY MR. BRUSTIN:

7          Q.   Ah, so you hadn't been able to confirm

8    that she was the person who called, the woman from

9    the red Tracker?

10         A.   Correct.

11         Q.   That's the reason you didn't talk about

12   it?

13         A.   Maybe it was just not part of the

14   answer, responsive in the context of what's going

15   on, I have no idea, but you don't just throw stuff

16   in when you're asked a question and trying to

17   answer it.

18         Q.   All right.  Take a look at page -- of

19   the DA file, page 2309.

20         A.   Okay.

21         Q.   Are you there?

22         A.   Yes.

23         Q.   Am I reading this right?  Is this -- is

24   this your notes of your interview with Tamara

25   Frieda?



1                   Christopher J. Belling

2        A.   Yes, it is.

3        Q.   All right.  And you've got her birth

4   date on top, right?

5        A.   Correct.

6        Q.   And it looks like she was interviewed

7   with her mom, Brenda Frieda, right?

8        A.   Correct.

9        Q.   And no mention here of anything about

10  her anonymous call, correct?

11       A.   Correct.

12       Q.   Not anything -- nothing about it,

13  correct?

14       MS. PERSICO:  Form.

15       THE WITNESS:  Not in these notes.

16       BY MR. BRUSTIN:

17       Q.   You think it may be written somewhere

18  else?

19       A.   I don't think these notes were written

20  at her house.  I don't think these are notes from

21  that interview.

22       Q.   My question is different.  My question

23  is:  Do you think that you wrote some other notes

24  where maybe you mentioned that you confronted her

25  with being the anonymous caller?



1                    Christopher J. Belling

2          A.    No.

3          Q.    These are your notes of that

4    conversation, correct?

5          A.    No.

6          Q.    Well, what are they?

7          A.    I think these are my notes in my office

8    when she showed up pursuant to her Grand Jury

9    subpoena.

10         Q.    Okay.  And how do you know that?

11         A.    Just based upon the format and based

12   upon where they are in the file.

13         Q.    So it looks like you conducted a second

14   substantive interview of Miss Frieda.

15         A.    Correct.

16         Q.    And I take it at that time did you also

17   ask her again, do you want to talk to us about the

18   anonymous call you made?

19         MS. PERSICO:  Form.

20         THE WITNESS:  I don't know if I asked her

21   that at that time.

22         BY MR. BRUSTIN:

23         Q.    Why not?

24         A.    Because I don't -- I don't remember.  I

25   didn't write it down and I don't remember.



1                   Christopher J. Belling

2         Q.    Okay.   And what about this document

3   makes you think this is from your interview with

4   her in connection with the subpoena as opposed to

5   when you went to her house?

6         A.    Because I don't remember her mother

7   being at the interview at her house.

8         Q.    You remember her being in the office

9   when she --

10        A.    The note reflects that she was present

11  with her mother, and that would be in the office.

12        Q.    You're certain about that?

13        A.    As best as these notes refresh my

14  recollection.

15        Q.    Take a look at page 2438.   And while

16  you're looking, why did you tell the law students

17  that she didn't come forward for years if you

18  believed that she was the person who made the

19  anonymous call?

20        MS. PERSICO:   Form.

21        THE WITNESS:   Now that I found the page you

22  wanted me to find, do you want to ask the question?

23        BY MR. BRUSTIN:

24        Q.    Sure.   Why did you tell the law

25  students if you knew that she was the person who



1            Christopher J. Belling

2   made the anonymous call saying that Valentino Dixon

3   was not the shooter and nobody followed up with her

4   on that call for three months, why did you tell the

5   law students that she only came forward to be on TV

6   years later?

7            MS. PERSICO:  Form.

8            THE WITNESS:  I was referring to her claim

9   that Lamarr Scott was the shooter and that she saw

10  him that night.

11           BY MR. BRUSTIN:

12           Q.   But she called within days.

13           MS. PERSICO:  Form.

14           BY MR. BRUSTIN:

15           Q.   Trying -- did you see her testimony

16  that she said she called from her therapist's

17  office?

18           A.   I don't remember that, no.

19           Q.   She testified that she was so

20  distraught over what she saw that she went and saw

21  a therapist, and after communicating with the

22  therapist, she decided that she would make an

23  anonymous call to the police department and tell

24  them what she saw.

25           MS. PERSICO:  Form.



1                   Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Any reason to dispute that?

4          A.   I don't know anything about that.

5          Q.   Well, based on the document that you

6    reviewed concerning her anonymous call, it appears

7    that she was trying -- she was trying to tell them

8    that Valentino Dixon was the shooter but she was

9    scared.

10         MS. PERSICO:   What document are you talking

11   about?

12         BY MR. BRUSTIN:

13         Q.   So take a look at -- well, before we go

14   there, let's just finish this page first.  You have

15   notes here on Tamara Frieda, correct?

16         A.   On 2438?

17         Q.   Yes.

18         A.   Yes.

19         Q.   No mention of her being the anonymous

20   caller, right?

21         A.   Correct.

22         Q.   Take a look at -- take a look at page

23   2275.

24         A.   Okay.

25         Q.   And what is this, please?



1                    Christopher J. Belling

2          A.    It appears to be a phone message slip.

3          Q.    Do you know anything else about it?

4          A.    It reflects that Tamara Frieda called

5    and left a message for me.

6          Q.    In late December?

7          A.    December 27th.

8          Q.    Do you know what this is about?

9          A.    I presume it's in response to the Grand

10   Jury subpoena.

11         Q.    Okay.  Now, take a look at the police

12   file that's already been marked as Exhibit 2.

13         A.    Okay.

14         Q.    And take a look at page --

15         MS. PERSICO:  Can you hang on one second?  I

16   just want to grab the --

17         THE WITNESS:  Okay.  What page?  Go ahead.

18         BY MR. BRUSTIN:

19         Q.    203, BPD203.

20         A.    BPD -- oh, okay.  They're on the other

21   side.  203.  Yeah.

22         Q.    This is the report that you claim to

23   have asked Tamara Frieda about when you went to see

24   her in November?

25         MS. PERSICO:  Form.



1                    Christopher J. Belling

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   Have you reviewed this in preparation

5     for today?

6          A.   I've seen it, yes.

7          Q.   And here she is, according to Stambach,

8     she is identifying herself by everything other than

9     name, correct?

10         MS. PERSICO:  Form.

11         THE WITNESS:  She said she was the girl from

12    the red Tracker.

13         BY MR. BRUSTIN:

14         Q.   That's a form of identifying herself,

15    correct?

16         A.   Yes.

17         MS. PERSICO:  Form.

18         BY MR. BRUSTIN:

19         Q.   It suggests a woman who is -- or a girl

20    who is afraid but is reluctantly telling the police

21    who she is.

22         MS. PERSICO:  Form.

23         BY MR. BRUSTIN:

24         Q.   That's what it suggests, correct?

25         A.   Sure.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             152

1                   Christopher J. Belling

2         Q.   And she's saying that Valentino was not

3   the shooter, correct?

4         A.   That's what she said.

5         Q.   Indicating that she saw who the shooter

6   was?  In fact, she's saying that she would make --

7         MS. PERSICO:  Form.

8         BY MR. BRUSTIN:

9         Q.   I'll withdraw the question.  Fair

10  enough.

11        She is making clear, according to Stambach,

12  if he's accurately documenting it, she is telling

13  him that she will make an attempt to look at

14  pictures and see if she can identify the shooter,

15  correct?

16        A.   No.

17        Q.   She did say she could look at pictures

18  and make an identification of the people that were

19  there.  She would not say if she could identify the

20  shooter.  In other words, she couldn't say one way

21  or the other.

22        MS. PERSICO:  Form.

23        THE WITNESS:  She said two things.  She'll

24  look at pictures to see if she could say who was

25  there.  Number 2, she would not say if she could



1                    Christopher J. Belling

2    identify the shooter.

3            BY MR. BRUSTIN:

4            Q.   All right.  Let's make it real simple.

5    This is October 14th, two days after Lamarr Scott

6    in an extraordinary turn of events comes in and

7    confesses to the murder, correct?

8            MS. PERSICO:  You mean August 14th.

9            MR. BRUSTIN:  August 14th.

10           THE WITNESS:  Yes.

11           BY MR. BRUSTIN:

12           Q.   So what any competent detective with a

13   pulse would do at this point is to go to Tamara

14   Frieda immediately and interview her and show her

15   photos, correct?

16           MS. PERSICO:  Form.

17           MR. RUSS:  Objection to form.

18           THE WITNESS:  And the answer is I don't know

19   what they would do.

20           BY MR. BRUSTIN:

21           Q.   Does that seem like something that you

22   might expect a homicide detective to do, to follow

23   up with this alleged eyewitness who says Valentino

24   Dixon isn't the shooter after Lamarr Scott came and

25   confessed?



1              Christopher J. Belling

2         MS. PERSICO:  Form.  Calls for speculation.

3         MR. RUSS:  Objection to form.

4         THE WITNESS:  I don't know.  I have no

5    expectations.

6         BY MR. BRUSTIN:

7         Q.   And I take it when you went to Tamara

8    Frieda you didn't -- that didn't strike you as odd.

9    How come nobody followed up with this?

10        MS. PERSICO:  Form.

11        THE WITNESS:  I don't know if it struck me

12   as odd or not.  We were following up on it then and

13   there.

14        BY MR. BRUSTIN:

15        Q.   Okay.  And what you wanted to do, and

16   it sounds like you did this, even though she denies

17   it, is to go to her and say, look, we're really

18   sorry that we didn't come to you before, we know

19   you called us, we just want the truth.  Is that

20   what you said to her?

21        MS. PERSICO:  Form.

22        THE WITNESS:  I'd have to answer no, because

23   your compound question again.  You got two things

24   in there.

25        BY MR. BRUSTIN:



1                    Christopher J. Belling

2          Q.   Ah, it was too compound.  So you didn't

3    ask her -- you didn't say a word to her about the

4    anonymous call because that didn't help your case

5    against Valentino Dixon; isn't that true?

6          MS. PERSICO:  Form.

7          THE WITNESS:  No, no, absolutely not.

8          BY MR. BRUSTIN:

9          Q.   Did you ever ask anybody whether or not

10   they showed her pictures?

11         MS. PERSICO:  Form.

12         THE WITNESS:  I don't recall asking anybody

13   whether or not they showed her photos.

14         BY MR. BRUSTIN:

15         Q.   That would be an important question,

16   right?

17         MS. PERSICO:  Form.

18         THE WITNESS:  It would be.

19         BY MR. BRUSTIN:

20         Q.   To the best of your recollection, you

21   never noticed any gaps in the police investigation

22   into Tamara Frieda; fair to say?

23         MS. PERSICO:  Form.

24         THE WITNESS:  No.

25         MR. RUSS:  Objection to form.



1              Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   Do you agree with me or no?

4         A.   I do not agree with you.

5         Q.   Ah.  So you did notice that this should

6    have been followed up on and it wasn't?

7         MS. PERSICO:  Form.

8         MR. RUSS:  Objection to form.

9         THE WITNESS:  I think it was followed up on.

10        BY MR. BRUSTIN:

11        Q.   All right.  And you said you went with

12   a detective.  Do you remember which detective you

13   went with?

14        MS. PERSICO:  Form.

15        THE WITNESS:  I don't remember if it was a

16   DA's investigator or a detective.  I think it was a

17   detective, and I don't remember which one.

18        BY MR. BRUSTIN:

19        Q.   Well, you testified both at the perjury

20   trial and here that it was a detective from the

21   BPD.

22        A.   Okay.

23        Q.   Do you have any reason to dispute that?

24        A.   No.

25        Q.   Can you explain why there's no report



1                    Christopher J. Belling

2  from that interview from the BPD detective?

3          MS. PERSICO:  Form.

4          THE WITNESS:  No.

5          MR. RUSS:  Objection to form.

6          BY MR. BRUSTIN:

7          Q.   During that interview, I take it -- do

8  you know if it was Stambach?  Could it have been

9  Stambach?

10         A.   It could have been.  He was one of the

11 detectives on the case.

12         Q.   All right.  And certainly it was a

13 joint interview, correct?

14         MS. PERSICO:  Form.

15         THE WITNESS:  You mean, both he and I were

16 talking?

17         MR. BRUSTIN:  Yes, sir.

18         THE WITNESS:  Yes.

19         BY MR. BRUSTIN:

20         Q.   And you were both taking notes?

21         MS. PERSICO:  Form.

22         THE WITNESS:  I probably wasn't taking

23 notes.

24         BY MR. BRUSTIN:

25         Q.   Do you remember if the detective was?



1                    Christopher J. Belling

2          A.   I do not.

3          Q.   Do you have an understanding as to why

4    there was no police report, P-73, created of that

5    interview?

6          A.   Not a clue.

7          Q.   It's an important interview, right?

8          MR. RUSS:  Objection to form.

9          MS. PERSICO:  Form.

10         THE WITNESS:  In the long run, no.

11         BY MR. BRUSTIN:

12         Q.   That day when you left there, did you

13   think that was an important interview?

14         A.   No.

15         Q.   The fact that she contradicted what she

16   had said when she made an anonymous call saying

17   Valentino Dixon wasn't the shooter, not a

18   significant interview?

19         MS. PERSICO:  Form.

20         THE WITNESS:  That day she was a nonwitness,

21   so it didn't matter.

22         BY MR. BRUSTIN:

23         Q.   You have no problem with no P-73 being

24   created by the police department?

25         MS. PERSICO:  Form.



```
 1              Christopher J. Belling
 2         MR. RUSS:  Objection to form.
 3         THE WITNESS:  It's not my job to have a
 4    problem with the police department.
 5         BY MR. BRUSTIN:
 6         Q.   That's their issue, not yours?
 7         MS. PERSICO:  Form.
 8         THE WITNESS:  Not my issue.
 9         MR. RUSS:  Objection to form.
10         BY MR. BRUSTIN:
11         Q.   Now, according to Stambach, he gave
12    this report, page 203, to you within days of it
13    being made.  Do you have any reason to dispute
14    that?
15         MS. PERSICO:  Form.
16         MR. RUSS:  Objection to form.
17         THE WITNESS:  Well, he gave -- I don't know
18    whether he gave it to me or how I got it, but I
19    would have gotten it within a few days of it being
20    created.
21         BY MR. BRUSTIN:
22         Q.   Okay.  So, in other words, you were
23    aware certainly by let's say mid-August, August
24    15th, or let's say August 20th, of this call from
25    Tamara -- from the person who you believe was in
```



1                    Christopher J. Belling

2   the red Tracker?

3           MS. PERSICO:  Form.

4           THE WITNESS:  Who the report says was in the

5   red Tracker.

6           MR. BRUSTIN:  Right.

7           THE WITNESS:  Yeah.

8           BY MR. BRUSTIN:

9           Q.   And why -- and I take it you took no

10  steps to follow up on this yourself, correct, until

11  November?

12          A.   I myself did not, no.

13          Q.   All right.  And you didn't direct

14  anybody else to follow up on it when you read it?

15          A.   Not that I remember.  I may have called

16  over and said, you know, did we do anything more on

17  this but --

18          Q.   And can you explain why you waited two

19  and a half months to follow up on this?

20          MS. PERSICO:  Form.

21          THE WITNESS:  Just the timing of the -- the

22  events, the Grand Jury presentation.

23          BY MR. BRUSTIN:

24          Q.   Look at the police file, page 258.

25  Have you reviewed this document?



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            161

1                   Christopher J. Belling

2          A.   No.

3          Q.   This is a document from -- and as

4    you've told us, you were in close communication

5    with Detective Stambach and other detectives during

6    the course of this investigation, correct?

7          A.   No, I didn't tell you that.

8          Q.   Well, you did, but --

9          MR. RUSS:  Form.

10         THE WITNESS:  No, I didn't.

11         MR. BRUSTIN:  You did, but that's okay.  The

12   record will be what it is.

13         BY MR. BRUSTIN:

14         Q.   In any case, is it -- is it your

15   testimony that Detective Stambach -- withdrawn.

16         Based on reviewing this document, does it

17   appear that you did not interview Miss Frieda until

18   sometime after December 5th, 1991?

19         MS. PERSICO:  Form.

20         THE WITNESS:  That -- that's probably the

21   chronology.  I can't tell one way or another, but

22   it would not have made sense for -- if they had

23   interviewed her on the 5th, then I wouldn't have

24   had to be involved in the finding of her interview.

25         BY MR. BRUSTIN:



1             Christopher J. Belling

2        Q.   All right.  So, in other words, it

3   appears that Stambach on December 5th, 1991, went

4   to interview her.  She wasn't home, and then

5   sometime later you went to interview her, correct?

6        MS. PERSICO:  Form.

7        THE WITNESS:  That's the extrapolation you

8   can make.

9        BY MR. BRUSTIN:

10       Q.   And you have no idea when in December

11  or January that was; fair to say?

12       A.   Before the Grand Jury was concluded in

13  January.

14       Q.   Sometime before the conclusion of the

15  Grand Jury in January?

16       A.   Correct.

17       Q.   It could have been the day before?

18       A.   Could have been.

19       Q.   But it was -- based on the

20  documentation, it appears it was after 12/5/91?

21       MS. PERSICO:  Form.

22       THE WITNESS:  It appears that way.

23       BY MR. BRUSTIN:

24       Q.   And you don't have any understanding as

25  to how Detective Stambach -- withdrawn.



```
1               Christopher J. Belling
2         Fair to say you don't have any understanding
3   as to why Detective Stambach went to see her on
4   December 5th, 1991?
5         MS. PERSICO:  Form.
6         THE WITNESS:  I think that's one of the
7   things that's in my letter from November asking
8   them to do, so, again, extrapolating, there you go.
9         BY MR. BRUSTIN:
10        Q.   Okay.  And why doesn't your letter, by
11  the way, reference the anonymous call?
12        MS. PERSICO:  Form.
13        THE WITNESS:  I don't know.
14        MR. RUSS:  Objection to form.
15        BY MR. BRUSTIN:
16        Q.   Isn't that -- you were writing a letter
17  to the detectives.  16 -- and, by the way, this is
18  you writing to Chief Donovan telling him what you
19  want investigated, correct?
20        A.   Correct.
21        Q.   You're not asking for a favor or if he
22  feels like doing it.  You're telling him, this is
23  what I need you to do, correct?
24        A.   Yeah, in general terms, yes.
25        Q.   And, in fact, you're even telling him
```



1                    Christopher J. Belling
2    that you want to be present for these interviews if
3    possible.
4            A.   Yes.
5            MS. PERSICO:   Form.
6            BY MR. BRUSTIN:
7            Q.   And you're telling him the people --
8    these are the people who need to be located and
9    interviewed, correct?
10           A.   That's what it says.
11           Q.   Not a suggestion.   It's a direction,
12   correct?
13           MS. PERSICO:   Form.
14           THE WITNESS:   No, it's a statement.
15           BY MR. BRUSTIN:
16           Q.   That you intended to be followed; fair
17   to say?
18           MS. PERSICO:   Form.
19           THE WITNESS:   That I made to them.
20           BY MR. BRUSTIN:
21           Q.   And you're giving descriptions of the
22   people you want them to interview?
23           A.   Correct.
24           Q.   For example, for Mario Jarmon you
25   write:   He is one of the victims of the shooting



1                    Christopher J. Belling

2   who has all along claimed that he was not shot by

3   Valentino Dixon.

4           A.    That's what the line says, yes.

5           Q.    And then for Tamara Frieda who owned a

6   red and white Geo Tracker which was hit by a stray

7   bullet at the scene, and you give -- her auto

8   registration reflects an address of 40 West Balcom

9   Street.

10          A.    That's what it says.

11          Q.    But no mention that the important thing

12  to follow up with her on is when she called the

13  police department and said Valentino Dixon wasn't

14  the shooter, correct?

15          MS. PERSICO:  Form.

16          THE WITNESS:  It's not mentioned in the

17  letter, you are correct.

18          BY MR. BRUSTIN:

19          Q.    But you do mention, for example,

20  what -- what is important about what Mario Jarmon

21  says, correct?

22          A.    No.

23          MS. PERSICO:  Form.

24          BY MR. BRUSTIN:

25          Q.    He claimed that he was not shot by



1               Christopher J. Belling

2  Valentino Dixon.

3          MS. PERSICO:  Is there a question?

4          BY MR. BRUSTIN:

5          Q.   That's what you want followed up on,

6  among other things, right?

7          MS. PERSICO:  Form.

8          THE WITNESS:  That's one of the things I

9  stated in the letter for them to follow up on, yes.

10         MR. BRUSTIN:  All right.

11         MR. RUSS:  If you're moving on, can you just

12  say the page number?  I missed that.

13         MR. BRUSTIN:  1686 and 87.

14         MR. RUSS:  Thank you.

15         MR. BRUSTIN:  So I think this is a

16  reasonable time to stop for lunch.

17         MS. PERSICO:  Sure.

18         MR. BRUSTIN:  Can we shoot for 45 minutes?

19  It may not be possible but give it a shot, though.

20         MS. PERSICO:  I think it's probably

21  possible.

22         THE VIDEOGRAPHER:  Going off the record at a

23  time of 1301 as indicated on the video screen.

24         (A luncheon recess was taken at 1:00 p.m.)

25         THE VIDEOGRAPHER:  We are back on the record



1                   Christopher J. Belling

2   at a time of 1346.

3         BY MR. BRUSTIN:

4         Q.   All right.  And I think you were --

5   when we left, if you can go back to page 2309, your

6   notes on meeting with Miss Frieda.

7         A.   2309.  Here we go.  I got it.  I got

8   it.  I got it.

9         Q.   And you were telling us that you

10  thought that these were notes that you took from

11  your meeting with her in connection with the

12  perjury trial before she testified, correct?

13        A.   No.

14        Q.   Do you think you met with her -- you

15  didn't meet with her in connection with the perjury

16  trial?

17        A.   No.

18        Q.   Are you sure about that?

19        A.   Yes.

20        Q.   When did you become -- when did you

21  stop being the prosecutor in the perjury trial and

22  become a witness?

23        A.   I think right after the case was

24  indicted.

25        Q.   Okay.  All right.  I want to ask you



1              Christopher J. Belling

2   some questions -- all right.  I want to ask you

3   some questions about Emil Adams, and for this,

4   first of all, let's start with the DA file, and I

5   want to ask you about a few documents.  If you can

6   take a look at 2910.  Is that a different document?

7         A.   Well, it's not 2910, because this ends

8   at 2439.

9         MR. BRUSTIN:  Is that a second binder?  Give

10  me the binder.

11        MR. SOTO-BRITO:  It's the compilation of

12  Jarmon and Brown perjury file documents.

13        MR. BRUSTIN:  So let's mark that as Exhibit

14  32, please.

15  The following was marked for Identification:

16   EXH. 32              compilation of Jarmon and

17                        Brown perjury file documents

18        BY MR. BRUSTIN:

19        Q.   2910.  These are some documents we

20  pulled out of the perjury file from the DA's

21  office, and they are consecutive but they're not --

22  they don't have all of the documents in there, just

23  the ones we needed potentially.

24        So if you take a look at 2910 and 2911.

25        A.   Okay.



1                    Christopher J. Belling

2         Q.   Does this refresh your recollection, or

3    maybe you don't need it.  Do you recall

4    testifying -- withdrawn.

5         Do you recall making efforts to -- to reach

6    out to Emil Adams and law enforcement in Michigan

7    concerning Emil Adams?

8         A.   Yes.

9         MS. PERSICO:  I'm sorry, are we talking

10   about in connection with the perjury trial or just

11   generally asking?

12        MR. BRUSTIN:  I'm asking him generally.  In

13   fact, in both trials, right?

14        THE WITNESS:  I didn't do the perjury trial,

15   so I don't know.

16        BY MR. BRUSTIN:

17        Q.   You recall reaching out to him in

18   connection with the -- with the Valentino Dixon

19   trial?

20        A.   Correct.

21        Q.   Okay.  And it was very difficult to get

22   him to come to trial, correct?

23        A.   It was challenging.

24        Q.   And you actually ended up sending a

25   couple detectives out there to go get him, correct?



1                      Christopher J. Belling

2           MS. PERSICO:   Form.

3           THE WITNESS:   I honestly don't remember.   I

4    remember he was in Michigan and we had to arrange

5    to get him back, and I don't know the mechanism

6    that was pursued at this point.

7           BY MR. BRUSTIN:

8           Q.   Okay.   And one of the things you

9    mentioned to the students at Georgetown and it's

10   consistent with other information that we have in

11   the file is that -- I don't know if you can

12   remember specifically, but that Emil Adams had some

13   legal issues going on in Michigan around the time

14   of the trial.   Do you recall that?

15          A.   I recollect that he did have some legal

16   issues, yes.

17          Q.   Okay.   And I know it's a long time ago,

18   but I want to know a couple of things.   One is,

19   what's your recollection as best you can as to what

20   his legal issues were in Michigan at the time?

21   And -- that's the first question.

22          A.   Okay.   First question, I don't

23   remember.   I knew he had some issues in Michigan,

24   that's all.

25          Q.   Okay.   You don't remember whether it



1            Christopher J. Belling

2   was in connection with an ongoing prosecution or

3   investigation that was going on?  Some criminal

4   involvement that there was -- withdrawn.

5        Would it be fair to say that there was

6   some -- some -- something going on with the

7   criminal justice system and Emil Adams in Michigan

8   to the best of your recollection?

9        MS. PERSICO:  Form.

10       THE WITNESS:  That's correct.

11       BY MR. BRUSTIN:

12       Q.  And you just can't remember today what

13  it was?

14       A.  Correct.

15       Q.  But you do remember having -- even

16  though you don't remember the substance, you

17  remember having conversations about local law

18  enforcement concerning Emil Adams?

19       MS. PERSICO:  Form.

20       THE WITNESS:  I remember having to talk to

21  people in Michigan who were involved in law

22  enforcement to arrange for Emil Adams to come back

23  to Buffalo.

24       BY MR. BRUSTIN:

25       Q.  And also, I take it, talking about his



```
 1                  Christopher J. Belling
 2   criminal situation in Michigan.
 3        MS. PERSICO:  Form.
 4        MR. BRUSTIN:  Even though you can't remember
 5   the specifics.
 6        THE WITNESS:  I don't know what his
 7   situation was, so I don't remember what I talked to
 8   them about.  I remember we had to do something with
 9   Michigan getting him back.
10        BY MR. BRUSTIN:
11        Q.   And you don't remember how you learned
12   about his criminal issues in Michigan?
13        A.   No.
14        Q.   Only that they existed?
15        A.   Yes, that's correct.
16        Q.   But you remember learning about those
17   criminal issues at or around the time you were
18   trying to get him to come to testify, correct?
19        MS. PERSICO:  Form.
20        THE WITNESS:  Yes, that's true.
21        BY MR. BRUSTIN:
22        Q.   And you remember as a general matter
23   that those criminal issues were one of the
24   impediments in your -- at least in your mind to him
25   coming to testify?
```



```
 1                    Christopher J. Belling

 2          MS. PERSICO:  Form.

 3          THE WITNESS:  It was a problem.  It wasn't

 4   an impediment.

 5          BY MR. BRUSTIN:

 6          Q.   One of -- one of the things that was

 7   causing you a problem in getting him to come

 8   testify was his ongoing criminal issues in

 9   Michigan, correct?

10          MS. PERSICO:  Form.

11          THE WITNESS:  No.  One of the things making

12   it difficult for him to physically be in Buffalo

13   was whatever was going on in Michigan.

14          BY MR. BRUSTIN:

15          Q.   The criminal issues in Michigan?

16          A.   Whatever was going on in Michigan.

17          Q.   In other words, there was -- there was

18   a process going on in Michigan that was making it

19   difficult for him to come out of state; is that

20   what you're saying?

21          A.   No.

22          MS. PERSICO:  Form.

23          BY MR. BRUSTIN:

24          Q.   There were things happening in Michigan

25   with the criminal justice system that, to your
```



1                    Christopher J. Belling

2    understanding, made it difficult for him to come?

3          MS. PERSICO:  Form.  Asked and answered.

4          THE WITNESS:  No.

5          BY MR. BRUSTIN:

6          Q.   So what was your understanding as to

7    what was going on in Michigan?

8          A.   I don't remember.  He was in Michigan.

9    That's what I remember.

10         Q.   Okay.  And do you recall providing any

11   assistance with him concerning any potential

12   criminal issues in Michigan as a result of his

13   cooperation in this case?

14         MS. PERSICO:  Form.

15         THE WITNESS:  I do not specifically

16   remember.

17         BY MR. BRUSTIN:

18         Q.   Do you remember anything in general

19   about talking to law enforcement to try to assist

20   him or at least let them know that he was

21   cooperating in your case?

22         MS. PERSICO:  Form.

23         THE WITNESS:  And that's fairly standard

24   what -- how I would have done it.  I would have

25   told him, I'll talk to whatever law enforcement is



1                    Christopher J. Belling

2   on the other end telling them you cooperated.

3          BY MR. BRUSTIN:

4          Q.   And you remember that broadly.  You

5   just can't remember the specifics?

6          MS. PERSICO:  Form.

7          THE WITNESS:  Correct.

8          BY MR. BRUSTIN:

9          Q.   Is that correct?

10         A.   Correct.

11         Q.   But, in any case, it was very difficult

12  for a variety of reasons to get him to come and

13  testify, correct?

14         MS. PERSICO:  Form.

15         THE WITNESS:  It was difficult.

16         BY MR. BRUSTIN:

17         Q.   And that limited the amount of time

18  that you were able to spend with him in preparation

19  for trial; fair to say?

20         MS. PERSICO:  Form.

21         THE WITNESS:  I don't know.

22         BY MR. BRUSTIN:

23         Q.   Do you have any recollection as you sit

24  here today of meeting with Mr. Adams before trial

25  concerning what he observed on the day of the crime



1                    Christopher J. Belling

2     and what transpired with the police during the

3     investigation?

4              MS. PERSICO:  Form.

5              THE WITNESS:  I don't recall that -- those

6     conversations, no.

7              BY MR. BRUSTIN:

8              Q.   Okay.  And is it your testimony that

9     you don't believe that you met with him prior to

10    the trial or you just can't recall one way or

11    another whether you did?

12             A.   I can't recall whether I did or not.

13             Q.   Do you expect that you would have had

14    some form of meeting with him?

15             A.   Yes.

16             Q.   Okay.  And certainly you would have met

17    with the detectives who interacted with him before

18    trial, correct?

19             MS. PERSICO:  Form.

20             THE WITNESS:  No.

21             BY MR. BRUSTIN:

22             Q.   Well, you -- you've already told us

23    that you were talking to the detectives throughout

24    the case, including Stambach, about the activities

25    they conducted, correct?



1                    Christopher J. Belling

2          A.    When the need arose, I talked to them

3    about what they did in the case, yeah.

4          Q.    Okay.  But primarily you were relying

5    on their police reports as to what transpired; fair

6    to say?

7          A.    I think that's fair to say.

8          Q.    All right.  So let's take a look at

9    some of the police reports in this case.  So, first

10   of all, if you take a look at -- going back to the

11   police file.

12         MR. RUSS:  Exhibit 2?

13         MR. BRUSTIN:  Yes, please.

14         BY MR. BRUSTIN:

15         Q.    Take a look and start at page 47.

16         A.    What was that number again?

17         Q.    47.

18         A.    Okay.  I've got it.

19         Q.    And this is one of the reports

20   concerning Emil Adams' alleged identification of

21   Valentino Dixon as the shooter, correct?

22         A.    His identification.  Yes, this is the

23   document, the P-73 about the process.

24         Q.    Okay.  And, by the way, there's been

25   some discrepancy in the case as to whether or not



1              Christopher J. Belling

2  Detective Stambach was present for this

3  identification procedure.  Do you recall one way or

4  another whether he was or not?

5          MS. PERSICO:  Form.

6          MR. RUSS:  Objection to form.

7          THE WITNESS:  I have no idea.

8          BY MR. BRUSTIN:

9          Q.   Okay.  But certainly this is one of the

10  key documents that you reviewed in preparation for

11  Grand Jury and trial, correct?

12          MS. PERSICO:  Form.

13          THE WITNESS:  No.

14          BY MR. BRUSTIN:

15          Q.   The -- the initial identification

16  procedure that was conducted with -- with Emil

17  Adams was not an important document that you

18  reviewed?

19          MS. PERSICO:  Form.

20          THE WITNESS:  It was not a document that I

21  reviewed -- reviewed in regard to Grand Jury or

22  trial, no.

23          BY MR. BRUSTIN:

24          Q.   Well, how would you know what happened

25  during the ID procedure, how he came to identify



```
 1                 Christopher J. Belling
 2  Valentino Dixon if you didn't review this document?
 3        A.   Well, I undoubtedly read this document,
 4  but I didn't -- it wasn't an important document to
 5  review at those other stages you talked about.
 6        Q.   All right.  But certainly you
 7  understood that according to this police report and
 8  according to your discussions with the detectives,
 9  Emil Adams identified Valentino Dixon from a
10  properly conducted six-person photo array, correct?
11        MS. PERSICO:  Form.
12        THE WITNESS:  That was my understanding,
13  yes.
14        BY MR. BRUSTIN:
15        Q.   And that there was -- and that it was
16  your understanding that there was no suggestion as
17  to who he should pick, correct?
18        A.   I didn't know of any suggestion.
19        Q.   Okay.  And that he positively
20  identified -- in other words, you understood
21  through this report and others that he positively
22  identified Valentino Dixon through a properly
23  conducted six-person photo array, correct?
24        A.   That's what the document reflects, yes.
25        Q.   And you never received any information
```



1                    Christopher J. Belling

2    from any detective to the contrary, correct?

3         A.    Not that I recall.

4         Q.    And as you said, you have no

5    recollection of discussing any of this with Emil

6    Adams, correct?

7         A.    Correct.

8         Q.    Now, if you take a look at page 30.

9         A.    Okay.

10        Q.    And do you recall reviewing BPD30

11   through 32, the statement of Emil Adams taken by

12   Mark Stambach?

13        A.    I don't recall reviewing it, but I

14   certainly would have.

15        Q.    Okay.  Take a look at page 25.  And by

16   the way, before you leave that -- withdrawn.

17        Take a look at page 25.

18        A.    Okay.

19        Q.    And read this if you haven't reviewed

20   it in preparation for today.

21        MR. RUSS:  I'm sorry, what page?

22        MR. BRUSTIN:  25.

23        BY MR. BRUSTIN:

24        Q.    Just let me know when you're ready.

25        A.    Okay.  I've read it.



1              Christopher J. Belling

2          Q.   And you -- certainly this is a -- this

3    is a report that you would have reviewed early on

4    in the investigation, correct?

5          MS. PERSICO:  Form.

6          THE WITNESS:  I have no doubt I did, yes.

7          BY MR. BRUSTIN:

8          Q.   Okay.  And you would agree that

9    according to this report from Detective Stambach,

10   Emil Adams was first interviewed, gave a sworn

11   statement, after which time he was shown a photo

12   array with six pictures and positively identified

13   Valentino Dixon as the shooter, correct?

14         A.   That's what the report says.

15         Q.   In other words, no suggestion in this

16   report that he was ever -- there was ever any

17   suggestion used, correct?

18         MS. PERSICO:  Form.

19         THE WITNESS:  No suggestion in the report

20   that any suggestion was used in the showing of the

21   array?

22         BY MR. BRUSTIN:

23         Q.   There's nothing in the report telling

24   you that -- withdrawn.

25         This report indicates that he was properly



```
 1                  Christopher J. Belling
 2   interviewed and that there was a properly conducted
 3   photo array and he made a positive identification?
 4        A.   This report indicates that he was
 5   interviewed, he made an identification.
 6        Q.   And nothing -- nothing in this report
 7   suggests anything improper was done, correct?
 8        A.   Correct.
 9        Q.   Nothing in this report indicates any
10   suggestion, correct?
11        A.   Correct.
12        Q.   And you did not receive any information
13   from any police officer to the contrary, correct?
14        A.   Correct.
15        Q.   Another report indicating that -- that
16   everything that was done with Emil Adams was
17   consistent with proper procedure, correct?
18        A.   I don't know about another report, but
19   it's a report that indicates that.
20        Q.   As to the other reports you reviewed
21   today, just now.
22        MS. PERSICO:  Form.
23        THE WITNESS:  Well, I reviewed a statement
24   of his, and I reviewed a P-88.
25        BY MR. BRUSTIN:
```



1                    Christopher J. Belling

2          Q.    And both seem to suggest proper form

3     was used with Mr. Adams, correct, proper procedure?

4          A.    As far as they read, sure.

5          Q.    Okay.  No hint of suggestion or

6     anything like that, correct?

7          A.    No.

8          Q.    And you -- you understand that

9     consistent with those reports Emil Adams testified

10    at trial that he -- the police showed him a group

11    of photos and he made a positive identification,

12    correct?

13         MS. PERSICO:  Form.

14         THE WITNESS:  I would doubt that, because it

15    would not have come out at trial that he was shown

16    a photo array.

17         MR. BRUSTIN:  Sorry, the Grand Jury, sorry.

18         THE WITNESS:  Oh, at the Grand Jury?  I'd

19    have to see the Grand Jury minutes, but I would

20    have no doubt that that was what happened.

21         BY MR. BRUSTIN:

22         Q.    I'm reading from my summary, but you

23    have no doubt that's what happened?

24         MS. PERSICO:  Form.

25         THE WITNESS:  Well, no.



```
 1                Christopher J. Belling
 2         BY MR. BRUSTIN:
 3         Q.   Let me put it this way:  If, in fact,
 4    Mr. Adams had testified inconsistently at the Grand
 5    Jury with a police report, you would have noted it,
 6    correct?
 7         MS. PERSICO:  Form.
 8         THE WITNESS:  I don't -- inconsistently with
 9    a police --
10         MR. RUSS:  Objection to form.
11         THE WITNESS:  If he said he didn't identify
12    the guy, it would have been a problem.  I don't
13    know what else we're talking about here.
14         BY MR. BRUSTIN:
15         Q.   All right.  I'll represent to you what
16    he testified to was that the police showed him a
17    group of photos and he picked out Valentino Dixon.
18    Any reason to dispute that?
19         A.   No.
20         MS. PERSICO:  Form.
21         BY MR. BRUSTIN:
22         Q.   And certainly as per his report,
23    Stambach represented to you in writing and in your
24    discussions pretrial that Emil Adams made a
25    positive ID of Valentino Dixon through a six-person
```



1                      Christopher J. Belling

2    photo array, correct?

3          A.   If that's what the report says.

4          Q.   The report makes clear that -- the

5    reports make clear that Emil Adams never expressed

6    any uncertainty about who the shooter was or

7    whether Valentino Dixon was the shooter, correct?

8          MS. PERSICO:   Form.

9          THE WITNESS:   I don't know the answer to

10   that.  The report --

11         BY MR. BRUSTIN:

12         Q.   You just reviewed the reports.

13         A.   Right.  And what number was the report?

14         Q.   For example --

15         A.   Where is the report?

16         Q.   Page 25, for example.

17         A.   Okay.

18         Q.   Nothing in page 25 suggesting that Emil

19   Adams expressed any uncertainty about who the

20   shooter was, right?

21         A.   That's correct.

22         Q.   Or whether it was Valentino Dixon,

23   correct?

24         A.   Correct.

25         Q.   All it expresses is that he made a



 1                    Christopher J. Belling

 2   certain identification, correct?

 3        A.   He positively identified Valentino

 4   Dixon as the shooter.

 5        Q.   And you took that to be true, correct?

 6        A.   Correct.

 7        Q.   Now, did you ever become aware at any

 8   time that Mr. Bryant, Valentino Dixon's father,

 9   along with his wife and another witness -- and

10   Antoine Shannon took a tape-recorded interview --

11   did a tape-recorded interview of Emil Adams after

12   the -- after the crime?

13        MS. PERSICO:  Form.

14        THE WITNESS:  No, I was never aware of that.

15        BY MR. BRUSTIN:

16        Q.   The first you've ever heard of that is

17   me saying it?

18        A.   I had heard of the Robert Bryant and

19   Annie Shannon tape-recording Joe Terranova, and I

20   don't know if I ever heard about taping anybody

21   else.

22        Q.   Okay.  As you sit here today, you don't

23   recall learning that there was a taped statement of

24   Emil Adams at his home?

25        A.   I do not recall that.



1                    Christopher J. Belling

2          Q.    Okay.   But you would agree that

3    certainly you don't recall seeing any report or

4    receiving any information from any detective that

5    Emil Adams told the police he couldn't make an

6    identification?

7          MS. PERSICO:   Form.

8          THE WITNESS:   That is correct.

9          BY MR. BRUSTIN:

10         Q.    And you don't recall seeing any report

11   indicating that Emil Adams was shown three

12   individual photos, including a photo of Mario

13   Joiner and Valentino Dixon, as opposed to a

14   six-person array?

15         MS. PERSICO:   Form.

16         MR. RUSS:   Objection to form.

17         THE WITNESS:   I have no idea what -- if that

18   ever happened or anything like that.   I know

19   nothing about it.

20         BY MR. BRUSTIN:

21         Q.    No one ever told you about that?

22         A.    No.

23         Q.    And no one ever -- in fact, more

24   specifically, nobody ever told you in writing or

25   orally that Emil Adams was shown an individual



1              Christopher J. Belling

2  photo of Valentino Dixon, correct?

3        MS. PERSICO:  Form.

4        MR. RUSS:  Objection to form.

5        THE WITNESS:  That's correct.

6        BY MR. BRUSTIN:

7        Q.   In fact, if that had happened, you

8  would have remembered it, correct?

9        MS. PERSICO:  Form.

10       THE WITNESS:  If what had happened?

11       MR. RUSS:  Objection to form.

12       BY MR. BRUSTIN:

13       Q.   If he had been shown individual photos,

14 including an individual photo of Valentino Dixon,

15 of course you'd remember that?

16       MS. PERSICO:  Form.

17       MR. RUSS:  Objection to form.

18       THE WITNESS:  If I knew about it, it would

19 be something that would be memorable.

20       BY MR. BRUSTIN:

21       Q.   And you would obviously have to

22 disclose that as Brady material?

23       MS. PERSICO:  Form.

24       THE WITNESS:  If I knew about it, yes.

25       MR. RUSS:  Objection to form.



1              Christopher J. Belling

2        BY MR. BRUSTIN:

3        Q.   And it would have caused you to

4   question the integrity of the entire investigation?

5        MS. PERSICO:  Form.

6        THE WITNESS:  No.

7        MR. RUSS:  Objection to form.

8        BY MR. BRUSTIN:

9        Q.   If -- if you learned that -- let's do

10  it this way:  If you learned that Stambach showed

11  individual photos or Stambach and/or others showed

12  individual photos to Emil Adams, including photos

13  of Valentino Dixon, and then represented in the

14  reports that they only showed him a six-person

15  array, that wouldn't cause you to question the

16  integrity of the investigation?

17       MS. PERSICO:  Form.

18       MR. RUSS:  Objection to form.

19       THE WITNESS:  It would have caused an issue

20  with the identification by Emil Adams certainly.

21       BY MR. BRUSTIN:

22       Q.   Would it have caused you any issues as

23  to the credibility, the reliability of Stambach and

24  the other detectives in their reporting?

25       MS. PERSICO:  Form.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            190

1              Christopher J. Belling

2        MR. RUSS:  Objection to form.

3        THE WITNESS:  It's -- it's just too

4   hypothetical.  I don't know.  I can't tell you.

5        BY MR. BRUSTIN:

6        Q.   Well, Emil Adams was on tape stating

7   that he was shown individual photos, including an

8   individual photo of Valentino Dixon and Mario

9   Joiner and a third unidentified person.

10        MS. PERSICO:  Objection to form.

11        MR. RUSS:  Objection to form.

12        MS. PERSICO:  You're mischaracterizing the

13   prior testimony.

14        MR. BRUSTIN:  I'm characterizing what's on

15   the tape-recorder.

16        MS. PERSICO:  Which Mr. Adams --

17        MR. RUSS:  No, you're not.  You questioned

18   Emil extensively about it.  He couldn't even say it

19   was him, and he didn't agree with any of what

20   you're saying.  So I object to the form.

21        MR. BRUSTIN:  I'm not asking you what he

22   agreed to.  I'm asking what's -- I'm telling you

23   what's on the tape-recorder.  So this is not for

24   you.  This is an issue for trial, but assume that

25   he said that --



1              Christopher J. Belling

2          MS. PERSICO:  Well, we're not going to go

3    there, because there is no -- there is nothing that

4    said that he --

5          MR. BRUSTIN:  Well, of course we're going to

6    go there.  That's the heart of the case.  That's

7    what summary judgment's going to be about.

8          MS. PERSICO:  Well, then find somebody who

9    can authenticate Emil Adams before you represent --

10         MR. BRUSTIN:  Well, I got it.

11         MS. PERSICO:  That was not the testimony, or

12   at least we don't have that testimony.

13         MR. BRUSTIN:  I've got it.

14         BY MR. BRUSTIN:

15         Q.   So, in any case, you would agree that

16   if Stambach represented in his report that he was

17   shown a six-person photo array but, in fact, he was

18   shown three individual photos, including a photo of

19   Valentino Dixon, you would agree that would be a

20   serious misrepresentation in his report, correct?

21         MS. PERSICO:  Objection.  Asked and

22   answered.

23         MR. RUSS:  Objection to form.

24         THE WITNESS:  If it was true.

25         MR. BRUSTIN:  If true, of course.  That's



1                  Christopher J. Belling

2   all I'm asking.

3         BY MR. BRUSTIN:

4         Q.   And that would cause you to question

5   the integrity of the investigation?

6         MS. PERSICO:   Asked and answered.

7         THE WITNESS:   It would cause me to question

8   the integrity of identification by Emil Adams.

9         BY MR. BRUSTIN:

10        Q.   But not the entire investigation?

11        A.   No.

12        Q.   Okay.   In any case, you had no

13  knowledge of that whatsoever?

14        A.   That's my recollection, yeah, I never

15  heard that.

16        Q.   Okay.   Now, let's talk about Sullivan.

17  So, first of all, you've already told us, but I

18  want to ask you more specifically, about the

19  difficulties you had getting Sullivan to come and

20  testify, correct?

21        A.   What --

22        Q.   You've already told us he had some

23  difficulties, correct?

24        A.   He was in Georgia, as I recall, and we

25  had to arrange to get him back.



1              Christopher J. Belling

2         Q.   All right.  And he was a reluctant

3    witness; fair to say?

4         MS. PERSICO:  Form.

5         THE WITNESS:  Apples and oranges.  He was in

6    Georgia because he had some criminal problems.  He

7    wasn't necessarily a reluctant witness once he was

8    here.

9         BY MR. BRUSTIN:

10        Q.   Do you recall meeting with him?

11        A.   I don't recall it specifically, but I

12   did I'm sure.

13        Q.   Okay.  As you sit here today, though,

14   you don't recall meeting with him and discussing

15   what he saw -- withdrawn.

16        Do you know whether or not you met with Mr.

17   Sullivan before trial and discussed what he

18   observed at the scene of the crime and what

19   happened with the police?

20        MS. PERSICO:  Form.

21        THE WITNESS:  I don't recall doing it, but

22   I'm sure I did.

23        BY MR. BRUSTIN:

24        Q.   Okay.  But you have no recollection of

25   it, correct?



1                    Christopher J. Belling

2          A.    Correct.

3          Q.    And, again, I take it with Mr. Adams,

4    like with Mr. Adams, you relied on the police

5    reports concerning what transpired between the

6    police and Mr. Sullivan, correct?

7          MS. PERSICO:  Form.

8          THE WITNESS:  Yes.

9          BY MR. BRUSTIN:

10         Q.    Now, let's go to the DA file, 30, the

11   first DA file, the Dixon DA file, and let's take a

12   look at page 2130.

13         MS. PERSICO:  Is this the one there's only

14   one of?  There's not another copy of this floating

15   around, is there?

16         MR. BRUSTIN:  Yeah, sorry.

17         MS. PERSICO:  What page?

18         MR. BRUSTIN:  2130.

19         THE WITNESS:  2130.

20         BY MR. BRUSTIN:

21         Q.    Okay.  Have you reviewed these notes in

22   preparation for today?

23         A.    No.

24         Q.    All right.  Why don't you take a minute

25   and review 2130, let me know when you're done.



1                      Christopher J. Belling

2          A.    Okay.  I've read it.

3          Q.    And here, why is it then in these notes

4   you're putting the date when the interview happened

5   as opposed to other notes you did not?

6          MS. PERSICO:  Form.

7          THE WITNESS:  I have no idea.

8          BY MR. BRUSTIN:

9          Q.    Okay.  In any case it appears this

10  interview -- withdrawn.

11          In any case, it appears that these notes

12  were taken on May 18th, 1992, correct?

13          A.    This -- these notes are May 18th, May

14  19th, and June 1st of 1992.

15          Q.    Just before the trial in June, correct?

16          A.    Correct.

17          Q.    And it looks like on May 18th or

18  thereabouts you were learning that Mr. Sullivan is

19  about to be indicted for some type of rape offense

20  concerning a 15-year-old girl in Georgia, correct?

21          A.    Correct.

22          Q.    Tell me what you learned about that.

23          A.    Exactly what the notes say, that the

24  indictment will be returned within the next two

25  weeks, be arraigned within a month, 15-year-old



1              Christopher J. Belling

2    girl, and the assistant DA's name was Petrey,

3    P-E-T-R-E-Y, Petrey, and his address, the ADA's

4    address.

5         Q.    And did you disclose that information

6    to Mr. Terranova?

7         A.    I disclosed to Mr. Terranova the fact

8    that John Sullivan had a pending case in Georgia.

9         Q.    Did you tell him it was for raping a

10   15-year-old girl?

11        A.    I believe so.

12        Q.    Did you do it in writing?

13        A.    I don't remember.

14        Q.    Did you have an obligation to do it in

15   writing since you have Brady obligations?

16        A.    I don't think there's an obligation to

17   do it in writing.  There's an obligation to let him

18   know.

19        Q.    Is it your practice -- withdrawn.

20        Would it be fair to say that -- I showed you

21   a document earlier where you disclosed Brady

22   material in writing, correct?

23        A.    Oh, yes.

24        Q.    And one of the reasons why you disclose

25   Brady material in writing is because you want to



1               Christopher J. Belling
2    keep a record in case anybody questions whether you
3    disclosed it, correct?
4         A.   It's one of the reasons, yeah.
5         Q.   This is basic -- a basic concept for a
6    District Attorney, correct?
7         MS. PERSICO:  Form.
8         BY MR. BRUSTIN:
9         Q.   You document what you give to the
10   defense?
11        MS. PERSICO:  Form.
12        THE WITNESS:  In general you do, yes.
13        BY MR. BRUSTIN:
14        Q.   All right.  And so obviously, being
15   charged with raping a 15-year-old girl just months
16   before -- just months before this trial could be
17   important impeachment evidence against
18   Mr. Sullivan, correct?
19        A.   Yes.
20        MS. PERSICO:  Form.
21        BY MR. BRUSTIN:
22        Q.   And, frankly, you don't know enough
23   about the circumstances of what transpired, at
24   least based on these notes, to know whether or not
25   it would be admissible impeachment, correct?



1              Christopher J. Belling

2          MS. PERSICO:  Form.

3          THE WITNESS:  I can't answer that.  I don't

4    know the answer.

5          BY MR. BRUSTIN:

6          Q.   All right.  But certainly you had an

7    obligation to disclose the information you learned

8    to Mr. Terranova, correct?

9          A.   Yes.

10         MS. PERSICO:  Form.

11         BY MR. BRUSTIN:

12         Q.   And as you sit here today, would it be

13   fair to say, and maybe I'm reading into your --

14   your pause, but is it fair to say you don't

15   remember one way or another whether or not you

16   provided this information to Mr. Terranova?

17         MS. PERSICO:  Form.

18         THE WITNESS:  No, that's not fair to say.

19         BY MR. BRUSTIN:

20         Q.   You're certain that you did?

21         A.   I am.

22         Q.   You're just not certain whether you did

23   it in writing or not?

24         A.   Correct.

25         Q.   And why wouldn't you have provided this



1               Christopher J. Belling

2   information in writing?

3         A.   It depends on timing.  I could have run

4   into Joe somewhere and said, you know, by the way,

5   his trial's coming up, John Sullivan's in jail in

6   Georgia, appears to be some sort of a rape case,

7   and if I get anything more, I'll let you know,

8   something like that.

9         Q.   Would it be fair to say that, and I

10  think you've testified before and you've certainly

11  spoken about it, that you held Mr. Terranova in

12  high esteem?  You thought he was a competent

13  criminal defense lawyer?

14        A.   I felt he was a competent criminal

15  defense lawyer.

16        Q.   Any doubt in your mind that

17  Mr. Terranova would have attempted to impeach

18  Mr. Sullivan with a charge that he raped a

19  15-year-old girl?

20        MS. PERSICO:  Form.

21        THE WITNESS:  I can't answer that.

22        BY MR. BRUSTIN:

23        Q.   Can you think of any reason why he

24  wouldn't?

25        MS. PERSICO:  Form.



1                    Christopher J. Belling

2          THE WITNESS:  No, not really.

3          BY MR. BRUSTIN:

4          Q.   But you're certain you gave it to him?

5          A.   Yes.

6          Q.   He may have just forgotten to question

7     him about it?

8          MS. PERSICO:  Form.

9          THE WITNESS:  I don't know what you just

10    said there, I don't think that's --

11         BY MR. BRUSTIN:

12         Q.   You don't know what I just said?  I

13    said --

14         A.   Correct.

15         Q.   -- do you think he just forgot to

16    question John Sullivan about raping the

17    15-year-old?

18         A.   Or he tactically decided not to for

19    whatever reason.

20         Q.   Take a look at page 2170.

21         A.   Okay.

22         Q.   This appears to be a call with John

23    Sullivan on June 2nd?

24         MS. PERSICO:  Form.

25         THE WITNESS:  It is a call from John



1                     Christopher J. Belling

2   Sullivan, yes.

3           BY MR. BRUSTIN:

4           Q.   Do you recall this call?

5           A.   No, not specifically.

6           Q.   Do you recall discussing with John

7   Sullivan the rape charges?

8           A.   There's two John Sullivans.  This I

9   think is a call from his father, John Sullivan, Jr.

10          Q.   Gotcha.  Do you recall any

11  conversation -- well, do you recall what you talked

12  about with John Sullivan, Sr.?

13          A.   He's Jr.  Rabbit is the III.

14          Q.   Gotcha.  Do you recall what you

15  discussed with his father?

16          A.   No.

17          Q.   Do you recall whether you discussed

18  with his father or with John Sullivan, Jr.-Jr.,

19  that -- anything about the rape case?

20          A.   No.

21          Q.   Take a look at page 2160.

22          A.   2160, okay.

23          MS. PERSICO:  We're not looking at the same

24  thing as you are.  Are you on a different --

25          MR. BRUSTIN:  I'm wrong.  2126, I'm sorry.



```
1                    Christopher J. Belling
2          THE WITNESS:  2126.
3          BY MR. BRUSTIN:
4          Q.   Actually, start with 2125.
5          A.   Okay.  2125, okay.
6          Q.   So it looks like, you correct me if I'm
7    wrong, on 2125 you're getting a call from John
8    Sullivan, the witness?
9          A.   On 2125?
10         Q.   Yes.
11         A.   No.
12         Q.   2125, while you were out -- oh, Mrs.
13   Sullivan.
14         A.   Right, John Sullivan's mother.
15         Q.   Gotcha.  Do you recall that call?
16         A.   No.
17         Q.   All right.  But then it appears that in
18   response to that call you reached out to -- you
19   also got a call that same day concerning John
20   Sullivan's bond being $50,000, correct?
21         A.   That's what the message says, yes.
22         Q.   Presumably that was from the rape
23   charge, correct?
24         MS. PERSICO:  Form.
25         THE WITNESS:  I have no idea.  He was in
```



1                    Christopher J. Belling

2    jail, and he had $50,000 bail.

3        BY MR. BRUSTIN:

4        Q.   You have no idea -- you don't remember

5    today or you had no idea then?

6        A.   Oh, I undoubtedly knew then, but I

7    don't remember what it is now.

8        Q.   All right.  And this appears to be you

9    making efforts to help him work out so he can come

10   to New York; is that right?

11       A.   No, it's me attempting to locate him so

12   that I can take steps to secure his appearance at

13   the trial.

14       Q.   All right.  And this doesn't refresh

15   your recollection about the -- about the rape,

16   anything more about the rape charge?

17       A.   No.

18       Q.   Do you know whether or not he was

19   convicted?

20       A.   I do not.

21       Q.   Take a look at page 2129.

22       A.   Okay.

23       Q.   These are your May 18, 1992, notes.  Is

24   this with John Sullivan, the witness, or John

25   Sullivan, his father?



1                    Christopher J. Belling

2          A.    I'm thinking it's the father, because

3    it says John Sullivan, Jr., and I did try to be

4    fairly specific about differentiating Jr. from the

5    III.

6          Q.    And does this refresh your recollection

7    about what you spoke to John Sullivan, the father,

8    concerning the rape charge?

9          A.    Well, there's one line, and it seems to

10   be what the dad, John Sullivan, Jr., is describing

11   to me what went on in Georgia.

12         Q.    And does this refresh your recollection

13   about what he said went on?

14         A.    No.

15         Q.    What happened to your great memory?

16         MS. PERSICO:    That's uncalled for.   Don't

17   answer that question.

18         BY MR. BRUSTIN:

19         Q.    Do you remember him describing to you

20   that he had sex with this girl who was 15 while

21   they were watching a porno movie?

22         A.    No.

23         Q.    No recollection of the details at all?

24         MS. PERSICO:    Form.

25         THE WITNESS:    That's correct.



1                     Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   You understood John Sullivan was an

4    important witness, right?

5          A.   John Sullivan III was an important

6    witness, yes.

7          Q.   And obviously a rape charge where he

8    raped a 15-year-old was an important issue in his

9    credibility and reliability, correct?

10         A.   It certainly would be, yeah.

11         Q.   But you remember nothing about it?

12         MS. PERSICO:   Form.

13         THE WITNESS:   It's -- yeah, that's true.

14         BY MR. BRUSTIN:

15         Q.   Do you remember talking to the DeKalb

16   County solicitor?

17         A.   No, I don't.   I talked to somebody who

18   didn't handle the case.   That's a note at the

19   bottom of this page, but I don't remember talking

20   to the people that were handling the case.

21         Q.   Take a look at page 2161.

22         A.   2161, okay.   Okay.   Here we go.

23         Q.   Have you reviewed this in preparation

24   for today?

25         A.   No.



```
 1                  Christopher J. Belling
 2          Q.   So why don't you take a minute and
 3   review it.
 4          A.   Okay.
 5          Q.   It's a two-page document.
 6          A.   Okay.
 7          Q.   And this is you writing a letter in
 8   support of Mr. Sullivan, the witness, after he
 9   testified in the trial, correct?
10          A.   Correct.
11          Q.   And you're cc'ing his father, correct?
12          A.   Correct.
13          Q.   And I take it that one of the things
14   you told his father and one of the things you told
15   his son is that if he cooperated and came to trial,
16   you would -- you would write a letter on his
17   behalf, correct?
18          MS. PERSICO:  Form.
19          THE WITNESS:  I don't think I would have
20   done that, because had I done that, it would have
21   been a Brady issue, so I didn't do it.
22          BY MR. BRUSTIN:
23          Q.   Of course it would have been.  Do you
24   deny doing that?
25          A.   I don't remember doing it, no.
```



1                     Christopher J. Belling

2          Q.   Do you deny doing it, sir?

3          A.   I don't know whether I did it or not.

4          Q.   All right.  So, in other words, it's

5     possible that you did it knowing it was a Brady

6     violation, correct?

7          MS. PERSICO:  Form.

8          THE WITNESS:  That I did what?

9          BY MR. BRUSTIN:

10         Q.   Let me be very clear, sir.  It's

11    possible that you talked to Mr. Sullivan and/or his

12    son about writing a letter if he cooperated and

13    it's possible that you didn't disclose that to the

14    other side, correct?

15         MS. PERSICO:  Form.

16         THE WITNESS:  I would have been much more

17    general than that, and I don't -- just don't know

18    what happened with that.

19         BY MR. BRUSTIN:

20         Q.   So, in other words, it's possible that

21    you failed to disclose that you told John Sullivan,

22    Jr., if he cooperated you would write a letter for

23    him in support of his rape prosecution?

24         MS. PERSICO:  Form.

25         THE WITNESS:  I have no idea.



1                    Christopher J. Belling

2           BY MR. BRUSTIN:

3           Q.   You may have?

4           MS. PERSICO:  Form.

5           THE WITNESS:  I'm not going to say I may

6    have or may have not.  I just don't know.

7           BY MR. BRUSTIN:

8           Q.   You certainly can't deny it.

9           MS. PERSICO:  Form.

10          THE WITNESS:  If before this letter was

11   written I had some conversation about it?

12          MR. BRUSTIN:  Yes, sir.

13          THE WITNESS:  I just don't know.

14          BY MR. BRUSTIN:

15          Q.   Do you think you just wrote this out of

16   the goodness of your heart because he was such a

17   great guy?

18          MS. PERSICO:  Form.

19          THE WITNESS:  He was a nice kid, and I could

20   have written it out of the goodness of my heart,

21   sure.

22          BY MR. BRUSTIN:

23          Q.   Do you think that's what happened?

24          A.   That's absolutely possible.

25          Q.   And you say here he wasn't -- he wasn't



1            Christopher J. Belling

2  your average street punk that you're both used to

3  dealing with, right?

4        A.    Correct.

5        Q.    And you were writing this in hopes that

6  it would cause the DA in Georgia to take a

7  favorable view of Mr. Sullivan in connection with

8  his rape prosecution, correct?

9        MS. PERSICO:  Form.

10       THE WITNESS:  Yeah, I say that I hope that

11 you have some discretion to factor in his

12 background when it comes time to dispose of his

13 Georgia case.

14       BY MR. BRUSTIN:

15       Q.    Well, it didn't say that.  It says,

16 when it comes time for disposition of his Georgia

17 charges, correct?

18       A.    Yes.

19       Q.    So, in other words, when he's

20 considering how to handle the charges against him,

21 he should consider your recommendation, correct?

22       MS. PERSICO:  Form.

23       THE WITNESS:  No.  It's asking him if he has

24 the discretion to consider the fact that John

25 Sullivan III had testified in a murder case.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Okay.  And that could be very helpful

4    in connection with those rape charges in Georgia.

5    You knew that, right?

6          MS. PERSICO:  Form.

7          THE WITNESS:  I would expect that it could

8    be, sure.

9          BY MR. BRUSTIN:

10         Q.   Okay.  And obviously to the extent that

11   you had talked to Mr. Sullivan or his son or his

12   wife about writing a letter on his behalf, that

13   would be Brady material that Mr. Terranova would

14   have been entitled to, correct?

15         MS. PERSICO:  Form.

16         THE WITNESS:  If there was discussion of

17   writing a letter, it probably could be Brady

18   material.

19         BY MR. BRUSTIN:

20         Q.   If there was discussion of putting in a

21   good word for him, doing a favor for him, that's

22   classic Brady material, correct?

23         MS. PERSICO:  Form.

24         THE WITNESS:  No, it's not classic Brady

25   material.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   You would agree, sir, that if you had a

4     discussion with him of doing a favor for him and

5     calling the DA or writing the DA a letter on his

6     behalf, that's Brady material?

7          A.   It is not Brady material.

8          Q.   It's -- it's impeachment material?

9          A.   It is.

10         Q.   Clearly -- clearly information you have

11    to disclose?

12         A.   That's true.

13         MS. PERSICO:  Form.

14         BY MR. BRUSTIN:

15         Q.   And should be disclosed in writing?

16         MS. PERSICO:  Form.

17         THE WITNESS:  It -- maybe yes, maybe no.

18    Who knows.

19         BY MR. BRUSTIN:

20         Q.   I take it that one of the concerns, and

21    we see it in your notes, from John Sullivan's

22    father and from John Sullivan when he spoke to you

23    were these pending charges in Georgia, right?

24         MS. PERSICO:  Form.

25         THE WITNESS:  There was concern --



```
 1                    Christopher J. Belling
 2           MS. PERSICO:  I'm sorry, what are you
 3   referring to?
 4           MR. BRUSTIN:  The notes you just looked at
 5   indicating your conversations with Mr. Sullivan,
 6   Sr.
 7           MS. PERSICO:  Can you point us to the page?
 8           BY MR. BRUSTIN:
 9           Q.   No.  Do you recall, sir, just a few
10   moments ago looking at notes concerning you
11   discussing his bond and the charges against him?
12           A.   No, I recall looking at some phone
13   messages, and then there were some notes that had
14   that type of information in them, yes.
15           Q.   Yes, and when you spoke to
16   Mr. Sullivan, Sr. -- withdrawn.
17           When you spoke to Mr. Sullivan's father and
18   when you spoke to Mr. Sullivan, one of the things
19   they expressed to you was their concern about the
20   rape charges, correct?
21           MS. PERSICO:  Form.
22           THE WITNESS:  I don't think I talked to John
23   Sullivan III, Rabbit, at all.  His parents
24   undoubtedly expressed their concern to me about the
25   fact that he had these charges in Georgia.
```



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Well, you've already told us that you

4    would have talked to Rabbit or John Sullivan III

5    before he testified at trial, correct?

6          A.   Correct.

7          Q.   And one of the things -- you don't

8    recall John Sullivan III when he was about to

9    testify at a murder trial in New York talking to

10   you about his concern about the rape charges in

11   Georgia?

12         MS. PERSICO:  Form.

13         THE WITNESS:  I don't recall any

14   conversation about that with him.

15         BY MR. BRUSTIN:

16         Q.   Do you recall any conversation about

17   that with mother -- with mom or dad?

18         MS. PERSICO:  Form.

19         THE WITNESS:  Certainly I recall the dad

20   calling with his concern.  I don't recall talking

21   to the mom about specifically her concerns.

22         BY MR. BRUSTIN:

23         Q.   You don't remember any of them asking

24   whether you could put a good word in for Rabbit

25   with the DA?



```
1                    Christopher J. Belling
2            MS. PERSICO:  Form.
3            THE WITNESS:  No, I don't recall them asking
4    that.
5            BY MR. BRUSTIN:
6        Q.   In fact, to the best of your
7    recollection, nobody mentioned it, right?
8            MS. PERSICO:  Form.
9            THE WITNESS:  As far as I recall, that's
10   correct.
11           BY MR. BRUSTIN:
12       Q.   And you just thought of it on your own
13   after he testified?
14           MS. PERSICO:  Form.
15           THE WITNESS:  Well, it -- it was the
16   appropriate time to think about it after he
17   testified, yes.
18           BY MR. BRUSTIN:
19       Q.   And, by the way, you do recall that
20   when he testified, there were massive problems with
21   his testimony, correct?
22           MS. PERSICO:  Form.
23           THE WITNESS:  No, I just recall he
24   testified.
25           BY MR. BRUSTIN:
```



CHRISTOPHER J. BELLING                                  April 11, 2023
DIXON V. CITY OF BUFFALO                                           215

1                    Christopher J. Belling

2          Q.   Don't recall major contradictions

3    between what was in the reports and what he

4    testified to?

5          A.   No.

6          Q.   You don't recall him being

7    cross-examined intensely and effectively by

8    Mr. Terranova?

9          A.   No.

10         Q.   Your memory is he was just a good,

11   reliable, honest witness?

12         MS. PERSICO:   Form.

13         THE WITNESS:   I remember he was a witness

14   and he testified at the trial.

15         BY MR. BRUSTIN:

16         Q.   Take a look at page 82.  I'm sorry, I'm

17   now going back to the police reports.

18         A.   Okay.  BPD COMP 0082.

19         Q.   I'm sorry, hold on just one second.

20   Actually, let's start with page 74.  And if you

21   could read to yourself page 74 and 75 if you

22   haven't already in preparation for today.  It's the

23   state -- BPD 74 and 75.  It's John Sullivan's

24   statement.

25         A.   Okay.  I'll read it.



1                    Christopher J. Belling

2          Q.    Just 74 and 75.

3          A.    That's fine.  I'm good.

4          Q.    Have you had a chance to read it?

5          A.    Yeah, I've read it.

6          Q.    Okay.  And so what this document is

7     purporting to say is that John Sullivan is the

8     first person to mention Valentino Dixon, correct?

9          MS. PERSICO:  Form.

10         THE WITNESS:  As far as I know, yes.

11         MR. RUSS:  Objection to form.

12         BY MR. BRUSTIN:

13         Q.    And that he identifies him without

14    ever -- him ever having been mentioned as the

15    shooter, correct?

16         A.    Correct.  He injects Tino's name into

17    the event.

18         Q.    He's the person -- your understanding

19    was he's the person who interjected Valentino

20    Dixon's name into this case, correct?

21         A.    Correct.

22         Q.    And it's your understanding based on

23    this report and your communications with detectives

24    that he then confirmed his identification, his

25    volunteering Valentino Dixon for the first time in



1              Christopher J. Belling

2  this case, he confirmed it by picking him out of a

3  photo array?

4          MS. PERSICO:  Form.

5          THE WITNESS:  That's what the statement

6  says.

7          BY MR. BRUSTIN:

8          Q.   And according to the statement, it's a

9  properly conducted six-person array, correct?

10         A.   That's what it says.

11         Q.   With no suggestion whatsoever?

12         MS. PERSICO:  Form.

13         THE WITNESS:  It doesn't -- there's none in

14  there, no suggestion is shown in the statement.

15         BY MR. BRUSTIN:

16         Q.   But the most important thing is that

17  he's the person volunteering Valentino Dixon's

18  name, not the other way around, correct?

19         MS. PERSICO:  Form.

20         THE WITNESS:  That's correct.

21         BY MR. BRUSTIN:

22         Q.   And your understanding throughout this

23  case has been that John Sullivan is the first

24  person in this investigation to mention Valentino

25  Dixon?



 1                    Christopher J. Belling

 2          A.    That's my understanding, yes.

 3          Q.    Now, let's go back for a minute to the

 4   DA file, and let's go to 2171.

 5          A.    Okay.

 6          Q.    Now, this appears to be a call on 6/9

 7   from John Sullivan.  Do you know if it's dad or --

 8   dad or John III?

 9          A.    It's dad.

10          Q.    Okay.  Son going back to Georgia.  Not

11   going to testify under the circumstances.  Very

12   disgusted.  Then he hung up before I could say

13   anything.

14          A.    Oh, okay, yeah.

15          Q.    Did I read that correctly?

16          A.    Yes.

17          Q.    So the date -- and I will represent to

18   you that John Sullivan testified on June 10th.

19          A.    John Sullivan III testified on June

20   10th at the trial?

21          Q.    Well, John Sullivan's dad never

22   testified, right?

23          A.    As far as I know.

24          MS. PERSICO:  Wait.  Are you saying that he

25   testified on the 10th of this year or --



```
1                   Christopher J. Belling
2          MR. BRUSTIN:  No.  I wasn't clear.
3          BY MR. BRUSTIN:
4          Q.   The day after you got this call from
5    John Sullivan, you understand that John Sullivan
6    III testified, correct?
7          A.   I don't know the date, but if that's
8    the date he testified at the trial, that's the date
9    he testified on.
10         Q.   Assuming I'm accurately describing to
11   you as June 10th.
12         A.   Assuming that, yes.
13         Q.   And it appears from this note that it's
14   just before he's about to testify, correct?
15         A.   That's what it appears, sure.
16         Q.   Okay.  And so my question to you is:
17   What did you tell John Sullivan III in between this
18   phone call and when he testified to get him to
19   testify?
20         MS. PERSICO:  Form.
21         THE WITNESS:  I have no idea.
22         BY MR. BRUSTIN:
23         Q.   Is it possible that maybe what you told
24   him is that you put a good word in for him with the
25   DA in Georgia on the rape case?
```



1                    Christopher J. Belling

2           MS. PERSICO:  Form.

3           THE WITNESS:  I would not have told him

4    that.

5           BY MR. BRUSTIN:

6           Q.  Well, you must have told him something,

7    because he was leaving town.

8           MS. PERSICO:  Form.

9           THE WITNESS:  He couldn't leave town.  He

10   was in custody.  He came back in custody, and he

11   couldn't leave town by himself.

12          BY MR. BRUSTIN:

13          Q.  Well, it certainly doesn't suggest he's

14   going to be a cooperative witness, right?

15          A.  It does seem to indicate he's

16   recalcitrant.

17          MS. PERSICO:  Form.

18          BY MR. BRUSTIN:

19          Q.  And you've testified that you didn't

20   notice him to be recalcitrant at all at trial.  He

21   testified freely and openly according to you,

22   right?

23          A.  As far as I remember.

24          Q.  So what did you do --

25          MS. PERSICO:  Form.



CHRISTOPHER J. BELLING                              April 11, 2023
DIXON V. CITY OF BUFFALO                                    221

1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.    -- in between this call and the next

4    day to get him to be a good witness?

5          A.    I have no idea.

6          Q.    But one thing you know you didn't do is

7    you didn't tell him, I'll put a good word for you

8    in your rape case.

9          A.    I would not have done that.  It would

10   have not have been the appropriate thing to do.

11         Q.    You thought of that sometime later as a

12   reward?

13         MS. PERSICO:  Form.

14         THE WITNESS:  After the fact.

15         BY MR. BRUSTIN:

16         Q.    You're sure about that now.  Before you

17   didn't remember.  Now you're sure?

18         MS. PERSICO:  Form.

19         THE WITNESS:  I'm remembering normal

20   procedure, and that's the way it would have

21   happened.

22         BY MR. BRUSTIN:

23         Q.    Ah, so you don't remember one way or

24   another.  That's what you're thinking you must have

25   done?



1              Christopher J. Belling

2         MS. PERSICO:  Form.  I can't even understand

3    that question.  Could you rephrase?

4         MR. BRUSTIN:  That wasn't a good question.

5         BY MR. BRUSTIN:

6         Q.   Before you were unwilling to deny that

7    you talked to John Sullivan III about putting

8    the -- putting the word in for him.  Are you now

9    denying it?

10        MS. PERSICO:  Form.  That's not what the

11   testimony was.

12        THE WITNESS:  I wasn't before unwilling to

13   -- that's a bad question, and yes, I didn't talk to

14   him beforehand about it.

15        BY MR. BRUSTIN:

16        Q.   You're sure about that?

17        A.   Yeah.

18        Q.   Okay.  Now, one of the things you told

19   the Georgetown students was that one of the

20   concerns about John Sullivan, Jr., as a witness was

21   where he was standing at the time of the crime,

22   correct?

23        MS. PERSICO:  Form.

24        THE WITNESS:  I don't recall saying that to

25   them.



1                     Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.    Do you remember having a concern in

4    your mind that John Sullivan may have been in a

5    position where it would be difficult for him to see

6    what he claims to have seen?

7          MS. PERSICO:    Form.

8          THE WITNESS:    No.

9          BY MR. BRUSTIN:

10         Q.    Do you remember having a concern in

11   general about where he was standing in relation to

12   the shooting?

13         A.    No.

14         Q.    That never crossed your mind?

15         A.    I don't remember being concerned about

16   it.

17         Q.    How about his physical condition at the

18   time of the shooting, whether he had been drunk or

19   high?  Do you remember having that concern?

20         A.    No, I didn't have any concerns like

21   that.

22         Q.    Now, you would agree that Mr. Dixon was

23   arrested and convicted of murder in the second

24   degree and for possession of a weapon in the second

25   degree, correct?



```
 1                  Christopher J. Belling

 2         A.   Yes.

 3         Q.   And --

 4         MR. RUSS:  And assault.

 5         MR. BRUSTIN:  And assault.

 6         BY MR. BRUSTIN:

 7         Q.   And the supporting evidence for the

 8   weapons charge, the intent to kill, is that he did,

 9   in fact, shoot them, correct?

10         MS. PERSICO:  Form.

11         THE WITNESS:  I don't understand that

12   question.

13         BY MR. BRUSTIN:

14         Q.   The supporting evidence for the

15   possession of the weapon in the second degree was

16   that there was an intent to shoot them, which he,

17   in fact, did?

18         MS. PERSICO:  Form.

19         THE WITNESS:  As I recall, 265.03, which is

20   weapons possession second, at the time required

21   possession of a loaded handgun with intent to use

22   unlawfully.

23         BY MR. BRUSTIN:

24         Q.   All right.  Do you recall -- do you

25   recall that in this case the evidence put forward
```



1              Christopher J. Belling

2   for intent was the fact that he did, in fact,

3   shoot?

4         MS. PERSICO:  Form.

5         THE WITNESS:  I -- you know, the evidence

6   was the evidence, the trial transcript.

7         BY MR. BRUSTIN:

8         Q.   Okay.  One of the things you also told

9   the Georgetown students -- and, by the way, when

10  you spoke to the Georgetown students, that was

11  before Lamarr Scott pled guilty to second-degree

12  murder, correct?

13        MS. PERSICO:  Form.

14        THE WITNESS:  He didn't plead guilty to

15  second-degree murder.

16        BY MR. BRUSTIN:

17        Q.   Before Lamarr Scott pled guilty to

18  shooting and killing Torriano Jackson and shooting

19  others, that was -- that was after you spoke to the

20  Georgetown students, correct?

21        MS. PERSICO:  Form.

22        THE WITNESS:  That plea occurred after.

23        BY MR. BRUSTIN:

24        Q.   And one of the things you told the

25  Georgetown students was that Lamarr Scott was not



```
 1                  Christopher J. Belling
 2  compromising himself at all by saying that he did
 3  it, correct?
 4          A.   Correct.
 5          MS. PERSICO:  Form.
 6          BY MR. BRUSTIN:
 7          Q.   And you said that over and over to the
 8  Georgetown students, right?
 9          A.   Correct.
10          MS. PERSICO:  Form.
11          BY MR. BRUSTIN:
12          Q.   And one of the things you said is the
13  system is not designed to prosecute two different
14  people for the same crime.
15          MS. PERSICO:  Form.
16          THE WITNESS:  True.
17          BY MR. BRUSTIN:
18          Q.   And that prosecuting Lamarr Scott was
19  futile.
20          MS. PERSICO:  Form.
21          THE WITNESS:  True.
22          BY MR. BRUSTIN:
23          Q.   And that Lamarr Scott was never going
24  to be prosecuted, there was no --
25          MS. PERSICO:  Are you saying is that what he
```



1                    Christopher J. Belling

2    said to the students rather than just asking him

3    the question?

4            BY MR. BRUSTIN:

5            Q.    Yeah.   What you told the students is

6    that Lamarr Scott was never going to be prosecuted,

7    correct?

8            MS. PERSICO:   Form.

9            THE WITNESS:   I don't recall exactly what I

10   told them, but that was the thematic content, that

11   there were no criminal consequences inuring to

12   Lamarr Scott.

13           BY MR. BRUSTIN:

14           Q.    And that Lamarr Scott knows he won't be

15   tried?

16           MS. PERSICO:   Form.

17           THE WITNESS:   I don't know if I said that.

18           BY MR. BRUSTIN:

19           Q.    Okay.   And you made those confident

20   statements to those students before he pled guilty,

21   correct?

22           MS. PERSICO:   Mischaracterization.   Form.

23           THE WITNESS:   I made those statements before

24   he pled guilty.

25           BY MR. BRUSTIN:



1                    Christopher J. Belling

2         Q.   Now, another thing you told the

3    students is that Valentino Dixon's parents told

4    Lamarr Scott because he was only 16 any conviction

5    would be less consequential to him.

6         MS. PERSICO:  Can we look at the documents

7    that you're reading from.

8         BY MR. BRUSTIN:

9         Q.   Do you remember saying that to them?

10        A.   I said something in that genre, yes.

11        Q.   All right.  Now --

12        MS. PERSICO:  But can we just look -- if

13   you're going to use those, can we look at the

14   transcript that you --

15        MR. BRUSTIN:  No.  You can do it.  You can

16   ask him about it.

17        BY MR. BRUSTIN:

18        Q.   You said something along those lines,

19   correct?

20        A.   Correct.

21        Q.   Now, was that your belief?  Was it your

22   belief that Lamarr Scott believed he was only 16

23   years old even though he was 18?

24        MS. PERSICO:  Form.

25        THE WITNESS:  As I said before, my



```
 1              Christopher J. Belling
 2  information at one point was that Robert Bryant and
 3  Annie Shannon told Lamarr Scott that the system
 4  would be lighter on him because of his age.
 5        BY MR. BRUSTIN:
 6        Q.   Because he was 16?
 7        A.   Whatever the age was.  16, 17, 18, I
 8  don't know.
 9        Q.   But he was 19.
10        A.   That's what he said in the TV
11  interview, yes.
12        Q.   He was an adult.
13        A.   That's what he said in the TV
14  interview.
15        Q.   Okay.  And you also told the students
16  that you didn't know anything about Lamarr Scott's
17  relationship with Valentino Dixon's family,
18  correct?
19        MS. PERSICO:  Form.
20        THE WITNESS:  Anything in particular, that's
21  correct.
22        BY MR. BRUSTIN:
23        Q.   And that's because you never
24  investigated that, correct?
25        MS. PERSICO:  Form.
```



```
 1                  Christopher J. Belling
 2          THE WITNESS:  I didn't investigate that, no.
 3          BY MR. BRUSTIN:
 4          Q.   And, to your knowledge, neither did the
 5   BPD?
 6          A.   I don't know what they did.
 7          Q.   Well, do you recall -- you reviewed --
 8   you've reviewed reports and testimony in
 9   preparation for today.  Do you remember seeing
10   anything concerning an investigation into Lamarr
11   Scott's relationship with Valentino Dixon's family?
12          MS. PERSICO:  Form.
13          THE WITNESS:  The information came out,
14   unfolded, that Lamarr Scott was part of Valentino
15   Dixon's circle of people.  I don't know from whence
16   that came, but it developed out he knew Mario
17   Jarmon.  He knew Leonard Brown.  He knew these
18   people, and he was called to the scene with
19   Valentino because he knew these people.
20          BY MR. BRUSTIN:
21          Q.   And the reason that you -- so your
22   understanding was -- throughout this case was that
23   19-year-old Lamarr Scott came in as an adult and
24   voluntarily admitted to shooting with a machine
25   gun, as you called it throughout the trial,
```



1              Christopher J. Belling

2    Mr. Jackson?

3         MS. PERSICO:  Form.

4         THE WITNESS:  Yes, that's true.

5         BY MR. BRUSTIN:

6         Q.   And your theory as to why he did that

7    was some kind of pressure from Valentino Dixon's

8    family, correct?

9         A.   That's true.

10        Q.   And you conducted zero investigation

11   into that pressure, correct?

12        A.   No.

13        MS. PERSICO:  Form.

14        THE WITNESS:  That's what the Grand Jury

15   did.  We had Lamarr Jackson -- or Lamarr Scott in

16   the Grand Jury and testified about that very fact.

17        BY MR. BRUSTIN:

18        Q.   Ah, so it was an investigative Grand

19   Jury?

20        A.   No.  It was a Grand Jury investigation.

21        Q.   Yes.  You know what an investigative

22   Grand Jury is, right?

23        A.   Right, and we don't use them here.

24        Q.   You don't use them here.  What you do

25   is you do good old-fashioned police work, right, in



1              Christopher J. Belling

2    Buffalo?

3         MS. PERSICO:  Form.

4         THE WITNESS:  I don't do any police work.

5         BY MR. BRUSTIN:

6         Q.   Well, my question is:  Before the Grand

7    Jury, many months later you conducted, first

8    yourself, you conducted zero investigation into the

9    connection between Lamarr Scott and Valentino

10   Dixon's family, correct?

11        A.   I did not, that's correct.

12        Q.   You have no idea whether the police

13   department conducted any investigation into the

14   relationship between Lamarr Scott and Valentino

15   Dixon's family?

16        MS. PERSICO:  Form.

17        THE WITNESS:  I can't agree with that,

18   because there was information coming in.  I don't

19   know how it came in, but it came in.

20        BY MR. BRUSTIN:

21        Q.   Well, was there -- what information

22   came in?

23        A.   That Lamarr Scott was part of Tino's

24   crew and that he was buddies with Mario, he was

25   buddies with Leonard Brown, he was buddies with



1                    Christopher J. Belling

2    Antoine Shannon, and he was buddies with Valentino

3    Dixon.

4         Q.   And that's why he committed to a brutal

5    homicide that he didn't commit?

6         MS. PERSICO:  Form.

7         THE WITNESS:  That's -- you know, call him

8    crazy, but that's what happened.

9         BY MR. BRUSTIN:

10        Q.   Was there any investigation to whether

11   he was paid?

12        MS. PERSICO:  Pardon me?

13        BY MR. BRUSTIN:

14        Q.   Was there any investigation to whether

15   Lamarr Scott was paid?

16        MS. PERSICO:  Form.

17        THE WITNESS:  That was inquired into later

18   but not at the time I don't think.

19        BY MR. BRUSTIN:

20        Q.   By who?

21        A.   Let's see who got into that.  A lot

22   later.  Actually, in this -- in this case, I think

23   that was spoken about in his -- in his deposition.

24        Q.   Ah, so 30 years later?

25        A.   Apparently.



1                    Christopher J. Belling

2          Q.    Did anyone look at bank accounts?

3          A.    No.

4          MS. PERSICO:  Form.

5          BY MR. BRUSTIN:

6          Q.    Why wouldn't -- is that a crazy

7    question that I'm asking?

8          A.    It is.

9          Q.    It is?

10         A.    This is a street murder.  We weren't

11   looking at bank accounts in 1991.

12         Q.    Ah, it would be crazy to think that

13   these street people like Mr. Bryant and his wife

14   might have a bank account, right?

15         MS. PERSICO:  Form.

16         BY MR. BRUSTIN:

17         Q.    Street people like that don't have bank

18   accounts, right?

19         A.    It would be something that would be --

20         MR. RUSS:  Objection to form.

21         THE WITNESS:  It would be something that

22   would be even more unusual that Lamarr Scott

23   walking in and confessing to a murder.

24         BY MR. BRUSTIN:

25         Q.    It would be.  If, for example, there



800.211.DEPO (3376)
EsquireSolutions.com

1              Christopher J. Belling
2    was a withdrawal from Mr. Bryant's bank account or
3    his wife's bank account, that would be -- that
4    would be crazy, right?
5         MS. PERSICO:  Form.
6         THE WITNESS:  It's just something that
7    wasn't in the realm of focus of this investigation.
8         BY MR. BRUSTIN:
9         Q.   That these kinds of people would
10   actually take money out of a bank, right?
11        MS. PERSICO:  Form.
12        THE WITNESS:  It wasn't the realm of focus.
13        MR. RUSS:  Objection to form.
14        THE WITNESS:  This wasn't a white-collar
15   crime investigation.
16        MR. BRUSTIN:  It wasn't white at all, I
17   agree.
18        MS. PERSICO:  Enough with that.  That's
19   improper.  Don't respond to that.
20        BY MR. BRUSTIN:
21        Q.   What made you -- so presumably as a --
22   as a decades-long homicide prosecutor, you were
23   interested in determining, what did these people
24   say to Lamarr Scott?  What did they give him to
25   cause him to confess to a brutal murder he didn't



1                       Christopher J. Belling

2     commit, correct?

3            MS. PERSICO:  Form.

4            THE WITNESS:  No.

5            BY MR. BRUSTIN:

6            Q.    Never crossed your mind?

7            A.    No.  I just knew they did it.

8            Q.    How did you know they did it?

9            A.    I saw it on TV.

10           Q.    What did you see them doing on TV that

11    made you convinced that they put him up to it?

12           MS. PERSICO:  Form.

13           THE WITNESS:  The fact that they brought him

14    to the scene of the so-called TV confession.

15           BY MR. BRUSTIN:

16           Q.    Did you have reason to believe that

17    Valentino Dixon's parents were criminals?

18           A.    Yes.

19           MS. PERSICO:  Form.

20           BY MR. BRUSTIN:

21           Q.    Oh, tell me about that.

22           A.    As I recall, Robert Bryant, it was told

23    to me by the police, did have some criminal

24    history.  I don't know about Annie Shannon.

25           Q.    Ah, when did that happen?



```
 1                   Christopher J. Belling
 2         A.    Sometime in the same chain of events.
 3         Q.    All right.  And do you know what his --
 4    what his criminal history was?
 5         A.    No.
 6         Q.    And is there a reason why that's not in
 7    the file?
 8         A.    No.
 9         Q.    And did that cause you to conclude
10    because he had had some criminal history that you
11    can't recall right now that he must have caused
12    Lamarr Scott to confess to a murder he didn't
13    commit?
14         MS. PERSICO:  Form.  I don't understand that
15    question.
16         THE WITNESS:  Yeah, I can't answer.
17         BY MR. BRUSTIN:
18         Q.    You're having trouble with that
19    question, too?
20         A.    Yeah.
21         Q.    So because he had a criminal history,
22    is that why you didn't conduct any further
23    investigation -- withdrawn.
24         So I'm trying to get at why you decided just
25    based on what you saw on TV that they somehow
```



1                    Christopher J. Belling

2    convinced Lamarr Scott to confess to a murder he

3    didn't commit.

4            MS. PERSICO:  Form.

5            THE WITNESS:  That was the appearance of the

6    event.  The -- this wasn't resolved until January

7    of '92 when Lamarr Scott testified in the Grand

8    Jury.

9            BY MR. BRUSTIN:

10           Q.   Right.  So what did you do to

11   investigate what, if anything --

12           MS. PERSICO:  Form.

13           MR. BRUSTIN:  -- the family did to cause

14   Mr. Scott to lie as you -- as you concluded the

15   first day?

16           MS. PERSICO:  Objection.  Asked and

17   answered.

18           THE WITNESS:  There's nothing to investigate

19   there.

20           BY MR. BRUSTIN:

21           Q.   Really?  It wouldn't have been

22   necessary to talk -- to interview the parents

23   separately if they were willing to talk?

24           MS. PERSICO:  Mr. Brustin, Mr. Belling has

25   told you many times that he doesn't investigate.



1              Christopher J. Belling

2        BY MR. BRUSTIN:

3        Q.   Ah.  So was that something you expected

4   the BPD to do?

5        A.   I would have expected the BPD to try

6   and them to say, no, we're not talking to you.

7        Q.   All right.  You've also told us today

8   that, in fact, you do investigate, and you

9   conducted a lot of investigative activities in this

10  case, correct?

11       MS. PERSICO:  Objection.  That has not been

12  the testimony.

13       THE WITNESS:  I conducted the Grand Jury

14  inquiry, which we call the Grand Jury

15  investigation, and during the process of putting

16  that together I did what I did.  The record's

17  clear.

18       BY MR. BRUSTIN:

19       Q.   You listed -- you told us earlier that

20  you interviewed as many as five or six witnesses,

21  correct?

22       A.   Right, for Grand Jury.

23       Q.   Just for Grand Jury purposes, not as an

24  investigator?

25       A.   Right, for Grand -- the Grand Jury



1              Christopher J. Belling

2  investigation was ongoing from November, and I was

3  talking to people November, December, January.

4        MR. BRUSTIN:  All right.  You know what?

5  Let's take a two-minute break or a five-minute

6  break.

7        THE VIDEOGRAPHER:  Going off the record at a

8  time of 1459 as indicated on the video screen.

9        (A recess was then taken at 2:59 p.m.)

10       THE VIDEOGRAPHER:  Back on the record at a

11  time of 1507.

12       BY MR. BRUSTIN:

13       Q.   Okay.  Just before we got on the

14  record, Mr. Belling, one of the things -- I take it

15  you and Mr. Russ are friends.

16       A.   Yes, I know Hugh.

17       Q.   And one of the things he said to you

18  during the break is that he gave you a reason as to

19  why -- he suggested a reason to you as to why you

20  wouldn't have mentioned contacting the DA before

21  trial, correct?

22       A.   Correct.

23       Q.   And is that your explanation as to why

24  you didn't say anything to him?

25       MS. PERSICO:  Form.



1                    Christopher J. Belling

2          THE WITNESS:  That's why I would not have

3   said anything to John Sullivan III, Rabbit, about

4   that.

5          BY MR. BRUSTIN:

6          Q.   Or you might have told -- you might

7   have told his father or John Sullivan just not to

8   mention anything, right?

9          MS. PERSICO:  Form.

10         BY MR. BRUSTIN:

11         Q.   You're happy to do it, but don't

12  mention it?

13         A.   No, I wouldn't have done that.

14         Q.   You wouldn't have done that.  But it

15  sounds like -- so are you saying now that you

16  always intended to do it, you just didn't tell him?

17         MS. PERSICO:  Form.

18         THE WITNESS:  No, I'm not saying that.

19         BY MR. BRUSTIN:

20         Q.   All right.  But I take it you were

21  appreciative of Mr. Russ's suggestion as to why you

22  might do that.

23         MS. PERSICO:  You don't need to answer that.

24         MR. BRUSTIN:  If Mr. Russ is giving him

25  information on the -- off the record about



1              Christopher J. Belling

2    testimony he's giving in this case, I'm free to

3    question him about it.

4         MS. PERSICO:  Well, he wasn't.  He asked him

5    a question.  You were here.  You've already asked

6    him questions about it, and if you -- you're just

7    making kind of a snarky commentary so --

8         MR. BRUSTIN:  All right.  So let's mark this

9    as Exhibit 33.

10   The following was marked for Identification:

11    EXH. 33                9/17/18 Answering Affidavit

12                           of DA Heraty (Dixon 4226-35)

13        MR. RUSS:  Okay.  What is it?

14        MR. BRUSTIN:  I'm going to give it to you

15   once she gets back on the record.  Patience.  It's

16   Bates-stamped pages Dixon 4226 through 4235, and

17   it's an affidavit from DA Heraty in connection with

18   the prosecution of Lamarr Scott.

19        BY MR. BRUSTIN:

20        Q.   So, first of all, have you reviewed

21   this document in preparation for today?

22        A.   No.

23        Q.   So, first of all, I'm not going to have

24   you read the whole thing.  It's too long, and we

25   don't have time.  But I will certainly let you read



1                   Christopher J. Belling

2   any portion that I ask you about, okay?

3         Do you know David Heraty and Sara Dee?

4         A.   Yes.

5         Q.   And did you work with them as assistant

6   district attorneys?

7         A.   Yes.

8         Q.   Did you ever have any reason to

9   question their honesty or integrity?

10        A.   Yes.

11        Q.   Tell me about that.

12        A.   Well, Sara Dee was fired from the DA's

13  office for drinking on the job, and eventually

14  there was some disclosures on Facebook that she had

15  admitted to cheating on the bar exam.  I also knew

16  her to be often distracted at work.

17        David Heraty, one of the first things when I

18  came back to the DA's office in 2011 is I was asked

19  to review a Grand Jury transcript of his, and he

20  had fed a Grand Jury witness the wrong date of the

21  crime, and his proposed solution to the problem was

22  for him to go into the Grand Jury and tell them

23  that he gave the Grand Jury -- that he gave the

24  witness the wrong date and tell them what the right

25  date was.  And that forever marked David Heraty for



1                      Christopher J. Belling

2    me in terms of his level of competence.

3         Q.    Okay.  So that was a competence issue

4    and not an integrity issue?

5         A.    Well, if he wanted to go back in the

6    Grand Jury and testify himself to change a date, I

7    think it was both.

8         Q.    And what did you do -- what type of

9    action did you take as a result of his -- of that

10   conduct?  Did you report him to the DA?

11        A.    I told the DA about what had occurred,

12   and I directed Heraty that he had to get the

13   witness back into the Grand Jury and straighten it

14   out appropriately.

15        Q.    Was there any discipline taken against

16   Heraty as a result of that?

17        A.    I don't know.

18        Q.    Did you put anything in writing about

19   that complaint?

20        A.    No.

21        Q.    And in terms of -- anything else with

22   Heraty?

23        A.    Well, Heraty's now out of the DA's

24   office, and it's my understanding that's because he

25   conducted an unauthorized exoneration review.



1                    Christopher J. Belling

2         Q.   Okay.  And that's just what you're

3    hearing.  You don't know that to be the fact,

4    correct?

5         A.   Well, I received the information from

6    many authoritative sources, including studying the

7    news reports of what went on, et cetera.

8         Q.   Okay.  And in terms of -- anything else

9    about Heraty?

10        A.   Not that I can think of.

11        Q.   And in terms of Miss Dee, did you also

12   know there were allegations of sexual harassment on

13   the job against her?

14        A.   That she was sexually harassing

15   someone?

16        Q.   That she was being sexually harassed.

17        A.   Oh.  I was not aware of those, no.

18        Q.   Okay.  Or that there were other

19   issues -- other issues that she complained of on

20   the job?

21        MS. PERSICO:  Form.

22        THE WITNESS:  Not that I was made aware of.

23        BY MR. BRUSTIN:

24        Q.   And certainly you didn't -- did you --

25   did you hear rumors that she was drinking on the



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                           246

1                    Christopher J. Belling
2   job, or did you observe her to be drinking on the
3   job?
4        A.   No, she was fired for drinking on the
5   job.  I didn't observe it.  It was in one of the
6   town courts at a night court.
7        Q.   Okay.  And when was that?
8        A.   During the Frank Clark years, because
9   she was fired, and then she threatened to sue the
10  county because alcoholism is a disease, and she was
11  reinstated with a program and eventually, you know,
12  sort of righted that part of the ship.
13       Q.   Any other -- any other concerns about
14  Sara Dee?
15       A.   That she married a complete knucklehead
16  sheriff's deputy who's now indicted himself for
17  stuff out of the jail, and as I said, may --
18  admitted cheating on the bar exam and --
19       Q.   When did she admit to that?
20       A.   In a journal entry which her then
21  husband published online.
22       Q.   Okay.  Now, you were interviewed in
23  connection with the reinvestigation into the
24  Valentino Dixon prosecution, correct?
25       A.   I don't know that I was interviewed.  I



1                   Christopher J. Belling

2    know that Heraty called up and told me that they

3    were reaching a conclusion and, you know, sort of

4    sought my -- you know, sought my approval.  I don't

5    know if that's the right word but wanted to tell me

6    what was going on.

7         Q.   And what did you -- tell me about that

8    conversation you had with him.

9         A.   He said they conducted an investigation

10   and that they had reached a conclusion or John

11   Flynn had reached a conclusion and that they were

12   going to declare Valentino Dixon exonerated.

13        Q.   And what was your reaction to that?

14   What did you say to them?

15        A.   I said, you're going to do what you're

16   going to do, I'm not there anymore.

17        Q.   Take a look at paragraph 16.

18        A.   16.

19        Q.   And 17.

20        A.   Okay.

21        Q.   Let me know when you're done reading

22   those.

23        A.   Okay.

24        Q.   You read them both?

25        A.   Yes.



1              Christopher J. Belling

2        Q.   Does this accurately describe the

3   conversation that you had with them concerning the

4   testing of gunpowder residue?

5        A.   Yes.

6        MS. PERSICO:  When you say them, you mean --

7        THE WITNESS:  Paragraphs 16 and 17?

8        MR. BRUSTIN:  Yes.

9        THE WITNESS:  Yes.

10       BY MR. BRUSTIN:

11       Q.   Does Mr. Heraty in this -- what is it

12   called -- this affidavit accurately describe the

13   conversation he had with you?

14       MS. PERSICO:  I'm sorry, I think that this

15   is 16 -- 16 and 17 are talking about conversations

16   with the Georgetown?

17       MR. BRUSTIN:  No, 17 is talking about

18   conversations with --

19       MS. PERSICO:  Oh, I'm sorry.  16 is with the

20   students and 17 is --

21       THE WITNESS:  17, yeah, I accepted the

22   questioner's premise, yeah.

23       BY MR. BRUSTIN:

24       Q.   So he did -- he did talk to you -- he

25   did talk to you about this?



1                    Christopher J. Belling

2          A.    Correct.

3          Q.    And he accepted your answer as true?

4          A.    Well, actually he established my answer

5    to the students as having been wrong.

6          Q.    And did you, in fact -- you did, in

7    fact, tell the students that you thought that there

8    had been testing on Valentino Dixon's case which

9    came back negative?

10         A.    No, the students told me that there had

11   been testing that came back negative, and I just

12   went with it.

13         Q.    Okay.  But you -- you assumed it to be

14   true?

15         A.    I assumed them to be telling me the

16   truth.

17         Q.    Okay.  And your position today is you

18   just misremembered it?

19         A.    Correct, and they were lying to me, the

20   students.

21         Q.    Ah, they were lying.  They weren't --

22   they weren't mistaken, they were lying?

23         A.    They could have been mistaken as well.

24         Q.    Okay.  Now, I think -- is it still your

25   position that Mr. Scott faced no jeopardy by



1                    Christopher J. Belling

2   pleading guilty to the crimes that he pled to?

3          A.   Yes.

4          Q.   None whatsoever?

5          A.   Correct.

6          Q.   No jeopardy in terms of parole?

7          A.   Not inured to him.

8          Q.   And so you remain as confident today as

9   you did at the time of the investigation that

10  Lamarr Scott was not the shooter?

11         A.   I wasn't there.  I don't know who was

12  the shooter.  But I think there are bigger problems

13  with Lamarr Scott being the shooter than with

14  Valentino Dixon being the shooter.

15         Q.   Well, just be clear.  You prosecuted

16  Valentino Dixon as being the shooter, correct?

17         A.   Correct.

18         Q.   And you prosecuted Mario Jarmon and

19  Leonard Brown for lying about Lamarr Scott being

20  the shooter, correct?

21         A.   Correct.

22         Q.   You must have been pretty sure about

23  it, right?

24         A.   At the time certainly.

25         Q.   Do you remain as sure today?  Simple



1              Christopher J. Belling
2    question.
3          A.   I would say yes.
4          Q.   Okay.  Now, just to -- just to finish
5    up with this document, Exhibit 32, take a look at
6    paragraph 13.  Now, I want you just to read to
7    yourself number 6 of the bullet points.
8          A.    Number 6, okay.
9          Q.    On page 4.
10         A.    Okay.  Okay.
11         Q.    Other than Antoine Shannon, are you
12   familiar with any of these other witnesses and what
13   they say in regard to Lamarr Scott being the
14   shooter?
15         A.   I'm familiar with the name Walter
16   Dennis.  That goes back to the original
17   investigation.  The others, I have no idea.  I
18   never heard the names.
19         Q.   And you've already told us that you
20   went to Kentucky to interview Antoine Shannon?
21         A.   Correct.
22         Q.   As part of your investigation, correct?
23         A.   As part of getting everything ready for
24   the Grand Jury, yes.
25         Q.   You travelled to Kentucky as part of



1                    Christopher J. Belling

2   getting ready for the Grand Jury?

3          A.   Right.  He was a loose -- something

4   that had to be dealt with before we put the case to

5   the Grand Jury.

6          Q.   And you could have easily sent a

7   detective to do it, correct?

8          A.   Buffalo would have never paid for it.

9          Q.   Well, what you said in your letter was

10  that you wanted to do it personally, correct?

11         A.   No, what I said in my letter is that if

12  they locate any of these witnesses during the

13  daytime, I'd like to be there for the interview.

14         Q.   What you said was in particular with

15  Antoine Jarmon -- with Antoine Shannon, that you

16  wanted to be there for that one.  Do I need to show

17  it to you again?

18         A.   Yeah, because that's not what I said.

19  The letter was written after I talked to Antoine

20  Shannon.

21         Q.   All right.

22         MS. PERSICO:  Would you like him to look at

23  the letter?

24         MR. BRUSTIN:  The letter does say that but,

25  no, it's not worth it.



1                  Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Any of these other names you know?

4          A.   No.

5          Q.   So, to the best of your knowledge, you

6    were not aware of them at the time of the

7    investigation?

8          A.   Correct.

9          Q.   And you don't remember what, if

10   anything, Walter Dennis had to say?

11         A.   Yeah, I -- I do not remember what

12   Walter Dennis had to say or not say.  He was a

13   relative of Leonard Brown's I think, but that's all

14   I remember about him.

15         Q.   Okay.  And we're going to get to

16   Antoine Shannon in a minute, but the others you

17   don't recognize?

18         A.   Correct.

19         Q.   Okay.  Now, let's take a look at the

20   DA's file again, page 2409.

21         A.   2409.  2409.

22         Q.   Yeah.

23         A.   Yes.

24         Q.   And do you see at the bottom of the

25   page 2409, this is a handwritten version of a



1                Christopher J. Belling

2   report that Stambach did.  It begins on 2407.

3          A.   Yes.

4          Q.   And the bottom it says:  Both bad boys

5   let go.  See you in the morning?

6          A.   Yes.

7          Q.   Well, that doesn't appear -- that

8   doesn't appear in the actual report.  Do you have

9   any understanding as to where that came from and

10  whose handwriting it is?

11         MS. PERSICO:  Form.

12         THE WITNESS:  No, not really.

13         BY MR. BRUSTIN:

14         Q.   Do you remember having any discussion

15  with Detective Stambach that morning or the next

16  day about letting two bad boys go?

17         MS. PERSICO:  Form.

18         THE WITNESS:  Not in those terms, no.

19         BY MR. BRUSTIN:

20         Q.   Those are not your terms, bad boys?

21         A.   No.

22         Q.   You didn't have discussion with

23  Lamarr -- with Stambach about Lamarr Scott and

24  Leonard Brown being bad boys and they should let

25  them go?



1                    Christopher J. Belling

2            MS. PERSICO:  Form.

3            THE WITNESS:  No, I did not.

4            BY MR. BRUSTIN:

5            Q.   And I take it you didn't notice that

6    that statement was on the handwritten document but

7    not in the report?

8            MS. PERSICO:  Form.

9            THE WITNESS:  I've seen the statement on the

10   handwritten notes, but I didn't know whether it was

11   on the report or not.

12           BY MR. BRUSTIN:

13           Q.   Do you think "both bad boys let go, see

14   you in the morning" is in the report that's in the

15   police file?

16           MS. PERSICO:  Form.

17           THE WITNESS:  I haven't seen the report, so

18   I don't know.

19           BY MR. BRUSTIN:

20           Q.   All right.  So let's take a look at

21   2213.

22           MR. RUSS:  Sorry, did you say 2213?

23           MR. BRUSTIN:  I did.

24           THE WITNESS:  Okay.

25           MS. PERSICO:  We're not looking at the same



1              Christopher J. Belling

2    book.  Our 2213 is --

3         THE WITNESS:  Is Antoine Shannon's

4    statement.

5         MR. BRUSTIN:  Yeah.  I will represent to you

6    that --

7         MS. PERSICO:  Well, what are you looking

8    for?  We might know where it is.

9         MR. BRUSTIN:  I'm going to skip it.

10        BY MR. BRUSTIN:

11        Q.   I will represent to you that Lamarr

12   Scott was subpoenaed to testify in the Grand Jury

13   on January 13th.  Does that sound about right?

14        A.   That's the right time frame, yes,

15   and -- yeah.

16        Q.   All right.  I want you to take a look

17   at the DA file again, and I want you to look at

18   1692.

19        A.   Got it.

20        Q.   And do you -- have you reviewed this

21   document in preparation for today?

22        A.   Yes.

23        Q.   All right.  And can you explain the

24   process by which Mr. Molloy was appointed?

25        A.   Okay.  As I testified earlier, at some



```
 1                   Christopher J. Belling
 2   point in this few days here, Lamarr Scott called in
 3   and said, okay, I do want that lawyer.  So I had
 4   him come to the DA's office.  From the DA's office,
 5   we went to so-called criminal special term.
 6        Criminal special term was in front of Judge
 7   Joseph McCarthy in County Court at the time.  We
 8   went in front of Judge McCarthy.  I explained to
 9   Judge McCarthy the situation, that this individual
10   needed counsel in regard to a potential Grand Jury
11   appearance.  Judge McCarthy may have asked for some
12   more information, may not have, and Judge McCarthy
13   then would have just gotten out the book of
14   assigned counsel and said, okay, Jack Molloy.
15        Q.   It was the judge who decided Jack
16   Molloy?
17        A.   Oh, yeah.
18        Q.   Okay.  And did you know Jack Molloy?
19        A.   Yes.
20        Q.   How did you know him?
21        A.   He was an assistant DA earlier in my
22   career.  He came after I came to the DA's office
23   and left before I did.
24        Q.   Is he a friend of yours?
25        A.   He's a professional acquaintance.  I
```



1                  Christopher J. Belling

2   don't know that he's a friend.  I don't think I've

3   ever been out with him on any occasion.  Might have

4   been at like a kind of retirement party perhaps.

5          Q.   And did you talk to Mr. Molloy in

6   connection with Lamarr Scott once he became

7   appointed?

8          A.   Yes.

9          Q.   All right.  Did you meet with the two

10  of them together?

11         A.   Yes.

12         Q.   All right.  And what did you -- what,

13  if anything -- well, withdrawn.

14         First of all, what did you tell -- did you

15  speak to Mr. Molloy substantively about Lamarr

16  Scott prior to meeting with the two of them?

17         A.   I have no recollection of doing it, but

18  I certainly would have.

19         Q.   All right.  You have no recollection of

20  what you said -- what you said to Mr. Molloy prior

21  to him meeting with Mr. Scott?

22         MS. PERSICO:  Form.

23         MR. BRUSTIN:  I'm sorry, that was a bad

24  question.

25         BY MR. BRUSTIN:



1           Christopher J. Belling

2       Q.   Prior to your meeting with Mr. Scott

3   and Mr. Molloy --

4       A.   Right.

5       Q.   -- you believe you spoke to Mr. Molloy

6   but you don't have any recollection as to what you

7   said to him?

8       A.   I briefed him on what was going on in

9   the case, that he had been assigned by Judge

10  McCarthy.  I would have given him access to the TV

11  confession, Lamarr Scott's statement to the police,

12  so he had all those materials before he talked to

13  his client, and then he and I spoke.

14      Q.   Did you talk to him about -- did you

15  talk to either him or Mr. Scott about the

16  possibility of Mr. Scott being charged with perjury

17  if he maintained that he was the shooter and

18  Valentino Dixon was not?

19      MS. PERSICO:  Form.

20      THE WITNESS:  No, I don't think so.

21      BY MR. BRUSTIN:

22      Q.   Is it possible that you did?

23      A.   Certainly not with Lamarr Scott,

24  because I did not talk to Lamarr Scott other than

25  interviewing him as a witness in the presence of



```
 1                  Christopher J. Belling
 2    his lawyer.  And I don't know that I ever said
 3    anything to Molloy about that either.
 4          Q.   But you may have.
 5          A.   I was more concerned with talking to
 6    Molloy about getting to the bottom of this.  He --
 7    Jack Molloy is the kind of guy that would be able
 8    to get to the bottom of this.
 9          Q.   And Jack Molloy was able to get to the
10    bottom of this between January 9th and January
11    10th; is that right?  In one day he got to the
12    bottom of it?
13          A.   Apparently.
14          Q.   All right.  In any case, I'm not asking
15    you about other things that you talked to Jack
16    Molloy about.  I'm asking you whether it's possible
17    you said to him that Lamarr Scott might be charged
18    with perjury if he maintains the story that he shot
19    Torri Jackson.
20          A.   No.
21          Q.   You're sure -- now you're sure you
22    didn't say that?
23          MS. PERSICO:  Form.
24          THE WITNESS:  No, I didn't say that.
25          BY MR. BRUSTIN:
```



1              Christopher J. Belling

2        Q.    Nothing like that.  Nothing about the

3    possibility of perjury if you maintain the story?

4        A.    No.

5        Q.    And nothing like that in front of --

6    nothing like that with Mr. Scott when you were

7    meeting with the two of them?

8        A.    No.

9        Q.    And, again, you're certain about that?

10       A.    Yes.

11       Q.    You're certain you never said anything

12   about perjury before and you're certain you never

13   said anything about perjury when you met with the

14   two of them?

15       MS. PERSICO:  Form.

16       THE WITNESS:  I did not say that to Lamarr

17   Scott in regard to this thing.

18       BY MR. BRUSTIN:

19       Q.    And you're certain you never said it to

20   Molloy?

21       A.    I'm not certain what we discussed.

22       Q.    Well, that was my question before.  You

23   may have talked about the possibility of perjury

24   charges against him, correct?

25       A.    He may have said it to me.  I don't



1                    Christopher J. Belling

2    know.

3         Q.    Well, you may have said it to him,

4    correct?

5         MS. PERSICO:    Form.

6         THE WITNESS:    I would doubt it given the

7    procedural posture of what was going on at the

8    time.

9         BY MR. BRUSTIN:

10        Q.    All right.    Well, you were certainly by

11   that time considering perjury charges against

12   Jarmon and Brown, correct?

13        MS. PERSICO:    By what time?

14        MR. BRUSTIN:    By the time -- by January 9th

15   of 1992.

16        THE WITNESS:    No, I don't think so.

17        BY MR. BRUSTIN:

18        Q.    Never crossed your mind?

19        A.    I don't think so, no.

20        Q.    Hadn't threatened it yet?

21        MS. PERSICO:    Form.    Don't answer that.

22        BY MR. BRUSTIN:

23        Q.    You hadn't mentioned that thought to

24   anybody?

25        MS. PERSICO:    Form.



1                    Christopher J. Belling

2           THE WITNESS:  I don't recollect it, no.

3           BY MR. BRUSTIN:

4           Q.   Has there ever been another case in

5    your career where you prosecuted two witnesses --

6    withdrawn.

7           Has there ever been another case in your

8    career when you prosecuted a witness to a crime for

9    misrepresenting who committed the crime?

10          MS. PERSICO:  Form.

11          THE WITNESS:  Yes.

12          BY MR. BRUSTIN:

13          Q.   What is the other case?

14          A.   There were a couple of cases in the --

15   the 2000s, after I came back to the office.  I

16   never prosecuted anybody for perjury, but we

17   prosecuted a couple people for contempt, for going

18   to the Grand Jury and saying they didn't know about

19   something that they obviously knew about.

20          Q.   And you actually prosecuted them, took

21   them to trial?

22          A.   Yes, yes.

23          Q.   And what case was that?

24          A.   I don't remember the names of the

25   people.



1                    Christopher J. Belling

2         Q.    When was it?

3         A.    Well, it was between 2011 and 2017.

4         Q.    Okay.  Do you remember any other -- was

5   it more than once?

6         A.    At least twice that I'm recollecting.

7         Q.    Do you remember anything about those

8   two cases?

9         A.    They were murder cases, and somebody

10  showed up in the Grand Jury and said they -- you

11  know, like they were standing here facing this

12  young lady and they didn't see anything, that kind

13  of thing.

14        Q.    And you prosecuted them for that?

15        A.    Yes.

16        Q.    And who were the defense lawyers in the

17  case?

18        A.    Not a clue.

19        Q.    Don't remember?

20        A.    No.

21        Q.    Nothing else you remember about it so

22  that I could find them?

23        A.    I don't remember anything about them.

24        Q.    But they were prosecuted for criminal

25  contempt?



1                    Christopher J. Belling

2         A.    That's my recollection, yes.

3         Q.    And it was sometime between 2000 and

4    2017?

5         A.    Correct.

6         Q.    All right.

7         MS. PERSICO:   2011 I think.

8         MR. BRUSTIN:   2011, I'm sorry, and 2017.

9         THE WITNESS:   Right.

10        BY MR. BRUSTIN:

11        Q.    Any other cases that you were involved

12   in where someone was prosecuted for lying about who

13   committed a crime?   That's what Brown -- withdrawn.

14        Brown essentially, Brown and Jarmon were

15   prosecuted for lying about who committed this

16   crime, correct?

17        MS. PERSICO:   Form.

18        THE WITNESS:   Yes.

19        BY MR. BRUSTIN:

20        Q.    Other than those contempt cases that

21   you just told us about, any other cases in your

22   career?

23        A.    I want to say one of the hinterlands.

24   I may have at least crossed paths with a case of

25   similar ilk in St. Lawrence County or maybe



1                    Christopher J. Belling

2      Chenango County, but I'm not sure.

3           Q.    You have a vague recollection of

4      somebody else doing it in one of those counties?

5           A.    Yes.

6           Q.    Anybody else in your office prosecute

7      under those circumstances?

8           A.    I don't know.  Neither of the contempt

9      cases were mine, by the way.  They were somebody

10     else's.

11          Q.    Oh, okay.  Any other case -- so you

12     were actually -- you were answering a question as

13     to any case in the office?

14          A.    Correct.

15          Q.    Have there been other cases when you

16     have threatened witnesses or their attorneys with

17     prosecuting them for perjury based on information

18     they had provided to you prior to their testifying

19     at a trial?

20          MS. PERSICO:   Form.

21          THE WITNESS:   No.

22          BY MR. BRUSTIN:

23          Q.    Not once?

24          A.    Not that I recollect.

25          Q.    Okay.  So the only time you've ever



1                   Christopher J. Belling

2     threatened or -- or prosecuted somebody for perjury

3     was this case?

4          MS. PERSICO:  Form.

5          THE WITNESS:  Well, I don't think I

6     threatened anybody in this case, but prosecuted,

7     yes.

8          BY MR. BRUSTIN:

9          Q.   Well, when they testified in the Grand

10    Jury, at least Leonard Brown, you read him the

11    perjury statute?

12         A.   Correct.

13         Q.   That's -- maybe threat's not the right

14    word, but warned?

15         MS. PERSICO:  Form.

16         THE WITNESS:  Informed.

17         BY MR. BRUSTIN:

18         Q.   Warned is too strong?

19         A.   I think so.

20         Q.   All right.  But the only case -- you've

21    done that in other cases?

22         MS. PERSICO:  I'm sorry.

23         THE WITNESS:  Done what?

24         BY MR. BRUSTIN:

25         Q.   Have you warned during the -- during



1                    Christopher J. Belling
2    testimony by reading them the perjury statute other
3    witnesses about lying?
4         A.    I think I can think of at least one
5    case where I may have done that, yes.
6         Q.    In connection with the perjury case, by
7    the way, because I've asked you what investigation
8    you directed or conducted in regard to Lamarr Scott
9    lying --
10         A.    Lamarr Scott what?
11         Q.    Lying about the shooter.
12         A.    Okay.
13         Q.    Did you conduct any additional
14    investigation of Lamarr Scott's version of the
15    shooting in connection with the perjury
16    investigation or trial?
17         MS. PERSICO:  Form.
18         THE WITNESS:  I didn't run the perjury
19    trial, so I don't know what Frank Sedita who did
20    run it did.
21         BY MR. BRUSTIN:
22         Q.    Well, up until the time of trial you
23    were the prosecutor on the case, correct?
24         MS. PERSICO:  Form.
25         THE WITNESS:  Not that I recall.



1                  Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   That's what documentation suggests.

4    Are you sure?

5          MS. PERSICO:   I think he testified that as

6    soon as -- he stopped being a prosecutor as soon as

7    the Grand Jury indictment.

8          BY MR. BRUSTIN:

9          Q.   All right.   So in connection with the

10   Grand Jury, let's start with that, what

11   investigation -- what additional investigation into

12   Lamarr Scott's version of events did you conduct or

13   did you direct be conducted by the BPD?

14         MS. PERSICO:   In addition to what?

15         MR. BRUSTIN:   What you've described in

16   regard to Valentino Dixon's prosecution.

17         MS. PERSICO:   Object to the form of that.

18         THE WITNESS:   I still don't understand that.

19         BY MR. BRUSTIN:

20         Q.   So you talked about doing zero

21   investigation yourself in connection with

22   Valentino -- in connection with Lamarr Scott's

23   being the shooter, and you said you don't know what

24   the police did.  Do you remember that testimony

25   earlier today?



1                    Christopher J. Belling

2          A.   Yes.

3          Q.   Did you conduct any -- any

4    investigation in connection with -- withdrawn.

5          The perjury charges were based on your

6    belief that Lamarr Scott was lying about being the

7    shooter, correct?

8          MS. PERSICO:   Form.

9          THE WITNESS:   No.

10         BY MR. BRUSTIN:

11         Q.   Well, that was a condition necessary to

12   prosecuting them, correct?

13         MS. PERSICO:   Form.

14         BY MR. BRUSTIN:

15         Q.   Lamarr Scott had to be lying about

16   being the shooter, correct?

17         MS. PERSICO:   Form.

18         THE WITNESS:   No, that's not a condition

19   necessary, no.

20         BY MR. BRUSTIN:

21         Q.   So, in other words, you -- even if you

22   knew that Lamarr Scott was the shooter, you still

23   might have prosecuted Leonard Brown and Mario

24   Jarmon for perjury?

25         MS. PERSICO:   Form.



1              Christopher J. Belling

2         THE WITNESS:  It's the result of the Grand

3    Jury investigation that caused them to be

4    prosecuted for perjury.

5         BY MR. BRUSTIN:

6         Q.   But it's based on the lie that Lamarr

7    Scott told in your view, correct?

8         MS. PERSICO:  Form.

9         THE WITNESS:  That's the --

10        BY MR. BRUSTIN:

11        Q.   That's the big lie?

12        MS. PERSICO:  Form.

13        THE WITNESS:  That's the net issue of the

14   whole event, yeah.

15        BY MR. BRUSTIN:

16        Q.   All right.  So did you conduct -- so my

17   simple question is:  Did you conduct any additional

18   investigation or direct any additional

19   investigation of Lamarr Scott's version of events

20   in connection with the perjury Grand Jury?

21        A.   The perjury Grand Jury was the same

22   Grand Jury.

23        Q.   Okay.  Take a look at page 1696 through

24   1700.

25        A.   1696?



```
 1                   Christopher J. Belling
 2          Q.   Yes, which is an affidavit you created
 3   on January 13th, 1992.
 4          A.   Okay.  You want me to read it?
 5          Q.   No, I want to direct your attention to
 6   certain portions.  First take a look at number 4.
 7          A.   Okay.
 8          Q.   And in number 4 you are making clear
 9   that pursuant to the investigation of the case, it
10   has been determined that Lamarr Scott came forward
11   as a result of the urging of Valentino Dixon's
12   family, correct?
13          A.   Correct.
14          Q.   And you've already described that
15   investigation, right?
16          A.   Correct.
17          Q.   Which was nonexistent?
18          MS. PERSICO:  Form.
19          THE WITNESS:  Is that a question?
20          BY MR. BRUSTIN:
21          Q.   Yeah, do you agree it was nonexistent
22   based on what you described earlier today under
23   oath?
24          A.   No.
25          Q.   Okay.  And -- and implicit in this is
```



1                    Christopher J. Belling

2    you determined it was false, that statement?

3          A.   That was my belief.

4          Q.   And take a look at paragraph 6.  Read

5    that, and tell me when you're done.

6          A.   I read that.

7          Q.   Do you remember what time Mr. Molloy

8    was appointed on January 9th?

9          A.   I do not.

10         Q.   Do you remember what time you spoke to

11   him on January 10th?

12         A.   No.

13         Q.   But fair to say it was a very short

14   period of time between when Mr. Molloy was

15   appointed, when you met with Mr. Molloy and

16   Mr. Scott, and when Mr. Scott recanted his

17   statement?

18         MS. PERSICO:  Form.

19         MR. RUSS:  Objection to form.

20         THE WITNESS:  And when Mr. Scott testified

21   in the Grand Jury.

22         BY MR. BRUSTIN:

23         Q.   No, I'm not talking about that.  I'm

24   only talking between the 9th and the 10th.

25         A.   Oh, okay.



1                  Christopher J. Belling

2          Q.    That's all I'm talking about now.

3    Presumably you learned either in the meeting with

4    Mr. Molloy and Mr. Scott or soon after that

5    Mr. Scott was recanting his statement, correct?

6          A.    Yes, I did.

7          Q.    And it all happened in a matter of

8    hours, correct?

9          A.    I don't know the time frame.  It

10   happened between when Molloy got involved and

11   whenever I talked to him and Mr. Scott.

12         Q.    Sometime on the 9th to sometime on the

13   10th, correct, it all happened?

14         A.    That's the time frame, yeah.

15         Q.    During that time frame you spoke to --

16   he was appointed.  You spoke to Molloy.  Then you

17   spoke with the two of them, and Scott fully

18   recanted.

19         A.    Correct.

20         Q.    Without any threats or promises from

21   you?

22         A.    Correct.

23         MS. PERSICO:  Form.  I'm not sure that this

24   indicates -- just to be clear, I'm not sure that

25   this affidavit indicates that Mr. Belling had that



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              275

1                    Christopher J. Belling
2    conference with Mr. Scott and Mr. Molloy.
3         BY MR. BRUSTIN:
4         Q.   It does not, but -- but I assume what
5    you're telling us is that you had that conference
6    before he recanted, correct?  Or was it during that
7    conference when he recanted?  Or something else?
8         A.   Okay.  Let me read paragraph 6 again.
9         Q.   Sure.
10        A.   Yeah, this reflects a meeting with
11   Molloy where he told me what Lamarr Scott had told
12   him.
13        Q.   So you don't know one way or another --
14        A.   Whether Lamarr Scott was there or not.
15        Q.   Let me finish the question.  You don't
16   know one way or another whether you met with Molloy
17   and Lamarr Scott prior to learning that he was
18   recanting?
19        A.   That is correct.
20        Q.   You may have, you may not have,
21   correct?
22        A.   According to this paragraph, I did not.
23   I just met with Molloy or talked to him on the --
24        Q.   Where does it say that?
25        A.   Conference with Molloy wherein he



1              Christopher J. Belling
2  confirmed that Lamarr Scott had falsely confessed,
3  so I'm -- paragraph 6.  I'm only talking to Molloy
4  at this point.
5       Q.   Okay.  But you have no mention in here,
6  which is done by the 13th, of any meeting with
7  Mr. Scott and Mr. Molloy, correct?
8       A.   No mention in here, no.
9       Q.   So you don't know as you sit here today
10 whether or not you met with them and just didn't
11 put it in your affidavit, correct?
12      MS. PERSICO:  Form.
13      THE WITNESS:  That's true.  I had to have
14 met with the two of them at some point before the
15 Grand Jury which was I think the 13th.
16      BY MR. BRUSTIN:
17      Q.   Okay.  In any case, though, no threats
18 to Mr. Molloy regarding Mr. Scott or to Mr. Scott
19 directly that caused him to recant, correct?
20      A.   Absolutely not.
21      Q.   And, by the way, you had no idea, I
22 take it, on January 9th that Mr. Scott was going to
23 recant; is that your position?
24      A.   That is correct.
25      Q.   And anybody who says differently would



1                    Christopher J. Belling

2    be lying, correct?

3           MS. PERSICO:  Form.

4           THE WITNESS:  I can't say who's lying or

5    who's not.  I can tell you what I know, and there's

6    no such conversation.

7           BY MR. BRUSTIN:

8           Q.   Fair enough.  Anybody who suggests that

9    you knew before January 9th that Lamarr Scott was

10   going to recant is either lying or mistaken?

11          MS. PERSICO:  Form.

12          THE WITNESS:  That's not what I knew, let's

13   put it that way.

14          BY MR. BRUSTIN:

15          Q.   Do you have a problem calling somebody

16   a liar?

17          MS. PERSICO:  Form.

18          THE WITNESS:  Inappropriately, yes.

19          BY MR. BRUSTIN:

20          Q.   Okay.  You would only call someone a

21   liar appropriately?

22          MS. PERSICO:  Form.  You don't need to

23   answer that.

24          BY MR. BRUSTIN:

25          Q.   Like you did with Mr. Brown and



```
 1                  Christopher J. Belling
 2   Mr. Jarmon.
 3          A.    Mr. Who?
 4          Q.    Mr. Brown and Mr. Jarmon.
 5          A.    I didn't call them liars.
 6          Q.    You charged them with perjury.  That's
 7   lying.
 8          A.    No, the Grand Jury charged them with
 9   perjury.
10          Q.    Based on your presentation.
11          A.    Based on the presentation that occurred
12   that day.
13          Q.    By you?
14          A.    The evidence was presented by me.
15          Q.    You were the only lawyer in the room?
16          A.    Correct.
17          Q.    You ran that Grand Jury?
18          A.    In the expression, yes.
19          Q.    Take a look at the perjury binder,
20   please.
21          A.    Okay.
22          Q.    And take a look at page 3130 --
23          MR. RUSS:   Sorry.  I'm not sure why that
24   happened.  That's the music I was listening to this
25   morning.
```



1                  Christopher J. Belling

2          MR. BRUSTIN:  Just make it stop, please.

3          THE WITNESS:  3130?  There is no 3130.

4          BY MR. BRUSTIN:

5          Q.    There's 3133.

6          A.    I have 3133, yes.

7          Q.    Yeah, that's what I want.  3133 and

8     3134.

9          A.    Yes.

10         Q.    And this is when you are bringing

11    perjury charges against Leonard Brown and Mario

12    Jarmon?

13         A.    This is the computer input form that

14    reflects opening of these cases.

15         Q.    And that was on 1/13/92.

16         A.    That is correct.

17         Q.    January 13th, 1992.

18         A.    Correct.

19         Q.    This is two days after Mr. Scott

20    recanted, correct?

21         A.    I think this is the same day as the

22    Grand Jury presentment.

23         Q.    Okay.  And does this refresh your

24    recollection about anything you may have said to

25    Mr. -- Mr. Molloy or Mr. Scott in regard to



1                Christopher J. Belling

2    potential perjury charges three days before?

3        A.    No.

4        MS. PERSICO:  Form.

5        BY MR. BRUSTIN:

6        Q.    But certainly you were aware by the 9th

7    and the 10th that you were going to be bringing

8    perjury charges against Mario Jarmon and Leonard

9    Brown, right?

10       A.    No.

11       MS. PERSICO:  Form.  Asked and answered.

12       BY MR. BRUSTIN:

13       Q.    You decided it on the 13th?

14       A.    It was determined that they would --

15   the Grand Jury would be given that charge on the

16   law on the 13th.

17       Q.    You hadn't considered it -- but you

18   hadn't considered it by the 9th?

19       A.    I didn't, no.

20       Q.    When did they testify?

21       A.    I think on the 13th.

22       Q.    Okay.  Now, do you deny, Mr. Belling,

23   telling Lamarr Scott that it would be in his best

24   interest -- best interest to testify at the Grand

25   Jury and say that Valentino Dixon committed the



```
 1                 Christopher J. Belling
 2  crime?
 3          MS. PERSICO:  Form.
 4          THE WITNESS:  I do deny that, yes.
 5          BY MR. BRUSTIN:
 6          Q.   And do you deny conspiring with
 7  Detective Stambach to threaten Mr. Scott if he
 8  didn't recant his testimony?
 9          A.   Yes, I deny that.
10          Q.   Do you deny any knowledge of Mr. -- of
11  Detective Stambach making threats to Mr. Scott
12  concerning recanting his testimony in between
13  August 12th of 1991 and the Grand Jury?
14          MS. PERSICO:  Form.
15          MR. RUSS:  Objection to form.
16          THE WITNESS:  I don't know anything about
17  that.
18          BY MR. BRUSTIN:
19          Q.   Do you deny telling Mr. Scott that you
20  know he didn't commit the crime but that you're
21  going to prosecute Valentino Dixon for it anyway?
22          MS. PERSICO:  Form.
23          THE WITNESS:  That question has a double
24  entendre in it.
25          BY MR. BRUSTIN:
```



1                     Christopher J. Belling

2           Q.    Okay.  I'll make it clear.

3           A.    Okay.

4           Q.    Do you recall telling -- withdrawn.

5           Do you deny telling Lamarr Scott in

6    substance that you know Valentino Dixon didn't

7    commit the crime but that you were going to

8    prosecute him anyways?

9           A.    I never said anything like that to

10   Lamarr Scott.

11          Q.    Do you deny telling Lamarr Scott that

12   you know he's being pressured by the Dixon family

13   and that there was even a rumor that they gave him

14   $5,000?

15          A.    I never said anything like that to

16   Lamarr Scott.

17          Q.    Do you deny saying anything about a

18   money payment from the family to Lamarr Scott?

19          A.    Yes, I deny that.

20          Q.    And you deny having any information,

21   even rumor, that the family paid Lamarr Scott money

22   to falsely confess to the crime?

23          MS. PERSICO:  Form.

24          THE WITNESS:  I don't know that one way or

25   the other.



1                     Christopher J. Belling

2           BY MR. BRUSTIN:

3           Q.   Well, you didn't receive any

4    information to that effect; is that fair to say?

5           A.   After the fact, in this proceeding I

6    have heard that bandy develop, but I didn't know

7    anything about it then.

8           Q.   What did you hear about it in this

9    proceeding?

10          A.   As I recall, during somebody's

11   deposition there was an inquiry as to whether Scott

12   and Dixon had colluded in prison to agree to

13   somebody gets paid for something if you say

14   something.

15          Q.   Ah.  Do you remember where you saw

16   that?

17          A.   No, not really.

18          Q.   All right.  But at the time that you

19   were prosecuting this case, you didn't have any

20   information concerning payments from the Dixon

21   family to Lamarr Scott?

22          MS. PERSICO:  Form.

23          THE WITNESS:  I didn't have any such

24   information, no.

25          BY MR. BRUSTIN:



1                    Christopher J. Belling

2          Q.    And I think you told us you couldn't

3    recall one way or another whether or not you met

4    with Mr. Scott's foster parents at any point in

5    time; is that correct?

6          A.    Correct.  I just don't remember that at

7    all.

8          Q.    All right.  But you certainly deny

9    telling Lamarr Scott that his parents could be held

10   responsible for his actions; fair to say?

11         A.    Yeah, that's ludicrous.

12         Q.    Okay.  And if he said that, he's lying?

13         MS. PERSICO:  Form.

14         THE WITNESS:  Well, he's mistaken clearly.

15         BY MR. BRUSTIN:

16         Q.    You certainly never did that?

17         A.    I never did that.  I never -- don't

18   remember talking to his parents, and if I had, I

19   wouldn't have said that.

20         Q.    And it would have been totally

21   inappropriate to do it, correct?

22         A.    True.

23         Q.    It would have been clear coercion?

24         MS. PERSICO:  Form.

25         THE WITNESS:  It would have been wrong.



1              Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   It would have been coercive.

4         MS. PERSICO:   Form.

5         THE WITNESS:   Well, coercion is a crime that

6    has elements, but it would have been wrong.

7         BY MR. BRUSTIN:

8         Q.   All right.  And you never would have

9    done that?

10        A.   Correct.

11        Q.   And you deny providing any pressure on

12   him to change his story by bringing his foster

13   parents into a meeting with him, correct?

14        A.   Correct.

15        Q.   And you deny any type of threats of any

16   kind to their well-being after they left?

17        A.   Absolutely.

18        Q.   And you deny telling Lamarr Scott you

19   got the guy you wanted, there's nothing he can do,

20   he's going to be convicted?

21        A.   Again, you had some misplaced pronouns

22   there.

23        Q.   I did, you're right.  Let me do it

24   again.  Do you deny telling Mr. Scott, we got the

25   guy you wanted, there's nothing you can do, he,



1                    Christopher J. Belling

2    being Valentino Dixon, is going to be convicted?

3             MS. PERSICO:  Form.

4             THE WITNESS:  I never said that.

5             BY MR. BRUSTIN:

6             Q.   Do you deny ever telling him in words

7    or in substance that you knew Valentino Dixon

8    wasn't the shooter?

9             MS. PERSICO:  Form.

10            THE WITNESS:  Absolutely not.

11            BY MR. BRUSTIN:

12            Q.   And that he was going to be convicted

13   with or without Lamarr's confession.  Do you deny

14   that?

15            A.   Correct, I do deny that.

16            MS. PERSICO:  Form.

17            BY MR. BRUSTIN:

18            Q.   And obviously either of those things

19   would have been completely inappropriate if you had

20   done them?

21            MS. PERSICO:  Form.

22            THE WITNESS:  Yeah.

23            BY MR. BRUSTIN:

24            Q.   If you used either of those things to

25   get him to recant his statement, they would have



1                    Christopher J. Belling

2    been wholly inappropriate, correct?

3         A.   Yes.

4         Q.   And you deny telling Lamarr Scott in

5    substance that if he didn't change his story, you

6    would go after Mr. Scott every time he was charged

7    and Lamarr would ultimately serve a lot of time

8    anyway?

9         MS. PERSICO:  Form.

10        THE WITNESS:  I never said anything like

11   that.

12        BY MR. BRUSTIN:

13        Q.   And that would have been totally

14   inappropriate if you had, correct?

15        A.   Yeah.

16        Q.   He's lying if he says that you said

17   that, correct?

18        MS. PERSICO:  Form.

19        THE WITNESS:  It's clearly inaccurate on his

20   part.

21        BY MR. BRUSTIN:

22        Q.   Well, that's not the kind of thing you

23   make a mistake about, right?

24        MS. PERSICO:  Form.  You don't need to

25   answer that.



```
 1                   Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   You never said it?
 4          A.   I never said it.
 5          Q.   Nothing like that, correct?
 6          A.   No.
 7          Q.   Now, I know that you said that you
 8   don't investigation homicides, that's for the
 9   police to do, but you did have numerous cases where
10   you relied on physical evidence for -- to prove
11   guilt, correct?
12          MS. PERSICO:  Form.
13          THE WITNESS:  I have had cases with physical
14   evidence, yes.
15          BY MR. BRUSTIN:
16          Q.   And certainly based on the
17   circumstances described concerning this shooting,
18   you would have expected that the shooter who was
19   firing the machine gun as you refer to it as and
20   was standing over the victim unloading the
21   automatic weapon, you would expect that the shooter
22   would likely have all kinds of potential forensic
23   evidence on their person, correct?
24          MS. PERSICO:  Form.
25          THE WITNESS:  Not necessarily.
```



```
 1                      Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   Well, certainly you would expect there
 4   was a possibility of there being blood on the
 5   shooter, correct?
 6          MS. PERSICO:  Form.
 7          THE WITNESS:  Expect the possibility?
 8          BY MR. BRUSTIN:
 9          Q.   You would expect there's a reasonable
10   likelihood that there would be blood given the
11   circumstances of this shooting somewhere on the
12   shooter's body, correct?
13          MS. PERSICO:  Form.
14          THE WITNESS:  It's possible.
15          BY MR. BRUSTIN:
16          Q.   Perhaps on their clothes or their
17   shoes, correct?
18          MS. PERSICO:  Form.
19          THE WITNESS:  If it's possible, it's
20   possible, yeah.
21          BY MR. BRUSTIN:
22          Q.   All right.  And do you know something
23   about weapons through either your personal life or
24   through your experience as a prosecutor?
25          A.   A little bit.
```



1                      Christopher J. Belling

2          Q.   In fact, didn't you carry a gun

3    yourself for a long time?

4          A.   I have a pistol permit and I have

5    carried a gun, yes.

6          Q.   All right.  And would it be fair to say

7    that you would expect that someone who fired that

8    TEC-9 in the manner and in which it was fired and

9    the range at which it was fired, you would expect

10   that that person, their clothing would be covered

11   in gunpowder, correct?

12         MS. PERSICO:  Form.

13         THE WITNESS:  Not necessarily.  There's a

14   lot of variables in there.

15         BY MR. BRUSTIN:

16         Q.   Certainly there's a possibility of that

17   given the weapon and the number of shots fired and

18   the distance, correct?

19         A.   Possibilities are endless.

20         Q.   Okay.  And one of the ways that the

21   police could have investigated Lamarr Scott's story

22   would have been to ascertain whether there was any

23   physical evidence connecting him to the crime,

24   correct?

25         MS. PERSICO:  Form.



1                    Christopher J. Belling

2           MR. RUSS:  Objection to form.

3           THE WITNESS:  Speculatively, sure, I guess.

4           BY MR. BRUSTIN:

5           Q.   You guess?

6           A.   Yeah.

7           Q.   Well, what about blood evidence?  What

8  if, for example, Lamarr Scott had blood on his

9  clothing or his shoes from the victim?  Would that

10  be evidence that might tend to corroborate his

11  version of events?

12          MS. PERSICO:  Form.

13          THE WITNESS:  If -- on the happenstance that

14  he did, sure.

15          BY MR. BRUSTIN:

16          Q.   Do you know whether or not he ever

17  volunteered providing any clothing to the police?

18          MS. PERSICO:  Form.

19          THE WITNESS:  I do not know that.

20          BY MR. BRUSTIN:

21          Q.   Do you know whether or not the

22  police -- whether or not he ever volunteered

23  providing his clothing to the police?

24          MS. PERSICO:  You just asked that question.

25          MR. RUSS:  Objection to form.



```
 1                Christopher J. Belling

 2        BY MR. BRUSTIN:

 3        Q.   I'm sorry, do you know whether or not

 4   the police ever questioned Lamarr Scott about what

 5   clothes he was wearing and whether he would provide

 6   them?

 7        A.   I do not know that.

 8        Q.   You certainly did not make any

 9   suggestions in that regard, correct?

10        A.   No.

11        Q.   Now, you understood by 1991 that

12   gunpowder residue testing -- I have a couple of

13   articles actually about cases that were going on in

14   Erie County.  Although it was recognized that

15   gunpowder testing wasn't conclusive frankly in any

16   case, it was still evidence that was used in a

17   variety of criminal investigations; fair to say?

18        MS. PERSICO:  Form.

19        THE WITNESS:  It was used during a period of

20   time, yes.  I don't know what the period of time

21   was.

22        BY MR. BRUSTIN:

23        Q.   Do you remember the Clarissa Gladden

24   trial?  This is a case in which she was accused and

25   convicted of -- no, this is the wrong one.
```



1                    Christopher J. Belling

2          MS. PERSICO:  Do you need a minute?

3          MR. BRUSTIN:  Let's take a break.

4          THE VIDEOGRAPHER:  Going off the record at a

5    time of 1601.

6          (A recess was then taken at 4:01 p.m.)

7          THE VIDEOGRAPHER:  Going back on the record

8    at a time of 1606.

9          BY MR. BRUSTIN:

10         Q.   Before we get to the article, can you

11   go back to -- is that the perjury file?  I think it

12   is.

13         A.   Yes, compilation of Jarmon and Brown

14   perjury file documents.

15         Q.   Take a look at page 2757, please.

16         A.   2757.  Got it.

17         Q.   And this indicates that -- this letter

18   on page 2757 indicates that you're still the DA,

19   assistant DA, on the perjury prosecution as of June

20   24th, 1992, correct?

21         A.   Let me read it.  It indicates that I'm

22   still somehow involved.  I don't know.  If my name

23   was on the file, it's because I was city to --

24   supervisor or whatever.

25         Q.   Had you been taken off the case by this



1                    Christopher J. Belling

2    point as the assistant DA?

3         A.    My belief is that I took myself off the

4    case and gave it to one of my assistants, Frank

5    Sedita.

6         Q.    But you continued to conduct activities

7    as the Assistant District Attorney in the case?

8         A.    I continued to conduct activities as an

9    Assistant District Attorney in Erie County who was

10   involved in this case.

11        Q.    Now, one of the things you told -- you

12   know, I'll come back to that.

13        MR. BRUSTIN:  Let's take a look at this.

14   Let's mark this please as 34.

15   The following was marked for Identification:

16    EXH. 34              article headed Chemist Tells

17                         of Tests After Gladden

18                         Slaying

19        BY MR. BRUSTIN:

20        Q.    So I'm showing the witness a newspaper

21   article from May 1993 from The Buffalo News

22   concerning the Gladden case.  You know what?  This

23   is super short.  Why don't you just read it.

24        A.    Okay.

25        Q.    Do you recall this case?



1                    Christopher J. Belling

2          A.    I do not.

3          Q.    But at least pursuant to this

4  description of the case, it appears that as of 1993

5  in Buffalo, in Erie County, they were still doing

6  gunpowder residue testing on clothes, correct?

7          MS. PERSICO:   Form.

8          THE WITNESS:   That's -- I don't know if The

9  Buffalo News is accurate here, but there seems to

10  be a 1990 homicide on trial in '93 so -- and

11  supposedly in this 1990 homicide there is -- there

12  was a gunshot residue test done.

13          BY MR. BRUSTIN:

14          Q.    And, in fact, at least according to

15  this article, the clothing was gathered around the

16  time of the crime, and the testing wasn't conducted

17  for two weeks, correct?

18          MS. PERSICO:   I don't know where you're

19  getting that from.

20          BY MR. BRUSTIN:

21          Q.    Second paragraph, Dr. Germani told

22  State Supreme Court Justice Vincent Doyle he did

23  tests on the nightgown several weeks after the

24  November 25th, 1990, slaying, correct?

25          A.    Oh, okay, yeah.



1                    Christopher J. Belling

2          MS. PERSICO:  You're asking if that's what

3    it says?

4          MR. BRUSTIN:  Yes.

5          BY MR. BRUSTIN:

6          Q.   And your understanding was that that's

7    the kind of testing that was being done in Erie

8    County in 1990, 1991, correct?

9          A.   Sometimes yes, sometimes no.

10         Q.   All right.  And would it be fair to say

11   that although you as a lay person in regard to

12   forensic testing -- withdrawn.

13         You were not a forensic analyst, correct?

14         A.   Correct.

15         Q.   But you often presented forensic

16   evidence at trial, correct?

17         A.   True.

18         Q.   And you became accustomed with how it

19   worked, at least in general, from a layman's

20   perspective?

21         A.   True.

22         Q.   Enough to explain it to a jury?

23         A.   True.

24         Q.   And you understood, for example, that

25   in 1991, although gunshot residue testing wasn't



```
 1                  Christopher J. Belling
 2  dispositive, the presence of gunshot residue,
 3  particularly a large amount of gunshot residue,
 4  could be incriminating evidence.
 5         A.   Could be.
 6         Q.   And --
 7         MS. PERSICO:  I'm sorry, this is my office
 8  keeps calling.  I feel like there's an emergency.
 9  I'm sorry.
10         MR. BRUSTIN:  Let's go off the record for a
11  minute.
12         THE VIDEOGRAPHER:  Going off the record at a
13  time of 1612 as indicated on the video screen.
14         (Off the record at 4:12 p.m.)
15         THE VIDEOGRAPHER:  Back on the record at a
16  time of 1613 as indicated on the video screen.
17         (Off the record at 4:13 p.m.)
18         BY MR. BRUSTIN:
19         Q.   I can't remember exactly where I left
20  off, but certainly you understood in 1991 that
21  large -- particularly large amounts of gunpowder
22  residue on a shooter's clothing could be evidence
23  used to demonstrate that they committed a crime?
24         MS. PERSICO:  Form.
25         THE WITNESS:  Could be helpful evidence,
```



```
 1                    Christopher J. Belling
 2   yes.
 3            BY MR. BRUSTIN:
 4            Q.   And in this case you understood, as
 5   you've described, Lamarr Scott came in and
 6   voluntarily confessed to this crime, correct?
 7            A.   Correct.
 8            Q.   The police didn't go to his house.  He
 9   came in on his own?
10            A.   Correct.
11            Q.   And he voluntarily gave a statement?
12            A.   Correct.
13            Q.   As far as you knew, he answered all the
14   questions that were asked of him?
15            A.   As far as I know.
16            Q.   And you would agree that one of the
17   best ways to determine whether or not what he was
18   saying was truthful or not would be to look for
19   corroborating evidence, correct?
20            MS. PERSICO:  Form.
21            THE WITNESS:  Could have been helpful.
22            BY MR. BRUSTIN:
23            Q.   Well, it would have been -- it could
24   have been dispositive, correct?
25            A.   No, I don't think so.
```



1                     Christopher J. Belling

2          Q.    It would have been very helpful in

3    determining whether he was telling the truth,

4    correct?

5          A.    It could have been helpful.

6          Q.    All right.  And you would expect if he

7    was telling the truth, one of the things he may

8    well have done is offered, if he's asked, offered

9    to provide clothing that he was wearing that night,

10   correct?

11         MS. PERSICO:  Form.

12         THE WITNESS:  Double speculation.  I don't

13   know how to answer that.

14         BY MR. BRUSTIN:

15         Q.    Well, the way to answer it is, he

16   should have been asked, right?

17         MS. PERSICO:  Let him do the answering.

18         THE WITNESS:  Yeah, exactly, if you want to

19   do the answering.  I don't know.  They didn't ask,

20   so there's no clothing, so there you go.

21         BY MR. BRUSTIN:

22         Q.    Did it ever strike you as odd that

23   nobody asked him --

24         MS. PERSICO:  Form.

25         BY MR. BRUSTIN:



1          Christopher J. Belling

2          Q.   -- for what he was wearing the night

3   of -- the night where he claims to have killed

4   someone at close range with a semiautomatic -- with

5   a machine gun, as you called it?

6          A.   Right.  It didn't seem particularly

7   unusual, no.

8          Q.   Okay.  Did it ever cross your mind that

9   maybe we should ask him what he was wearing and see

10  if it's filled with gunpowder?

11         MS. PERSICO:  Form.

12         THE WITNESS:  Never crossed my mind, as I

13  recall.

14         BY MR. BRUSTIN:

15         Q.   Well, you know -- you knew at that time

16  based on your involvement with gunpowder residue

17  testing in other case that if, in fact, he shot

18  that gun the way he described and if, in fact, he

19  didn't wash, for example, the shirt or the coat

20  that he was wearing, there might well be large

21  amounts of gunpowder remaining on that garment?

22         MS. PERSICO:  Form.

23         THE WITNESS:  I did not know that, no.

24         BY MR. BRUSTIN:

25         Q.   You didn't know that was a possibility?



1                    Christopher J. Belling

2          MS. PERSICO:  Form.

3          THE WITNESS:  I did not know that all those

4     potential possibilities were out there, no.

5          BY MR. BRUSTIN:

6          Q.   All right.  It sounds like one thing we

7     can agree on for sure is that you don't recall

8     having any discussion with any police officers

9     concerning potential forensic testing on Mr. Scott.

10         A.   Right.  Mr. Scott showed up wearing

11    absolute fresh out-of-the-box clean clothes based

12    on my observations of him.  So, yeah, no, I had no

13    discussions about any other clothes.

14         Q.   Did you look at him for that reason, to

15    see if there might be something he was wearing that

16    could be tested?

17         MS. PERSICO:  Form.

18         THE WITNESS:  No, I looked at him because I

19    looked at him.  That's -- saw who he was.

20         BY MR. BRUSTIN:

21         Q.   Did you look at his shoes?

22         MS. PERSICO:  Form.

23         THE WITNESS:  I don't recall looking at his

24    shoes.

25         BY MR. BRUSTIN:



1                    Christopher J. Belling

2          Q.   All right.   But you remember being

3    struck by how new his clothes were?

4          A.   Yes.

5          Q.   Are you suggesting that they bought him

6    these clothes as a reward?

7          MS. PERSICO:   Form.

8          THE WITNESS:   I have no idea where his

9    clothes came from.

10         BY MR. BRUSTIN:

11         Q.   Why was it striking that he was wearing

12   very clean clothes?

13         A.   Because that was just, you know, item

14   number 72 on the list of bizarre things with him

15   showing up to confess on a street corner to the

16   news media dressed in a brand new flat-brimmed hat

17   and a brand-spanking-new white T-shirt.

18         Q.   Yeah, what I'm asking you about is why

19   is it unusual?   It doesn't strike me as unusual.

20   I'm trying to find out what you thought was unusual

21   about it.

22         A.   Because he's showing up to confess to a

23   murder, and he's apparently dressed up to do it.

24         Q.   So what you viewed as a new hat and a

25   clean or new T-shirt --



1                    Christopher J. Belling

2          A.    Right.

3          Q.    -- you thought was dressed up?

4          A.    I thought was dressed up to show up to

5    confess to a murder, yes.

6          Q.    That he was wearing a T-shirt and a

7    hat?

8          A.    A bright white T-shirt and a

9    flat-brimmed hat, yes.

10         Q.    Okay.  Now, one of the things you told

11   the students at Georgetown was that Lamarr Scott

12   was not charged with perjury because he went to the

13   Grand Jury and retracted his lying statements,

14   correct?

15         A.    Yes.

16         MS. PERSICO:  Form.

17         BY MR. BRUSTIN:

18         Q.    And you also told them that effectively

19   that eliminated him as a witness in Valentino

20   Dixon's criminal trial.

21         MS. PERSICO:  Form.

22         THE WITNESS:  Well, it certainly --

23         MS. PERSICO:  Are you asking what he said to

24   them or his -- or are you asking him a question?

25         MR. BRUSTIN:  First of all, I'm asking what



1                    Christopher J. Belling

2     he said to them.

3          THE WITNESS:  I did say that to them.

4          BY MR. BRUSTIN:

5          Q.   And that's true, correct?  You knew

6     that?

7          MS. PERSICO:  Form.

8          THE WITNESS:  Actually, I wasn't thinking

9     that far down the road when he was at the Grand

10    Jury, but in retrospect, that's the case.

11         BY MR. BRUSTIN:

12         Q.   Okay.  And obviously the same is true

13    for Leonard Brown and Mario Jarmon.

14         MS. PERSICO:  Form.

15         BY MR. BRUSTIN:

16         Q.   By prosecuting them for perjury, they

17    were worthless as witnesses to Mr. Dixon, correct?

18         A.   No, I don't agree with that.  I think

19    that with an appropriate application from defense

20    counsel, they probably could have still testified

21    and that wouldn't have come out.

22         Q.   Did you think that that might be a

23    hindrance to their willingness to testify in

24    Mr. Dixon's criminal trial, the fact that you were

25    prosecuting them for perjury?



```
 1                   Christopher J. Belling

 2          MS. PERSICO:  Form.

 3          THE WITNESS:  I don't know what they

 4   considered.

 5          BY MR. BRUSTIN:

 6      Q.   You haven't considered that?

 7      A.   No.

 8      Q.   I think I may have asked you this, but

 9   I just want to make sure.  Did you ever have any

10   discussion with any of the officers concerning why

11   Aaron Jackson or other witnesses who were

12   interviewed after Mr. Scott came forward weren't

13   shown photo arrays with Mr. Scott in them?

14          MS. PERSICO:  Form.

15          MR. RUSS:  Objection to form.

16          THE WITNESS:  I know some witnesses were.  I

17   don't know who they all were.

18          BY MR. BRUSTIN:

19      Q.   Okay.  What I can tell you from the

20   records is that there is a note in the file, an

21   undated note, of Fred Stencil and one other person

22   being showing photo arrays of Lamarr Scott but no

23   police reports whatsoever of anyone being shown

24   photos of Lamarr Scott.  Do you have an explanation

25   for that?
```



```
 1                  Christopher J. Belling
 2          A.   Of Fred Stencil and who being showed
 3    photos of who?
 4          Q.   Fred Stencil and --
 5          A.   And Robert Lewis.
 6          Q.   And Robert Lewis.
 7          A.   Being showed a photo array with Lamarr
 8    Scott in it.
 9          Q.   Being shown two photo arrays.  One
10    was -- there's a note of Robert Lewis and Fred
11    Stencil being shown two photos -- photo arrays, one
12    with Valentino Dixon and one with Lamarr Scott, and
13    according to the note making no identification.
14          A.   Okay.
15          MS. PERSICO:  Whose note is that?
16          THE WITNESS:  It's my note.
17          MS. PERSICO:  Okay.
18          BY MR. BRUSTIN:
19          Q.   And it's undated?
20          A.   I don't remember it that well, but I
21    remember seeing it.
22          Q.   Okay.  I can represent to you it's
23    undated, and you don't remember when it happened?
24          A.   No.
25          Q.   Okay.  It may have been months after
```



1                    Christopher J. Belling

2    the shooting, correct?

3         A.    Could have been.

4         Q.    And do you have any explanation as to

5    why there are no police reports of any witness

6    being shown photo arrays of Lamarr Scott?

7         MR. RUSS:  Objection to form.

8         THE WITNESS:  I do not know.

9         BY MR. BRUSTIN:

10        Q.    And you don't recall having any

11   discussions with any officers about that?

12        A.    No.

13        Q.    Including Aaron Jackson?

14        A.    Aaron Jackson is not a police officer.

15        Q.    Including -- showing -- no discussions

16   with police officers concerning their failure to

17   show Aaron Jackson a photo array with Lamarr Scott?

18        MS. PERSICO:  Form.

19        THE WITNESS:  Yeah, I don't recall

20   discussing that with anybody.

21        BY MR. BRUSTIN:

22        Q.    All right.  So let's take a look at

23   page -- in the police file, page 155.

24        A.    Oh, at the BPD COMP number, okay.

25        Q.    Yes.



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                             308

```
1                    Christopher J. Belling

2          A.    155.  Okay.  BPD COMP 0155.

3          Q.    Actually, this is the wrong page.

4    Sorry about that.  Let's take a look at page 185.

5          A.    Okay.

6          MS. PERSICO:  COMP 185?

7          MR. BRUSTIN:  Yes.

8          THE WITNESS:  COMP 185.  A P-73 from Mark

9    Stambach reflecting --

10         MR. BRUSTIN:  Interaction with Aaron

11   Jackson.

12         THE WITNESS:  Okay.

13         BY MR. BRUSTIN:

14         Q.    And, first of all, you understood based

15   on this report and others that the initial

16   identification by Aaron Jackson of Valentino Dixon

17   was tentative?

18         A.    That's what this report reflects.

19         Q.    And you did not receive any information

20   from any police officer or any other report

21   contradicting that; fair to say?

22         MS. PERSICO:  Form.

23         MR. RUSS:  Objection to form.

24         THE WITNESS:  From the police, I don't know.

25   I don't think so.
```



1                     Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.    Okay.   In other words, the police

4     reported to you consistently that the initial

5     viewing of a photo of Valentino Dixon by Aaron

6     Jackson resulted in only a tentative

7     identification, correct?

8          MS. PERSICO:   Form.

9          THE WITNESS:   This report reflects that.

10         BY MR. BRUSTIN:

11         Q.    All right.   And you don't recall the

12    police telling you anything inconsistent with this

13    report, correct?

14         MS. PERSICO:   Form.

15         THE WITNESS:   Not that I recall.

16         BY MR. BRUSTIN:

17         Q.    Do you recall receiving any information

18    from any source inconsistent with this report?

19         MS. PERSICO:   Form.

20         THE WITNESS:   Well, eventually talking to

21    Aaron Jackson, he told me that he was sure it was

22    Valentino, but that's not from the police.

23         BY MR. BRUSTIN:

24         Q.    Did he tell you that he was certain

25    when he had looked at the photo array?



1                    Christopher J. Belling

2          A.    I don't remember.

3          Q.    Did he tell you when he became certain

4   it was Valentino Dixon?

5          A.    I don't remember that either.

6          Q.    Did he tell you it had anything to do

7   with anything the police said to him?

8          A.    I don't remember anything like that.

9          Q.    Certainly the police never disclosed to

10  you anything they said or did with Aaron Jackson to

11  change his identification from a tentative

12  identification to a certain identification,

13  correct?

14         A.    Correct.

15         MR. RUSS:  Objection to form.

16         BY MR. BRUSTIN:

17         Q.    Now, what investigation did you

18  conduct, if any, into whether Aaron Jackson or

19  Torriano Jackson had a gun the night of the

20  homicide?

21         MS. PERSICO:  Form.

22         THE WITNESS:  Interviewed the witnesses in

23  regard to the Grand Jury presentation to see if

24  anybody said they saw Torriano or Aaron Jackson

25  with a gun.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Okay.  So sometime months later you

4    asked some witnesses about that?

5          MS. PERSICO:  Form.

6          THE WITNESS:  Well, November, and then

7    December, and then January.

8          BY MR. BRUSTIN:

9          Q.   Which witnesses did you ask?

10         A.   Any witnesses I could get to come in

11   and talk to me who claimed to know about that.

12         Q.   Well, tell me one.

13         A.   Emil Adams, Travis Powell.

14         Q.   Did you document those interviews where

15   they told you that -- you asked them if Torri

16   Jackson or Aaron Jackson had weapons and they said

17   no?

18         A.   I haven't seen notes that I did, so I

19   presume I didn't.

20         Q.   Are you aware of any investigation that

21   was conducted by the BPD into whether or not Aaron

22   Jackson or Torri Jackson had a gun that night?

23         A.   I am not aware of any.

24         Q.   All right.  Now, one of the things that

25   you would agree, I take it, is -- from your



```
 1                    Christopher J. Belling
 2   experience as a prosecutor is that oftentimes
 3   well-meaning witnesses are notoriously bad at
 4   describing how many shots were fired?
 5         A.   I could not agree with that.
 6         MR. RUSS:  Objection to form.
 7         BY MR. BRUSTIN:
 8         Q.   It hasn't been your experience that
 9   oftentimes witnesses in traumatic situations like
10   shootings misremember how many shots were fired?
11         A.   That has not been my experience.
12         MR. RUSS:  Objection to form.
13         BY MR. BRUSTIN:
14         Q.   Your experience has been typically
15   witnesses remember exactly how many shots were
16   fired?
17         MS. PERSICO:  Form.
18         THE WITNESS:  My experience has been they
19   testify to what they testify to.  I didn't keep
20   score of who got the number of shots right and who
21   got it wrong.
22         BY MR. BRUSTIN:
23         Q.   But you certainly -- you certainly
24   evaluate the reliability and credibility of
25   witnesses that you call, correct?
```



1                    Christopher J. Belling

2          A.   Yes.

3          Q.   And my question is:  In your

4    experience, have you noticed in general that

5    witnesses who you believe are otherwise telling the

6    truth often are mistaken about the number of shots

7    that were fired?

8          MS. PERSICO:  He's answered that question.

9          MR. RUSS:  Objection to form.

10         THE WITNESS:  And the answer is no, I have

11   never made any observation like that.

12         BY MR. BRUSTIN:

13         Q.   All right.  In fact, best you can

14   recall, that never happened?

15         MS. PERSICO:  That is not what the testimony

16   was, and you've asked him that question three

17   times.  He's not going to give you the answer you

18   want.  You may just move on.

19         MR. BRUSTIN:  That's exactly the answer I

20   want.

21         BY MR. BRUSTIN:

22         Q.   Has it been your experience then that

23   generally people are pretty reliable about how many

24   shots were fired and how many they heard?

25         MS. PERSICO:  Object to form.



1                   Christopher J. Belling

2          THE WITNESS:  I'm trying to think of cases

3    where that mattered, and I can't even think of any.

4          BY MR. BRUSTIN:

5          Q.   It certainly didn't matter in this

6    case, correct?

7          MS. PERSICO:  Form.

8          THE WITNESS:  Well, it was certainly

9    mentioned in this case, but in the long run, it

10   wasn't a particularly pivotal issue.

11         BY MR. BRUSTIN:

12         Q.   One of the reasons you mentioned to the

13   Georgetown students as to why you determined that

14   Aaron Jackson and Torri Jackson didn't have a gun

15   is because Leonard Brown and Mario Jarmon described

16   more than one shot, correct?

17         MS. PERSICO:  Form.

18         THE WITNESS:  Leonard --

19         MR. RUSS:  Objection to form.

20         THE WITNESS:  Mario Jarmon said that one of

21   the Jacksons shot him three times which was a

22   physical impossibility, so that was of

23   significance.

24         BY MR. BRUSTIN:

25         Q.   In other words, what was significant to



1                    Christopher J. Belling

2   you was that based on the physical evidence you

3   were told that there was only one shot that could

4   have been fired by that gun, correct?

5            A.   If that gun was fired at all, yes.

6            MS. PERSICO:   Form.

7            BY MR. BRUSTIN:

8            Q.   If it was fired at all, it was fired

9   once?

10           A.   Correct.

11           Q.   And so the fact that he said it was

12  three times when it was only one time was highly

13  significant to you?

14           MS. PERSICO:   Form.

15           THE WITNESS:   It was significant to me.

16           BY MR. BRUSTIN:

17           Q.   So this was a case where a -- a witness

18  saying the wrong number of shots was significant?

19           MS. PERSICO:   Form.

20           THE WITNESS:   No, this is a case where a

21  witness who had an interest in the outcome, namely

22  was a friend of Valentino's, was saying something

23  that was demonstrably untrue.

24           BY MR. BRUSTIN:

25           Q.   So that's something that you determined



1                  Christopher J. Belling

2   wasn't a mistake when he said three shots versus

3   one shot.  You determined that it was a

4   fabrication?

5          MS. PERSICO:  Form.

6          THE WITNESS:  It was the conclusion that the

7   evidence versus what he said brought me to, sure.

8          BY MR. BRUSTIN:

9          Q.   The fact that he said three shots when

10  the evidence showed it was only one shot?

11         MS. PERSICO:  Form.

12         THE WITNESS:  At best it was one shot, if it

13  was any.

14         BY MR. BRUSTIN:

15         Q.   Well, the physical evidence certainly

16  allowed for one shot, correct?

17         MS. PERSICO:  Form.

18         THE WITNESS:  Correct, it allowed for it.

19         BY MR. BRUSTIN:

20         Q.   All right.  Now, you talked about going

21  to visit Antoine Shannon in Kentucky, correct?

22         A.   I did go to visit him in

23  Campbellsville, Kentucky.

24         Q.   And the reason you went there, you

25  said, is because you knew the BPD wouldn't have



1            Christopher J. Belling

2   authorized detectives to go there?

3            MS. PERSICO:  Form.

4            THE WITNESS:  Well, the District Attorney at

5   the time suggested strongly that he was a loose end

6   who should be interviewed, and I knew the BPD

7   wouldn't spring for it.

8            BY MR. BRUSTIN:

9            Q.   Well, how did you get the BPD to spring

10   for them going to Michigan to get Emil Adams?

11            A.   They had no option.  They had to do

12   that.

13            Q.   But the only reason you went to

14   interview Antoine Shannon in person is because you

15   knew that BPD wouldn't do it?

16            A.   I suspected BPD wouldn't do it, and the

17   DA told me to do it.

18            Q.   All right.  Now, do you deny trying to

19   persuade -- withdrawn.

20            First of all, did you tape-record the

21   interview with Antoine Shannon?

22            A.   No.

23            Q.   Did you take notes at that interview?

24            A.   No, not that I remember.

25            Q.   And you said you were with the DA at



1                  Christopher J. Belling

2    the time, correct?

3         A.    Correct.

4         Q.    At that time in 1991, was it the

5    practice of the DEA investigators to create reports

6    of witness interviews they conduct?

7         A.    No, not necessarily.

8         Q.    Sometimes?

9         A.    I suppose there would be circumstances

10   when you'd ask an investigator to go out and

11   interview a witness and bring back a report on what

12   was said, but there was no policy in regard to

13   that.

14        Q.    Okay.  Did the investigator that you

15   brought with you to Kentucky take notes?

16        A.    Not that I'm aware of.

17        Q.    Did he create a report?

18        A.    No.

19        Q.    Do you deny trying to persuade Antoine

20   Shannon not to say that Valentino was innocent?

21        MS. PERSICO:  Form.

22        THE WITNESS:  Do I -- triple negative.  Do I

23   deny trying to persuade not to --

24        BY MR. BRUSTIN:

25        Q.    It was a bad question.  It was a bad



1              Christopher J. Belling

2   question.  Let me ask you a different question.  Do

3   you deny trying to get Antoine Shannon to recant

4   his statement saying that Valentino Dixon was not

5   the shooter?

6        MS. PERSICO:  Form.

7        THE WITNESS:  No, he gave the statement to

8   me.

9        BY MR. BRUSTIN:

10       Q.   During that interview did you try to

11  get him to recant that statement?

12       A.   No.

13       Q.   If he's saying that, he's lying or

14  mistaken, correct?

15       A.   Yes.

16       MS. PERSICO:  Form.

17       BY MR. BRUSTIN:

18       Q.   Do you deny telling Mr. Shannon that

19  you knew he was getting pressure from the family

20  and that's why he was giving this false statement?

21       MS. PERSICO:  Form.

22       THE WITNESS:  I have no recollection of ever

23  having said anything like that.  That doesn't make

24  sense in the context in which we were at this point

25  but -- yeah, I didn't say that.



1                        Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   It certainly doesn't make sense if you

4    weren't trying to convince him to change his story,

5    right?

6          A.   True.

7          MS. PERSICO:   Form.

8          BY MR. BRUSTIN:

9          Q.   And you deny doing that, right?

10         A.   True.

11         Q.   And according -- do you deny repeatedly

12   during that interview trying to get Mr. Shannon to

13   admit that Mr. Dixon's family put him up to lying?

14         MS. PERSICO:   Form.   Wait a minute, I can't

15   even process that question.

16         BY MR. BRUSTIN:

17         Q.   Mr. Shannon --

18         A.   The answer is that never happened.   I

19   took his statement.   I wrote it out as he told it

20   to me.

21         Q.   All right.   And you never -- you never

22   once, let alone numerous times, tried to convince

23   him that he was lying because of pressure from

24   Valentino's family, correct?

25         A.   No, I just took his statement.



1                  Christopher J. Belling

2          Q.    And do you deny that Mr. Shannon told

3    you that Torriano Jackson had a gun?

4          A.    No, I think it's in his statement.

5          Q.    All right.  Have you ever been -- have

6    you ever been accused of prosecutorial misconduct

7    other than in this case?

8          A.    Other than what?

9          Q.    In this case.

10         A.    I don't remember ever having been.

11         Q.    To the best of your recollection, you

12   never were?

13         A.    Yes.

14         Q.    All right.  What about -- what about

15   the Anitha Ubiles case?

16         MS. PERSICO:  Can you spell that?

17         THE WITNESS:  Anitha Ubiles, not that I

18   recall.  That was a simple straight-up murder.

19         MR. BRUSTIN:  Okay.  Do you --

20         MS. PERSICO:  Do you mind spelling that?

21         MR. BRUSTIN:  Yeah.  I think it's

22   A-N-I-T-H-A, U-B-I-L-E-S.

23         THE WITNESS:  That's correct.

24         BY MR. BRUSTIN:

25         Q.    And this was a case where Miss Ubiles



1              Christopher J. Belling

2  was charged with arson and murder for killing her

3  husband's pregnant girlfriend and their two sons,

4  correct?

5          A.   Correct.

6          Q.   And although the conviction was upheld,

7  do you recall the Court of Appeals rebuking you for

8  your contemptuous comments to the jury, their

9  words, including that she invoked her right to an

10 attorney?

11         MS. PERSICO:  Form.  Do you have that case?

12         MR. BRUSTIN:  I don't.

13         THE WITNESS:  I don't recall either that

14 happening during the trial or the Court of Appeals'

15 decision.

16         BY MR. BRUSTIN:

17         Q.   Okay.  Certainly if that ever happened,

18 you weren't made aware of it, to the best of your

19 knowledge?

20         MS. PERSICO:  I'm sorry, can you just be

21 clear?

22         BY MR. BRUSTIN:

23         Q.   If you -- if you were rebuked, as I

24 just described, for contemptuous comments to the

25 jury by the Court of Appeals, the Appellate



1                     Christopher J. Belling

2    Division --

3          A.   Which is it?

4          Q.   I think it's the Appellate Division,

5    sorry.

6          A.   Okay.

7          MS. PERSICO:  Do you have the cite?

8          MR. BRUSTIN:  I don't have the cite with me,

9    but I'm reading from -- I'm quoting from a

10   newspaper article around the time.

11         BY MR. BRUSTIN:

12         Q.   Do you -- would it be fair to say that

13   if that had been in a decision from the Appellate

14   Division, that's something you'd remember?

15         A.   Might be if it was brought to my

16   attention.

17         MS. PERSICO:  When was that?

18         MR. BRUSTIN:  1985.

19         BY MR. BRUSTIN:

20         Q.   In any case, you have no recollection

21   of it?

22         A.   No.

23         Q.   While I'm looking for this --

24         A.   You know -- no, never mind.  I was

25   trying to think of the Ubiles case.



1                    Christopher J. Belling

2           MS. PERSICO:  Wait for a question.

3           BY MR. BRUSTIN:

4           Q.   I should have told you outright in the

5    beginning.  If at any time you have a clearer

6    memory of anything, please put it on the record.

7           Okay.  So one of the other things you told

8    the Georgetown students was that there was

9    communication after Mr. Dixon's trial between the

10   judge and a juror concerning a mistake being made

11   at the trial.

12          So, first of all, do you remember saying

13   that to the Georgetown students?

14          A.   No, they said that to me as I recall.

15          Q.   All right.  Did you recall a

16   conversation between the judge and a juror about

17   the validity of the conviction?

18          A.   No.

19          Q.   You have no recollection whatsoever?

20          A.   No, never heard that.

21          Q.   No recollection of a juror expressing

22   doubt to the judge and the judge telling the juror

23   in substance that they had made the right decision?

24          A.   Well, that's been --

25          MR. RUSS:  Objection to form.



```
 1                    Christopher J. Belling
 2          THE WITNESS:  That's been bandied about in
 3    this whole process, but I don't have any direct
 4    knowledge of it.
 5          BY MR. BRUSTIN:
 6          Q.   That's what I'm asking you.  You don't
 7    remember ever hearing anything like that?
 8          A.   No.
 9          Q.   And you were certainly present for
10    those proceedings?
11          MS. PERSICO:  Object to form.
12          THE WITNESS:  No, I wasn't.
13          BY MR. BRUSTIN:
14          Q.   Let me rephrase the question.  Would it
15    be fair to say that to the extent the judge was
16    talking to the jury in the courtroom, you would
17    have been present?
18          A.   Talking to the jury in the courtroom,
19    yes, you're accurate.
20          Q.   All right.  Let's go back to -- let's
21    do this first.  Let's mark this as 35.
22    The following was marked for Identification:
23     EXH. 35              10/9/07 Affidavit of Thomas
24                          Roland (Dixon 5943-45)
25          MR. BRUSTIN:  Just let me know when you're
```



1                    Christopher J. Belling
2   done.
3         MS. PERSICO:  I just have a -- so is this --
4   so this is a statement of Thomas Roland on behalf
5   of Johnnie Lane?
6         MR. BRUSTIN:  Yeah.
7         MR. RUSS:  Thomas who?
8         THE WITNESS:  Thomas Roland, R-O-L-A-N-D.
9         MR. RUSS:  Thank you.
10        MS. PERSICO:  Made an affidavit on behalf of
11  Derrick Brown.
12        THE WITNESS:  And Johnnie Lane, yeah.  Okay.
13        BY MR. BRUSTIN:
14        Q.   So, first of all, are you -- prior to
15  seeing this just now, have you ever been made aware
16  of these allegations against you?
17        A.   No.
18        Q.   Do you recall this case?
19        A.   Yes.
20        Q.   Can you describe the case?
21        A.   The case was called The Tomatoes
22  Pizzeria Murders.  Actually, it was three different
23  cases linked together by a common firearm.  Johnnie
24  Lane and Derrick Brown were the defendants charged
25  in each of those three cases.  Thomas Roland was a



1                    Christopher J. Belling
2    witness.
3         Q.   And I take it you deny the allegations
4    in here against you, correct?
5         A.   Yes.
6         Q.   And specifically you deny coaching this
7    witness --
8         MS. PERSICO:  Which witness do you think
9    this is?
10         MR. BRUSTIN:  This is Mr. Roland.
11         BY MR. BRUSTIN:
12         Q.   You deny coaching Mr. Roland to
13    implicate defendant Johnnie Lane, correct?
14         A.   Correct.
15         MS. PERSICO:  Form.
16         BY MR. BRUSTIN:
17         Q.   And you deny learning from Mr. Lane
18    that he knew nothing about these crimes and
19    covering it up, correct?
20         MS. PERSICO:  Form.
21         THE WITNESS:  I don't think I ever talked to
22    Mr. Lane.
23         BY MR. BRUSTIN:
24         Q.   Mr. Roland, I'm sorry.
25         A.   I --



1                     Christopher J. Belling

2          Q.   You deny -- you deny that Mr. Roland

3    told you he knew nothing and you effectively

4    coerced him into implicating Mr. Lane, you deny

5    that, correct?

6          A.   Certainly, yes.

7          MS. PERSICO:  Form.

8          BY MR. BRUSTIN:

9          Q.   But you would agree that those are the

10   same allegations that we're making against you in

11   this case, correct?

12         MS. PERSICO:  Form.

13         THE WITNESS:  No.

14         BY MR. BRUSTIN:

15         Q.   They're similar.

16         MS. PERSICO:  Form.

17         BY MR. BRUSTIN:

18         Q.   You coerced Mr. Scott into recanting?

19         A.   No.

20         MS. PERSICO:  Form.

21         BY MR. BRUSTIN:

22         Q.   You don't see the similarity in the

23   allegations?

24         A.   I do not.

25         MS. PERSICO:  Form.



```
 1                    Christopher J. Belling
 2         BY MR. BRUSTIN:
 3         Q.    Mr. Lane is accusing you of coercing --
 4   Mr. Roland is accusing you of coaching him into
 5   implicating Mr. Lane, correct?
 6         MS. PERSICO:  Form.  He's already denied
 7   those allegations.
 8         MR. BRUSTIN:  I understand that.
 9         MS. PERSICO:  Well, then don't ask him to
10   say that the allegations are correct.
11         BY MR. BRUSTIN:
12         Q.   Well, I'm asking you to say the
13   allegations are similar, that's all.
14         A.    The allegations are --
15         MS. PERSICO:  Form.
16         THE WITNESS:  -- not similar.
17         BY MR. BRUSTIN:
18         Q.    How are they different?
19         A.    Well, Roland was a witness, not a
20   potential target in the investigation.  And Roland
21   makes --
22         MS. PERSICO:  First of all, we won't --
23         THE WITNESS:  I disagree that they're
24   similar, let's put it at that.
25         MR. BRUSTIN:  Okay.  And please don't stop
```



```
 1                 Christopher J. Belling
 2   him during an answer.
 3         BY MR. BRUSTIN:
 4         Q.   Now, one of the things I've been told
 5   by a number of defense attorneys is that, or my
 6   colleagues have been told, is that one of the
 7   things you would brag about as a prosecutor is that
 8   it's easy to convict a guilty man.  It's really
 9   difficult to convict an innocent man.  Do you
10   remember saying that to any defense attorneys?
11         MS. PERSICO:  Form.
12         THE WITNESS:  No.
13         BY MR. BRUSTIN:
14         Q.   Is that something you remember ever
15   saying?
16         MS. PERSICO:  Form.
17         BY MR. BRUSTIN:
18         Q.   Did those words ever come out of your
19   mouth, to your recollection?
20         MS. PERSICO:  That's a -- how can he answer
21   that question?  Did those words all come out in a
22   sequence?  What are you asking him?
23         BY MR. BRUSTIN:
24         Q.   I'm really -- I think I'm obviously
25   asking about the sequence.  Did you ever say in
```



1                    Christopher J. Belling

2   substance what I just described to you out loud,

3   that it's easy to convict a guilty man but it's

4   difficult to convict an innocent man?

5          MS. PERSICO:  It's easy to convict a guilty

6   man --

7          THE WITNESS:  Yeah, I -- I don't recall

8   saying that.

9          BY MR. BRUSTIN:

10         Q.   Okay.  Do you deny saying that?

11         A.   Yeah, I would say so.

12         Q.   So anybody who would state that you

13  said in words or substance it's easy to convict a

14  guilty man but it's hard to convict an innocent man

15  is either lying or mistaken?

16         MS. PERSICO:  Form.

17         THE WITNESS:  Yes, or misinterpreting the

18  statement.

19         BY MR. BRUSTIN:

20         Q.   Okay.  And you also deny, I think

21  you've already done this but I want to make it

22  clear, you deny ever threatening other witnesses

23  with prosecution the way you prosecuted Mario

24  Jarmon and Leonard Brown for perjury?

25         MS. PERSICO:  Object to the form.



1                    Christopher J. Belling

2         THE WITNESS:  I do deny that.  Again, it's a

3    compound question, but I do deny it.

4         BY MR. BRUSTIN:

5         Q.   You certainly deny using the

6    prosecution of Mario Jarmon and Leonard Brown to

7    convince other witnesses to tell the story that you

8    want them to tell?

9         MS. PERSICO:  Objection to form.

10        THE WITNESS:  That just makes no sense.

11        BY MR. BRUSTIN:

12        Q.   Sure.  Do you ever -- do you deny ever

13   telling, after you prosecuted Mario Jarmon and

14   Leonard Brown for perjury --

15        A.   Right.

16        Q.   -- do you deny ever using that

17   successful prosecution to convince other witnesses

18   in your cases to stick with the version of events

19   that you want?

20        A.   No, never happened.

21        MS. PERSICO:  You mean, in other unrelated

22   matters?

23        MR. BRUSTIN:  Yes.

24        BY MR. BRUSTIN:

25        Q.   Okay.  Okay.  What I'd like you to do,



1              Christopher J. Belling

2  if you don't mind, and I'm going to give you a few

3  minutes to do it, but if you can review -- I'm

4  going to go through my notes while you're doing it

5  and see if I can short-circuit some of this.  If

6  you can take a look at the DA's file and read to

7  yourself your affidavit on page 1716 through 1720.

8  I want to question you about that.

9         MS. PERSICO:  We're ready when you are.

10        BY MR. BRUSTIN:

11        Q.   Okay.  You've had an opportunity to

12  review this?

13        A.   Yes.

14        Q.   All right.  Now, I take it that this

15  wasn't the first case where you utilized

16  information from surveillance done by the Buffalo

17  Police Department intelligence section; fair to

18  say?

19        A.   I honestly don't remember whether I did

20  or not.

21        Q.   Okay.  Fair to say that you understood

22  as evidenced by this affidavit that Valentino Dixon

23  was a well-known drug dealer long before this case?

24        MS. PERSICO:  Form.

25        THE WITNESS:  That's the information I



1              Christopher J. Belling

2    received, yes.

3         BY MR. BRUSTIN:

4         Q.   All right.  Is it your testimony that

5    you did not know anything about Valentino Dixon

6    prior to this case?

7         A.   That's correct, yes.

8         Q.   Not that you don't remember.  It's that

9    you're certain you had no -- you had no knowledge

10   of him whatsoever?

11        A.   I had never heard his name before.

12        Q.   All right.  And how did you access the

13   information that's contained in this affidavit?

14        A.   Another Assistant District Attorney who

15   had two indictment files on Valentino Dixon brought

16   that information to me.

17        Q.   And who was that?

18        A.   Barry Zavah, Z-A-V-A-H.

19        Q.   And you didn't ask for that.  He

20   just -- he volunteered it to you?

21        A.   Yes, I think he did.

22        Q.   Now, are you familiar with any efforts

23   that were conducted, joint efforts by the homicide

24   bureau and the BPD and the prosecutor's office,

25   your section of the prosecutor's office, to



1                     Christopher J. Belling
2    investigate street-level violence and particularly
3    drug-related violence?
4          A.    I am not aware of any such
5    interrelationship or cooperation.
6          Q.    Are you familiar with the term
7    operation crackdown?
8          A.    No.
9          Q.    Or a unit headed by Lieutenant Timothy
10   Scioli who was the commander of the BPD
11   intelligence unit and ADA George Quinlan?  Are you
12   familiar with them?
13         A.    I know both those people, but I don't
14   know what they were doing.
15         Q.    You weren't familiar with an operation
16   that they were conducting to surveil and track drug
17   dealers in Buffalo?
18         A.    No, I was not.
19         Q.    Or a prosecutor named Kevin Kane and
20   his involvement in that effort?
21         A.    I know Kevin Kane, but I don't know
22   anything about his involvement in anything that
23   you're talking about.
24         MR. BRUSTIN:  All right.  Let's take a
25   two-minute break.



1                  Christopher J. Belling

2          THE VIDEOGRAPHER:  Going off the record.

3    The time is 1655.

4          (A recess was then taken at 4:55 p.m.)

5          THE VIDEOGRAPHER:  Back on the record at a

6    time of 1704.

7          BY MR. BRUSTIN:

8          Q.   And I think I read to you your alleged

9    motto incorrectly, so let me give it to you again.

10   Do you deny telling -- stating publicly it takes a

11   good lawyer to get a guilty man off but it takes a

12   great lawyer to convict an innocent one?

13         MS. PERSICO:  Form.

14         THE WITNESS:  I deny saying that.

15         BY MR. BRUSTIN:

16         Q.   And you've also told us that you deny

17   threatening defense witnesses with perjury charges?

18         A.   True.

19         Q.   Do you also deny -- deny threatening

20   defense attorneys with prosecution for witness

21   tampering if they sought to interview witnesses who

22   had participated in police arranged identification

23   procedures?

24         MS. PERSICO:  Form.

25         THE WITNESS:  I would never threaten a



1                    Christopher J. Belling

2     defense lawyer.

3          BY MR. BRUSTIN:

4          Q.   Well, I'm trying to explain very

5     specific.  Do you deny threatening any defense

6     lawyers for attempting to speak to witnesses who

7     have participated in identification procedures?

8          MS. PERSICO:  Form.

9          THE WITNESS:  I deny that.

10         BY MR. BRUSTIN:

11         Q.   Now, do you recall telling the

12    Georgetown students that the fact that Leonard

13    Brown and Mario Jarmon were indicted put the

14    defense in a compromised position in the Valentino

15    Dixon prosecution?

16         MS. PERSICO:  Form.

17         THE WITNESS:  I do not remember specifically

18    saying that, no.

19         BY MR. BRUSTIN:

20         Q.   But you agree with that, correct?  You

21    knew that?

22         MS. PERSICO:  Form.

23         THE WITNESS:  As I said in the perjury

24    trial, it's not necessarily true.  I -- so I would

25    say no.



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              338

```
 1                    Christopher J. Belling
 2          BY MR. BRUSTIN:
 3          Q.   Do you deny telling the students on
 4    tape for everyone to see that Brown and Jarmon
 5    couldn't testify because their lawyers would never
 6    allow it?
 7          MS. PERSICO:  Form.
 8          THE WITNESS:  Well, that's something
 9    different, and I did say that to the students.
10          BY MR. BRUSTIN:
11          Q.   And you meant that, right?
12          MS. PERSICO:  Form.
13          THE WITNESS:  I assumed that their lawyers
14    would be difficult about that.
15          BY MR. BRUSTIN:
16          Q.   No defense lawyer in their right mind
17    would allow it, correct?
18          MS. PERSICO:  Form.
19          THE WITNESS:  I have no idea what defense
20    lawyers in their right minds or wrong minds would
21    do.
22          BY MR. BRUSTIN:
23          Q.   Well, you did, because you said to the
24    students that they wouldn't allow it, right?
25          MS. PERSICO:  Form.
```



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   You were happy to tell them that.

4          MS. PERSICO:  Form.

5          THE WITNESS:  The two things do not match,

6    so I can't answer that.

7          BY MR. BRUSTIN:

8          Q.   Two things don't match.  You understood

9    that when you prosecuted Brown and Jarmon, it was

10   unlikely that their defense lawyers, regardless of

11   who they were, would allow them to testify at

12   Valentino Dixon's trial, correct?

13         MS. PERSICO:  Form.

14         THE WITNESS:  I suspected that could occur.

15         BY MR. BRUSTIN:

16         Q.   Do you recall testifying in the perjury

17   trial that when Leonard Brown testified at the

18   Grand Jury he appeared to be -- to you to be

19   nervous and jittery?

20         A.   Yes, I do recall testifying to that in

21   the perjury trial.

22         Q.   And, in other words, you were

23   testifying that based on your observations of him

24   during the Grand Jury testimony, you believed he

25   was lying?



1                   Christopher J. Belling

2        A.    No.   I believed he was nervous and

3   jittery.

4        Q.    You understood the purpose of that

5   testimony would suggest that he was lying, correct?

6        MS. PERSICO:   Form.

7        THE WITNESS:   I was asked a question.   I

8   gave an answer.

9        BY MR. BRUSTIN:

10       Q.    Never gave it a thought as to what it

11   meant?

12       A.    I was a witness at that time.   I

13   testified as best I could in regard to answering

14   the question.

15       Q.    Just a regular old witness in that

16   case?

17       A.    Yes.

18       Q.    And when you testified about him being

19   nervous and jittery, you hadn't discussed that with

20   Mr. Sedita, that might be a good question to ask?

21       MS. PERSICO:   Form.

22       THE WITNESS:   No.

23       BY MR. BRUSTIN:

24       Q.    How did it come up?

25       MS. PERSICO:   Form.



1                    Christopher J. Belling

2           THE WITNESS:  Mr. Sedita asked it.

3           BY MR. BRUSTIN:

4           Q.   In fact, is it your testimony that the

5      first time he asked about what Leonard Brown looked

6      like on the Grand Jury stand or during the Grand

7      Jury was on the stand at the perjury trial?

8           MS. PERSICO:  Form.

9           THE WITNESS:  I don't recall when the first

10     time he asked me about that was.

11          BY MR. BRUSTIN:

12          Q.   How would he ever know to ask that if

13     you hadn't told him about it?

14          MS. PERSICO:  Form.

15          THE WITNESS:  I have no idea.  Frank's a

16     very good lawyer, very thorough.

17          BY MR. BRUSTIN:

18          Q.   Well, Sedita wasn't present at the

19     Grand Jury to see Leonard Brown testify, correct?

20          A.   I don't think he was, no.

21          MS. PERSICO:  Form.

22          BY MR. BRUSTIN:

23          Q.   The fact that he was nervous and

24     jittery didn't show up on the transcript, right?

25          MS. PERSICO:  Form.



```
 1                     Christopher J. Belling

 2          THE WITNESS:  I think I might have mentioned

 3   it, that he looked nervous, but I don't know.  I

 4   don't know precisely.

 5          BY MR. BRUSTIN:

 6          Q.   Okay.  In any case, the first time you

 7   remember being asked about it was on the stand in

 8   the perjury trial?

 9          A.   Yes.

10          Q.   Do you remember any meetings occurring

11   in around December of 1990 -- 1989 between senior

12   aides in the DA's office and Mr. Dillon and BPD

13   concerning drug violence?

14          MS. PERSICO:  I think you just asked that

15   question.  Form.

16          THE WITNESS:  No.

17          BY MR. BRUSTIN:

18          Q.   Certainly you were a senior aide to

19   Mr. Dillon in 1989, correct?

20          MS. PERSICO:  Form.

21          THE WITNESS:  Among many, yes.

22          BY MR. BRUSTIN:

23          Q.   Among how many?

24          A.   Well, higher than me would have been

25   whoever was the chief of special investigations at
```



1                      Christopher J. Belling

2   the time, chief of Grand Jury at the time, the

3   first assistant DA, the chief of appeals.  They

4   were all higher than me so --

5          Q.   All those people were higher than you

6   in 1989?

7          A.   Yeah.

8          Q.   And that would be the same in 1991?

9          A.   Yes.

10         Q.   How many homicide prosecutors were

11  there in 1991?

12         A.   Four.

13         Q.   How many total prosecutors were there

14  in 1990 -- in 1991?

15         A.   Ballpark, 90.  It fluctuated with

16  grants and things like that, but in the range I

17  would think of 90.

18         Q.   All right.  And you were about fourth

19  in command, does that sound about right?

20         A.   Probably more fifth or sixth.

21         MR. BRUSTIN:  I think that's all I have

22  right now.  I may have some follow-ups depending on

23  what other lawyers ask you, if anything.

24         MS. PERSICO:  Could we just take another

25  two-minute break?  Hugh, do you have questions?



1               Christopher J. Belling

2          MR. RUSS:  I do.  Not many.  A few.

3   Certainly less than five minutes.

4          MS. PERSICO:  All right.

5          MR. RUSS:  Can you start, though, by opening

6   up in front of Mr. Belling --

7          MS. PERSICO:  Can we start by just letting

8   me take a facilities break for two minutes?

9          MR. BRUSTIN:  Hugh, what do you want?  I can

10  do it.  Tell me what you want.

11         MR. RUSS:  Yeah, sure.  Take a break, yeah.

12         THE VIDEOGRAPHER:  Going off the record at a

13  time of 1712.

14         (A recess was then taken at 5:12 p.m.)

15         THE VIDEOGRAPHER:  Back on the record at a

16  time of 1714.

17                     EXAMINATION

18      BY MR. RUSS:

19      Q.   Okay.  Thank you.  Mr. Belling, much

20  earlier today you gave testimony concerning being

21  woken up at like 3 in the morning and coming into

22  the homicide office and Lamarr Scott was there.  Do

23  you recall that testimony?

24      A.   Yes, I do.

25      Q.   And I believe you indicated that



1                 Christopher J. Belling

2   Detective Stambach was the detective on duty, so to

3   speak?

4          A.   He's the person that called me in who I

5   met when I got to police headquarters.

6          Q.   Okay.  I know we've already put Exhibit

7   2 in front of you.  Can you turn to page BPD 0200.

8          MR. BRUSTIN:  0200?  Oh, 200, sorry.

9   Gotcha.  You mean 200, right?

10         MR. RUSS:  Yes.  I just wanted to be as

11  precise as you've been all day.

12         MR. BRUSTIN:  All right.  I'm just trying to

13  find it.

14         THE WITNESS:  Yeah, I've got it.

15         BY MR. RUSS:

16         Q.   Okay.  So page 200 appears to be a P-73

17  authored by Detective Stambach concerning that

18  night in the homicide bureau; is that correct?

19         A.   That is correct.

20         Q.   Is this one of the documents that you

21  reviewed prior to testifying today?

22         A.   I have reviewed it, yes.

23         Q.   And does that P-73 accurately describe

24  what transpired that night?

25         A.   In general terms, yes.



1                    Christopher J. Belling

2          Q.   You were asked some questions

3    concerning task forces and whether there were task

4    forces.  It's been alleged in this case both

5    verbally and in writing that the DA's office and

6    the Buffalo Police Department had a list of

7    criminals they wanted to take off the street.  Have

8    you ever heard anything like that?

9          A.   I saw it in the complaint here, but I

10   haven't heard anything about it other than that.

11         Q.   Did the DA's office have a -- Buffalo

12   Police Department have a list of criminals that

13   they wanted to take off the street on or about

14   1991?

15         A.   Not that I was aware of.

16         Q.   And was the DA's office acting with the

17   Buffalo Police Department actively trying to find

18   this list of criminals to indict them for anything?

19         MR. BRUSTIN:  Objection to form.

20         THE WITNESS:  As far as I know, there was no

21   such list.  That's all I can say.

22         BY MR. RUSS:

23         Q.   I forgot the page, but in this exhibit

24   was the criminal complaint against Valentino Dixon.

25   Do you remember that?



1                    Christopher J. Belling

2          A.   I know it existed, yes.

3          MR. BRUSTIN:  I think it's 80 if you want

4    it.

5          THE WITNESS:  No, that's the arrest booking

6    form, but it's in the neighborhood.

7          MS. PERSICO:  I think it's 82.

8          THE WITNESS:  It's 82, Hugh.

9          BY MR. RUSS:

10         Q.   Okay.  And on the complaint which is

11   page 82, does it give a brief description of the

12   crimes for which Valentino Dixon was charged?

13         A.   It does.

14         Q.   And is that a document that would have

15   been prepared by your office, that is, the DA's

16   office, or by the Buffalo Police Department?

17         A.   It would have been prepared by the

18   Buffalo Police Department report technicians in

19   so-called central booking.

20         Q.   Do you and the DA's office have any

21   input into what goes into a criminal complaint?

22         A.   In general, no.

23         Q.   Do you remember whether you had any

24   input into what went into this specific criminal

25   complaint?



1                    Christopher J. Belling

2          A.   I did not.

3          Q.   You did not have input?

4          A.   I did not have input.  This -- yeah, I

5   did not have input into this document.

6          MR. RUSS:  That's all I have.  Thank you.

7          MS. PERSICO:  Thank you.

8          MR. BRUSTIN:  I have a few follow-up, unless

9   you have anything.

10         MS. PERSICO:  Do you want to do it now?  Why

11  don't you go now, and then I'll finish up.

12         MR. BRUSTIN:  Well, no, you should finish,

13  and then I'll follow.

14                    EXAMINATION

15         BY MS. PERSICO:

16         Q.   Mr. Belling, on the -- I think you have

17  the right booklet exhibit here, so can I ask you --

18         MR. BRUSTIN:  Can I stop for one minute,

19  just so I know for planning purposes, do you have

20  more than a few minutes?

21         MS. PERSICO:  Like maybe ten minutes.  Are

22  you late for your flight?

23         MR. SOTO-BRITO:  No.

24         BY MS. PERSICO:

25         Q.   Can you turn, Mr. Belling, to BPD COMP



1                    Christopher J. Belling

2    0186, please, and just take a look at that

3    document.

4         A.   0186, okay.

5         Q.   Just read that over, and let me know

6    when you're done.

7         A.   Okay.  I've read it, 0186.

8         Q.   Okay.  And then I'm going to ask you to

9    turn to what we were just looking at, which is BPD

10   COMP 200.

11        MR. BRUSTIN:  200?

12        MS. PERSICO:  Yes.

13        THE WITNESS:  200, okay.  I've got that.

14        BY MS. PERSICO:

15        Q.   Okay.  And I think as Mr. Russ was

16   questioning you, does document 200 reflect the fact

17   that you got a call in the middle of the night to

18   come down to look at the tape of Lamarr Scott

19   confessing and review Leonard Brown and Lamarr

20   Scott's statements?

21        A.   Yes.  That's what 200 is about.

22        Q.   And so you went down there that night,

23   right?

24        A.   Correct.

25        Q.   And just flip back to 186.  Would you



1                    Christopher J. Belling

2  also have reviewed the document at BPD COMP 186,

3  the notes?

4          A.    If it existed at the time.  I would

5  have if it was there.  I don't know if it was there

6  or not.

7          Q.    Okay.  So you went down to -- you went

8  down to headquarters and watched Lamarr Scott's

9  video confession and read both his and Leonard

10  Brown's statements; is that correct?

11          MR. BRUSTIN:  Objection to form.

12          THE WITNESS:  That is correct.

13          BY MS. PERSICO:

14          Q.    And you then made a determination as I

15  think when Mr. Brustin was questioning you that

16  Lamarr Scott's confession was not credible and that

17  both he and Leonard Brown should be released that

18  evening; is that correct?

19          A.    Well, yeah, in general terms, yeah.

20          Q.    Did that mean that the investigation

21  with regard to the shooting of Torriano Jackson was

22  concluded?

23          A.    Nowhere near.  It meant that there was

24  a lot more to do in that investigation.

25          Q.    And there were -- so just so that --



```
1                    Christopher J. Belling
2   I'm not sure, and if you guys covered this before I
3   arrived, I apologize, but we did go through since
4   I've been here quite a bit of the Buffalo Police
5   Department investigation, and we discussed -- I
6   think briefly touched upon the Grand Jury process.
7         But I just wanted to have you briefly tell
8   the record how the Grand Jury comes about and what
9   its function is.
10        A.   The --
11        Q.   In a -- you know, in a minute.
12        MR. BRUSTIN:   Objection to form.
13        THE WITNESS:   The Grand Jury is a body that
14  in New York State law must hear every felony charge
15  to determine whether it should be indicted.
16  There's 23 citizens.  The District Attorney's
17  office coordinates the presentation of evidence to
18  the Grand Jury.  An Assistant District Attorney
19  questions the witness.
20        And after the witnesses are questioned, the
21  Assistant District Attorney advises the Grand Jury
22  about the applicable law for the charge that's
23  before it, and the Grand Jury votes.  Some counties
24  do it in a different order, but that's what's done
25  in Erie County.
```



1                    Christopher J. Belling

2          BY MS. PERSICO:

3          Q.   And that's the way it was done in

4    connection with this case?

5          A.   Correct.

6          Q.   And in preparation for your

7    presentation of the case to the Grand Jury, you

8    reviewed the witness statements and Buffalo Police

9    Department file?

10         A.   Yes.

11         Q.   And that means you would have reviewed

12   the statement taken of Valentino Dixon?

13         A.   Yes.

14         Q.   And you would have reviewed the

15   statement of Lamarr Scott?

16         A.   Correct.

17         Q.   And both of those documents would have

18   been important in your mind in assessing the case

19   going up into the Grand Jury?

20         MR. BRUSTIN:  Objection to form.

21         THE WITNESS:  Yes, I think so.

22         BY MS. PERSICO:

23         Q.   So you then eventually presented this

24   case to the Grand Jury beginning in November of

25   1991; is that correct?



1                    Christopher J. Belling

2          A.    That is correct.

3          Q.    And on November 6th of 1991 you

4   presented to the Grand Jury the following

5   witnesses:  Aaron Jackson, John Sullivan III, and

6   Travis Powell; is that correct?

7          A.    Yeah.  I haven't seen the transcript

8   recently, but I have no doubt that, you know, those

9   are the people that testified that day.

10         Q.    Okay.  And then on November 20th of

11  1991 Michael Bland testified; is that correct?

12         A.    Correct.

13         Q.    Now, at that time there was no -- there

14  was no vote at the Grand Jury.  There was no

15  indictment.  There were further proceedings that

16  continued in January of 1992; is that correct?

17         A.    That is correct.

18         Q.    And I think -- I'm going to try and use

19  the exhibits that we've already talked about today,

20  so just bear with me for a second.  I'm just

21  looking for the Antoine Shannon statement and the

22  letter to Donovan, and I think those are probably

23  in the DA file.

24               So we talked quite a bit earlier about the

25  fact that you went to -- in preparation for putting



1              Christopher J. Belling

2    the case in the Grand Jury in November of 1991, you

3    went to Campbellsville, Kentucky, and took a

4    statement from Antoine Shannon?

5         A.    Correct.

6         Q.    And then we looked at what is COE1686.

7    I apologize if it's not the same as what was in the

8    files we looked at today.  And that was a letter

9    you wrote to Chief Donovan listing additional

10   investigations that you would like to have seen

11   happen; is that right?

12        MR. BRUSTIN:  Objection to form.

13        THE WITNESS:  Right.  That's a November 22nd

14   letter which lists seven things that I asked them

15   to look into.

16        BY MS. PERSICO:

17        Q.    So, in fact, even though you had

18   already had the Grand Jury convened in November, at

19   that time you still wanted additional investigation

20   done; is that correct?

21        MR. BRUSTIN:  Objection to form.

22        THE WITNESS:  Yes.

23        BY MS. PERSICO:

24        Q.    And what did that do to your Grand Jury

25   proceedings?



1                  Christopher J. Belling

2          A.    Well, it caused the Grand Jury to go

3    into what we call holdover mode.  The Grand Jury

4    sits officially for one month and then has to vote,

5    and a judge has to authorize them to be held over

6    to hear evidence to complete the cases that they

7    opened up in that first month.

8          Q.    And so in this case you had the Grand

9    Jury hold over until the next January at which time

10   you presented Mario Jarmon, Leonard Brown, Lamarr

11   Scott, Emil Adams, Fred Stencil, and Robert Lewis;

12   is that correct?

13         A.    Correct.

14         Q.    And a number of those witnesses who

15   testified in January were -- were not, as

16   Mr. Brustin was calling it earlier, were not going

17   to testify to the story that, using air quotes

18   here, you wanted to tell.  In fact, they were going

19   to say that Valentino Dixon did not do the

20   shooting; is that correct?

21         MR. BRUSTIN:  Objection to form.

22         THE WITNESS:  Well, I didn't really know

23   what Lamarr Scott was going to do other than the

24   representations his attorney, John Molloy, had made

25   to me, and I honestly didn't know what Brown and



1                 Christopher J. Belling
2    Shannon would do either -- Brown and Jarmon would
3    do either until we got in there and what happened
4    happened.
5           BY MS. PERSICO:
6           Q.   So the Grand Jury could have come back
7    and said Valentino Dixon -- they could have
8    no-billed you, right, and said Valentino Dixon was
9    not the shooter?
10          MR. BRUSTIN:   Objection to form.
11          THE WITNESS:   They could have, yes.
12          BY MS. PERSICO:
13          Q.   And so in connection with your
14   preparation for the Grand Jury, you reviewed all
15   the statements that we talked about of all those
16   witnesses, right?
17          A.   Yes.
18          Q.   And you read Valentino Dixon's
19   statement?
20          A.   Yes.
21          Q.   And Valentino Dixon's statement does
22   not indicate anywhere on it that Lamarr Scott was
23   the shooter, does it?
24          A.   It does not.
25          Q.   Had Valentino Dixon said in his



1                    Christopher J. Belling

2   statement when he was arrested that Lamarr Scott

3   was the shooter, would that have changed your

4   evaluation of Lamarr Scott's confession?

5             MR. BRUSTIN:  Objection to form.

6             THE WITNESS:  It would have changed the

7   tenor of the case significantly.

8             BY MS. PERSICO:

9        Q.   And during the -- during the ensuing

10  investigation, Mr. Dixon had a lawyer, correct?

11       A.   Correct.

12       Q.   And there came a time, as I think we

13  talked about with Mr. Brustin, wherein you were

14  instrumental in getting Mr. Scott an attorney?

15       A.   Correct.

16       Q.   Why did you do that?

17            MR. BRUSTIN:  Objection to form.

18            THE WITNESS:  Because he had confessed to a

19  murder, and he was going to be asked to testify in

20  the Grand Jury and he was going to be asked to

21  execute a waiver of immunity in order to testify,

22  and all of those things left the clear and obvious

23  conclusion that he needed a lawyer to advise him.

24            BY MS. PERSICO:

25       Q.   And so you -- you, as I think we looked



1                    Christopher J. Belling

2    at in your affidavit and as you testified to,

3    brought him over and Judge McCarthy appointed John

4    Molloy to be his attorney.  You sent the letter to

5    John Molloy, and let me back that up a little bit.

6         Has that happened in other cases in your

7    experience, where you have been instrumental in

8    getting an unrepresented person counsel before they

9    go to the Grand --

10        A.   Yes.

11        MR. BRUSTIN:  Objection to form.  Sorry.

12        THE WITNESS:  It's happened many times.

13        BY MS. PERSICO:

14        Q.   And is the speed with which the

15   assigned counsel gets in touch with their client --

16   well, that's a bad question.  Strike that.

17        There was some discussion about the fact

18   that the letter to Mr. Molloy was dated the 9th and

19   then there was a subsequent conversation that you

20   had with him on the 10th.  In your experience, is

21   it unusual that there be a very short amount of

22   time in between assigned counsel communicating with

23   their client pre-Grand Jury and then further

24   communicating with you?

25        MR. BRUSTIN:  Objection to form.



1                    Christopher J. Belling

2          THE WITNESS:  It is not unusual.

3          BY MS. PERSICO:

4          Q.   So the mere fact that Mr. Molloy got in

5    touch with his client either on the 9th when he was

6    appointed as counsel or on the 10th, that was

7    not -- that didn't stand out in this particular

8    case?

9          MR. BRUSTIN:  Objection to form.

10         THE WITNESS:  It was not unusual.

11         BY MS. PERSICO:

12         Q.   And once Mr. -- once Mr. Scott had

13   Mr. Molloy as an attorney, would there ever have

14   been an opportunity for you to be with Mr. Scott

15   without the presence of his lawyer?

16         MR. BRUSTIN:  Objection to form.

17         THE WITNESS:  There wasn't such an

18   opportunity, and it wouldn't have been appropriate

19   to do that.

20         BY MS. PERSICO:

21         Q.   Right.  You understand as a -- as a

22   practicing attorney that you are not permitted to

23   communicate directly with represented people?

24         A.   Correct.

25         Q.   And so in this case once -- once



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                              360

1                    Christopher J. Belling

2    Mr. Molloy was assigned to represent Mr. Scott, you

3    didn't have any individual conversations with

4    Mr. Scott alone?

5              A.    Correct.

6              Q.    And you really didn't know what he was

7    going to say in terms of his Grand Jury testimony?

8              MR. BRUSTIN:  Objection to form.

9              THE WITNESS:  No.  That's why I asked him to

10   sign the waiver of immunity, because I didn't want

11   to be in a position where he admitted to killing

12   and obtained transactional immunity.

13             BY MS. PERSICO:

14             Q.    So can you just briefly explain

15   transactional immunity?

16             A.    Well, in New York State the concept of

17   transactional immunity means that if you testify in

18   the Grand Jury about a criminal event, a robbery, a

19   murder, a rape, you receive immunity from any

20   transaction around that event except for perjury.

21   So if Lamarr Scott had gone in and said as he did

22   in his original statement to the police, yup, I did

23   it, I shot Torriano Jackson with a machine gun in

24   the middle of the street, he would have been

25   immunized from prosecution in regard to that



 1                    Christopher J. Belling

 2  charge.

 3           Q.   And had you not gotten him an attorney

 4  and he had -- and he had gone in there and said

 5  that, obviously he would have been immunitized --

 6  wait.  That's not -- you know what I mean, I don't

 7  know if you can spell that properly, but on the

 8  flip side, had you had him sign a waiver of

 9  immunity without counsel, what would the impact of

10  that have been?

11           A.   I -- I don't know that I've ever done

12  that.  I expect litigation would have ensued, but I

13  don't know exactly his -- the form that we use says

14  you got a lawyer and your lawyer's sitting here

15  with you, so I don't know how you'd get to that

16  point, and I don't think I ever did it.

17           Q.   It's so out of the norm that your forms

18  didn't account for someone signing a waiver of

19  immunity without a lawyer?

20           MR. BRUSTIN:  Objection to form.

21           THE WITNESS:  Correct.

22           MS. PERSICO:  I think that's just about all

23  I have.  So if, Nick, you want to jump in.

24                    FURTHER EXAMINATION

25           BY MR. BRUSTIN:



1                   Christopher J. Belling

2          Q.    Just a few follow-ups.   Let me start

3     backwards with where you left off.   You would

4     agree, Mr. Belling, that at least as a matter of

5     ethics you were free to talk to Mr. Scott between

6     August 12th and when you got him an attorney just

7     before the Grand Jury, correct?

8          A.    I would not have been comfortable doing

9     that, because I don't think it would be ethical.

10    He at that point had implicated himself in an

11    extremely serious crime and, therefore, our roles

12    would have been in conflict.

13         Q.    So you thought -- at a minimum it's a

14    gray area as to whether or not you could have

15    talked to him?

16         MS. PERSICO:   Form.

17         THE WITNESS:   At least a gray area.

18    Probably more.

19         BY MR. BRUSTIN:

20         Q.    Okay.  And was it permissible in your

21    view once he came in and confessed for the police

22    to talk to him at that point, if he was voluntarily

23    talking?

24         A.    For the police to talk to him some more

25    after they already talked to him?



1              Christopher J. Belling

2         Q.   Yes.  If he wanted to.

3         A.   Again, I wouldn't have wanted to run

4    that Huntley hearing, but I think that the law --

5    it would probably have been a lighter gray area.

6         Q.   All right.  But if you had -- if you

7    had clearly warned him that he had a right to an

8    attorney and he chose not to speak to an attorney,

9    you were free to speak to him, correct?

10        A.   I could have, I could have.

11        Q.   Nothing preventing you that under the

12   ethics rules that you're aware of, correct?

13        A.   I don't think it would have been

14   proper, and I wouldn't have done it.

15        Q.   All right.  Well, that's a different

16   issue, but, now, it sounds like what you just said

17   on cross-examination from your attorney is that

18   when you got Mr. Scott a lawyer, all you were

19   trying to do was to protect him, correct?

20        A.   Trying to protect his rights.

21        Q.   That was all that was in your mind, is

22   protecting Mr. Scott's rights?

23        A.   Well, and by protecting Mr. Scott's

24   rights enabled the investigation of the killing of

25   Torriano Jackson to proceed.



1              Christopher J. Belling

2       Q.   And as a secondary matter it sounds

3  like what you're saying is, in addition to

4  protecting his rights, you also wanted to protect

5  your ability to get a conviction against Valentino

6  Dixon, correct?

7       A.   No, I wanted to protect the ability of

8  the investigation in the Grand Jury to be resolved

9  uncompromised.

10      Q.   You were completely objective.  You

11 wanted truth and justice to be served.  You had no

12 ulterior motive in getting him a lawyer.  It was

13 all about protecting everybody's rights, correct?

14      MR. RUSS:  Objection to form.

15      THE WITNESS:  Yes, that's true.

16      BY MR. BRUSTIN:

17      Q.   Not about getting a conviction against

18 Valentino Dixon?  That never crossed your mind?

19      A.   It was not about getting a conviction

20 of Valentino Dixon.

21      Q.   All right.  What would have changed,

22 how would the tenor have changed if Valentino Dixon

23 had told you when he came in and voluntarily gave a

24 statement that Lamarr Scott did it?  How would that

25 have changed the tenor of the investigation?  What



```
 1                 Christopher J. Belling
 2   would have happened?
 3        A.   Well, then the police should have gone
 4   out and looked for Lamarr Scott and attempted to
 5   get his version of these events, and presuming they
 6   found Lamarr Scott, they would have gotten whatever
 7   version he was going to tell them when they got
 8   him, and that may have been something that impacted
 9   the eventual outcome of the case.
10        Q.   I'm not understanding.  Lamarr Scott
11   came in on his own and volunteered a confession?
12        A.   Correct.
13        Q.   So what would have changed in regard to
14   the quality or scope of the investigation?
15        A.   If we were looking for Lamarr Scott
16   because he was implicated in this case, that's
17   different than Lamarr Scott coming forward at the
18   behest of Valentino Dixon's family and saying I did
19   it.  That's the thing that makes it incredible.
20        Q.   Ah, and so that's what -- that's what
21   caused you to do less investigation?
22        MS. PERSICO:  Form.
23        THE WITNESS:  I don't know what -- the
24   police did the investigation.
25        BY MR. BRUSTIN:
```



1                    Christopher J. Belling

2          Q.    All right.  And, again, when you say

3     when he came forward at the behest of Valentino

4     Dixon's family, all you mean is they took him to

5     give the statement, correct?

6          MS. PERSICO:  Form.

7          THE WITNESS:  Well --

8          MR. RUSS:  Objection to form.

9          BY MR. BRUSTIN:

10         Q.    In other words -- let me withdraw the

11    question.

12         You never received a scintilla of proof,

13    evidence, that Valentino Dixon's parents did

14    anything improper in regard to Lamarr Scott,

15    correct?

16         A.    No.

17         MR. RUSS:  Objection to form.

18         THE WITNESS:  That's not true.

19         BY MR. BRUSTIN:

20         Q.    What evidence did you receive that they

21    did?

22         A.    In the Grand Jury Lamarr Scott

23    testified that Valentino Dixon's parents put him up

24    to the statement.

25         Q.    I'm sorry, what I meant to say was:



```
 1              Christopher J. Belling
 2  Prior to your objective Grand Jury, your
 3  truth-seeking Grand Jury, is there anything -- any
 4  piece of evidence that you're aware of actually
 5  implicating Lamarr Scott's parents in doing
 6  anything wrong with Lamarr Scott?
 7         MS. PERSICO:  Not Lamarr Scott.
 8         MR. RUSS:  Objection to form.
 9         MR. BRUSTIN:  No, Lamarr Scott.
10         THE WITNESS:  You're talking about Valentino
11  Dixon's parents.
12         MS. PERSICO:  You mean, Valentino Dixon's
13  parents.
14         BY MR. BRUSTIN:
15         Q.   Valentino Dixon.  Let me do the
16  question again.  Prior to the Grand Jury, did you
17  receive a single piece of information or evidence
18  that Valentino Dixon's parents did anything
19  improper with Lamarr Scott?
20         MR. RUSS:  Objection to form.
21         THE WITNESS:  The answer is yes.  I was told
22  the night that I came down there, which I think was
23  the early morning hours of the 12th of August, that
24  the -- Robert Bryant and Annie Shannon had brought
25  Lamarr to the street corner, arranged for the news
```



1                    Christopher J. Belling

2    media to interact, and then arranged for the police

3    to interact with that whole thing.

4         BY MR. BRUSTIN:

5         Q.   Anything else?

6         A.   No, I didn't have anything else that I

7    remember.

8         Q.   And all of that would have been

9    consistent with Lamarr Scott confessing to them and

10   them encouraging him to come forward, correct?

11        MR. RUSS:  Objection to form.

12        THE WITNESS:  No.

13        BY MR. BRUSTIN:

14        Q.   Explain -- explain what I'm missing in

15   my logic.

16        A.   If Lamarr Scott said to anybody on the

17   street, including the parents, that he had

18   committed this crime, the appropriate thing to do

19   is call 911 and let the police in on it.  Trying to

20   leverage this into a media event is where it became

21   really remarkably transparent to me that this guy

22   was being put up to make this statement by

23   Valentino's parents.

24        Q.   Do you think -- let's assume Valentino

25   Dixon is innocent, like the current conviction



1              Christopher J. Belling

2    states.  Assuming Valentino Dixon didn't do the

3    shooting and he was in jail and arrested for doing

4    the shooting, would it make sense that Valentino

5    Dixon's parents -- who, by the way, didn't live on

6    the street -- would it make sense that they might

7    be concerned about simply going to the police and

8    not having the protection of making a statement on

9    the record -- I mean, in the media?  Would that

10   make sense to you?

11         MS. PERSICO:  Form.

12         MR. RUSS:  Objection to form.

13         THE WITNESS:  No.

14         BY MR. BRUSTIN:

15         Q.   Would it make sense that Valentino

16   Dixon's parents might not trust the police given

17   that he had been arrested for a crime he didn't

18   commit, assuming that to be true?

19         MR. RUSS:  Objection to form.

20         THE WITNESS:  It doesn't ring true to me,

21   no.

22         BY MR. BRUSTIN:

23         Q.   Okay.  And you would agree that lots of

24   people in Buffalo didn't trust the police or the

25   prosecutors, right?



1            Christopher J. Belling

2          MR. RUSS:  Objection to form.

3          THE WITNESS:  I would not agree with that, no.

4          BY MR. BRUSTIN:

5          Q.   No?  It wasn't your experience that a

6    lot of black people in particular didn't trust the

7    police?

8          MS. PERSICO:  Form.

9          THE WITNESS:  I don't know that to be true

10   or not.

11         MR. RUSS:  Objection to form.

12         BY MR. BRUSTIN:

13         Q.   And would you expect that one way to

14   protect against police misconduct would be to make

15   sure that the statement was on the news so you

16   could never take it back?

17         MS. PERSICO:  Form.

18         THE WITNESS:  That could be one motive for

19   doing it the way it was done.

20         BY MR. BRUSTIN:

21         Q.   But you had determined that night that

22   that wasn't the motive, correct?

23         A.   That was my belief at that time.

24         Q.   And that's been your belief since that

25   day?



```
 1              Christopher J. Belling
 2        A.    True.
 3        Q.    All right.  Take a look at 186, police
 4   file.
 5        A.    In which file?
 6        Q.    Police file.  And I just want to make
 7   one point clear, that I think it is, but I want to
 8   make sure that it is from you.  So my
 9   understanding, because there's been a little
10   confusion in some of the reports, is that Lamarr
11   Scott came -- came forward to the press late on
12   August 11th, 1991, correct?
13        A.    That's what the reports indicate, and I
14   recall that it was sometime around the time of the
15   11 o'clock news.
16        Q.    All right.  And then the interview in
17   your presence at the department was very early in
18   the morning on the 12th?
19        A.    There was no interview in my presence.
20        Q.    I'm sorry, the interview of Lamarr
21   Scott and your coming to the precinct happened very
22   early in the morning on the 12th?
23        A.    The police interview of Lamarr Scott
24   happened very early on the 12th, and my coming to
25   the precinct also happened very early on the 12th.
```



1                    Christopher J. Belling

2          Q.    Okay.  Now take a look at page 82.

3          A.    82?  I thought you said 186.

4          Q.    I did.  We're done with that now.  Page

5    82 now, because you're going to need it.

6          A.    82, the complaint?

7          Q.    No, I don't -- oh, I'm sorry, yeah, one

8    quick question on 82.  I think you talked something

9    about a unit that would prepare this?

10         A.    Correct.

11         Q.    But you understood that the information

12   in this document all came from Detective Stambach,

13   correct?

14         MR. RUSS:  Objection to form.

15         THE WITNESS:  It came from the police

16   investigation obviously, because the report

17   technicians don't know what to write in here if

18   they don't get it from somebody else.

19         BY MR. BRUSTIN:

20         Q.    Well, does the fact that Stambach

21   signed this indicate that he provided this

22   information?

23         A.    He has to sign it.  He's the charging

24   officer.

25         MR. RUSS:  Objection to form.



1                    Christopher J. Belling

2          BY MR. BRUSTIN:

3          Q.   Does it indicate that the substance,

4     the text in the body here, is from Detective

5     Stambach?

6          MR. RUSS:  Objection to form.

7          THE WITNESS:  That's the general information.

8          BY MR. BRUSTIN:

9          Q.   All right.  Now take a look at page

10    200.  And I hadn't noticed this, but it appears

11    that the description of what you did in this

12    document is different than what you talked about on

13    my direct examination, and in particular it says:

14    ADA Belling talked with Lamarr Scott and a

15    polygraph was set up for him.  At this time ADA

16    Belling requested that both Brown and Scott be let

17    go to return to their homes.

18          Maybe I'm reading this wrong, but this

19    suggests that you conducted an interview with

20    Lamarr Scott where you talked about things,

21    including a polygraph.  Did I miss -- did I misread

22    this?

23          A.   You're misreading it or they miswrote

24    it, because that didn't happen.

25          Q.   So you deny talking to Lamarr Scott



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                             374

1                        Christopher J. Belling

2    about a polygraph?

3          A.    You are correct, I did not.

4          Q.    And you deny -- and, frankly, you were

5    certainly free -- is it true that you made a

6    decision to let them go?

7          A.    I -- they asked me should we arrest

8    Lamarr Scott, and my answer was no, you're just

9    going to complicate this thing, we got to sort it

10   out, don't arrest anybody at this point.

11         Q.    Okay.  But your testimony is that you

12   did not interview Lamarr Scott in regard to making

13   that decision, correct?

14         A.    Correct.

15         Q.    Why not?

16         A.    Because, as I've said, I didn't want to

17   be in a position of testifying at my own Huntley

18   hearing.

19         Q.    And you certainly could have directed

20   additional questioning by the officers that you

21   observed, correct?

22         A.    The statement was already complete.  I

23   suppose I could have done many things.  This is

24   what I did.

25         Q.    So you reviewed the statement and you



1                   Christopher J. Belling
2    determined that it was invalid, correct, he didn't
3    commit this crime?
4          A.   No, I determined that there were issues
5    with the statement that needed more inquiry.
6          Q.   Okay.  But you certainly were free, and
7    you've done this before, I take it, to ask the
8    officers after reviewing the statement to conduct a
9    follow-up interview of Lamarr Scott, correct?
10         MS. PERSICO:  Form.
11         THE WITNESS:  I don't recall ever doing
12   that.  There was nothing that was stopping me from
13   doing it.
14         BY MR. BRUSTIN:
15         Q.   Okay.  And you could have observed it?
16         A.   Yeah, I suppose I could have.
17         Q.   And that wouldn't jeopardize your
18   ability to prosecute the case, correct?
19         A.   It could have.  Advocate witness rule.
20   I could have -- it could have been a problem.
21         Q.   If you stood through a two-way mirror
22   and observed an interview of a suspect?
23         MS. PERSICO:  Form.
24         THE WITNESS:  I don't know that there was a
25   two-way mirror, but it -- I would not have been



1              Christopher J. Belling

2   comfortable doing it, no.

3         MR. BRUSTIN:  Okay.  That's all I have.

4         MS. PERSICO:  I have one quick follow-up.

5         MR. BRUSTIN:  Mo's got to go, come on.

6         MS. PERSICO:  I know.  I'll be quick.  I

7   promise.  I'm sorry, Mo.

8                 FURTHER EXAMINATION

9         BY MS. PERSICO:

10        Q.   Mr. Belling, I'm showing you what has

11   been marked COE2411, and that is a statement of --

12        A.   Leonard Brown.

13        Q.   For expediency purposes, that's a

14   statement of Leonard Brown who came to the police

15   station on the same night that Lamarr confessed; is

16   that correct?

17        A.   It is.

18        Q.   And you testified earlier that you

19   reviewed that in connection -- in assistance with

20   your evaluation of Lamarr's confession and your --

21   your determination that Valentino Dixon's parents

22   may have been involved.  Can you turn to the second

23   page of that statement, please.

24        A.   Okay.

25        Q.   COE2412, and can you -- can you read



1              Christopher J. Belling

2  this highlighted -- well, actually -- you don't get

3  the highlighted version, but you'll be able to

4  follow along.  It's COE24 --

5         MR. BRUSTIN:  Why don't you read it, then

6  I'll look at it.

7         THE WITNESS:  I had forgotten this.  Right

8  in Leonard Brown's statement --

9         BY MS. PERSICO:

10        Q.   Just read this highlighted portion

11 starting at the first space there.

12        A.   It says:  My father, stepfather, talked

13 to Tino in jail, and he got us all together and had

14 us call the deuce.

15        Q.   And then can you read that next section

16 there.

17        A.   What is your relationship to Tino,

18 Valentino Dixon.  He's my half-brother.  We got the

19 same father.

20        Q.   And then you'll see three other

21 highlighted sections there.  Could you just read

22 the questions and the answers.

23        A.   Do you know where Lamarr was when he

24 called Channel 2 News.  Yes, he was at 63 Fay

25 Street, my house.  Who else was at your house when



1              Christopher J. Belling

2  he called.  My father, Robert Bryant, my mother,

3  Anne Shannon, and my brother, Antoine, and then

4  Channel 2 stated that they called 893-1497.  Whose

5  phone number is that.  That's my mother's phone

6  number, Anne Shannon.

7          Q.   And Anne Shannon at --

8          A.   Oh, at 63 Fay Street.

9          Q.   And that would have been one of the

10  documents that you reviewed in evaluating whether

11  or not Mr. Scott's confession was credible?

12          A.   Correct.

13          Q.   And whether or not Mr. Dixon's parents

14  were at least tangentially involved in that?

15          MR. BRUSTIN:  Object to form.

16          THE WITNESS:  Correct.

17          MS. PERSICO:  That's all I have.

18                  FURTHER EXAMINATION

19          BY MR. BRUSTIN:

20          Q.   Every single thing that you just read

21  is consistent with Lamarr Scott committing the

22  crime, admitting it to the family, and the family

23  making efforts to bring the truth out; isn't that

24  true, sir?

25          MS. PERSICO:  Form.



1                  Christopher J. Belling

2          MR. BRUSTIN:  Potentially.

3          THE WITNESS:  Well, potentially true is --

4   is a little hard.  I would say no, it's not.

5          BY MR. BRUSTIN:

6          Q.   It's outlandish?

7          A.   I would say it demonstrates Valentino's

8   family putting their finger on the scale trying to

9   get a result.

10         Q.   Even assuming that Lamarr Scott

11  committed -- withdrawn.

12         So Lamarr Scott coming to them or Valentino

13  Dixon telling them that Lamarr Scott committed the

14  crime and Lamarr Scott admitting it and then trying

15  to get him to come forward is outlandish?

16         MS. PERSICO:  Form.

17         THE WITNESS:  No, it's manipulative of the

18  system.

19         MR. BRUSTIN:  Okay.  I think that's --

20  that's a good place to end.

21         MS. PERSICO:  Okay.  Thanks.

22         THE VIDEOGRAPHER:  This concludes today's

23  video deposition.  The time is 1754.

24         (Deposition concluded at 5:54 p.m.)

25                  *    *    *



CHRISTOPHER J. BELLING                                          April 11, 2023
DIXON V. CITY OF BUFFALO                                              380

```
 1
 2   STATE OF NEW YORK)
 3                      ss:
 4   COUNTY OF ERIE   )
 5
 6        I DO HEREBY CERTIFY as a Notary Public in and
 7   for the State of New York, that I did attend and
 8   report the foregoing deposition, which was taken
 9   down by me in a verbatim manner by means of machine
10   shorthand.  Further, that the deposition was then
11   reduced to writing in my presence and under my
12   direction.  That the deposition was taken to be
13   used in the foregoing entitled action.  That the
14   said deponent, before examination, was duly sworn
15   to testify to the truth, the whole truth and
16   nothing but the truth, relative to said action.
17
18
19
20                    JOAN M. METZGER-HUBBELL,
                      CM, Realtime Reporter,
21                    Notary Public.
22
23
24
25
```



```
 1
 2                  DEPOSITION ERRATA SHEET
 3   Our Assignment No.  J9466053
 4   Case Caption:  VALENTINO DIXON
 5   vs.  CITY OF BUFFALO, et al.
 6      DECLARATION UNDER PENALTY OF PERJURY
 7        I declare under penalty of perjury
 8   that I have read the entire transcript of
 9   my Deposition taken in the captioned matter
10   or the same has been read to me, and
11   the same is true and accurate, save and
12   except for changes and/or corrections, if
13   any, as indicated by me on the DEPOSITION
14   ERRATA SHEET hereof, with the understanding
15   that I offer these changes as if still under
16   oath.
17   _____
18           CHRISTOPHER J. BELLING
19   Subscribed and sworn to on the _____ day of
20   _____, 20____ before me,
21   _____
22   Notary Public,
23   in and for the State of _____
24
25
```



800.211.DEPO (3376)
EsquireSolutions.com

CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                              382

```
 1
 2                    DEPOSITION ERRATA SHEET
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25             CHRISTOPHER J. BELLING
```



```
 1
 2              DEPOSITION ERRATA SHEET
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25              CHRISTOPHER J. BELLING
```



CHRISTOPHER J. BELLING                                      April 11, 2023
DIXON V. CITY OF BUFFALO                                               384

```
 1
 2                        INDEX TO EXHIBITS
 3    Exhibit              Description                    Page
 4     EXH. 30        excerpt of Dixon DA file              43
 5     EXH. 31        excerpt of Christopher                86
                      Belling perjury testimony
 6
 7     EXH. 32        compilation of Jarmon and            168
                      Brown perjury file
 8                    documents
 9     EXH. 33        9/17/18 Answering Affidavit          242
                      of DA Heraty (Dixon
10                    4226-35)
11     EXH. 34        article headed Chemist               294
                      Tells of Tests After
12                    Gladden Slaying
13     EXH. 35        10/9/07 Affidavit of Thomas          325
                      Roland (Dixon 5943-45)
14
15
16   * Exhibits retained by Mr. Brustin.
       Copies of exhibits supplied to all counsel.
17
18
19
20
21
22
23
24
25
```



CHRISTOPHER J. BELLING                          April 11, 2023
DIXON V. CITY OF BUFFALO                               385

```
 1
 2                    INDEX TO WITNESSES
 3    Witness              Examination              Page
 4     CHRISTOPHER J.     BY MR. BRUSTIN              4
       BELLING
 5                        BY MR. RUSS               344
 6                        BY MS. PERSICO            348
 7                        BY MR. BRUSTIN            361
 8                        BY MS. PERSICO:           376
 9                        BY MR. BRUSTIN            378
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

