```
 1                    Robert J. Bryant, Jr.
 2   I'm going to do that?
 3        Q.   So -- so presumably the police were
 4   taking people to the police station to give
 5   statements, correct?
 6        A.   Yes.
 7        MR. BRUSTIN:  Object to the form.
 8        THE WITNESS:  Yes.  Yes.
 9        BY MR. SAHASRABUDHE:
10        Q.   Did you notice that Lamarr Scott was
11   put in handcuffs when he was put in the back of the
12   police car?
13        A.   Yes, oh, he definitely was.
14        Q.   Was Leonard Brown put in handcuffs?
15        A.   All they did was make Leonard Brown sit
16   is the back of the cruiser.  They didn't handcuff
17   him.
18        Q.   Did you see anyone besides Lamarr Scott
19   put in handcuffs?
20        A.   Nobody but Lamarr.
21        Q.   So in other words, the person who had
22   just admitted to committing the crime was put in
23   handcuffs and put in the back of the police car
24   almost immediately after he admitted --
25        A.   Well, no.
```



```
 1                    Robert J. Bryant, Jr.
 2          Q.   -- to being the killer.
 3          MR. BRUSTIN:  Object to the form.
 4          THE WITNESS:  They didn't let him finish.
 5   They just snatched him from in front of the cameras
 6   and threw him in the car.  They wouldn't even let
 7   Wanda Stark finish her interview with him.
 8          BY MR. SAHASRABUDHE:
 9          Q.   He -- he was in handcuffs, though.
10          A.   Oh, yeah, they -- when they -- they put
11   him in handcuffs in the back of the police cruiser.
12          Q.   And again, no other -- no other
13   individual who the police took to headquarters was
14   in handcuffs.
15          A.   No.
16          Q.   This is a little bit random.  Earlier
17   you talked about a private investigator you were
18   working with, and you couldn't remember his name.
19          A.   Oh, man.  I don't remember his name.
20   So many years.
21          Q.   Could his name have been Roger Putnam?
22          A.   Roger Putnam, I definitely talked with
23   him, but -- I remember Roger because I hired -- I'm
24   the one that hired Roger to help.
25          Q.   Right.
```



```
1                    Robert J. Bryant, Jr.
2           A.   But I remember -- did he pass away?  Is
3    he still alive?
4           Q.   I believe's passed away.  I don't know
5    for a fact, but I just want to know if that was the
6    person --
7           MR. BRUSTIN:  He's still alive.
8           THE WITNESS:  Yeah.
9           MR. SAHASRABUDHE:  Is he?  Okay.
10          BY MR. SAHASRABUDHE:
11          Q.   So I think J.P. cleared this up, but
12   you were never made aware from anyone, whether it
13   was Leonard or whether it was Antoine Shannon,
14   where the murder weapon was, correct?
15          MR. BRUSTIN:  Object to the form.
16          THE WITNESS:  But I think -- I think that
17   Leonard may have had it afterwards.  But -- okay.
18   I'm saying this because they -- okay.
19          I went by there, and I said, "Where's the
20   gun?"  I went by Leonard and his girlfriend house.
21   I said, "Where's that gun that was used in that
22   shooting last night?"
23          And they lied to me.  I think they lied to
24   me.  I think Leonard or one of his friends may have
25   had it afterwards, but I can't -- I mean, that's
```



```
 1                Robert J. Bryant, Jr.
 2   just me -- my assumption, because I remember one
 3   thing Leonard -- I remember one thing Leonard
 4   saying that -- I asked him where the gun was, and I
 5   think he said that his -- his father at the time --
 6   his father, older guy, you know, his
 7   grandmother's -- his step-grandfather threw it away
 8   down the gutter.
 9         But I kind of believe that was a lie that he
10   was telling me, but I couldn't tell him, "Are you
11   lying or what," you know?
12         Because that didn't sound right, but --
13         BY MR. SAHASRABUDHE:
14         Q.   So you've testified a couple times that
15   no matter what, you wanted the person who committed
16   the crime to come forward to the police and admit
17   to what they had done, correct?
18         A.   Right.
19         Q.   Do you feel the same --
20         MR. BRUSTIN:  Object to the form.
21         BY MR. SAHASRABUDHE:
22         Q.   Do you feel the same way about the gun?
23   Had you known where the gun was, would you have
24   tried to persuade the person who had the gun to
25   come forward and give it to the police to assist
```



1                    Robert J. Bryant, Jr.

2    with their investigation?

3            MR. BRUSTIN:  Object to the form.

4            THE WITNESS:  I would have persuaded Lamarr

5    or Tino or anybody that still had that -- that

6    murder weapon to turn it in, but in the

7    circumstances I couldn't -- I couldn't ask anybody,

8    because I had nobody on my side.

9            The -- the -- the kids were just like

10   immature, just out there in the street.  There's a

11   mess of them in the Buffalo streets in the '90s,

12   and I couldn't go to the police.  I go to the

13   police, they don't care about me.

14           And then trying to convict my artist son,

15   which I told him to go down on Allen Street and

16   open up a shop with his artworks and stuff like

17   that.  So you think he going to go down messing

18   around with some art with what he can get with that

19   crowd -- that crowd that he got mixed up with?  No.

20           BY MR. SAHASRABUDHE:

21           Q.   So -- so kind of just directing you

22   back to the question, you might have tried to

23   persuade whoever had the gun to bring it forward to

24   the police if you had known who had the gun?

25           MR. BRUSTIN:  Object to the form.



```
 1              Robert J. Bryant, Jr.
 2         THE WITNESS:  Yes.  Not persuade.  If I
 3    could have got the gun, I could have called the
 4    police myself and told them the gun is -- like
 5    Mr. Terranova tried for me to do, the gun is there
 6    or whatever, so on, so on, because that killed
 7    somebody.
 8         BY MR. SAHASRABUDHE:
 9         Q.   But you never knew for sure where the
10    gun was or who --
11         A.   Never knew --
12         Q.   You never knew for sure where the gun
13    was or who had the gun.
14         A.   Oh, definitely not.
15         Q.   Okay.  Just a quick question:
16         Leonard and -- and Valentino are brothers?
17         A.   Half-brothers.
18         Q.   Half-brothers?  Would you say in 1991
19    they looked similar to one another?
20         MR. BRUSTIN:  Object to the form.
21         THE WITNESS:  No, not really.  No.
22         BY MR. SAHASRABUDHE:
23         Q.   Were they both thin in 1991?
24         A.   Yes.  Now, in the dark you may mistake
25    him for -- you know, they be similar, but if you
```



1                    Robert J. Bryant, Jr.

2    know them, you -- you wouldn't.

3         Q.   So you might mistake them if you

4    weren't acquainted with them prior to having

5    observed them.

6         A.   Yeah, a stranger.

7         Q.   I know you said you're not currently on

8    speaking terms with Valentino; is that correct?

9         A.   I mean, not -- I mean, I love him.  You

10   know, he love me.  We just got differences.

11   There's differences that we have.

12        Q.   And --

13        A.   And he's in a bigger world than me now.

14   He's at another level than I am, and we just got

15   differences -- personal difference between him

16   and I.

17        Q.   And you understand I'm not at all

18   trying to pry into family stuff here.  I just want

19   to know have you talked to him at all about the

20   details of his lawsuit in the past three to five

21   years.

22        A.   Just that he's waiting on his lawsuit.

23   That's it.  No details in it, nothing like that,

24   no.

25        Q.   Have you spoken about this case at all



```
1                  Robert J. Bryant, Jr.
2    with Leonard Brown in the past 20 to 30 years?
3          A.   I haven't talked to Leonard or Toine in
4    almost 20 -- about 27, 28 years, because they
5    didn't testify at the perjury, so --
6          Q.   And you resent the fact that they
7    didn't testify.
8          A.   Not so much as resent it.  I know --
9          MR. BRUSTIN:  Objection.
10         THE WITNESS:  Not -- not so much as resent
11   it.  I know they know everything that happened.
12         And like the perjury lawyers, they shook
13   their head and wanted to throw it out the books.
14   They shook their head and said, "Never seen nothing
15   like -- like them, Mr. Bryant."
16         BY MR. SAHASRABUDHE:
17         Q.   Tell me if I'm wrong:  I take you to
18   mean you think it would have helped Valentino
19   Dixon's cause had they testified.
20         A.   If they had testified --
21         MR. BRUSTIN:  Object to the form.
22         THE WITNESS:  Yes.  Yes.  If they would have
23   testified, it would have helped; if Mario would
24   have testified to the bullet that was still in him
25   from the .38 caliber.  Never got to testify.  He
```



1                    Robert J. Bryant, Jr.

2    never -- Mario Jarmon never got to testify.

3         MR. SAHASRABUDHE:  That's all I have.  Thank

4    you, sir.

5         MR. BRUSTIN:  I have just a few follow-ups.

6                    FURTHER EXAMINATION

7         BY MR. BRUSTIN:

8         Q.   Mr. Bryant, by the way, how old are

9    you?  Did you say you're 76?

10        A.   76.  1947, October.

11        Q.   Okay.  Now, the -- the tape that you

12   described, would it be possible, just so I -- I

13   know that you're sometimes difficult to reach.

14   Would it be possible for Mr. Thompson to go to your

15   house tonight and see if you can get those tapes?

16        A.   Oh, I know I couldn't get them tonight.

17   I got to find them.

18        Q.   Okay.  Can -- but you'd be able --

19   you'll answer your phone or you'll -- you'll be

20   able to reach out?  Because we were having trouble

21   reaching you, so that's why I want to make sure

22   that we're able to get that.

23        What's the best way to reach out to you?

24        A.   At 8 -- at 9 -- 933 -- is that right?

25   933 -- I can't even remember which number this is.



1              Robert J. Bryant, Jr.

2       Janeen, what's my cell phone?  933?

3       MR. SAHASRABUDHE:  Yes, we can do this off

4  the record.

5       MR. BRUSTIN:  Just off the record, but I

6  want to make sure we're able to get these.

7            (Off the record: 4:02 p.m.)

8            (On the record: 4:02 p.m.)

9       BY MR. BRUSTIN:

10      Q.   My question, Mr. Bryant, is whether

11  it's possible that those tapes are at your current

12  home such that Mr. Thompson can get them tonight or

13  you don't think they are.

14      A.   No, they're definitely not there.  I

15  just got to go a few places and I'll -- I'll find

16  them.

17      Q.   Okay.  All right.  Now, in this case,

18  you recognize that there were a lot of different

19  criminal proceedings.  There was a Grand Jury for

20  your son's criminal case.

21      A.   Right.

22      Q.   There was a criminal trial, and there

23  was also a perjury trial, right?

24      A.   Yes.

25      Q.   And that all happened over the course



```
 1                    Robert J. Bryant, Jr.
 2    of a couple of years, right?
 3         A.    Yes.
 4         Q.    Would it be fair to say that given how
 5    long ago this happened, sometimes when you're
 6    trying to remember what happened when, you might
 7    get confused about the timing of events?  Is that
 8    fair to say?
 9         MR. BLENK:  Form.
10         THE WITNESS:  It is -- definitely could be,
11    yes.
12         BY MR. BRUSTIN:
13         Q.    For example, when I showed you the
14    tape -- the transcription and the actual audio
15    recording of the tape you conducted with Emil
16    Adams --
17         A.    Yes.
18         Q.    -- you initially thought it was 1991,
19    but then when you heard the tape, then you realized
20    it was actually made in '93, correct?
21         A.    Yes.
22         Q.    And that's just because it happened so
23    long ago it's tough for to you remember today,
24    correct?
25         MR. BLENK:  Form.
```



1                    Robert J. Bryant, Jr.

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   And the same is true for the exact

5     conversations that you had with people 30 years

6     ago, correct?

7          MR. SAHASRABUDHE:  Form.

8          MR. BLENK:  Form.

9          BY MR. BRUSTIN:

10         Q.   Let me ask it a different way.

11         You've done your very best today to try to

12    describe the communications that you had with

13    various people at various times in connection with

14    this case, correct?

15         A.   Yes.

16         Q.   But given how long ago this happened,

17    some of the details, like exactly when things

18    happened, are hard for you to remember; is that

19    fair to say?

20         MR. SAHASRABUDHE:  Form.

21         THE WITNESS:  Yes.  Yes.

22         BY MR. BRUSTIN:

23         Q.   Okay.  Now -- so, for example, you --

24    you were asked questions about whether or not you

25    remembered Lamarr Scott telling the TV reporter --



```
 1               Robert J. Bryant, Jr.
 2   telling the TV reporter that he lost control of the
 3   gun.  Do you remember that?
 4        A.   I remember being asked that.
 5        Q.   That's right.  You were asked that
 6   question.
 7        A.   Yes.
 8        Q.   And that's something that you just
 9   didn't remember because it happened so long ago,
10   right?
11        A.   And things that he was saying to -- to
12   Wanda Stark, the news reporter -- I was looking at
13   the activity of the police when they was just
14   snatching the other youth, and then my other son
15   was right beside me, and I thought they was getting
16   ready to snatch him, too.
17        So I was distracted because of what the --
18   they came out of nowhere, the police presence.
19        Q.   But it also happened more than 30 years
20   ago, right?
21        A.   Yeah.  Yeah.
22        Q.   It was a long time ago, right?
23        A.   Yes.
24        Q.   Now, you were also asked some questions
25   about what you would have told the police had they
```



```
 1                    Robert J. Bryant, Jr.
 2   questioned you in 1991.  Do you remember being
 3   asked that just a few minutes ago by the attorneys
 4   for the city?
 5           A.   Yes.
 6           MR. SAHASRABUDHE:  Form.
 7           BY MR. BRUSTIN:
 8           Q.   Okay.  And isn't it fair to say,
 9   Mr. Bryant, that if you had been asked questions,
10   let's say, two days after you spoke to Lamarr
11   Scott --
12           A.   Yes.
13           Q.   -- by the police, you would have had a
14   better memory of exactly what you said to Lamarr
15   Scott and what he said to you?
16           Would that be fair to say?
17           MR. BLENK:  Form.
18           THE WITNESS:  Yes.
19           MR. SAHASRABUDHE:  Form.
20           BY MR. BRUSTIN:
21           Q.   But no one ever asked you any questions
22   in 1991 about what happened with Lamarr Scott,
23   correct?
24           A.   Not -- not one time, no.
25           MR. SAHASRABUDHE:  Form.
```

```
 1                   Robert J. Bryant, Jr.

 2            MR. BLENK:   Form.

 3            BY MR. BRUSTIN:

 4            Q.   No one ever asked you in 1991, 30 years

 5    ago, the words that Lamarr spoke to you when he

 6    confessed to the crime, right?

 7            A.   Not one.

 8            Q.   Now, do you remember if when you spoke

 9    to Lamarr Scott on tape, whether you stated the

10    date that you were speaking to him on the tape?

11            A.   Definitely.

12            Q.   Okay.  So it will be on there.

13            A.   Oh, yes.

14            Q.   And we'll know what it is.

15            A.   Yes, you will.

16            Q.   Okay.  But fair to say as you sit here

17    today, you can't be sure exactly when that tape was

18    made, what year, fair to say?

19            A.   I -- I can't say, because I know it's

20    on the tape.

21            Q.   Okay.

22            A.   But I -- I just can't say just when in

23    19 -- 1991, 1992, but all I know is that I

24    brought up -- you could almost figure it out,

25    because I said on the tape that I just got the
```



1                    Robert J. Bryant, Jr.
2    Grand Jury minutes back.
3          Q.   Okay.  But you don't know exactly
4    which --
5          A.   That we had been waiting --
6          Q.   Right, but you don't remember exactly
7    when you got the Grand Jury minutes back, right?
8          A.   I don't remember exactly when I got
9    them back, but it shows it on the Grand Jury
10   minutes, because it was handed over to the lawyers
11   finally, and the lawyers gave me a copy.
12         Q.   Okay.  All right.  So around the time
13   when you finally got the Grand Jury minutes --
14         A.   Yes.
15         Q.   -- it's your best recollection that's
16   when you taped Lamarr Scott; is that correct?
17         A.   Yes.  Definitely.
18         Q.   Okay.
19         MR. BRUSTIN:  That's all I have.  Thanks
20   very much.
21         THE WITNESS:  Okay.
22         MR. BLENK:  I don't have anything else.
23         MR. THOMPSON:  All right.  So off the record
24   now.
25              (Deposition concluded at 4:07:54 p.m.)



ROBERT J. BRYANT JR.                                    May 02, 2023
DIXON V CITY OF BUFFALO                                           203

```
1
2   STATE OF NEW YORK)
3                   SS:
4   COUNTY OF ERIE   )
5
6       I DO HEREBY CERTIFY as a Notary Public in and
7   for the State of New York, that I did attend and
8   report the foregoing deposition, which was taken
9   down by me in a verbatim manner by means of machine
10  shorthand.  Further, that the deposition was then
11  reduced to writing in my presence and under my
12  direction.  That the deposition was taken to be
13  used in the foregoing entitled action.  That the
14  said deponent, before examination, was duly sworn
15  to testify to the truth, the whole truth and
16  nothing but the truth, relative to said action.
17
18
19
20  LORI K. BECK, CSR, CM,
    Notary Public.
21  Notary expires 4/30/2026
22
23
24
25
```



ROBERT J. BRYANT JR.                                    May 02, 2023
DIXON V CITY OF BUFFALO                                          204

```
1
2              DEPOSITION ERRATA SHEET
3   Our Assignment No.  J9616677
4   Case Caption:  Valentino Dixon
5   vs.  City of Buffalo, et al.
6      DECLARATION UNDER PENALTY OF PERJURY
7         I declare under penalty of perjury
8   that I have read the entire transcript of
9   my Deposition taken in the captioned matter
10  or the same has been read to me, and
11  the same is true and accurate, save and
12  except for changes and/or corrections, if
13  any, as indicated by me on the DEPOSITION
14  ERRATA SHEET hereof, with the understanding
15  that I offer these changes as if still under
16  oath.
17  _____
18           Robert J. Bryant, Jr.
19  Subscribed and sworn to on the _____ day of
20  _____, 20____ before me,
21  _____
22  Notary Public,
23  in and for the State of _____
24
25
```



ROBERT J. BRYANT JR.
DIXON V CITY OF BUFFALO

May 02, 2023
205

```
 1
 2              DEPOSITION ERRATA SHEET
 3  Page No._____Line No._____Change to:_____
 4  _____
 5  Reason for change:_____
 6  Page No._____Line No._____Change to:_____
 7  _____
 8  Reason for change:_____
 9  Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24  SIGNATURE:_____DATE:_____
25            Robert J. Bryant, Jr.
```



ROBERT J. BRYANT JR.                                    May 02, 2023
DIXON V CITY OF BUFFALO                                        206

```
 1
 2                   DEPOSITION ERRATA SHEET
 3    Page No._____Line No._____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No._____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No._____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No._____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No._____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No._____Change to:_____
22    _____
23    Reason for change:_____
24    SIGNATURE:_____DATE:_____
25             Robert J. Bryant, Jr.
```



```
 1

 2                      INDEX TO WITNESSES

 3    Witness                 Examination              Page

 4     ROBERT J. BRYANT, JR.   BY MR. THOMPSON            5

 5                             BY MR. BLENK              86

 6                             BY MR. SAHASRABUDHE      174

 7                             BY MR. BRUSTIN           195

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



ROBERT J. BRYANT JR.                                          May 02, 2023
DIXON V CITY OF BUFFALO                                                208

DOCUMENT PRODUCTION REQUEST

Request                                                      Page

1

2    MR. BLENK:  Did you record that              110

3    conversation with Lamarr Scott?

4    (Reporter interruption.)

5    THE WITNESS:  Oh.  Yes.  I had to say yes

6    like that, because I told myself back

7    then, "Gotcha."

8    But --

9    MR. BLENK:  Where is that recording?

10   THE WITNESS:  I'll bring it in to you

11   guys.  I'll bring it in to his lawyers.

12   I'll give it to the lawyers.

13   MR. THOMPSON:  He can give it to me, and

14   I'll -- I'll take care of it.

15   THE WITNESS:  Okay.  I'll give it to you,

16   because I got it in a mini cassette, and

17   then what I did, I went down with my

18   speaker system -- I'm a musician -- and I

19   put a mic to the mini cassette so that

20   you can hear it louder.

21   MR. BLENK:  Okay.  Can you get that to

22   Mr. Thompson within the next two weeks?

23   THE WITNESS:  I can get it to him sooner

24   than that.

25   MR. THOMPSON:  Okay.



ROBERT J. BRYANT JR.                              May 02, 2023
DIXON V CITY OF BUFFALO                                    209

```
                  DOCUMENT PRODUCTION REQUEST
   Request                                         Page
 1   MR. BLENK:  One of Emil Adams; one of     154
 2   Wendell Williams, which we'll also ask --
 3   THE WITNESS:  Another material witness,
 4   yes.
 5   MR. BLENK:  We'll ask you for a copy of
 6   that.  Can you get it to Mr. Thompson
 7   within two weeks?
 8   THE WITNESS:  Yes.
 9   MR. BLENK:  If you find other tapes,     154
10   you'll give them to Don Thompson.
11   THE WITNESS:  Yes, I will.  I mean, now
12   that I know who's on the case.  Wasn't
13   anybody come knocking on my door for 30
14   years.
15
16
17
18
19
20
21
22
23
24
25
```

