**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

VALENTINO DIXON,

       Plaintiff,

     v.

CITY OF BUFFALO et al.,

       Defendants.

No. 19-cv-01678 (WMS) (JJM)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF BUFFALO
AND OTHER CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction ............................................................................................................................. 1

Standard of Review ................................................................................................................ 2

Facts ....................................................................................................................................... 2

Argument .............................................................................................................................. 11

   I.   Plaintiff's convictions were favorably terminated. ........................................................ 11

     A.   For fair-trial claims, favorable termination means only that there is no outstanding conviction and no ongoing prosecution. ................................................................ 12

     B.   The Second Circuit's favorable-termination rule for malicious-prosecution claims was rejected in *Thompson v. Clark*; after *Thompson*, favorable termination is a much lower bar, which Dixon clearly meets. ........................................................ 15

     C.   Even under pre-*Thompson* rules for malicious prosecution, the murder, attempted murder, and assault charges terminated favorably because their elements and penalties are distinct from those for criminal possession of a weapon. ................................... 17

   II.   Defendant officers deprived Plaintiff of a fair trial. ...................................................... 21

     A.   Defendants fabricated evidence. ........................................................................... 21

     B.   Defendants obtained the identifications through impermissible suggestion. ............. 30

     C.   Defendants suppressed exculpatory evidence. .......................................................... 31

   III.   Defendant officers maliciously prosecuted Plaintiff. ..................................................... 33

     A.   Defendants lacked probable cause. ......................................................................... 33

     B.   Malice can be inferred from a lack of probable cause. ............................................. 35

   IV.   There is no basis to dismiss Plaintiff's failure to intervene or civil rights conspiracy claims. ................................................................................................................................ 35

   V.   Dixon's state-law malicious-prosecution claim must be tried to a jury............................ 36

   VI.   Defendants are not entitled to qualified immunity............................................................ 37

   VII.   The *Monell* and negligent hiring, supervision, and training claims were bifurcated and cannot be dismissed. ................................................................................................... 39

Conclusion ........................................................................................................................... 40

# TABLE OF AUTHORITIES

## US SUPREME COURT CASES

*Bousley v. United States,*
    523 U.S. 614 (1998)...............................................................................................20

*Brady v. Maryland,*
    373 U.S. 83 (1963).................................................................................................38

*Heck v. Humphrey,*
    512 U.S. 477 (1994)...............................................................................................13

*Hope v. Pelzer,*
    536 U.S. 730 (2002)...............................................................................................39

*Kyles v. Whitley,*
    514 U.S. 419 (1995)..........................................................................................31, 32

*McDonough v. Smith,*
    139 S. Ct. 2149......................................................................................................14

*Mooney v. Holohan,*
    294 U.S. 103 (1935)...............................................................................................38

*Pyle v. Kansas,*
    317 U.S. 213 (1942)...............................................................................................38

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000)...............................................................................................25

*Thompson v. Clark,*
    596 U.S. 36 (2022)..............................................................................1, 12, 15, 16, 33

*United States v. Agurs,*
    427 U.S. 97 (1976).................................................................................................32

## FEDERAL CASES

*Barnes v. City of New York,*
    68 F.4th 123 (2d Cir. 2023) ...................................................................................13

*Bellamy v. City of New York,*
    914 F.3d 727 (2d Cir. 2019)................................................................2, 21, 29, 31

*Bermudez v. City of New York*,
    790 F.3d 368 ........................................................................................ 22, 29, 30, 31

*Binder & Binder PC v. Barnhart*,
    481 F.3d 141 (2d Cir. 2007)................................................................................. 2

*Boyd v. City of New York*,
    336 F.3d 72 (2d Cir. 2003)........................................................................... 34, 35

*Boyette v. Lefevre*,
    246 F.3d 76 (2d Cir. 2001)................................................................................ 32

*Brandon v. Kinter*,
    938 F.3d 21 (2d Cir. 2019)................................................................................ 23

*Buchy v. City of White Plains*,
    14 CV 1806; 2015 WL 8207492 (S.D.N.Y. Dec. 7, 2015)................................. 36

*Davis-Garett v. Urban Outfitters, Inc.*,
    921 F.3d 30 (2d Cir. 2019)................................................................................. 2

*DiBlasio v. City of New York*,
    102 F.3d 654 (2d Cir. 1996)........................................................................ 15, 20

*Dickerson v. Fogg*,
    692 F.2d 238 (2d Cir. 1982)............................................................................. 30

*Dufort v. City of New York*,
    874 F.3d 338 (2d Cir. 2017)............................................................... 28, 30, 34, 38

*Dukes v. City of Albany*,
    289 F. Supp. 3d 387 (N.D.N.Y. 2018)........................................................... 19, 21

*Dunham v. City of New York*,
    295 F. Supp. 3d 319 (S.D.N.Y. 2018)................................................................ 18

*Farm Sanctuary v. United States Dep't of Agric.*,
    545 F. Supp. 3d 50 ........................................................................................... 37

*Gondola v. City of New York*,
    No. 16-CV-369; 2020 WL 1433874 (SJB)........................................................ 14

*Haley v. City of Boston*,
    657 F.3d 39 (1st Cir. 2011)............................................................................... 38

*Horn v. Stephenson*,
    11 F.4th 163 (2d Cir. 2021) ................................................................ 37

*In re Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009) ................................................................. 2

*Ismail v. Cohen*,
    899 F.2d 183 (2d Cir. 1990) ............................................................... 28

*Janetka v. Dabe*,
    892 F.2d 187 (2d Cir. 1989) ............................................... 15, 17, 17

*Jiles v. Rochester Genesee Reg'l Transportation Auth.*,
    317 F. Supp. 3d 695 (W.D.N.Y. 2018) .............................................. 37

*Jimenez v. City of Chicago*,
    732 F.3d 710 (7th Cir. 2013) .............................................................. 28

*Jones v. Blekis*,
    No. 23-CV-1641; 2024 WL 230288 (D. Conn. Jan. 22, 2024) ............ 36

*Kee v. City of New York*,
    12 F.4th 150 (2d Cir. 2021) ........................................... 14, 22, 33, 35

*Laskar v. Hurd*,
    972 F.3d 1278 (11th Cir. 2020) ......................................................... 16

*Leka v. Portuondo*,
    257 F.3d 89 (2d Cir. 2001) ................................................................ 32

*Lopez v. City of New York*,
    No. 20-CV-2502; 2021 WL 2739058 (S.D.N.Y. July 1, 2021) ........... 39

*Lowth v. Town of Cheektowaga*,
    82 F.3d 563 (2d Cir.1996) ................................................................. 27

*Manganiello v. City of New York*,
    612 F.3d 149 (2d Cir. 2010) ............................................... 33, 34, 35

*Mazyck v. Keller*,
    531 F. Supp. 3d 630 (W.D.N.Y. 2021) .............................................. 36

*McCardle v. Haddad*,
    131 F.3d 43 (2d Cir. 1997) ................................................................ 37

*McClellan v. Smith*,
    439 F.3d 137 (2d Cir. 2006)........................................................................ 33

*Mellen v. Winn*,
    900 F.3d 1085 (9th Cir. 2018) ................................................................... 27

*Morse v. Fusto*,
    804 F.3d 538 (2d Cir. 2015)........................................................................ 22

No. 13-CV-128; 2015 WL 1475819 (E.D.N.Y. Mar. 31, 2015)............................... 20

No. 19-cv-01678 (JJM)........................................................................................... i

*O'Brien v. National Gypsum Co.*,
    944 F.2d 69 (2d Cir. 1991).......................................................................... 24

*Ortiz v. Stambach*,
    657 F. Supp. 3d 243 (W.D.N.Y. 2023)....................................................... 29

*Ostroski v. Town of Southold*,
    443 F. Supp. 2d 325 (E.D.N.Y. 2006) ....................................................... 18

*Pinsky v. Duncan*,
    79 F.3d 306 (2d Cir. 1996).......................................................................... 35

*Poventud v. City of New York*,
    750 F.3d 121 (2d Cir. 2014)........................................................... 12, 16, 31

*Raheem v. Kelly*,
    257 F.3d 122 (2d Cir. 2001)........................................................................ 30

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017)................................................................. 28, 38

*Ricciuti v. N.Y.C. Transit Auth.*,
    124 F.3d 123 (2d Cir. 1997)........................................................... 13, 21, 37

*S. Katzman Produce Inc. v. Yadid*,
    999 F.3d 867 (2d Cir. 2021)........................................................................ 23

*Simon*,
    893 F.3d 97 (2d Cir. 2018).......................................................................... 39

*Smalls v. Collins*,
    10 F.4th 117 (2d Cir. 2021) ................................................................. *passim*

*Stansbury v. Wertman*,
    721 F.3d 84 (2d Cir. 2013)................................................................................ 30, 34, 35

*U.S. v. Thai*,
    29 F.3d 785 (2d Cir. 1994)...................................................................................... 30, 33

*United States Underwriters Ins. Co. v. ITG Dev. Grp., LLC*,
    294 F. Supp. 3d 18 (E.D.N.Y. 2018) ............................................................................ 26

*United States v. Requena*,
    980 F.3d 30 (2d Cir. 2020)............................................................................................ 25

*Vazquez v. City of New York*,
    No. 10-cv-6277; 2014 WL 4388497 (S.D.N.Y. Sept. 5, 2014) ........................................ 34

*Victory v. Pataki*,
    814 F.3d 47 (2d Cir. 2016)............................................................................................ 29

*Warren v. Fischl*,
    No. 15-CV-2829 ........................................................................................................ 20

## STATE CASES

*Haynes v. City of New York*,
    29 A.D. 3d 521 (2d Dep't 2006)..................................................................................... 34

## OTHER CASES

2015 WL 6760230 (E.D.N.Y. Nov. 5, 2015)........................................................................ 20

*Belot v. Wieshaupt*,
    1997 WL 218449 (S.D.N.Y. Apr. 29, 1997)..................................................................... 19

*Kurtz v. Hansell*,
    2021 WL 1143619 (S.D.N.Y. Mar. 24, 2021) ................................................................. 37

*McCoy v. City of New York*,
    2008 WL 3884388 (E.D.N.Y. Aug. 13, 2008).................................................................. 39

*Reid v. New York County District Attyorney Marrinaccio*,
    2004 WL 1488194 (S.D.N.Y. July 1, 2004 2004) ............................................................ 19

*Rosario v. City of New York,  (LGS)*,
    2021 WL 199342 (S.D.N.Y. Jan. 20, 2021) ............................................................... 29, 30

*Rutherford v. City of Mount Vernon,* *(AEK),*
  2023 WL 6395375 (S.D.N.Y. Sept. 29, 2023)....................................................... 35

*Sassower v. City of White Plains, Cnty. of Westchester,* *(MJL),*
  1995 WL 222206 (S.D.N.Y. Apr. 13, 1995)......................................................... 18

## FEDERAL STATUTES

Title 42 U.S.C.
  § 1983............................................................................................................. 37

## STATE STATUTES

State of New York
  N.Y. Penal Law § 125.25................................................................................. 18
  N.Y. Penal Law § 125.25(2)(a)....................................................................... 18
  N.Y. Penal Law § 125.25(2)(b) ...................................................................... 18
  N.Y. Penal Law § 125.25(c)(a)....................................................................... 18

## FEDERAL RULES

Federal Rules of Civil Procedure
  Rule 56(a).......................................................................................................... 2

Federal Rules of Evidence
  Rule 803(5) ..................................................................................................... 26
  Rule 803(16) ................................................................................................... 26
  Rule 804(b)(3)................................................................................................. 26
  Rule 807 .......................................................................................................... 26

## INTRODUCTION

Defendants' motion for summary judgment is divorced from the governing law and the relevant facts. For example, Defendants completely ignore a recent Supreme Court case, *Thompson v. Clark*, 596 U.S. 36 (2022), and a recent Second Circuit case, *Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021), which squarely preclude the primary legal argument they make—that the possibility Valentino Dixon may be convicted of gun possession somehow bars his § 1983 claims that Defendants framed him for murder.

When the correct legal standards, including the familiar summary-judgment standard, are applied, it's obvious that Defendants' motion must be denied. Just consider this: at Dixon's criminal trial, the prosecutor highlighted that three eyewitnesses had independently identified Dixon as the shooter, saying that was so unlikely to have happened if Dixon was not the shooter that it would warrant going to "lay some money down" on the lottery. But we now know that's exactly what happened: Dixon is innocent and looks nothing like the real shooter—who, by the way, confessed to Defendants just days after the crime—yet three people who saw the real shooter somehow identified Dixon. How did that happen? Dixon has amassed substantial evidence, discussed below, to explain how: put simply, Defendants fabricated those identifications. But what have Defendants offered? Nothing. They offer no innocent explanation for those identifications, much less one that this Court could hold is the *only* reasonable explanation—as it would have to in order to grant Defendants' motion.

In short, there is abundant evidence that Defendants' unconstitutional misconduct caused Valentino Dixon to spend over two decades imprisoned for a shooting he did not commit. Defendants' motion for summary judgment must be denied.

## STANDARD OF REVIEW

Summary judgment is improper unless Defendants show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). The Court may not make credibility determinations or weigh the evidence, but instead "must draw all reasonable inferences in favor of" Plaintiff, "even though contrary inferences might reasonably be drawn." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (cleaned up). Because "a jury is free to believe part and disbelieve part of any witness's testimony," the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (cleaned up). Defendants' motion may not be granted unless "resolving all ambiguities and drawing all permissible factual inferences in favor of [Plaintiff] the record taken as a whole could not lead a rational trier of fact to find for [Plaintiff]." *Bellamy v. City of New York*, 914 F.3d 727, 744 (2d Cir. 2019) (citation omitted).

## FACTS

Shortly before 1:30 a.m. on August 10, 1991, on a busy corner near Louie's Texas Red Hots, brothers Torriano and Aaron Jackson started a fight with Mario Jarmon. P1, D13.[1] Aaron Jackson had earlier that night threatened Jarmon and his friends Antoine Shannon and Leonard Brown that he would "come back and spray all [you] mother f—ers." D1. Torriano Jackson, who weeks earlier had put a gun to Shannon's head to threaten him, pulled out a silver handgun and shot at Jarmon. P2, D1, 17. Lamarr Scott, who knew Shannon and Shannon's half-brother,

---

[1] Citations to Plaintiff's Statement of Additional Material Facts are abbreviated P followed by paragraph number. Citations to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Fact are abbreviated D followed by paragraph number. All docket citations reference the ECF pagination.

Valentino Dixon, then fired a total of 27 shots from a TEC-9 firearm, killing Torriano Jackson and wounding his brother Aaron and bystander John Sullivan before fleeing. P1–5, D8.

Valentino Dixon is innocent of the murder; he did not shoot Torriano Jackson (or anyone else) or direct Scott to shoot anyone. P7–11. Nor was he in the immediate vicinity of the shooting; while he was one of dozens of people in the greater area, he was inside a convenience store when shots first rang out and ran down the block away from the shooting, towards his car in front of Jarmon's house. Dixon was about 40 yards away when Scott began shooting. P10.

Although witnesses were reluctant to volunteer information to the police, it was well known in the neighborhood that Scott did the shooting, not Dixon. P4, 11. Lamarr Scott and Valentino Dixon look nothing alike and could not be mistaken for one another. P28–34. At well over 6 feet and heavyset (over 200 pounds), Scott had the stereotypical build of a football lineman; indeed, he played high school ball and had been recruited to play defensive end in college. P31–32. By contrast, Dixon was only 5'9" and very slim (around 140 pounds), with a youthful appearance. P33. Their faces did not resemble each other and they were wearing distinct clothes from each other that night. P29–30, 77.

The investigation into the shooting was led by Buffalo Police Department homicide detectives Mark Stambach, Raniero Masecchia, James Lonergan and John Vickerd, assisted at the scene by BPD officers. P12–16. Despite his innocence and complete lack of resemblance to the shooter, within 15–20 minutes after the shooting, police radio was broadcasting an "all points bulletin" for Valentino Dixon—something the homicide detectives at the scene, Lonergan and Vickerd, certainly would have known. P17–25. And the investigative file shows—in a report by a patrol officer—that Dixon was an immediate focus. P20. If there were any legitimate bases for this suspicion—beyond Dixon's familiarity to local Buffalo police, who kept a running file on him and stopped him with regularity—it would have been recorded in the file, but the file

contains nothing of the sort. P20–21. Instead, the investigating homicide detectives affirmatively misrepresented to the prosecutor that Dixon did not become a suspect until hours later. P49–52.

Defendants then reported that three separate witnesses (Emil Adams, John Sullivan and Aaron Jackson) each independently and without any suggestion selected Dixon as the shooter from fair 6-photo arrays—two of them within hours of the crime. P26–27. These false identifications became the basis for Dixon's wrongful prosecution and conviction. P69, 191, 202. Based on the science of eyewitness memory, it is very unlikely that a single witness who viewed Scott commit the crime would, in an innocent mistake, select Dixon from a fair photo array; it's near impossible that *three* would do so. P35–37. Instead, there is abundant evidence from which a reasonable jury can conclude what the police reported was false, and that any initial misidentifications of Dixon were the result of police suggestion.

For one, a reasonable jury can conclude Stambach and Vickerd used suggestion to obtain an identification from Emil Adams and fabricated their reports claiming that he independently selected Dixon. P70–105. From his vantage point right across the street in the Louie's parking lot, Emil Adams had a good view of Scott shooting Torriano Jackson. P70–71. Adams was isolated by officers within minutes of the shooting and brought down to the precinct, where Stambach ensured he was segregated from any other witnesses to avoid any potential contamination of his statement. P72–74. Adams then provided a detailed description of the shooter which Stambach later realized fit Scott precisely: a "heavy set" six-foot-tall Black man wearing a white T-shirt and white hat. P75–79, 124–25. Stambach believed Adams was credible and as important a witness as there was in the case. P75.

Just after Stambach took this description from Adams, he learned from Vickerd of the focus on Dixon. P78–81. Stambach and Vickerd then conducted an ID procedure with Adams. P82. Stambach and Vickerd reported that, without any suggestion, Adams viewed a fair 6-person

photo array and positively identified Dixon as "the person he saw shooting the Tech-9 at Bailey/Delavan." P82. Based on eyewitness identification science, it is very unlikely after viewing Scott commit the shooting that Adams would mistakenly identify Dixon from a fair array; rather, suggestion or influence during the ID procedure is a more likely explanation. P37, 83. Given that Adams was segregated from any other witnesses during this entire time, the only source of the suggestion which could have caused Adams to switch from accurately describing the shooter he saw to selecting the police suspect who looked completely different is Defendants. P72–74.

In a secretly recorded interview months after Dixon's conviction, Adams described how the police had used such suggestion: they showed him a series of three individual photos (of Mario Jarmon, Valentino Dixon, and a third person). P85–105. Stambach admits if that happened it would be highly suggestive, illegal, and severe misconduct—the type of suggestion that could produce a false identification—but he denies it happened. P91, 99. Although his memory is not as good today as it was when he gave the secretly recorded interview, Adams says (now, at his deposition) that he was telling the truth during that interview. P92–93, 96. He also describes all the photos he was shown by Stambach as being shown in the same manner, and it's undisputed that he was shown an individual mug shot of Jarmon; so it is very likely he was shown an individual photo of Dixon too. P94–96. At that time only three individual photos had been requested by homicide: of Jarmon, Dixon, and witness John Sullivan. P98. All were available to Stambach by the time he showed the individual photo of Jarmon to Adams. P97.

A reasonable jury can also conclude that Vickerd and Masecchia fabricated their reports claiming John Sullivan independently volunteered an identification of Dixon and selected him from a fair array. P38–69. Sullivan was a 17-year-old who had come to Louie's Texas Red Hots after a day of drinking and smoking cocaine-laced marijuana with his friends; he ran away once

the shooting started and did not see the shooter until after he was shot in the leg. P38–41. From his vantage point—150 yards away (greater than the length of a football field), in the dark, suffering from a gunshot injury, with a quick side view of the shooter obstructed by headlights and crowds—it would be "nearly impossible" for Sullivan to observe the shooter well enough to identify him. P41–42. Immediately after the shooting Sullivan was taken to Sister's Hospital (a different hospital from all other victims). P43. Defendants claimed Sullivan volunteered two separate statements: one at approximately 4:00 a.m. to Vickerd at the hospital where Sullivan was waiting to receive medical treatment, and one in the early afternoon to Masecchia at the precinct. P44–69. But Sullivan denied the accounts reflect what he told them: "[t]here's a lot of stuff in the statement that is typed…that I didn't really put in there, you know." P48, 57.

Neither police report recorded any of the factors demonstrating Sullivan could not make a reliable identification, including Sullivan's intoxication, which he told the police about. P45–47, 58. Lonergan claimed what demonstrated that Sullivan was a reliable witness was that he was the first person to mention Dixon's name as the shooter, and that Defendants know he did so without any police influence or suggestion because Dixon's name had not come up before Sullivan mentioned it. P51. But that is false: Dixon was on the police's radar as a suspect shortly after the shooting (although no one has ever said *why*). P52. And police ordered individual photos and a criminal-records check of Dixon at 3:30 a.m., more than half an hour *before* Vickerd spoke to Sullivan. P53–54. Indeed, at his deposition, Vickerd admitted that he may have known Dixon was a suspect before he spoke to Sullivan and that he may have been the one to mention Dixon to Sullivan, not the other way around. P55. But the prosecutor, Belling, had understood from Defendants' reports and representations that Sullivan had been the person to "interject" Dixon's name into the case and that it was significant that Sullivan did so, not Defendants. P50.

Masecchia reported that he presented Sullivan with a fair, six-photo array, from which Sullivan positively identified Dixon as the shooter he had seen. P64. But when Sullivan was asked at a later proceeding if he had been shown a photo array, he corrected that he had seen "mug shots." P66. This is the exact same suggestion Emil Adams separately described in his own identification procedure, which Defendants conducted the same day. P85–105. Masecchia admitted he understood showing Sullivan individual mug shots of Dixon or anyone else would be highly suggestive and improper, but he denied doing so. P65. Defendants admit such suggestion could explain the misidentification—i.e., how a witness could falsely identify someone who looked completely different from the shooter he saw. P99.

A reasonable jury can also conclude Defendants understood Sullivan was an unreliable witness and that any identifications he made were the product of their suggestion. P38–67. The two accounts Defendants attributed to Sullivan, purportedly given just hours apart, were incompatible, containing the sort of glaring inconsistencies that show a witness is not reliable. P48, 60–61. Although Defendants admit it would be essential—"as basic as it gets"—to investigate those inconsistencies before relying on the witness for an arrest, there is zero evidence that Defendants did so. P61–63. Defendants nevertheless relied on Sullivan's purported identification as the sole basis for probable cause to arrest Dixon. P69. Even though Stambach had been present for Adams's purported identification—and even though Adams, who was not intoxicated and had a much better vantage point, would appear to make a far more reliable witness—Stambach did not reference Adams in his criminal complaint. P84. Stambach denied the reason for this omission was his knowledge that police had used suggestion and coercion to obtain Adams's identification, but a reasonable jury could conclude it was, especially as Stambach could not provide any alternate explanation. P84.

Stambach recognized that Adams's initial detailed description of the shooter as a "heavyset" Black man did not describe Dixon, and that that was a "red flag." P79. Within hours of the shooting Dixon was brought into the office and interviewed by Stambach. P106–09. Dixon truthfully denied being the shooter but, following the neighborhood code, did not volunteer evidence implicating Scott. P109, 115. Stambach threatened Dixon if he wouldn't tell him who the shooter was, Dixon would go to prison for it himself. P116. Stambach then arrested Dixon. P117. Defendants collected Dixon's clothes—the same ones he had been wearing the night before—but did not order forensic testing, even though Stambach understood the shooter was likely to have blood on his clothing. P110–14.

The following evening, Lamarr Scott contacted a local TV station and arranged to give a videotaped public confession admitting that he—not Dixon—had committed the shooting. P118–19. Scott's voluntary confession to a shooting for which someone else had been arrested was extraordinarily unusual and a big deal at the homicide unit—the only time something like this happened in Defendants' long careers. P120–23. And it was presumptively credible because, barring obvious mental illness (which Scott did not display), you do not expect someone to voluntarily confess to a crime they did not commit. P122. Stambach recognized that for that reason this was an "extremely important interview" and that he had to be careful, comprehensive, and develop information he could follow up on. P123. Stambach and Masecchia both recognized when they saw Scott in person that while Adams's description of the shooter had *not* matched Dixon, it *did* match Scott—down to the white hat and white shirt he was wearing—which was another "red flag." P125–26.

Stambach also understood from training and experience the way to tell if a confession was reliable was (1) if the suspect volunteered nonpublic information only the real perpetrator (and police) would know, and (2) if the suspect provided information that could be corroborated

8

by follow-up investigation. P131. Scott did both: he provided a detailed account of the shooting matching evidence gathered so far, including (a) where the shooting started; (b) people present, including a bystander (Michael Bland) whose name had not publicly surfaced; (c) descriptive details about the silver gun found next to Torriano Jackson's body; and (d) the fact that he had emptied the entire clip of the TEC-9. P132. His statement was also corroborated by two other witnesses, Leonard Brown and Antoine Shannon, who identified him as the shooter. P127–30.

Scott also offered to provide the clothes he was wearing on the night of the crime, including the white sneakers which he indicated still had blood on them from when he stood directly over Torriano Jackson and fired multiple shots at close range. P133. Although "any detective acting in good faith" would of course have collected that critical evidence at that point, Stambach refused Scott's offer. P134–41. Instead, he told Scott to leave because they "had their guy and it wasn't [him]." P142–46. Nor did Stambach or any of the other detectives conduct any of the follow up "basic investigative" tasks he admits would have been done if they were "conducting a conscientious, good-faith investigation," such as (a) searching for the TEC-9 where Scott described discarding it; (b) investigating whether Torriano or Aaron Jackson were armed; (c) showing eyewitnesses from the scene photo arrays including Scott's photo; or (d) investigating whether Dixon's family had provided any inducements to Scott to confess, as Defendants claimed they believed. P147–49. To the extent Defendants offered any explanation for these glaring failures, they attempted to point the finger at Belling. P150. But Belling points right back at Defendants, flatly denying he told them not to investigate Scott and testifying he expected them to continue investigating. P151.[2]

_____

[2] A year after Dixon's wrongful conviction, Scott committed another shooting: he shot a 16-year-old in the head, unprovoked, rendering him quadriplegic. P6.

The same day that Stambach received Scott's credible confession, he met with Aaron Jackson, who was recovering in his hospital bed from his serious gunshot wounds. P152–60. Stambach reported that Jackson, too, selected Dixon's photo from a fair 6-photo array without any suggestion—making this the third witness Defendants claim viewed Scott commit the shooting yet (somehow) mistakenly selected Dixon. P155–56. However, Jackson would not make a positive identification of Dixon, saying only that he "looked like" the shooter. P155. Although Stambach admits given this tentative ID and Scott's confession it would have been important to show Jackson a photo array including Scott's photo at this time, and although Stambach had a photo of Scott readily available, he did not do so. P158. Nor did Stambach (or anyone else) conduct any other follow up with Jackson to test the reliability of Scott's confession. P159–60. Stambach could not offer any explanation for this failure. P159.

Defendants also failed to follow up with other obvious leads—such as the woman, Tamara Frida, who had called the precinct three days after the shooting, told Stambach she had witnessed the shooting and that Dixon was not the shooter, and offered to view photos to identify the shooter. P161–70. Frida would later identify Scott as the shooter and was one of the key witnesses relied on by the DA in the reinvestigation leading to Dixon's exoneration. P7, 11, 165.

Trial prosecutor Belling never knew of any suggestion with the identifications; he relied on Defendants' reports claiming each witness identified Dixon from a fair 6-photo array. P171–77. Belling also understood from Defendants that Scott had only confessed because Dixon's parents put him up to it. P178–79. Even without knowing about Defendants' suggestion or the true circumstances of Scott's confession, Belling recognized there were "major discrepancies" about who committed the murder and waited months to seek an indictment. P181–84. Eventually, Adams, Sullivan and Jackson all identified Dixon as the shooter; but the grand jury did not learn of the suggestion used to obtain their false IDs. P185. Mario Jarmon and Leonard

Brown both truthfully testified that Scott was the shooter and Torriano Jackson had a gun that night. P184. Ultimately, after Defendants and Belling pressured Scott, Scott falsely testified at the grand jury that Dixon had committed the shooting, not him; this was the only time in 30 years he falsely maintained he was not the shooter. P180, 186–88. Dixon was indicted. P189.

At Dixon's June 1992 trial, Adams and Sullivan were both extremely reluctant witnesses, as both were dealing with criminal charges of their own. P192–94, 196–200. Sullivan and Jackson were impeached with disclosed evidence demonstrating they had limited ability to make a reliable identification, and Adams was impeached with evidence his initial description did not match Dixon. P195, 199, 201. No physical or forensic evidence implicated Dixon; the case rested on the IDs. P191. But Belling argued three separate independent identifications could not be a coincidence. P202. And neither Belling nor the jury learned of the suggestion used to obtain these false IDs. P171–77. Although the jury initially split 9–3 for acquittal, Dixon was wrongly convicted. P203. Twenty-six years later, after a comprehensive reinvestigation in 2018, the DA determined that Dixon was not the shooter, Scott was. P5, 7–11, 205–08. Dixon was exonerated and Scott was convicted for these crimes on the same day. P205–08.

## ARGUMENT

### I. Plaintiff's convictions were favorably terminated.

Defendants' primary argument is that both the fair-trial and malicious-prosecution claims must fail because Dixon has not obtained a sufficiently favorable termination of the relevant criminal counts. Dixon's convictions for murder, attempted murder, and assault were all vacated after a conclusive determination by the District Attorney that Dixon was *not* the shooter, Lamarr Scott was. All charges for those crimes were dismissed and Lamarr Scott was criminally convicted. Defendants note, correctly, that although the gun-possession conviction has *also* been vacated, the State noticed an appeal and that charge has not yet been dismissed. Defendants now

argue that the status of the gun-possession charge bars Dixon's fair-trial and malicious-prosecution claims for the murder, attempted murder, and assault. Defendants are wrong.

To begin, Defendants' brief glaringly omits any discussion of, or even a citation to, *Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021). In *Smalls*, the Second Circuit rejected precisely the argument Defendants make here: that a plaintiff bringing a § 1983 fair-trial claim must meet the more onerous favorable-termination standard the Second Circuit traditionally applied to malicious-prosecution claims. Defendants fail to cite the correct standard for fair-trial claims, let alone attempt an argument that Dixon fails to meet this easier standard, because he plainly does.[3]

In another troubling omission, Defendants also fail to discuss or cite the leading case on the favorable-termination standard: the Supreme Court's recent decision in *Thompson v. Clark*, 596 U.S. 36 (2022). In *Thompson*, the Supreme Court reversed the Second Circuit for applying too onerous a favorable-termination requirement in a § 1983 malicious-prosecution case. The favorable-termination cases Defendants cite—all of which predate *Thompson*—are no longer good law. Again, Defendants fail to cite the current standard, let alone claim Dixon does not meet it—because he clearly does. And in any event, Dixon meets the pre-*Thompson* Second-Circuit rule as well.

### A. For fair-trial claims, favorable termination means only that there is no outstanding conviction and no ongoing prosecution.

In the Second Circuit, fair-trial claims have long been subject to a favorable-termination rule that is much easier to satisfy than the rule for malicious-prosecution claims. Indeed, the *en banc* court has held that a plaintiff can bring a fair-trial claim even where he had agreed "to plead to a lesser offense." *Poventud v. City of New York*, 750 F.3d 121, 138 (2d Cir. 2014).[4] As the

---

[3] None of the district-court cases Defendants cite post-date *Smalls*, either.
[4] In *Poventud*, the plaintiff was convicted of attempted murder, but that conviction was vacated because of a *Brady* violation—evidence that supported his alibi had been withheld from him. 750

Second Circuit explained in *Smalls*, the reason for a minimalist rule is that for fair-trial claims—like "knowingly falsifying evidence" or "withholding of exculpatory or other impeachment material"— liability attaches "even where there simultaneously exists a lawful basis for the deprivation of liberty that the plaintiff suffered." 10 F.4th at 132 (cleaned up); *see also Barnes v. City of New York*, 68 F.4th 123, 129–30 (2d Cir. 2023) ("The use of fabricated evidence in initiating a prosecution or at trial may amount to a deprivation of liberty even in the absence of a conviction based on the fabricated evidence and even when, as here, a plaintiff simultaneously was charged, detained, tried, and convicted for a separate offense.").

Because fair-trial claims do not turn on whether there was some other lawful basis for the deprivation of liberty, the rules courts have developed in the malicious-prosecution context—designed to ascertain innocence or probable cause—have no place here. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (importing probable cause to the fair-trial context is "an ill-conceived attempt to erect a legal barricade to shield police officials from liability"); *see also Barnes*, 68 F.4th at 132 ("We have repeatedly rejected the effort to import probable cause into the due process analysis."). The minimalist rule, instead, serves only the "pragmatic concerns" the Supreme Court first identified in *Heck v. Humphrey*, 512 U.S. 477 (1994). *Smalls*, 10 F.4th at 136–39. When the Supreme Court recognized the extension of those pragmatic concerns to fair-trial claims, it noted that fair-trial claims "might call for a context-

---

F.3d at 124. To get out of prison, he agreed to plead guilty to a lesser-included offense (attempted robbery) in exchange for the State dropping all other charges and agreeing to a sentence of time-served. *Id*. In so doing, his plea colloquy—perhaps untruthfully—contradicted the alibi that he had previously offered. *Id*. The district court dismissed his fair-trial claim, holding that the guilty plea on the lesser offense meant that the plaintiff could not satisfy the favorable-termination rule. *Id*. But the Second Circuit reversed. His fair-trial claim did not require him to prove factual innocence—which could be seen as inconsistent with his later plea—only that his constitutional rights were violated in his first trial. *Id*. at 134–35. Because success on his § 1983 *Brady* claim would not be inconsistent with any existing conviction, there was no favorable-termination problem. *Id*. at 133. The court explicitly noted that the favorable-termination rule for malicious-prosecution claims was more difficult to meet. *Id*. at 136.

specific and more capacious understanding of what constitutes 'favorable' termination."
*McDonough v. Smith*, 139 S. Ct. 2149, 2160 n.10 (2019); *Smalls*, 10 F.4th at 138 (quoting
*McDonough*'s "capacious" language). Accordingly, for fair-trial claims, the favorable-
termination rule requires only that "the underlying criminal proceeding be terminated in such a
manner that the lawsuit does not impugn an *ongoing* prosecution or *outstanding* conviction." *Kee
v. City of New York*, 12 F.4th 150, 169 (2d Cir. 2021) (quoting *Smalls*, 10 F.4th at 139 (emphasis
in original)).[5]

Dixon plainly meets this standard. None of his relevant convictions are "outstanding."
The only prosecution that might be considered "ongoing" is the gun-possession charge, and
Dixon's allegations of evidence-fabrication do not impugn that conviction. Consider the State's
actions: On the one hand, the State dismissed the murder, attempted murder, and assault charges,
and convicted Lamarr Scott of them. On the other hand, the State *opposed* vacating the gun-
possession charge, adopting a brand-new theory: arguing that the conviction can be sustained
because Dixon possessed the gun, at a different location but near enough to the shooting, earlier
but close enough in time to when Scott started shooting. P207. Of course, none of the witnesses
used to convict Dixon of the murder testified to anything like that. This shows, conclusively, that
there is no ongoing prosecution that relies on the false eyewitness testimony that was key to the
murder, attempted murder, and assault convictions. So Dixon's successful demonstration in this
case that the eyewitness identifications of him were fabricated does not impugn any "ongoing
prosecution."

---

[5] Defendants' argument to the contrary is based on a single, unreported, district-court case which
predates *Smalls*. ECF 169 at 32 (citing *Gondola v. City of New York*, No. 16-CV-369 (AMD)
(SJB), 2020 WL 1433874, at *5 (E.D.N.Y. Mar. 24, 2020)).

Indeed, Defendants hardly argue to the contrary, asserting without citation that it would be "absurd" for Dixon to "recover substantial damages" if he is found guilty of weapon possession, even if he proves Defendants framed him for murder. ECF 169 at 33. But Defendants do not articulate any way in which the judgments would *actually* be inconsistent, because there is none. To the extent Defendants are suggesting the possibility that *any* outstanding conviction arising out of the incident should preclude any § 1983 fair-trial claim, that is clearly foreclosed by binding Second Circuit authority, including *Poventud*. In short, Defendants do not come close to providing a basis for the Court to ignore binding Second Circuit law on what is required for favorable termination on fair-trial claims.

### B. The Second Circuit's favorable-termination rule for malicious-prosecution claims was rejected in *Thompson v. Clark*; after *Thompson*, favorable termination is a much lower bar, which Dixon clearly meets.

Somehow, Defendants argue about the favorable-termination rule for § 1983 malicious-prosecution claims without discussing, or citing, *Thompson v. Clark*, 596 U.S. 36 (2022), or *any* case that post-dates *Thompson*. That's hard to fathom given that *Thompson* is a recent case from the Supreme Court, explicitly addressing—and rejecting—the Second Circuit's prior rule on favorable terminations in malicious-prosecution claims.

Before *Thompson*, the Second Circuit required a malicious-prosecution plaintiff to show "that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Smalls*, 10 F.4th at 132. This requirement to show innocence led courts to compare the charges for which there was an outstanding conviction or ongoing prosecution with the charges which had terminated. *See, e.g.*, *Janetka v. Dabe*, 892 F.2d 187, 189–90 (2d Cir. 1989); *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996) ("The [termination] could not be considered an '*indication of innocence*' since DiBlasio conceded both the possession," the charge of conviction, "and sale," the charge on which he was acquitted, "of the cocaine")

15

(emphasis added). This rule derived from the requirement that the proceeding ends in a way that indicates innocence: even if you've been acquitted or had a conviction vacated, you're not *innocent* if you were convicted of something reasonably similar.

But *Thompson* rejected the "affirmative indications of innocence" standard. 596 U.S. at 49. The Supreme Court made clear that the favorable-termination requirement was adopted for pragmatic reasons, specifically, to avoid: (i) parallel criminal and civil litigation; (ii) conflicting civil and criminal judgments; and (iii) collateral attacks on criminal judgments through civil litigation. *Id.* at 44. Addressing those concerns, the Court held that a plaintiff is not required "to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." 596 U.S. at 49.[6] Accordingly, the same rationale the Court applied in *McDonough*—which the Second Circuit later applied to fair-trial claims in *Smalls* and *Kee*—now applies to malicious-prosecution claims too. So for these claims, too, favorable termination requires only that the underlying criminal proceeding terminate such that the lawsuit does not impugn an *ongoing* prosecution or *outstanding* conviction, which Dixon satisfies.

---

[6] To be sure, *Thompson* used the word "prosecution," not "charge." But as discussed in Section A, this Circuit has long used a charge-by-charge approach for fair-trial claims. See, *e.g.*, *Poventud*, 750 F.3d at 138. By rejecting the "affirmative indications of innocence" rule, *Thompson* extinguished any justification for avoiding a charge-by-charge approach for malicious-prosecution claims. The Court may find *Laskar v. Hurd*, 972 F.3d 1278 (11th Cir. 2020) helpful. After thorough analysis, *Laskar* held that "the favorable-termination requirement will bar a suit for malicious prosecution only when…the prosecution ends in the plaintiff's conviction on or admission of guilt *to each charge* that justified his seizure." *Id.* at 1293 (emphasis added). The Supreme Court in *Thompson* cited *Laskar* approvingly, twice, calling it a "comprehensive opinion." 596 U.S. at 47.

**C. Even under pre-*Thompson* rules for malicious prosecution, the murder, attempted murder, and assault charges terminated favorably because their elements and penalties are distinct from those for criminal possession of a weapon.**

### 1. *Janetka v. Dabe*

Before *Thompson*, under Second Circuit law, a charge was considered to end favorably for a criminal defendant if: (i) it ended without a conviction; and (ii) it had different elements and penalties than any charges that *did* end in a conviction (or that remained pending). So even if *Thompson* could be ignored (which it cannot), Dixon also meets this earlier standard.

In *Janetka v. Dabe*, the plaintiff was prosecuted for resisting arrest and for disorderly conduct, based on a single incident, but convicted only of the latter. 892 F.2d 187, 188 (2d Cir. 1989). In his malicious-prosecution suit, the district court held that the resisting-arrest charge did not terminate favorably, despite the acquittal, because of the disorderly-conduct conviction. *Id*. The district court believed that result was appropriate because "although separate offenses were charged, both arose out of events that occurred on the same occasion. The charges were closely related and arose in connection with two types of behavior that occurred either simultaneously or within minutes of each other." *Id*. at 189.

The Second Circuit reversed. Even under the pre-*Thompson* regime, the court held that the charges were distinct so the outstanding conviction did not defeat the favorable-termination requirement for the resisting-arrest charge. *Id*. Though it's not clear which of these factors, if any, was necessary to its holding, the court noted that, for the resisting-arrest and disorderly-conduct charges: (i) the charges were aimed at different victims; (ii) the elements of the charge were different; (iii) neither charge was a lesser included offense of the other; (iv) the charge resulting in an acquittal was more serious than the one resulting in a conviction; (v) resisting arrest is a misdemeanor; and (vi) disorderly conduct is a violation. *Id*. The court also offered that

17

it would be bad policy if "police officers could add unsupported serious charges to legitimate minor charges with impunity." *Id.*

There is no disputing—not reasonably, anyway—that the murder, attempted murder, and assault charges are distinct from the charge for criminal possession of a weapon. Start with the elements: Murder in the second degree requires that a victim was killed, and assault in the first degree requires that a victim was seriously physically injured; neither is required for criminal possession of a weapon in the second degree. N.Y. Penal Law § 125.25 (second-degree murder); *id.* § 120.00 (first-degree assault); *id.* § 265.03 (criminal possession of a weapon in the second degree). The weapons charge, naturally, requires possession of a weapon, which is not required for the murder or assault charge. *Id.* §§ 125.25, 120.00, 265.03.

Next, consider the penalties[7]: The murder charge carried a maximum sentence of life in prison, *id.* § 70.00(2)(a), and the attempted murder charge exposed Dixon to 25 years, *id.* § 70.00(2)(b). The gun-possession charge, while serious, carried a significantly lighter potential sentence: fifteen years. *Id.* § 70.00(c)(a). Indeed, Dixon *spent* nearly twice as long in prison as the maximum possible sentence on the gun-possession charge. It makes no sense to argue that his gun-possession charge is indistinct from the charges that have been finally dismissed.[8]

---

[7] Defendants' suggestion that an outstanding conviction defeats favorable termination unless it is for an "easy to prove misdemeanor," ECF 169 at 31, has been repeatedly rejected. *See, e.g.*, *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 336–37 (E.D.N.Y. 2006) (citing numerous cases and rejecting the argument, writing: "[T]he Court does not read *Janetka* so narrowly. The primary basis for the Second Circuit's decision in *Janetka* was the fact that the charges involved 'two distinct offenses involving distinct allegations.'"). Indeed, even comparing the relative penalties is not required by *Janetka*. *See Dunham v. City of New York*, 295 F. Supp. 3d 319, 334 (S.D.N.Y. 2018) (finding favorable termination based on distinctness of the elements even where court lacked information required to analyze penalties); *Sassower v. City of White Plains, Cnty. of Westchester*, No. 89 CIV. 1267 (MJL), 1995 WL 222206, at *9 n.8 (S.D.N.Y. Apr. 13, 1995) (noting that courts have "considered the comparative severity" but under *Janetka*, "the distinctness of the charges appears to be the more controlling factor in this Circuit.").

[8] Again, the State's actions demonstrate that the charges are distinct—it consented to vacating Dixon's murder, attempted murder, and assault charges, conceding that the eyewitness evidence

### 2. Case law since *Janetka*

Courts have been applying *Janetka* for thirty-five years. Defendants have not identified a *single* case in which an otherwise favorable termination on a murder charge was considered unfavorable due to another conviction or outstanding charge. Nor have we found any. Instead, the case law makes clear that someone who is wrongfully prosecuted for murder can bring a malicious-prosecution suit even if he has outstanding convictions or ongoing prosecutions on other charges, even related ones. Some examples follow.

In *Reid v. New York County District Attorney Marrinaccio*, the plaintiff had been prosecuted for "murder in the second degree, reckless endangerment in the first degree, and two weapons possession charges." No. 00 CIV 5164, 2004 WL 1488194, at *5 (S.D.N.Y. July 1, 2004). All charges stemmed from a single incident and there was assuredly "some overlap between the crimes." *Id.* at 6. Nonetheless, applying *Janetka*, the court noted that the offenses were "distinct in both their elements and level of severity." *Id.* at *6. Accordingly, the convictions—on charges that were very serious, to be sure—did not render the plaintiff's acquittal on the murder charge anything other than favorable. *Id.*

Other cases include *Dukes v. City of Albany*, 289 F. Supp. 3d 387, 396–97 (N.D.N.Y. 2018) (rejecting the defendants' reliance on *DiBlasio*—a case discussed next—and holding that vacatur of murder conviction was favorable, despite conviction for robbery), and *Belot v. Wieshaupt*, No. 96 CIV 3005, 1997 WL 218449, at *4 (S.D.N.Y. Apr. 29, 1997) (finding argument to be "without merit" where the defendants relied on *DiBlasio* and argued that the plaintiff's acquittal on a murder charge was not favorable because he was convicted of criminal

---

was inaccurate; but it did not consent to vacating the gun-possession charge and when a judge vacated that charge anyway, the State appealed. The State's pursuit of gun-possession charge explicitly adopts a new theory of that conviction—that Dixon possessed the gun at a different location but near enough to the shooting, earlier but close enough in time to when Lamarr Scott started shooting. P207.

possession of a weapon). Indeed, unlike here, the defendants in *McLennon v. New York City* acknowledged the state of the law, such that "[t]he parties [*did*] *not dispute* that the acquitted charges of murder, manslaughter, and assault [were] sufficiently distinct from the weapons charges for which plaintiffs were convicted such that plaintiffs' malicious prosecution claims [could] proceed with regard to the former charges." No. 13 CIV 128, 2015 WL 1475819, at *6 (E.D.N.Y. Mar. 31, 2015) (emphasis added).

Against all this precedent, Defendants rely on *DiBlasio*. In *DiBlasio*, the criminal defendant was convicted of cocaine *possession* and acquitted of cocaine *distribution*—but he *admitted* to distributing cocaine and was acquitted only on an entrapment defense. 102 F.3d at 655–56. Given that he admitted to all the charged conduct, and his malicious-prosecution suit was decided at a time when courts looked for indications of innocence, one can see why a majority of the panel viewed the split jury verdict as insufficiently favorable. *Cf. Bousley v. United States*, 523 U.S. 614, 623 (1998) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency"). Given the very unusual facts in *DiBlasio*, it's not surprising that its footprint has been small. For example, the plaintiff in *Warren v. Fischl*, another case cited by Defendants, was convicted on thirteen drug charges (and three weapons charges) and had four of the drug charges vacated on *mens rea* grounds—the State failed to prove he knew *the amount* of drugs in his possession. No. 15 CIV 2829, 2015 WL 6760230, at *3, *6 (E.D.N.Y. Nov. 5, 2015). The plaintiff in that case alleged a wide-ranging conspiracy against him that, if true, impugned the entire criminal prosecution. *Id.* at *6. It's not surprising then that, notwithstanding the vacatur of four convictions on that technical legal—not factual—ground, potential success in his civil case could not "be reconciled with [his] conviction on the remaining twelve counts[.]" *Id.*

The cases within *DiBlasio*'s footprint bear no resemblance to this case, where: (i) the ongoing prosecution is on a less serious offense; (ii) the ongoing prosecution does not rely on the

evidence that led to the initiation of the finally terminated charges; (iii) the finally terminated charges are for serious violent offenses of murder, attempted murder, and assault; and (iv) the State admits Dixon did not engage in the conduct underlying the finally terminated charges. *See Dukes*, 289 F. Supp. 3d at 396 ("Defendants rely in large part on [*DiBlasio*], a case which held that an acquittal is not a 'favorable termination' when the prosecution also results in a conviction of a lesser included offense. However, defendants' argument elides the difference between a conviction for a 'lesser included offense' (*e.g.* varying degrees of robbery) and conviction for a lesser, unrelated offense (*e.g.* robbery versus murder)—a distinction squarely presented in this case.").

Dixon has been completely exonerated of murdering Torriano Jackson, attempting to murder Aaron Jackson, and assaulting John Sullivan. But, to avoid facing a civil jury, Defendants ask this Court to rule that those exonerations—on factual grounds, not technical legal ones—were not favorable. They ask for the judgment they would be entitled to if Dixon had never been exonerated. In other words, after 27 years in prison, the criminal-justice system has finally recognized that Dixon is innocent, but Defendants ask this court, in a civil case, on summary judgment, to treat him as guilty. This argument has no legal or factual basis. It must be denied.

## II.    Defendant officers deprived Plaintiff of a fair trial.

### A.    Defendants fabricated evidence.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." *Bellamy v. City of New York*, 914 F.3d 727, 745 (2d Cir. 2019) (citation omitted). As the Second Circuit has oft observed, "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." *Smalls*, 10 F.4th at 132 (quoting *Ricciuti*, 124 F.3d at 130 (quotation marks omitted)). "To prove a Section 1983 fair trial claim, a plaintiff must establish that (1) the officer created

false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee*, 12 F.4th at 168 (cleaned up).[9] Fabricated evidence "may be 'false' if material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015).

There is ample evidence that Defendants Stambach, Massecchia and Vickerd all fabricated their reports of the initial identifications of Dixon, falsely claiming three separate people identified Dixon as the shooter independently and without suggestion. We now know Dixon is completely innocent of the shooting.[10] And, as the prosecutor argued at trial, it is extremely unlikely that three independent witnesses would happen to select Dixon as the shooter if it were not true. P202 (suggesting the three separate identifications were so unlikely to be a coincidence that they should "go and lay some money down" on the lottery).

The bare circumstances alone support a reasonable inference that what Defendants reported about the identifications was not true. The witnesses observed Lamarr Scott—who looks nothing like Valentino Dixon—commit the shooting. As Plaintiff's eyewitness ID expert explains, based on the science it is exceptionally unlikely someone who saw Scott commit the shooting would mistakenly select Dixon from a fair array. Indeed, the entire point of a photo array is to test the reliability of any selection by minimizing the risk that a witness would select an innocent suspect by chance. If a six-photo array is fair, meaning that Dixon did not stand out from the other photos (as everyone agrees he did not in the arrays shown here), there is no more

---

[9] Again, "the absence of probable cause is not an element of a due process claim." *Bermudez v. City of New York*, 790 F.3d 368, 376 n.5 (2d Cir. 2015).

[10] Even if Defendants wanted to contend Dixon is guilty, despite his exoneration by the DA and the conviction of Lamarr Scott, they cannot do so at summary judgment.

than a one-in-six chance that any given witness would happen to select the innocent suspect.[11]

Here Defendants claimed *three* witnesses did so, and claimed they all did so independently and

without suggestion. The odds of that happening by chance are lower than one in two hundred[12]—

which is why the prosecutor suggested they merited playing the lottery. As Plaintiff's unrebutted

eyewitness expert concluded, based on the science of eyewitness memory, "the most reasonable

explanation for how three witnesses all came to select Mr. Dixon—who was not the shooter—

from the arrays is suggestion or influence during the identification procedures."[13] While

summary judgment must be denied so long as a reasonable jury *could* draw this inference, here it

is far stronger, as Defendants offer no other reasonable explanation for these facts. *See S.*

*Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 879 (2d Cir. 2021) (reversing summary judgment

because "while the district court acknowledged that it was required to resolve all ambiguities in

favor of [] the party against whom summary judgment was being sought, it plainly did not do

so"); *Brandon v. Kinter*, 938 F.3d 21, 34 (2d Cir. 2019) (reversing summary judgment in § 1983

case where district court failed to draw inference supported by the record in non-movant's

favor).

---

[11] The chance is actually lower than one in six because that doesn't account for the "none of the above" option—which is what a witness *should* say if viewing an array that does not include the perpetrator, as was the case here for all three witnesses.

[12] Given that each of the three witnesses could have selected any of the six photos from their array, there are 216 different combinations of selections (6 x 6 x 6)—and only one in which all three select Dixon.

[13] For this reason, Defendants' reliance on *criminal* cases rejecting motions to suppress, ECF 169 at 34, is badly misplaced. In those cases, courts hold that the procedures were sufficiently reliable that a jury may hear, and may choose to credit, the evidence. But the question in this civil case is not whether the evidence is reliable—we already know it's not, it was plain wrong. The question here is, how was so much false eyewitness evidence created? Dixon offers a reasonable answer, supported by evidence: the Defendants fabricated the eyewitness evidence, through suggestive photo displays or another means. Defendants, on the other hand, have offered no explanation whatsoever, apparently hoping the Court overlooks that Dixon was not the shooter and looks nothing like the shooter.

This is presented mostly starkly with Emil Adams, who Stambach admitted was "as important a witness as any in the case," P75, given that Adams had the best opportunity to view the shooting and was not intoxicated or injured. Immediately after the shooting, Adams provided Stambach with an extremely detailed and accurate description of both what Scott looked like and what he was wearing, confirming that he observed what we know happened: Scott shooting people with the TEC-9. Stambach testified there is "no doubt" that Adams was segregated from all other witnesses the entire time he was at the police station—from before when he gave this description of Scott as the shooter until after Stambach and Vickerd claim that Adams identified Dixon from the photo array. It is exceptionally unlikely Adams would mistakenly select Dixon, who looks nothing like Scott, after viewing Scott. Given that Adams was intentionally segregated from other witnesses, there is no possible source for suggestion during this period other than Defendants.

That alone would be enough to support a reasonable inference that Defendants' reports are false. *See, e.g., O'Brien v. National Gypsum Co.*, 944 F.2d 69, 72 (2d Cir. 1991) ("[I]t is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts."). But there is far more. First, although Defendants admitted they understood they had to accurately record everything Sullivan stated to them and information they provided to him, and claimed they did so, Sullivan himself testified that the reports were not accurate. P57 ("There's a lot of stuff in the statement… I didn't really put in there."). Sullivan also described how he had told Defendants about his substance use, but they did not report it, even though they admitted it was relevant to the reliability of his statement and must be reported if they knew it.[14]

---

[14] Despite concerted efforts, counsel for Dixon could not locate Sullivan for deposition; our understanding is he is homeless and has not been seen since the 2022 Buffalo snowstorms. P68.

There is also direct, indisputable evidence that Defendants—including Lonergan—falsely claimed that John Sullivan first interjected Dixon's name into the case when Vickerd interviewed him at the hospital.[15] Not only was Valentino Dixon identified by police as a suspect within minutes of the crime (long before any of them spoke to Sullivan) but Dixon's mug photo and criminal records were ordered at 3:30 a.m., over half an hour *before* Vickerd made it to the hospital to interview Sullivan. This lie that Defendants did not suspect Dixon before the witnesses identified him is important because it was used to falsely suggest Defendants could not have tainted the witness identifications. Lonergan also claimed Sullivan volunteering Dixon's name is what made him a reliable witness, despite the objective circumstances (intoxication, distance, gunshot injury) which all suggested he was not. But Vickerd himself admits he may actually have been the one to mention Dixon to Sullivan, not the other way around (as his report falsely indicates). The jury may "consider [Defendants'] dishonesty about [this] material fact as affirmative evidence of guilt." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (cleaned up).

Although the jury need not decide *how* Defendants used suggestion to obtain the identifications, just that they did (and that their reports of non-suggestive identifications from fair procedures were false)[16] both Adams and Sullivan also provide direct evidence of the method— showing individual mugshots of Dixon. Adams admits that, just a year and a half after this ID procedure, he truthfully told Dixon's family that he was actually shown three *individual* photos—of Valentino Dixon, Mario Jarmon, and a third person. There were in fact three (and

---

[15] This alone rebuts Defendants' argument that Lonergan—who was the designated lead detective—was insufficiently personally involved to be held liable. ECF 169 at 33.

[16] Even in a criminal case a jury need only agree on the *elements* of a charge, not on the *means*. *E.g.*, *United States v. Requena*, 980 F.3d 30, 48 (2d Cir. 2020) (explaining that jurors could find a criminal defendant used "a deadly weapon" even if some jurors thought the defendant used a knife and others thought he used a gun).

only three) individual mugshots requested by Defendants by the time Adams was interviewed early that morning: of Dixon, Jarmon, and John Sullivan. Although Adams at the time of his deposition initially denied remembering that any photos were shown individually, he believed all were shown in the same manner. After his memory was refreshed with contemporaneous evidence demonstrating that he was shown the Jarmon mug photo individually, Adams admitted he may well have been shown the Dixon mug photo individually, as well (as he had reported when his memory was fresher).[17] And Sullivan himself, when asked at a later proceeding if he had seen a photo array corrected that he had seen "mug shots"—i.e., the same suggestive identification procedure Adams separately describes.

Defendants all deny showing individual photos of Dixon to witnesses, as they admit that they understood that would be improperly suggestive and could produce misidentifications. And a reasonable jury can certainly conclude that this suggestion is the most plausible explanation for

---

[17] Defendants argue that the Court must blind itself to the evidence of how they unduly influenced Adams's identification, dismissing this evidence as all hearsay. That is wrong. As demonstrated above there is ample non-hearsay evidence—including Adams's sworn testimony at his deposition—that supports the reasonable inference the means of procuring Adams's misidentification was showing an individual photo of Dixon. To be sure, that evidence is *corroborated* by the audio tape of Dixon's family's interview of Adams, but even without that corroboration, independent plainly admissible evidence supports that conclusion. Moreover, Defendants' mere invocation of the word "hearsay" does not show that the audio tape will not be admissible at trial, which was their task. *Kee*, 12 F.4th at 170 (where defendants did not show that the plaintiff "will be unable to overcome any hearsay issues" at trial, it was error to ignore the evidence at the summary-judgment stage). Under Federal Rule of Evidence 804(b)(3), the tape is a statement against interest, as it exposed Adams to perjury charges. Under Rule 803(5), it is a recorded recollection, made by Adams when the matter was fresh in his memory, and he no longer recalls the events clearly. P96. Under Rule 803(16), the tape was prepared before 1998 and has been authenticated. P87. And under Rule 807, the tape is trustworthy as it is corroborated by all the evidence discussed above; it matches what Adams told others at the time; P85–86, P104–05; Adams at his deposition vouched for the accuracy of much of the tape's content P92, P101; he is demonstrably mistaken about the one thing he disputes, P102–103; and he testified at his deposition that whatever he said when he was interviewed by Dixon's family was the truth P86. Courts have also admitted evidence under Rule 807 when Rule 801(d)(2)(A) doesn't technically apply but the witness is similar to an adverse party, like Adams is here. *See, e.g.*, *U.S. Underwriters Ins. Co. v. ITG Dev. Grp., LLC*, 294 F. Supp. 3d 18, 31 (E.D.N.Y. 2018).

three independent witnesses falsely identifying Dixon as the shooter after observing Scott (who looks nothing like Dixon) commit the crime. Indeed, Defendants offer no *other* explanation for how three witnesses independently made such a grave error.

And there's more. Lamarr Scott fit the description of the shooter, voluntarily confessed to the crime, provided details demonstrating the reliability of his statement, and offered to provide his clothing for forensic testing to confirm it, even pointing out the victim's blood still on his shoes, and Defendants did *nothing* to investigate him. This shocking misconduct "is the hallmark of a deliberate action to avoid confirming suspicions—an action tantamount to knowledge under the law." *Mellen v. Winn*, 900 F.3d 1085, 1102 (9th Cir. 2018) (cleaned up) (holding officer's failure to inquire further into obviously exculpatory evidence alone "established the mental state necessary to prove" due-process violation); *cf. Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir.1996) ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of a lack of probable cause.").

Indeed, both Stambach and Masecchia *admitted* they recognized that Scott fit the description of the shooter, and Dixon did not, and that these were "red flags." And Defendants admitted that Scott's confession was a big deal, because it would be very unusual for someone to voluntarily confess to a crime they did not commit. Stambach also admitted he understood how to evaluate whether a confession is reliable—if it provides nonpublic details and offers new information police can corroborate through follow up investigation—and Scott's confession clearly meets that test. A reasonable jury can conclude Defendants' otherwise inexplicable failure to further investigate Scott—who voluntarily confessed to shooting three people with a TEC-9—was intended to cover for their earlier misconduct. In other words, Defendants failed to take the basic steps they admitted should have been taken to follow up precisely because they understood Scott's confession *was* reliable, and that further investigation would demonstrate not

only his guilt and Dixon's innocence, but that the identifications they had reported were the unreliable product of Defendants' suggestion. Indeed, not even in this litigation, with their own reputations at stake, could Defendants come up with *any* legitimate reason not to collect Scott's clothing and have it forensically tested. There is no such reason.

In addition, evidence of a defendant's persistent deviations from "applicable professional standards" can "support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017) (cleaned up); *see also Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (same); *Dufort v. City of New York*, 874 F.3d 338, 349 (2d Cir. 2017) (holding "Defendants' unusual decision to depart from normal [police] practice" must be construed against them on summary judgment). Here, Defendants have admitted pervasive deviations from required police procedure, for which they can offer no good-faith explanation, including, for example, their failure to record any basis for initial suspicion of Dixon, their failure to follow up on Scott's extraordinary confession, and their failure to timely follow up with witness Tamara Frida, who called the station within days of the shooting and volunteered Dixon was not the shooter and that she could help identify who was. That, too, amply supports a finding of deliberate misconduct. And the jury can also consider Defendants' striking pattern of similar misconduct—their fabrication of evidence and other misconduct caused three other wrongful convictions of innocent people in Buffalo, P209–29—as additional evidence of their opportunity, intent, and absence of mistake. *See Ismail v. Cohen*, 899 F.2d 183, 188–89 (2d Cir. 1990) (holding trial court properly admitted evidence of officer's similar act misconduct at § 1983 trial).

There is no dispute that Defendants provided false information about the identifications to the prosecutor, who relied on them. This easily demonstrates a dispute of fact about causation. As the Second Circuit has made clear, unless it is beyond dispute the fabricated evidence had "*no*

impact on the conduct" of the criminal trial, this causation question is for the jury. *See, e.g., Bellamy*, 914 F.3d at 748–49 (reversing summary judgment where reasonable jury could find fabricated evidence impacted the trial, even though the fabricated evidence was not introduced). And the Second Circuit has spelled out specific ways to meet this burden. For example, if the prosecutor accepted Defendants' falsified evidence, he "might have been led to conclude, incorrectly, that any defects in the witnesses' identifications were minor matters and for that reason could be ignored." *See Bermudez*, 790 F.3d at 375. That's exactly what the evidence shows happened here. Accordingly, "there are triable issues of fact concerning whether [the prosecutor's] decision to bring charges was tainted by misleading information." *Id.* at 376.

Defendants fail to engage with any of this evidence. Instead, they make a cursory argument that Plaintiff cannot prove his claims without direct admissions of their misconduct from either Defendants themselves or the witnesses they conspired with. *See* ECF 169 at 30–31. But "it is axiomatic…that conspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence." *Victory v. Pataki*, 814 F.3d 47, 68 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (cleaned up). Thus courts regularly find circumstantial evidence of the sort Plaintiff identifies here sufficient to prove fabrication of evidence claims. *See, e.g., Ortiz v. Stambach*, 657 F. Supp. 3d 243, 254–55 (W.D.N.Y. 2023) (rejecting argument that plaintiff could not prove fabrication without direct evidence contradicting Stambach's account, holding circumstantial evidence was sufficient to permit jury to draw the reasonable inference that Stambach fabricated confession from innocent suspect); *Rosario v. City of New York*, No. 18 CIV. 4023 (LGS), 2021 WL 199342, at *6–7 (S.D.N.Y. Jan. 20, 2021) (describing how circumstantial evidence could establish that identification procedures were unduly suggestive).

**B.  Defendants obtained the identifications through impermissible suggestion.**

The Second Circuit has made clear that officers may be held liable in a § 1983 action for using impermissibly suggestive identification procedures to obtain identifications that are subsequently used to convict a suspect. *See Bermudez*, 790 F.3d at 374–76. Defendants admit *if* they used suggestion to taint the identifications—such as by showing individual photos of Dixon—then that was illegal, serious misconduct, and a constitutional violation. As they must, because the law is crystal clear on this point. *See, e.g., Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013) (describing single-suspect identification procedures as unreliable and "widely condemned"); *Dufort*, 874 F.3d at 348 (describing as "paradigmatic example of an improperly suggestive" procedure where suspect was only one wearing a red shirt like that worn by the assailant). Although Defendants deny that they engaged in such suggestion, a reasonable jury can find that they did, for the reasons explained above. That provides another basis for finding Defendants liable for violating Plaintiff's right to a fair trial, as "[u]nduly suggestive identification procedures can render subsequent identifications tainted or unreliable." *Rosario*, 2021 WL 199342, at *7 (citing *U.S. v. Thai*, 29 F.3d 785, 807–08 (2d Cir. 1994)).

Although Defendants fail to directly address this argument, they do suggest that the passage of time between their improper suggestion and the use of the identifications at trial somehow absolves them of responsibility. Not so. As has been recognized for decades, the danger of an unduly suggestive identification procedure is that it causes an *irreparable* misidentification—that is, that it so taints any subsequent identification testimony as to render it fundamentally unreliable. *See Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir. 1982). Thus, when the procedure is suggestive enough, any identification testimony from that witness cannot be introduced consistent with due process. *See, e.g.*, *Raheem v. Kelly*, 257 F.3d 122, 133–34 (2d Cir. 2001); *Dickerson*, 692 F.2d at 247. As in *Bermudez*, the jury here can find that the

witnesses' subsequent identifications can be explained by the suggestive identification procedure—"they might very well have decided to stick with that story (or become convinced that it was true), and for that reason…misinformed the ADA when [she] subsequently questioned them." 790 F.3d at 375–76.

### C. Defendants suppressed exculpatory evidence.

It is undisputed that "[w]hen police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating…*Brady*." *Bellamy*, 914 F.3d at 751; *see also Poventud*, 750 F.3d at 133. This includes when a police officer misleads the prosecutor "as to the nature of the photo identification procedures and the fact that [a witness'] testimony was coerced." *Bermudez*, 790 F.3d at 376 n.4. Plaintiff must show he was prejudiced by the suppression because there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"—for example, "he would have been acquitted based on reasonable doubt or convicted on a lesser charge." *Bellamy*, 914 F.3d at 751 (quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, the same evidence that establishes Defendants' fabrications of evidence about the identification procedures also establishes that they withheld exculpatory evidence of the suggestion they used to obtain the identifications. *See, e.g.*, *Bermudez*, 790 F.3d at 376 n.4 (holding the same facts proving a fabrication claim can also prove a *Brady* claim). Belling admitted he was not aware of any suggestion in the identification procedures, but if he had been he would have disclosed it as *Brady* material. P171–77.

Materiality must be assessed in light of the closeness of the case, as "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 113 (1976). Here, the only inculpatory evidence at trial was the three identifications—two of them from people who were shot at the time, limiting their ability to provide a reliable identification—and the jury originally broke 9–3 for acquittal. *See, e.g., Leka v. Portuondo*, 257 F.3d 89, 107 (2d Cir. 2001) (finding "it is easy to conclude that 'the government's evidentiary suppression undermines confidence in the outcome of [the] trial,'" given "the fact that the jury was at one point hung" and that the suppressed evidence "would have…cast doubt on [the witness's] identification"); *Boyette v. Lefevre*, 246 F.3d 76, 92 (2d Cir. 2001) (holding it "objectively unreasonable" to find *Brady* violation did not cause prejudice where first jury had deadlocked 9–3 for acquittal). Defendants themselves admit if they engaged in this suggestion it would be severe, unconstitutional misconduct that would taint the IDs; they just deny they did so. In other words, there's no dispute if this happened—as a reasonable jury can certainly find—it undermines the reliability of the identifications.

Defendants also withheld evidence of their own investigative misconduct. Belling agreed if Defendants falsely claimed the witnesses made identifications from fair photo arrays, when they actually were shown individual photos—as a jury can find Defendants did—that would be a serious misrepresentation. Particularly given that the conviction in this case hinged on identifications Defendants procured—and therefore the reliability of the procedures Defendants used to obtain them—this evidence, too, was material. *See Kyles*, 514 U.S. at 445–49 (finding *Brady* violation based on suppression of evidence that undermines the credibility and reliability of the investigating officers and the investigation as a whole).

Defendants do not address any of this evidence, again improperly taking the facts in their own favor and making inapposite arguments that officers may not be held liable for a "mere failure to take notes as to everything a witness says" or "track down every lead which may produce" favorable evidence. ECF 169 at 33. Plaintiff never claimed they could.

## III.    Defendant officers maliciously prosecuted Plaintiff.

In addition to the favorable-termination requirement discussed above, a § 1983 malicious prosecution claim requires proof of a seizure in violation of the Fourth Amendment and initiation or continuation of a criminal proceeding without probable cause. *Thompson*, 596 U.S. at 42–43; *see also Kee*, 12 F.4th at 161–62. Although the Supreme Court expressly did not reach whether malice is also required, *Thompson*, 596 U.S. at 44 n.3, the Second Circuit has held it is, *see, e.g., Kee*, 12 F.4th at 161–62. A reasonable jury can easily find all elements met here.[18]

### A.    Defendants lacked probable cause.

Defendants primarily argue that a subsequent decisionmaker—either the prosecutor who sought an indictment, or the grand jury that issued it—establishes probable cause and relieves Defendants of responsibility for the groundless prosecution. Both arguments suffer from the same fatal flaw: the subsequent decisions are not independent if they rely on false information provided by the Defendants (as Plaintiff's evidence demonstrates they did here).

Thus "[a]lthough a grand jury indictment gives rise to a presumption that probable cause exists…that…presumption may be rebutted by evidence of various wrongful acts on the part of police." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). Specifically, Plaintiff can rebut the presumption of probable cause by showing police "failed to make a complete and full

---

[18] Defendants do not dispute that Plaintiff's years of wrongful incarceration qualify as a seizure, or that they initiated the prosecution. *See Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (A "jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared…alleged false [evidence] and forwarded it to prosecutors.").

statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith," *Manganiello v. City of New York*, 612 F.3d 149,160–63 (2d Cir. 2010) (cleaned up); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003); or by showing that the police "failed to make further inquiry when a reasonable person would have done so," *Haynes v. City of New York*, 29 A.D. 3d 521, 523 (2d Dep't 2006); or by showing "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures," *Vazquez v. City of New York*, No. 10-cv-6277, 2014 WL 4388497, at *9 (S.D.N.Y. Sept. 5, 2014).

Similarly, "if the District Attorney's office pursued its prosecution…after it was deliberately misled by the Defendants, then the decision to prosecute does not interrupt the chain of causation." *Dufort*, 874 F.3d at 352. Here, Belling testified he relied on Defendants' reports about how the identifications were procured, and never knew of any suggestion. Defendants cannot escape responsibility for the baseless prosecution.

And taking the evidence in the light most favorable to Plaintiff—as the Court must at this stage—it easily supports a finding there was no probable cause. The *only* inculpatory evidence was the identifications which were the result of Defendants' suggestion, and therefore cannot provide probable cause. *See Stansbury*, 721 F.3d at 90–91 (holding two positive identifications from single photographs were "too problematic…to provide probable cause" on their own); *Dufort*, 874 F.3d at 348 (holding identification from unduly suggestive procedure "should not factor into any probable cause analysis"). And there were other reasons to discount the reliability of any statement from Sullivan (who Defendants knew was intoxicated, injured, and too far away from the shooter to make a reliable identification) or Jackson (who was severely injured and reported himself to Defendants he did not think he could make a positive identification). Furthermore, "[r]eview for probable cause should encompass 'plainly exculpatory evidence'

34

alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury*, 721 F.3d at 93. Here, there was astonishingly exculpatory evidence: a credible confession from the real shooter, Lamarr Scott, corroborated by other witnesses who identified him. And Defendants' own actions and admissions demonstrate they understood Scott's confession was reliable. A reasonable jury could plainly find there was no probable cause. *Kee*, 12 F.4th at 166–67 ("[T]he district court is not permitted to make credibility determinations or weigh the evidence on the probable cause element or any other element, for these are jury functions, not those of a judge.") (cleaned up).

### B. Malice can be inferred from a lack of probable cause.

"A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78; *Rutherford v. City of Mount Vernon*, No. 18 CIV. 10706 (AEK), 2023 WL 6395375, at *19 (S.D.N.Y. Sept. 29, 2023) ("Lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment.") (cleaned up). Malice may also be shown "by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996). Aside from the evidence that Defendants lacked probable cause to prosecute Dixon, malice can also be shown through the repeated misconduct of each Defendant, as well as Defendants' "apparently myopic focus on" him—beginning from the earliest moments of the investigation, with no articulated basis at all, and continuing even after the true shooter presented himself gift-wrapped to the investigating officers. *See Manganiello*, 612 F.3d at 164.

### IV. There is no basis to dismiss Plaintiff's failure to intervene or civil rights conspiracy claims.

Defendants concede that these are viable legal theories but dispute the facts—arguing there were no constitutional violations or they weren't aware of any that they could have prevented. ECF 169 at 41–43. That argument fails based on all the evidence discussed above.

Defendants' argument that no individual defendant can be both directly liable and also liable for a failure to intervene is premature. *Buchy v. City of White Plains*, No. 14 CV 1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (denying summary judgment based on this same argument, holding the jury has to decide which alternative theory fits the facts).

Nor is Dixon's conspiracy claim barred by the intra-corporate conspiracy doctrine. For starters, the Second Circuit has not yet decided whether this doctrine applies in § 1983 cases. *See Jones v. Blekis*, No. 23-CV-1641, 2024 WL 230288, at *6 (D. Conn. Jan. 22, 2024). But even assuming it does, Defendants concede the claim is viable if they conspired with someone outside the police department. ECF 169 at 14. There is ample evidence that Defendants conspired with outsiders. For example, under the unique circumstances here, where after Defendants' suggestion the eyewitnesses repeatedly maintained identifications they have acknowledged they knew were false, a reasonable jury could conclude that Defendants conspired with Aaron Jackson, John Sullivan, or Emil Adams to falsely implicate Dixon. And although Defendants primarily hid their misconduct from Belling, there is evidence that, with respect to pressuring Lamarr Scott to falsely recant his confession before the grand jury, they worked hand-in-hand. *See Mazyck v. Keller*, 531 F. Supp. 3d 630, 647 (W.D.N.Y. 2021) (intra-corporate conspiracy doctrine did not bar claim where plaintiff alleged that defendants fabricated evidence to cover up actions of a third defendant and those actions were not related to corporate policy or management decisions).

## V.    Dixon's state-law malicious-prosecution claim must be tried to a jury.

As Defendants concede, ECF 169 at 46, the legal standard applicable to Dixon's state-law malicious-prosecution claim is not meaningfully different, in any way relevant to the present summary-judgment motions, from the federal standard. So Dixon's state-law claim survives for the same reasons the federal one does. And for that same reason, Dixon's claim for *respondeat superior* survives too.

**VI.    Defendants are not entitled to qualified immunity.**

Defendants have waived any argument that they are entitled to qualified immunity. Other than parroting the generic legal standard, Defendants make no case-specific argument for qualified immunity whatsoever, and indeed explicitly say that they will do so for the first time in their reply brief. ECF 169 at 45. That is a waiver. *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) ("The qualified immunity defense can be waived, either by failure to raise it in a timely fashion, or by failure to raise it with sufficient particularity."); *Kurtz v. Hansell*, No. 20 CIV. 3401, 2021 WL 1143619, at *8 n.9 (S.D.N.Y. Mar. 24, 2021) (finding waiver because qualified immunity is an affirmative defense and it was only "cursorily" addressed in defendants' opening brief); see also *Farm Sanctuary v. U.S. Dep't of Agric.*, 545 F. Supp. 3d 50, 65 n.5 (W.D.N.Y. 2021) ("[A]rguments made for the first time in a reply brief need not be considered by a court."); *Jiles v. Rochester Genesee Reg'l Trans. Auth.*, 317 F. Supp. 3d 695, 701 (W.D.N.Y. 2018) ("[I]t is well settled that courts should not consider arguments first raised in a party's reply brief which afford no opportunity for response from the opposing party.").

In any event, Defendants will not be able to make a good argument, even in their reply brief. That's because the law has long been clear that the conduct these Defendants engaged in is not protected by qualified immunity. Consider what the Second Circuit wrote in 1997, concerning conduct that took place in 1989:

> When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983. [Such] defendant police officers are not entitled to summary judgment on the ground of qualified immunity. Qualified immunity is unavailable where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise.

*Ricciuti*, 124 F.3d at 130; *see also Horn v. Stephenson*, 11 F.4th 163, 170–73 (2d Cir. 2021) (denying qualified immunity on *Brady* claim, tracing obligation not to deliberately suppress

37

exculpatory evidence back to *Brady v. Maryland*, 373 U.S. 83 (1963), *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Pyle v. Kansas*, 317 U.S. 213 (1942)). The Second Circuit has routinely held officers liable for the type of misconduct alleged here—fabricating evidence, hiding exculpatory evidence, and malicious prosecution—arising out of prosecutions at or before the time of the conduct in this case. *Bermudez*, 790 F.3d at 376 n.3 (denying qualified immunity on fabrication, suggestive identification and *Brady* claims based on 1991 misconduct); *Restivo*, 846 F.3d at 552 (holding officer liable for fabrication, *Brady* violations, and malicious prosecution based on 1984 misconduct).

In a footnote, without asking *this* Court to so hold, Defendants argue that "[s]ome courts have gone so far as to say that *Brady*'s application to police officers was not clearly established until as late as 1995." ECF 169 at 45 n.117 (citing *Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011)). But that's not what the cited case held. *Haley*, the First Circuit case cited in Defendants' footnote, held that the law in 1972 was unclear only with respect to police officers' "no-fault disclosure obligation," but also that the law *was* clearly established that "[d]eliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction," violates the Constitution. *Haley*, 657 F.3d at 48–51. Dixon does not contend that Defendants happened upon exculpatory evidence, didn't realize that it was exculpatory, and innocently failed to turn it over—he contends, and his evidence shows, that Defendants *fabricated* the most important evidence against him and covered up their misconduct from both the prosecutor and the defense. *Cf. Dufort*, 874 F.3d at 354 (denying qualified immunity at the summary-judgment stage based on "[c]ircumstantial evidence" that "Defendants intentionally withheld or manipulated key evidence during [the plaintiff's] arrest and prosecution"). Defendants do not even hint at a court finding *that* misconduct was not clearly unlawful by 1991. Indeed, not only has such misconduct been long, specifically outlawed, it's

38

also obviously unlawful enough to fall within the rule of *Hope v. Pelzer*, 536 U.S. 730, 740–41

(2002) (when misconduct is obvious, "officials can still be on notice that their conduct violates

established law even in novel factual circumstances")); *see Simon*, 893 F.3d at 97 (2d Cir. 2018)

(citing *Hope* and rejecting qualified-immunity defense even where "few decisions have

examined the constitutional limits of material witness seizures and detentions and that none of

them involved a factual scenario quite like this one").

## VII.    The *Monell* and negligent hiring, supervision, and training claims were bifurcated and cannot be dismissed.

Defendants argue that the *Monell* claim should be dismissed because there is no underlying

constitutional violation. But as discussed thoroughly above, there *were* underlying constitutional

violations, so the *Monell* claim cannot be dismissed. Moreover, *Monell* liability can arise even

when individual liability is absent (for immunity reasons, for example). *See, e.g.*, *Lopez v. City of

N.Y.*, No. 20-CV-2502, 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021); *McCoy v. City of N.Y.*,

No. CV 07-4143, 2008 WL 3884388, at *2 (E.D.N.Y. Aug. 13, 2008).

Furthermore, discovery into entity liability was bifurcated. ECF 73. That was done at the

behest of the Defendants, who asked the Court to order the parties to "proceed only with

discovery of facts related to the plaintiff's arrest and conviction at this time," ECF 60-1 at 4. *See

also* ECF 73 at 2 n.4 (noting Defendants' support of County Defendants' motion and treating the

motion as applicable to all defendants). As Defendants argued, "[i]f bifurcation is granted, the

parties can focus their efforts solely on litigating whether any of the individual defendants

actually violated the plaintiff's constitutional rights." ECF 60-1 at 4. Defendants asked that,

"before the City and County conduct extensive discovery into what their policies and customs

were during the relevant time period by looking into unrelated cases dating back over 20 years,

the parties should first conduct discovery regarding what ADA Belling and the relevant police

officers actually did in the underlying investigation and prosecution of the plaintiff." *Id*. at 8.

Dixon argued specifically that the evidence was relevant to issues of training and supervision. ECF 52-1 at 1, 11, 12, 24; ECF 61 at 9. But the Court agreed with Defendants. ECF 73, and Dixon was blocked from conducting *Monell* discovery and discovery into the City of Buffalo's negligence in hiring, supervision, and training. Those claims were put on hold and cannot be dismissed now.

## CONCLUSION

For the reasons stated above, Defendants' motion should be denied.

Dated: February 15, 2024
New York, New York

/s/ Anna Benvenutti Hoffmann

Nick Joel Brustin
Anna Benvenutti Hoffmann
Mary Katherine McCarthy
Gerardo Romo

NEUFELD SCHECK BRUSTIN HOFFMANN
& FREUDENBERGER LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
T: (212) 965-9081

Donald M. Thompson

EASTON THOMPSON KASPEREK
SHIFFRIN LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
T: (585) 423-8290

40