## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| |
|---|
| VALENTINO DIXON, |
| Plaintiff, |
| v. |
| CITY OF BUFFALO et al., |
| Defendants. |

No. 19-cv-01678 (WMS) (HKS)

**Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 56**

**On August 10, 1991, Lamarr Scott shoots and kills Torriano Jackson and wounds Aaron Jackson and John Sullivan.**

1.      At approximately 1:15 a.m. on August 10, 1991, after a fight broke out on the corner of Delavan Avenue and Bailey Street near Louie's Hot Dogs in Buffalo, Lamarr Scott used a TEC-9 firearm to fatally shoot Torriano Jackson and wound two other men, Aaron Jackson and John Sullivan. Ex. 5 (Scott Plea 2018) 13–14 (caused death of Torriano Jackson and shot Aaron Jackson and John Sullivan); Ex. 4 (Scott Dep.) 18:5–19; Ex. 1 (Homicide File (Scott Stmt)) BPD Comp. 196–97 (confessing to being the shooter); BPD Comp. 2 (initial report); Ex. 76 (Shannon Decl.) ¶¶ 1, 4.

2.      Shortly before Scott shot and killed Torriano Jackson, Torriano had pulled out a silver handgun and shot at Mario Jarmon. Ex. 68 (GJ Tr. (Jarmon)) 10:7–9 (Tory brandished gun, stating he had a bullet for him); Ex. 23 (Dixon Dep.) 123:15–22, 125:10–11 (ran out of store, one Jackson brother had silver handgun); Ex. 4 (Scott Dep.) 18:13–19:7 (saw Torriano shoot Mario with a handgun); Ex. 1 (Homicide File (Scott Stmt)) BPD Comp. 197 (Tory had silver gun with nickel plate); Ex. 79 (Perj. Tr. (Maxian)) 454:8–21 (describing Jarmon's multiple gunshot wounds). The only people at the scene with guns were Scott and Torriano. Ex. 1 (Homicide File (Scott Stmt)) BPD Comp. 198.

3.      Scott emptied the entire clip of the TEC-9 that night, firing 27 shots total. Ex. 1 (Homicide File (Scott Stmt)) BPD Comp. 197; Ex. 1 (Homicide File (ballistics report)) BPD Comp. 236. After opening fire, Scott stood over Torriano Jackson and fired ten shots into his back as Torriano lay on the ground. Ex. 14 (DA memo) COE 4761; Ex. 6 (Frida Dep.) 14:16–18; Ex. 76 (Shannon Decl.) ¶ 1. Scott then fled the scene, disposing of the gun along the way. Ex. 1 (Homicide File (Scott Stmt)) BPD Comp. 197.

4.      The entire time that Scott was shooting was only 10–15 seconds. Ex. 17 (8/15/18 Scott

Interview, ECDAO Reinvestigation, Transcript Pt. 1) 11. During that time, the large crowd of

people gathered at the corner started running from Scott's gunfire. Ex. 20 (Scott Ltr., 12/11/98)

Dixon-003808. Within days of the shooting, Scott confessed to the news media, the Buffalo

Police Department, and several others. People in the neighborhood were all talking about how

Scott was the shooter. Ex. 76 (Shannon Decl.) ¶¶ 4–11.

5.      Lamarr Scott has now been criminally convicted of manslaughter in the first degree,

assault in the first degree, and assault in the third degree, after a comprehensive investigation by

the Erie County District Attorney's Office (ECDAO)—including detailed interviews of

approximately thirty witnesses and a review of the District Attorney's Office file, trial

transcripts, records of prior proceedings, and the physical evidence—concluded he was the

shooter. Ex. 5 (Scott Plea) 13:4–14:20 (pleading guilty); Ex. 32 (440 Order Vacating Conviction)

Dixon-5401; Ex. 33 (440 Motion Tr.) Dixon-699-700; Ex. 28 (ECDAO Aff. 2018) ¶¶ 4, 12–13.

6.      In November 1993, the year after Dixon was wrongfully convicted for Scott's crimes,

Scott shot a 16-year-old teenager in the head in an unprovoked armed robbery, leaving the young

man quadriplegic. Scott was ultimately convicted of attempted murder, first-degree assault, first-

degree robbery, attempted robbery, and weapons and cocaine possession in that case. The judge

sentenced him to the maximum term of 57 years, observing that Scott shot the teenager "just for

the thrill of it." Ex. 81 (11/9/94 Buffalo News Article); Ex. 35 (Prisoner Return Ord.)) COE

4265.

**Valentino Dixon is actually innocent of Torriano Jackson's murder.**

7.      After its comprehensive investigation, the ECDAO conclusively determined that Dixon did not shoot Torriano Jackson, Aaron Jackson, or John Sullivan on August 10, 1991, and consented to a vacatur of Dixon's convictions for murder, attempted murder, and assault. Ex. 28 (ECDAO Aff. 2018) ¶¶ 4, 12; Ex. 32 (440 Order) Dixon-5401. On September 19, 2018, the court vacated Dixon's wrongful convictions, and he was released. Ex. 32 (440 Order) Dixon-5401; Ex. 33 (440 Motion Tr.) Dixon 701–02.

8.      As Dixon has maintained for over two decades, he did not shoot Torriano Jackson or anyone else on August 10, 1991. Ex. 24 (Dixon 50-H)) 30:4–6 (not armed when shooting occurred); Ex. 1 (Homicide File (Dixon Stmt)) BPD Comp. 71 (did not shoot anyone); Ex. 5 (Scott Plea 2018) 2:1–4:19, 13:4–14:20 (pleading guilty to these crimes the same day Dixon was released).

9.      Scott's actions in shooting the TEC-9 were committed by him alone; Dixon did not ask or direct Scott to shoot anyone. Ex. 23 (Dixon Dep.) 184:2–11 (did not say anything to Scott before or during shooting).

10.     Dixon was not in the immediate vicinity of the shooting; he was in a store when gunshots first rang out and had already ran down the block and towards his car when Scott began shooting. Ex. 18 (Scott Int., ECDAO Reinvest., Transcript Pt. 2, 8/15/18) 17 (Dixon was already gone and going towards his car when Scott began shooting); Ex. 4 (Scott Dep.) 45:19–46:12, 57:3–11; Ex. 23 (Dixon Dep.) 122:20–22, 123:10–22, 124:18–125:8, 189:11–16; Ex. 24 (Dixon City 50-H) 31:6–15, 31:23–32:10; Ex. 6 (Frida Dep.) 13:4–19.

11.    At least seven eyewitnesses in a position to observe the shooting have identified Lamarr Scott—not Dixon—as the individual who fired the TEC-9 on August 10. *See* Ex. 28 (ECDAO Aff. 2018) ¶ 13; Ex. 14 (DA Memo) COE 4766–70; Ex. 6 (Frida Dep.) 12:17–23; Ex. 76 (Shannon Decl.) ¶¶ 1, 4.

**Police arrive at scene within minutes.**

12.    Buffalo Police Department (BPD) officers arrived at the scene within minutes of the shooting. Ex. 1 (Homicide File) at BDP Comp. 1–2 (Initial Reports); Ex. 2 (Cr. Tr. (Diegelman)) 383:21–23 (responded within 2–3 minutes of receiving 911 call).

13.    The shooting was investigated by several experienced BPD homicide detectives Defendants Mark Stambach, Raniero Masecchia, James Lonergan, and John Vickerd. As the first detective to the scene, Lonergan was designated the lead detective in form, but was not the primary investigator. Ex. 3 (Stambach Dep.) 52:23–53:02; Ex. 8 (Lonergan Dep.) 29:16–25, 30:25–31:19. Instead, the investigation was conducted collaboratively by Defendants who "constantly communicat[ed] about … [the] evidence" and "worked with one another to solve crimes" through informal communication, reports, and statements. Ex. 8 (Lonergan Dep.) 82:06–83:09; Ex. 3 (Stambach Dep.) 15:25–16:16, 105:03–106:13, 119:02–14.

14.    Stambach was integrally involved in the bulk of the investigative work on the case. Ex. 8 (Lonergan Dep.) 31:16–25; Ex. 3 (Stambach Dep.) 53:08–12. Stambach conducted several key investigative activities, including critical witness interviews of the true perpetrator Scott, and interviews and photo arrays with eyewitness Emil Adams and Aaron Jackson. He also coordinated a stake out pursuant to a pick-up order for Dixon, arrested him, took his statement, and authored the complaint that was the basis for probable cause for his arrest. Ex. 1 (Homicide

File) BPD Comp. 196–199 (Scott Stmt.); BPD Comp. 30–32 (Adams Stmt.); BPD Comp. 64–65 (Stambach Report); BPD Comp. 82–83 (Complaint); Ex. 3 (Stambach Dep.) 156:4–6, 156:18–19, 416:03–06.

15.    At the scene, officers recovered Torriano's silver handgun from near his body; the handgun had one spent casing in its cylinder. Ex. 1 (Homicide File) BPD Comp. 1 (Diegelman Report) (small caliber gun containing one spent casing recovered near blood splotches), BPD Comp. 5 (Evidence Slip); Ex. 2 (Cr. Tr. (Diegelman)) 384:22–385:2; *see also* Ex. 14 (DA memo) COE 4765 ("[A] .32 caliber revolver with one spent shell casing was recovered right next to the spot where Torry fell.").

16.    Officers also recovered 27 spent .9mm casings around the gun. Ex. 1 (Homicide File) BPD Comp. 5 (Evidence Slip); Ex. 2 (Cr. Tr. (Diegelman)) 384:22–385:8. The TEC-9 Scott used to murder Torriano Jackson and shoot Aaron Jackson and John Sullivan was never recovered. *See* Ex. 1 (Homicide File) BPD Comp. 3–10 (full evidence log).

**Dixon becomes a focus immediately and without any basis.**

17.    Despite his innocence of the shooting, within minutes of BPD arriving at the scene, Dixon's name was already being broadcast over the police radio as a possible suspect. Witness Tamara Frida heard over the radio that police had put out an "all points [bulletin]—APB—for Valentino Dixon as being the shooter" within 15 or 20 minutes of the shooting. Ex. 6 (Frida Dep.) 20:20–21:10.

18.    Sonya James, who was also present for the shooting, approached officers shortly after 1:39 a.m. to provide information; while talking to an officer in his patrol car, "she heard on the

radio that a possible suspect was Valentino Dixon." Ex. 1 (Homicide File) BPD Comp. 11 (Serwon Report); BPD Comp. 46 (James Stmt ("I was seated in the back of one of the cop cars, when I heard the dispatcher ask if anyone had a description of a Valentino [Dixon].")).

19.    In other words, within minutes of the crime, Valentino Dixon's name was mentioned on the police radio as a possible suspect. Ex. 7 (Masecchia Dep.) 145:14–46:19. That meant an officer must have provided Valentino Dixon's name as a suspect to the dispatcher before that point. Ex.7 (Masecchia Dep.) 149:24–150:15.

20.    Although a police report by patrol officer Joseph Serwon memorializes that Dixon was broadcast on the radio as a suspect immediately after the crime, nothing in that report indicates the reason or basis. Ex. 7 (Masecchia Dep.) 150:18–24. Nor is there any other documentation in the police file for the immediate focus on Dixon. *See* generally Ex. 1 (Homicide File); *see also,* McCarthy Decl. ⁋ 9. There should have been a report in the police file explaining how or why Dixon first became a suspect; given that Dixon was ultimately prosecuted for this crime it was particularly important to document how and when he first became a suspect. Ex. 7 (Masecchia Dep.) 150:25–52:14, 153:3–18. Any investigator would know it is important both to know how a suspect first came on the radar and to ensure it was recorded in the file. Ex. 7 (Masecchia Dep.) 154:3–55:6.

21.    At the time, Dixon was known to Buffalo police as they had a practice of pulling him over on a regular basis. Ex. 23 (Dixon Dep.) 33:19–20; Ex. 78 (Perj. Tr. (Militello)) 408:8–20 ("[W]e stopped him all the time to talk to him."). In fact, BPD kept a running file on Dixon, monitoring his whereabouts and documenting their stops of him. Ex. 31 (Dixon Intelligence) COE 4124–25 (BPD officers stopped Dixon in area just weeks before the shooting).

22.    Lonergan was the lead homicide detective who was in charge of the crime scene. Ex. 8 (Lonergan Dep.) 53:17–54:1. To the extent any police officer received any information of a potential suspect, he would expect that information to reach him immediately. Ex. 8 (Lonergan Dep.) 54:2–8; Ex. 12 (Vickerd Dep.) 88:2–25.

23.    Buffalo police officers understood to the extent there was any information about potential suspects, that needed to be provided to the lead detective at the scene. Ex. 8 (Lonergan Dep.) 53:6–16; Ex. 7 (Masecchia Dep.) 50:14–51:25; Ex. 3 (Stambach Dep.) 103:1–18 (obligation to provide relevant information expeditiously to other detectives).

24.    Lonergan himself admits that one of the most important things for any homicide detective at the crime scene is to identify any potential suspects as quickly as possible. Ex 8 (Lonergan Dep.) 50:2–53:5; Ex. 12 (Vickerd Dep.) 89:3–90:10.

25.    Lonergan admits that contemporaneous police records demonstrate Valentino Dixon was mentioned as a police suspect within minutes of the shooting, and that everyone at the scene would have known to provide that information to him. But at his deposition, he implausibly claimed he never learned that at the time. Ex. 8 (Lonergan Dep.) 146:4–48:15, 149:6–12.

**Defendants fabricate identifications of Valentino Dixon.**

26.    Because Dixon is innocent, no eyewitness ever saw him shoot anyone on August 10, 1991. Ex. 28 (ECDAO Aff. 2018 ¶ 12 ("The People's investigation revealed, conclusively, that [Dixon] did not shoot Torriano Jackson, Aaron Jackson, or John Sullivan. Lamarr Scott was the shooter[.]"); Ex. 5 (Scott Plea 2018) 13:4–14:20.

27.    Nevertheless, Defendants reported that three separate witnesses (John Sullivan, Emil Adams, and Aaron Jackson) independently and without any suggestion from them identified Dixon as the shooter—two of them within hours of the crime. Ex. 1 (Homicide File) BPD Comp. 15–16 (Vickerd report on Sullivan description); BPD Comp. 25 (Stambach report on Adams identification); BPD Comp. 47 (Vickerd report on Adams identification); BPD Comp. 185 (Stambach report on Jackson identification).

28.    Dixon and Scott look nothing alike and could never have been mistaken for one another in 1991. Ex. 4 (Scott Dep.) 11:11–21; Ex. 80 (Perj. Tr. (Belling)) 566:13–18; Ex. 76 (Shannon Decl.) ¶ 3.

29.    Dixon's slim build and youthful appearance are evident in his booking photograph from the time. Ex. 1 (Homicide File) BPD Comp. 145 (array photo).



30.    As compared with Scott's appearance in a 1991 booking photo. Ex. 39 (Photo Array) COE 3227.



31.     As Scott testified at his deposition, he played football in high school and had been recruited to play defensive end in college before he went to prison. Ex. 4 (Scott Dep.) 9:11–10:11. Scott described himself a "big guy" back then, over 6' tall and 200 pounds. Ex. 4 (Scott Dep.) 10:12–21. ADA Belling also described Scott as "six feet two tall, quite a substantial fellow. He [was] at least 200 pounds, maybe a little bit more." Ex. 80 (Perj Tr. (Belling)) 471:15–23.

32.     Scott's height and heavyset build are evident in his August 12, 1991 mug photograph taken at the Buffalo Police Department. Ex. 38 (Scott 8/12/91 Polaroid) COE 2179.



33.     Dixon is only about 5'9" tall, and in 1991, he was very slim, around 130 to 140 pounds. Ex. 80 (Perj. Tr. (Belling)) 566:15–16; Ex. 23 (Dixon Dep.) 170:16; Ex. 4 (Scott Dep.) 11:4–10 (describing Dixon as slim); Ex. 78 (Perj. Tr. (Militello)) 408:23–409:8 (about 5'8", 5'9" real slender, real slim build). As Assistant District Attorney Christopher Belling described, Valentino had a "very youthful looking appearance" back then. Ex. 80 (Perj. Tr. (Belling)) 566:13–16.

34.     As Scott testified in his deposition, in 1991 and today, no one would ever mistake him for Dixon as they are totally different sizes. Scott is and was a much bigger man. Ex. 4 (Scott Dep.) 11:11–23. Ex. 76 (Shannon Decl.) ¶ 3 (size difference between Scott and Dixon was obvious, would not be possible to mistake Scott for Dixon).

35.     Plaintiff's eyewitness identification expert, Dr. Jennifer Dysart, Ph.D., is an Associate Professor of Psychology at John Jay College of Criminal Justice in New York City. She has been providing expert testimony in the realm of eyewitness identifications for nearly two decades, since 2006, and has been qualified as an eyewitness ID expert approximately 85 times in federal and state courts around the country. Ex. 29 (Dysart Rpt.) 1; Ex. 30 (Dysart Dep.) 6:23–7:3. Dr. Dysart has also given training to law enforcement agencies around the country on the subject of eyewitness identifications. Ex. 30 (Dysart Dep.) 8:10–16.

36.     Based on the science of eyewitness memory, Dr. Dysart explains that it would be very unlikely that witnesses who viewed Scott commit the crime would mistakenly select Dixon from a non-suggestive photo array. Ex. 29 (Dysart Rpt.) 4.

37.     Dr. Dysart concludes, based on the science of eyewitness memory, "the most reasonable explanation for how three witnesses all came to select Mr. Dixon—who was not the shooter—

from the arrays is suggestion or influence during the identification procedures. Further, scientific research has demonstrated that the type of suggestion and influence that can result in mistaken selections of innocent suspects can occur without the witness's conscious awareness." Ex. 29 (Dysart Rpt.) 5.

**Defendants fabricate an identification of Valentino Dixon from John Sullivan**
*Due to intoxication, limited view, and gunshot injury, Sullivan does not see shooter well enough to identify him.*

38.    John Sullivan was a 17-year-old friend of Aaron Jackson's who was present at the intersection of Delevan and Bailey going to get something to eat at Louie's Texas Red Hots at the time of the shooting. Ex. 1 (Homicide File (Sullivan Aff.)) BPD Comp. 76; Ex. 77 (Perj. Tr. (Sullivan)) 206:24–07:9.

39.    On the day leading up to his arrival at the scene, he had consumed a number of beers (malt liquor), had smoked marijuana laced with cocaine (first in the morning, and then again that afternoon), had consumed additional beers that evening, and then spent several hours into the late evening with Fred Stancil driving to various locations around the City. Ex. 2 (Cr. Tr. (Sullivan)) 101:17–21, 102:2–14, 103:2–04:22, 105:10–22, 106:25–07:8, 108:5–22, 109:7-19, 110:4–13,112:15–24; Ex. 37 (Sullivan Med. Records) COE 1907 (tested positive for cocaine).

40.    While Sullivan was watching the fight between Mario Jarmon and the Jacksons, he heard someone yell "look out, he's got a gun" and started running away without looking at the shooter. Sullivan was shot in the leg as he ran away. Ex. 1 (Homicide File) BPD Comp. 76 (Sullivan Aff.) ("I didn't look to see who had the gun, I just ran"); Ex. 2 (Cr. Tr. (Sullivan)) 78:22–79:03, 80:10–16, 81:7–9, 82:6–21, 131:15–132:09.

41.    It was not until Sullivan reached the church on Delavan to the east of Bailey, 100 to 150

11

yards away from the corner, that he first looked back to briefly observe the shooter (Scott) standing over Torriano Jackson and firing at him, before Scott ran from the scene. Ex. 2 (Cr. Tr. (Sullivan)) 83:8-16, 85:20-86:5, 86:11-87:9, 118:9-13, 119:2-12, 121:6-122:6, 124:3–9. It was dark, the shooter was not facing in his direction, there was a crowd of people around, and Sullivan's view was obstructed by headlights. Ex. 2 (Cr. Tr. (Sullivan)) 111:17–112:2, 116:21–118:8, 136:6–37:7, 140:19–41:3, 141:13–42:4. Sullivan had also been shot himself. Ex. 2 (Cr. Tr. (Gordon)) 518:17–19 :15 (treated bullet holes in Sullivan's right thigh).

42.     Given these factors, Sullivan's "opportunity to view the shooter was essentially non-existent and other factors such as weapon focus and stress" would have "further reduced his opportunity to observe and encode relevant information." Ex. 29 (Dysart Rpt.) 5. Under these circumstances, eyewitness memory science shows it would be "nearly impossible" for Sullivan to have observed the shooter well enough to identify him. Ex. 29 (Dysart Rpt.) 9–13; Ex. 30 (Dysart Dep.) 99:07–25.

*Vickerd claims Sullivan volunteers detailed description of shooting and is the first person to volunteer Valentino Dixon as shooter.*

43.     At approximately 4:00 a.m., after speaking to Det. Lonergan at the scene about information gathered to date (including any suspects), Det. Vickerd went to Sister's Hospital to speak to Sullivan, who was receiving medical treatment for his gunshot wounds. Ex. 1 (Homicide File) BPD Comp. 15–16, Ex. 12 (Vickerd Dep.) 93:16-95:10; Ex. 37 (Sullivan Med. Records) COE 1901 (homicide detective arrived at 4:03 a.m.). Sullivan had been taken to the Sister's Hospital—a different hospital than the other victims—before any homicide investigators arrived at the scene. Ex. 1 (Homicide File) BPD Comp. 2 (Sullivan "eventually located" at Sister's Hospital); BPD Comp. 13 (other victims taken to Erie County Medical Center).

44.     Sullivan, who had two bullet wounds in his right thigh, did not have his wounds sutured by the doctor until 4:45 am—after he was interviewed by Vickerd. Ex. 37 (Sullivan Med. Records) COE 1901 (lacerations sutured at 4:45 am).

45.     Vickerd understood he was required to document all information Sullivan provided to him and also all information Vickerd provided to Sullivan during the interview, and represented he did so carefully and accurately. Ex. 12 (Vickerd Dep.) 95:7–20, 148:9–21.

46.     It is "basic" for a homicide detective interviewing an eyewitness to a crime to ask questions geared towards ascertaining the witness's ability to see and make a reliable identification, such as where they were standing and whether they were under the influence of drugs or alcohol. Ex. 7 (Masecchia Dep.) 115:22–19:13; *see also* Ex. 3 (Stambach Dep.) 152:16–53:15 (as a homicide detective "it's your job" to ascertain witness's ability to observe and anything that would impede ability to make an identification, such as if the witness is drunk or high).

47.     Sullivan told Vickerd at the hospital about the drugs and alcohol, and Sullivan also tested positive for cocaine in a blood test, as documented in contemporaneous hospital records. But Vickerd failed to report any of Sullivan's substance use. Ex. 2 (Cr. Tr. (Sullivan)) 105 :20–106 :09 ; Ex. 12 (Vickerd Dep.) 138:10–14; Ex. 1 (Homicide File) BPD Comp. 16; Ex. 37 (Sullivan Med. Records) COE 1907. Vickerd also failed to report other circumstances indicating Sullivan was not a reliable witness, including that he had only an extremely brief view of the shooter from 150 yards away. Ex. 1 (Homicide File) BPD Comp. 16, Ex. 2 (Cr. Tr. (Sullivan)) 83:8–16, 85:20–86:5, 86:11–87:9, 118:9–13, 119:2–12, 121:6–122:6, 124:3–9.

48.    Instead, Vickerd reported that Sullivan volunteered to him a detailed description of observing the shooter, including that Sullivan allegedly observed the shooter collect a gun from behind a van, and that the shooter was allegedly wearing a "black/white jogging suit, possibly with another color trim." Ex. 1 (Homicide File) BPD Comp. 15–16. But Sullivan later admitted he never saw the shooter before he started shooting and that he had "no idea" what the shooter was wearing. Ex. 2 (Cr. Tr. (Sullivan)) 128:12–22, 130:5–31:3, 136:21–37:2, 139:24–25.

49.    Vickerd also reported that Sullivan volunteered that he could identify the shooter by nickname ("TINO") and first name (Valentino), although his last name was unknown. Ex. 1 (Homicide File) BPD Comp. 16; Ex. 7 (Masecchia Dep.) 179:7–81:20.

50.    It was trial prosecutor Chrisopher Belling's understanding from Detectives and their reports that John Sullivan was the person to "interject" Valentino Dixon's name into the case, and that after volunteering the name Sullivan confirmed it by picking Dixon out of a photo array with no police suggestion whatsoever. As Belling testified, the most important thing was that Sullivan volunteered Dixon's name to police—not the other way around. Ex. 41 (Belling Dep.) 216:6–18:2.

51.    At his deposition, Defendant Lonergan claimed what made John Sullivan a reliable witness was he was the first one to mention Valentino Dixon's name, and that Defendants know Sullivan did that with no police influence or suggestion because no one had mentioned Valentino Dixon by name or nickname at that point in connection with the case. Ex. 8 (Lonergan Dep.) 47:22–49:22.

52.    Defendants' claim that the police did not have Valentino Dixon as a suspect before

Sullivan was interviewed at the hospital is false. Although no basis is provided for the suspicion, Dixon was mentioned as a possible police suspect within minutes of the shooting. Ex. 1 (Homicide File) BPD Comp. 11; Ex. 7 (Masecchia Dep.) 145:14–46:19; Ex. 6 (Frida Dep.) 20:20–21:10.

53.　　By 3:30 a.m. on August 10, homicide detectives had requested criminal records and photographs of Valentino Dixon from BPD's Identification Section. Ex 1 (Homicide File) BPD Comp. 36 (request "for homicide" of 5 photographs of Dixon). In BPD's running file on Dixon, created well before the shooting, Dixon's alias is documented as "TINO." Ex. 31 (Dixon Intelligence) COE 4125.

54.　　Vickerd did not arrive to interview Sullivan until 4:03 a.m.—a half hour after homicide detectives requested Dixon's photographs and records. Ex. 37 (Sullivan Med. Records) COE 1901 (homicide detective arrived at 4:03 a.m.).

55.　　Vickerd admitted at his deposition he may have known Dixon was a suspect before he went to the hospital, and that he may have been the one to first mention Valentino to Sullivan, not the other way around. Ex. 12 (Vickerd Dep.) 118:14–20:10, 121:7–23:25, 124:16–27:19.

*Masecchia claims Sullivan volunteers contradictory statement about shooting.*

56.　　Later that day, August 10, Defendant Masecchia took a statement from Sullivan in a Q-and-A format, Masecchia admitted it was a "very basic rule" to type everything he said and everything Sullivan said during this interview, and claimed he did so. Ex. 7 (Masecchia Dep.) 199:11–200:11; Ex. 1 (Homicide File) BPD Comp. 76–77 (Sullivan Stmt).

57.    Sullivan later denied the statement accurately reflected their interaction, however, testifying: "There's a lot of stuff in the statement that is typed, he typed that I didn't really put in there, you know." Ex. 77 (Sullivan Perj. Test.) 222:16–20.

58.    Like Vickerd's report, Masecchia's also fails to document any of the many factors demonstrating Sullivan's inability to make a reliable identification of the shooter, including Sullivan's intoxication, the long distance from which he viewed the shooter, the brief time for which he viewed the shooter, and obstructions. Ex. 1 (Homicide File (Sullivan Aff.) BPD Comp. 77;  Ex. 2 (Cr. Tr. (Sullivan)) 83:8-16, 85:20-86:5, 86:11-87:9, 111:17–112:2, 116:21–118:13, 119:2–12, 121:6–122:6, 124:3–9, 136:6–37:7, 140:19–41:3, 141:13–42:4.

59.    Masecchia also admitted any time he was interviewing an eyewitness, he would want to ask a series of questions to get as detailed a description of the perpetrator as he could. Masecchia admitted this was important both to demonstrate the witness's ability to see and make an identification and to test the reliability of that identification based on the consistency or inconsistency of the description with the suspect, and that these were "basic things" he was looking for as a homicide detective. Ex. 7 (Masecchia Dep.) 114:2–15:21.

60.    In contrast to Vickerd's statement, in which Sullivan purportedly provided a detailed description of the shooter's clothes, Masecchia records Sullivan as providing only a basic description of the shooter and that Sullivan was unable to recount much, if anything, about his clothing only 10 hours later. *Compare* Ex. 1 (Homicide File) BPD Comp. 77 (Sullivan Aff.) ("[H]e had on something dark… I don't remember"), *with* Ex. 1 (Homicide File) BPD Comp. 16 (wearing "black/white jogging suit with another color trim").

61.    The descriptions of the crime attributed to Sullivan in the report by Vickerd and in the report by Masecchia differ in substantial ways. Both Masecchia and Stambach acknowledge that the investigation of inconsistencies in the accounts of eyewitnesses such as Sullivan is essential—"as basic as it gets"—requiring critical review and follow-up before seeking an arrest on the basis of such statements. Ex. 3 (Stambach Dep.) 239:14–24, 243:4–244:2, 245:24–246:11; Ex. 7 (Masecchia Dep.) 73:25–75:6, 185:22–186:14, 189:11–191:9.

62.    They likewise acknowledge that the respective eyewitness statements of Sullivan purporting to identify Dixon as the shooter—first to Vickerd, replete with a detailed on-scene account of observing the shooter while still at the corner and then, within hours, an account to Masecchia in which those details somehow disappeared—involved precisely the kind of contradictions that any competent homicide detective should have explored further before basing an arrest on his say-so. Ex. 3 (Stambach Dep.), 243:16–244:2, 245:24–246:11; Ex. 7 (Masecchia Dep.) 189:11–190:24. The two accounts attributed to Sullivan within hours of each other were incompatible, containing critical inconsistencies about the most important event in the case, suggesting the witness is not reliable. Ex. 3 (Stambach Dep.) 246:4-11; Ex. 7 (Masecchia Dep.) 189:21–191:6.

63.    Despite these admitted glaring inconsistencies, there is no record of any follow-up investigation in the police file exploring the basis for these inconsistencies. *See* generally Ex. 1 (Homicide File); Ex. 7 (Masecchia Dep.) 196:06–22; *see* McCarthy Decl. ¶ 9.

64.    Masecchia also reported that he presented Sullivan with a six-photo array, from which he reported Sullivan identified Valentino Dixon as the shooter he had seen. Ex. 7 (Masecchia Dep.) 196:23–197:02; Ex. 1 (Homicide File) BPD Comp. 77 (Sullivan Aff.); BPD Comp.150–151

17

(Sullivan Array).

65.     Masecchia admitted he understood there were important rules and regulations to prevent an officer from tainting a witness's identification in any way, and that it would never be appropriate to show individual photos, because that would be impermissibly suggestive. Ex. 7 (Masecchia Dep.) 126:8–31:24. Masecchia denied showing Sullivan individual mug shots of Valentino Dixon or anyone else, which he agreed would be highly suggestive. Ex. 7 (Masecchia Dep.) 197:3–98:3.

66.     But when Sullivan was asked in a later proceeding whether he had been shown a photo array when at the Buffalo Police Department, he corrected that he had seen "mug shots." Ex. 77 (Sullivan Perj. Test.) 233:12–17.

67.     As memorialized in the police file, three and only three individual photos were requested that night: at 3:30 a.m. photos of Valentino Dixon, at 4:24 a.m. photos of John Sullivan, and at 4:25 a.m. photos of Mario Jarmon. Homicide detectives had these individual mug photos when they re-interviewed Sullivan at 2:30 p.m. on August 10. Ex. 1 (Homicide File) BPD Comp. 36 (Dixon request); BPD Comp. 39 (Sullivan request); BPD Comp. 40 (Jarmon request); *see also* McCarthy Decl. ¶ 9.

68.     Plaintiff tried repeatedly to locate Sullivan to serve him in this civil case but was unable to find him, as Sullivan is now homeless. Ex. 95 D.E. 106-1 (Romo Decl.) ¶¶ 3–5; *see also* D.E. 121 (postponing hearing due to "service issues posed by Mr. Sulllivan's homelessness"). When Plaintiff's investigator last attempted to find him, he was told that Sullivan had not been seen by anyone in the area since Buffalo's historic snowstorms in mid-to-late December 2022. D.E. 124-

1 (Olivo Decl.) ¶¶ 3–4. After months of attempting to serve Sullivan with the Court's orders

commanding his appearance at a civil contempt hearing, Sullivan still could not be located. D.E.

119-1 (Olivo Decl.) ¶¶ 3–4; D.E. 102, 107 (Court Orders); D.E. 124-1 (Olivo Decl.) ¶¶ 3–4. As a

result, Sullivan was not deposed in this matter regarding his interactions with Defendants.

69.    The purported identification from Sullivan was the sole basis provided for probable cause

to arrest Valentino Dixon. Ex. 3 (Stambach Dep.) 229:08–22; Ex. 7 (Masecchia Dep.) 223:18–

224:03; Ex. 8 (Lonergan Dep.) 46:10–47:08. The complaint sworn out by Defendant Stambach

to arrest Dixon in this case relied solely on the affidavit Masecchia took from John Sullivan on

August 10, 1991. Ex. 1 (Homicide File) BPD Comp. 82 (Complaint).

*Emil Adams has an unobstructed view of Lamar Scott shooting Torriano Jackson.*

70.    Emil Adams, who lived in Michigan at the time but was in Buffalo for the summer, had

been standing on the sidewalk on the parking lot side of Louie's Texas Red Hots talking with

Tamara Frida and other girls parked in the red Geo Tracker SUV, when the fight broke out that

led to the shooting. Adams was close friends with Aaron and Torriano Jackson. Ex. 1 (Homicide

File) BPD Comp. 30–32 (Adams Stmt); Ex. 65 (Adams GJ Test.) 75:1–3, 75:15–16, 79:20–80:1,

78:2–5; Ex. 2 (Cr. Tr. (Adams)) 169:16–20; 182:19–25; Ex. 15 (Adams Dep.) 106:15–19.

71.    From his vantage point, Adams had a good view of the shooter (Scott) shooting Torriano

Jackson. Ex. 3 (Stambach Dep.) 221:25–22:25; Ex. 2 (Cr. Tr. (Adams)) 182:19–22, 193:4–6; Ex.

65 (Adams GJ Test.) 78:2–5; *see also* Ex. 6 (Frida Dep) 11:15–13:19, 14:2–15:17, 32:20–33:3,

52:17–53:6.

*Adams is immediately segregated by police as key witness.*

72.    Immediately after the shooting, Adams was approached by officers at the scene to discuss what he had observed; within a few minutes, he was brought down to the precinct where he would be interviewed by Det. Stambach. Ex. 15 (Adams Dep.) 106:20–07:12, 108:16–21; Ex. 1 (Homicide File) BPD Comp. 25 (Stambach Rep.).

73.    During his time with officers at the scene, the officers did not ask Adams about any particular suspects. Adams did not know Valentino Dixon's name at the time; he does not remember hearing it on the police radio but, if he had, it would not have meant anything to him. Ex. 15 (Adams Dep.) 107:13–108:14.

74.    It is a basic task for a homicide detective to make sure any potential witnesses are segregated from each other before they are interviewed to ensure they cannot contaminate each others' statements or identification procedures. Stambach ensured that Adams was segregated from other potential witnesses before he gave a statement and viewed a photo array; there is "[n]o doubt in [his] mind" about that. Ex. 3 (Stambach Dep.) 135:9–36:5, 138:1–5, 178:12–20; Ex. 15 (Adams Dep.) 68:5–69:3.

*Adams provides description of shooter accurately matching Scott, not Dixon.*

75.    Stambach began interviewing Emil Adams when he responded to the homicide office around 2:45 a.m.. Ex. 1 (Homicide File) BPD Comp. 25 (Stambach Rep.). Early in the interview, Stambach obtained a detailed description of the shooter and his clothing from Adams. Ex. 3 (Stambach Dep.) 147:22–49:17; Ex. 1 (Homicide File) BPD Comp. 25 (Stambach Rep.). Given his vantage point and ability to provide a detailed description of the shooter, Stambach believed Adams to be a credible eyewitness and as important a witness as there was in the case. Ex. 3

(Stambach Dep.) 180:25–81:16.

76.　　Adams described the individual with the TEC-9 as a **"heavy set" Black male, six feet tall, wearing a white T-shirt and a white hat**. Ex. 1 (Homicide File) BPD Comp. 31; Ex. 3 (Stambach Dep.) 165:15–25 (emphasis added). These were Adams's words, including the description **"heavy set."** Ex. 3 (Stambach Dep.) 149:24–50:7 (emphasis added).

77.　　In addition to the obvious differences in height and build between Scott and Dixon, the two were also dressed totally differently on August 10, 1991:

|  | **Lamarr Scott** | **Valentino Dixon** |
|---|---|---|
| **Height** | well over 6 feet | 5'9" |
| **Build** | heavyset | thin |
| **Hat** | white baseball cap | dark blue hat |
| **Top** | white T-shirt | gray sweatshirt |
| **Pants** | dark shorts | black jogging pants |
| **Shoes** | white sneakers | dark blue & black sneakers |

Ex. 38 (Scott 8/12/91 Polaroid) COE 2179; Ex. 80 (Belling Perj. Test.) 471:15–23 (Scott over 6', would say 6'2", at least 200 pounds, maybe more), 566:15–18 (Dixon 5'7", 5'8", very youthful looking appearance, 130, 140 pounds, looked nothing like Scott); Ex. 78 (Militello Perj. Test.) 408:23–409:8 (Dixon about 5'8", 5'9" real slender, real slim build); Ex. 23 (Dixon Dep.) 170:16–17 (around 5'9" in height); Ex. 4 (Scott Dep.) 10:14–11:23 (Scott was a "big guy" who was "much bigger" than Dixon), 11:4–10 (Dixon was slim); Ex. 76 (Shannon Decl.) ¶ 3 (Scott about 50lbs heavier, 4 inches taller than Dixon); Ex. 1 (Homicide File) BPD Comp. 197 (Scott Stmt (describing his clothing)); BPD Comp. 71 (Dixon Stmt (wearing same clothing)); BPD Comp. 235 (Dixon Clothing Evidence Log).

78.    At his deposition, Stambach testified that while taking Adams's statement, he did not know anything about Valentino Dixon or that Dixon was a suspect. Ex. 3 (Stambach Dep.) 123:3–19. Stambach admits that this early description of the shooter, provided by an eyewitness actually in a position to see, fit Scott precisely. Ex. 3 (Stambach Dep) 157:17–19, 170:21–25.

79.    Although Stambach denied knowing anything about Valentino Dixon during the time he was interviewing Adams, he also admits that, within hours, he recognized Adams's description of the shooter as "heavy set" did not match Dixon, who was noticeably thin. This was a "red flag" for Stambach at the time. Ex. 3 (Stambach Dep.) 123:3–19, 168:12–69:6, 123:3–19.

80.    At 3:30 a.m.—45 minutes after Stambach began taking Adams's statement with the shooter's description—homicide requested mug photographs of Valentino Dixon from the BPD Identification Section. Ex. 1 (Homicide File) BPD. Comp. 36 (request submitted by Lt. Sack "for homicide"). At that time, Vickerd was still in the field and had not yet interviewed Sullivan. Ex. 1 (Homicide File) BPD Comp. 13–14 (Lonergan Rep.); BPD Comp. 15–16 (Vickerd Rep.); Ex. 37 (Sullivan Med. Records) COE 1901.

81.    By 4:45 a.m., Vickerd had returned to the homicide office and prepared a six-photo array using Dixon's mug photo, with Dixon as the suspect and five fillers. Ex 1 (Homicide File) BPD Comp. 47 (Vickerd Rep.); BPD Comp. 145 (Photo Array).

82.    Stambach and Vickerd conducted a photo identification procedure with Adams around 5:05 a.m. Ex. 1 (Homicide File) BPD Comp. 47–48. Ex. 3 (Stambach Dep.) 133:7–34:16, 180:17–24, 175:8–11, 176:3–20, 179:4–180:24. Both Vickerd and Stambach reported that, without any suggestion, Adams viewed the array and "positively identified" Valentino Dixon as

"the person he saw shooting the Tech-9 at Bailey/Delavan." Ex. 1 (Homicide File) BPD Comp. 47 (Vickerd Rep.); *see also* BPD Comp. 25 (Stambach Rep.) ("He positively identified Valentino TINO Dixon as the shooter. He pointed him out and said 'this is the guy with the Tech 9 who was doing the shooting[.]'").

83.    Eyewitness expert Dr. Dysart explains, based on the eyewitness science, "if in fact Mr. Adams viewed Mr. Scott shooting the semi-automatic gun as his description suggests, it would be very unlikely that he would have mistaken Mr. Dixon for Mr. Scott in the photo array." Ex. 29 (Dysart Rpt.) 4.

84.    Nearly twelve hours later, at 4:15 pm, Stambach prepared and swore a criminal complaint for Dixon that was based solely on the reported identification from Sullivan, with no mention of the alleged positive identification from the witness with a far better vantage point, Emil Adams. Ex. 1 (Homicide File) BPD Comp. 82. At his deposition, Stambach denied that the reason for this omission was his knowledge the police had used suggestion and coercion to obtain Adams's identification, but he could not provide any other explanation for why Adams's alleged identification was not mentioned in the complaint. Ex. 3 (Stambach Dep.) 229:8–232:24.

85.    After Dixon was convicted, Adams approached Antoine Shannon—Dixon's half-brother, whom Adams knew from going to school and playing football together—and apologized to Shannon. Adams said he knew Valentino was not the shooter and he felt bad for having "lied on" someone that he knows now is related to Shannon. Adams explained that he was having legal trouble in Michigan at the time, and that they "pretty much gave him a free pass" for cooperating against Dixon. Specifically, Adams told Shannon that they said to him that, if he cooperated, his legal troubles would "pretty much go away." Ex. 76 (Shannon Decl.) ¶¶ 11–14.

86.     In March 1993, after Adams and Shannon had that conversation, Dixon's parents (Robert Bryant and Barbara Dixon) and Shannon met with Adams at his home. During that meeting, they discussed Adams's photo identification of Dixon in August 1991 and his testimony at Dixon's criminal trial. Ex. 15 (Adams Dep.) 11:10–12:1, 12:18-24, 33:18–34:19; Ex. 76 (Shannon Decl) ¶¶ 14–15. Adams stated in his deposition testimony that in the 1993 meeting he had truthfully answered everything the Dixon family asked. Ex. 15 (Adams Dep.) 34:7–19.

87.     Unknown to Adams, a tape recording was being made of the conversation. Ex. 86 (Bryant Dep.) 48:14–24 (acknowledging he tape-recorded conversation with Adams); 53:20–23 (admitting he did not tell Adams he was recording). Both the recording and a certified transcription were entered as exhibits at Adams's deposition. Ex. 15 (Adams Dep.) 14:12–15:23. See Ex. 22 (Adams, Audio Transcription, 3/7/1993); Ex. 21 (Adams, Audio Interview, 3/7/93). Bryant and Shannon, who were present for the tape-recorded conversation, both confirmed that the tape accurately reflects their 1993 conversation with Adams. Ex. 86 (Bryant Dep.) 83:17–21 (confirming tape recording was of his 1993 conversation with Adams); 59:20–22 (same); 64:21–65:11 (same); 70:9–14 (same); 81:25–82:8 (same); Ex. 76 (Shannon Decl) ¶ 15 (listened to tape recording in February 2024 and confirmed it accurately reflected the conversation).

88.     On the tape, Adams stated that he was first shown three pictures—one of Mario Jarmon, one of Dixon, and one of somebody else whose identity he could not recall. Ex. 22 (Adams, Audio Transcription, 3/7/1993) 13:4–15.

89.     He also stated he told the police "lieutenant" that "I can't really point the finger, you know what I mean? I can't do that. I don't want to lock up an innocent man" and that although

he "kind of saw the guy" – "heavy set…with a hat," he "wasn't really sure." Ex. 22 (Adams, Audio Transcription, 3/7/1993) 12:4–15:2.

90.     On the tape, Adams explained how police then showed him the three individual photographs (of Jarmon, Dixon and a third person), asking as to each of them in turn whether he saw the person there that night. Ex. 22 (Adams, Audio Transcription, 3/7/1993) 13:4–22, 13:25–14:3.

91.     Stambach admitted if Adams was shown individual photos of Mario Jarmon, Valentino Dixon and a third person from the scene, that would be highly suggestive, illegal, and severe misconduct. He also admits if anyone had done that Stambach would have been in a position to see it, and if he failed to report it that would be horrible and as serious as if he showed the photos himself. But Stambach denies that anyone showed Adams these photos, saying if Adams said he did "he would be lying." Ex. 3 (Stambach Dep.) 189:4–93:12.

92.     At his deposition, when asked if he had said "any of the other things about being shown three pictures" Adams first answered "I was shown pictures, yes." When he is asked again "Do you remember telling them that you were shown three, just like it says on Page 13?" Adams answered "I don't know if it was just three pictures, but I remember pictures being shown." Ex. 15 (Adams Dep.) 32:23–33:4.

93.     Adams then read the following statement from the tape and asked if he made it to Valentino Dixon's father when he came to his house: "I'm not really sure, he said if I just show you a picture. You know, if he's in or not. They brought me three pictures…I saw the three pictures first and they showed me Mario, Tino, and somebody else. And they said were they

there?" Adams admits "I could have" said that "because they did ask me about some pictures and how…I was able to point them out." He also admits he was attempting to tell the truth at that time and did not lie to Dixon's father. Ex 15 (Adams Dep.) 33:13–34:19.

94.     Adams then claimed that *none* of the photos were shown individually, but rather all photos (including Mario Jarmon's) were shown in the same manner in "groups of people." Ex. 15 (Adams Dep.) 34:20–35:10, 41:13–42:20.

95.     Stambach admits to showing one single photo of Mario Jarmon to Adams, which was contemporaneously memorialized in the statement Stambach took. Ex. 3 (Stambach Dep.) 193:13–24; Ex. 1 (Homicide File) BPD Comp. 31 ("Q. I am now going to show you a mug shot number 162576 can you tell me who that is? A. Thats Mario.").

96.     After being presented with his contemporaneous statement, Adams admitted he was shown a single photo of Mario Jarmon, even though he did not remember it at the time of his deposition. And he admitted he didn't "remember one way or another whether or not [he was] shown an individual photo of Valentino Dixon" at this point, 30 years later. Ex. 15 (Adams Dep.) 77:12–78:2, 75:7–12.

97.     Stambach would not have had Jarmon's mug photo to show Adams until after 4:25 a.m. when it was requested from the identification section. Ex 1 (Homicide File) BPD Comp. 40 (Jarmon photograph). By then, Dixon's mug photo would also have been available in the homicide office. Ex 1 (Homicide File) BPD Comp. 36 (Dixon photos "delivered to homicide").

98.     As memorialized in the police file, three and only three individual mug photos were requested by homicide that night: photos of Dixon at 3:30 a.m., photos of Sullivan at 4:24 a.m.,

and photos of Jarmon at 4:25 a.m. Ex. 1 (Homicide File) BPD Comp. 36, 39, 40; *see also* McCarthy Decl. ¶ 9.

99.    Stambach admits if Adams was shown a single photo of Valentino Dixon along with two other people from the scene before he viewed the photo array, that would be the kind of suggestion that could lead to a false identification. Ex. 3 (Stambach Dep.) 194:11–17.

100.    Stambach also admits he understood it was "very important" to put the time when witness interviews started and ended in the report. Ex. 3 (Stambach Dep.) 139:22–140:2. As Massechia explained, this was a "basic rule" for Buffalo homicide detectives because it was important to know how long the interview lasted, including to know what information a witness had access to a certain point in the interview. Ex. 7 (Massechia Dep.) 76:9–77:12. Although Stambach recorded the start and end time for other interviews, he did not record the end time for his interview of Adams. *Compare* Ex 1 (Homicide File) BPD Comp. 30–32 (Adams stmt), *with* BPD Comp. 71–72 (Dixon stmt with start/end time), *and* BPD Comp. 33–35 (Powell stmt with start/end times). And although there is a explicit line for a witness to sign below Adams's signature line, there is no witness signature on Adams's statement—which was taken alone by Stambach for over two hours at the homicide office. Ex. 1 (Homicide File) BPD Comp. 32.

101.    At his deposition, Adams acknowledged that there was a conversation with Dixon's parents and Antoine Shannon in March 1993, that the conversation was amicable and no one there threatened him in any way, that the discussion involved his police interaction surrounding the August 10, 1991 identification of Dixon and the photographs the officers had shown him, and that everything he had told the Dixons was the truth. Ex. 15 (Adams Dep.) 11:21–12:1, 12:18–24, 13:14–21, 34:7–19. But although he admitted all these facts, and agreed initially, after

27

reviewing one portion the tape and the corresponding transcription, that it was his voice and that it reflected the words he spoke in the March 1993 meeting, Ex. 15 (Adams Dep.) 23:3–19, 24:2–5, Adams refused thereafter to acknowledge that it was his voice on the tape. Ex. 15 (Adams Dep.) 25:23-26:4, 51:15-52:3; *see also* Ex. 76 (Shannon Decl.) ¶¶ 14–17 (no one pressured or threatened Adams, he was "really calm and didn't even express any reservations about speaking with us").

102.    This refusal came after Adams listened to portions of the 1993 tape where he discussed feeling threatened that he may "get more time on his court case" in Michigan if he didn't testify against Dixon. Ex. 22 (Adams, Audio Transcription, 3/7/1993) 14:12–15:1 ("I could have got more time in Saginaw [Michigan], I was out on bail."); 8:17–25 (DA's office here was saying would "make it hard for [him" down in Michigan if he didn't come back and testify"). At his deposition, Adams claimed that could not be his voice on the tape because he did not have "any legal issues" and "never had a charge in Michigan." Ex. 15 (Adams Dep) 24:15–26:8 ("I've never been on bail. So, if I said that I was on bail, then that's not me."); 51:19–52:5.

103.    But Adams's claim that he never had any charges in Michigan is false. As ADA Belling testified: "there was something going on with the criminal justice system and Adams in Michigan," and Belling had to "talk to people in Michigan who were in law enforcement" to arrange for Adams to come back to Buffalo to testify. Ex. 41 (Belling Dep.) 170:8–171:23; *see also* 172:16–173:4 (Adams was having criminal issues around the time Belling was trying to get him to come testify). Belling also testified that his practice would have been to tell Adams that he would talk to law enforcement in Michigan (on Adams behalf) to tell them that he cooperated. Ex. 41 (Belling Dep.) 174:18–175:10.

104.    At some point months after the shooting Emil Adams spoke to Tamara Frida, who had been next to him during the shooting and had seen (as he had) that Lamar Scott was the shooter, not Valentino Dixon. Adams told Frida that he knew that Valentino was not the shooter, but that he had to testify that Valentino was the shooter because he was being threatened by the police and the District Attorney that he would be sent back to Michigan to face pending charges there. Ex. 6 (Frida Dep.) 32:2–34:16, 53:7–56:2. Adams reiterated the same thing to Frida again years later. Ex. 6 (Frida Dep.) 56:17–57:15.

105.    At his deposition, Michael Bland was asked whether Emil Adams had told him that Adams knew Scott was the shooter, not Dixon; Bland responded by pleading the Fifth. Ex. 85 (Bland Dep.) 38:22–39:5. When asked about Adams having told him on multiple occasions that he was pressured by the police to maintain that Dixon was the shooter, even though he and they knew it was Scott, Bland again invoked the Fifth. Ex. 85 (Bland Dep.) 39:8–13.

**Valentino Dixon is arrested less than 10 hours after the shooting.**

106.    By 11:30 a.m. on August 10, 1991, about ten hours after the shootings and without following up with numerous witnesses who remained to be interviewed, Stambach issued a "pick-up" order to apprehend Dixon. Ex. 1 (Homicide File) BPD Comp. 59 (Pick-Up Order). The "pick up" order described Dixon as "5–10, 160 pounds, **slight build**." Ex. 1 (Homicide File) BPD Comp. 59 (Pick-Up Order (emphasis added)).

107.    Defendants Stambach and Masecchia also met with Special Services & Intelligence detectives to advise them there was a pick up for Valentino Dixon, a/k/a "Tino." Ex. 1 (Homicide File) BPD Comp. 87 (Militello Rep.). In that meeting, Defendants described Dixon as

29

"5'10", **slim build**." Ex. 1 (Homicide File) BPD Comp. 87 (Militello Rep. (emphasis added)). Those officers and Stambach then began to surveil the Bailey/Delavan area for Dixon. Ex. 1 (Homicide File) BPD Comp. 64 (Stambach Rep.); BPD Comp. 87 (Militello Rep.).

108.    Dixon was taken into custody shortly thereafter and transported to the BPD homicide office. At the station, Dixon truthfully told Stambach that he did not do the shooting. Ex. 1 (Homicide File) BPD Comp. 64–65 (Stambach Rep.).

109.    Dixon then voluntarily waived his rights and gave a statement to Stambach, which was witnessed by intelligence detective Milettello. Ex. 1 (Homicide File) BPD Comp. 71–73 (Dixon Stmt.). The statement began at 1:45 p.m. and finished at 2:17 p.m. Ex. 1 (Homicide File) BPD Comp. 64 (Stambach Rep.). In his statement, Dixon again truthfully denied being the shooter or firing any weapons. Ex. 1 (Homicide File) BPD Comp. 72 (Dixon Stmt.).

110.    When asked, Dixon told Stambach he was still wearing the same clothing he had on the night before. Ex. 1 (Homicide File) BPD Comp. 71 (Dixon Stmt.). Dixon's clothing and shoes were later taken into evidence. Ex. 1 (Homicide File) BPD Comp. 182 (Evidence Log).

111.    Stambach testified that if a victim was shot at close range with an automatic weapon, he would expect there could be blood splatter on the shooter, and so, if possible, he would want to gather the suspect's clothing to test whether it had physical evidence that could be connected to the shooting. Ex. 3 (Stambach Dep.) 267:16–268:4. Stambach understood it was possible in 1991 for a forensic analyst to determine whether Torriano Jackson's blood was on Dixon's clothing, and that the presence of blood could be powerful incriminating evidence. Ex. 3 (Stambach Dep.) 268:8–21; *see also* Ex. 40 (Smardz Dep.) 123:13–19 (one of the tests lab could run was

serological testing to confirm blood). Stambach also admitted that the absence of blood on Dixon's clothing could be exculpatory evidence. Ex. 3 (Stambach Dep.) 268:23–269:3.

112.    Henry Smardz, a detective in the BPD Evidence Collection Unit (ECU) at the time, testified that the evidence techs worked under the direction of the homicide section on this case. Ex. 40 (Smardz Dep.) 46:1–14. Detectives could also go the laboratory and request additional testing on evidence. Ex. 40 (Smardz Dep.) 23:5–9. It was his expectation that if items of clothing were collected, they would be tested: "There's got to be a reason for collecting them." Ex. 40 (Smardz Dep.) 118:24–119:6.

113.    Although Dixon's clothing was taken into evidence on August 10, Defendants did not have his clothing tested for blood or gunpowder residue. Ex. 1 (Homicide File) BPD Comp. 235 (Dixon Clothing Evidence Log); BPD Comp. 244 (Hojnacki Rep.) ("The items submitted have not been examined for blood at this time. Please contact the laboratory if analysis is indicated."); Ex. 14 (DA Memo) COE 4773–74 (no gunshot residue testing performed).

114.    Dixon's clothing (black nylon jogging pants, a gray sweatshirt, and a navy blue baseball hat) did not match the description Adams had provided of the clothing the shooter wore (cut-up blue jeans, a white T-shirt, and a white hat). Ex. 1 (Homicide File) BPD Comp. 235 (Dixon Clothing Evidence Log); BPD Comp. 31–32 (Adams Stmt).

115.    Even though Dixon knew he was being arrested for something Lamarr Scott did, Dixon did not give the police information implicating Scott in the shooting because of the understanding "in the neighborhood" that "you just don't speak about these type of things, because it can be harmful to you…it just makes your life horrible. Like it travels with you for the

31

rest of your life…unless you move into the Arizona desert somewhere away from the whole…environment." Ex. 23 (Dixon Dep.) 142:06–43:19.

116.    Stambach threatened Dixon if he would not tell him who the shooter was, then Dixon would go to prison for it himself. Ex. 23 (Dixon Dep.) 152:12-23.

117.    After Dixon gave his statement, Stambach booked Dixon on charges of murder in the 2nd degree for purportedly shooting Torriano Jackson, assault in 1st degree for purportedly shooting Aaron Jackson, Mario Jarmon, and John Sullivan, and criminal weapon possession for purportedly possessing a TEC-9 to shoot Torriano Jackson, Aaron Jackson, Mario Jarmon, and John Sullivan. Ex. 1 (Homicide File) BPD. Comp. 82–83 (sworn Complaint).

**Defendants deliberately ignored Scott's truthful, credible confession to the crime after Dixon's arrest.**

118.    The following evening on August 11, Lamarr Scott contacted a local TV station and arranged to give a videotaped public confession admitting that he—not Dixon—had committed the shooting. Ex. 1 (Homicide File) BPD Comp. 186 (O'Shei Rep.) (received call from the news at 11:40pm); Ex. 1 (Homicide File) BPD Comp. 196–199 (Scott Stmt); Ex. 4 (Scott Dep.) 29:14– 31:17.

119.    Scott made the decision to confess to the crime on television; nobody forced him to do that, and nobody offered him anything to confess. Ex. 4 (Scott Dep.) 29:25–30:10. He went first to confess on television to protect himself from police. Ex. 4 (Scott Dep.) 30:18–25 (had a "fear of authority figures," including police); Ex. 1 (Homicide File) BPD Comp. 186 (news editor called police explaining that a caller (now known to be Scott) would confess to the shooting only

on the condition he could first make a statement to the news on camera and be escorted by the news downtown); Ex. 4 (Scott Dep.) 31:3–7; Ex. 76 (Shannon Decl.) ¶¶ 5–7 (no one pressured, coerced, or bribed Scott to confess; he did not seem forced or nervous, he was very calm).

120.    It was unusual and a big deal for Scott to confess on TV, and was big news in the homicide department. Ex. 7 (Masecchia Dep.) 341:20–43:16; Ex. 8 (Lonergan Dep.) 157:13–58:13.

121.    Scott was then transported to the BPD homicide office, where he made the same confession, signing and swearing to a 4-page statement taken by Defendant Stambach. Ex. 1 (Homicide File (Scott Stmt.)) BPD Comp. 196–199.

122.    Barring mental illness, it is extraordinarily unusual for someone to voluntarily come down to a police station to confess to a crime they did not commit; in his 35 years as a police officer, Stambach does not ever remember that happening. Ex. 3 (Stambach Dep.) 208:9–09:15; *see also* Ex. 8 (Lonergan Dep.) 201:19–02:20; Ex. 41 (Belling Dep.) 65:20–21.

123.    This was also the only time in Stambach's career where he had arrested someone and another person came in and claimed they were actually the person who had committed the crime; he admitted he recognized this was an "extremely important interview" and that it was important to be careful, comprehensive, and develop information he could follow up on. Ex. 3 (Stambach Dep.) 206:18–07:13; 255:9–20; 256:18–57:7; 287:24–88:5; *see also* Ex. 12 (Vickerd Dep.) 210:6–24; Ex. 8 (Lonergan Dep.) 27:21–29:15, 156:19–57:6 (only case like this in Lonergan's 40 year career); Ex. 41 (Belling Dep.) 65:14–18 (only time in career that ever happened).

124.    When taking Scott's confession, Stambach recognized that Scott—unlike Dixon—

matched the person Adams described as shooting the TEC-9 less than two days prior. Ex. 3 (Stambach Dep.) 157:8–19, 168:1–8 (Scott "fit the bill" as the "big, heavyset guy" Adams had described).

125.    Stambach admits he recognized on August 10 that Dixon did not match the description from Adams—a fact he acknowledged was a "red flag." Ex. 3 (Stambach Dep.) 168:12–20, 173:5–19, 176:21–177:14. Stambach also admits that, less than two days after he recognized the mismatch between Dixon and the shooter described by Adams, he was in the presence of someone confessing to being the shooter—Lamarr Scott—who matched the person Adams described, which was another "red flag" he recognized at the time. Ex. 3 (Stambach Dep.) 170:21–171:25.

126.    Defendant Masecchia was also present at the station at the time of Scott's confession. Ex. 3 (Stambach Dep.) 286:13–22; Ex. 7 (Masecchia Dep.) 272:17–23. He also admits that Scott, unlike Dixon, matched the description of the shooter that had been provided to the detectives by Emil Adams, and that those facts were a "red flag." Ex. 7 (Masecchia Dep.) 271:20–274:9, 277:12–278:15, 280:5–20.

127.    While Scott was at the BPD station, Leonard Brown also came to the station to give a statement. In his statement—taken by Massechia at the same time Stambach was taking Scott's confession—Brown told detectives that he had witnessed the shooting and that Scott was the shooter. Ex. 1 (Homicide File) BPD Comp. 158–159 (Brown Stmt.); Ex. 3 (Stambach Dep.) 289:13-18; Ex. 7 (Masecchia Dep.) 272:17–23; Ex. 4 (Scott Dep.) 39:18–40:06.

128.    Antoine Shannon also went to the BPD station that night, where BPD officers spoke to

him about the shooting. Like Brown, Shannon told officers that Scott was the shooter. Shannon noticed that the officers did not write anything down. When he asked why they were not writing anything down, police responded that they had "got everything" they needed and did not need to write down his statement. Ex. 76 (Shannon Decl.) ¶¶ 8–9. In fact, there are no reports nor typed documentation of Shannon's August 12 statement that Scott was the shooter recorded in the BPD file, although handwritten notes in the police file demonstrate they did receive this information from Shannon. *See* McCarthy Decl. ¶ 9; Ex. 1 (Homicide File) BPD Comp. 296–7. And no one from the BPD ever contacted Shannon after that night. Ex. 76 (Shannon Decl.) ¶ 9.

129.    Massechia and Stambach were communicating with each other during and after their interviews of Scott and Brown, and Massechia and other detectives were briefed by Stambach about the confession that Scott had given to the media before he confessed at BPD that night. Ex. 1 (Homicide File) BPD Comp. 161 (DiPirro Rep.); Ex. 3 (Stambach Dep.) 289:13–22; Ex. 7 (Masecchia Dep.) 246:3–247:11.

130.    Masecchia agreed that the information he and Stambach learned—including that Scott matched the shooter description given by Adams, and that Dixon did not match that physical description—were "critically important issues to follow up on," and that any detective acting in good faith would do everything in their power to do so. Ex. 7 (Masecchia Dep.) 277:12–278:15, 280:5–20.

*Despite recognizing the importance of follow up investigation, Stambach instead sends Scott away and refuses to collect evidence from him.*

131.    Stambach understood from training and experience the way to tell if a confession was reliable was (1) if the suspect volunteered nonpublic information about the crime that only the

real perpetrator (and the police) would know; and (2) if the suspect provided information that

could be corroborated by follow up investigation. Ex. 3 (Stambach Dep.) 260:9–65:2. Masecchia

agreed that, as a homicide detective, it was critically important to investigate any information a

potential suspect provides and, if a suspect gives admissions about the crime, critically important

to investigate the reliability of those admissions. Ex. 7 (Masecchia Dep.) 92:6–97:20.

132.    Scott's confession to Stambach included credible indicia of Scott's involvement and was

consistent with other evidence in the investigation up to that point in a number of respects:

> (a) Scott's description of the sequence of events preceding the shooting including
> that he fired from the right-hand side of the street coming from Bailey;
> (b) Scott's knowledge of the individuals present and where they were located during
> the events, including the Jacksons and one of the bystanders (Michael Bland),
> whose name had not publicly surfaced, whom Scott described seeing before the
> shooting and remaining on the corner, consistent with information the detectives
> obtained from other sources;
> (c) Scott's descriptive details of the revolver recovered next to the body of Torriano
> Jackson, in particular that it was a silver gun with a nickel plate;
> (d) and the fact that Scott had emptied the entire clip of the TEC 9 that night.

Ex. 3 (Stambach Dep.) 292:10–293:6, 294:3–15, 294:17–296:8, 297:8–16; Ex. 1 (Homicide File)

Comp. BPD 197 (Scott Stmt); BPD Comp. 216 (Grabowski Rep. Re: Jackson 8/21 Intv.).

133.    While confessing to Stambach, Scott not only provided a description of the clothing he

was wearing during the shooting (less than 48 hours prior), but also offered to turn over that

clothing for testing—including, most significantly, the white sneakers Scott indicated still had

blood on them from his standing directly over Torriano Jackson while firing multiple shots at

close range. Scott's clothing, unlike Dixon's, matched the clothing Adams described the shooter

to be wearing. Ex. 4 (Scott Dep.) 39:4–10; Ex. 1 (Homicide File) BPD Comp. 197 (Scott Stmt)

(describing clothing); BPD Comp. 235 (Dixon Clothing Evidence Log); BPD Comp. 30–32

(Adams Stmt.).

134.    Stambach testified that in a homicide case you are "always looking" for physical evidence that could be connected to a shooter, especially "hard scientific evidence." Ex. 3 (Stambach Dep.) 264:22–65:8. And he admitted in this case in particular, given that one of the victims was shot at close range with an automatic weapon, he would expect there might be blood spatter on the shooter's shoes or clothing which could be powerful incriminating evidence. Ex. 3 (Stambach Dep.) 266:17–69:10; 271:15–73:5.

135.    Stambach admitted he understood one way to determine if Scott's confession was reliable was to have his clothing tested for blood; that there was a good likelihood if Scott was the shooter there could be blood on his clothes; and if there was blood found that would be powerful incriminating evidence supporting his confession. Ex. 3 (Stambach Dep.) 269:4–17, 276:6–15. Stambach testified that should have been one of his "basic goals" once Lamarr Scott confessed, and a "basic step[] that should have been taken" to confirm what clothes Scott had been wearing the night of the murder and ask to collect them. Ex. 3 (Stambach Dep.) 282:17–83:6, 283:11–14.

136.    Masecchia agreed "any detective acting in good faith" would of course collect shoes from Lamarr Scott for testing in those circumstances. Ex. 7 (Masecchia Dep). 248:14–50:2; *see also* Ex. 8 (Lonergan Dep.) 183:15–85:24.

137.    In fact, it was Buffalo Police Department policy to collect and process any potentially relevant evidence available. Ex. 40 (Smardz Dep.) 54:4–17, 52:18–23; *see also* Ex. 75 (BPD Policy) HR-Dixon 1797 ("§ 2.9 Recognizing Evidence: All items of evidence must be collected and preserved regardless of whether they tend to exonerate or implicate a particular suspect.")

138.    Henry Smardz, a detective in the Evidence Collection Unit, testified at his deposition that, when requested, he would collect clothing from individuals like victims and suspects. In this case, he was instructed by homicide to collect the clothing of Torriano Jackson, Aaron Jackson, Mario Jarmon, and Valentino Dixon, which he did. Ex. 40 (Smardz Dep.) 36:6–11; 46:7–14; 120:12–19. But Smardz was never directed to collect Scott's clothing or shoes; had he been, he would have submitted Scott's clothing including his shoes for serological testing to determine if blood was present. Ex. 40 (Smardz Dep.) 121:21–122:8; 122:10–123:19. When asked what law enforcement reason he could think of to not collect Scott's clothing when offered, Smardz testified: "What reason? I have no idea. [I] don't know why I wasn't asked to collect it." Ex. 40 (Smardz Dep) 120:21–121:5.

139.    Smardz also testified that in the 1990s, BPD could and did request gunshot residue (GSR) testing as part of its investigations, and that the investigative purpose of testing an individual's clothing for GSR would be to see if that person had fired a gun. Ex. 40 (Smardz Dep.) 43:9–23; 46:21–25. Smardz explained that GSR would be expected to last longer on a person's clothing than hands, and that the amount of residue likely to be found would increase based on how many times the weapon was fired because GSR is generated every time a gun is fired. Ex. 40 (Smardz Dep.) 117:23–7; 67:23–68:11. If Scott provided the clothing he wore on night of the homicide without washing it—as Scott says he did—Smardz testified you would expect there to be potentially large amounts of GSR on that clothing given the circumstances of the crime. Ex. 40 (Smardz Dep. 118:9–16); *see also* Ex. 69 (Diegelman GJ Test.) 18:9-14 ("so much gunpowder in the air" when arrived on scene).

140.    Smardz testified that had he been instructed by any of the detectives to collect Scott's

clothing at the BPD homicide office, he absolutely would have collected it and would have forwarded it for appropriate testing. Ex. 40 (Smardz Dep.) 115:11–25, 116:12–18. But he was never directed to do so by Defendants. Ex. 40 (Smardz Dep.) 120:4–11.

141.    Scott describes that Stambach refused the offer of the clothes and shoes and told Scott to leave until "you guys get your statements together." Ex. 4 (Scott Dep.) 39:11–17, 40:14–18; 55:18–56:16; Ex. 17 (Scott Int., ECDAO Reinvest., Transcript Pt. 1, 8/15/18)14 ⸿ 2.

142.    Instead of charging Scott in connection with his confession, Scott was told by Stambach that "they had their guy and it wasn't [him]." Ex. 4 (Scott Dep.) 36:19–37:18; *see also* Ex. 74 (4/9/05 Scott Sworn Ltr.) Dixon 6318 (told "we got who we want, get the hell out of here"); Ex. 73 (2/27/02 Scott Sworn Ltr.) Dixon 5931 (told had who they wanted and to leave situation up to them); *see also* Ex. 76 (Shannon Decl.) ¶ 9 (was told by police that night that they "got everything" they needed and never contacted by BPD again after telling them Scott was the shooter).

143.    Scott was released that same day. Ex. 1 (Homicide File) BPD Comp. 200 (Stambach Rep.). As Scott testified at his deposition, Defendants did not take any of the evidence he offered them before he was released. Ex. 4 (Scott Dep.) 39:16–17 ("I just know that nobody ever took anything that I offered.").

144.    At the end of his handwritten report of the evening, Stambach wrote: "Both bad boys let go. See you in the morning." Ex. 1 (Homicide File) BPD Comp. 193 (draft report). That language does not appear in Stambach's later typed report about the evening. Ex. 1 (Homicide File) BPD Comp. 200.

145.    Stambach denied telling Scott he did not want to see his clothing or threatening him in any way. He also denied telling Scott anything like "get your story straight…and get out of here"; he claimed Lamarr Scott was lying when he said he had. Ex. 3 (Stambach Dep.) 285:5–24; 290:9–21. But Stambach admits he did not collect Scott's clothes or shoes for testing; he could not provide a reason why he would not have done so. Ex.3 (Stambach Dep.) 279:1–80:12, 283:2–84:22.

146.    Masecchia admitted "the last thing a homicide detective acting in good faith" would want to do is try to coerce, threaten, or strong arm a witness like Scott or Brown into changing their story. Ex. 7 (Masecchia Dep.) 247:13–248:6. Nor would any detective acting in good faith ever want to tell such a witness they have who they want and they don't want to hear it. Ex. 7 (Masecchia Dep.) 253:21–54:23.

147.    There were a number of other basic investigative steps that should have been taken in follow-up to Scott's confession, all of which Stambach has now admitted should have been performed. Those steps included:

>   a. Following up on retrieving the TEC 9 based on where Scott indicated he had discarded it. Stambach admitted that Scott's admission about where he threw the murder weapon was "new information," and that this was another basic investigative task that should have been done if he was acting in good faith. When asked why he didn't follow up on that information, his only answer was: "I didn't do it." Ex. 3 (Stambach Dep.) 298:4–299:9; Ex. 8 (Lonergan Dep) 192:25–193:3. Vickerd similarly testified that "normal procedure" would have been to search where Scott said he threw the gun, and that whether the gun was found or not should have been documented. Ex. 12 (Vickerd Dep.) 213:13–214:5. Lonergan also agreed that it would have been important to document police efforts to search the area where Scott said he had left the murder weapon. Ex. 8 (Lonergan Dep.) 192:10-193:3. But there is no documentation of any such efforts by Defendants in the police file. *See* McCarthy Decl. ¶ 9.

b. Following up on Scott's claim of self-defense by investigating whether Aaron or Torriano Jackson were themselves armed at the scene, Ex. 3 (Stambach Dep.) 291:5–14, 293:1–14. Stambach knew that a second gun had been found at the scene; he had also been told by Mario Jarmon on August 11 that Torriano Jackson shot him. Ex. 3 (Stambach Dep.) 416:3–9. At his deposition, Stambach agreed that any police officer acting in good faith would have asked Aaron Jackson questions about his brother potentially having a gun, and he could not offer any explanation or legitimate police reason for his failure to do so. Ex. 3 (Stambach Dep) 410:18–412:7; 416:19–417:17. Vickerd also agreed that Scott's statement that Torriano had fired a gun should have been followed up on, and that investigation documented. Ex. 12 (Vickerd Dep.) 214:6–17.

c. Following up with witnesses at the scene, including showing them photo arrays with Scott as a suspect. As Lonergan testified, after Scott's confession, it would be important to interview all of the people at the scene who could have seen Scott do the shooting as soon as possible to determine whether or not Scott's confession were true and to avoid the risk of contamination.  Ex. 8 (Lonergan Dep.) 187:19–188:24. Masecchia agreed it would be to "critically important" to interview any new witnesses Scott raised who were present during the shooting and may have seen Scott; that appropriate follow-up to his confession would be to show photo arrays including Scott as the new potential suspect; and that it would be "critically important" to conduct such interviews as soon as possible.  Ex. 7 (Masecchia Dep.) 244:20–245:17; 93:21-94:3; 187:19–188:24. Stambach agreed that showing potential eyewitnesses photographs or a line-up as soon as practicable was "as basic as it gets." Ex. 3 (Stambach Dep.) 200:18–201:6, 219:14–220:9, 410:8–16, 418:10–19:11. But he could not give any explanation for why Aaron Jackson was never shown a photo array with Scott's photo after he confessed. Ex. 3 (Stambach Dep.) 200:18–201:6, 219:14–220:9, 410:8–16; 412:3–19. In fact, there is no documentation in the police file of any witnesses being shown an array with Scott's photo. *See* McCarthy Decl. at ¶ 9.

d. Following up on the detectives' alleged concerns that Dixon's family may have used threats or promises to get Scott to confess. Stambach and Lonergan both testified that they were suspicious Scott's confession was prompted by pressure or incentives provided by Dixon's family, and that one of the most basic steps to follow up on that suspicion would have been to interview Dixon's mother and father promptly after Scott confessed. Ex. 3 (Stambach Dep.) 300:18–301:21, 302:4–21, 305:8–19, 313:1–14, Ex. 8 (Lonergan Dep.) 193:6–194:12. As Stambach testified, he would expect someone confessing to a murder to demand a lot of money to do that, and if something like that had happened, it was the kind of thing a homicide detective could figure out. Ex. 3 (Stambach Dep.) 304:12–305:2. Vickerd agreed that it would have been important to investigate any information about interactions Scott had with Dixon's family. Ex. 12 (Vickerd Dep.) 215:17–2. ADA Belling also testified that he would have expected detectives to ask to speak with Dixon's parents given their purported concerns. Ex. 41 (Belling Dep.) 238:21–239:6.

41

Although Stambach agreed that a conscientious detective acting in good faith would have attempted to talk to the people who may have made threats or promises as soon possible, there is no evidence that Defendants ever made any effort to speak to Dixon's parents or follow-up on the purported threats or inducements. Ex. 3 (Stambach Dep.) 302:4–16; Ex. 8 (Lonergan Dep.) 193:25-194:12 (important to document any such efforts); *see* McCarthy Decl. ¶ 9 (no documentation in BPD file); Ex. 41 (Belling Dep.) 109:3–18 ("don't remember seeing any paperwork on that"); Ex. 76 (Shannon Decl.) ¶ 9 (never contacted by BPD after August 12); Ex 86 (Bryant Dep.) 36:7–16. Detectives nevertheless falsely represented to ADA Belling that the only reason Scott came forward was because Dixon's parents had put him up to it. Ex. 41 (Belling Dep.) 95:12–96:21; Ex. 86 (Bryant Dep.) 25:7–26:9 (did not pressure or threaten Scott to confess); Ex. 4 (Scott Dep.) 29:20–30:15 (decided on his own to confess on the news, no one offered him anything or forced him to)

148.   Stambach admitted these were all "basic investigative" tasks that he would have performed if he was "conducting a conscientious, good-faith investigation" but that he did not do any of them. Ex. 3 (Stambach Dep.) 291:5–13, 293:1–14, 298:25– 299:9, 301:3–21; 302:10–21.

149.   Massechia also admitted that Defendants' job did not end with an arrest, and if information were received after an arrest that called into question the reliability of that arrest, it was even more important to investigate that. Ex. 7 (Massechia Dep.) 95:17–96:4. As Scott himself has observed, had he been charged when he truthfully confessed to shooting Torriano Jackson, the 16-year-old he shot in the face less than two years later "would not have been a quadriplegic." Ex. 34 (Scott Ltr. to ADA and DA 2005) COE 4738**.**

150.   To the extent the BPD defendants could provide an explanation for their failure to take any of these basic steps to follow up on Scott's extraordinary confession, they sought to attribute that failure to Defendant Belling. Ex. 3 (Stambach Dep.) 171:15–172:12; Ex. 7 (Masecchia Dep.) 243:18–22.

151.   At his deposition, Assistant District Attorney Belling flatly denied telling Defendants that there was no need to investigate Scott. He testified that he expected the detectives to continue

investigating. Ex. 41 (Belling Dep.) 111:25–112:13. Belling also denied that he ever took over direction of the investigation, or even played an integral role in directing the investigation after Scott came forward to confess. Ex. 41 (Belling Dep.) 66:6–16.

**Aaron Jackson's tentative identification.**

152.    On August 12, 1991—after taking Scott's confession earlier that day—Stambach went to the hospital to interview Aaron Jackson and conduct a photo ID procedure. Ex. 1 (Homicide File) BPD Comp. 191–92 (Stambach took Scott into custody early morning on 8/12/91); BPD Comp. 170 (Jackson statement signed at 7:15 p.m. on 8/12/91).

153.    The night of the shooting, Jackson was shot as he fled from the scene and was badly wounded. Jackson was taken to the hospital, where he had to be resuscitated and required immediate surgery. Ex. 2 (Cr. Tr. (LaDuca)) 405:25–406:15 (surgeon testimony). Jackson had significant internal bleeding due to an extensive abdominal wound. Ex. 2 (Cr. Tr. (LaDuca)) 406:11–407:15. After surgery, he was treated with medication, including a tranquilizer and strong narcotic pain medication. Jackson required a second surgery five days later on August 15, and was not released from the hospital until August 23. Ex. 2 (Cr. Tr. (LaDuca)) 407:22–409:24.

154.    Stambach reported that he showed Jackson a six-photo array that was prepared to include Dixon as the suspect, not Scott. Ex. 1 (Homicide File) BPD Comp. 185 (Stambach Rep.); BPD Comp. 166–68 (Jackson array).

155.    Stambach reported that Jackson selected Dixon's photo from a 6-photo array without suggestion and stated that Dixon was there on the night in question and "looked like" the shooter, but he could not be sure because "everything happened so fast." Ex. 1 (Homicide File)

BPD Comp. 185 (Stambach Rep.); BPD Comp. 166 (Jackson affidavit).

156.    Even if Jackson could make a reliable identification, given that Scott (not Dixon) was the shooter, and the two looked nothing alike, the likelihood of Jackson mistakenly selecting Dixon from the photo array was very low absent police suggestion. Ex. 29 (Dysart Rpt.) 4–5, 18.

157.    Jackson's ability to view the shooter (Scott) was also very limited. As he testified, Jackson was "looking on the ground" when the shooting started and did not look at the shooter's face before he started running, because he first thought it was just the police shooting in the air. He was then surrounded by "sparks everywhere," shot and badly injured himself, and was focused on his wounded brother Torriano—who he saw fall and call out for help. Ex. 1 (Homicide File) BPD Comp. 216–7 (Grabowski Rep.); Ex. 70 (Jackson GJ Test.) 13:2–15; Ex. 2 (Cr. Tr. (Jackson)) 224:8–225:2, 268:6–70:16; Ex. 29 (Dysart Rpt.) 5, 9, 26.

158.    Stambach agreed that, under the circumstances (i.e., Scott's confession, and Jackson's inability to make a positive identification of from the Dixon array), it would have been important to show Jackson a photo array including Scott within a day or two. A photo of Scott was readily available at the time because Scott's Polaroid mug shot was taken that very morning when Scott confessed to Stambach at the BPD. Ex. 3 (Stambach Dep.) 410:2–12; Ex. 38 (8/12/91Scott Polaroid) COE 2179. Stambach admits he could have shown Jackson a photo array containing Scott's photo, but that he did not. Ex. 3 (Stambach Dep.) 410:2–12, 418:14–419:11. When asked at his deposition about this failure, Stambach could not offer any explanation for why that never happened. Ex. 3 (Stambach Dep.) 410:2–16.

159.    Stambach also admitted that he also did not ask Jackson a single question concerning any

of the information Scott had just given him hours before. Ex. 3 (Stambach Dep.) 410:2–411:1, 418:14–419:11. He did not ask Jackson any questions about whether he or his brother had a gun when they were fighting Jarmon in the immediate lead-up to the shooting—which Stambach admitted was an obvious follow-up to Scott's confession and to Jarmon having told him the day before that Torriano shot him (especially given the gun found at the scene). Ex. 3 (Stambach Dep.) 412:3–12, 413:3–14, 416:3–417:15; *see also* Ex. 14 (DA memo) 7 (revolver with spent shell casing recovered right next to Torriano). When asked how he could explain not asking Jackson a single question about that, Stambach responded: "I don't know. I can't answer that." Ex. 3 (Stambach Dep.) 416:19–417:6.

160.    Stambach at his deposition agreed that, as to Jackson, there was no investigation whatsoever to determine whether or not the allegations that Scott confessed to were true. Ex. 3 (Stambach Dep.) 412:14–19; 419:6–11.

**Anonymous calls and further failures to investigate.**

161.    On August 14, 1991—two days after Scott's confession to the BPD, and only four days after the shootings—Stambach received a call from Tamara Frida, who had witnessed the shooting. Frida stated that Dixon was not the shooter, adding that she was available to review photographs to make possible identifications. Although Frida did not identify herself by name, when asked by Stambach, she said she was "the girl from the red Tracker." Ex. 1 (Homicide File) 203 (Stambach Rep.); Ex. 6 (Frida Dep.) 26:16–23 (although did not give name, understood was identifying herself to Stambach). The registration number of the car is handwritten next to "red Tracker" on Stambach's typed report. Ex. 1 (Homicide File) BPD Comp. 203 (Stambach Rep.).

162.    Stambach agrees that any competent detective would try to find the woman caller and develop a rapport with her. Ex. 3 (Stambach Dep.) 203:21–204:6. He admits he had the names of the girls in the red Tracker the night of the shooting, and that it would have been very easy for him to find out who the caller was. Ex. 3 (Stambach Dep.) 198:25–199:14. But he took no steps to do that, even though he agreed it was obviously something he should have followed up on. When asked why he did not, Stambach responded: "I have no idea." Ex. 3 (Stambach Dep.) 199:15–19, 200:18–20, 204:7–8.

163.    On November 22, 1991, ADA Belling sent a letter to Homicide Chief Richard Donovan. In that letter, Belling wrote that it was "apparent that we have major discrepancies in regard to who committed the murder of Torriano Jackson. It is my opinion that these discrepancies can only be cleared up by continued investigation. Namely, there are various people who were at the scene of this shooting who have never been talked to." In that letter, Belling explicitly identifies "Tamara Frida" who "owned a red…Tracker which was hit by a stray bullet along with her address" as one of those witnesses. Ex. 26 (11/22/91 Belling Ltr.) COE 1687. Belling explained that he knew who Frida was and where she lived because police traced her plate. Ex. 41 (Belling Dep.) 123:21–23. In other words, Defendants not only could have determined her identity, they in fact did know Frida's identity and her address months before Dixon was indicted in January 1992. Ex. 58 (Indictment); Ex. 72 (GJ Charges) (grand jury charged on January 13, 1992).

164.    It was not until December 1991, four months after Frida called, that Stambach and a fellow detective got around to trying to contact her, even though she appeared to be "a very reliable, credible eyewitness" who had no connection to either group involved in the dispute and had already called on her own to tell him they had arrested the wrong person. Ex. 3 (Stambach

Dep.) 202:10–20, 206:7–10, 220:24–221:9. Stambach's belated follow-up consisted of a single visit to Frida's home, where her mother indicated Frida was at work. There is no documentation anywhere in the police file that Stambach or any other Defendant made additional efforts to contact Frida, show her a photo array, or take any further steps to determine what she knew about the identity of the shooter—who she had already definitively told them was not Dixon. Ex. 1 (Homicide File) BPD Comp. 258 (Stambach Rep.); *see also* McCarthy Decl. ¶ 9.

165.    At her deposition, Frida testified there was no doubt in her mind that Lamar Scott was the person that she saw shoot and kill Torriano Jackson in the early morning hours of August 10, 1991. Ex. 6 (Frida Dep.) 12:4–23, 15:6–9. She further testified that had any police officer come to her house and shown her pictures, including a picture of Scott, she would have identified him as the shooter. Ex. 6 (Frida Dep.) 26:24–27:9.

166.    In the days surrounding Scott's confession there were statements from several other eyewitnesses indicating that it was Lamar Scott, and not Valentino Dixon, who was the shooter. On August 11, Mario Jarmon (while still in the ICU) told Stambach and another detective that Dixon did not shoot him and that he did not see Dixon with a gun. Ex. 1 (Homicide File) BPD Comp. 155 (Stambach Rep.). About a week later, Jarmon give a second statement—providing a more detailed accounting including his observations of Torriano Jackson having a silver gun and seeing Scott running toward the fight shooting a Tec9. Ex. 1 (Homicide File) BPD Comp. 215 (Grabowski Rep.).

167.    A number of other witnesses known to detectives also had firsthand information about Scott's responsibility for the shooting. Antoine Shannon went to the BPD station on August 12 with Scott, and told police that Scott was the shooter, not Dixon. Police did not take a statement

from Shannon, and although he was told that police would contact him if they needed more information, no one from BPD ever reached out to him again. Ex. 76 (Shannon Decl.) ¶¶ 7–9.

168.    Michael Bland was a close friend of the Jackson brothers who had been standing on the side of the market just outside the fight—likely the best vantage point to observe the shooting.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████

169.    Defendants were aware of Bland as an eyewitness from early in their investigation. During Scott's August 12 confession, Stambach asked him directly if "Mike Bland was on the corner" during the shooting, and Scott told him that Bland was. Ex. 1 (Homicide File) BPD Comp. 197 (Scott Stmt). Aaron Jackson also told detectives in a follow-up interview that he saw Michael Bland at the shooting scene, and that Bland lives in his neighborhood. Ex. 1 (Homicide File) BPD Comp. 217 (Grabowski Rep.). But there is no documentation in the police file that Stambach or any other detective made any efforts to locate or interview Bland. *See* McCarthy Decl. ¶ 9. At his deposition, Stambach claimed he had "no idea" why he was asking Scott questions about Bland being on the corner. Ex. 3 (Stambach Dep.) 297:6–12.

170.    At his deposition, Bland was asked whether he knew Valentino Dixon was not the shooter and had nothing to do with the shooting, and whether when he spoke to detectives soon

after the shooting attempted to tell them the truth, but was pressured by detectives including Stambach to say that Dixon was the shooter even though he and the detectives knew that Dixon was not. Bland invoked his Fifth Amendment rights against self-incrimination to all of these questions. Ex. 85 (Bland Dep.) 9:13–21. If detectives did interview Bland and learn this information, it was never documented or disclosed. *See* McCarthy Decl. ¶ 9.

**Defendants send fabricated evidence to prosecutor and hide exculpatory evidence.**

*Belling not involved in Adams, Sullivan, or Jackson ID procedures.*

171.    Defendants forwarded their police reports to the assigned assistant district attorney Christopher Belling. The case file included Defendants' reports falsely claiming that Sullivan, Adams, and Jackson selected Dixon from photo arrays through properly conducted, nonsuggestive photo ID procedures, and that Sullivan was the first person to volunteer Dixon's name as a suspect. Ex. 1 (Homicide File) BPD Comp. 174; Ex. 41 (Belling Dep) 78:20–79:24, 88:11–24; 216:6–21.

172.    Belling testified that he talked to the detectives throughout the case when the need arose, but that he was primarily relying on their police reports for the activities they conducted. Ex. 41 (Belling Dep.) 176:22–177:7. His expectation for Defendants in this case was that they were documenting and providing to him any potential exculpatory or impeachment evidence, including contradictions in witness statements, and he did not have any reason to doubt that they would. Ex. 41 (Belling Dep.) 39:19–40:6, 42:5–23.

173.    Belling had no input into Dixon's arrest or the criminal complaint that Stambach swore against Dixon on August 10, and he was not present for the photo arrays shown to Adams,

Sullivan, or Jackson. Ex. 41 (Belling Dep.) 347:10–348:5, 61:17–25. He was relying on

Defendants to accurately and completely describe what happened during identification

procedures, including about how many photos were shown to witnesses and which photos were

shown to witnesses. Ex. 41 (Belling Dep.) 55:8–56:2. And to the extent an officer said anything

suggestive about who to pick before, during, or after a photo array, he also expected that to be

documented. Ex. 41 (Belling Dep.) 56:13–25 ("I would say that's pretty basic.").

174.     Belling's understanding from the police reports and his discussions with the detectives

was that Adams identified Dixon from a properly conducted six-person photo array. Ex. 41

(Belling Dep.) 179:6–13. Belling did not know of any suggestion with Adams as to who he

should pick from the array, and he never received any information from any police officer

indicating that suggestion or improper conduct was used with Adams. Ex. 41 (Belling Dep.)

179:15–18, 181:25–182:14. Belling also took to be true from the police report that Adams never

expressed any uncertainty about whether Dixon was the shooter. Ex. 41 (Belling Dep.) 185:18–

186:6.

175.     Belling agreed that if Stambach represented in his report that he showed Adams a six-

person array when in fact he showed Adams three individual photos, including a photo of Dixon,

that would be a serious misrepresentation. Ex. 41 (Belling Dep.) 191:15–24. If Belling had been

told or knew about Adams being shown individual photos, including an individual photo of

Dixon, he would have had to disclose it as *Brady* material  Ex. 41 (Belling Dep.) 188:13–25.  But

if Adams was ever shown three individual photos, including a photo of Dixon, as opposed to a

six-person array, Belling never knew anything about it because no one ever told him. Ex. 41

(Belling Dep.) 187:10–22.

176.    Like with Adams, Belling relied on the police reports concerning what transpired

between the police and John Sullivan. Ex. 41 (Belling Dep.) 194:3–8. Based on the police report,

Belling understood Sullivan was the person who "interjected" Valentino Dixon's name into the

case for the first time. Ex. 41 (Belling Dep.) 216:6–21. The most important thing to Belling was

that Sullivan was the person volunteering Dixon's name, not the other way around (i.e, not the

police giving him Dixon's name), and that was his understanding throughout the entire case—

that Sullivan was the first person in the investigation to mention Valentino Dixon.  Ex. 41

(Belling Dep.) 217:16–20, 217:22–218:2. It was also Belling's understanding based on the police

reports and his communications with detectives that Sullivan confirmed his volunteering of

Dixon's name by then picking Dixon out of a properly conducted six-person array without any

suggestion. Ex. 41 (Belling Dep.) 216:22–217:14.

177.    Belling also understood based on Defendants' reports that Aaron Jackson's initial

viewing of a photo array resulted in a tentative identification of Dixon, and the police never

disclosed to him anything they said or did with Jackson to change his identification of Dixon

from tentative to certain. Ex. 41 (Belling Dep) 309:3–15, 310:9–14; *see also* 56:13–25 (expected

detectives to document anything suggestive before, during, or after a photo procedure with a

witness); 39:19–40:6 (expectation was that police were documenting and providing him all

potentially exculpatory and impeachment evidence).

*Belling limited interactions with Scott.*

178.    Early in the morning on August 12, Stambach called Belling to the station after Scott had

confessed on the news and to BPD. By that point, Stambach had already interviewed Scott. Ex. 1

(Homicide File) BPD Comp. 200 (Stambach Rep.). Belling read the statement Stambach had

51

taken from Scott, then spoke to Scott for about five minutes; in that conversation, Belling

avoided speaking to Scott about substance Ex. 41 (Belling Dep) 63:2–14, 68:5–69:7. He did not

know whether the police ever questioned Scott about what clothes he was wearing or if he would

provide them. Ex. 41 (Belling Dep) 291:16–292:7.

179.    It was his understanding from watching the video of Scott's confession and speaking to

the homicide detectives, that Scott confessed because Dixon's parents put him up to it. Ex. 41

(Belling Dep.) 95:14–96:10. After Scott was released, Belling expected Defendants to continue

investigating the case. Ex. 41 (Belling Dep.) 112:8–13, 63:2–64:16.

180.    After his confession, Scott felt harassed by Detective Stambach, as Stambach kept

showing up in places where Scott was—"places that I didn't think anybody should know about

and/or show up." Ex. 4 (Scott Dep.) 59:4–19, 58:9-58:13.


**Grand jury – November 1991, January 1992**

181.    On November 6, 1991 Belling presented Aaron Jackson, John Sullivan, and Travis

Powell as witnesses to the grand jury. Ex. 41 (Belling Dep.) 353:3–9. On November 20, Belling

presented Michael Bland as a witness. Ex. 41 (Belling Dep.) 353:10–12. At that time, there was

no vote at the grand jury. Ex. 41 (Belling Dep.) 353:13–17.

182.    Instead, two days later on November 22, Belling sent a letter to Captain Richard Donovan

of the BPD Homicide Bureau, copying the Commissioner of the BPD.  Ex. 26 (11/22/91 Belling

Ltr.) COE 1686–87. In that letter, Belling references an earlier discussion with Donovan about

this case, and flags that there are still "major discrepancies in regard to who committed the

murder of Torriano Jackson"—especially in light of Shannon's recent sworn statement to Belling

that Scott, not Dixon, was the shooter. As Belling testified, he wrote that letter to tell Donovan what additional investigation he wanted done and listing seven additional witnesses he wanted police to interview. Ex. 41 (Belling Dep.) 163:16–20, 354:13–22. These witnesses included Jarmon, who all along said he was not shot by Dixon but "[had] never been interviewed." Ex. 26 (11/22/91 Belling Ltr.) COE 1687.

183.    In the meantime, the grand jury proceedings were continued on January 13, 1992—nearly two months later—when Belling presented testimony from Mario Jarmon, Leonard Brown, Lamarr Scott, Emil Adams, Fred Stencil, and Robert Lewis. Ex. 41 (Belling Dep.) 353:13–17, 354:17–355:13.

184.    Powell, Bland, Stencil, and Lewis all testified they were present the night of the shooting but did not identify the shooter. Ex. 63 (Powell GJ Test.) 35:8–36:8 ; Ex. 61 (Bland GJ Test.) 5:1–20, 7:13–8:9; Ex. 62 (Stancil GJ Test.) 86:22–87:9; Ex. 64 (Lewis GJ Test.) 93:23–94:24. Jarmon and Brown truthfully testified that Torriano had a gun that night and that Scott was the shooter. Ex. 68 (Jarmon GJ Test.) 10:5–15, 11:22–12:4; Ex. 67 (Brown GJ Test.) 31:6–32:23, 42:9–43:6, 45:7–9, 47:12–19.

185.    No Defendants testified, and no evidence of the true circumstances of Defendants' suggestive identification procedures with Adams, Sullivan, or Jackson was presented. Ex. 65 (Adams GJ Test. ); Ex. 71 (Sullivan GJ Test.); Ex. 70 (Jackson GJ Test.). Adams, Sullivan, and Jackson all testified that Dixon was the shooter. Ex 71 (Sullivan GJ Test.) 28:5–12 ; Ex. 70 (Jackson GJ. Test.) 15:2–4; Ex. 65 (Adams GJ Test.) 76:11–77:18 . As Plaintiff's eyewitness expert Dr. Jennifer Dysart explains "[r]esearch shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent

procedure regardless of whether or not they are the actual perpetrator." Ex. 29 (Dystart Rpt.) 21.

Moreover, as Dysart further explains, "scientific research has demonstrated that the type of

suggestion and influence that can result in mistaken selections of innocent suspects can occur

without the witness's conscious awareness." Ex. 29 (Dystart Rpt.) 5.

186.    As a result of threats, pressure, and coercion by Defendants, Scott perjured himself in the

grand jury—falsely testifying that Dixon committed the shooting, not him. Ex. 66 (Scott GJ

Test.) 67:21–68:3; Ex. 20 (Scott Ltr., 12/11/98) (recanted because felt his life was threatened

because of harassment from Stambach and Belling); Ex. 60 (1/31/92 Scott Aff.) (perjured

himself because believed his life and lives of family were in jeopardy from BPD and Das office

if did not testify in the way he did); *see also* Ex. 59 (Yates Aff.) Dixon 5183 (Scott stayed with

her because he was afraid of the police).

187.    As Scott later explained: "I was told that they had who they wanted, and to say that Mr.

Dixon's parents' had put me up to confessing. I committed perjury and this is something I deeply

regret. But I was young and the pressure from the police was to[o] strong for me to handle. Ex. 1

(Homicide File) BPD Comp. 267 (1/14/03 Letter); Ex. 4 (Scott Dep.) 61:15–62:16 (letter is

accurate description of what happened with police, was truthful to best of recollection at the

time).

188.    Scott's grand jury testimony was the only time in over 30 years that he has falsely

maintained he was not the shooter. Ex. 5 (Scott Plea 2018) 4 ("But for an appearance that he did

not make in the grand jury, [Scott] has maintained that confession for the last 27 years. He has

been confessing to this crime in excess of ten times and has come into our office and confessed

to the crime as well.")

189.    Belling charged the grand jury to "consider first if Scott did it" because then they would not have to vote on Dixon. Ex. 72 (Jury Charges GJ Charges) 106:11–12. But the grand jury returned an indictment for Dixon. Ex. 58 (Indictment) COE 1709–12. Jarmon and Brown were also charged in concurrent indictments with perjury for "falsely" implicating Scott in the shooting in their grand jury testimony. Ex 57 (DA Press Release) COE 2228; *see also* Ex. 56 (*Buffalo News* Article) COE 2738 (publishing that Brown and Jarmon were arraigned on perjury charges).

**Criminal Trial – June 1992**

190.    Dixon's trial took place over four days in June 1992. Scott's grand jury testimony "effectively eliminated" him as a witness in Dixon's trial, and he did not testify. *See* Ex. 2 (Cr. Tr.); Ex. 41 (Belling Dep) 303:10–304:10. Brown and Jarmon could not be called to testify because they were facing pending perjury charges. Ex. 56 (Buff. News Article) COE 2738; Ex. 41 (Belling Dep) 338:3–9, 339:8–14.

191.    At trial, the prosecution presented no physical or forensic evidence linking Dixon to the shooting. Instead, the prosecution relied on the testimony of Adams, Sullivan, and Jackson, who all identified Dixon as the shooter at trial. *See* Ex. 2 (Cr. Tr.). These identifications were unspurprising given these witnesses had been in multiple identification procedures with Dixon prior to trial, *e.g.,* identifying him in arrays and at the grand jury, and as plaintiff's eyewitness expert Dysart explains, must be "treated with extreme caution because it is very likely that a witness will merely select in subsequent procedures a person they have viewed or selected in a previous procedure." Ex. 29 (Dystart Rpt.) 22. "It is for this reason," Dysart further explains,

psychologists consider these subsequent identifications as "not actual independent tests of a witness's memory or ability to identify perpetrators." Ex. 29 (Dystart Rpt.) 22.

192.    As Belling testified, it was "challenging" to get Adams to come testify as trial Dixon. Ex. 41 (Belling Dep.) 169:5–23, 175:11–15. Adams was having criminal issues in Michigan at or around the time Belling was trying to get him to come testify, and that was a problem with getting Adams to come testify. Ex 41 (Belling Dep.) 170:8–171:23, 172:16–173:4

193.    Belling sent numerous letters to Adams requesting his cooperation to testify at trial. Ex. 55 (5/11/92 DA Letter) COE 1753 ("you are a crucial witness in regard to this case"; Ex. 54 (6/2/92 DA Letter) COE 1766 (contact Belling "immediately" upon receipt); Ex. 53 (6/5/92 DA Letter) COE 1769 ("The time for your voluntary cooperation is now. Should you continue to be uncooperative, I will have no alternative but to have the Saginaw Prosecutor's Office execute a warrant against you and have you returned to Buffalo in custody to testify.").

194.    Belling ultimately had to request a continuance of the trial date and secure an Interstate Material Witness warrant for Adams's arrest and forcible return to Buffalo to get him to testify. Ex. 53 (6/5/92 DA Letter) COE 1769; Ex. 52 (6/5/92 Belling Aff.) COE 1775 (Belling Aff); Ex. 51 (6/5/92 DA Letter) COE 1784 (I have requested a brief continuance of the trial in the hopes of securing Mr. Adams as a witness…. I would ask that you take appropriate steps to immediately locate and subpoena Mr. Adams and advise me of your results.")

195.    At trial, Adams was crossed on the fact that Dixon did not look "heavyset" to him, like the description he original provided. Adams claimed he now could not describe the appearance of the shooter but that he knew it was Dixon. Ex. 2 (Cr. Tr. (Adams) 204:24–05:14, 208:5–14,

211:4–12:16.

196.    Around the time of trial, Sullivan was in Georgia because he was also having "some criminal problems," and Belling had to arrange to get him back to Buffalo to testify; in particular, Belling learned that Sullivan was going to be indicted in Georgia for raping a 15-year-old girl. Ex. 41 (Belling Dep.) 195:17–196:4; *see also* Ex. 50 (Belling Handwritten Notes) COE 2129-30 (Belling handwritten notes re Sullivan held girl hostage and raped her).

197.    As with Adams, Belling had to seek a material witness warrant to procure Sullivan's testimony at trial. Ex. 49 (Signed Order re Sullivan) COE 2149–51 (sought warrant on 5/21); Ex. 48 (5/20/92 Belling Aff.) COE 2153 ¶ 5 (Sullivan a "necessary and critical witness"); Ex. 47 (Sullivan Warrant)COE 2147–48 (warrant entered on 6/3).

198.    On June 9, Belling missed several calls from Sullivan who left the following message: "I'm going back to Georgia—not going to testify under the circumstances, very disgusted (then he hung up) before I could say anything."  Ex. 46 (6/9 4:20 p.m. Tele. Mess.) COE 2171; Ex. 45 (6/9 12 Tele Mess.) COE 2277 (missed call at 12pm); Ex. 44 (6/9 10am Mess.) COE 2278 (missed called at 10am). At his deposition, Belling agreed that messaged indicated Sullivan was recalcitrant. Ex. 41 (Belling Dep.) 219:16–20:16.

199.    But Sullivan testified the following day, June 10, at trial against Dixon. He was crossed at trial about having smoked marijuana and drank leading up to the shooting, and about the far distance (100–150 yards) from which he claimed to have seen the shooter's face well enough to make an ID even though it was dark and he had been shot. Ex. 2 (Cr. Tr. (Sullivan)) 101:17–104:24, 109:7–110:24, 122:3–24:9, 133:7–35:24, 137:3–13.

200.    After Sullivan's testimony, on June 12, Belling sent a letter to the prosecutor in Sullivan's Georgia rape case, praising Sullivan as "far and above the average 'street punk' that I'm sure we both deal with on a daily basis" and asking that Sullivan's cooperation be considered "when it comes time for disposition of his Georgia charges." Ex. 43 (6/12/1992 Belling Letter) COE 2161. At his deposition, Belling agreed that his letter could have been very helpful in connection with Sullivan's rape charges, although he "didn't know" whether or not he told Sullivan's father that if Sullivan cooperated at trial, he would write a letter on his behalf to get Sullivan to testify. Ex. 41 (Belling Dep.) 210:3–8, 206:13–207:3.

201.    Jackson also testified at trial, where he was crossed on the fact that he first told police he was not sure Dixon was the shooter because it all happened so quick but was now testifying he was certain Dixon was the shooter. Jackson testified that "his memory gets better with time." Ex. 2 (Cr. Tr. (Jackson)) 241:4–246:20, 257:18–58:24, 252:1–11.

202.    In closing, Belling argued that it could not be a mere coincidence that Adams, Sullivan, and Jackson all three independently picked the same person: "[T]he big coincidence has come in. I don't know how many numbers it takes to win the lottery, but go and lay some money down because this is our day, this is our week, we have got three people at different places, different times, two of them live in different states, and they all say one thing. They all say this man here machine gunned down Torriano Jackson as he lay on the ground, shot a hole in Aaron, and hit John Sullivan with a stray round. They all say that." Ex. 2 (Cr. Tr. (Belling Closing)) 605:12–06:4.

203.    The jury was initially split 9–3 in favor of acquittal. Ex. 14 (DA Memo) COE 4773

(Krahling juror interview). But ultimately the jury convicted Dixon of murder in the second degree, attempted murder in the second degree, assault in the third degree, and criminal possession of a weapon on the second degree based on the eyewitness identifications of Adams, Sullivan, and Jackson. Dixon was then sentenced to 33 1/3 years to life. Ex. 14 (DA Memo) COE 4759.

204.    In November 1992, Brown and Jarmon were tried on the perjury charges. They were both acquitted of charges relating to their purportedly false testimony about Torriano Jackson having a gun that night, but were convicted for their (truthful) testimony that Scott, not Dixon, was the shooter. Ex. 13 (Newcomb Aff.) COE 3349 ¶¶ 5, 10.

**Dixon is exonerated 27 years after Scott truthfully confessed to the crimes.**

205.    Dixon maintained his innocence throughout his incarceration, filing multiple post-conviction appeals for relief. Ex. 14 (DA Memo) COE 4759 (Dixon directly appealed and filed § 440 motions in 2003, 2005, and 2018).

206.    In 2018, the newly-elected Erie County District Attorney, John Flynn, thoroughly reinvestigated the crime by interviewing over thirty witnesses (including every critical witness and, in the ECDAO's view, every individual with relevant information), reviewing the records and physical evidence, and conducting a polygraph examination of Dixon. Ex. 28 (ECDAO Aff. 2018 ) ¶ 4; Ex. 33 (440 Motion Tr.) Dixon-699. The ECDAO conclusively determined that Lamarr Scott was the shooter, not Dixon. Ex. 28 (ECDAO Aff. 2018) ¶¶ 12–13.

207.    On September 19, 2018—more than 27 years after his arrest in August 1991—Dixon's convictions for second-degree murder, attempted murder, and assault were vacated by the Erie

County District Court on the basis of newly discovered evidence: that consistent with his confession on August 12, 1991, the ECDAO conclusively determined Scott was the shooter, not Dixon. The State also consented to dismissal of those charges. Ex. 32 (440 Order) Dixon-5401–2; Ex. 33 (440 Motion Tr.) Dixon-699-700; Ex. 28 (ECDAO Aff. 2018) ¶¶ 4, 12–13. On November 1, 2023, Dixon's conviction for criminal weapon possession in the second degree was also vacated by the Erie County District Court on the basis of newly discovered evidence, even though the State opposed vacating the conviction because Dixon had possessed the gun near the crime scene earlier in time. Ex. 42 (Eagan Order) 7; Ex. 25 (State 440).

208.    On September 19, 2018, the same day Dixon was exonerated, Scott pled guilty to those crimes, even though he understood that the plea would have adverse consequences on his parole status. Ex. 5 (Scott Plea 2018) 13:4–14:20 (pleading guilty); Ex. 4 (Scott Dep.) 22:4–20 ("I still have 20 years left on parole, and if I sneeze wrong, there's a strong possibility that could be violated because [plea is to] a violent crime."). As Scott explained at his deposition, he did so because: "You can't allow another human being to continue to be punished for something that they didn't do." Ex. 4 (Scott Dep.) 23:14–20.

*Stambach found liable for fabricating evidence and maliciously prosecuting mentally unstable Josue Ortiz.*

209.    On May 9, 2022, a jury in this District found that Stambach maliciously prosecuted Josue Ortiz and fabricated evidence against him. Ex. 90 (Ortiz Verdict) 1–2. The jury awarded Ortiz $5 million in damages and 1.5 in punitive damages, an amount higher than what Ortiz's attorneys asked for. Ex. 90 (Ortiz Verdict) 3; Ex. 91 (Ortiz Verdict on Punitive Damages); Ex. 3 (Stambach Dep.) 319:17–23.

210.    In 2006, Ortiz was convicted of the November 11, 2004 murders of Nelson and Miguel

Camacho and sentenced to 25 years imprisonment. Ex. 89 (Ortiz Stip.) ¶¶ 1, 5–7. After an

investigation by the Federal Bureau of Investigation and the United States Attorney's Office for

the Western District of New York determined that Ortiz was not involved in the murders, he was

exonerated in 2014. Ex. 89 (Ortiz Stip.) ¶¶ 8–9.

211.    Ortiz's prosecution was based almost entirely on a confession that Stambach procured

from him on November 16, 2004. Ex. 3 (Stambach Dep.) 330:18–331:3 (conviction based solely

on the admission and Stambach report); Ex. 89 (Ortiz Stip.) ¶ 8 (Ortiz convicted based on

confession). The confession contained non-public facts that Ortiz could not have been aware of.

Ex. 3 (Stambach Dep.) 331:4–10. It was this confession that the jury found Stambach had

fabricated. Ex. 90 (Ortiz Verdict) 1; Ex. 3 (Stambach Dep.) 318:25–319:6.

212.    The day before Stambach fabricated this confession, Ortiz was interviewed by BPD

officers, including Lonergan, in the psych unit of a hospital. Ex. 3 (Stambach Dep.) 331:25–

332:11; Ex. 8 (Lonergan Dep.) 212:11–16, 214:16–23, 215:22–216:2. The officers, including

Lonergan, determined that Ortiz was not a suspect and that he had no reliable information. Ex. 8

(Lonergan Dep.) 214:16–23; Ex. 3 (Stambach Dep.) 333:1–5. The officers also noticed that he

was exhibiting psychiatric issues. Ex. 8 (Lonergan Dep.) 212:11–22; 215:22–216:2.

213.    Despite knowing that Ortiz had no reliable information and was experiencing

psychological issues, Lonergan did not attempt to intervene when Stambach alerted him to

Ortiz's false confession. Ex. 3 (Stambach Dep.) 353:3–20; Ex. 8 (Lonergan Dep.) 217:23–

218:11(does not recall if he told Stambach). Indeed, he was a witness to Ortiz's false statement.

Ex. 88 (Ortiz Confession); Ex. 3 (Stambach Dep.) 349:1–2; Ex. 8 (Lonergan Dep.) 217:12–16.

Lonergan noticed that during the purported confession, Ortiz appeared frightened. Ex. 8 (Lonergan Dep.) 215:22–216:2, 221:9–15. At his deposition in this case, Lonergan agreed that it would be critically important to provide Stambach with information about Ortiz's mental health history even though he did not do so. Ex. 8 (Lonergan Dep.) 216:14–25; Ex. 3 (Stambach Dep.) 353:3–20.

214.    As the supervisor, Lonergan knew that while Ortiz was allegedly confessing the murders, the BPD was also interviewing an eyewitness who described seeing three perpetrators, all of whom were around 5'7". Ex. 8 (Lonergan Dep.) 232:9–23, 247:4–16; Ex. 3 (Stambach Dep.) 375:3–22; 98:17–19 (Lonergan was his supervisor). Ortiz is 6'6". Ex. 8 (Lonergan Dep.) 233:12–22; Ex. 3 (Stambach Dep.) 375:23–376:3. As a basic investigative activity, Stambach should have reviewed the file before Ortiz confessed. Ex. 8 (Lonergan Dep.) 222:20–223:2.

215.    Despite learning that Ortiz had been in the psychiatric unit the day before the fabricated confession, Stambach took no steps to corroborate the confession. Ex. 3 (Stambach Dep.) 345:23–346:5. Stambach admits that given that Ortiz had been in the psych unit the day before, it was even more important to corroborate the information in the purported confession. Ex. 3 (Stambach Dep.) 345:4–15. Ortiz's conviction was based solely on the substance of the false confession and Stambach's fabrication of that admission. Ex. 3 (Stambach Dep.) 330:18–331:3 (conviction based solely on the admission and Stambach report); Ex. 89 (Ortiz Stip.) ¶ 8 (Ortiz convicted based on confession); Ex. 3 (Stambach Dep.) 318:25–319:6 (jury found Stambach fabricated the confession).

216.    Similar to how Stamback ignored evidence of Dixon's innocence, despite the overwhelming evidence of Ortiz's innocence, including their own attorneys stipulating to Ortiz's

innocence, Stambach and Lonergan maintain that Ortiz is guilty. Ex. 8 (Lonergan Dep.) 160:6–12; Ex. 3 (Stambach Dep.) 326:7–14; Ex. 89 (Ortiz Stip.) ¶ 14 (stipulating to the fact that Judge Franczyk found that Mr. Ortiz had demonstrated he was actually innocent). Lonergan maintains that the jury was wrong in finding Stambach liable for his misconduct. Ex. 8 (Lonergan Dep.) 164:5–18.

*City of Buffalo settles case in which Stambach and Lonergan frame innocent Lynn Peters for the murder of her daughter*

217.    In 2010, Lynn Peters (fka Lynn DeJac) filed a civil rights lawsuit against the City of Buffalo and individual BPD officers, including Lonergan, Vickerd, and Stambach, alleging that the BPD officers manufactured false evidence against her and maliciously prosecuted her. Ex. 27 (DeJac Amd. Cmplt.) ¶¶ 89, 93; *see generally Charles W. Peters, Executor of the Estate of Lynn M. Peters f/k/a Lynn M. Dejac v. City of Buffalo et al.*, No. 1:10-cv-953 (WMS) (JJM). The case was ultimately settled in 2015. Ex. 84 (10/3/15 Dejac Buff. News Article); Ex. 27 (DeJac Amd. Cmplt.) ¶¶ 89, 93; *see generally Charles W. Peters, Executor of the Estate of Lynn M. Peters f/k/a Lynn M. DeJac v. City of Buffalo et al.*, No. 1:10-cv-953 (WMS) (JJM).

218.    Lynn Peters was convicted of the February 1993 murder of her 13-year-old daughter, Crystallyn Girard, and sentenced to imprisonment for life with a minimum of 25 years. Ex. 3 (Stambach Dep.) 378:24–379:5; Ex. 82 (Finnerty Aff.) ¶ 4.

219.    Peters was exonerated in 2007 after DNA testing found Dennis Donohue's DNA in a swab taken from her daughter's vagina and on blood found on the wall in her room where she was murdered. Ex. 3 (Stambach Dep.) 379:6–13; Ex. 82 (Finnerty Aff.) ¶¶ 7–8. Stambach knew that Donohue was previously a suspect in a 1975 unsolved murder of Carol Reed, a woman who

was found raped and naked. Ex. 3 (Stambach Dep.) 380:15-22; Ex. 82 (Finnerty Aff.) ¶ 5.

220.    The DNA was tested because the BPD Cold Case Squad determined that the 1993 murder

of Girard, the 1993 murder of Joan Giambra, and the 1975 murder of Carol Reed all shared two

details in common: they all knew Donohue and they all died of manual strangulation. Ex. 82

(Finnerty Aff.) ¶ 5.

221.    Part of the evidence falsely accusing Peters of the murder of her own daughter was a

statement that Lonergan took from Wayne Hudson claiming that Peters had admitted to Hudson

she had committed the crime. Ex. 8 (Lonergan Dep.) 251:11–252:14. Lonergan now believes that

the information Hudson provided him was not true and accurate. Ex. 8 (Lonergan Dep.) 255:17–

20.At the deposition in this case, Lonergan denied knowing that Wayne Hudson was facing up to

25 years in prison when Lonergan took the false inculpatory statement from him. Ex. 8

(Lonergan Dep.) 254:18–255:7. However, at the criminal trial against Peters, Lonergan admitted

to knowing Hudson was picked up on an indictment warrant facing and that the DA's office

would help him get released that day. Ex. 92 (Lonergan Dejac  Tr. Test.) 428:21–429:6; 435:8–

13.

222.    In 2007, Wayne Hudson publicly recanted his false statement. Ex. 27 (DeJac Amd.

Cmplt.) ¶ 132. After hearing about Hudson's recantation, Stambach pressured him to sign

another statement falsely claiming that Peters confessed to murdering her daughter, which

Stambach still denies. Ex. 3 (Stambach Dep.) 383:12-17, 384:18-25; Ex. 8 (Lonergan Dep.)

252:10–17; Ex. 27 (DeJac Amd. Cmplt.) ¶¶ 120–121.

*Stambach suppressed evidence that Cory Epps was innocent of the murder of Tamika Means.*

223.    In 1998, Cory Epps was convicted of the 1997 murder of Tamika Means and wrongfully

incarcerated for almost 20 years before he was exonerated in 2017. Ex. 83 (*Epps v. Epps*,

Amended Rpt. and Rec.n). His conviction was based on the identification by Jacqueline Bradley,

who was in the car with Means when she was murdered. Ex. 3 (Stambach Dep.) 386:4–10; Ex. 7

(Masecchia Dep.) 289:22–290:7.

224.    Masecchia was the lead investigator on the case and involved in the lineup, photo array,

and interview of Epps. Ex. 7 (Masecchia Dep.) 299:8–300:6. Although Masecchia denies it,

Bradley contends she was shown mug books, which was never documented in Masecchia's

reports. Ex. 7 (Masecchia Dep.) 295:5–17; Ex. 94 (Bradley Dep.) 6:14–7:19.

225.    Masecchia admits that the Epps case hinged on only the identification from Bradley and

that because of this the case was not strong. Ex. 7 (Masecchia Dep.) 292:14–293:25.

226.    During an interview as a witness for the murder of Paul Pope, Wymoko (sometimes

Wymike) "Pumpkin" Anderson informed Stambach that Pope was murdered by Russell

Montgomery because Pope knew Montogomery was the person who actually shot and killed

Means, not Epps. Ex. 93 (4/29/00 Anderson Aff.); Ex. 87 (Anderson Test.) 27:13–21, 31:17–25;

Ex. 3 (Stambach Dep.) 389:2–17, 400:20–24 (agreeing Anderson describing provided

information regarding the Means murder); Ex. 7 (Masecchia Dep.) 310:4–9 (same).

227.    Just as Stambach dismissed witnesses in this case who gave him information that he had

arrested the wrong person, Stambach told Anderson that the exculpatory information was

"hearsay" and that they had already had the right person, referring to Epps. Ex. 3 (Stambach

Dep.) 401:4–15, 405:6–12; Ex. 93 (4/29/00 Anderson Aff.); Ex. 87 (Anderson Test.) 31:17–25.

Although Stambach denies doing so, he admits that he had an obligation to document such

information if she did say it. Ex. 3 (Stambach Dep.) 390:21–391:5;401:16–402:2, 405:13–20.

Anderson also agreed to take a lie detector test, but BPD officers never followed up. Ex. 93

(4/29/00 Anderson Aff.).

228.    The officers took no steps to ensure that Anderson's allegations were fully investigated.

Ex. 7 (Masecchia Dep.) 332:17–333:24.

229.    Just like Valentino Dixon's case, the cases of Josue Ortiz, Lynn DeJac, and Cory Epps

are all examples in which innocent people were wrongly convicted through Defendants'

investigations and all eventually found to be innocent. Ex. 3 (Stambach Dep.) 325:24–326:2. In

addition, while Defendant Stamback even admits that all of these cases share similar allegations

of misconduct, he still denies any wrongdoing. Ex. 3 (Stambach Dep.) 326:19–25; Ex. 89 (Ortiz

Stip.). Moreover, despite the egregious misconduct, Stambach was not punished for his conduct

in these cases, and instead received positive feedback. Ex. 3 (Stambach Dep.) 112:11–23.

Dated: February 15, 2024
New York, New York

                                     /s/ Anna Benvenutti Hoffmann

                                     Nick Joel Brustin
                                     Anna Benvenutti Hoffmann
                                     Mary Katherine McCarthy
                                     Gerardo Romo

                                     NEUFELD SCHECK BRUSTIN HOFFMANN
                                     & FREUDENBERGER LLP
                                     99 Hudson Street, Eighth Floor
                                     New York, NY 10013
                                     T: (212) 965-9081

Donald M. Thompson

EASTON THOMPSON KASPEREK
SHIFFRIN LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
T: (585) 423-8290