**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

VALENTINO DIXON,

          Plaintiff,

      v.

CITY OF BUFFALO et al.,

          Defendants.

Civil Action No. 19-cv-01678

---

**PLAINTIFF'S RESPONSE TO THE DEFENDANT CITY OF BUFFALO AND OTHER CITY DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

1. The feud leading up to the shooting in this case started over a girl named Heather Smith. Ex. 6 ("Dixon Dep") at p. 175.

      **Response:** Admit that the shooting in this case did start over a dispute about a girl named Heather Smith but deny characterization that it was "feud." A few weeks before the shooting, Torriano Jackson, his brother Aaron Jackson, and their friends surrounded a young man named Antoine Shannon after a party. Torriano Jackson pulled out a silver handgun, told Shannon to get on his knees, and aimed the gun at his head. Ex. 1 (Homicide File (Brown Stmt)) BDP Comp. 158; Ex. 14 (ADA Memo) COE 4767; Ex. 96 (Shannon Perj. Test.) 634:13–635:6; 635:19–636:4. On August 9, in the hours before the shooting, Shannon, Brown, and Jarmon saw Aaron Jackson sitting in a parking lot in his friend Travis Powell's yellow Geo Storm. The three men approached Jackson about the incident with Shannon weeks earlier, and the men exchanged words. Ex. 1 (Homicide File

(Brown Stmt)) BDP Comp. 158; Ex. 76 (2/12/24 Shannon Decl.) ¶¶ 3–5; Ex. 68
(Jarmon GJ Test.) 3:12–4:23; Ex. 67 (Brown GJ Test.) 24:3–22; Ex. 14 (ADA
Memo) COE 4767. Before driving away, Jackson threatened to "come back and
spray all [you] mother f—ers." Ex. 1 (Homicide File (Brown Stmt)) BDP Comp.
158; *see also* Ex. 67 (Brown GJ Test.) 24:23–25:7 (Jackson threatened to "come
back and smoke all of [us]"); Ex. 96 (Shannon Perj. Test.) 641:4–18 (Jackson
saying "he was going to come back and shoot us, spray us up," making "a lot of
serious threats on my life"); Ex. 68 (Jarmon GJ Test.) 5:1–7 (Jackson started
going off "like making threats" and saying he'd be "right back"); Ex. 14 (ADA
Memo) (Jackson stated "he would be back and that he had something for them").

2. Aaron Jackson, the brother of the deceased, Torriano Jackson, dated Heather Smith in or
around the time of the shooting. Decl. Ex. 6 (Dixon Dep.) at p. 176.

    **Response:** Admit.

3. After an initial altercation relating to Ms. Smith, there was a continuing disagreement
between two groups of young men. One group included Aaron Jackson, Torriano
Jackson, and Travis Powell, and the other group included Antoine Shannon, Leonard
Brown, and Mario Jarmon. Decl. Ex. 36 (Brown Statement) at p. 1; Decl. Ex. 11
("Jackson Dep.") at p. 90–94.

    **Response**: Deny characterization that there was a continuing disagreement
between Aaron Jackson, Torriano Jackson, Travis Powell and Antoine Shannon,
Leonard Brown, and Mario Jarmon. A few weeks before the shooting, Torriano
Jackson, his brother Aaron Jackson, and their friends surrounded a young man
named Antoine Shannon after a party. Torriano Jackson pulled out a silver

handgun, told Shannon to get on his knees, and aimed the gun at his head. Ex. 1 (Homicide File (Brown Stmt)) BDP Comp. 158; Ex. 14 (DA Memo) COE 4767; Ex. 96 (Shannon Perj. Test.) 634:13–635:6; 635:19–636:4. On August 9, in the hours before the shooting, Shannon, Brown, and Jarmon saw Aaron Jackson sitting in a parking lot in his friend Travis Powell's yellow Geo Storm. The three men approached Jackson about the incident with Shannon weeks earlier, and the men exchanged words. Ex. 1 (Homicide File (Brown Stmt)) BDP Comp. 158; Ex. 76 (2/12/24 Shannon Decl.) ¶¶ 3–5; Ex. 68 (Jarmon GJ Test.) 3:12–4:23; Ex. 67 (Brown GJ Test.) 24:3–22; Ex. 14 (DA Memo) COE 4767. Before driving away, Jackson threatened to "come back and spray all [you] mother f—ers." Ex. 1 (Homicide File (Brown Stmt)) BDP Comp. 158; *see also* Ex. 67 (Brown GJ Test.) 24:23–25:7 (Jackson threatened to "come back and smoke all of [us]"); Ex. 96 (Shannon Perj. Test.) 641:4–18 (Jackson saying "he was going to come back and shoot us, spray us up," making "a lot of serious threats on my life"); Ex. 68 (Jarmon GJ Test.) 5:1–7 (Jackson started going off "like making threats" and saying he'd be "right back"); Ex. 14 (DA Memo) (Jackson stated "he would be back and that he had something for them").

4. Brown is the step brother of plaintiff, Valentino Dixon. Shannon is Dixon's half-brother, and Jarmon was Dixon's friend. Decl. Ex. 6 (Dixon Dep.) at p. 44, 170; Decl. Ex. 17 ("Jarmon Testimony") at p. 3.

> **Response:** Admit that Shannon is Dixon's half-brother but add that Dixon's father is *like* a step-father to Brown. Ex. 23 (Dixon Dep.) 170:9–11 (share same father); 44:16–22 (Dixon's father like step-father to Brown); 13:22–14:3.

3

5. In the afternoon of August 9, 1991, Jarmon, Brown and Shannon confronted Aaron Jackson
in a parking lot near the corner of Bailey and Delavan Avenue in the City of Buffalo.
Decl. Ex. 11 (Jackson Dep.) at p. 90-94.

> **Response:** Deny characterization Jarmon, Brown, and Shannon "confronted"
> Aaron Jackson. On August 9, in the hours before the shooting, Shannon, Brown,
> and Jarmon saw Aaron Jackson sitting in a parking lot in his friend Travis
> Powell's yellow Geo Storm. The three men approached Jackson about the
> incident with Shannon weeks earlier, and the men exchanged words. Ex. 1
> (Homicide File (Brown Stmt)) BDP Comp. 158; Ex. 76 (Shannon Decl.) ¶¶ 3–5;
> Ex. 68 (Jarmon GJ Test.) 3:12–4:23; Ex. 67 (Brown GJ Test.) 24:3–22; Ex. 14
> (DA Memo) COE 4767.

6. Jackson ultimately drove away accompanied by Powell, and stated that he would be back
later with this brother, Torriano. Decl. Ex. 11 (Jackson Dep.) at p. 90-94.

> **Response:** Admit. Add that before driving away, Jackson threatened to "come
> back and spray all [you] mother f—ers." Ex. 1 (Homicide File (Brown Stmt))
> BDP Comp. 158; *see also* Ex. 67 (Brown GJ Test.) 24:23–25:7 (Jackson
> threatened to "come back and smoke all of [us]"); Ex. 96 (Shannon Perj. Test.)
> 641:4–18 (Jackson saying "he was going to come back and shoot us, spray us up,"
> making "a lot of serious threats on my life"); Ex. 68 (Jarmon GJ Test.) 5:1–7
> (Jackson started going off "like making threats" and saying he'd be "right back");
> Ex. 14 (DA Memo) (Jackson stated "he would be back and that he had something
> for them"). Aaron Jackson and Powell then went home to pick up Jackson's little
> brother, Torriano. Ex. 1 (Homicide File (Jackson Int.)) BPD Comp. 216; Ex. 2

(Cr. Tr. (Jackson)) 216:2–4 ("I went to my house to get my little brother.").

Jackson claimed he "felt safer" with his little brother there. Ex. 97 (Jackson Perj.

Test.) 116:19–25; Ex. 2 (Cr. Tr. (Jackson)) 216:15–20. At the time, Torriano

Jackson was 5'7" and weighed only 134 pounds. Ex. 98 (Autopsy Report) COE

2633.

7. Realizing that there may be further conflict, Brown and Shannon called their older brother

   Valentino Dixon for help. Decl. Ex. 6 (Dixon Dep). at p. 12-14.

   > **Response:** Admit Brown and Shannon contacted their half-brother/step-brother
   >
   > Valentino Dixon. Object to the extent that the cited record does not establish
   >
   > Brown and Shannon's motivation for calling Dixon, but admit they told Dixon
   >
   > they were having some trouble with the Jackson brothers. Ex. 23 (Dixon Dep.)
   >
   > 13:22–14:3.

8. Dixon then enlisted the help of his confederate, Lamar Scott, a young impressionable

   teenager who dealt drugs for Dixon and looked up to him as well. Decl. Ex. 6 (Dixon

   Dep.) at p. 14; 173; Decl. Ex. 3 ("Scott Dep.") at p. 78.

   > **Response:** Deny. Sometime thereafter, Dixon went to a friend's house to hang out
   >
   > there, as he and others often did.  Dixon did not go to the friend's house to
   >
   > "enlist" Lamarr Scott. Scott happened to be hanging out at the house when Dixon
   >
   > arrived. On August 10, 1991, Scott was one month away from turning 19; Dixon
   >
   > was 21 years old. Dixon did not "enlist" the help of Scott, and Scott did not deal
   >
   > drugs for Dixon. Ex. 23 (Dixon Dep.) 17:5–22, 159:19–20; Ex. 1 (Homicide File)
   >
   > BPD Comp. 196 (Scott Aff.); Ex. 1 (Homicide File) BPD Comp. 71 (Dixon Aff.).

9. Dixon armed Scott with an automatic weapon. Decl. Ex. 3 (Scott Dep.) at p. 77-79.

**Response:** Deny. Dixon did not arm Scott with an automatic weapon. After leaving their mutual friend's house, Dixon drove with Scott to Jarmon's house on East Delavan, about 80 yards from the Bailey/Delevan intersection; Dixon then left for hours to run errands, came back, and dropped the gun in Jarmon's hallway. On his own accord, Scott later retrieved the TEC-9 that Dixon left in Mario's hallway, ran toward the fight between the Jacksons and Jarmon, and started shooting. Ex. 6 (Frida Dep.) 14:5–18; Ex. 23 (Dixon Dep.) 122:18–123:1; Ex. 24 (Dixon City 50-H)) 28:12–19 (Jarmon's house about 80 yards away from shooting); Ex. 1 (Homicide File) BPD Comp. 215 (Jarmon address was 1122 Delevan Avenue); BPD Comp 2 (Jarmon body found in front of 2510 Bailey); Ex. 96 (Shannon Perj. Test.) 655:4–24; Ex. 4 (Scott Dep.) 15:2–10 , 18:5–19, 80:07–13; Ex. 5 (Scott Plea 2018) 13:4–8; *See* Affirmative Facts at ¶¶ 6–10.

10. Dixon then drove Scott and the automatic weapon to the house of Mario Jarmon, where Jarmon was waiting with Brown and Shannon. Decl. Ex. 3 (Scott Dep.) at p. 78.

**Response:** Deny, including characterization that Jarmon, Brown and Shannon were "waiting" for Dixon. Dixon and Scott later left their friend house and stopped at Jarmon's; Dixon had the TEC-9 in his car at the time. Ex. 23 (Dixon Dep.) 14:4–17. Brown, Jarmon, and Shannon were hanging out at Jarmon's house about 80 yards from the Bailey/Delevan corner, a popular hangout spot. Ex. 2 (Cr. Tr. (Sullivan)) 114:06–11; Ex. 14 (DA Memo) at COE 4760. Dixon then left Jarmon's to run errands with the gun in his car. Scott stayed behind to hang out at Jarmon's. Dixon did not return for a couple of hours. Ex. 23 (Dixon Dep.) 165:20–167:8.

11. In the early morning hours of August 10, 1991, the five young men - Dixon, Scott, Jarmon, Brown, and Shannon then proceeded to the corner of Bailey and Delavan Avenue, which is in very close proximity to Jarmon's home. Decl. Ex. 17 (Jarmon Testimony) at p. 8.

> **Response:** Admit that Dixon, Scott, Jarmon, Brown, and Shannon were at the corner of Bailey and Delevan Avenue on August 10, 1991, but deny the characterization that it is in "very close proximity" to Jarmon's house. Ex. 24 (Dixon City 50-H)) 28:12–19 (Jarmon's house about 80 yards away from corner); Ex. 1 (Homicide File) BPD Comp. 215 (Jarmon address was 1122 Delevan Avenue); BPD Comp 2 (Jarmon found shot in front of 2510 Bailey). Add that Bailey and Delevan Avenue was a place where people typically hung out and there were "scores of young people" at the corner that night. Ex. 2 (Cr. Tr.) (Sullivan) 114:06–11; Ex. 14 (DA Memo) at COE 4760.

12. Sometime after Dixon, Scott, Jarmon, Brown, and Shannon arrived at the corner of Bailey and Delavan, Aaron Jackson and Torriano Jackson arrived at the same corner in the vehicle of their friend, Travis Powell. Decl. Ex. 11 (Jackson Dep.) at p. 95-97.

> **Response:** Admit.

13. A fight broke out between Jarmon and the Jackson brothers. Decl. Ex. 3 (Scott Dep.) at p. 14.

> **Response:** Admit but add that Torriano and Aaron Jackson initiated the fight after they jumped out of their car and approached Jarmon. Ex. 14 (DA Memo) at COE 4760; Ex. 96 (Shannon Perj. Test.) 653:22–654:16; Ex. 97 (Jackson Perj. Test.) 77:19–78:07.

14. Scott then retrieved the weapon which he had been given by Dixon. Decl. Ex. 3 (Scott Dep.) at p. 14; 83-85

> **Response:** Admit that Scott retrieved the weapon, but deny the characterization that Dixon "gave" him the gun and deny to the extent the statement implies Dixon directed Scott to shoot anyone. Scott retrieved the TEC-9. Dixon did not tell Scott to "go kill somebody or anything like that." Ex. 6 (Frida Dep.) 14:5–18; Ex. 23 (Dixon Dep.) 122:18–123:1, 166:6–8; Ex. 96 (Shannon Perj. Test.) 655:4–24; Ex. 4 (Scott Dep.) 15:2–10 , 18:5–19, 80:07–13; Ex. 5 (Scott Plea 2018) 13:4–8.

15. Using Dixon's gun, Scott shot Torriano Jackson multiple times, which resulted in Torriano Jackson's death. Decl. Ex. 3 (Scott Dep.) at p. 14.

> **Response:** Admit.

16. Using Dixon's gun, Scott also shot Aaron Jackson as well as John Sullivan. Decl. Ex. 3 (Scott Dep.) at p. 18-19

> **Response:** Admit.

17. Using Dixon's gun, Scott also shot and injured Mario Jarmon. Decl. Ex. 3 (Scott Dep.) at p. 18-19

> **Response:** Admit that Scott may have shot and injured Mario Jarmon but add that there is also evidence that Jarmon was alternatively or additionally shot by Torriano Jackson, who possessed a revolver and did shoot at Jarmon. Ex. 1 (Homicide File) BPD Comp. 154, Ex. 68 (Jarmon GJ Test.) 8:13–9:04. *See* Affirmative Facts at ¶ 2.

18. After the shooting, Lamar Scott dropped the murder weapon a couple houses away, and the gun was never recovered by law enforcement. Decl. Ex. 3 (Scott Dep.) at p. 79; Decl. Ex. 6 (Dixon Dep.) at p. 73.

> **Response:** Admit, but add that Defendants failed to investigate the location of the gun after Scott told them where he left it. *See* Affirmative Facts at ¶ 147 (a).

19. Dixon sped away from the murder scene and did allow Scott in his car. Decl. Ex. 6 (Dixon Dep.) at p. 169.

> **Response:** Admit that Valentino left the scene of an active shooting, deny that he "did allow" Scott in his car. Dixon did not allow the shooter, Scott, in his car. Ex. 23 (Dixon Dep.) 169:19–23. *See* Affirmative Facts at ¶ 10.

20. An ambulance took John Sullivan to Sister's Hospital in the City of Buffalo after the shooting. There, Mr. Sullivan received treatment for his injuries. Decl. Ex. 25.

> **Response:** Admit.

21. Later, on August 10, 1991, while still admitted to Sister's Hospital, Mr. Sullivan answered questions posed to him by Buffalo Police Department ("BPD") Detective John Vickerd in an unsworn interview. Decl. Ex. 25.

> **Response:** Admit.

22. Mr. Sullivan told Detective Vickerd that he observed a man known to him as "Tino" grab a gun which Sullivan believed to be an "Uzi." Decl. Ex. 25.

> **Response:** Admit this is what Vickerd reported but deny that it accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 26–55.

23. Sullivan told Detective Vickerd that the person known to him as "Tino" was the individual who shot him and Torriano Jackson. Decl. Ex. 25.

**Response:** Admit this is what Vickerd reported but deny that it accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 26–55.

24. Mr. Sullivan described Tino as a black male, age 21, approximately six feet tall, and weighing around one hundred sixty pounds. Decl. Ex. 25.

**Response:** Admit this is what Vickerd reported but deny that it accurately reflects what Sullivan stated. *See* Affirmative Facts at ¶¶ 26–37, 41–42, 56–57.

25. Sullivan told Detective Vickerd that "Tino's" real name was Valentino, and that he knew this individual as someone from around his neighborhood and the Genesee/Moselle area. Decl. Ex. 25.

**Response:** Admit this is what Vickerd reported but deny that it accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 49–55.

26. Mr. Sullivan told Detective Vickerd that, after the shooting, he observed "Tino" and another black male run west on Delavan towards Olympic Avenue. Decl. Ex. 25.

**Response:** Admit this is what Vickerd reported but deny that it accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 26–55.

27. Later in the day on August 10, 1991, after he was released from the hospital, John Sullivan gave a formal sworn statement to Detective Raniero Masecchia at the homicide division's offices. Decl. Ex. 26 ("Sullivan Statement").

**Response:** Admit Sullivan was released from the hospital and gave a statement reported to be taken by Masecchia but deny that that statement accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 56–58.

28. In the sworn interview, Sullivan gave an account of the shooting similar to what he had relayed to Detective Vickerd. He told Detective Masecchia that an individual known to

him as "Tino" was the person who shot and killed Torriano Jackson. Decl. Ex. 26

("Sullivan Statement").

> **Response:** Admit Masecchia reported that Sullivan gave him an account of the
>
> shooting, but deny that the reported accurately reflects what Sullivan told him and
>
> deny the account reported by Masecchia was "similar" to the account reported by
>
> Vickerd. *See* Affirmative Facts at ¶¶ 60–63.

29. Detective Masecchia then prepared a six-person photo array with Dixon's photo present.

    The photo array prepared by Detective Masecchia contained five fillers of individuals

    who were of the same age and general appearance as Mr. Dixon. Decl Ex. 27.

    > **Response:** Admit that Masecchia prepared a six-person photo array with Dixon's
    >
    > photo present with five fillers of individuals who were of the same age and
    >
    > general appearance as Mr. Dixon. *See* Affirmative Facts at ¶¶ 64-67.

30. After viewing the photo array, Mr. Sullivan picked out Dixon's photo and positively

    identified his photograph as depicting the individual who shot and killed Torriano

    Jackson. Decl. Ex. 26 (Sullivan Statement).

    > **Response:** Admit this is what Masecchia reported but deny that it accurately
    >
    > reflects what Sullivan told him or the true circumstances of the identification
    >
    > procedure. *See* Affirmative Facts at ¶¶ 26–37, 41–42, 64–67.

31. This identification occurred on August 10, 1991, the day of the shooting. Decl. Ex. 26

    (Sullivan Statement). Decl. Ex. 26 (Sullivan Statement).

    > **Response:** Admit that Masecchia reported Sullivan made an identification on
    >
    > August 10, 1991 but deny it accurately reflects what Sullivan told him or the true

circumstances of the identification procedure. *See* Affirmative Facts at ¶¶ 26–37, 41–42, 64–67.

32. Sullivan has never recanted his identification of Dixon. Decl. Ex. 51 ("Reinvestigation Memo") (to be filed under seal). Decl. Ex. 51 ("Reinvestigation Memo") (to be filed under seal).

> **Response:** Admit Sullivan has not recanted his identification on record in any judicial proceeding but add that ADA Belling had to secure a material witness warrant to procure Sullivan's testimony at the criminal trial, and that Sullivan told Belling he was "not going to testify under the circumstances" on day prior to his trial testimony, and that Belling wrote a letter in support of Sullivan in his pending rape case directly after Sullivan's testimony. Deny that Sullivan's purported identification was properly obtained. Add that because Sullivan could not be located, he did not have the opportunity to testify regarding his interactions with Defendants at a deposition in this case. *See* Affirmative Facts at ¶¶ 26–42, 56–68, 196–200.

33. Emil Adams was at the corner of Bailey and Delavan when the fight broke out between the Jackson brothers and Mario Jarmon. Decl. Ex. 28 ("Adams Statement").

> **Response:** Admit.

34. Detective Mark Stambach met with Mr. Adams and took a statement from him. Decl. Ex. 28 ("Adams Statement").

> **Response:** Admit.

35. Mr. Adams gave a description of the shooting, which suggested there were two shooters present. He gave a description of one shooter that was not entirely consistent with

Valentino Dixon's appearance in that he described the shooter as a heavy-set male who was over six feet tall. Decl. Ex. 28 ("Adams Statement").

> **Response:** Admit that Mr. Adams gave a description of the shooting, deny the characterization that his was "not entirely consistent" with Dixon's appearance and add that Adams' description contained obvious differences, in particular: Adams described the TEC-9 shooter as heavy set, six foot, and wearing a white hat and white shirt. Dixon was 5'9", 130-140lbs, and dressed entirely different that night. *See* Affirmative Facts at ¶¶ 75–79.

36. Detective Stambach did not attempt to hide or omit this part of Mr. Adams's account-the detail was included in Adams's sworn statement. Decl. Ex. 28 ("Adams Statement").

> **Response:** Admit the description of the shooter was included in the statement obtained by Detective Stambach but deny Detective Stambach did not attempt to hide or omit Mr. Adams's account, including without limitation by Stambach's failure to follow up on the obvious discrepancy between the description Adams provided of the shooter and Dixon's appearance and Stambach's use of suggestive police identification procedures. *See* Affirmative Facts at ¶¶ 75–105.

37. Mr. Adams told Detective Stambach that he did not know the name of the shooter or shooters that he had observed. Decl. Ex. 28 ("Adams Statement").

> **Response:** Admit.

38. Later, on August 10, 1991, Detective Vickerd, who presumably arrived back at headquarters after interviewing Mr. Sullivan, prepared a photo array with Dixon's photo present. Decl. Ex. 29, 30.

> **Response:** Admit.

39. The fillers in the photo array contained pictures of five males who were of the same

   relative age and appearance as Mr. Dixon. Decl. Ex. 30.

   **Response:** Admit.

40. Upon being shown the photo array, Mr. Adams identified Mr. Dixon as the individual who

   shot and killed Torriano Jackson with a Tec-9 machine gun. Decl. Ex. 31.

   **Response:** Admit this is what Defendants Stambach and Vickerd reported but

   deny it accurately reflects what Adams told them or the true circumstances of the

   photo identification procedure. *See* Affirmative Facts at ¶¶ 26–37, 75–105.

41. Mr. Adams sticks by his identification of Dixon to this day and has never given sworn,

   admissible testimony suggesting that his identification was illegitimate or the result of

   police coercion. Decl. Ex. 12 (Adams Dep.) at p. 52, 142.

   **Response:** Deny. Add that ADA Belling had to secure an Interstate Material

   Witness warrant for Adam's arrest and forcible return to Buffalo to get him to

   testify at the criminal trial. *See* Affirmative Facts at ¶¶ 75–105, 192–196.

42. After two witnesses identified Dixon as the perpetrator of the Jackson homicide, the

   Buffalo Police Department arrested him. Decl. Ex. 33.

   **Response:** Admit that it was reported by Defendants that two witnesses identified

   Dixon as the perpetrator of the Jackson homicide but deny that the identifications

   were the product of proper, non-suggestive identification procedures. And add

   that the basis of the complaint for Dixon's arrest, which was sworn by Defendant

   Stambach, only included Sullivan's identification. *See* Affirmative Facts at ¶¶

   38–42, 64–69, 75–84.

43. Thereafter, Dixon gave a sworn Mirandized statement to Detective Stambach. Decl. Ex. 34.

   **Response:** Admit.

44. In his statement, Dixon denied involvement in the crime. He did not tell Detective Stambach that Scott was the shooter or that he had provided Scott with the murder weapon. Decl. Ex. 34.

   **Response:** Admit Dixon denied involvement in the crime and told Stambach that he was not the shooter. Add that Dixon did not tell Detective Stambach that Scott was the shooter because it could be harmful to him in the neighborhood. Also, add that Detective Stambach threatened Dixon that if he did not tell him who the shooter was, Dixon would go to prison for it himself. *See* Affirmative Facts at ¶¶ 109–110, 115–116.

45. Two days later, Lamar Scott had a discussion with Dixon's father, Robert Bryant. During this discussion, Scott told Mr. Bryant that he was the shooter. Decl. Ex. 14 (Bryant Dep.) at p. 22-24.

   **Response:** Admit that Scott told Bryant at some point shortly after the crime that he was the shooter but add that, in addition to truthfully confessing to several others he was the shooter, Scott made the decision to confess to police independently and was never coerced, pressured, or induced to admit the truth. Ex. 76 (Shannon Decl.) at ¶ 10; *see* Affirmative Facts at ¶¶ 118–119.

46. Bryant encouraged Scott to come forward and admit that he was the shooter –but he chose an unconventional approach. Instead of encouraging Scott to go to the police, Bryant

contacted Wanda Stark, a reporter for Local Channel 2 News in the Buffalo area. Decl.
Ex. 14 (Bryant Dep.) at p. 26-30.

> **Response:** Deny, Scott testified that he contacted the local news channel and
> turned himself in. Ex. 4 (Scott Dep.) 29:24–30:10.  Add that Scott made the
> decision to confess to police independently and was never coerced, pressured, or
> induced to admit the truth.  Ex. 76 (Shannon Decl.) at ¶ 10; *see* Affirmative Facts
> at  ¶¶ 118–119.

47. Thereafter, Scott went on camera and confessed to the crime. Decl. Ex. 14 (Bryant Dep.) at
p. 34.

> **Response:** Admit that Scott went on camera and confessed to the crime late on
> August 11, 1991.

48. While Scott was confessing to the murder on camera, Detective Stambach and other police
personnel arrived. Decl. Ex. 14 (Bryant Dep.) at p. 33.

> **Response:** Admit.

49. Stambach placed Scott in handcuffs and put him in the back of a police car immediately.
Decl. Ex. 14 (Bryant Dep.) at p. 187.

> **Response:** Admit Stambach placed Scott in the back of the police car after a
> seven-minute interview. Ex. 1 (Homicide File) BPD Comp. 191–192.

50. At the homicide office, Scott gave a sworn confession, which was extracted by Detective
Stambach after he read Scott his Miranda warnings. Decl. Ex. 35 ("Confession").

> **Response:** Admit Scott gave a sworn confession but deny the characterization it
> was "extracted" by Stambach as Scott voluntarily came forward and confessed.
> *See* Affirmative Facts at ¶¶ 118–119.

16

51. Scott admitted that he used a Tec 9 to shoot and kill Torriano Jackson. Decl. Ex. 35
("Confession").

> **Response:** Admit.

52. In his sworn confession Scott also stated, untruthfully, that the gun he used to kill Torriano
Jackson belonged to him. Decl. Ex. 35 ("Confession").

> **Response:** Admit that Scott stated the gun he used to kill Torriano Jackson
> belonged to him.

53. At the same time that Scott confessed, Leonard Brown gave a statement to Detective
Masecchia. Decl Ex. 36 (Brown Statement).

> **Response:** Admit.

54. Brown also stated that it was Scott who killed Torriano Jackson. Decl Ex. 36 (Brown
Statement).

> **Response:** Admit.

55. Brown also did not tell Detective Masecchia that Dixon had provided Scott with the
murder weapon. Decl Ex. 36 (Brown Statement).

> **Response:** Admit that Masecchia so reported but deny that Dixon provided Scott
> with the murder weapon. Dixon and Scott left their friend's house and drove to
> Jarmon's; Dixon had the TEC-9 in his car at the time. Ex. 23 (Dixon dep) 14:4–
> 17. Dixon placed the gun in Jarmon's hallway. At no point did Dixon "give" the
> gun to Scott. When the fight broke out, Scott retrieved the TEC-9, ran toward the
> fight between the Jacksons and Jarmon, and started shooting. Ex. 6 (Frida Dep.)
> 14:5–18 ;Ex. 23 (Dixon Dep.) 122:18–123:1,165:20–167:8; Ex. 96 (Shannon Perj.

Test.) 655:4–24; Ex. 4 (Scott Dep.) 15:2–10, 18:5–19, 80:07–13; Ex. 5 (Scott Plea 2018) 13:4–8

56. After Scott and Brown gave their sworn statements, Detective Stambach showed the statements to Assistant District Attorney Chris Belling. Decl. Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374.

> **Response:** Admit that the reports reflect ADA Belling reviewed Scott and Brown's statements, but add that ADA Belling was also shown the video confession and given Stambach's reading on the "tenor of the situation," specifically Stambach's belief that Dixon's parents "made" Scott confess. Ex. 41 (Belling Dep.) 96:12–99:11. *See* Affirmative Facts at ¶¶ 178–179.

57. ADA Belling reviewed Scott and Brown's statements. He also reviewed the videotaped confession Scott gave to Channel 2. After reviewing those materials, ADA Belling instructed that Scott be released but that a lie detector test be set up for him. Decl Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374.

> **Response:** Admit that Belling reviewed the statements and video but add that Belling denies he set up a lie detector test for Scott. Ex. 41 (Belling Dep.) 373:09–24. ADA Belling based his decision to release Scott on the videotaped confession and information Defendants provided that Dixon's parents "made" Lamarr confess. ADA Belling did not have information about the true circumstances of the purported identifications of Dixon by Adams or Sullivan. ADA Belling was also not told that Scott had offered his clothing and shoes for testing. ADA Belling expected BPD officers to continue investigating Scott's confession. Ex.

41 (Belling Dep.) 95:20–99:11; s*ee* Affirmative Facts at  ¶¶ 147–151, 171–173, 178–180.

58. Detective Masecchia thereafter attempted to have Scott come in for a lie detector test, but Scott never did so. Decl. Ex. 38.

> **Response:** Admit that Scott was scheduled to take a lie detector test but add that there was no follow-up investigation conducted on Scott's truthful confession, including a failure to follow up with Scott to appear for the scheduled polygraph, or several other basic investigative steps. *See* Affirmative Facts at ¶¶ 147–151.

59. During his deposition testimony, Scott confirmed that detectives asked him to come back to take a lie detector test. Decl Ex. 3 (Scott Dep.) at p. 58-59.

> **Response:** Admit.

60. He also confirmed that this was the sum and substance of all interactions he had with the police after the day he gave his sworn confession. Decl. Ex. 3 (Scott Dep.) at p. 58-59.

> **Response:** Deny. Lamarr Scott stated that Stambach showed up at places where he was unexpected on a few occasions after he tried to confess, which caused him to feel harassed. Ex. 4 (Scott Dep.) 58:09–59:24. *See* Affirmative Facts at ¶ 180, 186–188. Scott has also repeatedly expressed that he was pressured by both the police and ADA Belling to lie and say Dixon was the shooter after he confessed. *See, e.g.*, Ex. 17 (Scott Int., ECDAO Reinvest., Transcript Pt. 1, 8/15/18) at 13–15, 17, 21–22; Ex. 1 (Homicide File) BPD Comp. 267 (1/14/03 Lamarr Scott Letter); Ex. 4 (Scott Dep.) 45:19–46:12, 55:18–56:14; *see also* 49:13–21.

61. In other words, no detective threatened or coerced Scott to change his story after he confessed. Decl. Ex. 3 (Scott Dep.) at p. 58-59.

> **Response:** Deny. In several sworn statements, including in the ECDAO
> reinvestigation, Lamarr Scott describes being harassed and fearing Detective
> Stambach, which led him to recant his confession at the Grand Jury. Scott regrets
> his recantation, but states he was young and the "pressure from the police was
> to[o] strong for [him] to handle." *See, e.g.*, Ex. 1 (Homicide File) BPD Comp.
> 267; Ex. 20 (12/11/98 Stmt to PI) Dixon-003809; Ex. 17 (Scott Int., ECDAO
> Reinvest., Transcript Pt. 1, 8/15/18) 14, 21–22; Ex. 99 (Golf Digest Int.) at 3–4
> [Dixon 007245]; *see* Affirmative Facts at ⸿ 180, 186–188.

62. Scott, not wanting to further involve himself, did not take the lie detector test and
eventually recanted his confession when he testified in front of a grand jury. Decl. Ex. 19
("Scott Grand Jury Testimony") at p. 66-67.

> **Response:** Admit that as a result of police pressure Scott falsely testified to the
> grand jury. In several sworn statements, including in the ECDAO reinvestigation,
> Lamarr Scott describes being harassed and fearing Detective Stambach, which led
> him to recant his confession at the Grand Jury. Scott regrets his recantation, but
> states he was young and the "pressure from the police was to[o] strong for [him]
> to handle." Ex. 1 (Homicide File) BPD Comp. 267; Ex. 20 (12/11/98 Stmt to PI)
> Dixon-003809 ; Ex. 17 (Scott Int., ECDAO Reinvest., Transcript Pt. 1, 8/15/18)
> 14, 21–22; Ex. 99 (Golf Digest Int.) at 3-4 [Dixon 007245]; *See* Affirmative Facts
> at ⸿ 180, 186–188. Add that Scott's grand jury testimony was the only time in the
> last 30 years he has falsely maintained he was not the shooter. Ex. 5 (Scott Plea
> 2018) 3:24–4:8.

63. Although he was seriously injured from gunshot wounds, Aaron Jackson was able to

participate in an unsworn interview with Detective Stambach on August 12, 1991, at Erie

County Medical Center in the City of Buffalo. Decl. Ex. 39.

> **Response:** Admit.

64. During that interview, Detective Stambach showed Aaron Jackson a nonsuggestive

photo array with Dixon's picture present. Decl. Ex. 40.

> **Response:** Admit the photo array was not suggestive but deny the procedure was
>
> not suggestive or that Stambach accurately reported the true circumstances of the
>
> photo identification procedure. *See* Affirmative Facts at ¶¶ 26–37, 152–160, 168.

65. After viewing the photo array, Jackson tentatively identified Dixon as the individual who

shot him and his brother, Torriano. Decl. Ex. 40, 41.

> **Response:** Admit that Stambach so reported, deny it accurately reflects what
>
> Jackson told him or the true circumstances of the photo identification procedure.
>
> *See* Affirmative Facts at ¶¶ 26–37, 152–156, 168.

66. Jackson signed a sworn affidavit to this effect. Jackson stated, at the time, that events

occurred so quickly that he could not be absolutely positive that Dixon was in fact the

shooter. But Jackson did state Dixon's photo looked like the shooter. Decl. Ex. 40, 41.

> **Response:** Admit that Jackson signed a sworn affidavit, deny Jackson stated he
>
> could not be "absolutely positive." Add that the affidavit reads: "I picked out a
>
> photo in the number 4 slot and identified the person in that photograph as look
>
> like the person who shot my brother Torry… but I cannot be sure." Ex. 1
>
> (Homicide File) BPD Comp. 166.  And deny that the true circumstances of that

photo identification procedure were accurately reported. *See* Affirmative Facts at ¶¶ 26–37, 152–156, 168.

67. Later, after independent discussions with ADA Belling, Jackson's identification of Dixon went from tentative to positive. Decl. Ex. 15 ("Jackson Trial Testimony") at p. 227-228.

> **Response:** Admit it was reported that Jackson initially made a tentative identification, but deny that the true circumstances of Jackson's photo identification procedure were accurately reported. Add that that after making no conclusive initial identification, at trial, Jackson claimed his "memory gets better with time" and positively identified Valentino as the shooter for the first time. Ex. 2 (Cr. Tr. (Jackson)) 251:24–252:11; *See* Affirmative Facts at ¶¶ 26–37, 185, 201.

68. Jackson has never recanted his identification of Dixon. Nor has Jackson ever stated, under oath or otherwise, that his identification of Dixon was brought about by coercive or suggestive law enforcement practices. Ex. 11 ("Jackson Dep.") at p. 135-136.

> **Response:** Admit Jackson has not recanted his identification of Dixon on record in any judicial proceeding but deny that his identification of Dixon was properly obtained. Add that Jackson recanted his identification others including ███████ ███████ and Leonard Brown. *See* Affirmative Facts at ¶¶ 26–37, 168.

69. In November of 1991, months after they had any interaction with the police, both John Sullivan and Aaron Jackson positively identified Valentino Dixon as the individual who shot and killed Torriano Jackson when they testified in front of a grand jury. Decl. Ex. 15 ("Jackson Grand Jury") at p. 15; Decl. Ex. 16 ("Sullivan Grand Jury") at p. 23-24.

> **Response:** Admit that both John Sullivan and Aaron Jackson positively identified Valentino Dixon in front of a grand jury but add that no evidence of the true

circumstances of Defendants' suggestive identification procedures was presented. *See* Affirmative Facts at ¶¶ 35–37, 41–42, 156, 185, 191.

70. During the grand jury proceedings, neither Aaron Jackson nor Sullivan testified about their interactions with the police. They independently told the grand jury, based on their own recollection of events, that Dixon was in fact the shooter. Decl. Ex. 15 ("Jackson Grand Jury") at p. 15; Decl. Ex. 16 ("Sullivan Grand Jury") at p. 23-24.

> **Response:** Admit neither testified about their interactions with the police and that Jackson and Sullivan falsely identified Valentino as the shooter, but deny Jackson and Sullivan "independently" told the grand jury Dixon was the shooter based on their own recollection of events. *See* Affirmative Facts at ¶¶ 26–69, 152–160.

71. In January of 1992, Emil Adams testified in front of a grand jury that Dixon was the shooter. Decl. Ex. 20 at p. 76-77.

> **Response:** Admit.

72. Adams testified that he picked Dixon's photo out from a group of photos–which is consistent with the police reports stating that Adams picked Dixon's photo out from a six-person photo array. Decl. Ex. 20 at p. 76-77.

> **Response:** Admit that Adams so testified that he picked out Valentino from a group of photos but deny that it is consistent with the police reports stating Adams picked Dixon's photo out from a six-person photo array. Add that Adams has described being shown individual photographs by police during his August 10, 1991 interview. *See* Affirmative Facts at ¶¶ 75–99.

73. Based on the testimony of these three (and other) witnesses, a grand jury issued an indictment against Valentino Dixon in January of 1992. Decl. Ex. 46.

**Response:** Admit, but add that no evidence of the true circumstances of Defendants' suggestive identification procedures was presented. *See* Affirmative Facts at ¶¶ 185.

74. Dixon was charged with murder in the second degree, attempted murder in the second degree, assault in the third degree, and criminal possession of a weapon in the second degree. Decl. Ex. 47 ("Heraty Aff.") at ¶ 5.

**Response:** Admit.

75. Notably, as part of the grand jury proceedings, Lamar Scott recanted his confession and testified that Dixon was in fact the shooter. Decl. Ex. 19 ("Scott Grand Jury") at p. 64-68.

**Response:** Admit in the grand jury proceedings Scott for the first and only time in 30 years falsely denied committing the crime. Ex. 5 (Scott Plea 2018) 3:24–4:8. Add that this false recantation was a result of pressure from the police, including Defendant Stambach, and ADA Belling. In several sworn statements, including in the ECDAO reinvestigation, Lamarr Scott describes being harassed and fearing Detective Stambach, which led him to recant his confession at the Grand Jury. Scott regrets his later false recantation, but states he was young and the "pressure from the police was to[o] strong for [him] to handle." *See, e.g.*, Ex. 1 (Homicide File) BPD Comp. 267; Ex. 20 (12/11/98 Stmt to PI) Dixon-003809; Ex. 17 (Scott Int., ECDAO Reinvest., Transcript Pt. 1, 8/15/18) 14, 21–22; Ex. 99 (Golf Digest Int.) at 3–4 [Dixon 007245]; *See* Affirmative Facts at ¶ 180, 186–188.

76. ADA Belling, acting on behalf of the State of New York, tried Dixon in the summer of 1992. The People's three key witnesses were Adams, Sullivan, and Aaron Jackson. Each of these three witnesses, testified that Dixon was the shooter and identified him in court

as such. Decl. Ex. 21 ("Sullivan Trial Testimony") at p. 83-84; Decl. Ex. 22 ("Adams

Trial Testimony) at p. 151-153; Decl. Ex. 23 ("Jackson Trial Testimony") at p. 225-228.

> **Response:** Admit that ADA Belling was the trial prosecutor, and that Adams,
> Sullivan, and Jackson were the key witnesses. Admit that each testified Dixon
> was the shooter, but deny the accuracy of their identifications. Add that ADA
> Belling did not know about true circumstances of the photo identification
> procedures used with these witnesses; neither did the Court or the jury, as no
> evidence of the true circumstances of Defendants' suggestive identification
> procedures was presented. *See* Affirmative Facts at ¶¶ 26–105, 152–77, 183–85,
> 191.

77. Each of the key People's witnesses were vigorously cross-examined. For example, Dixon's

defense counsel cross-examined Aaron Jackson on the fact that his initial identification of

Dixon was tentative– a fact that was neither concealed nor hidden by Detective

Stambach. Decl. Ex. 23 ("Jackson Trial Testimony") at p. 244-247.

> **Response:** Admit the witnesses were cross-examined on disclosed facts
> demonstrating the unlikelihood of the identifications. However, key evidence of
> suggestive identification procedures used with these witnesses was not disclosed.
> Add that neither Stambach nor any other Defendant conducted any basic follow-
> up investigation, including investigating Scott's truthful confession or the obvious
> inconsistencies between Adams' description of the shooter and Dixon. Add that
> there is no evidence any Defendant ever showed witnesses an array with Scott's
> photograph, even after he confessed to them. *See* Affirmative Facts at ¶¶ 152–
> 177, 185.

78. Defense counsel cross-examined Adams based on the fact that his initial description of the shooter did not match up with the physical characteristics of Dixon–again a fact not withheld or concealed by Detective Stambach. Decl. Ex. 22 (Adams Trial Testimony) at p. 204-207.

> **Response:** Admit Adams was cross-examined on disclosed facts demonstrating the discrepancy between the description he provided of the shooter before Stambach learned that Dixon was the suspect, and his purported identification of Dixon as the perpetrator. Add that key evidence of suggestive identification procedures was not disclosed. Add that neither Stambach, nor any other police officer, conducted a basic follow-up investigation into Adams' initial description of Dixon despite noting it was a "red flag" for Stambach at the time. *See* Affirmative Facts at ⁋⁋ 70–105, 171–177, 185.

79. Despite defense counsel's ability to vigorously cross-examine the three witnesses, the jury still convicted Dixon of murder, assault, and criminal possession of a weapon. Decl. Ex. 24 ("Jury Verdict Reading").

> **Response:** Admit that without evidence of suggestive identification procedures Dixon was convicted based on the three false identifications for a shooting he did not commit. *See* Affirmative Facts at ⁋ 171–177, 185.

80. Dixon's defense counsel also knew about the identity of Lamar Scott as well as Mr. Scott's confession prior to Dixon's trial. Counsel nonetheless chose not to call Lamar Scott as a witness. Decl. Ex. 14 (Bryant Dep.) at p. 175.

> **Response:** Admit that Dixon's defense counsel knew about the identity of Lamarr Scott, but add that Scott was pressured to recant his truthful confession at the

grand jury. According to ADA Belling, Scott's grand jury testimony "effectively eliminated" him as a witness in Dixon's trial. *See* Affirmative Facts at ¶¶ 180, 186–190.

81. Nor did counsel attempt to call Leonard Brown or Mario Jarmon, all of whom had testified during grand jury proceedings that Scott, not Dixon, was the shooter. Decl. Ex. 17; 18

**Response:** Admit that Brown and Jarmon were not called but add that Leonard Brown and Mario Jarmon were facing and ultimately charged with perjury for their truthful testimony at the grand jury before the criminal trial. *See* Affirmative Facts at ¶¶ 180, 186–190.

82. After these two witnesses testified to the grand jury, the District Attorney's Office charged them with perjury. Decl. Ex. 13 ("Belling Dep.") at p. 278; Decl. Ex. 52 ("Grand Jury Excerpt").

**Response:** Admit Brown and Jarmon were charged for perjury for their truthful testimony identifying Scott as the shooter.

83. In 2018, the Erie County District Attorney's Office conducted a reinvestigation into the murder of Torriano Jackson. Decl. Ex. Decl. Ex. 47 ("Heraty Aff.") at ¶ 4.

**Response:** Admit.

84. Finally, after years of claiming that he had no involvement with the crime, Dixon admitted that he was the one who armed Scott before the shooting and he was the one who drove Scott to the scene of the crime. (Id.). at ¶ 14; Dec. Ex. 6 (Dixon Dep.) at p. 12-14.

**Response:** Admit that Dixon admitted TEC 9 was his but deny that Dixon was involved in the crime to the extent involvement means participation in the shooting of Torriano Jackson or anyone else. Deny that Dixon armed Scott before

the shooting, and deny characterization that Dixon has "admitted" such. Dixon

and Scott left their friend Jarrett's house and drove to Jarmon's; Dixon had the

TEC-9 in his car at the time. Ex. 23 (Dixon Dep.) 14:4–17. Dixon left Jarmon's to

run errands, came back, and dropped the gun in Jarmon's hallway. On his own

accord, Scott later retrieved the TEC-9, ran toward the fight between the Jacksons

and Jarmon, and started shooting. Dixon did not arm Scott with an automatic

weapon. Ex. 6 (Frida Dep.) 14:5–18; Ex. 23 (Dixon Dep.) 122:18–123:1; Ex. 96

(Shannon Perj. Test.) 655:4–24; Ex. 4 (Scott Dep.) 15:2–10 , 18:5–19, 80:07–13;

Ex. 5 (Scott Plea 2018) 13:4–8; *See* Affirmative Facts at ¶¶ 1–11.

85. Based on this account given by Dixon, and based on Scott pleading guilty to the Jackson

murder, the District Attorney's Office agreed to dismiss Dixon's murder and assault

convictions. Dixon's conviction for criminal possession of a weapon in the second

degree, however, was not dismissed. Decl. Ex. Decl. Ex. 47 ("Heraty Aff.") at p. 7

(WHEREFORE clause).

> **Response:** Admit that ECDAO agreed to dismiss Dixon's murder and assault
>
> convictions but add that it was based on comprehensive investigation conclusively
>
> demonstrating that Scott was the shooter and Dixon was not. *See* Affirmative
>
> Facts at ¶¶ 7–8, 207–208.

86. After being released from incarceration, Dixon separately challenged his criminal

possession of a weapon conviction. Although Erie County Judge Susan Eagan vacated

the conviction–she did not rule that Dixon was actually innocent of the charge. Decl. Ex.

48 ("Eagan Decision").

> **Response:** Admit.

87. Instead, Judge Eagan ruled only that Dixon was entitled to a new trial on his criminal possession of a weapon charge. Decl. Ex. 48 ("Eagan Decision").

    **Response:** Admit.

88. The Erie County District Attorneys' Office is appealing Judge Eagan's decision. Further, if the District Attorney's Office so chooses, they are entitled to re-try Dixon for criminal possession of a weapon in the second degree. Thus, the portion of the indictment issued against Dixon in 1992 which charged him with criminal possession of a weapon in the second degree has not reached a final termination. Decl. Ex. 49 ("Notice of Appeal").

    **Response:** Admit that ECDAO filed a notice of appeal but deny that the ECDAO is "entitled to re-try" because doing so would violate Dixon's right to be tried by indictment. Deny that the criminal possession of a weapon in the second degree has not reached a final termination because it is a legal conclusion not a statement of fact.

89. Detective James Lonergan was first the detective of BPD's homicide division to arrive at the Torriano Jackson murder scene. He thereafter took control of the scene. None of the physical evidence gathered at the scene was ultimately used to tie Valentino Dixon to the shooting. Decl. Ex. 44.

    **Response:** Admit.

90. After securing the scene, Detective Lonergan did note that a gun, separate from the murder weapon, a .32 caliber revolver, was collected at the scene of the crime. Neither Detective Lonergan nor any other member of the homicide division concealed the fact that a second gun was recovered from the crime scene. Decl. Ex. 44.

    **Response:** Admit Defendant Lonergan so reported.

91. Detective Lonergan also received an anonymous call during the late afternoon of August
    10, 1991. Decl. Ex. 45.

    **Response:** Admit that Defendant Lonergan so reported.

92. The anonymous caller stated that the perpetrator of the Torriano Jackson murder was
    Valentino Dixon. Decl. Ex. 45.

    **Response:** Deny, according to Lonergan's report, the anonymous caller said "the
    shooting last night at Bailey & Delavan was over a girl**,"** and that "Dixon and one
    of the Jackson boys were dating the same girl," but does not state the perpetrator
    was Valentino Dixon. Ex. 1 (Homicide File) BPD Comp. 84 (Lonergan Report).

93. The caller further stated that the dispute leading to the shooting started over a girl by the
    name of Heather Smith, which is the actual name of the individual over whom the
    underlying dispute started. Decl. Ex. 45.

    **Response:** Admit the Lonergan so reported.

94. The anonymous call taken by Detective Lonergan is not admissible evidence and was not
    used as a basis to prosecute Valentino Dixon. Decl. Ex. 45.

    **Response:** Admit.

95. Detective Lonergan also took witness statements during the investigation of the Jackson
    murder, but none of the statements taken by Detective Lonergan were used in Dixon's
    prosecution. Decl. Ex. 8 ("Lonergan Dep.") at p. 85-88.

    **Response:** Admit that Lonergan took witness statements during the investigation
    of the Jackson murder but add that none of the statements were followed up on.

96. Detective John Vickerd conducted an initial interview with John Sullivan at Sister's
    Hospital on August 10, 1991. Decl. Ex. 25.

**Response:** Admit.

97. During this interview, Mr. Sullivan told Detective Vickerd that the shooter was an individual who went by the nickname "Tino." Decl. Ex. 25.

> **Response:** Admit this is what Vickerd reported but deny it accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 26–69.

98. Sullivan further told Vickerd that "Tino's" real name was Valentino. Decl. Ex. 25.

> **Response:** Admit this is what Vickerd reported but deny it accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 26–69.

99. Detective Vickerd also prepared a non-suggestive photo array containing Valentino Dixon's photograph on August 10, 1991. Decl. Ex. 29, 30.

> **Response:** Admit the photo array was non-suggestive, but deny the procedure was non-suggestive. *See* Affirmative Facts at ¶¶ 26–69.

100. Detective Vickerd showed this photo array to Emil Adams, who ultimately identified Dixon's photo as depicting the individual who shot Torriano Jackson. Decl. Ex. 29, 30, 31.

> **Response:** Deny that Adams identified Dixon's photo. *See* Affirmative Facts at ¶¶ 26–37, 75–105.

101. Detective Vickerd took no other relevant investigative steps.

> **Response:** Admit that Vickerd did not report taking any other relevant investigative steps, but deny it accurately reflects whether Vickerd took any other relevant investigative steps.

102. Detective Raniero Masecchia took a sworn statement from John Sullivan on August 10, 1991, after Mr. Sullivan was released from Sister's Hospital. Decl. Ex. 26.

> **Response:** Admit that he took a sworn statement from Sullivan but deny it
> accurately reflects what Sullivan told him. *See* Affirmative Facts at ¶¶ 26–42,
> 56–63.

103. During this interview, Detective Masecchia showed Mr. Sullivan a six-person photo array
containing Valentino Dixon's mug shot. Decl. Ex. 26, 27.

> **Response:** Admit Masecchia so reported but deny he reported the true
> circumstances of the purported photo identification procedure. *See* Affirmative
> Facts at ¶¶ 64–67.

104. Mr. Sullivan identified Mr. Dixon's photo as depicting the individual who shot Torriano
Jackson. Decl. Ex. 26.

> **Response:** Deny. *See* Affirmative Facts at ¶¶ 26–42, 56–69.

105. The photo array prepared by Detective Masecchia was non-suggestive –it contained five
filler mug shots of individuals who were of the same relative age and appearance as Mr.
Dixon. Decl. Ex. 27.

> **Response:** Admit the photo array was non-suggestive, but deny the procedure
> was non-suggestive. *See* Affirmative Facts at ¶¶ 26–42, 56–69.

106. Detective Masecchia also took a sworn statement from Leonard Brown wherein Brown
identified Lamar Scott as the perpetrator of the Torriano Jackson homicide. Decl. Ex. 36.

> **Response:** Admit.

107. Detective Masecchia did not conceal Brown's statement from ADA Belling–the
statement was shown to Belling within hours after it was taken. Decl Ex. 37; Decl. Ex. 13
(Belling Dep.) at p. 345; 374.

**Response:** Admit that the statement was shown to Belling, but add Stambach and/or other Defendants misrepresented that Dixon's parents pressured Scott to confess to Belling. Also, add that no follow-up investigation was conducted into Scott and Brown's statement. Ex. 1 (Homicide File) BPD Comp. 200 (Stambach Report); *See* Affirmative Facts at ¶¶ 131–151, 178–179.

108. Detective Masecchia also spoke with Lamar Scott after his confession about taking a lie detector test. Decl. Ex. 38.

**Response:** Admit that Masecchia so reported but add that there was no follow-up conducted on Scott's truthful confession including a failure to follow up with Scott to appear for a polygraph, or several other basic investigative steps. *See* Affirmative Facts at ¶¶ 131–151, 178–179.

109. In other words, Detective Masecchia tried to get Lamar Scott to further participate in the investigation after he confessed–despite the fact that Valentino Dixon had already been arrested. Decl. Ex. 38.

**Response:** Deny. Despite the fact that Scott truthfully confessed to the crime, there was no follow-up conducted on Scott's truthful confession including a further follow up with Scott to appear for a polygraph, or several other basic investigative steps. *See* Affirmative Facts at ¶¶ 131–151.

110. Detective Stambach took a sworn statement from Emil Adams the morning of the shooting. Decl. Ex. 28 (Adams Statement).

**Response:** Admit.

111. Mr. Adams description of the shooter's appearance was somewhat inconsistent with Dixon's appearance– a fact that Stambach never tried to conceal and was a subject of

cross-examination at Dixon's trial. Decl. Ex. 28; Decl. Ex. 22 (Adams Trial Testimony) at p. 204-207.

> **Response:** Deny the characterization of "somewhat inconsistent" and that it was a fact that Stambach never tried to conceal. Add that the description contained obvious differences that Stambach admits were a "red flag" and there was no follow-up investigation. *See* Affirmative Facts at ¶¶ 75–84.

112. Thereafter, Stambach took a sworn, Mirandized statement from Dixon after Dixon was arrested. Decl. Ex. 34.

> **Response:** Admit.

113. In the sworn statement, Dixon denied any involvement in the crime and did not reveal that he provided Scott with the murder weapon. Decl. Ex. 34.

> **Response:** Admit that Dixon denied involvement in the crime to the extent involvement means participation in the shooting of Torriano Jackson or anyone else. Deny that Dixon provided Scott with the murder weapon. Dixon and Scott left and drove to Jarmon's; Dixon had the TEC-9 in his car at the time. Ex. 5 (Dixon dep) 14:4–17. Dixon left for hours to run errands, came back, and dropped the gun in Jarmon's hallway. On his own accord, Scott later retrieved the TEC-9, ran toward the fight between the Jacksons and Jarmon, and started shooting. Dixon did not provide Scott with an automatic weapon. Ex. 6 (Frida Dep.) 14:5–18; Ex. 23 (Dixon Dep.) 122:18–123:1; Ex. 96 (Shannon Perj. Test.) 655:4–24; Ex. 4 (Scott Dep.) 15:2–10 , 18:5–19, 80:07–13; Ex. 5 (Scott Plea 2018) 13:4–8; *See* Affirmative Facts at ¶¶ 7–11.

114. Stambach accurately transcribed Dixon's statement. Decl. Ex. 6 (Dixon Dep.) at p. 153-155.

        **Response:** Admit.

115. When Lamar Scott began confessing to the Jackson homicide on Channel 2 News, Stambach placed Scott in handcuffs and put him in the back of a police car. Decl. Ex. 14 (Bryant Dep.) at p. 187-188.

        **Response:** Admit that Bryant so testified.

116. Stambach thereafter took a sworn confession from Scott after reading Scott his Miranda rights on August 12, 1991. Decl. Ex. 35.

        **Response:** Admit.

117. Stambach showed Scott's sworn confession to ADA Belling, who reviewed the confession and instructed that Scott be released. Decl Ex. 37; Decl. Ex. 13 (Belling Dep.) at p. 345; 374

        **Response:** Admit that Belling reviewed the statements and video but deny ADA Belling set up a lie detector for Lamarr Scott. Add that ADA Belling instructed that Scott be released but ADA Belling based his decision to release Scott on the videotaped confession and misinformation Stambach provided that Valentino's parents made Scott confess. ADA Belling expected BPD officers to continue investigating after Scott's confession. Ex. 41 (Belling Dep.) 95:20–96:21. *See* Affirmative Facts at ¶¶ 147–151, 172–173, 178–180.

118. Detective Stambach also showed Aaron Jackson a photo array with Dixon's photograph and five fillers on August 12, 1991. Decl. Ex. 39-40.

> **Response:** Admit that Stambach reported Jackson was shown an identification
> procedure, but deny it was not suggestive. *See* Affirmative Facts at ¶ 152–160.

119. Stambach recorded, accurately, that Jackson only tentatively identified Dixon's photo as
depicting the individual who shot and killed his brother. Decl. Ex. 39, 41.

> **Response:** Admit that Stambach so reported that the initial identification was at
> most tentative but deny he accurately reported what Jackson said or the true
> circumstances of the identification procedure. *See* Affirmative Facts at ¶¶ 26–37,
> 152–56, 168.

120. Jackson was later cross-examined on his tentative identification at Dixon's criminal trial.
Decl. Ex. 23 ("Jackson Trial Testimony") at p. 244-247.

> **Response:** Admit.

121. Detective Stambach also conducted an interview of Mario Jarmon while Mr. Jarmon was
hospitalized from his gun wounds. Decl. Ex. 42.

> **Response:** Admit.

122. During this interview, Jarmon indicated that Torriano Jackson, not Dixon, was
responsible for shooting him and that Dixon did not have a gun. Decl. Ex. 42.

> **Response:** Admit.

123. Stambach did not conceal or hide this interview from ADA Belling. Decl. Ex. 42.

> **Response:** Deny. In a letter to the BPD, Belling states there are "major
> discrepancies in regard to who committed the murder of Torriano Jackson" and
> that there were "various people who were at the scene of this shooting who have
> never been talked to" and lists Mario Jarmon as "one of the victims" who has
> "never been interviewed." Ex. 26 (11/22/91 Belling Ltr.) COE 1686–87.

124. Detective Stambach also took a call from Tamara Frida, who at the time was unwilling to identify herself. Decl. Ex. 43; Decl. Ex. 10 ("Frida Dep.") at p. 24-25; 61.

> **Response:** Deny. Tamara Frida identified herself as the "girl from the Red Tracker," who would've been "very easy" to find out who the caller was. Ex. 3 (Stambach Dep.) 198:25–199:14; Affirmative Facts at ¶¶ 161–162.

125. Ms. Frida told Stambach that Valentino Dixon was not the shooter. Decl. Ex. 43; Decl. Ex. 10 ("Frida Dep.") at p. 24-25; 61.

> **Response:** Admit.

126. Stambach accurately recorded this conversation with Ms. Frida and did not conceal or hide the conversation from ADA Belling. Decl. Ex. 43; Decl. Ex. 10 ("Frida Dep.") at p. 24-25; 61.

> **Response:** Admit that Stambach so reported but add that Stambach failed to follow up on Frida's truthful statement, including failing to show her a photo array or take any other steps to determine what she knew about the shooter. *See* Affirmative Facts at ¶¶ 161–164.

127. Richard Donovan was the chief of BPD's homicide division when the Jackson murder was being investigated. Decl. Ex. 9 ("Donovan Dep.") at p. 24.

> **Response:** Admit.

128. There is no evidence that Chief Donovan had any interaction with any witness to the Torriano Jackson murder, or that he that he played any meaningful role in the investigation of the murder. See generally, Decl. Ex. 9 (Donovan Dep.).

> **Response:** Admit that there is no documentation that Chief Donovan had any interaction with any witness to the Torriano Jackson murder but add Chief

Donovan "was active" as an "administrator in this case" and that he "probably did stuff in this case." Ex. 100 (Donovan Dep.) 33:17–34:08. Also, the circumstances in this case were "very unusual" and it would be the "kind of situation where [he] would be asked to get involved." In other words, there is no doubt that he would have "been made aware" of the circumstances and would have "ensured" that the officers "did a full investigation of Lamarr Scott's confession to determine whether or not he was the murderer." Ex. 100 (Donovan Dep.) 37:06–39:07.

DATED: February 15, 2024
New York, New York

/s/ Anna Benvenutti Hoffmann

Anna Benvenutti Hoffmann
NEUFELD SCHECK BRUSTIN
HOFFMANN & FREUDENBERGER, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
T: (212) 965-9081
E: anna@nsbhf.com

*Counsel for Plaintiff Valentino Dixon*