# EXHIBIT 6

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
**Tamara L. Frida on 10/19/2022**

```
 1              UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF NEW YORK
 2
      VALENTINO DIXON,
 3
                   Plaintiff,
 4
        vs.         Civil Action No. 19-CV-01678
 5
      CITY OF BUFFALO, et al.,
 6
                   Defendants.
 7

 8    VIDEOTAPED        TAMARA L. FRIDA

 9    DEPOSITION OF:

10    DATE:            October 19, 2022

11    TIME:            10:27 a.m.

12    LOCATION:        Offices of
                       HUSEBY GLOBAL LITIGATION
13                     1230 West Morehead Street
                       Suite 104
14                     Charlotte, North Carolina

15    TAKEN BY:        Counsel for the Plaintiff

16    REPORTED BY:     MINDY VISLAY

17    _____

18

19

20

21

22

23

24

25
```

1  or three jobs.  I think I was working, too, at either

2  Super Duper or either Sears Service Center, one of

3  those two -- somewhere in between those two, but my

4  main job was at Buffalo General Hospital at that time.

5       Q.   Okay.  And were you also a student at that

6  time or not yet?

7       A.   No.  I was -- well, I was in transition at

8  that time.  I wasn't -- I had unenrolled from Alfred

9  University, and I was pursuing -- thinking about going

10 to Buff State.

11      Q.   Okay.  And then you went back to Alfred and

12 graduated?

13      A.   No.  I graduated from Buff State.

14      Q.   Oh.  I apologize.  Thank you.

15   Okay.  So let's get right to it.  Were you present

16 in the area of Louie's restaurant in Buffalo on

17 August 10th, 1991, when Torriano Jackson was shot and

18 killed?

19      A.   Yes, I was.

20      Q.   Where were you?

21      A.   I was in the parking lot of Louie's,

22 Louie's parking lot, and I was inside of my vehicle.

23      Q.   Okay.  And can you describe your vehicle?

24      A.   It was a red 1990 Geo Tracker convertible.

25 It was red with a white convertible top.

```
1          Q.    Okay.  And who were you with?

2          A.    I was with LaSandra Smith and Jacqueline

3     Parks.

4          Q.    Okay.  And did you see who shot and killed

5     Torriano Jackson?

6          A.    Yes, I did.

7          Q.    And who shot and killed Torriano Jackson?

8                MR. SAHASRABUDHE:  Form.

9     BY MR. BRUSTIN:

10         Q.    Let me ask it a different way.

11         A.    Okay.

12         Q.    Who did you see -- do you know the person

13    today who shot and killed Torriano Jackson?

14         A.    I know the person today.

15               MR. SAHASRABUDHE:  Form.

16    BY MR. BRUSTIN:

17         Q.    Who did you see shoot and kill Torriano

18    Jackson?

19         A.    Lamar Scott.

20         Q.    All right.  Do you have any doubt in your

21    mind that Lamar Scott is the person that shot and

22    killed Torriano Jackson?

23         A.    There is no doubt in my mind.

24         Q.    Did you know Lamar Scott at that time?

25         A.    At that time I did not know him when he was
```

 1  shooting, but later on I found out that he was the

 2  same person that I went to grammar school with and --

 3  so if you want to kind of divulge from there.

 4       Q.   Okay.  Did you see Valentino Dixon at any

 5  time the night that Torriano Jackson was shot?

 6       A.   No, I did not.

 7       Q.   Was he present in the vicinity, to your

 8  knowledge, of where Torriano Jackson was shot?  Did

 9  you see him at all?

10       A.   I did not see him at all.

11       Q.   Did you know Valentino Dixon personally at

12  that time?

13       A.   No, I did not.

14       Q.   Did you know Valentino Dixon by sight and

15  reputation at that time?

16       A.   Yes, I did.

17       Q.   So, in other words, if you had seen him,

18  you would have recognized him?

19       A.   Yes.

20       Q.   And would it be fair to say as a general

21  matter you knew Valentino Dixon as somebody who dealt

22  drugs and also drove nice cars?

23       A.   Yes.

24       Q.   Was he known that way in the community to

25  your knowledge?

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 14

```
 1        A.   Yes.
 2        Q.   Can you just briefly describe what you saw
 3   Lamar Scott do in the moments leading up to and
 4   including the shooting?
 5        A.   Okay.  Of course, there was a fight
 6   involving a lot of individuals.  We were watching the
 7   fight.  We were all inside of the car watching the
 8   fight, and I saw Lamar Scott run down East Delavan
 9   headed towards Bailey, and he had a gun in his hand.
10   He started shooting into the crowd before he got all
11   the way to the crowd, and he started shooting into the
12   crowd.  Mario Jarmon kind of ran out of the crowd, and
13   it was almost simultaneously that Torri started
14   running out of the crowd, but he was coming directly
15   towards my truck, and Lamar Scott was right behind
16   him, and he was shooting.  Torri fell face forward
17   onto the ground -- onto the street on Delavan, and
18   Lamar stood up over him and continued to shoot.
19        Q.   Okay.  Were you able to see Lamar Scott
20   both from the front and the back?
21             MR. SAHASRABUDHE:  Form.
22   BY MR. BRUSTIN:
23        Q.   Were you able to see Lamar Scott's face?
24             MR. SAHASRABUDHE:  Form.
25             THE WITNESS:  Yes.
```

1   BY MR. BRUSTIN:

2        Q.   For approximately how long?

3        A.   I would say the entire time when he was

4   running face forward towards -- you know, he was

5   chasing behind Torri.

6        Q.   Okay.  Do you have any doubt in your mind

7   that it was Lamar Scott who shot Torriano Jackson as

8   opposed to Valentino Dixon?

9        A.   No.  There's no doubt in my mind.

10       Q.   Do you have any doubt in your mind you

11  would have recognized Valentino Dixon that night if

12  you had seen him?

13       A.   Yes.

14       Q.   In other words, you don't have any doubt in

15  your mind?

16       A.   Oh.  No.  I'm sorry.  Yes.  I don't have

17  any doubt.

18       Q.   It was a bad question.

19       A.   Okay.

20       Q.   Now, had you ever witnessed a shooting of

21  any kind up to that point in your life?

22       A.   No.

23       Q.   Can you describe how it was for you

24  emotionally to observe that shooting?

25       A.   I was very, very scared, very, very shaken

**VALENTINO DIXON vs CITY OF BUFFALO, ET AL.**
Tamara L. Frida on 10/19/2022                                    Page 20

1  providing information in a crime like that could be

2  dangerous?

3              MR. SAHASRABUDHE:  Form.

4              THE WITNESS:  Uh-huh.  Yes.

5  BY MR. BRUSTIN:

6      Q.  All right.  A little more specifically, can

7  you tell us at that time -- because I'm going to ask

8  you about questions about what you were concerned

9  about later, but at that time were you concerned for

10 your physical safety if you provided information?

11     A.  Yes.

12     Q.  At that time did you have any idea why

13 Lamar Scott shot and killed Torriano Jackson?

14     A.  No.

15     Q.  Did you observe it to be a brutal crime?

16     A.  Yes.

17     Q.  Had you ever seen anything like that in

18 your life?

19     A.  Never.

20     Q.  Now, you mentioned that you heard Valentino

21 Dixon's name over the radio.  Do you remember exactly

22 what you heard?

23     A.  I just heard that they had put out an all

24 points -- APB for Valentino Dixon as being the

25 shooter.

```
 1        Q.    You heard something about him being the

 2   shooter over the radio?

 3        A.    Uh-huh.

 4        Q.    And that was over the police radio --

 5        A.    Yes.

 6        Q.    -- that you overheard?

 7        A.    Yes.

 8        Q.    And that was approximately within 15 or

 9   20 minutes of the shooting?

10        A.    Yes.

11              MR. SAHASRABUDHE:  Form.

12   BY MR. BRUSTIN:

13        Q.    Now, you mentioned that you sought

14   counseling after the shooting.  Who did you go to see

15   at that time or where did you go?

16        A.    I went to at that time it was Buffalo

17   General's community mental health center.  I believe

18   the address was 80 Goodrich.  I cannot remember the

19   counselor's name.  He was a male at that time.  A

20   white male.  I can't remember his name.

21        Q.    Okay.  And do you remember how many times

22   you saw that counselor?

23        A.    I believe it may have been two times.

24        Q.    Okay.  And I think you told us this, but

25   that was because you were having nightmares after the
```

```
 1  able to identify pictures, correct?

 2       A.   Yes.

 3       Q.   And although you didn't identify yourself

 4  by name, you told them that in fact you were the

 5  person from the red Tracker, correct?

 6       A.   Yes.

 7       Q.   And you understood when you did that that

 8  you were telling him who you were?

 9            MR. SAHASRABUDHE:  Form.

10            THE WITNESS:  Yes.

11  BY MR. BRUSTIN:

12       Q.   Your understanding was that the police knew

13  you because you talked to them about being in the red

14  Tracker which was shot by one of the bullets, correct?

15       A.   Yes.

16       Q.   And, so, although you didn't give him your

17  name, you understood that you were identifying

18  yourself to this officer?

19            MR. SAHASRABUDHE:  Form.

20            THE WITNESS:  Yes.

21  BY MR. BRUSTIN:

22       Q.   Even though you were scared?

23       A.   Yes.

24       Q.   All right.  After this time did any police

25  officer, Detective Stambach or anybody else, ever come
```

```
 1  and show you pictures?

 2       A.   No.

 3       Q.   And if they had come to your house at this

 4  time and shown you pictures, including a picture of

 5  Lamar Scott, do you think you would have had the

 6  courage at that time to identify him?

 7            MR. SAHASRABUDHE:  Form.

 8            THE WITNESS:  At that time, yes, with

 9  reservation.

10  BY MR. BRUSTIN:

11       Q.   Okay.  And by the way, I'm asking you about

12  before people were prosecuted for telling the truth

13  about Lamar Scott being the shooter.  Before that

14  time.

15            MR. SAHASRABUDHE:  Form.

16            THE WITNESS:  Yes.  It would have been with

17  reservation still, yes.

18  BY MR. BRUSTIN:

19       Q.   But you think you would have done it?

20       A.   Yes.

21            MR. SAHASRABUDHE:  Form.

22  BY MR. BRUSTIN:

23       Q.   And did you understand when you told them

24  that you were the girl from the red Tracker that they

25  would likely come and visit you?
```

VALENTINO DIXON vs CITY OF BUFFALO, ET AL.
Tamara L. Frida on 10/19/2022                              Page 32

1        A.   Yes.

2        Q.   Did you also in the days and months

3   following the shooting have discussions with Emil

4   Adams about what he saw and heard?

5             MR. SAHASRABUDHE:   Form.

6             THE WITNESS:   It was actually well after.

7   It was probably --

8   BY MR. BRUSTIN:

9        Q.   Let me ask you this:   Were the discussions

10   that you had with Emil Adams about what he saw and

11   heard before or after you learned about the perjury

12   charges?

13        A.   It was after the perjury charges.

14        Q.   Okay.  And did you -- so more than a year

15   later it sounds like?

16        A.   Uh-huh.

17        Q.   Did you speak to Emil Adams about what he

18   saw and heard?

19        A.   Yes.

20        Q.   And just generally what did Emil Adams tell

21   you, if anything, about who the shooter was?

22             MR. SAHASRABUDHE:   Form.

23             THE WITNESS:   He told me, of course, what

24   we had saw, because he was standing right there as

25   well.  He was standing right next to my truck.  And he

 1  said that the reason why he had to say that 'Tino was

 2  the shooter was because the police department was

 3  threatening him with some charges he had in Michigan.

 4  BY MR. BRUSTIN:

 5         Q.   Okay.  I think you skipped the first part.

 6         A.   Oh.  Okay.

 7         Q.   But that was the second part of the

 8  question.

 9         A.   Okay.

10         Q.   The first part of the question is did he

11  tell you who the shooter was?

12              MS. HURLEY:  Form.

13              THE WITNESS:  No, he didn't tell me who the

14  shooter was.  By name, when you say --

15  BY MR. BRUSTIN:

16         Q.   It was a bad question.

17         A.   Okay.

18         Q.   Did you talk to Emil Adams about whether or

19  not Valentino Dixon was in fact the shooter?

20         A.   Yes.

21         Q.   And what did he tell you, if anything?

22         A.   He told me that he knew that Valentino was

23  not the shooter.  He knew that.

24         Q.   Okay.

25         A.   And then he went on to explain why he said

1  Valentino was the shooter.

2      Q.   Okay.  Other than pending charges that he

3  had did he give you any other reasons as to why --

4  withdrawn.  Did he give you any other information

5  about any pressure that the police or the prosecutors

6  put on him to state that Valentino Dixon was the

7  shooter even when he knew that he wasn't?

8           MR. SAHASRABUDHE:  Form.

9           MS. HURLEY:  Form.

10          THE WITNESS:  The only thing he told me was

11  that they were threatening to actually send him back

12  to Michigan to face the charges.  That was it.

13  BY MR. BRUSTIN:

14      Q.   Do you remember how many times you talked

15  to Emil Adams about the shooting?

16      A.   I would say maybe two -- about two times.

17      Q.   Okay.  Did you talk to any other people?

18  Did you talk to -- first of all, did you talk to your

19  two friends about what they saw?

20      A.   Yes.  Absolutely.

21      Q.   Okay.  And did they also see the shooting?

22      A.   Yes.

23      Q.   And did they also tell you that it was not

24  Valentino Dixon who was the shooter but Lamar Scott?

25      A.   Yes.  Well, they didn't say Lamar Scott,

```
 1        Q.   Do you feel like you need me to repeat them

 2  or --

 3        A.   You can repeat them.

 4        Q.   Okay.  Well, do you understand that those

 5  ground rules apply equally to the questions I'm about

 6  to ask you?

 7        A.   Yes.

 8        Q.   Okay.  And if don't need me to repeat them

 9  I don't want to waste any more time.

10        A.   Okay.  Yes.

11        Q.   So if you remember them --

12        A.   All right.

13        Q.   -- I'll just get into it.

14        A.   Okay.

15        Q.   If that's okay with you?

16        A.   Yes.

17        Q.   All right.  So I want to start if we could

18  with Emil Adams.

19        A.   Uh-huh.

20        Q.   So, prior to August 10th, 1991, did you

21  know Emil Adams?

22        A.   No.

23        Q.   Okay.  So had you ever seen him or spoken

24  to him before that evening?

25        A.   No.  That was the first time.
```

```
 1        Q.   And my understanding is prior to the
 2   shooting you were speaking to Emil Adams?
 3        A.   Yes.
 4        Q.   And that was when the two of you became
 5   introduced to each other?
 6        A.   Yes.
 7        Q.   Okay.  After the evening of the shooting
 8   when was the next time that you spoke to Emil Adams?
 9        A.   The next time that I spoke to him was
10   probably -- it might have been about maybe two, three
11   months after the shooting.
12        Q.   Okay.  And two, three months after the
13   shooting do you recall where that took place?
14        A.   I can't recall exactly.
15        Q.   Would it have been an in person
16   conversation?
17        A.   Yes.
18        Q.   And would it have been a meeting through
19   happenstance?
20             MR. BRUSTIN:  Objection to form and
21   foundation.
22             THE WITNESS:  I would say it would have
23   been like maybe out in the community somewhere.  It
24   might have been out -- like, at that time, going out
25   to like a club or something like that.  Yeah.
```

```
 1  BY MR. SAHASRABUDHE:

 2        Q.   Okay.  In other words, you hadn't planned

 3  to meet up with him --

 4        A.   No.

 5        Q.   -- you ran into him out in public?

 6        A.   Exactly.

 7        Q.   Okay.  And I believe you said it was about

 8  two to three months after the shooting?

 9        A.   Uh-huh.

10        Q.   Is this an instance where Emil Adams

11  relayed to you why he was identifying Valentino Dixon

12  as the shooter?

13             MR. BRUSTIN:  Objection to form.

14             THE WITNESS:  This is one of them.

15  BY MR. SAHASRABUDHE:

16        Q.   One of the two that we talked about

17  earlier?

18        A.   Yes.

19        Q.   Okay.  And you mentioned that he had said

20  something about being threatened with charges that

21  were pending against him in Michigan, correct?

22        A.   Yes.

23             MR. BRUSTIN:  Objection to form.

24  MR. SAHASRABUDHE:

25        Q.   Did he tell you when those threats had been
```

1  made?

2        A.   No.  He didn't tell me when.  He just told

3  me just in general --

4        Q.   **Okay.**

5        A.   -- that that was why.

6        Q.   **Did he go into any detail as to who had**

7  **made those threats?**

8        A.   He just said that the police were saying

9  that they were going to bring up those charges in

10 Michigan or call Michigan and have him arrested or

11 whatever on those charges.

12       Q.   **But he never mentioned the name of an**

13 **individual detective or police officer --**

14       A.   No, he did not.

15       Q.   **And did he specify -- do you know for a**

16 **fact that he's testified that it was a Buffalo Police**

17 **Department employee or individual?**

18       A.   He said it was the police.  He just said

19 the police, so I'm assuming Buffalo police.  He said

20 the police and the District Attorney.  He just said

21 the District Attorney.  He didn't say like ADA or

22 specific, he just said like their office pretty much.

23       Q.   **Okay.  And besides saying that charges in**

24 **Michigan were being -- potentially going to be used**

25 **against him he didn't go into any further detail; is**

 1  that correct?

 2          A.   No.

 3               MR. BRUSTIN:   Object to form.

 4  BY MR. SAHASRABUDHE:

 5          Q.   And you of course were not present for any

 6  conversations or interviews that Emil Adams did

 7  with --

 8          A.   No.

 9          Q.   -- the Buffalo Police Department or the

10  Erie County District Attorney's office's --

11          A.   No.

12          Q.   -- is that correct?  So you have no

13  firsthand knowledge other than what was relayed to you

14  by Emil Adams as to what may have been communicated to

15  him or what was not communicated to him?

16          A.   Right.  That's correct.

17          Q.   And I don't want to belabor the point, but

18  that's the second conversation you had with him that

19  we talked about earlier.  When approximately was that

20  conversation, if you remember?

21          A.   The second conversation would have been

22  maybe -- I want to say maybe 2002/2003.  I think it

23  was around the time when I did the interview with the

24  Buffalo News.  So, we had ran into each other.  It was

25  in public.  We were both at a store, and we had that

```
 1  discussion --
 2        Q.   Okay.
 3        A.   -- and he said it again.  He reiterated
 4  that, you know, he said Valentino was the shooter
 5  because of the charges in Michigan.
 6        Q.   Did he go into any further detail in the
 7  second conversation as he did in the first
 8  conversation?
 9        A.   No.  Not really.  No.
10        Q.   So, again, just generally a claim that
11  charges may have been used against him if he didn't
12  identify Valentino Dixon --
13        A.   Yes.
14        Q.   -- as the shooter?  But nothing further?
15        A.   Nothing further.
16        Q.   And no information as to who the individual
17  was that made those threats or when those threats may
18  have been --
19        A.   No.
20        Q.   -- made?  Okay.  Have you spoken with Emil
21  Adams since that conversation you had with him?
22        A.   No.
23        Q.   Okay.  And that would have been the last
24  time you spoke to him, in 2002?
25        A.   Yes.  I would say 2002.  Somewhere around
```

```
 1  STATE OF NORTH CAROLINA

 2  COUNTY OF MECKLENBURG

 3

 4            CERTIFICATE OF VERBATIM TRANSCRIPT

 5

 6            I, Mindy Vislay, Court Reporter and Notary

 7  Public for the State of North Carolina at Large, do

 8  hereby certify that the foregoing transcript of TAMARA

 9  L. FRIDA was taken by me and transcribed by me and is

10  a true, accurate, and complete record.

11            I further certify that I am neither related

12  to nor counsel for any party to the cause pending or

13  interested in the events thereof.

14            In witness whereof, I have hereunto set my

15  hand this 1st day of November, 2022 at Charlotte,

16  North Carolina.

17

18

19

20  _____

21  Mindy Lynn Vislay
    #200926400076

22

23

24

25
```