# EXHIBIT 7

2                        VIDEO DEPOSITION
                         RANIERO MASECCHIA
3


4
     UNITED STATES DISTRICT COURT
5    WESTERN DISTRICT OF NEW YORK

6    -----------------------------------------
     VALENTINO DIXON,
7
                              Plaintiff,
8
                    - vs -        Case No.
9                                1:19-cv-01678-WMS

10   CITY OF BUFFALO and COUNTY OF ERIE;
     and DETECTIVE MARK R. STAMBACH,
11   DETECTIVE RANIERO MASECCHIA, DETECTIVE
     JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
12   CHIEF RICHARD T. DONOVAN, JOHN DOES,
     Unknown Buffalo Police Department Supervisors,
13   and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
     BELLING, in their individual capacities,
14
                              Defendants.
15   -----------------------------------------

16

17            Video recorded deposition of RANIERO

18   MASECCHIA, Defendant, taken pursuant to the Federal

19   Rules of Civil Procedure, in the law offices of

20   HARRINGTON & MAHONEY, 70 Niagara Street, Buffalo,

21   New York, on March 15, 2022, commencing at

22   9:59 a.m., before DANIELLE M. FETZER, Notary

23   Public.

24

25



```
 1                    Raniero Masecchia
 2    evidence collection unit.
 3           Q.   I'm -- I'm speaking more broadly.  For
 4    example, it was the lead detective's responsibility
 5    to ensure that either that lead detective or
 6    somebody else interviewed all relevant witnesses,
 7    correct?
 8           A.   It's -- it's a group effort, yes.
 9           Q.   Well, I want -- right now I'm focusing
10    on the lead detective --
11           A.   Right.
12           Q.   -- and the lead detective's
13    responsibility.
14           My understanding from other police
15    departments is that the lead detective is
16    responsible for ensuring, along with the
17    supervisors, that all relevant witnesses are
18    interviewed; is that accurate?
19           A.   Yes, I would say so --
20           Q.   Okay.
21           A.   -- and -- but the person in charge to
22    make sure that all -- all the checkmarks were
23    checked would be the lieutenant --
24           Q.   Okay.
25           A.   -- and tell you, Hey, did you finish
```



1                  Raniero Masecchia

2    your canvas?  Did you have any witnesses?

3         Q.   Okay.

4         A.   Was it -- you know, it's the

5    lieutenant, but the lead detective is the person

6    you're going to go to.  If you have pertinent

7    information, you go to the lead detective.  If it's

8    irrelevant, continue on with it.

9         Q.   Okay.  So would it be fair to say that

10   the lead detective, as a -- as a matter of practice

11   in 1991, all of the other homicide detectives would

12   understand that any potentially relevant

13   information they gathered had to be brought to the

14   attention of both the lead detective and the

15   supervisor?

16        MR. RUSS:  Objection to form.

17        THE WITNESS:  Well, the two detectives who

18   caught the case are probably the lead detectives.

19        BY MR. BRUSTIN:

20        Q.   Okay.  And did I describe the process

21   accurately, that any relevant evidence that any

22   homicide detective gathered in connection with the

23   case, they would make sure that the lead detectives

24   were in the loop?

25        A.   I would hope so, yes.



```
 1                    Raniero Masecchia
 2   you're interviewing eyewitnesses, for example, to
 3   document any differences in versions of events they
 4   give you about what they saw or heard, correct?
 5           A.    Any what?
 6           Q.    Any differences in what they saw or
 7   heard from interview to interview.
 8           A.    Yes.
 9           Q.    That, in and of itself, could
10   constitute impeachment evidence, a witness who
11   gives you different versions of events over time?
12           A.    Yes.
13           Q.    Could be an innocent mistake, or it
14   could suggest that they're actually not credible or
15   reliable, correct?
16           A.    Or remembered something they didn't
17   remember earlier.
18           Q.    Right.  But your job is to write it all
19   down and put it into a report, correct?
20           A.    Yes.
21           Q.    The last thing you'd ever want to do as
22   a homicide detective, pursuant to training, is to
23   hide inconsistencies between statements, correct?
24           A.    Yes.
25           Q.    And, in fact, when you get
```



```
 1                  Raniero Masecchia
 2  inconsistencies in statements from an eyewitness,
 3  it's your job to explore the basis for those
 4  inconsistencies, correct?
 5          A.    In what manner?
 6          Q.    So, for example, if you -- if you're
 7  talking to a witness and on day one that witness
 8  tells you that a perpetrator was wearing a blue
 9  coat, and on day two, that witness tells you that
10  the perpetrator was wearing a white coat, you're
11  going to want to ask questions about that
12  inconsistency, correct?
13          A.    Yes.
14          Q.    For example, you might say, Well,
15  yesterday you told me that he was wearing a white
16  coat, can you explain that?
17          A.    Yes.
18          Q.    It's the kind of question a trained
19  homicide detective asks?
20          A.    Yes.
21      MR. SOEHNLEIN:  Objection as to form.
22      BY MR. BRUSTIN:
23          Q.    The last thing you want to do as a
24  homicide detective is cover up inconsistencies, you
25  want to explore them --
```



1                    Raniero Masecchia

2          A.    Yes.

3          Q.    -- correct?

4          That's as basic as it gets for a homicide

5    detective, right?

6          A.    Yes.

7          Q.    And each of the homicide detectives

8    that you worked with understood that rule, correct?

9          A.    I would hope so.

10         Q.    And based on your experience with them,

11   they did?

12         A.    The guys I worked with, yes.

13         Q.    Including Mark Stambach?

14         A.    I believe so.

15         Q.    One of the worst things that you could

16   do as a homicide detective is to receive a piece of

17   information that doesn't fit your theory of the

18   case and then fail to report and document it,

19   correct?

20         A.    Yes.

21         Q.    And would it be fair to say that --

22   that your practice and the practice of all the

23   homicide detectives you worked with was to either

24   dictate or write reports concerning evidence they

25   received within a day of receiving it?



```
 1                  Raniero Masecchia

 2          MR. RUSS:  Objection to form.

 3          MR. SOEHNLEIN:  Objection to form.

 4          THE WITNESS:  Yeah.  You would try to, yes.

 5          BY MR. BRUSTIN:

 6          Q.   If possible, you'd try to do it before

 7    the end of your shift?

 8          A.   Yes.

 9          Q.   And when taking a statement or

10    interviewing a witness, there are a variety of --

11    there's a variety of basic information that -- from

12    witness to witness you always want to document;

13    would that be fair to say?

14          A.   Yes.

15          Q.   So, for example, you always want to

16    document the time that that -- that that witness

17    interview is taking place, correct?

18          A.   Yes.

19          Q.   That could be important for a variety

20    of reasons?

21          A.   Yes.

22          Q.   What -- what a witness knows at a

23    certain period of time, who they've had access to

24    before that and after that, could be important?

25          A.   Yes.
```



1                    Raniero Masecchia

2         Q.    Okay.  So basic rule for homicide

3    detectives in Buffalo, you write down the time of

4    the interview?

5         A.    Correct.

6         Q.    And you write down the time the

7    interview ends?

8         A.    Correct, or you take a picture in front

9    of a clock.

10        Q.    Okay.  But it's important to know how

11   long an interview lasted?

12        A.    Yes.

13        Q.    For a variety of reasons, including

14   defending against accusations that the meeting was

15   coercive, for example?

16        A.    You're talking about with a suspect or

17   with a witness or ...

18        Q.    Either, potentially, right?

19        A.    Yes.

20        Q.    For a variety of reasons, it's

21   important to write both the start and the end time?

22        MR. RUSS:  Objection to form.

23        THE WITNESS:  Yes, for the most part you

24   should do that.

25        BY MR. BRUSTIN:



```
 1                  Raniero Masecchia
 2        A.   Yes.
 3        Q.   And to let the chips fall where they
 4   may?
 5        A.   Yes.
 6        Q.   And obviously any time a suspect -- a
 7   potential suspect is interviewed, it's critically
 8   important to document what they say to you and what
 9   you say to them, correct?
10        A.   Yes.
11        Q.   And it's critically important as a
12   homicide detective to investigate what a
13   potential suspect -- what information a potential
14   suspect provides to you, to the extent that it can
15   be investigated?
16        A.   Yes.
17        Q.   If a -- if a potential suspect gives
18   you an alibi, it's critically important to
19   investigate that alibi, correct?
20        A.   Yes.
21        Q.   Oftentimes an alibi could be false and
22   you can prove it false and that could be evidence
23   of guilt, correct?
24        A.   Yes.
25        Q.   And sometimes an alibi could be true
```



```
 1                    Raniero Masecchia
 2    and it could prove that someone actually didn't
 3    commit the crime?
 4            A.    Yes.
 5            Q.    What's important from the perspective
 6    of a homicide detective is to investigate that
 7    evidence, to the extent practical, as soon as
 8    possible after you get it, correct?
 9            A.    Yes.
10            Q.    Before -- before -- before, for
11    example, a witness has an opportunity to tamper
12    with other witnesses?
13            A.    Yes.
14            Q.    And the same is true when a suspect
15    provides you admissions about a crime?
16            A.    Yes.
17            Q.    It's critically important to
18    investigate, to the extent you can, the reliability
19    of those admissions?
20            A.    Yes.
21            Q.    So, for example, if a suspect makes
22    confessions or admissions to a crime and tells you
23    that other people witness that crime, it's
24    critically important to interview those other
25    witnesses as soon as possible after you receive
```



1                    Raniero Masecchia

2    that information?

3            A.    Yes.

4            Q.    Whether or not those witnesses had been

5    interviewed before or not?

6            A.    For the most part if they've already

7    been interviewed and statements taken from them, I

8    would assume the job is already done --

9            Q.    Well, if --

10           A.    -- if it wasn't, then I would do it.

11           Q.    That's fair.  Let me -- let me add

12   another factor to it.  If you receive admissions

13   from a suspect --

14           A.    Yes.

15           Q.    -- that con -- about witnesses,

16   including about witnesses, and those witnesses have

17   already given interviews contradicting that

18   information, you're going to want to re-interview

19   those witnesses, correct, with the new information?

20           A.    Somewhere down the road I would assume

21   they -- either through the DA's office they would

22   be brought in to -- to testify and everything would

23   be reviewed.

24           Q.    Well, as a homicide detective, to the

25   extent you can, you want to re-interview those



1                   Raniero Masecchia

2  witnesses, correct --

3          MR. RUSS:  Objection to form.

4          BY MR. BRUSTIN:

5          Q.   -- that's your job, pre-arrest?

6          A.   Pre-arrest, while the investigation is

7  still going on, yes.

8          Q.   Okay.

9          A.   After the arrest, if statements are

10  already taken, the DA's office should handle that.

11          Q.   Okay.  Well, certainly, you continue to

12  investigate -- even after an arrest, you continue

13  to investigate crimes routinely, correct?

14          MR. RUSS:  Objection to form.

15          THE WITNESS:  Other crimes?

16          BY MR. BRUSTIN:

17          Q.   Same crime even after an arrest is

18  made, if you receive additional information --

19          A.   Yes.

20          Q.   -- you investigate?

21          A.   Yes.

22          Q.   Your job doesn't end with an arrest?

23          A.   No.

24          Q.   And, certainly, if you receive

25  information after an arrest that caused you to



1                    Raniero Masecchia
2   question the reliability of that arrest, it's even
3   more important that you investigate, correct?
4          A.   Yes, and I've done so.
5          Q.   Now, how was the homicide file kept in
6   1991 in the homicide unit?
7          MR. RUSS:  In general?
8          MR. BRUSTIN:  Yeah.
9          THE WITNESS:  It was being -- folders, not
10  like that, but manilla folders in the cabinet and
11  you'd -- like I said, you had the DA's copy in
12  there, the DA folder, the court folder, as we would
13  call it, the original file, and the work folder in
14  case there's anything added on to it, you know, if
15  you -- there's something you wanted to work with,
16  you take the work folder out with you and you had
17  to bring it out -- out of the office --
18          BY MR. BRUSTIN:
19          Q.   Okay.
20          A.   -- but the files never left the office
21  unless they were requested by the DA's office or by
22  a judge.
23          Q.   And then presumably there would be
24  copies maintained in the file, fair to say?  Or the
25  originals would stay in the file?



```
 1                    Raniero Masecchia
 2         Q.   Okay.  And you understood any time you
 3    were interviewing an eyewitness to a crime who
 4    potentially saw a perpetrator, one important
 5    question -- series of questions to ask them is to
 6    get as -- get as detailed a description of the
 7    perpetrator as they can get?
 8         A.   Yes.
 9         Q.   And you're looking for distinguishing
10    characteristics, for example?  One thing you're
11    looking for are distinguishing characteristics --
12         A.   Yes.
13         Q.   -- right?
14         A specific hair style, tattoos, specific
15    clothing items, those kinds of things?
16         A.   Yes.
17         Q.   And as a detective, you know how to ask
18    questions that get at that information?
19         A.   Yes.
20         Q.   But you want as detailed a description
21    as you can get from a witness, correct?
22         MR. RUSS:  Objection to form.  You may
23    answer.
24         THE WITNESS:  Yes.
25         BY MR. BRUSTIN:
```



1                    Raniero Masecchia

2          Q.   All right.  And that's important for a

3     variety of reasons, correct?

4          MR. RUSS:  Objection to form.

5          THE WITNESS:  Yes.

6          MR. RUSS:  You may answer.

7          BY MR. BRUSTIN:

8          Q.   One reason is you want to ascertain as

9     a detective whether or not this witness had

10    sufficient ability to see the suspect to make a

11    subsequent ID?

12         A.   Yes.

13         Q.   Another reason is you're going to want

14    to ascertain whether or not to the extent they make

15    any kind of identification later on, whether that

16    identification is consistent with the person they

17    described?

18         A.   Yes.

19         Q.   Those are basic things that you're

20    looking for as a homicide detective, correct?

21         A.   Yes.

22         Q.   Another basic question you want to ask

23    any eyewitness to a crime is whether or not is

24    there -- you want to ask them questions that are

25    geared towards ascertaining their ability to see



1                  Raniero Masecchia

2   the crime?

3          A.   To what?

4          Q.   To ascertain their ability to see the

5   crime.

6          A.   See it?

7          Q.   Yes.

8          A.   Yeah.

9          Q.   And hear it potentially?

10          A.   Right.

11          Q.   Where were they standing, for example,

12   right?

13          A.   Yeah.

14          Q.   Were they under the influence of drugs

15   or alcohol at the time?

16          A.   If -- yeah, that's a good question to

17   ask, but sometimes you don't ask it if the person

18   seems coherent, lucid, and -- you know.

19          Q.   Okay.  But if you got a -- if you got

20   a --

21          A.   I don't -- I don't ask that all the

22   time --

23          Q.   Okay.

24          A.   -- were you drunk, were you under the

25   influence, unless the person was at a bar.  You



```
 1                    Raniero Masecchia
 2   know, every -- every one is different --
 3            Q.   Sure.
 4            A.   -- every interview, every statement is
 5   different.
 6            Q.   But you understood that whether or not
 7   a witness was drinking or doing drugs could affect
 8   their ability to make a reliable identification?
 9            A.   Yes.
10            Q.   And so, for example, if you have -- if
11   you have a school teacher who witnessed a crime in
12   their classroom, you might not ask that person --
13            A.   Right.
14            Q.   -- whether they were drunk?
15            A.   That's correct.
16            Q.   But if you have a witness who was
17   hanging out with his friends --
18            A.   But today, you never know.  They might
19   be high while they're doing --
20            MR. SAHASRABUDHE:  I was going to say, I
21   know some teachers.
22            BY MR. BRUSTIN:
23            Q.   But if you have a --
24            A.   No, but I understand.  And that's what
25   I'm saying.  There's -- in a statement, you could
```



1                       Raniero Masecchia

2    ask -- after I take a statement, I could go over my

3    own statement and say --

4            BY MR. BRUSTIN:

5            Q.   All right.

6            A.   -- there's 22 more questions I could

7    have asked.

8            Q.   Okay.

9            A.   All right?  It's on every one.  There's

10   10,000 questions you could --

11           Q.   Right.

12           A.   -- ask, but you're limited in your

13   time, the case is ongoing, you want to get the most

14   accurate description you can of the incident, and

15   that person later on is going to be able to testify

16   in court as to his statement and expand on it if

17   necessary.  That's the way I always --

18           Q.   All right.  But as a homicide

19   detective, if you're interviewing an eyewitness to

20   a murder --

21           A.   Correct.

22           Q.   -- you take generally as much time as

23   you need to get the information you need, correct?

24           A.   That's correct.

25           Q.   If it takes two hours, you take two



1                    Raniero Masecchia

2   hours?

3           A.    Right.

4           Q.    All right.  And --

5           A.    And most of them do.

6           Q.    All right.  And if you have a -- if you

7   have a witness who is hanging out with his friends

8   at 1:00 in the morning in front of a hotdog joint

9   when they see a homicide, one of the questions

10  you're going to ask is, Had you been drinking?

11  Right?

12          A.    I guess, yes.  It would be a good

13  question.

14          Q.    All right.  But one of your jobs as a

15  homicide detective is to evaluate the credibility

16  and reliability of the witnesses that you come into

17  contact with, correct?

18          A.    In what way?

19          Q.    You're -- you're constantly assessing

20  in your own mind and in conversations --

21          A.    If he's being truthful, if he's lying.

22          Q.    That's right.  Something you're always

23  assessing?

24          A.    You might have an opinion on that, but

25  if he's willing to swear to it and testify in



```
 1                   Raniero Masecchia
 2   put a line-up together, if the person misidentifies
 3   someone and picks the wrong person, it's normal.
 4        Q.   Okay.
 5        A.   It could happen.
 6        Q.   No, of course.  I think you're
 7   misunderstanding me.
 8        You understood that there were rules and
 9   regulations and training in place that were
10   designed to prevent a witness from making a mistake
11   to the extent possible?
12        A.   The only thing I'm preventing is to
13   taint it in any way.
14        Q.   That's another way of saying the same
15   thing I think.
16        A.   Making sure they -- they don't see the
17   person before the line-up, making sure they don't
18   see us putting the photo array together or in what
19   position we put the suspect in.  Everything is done
20   in a --
21        Q.   Right.
22        A.   I don't care who he picks out.
23        Q.   Okay.
24        A.   I do care, because I want to solve the
25   murder, but if he picks out the wrong person, he
```



1                    Raniero Masecchia

2    picks out the wrong person.

3        Q.   Right.  Another way of saying it is you

4    want to avoid any suggestion -- suggestions

5    whatsoever in the process?

6        A.   Right.

7        Q.   And you want to avoid any suggestion

8    before, during, or after the ID procedure, correct?

9        A.   Yes, except after the ID procedure if

10   he picked out the correct person, I have to have

11   him sign a document relating to that and telling

12   them who he picked out.

13       Q.   Right.  But you would never say to

14   them, You picked out Joe Brown and, by the way, Joe

15   Brown is the person we suspected, we think you got

16   the right guy?

17       A.   No.

18       Q.   That would be suggestive?

19       A.   Right.

20       Q.   Or, Joe Brown committed other crimes in

21   the area, we think he did this.  You would never

22   say that?

23       A.   No.

24       Q.   Because that would improperly

25   strengthen their ID potentially?



```
 1                    Raniero Masecchia
 2         A.    It would taint it --
 3         Q.    Yes.
 4         A.    -- very much so.
 5         Q.    Now, in Buffalo in 1991, I take it
 6   there were three separate ways you could do
 7   identifications.  You could do a photo array,
 8   correct, that's one?
 9         A.    Yes.
10         Q.    You could do an in-person physical
11   line-up?
12         A.    Yes.
13         Q.    And under a very limited set of
14   circumstances, you could show a witness the actual
15   suspect one-on-one or a picture of the suspect?
16         A.    I've never done that.
17         Q.    Okay.  Maybe they didn't do that in
18   Buffalo.  Some places, what they were allowed to
19   do, is within minutes of the crime --
20         A.    Within minutes of the crime if the
21   suspect was there, I believe we could do a
22   one-on-one person --
23         Q.    Okay.
24         A.    -- at the time --
25         Q.    All right.
```



1              Raniero Masecchia

2       A.   -- within minutes of the crime.

3       Q.   All right.  But other than that, your

4  understanding is certainly by 1991 in Buffalo, you

5  could never show a witness an individual photo or

6  the suspect one-on-one other than minutes after the

7  crime?

8       A.   Right.

9       Q.   Okay.  And the only way you could do an

10 identification procedure with an eyewitness in

11 Buffalo was either you could show them a six-person

12 photo array --

13      A.   Correct.

14      Q.   -- with one suspect in the photo array?

15      A.   Yes.

16      Q.   Or you could show them a six-person

17 in-person line-up --

18      A.   Yes.

19      Q.   -- with one suspect?

20      A.   Yes.

21      Q.   And in both instances, it was your job

22 to ensure that you had fillers that either

23 looked -- either looked consistent with the suspect

24 or looked consistent with the description of the

25 suspect?



```
 1              Raniero Masecchia
 2       A.   Yeah, you tried your best.
 3       Q.   Okay.  And I guess another way that you
 4  would be able to show photos to witnesses would be
 5  through mug books; is that correct?
 6       A.   We didn't use mug books.
 7       Q.   You didn't use mug books?
 8       A.   We had them, but in '86 when I got up
 9  there, they didn't -- they didn't use mug -- mug
10  books anymore.
11       Q.   Okay.
12       A.   They were strictly with the folder.
13  I -- folder six.
14       Q.   All right.  So just so I'm clear now,
15  because I want to make sure I understand all the
16  different possibilities in 1991.
17       In 1991, other than a few minutes after the
18  crime, there would never be a reason to show a
19  witness an individual photo of a suspect, correct?
20       A.   Right.
21       Q.   The only permissible way to show them a
22  photograph of a suspect or that suspect in person
23  would be through a six-person photo array or a
24  six-person line-up?
25       A.   Right.
```



 1              Raniero Masecchia

 2      Q.    There would never be a reason -- a

 3 legitimate law enforcement reason to show witnesses

 4 pictures for any -- in any other way, correct, of

 5 individuals?

 6      A.    Correct.

 7      Q.    The only legitimate way to show

 8 eyewitnesses photos in Buffalo in 1991 in homicide

 9 investigation was through those two mechanisms,

10 photo array or a line-up?

11      A.    To the best of my recollection, that's

12 all we used.

13      Q.    And that was clear through training and

14 policy?

15      A.    Right.

16      Q.    Without exception?

17      A.    Correct.

18      Q.    And any time that you were conducting a

19 photo array --

20      A.    Right.

21      Q.    -- you've already told us how important

22 it was not to provide any suggestion to the witness

23 before, during, or after the array, correct?

24      A.    Correct.

25      Q.    And would you also agree that it was



1                       Raniero Masecchia

2    say yes.

3         Q.    Okay.  And sometimes even if you were

4    not the lead detective but it related to a witness

5    you were interviewing, you might read it?

6         A.    Yes.

7         Q.    And you would -- if there wasn't

8    sufficient information in the report, you might go

9    to that officer and ask them questions?

10        A.    It depends.  Yes, no.  Why not just go

11   to the person who you interviewed --

12        Q.    Okay.

13        A.    -- and get the -- get the answers.

14        Q.    All right.  Well, what it appears

15   happened from this report is that within less than

16   15 minutes after the crime, this officer

17   interviewed a woman named Sonja James, correct?

18        A.    Right.

19        Q.    That's what this report describes,

20   right?

21        A.    Yes.

22        Q.    And it appears that while he was

23   interviewing this witness within minutes of the

24   crime, Valentino Dixon, his name was mentioned on

25   the radio as a possible suspect in this homicide,



```
 1                    Raniero Masecchia

 2   correct?

 3          A.   Yes.

 4          MR. RUSS:  Is that what the report says?

 5          THE WITNESS:  That's what it says.

 6          BY MR. BRUSTIN:

 7          Q.   Okay.  And so it appears -- assuming

 8   this report is an accurate description, it appears

 9   that very soon after the crime, Valentino Dixon's

10   name was mentioned as a suspect to the dispatcher,

11   such that the dispatcher put his name out over the

12   radio?

13          MR. RUSS:  Objection to form.  You may

14   answer.

15          THE WITNESS:  Yes.

16          BY MR. BRUSTIN:

17          Q.   Okay.  And it appears that this officer

18   accurately documented that?

19          A.   Yes.

20          MR. RUSS:  Does the report say that Dixon's

21   name was mentioned over the radio?

22          BY MR. BRUSTIN:

23          Q.   So I don't care about the question he's

24   asking you.  I don't want you to answer his

25   questions.  I want you to --
```



```
 1                    Raniero Masecchia

 2          A.   Not -- I would --

 3          Q.   Okay.

 4          A.   -- but a patrolman is -- no, I wouldn't

 5   expect that to be in the report.

 6          Q.   All right.  And, certainly, I've spoken

 7   to Ms. James and she told us that right after the

 8   shooting, she went down the street to speak to the

 9   police officers.

10          A.   Okay.

11          Q.   You certainly have no reason to dispute

12   that, correct?

13          A.   No.

14          Q.   And there's nothing inconsistent with

15   this report about her talking to the police right

16   after the shooting?

17          A.   Right.

18          Q.   And the most reasonable reading of this

19   report is that soon after they arrived, she

20   approached them, correct?

21          A.   Yes.

22          MR. RUSS:  Objection to form.

23          BY MR. BRUSTIN:

24          Q.   All right.  And so you don't -- there's

25   nothing in this -- and it appears that if she -- if
```



1                        Raniero Masecchia

2    she heard Valentino's Dixon -- Valentino Dixon's

3    name over the dispatch radio in the car, that would

4    mean that someone before that had to have provided

5    that information to the dispatcher, correct?

6            MR. RUSS:  Objection to form.

7            THE WITNESS:  Yeah.  You would have to

8    assume that, yes.

9            BY MR. BRUSTIN:

10           Q.   The dispatcher wasn't making up

11   suspects on their own, right?

12           A.   No.

13           Q.   Okay.  Somebody had to have provided

14   that information to the dispatcher sometime before?

15           A.   Correct.

16           MR. RUSS:  Objection to form.

17           BY MR. BRUSTIN:

18           Q.   All right.  And so there is nothing in

19   this report about how Valentino Dixon became a

20   suspect sometime likely soon after 1:39 in the

21   morning, correct?

22           A.   That's correct.

23           Q.   Only that he was?

24           A.   Correct.

25           Q.   All right.  So what you would expect to



1                      Raniero Masecchia

2    see in the file is another document indicating how

3    and why Valentino Dixon became a suspect, correct?

4          MR. RUSS:  Objection to form.  You may

5    answer.

6          THE WITNESS:  I'm assuming there should be a

7    P73 somewhere how Valentino Dixon became the

8    suspect.

9          BY MR. BRUSTIN:

10         Q.   Right.  Why was Valentino's Dixon's

11   name -- in other words, a document explaining why

12   Valentino Dixon's name was mentioned by the

13   dispatcher sometime soon after 1:39 in the morning,

14   correct?

15         A.   Correct.

16         Q.   It would be particularly -- given that

17   Valentino Dixon was arrested, prosecuted, and

18   convicted of this crime, it would be particularly

19   important to know how he first became a suspect,

20   correct?

21         MR. RUSS:  Objection to form.  You may

22   answer.

23         THE WITNESS:  Yes.

24         BY MR. BRUSTIN:

25         Q.   Any information provided from any



```
 1                    Raniero Masecchia

 2   source as -- that put him on the police radar as a

 3   suspect, that's critically important information to

 4   document?

 5           A.   Yes.

 6           MR. RUSS:  Objection to form.

 7           BY MR. BRUSTIN:

 8           Q.   And if, for example, that information

 9   came from a witness who didn't want to be

10   identified or a confidential source, the

11   information would still have to be documented, it

12   would just have to say witness doesn't want to be

13   identified, correct?

14           A.   Yes.

15           Q.   Can you think of any exception to the

16   rule that the -- that the basis for how a homicide

17   suspect became a suspect has to be documented?

18           A.   I'm sure it's happened.

19           Q.   Okay.

20           A.   You know, police versus police officers

21   on the scene, maybe someone came up to him and

22   said, Valentino Dixon is the shooter.

23           Q.   Okay.

24           A.   Boom.  He puts that out over the air.

25   It's documented, but it's documented through the
```



1                    Raniero Masecchia

2  radio transmission.  Those are all recorded.

3          Q.   All right.  But what's --

4          A.   So those are documented --

5          Q.   Okay.  What's really --

6          A.   -- did he -- should he have written a

7  report on that?  Yeah, he should have documented

8  it.

9          Q.   All right.

10         A.   Does it happen that they don't?

11 That's --

12         Q.   Okay.  But what you want to know as a

13 homicide detective investigating this case --

14         A.   Yeah.  How did the name came up?

15         Q.   How did the name came up?  That's a

16 very basic important question you're going to want

17 to get an answer to.

18         A.   Yes.

19         Q.   And even if that information hadn't

20 been properly documented before, if you're a

21 detective asking that question, you document it

22 after the fact, correct?

23         MR. RUSS:  Objection to form.  You may

24 answer.

25         THE WITNESS:  I don't understand.



```
 1                   Raniero Masecchia

 2          BY MR. BRUSTIN:

 3          Q.   Sure.  So one of the basic questions

 4   you have, if you're a lead investigator on the

 5   case, or you're an investigator who is very

 6   involved in the case, is how did this person become

 7   on the radar?  You're going to try to ascertain

 8   that, correct?

 9          A.   Yes.

10          Q.   And if you ascertain how he became a

11   suspect, you're going to write it down, correct?

12          A.   Or I would tell the person, if he's a

13   police officer, to memorialize that --

14          Q.   Okay.

15          A.   -- for him to document it.

16          Q.   Either you write it down or they write

17   it down?

18          A.   Right.

19          Q.   Okay.  It's important information to

20   have in the file?

21          A.   Yeah, of course.

22          Q.   And if you can't find that information,

23   you don't know how he became a suspect, that's

24   important to write down?

25          In other words, for some reason, he was
```



```
 1                   Raniero Masecchia
 2   mentioned over the radio as a suspect, we don't
 3   know how that happened --
 4         A.    Well --
 5         Q.    -- that would be important to document?
 6         A.    I would think so.
 7         Q.    Take a look at page 113.
 8         MR. SOEHNLEIN:  I'm sorry.  Could you say
 9   the page again?
10         MR. BRUSTIN:  113.
11         MR. SOEHNLEIN:  Thank you.
12         BY MR. BRUSTIN:
13         Q.    I will represent to you that this is a
14   photograph of Valentino Dixon's -- of the white
15   Cadillac that Valentino Dixon drove during that
16   time period, which is parked within a block of the
17   crime scene.
18         A.    Okay.
19         Q.    Does that refresh your recollection --
20         A.    No.
21         Q.    -- about Valentino Dixon driving a
22   Cadillac, first of all?
23         A.    No.
24         Q.    Or his car being seen at the crime
25   scene?
```



```
 1                    Raniero Masecchia
 2   what he saw at the crime, correct?
 3           MR. RUSS:  What he told the former officers.
 4           MR. BRUSTIN:  What he told their -- yes.
 5           THE WITNESS:  I -- I don't know.
 6           BY MR. BRUSTIN:
 7           Q.   Okay.  Well, if you take a look at
 8   page 16, he's describing -- Vickerd is describing
 9   what John Sullivan allegedly told him about the
10   crime?
11           A.   I understand.  Where are we?  16?
12           Q.   Yeah.
13           Fight broke out --
14           A.   Right.
15           Q.   -- that's where it starts.
16           A.   Right.
17           Q.   Okay.  And according to Vickerd, John
18   Sullivan, on his own, mentions that he saw a black
19   male known to him as Tino go behind the van and
20   come out with a black Uzi.  Okay?  A very -- very
21   specific description of seeing someone he knows as
22   Tino walk to a van, come out from behind the van
23   carrying a specific type of weapon, correct?
24           A.   Correct.
25           Q.   That's a very specific recollection,
```



```
 1                   Raniero Masecchia

 2   correct?

 3          A.    Yes.

 4          Q.    And from this description, it appears

 5   that John Sullivan knows the person who committed

 6   this crime by name, Tino, right?

 7          A.    Yes.

 8          Q.    And he had an opportunity to not only

 9   see him do the shooting, but to watch him walk and

10   get the weapon, come back and then do the shooting,

11   right?

12          A.    That's what it says.

13          Q.    Suggests that he had a long opportunity

14   to see the suspect?

15          A.    Yes.

16          Q.    Okay.  Very important information to

17   follow up on or to be aware of, correct?

18          A.    Correct.

19          Q.    Then he goes on to say after going

20   behind the van getting the black Uzi, walking back

21   towards Torri, the person who died, he pointed it

22   and started firing, and that's when he was shot in

23   the leg.

24          A.    Okay.

25          Q.    Okay.  And then he gives a description
```



```
 1                    Raniero Masecchia

 2   of the person he knows as Tino, right?

 3            A.   Yes.

 4            Q.   And then he gives his real name,

 5   Valentino?

 6            A.   Yes.

 7            Q.   And according to this report, all of

 8   that information is volunteered by John Sullivan

 9   without any suggestion or any help from the police

10   officers whatsoever, correct?

11            A.   Yes.

12            Q.   And he goes further and says that after

13   observing the person he knows as Tino walk behind a

14   van, get a gun, walk up to Torri and shoot him, he

15   saw him continue to stand over Torri and keep

16   firing, correct?

17            A.   Yes.

18            Q.   And he is saying here that he saw all

19   of those things?

20            A.   Yes.

21            Q.   And at the bottom, it says, Subsequent

22   developments will be reported via additional P73s?

23            A.   That's a normal ending to all --

24            Q.   Okay.

25            A.   -- the P73s.
```



```
 1                    Raniero Masecchia
 2   don't know.  I -- I don't recall it.
 3          Q.   Fair enough.  So one important --
 4   because -- for the reasons you just described, one
 5   very important thing to do down the road --
 6          A.   Yeah, you could always come back to
 7   that.
 8          Q.   Let me finish.
 9          A.   You're right.
10          Q.   One very important thing down the road
11   to do by the detectives is to look at the two
12   statements and make sure there aren't any big
13   inconsistencies or gaps in information, correct?
14          A.   We let --
15          MR. RUSS:  Objection to form.
16          THE WITNESS:  -- the DA's office handle
17   that.
18          BY MR. BRUSTIN:
19          Q.   Well, the DA's office is not involved
20   until after the arrest, correct?
21          A.   Yes.
22          Q.   All right.  And so one of -- you've
23   already told us under oath that one of your jobs is
24   to follow up on inconsistencies.  Remember that?
25          A.   Yes.
```



```
 1               Raniero Masecchia
 2        Q.   Okay.
 3        MR. RUSS:  You've asked the question 12
 4   times --
 5        MR. BRUSTIN:  All right.
 6        MR. RUSS:  -- if you've asked it once.
 7        BY MR. BRUSTIN:
 8        Q.   And so to the extent that there are
 9   inconsistencies or gaps in information for an
10   important -- important witness like John Sullivan,
11   you have to follow up on it, correct?
12        MR. RUSS:  Objection to form.
13        THE WITNESS:  Yes.  If you see the
14   inconsistencies, yes.
15        BY MR. BRUSTIN:
16        Q.   All right.  And, by the way, as you --
17   as you're -- what you've -- what happened in this
18   case, like all cases --
19        A.   Right.
20        Q.   -- is as these witnesses are being
21   interviewed, especially in the homicide unit,
22   detectives are sitting outside the interview room
23   and they're talking about what's happening on the
24   case, right?
25        MR. RUSS:  Objection to form.
```



```
 1                     Raniero Masecchia

 2          THE WITNESS:  To?

 3          BY MR. BRUSTIN:

 4          Q.   To each other.  Homicide detectives, as

 5   you're writing your reports, you're talking to

 6   other officers about what they're finding on the

 7   case?

 8          A.   Possible.

 9          Q.   That's generally what you do?

10          A.   It's possible.

11          Q.   All right.  Now take a look at page 74.

12          A.   Yes, sir.

13          Q.   All right.  And this is a document you

14   have reviewed in preparation for today?

15          A.   Yes, I've gone over it.

16          Q.   All right.

17          MR. BRUSTIN:  And -- is that mine or yours?

18          MR. ROMO:  Yours.

19          BY MR. BRUSTIN:

20          Q.   You -- early in the interview, you

21   ask -- oh, by the way, this witness is 17 years

22   old, correct?

23          A.   Yes.

24          Q.   Any obligation in 1991 to get

25   permission from his parents or --
```



```
 1                   Raniero Masecchia
 2         A.   If he was a suspect I believe, but I
 3   don't think as a witness.
 4         Q.   Okay.  But obviously as a 17 year old,
 5   you have to be a little careful, correct?
 6         A.   Well, maybe 16, 15, 14.  17 is -- could
 7   be charged as an adult if he were a suspect in
 8   anything.
 9         Q.   Okay.  And, again, one of the first
10   things that he mentions to you when you ask him
11   what happened that night is that he's with his
12   friend, Fred Stencil?
13         A.   Where's that?  Yes.
14         Q.   Another mention of someone who
15   obviously has to be spoken to and interviewed,
16   correct?
17         A.   Yes.
18         Q.   All right.  And read this description
19   to yourself of the shooting.  Let me know when
20   you're done.
21         MR. RUSS:  Which description?
22         MR. BRUSTIN:  Just -- just -- just the first
23   Q --
24         THE WITNESS:  The first paragraph here?
25         MR. BRUSTIN:  -- substantive -- yeah, the
```



```
 1                  Raniero Masecchia
 2   big Q and A.  The first -- when he describes the
 3   crime in the top of the page.
 4         MR. RUSS:  It begins, I was with my friend?
 5         MR. BRUSTIN:  Yeah, I'm sorry.  So it
 6   begins, I was with my friend, and ends, They let me
 7   go home about 7:00.
 8         MR. RUSS:  Okay.
 9         THE WITNESS:  Okay.
10         BY MR. BRUSTIN:
11         Q.   So in this description that he gives to
12   you later that day, according to this description,
13   he specifically tells you that he did not see
14   anybody with a gun until somebody hollered, gun,
15   correct?
16         A.   Right.
17         Q.   Right?
18         MR. RUSS:  That's what it says.
19         THE WITNESS:  That's what it says.
20         BY MR. BRUSTIN:
21         Q.   And so the first time he's telling you
22   he saw someone with a gun was when the person he
23   knew to be Tino was standing over the victim,
24   correct?
25         A.   Right.
```



1                    Raniero Masecchia

2          Q.    In other words, directly contradicting

3     the statement he gave earlier where he said that he

4     saw the person he knew as Tino go and retrieve a

5     gun from behind a van, correct?

6          A.    Okay.

7          Q.    Completely different story, correct?

8          A.    Yes.

9          Q.    It can't both be true, correct?

10         A.    Yes.

11         Q.    In the version he gives to you, he

12    doesn't see him retrieve a gun, he doesn't even see

13    a gun until he's standing over the victim, correct?

14         A.    He heard the gun, he didn't see it

15    until he turned around and seen him standing

16    over --

17         Q.    All right.  And that's the kind of

18    contradiction that any homicide detective would

19    want to explore because it suggests that this

20    witness may not be reliable, correct?

21         MR. RUSS:  Objection to form.  You may

22    answer.

23         THE WITNESS:  I -- I would think so if you

24    had both things in front of you --

25         BY MR. BRUSTIN:



1                    Raniero Masecchia

2         Q.    Okay.

3         A.    -- you would question that.

4         Q.    Okay.  There -- there -- it's a

5    critical inconsistency about the most important

6    event in the case, correct?

7         MR. RUSS:  Objection to form.  You may

8    answer.

9         THE WITNESS:  Yes.

10        BY MR. BRUSTIN:

11        Q.    So to the extent that you are aware of

12   it during your interview, it would have been

13   important for you to question him about it,

14   correct?

15        A.    That --

16        MR. RUSS:  Objection to form.

17        THE WITNESS:  If I was --

18        MR. RUSS:  You may answer.

19        THE WITNESS:  -- aware of it.

20        BY MR. BRUSTIN:

21        Q.    And to -- and, obviously, as soon as a

22   detective became aware of it when they looked at

23   the reports, he had to be questioned about it?

24        MR. RUSS:  Objection --

25        THE WITNESS:  Yes, but I --



```
 1                  Raniero Masecchia

 2         Q.    On page 16.

 3         A.    Oh, I'm sorry.

 4         Q.    Beginning with, John describes.

 5         A.    Right.

 6         Q.    And here when he's speaking to Vickerd,

 7   for some reason he's able to give a much more

 8   specific description of what he was wearing,

 9   correct?

10         A.    I see that, yes.

11         Q.    No explanation for why that is,

12   correct?

13         A.    No.

14         Q.    Certainly not something that you

15   followed up on?

16         A.    Not that I recall, no.

17         Q.    And no idea if anybody else followed up

18   on that?

19         A.    I don't.

20         Q.    Obviously important to follow up on

21   that, though, correct?

22         A.    I would think so.

23         Q.    Now, on page 75, it indicates that

24   during this interview, you also showed him a

25   six-person array, correct?
```



1                    Raniero Masecchia

2          A.   Yes, sir.

3          Q.   And even though this witness had

4    already identified Valentino Dixon as somebody he

5    knew and somebody he, according to Vickerd, he

6    claimed did the shooting, you still were careful to

7    only show him a picture of Valentino Dixon among a

8    six-person photo array, correct?

9          A.   Yes.

10         Q.   Because you understood, even under

11   these circumstances, it would have been

12   inappropriate to show him an individual mug shot,

13   correct?

14         A.   Yes.

15         Q.   Of Valentino Dixon or anybody else?

16         A.   Yes.

17         Q.   And you didn't do that?

18         A.   No.

19         Q.   And, to your knowledge, nobody else

20   did?

21         A.   No.

22         Q.   Because that would have been totally

23   contrary to procedure?

24         A.   That's something I would never do.

25         Q.   Okay.  That would be highly suggestive,



```
 1                    Raniero Masecchia
 2    correct?
 3            A.    Very.
 4            Q.    Okay.  Now, you did not ask
 5    Mr. Sullivan any questions about whether he was
 6    drinking or doing drugs that evening, correct?
 7            A.    Not that I can see here, no.
 8            Q.    All right.  Now, at the -- at the
 9    trial, Sullivan testified, I'll represent to you,
10    that that night he had been drinking malt liquor,
11    he had a couple of beers, and that he had earlier
12    in the day smoked marijuana with cocaine.
13            A.    Okay.
14            Q.    And you would agree, I take it, that
15    that's -- that's a question you probably should
16    have asked him?
17            MR. RUSS:  Objection to form.
18            THE WITNESS:  I guess.  I didn't.
19            BY MR. BRUSTIN:
20            Q.    Okay.  That's something you probably
21    should have --
22            A.    I didn't.
23            Q.    -- asked, right?
24            A.    Yes.
25            Q.    Okay.  And -- now, another thing that
```



1                    Raniero Masecchia

2   John Sullivan testified at the trial, and this is

3   on the stand on page 220 -- at page 222.

4        He testified that he told the police that

5   Valentino was between 5-foot and 10 and 6 feet

6   tall, that the police typed a statement, but

7   there's a lot of things that were typed that he

8   didn't really put in.  That's what John Sullivan

9   testified to.

10        A.   Okay.

11        Q.   Now, I take it that you deny typing any

12   words or statements from -- from John Sullivan that

13   he didn't actually state, correct?

14        A.   That's correct.

15        Q.   And you deny failing to document any

16   information that John Sullivan gave you during this

17   statement, correct?

18        A.   Yes.

19        Q.   In other words, you didn't stop typing

20   and fail to put in information that you didn't want

21   to put in, correct?

22        A.   Correct.

23        Q.   You typed everything that he said and

24   everything --

25        A.   Correct.



```
1                       Raniero Masecchia

2          Q.   -- you said?

3          And that was the procedure, correct?

4          A.   Yes.

5          Q.   Not just for you, but for any officer?

6          A.   Yes.

7          Q.   In 1991 and at all times when you were

8    a homicide detective?

9          A.   Yes.

10         Q.   Again, a very basic rule?

11         A.   Yes.

12         Q.   Okay.  Now, you would agree -- I think

13   you told us earlier that to the best of your

14   recollection, you don't remember ever showing

15   witnesses, in this case or any case as a homicide

16   detective, mug books; is that right?

17         A.   Yeah, I don't.

18         Q.   Okay.  Is it possible that you've done

19   it and don't remember it?

20         A.   No.

21         Q.   You don't think that happened?

22         A.   No.

23         Q.   All right.  But you would agree,

24   though, that to the extent you ever showed a

25   suspect mug books or mug photos of any kind, that
```



```
 1                    Raniero Masecchia
 2    conclusion.
 3            THE WITNESS:  I'm -- I'm sure it was one of
 4    the things that was taken into consideration was my
 5    statement --
 6            BY MR. BRUSTIN:
 7            Q.   I'm sorry.
 8            A.   -- that was taken --
 9            Q.   The only --
10            A.   -- not the only thing.
11            Q.   Well, the only thing that's mentioned
12    is the John Sullivan statement here, correct?
13            A.   Well, that's whoever made this report
14    out --
15            Q.   Right.
16            A.   -- but I don't know if that's the only
17    basis, or if it was, so be it.
18            Q.   Fair enough.  The only basis stated on
19    this arrest affidavit from Stambach is the
20    statement you took from John Sullivan, correct?
21            A.   That's --
22            MR. SAHASRABUDHE:  Object to the form of the
23    question.
24            BY MR. BRUSTIN:
25            Q.   You agree, sir?
```



```
 1                    Raniero Masecchia

 2          A.   I -- yeah.  What I read in this

 3   statement, yes.

 4          Q.   Okay.  And so this is August 10th.

 5   Now, if you take a look -- page 158 and 159.

 6          And this is the statement that you took a

 7   little more than a day later at 1:30 in the morning

 8   of a man named Leonard Brown, correct?

 9          A.   Yes.

10          Q.   And I take it this is a statement that

11   you reviewed in preparation for today?

12          A.   Yes.

13          Q.   And you understand, I take it, today

14   that around the same time that you were taking a

15   statement from Leonard Brown, Stambach was taking a

16   statement from LaMarr Scott, correct?

17          MR. SAHASRABUDHE:  Object to form.

18          THE WITNESS:  I don't know, but I'll agree

19   with it if it's in there.

20          BY MR. BRUSTIN:

21          Q.   You didn't see any -- you haven't seen

22   any --

23          A.   I don't remember that.

24          Q.   Okay.  And you haven't reviewed any

25   documents suggesting that?
```



 1              Raniero Masecchia

 2        Q.   Now, obviously, independent from the

 3  district attorney, if you received information

 4  suggesting -- withdrawn.

 5        If you're the lead detective on a case and

 6  you receive information suggesting that you

 7  arrested the wrong person --

 8        A.   Right.

 9        Q.   -- you have an independent obligation

10  to investigate that, fair to say?

11        A.   Yes, and it was done right here.

12        Q.   Well, this isn't an investigation.

13  This is taking a statement.

14        A.   It's part --

15        MR. RUSS:  Objection to form.

16        THE WITNESS:  -- of the investigation.

17        BY MR. BRUSTIN:

18        Q.   Okay.  And another part of the

19  investigation would be to interview other witnesses

20  at the scene about what this person is reporting;

21  that would be another part, correct?

22        A.   That would be up to the DA's --

23        Q.   So I'm --

24        A.   -- office.

25        Q.   -- not asking who makes the decision.



1              Raniero Masecchia

2    I'm just asking you what the investigation would

3    include.

4         MR. RUSS:  He's trying to answer your

5    questions as best he can.

6         BY MR. BRUSTIN:

7         Q.  All right.  So let me be clear.  I'm

8    now not asking you a question about who would

9    determine what steps would be taken, I'm asking you

10   what a proper investigation would include.

11        A.  I would -- I would hope that the

12   follow-up would be done.

13        Q.  Okay.  Now I'm asking you -- I'm not

14   asking you about who would direct the follow-up --

15        A.  Right.

16        Q.  -- I'm asking you what an appropriate

17   follow-up investigation would include based on your

18   experience.  Okay?

19        A.  Okay.

20        Q.  All right.  You would agree one thing

21   an appropriate follow-up investigation would

22   include would be interviewing witnesses at the

23   scene?

24        MR. RUSS:  Objection to form.

25        THE WITNESS:  All of them?



```
 1                 Raniero Masecchia
 2         MR. RUSS:  You may answer.
 3         BY MR. BRUSTIN:
 4         Q.   People who might have relevant
 5    information about --
 6         A.   Yes.
 7         Q.   -- this.
 8         MR. RUSS:  Objection to form.  You may
 9    answer.
10         BY MR. BRUSTIN:
11         Q.   It would include potentially showing
12    photo arrays to witnesses of this new potential
13    suspect?
14         A.   Yes.
15         Q.   And obviously documenting whatever you
16    did?
17         A.   Yes.
18         Q.   Now, you would agree that the last
19    thing you would ever want to do when -- and --
20    withdrawn.
21         Did you also in preparation for today read
22    the statement that LaMarr Scott gave --
23         A.   No.
24         Q.   -- at the same time?
25         A.   No.  I just -- they just gave me
```



 1                    Raniero Masecchia
 2   whatever my name was on.
 3        Q.   All right.  Now, no question that one
 4   of the things that you and Stambach would have been
 5   doing as you were doing these interviews is either
 6   during the interviews or before the interviews or
 7   after the interviews, or all three, you would have
 8   been talking about what you were learning?
 9        MR. RUSS:  Objection to form.  You may
10   answer.
11        THE WITNESS:  I don't recall.
12        BY MR. BRUSTIN:
13        Q.   All right.  I understand you don't
14   recall.  You don't recall any of it, but would
15   you -- you would agree at a minimum, you and
16   Stambach would have been discussing what you
17   learned from these witnesses after the interviews?
18        MR. RUSS:  Objection to form.  You may
19   answer.
20        BY MR. BRUSTIN:
21        Q.   Pursuant to your practices.
22        A.   I'm sure we --
23        MR. RUSS:  Objection to form.
24        THE WITNESS:  I'm sure we --
25        MR. RUSS:  You may answer.



```
 1                    Raniero Masecchia

 2          THE WITNESS:  -- did.

 3          THE REPORTER:  Hold on.  Just -- sir,

 4   please, if somebody else is talking --

 5          THE WITNESS:  Oh, I didn't --

 6          THE REPORTER:  -- I really need --

 7          THE WITNESS:  -- hear him.

 8          MR. RUSS:  Sorry.

 9          THE REPORTER:  -- you to just wait.

10          Go ahead.

11          THE WITNESS:  I'm sure at some point we did.

12          BY MR. BRUSTIN:

13          Q.   Now, you would agree that the last

14   thing a homicide detective acting in good faith

15   would ever want to do when interviewing a witness

16   like Leonard Brown or LaMarr Scott claiming that

17   you have the wrong person would be to try to coerce

18   them into changing their story, correct?

19          A.   Yes.

20          Q.   To threaten them --

21          A.   Yes.

22          Q.   -- with repercussions if they continue

23   to tell the story?

24          A.   Yes.

25          Q.   You might question the veracity of the
```



1                    Raniero Masecchia

2  story, right?

3           A.   Yes.

4           Q.   But you would never try to strong-arm

5  them into changing it, correct?

6           A.   Correct.

7           Q.   And you would -- like any witness, you

8  would want to ask them open-ended questions about

9  the information they were providing you?

10          A.   Yes.

11          Q.   And other witnesses who could

12  corroborate it?

13          A.   Yes.

14          Q.   And for any physical evidence that they

15  might be able to provide you?

16          A.   Okay.

17          Q.   You agree, right?

18          A.   I agree.

19          Q.   And so if, for example, LaMarr Scott

20  came in and said, I committed this murder, and in

21  fact, when I committed the murder, I got blood on

22  my shoes and it's the shoes I'm wearing now.  Would

23  you like to have those shoes --

24          A.   Yes.

25          Q.   -- if something like that happened --



1                        Raniero Masecchia

2    through like in this case?

3            A.    Yes.

4            Q.    Now, you would agree that -- would it

5    be fair to say that there is -- although you don't

6    remember it, there's no question that you would

7    have actually physically seen LaMarr Scott and

8    Leonard Brown when they were brought into the

9    homicide office?

10           A.    Quite possibly, yes.

11           Q.    Okay.  And you've already told us how

12   important it is to do an objective investigation

13   into information, including information that you

14   have the wrong person, correct?

15           A.    Correct, yes.

16           Q.    And in some ways, that's even more

17   important to carefully investigate that type of

18   information as compared to innocent -- evidence of

19   guilt, correct?

20           A.    Yes.

21           Q.    All right.  And you would agree that

22   the last thing a detective would ever do acting in

23   good faith is to tell a witness who came in and

24   said, You have the wrong person, No, we've got who

25   we want, we don't want to hear it, that's the last



```
 1                  Raniero Masecchia
 2   thing you would do, correct?
 3        A.   Yes.
 4        Q.   You wouldn't want to make any kind of
 5   statement to that witness that could seem coercive
 6   or threatening, correct?
 7        A.   Correct.
 8        Q.   Even -- even a subtle threat would be
 9   completely inappropriate, correct?
10        A.   A what threat?
11        Q.   A subtle threat.
12        A.   Yes.
13        Q.   Your only job is to get their
14   information and to follow up on it, correct?
15        A.   Yes.
16        Q.   You would never say something like, Get
17   your story -- get your story straight and then come
18   back.  That would never be something you would
19   say --
20        A.   No.
21        Q.   -- to witnesses?
22        That would never be appropriate, correct?
23        A.   Correct.
24        Q.   Now, you would agree that based -- one
25   of the things you became good at as a homicide
```



1                    Raniero Masecchia

2    opposed to saying, this person looked to be

3    20 years old?

4          MR. RUSS:  Objection to form.  You may

5    answer.

6          THE WITNESS:  I'll agree with you on that.

7          BY MR. BRUSTIN:

8          Q.   Okay.  Now, take a look at page 197.

9          A.   97?

10         MR. RUSS:  197.

11         THE WITNESS:  Okay.

12         BY MR. BRUSTIN:

13         Q.   Now, I will represent to you that

14   according to multiple sources, LaMarr Scott was a

15   big man, as big as 210 or 220 pounds at the time;

16   do you recall reading that or learning that?

17         A.   No, I --

18         Q.   Any reason to dispute that?

19         A.   No.

20         Q.   Okay.  Do you understand, at least as a

21   basic matter, that LaMarr Scott was a much heavier

22   man than Valentino Dixon?

23         A.   I'll concede to that.  I don't know.

24         Q.   All right.  But, certainly, you

25   understand from looking at documents that Valentino



```
 1                    Raniero Masecchia
 2    Dixon was thin?
 3           A.   Yes.
 4           Q.   All right.  Now, take a look --
 5           MR. RUSS:   The documents say that Valentino
 6    Dixon was thin, not -- not that he knew.
 7           MR. BRUSTIN:   That's correct.   That's what I
 8    meant to say.
 9           BY MR. BRUSTIN:
10           Q.   Take a look at page -- you may have
11    known at the time, you don't remember now?
12           You probably knew it at the time, but you
13    don't remember it today?
14           A.   Yeah, I don't recall any of that today.
15           Q.   All right.  Take a look at page 197.
16           A.   I am, sir.
17           Q.   All right.  And this is the interview
18    of LaMarr Scott a day later who claims he did the
19    shooting, right?
20           A.   Yes.
21           Q.   The same time you're interviewing
22    Leonard Brown, right?
23           A.   I believe so, yes.
24           Q.   And we know that Stambach did the
25    interview of Emil Adams a day before, you just saw
```



```
 1                    Raniero Masecchia
 2   that, right?
 3           A.   Yes.
 4           Q.   And take a look at -- and we know that
 5   LaMarr Scott is a heavyset man, correct?
 6           A.   Yes.
 7           MR. RUSS:  You've represented that, yes.
 8           BY MR. BRUSTIN:
 9           Q.   All right.  And if you take a look,
10   what it says here about eight Q and As down on
11   page 197 beginning with, what were you wearing that
12   night?
13           MR. RUSS:  Right here.
14           THE WITNESS:  Yes.
15           BY MR. BRUSTIN:
16           Q.   Okay.  And he's describing that he was
17   wearing a white T-shirt and a white hat, right?
18           A.   Yes.
19           Q.   Those are two distinct descriptive
20   pieces of clothing?
21           A.   Excuse me?
22           Q.   They're distinct descriptive pieces of
23   clothing, correct?
24           A.   Yes.
25           Q.   And they track what Emil Adams says he
```



```
 1                    Raniero Masecchia
 2   saw the shooter wearing?
 3           MR. RUSS:  Objection to form.  You may
 4   answer.
 5           THE WITNESS:  From what I read, yes.
 6           BY MR. BRUSTIN:
 7           Q.   And he -- and Emil Adams also describes
 8   seeing a heavyset man, not a thin man, right?
 9           A.   Yes.
10           Q.   Yet, somehow -- withdrawn.
11           So, first of all, when LaMarr Scott comes in
12   and says -- and is obviously a heavyset man, big
13   man --
14           A.   Okay.
15           Q.   -- and says he was wearing a white hat
16   and a white T-shirt, one of the most important
17   things to do would be to go back to Emil Adams and
18   say, Wait a minute.  Has there been a terrible
19   mistake here?  Did you actually see LaMarr Scott,
20   the person who was wearing a white hat, a white
21   shirt, and was heavyset?
22           MR. RUSS:  Objection.
23           BY MR. BRUSTIN:
24           Q.   That'd be the first thing any homicide
25   detective would want to do, correct?
```



```
 1              Raniero Masecchia
 2         THE WITNESS:  It should be followed up, and
 3  I think it was.
 4         BY MR. BRUSTIN:
 5         Q.   Okay.  Oh, you do?  When was it
 6  followed up?
 7         A.   I don't know when or what.  I -- that's
 8  what I would do --
 9         Q.   Okay.
10         A.   -- and I think it would have been
11  followed up.
12         Q.   And one question you -- if you're a
13  detective acting in good faith, when Emil Adams
14  describes the shooter as being heavyset and then
15  identifies Valentino Dixon who is a very thin
16  build, that's a red flag, right?
17         MR. RUSS:  Objection to form.
18         MR. SOEHNLEIN:  Objection to form.
19         MR. RUSS:  Go ahead.
20         THE WITNESS:  To certain people it would be
21  a red flag.
22         BY MR. BRUSTIN:
23         Q.   And it's really a red flag when LaMarr
24  Scott comes in a day later who is heavyset and
25  says, I was the shooter, right?
```



1                    Raniero Masecchia

2          MR. RUSS:  Objection to form.

3          MR. SOEHNLEIN:  Objection to form.

4          THE WITNESS:  That's why the statement was

5     taken, I'm assuming.

6          BY MR. BRUSTIN:

7          Q.   And, obviously, all of those things had

8     to be followed up on, regardless of who did it,

9     correct?

10         A.   And I'm sure they were, one way or the

11    other.

12         Q.   Well, first of all, you agree that

13    those are critically important issues to follow up

14    on, correct?

15         A.   Yes.

16         Q.   And regardless of who directed it, you

17    would have expected to see a re-interview of Emil

18    Adams soon after that statement was taken, correct?

19         A.   I don't know.

20         Q.   Well, my -- my question is not whether

21    it happened.

22         A.   You're asking me what steps should be

23    taken --

24         Q.   That's correct.

25         A.   -- or should have been taken --



```
 1              Raniero Masecchia
 2         THE WITNESS:  He also --
 3         MR. RUSS:  Don't -- don't answer.
 4         BY MR. BRUSTIN:
 5         Q.   So let me ask you a different way.  You
 6    would agree that as a detective acting in good
 7    faith, as soon as you receive information that you
 8    might have the wrong person, you want to do
 9    everything in your power to investigate that
10    information, correct?
11         MR. RUSS:  Objection to form.  You may
12    answer.
13         THE WITNESS:  And I believe it was.  I mean,
14    in my head, I -- yeah, it was.
15         BY MR. BRUSTIN:
16         Q.   Okay.  Well, you have no memory or
17    understanding as to anything that happened here,
18    correct?
19         A.   Well, I have no memory that it didn't
20    happen.
21         Q.   All right.  Now, obviously it would
22    have been completely inappropriate -- withdrawn.
23         You saw a document representing -- Stambach
24    representing that Emil Adams was shown a photo
25    array with Valentino Dixon in the photo array,
```



1                    Raniero Masecchia

2      believe Bradley had provided a description of both

3      the shooter and the female driver; do you recall

4      that?

5           A.   I --

6           MR. RUSS:  Does he recall his testimony?

7           THE WITNESS:  I recall it now that you told

8      me that, but I -- I haven't really reviewed my

9      testimony --

10          BY MR. BRUSTIN:

11          Q.   Okay.

12          A.   -- since I gave it.

13          Q.   But my saying it reminds you that, in

14     fact, Bradley had described both?

15          A.   If that's what I said in my statement,

16     yes.

17          Q.   I'll represent to you that's what you

18     said in your deposition.

19          A.   Okay.

20          Q.   That was your recollection at the time?

21          A.   Yes.

22          Q.   And, certainly, you recall that Cory

23     Epps was in fact identified by Ms. Bradley as the

24     shooter?

25          A.   Yes.



```
 1                   Raniero Masecchia

 2        Q.   And that formed the basis of the

 3   prosecution of Cory Epps?

 4        A.   Yes.

 5        Q.   And Cory Epps was subsequently

 6   convicted based on the testimony of Ms. Bradley?

 7        A.   Yes.

 8        Q.   And in fact, that was really the only

 9   evidence against Epps?  There was no physical

10   evidence, no other evidence of any kind, correct?

11        A.   Yes.

12        MR. RUSS:  Objection to form.

13        THE WITNESS:  Oh, I'm sorry.

14        BY MR. BRUSTIN:

15        Q.   Yes, in that you agree with me,

16   correct?

17        A.   Yes.

18        Q.   It was a single witness ID, nothing

19   more?

20        A.   Yes.

21        Q.   And you understood by -- certainly by

22   the time of the Epps case -- what was that '98?

23   '97?

24        A.   I don't recall the exact date.  It

25   could have been '97.
```



```
 1                   Raniero Masecchia
 2  that time that single witness ID cases were -- were
 3  frowned upon?
 4        MR. RUSS:  Objection to form.
 5        THE WITNESS:  I don't believe so at that
 6  time they were frowned upon, but I think they
 7  were --
 8        BY MR. BRUSTIN:
 9        Q.   It was a bad question.  Let me
10  withdrawn the question.
11        A.   -- tough ones to bring to trial --
12        Q.   All right.
13        A.   -- you know.
14        Q.   You understood as a -- as a detective
15  by 1997 or 1998 that if all you had was a single
16  witness identification, that could be problematic
17  and you wanted to gather more evidence if you
18  could?
19        A.   Yes.
20        Q.   Because for the simple reason that
21  sometimes eyewitnesses make mistakes?
22        A.   Yes.
23        Q.   You always wanted to have more than a
24  single witness ID?
25        A.   Yes.
```



```
 1                    Raniero Masecchia
 2         Q.   And so you knew that as lead
 3   investigator in the Epps case --
 4         A.   I did.
 5         Q.   -- that's all the evidence you had?
 6         A.   Yes.
 7         Q.   And did that cause you to have some
 8   question, not about probable cause, but about
 9   whether or not Cory Epps was actually the
10   perpetrator?
11         A.   Some question?
12         Q.   Yeah, in your mind, did you have -- I'm
13   sure -- you have cases -- let me ask you this way:
14   I'm sure you had cases in your career where you
15   were certain you had the right guy and other
16   cases --
17         THE REPORTER:   Hang on.   Slow down.   I'm
18   sure you had cases in your ...
19         BY MR. BRUSTIN:
20         Q.   I'm sure you had cases in your career
21   where you felt very confident that you had the
22   right perpetrator and other cases where you felt
23   less certain.   Was Cory Epps a case where you felt
24   less certain?
25         A.   Probably on the lesser side, yes.
```



 1                   Raniero Masecchia

 2          Q.    Crime scene detective?

 3          A.    Yeah, they were the evidence unit and

 4   they were also in charge of line-ups.

 5          Q.    Now, Ms. Bradley testified in her

 6   deposition that she recalled during the

 7   investigation being shown photo books in addition

 8   to being shown the photo array.

 9          MR. RUSS:  You're representing that to him?

10          MR. BRUSTIN:  I am, and that's at page 6

11   and 7 of her deposition of the Epps case.

12          THE WITNESS:  Photo books?

13          BY MR. BRUSTIN:

14          Q.    Photo books.  In other words, books

15   containing photos, like mug book books.  Do you

16   recall ever doing that with her?

17          A.    No.

18          Q.    All right.  Would it be fair to say,

19   though, to the extent that you were lead detective

20   on the case, if that happened, either by you or by

21   another detective, it had to be documented?

22          A.    Yes.

23          Q.    And you also recall from the Epps

24   deposition that in addition to doing both the photo

25   array and the line-up, you also interviewed



1                    Raniero Masecchia

2          A.   They caught the case, yes.

3          Q.   Right.  But it appears that other

4   detectives on the case, including Stambach in

5   particular, conducted a lot of the investigative

6   activities?

7          A.   Yes.

8          Q.   And that was different than the Epps

9   case where you actually caught the case and did

10  most of the investigative activities?

11         A.   In that case, yes.  They're all

12  different.

13         Q.   But in the Epps case, you were the lead

14  investigator and you were a true lead investigator,

15  you really did the work?

16         MR. RUSS:  Objection to form.  You may

17  answer.

18         THE WITNESS:  Whatever work needed to be

19  done that could have been done, I did, but there

20  were other detectives also involved in the case.

21         BY MR. BRUSTIN:

22         Q.   Okay.  But most -- just from what we've

23  talked about already --

24         A.   Yeah.

25         Q.   -- most of the key investigative



```
 1                   Raniero Masecchia
 2   activities, the line-up, the photo array, the
 3   investigation of -- the interview of Epps, you
 4   conducted those yourself?
 5           A.   I was involved in -- in most of that,
 6   yes.
 7           Q.   Okay.  Now, at the time you were
 8   deposed in the Epps case, you -- you acknowledged
 9   that you were familiar with the name Wymiko
10   Anderson?
11           A.   I became familiar with it later --
12           Q.   Okay.
13           A.   -- not at the time of the
14   investigation.
15           Q.   Okay.  And you understood -- whenever
16   you became aware of it, you understood that she was
17   part of a separate investigation from Means
18   involving the murder of a man named Paul Pope?
19           A.   Yes.
20           Q.   All right.  And you came to learn,
21   according to you, that Ms. Anderson had provided a
22   statement in regard to the Paul Pope murder on or
23   about April 17th of 1998, correct?
24           A.   She gave that statement in April of
25   1998?
```



```
 1                   Raniero Masecchia

 2          MR. ROMO:  Wymiko.

 3          BY MR. BRUSTIN:

 4          Q.   Wymiko, I'm sorry.  Wymiko Anderson

 5   came in after Epps had been convicted --

 6          A.   Okay.

 7          Q.   -- and claimed that her boyfriend,

 8   Russell Montgomery, killed Paul Pope.

 9          A.   I do -- I know that now, yes.

10          Q.   Okay.  And you understand that

11   according to Wymiko Anderson, Paul Pope, her

12   boyfriend, told her in 1997 that Russell Montgomery

13   actually killed Tameka Means, that's what she's

14   claiming today.

15          A.   That's what she's claiming?

16          Q.   Yes.

17          A.   Okay.

18          Q.   And according to Wymiko Anderson, you

19   know that today, she claims that when she came to

20   the precinct, the homicide office, in April of 1998

21   and reported that Russell Montgomery killed Paul

22   Pope, she claims that she also told the detectives

23   who interviewed her that Russell Montgomery killed

24   Tameka Means, correct?  You know that's what she

25   claims today?
```



```
 1                  Raniero Masecchia
 2        A.   I don't.  I don't recall.
 3        Q.   Okay.  You don't remember anything that
 4   you did?
 5        A.   I don't.
 6        Q.   You don't remember if, in fact, you did
 7   anything?
 8        A.   Correct.
 9        Q.   Your memory on that is a complete
10   blank?
11        A.   Yes.  Everything I say would be
12   guessing --
13        Q.   Right.
14        A.   -- and I don't want to guess at it.
15        Q.   Fair enough.
16        A.   I do not recall.
17        Q.   You know that you received information
18   from Wymiko Anderson that it was her boyfriend who
19   killed Meaks and not Epps, you just don't remember
20   anything you did with that information?
21        A.   Correct.
22        Q.   And, in fact, you don't remember if you
23   did, in fact, do anything with that information?
24        MR. RUSS:  Objection to form.  You may
25   answer.
```



```
 1                    Raniero Masecchia

 2          THE WITNESS:  I don't recall.

 3          BY MR. BRUSTIN:

 4          Q.   And would it be fair to say that to the

 5   extent you conducted any investigative activities

 6   concerning that information from Wymiko Anderson,

 7   even if it was post-conviction, that information --

 8   that investigation had to be documented?

 9          A.   Okay.

10          Q.   You agree, right?

11          A.   Okay.

12          Q.   I'm asking if you agree.  I don't --

13          A.   Yes.

14          Q.   Okay.  And so to the extent that you

15   conducted any investigative activities, that --

16   that should be in the Means homicide file today?

17          A.   Yes.

18          Q.   Any report you created, any notes you

19   created, those would be in the file?

20          A.   Yes.

21          Q.   And, obviously, that would help you

22   remember what, if anything, you did once you

23   learned of these allegations?

24          A.   Yes.

25          Q.   Now, one of the things -- I want to
```



```
 1                    Raniero Masecchia
 2          BY MR. BRUSTIN:
 3          Q.   No, I'm sorry.  I apologize.
 4          A.   161, okay.
 5          Q.   Oh, I'm sorry.  Yeah, take a minute.
 6          Just a couple of follow-ups on this.  Did
 7   you -- when you -- you said -- I think you said you
 8   reviewed this document before, correct?
 9          A.   This one?
10          Q.   Yes.
11          A.   Yes.
12          MR. RUSS:  You mean when he met with us?
13          MR. BRUSTIN:  Yeah.  I think I -- maybe I
14   misunderstood, but I think he said --
15          THE WITNESS:  Yeah, this is one of the ones
16   that --
17          MR. RUSS:  Right.
18          THE WITNESS:  -- you gave me.
19          BY MR. BRUSTIN:
20          Q.   Okay.  So I know you don't remember it
21   today, but this -- this document references before
22   LaMarr Scott and Leonard Brown were interviewed,
23   LaMarr Scott made a statement on the news
24   concerning his involvement in the crime, correct?
25          A.   In what order was that?
```



1                    Raniero Masecchia

2          Q.   So before you interviewed LaMarr Scott

3   and you interviewed Leonard Brown -- before

4   Stambach interviewed LaMarr Scott while you were

5   interviewing Leonard Brown --

6          A.   Right, right.

7          Q.   -- according to this memo, LaMarr Scott

8   made a statement about his involvement in the

9   killing, his shooting -- him being the shooter on

10  the news.

11         A.   Yeah, that's what it says here.

12         Q.   Okay.  And I take it you don't remember

13  that today?

14         A.   No.

15         Q.   All right.  Obviously, you would have

16  known that at the time, correct?

17         MR. RUSS:  That he was on TV?

18         MR. BRUSTIN:  Yes.

19         BY MR. BRUSTIN:

20         Q.   Before you interviewed --

21         A.   Yes.

22         Q.   -- LaMarr Scott, you would have --

23         A.   I think that's --

24         Q.   -- known that, right?

25         A.   -- what it says here, yes.



1                    Raniero Masecchia

2          Q.    That doesn't happen every day, right?

3     Suspects --

4          A.    No.

5          Q.    -- don't go and confess on TV?

6          A.    Right.

7          Q.    That would have been a big deal, right?

8          A.    Right.

9          Q.    And you have no recollection of it

10    today?

11         A.    No.

12         Q.    Okay.  But, certainly, you would have

13    known that at the time you interviewed Leonard

14    Brown?

15         A.    Yes.  I was there, so I must have known

16    about it.

17         Q.    Take a look at page 202.

18         A.    202.  Okay.

19         Q.    Did you review this report in

20    preparation for today?

21         A.    I believe so.

22         Q.    Do you have any recollection of -- of

23    these activities?

24         A.    No.

25         Q.    All right.  But no question that you



1

2  STATE OF NEW YORK )

3                          ss:

4  COUNTY OF ERIE    )

5

6      I DO HEREBY CERTIFY as a Notary Public in and

7  for the State of New York, that I did attend and

8  report the foregoing deposition, which was taken

9  down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18

19                    

20                    _____
                      DANIELLE FETZER,
21                    Notary Public.

22

23

24

25