EXHIBIT 12

```
                    VIDEO DEPOSITION
                  JOHN THOMAS VICKERD


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

-----------------------------------------
VALENTINO DIXON,

                        Plaintiff,

             - vs -      Case No.
                         1:19-cv-01678-WMS

CITY OF BUFFALO and COUNTY OF ERIE;
and DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA, DETECTIVE
JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN, JOHN DOES,
Unknown Buffalo Police Department Supervisors,
and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
BELLING, in their individual capacities,

                        Defendants.
-----------------------------------------
```

        Video recorded deposition of JOHN THOMAS

VICKERD Defendant, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of

HODGSON RUSS LLP, The Guaranty Building, 140 Pearl

Street, Suite 100, Buffalo, New York, on March 24,

2022, commencing at 10:08 a.m., before ANDREA J.

HOBBS, Notary Public.



 1                    John Vickerd
 2  So you -- you worked closely with Lonergan on many
 3  cases, correct?
 4          A.    Yes.
 5          Q.    Okay.  And what you would -- what you
 6  would have done if you went to the scene and what
 7  you would have expected Lonergan to do, is to talk
 8  to the police officers who had gotten them -- who
 9  had gotten there before him to ask them questions
10  about what they had learned, correct?
11          MR. RUSS:  Objection to form.
12          MS. PERSICO:  Form.
13          MR. RUSS:  You may answer.
14          THE WITNESS:  I would believe so.  Yes.
15          BY MR. BRUSTIN:
16          Q.    Okay.  That's certainly what you would
17  have done when you got to the scene of a homicide
18  when a police officer had -- when police officers
19  had been there for some minutes before you got
20  there, correct?
21          A.    That's --
22          MR. RUSS:  Objection to form.  You may
23  answer.
24          THE WITNESS:  That's what I would -- that's
25  what I would have done, yes.



```
 1                      John Vickerd
 2         BY MR. BRUSTIN:
 3         Q.   Okay.  And what you'd be looking for is
 4    potential witnesses, correct?
 5         A.   Depends on the circumstances.
 6         Q.   If there's a shooting with 100 people
 7    there, one of the things you're going to be asking
 8    the police officers who respond to the scene is are
 9    there any potential witnesses, right?
10         A.   Yes, because they -- they should
11    have -- did they or did they not approach the
12    police officers before I got there, yes.
13         Q.   And you're going to want to know has
14    anyone mentioned any suspects, are there any
15    suspects in mind, correct?
16         A.   Yep.  That would be the general
17    knowledge, yes.
18         Q.   That's a basic question that any
19    homicide detective would ask the police officers
20    when they get to the scene of a crime?
21         A.   Correct.
22         Q.   And as soon as a suspect is mentioned,
23    you're going to want to ascertain who that suspect
24    is, correct?
25         A.   If a suspect was mentioned to them,
```



```
 1                    John Vickerd
 2   yes.
 3          Q.   Okay.  And -- and start investigating?
 4          A.   If the subject was under investigation,
 5   then yes.
 6          Q.   All right.  But that's the basic --
 7   that's the kind of basic question you ask police
 8   officers at the scene of a homicide when you get
 9   there?
10          A.   Correct.
11          MR. RUSS:  Objection to form.  You may
12   answer.
13          BY MR. BRUSTIN:
14          Q.   Now, so just based on -- you mentioned
15   you -- you had a chance to read your report,
16   correct?
17          A.   I did.
18          Q.   All right.  And it looks like so you
19   get -- you get to headquarters at -- at
20   approximately 1:45 in the morning?
21          A.   Correct.
22          Q.   And then you go to -- you're directed
23   at some point thereafter, probably within 15,
24   20 minutes, you're directed to go to the hospital.
25   Does that sound about right?
```

1                      John Vickerd

2    scenes or at hospitals with victims and you would

3    want to know what, if anything, they learned that

4    could help your case, right?

5            MR. RUSS:  Objection to form.  You may

6    answer.

7            THE WITNESS:  Yes.

8            BY MR. BRUSTIN:

9            Q.   All right.  And so you spoke to PO --

10   PO O'Neill and then you went back -- then you went

11   for the first time to the crime scene, correct?

12           A.    Bailey and East Delavan, yes.

13           Q.    And how far is that from the hospital?

14           A.    That was from ECMC, no more than like

15   five minutes.

16           Q.    Okay.  So probably at this point you've

17   done all the things you've done, going to

18   headquarters, going to ECMC, going to the crime

19   scene.  Probably something like 3:00 or so in the

20   morning, sound right, maybe a little later?

21           A.    I believe so, yes.

22           Q.    Okay.  And then you go from -- after

23   you go to the crime scene, you speak to Lonergan?

24           A.    Correct.

25           Q.    And you -- and you -- you fill him in



1                         John Vickerd

2   on the information you've gathered, right?

3          A.   Yes.

4          Q.   Okay.  And, again, this would be the

5   time when you'd be talking to Lonergan, you'd be

6   talking to police officers about what information

7   they've gathered.

8          Are there any witnesses, are there any

9   suspects, those are the kinds of questions you're

10  asking, right?

11         A.   I -- I would -- I would not recollect,

12  but I would reason that that would be the case,

13  yes.

14         Q.   Okay.  And then after that, you go --

15  you learn about another victim and -- in the

16  hospital, John Sullivan, correct?

17         A.   Yes.  That would be at Sisters

18  Hospital.

19         Q.   Okay.  And how far is Sisters Hospital

20  from the scene?

21         A.   Probably another 10 minutes.

22         Q.   Okay.  So it was sometime 3:30, 4:00

23  you're at Sisters Hospital, sound about right?

24         A.   About right, yes.

25         Q.   All right.  And you're going there --



```
 1                      John Vickerd
 2   presumably, correct me if I'm wrong, but based on
 3   this report, you're going there to interview a
 4   victim in an effort to try to determine who
 5   committed this crime, correct?
 6          A.   Yes.
 7          Q.   And then you describe an interview that
 8   you had at that hospital with John Sullivan,
 9   correct?
10          A.   Yes.
11          Q.   And you don't put a time, but it has to
12   be sometime after 3:00, 3:30 in the morning, right?
13          A.   I would assume so, yes.
14          Q.   And I take it you understood you were
15   obligated to document all the information that he
16   provided to you, correct?
17          A.   Yes.
18          Q.   And all the information you provided to
19   him, correct?
20          A.   Correct.
21          Q.   And I take it -- you mentioned what a
22   careful and meticulous detective you were.  I take
23   it that within -- withdrawn.
24          Later that evening, John Sullivan is
25   questioned by Detective Masecchia in a formal Q&A.
```



1                       John Vickerd

2          THE WITNESS:  It could have been a phone

3    call, it could have been somebody with a -- I don't

4    know, a difference of opinion.  I have no idea.

5          BY MR. BRUSTIN:

6          Q.   Wherever it came from, it would be

7    important that that information be documented,

8    correct?

9          MR. RUSS:  Objection to form.  You may

10   answer.

11         THE WITNESS:  I never worked in another

12   squad besides what I told you.

13         BY MR. BRUSTIN:

14         Q.   Okay.  Now, so it sounds like you have

15   no idea if you knew by the time that you got to

16   John Sullivan in the hospital, as to whether or not

17   Valentino Dixon was a suspect, correct?

18         MS. PERSICO:  Objection to form.

19         MR. RUSS:  Objection to form.  You may

20   answer.

21         THE WITNESS:  According to my report, he

22   mentioned somebody by the name of Tino and said

23   that the first name was Valentino.

24         He did not report that the name was Dixon

25   and that's just what I wrote and do I remember



```
1                      John Vickerd

2  writing it, no.

3           BY MR. BRUSTIN:

4           Q.   So I'm asking you a totally different

5  question than the one you just answered so I want

6  you to answer my question.

7           My question is, when you went to the

8  hospital to visit with John Sullivan, you don't

9  recall today one way or another whether you had

10 learned by that point in time that Valentino Dixon

11 was a suspect in the case, correct?

12          MS. PERSICO:  Form.

13          THE WITNESS:  Do I remember?  No, I don't.

14          BY MR. BRUSTIN:

15          Q.   You don't know one way or the other,

16 correct?

17          A.   Correct.

18          Q.   And you can't tell from the report

19 whether or not you asked John Sullivan whether he

20 knew Valentino Dixon before he told you that he was

21 the shooter, correct?

22          MS. PERSICO:  Objection to form.

23          MR. RUSS:  Objection to form.  You may

24 answer.

25          THE WITNESS:  No, I don't.
```



```
1                        John Vickerd

2          BY MR. BRUSTIN:

3          Q.   You don't know one way or another

4   whether or not you talked to him about

5   Valentino Dixon before he said Valentino Dixon was

6   the shooter, correct?

7          MR. RUSS:  Objection to form.  You may

8   answer.

9          MS. PERSICO:  Form.

10         THE WITNESS:  No.

11         BY MR. BRUSTIN:

12         Q.   And obviously this reports is not a

13  verbatim account, not an exact account of

14  everything you said to John Sullivan and everything

15  John Sullivan said to you, correct?

16         A.   If I wrote it back 28, 30 years ago and

17  it was typed the way I wrote it, yes, it would be

18  exact.

19         Q.   All right.  Well, let me try it a

20  different way.  So take a look at page -- your

21  report's on page 15 and 16.  Okay?  Let me know

22  when you're there.

23         A.   I've got 15 and 16.

24         Q.   All right.  Look at the bottom of

25  page 15 where it says your writer.  Do you see
```



```
 1                    John Vickerd
 2  that?
 3        A.   Your writer then proceeded to Sisters
 4  Hospital.
 5        Q.   No.
 6        A.   That area?
 7        Q.   Your writer then spoke with
 8  John Sullivan.  The bottom of the page.
 9        A.   With John Sullivan, yeah.
10        Q.   Okay.  Read that all the way through
11  the next page.  Let me know when you're done.
12        MR. RUSS:  The whole next page?
13        MR. BRUSTIN:  Yeah.
14        THE WITNESS:  It's just short.
15        MR. RUSS:  Okay.
16        THE WITNESS:  Well, kind of short.
17        MR. BRUSTIN:  If you need to.  You've read
18  it just a moment ago, but if you want to refresh
19  your recollection, that's fine.
20        THE WITNESS:  Yeah.  This is where he
21  mentioned Tino.
22        BY MR. BRUSTIN:
23        Q.   Yes, sir.
24        A.   Last name unknown.  And what he was
25  wearing.  Okay.
```



 1                    John Vickerd

 2         Q.   All right.  And so -- and by the way,

 3   you never reviewed even this report prior to today,

 4   you haven't looked at this report for many years,

 5   correct?

 6         A.   Correct.

 7         Q.   But you would agree that what you're

 8   attempting to do here is you're attempting to

 9   summarize the important information that

10   John Sullivan provided to you, correct?

11         MR. RUSS:  Objection to form.  You may

12   answer.

13         THE WITNESS:  I would have back at that

14   time, yes.

15         BY MR. BRUSTIN:

16         Q.   You're not writing down every word you

17   said to him and every word that he said to you,

18   correct?

19         A.   No.  I've got -- my next page is 17 and

20   it's got handwritten notes by me.

21         Q.   Okay.  The handwritten notes I will

22   represent to you almost directly track what --

23   what's in this report.

24              Was it your process to simply read that into

25   a -- a Dictaphone and have it typed up?



```
 1                    John Vickerd

 2        A.   No.  I would have handed it to the

 3   secretary and she would have typed it up for me.

 4        Q.   Okay.  So when you were taking notes of

 5   your meeting with John Sullivan, you did not

 6   include in your notes every word that you said to

 7   him and every word that he said to you, you tried

 8   to summarize what you thought was important,

 9   correct?

10        MR. RUSS:  Objection to form.  You may

11   answer.

12        THE WITNESS:  I believe so, yes.

13        BY MR. BRUSTIN:

14        Q.   All right.  For example, you -- you

15   don't -- you haven't written any of the questions

16   that you asked him in this report, correct?

17        A.   Correct.

18        Q.   And there's nothing in this report that

19   describes what information, if any, you had about

20   Valentino Dixon prior to this meeting, correct?

21        MR. RUSS:  Objection to form.

22        MS. PERSICO:  Form.

23        MR. RUSS:  You may answer.

24        THE WITNESS:  I didn't read my handwritten

25   notes, but I would believe so, yes.
```



```
 1                        John Vickerd

 2            BY MR. BRUSTIN:

 3            Q.   I mean, it was a little tough to read

 4    for me.  But it appears to me when you look at

 5    them, that they almost directly track your report.

 6            And is that -- is that the process, you

 7    would hand your notes to the secretary and she

 8    would type them up?

 9            MS. PERSICO:  Form.

10            MR. RUSS:  Objection to form.  You may

11    answer.

12            THE WITNESS:  Yes.  It would have been the

13    secretary in the office and she would have typed it

14    up and I would have reread it at that time.

15            BY MR. BRUSTIN:

16            Q.   Okay.  In any case, you would agree

17    though that based on your review of this report

18    today, there's nothing in this report indicating

19    what, if anything, you knew about Valentino Dixon

20    prior to this interview, correct?

21            MR. RUSS:  Objection to form.

22            MS. PERSICO:  Form.

23            MR. RUSS:  You may answer.

24            MS. PERSICO:  How many times are you going

25    to ask this question?
```



```
 1                     John Vickerd
 2          THE WITNESS:  According to this report, yes.
 3          BY MR. BRUSTIN:
 4          Q.   According to this report, there's no
 5   information about it, it doesn't say anything about
 6   it, correct?
 7          A.   Correct.
 8          MR. RUSS:  Objection to form.
 9          MS. PERSICO:  Form.
10          MR. RUSS:  You may answer.
11          BY MR. BRUSTIN:
12          Q.   You don't know, for example --
13   withdrawn.
14          And you can't tell from this report whether
15   or not you spoke -- you spoke to John Sullivan
16   about Valentino Dixon prior to him telling you that
17   Valentino Dixon or Tino was the shooter, correct?
18          MS. PERSICO:  Form.
19          MR. RUSS:  Objection to form.  You may
20   answer.
21          THE WITNESS:  By reading --
22          BY MR. BRUSTIN:
23          Q.   I didn't hear you.
24          A.   -- this report from this many years
25   ago, no.
```



1                        John Vickerd

2        Q.    All right.  And by the way, you don't

3   know, for example, whether or not prior to this

4   interview, you knew that Valentino Dixon's nickname

5   was Tino, correct?

6        A.    I did not know, no.

7        Q.    Well, are you telling me you remember

8   you didn't know?

9        A.    No.

10       Q.    How could you -- how could you remember

11  that today?

12       A.    Because I'm reading this report and it

13  says that he gave me that information and that's

14  the first time I've heard Tino mentioned.

15       Q.    Where does it say that, that that's the

16  first time you heard Tino mentioned?

17       A.    Let me get back to the page that was

18  typewritten.  It's easier to read.  It's actually

19  not Torri, it's Tino -- it's Torri, not Tino

20  fighting Mario and his name is Mario last name

21  unknown.

22       MR. RUSS:  Yeah.  No, I think --

23       THE WITNESS:  And here's Tino.  Is -- is --

24  is -- yeah, Tino is -- name is Valentino, last name

25  unknown.



```
 1                      John Vickerd

 2          BY MR. BRUSTIN:

 3          Q.   But he doesn't know the last name.  It

 4  doesn't mean you don't know the last name, right?

 5          A.   Do --

 6          MR. RUSS:  Objection to form.

 7          THE WITNESS:  Do I recall back from then, no

 8  I don't.

 9          BY MR. BRUSTIN:

10          Q.   This report doesn't indicate -- this

11  report indicates that he doesn't known the name

12  Tino.  He doesn't know Valentino's last name,

13  correct?

14          In other words, let me -- let me ask you a

15  better question.  Okay?  There's nothing in this

16  report that indicates whether or not you had heard

17  the name Tino prior to this interview, correct?

18          MS. PERSICO:  Form.

19          THE WITNESS:  Yes.

20          BY MR. BRUSTIN:

21          Q.   You don't know one way or the other

22  whether you did or didn't, correct?

23          MR. RUSS:  Objection to form.  You may

24  answer.

25          THE WITNESS:  I don't remember Tino being
```



```
 1                        John Vickerd
 2  observed the crime?
 3           MS. PERSICO:  Objection.
 4           MR. RUSS:  Objection to form.  You may
 5  answer.
 6           THE WITNESS:  At the time, they -- somebody
 7  should have been aware of that I would imagine
 8  talking to -- to an individual that was a witness.
 9           BY MR. BRUSTIN:
10      Q.   Well, so this is your report of your
11  interview with John Sullivan.  There's no mention
12  of drugs or alcohol in this -- in this report,
13  correct?
14      A.   Correct.
15      Q.   Is it your testimony though that you
16  may have talked with him about that and it just
17  didn't make its way into the report?
18           MS. PERSICO:  Objection.
19           MR. RUSS:  Objection to form.  You may
20  answer.
21           THE WITNESS:  If I would have noted that
22  back at that time, it would have been in my report.
23           BY MR. BRUSTIN:
24      Q.   All right.  But I -- I think what you
25  just told me -- and you correct me if I'm wrong.
```



```
 1                    John Vickerd
 2   what he saw during the homicide?
 3        MS. PERSICO:  Objection to form.
 4        MR. RUSS:  Objection to form.  You may
 5   answer.
 6        THE WITNESS:  How I remember the type of
 7   detective work I did back then, yes.
 8        BY MR. BRUSTIN:
 9        Q.   And would it be fair to say that you
10   were attempting to carefully and meticulously
11   document what he told you about what he saw and
12   heard during the homicide?
13        MS. PERSICO:  Objection to form.
14        THE WITNESS:  According to this report, it's
15   what he -- how he described Tino.
16        BY MR. BRUSTIN:
17        Q.   So my question is at the time, was it
18   your process to carefully and meticulously document
19   what a witness to a homicide told you about what
20   they saw and heard during the homicide?
21        A.   According to back that date, yes.
22        Q.   And you would agree that there's
23   nothing in this report indicating that
24   Valentino Dixon's last name is unknown to you,
25   correct?
```



1                        John Vickerd

2   that.  As you sit here today, you have no

3   recollection of it, you don't know whether or not

4   you learned about it at the time, correct?

5        A.    Correct.

6        Q.    All right.  And would it be fair to say

7   that -- well, first of all, can you remember any

8   other case that you were involved in or even heard

9   about in the Buffalo Police Department where

10  somebody was arrested for a homicide and somebody

11  else came in and confessed to the crime?

12       MR. RUSS:  Objection to form.  You may

13  answer.

14       THE WITNESS:  I wish I could tell you I did,

15  but I haven't and I don't remember and no, not --

16  not once.  Not once that I recall.

17       BY MR. BRUSTIN:

18       Q.    Okay.  Now, is that something you think

19  is an issue of memory or you think that's probably

20  never happened before?

21       A.    That could be part of both.

22       Q.    Okay.  Fair enough.  In any case, you

23  have no memory of it today?

24       A.    Correct.

25       Q.    Would it be fair to say though that to



```
 1                      John Vickerd
 2          A.   It's possible.
 3          MR. RUSS:  Objection to form.  You may
 4    answer.
 5          BY MR. BRUSTIN:
 6          Q.   Now, you would agree that there is a
 7    lot of information in this statement that needs to
 8    be followed up on, correct?
 9          MR. RUSS:  Objection to form.  You may
10    answer.
11          THE WITNESS:  Yes.
12          BY MR. BRUSTIN:
13          Q.   For example, there needs to be an
14    investigation into trying to locate the gun,
15    correct?
16          A.   I saw in this question and answer sworn
17    statement that he threw it away.
18          Q.   Right.  So there needs to be a search
19    for where he claims to have thrown the gun, right?
20          A.   That would have -- that would have been
21    normal procedure.
22          Q.   And -- and that -- and that
23    investigation needs to be documented, correct?
24          A.   If it was found, it should have been,
25    yes.
```



1                        John Vickerd

2        Q.   Or if it wasn't found, it had to be

3   documented that it was searched for and not found,

4   correct?

5        A.   It should have been back then, yes.

6        Q.   And the statement that he fired at

7   Torriano Jackson because Torriano Jackson was

8   firing at him, that also -- that information had to

9   be investigated, correct?

10        MR. RUSS:  Objection to form.  You may

11   answer.

12        THE WITNESS:  That would have been

13   advisable, yes.

14        BY MR. BRUSTIN:

15        Q.   And that -- and that investigation had

16   to be documented?

17        A.   Correct.

18        MS. PERSICO:  My fuse is like this short

19   right now.

20        BY MR. BRUSTIN:

21        Q.   Now, if you take a look at -- you

22   see -- do you recall from reading this just a

23   moment ago that there are questions about any

24   threats or promises that were made to him including

25   by Valentino's family?



 1                    John Vickerd

 2          MR. RUSS:  Does he remember reading that

 3    today?

 4          MR. BRUSTIN:  Yes.

 5          THE WITNESS:  No, I didn't.

 6          BY MR. BRUSTIN:

 7          Q.   Take a look at page 198 at the top.

 8    About five lines down, have there been any threats

 9    or promises made to you.

10          A.   No was the answer.

11          Q.   Yeah.  And then take a look at

12    page 199.

13          A.   Yeah.  He said he got --

14          Q.   About middle of the page, did Tino's

15    mother make you turn yourself in.  Do you see that?

16          A.   Yes, I did.

17          Q.   Another important area to follow up on

18    and investigate based on this information is what,

19    if any, interaction he had with -- with Valentino's

20    family, correct?

21          MR. RUSS:  Objection to form.  You may

22    answer.

23          THE WITNESS:  Yes.

24          BY MR. BRUSTIN:

25          Q.   Take a look at page 207 and just read



```
 1

 2  STATE OF NEW YORK    )

 3                            ss:

 4  COUNTY OF ERIE)

 5

 6       I DO HEREBY CERTIFY as a Notary Public in and

 7  for the State of New York, that I did attend and

 8  report the foregoing deposition, which was taken

 9  down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18

19       _____

20       ANDREA J. HOBBS,
         Notary Public.

21

22

23

24

25
```

