# EXHIBIT 29

**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
*Valentino Dixon v. City of Buffalo and County of Erie; and Detective Mark R. Stambach, Detective*
*Raniero Masecchia, Detective James P. Lonergan, Detective John Vickerd, Chief Richard T. Donovan,*
*John Does, Unknown Buffalo Police Department Supervisors, and Assistant District Attorney*
*Christopher Belling, in their individual capacities* (Case No. 19-cv-01678)

**Report Date: August 1, 2023**

**I. Overview and Credentials of Dr. Dysart**

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. In January 2023, I was contacted by attorneys representing Mr. Valentino Dixon and asked to review materials in the above referenced case and provide my opinions regarding the eyewitness identification evidence relating to the wrongful conviction of Mr. Dixon for the 1991 murder of Torriano Jackson and the shooting of Aaron Jackson and John Sullivan. On September 19, 2018, Mr. Dixon's murder and assault convictions were vacated, the charges were dropped, and Mr. LaMarr Scott pled guilty to killing Mr. Jackson. I am being compensated for my time writing this report at my standard rate of $375/hr. My fee for testimony (deposition and trial) is $500/hr.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have given testimony as an eyewitness expert approximately 85 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Illinois, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in Conviction Review Units in several states including the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

***Publications:*** I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

***Presentations:*** I have given more than 180 presentations over the past 25 years on Eyewitness Identification at Psychology conferences and at conferences attended by judges, attorneys, police officers, investigators,

1

law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

***Curriculum Vitae:*** My complete academic curriculum vitae is attached to this report as Appendix B.

## II. Materials Reviewed in this Case

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with all available relevant materials related to the eyewitness evidence in the case, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the following materials, plus other materials cited in this report:

1. Civil Complaint for Dixon v. City of Buffalo et al., Case No. 19-cv-01678
2. Mug Shot of Suspects (undated)
3. Polaroid of LaMarr Scott
4. Erie County Arrest and Booking Form for Valentino Dixon, File No. 90-6388, dated April 1990
5. Erie County Arrest and Booking Form for Valentino Dixon, File No. 91-5088, dated March 1991
6. Erie County Arrest and Booking Form for Valentino Dixon, File No. 91-5374, dated March 1991
7. BPD Evidence Slips, dated August 10, 1991
8. BPD Interview of Emil Adams, dated August 10, 1991
9. BPD Interview of John Sullivan, dated August 10, 1991
10. BPD Interview of Valentino Dixon, dated August 10, 1991
11. Photo Array Identification of Emil Adams, dated August 10, 1991
12. Photo Array Identification Affidavit of Emil Adams, dated August 10, 1991
13. Emil Adams Photo Lineup, dated August 10, 1991
14. John Sullivan Photo Lineup, dated August 10, 1991
15. Car Crime Scene Photos by Detective Shephard, dated August 10, 1991
16. Crime Scene Photos by Detective Shephard, dated August 10, 1991
17. BPD Report from Detective Vickerd to Chief Donovan, dated August 10, 1991
18. BPD Report from Detective Stambach to Chief Donovan, dated August 10, 1991
19. BPD Report from Detective Vickerd and Lonergan to Chief Donovan, dated August 10, 1991
20. BPD Radio Pick-Up, dated August 10, 1991
21. BPD Report from B.M.H.A Officer Joseph Serwon, dated August 10, 1991
22. BPD Report from Detective Militello and Donovan to Timothy Scioli, dated August 10, 1991
23. BPD Report from Detective Stambach and DiPirro to Chief Donovan, dated August 11, 1991
24. BPD Report from Detective Stambach and DiPirro to Chief Donovan, dated August 12, 1991
25. BPD Report from Lt. O'Shei to Commissioner Degenhart, dated August 12, 1991
26. BPD Warning Suspects Rights Card of LaMarr Scott, dated August 12, 1991
27. BPD Handwritten Report from Detective Stambach to Chief Donovan, August 12, 1991
28. Aaron Jackson Photo Lineup, dated August 12, 1991
29. Photo Array Identification Affidavit of Aaron Jackson, dated August 12, 1991
30. BPD Interview of LaMarr Scott, dated August 12, 1991
31. BPD Report from Detective Stambach to Chief Donovan, dated August 13, 1991
32. BPD Report from Detective Grabowski and DiPirro to Chief Donovan, dated August 21, 1991
33. Grand Jury Testimony of Aaron Jackson in Valentino Dixon v. James T. Conway, dated November 6, 1991
34. Grand Jury Testimony of Emil Adams in Valentino Dixon v. James T. Conway, dated January 13, 1992
35. Grand Jury Testimony of John Sullivan in Valentino Dixon v. James T. Conway, dated November 6, 1991

36. Trial Testimony of Aaron Jackson in State of New York v. Valentino Dixon, dated June 8, 1992
37. Trial Testimony of Emil Adams in State of New York v. Valentino Dixon, dated June 8, 1992
38. Trial Testimony of John Sullivan in State of New York v. Valentino Dixon, dated June 8, 1992
39. Statement of Aaron Jackson to Probation Officer Charles F. Skipper, dated August 5, 1992
40. Perjury Trial Testimony of Aaron Jackson in State of New York v. Leonard Brown and Mario Jarmon, dated November 5, 1992
41. Perjury Trial Testimony of John Sullivan in State of New York v. Leonard Brown and Mario Jarmon, dated November 5, 1992
42. Perjury Trial Testimony of Christopher Belling in State of New York v. Leonard Brown and Mario Jarmon, dated November 10, 1992 [Re-Direct Only]
43. Interview of Emil Adams by Robert Bryant, dated March 7, 1993
44. Audio Recording of Interview of Emil Adams by Robert Bryant, dated March 7, 1993
45. Affidavit of Daniel Dill and Emil Adams, dated July 11, 2005
46. Affidavit of Roger Putnam (nd)
47. Redacted Investigation Memo from the Buffalo Conviction Integrity Unit to the District Attorney, dated September 11, 2018 (Attorney's Eyes Only version)
48. Assistant District Attorney David Hearty Answering Affidavit, dated September 17, 2018
49. Transcript of Plea for LaMarr Scott in State of New York v. Scott, File No. 01476-1991, dated September 19, 2018
50. Deposition of LaMarr Scott, dated March 14, 2022
51. Deposition of John Vickerd, dated March 24, 2022
52. Deposition of Mark Stambach, dated June 8, 2022
53. Deposition of Tamara Frida, dated October 19, 2022
54. Deposition of Aaron Jackson, dated January 12, 2023
55. Deposition of Emil Adams, dated January 17, 2023

If other materials related to the eyewitness evidence in this case are provided to me at a later time, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

## III. Summary of Case and Opinions

On August 10, 1991 around 1:00am, a fight broke out on the sidewalk/street near the corner of Bailey and East Delavan Avenues in Buffalo, NY between Mario Jarmon and brothers Torriano and Aaron Jackson. There was a large number of bystander onlookers. Mr. Dixon was also at the scene that night, although according to Mr. Dixon and numerous witnesses, he was not in the immediate vicinity when the shooting began. LaMarr Scott, a friend of Mr. Jarmon's, was watching the fight, retrieved a semi-automatic gun that was hidden nearby, and fired approximately 27 bullets, at close range, killing Torriano Jackson and shooting Aaron Jackson and 17-year-old bystander John Sullivan. Mario Jarmon also was shot during this incident.[1]

Within approximately 15 minutes of the shooting, there is evidence that police had named Valentino Dixon as a possible suspect. Mr. Dixon was arrested approximately 12 hours after the shooting allegedly based on Mr. Adams's selection of him from a photo array at approximately 5:00am on August 10, 1991. Later that afternoon, Mr. Dixon was selected by Mr. Sullivan from a different photo array. Mr. Dixon also was tentatively selected by Mr. Jackson on August 12, 1991 from the same array viewed by Sullivan. Jackson stated that Mr. Dixon "looked like" the shooter but he couldn't be sure because everything happened so fast. At trial, all three witnesses identified Mr. Dixon in court as the shooter.

---

[1] On 8/11/91, Det. Stambach and Det. Daniel DiPirro interviewed Mr. Jarmon at the hospital. Mr. Jarmon told them that Torriano Jackson shot him and he did not see Mr. Dixon with a gun. Lamar Scott told Stambach on 8/12/91 that only he and T. Jackson had guns. (COB000215) This is consistent with what Mr. Jarmon told police – that T. Jackson had shot him.

3

Within 2 days of the shooting, Mr. Scott confessed to being the shooter on a local news station, to his friends, and to the police in a formal sworn statement on August 12, 1991. Also within a few days of the shooting, Mr. Jarmon, who was friends with both Mr. Dixon and Mr. Scott, gave a sworn statement saying Mr. Dixon was not involved in the shooting incident. The same information was provided by Walter Lee Dennis[2] and Leonard Brown. Tamara Frida also called the Homicide Section, spoke with Det. Stambach and said that Mr. Dixon was not the shooter. She volunteered to view photographs but she was never contacted by the police. When Mr. Jarmon and Mr. Brown tried to testify that Mr. Dixon was *not* the shooter and that Mr. Scott was the shooter, ADA Belling charged them with perjury. Both men were convicted of perjury and their convictions for perjury were ultimately vacated after Mr. Dixon's conviction was vacated and Mr. Scott pled guilty.[3]

**Summary of Expert Opinions**

It is my understanding that Mr. LaMarr Scott, who confessed to the shooting both publicly and to the police within days after Mr. Jackson was killed, pled guilty to killing Mr. Jackson in 2018 on the same day that Mr. Dixon's murder and assault convictions were vacated. In addition, several witnesses who were at the scene of the shooting identified Mr. Scott as the shooter decades ago and continue to assert that Mr. Scott is the person they saw shoot Mr. Jackson. I also understand that the Erie County District Attorney's Office conducted a thorough reinvestigation of the August 10, 1991 shooting, and that their reinvestigation concluded that Mr. Scott, not Mr. Dixon, was the shooter that night. Therefore, in this case, I have assumed for the purposes of my report that Mr. Dixon is innocent of the shooting of Mr. Jackson and Mr. Scott is guilty. This assumption will be relevant when I apply the science of eyewitness memory in opining how it is that three separate witnesses all incorrectly selected Mr. Dixon from police procedures and ultimately testified that he was the shooter they saw on August 10, 1991.

It is my opinion that the two photo arrays containing Mr. Dixon's picture that were used to obtain the eyewitness selections of Mr. Dixon in this case were relatively "fair" procedures. That is, Mr. Dixon's photograph does not unduly stand out from the fillers in either array. In addition, it is my opinion – and the opinions of ADA Belling (who tried Mr. Dixon in 1992) and Mr. Scott himself – that Mr. Dixon and Mr. Scott do not look similar to one another. Therefore, when trying to assess how it is that three separate witnesses all came to select Mr. Dixon from these arrays, one cannot reasonably use "coincidental resemblance" as an explanation given the evidence in the record that Mr. Dixon and Mr. Scott look nothing alike (and also have different heights/builds). With respect to Mr. Adams, the original description he provided to police of the shooter as a heavy set, 6-foot tall Black male, wearing a white T-shirt with a white hat is consistent with Mr. Scott's height, build, and clothing that night. Therefore, it is my opinion that if in fact Mr. Adams viewed Mr. Scott shooting the semi-automatic gun as his description suggests, it would be very unlikely that he would have mistaken Mr. Dixon for Mr. Scott in the photo array. Moreover, the photo identification procedure Mr. Adams has previously described (i.e., being shown three individual photographs including one of Valentino Dixon, not making any identification, and then being shown a six-photograph array containing a photograph of Mr. Dixon) is evidence that police engaged in behavior known to be suggestive and consistent with the empirical research about the effects of such suggestion on eyewitness identification accuracy and memory.

---

[2] On August 14, 1991, witness Walter Lee Dennis told private investigator Evan Kenner that he was familiar with Mr. Dixon and he was sure he was not the shooter. Mr. Dennis did not recognize the shooter.

[3] After Mr. Dixon's conviction in June 1992, four additional witnesses to the shooting came forward to say Mr. Dixon was not the shooter: Anthony Watkins, Michael Bland, Tamara Frida, and Antoine Shannon. The latter 3 identified Mr. Scott as the shooter. In addition, Mr. Scott continued to assert his guilt in this case by sending notarized letters to the Erie County District Attorney, the BPD Commissioner, the FBI in Buffalo, the Internal Affairs department, and several news organizations.

For Mr. Sullivan, there is ample evidence in the record that he did not have a good opportunity to view the shooter although he reportedly made a positive identification of Mr. Dixon. In particular, there is evidence that Mr. Sullivan's opportunity to view the shooter was essentially non-existent and that other factors such as weapon focus and stress (including from being shot through the thigh) further reduced his opportunity to observe and encode relevant information. Mr. Sullivan has also reported that he was not sober that night, having been drinking and earlier smoked marijuana laced with cocaine.

Finally, when Mr. Jackson (who was badly wounded in the shooting) viewed a photo array containing Mr. Dixon on August 12, 1991, he indicated that Mr. Dixon "looked like" the shooter but he could not be sure because "it happened so fast." By the time of trial, however, Mr. Jackson positively identified Mr. Dixon as the shooter and testified he was certain. It is my understanding that Mr. Jackson has maintained to the District Attorney's Office and in his deposition in this case that he is still certain Mr. Dixon was the shooter, but that he has privately told others—including one of his lifelong friends—that he knows Mr. Scott, not Mr. Dixon, was the shooter (although he nonetheless holds Mr. Dixon responsible).

Given the relatively fair arrays and the lack of double-blind administration and audio or video recordings of the identification procedures with all three witnesses, it is my opinion that the most reasonable explanation for how three witnesses all came to select Mr. Dixon—who was the not the shooter—from the arrays is suggestion or influence during the identification procedures. Further, scientific research has demonstrated that the type of suggestion and influence that can result in mistaken selections of innocent suspects can occur without the witness's conscious awareness.

## IV. Basis for Opinions in This Case

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the selection of Mr. Dixon as the shooter in this case, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that influence eyewitness decisions that are under the control of law enforcement (known as "system variables").[4] It is critical to understand the impact of both types of variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made. In addition, the "reflector" variable eyewitness confidence also will be discussed with respect to its relationship to eyewitness accuracy.[5]

As far back as 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006. The IACP website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[6] In January 2017, New York State passed a law on eyewitness identification best practices and in June 2017 published a model policy on photo arrays and lineups.[7] The law and model policy will be discussed in the relevant sections of this report.

---

[4] Wells (1978). Applied eyewitness testimony research: System variables and estimator variables. *Journal of Personality and Social Psychology, 36,* 1546 –1557.
[5] Wells (2020). Psychological science on eyewitness identification and its impact on police practices and policies. *American Psychologist, 75(9),* 1316-1329.
[6] See: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification
[7] https://www.criminaljustice.ny.gov/crimnet/ojsa/standards/MPTC%20Model%20Policy-Identification%20Procedures%20and%20Forms%20June2017.pdf

Based on my review of the above materials, the estimator and system variables relevant to the selection of Mr. Dixon include:

**Estimator Variables:**

1) Effects of Limited Opportunity to Observe at the Time of the Event
   a) Exposure Time
   b) Distance
   c) Lighting
   d) Weapon-focus Effect
2) Stress/Arousal

**System & Reflector Variables:**

1) Post-event Contamination
2) Description "Accuracy"
3) Photographic Showup
4) Photo Array
5) Non-blind Lineup Administration & Suggestion
6) Pre-identification Warnings/Instructions
7) Repeated Identification Procedures
8) Witness Confidence & Post-identification Feedback

**V. General Background on Eyewitness Research**

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[8] In fact, the National Research Council Report on eyewitness identification titled "Identifying the Culprit: Assessing Eyewitness Identification"[9] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> *Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

In fact, the prevailing theory of memory divides it into three stages. First, a witness perceives an event and some of that information is entered into the memory system. Next, some time passes before a witness tries to remember the details of the event. Finally, the witness tries to retrieve the information that was stored in memory. The National Research Council report reminds us that (P.57-58):

> *The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer is commonly none the wiser when perception differs from the "ground truth" of the external world— it appears that accurate eyewitness identification may be difficult to achieve.*

---

[8] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.
[9] Ibid.

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of **trace evidence** in an investigation, can be altered and/or affected through **contamination**, especially when the witness' memory for the event is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, and media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impact of this contamination on a witness' subsequent recollection of events and people.

Numerous factors at each stage of memory affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face and body, and stress or fear experienced during the event. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage of memory can influence the reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect an eyewitness' accuracy and memory include the use of pre-lineup/photo array[10] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness both before and after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their 1998 Eyewitness White Paper.[11] The 2020 White Paper[12] maintained the original four best practice recommendations from 1998[13] and added five new best practice recommendations for the collection and preservation of eyewitness evidence.[14] The opinions in this report regarding best practices are, where relevant, consistent with the AP-LS White Paper recommendations as well as the June 2017 New York State model policy on photo arrays and lineups.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently numbers as more than **375.**[15] In a 2011 analysis of the first 250 DNA exoneration cases in the United States,

---

[10] In this report, the terms "lineup" and "photo array" will be used interchangeably except when discussing the specific procedures utilized in this case.

[11] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603–647.

[12] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[13] These include: how to select lineup fillers, providing witnesses with a pre-lineup warning, the use of double-blind administration, and recording a confidence statement from a witness after they have made a selection.

[14] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups when possible.

[15] This statistic has not been updated on the Innocence Project website (www.innocenceproject.org) for at least two years and therefore this figure likely is an underestimate of the current number of DNA

Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[16] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 DNA cases where there was an erroneous eyewitness identification of the defendant, 36% included mistaken identifications from *more* than one eyewitness, such as in this case. In fact, some of the DNA cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. In addition, there are 31 DNA exoneration cases where the innocent defendant was identified by a person who was familiar with them before the crime was committed. In these exoneration cases, there is no evidence that witnesses were anything more than wrong. In other words, mistaken eyewitnesses were not accused or suspected of lying about their selection of the innocent defendant. In summary, evidence demonstrates it is common for eyewitnesses to genuinely believe they have identified the right person yet still be mistaken.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[17] In the 2020 White Paper discussed above, Wells and colleagues summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[18] The authors examined 11 published articles with data from over 6,500 witnesses in actual cases. The results showed that nearly one quarter of all witnesses who viewed a photo array or lineup in actual cases chose an innocent filler. Of those who "identified"[19] a person from a photo array or lineup, more than one third (37%) chose an innocent filler as the perpetrator. Further, the overall eyewitness identification error rate must be higher than 37% because the data does not include erroneous selections of innocent suspects (it only includes known-innocent filler selections).

In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" in actual cases are incorrect. While false identifications of innocent fillers invariably do not send those fillers to prison, these choices still constitute identification errors and provide

---

exonerations in the United States. For example, the National Registry of Exonerations lists **581** exonerations with DNA evidence as of July 18, 2023. Visit: https://www.law.umich.edu/special/exoneration/Pages/about.aspx

[16] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[17] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the ground truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[18] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[19] Witnesses who "identify" an innocent lineup filler are obviously not making this selection because they truly recognize the filler from the crime, so the term "identify" is not the correct term. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person based on match-to-memory) and *choosing* behavior (selecting someone from a showup, mug-shot, photo array or lineup procedure).

valuable information about the reliability of eyewitnesses and the reliability of identification procedures generally.

## VI. Expert Opinions Regarding Eyewitness Reliability

Following my review of the materials listed above, I have identified the following eyewitness reliability factors as being relevant to the eyewitnesses in this case. Below, I use examples from the scientific literature to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below, rather a sample of the scientific literature. In addition, samples of testimony and other evidence from the materials reviewed in this case will be used to support the relevance of each scientific factor to this case. Not all of the relevant examples found in the materials reviewed in this case will be repeated in this report.

**Estimator Variables**

**1. Effects of Limited Opportunity to Observe at the Time of the Event**

Common sense might suggest that even a brief opportunity to view a person's face allows us to form a mental "snapshot" of that person. But research supports a different conclusion: the opportunity a witness has to view a person's face significantly impacts the witness' later ability to describe and identify that individual. Generally, when the opportunity to see a person's face is limited (due to a short observation time, the presence of a weapon, a long distance, etc.), the result will be a weak or poor memory (trace) for that individual. What is critical with respect to reliability is the amount of time that a witness has to view a person's face *at the time of the event*.

**a) Exposure Time.**

According to Mr. Sullivan's accounts of his observation of the shooter, he did not see the person who was shooting until after he ran across the street (at least 50 yards/150 feet away). Although he did not provide any time estimates for his observation of the shooter's face, the DA Reinvestigation Memo (COE004761) discusses Mr. Sullivan's opportunity to observe: "Sullivan ran east, across Bailey, was shot through the thigh, and **briefly** (emphasis added) turned around in front of the market, started to the turn the corner, and collapsed." Further, the science on the effects of distance on eyewitness memory (discussed in more detail below) shows that seeing a person's face at a distance of 50 yards (at night) would render it nearly impossible to create a sufficient memory in order to make an accurate identification decision.[20]

Mr. Jackson testified at the Grand Jury that he thought it was the police firing bullets into the air and "I didn't look at his face" before he started running. (Dixon-001499) He then testified that when he looked back while running, he saw Tino (Mr. Dixon). (Dixon-001500) He testified that he then crawled on the ground and got into his friend Travis' vehicle. At this time, bullets were still being fired and they were coming in his direction. (Dixon-001500) He told police on August 12, 1991 that he could not be sure that Dixon was the shooter because "everything happened so fast." (COE001550)

In research on the effects of exposure duration – the amount of time one has to view or encode something – on eyewitness accuracy, Shapiro and Penrod found a systematic relationship between exposure time and

---

[20] Mr. Sullivan has also provided testimony that he smoked a marijuana cigarette laced with cocaine around 3:30pm on Aug 9, 1991 (Dixon-000105) and slept until 10pm. He testified that he wasn't high when he woke up because he had slept it off. (0000107) He also testified that he told police he had smoked at the hospital although this does not appear in the police report I have reviewed. (Dixon-000107).

identification accuracy in their 1986 meta-analysis on this topic.[21] That is, shorter exposure time generally correlates to less accurate identifications. In the time since this comprehensive review was published, an updated meta-analysis[22] and other research[23] have replicated the positive correlation between the amount of time a witness saw the perpetrator's face and reliability.

**b) Distance.**

With the exceptions of a police report authored by Det. Vickerd on August 10, 1991 and his Grand Jury testimony, there is consistent evidence that Mr. Sullivan did not see the shooter's face until after the shooting began and he ran across the street, at least 50 yards/150 feet away.[24] Mr. Sullivan has given testimony on multiple occasions that after hearing gunshots, he ran across the street and did not see who was shooting (COB000111) until he turned around. The distance of his observations was estimated to be between 50 yards/150 feet (COE004765) and 100-150 yards/300-450 feet. (Dixon-000133). Mr. Sullivan also would have been across Bailey Street, where traffic would pass to get to the popular restaurant on the corner, and looking back in the direction of traffic toward the shooting. In addition, when he saw the shooter, Mr. Sullivan only viewed the shooter's profile and not his face straight on. (Dixon-000141).

The inconsistent statement attributed to Mr. Sullivan in the Det. Vickerd report comes from an unrecorded interview with Mr. Sullivan in the hospital before he was released. Det. Vickerd wrote that Sullivan tried to break up the fight between Mario and the Jackson brothers, he then saw Dixon go behind a van and come out with a black Uzi[25], point it at Torriano Jackson and start firing. (COE001507) The Vickerd report is inconsistent with information Mr. Sullivan gave in a second interview conducted only hours later by Det. Masecchia. According to Masecchia's report, Mr. Sullivan heard someone yell "look out he's got a gun." He didn't look to see who had the gun and started running. (COB000111) After being shot in the leg, he turned around to see who had shot him and he saw "Tino" with a gun, shooting Mr. Jackson. (COB000111)

Mr. Jackson testified at trial that he did not see the shooter's face until after he was running across the street and had been hit by a bullet.

Regardless of the exact distances, based on the overall description of the events from various witnesses, it appears that distance is a relevant estimator variable in this case.

---

[21] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.

[22] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.

[23] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

[24] In his Grand Jury testimony, he stated that he saw Tino run up and start shooting (Dixon-001508) that he saw Tino with a gun before the shooting. (Grand Jury Dixon-001510)

[25] At trial, Mr. Sullivan testified that he could not tell the color of the gun because it was nighttime.

Research conducted on this topic has shown that distance can significantly impact a person's ability to view the details of another person's face.[26] In his "distance-as-filtering hypothesis", Dr. Geoff Loftus explains that as a face is viewed at further and further distances, there is less ability to detect the details of the face because facial details become coarser and coarser. As way of example, the image below from Loftus' research recreates the loss of detail when one view's a face from 20 feet (6.7 yards; left) to 100 feet (33.3 yards; right).



In other research, scientists tested eyewitnesses on their ability to recognize a person's face from a range of distances.[27] Participants viewed faces from distances between 10 feet and 131 feet and were then immediately asked to make an identification decision from a six-person photo array. The results showed that at distances over 49 feet the ratio of correct to incorrect decisions was too great for an identification to be considered reliable. Consequently, the authors recommended a 50 foot (16 yards) cutoff point as a useful "rule of thumb" for courts when assessing reliability. A replication of this study using photos of famous people led to a similar conclusion.[28] Other researchers[29] have also found significant impairments in identification accuracy when the distance between a witness and the target increases but do not recommend a particular cutoff point, as did Wagenaar and van der Schrier. The implication of the scientific research is that distances over 100 feet, as shown above, make it extremely difficult to encode the details of a person's face, which is required in order to make an accurate identification decision. Further, researchers have also found that the confidence-accuracy relationship (discussed in more detail later in this report) is significantly weakened when the distance between the witness and the perpetrator is over 66 feet.[30]

**c) Weapon-focus Effect.**

Several witnesses who testified that Mr. Dixon was the shooter described seeing the shooter fire a semi-automatic weapon. Mr. Adams believed the gun was a TECH-9 (COE001532) semi-automatic about 2 feet

---

[26] Loftus & Harley (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review, 12,* 43-65; Harley, Carlsen & Loftus (2004). The 'saw-it-all-along' effect: Demonstrations of visual hindsight bias. *Journal of Experimental Psychology: Learning, Memory and Cognition, 30,* 960-968.

[27] Wagenaar & van der Schrier (1996). Face recognition as a function of distance and illumination: A practival tool for use in the courtroom. *Psychology, Crime & Law, 2,* 321-332.

[28] De Jong, Wagenaar, Wolters, & Verstijnen (2005). Familiar face recognition as a function of distance and illumination: A practical tool for use in the courtroom. *Psychology, Crime & law, 11,* 87-97.

[29] Lindsay, Semmler, Weber, Brewer, & Lindsay (2008). How variations in distance affect eyewitness reports and identification accuracy. *Law and Human Behavior, 32,* 526-535.

[30] See Lockamyeir, Carlson, Jones, Carlson & Weatherford (2020). The effect of viewing distance on empirical discriminability and the confidence–accuracy relationship for eyewitness identification. *Applied Cognitive Psychology, 34,* 1047-1060.

(000194) to 3 feet long.[31] (GJ testimony, Dixon-0001622) At trial, Mr. Jackson testified that he didn't see the gun but saw a lot of sparks. (Dixon-000226)

The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect." As the witness focuses on the weapon, their ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was first reviewed in a meta-analysis published by Steblay in 1992. The weapon focus effect was statistically significant and demonstrated an impairment of identification accuracy when a weapon was present during the event/crime. A more recent meta-analysis confirms the findings of the Steblay 1992 report.[32] In summary, although it can certainly be true that a witness pays close attention to a *weapon*, the research results indicate that attending to the weapon impairs memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited. In addition, viewing a weapon can also cause a witness to become afraid, which also can decrease the quality of a witness' memory (see below).

### d) Lighting.

The shooting took place at approximately 1:00 am on August 10, 1991. Mr. Adams testified at trial that it was dark out at the time of the shooting (000186) but during his Grand Jury testimony testified that it was "real light" at the corner. (001618) This testimony is inconsistent with Mr. Sullivan's account. When he was asked at trial what color the gun was and he responded "I would guess black. It was nighttime. I couldn't really see." (Dixon-000086) During Mr. Dixon's trial, Mr. Sullivan also testified that car headlights were possibly shining in his direction at this time as well. (Dixon-000137)

It is important to have a basic idea of how visual information gets into the brain in order to understand how lighting conditions can affect perception.[33] The answer lies in a network of millions of nerve cells. Of particular importance to the visual system are two types of receptor cells in the eye called *rods* and *cones*. Rods and cones absorb information that is eventually transmitted to the brain, telling us what we "see". Critically, rods and cones have different functions. Rods are related to *nighttime* or low-lighting visual conditions – such as the conditions the witnesses would have experienced – and cones are related to daytime or good-lighting conditions. Cones are the primary mechanism for color vision and this is why we see little color by moonlight because there is not enough light to stimulate the cones.  We can see shades of light and dark at night because moonlight is intense enough to stimulate the rods. Rods, however, provide a much less sharp image than do cones. That is why objects and people lit by moonlight, although visible, may appear coarse and ill-defined.[34] In this case, the poor lighting conditions could not have increased the reliability of the witnesses' observations and could only have served to reduce their ability to see clearly and in detail.

---

[31] Mr. Adams told police and testified at trial that he saw two males with guns walking towards the fight but this observation is not consistent with statements from other witnesses who only saw one person with a gun. (000152)

[32] Fawcett, Russell, Peace, & Christie (2013). Of guns and geese: A meta-analytic review of the "weapon focus" literature. *Psychology, Crime & Law, 19,* 35–66.

[33] For a detailed review of this process, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[34] Loftus, Doyle, Dysart, & Newirth (2020). Eyewitness testimony: Civil and criminal (6th Edition). LexisNexis.

## 2. Stress/Arousal

Mr. Adams testified in his 2023 deposition that witnessing the shooting was a traumatic experience. (P.121) In addition, Mr. Sullivan and Mr. Jackson were shot during the incident, with Mr. Jackson being seriously injured and hospitalized for weeks after the shooting. Mr. Sullivan was shot through the thigh. (COE 4765) In addition, all witnesses ran for their lives after the gunfire began.

In research related to the effects of stress and arousal on eyewitness accuracy, Deffenbacher and colleagues published a meta-analysis on this subject in 2004.[35] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory. The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates.  Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities.

Researchers have also found that even physical exertion – such as running – can cause increases in arousal which result in impaired eyewitness identification abilities.[36] In summary, high levels of stress and arousal, which these witnesses unquestionably experienced, have been shown to significantly reduce the reliability of eyewitness identification decisions.

### System & Reflector Variables Relevant to the Current Case

The police reports and other documentation reveal that several system variables employed in this case, in my opinion, led to or significantly increased the likelihood of a selection of Mr. Dixon as the shooter. I first address the three "identifying" witnesses and then the relevant systems variables.

### "Identifying" Witnesses from the Shooting

1) **Emil Adams, witness to the shooting, friend of Torriano and Aaron Jackson.** Mr. Adams has testified that on August 10, 1991, he was talking to someone near Tamara Frida's car and, when he heard gunshots, he hid behind Travis Powell's car where he witnessed the shooting. I understand that from this position, Mr. Adams would have had an unobstructed view of everything that happened on the corner. I also understand that Mr. Adams was transported by a BPD officer from the scene to the police station, where he was kept segregated in the homicide office away from other witnesses. According to police reports, when asked "Can you tell me what the person that had the Tech-Nine looked like?," Mr. Adams provided a detailed description of the shooter and his clothing: "A black male, heavy set, maybe about twenty the same age as Mario, about six feet tall, and I did not see any hair as he had a hat on." Mr. Adams further described the shooter as wearing a white T-shirt with something on the front and a white hat. (Adams Stmt., COE 1533)

Mr. Adam's description is consistent with Mr. Scott's height/weight and the clothing he said he wore that night. In his interview on August 12, 1991, Mr. Scott told police he was wearing a black jacket, white T-shirt, white Nike sneakers, and a white hat during the shooting. (COB 214) At that time, Mr. Scott was over six foot and stocky: Mr. Scott testified that he was around 6'1", maybe

---

[35] Deffenbacher, Bornstein, Penrod, & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687–706.
[36] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

205 pounds, and played defensive end in football. (Scott Dep. 10) Mr. Dixon was around 5'8"-5'9" and slim. Multiple witnesses, including Mr. Scott, ADA Belling, and Detective Stambach, have testified that Mr. Dixon and Mr. Scott did not look anything alike. Detective Stambach, who interviewed Mr. Adams, Mr. Dixon, and Mr. Scott in this investigation, further testified that Mr. Scott "fit the bill as a big, heavyset guy" like Mr. Adams described. (Stambach Dep. 157)

According to police documents, after providing this detailed description matching Mr. Scott, Mr. Adams then positively identified Valentino Dixon from a properly administered six-photograph array. In particular, police reports state that Mr. Adams pointed out Mr. Dixon in the array and said "this is the guy with the Tech 9 who was doing the shooting." But in a 1993 taped interview, Mr. Adams described a very different process with the police. Mr. Adams described being taken to the police station to give a statement, and telling police the shooter was a heavyset guy with a hat, but explained that he never said who the shooter was because he was not really sure. Mr. Adams also described how police showed him three individual photographs of Mario Jarmon, Valentino Dixon, and a third man, and asked him what each of them did and whether he knew them, which he confirmed only that he did. (Adams 3/7/93 int)[37] In the contemporaneous police report by Detective Stambach, it is documented that Mr. Adams was shown an individual photograph of Mario Jarmon (whom he identified). There is no documentation I have seen in the police file of Mr. Adams being shown an individual photograph of Valentino Dixon, and I understand that the detectives deny doing so. Based on police records, Mr. Adams was with the police from 2:20 a.m. until he reportedly made a positive identification of Valentino Dixon at 5:05 a.m. There is no police report detailing the questions asked and answers given during Mr. Adam's actual identification procedure, although there is a such report for another witness (Mr. Sullivan).

2) **John Sullivan, shooting victim, close friend of Aaron Jackson.** Mr. Sullivan was in the process of breaking up the fight between Mario Jarmon and Torriano and Aaron Jackson when the shooting began. He ran across Bailey Street and turned around, briefly, for the first time at the corner about 50 yards/150 feet away from the shooting at night. Mr. Sullivan was shot through the thigh and taken to the hospital for treatment. Prior to the shooting, he had consumed malt liquor, several beers, and smoked marijuana laced with cocaine, although he claimed to have slept off the high. (COE 4765). Based on police reports, Mr. Sullivan provided two different accounts of the shooting; the first a narrative taken by Detective Vickerd while Mr. Sullivan was in the hospital, and the second a sworn statement taken at the police station by Detective Masecchia. (COE 1506-07; COB 113-14). In both statements, Mr. Sullivan reportedly identified Mr. Dixon by name as the shooter. In his 2022 deposition, Detective Vickerd testified that he does not recall one way or another whether he knew Mr. Dixon was a suspect or spoke to Mr. Sullivan about Mr. Dixon before Mr. Sullivan reportedly said Mr. Dixon was the shooter (Vickerd Dep 119–20). There is evidence in

---

[37] I understand that the District Attorney's Office tried to contact Mr. Adams for over a month in 2018 as part of its reinvestigation, that he spoke to them briefly only after Aaron Jackson reached out to him, and that during that conversation he said he stood by his testimony that Mr. Dixon was the shooter and denied recanting his identification. (COE 4765) I further understand that Mr. Adams took the same position in his 2023 deposition in this case. I have not made any credibility determinations, but explain herein how Mr. Adams' 1993 account is consistent with empirical research on the effects of influence/suggestion on eyewitness identification accuracy and why that is a better explanation for the identification outcome in this case (i.e., picking Mr. Dixon, who was not the shooter, did not look like the shooter, and who did not match the physical description of the shooter Mr. Adams first provided).

the record that within 15 minutes of the shooting Mr. Dixon was considered a possible suspect by the police. (COE 1503).[38]

3) **Aaron Jackson, shooting victim, brother of victim Torriano Jackson.** Aaron Jackson was with his brother Torriano Jackson when the shooting began. He was badly injured and treated in the hospital for weeks after the shooting. On August 12, 1991, Aaron Jackson tentatively identified Mr. Dixon as the shooter, stating that #4 (Mr. Dixon) was there but he could not be sure because everything happened so fast. Mr. Jackson did not or was not able to provide a description of the shooter. At trial, however, he positively identified Mr. Dixon as the shooter and described watching Mr. Dixon shoot his brother and himself. Mr. Jackson also testified that he picked Mr. Dixon out of the photo array and recanted only when confronted with his own affidavit. (COE 4765) There is evidence in the record that Mr. Jackson knows that Mr. Dixon was not the shooter, and that Mr. Scott was, but I understand that he has testified that he is still certain Mr. Dixon was the shooter. (COE 4767–68)

**System & Reflector Variables**

**1. Post-Event Contamination**

Aaron Jackson initially made only a tentative identification, which became certain by the time of trial. Given record evidence that Mr. Jackson knows Mr. Dixon was not the shooter, as well as other problems with his ability to observe the events (including being seriously injured himself), the most reasonable explanation for how his tentative identification became a positive identification by the trial of trial is contamination.

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[39] There are many sources of post-event memory contamination that can affect a witness's memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses (aka *co-witness contamination*), law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person's memory and identification accuracy, Zajac and Henderson[40] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that the participants believed was another participant in the study (i.e., a co-witness). Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a target-absent (the accomplice was not present) line-up comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning

---

[38] I understand that Mr. Sullivan was interviewed twice by the District Attorney's Office in 2018, and that he has stood by his testimony that Mr. Dixon was the shooter both times, although the DA's Office observed that Mr. Sullivan was with his close friend Aaron Jackson both times. (COE 4765) I further understand that Mr. Sullivan could not be located to give deposition testimony in this case.

[39] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[40] Zajac & Henderson (2009). Don't it make my brown eyes blue: Co-witness misinformation about a target's appearance can impair target-absent line-up performance. *Memory, 17,* 266-278.

information from another source can influence memory, reports, and identifications made by witnesses to a crime.

In summary, the concern with post-event contamination is that it can be difficult to accurately remember the *source* of our memories and, thus, information learned from others is likely to contaminate our "original" memory for a person or event. In many cases, the full scope and impact of post-event contamination is unknown which is why it is so important to obtain a detailed, recorded interview with a witness. In this case, the extent of the contamination is unclear but the record indicates there were multiple opportunities for Mr. Jackson especially to have learned information from others, including friends and family members, as well as law enforcement between the night of the shooting, his August 12, 1991 interview, and his testimony at trial.

By comparison, <u>accord</u>ing to lead Det. Stambach, Mr. Adams was taken directly from the scene to the police station by an officer and kept segregated from other witnesses at the station. Mr. Adams was with only the police from 2 a.m. until at least 5:05 a.m. when he reportedly positively identified Mr. Dixon as the shooter. Therefore, it does not appear there was an opportunity for post-event contamination of Mr. Adams by other witnesses or anyone outside of law enforcement prior to his reported selection of Mr. Dixon from the photo array.

## 2. Description "Accuracy"

On August 10, 1991, Mr. Adams described the person with the TECH-9 to Det. Stambach as follows (COE001533):

- Black male, heavy set, about 20 years old (same age as Mario [Jarmon]), about 6' tall, did not see hair as he had a white hat with a black or blue brim on, wearing cut off blue jeans, white T-shirt with something on the front.

According to a police report authored by Det. Vickerd on August 10, 1991, Mr. Sullivan told Vickerd that the shooter was Black male, 21 years old, 6' tall and 160 lbs., wearing black and white clothes and that he knew him as Tino. (COE0001507) From the materials I have reviewed, it does not appear that Mr. Jackson was asked to (or could) provide a description of the shooter before being shown a photo array containing Mr. Dixon. He testified at trial that he did not see a hat. (Dixon-000274)

When asked during the Jarmon/Brown perjury trial what Mr. Dixon looks like, ADA Belling testified that Dixon is 5'7-5'8" tall, 130-140 lbs., with a very youthful appearance. He also testified that Dixon looks nothing like LaMarr Scott. (COE001124).[41]

LaMarr Scott was interviewed on August 12, 1991, and confessed to Det. Stambach that he had shot Mr. Jackson in self-defense. He told Stambach that he was wearing a black jacket, a white T-shirt, checkered shorts, white Nike sneakers and a white hat. (COB000214) He testified in 2022 that he is 6'1" tall and back in 1991 he played defensive end and was thinking of going to college for football. (P.10) He was "a big guy", over 200 lbs. (P.10) Scott testified that Dixon was a slim guy (P.11) and it is his opinion that no one in 1991 (or in 2022) would have mistaken him and Dixon based on body/size. (P.11) This opinion is consistent with ADA Belling's testimony.

Notably, the description given by Mr. Adams is consistent with Mr. Scott's height/weight at the time, and with the white T-shirt and hat Mr. Scott reported wearing that night. It was clearly inconsistent with

---

[41] During his deposition in this case, Mr. Dixon testified that he is 5'9" tall. Various booking documents in the early 1990s list Mr. Dixon's height as 5'10" tall.

Valentino Dixon, whose photograph he reportedly then selected from a photo array.

With respect to research on witness description accuracy, in Professor Garrett's (2011)[42] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[43]

### 3. Photographic Showup

As reported by Det. Stambach, on August 10, 1991, Mr. Adams was apparently shown a single photograph of Mario Jarmon before viewing the six-pack photo array containing Mr. Dixon's photograph. (COE001533) But in an interview with Mr. Bryant in 1993, Mr. Adams recalled being shown 3 photographs, one of Mario Jarmon, one of Tino (Mr. Dixon) and a third photograph. (009614) He stated that he "never said who it was" because he was not sure, and that he told the police he "couldn't point the finger" because he didn't want to lock an innocent man in jail. Mr. Adams further described how he was asked if he knew the individuals in the single photographs (Mr. Jarmon and Mr. Dixon), which he confirmed but that he did not make an identification beyond saying that he knew them.

In his 2023 deposition, Mr. Adams initially could not recall if he only saw 3 photographs or if he saw more photos (P.33) and then recalled seeing groups of photographs (P.42). Mr. Adams also testified that he did not remember being shown a single photo of Mario (as depicted in the police transcript) or a single photo of anyone else. (P.78)

If police showed an individual photograph of Valentino Dixon to Mr. Adams, that is a photographic showup procedure. Given that Mr. Dixon was not the shooter, and that Mr. Adams had just provided a physical description inconsistent with Mr. Dixon, his 1993 account of what happened is significantly more consistent with the empirical research about eyewitness identification accuracy and memory than the police account of Mr. Adams having made an immediate, positive identification of Mr. Dixon from a fairly administered photo array.

During his Grand Jury testimony, ADA Belling took the photo of Mr. Dixon from the 6-person array and showed the single photograph to Mr. Jackson, asking if this is the man he picked out of the array. (Dixon-001501) This is also a photographic showup procedure.

Showup identification procedures are suggestive by their nature and are dangerous because there is no particular way for law enforcement to know when an eyewitness has made an error and identified an innocent person from a show-up because, unlike lineups, there are no known-innocent fillers.[44] A meta-analysis comparing witness performance in show-ups to six-person photo arrays indicates that mistaken identifications are significantly more likely with show-ups.[45]

---

[42] Garrett (2011). *Convicting the Innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[43] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

[44] As stated elsewhere in this report, this is why it is critical to have only one suspect per lineup so that law enforcement can better ascertain whether a witness has a reliable memory.

[45] Steblay, Dysart, Fulero, & Lindsay (2003). Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

In addition, the Revised 2020 AP-LS White Paper recommends that showups be avoided altogether unless deemed absolutely necessary. When showups are used, safeguards should be used to reduce suggestion, such as eliminating inferences of police custody.[46]

**4. Photo Array**

The materials received in this case include two different photo arrays (with different fillers) that were created and shown to witnesses with Mr. Dixon as the suspect. One array, created by Det. Vickerd, was shown to Mr. Adams at 5:05am on 8/10/91 and a second array was shown to Mr. Sullivan on 8/10/91 and Mr. Jackson 8/12/91.

It is my opinion that nothing about the construction of the two arrays containing Mr. Dixon is particularly suggestive, with the exception of possible clothing bias.[47] That is, based on the witnesses' brief descriptions of the shooter and the array itself, Mr. Dixon does not stand out from the fillers making the array biased against him.[48] If the trier of fact accepts that Mr. Dixon is innocent, and Mr. Scott is guilty, then the most reasonable explanation as to how Mr. Dixon was allegedly selected by three separate witnesses cannot be the use of a suggestive photo array(s). This is especially true given the two men do not resemble each other. Rather, other explanations for why Mr. Dixon was selected by three witnesses are much more likely, including police suggestion during the identification procedures.

**5. Non-blind Lineup Administration & Suggestion**

The detectives who conducted identification procedures with Mr. Dixon were aware that he was the suspect in those procedures. None of the identification procedures were audio or video recorded thus it is unclear what statements were made to witnesses during these procedure. For example, Det. Vickerd testified that he is not sure today whether he discussed Mr. Dixon with Mr. Sullivan before Mr. Sullivan reportedly identified him as the shooter by name. And for Mr. Adams, there is not even a "Q&A" portion in his sworn statement for the photo array procedure, although that does appear in the sworn statement for Mr. Sullivan's photo array procedure.

---

[46] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[47] Clothing bias is when the suspect is the only person – or one of a few people – wearing clothing that is the same or similar to the clothing worn by the perpetrator. When clothing bias is present for a suspect, there is a significant increase in false identifications of that innocent suspect. (E.g., Dysart, Lindsay, & Dupuis, 2004; Yarmey et al., 1996). In this case, Mr. Dixon is wearing a white shirt in both photo arrays and most of the fillers' shirts are not visible.

[48] For example, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press; Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement.* United States Department of Justice, Office of Justice Programs. Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

As discussed, in 1993, Mr. Adams stated that he never said who the shooter was because he "wasn't really sure". (Dixon-009614) He also communicated that he was pressured to say it was Tino by ADA Belling because of Mr. Adams' own legal issues in Michigan. (009617) He was scared and his hands were tied. (009620) In his 2023 deposition, however, Mr. Adams repeatedly denied that it was him on the tape and that he had ever had any legal troubles in Michigan or anywhere else. (E.g., P.46)

Contemporary police guidelines (e.g., IACP, 2006) and the law in over half of the United States for conducting identification procedures,[49] indicates that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. The influence by the administrator may be unintentional and it may be outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect.[50] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[51] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. This was not done in this case.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[52] in which 234 witnesses viewed a videotaped speech, that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the award if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 8% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 33% of witnesses chose the innocent suspect.

Participants in the Greathouse and Kovera study also were asked whether they believed the administrator's behavior influenced their decision in the lineup and whether the administrator pressured them. It is clear from the data above that the administrator behavior did influence decision making but the question the researchers were asking here gets to heart of whether witnesses perceive that they have been influenced.

---

[49] The 2017 eyewitness identification bill passed in New York State requires double-blind or blinded administration of identification procedures.

[50] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

[51] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[52] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

The researchers also asked administrators if they had influenced the witness during the lineup procedure. The results demonstrated that neither participants nor administrators believed that they had been influenced or did any influencing, respectively. The researchers concluded:

> *It is important to note that both the witnesses and administrators participating in the photo spread administration reported few if any differences in administrator influence as a function of single blind versus double blind administration. This finding is particularly troubling for a number of reasons. If lineup administrators are not aware that they are exhibiting behavioral cues to the suspect's identity, they obviously will not try to inhibit them. In addition, during trial, jurors rely on the witnesses' accounts of the lineup administration procedure to judge the reliability of the identification. If witnesses are not able to convey that the administrator influenced their decision, jurors will not be able to consider this in their decision making process. (P. 80)*

In summary, though double-blind administration was not the norm in the United States in 1991, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detectives influenced the witnesses to select Mr. Dixon from the identification procedures. In other words, because Mr. Dixon was identified as a suspect almost immediately, there was an opportunity for "steering" or suggestion by law enforcement in these procedures. Further, if Mr. Adam's 1993 account is credited, there is direct evidence of steering/suggestion as he was shown an individual photograph of Mr. Dixon. In cases where law enforcement have "steered" a witness toward a particular lineup member, the resulting selection is relatively meaningless with respect to witness reliability.

## 6. Pre-identification Warnings/Instructions

Mr. Adams testified at his deposition that when viewing the photographs he "had to pick the guy out of the pictures." (P.42) Due to the failure to record the identification procedures with other witnesses, it is unknown what was said to them before they viewed photographs or photo arrays containing Mr. Dixon.

Simply failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the identification procedure encourages witnesses to make a selection and leads to an increase in identification errors. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array or lineup and that they should not feel compelled to make an identification. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[53] Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[54] This law

---

[53] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions, in Cutler (Ed.)., *Reform of eyewitness identification procedures* (65–86). American Psychological Association.

[54] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

enforcement guidance recommended, among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no identification is made, so as to minimize the natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array. Consistent with these recommendations, the 2017 New York State law requires the use of pre-identification instructions and warnings in eyewitness identification procedures.

## 7. Repeated Identification Procedures

With respect to repeated identification procedures being used in this case, before Mr. Jackson testified at the Grand Jury, ADA Belling showed him a single photograph of Dixon and told him that he was going to show him that photograph during his testimony. (Dixon-000252) He was then told that Mr. Dixon would be in court and knew that he would be asked to make an in-court ID of Dixon. (Dixon-000252) When asked how he changed his ID decision from "looks like" to choosing Dixon in court, Mr. Jackson responded "My memory gets better with time." (Dixon-000253) Alternatively, the repeated viewings of Mr. Dixon in this case could attribute for his change in identification confidence/decision.

Mr. Adams and Mr. Sullivan also viewed Mr. Dixon in multiple identification procedures (both photos and in person). In particular, there is evidence that Mr. Adams was shown an individual photograph of Mr. Dixon prior to or instead of a proper six-pack photo array.

The concepts of unconscious transference and commitment are therefore relevant to this case. Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts (e.g., in a photo array and then in court) are faced with a similar question. The correct answer is for the witness to say "I saw that face from several different contexts," but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. In fact, a meta-analysis on transference from viewing photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[55]

Research shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator;[56] this is known as "commitment."[57] Thus, it is quite possible that Mr. Dixon was selected by witnesses at the at trial because they had previously viewed and selected him from previous procedures.

[55] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[56] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289; Wixted, Wells, Loftus & Garrett (2021). Test a witness' memory of a suspect only once. *Psychological Science in the Public Interest, 22,* 1S-18S.

[57] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006). Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior*, *30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman &

Results from a second, third, fourth, etc. identification procedure whereby a witness has already viewed the suspect are not independent of the previous viewings and should be treated with extreme caution because it is very likely that a witness will merely select in subsequent procedures a person they have viewed or selected in a previous procedure. It is for this reason that psychologists view in-court identifications as mere theater and not actual independent tests of a witness's memory or ability to identify perpetrators.[58] In each succeeding procedure, witnesses can become increasingly more committed to their identifications and increasingly certain of their accuracy. In fact, there are examples from post-conviction DNA exoneration cases where, after a witness had incorrectly selected an innocent suspect, they continued to identify the innocent suspect even when presented with the actual perpetrator responsible for the crime.[59]

As early as 1968, the Supreme Court provided the following guidance to police, consistent with scientific findings and best practice recommendations:

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

*Simmons v. United States*, 390 U.S. 377, 383–84 (1968).

---

Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

[58] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289. In fact, courts in MA and CT are also beginning to limit in-court identifications as they have recognized the suggestive nature of the procedure.

[59] The wrongful convictions of John Jerome White and Ronald Cotton are two such examples. See https://www.innocenceproject.org/cases/john-jerome-white/ (the rape victim incorrectly selected John White from a lineup and did *not* select James Parham from the same lineup, even though Parham was present; Parham was later identified by DNA testing as the actual rapist, and White was exonerated); Jennifer Thompson, "I Was Certain, but I Was Wrong," *N.Y. Times,* June 18, 2000 (rape victim describing her misidentification of Ronald Cotton as her assailant, and how she subsequently testified at a second trial in which the real assailant (later identified through DNA), Bobby Poole, was brought to court, at which Thompson testified, "I have never seen [Poole] in my life" and maintained she was still positive that Cotton was her assailant; DNA testing later exonerated Cotton and implicated Poole, proving that Thompson was incorrect in her identification of Cotton and her non-identification of Poole). See also: https://www.youtube.com/watch?v=u-SBTRLoPuo and https://www.youtube.com/watch?v=I4V6aoYuDcg

In this case, witnesses were presented with repeated identification procedures with Mr. Dixon as the suspect. The results from repeated identification procedures with the same suspect are not independently informative with respect to witness accuracy. That is, viewing an earlier procedure with the same suspect taints the result of any subsequent procedure.

## 8. Witness Confidence & Post-Identification Feedback

The evidence shows that Mr. Jackson did not positively identify Mr. Dixon from the photo array shown to him on 8/12/91. Below is an image of Mr. Jackson's response on the police form after he viewed the photo array. (COE001396) The image shows that the word "positively" is crossed out and that Mr. Jackson was stating that Mr. Dixon (who was in position #4) "looks like the guy that shot my brother". In other words, Mr. Jackson was not certain of his selection and merely indicated that Mr. Dixon looks like the shooter.[60] When he testified at trial, however, he positively identified Mr. Dixon as the shooter.



At trial, Mr. Jackson testified that he was unsure at time of photo array but now (at trial) is certain.[61] But he has thought about it over and over again. "The thoughts go through my mind so vividly, and I have no doubt in my mind that that person sitting right there next to you is who shot my little brother." (Dixon-000249) Mr. Jackson testified in his 2023 deposition that he still believes Mr. Dixon shot him even though he understands that the state has exonerated him and that Mr. Scott has pled guilty. (P.13-4), although there is evidence indicating that Mr. Jackson knows that Mr. Dixon was not the shooter.

Mr. Adams stated that he never said who the shooter was because he "wasn't really sure". (Dixon-009614) In his 2023 deposition, Mr. Adams denied that it was him on tape with Mr. Bryant in 1993 saying he was unsure of his selection of Mr. Dixon. He held to his selection of Mr. Dixon in his deposition (P.39) and said he was sure (at the time). (P.50)

After viewing a 6-pack with Mr. Dixon, Mr. Sullivan was told "I will now tell you that the person you picked out is Valentino Dixon do you understand?" This is an example of post-identification feedback.

In addition, it is my opinion that the "BPD Photo - Array Identification Affidavit" form inappropriately provides witnesses with only two options (positive ID or tentative ID) as well as post-identification feedback by including the following information: "I was told by the above police officer that the name of the person in the photograph is _____." (COE001529) It is unclear why only two options are provided

---

[60] Mr. Jackson has given various accounts of this identification procedure, testifying at trial that he was certain the shooter was Mr. Dixon.

[61] Mr. Jackson is as certain in 2023 than he was in 1991 that Mr. Dixon shot him and his brother. (Depo P.14) He testified at his 2023 deposition that he was certain in his selection of Mr. Dixon when he viewed the array on August 12, 1991 but he doesn't have an answer in 2023 as to why he told police it "looked like the shooter, he was there, it all happened so fast." (P.50, 52)

given that witnesses should be able to make an identification decision using a range of levels of confidence, not two options pre-specified in an affidavit. In addition, I have never before seen in any other case an identification form that is a sworn affidavit. This is concerning given that there were witness reports of suggestion and pressure in addition to two witnesses - who truthfully told police that Mr. Scott was the shooter – being charged and prosecuted for perjury in this case.

These issues are important because research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[62] Specifically, eyewitness confidence can be extremely important and meaningful when "pristine" testing conditions are used.[63] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory including suggestion, and other factors.[64]

An important fact to consider is that the relationship between confidence and accuracy can be significantly affected by pre- and post-identification factors. For example, researchers have recently learned that the confidence accuracy relationship is significantly weakened when the distance between the witness and the perpetrator is over 66 feet.

Expressions of confidence at trial, however, are relatively meaningless[65] because confidence is *malleable*, and easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[66]

---

[62] See, Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[63] These include: The first uncontaminated identification procedure with the suspect using an unbiased procedure, double-blind administration, pre-lineup warnings, and obtaining a confidence statement immediately after a selection; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[64] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

[65] Ibid.

[66] E.g., Cutler, Penrod & Dexter (1990). Juror sensitivity to eyewitness evidence. *Law and Human Behavior, 14,* 185-191; Leippe & Romanczyk (1989). Reactions to child (versus adult) eyewitnesses: The influence of jurors' conceptions and witness behavior. *Law and Human Behavior, 13,* 103-132; Lindsay, Wells, & O'Connor (1989). Mock-juror belief of accurate and inaccurate eyewitnesses: A replication and extension. *Law and Human Behavior, 13,* 333-339; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688-

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that research shows *confidence is easily changed*. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[67] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as (confirmatory) *post-identification feedback*.[68]

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate, such as telling the witness that they have identified the suspect /defendant or that they have been a really good witness.[69] In the first research on the post-identification feedback phenomenon, Wells and Bradfield[70] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[71]

One explanation that has been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance.[72] In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Mr. Cage was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Mr. Cage was guilty. Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Mr. Cage was innocent and was not the man who had raped her in 1994.

696; Wells, Lindsay, & Ferguson (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology, 64,* 440-448.

[67] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.

[68] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[69] Dysart, Lawson, & Rainey (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

[70] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[71] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

[72] Charman, Carlucci, Vallano & Hyman Gregory (2010). Selective Cue Integration Framework: A theory of postidentification witness confidence assessment. *Journal of Experimental Psychology: Applied, 16,* 204-218; Festinger (1957). *A theory of cognitive dissonance*. Stanford University Press; Festinger & Carlsmith (1959). Cognitive consequences of forced compliance. *Journal of Abnormal and Social Psychology, 58,* 203-210.

In summary, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[73]

## VII. Summary of Opinions in This Case

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability. Given these factors, it is not difficult to arrive at a reasonable explanation as to how several witnesses came to select Mr. Dixon from the photo array. Mr. Sullivan had limited opportunity to see the shooter, and other factors such as weapon focus and stress further would have reduced his opportunity to observe. Given these factors, it is unlikely that Mr. Sullivan had a sufficient opportunity to create a strong memory for the shooter's face. Similarly, Mr. Jackson made only a tentative identification at first as he said that "everything happened so fast" and his opportunity to observe the shooter was also likely impacted by other factors, including being shot and badly injured himself. Moreover, there is evidence that Mr. Jackson positively identified Mr. Dixon at trial and today as the shooter although he knows that it was Mr. Scott, not Mr. Dixon. For Mr. Adams, what the police describe (him making an immediate, positive identification of Mr. Dixon upon administration of the photo array) is highly unlikely given what the empirical research teaches about eyewitness identification accuracy and memory. If Mr. Dixon's innocence is credited, the police account becomes even less likely based on the scientific research. The far more likely explanation is suggestive identification procedures account for the selection of Mr. Dixon, who has been deemed innocent.

## VIII. Supplemental Materials

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 1, 2023.

_Jennifer Dysart_
Jennifer Dysart, PhD

---

[73] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology, 20,* 859–869.

## Appendix A

### List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (as of July 31, 2023)

**California:**
*Andrew Wilson v. City of Los Angeles, et al.*, Case No. 2:18-cv-05775 (April 29, 2020)
*Maurice Caldwell v. City and County of San Francisco and Kitt Crenshaw,* Case No. 12-cv-1892 EDL (December 21, 2020)
*Ruben Martinez and Maria Martinez v. City of Los Angeles, et al.,* Case No. 2:20-cv-10559-PA-KS (April 19, 2022)
*Lionel Rubalcava v. City of San Jose, et al.,* Case No. 20-cv-04191-BLF (July 6, 2023)

**Florida:**
*State of Florida v. Michael Keetley,* Case No. 10-18429 (February 19, 2020)
*State of Florida v. Billy Joe Holton*, Case No. 87-CF-6409 (June 14, 2023)

**Illinois:**
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020)
*Robert Bouto v. Reynaldo Guevara, et al*., Case No. 1:19-cv-02441 (December 12, 2022)
*Thomas Sierra v. Reynaldo Guevara, et al*., Case No. 1:18-cv-03029 (January 18, 2023)
*Geraldo Iglesias v. Reynaldo Guevara, et al*., Case No. 1:19-cv-06508 (March 2, 2023)
*Demetrius Johnson v. Reynaldo Guevara, et al.,* Case No. 20-cv-4156 (June 20, 2023)

**Kansas:**
*Lamonte McIntyre & Rose Lee McIntyre v. Unified Government of Wyandotte County and Kansas City, Kansas, et al., Case No. 2:18-cv-02545-KHV-KGG* (September 23, 2021)

**Louisiana:**
*Robert Jones v. Leon Cannizzaro, Jr., et al.*, Case No. 2:18-cv-00503 (December 15, 2019)

**Maryland:**
*The Estate of Malcolm J. Bryant v. Baltimore Police Department, et al.,* Case No. 1:19-cv-00384-ELH (September 14, 2021)
*State of Maryland v. Anthony G. Hall,* Case No. 19130527 (March 8, 2023)

**Massachusetts**
*Angel Echavarria v. J. Michael Roach, et al.,* Case No. 1:16-cv-11118 (August 5, 2020)

**Missouri:**
*Lamont Campbell v. State of Missouri,* Cause No. 1122-CR04130-01, Division 11; Appeal No. ED105247 (April 14, 2022)

**New York:**
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019; July 26, 2022)

**Ohio:**
*Roger Dean Gillispie v. The City of Miami Township, et al.,* Case No. 3:13-cv-416 (August 27, 2019; November 9, 2022)

**Texas:**

*State of Texas v. Eric Tostado,* Ind. No. F02-55040-QU (January 19, 2023)

**Appendix B**

**Academic Curriculum Vitae of Jennifer E. Dysart**

# JENNIFER E. DYSART
## Curriculum Vitae

---

University Address:
Department of Psychology                *Email:*    jdysart@jjay.cuny.edu
John Jay College of Criminal Justice    *Phone:*    212.484.1160
524 West 59th Street, 10th Floor
New York, NY  10019

## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology) <br> *Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

## Peer-Reviewed Journal Publications

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39,* 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19*, 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

## Books

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

## Book Chapters

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92)*. Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

---

**Other Publications**

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2022). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2022.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2021). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2021.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13)*.* Thousand Oaks, CA: Sage.

## Peer-Reviewed Conference Presentations

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical*

*insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification*

*accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

## Invited Judicial Presentations

Dysart, J. E. (2022, November). *The science of eyewitness memory and behavior.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2022, March). *Assessing credibility and reliability: Perception, memory and eyewitnesses identification.* Invited speaker at the National Judicial Institute of Canada "Criminal Law Seminar". Training provided via Zoom.

Dysart, J. E. (2022, February). *The science of eyewitness memory and behavior.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Philadelphia, PA.

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB, Canada.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at *the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.*

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory.* Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory.* Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification.* Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, New York, NY.

Dysart, J. E. (2011, June). *Eyewitness identification.* Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification.* Invited speaker at the Ontario Judges Annual conference, Niagara Falls, ON, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, NL, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification.* Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification.* Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions.* Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence.* Invited speaker at the Ontario Court of Justice West Regional Seminar, Toronto, ON, Canada.

Dysart, J. E. (2009, March). *Identification evidence.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification.* Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification.* Invited speaker at the Atlantic Courts Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, NL, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification.* Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, QC, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, SK, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, PEI, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification.* Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification.* Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony.* Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June). *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification.* Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification.* Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification.* Invited speaker at the Suffolk County Bar Association CLE program "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification.* Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

---

## Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification.* Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research.* Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification.* Invited speaker at the Newfoundland Department of Justice conference, St. Johns, NL, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification.* Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification.* Invited speaker at the "Actual Innocence:

Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification.* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes.* Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification.* Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective*. Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work*. Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, NS, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, SK, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Prosecutor/Conviction Review Presentations

Dysart, J. E. (2022, June). *The science of eyewitness memory and behavior.* Invited Presentation at the Middlesex County, Massachusetts District Attorney's Office webinar on "Eyewitness Identification: Scientific Best Practices." Training provided via Zoom.

Dysart, J. E. (2021, October). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 17th Judicial Circuit, Conviction Integrity Review Division & Assistant State Attorneys. Conducted under the Bureau of Justice Assistance Grant. Training provided via Zoom.

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 4th Circuit, Florida, Conviction Integrity Review Division & Assistant State Attorneys. Training provided via Zoom.

Dysart, J. E. (2021, April). *The science of eyewitness memory and behavior.* Invited presentation to the Suffolk County, MA Conviction Review Unit Team. Training provided via Zoom.

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Defense Attorney Presentations

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21st Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

## Invited Law School and University Presentations

Dysart, J. E. (2021, January). Invited speaker at the Wrongful Convictions Panel Series, Institute for Innovation in Prosecution at John Jay College of Criminal Justice. Meeting via Zoom.

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the "Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the

"Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

## Invited Non-Profit Presentations

Dysart, J. E. (2023, February). *The science of eyewitness memory and behavior.* Invited speaker at the Innocence Project Staff Training seminar. Training provided via Zoom.

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

**Supervision of Doctoral Students at John Jay College of Criminal Justice**

2010        John DeCarlo (Criminal Justice Doctoral Student)
                Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011   Victoria Lawson (Forensic Psychology Doctoral Student)
                Topic: Eyewitness Identification

2006-2009   Anna Rainey (Forensic Psychology Doctoral Student)
                Topics: Showups; Cross-race identification

2006-2009   Brian Wallace (Forensic Psychology Doctoral Student)
                Topics: Alibi believability; Mug shot searching.

**Supervision of Masters Theses at John Jay College of Criminal Justice**

2018 – 2020  Elena Christofi
                Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019  Samantha Kosziollek
                Topic: 911 Dispatchers

2016 – 2018  Marisa Jaross
                Topic: Composite sketches

2016 – 2017  Brittany Kassis
                Topic: 911 Dispatchers

2011 – 2012  Tamara Andrade
                Topic: Composite creation in cross-race identifications

2010 – 2011  Jennifer Savion
                Topic: Composite creation in cross-race identifications

2009 – 2010  Lindsey Butera
                Topic: Eye-tracking and lineup accuracy with biased lineups
              Yinglee Wong
                Topic: Cross-race description accuracy of hair/hairstyles
              Nancy Yang
                Topic: Eye-tracking and weapon focus effect

2008 – 2009  Alexander Buijsrogge
                Topic: Cross-race composite creation of famous faces
              Kristin Chong
                Topic: Stranger alibis and identification accuracy

Victoria Lawson
 Topic: Cross-race showup and lineup accuracy
Jessica Owens
 Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008 Sarah Kopelovich
 Topic: Cross-race and Accent effects on identification accuracy
Jason Mandelbaum
 Topic: Cross-race effects in mug shot searching

## Supervision of Master's Theses at Southern Connecticut State University

2005 Lisbeth Fugal
 Topic: Post-identification feedback
Anna Rainey
 Topic: Cross-race identification and "contact" with other groups

2004 Sandra Soucie
 Topic: CSI Effect

## Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University

2005 Daniel Csuka
 Topic: Multiple Independent Identification Accuracy

## Awards and Scholarships

2017 PSC CUNY research grant ($3,500)

2008 John Jay College Research Assistance Program Grant ($1,000)

2005 Connecticut State University Research Grant ($4,400)

2005 Junior Faculty Research Fellowship, Southern Connecticut State University
 (9 credits teaching release time for Fall 2005)

2003-2005 Social Sciences and Humanities Research Council of Canada (SSHRC)
 Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined)

2002 American Psychological Foundation/Council of Graduate Departments of
 Psychology (APF/COGDOP) Graduate research scholarship ($1,500)

2002 American Psychology-Law Society Grants-in-Aid award ($650)

2001-2003    Social Sciences and Humanities Research Council of Canada (SSHRC) Doctoral Award ($17,900 annually)

2000-2001    Ontario Graduate Scholarship ($15,000)

1999-2000    Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900)

1998-1999    Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300)

## Courses Taught

**John Jay College of Criminal Justice, New York, NY**
- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**
- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)
- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**
- Introduction to Psychology (undergraduate course)

## University Committee Service

2016 – 2019    Graduate Studies Council, John Jay College of Criminal Justice

2013 – 2016    College Council Member, John Jay College of Criminal Justice

2013 – 2016    Faculty Senate Member, John Jay College of Criminal Justice

2013 – 2014    College Council Executive Committee Member, John Jay College of Criminal Justice

| | |
|---|---|
| 2010 – 2012 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |

| | |
|---|---|
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| | |
|---|---|
| 2006 – present | Consultant, eyewitness identification expert |
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011-2012 | Advisory Board member for the Houston Police Department Eyewitness Identification Experiment |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

## Reviewing (past and current)

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

## Professional Affiliations

American Psychology–Law Society
Society for Applied Research in Memory and Cognition