# EXHIBIT 40

```
 2                        HENRY SMARDZ

 3

 4

 5    UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF NEW YORK
 6

 7    ------------------------------------------
      VALENTINO DIXON,
 8
                              Plaintiff,
 9
                    - vs -      Case No.
10                              1:19-cv-01678-WMS

11    CITY OF BUFFALO and COUNTY OF ERIE;
      and DETECTIVE MARK R. STAMBACH,
12    DETECTIVE RANIERO MASECCHIA, DETECTIVE
      JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
13    CHIEF RICHARD T. DONOVAN, JOHN DOES,
      Unknown Buffalo Police Department Supervisors,
14    and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
      BELLING, in their individual capacities,
15
                              Defendants.
16    ------------------------------------------

17

18           Examination before trial of HENRY SMARDZ,

19    taken pursuant to the Federal Rules of Civil

20    Procedure, in the law offices of HARRINGTON &

21    MAHONEY, 70 Niagara Street, Buffalo, New York, on

22    May 10, 2023, commencing at 10:05 a.m., before

23    LORI K. BECK, CSR, CM, Notary Public.

24

25
```



```
 1                     Henry Smardz
 2   administrator's office.  It would be out of my
 3   hands.
 4           BY MS. McCARTHY:
 5           Q.   I see.  Okay.  All right.  I take it,
 6   of course, the detective working the case could
 7   also go to the lab or the administrative office to
 8   request additional testing?
 9           A.   I believe so, sure.
10           Q.   And you said that after evidence was
11   collected, there were certain tests that were
12   required to be done?
13           A.   Yes.
14           Q.   Okay.  Could you -- could you explain
15   what -- what tests would be required of different
16   types of evidence?
17           A.   Well, the main -- the main testing that
18   I would handle would be fingerprint examination.
19           Q.   Okay.
20           A.   That was my forte.  As far as any other
21   thing goes, that would be strictly lab personnel.
22           Like, you know, if they were doing serology
23   tests or firearm tests or trace-evidence tests of
24   that nature, the lab would handle that, the people
25   with the expertise, the chemists, the firearms
```

1                       Henry Smardz
2    have nothing to do with -- would have -- let me
3    add:  Would have nothing to do with the evidence
4    unit.  We didn't take fingerprints like that from
5    prisoners, no.
6         Q.   Okay.  In the 1990s, would the evidence
7    collection unit be involved in collecting the
8    clothing of suspects who were being arrested?
9         A.   If requested, yeah, if we were
10   requested to obtain clothing from an individual
11   like who would be a suspect.
12             Obviously we would collect the clothing from
13   the victim, you know, especially if they were like
14   deceased, but -- or any other time, but unless we
15   were requested to, we -- we didn't take the
16   clothing.
17        Q.   Okay.  So you mentioned especially if a
18   victim were deceased.  Would you attend the autopsy
19   of victims as part of your duties in the evidence
20   collection unit?
21        A.   Yes.
22        Q.   Okay.  And why would -- why would you
23   collect the clothing of the victims?
24        A.   Because -- well, lot of them, they had
25   either, let's say, material on them, let's -- like



1                         Henry Smardz
2    it or not.
3             I had several cases where gunshot residue
4    kits were sent out -- out of state for examination
5    because they had the facilities, from the best of
6    my knowledge.  The facilities weren't here.  We
7    didn't have them, you know, near -- nearby.
8         Q.   I want to take this a step at a time.
9             Putting aside where the testing was done,
10   certainly the Buffalo Police Department had the
11   ability to request gunshot residue testing, whether
12   it was from the central lab or elsewhere.
13        A.   Did we have -- yeah, they could request
14   it, sure.
15        Q.   And -- and you did, in fact, in cases
16   that you worked, swab individuals or clothing for
17   gunshot residue.
18        A.   Several times, yes.  Many times, I'd
19   say, yeah.  Our -- our unit did.  We did collect --
20        Q.   Okay.  And -- and you didn't just swab
21   them and let them sit there.  You -- that evidence
22   was sent for testing somewhere, right?
23        A.   Yes.
24        MR. RUSS:  Objection to form.
25        THE WITNESS:  Oh.



```
1                     Henry Smardz
2        A.   On request, yeah.  Usually it would be
3   from some member of the investigating unit, whether
4   it was -- probably homicide in a case like this.
5   They -- they would make the request for us to
6   obtain a gunshot residue kit, test kit.
7        Q.   And -- and if an investigator requested
8   that you perform a hand swab or collect clothing,
9   you certainly would have complied with that
10  request.
11       A.   Yes.  Yes.  Yeah, we worked under the
12  direction of the initial investigating unit.  In
13  this case that we're talking, with the homicide
14  section.
15       Q.   And what -- what is the investigative
16  purpose of swabbing someone's hands for gunshot
17  residue?
18       A.   Main thing I'm thinking would have been
19  someone had fired -- like used a firearm, fired a
20  weapon.
21       Q.   Okay.  And I take it that the
22  investigative purpose of testing an individual's
23  clothing for gunshot residue would also be to see
24  if that person had fired a firearm.
25       A.   Yeah, I would say.  Well -- yeah.
```



1                    Henry Smardz
2  see the evidence.
3         And I -- I'm assuming it's kept -- from what
4  I understand, the -- like homicide, the statute of
5  limitations on homicide never ends, so I'm assuming
6  they keep -- all the homicide cases are still in
7  there, but I -- I'm assuming the evidence is
8  collect -- is -- is kept and retained following
9  court cases.  That's what I'm told.  I have nothing
10 to do with it.
11        BY MS. McCARTHY:
12        Q.   Okay.  Sure.
13        A.   Our administrative people handle all
14 that.
15        Q.   Okay.  And sorry, Mr. Smardz, I think
16 my question was not very well put, so I want to ask
17 you:
18        It was -- it was your training and your
19 understanding when you were in the evidence
20 collection unit that all items of evidence had to
21 be collected, and that was whether it might help
22 the case or hurt the case, right?
23        A.   Yes.
24        MR. RUSS:  Form.  Objection to form.
25        THE WITNESS:  Oh.



```
 1                       Henry Smardz
 2    something up and say, "Disregard it," you know.
 3            BY MS. McCARTHY:
 4            Q.   If there is potentially pertinent
 5    evidence available to you, you would have collected
 6    and processed that evidence appropriately.
 7            MR. BLENK:  Form.
 8            MR. RUSS:  Objection to form.  You may
 9    answer.
10            THE WITNESS:  Sure.  Yeah, we would have
11    picked it up.  I would have.
12            BY MS. McCARTHY:
13            Q.   And that was, in fact, the BPD policy
14    on recognizing evidence at the time, right?
15            MR. RUSS:  Objection to form.  You may
16    answer.
17            THE WITNESS:  Yeah.
18            BY MS. McCARTHY:
19            Q.   Okay.  So I -- I understand that you
20    didn't perform any forensic testing personally,
21    just latent print examination, but I -- I wanted to
22    ask you just some -- to explain, if you can, some
23    basic ballistic terms that have come up in this
24    case that you testified about at trial.
25            A.   Okay.  If I can remember, sure.  Go
```



```
 1                       Henry Smardz
 2   residue than a cotton tee shirt.
 3           A.   Yeah, maybe.
 4           MR. RUSS:  Objection to form.  You may
 5   answer.
 6           THE WITNESS:  I don't know that offhand,
 7   but, you know, just off the top of my head, it's --
 8   you know, throwing a guess out there, I'd say sure.
 9           BY MS. McCARTHY:
10           Q.   Well, and it's also based on your
11   decades of experience handling evidence generally.
12           A.   Yeah.
13           MR. RUSS:  Objection to form.  You may
14   answer.
15           BY MS. McCARTHY:
16           Q.   The same principle applies with other
17   trace evidence, right?  Hairs, soil, even blood?
18           A.   Yeah.
19           MR. RUSS:  Objection to form.  You may
20   answer.
21           THE WITNESS:  Yeah.
22           BY MS. McCARTHY:
23           Q.   Okay.  And because gunshot residue is
24   generated every time a gun is fired, the -- the
25   amount of residue that's likely to be found is
```



1                      Henry Smardz
2    going to increase the number of times a weapon's
3    fired, right?
4           MR. RUSS:  Objection to form.  You may
5    answer.
6           THE WITNESS:  I would think so.  I would,
7    you know -- in one shot as opposed to three or four
8    or five.
9           BY MS. McCARTHY:
10      Q.   Versus 27, right?
11      A.   Well, yeah.
12          MR. RUSS:  Objection to form.
13          THE WITNESS:  Oh.
14          MR. RUSS:  You may answer.
15          THE WITNESS:  Yeah.
16          BY MS. McCARTHY:
17      Q.   And certainly in your experience, given
18   that each shot produces gunshot residue, if you
19   have 26, 27 shots, cumulatively you would expect
20   there to be a lot of residue.
21          MR. RUSS:  Objection to form.  You may
22   answer.
23          THE WITNESS:  Let's say I'm going out on --
24   I'm not, going out.  I'm thinking about -- let's
25   see.



1                      Henry Smardz
2           MR. BLENK:  Form.
3           MR. SAHASRABUDHE:  Object to the form of the
4    question.
5           THE WITNESS:  Should -- should it be on the
6    shooter?  The person who handled the weapon?  Is
7    that what you're saying?
8           I would think so, yeah.  Yeah, I think it
9    would be on them.
10          BY MS. McCARTHY:
11          Q.   Okay.  And in -- in this case,
12   Mr. Scott has told us that he -- he came two days
13   after the shooting to the Buffalo Police Department
14   and confessed to having been the shooter, and he
15   told us that at the time he offered his clothing to
16   the police officers, okay?
17          MR. SAHASRABUDHE:  Form.
18          BY MS. McCARTHY:
19          Q.   If -- if you had been instructed by any
20   of the detectives to collect his clothing at the
21   BPD homicide office, you absolutely would have
22   collected it, right?
23          MR. SAHASRABUDHE:  Form.
24          MR. BLENK:  Form.
25          THE WITNESS:  Yes.



```
 1                      Henry Smardz
 2           BY MS. McCARTHY:
 3           Q.   And also, when Mr. Scott came on
 4   August 12th, ADA Belling was there and interviewed
 5   him.  If Belling had instructed you to collect
 6   Scott's clothing, you, of course, would have
 7   collected it.
 8           MR. BLENK:  Form.
 9           MR. SAHASRABUDHE:  Form.
10           THE WITNESS:  Sure.  Yeah.
11           BY MS. McCARTHY:
12           Q.   And as with the other evidence in this
13   case, you would have also forwarded it to the lab
14   or to another appropriate entity for appropriate
15   testing, right?
16           MR. SAHASRABUDHE:  Form.
17           MR. BLENK:  Form.
18           THE WITNESS:  Yes.
19           BY MS. McCARTHY:
20           Q.   And -- and here, so -- if you take Mr.
21   Scott at his word that he has the clothing and he
22   hasn't washed it, you would expect potentially
23   there would be a large amount of gunshot residue on
24   his clothing and he was the shooter, right?
25           MR. BLENK:  Form.
```



1                       Henry Smardz
2           MR. SAHASRABUDHE:  Objection to the form of
3    the question.
4           THE WITNESS:  I wouldn't know that.  I've
5    never tested the clothing, but -- that would be up
6    to a lab to determine.  I -- I wouldn't know.
7           He said -- he said that he didn't launder
8    it.  I don't know anything about that end of the
9    investigation right there, because, like I said, I
10   was never -- you said I -- I was never instructed
11   to get his clothing, to the best of my knowledge,
12   so I --
13          BY MS. McCARTHY:
14       Q.  Right.  And I -- I don't -- I'm not
15   trying to say that you were.  My questions to you
16   have been that had you been instructed, you, of
17   course, would have collected and preserved and
18   forwarded for testing the -- the clothing evidence.
19          MR. BLENK:  Form.
20          MR. SAHASRABUDHE:  Form.
21          THE WITNESS:  Yes.
22          BY MS. McCARTHY:
23       Q.  All right.  And -- and you told us --
24   you told us earlier that you would expect that
25   clothing -- if there is gunshot residue on



1                    Henry Smardz
2  clothing, that it would last longer than on a
3  person's hands, because you can wash your hands,
4  there's a lot of transference, right?
5           MR. BLENK:  Form.
6           MR. SAHASRABUDHE:  Form.
7           THE WITNESS:  Yeah.
8           BY MS. McCARTHY:
9       Q.  Okay.  So my question to you, just
10 basic, is if -- if we take Mr. Scott at his word
11 and he provided his clothing that wasn't washed,
12 you would expect that there might potentially be
13 large amounts of gunshot residue on that clothing.
14          MR. BLENK:  Form.
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  I'd say yes.
17          BY MS. McCARTHY:
18      Q.  And the way to determine that would be
19 to have the CPS lab or another lab perform the
20 appropriate gunshot residue testing on that
21 clothing.
22      A.  Also yes.
23          MR. SAHASRABUDHE:  Form.
24          THE WITNESS:  I -- I'd expect them -- why
25 would you take somebody's clothing from them and



```
 1                         Henry Smardz
 2   not expect to do something?  You take the clothing
 3   away from them and say, "We got your clothes, and
 4   what do we do with them?"
 5           There's got to be a reason for collecting
 6   them, so yeah.
 7           BY MS. McCARTHY:
 8       Q.   Right.  And -- and if -- if Mr. Scott
 9   has offered his clothing and is confessing to the
10   crime, then of course you would expect that his
11   clothing should have been collected.
12           MR. BLENK:  Form.
13           BY MS. McCARTHY:
14       Q.   You should have been asked to collect
15   his clothing, right?
16           MR. BLENK:  Form.
17           MR. SAHASRABUDHE:  Object to the form of the
18   question.
19           THE WITNESS:  Yeah, I would have been asked
20   for sure, but I can't recall if I was asked.  I
21   don't remember, and --
22           BY MS. McCARTHY:
23       Q.   Well --
24       A.   -- I don't know if I did collect it.
25   Tell you the truth, I don't believe I did.
```



800.211.DEPO (3376)
*EsquireSolutions.com*

1                      Henry Smardz
2         Q.   Okay.  Well, let's -- let's break this
3    down, because this is important, Mr. Smardz.
4         If -- I'll represent to you I've been
5    through the whole police file.  There's no
6    documentation of you having collected Mr. Scott's
7    clothing.
8         If you'd collected his clothing, you would
9    have prepared an evidence tag and documented that,
10   right?
11        A.   Yes.
12        Q.   Okay.  But you were instructed to and
13   did collect the clothing of Torriano Jackson, Aaron
14   Jackson, Mario Jarmon, and Valentino Dixon, right?
15             MR. BLENK:  Form.
16             THE WITNESS:  Yeah, if I -- according to my
17   report, I did collect their clothing.  That was, I
18   think, shortly after the incident, from what I
19   understand.
20             BY MS. McCARTHY:
21        Q.   What -- what law enforcement reason can
22   you think of for not having you also collect
23   Mr. Scott's clothing when he was there in the BPD
24   homicide office?
25             MR. SAHASRABUDHE:  Objection to the form of



1                    Henry Smardz
2    the question.
3           THE WITNESS:  What reason?  I have no idea.
4    I -- I don't know why I wasn't asked to collect it.
5    I don't know.
6           Like I said, if I was requested to, it would
7    have been collected, and if it would have been
8    collected, it would have been submitted.  If I
9    didn't collect it, then I didn't collect it, and I
10   don't know why.
11          BY MS. McCARTHY:
12       Q.   And that's fair.  Also, had you been
13   directed to, you could have arranged to have
14   Mr. Scott's clothing be photographed, right?
15       A.   That would -- not me.  That would
16   have -- homicide would have called somebody down
17   from the photo unit and probably told them to
18   photograph his shirt.
19          It's happened in the past.  I've seen it
20   happen in the past.
21       Q.   Okay.  So something else that Mr. Scott
22   told us is that because he was the shooter, there
23   was blood on his shoes, and when he came to the
24   homicide office, he told the officers that he was
25   willing to give them his shoes with blood on them.



1                    Henry Smardz
2           You were never directed to collect
3    Mr. Scott's shoes, were you?
4           MR. SAHASRABUDHE:  Objection to the form of
5    the question.
6           MR. BLENK:  Form.
7           THE WITNESS:  No.  I know nothing about that
8    at all.
9           BY MS. McCARTHY:
10          Q.  Okay.  And these were -- these were
11   white Nike sneakers.  Had -- had you been directed
12   to collect those sneakers, you would have collected
13   them, logged them, and sent them to the laboratory
14   for appropriate testing, right?
15          MR. BLENK:  Form.
16          MR. SAHASRABUDHE:  Form.
17          THE WITNESS:  True.  They would have been
18   photographed, cataloged.  You know, description,
19   whether it had stains on it or not, the size of it,
20   the style of it.
21          It would have been bagged, and we'd take it
22   to the lab, sure, ask them to check it out for --
23   if the request was there to say, "Check these
24   sneakers out, see if there's any blood on them,"
25   that same request would have been submitted, but I



800.211.DEPO (3376)
EsquireSolutions.com

```
1                      Henry Smardz
2    don't -- I didn't do anything like that.
3            BY MS. McCARTHY:
4            Q.   You didn't do that because you weren't
5    asked to do that.
6            A.   No, I wasn't asked.  If I was asked,
7    I -- it would have been obvious, because like I
8    said, we -- they -- there would be a reason to
9    collect them.  Just to collect them for
10   collecting's sake means nothing, but being a piece
11   of prime evidence in a case, I would have collected
12   them and submitted them.
13           Q.   And one of the tests that the CPS
14   laboratory, which is right down the hall, could run
15   would have been serological testing, right, to
16   confirm --
17           A.   Yes.
18           Q.   -- if there was blood on the sneakers?
19           A.   Yes.
20           Q.   Okay.
21           A.   If there were, you know -- like they
22   see stains on them, they'd tell you what it is, you
23   know, if there was -- or amongst other things.
24   Excuse me.  There may have been other -- there may
25   have been other stains on it, too.  Who knows?
```



```
 1
 2  STATE OF NEW YORK )
 3                     ss:
 4  COUNTY OF ERIE    )
 5
 6       I DO HEREBY CERTIFY as a Notary Public in and
 7  for the State of New York, that I did attend and
 8  report the foregoing deposition, which was taken
 9  down by me in a verbatim manner by means of machine
10  shorthand.  Further, that the deposition was then
11  reduced to writing in my presence and under my
12  direction.  That the deposition was taken to be
13  used in the foregoing entitled action.  That the
14  said deponent, before examination, was duly sworn
15  to testify to the truth, the whole truth and
16  nothing but the truth, relative to said action.
17
18                          _____
19                          
                            LORI K. BECK,
20                          CSR, RDR, CRR,
                            Notary Public,
21                          Notary expires 4/30/2026
22
23
24
25
```