# EXHIBIT 41

2                          VIDEO DEPOSITION
                        CHRISTOPHER J. BELLING
3


4
    UNITED STATES DISTRICT COURT
5   WESTERN DISTRICT OF NEW YORK

6   ----------------------------------------
7   VALENTINO DIXON,

8                            Plaintiff,

9              - vs -      Case No.
                          1:19-cv-01678-WMS
10
    CITY OF BUFFALO and COUNTY OF ERIE;
11  and DETECTIVE MARK R. STAMBACH,
    DETECTIVE RANIERO MASECCHIA, DETECTIVE
12  JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
    CHIEF RICHARD T. DONOVAN, JOHN DOES,
13  Unknown Buffalo Police Department Supervisors,
    and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
14  BELLING, in their individual capacities,

15                         Defendants.
    ----------------------------------------
16

17          Video recorded deposition of CHRISTOPHER

18  J. BELLING Defendant, taken pursuant to the Federal

19  Rules of Civil Procedure, in the law offices of

20  HARRINGTON & MAHONEY, 70 Niagara Street, Third

21  Floor, Buffalo, New York, on April 11, 2023,

22  commencing at 10:18 a.m., before JOAN M.

23  METZGER-HUBBELL, CM, Realtime Reporter, Notary

24  Public.

25



```
 1

 2   APPEARANCES:       NEUFELD SCHECK & BRUSTIN, LLP,
                        By NICK J. BRUSTIN, ESQ.,
 3                      nick@nsbcivilrights.com,
                        GERARDO ROMO, ESQ.,
 4                      gerardo@nsbcivilrights.com,
                        via Zoom,
 5                      KATIE McCARTHY, ESQ.,
                        katie@nsbcivilrights.com,
 6                      via Zoom,
                        99 Hudson Street,
 7                      8th Floor,
                        New York, New York  10013,
 8                      (212) 965-9081,
                        Appearing for the Plaintiff.
 9
                        HODGSON RUSS LLP,
10                      By HUGH M. RUSS, III, ESQ.,
                        The Guaranty Building,
11                      140 Pearl Street, Suite 100,
                        Buffalo, New York  14202,
12                      (716) 856-4000,
                        hruss@hodgsonruss.com,
13                      Appearing for the Defendants,
                        City of Buffalo; Detective
14                      Mark R. Stambach, Detective
                        Raniero Masecchia, Detective
15                      James P. Lonergan, Detective
                        John Vickerd, Chief Richard T.
16                      Donovan, and John Does, Unknown
                        Buffalo Police Department
17                      Supervisors, via Zoom.

18                      LIPPES MATHIAS WEXLER FRIEDMAN LLP,
                        By JAMES P. BLENK, ESQ.,
19                      jblenk@lippes.com and
                        JENNIFER C. PERSICO, ESQ.,
20                      jpersico@lippes.com,
                        50 Fountain Plaza, Suite 1700,
21                      Buffalo, New York  14202,
                        (716) 853-5100,
22                      Appearing for the Defendants,
                        County of Erie and
23                      Assistant District Attorney
                        Christopher Belling.
24
     PRESENT:           MOISES SOTO-BRITO
25                      JEFFREY J. LOFTUS, Videographer
```



1                    Christopher J. Belling

2  officers, was that they would document any

3  potentially exculpatory or impeachment evidence and

4  provide it to you so you could determine whether it

5  had to be disclosed, correct?

6         MR. BLENK:  Form.

7         THE WITNESS:  Oh, definitely.

8         BY MR. BRUSTIN:

9         Q.   And you understood that that was a

10 basic function of the Buffalo Police Department

11 homicide division?

12        MR. BLENK:  Form.

13        THE WITNESS:  I don't know if it's a basic

14 function, but they were supposed to do it.

15        BY MR. BRUSTIN:

16        Q.   Okay.  Did you ever have any reason to

17 question whether they were doing it?

18        A.   I don't recollect any time that I did.

19        Q.   Okay.  So certainly -- and in this case

20 your understanding with your expectation is that

21 they were -- they were documenting and providing to

22 you any potential exculpatory or impeachment

23 evidence, correct?

24        A.   Yes.

25        Q.   And you had no reason to question



```
 1                Christopher J. Belling
 2   whether or not they were fulfilling that
 3   obligation.  You believe they did?
 4          MR. BLENK:  Form.
 5          THE WITNESS:  I didn't have any reason to
 6   doubt that they would.
 7          BY MR. BRUSTIN:
 8          Q.   Okay.  And obviously you didn't have
 9   the time or the role of supervising directly
10   Buffalo Police Department homicide detectives,
11   correct?
12          A.   Correct.
13          MR. BLENK:  Form.
14          BY MR. BRUSTIN:
15          Q.   You made it clear what your
16   expectations were, and you assumed that through
17   their supervisors they would follow those rules,
18   correct?
19          MR. BLENK:  Form.
20          THE WITNESS:  In general terms, yes.
21          BY MR. BRUSTIN:
22          Q.   And I take it you made it clear that to
23   the extent of homicide detectives who typically
24   weren't lawyers had any questions about whether a
25   particular piece of evidence was Brady material,
```



```
 1                    Christopher J. Belling
 2         BY MR. BRUSTIN:
 3         Q.    Certainly not on this case.
 4         A.    Not on this case.
 5         Q.    If, for example, you understood, for
 6  example, a homicide detective spoke to an
 7  eyewitness two or three times and that eyewitness
 8  provided contradictory statements, you expected
 9  that that -- those contradictory statements would
10  be documented so you could evaluate them, correct?
11         MR. BLENK:  Form.
12         THE WITNESS:  It would have been standard
13  procedure that whatever they talked to anybody
14  about would have been the subject of a police
15  report, and I would have gotten those police
16  reports and been able to compare them.
17         BY MR. BRUSTIN:
18         Q.    So your answer is yes, you would have
19  expected that to be documented, any contradictions,
20  including any contradictions?
21         MR. BLENK:  Form.
22         THE WITNESS:  I would expect that it would
23  be documented.
24         MR. BRUSTIN:  Okay.  Let's mark -- let's mark
25  this as -- what number are we on, Mo?
```



1                    Christopher J. Belling

2          Q.   But you can only litigate it if you

3     have full information about what actually

4     transpired, correct?

5          MR. BLENK:   Form.

6          THE WITNESS:   True.

7          BY MR. BRUSTIN:

8          Q.   So, again, you were reliant on the

9     police to accurately and completely describe to you

10    what happened during identification procedures so

11    you could properly conduct Wade hearings, correct?

12         MR. BLENK:   Form.

13         THE WITNESS:   Yes.

14         BY MR. BRUSTIN:

15         Q.   And the form for that was as you

16    described, in P-73s and P-88s, correct?

17         A.   Correct.

18         Q.   And you were relying on those P-73s and

19    P-88s to be accurate in regard to identification

20    procedures, correct?

21         A.   Yes.

22         Q.   Including how many photos were shown to

23    a witness?

24         A.   Yes.

25         Q.   Which photos were shown to a witness?



1                  Christopher J. Belling

2          A.    Yes.

3          Q.    What, if anything, was said to the

4    witness during the photo array?

5          MR. BLENK:   Form.

6          THE WITNESS:   I'm trying to remember what

7    the P-88 looks like.  There's a narrative part in

8    there, but I think the -- the blank is what did the

9    witness say after they saw the photos.  I don't

10   know if there's a blank or what the officers said

11   to the witness.

12         BY MR. BRUSTIN:

13         Q.    Well, obviously you understood that to

14   the extent that the police officers said anything

15   suggestive about who to pick before, during, or

16   after a photo array, that had to be documented so

17   that you could properly litigate that in a Wade

18   hearing?

19         MR. BLENK:   Form.

20         THE WITNESS:  Sure.

21         BY MR. BRUSTIN:

22         Q.    Basic as it gets, right?

23         MR. BLENK:   Form.

24         THE WITNESS:  I would say that's pretty

25   basic, yeah.



1                     Christopher J. Belling

2           THE WITNESS:  The second part of the

3    question was which would you meet?

4           BY MR. BRUSTIN:

5           Q.   Which detective.  Would it be a lead

6    detective?  Would it be any -- would it be more

7    than that?  Would it vary from case to case?

8           MR. BLENK:  Form.

9           THE WITNESS:  It varied from case to case.

10          BY MR. BRUSTIN:

11          Q.   Did you have a general process in a

12   homicide case for when you would first meet with

13   the homicide detectives?

14          MR. BLENK:  Form.

15          THE WITNESS:  No.  It was ad hoc.

16          BY MR. BRUSTIN:

17          Q.   Okay.  Let's talk about this case just

18   broadly.  Would it be fair to say that the first

19   time you became involved in this case was when

20   Lamarr Scott came in?

21          MR. BLENK:  Form.

22          THE WITNESS:  I would say that the first

23   time I was actually at the homicide office in

24   regard to this case was when Lamarr Scott came in,

25   yes.



1                    Christopher J. Belling

2          Q.    Did you speak to Lamarr Scott at that

3     time?

4          A.    Yes, I did.

5          Q.    For how long?

6          A.    Five minutes.

7          Q.    Did you speak to Leonard Brown at that

8     time?

9          A.    I don't recall talking to Leonard

10    Brown.

11         Q.    And I take it you spoke to Lamarr Scott

12    after the police had already taken a statement from

13    him, correct?

14         A.    Yes.

15         Q.    When did you speak to Lamarr Scott

16    next, after that five-minute conversation that

17    night, or that morning?

18         A.    Probably in December of 1991.

19         Q.    You're sure about that?

20         A.    No, I'm not.  I said probably.  I don't

21    know if I talked to him in between.

22         Q.    Well, let me do it this way, then.   In

23    those first few days after Lamarr Scott came

24    forward, is it your testimony that you only spoke

25    to him for five minutes, or is it possible you



1                    Christopher J. Belling

2   spoke to him more than that?

3           A.   My recollection is I only spoke to him

4   at the homicide office for about five minutes.

5           Q.   Okay.  And not again for months?

6           A.   Again, that's my recollection, yes.

7           Q.   Okay.  But it sounds like, unlike some

8   other things, you're not certain about that; is

9   that fair?

10          MR. BLENK:  Form.

11          THE WITNESS:  I just -- I jump from talking

12  to him in the homicide office establishing that he

13  existed and then went on to the whole process of

14  getting him a lawyer and when Jack Molloy was

15  assigned to represent him.  I don't remember

16  contact with him in between those two times.

17          BY MR. BRUSTIN:

18          Q.   Okay.  And when you -- when you -- when

19  you spoke to -- withdrawn.

20          I take it it wasn't unusual for you to be

21  called down to -- requested to come to the precinct

22  in a homicide case.  That was something -- that was

23  one of your responsibilities, to give assistance to

24  the homicide detectives when needed, correct?

25          MR. BLENK:  Form.



1                    Christopher J. Belling

2            THE WITNESS:  It was, but it didn't happen

3    that often.

4            BY MR. BRUSTIN:

5            Q.   Okay.  So this was -- so this was

6    somewhat unusual?

7            A.   Relatively speaking, yes.

8            Q.   Okay.  And certainly it was unusual

9    after a person had been arrested for a homicide for

10   somebody else to come forward and say, no, they

11   were the person who actually committed the crime,

12   correct?

13           A.   That was unusual, yes.

14           Q.   In fact, would it be fair to say that

15   absent clear mental illness, this was the only time

16   in your career when that's ever happened?

17           MR. BLENK:  Form.

18           THE WITNESS:  Yes.

19           BY MR. BRUSTIN:

20           Q.   Okay.  It was an extraordinary event?

21           A.   Very unusual.

22           Q.   And as a result of this happening, you

23   took a more substantial role in directing the

24   investigation after that point in time than you

25   otherwise would have in a typical homicide



```
 1                   Christopher J. Belling
 2   investigation; fair to say?
 3           MR. BLENK:  Form.
 4           THE WITNESS:  Yes.
 5           BY MR. BRUSTIN:
 6           Q.   Fair to say that you took over the
 7   direction of the investigation at that point in
 8   time?
 9           A.   No.
10           MR. BLENK:  Form.
11           BY MR. BRUSTIN:
12           Q.   You were certainly an integral part of
13   directing the investigation after he came forward;
14   fair to say?
15           MR. BLENK:  Form.
16           THE WITNESS:  No.
17           BY MR. BRUSTIN:
18           Q.   How did I get that wrong?
19           A.   Well, the investigation was ongoing.  I
20   had my concerns.  I told the chief of homicide.  I
21   told the individual detectives, and they went out
22   and did whatever they did to deal with the issues.
23           Q.   But you told them what you wanted?
24           MR. BLENK:  Form.
25           THE WITNESS:  I told them what I was
```



1                    Christopher J. Belling

2    been me and Lamarr Scott alone.  It could have been

3    Stambach there, or it could have been whoever was

4    with Stambach that night.  I think it was DiPirro.

5          Q.    Okay.  And what did you say to Lamarr

6    Scott and what did he say to you during that

7    five-minute conversation?

8          A.    I asked him to identify himself, and I

9    asked if he had just given a statement implicating

10   himself in a homicide.  And I told him that given

11   that set of circumstances, I felt that it would be

12   appropriate for arrangements to be made to get him

13   a lawyer.  And that if he needed a lawyer, he

14   should contact the DA's office and we'd take him to

15   criminal special term and get him an assigned

16   lawyer.

17         Q.    Okay.  And what did he say to you?

18         A.    I don't recollect exactly what he said.

19   I don't think he was particularly talkative.  He

20   told me he was Lamarr Scott.  I think I asked him

21   his age.  I may have asked him about Valentino

22   Dixon's parents having brought him to the scene of

23   the videotape with Wanda Starke, but I tried to

24   stay away from substantive information about what

25   he said, because I felt that that would be -- you



 1                  Christopher J. Belling
 2  know, I didn't want to end up a witness at my own
 3  Huntley hearing, so to speak.
 4       Q.   Okay.  So you made it your business not
 5  to speak to him about any substance?
 6       A.   I tried to avoid the substance of what
 7  was going on and tried to get the context.
 8       Q.   The only substantive question you asked
 9  him was about Valentino Dixon's parents bringing
10  him to the interview?
11       MR. BLENK:  Form.
12       THE WITNESS:  If I asked that, and I don't
13  remember specifically, but it's possible.
14       BY MR. BRUSTIN:
15       Q.   And what did he say about that?
16       A.   I believe he said they had.
17       Q.   What information, if any, without --
18  tell me everything you remember him telling you in
19  substance.
20       A.   That he had given the police a
21  statement, his name, his age.
22       Q.   So he told you he was 18?
23       A.   Yeah, I thought he was 19, but
24  whatever.  And that he told me he had talked to
25  Wanda Starke on TV and that the events that got him



1                   Christopher J. Belling

2          THE WITNESS:  That was more often the case

3    than not.

4          BY MR. BRUSTIN:

5          Q.   It wasn't a hard-and-fast rule I guess

6    is what you're describing?

7          A.   Not at that point in time, it was not.

8          Q.   Was there any involvement of you or any

9    other Assistant District Attorney in this case

10   prior to Valentino Dixon being arrested?

11         A.   Not that I know of.

12         Q.   And that would be something given your

13   involvement in this case you likely would have

14   known, correct, you would have expected to have

15   known about?

16         MR. BLENK:  Form.

17         THE WITNESS:  Maybe.  I don't know.  I

18   just -- there wasn't any that I'm aware of.

19         BY MR. BRUSTIN:

20         Q.   All right.  But you do agree with

21   Mr. Stambach that certainly in this case after an

22   arrest was made and after Lamarr Scott came

23   forward, you did a careful review of the file,

24   correct?

25         MR. BLENK:  Form.



1              Christopher J. Belling

2         THE WITNESS:  I did review the file, yes.

3         BY MR. BRUSTIN:

4         Q.   And that would have been certainly

5    within a week or so of Lamarr Scott coming in?

6         A.   Yes.

7         Q.   And when you say review the file, you

8    would have reviewed every page in the homicide

9    file, correct?

10        MR. BLENK:  Form.

11        THE WITNESS:  Yes, every page as it came

12   into existence, yes.

13        BY MR. BRUSTIN:

14        Q.   And that was -- and given the

15   extraordinary circumstance of this case, Lamarr

16   Scott coming forward and saying he confessed to a

17   crime -- him confessing to a crime that Valentino

18   Dixon was being charged with, I take it that going

19   forward you reviewed every report or document in

20   the file that in any way went to the issue of who

21   the shooter was.

22        MR. BLENK:  Form.

23        THE WITNESS:  I reviewed everything that was

24   in the file as it came into existence, yes.

25        BY MR. BRUSTIN:



```
 1                    Christopher J. Belling

 2  correct?

 3          A.    As far as I know, yes.

 4          Q.    All right.  So take a look at page 487.

 5          A.    47?

 6          Q.    487.

 7          A.    Oh, 487.

 8          Q.    Yeah.

 9          A.    487, yes.

10          Q.    And line 15.

11          "Question:  Okay.  And prior to the formal

12  presentation of anything to a Grand Jury, you

13  review all the available investigation, don't you?

14          "Answer:  Yes.

15          "Question:  So that even before you walk

16  into a Grand Jury for the first time you know

17  everything that has been reported.

18          "Answer:  I would say that's a fair

19  statement."

20          A.    Okay.

21          Q.    Okay.  And that's an accurate

22  description of what you knew by the time of the

23  Grand Jury, correct?

24          A.    I would say that's a fair statement.

25          MR. BLENK:  Form.
```



1              Christopher J. Belling

2    responsible for getting Lamarr Scott to the

3    original TV confession.

4         Q.    They drove him there?

5         A.    Excuse me?

6         Q.    They drove him there is what you mean?

7         MR. BLENK:  I didn't hear that.

8         BY MR. BRUSTIN:

9         Q.    They drove him there is what you mean?

10        A.    No, that's not what I mean.

11        Q.    What do you mean?

12        A.    I mean, they put him up to going there

13   and doing that.

14        Q.    Ah, and where did that information come

15   from?

16        A.    Well --

17        Q.    Other than in your head?

18        A.    It came from the homicide detectives,

19   and it came from my looking at the video.

20        Q.    Okay.  So you learned from the homicide

21   detectives that night that they had determined that

22   the only reason Lamarr Scott came forward was

23   because Valentino Dixon's parents had put him up to

24   it?

25        MR. BLENK:  Form.  Argumentative.



1              Christopher J. Belling

2         THE WITNESS:  That was information that I

3    got at some point right in there time-wise, yes.

4         BY MR. BRUSTIN:

5         Q.  All right.  So, in other words, what

6    you learned was from the homicide detectives -- and

7    I take it you were dealing mostly with Stambach at

8    that point, correct?

9         MR. BLENK:  Form.

10        THE WITNESS:  Yes, my recollection.

11        BY MR. BRUSTIN:

12        Q.  All right.  And so what you learned

13   from Stambach that night or the next day is that

14   they had determined that the reason that -- through

15   their investigation they had determined that the

16   reason Lamarr Scott came forward and confessed was

17   because Valentino Dixon's parents made him do it?

18        MR. BLENK:  Form.

19        THE WITNESS:  That was the undercurrent,

20   that was the tenor of what was operating at that

21   point, yes.

22        BY MR. BRUSTIN:

23        Q.  Well, DA's don't work with

24   undercurrents.  They work with evidence, right?

25        A.  When we have it.



1                    Christopher J. Belling

2        Q.   Well, if you don't have it, then you --

3   then you have nothing, right?

4        MR. BLENK:   Form.

5        MR. BRUSTIN:   You can't prosecute someone

6   based on an undercurrent.

7        MR. BLENK:   Form.

8        THE WITNESS:   That's true.

9        BY MR. BRUSTIN:

10       Q.   All right.   So what evidence did they

11  describe to you in those following days, the day

12  after he came in and confessed to committing a

13  murder, what evidence did they provide to you that

14  made it clear to them that Valentino Dixon's

15  parents had made Lamarr Scott confess to a crime

16  that Valentino Dixon committed?

17       MR. BLENK:   Form.

18       THE WITNESS:   I don't recall any specific,

19  you know, individual points of evidence other than

20  their presence on the video, their -- the fact that

21  they brought him there.   Other than that, I don't

22  recall specifically what was discussed at that

23  point.

24       BY MR. BRUSTIN:

25       Q.   Well, you understood that the most



1                  Christopher J. Belling

2    important issue when this extraordinary event

3    happened, Lamarr Scott said I committed this

4    murder, the most important issue was, was it true,

5    right?

6            MR. BLENK:  Form.

7            THE WITNESS:  That was an issue, sure.

8            BY MR. BRUSTIN:

9            Q.   And if it wasn't true, then why would

10   he say something crazy like that, right?

11           A.   True.

12           Q.   And that required a full and careful

13   investigation, correct?

14           MR. BLENK:  Form.

15           THE WITNESS:  It required some

16   investigation, yes.

17           BY MR. BRUSTIN:

18           Q.   Just some?

19           A.   Well, I think some was done, and I

20   think that it was clear where the situation was

21   going.

22           Q.   Okay.  What investigation was done?

23   Because I haven't seen any documentation of any of

24   it.

25           MR. BLENK:  Form.



1                     Christopher J. Belling

2          THE WITNESS:  I don't know what they did.

3    The information they gave me was what I just told

4    you.

5          MR. BRUSTIN:  Okay.

6          THE WITNESS:  Then I viewed the video of his

7    supposed confession to Wanda Starke and, you know,

8    that that was the tenor of the situation.

9          BY MR. BRUSTIN:

10         Q.   The undercurrent, so to speak?

11         A.   That's what I said.

12         Q.   And so I think I understand.  Your

13   understanding, you expressed your concern to the

14   police that you wanted to make sure that it was

15   investigated as to whether or not what he said was

16   true and, if not, why he made it, correct?

17         MR. BLENK:  Form.

18         MR. BRUSTIN:  In substance.

19         THE WITNESS:  It's a little -- that's a

20   little broken down.  The bottom line is, is he a

21   false confessor because he was put up to it or not.

22         BY MR. BRUSTIN:

23         Q.   Did you start with the premise that he

24   was a false confessor?

25         MR. BLENK:  Form.



1              Christopher J. Belling

2    possibility that -- withdrawn.

3         So -- all right.  So it sounds like you

4    formed some pretty strong beliefs based on your

5    impression of him that night, and you said that you

6    learned that, among other things, the -- the

7    homicide detectives checked the background of

8    Robert Bryant and Valentino Dixon's mother,

9    correct?

10            MR. BLENK:  Form.

11            THE WITNESS:  I think I asked them to do

12   that.  I don't know that they had done that at that

13   point in time.

14            BY MR. BRUSTIN:

15            Q.  Do you remember seeing any paperwork on

16   that?  Because I don't.

17            A.  No, I don't remember seeing any

18   paperwork.

19            Q.  What else did -- other than -- other

20   than asking them to check the background, what else

21   did you ask them to check, if anything?

22            MR. BLENK:  Form.  Asked and answered.

23            BY MR. BRUSTIN:

24            Q.  Withdrawn.  It sounds like that's the

25   sum total of what you asked them to do; is that



1              Christopher J. Belling

2  or was fabricated, the most important time to

3  investigate that was in the days following that --

4  those statements, correct?

5          MR. BLENK:  Form.

6          THE WITNESS:  I would not agree with that.

7          BY MR. BRUSTIN:

8          Q.   No?  It wouldn't be important, for

9  example, to interview Valentino Dixon's parents or

10 other people who may have information about some

11 bribe potentially as soon as -- as soon as possible

12 after the statements were made?

13         MR. BLENK:  Form.

14         THE WITNESS:  It certainly could have been

15 helpful.

16         BY MR. BRUSTIN:

17         Q.   Those are some of the basic things you

18 would expect would be done by homicide detectives

19 to determine whether or not Lamarr Scott's

20 confession was true or not, correct?

21         MR. BLENK:  Form.

22         THE WITNESS:  It would have been helpful.

23         BY MR. BRUSTIN:

24         Q.   Were you -- by the way, is it possible

25 that maybe you shared your view with the homicide



1                    Christopher J. Belling

2  detectives and you told them, you know what, I just

3  don't think he's telling the truth, no need to

4  investigate?

5            MR. BLENK:  Form.

6            THE WITNESS:  No.

7            BY MR. BRUSTIN:

8            Q.   You expected them to do a full

9  investigation into the reliability and the accuracy

10  of Lamarr Scott's admissions, correct?

11            MR. BLENK:  Form.

12            THE WITNESS:  I expected them to continue

13  investigating.

14            BY MR. BRUSTIN:

15            Q.   All right.  Did you notice that in the

16  days following Lamarr Scott's confession no reports

17  were generated concerning an investigation into

18  whether Lamarr Scott was the shooter?

19            MR. BLENK:  Form.

20            MR. RUSS:  Objection to form.

21            THE WITNESS:  And I don't recollect that.

22            BY MR. BRUSTIN:

23            Q.   Did you notice when you looked at

24  police reports, which you said you were reviewing

25  as they came in, that nobody showed Lamarr Scott's



1                    Christopher J. Belling

2          A.    Right.

3          Q.    Good enough.

4          A.    Okay.

5          Q.    And you got to her because you had

6    traced her plate, and that's how you got to her

7    house, license plate?

8          A.    That's correct.

9          MS. PERSICO:  Form.  Can we -- are you

10   asking -- I want to be clear.

11         MR. BRUSTIN:  I'll clarify.

12         BY MR. BRUSTIN:

13         Q.    So now I'm -- let me do -- let me do it

14   a better way, because it wasn't clear.  Let me

15   first ask you straight.  So, first of all, you went

16   to Tamara Frieda's house with another detective,

17   correct?

18         A.    With a detective.

19         Q.    Sorry, with a detective, one detective.

20         A.    Correct.

21         Q.    And you got there because you had

22   traced her plate and learned where she lived?

23         A.    Police traced the plate, yes.

24         Q.    Okay.  And she said that she didn't --

25   when you met with her, she was a nice young women,



1              Christopher J. Belling
2         Fair to say you don't have any understanding
3    as to why Detective Stambach went to see her on
4    December 5th, 1991?
5         MS. PERSICO:  Form.
6         THE WITNESS:  I think that's one of the
7    things that's in my letter from November asking
8    them to do, so, again, extrapolating, there you go.
9         BY MR. BRUSTIN:
10        Q.   Okay.  And why doesn't your letter, by
11   the way, reference the anonymous call?
12        MS. PERSICO:  Form.
13        THE WITNESS:  I don't know.
14        MR. RUSS:  Objection to form.
15        BY MR. BRUSTIN:
16        Q.   Isn't that -- you were writing a letter
17   to the detectives.  16 -- and, by the way, this is
18   you writing to Chief Donovan telling him what you
19   want investigated, correct?
20        A.   Correct.
21        Q.   You're not asking for a favor or if he
22   feels like doing it.  You're telling him, this is
23   what I need you to do, correct?
24        A.   Yeah, in general terms, yes.
25        Q.   And, in fact, you're even telling him



1                    Christopher J. Belling
2           Q.   Does this refresh your recollection, or
3    maybe you don't need it.  Do you recall
4    testifying -- withdrawn.
5           Do you recall making efforts to -- to reach
6    out to Emil Adams and law enforcement in Michigan
7    concerning Emil Adams?
8           A.   Yes.
9           MS. PERSICO:  I'm sorry, are we talking
10   about in connection with the perjury trial or just
11   generally asking?
12          MR. BRUSTIN:  I'm asking him generally.  In
13   fact, in both trials, right?
14          THE WITNESS:  I didn't do the perjury trial,
15   so I don't know.
16          BY MR. BRUSTIN:
17          Q.   You recall reaching out to him in
18   connection with the -- with the Valentino Dixon
19   trial?
20          A.   Correct.
21          Q.   Okay.  And it was very difficult to get
22   him to come to trial, correct?
23          A.   It was challenging.
24          Q.   And you actually ended up sending a
25   couple detectives out there to go get him, correct?



1                    Christopher J. Belling

2            MS. PERSICO:   Form.

3            THE WITNESS:   I honestly don't remember.   I

4    remember he was in Michigan and we had to arrange

5    to get him back, and I don't know the mechanism

6    that was pursued at this point.

7            BY MR. BRUSTIN:

8            Q.   Okay.  And one of the things you

9    mentioned to the students at Georgetown and it's

10   consistent with other information that we have in

11   the file is that -- I don't know if you can

12   remember specifically, but that Emil Adams had some

13   legal issues going on in Michigan around the time

14   of the trial.  Do you recall that?

15           A.   I recollect that he did have some legal

16   issues, yes.

17           Q.   Okay.  And I know it's a long time ago,

18   but I want to know a couple of things.  One is,

19   what's your recollection as best you can as to what

20   his legal issues were in Michigan at the time?

21   And -- that's the first question.

22           A.   Okay.  First question, I don't

23   remember.  I knew he had some issues in Michigan,

24   that's all.

25           Q.   Okay.  You don't remember whether it



1              Christopher J. Belling

2   was in connection with an ongoing prosecution or

3   investigation that was going on?  Some criminal

4   involvement that there was -- withdrawn.

5        Would it be fair to say that there was

6   some -- some -- something going on with the

7   criminal justice system and Emil Adams in Michigan

8   to the best of your recollection?

9        MS. PERSICO:  Form.

10       THE WITNESS:  That's correct.

11       BY MR. BRUSTIN:

12       Q.   And you just can't remember today what

13  it was?

14       A.   Correct.

15       Q.   But you do remember having -- even

16  though you don't remember the substance, you

17  remember having conversations about local law

18  enforcement concerning Emil Adams?

19       MS. PERSICO:  Form.

20       THE WITNESS:  I remember having to talk to

21  people in Michigan who were involved in law

22  enforcement to arrange for Emil Adams to come back

23  to Buffalo.

24       BY MR. BRUSTIN:

25       Q.   And also, I take it, talking about his



1                    Christopher J. Belling

2    criminal situation in Michigan.

3           MS. PERSICO:  Form.

4           MR. BRUSTIN:  Even though you can't remember

5    the specifics.

6           THE WITNESS:  I don't know what his

7    situation was, so I don't remember what I talked to

8    them about.  I remember we had to do something with

9    Michigan getting him back.

10          BY MR. BRUSTIN:

11          Q.   And you don't remember how you learned

12   about his criminal issues in Michigan?

13          A.   No.

14          Q.   Only that they existed?

15          A.   Yes, that's correct.

16          Q.   But you remember learning about those

17   criminal issues at or around the time you were

18   trying to get him to come to testify, correct?

19          MS. PERSICO:  Form.

20          THE WITNESS:  Yes, that's true.

21          BY MR. BRUSTIN:

22          Q.   And you remember as a general matter

23   that those criminal issues were one of the

24   impediments in your -- at least in your mind to him

25   coming to testify?



1                    Christopher J. Belling

2          MS. PERSICO:  Form.

3          THE WITNESS:  It was a problem.  It wasn't

4   an impediment.

5          BY MR. BRUSTIN:

6          Q.   One of -- one of the things that was

7   causing you a problem in getting him to come

8   testify was his ongoing criminal issues in

9   Michigan, correct?

10         MS. PERSICO:  Form.

11         THE WITNESS:  No.  One of the things making

12  it difficult for him to physically be in Buffalo

13  was whatever was going on in Michigan.

14         BY MR. BRUSTIN:

15         Q.   The criminal issues in Michigan?

16         A.   Whatever was going on in Michigan.

17         Q.   In other words, there was -- there was

18  a process going on in Michigan that was making it

19  difficult for him to come out of state; is that

20  what you're saying?

21         A.   No.

22         MS. PERSICO:  Form.

23         BY MR. BRUSTIN:

24         Q.   There were things happening in Michigan

25  with the criminal justice system that, to your



```
 1                    Christopher J. Belling
 2   understanding, made it difficult for him to come?
 3           MS. PERSICO:  Form.  Asked and answered.
 4           THE WITNESS:  No.
 5           BY MR. BRUSTIN:
 6           Q.   So what was your understanding as to
 7   what was going on in Michigan?
 8           A.   I don't remember.  He was in Michigan.
 9   That's what I remember.
10           Q.   Okay.  And do you recall providing any
11   assistance with him concerning any potential
12   criminal issues in Michigan as a result of his
13   cooperation in this case?
14           MS. PERSICO:  Form.
15           THE WITNESS:  I do not specifically
16   remember.
17           BY MR. BRUSTIN:
18           Q.   Do you remember anything in general
19   about talking to law enforcement to try to assist
20   him or at least let them know that he was
21   cooperating in your case?
22           MS. PERSICO:  Form.
23           THE WITNESS:  And that's fairly standard
24   what -- how I would have done it.  I would have
25   told him, I'll talk to whatever law enforcement is
```



1              Christopher J. Belling

2  on the other end telling them you cooperated.

3          BY MR. BRUSTIN:

4          Q.   And you remember that broadly.  You

5  just can't remember the specifics?

6          MS. PERSICO:  Form.

7          THE WITNESS:  Correct.

8          BY MR. BRUSTIN:

9          Q.   Is that correct?

10         A.   Correct.

11         Q.   But, in any case, it was very difficult

12  for a variety of reasons to get him to come and

13  testify, correct?

14         MS. PERSICO:  Form.

15         THE WITNESS:  It was difficult.

16         BY MR. BRUSTIN:

17         Q.   And that limited the amount of time

18  that you were able to spend with him in preparation

19  for trial; fair to say?

20         MS. PERSICO:  Form.

21         THE WITNESS:  I don't know.

22         BY MR. BRUSTIN:

23         Q.   Do you have any recollection as you sit

24  here today of meeting with Mr. Adams before trial

25  concerning what he observed on the day of the crime



1                    Christopher J. Belling

2    and what transpired with the police during the

3    investigation?

4          MS. PERSICO:  Form.

5          THE WITNESS:  I don't recall that -- those

6    conversations, no.

7          BY MR. BRUSTIN:

8          Q.   Okay.  And is it your testimony that

9    you don't believe that you met with him prior to

10   the trial or you just can't recall one way or

11   another whether you did?

12         A.   I can't recall whether I did or not.

13         Q.   Do you expect that you would have had

14   some form of meeting with him?

15         A.   Yes.

16         Q.   Okay.  And certainly you would have met

17   with the detectives who interacted with him before

18   trial, correct?

19         MS. PERSICO:  Form.

20         THE WITNESS:  No.

21         BY MR. BRUSTIN:

22         Q.   Well, you -- you've already told us

23   that you were talking to the detectives throughout

24   the case, including Stambach, about the activities

25   they conducted, correct?



1                    Christopher J. Belling

2          A.    When the need arose, I talked to them

3    about what they did in the case, yeah.

4          Q.    Okay.  But primarily you were relying

5    on their police reports as to what transpired; fair

6    to say?

7          A.    I think that's fair to say.

8          Q.    All right.  So let's take a look at

9    some of the police reports in this case.  So, first

10   of all, if you take a look at -- going back to the

11   police file.

12         MR. RUSS:  Exhibit 2?

13         MR. BRUSTIN:  Yes, please.

14         BY MR. BRUSTIN:

15         Q.    Take a look and start at page 47.

16         A.    What was that number again?

17         Q.    47.

18         A.    Okay.  I've got it.

19         Q.    And this is one of the reports

20   concerning Emil Adams' alleged identification of

21   Valentino Dixon as the shooter, correct?

22         A.    His identification.  Yes, this is the

23   document, the P-73 about the process.

24         Q.    Okay.  And, by the way, there's been

25   some discrepancy in the case as to whether or not



 1                    Christopher J. Belling

 2   Valentino Dixon if you didn't review this document?

 3          A.   Well, I undoubtedly read this document,

 4   but I didn't -- it wasn't an important document to

 5   review at those other stages you talked about.

 6          Q.   All right.  But certainly you

 7   understood that according to this police report and

 8   according to your discussions with the detectives,

 9   Emil Adams identified Valentino Dixon from a

10   properly conducted six-person photo array, correct?

11          MS. PERSICO:  Form.

12          THE WITNESS:  That was my understanding,

13   yes.

14          BY MR. BRUSTIN:

15          Q.   And that there was -- and that it was

16   your understanding that there was no suggestion as

17   to who he should pick, correct?

18          A.   I didn't know of any suggestion.

19          Q.   Okay.  And that he positively

20   identified -- in other words, you understood

21   through this report and others that he positively

22   identified Valentino Dixon through a properly

23   conducted six-person photo array, correct?

24          A.   That's what the document reflects, yes.

25          Q.   And you never received any information



1              Christopher J. Belling

2         Q.   And you -- certainly this is a -- this

3    is a report that you would have reviewed early on

4    in the investigation, correct?

5         MS. PERSICO:   Form.

6         THE WITNESS:   I have no doubt I did, yes.

7         BY MR. BRUSTIN:

8         Q.   Okay.  And you would agree that

9    according to this report from Detective Stambach,

10   Emil Adams was first interviewed, gave a sworn

11   statement, after which time he was shown a photo

12   array with six pictures and positively identified

13   Valentino Dixon as the shooter, correct?

14        A.   That's what the report says.

15        Q.   In other words, no suggestion in this

16   report that he was ever -- there was ever any

17   suggestion used, correct?

18        MS. PERSICO:   Form.

19        THE WITNESS:   No suggestion in the report

20   that any suggestion was used in the showing of the

21   array?

22        BY MR. BRUSTIN:

23        Q.   There's nothing in the report telling

24   you that -- withdrawn.

25           This report indicates that he was properly



 1                 Christopher J. Belling

 2  interviewed and that there was a properly conducted

 3  photo array and he made a positive identification?

 4        A.   This report indicates that he was

 5  interviewed, he made an identification.

 6        Q.   And nothing -- nothing in this report

 7  suggests anything improper was done, correct?

 8        A.   Correct.

 9        Q.   Nothing in this report indicates any

10  suggestion, correct?

11        A.   Correct.

12        Q.   And you did not receive any information

13  from any police officer to the contrary, correct?

14        A.   Correct.

15        Q.   Another report indicating that -- that

16  everything that was done with Emil Adams was

17  consistent with proper procedure, correct?

18        A.   I don't know about another report, but

19  it's a report that indicates that.

20        Q.   As to the other reports you reviewed

21  today, just now.

22        MS. PERSICO:  Form.

23        THE WITNESS:  Well, I reviewed a statement

24  of his, and I reviewed a P-88.

25        BY MR. BRUSTIN:



1                    Christopher J. Belling

2   photo array, correct?

3          A.   If that's what the report says.

4          Q.   The report makes clear that -- the

5   reports make clear that Emil Adams never expressed

6   any uncertainty about who the shooter was or

7   whether Valentino Dixon was the shooter, correct?

8          MS. PERSICO:   Form.

9          THE WITNESS:   I don't know the answer to

10  that.   The report --

11         BY MR. BRUSTIN:

12         Q.   You just reviewed the reports.

13         A.   Right.   And what number was the report?

14         Q.   For example --

15         A.   Where is the report?

16         Q.   Page 25, for example.

17         A.   Okay.

18         Q.   Nothing in page 25 suggesting that Emil

19  Adams expressed any uncertainty about who the

20  shooter was, right?

21         A.   That's correct.

22         Q.   Or whether it was Valentino Dixon,

23  correct?

24         A.   Correct.

25         Q.   All it expresses is that he made a



1              Christopher J. Belling
2    certain identification, correct?
3         A.   He positively identified Valentino
4    Dixon as the shooter.
5         Q.   And you took that to be true, correct?
6         A.   Correct.
7         Q.   Now, did you ever become aware at any
8    time that Mr. Bryant, Valentino Dixon's father,
9    along with his wife and another witness -- and
10   Antoine Shannon took a tape-recorded interview --
11   did a tape-recorded interview of Emil Adams after
12   the -- after the crime?
13        MS. PERSICO:  Form.
14        THE WITNESS:  No, I was never aware of that.
15        BY MR. BRUSTIN:
16        Q.   The first you've ever heard of that is
17   me saying it?
18        A.   I had heard of the Robert Bryant and
19   Annie Shannon tape-recording Joe Terranova, and I
20   don't know if I ever heard about taping anybody
21   else.
22        Q.   Okay.  As you sit here today, you don't
23   recall learning that there was a taped statement of
24   Emil Adams at his home?
25        A.   I do not recall that.



1                    Christopher J. Belling

2          Q.    Okay.    But you would agree that

3   certainly you don't recall seeing any report or

4   receiving any information from any detective that

5   Emil Adams told the police he couldn't make an

6   identification?

7          MS. PERSICO:    Form.

8          THE WITNESS:    That is correct.

9          BY MR. BRUSTIN:

10         Q.    And you don't recall seeing any report

11  indicating that Emil Adams was shown three

12  individual photos, including a photo of Mario

13  Joiner and Valentino Dixon, as opposed to a

14  six-person array?

15         MS. PERSICO:    Form.

16         MR. RUSS:    Objection to form.

17         THE WITNESS:    I have no idea what -- if that

18  ever happened or anything like that.    I know

19  nothing about it.

20         BY MR. BRUSTIN:

21         Q.    No one ever told you about that?

22         A.    No.

23         Q.    And no one ever -- in fact, more

24  specifically, nobody ever told you in writing or

25  orally that Emil Adams was shown an individual



```
 1                    Christopher J. Belling
 2   photo of Valentino Dixon, correct?
 3           MS. PERSICO:  Form.
 4           MR. RUSS:  Objection to form.
 5           THE WITNESS:  That's correct.
 6           BY MR. BRUSTIN:
 7           Q.   In fact, if that had happened, you
 8   would have remembered it, correct?
 9           MS. PERSICO:  Form.
10           THE WITNESS:  If what had happened?
11           MR. RUSS:  Objection to form.
12           BY MR. BRUSTIN:
13           Q.   If he had been shown individual photos,
14   including an individual photo of Valentino Dixon,
15   of course you'd remember that?
16           MS. PERSICO:  Form.
17           MR. RUSS:  Objection to form.
18           THE WITNESS:  If I knew about it, it would
19   be something that would be memorable.
20           BY MR. BRUSTIN:
21           Q.   And you would obviously have to
22   disclose that as Brady material?
23           MS. PERSICO:  Form.
24           THE WITNESS:  If I knew about it, yes.
25           MR. RUSS:  Objection to form.
```



1              Christopher J. Belling

2         MS. PERSICO:  Well, we're not going to go

3    there, because there is no -- there is nothing that

4    said that he --

5         MR. BRUSTIN:  Well, of course we're going to

6    go there.  That's the heart of the case.  That's

7    what summary judgment's going to be about.

8         MS. PERSICO:  Well, then find somebody who

9    can authenticate Emil Adams before you represent --

10        MR. BRUSTIN:  Well, I got it.

11        MS. PERSICO:  That was not the testimony, or

12   at least we don't have that testimony.

13        MR. BRUSTIN:  I've got it.

14        BY MR. BRUSTIN:

15        Q.   So, in any case, you would agree that

16   if Stambach represented in his report that he was

17   shown a six-person photo array but, in fact, he was

18   shown three individual photos, including a photo of

19   Valentino Dixon, you would agree that would be a

20   serious misrepresentation in his report, correct?

21        MS. PERSICO:  Objection.  Asked and

22   answered.

23        MR. RUSS:  Objection to form.

24        THE WITNESS:  If it was true.

25        MR. BRUSTIN:  If true, of course.  That's



1                      Christopher J. Belling

2           A.    Correct.

3           Q.    And, again, I take it with Mr. Adams,

4    like with Mr. Adams, you relied on the police

5    reports concerning what transpired between the

6    police and Mr. Sullivan, correct?

7           MS. PERSICO:  Form.

8           THE WITNESS:  Yes.

9           BY MR. BRUSTIN:

10          Q.    Now, let's go to the DA file, 30, the

11   first DA file, the Dixon DA file, and let's take a

12   look at page 2130.

13          MS. PERSICO:  Is this the one there's only

14   one of?  There's not another copy of this floating

15   around, is there?

16          MR. BRUSTIN:  Yeah, sorry.

17          MS. PERSICO:  What page?

18          MR. BRUSTIN:  2130.

19          THE WITNESS:  2130.

20          BY MR. BRUSTIN:

21          Q.    Okay.  Have you reviewed these notes in

22   preparation for today?

23          A.    No.

24          Q.    All right.  Why don't you take a minute

25   and review 2130, let me know when you're done.



1                 Christopher J. Belling

2          A.    Okay.  I've read it.

3          Q.    And here, why is it then in these notes

4  you're putting the date when the interview happened

5  as opposed to other notes you did not?

6          MS. PERSICO:  Form.

7          THE WITNESS:  I have no idea.

8          BY MR. BRUSTIN:

9          Q.    Okay.  In any case it appears this

10  interview -- withdrawn.

11          In any case, it appears that these notes

12  were taken on May 18th, 1992, correct?

13          A.    This -- these notes are May 18th, May

14  19th, and June 1st of 1992.

15          Q.    Just before the trial in June, correct?

16          A.    Correct.

17          Q.    And it looks like on May 18th or

18  thereabouts you were learning that Mr. Sullivan is

19  about to be indicted for some type of rape offense

20  concerning a 15-year-old girl in Georgia, correct?

21          A.    Correct.

22          Q.    Tell me what you learned about that.

23          A.    Exactly what the notes say, that the

24  indictment will be returned within the next two

25  weeks, be arraigned within a month, 15-year-old



```
 1                    Christopher J. Belling
 2   girl, and the assistant DA's name was Petrey,
 3   P-E-T-R-E-Y, Petrey, and his address, the ADA's
 4   address.
 5          Q.   And did you disclose that information
 6   to Mr. Terranova?
 7          A.   I disclosed to Mr. Terranova the fact
 8   that John Sullivan had a pending case in Georgia.
 9          Q.   Did you tell him it was for raping a
10   15-year-old girl?
11          A.   I believe so.
12          Q.   Did you do it in writing?
13          A.   I don't remember.
14          Q.   Did you have an obligation to do it in
15   writing since you have Brady obligations?
16          A.   I don't think there's an obligation to
17   do it in writing.  There's an obligation to let him
18   know.
19          Q.   Is it your practice -- withdrawn.
20          Would it be fair to say that -- I showed you
21   a document earlier where you disclosed Brady
22   material in writing, correct?
23          A.   Oh, yes.
24          Q.   And one of the reasons why you disclose
25   Brady material in writing is because you want to
```



```
 1                 Christopher J. Belling
 2         Q.    So why don't you take a minute and
 3  review it.
 4         A.    Okay.
 5         Q.    It's a two-page document.
 6         A.    Okay.
 7         Q.    And this is you writing a letter in
 8  support of Mr. Sullivan, the witness, after he
 9  testified in the trial, correct?
10         A.    Correct.
11         Q.    And you're cc'ing his father, correct?
12         A.    Correct.
13         Q.    And I take it that one of the things
14  you told his father and one of the things you told
15  his son is that if he cooperated and came to trial,
16  you would -- you would write a letter on his
17  behalf, correct?
18         MS. PERSICO:  Form.
19         THE WITNESS:  I don't think I would have
20  done that, because had I done that, it would have
21  been a Brady issue, so I didn't do it.
22         BY MR. BRUSTIN:
23         Q.    Of course it would have been.  Do you
24  deny doing that?
25         A.    I don't remember doing it, no.
```



1                    Christopher J. Belling

2          Q.   Do you deny doing it, sir?

3          A.   I don't know whether I did it or not.

4          Q.   All right.  So, in other words, it's

5    possible that you did it knowing it was a Brady

6    violation, correct?

7          MS. PERSICO:  Form.

8          THE WITNESS:  That I did what?

9          BY MR. BRUSTIN:

10         Q.   Let me be very clear, sir.  It's

11   possible that you talked to Mr. Sullivan and/or his

12   son about writing a letter if he cooperated and

13   it's possible that you didn't disclose that to the

14   other side, correct?

15         MS. PERSICO:  Form.

16         THE WITNESS:  I would have been much more

17   general than that, and I don't -- just don't know

18   what happened with that.

19         BY MR. BRUSTIN:

20         Q.   So, in other words, it's possible that

21   you failed to disclose that you told John Sullivan,

22   Jr., if he cooperated you would write a letter for

23   him in support of his rape prosecution?

24         MS. PERSICO:  Form.

25         THE WITNESS:  I have no idea.



1                    Christopher J. Belling

2           BY MR. BRUSTIN:

3           Q.   Okay.  And that could be very helpful

4   in connection with those rape charges in Georgia.

5   You knew that, right?

6           MS. PERSICO:  Form.

7           THE WITNESS:  I would expect that it could

8   be, sure.

9           BY MR. BRUSTIN:

10          Q.   Okay.  And obviously to the extent that

11  you had talked to Mr. Sullivan or his son or his

12  wife about writing a letter on his behalf, that

13  would be Brady material that Mr. Terranova would

14  have been entitled to, correct?

15          MS. PERSICO:  Form.

16          THE WITNESS:  If there was discussion of

17  writing a letter, it probably could be Brady

18  material.

19          BY MR. BRUSTIN:

20          Q.   If there was discussion of putting in a

21  good word for him, doing a favor for him, that's

22  classic Brady material, correct?

23          MS. PERSICO:  Form.

24          THE WITNESS:  No, it's not classic Brady

25  material.



1                    Christopher J. Belling

2         Q.    Just 74 and 75.

3         A.    That's fine.  I'm good.

4         Q.    Have you had a chance to read it?

5         A.    Yeah, I've read it.

6         Q.    Okay.  And so what this document is

7    purporting to say is that John Sullivan is the

8    first person to mention Valentino Dixon, correct?

9         MS. PERSICO:  Form.

10        THE WITNESS:  As far as I know, yes.

11        MR. RUSS:  Objection to form.

12        BY MR. BRUSTIN:

13        Q.    And that he identifies him without

14   ever -- him ever having been mentioned as the

15   shooter, correct?

16        A.    Correct.  He injects Tino's name into

17   the event.

18        Q.    He's the person -- your understanding

19   was he's the person who interjected Valentino

20   Dixon's name into this case, correct?

21        A.    Correct.

22        Q.    And it's your understanding based on

23   this report and your communications with detectives

24   that he then confirmed his identification, his

25   volunteering Valentino Dixon for the first time in



1                   Christopher J. Belling

2    this case, he confirmed it by picking him out of a

3    photo array?

4          MS. PERSICO:  Form.

5          THE WITNESS:  That's what the statement

6    says.

7          BY MR. BRUSTIN:

8          Q.   And according to the statement, it's a

9    properly conducted six-person array, correct?

10         A.   That's what it says.

11         Q.   With no suggestion whatsoever?

12         MS. PERSICO:  Form.

13         THE WITNESS:  It doesn't -- there's none in

14   there, no suggestion is shown in the statement.

15         BY MR. BRUSTIN:

16         Q.   But the most important thing is that

17   he's the person volunteering Valentino Dixon's

18   name, not the other way around, correct?

19         MS. PERSICO:  Form.

20         THE WITNESS:  That's correct.

21         BY MR. BRUSTIN:

22         Q.   And your understanding throughout this

23   case has been that John Sullivan is the first

24   person in this investigation to mention Valentino

25   Dixon?



1                    Christopher J. Belling

2          A.    That's my understanding, yes.

3          Q.    Now, let's go back for a minute to the

4    DA file, and let's go to 2171.

5          A.    Okay.

6          Q.    Now, this appears to be a call on 6/9

7    from John Sullivan.  Do you know if it's dad or --

8    dad or John III?

9          A.    It's dad.

10         Q.    Okay.  Son going back to Georgia.  Not

11   going to testify under the circumstances.  Very

12   disgusted.  Then he hung up before I could say

13   anything.

14         A.    Oh, okay, yeah.

15         Q.    Did I read that correctly?

16         A.    Yes.

17         Q.    So the date -- and I will represent to

18   you that John Sullivan testified on June 10th.

19         A.    John Sullivan III testified on June

20   10th at the trial?

21         Q.    Well, John Sullivan's dad never

22   testified, right?

23         A.    As far as I know.

24         MS. PERSICO:  Wait.  Are you saying that he

25   testified on the 10th of this year or --



1                    Christopher J. Belling

2            MR. BRUSTIN:  No.  I wasn't clear.

3            BY MR. BRUSTIN:

4            Q.   The day after you got this call from

5     John Sullivan, you understand that John Sullivan

6     III testified, correct?

7            A.   I don't know the date, but if that's

8     the date he testified at the trial, that's the date

9     he testified on.

10           Q.   Assuming I'm accurately describing to

11    you as June 10th.

12           A.   Assuming that, yes.

13           Q.   And it appears from this note that it's

14    just before he's about to testify, correct?

15           A.   That's what it appears, sure.

16           Q.   Okay.  And so my question to you is:

17    What did you tell John Sullivan III in between this

18    phone call and when he testified to get him to

19    testify?

20           MS. PERSICO:  Form.

21           THE WITNESS:  I have no idea.

22           BY MR. BRUSTIN:

23           Q.   Is it possible that maybe what you told

24    him is that you put a good word in for him with the

25    DA in Georgia on the rape case?



1                    Christopher J. Belling

2          MS. PERSICO:  Form.

3          THE WITNESS:  I would not have told him

4    that.

5          BY MR. BRUSTIN:

6          Q.   Well, you must have told him something,

7    because he was leaving town.

8          MS. PERSICO:  Form.

9          THE WITNESS:  He couldn't leave town.  He

10   was in custody.  He came back in custody, and he

11   couldn't leave town by himself.

12         BY MR. BRUSTIN:

13         Q.   Well, it certainly doesn't suggest he's

14   going to be a cooperative witness, right?

15         A.   It does seem to indicate he's

16   recalcitrant.

17         MS. PERSICO:  Form.

18         BY MR. BRUSTIN:

19         Q.   And you've testified that you didn't

20   notice him to be recalcitrant at all at trial.  He

21   testified freely and openly according to you,

22   right?

23         A.   As far as I remember.

24         Q.   So what did you do --

25         MS. PERSICO:  Form.



1              Christopher J. Belling
2    convinced Lamarr Scott to confess to a murder he
3    didn't commit.
4         MS. PERSICO:  Form.
5         THE WITNESS:  That was the appearance of the
6    event.  The -- this wasn't resolved until January
7    of '92 when Lamarr Scott testified in the Grand
8    Jury.
9         BY MR. BRUSTIN:
10        Q.   Right.  So what did you do to
11   investigate what, if anything --
12        MS. PERSICO:  Form.
13        MR. BRUSTIN:  -- the family did to cause
14   Mr. Scott to lie as you -- as you concluded the
15   first day?
16        MS. PERSICO:  Objection.  Asked and
17   answered.
18        THE WITNESS:  There's nothing to investigate
19   there.
20        BY MR. BRUSTIN:
21        Q.   Really?  It wouldn't have been
22   necessary to talk -- to interview the parents
23   separately if they were willing to talk?
24        MS. PERSICO:  Mr. Brustin, Mr. Belling has
25   told you many times that he doesn't investigate.



1                    Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   Ah.  So was that something you expected

4    the BPD to do?

5         A.   I would have expected the BPD to try

6    and them to say, no, we're not talking to you.

7         Q.   All right.  You've also told us today

8    that, in fact, you do investigate, and you

9    conducted a lot of investigative activities in this

10   case, correct?

11        MS. PERSICO:  Objection.  That has not been

12   the testimony.

13        THE WITNESS:  I conducted the Grand Jury

14   inquiry, which we call the Grand Jury

15   investigation, and during the process of putting

16   that together I did what I did.  The record's

17   clear.

18        BY MR. BRUSTIN:

19        Q.   You listed -- you told us earlier that

20   you interviewed as many as five or six witnesses,

21   correct?

22        A.   Right, for Grand Jury.

23        Q.   Just for Grand Jury purposes, not as an

24   investigator?

25        A.   Right, for Grand -- the Grand Jury



1                    Christopher J. Belling

2          MR. RUSS:  Objection to form.

3          THE WITNESS:  Speculatively, sure, I guess.

4          BY MR. BRUSTIN:

5          Q.   You guess?

6          A.   Yeah.

7          Q.   Well, what about blood evidence?  What

8     if, for example, Lamarr Scott had blood on his

9     clothing or his shoes from the victim?  Would that

10    be evidence that might tend to corroborate his

11    version of events?

12         MS. PERSICO:  Form.

13         THE WITNESS:  If -- on the happenstance that

14    he did, sure.

15         BY MR. BRUSTIN:

16         Q.   Do you know whether or not he ever

17    volunteered providing any clothing to the police?

18         MS. PERSICO:  Form.

19         THE WITNESS:  I do not know that.

20         BY MR. BRUSTIN:

21         Q.   Do you know whether or not the

22    police -- whether or not he ever volunteered

23    providing his clothing to the police?

24         MS. PERSICO:  You just asked that question.

25         MR. RUSS:  Objection to form.



1                        Christopher J. Belling

2            BY MR. BRUSTIN:

3            Q.    I'm sorry, do you know whether or not

4    the police ever questioned Lamarr Scott about what

5    clothes he was wearing and whether he would provide

6    them?

7            A.    I do not know that.

8            Q.    You certainly did not make any

9    suggestions in that regard, correct?

10           A.    No.

11           Q.    Now, you understood by 1991 that

12   gunpowder residue testing -- I have a couple of

13   articles actually about cases that were going on in

14   Erie County.  Although it was recognized that

15   gunpowder testing wasn't conclusive frankly in any

16   case, it was still evidence that was used in a

17   variety of criminal investigations; fair to say?

18           MS. PERSICO:  Form.

19           THE WITNESS:  It was used during a period of

20   time, yes.  I don't know what the period of time

21   was.

22           BY MR. BRUSTIN:

23           Q.    Do you remember the Clarissa Gladden

24   trial?  This is a case in which she was accused and

25   convicted of -- no, this is the wrong one.



1                    Christopher J. Belling

2          A.    Right.

3          Q.    -- you thought was dressed up?

4          A.    I thought was dressed up to show up to

5    confess to a murder, yes.

6          Q.    That he was wearing a T-shirt and a

7    hat?

8          A.    A bright white T-shirt and a

9    flat-brimmed hat, yes.

10         Q.    Okay.  Now, one of the things you told

11   the students at Georgetown was that Lamarr Scott

12   was not charged with perjury because he went to the

13   Grand Jury and retracted his lying statements,

14   correct?

15         A.    Yes.

16         MS. PERSICO:  Form.

17         BY MR. BRUSTIN:

18         Q.    And you also told them that effectively

19   that eliminated him as a witness in Valentino

20   Dixon's criminal trial.

21         MS. PERSICO:  Form.

22         THE WITNESS:  Well, it certainly --

23         MS. PERSICO:  Are you asking what he said to

24   them or his -- or are you asking him a question?

25         MR. BRUSTIN:  First of all, I'm asking what



1              Christopher J. Belling

2   he said to them.

3        THE WITNESS:  I did say that to them.

4        BY MR. BRUSTIN:

5        Q.   And that's true, correct?  You knew

6   that?

7        MS. PERSICO:  Form.

8        THE WITNESS:  Actually, I wasn't thinking

9   that far down the road when he was at the Grand

10  Jury, but in retrospect, that's the case.

11       BY MR. BRUSTIN:

12       Q.   Okay.  And obviously the same is true

13  for Leonard Brown and Mario Jarmon.

14       MS. PERSICO:  Form.

15       BY MR. BRUSTIN:

16       Q.   By prosecuting them for perjury, they

17  were worthless as witnesses to Mr. Dixon, correct?

18       A.   No, I don't agree with that.  I think

19  that with an appropriate application from defense

20  counsel, they probably could have still testified

21  and that wouldn't have come out.

22       Q.   Did you think that that might be a

23  hindrance to their willingness to testify in

24  Mr. Dixon's criminal trial, the fact that you were

25  prosecuting them for perjury?



1              Christopher J. Belling

2         BY MR. BRUSTIN:

3         Q.   Okay.   In other words, the police

4    reported to you consistently that the initial

5    viewing of a photo of Valentino Dixon by Aaron

6    Jackson resulted in only a tentative

7    identification, correct?

8         MS. PERSICO:   Form.

9         THE WITNESS:   This report reflects that.

10        BY MR. BRUSTIN:

11        Q.   All right.   And you don't recall the

12   police telling you anything inconsistent with this

13   report, correct?

14        MS. PERSICO:   Form.

15        THE WITNESS:   Not that I recall.

16        BY MR. BRUSTIN:

17        Q.   Do you recall receiving any information

18   from any source inconsistent with this report?

19        MS. PERSICO:   Form.

20        THE WITNESS:   Well, eventually talking to

21   Aaron Jackson, he told me that he was sure it was

22   Valentino, but that's not from the police.

23        BY MR. BRUSTIN:

24        Q.   Did he tell you that he was certain

25   when he had looked at the photo array?



1                        Christopher J. Belling

2          A.    I don't remember.

3          Q.    Did he tell you when he became certain

4    it was Valentino Dixon?

5          A.    I don't remember that either.

6          Q.    Did he tell you it had anything to do

7    with anything the police said to him?

8          A.    I don't remember anything like that.

9          Q.    Certainly the police never disclosed to

10   you anything they said or did with Aaron Jackson to

11   change his identification from a tentative

12   identification to a certain identification,

13   correct?

14         A.    Correct.

15         MR. RUSS:  Objection to form.

16         BY MR. BRUSTIN:

17         Q.    Now, what investigation did you

18   conduct, if any, into whether Aaron Jackson or

19   Torriano Jackson had a gun the night of the

20   homicide?

21         MS. PERSICO:  Form.

22         THE WITNESS:  Interviewed the witnesses in

23   regard to the Grand Jury presentation to see if

24   anybody said they saw Torriano or Aaron Jackson

25   with a gun.



1                       Christopher J. Belling

2           BY MR. BRUSTIN:

3           Q.   Do you deny telling the students on

4    tape for everyone to see that Brown and Jarmon

5    couldn't testify because their lawyers would never

6    allow it?

7           MS. PERSICO:  Form.

8           THE WITNESS:  Well, that's something

9    different, and I did say that to the students.

10          BY MR. BRUSTIN:

11          Q.   And you meant that, right?

12          MS. PERSICO:  Form.

13          THE WITNESS:  I assumed that their lawyers

14   would be difficult about that.

15          BY MR. BRUSTIN:

16          Q.   No defense lawyer in their right mind

17   would allow it, correct?

18          MS. PERSICO:  Form.

19          THE WITNESS:  I have no idea what defense

20   lawyers in their right minds or wrong minds would

21   do.

22          BY MR. BRUSTIN:

23          Q.   Well, you did, because you said to the

24   students that they wouldn't allow it, right?

25          MS. PERSICO:  Form.



```
 1                     Christopher J. Belling

 2           BY MR. BRUSTIN:

 3           Q.   You were happy to tell them that.

 4           MS. PERSICO:  Form.

 5           THE WITNESS:  The two things do not match,

 6   so I can't answer that.

 7           BY MR. BRUSTIN:

 8           Q.   Two things don't match.  You understood

 9   that when you prosecuted Brown and Jarmon, it was

10   unlikely that their defense lawyers, regardless of

11   who they were, would allow them to testify at

12   Valentino Dixon's trial, correct?

13           MS. PERSICO:  Form.

14           THE WITNESS:  I suspected that could occur.

15           BY MR. BRUSTIN:

16           Q.   Do you recall testifying in the perjury

17   trial that when Leonard Brown testified at the

18   Grand Jury he appeared to be -- to you to be

19   nervous and jittery?

20           A.   Yes, I do recall testifying to that in

21   the perjury trial.

22           Q.   And, in other words, you were

23   testifying that based on your observations of him

24   during the Grand Jury testimony, you believed he

25   was lying?
```



```
 1                    Christopher J. Belling
 2          A.   I know it existed, yes.
 3          MR. BRUSTIN:  I think it's 80 if you want
 4  it.
 5          THE WITNESS:  No, that's the arrest booking
 6  form, but it's in the neighborhood.
 7          MS. PERSICO:  I think it's 82.
 8          THE WITNESS:  It's 82, Hugh.
 9          BY MR. RUSS:
10          Q.   Okay.  And on the complaint which is
11  page 82, does it give a brief description of the
12  crimes for which Valentino Dixon was charged?
13          A.   It does.
14          Q.   And is that a document that would have
15  been prepared by your office, that is, the DA's
16  office, or by the Buffalo Police Department?
17          A.   It would have been prepared by the
18  Buffalo Police Department report technicians in
19  so-called central booking.
20          Q.   Do you and the DA's office have any
21  input into what goes into a criminal complaint?
22          A.   In general, no.
23          Q.   Do you remember whether you had any
24  input into what went into this specific criminal
25  complaint?
```



CHRISTOPHER J. BELLING                                    April 11, 2023
DIXON V. CITY OF BUFFALO                                            348

1                       Christopher J. Belling

2          A.    I did not.

3          Q.    You did not have input?

4          A.    I did not have input.  This -- yeah, I

5    did not have input into this document.

6          MR. RUSS:  That's all I have.  Thank you.

7          MS. PERSICO:  Thank you.

8          MR. BRUSTIN:  I have a few follow-up, unless

9    you have anything.

10          MS. PERSICO:  Do you want to do it now?  Why

11   don't you go now, and then I'll finish up.

12          MR. BRUSTIN:  Well, no, you should finish,

13   and then I'll follow.

14                       EXAMINATION

15          BY MS. PERSICO:

16          Q.    Mr. Belling, on the -- I think you have

17   the right booklet exhibit here, so can I ask you --

18          MR. BRUSTIN:  Can I stop for one minute,

19   just so I know for planning purposes, do you have

20   more than a few minutes?

21          MS. PERSICO:  Like maybe ten minutes.  Are

22   you late for your flight?

23          MR. SOTO-BRITO:  No.

24          BY MS. PERSICO:

25          Q.    Can you turn, Mr. Belling, to BPD COMP



1                    Christopher J. Belling

2          A.    That is correct.

3          Q.    And on November 6th of 1991 you

4    presented to the Grand Jury the following

5    witnesses:  Aaron Jackson, John Sullivan III, and

6    Travis Powell; is that correct?

7          A.    Yeah.  I haven't seen the transcript

8    recently, but I have no doubt that, you know, those

9    are the people that testified that day.

10         Q.    Okay.  And then on November 20th of

11   1991 Michael Bland testified; is that correct?

12         A.    Correct.

13         Q.    Now, at that time there was no -- there

14   was no vote at the Grand Jury.  There was no

15   indictment.  There were further proceedings that

16   continued in January of 1992; is that correct?

17         A.    That is correct.

18         Q.    And I think -- I'm going to try and use

19   the exhibits that we've already talked about today,

20   so just bear with me for a second.  I'm just

21   looking for the Antoine Shannon statement and the

22   letter to Donovan, and I think those are probably

23   in the DA file.

24         So we talked quite a bit earlier about the

25   fact that you went to -- in preparation for putting



```
 1                    Christopher J. Belling
 2   the case in the Grand Jury in November of 1991, you
 3   went to Campbellsville, Kentucky, and took a
 4   statement from Antoine Shannon?
 5            A.   Correct.
 6            Q.   And then we looked at what is COE1686.
 7   I apologize if it's not the same as what was in the
 8   files we looked at today.  And that was a letter
 9   you wrote to Chief Donovan listing additional
10   investigations that you would like to have seen
11   happen; is that right?
12            MR. BRUSTIN:  Objection to form.
13            THE WITNESS:  Right.  That's a November 22nd
14   letter which lists seven things that I asked them
15   to look into.
16            BY MS. PERSICO:
17            Q.   So, in fact, even though you had
18   already had the Grand Jury convened in November, at
19   that time you still wanted additional investigation
20   done; is that correct?
21            MR. BRUSTIN:  Objection to form.
22            THE WITNESS:  Yes.
23            BY MS. PERSICO:
24            Q.   And what did that do to your Grand Jury
25   proceedings?
```



1                    Christopher J. Belling

2          A.    Well, it caused the Grand Jury to go

3    into what we call holdover mode.  The Grand Jury

4    sits officially for one month and then has to vote,

5    and a judge has to authorize them to be held over

6    to hear evidence to complete the cases that they

7    opened up in that first month.

8          Q.    And so in this case you had the Grand

9    Jury hold over until the next January at which time

10   you presented Mario Jarmon, Leonard Brown, Lamarr

11   Scott, Emil Adams, Fred Stencil, and Robert Lewis;

12   is that correct?

13         A.    Correct.

14         Q.    And a number of those witnesses who

15   testified in January were -- were not, as

16   Mr. Brustin was calling it earlier, were not going

17   to testify to the story that, using air quotes

18   here, you wanted to tell.  In fact, they were going

19   to say that Valentino Dixon did not do the

20   shooting; is that correct?

21         MR. BRUSTIN:  Objection to form.

22         THE WITNESS:  Well, I didn't really know

23   what Lamarr Scott was going to do other than the

24   representations his attorney, John Molloy, had made

25   to me, and I honestly didn't know what Brown and



 1

 2  STATE OF NEW YORK)

 3                          ss:

 4  COUNTY OF ERIE    )

 5

 6       I DO HEREBY CERTIFY as a Notary Public in and

 7  for the State of New York, that I did attend and

 8  report the foregoing deposition, which was taken

 9  down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18

19

20                    JOAN M. METZGER-HUBBELL,
                      CM, Realtime Reporter,
21                    Notary Public.

22

23

24

25

