# EXHIBIT 76

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALENTINO DIXON,<br><br>  Plaintiff,<br><br>v.<br><br>CITY OF BUFFALO et al.,<br><br>  Defendants. | Civil Action No. 19-cv-01678<br><br>**DECLARATION OF<br>ANTOINE SHANNON** |

## DECLARATION OF ANTOINE SHANNON

I, ANTOINE SHANNON, hereby swear and state as follows:

1. On August 10, 1991, I witnessed Lamarr Scott shoot and kill Torriano Jackson. Specifically, I saw Lamarr Scott stand over Torriano Jackson and empty the gun's clip.

2. When the shooting occurred, I was with my brother Valentino Dixon outside a convenience store on the corner of Bailey and Delevan. There were many other people in the area too.

3. In August 1991, Lamarr Scott was a really big guy. The size difference between him and Valentino Dixon was obvious. Scott was about 50 pounds heavier, 4 inches taller, and had darker skin than Valentino. It would not be possible to mistake Scott for Dixon; even at night their differences were overwhelming.

4. Soon after the shooting, I spoke to Lamarr Scott who told me that he shot Torriano Jackson, but that he did not mean to shoot Torriano that many times.

5. On August 12, 1991, I was present when Lamarr Scott confessed on the news to killing Torriano Jackson. I did not pressure, coerce, or threaten Scott to confess. I never saw or heard anyone else, including my family members, pressure, coerce, or threaten Scott. To my knowledge, no one has ever pressured, coerced, or threatened Scott to confess.

1

6. I did not pay or induce Scott to confess to killing Torriano Jackson. I never saw or heard anyone else, including my family members, pay or induce Scott to confess. To my knowledge, no one has ever paid or induced Scott to confess.

7. When Scott confessed to the news, he did not seem forced or nervous. He was very calm.

8. On August 12, 1991, after Scott confessed to the news, I went to the Buffalo Police Department downtown, where I understood Scott was being interviewed. There, Buffalo Police officers spoke to me about the shooting. I told the officers that Lamarr Scott was the shooter.

9. When I was talking to the officers, I noticed they were not writing anything down. I asked the officers why they were not writing anything down. My memory is that they responded that they already "got everything" they needed, and did not need to write it down. The officers told me that if they needed to know more, they would get in contact with me. No one from the Buffalo Police Department ever contacted me after that night.

10. In the weeks after the shooting, I heard from other people that Lamarr told them directly that he shot Torriano Jackson. People in the neighborhood were talking about how Scott was the shooter.

11. I knew Emil Adams because I went to elementary school with him, and we'd played football together.

12. After Valentino was convicted, Emil told multiple people, including me, that he knew Valentino was not the shooter that night.

13. Emil approached me to apologize. He told me that he knew that Valentino was not the shooter, but he did not know at the time that Valentino was my brother. Emil said he felt bad because he realized that he "lied on" somebody that he knows. Emil explained to me that he was having legal trouble in Michigan at the time, and that they "pretty much gave

2

him a free pass" for cooperating against Valentino. Specifically, he told me they said to him that, if he cooperated, his legal troubles would "pretty much go away."

14. I was later present during a conversation between Robert Bryant and Emil Adams on March 7, 1993. Barbera Dixon was also present during this conversation. The conversation was tape recorded.

15. On February 8, 2024, I listened to the audio of that March 7, 1993 conversation. From the audio, I recognize the voices on the tape as myself, Emil Adams, Robert Bryant, and Barbara Dixon. To my memory, the audio I listened to accurately reflects the conversation we had on March 7.

16. I did not pressure, coerce, or threaten Emil Adams to speak to us. I also did not pay or induce Adams to speak to us. I never saw or heard anyone, including my family members, pressure, coerce, or threaten Adams to speak to us. I also never saw or heard anyone, including my family members, pay or try to induce Adams to speak to us. To my knowledge, no one ever pressured, coerced, threatened, paid, or induced Adams to speak to us.

17. From what I saw on March 7, Adams was really calm and didn't even express any reservations about speaking with us. Adams never raised his voice; he did not appear apprehensive or combative.

18. In November 1991, Assistant District Attorney Christopher Belling flew to Kentucky to interview me on my college campus. During that interview, I told Belling exactly what I saw that night, including how Scott stood over Torriano and emptied the clip. I told Belling blow-by-blow everything that happened.

19. During the interview, Belling repeatedly told me that he knew I was getting a lot of pressure from my family to say that Scott was the shooter. I told Belling that I was not

3

getting any pressure from my family, because I was not. I told Belling I was telling the truth, and that I had no reason to lie about this.

20. Belling kept trying to make me say that Valentino did the shooting. I told Belling that I did not know what else to say, that I thought he was coming down to hear the truth, but he seemed stuck on something else.

21. Before he left, Belling told me to "really think over" my statement that Scott was the shooter. He wanted me to reverse my story. Belling was completely focused on Valentino being the shooter, even when I told him that Valentino did not do it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2024

Rochester, New York

*Antoine Shannon*

ANTOINE SHANNON

4