# EXHIBIT 80

425

'93 FEB 26 A10 :54

1

2     COUNTY COURT OF THE STATE OF NEW YORK

3     COUNTY OF ERIE : CRIMINAL TERM : PART 1

4     ----------------------------------------------x

5     THE PEOPLE OF THE STATE OF NEW YORK        :    Indictment
                                                      No. 91-1476-003
6
                                                 :
7              -against-

8     LEONARD BROWN & MARIO JARMON,              :    Perjury

9                        Defendant.              :    Trial

10    ----------------------------------------------x

11                              Erie County Hall
                                Buffalo, New York  14202
12                              Tuesday, November 10, 1992

13    B e f o r e :

14              HONORABLE MICHAEL L. D'AMICO

15                                          Judge

16    A p p e a r a n c e s :

17              KEVIN M. DILLON, ESQ.
                      District Attorney, Erie County
18                    BY:  FRANK A. SEDITA, III, ESQ.
                          Assistant District Attorney
19                        Appearing for the People

20              EDWARD COUGHLIN, ESQ.
                Appearing for the Defendant Brown
21
                TERENCE B. NEWCOMB, ESQ.
22              Appearing for the Defendant Jarmon

23

24

25                              Kenneth D. Meier, C.S.R.
                                Senior Court Reporter

COE000979

467

1                      Belling - Sedita - Direct

2                 MR. COUGHLIN:  I have no objection.

3                 MR. NEWCOMB:  No objection.

4                 THE COURT:  Fine, 55 is in evidence.

5                      (Whereupon, People's Exhibit Number 55

6                      was received in evidence.)

7  C H R I S T O P H E R   J.   B E L L I N G, a witness located

8       in Buffalo, New York, having been first duly sworn, was

9       examined, and testified as follows:

10  DIRECT EXAMINATION

11  BY MR. SEDITA:

12       Q.   Mr. Belling, what do you do for a living?

13       A.   I am an Assistant District Attorney for Erie

14  County.

15       Q.   What is your present position with the District

16  Attorney's Office?

17       A.   Chief of the Homicide Bureau.

18       Q.   Sir, what kind of education did you get to become

19  an attorney and assistant DA?

20       A.   Bachelor's Degree from the State University of New

21  York at Buffalo, law degree from the State University of New

22  York at Buffalo.

23       Q.   And, how long have you been a prosecutor, sir?

24       A.   Seventeen years.

25       Q.   Before you became Chief of the District Attorney's

468

Belling - Sedita - Direct

1    Office Homicide Bureau, did you have other assignments in the

3    office?

4         A.    Yes.   I have been Chief of the Major Offense

5    Bureau, the Career Criminal Prosecution Bureau, Felony Trial

6    Bureau, and served as a line assistant in most of the other

7    bureaus of the office.

8         Q.    Have you received any training, or have you taught

9    any courses with respect to obligations of an Assistant

10   District Attorney, how to perform his job?

11        A.    Both.   I have attended the National College of

12   District Attorneys career prosecutor course, and I have

13   taught for the National College of District Attorneys at a

14   career prosecutor course at their violent crimes prosecution

15   course, at their forensic evidence course, and at their trial

16   advocacy course at various locations around the country; and

17   also in Puerto Rico I taught for the Attorney General's

18   Institute there, training their prosecutors.

19        Q.    Would it be fair to say, sir, that you have

20   conducted a number of trial prosecutions?

21        A.    Yes, that's true.

22        Q.    And, in addition to that, have you also conducted

23   what are known as Grand Jury investigations?

24        A.    Yes.

25        Q.    Would you explain the difference between the two to

COE001026

469

Belling - Sedita - Direct

1  the jury?

3      A.    Well, the Grand Jury is an investigative procedure

4  where the prosecutor's obligation is to assist the Grand Jury

5  in conducting an objective study of what proof is available

6  to determine whether or not anyone in particular should be

7  charged with a crime.

8      Q.    Sir, I refer you to a Grand Jury investigation with

9  the caption 91-1476-001, and with respect to that

10 investigation would you tell the jury what that was or what

11 that is?

12     A.    That number was assigned to the investigation of

13 the homicide of Torriano Jackson, which was accompanied by

14 the shooting of Aaron Jackson, the shooting of John Sullivan,

15 and resulted in the eventual indictment of one Valentino

16 Dixon for those crimes.

17     Q.    Did two other indictments generate from that

18 proceeding?

19     A.    Yes, eventually two other indictments did.

20     Q.    And those would be 91-1476-002 and 003?

21     A.    Correct.

22     Q.    And, who are those two indictments against, sir?

23     A.    I don't remember which one is 2 and which one is 3,

24 but one of them is Leonard Brown and one is Mario Jarmon.

25     Q.    I believe 2 is Mr. Brown and 3 is Mr. Jarmon.  Is

COE001027

470

1                    Belling – Sedita – Direct

2   Leonard Brown in the courtroom today, sir?

3       A.    Yes, Leonard Brown is sitting just about directly

4   in front of me, with the multicolored sweater.   Mario Jarmon

5   is seated over to the right, with the blue denim like shirt,

6   and the green and purple tie.

7                    MR. SEDITA:  Your Honor, may the record

8                reflect an identification of the defendants?

9                    THE COURT:  He has identified them.

10  BY MR. SEDITA:

11      Q.    Sir, do you remember when the Grand Jury

12  investigation started with respect to 91-1476-001?

13      A.    We started in November of '91, and eventually the

14  investigation carried over past the new year into January of

15  '92.

16      Q.    Sir, when you began the Grand Jury proceedings, was

17  a suspect already arrested by the Buffalo police?

18      A.    Yes.   It would be either the day of or the day

19  after the crime Valentino Dixon was arrested and charged with

20  these crimes.

21      Q.    Did several people testify before the Grand Jury,

22  sir?

23      A.    Yes, quite a number.

24      Q.    Did Aaron Jackson testify?

25      A.    Yes, did he.

471

Belling - Sedita - Direct

1

2    Q.    How about Travis Powell?

3    A.    Yes.

4    Q.    John Sullivan?

5    A.    Yes.

6    Q.    Emil Adams?

7    A.    Yes.

8    Q.    Robert Lewis?

9    A.    Yes.

10   Q.    Fred Stancil?

11   A.    Yes.

12   Q.    How about Lamarr Scott, did he testify before the

13   Grand Jury?

14   A.    Yes, he did.

15   Q.    Sir, you had occasion to see Mr. Scott?

16   A.    Yes, I have seen Mr. Scott at the Grand Jury, I

17   have seen him before the Grand Jury, and I saw him in the

18   courthouse hallway during Mr. Valentino Dixon's trial.

19   Q.    And, sir, would you describe to the jury the size

20   and how tall Mr. Scott is, and so forth?

21   A.    Lamarr Scott is over six feet, I'd say six feet,

22   two tall, quite a substantial fellow.  He's at least 200

23   pounds, maybe a little bit more.

24   Q.    Would he be of similar weight to me, or size to me?

25   A.    I would say that's about what he is.

472

1                    Belling - Sedita - Direct

2        Q.    Sir, I'm going to show you what has been marked as

3   People's Exhibit Number 8 for identification and ask if you

4   can tell us what that is?

5        A.    It's a photographer of Lamarr Scott.

6              MR. SEDITA:  People would move 8 into

7         evidence, your Honor.

8              MR. NEWCOMB:  No objection.

9              MR. COUGHLIN:  No objection.

10             THE COURT:  8 is received in evidence.

11                  (Whereupon, People's Exhibit Number 8

12                   was received in evidence.)

13  BY MR. SEDITA:

14       Q.    Now, did Antione Shannon testify before the Grand

15  Jury?

16       A.    No, sir, he did not.

17       Q.    Was he subpoenaed?

18       A.    Well, subpoena was issued for him, but he either

19  wasn't personally served or was served, but didn't attend.

20  He had left town --

21             MR. COUGHLIN:  Objection, your Honor.  It's

22         not responsive.  Either/or answer is not

23         responsive.

24             THE COURT:  Your question was did he testify?

25         The answer was no.  Forget the rest of the answer,

473

Belling - Sedita - Direct

1                    Belling - Sedita - Direct

2          ladies and gentlemen.   Next question.

3            MR. COUGHLIN:  Thank you, your Honor

4  BY MR. SEDITA:

5     Q.   Did there come a point in time when you went

6  looking for Mr. Shannon?

7     A.   Yes.

8     Q.   Did you find him?

9     A.   Yes.

10    Q.   Where did you find him?

11    A.   Campbellville, Kentucky.

12    Q.   Did you seek to interview Mr. Shannon, sir?

13    A.   Yes.

14    Q.   Did you interview Mr. Shannon?

15    A.   Yes.

16    Q.   And that was you?

17    A.   Correct.

18    Q.   Sir, all the witnesses that I have spoken about so

19  far, Lamarr Scott, Fred Stancil, Robert Lewis, Emil Adams,

20  John Sullivan, Travis Powell and Aaron Jackson, how did did

21  they become witnesses?

22    A.   They were subpoenaed.

23    Q.   With respect to Valentino Dixon, was he ever

24  subpoenaed as a witness?

25    A.   No, sir, he was not.

COE001031

474

Belling – Sedita – Direct

1

2    Q.   Can you tell the jury why not?

3    A.   Well, as a defendant already arrested by the

4  Buffalo Police Department, it would be improper to subpoena

5  him because a subpoena compels his testimony, and you can't

6  compel a defendant to testify against himself.

7    Q.   Unless you do what?

8    A.   Well, unless you grant him immunity, in which case

9  he can't be prosecuted for what he has already been arrested

10  for.

11    Q.   Now, as you were conducting this Grand Jury

12  investigation, or assisting the Grand Jury in their

13  investigation, would you tell the jury what the subject

14  matters of that investigation was, and what the material

15  issues were as you were investigating the case?

16    A.   Well, the subject matter of the investigation was

17  the murder of Torriano Jackson, the assault upon Aaron

18  Jackson, the assault upon John Sullivan, III, and all the

19  attendant circumstances surrounding that event which had

20  occurred in the early morning hours of August 10th, 1991 in

21  the vicinity of Bailey and East Delevan in the city.

22    Q.   Was the identification of who shot Torriano Jackson

23  and other people a material issue in that case?

24    A.   Yes, that was the primary material issue in the

25  case.

COE001032

475

Belling - Sedita - Direct

1

2      Q.   Did another material issue arise during the

3  investigation stages in the Grand Jury?

4      A.   Yes.   At the scene a second firearm had been

5  recovered, a .32 caliber revolver, and this was sort of a sub

6  material issue of who possessed that at what point in time,

7  and what they might have done with it.

8      Q.   Mario Jarmon testify before the Grand Jury?

9      A.   Yes, he did.

10      Q.   And how did he get there?

11      A.   He was subpoenaed to testify.

12      Q.   And, who was the assistant DA asking him questions

13  in the Grand Jury?

14      A.   I was.

15      Q.   And, before he began his testimony, did he take

16  some type of an oath?

17      A.   Yes, he was sworn in by the Foreman, or it could

18  have been the assistant foreman that was presiding that day,

19  but whichever functionary was there administered an oath to

20  him, that he swore to tell the truth in this high inquisition

21  of the People of the State of New York versus Valentino

22  Dixon.

23      Q.   Did he so swear to tell the truth, sir?

24      A.   Yes, he did.

25      Q.   Now, in your questions to Mr. Jarmon, did you ask

COE001033

476

Belling - Sedita - Direct

1

2 him about any relationship that he had with Valentino Dixon?

3     A.    Yes, I did.

4     Q.    What did he indicate his relationship with Mr.

5 Dixon was?

6     A.    Mr. Jarmon said that he was a friend of Valentino

7 Dixon.

8     Q.    Did a series of questions begin relative to who had

9 weapons at the vicinity of East Delevan and Bailey Avenues in

10 the early morning hours of August 10th, 1991?

11     A.    Yes, those questions were asked.

12     Q.    And, do you remember Mr. Jarmon's testimony in

13 regard to that?  And the background?

14     A.    Mario Jarmon's testimony was that Torriano Jackson

15 possessed a small, what he believed to be a revolver, and

16 that Aaron Jackson possessed a knife of some sort, sometimes

17 described as a box cutter.

18     Q.    And, did Mr. Jarmon further indicate whether or not

19 Mr. Torriano Jackson shot him with that gun?

20     A.    Yes, Mr. Jarmon claimed that he had been shot at

21 least two and possibly three times by Torre Jackson with the

22 small revolver.

23     Q.    Was that a material issue in the Grand Jury

24 proceeding?

25     A.    Yes.

COE001034

477

Belling - Sedita - Direct

1

2          MR. NEWCOMB:  Objection, your Honor.  It calls

3      for a conclusion.

4          THE COURT:  Overruled.

5   BY MR. SEDITA:

6      Q.   Was that a material issue in the Grand Jury

7   proceeding?

8      A.   Yes, it was.

9      Q.   Now, did you also seek to question Mr. Jarmon with

10  respect to an individual who had shot a great number of

11  bullets at that scene at that time?

12     A.   Yes.

13     Q.   And, tell us about the question and answers in that

14  regard?

15     A.   Well, after he had explained the event leading up

16  to immediately before the firing of a machine gun, he was

17  then asked to explain what he recollected about the firing of

18  that machine gun, and he testified that he had observed one

19  Lamarr Scott, whose picture he identified, in possession of

20  that particular machine gun, but said that he didn't see

21  whether or not Lamarr Scott had shot anybody with it because

22  he was at that time -- this is Jarmon at that time -- was

23  running around the corner from Delevan onto Bailey at the

24  time the machine gun was being fired.

25     Q.   Did he indicate Scott had the machine gun?

478

Belling - Sedita - Direct

1

2      A.   Yes.

3      Q.   Did he indicate Scott was firing the machine gun?

4      A.   Yes.

5      Q.   Was that a material issue, who was firing that

6   machine gun?

7      A.   That was the primary material issue in the whole

8   case.

9      Q.   Did a Leonard Brown testify before the Grand Jury?

10      A.   Yes, he did.

11      Q.   Specifically referring your attention to January

12   13th of 1992 at approximately 10:30 a.m. right after Mr.

13   Jarmon got done testifying, did Brown come into the Grand

14   Jury and swear an oath to tell the truth?

15      A.   Yes, he did.

16      Q.   How did he get there, Mr. Brown?

17      A.   He was subpoenaed.

18      Q.   And, did you begin the same types of questions

19   relative to Mr. Brown and the events of East Delevan and

20   Bailey Avenues in the early morning hours of August 10th of

21   1991?

22      A.   Yes.   The subject matter was exactly the same.

23      Q.   Did you ask him about his relationship with

24   Valentino Dixon, that being Mr. Brown?

25      A.   Yes.   Mr. Brown told the Grand Jury that although

**Belling – Sedita – Direct**

1    he's known as the half brother of Valentino Dixon, the actual

2    formal relationship is that the two of them had been raised

3    by the same father figure, and that person is Robert Bryant,

4    who is actually Valentino Dixon's father, but is not actually

5    Leonard Brown's father.  He was just the father figure in

6    Leonard's household as he grew up.

7         Q.   Leonard indicate that he had another brother?

8         A.   Yes, Leonard has another brother, Antione Shannon

9    who was mentioned in the testimony.

10        Q.   Did you ask Mr. Brown questions about who had

11   weapons and who was using weapons in the vicinity of East

12   Delevan and Bailey Avenues on August 10th?

13        A.   Yes, I did.

14        Q.   With respect to his testimony regarding Torriano

15   Jackson having, or Aaron Jackson having any weapons, what did

16   Mr. Brown say?

17        A.   Mr. Brown didn't say anything about Aaron Jackson

18   having a weapon.  He claimed he was in a location where he

19   could see whether or not Aaron Jackson had a weapon.

20        Q.   What about Torriano Jackson?

21        A.   Well, he alternately claimed that he either saw or

22   heard a firearm in the possession of Torre Jackson, and went

23   back and forth between the two of those:  Did he see it or

24   did he hear it?

480

Belling - Sedita - Direct

1

2          MR. COUGHLIN:  Objection to the

3    characterization.

4          THE COURT:  Sorry?

5          MR. COUGHLIN:  I object to the form.  That

6    response is characterization, unresponsive to the

7    question.  Calls for a conclusory answer.

8          THE COURT:  It sounded like he answered it.

9    Your question was did he indicate whether he saw

10   Torriano Jackson; is that your question?

11         MR. SEDITA:  With a weapon.

12         THE COURT:  With a weapon.  Answer stands.

13   Next question.

14 BY MR. SEDITA:

15    Q.   And everything that Mr. Brown said with respect to

16 that issue would be captured in the Grand Jury minutes, is

17 that correct?

18    A.   That's correct.

19    Q.   Now, Mr. Brown indicate that he got any

20 relationship or knew an individual before August 10th of 1991

21 by the name of Lamarr Scott?

22    A.   Mr. Brown's testimony in that regard was that he

23 had never seen Lamarr Scott before August 10th of '91.

24    Q.   And, did Mr. Brown identify somebody as the shooter

25 with the machine gun on East Delevan and Bailey intersection

481

1                    Belling - Sedita - Direct

2  in the early morning hours of August 10th?

3       A.   Yes.  He told the Grand Jury that Lamarr Scott was

4  wielding the machine gun during these events.

5       Q.   Now, in your questioning him in this regard, Mr.

6  Belling, did you make any observations as to Leonard Brown's

7  physical condition during his testimony?

8       A.   He was agitated, somewhat jittery, nervous as he

9  testified.

10              MR. COUGHLIN:  Objection, your Honor.

11              THE COURT:  What is the objection, Mr.

12          Coughlin?

13              MR. COUGHLIN:  There is no need for that.

14          It's again a characterization without any

15          foundation other than in Mr. Belling's mind.  I

16          don't believe that's proper.

17              MR. SEDITA:  Sounds like an observation to me,

18          Judge.

19              THE COURT:  Overruled.

20  BY MR. SEDITA:

21       Q.   Based upon your observation in this regard of Mr.

22  Brown, did you issue him some warnings?

23       A.   Yes.  On at least three different occasions during

24  his testimony.  First I just told him to slow down, take his

25  time.  The Grand Jury stenographer had to take all of his

482

**Belling - Sedita - Direct**

1

2    testimony, and that was becoming difficult; and on another

3    occasion I advised him that he should slow down, take his

4    time, and that based upon his appearance, he seemed

5    frightened, that he didn't have anything to be afraid of as

6    long as he told the truth.   And then on a third occasion

7    during his testimony I actually stopped and read the Penal

8    Law Section, Perjury in the 1st Degree, to him.

9        Q.   Mr. Brown indicate he understood what you read to

10   him?

11       A.   Yes.

12       Q.   Did Mr. Brown continue in his testimony regarding

13   whether Torriano Jackson had shot a gun and Lamarr Scott was

14   the person with the machine gun?  Did he keep with the same

15   story?

16       A.   Yes, he did.

17            MR. SEDITA:  I have nothing further.

18            THE COURT:  Is there going to be

19        cross-examination?

20            MR. NEWCOMB:  Oh, yeah.

21            THE COURT:  Let's take a short break here.

22        You have been sitting here for about an hour and 20

23        minutes, or so.  About 10 minute recess and we will

24        resume the cross-examination.

25            (11:15 a.m., Court recessed.)

COE001040

483

Belling - Coughlin - Cross

1

2          (11:30 a.m., jury, counsel and defendants

3          present.)

4 C H R I S T O P H E R   J.   B E L L I N G, having been

5          previously sworn, resumed the stand and testified

6          further as follows:

7                    THE COURT:  Mr. Coughlin?

8 CROSS-EXAMINATION

9 BY MR. COUGHLIN:

10      Q.   Mr. Belling, I was curious.  During your direct

11 testimony you mentioned that the Grand Jury proceeding that

12 we're concerned with, that jury was impaneled to investigate

13 the shooting, and you mentioned, I believe three people or

14 two people, Aaron Jackson, Torre Jackson -- three people --

15 and Mr. Sullivan.  Was the District Attorney's Office at that

16 time at all concerned about a fourth person who was shot?

17      A.   Mario Jarmon.

18      Q.   But you didn't mention that?

19      A.   Well, that's because he was never fully cooperative

20 with the investigation, and I knew he would be at the Grand

21 Jury anyway and that our concerns about his injuries could be

22 dealt with at that time.

23      Q.   Nonetheless, in your direct testimony before you

24 had a chance to reflect upon it, you mentioned that there

25 were only three shooting victims that you were concerned

484

Belling - Coughlin - Cross

1

2  about?

3        MR. SEDITA:  Objection.  It's asked and

4        answered.  I object to the characterization of

5        reflected upon.

6        THE COURT:  No, I will allow him to answer.

7        Overruled.

8        THE WITNESS:  Can you read back the question,

9        please?

10        THE COURT:  He wants to know if you were only

11        concerned with the three?

12        THE WITNESS:  No, that's not accurate.

13  BY MR. COUGHLIN:

14      Q.  Those are the only three you mentioned as being

15  concerned?

16      A.  Those are the only three that ended up in the

17  indictment.

18      Q.  Okay.  You also characterized your position with

19  respect to a Grand Jury proceeding as being one of assistance

20  to the Grand Jury in their determination, if I quote you

21  correctly, whether or not to charge anyone with a crime?

22      A.  That's correct.

23      Q.  You have been in the DA's office for 17 years, I

24  believe?

25      A.  Correct.

COE001042

485

Belling – Coughlin – Cross

1
2      Q.    Fourteen years in there more than I ever had.

3             MR. SEDITA:  Objection.

4             THE COURT:  Thanks for the comment.  Now what

5      is the question?

6  BY MR. COUGHLIN:

7      Q.    You heard the old lawyer's adage about a District

8  Attorney could indict a ham sandwich?

9             MR. SEDITA:  Objection.

10            THE COURT:  Sustained.

11  BY MR. COUGHLIN:

12     Q.    Well, in fact, basically, you control and run a

13  Grand Jury proceeding, do you not?  And I don't mean you

14  personally, but I mean the Assistant DA assigned to the Grand

15  Jury?

16     A.    The District Attorney's office controls the timing,

17  of course, what cases the Grand Jury hears at what time, and

18  the evidence flow of most witnesses, yes.

19     Q.    And it is the District Attorney's office who has

20  access to each and every bit of evidence, each and every bit

21  of interdepartmental memoranda and investigative reports by

22  any law enforcement agency; is that correct?

23     A.    Well, to the extent that those things can be

24  identified and located, yes.

25     Q.    Can be located?

486

Belling - Coughlin - Cross

1

2      A.    Yes.    Finding police reports is not an easy task in

3  many cases, and that's what I'm referring to.

4      Q.    Well, certainly it's easier for the District

5  Attorney's office to locate whatever they want to locate in

6  the way of memoranda, investigative reports, pieces of

7  evidence, documents, and whatever, than it is for the Grand

8  Jury or the Grand Jury foreman even to locate, isn't it?

9      A.    That's true.

10     Q.    And, with respect to this particular Grand Jury

11  investigation, you had no problems locating any P-73 or

12  interdepartmental investigative report that you wanted, did

13  you?

14     A.    I don't remember any specific problems finding

15  anything I wanted in this case, no.    I do remember needing

16  things done that I didn't have, but nothing that I can think

17  of specifically that I couldn't get.

18     Q.    Okay, and anything that you say you didn't have, if

19  you didn't have anything or if there was anything you didn't

20  have, you have not only all the investigators out of your own

21  District Attorney's office, you have got a telephone, you can

22  call the Chief of Homicide and say hey, I want this, or hey,

23  I want that, can't you?

24     A.    You can call and say that.    That doesn't mean you

25  are going to get it.    But you can call and say that.

487

Belling - Coughlin - Cross

1

2    Q.    Okay, thank you.  Well, you're not suggesting to

3    this jury, are you, that if you as the Assistant District

4    Attorney in charge of a Grand Jury investigation, or you as

5    the Chief of the Homicide Bureau called the homicide

6    department and asked for something, are you suggesting that

7    you might not get it or you might not get their cooperation?

8    A.    I might get their prompt cooperation.  The

9    possibility that they follow-up on what I need is depending

10   on their work load.

11   Q.    Okay.  And, if necessary, you can adjourn a Grand

12   Jury proceeding from day-to-day to get what you want; is that

13   right?

14   A.    That's true, and that occurred in this case, yes.

15   Q.    Okay.  And prior to the formal presentation of

16   anything to a Grand Jury, you review all the available

17   investigation, don't you?

18   A.    Yes.

19   Q.    So that even before you walk into a Grand Jury for

20   the first time, you know everything that has been reported?

21   A.    I would say that's a fair statement.

22   Q.    And, if there is anything lacking or you need

23   something further, or even if you just have a question in

24   your mind about something, you have the authority and the

25   time to make inquiry; is that correct?

488

Belling - Coughlin - Cross

1

2      A.   That's true.

3      Q.   So that basically when you first step into the

4  Grand Jury, you have what you feel you need?

5      A.   Correct.

6      Q.   And when you first step into a Grand Jury, you also

7  feel and believe that you have a particular target or target

8  defendant.   You know who you're presenting the evidence

9  against?

10     A.   In some instances, yes.

11     Q.   And most certainly in this instance, right?

12     A.   This instance was not one of the clearer-cut cases,

13  no.

14     Q.   It was not a clear-cut case?

15     A.   No, it was not.

16     Q.   Okay, but you knew that a primary target of this

17  proceeding was a fellow by the name of Valentino Dixon,

18  right?

19     A.   Yes.

20     Q.   As a matter of fact, Valentino Dixon had already

21  been arrested and charged; is that correct?

22     A.   That's true.   He was.

23     Q.   And he was arrested and charged literally within

24  hours of the incident?

25     A.   Yes, that's true.

489

Belling - Coughlin - Cross

1

2    Q.    Okay.    Nonetheless, you say it was not a clear-cut

3    case; and, in fact, prior to your presentation of anything to

4    the Grand Jury, you knew that there were some conflicting

5    versions as to what had happened, didn't you?

6    A.    That's true.

7    Q.    And with respect to what you had available to you,

8    you were aware of a number of witnesses who you deigned not

9    to present to the Grand Jury, is that correct?

10   A.    No, I don't think that's a good way to characterize

11   it.

12   Q.    There were people who had been spoken to by the

13   Buffalo Police Department and who had given statements to the

14   Buffalo Police Department who you did not deign to offer to

15   the Erie County Grand Jury; is that correct?

16   A.    That is correct.

17   Q.    Thank you.    As a matter of fact, how many people in

18   all, exclusive of expert testimony and exclusive of forensic

19   testimony, how many lay witnesses in all did you present to

20   the Grand Jury?

21   A.    More than in most cases, but I don't recall the

22   specific number.

23   Q.    Well, you brought in Aaron Jackson, did you?

24   A.    Correct.

25   Q.    And, his chauffeur, Travis Powell?

490

1                    Belling – Coughlin – Cross

2                    MR. SEDITA:  Objection to that characterization.

3                    THE COURT:  Sustained.

4    BY MR. COUGHLIN:

5         Q.    Okay, the driver in the car, Travis Powell?

6         A.    Yes, he testified.

7         Q.    Okay, you brought in a John Sullivan?

8         A.    Yes.

9         Q.    And you brought in a Robert Lewis?

10        A.    Yes.

11        Q.    And, you brought in a Fred Stancil?

12        A.    Correct.

13        Q.    And, of course, you brought in each of these

14   defendants?

15        A.    Correct.

16        Q.    Do you recall bringing in anybody else?

17        A.    The term bringing in is a little hard to

18   understand.  Various other witnesses were subpoenaed,

19   interviewed and did not testify in the Grand Jury.  And, in

20   terms of actually going into the Grand Jury, there were a few

21   more than these folks, but --

22        Q.    Do you recall who?

23        A.    Well, Lamarr Scott for one.

24        Q.    Okay.

25        A.    Emil Adams I don't think you mentioned.

491

Belling - Coughlin - Cross

1

2    Q.    Emil Adams, all right.

3    A.    Police officers.

4    Q.    I'm just concerned with lay witnesses.

5    A.    Okay.

6    Q.    All right.  So, that you may have just mentioned

7    nine, somewhere around 7 to 9 lay witnesses; is that right?

8    A.    Well, I wasn't keeping count.  I was hoping you

9    were as you ticked them off, but there was a substantial

10   number, more than a normal case.

11   Q.    All right.  You would agree with me the best of our

12   collective recollections those are the only lay witnesses who

13   testified before the Grand Jury?

14   A.    Yes.

15   Q.    And, if that number is 9, it was sort of a 7 said

16   it one way and 2 said it another way situation; is that

17   right?

18   A.    Yes.  No -- yeah, that's correct, yes.

19   Q.    Seven for your side, and the other two were Leonard

20   Brown and Mario Jarmon, right?

21   A.    Depending on where you put Lamarr Scott, but yes.

22   Q.    He told you in the Grand Jury that no, he didn't

23   commit the crime?

24   A.    Right, Lamarr Scott testified under oath that he

25   didn't do it.

COE001049

492

1          Belling – Coughlin – Cross

2      Q.    Incidentally, just for the moment, you likened

3   Lamarr Scott to being something in the area of six feet and

4   rather husky or well-built fellow; is that right?

5      A.    Yes.  He's a substantial lad.

6      Q.    On, that happens to correspond with the physical

7   description of automatic weapon shooter given by Emil Adams,

8   doesn't it?

9              MR. SEDITA:  Objection.

10             THE COURT:  Sustained.

11  BY MR. COUGHLIN:

12     Q.    Let me ask you this:  You have reviewed all the

13  reports, all the investigation prior to the Grand Jury.  You

14  interviewed the witnesses again before it actually went into

15  the Grand Jury, right?

16     A.    Some of them, yes.  Some of them, no.

17     Q.    The important ones you did, though, right?

18     A.    I think that's a fair characterization, yes.

19     Q.    Were the descriptions of the person who fired the

20  automatic weapon, were they uniform?

21             MR. SEDITA:  Objection.

22             THE COURT:  Overruled.

23             THE WITNESS:  Descriptions are never

24             uniformed, and I have no doubt they were in this

25             case

493

Belling - Coughlin - Cross

1

2  BY MR. COUGHLIN:

3      Q.   Were they?

4      A.   I don't remember, but I don't think they were.

5      Q.   And, do you recall how Emil Adams described the

6  shooter?

7               MR. SEDITA:  Same objection.

8               THE COURT:  You can answer that yes or no.

9               THE WITNESS:  No.

10  BY MR. COUGHLIN:

11      Q.   Would a review of the Grand Jury transcript help

12  refresh your recollection?

13      A.   If it's in there, it might.  I can tell you who he

14  identified as the shooter.

15      Q.   I know who he identified?

16      A.   As do I.

17      Q.   He identified Dixon?

18      A.   Correct.

19      Q.   The question is, did he describe him properly?

20      A.   As I said, descriptions don't carry a lot of weight

21  in my business.

22      Q.   Oh, okay.  Are they important at a trial level,

23  though, as far as you as a 17-year prosecutor are concerned?

24      A.   It all depends on whether they can be used by the

25  defense to cloud issues or not.  I find that descriptions are

494

Belling - Coughlin - Cross

1
2 usually not very valuable from witnesses.

3    Q.    Okay.  I'll go with that also.

4    Now, this jury perhaps might be interested if you would
5 explain the actual Grand Jury proceeding as such.

6    A.    How it's conducted, you mean?

7    Q.    First of all, there are grand jurors, members of
8 the Grand Jury present in a room, right?

9    A.    Correct.

10    Q.    And, there is a foreman of the Grand Jury?

11    A.    Correct.

12    Q.    And, there is someone who is denominated the
13 secretary of the Grand Jury that keeps notes?

14    A.    Correct.

15    Q.    And, those kind of notes are not stenographic
16 notes, are they?

17    A.    No, those are notes of charges, things like that.

18    Q.    Relative to witness one, witness two, witness
19 three?

20    A.    Correct, attendance of the grand jurors, things
21 like that.

22    Q.    And, there is a stenographer present; is that
23 correct?

24    A.    That's correct.

25    Q.    And, there is a District Attorney, an Assistant

495

Belling - Coughlin - Cross

1
2  District Attorney present?

3      A.    Correct.

4      Q.    Anybody else present?

5      A.    Well, if there's a witness in the room, the witness

6  is present.

7      Q.    We will get to the witnesses.

8      A.    So at that point you have anywhere up to 23 grand

9  jurors.

10      Q.    I didn't ask you -- I said anyone else present?

11      A.    I'm ticking them off.  I can't think of anybody

12  else that should be present, no.

13      Q.    Now, there comes a time a witness is called into

14  the Grand Jury; is that right?

15      A.    Correct.

16      Q.    And, in the usual and normal course of the events,

17  the witness comes into the Grand Jury without counsel; is

18  that correct?

19      A.    That is correct.

20      Q.    And, a Grand Jury proceeding is, in fact, a secret

21  proceeding, is it not?

22      A.    Correct.

23      Q.    And the only -- the only lawyer in the room is the

24  Assistant District Attorney; is that correct?

25      A.    Correct.

1                    Belling - Coughlin - Cross

2        Q.    Assuming no lawyer is sitting as a grand juror?

3        A.    Correct, or that there's not a second assistant DA

4   or defendant with counsel.

5        Q.    All right, but the DA's office is the -- they're

6   the lawyer in the room, correct?

7        A.    Yes.

8        Q.    And, as a matter of fact, the Assistant District

9   Attorney acts as a legal adviser to the grand jurors?

10       A.    By law, yes.

11       Q.    And, he advises them as to the conclusion of the

12  testimony the Assistant District Attorney may summarize the

13  jurors and call the juror's attention as to how the testimony

14  matches up with a certain Statute; is that correct?

15       A.    Correct.  It's a possibility, yes.

16       Q.    And, in the process of doing that, he will recall

17  to the juror's attention that they are there on that

18  particular day with respect to that particular case to

19  consider charges of such and such a crime?  Violation of

20  section so and so of the Penal Law, and you read the Penal

21  Law, right?

22       A.    Correct.

23       Q.    And, you explain the Penal Law to them if there's

24  any question about it, right?

25       A.    Yes.

COE001054

497

Belling - Coughlin - Cross

1

2    Q.    Okay.  And you call their attention as to how the

3    testimony fits that Statute?  Right?

4    A.    Normally I wouldn't do that, no.

5    Q.    If there's a question?

6    A.    If there's a question, yes.

7    Q.    Now, you mentioned something in direct about a

8    witness acquiring immunity; is that correct?

9    A.    Yes.

10    Q.    And, normally, if a witness comes in and is asked

11    questions concerning any particular event, such as this

12    incident, the witness is automatically immunized from any

13    prosecution for anything, any prosecution for a crime

14    associated with that event; is that correct?

15    A.    Other than perjury, yes.

16    Q.    I didn't get to that yet.  Okay.

17    So, as long as the witness comes in and tells the truth,

18    he's immunized from anything; is that correct?

19    A.    Any charges in regard to the substantive

20    investigation, yes.

21    Q.    Okay.  Did the defendant -- strike that.

22    Sometimes, and in this case you asked the defendant Brown to

23    execute a waiver of that automatic immunity; is that correct?

24    A.    Leonard Brown?

25    Q.    Yes.

498

Belling - Coughlin - Cross

1

2      A.   I don't recall asking him to execute a waiver of

3  immunity in this case.

4      Q.   Did any of the witnesses that you presented to this

5  Grand Jury exercise a waiver of immunity?

6      A.   Exercise is the wrong term, but execute.

7      Q.   Execute?

8      A.   The answer is yes, Lamarr Scott executed a waiver

9  of immunity.

10      Q.   All right.

11      Q.   The defendant Leonard Brown, he appeared and

12  testified before your Grand Jury voluntarily; is that

13  correct?

14      A.   Under subpoena.

15      Q.   Under subpoena.  Oh, and by the way, getting to

16  that.  You mentioned that Antione Shannon, his half brother

17  was subpoenaed?

18      A.   Correct.

19      Q.   And you say didn't appear?

20      A.   Correct.

21      Q.   Do you recall who served that subpoena from your

22  office?

23      A.   No.

24      Q.   Do you recall who served the subpoena from your

25  office on Leonard Brown?

COE001056

499

**Belling - Coughlin - Cross**

1

2     A.   No.

3     Q.   Do you know whether, in fact, it was Leonard Brown

4 who received the subpoena?

5     A.   No, I wasn't there.

6     Q.   As far as you know, it could have been Antione

7 Shannon himself who received Leonard Brown's subpoena,

8 couldn't it?

9     A.   All I can tell you is Leonard Brown is the one that

10 showed up.

11     Q.   That's my point.

12     A.   So that leads me to a logic conclusion.

13     Q.   He showed up, right?

14     A.   Correct.

15     Q.   You also indicated, speaking of Antione, that you

16 interviewed Antione at his college down in Kentucky?

17     A.   Correct.

18     Q.   And, by the way, when you said you found him in

19 someplace called Campbellville, Kentucky, he was at school at

20 that location, isn't that correct?

21     A.   Correct, Campbellville College, Campbellville,

22 Kentucky.

23     Q.   You forgot the college part, though, on your

24 direct?

25     A.   I don't think I was asked.

500

Belling - Coughlin - Cross

1

2    Q.    Okay.    He was going to school down there on a

3    football and partial academic scholarship, do you know?

4                    MR. SEDITA:    Objection.

5                    THE COURT:    Sustained.

6                    MR. COUGHLIN:    All right.

7    BY MR. COUGHLIN:

8    Q.    As far as you interviewing Antione Shannon, did you

9    personally speak to him?

10   A.    Yes.

11   Q.    Okay, did you personally take a statement at that

12   time from Mr. Shannon?

13   A.    Yes.

14   Q.    Who else was with you?

15   A.    District Attorney's investigator Richard Shanley

16   was with me.

17   Q.    Okay, nobody there but you and Shanley?

18   A.    At the time of taking of the statement, we were the

19   only three in the room.    When the statement was sworn to, we

20   had a Kentucky notary public come into the room and take the

21   oath.

22   Q.    Okay.

23   Q.    Now, in the course of your reviewing all of the

24   investigative material that you had at your disposal, did you

25   come across a Lisa McCullough's name?

COE001058

501

Belling - Coughlin - Cross

1

2     A.    Yes.

3     Q.    Did you come across Shonique, S H O N I Q U E?

4     A.    Yes.

5     Q.    Did you come across a Heather Smith's name?

6     A.    Yes.

7     Q.    We'll cut it short.  Did you come across a lot of

8     names of people whom you did not present or call into or

9     invite or subpoena into the Grand Jury?

10    A.    Well, none of those --

11    Q.    Just that's a yes or no, Mr. Belling.

12    A.    Then the answer would have to be no.

13    Q.    The three that I just mentioned, you didn't

14    subpoena them?

15    A.    Well, they were all subpoenaed.

16    Q.    Did you bring them in, present them to the Grand

17    Jury?

18    A.    They did not give testimony after they were

19    interviewed, no.

20    Q.    Well, maybe I should ask this, then.  How many

21    people were subpoenaed to appear before the Erie County Grand

22    Jury with respect to this shooting?

23    A.    Anybody whose name came up in the file.  Whatever

24    the number is, I don't know.

25    Q.    You have no idea at all?

502

Belling - Coughlin - Cross

1

2    A.   No.

3    Q.   Could have been 30?

4    A.   Easily.

5    Q.   Could have been 50?

6    A.   50 is probably a little high.  Could have been 30.

7    Q.   30 to 50, somewhere in that range?

8    A.   Decent ballpark.

9    Q.   Now, in presenting the testimony of the witnesses

10 that you selected to actually bring into the Grand Jury, and

11 whose testimony you elected to elicited for the grand jury's

12 consideration, would you agree with me that it would be your

13 questioning of those witnesses could by and large be fairly

14 characterized as question and answer, question and answer,

15 question and answer?

16    A.   Yes.

17    Q.   And, that is how you usually proceed in a Grand

18 Jury, is that correct?

19    A.   Correct.

20    Q.   Very similar to the testimonial procedures that are

21 followed in a trial; is that correct?

22    A.   Yes.

23    Q.   Just like we're doing now?

24    A.   Little different than we're doing now, but somewhat

25 similar.

COE001060

503

Belling – Coughlin – Cross

1

2    Q.   Well, hopefully -- never mind.

3    Did you follow that procedure with respect to the

4    questioning of Leonard Brown in the Grand Jury?

5    A.   Yes.

6    Q.   Have you reviewed Leonard Brown's Grand Jury

7    testimony prior to coming in today?

8    A.   Yes.

9    Q.   Do you recall telling Leonard Brown, I'm just going

10   to let you sit there and tell us in your own words what

11   happened?

12   A.   Yes.

13   Q.   And, would it be fair to state that perhaps better

14   than a half of the pages of his testimony, Grand Jury

15   transcript, was given in a narrative style in response to

16   your suggestion that he just tell us in his own words what

17   happened?

18   A.   No, I don't think that's a fair characterization.

19   Q.   It's not a half?

20   A.   No.

21   Q.   How much?

22   A.   Well, the only thing I can say is his answers were

23   sometimes longer than most, but it had nothing to do with any

24   difference in question and answer format.  I would ask him a

25   question.  If his answer was longer, I would just let him

504

Belling - Coughlin - Cross

2    answer it.

3        Q.    Well, you invited him to tell you, or tell the

4    Grand Jury in his own words?

5        A.    Right, and that's what I do with any witness.

6        Q.    Is that what you did with Emil Adams?

7        A.    Best of my recollection, sure, yes.

8        Q.    Is that what you did with Aaron Jackson?

9        A.    Again, yes, to the best of my recollection.

10       Q.    Have you reviewed the testimony or the transcript

11   of testimony of John Sullivan, Travis Powell, Lamarr Scott,

12   Emil Adams, Antione Shannon -- excuse me, there wasn't any --

13   Aaron Jackson, Robert Lewis, Fred Stancil, have you reviewed

14   all their transcripts?

15       A.    Not in the recent past.  I have seen them, but not

16   within the last several months.

17       Q.    Is it your testimony here under oath that in each

18   and every one of those witnesses, or with each and every one

19   of those witnesses you asked or invited their narrative

20   testimony?

21       A.    Well, I may not have used the term, the word

22   narrative.  I believe that's where you might be going, but I

23   asked questions and let them answer.

24       Q.    Never mind where I'm going.

25       A.    I asked questions and let them answer questions to

505

Belling – Coughlin – Cross

1

2 the best of their recollection.

3      Q.    You asked questions?

4      A.    Correct.

5      Q.    And they would give an answer, and then you would

6 ask another question?

7      A.    Correct.

8      Q.    You did not with respect to those witnesses, you

9 did not invite a general narrative response?

10                 MR. SEDITA:  Objection, asked and answered.

11                 THE COURT:  Well, I thought he had, but I

12            guess Mr. Coughlin wants to reiterate the point.

13            Answer the question.

14                 THE WITNESS:  My answer is, I may not have

15            used the word narrative, but my question and answer

16            was the same technique for all of the witnesses.

17 BY MR. COUGHLIN:

18      Q.    Can you recall a single one of those witnesses whom

19 I just named as giving a rambling narrative type response at

20 your suggestion?

21                 MR. SEDITA:  Objection.  Asked and answered.

22            Characterizations.

23                 THE COURT:  Overruled.

24                 THE WITNESS:  Yes.

25 BY MR. COUGHLIN:

506

Belling - Coughlin - Cross

1

2    Q.   Which ones?

3    A.   My recollection was Aaron Jackson was rather

4 talkative and gave narrative answers, and John Sullivan also,

5 although I don't recall Emil Adams specifically.

6    Q.   You characterized Mr. Brown as being jittery,

7 agitated?

8    A.   Correct.

9    Q.   Appear nervous?

10    A.   He did.

11    Q.   Have you -- do you often see witnesses who appear a

12 little bit uncomfortable?

13    A.   It happens.  I have seen it before.

14    Q.   It's not particularly your responsibility to make

15 them comfortable, is it?

16    A.   I don't view that as one of my primary job

17 functions, making witnesses comfortable, no.

18    Q.   With respect to, again, how you handle the

19 witnesses in the Grand Jury, how you choose to handle them,

20 what type of questioning you choose to use, do you have any

21 recollection of the length of time that some of those

22 witnesses testified, the duration of their testimony?

23    A.   Nothing specific.  Some obviously were longer than

24 others.  It just depends on the witness, how much they know

25 and what they're willing to tell us.

507

1                    Belling – Coughlin – Cross

2       Q.   Well, for instance, John Sullivan whom you

3    indicated to have perhaps rambled a bit, would it surprise

4    you to realize that according to the transcripts of

5    testimony, he was in the Grand Jury room a total of 10

6    minutes?

7                    MR. SEDITA:  I object as to the relevancy of

8              the length of the Grand Jury minutes.

9                    THE COURT:  I don't know, is there some

10             relevance here, Mr. Coughlin?

11                   MR. COUGHLIN:  I believe there is, your Honor.

12                   THE COURT:  Okay, go ahead and ask.

13                   THE WITNESS:  That wouldn't surprise me, no.

14   BY MR. COUGHLIN:

15       Q.   As a matter of fact, most of, we'll call them your

16   7 --

17                   MR. SEDITA:  Objection to that characterization.

18                   THE COURT:  Sustained.

19   BY MR. COUGHLIN:

20       Q.   Okay.  Well, do you know who I mean, Mr. Belling?

21       A.   Yes.

22       Q.   Most of those witnesses were all in the 7, 8,

23   10-minute area, were they?

24       A.   I honestly don't remember.  I would expect Aaron

25   Jackson was longer than that, but a lot of different factors

COE001065

508

1                           Belling - Coughlin - Cross

2    impinge upon how long they're in there.

3          Q.    Prior to presenting this case to the Grand Jury,

4    Mr. Belling, were you advised as to what a Tech 9 weapon

5    was?

6          A.    Yeah, I know what a Tech 9 was.  I knew before this

7    presentation, sure.

8          Q.    Did you know before the presentation that it's a

9    semiautomatic weapon?

10         A.    It can be a semi, it can be a full auto, but yes,

11   it's a 9-millimeter type of weapon that's either semi or full

12   auto.

13         Q.    Okay, and you know that it is produced as a

14   semiautomatic weapon?

15         A.    Didn't know that, no.

16         Q.    But you did know it wasn't a machine gun, was it?

17         A.    No, I didn't know that.

18               MR. COUGHLIN:  Nothing further.

19               THE COURT:  Mr. Newcomb?

20               MR. NEWCOMB:  Judge, in all due respect, my

21               cross-examination might be shortened if I could do

22               it after lunch.  Now, I have been pretty brief with

23               a lot of witnesses, but I think I'm going to be a

24               little more lengthy with Mr. Belling.

25               THE COURT:  Do you?

509

People vs. Brown & Jarmon

1

2      MR. NEWCOMB:  Yes, sir.

3      THE COURT:  You want to go to lunch?

4      MR. NEWCOMB:  Yes, sir.

5      THE COURT:  Are you hungry?

6      MR. NEWCOMB:  It's not that, Judge.

7      THE COURT:  Okay, fine.

8      MR. NEWCOMB:  We would have to stop.

9      THE COURT:  Sure, you get to go to lunch too.

10     We are all going to go to lunch.  Let's take a

11     break, ladies and gentlemen.  I'm going to, let's

12     see, return at 10 to 2:00, and we will have you in

13     shortly to continue with the cross-examination of

14     Mr. Belling.

15         (12:07 p.m. court adjourned.)

16         (2:14 p.m., counsel and defendants present.)

17         MR. SEDITA:  First off, your Honor, I'm going

18     to rest my case after Mr. Belling testifies.

19     Before I close my case, I want to move in Grand

20     Jury minutes of Mario Jarmon and Leonard Brown into

21     evidence.  Both counsel told me they want to call

22     Cynthia Williams, Grand Jury stenographer.

23     However, there is no need to.  As a matter of

24     mechanics, there are some deletions or

25     modifications which I request the Court to make of

COE001067

510

People vs. Brown & Jarmon

1

2      those transcripts.  I have prepared copies of the

3      proposed transcripts in that regard, but in terms

4      of just having something physically to move into

5      evidence, I would like to move in the transcripts

6      now, subject to any later modifications that the

7      Court may deem.

8          THE COURT:  Well, number one, is there

9      agreement that these come in?

10         MR. NEWCOMB:  Yeah, I don't have a problem

11     with stipulating that the Grand Jury testimony come

12     in.  But I would move to redact any part of their

13     Grand Jury testimony that doesn't have to do with

14     the counts in the indictment.  I can articulate

15     why.

16         THE COURT:  Maybe you ought to tell me what we

17     are talking about.  What portion of the testimony,

18     for example, would you redact?  I suppose, Mr.

19     Newcomb, that there's really no need -- why would

20     you need anything except the statements that are

21     alleged to be false?  Do you need anything else,

22     Mr. Sedita?  Are you looking for anything else?

23         MR. SEDITA:  Mr. Belling's warnings of

24     perjury, for example.

25         THE COURT:  Oh, sure.

COE001068

511

People vs. Brown & Jarmon

1

2    MR. SEDITA:  There's a whole bunch of things.

3    The background of the situation.  Things I'm trying

4    to keep out are any hearsay references in the Grand

5    Jury transcript as to what this person might have

6    said to this witness, or that person might have

7    said to that witness.  That's what I am looking to

8    keep out.

9    MR. NEWCOMB:  Here is what I am saying.  My

10   client made some statements from page, anything

11   before Page 8 which deal with Dixon shooting that

12   may be prior inconsistent statements that aren't

13   anything alleged charged.

14   THE COURT:  Such as?

15   MR. NEWCOMB:  That Torre had a gun or that

16   Lamarr had a gun.

17   THE COURT:  Well, that's one of the -- is not

18   that one of the --

19   MR. SEDITA:  I think that's one of the

20   counts.

21   MR. COUGHLIN:  Not as such.

22   MR. NEWCOMB:  Not as such, Judge.

23   THE COURT:  Count Number 1, the allegation is

24   that Torriano Jackson possessed a handgun in the

25   Bailey and East Delevan.

512

People vs. Brown & Jarmon

1

2      MR. NEWCOMB:  I don't have a problem of that.

3  I meant to say Lamarr Scott.

4      THE COURT:  Oh.

5      MR. NEWCOMB:  It deals -- he gave testimony to

6  his background with Valentino Dixon.  He gave

7  testimony as to events that occurred prior to the

8  fight, in terms of what they were doing, who was at

9  his house, the fact that he says Lamarr brought a

10  gun to his house.  I think that's prejudicial.

11  They didn't charge him with that.  That's clearly

12  inconsistent with the People's theory.

13      THE COURT:  Well, it would be my sense of the

14  matter that anything extraneous should be deleted.

15  Now, if you can't agree on what should be redacted,

16  I suppose I can make a determination, but first of

17  all, why don't you see if you can agree; and

18  secondly, if you can't agree, then identify for me

19  the specific areas that you disagree on, and I'll

20  listen to what you have to say.  But, I guess the

21  basic question at the moment is do we have a

22  stipulation that the minutes, or portion thereof,

23  go in?

24      MR. COUGHLIN:  I have no objection, your

25  Honor.

513

People vs. Brown & Jarmon

1

2      MR. NEWCOMB:  No objection.

3      THE COURT:  So what you want to do, Mr.

4  Sedita, prior to closing, is indicate to this jury

5  that you would like to move these exhibits in, that

6  you have conferred with defense counsel, and you

7  believe they have no objection.  I'll ask you,

8  obviously, on the record in their presence, and

9  then I'll receive them, but with an understanding

10  that they are yet to be redacted.  Any problem with

11  that?

12      MR. NEWCOMB:  No.

13      MR. COUGHLIN:  I have no problem.

14      THE COURT:  And clearly what we will do is

15  this:  Let me just back up a second.  There's no

16  question that there are certain portions of that

17  transcript which you agree are to be admitted,

18  right?

19      MR. NEWCOMB:  Sorry, Judge?

20      THE COURT:  There's no question that there are

21  certain portions of the transcript that are to be

22  admitted.

23      MR. NEWCOMB:  Absolutely, correct.

24      THE COURT:  So what you may need, depending

25  upon whether or not you can work it out, is

514

People vs. Brown & Jarmon

1

2    direction from me with respect to what is redacted.

3    MR. NEWCOMB:  We would rely on your sound

4    judgment.

5    MR. SEDITA:  I'll rely on that.

6    THE COURT:  First you have to attempt to

7    agree, and then if you can't agree, I'll take a

8    look at it.  Okay.

9    MR. SEDITA:  Second thing, Judge, is they

10   subpoenaed some Buffalo police officers, Detective

11   Grabowski, Detective DiPirro, who are here.

12   Detective Stambach, who is not here.  I understand

13   from what I can gather from going over their

14   memoranda, and so forth, those witness's testimony

15   would relate to certain statements Mr. Jarmon or

16   Lamarr Scott or Mr. Brown may have said on other

17   occasions.  I want offers of proof on that if those

18   witnesses come in, because I think that's rank

19   hearsay.  I have quite a bit of law on that, and I

20   don't want that done in the presence of the jury.

21   I want to make that clear.

22   THE COURT:  Why don't we make sure that's

23   where they are going.  First of all, you are going

24   to finish with this witness.  And then Mr.

25   Coughlin, you're going to call witnesses?

COE001072

515

People vs. Brown & Jarmon

1

2          MR. COUGHLIN:  Yes, your Honor.

3          THE COURT:  How many are we talking about?

4          MR. COUGHLIN:  At this moment one for sure,

5     probably two.

6          THE COURT:  Okay.  We'll make a determination

7     when you let us know who you are calling, and then

8     I'll see if there's need for an offer.

9          MR. SEDITA:  I would then make if they are

10     going to call witness the relevant Rosario

11     application, 240.45, Sub 2, of the CPL.

12          MR. COUGHLIN:  No statements.

13          MR. NEWCOMB:  To be fair to Mr. Sedita, Judge,

14     during my cross-examination of Mr. Belling, I'm

15     going to ask him if he saw certain prior statements

16     on P-73s of my client.  That's the very subject

17     matter which he wishes to keep out, so I don't want

18     to make any appearance I'm trying to --

19          THE COURT:  You want to elicit from Mr.

20     Belling what your client told him?

21          MR. NEWCOMB:  No, what is in the police report

22     P-73.

23          THE COURT:  Why would it not be permissible,

24     Mr. Sedita, for Mr. Newcomb to call the person to

25     whom the defendant made the statement on this

516

1          People vs. Brown & Jarmon

2    issue?

3         MR. SEDITA:  Called hearsay, Judge.  It's

4    impermissible bolstering.

5         THE COURT:  What do you call it when you

6    elicit the testimony or the statement made by the

7    defendant to Mr. Belling?

8         MR. SEDITA:  It's non-hearsay because under

9    the law that's called an admission of a party.

10        THE COURT:  And you are worried about some

11   other statement that he made that what --

12        MR. SEDITA:  Any other earlier statements that

13   he may have made would come in as prior consistent

14   statements.  That's bolstering, and there's no

15   exception to the hearsay.

16        THE COURT:  As prior --

17        MR. SEDITA:  Prior consistent statement.

18        THE COURT:  Consistent statements.

19        MR. SEDITA:  Right, that's bolstering.  That

20   is hearsay judge.  I have several cases on that

21   point.  Not a declaration against interest.

22        THE COURT:  Well, it's pretty clear you can't

23   elicit from this witness what is on some report

24   that allegedly was said by Mr. Jarmon.  I don't

25   know how you are going to get that in.

People vs. Brown & Jarmon

1

2    MR. NEWCOMB:  Well, not for the truth of the

3    matter of the fact, but the fact that he read and

4    was aware of those statements, and what was said.

5    MR. SEDITA:  That's a hypertechnical

6    situation.

7    MR. NEWCOMB:  Absolutely it's technical, but

8    it's fundamental.

9    THE COURT:  Well, as you know, you can't have

10   a defendant make a statement and then move the

11   statement in during a trial to avoid the necessity

12   of that defendant testifying.  You can't

13   cross-examine the statement.  So, we're going to

14   need to know exactly what it is we're talking

15   about; but I'm just saying for purposes of this

16   testimony, I don't know how you are going to get

17   Mr. Belling to enunciate what he may have read that

18   the defendant may have said.  I don't know how

19   that's going to come in.  He's not going to be

20   permitted to do that.

21   MR. NEWCOMB:  Okay.

22   THE COURT:  Maybe -- and it depends on the

23   statement and when it was said, it may be

24   admissible from another witness, namely the witness

25   to whom the defendant spoke.

COE001075

518

1                    Belling - Newcomb - Cross

2                    MR. NEWCOMB:  Correct.

3                    THE COURT:  But I don't know if it is yet.

4                    MR. NEWCOMB:  All right, I'll for wait.

5              Forewarned is forearmed, Judge.

6                    THE COURT:  All right, let's get them in.

7              (2:23 p.m. jury present.)

8    C H R I S T O P H E R   J.   B E L L I N G, having been

9         previously sworn, resumed the stand and testified

10        further as follows:

11                   MR. SEDITA:  May I have these marked, please.

12                        (Whereupon, People's Exhibit Number 56

13                        and 57 were marked for identification.)

14                   THE COURT:  I think we are ready for

15             cross-examination of Mr. Belling by Mr. Newcomb.

16                   MR. NEWCOMB:  Mark this, please.

17                        (Whereupon, Defendant's Exhibit O was

18                        marked for identification.)

19   CROSS-EXAMINATION

20   BY MR. NEWCOMB:

21        Q.   Mr. Belling, some housekeeping matters first.  You

22   testified this morning that you presented this case to an

23   Erie County Grand Jury, correct?

24        A.   Correct.

25        Q.   During the course of that presentation, you had an

COE001076

519

Belling - Newcomb - Cross

1

2   opportunity to review numerous documents involved in this

3   investigation?

4       A.   During the course of the investigation I did, yes.

5       Q.   Did you, yourself, make any notes of any type?

6       A.   Not in terms of anything factual, no.

7       Q.   Did you make any notes?

8       A.   Well, during the course of the whole matter, trial

9   notes, things like that, but no notes in terms of documents

10  relative to what these individuals testified about.

11      Q.   Did you dictate anything?

12      A.   Again, nothing in these areas.  I probably dictated

13  a lot of things in this case, but I can't think of anything

14  relative to the testimony of Jarmon or Brown.

15      Q.   To your recollection, do you recall making any

16  notes prior to the Grand Jury voting an indictment of these

17  two gentlemen?

18      A.   The category notes is awfully broad.

19      Q.   Any writings on your part where you took a pen and

20  put it to a piece of paper?

21      A.   Right, I'm sure there are some when I talked to

22  witnesses.  I would have made notes either before, during or

23  after talking to witnesses.  I would have made notes who to

24  subpoena.  There's a lot of different notes.

25      Q.   Do you have those notes?

520

Belling – Newcomb – Cross

1

2      A.   I don't have them with me, nor have I seen them

3   since the trial of Valentino Dixon.

4                MR. NEWCOMB:  Judge, could we approach a

5           second?  I'm sorry.

6                THE COURT:  Certainly.

7                (Bench Conference held.)

8                THE COURT:  I am going to excuse you, ladies

9           and gentlemen, while we find out whether or not

10          there are any notes.  You can go back up to the

11          jury room.  We will have you back here as soon as

12          possible.

13               (2:30 p.m. jury leaves courtroom.)

14               THE COURT:  Mr. Newcomb, tell us what it is

15          specifically that you want, and maybe we can get an

16          answer as to whether or not they exist, and if they

17          exist or they may exist, then we'll ask Mr. Belling

18          to go back and check it out.  What do you want?

19               MR. NEWCOMB:  Judge, based on the Statute, I'm

20          entitled to any written records that this witness

21          may have made in regards to this proceeding.

22          Therefore --

23               THE COURT:  Well, that's pretty broad.  You're

24          not entitled to every written note that he made

25          regarding these proceedings.  What you may be

521

1                        People vs. Brown & Jarmon

2        entitled to is any notes that he took in

3        interviewing witnesses who testified here or notes

4        he may have taken with respect to these defendants,

5        or if you can show some tie on notes that he may

6        have taken with some other party who has not been

7        called as a witness, I don't know, but certainly

8        you are not entitled to every scrap of paper that

9        he wrote that deals with the Valentino Dixon case.

10       You're not proposing that, are you?

11            MR. NEWCOMB:  Well, Judge, I would, but I

12       would settle for the limitation which you just

13       articulated.

14            THE COURT:  Mr. Sedita, what is your

15       position?

16            MR. SEDITA:  My position is that if he took

17       any notes relative to the witness conferences he

18       had with respect to Mr. Jarmon or Mr. Brown, those

19       probably should be turned over as Rosario

20       material.  Other than that, this is a mere fishing

21       expedition and he's not entitled to it.

22            THE COURT:  Would you acknowledge that if he

23       took notes, say with respect to any of the other

24       witnesses that have testified here, that they

25       should have been turned over as well as Rosario?

522

People vs. Brown & Jarmon

1

2     MR. SEDITA:  I don't think the subject matter

3     was testified to.

4         THE COURT:  Well, I don't know.  I guess

5     that's what it's all about.

6         MR. NEWCOMB:  That's the whole purpose of the

7     rule.

8         THE COURT:  If Mr. Belling, for example, had

9     an interview with Robert Lewis, just for example,

10    and took notes about his testimony, and that is the

11    subject matter of what he testified about here,

12    which I assume it would be, would those notes not

13    have to be turned over?

14        MR. SEDITA:  That's not my reading of the law,

15    Judge, but you are the final arbitor.

16        THE COURT:  What do you think, Mr. Belling?

17        THE WITNESS:  It's not the subject matter of

18    my testimony, and, therefore, because I'm not

19    testifying about what they said --

20        THE COURT:  Sure.  With respect to the fact

21    that Lewis is called, should they not have been

22    turned over?

23        THE WITNESS:  In the context of what Lewis

24    testified to, I don't know.  Again, I try to take

25    minimal notes, and if the notes exist, depending on

523

People vs. Brown & Jarmon

1

2      what the content is, there's a possibility both

3      ways.

4           THE COURT:  Sure.  So that's why we're in the

5      position now where what we have to do is take a

6      break here, ask Mr. Belling to go back and see if

7      there are any.  I mean, he doesn't even know if

8      there are any, and if there are some notes that

9      might qualify as Rosario Federal, turn them over.

10          MR. COUGHLIN:  Your Honor, just to make sure

11     that I understand the Court's ruling.

12          THE COURT:  I didn't even make a ruling yet.

13          MR. COUGHLIN:  Well, directive.

14          THE COURT:  Go ahead.

15          MR. COUGHLIN:  As I understand Mr. Belling

16     earlier this morning to have testified that he

17     interviewed any number of people prior to the

18     presentation of this case to the Grand Jury.  He

19     again most recently reiterated that position, that

20     yeah, he made notes during witness interviews.

21     That was his response.  And I suggest whether it's

22     Mr. Lewis who testified here, or whether it's a

23     Lisa McCullough or a Sonja James, or any other

24     witness who he interviewed relative to this

25     incident prior to his presentation of the matter

COE001081

524

People vs. Brown & Jarmon

1

2     into the Grand Jury, I think we're entitled to just

3     like --

4          THE COURT:  Under what theory.

5          MR. COUGHLIN: -- a P-73.

6          THE COURT:  Under what theory would you be

7     entitled to the notes if they exist that, notes

8     that Mr. Belling took from someone who hasn't

9     testified here?

10          MR. COUGHLIN:  All right.

11          THE COURT:  And is not Brady?

12          MR. COUGHLIN:  Okay.

13          THE COURT:  Under what theory?

14          MR. COUGHLIN:  Well, if it's not Brady, Brady

15     is another matter.  If it is Brady, we are entitled

16     to it.

17          THE COURT:  Of course, but your statement is

18     you are entitled to all the notes he took on this

19     whole case from everybody he interviewed.  Under

20     what theory?  If you can explain it to me, I'll

21     order it.

22          MR. COUGHLIN:  No, no.

23          THE COURT:  Do counsel, all four present in

24     the courtroom, including the witness, understand

25     what Rosario is?

525

People vs. Brown & Jarmon

1

2          MR. SEDITA:  I understand exactly what you are

3      directing, Judge.

4          THE COURT:  All right, you know what Rosario

5      is, Mr. Belling?

6          THE WITNESS:  Sure.

7          THE COURT:  Seventeen years as a District

8      Attorney.  If you got any, give it to them.  And,

9      obviously, if you need to see who has testified in

10      this case, Mr. Sedita has that list.  If there are

11      such notes that qualify as Rosario, they probably

12      should have been turned over prior to this point.

13      Now, whether we can remedy that, I don't know.

14      First of all, I guess we need to determine whether

15      there are any.  If there are any, then we'll see

16      what we can do to correct the situation if it needs

17      correcting.  If there are none, then there's no

18      need to correct anything.

19          MR. COUGHLIN:  All right.

20          THE COURT:  How is that?

21          MR. NEWCOMB:  Thank you.

22          MR. COUGHLIN:  Sounds good.

23          THE COURT:  Sounds good to me too.  Go check

24      out your file, Mr. Belling.  Give us a call when

25      you are ready.

COE001083

526

1          People vs. Brown & Jarmon

2          THE WITNESS:  It shouldn't be long because

3    everything is categorized by witness, and as I say,

4    I try not to take many notes.

5          (2:35 p.m. Court recessed.)

6          (2:55 p.m., counsel and defendants present.)

7          THE COURT:  I see everyone is back.  What have

8    we decided here?

9          MR. SEDITA:  I have given some things over to

10   defense counsel.  I would like to put them on

11   record.  To make the record of appeal crystal

12   clear, what I have given them, the first document

13   are Mr. Belling's notes from December 4, 1991

14   regarding a telephone conversation Mr. Belling had

15   with Mario Jarmon where Mr. Jarmon says that the

16   three shots by Torre were with a little revolver

17   and they all hit Mario.

18         The second note.  Note from Mr. Belling on

19   January 9, 1992, Leonard Brown threatened Aaron

20   Jackson sister Predina Jackson.  The note also

21   refers to an address of Mr. Jackson.  It also

22   refers to Leonard Brown threatening Emil Adams.

23         Note from Mr. Belling November 19th, 1991,

24   Robert Lewis, Jr. gives some pedigreed information,

25   and last note is intentional shooting, standing

COE001084

527

People vs. Brown & Jarmon

1

2    over victim on ground.

3        Note by Mr. Belling relative to Robert Lewis,

4    man on bike and shooter are two different people.

5    They were dressed similarly, but were different

6    sizes, physical stature.

7        Note from Mr. Belling.  Robert Lewis shown

8    photo arrays on 11-19-91 by H. Frank.  Arrays of

9    both Valentino Dixon and Lamarr Scott are shown.

10   No ID.  Also, Fred Stancil shown same two arrays in

11   CJB's office by Lonergan November, 91.  Also no

12   ID.

13       A note by Mr. Belling relative to witness by

14   the name of Walter Dennis who has not been called

15   to testify by the People.  He is the brother to

16   Leonard Brown by marriage.  As Lori Frank who is an

17   assistant DA brought him through the buzzer doors,

18   that would be in the DA's office, Leonard Brown

19   called out to him, remember, you don't know

20   nothing.

21       Notes relative to Tamara Frida, a witness

22   called by the People, basically pedigreed

23   information, and a note, duck at first shot,

24   doesn't know any of the parties, and it refers to

25   people by the name of Jacqueline Parks and Sandra

528

People vs. Brown & Jarmon

1
2  Smith, and their addresses.

3       Finally, notes by Mr. Belling relative to

4  Lamarr Scott, taken on 8-12-91 confession -- 3:30

5  a.m., confession on TV, Uzi from Montana Street via

6  bicycle.  Yellow Dodge Shadow, Lamarr victims jump

7  out.  Geo -- Leonard shooting.  LS returns fire,

8  panic and out of control, shooting underline

9  threats, problem, self protection and poor shooting

10 control.  Can't come up with underlying reason.  19

11 years old, no priors.  Revoked Tino's bail.  Four

12 people in Lamarr's party.  Did Fred Jackson die of

13 OD weeks ago?  Tech 9, something underneath that.

14 I can't really read it, and then Uzi, TV.  And that

15 is -- that's already been turned over to the

16 defense, statement of Lamarr Scott's.  I mean,

17 video of Mr. Lamarr -- video confession.  There is

18 really nothing here that hasn't been supplied by

19 the people in other documents, except, of course,

20 writings indicating threats by these defendants of

21 People's witnesses.

22       THE COURT:  Mr. Newcomb?

23       MR. NEWCOMB:  Judge, first of all, there's a

24 communication in here dated December 4th, 1991.

25 Although it's brief, it does indicate that the

529

People vs. Brown & Jarmon

1
2    witness had had an encounter with Mr. Jarmon that I
3    didn't know of.  And then in the course of
4    preparing my cross-examination, I wasn't aware of
5    this.

6        THE COURT:  What witness?

7        MR. NEWCOMB:  In the course of preparing my
8    cross-examination of this witness.

9        THE COURT:  What note are you looking at?

10       MR. NEWCOMB:  First one, December 4, 91.

11       THE COURT:  All right, what about it?  What is
12   your point?

13       MR. NEWCOMB:  Well, I wasn't aware that there
14   was a meeting between my client and Mr. Belling.

15       THE COURT:  What would be the obligation of
16   Mr. Belling to turn over this note?

17       MR. NEWCOMB:  It's a note, Judge, that he made
18   that regards the exact one count of one of the
19   indictments, Judge.  I move for a sanction, Judge,
20   and the sanction being that this witness's
21   statement be stricken.

22       THE COURT:  What is this, Mr. Belling?

23       THE WITNESS:  That is a note of a conversation
24   that I had with Mario Jarmon before he testified as
25   a Grand Jury witness, during which his testimony,

530

People vs. Brown & Jarmon

1

2    or his conversation, because he wasn't under oath,

3    proved to be even less consistent with the reality

4    than his eventual Grand Jury testimony was; and

5    quite frankly, I even forgotten that we had that

6    conversation or I would have had Mr. Sedita 710.30

7    it for this trial, but, I found that going back

8    through the folder where, you know, my notes would

9    have been, and there it is.  So, I did talk to

10   Mario once before, and he was, as I say, even less

11   consistent with the reality of these events at that

12   time, but we have now lost that in terms of its

13   usefulness, in terms of its use to the prosecution

14   because it wasn't 710.30.

15        MR. NEWCOMB:  Judge, everybody knows the rule.

16        THE COURT:  What is the rule that this note

17   has to go to you?

18        MR. SEDITA:  I don't think there is any.

19        THE COURT:  What is the rule that would

20   require that this note be turned over to the

21   defense?

22        THE WITNESS:  Well, if it was 710.30, it would

23   have to be turned over, but apparently it's our

24   loss.  It wasn't in the 710.30, so we can't use

25   that prior conversations with Mr. Jarmon, as I say,

531

People vs. Brown & Jarmon

1
2    even though it's more detrimental to his case here.
3        THE COURT:  How do you -- what sanction would
4    you like, Mr. Newcomb?  I mean, under what theory
5    did he do something wrong here?
6        MR. NEWCOMB:  He failed to turn over Rosario
7    material.
8        THE COURT:  Rosario?  Your guy hasn't even
9    testified.
10        MR. NEWCOMB:  He doesn't have to.  My man's
11    statement he has to turn over with the writings of
12    this witness.
13        THE COURT:  Which witness?
14        MR. NEWCOMB:  This witness.
15        THE COURT:  Of Jarmon's statement to him?
16        MR. NEWCOMB:  Any notes, Judge.
17        MR. COUGHLIN:  Same as a P-73, Judge.
18        MR. NEWCOMB:  That's my understanding.
19        THE COURT:  I thought you would want
20    statements of this witness as Rosario, not
21    statements --
22        MR. NEWCOMB:  Any writings that this witness
23    may have made with regards to the indictment that
24    is on trial now.
25        THE COURT:  No, that's not Rosario material.

People vs. Brown & Jarmon

1

2    It's not any writings he made.  He may have written

3    a treatise to himself.  You think you are entitled

4    to that?

5         MR. NEWCOMB:  Yes, Judge.

6         THE COURT:  Under what theory?

7         MR. NEWCOMB:  Under Rosario, 240.45.

8         THE COURT:  Really?

9         MR. NEWCOMB:  Judge, I don't make this

10   application frivolously.

11        THE COURT:  Look it, Mr. Newcomb, maybe I'll

12   learn something here, okay.  Let's see.  Prior

13   statements and criminal history of witnesses is

14   240.45, is that right?

15        MR. NEWCOMB:  Right.  No, 240.44, Judge.

16        THE COURT:  44.

17        MR. NEWCOMB:  Number one.

18        MR. SEDITA:  That's discovery.  Upon Court

19   Order, 240.44.  I don't think that applies.

20        MR. NEWCOMB:  All right, 240.45.

21        THE COURT:  All right, 240.45.  Which

22   paragraph, under which paragraph do you think that

23   Mr. Belling would have to give you his synopsis,

24   for example, of the --

25        MR. NEWCOMB:  Independent of any written or

533

People vs. Brown & Jarmon

1
2  recorded statement, including any testimony before
3  a Grand Jury and an examination, videotape pursuant
4  to Section 190.32 of this Chapter made by a person
5  who is a prosecutor who intends to call as a
6  witness at trial and which relates to the subject
7  matter of the witness's testimony.

8      MR. SEDITA:  I don't intend to call him at
9  trial, because I can't.

10     MR. NEWCOMB:  This witness, Judge.

11     THE COURT:  He didn't make any statements.
12 They're not Mr. Belling's statements.

13     MR. NEWCOMB:  Any writings, Judge.

14     THE COURT:  What is the purpose of Rosario,
15 Mr. Newcomb?  What is the purpose of it?

16     MR. NEWCOMB:  Purpose of the Rosario material
17 is so that the defendant will have an opportunity
18 to review any statements of all witnesses to
19 prepare for cross-examination of those witnesses.

20     THE COURT:  Sure.

21     MR. NEWCOMB:  The law is clear that it's up --
22 the defense counsel is the only person who is
23 entitled to decide what is usable and what is not
24 usable.  It's not Brady.

25     THE COURT:  So, the purpose of giving prior

534

People vs. Brown & Jarmon

1
2    statements made by a witness to be called, who is
3    to be called by the People, is so that you have the
4    information that the People have with regard to
5    what that witness may or may not have said on a
6    prior occasion.   The purpose is impeachment,
7    whatever.   Now, what statement is it of Mr.
8    Belling's?
9            MR. NEWCOMB:   It's not a statement, Judge.
10   It's a writing.
11           THE COURT:   And you're trying to tell me that
12   if he wrote down something concerning his view of
13   the matter, that you're entitled to it.
14           MR. NEWCOMB:   Absolutely.
15           MR. COUGHLIN:   Your Honor, if I may, it seems
16   to me that it is no different than if this witness
17   were Detective Lonergan.   Now, there's no dispute
18   that we were entitled to receive all notes, all
19   P-73s, all memoranda generated.
20           THE COURT:   How about an attorney's work
21   product, Mr. Coughlin?   Have you ever heard of
22   that?   Is he not entitled to do anything in terms
23   of his own work product?   You are entitled to get
24   all of that?
25           MR. COUGHLIN:   He can do all his thinking and

535

People vs. Brown & Jarmon

1
2      jotting and scribbling that he wants to relative to
3      his work product such as revoked Tino's bail.
4      That's fine and dandy.  That's not what we are
5      asking for.
6          THE COURT:  What are you asking for?
7          MR. COUGHLIN:  We were entitled, your Honor,
8      to these notes relating to the testimony of the
9      defendants, or of the client relative to the counts
10     of this indictment.
11         THE WITNESS:  Your Honor, can I switch roles
12     here a minute?  I have sort of been in a couple
13     roles here.
14         MR. NEWCOMB:  Wait.  I object to that judge.
15         THE COURT:  That is all right, object.  Go
16     ahead, let me know what you want to tell me.
17         THE WITNESS:  Well, even assuming that the
18     defense is correct and that this one document that
19     Mr. Newcomb is talking about should have been
20     turned over, the cases in the Rosario area are
21     clear, the analysis is multi-stage.  When did they
22     get it, what prejudice did they have?  When
23     sanctions should be imposed, et cetera.  In this
24     instance, let's assume worse case scenario and the
25     Court should impose sanctions, the only sanction

536

1           People vs. Brown & Jarmon

2      that would be appropriate -- and in this point I'm

3      on the other side of the podium here -- would be

4      that Mr. Sedita can't ask me did I have a

5      conversation with Mario Jarmon on an earlier

6      occasion in which he said such and thus.  And

7      because of 710.30, we couldn't do that anyway.

8           MR. SEDITA:  Judge, let me -- I don't even

9      think this constitutes Rosario material, but it was

10     turned over anyway.

11          MR. NEWCOMB:  First, I don't mind if the

12     witness talks to his lawyer and that goes in

13     through his lawyer, but I resent the fact that the

14     witness is giving instruction.  I object to it.  I

15     don't resent it.  I apologize.  I have great

16     respect for Mr. Belling.  But, this is People

17     versus Consolazio, C O N S O L A Z I O, 40 New York

18     2d, 446 on the square, where an Assistant District

19     Attorney failed to turn over his notes which were

20     Rosario material because he was a witness.

21          THE COURT:  What case?

22          MR. NEWCOMB:  Consolazio.

23          THE COURT:  Well, it's pretty clear from

24     Consolazio as well as some of the other cases that

25     you're not entitled to his work product, right?

537

People vs. Brown & Jarmon

1
2  You know that.  Any dispute there?

3       MR. NEWCOMB:  No, Judge.

4       MR. COUGHLIN:  I have no dispute there.

5       THE COURT:  The prosecutor's work sheets you

6  are not entitled to, correct?

7       MR. NEWCOMB:  Right.

8       THE COURT:  Now, he has given you what notes

9  he had with respect to any of the witnesses

10  involved in this proceeding, I think.  Have you?

11       THE WITNESS:  That's correct.

12       THE COURT:  So what now?  What do you want

13  now?

14       MR. NEWCOMB:  That's it.

15       THE COURT:  You don't want anything else?

16       MR. NEWCOMB:  No.  I move for a sanction.

17       THE COURT:  What sanction would you like?

18       MR. NEWCOMB:  Strike his testimony.

19       THE COURT:  Strike this witness's testimony?

20       MR. NEWCOMB:  Yes.

21       THE COURT:  I don't think so.

22       MR. COUGHLIN:  Now, may I be heard, Judge?

23       THE COURT:  Sure.

24       MR. COUGHLIN:  My cross-examination is

25  finished.  I may or may not been able to use some

538

People vs. Brown & Jarmon

1

2      of these notes, but that's not important.  What is

3      important --

4          THE COURT:  It's not important, then why do

5      you mention it?

6          MR. COUGHLIN:  What is important is in the

7      presence of the jury perhaps we can get this

8      straightened out.  I'm informed by my client that,

9      indeed, he did sit with Mr. Belling and with

10     somebody else associated with the District

11     Attorney's office, either another assistant or

12     somebody, wherein Mr. Belling for some period of

13     time made notes of his conversation with this

14     defendant.  I don't see those notes here.

15         THE COURT:  Am I missing something here?  What

16     would be wrong with Mr. Belling taking notes of an

17     interview with your client, and he, Mr. Belling,

18     not turning those over to you?  What would be wrong

19     with that?

20         MR. COUGHLIN:  Nothing if he wasn't going to

21     testify against my client.

22         THE COURT:  But it's your client's statement

23     that he's memorializing, not his statement, not

24     Belling's statement that is being memorialized.

25     It's your client's statement.  If he were to call,

539

People vs. Brown & Jarmon

1
2    and he were able to call your client as a witness,
3    sure, now he has got to turn it over.  What theory,
4    Mr. Coughlin, what theory would require Mr. Belling
5    or anyone else in the District Attorney's office to
6    turn over a note that he made regarding an
7    interview with your client if he doesn't want to
8    use it as a statement against him?
9        MR. COUGHLIN:  Fine.  If he doesn't, and as
10   long as he's not going to testify.
11       THE COURT:  Why can't he testify?
12       MR. COUGHLIN:  He cannot testify as to
13   anything relative to my client relating to the
14   incident of this indictment.
15       THE COURT:  Under what theory?  Where is your
16   law?  Where is your authority?
17       MR. COUGHLIN:  That is Rosario, and that is
18   the Statute.
19       THE COURT:  Rosario.  We are back to Rosario
20   again.
21       MR. SEDITA:  Judge, with all due respect to
22   defense counsel, the Court has an understanding of
23   what the Rosario doctrine is.  I think I have an
24   understanding of what the Rosario doctrine is.  I
25   have provided full disclosure to the defense and

540

**People vs. Brown & Jarmon**

1

2   probably gone beyond any of my duties, and I just

3   ask this fishing expedition stop and we get back to

4   the trial.

5         MR. COUGHLIN:  For purposes of the record,

6   your Honor, may we have any kind of an indication

7   -- I would like some indication as to whether or

8   not my understanding of the facts is correct, that,

9   indeed, there are some notes, writings, documents,

10   memoranda, whatever you want to call it of this

11   witness's conversations with this defendant?

12         THE COURT:  Well, now you have twisted that

13   around a little bit.  Are you asking if Mr.

14   Belling's conversations was noted, or if Mr.

15   Brown's conversation was noted?

16         MR. COUGHLIN:  A conversation is two people.

17         THE COURT:  What Brown said or what Belling

18   said?

19         MR. COUGHLIN:  Whatever Mr. Belling --

20         THE COURT:  Did you take any notes, Mr.

21   Belling, about what you said?

22         THE WITNESS:  No.

23         THE COURT:  Did you make any notes about what

24   Mr. Brown said?

25         THE WITNESS:  No.

541

People vs. Brown & Jarmon

1

2    THE COURT:  There you are.  Now?

3    MR. COUGHLIN:  If the witness has that kind of

4    recollection without even looking --

5    THE WITNESS:  I just looked.  Where do you

6    think we were for the last 20 minutes?  I was down

7    looking through the file.  There are no such notes.

8    MR. COUGHLIN:  All right, thank you, your

9    Honor.

10    MR. NEWCOMB:  Judge, I just want to add, I

11    made this application in good faith, and this was

12    not a fishing expedition.

13    THE COURT:  What were you looking for, Mr.

14    Newcomb?

15    MR. NEWCOMB:  Any written notes this man made

16    in regards to this proceeding.

17    THE COURT:  But you understand there's no

18    reason that you would be entitled to any written

19    notes that he made regarding this proceeding.  You

20    are entitled, obviously, to any written notes that

21    he made which may have memorialized a statement

22    made by a witness called by the prosecution.

23    That's Rosario.

24    MR. NEWCOMB:  That is not my reading of the

25    law, Judge, and I don't want to argue with you.

542

People vs. Brown & Jarmon

1

2    That's not my understanding.

3        THE COURT:  I don't believe so.  You have got

4    apparently what Mr. Belling recorded with respect

5    to some people, including Mario Jarmon.  I frankly

6    don't know what the requirement would be that he

7    turn this over to you, but you have it.  I don't

8    know whether the rest of these notes are

9    memorializations of conversations he had with other

10   witnesses who testified here because I can't tell.

11   The note with regard to Robert Lewis seems to be

12   purely pedigreed.  I don't know what is in here

13   that could have been used for impeachment purposes,

14   but I'll tell you what I'm going to do, gentlemen.

15   If you think that you can impeach Mr. Lewis with

16   this half page that has been supplied to you, you

17   can call him back, and I'll give you an adjournment

18   for that purpose.

19        Now, other than that, what have we got?

20   Walter Dennis.  Walter Dennis has never been called

21   as a witness.  I don't know who he is.  I don't

22   know what purpose that note serves.  Tamara Frida,

23   she was called.  This note seems to indicate that

24   she ducked at the time of the first shot.  You can

25   call her back if you wish and I'll allow you to

543

People vs. Brown & Jarmon

1    cross-examine if you wish regarding the statements

2    she may have made.  Those two may be Rosario and

3    probably should have been turned over prior to the

4    testimony.  Is this information reflected in

5    something else that was sent over to the defense,

6    Mr. Sedita?

7         MR. SEDITA:  With respect to what witness,

8    Judge?

9         THE COURT:  Well, Tamara Frida, for one.

10   Robert Lewis is the other one.  I think those are

11   the only two here that would qualify.

12        MR. COUGHLIN:  Mr. Stancil also.

13        MR. SEDITA:  Everything that I have with

14   respect to P-73s, and so forth, regarding Lewis and

15   Stancil, were turned over to the defense.  If there

16   was -- I can't remember off the top of my head

17   there's a P-73 related to Tamara Frida, but if

18   there was, it was turned over to the defense.

19   There's nothing inconsistent -- I mean, what is in

20   this note by Mr. Belling if it constitutes a direct

21   conversation with Tamara Frida, or if it just is

22   his recollection of a conversation or notes in

23   preparing for trial, that's exactly what she said

24   up there on the stand.  I try -- any witness I had,

544

People vs. Brown & Jarmon

1
2      I turned over everything that I could find that I
3      had on that witness to the defense.   That's all I
4      can tell you, Judge.
5          THE COURT:  So, there we are.   If you wish,
6      you may recall.   So far as your application for
7      every scrap of paper that Mr. Belling wrote
8      concerning this case, it's denied.   Obviously,
9      they, being the People, know their obligation with
10     regard to Brady, and I believe they know their
11     obligation with regard to Rosario, although I
12     suppose occasionally a note slips through here and
13     there.   In any event if these, indeed, were made as
14     memorialization of a statement of the witness --
15     and by the way, I'm not sure they are.   I don't
16     know if these were made in interviewing.   They may
17     have been, but I don't see anything here that would
18     be grounds for impeachment, but maybe you can find
19     something, so I'll permit you to call those
20     witnesses back and continue to question them; and
21     Mr. Coughlin, you said something before about you
22     finished your cross-examination of Mr. Belling.
23     I'll allow you to ask again if you want.
24         MR. COUGHLIN:  Thank you.
25         THE COURT:  What else?  Anything else?

COE001102

545

1                Belling - Newcomb - Cross

2          MR. NEWCOMB:   No.

3          THE COURT:   Okay, let's get the jury back down

4       and continue with Mr. Belling's testimony.

5               (3:20 p.m. jury present.)

6   C H R I S T O P H E R   J.   B E L L I N G, having been

7       previously sworn, resumed the stand and testified

8       further as follows:

9          THE COURT:   Sorry for the delay, ladies and

10       gentlemen.   I needed to listen to some legal

11       arguments, and I think we are now ready to

12       proceed.   Mr. Newcomb, you may continue.

13   CROSS-EXAMINATION

14   BY MR. NEWCOMB:

15      Q.   Mr. Belling, Grand Jury heard testimony on two

16   occasions, only on two days in this case?

17      A.    I believe they heard witnesses on two days,

18   November of '91, and then in January of '92.

19      Q.   January 13th of '92?

20      A.   Yes.

21      Q.   You're the legal adviser.   It's part of your duties

22   as an Assistant District Attorney to be the legal adviser to

23   the Grand Jury, correct?

24      A.   The law mandates it, yes.

25      Q.   Any legal questions that they have, you would then

546

Belling - Newcomb - Cross

1    answer?

2

3      A.   Yes.

4      Q.   And you conducted the examination of all the

5    witnesses before this Grand Jury?

6      A.   I don't know if I did them all myself or if I had

7    an assistant.  I did most of them for sure.

8      Q.   And in your investigation of this crime, did you

9    order any clothing examined from any of the victims?

10      A.   Clothing from victims?

11      Q.   Yes, for gunpowder residue?

12      A.   Gunpowder residue is not a test that I found very

13    reliable in my experience.  I don't recall ordering any such

14    examination.

15      Q.   Did you ask the police conduct an investigation of

16    any gunpowder residue on Torre Jackson?

17      A.   Well, that request would not be made of the police,

18    and no.

19      Q.   Now, at the time of this investigation there was

20    already an accusatory instrument titled People the State of

21    New York versus Valentino Dixon?

22      A.   Yes, there was.

23      Q.   Let me call your attention to January 13th, 1992.

24    Do you recall the order in which you called your witnesses

25    that day?  Mario Jarmon was first?

COE001104

547

Belling - Newcomb - Cross

1

2     A.    My recollection is Jarmon was before Brown, but I

3 don't know where they fit in with the rest of the witnesses

4 that were called that day.

5     Q.    That's fine.  And, of course, there's only one

6 witness in the Grand Jury at a time?

7     A.    Correct.

8     Q.    And Mr. Brown and Mr. Jarmon were not in the Grand

9 Jury at the same time?

10    A.    Not in the Grand Jury room at the same time, no.

11    Q.    And by that time you had your own knowledge that

12 Mr. Jarmon had been in the hospital, that he was shot during

13 this --

14    A.    Yes, I knew that.

15    Q.    And he was in the hospital?

16    A.    Yes.

17    Q.    For a lengthy period of time?

18    A.    I didn't know for how long.  I knew he had been

19 hospitalized the night of this incident.

20    Q.    As Chief of the Homicide Bureau, you have some

21 input in who tries cases?

22    A.    Yes.

23    Q.    And, at that time did you decide that you were

24 going to try the case of People versus Valentino Dixon?

25    A.    Yes.

548

Belling - Newcomb - Cross

1

2    Q.    Did you ask the Grand Jury to indict my client, Mr.

3  Jarmon?

4    A.    No.

5    Q.    Did you prepare the indictment?

6    A.    After the Grand Jury voted it, I did prepare it,

7  yes.

8    Q.    Did you charge the Grand Jury as far as that

9  indictment?

10    A.    Yes.

11    Q.    Now, Mr. Jarmon did not testify at the Valentino

12  Dixon trial, correct?

13    A.    He did not.

14    Q.    If he had testified, could you have used that

15  indictment on your cross-examination of him?

16                MR. SEDITA:  Objection.

17                THE COURT:  Sustained.

18  BY MR. NEWCOMB:

19    Q.    Did there come a point later in the day on that day

20  where a witness by the name of Lamarr Scott gave testimony

21  before the Grand Jury?

22    A.    It was on the 13th of January.  I don't remember if

23  it was before Brown and Jarmon or after Brown and Jarmon.

24    Q.    Do you recall asking Lamarr Scott a question of

25  what happened?

549

Belling - Newcomb - Cross

1
2    A.    I asked him that question, yeah.

3    Q.    Do you recall his response?

4    A.    Not with any degree of particularity.

5    Q.    If I showed you a document, would it refresh your

6  memory?

7    A.    I assume it would, depending on what the document is.

8                MR. NEWCOMB:  Would you mark that, please.

9                (Whereupon, Defendant's Exhibit P was

10               marked for identification.)

11               MR. SEDITA:  I'm going to object to anything

12   Lamarr Scott said.  Hearsay.

13               THE COURT:  Are you trying to elicit what Mr.

14   Scott said from this witness?

15               MR. NEWCOMB:  Yes, Judge.

16               THE COURT:  Sustained.

17               MR. NEWCOMB:  Judge, this mornig there was

18   testimony about what Mr. Scott said.

19               MR. SEDITA:  Yeah, but I didn't object at that

20   time.  Now I do.

21               THE COURT:  That's right, Mr. Newcomb.  Who

22   elicited it?  And from whom?

23               MR. NEWCOMB:  I don't recall.

24               MR. SEDITA:  There was no specific testimony

25   from Lamarr Scott elicited.

550

1                    Belling – Newcomb – Cross

2              THE COURT:   I didn't think so.   Objection

3         sustained.

4    BY MR. NEWCOMB:

5         Q.   Mr. Belling, I am going to show you what I believe

6    is a copy of the indictment in this case.

7         A.   Yes, it appears to be a Xerox copy of the

8    indictment in this matter, without the cover, and as to

9    Jarmon only.

10        Q.   Mr. Belling, I refer you to Count 4 of the

11   indictment.   Could you read that portion of the indictment

12   that the defendant allegedly said to the Grand Jury after, "to

13   wit":   That's defendant Jarmon, that is?

14        A.   That the defendant swore falsely in testimony

15   before the Grand Jury by stating under oath that Lamarr Scott

16   shot Torriano Jackson on August 10th, '91 in the vicinity of

17   Bailey and East Delevan Avenues in the City of Buffalo.

18        Q.   I'm going to show you now what has been marked as

19   Defendant's Exhibit O.   Would you tell the jury what that is,

20   please?

21        A.   Defendant's O is a Xerox copy of the Grand Jury

22   testimony of Mario Jarmon.

23        Q.   I believe from Page 8 on deals with the matter that

24   is here before us today.   Would you take a second and review

25   that.

551

Belling - Newcomb - Cross

1

2   A.   I have reviewed it.

3   Q.   Do you recollect testimony of defendant Jarmon any

4  place where he says Lamarr Scott shot Torre Jackson?

5   A.   He says that he saw Lamarr Scott shooting.

6   Q.   Please.  Is there any place in there to your

7  recollection where he says Lamarr Scott shot Torre Jackson?

8   A.   Not in those direct words, no.

9   Q.   Not in those words?

10   A.   Not in those direct words, no.

11   Q.   Is there any place that you recollect that he says

12  Lamarr Scott shot Torre Jackson?

13   A.   Not as a direct quote as you have just laid it out,

14  no.

15   Q.   Thank you.

16   I'd ask you to pick the indictment up again, and read

17  that part of the defendant's alleged testimony as it pertains

18  to Count 1?

19   A.   By stating under oath that Torriano Jackson

20  possessed a handgun on August 10, 1991 in the vicinity of

21  Bailey and East Delevan Avenues in the City of Buffalo.

22   Q.   And it's your recollection that there are several

23  places during this testimony where he said that, correct?

24   A.   That's correct.

25   Q.   In terms of Count 2, would you do the same,

552

Belling - Newcomb - Cross

1    please.

2    please.

3    A.    That's the count dealing with testimony under oath

4    that Torriano Jackson fired a handgun two or three times at

5    Mario Jarmon on August 10th, 1991 in the vicinity of Bailey

6    and East Delevan Avenues in the City of Buffalo.

7    Q.    Could you tell me where he said that in his

8    testimony?

9    A.    It's on Page 10 of his Grand Jury testimony.

10   Q.    And, you asked him did you hear three shots?  Is

11   that where you are referring to?

12   A.    No, I'm referring to the middle of Page 10 where he

13   says, "He shot me."  It's in the middle of the page, line

14   number 9, Page 10.

15   Q.    Page 10, Line 5, the question is:  "He didn't shoot

16   it.  He swung it at you?"

17   A.    That's the original question that precedes the

18   lengthy answer, yes.

19   Q.    And the lengthy answer is, "Yeah, he nicked me on

20   the side of my head.  I was bouncing around.  I wouldn't get

21   cornered.  I said what is up?  He said I got a bullet full of

22   you A.   He shot me.  I kept -- I kept coming at him.  He

23   shot me again.  I think he shot me another time.  I grabbed

24   him and I threw him in the street and hitting him in his

25   face.  Aaron came from the left side.  He swung the knife and

COE001110

553

Belling - Newcomb - Cross

1

2    I jumped up and hit him some way.  By that time Lamarr was

3    shooting.  I heard the gunshots."  Is that correct?

4        A.    That's the whole answer, correct.

5        Q.    And Count 3 of the indictment?

6        A.    Count 3, the actual accusatory portion reads that

7    the defendant swore falsely in testimony before the Grand

8    Jury by stating under oath that Torriano Jackson wounded

9    Mario Jarmon on August 10th, 1991 in the vicinity of Bailey

10   and East Delevan Avenues in the City of Buffalo.

11       Q.    Where is that in the testimony?

12       A.    The same answer.  It's, at least in my experience,

13   difficult to be shot and not be wounded.  Page 10, that

14   middle answer covers both of those counts.  And that answer

15   also -- well, that subject also continues on into Page 11 of

16   the defendant's Grand Jury testimony where he talks about

17   when the first shot was fired, when the second shot was

18   fired, et cetera.

19       Q.    And you knew at the time of this examination of Mr.

20   Jarmon that a .32 caliber revolver was found at the scene of

21   the crime?

22       A.    I did know that, yes.

23       Q.    You also knew there was a fight going on between

24   the Jacksons and Mr. Jarmon?

25       A.    I did know that also, yes.

COE001111

554

Belling – Newcomb – Cross

1

2      Q.    In fact, if Mr. Torre Jackson did possess the

3  handgun, it would be logical to conclude that my client

4  believed he wounded him because he was wounded?

5              MR. SEDITA:   Objection to what his client

6              believed was logical.

7              THE COURT:   Sustained.

8  BY MR. NEWCOMB:

9      Q.    What did you think?

10             MR. SEDITA:   How is that relevant?   Objection.

11             THE COURT:   What did he think what, Mr.

12             Newcomb?

13             MR. NEWCOMB:   Whether Mr. Belling believed who

14             wounded my client?

15             MR. SEDITA:   I'll withdraw the objection.

16             THE WITNESS:   Well, I believed that your

17             client was hit by a stray round fired by Valentino

18             Dixon inasmuch as the 32 that was recovered had

19             only one spent casing in it, which would have made

20             it impossible to have been the weapon that shot two

21             or three times as Mario Jarmon testified hitting

22             him two or three times.

23  BY MR. NEWCOMB:

24     Q.    Is it true that my client was shot two or three

25  times?

555

**Belling - Newcomb - Cross**

1

2     A.    I don't recollect that.  My recollection is that he

3 had an in and out, a single in and out bullet wound, which

4 would again be consistent with a 9 millimeter and a stray

5 round from the machine gun.

6     Q.    That's two holes, though, in the body?

7     A.    Correct, an in and out would be an in hole and an

8 out hole.

9     Q.    Now, my client did not waive his immunity, did he?

10     A.    He did not, no.

11     Q.    So he testified under the belief that he had

12 received immunity?

13     A.    From everything but perjury, correct.

14     Q.    Right.  Did you explain that to him?

15     A.    I don't recall if I did.  I did not explain it to

16 him in the jury on the record.  That's clear from the

17 transcript.

18     Q.    Did you warn him after he gave his testimony that

19 he would maybe be committing perjury?

20     A.    No.

21     Q.    Did there come a later witness that you warned?

22     A.    Well, again, if Brown testified after Jarmon, which

23 I think he did, yes, I did warn Leonard a couple of times.

24     Q.    Did you provide Mr. Jarmon with any opportunity to

25 recant his testimony?

556

Belling - Newcomb - Cross

1

2    A.    Yes, I did.

3    Q.    Where was that?

4    A.    Well, after I read him the perjury Statute --

5    Q.    No, Mr. Jarmon?

6    A.    Oh, Mr. Jarmon?

7    Q.    Yes.

8    A.    Not that I recollect, no.

9    Q.    Did you ask him if anyone else had a gun or a

10   firearm?  You can look at it, please, refresh your memory.

11   A.    No, I didn't ask him about any other guns other

12   than the automatic or machine gun and the small revolver.

13   Q.    That wasn't the question.  Did you ask him if

14   anybody else had a gun?

15   A.    No.

16   Q.    Did you ask him if Valentino Dixon had a gun?

17   A.    No.

18   Q.    Did you ask him any question about Valentino Dixon

19   in relationship to his being shot?

20   A.    No, I didn't.

21   Q.    You said this morning on cross-examination that you

22   formed a belief or a conclusion that Mario Jarmon wasn't

23   fully cooperating, correct?

24   A.    Yes.

25   Q.    When did you first formulate that opinion or

557

Belling - Newcomb - Cross

1

2  conclusion?

3      A.    After discussions with members of the Buffalo

4  Police Homicide Squad.

5      Q.    You didn't indict him for the purpose of using that

6  indictment for cross-examination for the forthcoming trial?

7      A.    I couldn't have.    It would have been precluded in

8  any event.

9      Q.    Your testimony is that if he had taken the stand,

10  you couldn't have used that indictment against him?

11      A.    My understanding of the law is that if he took the

12  stand, I would not have been allowed to cross-examine him

13  about a pending indictment, which there one was at the time

14  of the Dixon trial.

15      Q.    It's not a prior bad act?

16      A.    It's a prior bad act, but the law makes a balancing

17  test.

18      Q.    It doesn't deal with his veracity?

19              MR. SEDITA:  Objection.  Let him answer the

20          question.

21              MR. NEWCOMB:  He answered it.

22              THE COURT:  Answer the question.

23              THE WITNESS:  My answer is it is a prior bad

24          act, but the law mandates a balancing test by the

25          trial judge, and the trial judge I have no doubt

558

1                    Belling - Newcomb - Cross

2           would have ruled that I couldn't ask a defense

3           witness isn't it true you got indicted for perjury

4           in this very case?  Because the effect on that

5           witness's testimony would have been devastating,

6           and the prejudice to the defendant in that case

7           would, therefore, have outweighed the probative

8           value of my getting to ask the question.

9    BY MR. NEWCOMB:

10        Q.    So you're saying that you know for a fact that a

11   judge would make that ruling that way, yes or no?

12        A.    Yes.

13                MR. NEWCOMB:  Thank you.

14                THE COURT:  Mr. Sedita, redirect?

15                MR. SEDITA:  I believe Mr. Coughlin indicated

16           he had some more cross-examination, your Honor.

17                THE COURT:  You have additional cross, Mr.

18           Coughlin?

19                MR. COUGHLIN:  No, your Honor.

20                THE COURT:  Mr. Sedita?

21   REDIRECT EXAMINATION

22   BY MR. SEDITA:

23        Q.    Thank you, your Honor.

24        Mr. Belling, was Lamarr Scott given immunity at the

25   Grand Jury proceeding?

Belling - Sedita - Redirect

1

2     A.    No, he was not.  He was required to sign a waiver

3  of immunity before he gave testimony.

4     Q.    Just so the jury understands, Mr. Belling,

5  sometimes this legal stuff is confusing.  Would you explain

6  what immunity and non-immunity is?  How that works at the

7  Grand Jury level for the jury?

8     A.    By operation of law, any witness who gives

9  testimony before a Grand Jury receives automatic

10  transactional immunity, which means they're immune from any

11  prosecution surrounding the events about which they testify,

12  except for perjury.  That happens by operation of law as soon

13  as they give testimony in any investigation.  There is,

14  however, a provision which is designed, because sometimes

15  defendants want to testify.  For example, if Valentino Dixon

16  had wanted to testify in the Grand Jury, the law provides an

17  opportunity for him to be heard by allowing him to sign a

18  waiver of immunity, which means that he signs a paper that

19  says he waives his statutory or legally-given immunity if he

20  testifies.  We're not required to give any witness who

21  testifies because obviously then a witness could force us to

22  give him immunity.  But a witness who has been charged, like

23  Valentino Dixon, or a witness who could possibly be a

24  suspect, like Lamarr Scott, we would require them to sign a

25  waiver so that the Grand Jury would be able to hear their

COE001117

560

1                    Belling - Sedita - Redirect

2   testimony, but they would not receive that automatic

3   immunity.

4        Q.   Valentino Dixon didn't testify before the Grand

5   Jury; is that correct?

6        A.   No.  He was served with a notice that the case was

7   pending, but he did not exercise his option to testify.

8        Q.   Lamarr Scott testified before the Grand Jury,

9   didn't he?

10       A.   Yes, did he.

11       Q.   Did Lamarr Scott waive his immunity?

12       A.   Yes, he did.

13       Q.   Now, you were asked some questions about

14  indictments, ham sandwiches, and so forth.  Explain to the

15  jury what the --

16                    MR. NEWCOMB:  I object to that, Judge.  You

17            wouldn't let Mr. Coughlin ask any questions about

18            that.

19                    THE COURT:  Let me hear the question, Mr.

20            Sedita.  What is your question?

21  BY MR. SEDITA:

22       Q.   When a Grand Jury votes an indictment, what is it

23  called?

24       A.   Its called a true bill.

25       Q.   When a Grand Jury votes not to indict, what is it

561

Belling - Sedita - Redirect

1

2    called?

3        A.    No bill.

4        Q.    You have handled many Grand Jury indictments in

5    your career?

6        A.    Yes.

7        Q.    You have had occasion to have many no bills?

8        A.    I have my share of no bills, yes.

9        Q.    Sir, when you investigate a case and put that

10   evidence before the Grand Jury, do you have access to defense

11   exhibits or defense memorandums or defense investigative

12   reports?

13       A.    No.

14       Q.    Does your subpoena power, or what have you, extend

15   to that?

16       A.    No.

17       Q.    And when you determine who to put in the Grand Jury

18   and how many witnesses, and so forth, do you put everybody in

19   that the police interview?

20       A.    No.

21       Q.    You have been asked several questions about who you

22   didn't put into the Grand Jury, some witnesses.  Can you tell

23   the jury why certain witnesses weren't put into the Grand

24   Jury?

25       A.    Well, witnesses who upon interview didn't have any

562

1                              Belling - Sedita - Redirect

2    significant information about the, in this case question of

3    who was shooting that machine gun, witnesses, well, for

4    example, Tamara Frida did not testify in the Grand Jury

5    because she indicated that she did not observe who had the

6    gun in their hands, and it would have been superfluous for

7    her.  Other witnesses indicated that they couldn't provide us

8    with directions of people coming, or a lot of different

9    things.  One witness said he was upstairs in a building and

10   didn't see anything, but he heard it, et cetera.

11        Q.    One witness that you have been asked a series of

12   questions about is a witness by the name of Emil Adams during

13   cross-examination.  Do you remember those questions asked by

14   defense counsel of you?

15        A.    Yes.

16        Q.    Did Mr. Adams testify before the Grand Jury?

17        A.    Yes, he did.

18        Q.    Mr. Adams also testified at Valentino Dixon's

19   trial?

20        A.    Yes, he did.

21        Q.    And when you tried to get him in for the Valentino

22   Dixon trial, was that an easy process, or difficult process?

23                    MR. NEWCOMB:  Objection, your Honor.

24                    MR. COUGHLIN:  Objection.

25                    THE COURT:  Sustained.

563

Belling – Sedita – Redirect

1

2  BY MR. BELLING:

3      Q.   Are you aware of the efforts to locate Mr. Adams

4  for this trial?

5      A.   Yes, I am.

6          MR. NEWCOMB:  Objection.

7          MR. COUGHLIN:  Objection, your Honor.

8          THE COURT:  Objection is sustained.  Strike

9      the answer.  Disregard it.  Go ahead.

10  BY MR. SEDITA:

11      Q.   In the course of your Grand Jury investigation,

12  sir, of this matter, were you able to come up with any other

13  explanation for the existence of a .32 caliber revolver at

14  the shooting scene?

15          MR. COUGHLIN:  Objection, your Honor.

16          THE COURT:  I'm sorry, the question is?

17          MR. SEDITA:  During the course of the Grand

18      Jury investigation were you able to come up with

19      any other explanation for the existence of a .32

20      caliber revolver at the crime scene?

21          THE COURT:  Other than what?  Objection

22      sustained.  I don't even understand that question.

23      I don't know how he can answer it.  Go ahead.

24  BY MR. SEDITA:

25      Q.   Mr. Newcomb asked you a series of questions with

COE001121

564

Belling - Sedita - Redirect

1
2 respect to the indictment lodged against Mario Jarmon.  He

3 particularly directed you to the Fourth Count which alleges

4 that Mr. Jarmon said that Lamarr Scott shot Torriano Jackson,

5 is that correct, sir?  Do you remember those questions?

6     A.    Oh, yes.

7     Q.    I'm going to show you what has been marked as

8 Defendant's O for identification.  It's also marked as a

9 People's Exhibit.  I'll show you what has been marked

10 Defendant's O for identification --

11     A.    I got it.

12     Q.    -- grand jury minutes of Mario Jarmon, and ask

13 whether Mario Jarmon indicated clearly to a Grand Jury that

14 Lamarr Scott shot Torriano Jackson?

15     A.    His testimony in the Grand Jury was, his claim was

16 Torriano Jackson shot --

17             MR. NEWCOMB:  Objection.  It's not

18             responsive.  He asked where it shows.

19             THE COURT:  Would you like him to show you in

20             the transcript?

21             MR. SEDITA:  I want him to relate to this jury

22             where that testimony was in the Grand Jury minutes.

23             THE COURT:  Okay.  Why don't you show him.

24             MR. NEWCOMB:  Asked and answered, Judge.  I

25             asked that question and he answered it.

565

Belling - Sedita - Redirect

1

2          MR. SEDITA:  That doesn't apply to different

3     parties inquiring of the witness, Judge.

4          THE COURT:  Wait.  Can you identify where he

5     said that?

6          THE WITNESS:  Well, it's as I discussed with

7     Mr. Newcomb, not specifically stated, but said over

8     the course of the testimony, starting at about Page

9     11.

10          THE COURT:  Next question.

11    BY MR. SEDITA:

12     Q.   How did he indicate that Lamarr Scott was the one

13    shooting Torriano Jackson?

14     A.   By his testimony that Lamarr Scott was the one

15    firing the automatic weapon or machine gun.

16     Q.   Did he indicate anybody else was shooting an

17    automatic weapon or machine gun?

18     A.   No.

19     Q.   With respect to Mr. Newcomb's examination of you

20    relative to Count 1 of the indictment lodged against Mr.

21    Jarmon where it was alleged that Mr. Jarmon testified falsely

22    by stating under oath that Torriano Jackson possessed a

23    handgun, did he actually use the words, meaning Mario Jarmon,

24    possessed a handgun?

25     A.   He didn't use the word possessed a handgun.  He

COE001123

566

1                    Belling - Sedita - Redirect

2    testified about what Torriano Jackson allegedly did with a

3    handgun that he had.

4        Q.    He alleged that, Mario Jarmon said that Torriano

5    Jackson shot him, right?

6        A.    Two, possibly three times, yes.

7        Q.    Kind of hard to possess a handgun unless you

8    possess it, would that be fair to say?

9        A.    That's correct.

10       Q.    One more question.  You have had occasion to see

11   Valentino Dixon, is that correct?

12       A.    Yes.

13       Q.    Describe to the best of your recollection what

14   Valentino Dixon looks like?

15       A.    Five-seven, five-eight, very youthful looking

16   appearance, 130, 140 pounds.

17       Q.    Look anything like Lamarr Scott?

18       A.    No.

19                    MR. SEDITA:  Nothing further.

20                    THE COURT:  Mr. Coughlin, any recross?

21                    MR. COUGHLIN:  No, your Honor.

22                    THE COURT:  Mr. Newcomb?

23                    MR. NEWCOMB:  Sorry, Judge.

24                    THE COURT:  You don't have to apologize, Mr.

25               Newcomb.  Go right ahead and ask.

567

Belling – Newcomb – Recross

1

2  RECROSS-EXAMINATION

3  BY MR. NEWCOMB:

4      Q.    Mr. Belling, you testified this morning that

5  physical descriptions weren't very reliable; is that correct?

6      A.    That's true from witnesses at crime scenes.

7      Q.    In terms of the fourth count in the indictment that

8  Lamarr Scott shot Torre Jackson, do you recollect that my

9  defendant, Mario Jarmon, testified that he couldn't see

10  anyone over Torre Jackson, and, in fact, he was around the

11  corner?

12      A.    Yes, he testified to that.

13      Q.    And you already stated that you didn't ask him if

14  anybody else had a gun?

15      A.    That's true.

16      Q.    And, you testified under cross-examination to Mr.

17  Sedita's question that you are not entitled to exhibits of

18  defendants; is that correct?

19      A.    Yes, that's correct.

20      Q.    But oftentimes Grand Jury investigations are

21  conducted when there isn't a named defendant, true?

22      A.    Yes.

23      Q.    And, you also stated that you were -- that in your

24  experience in 17 years there were occasions where no bills

25  are issued by grand juries?

568

1                    Belling - Newcomb - Recross

2       A.    Yes.

3       Q.    Would it be fair that that's in the minority?  No

4   bills are in the minority versus true bills?

5       A.    Yes.

6                 MR. NEWCOMB:  Thank you.

7                 MR. SEDITA:  Nothing further.

8                 THE COURT:  Thank you, Mr. Belling.

9                 (Witness excused.)

10                MR. SEDITA:  People would make application to

11            move People's Exhibit 56 and 57 in evidence.  56

12            being Grand Jury testimony of Leonard Brown, and 57

13            being Grand Jury testimony of Mario Jarmon.  Other

14            than those two exhibits coming into evidence,

15            Judge, People rest their case.

16                THE COURT:  I understand no objection with

17            regard to 56 and 57, is that correct?

18                MR. NEWCOMB:  That is correct, your Honor.

19                MR. COUGHLIN:  As per our earlier discussion.

20                THE COURT:  Exhibits 56 and 57 are received

21            into evidence.  And the People rest.

22                    (Whereupon, People's Exhibit Numbers 56

23                    and 57 were received in evidence.).

24                THE COURT:  Now, would counsel approach here

25            for a moment?

569

Belling - Newcomb - Recross

1

2       (Bench Conference held.)

3       THE COURT:  We are going to break for a short

4    time, and then I understand there will be some

5    witnesses called.  So we will give you a short

6    witness while I listen once again to some legal

7    arguments, and we will have you back into the

8    courtroom in about 10 minutes.

9       (4:00 p.m., Jury excused from courtroom.)

10       MR. COUGHLIN:  Your Honor, at this time

11    defendant Leonard Brown would move a dismissal of

12    the indictment on each count therein on the grounds

13    that there has been a total failure of proof by the

14    People as to a prima facie case, specifically, as

15    to this particular defendant intentionally lying or

16    intentionally testifying falsely as to each and

17    every one of the incidents referred to in Counts 1

18    through 4.

19       MR. NEWCOMB:  First, Judge, I want to make a

20    general application for dismissal on the grounds

21    that the People have failed to present a prima

22    facie case in each of the four counts.

23    Specifically, with Count 4, I would move for that

24    dismissal.  There was no testimony given by the

25    People that the defendant said that Lamarr Scott

570

Belling - Newcomb - Recross

1

2     shot Torre Jackson.  The reference to the other

3     counts, 1, 2 and 3, I would move for dismissal of

4     Counts 2 and 3 and consolidate them into 1 on the

5     grounds that they are duplications, duplicative by

6     the People's own witness, Mr. Belling, that stated

7     -- he stated in essence that they were the same

8     elements.  In order for any of the Counts 1, 2 or 3

9     to stand, Torre Jackson would have had to possess

10    or had a handgun.  And under 450.10 or 40.10, Sub

11    2-A, it's the same offense.  There's no

12    significantly different elements, and it's the same

13    act.  It's one offense.  There's nothing that

14    clearly distinguishes one from the other, and they

15    didn't put any proof in as to the number of wounds,

16    number of shots.

17         THE COURT:  Mr. Sedita?

18         MR. SEDITA:  First of all, Judge, People's

19    burden is only to make out a prima facie case.

20    People have done that.  I would just comment that I

21    believe the specific intent -- intentional is not a

22    element in the Penal Law in any counts of this

23    indictment.  With respect to duplicative counts, I

24    guess you can possess a gun without shooting a gun,

25    but that is not what I asked Mr. Belling.  You

COE001128

571

People vs. Brown & Jarmon

1

2    can't shoot a gun unless you possess a gun, and

3    then there's another distinct count of a possessing

4    it and shooting it, and shooting at a person for

5    two or three times.  So they are not duplicitous

6    counts, and I would oppose any motion to dismiss at

7    this point.

8         THE COURT:  Intent might well be an element of

9    these crimes, Mr. Sedita.

10        MR. SEDITA:  Intent is always a element, but

11   intentionally is not an element under the Penal

12   law.

13        THE COURT:  Mr. Newcomb makes a point with

14   regard to the counts.  I suppose, Mr. Newcomb, that

15   Counts 1, 2 and 3 could have been charged as one

16   false statement, I don't know.  I'm not familiar

17   with the testimony to the point that I recall

18   specifically what he said and where, but, in any

19   event, it is broken down and I'm not going to

20   change that.  Obviously, however, it won't make any

21   difference in terms of either acquittal or

22   conviction.

23        MR. NEWCOMB:  Sure, Judge, it exposes my

24   client to more liability.

25        THE COURT:  But there are separate

572

1          People vs. Brown & Jarmon

2     allegations.  It doesn't expose him to more

3     liability.  How does it expose him to more

4     liability?  You mean there is consecutive

5     sentencing on perjury?

6          MR. NEWCOMB:  No, no, Judge.

7          THE COURT:  Denied.  Motion denied.

8          (4:02 p.m. recess.)

9          (4:20 p.m., jury, counsel and defendants

10    present.)

11         THE COURT:  I understand that Mr. Coughlin

12    wishes to call a witness on behalf of the defendant

13    Leonard Brown, correct?

14         MR. COUGHLIN:  That's correct, your Honor.

15         THE COURT:  Call him.

16         MR. COUGHLIN:  Floyd Fisher.

17 F L O Y D   E.   F I S H E R, a witness located in Buffalo,

18     New York, having been first duly sworn, was examined,

19     and testified as follow:

20 DIRECT EXAMINATION

21 BY MR. COUGHLIN:

22    Q.   Mr. Fisher, you're here today pursuant to a

23 subpoena served upon you by my office?

24    A.   Yes, sir.

25    Q.   And, let me ask you initially, run some names by

COE001130