EXHIBIT 83

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CORY EPPS,

                          Plaintiff,

            v.

CITY OF BUFFALO,
DETECTIVE JOHN BOHAN,
DETECTIVE REGINALD MINOR,
DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA,
DETECTIVE ANTHONY CONSTANTINO,
DETECTIVE ROBERT CHELLA,
DETECTIVE RANIERO MASSECHIA,
DETECTIVE CHARLES ARONICA, and
CHIEF JOSEPH RIGA,

                    Defendants.
_____

|  |  |
|---|---|
| | AMENDED<br>REPORT<br>and<br>RECOMMENDATION |
| | 19-CV-281-LJV-LGF |

APPEARANCES:      GLENN A. GARBER, P.C.
                        Attorneys for Plaintiff
                        GLENN ANDREW GARBER, of Counsel
                        233 Broadway
                        Suite 2370
                        New York, New York  10279

                        RICKNER PLLC
                        Attorneys for Plaintiff
                        ROBERT HOWARD RICKNER, of Counsel
                        14 Wall Street
                        Suite 1603
                        New York, New York  10005

                        HODGSON RUSS LLP
                        Attorneys for Defendants
                        HUGH M. RUSS, III, and
                        PETER A. SAHASRABUDHE, of Counsel
                        The Guaranty Building
                        140 Pearl Street
                        Suite 100
                        Buffalo, New York  14202

CAVETTE A. CHAMBERS
CORPORATION COUNSEL, CITY OF BUFFALO
Attorney for Defendants
DAVID M. LEE
Assistant Corporation Counsel, of Counsel
City of Buffalo and City of Buffalo Police Officers
1100 City Hall
65 Niagara Square
Buffalo, New York 14202

## JURISDICTION

This case was referred to the undersigned by Honorable Lawrence J. Vilardo on August 18, 2021, for all pretrial matters including preparation of a report and recommendation on dispositive motions. (Dkt. 41). The matter is presently before the court on Defendants' motion for summary judgment filed October 7, 2022 (Dkt. 77).

## BACKGROUND

On March 1, 2019, Plaintiff Cory Epps ("Plaintiff"), commenced this civil rights action against Defendants alleging violations of his civil rights in connection with Plaintiff's April 24, 1998 conviction by jury in New York State Supreme Court, Erie County ("the trial court") for the murder of one Tomika Means,[1] which was vacated on December 1, 2017, when newly discovered evidence exonerating Plaintiff was presented to the trial court through a N.Y. Crim. Proc. Law § 440 motion. Defendants to this action include the City of Buffalo ("the City"), and employees of the City of Buffalo Police Department ("Buffalo Police" or "Police"), including Buffalo Police Detectives John Bohen ("Bohen"),[2] Reginald Minor ("Minor"), Mark Stambach ("Stambach"), James

---

[1] Alternatively spelled "Tamika Means."
[2] Bohen's name is incorrectly spelled in the caption and at various placed in the record as "Bohan."

Giardina ("Giardina""), and Anthony Costantino ("Costantino"),[3] ("Defendant Detectives") (together, "Defendants").[4]  The Complaint asserts five claims for relief including pre-trial denial of due process and a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments based on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*") ("*Brady* violation"), asserted against Defendant Detectives, Complaint, First Cause of Action ("First Claim"); post-trial deprivation of due process in violation of 42 U.S.C. § 1983 in violation of the Fifth, Sixth and Fourteenth Amendments against Defendant Detectives, *id*., Second Cause of Action ("Second Claim"); a New York common law claim for malicious prosecution against Defendant Detectives and the City, *id*., Third Cause of Action ("Third Claim"), a malicious prosecution claim under § 1983 against Defendant Detectives, *id*., Fourth Cause of Action ("Fourth Claim"), and due process violations under the New York State Constitution against the City.  *Id*., Fifth Cause of Action ("Fifth Claim").[5]  On May 1, 2019, Defendants filed an answer (Dkt. 4).

On October 7, 2022, Defendants filed their motion seeking summary judgment (Dkt. 77) ("Defendant's Motion"), supported by the Declaration [of Peter A. Sahasrabudhe, Esq.][6] in Support of Motion for Summary Judgment (Dkt. 78) ("Sahasrabudhe Declaration"), attaching exhibits 1 through 40 (Dkts. 78-1 through 78-40) ("Defendants' Exh(s). __"),[7] the Statement of Undisputed Facts in Support of

---

[3] Costantino's name is misspelled in the caption and in various places in the record as "Constantino."

[4] Defendants note, Defendants' Memorandum at 3, n. 4, and Plaintiff does not dispute, that Plaintiff has agreed to dismiss all claims against Defendant Detectives Robert Chella ("Chella"), Raniero Massechia ("Massechia"), and Charles Aronica ("Aronica"), as well as Buffalo Police Chief Joseph Riga ("Riga").  No stipulation regarding such dismissal has been filed, however, nor do Defendants present any argument on summary judgment on behalf of these Defendants.

[5] Plaintiff has discontinued his Fifth Claim against all Defendants except the City.  Defendants' Memorandum at 3, n. 4.

[6] Unless otherwise indicated, all bracketed material has been added.

[7] The court notes there is no Defendants' Exh. 22.  Further, Defendants' Exhs. 36 and 37 are separately filed under seal as Dkt. 84.

Defendants' Motion for Summary Judgment (Dkt. 79) ("Defendants' Statement of

Facts"), and the Memorandum of Law in Support of Defendants' Motion for Summary

Judgment (Dkt. 80) ("Defendants' Memorandum").  In opposition to Defendants' Motion,

Plaintiff filed on December 22, 2022, the Declaration of Rob Rickner[, Esq.] (Dkt. 89)

("Rickner Declaration"), attaching exhibits A through HH (Dkts. 89-1 through 89-34)

("Plaintiff's Exh(s). __"),[8] Plaintiff's Memorandum in Opposition to the Defendants'

Motion for Summary Judgment (Dkt. 90) ("Plaintiff's Response"), and Plaintiff's 46.1 [*sic*]

Counter-Statement of Facts (Dkt. 91) ("Plaintiff's Statement of Facts").  On January 27,

2023, Defendants filed the Reply Declaration [of Peter A. Sahasrabudhe, Esq.] in

Further Support of Motion for Summary Judgment (Dkt. 94) ("Sahasrabudhe Reply

Declaration"), attaching exhibit 41 (Dkt. 94-1) ("Defendants' Exh. 41"), and the Affidavit

of [Assistant Erie County District Attorney] Patricia Carrington (Dkt. 94-1) ("ADA

Carrington Affidavit"), and the Reply Memorandum of Law in Further Support of

Defendants' Motion for Summary Judgment (Dkt. 95) ("Defendants' Reply").  Oral

argument was deemed unnecessary.

　　　　Based on the following, Defendants' Motion should be GRANTED.


**FACTS**[9]

　　　　At 4:00 A.M. in the morning of Monday, May 26, 1997,[10] one Tomika Means

("Means" or "the victim"), was driving her vehicle ("Means's vehicle" or "the victim's

---

[8] The court notes that although Plaintiff's Exh. FF (Dkt. 89-32) is denominated on the court's CM/ECF electronic filing system as "Massechia Aff[idavit," the document is comprised of 105 exhibits from Massechia's February 17, 2021 deposition, a transcript of which is filed as Plaintiff's Exh. B (Dkt. 89-2).
[9] Taken from the pleadings and motion papers filed in this action.
[10] The court takes judicial notice that Monday, May 26, 1997, was Memorial Day.  *See United States v. Waterbury*, 2021 WL 4304811, at *6 n. 7 (N.D.N.Y. Sept. 22, 2021) (taking judicial notice of the Memorial Day observance based on the calendar).

vehicle"), in the City of Buffalo, New York ("Buffalo" or "the City"), accompanied by her

friend Jacqueline Bradley ("Bradley"). Means's vehicle, a red Alfa Romeo, belonged to

her boyfriend, one Kenyon Edwards ("Edwards"). Trial Tr.[11] at 157-58. After stopping

at several bars for drinks, Bradley and Means were planning to get something to eat

before heading home. While driving in a westerly direction on East Delevan Avenue, a

vehicle ("the suspect's vehicle"), driven by a female accompanied by a male in the front

passenger seat, was driving behind Means and pulled up to the right, alongside

Means's vehicle, before making an illegal left-hand turn, crossing in front of, and almost

striking, Means's vehicle and heading into a gas station located on the south side of

East Delevan Avenue just east of intersection of East Delevan Avenue and Grider

Street. In response, Means blew her vehicle's horn and proceeded to drive west along

East Delevan Avenue until encountering a red light at the intersection of East Delevan

Avenue and Fillmore Avenue where Means stopped her vehicle in the driving lane

closest to the curb ("the curb lane"). While waiting at the red light, the windows on

Means's vehicle were open, and the suspect's vehicle drove up in the left lane, stopping

next to the driver's side of Means's vehicle. A man seated in the front passenger's seat

of the suspect's vehicle rolled down the window and commented, twice, to Means, "You

lucky you ain't no Nigger." Trial Tr.[12] at 130. Neither Means nor Bradley responded to

the comment, which Bradley interpreted as meaning Means and Bradley were fortunate

that neither she nor Means was a man. Trial Tr. at 131-32. At that point, Bradley and

Means decided not to get something to eat, but to go home, and when the light turned

---

[11] References to "Trial Tr." are to the page numbers of the transcript of the trial, filed as Plaintiff's Exh. A (Dkt. 89-1).

[12] The court notes that the portion of the trial transcript containing Bradley's trial testimony is also separately filed as Defendants' Exh. 11 (Dkt. 78-11).

green, Means turned right onto Fillmore Avenue for one block before turning right onto

Appenheimer Avenue on which Means traveled in an easterly direction.  As Means

drove east on Appenheimer Avenue, Bradley and Means became aware that the

suspect's vehicle was driving behind them.  At the intersection of Appenheimer and

Chelsea Place, Means turned right and drove south on Chelsea Place toward its

intersection with East Delevan Avenue with the suspect's vehicle still following.  Before

reaching Delevan Avenue, the suspect's vehicle passed Means's on the left, pulling

ahead and turning to the right in front of Means's vehicle, thereby preventing Means

from continuing toward Delevan Avenue.  The suspect's vehicle stopped and a man

("the suspect"), exited from the front passenger's seat, pulled out a handgun,

approached the passenger's side of Means's vehicle, and leaned in through the open

front passenger window, aiming the gun at Means just inches from her head.  Bradley

looked at the suspect, touched his arm and said, "It ain't worth it."  Trial Tr. at 134.  The

suspect responded, "Fuck that, bitch," and shot Means in the face, *id*., before running

back to the suspect's vehicle and entering it after which the suspect's vehicle drove

away.  *Id*. at 134-35.

Bradley told Means to keep breathing, grabbed her cell phone and dialed 911,

but when the call failed to connect, Bradley ran across the street first to the home of a

friend of Bradley's mother and asked her to call Bradley's mother, and then ran to a

nearby pay phone from which she successfully called 911 at 4:27 A.M. on May 26, 1997.

Bradley returned to Means's vehicle where Means was slumped over the steering

wheel.  The ambulance and police arrived and Bradley was pulled away from the scene

by the police.  Means was taken by ambulance to a hospital where she succumbed to her injuries the next day.

Buffalo Police Officer Danielle Bratton ("Bratton"),[13] was directed to the scene to assist with calming down Bradley who was extremely upset, arrived at the scene and escorted Bradley to Bratton's patrol vehicle which was parked a short distance from the scene of the shooting, several vehicles away from the victim's vehicle.  Bradley's mother also arrived at the scene and remained with Bradley near Bratton's patrol vehicle in which Bradley was seated with Bratton.  At some point, Bratton took a statement from Bradley who described what the suspect was wearing and that she recognized the suspect from seeing him in local taverns and bars, but did not know his name.[14]  Bradley also described the suspect's vehicle as a gray to light blue Oldsmobile Delta 88 or Pontiac 6000, with tinted windows, and a female driver.  Trial Tr. at 138; Trial Tr. at 113.  While Bradley was in Officer Bratton's vehicle, three male individuals were separately brought by unidentified police officers to Bratton's patrol vehicle for Bradley to view, including Donald Faison ("Faison") and Patrick Bush ("Bush"), and Patrick Morgan ("Morgan"), but Bradley denied any of the three individuals was the suspect.  Trail Tr. at 156-59, 172.  At the direction of a superior officer, Bratton escorted Bradley and her mother in a police vehicle to the homicide office ("homicide office") at Buffalo Police Headquarters.  En route to the homicide office, Bradley verbally provided a description of the suspect.[15]  Bratton recorded in a written report Plaintiff's description

---

[13] Officer Bratton's partner, Officer Deane Hoefler, accompanied Bratton to the scene.
[14] It is not clear from the record precisely when Bradley gave Bratton a description of the suspect.
[15] It is not clear from the record how many descriptions of the suspect Bradley provided to Bratton and no copy of any oral or written statement by Bradley describing the suspect is in the record.

of the suspect "a light-skinned black male, approximately five [feet] nine [inches],[16] two hundred fifty pounds, twenty-four to twenty-five years of age, a light goatee, navy blue windbreaker and navy blue baseball cap."  Trial Tr. at 94; *see* Dkt. 89-32 at 155-56.[17] During the ride to the homicide office, Bradley also described the suspect to Bratton as having "blemishes," "pimples," or "little brown or black" marks on his face, *id*. at 155. Bradley also provided a description of the driver of the suspect's vehicle as "a slight woman, thin build, white skin, large space between her teeth or missing a tooth in the front of her mouth."  Trial Tr. at 186.

Bradley cooperated with the Buffalo Police in their efforts to identify the suspect. In particular, the next day, Tuesday, May 27, 1997, Bradley went to the Town of Tonawanda Police Department where she met with members of the Buffalo Police Homicide Squad to create a sketch using a computer program owned by the Tonawanda Police.  Masecchia Dep. Tr. at 37.[18, 19]  Based on Bradley's description of the suspect, Buffalo Police Detective Robert Vanderwerf used an "identikit" to create a composite sketch ("the composite sketch")[20] which Bradley agreed looked like the suspect.  The composite sketch was subsequently used by Defendant Buffalo Police Detective John Bohen ("Bohen"), to create a photo array comprised of the mug shots of six individuals ("first photo array").  The first photo array contained a mug shot of

---

[16]  According to a written statement signed by Bradley, the suspect's height was between 5' 8" and 5' 9." Trial Tr. at 151.

[17] Officer Bratton concurred that the individuals previously presented to Bradley did not fit the description Bradley provided of the suspect.  Trial Tr. at 88.

[18] References to "Masecchia Dep. Tr." are to the pages of the transcript of Defendant Buffalo Police Homicide Detentive Raniero Masecchia's February 17, 2021 deposition, filed as Plaintiff's Exh. B (Dkt. 89-2).

[19] Masecchia explained that because the Buffalo Police Department does not have a sketch artist, and given Bradley was able to describe the suspect "fairly well," the decision was made to take Bradley to the nearby Tonawanda Police Department where an "identikit" was used to create a composite sketch of the suspect.  Masecchia Dep. Tr. at 37-38.

[20] Filed as Plaintiff's Exh. H (Dkt. 89-8).

Faison, for whom the Buffalo Police had some suspicion of possibly being the man who murdered Means, but no mug shot of Epps.[21]  Bohen Dep. Tr.[22] at 59-60; Defendants' Exh. 29 (Dkt. 78-28); Plaintiff's Exh. FF (Dkt. 89-32) at 3-5.  On June 25, 1997, Bohen and his partner, Defendant Police Detective Reginald Minor ("Minor") went to Bradley's home in Buffalo where Bradley viewed the first photo array.  Bradley did not identify any of the mug shots in the first photo array as depicting the suspect.  On a Buffalo Police Department Homicide Section Activity Report ("P-73 Report") dated June 26, 1997, Bohen reported receiving a call from the victim's aunt, one Linda Means ("Linda Means"), who stated the composite sketch of the suspect that had been shown on local television news programs looked like Cory Epps.  Bohen Dep. Tr. at 72-74; June 26, 1997 P-73 (Dkt. 78-34 at 2).  Based on this information, on July 3, 1997, Bohen and Buffalo Police Homicide Detective Juan Morales ("Morales") created a second photo array comprised of Plaintiff's mug shot and the mug shots of five "fillers," *i.e.*, non-suspects who fit the suspect's description ("second photo array").[23]  *See* Defendants' Exh. 28 (Dkt. 78-27); Plaintiff's Exh. FF (Dkt. 89-32) at 6-14.  On July 6, 1997, Bohen and Minor returned to Bradley's residence and presented the second photo array to Bradley who identified Plaintiff, whose mug shot was in slot five of the six-person photo array, as Means's shooter.  *See* Bohen Dep. Tr. at 83 (referencing Defendants' Exh. 28 (Dkt. 78-29)), *see also* Plaintiff's Exh. FF (Dkt. 89-32) at 15 (Buffalo Police Intra-Department Correspondence dated July 7, 1997, memorializing Bradley's identification of Epps as the suspect from a photo array).  Bradley signed the back of the second

---

[21] It is not clear from the record the reason why Faison was initially thought to be involved with Means's murder.

[22] References to "Bohen Dep. Tr." are to the pages of the transcript of Bohen's January 19, 2021 deposition filed as Defendants' Exh. 3 (Dkt. 78-3).

[23] The record does not explain why the police had Plaintiff's mugshot.

photo array and an affidavit indicating Bradley identified Epps as the suspect in the second photo array.  Bohen Dep. Tr. at 85; Defendants' Exh. 28 (Dkt. 78-27); Plaintiff's Exhs. L & M (Dkts. 89-12 & 89-13).  Bradley also signed a Buffalo Police Photo-Array Identification Affidavit indicating that on July 6, 1997, Bradley selected the photo in array slot number 5 and "positively identif[ied] the person in the photograph as being the one that I saw shoot Tomika Means on 5/26/1997."  Defendants' Exh. 28 (Dkt. 78-27) at 3; Plaintiff's Exh. FF (Dkt. 89-32) at 17.  Bradley further averred that she "was told by the above Police Officer [Bohen and Minor] that the name of the person in the photograph is Cory Epps."  *Id*.  At 11:30 P.M. on July 7, 1997, Linda Means again contacted the homicide office, reporting "she heard that people were saying that Cory Epps did the shooting."  (Dkt. 78-34).  *See* Dkt. 90 at 6.  Bradley, subsequently, at Epps's trial, denied she was ever shown a mug shot or photograph of Plaintiff alone.  Trial Tr. at 159.

On July 9, 1997, Epps was at home when Buffalo Police Homicide Detectives Raniero Masecchia ("Masecchia") and Morales arrived at his apartment looking for Plaintiff's girlfriend Jerrihia Johnson ("Johnson"), with whom the Detectives wanted to speak about Johnson's vehicle.  Trial Tr. at 245-46.  Epps informed the Detectives that Johnson was at work but agreed to ask Johnson to call the Detectives.  After speaking with Epps on July 9, 1997, Johnson called Morales and Masecchia.  Although Morales and Masecchia refused to reveal why they wanted to see Johnson's vehicle, Johnson agreed to bring her vehicle, a turquoise blue Pontiac Sunbird, Trial Tr. at 242, to the Buffalo Police homicide office ("the homicide office") that day.  Trial Tr. at 252.  That same day, Epps, accompanied Johnson, showed up at the homicide office with

Johnson's vehicle, where Johnson was interviewed by Morales and Masecchia, while Epps waited for Johnson in the waiting room.  *Id*. at 248-50.  Morales and Masecchia questioned Johnson about where she was in the early morning hours of May 26, 1997, and Johnson responded that she had been with her girlfriend, Yolanda ("Yolanda"), at several bars in Buffalo beginning with Birchfields then located at the corner of Glenwood Avenue and Main Street in the City.  When a fight broke out at Birchfields, Johnson and Yolanda left and went to Metroplex, but another fight broke out around 3:30 A.M. in the morning of May 26, 1997, at which time Johnson and Yolanda decided to go home and left Metroplex.  Johnson dropped off Yolanda at her residence, then Johnson went home and made breakfast for herself and Epps.  The Detectives took Johnson's picture and Johnson complied with their request to see her teeth.[24]  Trial Tr. at 257-58.  After the Detectives finished speaking with Johnson, they asked Johnson to wait outside in the hallway while they spoke with Epps.

Morales and Masecchia prepared a statement memorializing the interview with Epps which Epps signed ("Epps's Statement").[25]  Epps, who was wearing a navy blue windbreaker, Trial Tr. at 215-16, or black jacket, *id*. at 254, stated that although he did not personally know Means, he knew Means was the girlfriend of an acquaintance, one Kenyon Edwards ("Edwards"), and recalled frequently seeing Means, who was usually accompanied by her girlfriends, in various bars.  Epps could not recall where he was when Means was shot, but assumed that because he could not recall being out, he must have been home, which Epps later clarified as being at Johnson's apartment.

---

[24] Although not discussed by the parties, the request to view Johnson's teeth is consistent with an attempt by the Buffalo Police to determine whether there was a gap between Johnson's front teeth given Bradley described the driver of the suspect's vehicle as having a large space between her front teeth.  Trial Tr. at 186.
[25] Filed as Defendants' Exh. 34 (Dkt. 78-33).

According to Epps, Johnson drove a blue vehicle, whereas Epps drove a four-door, hunter green 1981 Chevy Malibu which was registered to Johnson. Johnson bears no resemblance to the description of the driver of the suspect's vehicle provided by Bradley. Trial Tr. at 186-87, 243-44.[26] Epps also stated that he occasionally drove Johnson's blue vehicle when he went out with Johnson, but never drove it at night. Epps stated he was willing to stand in a police line-up in connection with the Means murder investigation.

Based on Bradley's second photo array identification of Plaintiff as the suspect, and Epps's Statement, on July 30, 1997, ADA Carrington arranged for an in-person lineup ("the lineup"). Detective Masecchia assisted in assembling the lineup which included Plaintiff and five other individuals, all similarly attired in blue sweatsuits. The lineup was assembled for Bradley to view at the homicide office. Johnson accompanied Epps to the lineup, but waited outside in the hallway while the lineup was conducted. Epps was represented at the lineup by appointed counsel, Samuel Abbate, Esq. ("Abbate"). Bradley was the only witness to view the lineup. During the time between participating in the second photo array and viewing the lineup, Bradley was unaware that the person she identified as the suspect in the second photo array was Epps. Bradley Dep. Tr.[27] at 18-10. Of the other five individuals in the lineup, three were Buffalo Police Officers and one was a Buffalo Police civilian employee, but Bradley denied knowing any Buffalo Police officers or employees. Trial Tr. at 195-97. Upon viewing the lineup, Bradley selected Epps as the one who shot Means. The lineup participants then changed the order of their positions in the lineup and Bradley again

---

[26] Bradley never identified any vehicle as the suspect's vehicle. Trial Tr. at 205.
[27] References to "Bradley Dep. Tr." are to the pages of Bradley's deposition testimony filed as Defendants' Exh. 9 (Dkt. 78-9).

selected Epps as the suspect. Epps was then placed under arrest. After Epps was arrested, Johnson left the homicide office and went to visit Epps's mother who retained Andrew LoTempio, Esq. ("LoTempio") as Epps's counsel.

Shortly after LoTempio commenced representing Epps, Johnson met with LoTempio and advised she recalled that on the morning Means was shot, Johnson, after dropping off Yolanda, drove to the apartment she shared with Epps who was not home. Trial Tr. at 272. The time was then 4:00 A.M. *Id*. at 295. Johnson paged Epps who immediately called Johnson and agreed to go with Johnson to get something to eat. *Id*. A few minutes later, around 4:15 A.M., Epps arrived home in his vehicle, picked up Johnson and the two drove in Epps's vehicle to a Perkins restaurant ("Perkins" or "the restaurant"), on Maple Road in Amherst, New York, where Johnson ate an omelet and Epps had a brownie. Trial Tr. at 263-64, 273. Johnson recalled Epps was wearing a black jacket which was the only jacket Epps owned. *Id*. at 255-56. At LoTempio's request, Johnson obtained from the Perkins restaurant a receipt showing that an order for a "Mega Omelet" meal and a brownie was paid for at 5:30 A.M. on May 26, 1997. Trial Tr. at 267-68. Johnson also described the Perkins waiter as a college-age male, 5' 8" tall, skinny and with brownish blonde hair who acted unsure as if he were newly hired, and the Perkins manager confirmed to Johnson that someone matching that description was working the morning of May 26, 1997. *Id*. at 264-66. Johnson estimated the Perkins restaurant was a 15 minute drive from the apartment she shared with Epps. *Id*. at 274, 297.

On August 4, 1997, Bradley appeared and testified before an Erie County Grand Jury. Bradley testified that she viewed two lineups, each containing Epps, and both

times Bradley selected Epps as the shooter.  Bradley GJ Tr. at 17-18.[28]  Bradley was

indicted by the Grand Jury on August 7, 1997.  On December 9, 1997, a pre-trial

hearing was held before New York Supreme Court Justice P. McCarthy ("Justice

McCarthy") on Plaintiff's suppression motion pursuant to *United States v. Wade,* 388

U.S. 218, 232 (1967) ("*Wade*") and *People v. Huntley,* 204 N.E.2d 179 (N.Y. 1965)

("*Huntley*") ("the *Wade* Hearing").[29]  Plaintiff's Exh. E (Dkt. 89-5).   During the hearing,

Justice McCarthy granted Mr. LoTempio's request that the prosecution provide him with

photos of five other persons who, prior to Epps's arrest, were considered as possible

suspects including Bush and Faison, both of whom were presented to Bradley at the

time of the murder, as well as Michael Carr ("Carr"), Damion Morgan ("Morgan"), and

Carlos Wiggins ("Wiggins").  Wade Hearing Tr. at 70-80.[30]  Bradley did not testify at the

hearing.  Justice McCarthy denied Plaintiff's motion.

On April 16, 1998, the body of one Paul Pope ("Pope"), was recovered from the

trunk of Pope's vehicle, a white 1992 Pontiac Grand Am.  In the early morning hours of

April 17, 1998, Defendants Buffalo Police Detectives Stambach and Giardina spoke with

one of Pope's girlfriends, Wymiko "Pumkin" Anderson ("Anderson"), at Anderson's

mother's home before bringing Anderson to the homicide unit where Defendant Buffalo

Police Detective Costantino joined Stambach and Giardina in questioning Anderson and

a statement was prepared from the interview of Anderson ("Anderson's Statement").[31]

Anderson's Statement, dated April 17, 1998, specifically provides that it is made in

---

[28] References to "Bradley GJ Tr." are to the page numbers of the transcript of Bradley's August 4, 1997 Grand Jury testimony, filed as Defendants' Exh. 10 (Dkt. 78-10).

[29] A *Wade* hearing is used to determine whether a witness identification procedure was unduly suggestive while a *Huntley* hearing is used to determine whether a defendant's statements to law enforcement were voluntary.

[30] References to "Wade Hearing Tr." are to the pages of the transcript of the Wade Hearing, filed as Plaintiff's Exh. E (Dkt. 89-5).

[31] Defendants' Exh. 32 (Dkt. 78-31).

connection with the Buffalo Police Department Homicide Squad's investigation of the murder of Pope, whose body was found on Thursday, April 16, 1998, at 11:52 P.M. Anderson Statement at 1. Anderson stated that Pope was her boyfriend, the father of her children, that he lived with Anderson, and that Anderson last saw Pope on April 16, 1998, between 1:00 and 2:00[32] when Pope left the home, telling Anderson he was going to see one Russell Montgomery ("Montgomery"). *Id.* Pope was alone when he left the house, wore a blue and tan jacket, blue pants, and blue and white sneakers, and drove away in a 1992 red, 2-door Pontiac Grand Am, and carried $ 25. *Id.* Anderson learned of Pope's death from Pope's sister, one Danita Pope ("Danita Pope"), after which she contacted her brother, Dion Anderson ("Dion Anderson"), who drove Anderson to a hospital. *Id.* at 2.[33] Anderson reported that on April 16, 1998, between 11:30 and 12:00,[34] Dion Anderson told her that he saw "a light skinned dude driving [Pope's] car and a girl on the other side." *Id.* at 2. Dion Anderson pulled up near the vehicle he believed to be Pope's and inquired of the driver where Pope was. *Id.* According to Anderson, "[t]he dude told him [Dion Anderson] that [Pope] was taking care of some business." *Id.* When Dion Anderson responded that he intended to call Pope's cell phone, the girl who accompanied the driver of Pope's vehicle said if you "page him he is not going to answer his cellular phone." *Id.* Anderson stated Montgomery's girlfriend's name is "Connie," who lived on Dartmouth Avenue in Buffalo, and denied that she had any more information that would be helpful in the investigation of Pope's murder. *Id.*

---

[32] Anderson's Statement does not specify whether morning or afternoon.
[33] The court notes that at a post-conviction hearing on May 15, 2001, Anderson testified she was home when she learned of Pope's death, then went to the morgue where she identified Pope, after which she went to her mother's house. *See* Dkt. 89-24 at 23.
[34] Anderson's Statement does not specify whether morning or afternoon.

Later, on April 17, 1998, Anderson spoke with Detective Robert Chella ("Chella"),

advising Anderson believed Pope was murdered by Montgomery.

In an affidavit dated April 29, 2000, Anderson maintains that while being

interviewed by the Defendant Detectives on April 17, 1998, Anderson purportedly stated

it was her belief that Montgomery murdered Pope to silence Pope from telling others

that Montgomery, not Epps, murdered Means.  Anderson Affidavit at 1.[35]  According to

Anderson, on the same day Means was murdered, Anderson was sleeping in the

bedroom of the home she shared with Pope when Montgomery arrived at the home.  *Id*.

Pope left with Montgomery, but returned shortly after and told Anderson that

Montgomery had confessed to killing Means earlier that morning.  *Id*.  Although

Anderson maintains she informed the Defendant Detectives of these statements ("the

exculpatory comments"), the exculpatory comments regarding Anderson's belief that

---

[35] Plaintiff's Exh. HH (Dkt. 89-34).  The relevant text of the Anderson Affidavit provides,

> I was the girlfriend of the now deceased Paul Pope.  Paul Pope was killed on April 16, 1998.  His body was found in the morning of April 17, 1998,  He was killed by Russell Montgomery at Russell's house on Dartmouth.  On the 17th of April 1998 the Buffalo Police homicide detectives came to my house at [ ] and  then I met them at my mother's house at [ ].  I went with them down to Police Headquarters.  The asked me questions about Paul Pope.  They asked me what was my relationship, when did I last see him and what was he wearing.  They asked what was his occupation and who his friends were.  I answered all their questions which included whether Paul sold drugs to Russell Montgomery.  They asked me what he looked like.  I answered "You know the sketch you all made of the guy who killed Tomika Means – that's him.  That's Russell Montgomery."  They told me they do look alike but that's not enough.  I told them that Paul told me that Russell Montgomery told him that he did kill Tomika.  They told me that is hearsay.  They asked me if I would take a lie detector text and I said yes.  They never called me back.  They said you're just an angry girlfriend.  I told then that Russell came over to our house on [ ] the same day that Tomika was killed.  Russell was talking in a low voice to Paul in the living room.  I was in the bedroom.  Paul got dressed and then Paul and Russell Montgomery left the house.  When Paul got back he told me that Russell killed that girl.  He said that Russell killed Keyon's girl.  I knew that was Tomika Means.  I told all of this to the Buffalo Police homicide squad.  There were about 5 or 6 detectives in the room when I got there.  I told the Police I wrote the letter which is attached to this statement.  I mean by that a copy of my letter that was addressed to Cory Epp's lawyer.  I have read this statement and everything I have said is true to the best of my recollection.

Anderson Affidavit.
The Anderson Affidavit was prepared by one Roger Putnam ("Putnam"), a private investigator hired by Plaintiff's defense counsel to locate to locate witnesses in connection with Epps's murder conviction.  *See* Dkt. 89-24 at 44-46, 111-15.  Putnam testified at a § 440 hearing that he handwrote the Anderson Affidavit, to which Anderson swore before signing it.  *Id*. at 113-14.

Montgomery murdered Means were not included in Anderson's Statement which
Anderson signed. *Id*.

Plaintiff's criminal trial commenced on April 20, 1998, in New York State
Supreme Court, Erie County with Plaintiff represented by LoTempio, assisted by David
Cotter, Esq. ("Cotter"). Justice McCarthy presided over Plaintiff's criminal trial.
Appearing on behalf of the prosecution were Assistant Erie County District Attorneys
Lawrence M. Schwegler ("ADA Schwegler"), and Joseph L. Kilbridge ("ADA Kilbridge").
At that time, LoTempio and Cotter (together, "Plaintiff's defense counsel"), had not been
informed of Anderson's Statement or the exculpatory comments, and were not aware
that Montgomery, who resembles Plaintiff but was six inches shorter than Epps and had
blemishes on his face in contrast to Epps's smooth complexion, a fact also unknown to
Plaintiff's defense counsel, was suspected by Anderson of murdering Pope, or that
Defendants Stambach, Giardina, and Costantino had interviewed Anderson regarding
Pope's murder. At Plaintiff's criminal trial, Bradley testified and identified Epps in-court
as the person who shot Means. Trial Tr. at 135-36. On cross-examination, Bradley
admitted that the description of the suspect Plaintiff gave to the Buffalo Police included
that the suspect was taller than Epps, and had pimples of blemishes on his face, but
Epps, as he appeared in the lineup, did not have blemishes or pockmarks. Trial Tr. at
153-56. Bradley attributed the apparent inconsistencies to the fact that when viewing
Plaintiff in the lineup, she was not close enough to see the height demarcations or any
such blemishes. *Id*. at 154-56. Although LoTempio cross-examined Bradley,
presenting to Bradley photographs of other individuals that had emerged through the
Buffalo Police investigation of Means's murder, LoTempio was unaware that Anderson,

17

in her exculpatory comments, had implicated Montgomery in the murder of Means and did not present Montgomery's photograph to Bradley,[36] nor did LoTempio present any defense based on an alternate suspect who, like Montgomery, more closely matched Bradley's description of the suspect in height and blemished complexion.

Johnson appeared at the criminal trial as a defense witness and testified that at the time of the murder, she lived in an apartment with her brother and Epps. Trial Tr. at 241. At the time Means was shot, Johnson drove a turquoise blue Pontiac Sunbird. Trial Tr. at 242. Although Johnson was out with a girlfriend, Yolanda, at several bars in the early morning hours of Monday, May 26, 1997, Epps was not with them and Johnson drove herself and Yolanda to the bars. Johnson and Yolanda left the bars around 3:30 A.M., at which time Johnson wanted to get something to eat, but Yolanda was not hungry so Johnson drove Yolanda home before continuing to Johnson's apartment that she shared with Epps, but Epps was not then home so Johnson paged him. *Id*. at 270-73. After receiving the page, Epps immediately called Johnson and agreed to go with her to get something to eat. *Id*. at 273. Epps, driving the dark green Chevy Malibu, picked up Johnson at the apartment and they drove to the Perkins restaurant located on Maple Road in Amherst, New York, arriving at 4:30 A.M. *Id*. at 270, 274. Johnson estimated the drive from her home to the restaurant took 15 minutes, after which it was 15 minutes before the food order was placed, stating traffic was very light at that hour and although there were not many other diners at the restaurant, they were delayed in ordering because the inexperienced waiter had to check with the manager to answer Johnson's questions about the menu. *Id*. at 297-

---

[36] It is not clear from a photograph or mug shot of Montgomery, Dkt. 89-32 at 335, whether Montgomery has blemishes of pockmarks.

301.  According to the receipt, the food order was placed at 5:01 A.M.  *Id*. at 302.

Johnson attributed some of her initial confusion regarding where she and Epps were

when Means was shot to the fact that although she did not regularly got out to the bars

on Sunday night, she did that weekend because Monday, May 26, 1997 was Memorial

Day.  *Id*. at 305.

      On April 24, 1998, Epps was convicted of the second degree murder of Means in

violation of N.Y. Penal Law § 125.25, and was scheduled to be sentenced on June 2,

1998, but at the request of Plaintiff's defense counsel, sentencing was adjourned to

permit defense counsel to investigate an anonymous letter dated April 27, 1998

("Anonymous Letter"), received by Plaintiff's defense counsel who eventually learned, in

2000, the Anonymous Letter was written by Anderson.[37]  On June 5, 1998, Epps filed a

motion pursuant to N.Y. Crim. Proc. Law § 330.30[3] to set aside the guilty verdict

based on the newly discovered evidence, *i.e.*, the information provided in the

Anonymous  Letter ("the § 330 motion").  In particular, the Anonymous Letter states that

Montgomery was "the real killer."  Anonymous Letter at 1.  It further stated Montgomery

wears a light green and tan coat, and was a passenger in a tan or gold colored 1987

Park Avenue or 98 Oldsmobile driven by his girlfriend, one "Connie."  *Id*.  Montgomery

and Connie lived "around the corner from the murder . . . ."  *Id*.  The Anonymous Letter

concludes with the suggestion that Plaintiff's defense attorneys contact the tenant of an

apartment located over the store at the corner of East Delevan Avenue and Chelsea

---

[37] Defendants' Exh. 33 (Dkt. 78-32).  It was not until receiving the Anderson Affidavit dated April 29, 2000, that Plaintiff learned Anderson was the author of the Anonymous Letter, a fact revealed in the record by the context of the hearing held on Plaintiff's first § 440 motion that the Anderson Affidavit was prepared by Putnam.  See Discussion, *supra*, at 16 n. 35.  *See also* Dkt. 89-24 at 44-46, 111-15.

Place.[38]  *Id*. at 2.   Significantly, the Anonymous Letter does not mention Means or that the murder referenced therein is the murder of Means; nor does the Anonymous Letter repeat the exculpatory comments Anderson asserts she made to Defendants Stambach and Giardina on April 17, 1998, regarding Andersons's belief that Montgomery killed Pope to silence Pope from repeating Montgomery's confession to Pope about killing Means.[39]  When oral argument on the § 330 motion was conducted before Justice McCarthy on July 10, 1998, Epps's defendant counsel remained unaware of who wrote the letter.  Following oral argument, Justice McCarthy denied the § 330 motion, finding Anderson's Letter did not present any sufficient legal basis to set aside the jury verdict. Epps was then sentenced to an indeterminate term of 25 years to life.  Plaintiff's conviction was upheld on appeal, *People v. Epps*,  728 N.Y.S.2d 607, 608 (4th Dept. 2001), *lv. to appeal denied*, 914 N.E.2d 1015 (N.Y. 2009), and Plaintiff never filed for habeas relief.

---

[38] The pay phone from which Bradley placed the 911 call is located near in front of this store.

[39] To assist the reader, the entire text of the Anonymous Letter follows:

> 4/27/98
> To the lawyer of Corey Epps?
> I may have a little information that may help you out in your appeal.  I know they have the wrong man the real killer is RUSSELL MONGUMERY?  [*sic*] If you can recall they said that the killer was driving a tan or gold color car year 1987 Park Avenue or a nighty-eight [*sic*] oldsmobile  Russell and his daughter mother/Connie was driving the car the night of the murder they lived at 21 Durham around the corner from the murder  they was coming from the steak house on Elmwood. They never had Russell in the line up but I'm willing to beat [*sic*] anything if you put those two together at night they can pass for each other.  Connie real name is Constence.  talk to her old land lord to get her real name.  Get a mug shoot [*sic*] of Russell and you got your man.  The reason why I'm coming forth now is because Russ is a cruel and heart less man that have to be stopped  I can only Remember that he had a light green and tan bear force steak coat on that night. the car may have been registered in Connie's name I'm not sure but if I can remember anything else about your case I will write you or call you on the phone.  But with God on our side we will put this beast away so don't stop if you believe in your heart that he's innocent just Keep the faith in the lord and justice will be served.  So I hope and Pray that what I'm telling you will help a lot. P.S. talk to a lady that lived up stair over the store on Delevan and Chelsea  I don't know her but she maybe able to add on to what I'm telling you.  She a white female
> yours
> truly
> (I'll keep in touch)

Anonymous Letter (Dkt. 78-32).

It was not until after Epps was sentenced that Epps's defense counsel learned the identity of Anderson and that Anderson was the author of the Anonymous Letter. By this time, LoTempio had been appointed to a judicial position with the Buffalo City Court, and Cotter assumed Epps's representation sometime in 2000 or 2001 on post-verdict motions. Epps filed a motion pursuant to N.Y. Crim. Proc. Law § 440.10[1](g) and (h) ("first § 440 motion"),[40] to vacate Epps's conviction based on the discovery of new evidence and asserting that Epps's conviction was obtained in violation of Plaintiff's constitutional rights under the Constitution of the United States or New York. The newly discovered evidence included the Anderson Affidavit,[41] dated April 29, 2000, in which Anderson avers on April 17, 1998, she answered questions posed by the Buffalo Police homicide detectives regarding Pope's murder including whether Pope sold drugs to Montgomery and what Montgomery looked like. Anderson Affidavit at 1. According to Anderson, Anderson further responded to the detectives' questions by stating, "You know the sketch you all make of the guy who killed Tomika Means – that's him. That's Russell Montgomery." *Id.* In her affidavit, Anderson further averred that Pope told her that Montgomery told Pope that Montgomery killed Means, but the police responded that such statements were hearsay. *Id.* Anderson then offered to take a lie detector test regarding the statements, but she was never contacted to arrange for such test. *Id.* The police allegedly told Anderson she was "just an angry girlfriend,"[42] *id.*, and Anderson repeated in her affidavit that the morning after Means was killed, Montgomery came to Pope's house where Montgomery spoke to Pope in the living room while

---

[40] The record does not provide the exact date of such motion; however, oral argument on the motion took place on May 15, 2001. First § 440 Hearing Tr. (Plaintiff's Exh. X (Dkt. 89-24)) at 1.
[41] Filed as Plaintiff's Exh. HH (Dkt. 89-34). The record does not explain how Plaintiff came into possession of the Anderson Affidavit.
[42] The exact reason for the officer's alleged assertion is not revealed in the record.

Anderson was in the bedroom. *Id*. at 1-2. Pope then left with Montgomery and upon returning, told Anderson that Montgomery confessed to killing Means. *Id*. at 2. Anderson further averred she previously provided all this information to the Buffalo Police and also advised she was the author of the Anonymous Letter. *Id*.

On May 15, 2001, a hearing was held on the first § 440 Motion, at which LoTempio and Anderson appeared and testified. LoTempio testified that after the conclusion of Epps's criminal trial on April 24, 1998, he was provided with a copy of the Anonymous Letter which was the impetus for the § 330 motion, LoTempio First § 440 Hearing Tr.[43] at 9-10, but denied receiving any information from either the Erie County District Attorney's Office or the Buffalo Police that someone other than Epps had been implicated in Means's murder. *Id*. at 12-13. During her § 440 hearing testimony, Anderson explained that for several years, Pope and Montgomery had dealt drugs together, and stated it was her belief that Pope was killed by Russell Montgomery ("Montgomery"), to silence Pope who had been telling people that it was Montgomery who shot and killed Means. According to Anderson, at 9:00 A.M. on May 26, 1997, which was only several hours after Means was shot, Anderson was asleep with Pope when Montgomery arrived.[44] Pope left with Montgomery and upon returning a while later,[45] told Anderson that Montgomery had confessed to killing Means earlier that morning. When asked what Montgomery looked like, Anderson said Montgomery looked like the sketch that she had seen on the news of the suspect who killed Means. Anderson First § 440 Hearing Tr. at 27-29. Anderson did not mention that Montgomery

---

[43] References to "LoTempio § 440 Hearing Tr." are to the pages of the transcript of Judge LoTempio's May 15, 2001 hearing testimony on Plaintiff's first § 440 motion, filed as Plaintiff's Exh. X (Dkt. 89-24).
[44] It is not clear from the record where Anderson and Pope were sleeping.
[45] Anderson did not specify for how long Pope was gone.

had blemishes or pockmarks on his face.  According to Anderson, after she made the statements that Montgomery was the person in the sketch and that he killed Pope to prevent Pope from telling others that Montgomery, not Epps, killed Means ("the exculpatory comments"), Stambach left room with Giardina and spoke privately, before returning to the room and informing Anderson that the police were "pretty sure" that Epps killed Means, Anderson replied that they, meaning Epps and Montgomery, look alike.  *Id*. at 30-31.  Anderson's Statement prepared by Stambach and Giardina regarding their interview of Anderson on April 17, 1998, concerning Pope's murder, which was signed by Anderson, does not include the exculpatory comments regarding Anderson's belief that Montgomery murdered Means.  In the Anderson Affidavit, Anderson admitted she wrote the Anonymous Letter, *id*. at 39-40, but also admitted she did not have any personal knowledge that Montgomery killed Means.  *Id*. at 46.  The First § 440 motion hearing was continued on June 19, 2001, when testimony was given by Putnam, Costantino, Giardina, Masecchia, and Stambach.  *Id*. at 107-75.  Affidavits by Defendants Costantino, Stambach, and Giardina[46] dated August 20, 2020, were presented at the first § 440 motion hearing.  All three Defendant Detectives averred that when they interviewed Anderson on April 17, 1998 in investigating Pope's murder, Anderson did not inform them of the hearsay statement that Pope said on May 27, 1997, Montgomery admitted to shooting Means.  Costantino Affidavit ¶¶ 3-4; Giardina Affidavit ¶¶ 3, 5-8; Stambach Affidavit ¶¶ 5-7.

On September 13, 2001, Justice McCarthy issued a Memorandum and Order (September 13, 2001 Order)[47] denying Plaintiff's first § 440 motion, finding Anderson

---

[46] Respectively filed as Defendants' Exhs. 19, 20 and 21 (Dkts. 78-19 to 78-21).
[47] Filed as Defendants' Exh. 26 (Dkt. 78-25), and Plaintiff's Exh. GG (Dkt. 89-33).

was not a credible witness because Anderson's Statement was devoid of any reference to Means's murder or to Epps, September 13, 2001 Order at 2, although the Anonymous Letter "names Montgomery as the murderer of Tamika [*sic*] Means,[48] the Anonymous Letter does not mention Montgomery's admission to Pope of murdering Means, *id*. at 2-3, does not "assert that the police had been informed by [Anderson] that Montgomery committed this crime," *id*. at 3, and Anderson failed to offer any explanation as to why she did not sign the Anonymous Letter despite claiming to have made the exculpatory comments to Defendant Detectives prior to Epps's criminal trial. *Id*. Justice McCarthy further found that although the Anderson Affidavit avers that while being interviewed by the police on April 17, 1998, Anderson stated that Montgomery looked like Epps, thus implying Montgomery was Means's killer, agreed to submit to a polygraph test but was never called back for such test, Anderson Affidavit at 1, and that she spoke with five or six police detectives on April 17, 1998, Anderson's testimony during the first § 440 motion hearing did not include any reference to a polygraph test and mentioned only Defendants Giardina and Stambach were present when she was interviewed on April 17, 1998, September 13, 2001 Order at 3, and Anderson referred to the exculpatory hearsay statements as being made in June 1998. *Id*. In contrast, testimony by Costantino, Giardina, and Stambach, as determined by Justice McCarthy, was consistent and unequivocal that Anderson was questioned on April 17, 1998, only with regard to Pope's murder, during which Anderson never mentioned Epps or Means. *Id*. at 4. Also, both Defendant Costantino as well as Defendant Masecchia gave

---

[48] The court notes that although the Anonymous Letter does refer to a murder and that Epps is not the killer, the Anonymous Letter does not mention Means as the victim of the murder.

testimony that Anderson never mentioned during her April 17, 1998 interview that it was Montgomery, not Epps, who murdered Means. *Id*.

In 2014, an unidentified witness ("Witness 1"), contacted a relative of Epps with new information regarding Means's murder. In an affidavit dated November 11, 2014 ("Witness 1's Affidavit"),[49] Witness 1 avers that in 1997, she lived with Pope who was then her boyfriend. Witness 1's Affidavit ¶ 1. Early in the morning on an unspecified date in 1997, Witness 1 awoke to the sound of voices in the front room of the residence. *Id*. ¶ 3. Witness 1 identified the voices as Pope and Montgomery who was Pope's close friend. *Id*. ¶ 4. According to Witness 1, "Russell [Montgomery] sounded drunk and agitated," *id*. ¶ 5, and from the bedroom, Witness 1 heard Montgomery tell Pope, "I didn't know that was Keyon's [*sic*] baby mama . . . I really fucked up, I killed Keyon's [*sic*] baby mama." *Id*. ¶ 6. After Pope said he did not want to get involved, Montgomery left the residence with Pope, but Pope returned a few minutes later and told Witness 1, "this motherfucker's crazy," and that Montgomery admitted to killing "Tamika, who was the mother of Keyon's [*sic*] children." *Id*. ¶¶ 7-8. Later that morning, Pope repeated to Witness 1 the details of the crime as described by Montgomery, including that Montgomery was the passenger in a car and when Means honked her horn, Montgomery "went crazy on her [Means] and exploded the way he normally does." *Id*. ¶ 9. Witness 1 continued that she assumed Montgomery killed Pope because Pope was telling people that Montgomery killed Means. *Id*. ¶¶ 12-13. According to Witness 1, although initially she did not want to get involved, she felt guilty for remaining silent after seeing a social media account about Epps's conviction posted on the internet by Epps's brother-in-law on November 3, 2011, and contacted brother-in-law. *Id*. ¶¶ 16-19.

---

[49] Filed under seal as Defendants' Exh. 36 (Dkt. 84 at 1-3).

Witness 1 also averred Epps and Montgomery "look alike except for that [Montgomery] has a tattoo of a snake on his neck and [Epps] doesn't, but you wouldn't be able to see the tattoo in the dark anyway." *Id.* ¶ 20. The information provided by Witness 1 became the basis for Plaintiff's second § 440 motion filed February 21, 2017. Witness 1 later testified at a hearing on the second § 440 motion, consistent with her affidavit. *See* Witness 1 Second § 440 Hearing Tr.,[50] *passim*. At the conclusion of the Second § 440 Hearing, which was conducted by Honorable James F. Bargnesi, Erie County Court Judge, on November 30, 2017, see Defendants' Exh. 39 (Dkt. 78-38) at 1, Plaintiff was released from custody on December 1, 2017, by Judge Bargnesi.[51] Montgomery was convicted of Pope's murder,[52] for which Montgomery was sentenced to 22 years incarceration.[53] *See Montgomery v. Wood*, 727 F.Supp.2d 171, 174 (W.D.N.Y. 2010) (habeas proceeding challenging Montgomery's conviction for the murder of Pope).

In connection with this action, Bradley was deposed on October 29, 2021. In contrast to her trial testimony, Bradley did not recall being presented with two photo arrays but, rather, Bradley testified that on two separate days, unidentified Buffalo Police Officers presented Bradley with so-called "mug shot" books containing numerous, possibly as many as hundreds, of mug shots. Bradley Dep. Tr. at 6-10, 13-16. Bradley admitted the signature on the back of the second photo array was hers, but

---

[50] Filed under seal as Defendants' Exh. 37 (Dkt. 84 at 4-29).

[51] The court notes Plaintiff's exoneration was not based on any statements or testimony by Anderson, but by Witness 1.

[52] The date of Montgomery's conviction for Pope's murder is not revealed in the record, nor in any of the published decisions regarding the conviction, but the conviction must have occurred prior to March 21, 2003, when it was unanimously affirmed by the New York Supreme Court, Appellate Division, Fourth Department. See People v. Montgomery, 756 N.Y.S.2d 680 (4th Dept.), *lv. to appeal denied*, 798 N.E.2d 356 (N.Y. 2003).

[53] According to an internet website maintained by New York State Department of Corrections and Community Supervision for looking up where inmates are incarcerated, Montgomery has been released from custody. *See* New York State Department of Corrections and Community Supervision, Incarcerated Lookup, available at https://nysdoccslookup.doccs.ny.gov. Based on the record, there is no indication that the District Attorney intends to seek to charge Montgomery with Means's murder.

did not recall viewing any photo array. *Id*. at 16-17. Bradley did not indicate that any of the images in the first mug shot book depicted the suspect, but several weeks later, after perusing the second mug shot book, Bradley "zoned right in" on Plaintiff's mug shot, confident that Plaintiff was the suspect, and broke into tears. *Id*. at 11-12.

## DISCUSSION

**1.    Summary Judgment**

In support of summary judgment, Defendants argue with regard to Plaintiff's Third and Fourth Claims asserting malicious prosecution in violation of state common law and § 1983 that such claims are without merit because Defendants Stambach, Giardina, and Costantino did not cause Epps to be indicted, Defendants' Memorandum at 17-18, there is no evidence establishing Defendants Bohen and Minor acted in bad faith in participating in identification procedures, *id*. at 19-20, Bradley's independent lineup identification of Epps as the man who shot Means created probable cause, *id*. at 21-23, and the City cannot be vicariously liable for malicious prosecution. *Id*. at 23. With regard to Plaintiff's due process claim based on alleged *Brady* violations, Defendants argue Plaintiff cannot establish that any Defendant intentionally suppressed exculpatory material, *id*. at 23-24, Defendant Detectives Bohen and Minor were not present during the April 17, 1998 interview of Anderson and unaware of Anderson's Statement, *id*. at 24-25, the attribution of Montgomery's guilt in Anderson's Statement is hearsay and thus not admissible as evidence and is therefore not *Brady* material, *id*. at 25-26, and, alternatively, Defendants are entitled to qualified immunity for failing to turn over what Plaintiff maintains is *Brady* material. *Id*. at 26-29. Defendants further argue

Plaintiff's claim based on a post-trial *Brady* violation is not a recognized due process claim and, thus, fails as a matter of law, *id*. at 29-30, nor can Plaintiff prevail on his state law due process claim against the City on a respondeat superior theory. *Id*. at 30-32.

In opposition to summary judgment, Plaintiff argues with regard to his malicious prosecution claims that Defendants Bohen and Minor initiated criminal proceedings against Plaintiff without probable cause, Plaintiff's Response at 13-17, by forwarding a fabricated account of Bradley's identification of Epps as the suspect to the prosecution, *id*. at 18-19, Bradley's selection of Epps as the suspect in the in-person lineup did not independently create probable cause, *id*. at 19-20, the Grand Jury indictment was procured with false testimony and, thus, did not independently create a presumption of probable cause, *id*. at 20, and the City is liable under the doctrine of *respondeat superior*. *Id*. at 21. In opposing summary judgment on his claimed *Brady* violation, Plaintiff argues Anderson's Statement was exculpatory material that should have been disclosed, *id*. at 21-23, and Defendants are not protected by qualified immunity. *Id*. at 24-26. Plaintiff further argues his due process rights were violated when Defendants forwarded false evidence to the prosecution, thereby undermining Plaintiff's post-trial hearings, *id*. at 27-30, and his asserted violations of the New York State Constitution should be permitted to proceed because there is no equivalent state law claim. *Id*. at 30-32.

In further support of summary judgment, Defendants argue the malicious prosecution claims fail as a matter of law because Defendants Bohen and Minor did not fabricate the photo array identification, Defendants' Reply at 2-5, and the lineup and Bradley's grand jury testimony independently created probable cause. *Id*. at 5-7.

Defendants further argue they are entitled to qualified immunity on any *Brady*-based §
1983 violation, *id*. at 7-8, Plaintiff's post-trial due process claim fails because such claim
cannot be premised upon a "fabrication of evidence" assertion, *id*. at 8-9, and,
alternatively, Defendants would be absolutely immune from liability on such claim
insofar as it is predicated on statements made in furtherance of judicial proceedings. *Id*.
at 9-10. Defendants repeat their argument that absent a valid claim against any of the
Defendant Detectives, Plaintiff's state law *respondeat superior* claim filed against the
City fails as a matter of law. *Id*. at 10.

Summary judgment of a claim or defense will be granted when a moving party
demonstrates that there are no genuine issues as to any material fact and that a moving
party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.
2003). The court is required to construe the evidence in the light most favorable to the
non-moving party, *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011), and summary
judgment may not be granted based on a credibility assessment. *See Reyes v. Lincoln
Automotive Financial Services*, 861 F.3d 51, 55 (2d Cir. 2017) ("Adverse parties
commonly advance conflicting versions of the events throughout a course of litigation.
In such instances on summary judgment, the court is required to resolve all ambiguities
and draw all permissible factual inferences in favor of the party against whom summary
judgment is sought." (citations, quotation marks, and brackets omitted)). The party
moving for summary judgment bears the burden of establishing the nonexistence of any
genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Cross Commerce Media, Inc. v.*

*Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

### 3.     42 U.S.C. § 1983

Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 ("§ 1983"), which permits imposing civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Patterson v. County of Oneida, New York*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983). Section 1983, however, "'is not itself a source of substantive rights.'" *Id*. (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred' . . . ." *Id*. To succeed on a § 1983 claim, a plaintiff must establish the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). *See Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (describing the elements of a § 1983 claim as (1) the deprivation of a federal constitutional or statutory right, and (2) by a person acting under color of state law. (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Whalen*, 126 F.3d at 405 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and *Baker*, 443 U.S. at 140).

Preliminarily, Plaintiff's *Brady* violation claim concerns Fifth and Fourteenth Amendment due process. *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995) ("the suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" (quoting *Brady*, 373 U.S. at 87)). Further, with regard to Plaintiff's malicious prosecution claim asserted under federal law, claims for malicious prosecution are common law torts which generally are not cognizable under § 1983 unless the tort also resulted in a violation of federal constitutional or statutory law. *Cook v. Sheldon*, 41 F.3d 73, 77 (2d Cir. 1994) ("common law tort is not cognizable under section 1983 unless it also results in a violation of federal constitutional or statutory law" (citing *Easton v. Sundram,* 947 F.2d 1011, 1016 (2d Cir.1991) (noting that state law tort does not always rise to level of constitutional violation), *cert. denied,* 504 U.S. 911 (1992)). "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures and denials of due process, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (false arrest)). *See also Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (malicious prosecution). Plaintiff's federal malicious prosecution claim is thus properly asserted under § 1983.

## 3. First Claim - Pre-Trial Federal Due Process Violation

In his First Claim, Plaintiff alleges he was denied procedural due process when Defendants failed to provide Plaintiff's defense counsel with exculpatory Brady material, specifically, Anderson's exculpatory comments and information pertaining to the April 17, 1998 interview of Anderson by Defendants Stambach, Giardina, and Cosentino during which Anderson allegedly made the unrecorded exculpatory comments, *i.e.*, that

Montgomery confessed to Pope that Montgomery killed Means, which Plaintiff's defense counsel could have used to cross-examine Bradley and to develop and present an alternate suspect defense, namely, Montgomery who had facial blemishes and was six inches shorter than Epps and thus more closely matched Bradley's description of the suspect. Complaint, First Claim. In support of summary judgment on this claim, Defendants argue that Anderson's exculpatory comments were hearsay which is not admissible as evidence and, as such, was not required to be turned over to Plaintiff pursuant to *Brady*. Defendants' Memorandum at 25-26 (citing *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (material need not be turned over pursuant to *Brady* where the material is not exculpatory and clearly inadmissible as evidence), and *United States v. Wilson*, 2017 WL 1456984, at * 4 (W.D.N.Y. Apr. 25, 2017) (inadmissible evidence may be material for purposes of *Brady* if it could lead to the discovery of admissible evidence)). Alternatively, Defendants maintain they are qualified immune from any liability for failing to turn over such information. *Id*. at 26-29. Defendants also deny that Anderson made the exculpatory comments implicating Montgomery as the man who murdered Means which is corroborated by the fact that the P-73 reports generated on April 16, 17, and 20, 1998 in connection with Anderson's interviews by the police. Costantino Affidavit (Dkt. 78-19) ¶¶ 2-4; Stambach Affidavit (Dkt. 78-20) ¶¶ 5-7; Giardina Affidavit (Dkt. 78-21) ¶¶ 2-8. In opposition to summary judgment on this claim, Plaintiff argues Anderson's Statement would have led to the discovery of the exculpatory statements and thus was *Brady* material that should have been disclosed prior to Epps's criminal trial, Plaintiff's Response at 21-23, and the law requiring disclosure of exculpatory material pretrial was clearly established such that Defendants

are not qualifiedly immune from liability for failing to timely provide the information to Epps. *Id*. at 24-26. Defendants argue in reply that even if the failure to turn over information regarding the information provided by Anderson in investigating Montgomery for the murder of Pope was a *Brady* violation, Defendants are qualifiedly immune from liability on such claim. Defendants' Reply at 7-8.

Preliminarily, in support of summary judgment, Defendants argue this claim must be dismissed against Defendants Bohen and Minor, neither of whom was present when Anderson allegedly made the exculpatory comments on April 17, 1998. Defendants' Memorandum at 24-25. Plaintiff does not argue in opposition on this point, nor do Defendants further address this in reply. A careful reading of the Complaint and the record in opposition to Defendants' Motion fails to reveal any facts which, if true, establish Bohen and Minor were present when Anderson allegedly made the exculpatory comments. *See* Complaint, *passim*. Plaintiff thus has failed to establish the requisite personal involvement to hold either Bohen or Minor liable on this claim. *See Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) (requiring "personal involvement of defendants" under Section 1983). Accordingly, Defendants' Motion should be GRANTED with regard to Defendants Bohen and Minor on the First Claim.

With regard to Defendants Stambach, Giardina, and Costantino, although these Defendants were present when Anderson allegedly made the exculpatory comments, such comments constituted double hearsay which, in April 1998, had yet to be considered *Brady* material and, as such, were not required to be turned over to Plaintiff. Alternatively, Defendants are qualifiedly immune from liability under § 1983 for not providing Plaintiff with the exculpatory comments. Specifically, pursuant to *Brady* and

its progeny, as of Plaintiff's criminal trial for the murder of Means, *i.e.*, April 1998, the Government had an obligation to disclose exculpatory material, or material favorable to an accused as to either guilt or punishment, even when no affirmative request has been made. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.") (underlining added). After *Brady* was decided, the obligation to provide so-called *Brady* material was extended to all criminal defendants regardless of whether such material was specifically requested. *United States v. Agurs*, 427 U.S. 97, 103-04 (1976).

The three elements for a *Brady* violation include, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir.2004) (internal quotation omitted). The requisite prejudice ensues where a plaintiff demonstrates the withheld evidence was material, specifically, where the "evidentiary suppression undermines confidence in the outcome of the trial." *Leka v. Portuondo,* 257 F.3d 89, 104 (2d Cir.2001) (internal quotations omitted). The limited precedent addressing fair trial claims predicated on a *Brady* violation confirms that police officers may be held liable for *Brady* violations when they intentionally suppress exculpatory evidence. *See Poventud v. City of New York,* 750 F.3d 121, 138 (2d Cir. 2014) (recognizing a *Brady* violation where the defendant police officers "willfully withheld exculpatory evidence that called into question the testimony of the only witness to place

him at the scene of the crime"). *See also Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence.") (footnote omitted). The applicable *mens rea* to support a *Brady* violation requires proof that "an official acted intentionally or recklessly, and not merely negligently." *Id.*

In the instant case, Anderson's Statement does not qualify as *Brady* material because it was made in connection with Defendants' investigation of Pope's murder and does not even mention Epps or Means. Anderson's Statement at 1. None of the statements within Anderson's Statement remotely pertains to the murder of Means and the criminal prosecution of Epps. Accordingly, not only is Anderson's Statement not exculpatory or impeachment evidence, but nothing within Anderson's Statement would have led to exculpatory or impeachment evidence and Defendants' failure to provide Anderson's Statement to Plaintiff's criminal defense counsel did not violate *Brady*.

With regard to the alleged exculpatory comments made by Anderson, but not recorded by any Defendant, that early on the morning of May 26, 1997, Pope told Anderson that Montgomery confessed to killing Means, such comments, even if made, constitute double hearsay or hearsay within hearsay which is not admissible as evidence "unless each part of the combined statements conforms with an exception to the [hearsay] rule." Fed.R.Evid. 805. Significantly, prior to 2022, neither the Supreme Court nor the Second Circuit had held the *Brady* obligation attached to inadmissible evidence; rather, in 2002, after Plaintiff's conviction, the definition of exculpatory material for *Brady* purposes was extended to include information that it is not admissible, provided the information could lead to the discovery of admissible evidence.

36

*United States v. Gill*, 297 F.3d 93, 104 (2d Cir. 2002). Accordingly, for the exculpatory comments to qualify as *Brady* material at the time of Plaintiff's trial, both parts of the statement had to be excepted from the hearsay rule under Fed. R. Evid. 803 (hearsay rule exceptions regardless of whether the declarant is available as a witness) or 804 (hearsay rule exceptions where the declarant is unavailable as a witness). Plaintiff has not argued that either hearsay statement comprising the exculpatory comments qualifies for the hearsay rule exception.[54]

Nor did Defendants' failure to provide Plaintiff with the exculpatory comments Anderson allegedly made that implicated Montgomery in the murder of Means violate *Brady*. Even assuming, *arguendo*, such comments would have qualified as *Brady* material, either because the hearsay statements were exempt under the Federal Rules of Evidence or applicable New York law as hearsay exceptions, or because the exculpatory nature of the exculpatory comments, despite being inadmissible as evidence, required they be produced, the comments were never recorded by any of the investigating Buffalo Police officers or detectives investigating Pope's murder. Not only were the exculpatory comments not included in Anderson's Statement, which Anderson signed, but they were not recorded by Costantino, Giardina, nor Stambach in any of the police reports prepared in connection with their interviews of Anderson and Defendants deny such comments were made. *See* Costantino Affidavit (Ckt. 78-19), ¶¶ 2-4; Giardina Affidavit (Dkt. 78-21), ¶¶ 3-8; Stambach Affidavit (Dkt. 78-20), ¶¶ 2-7. Costantino, who was involved in the investigations of both the Epps and Pope homicide

---

[54] The court notes that Montgomery's alleged statement to Pope that he killed Means may qualify as an admission against interest exception to the hearsay rule under Fed. R. Evid. 804(b)(3). *See also People v. Thibodeau*, 56 N.Y.S.3d 669, 675 (4th Dept. 2017), *aff'd*, 106 N.E.3d 1145 (N.Y. 2018) (same exception to hearsay under New York law).

cases, Costantino Affidavit ¶ 2, avers that while investigating the criminal case against

Epps, Costantino never received any information suggesting Montgomery, not Epps,

shot Means, but had Costantino received any such information, Costantino would have

"pursue[d] it as a lead generating note[ ]" and "would also inform the assistant district

attorney working on the case." *Id*. ¶ 4. Giardina avers that on April 16, 1998, he met

with Anderson at her apartment and then brought her to the Buffalo Police Homicide

office where, on April 17, 1998, Giardina interviewed Anderson regarding Pope's

murder and Anderson's Statement was prepared based on the interview. Giardina

Affidavit ¶¶ 2-5. According to Giardina, at no time during the interview did Anderson

reference the murder of Means or implicate Epps was involved in Means's murder, *id*. ¶

5, adding that had Anderson made any such remarks, Giardina would have included the

information in Anderson's Statement or recorded it on a P-73 form report. *Id*. ¶ 6. On

April 20, 1998, Anderson returned to the homicide office, and was interviewed by one

Melvin Calhoun ("Calhoun"), who never told Giardina that Anderson said anything about

Montgomery being involved in Means's murder, but if Calhoun had made such a

statement, Giardina would have recorded it on the P-73 form report dated April 20,

1998. *Id*. ¶ 7. That Costantino, Giardina, and Stambach all deny Anderson made the

exculpatory comments is consistent with Anderson's Anonymous Letter, dated after the

conclusion of Plaintiff's criminal trial, which does not reference either the exculpatory

comments Anderson maintains she provided to Defendants when speaking with them

on April 17, 1998 which Defendants did not record or otherwise memorialize, or that

Montgomery confessed to killing Pope to prevent Pope from telling others that

Montgomery killed Means.[55]

---

[55] In fact, the Anonymous Letter does not even mention Means by name, although the context of the letter

Assuming, *arguendo*, Anderson made the exculpatory comments, which Defendants Costantino, Giardina, and Stambach failed to preserve, the Second Circuit has held that the failure of law enforcement to take notes of interviews with witnesses does not constitute a *Brady*-based violation. *See United States v. Rodriguez*, 496 F.3d 221, 224-25 (2d Cir. 2007) (no *Brady* violation where law enforcement fails to take notes during witness interview). Nor is a criminal defendant's "mere speculation that some exculpatory or impeachment material may have been withheld" enough to establish a *Brady* violation, *United States v. Walsh*, 774 Fed.Appx. 706, 707 (2d Cir. 2019); rather, there must be some evidence that law enforcement was directed not to take notes so as to avoid *Brady* obligations. *Id*. (citing *Rodriguez*, 496 F.3d at 225 n. 3).

Moreover, a police officer's failure to preserve exculpatory evidence does not support a *Brady* violation absent evidence that such failure to preserve was undertaken in bad faith. *See Fappiano v. City of New York*, 640 Fed. Appx. 115, 120 (2d Cir. 2016) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (specifying that the Court's extension of liability for *Brady* violation to police officers for their reckless behavior handling potentially exculpatory behavior did not impose an "absolute duty on the police to preserve evidence based on a freestanding constitutional due process right.")). Rather, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. To date, however, the Second Circuit has not held that anything less than an intentional *Brady* violation establishes a § 1983 due process claim. *See Fappiano*, 640 Fed. Appx. at 118 (observing Second Circuit has "never held

---

strongly implies the author, now known to be Anderson, is informing the reader, *i.e.*, "the lawyer of Corey Epps," Anonymous Letter at 1, that it was Montgomery that killed Means given the Anonymous Letter specifies it was written to "help you out in your appeal." *Id*.

that anything less than an intentional *Brady* violation establishes a § 1983 due process claim for damages . . . .").  "Regardless of a defendant's request, the government violates its duties under *Brady* if it suppresses evidence that, if disclosed, would have had a reasonable probability of changing the outcome of the proceedings."  *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001) (citing *United States v. Bagley*, 473 U.S. 667, 681-82 (1985)).  "Materiality" means "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  Information is considered "material" if it is "favorable to an accused" which includes not only evidence that affirmatively tends to exculpate the defendant, but also information that impeaches the credibility of government witnesses.  *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  Further, "as a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant."  "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."  *Id.*  Here, nothing in the record creates a material issue of fact as to whether the Defendant Detectives purposely failed to record Anderson's exculpatory comments even assuming they received them.  Accordingly, at the time of Plaintiff's criminal trial in April 1998, there was no obligation to turn over the exculpatory comments, assuming, *arguendo*, the comments were in fact made by Anderson to the investigating Defendant Detectives Costantino, Giardina, and Stambach.

Furthermore, even if the failure to provide Anderson's Statement and exculpatory comments to Plaintiff's defense counsel did violate *Brady* and thus federal due process,

Costantino, Giardina, and Stambach are qualifiedly immune from § 1983 liability on such violation.  In particular "[t]he doctrine of qualified immunity protects state officials from civil liability for actions performed in the course of their duties if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999) (internal citation and quotation marks omitted in *Luna*).  "The doctrine protects officials who 'act in ways they reasonably believe to be lawful.'"  *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)).  "Hence, a defendant is not liable if he did not violate clearly established law *or* it was objectively reasonable for him to believe that he was not violating clearly established law."  *Id.* (italics in original) (citing *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

Two questions guide the analysis including "whether 'the facts show that the [defendants'] conduct violated plaintiff[s'] constitutional rights,' and second, whether the right was 'clearly established at the time of the defendant[s'] actions.'" *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014) (quoting *Zalaski v. City of Hartford,* 723 F.3d 382, 388 (2d Cir.2013)).  If either question is answered in the negative, qualified immunity attaches.  *Id.*  Further, these questions may be addressed "in either order."  *Id.* (citing *Pearson v. Callahan,* 555 U.S. 223, 227 (2009) (holding that courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first)).  In the instant case, the second question is addressed first and is answered in the negative, establishing Defendant Detectives are entitled to qualified immunity on this claim.

As relevant, the Second Circuit has held, "'[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Luna*, 356 F.3d at 490 (quoting *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir. 2003) (further quotation omitted))). "The question is 'what a reasonable person in the defendant's position should know about the constitutionality of the conduct.'" *Id*. (quoting *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999), and citing *Anderson v. Creighton,* 483 U.S. at 640 ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.")). "Hence, even assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully." *Id*. (citing *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'") (*quoting Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In the instant case, because Anderson's Statement is devoid of any mention of Means or Epps, it is neither exculpatory, impeachment evidence, nor likely to lead to exculpatory or impeachment evidence, it is not *Brady* material and, as such, there was no reason for any Defendants to believe that he was not acting lawfully if he failed to provide Anderson's Statement to Plaintiff's defense counsel. *Luna*, 356 F.3d at 490 (citing *Hunter,* 502 U.S. at 229). Further, not only was the need to turn over material

inadmissible as evidence which could nevertheless lead to admissible evidence, such as Anderson's exculpatory comments which are hearsay within hearsay, not established within the Second Circuit until *Gil* was decided in 2002, well after the conclusion of Plaintiff's criminal trial, but insofar as the exculpatory comments were made in connection with Defendants' investigation of the murder of Pope, not of Means, and in the absence of any evidence in this record that Defendants were directed not to take notes so as to avoid *Brady* obligations, *Walsh*, 774 Fed.Appx. at 707, it cannot be said, as a matter of law, that Plaintiff's right to receive the exculpatory comments was clearly established prior to Plaintiff's criminal trial.  Because the question of whether Plaintiff's right to receive the exculpatory comments, assuming, for the sake of discussion, they were in fact made by Anderson when interviewed by Defendants on April 17, 1998, is answered in the negative, the court need not reach the question of whether the facts show that Defendants' conduct in failing to record and turn over the exculpatory comments violated Plaintiff's constitutional right to *Brady* material.  *Golodner*, 770 F.3d at 201 (citing *Pearson,* 555 U.S. at 227).  Accordingly, Defendants are entitled to qualified immunity on Plaintiff's First Claim asserting *Brady* violations under § 1983.

Defendants' Motion should be GRANTED as to Plaintiff's First Claim.

## 4.     Third and Fourth Claims – Malicious Prosecution

Plaintiff's Third and Fourth Claims allege malicious prosecution in violation of state and federal law, based on the commencement of criminal proceedings against Plaintiff without probable cause in light of asserted constitutionally defective identification procedures.  Complaint, Third Claim (New York common law), and Fourth Claim (§ 1983).  In support of summary judgment, Defendants argue these claims fail as

a matter of law against Defendants Giardina and Stambach who were not involved in the investigation of Means's murder until after Epps was indicted, as well as against Costantino who was not involved in the photo identification procedures leading to ADA Carrington's application for the in-person lineup at which Bradley selected Epps as the murderer. Defendants' Memorandum at 18. With regard to Defendants Bohen and Minor, both of whom conducted photo identification procedures through which Bradley identified Epps as Means's killer, Defendants argue there is no evidence that either Bohen or Minor acted in bad faith, that the photo arrays were unduly suggestive, or that mug books were shown to Bradley which, in any event, was permissible. *Id*. at 19-20. Defendants further argue Bradley's independent identification of Epps via the in-person lineup presented at the request of ADA Carrington, as well as the indictment returned by the Grand Jury, are superseding events that caused Epps to be indicted thereby establishing probable cause for Epps's prosecution and requiring dismissal of the malicious prosecution claims against Defendants Bohen and Minor. *Id*. at 21-23. Defendants further maintain that insofar as the malicious prosecution claims fail against each of the individual Defendants, the City may not be held vicariously liable on these claims. *Id*. at 23. In opposition, Plaintiff argues Bohen and Minor failed to properly document the identification procedures by which Bradley initially identified Epps as the murderer of Means, specifically that Bradley selected Epps's photo from mug shot books rather than a photo array, and then lied to the prosecution about how Bradley first identified Epps, thereby tainting the prosecution which was not based upon probable cause. Plaintiff's Response at 13-19. Plaintiff maintains that Bohen and Minor's failure to properly document the mugshot book identification creates a presumption that the

44

identification was suggestive, which presumption was not overcome by Bradley's subsequent selection of Epps from the in-person lineup, *id*. at 20, or the grand jury indictment. *Id*. at 20. Plaintiff further maintains Defendant City can be held liable for malicious prosecution based on Bohen and Minor's liability on such claims. *Id*. at 21. In further support of summary judgment, Defendants argue Plaintiff's "mug book" identification argument is a "red herring" and provides no basis for the malicious prosecution claim, Defendants' Reply at 2-3, there is no evidence that Bohen and Minor fabricated the photo array identification, *id*. at 3-4, and in any event, the in-person lineup and Bradley's grand jury testimony independently created probable cause for Epps's criminal prosecution. *Id*. at 5-7.

Preliminarily, although the Complaint indicates the Third and Fourth Claims are asserted against all Defendant Detectives, Defendants argue, Defendants' Memorandum at 18, and Plaintiff does not dispute, that the record is devoid of any evidence Defendants Giardina and Stambach were involved in "gathering any evidence" leading to Plaintiff's arrest, arraignment, or indictment.[56] Further, although Defendant Costantino investigated Means's homicide prior to Epps's indictment, Costantino was not involved in the photo identification procedures that led ADA Carrington to apply for the in-person lineup. Plaintiff concedes he is not asserting any malicious prosecution claim against Costantino, Giardina, or Stambach. Plaintiff's Response at 13 n. 2. Accordingly, Defendants' Motion seeking summary judgment should be GRANTED insofar as the Third and Fourth Claims are asserted against Defendants Costantino, Giardina, and Stambach.

---

[56] The court notes it was not until April 17, 1998 that Giardina and Stambach interviewed Anderson in connection with Pope's murder, well after Epps was indicted on August 7, 1997.

"'A malicious prosecution action under Section 1983 is, in essence, a claim for damages for violations of a plaintiff's Fourth Amendment constitutional right "to be free of unreasonable seizure of the person - *i.e.,* the right to be free of unreasonable or unwarranted restraints on personal liberty.'" *Washington v. Cnty. of Rockland,* 373 F.3d 310, 316 (2d Cir.2004) (quoting *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995)). A criminal prosecution is a "deprivation of liberty consistent with the concept of 'seizure,'" *Singer,* 63 F.3d at 115 - 16, is only actionable if it is "'unreasonable' within the meaning of [the Fourth] Amendment," and is only unreasonable if initiated or continued without probable cause, *Murphy v. Lynn,* 118 F.3d 938, 946 (2d Cir.1997).

"To prevail on a malicious prosecution claim under New York and federal law, a plaintiff must show: '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice.'" *Kee v. City of New York*, 13 F.4th 150, 161-62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 752 (2000), and citing *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). Fundamentally, "probable cause is a complete defense to a claim of malicious prosecution." *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003). *See Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003) (If there is "probable cause for the prosecution, ... no malicious prosecution claim can stand.").

In the instant case, it is undisputed that the first and second elements are satisfied by the fact that a criminal proceeding, *i.e.*, the criminal prosecution of Epps for the murder of Means, was commenced against Epps, and terminated in Plaintiff's favor with the vacating of his conviction on December 1, 2017. The court therefore does not

further consider the first two elements, but only the third element that the prosecution was not supported by probable cause, and the fourth element that the prosecution was based on actual malice.[57]

Plaintiff's malicious prosecution claims are premised on the allegedly photo identification procedures by which Epps was identified by Bradley as Means's killer. In particular, Plaintiff does not assert that such procedures were in themselves unduly suggestive but, rather, that Bohen and Minor failed to document that Bradley initially picked Epps's photo not out of a photo array, but "mug books" containing numerous mug shots of criminal suspects and defendants, and also failed to preserve the relevant mug books.[58] Plaintiff's Response at 16. According to Plaintiff, the failure to preserve the relevant mug books and to document such identification procedures creates a rebuttable presumption that the identification procedures were unduly suggestive which destroys probable cause for the ensuing prosecution. *Id*. at 16-17. Plaintiff maintains Bohen and Minor "created a false narrative" regarding Linda Means's statement that, upon viewing the composite sketch of the suspect, Linda Means recognized Epps and that it was based on this identification by Linda Means that Epps's mug shot was included in the photo array shown to Bradley. *Id*. at 17-18. Plaintiff further maintains that the illegality plaguing Bohen and Minor's failure to properly document Bradley's

---

[57] Although generally, the elements of a malicious prosecution claim are the same whether asserted under federal or New York law, "[f]or a malicious prosecution claim under Section 1983, a plaintiff also must demonstrate a 'sufficient post-arraignment liberty restraint.'" *Kee*, 13 F.4th at 162 (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)). In the instant case, it cannot be disputed that this additional element is satisfied by Plaintiff, who was in custody for more than two decades after his arraignment on August 7, 1997, until his conviction was vacated on December 1, 2017.

[58] Bradley's assertion that she selected Epps's photo not from a photo array, but from mug books was first asserted at Bradley's October 29, 2021 deposition given in connection with this action. *See* Plaintiff's Response at 5 (asserting that at her deposition, "Bradley gave a completely different account" regarding the procedure by which Bradley identified Epps as the one who shot Means, *i.e.*, the Bradley did not recall every seeing a photo array but only mug books).

identification of Epps through viewing mug books, failure to preserve the mug books
Bradley purportedly viewed, and the subsequent fabrication of the receipt of a report
from Linda Means that the composite sketch looked like Epps, infected Bradley's
subsequent lineup and in-court identification of Epps, thereby negating the requisite
probable cause for Epps's criminal prosecution.[59]  *Id*.  In further support of summary
judgment, Defendants argue Plaintiff's mug book argument is a "red herring" in the
absence of any facts supported by the record and, furthermore, even if Bohen and
Minor did fail to document that they showed Bradley mug books which were not
preserved, "[a] mere failure by the police to record every identification procedure they
used in an investigation cannot serve as the basis of a malicious prosecution claim."
Defendants' Reply at 2 (citing *Fappiano v. City of New York*, 2015 WL 94190, at * 13
(E.D.N.Y. Jan. 7, 2015), *aff'd* 640 Fed.Appx. 115 (2d Cir.), *cert. denied*, __ U.S. __; 137
S.Ct. 341 (2016).  There is no merit to Plaintiff's malicious prosecution claims.

        As stated, "[t]he existence of 'probable cause is a complete defense to a claim of
malicious prosecution in New York.'"  *Fappiano v. City of New York*, 640 Fed.Appx 115,
119 (2d Cir. 2016) (quoting *Savino*, 331 F.3d at 72).  The existence of probable cause
to support a criminal indictment defeats a malicious prosecution claim.  *See Stansbury
v. Wertman*, 721 F.3d 84, 90 (2d Cir.2013) ("'[A]bsent circumstances that raise doubts
as to the victim's veracity,' a victim's identification is typically sufficient to provide
probable cause.") (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.
1995)).  Nevertheless, the presumption of probable cause can be overcome by showing
"that the conduct of the police deviated so egregiously from acceptable police activity as

---

[59] Plaintiff provides no explanation how the report by Linda Means was allegedly fabricated, nor does
Plaintiff explain how such request affected Bradley's identification of Epps.

to demonstrate an intentional or reckless disregard for proper procedures . . . ." *Hill v. Melvin,* 2006 WL 1749520, at *13 (S.D.N.Y. June 27, 2006) (citing *Williams v. City of New York*, 2003 WL 22434151, at *6 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 Fed.Appx. 388 (2d Cir. 2005)). Significantly, in the absence of probable cause to support the prosecution, malice is presumed. *See Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003) ("A lack of probable cause generally creates an inference of malice.") (citation omitted). In the instant case, Plaintiff has failed to demonstrate the existence of any material issue of fact as to both the absence of probable cause required for a malicious prosecution claim, as well as the existence of a material fact showing Defendants' conduct egregiously so deviated from proper police conduct as to establish an intentional or reckless disregard for proper procedures and, thus, malice.[60]

Specifically, the record establishes legitimate identification procedures were followed in identifying Epps as the suspect. Such procedures include Bradley's deposition testimony that she could not recall whether she selected Plaintiff's photo from mug books or a photo array, Bradley's Dep. Tr. at 6-10,[61] but in any event, Bradley also testified that she was not positive that she did not select Plaintiff's photo from a photo array as opposed to a mug book, *id*. at 13-15, and admitted the signature on the back of the second photo array indicating Bradley selected Epps as the suspect was hers, *id*. at 15-17, thereby establishing Bradley selected Epps from the second photo

---

[60] The relevance to Plaintiff's malicious prosecution claim of the use of mug books, regarding Bradley's pre-trial identification of Epps, is not provided by Plaintiff. In particular, although Plaintiff argues that the use of mug books was detrimental to Epps's identification by Bradley, Plaintiff's Response at 1, 14, Plaintiff fails to explain specifically how such an identification procedure, *i.e.*, the use of mug books, was improper. Nor is there any evidence in the record that the use of mug books, assuming, *arguendo*, mug books were presented to Bradley for identifying the shooter, was an egregious deviation from the Buffalo Police Department's acceptable police activity or conduct in a homicide case. *Hill*, 2006 WL 1749520, at * 13.

[61] References to "Bradley Dep. Tr." are to the pages of the transcript of Bradley's October 29, 2021 deposition, filed as Defendants' Exh. 9 (Dkt. 78-9).

array which is enough to establish probable cause for Epps's arrest. *See Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994) ("'because an unequivocal identification of a suspect received by police from a victim or eyewitness can provide probable cause, then, assuming the information . . . relied upon was wrong, probable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information.'") (quoting *Colon v. City of New York*, 468 N.Y.S.2d 453, 455-56 (1983)).  Not only does Plaintiff not challenge the accuracy of the composite sketch, but it was only after Linda Means, the victim's aunt, contacted the Buffalo Police on June 26, 1997, and reported the composite sketch, which Linda Means saw on a local television news broadcast, looked like Epps, June 26, 1997 P-73 (Dkt. 78-34 at 2), that Bohen created the second photo array which included Epps along with photos of the five fillers who resembled Epps and Plaintiff points to no authority that such citizen cooperation constitutes legal impropriety.  Moreover, Plaintiff presents no evidence calling into question the accuracy of Linda Means's informing the police that the composite sketch looked like Epps.  Because Bohen's creation of the second photo array was predicated not on Bradley's selection of Epps's photo from a mug book, but on the tip provided by Linda Means, any improper identification procedure based on a failure to document and preserve a prior mug book identification by Bradley is irrelevant to this action.  Further, it was Bradley's selection of Plaintiff's photo from the untainted second photo array on which ADA Carrington relied in arranging for the lineup at which Bradley twice selected Epps as the perpetrator.  Bradley repeated her identification of Plaintiff before the Grand Jury, *see* Grand Jury Tr. at 10-11, 17-18,[62] which established

---

[62] References to "Grand Jury Tr." are to the pages of the portion of Bradley's testimony before the Grand Jury, filed as Defendants' Exh. 10 (Dkt. 78-10).

probable cause for Plaintiff's arrest.  *See Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003) (an "indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." (internal quotation omitted)) (italics in original).

Although the presumption of probable cause can be overcome by showing "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures . . . ," *Hill,* 2006 WL 1749520, at *13, as Defendants argue, Defendants' Memorandum at 21, Plaintiff fails to present any evidence supporting his assertion that Bradley identified Epps through some suggestive identification procedure, to wit, a mug book.  Nor does the apparent failure to include in the photo array or in-person lineup any photos or persons with pockmarks or blemishes initially described by Bradley as a facial feature of the suspect establish any failure to abide by acceptable police procedures in light of the fact that Bradley selected Epps as the suspect despite his clear complexion and raised no concern about the issue.

Plaintiff's attack on the purported use by Defendant Detectives of so-called "mug books," Plaintiff's Response at 14-17, thus fails for several reasons.  First, the use of mug books to identify perpetrators has been judicially approved.  *See United States v. Rivera*, 2019 WL 6497504, at *5 (S.D.N.Y. Dec. 3, 2019) (finding photo book from which witnesses positively identified the defendant as a criminal suspect was "merely a sequential compilation of dozens of photographs, drawn from state court and motor vehicle records and/or social media" without any "identifying language" setting any

photograph apart from the others was not unduly suggestive); *United States v. Rodriguez*, 2013 WL 6057862, at * 3 (W.D.N.Y. Nov. 13, 2013) (recommending witnesses' identification of suspect upon reviewing photo book containing 35 mug shots be upheld); *report and recommendation accepted*, No. 12-CV-45S, Dkt. 153 (W.D.N.Y. Jan. 6, 2014) (unpublished).  Second, even assuming mug books were used by Defendant Detectives, nothing in the record supports such use was a significant or "egregious" deviation from acceptable police conduct in such circumstances, let alone that it was "recklessly" employed by the Defendant Detectives as Plaintiff contends. Plaintiff's Response at 14-18.  Third, the evidence supporting Defendants used mug books to facilitate Bradley's identification of Epps is inconsistent.  The evidence relating to this issue strongly indicates that Bradley was shown two photo arrays, the second including Epps's mug shot which Bradley identified as the shooter.  While Bradley's October 29, 2021 deposition testimony in which Bradley, for the first time, asserted she identified Epps as the shooter after viewing mug books, rather than photo arrays, Bradley Dep. Tr. at 6-12, such testimony is inconsistent with Bradley's signature on the back of the second photo array and the accompanying affidavit, neither of which Bradley disputes as authentic, thereby substantially undermining Bradley's recollection concerning the use of mug books as she stated in her deposition.  *See Barrows v. Brinker Restaurant Corporation*, 36 F.4th 45, 51 (2d Cir. 2022) ("a party's declaration will not create a material issue of fact in those rare cases where it is 'blatantly contradicted by the record, so that no reasonable jury could believe it'" and "[w]here a party merely states that she cannot *recall* signing an agreement (as opposed to *denying* that she has done so), such as a declaration ordinarily fails to create a triable issue of fact." (quoting

*Scott v. Harris*, 550 U.S. 372, 380 (2007), and citing *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000)) (italics in original)). Here, significantly, Bradley did not deny she identified Epps through the use of the second photo array.

These failures render Plaintiff's assertion that accepted police identification procedures were not followed mere speculation which is insufficient to overcome the presumption of probable cause created by evidence of legitimate identification procedures as well as by the subsequent Grand Jury indictment. *See Fappiano*, 2015 WL 94190, at *13 (holding defendant police officers' failure to preserve and disclose two photo arrays from which the witness failed to select the defendant as the suspect did not obviate probable cause otherwise established by an indictment).

Based on Plaintiff's failure to establish a lack of probable cause supporting his criminal prosecution, as well as his failure to overcome the presumption of probable cause so as to establish the requisite malice, Defendants' Motion should be GRANTED as to Plaintiff's Third and Fourth Claims for malicious prosecution.

**5. Second Claim - Post-Trial Federal Substantive Due Process Violation**

Plaintiff's Second Claim alleges a denial of federal substantive due process based on Defendant Detectives' conduct following Plaintiff's conviction including Defendants Detectives' failure to disclose Anderson's exculpatory comments, and the provision of allegedly perjurious affidavits and testimony by Defendant Detectives at Plaintiff's post-conviction § 330 hearing and at Plaintiff's first § 440 hearing, causing Plaintiff to be incarcerated for more than two decades before Plaintiff was finally exonerated on December 1, 2017. Complaint, Second Claim. Plaintiff alleges that such

conduct "undercut Anderson's credibility and undermined Plaintiff's ability to fairly and effectively litigate a violation of his rights under *Brady*, as well as to strengthen the identification by Bradley." *Id*. In support of summary judgment of Plaintiff's Second Claim, Defendant Detectives argue there is no due process right to the disclosure of *Brady* material post-conviction, Defendants' Memorandum at 29, and even if such right did exist, then Defendant Detectives are qualifiedly immune from liability for any civil rights violation based on the failure to disclose any *Brady* material. Defendants' Memorandum at 29. Defendant Detectives further maintain they are entitled to absolute immunity for any statements or affidavits made in connection with Plaintiff's post-trial judicial proceedings. *Id*. at 29-30 (citing *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983), and *Sykes v. James*, 13 F.3d 515, 519-20 (2d Cir. 1993)). In opposition to summary judgment, Plaintiff argues that Defendant Detectives violated Plaintiffs' due process rights by presenting allegedly fabricated evidence, including memoranda by Bohen and Minor falsely describing how Bradley identified Epps, and the August 30, 2000 affidavits by Costantino, Giardina, and Stambach falsely stating Anderson never told them that Montgomery, not Epps, killed Means, thereby negating the existence of probably cause supporting Plaintiff's prosecution. Plaintiff's Response at 28-29. In further support of summary judgment, Defendant Detectives argue Plaintiff may not newly argue Defendant Detectives fabricated evidence, which is distinguishable from a due process claim that is based on a *Brady* violation, Defendants' Reply at 8-9, and point out that Plaintiff failed to argue in opposition to Defendant's qualified and absolute immunity claims. *Id*. at 8-9.

Insofar as Plaintiff's Second Claim is premised on Defendants' alleged failure to provide Plaintiff with Anderson's Statement after Epps was convicted, as Defendants argue, Defendants' Memorandum at 29, as discussed above, Discussion, *supra*, at 36, Anderson's Statement is devoid of any mention of Epps or of Means's murder such that not only is Anderson's Statement not exculpatory or impeachment material, but also the mere possibility that it might lead to exculpatory or impeachment material if Plaintiff's defense counsel decided to interview Anderson based on her statement and possibly learn that Anderson believed Montgomery killed Pope to prevent Pope from spreading information implicating Montgomery in Means's murder, is too remote as to be speculative which, again, will not support a *Brady* or due process violation.  *See United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."); *Jeanty v. Cerminaro*, ___ F.4th ___; 2023 WL 325012, at * 4 (2d Cir. 2023) (holding speculation that withheld photographs would create a material issue of fact was insufficient to establish the photographs were *Brady* material supporting a due process violation). Further, even if Anderson's Statement constituted *Brady* material, or became *Brady* material after Anderson spoke with Chella by telephone on July 3, 1998, Chella Dep. Tr. at 79-81, 85,[63] after conviction there is no substantive due process right to the disclosure of *Brady* material under either federal or New York law.  *See Pierre v. City of Rochester*, 2018 WL 10072453, at * 17 (W.D.N.Y. Sept. 7, 2018) ("[t]her is no freestanding substantive due process right to *Brady*-like disclosure post-conviction."

---

[63] References to "Chella Dep. Tr." are to the pages of the transcript of Chella's January 25, 2021 deposition, filed as Plaintiff's Exh. C (Dkt. 89-3).

(citing *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009), and *Ermichine v. United States*, 2011 WL 1842951, at *13 (S.D.N.Y. May 12, 2011) ("The Supreme Court has explained that the prosecutorial duty to disclose exculpatory evidence under *Brady* is a 'preconviction trial right' that does not apply post-conviction or to post-conviction proceedings . . . .")).  Moreover, Plaintiff's first § 440 motion was premised on the Anderson Affidavit dated April 29, 2000, in which Anderson specifically states that Montgomery killed Means, Anderson Affidavit at 1, a fact with which Anderson's first § 440 motion hearing testimony was consistent, yet Justice McCarthy denied Plaintiff's first § 440 motion because he found such statements by Anderson were both hearsay and not credible, September 13, 2001 Order at 2-4, which finding undermines Plaintiff's argument that had he been provided with Anderson's Statement prior to his criminal trial, Epps's attorneys could have spoken with Anderson and upon learning of Anderson's belief that Montgomery was the murderer, prepared an alternate suspect defense.  Plaintiff points to no evidence supporting the existence of a material issue of fact sufficient to create a triable issue of fact regarding this issue.  Relevantly, even if Defendant Detectives violated Plaintiff's due process rights by failing to provide Epps with Anderson's Statement prior to Epps's criminal trial for the murder of Means, then for the same reasons discussed in connection with Plaintiff's First Claim, Discussion, *supra*, at 41-43, Defendants are qualifiedly immune from liability on such claim.

Nor is there any merit to Plaintiff's further argument, Plaintiff's Response at 27-30, that absolute immunity does not shield any of Defendants from liability on the malicious prosecution claims as Plaintiff's criminal prosecution was predicated on false

statements and fabricated evidence provided by Defendants Bohen and Minor regarding the identification procedures pursuant to which Bradley selected Plaintiff as the shooter, and by Defendants Costantino, Giardina, and Stambach who falsely denied knowledge that Anderson made the exculpatory comments prior to Plaintiff's criminal trial. "[I]n litigation brought under 42 U.S.C. § 1983, all witnesses – police officers as well as lay witnesses – are absolutely immune from civil liability based on their testimony in judicial proceedings." *See Briscoe v. LaHue*, 460 U.S. 325, 329-30 (1983) (citing *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir. 1981))); *see also Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (parole officer entitled to absolute immunity for testimony, in the form of an affidavit, offered during habeas proceeding), *cert. denied*, 512 U.S. 1240 (1994). Absolute immunity, however, does not shield a defendant from liability for the falsification of statements and the fabrication of evidence prior to the activity for which Defendants claim protection by absolute immunity, here, Plaintiff's post-trial motions. *See Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) (although absolute immunity protects law enforcement officer's conduct in judicial proceedings, it does not protect a police officer's conduct that is independent of such proceedings). Accordingly, Defendants' statements provided in affidavits and testimony relative to Plaintiff's post-conviction motions are protected only if such statements are not based on falsified evidence. In the instant case, this argument, as advanced by Plaintiff, fails because there is no evidence that Defendants falsified any statements made in affidavits or testimony relative to Plaintiff's post-conviction proceedings.

Insofar as Plaintiff argues Defendants Bohen and Minor made false statements regarding how the identification process by which Epps was identified as Means's

murderer, as discussed above, Discussion, *supra*, at 49-51, no evidence in the record, other than Plaintiff's conclusory statements, supports this finding. *See Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (to avoid summary judgment, the non-moving party may not rely upon "conclusory statements or mere allegations" but must "go beyond the pleadings, and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (alterations and internal quotation marks omitted). Accordingly, this argument is without merit and Bohen and Minor are absolutely immune from liability relative to Plaintiff's post-conviction motions.

With regard to Defendants Costantino, Giardina, and Stambach, who Plaintiff maintains withheld Anderson's exculpatory comments, Plaintiff relies on the deposition testimony of Chella, who Plaintiff named as a Defendant but against whom Plaintiff has indicated an intention to withdraw his claims. *See* Background, *supra*, at 3 n. 4. In particular, on January 25, 2021, Chella who, based on the record had no prior involvement in the Means murder investigation, was deposed in connection with this action and testified that in August 2000, he signed an affidavit stating on July 3, 1998, Chella met with Anderson who told Chella that Montgomery murdered Means, and that Anderson was afraid because Montgomery had yet to be arrested for Pope's murder. Chella Dep. Tr. at 85-86, 88-89. *See also* August 3, 2000 Affidavit of Robert Chella ("Chella Affidavit"),[64] ¶¶ 4 and 6.[65] Although Chella denied having any memory of the conversation, Chella testified it would have been his practice to memorialize such conversation in a P-73 report directed to his superiors, but did not recall preparing such

---

[64] Plaintiff's Exh. DD (Dkt. 89-30).
[65] At his deposition, Chella testified that he did not recall who prepared the Chella Affidavit for his signature. *See* Chella Dep. Tr. at 84-85.

report.  *Id*. at 89-90.  No such P-73 report by Chella was presented at Chella's deposition nor is any P-73 report prepared by Chella in the record.  In his affidavit, Chella does not aver he made any report regarding his July 3, 1998 conversation with Anderson, but states he "notified my superiors and it is my understanding that they informed the District Attorney's Office."  Chella Affidavit ¶ 7.  Although a copy of the Chella Affidavit is filed in the record, nothing establishes Costantino, Giardina, or Stambach was aware of Chella's Affidavit or that Anderson ever told Chella that Montgomery murdered Means or that she wrote the Anonymous Letter.  Accordingly, other than Plaintiff's own conclusory statement which is insufficient to defeat summary judgment, *Davis*, 316 F.3d at 100, regarding this asserted conversation by Anderson with Chella, there is no basis for finding that Costantino, Giardina, or Stambach fabricated their respective affidavits by denying any knowledge, either prior to trial in 1998, or prior to Plaintiff's § 330 and first § 440 motion proceedings that Anderson was reporting Montgomery, not Epps, murdered Means so as to deny these Defendants absolute immunity based on post-conviction conduct.

Defendants' Motion should thus be GRANTED as to Plaintiff's Second Claim.

### 6.    Due New York State Constitution – Fifth Claim

Plaintiff's Fifth Claim alleges due process violations under the New York State Constitution against Defendant Detectives and the City.  Complaint, Fifth Claim.  In support of summary judgment, Defendants argue that insofar as the Fifth Claim is asserted against the City, because no individual Defendant can be held individually liable for any of Plaintiff's other claims, there is no claim for which the City can be liable under a theory of *respondeat superior*, Defendants' Memorandum at 30-31, as well as

that a *respondeat superior* claim may be asserted under the New York State

Constitution only when no other state laws provide an adequate remedy to seek redress

such as, in this case, post-conviction remedies including vacating of his criminal

conviction for the murder of means. *Id*. at 31. Because Plaintiff was not left in a

situation, as a result of Defendants' alleged wrongdoing, where there was no other

avenue for redress, Plaintiff cannot maintain a state law due process claim. *Id*. at 31-

32. In opposition, Plaintiff argues because there are no common law torts covering the

alleged fabrication of evidence or other alleged due process violations actionable under

§ 1983, courts regularly allow common law claims for violations of the State Constitution

to proceed against a municipality under *respondeat superior*, Plaintiff's Response at 30-

31, even when the individual defendant responsible for the violation is protected from

liability by qualified immunity. *Id*. at 31-32 (citing cases). In further support of summary

judgment, Defendants argue that should all of Plaintiff's federal law claims be

dismissed, then the court should refrain from exercising supplemental jurisdiction over

any claim under the New York Constitution particularly as "the extent to which New York

law allows a civil rights plaintiff to recover against a municipality for the acts of its agents

when those agents are entitled to qualified immunity is a novel issue of New York law."

Defendants' Reply at 10. *See* 28 U.S.C. § 1367(c)(1) (permitting the district court to

decline to exercise jurisdiction over a claim that "raises a novel or complex issue of

State law").

The dismissal of all claims against the individual Defendant Detectives would bar

Plaintiff's claim against the City on a theory of *respondeat superior* liability. *See Kass v.

City of New York*, 864 F.3d 200, 213-14 (2d Cir.), *cert. denied*, __ U.S. __, 138 S.Ct.

487 (2017).  *See also Jenkins v. City of N.Y.*, 478 F.3d 76, 86-87 (2d Cir. 2007) ("If the . . . defendants [are] entitled to qualified immunity under federal law, . . . judgment [is] similarly appropriate on [plaintiff's] state law false arrest claim.").  Alternatively, as Defendants argue, Defendants' Reply at 10, should the District Judge agree with the recommendation that all of Plaintiff's federal claims should be dismissed on summary judgment, the court should refrain from retaining jurisdiction over any state law claims that may remain, including Plaintiff's Fifth Claim asserting *respondeat superior* under New York law because the extent to which New York law allows a civil rights plaintiff to recover against a municipality for the acts of its agents who are qualifiedly immune from liability on the federal civil rights claim presents a novel issue of New York law.  *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the claim raises a novel or complex issue of State law . . . ."); see *also Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (recognizing court's discretion to decline to exercise supplemental jurisdiction over novel or complex state claim after dismissal of claims supporting original jurisdiction). Accordingly, such state law claims, alternatively, should be remanded to the New York courts.

**7.    Non-Moving Defendants**

As noted, Background, *supra*, at 3 n. 4, Defendants maintain that Plaintiff has agreed to dismiss all claims against Defendants Chella, Massechia, Aronica, and Riga ("the Non-Moving Defendants"), but no stipulation regarding the dismissal of the Non-Moving Defendants has been filed, nor have Defendants argued in support of summary judgment on behalf of the Non-Moving Defendants.  Accordingly, regardless of whether

the District Judge agrees with the undersigned's recommendation that Defendants'

Motion be granted, the action continues with regard to the Non-Moving Defendants;

rather, the Non-Moving Defendants will remain in the action until and unless the parties

formally stipulate to their dismissal by the filing of a stipulation for the court's

consideration.

## CONCLUSION

Based on the foregoing, Defendants' Motion (Dkt. 77), should be GRANTED.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      May 23, 2023
                Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      May 23, 2023
               Buffalo, New York