# EXHIBIT 87

```
 1              Anderson - Direct - Cotter
 2        the person from somewhere, yeah.
 3              THE COURT:  From certain clubs about the
 4        area.  In fact, Birchfield's even comes to mind.
 5              THE WITNESS:  There was another one on Main
 6        Street, another bar on Main Street.  I remember
 7        that.
 8              THE COURT:  It was that form of inquiry
 9        and the sketch that was prepared by Ms. Bradley
10        that led to the identification and prosecution
11        of Mr. Epps, which the jury confirmed by their
12        verdict.  Okay.  I have no further questions.
13        Thank you.
14              THE WITNESS:  Thank you.
15              THE COURT:  Yes.
16              MR. COTTER:  Call Wymiko Anderson.
17  W Y M I K O    A N D E R S O N , having been duly sworn,
18  testified as follows:
19              THE CLERK:  Please state your name for the
20        record, spelling your first and last name.
21              THE WITNESS:  Anderson, Wymiko.
22              THE CLERK:  Pardon?
23              THE WITNESS:  Wymiko, W-Y-M-I-K-O.
24              THE CLERK:  City, town or village in which
25        you reside?
```

EXHIBIT
105
8/11/21

EXHIBIT
P.I.f. 15
6·8·22 kB
PENGAD 800-631-6989

EPPS 01912

Dixon-008464

```
 1                    Anderson - Direct - Cotter

 2              THE WITNESS:  Buffalo, New York.

 3              THE CLERK:  Thank you.

 4   DIRECT EXAMINATION BY MR. COTTER:

 5        Q.    Ms. Anderson, you're here pursuant to a

 6   subpoena?

 7        A.    Yes.

 8        Q.    And you know that you're going to be asked a

 9   series of questions that touch on when Paul Pope was

10   killed?

11        A.    Yes.

12        Q.    Okay.  If I can, ma'am, what I'd like to do

13   would be to turn your attention back to the late evening

14   hours of April 16th, 1998.  Do you recall that date?

15        A.    Yes.

16        Q.    Okay.  Can you tell the Judge why you remember

17   that day specifically and --

18        A.    That was the day my boyfriend was killed.

19        Q.    Do you recall approximately what time of day

20   you learned -- well, who was your boyfriend?

21        A.    Paul Pope.

22        Q.    And approximately what time of day did you

23   learn that Paul Pope had been killed?

24        A.    It was like 11 at night.

25        Q.    Eleven in the evening.  Do you recall where
```

EPPS 01913

Dixon-008465

```
 1                  Anderson - Direct - Cotter
 2   you were?
 3        A.    I was at home.
 4        Q.    What address was that?
 5        A.    239 Dewey.
 6        Q.    What did you do when you learned?
 7        A.    Cried.
 8        Q.    Shortly after that and shortly after learning,
 9   did you go anywhere?
10        A.    I went to my mother's house, after we left
11   from the morgue.
12        Q.    After you left from the morgue?
13        A.    Mm-hmm.
14        Q.    Do you recall about what time that would have
15   been?
16        A.    About 3, between 3 and 4 o'clock in the
17   morning.
18        Q.    And then you went to your mother's house?
19        A.    Yes.
20        Q.    Where did she live?
21        A.    1270 Fillmore.
22        Q.    And do you recall -- when was the first time
23   -- hang on a second.  After you got to your mother's
24   house, were you contacted by the Buffalo Police?
25        A.    Yes.
```

```
 1                    Anderson - Direct - Cotter
 2        Q.    How did that happen?
 3        A.    Well, actually, the alarm -- they went into my
 4   house and the alarm went off and the alarm contacted my
 5   mother house because that was the emergency number; and
 6   we -- they got on the phone and I was talking to them
 7   and they asked me, would I come down to answer some
 8   questions.  So then they -- the detectives came over
 9   there and then I went downtown with them.
10        Q.    Let me just back you up a little bit.
11        A.    Okay.
12        Q.    You're at your mother's house --
13        A.    Yes.
14        Q.    -- at 1270 Fillmore?
15        A.    Yes.
16        Q.    And the alarm, alarm to your house at 239
17   Dewey went off and then rang to your mother's house?
18        A.    Right.
19        Q.    Did the police call your mother's house?
20        A.    No.  The alarm people called and I guess they
21   must have told them who they were, the homicide people,
22   Stambach and I forgot the other guy's name.
23        Q.    The first name was Stambach?
24        A.    I don't remember if that was his last or first
25   name.  I just know it was Stambach.
```

EPPS 01915

Dixon-008467

```
 1                 Anderson - Direct - Cotter

 2         Q.    Okay.  At some point shortly after that did

 3   detectives come to your mother's house?

 4         A.    Yes.

 5         Q.    How many were there?

 6         A.    Two.

 7         Q.    And do you recall about what time of the

 8   morning this was?

 9         A.    About 6, 6 or 7, around then.

10         Q.    And did you go anywhere with them?

11         A.    Is it headquarters, I think it is, or -- yeah,

12   I went down there to the homicide, to their office.

13         Q.    Buffalo Police Homicide office?

14         A.    Yes.

15         Q.    When you were pointing, indicating that it's

16   somewhere near this courtroom?

17         A.    I can't hear you.

18         Q.    When you're pointing with your thumb, are you

19   indicating that it's someplace near this courtroom?

20         A.    Yeah.  I think that's it right there across

21   the street.

22         Q.    Okay.  Do you recall how long you were at the

23   Homicide Bureau?

24         A.    About an hour.

25         Q.    Okay.  And if you can tell me, what happened
```

Dixon-008468

```
 1                  Anderson - Direct - Cotter
 2  while you were there?  Let me back up a second.  What did
 3  the police tell you that they wanted you to do?
 4       A.    Give them a statement.
 5       Q.    And do you know what -- what was the statement
 6  regarding, what was it about?
 7       A.    My boyfriend, Paul Pope.
 8       Q.    Now, had you seen Paul Pope during the day on
 9  April 16th, '98?
10       A.    Yes.
11       Q.    Did the police ask you questions?
12       A.    When I went down there, yes.
13       Q.    Yes.  Do you recall what any of the questions
14  were?
15       A.    Yes.
16       Q.    Could you tell me what some of them were?
17       A.    Who was Paul to me?  What does Russell look
18  like?  How long have I known Russell?  When was the last
19  time I seen Paul?  What time did I see Paul?  Do I know
20  if Paul went to see Russell for anything?  Can I read?
21       Q.    Now, during the course of the time when the
22  police were asking you questions, the two cops, were
23  either of them typing?
24       A.    Yeah, sometimes.
25       Q.    Okay.  Did you see either one of them writing
```

EPPS 01917

Dixon-008469

```
 1                  Anderson - Direct - Cotter
 2   with a pen?
 3        A.    I really didn't pay it any attention.
 4        Q.    Okay.  I'm going to show you what's been
 5   marked as Defendant's Exhibit 3 for identification.  Can
 6   you look at that and tell me if you recognize it?
 7        A.    Yes.
 8        Q.    Okay.  What do you recognize it as?
 9        A.    This is my statement that I had gave to them.
10        Q.    Back on April 17th --
11        A.    Yes.
12        Q.    -- 1998.  Okay.  I'll take it back.  Thanks.
13   Now, do you recall the police asking you what Russell
14   Montgomery looked like?
15        A.    Yes.
16        Q.    Do you recall what your response was?
17        A.    I said, did you see that sketch that they had
18   on the news of the guy who killed Tomika Means?  That's
19   him.
20        Q.    Okay.  And that was on April 17th, '98?
21        A.    Yes, it was.
22        Q.    I'm going to show you what's been marked for
23   identification as Defendant's 1 and ask you if you
24   recognize that?
25        A.    Yes.
```

                     Anderson - Direct - Cotter

1
2       Q.    Yes, you do.  What do you recognize
3   Defendant's 1 as?
4       A.    Russell.
5       Q.    Well, is Defendant's 1 the same sketch that
6   you were referring to when you responded to the police
7   question, what does Russell look like?
8       A.    Yes.
9       Q.    Okay.  Now, can you tell the Judge what the
10  police did when you said -- when you gave -- when you
11  said that Russell is the person in that sketch?
12      A.    What they did or what they said?
13      Q.    First what they did.
14            MR. SCHWEGLER:  Objection, Your Honor, as
15        to what they did.  This witness could specify.
16            THE COURT:  Yes, if we can identify who is
17        speaking, we should try.
18            THE WITNESS:  What Mr. Stambach said?  I
19        don't know the other guys.  I could describe
20        them to you.
21            THE COURT:  Rephrase your question.
22            MR. COTTER:  Okay.
23      Q.    Ms. Anderson, do you know the names of the two
24  police officers who were in the room when you gave the
25  response about the identi-sketch?

```
 1              Anderson - Direct - Cotter
 2       A.    Only the one.
 3       Q.    You know one of them.  What was his name?
 4       A.    By name?
 5       Q.    What was his name?
 6       A.    Stambach.
 7       Q.    What did he look like?
 8       A.    He was pretty tall, light, light -- I don't
 9  know if they were blue eyes or green, older guy, about in
10  his late 40s, early 50s, clean-shaved face.
11       Q.    How about the other gentleman, was the other
12  person a male?
13       A.    Yes, he was.
14       Q.    What did the other person look like?
15       A.    He kind of -- about 5'11".  He was kind of
16  round.  He had thinned-out hair up here, shirt, khakis.
17  He about 250, 260.
18       Q.    You don't know his name?
19       A.    No.
20       Q.    After you responded to their question, what
21  does Russell look like, did either of the two police
22  officers say anything?
23       A.    What makes you say that?  Well, why are you
24  just --
25       Q.    If you can identify which officer?
```

EPPS 01920

Dixon-008472

30

| | | |
|---|---|---|
| 1 | | Anderson - Direct - Cotter |
| 2 | A. | The little round one. |
| 3 | Q. | The one whose name is not Stambach? |
| 4 | A. | Right. |
| 5 | Q. | Right? |
| 6 | A. | Right. |
| 7 | Q. | Do you recall what he said? |
| 8 | A. | Why did you wait this long to say something |
| 9 | about it? |
| 10 | Q. | Okay. Did that officer say anything more at |
| 11 | that time? |
| 12 | A. | No. |
| 13 | Q. | Okay. How about the one with the name of |
| 14 | Stambach? |
| 15 | A. | No. Well -- |
| 16 | Q. | Did either officer do anything? |
| 17 | A. | They left out the room. |
| 18 | Q. | Okay. And do you recall, did they ultimately |
| 19 | come back in the room? |
| 20 | A. | Yes. |
| 21 | Q. | Okay. How long were they out of the room? |
| 22 | A. | For about a good three, four minutes, tops. |
| 23 | Q. | Was anyone left in the room with you? |
| 24 | A. | No. |
| 25 | Q. | Do you remember whether or not -- okay. If |

EPPS 01921

Dixon-008473

```
1                Anderson - Direct - Cotter
2   you could just describe for the Judge what you remember
3   the process being when this statement was typed.  Okay.
4   Did you type it?
5        A.    No.
6        Q.    Did one of the two officers who was in the
7   room type it?
8        A.    Yes.
9        Q.    Okay.  Were they in the process of typing your
10  statement when you gave the response to, what does
11  Russell look like?
12       A.    Yes.
13       Q.    Now, either -- now, before the officers left
14  the room, did they ask you any other questions about
15  Russell Montgomery and Tomika Means?
16       A.    No.
17       Q.    When they came back in the room, did they ask
18  you any questions about Russell Montgomery and Tomika
19  Means?
20       A.    Well, they didn't ask me anything.  They just
21  told me something.
22       Q.    What did they tell you?
23       A.    They pretty sure they got the right guy
24  because all the evidence points to him, and I then told
25  them no.
```

EPPS 01922

Dixon-008474

```
 1                      Anderson - Direct - Cotter
 2              MR. SCHWEGLER:  Objection to they.  If she
 3          can specify.
 4              THE WITNESS:  Mr. Stambach and the other
 5          officer, I don't know his name.
 6              MR. SCHWEGLER:  I'm not clear, Your Honor.
 7          Did both of them say it?  You know, I don't know
 8          who said what.
 9              THE COURT:  Nor do I, not having been
10          there.  If she can identify the speaker, she
11          should.
12      Q.    Do you understand what the Judge just said?
13  I'll try to clean it up.
14      A.    Okay.
15      Q.    Now, can you tell the Judge which officer said
16  what to you?
17      A.    Stambach, he said he's pretty sure that they
18  got the right guy because the evidence point to him.
19  Then I, Wymiko Anderson, stated, no, he did not do that.
20  Russell killed that boy.  I said, look at both of them.
21  They look just alike.  Then they asked me --
22      Q.    Which one asked you?
23      A.    Stambach.
24      Q.    Okay.  What did he ask you?
25      A.    Did you know Cory?  No.
```

EPPS 01923

Dixon-008475

 1                  Anderson - Direct - Cotter

 2        Q.    Do you know Cory Epps?

 3        A.    No.

 4        Q.    Now, you're positive that this was on April

 5   17th, 1998?

 6        A.    Yes.  I never forget it.

 7        Q.    And it was during the course of the period of

 8   time when you were giving a statement relative to your

 9   boyfriend, Paul Pope's killing?

10        A.    Right.

11        Q.    Now, you've indicated that at some point in

12   the very early -- well, it's around dawn, 6 o'clock, 7

13   o'clock at this point in time?

14        A.    Right, when I went down there.

15        Q.    Do you remember what time you went home?

16        A.    Close to 9 o'clock.

17        Q.    Before you left, did the officers ask you to

18   sign -- well, hang on a second.  After the officers came

19   back into the room, did they continue typing --

20        A.    Yes.

21        Q.    -- and continue taking the statement?

22        A.    Right.

23        Q.    And that's the statement that's in front of

24   you as Defendant's 3?

25                  THE COURT:  I'm just looking to see if it's

EPPS 01924

Dixon-008476

Anderson - Direct - Cotter

1    the same copy that I have and, of course, it

2    isn't.  I only have but the first page that's

3    contained in the response to your subpoena.

4

5    MR. COTTER:  Judge, if I can, for purposes

6    of clarification, that statement was submitted

7    in -- as part of an exhibit or as an exhibit

8    in a People's reply, I believe, to the second

9    supplemental affirmation and it is either

10   Exhibit L or S to something that was received by

11   you in November of 2000.

12   THE COURT:  I don't question that --

13   MR. COTTER:  Okay.

14   THE COURT:  -- as being submitted.  What

15   I'm questioning is that the exhibit that was

16   sent to the Court in conjunction with your

17   subpoena has attached to it a one-page statement

18   of this witness.  It does not contain page two

19   and page three and her signature.  That's all

20   I'm saying.

21   MR. COTTER:  Okay.

22   THE COURT:  We, presumably, have the

23   complete exhibit here somewhere, but it wasn't

24   in the envelope that I received pursuant to

25   subpoena.  I have but the single statement.  So

Dixon-008477

```
 1                    Anderson - Direct - Cotter
 2        the balance of it is not before me, as yet,
 3        other than in the pleadings.  Okay.  And I'm
 4        sure we'll review it and its importance and
 5        what's in it and what's not in it.
 6             Okay.  Just let me look at it for a minute
 7        because I had read only up to the bottom of page
 8        one in which she was being questioned about
 9        Mr. Pope and his leaving.  Did he have any money
10        on him?  I thought he had 25 left with him.  I
11        don't know.  Let me just review the balance.
12        Communications about whether he had a beeper or
13        not.  Was a question, can you describe Russell
14        to me?  And a response as stated in the
15        affidavit reads, he is a black male, light
16        skinned to medium, has a lot of hair on his
17        face, a beard, but sometime he shaves.  He is
18        a big dude up on top.  He's about 25 and he is
19        about 5'10", 5'9" and about 250 to 285 pounds.
20        Statement goes on to suggest that she tried to
21        call him on his cell phone --
22             THE WITNESS:  Mm-hmm.
23             THE COURT:  -- in the early evening.
24        Indicating that she stopped paging him about 9
25        or so.  Discussion about his occupation of drug
```

```
 1              Anderson - Direct - Cotter
 2         sale --
 3              THE WITNESS:  Mm-hmm.
 4              THE COURT:  -- and his association with
 5         Paul Pope.  Okay.  I have a refreshed view of
 6         the affidavit as submitted.
 7              The last thing I have noted is that she did
 8         not know Cory Epps.
 9  BY MR. COTTER:
10      Q.    Now, Ms. Anderson if you can, can you tell me
11  or tell the Judge how it is that you recall Detective
12  Stambach's name?
13      A.    How I remember his name?
14      Q.    Yes.
15      A.    Because I -- when I get headaches, they got an
16  aspirin called Stand Back.  And his name is Stambach.  So
17  that's how I remember it.  It's like an over-the-counter
18  aspirin, crushed up.
19      Q.    Now, when you were in the room with the
20  homicide detectives back on April 17th of '98, are you
21  aware of how far through your statement they were when
22  they got up and walked out of the room?
23      A.    When they asked, what does Russell look like.
24      Q.    Correct.
25      A.    That's when.
```

Anderson - Direct - Cotter

1

2      Q.    Okay.  Do you remember where they were on

3  these three typed pages?

4      A.    No, no.

5      Q.    Now, do you recall them asking you either --

6  and direct your attention to the third page of it and the

7  second last question -- second question -- second last

8  question is where they're asking you to read it and if

9  everything in it is correct.  Do you see that?

10     A.    Yes.

11     Q.    Did you say anything to the homicide

12 detectives about the absence of the information you gave

13 about Russell Montgomery?

14     A.    No.

15     Q.    Now, I think you indicated before that at some

16 point around 8 o'clock or 9 o'clock you left homicide and

17 went home?

18     A.    Right.  They took me.

19     Q.    They took you?

20     A.    Well, Stambach took me.

21     Q.    He drove you, do you recall where?

22     A.    Back to 1270 Fillmore.

23     Q.    Your mother's house?

24     A.    Yes.

25     Q.    Now, shortly -- did you go to Buffalo Police

```
 1                  Anderson - Direct - Cotter
 2   Headquarters again in the near future?
 3        A.    Yes.
 4        Q.    Okay.  Do you recall approximately when that
 5   was?
 6        A.    Which time?
 7        Q.    Well, the next time after April 17th.
 8        A.    I went down there with my aunt's boyfriend,
 9   Melvin.  He had to give them a statement about Paul.
10        Q.    Do you recall when that was?
11        A.    That was probably like a day or two after, not
12   very long.
13        Q.    And did the homicide cops ask you any
14   questions or did anybody ask any questions of you on the
15   second trip down there when you went with Melvin?
16        A.    No.
17        Q.    For the record, do you remember Melvin's last
18   name?
19        A.    Calhoun.
20        Q.    Now, after -- that puts us up to April 19th or
21   20th of 1998.  Did you again have more contact with the
22   homicide detectives?
23        A.    Well, I was calling them periodically to check
24   up on the status of Paul's case.
25        Q.    Okay.  Do you know who you would call?
```

EPPS 01929

Dixon-008481

```
 1              Anderson - Direct - Cotter
 2       A.    Well, at first I started off calling
 3  Mr. Stambach because he was the one that took me down and
 4  gave me this -- took me down to take my statement.
 5       Q.    And did you ever go back to police
 6  headquarters after April 20th --
 7       A.    Yes.
 8       Q.    -- '98.  Okay.  Did you ever provide
 9  subsequent statements to homicide?
10       A.    Yeah.  That's when I told them that I was the
11  one that wrote the letter.
12       Q.    Okay.  I --
13             MR. SCHWEGLER:  Objection.  Once again, I
14        don't know who she told, told them.
15             THE COURT:  I agree.  I don't have a date,
16        time or place.  To the extent that it can be
17        obtained, it should be.
18       Q.    Ms. Anderson, showing you what's been marked
19  as Defendant's 5 for identification, can you look at that
20  and tell me if you recognize it?
21       A.    Can I?  This is my handwriting.
22       Q.    Okay.  Can you tell the Judge what it is?
23       A.    This is the letter that I had wrote to Cory's
24  lawyer.
25       Q.    Do you recall when you wrote it?
```

```
 1                    Anderson - Direct - Cotter

 2        A.    On the 27th.

 3        Q.    Of what month?

 4        A.    4/27/98.

 5        Q.    And I believe in earlier testimony you

 6   indicated that you told someone at least from the Buffalo

 7   Police Department that you wrote that letter?

 8        A.    Yes.

 9        Q.    Okay.  Do you recall first who you told?

10        A.    I told -- I told Mr. Chella that day.  That's

11   when he was, like, well, would you like to come down

12   here, tell me something about it.  And I say, sure, I

13   come down there and I went, me and my aunt.  My aunt came

14   down there with me, but she didn't go in the room with

15   me.  It was just me and --

16        Q.    Do you recall when that was?

17        A.    I don't know the actual date, but it was like

18   probably a day or two after this was on the news.

19        Q.    Okay.  Do you recall if Chella called you or

20   if you called Chella?

21        A.    I called him.

22        Q.    And were there any other detectives present

23   when you told Chella that you wrote the letter?

24        A.    Well, actually, I told him over the phone, but

25   when I then got down there, I didn't tell him.  It was,
```

```
 1                    Anderson - Direct - Cotter
 2   like, one, two, three, four -- four to five of them in
 3   there.
 4        Q.    Okay.
 5        A.    I don't know all their names, but I know what
 6   they look like.
 7        Q.    Could you describe them?
 8        A.    One is a very, very light-skinned man.  He was
 9   the one.
10              THE COURT:  Presumably, the witness is
11         referring to somebody who just stuck his head in
12         the door.
13              MR. SCHWEGLER:  Sergeant Costantino.
14              THE COURT:  Who might that be?
15              MR. SCHWEGLER:  Sergeant Costantino.
16              THE COURT:  Is that who you referred to --
17              THE WITNESS:  Yes.
18              THE COURT:  -- when you said, he's one of
19         them?
20              THE WITNESS:  I'm sorry, sir.  Yes.
21              THE COURT:  Detective Costantino?
22              THE WITNESS:  Detective Costantino.  Then
23         there was one, he looked like he was mixed, very
24         high yellow, thin hair, glasses.
25        Q.    Just to clear up the record, Ms. Anderson,
```

Dixon-008484

```
 1                   Anderson - Direct - Cotter
 2   when you say he looked like he was mixed, can you explain
 3   what that means?
 4        A.    I'm sorry.  Like he might be black and white.
 5        Q.    Okay.  Of mixed race?
 6        A.    Right.
 7        Q.    Okay.  And how about any of the other ones, do
 8   you recall what they looked like?
 9        A.    The black one wasn't in there.  It was very
10   blurry.  I remembered him because he was kind of nasty
11   towards me.  So the others --
12        Q.    Ms. Anderson, when you just said, I remember
13   him because he was kind of nasty, you pointed back to the
14   door.  Were you referring to --
15        A.    Costantino.
16        Q.    You were referring to Sergeant Costantino?
17        A.    Yes.
18        Q.    Where did this conversation take place?
19        A.    At headquarters, I think it is, in their
20   office.
21        Q.    Do you recall any of the detectives telling
22   you and if -- okay.  Let me back up a second.  The day
23   that you told the detectives that you wrote the letter --
24        A.    Right.
25        Q.    -- did any of the detectives say anything to
```

EPPS 01933

Dixon-008485

```
 1                  Anderson - Direct - Cotter
 2   you?
 3        A.    Well --
 4        Q.    Yes or no?
 5        A.    Yes.
 6        Q.    Okay.  Can you recall which detective said
 7   anything to you?
 8        A.    I don't know his name and I hate to say the
 9   mixed one.
10        Q.    Okay.
11        A.    Him.  He said -- well, first, he sent a few of
12   them out.  He said, Wymiko, I know you believe this, but
13   we need more than just your hearsay to say that he's --
14   that Russell did this.  I said, well, that's all I really
15   have, you know.  He said, well, Paul is not here to
16   defend hisself, so like it's your word against his.  And
17   I said, well, you can take it how you want because I know
18   the truth.  And then he said, well, I admit they do look
19   a like.  I said see.  You know, see.  So he was like,
20   well, but it's still just hearsay.  You don't know what
21   the gun looked like.  You don't know where they put the
22   gun.  Then I was like, no.
23        Q.    Okay.  Back on April 17th of '98, when you
24   were giving your statement in Paul's case, Mr. Pope's
25   case, did you mention anything about the gun on that day?
```

EPPS 01934

Dixon-008486

```
 1                      Anderson - Direct - Cotter

 2       A.    No.

 3       Q.    Now, after -- going back to the day, now, when

 4   you told the police that you wrote the letter, did any of

 5   the other detectives say anything to you about the Cory

 6   Epps case?

 7       A.    The Costantino guy said something, but it was

 8   in one ear, out the other, because he was very rude.  So

 9   it was, like, no.  It was really the -- I don't know his

10   name, the very light-skinned guy.  He was pretty nice.

11   That's how I remember him.  So I said I would prefer to

12   do the talking with him.

13       Q.    Now, showing you Defendant's 2 for

14   identification, can you look at that and tell me if you

15   can identify it?

16       A.    This is my information.

17       Q.    Do you remember when you wrote that or when

18   you signed that?

19       A.    Yes.

20       Q.    When was that?

21       A.    In '98.  No, no, no, no, no.  '99, after

22   Paul's trial, like a -- probably not even a week later.

23       Q.    Okay.

24       A.    He came to my house.

25       Q.    Did you sign that in front of somebody?
```

```
 1                  Anderson - Direct - Cotter

 2       A.      In front of him, Mr. Putnam.

 3       Q.      Okay.

 4               THE COURT:  This is the statement you gave

 5          to Roger Putnam, is that it?

 6               MR. COTTER:  Correct, Judge.

 7               THE COURT:  Investigator.  As to what date?

 8               MR. COTTER:  The actual date is 4/29/2000.

 9               THE COURT:  It's part of the pleadings?

10               MR. COTTER:  Correct.

11       Q.      Now, if I can ask you just a couple of

12  questions about that statement that you gave to Roger

13  Putnam.  Now, I'm going to draw your attention to the

14  second page and to the tenth line down.  Do you see a

15  sentence that begins with, I told the two -- looks like,

16  I told the police I wrote the letter which is attached.

17  Do you remember that?

18       A.      Yeah.

19       Q.      Okay.  Just to be clear, Ms. Anderson, you

20  didn't tell the police on April 17th that you wrote the

21  letter?

22       A.      No.  I didn't even write the letter then.

23       Q.      Okay.  So even in your statement that you gave

24  to Roger Putnam, you're talking about two different

25  times; at least two different times when you talked to
```

```
1                    Anderson - Direct - Cotter
2    the police?
3         A.    Right.
4              MR. SCHWEGLER:  Object to this leading,
5         Judge.
6              THE COURT:  Sustained.
7         Q.    Does this statement that you gave to Roger
8    Putnam refer to more than one conversation with the
9    police?
10        A.    Wait.  To more than one conversation did I
11   have with the police?
12        Q.    Correct.
13        A.    I don't think so.  I didn't read it all the
14   way through just yet, but I just told him that I did, in
15   fact, tell the police that I was the one that wrote the
16   letter and I did tell them that Russell did kill Tomika
17   -- Nicole.
18              THE COURT:  Well, you have no personal
19         knowledge, do you, of whether or not Cory Epps
20         or Russell Montgomery killed Tomika Means?
21              THE WITNESS:  Do I have any knowledge?
22              THE COURT:  Any personal knowledge of your
23         own.
24              THE WITNESS:  No.
25              THE COURT:  What you have, then, is what
```

EPPS 01937

Dixon-008489

```
 1              Anderson - Direct - Cotter
 2          you claim to have heard from Paul Pope, who is
 3          now dead?
 4              THE WITNESS:  He told me, yes.
 5              THE COURT:  He told you what somebody told
 6          him?
 7              THE WITNESS:  Pretty much.  That's why they
 8          said they needed more than hearsay.  Since Paul
 9          is dead, there is no way that they can, you
10          know, get it together.  And they didn't ask me
11          why I waited so long.  I told them.
12     Q.    Tell me now, why did you wait so long?
13     A.    Paul told me not to tell nobody about that
14 because it could get him killed and I said, well, Paul,
15 that's Keion's girlfriend.  And me and Kei --
16     Q.    Who is Keion's girlfriend?
17     A.    Nicole -- Tomika Means.
18     Q.    Okay.  Who is Keion?
19     A.    Keion is one of my good friends.
20     Q.    Does Keion have a last name?
21     A.    Edwards.
22     Q.    And do you know -- well, so go ahead.  I'm
23 sorry.
24              THE COURT:  Well, let's not go ahead.
25          Let's get some formulation here of claimed
```

EPPS 01938

Dixon-008490

```
 1                    Anderson - Direct - Cotter
 2          information.  The thrust of this hearing is to
 3          determine whether she did or did not advise the
 4          police of this alleged information and when she
 5          did it, if she did it, and what information was
 6          provided.  That's the thrust of this hearing.
 7          So far or most recently I have that she told the
 8          police that she was the author of the letter and
 9          that they questioned her about that some time
10          after 4/27/98, and that she provided to you or
11          your investigator somewhere around 4/29/2000
12          such information.  What's the next question?
13               MR. COTTER:  Okay.
14      Q.    Ms. Anderson, going back to April 17th of
15  1998, did you tell the police any other information about
16  Russell Montgomery being involved in the killing of
17  Tomika Means?
18      A.    What do you mean, other than what I told you?
19      Q.    Yes, so far today.
20      A.    Well, him and Paul left that morning.
21      Q.    Did you describe that for the police officers
22  on April 17th?
23      A.    Yes, yes.
24      Q.    Okay.  When you say, when him and Paul left
25  that morning, what morning were you talking about?
```

EPPS 01939

Dixon-008491

```
 1                   Anderson - Direct - Cotter

 2        A.    It had to be like the day after -- well, that

 3   morning, because Nicole was killed -- well, Tomika was

 4   killed around 4:30 in the morning.  Russell came over our

 5   house at 9 o'clock, between 9 and 9:30.

 6        Q.    Okay.  If I may interrupt for a second.

 7   Russell came over to your house --

 8        A.    Mm-hmm.

 9        Q.    -- on the same day that Tomika Means was

10   killed?

11        A.    Yes.

12        Q.    And you indicate that that's around 9 or 9:30

13   on the same morning?

14        A.    Right.

15        Q.    And what did you tell the police happened?

16        A.    He came in.  Then him and Paul left out,

17   because Paul was still in the bed.

18        Q.    Who came in?

19        A.    Russell.

20        Q.    And what happened next?

21        A.    Him and Paul left out.  I don't know what they

22   did when they left out.  But when he came back in, that's

23   when he had told me, Russell -- he said it just like

24   this, yo, man, Russell killed Keion girl.  And I was

25   like, oh, no.
```

EPPS 01940

Dixon-008492

```
1                   Anderson - Direct - Cotter
2          Q.     Did you tell the police this on April 17th?
3          A.     Yes.
4          Q.     And this is to Detective Stambach and the
5    other one?
6          A.     Right.
7          Q.     Now, you have used several times the names
8    both Nicole and Tomika Means at the same time.
9          A.     Well, her name, real name is Tomika Means, but
10   her nickname is Tomika Nicole Means.  We just called her
11   Nicole.
12         Q.     So you're referring to the same person?
13         A.     Right.  I'm sorry.
14         Q.     On April 17th of '98, after you told the
15   police about Russell coming over to your house at around
16   9 o'clock or 9:30 in the morning, did they ask you any
17   more questions or did either officer say anything?
18         A.     No.  They asked me if I knew where the gun was
19   and I said no, I didn't see any gun; I didn't know what
20   they did with it.
21         Q.     Now, is there anything else that you told the
22   police back on April 17th of 1998, regarding Russell
23   Montgomery's involvement or information about his
24   involvement in the death of Tomika Means?
25         A.     Other than he said he was sorry.
```

EPPS 01941

Dixon-008493

```
 1                  Anderson - Direct - Cotter
 2       Q.    Who said he was sorry?
 3       A.    Russell.
 4       Q.    Did you tell that to the police?
 5       A.    Yeah.
 6       Q.    And you're positive that was on April 17th --
 7       A.    Yes.
 8       Q.    -- 1998?
 9       A.    '98.
10             THE COURT:  You're not quoting Russell
11       Montgomery at this point, are you?  You're
12       quoting Mr. Pope as saying Montgomery was sorry?
13             THE WITNESS:  Right, right.
14       Q.    Ms. Anderson, have you ever testified before?
15       A.    Yes.
16       Q.    Can you tell this Judge when?
17       A.    Paul Pope's murder.
18       Q.    Who called you as a witness in that case?
19       A.    Mr. Mordino.
20       Q.    From the DA's Office?
21       A.    Yes.
22       Q.    And you did testify?
23       A.    Yes.
24             MR. COTTER:  Nothing further, Judge.  Oops,
25       if I can.
```

```
 1              Anderson - Direct - Cotter
 2       Q.    Showing you what's been marked as Defendant's
 3  -- for identification, Defendant's 4.  It's a picture of
 4  an individual.  Do you recognize the individual?
 5       A.    Yes.
 6       Q.    What is that person's name?
 7       A.    Russell.
 8       Q.    Do you know his last name?
 9       A.    Montgomery.
10            MR. COTTER:  Okay.  Judge, if I can, this
11        is Defendant's 4.  I believe that other part of
12        the matter that was turned over to the Court
13        pursuant to the subpoena is the lower portion of
14        what I take this picture to be.
15            THE COURT:  That's correct.  Do you want
16        this marked --
17            MR. COTTER:  I'd prefer it.
18            THE COURT:  -- rather than the copy.
19            (Whereupon, a photograph was marked
20        Defendant's Exhibit 6 for identification.)
21            MR. COTTER:  I'm sorry, ma'am?
22            THE WITNESS:  That's Russell.
23            MR. COTTER:  That's Russell Montgomery.
24        Nothing further, Judge.
25            MR. SCHWEGLER:  I would request all
```

```
 1              Anderson - Cross - Schwegler
 2          materials pursuant to 240.44 and 240.45, please.
 3   CROSS-EXAMINATION BY MR. SCHWEGLER:
 4      Q.    Ms. Anderson, good afternoon.
 5      A.    Hi.
 6      Q.    How are you?
 7      A.    Doing.
 8      Q.    Ms. Anderson, before we get into your visits
 9   to homicide, let me ask you, have you, yourself, ever
10   been convicted of a crime, ma'am?
11      A.    I can't hear you.
12      Q.    Have you ever been convicted of a crime,
13   ma'am?
14      A.    No.
15      Q.    You have not.  Okay.  In addition to speaking
16   with homicide about -- Homicide Squad concerning the
17   death of Paul Pope, have you on occasion contacted
18   members of the Buffalo Police and given them information
19   on other matters?
20      A.    Yes.
21      Q.    How many times?
22      A.    Twice.
23      Q.    What were those matters related to?
24      A.    Reuben Bail.
25      Q.    And the other one?
```

Dixon-008496

```
 1                    Anderson - Cross - Schwegler
 2         A.    Lizzy and Marve, Lizzy and Marve.
 3         Q.    Who would you speak with at homicide when you
 4    would call?
 5         A.    I liked Chella sometimes.
 6         Q.    Do you have a relationship with Sergeant
 7    Chella outside of that which was developed as a result of
 8    your involvement in the Paul Pope homicide?
 9         A.    You mean, a personal relationship?
10         Q.    Well, professional relationship in terms of
11    providing information to him specifically as a police
12    officer?
13         A.    Well, yeah.
14         Q.    Would you ask for him when you called or would
15    you speak with anyone who happened to pick up the phone?
16         A.    I would ask for Mr. Chella.
17         Q.    All right.  Your relationship with him was a
18    good one?
19         A.    Mediocre, I guess.
20         Q.    You trusted him?
21         A.    I don't trust anyone, sir.
22         Q.    You don't trust anyone?
23         A.    No.
24         Q.    I'm going to take these from you for a moment.
25    Ma'am, on April 17th you gave a statement to two homicide
```

Dixon-008497

```
 1              Anderson - Cross - Schwegler
 2   detectives, witnessed by Detective Giardina.  Does that
 3   name ring a bell with you at all?
 4        A.    The name sounds familiar, but I can't place
 5   the face with a name.
 6        Q.    But you know Detective Stambach was there at
 7   that time, correct?
 8        A.    Yes.
 9        Q.    And you've identified Defendant's Exhibit 3 as
10   the statement you gave to those detectives or at least to
11   Detective Stambach --
12        A.    Yes, sir.
13        Q.    -- on -- that was on April 17th of 1998?
14        A.    Yes, sir.
15        Q.    Okay.  And you said they were typing as you
16   were giving your statement in response to their
17   questions; is that right?
18        A.    Yes.
19        Q.    Okay.  At the conclusion of that statement did
20   they ask you to read the statement to see if it was
21   correct?
22        A.    Yes, sir.
23        Q.    Did you do that?
24        A.    Yes, sir.
25        Q.    And to signify it was correct you placed your
```

EPPS 01946

Dixon-008498

1              Anderson - Cross - Schwegler

2    initial on each page; is that correct?

3        A.    Yes, sir.

4        Q.    Then you signed it and swore under oath that

5    it was correct?

6        A.    Yes, sir.

7        Q.    Okay.  And you claim that during the middle of

8    this or somewhere during the giving of this statement you

9    volunteered some information about the Cory Epps matter;

10   is that correct?

11       A.    Yes, sir.

12       Q.    Did you expect that to be in your statement

13   when you said that?

14       A.    Not really, because he said that, how do I

15   know.  And then they start typing and things once I said

16   it.  So, no, I didn't expect it to be in there because I

17   know that they weren't going to do nothing about it.

18   That's why I then wrote that letter.

19       Q.    So you made that one statement and that was

20   the last -- according to you, and then that's the last

21   you said about it to the police?

22       A.    At that time, yes, sir.

23       Q.    On April 17th?

24       A.    Yes, sir.

25       Q.    Later that day, 17th, after you reviewed your

Dixon-008499

                    Anderson - Cross - Schwegler
1
2  statement and signed it, did you say anything further
3  about the Cory Epps matter, the homicide of Tomika Means?
4       A.    No, sir.
5       Q.    Okay.  You said you went back a day or two
6  later with Melvin Calhoun?
7       A.    Yes, sir.
8       Q.    Okay.  And did you make some comment then to
9  the police about the Tomika Means homicide, that you
10  thought it was Russell Montgomery?
11      A.    No, because I was in the waiting room and they
12  took Mel back in there -- Melvin back in the back.
13      Q.    I see.  When did you next -- after the 17th,
14  when did you next make a statement to any police officer,
15  saying that you know what Russell Montgomery is the
16  person that killed Tomika Means?
17      A.    I always screamed that.  When did I actually
18  go down there?
19      Q.    Yes.  My question specifically is, when did
20  you say it to a police officer?
21      A.    When I went and told them I wrote the letter.
22      Q.    Okay.  When was that?
23      A.    Few days after the letter was on the news or
24  either maybe probably the next day.
25      Q.    Was that after you gave your statement?

EPPS 01948

Dixon-008500

```
 1                    Anderson - Cross - Schwegler
 2         A.    Yes, sir.
 3         Q.    Okay.  A few days after you gave your
 4  statement regarding Paul's death?
 5         A.    No, it wasn't a few days.  It probably was
 6  like a week.  Probably about a week, sir.
 7         Q.    Okay.  Could be longer?  Could be shorter?
 8         A.    It ain't -- it wasn't no longer than that.
 9         Q.    Okay.  So it was -- within a week is when you
10  went to homicide and said, look, I wrote that letter and
11  I'm the author, even though it was anonymous?
12         A.    Right, right.
13         Q.    It was definitely within a week of the time
14  that you told them about Paul Pope?
15         A.    Yeah, about a week, yeah.  Yes.
16         Q.    No more than that?
17         A.    Could be a day, not much more than that, if it
18  is.
19         Q.    Eight days?
20         A.    No longer than ten.
21         Q.    All right.  What did you do with that
22  anonymous letter once you wrote it?
23         A.    I mailed it.
24         Q.    Okay.
25         A.    I prayed over it and then I mailed it.
```

Dixon-008501

Anderson - Cross - Schwegler

1

2    Q.    You mailed it to whom?

3    A.    To -- I think his name was -- Cory Epps'

4    lawyer, LoTempio.

5    Q.    Mr. LoTempio.  All right.  Let me have you

6    identify, again, this is Defendant's 5.  I think you

7    looked at this and said this is a copy of the letter you

8    mailed; is that right?

9    A.    Yes, sir.

10   Q.    And is that the day you wrote it, as you

11   testified, April 27th?

12   A.    Yes, yes.

13   Q.    Okay.  Then after it came on the news, you

14   went back to homicide and told them that, I wrote that

15   letter; is that right?

16   A.    Yes, sir.

17   Q.    Did you mail this letter right after you

18   signed it and dated it or did you wait and pray or think

19   about it some more?

20   A.    I know I prayed.  Yeah.  Actually, I called

21   him and told him that I was going to send him a letter

22   and he was like, oh, okay and he hung up, and then I

23   mailed it.

24   Q.    You called who, Mr. LoTempio?

25   A.    Yes.

EPPS 01950

Dixon-008502

1                  Anderson - Cross - Schwegler

2          Q.     Okay.  What exactly did you say to

3     Mr. LoTempio?

4          A.     I ain't call him from my house.  I went to a

5     pay phone.

6          Q.     Okay.  Wherever you called him from, what did

7     you say to him?

8          A.     I told him I have a little information that

9     can help him on this case.  And he said I have tons of

10    cases.  So I told him which one it was and he said, oh,

11    okay.  Then he was, like, just send it.

12         Q.     And did you tell Mr. LoTempio, you know, good

13    morning, this is Wymiko Anderson?

14         A.     No.

15         Q.     Okay.

16         A.     I never gave him my name.

17         Q.     Even though he was the lawyer representing

18    Mr. Epps --

19         A.     Right.

20         Q.     -- who you believed to be an innocent man?

21         A.     Yes.

22         Q.     On April 17th you fully identified yourself to

23    police officers and gave that information, didn't you?

24         A.     Because at the time I thought they was the

25    good guys.

```
 1              Anderson - Cross - Schwegler
 2      Q.    Did you think Mr. LoTempio, representing this
 3  innocent man, Mr. Epps, was a good guy?
 4      A.    Yeah.
 5      Q.    But you refused to give your name to him?
 6      A.    I didn't refuse.  He didn't ask me.
 7      Q.    You didn't put it in any letter, did you?
 8      A.    No, no, I didn't.
 9      Q.    You didn't volunteer it when you called with
10  this information about a homicide?
11      A.    No, sir.
12      Q.    You specifically did not give him your name;
13  is that right?
14      A.    Right.
15      Q.    Okay.  That's my question to you, ma'am.
16  April 17th you were right up front and talking with the
17  police officer, saying I'm Wymiko Anderson?
18      A.    Right.
19      Q.    I have this information?
20      A.    Yes.
21      Q.    Russell told Paul, Paul told me, you got the
22  wrong guy, right; they knew who you were?
23      A.    Exactly.
24      Q.    You thought they were the good guys?
25      A.    Yeah.  But once I seen that they weren't going
```

EPPS 01952

Dixon-008504

```
 1                    Anderson - Cross - Schwegler
 2     to do anything about this, that's when I wrote the
 3     letter.
 4         Q.    Why, ma'am, did you write an anonymous letter,
 5     rather than fully identifying yourself to Mr. LoTempio?
 6         A.    At that time it was pretty confusing.  Russell
 7     was still out here on the streets.  Hello.  He's a
 8     murderer.  He killed many times before.  One more time
 9     would not stop him.  He knew where I lived, where my kids
10     lived and where my family lived.  That's why I did not
11     give him Wymiko Anderson.
12         Q.    When was Mr. Montgomery arrested?
13         A.    A year, a year, about a year later.  For
14     Paul's murder?
15         Q.    Yes.
16         A.    Yes.  He was still out here in the streets.
17         Q.    When did you come forward and say, I'm the
18     author of that letter?
19         A.    After Russell was convicted and stuff.  I know
20     him personally.  He's -- any time a man beats up his own
21     mother in front of tons of people, what remorse would he
22     have for me?  None whatsoever.
23         Q.    You don't care much for Mr. Montgomery, do
24     you?
25         A.    No, I don't.
```

```
 1              Anderson - Cross - Schwegler
 2       Q.    Okay.  You're happy he's in prison, aren't
 3   you?
 4       A.    He deserve to be.
 5       Q.    Okay.
 6       A.    Anybody who kills somebody in cold blood
 7   deserve to do the rest of their life in jail.
 8       Q.    All right.  You just told us that you did not
 9   tell anyone that you were the author of that letter until
10   when?
11       A.    Until he was in jail.
12       Q.    Okay.  So that certainly wasn't the end of
13   April of 1998, was it?
14       A.    No.
15       Q.    Did you not just tell this Court --
16       A.    Oh, I told the police.
17       Q.    Did you not just tell the Court that you came
18   in and identified yourself as the author of that letter
19   to the police?
20       A.    Right.  I misunderstood you.  I was thinking
21   you was talking about as far as Cory lawyers and things
22   like that.  Like I said, I thought they were the good
23   guys.  That's why I told them I wrote the letter.
24       Q.    And that was seven to eight, no more than ten
25   days after you originally spoke to homicide, correct?
```

EPPS 01954

Dixon-008506

1              Anderson - Cross - Schwegler

2      A.    About that time, yes, sir.

3      Q.    Okay.  And you mailed this letter on April

4  27th to Mr. LoTempio?

5      A.    Yes.

6              THE COURT:  Excuse me.  I'm confused.

7         The question I have is, following the anonymous

8         information provided to Mr. LoTempio, as

9         evidenced by the letter dated 4/27/98, the next

10        time there was communication to homicide that

11        she was the author of that letter was what date?

12             MR. SCHWEGLER:  Your Honor, the witness

13        indicated --

14             THE COURT:  I'm aware that -- I'm confused

15        on the point because I believe the witness had

16        suggested that it was some time in April of '98.

17             MR. SCHWEGLER:  That's my understanding,

18        Your Honor, seven to ten days after she

19        originally spoke with homicide.

20             THE COURT:  That's right.  And I have no

21        police memorandum with respect to that alleged

22        communication, nor has any been turned over.

23        Perhaps, none exists.

24             But I'm trying to get clarified, you only

25        disclosed this information to the police that

EPPS 01955

Dixon-008507

```
 1                  Anderson - Cross - Schwegler
 2          you were the author of this letter after Pope
 3          was arrested; is that what you're saying?
 4                  THE WITNESS:  No.  Russell.
 5                  MR. SCHWEGLER:  Montgomery, Your Honor.
 6                  THE COURT:  Montgomery was arrested.
 7                  THE WITNESS:  Can you say that again, Your
 8          Honor?  I'm sorry.
 9                  THE COURT:  When -- I guess the bottom
10          line question is, when did you release, in
11          effect, that you were the author of that
12          previous drafted anonymous letter; when did you
13          disclose that to the police?
14                  THE WITNESS:  Like, when it was on the
15          news, that's when I called them.  I can't tell
16          you the exact date it was, sir.
17                  THE COURT:  And did you go downtown and
18          meet with the police?
19                  THE WITNESS:  Yes.
20                  THE COURT:  Okay.  Do you have any
21          memorandum to that effect?
22                  MR. SCHWEGLER:  Not at all, Your Honor.
23                  THE COURT:  All right.  Just asking.
24     BY MR. SCHWEGLER:
25          Q.   Ma'am, let me approach you and show you that
```

```
 1            Anderson - Cross - Schwegler
 2   anonymous letter that you have subsequently identified as
 3   having been written by you.
 4        A.   Yes.
 5        Q.   Down at the bottom, four lines from the top,
 6   five lines, did you say, the reason why I'm coming forth
 7   now is because Russ is a cruel and heartless man that
 8   have to be stopped --
 9        A.   Yes.
10        Q.   -- has to be stopped?
11        A.   Yes.
12        Q.   You're coming forth now.  You didn't tell
13   Mr. LoTempio that you had come forward already to the
14   police, did you?
15        A.   No.  I didn't think -- I didn't think it was
16   relevant.  I thought that the police was going to handle
17   it, because when I talked to Keion, he said that, yeah,
18   the police are looking to it, Punkin.  And I was, like, I
19   don't think so, Keion; they don't believe me.
20        Q.   You didn't think it was relevant to tell
21   Mr. Epps' attorney you gave him a two-page letter --
22        A.   Right.
23        Q.   -- outlining your beliefs and the hearsay
24   information you received from Mr. Pope --
25        A.   Right.
```

EPPS 01957

Dixon-008509

```
 1                  Anderson - Cross - Schwegler
 2        Q.    -- in some good detail, right?
 3        A.    Right.
 4        Q.    You never mention in there that you already
 5   told the police this same information, did you?
 6        A.    Right, no, sir.  I should have, but no.
 7        Q.    And, in fact, you say, the reason I'm coming
 8   forward now is because Russ is cruel and heartless and so
 9   forth; isn't that right?
10        A.    He is.
11        Q.    Okay.  Did you believe that he murdered your
12   boyfriend and the father of your children?
13        A.    Yes.
14        Q.    Okay.  And you wanted to see that he got what
15   was coming to him, didn't you?
16        A.    Well, he deserved to get what was coming to
17   him, whenever you go around just shooting people.  These
18   aren't the only murders that he been involved in.  He
19   shot before.
20        Q.    When you gave your statement, this typewritten
21   one --
22        A.    Yes.
23        Q.    -- Defendant's 3 for ID, this is concerning
24   Mr. Pope's homicide, correct?
25        A.    Yes.
```

EPPS 01958

Dixon-008510

```
 1                    Anderson - Cross - Schwegler
 2         Q.    Who all was present in the homicide office?
 3         A.    When I gave my statement --
 4         Q.    This one.
 5         A.    -- about Paul?
 6         Q.    Mm-hmm.
 7         A.    Officer Stambach and Costantino.  I don't know
 8    his name.  No, not him, not the one that was out the
 9    door.
10         Q.    That's Sergeant Costantino.
11         A.    Well, no.
12         Q.    You told us you're not sure of the name of the
13    other one?
14         A.    No, correct; but I know his face when I see
15    it.
16         Q.    No one else was present at that time?
17         A.    No.
18         Q.    All right.  I want to get this clear, so we're
19    right.
20         A.    Okay.
21         Q.    You told -- when you say, I told the police
22    that I was the author, was that Sergeant Chella that you
23    were speaking to, or was it Detective Stambach, or was it
24    some unknown officer to you?
25         A.    It was a lot of people in the room.
```

EPPS 01959

Dixon-008511

```
 1                  Anderson - Cross - Schwegler
 2        Q.    Well, all right.  Did you make a general
 3   announcement?  I mean, did you walk in and say, you know
 4   what, I told you guys who did this, or did you speak with
 5   one or two specific officers?
 6        A.    It was a lot of them in the room.  It was one
 7   nice guy who left and said, I don't want -- she's going
 8   to be nervous.  I'm not going to stand in here, if she
 9   got five or six guys around here, so I'll just leave out.
10   But, no, I was like, I just wrote the letter, you know,
11   because it was on my conscience, I wrote the letter.
12        Q.    Would you agree with me you don't walk in and
13   make a general statement in a group?
14        A.    I didn't go in there and said, oh, guys, I
15   wrote the letter.
16        Q.    To whom did you make that statement?  Who were
17   you speaking to when you said, I wrote that anonymous
18   letter; who did you say that to?
19        A.    The light-skinned guy.  I don't know his name.
20        Q.    Light-skinned black male officer?
21        A.    Right.
22        Q.    Anyone else standing right next to him?  You
23   know, Stambach, was he present?
24        A.    No.  He was there the first night when I told
25   him about it.
```

Dixon-008512

```
 1                    Anderson - Cross - Schwegler
 2          Q.    He was not present.  Was Detective Costantino
 3     present?
 4          A.    No.  He was there.
 5          Q.    He was there?
 6          A.    He was there.  He was sitting at the desk.
 7          Q.    And after you said -- and who else could you
 8     identify for us?  Anyone else?
 9          A.    I didn't see them enough.
10          Q.    Okay.  After you made this statement to
11     this light-skinned black officer in the presence of
12     Sergeant Costantino, did Sergeant Costantino or the black
13     officer step forward and say, wait a minute, you're the
14     one who wrote that letter, let me talk to you?  What
15     happened next exactly?
16          A.    They asked me.  They asked me.
17          Q.    Who are they?  Who said what to you?
18          A.    The detectives.
19          Q.    Which one, the light-skinned black male?
20          A.    Yes.  That's when he said, well, how do you
21     know that and why are you now coming forward with this.
22     I said, because Paul is dead now and there's no need for
23     me to hold this information in any more.  What would I
24     have to lose?  Paul was the only one keeping me from
25     telling.  Keion was my friend; his kids' mother.  Why
```

EPPS 01961

Dixon-008513

1              Anderson - Cross - Schwegler

2    would I hold it in like this, unless my man tell me not

3    to?  And look what happened.  What comes around goes

4    around.

5         Q.    So that's clear, that was not on the 17th,

6    when you gave that long statement.  That's when you went

7    back the next time?

8         A.    Say that again.

9         Q.    On the 17th is the day after Paul was killed

10   and you went down to homicide and gave this statement?

11        A.    Yes, sir.

12        Q.    Okay.  Is that the day that you said to them,

13   you know what, I wrote the letter?

14        A.    I didn't write the letter at that time.

15        Q.    Okay.

16        A.    That's when I told them verbally.

17        Q.    Okay.

18        A.    It was verbal.

19        Q.    Got you.  Now, you were present -- when did

20   you go back to homicide the next time when you spoke with

21   the light-skinned black male officer?

22        A.    That was the day I told him that I wrote the

23   letter.

24        Q.    Tell us when that was, please?

25        A.    I don't know the exact date.  It was a day or

EPPS 01962

Dixon-008514

```
 1                  Anderson - Cross - Schwegler
 2   so, a day after it was on the news, because I was scared.
 3   I was, like, oh, goodness.  Then I --
 4         Q.    What was on the news, ma'am?
 5         A.    The letter, my letter was on Channel 4 News.
 6   Get the tape.  It's there.
 7                THE COURT:  So it was within a week to ten
 8            days following you writing the letter, as best
 9            you can recall it?
10                THE WITNESS:  Yes, sir.
11                THE COURT:  Okay.  That pins it down to
12            some time up through and including April 27th
13            is the claim.
14                MR. SCHWEGLER:  All right.
15                MR. COTTER:  May I, Judge?
16                THE COURT:  No.
17                MR. COTTER:  No.
18                THE COURT:  Do you have much more?
19                MR. SCHWEGLER:  At least half an hour,
20            Judge.
21                THE COURT:  We'll take a recess for about
22            ten minutes.  We'd ask you not to speak to
23            anyone in the meantime.
24                THE WITNESS:  I leave?
25                THE COURT:  No.  We're not done yet.
```

EPPS 01963

Dixon-008515

Anderson - Cross - Schwegler

1     Anderson - Cross - Schwegler

2    THE WITNESS:  I just sit here?

3    THE COURT:  Either there, just relax.

4    (Recess.)

5    THE CLERK:  Pursuant to recess, this court

6  is now in session.  The record reflect all

7  parties present.

8    THE COURT:  Okay.

9    THE CLERK:  Miss Anderson, I remind you

10  you're still under oath.

11    THE WITNESS:  Yes.

12    THE COURT:  All right.  Let's see if we

13  can refine this information from the witness.

14  She has indicated that within approximately ten

15  days, perhaps less, perhaps a bit more, after

16  writing the letter, she did communicate directly

17  with members of the homicide office of the

18  Buffalo Police Department at headquarters.

19    Were you alone at that time?

20    THE WITNESS:  My aunt went down there with

21  me.

22    MR. SCHWEGLER:  All right.  Thank you, Your

23  Honor.

24 BY MR. SCHWEGLER:

25  Q. Ms. Anderson, I believe on direct you said

```
 1              Anderson - Cross - Schwegler
 2   that one of the things that triggered you to make a
 3   comment such as that was that you saw a sketch on the
 4   news and I believe you identified that as Defendant's
 5   1 --
 6        A.    Russell.
 7        Q.    -- is that right.  When did that -- when did
 8   you see that?  Was that the day you -- was that just
 9   before Mr. Pope was killed or was it the same day?
10        A.    No.  I seen -- this sketch right here?
11        Q.    Yes.
12        A.    No.  I had seen that on the news probably like
13   a day or two after Nicole had got killed.
14        Q.    I see.  And you thought that -- you believed
15   that that was -- pardon me.  You believed that was
16   Mr. Montgomery?
17        A.    Yes.
18        Q.    Okay.  And you identified Defendant's 1 as
19   being Mr. Montgomery --
20        A.    Yes.
21        Q.    -- that sketch that resembles him?
22        A.    Yes.
23        Q.    And looking at this defendant, Mr. Epps, would
24   you say that that sketch resembles him, as well?
25        A.    Well, I said that Russell and him look alike.
```

EPPS 01965

```
 1            Anderson - Cross - Schwegler
 2       Q.    Okay.  So you would agree that the sketch does
 3  look like Mr. Epps?
 4       A.    Yeah, I guess, if you don't know him.
 5       Q.    Okay.  It's your testimony that on the 17th,
 6  when you were being examined, questioned about Paul Pope,
 7  his death, that you interjected or said, you know what?
 8  Tomika Means was killed by Russell Montgomery?
 9       A.    His question to me was, what does Russell look
10  like?  And I answered, you know that sketch of the guy
11  they made of Tomika Means -- who killed Tomika Means,
12  that's what Russell look like.
13       Q.    So you said --
14       A.    And then I went on to describe him personally.
15       Q.    Okay.  Was that the extent of your
16  conversation at that point?
17       A.    No.
18       Q.    Did you go on and describe then the hearsay or
19  the information you had received from Paul?
20       A.    Yes.  That's when he left, the -- not
21  Stambach, the other detective.  I don't know his name,
22  but the one that I described earlier, thin hair, medium
23  build, well, kind of -- not extra large, but large guy.
24       Q.    The one that took your statement with
25  Detective Stambach?
```

EPPS 01966

Dixon-008518

```
 1                 Anderson - Cross - Schwegler
 2        A.    Yes, sir.
 3        Q.    All right.  How many times had you seen that
 4   particular sketch prior to being in the homicide office
 5   on April 17th of '98?
 6        A.    How many times before that I had seen it?
 7        Q.    Yes, on TV.
 8        A.    On TV, like, oh, I seen it, it was on the
 9   6 o'clock news, because I made my cousin at that time
10   watch it.  And that was really it, because I had knew
11   already who had killed him -- killed her, I mean.
12        Q.    So that was back in May of '97, shortly after
13   the homicide of Ms. Means?
14        A.    Right.
15        Q.    Okay.  And you hadn't seen it since that time?
16        A.    Have I seen it before -- I mean, after?
17        Q.    Between then and April 17th of '98, had you
18   ever seen that sketch again?
19        A.    No.  I only seen that sketch on the news.
20        Q.    In your letter of April 27th did you indicate
21   that, with God on our side, we'll put the beast away,
22   meaning Mr. Montgomery?
23        A.    Yeah, I wrote that.  Yes.
24        Q.    Did you immediately believe, on hearing of
25   Mr. Pope's death, that Mr. Montgomery was responsible;
```

EPPS 01967

Dixon-008519

```
                    Anderson - Cross - Schwegler
 1
 2   did you know that?
 3       A.    Yeah, I believed it.  I didn't actually know.
 4   All I knew was that Paul was in the house and that he
 5   never came back out.
 6       Q.    Okay.
 7       A.    And I know what type of person Russell is; so,
 8   yeah, I believed.
 9       Q.    Did you know what type of person he was and
10   the fact that you believed he killed your man, the father
11   of your children and your boyfriend -- well, you felt
12   that he was a beast, that he --
13       A.    He is.
14       Q.    -- was cruel and so forth?
15       A.    Mean, yes.  Any time a man, like I said, jumps
16   on his mother, that's got to be mean.  His mother is
17   smaller than me.  He big as him.
18       Q.    So the next day you would do whatever you
19   could to see to it that he got what's coming to him; is
20   that correct?
21       A.    I told the truth.
22       Q.    Okay.
23       A.    If that's whatever I can, then yes.
24       Q.    And the truth with a little emotion, wouldn't
25   you say; calling him a beast and cruel, there's a little
```

```
 1              Anderson - Cross - Schwegler
 2   bit more than just --
 3        A.   I call it like I see it, sir.
 4        Q.   Okay.  And as you saw it then, one day after
 5   Mr. Pope's death, where you thought Montgomery was
 6   responsible, you had some pretty strong feelings against
 7   Mr. Montgomery, did you not?
 8        A.   I had them back when I found out he killed
 9   Nicole.  I'm a mother of two kids.  Her kids -- I see her
10   kids daily now.  They don't have a mother.
11        Q.   Well, with all that concern for her children,
12   you didn't see fit to come forward to the police and tell
13   them what you knew, did you?
14        A.   Not at that time because Paul Pope, my man,
15   told me not to say anything.  And if I would -- I
16   figured, if I would have said something back then, Paul
17   wouldn't be dead to this day.  He wouldn't have been able
18   to been the one that killed him had I had told.
19        Q.   You let this man, who you believed to be
20   innocent, be indicted and stand trial, rather than come
21   forward.  You're going to let him go to prison for life?
22        A.   So?
23        Q.   So?
24        A.   I'm not saying so, oh, well.  No.  I was
25   saying, so what I'm supposed to do?  I'm caught up in --
```

```
 1              Anderson - Cross - Schwegler
 2   Keion is my -- was one of my good friends.  How do you
 3   think I felt, looking at him, knowing this type of
 4   information, that Russell killed his girlfriend?  That
 5   was a hard pill for me to swallow.
 6        Q.    Not so hard that you saw fit to take any
 7   action and do anything about it until Mr. Pope was
 8   killed, though, correct?
 9        A.    Well --
10        Q.    Yes or no?
11        A.    That seems to sum it up.
12        Q.    Okay.  Then you come forward with information
13   that you claim to have received from a dead man,
14   Mr. Pope, that just happens to implicate the man who you
15   believe killed your boyfriend for whom you had good
16   feelings; isn't that right?
17        A.    Say that again, sir.
18        Q.    You come forward the day after Mr. Pope is
19   killed; that was your man, the father of your children?
20        A.    Right.
21        Q.    And you point the finger on another homicide,
22   that of Tomika Means, at Russell Montgomery as being the
23   one who did it?
24        A.    Yes, I did.  This is --
25        Q.    The person you have such strong feelings
```

EPPS 01970

Dixon-008522

```
 1                  Anderson - Cross - Schwegler
 2    against for what he did to Mr. Pope, in your mind,
 3    correct?
 4         A.    Right.
 5         Q.    All right.  Thank you.
 6         A.    You think I want to be sitting up here in
 7    court, testifying against somebody, especially if I think
 8    that he didn't do it?  I --
 9         Q.    Thank you, ma'am.
10         A.    Can I leave?
11         Q.    I think the Judge has nailed down the time
12    as to when you told homicide that you were the author
13    of that letter.  That was seven or ten days after what,
14    after the -- when was that?  When did you go into
15    homicide and tell them that, that you wrote the letter?
16         A.    I told you, when I seen it on the news, when
17    they publicized it on Channel 4, that's when I went down
18    there.
19         Q.    All right.  Mr. LoTempio, did you ever write
20    him back or call him back, the attorney -- when was the
21    first time, if ever, that you told the attorney for
22    Mr. Epps, look, it's out, I already told homicide I'm
23    the author of that letter; when did that happen?
24         A.    I never talked to him after that.  After I
25    had called him from the pay phone, I never talked to him.
```

EPPS 01971

Dixon-008523

```
 1              Anderson - Cross - Schwegler
 2    Never.  I told the police I was the one that wrote the
 3    letter before I told anybody.
 4         Q.    Who did you tell next?
 5         A.    Oh, my cousin knew.
 6         Q.    As far as attorneys for Mr. Epps?
 7         A.    No.  I didn't -- no.
 8         Q.    You kept it within your family, other than the
 9    police that you say you told?
10         A.    Right.
11         Q.    For the last time, ma'am, if you could explain
12    to me why you came forward with your own name, gave that
13    information to the police and, yet, you still saw fit to
14    write an anonymous letter and never tell the attorney or
15    anyone else who you were; that was out of fear, you said?
16         A.    Yes.
17         Q.    Had you been threatened overtly?  Had someone
18    come up to you and threatened you?
19         A.    No.  Usually it don't happen like that on the
20    East Side.  They don't come and tell you I'm going to
21    harm you.
22              MR. SCHWEGLER:  Thank you, ma'am.
23              Ask that be stricken, Your Honor.  It's not
24         responsive.
25              THE COURT:  Allow for it to stand.
```

```
1                    Anderson - Cross - Schwegler
2               MR. SCHWEGLER:  Okay.
3               THE COURT:  As I understand it, Miss
4          Anderson, you have no prior knowledge of
5          Mr. Epps at all?
6               THE WITNESS:  Do I know him, sir?
7               THE COURT:  Yes.
8               THE WITNESS:  No, no.  I put my hand on ten
9          Bibles.  I do not know that man.
10              THE COURT:  The only information you have
11         as to whether or not Russell Montgomery was
12         responsible for the death of Tomika Means is
13         that which your boyfriend told you, who claims
14         he got it from Russell Montgomery?
15              THE WITNESS:  Yes, sir.
16              THE COURT:  And that you did see the two of
17         them together on that date --
18              THE WITNESS:  Yes.
19              THE COURT:  -- the date of her homicide or
20         shortly after that?
21              THE WITNESS:  Yeah.  Like early morning.
22         She was like late at night, early morning, 4
23         o'clock, after the bars.  He came like 9 o'clock
24         that morning.
25    BY MR. SCHWEGLER:
```

EPPS 01973

Dixon-008525

```
 1              Anderson - Cross - Schwegler
 2         Q.    Was Montgomery alone when he came to your
 3    house that morning?
 4         A.    To my knowledge.  He was the only one that
 5    came to my house, inside.
 6         Q.    Did anything seem remarkable at the time when
 7    he came in?  He and Paul were business partners, were
 8    they not --
 9         A.    Yes.
10         Q.    -- dealing coke?
11         A.    Yes.
12         Q.    Okay.  And it wasn't unusual for
13    Mr. Montgomery to come over to your home and speak with
14    Paul or do some business or whatever they were doing?
15         A.    Not from my house they didn't.
16         Q.    This was at your house?
17         A.    Yes.  He -- that he came.  The house that he
18    came to was my house.
19         Q.    Let me clear that up.
20         A.    Okay.
21         Q.    You were living where, ma'am?
22         A.    239.
23         Q.    239 what?
24         A.    Dewey.
25         Q.    Okay.  And Mr. Pope was with you at that
```

```
 1                    Anderson - Cross - Schwegler
 2    time --
 3         A.    Yes.
 4         Q.    -- that morning.  And Mr. Montgomery came to
 5    239 Dewey?
 6         A.    Yes.
 7         Q.    Okay.  He came in and he went and spoke with
 8    Paul and then Paul came back in, correct?
 9         A.    No.  He came in.  Paul -- knocked on the door.
10    Paul goes down.  He comes in.  They chat for a second.
11    Paul comes back upstairs, gets dressed, leaves out.
12         Q.    All right.
13         A.    Then --
14         Q.    Did Mr. Montgomery seem at all upset to you?
15         A.    I was upstairs.  I didn't see him.
16         Q.    Did you hear him?
17         A.    Yeah, a little bit.
18         Q.    So when you say that he was at your house, you
19    identified him by voice that morning?
20         A.    Yes, it's Russ.
21         Q.    Okay.
22         A.    Who is it?  Knock-knock.  Who is it?  It's
23    Russ.  We don't have another Russ.
24         Q.    Okay.  So you said, come in.  You never did
25    see him that morning?
```

EPPS 01975

Dixon-008527

```
1              Anderson - Cross - Schwegler

2    A.    No, I didn't see him.

3    Q.    Okay.  You didn't overhear their conversation?

4    A.    No.  They left.

5    Q.    Okay.

6          THE COURT:  There is no claim by this

7    witness that she overheard the conversation

8    alleged to have taken place between Mr. Pope and

9    Mr. Montgomery.  There's no claim of it, so --

10         MR. SCHWEGLER:  Well, aside from the

11   hearsay, Judge, I don't know what her claim is,

12   frankly, that we have here.

13         THE COURT:  You know what her claim is.

14   It's grounded on hearsay.  It's been part of the

15   process.  The Court has ruled on the hearsay

16   question.  The question bears upon the conflict

17   of alleged information to the police.

18         MR. SCHWEGLER:  Very well.

19         THE COURT:  If you have nothing further,

20   we'll have redirect.

21         MR. SCHWEGLER:  I believe that's going to

22   be correct, Judge, if I can have just 30 more

23   seconds here.

24         THE COURT:  You may.

25   Q.    The affidavit that you gave to Mr. Putnam, the
```

```
 1                  Anderson - Cross - Schwegler
 2   investigator, was that in 1999 or 2000?
 3        A.    Well, I thought it was 1999, but he said it
 4   was in 2000.
 5        Q.    It is 2000.  You had a chance to look at the
 6   --
 7        A.    Yeah, but I didn't look at the dates or
 8   anything.
 9        Q.    Do you have a specific recollection if it was
10   just 2000 or '99, or are you relying on the paperwork?
11        A.    No.  That's why I didn't look at it to see the
12   date because I was trying to --
13        Q.    It's a bit of a scribble.
14        A.    I'd say 2000.
15        Q.    Was it 1999 or changed to 2000 or do you
16   recall?
17        A.    It was after Russell was -- after Paul's
18   trial.  So '98.  He was out still in '99.  That was last
19   year.  This is 2001.  Last year, 2000.  I made a mistake.
20        Q.    April of 2000, about a year ago?
21        A.    Yes.
22             MR. SCHWEGLER:  All right.  Thank you.  No
23         further cross.  Thank you.
24             (Whereupon, a one-page document was marked
25         Defendant's Exhibit 7 for identification.)
```

EPPS 01977

Dixon-008529

```
 1                    Anderson - Redirect - Cotter
 2   REDIRECT EXAMINATION BY MR. COTTER:
 3       Q.    Ms. Anderson, I know you've been patient in
 4   being here and I know people have asked you a lot of
 5   questions about the letter and the news.  I just want to
 6   see if we can make sure we've got the time frame correct.
 7   Now, do you -- you've told us that you saw your letter on
 8   the news?
 9       A.    Yes, sir.
10       Q.    Do you remember what else it was?
11              THE COURT:  Well, I don't think she saw the
12         letter, did you?
13              THE WITNESS:  Yeah.  It was on the news.
14              THE COURT:  Visually --
15              THE WITNESS:  Yeah.
16              THE COURT:  -- or just reference to it?
17              THE WITNESS:  Reference to it, more or
18         less.
19       Q.    Do you remember anything else about that news
20   story?
21       A.    No.
22       Q.    Do you know why your letter was referenced in
23   the news?
24       A.    Oh, it -- he -- let me get it right.  I don't
25   want to make any mistake.
```

EPPS 01978

Dixon-008530

```
 1              Anderson - Redirect - Cotter

 2              THE COURT:  When you speak of the news,

 3         Miss Anderson, you're referring solely to TV?

 4              THE WITNESS:  Right.

 5              THE COURT:  Not the newspaper?

 6              THE WITNESS:  No, sir.

 7              THE COURT:  Okay.

 8              THE WITNESS:  Just to the TV.

 9              THE COURT:  So we're talking about Channel

10         4, as you recall it?

11              THE WITNESS:  Right.

12              THE COURT:  TV news, as reported around the

13         time that Mr. Epps was sentenced?  It would have

14         been after you wrote the letter, right?

15              THE WITNESS:  Right, right.

16              THE COURT:  Some time when it was disclosed

17         to the public at large?

18              THE WITNESS:  Right.

19 BY MR. COTTER:

20     Q.    Now, as to the day when you told the police,

21 the five or six or so homicide detectives, was that after

22 you had seen the letter --

23     A.    Right.

24     Q.    -- on the news?

25     A.    Yes, yes.
```

EPPS 01979

Dixon-008531

```
 1                  Anderson - Redirect - Cotter

 2        Q.    Okay.  And do you remember, was there a day

 3   when the police showed you a picture of Connie Ferguson?

 4        A.    That day.

 5        Q.    The same day?

 6        A.    When I went down there.

 7        Q.    Okay.

 8        A.    Not on the 17th.

 9        Q.    Okay.

10        A.    When I told them about the letter.

11        Q.    Okay.  You're talking about the 17th of April,

12   1998 --

13        A.    Okay.

14        Q.    -- when you gave the statement the day after

15   Paul Pope was killed?

16        A.    Right.

17        Q.    Okay.  And then at some other point after you

18   had seen your letter on the news, you were in homicide

19   again?

20        A.    Yes.

21        Q.    And they showed you a picture of Connie

22   Ferguson?

23        A.    Right.

24        Q.    Okay.  I'm going to show you --

25              THE COURT:  Who is Connie Ferguson?
```

EPPS 01980

Dixon-008532

```
 1                    Anderson - Redirect - Cotter
 2               THE WITNESS:  Russell's girlfriend.
 3               THE COURT:  Russell Montgomery's
 4     girlfriend?
 5               THE WITNESS:  Yes.
 6               THE COURT:  Okay.
 7               MR. COTTER:  I'm going to show you what's
 8     been marked as Defendant's 7 for identification
 9     and ask you if you recognize your signature at
10     the bottom of the page?
11               THE WITNESS:  Yes.
12               MR. COTTER:  Judge, for your own reference,
13     I believe this is Exhibit T -- P, I believe, to
14     the People's second supplemental affidavit.
15               THE COURT:  Well, what should it be marked
16     in this proceeding?
17               MR. COTTER:  Right now it's Defendant's 7.
18               THE COURT:  Defendant's 7, just to identify
19     it for the record, is what or purports to be
20     what?
21               MR. COTTER:  A photo array identification
22     affidavit, I believe, a form of the Buffalo
23     Police Department.
24               THE COURT:  Okay.
25               MR. COTTER:  You recognize your signature
```

```
 1                   Anderson - Redirect - Cotter

 2          at the bottom?

 3                  THE WITNESS:  Yes.

 4                  MR. COTTER:  And is it fair to say that --

 5          why don't you take a look at that for a minute

 6          and --

 7                  THE COURT:  Purported date of this

 8          affidavit?

 9                  MR. COTTER:  June 4th of 1998.

10                  THE WITNESS:  Right.

11      Q.    Okay.  And you remember at least detectives --

12  detectives' names of Costantino and Masecchia are on that

13  document, right?

14      A.    I can't remember Masecchia or what's his name.

15  Is that the light-skinned one?

16      Q.    I don't know, ma'am.

17      A.    I remember --

18      Q.    But you see the name Masecchia on Defendant's

19  7?

20      A.    Yes.

21      Q.    And you also see the name Costantino?

22      A.    Yes.

23      Q.    And you see your name?

24      A.    Yes.

25      Q.    And that statement says you saw a picture of
```

```
 1              Anderson - Redirect - Cotter

 2   someone you know to be Russell Montgomery's girlfriend,

 3   Constance Ferguson.  That's June 4, 1998?

 4        A.    Right.

 5        Q.    That's the same day that you told the police

 6   you wrote the letter?

 7        A.    Yes.

 8        Q.    You're positive?

 9        A.    Yeah.

10              THE COURT:  Does that refresh your recall

11         of the time frame?

12              THE WITNESS:  Yeah.  Because I remember

13         they showed me a bunch of photos and stuff and I

14         did pick Connie out.

15              THE COURT:  So rather than being April

16         27th, it may well have been June 4th that you

17         indicated to homicide that you were the author

18         of the letter forwarded to counsel for the

19         defense, Mr. LoTempio, correct?

20              THE WITNESS:  Yes.

21              THE COURT:  I'm not saying it's so, but

22         that's what your best recall is?

23              THE WITNESS:  I didn't think it was that

24         far apart, though.

25              MR. SCHWEGLER:  I didn't hear the witness.
```

Dixon-008535

```
 1              Anderson - Redirect - Cotter
 2          THE COURT:  She said, I didn't believe it
 3     was that far apart.  So, apparently, there's
 4     still a question in her mind as to the accuracy
 5     of the date, but it does establish, apparently,
 6     contact with Costantino and Masecchia with
 7     respect to a photo array shown to her on June
 8     4th in connection with the prosecution of
 9     Russell Montgomery for the death of Paul Pope.
10          MR. SCHWEGLER:  I don't believe that's
11     correct, Your Honor.
12          MR. COTTER:  It's not the death of Paul
13     Pope.  It's for the death of Tomika Means.
14          THE COURT:  Ah.  It was in conjunction with
15     Mr. Epps' post-motion --
16          MR. COTTER:  330.30 motion.
17          THE COURT:  -- activity.
18          MR. SCHWEGLER:  It was after Mr. LoTempio
19     raised the letter and then they continued the
20     investigation --
21          THE COURT:  I have it.
22          MR. SCHWEGLER:  -- and spoke with her.
23          THE COURT:  Okay.  Latter statement is
24     affirmed, former struck, that it's police
25     activity on or about June 4th, as represented,
```

EPPS 01984

Dixon-008536

```
1              Anderson - Redirect - Cotter
2       1998, some time six days prior to the
3       imposition of sentence of Mr. Epps, based upon,
4       apparently, contact with the Buffalo Police
5       Department in conjunction with whether or not
6       Connie Ferguson could be identified by this
7       witness as being the girlfriend of Russell
8       Montgomery; is that it?
9            MR. SCHWEGLER:  Beyond that, Judge, also,
10      whether or not that was the operator of the
11      vehicle.  As the Court will recall, a woman was
12      driving the vehicle in which the shooter was
13      riding.
14           THE COURT:  I do recall that, but, of
15      course, she has no personal knowledge of the
16      driver, only the relationship.  And she did
17      identify in this exhibit her ability to identify
18      Connie Ferguson as being the girlfriend of
19      Russell Montgomery.  Is that about it?
20           MR. COTTER:  That's correct.  It's also --
21           THE COURT:  It establishes the contact
22      between the police and her on that date.
23           MR. COTTER:  On the 4th of June.
24           THE COURT:  I have it.
25           MR. COTTER:  I just want to make sure that
```

EPPS 01985

Dixon-008537

1               Anderson - Redirect - Cotter

2       the Court is clear of the time frame between the

3       letter.

4               THE COURT:  Well, without pinning it to the

5       exact date as to her disclosure of authorship,

6       that at least inferentially presents contact

7       with the Homicide Squad in or about that date.

8               MR. COTTER:  Correct.

9               Now, Ms. Anderson --

10              THE COURT:  That's why I've asked whether

11      or not there was any police reports reflective

12      of this witness's contact with the Homicide

13      Squad between the date of the letter and date of

14      sentence and there's been none forthcoming; and,

15      apparently, the prosecution claims there is none

16      available or none generated, other than this

17      exhibit, as just disclosed.

18              MR. SCHWEGLER:  That document does contain

19      an affidavit.  I think it speaks for itself.

20              THE COURT:  Was that turned over to Mr. --

21              MR. SCHWEGLER:  Yes, that's where he had

22      it.

23              MR. COTTER:  It was turned over as part of

24      this motion proceeding on 440.  It was not

25      turned over as part of the proceeding on 330

1          Anderson - Redirect - Cotter

2     back in 1998.

3          THE COURT:  Okay.  I was making -- when I

4     made the inquiry earlier, I was inferring in my

5     question to P-73s, activity reports, as opposed

6     to ID affidavits.  And from what I'm able to

7     gather to date, we have none from Mr. Costantino

8     or Mr. Masecchia with respect to their

9     activities, or do we?

10          MR. SCHWEGLER:  It's my understanding,

11     Judge, that they've combed their files.  I'll

12     have them do it again.  If there's any other

13     document, I'll immediately turn it over.  But to

14     the best of my knowledge, this is it.

15          THE COURT:  I'm not calling your integrity

16     into question.

17          MR. SCHWEGLER:  I understand.  It could

18     have been overlooked.

19          THE COURT:  Only asking whether or not,

20     subsequent to the motion, 330.30 motion made by

21     Mr. LoTempio and the disclosure of an anonymous

22     letter, which, apparently, was generated or

23     disclosed on or about the date of his motion or

24     shortly before on June 2nd -- according to the

25     Court's records, it was on June 10th or June

```
 1              Anderson - Redirect - Cotter
 2          2nd.   June 10th the motion was heard and denied.
 3          The adjournment of the original sentence was
 4          adjourned from the 2nd to the 10th.  So,
 5          apparently, this was activity said to have
 6          occurred in the interim.
 7   BY MR. COTTER:
 8       Q.    Couple more questions.  Miss Anderson, are you
 9   fairly certain that it was the same day that you picked
10   out the picture of Connie Ferguson that you told the
11   police that you wrote the letter on April 27th?
12       A.    Yeah.
13       Q.    Okay.  Now, you indicated previously in your
14   cross-examination there was some relationship between
15   Keion and Nicole?
16       A.    Yes.
17       Q.    Okay.
18          THE COURT:  Nicole being the victim of the
19          --
20          MR. COTTER:  Tomika Means.
21          THE COURT:  Tomika Means, yes.
22          MR. COTTER:  Can you tell the Judge real
23          quickly what your knowledge -- or what you knew
24          their relationship to be?
25          THE WITNESS:  Oh, they was high school
```

EPPS 01988

Dixon-008540

```
 1              Anderson - Redirect - Cotter
 2    sweethearts.
 3              MR. SCHWEGLER:  Objection, Your Honor.
 4    Relevance.  The scope of this hearing is, as
 5    the Court has pointed out, whether or not
 6    Brady material was withheld, not to retry
 7    relationships and so forth that may or may not
 8    have existed.
 9              THE COURT:  Well, who would know better
10    than somebody who knew both.  I'll take it,
11    while focusing on the purpose of the hearing.
12              Keion and Tomika Means were
13    boyfriend/girlfriend; is that your
14    representation?
15              THE WITNESS:  From high school.
16              THE COURT:  High school?
17              THE WITNESS:  Yes, high school sweethearts.
18              THE COURT:  And Keion, to refresh my
19    recollection, is who?
20              THE WITNESS:  Tomika's boyfriend.
21              THE COURT:  Yes, but other than that?
22              THE WITNESS:  To me?
23              THE COURT:  Yes.
24              THE WITNESS:  He's one of my good friends.
25              THE COURT:  A friend.  A friend of Miss
```

```
 1                   Anderson - Redirect - Cotter

 2            Anderson.  Go ahead.

 3       Q.    Do you know whose car -- or to your knowledge

 4   whose car was Tomika in when she was killed?

 5       A.    Her and Keion car.

 6       Q.    Do you recall what color it was?

 7       A.    It was -- was it the Mustang or the --

 8              THE COURT:  She doesn't know.

 9              MR. COTTER:  That's fine.

10              THE COURT:  She doesn't have any personal

11         knowledge of that.

12       Q.    Mr. Schwegler asked a couple of questions

13   about when you disclosed your authorship of this letter

14   to one of Cory's attorneys.

15       A.    Right.

16       Q.    Do you remember talking to me?

17       A.    During that time of the letter or after?

18       Q.    When did you tell me that you wrote this

19   letter?

20       A.    When I seen you downtown in court.

21       Q.    Okay.  And was it during Paul Pope's trial?

22       A.    Yes.

23       Q.    Okay.  And where did you see me?

24       A.    At the courtroom.

25              MR. SCHWEGLER:  Object, Your Honor.  This
```

```
 1              Anderson - Recross - Schwegler

 2         is bolstering.  If counsel wants to testify as

 3         to his recollection, that's a different matter.

 4              THE COURT:  I'm going to sustain at this

 5         point.  You have Putnam's affidavit and its date

 6         and the approximate time it was provided.

 7              MR. COTTER:  I don't have anything further,

 8         Judge.

 9  RECROSS-EXAMINATION BY MR. SCHWEGLER:

10         Q.   Ms. Means -- pardon me, Miss Anderson --

11         A.   Yes.

12         Q.   -- briefly I'm going to let you go.

13         A.   Okay.

14         Q.   Been a lot of dates thrown around.  And,

15  frankly, you were very forthright with Judge McCarthy

16  when he looked over at you and said, you know, are you

17  really positive of that date.  The truth is, you're not

18  really positive of the date, are you?

19         A.   Not really, no.

20         Q.   Okay.

21         A.   Not the actual date day.  Around the frame

22  time, yeah, but --

23         Q.   Okay, that's fair enough.  As you told the

24  Judge, it was your opinion that it was some much shorter

25  period than from April to June --
```

EPPS 01991

Dixon-008543

```
 1                Anderson - Recross - Schwegler

 2        A.    Yeah.

 3        Q.    -- when you said that?

 4        A.    Yeah.

 5        Q.    Okay.  Could you tell us, please -- obviously,

 6  you went down and spoke with the detectives after your

 7  boyfriend was killed, the next day, the 17th.  How many

 8  times have you been over to homicide since that time,

 9  since the time you gave that statement about Mr. Pope's

10  death?

11        A.    How many times?

12        Q.    Mm-hmm.

13        A.    About -- or I can't give you approximate.  I

14  went down there to take -- a couple times I went down

15  there just to ask questions, but I never got through to

16  upstairs.  Then my aunt took me down there.  That's when

17  I told them I wrote the letter.  Then me and Mel went

18  down there and I guess on the 4th of June.

19        Q.    Okay.  So when you went --

20        A.    And when I got my picture back that they took

21  from my house.

22        Q.    So your best recollection is, you said, hey, I

23  wrote that letter, when you went down with your aunt, and

24  that was before you went down with Melvin; is that

25  correct?
```

EPPS 01992

Dixon-008544

```
 1              Anderson - Recross - Schwegler

 2       A.    No.   That was after.  Mel came before that,

 3  before the letter.

 4              THE COURT:   That's correct.  4/20 is the

 5              date of her conversation or accompanying Melvin

 6              Calhoun to homicide.

 7       Q.    On what date did you accompany your aunt to

 8  homicide, if you know?

 9       A.    Me and my aunt, that was the day I told them

10  that I wrote the letter.  My aunt came down there with

11  me.

12       Q.    Can you tell us when that was, the date, other

13  than -- we know you were with your aunt, but do you know

14  the date?

15       A.    I guess it must have been June 4th.  I don't

16  remember.

17       Q.    Okay.  But, as you point out, that's your

18  guess?

19              THE COURT:   Okay.  You know, we're going

20              over and over the same thing.

21              MR. SCHWEGLER:   All right.  Point is made.

22              Thank you.

23              THE COURT:   The point is made that it's

24              some time subsequent to 4/20/98 when she was

25              there with Calhoun on the Pope investigation.
```

EPPS 01993

Dixon-008545

1
2       She accompanied her aunt some time thereafter
3       and she picked out a picture on June 4th.  So
4       somewhere in through that area is the period of
5       time in which she indicated she disclosed the
6       authorship of the letter.  That's what I would
7       perceive from what I've heard to date.  Anything
8       further?
9              MR. COTTER:  No, I do not, Judge.
10             MR. SCHWEGLER:  No, Your Honor.
11             THE COURT:  Okay.  Thank you, Miss
12      Anderson, for your time and attention and
13      testimony.
14             MS. ANDERSON:  Thank you.  You're welcome.
15             THE COURT:  Twenty to five.  I don't think
16      we are able to take another witness.  I have
17      already spoken to counsel.  We'll have to
18      adjourn this to June 5, 2 o'clock, only time I
19      have available, to take up and continue this
20      process.
21             Mr. Epps can be accompanied back to Wende
22      and, perhaps, to Auburn from there and be
23      transferred back at the appropriate time.
24             MR. COTTER:  Judge, I'm sorry.  My client
25      has asked to request whether or not you have the

EPPS 01994

Dixon-008546