# EXHIBIT 92

```
                                                             355
 1

 2   COUNTY COURT OF THE STATE OF NEW YORK

 3   COUNTY OF ERIE : CRIMINAL TERM : PART 1

 4   ----------------------------------------x

 5   THE PEOPLE OF THE STATE OF NEW YORK       :  Indictment
                                                  No. 93-0329-001
 6
              -against-                        :
 7
     LYNN DEJAC,                               :  Murder 2nd
 8
                    Defendant.                 :  Trial
 9
     ----------------------------------------x
10
                                     Erie County Hall
11                                   Buffalo, New York  14202
                                     Friday, April 15, 1994
12
     B e f o r e :
13
                  HONORABLE MICHAEL L. D'AMICO
14
                                          Judge, Presiding
15
     A p p e a r a n c e s :
16
              KEVIN H. DILLON, ESQ.
17                District Attorney, Erie County
              BY: JOSEPH J. MARUSAK, ESQ.
18                Assistant District Attorney
                  Appearing for the People
19
              ANDREW C. LO TEMPIO, ESQ.
20                Appearing for the Defendant

21

22

23

24
                                     Kenneth D. Meier, C.S.R.
25                                   Senior Court Reporter
```

FILED
94 NOV 28 PM 3:37
ERIE COUNTY
CLERK'S OFFICE

```
                                                              423
 1                      Lonergan - Marusak - Direct

 2       A.    No.

 3       Q.    Did you see how Mr. Hudson got to the Homicide
 4  Bureau?

 5       A.    Yes, sir.

 6       Q.    How was that?

 7       A.    He was brought to the Homicide Bureau by DA's
 8  Investigator, Cliff Braxton.

 9       Q.    And, were you asked to do anything with Mr.
10  Hudson?  By anyone?

11       A.    Chief Fieramusca instructed me to take a statement
12  from Mr. Hudson.

13       Q.    Showing you People's Exhibit 38 that is in front of
14  you there, is that the statement?

15       A.    Yes, it is.

16       Q.    Tell the jury just simply the procedure by which
17  you took it?

18       A.    I would type a specific question.  Then I would
19  read it to Mr. Hudson, and I would type his response on the
20  paper.

21       Q.    Prior to doing that, did you promise him anything
22  in exchange for that statement?

23       A.    No, I did not.

24       Q.    Did he have any discussion with you about his
25  pending charges?
```

```
                                                              429
 1                    Lonergan - Marusak - Direct

 2       A.   After the statement was completed, yes.

 3       Q.   What did he say?

 4       A.   He informed me that Mr. Braxton had told Wayne

 5  Hudson that he was going to try and get him released that day

 6  on the charges he had pending.

 7       Q.   And was that the extent of what he told you?

 8       A.   Yes, sir.

 9       Q.   Did you promise him anything further?

10       A.   No, I did not.

11       Q.   Did he ask you if anything could be done with

12  respect to the disposition of his charges?

13       A.   No, sir.

14       Q.   After you typed the last question and answer out,

15  what did you do?

16       A.   Mr. Hudson read the statement.  I asked him if

17  there were any corrections or additions.  He told me no.  I

18  asked him if it was true and correct.  He said yes.  He

19  signed it, swore on the Bible that it was the truth.

20       Q.   And, in following that, what happened?

21       A.   Following that, I brought Mr. Hudson over to your

22  office and I left him there.

23       Q.   And was that the extent of your contact with Mr.

24  Hudson?

25       A.   Yes.
```

```
                                                                435
 1                    Lonergan - LoTempio - Recross

 2              MR. MARUSAK:  Nothing further.

 3   RECROSS-EXAMINATION

 4   BY MR. LO TEMPIO:

 5       Q.   Now, when Mr. Hudson came to your office, where had

 6   he been prior to that?  Do you know?

 7       A.   No, sir.

 8       Q.   When Mr. Hudson gave this statement, who brought

 9   him to your office?

10       A.   Cliff Braxton of the District Attorney's office.

11       Q.   And it was your understanding that Mr. Braxton

12   picked him up on an indictment warrant, correct?

13       A.   Yes, sir.

14       Q.   Did Mr. Braxton take any notes as to what Wayne

15   Hudson said to him, do you know?

16       A.   I don't know.

17       Q.   Did he turn anything over to you, notations about

18   the information Mr. Hudson gave to him on the way over to the

19   police station?

20       A.   No.

21       Q.   How long was it, do you know, that Wayne Hudson sat

22   by himself after he got picked up on the indictment warrant?

23       A.   I don't know how long he was in the Homicide

24   office.  I was on the street.  I was called back to the

25   office, so I couldn't say how long he was there.
```