# EXHIBIT 96

425

COUNTY COURT OF THE STATE OF NEW YORK

COUNTY OF ERIE : CRIMINAL TERM : PART 1

-------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK    :    Indictment
                                            No. 91-1476-003

        -against-                      :

LEONARD BROWN & MARIO JARMON,          :    Perjury

            Defendant.                 :    Trial

-------------------------------------------x

                            Erie County Hall
                            Buffalo, New York  14202
                            Tuesday, November 10, 1992

B e f o r e :

            HONORABLE MICHAEL L. D'AMICO

                                    Judge

A p p e a r a n c e s :

        KEVIN M. DILLON, ESQ.
            District Attorney, Erie County
            BY:  FRANK A. SEDITA, III, ESQ.
                Assistant District Attorney
                Appearing for the People

        EDWARD COUGHLIN, ESQ.
        Appearing for the Defendant Brown

        TERENCE B. NEWCOMB, ESQ.
        Appearing for the Defendant Jarmon

                        Kenneth D. Meier, C.S.R.
                        Senior Court Reporter

93 FEB 26 AM 11: 16
ERIE COUNTY CLERK

1                      Shannon - Coughlin - Direct                626

2           New York, having been first duly sworn, was examined,

3      and testified as follows:

4   DIRECT EXAMINATION

5   BY MR. COUGHLIN:

6        Q.    Antione, will you pull your chair up close to that

7   microphone, and please speak directly into it as best you

8   can, okay?

9        A.    Okay.

10       Q.    How old are you, Antione?

11       A.    Nineteen.

12       Q.    Have you ever been convicted of a crime in your

13  life?

14                      MR. SEDITA:  Objection, bolstering.

15                      THE COURT:  Overruled.

16                      THE WITNESS:  No.

17  BY MR. COUGHLIN:

18       Q.    Now, are you related by blood to the defendant

19  Leonard Brown?

20       A.    Yes, he's my brother.

21       Q.    And how is he your brother?

22       A.    We have the same mother.

23       Q.    Annie Shannon is the mother of you and Leonard; is

24  that correct?

25       A.    Yes.

Shannon - Coughlin - Direct                627

1
2    Q.    Do you have the same father?

3    A.    No.

4    Q.    How long -- strike that.  Were you raised basically
5    with Leonard?

6    A.    Yes.

7    Q.    Grew up with Leonard?

8    A.    Yes.

9    Q.    And, who was in the household that you grew up in
10   with Leonard?

11   A.    Me, Leonard, and my mother.

12   Q.    Now, do you also bear any type of relationship,
13   blood relationship with a person named Valentino Dixon?

14   A.    Me and Valentino have the same father.

15   Q.    All right, is Annie Shannon Valentino's mother?

16   A.    No.

17   Q.    Okay.  So just so that we get it straight then, you
18   are a half brother to Valentino; is that correct?

19   A.    Yes, it is.

20   Q.    Through your father?

21   A.    Yes.

22   Q.    And you're a half brother to the defendant Leonard
23   Brown through your mother?

24   A.    Yes.

25   Q.    Okay.  Now, would you tell the jury, Antione, how

628

Shannon – Coughlin – Direct

1  far you have gone in school?

2      A.   I went to high school, graduated from high school

3  and finished a year in college, and presently am going to

4  college right now to receive my degree.

5      Q.   Where did you go to high school?

6      A.   I went one year Bishop Timon, and I transferred

7  over to Grover Cleveland and finished at Grover Cleveland.

8      Q.   How is it that you transferred from Timon to Grover

9  Cleveland?

10          MR. SEDITA:  Objection.  Is this relevant?

11          THE COURT:  Sustained.

12  BY MR. COUGHLIN:

13      Q.   All right.  During your high school career at those

14  schools, did you receive any honors?

15          MR. SEDITA:  Objection.  Is this relevant?

16          MR. COUGHLIN:  Can we approach, your Honor?

17          THE COURT:  Sure, you can answer the

18          question.  No, you don't have to approach.

19          THE WITNESS:  Yes, I was on the honor roll,

20          and I was all high football and Western New York

21          football.

22  BY MR. COUGHLIN:

23      Q.   Did you participate in any other athletics?

24      A.   I ran track and I was All Western --

Shannon - Coughlin - Direct                    629

1

2          MR. SEDITA:  Objection.

3          THE COURT:  Mr. Sedita, I'm going to allow him

4     to develop what he wants with respect to his

5     background.

6          MR. SEDITA:  Thank you.

7          THE COURT:  So the objection is overruled.

8     Answer the question.

9          MR. COUGHLIN:  Thank you.

10         THE WITNESS:  Yes, I was All Western New York

11    in track too as well.

12   BY MR. COUGHLIN:

13         Q.   As a result of your honor roll accomplishments and

14    your athletics accomplishments, did you receive a scholarship

15    to college?

16         A.   Yes, I received a scholarship to college in

17    football.

18         Q.   And, you pursued that scholarship?

19         A.   Yes.

20         Q.   And, that was -- where was that school?

21         A.   It was in Kentucky, Campbellville College.

22         Q.   And, are you presently, but for these proceedings,

23    are you presently attending Campbellville?

24         A.   No, I will be attending Tennessee State in

25    January.

Shannon - Coughlin - Direct                    630

Q.   Transferred?

A.   Yes.

Q.   Is there a difference between Campbellville College and Tennessee State that necessitated the transfer?

MR. SEDITA:  Objection.

THE COURT:  That is sustained.

BY MR. COUGHLIN:

Q.   It's a higher level of football, isn't it?

A.   Yes, it is.

Q.   Now, as you were growing up in Buffalo, did you come to know a Torre Jackson or an Aaron Jackson?

A.   When I used to live on Kensington, we played basketball maybe twice, behind School 68 lighthouse.

Q.   That was with who, with Aaron?

A.   With both of them.

Q.   Oh, with both of them, all right.  This was as you were growing up?

A.   As I was growing up, like in grammar school like.

Q.   All right.  Now, did there come a time in the summer of 1991 when you had occasion to see Aaron and Torre Jackson?

A.   Yes, I did.

Q.   Where did you see them?

A.   I seen Aaron Jackson and Torre Jackson at a club

Shannon - Coughlin - Direct                    631

1

2   called The Difference on Eagle Street.

3       Q.    What is The Difference, what kind of club is that?

4       A.    It's like a teenage club.

5       Q.    Is that the nature of a dance hall, or something?

6       A.    Yes.

7       Q.    And, did something unusual happen while you were at

8   The Difference?

9               MR. SEDITA:  Objection to the relevancy at

10               this time.

11               THE COURT:  Where are we going with this, Mr.

12               Coughlin?

13               MR. COUGHLIN:  Shall we approach?

14               THE COURT:  Yes.

15               (Bench Conference held.)

16  BY MR. COUGHLIN:

17      Q.    Antione, I asked you if something unusual happened

18  while you were at The Difference that night?

19               THE COURT:  Just to refresh my recollection,

20               what is the date?  Do we have a date?

21  BY MR. COUGHLIN:

22      Q.    Do you recall the date, or do you recall the

23  approximate time in relation to the later incident that

24  occurred on August 9th?

25      A.    The approximate time, oh, the time at The

1

2  Difference?

3      Q.   Yes.

4      A.   The time of day or time --

5      Q.   No, day?

6          THE COURT:  How soon, how long before that?

7          THE WITNESS:  About two weeks.

8          THE COURT:  All right, go ahead.

9  BY MR. COUGHLIN:

10     Q.   On the occasion two weeks prior to the incident of

11 the 9th and 10th of August when you were at The Difference

12 when you saw Torre Jackson, the question was, did you see

13 something unusual happen?

14     A.   Yes.  Torre Jackson --

15          THE COURT:  Wait.  You have answered the

16          question.  Next question.

17 BY MR. COUGHLIN:

18     Q.   What was it that you saw?

19     A.   I saw Torre Jackson chasing a friend of mine, Derek

20 Walton, with a gun.

21     Q.   When you say chasing him with a gun, can you

22 describe in detail what you actually saw or what was going

23 on?

24          MR. SEDITA:  Judge, I object.  This goes

25          beyond the scope of the ruling.

Shannon - Coughlin - Direct                           633

THE COURT: What are you looking for here, Mr. Coughlin? Whether he was running down the street or --

MR. COUGHLIN: He has made a statement that he saw him chasing him with a gun. I think it's appropriate for the jury to find out where was he, where were the other people? Was his observation accurate or not accurate?

THE COURT: Sure, go ahead. Answer the question.

THE WITNESS: Yes, I was across the street, and Aaron Jackson and Torre Jackson was on the other side of the street, and Derek Walton proceeded to run this way, and Torre Jackson and Aaron Jackson and few other people was chasing Derek Walton and Robin Gillmore with a gun, going towards this way, and I was over this way.

BY MR. COUGHLIN:

Q.    And who was holding the gun when they were chasing Walton and Gillmore?

A.    Torre Jackson.

Q.    How was he holding the gun?

A.    He was holding the gun like this.

Q.    Out in front of him?

634

Shannon - Coughlin - Direct

1

2     A.    Yes.

3     Q.    Were you able to see the color of the gun?

4     A.    I was able to see it was a gun and it was silver.

5     Q.    All right.  And what, if anything, did you do after

6  that?

7     A.    Since I came up there with Derek Walton, I walked

8  home because that was my ride home.

9     Q.    Derek Walton was your ride up there?

10     A.    Yes.

11     Q.    Now he's gone?

12     A.    Yes.

13     Q.    Did anything unusual happen as you were walking

14  home?

15     A.    Yes.  I was walking home.

16     Q.    What happened?

17     A.    Aaron Jackson and Torre Jackson approached me and

18  pulled out a gun on me.

19     Q.    All right.  Now, you say Aaron and Torre approached

20  you?

21     A.    Yes.  They like --

22     Q.    How did they approach you?  Describe it.

23     A.    They rode up on me really fast, pulled in front of

24  me.  It was like five of them in the car.  Couple ran in

25  front of me and couple ran behind me, and they pulled out a

gun on me and said what's up with your boy?

Q.    Wait a minute, now.  You said they?

A.    They, I mean Torre Jackson pulled out a gun on me.

Q.    And what kind of gun was it that he pulled out?

A.    It was a silver gun.

JUROR NO. 4:  Judge, we can't understand.

THE COURT:  Can't understand him.

MR. COUGHLIN:  Okay.

JUROR NO. 4:  We didn't understand the last couple questions.

JUROR NO. 5:  Yes.

THE COURT:  Read them back, would you please, Mr. Meier.

(Record read.)

THE COURT:  Don't get quite so close to that microphone.  Go ahead.

BY MR. COUGHLIN:

Q.    When Torre Jackson pulled out the silver gun, did he say anything?

MR. SEDITA:  Objection, hearsay.

THE COURT:  Overruled.

THE WITNESS:  Yes, he says get on your knees. He says, you think I am going to joke?  Get on your knees.  I wouldn't get on my knees, so --

Shannon - Coughlin - Direct                    636

BY MR. COUGHLIN:

Q.    Okay, get on your knees, you think I'm a joke?

A.    Yes.

MR. SEDITA:  Objection, Judge.  This is beyond the scope of your ruling.

THE COURT:  Where are we going, Mr. Coughlin?

MR. COUGHLIN:  I just want to know what happened with the gun.

THE COURT:  Yeah, but do you remember this discussion.

MR. COUGHLIN:  Yes, I remember it, Judge.

THE COURT:  All right, next question.

BY MR. COUGHLIN:

Q.    How close to you was the gun in Torre Jackson's hands?

MR. SEDITA:  Objection.

THE COURT:  Overruled.

THE WITNESS:  About here to this microphone here.

BY MR. COUGHLIN:

Q.    You're indicating the distance from your face to the Judge's microphone?

A.    Yes.

Q.    When he told you to get down on your knees, did you

1
2   get down on your knees?

3       A.   No.

4       Q.   What did you do?

5       A.   I was nervous, and I knew if I got on my knees,
6   there would be no way for me --

7       Q.   Don't lean too close to that mike.

8       A.   I knew there would be no way for me to get myself
9   out of the situation, so I never did get on my knees.

10      Q.   And, did you get out of the situation?

11      A.   Yes, because somebody tried to swing at me and I
12  moved to the side and pushed Torre into Aaron, Aaron into
13  Torre.

14          THE COURT:  Look, do you have a little problem
15      understanding staying away from that microphone at
16      least enough so it doesn't vibrate.  Stay a couple
17      inches away from the microphone.

18          MR. COUGHLIN:  It's my fault.  I probably told
19      you to sit too close.

20          THE COURT:  Can't you hear that?  All right,
21      go ahead.

22  BY MR. COUGHLIN:

23      Q.   How did you get out of the situation?

24      A.   I got out of the situation by someone trying to
25  swing at me.  Then I moved to the side and pushed Aaron into

Shannon - Coughlin - Direct                     638

1  Torre which had the gun, and I ran away, and Torre tried to,

2  he tried to -- he was messing with the top of the gun, trying

3  to pull something, and I was able to get away around the

4  corner and they never caught up to me.

5      Q.   You said you saw Torre trying to pull something or

6  try to do something with the gun?

7      A.   Yes.

8          MR. SEDITA:  For the record, I'm going to

9              object to a demonstration.

10 BY MR. COUGHLIN:

11     Q.   Showing you, Antione, what has been marked People's

12 Exhibit 7A, I want you to take a look at that, please, for

13 just a moment.  Would you know, or do you know whether you

14 would have ever seen that particular gun before?

15     A.   No.

16     Q.   Can you tell us what similarities or what

17 dissimilarities there are between that gun and the gun that

18 you saw in Torre Jackson's hands when he stopped you as you

19 were walking home?

20         MR. SEDITA:  Objection.

21         THE COURT:  Overruled.  Answer the question.

22         THE WITNESS:  The gun was around the same size

23             and the same color.  That was the similarities.

24 BY MR. COUGHLIN:

Shannon - Coughlin - Direct                                     639

1

2      Q.    Okay.  And, you saw him doing something with this

3  gun as you ran away?

4      A.    Yes.

5      Q.    After that incident, can you tell me when you next

6  had occasion to see either Aaron or Torre Jackson?

7      A.    Next time I seen Aaron Jackson was the night of the

8  incident in the Norstar Bank parking lot.

9      Q.    And the Norstar Bank parking lot, are you referring

10 to the bank parking lot that is on the southeast corner of

11 East Delevan Avenue and Bailey Avenue?

12     A.    Yes, I am.

13     Q.    And, about what time of day or night did you see

14 Aaron Jackson in that parking lot?

15     A.    In between 11:00 and 12:00.

16     Q.    And, can you tell us the circumstances, what were

17 you doing when you made that observation?

18     A.    I was going to the store.

19     Q.    Where is the store located?

20     A.    On Bailey and Delevan.

21     Q.    And, would that be the Arab market on the northwest

22 corner?

23     A.    Yes, it will.

24     Q.    And were you with anybody when you were going to

25 the store?

Shannon - Coughlin - Direct

1

2    A.    Yes, I was with my brother Leonard and Mario

3    Jarmon.

4    Q.    And what happened as you were going to the store

5    with Mario and Leonard?

6    A.    I was going to the store and I seen Aaron Jackson

7    ride past.  Then he pulled up in the bank parking lot.  Then

8    I told my brother there is Aaron Jackson, the one who pulled

9    the gun out on me.  I said go talk to him and get it

10   straightened out about, just talk to him and ask him why did

11   he pull the gun on me.

12   Q.    Okay.  Let me interrupt.  You said you told your

13   brother?

14   A.    Yes.

15   Q.    Identify your brother by name, just for the record?

16   A.    Leonard Brown.

17   Q.    Now, did you and Leonard go over to the parking

18   lot?

19   A.    Yes.

20   Q.    Did Mario go with you?

21   A.    Mario went towards that way, but he didn't go up to

22   the car with us.  He went into the store.

23   Q.    What store is that?

24   A.    Mini mall, the other store.

25   Q.    And is that the store that is immediately to the

Shannon - Coughlin - Direct

1
2 south of the bank parking lot property?

3    A.   Yes.

4    Q.   And, what happened then?

5    A.   I approached him and I asked him why did he pull
6 the gun out on me. He got real hostile and said I ain't
7 trying to hear that. Anybody pressing up on me about a lot
8 of things. I ain't telling you nothing. My brother just
9 died. He was telling me things like real hostile, like get
10 out of his face, but then he pulled over, and he was in the
11 passenger seat of the car and the keys was in the ignition on
12 the driver side. Shall I proceed?

13    Q.   Yes. I just wanted you to sit back a little.

14    A.   The keys were in the ignition of the car. He slid
15 over and, um, put the car in reverse and drove away, saying
16 he was going to come back and shoot us, spray us up, and be
17 here when I come back, and he was making a lot of serious
18 threats to my life.

19    Q.   To his first comments that you just recited, what
20 were they? Something about I ain't this or that?

21    A.   I'm not --

22          MR. SEDITA: Asked and answered.

23          THE COURT: What is that review, Mr.
24 Coughlin? Sustained. Next question.

25          MR. NEWCOMB: Could you ask him to move back a

Shannon - Coughlin - Direct

1
2   little?

3       THE COURT:  I have told him three times, all

4   right.  Now, if he wants to keep his lips on the

5   microphone so it's garbled, I can't tell him again,

6   Mr. Newcomb.  Go ahead, next question.

7  BY MR. COUGHLIN:

8       Q.  It does sound different when you are back here than

9  when you are sitting in my chair?

10      THE COURT:  Well, we are trying to have him

11      stay far enough away so everybody with hear.  He

12      has been told three times but he doesn't want to do

13      it, all right, so ask your next question.

14      MR. COUGHLIN:  I understand, Judge, sorry.

15  BY MR. COUGHLIN:

16      Q.  Did you -- well, what effect, if any, on you

17  personally did his comment that stay right there, he was

18  going to be back and shoot, what effect did that have on

19  you?

20      MR. SEDITA:  Objection.

21      THE COURT:  Sustained.  That means don't

22      answer.  Next question.

23  BY MR. COUGHLIN:

24      Q.  Were you concerned at all about his comments?

25      MR. SEDITA:  Objection.

Shannon - Coughlin - Direct

1

2          THE COURT:  Sustained.

3          MR. COUGHLIN:  Your -- may we approach?

4          THE COURT:  Sure.

5          (Bench Conference held.)

6  BY MR. COUGHLIN:

7      Q.    All right.  Now, was there anybody else around when

8  he was saying what you said he said besides Aaron and you and

9  Leonard?  Anybody else around?

10     A.    Yes.

11     Q.    Who else was around?

12     A.    Mario Jarmon.

13     Q.    And, who else?

14     A.    Travis Powell.

15     Q.    Now, was there any argument or disagreement

16 between, or words between Mario and either Travis or Aaron?

17     A.    Mario and Aaron had some words.

18     Q.    And, do you recall what Aaron may have said, if

19 anything, to Mario?

20          MR. SEDITA:  Objection.

21          THE COURT:  You can answer.

22          THE WITNESS:  Aaron said he was going to spray

23      Mario up.

24 BY MR. COUGHLIN:

25     Q.    What does the phrase spray mean in the street?  How

644

Shannon - Coughlin - Direct

1

2  do you understand spray?

3      A.    That means he's going to shoot you.

4      Q.    All right, and what happened after that?

5      A.    After that, Travis said please don't -- take this

6  somewhere else, please don't trash my mother's car; and Aaron

7  pulled out in the street and said real Niggers don't die.

8  Wait until I come back.  I'm going to spray you all up, just

9  be here when I come back.  And, um, Travis got in the car and

10  they pulled off.

11      Q.    Now, what did you and Mario and Leonard do at that

12  point?

13      A.    Me, Mario and Leonard went back to Mario house.

14      Q.    And where is Mario's house in relation to this

15  corner?

16      A.    About five houses away from the corner.

17      Q.    On what street?

18      A.    Delevan.

19      Q.    That's on East Delevan Avenue?

20      A.    Yes.

21      Q.    Is it to the west or to the east of Bailey Avenue?

22      A.    It's to the west.

23      Q.    As Mr. Sedita likes to say, is that towards the

24  Saginaw plant?

25      A.    Saginaw plant, I'm not sure --

645

Shannon - Coughlin - Direct

1

2    Q.    Chevy plant?

3    A.    Yes.

4    Q.    Now, you went directly to Mario's house?

5    A.    Yes.

6    Q.    What did you do when you got to Mario's house?

7    A.    We sat around and we was scared about what they was

8    going to do. We didn't know who they was going to come back

9    with or what they was going to come back with. And we know

10   we had -- we know we couldn't avoid them if they came back.

11   Q.    When you went back to Mario's house, did you go

12   inside the house?

13   A.    Yes.

14   Q.    And, at some time thereafter did you, in fact, see

15   Travis' car in the area again?

16   A.    Yes.

17   Q.    Where did you see his car?

18   A.    They kept on circling the block, around the Bailey

19   and Delevan area.

20   Q.    And, how many -- who was in the car when you saw it

21   again going by your house?

22   A.    Travis, Aaron and Torre.

23   Q.    Anybody else?

24   A.    No.

25   Q.    Now, at that point in time did you do anything?

646
Shannon - Coughlin - Direct

1

2 A. I attempt to call my half brother, Valentino, but

3 he didn't answer.

4 Q. Now, how did you attempt to call Valentino?

5 A. He had a beeper at the time.

6 Q. Is that some type of paging device, or something?

7 A. Yes.

8 Q. Do you know, is it a device that you could speak

9 to?

10 A. It's one that you leave a message, your number at

11 the tone.

12 Q. All right, so you left a message and a phone

13 number, did you?

14 A. I dropped a phone number.  That was the message.

15 Q. Oh, it does not record voice messages?

16 A. No.

17 Q. You can just leave a phone number?

18 A. Yes.

19 Q. All right.  Whose phone number did you leave?

20 A. Mario's phone number, the one that was at his

21 house.

22 Q. Did Valentino ever call back to that number?

23 A. He never called back.

24 Q. What happened after that?

25 A. Me, Mario and Leonard went out in front of Mario

Shannon - Coughlin - Direct

1

2    house.  We was sitting around talking for awhile.

3         Q.    Where exactly were you sitting around talking?

4         A.    In the car.  It was, Mario mother has a car that is

5    not presently -- it wasn't presently on the road at the time,

6    and we was just sitting talking inside the car.

7         Q.    And where was that car located, out on the street,

8    or where?

9         A.    In the driveway.

10        Q.    While you were sitting in the car, did you see the

11   yellow Geo again?

12        A.    Yes.

13        Q.    How many people at that time?

14        A.    Same amount of people, Torre, Aaron and Travis.

15        Q.    Did they see you?

16        A.    No, they wasn't able to see us.

17        Q.    Now, what happened after that?

18        A.    After that we waited like 10 minutes.  We talked

19   for about 10 minutes.  And then we got out of the car, it was

20   getting stuffy.  It was hot out, so we got out of the car.

21   And that's when I seen my brother Tino, he turned the corner

22   and I seen his red car.  And I flagged him down.

23        Q.    When you say you flagged him down, what do you

24   mean?

25        A.    Like when he was turning the corner.  You could see

648

Shannon - Coughlin - Direct

1  him coming from a distance.  From Mario house you can see

2  like that side of the street, that side of the street and

3  this side of the street all the way down.

4

5      Q.   Sit back a little.  All right, you flagged

6  Valentino down.  Then what happened?

7      A.   Then he got out and parked the car in front of

8  Mario house, and I filled him in on the situation that I was

9  in.

10     Q.   What did he say?

11     A.   He said he will stick around.

12     Q.   Did he show you any evidence of any weapons of any

13  kind?

14     A.   No.

15     Q.   Up to this point in time did you or Mario or

16  Leonard Brown have any weapon of any kind?

17     A.   No.

18     Q.   Now, so now there are four of you standing around

19  there?

20     A.   Yes.

21     Q.   And then what happened?

22     A.   Then we was standing around talking for about 10

23  minutes.  Then Lamarr Scott came up.

24     Q.   Now, who exactly is Lamarr Scott?  Is he a friend

25  of yours?

Shannon - Coughlin - Direct

1

2     A.    I met him in high school.  He was on the football

3 team with me for a year and he got kicked out, so after that

4 I might see him from time to time around Buffalo.

5     Q.    All right, was he a day-to-day social friend of

6 yours?

7     A.    No.

8     Q.    You didn't associate with him regularly?

9     A.    Not regularly.

10    Q.    Was he to your knowledge acquainted with your half

11 brother, Leonard Brown?

12    A.    No.

13    Q.    Was he to your knowledge acquainted with Valentino

14 Dixon?

15    A.    Not to my knowledge.

16    Q.    Now, describe exactly for the jury how he came to

17 be upon the scene?

18    A.    Lamarr came up.  He was like, what's up, you all?

19         MR. SEDITA:  I'm going to object to hearsay.

20         MR. COUGHLIN:  First of all, let's get the

21         microphone away.  Push your chair back.

22         THE COURT:  What was the question?  What did

23         he say?  Did you ask what Lamarr said?  Is that

24         your question?

25         MR. COUGHLIN:  I forgotten.  I think I asked

650

Shannon - Coughlin - Direct

1

2       him to describe the circumstances of Lamarr's

3       arrival.

4               THE COURT:  That's kind of vague.  Why don't

5       you ask him another question.  Try to be more

6       specific.

7               MR. COUGHLIN:  Okay.

8   BY MR. COUGHLIN:

9       Q.   Was Lamarr driving or walking, or how did Lamarr

10  come to be at Mario's house?

11      A.   He came up on a bike.

12      Q.   What kind of a bike?

13      A.   A ten speed.

14      Q.   Two wheel bicycle, bike, is that what you mean?

15      A.   Yes.

16      Q.   Had he stopped?

17      A.   Yes.

18      Q.   Did you flag him down?

19      A.   No, I did not.

20      Q.   And he stopped and approached you?

21      A.   Yes.

22      Q.   And what did he say?

23      A.   He was like what's up, you all?

24              MR. SEDITA:  Objection.

25              THE COURT:  Sustained.

Shannon - Coughlin - Direct

1

2  BY MR. COUGHLIN:

3       Q.   Now, you had some conversation with Lamarr?

4       A.   Yes.

5       Q.   And, what happened then?

6       A.   He said they got beef --

7                 MR. SEDITA:  Objection.

8                 THE COURT:  Wait a minute.  You can't tell us

9            what he said, okay.  The question was what happened

10           then?

11 BY MR. COUGHLIN:

12      Q.   You had a conversation with Lamarr.  Were the

13 other, your other friends, were they standing there?

14      A.   Yes.

15      Q.   Everybody talking?

16      A.   Yes.

17      Q.   As a result of that conversation or discussion,

18 whatever -- strike that.

19      After everybody was talking, what happened next?

20      A.   He got on the bike and said he would be back.

21                MR. SEDITA:  Objection.

22                THE COURT:  Strike the part where he said he'd

23           be back.  Disregard that.  Next question.

24 BY MR. COUGHLIN:

25      Q.   He got on his bike?

652

Shannon - Coughlin - Direct

1

2     A.   Yes.

3     Q.   Did he leave the area on his bike?

4     A.   Yes.

5     Q.   Did he return on his bike?

6     A.   Yes.

7     Q.   You can't get into what was said.

8     Did he have anything with him when he returned?

9     A.   Yes.

10    Q.   Did you see what he had?

11    A.   Yes, I did.

12    Q.   What was it?

13    A.   It was a black gun, like a machine gun.

14    Q.   How was he carrying that machine gun?

15    A.   He had it in a garbage --

16            MR. SEDITA:  Objection -- withdrawn.

17            THE COURT:  All right, go ahead.

18            THE WITNESS:  He had it in a garbage bag.

19    BY MR. COUGHLIN:

20    Q.   What kind of garbage bag?

21    A.   Garbage bag with the strings on the top.

22    Q.   And what did he do with that?

23    A.   He put it in the bushes.  He hid it in the bushes.

24    Q.   Where were these bushes?

25    A.   On the side of Mario's house.

653
Shannon - Coughlin - Direct

1

2      Q.    What happened -- can everybody hear okay now?

3      What happened after he hid the gun in the bushes?

4      A.    We went up to the store.

5      Q.    Who?

6      A.    Me, Valentino and Mario.

7      Q.    You, Valentino and Mario went to the store?

8      A.    Yes.

9      Q.    Is that the same store we keep hearing about, the

10     one --

11     A.    The Arab store.

12     Q.    The Arab store.

13     And what happened?

14     A.    Then we was about to go into the store.  That's

15     when Aaron Jackson and Travis Powell and Torre Jackson drove

16     up.

17     Q.    And when they drove up --

18     A.    Aaron and Mario had words.  They was -- Aaron was

19     shouting at Mario, and Mario was shouting back.  I couldn't

20     make out what they was saying because I was halfway in the

21     store, and Mario was outside.

22     Q.    All right.  Did you make any observations or see

23     anything transpire or happen after that?

24     A.    Travis pulled up in Louie's parking lot and they

25     jumped out the car.  Travis got out first.  Aaron got out and

Shannon - Coughlin - Direct

1  Torre got out the back seat, and I seen Torre, he was messing
2  with the top of the gun again. He had the gun, and I told
3  Mario, I told Mario to come on, come on, he got a gun. I
4  guess Mario didn't hear me. I told him come on again, and by
5  that time Aaron had rushed him, and Mario and Aaron was
6  tussling, Mario was throwing Aaron around, and Torre was
7  running up and I started running. I started running, so I
8  seen he had a gun, and I was looking back while I was running
9  at the same time. Looking back like this. But I wasn't
10 really running at full speed. I was jogging, like halfway
11 jogging. And I was looking back and I seen Torre had a gun.
12 He was pointing it at Mario, and Mario swinging at Aaron, and
13 Torre couldn't shoot Mario because he was swinging at Aaron,
14 and somehow Aaron broke loose from Mario and I heard a shot,
15 and Mario went down.

16     Q.    You said went down?

17     A.    Bent down like, like jerked like that, like he got
18 shot in the stomach area around here, where he bent over.

19     Q.    Was he --

20     A.    He stumbled.

21     Q.    Were they still there, though? Were they still
22 fighting?

23     A.    He had just broke away from him. They wasn't a
24 distance apart. They was a small distance apart, but he had

655

Shannon - Coughlin - Direct

1

2   room enough, like an opening.

3       Q.   All right, continue.  What happened next?

4       A.   So, I heard the shot at Mario, he bent down, he had

5   got hit apparently, and at that time I was running.  I was

6   still running.  Then I stopped.  Then Lamore comes past me --

7   or Lamarr comes past me with the gun in his hand, comes past

8   me, running past me with the gun in his hand, and he start

9   shooting everywhere, like first he shot Aaron, he just --

10  first he shot up in the air.  Then he shot at Aaron.

11      Q.   Hang on.  You said shooting everywhere?

12      A.   He was just like, like the gun had control of him.

13  He was just shooting at first, and then like he just came

14  up.  He was shooting um, boom, boom, and then he got control

15  of the gun and start shooting at Aaron and he hit Aaron, and

16  Torre was trying to run this -- like away from him, but he

17  had the gun in his hand and he shot Torre in the leg, and

18  Torre just stopped in his track.  Then he shot him in the

19  back, and Torre just fell down straight flat, and then he ran

20  up on him and kept on shooting him.  That's when I looked at

21  my brother Tino, and looked at him like, he's crazy, and I

22  ran, hopped the gate, ran through Mario and hopped the gate

23  and head over my friend house name Michael.  Then I called a

24  cab home later on that night.

25      Q.   Did you at any time on that evening or early

656

Shannon - Coughlin - Direct

1

2    morning now return to the scene?

3    A.    No.

4    Q.    You said you called a cab from your friend's

5    house?

6    A.    Yes.

7    Q.    Interrupt for a moment.  There came a time when you

8    were interviewed by some people from the Erie County District

9    Attorney's Office; is that correct?

10   A.    Yes.

11   Q.    And that was down in Kentucky?

12   A.    Yes.

13   Q.    When after this incident had you gone back to

14   school?

15   A.    After this incident, after this incident, the

16   shooting, I went to school -- the incident happened on the

17   10th.  I left for school -- I was at school on the 14th.

18   Q.    The 14th?

19   A.    Yes.

20   Q.    When were you supposed to have been at school?

21   A.    On the 12th.

22   Q.    And when you were speaking to the district

23   attorneys down in Kentucky, did you tell them about calling

24   the cab?

25   A.    Yes.

Shannon - Coughlin - Direct

1

2    Q.    Incidentally, the District Attorneys that that were

3    talking to you, they wrote out a statement as you were

4    relating it; is that correct?

5    A.    Yes.

6    Q.    Have you since had occasion to see that statement?

7    A.    I seen it.

8    Q.    Is that statement absolutely one hundred percent

9    consistent with the testimony that you have given this

10   morning?

11   A.    Yes.

12          MR. SEDITA:  Objection.  I think that's for

13          the jury to decide.

14          THE COURT:  Sustained.

15   BY MR. COUGHLIN:

16   Q.    Did you testify in the Grand Jury?

17   A.    No.

18   Q.    There has been testimony that you were subpoenaed,

19   but failed to appear, or did not appear?

20   A.    That's not true.

21   Q.    Pardon?

22   A.    That's not true.

23   Q.    Were you, in fact, ever personally subpoenaed to

24   appear before the Grand Jury?

25   A.    No.

Shannon - Coughlin - Direct

1

2    Q.    Were you ever requested?

3    A.    No.

4    Q.    Did they ever send you a letter?

5    A.    No.

6    Q.    Did they ever call you on the phone?

7    A.    No.

8    Q.    Now, the Grand Jury, at least the second half of it

9 was presented, presented this case in early January of 1992,

10 this year.  Were you home from school at that time?

11   A.    Yes, I was home on Christmas break.

12   Q.    And, were you, in fact, at home on the day that the

13 District Attorney's investigators came to serve a Grand Jury

14 subpoena on Leonard Brown?

15   A.    Yes, he gave me Leonard Brown's subpoena because I

16 answered the door.

17   Q.    And, did you tell him no, I'm not Leonard, I'm his

18 brother Antione?

19   A.    Yes.

20   Q.    Back to when the shooting was going on, or the

21 shooting had stopped and you were running away, you said?

22   A.    Yes.

23   Q.    You hopped the gate, or hopped the rear fence with

24 Mario?

25   A.    Yes.

659

Shannon - Coughlin - Direct

1

2    Q.    Do you remember what -- or do you know where

3    anybody else went to or ran to?

4    A.    We all went our separate ways.

5    Q.    Did you ever see the gun that Lamarr had, did you

6    ever see that again?

7    A.    Did I ever see it after the incident?

8    Q.    Yes.

9    A.    No.

10    Q.    Did you ever see the silver gun that Torre had

11    after the incident?

12    A.    No.

13    Q.    Did there come a time on the early morning hours of

14    the 12th of August, two days after this incident, when you

15    had occasion to be back on the corner of East Delevan and

16    Bailey Avenue?

17    A.    Not on East Delevan and Bailey Avenue.

18            THE COURT:  Is that a no, you weren't there?

19            THE WITNESS:  On East Delevan and Bailey

20        Avenue?

21            THE COURT:  That's what he asked you.

22            THE WITNESS:  No.

23            THE COURT:  Next question.

24    BY MR. COUGHLIN:

25    Q.    Did there come a time subsequent to this incident

Shannon - Coughlin - Direct

1

2  and before you went back to school when you saw Lamarr Scott?

3      A.    Yes.

4      Q.    And, at the time, was that on the 12th of August?

5      A.    Yes.

6      Q.    And, at the time you saw Lamarr Scott, were there

7  police officers in attendance?

8      A.    Yes.

9      Q.    And did you personally see and observe Lamarr Scott

10 be arrested and taken into custody in connection with the

11 incident, shooting of Torriano Jackson?

12              MR. SEDITA:  Objection to arrest.  That's a

13          conclusion.

14              THE COURT:  Overruled.  You can answer.

15              THE WITNESS:  Yes.

16 BY MR. COUGHLIN:

17     Q.    What did you see them do with respect to Lamarr

18 Scott?

19     A.    Handcuffed him and put him in the back seat of the

20 car.

21     Q.    And when they handcuffed him, they handcuffed him

22 behind his back?

23     A.    Yes.

24              MR. COUGHLIN:  I have nothing further.

25              THE COURT:  Mr. Newcomb?

661

1                     Shannon - Sedita - Cross
2                 MR. NEWCOMB:  No questions, Judge.
3                 THE COURT:  Mr. Sedita?
4                 MR. SEDITA:  Could we take a five-minute
5           recess, Judge.
6                 THE COURT:  Sure.  Let's take a short recess.
7           Ladies and gentlemen, we will have you back for
8           cross-examination in a few minutes.  You may go.
9                 (11:30 p.m. recess.)
10                (11:47 a.m., jury, counsel and defendants
11          present.)
12                     (Whereupon, People's Exhibit Number 58
13                     was marked for identification.)
14   A N T I O N E     S H A N N O N, having been previously sworn,
15          resumed the stand and testified further as follows:
16                THE COURT:  Mr. Sedita?
17   CROSS-EXAMINATION
18   BY MR. SEDITA:
19      Q.    Good morning, Mr. Shannon.
20      A.    Good morning.
21      Q.    Let's start off by talking about this incident in
22   the summer of 1991, about two weeks before the shooting that
23   occurred at East Delevan and Bailey Avenue on August 10th of
24   1991.  Are you familiar with what I am talking about,
25   referring to?

Shannon - Sedita - Cross

A.    You have to make yourself more specific.

Q.    You can move a little closer to the microphone. Just don't put your face in it, that's all.  Now, this incident at this dance club, it's your testimony that Torriano Jackson put a gun to your head; is that correct?

A.    Yes.

Q.    Now, you're in college right now; is that right?

A.    Yes.

Q.    No criminal record at all?

A.    No.

Q.    Football scholarship?

A.    Yes.

Q.    Never been in any kind of trouble at all?

A.    No.

Q.    And when somebody put a gun to your head -- first of all, they chased you and then put the gun to your head, right?

A.    They did not chase me.

        THE COURT:  Look it, now you are turning away from the microphone and not talking into it at all.  It might help if you were standing over there because he's looking at you.

        MR. SEDITA:  Okay.

BY MR. SEDITA:

663

Shannon - Sedita - Cross

Q. First they chased you, and then they put a gun to your head?

A. When did I say they chased me? I never said that.

Q. Did they chase you with a car?

A. They never chased me.

Q. Okay. They approached you very quickly with a car. Five people in one car; is that correct, right?

A. Yes.

Q. Isn't that what you testified to before?

A. Yes.

Q. They all jumped out of the car, right?

A. Yes.

Q. Torriano Jackson put a gun to your head; is that right?

A. Yes.

Q. And, when Torriano Jackson put a gun to your head according to your testimony, he manipulated that gun in some fashion or some way?

A. As I was running away he did.

Q. You saw that?

A. Yes.

Q. We are still talking about that first incident now. We are not talking about the shooting on August 10. You know where we are, right?

1

2    A.    Yes, at the club.

3    Q.    Describe to the jury -- well, let's do it this

4 way.  Was it a motion on top of the gun like this, back and

5 forth?

6    A.    Yes.

7    Q.    A sliding motion; is that right?

8    A.    Yes.

9    Q.    It was a sliding motion?

10        MR. COUGHLIN:  Just a moment.  I don't know if

11 the witness completed his answer or showed him what

12 he means.  I couldn't see what he was doing.

13        THE COURT:  What did he do?

14        THE WITNESS:  He like pulled something like at

15 the top of the gun.

16        MR. COUGHLIN:  For the record, your Honor,

17 indicating his left hand over his right hand,

18 moving back and forth.

19        MR. SEDITA:  I object to Mr. Coughlin

20 testifying.

21        THE COURT:  Yeah, I don't think we need to

22 elaborate.

23 BY MR. SEDITA:

24    Q.    Was it a sliding motion?  That's all I'm asking.

25    A.    It was a moving back and forth.

665

Shannon - Sedita - Cross

1

2    Q.    All right.   Now, you were scared when he put the

3    gun to your head, weren't you?

4    A.    Yes.   Not every day a person put a gun to your

5    head.

6    Q.    Very serious when somebody puts a gun to your head

7    and threatens you, isn't it?

8    A.    Yes.

9    Q.    And, as a law-abiding citizen, being scared of this

10   event, you, of course, would want to immediately contact the

11   police authorities about something like that, wouldn't you?

12   A.    In the neighborhood I would get ridiculed and

13   talked about, and everybody will like call me different names

14   and sorts, if you done that.   Like Aaron Jackson --

15   Q.    That's not what I asked you.

16         MR. COUGHLIN:  Objection, your Honor.

17         MR. SEDITA:  Well, I am not going to let him

18   give rambling, nonresponsive answers, Judge.

19         MR. COUGHLIN:  It was responsive.

20         THE COURT:  Just wait.   His answer is not

21   responsive.   He's trying to elaborate, and you have

22   the opportunity to ask him to elaborate if you

23   don't like his answer.   Now, the question was,

24   would you go to the police, and your answer is no,

25   it would be a problem in the neighborhood, right?

666

Shannon - Sedita - Cross

1

2          That's basically it.  Anything else you want to add

3          to that answer?

4               THE WITNESS:  No.

5               THE COURT:  All right, next question.

6    BY MR. SEDITA:

7          Q.   Would you agree that a crime had been committed on

8    you?

9          A.   Yes.

10         Q.   A crime had been committed on you.  You were

11   threatened with violence; is that correct?

12         A.   Yes.

13         Q.   You did not go to the police, is that also correct?

14         A.   Yes.

15         Q.   And the reason that you did not go to the police is

16   the police, as I understand your testimony, is because that

17   would meet with ridicule in your neighborhood.  Is that also

18   correct?

19         A.   That's what I said.

20         Q.   Is it because you don't trust the police?

21         A.   Maybe that's part of it.

22         Q.   Because you don't particularly like the police?

23         A.   That's not part of it.

24         Q.   But the point is you didn't report this violent

25   incident to the police?

Shannon - Sedita - Cross                    667

A.    No, I didn't.

Q.    Right?

A.    Right.

Q.    Now, this incident stayed in your mind for two weeks, didn't it?

A.    Yes.

Q.    It concerned you, this incident, didn't it?

A.    Yes.

Q.    In fact, it concerned you so much that on the evening of August 9th of 1991 when you saw the Jackson brothers, you confronted them for that reason, is that right?

A.    The reason why I confronted him, I confronted him because I didn't have a conflict. Someone else had a conflict with him and I wanted to straighten out the problem between me and him, but he got hostile. That's what started everything from getting out of hand.

MR. SEDITA:  Objection to that. It's not responsive.

THE COURT:  Overruled. It stands. Go ahead.

BY MR. SEDITA:

Q.    The point is, you came up to talk to Aaron Jackson, right?

A.    Yes.

Q.    And, in your words, in your prior statement, words

668

Shannon - Sedita - Cross

1

2    were exchanged.   Is that also correct?

3        A.    Between me and Aaron Jackson?

4        Q.    Right.

5        A.    I asked Aaron Jackson --

6        Q.    All I am asking you, sir, were words exchanged?

7        A.    Yes.

8        Q.    Just answer the question that I asked you.  Now,

9    there came a point in time when Aaron Jackson and Travis

10   Powell took off; is that right?

11       A.    Yes.

12       Q.    And then there came a time when you went after that

13   back to Mario Jarmon's house, right?

14       A.    Yes.

15       Q.    Now, when Aaron Jackson and Travis Powell took off,

16   according to your prior testimony, again Aaron Jackson

17   started threatening you about shooting you and coming at you

18   with a gun.  I think your words were spraying you; is that

19   right?

20       A.    Yes.

21       Q.    He didn't say shooting you.  He said spraying you,

22   right?

23       A.    Yes.

24       Q.    And you understand spraying to mean any kind of

25   shooting, or is it more like machine gun type shooting?

Shannon - Sedita - Cross

A.    Spray, meaning like machine gun -- it's like getting shot, shooting.

Q.    He said he was going to spray you, right?

A.    Yes.

Q.    Now, given the prior experience that you had had two weeks before, and he threatened you now again, this time Aaron Jackson is threatening you, are you a little worried?

A.    Yes, I can't underestimate him.  He pulled a gun out on me before.

Q.    Sure.  You were scared, weren't you?

A.    Yes, right.

Q.    You went back to Mario Jarmon's house; is that right?

A.    Yes.

Q.    You stayed there for awhile; is that right?

A.    This all happened, not real long.

Q.    How long did you stay there?

A.    It was no longer than an hour.

Q.    Is there a phone in that house?

A.    Yes.

Q.    Now, did you have a weapon when you went back to that house?

A.    No.

Q.    Mario Jarmon have a weapon?

Shannon - Sedita - Cross                    670

A.    No.

Q.    Leonard Brown have a weapon?

A.    No.

Q.    None of you guys had weapons, right?

A.    No.

Q.    Would it be fair to say that you were all very concerned about this incident that had just happened to you in front of the Bailey-Delevan market?

A.    Yes.

Q.    I think it was also your testimony that you kept seeing that little yellow Geo driving by your house; is that right?

A.    Not my house, Mario house.

Q.    Mario's house.  You kept seeing that little yellow Geo driving by the house; is that right?

A.    Yes.

Q.    Did you ever hear the term, a drive-by shooting?

A.    Yes, I have heard the term.

Q.    Were you afraid that they might do a drive-by shooting on you?

A.    I was afraid -- I don't know what would happen.  I can't -- I can't imagine things.  You ask me what I know, what I seen.  I can't imagine things.  You are asking me to imagine things now.

Shannon - Sedita - Cross

1

2    Q.    Were you afraid that violence was going to be

3    performed on you?

4    A.    Yes.

5    Q.    Were you afraid that you might get shot?

6    A.    Yes, there was a possibility.

7    Q.    Were your fears confirmed when you kept seeing,

8    according to your testimony, this little yellow car go by?

9    A.    Can you say that again?

10   Q.    Were your fears confirmed even more when you saw

11   that little yellow car keep driving by?  Did it make you more

12   scared?

13   A.    Yes.

14   Q.    All right.  When somebody -- when you are afraid

15   that somebody is going to shoot you, who should you call?

16   A.    I call anybody I feel as though that would, that I

17   could depend on.

18   Q.    That you can depend on?

19   A.    Yeah, like family.

20   Q.    When somebody has threatened you with a gun, who do

21   you call?

22   A.    Anybody I feel I can depend on.

23   Q.    Didn't call the police, did you?

24   A.    No, I didn't.

25   Q.    Who did you call?

Shannon - Sedita - Cross                    672

A.    I called my brother.

Q.    You called Valentino Dixon, right?

A.    Yes.

Q.    Right?

A.    Yes.

Q.    You felt you could depend on Valentino Dixon?

A.    Because he's my brother.  That's why I can depend on him.

Q.    Now, you just have been threatened with a shooting.  This yellow car goes by, and the guy you want to call is your half brother Valentino, right?

A.    That's the guy I called.

Q.    And how did you call him?  Did you call him on the telephone?

A.    Yes.

Q.    Did you get in contact with him over the telephone?

A.    No.

Q.    Call him on the beeper, right?

A.    Yeah, the beeper.

Q.    Valentino a medical doctor, or something?

A.    No.

Q.    No.  Is he a businessman of some kind?

A.    No.

Q.    Do you remember what he did for a living, what his

Shannon - Sedita - Cross                          673

1

2    job was at that point this time?  *[handwritten: Attacking credibility to show history of prior criminal activity?]*

3        A.    No.

4        Q.    But he had a beeper.  How many cars did he have?

5                    MR. COUGHLIN:  Objection, your Honor.

6                    THE COURT:  Sustained.

7    BY MR. SEDITA:

8        Q.    He drove up eventually in a red RX 7, right?

9        A.    Yes.

10       Q.    Brand new sports car?

11       A.    It's a sports car.

12       Q.    Expensive sports car?

13                   MR. COUGHLIN:  Objection, your Honor.

14                   THE WITNESS:  I don't know the price of that.

15                   THE COURT:  Sustained.

16   BY MR. SEDITA:

17       Q.    Now, as I understand this, there comes a point in

18   time that Valentino Dixon arrives; is that right?

19       A.    Yes.

20       Q.    And when Valentino Dixon arrives, he's there,

21   right?

22       A.    Yes.

23       Q.    You're there, Mario Jarmon's house, right?

24       A.    Yes.

25       Q.    Your brother Leonard Brown is there, right?

674

1                  Shannon - Sedita - Cross

2       A.    Yes.

3       Q.    Mario Jarmon is there, right?

4       A.    Yes.

5       Q.    Four people.  And then a few minutes later Lamarr

6  Scott comes riding by on his 10-speed bike; is that your

7  testimony?

8       A.    That's my testimony.

9       Q.    You weren't really friends with Lamarr, were you?

10      A.    Like I said, I knew him from school, from Grover.

11      Q.    You guys weren't tight?

12      A.    We wasn't tight.

13      Q.    He wasn't tight with Leonard Lamarr Scott, was he?

14      A.    No.

15      Q.    He wasn't tight with Tino, was he?

16      A.    No.

17      Q.    Do you know if he was tight with Mario?

18      A.    No.

19      Q.    Not tight with any of you four guys; is that

20  right?

21      A.    No.  That's right.  That's right.

22      Q.    But, Lamarr, you tell Lamarr your problems, right?

23      A.    Yes.

24      Q.    And Lamarr says I'll be back?

25      A.    Yes.

675

Shannon - Sedita - Cross

1

2      Q.    And Lamarr does come back, right?

3      A.    Yes.

4      Q.    And when Lamarr comes back out, he's got a machine

5  gun, right?

6      A.    Right.

7      Q.    Did he show it all to you?

8      A.    He showed it briefly, quick, like a gun.

9      Q.    Were you all around when he showed you the machine

10 gun?

11     A.    Around, like make yourself clear.

12     Q.    You had seen the machine gun, right?

13     A.    Yes.

14     Q.    Leonard Brown could see the machine gun?

15     A.    Can't speak for him.   He should be.

16     Q.    You don't know.  Do you know if Mario could see the

17 machine gun?

18     A.    Like I say, same thing goes for him.   They were in

19 the point that they could.

20     Q.    They were there?

21     A.    Yes.

22     Q.    So was Valentino Dixon?

23     A.    Yes.

24     Q.    Now a few of you decide, let's go back up to the

25 store, the Bailey-Delevan market and get some beer, right?

Shannon — Sedita — Cross

676

A.    Did I say that?

Q.    I don't know.  I'm asking a question.  Is that why you went to the Bailey-Delevan market, to get some beer?

A.    No.

Q.    Why did you go to the Bailey-Delevan market?

A.    I went up there to get a pop.

Q.    You wanted to get a pop.  Okay.  Now Lamarr is back at Mario's house with the machine gun, right?

A.    Yes.

Q.    You go up to the Bailey-Delevan market, right?

A.    Right.

Q.    You know that somebody has just threatened you with a gun, right?

A.    Right.

Q.    These people are driving by, you think they might be looking for you; is that right?

A.    Could be, right.

Q.    Haven't called the police about anything, right?

A.    Right.

Q.    You decide hey, let's go up to the Bailey-Delevan market and get a pop, right?

A.    Right.

Q.    Okay, are you thirsty?

A.    Yeah.

Q.   Any pop inside Mario's house?

A.   No.

Q.   Now, who do you go to the Bailey-Delevan market with?

A.   Me, Mario and Valentino.

Q.   Three people altogether, right?

A.   Yes.

Q.   You're sure about that?  Lamarr Scott did not go with you the to the Bailey-Delevan market; is that right?

A.   Right.

Q.   Okay.  And while you're at the Bailey-Delevan market, something else happens.  A yellow Geo pulls up into Louie's parking lot and the Jackson brothers get out, right?

A.   Yes.

Q.   Were you able to see the Jackson brothers get out of their car?

A.   Yes.

Q.   Were you inside or outside the Bailey-Delevan market at that point?

A.   Outside at that point.

Q.   Who else was outside with you?

A.   Me, Tino and Mario.

Q.   All three of you are outside?

A.   Yes.

Shannon - Sedita - Cross                    678

1

2        Q.    You see the Geo park, right?

3        A.    Yes.

4        Q.    Do you see the Geo go down East Delevan, take a

5   turn on Bailey, and then go into the parking lot?

6        A.    Can you do that again one more time?

7        Q.    I don't mean to confuse you, all right.  Before you

8   saw the Geo park, did you see the Geo go down East Delevan,

9   stop at the light, turn and come back into the parking lot?

10       A.    I seen him turn and go into the parking lot the

11  other way.

12       Q.    So, you're standing outside the Bailey-Delevan

13  market.  You see the Geo pull in the parking lot, right?

14       A.    Yes.

15       Q.    Same car that Aaron Jackson was in earlier when he

16  threatened you with the gun, right?

17       A.    Yes.

18       Q.    Same car that according to you that he been driving

19  around the neighborhood, right?

20       A.    Yes.

21       Q.    And you don't have any weapons, do you?

22       A.    No.

23       Q.    And Mario doesn't have any weapons, does he?

24       A.    No.

25       Q.    And, of course, Valentino Dixon, he doesn't have

679

Shannon - Sedita - Cross

1

2    any weapons either, does he?

3        A.    No.

4        Q.    Okay.  You guys see the yellow car pull in the

5    parking lot, the three of you stay there at that point,

6    right?

7        A.    I didn't stay there.

8        Q.    You ran right away?

9        A.    Not right away.

10       Q.    You stayed for how long?

11       A.    Seconds.

12       Q.    How many seconds?

13       A.    I can't say the precise seconds.  I didn't have a

14   watch on.

15       Q.    More than 10?

16       A.    It happened so fast.

17                THE COURT:  Mr. Sedita, you are standing

18                between the jury and the witness.

19                MR. SEDITA:  I'm sorry.

20   BY MR. SEDITA:

21       Q.    You didn't take off right away when you saw that

22   yellow Geo pull into the lot, did you?

23       A.    Like I said, I told Mario to come on.  I told him

24   to come on again.

25       Q.    That's not my question to you?

Shannon - Sedita - Cross

1

2    A.   But I am saying the time it took me to say that,

3  that's the time that I stayed.

4    Q.   Listen to my question.  If you don't understand my

5  question, tell me.  When you first saw the Geo, you didn't

6  get out of there right away, did you?

7    A.   Like this, run?

8    Q.   Right.

9    A.   No.

10    Q.   You stayed outside the Bailey-Delevan market,

11  right?

12    A.   Yes.

13    Q.   You thought the guys in the Geo might have some

14  weapons, right?

15    A.   Yes.

16    Q.   Yeah.  And you guys didn't have any weapons?

17    A.   Right.

18    Q.   You thought they might be looking for you in that

19  Geo, right?

20    A.   Right.

21    Q.   But you didn't take off right away when you saw the

22  Geo.  Is that also right?

23    A.   Right.

24    Q.   Now, who pops out of the Geo?

25    A.   Travis gets out, Aaron gets out and Torre gets out.

Shannon - Sedita - Cross                    681

1

2    Q.    They all get out?

3    A.    Yes.

4    Q.    Did they come right at you?

5    A.    Yes.

6    Q.    When do you first see the gun that Torriano Jackson

7    supposedly has?

8    A.    When Torre was getting out the car.

9    Q.    When he was getting out of the car?

10   A.    Yes.

11   Q.    When you were outside the Bailey-Delevan market and

12   they were getting out of the car, you saw the gun the first

13   time?

14   A.    Yes.

15   Q.    Did you see Torriano Jackson make any movements

16   with the gun?

17   A.    Yes.

18   Q.    What did you see?

19   A.    I seen the same movement that I demonstrated

20   earlier at the top.

21   Q.    That motion, okay.

22   Did Torriano Jackson -- strike that.

23   Now, is that when you started jogging away?

24   A.    Yes.

25   Q.    What about Mario, is he going to jog away?

682

Shannon - Sedita - Cross

1

2    A.   He didn't jog away.

3    Q.   What about Valentino, did he jog away?

4    A.   Yes, he jogged.

5    Q.   That's when the fight starts, right?

6    A.   Yes, that's when Aaron rushed Mario.

7    Q.   Where does the fight start?  Does it start in the

8 street or sidewalk?

9    A.   Sidewalk.

10    Q.   And when the fight starts on the sidewalk, where

11 are you?

12    A.   Down on the sidewalk, like maybe 25 feet away.

13    Q.   All right, you are jogging down East Delevan?

14    A.   Jogging down towards west.

15    Q.   Where are you going?

16    A.   Towards Mario house.

17    Q.   Why are you going to Mario's house?

18    A.   That's the way I came from.

19    Q.   You also knew there was a gun at Mario's?

20    A.   Why would I go back this way and they back that

21 way?

22    Q.   I don't know.

23    A.   Why would I do that and get shot?

24    Q.   All I know is you ran back towards Mario's house,

25 right?

683

Shannon - Sedita - Cross

1

2    A.    Why would I run back intentionally into a gun?

3    Q.    You ran to Mario's house, is that right?

4    A.    I didn't get to Mario's house.  I stopped.

5    Q.    Listen to my question.  You ran towards Mario

6    Jarmon's house, right?

7    A.    Yes.

8    Q.    Valentino Dixon ran with you toward Mario Jarmon's

9    house, right?

10    A.    Yes.

11    Q.    There's a machine gun at Mario Jarmon's house,

12    right?

13    A.    Yes.

14    Q.    Okay.  Were you going to Mario's house to call the

15    police?

16    A.    I never said I was going to Mario house.

17    Q.    You were going towards Mario's house, weren't you?

18    A.    Yes.

19    Q.    Then you hear a shot, right?

20    A.    Yes.

21    Q.    Do you see the shot, or do you hear it, or both?

22    A.    I'm looking -- I can't see a bullet.  You know

23    bullet too fast to see.  I heard the shot.  I heard Mario go

24    down like as if he was hit.

25    Q.    Where was Torre when you turned around?

684

Shannon - Sedita - Cross

1

2     A.    He was right there, right --

3     Q.    Was he over Mario?

4     A.    He wasn't over him because Mario did not fall right

5     then.

6     Q.    Were they still on the sidewalk?

7     A.    No, they was in the street.

8     Q.    They were in the street?

9     A.    Yes.

10    Q.    How many times did -- how many times did Torre

11    shoot Mario, if you know?

12    A.    I don't know how many times.

13    Q.    Was it more than once?

14    A.    I couldn't tell.  I know he shot him.

15    Q.    I'm sorry, didn't hear that?

16    A.    I just know he shot him.

17    Q.    You just know he shot him?

18    A.    Yes.

19    Q.    Now, how long between when Torre takes a shot and

20    Lamarr comes running up the street with the machine gun?  How

21    long?

22    A.    How long was it?

23    Q.    Yes.

24    A.    Seconds.  He heard the shot and he came running

25    down there immediately.  He heard the shot.  He came running

685

Shannon – Sedita – Cross

1
2  down there immediately with the gun because he stayed back at
3  the house.

4      Q.   It's no doubt in your mind that it's Lamarr Scott?

5      A.   No doubt in my mind.  He ran right past me.

6      Q.   The same Lamarr Scott that wasn't your friend,
7  right?

8      A.   I knew him, but I say --

9      Q.   He's not your friend, right?

10     A.   Right.

11     Q.   The same Lamarr Scott that is not Mr. Brown's
12  friend, right?

13     A.   Yes.

14     Q.   Same Lamarr Scott that is not Mario Jarmon's
15  friend, right?  Same Lamarr Scott that is not Valentino
16  Dixon's friend, right?

17     A.   Right.

18     Q.   Now, you talk about this incident in the summer of
19  1991 about two weeks before what happened on Bailey and
20  Delevan Avenue when Torriano Jackson put a gun to your head,
21  right?

22     A.   Yes.

23     Q.   Remember November 21st of 1991, Mr. Belling came
24  down to Campbellville, Kentucky, to talk to you?

25     A.   I don't remember who talked to me.  I remember

686

Shannon - Sedita - Cross

1

2    somebody talked to me.

3        Q.    Well, you gave a statement to somebody on November

4    21st of 1991, right?

5        A.    Yes.

6        Q.    It's not in your handwriting, right?

7        A.    No.

8        Q.    I'm going to show you what has been marked as

9    People's Exhibit Number 58 for identification.  You can keep

10   that in your hands.  It's all right, keep it in your hands.

11   Is that statement the truth?

12       A.    Yes.

13              THE COURT:  Speak a little more into the

14              microphone now.

15              THE WITNESS:  Yes.

16   BY MR. SEDITA:

17       Q.    Were you trying to be as accurate as possible when

18   you made that statement?

19       A.    Yes.

20       Q.    In fact, you initialed every page of that

21   statement; isn't that right?

22       A.    Yes.

23       Q.    At the end of the statement you signed it, swore in

24   front of a notary public, right?

25       A.    Yes.

687

Shannon - Sedita - Cross

1

2          Q.    And at the end of the statement you signed

3    underneath, I have read the preceding five pages and they are

4    true and correct insofar as they go into detail and to the

5    best of my recollection, right?

6          A.    Yes.

7          Q.    Now, the event that happened two weeks before this

8    August 10th, 1991 shooting over here, as you said before a

9    few minutes ago in the cross-examination, it was still in

10   your mind, right?

11         A.    Yeah.

12         Q.    It was a violent act performed upon you, right?

13         A.    Right.

14         Q.    Where is that in that statement?

15         A.    Where is it in the statement?

16         Q.    Yeah, where is it in the statement?

17         A.    Where is it -- what you mean?  They didn't ask me

18   that.

19         Q.    Where do you talk about that incident in the

20   statement?

21         A.    They didn't write it down.

22         Q.    You don't talk about that incident in the

23   statement, do you?

24         A.    They didn't write it down.  I told him about it,

25   but they didn't write it down.

688

Shannon - Sedita - Cross

1

2     Q.   Oh, so this is not accurate, what you told Mr.

3    Belling?

4              MR. COUGHLIN:  Objection, your Honor,

5              argumentative and calls for a conclusion.  The

6              statement itself says insofar as it goes into

7              details in Mr. Belling's word.

8              MR. SEDITA:  Well, I object to the little

9              speech there.

10             THE COURT:  You can rephrase your question.

11             MR. SEDITA:  Sure.

12   BY MR. SEDITA:

13     Q.   You initialed every page of this document, didn't

14   you?

15     A.   Mm-hmm.

16     Q.   You said that you -- let me see it for a second.

17   You said at the end of this statement, I have read the

18   preceding five pages and they are true and correct inasmuch

19   as they go into detail, to the best of my recollection; isn't

20   that right?  You said that in the statement?

21     A.   Yes, I did.

22     Q.   And, this incident that happened two weeks before

23   the shooting on Bailey and Delevan, that was wearing on your

24   mind, right?

25     A.   Yes.

689

Shannon - Sedita - Cross

1

2      Q.    Answer this question yes or no.  Do you mention

3    that incident in that statement at any point?

4      A.    I mentioned it in the interview, but they didn't

5    write it down.  I'm talking about everything is correct that

6    they wrote down that I said about the incident that happened

7    that night, but they didn't write nothing prior to what

8    happened that night.

9      Q.    So, Mr. Belling just didn't write this down?

10     A.    He just didn't write it down.

11     Q.    You told him that, but Mr. Belling didn't write

12   that down?

13     A.    Yes, I did.

14     Q.    And, before November 21st of 1991 you never told

15   the police about this little incident that happened two weeks

16   on Bailey and East Delevan, did you?

17     A.    No.

18     Q.    Never told the police about that?  Right?

19     A.    No.  I tried to tell the News, but I didn't get a

20   chance.

21     Q.    Well, today is what, November 12th, '92, right?

22     A.    Yes.

23     Q.    And this is the first time you talked about this in

24   a setting such as a courtroom, or put it down on a statement

25   somewhere; is that right?

Shannon - Sedita - Cross

1    A.    No.

2    Q.    It's not the first time?

3    A.    I talked to Valentino lawyer, Sean Hill, about a

4    couple days after the incident happened, and he wrote down

5    everything I said, everything as far as what happened

6    before.

7    Q.    Mr. Hill wrote down all those things?

8    A.    Yes.

9    Q.    I assume you gave copy -- did you have a copy of

10   that document?

11   A.    I don't have a copy of it.

12   Q.    You know if Mr. Coughlin got a copy of that

13   document?

14   A.    I don't know if he have one.  You can ask him.

15   MR. COUGHLIN:  Nope.

16   BY MR. SEDITA:

17   Q.    Now, when you ran away from the shooting scene, you

18   hopped the fence and went to a friend's house on Herman

19   Street and called a cab, right?

20   A.    Yes.

21   Q.    You didn't go back into Mario's house, did you?

22   A.    No.

23   Q.    And you were alone when you did that, weren't you?

24   A.    Yes.

25

Shannon - Sedita - Cross                    691

1

2      Q.    Were you with Leonard Brown when you hopped the

3   fence and went to call the cab on Herman?

4      A.    Me and Leonard went our separate ways.

5      Q.    You went your separate ways?

6      A.    Yes.

7      Q.    No doubt in your mind about that?

8      A.    No doubt.

9      Q.    You also said -- strike that.  Now you talked about

10  being around on August 12, 1991 when Lamarr Scott was taken

11  into custody by some Buffalo police officers.  Do you

12  remember that?

13     A.    Yes.

14     Q.    Do you know how Lamarr Scott got there?

15     A.    Yes.

16     Q.    How did he get there?

17     A.    He got drove down by, they set up an appointment.

18     Q.    I'm not asking you about appointments.  Do you know

19  how he got there?  Yes or no, do you know how he got there?

20     A.    Yes.

21     Q.    Did you bring him down there?

22     A.    I didn't bring him.

23     Q.    Were you with Lamarr Scott when he was brought down

24  to Genesee and Bailey on August 12th?

25     A.    Yes.

Shannon - Sedita - Cross

1

2    Q.   Was Mario Jarmon there?

3    A.   No, no.

4    Q.   Was Leonard Brown there?

5    A.   Yes.

6    Q.   All right.  Who is Robert Bryant?

7    A.   He's my father.

8    Q.   That's also Valentino's father, right?

9    A.   Yes.

10   Q.   Was he there?

11   A.   Yes.

12   Q.   In fact, it was Robert Bryant who drove Lamarr

13   Scott down to Genesee and Bailey, wasn't it?

14   A.   Yes.

15   Q.   In fact, everybody before you went down to Genesee

16   and Bailey met at your house at 63 Fay Street, didn't they?

17   A.   Yes, they had to call to set up an appointment.

18   Q.   They met at 63 Fay Street at your house, yes or no?

19   A.   Yes.

20   Q.   The first time that you ever testified about the

21   events of August 10th of 1991 is today, right?

22   A.   Ever testified in court?

23   Q.   Ever testify anywhere?

24   A.   What you mean by testifying?

25   Q.   Testify before a Grand Jury?

Shannon - Coughlin - Redirect

693

1

2    A.   No.

3    Q.   Did you ever testify at trial?

4    A.   No.

5    Q.   Today is the first time, right?

6    A.   Yes.

7         MR. SEDITA:  Nothing further.

8         THE COURT:  Mr. Coughlin?

9  REDIRECT EXAMINATION

10  BY MR. COUGHLIN:

11    Q.   Showing you what has been marked as Exhibit 58 for

12  identification, first of all, that's a handwritten statement?

13    A.   Yes.

14    Q.   And that statement was written by Mr. Belling?

15    A.   They got it down there it was written by Mr.

16  Belling.

17    Q.   It was written by the Assistant District Attorney,

18  whatever his name was, that was talking to you; is that

19  correct?

20    A.   Yes.  Right.  That's correct.

21    Q.   Is that a verbatim -- do you know what verbatim

22  statement means?  An exact statement?

23    A.   No.

24    Q.   Does those -- do those five pages contain each and

25  every single word that was spoken by you in response to Mr.

694

Shannon - Coughlin - Redirect

1

2  Belling's questions?

3      A.   No.  It would be way bigger than that.

4      Q.   As a matter of fact, that statement doesn't show

5  Mr. Belling's questions either, does it?

6      A.   No.

7      Q.   And that statement doesn't show anything about who

8  you are or what you were or why you were in Campbellville,

9  Kentucky, does it?

10     A.   No.

11     Q.   Could have been a jail for all this statement says,

12 right?

13              MR. SEDITA:  Objection.

14              THE COURT:  Sustained.

15 BY MR. COUGHLIN:

16     Q.   And if you'll look at the last page, the last

17 paragraph that Mr. Belling or some prosecutor wrote states

18 that what has been written before was true and correct

19 insofar as it goes into detail.  Is that what that says?

20     A.   Yes.

21     Q.   And, were there details of your conversation with

22 Mr. Belling or some prosecutor that are not in that

23 statement?

24     A.   Yes.

25     Q.   Including the details about the incident in July at

Shannon - Coughlin - Redirect                    695

1

2  The Difference?

3       A.   Yes.

4       Q.   Did you get the impression at the time that Mr.

5  Belling didn't like what he was hearing from you?

6            MR. SEDITA:  Oh, objection to that.

7            THE COURT:  Sustained.

8  BY MR. COUGHLIN:

9       Q.   Now, directing your attention to the very first few

10  seconds when you came back out of the market, or out of the

11  market doorway and you saw Torre and Aaron cross the street,

12  just those first few glimpses of them, okay?

13       A.   Okay.

14       Q.   At that time were there still a lot of people

15  milling around in and about that intersection and the parking

16  lot?

17       A.   No.

18       Q.   Cars, though?

19       A.   There was cars.

20       Q.   People in and out of Louie's?

21       A.   There was cars.  I didn't see nobody go in and out

22  of Louie's, but I wasn't focusing on it.

23       Q.   Cars or people over across the street in the

24  parking lot of Norstar?

25       A.   Yes.

Shannon - Coughlin - Redirect                    696

Q.   Again, focusing your attention just on your first glimpse of Tino and Aaron getting out of that car --

A.   Torre.

Q.   Torre and Aaron getting out of that car.  Did you think at that very instant that they were going to come over and shoot anybody, at that instant?

MR. SEDITA:  Objection, leading.

THE COURT:  Sustained.

BY MR. COUGHLIN:

Q.   All right, just one last thing.  I would like you to explain a little more your response to Mr. Sedita's question concerning why you didn't call the police after the incident in July, or didn't stop and call the police from whatever available phone in that intersection when you saw this incident developing then on the 10th.  Why didn't you call them?  Why didn't you call the police in July, first of all?

A.   Because I would have been ridiculed and talked about, and everything.  Everybody would say like, you called the police.  I probably would be tried by the whole neighborhood about that.

Q.   You would be tried by the whole neighborhood?

A.   Yeah, different people say like you this and that, and personally I didn't think it was going to get out of hand

697

Shannon - Coughlin - Redirect

1
2  like that.  I didn't know that Aaron Jackson was that hyper
3  and had had all them hangups.
4         MR. SEDITA:  Objection to that.
5         THE WITNESS:  I thought we could just settle
6         it like.
7         MR. SEDITA:  Objection.
8         THE COURT:  Overruled.  Go ahead.
9         THE WITNESS:  I thought we could just settle
10        it with talking about it.  Because I didn't really
11        have a conflict with him in the first, from the
12        start.
13  BY MR. COUGHLIN:
14     Q.   You had never had any personal conflict or problem
15  with Aaron Jackson, right?
16     A.   No.
17     Q.   Never had any problem of any kind with Torre
18  Jackson, right?
19     A.   No.
20     Q.   You had observed that they apparently had some kind
21  of a problem with your friends that had driven you to The
22  Difference, right?
23     A.   Yes.
24     Q.   Is that what you wanted to straighten out when you
25  walked across the street on the evening, morning of the 10th

698

Shannon - Coughlin - Redirect

1

2   to talk to Aaron?

3       A.   Yes.

4       Q.   His problem was with your friend, not with you,

5   right?

6       A.   Yes.

7                MR. COUGHLIN:  Nothing more.

8                THE COURT:  Mr. Sedita?

9                MR. SEDITA:  I have nothing further.

10               THE COURT:  That's it, Mr. Shannon.  You may

11           step down.

12           (Witness excused.)

13               THE COURT:  What else do you have, Mr.

14           Coughlin?

15               MR. COUGHLIN:  Defendant rests, your Honor.

16               MR. NEWCOMB:  Defendant Jarmon rests, your

17           Honor.

18               THE COURT:  Mr. Sedita?

19               MR. SEDITA:  I'm not sure if I want to call

20           another witness.  Could we have a recess?

21               THE COURT:  Sure.  What is the time

22           constraints here?  Would counsel approach a

23           minute?

24           (Bench Conference held.)

25               THE COURT:  Okay, ladies and gentlemen, I will