# EXHIBIT 97

1

2   COUNTY COURT OF THE STATE OF NEW YORK

3   COUNTY OF ERIE : CRIMINAL TERM : PART 1

4   ------------------------------------------x

5   THE PEOPLE OF THE STATE OF NEW YORK

6                          :  Indictment
                              No. 91-1476-003

7      -against-              :

8   LEONARD BROWN & MARIO JARMON,
                            :  Perjury

9          Defendant.        :  Trial

10  ------------------------------------------x

11                    Erie County Hall

12                 Buffalo, New York  14202
                  Thursday, November 5, 1992

13  B e f o r e :

14           HONORABLE MICHAEL L. D'AMICO

15

16  A p p e a r a n c e s :            Judge

17        KEVIN M. DILLON, ESQ.
           District Attorney, Erie County

18        BY:  FRANK A. SEDITA, III, ESQ.
            Assistant District Attorney

19           Appearing for the People

20        EDWARD COUGHLIN, ESQ.
           Appearing for the Defendant Brown

21

22        TERENCE B. NEWCOMB, ESQ.
           Appearing for the Defendant Jarmon

23

24

25

                   Kenneth D. Meier, C.S.R.
                  Senior Court Reporter

93 FEB 26 AM 11:17
ERIE COUNTY CLERK

<u>I N D E X</u>

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Frank Tucci | 45 | 51C | | |
| William Shephard | 56 | 64C | | |
| Aaron Jackson | 67 | 94C 96N 100C 155N | 160 | |
| Travis Powell | 172 | 191C 201N 205C | | |
| John Sullivan | 206 | 220C 230N | 233 | |
| Fazollah Loghmanee | 239 | 245C | 249 | 250C |
| Robert Lewis | 251 | 260C 282N | 284 | 285C |
| Fred Stancil, Jr. | 291 | 299C 305N | | |
| Tamara Frida | 312 | 317C 320N | | |
| James Lonergan | 321 | 325C 333N | 335 | |
| Henry Smardz | 336 | 363C 373N | 375 | 376C |
| James Diegelman | 377 | 381 | | |
| Bert Pandolfino | 395 | 401C 403N | | |
| Charles Militello | 404 | 412C 415N | | |
| Michael Dujanovich | 430 | 442C 444N | | |
| Thomas Maxian | 446 | 452N | 455 | |

*C - Coughlin   N - Newcomb

3

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Raneiro Rasecchia | 455 | 459C | | |
| Christopher J. Belling | 467 | 483C<br>518N | 558 | 567N |
| Floyd Fisher | 572 | 588 | | |
| Darwin Amerson | 610 | 617N | | |
| Daniel DiPirro | 619 | 622 | 623 | 624 |
| Antione Shannon | 626 | 661 | 693 | |

## E X H I B I T S

| PEOPLE'S | FOR IDENT. | IN EVIDENCE |
|---|---|---|
| No. 1 (Copper bullet) | 6 | |
| No. 2, 3 (copper bullets) | 6 | 394 |
| No. 4 (lead slug) | 6 | 394 |
| No. 5 (22 caliber casing) | 6 | 394 |
| (No Exhibit No. 6) | | 394 |
| No. 7A, 7B, 7C<br>(.32 Caliber revolver)<br>(27 9mm casings)<br>(1 9mm copper jacket bullet) | 6 | 394 |
| No. 8 (Lamarr Scott mug shot) | 6 | 472 |
| No. 9 (lead slug) | 6 | 394 |
| No. 10 (9mm bullet) | 6 | 394 |
| No. 11 (Photo) | 6 | |
| Nos. 12, 13, 14 (Photos) | 6 | 60 |
| No. 15 (Photo - Dixon) | 6 | |
| Nos. 16 thru 20 (9mm slug<br>from victim) | 6 | 394 |
| No. 21 (Dixon's clothes) | 6 | |

EXHIBITS (Continued)                                                    3~A

| PEOPLE'S | FOR IDENT. | IN EVIDENCE |
|---|---|---|
| No. 22 (Map) | 6 | 56 |
| No. 23 (Photo) | 6 | 190 |
| Nos.24, 25, 26 (Photos) | 6 | 96 |
| No. 27 (Photo) | 6 | 394 |
| No. 28 (Photo) | 6 | 334 |
| No. 29 thru 33 (Photos) | 6 | 394 |
| No. 35 (Photo) | 6 | 190 |
| Nos. 34, 36 (Photos) | 6 | 96 |
| Nos. 37 thru 43 (Photos) | 6 | 394 |
| Nos. 44 thru 50 (Photos) | 6 | |
| Nos. 51, 52 (Photos) | 6 | 317 |
| No. 53 (statement-Dixon) | 411 | |
| No. 54 (Ambulance run report) | 446 | |
| No. 55 (Statement - Brown) | 455 | 467 |
| No. 56 (GJ Test. Brown) | 518 | 568 |
| No. 57 (GJ Test. Jarmon) | 518 | 568 |
| No. 58 (Shannon statement) | 661 | |

| DEFENDANTS' | | |
|---|---|---|
| A (GJ test. A. Jackson) | 110 | |
| B (Dixon trial transcript) | 145 | |
| C (P-73) | 152 | |
| D thru J (Photos) | 197 | 200 |

EXHIBITS (Continued)


| DEFENDANTS' | FOR IDENT. | IN EVIDENCE |
|---|---|---|
| K (Statement-Sullivan) | 221 | |
| L (GJ test. Lewis) | 288 | |
| M (P-73) | 329 | |
| N (BPD Certificate) | 369 | |
| O (GJ - Jarmon) | 518 | |
| P (Scott -testimony) | 549 | |

| | PAGE |
|---|---|
| Preliminary Charge | 6 |
| Proceedings of Friday, November 6, 1992 | 29 |
| Opening Statement - Mr. Sedita | 37 |
| Opening Statement - Mr. Coughlin | 40 |
| Opening Statement - Mr. Newcomb | 43 |
| Proceedings of Monday, November 9, 1992 | 238 |
| Proceedings of Tuesday, November 10, 1992 | 425 |
| Proceedings of Thursday, November 12 | 606 |
| Closing Summation - Mr. Coughlin | 701 |
| Closing Summation - Mr. Newcomb | 724 |
| Closing Summation - Mr. Sedita | 740 |
| Proceedings of Friday, November 13, 1992 | 764 |
| Jury Charge | 770 |
| Proceedings of Monday, November 16, 1992 | 181 |
| Jury Verdict | 827 |

66

Jackson - Sedita - Direct

1

2    A.    No, the duration of the flash is one

3    ten-thousandths of a second, and actually it's much too quick

4    for the human eye to record it.  It would record that there

5    was a bright flash of light, but the actual detail that you

6    are looking at when you look at the flash would not linger

7    long enough to be recorded by the eye.

8                    MR. NEWCOMB:  Okay, thank you.

9                    THE COURT:  Is that it?  Mr. Sedita,

10           anything?

11                    MR. SEDITA:  I have no redirect, your Honor.

12                    MR. COUGHLIN:  May I have just one moment,

13           please?  I have nothing.

14                    THE COURT:  Thank you.

15                    (Witness excused.)

16                    MR. SEDITA:  People call Aaron Jackson.

17   A A R O N    J O C K S O N, a witness located in Buffalo, New

18        York, having been first duly sworn, was examined, and

19        testified as follows:

20   DIRECT EXAMINATION

21   BY MR. SEDITA:

22    Q.    Mr. Jackson, what do you currently do for a

23   living?  Are you working or in school?

24    A.    I'm in school.

25    Q.    You are a student; is that correct?

Jackson - Sedita - Direct                    67

A.    Yes.

Q.    What year are you in?

A.    Excuse me?

Q.    What year are you in?

A.    Senior.

Q.    What are you studying?

A.    Criminal justice.

Q.    Now, Aaron, did you used to have a brother by the name of Torriano Jackson?

A.    Yes.

Q.    And, is your brother still alive?

A.    No.

Q.    Why isn't your brother still alive?

A.    Excuse me?

Q.    Why isn't your brother still alive?

A.    Passed away.

Q.    He was shot and killed; is that correct?

A.    Yes.

Q.    Aaron, I would like to refer your attention first of all to the late evening hours of August 9th of 1991 in the vicinity of Bailey and Delevan Avenues, and at that point in time, at that moment in time ask where you were and who you were with?

A.    I was with Travis Powell.  We were at --

68

Jackson - Sedita - Direct

1

2      Q.    Were you in some type of vehicle?

3      A.    Yes.

4      Q.    What kind of car were you in?

5      A.    A yellow Geo storm.

6      Q.    And, did you go somewhere with Mr. Travis Powell in

7      the yellow Geo storm?

8      A.    Yes.

9      Q.    Where was that?

10     A.    To the mini mall.

11          MR. COUGHLIN:  Excuse me, your Honor.

12          THE COURT:  Can't hear him?

13          MR. COUGHLIN:  I am not hearing him.

14          THE COURT:  All right, look it.  If you sit

15          up, sit up in the seat a little higher, and if you

16          just talk right into that microphone, I think they

17          will hear you.  Okay.

18          MR. SEDITA:  Thank you, your Honor.

19     BY MR. SEDITA:

20     Q.    When you say the Mini Mall, do you mean Ginn's Mini

21     Mall on Bailey?

22     A.    Yes.

23     Q.    About where did Travis park his car?

24     A.    Near the Norstar bank.

25     Q.    Did you go inside the store with Travis?

Jackson - Sedita - Direct                                    69

1

2    A.    No.

3    Q.    Where were you?

4    A.    Sitting in the car, the passenger seat.

5    Q.    And as you were sitting in the car by yourself, did

6  anything unusual happen?

7    A.    Yes.

8    Q.    Could you describe for this jury what occurred at

9  that point in time?

10    A.    I was approached by three black males.

11    Q.    Any of these people in the courtroom today?

12    A.    Yes.

13    Q.    Who is that?

14    A.    Right here.

15    Q.    You are pointing to Leonard Brown?

16    A.    Yes.

17    Q.    And who else?

18    A.    Right there.

19    Q.    You are pointing to Mario Jarmon?

20    A.    Yes.

21          MR. SEDITA:  Your Honor, may the record

22        reflect an identification of those defendants.

23          MR. COUGHLIN:  Stipulated.

24          THE COURT:  He has identified the defendants.

25  BY MR. SEDITA:

Jackson - Sedita - Direct                70

1

2      Q.   As you are sitting in the car, do these individuals

3   say anything to you?

4      A.   Yes.

5      Q.   With respect to Mr. Brown, does he say anything to

6   you?

7      A.   No.

8      Q.   With respect to Mr. Jarmon, does he say anything to

9   you?

10      A.   Yes.

11      Q.   Basically, what was he saying?

12      A.   Get out of the car and let's take care of this.

13      Q.   When he said get out of car --

14          MR. COUGHLIN:   I'm sorry, get out of the car,

15          and there was something else.

16          THE COURT:   And let's take care of this was

17          his answer.

18   BY MR. SEDITA:

19      Q.   When he said let's take care of this, what did you

20   think that meant?

21      A.   Maybe there was a problem of some kind.

22      Q.   What did you respond?

23      A.   No.

24      Q.   Was there anybody else out there besides these two

25   people?

Jackson - Sedita - Direct                    71

1

2    A.    Yes.

3    Q.    How many?

4    A.    There was another guy, Antione.

5    Q.    Would that be Antione Shannon, sir?

6    A.    Yes.

7    Q.    What happened next?

8    A.    I got into the driver side and pulled off.

9    Q.    Why did you do that, sir?

10    A.    Because I saw it was a problem and I was clearly

11   outnumbered.

12    Q.    Thought there was going to be a fight?

13    A.    Maybe.

14    Q.    What about Mr. Powell?

15    A.    He was in the store.

16    Q.    All right, did he come out?

17    A.    Yes, after I pulled in front of the store.

18    Q.    And what happened at that point?

19    A.    He got in the car and we left.

20    Q.    Did either one of these individuals, the defendants

21   sitting here today, indicate what the nature of their problem

22   was?

23    A.    No, they said something about --

24              MR. COUGHLIN:  Objection, your Honor.  There

25   has been no testimony that any of the individuals,

72

Jackson - Sedita - Direct

1

2   certainly not this defendant, had a problem.  He

3   said nothing.  Object to the form of the question.

4        THE COURT:  What the problem was, do you want

5   to rephrase it, Mr. Sedita?

6        MR. SEDITA:  Sure.

7   BY MR. SEDITA:

8    Q.   Did either one of these defendants indicate why

9   they were approaching you in this manner and saying what they

10  were saying to you?

11   A.   Yes, Mario.

12        MR. COUGHLIN:  Objection, your Honor.  Object

13   to the form of the question.

14        THE COURT:  Overruled.

15        MR. COUGHLIN:  This defendant said nothing.

16   He used the plural.  This defendant said nothing

17   according to this witness.

18        MR. SEDITA:  Other than speeches to the jury,

19   Judge --

20        THE COURT:  The objection is overruled.

21  BY MR. SEDITA:

22   Q.   You may answer, sir?

23   A.   Yes, Mario.  He said something about pointing a gun

24  at someone.

25   Q.   He said you did that?

73

Jackson - Sedita - Direct

1

2    A.   I don't know.  He never said my name.

3    Q.   Have you ever pointed a gun at anybody?

4          MR. COUGHLIN:  Objection, your Honor.  That is

5   not responsive.

6          THE WITNESS:  No.

7          THE COURT:  Thank you, Mr. Coughlin.

8   Overruled.

9  BY MR. SEDITA:

10    Q.   Have you ever pointed a gun at anybody in your

11 life?

12    A.   No.

13    Q.   Did you and Travis leave the scene, sir?

14    A.   Yes.

15    Q.   Can you tell the jury where you went from there?

16    A.   I went home.

17    Q.   And while you were home, did somebody else come

18 home?

19    A.   Yes.

20    Q.   And who was that, sir?

21    A.   My little brother.

22    Q.   What was his name, sir?

23    A.   Torriano.

24    Q.   Torriano Jackson?

25    A.   Yes.

74

Jackson - Sedita - Direct

1

2      Q.    About what time did he get home?

3      A.    About 11:00 o'clock, 11:30.

4      Q.    Coming home from work or school, or do you know?

5      A.    Work.

6      Q.    Where did he work?

7      A.    Burger King, right there downtown near the bus

8  station.

9      Q.    When he came home, did you say anything to him?

10     A.    I told him I had a problem, maybe a problem.

11     Q.    Was Mr. Powell still there?

12     A.    He was in the car, he was outside.  He was still

13  there.

14     Q.    Did you, Mr. Powell and your brother Torriano

15  Jackson go anywhere?

16     A.    Yes.

17     Q.    Where did you go?

18     A.    We drove back by so I could show my little brother

19  the situation.

20     Q.    Was anybody there at that point?

21     A.    No.

22     Q.    What did the three of you do at that point?

23     A.    Drove around for a little while.

24     Q.    Where did you go?

25     A.    Just to a few parties.

Jackson - Sedita - Direct                    75

1

2      Q.   Did there come a point in time on August 10th of

3  1991 when you returned to the Bailey and Delevan area?

4      A.   Yes.

5      Q.   Who was with you?

6      A.   Myself, Travis, and my little brother, Torriano.

7      Q.   Who was driving the car?

8      A.   Travis.

9      Q.   Same car?

10     A.   Yes.

11     Q.   Who was the front seat passenger in the car?

12     A.   I was.

13     Q.   And, was anybody in the back seat?

14     A.   Yes, my little brother.

15     Q.   That would be Torriano Jackson?

16     A.   Yes.

17     Q.   You refer to him as your little brother.  Why do

18  you refer had to him as your little brother?

19     A.   Because I'm 21 years old and he was 17.

20     Q.   I understand.

21     When you came to this Bailey and Delevan Avenue

22  intersection, were you awake or asleep?

23     A.   I was asleep.

24     Q.   Did somebody wake you up?

25     A.   Yes.

76

Jackson - Sedita - Direct

1

2      Q.    Who woke you up?

3      A.    Travis.

4      Q.    And what did Travis indicate to you?

5      A.    He was nudging me and pointed out the window and

6  said this is the guy from earlier, which was Mario.

7      Q.    What -- did Travis do anything with his car at that

8  point?

9      A.    No, we were at a red light.

10      Q.    Did he park somewhere?

11      A.    Yes.

12      Q.    Where did he park?

13      A.    In the parking lot of Louie's parking lot.

14      Q.    That would be Louie's Texas Red Hots?

15      A.    Yes.

16      Q.    When he did so, sir, did you see anybody in the

17  immediate vicinity of the Bailey-Delevan Avenue area that you

18  had seen on November 9th of 1991?

19      A.    Yes.

20      Q.    I'm sorry, August 9, 1991?

21      A.    Yes.

22      Q.    Who was that?

23      A.    Mario Jarmon.

24      Q.    Was anybody with Mario Jarmon?

25      A.    No.

77

Jackson - Sedita - Direct

1

2      Q.    Was anybody near Mario Jarmon?

3      A.    Yes.  It was like a little group a few feet away.

4      Q.    And how many people were there?

5      A.    I don't know, maybe about five.

6              MR. COUGHLIN:  Objection, your Honor.  Does

7         not know.

8              THE COURT:  He can estimate.  Overruled.  Go

9         ahead.

10   BY MR. SEDITA:

11     Q.    Can you estimate how many people were there?

12     A.    About five or six.

13     Q.    Where was Mario Jarmon standing at that moment and

14   time?

15     A.    Near the mailbox, near benches.

16     Q.    Would that be in the area of the Bailey-Delevan

17   market, sir?

18     A.    Yes.

19     Q.    When you saw him there near the Bailey-Delevan

20   market, what did you and/or your brother do at that moment in

21   time?

22     A.    Got out of the car immediately.

23     Q.    What happened then?

24     A.    I stepped up to him.

25     Q.    Say anything to him?

78

Jackson - Sedita - Direct

1

2    A.   Yes, I asked him what was the problem now.

3    Q.   This is to Mr. Jarmon, right?

4    A.   Yes.

5    Q.   What did he say?

6    A.   He started -- he wasn't really saying anything.  He

7   was not really -- he was just confused.

8    Q.   Was he doing anything with his hands?

9    A.   Yes, he kind of motioned like, what's up?

10    Q.   Could you demonstrate that for the jury?

11    A.   Like that.  What's up now?

12    Q.   Did Torriano Jackson become involved?

13    A.   Yes.

14    Q.   Could you tell the jury how that happened?

15    A.   He came following me.  He ran immediately after I

16   got out the car and approached Mario.

17    Q.   Did Torriano say anything?

18    A.   Yes.

19    Q.   What did he say?

20    A.   He said you didn't know this was my brother, did

21   you?

22    Q.   What did Mr. Jarmon do or say at that point?

23    A.   Nothing.  He motioned put his hands up.

24    Q.   Would you demonstrate that for the jury?

25    A.   As if to fight.

79

Jackson - Sedita - Direct

1

2      Q.    Indicating two fists in front of your face, for the

3  record?

4      A.    Yes.

5      Q.    What happened next?

6      A.    Well, he motioned to swing, then my little brother

7  hit him first.

8      Q.    Your little brother hit Mario Jarmon first; is that

9  correct?

10     A.    Yes.

11     Q.    There was a fight that was going on; is that

12  correct?

13     A.    Yes.

14     Q.    Who was in the fight right now?

15     A.    Myself, Torriano and Mario.

16     Q.    Who is winning the fight at that point?

17     A.    Myself and my little brother.

18     Q.    Two against one, right?

19     A.    Yes, definitely.

20     Q.    By the way, did you have any kind of weapon on you?

21     A.    No.

22     Q.    Did your brother Torriano Jackson have any kind of

23  weapon on him?

24     A.    No.

25     Q.    Did you ever see in your life that you knew

80

1                              Jackson - Sedita - Direct

2     Torriano Jackson to have a weapon on him?

3          A.    No.

4          Q.    Now, where did the fist fight actually begin?

5          A.    On the sidewalk near the bench.

6          Q.    Bailey-Delevan market?

7          A.    Yes.

8          Q.    I'm going to have you come down here in a few

9     minute and mark some things?

10         A.    Yes.

11         Q.    Did the fight stay there, or did it go somewhere

12    else?

13         A.    No, it moved into the street.

14         Q.    That's where it's going on, correct?

15         A.    Yes.

16         Q.    Now, in the Bailey-Delevan area -- let me rephrase

17    it.  Louie's hot dog stand?

18         A.    Yes.

19         Q.    You have had occasion to go there before, right?

20         A.    Yes.

21         Q.    Stays open late at night?

22         A.    Yes.

23         Q.    Were there people around?

24         A.    Yes.

25         Q.    Did these people that were around in any way become

Jackson - Sedita - Direct                    81

1
2    involved with what you, your brother Torriano, and Mario
3    Jarmon are doing in the street?
4         A.   Yes, they moved up on the situation.
5              MR. COUGHLIN:  Was that moved up on the
6         situation?
7              THE WITNESS:  M O V E D, moved up on the
8         situation.
9              MR. COUGHLIN:  I don't want to be difficult.
10        I'm not sure that the jurors can hear each and
11        every word of this witness as he moves his head or
12        moves back and forth from the mike.
13             MR. SEDITA:  You can ask the jury.
14             THE COURT:  If you can't hear something, let
15        me know.  Everybody hear what is going on?  Okay,
16        go ahead.
17   BY MR. SEDITA:
18        Q.   Now, you're in this fist fight, you and Torriano
19   and the defendant Jarmon here?
20        A.   Yes.
21        Q.   Do you hear anything?
22        A.   Yes.
23        Q.   What do you hear?
24        A.   Somebody said you better run, Tino is going to his
25   car.

Jackson - Sedita - Direct                    82

        MR. COUGHLIN:  Objection, your Honor.

        THE COURT:  Overruled.  I'll allow it.

BY MR. SEDITA:

    Q.    What happens next?

    A.    I hear gunshots.

    Q.    From where are the gunshots coming?

    A.    Coming from the Saginaw plant, that part of Delevan.

    Q.    That would be west on East Delevan?

    A.    Yes.

    Q.    As you hear these, you said they were shots, gunshots?

    A.    Yes.

    Q.    Can you describe how the gun shots were fired in terms of their rapidity?

    A.    Rapid fire, over and over again, constant.

    Q.    Boom, boom, boom?

    A.    Yes, exactly.

    Q.    When that happened, what did you do?

    A.    I hit my little brother hand and told him to run.

    Q.    Did he run?

    A.    Yes.

    Q.    How far did he get?

    A.    Not far.

Jackson - Sedita - Direct                    83

1

2    Q.    Fell down?

3    A.    Yes.

4    Q.    What happened to you?

5    A.    I fell down too.

6    Q.    Did you make your way somewhere?

7    A.    Yes.

8    Q.    Where did you make your way to?

9    A.    Back to the car.

10   Q.    Was your brother with you at that point?

11   A.    No.

12   Q.    Where was your brother?

13   A.    Laying in the street.

14   Q.    On East Delevan?

15   A.    Yes.

16   Q.    Did you look back towards your brother?

17   A.    Yes.

18   Q.    Did you see anything with respect to your brother?

19   A.    Yes.

20   Q.    What did you see?

21   A.    Saw him laying in the street, and I saw sparks over

22   him.

23   Q.    See somebody standing over him?

24   A.    Yes.

25                MR. COUGHLIN:  Objection.  Withdraw it.

84

Jackson - Sedita - Direct

1

2   BY MR. SEDITA:

3       Q.   Who was standing over him?

4       A.   The shooter.

5       Q.   Who was that?

6       A.   Valentino Dixon.

7       Q.   Any doubt in your mind?

8       A.   No doubt in my mind.

9       Q.   He was standing over him, that being Mr. Valentino

10  Dixon, what was he doing?

11      A.   Shooting my little brother.

12      Q.   What were you trying to do at this point?

13      A.   I was looking to the ignition for the keys.

14      Q.   The ignition of the Geo?

15      A.   Yes.

16      Q.   Were you able to do anything?

17      A.   Nothing at all.

18      Q.   Can you tell the jury why?

19      A.   Because it was shots coming towards the car also.

20  As I looked up out the front window, there were shots coming

21  towards the car also.

22      Q.   Before you were able to get over to the Geo -- I'm

23  sorry, strike that.  I'll rephrase that.

24      Between the time that you first saw Valentino Dixon, and

25  then later you saw Valentino Dixon standing over your

85

Jackson - Sedita - Direct

1  brother, those two moment in time --

2      A.   Yes.

3      Q.   -- did Valentino Dixon come at you?

4      A.   Turned the gun fire towards me.

5      Q.   Take some shots at you?

6      A.   Yes.

7      Q.   Did there come a point in time when all there

8  ended?

9      A.   Yes.

10     Q.   When it ended, where was your brother?

11     A.   In the street.

12     Q.   Somebody go to him and help him?

13     A.   Yes.

14     Q.   Who was that?

15     A.   Travis Powell.

16     Q.   What about you, where were you?

17     A.   I got out the car and I fell on the ground because

18 I couldn't move.

19     Q.   Were you hospitalized, sir?

20     A.   Yes.

21     Q.   By the way, which way did the shooter run?

22     A.   Back towards the Saginaw plant.

23     Q.   Same way from which he came?

24     A.   Yes.

86

Jackson - Sedita - Direct

1

2    Q.    I asked you a question about injuries a second

3  ago.  Can you describe your injuries for the jury?

4    A.    I got shot in the stomach.  It hit my pelvic bone

5  and came out.  I had to have a colostomy bag for like a month

6  maybe.

7    Q.    How many surgeries did you go through?

8    A.    Three.

9        MR. COUGHLIN:  Excuse me, your Honor.  At this

10       point, this poor witness has been shot.  I don't

11       think the nature of the wounds or the length of

12       recuperation has any relevancy or materiality to

13       these perjury indictments.

14        THE COURT:  I don't know.  It may.  Are you

15       going much farther with it?

16        MR. SEDITA:  I'll move on, your Honor.

17        Judge, with the Court's permission, I would

18       like Mr. Jackson to get off the stand for a moment

19       so he can make some map references for me.

20        THE COURT:  Only if you keep your voice up

21       when you are over there.  Go ahead.

22        We all have to hear you.

23        MR. SEDITA:  You have to speak up.

24  BY MR. SEDITA:

25    Q.    Your Honor, I'm going to hand him a red flare, and

87

Jackson - Sedita - Direct

1

2    I want you to mark your initials with some numbers next to

3    your initials so we know for the record and later on where

4    you're marking.  First thing I would like you to mark, Aaron,

5    is where the initial fist fight started?  Mark that AJ1.

6        Now, when that fist fight went into Delevan Avenue, mark

7    AJ2.  Is that where the shots rang out where you were?  In

8    terms of where your brother was laying, mark AJ3?  And, in

9    terms of -- well, that's okay.  That's sufficient.  Thank

10   you.

11       Now, Aaron, you haven't gone out and actually measured

12   that scene with tape measure or anything, have you?

13       A.    No.

14       Q.    This is your best approximation?

15       A.    Yes.

16       Q.    Aaron, I'm going to show you some photographs as

17   well.

18       First of all, Aaron, I'm going to show you what has been

19   marked as People's Exhibit Number 13 already admitted into

20   evidence and ask if you recognize the scene depicted in that

21   photograph?

22       A.    Yes.

23       Q.    Is that an accurate depiction of the Bailey and

24   Delevan market?

25       A.    Yes.

88

Jackson - Sedita - Direct

1

2    Q.    And, is that where, with respect to the Bailey and

3    Delevan market, is that where Mario Jarmon was initially

4    standing with reference to your initial AJl?

5    A.    Yes.

6    Q.    With respect to -- by the way, I know it was

7    nighttime out, but is that a reasonable and accurate picture

8    of what Bailey and Delevan looks like?

9    A.    Yes.

10    Q.    With respect to People's Exhibit Number 25 for

11    identification purposes, please describe the scene depicted

12    in that photograph?

13    A.    This is the scene taped off, the cones, police

14    cars.

15    Q.    Do you know with respect to the cones depicted in

16    that picture, the four cones over there, what spot is that

17    significant for?

18    A.    My little brother.

19    Q.    That's where he lay down and was shot; is that

20    right?

21    A.    Yes.

22    Q.    Need a second?

23    Almost done.  Aaron, People's Exhibit Number 24 for

24    identification, would you take a look at that photograph and

25    just tell me what it depicts?

89

Jackson - Sedita - Direct

1

2      A.    The car.

3      Q.    The yellow Geo?

4      A.    Yes.

5      Q.    Is that in Louie's parking lot?

6      A.    Yes.

7      Q.    Is that how the scene looked on August 10th of

8  1991?

9      A.    Yes, exactly.

10      Q.    Only a couple more.

11      People's Exhibit 26 for identification, what does that

12  depict?

13      A.    Where my little brother was.

14      Q.    Bailey and Delevan Avenue?

15      A.    Yes.

16      Q.    Is that a reasonable depiction?

17      A.    Yes.

18      Q.    When you say your little brother was somewhere, is

19  there something on that picture that indicates where he was?

20      A.    Yes, the cones.

21      Q.    People's Number 32 for identification, Aaron, what

22  does that depict?

23      A.    The yellow Geo.

24      Q.    Is that a reasonable and accurate depiction?

25      A.    Yes.

90

Jackson - Sedita - Direct

1

2    Q.    People's Number 34 for identification, Aaron,

3    describe what that is?

4    A.    Yellow Geo again.

5    Q.    Is that a reasonable and accurate depiction as the

6    scene appeared on August 10th of 1991?

7    A.    Yes.

8    Q.    Now, I'll refer your attention to some red wet

9    stains on the ground there. Can you explain what those are

10   from?

11   A.    From my body, I am bleeding.

12   Q.    You are bleeding.  One more.

13   Aaron, finally I'm going to show you what has been

14   marked as People's Exhibit Number 36 for identification and

15   ask if you can describe that?

16   A.    This is the inside of the car where I set.

17   Q.    With respect to the red stain on the seat, what's

18   that from?

19   A.    Blood.

20   Q.    Your blood?

21   A.    Yes.

22   Q.    Is that a reasonable and accurate depiction of how

23   that appeared on August 10th of 1991?

24   A.    Yes.

25              MR. SEDITA:  Your Honor, at this time I would

91

Jackson - Sedita - Direct

1

2  like to move in People's Exhibit number -- we have

3  already put in 13.  That's already in evidence.

4  There is some water spilled on it there.  24, 25,

5  26, 32, 34 and 36.

6      THE COURT:  What was 32, Mr. Sedita?

7      MR. SEDITA:  Photograph, or Exhibit Number 32,

8  your Honor, is a shot of the car in the parking

9  lot.  Apologize for getting some water on these.

10     THE COURT:  Objection, gentlemen?

11     MR. COUGHLIN:  Mr. Jackson, if I understand

12 your testimony correctly --

13     THE COURT:  Wait a minute.  He's not finished

14 with his direct.  Is there any objection to the

15 photographs?

16     MR. COUGHLIN:  I am sorry, voir dire on the

17 offer.

18     MR. SEDITA:  Your Honor, could we have a

19 combination of cross-examination, so I can finish

20 up my direct?

21     THE COURT:  Sure.  Why don't we wait then for

22 the offer?

23     MR. COUGHLIN:  Sure, that's fine.

24 BY MR. SEDITA:

25     Q.   Aaron, on either August 9 or August 10 of 1992 did

92

Jackson - Sedita - Direct

1    you have any kind of weapon on you?

3    A.    No.

4    Q.    On either August 9 or August 10th of 1992, or any

5    time, did you ever see your brother Torriano Jackson with a

6    weapon?

7    THE COURT:    Are you talking '91.

8    MR. SEDITA:    '91, I'm sorry.

9    THE WITNESS:    No.

10    BY MR. SEDITA:

11    Q.    Did Torriano Jackson have a gun that night?

12    A.    No.

13    Q.    Was anybody else firing a weapon besides Valentino

14    Dixon?

15    A.    No.

16    Q.    I'm going to show what you has been marked as

17    People's Exhibit Number 8 for identification, a photograph of

18    an individual, and merely ask have you ever seen that

19    individual before?

20    A.    No.

21    MR. COUGHLIN:    Number which?

22    MR. SEDITA:    8.

23    BY MR. SEDITA:

24    Q.    Sir, did you ever see an individual by the name of

25    Lamarr Scott out there that night?

1

2    A.    No.

3         MR. SEDITA:  I have no further questions of

4    the witness, your Honor.  I would still offer the

5    exhibits.

6    CROSS-EXAMINATION

7    BY MR. COUGHLIN:

8    Q.    With respect to, Mr. Jackson, to these photographs

9    24 and 26 and 25 and 32, you have indicated that these depict

10   what might be referred to as a crime scene; is that right?

11   A.    Yes.

12   Q.    And you indicated that they were a fair and

13   accurate description of this location as of the time you were

14   there on August 10th of 1991; is that right?

15   A.    Yes.

16   Q.    But, in fact, they're really not how this area

17   looked when you were still at that area, is it?  The people

18   are all gone, there's police cars around?

19   A.    Cars is exactly where it was at.

20   Q.    The car.  Other than that, the Geo is parked in the

21   same location, is that what you want to say?

22   A.    Yes.

23   Q.    Okay, and you're not indicating that this

24   photograph in any other way, shape, manner or form represents

25   this depicted scene as you last saw it on that morning?

Jackson - Coughlin - Cross                            94

A.    It does depict the scene with the subtraction of my brother and myself.

Q.    What about all the people?

MR. SEDITA:  Objection.

THE COURT:  Where are we going with this, Mr. Coughlin?

MR. COUGHLIN:  Well, I don't think these can be -- these cannot be admitted.

THE COURT:  Are you objecting to them?

MR. COUGHLIN:  Yes.

THE COURT:  Overruled.  They are admitted. Cross-examine.

MR. NEWCOMB:  But, Judge, please.

MR. COUGHLIN:  We have got another defendant.

THE COURT:  I'm sorry, did I say defendant? Cross-examine the witness.  His cross-examination of the witness.

MR. NEWCOMB:  So you said admitted?

THE COURT:  Yes, they are.  I am receiving those items in evidence.

MR. NEWCOMB:  Well, my voir dire --

THE COURT:  Did you want voir dire now?

MR. NEWCOMB:  I would like to look at them.

THE COURT:  I'm sorry, I'll hear you.

1                    Jackson - Newcomb - Cross

2                    MR. NEWCOMB:  No disrespect, Judge.

3    BY MR. NEWCOMB:

4        Q.    Mr. Jackson, I'm going to show you what has been

5    marked as Exhibit, People's Exhibit 36.  You said -- would

6    you tell the jury what that is?

7        A.    It's a picture of the seat inside the car with the

8    blood on it, my blood.

9        Q.    How do you know it's your blood?

10       A.    Because this is exactly where I sit.

11       Q.    Okay, how do you know it's blood?

12       A.    It's clearly, you can see it is red.  It was not on

13   the seat when I got in the car.

14       Q.    Did you see that when you got out of the car?

15       A.    I fell out of the car.

16       Q.    Did you see that on the seat when you fell out of

17   the car?

18       A.    I wasn't looking back into the car.

19       Q.    Thank you, sir.

20       A.    Welcome.

21                    MR. NEWCOMB:  I have no objections to all of

22                    these offered, except for 36, Judge.

23                    THE COURT:  Any objection at all?

24                    MR. COUGHLIN:  I would object to all of them

25                    at this point, but I will also specifically object

96

Jackson - Newcomb - Cross

1
2     on other grounds relative to 36.

3           THE COURT:  Something other than what he
4     said?

5           MR. COUGHLIN:  Has no relevancy or
6     materiality.  Whether this witness was wounded or
7     not wounded is neither here nor there.  It has no
8     materiality or relevance.

9           THE COURT:  All right, please, that's
10    sufficient.  They're received.  24, 25, 26, 32, 34,
11    36 are received in evidence.

12                (Whereupon, People's Exhibit Numbers 24,
13                25, 26, 32, 34 and 36 were received in
14                evidence.)

15          THE COURT:  Cross-examination, Mr. Coughlin?

16    CROSS-EXAMINATION

17    BY MR. COUGHLIN:

18       Q.   Mr. Jackson, prior to August 10th of 1991 were you
19    acquainted with Mario Jarmon?

20       A.   No, I had seen him around.

21       Q.   You had seen him in the neighborhood?

22       A.   Yes, he always hangs out on Bailey.

23       Q.   Okay.  But you did not know him by name?

24       A.   No.

25       Q.   Didn't go to school with him, or anything?

Jackson - Coughlin - Cross                    97

1
2    A.    Never.

3    Q.    What about the defendant, Leonard Brown?

4    A.    Yes.

5    Q.    You were acquainted with him?

6    A.    Yes, I knew him.

7    Q.    Okay, and you knew him by name?

8    A.    Yes.

9    Q.    And, did you also know his half brother by name?

10   A.    Who?

11   Q.    Who?

12   A.    I'm asking who?

13   Q.    Antione Shannon?

14   A.    No.

15   Q.    Did you in the course of your direct testimony

16   refer to Twan?

17   A.    Yes.

18   Q.    And do you know that Twan who you referred to,

19   that's Antione Shannon, right?

20   A.    Yes.

21   Q.    And you knew Antione Shannon before the 10th of --

22   A.    Yes.

23   Q.    Right.  And, in fact, short time before the 10th of

24   August, you had had a confrontation with Antione Shannon,

25   hadn't you?

98

Jackson - Coughlin - Cross

1

2      A.    No.

3      Q.    You had not?

4      A.    No.

5      Q.    Had you ever displayed a weapon to Antione

6   Shannon?

7      A.    No.

8      Q.    Or threatened him with a weapon?

9      A.    No.

10      Q.    When you were in the Norstar parking lot in the

11   latter part of the evening of August 9th of '91, you

12   indicated that someone said something to you about having

13   pulled a gun on somebody; is that right?

14      A.    Yes.

15      Q.    Was it your understanding that they were talking to

16   you about why you had pulled a gun on one of them?

17           MR. SEDITA:  Objection, Judge.

18           THE COURT:  I'm sorry, the question is, was it

19           your understanding what?

20           MR. COUGHLIN:  That they were speaking to you

21           or talking to you about why you had pulled a gun on

22           someone.

23           MR. SEDITA:  His understanding as to their

24           mental state?  Objection.

25           THE COURT:  I can't follow it either.  Maybe

Jackson - Coughlin - Cross

1

2          you can clarify it, Mr. Coughlin.

3    BY MR. COUGHLIN:

4          Q.    Well, let's do it this way:  In direct testimony

5    you indicated that someone of the three males that approached

6    you in the car said something to you about pulling a gun.

7    That's all I could get.

8          A.    Yes.

9          Q.    And, you understood that to mean they were accusing

10   you of having pulled a gun on someone, right?

11         A.    Yes.

12         Q.    Okay.  And, that was what that confrontation or

13   discussion was going to be about, right?

14         A.    Yes.

15         Q.    And, you felt outnumbered three to one, and you

16   didn't want to participate in that discussion; is that

17   correct?

18         A.    Yes.

19         Q.    Did you ever testify or give any statement in this

20   matter at any time to the effect that the three people who

21   approached you were unknown to you?

22         A.    Yes, I knew of them, but I didn't know them.

23         Q.    Did you just tell me that you knew Leonard Brown,

24   you knew he was Leonard Brown?

25         A.    Yes.

Jackson - Coughlin - Cross                    100

1

2      Q.   You kenw Antione Shannon?

3      A.   Of him.

4      Q.   You knew he was Antione Shannon?

5      A.   Yes.

6            MR. SEDITA:  Objection.  It has been asked and

7      answered, and he is arguing.

8            THE COURT:  We are getting argumentative.

9            MR. COUGHLIN:  Let's have the witness's

10     response read back.

11           THE COURT:  Go ahead, clarify.

12           THE WITNESS:  Yes, I knew Leonard and I saw

13     Antione, and I saw him afterwards.

14   BY MR. COUGHLIN:

15     Q.   Yes.  When?

16     A.   I knew Leonard.

17     Q.   So he was not an unknown black male to you as of

18   August 10th, was he?

19     A.   No.

20     Q.   Okay.  And, you knew Antione Shannon, you knew who

21   he was, right?

22     A.   Yes.

23     Q.   Okay, and he was not an unknown black male to you

24   on August 9th of 1991, was he?

25     A.   No.

Jackson - Coughlin - Cross                    101

1

2          Q.    Okay.  Do you recall testifying before the Erie

3    County Grand Jury in this matter?

4          A.    Yes.

5          Q.    Okay, do you recall telling the Erie County Grand

6    Jury that three unknown black males approached you?

7          A.    Yes.

8          Q.    Okay.  That wasn't quite true, was it?

9          A.    Yes, it was.

10         Q.    All right.  Let me back up a minute, Aaron.  You're

11   obviously upset about --

12         A.    Very.

13         Q.    -- you're obviously upset, right.  Did you say

14   yes?

15         A.    Yes.

16         Q.    But I was going to say you're obviously upset about

17   the death of your brother; is that correct?

18         A.    Yes.

19         Q.    And, as of August 9th of 1991 you were also upset

20   at that time about your then-recent death of another brother,

21   right?

22                    MR. SEDITA:  Objection, relevancy.

23                    THE COURT:  Sustained.

24   BY MR. COUGHLIN:

25         Q.    You were angry that night, weren't you?

Jackson - Coughlin - Cross                    102

1

2      A.    No.

3      Q.    No?

4      A.    No.

5      Q.    Are you, or have you been at any time between

6   August 10th of 1991 and this date, have you been angry about

7   the death of Torriano, your brother?

8                    MR. SEDITA:  Objection, relevancy.

9                    THE COURT:  Well, I'll allow him to answer

10           that.

11                   THE WITNESS:  Yes.

12   BY MR. COUGHLIN:

13      Q.    Yes, you're angry about that, right?

14      A.    Yes, upset.

15      Q.    As a matter of fact, you're very angry with these

16   two defendants, aren't you?

17      A.    Yes.  Upset.

18      Q.    You're angry?

19      A.    Upset, yes.

20      Q.    As a matter of fact, yesterday morning --

21                   MR. SEDITA:  Objection.

22                   MR. COUGHLIN:  -- you had words right here in

23           this Court house?

24                   MR. SEDITA:  Objection.

25                   THE COURT:  What is the question?

Jackson - Coughlin - Cross                103

2          MR. COUGHLIN:  -- with one of these defendants

as he was approaching the courtroom, right?

THE WITNESS:  No.

THE COURT:  Objection is overruled.

BY MR. COUGHLIN:

Q.    You say no?

A.    I say no.

Q.    You did see the deputies sheriffs standing around at the time?

A.    Yes.

Q.    But you say you did not have any words?

A.    No.

Q.    Did you utter any angry comments in their direction?

A.    No, I was thinking about -- I didn't say anything.

Q.    You were thinking about what?

A.    I had the thoughts in my head.  I didn't speak words from my mouth.

Q.    Oh, you just had thought?

A.    Yes.

Q.    Angry comments?

A.    Yes.

Q.    Okay.

Did you have any reason on August 9th or August 10th of

Jackson - Coughlin - Cross                    104

1   1991 to be angry with Valentino Dixon?

        A.   No.

        Q.   Were you then acquainted with a girl named Heather
Smith?

        A.   Yes.

        Q.   She was a girlfriend of yours?

        A.   No.

        Q.   Very close friend of yours?

        A.   Yes.

        Q.   And, was Valentino Dixon making any moves on
Heather Smith?

        A.   No.

        Q.   No?

        A.   No.

        Q.   Now, when you were in the parking lot at the bank
and these two defendants and Antione Shannon walked up to the
car, you felt frightened or threatened, right?

        A.   No.

        Q.   After they said something about the gun, you felt
frightened or threatened, right?

        A.   No.

        Q.   Did you tell us before you saw a problem?

        A.   Yes, a problem.

        Q.   Coming?

Jackson - Coughlin - Cross                    105

1

2    A.    Yes, I didn't say I was frightened.

3    Q.    You saw a problem?

4    A.    Yes.

5    Q.    And, did that problem that you foresaw, did that

6    concern you?

7    A.    No.

8    Q.    No, it didn't?

9    A.    No, it didn't.

10   Q.    But you didn't remain there?

11   A.    I left.  It's common sense.

12   Q.    Well, if you weren't concerned about anything and

13   you weren't frightened about anything or felt threatened

14   about anything, what caused you to decide to get out of

15   this?

16   A.    What would cause me to stay?

17          MR. SEDITA:  Asked and answered, common sense.

18          THE COURT:  Sustained.

19   BY MR. COUGHLIN:

20   Q.    How do you define common sense?

21          MR. SEDITA:  Objection, your Honor.

22          THE COURT:  Sustained.

23   BY MR. COUGHLIN:

24   Q.    Well, they hadn't physically threatened you in any

25   fashion at all, had they?

106

Jackson - Coughlin - Cross

1

2    A.   No.

3    Q.   No.  They didn't reach in the car?

4    A.   No.

5    Q.   They walked up to you and said something?

6    A.   Yes.

7    Q.   As a result of which you saw a problem and you

8 decided to leave?

9    A.   Yes.

10    Q.   And you jumped over from the passenger seat into

11 the driver seat?

12    A.   I moved over, I didn't jump.

13    Q.   All right.  Did you then move the car quickly over

14 from where it was parked over to the front of the mini mall,

15 right?

16    A.   I drove it slowly.

17    Q.   You drove it slowly?

18    A.   Yes.

19    Q.   Did you go into the Mini Mart?

20    A.   No.

21    Q.   How did you attract Mr. Powell's attention?

22    A.   Maybe.  I think I beeped the horn.

23    Q.   You leaned on the horn, right?

24          MR. SEDITA:  Objection.

25          THE WITNESS:  No, beeped the horn.  Didn't

Jackson - Coughlin - Cross                    107

2          lean on it.

3    BY MR. COUGHLIN:

4          Q.   How many times did you beep the horn?

5          A.   Maybe once or twice.

6          Q.   Any more than that?

7          A.   Maybe once or twice.

8          Q.   Any more than that?

9          A.   No.

10         Q.   Did Mr. Powell come out of the mini mall?

11         A.   Yes.

12         Q.   Did he run out of the mini mall?

13         A.   No.

14         Q.   He sauntered out?

15         A.   Yes.

16         Q.   Did he when he sauntered out, was that in response

17   to your one or two beeps?

18         A.   Yes.

19         Q.   And when he sauntered out, did he have whatever it

20   was he went into the mini mall to buy?

21         A.   No.

22         Q.   No.  Do you know, as a matter of fact, that he

23   dropped what he was buying and ran out, don't you?

24         A.   I don't know if he dropped it.  I was not in the

25   store at the time.

Jackson - Coughlin - Cross

108

1

Q.   But you do know he ran out?

A.   I didn't say he ran out.

Q.   Pardon me?

A.   I didn't say he ran out.

Q.   I know you didn't say it, but that's what you know?

A.   That's not what I know.  He came out of the store. He didn't run out.

Q.   Were you watching him?

A.   Yes.

Q.   Okay.  All right.

Now, did you leave the mini mall lot in a hurry?

A.   No.

Q.   When Travis came out of the mini mall, you got back in the passenger seat and he got in the driver seat?

A.   I was in the driver seat already.

Q.   Oh, did you continue to drive?

A.   Yes.

Q.   He got in the passenger seat?

A.   Yes.

Q.   Did you say anything to Travis?

A.   Said there was a problem.

Q.   Again, there was a problem?

A.   Potential, to be a problem.

Q.   What exactly did you say to Travis?

Jackson - Coughlin - Cross                      109

1

2      A.    I said there's a problem.  I said there's a

3  problem.

4      Q.    There's a problem?

5      A.    There's a problem.

6      Q.    Travis, there is a problem, is that what you are

7  saying?

8      A.    Yes, there's a problem.

9      Q.    And, did Travis ask you what problem?

10     A.    Yes.

11     Q.    What did you tell him?

12     A.    I said these three right here, and I pointed at the

13  three individuals who had just approached me at the car.

14     Q.    He didn't ask you who the problem was, he asked you

15  what the problem was?

16     A.    Yes.

17     Q.    What did you tell him?

18     A.    They were the problem.

19     Q.    That they were the problem?

20     A.    Yes.

21     Q.    You didn't explain the word problem any more than

22  that?

23     A.    No.

24     Q.    Did you say anything about trouble?

25     A.    No.

110

1                  Jackson - Coughlin - Cross

2                  MR. SEDITA:  Objection, Judge.  This is gone

3         over and asked and answered, I don't know how many

4         times.

5                  THE COURT:  I'm not sure where we are going

6         with this, Mr. Coughlin, but it does seem to be a

7         bit repetitive.  Is there some significance if he

8         used the word trouble?

9                  MR. COUGHLIN:  Yes.

10                 THE COURT:  Okay, answer the question.

11                 THE WITNESS:  Problem.

12   BY MR. COUGHLIN:

13       Q.    Problem.

14                 MR. COUGHLIN:  Mark this Defendant's A.

15                     (Whereupon, Defendant's Exhibit A was

16                     marked for identification.)

17   BY MR. COUGHLIN:

18       Q.    Mr. Jackson, showing you what has been marked

19   Defendant's Exhibit A for identification, being a transcript

20   of testimony offered by Aaron Jackson before the Erie County

21   Grand Jury on November 6 of 1991, calling your attention to

22   Page 7 of that transcript, do you recall being asked by Mr.

23   Belling in the Grand Jury what happened between you and these

24   three fellows while the car was parked and Travis was out

25   getting his cigarettes?  Do you remember that question being

Jackson - Coughlin - Cross                          111

1
2    asked?

3        A.    Yes.

4        Q.    Okay.  And do you remember telling him --

5                MR. SEDITA:  Objection to the impeachment

6        technique.  He has got to let him review the

7        document.

8                THE COURT:  Indeed.  Sustained.

9                MR. COUGHLIN:  It's right here.  He may do

10       it.  Take a look at it.

11               MR. SEDITA:  Why doesn't counsel give it to

12       him?

13               MR. COUGHLIN:  It is.  It's right here.

14               THE COURT:  Take a look at it, Mr. Jackson.

15               THE WITNESS:  And?

16               THE COURT:  Now wait for a question.  What is

17       the question?

18   BY MR. COUGHLIN:

19       Q.    My next question was, did you also then, or in

20   response to that question of Mr. Belling, do you recall

21   telling him at the end of Line 15 that you were telling

22   Travis, I was telling him let's go, some guy is out here

23   starting some trouble with me?

24       A.    Yes.

25       Q.    Okay, and that's what you told him, right?

112

1                           Jackson - Coughlin - Cross

2        A.    Yes.

3        Q.    And Mr. Belling then asked you, do you remember,

4    did you and Travis leave?

5        A.    Yes.

6        Q.    And did you tell Mr. Belling that, well, Travis

7    exchanged some words with them, or whatever, and then we

8    left?

9        A.    Yes.

10       Q.    What were those words that Travis exchanged?

11       A.    Don't remember.

12       Q.    You don't remember?

13       A.    No.

14       Q.    Do you remember you and Travis indicating to the

15   three people that approached you that you were going to

16   return and spray them?

17                  MR. SEDITA:  Objection.

18                  THE COURT:  Overruled.  Did you say that?

19                  THE WITNESS:  No.

20   BY MR. COUGHLIN:

21       Q.    You don't recall saying that?

22       A.    No.

23       Q.    How about, do you recall Travis saying that?

24       A.    No.

25       Q.    But you don't remember what he did say?

113

1                    Jackson - Coughlin - Cross

2       A.   Didn't say that.

3       Q.   My question is, you don't remember what he did

4  say?

5                    MR. SEDITA:  Objection.  Asked and answered.

6                    THE COURT:  Sustained.

7  BY MR. COUGHLIN:

8       Q.   Now, what time was it when you left the mini mall

9  parking lot?

10      A.   About 11:30.

11      Q.   You went directly to your house?

12      A.   Yes.

13      Q.   Prior to that, had you had anything to drink that

14 day or evening?

15      A.   No.

16      Q.   Nothing at all?

17      A.   No.

18      Q.   You did not have anything to drink while you were

19 with Travis?

20      A.   No.

21      Q.   And by drink, you understand I mean alcoholic

22 beverage?

23      A.   Yes.

24      Q.   Did you do any drugs prior to 11:30?

25      A.   No, I don't do drugs.

1                  Jackson - Coughlin - Cross

2      Q.    Okay.  Smoke any marijuana?

3                MR. SEDITA:  Objection.  Asked and answered.

4                THE COURT:  Sustained.

5  BY MR. COUGHLIN:

6      Q.    Why did you go back home to your house at 11:30 on

7  August 9th?

8      A.    Because I told my little brother I will return

9  there after he got out of work and we would go out.

10     Q.    And what?

11     A.    We would go out.

12     Q.    See, I'm sorry, when you raise your mouth up off

13  that microphone, your voice drops.

14     Did you go back there to get your brother for some help?

15     A.    No, I felt safer with my brother.

16     Q.    I'm sorry?

17     A.    I felt safer with my brother other than Travis.

18     Q.    My question was, did you go home to get your

19  brother for help?

20     A.    No.

21     Q.    But your response was you felt safer with your

22  brother?

23     A.    Yes.

24               MR. SEDITA:  I think he has answered the

25             question, Judge.

Jackson - Coughlin - Cross

1

2          THE COURT:  I think this is review, Mr.

3      Sedita.  Have a seat.

4  BY MR. COUGHLIN:

5      Q.   Why is it you feel safer when you're out on the

6  street if you're with your brother?

7      A.   Because I had just lost my brother, my older

8  brother, and me and my little brother were forming a bond

9  that I wanted to be close to him every time I could.

10     Q.   Especially when trouble was up?

11     A.   No especially.

12     Q.   You indicated, you referred to your brother Torre

13  as your little brother because of your age difference?

14     A.   Yes.

15     Q.   Was he also smaller in stature than you?

16     A.   About the same size.

17     Q.   Okay, about five feet, seven?

18     A.   No, that was my older brother, Fred.

19     Q.   Are you saying Torriano was not five feet, seven

20  inches tall?

21     A.   No.

22     Q.   How tall was he?

23     A.   About five, nine, about maybe five, 10.

24     Q.   If the medical examiner's measurements indicate 67

25  inches, was the medical examiner wrong?

Jackson - Coughlin - Cross                116

A.    You tell me.

Q.    Was the Medical Examiner wrong?

        MR. SEDITA:  Objection.

        THE COURT:  What is the burden of proof of this, Mr. Coughlin?  Let's move along.

BY MR. COUGHLIN:

Q.    You do recognize 67 inches as being five feet, seven inches tall?

        MR. SEDITA:  Objection.

        THE COURT:  Sustained.

BY MR. COUGHLIN:

Q.    Well, I want to know whether it is about five foot, seven, 134-pound individual or a five foot, nine individual?

        MR. SEDITA:  Objection.

        MR. COUGHLIN:  That makes --

        THE COURT:  What is the rest of the question?

BY MR. COUGHLIN:

Q.    That makes you feel safer when you're out on the street?

A.    Because I knew that anything happened, I would be there for him and he would be there for me, no matter what the case is.

Q.    If anything happened?

A.    Yes, if.

Jackson - Coughlin - Cross                    117

1

2    Q.   Were you expecting something to happen?

3              MR. SEDITA:  Objection.

4              THE WITNESS:  Just in case something happened.

5              MR. SEDITA:  Objection as to his expectations.

6              THE COURT:  No, that's overruled.  You can

7    answer that.  Were you expecting something to

8    happen?

9              THE WITNESS:  No.

10   BY MR. COUGHLIN:

11   Q.   What was your response, just in case?

12   A.   In case something happened.

13   Q.   Just in case something happened?

14   A.   Yes.

15   Q.   Now, in addition to -- strike that, please.

16   Subsequent to August 10th of '91 you were interviewed by

17   police officers on two occasions relative to this incident,

18   is that correct?

19   A.   Yes.

20   Q.   And, subsequent to that you testified, as you have

21   indicated, before the Erie County Grand Jury; is that right?

22   A.   Yes.

23   Q.   And subsequent to that you had occasion to testify

24   in an earlier trial relating to the incidence of August 10th,

25   is that right?

Jackson - Coughlin - Cross                    118

1

2       A.    Yes.

3       Q.    Now, during either of those two interviews or in

4    the Grand Jury or on the trial wherein you testified, had you

5    ever at any time previously indicated until just now today

6    that the reason you went home was because you promised your

7    brother you would pick him up?

8       A.    No.

9       Q.    Is that just a recent memory?

10      A.    No.

11      Q.    Why didn't you tell the police officers or the

12   Grand Jury or the trial jury that's why you went home?

13                  MR. SEDITA:  Objection.

14                  THE COURT:  Overruled.

15                  THE WITNESS:  Because it really doesn't matter

16          why I went home.  It was the fact I did go home to

17          get my little brother.

18   BY MR. COUGHLIN:

19      Q.    The fact is you went home to get your little

20   brother with whom you feel safer, right?

21      A.    Yes.

22      Q.    Is that because you know he has guns, or had a gun?

23                  MR. SEDITA:  Objection.

24                  THE COURT:  Overruled.

25                  THE WITNESS:  No.

Jackson - Coughlin - Cross                    119

BY MR. COUGHLIN:

Q.   Now, after you got home, did you then go back, or did you then go out with your brother as you claimed to have promised?

A.   Yes.

Q.   What did you go out for?

A.   There was a few parties that night.

Q.   Did you go out for any other reason?

A.   No, I wanted to show him the situation.

Q.   I'm sorry?

A.   I wanted to show him the previous situation.

Q.   You wanted to show him the previous situation?

A.   Yes.

Q.   What previous situation did you want to show him?

A.   The three black males who approached me.

Q.   Who threatened you?

A.   Approached me.

Q.   Just approached you, okay.  They didn't threaten you, didn't harm you, didn't threaten you in any way, did they?

A.   They said get out of the car.

Q.   Yeah, that is right, they said get out of the car. Other than that, they didn't threaten you at all, did they?

A.   No.

Jackson - Coughlin - Cross

Q.   But you wanted to show your little brother with whom you feel safer those three people, right?

A.   Yes.

Q.   Why did you want to show him?

A.   To let him know.

Q.   Let him know what?

A.   That if they had a problem with me, they would also have a problem with him.

Q.   Were you looking upon him as reenforcements?

A.   No.

Q.   Who did you want to know that if they had a problem with you, they would have a problem with him?  Who did you want to know that?

A.   The three.

Q.   The three?

A.   Mario, one.

Q.   And who else?

A.   And whoever else.

Q.   Well, whoever else, who?  You tell me, the three. What three are you talking about?

A.   Mario, Leonard and Antione.

Q.   All right.  So you went back out looking for those three individuals with your little brother with whom you feel safer, right?

1                    Jackson - Coughlin - Cross

2        A.    No.

3                        MR. SEDITA:   Objection.

4                        THE COURT:   Overruled.

5                        MR. COUGHLIN:   Withdraw it.

6                        THE WITNESS:   No.

7    BY MR. COUGHLIN:

8        Q.    That wasn't?

9        A.    No.

10       Q.    You just went out with him, though, to show them --

11       A.    To show him.

12       Q.    To show him --

13       A.    To show him then.

14       Q.    To show him then.   To show Torre the three guys

15   that had approached you earlier?

16       A.    Yes.

17       Q.    So that they would know that if there was any more

18   problem with you, they had a problem with him.   Is that

19   right?

20       A.    Yes.

21       Q.    Now you drove around for quite awhile looking for

22   these three guys to show your brother, didn't you?

23       A.    No.

24       Q.    No?

25       A.    No.

Jackson - Coughlin - Cross                    122

Q.   Oh, you went out to go to a party?

A.   Yes.

Q.   How many parties?

A.   I don't know.  I was asleep.  I didn't get to any parties.

Q.   Well, if you left your house with your brother and with Travis to go to parties --

A.   Yes.

Q.   -- and that was supposedly the only reason you left?

A.   Yes.

Q.   But you didn't go to any parties?

A.   None.

Q.   You rode around in a car, sleeping?

A.   Yeah, you can't attend a party sleeping.  You can't attend a party sleeping.

Q.   Well, that's what I'm asking you?

A.   Well, that's what I'm telling you.

Q.   You rode around in a car, but you didn't go to any parties?

A.   No.

Q.   You just slept?

A.   Tired.

Q.   You don't know if your brother was sleeping, you

123

Jackson - Coughlin - Cross

1
2  don't know what your brother was doing, do you?

3      A.    I know he was sleeping in the back seat.

4      Q.    How do you know if he was sleeping if you were
5  sleeping?

6      A.    Because he fell asleep before me, and then I went
7  to sleep.

8      Q.    Oh, okay, all right. But, in spite of the fact
9  that you're asleep and your brother is asleep, you still keep
10 riding around the neighborhood?

11     A.    No.

12     Q.    No. What did you do?

13     A.    Well, according to Travis, we drove around to a few
14 parties that weren't in the neighborhood.

15     Q.    Oh. Did Travis go to the parties?

16     A.    No.

17     Q.    And you didn't go to the parties?

18     A.    No.

19     Q.    And, your brother didn't go to the parties?

20     A.    No.

21     Q.    But you were driving around?

22     A.    I wasn't driving around.

23     Q.    Travis was driving around?

24     A.    Yes.

25     Q.    Do you know how many times you passed in or through

Jackson - Coughlin - Cross

1
2    the intersection of Bailey and East Delevan during this ride
3    around time?

4        A.    I guess if you sleep you don't know what is going
5    on when you sleep.

6        Q.    All right, just say no, I don't know.

7        A.    No.

8        Q.    All right, there did come a time, though, when you
9    pulled up to a red light at East Delevan and Bailey; is that
10   correct?

11       A.    Yes.

12       Q.    And, at that time Travis's car was pointing east on
13   East Delevan?

14       A.    Yes.

15       Q.    And, you claimed to have been nudged awake?

16       A.    Yes.

17       Q.    Who woke Torre up?

18       A.    I did.

19       Q.    You did.  Why did you wake him up?

20       A.    Because I was showing him the situation.

21       Q.    The situation.  What situation were you showing
22   him?

23       A.    Mario.

24       Q.    And what else?

25       A.    Mario.

Jackson - Coughlin - Cross                    125

Q.    Just Mario.  Okay.  You wanted to show him Mario?

A.    Yes.

Q.    Woke him up.  Hey, Torre, wake up.  There's Mario, right, or something of that effect.  Is that what you did?

A.    Torre, I'm getting out of the car.  There's Mario.  That is what I did.

Q.    Well, wait a minute.  Now, if you just, the sole purpose of doing this was to show your brother the situation, that is Mario --

A.    Yes.

Q.    -- what did anybody have to get out of the car for?

A.    I had to get out of car.

Q.    Why?

        MR. SEDITA:  Objection.  It's argumentative.

        MR. COUGHLIN:  No.

        THE COURT:  Well, I guess he can explain why he got out of the car.  Overruled.

BY MR. COUGHLIN:

Q.    Your testimony is the sole reason you were doing this was so that you could show your brother Torre, Mario?

A.    Yes.

Q.    Yes?

A.    Yes.

Q.    Okay.  Now, if you wanted to show Torre, point out

Jackson - Coughlin - Cross                    126

1

2   Mario, why can't you just wake him up and say hey, that's

3   Mario?

4       A.    Because I felt if he approached me like three on

5   one, I'm going to approach him two on one.

6       Q.    Two on one, okay.  So now we have got the -- strike

7   that.

8       So you didn't want to just show Mario to your brother.

9   You wanted to go out and have a confrontation with Mario?

10      A.    No.

11      Q.    With your brother?

12      A.    No.

13      Q.    Well, then let's back up again.  Do you agree with

14  me that you could have shown Mario to your brother by merely

15  pointing out the car window and saying that's Mario?

16      A.    Yes.

17      Q.    Yeah, okay.  But you didn't want to do that.  You

18  wanted to get back at Mario for walking up on you three on

19  one, right?

20      A.    I did.  I wanted to get out of the car and see what

21  the problem was now.

22      Q.    Wait a minute.  Just back up.  My question is, you

23  got out of the car, you said earlier, because you wanted, as

24  long as Mario had come up on you three on one, you were going

25  to come up on Mario two on one?

127

Jackson - Coughlin - Cross

1

2      A.   With my brother, and I was going to ask him what

3   the problem was now, which I did.

4      Q.   How were you going to ask him that?

5      A.   Through my mouth.

6      Q.   Okay, and what were you going to say?

7      A.   What's the problem now, exactly what I said.

8      Q.   Could you have called that out the car window?

9      A.   I --

10      Q.   Could you have called that out the car window?

11      A.   No, the window was rolled up.

12      Q.   How about rolling the window down?

13      A.   I had to reach over the driver.

14          THE COURT:  Wait, please.  If we are going to

15      get into how many things could have happened as

16      opposed to what happened, we will never finish this

17      case.  Why don't we talk about what happened.

18          In fact, why don't we take a break and go to

19      lunch.  Why don't you step down and come on back

20      after lunch, and we'll stop here and resume with

21      the cross-examination of Mr. Jackson after lunch.

22      Would you please return, ladies and gentlemen, at

23      10 minutes to 2:00, and we will resume shortly

24      after that time.  Please remember, there's no

25      conversation about this case.

People vs. Brown & Jarmon

128

1

2    (12:20 p.m. recess.)

3    (2:10 p.m. Counsel and defendants present.)

4    MR. SEDITA:  Your Honor, back on the record

5    with People versus Jarmon and Brown, or Brown and

6    Jarmon, I'm sorry.  Judge, this afternoon during

7    the break one of my witnesses, Travis Powell, the

8    young man that was driving the Geo car, indicated

9    to me in the hallway when he was sitting there

10   waiting to be called that Mr. Jarmon passed him,

11   and Mr. Jarmon stated to him I should have gunned

12   you too.  I think the Court is aware there have

13   been some friction between various people in the

14   hallway, and the Court is further aware of the

15   certain outbursts by defendant Dixon's family in

16   the trial of that case, and some other incidents

17   reported to me of staredowns in the community by

18   the defendants or defendant's family.

19       Judge, I think this latest incident

20   constitutes witness intimidation.  I have

21   researched some cases in talking about that.  I

22   would make an application to introduce that

23   evidence in the examination of Mr. Powell, who is

24   ready to testify here this afternoon.  I have some

25   recent case law on that proposition if the Court

People vs. Brown & Jarmon                    129

cares to entertain and look at that case law.  The first case on top is People versus Croft.  That's the most recent case.  That's a Fourth Department case, and there's Court of Appeals case in the Second Department and Third Department case all basically saying the same thing, that basically evidence of intimidation, threats, offers to change testimony by members by the defendant or defendant's family is indicative of consciousness of guilt, and therefore admissible in the People's case.

THE COURT:  Mr. Newcomb?

MR. NEWCOMB:  Judge, my client denied making that allocution that he said that.  Furthermore, he's walking in the hall with two deputies in chains, and cuffed.  I don't see how he can threaten or intimidate anyone.

THE COURT:  I don't know, who were the deputies?

MR. SEDITA:  I don't know.  I just talked to the one kid so far.

MR. NEWCOMB:  And furthermore, it really doesn't have any bearing on this case.

THE COURT:  Well, I'm not going to read these

People vs. Brown & Jarmon                              130

1    at the moment, Mr. Sedita.  Is Mr. Powell going to

2    testify this afternoon?

3         MR. SEDITA:  That's correct.

4         THE COURT:  All right, let's finish up with

5    Mr. Jackson, and then I'll take a look at what

6    occurred, and meanwhile, perhaps I might want to

7    know who the deputies are who witnessed this

8    alleged incident.

9         MR. NEWCOMB:  Thank you, Judge.

10        MR. SEDITA:  I see some members of Mr. Jarmon

11   family are in the courtroom.  I would just make a

12   motion to exclude any potential witnesses that may

13   be called in the case.  The only person here that I

14   am going to call is is Aaron Jackson.

15        THE COURT:  Obviously, anyone else who is a

16   prospective witness in the case is directed to

17   leave the courtroom.  Ready to go?  Get the jury

18   down.

19        (2:15 p.m. jury present.)

20   A A R O N    J O C K S O N, having been previously sworn,

21        resumed the stand and testified further as follows:

22        THE COURT:  Cross-examination is to continue

23        by Mr. Coughlin.

24   CROSS-EXAMINATION

Jackson - Coughlin - Cross                     131

1

2    BY MR. COUGHLIN:   (Continued.)

3        Q.    All right, Mr. Jackson, before we went to lunch, I

4    believe you had testify that you arrived at the intersection

5    of Bailey and Delevan in Mr. Powell's car and observed Mario

6    Jarmon standing on the sidewalk over next to the

7    Bailey-Delevan market, is that right?

8        A.    Yes.

9        Q.    Okay.  Then am I correct in understanding that you

10   and your brother then jumped out of the car and ran over

11   towards Mario?

12       A.    I got out of the car.  My brother followed behind

13   me.

14       Q.    And you jumped out of the car, right?

15       A.    No, I got out.

16       Q.    The car was still sitting in the middle of the

17   street waiting at a red light, right?

18       A.    Yes.

19       Q.    If you had previously testified both in the Grand

20   Jury and in the trial that was had earlier in this matter

21   that you both jumped out and ran over to Mario, that was not

22   quite correct.  Is that what you are saying?

23       A.    That was correct.  I got out of the car and walked

24   over to Mario.

25       Q.    No, I didn't say walked.  I said ran.

Jackson - Coughlin - Cross                    132

1

2      A.    No.

3      Q.    No what?

4      A.    It was like a slow pace, a trot.

5      Q.    You got out of the car, right, standing there in
6  the street at the light, right?

7      A.    Yes.

8      Q.    Showing you again what has been marked Defendant's
9  Exhibit A for identification, and directing your attention to
10  Page 10 of that Grand Jury testimony, starting at Line 4,
11  were you asked by Mr. Belling, the Assistant District
12  Attorney, and then what happened?

13     A.    Yes.

14     Q.    And, did you tell him there were three guys on the
15  corner?

16     A.    Yes.

17     Q.    And, did you tell him that we, meaning you and your
18  brother, right?

19     A.    Yes.

20     Q.    -- we ran over to Mario?

21     A.    Yes, that's what it says.

22     Q.    Okay.  Was that the truth when you said that?

23     A.    Yes.

24     Q.    Back in January?

25     A.    Yes.

133

Jackson - Coughlin - Cross

1

2    Q.    All right, so when you denied just a moment ago

3    that you ran over, that was not true, was it?

4            MR. SEDITA:  I object to that.  That's

5            argumentative.  The question of credibility is for

6            the jury to decide.

7            THE COURT:  Sustained.

8    BY MR. COUGHLIN:

9    Q.    All right, back in January of 1992, just a few

10   months after this incident you were sworn to tell the truth

11   in the Grand Jury, right?

12   A.    Yes.

13   Q.    And, you did at that time tell the truth to the

14   best of your then recollection?

15   A.    Yes.

16   Q.    And at that time that was much closer in point of

17   time to the incident that we are concerned with?

18   A.    No, I would say now is.

19   Q.    Pardon me?

20   A.    I would say now is.  I have had time to think of

21   this over --

22   Q.    Wait a minute.  Do you understand the question?

23   A.    Yes.

24            MR. SEDITA:  Objection.  Let him ask the

25            question.

134

Jackson - Coughlin - Cross

1

2          THE COURT:  He's answering the next question

3          already.  Let's just back up.  Ask your question

4          once again, Mr. Coughlin.

5    BY MR. COUGHLIN:

6      Q.    January of 1992 was, in fact, much closer in point

7    of time to the August 10th, 1991 incident we're talking about

8    than today is.  Is that correct?

9      A.    Yes.

10     Q.    Okay.  And, at that time you admitted that you and

11   your brother ran over towards Mario?

12     A.    Yes.

13     Q.    And, was that just to show your brother who Mario

14   was?

15     A.    No, that was to ask Mario what the problem was.

16     Q.    Okay.  And now, as a matter of fact, right at that

17   moment as you went running up to Mario Jarmon, it was your

18   brother who spoke, correct?

19     A.    Yes.

20     Q.    And, you remember telling the Grand Jury in January

21   what your brother said to Mario?

22     A.    Yes.

23     Q.    And did you tell the Grand Jury that your little

24   brother said --

25          MR. SEDITA:  Objection to reading it.

Jackson - Coughlin - Cross                    135

1                THE COURT:  Sustained.

2   BY MR. COUGHLIN:

3      Q.   What did you tell the Grand Jury that your little

4   brother said to Mario when he ran up to him?

5      A.   What's the problem now?  You didn't know this was

6   my brother, did you?

7      Q.   What did you tell the Grand Jury, sir?

8              MR. SEDITA:  Objection.  Asked and answered.

9              THE COURT:  Well, I don't know if it's asked

10  and answered.  Your question just now was.  What

11  did your brother say at the time?

12            MR. COUGHLIN:  No.  What did he tell the Grand

13  Jury his brother said?

14            THE COURT:  No, the prior question.  Was the

15  prior question that he just answered, what did your

16  brother say at the time?  Read it back to me, would

17  you, Mr. Meier, please.

18            (Record read.)

19            THE COURT:  Is not your next question exactly

20  the same?

21            MR. COUGHLIN:  Yes.

22            THE COURT:  Objection sustained.  Ask

23  something else.

24   BY MR. COUGHLIN:

Jackson - Coughlin - Cross                    136

Q.   All right, your brother ran up to Mario and said you got a problem now?

MR. SEDITA:  Objection.  That was answered.

BY MR. COUGHLIN:

Q.   You didn't know this was my little brother.  Is that what he said to him?

A.   I'm his older brother.  He is my little brother.

THE COURT:  No, overruled.  That is slightly different.  Overruled.  Answer the question.

THE WITNESS:  Can you repeat the question?

MR. COUGHLIN:  All right.

BY MR. COUGHLIN:

Q.   All right, your brother ran up to Mario and said what's your problem now?

A.   Yes.

Q.   You didn't know this was my brother?

A.   Yes.

Q.   Was Mario armed at the time?

A.   I don't know.

Q.   Was your brother armed at the time?

A.   No.

Q.   How do you know that?

A.   Because we started to fight with our hands.

Q.   You know your brother was not armed because you

Jackson - Coughlin - Cross                    137

1

2    started fighting?

3        A.    Yes.

4        Q.    Did your brother say to Mario Jarmon I've got a

5    bullet for you?

6        A.    No.

7        Q.    Okay, the first blow was struck by your brother,

8    right?

9        A.    Yes.

10       Q.    And, in fact, the first blow was, he hit Mario

11   Jarmon in the head, right?

12       A.    Yes.

13       Q.    And, in fact, he hit him in the head with a

14   revolver, didn't he?

15       A.    No, with a fist, a clutched fist.

16       Q.    What was?  His fist?

17       A.    Knuckles.

18       Q.    Knuckles.  What kind of knuckles?

19                   MR. SEDITA:  Oh, come on, Judge, objection.

20                   MR. COUGHLIN:  As in brass or natural, human

21            knuckles?

22                   THE WITNESS:  Human knuckles.

23   BY MR. COUGHLIN:

24       Q.    Okay.  Now, by this time a good crowd had gathered

25   around you folks, right?

Jackson - Coughlin - Cross                          138

A.    Yes.

Q.    This corner is a real busy corner.  It's a hangout for people in the neighborhood, right?

A.    Yes.

Q.    Now, you get into a real, not literally a knock down, drag out fight with Mario?

A.    Yes.

Q.    And you and your brother?

A.    Yes.

Q.    And at some point Mario goes down?

A.    Yes, immediately.

Q.    Well, just the one blow from your brother?

A.    Yes.

Q.    Okay.  But that wasn't a blow on the side of the head with a pistol?

A.    No.

Q.    It was just a fist.  He knocked him down with one blow?

A.    He hit him, and then I proceeded to hit him also.

Q.    Pardon?

A.    My little brother hit him, and then I proceeded to hit him also.

Q.    Okay, but you said he went down with the first blow, and you have also said the first blow was struck by

1                    Jackson - Coughlin - Cross                 139

2  your brother?

3        A.   Yes.

4        Q.   Okay.  Now, he's down, you're kicking him?

5        A.   Yes.

6        Q.   And your brother is continuing to hit him, isn't

7  he?

8        A.   Yes.

9        Q.   Nobody else involved in this fight, just the three

10 of you?

11       A.   Yes.

12       Q.   Did you get a little bit excited?

13       A.   Yes.

14       Q.   As a matter of fact, you testified that you became

15 very excited; is that correct?

16       A.   Yes.

17       Q.   There came a time when Mario pulled himself away

18 from you and your brother a little bit, or separated a little

19 bit?

20       A.   No.

21       Q.   No.  You were constantly face-to-face, banging,

22 kicking, slugging away?

23       A.   Yes, he was on the ground.

24       Q.   At all times?

25       A.   Most of the time.

Jackson - Coughlin - Cross                    140

Q.   Most of the time.   From the time he got back up and the fight was still going on out in the street?

A.   That's where the fight was anyway.   The fight was in the street.

Q.   It started up on the sidewalk, right?

A.   Yes, that was the talking part of it.

Q.   While you are out on the street, did there come a time when Mario was up on his feet again and the two of you are still going at it?

A.   In the street he was down.

Q.   At all times?

A.   In the street.

Q.   At all times?

A.   Yes.

Q.   Did your brother shoot him while he was down?

A.   No.

Q.   All right.   Now, as I understand your testimony, suddenly you first -- well, strike that.

There came a time when you suddenly heard a lot of gunshots?

A.   Yes.

Q.   Gunshots of a nature, I believe you described this morning as, well, as other times, as like a machine gun?

A.   Yes.

Jackson - Coughlin - Cross                    141

1

2       Q.   And, at that point in time when you first heard

3    those shots, you were still what, punching or kicking, or

4    what were you doing to Mario?

5       A.   Kicking.

6       Q.   Kicking?

7       A.   Yes.

8       Q.   All right.  And he was on the ground, right?

9       A.   Yes.

10      Q.   And, you were kicking him, facing him?

11      A.   Yes.

12      Q.   And, facing the Bailey-Delevan market?

13      A.   No, my back was towards west on East Delevan.

14      Q.   You were facing west -- I mean you were facing

15   east?

16      A.   I would be facing St. Gerard's church.

17      Q.   Okay.  So you are facing then in a northeast

18   direction at St. Gerard's church, right?

19      A.   Yes.

20      Q.   What direction did you hear those shots come from?

21      A.   From the Saginaw plant behind me.

22      Q.   Behind you.  Did you ever testify that you heard

23   the shots coming from your right?

24      A.   Coming from the Saginaw plant.

25      Q.   Coming from your right?

Jackson - Coughlin - Cross                     142

A.   From the Saginaw plant, from my right.

Q.   Okay.  Now, let's see.  Can you see this map?

A.   Yes.

Q.   This is St. Gerard's church; is that correct?

A.   Yes.

Q.   That's north going out towards the University of Buffalo campus, going out Bailey Avenue, right?

A.   Yes.

Q.   And this is east going out towards Cheektowaga?

A.   Yes.

Q.   Okay.  And you're standing here at AJ2 looking in the direction of St. Gerard's church?

A.   Looking down.

Q.   Looking at the direction of St. Gerard's church, is that what you testified to?

         MR. SEDITA:  Objection.

         THE WITNESS:  Looking down.  I was not looking at the church.  I was looking at the individual.

         THE COURT:  Overruled.

BY MR. COUGHLIN:

Q.   Okay, you're looking down at the ground, is that right?

A.   Yes.

Q.   Were you facing in the direction of St. Gerard's

                        Jackson - Coughlin - Cross                    143

1

2   church?  Your body?

3       A.    I was like catty-corner.

4       Q.    Yeah catty-corner.  You said before in a northeast

5   direction looking at, or facing St. Gerard's church.  That's

6   what you said, right?

7       A.    Yes.

8       Q.    And, in that direction you now hear shots coming

9   from your right?

10      A.    No, from my back.

11      Q.    From your back.  All right, we'll pass on that for

12  just a moment.

13      You told Mr. Sedita that you told your brother run?

14      A.    Yes.

15      Q.    In fact, I think you told him that you hit him and

16  told him run?

17      A.    Yes.

18      Q.    Why did you do that?

19      A.    Because I heard gunshots.

20      Q.    Okay.  Did you think it was the police responding

21  to a call relative to you and Torre shooting, kicking and

22  punching Mario Jarmon?

23                  MR. SEDITA:  Objection.

24                  THE COURT:  Sustained.

25  BY MR. COUGHLIN:

Jackson - Coughlin - Cross                    144

1

2    Q.    Have you ever testified that you thought it was the

3  police doing the shooting?

4                MR. SEDITA:  Objection.

5                THE COURT:  Overruled.

6                THE WITNESS:  Yes

7  BY MR. COUGHLIN:

8    Q.    Right.  The first thought that came to your mind as

9  you and Torre are kicking and slugging and whatever Mario

10  Jarmon is doing, is jiggers, here comes the cops, right?

11    A.    Yes.

12    Q.    And you testified that you thought the police were

13  firing in the air?

14    A.    Yes.

15    Q.    And you said to your brother let's get out of here,

16  right?

17    A.    Yes.

18    Q.    And the reason you wanted to get out of this is

19  because you were afraid your brother would get caught with a

20  gun and that the two of you would be arrested for at least

21  assault, is that right?

22                MR. SEDITA:  Objection.  Nice theory.

23                THE COURT:  Overruled.  You can answer that.

24                THE WITNESS:  No.

25  BY MR. COUGHLIN:

Jackson - Coughlin - Cross                145

1

2      Q.   Well, if it was only the police and you weren't

3   doing anything, why would you have to run from the police?

4      A.   Why stay there if they're firing shots in the air?

5   It's common sense.

6      Q.   My question is why run from the police?

7      A.   Why stay for the police?

8             MR. SEDITA:  He answered the question.

9             THE COURT:  Is that an objection?

10            MR. SEDITA:  That's an objection.

11            THE COURT:  Okay, I'll sustain that.  Next

12        question.  Move along.

13   BY MR. COUGHLIN:

14      Q.   So your answer is to you common sense dictated that

15   you and Torre take off?

16      A.   Leave the scene immediately.

17      Q.   Yeah, leave the scene.  Okay.

18            MR. COUGHLIN:  Mark this transcript, please.

19                (Whereupon, Defendant's Exhibit B was

20                marked for identification.)

21   BY MR. COUGHLIN:

22      Q.   I am going to show you what has been marked as

23   Defendant's Exhibit B for identification, being a partial

24   trial transcript under Indictment 91-1476-001, consisting of

25   401 pages, and directing your attention to page 264.  Do you

1

2  recall when you testified in the prior trial being asked with

3  respect to the gunshots you suddenly heard: "In what

4  direction were those gunshots fired?"  Remember being asked

5  that?

6      A.    Yes.

7      Q.    Okay.  And, did you tell Mr. Terranova that as you

8  were facing to the northeast, your body facing St. Gerard's

9  church, that the gunshots came from your right?

10     A.    Yes.

11     Q.    Thank you.

12 Now these machine gun sounding shots, can you tell this

13 jury from the very first one you heard to the last how much

14 time expired?

15     A.    Maybe about five to ten seconds.

16     Q.    Five to ten seconds.  And, during that five to ten

17 seconds you personally were running for your life, running

18 from, away from the cops, or whoever, towards Louie's hot dog

19 stand; is that right?

20     A.    Yes.

21     Q.    And during that five seconds that you were running

22 like heck ---

23          MR. SEDITA:  Objection, mischaracterization of

24      the witness's testimony.

25          THE COURT:  Sustained.

147

1                      Jackson - Coughlin - Cross

2  BY MR. COUGHLIN:

3      Q.   All right, during that five second that you were

4  running for your life --

5                  MR. SEDITA:  Objection to mischaracterization

6              of the witness's answer.

7                  THE COURT:  Sustained.

8  BY MR. COUGHLIN:

9      Q.   You tripped and fell down at the curb?

10     A.   Yes.

11     Q.   Got up and kept running?

12     A.   Crawling.

13     Q.   Crawling as fast as you can; is that right?

14     A.   Crawling is kind of slow, but as fast as I could.

15     Q.   Okay, thank you.  And you then managed to get a car

16  door open and get inside a car?

17     A.   Yes.

18     Q.   And was the shooting still going on at that time?

19     A.   Yes.

20     Q.   And, you then managed to spend some time in the

21  car, and then again open the door and fall out of the car,

22  you told us this morning?

23     A.   Yes.

24     Q.   The shooting was still going on?

25     A.   By the time I fell out of the car, the shooting had

Jackson - Coughlin - Cross                          148

1

2   stopped.

3       Q.   That's when the shooting stopped?

4       A.   Yes.

5       Q.   Okay.  And this was something in the area of five

6   seconds?

7            MR. SEDITA:  Objection, mischaracterization of

8   the witness's testimony.

9            THE COURT:  Why don't you ask him if that was

10  so, five seconds that he's talking about.

11           MR. COUGHLIN:  You said earlier the shooting

12  lasted for about five seconds?

13           THE WITNESS:  Five to ten seconds.

14           MR. SEDITA:  He said five to ten seconds.

15  BY MR. COUGHLIN:

16      Q.   Okay, five to ten seconds; is that right?

17      A.   Yes.

18      Q.   I thought you said five.  No, 5 to 10, I'm sorry.

19  Okay, and the shooting stopped, did it, while you were still

20  in the car?

21      A.   No, when I fell out of the car.

22      Q.   Okay.  So you fell out of the car after having run,

23  tripped, crawled, got in, looked out and then fell out, the

24  shooting was going on, right?

25      A.   Yes.

Jackson - Coughlin - Cross                    149

2      Q.    Okay.  And you were frightened, weren't you?

3      A.    I was in pain.

4      Q.    Well, let's see, you were very excited when you're

5   kicking and punching people, or Mario Jarmon?

6      A.    Yes.

7      Q.    And now you hear a machine gun going off?

8      A.    Yes.

9      Q.    And you're afraid it might be the police and you're

10  running, right?

11     A.    Yes.

12     Q.    And, at some point while you're running, you

13  believe you're shot?

14     A.    Yes.

15     Q.    I repeat, were you frightened?

16     A.    I was in pain.

17     Q.    Okay.  That's all you were?  Were you still

18  excited?  Were you still very excited?

19     A.    Yes.

20     Q.    Pardon?

21     A.    Yes.

22     Q.    Yes?

23     A.    Yes.

24     Q.    And, it was during that period when you are very

25  excited and you are in pain that you told us this morning you

Jackson - Coughlin - Cross                    150

1    looked out and observed someone whom you identified as Tino

2    Dixon?

3    A.    Yes.

4    Q.    Incidentally, in addition to you and Torre running

5    at the sound of these shots, all the other people that had

6    been hanging around, they all ran too, didn't they?

7    A.    Yes, the people towards the parking lot.

8    Q.    Pardon?

9    A.    People in the parking lot.

10    Q.    I'm sorry?

11    A.    The people in the parking lot started to run also.

12    Q.    Okay, well, people in the parking lot. As a matter

13    of fact, there were people standing across the street over on

14    Bailey Avenue watching what was going on. They ran too,

15    right?

16    A.    Excuse me?

17                MR. COUGHLIN:  Would you read it back.

18                (Record read.)

19                THE WITNESS:  Yes.

20    BY MR. COUGHLIN:

21    Q.    There was just a general exodus from Louie's and

22    from the east side of Bailey Avenue, both around St. Gerard's

23    and around Norstar, there were people over there watching

24    things going on, right?  They all ran?

Jackson – Coughlin – Cross                      151

1

2      A.    Couldn't see that far.

3      Q.    Oh, you couldn't see that far.  All right.  So, it

4  was a very exciting situation, right?

5      A.    Yes.

6      Q.    And, do you recall while you were in the hospital

7  on the 21st of August of 1991 being visited by some Buffalo

8  police detectives?

9      A.    Yes.

10     Q.    And, do you remember being shown by those police

11 detectives photographs of various black male individuals?

12     A.    Yes.

13     Q.    And, do you recall being told by the police officer

14 that one of those individuals was Tino Dixon?

15     A.    No.

16     Q.    Okay.  Do you recall being asked by those police

17 officers whether you could identify any of those individuals

18 as having been the shooter of your brother, Torriano?

19     A.    Which one looks like.

20     Q.    Which one looks like the guy that shot Torriano.

21 Is that what you were asked?

22     A.    Yes.

23     Q.    And so you pointed one out, did you?

24     A.    Yes.

25     Q.    And, did you positively identify him as being the

Jackson - Coughlin - Cross                    152

2  shooter?

3       A.   Yes.

4       Q.   You did.  Okay.

5       Mark that, please.

6            (Whereupon, Defendant's Exhibit C was

7            marked for identification.)

8  BY MR. COUGHLIN:

9       Q.   Mr. Jackson, showing you what has been marked

10 Defendant's Exhibit C for identification, being a two-page

11 document dated 8-21, and entitled Buffalo Police Department

12 intradepartmental correspondence P-73, directed from

13 Detective Mark Stambach to Richard T. Donovan, Chief of the

14 Homicide Section of the Buffalo Police Department.  Calling

15 your attention to the second page of that exhibit, and

16 specifically down at the bottom, do you recognize your

17 signature?

18      A.   Yes.

19      Q.   Just take a look at that exhibit.  Read it please

20 for a moment.

21      Have you read it, sir?

22      A.   Yes.

23      Q.   And, does that refresh your recollection, perhaps

24 -- well, strike that.

25      Did you tell Detective Stambach on the 21st of August,

Jackson - Coughlin - Cross                              153

1991 that you could not identify and were not sure whether any of those six photographs he showed you was the shooter? Did you say I'm not sure?

A.    Yes.

Q.    Okay.

MR. SEDITA:  Can I see the exhibit, please?

MR. COUGHLIN:  Sure.

BY MR. COUGHLIN:

Q.    And did you tell him you were not sure because -- well, strike that, please.  Did you tell him with respect to one particular picture of Tino Dixon, I cannot be sure he was there.  It happened so quick.  Did you say that?

A.    I said he was there.  It happened so quick.  I can see what is typed on the paper.

Q.    Right.  You said I cannot be sure he was there.  It happened so quick?

A.    That's what the paper says.

Q.    And you signed it, right?

A.    Yes.

Q.    And you swore that it was the truth?

A.    Yes.

MR. COUGHLIN:  I have nothing further of this witness.

THE COURT:  Mr. Newcomb?

154

Jackson - Newcomb - Cross

1

2  CROSS-EXAMINATION

3  BY MR. NEWCOMB:

4      Q.   Mr. Jackson, I promise you I'll be briefer, and I

5  have only got a couple general questions.  I don't have

6  anything real specific.

7      You testified this morning that you talked to the

8  Buffalo police twice.  Do you recall whether it was the same

9  officers that you talked to?

10     A.   I don't recall.

11     Q.   You testified today that there were other people

12 around the corner, around the corner of Bailey and East

13 Delevan in that area?

14     A.   I said in the driveway, in the little parking space

15 behind Bailey-Delevan mini mart.

16     Q.   Okay, during the course of this event, of those

17 people, are any of them known to you?

18     A.   I just saw a crowd of people.

19     Q.   Okay, I'm not trying to trick you.  Travis Powell

20 was there, correct?

21     A.   Yes.

22     Q.   All right, he's known to you?

23     A.   Yes.

24     Q.   Who else?

25     A.   Mario was there.

155

Jackson - Newcomb - Cross

1

2      Q.   Uh-huh?

3      A.   Of course, he was on the ground.

4      Q.   I am sorry?

5      A.   I said Mario was there.

6      Q.   That's all?

7           MR. COUGHLIN:  Was there another name?  I

8      couldn't hear.

9           MR. NEWCOMB:  I said Travis Powell, and he

10     said yes.

11  BY MR. NEWCOMB:

12     Q.   Nobody else there that you knew?

13     A.   There was a gang of people that I didn't really --

14  my main intention was going over to Mario.  I saw the gang of

15  people.

16     Q.   Okay, I'm not trying to trick you.  What were you

17  wearing that night, do you recall?

18     A.   Excuse me?

19     Q.   What were you wearing?

20     A.   Wearing a gray T-shirt, black sweat pants and brand

21  new sneakers.

22     Q.   What was your brother wearing?

23     A.   Hooded sweat shirt, blue jeans and brand new

24  sneakers.

25           MR. COUGHLIN:  Your Honor, I am sorry, it's

156

Jackson - Newcomb - Cross

1
2 probably me or acoustics, or the way the speakers
3 are, but I can barely hear.
4      THE COURT: He said a hooded sweat shirt, pair
5 of jeans, and brand new sneakers.
6      MR. COUGHLIN: Would you just ask the witness,
7 please, for my benefit to speak into the
8 microphone, keep his mouth at the microphone and
9 not above it. I'm sorry, I'm having a heck of a
10 time.
11      THE COURT: Mr. Jackson, for Mr. Coughlin's
12 benefit would you keep your mouth in front of the
13 microphone and not above it?
14      THE WITNESS: Yes.
15      MR. COUGHLIN: Thank you.
16      THE COURT: Go ahead.
17 BY MR. NEWCOMB:
18    Q.  Mr. Jackson, you said your brother was wearing
19 clothes that night, including a pair of jeans, correct?
20    A.  Yes.
21    Q.  Did that pair of jeans have pockets?
22    A.  Yes.
23    Q.  Changing gears now. There came a point in time
24 that you went to the Erie County Grand Jury and you gave
25 testimony?

157

Jackson - Newcomb - Cross

1

2    A.   Yes.

3    Q.   Did you go there alone?

4    A.   No.  I went with my father.

5    Q.   Did your father go in the Grand Jury room with you?

6    A.   No.

7    Q.   Only you went in the Grand Jury room?

8    A.   Yes.

9    Q.   Who was in the Grand Jury room?

10    A.   Group of people.

11    Q.   Was there a lawyer in there?

12    A.   No.  It was Mr. Belling.

13    Q.   Is he a District Attorney?

14    A.   Yes.

15    Q.   Did he ask you some questions?

16    A.   Yes.

17    Q.   And you answered those questions, correct?

18    A.   Yes.

19    Q.   Did anybody else talk?

20    A.   No.

21    Q.   Just Mr. Belling asking you questions?

22    A.   And some witness -- and some people in the Grand

23 Jury asked a few questions.

24    Q.   Through Mr. Belling?

25    A.   Through Mr. Belling.

158

1        Jackson - Newcomb - Cross

2        Q.   And then you answered his questions and he excused

3   you?

4        A.   Yes.

5        Q.   Now, you know Mario Jarmon, correct?

6        A.   Yes.

7        Q.   Did you know him from middle school Number 68?

8        A.   No.

9        Q.   Did you go to middle school 68?

10       A.   Yes.

11       Q.   Was Mario Jarmon ever over at your house?

12       A.   No.

13       Q.   Was he a friend of your brother Fred's?

14       A.   I don't know.

15       Q.   At your brother Fred's wake did you see Mario

16   Jarmon there?

17       A.   I don't know.

18            MR. SEDITA:  Objection.

19            THE COURT:  Is there some relevance?

20            MR. NEWCOMB:  I was trying to establish,

21       Judge, that he knew him prior to the incident.

22            MR. SEDITA:  I think he has answered that

23       question.

24            THE COURT:  Is that in dispute?  You can go

25       ahead.

159

Jackson - Newcomb - Cross

1
2          MR. NEWCOMB:  No, no, fine.

3          MR. COUGHLIN:  Initially it was in dispute.

4     They were unknown.

5          MR. NEWCOMB:  Earlier when I wrote the

6     question down, it was.  All right, sorry, ladies

7     and gentlemen.

8  BY MR. NEWCOMB:

9     Q.   Did you hang around with -- do you have friends in

10 the neighborhood?

11    A.   What neighborhood?

12    Q.   Where you live?

13    A.   Of course.

14    Q.   And, do they have a name?  Do you call your group

15 of buddies by a name?

16    A.   No, there was a music group called the Juice Crew.

17    Q.   Is there a name of Bailey Posse mean anything to

18 you?

19          MR. SEDITA:  Objection.

20          THE COURT:  Overruled.

21          THE WITNESS:  No.

22          MR. NEWCOMB:  Nothing further.  Thank you.

23          MR. SEDITA:  I have a few questions on

24     redirect.

25 REDIRECT EXAMINATION

160

1                      Jackson - Sedita - Redirect

2    BY MR. SEDITA:

3        Q.    Aaron, between the length of time between when the

4    gunshots started and when they stopped, did you have a stop

5    watch on you?

6        A.    No.

7        Q.    Did you time this event?

8        A.    No.

9        Q.    Did you take any notes to see how long the events

10   last?

11       A.    No.

12       Q.    Now, with the Court's permission, Judge, I would

13   like him to come off the stand and, just so the record is

14   real straight, show us where you were standing and where you

15   were facing when the gunshots started?

16              MR. COUGHLIN:  Objection, your Honor.  He has

17              already testified that he was at AJ -- yeah, AJ2,

18              and he said that's where he was when the shots --

19              MR. SEDITA:  Objection to the speech.

20          Redirect examination.

21              THE COURT:  Seems to be a question as to which

22              way he was facing, Mr. Coughlin.  Go down.

23              MR. COUGHLIN:  Okay, where he was standing,

24              though, was the question.  That has been covered.

25   BY MR. SEDITA:

161

Jackson - Sedita - Redirect

1

2    Q.   First of all, Aaron, in terms of the direction you

3    were standing where your face is looking when the shooting

4    starts, point that out on the map?

5    A.   There.

6    Q.   So where is your vision?

7    A.   Down.

8    Q.   Okay, where are the shots coming from?  They're

9    coming from behind you, which is west on East Delevan?

10   A.   Yes.

11   Q.   You stay in that position the whole time?

12   A.   Yes.

13   Q.   I mean, you go somewhere place?

14   A.   Yes.

15        MR. COUGHLIN:  Objection, your Honor.  He is

16        leading.

17        MR. SEDITA:  He didn't understand the

18        question.

19        THE COURT:  Go ahead.

20   BY MR. SEDITA:

21   Q.   You went over here to Louie's Texas Red Hots,

22   correct?

23   A.   Yes.

24   Q.   Did you look to see what was going on over here?

25   You testified when you went over to Louie's Red Hots,

163

Jackson - Sedita - Redirect

1

2      A.    I was in the hospital.

3      Q.    Can you describe to us the kind of physical

4   condition you were in when you were in the hospital on August

5   12th?

6      A.    I was drained.  I had tubes in my nose, tubes all

7   over my body.  Under medication.

8      Q.    Would it be fair to say that you were somewhat

9   uncomfortable?

10              MR. COUGHLIN:  Objection, your Honor.

11              THE WITNESS:  Very.

12              THE COURT:  Overruled.

13   BY MR. SEDITA:

14      Q.    You were uncomfortable, weren't you?

15      A.    Very uncomfortable.

16      Q.    And you were shown a photo array by Detective

17   Stambach, I think it was?

18      A.    Yes.

19      Q.    How many people were in that array, if you

20   remember?

21      A.    About six.

22      Q.    What was the race of all six of these people?

23      A.    Black males.

24      Q.    Black males.  And of those six, you picked

25   Valentino Dixon, right?

164

Jackson - Sedita - Redirect

1

2    A.    Yes.

3            MR. COUGHLIN:  Objection.

4            THE COURT:  Well, you better approach on

5        that.  Would you approach here?

6            (Bench Conference held.)

7            THE COURT:  Ooverruled.

8    BY MR. SEDITA:

9        Q.    Eventually you got out of the hospital; is that

10   correct, Aaron?

11       A.    Yes.

12       Q.    And, you thought about this incident since you got

13   out of the hospital?

14       A.    Yes, very much so.

15       Q.    Kind of relived it in your mind a lot?

16       A.    Yes.

17       Q.    I am going to ask you this straight up.  Is there

18   any doubt in your mind that Valentino Dixon was the person

19   that killed your brother and shot you?

20       A.    There's no doubt in my mind.

21            MR. COUGHLIN:  Objection, your Honor.

22            THE COURT:  Overruled.

23   BY MR. SEDITA:

24       Q.    One more series of questions with respect to Mr.

25   Coughlin's cross-examination.  You testified when Mr.

165

Jackson - Sedita - Redirect

1

2  Coughlin was questioning you that there were lots of people

3  running away when the shots broke out; is that correct?

4      A.   Yes.

5      Q.   Was there one person who wasn't running away?

6      A.   Yes.

7      Q.   And who is the one person that wasn't running away?

8      A.   The shooter.

9      Q.   Who was that?

10     A.   Valentino Dixon.

11          MR. SEDITA:  Thank you.  Nothing further.

12          THE COURT:  Any recross, Mr. Coughlin?

13          MR. COUGHLIN:  No, your Honor, but I will

14     offer Defense C in evidence.

15          THE COURT:  Mr. Newcomb?

16          MR. SEDITA:  Objection.

17          THE COURT:  Thank you, Mr. Jackson.  You may

18     step down.

19          (Witness excused.)

20          THE COURT:  I'll hear argument on it, I

21     suppose.  What is next?

22          MR. SEDITA:  I have two more witnesses lined

23     up for this afternoon.

24          THE COURT:  Who is next?

25          MR. SEDITA:  Travis Powell.

166

1      People vs. Brown & Jarmon

2          THE COURT:  Why don't, I'll give them a short

3      break and listen to your argument on the offer, and

4      then we can go right to your other witnesses.  10

5      minutes recess for you, ladies and gentlemen, and

6      we will have you back in the courtroom in a few

7      minutes.

8          (3:00 p.m. jury excused from courtroom.)

9          THE COURT:  Now, what do you want?

10         MR. COUGHLIN:  I was offering C in evidence.

11         THE COURT:  How does it come in, Mr.

12     Coughlin?

13         MR. COUGHLIN:  Well, perhaps at this point it

14     doesn't come in as easily as it might later, but

15     prior inconsistent sworn statement, and it was a

16     sworn statement, and is inconsistent.

17         THE COURT:  I see.

18         MR. SEDITA:  I don't know how it's a prior

19     inconsistent sworn statement when he agreed with

20     what the document said on the stand.

21         THE COURT:  Yeah, I think he acknowledged

22     pretty much what was on the document.  I don't see

23     any reasoning at this point to allow it in.  Maybe

24     later.

25         MR. COUGHLIN:  Wait a minute.  He has now said

People vs. Brown & Jarmon                    167

there is no doubt in his mind that the shooter was
Valentino Dixon.  This is a prior inconsistent
statement that says he can't be sure.

THE COURT:  Than you elicited it.

MR. COUGHLIN:  I know.

THE COURT:  So my point is, what does the
document do that he didn't do himself on
testimony?

MR. SEDITA:  Called bolstering, Judge.

THE COURT:  Yeah, I think so.

Okay, now, what else?  Before we get to Mr.
Powell, is there -- maybe I should run a little
hearing here.  Is there any evidence other than
what Mr. Powell says that this event occurred?  Do
we have the deputies -- how about the deputies?
He's in custody.

MR. SEDITA:  This deputy told me he heard
words exchanged, but didn't say what.

COURT DEPUTY:  This morning when we were
walking over, there were words exchanged.

THE COURT:  No, let's do this first of all.

MR. COUGHLIN:  You don't need me for this, do
you?

THE COURT:  Just so the record is complete,

168

People vs. Brown & Jarmon

1
2          give us your full name on the record.  This isn't

3          sworn question.

4                    COURT DEPUTY:  William Kluge, K L U G E.

5    BY THE COURT:

6          Q.   You are assigned to escort the defendant Mario

7    Jarmon this morning?

8          A.   Yes, I was.

9          Q.   And during that time did something happen?

10         A.   Words were exchanged.

11         Q.   By whom?

12         A.   By Mario Jarmon, and I don't know who the other

13   person was.

14         Q.   Did Mario Jarmon say something that you heard?

15         A.   He said something.  I would not be able to say what

16   was said.

17         Q.   You didn't understand what he said?

18         A.   I didn't understand what he said.

19                    THE COURT:  Okay, what else have we got?

20                    MR. SEDITA:  We got Powell saying that he

21         said, I am sorry, whatever I said before -- I am

22         sorry -- I should have gunned you too, or words to

23         that effect.  You'll have to ask Powell.

24                    THE COURT:  Was there another deputy

25         assigned?

169

People vs. Brown & Jarmon

DEFENDANT JARMON:  Somebody else walked me
over here.  I couldn't be able to tell you who it
was because we were walking all over the building.

THE COURT:  Now let me tell you this.  I'm not
going to allow you to elicit this on direct
examination of Mr. Powell.  However, let me make
something else pretty clear to the defendants as
well as your family members, and so on.  I'm going
to allow that kind of testimony to come in if there
is any occurrence out there in that hallway, and
it's not going to help you if it comes in that
family members are intimidating people or saying
things to people, so my suggestion to you is that
you tell them to just keep to themselves, and
certainly the two of you should keep to
yourselves.  I don't know what is going on in your
mind, but you don't need to cause any more trouble
or make any remarks to any witnesses, and if you
do, I'm going to allow it to come in, and I'll even
allow you to recall in the event that there is an
occurrence.

MR. SEDITA:  Thank you.

THE COURT:  Now, is there something else?

MR. COUGHLIN:  He just wanted to mention to

170

People vs. Brown & Jarmon

1  the Court, and I saw it.

2          DEFENDANT BROWN:  They came up to me

3  yesterday.  I was with my girlfriend, and wanted to

4  hit me.

5          THE COURT:  Mr. Brown and Mr. Jarmon, both of

6  you, obviously, there's a great deal of tension

7  among the families involved here, and there's a

8  great deal of tension.  The Dixon family, I think

9  has been around here as well, the Jackson family

10  obviously today, your families, your respective

11  families.  There's a lot of tension.  They have a

12  great deal of animosity on both sides, but that

13  animosity bubbling over out there in the corridor

14  isn't going to help you fellows during this trial.

15          MR. COUGHLIN:  He understands that.

16          THE COURT:  So I have told them as well, and

17  you know I have, that I don't want any remarks on

18  either side because if it does get out of hand, I'm

19  just going to throw everybody out of here, and

20  that's not going to be the best either.

21          Let's take a few minutes.

22          (3:05 p.m. recess.)

23          (3:17 p.m., jury, counsel and defendants

24  present.)

Powell - Sedita - Direct                                  171

1           THE COURT:  We are ready for the next witness,

2      Mr. Sedita?

3           MR. SEDITA:  Thank you, your Honor.  Travis

4      Powell.

5  T R A V I S    P O W E L L, a witness located in Buffalo, New

6      York, having been first duly sworn, was examined, and

7      testified as follows:

8  DIRECT EXAMINATION

9  BY MR. SEDITA:

10      Q.   Mr. Powell, do you work?

11      A.   Yes.

12      Q.   Would you tell this jury where you work, sir?

13      A.   Buffalo General.

14      Q.   That's the hospital, sir?

15      A.   Yes.

16      Q.   Sir, I would like to ask you about your knowledge

17  of some people.  Did you know an individual by the name of

18  Torriano Jackson?

19      A.   Yes.

20      Q.   Did you do you also know an individual by the name

21  of Aaron Jackson?

22      A.   Yes.

23      Q.   How long have you known the Jacksons?

24      A.   For about 12 years.