**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

VALENTINO DIXON,

   Plaintiff,

  v.

CITY OF BUFFALO et al.,

   Defendants.

Civil Action No. 19-cv-01678

<u>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS COUNTY OF ERIE
AND BELLING'S MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF AUTHORITIES

**US SUPREME COURT CASES**

*Buckley v. Fitzsimmons*,
    509 U.S. 269 (1995)..................................................................................*passim*

*Burns v. Reed*,
    500 U.S. 478 (1991)..................................................................................10, 16

*Hope v. Pelzer*,
    536 U.S. 730 (2002)..................................................................................23

*Kalina v. Fletcher*,
    522 U.S. 118 (1997)..................................................................................14

*Van de Kamp v. Goldstein*,
    555 U.S. 335 (2009)..................................................................................10, 16, 28

**FEDERAL CASES**

*Buari v. City of New York*,
    530 F. Supp. 3d 356 (S.D.N.Y. 2021)......................................................11

*Barbera v. Smith*,
    836 F.2d 96 (2d Cir. 1987).......................................................................16, 21

*Bellamy v. City of New York*,
    914 F.3d 727 (2d Cir. 2019).....................................................................2, 23, 28, 29

*Bermudez v. City of New York*,
    790 F.3d 368 ............................................................................................23

*Bernard v. Cnty. of Suffolk*,
    356 F.3d 495 (2d Cir. 2004).....................................................................12

*Binder & Binder PC v. Barnhart*,
    481 F.3d 141 (2d Cir. 2007).....................................................................2

*Crews v. Cty. of Nassau*,
    996 F. Supp. 2d 186 (E.D.N.Y. 2014) .....................................................16

*Davis-Garett v. Urban Outfitters, Inc.*,
    921 F.3d 30 (2d Cir. 2019).......................................................................2

*Dieter v. Quintilone*,
　764 F. App'x 71 (2d Cir. 2019) .......................................................................................... 19

*Enlow v. Tishomingo Cnty., Miss.*,
　962 F.2d 501 (5th Cir. 1992) ..................................................................................... 22, 23

*Fogle v. Sokol*,
　957 F.3d 148 (3d Cir. 2020) ..................................................................................... 17, 18

*Genzler v. Longanbach*,
　410 F.3d 630 (9th Cir. 2005) ........................................................................................... 17

*Giraldo v. Kessler*,
　694 F.3d 161 (2d Cir. 2012) ................................................................................. 11, 14, 21

*Grp. Health Inc. v. Blue Cross Ass'n*,
　793 F.2d 491 (2d Cir. 1986) ........................................................................................... 22

*Harris v. Tioga County*,
　663 F. Supp. 3d 212 (N.D.N.Y. 2023) ........................................................................... 22

*Hill v. City of New York*,
　45 F.3d 653 (2d Cir. 1995) ....................................................................... 9, 10, 15, 21, 22

*In re Dana Corp.*,
　574 F.3d 152 (2d Cir. 2009) ........................................................................................ 2, 25

*Kanciper v. Lato*,
　989 F. Supp. 2d 216 (E.D.N.Y. 2013) ........................................................................... 16

*Kee v. City of New York*,
　12 F.4th 150 (2d Cir. 2021) ............................................................................................ 24

*Kellner v. City of New York*,
　No. 17-CV-1268, 2021 WL 4251343 (MKB) (E.D.N.Y. Sept. 17, 2021) ......................... 11

*Lacey v. Maricopa Cnty.*,
　693 F.3d 896 (9th Cir. 2012) ........................................................................................... 21

*Lee v. Willins*,
　617 F.2d 320 (2d Cir. 1980) ......................................................................................... 8, 9

*Lopez v. City of New York*,
　No. 20-CV-2502, 2021 WL 2739058 (S.D.N.Y. July 1, 2021) .......................................... 28

*Lowth v. Town of Cheektowaga,*
    82 F.3d 563 (2d Cir. 1996)......................................................... 19

*McCoy v. City of New York,*
    No. CV 07-4143, 2008 WL 3884388 (E.D.N.Y. Aug. 13, 2008)...................................... 28

*Milstein v. Cooley,*
    257 F.3d 1004 (9th Cir. 2001) ......................................................... 12

*Morales v. City of New York,*
    59 F. Supp. 3d 573 (S.D.N.Y. 2014)......................................................... 12

*Morse v. Fusto,*
    804 F.3d 538 (2d Cir. 2015)......................................................... 23

*Morse v. Fusto,*
    No. 07-CV-4793; 2013 WL 4647603 (E.D.N.Y. Aug. 29, 2013) ...................................... 22

*Restivo v. Hessemann,*
    846 F.3d 547 (2d Cir. 2017)......................................................... 23

*Ricciuti v. N.Y.C. Transit Auth.,*
    124 F.3d 123 (2d Cir. 1997)......................................................... 23

*Simon v. City of New York,*
    727 F.3d 167 (2d Cir. 2013)......................................... 9, 10, 11, 14, 21

*Singleton v. Cannizzaro,*
    956 F.3d 773 (5th Cir. 2020) ......................................... 18, 19, 21

*Smalls v. Collins,*
    10 F.4th 117 (2d Cir. 2021) ......................................................... 23

*Taylor v. Kavanagh,*
    640 F.2d 450 (2d Cir. 1981)......................................................... 11

*Watkins v. Healy,*
    429 F. Supp. 3d 420 (E.D. Mich. 2019)......................................................... 20

*Watkins v. Healy,*
    986 F.3d 648 (6th Cir. 2021) ......................................... 17, 20

*Zahrey v. Coffey,*
    221 F.3d 342 (2d Cir. 2000)......................................... 17, 22

*Zanfardino v. City of New York*,
    230 F. Supp. 3d 325 (S.D.N.Y. 2017).................................................................. 12

**STATE CASES**

*Batten v. City of New York*,
    133 A.D.3d 803 (2015)....................................................................................... 19

**FEDERAL RULES**

Federal Rules of Civil Procedure
    Rule 56(a)............................................................................................................. 2

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STANDARD OF REVIEW .............................................................................................. 2

FACTS ............................................................................................................................. 2

ARGUMENT ................................................................................................................... 8

I.    Defendant Belling has not carried his burden to show, at the summary-judgment stage, that all of his misconduct was intimately associated with the judicial phase of the criminal process. ............................................................................................................ 8

A.    Belling misstates the law in urging that immunity covers "nearly all manner of interaction between prosecutors and witnesses." .................................................. 8

B.    The correct legal standard calls for a functional inquiry: advocacy in judicial proceedings is absolutely immune, but investigative acts are not. ........................ 9

C.    Belling acted as an investigator, not an advocate for the State of New York in a judicial proceeding. ............................................................................................ 11

D.    Belling's subjective beliefs about probable cause are irrelevant. ............................. 17

E.    If immunity turns on disputed facts, those facts must be resolved by a jury. ............. 22

II.    Belling violated Dixon's constitutional rights by fabricating evidence. .......................... 23

A.    The fabricated identification from Lamarr Scott ...................................................... 24

B.    The fabricated identification from Aaron Jackson .................................................. 26

III.   The conspiracy claim cannot be dismissed. .......................................................... 27

IV.   The failure to intervene claim cannot be dismissed. ................................................ 27

V.    The *Monell* and negligent hiring, supervision, and training claims were bifurcated and cannot be dismissed. ............................................................................................ 28

CONCLUSION ............................................................................................................. 29

## INTRODUCTION

It is undisputed that Valentino Dixon spent 27 years wrongly imprisoned for a shooting he did not commit. The Erie County DA's own comprehensive investigation conclusively determined that Dixon was *not* the shooter, Lamarr Scott was. On the basis of this 2018 investigation, Dixon's convictions for murder, attempted murder and assault were all vacated, the charges against him dismissed, and Scott convicted.

But while the Erie County DA reached this conclusion in 2018, it was obvious back in 1991. Lamarr Scott publicly confessed within days of the murder. Absent the misconduct of the investigating police and prosecutors, Dixon would never have been prosecuted. And Scott would never have been left out on the street, where he would go on to shoot a 16-year-old, rendering him quadriplegic.

Plaintiff does not dispute that Belling is absolutely immune for much of the misconduct that caused Dixon to be wrongly convicted. Belling cannot be held personally liable for seeking the charges despite the lack of basis, or for bringing perjury charges against witnesses who told the truth, or for making deals (even secret ones) with other witnesses to protect them from pending criminal charges in exchange for their trial testimony.

But that does not shield him from liability for the specific investigative misconduct, which is not immune, that is the basis of Dixon's claims against him: using improper suggestion to turn one witness's tentative identification into a positive one, and coercing Scott into falsely recanting before the grand jury. There is no dispute that conduct is clearly unconstitutional. And just as detectives may be held liable for their investigative misconduct, so may Belling when he engages in the same misconduct while investigating.

The County's motion for summary judgment should be denied.

1

## STANDARD OF REVIEW

Summary judgment is improper unless Defendants show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). The Court may not make credibility determinations or weigh the evidence, but instead "must draw all reasonable inferences in favor of" Plaintiff, "even though contrary inferences might reasonably be drawn." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (cleaned up). Because "a jury is free to believe part and disbelieve part of any witness's testimony," the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (cleaned up). Defendants' motion may not be granted unless "resolving all ambiguities and drawing all permissible factual inferences in favor of [Plaintiff] the record taken as a whole could not lead a rational trier of fact to find for [Plaintiff]." *Bellamy v. City of New York*, 914 F.3d 727, 744 (2d Cir. 2019) (citation omitted).

## FACTS

Shortly before 1:30 a.m. on August 10, 1991, on a busy corner near Louie's Texas Red Hots, brothers Torriano and Aaron Jackson started a fight with Mario Jarmon.[1] P1, D1. Aaron Jackson had earlier that night threatened Jarmon and his friends Antoine Shannon and Leonard Brown that he would "come back and spray all [you] mother f—ers." D5. Torriano Jackson, who weeks earlier had put a gun to Shannon's head to threaten him, pulled out a silver handgun and shot at Jarmon.P2, D2. Lamarr Scott, who knew Shannon and Shannon's half-brother, Valentino

---

[1] Citations to Plaintiff's Statement of Additional Material Facts are abbreviated P followed by paragraph number. Citations to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Fact are abbreviated D followed by paragraph number. All docket citations reference the ECF pagination.

Dixon, then fired a total of 27 shots from a TEC-9 firearm, killing Torriano Jackson and wounding his brother Aaron and bystander John Sullivan before fleeing. P1–7, D2.

Valentino Dixon is innocent of the murder; he did not shoot Torriano Jackson (or anyone else) or direct Scott to shoot anyone. P8–11. Nor was he in the immediate vicinity of the shooting; while he was one of dozens of people in the greater area, he was inside a convenience store when shots first rang out and then ran down the block away from the shooting, towards his car in front of Jarmon's house. Dixon was about 40 yards away when Scott began shooting. P11.

Although witnesses were reluctant to volunteer information to the police, it was well known in the neighborhood that Scott did the shooting, not Dixon. P4, 14. Lamarr Scott and Valentino Dixon look nothing alike and could not be mistaken for one another. P15–21. At well over 6 feet and heavyset (over 200 pounds), Scott had the stereotypical build of a football lineman; indeed, he played high school ball and had been recruited to play defensive end in college. P15, 18. By contrast, Dixon was only 5'9" and very slim (around 140 pounds), with a youthful appearance. P15–17. Their faces did not resemble each other and they were wearing distinct clothes from each other that night. P15–21.

Within hours of the crime, investigating Buffalo Police Department (BPD) officers reported that two witnesses had identified Dixon as the shooter, claiming both witnesses independently selected Dixon without suggestion from photo arrays.[2] P12–13, 22, 26–30, 31–33. There were reasons to question the ability of either witness to make a reliable identification of Dixon, however. Sullivan was a 17 year old who had come to Louie's Texas Red Hots after a

---

[2] Although there is ample evidence from which a reasonable jury can find BPD Defendants fabricated these reports of the initial identifications, see Opp to City Defendants' brief, there is no evidence trial prosecutor Belling was aware at the time that officers had used suggestion and their reports of the identifications were fabricated.

day drinking and smoking cocaine-laced marijuana with his friends; he ran away once the shooting started and did not see the shooter until after he was shot in the leg. P23–24. From his vantage point—150 yards away (greater than the length of a football field), in the dark, suffering from a gunshot injury, with a quick side view of the shooter obstructed by headlights and crowds—it would be "nearly impossible" for Sullivan to observe the shooter well enough to identify him. P25. And before identifying Dixon, Adams had provided a detailed description of the shooter which fit Scott precisely: a "heavy set" six-foot-tall Black man wearing a white T-shirt and white hat. P20, 31. This description did not match Dixon, who was noticeably slim. P15–16, 18. Dixon was nevertheless arrested; he gave a statement to police and denied committing the crime. P34–38.

The following evening, Lamarr Scott contacted a local TV station and arranged to give a videotaped public confession admitting that he—not Dixon—had committed the shooting. P39–44. Scott's voluntary confession to a shooting for which someone else had been arrested was extraordinarily unusual and a big deal—as Belling testified, this was the only time something like this happened in his long career. P42. And it was presumptively credible, because barring obvious mental illness (which Scott did not display) you do not expect someone to voluntarily confess to a crime they did not commit. P42. Scott's confession also included details consistent with the evidence gathered so far, demonstrating its reliability. P56. And there were other indicia of the confession's reliability: Scott matched the description Adams had provided of the shooter, and Scott's confession was corroborated by two other witnesses, Leonard Brown and Antoine Shannon. P43–44.

Belling was then called down to the homicide unit to meet with BPD Detectives and then Scott; given the "very unusual" circumstances of Scott's confession, from that point on Belling

4

took a substantial role in the ensuing investigation. P45–48. After reviewing the evidence the BPD Detectives had collected, Belling interviewed Scott himself, taking substantive notes of his investigative interview. P49–51. Belling also personally observed Scott's appearance (which matched Adams's initial description of the shooter). P52. Belling nevertheless directed the BPD detectives not to arrest Scott at that time, as it would just "complicate this thing." P53–55, 62–64. Although Scott had offered to turn over his clothes for testing—including the white sneakers he was wearing which he indicated still had Torriano Jackson's blood on them—nothing was collected from Scott and no testing ordered before Scott was released. P57–61.

Given Scott's confession, there was a big open question to answer: who was the shooter? P62–67. Belling recognized this needed to be investigated and he had an active role in that investigation. P62–68. However, a number of basic steps that should have been taken as part of any good-faith investigation into the reliability of Scott's confession were never taken. P71–74.

The same day that Scott gave his credible confession, Stambach met with Aaron Jackson, who was recovering in his hospital bed from his serious gunshot wounds. P75. Stambach reported that Jackson, too, selected Dixon's photo from a fair 6-photo array. P76. However, Jackson, who had had only a limited view of the shooter (Scott) would not make a positive identification of Dixon, saying only that he "looked like" the shooter. P76–77.

Belling understood the difference between a tentative ID like the one Jackson had given and a positive ID which could provide probable cause. P79. In late August 1991, after Jackson was released from the hospital (and months before Belling convened the grand jury) Belling met with Jackson to "firm up [his] ID." P78. At this meeting Belling showed Jackson a single loose photo of Valentino Dixon. P80. Belling admits he understood showing an individual photo like this would be a constitutional problem. P79. Belling claimed Jackson then told him he was

"sure" about his identification of Dixon; he would later testify to a positive identification at the grand jury. P81–82.

Although Belling had initially suggested he would seek to indict Dixon within days of his August 10, 1991, arrest, due to the ongoing investigation Belling did not even convene a grand jury until months later in November. P83–84. Even then, the grand jury was an "investigative procedure"; it was not clear cut who he was presenting evidence against, Dixon or Scott, and Belling did not seek any indictment. P85–89.

During this period Belling continued investigating, explicitly recognizing there were "major discrepancies in regard to who committed the murder of Torriano Jackson" and a number of witnesses who needed to be interviewed. P89, 94–95. He flew to Kentucky to interview Antoine Shannon; when he credibly told Belling Scott was the shooter, Belling decided not to call him as a witness. P90–93. Belling interviewed Tamara Frida, who knew Scott was the shooter and had called the police station anonymously within days of Dixon's arrest to say Dixon was *not* the shooter. P99–102. Although Frida had volunteered to view photos to identify the shooter, neither the police nor Belling ever asked her to do so. P101. Belling admits he understood Frida was the anonymous caller and claims he confronted her about it during the interview, but that she denied it. P100–02. But Frida directly disputes this: she says Belling never asked her if she was the caller and that she would have admitted it and identified Scott as the shooter had he done so (at least before Belling started charging people with perjury for their truthful testimony). P101–04.

During this time Belling also reached out to Lamarr Scott to pressure him to recant his confession. P105–18. Belling obtained Scott's phone number from another witness, Mario Jarmon. P96–98. Belling also spoke to Scott on the phone and personally served him with the

6

grand jury subpoena. P113. As Scott has repeatedly described, Belling (together with the police) exerted pressure on him to recant his truthful confession. P109. This included threats from Belling and Stambach against Scott and his parents and a pattern of harassment by Stambach. P109–11. Belling admits what Scott described would be totally inappropriate and wrong, but he denies he did so, or that he even had any conversation with Scott after August 12 without Scott's lawyer present. P112–16. But contemporaneous records demonstrate far more contact than Belling admits. P113, 116. Nor could Belling offer any alternate explanation for why Scott—for the first and only time in 30 years—falsely recanted his confession before the grand jury. P106–09, 117–18.

Although Belling had been investigating for months, when he obtained Scott's false recantation he suddenly asked for an indictment. P106–07, 119–23. Mario Jarmon and Leonard Brown both testified that Scott was the shooter and Torriano Jackson had a gun that night. P120. Belling subsequently charged them with perjury for this truthful testimony, a move he later called a "brilliant stroke of tactical genius." P120, 123–39. Based on false evidence including the positive ID from Jackson Belling procured through improper suggestion and the false recantation Belling coerced from Scott, Dixon was indicted in January 1992—more than five months after the shooting. P85–88, 105–23.

At Dixon's June 1992 trial, Adams and Sullivan were both extremely reluctant witnesses, as both were dealing with criminal charges of their own, including for Sullivan charges of holding a 15-year-old girl hostage and raping her. P138–54. Belling offered his assistance with their criminal charges to facilitate their testimony; Belling admitted he understood such deals would have to be disclosed as impeachment material, but there is no record he did so. P138–54. Although these deals were not disclosed at trial, Sullivan and Jackson were impeached with

disclosed evidence demonstrating they had limited ability to make a reliable identification, and

Adams was impeached with evidence his initial description did not match Dixon. P144, 150,

155–56. No physical or forensic evidence implicated Dixon; the case rested on the IDs. P140.

Scott did not testify; he was "essentially eliminated" as a defense witness because of his coerced

false grand jury testimony. P138. Jarmon and Brown could not testify because of pending perjury

charges—a result Belling expected when he charged them. P139.

Although the jury initially split 9–3 for acquittal, Dixon was wrongly convicted. P157.

Twenty-six years later, after a comprehensive 2018 reinvestigation, the DA determined that

Dixon was not the shooter, Scott was. P161–62. Dixon was exonerated and Scott was convicted

on the same day. P159–163.

## ARGUMENT

I.  **Defendant Belling has not carried his burden to show, at the summary-judgment stage, that all of his misconduct was intimately associated with the judicial phase of the criminal process.**

   A.  **Belling misstates the law in urging that immunity covers "nearly all manner of interaction between prosecutors and witnesses."**

Belling asserts that absolute immunity protects "nearly all manner of interaction between

prosecutors and witnesses, including pursuit of witnesses with threatened or actual legal process

and charges." ECF 167-1 at 15. In support, he cites *Lee v. Willins*, 617 F.2d 320, 321 (2d Cir.

1980). ECF 167-1 at 15; *id*. at 16 (arguing *Lee* is "[r]elevant to the allegations here). He fails to

mention that the Supreme Court has since bluntly repudiated the reasoning of *Lee*. *Lee* held that

whether absolute immunity applied turned on the nature of the plaintiff's injury:

> [A] prosecutor is immune from a suit to recover for an injury arising solely from
> the prosecution itself e.g. being compelled to stand trial or to suffer imprisonment
> or pretrial detention. Such harm must always result in substantial part from the
> protected prosecutorial activities of initiating prosecution or presenting the state's
> case.

> Where the alleged harm is inflicted independently of the prosecution, however,
> absolute immunity will not attach. See Hampton v. Hanrahan, supra. If, for
> example, a prosecutor violates the Fourth Amendment by conducting an illegal
> search, the victim is harmed by the invasion of his zone of privacy, whether or not
> the evidence unlawfully obtained is introduced at trial. Redress for this harm is
> not barred by Imbler.

617 F.2d at 322. *Lee*'s holding is exactly the holding of the Seventh Circuit decision that the

Supreme Court rejected in *Buckley v. Fitzsimmons*, finding injury to be "irrelevant … to the

question whether the conduct of a prosecutor is protected by absolute immunity":

> In this case the Court of Appeals held that respondents are entitled to absolute
> immunity because the injuries suffered by petitioner occurred during criminal
> proceedings. That holding is contrary to the approach we have consistently
> followed since *Imbler*. As we have noted, the *Imbler* approach focuses on the
> conduct for which immunity is claimed, not on the harm that the conduct may
> have caused or the question whether it was lawful.

509 U.S. 259, 271–72 (1993). *Buckley* is no needle-in-a-haystack case—it's "*passim*" in

Belling's table of authorities. ECF 167-1 at 4. Belling's reliance on *Lee* is therefore difficult to

understand, and in any event misplaced.

### B. The correct legal standard calls for a functional inquiry: advocacy in judicial proceedings is absolutely immune, but investigative acts are not.

Prosecutors play "more than one role in discharging the duties of the prosecutorial office:

sometimes an administrative, sometimes an investigative, and sometimes an advocate's role."

*Hill v. City of New York*, 45 F.3d 653, 656 (2d Cir. 1995). To determine whether a prosecutor's

misconduct is shielded from scrutiny by the doctrine of absolute immunity, courts take a

"functional approach," examining "the nature of the function performed, not the identity of the

actor who performed it." *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting

*Buckley*, 509 U.S. at 269 (quotation marks omitted)). Under that functional approach, a

"prosecutor acting in the role of an advocate in connection with a *judicial* proceeding is entitled

to absolute immunity for all acts intimately associated with the *judicial* phase of the criminal

process. *Id*. (emphasis added); *Burns v. Reed*, 500 U.S. 478, 494 (1991) ("Absolute immunity is designed to free the *judicial* process from the harassment and intimidation associated with litigation. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.") (citation omitted, emphasis in original).

But, as Belling concedes, the doctrine does *not* immunize a prosecutor when he is "not acting as an officer of the court," for example when he is "engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (cleaned up). "Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and they do not become prosecutorial functions merely because a prosecutor has chosen to participate." *Simon*, 727 F.3d at 172 (quotation omitted); *Hill*, 45 F.3d at 656 ("When acting as a criminal investigator, a prosecutor is accorded only the qualified immunity ordinarily granted to the police function.").

The person seeking immunity—here, Belling—bears the burden of showing it applies, not in general, but for the specific "function in question." *Simon*, 727 F.3d at 172 (quoting *Burns*, 500 U.S. at 486). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns*, 500 U.S. at 486–87. The Supreme Court, therefore, has been "quite sparing" in its recognition of absolute immunity. *Buckley*, 509 U.S. at 269 (quoting *Burns*, 500 U.S. at 487). And "if application of the principle is unclear, the defendant simply loses." *Buckley*, 509 U.S. at 281 (opinion of Scalia, J.).

In this case, at the summary-judgment stage, that means that Defendant Belling cannot avoid a jury's scrutiny of his actions unless, viewing all the evidence and reasonable inferences in Dixon's favor, Belling convinces the Court that for *all* of his challenged conduct: (1) he was

acting in the role of an advocate; (2) in connection with a judicial proceeding; and (3) the

conduct was intimately associated with the judicial phase of the criminal process. *Simon*, 727

F.3d at 171. Belling has not carried his burden.

### C. Belling acted as an investigator, not an advocate for the State of New York in a judicial proceeding.

Dixon accepts that when a prosecutor takes the evidence already "assembled by the

police" and uses his training as an attorney to conduct a "professional evaluation" of that

evidence, or to prepare it for "presentation at trial or before a grand jury after a decision to seek

an indictment has been made," he will be protected by absolute immunity. *Buckley*, 509 U.S. at

273. So Dixon cannot complain—and is not complaining—that Belling prepared a presentation

for a grand jury and then asked it to indict.

But when a prosecutor is not yet preparing for a judicial presentation, when he is merely

"searching for [] clues and corroboration," *Buckley*, 509 U.S. at 273, or "gathering and piecing

together [] evidence for indications of criminal activities and *determination of the perpetrators*,"

*Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) (emphasis added), absolute immunity does

not protect him. That means absolute immunity does not protect a prosecutor who fabricates

evidence so that an indictment can be sought.[3] *E.g.*, *Kellner v. City of New York*, No. 17-CV-

---

[3] Belling again misstates the law when he asserts that "[a]bsolute immunity applies 'even when the prosecutor is alleged to have engaged in such conduct as falsification of evidence [and] coercion of witnesses.'" ECF 167-1 at 16. According to Belling's brief, that language is a direct quotation, but in fact it does not appear in either of the two cases that Belling could have been referring to with his "*Id.*" citation. Belling also says that the proposition is supported by *Taylor v. Kavanagh*, 640 F.2d 450 (2d Cir. 1981), which appears to be the only underlying support for this proposition. ECF 176-1 at 16. Assuming this incorrect citation was an inadvertent error, the more serious problem for Belling is that *Taylor*—which had nothing to do with falsification or coercion and was merely summarizing the law generally—supported its statement about "the falsification of evidence and the coercion of witnesses" by citing *Lee v. Willins*. *Taylor*, 640 F.2d at 452. As discussed in Section A above, *Lee*'s rationale has been rejected by the Supreme Court.

1268 (MKB), 2021 WL 4251343, at *8 (E.D.N.Y. Sept. 17, 2021) (denying absolute immunity to a prosecutor who (i) indirectly, made a witness "crack," or change her testimony; and (ii) counseled others on what evidence to obtain against the target).

After *Buckley*, it cannot be argued—and should not have been argued by Belling—that prosecutors are absolutely immune when they fabricate evidence to create probable cause. *Buckley*'s holding directly forecloses that argument. Another way of looking at *Buckley* is that it would have come out differently if the Justices in the majority agreed with the dissent's characterization of the facts: a prosecutor who merely "consult[s] with a potential trial witness before he places the witness on the stand," 509 U.S. at 284 (dissenting opinion), will be protected by absolute immunity. But one who "shop[s] for experts" willing to lie, *id*. at 272, will not. In the former case, the prosecutor is using his training as an attorney to prepare evidence for presentation in judicial proceedings. But in the latter, the prosecutor is *creating* evidence (i.e., changing what the universe of evidence is) so that judicial proceedings can happen at all—and absolute immunity does not shield him.[4] See also *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 506 (2d Cir. 2004) ("Notably, the complaint does not accuse defendant Dunne of using his various pre-indictment meetings with Dominick Testa to induce this witness to commit perjury."); *Milstein v. Cooley*, 257 F.3d 1004, 1006, 1011 (9th Cir. 2001) (absolute immunity did not protect

---

Belling's reliance, *e.g.*, ECF 167-1 at 25, on *Buari v. City of New York*, is misplaced for the same reason. See 530 F. Supp. 3d 356, 380 (S.D.N.Y. 2021) (improperly relying on *Taylor* and *Lee* for the proposition that "the falsification of evidence and the coercion of witnesses are prosecutorial activities for which absolute immunity applies") (cleaned up).
[4] Belling cites *Morales v. City of New York*, 59 F. Supp. 3d 573, 579 (S.D.N.Y. 2014). ECF 167-1 at 16. But that case is inapposite because the plaintiff there merely alleged that prosecutors "fail[ed] to investigate" evidence that contradicted their case. *Id*. Likewise for *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 335 (S.D.N.Y. 2017) (plaintiff "has pleaded that Detective Wilson failed to adequately investigate leads pointing to potentially exculpatory evidence"). ECF 167-1 at 18 (citing *Zanfardino*). As should be clear by now, Dixon alleges—and has evidence to prove—that Belling *created* the evidence he used to indict Dixon.

prosecutors who fabricated evidence by approaching a defense witness "for the purpose of inducing [him] to agree to testify falsely").

Viewing the evidence and reasonable inferences in Dixon's favor, it is clear that Belling engaged in the *unprotected* type of conduct: fabricating evidence so that an indictment could be sought. To be clear, Dixon contends—and has marshalled evidence to show—that Belling fabricated identifications of him from two witnesses, Aaron Jackson and Lamarr Scott, while acting in an investigative capacity—*not* when merely preparing evidence that was brought to him for presentation for the grand jury.

There is a mountain of evidence showing that, from the time Scott confessed until January 1992, the case was unsolved—or at least not solved with Dixon as the perpetrator—and the investigation continued. Belling knew that Scott's confession was "very unusual," P47, and was significant, P63. Because of Scott's extraordinary confession, Belling took a substantial role in directing the investigation from that point forward—something he did not do in typical homicide cases. P48, P65. He took control to such an extent that, although he recognized Scott matched Emil Adams's earliest description of the shooter, P55, P58, and Scott's confession was reliable, P56, he actually directed the BPD Defendants not to arrest Scott. P53.

Belling's counsel argues that everything Belling did was in the role of a legal advocate because the case had already been "solved" by the time Belling got involved. ECF 167-1 at 17 ("By 4:15 pm on August 10, 1991, the police had "solved" the Jackson Murder."). But, contrary to his counsel's arguments, Belling himself has admitted, repeatedly, that he participated in and even directed the *investigation*, trying to solve the crime. *E.g.*, P66; P70. The BPD Defendants agree that Belling directed the investigation after Scott confessed. P68. Belling admitted that he took on a substantial investigative role because of the unusual fact of Scott's confession. P65.

13

After Scott's confession, he admitted that the "primary material issue in the whole case" was not how to best present the case to a grand jury, but rather "determin[ing] who did it." P67, P86. And that determination was not made for a very long time: on November 22, 1991, Belling admitted that there remained "major discrepancies in regard to who committed the murder of Torriano Jackson." P.94. And he admitted that as of December 1991, he was still investigating "whether Lamarr Scott was the shooter or whether Valentino was the shooter." P105.[5]

So, unlike his counsel, Belling admits that he was "searching for [] clues and corroboration," *Buckley*, 509 U.S. at 273, and "gathering and piecing together [] evidence for indications of criminal activities and determination of the perpetrators," *Giraldo*, 694 F.3d at 166.

Here are just a few examples of his investigative conduct in the time after Scott confessed:

- Belling admits that he interviewed Scott on the night he confessed. P50. (Although Belling contends this was non-substantive, P50, there is evidence to the contrary, P51.) [6]

_____

[5] Belling's admission that the case against Dixon was not yet closed in December 1991 makes perfect sense. At that point, Dixon had voluntarily waived his rights and denied he was the shooter; Scott had come forward and confessed to the crime in a sworn statement; witness Leonard Brown had given a sworn statement that Scott, not Dixon, was the shooter; witness Mario Jarmon had given statements to both BPD and Belling that Scott, not Dixon, was the shooter; witness Antoine Shannon had given Belling a sworn statement that Scott, not Dixon, was not the shooter; witness Tamara Frida had called the BPD to say that Dixon was not the shooter; Emil Adams had given a description of the shooter that matched Scott, not Dixon; and people in the neighborhood were all talking about how Scott was the shooter. P106.

[6] It does not matter how long or brief Belling's interactions with witnesses were. See, *e.g.*, *Simon*, 727 F.3d at 170 (noting the plaintiff only alleged that "she spoke *briefly*" with the prosecutor) (emphasis added). Consider also *Kalina v. Fletcher*, 522 U.S. 118 (1997), which rejected absolute immunity for a prosecutor who made false statements of fact in an arrest warrant application: "Testifying about facts is the function of the witness, not of the lawyer." *Id*. at 130. It did not matter "how brief or succinct" the statements were, nor that "the person who

- Belling said that he investigated Scott's claim of self-defense by trying to interview witnesses who knew whether either of the Jackson brothers was armed on the night of the shooting. P71(b).

- Even after it heard testimony in November 1991, Belling did not charge the grand jury because he "still wanted additional investigation done." P89.

- So he then personally flew to Kentucky, with no BPD personnel, to interview a witness. P90.

- On November 22, 1991, Belling sent the BPD a list of witnesses he wanted interviewed, writing, "If they can be located during the day I would like to participate in the interview." P95. The letter expressly references "investigation that I have conducted" in addition to investigation "that has been conducted by your Bureau." P95.

- Trying "to determine whether Lamarr Scott was the shooter or whether Valentino was the shooter," P100, Belling went to Tamara Frida's home and interviewed her, P101, P104.

Just as in *Buckley*, Belling's actions "occurred at a time when the crime being investigated could be classified as 'unsolved,'" and there was a large "lapse of time between the manufacture of evidence" and "the impanelling of a grand jury." *Hill*, 45 F.3d at 662 (citing *Buckley*, 509 U.S. at 275). In *Buckley*, "[i]t was well after the alleged fabrication of false evidence … that a special grand jury was empaneled," and absolute immunity was denied.

---

[made them] was a lawyer," what mattered is that "the only function that she performs in giving sworn testimony is that of a witness." *Id.* at 130–31.

*Buckley*, 509 U.S. at 275.[7] In *Hill*, the "time frame [was] more compressed," but it was still "possible to conclude" that the evidence was fabricated, "at least in part, to provide probable cause[.]" *Id*. In the instant case that conclusion is not merely "possible," it's nearly unavoidable: had Belling not fabricated Lamar Scott's recantation and false identification of Dixon, there would have been no probable cause to indict.

Belling happens to have joined in the conduct that makes absolute immunity inapplicable, but that conduct could just as easily have been done exclusively by the police-officer defendants. For example, coercing Lamar Scott into changing his story is not conduct that "necessarily require[d] legal knowledge and the exercise of related discretion." *Van de Kamp*, 555 U.S. at 344. And "[w]hen the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." *Buckley*, 509 U.S. at 276. Accordingly, Belling acted as an investigator and is not protected by absolute immunity. See *Barbera v. Smith*,

_____

[7] *Buckley* shows that an eventual empaneling of a grand jury does not retroactively immunize a prosecutor's earlier investigative work. 509 U.S. at 275–76 ("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial."). So it is irrelevant that Belling believes his conduct looks like protected advocacy if it is "[v]iewed from the perspective at the close of the grand jury presentation[.]" ECF 167-1 at 19. Belling's argument resembles language from the Supreme Court's opinion in *Burns:* "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute[.]" *Burns*, 500 U.S. at 495. The trouble for Belling is that the Court continued: "but we have never indicated that absolute immunity is that expansive. Rather, as in *Imbler*, we inquire whether the prosecutor's actions are closely associated with the judicial process." *Burns*, 500 U.S. at 495; see also *Kanciper v. Lato*, 989 F. Supp. 2d 216, 229 (E.D.N.Y. 2013) (case cited by Belling, denying absolute immunity where prosecutor "was performing investigate functions," notwithstanding the fact that his "actions may have been taken in preparation for the grand jury"); *Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 215 (E.D.N.Y. 2014) (holding that "to the extent it is alleged that [the] ADA [defendant] questioned [a witness] and coerced a false statement implicating [the] plaintiff, he was assisting police in the investigation of an unsolved robbery. Accordingly, the doctrine of absolute immunity would not shield [the] ADA [defendant] from liability in a false arrest claim for his participation in allegedly coercing [the witness] to implicate [the] plaintiff.").

836 F.2d 96, 101 (2d Cir. 1987) (denying absolute immunity where the prosecutors "activities at the time of the alleged conduct herein seem to have involved primarily the directing of an investigation by police and other law enforcement personnel.")

### D. Belling's subjective beliefs about probable cause are irrelevant.

Belling argues that his actions are absolutely immune because they all took place after there was "probable cause to arrest Valentino Dixon." ECF 167-1 at 17. Of course, there was *never* probable cause to arrest Dixon, as explained in Dixon's brief in response to the City Defendants' motion for summary judgment. But even setting that aside, Belling's argument lacks merit.

### 1. Prosecutors' actions can be investigative even after probable cause.

First, Belling's assertion that probable cause is a bright line after which conduct is absolutely immune is incorrect. The law is clear that prosecutors' actions can be investigative, and therefore not covered by absolute immunity, even after probable cause exists. *Zahrey v. Coffey*, 221 F.3d 342, 347 n.2 (2d Cir. 2000) ("All members of the [*Buckley*] Court recognized, however, that a prosecutor's conduct even after probable cause exists might be investigative.") (citing majority and dissenting opinions in *Buckley*); *Watkins v. Healy*, 986 F.3d 648, 664 (6th Cir. 2021), *as corrected on denial of reh'g en banc* (Mar. 16, 2021) ("Consistent with *Buckley*, we once again reject any bright-line rules that would suggest that a prosecutor automatically passes from the realm of investigation to the world of advocacy as soon as a witness implicates someone or when probable cause arises."); *Genzler v. Longanbach*, 410 F.3d 630, 638–41 (9th Cir. 2005) ("While interviews conducted before probable cause to arrest has been established are not protected by absolute immunity, the converse is not necessarily true.").

For example, in *Fogle v. Sokol*, the Third Circuit held that prosecutors were not entitled to absolute immunity for coercing a confession by "using threats, intimidation, and feeding [the

Case 1:19-cv-01678-MAV-JJM   Document 181   Filed 02/15/24   Page 24 of 35

suspect] non-public details…about the way the crimes supposedly had occurred." 957 F.3d 148, 162 (3d Cir. 2020). The prosecutors in that case argued—as Belling does here—that because the conduct occurred after an arrest had been made, the conduct had to be considered advocacy, not investigation. *Id*. The court rightly rejected that argument, noting that it had "rejected bright-line rules that would treat the timing of the prosecutor's action (e.g. pre- or post-indictment), or its location (i.e. in- or out-of-court), as dispositive." *Id*. "Instead, the key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the prosecutor occupies in carrying it out." *Id*. (cleaned up). The court reviewed the facts, found that the prosecutors were "functioning not as advocates, but as investigators seeking to generate evidence," and wrote: "This illustrates why a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards, because when the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." *Id*. at 164 (cleaned up).

For another example, in *Singleton v. Cannizzaro*, the Fifth Circuit held that prosecutors were not absolutely immune for issuing fake subpoenas to witnesses because that conduct was investigative. 956 F.3d 773, 783 (5th Cir. 2020). In so holding, the court explicitly rejected the prosecutors' argument that their conduct had to be immune because it occurred after probable cause existed:

> It is true that the Supreme Court in *Buckley* relied on the prosecutors' lack of probable cause to conclude that they were not absolutely immune for allegedly fabricating evidence. But the Court also recognized that even after probable cause has been found, a prosecutor may engage in police investigative work that is entitled to only qualified immunity. The Supreme Court has never held that the timing of a prosecutor's actions controls whether the prosecutor has absolute immunity. Instead, the Court focuses on the function the prosecutor was performing.

*Id.* (cleaned up). Accordingly, despite the existence of probable cause, the court held that the prosecutors' "attempt to obtain information from crime victims and witnesses outside the judicial context falls into the category of investigative conduct for which prosecutors are not immune." *Id*. at 783–84. The same is true here.

### 2.    In any event, Belling's conduct took place after probable cause, if it ever existed, had dissipated.

Even if probable cause existed at one point, that doesn't mean it exists for all time. As the Second Circuit wrote (applying New York law, but also common sense), "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996). The court also noted—again, in line with common sense—that "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Id*.

Wrongly suggesting that probable cause can never dissipate, Belling cites *Dieter v. Quintilone*, 764 F. App'x 71 (2d Cir. 2019)—an unpublished case. ECF 167-1 at 15–16. The plaintiff in that case argued that a prosecutor was unprotected by absolute immunity because probable cause had dissipated before the challenged conduct. *Dieter*, 764 F. App'x at 73. Far from saying that dissipation was impossible or legally irrelevant, the Second Circuit simply wrote that, on the facts of that case, probable cause had not dissipated. *Id*. ("Here, however, the child's denials, obviously influenced by her father's admonition 'not to talk about' what had happened, did not refute the probable cause established by her earlier accounts.").[8] *Dieter* helps

---

[8] The same is true for *Batten v. City of New York*, 133 A.D.3d 803 (2015), another case cited by Belling. ECF 167-1 at 17 n.7. Just like *Dieter*, *Batten* merely held that, on the facts of that case, probable cause had not dissipated. *Id*. at 807 ("Moreover, the information supplied by the confidential informant did not actually exonerate or otherwise exclude Batten, but rather raised the possibility of someone, conceivably in addition to Batten, being responsible for planning the robbery. Therefore, the existence of a lead regarding a possible additional suspect does little to

Dixon, not Belling, because it shows what common sense dictates—that it would matter, legally, if probable cause had dissipated.

An illustrative case is *Watkins v. Healy*, 429 F. Supp. 3d 420, 439 (E.D. Mich. 2019). In *Watkins*, a witness implicated Mr. Watkins in a murder, but then recanted. After the recantation, the prosecutor forced the witness to make a new, false statement, once again implicating Mr. Watkins. *Id*. In the subsequent civil suit, the prosecutor argued that he was absolutely immune because probable cause had once existed—an argument the court flatly rejected. *Id*. The court wrote that it was "reasonable to infer" that "probable cause had dissipated…as a direct result of [the witness's] recantation." *Id*. So when the prosecutor forced the witness to make the *new* statement "in order to re-establish probable cause that no longer existed," he was "was acting like a police officer" and was not entitled to absolute immunity. *Id*. The Sixth Circuit affirmed: "Consistent with *Buckley*, we once again reject any bright-line rules that would suggest that a prosecutor automatically passes from the realm of investigation to the world of advocacy as soon as a witness implicates someone or when probable cause arises." *Watkins v. Healy*, 986 F.3d at 664.

As in *Watkins*, the facts here, especially in the summary-judgment posture, show that any probable cause had dissipated. Belling asserts that "[e]ven after Lamar Scott came forward," he believed that probable cause to indict Dixon existed. ECF 167-1 at 17. Of course, that's the opposite of what he said numerous other times. P65–68, P70, P94, P105. And it doesn't add up, given that Belling waited over five months—from August 10, 1991, to January 13, 1992—before seeking an indictment. P83–84. A jury does not have to believe Belling's new, self-serving story,

---

diminish the probable cause created by the eyewitness identification of Batten as the person who actually shot [the victim].").

and the Court cannot credit it at the summary-judgment stage.[9] And even if Belling *did* personally, idiosyncratically, believe that probable cause continued to exist, that would be irrelevant: "Analysis of a claim of immunity requires [courts] to view the relevant circumstances as would a *reasonable* official in the claimant's position." *Giraldo*, 694 F.3d at 165 (emphasis added, footnote omitted); *Hill*, 45 F.3d at 662 ("[T]he 'functional' test for absolute immunity is an objective one; it does not depend upon the state actor's subjective intent.").

Given Belling's admissions, the apparent reliability of Lamar Scott's confession (which of course turned out to be true), the shocking failure to follow up on Lamar Scott's leads, and the length of time that passed before Dixon was finally indicted, a reasonable jury could certainly conclude that any probable cause had dissipated and that over the ensuing months Belling was "searching for [] clues and corroboration," *Buckley*, 509 U.S. at 273, or "gathering and piecing together [] evidence for … determination of the perpetrator[]." *Giraldo*, 694 F.3d at 166. Viewing the evidence and inferences in Dixon's favor, as required, it is clear "that the government was still actively pursuing its investigation, and was not yet engaged in the process of prosecuting a criminal defendant," *Barbera*, 836 F.2d at 101, so absolute immunity does not protect Belling.[10]

---

[9] So when Belling argues, for example, that "[b]y 4:15 pm on August 10, 1991, the police had 'solved' the Jackson Murder," ECF 167-1 at 17, he is asking the Court to exceed its summary-judgment authority and view the facts and inferences in *his* favor.

[10] One way to view Belling's conduct is that he actively *avoided* the judicial process. He was faced with a potential perpetrator of a serious crime who credibly and voluntarily confessed, first on television and then to law enforcement, and who fit the eyewitness description. By sending Lamar Scott away and pressuring him to change his story, Belling wasn't "taking actions intimately associated with the judicial phase of the criminal process," he was "actively avoiding" it, and is therefore not shielded by absolute immunity. *Simon*, 727 F.3d at 173; see also *Singleton*, 956 F.3d at 784 (holdings prosecutors were not immune where their conduct "intentionally avoided the judicial process"); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 913 (9th Cir. 2012) ("[W]e can find no justification for extending absolute immunity to the acts of a prosecutor designed to avoid the 'judicial phase.'").

**E.  If immunity turns on disputed facts, those facts must be resolved by a jury.**

For all the reasons above, Dixon respectfully submits that Belling is not entitled to absolute immunity. That said, counsel acknowledges that "[t]he line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." *Zahrey*, 221 F.3d at 347. Sometimes, the information needed to draw that line will turn on facts that are genuinely in dispute—such cases must proceed to a fact-finder. *E.g.*, *Hill*, 45 F.3d at 662–63 (finding it was "possible to conclude" that misconduct took place during the investigative phase but conclusive determination required further fact development).[11]

For example, the district court in *Harris v. Tioga County* wrote that the prosecutor was "absolutely immune from a significant amount of the alleged misconduct," but also found that there were "jury questions" as to whether some of the fabrication took place during the "investigative phase," so did not grant summary judgment on absolute-immunity grounds. 663 F. Supp. 3d 212, 240–41 (N.D.N.Y. 2023). In particular, just as in the case here, the court noted that the plaintiff had offered evidence that the prosecutor: had traveled out of town to interview a witness; had "instigated witnesses interviews"; and had been a "participant in the manipulation or fabrication…of certain key witness testimony." *Id.* at 240.

Also illustrative is *Morse v. Fusto*, No. 07-CV-4793, 2013 WL 4647603 (E.D.N.Y. Aug. 29, 2013). There, the district court "found that genuine issues of fact precluded a finding as a matter of law as to whether defendants allegedly fabricated records during the investigatory phase, when they were building a case against Morse, or only in preparation for presentation of

---

[11] See also *Grp. Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491, 497 (2d Cir. 1986) ("[T]he immunity question cannot be decided without addressing…essential and disputed questions of fact…. At this stage in the litigation the immunity issues presented are not solely questions of law."); *Enlow v. Tishomingo Cnty., Miss.*, 962 F.2d 501, 512–13 (5th Cir. 1992) ("We find there are disputed material facts which must be resolved at trial to determine the validity of Wall's qualified or absolute immunity defense.").

evidence to the grand jury." *Id*. at *1. The case went to trial and the jury was specifically asked whether the evidence at issue was created during the investigative phase. *Id*. at *4, *17. In post-trial motions, the prosecutors argued they were entitled to absolute immunity or, in the alternative, qualified immunity, and in deciding those issues the district court had the benefit of the trial evidence and the jury's explicit fact finding on a special interrogatory. *Id*. The Second Circuit affirmed, specifically noting that the jury had made factual findings. *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) ("Here, the jury found that by making material omissions in the billing summaries, the defendants in effect falsified them, and they did so knowingly *and as part of their investigation*.") (emphasis added).[12]

    Although it is unlikely, Belling may (somehow) be able to convince a jury that his conduct was purely "judicial" in nature—but given the record here, the Court is not required to so conclude, so Belling's motion must be denied.

**II.    Belling violated Dixon's constitutional rights by fabricating evidence.**

    Because Belling acted in an investigative role, he is not entitled to absolute immunity and his actions are judged by the same standards as the BPD Defendants.[13] That means if he created false information likely to influence a jury's decision, he worked "an unacceptable corruption of the truth-seeking function of the trial process." *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021). If that conduct caused a deprivation of life, liberty, or property, he is liable in this § 1983 action. *Buckley*, 509 U.S. at 272; *Bellamy v. City of New York*, 914 F.3d 727, 745 (2d Cir. 2019);

_____

[12] The Second Circuit did not have to second-guess those jury findings, even under a deferential standard of review, because the prosecutors did not appeal that issue. *Id*. at 546 n.6.

[13] Nowhere in Belling's brief does he develop an argument that he is entitled to *qualified* immunity. Any such argument is waived. He wouldn't have been able to make one, anyhow, as the law on fabricating evidence has long been clear. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Bermudez v. City of New York*, 790 F.3d 368, 376 n.3 (2d Cir. 2015); *Restivo v. Hessemann*, 846 F.3d 547, 552 (2d Cir. 2017); see also *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002).

*Kee v. City of N.Y.*, 12 F.4th 150, 168 (2d Cir. 2021). That's precisely what Belling did with—
and what resulted from—the false identifications of Aaron Jackson and Lamarr Scott. Below we
describe the fabrication of those identifications; notably, Belling has not argued that if these
identifications were indeed fabricated they had no impact. Any such argument is waived. In any
event, there is no reasonable dispute that these false identifications contributed to Dixon's
injury—they were used to procure his indictment and affected the evidence that was presented at
his criminal trial.

### A. The fabricated identification from Lamarr Scott

Lamarr Scott's January 1992 grand-jury testimony was the one and only time in the last
30 years that he has falsely claimed that he was not the shooter, and Dixon was. P108. Belling
says he couldn't have coerced Scott into falsely identifying Dixon because he barely spoke to
him on the night of his confession and then never spoke to him again until January 9 or 10, 1992,
when he learned through Scott's attorney that Scott wanted to recant his testimony. P112.
There's documentary evidence refuting that: On December 4, Belling got Scott's phone number,
and he also had Scott's parents' address, his mother's name, and the address and telephone
number of his aunt. P113. Most shockingly, Belling, an assistant district attorney, **personally
served** Scott with his grand-jury subpoena. P113. And there's evidence that the two exchanged
phone calls. P113. All of that is *before* Scott got an attorney, contrary to Belling's story today.
P113.

Even setting aside that documentary evidence, Scott himself has repeatedly given sworn
statements saying that it was ongoing coercion by Belling (and Stambach) that finally culminated
in the false evidence against Dixon (P109):

- **January 31, 1998 sworn statement:** "I testified before an Erie County Grand
  Jury on January 13, 1992. I gave perjured testimony at that time. I did this when I
  told the Grand Jury that Valentino Dixon committed a shooting in Buffalo on

August 10, 1991, and said that Valentino's father coached or persuaded me into confessing to the police. Those statements were lies… <u>The reason why I perjured myself before the Grand Jury is because, in my mind, my life and the lives of my family were in jeopardy from the [BPD] and the District Attorney's office if I did not testify the way I did.</u>

- **December 11, 1998 sworn statement:** "I gave a statement to the Buffalo Police and the Erie County District Attorney which included everything I am saying here…. I did all of these statements of my own free will. I was not forced or bribed. <u>I later recanted the statements because I felt my life was threatened because of the harassment done by Det. Stambach and the District Attorney Chris Belling</u>.

- **January 11, 2004 letter to Judge D'Amico**: "Nearly thirteen years ago, you presided over a case in which a man by the name of Valentino Dixon was convicted for a crime that I committed…. Several eyewitnesses saw me do the shooting. The DA and the police refused to. Believe me and concluded Dixon's parents made me confess. <u>With all the pressure that mounted I went to the grand jury and recanted my original testimony</u>."

- **April 9, 2005 sworn statement:** "After I confessed I was arrested on camera and taken to the Buffalo Police station, where I was released an hour later and told 'we got who we want, get the hell out of here.' Even though several people saw me commit this shooting, the person they wanted was someone I knew in the streets. His name is Valentino Dixon. Approximately six months later, after constant threats by members of the Buffalo Police Dept. and the D.A. on the case Christopher Belling, I was forced to recant my confession at the grand jury proceeding."

- **2012 Golf Digest interview:** in his interview, published in *Golf Digest*, Scott explained that he was pressured by criminal justice personnel to change his story by bringing his foster parents into the meeting room and threatening their well-being after they left.

For decades Scott has described how "a few months after" he confessed and tried to turn himself in, Belling contacted him and pressured him to lie and say that Dixon was the shooter. P110. Indeed, in 2018, when interviewed for ECDAO's reinvestigation, Scott told them Belling had threatened him that if he told the truth and said he was the shooter, his parents could be held responsible.[14] P111. And Belling has a history of pressuring witnesses to lie, often threatening to

---

[14] Given Scott's long history of sworn statements saying Belling coerced him, Belling's note in his brief that "[a]t deposition, Lamar Scott did not blame Mr. Belling for recanting," ECF 167-1

charge them—or, as in this case, *actually charging them*—with perjury if they tell the truth and the truth is not the story Belling wants told. P125–37. To be sure, Belling says that Scott is lying. P114. But that swearing contest requires a jury's resolution, not a court's.

### B.  The fabricated identification from Aaron Jackson

Jackson's ability to view the shooter (Scott) was very limited: Jackson was "looking on the ground" when the shooting started and did not look at the shooter's face before he started running; he was then surrounded by "sparks everywhere," shot and badly injured, and was focused on his wounded brother Torriano. P77. Not surprisingly then, he initially gave no more than a tentative identification, saying he could not be sure because "everything happened so fast." P75–76. Belling—who understood that a tentative identification might not establish probable cause, while a positive one could—wrote to himself that he needed to "**firm up ID**" from Aaron Jackson. P78. Belling then met with Aaron in late August 1991. P78. Belling knew that showing Aaron an individual photo of Dixon would be a constitutional problem. P.79. So Belling chose not to document the substance of his meeting with Aaron. P78. But we now know, from Aaron's testimony, that Belling did exactly what he knew the Constitution prohibited: he showed Aaron a loose photo of Dixon and told him that he would be shown that photo in the grand jury—so when Jackson testified at the grand jury, he knew which photo Belling wanted him to choose from the array. P80. And before the criminal trial, Belling told Aaron where Dixon would be seated in the courtroom and that Aaron would be asked to point him out. P155.

---

at 25, is odd. Even if Scott had affirmatively testified that Belling *did not* coerce him, that would simply present a fact dispute for a jury to resolve. *In re Dana Corp.*, 574 F.3d at 152 (because "a jury is free to believe part and disbelieve part of any witness's testimony," the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe") (cleaned up). But in any event, Belling doesn't point to anywhere in Scott's deposition where he was *asked*. Because Scott's affidavits—which predated his deposition—are competent evidence at the summary-judgment standard, Belling's counsel's choice not to ask questions about them at Scott's deposition carries no weight at all.

After meeting with Belling, Aaron Jackson's identification went from a tentative one (because everything happened so fast and he had no opportunity to see) to a false one—remember, Scott was the shooter, not Dixon—in which Aaron claimed that he saw Dixon's face, followed his eyes, and saw an evil look. Given the false identification, the change in testimony, Belling's notes to himself that he had to "firm up" Aaron's identification, and Belling having shown Aaron an individual photo of Dixon, a reasonable jury can certainly find that Aaron's false identification was fabricated by Belling.

### III.  The conspiracy claim cannot be dismissed.

Belling argues that he cannot be liable for conspiracy because he is absolutely immune, but that argument fails for the reasons, discussed above, that absolute immunity does not apply. Belling also asserts, in one sentence, that there is no evidence that he engaged in a conspiracy. ECF 167-1 at 27. The Court should find this undeveloped argument to be waived. In any event, as discussed thoroughly above, a reasonable jury could find that Belling conspired with Stambach and the other BPD Defendants, and with witnesses Aaron Jackson and Lamarr Scott, to deprive Dixon of his constitutional rights.

### IV.  The failure to intervene claim cannot be dismissed.

Belling argues that the failure to intervene claim must be dismissed because there was no underlying constitutional violation, but that is wrong for all the reasons stated above and in Dixon's response to the City Defendants' motion for summary judgment. Belling also says he is absolutely immune, but that's wrong for the reasons stated above. Finally, Belling is wrong that the only time period involved in the failure to intervene claim is before Dixon's arrest on August 10, 1991. As discussed above, for example, Lamarr Scott finally caved to the coercion applied by both Belling and Stambach, which took place over months and Belling had plenty of opportunity to prevent.

**V.    The *Monell* and negligent hiring, supervision, and training claims were bifurcated and cannot be dismissed.**

Belling argues first that the *Monell* claim should be dismissed because he is immune, but that's wrong—*Monell* liability can arise even when individual liability is absent because of immunity. *See, e.g.*, *Bellamy*, 914 F.3d at 760 ("[T]he legal question of when immunity should attach is an entirely separate inquiry from which state entity is a final policymaker for *Monell*."); *Lopez v. City of N.Y.*, No. 20-CV-2502, 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021); *McCoy v. City of N.Y.*, No. CV 07-4143, 2008 WL 3884388, at *2 (E.D.N.Y. Aug. 13, 2008).

Next, Belling argues that there is no evidence that his constitutional violations were caused by a County policy. ECF 167-1 at 30. But as Belling well knows, discovery into entity liability was bifurcated. ECF 73. That was done at Belling's behest. ECF 58. Dixon opposed the bifurcation and specifically argued that the evidence was also relevant to issues of training and supervision. ECF 52-1 at 1, 11, 12, 24; ECF 61 at 9. But the Court agreed with Belling, ECF 73, and Dixon was blocked from conducting *Monell* discovery and discovery into the County's negligence in hiring, supervision, and training. Those claims were put on hold and cannot be dismissed now.

Third, in one sentence, Belling argues that the *Monell* claim is barred by absolute immunity, citing *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009). Belling does not explain his argument; his citation is to the court reporter's syllabus, and *Van de Kamp* didn't involve *Monell* liability. *Bellamy*, 914 F.3d at 759 ("Van de Kamp said nothing about Monell or municipal liability"). This argument—whatever it is—is both waived and unpersuasive.

Fourth, Belling says that Dixon has chosen the wrong entity defendant, based on Belling's say-so as to what Dixon's *Monell* theory is. But the County *can be* the proper *Monell* defendant, although determination of which entity is the proper *Monell* defendant turns on the details of the

allegations. *See Bellamy*, 914 F.3d at 757–61. Since *Monell* discovery has been bifurcated, Dixon must develop his *Monell* theories once the hold on those claims is lifted.

Finally, Belling says that negligent hiring, supervision, and training claims are disfavored when the entity is already liable under a theory of *respondeat superior*. But Dixon's claims directly against the County are not based on *respondeat superior*, they are based on the County's own conduct. Development of those claims has been put on hold, at Belling's request, and they cannot be dismissed now.

**CONCLUSION**

For the reasons stated above, Defendants' motion should be denied.

Dated: February 15, 2024
New York, New York

<u>/s/ Mary Katherine McCarthy</u>

Nick Joel Brustin
Anna Benvenutti Hoffmann
Mary Katherine McCarthy
Gerardo Romo

NEUFELD SCHECK BRUSTIN HOFFMANN &
FREUDENBERGER LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
T: (212) 965-9081

Donald M. Thompson

EASTON THOMPSON KASPEREK
SHIFFRIN LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
T: (585) 423-8290