## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALENTINO DIXON,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF BUFFALO *et al.*,<br><br>        Defendants. | No. 19-cv-01678 (WMS) (HKS) |

### Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 56.1

**Lamarr Scott kills Torriano Jackson and wounds Aaron Jackson and John Sullivan.**

1.      At approximately 1:15 am on August 10, 1991, after a fight broke out on the corner of Delavan Avenue and Bailey Street near Louie's Texas Red Hots in Buffalo, Lamarr Scott used a TEC-9 firearm to fatally shoot Torriano Jackson and wound two other men, Aaron Jackson and John Sullivan. Ex. 5 (Scott Plea 2018) 13–14 (caused death of Torriano Jackson and shot Aaron Jackson and John Sullivan); Ex. 4 (Scott Dep.) 18:5–19: Ex. 1 (Homicide File) BPD Comp. 196–97 (Scott confession); BPD Comp. 2 (initial report); Ex. 76 (Shannon Decl.) ¶¶ 1, 4.

2.      Shortly before Scott shot and killed him, Torriano Jackson pulled out a silver handgun and shot at Mario Jarmon. Ex. 68 (Jarmon GJ Test.) 10:7–9 (Tory brandished gun, stating he had a bullet for him); Ex. 23 (Dixon Dep.) 123:15–22, 125:10–11 (ran out of store, one Jackson brother had silver handgun); Ex. 4 (Scott Dep.) 18:13–19:7 (saw Torriano shoot Mario with a handgun); Ex. 1 (Homicide File) BPD Comp. 197 (Scott confession) (Tory had silver gun with nickel plate); Ex. 79 (Maxian Perj. Test.) 454:8–21 (describing Jarmon's multiple gunshot wounds). The only people at the scene with guns were Scott and Torriano. Ex. 1 (Homicide File

(Scott Stmt.) BPD Comp. 198.

3.     Scott emptied the entire clip of the TEC-9 that night, firing 27 shots total. Ex. 1 (Homicide File) BPD Comp. 197 (Scott Stmt.); BPD Comp. 236 (ballistics report). After opening fire, Scott stood over Torriano Jackson and fired ten shots into his back as Torriano lay on the ground. Ex. 14 (DA Memo) COE 4761; Ex. 6 (Frida Dep.) 14:16–18; Ex. 76 (Shannon Decl.) ¶ 1. Scott then fled the scene, disposing of the gun along the way. Ex. 1 (Homicide File) BPD Comp. 197 (Scott Stmt.).

4.     When Scott opened fire, the large crowd of young people gathered at the corner—which was a popular hangout spot—started running. Ex. 14 (DA Memo) COE 4760; Ex. 20 (Scott Ltr., 12/11/98) Dixon-3808. Following the shooting, people in the neighborhood were all talking about how Scott was the shooter. Ex. 76 (Shannon Decl.) ¶¶ 4–11.

5.     Within days, on August 12, Scott came forward and confessed to the news media, the Buffalo Police Department, and ADA Christopher Belling. Ex. 1 (Homicide File) BPD Comp. 196–97 (Scott confession); Ex. 41 (Belling Dep.) 68:5–16. Nevertheless, Valentino Dixon was ultimately convicted of Scott's crimes in June 1992. Ex. 14 (DA Memo) COE 4759.

6.     The following year in November 1993, Scott shot a 16-year-old boy in the head unprovoked during an armed robbery, leaving the young man quadriplegic. Scott was ultimately convicted of attempted murder and other serious charges in that case. At sentencing, the judge observed that Scott shot the teenager "just for the thrill of it" and sentenced him to the maximum term of 57 years. Ex. 81 (11/9/94 Buffalo News Article); Ex. 35 (Prisoner Return Order) COE 4265.

7.     In 2018, Lamarr Scott was finally convicted of manslaughter and assault for having shot and killed Torriano Jackson and wounded Aaron Jackson and John Sullivan. Scott's conviction

came after a comprehensive reinvestigation was conducted by the Erie County District

Attorney's Office (ECDAO)—just one year after ADA Belling was forced to leave the office.

This reinvestigation included detailed interviews of approximately thirty witnesses and a

thorough review of Belling's file, the trial transcripts, records of prior proceedings, and the

physical evidence. Ex. 5 (Scott Plea) 13:4–14:20 (pleading guilty); Ex. 28 (ECDAO Aff. 2018)

¶¶ 4, 12–13; Ex. 10 (1/18/17 *Buffalo News* article, Belling's Forced Resignation).

**Valentino Dixon is actually innocent of Torriano Jackson's murder.**

8.      Through its exhaustive reinvestigation, the ECDAO conclusively determined that

Valentino Dixon <u>did not</u> shoot Torriano Jackson, Aaron Jackson, or John Sullivan on August 10,

1991. Rather, "Lamarr Scott was the shooter, just as he has maintained…with the exception of a

recantation before the grand jury [] since August 12, 1991." Ex. 28 (ECDAO Aff. 2018) ¶ 12.

The DA's office therefore consented to the vacatur of Dixon's wrongful convictions for these

crimes. Ex. 28 (ECDAO Aff. 2018) p.7.

9.      Dixon was released from prison on September 19, 2018—more than 26 years after he

was convicted for Scott's crimes. Ex. 32 (440 Order) Dixon-5401; Ex. 33 (440 Motion Tr.)

Dixon 701–02.

10.     As Dixon has maintained for over three decades, he did not shoot Torriano Jackson or

anyone else on August 10. Scott's actions in shooting the TEC-9 were committed by him alone;

Dixon did not ask or direct Scott to shoot anyone. Ex. 1 (Homicide File) BPD Comp. 71 (Dixon

Stmt.) (did not shoot anyone); Ex. 24 (Dixon 50-H) 30:4–6 (not armed when shooting occurred);

Ex. 23 (Dixon Dep.) 184:2–11 (did not say anything to Scott before or during shooting); Ex. 4

(Scott Dep.) 80:7–13.

11.     In fact, Dixon was not in the immediate vicinity of the shooting. He was inside the

convenience store on the corner when he first heard gunshots, and he had already run down the block—towards his car and away from the gunfire—when Scott opened fire. Ex. 23 (Dixon Dep.) 122:20–22, 123:10–22, 124:18–125:8, 189:11–16; Ex. 24 (Dixon 50-H) 31:6–15, 31:23–32:10; Ex. 6 (Frida Dep.) 13:4–19; Ex. 18 (Scott Int., ECDAO Reinvest., Transcript Pt. 2, 8/15/18) 17 (Dixon already gone and going towards his car when began shooting); Ex. 4 (Scott Dep.) 45:19–46:12, 57:3–11.

**Buffalo Police Department homicide detectives conduct the initial investigation.**

12.    Buffalo Police Department (BPD) officers arrived at the scene within minutes of the shooting. Ex. 1 (Homicide File) BPD Comp 1–2; Ex. 2 (Cr. Tr. (Diegelman)) 383:21–23. Several experienced homicide detectives—Mark Stambach, James Lonergan, John Vickerd, and Raniero Masecchia, under the supervision of Homicide Chief Richard Donovan ("BPD Defendants")—were assigned to investigate the shooting. Ex. 3 (Stambach Dep.) 52:23–53:02; Ex. 8 (Lonergan Dep.) 29:16–25, 30:25–31:19.

13.    At the scene, officers recovered Torriano's silver handgun from near his body; the handgun had one spent casing in its cylinder. Ex. 1 (Homicide File) BPD Comp. 1, 5; *see also* Ex. 14 (ADA memo) COE 4765 ("[A] .32 caliber revolver with one spent shell casing was recovered right next to the spot where Torry fell."). Officers also recovered 27 spent .9mm casings around the handgun. The TEC-9 that Scott used to murder Torriano Jackson was never recovered. Ex. 1 (Homicide File) BPD Comp. 3–10 (evidence log); Ex. 2 (Cr. Tr. (Belling Opening) 71:14–20; Ex. 2 (Cr. Tr. (Diegelman)) 384:22–385:8.

*Eyewitness Emil Adams provides BPD Defendants with an early description of the shooter that accurately matches Scott, not Dixon.*

14.    Because Dixon is innocent, no eyewitness ever saw him shoot anyone on August 10,

1991. It was Lamarr Scott that witnesses saw shoot the TEC-9. Ex. 28 (ECDAO Aff. 2018) ¶ 12; Ex. 5 (Scott Plea) 13:4–14:20.

15.    As ADA Belling has testified, Dixon and Scott looked nothing alike. Belling described Dixon as: "5'7", 5'8", very youthful looking appearance, 130, 140 pounds." Whereas, he testified that Scott was "over 6', I'd say 6'2" tall, quite a substantial fellow. He's at least 200 pounds, maybe a little bit more." Ex. 80 (Belling Perj. Test.) 566:13–18, 471:19–23; *see also* Ex. 76 (Shannon Decl.) ¶ 3 (Scott 50 pounds heavier, 4 inches taller, with darker skin).

16.    Dixon's slim build and youthful appearance are evident in his booking photograph from the time. Ex. 1 (Homicide File) BPD Comp. 145 (array photo).



17.    As compared with Scott's appearance in a 1991 booking photo. Ex. 39 (Photo Array) COE 3227.



18.     Scott played football in high school and was recruited to play defensive end in college before he went to prison. Ex. 4 (Scott Dep.) 9:11–10:11. His height and heavyset build are also evident in his August 12, 1991 mug photograph taken at the Buffalo Police Department the night he confessed—when he first met with ADA Belling. Ex. 38 (8/12/91 Scott Polaroid) COE 2179; Ex. 41 (Belling Dep.) 62:13–63:4.



19.     As Scott testified, no one in 1991 or today, would ever mistake him for Dixon as they are totally different sizes. Scott is and was a much bigger man. Ex. 4 (Scott Dep.) 11:11–23. Other witnesses, including Belling, confirm this. Ex. 80 (Belling Perj. Test.) 566:13–18; Ex. 76 (Shannon Decl.) ¶ 3 (size difference between Scott and Dixon was obvious; it would not be possible to mistake Scott for Dixon, even at night).

20.     Emil Adams, an eyewitness who had a good view of the shooter (Scott) from where he was located during the fight, provided an early description to police around an hour after the

shooting. Adams accurately described the individual with the TEC-9 as **a "heavy set" Black**

**male, six feet tall, wearing a white T-shirt and a white hat.** Ex. 1 (Homicide File) BPD Comp.

31 (Adams Stmt.) (emphasis added); Ex. 3 (Stambach Dep.) 165:15–25, 221:25–22:25; Ex. 2

(Cr. Tr. (Adams)) 182:19–22, 193:4–6; Ex. 65 (Adams GJ Test.) 78:2–5.

21.     In addition to the obvious differences in height and build between Scott and Dixon, the

two were also dressed totally differently on August 10, 1991:

|  | **Lamarr Scott** | **Valentino Dixon** |
|---|---|---|
| **Height** | well over 6 feet | 5'9" |
| **Build** | heavyset | thin |
| **Hat** | white baseball cap | dark blue hat |
| **Top** | white T-shirt | gray sweatshirt |
| **Pants** | dark shorts | black jogging pants |
| **Shoes** | white sneakers | dark blue & black sneakers |

Ex. 38 (8/12/91 Scott Polaroid) COE 2179; Ex. 80 (Belling Perj. Test.) 471:15–23, 566:15–18;

Ex. 78 (Militello Perj. Test.) 408:23–409:8 (Dixon about 5'8", 5'9" real slender, real slim build);

Ex. 23 (Dixon Dep.) 170:16–17; Ex. 4 (Scott Dep.) 10:14–11:23, 11:4–10 (Dixon was slim); Ex.

76 (Shannon Decl.) ¶ 3; Ex. 1 (Homicide File) BPD Comp. 197 (Scott confession (describing his

clothing)); BPD Comp. 71 (Dixon Stmt.); BPD Comp. 235 (Dixon Clothing Evidence Log).

**Valentino Dixon is wrongly arrested less than 10 hours after the shooting.**

22.     BPD Defendants reported that within hours of the shooting two witnesses—John Sullivan

and Emil Adams—positively identified Dixon as the shooter from properly conducted, non-

suggestive ID procedures, even though Adams had just described someone who looked nothing

like Dixon (i.e., 6' heavyset) as the shooter. Ex. 1 (Homicide File) BPD Comp. 76–77 (Sullivan Stmt); BPD Comp. 150–151 (Sullivan Array); Ex. 1 (Homicide File) BPD Comp. 25, 31, 47–48.

*John Sullivan could not see the shooter.*

23.     John Sullivan was a 17-year-old friend of Aaron Jackson's who was present at the intersection of Delevan and Bailey at the time of the shooting. Ex. 1 (Homicide File) BPD Comp. 76; Ex. 77 (Sullivan Perj. Test.) 206:24–207:9. During the day leading up to the shooting, Sullivan drank a number of beers (malt liquor), smoked marijuana laced with cocaine, and consumed more beer that evening.  Ex. 2 (Cr. Tr. (Sullivan)) 101:17–21, 102:2–14, 103:2–04:22, 105:10–22, 106:25–07:8, 108:5–22, 109:7-19, 110:4–13,112:15–24; Ex. 37 (Sullivan Med. Records) COE 1907 (blood tested positive for cocaine).

24.     When the fight broke out, Sullivan heard someone yell "look out, he's got a gun" and started running away without looking at the shooter. Sullivan did not look back to briefly observe the shooter (Scott) until he was 100 to 150 years away from the corner. It was dark, the shooter was not facing in his direction, there was a crowd of people around, and Sullivan's view was obstructed by headlights. Sullivan had also been shot himself in the leg as he ran away. Ex. 1 (Homicide File) BPD Comp. 76; Ex. 2 (Cr. Tr. (Sullivan)) 78:22–79:03, 80:10–16, 81:7–9, 82:6–21, 131:15–132:09, 111:17–112:2, 116:21–118:8, 136:6–37:7, 140:19–41:3, 141:13–42:4; Ex. 2 (Cr. Tr. (Gordon)) 518:17–19 :15 (treated bullet holes in Sullivan's right thigh).

25.     Under these circumstances, eyewitness memory science shows it would be "nearly impossible" for Sullivan to have observed the shooter well enough to identify him, because Sullivan's opportunity to view the shooter was essentially non-existent and other factors such as weapon focus and stress would have further reduced his opportunity to observe and encode relevant information. Ex. 29 (Dysart Report) 5, 9–13; Ex. 30 (Dysart Dep.) 99:07–25.

26.     BPD Defendant Vickerd interviewed Sullivan at the hospital at 4:00 a.m. on August 10. ADA Belling was not present for this interview. Ex. 1 (Homicide File) BPD Comp. 16; Ex. 37 (Sullivan Med. Records) COE 1901 (homicide detective arrived at 4:03 am).

27.     Vickerd reported that, during their interview, Sullivan volunteered he could identify the shooter by nickname ("TINO") and first name (Valentino), although his last name was unknown. Ex. 1 (Homicide File) BPD Comp. 16; Ex. 7 (Masecchia Dep.) 179:7–81:20.

28.     Because Belling was not present for the interview of Sullivan, he understood based on BPD Defendants' representations that Sullivan was the first person to "interject" Dixon's name into the case. Ex. 41 (Belling Dep.) 216:6–18:2, 217:16–20, 217:22–218:2.

29.     Later that day on August 10, BPD Defendant Masecchia took a statement from Sullivan at the homicide office. Masecchia also reported that he presented Sullivan with a six-photo array, from which he reported Sullivan identified Dixon as the shooter he had seen. Ex. 7 (Masecchia Dep.) 196:23–197:02; Ex. 1 (Homicide File) BPD Comp. 76–77 (Sullivan Aff.); BPD Comp. 150–151 (Sullivan Array).

30.     Belling testified it was his understanding, based on BPD Defendants' reports and communications, that Sullivan picked Dixon out of a properly administered photo array procedure. Ex. 41 (Belling Dep.) 216:6–218:2, 194:3–8.

*Police report Emil Adams identified Dixon even though that contradicted his earlier description of the shooter.*

31.     Around 5 a.m. on August 10, BPD Defendants Stambach and Vickerd report administering a six-photo array containing Dixon's photo to Emil Adams—the eyewitness who had a good view of the shooter, and who had provided an accurate description matching Scott's size and clothing two hours earlier. Belling was not present for this photo identification

procedure. Ex. 1 (Homicide File) BPD Comp. 25, 31, 47–48, 145 (photo array).

36.     Vickerd and Stambach both reported that Adams viewed the array and, without any

suggestion, "positively identified" Valentino Dixon as the person he saw shooting the Tech-9.

Ex. 1 (Homicide File) BPD Comp. 47, 25.

32.     Belling's understanding from the police reports and his discussions with BPD Defendants

was that Adams identified Dixon from a properly conducted six-person photo array. Ex 41

(Belling Dep.) 179:6–13. Belling testified that he never received any information from any

police officer indicating that suggestion or improper conduct was used with Adams. Ex 41

(Belling Dep.) 179:15–18, 181:25–182:14.

*BPD Defendants arrest Dixon, not Scott.*

33.     By 11:30 a.m. on August 10, about ten hours after the shooting and without following up

with numerous witnesses who remained to be interviewed, BPD Defendant Stambach issued a

"pick-up" order to apprehend Dixon. The order described Dixon as "5'10" with a "**slight build**."

Ex. 1 (Homicide File) BPD Comp. 59; *see also* BPD Comp. 87 (Dixon described to officers as

"5'10," slim build").

34.     Dixon was taken into custody shortly thereafter and transported to the BPD homicide

office. At the station, Dixon truthfully told BPD Defendant Stambach that he did not do the

shooting. Dixon then voluntarily waived his rights and gave a statement, in which he again

truthfully denied being the shooter or having any weapons. Ex. 1 (Homicide File) BPD Comp.

64–65 (Stambach Report), 72 (Dixon Stmt.).

35.     Dixon's clothing (black nylon jogging pants, a gray sweatshirt, and a navy blue baseball

hat) did not match the description Adams had provided of the clothing the shooter wore (cut-up

blue jeans, a white T-shirt, and a white hat). Ex. 1 (Homicide File) BPD Comp. 235 (Dixon

Clothing Evidence Log); BPD Comp. 31–32 (Adams Stmt.). Although Dixon's clothing was

taken into evidence, neither BPD Defendants nor Belling ever had his clothing tested for blood

or gunpowder residue—tests that were available at the time. Ex. 1 (Homicide File) BPD Comp.

244 (Hojnacki Rep.); Ex. 14 (DA Memo) COE 4773–74; Ex. 40 (Smardz Dep.) 123:13–19.

36.     Even though Dixon knew he was being arrested for something Lamarr Scott did, Dixon

did not give the police information implicating Scott in the shooting because of the

understanding "in the neighborhood" that "you just don't speak about these type of things,

because it can be harmful to you…it just makes your life horrible. Like it travels with you for the

rest of your life…unless you move into the Arizona desert somewhere away from the

whole…environment." Ex. 23 (Dixon Dep.) 142:06–43:19.

37.     At 4:15 pm on August 10, BPD Defendant Stambach prepared and swore a criminal

complaint for Dixon's arrest that was based solely on the reported identification from Sullivan.

Ex. 1 (Homicide File) BPD Comp. 82–83.

**ADA Belling joins the investigation when Scott confesses.**

38.     The following evening on August 11, Lamarr Scott contacted a local TV news station and

arranged to give a videotaped public confession admitting that he—not Dixon—had committed

the shooting. Ex. 1 (Homicide File) BPD Comp. 186 (received call from the news at 11:40 p.m.);

BPD Comp. 196–199 (Scott Stmt.); Ex. 4 (Scott Dep.) 29:14–31:17.

39.     Scott was then transported to the BPD homicide office, where he made the same

confession, signing and swearing to a 4-page statement taken by Defendant Stambach. Ex. 1

(Homicide File) BPD Comp. 196–199 (Scott confession).

40.     Scott made the decision to confess to the crime voluntarily; nobody forced him to do that,

and nobody offered him anything to confess. Scott decided to confess first on television to

protect himself from authority figures, including the police. Ex. 4 (Scott Dep.) 29:25–30:25, 31:3–7; Ex. 1 (Homicide File) BPD Comp. 186 (Scott would confess to the shooting only on condition he could first make a statement on camera and be escorted by the news downtown); Ex. 76 (Shannon Decl.) ¶¶ 5–7 (no one pressured, coerced, or bribed Scott to confess; he did not seem forced or nervous, he was very calm).

41.     It was unusual and a big deal for Scott to confess on TV and to police when Dixon had already been arrested for the shooting. As Belling testified, absent clear mental illness, this was the only time in his career where someone voluntarily came forward to confess that he was actually the person who committed the crime. Ex. 41 (Belling Dep.) 65:14–18 (only time in career that ever happened); *see also* Ex. 3 (Stambach Dep.) 208:9–09:15 (only time in 35-yearlice career remembered this happening); Ex. 7 (Masecchia Dep.) 341:20–43:16; Ex. 8 (Lonergan Dep.) 157:13–58:13.

42.     As Defendant Stambach recognized while taking Scott's confession, Scott—unlike Dixon— matched the person Adams described as shooting the TEC-9 less than two days prior. Ex. 3 (Stambach Dep.) 157:8–19, 168:1–8 (Scott "fit the bill" as the "big, heavyset guy" Adams had described). Defendant Masecchia was also present at the station when Scott confessed. Both Stambach and Masecchia admit they recognized this as a "red flag" at the time, especially as they knew by then that Dixon—the man they had already arrested—did not fit Adams' description of the shooter.  Ex. 3 (Stambach Dep.) 168:12–20, 173:5–19, 176:21–177:14, 170:21–171:25; Ex. 7 (Masecchia Dep.) 271:20–274:9, 277:12–278:15, 280:5–20.

43.     Two other witnesses who were present for the shooting—Leonard Brown and Antoine Shannon—also told police that night that Scott, not Dixon, was the shooter. Defendant Masecchia took Brown's statement down in a formal report. Ex. 1 (Homicide File) BPD Comp.

158–159 (Brown Stmt.); Ex. 3 (Stambach Dep.) 289:13-18. But the officers who spoke to Shannon did not document his statement in any formal report; the only documentation in the police file appears on handwritten post-it notes. Ex. 1 (Homicide File) BPD Comp. 296–297; Ex. 76 (Shannon Decl.) ¶¶ 8–9. *See also* McCarthy Decl. ¶ 9.

*Belling comes to the BPD Homicide Office and meets with detectives to discuss the case.*

44.    Around 3:00 a.m., Stambach notified Homicide Chief Donovan and ADA Belling about Scott's confession. Ex. 1 (Homicide File) BPD Comp. 193, 200.

45.    Belling responded to the BPD homicide office after speaking to Stambach; there he met with BPD detectives on the case. Ex. 1 (Homicide File) BPD Comp. 200; Ex. 41 (Belling Dep.) 62:13–25 (spent "probably an hour" in homicide division).

46.    As Belling acknowledges, although one of his responsibilities was to give assistance to homicide detectives when needed, it "didn't happen that often" that he was called down to the station; this was "relatively unusual."  Ex. 41 (Belling Dep.) 64:20–65:7. And it was "very unusual" to have Scott come forward to say he actually committed the crime. Ex. 41 (Belling Dep.) 65:8–21.

47.    As result, Belling admits he took a more substantial role in directing the investigation from that point forward than he otherwise would have in a typical homicide investigation. Ex. 41 (Belling Dep.) 65:22–66:4. As Defendant Lonergan described: "Belling was very active in Lamarr Scott's confession." Ex. 8 (Lonergan Dep.) 200:4–13.

*Belling interviews Scott.*

48.    At the station, Belling read the statement Masecchia had taken from Brown, and the confession Stambach had taken from Scott. He also viewed a videotape of Scott's confession to the news. Ex. 1 (Homicide File) BPD Comp. 200. Belling then interviewed Scott. He could not

remember at his deposition if Stambach or another detective was in the room with him and

admitted: "It could have been me and Lamarr Scott alone." Ex. 41 (Belling Dep.) 67:22–68:4.

49.     Belling repeatedly claimed that his interview of Scott lasted only five minutes, and that

he intentionally "tried to stay away from substantive information about what he said because [he]

didn't want to end up a witness at [his] own *Huntley* hearing." Ex. 41 (Belling Dep.) 68:23–69:3;

*see also* 69:6–7 ("I tried to avoid the substance of what was going on and tried to get the

context."), 75:25–76:4 (spoke approximately five minutes night Scott came in).

50.     But Belling's handwritten notes entitled "Lamarr Scott, taken on 8-12-91 confession"

have several substantive points showing this was an investigative interview—including "LS

returns fire, panic and out of control, shooting threats, self-protection, and poor shooting

control," and a notation "can't come up with underlying reason. 19 years old, no prior." Ex. 80

(Belling Perj. Test.) 528:3–21 (reading Belling notes into the trial record).

51.     As he was interviewing Scott, Belling had an opportunity to observe Scott's physical

appearance. He has described Scott as "a substantial lad," "at least 200 pounds, maybe a bit

more" and "over six feet" tall. Ex. 80 (Belling Perj. Test.) 471:16–23, 492:2–5.

*Belling directs detectives to let Scott go, despite knowing Scott matched the description of the*

*shooter given by an eyewitness.*

52.     After interviewing Scott about his confession, Belling made the decision that Scott (and

Brown) should be released. Ex. 1 (Homicide File) BPD Comp. 200. Belling admits he advised

detectives to let Scott go. Ex. 41 (Belling Dep.) 374:7–10. But at his deposition, Belling claimed

he made this decision without having spoken to detectives about the quality of evidence they had

against Dixon. Ex. 41 (Belling Dep.) 81:22–83:8 (responding "not particularly" when asked if

had such discussions that day or following day). He also denied that there was any discussion at

that time about whether there was sufficient evidence to continue prosecuting Dixon for the crime. Ex. 41 (Belling Dep.) 81:9–15.

53.     Stambach and other BPD Defendants describe a completely different situation. As Stambach testified: "[ADA] Christopher Belling came over, reviewed all the file at that particular time. He looked at all the evidence that we had collected, and he discussed it with us…." Ex. 3 (Stambach Dep.) 172:6–12. Lonergan similarly recalled that Belling was "very active" in the confession: "He was in the homicide office, and they were consulting him after the interview on TV, and what steps he may have taken." Ex. 8 (Lonergan Dep.) 200:4–13.

54.     Stambach further explained that, although he recognized Adams' description of the shooter did not match Dixon and did match Scott (who was confessing to the crime), he released Scott and did not document those concerns because Belling told him to let Scott go. There was "no doubt in his mind" that Belling knew Scott "match[ed] the description prior" and that they discussed it, but "it was the [ADA's] request that we not arrest him for it." Ex. 3 (Stambach Dep.) 172:6–19 (Belling said he "to let him go and that he had more information that he was working on").

55.     In addition to Scott matching Adams' earlier description of the shooter, Scott's confession that night included other credible indicia of his involvement and was consistent with evidence in the investigation up to that point a number of respects:

> (a) Scott's description of the sequence of events preceding the shooting including that he fired from the right-hand side of the street coming from Bailey;
>
> (b) Scott's knowledge of the individuals present and where they were located during the events, including the Jacksons and one of the bystanders (Michael Bland), whose name had not publicly surfaced, whom Scott described seeing before the

shooting and remaining on the corner, consistent with information the detectives

obtained from other sources;

(c) Scott's descriptive details of the revolver recovered next to the body of Torriano

Jackson, in particular that it was a silver gun with a nickel plate;

(d) and the fact that Scott had emptied the entire clip of the TEC-9 that night.

Ex. 3 (Stambach Dep.) 292:10--293:6, 294:3–15, 294:17–296:8, 297:8–16; Ex. 1

(Homicide File) Comp. BPD 197 (Scott Stmt.); BPD Comp. 216 (Grabowski Rep. Re:

Jackson 8/21 Intv.).

56.     And while at the BPD on August 12, Scott not only provided a description of the clothing

he was wearing during the shooting (white T-shirt, white hat, white sneakers), but also offered to

turn over that clothing for testing—including, most significantly, the white sneakers Scott

indicated still had blood on them from his standing directly over Torriano Jackson while firing

multiple shots at close range. Ex. 4 (Scott Dep.) 39:4–10; Ex. 1 (Homicide File) BPD Comp. 197

(Scott Stmt. (describing clothing); BPD Comp. 235 (Dixon Clothing Evidence Log); BPD Comp.

30–32 (Adams Stmt.).

57.     Scott's clothing, unlike Dixon's, matched the clothing Adams described the shooter as

wearing—a fact Stambach discussed with Belling that night. Ex. 3 (Stambach Dep.) 172:6–19

("[N]o doubt in my mind that that [Belling] would have to know about that white hat"); *see also*

Ex. 41 (Belling Dep.) 302:13–17 (recalled Scott wearing a flat-brimmed hat and a white T-shirt).

58.     Belling recognized that, given the circumstances of this shooting, it was possible the

shooter would have blood on his clothes or shoes. Ex. 41 (Belling Dep.) 289:9–20. He also

recognized that the presence of a large amount of gunshot residue on a shooter's clothing could

be helpful evidence to demonstrate that he committed the crime. Ex. 41 (Belling Dep.) 296:24–

297:5, 297:19–25. But Belling claimed that it "never crossed his mind" to ask Scott what he was wearing or test it. Ex. 41 (Belling Dep.) 299:22–300:13.

59.     At his deposition, BPD Evidence Collection Unit Detective Henry Smardz testified that, if ADA Belling had instructed him to collect Scott's clothing, he would have collected it and forwarded it for appropriate testing, including blood or gunshot residue testing. But Smardz was never directed to collect Scott's clothing or shoes. Ex. 40 (Smardz Dep.) 116:3–18, 120:4–11, 121:21–122:8; 122:10–123:19, 43:9–23; 46:21–25, 115:11–25.

60.     After Belling directed Scott be released, Stambach told him "they had their guy and it wasn't [him]." Ex. 4 (Scott Dep.) 36:19–37:18; *see also* Ex. 74 (4/9/05 Scott Sworn Ltr.) Dixon 6318 (told "we got who we want, get the hell out of here"); Ex. 73 (2/27/02 Scott Sworn Ltr.) Dixon 5931 (told had who they wanted and to leave situation up to them). As Scott testified at his deposition, no one took any of the evidence he offered them before he was released. Ex. 4 (Scott Dep.) 39:16–17 ("I just know that nobody ever took anything that I offered.").

**Belling admits Scott's confession changed the probable cause calculation for Dixon, and that he had an obligation to investigate whether Scott or Dixon was the shooter.**

61.     ADA Belling knew he could not prosecute a person for a crime without sufficient evidence of probable cause, and he understood that a confession could provide probable cause for an arrest. Ex. 41 (Belling Dep.) 31:17–22, 60:17–19.

62.     Belling admits that, when Scott confessed, there "became at least potential probable cause that [Dixon] didn't" commit the shooting. Ex. 41 (Belling Dep.) 35:3–11. But when asked by BPD Defendants whether they should arrest Scott, Belling responded: "My answer was no, you're just going to complicate this thing, we got to sort it out, don't arrest anybody at this point." Ex. 41 (Belling Dep.) 374:4–10.

63.    In Stambach's contemporaneous handwritten report—which was never reduced to a formal typewritten report—he wrote: "ADA Belling responded and arrived at the HBO office at 4:15 am. He viewed the tape and read the statements. Both bad boys let go." Ex. 1 (Homicide File) BPD Comp. 193. At his deposition, Belling denied having a discussion with Stambach about Scott and Brown being "bad boys" and that they should be let go. Ex. 41 (Belling Dep.) 254:22–255:3. Although he did admit he advised that Scott and Brown be let go. Ex. 1 (Homicide File) BPD Comp. 200; Ex. 41 (Belling Dep.) 374:4–10.

64.    Belling understood he had an obligation to investigate new evidence (like Scott's confession) that may have changed the probable cause calculation, regardless of when in the investigation or prosecution that evidence arose. Ex. 41 (Belling Dep.) 33:4–23. He agrees part of his role in this case was to ensure that Scott's confession was properly investigated, and that he took on a more substantial role in this investigation than usual given the confession. Ex. 41 (Belling Dep.) 35:13–19, 65:22–66:4. As he testified: the release of Scott did not mean that the investigation of who shot Torriano Jackson was over: "Nowhere near. It meant that there was a lot more to do in that investigation." Ex. 41 (Belling Dep.) 350:14–24.

65.    Belling admits that some of his conduct in this case was taken in the role of an investigator. Ex. 41 (Belling Dep.) 35:13–19, 33:4–23.

66.    After Scott's confession, Belling understood "the primary material issue in the whole case" was who fired the TEC-9 machine gun. Ex. 80 (Belling Perj. Test.) 478:3–8. When asked to describe his investigation, he answered: "[T]he subject matter of the investigation was the murder of Torriano Jackson, the assault upon Aaron Jackson, the assault upon John Sullivan III, and all the attendant circumstances surrounding that event," with the "primary material issue" being the identification of who shot Torriano and other people. Ex. 80 (Belling Perj. Test.)

474:16–25; *see also* Ex. 41 (Belling Dep.) 34:23–35:4 (after Scott confessed, "the issue [was] to determine who did it").

**Belling directs continued investigation and ignores obvious problems.**

67.     At their depositions, BPD Defendants claimed that—after Scott's confession—Belling was the one directing their investigation into who committed the shooting. Ex. 7 (Masecchia Dep.) 240:20–241:14 (expectation that DA's office would "get to the bottom" of Scott's confession, would "turn it over to the DA and let them do the follow-up investigation"); Ex. 3 (Stambach Dep.) 163:11–13 (case was turned over to DA's office and they "enhanced" the investigation); Ex. 12 (Vickerd Dep.) 68:23–69:3 (after an arrest, conducted investigative activities as directed by the ADA).

68.     On August 12, Belling received a copy of the Jackson homicide file. Ex. 1 (Homicide File) BPD Comp. 174. He reviewed everything in the file and continued to review reports as they came in. In other words, within days of interviewing Scott, Belling had seen Adams' description of the shooter as 6' tall, "heavyset"—which matched Scott. Ex. 41 (Belling Dep) 88:11–89:6, 62:13–63:4; Ex. 38 (8/12/91 Scott Polaroid) COE 2179.

69.     Belling admits that, prior to his presentation of evidence to a grand jury, if there was anything he felt was lacking or that he needed further investigated, he had the authority to make that inquiry. Ex. 80 (Belling Perj. Test.) 487:22–488:2. Belling also acknowledges that he had ongoing conversations with BPD detectives about the investigation—which went on for months after Scott's confession—where he provided input on what issues he believed needed to be followed up on. Ex. 41 (Belling Dep) 67:4–18, 89:8–15. Even though Belling admits he "could have done many things" then to follow up, including directing additional questioning by BPD officers, he testified that all he recalls doing then was telling detectives to run background checks

on Dixon's parents and to get the confession tape from the local news. Ex. 41 (Belling Dep.) 374:11–24, 94:8–21. Belling did not recall ever seeing any follow up reports from detectives on Dixon's parents. Ex. 41 (Belling Dep.) 109:3–18.

70.     BPD Defendants described a number of basic investigative steps that should have been taken to follow up on Scott's confession if "a conscientious, good-faith investigation" were being conducted—none of which were taken. Ex. 3 (Stambach Dep.) 291:5–13, 293:1–14, 298:25–299:9, 301:3–21; 302:10–21; *see also* Ex. 7 (Masecchia Dep.) 95:17–96:4.

These steps included:

a.  Following up on retrieving the TEC-9 based on where Scott indicated he had discarded it. Ex. 3 (Stambach Dep.) 298:4–299:9; Ex. 8 (Lonergan Dep) 192:25–193:3; Ex. 12 (Vickerd Dep.) 213:13–214:5; Ex. 8 (Lonergan Dep.) 192:10-193:3. But there is no documentation of any efforts to locate the murder weapon after Scott's confession in the police file. *See also* McCarthy Decl. ¶ 9.

b.  Following up on Scott's claim of self-defense by investigating whether Aaron or Torriano Jackson were themselves armed at the scene, especially given the second gun found near Torriano's body. Ex. 3 (Stambach Dep.) 291:5–14, 293:1–14, 416:3–9; Ex. 12 (Vickerd Dep.) 214:6–17; Ex. 14 (ADA Memo) COE 4765. Lonergan testified that, where someone claimed self-defense, he would expect the DA's office to follow-up on that evidence. Ex. 8 (Lonergan Dep.) 174:7–175:2. But there is no documentation in the police or DA file of Aaron Jackson being asked any questions by anyone about whether he or Torriano had a gun—including in the interview conducted by Stambach the same day he and Belling interviewed Scott. *See also* McCarthy Decl. ¶ 9. Ex. 3 (Stambach Dep.) 410:2–411:1, 418:14–419:11, 412:3–12,

413:3–14, 416:3–417:15; Ex. 1 (Homicide File) BPD Comp. 191–92 (Stambach took Scott into custody early morning on 8/12/91); BPD Comp. 170 (Jackson statement signed at 7:15 p.m. on 8/12/91).

Belling testified that he was not aware of any investigation conducted by BPD into whether Aaron or Torriano had a gun that night. Ex. 41 (Belling Dep.) 311:20–23. But claimed *he* investigated this issue by interviewing witnesses in "November, then December, and then January" by asking "[a]ny witnesses he could get to come in and talk to [him] who claimed to know about that" whether Aaron or Torriano Jackson had a gun. Ex. 41 (Belling Dep.) 310:17–311:13. But when asked for documentation of him asking witnesses those questions, Belling testified that he had not seen notes that he did, so he "presumed" he did not document it. Ex. 41 (Belling Dep.) 311:14–19.

c.  Following up with witnesses at the scene, including showing them photo arrays with Scott as a suspect. Ex. 8 (Lonergan Dep.) 187:19–188:24; Ex. 7 (Masecchia Dep.) 244:20–245:17; 93:21-94:3; 187:19–188:24; Ex. 3 (Stambach Dep.) 200:18–201:6, 219:14–220:9, 410:8–16, 418:10–19:11. Lonergan testified that he would consult with the ADA about "what direction they wanted us to go" before showing an array with Scott's photo to a witness who made a tentative identification of Dixon (like Aaron Jackson), but "if [the ADA] told me to show a photo array, I certainly would." Ex. 8 (Lonergan Dep.) 189:19–191:5. Belling testified that he did not recall having any discussions with officers about showing Aaron Jackson a photo array with Scott's photo. Ex. 41 (Belling Dep.) 307:10–20. And there is no documentation in the BPD police file of Aaron Jackson being shown such an array. *See also*

McCarthy Decl. ¶ 9.

71.    Another basic investigative step was following up on the alleged concern that Dixon's
family may have used threats or promises to get Scott to confess. At his deposition,
Belling suggested Scott's confession could be discounted if Dixon's parents "put Scott up
to" confessing. Ex. 41 (Belling Dep.) 94:24–95:24. Belling agreed that question "required
some investigation," and claimed he expressed his concern to police they investigated
whether or not Scott's confession was true, and, if not, why he made it. Ex. 41 (Belling
Dep.) 98:9–16, 99:12–18. Belling specifically agreed it would have been helpful if
detectives interviewed Dixon's parents or other people who may have had information
about a purported bribe. Ex. 41 (Belling Dep.) 111:8–23.

72.    There is no evidence that BPD Defendants ever made any effort to speak to Dixon's
parents or follow-up on the purported threats or inducements. Ex. 3 (Stambach Dep.)
302:4–16; Ex. 8 (Lonergan Dep.) 193:25-194:12 (important to document any such
efforts); McCarthy Decl. ¶ 9 (no documentation in BPD file); Ex. 76 (Shannon Decl.) ¶ 9
(never contacted by BPD after August 12); Ex 86 (Bryant Dep.) 36:7–16. Belling himself
admits he did not "remember seeing any paperwork on that issue," and that he could not
"recall any specific [] individual points of evidence other than [Dixon's parents']
presence on the video" and "the fact that they brought him there"—both of which were
facts already known to Belling on August 12 Ex. 41 (Belling Dep.) 109:3–18, 97:10–22.

73.    At his deposition, Belling eventually admitted that he never investigated the relationship
between Scott and Dixon's family. Ex. 41 (Belling Dep.) 229:15–230:2. Belling
conceded that in the many months leading up to the grand jury, he conducted "zero
investigation" in the purported connection between Scott and Dixon's family. Ex. 41

(Belling Dep.) 232:6–11; *see also* 234:1–235:12 (it "wasn't in the realm of focus of this investigation"); 282:18-24 (when prosecuting case, did not have any information concerning purported payments from Dixon family to Scott).

**Belling fabricates a positive ID of Dixon from Aaron Jackson.**

74.   On August 12, 1991—just hours after Belling and Stambach interviewed Scott—Stambach went to the hospital to interview Aaron Jackson, the brother of victim Torriano who was himself severely wounded in the shooting. Ex. 1 (Homicide File) BPD Comp. 170 (Jackson statement). Stambach reported showing Jackson a six-photo array that was prepared to include Dixon as the suspect, not Scott. Ex. 1 (Homicide File) BPD Comp. 185 (Stambach Rep.); BPD Comp. 166–68 (Jackson array).

75.   Stambach reported that Jackson selected Dixon's photo from a 6-photo array without suggestion and stated that Dixon was there on the night in question and "looked like" the shooter, but he could not be sure because "everything happened so fast." Ex. 1 (Homicide File) BPD Comp. 185 (Stambach Rep.); BPD Comp. 166 (Jackson Aff.).

76.   Jackson's ability to view the shooter (Scott) was very limited. He was "looking on the ground" when the shooting started and did not look at the shooter's face before he started running, because he first thought it was just the police shooting in the air. He was then surrounded by "sparks everywhere," shot and badly injured himself, and was focused on his wounded brother Torriano—who he saw fall and call out for help. Ex. 1 (Homicide File) BPD Comp. 216–7 (Grabowski Rep.); Ex. 70 (Jackson GJ Test.) 13:2–15; Ex. 2 (Cr. Tr. (Jackson)) 224:8–225:2, 268:6–70:16; Ex. 29 (Dysart Rep.) 5, 9, 26. And the shooter he saw was Scott, not Dixon. Ex. 28 (ECDAO Aff. 2018) ¶¶ 12–13.

77.    Based on Belling's handwritten notes, he met with Aaron Jackson in late August 1991
       after he was released from the hospital—but months before Belling convened the grand
       jury. The substance of that meeting is not documented anywhere. Ex. 11 (Belling
       Handwritten Notes re Jackson, Pt. 1) COE 2298.  But on another page of Belling's
       notes—entitled "Need to talk to:"—there is a notation next to Jackson's name that reads:
       "**firm up ID.**" Ex. 82 (Belling Handwritten Notes, Pt. 2) COE 2717.

78.    Belling understood the difference between a tentative and positive ID, and that while a
       positive ID could establish probable cause, a tentative ID may not. Ex. 41 (Belling Dep.)
       59:4–60:16. He also understood that showing an individual photo of a suspect to an
       eyewitness would be a constitutional problem. Ex. 41 (Belling Dep.) 52:24–53:13

79.    Belling showed Jackson a loose photo of Valentino Dixon and told him that he would be
       shown this photograph in the grand jury—so when Jackson saw Dixon's photo there, he
       had already seen that photograph before outside the array. Ex. 2 (Cr. Tr. (Jackson)) 251:3–
       11, 250:9–16 (shown not an array but "one photograph" of Dixon).

80.    At his deposition, Belling testified Jackson eventually told him that he was "sure" it was
       Dixon. Ex. 41 (Belling Dep.) 309:20–310:8.

81.    Even though Aaron Jackson's initial identification was only tentative, months later at the
       November 1991 grand jury, Jackson testified with certainty that he "turned and saw Tino's
       face" during the shooting—even describing an "evil look on his face as he was firing
       towards me." Ex. 70 (GJ Tr. (Jackson)) 13:14–14:21 ("I just saw a face. I was following a
       face and the eyes and everything."). He also testified that he had positively identified
       Dixon's photo from in the prior six-photo array.  Ex. 70 (GJ Tr. (Jackson)) 15:10–18.

**Belling delays convening a grand jury for months while he continues to investigate.**

82. As covered in an August 13, 1991 *Buffalo News* article, Belling "expected to ask a grand jury to vote on an indictment [against Dixon] on Wednesday or Thursday"—in other words, on August 14 or 15, within days of the shooting. Ex. 84 (8/13/91 BN article) COE 2735. But Belling ultimately did not even begin his presentation to the grand jury until November 6, 1991—three months after the shooting—and he did not ask the grand jury to vote on an indictment until January 13, 1992—more than five months after the shooting. Ex. 72 (GJ Charges).

83. The following day, in an article discussing Scott's confession, then-DA Kevin Dillon declined to comment on Sullivan's statement or Scott's confession—as he stated: "The entire matter is under investigation." Ex. 15 (8/14/91 BN article) COE 2736.

84. Belling did not begin to present the case until November 1991. As described by Belling, the grand jury was an "investigative procedure" where his obligation was to assist the grand jury in conducting "an objective study of what proof was available to determine whether or not anyone in particular should be charged with a crime." Ex. 80 (Belling Perj. Test.) 469:3–7.

85. Belling admits that prior to his presentation of anything to this grand jury, he was aware there were conflicting versions of what happened. Ex. 80 (Belling Perj. Test.) 489:1–6. He also testified that when he initiated the grand jury here, it was not "clear cut" who he was presenting evidence against—Dixon or Scott. Ex. 80 (Belling Perj. Test.) 488:6–15; Ex. 41 (Belling Dep) 114:1–7 (the "significant issue in the case" was whether Scott was the shooter or Dixon was the shooter); 81:18–21 ("The issue became was [the evidence against Dixon] reliable vis-à-vis Lamarr Scott coming out of the woodwork and saying he

did it.").

86.    On November 6, 1991, Aaron Jackson, John Sullivan, and Travis Powell testified at the

grand jury; on November 20, Michael Bland testified. Ex. 41 (Belling Dep.) 353:3–9,

353:10–12.  Powell and Bland both testified they were present the night of the shooting

but did not identify the shooter. Ex. 63 (Powell GJ Test.) 35:8–36:8; Ex. 61 (Bland GJ

Test.) 5:1–20, 7:13–8:9.

87.    Sullivan and Jackson both testified that Dixon was the shooter. Ex. 71 (Sullivan GJ

Test.); Ex. 70 (Jackson GJ Test.).

**After the November grand jury presentation, Belling does not charge the grand jury for
two additional months while he keeps actively investigating.**

88.    At that point, Belling still did not charge the grand jury. Instead, he continued the

proceedings while he kept investigating. Ex. 41 (Belling Dep.) 353:13–17. As explained

at his deposition, even though he had already convened the grand jury in November, "at

that time still wanted additional investigation done." Ex. 41 (Belling Dep.) 354:22–13.

*Belling flies to Kentucky to interview Shannon.*

89.    On November 21, Belling flew to Kentucky to interview witness Antoine Shannon. Ex.

41 (Belling Dep.) 90:5–10 (interview of Shannon was investigation he conducted by

himself "prior to the grand jury proceedings"); 316:20–23.

90.    Belling explained that the DA viewed Shannon as "a loose end who should be

interviewed," and told him to do the interview. Ex. 41 (Belling Dep.) 316:24–317:17;

*see also* 252:1–5 (Shannon was "something that had to be dealt with before we put the

case to the grand jury"). Belling did not tape record that interview or take any notes; the

DA investigator he was with for the interview also did not take any notes or create a

report. Ex. 41 (Belling Dep.) 317:20–24, 318:14–18.

91.    During that interview, Shannon told Belling that Scott, not Dixon, was the shooter.

Shannon also swore a statement to that effect. Ex. 19 (Shannon Stmt.) COE 2215 ¶¶ 20–

22.

92.    Belling did not call Shannon to testify before the grand jury. In a later interview, Belling

claimed he "concluded Shannon was not articulate enough to be a good witness." Ex. 27

(7/5/2004 BN Article). But the day after he interviewed Shannon—who was attending

Campbellsville College on a football and partial academic scholarship—Belling wrote a

letter to the dean stressing that Shannon was not under any suspicion and commending

his "personality development." Ex. 80 (Belling Perj. Test.) 500:2–3; Ex. 31 (11/22/91

Belling College Ltr.) COE 1685.

*Belling sends a letter to BPD regarding "major discrepancies" in who committed the crime.*

93.    On November 22, Belling sent a letter to Captain Richard Donovan of the BPD

Homicide Bureau, copying the Commissioner of the BPD. Ex. 26 (11/22/91 Belling Ltr.)

COE 1686–87. In that letter, Belling references an earlier discussion with Donovan

about this case and writes: "Obviously after review of the statement **it becomes**

**apparent that we have major discrepancies in regard to who committed the murder**

**of Torriano Jackson."** Ex. 26 (11/22/91 Belling Ltr.) COE 1687 (emphasis added). But

although Belling wrote the letter the day after he met with Shannon—and attached

Shannon's statement—at his deposition, he denied it was because Shannon seemed

credible and reliable. Ex. 41 (Belling Dep.) 117:10–17.

94.    In the letter, Belling identifies seven witnesses "who have never been talked to" and

directs, "[i]t is imperative that these people be located and interviewed in depth as soon

as possible. If they can be located during the day I would like to participate in the interview." Ex. 26 (11/22/91 Belling Ltr.) COE 1686–87; *see also* Ex. 41 (Belling Dep.) 163:21–164:10 (not asking for a favor, telling this is what needs done). Belling's letter also expressly references an "investigation that I have conducted" in addition to an investigation "that has been conducted by your Bureau." Ex. 26 (11/22/91 Belling Ltr.) COE 1686.

*Belling interviews Mario Jarmon and obtains Scott's telephone number.*

95.    One of the witnesses Belling identified to interview was Mario Jarmon, "one of the victims of this shooting who has all along claimed that he was not shot by Valentino Dixon," and flagging that he would "particularly like" to participate in that interview. Ex. 26 (11/22/91 Belling Ltr.) COE 1687.

96.    Less than two weeks later, on December 4, Belling interviewed Jarmon by phone— which was never disclosed until Belling testified as a witness in Jarmon's perjury trial a year later. Ex. 80 (Belling Perj. Test.) 526:9–17 (turning over notes mid-testimony); 529:23–530:14 (claims he had "forgotten" he had that conversation before Mario testified at the grand jury). During that conversation, based on Belling's notes, Jarmon told him he had been shot by Torriano Jackson. Ex. 80 (Belling Perj. Test.) 526:9–17; Ex. 36 (12/4/91 Belling Notes) COE 2306. This was consistent with earlier statements Jarmon gave BPD detectives months prior, where he explained that Torriano Jackson had a gun, that Dixon did not shoot him, and that he saw Scott running toward the fight shooting a TEC-9. Ex. 1 (Homicide File) BPD Comp. 155, 215.

97.    As indicated in Belling's notes, Jarmon also provided Belling with Scott's telephone number on that date. Ex. 36 (12/4/91 Belling Notes) COE 2306.

*Belling interviews eyewitness Tamara Frida at her home.*

98.     On August 14, 1991—two days after Scott's confession to the BPD, and only four days

after the shootings—BPD Defendant Stambach received a call from Tamara Frida, who had

witnessed the shooting. Frida stated that Dixon was not the shooter, adding that she was

available to review photographs to make possible identifications. Although Frida did not

identify herself by name, when asked by Stambach, she said she was "the girl from the red

Tracker."  Ex. 1 (Homicide File) 203 (Stambach Rep.); Ex. 6 (Frida Dep.) 26:16–23 (although

did not give name, understood was identifying herself to Stambach). The registration number of

her car is handwritten next to "red Tracker" on Stambach's typed report. Ex. 1 (Homicide File)

BPD Comp. 203 (Stambach Rep.).

99.     Three months later, Belling, in his letter, explicitly identifies "Tamara Frida" who

"owned a red…Tracker which was hit by a stray bullet along with her address" as one of those

witnesses to interview. Ex. 26 (11/22/91 Belling Ltr.) COE 1687. Belling explained that he

knew who Frida was and where she lived because the police traced her plate. Ex. 41 (Belling

Dep.) 123:21–23. It was his understanding that the police thought she was the person who made

the August 14 phone call. Ex. 41 (Belling Dep.) 137:18–20. "And that's why we wanted to talk

to her, because we wanted to determine whether Lamarr Scott was the shooter or whether

Valentino was the shooter." Ex. 41 (Belling Dep.) 138:3–6.

100.    At her deposition, Frida confirmed there was "no doubt in her mind" that Lamar Scott

was the person that she saw shoot and kill Torriano Jackson in the early morning hours of

August 10, 1991. Ex. 6 (Frida Dep.) 12:4–23, 15:6–9. She further testified that had anyone

shown her pictures, including a picture of Scott, she would have identified him as the shooter.

Ex. 6 (Frida Dep.) 26:24–27:9. But that no one from the police department or DA's office ever showed her any photographs in connection with the shooting. Ex. 6 (Frida Dep.) 48:1–8.

101.    Sometime after December 4, Belling went to Frida's home to interview her. Ex. 41 (Belling Dep.) 161:16–24. At his deposition, Belling claimed he asked Frida whether she was the anonymous caller and she repeatedly denied it. Ex. 41 (Belling Dep.) 141:11–15.

102.    But at her deposition, Frida directly contradicted that, testifying that Belling never asked her any questions about her call to the police department in the days following the shooting. Ex. 6 (Frida Dep.) 48:13–18. If Belling had asked her before the perjury charges against Jarmon and Brown, she would have told him that she was the person who made the call. Ex. 6 (Frida Dep.) 49:5–10; *see also* 39:25–40:6 ("I thought that I could go to jail if I told them the truth.").

103.    When confronted with this at his deposition, Belling testified he had "no idea why there's no record" anywhere about asking Frida even a single question about being the anonymous caller—but that Frida was either lying or mistaken in her testimony. Ex. 41 (Belling Dep.) 135:6–22, 143:23–146:1.

**Belling coerced false testimony from true perpetrator Lamarr Scott.**

104.    Belling admits that in December 1991, he was still investigating "whether Lamarr Scott was the shooter or whether Valentino was the shooter." Ex. 41 (Belling Dep.) 138:3–6.

105.    Although it had been four months since Scott confessed to the news, the police, and to Belling—Belling still had not asked for a grand jury vote. Ex. 72 (GJ Charges). At that point in the investigation, Dixon had voluntarily waived his rights and denied he was the shooter; Scott had come forward and confessed to the crime in a sworn statement; Brown had given a sworn statement that Scott, not Dixon, was the shooter; Jarmon had given statements to both BPD and Belling that Scott, not Dixon, was the shooter; Shannon had given Belling a sworn statement

that Scott, not Dixon, was not the shooter; Frida had called the BPD to say that Dixon was not

the shooter; Adams had given a description of the shooter that matched Scott, not Dixon; and

people in the neighborhood were all talking about how Scott was the shooter. Ex. 1 (Homicide

File) BPD Comp. 64–65 (Stambach Rep); BPD Comp. 31 (Adams Stmt.); BPD Comp. 72

(Dixon Stmt.); BPD Comp. 196 (Scott confession); BPD Comp. 158–159 (Brown Stmt.); BPD

Comp. 155, 215 (Jarmon Stmt.); BPD Comp. 203 (Frida Call); Ex. 19 (Shannon Stmt.) COE

2215 ¶¶ 20–22; Ex. 36 (12/4/91 Belling Notes) COE 2306; Ex. 76 (Shannon Decl.) ¶¶ 4–11.

106.    Within a month, on January 13, 1992, Belling called Scott to testify before the grand jury.

There, Scott perjured himself—falsely testifying that Dixon committed the shooting, not him.

Ex. 66 (Scott GJ Test.) 67:21–68:3; Ex. 20 (Scott Ltr., 12/11/98 ) Dixon 3809; Ex. 60

(1/31/1992 Scott Aff.) Dixon 5930. As Scott later explained: "I was told that they had who they

wanted, and to say that Mr. Dixon's parents had put me up to confessing. I committed perjury

and this is something I deeply regret. Ex. 1 (Homicide File) BPD Comp. 267 (1/14/03 Letter);

Ex. 4 (Scott Dep.) 61:15–62:16

107.    Scott's January 1992 grand jury testimony was one and only time in the last 30 years he

has falsely maintained he was not the shooter. Ex. 5 (Scott Plea) 3:24–4:8 ("But for an

appearance that he did make in the grand jury, [Scott] has maintained that confession for the last

27 years. He has been confessing to this crime in excess of ten times and has come into our

office and confessed to the crime as well."); Ex. 4 (Scott Dep.) 18:5–19.

108.    Since that day, Scott has consistently and repeatedly explained that the testimony he gave

in the grand jury was false and due to pressure and coercion from ADA Belling and BPD

Defendant Stambach, including:

a) **January 31, 1998 sworn statement:** "I testified before an Erie County Grand Jury on January 13, 1992. I gave perjured testimony at that time. I did this when I told the Grand Jury that Valentino Dixon committed a shooting in Buffalo on August 10, 1991, and said that Valentino's father coached or persuaded me into confessing to the police. Those statements were lies… <u>The reason why I perjured myself before the Grand Jury is because, in my mind, my life and the lives of my family were in jeopardy from the [BPD] and the District Attorney's office if I did not testify the way I did.</u> Ex. 60 (1/31/98 Scott Aff.) Dixon 5930 (emphasis added).

b) **December 11, 1998 sworn statement**: "I gave a statement to the Buffalo Police and the Erie County District Attorney which included everything I am saying here…. I did all of these statements of my own free will. I was not forced or bribed. <u>I later recanted the statements because I felt my life was threatened because of the harassment done by Det. Stambach and the District Attorney Chris Belling</u>. Ex. 20 (Scott Ltr., 12/11/98 ) Dixon 3809 (emphasis added).

c) **January 11, 2004 letter to Judge D'Amico**: "Nearly thirteen years ago, you presided over a case in which a man by the name of Valentino Dixon was convicted for a crime that I committed…. Several eyewitnesses saw me do the shooting. <u>The DA and the police refused to believe me and concluded Mr. Dixon's parents made me confess. With all the pressure that mounted I went to the grand jury and recanted my original testimony</u>." Ex. 1 (Homicide File) BPD Comp. 267 (emphasis added); Ex. 4 (Scott Dep.) 61:15–62:16 (letter is accurate description and was truthful to best of recollection at the time).

d) **April 9, 2005 sworn statement**: "After I confessed I was arrested on camera and taken to the Buffalo Police station, where I was released an hour later and told 'we got who we want, get the hell out of here.' Even though several people saw me commit this shooting, the person they wanted was someone I knew in the streets. His name is Valentino Dixon. <u>Approximately six months later, after constant threats by members of the Buffalo Police Dept. and the D.A. on the case Christopher Belling, I was forced to recant my confession at the grand jury proceeding</u>." Ex. 34 (Scott Ltr. to ADA and DA 2005) COE 4738 (copying Dateline NBC, Prime Time Live, 20/20, The New York Times, the New York Post, the ECDAO, the Buffalo Police Commission, and the FBI in Buffalo).

e) **2012 *Golf Digest* interview**: in an interview published in *Golf Digest,* Scott explained that <u>he was pressured by criminal justice personnel to change his story by bringing his foster parents into the meeting room and threatening their well-being after they left</u>. Ex. 1 (Homicide File) BPD Comp. 278.

109.   With respect to Belling in particular, Scott describes how—"a few months after" he turned himself in and was told "they had who they wanted and to leave"—he was contacted by ADA Belling. And that Belling advised him that it was "in his best interest" to testify at the grand jury and say that Valentino Dixon committed the crime. Scott repeatedly refused to do so. Ex. 73 (2/27/02 Scott Sworn Ltr.) Dixon 5931.

110.   But after his meeting with Belling, he was harassed by lead detective Stambach, who made threats on his life if he did not go to the grand jury and testify. Eventually, Scott caved to the pressure and recanted his original confession—falsely telling the grand jury that Dixon committed the crime. Ex. 73 (2/27/02 Scott Sworn Ltr.) Dixon 5931.

111.   In 2018, when interviewed for ECDAO's reinvestigation, Scott also told them Belling had threatened that his parents could be held responsible. Scott explained that Belling told him he "knew" Scott was being pressured by Dixon's family and had heard a rumor that Scott was given $5,000 to confess. Scott told Belling that Dixon's family did not pressure or pay him to confess. Ex. 17 (Scott Int., ECDAO Reinvest., Transcript Pt. 1, 8/15/18) 17; Ex. 4 (Scott Dep.) 39:11–17, 40:14–18; 55:18–56:16.

112.   At his deposition, Belling claimed that he never spoke to Scott after August 12, 1991, "other than interviewing him as a witness in the presence of his lawyer," who was retained on January 9. Ex. 41 (Belling Dep.) 259:23–60:2; see also 64:11–16 ("I jump from talking to him in the homicide office establishing that he existed and then went on to the whole process of getting him a lawyer and when Jack Molloy was assigned to represent him. I don't remember contact with him between those two times."). According to Belling, sometime from January 9 to January 10 he learned through Scott's lawyer that Scott was recanting his statement. Ex. 41 (Belling Dep.) 274:2–19. Belling claimed that on January 9, he had no idea that Scott would recant. Ex. 41 (Belling Dep.) 276:21–24.

113.   But on December 4, Belling got Scott's telephone number from Jarmon. Ex. 36 (12/4/91 Belling Notes) COE 2306. Handwritten notes in Belling's file indicate that he also had Scott's parents' address, his mother's name, and the address and telephone number of his aunt. The notes also show that it was Belling who served Scott with the grand jury subpoena. Ex. 69 (Belling Notes) COE 2281 (served by "CJB"). On January 3, Belling missed a call from Scott; Scott left a message saying "he was told to call re Valentino Dixon." That note also includes the names of Scott's adoptive parents, Eva and Edward Scott. Ex. 75 (Missed Call Slip) COE 2119. Scott was not appointed a lawyer until January 9. Ex. 87 (1/9/92 letter) COE 1692.

114.   When confronted with Scott's explanation for why he recanted at the grand jury, Belling flatly denied every aspect of Scott's account:

a)   Belling denies he ever talked to Scott (or Scott's lawyer) about the possibility of Scott being charged with perjury if he maintained that he was the shooter and Dixon was not. Ex. 41 (Belling Dep.) 259:14–260:3. He also denies ever telling Scott that it would be in his best interest to testify at the grand jury and say that Dixon committed the crime. Ex. 41 (Belling Dep.) 280:22–281:4.

b)   Belling further testified that it is not possible he said to Scott that he might be charged with perjury if he maintained the story that he was the shooter. Belling was certain he did not say that. Ex. 41 (Belling Dep.) 260:9–24. Belling was equally certain that he did not even say anything "like that" to Scott. Ex. 41 (Belling Dep.) 261:2–11; see also 261:16–17.

c)   Belling denies that Scott's recantation was due to any threats or promises by him, Ex. 41 (Belling Dep.)  274:2–22.

d)   Belling denies saying anything to Scott like that he knew Dixon did not commit the crime but that he was going to prosecute him anyway. Ex. 41 (Belling Dep.) 282:5–10. Belling denied ever telling Scott in words or substance that he knew Dixon was not the shooter but that he was going to be convicted with or without Scott's confession. Ex. 41 (Belling Dep.)  286:6–15 ("Absolutely not.").

e)   Belling denies telling Scott that he knows he has been pressured by Dixon's family and that there was a rumor he was paid $5,000. Belling denies saying anything about a money payment from the Dixon family to Scott at all. Ex. 41 (Belling Dep.) 282:11–19.

f)  Belling testified he could not recall at his deposition whether he met with Scott and his

    foster parents at any point. Ex. 41 (Belling Dep.) 37:7–23; 284:2–7. But he denied

    telling Scott that his parents could be held responsible for his actions. Ex. 41 (Belling

    Dep.) 284:8–19 ("I never did that. I don't remember talking to his parents, and if I had, I

    wouldn't have said that."). Belling also denied putting any pressure on Scott to change

    his story by bringing his foster parents into a meeting with him or making any threats to

    their well-being after they left. Ex. 41 (Belling Dep.) 285:11–17.

g)  Belling denies conspiring with BPD Defendant Stambach to threaten Scott if he did not

    recant his testimony. He also denied any knowledge of Stambach making threats to Scott

    concerning recanting his testimony between August 12, 1991 and the January grand

    jury. Ex. 41 (Belling Dep.) 280:22–281:17 ("I don't know anything about that.").

115.  Although Belling denies he engaged in any of the behavior Scott describes, he

acknowledges that—if he had—it would have been totally inappropriate and wrong. Ex. 41

(Belling Dep.) 284:20–25, 286:18–22, 286:24–287 (if did those things to get Scott to recant

would have been "wholly inappropriate"). He admits it would never be appropriate as an ADA

to coerce a witness or to threaten a witness, either subtly or overtly. Ex. 41 (Belling Dep.)

28:18–29:9.

116.  According to Belling, the sum total of his interactions with Scott before he was assigned

a lawyer on January 9 were: (1) speaking to Scott for approximately 5 minutes on August 12,

1991 after he confessed; (2) speaking to Scott on the phone after he was serving with a grand

jury subpoena to arrange to get him counsel (though he had no recollection of that phone call's

substance); and (3) speaking to Scott when he came in about the subpoena to get him an

attorney. That was "the last conversation" Belling "ever had with him without having an attorney present." Ex. 41 (Belling Dep.) 75:21–76:23.

117.    Apart from his denials of Scott's explanation, Belling at his deposition offered no alternative explanation for why Scott recanted his confession at the grand jury. See Ex. 41 (Belling Dep.).

118.    Several witnesses have corroborated Scott's account over the years. See Ex. 59 (Yates Aff.) Dixon 5183 (Scott confessed to her that he was the shooter and stayed with her because he was afraid); Ex. 76 (Shannon Decl.) ¶¶ 4–7 (Scott confessed to him; never saw anyone pressure or pay Scott to confess); Ex. 88 (12/16/02 Doss Aff.) (Scott confessed to him that he murdered Jackson); Ex. 25 (State 440 Resp.) ¶ 13 (listing corroborating witnesses who say either that Scott was the shooter, that Dixon was not the shooter, that Scott confessed in their presence, or that it was common knowledge on the streets that Scott was the shooter).

*After securing Scott's false recantation, Belling finally charges the grand jury.*

119.    On January 13, 1992, Belling presented testimony from Mario Jarmon, Leonard Brown, Lamarr Scott, Emil Adams, Fred Stencil, and Robert Lewis to the grand jury. Ex. 41 (Belling Dep.) 353:13–17, 354:17–355:13.

120.    Jarmon and Brown truthfully testified that Torriano had a gun that night and that Scott was the shooter. Ex. 68 (Jarmon GJ Test.) 10:5–15, 11:22–12:4; Ex. 67 (Brown GJ Test.) 31:6–32:23, 42:9–43:6, 45:7–9, 47:12–19. Stencil and Lewis testified they were present the night of the shooting but did not identify the shooter. Ex. 62 (Stancil GJ Test.) 86:22–87:9; Ex. 64 (Lewis GJ Test.) 93:23–94:24.

121.    Adams testified that Dixon was the shooter. Ex. 65 (Adams GJ Test.) 76:11–77:18.

122.    Scott falsely testified that Dixon was the shooter, not him. Ex. 66 (Scott GJ Test.) 67:21–68:3; see Ex. 25 (State 440 Resp) ¶ 12 (concluding Scott was the shooter just as he has maintained since August 12, 1991, with the exception of his recantation before the grand jury).

123.    Belling then charged the grand jury: "Consider first if Lamarr Scott did it, then you don't have to vote on Valentino Dixon." Ex. 72 (GJ Charges) 106:11–12; see also Ex. 41 (Belling Dep.) 356:6–11 (grand jury could have come back and said Dixon was not the shooter). The grand jury returned an indictment for Dixon. Ex. 58 (Indictment) COE 1709–12.

124.    Belling also charged Jarmon and Brown in concurrent indictments with perjury for "falsely" implicating Scott in the shooting in their grand jury testimony. Ex 57 (DA Press Release) COE 2228; see also Ex. 56 (Buffalo News Article) COE 2738 (Brown and Jarmon arraigned on perjury charges).

**Belling's conduct with other witnesses corroborates Scott's account.**

*Perjury cases*

125.    After the January 1992 grand jury, Belling prosecuted Brown and Jarmon for "lying" about who committed this crime. Ex. 41 (Belling Dep.) 265:14–18. Weeks later, in March 1992, Belling made a misdemeanor plea offer in exchange for trial testimony against Dixon." Ex. 89 (Plea sheets) COE 2681 (Brown), COE 2677 (Jarmon). Neither Jarmon nor Brown took the plea and instead went to trial on the perjury charges. See Ex. 80 (Belling Perj. Test.).

126.    At his deposition, Belling denied that he ever threatened other witnesses with prosecution the way he threatened Jarmon and Brown for perjury. Ex. 41 (Belling Dep.) 331:20–332:3 ("I do deny that."), 265:15–24 (never had other cases where threatened witnesses with perjury prosecution), 336:16–18 (deny threatening defense witnesses with perjury charges).

127.   A Buffalo News article entitled "Woman Charged with Perjury in Slaying" was published on September 1, 1993. According to the article, a woman was indicted "on charges of lying about what happened during the fatal stabbing of her estranged lover in an argument over their children…. Christopher J. Belling, a chief of the district attorney's Homicide Bureau, refused to discuss Ms. Carter's perjury indictment. But court sources said she was charged with falsely telling the grand jury that she didn't see her brother stab Simpson." Ex. 90 (9/1/93 Buffalo News Article).

128.   A Buffalo News article entitled "Innocent Plea Entered in Slaying" was published on September 27, 1988. According to the article, a man pled innocent to second-degree murder charges "and his brother pleaded innocent to a perjury charge linked to the probe of the slaying…. Prosecutor Christopher J. Belling said Michael McCloskey is accused of giving homicide investigators a false written statement about the fatal shooting. The prosecutor refused to release the statement." Ex. 91 (9/27/88 Buffalo News Article).

129.   A Buffalo News article entitled "Court Upholds Ubiles Conviction in Fire Deaths; Prosecutor Scolded" was published on March 14, 1989. According to the article: "In a unanimous ruling, the five-member Appellate Division of State Supreme Court found that prosecutor Christopher J. Belling…went too far in remarks to the jury about her guilt and her husband's perjury. 'This type of conduct by an experienced prosecutor is not only improper and highly prejudicial, but it also borders on the contemptuous and clearly contravenes numerous decisions from this court and the Court of Appeals concerning the duty of a prosecutor to present competent evidence fairly and temperately,' the Rochester court wrote." Ex. 92 (3/14/89 Buffalo News Article).

130.   At his deposition, Belling denied recalling any court decision admonishing his actions. Ex. 41 (Belling Dep.) 322:13–15.

*Witness pressure*

131.   In 1993, Belling coached witness Thomas Roland to say that he heard the defendant in that case, Johnnie Lane, brag about committing shootings and murders. In an affidavit, Roland swore: "When it was time to come back to Buffalo and testify against Mr. Lane, I was hesitant and I wanted to back out of the deal because I knew that I would be lying under oath. I was told by Christopher Belling that if I didn't live up to my part of the bargain, I would be arrested and thrown in jail for obstruction of justice." Ex. 93 (Roland Aff.) Dixon 5944.

132.   At his deposition, Belling remembered the case but denied coaching Roland to implicate Lane; in particular, Belling denied that Roland told him he knew nothing and Belling effectively coerced him into implicating Lane.  Ex. 41 (Belling Dep.) 327:3–14, 328:2–6.

133.   When Belling traveled to Kentucky to meet with Shannon, Shannon told Belling exactly what he saw the night of the shooting, including Scott standing over Torriano Jackson and emptying the clip. But Belling kept trying to make Shannon say that Dixon did the shooting, and repeatedly told Shannon that he knew Shannon was getting a lot of pressure from his family to say that Scott was the shooter—although Shannon told Belling that was not true. Before leaving, Belling told Shannon to "really think over" his statement that Scott was the shooter. Ex. 76 (Shannon Decl.) ¶¶ 18–21. Belling wanted Shannon to reverse his story and was completely focused on Valentino being the shooter, even when Shannon told him repeatedly that Valentino was not. Ex. 76 (Shannon Decl.) ¶ 21.

134.   At his deposition, Belling denied trying to get Shannon to recant in that interview, saying that Shannon must be either laying or mistaken. Ex. 41 (Belling Dep.) 319:10–15. Belling also

denied telling Shannon he knew Shannon was getting pressure from his family and that was why he was giving this false statement. Ex. 41 (Belling Dep.) 319:18–320:10. Belling testified that he never once, let alone numerous times, tried to convince Shannon that he was lying because of pressure from Dixon's family. Ex. 41 (Belling Dep.) 320:21–25 ("No, I just took his statement.").

*Michael Bland*

135.    Michael Bland was a close friend of the Jackson brothers who had been standing on the side of the market just outside the fight—likely the best vantage point to observe the shooting. ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████; see also Ex. 2 (Cr. Tr. (Sullivan)) 80:10–16 (Bland said "watch out, he's got a gun"); Ex. 1 (Homicide File) BPD Comp. 74 (Sullivan Stmt.) (heard someone holler "look out he's got a gun"). ███████████████████████████

█████████████████████████████████████████████████████████████

see also COE 4766 (Jackson told Brown in 1992 that he knew Dixon was innocent).

136.    Belling called Bland to testify before the grand jury on November 20, 1991. Ex. 41 (Belling Dep.) 353:3–9; Ex. 61 (Bland GJ Test.) 5:1–20, 7:13–8:9. Bland was arrested one week prior on November 12 or 13 by the Buffalo Police Department; a copy of this Central Booking record was kept in Belling's DA file—with Bland's name highlighted and the date of his grand jury testimony (11/20/91) handwritten next to his name. Ex. 9 (Bland Arrest) COE 2174.

137.    At his deposition, Bland was asked whether he knew Dixon was not the shooter and had nothing to do with the shooting, and whether he was pressured by ADA Belling to maintain the lie that he had not seen the shooting as opposed to having seen Scott shoot his friends. Bland

was also asked if ADA Belling caused him to be arrested so that he could force him to testify in the grand jury, and whether the reason he lied in the grand jury was fear of the police and Belling. Bland was also asked whether anyone has told him that the substance of their testimony was influenced by ADA Belling. Bland invoked his Fifth Amendment rights against self-incrimination to all of these questions. Ex. 85 (Bland Dep.) 10:25–11:10, 25:16–23, 28:18–29:5, 44:4–19, 49:9–18.

**Dixon is tried and wrongly convicted in June 1992.**

138.   Dixon's trial took place over four days in June 1992. As Belling testified, Scott's grand jury testimony "effectively eliminated" him as a witness in Dixon's criminal trial, and he did not testify about his confession to the crime. See Ex. 2 (Cr. Tr.); Ex. 41 (Belling Dep) 303:10–304:10.

139.   Brown and Jarmon also could not be called to testify to their identifications of Scott as the shooter because Belling had indicted them on perjury charges—a move Belling later called a "brilliant stroke of tactical genius." Ex. 56 (Buffalo News Article) COE 2738; Ex. 41 (Belling Dep) 338:3–9, 339:8–14; Ex. 1 (Homicide File) BPD Comp. 276 (July 2012 Golf Digest article); see also Ex. 41 (Belling Dep.) 338:3–9 (Brown and Jarmon could not testify because their perjury defense lawyers would never allow it). Belling admits that he expected that could occur when he prosecuted them for perjury. Ex. 41 (Belling Dep.) 339:8–14.

140.   At trial, Belling presented no physical or forensic evidence linking Dixon to the shooting—because there was none. Instead, he relied on the testimony of Adams, Sullivan, and Jackson, who all identified Dixon as the shooter at trial. See Ex. 2 (Cr. Tr.).

*Belling had to request a continuance and compel Adam's testimony.*

141.   As Belling testified, it was "challenging" to get Adams to come testify at trial against Dixon. Ex. 41 (Belling Dep.) 169:5–23, 175:11–15. Adams was having criminal issues in Michigan around that time, which was causing a problem with getting him to come testify. Ex 41 (Belling Dep.) 170:8–171:23, 172:16–173:4.

142.   Leading up to trial, Belling sent numerous letters to Adams requesting his cooperation. Ex. 55 (5/11/92 DA Letter) COE 1753 ("you are a crucial witness in regard to this case"); Ex. 54 (6/2/92 DA Letter) COE 1766 (contact Belling "immediately" upon receipt); Ex. 53 (6/5/92 DA Letter) COE 1769 ("The time for your voluntary cooperation is now. Should you continue to be uncooperative, I will have no alternative but to have the Saginaw Prosecutor's Office execute a warrant against you and have you returned to Buffalo in custody to testify.").

143.   Belling ultimately had to request a continuance of the trial date and secure an Interstate Material Witness warrant for Adams's arrest and forcible return to Buffalo to get him to testify. Ex. 53 (6/5/92 DA Letter) COE 1769; Ex. 52 (6/5/92 Belling Aff.) COE 1775 ; Ex. 51 (6/5/92 DA Letter) COE 1784 (I have requested a brief continuance of the trial in the hopes of securing Mr. Adams as a witness…. I would ask that you take appropriate steps to immediately locate and subpoena Mr. Adams and advise me of your results.").

144.   At trial, Adams was crossed on the fact that Dixon did not look "heavyset" to him, like the description he original provided. Adams claimed he now could not describe the appearance of the shooter but that he knew it was Dixon. Ex. 2 (Cr. Tr. (Adams) 204:24–05:14, 208:5–14, 211:4–12:16.

145.   After Dixon was convicted, Adams approached Dixon's half-brother Antoine Shannon—whom Adams knew from going to school and playing football together—and apologized to Shannon. Adams said he knew Valentino was not the shooter and he felt bad for having "lied

on" someone that he knows now is related to Shannon. Adams explained that he was having legal trouble in Michigan at the time, and that they "pretty much gave him a free pass" for cooperating against Dixon. Specifically, Adams told Shannon that they said to him that, if he cooperated, his legal troubles would "pretty much go away." Ex. 76 (Shannon Decl.) ¶¶ 11–14.

146.    In March 1993, Adams in a tape-recorded conversation explained that the DA's office told him they were "going to make it hard for him" down in Michigan if he did not come back at testify. Ex. 22 (Adams, Audio Transcription, 3/7/1993) 8; see also (Adams, Audio Transcription, 3/7/1993) 5 ("He was trying to give me more time, you know, than I was already facing if I didn't come up this—you know, testify against Tino."); Ex. 86 (Bryant Dep.) 48:14–24, 53:20–23, 83:17–21, 59:20–22, 64:21–65:1, 70:9–14, 81:25–82:8 (authenticating tape); Ex. 76 (Shannon Decl) ¶ 15 (same).

147.    At his deposition, Belling specifically recalled that Adams had something "going on with the criminal justice system" in Michigan, and testified that he talked to "people in Michigan who were in law enforcement" to arrange for Adams' testimony. Ex. 41 (Belling Dep.) 170:8–171:23; see also 172:16–173:4 (Adams was having criminal issues around the time Belling was trying to get him to come testify). Belling also testified that his practice would have been to tell Adams that he would talk to law enforcement in Michigan (on Adams behalf) to tell them that he cooperated. Ex. 41 (Belling Dep.) 174:18–175:10

*Belling also had to compel Sullivan's testimony and sends a letter requesting leniency for Sullivan on his pending rape charges, which is never disclosed to the defense.*

148.    Around the time of trial, Sullivan was in Georgia because he was also having "some criminal problems," and Belling had to arrange to get him back to Buffalo to testify; in particular, Belling learned that Sullivan was going to be indicted in Georgia for raping a 15-

year-old girl. Ex. 41 (Belling Dep.) 195:17–196:4; see also Ex. 50 (Belling Handwritten Notes) COE 2129–30 (notes re Sullivan held girl hostage and raped her).

149.    As with Adams, Belling had to seek a material witness warrant to procure Sullivan's testimony at trial. Ex. 49 (Signed Order re Sullivan) COE 2149–51 (sought warrant on 5/21); Ex. 48 (5/20/92 Belling Aff.) COE 2153 ¶ 5 (Sullivan a "necessary and critical witness"); Ex. 47 (Sullivan Warrant) COE 2147–48 (warrant entered on 6/3/92).

150.    At trial, Sullivan was crossed about having smoked marijuana and drank leading up to the shooting, and about the far distance (100–150 yards) from which he claimed to have seen the shooter's face well enough to make an ID even though it was dark and he had been shot. Ex. 2 (Cr. Tr. (Sullivan)) 101:17–104:24, 109:7–110:24, 122:3–24:9, 133:7–35:24, 137:3–13.

151.    On June 9, 1992, the day before Sullivan testified, Belling missed several calls from him. On one call, Sullivan left the following message for Belling: "I'm going back to Georgia—not going to testify under the circumstances, very disgusted" before he hung up. Ex. 46 (6/9 4:20pm Tele. Mess.) COE 2171; Ex. 45 (6/9 12 Tele Mess.) COE 2277 (missed call at 12pm); Ex. 44 (6/9 10am Mess.) COE 2278 (missed called at 10am).

152.    At his deposition, Belling agreed that message indicated Sullivan was a recalcitrant witness, but Belling claims that the very next day, on June 10, Sullivan testified "freely and openly" against Dixon. Ex. 41 (Belling Dep.) 219:16–220:23.

153.    Two days after Sullivan's testimony, Belling sent a letter to the prosecutor in Sullivan's Georgia rape case, praising Sullivan as "far and above the average 'street punk' that I'm sure we both deal with on a daily basis" and asking that Sullivan's cooperation be considered "when it comes time for disposition of his Georgia charges." Ex. 43 (6/12/1992 Belling Letter) COE 2161.

154.    At his deposition, Belling agreed that his letter could have been very helpful in connection with Sullivan's rape charges. At first, that he "didn't think" he would have told Sullivan or his father that he would write a letter on Sullivan's behalf in exchange for his cooperation at trial, "because had I done that, it would have been a Brady issue, so I didn't do it." Ex. 41 (Belling Dep.) 206:13–21. Belling then admitted he "didn't know" whether or not he did make that representation to Sullivan. Ex. 41 (Belling Dep.) 207:2–3, 208:11–13. But by the end of his deposition, Belling testified that he absolutely not did not say that, because it would not have been an "appropriate" thing to do.  Ex. 41 (Belling Dep.) 221:9–10, 222:16–17 (now "sure" about that). Instead, Belling claims that he thought of writing the letter "after the fact" as a reward. Ex. 41 (Belling Dep.) 221:11–14; see also 208:19–21 ("He was a nice kid, I could have written it out of the goodness of my heart.")

*Jackson testifies that his "memory gets better with time."*

155.    At trial, Jackson testified that he was told by Belling where Dixon would be seated in the courtroom, and that he would be asked to point him out. Ex. 2 (Cr. Tr. (Jackson)) 251:12–23; see also Ex. 83 (Jackson Dep.) 139:2–6 (testifying about being shown crime scene photo by Belling).

156.    Jackson was crossed on the fact that he first told police he was not sure Dixon was the shooter because it all happened so quick but was now testifying he was certain Dixon was the shooter. Jackson testified that "his memory gets better with time." Ex. 2 (Cr. Tr. (Jackson)) 241:4–246:20, 257:18–58:24, 252:1–11.

*Belling argues the identifications of Dixon could not be a mere coincidence.*

157.    The jury was initially split 9–3 in favor of acquittal. Ex. 14 (ADA Memo) COE 4773 (Krahling juror interview). But the jury ultimately convicted Dixon of murder in the second

degree, attempted murder in the second degree, assault in the third degree, and criminal

possession of a weapon on the second degree based on the eyewitness identifications of Adams,

Sullivan, and Jackson. Dixon was then sentenced to 33 1/3 years to life. Ex. 14 (ADA Memo)

COE 4759.

158.    In November 1992, Brown and Jarmon were tried for the perjury charges Belling indicted

them on. The jury acquitted both men of all charges relating to their purportedly false testimony

about Torriano Jackson having a gun that night. But they were convicted for their (truthful)

testimony that Scott, not Dixon, was the shooter. Ex. 13 (Newcomb Affidavit) COE 3349 ¶¶ 5,

10.

**In 2018, Dixon is finally exonerated through a reinvestigation conducted by ECDAO.**

159.    Dixon maintained his innocence throughout his incarceration, filing multiple post-

conviction appeals for relief including in 2003, 2005, and 2018. Ex. 14 (ADA Memo) COE

4759.

160.    On December 31, 2016, Belling was forced to resign from the ECDAO. Ex. 41 (Belling

Dep.) 12:19–13:7.

161.    A year later in 2018, the ECDAO thoroughly reinvestigated the crime by interviewing

over thirty witnesses (including every critical witness and every individual with relevant

information), reviewing the records and physical evidence, and conducting a polygraph

examination of Dixon. Ex. 28 (9/17/18 ECDAO Aff. 2018) ¶ 4; Ex. 33 (440 Motion Tr.) Dixon-

699. ECDAO conclusively determined that Lamarr Scott was the shooter, not Dixon. Ex. 28

(9/17/18 ECDAO Aff. 2018) ¶¶ 12–13.

162.    On September 19, 2018—more than 27 years after his arrest in August 1991—Dixon's

convictions for second-degree murder, attempted murder, and assault were vacated by the Erie

County District Court on the basis of newly discovered evidence: that consistent with his confession on August 12, 1991, the ECDAO conclusively determined Scott was the shooter, not Dixon. The State also consented to dismissal of those charges. Ex. 32 (440 Order) Dixon-5401–2; Ex. 33 (440 Motion Tr.) Dixon-699-700; Ex. 28 (ECDAO Aff. 2018) ¶¶ 4, 12–13. On November 1, 2023, Dixon's conviction for criminal weapon possession in the second degree was also vacated by the Erie County District Court on the basis of newly discovered evidence. Ex. 42 (Eagan Order) 7.

163.    On September 19, 2018, the same day Dixon was exonerated, Scott pled guilty to those crimes, even though he understood that the plea would have adverse consequences on his parole status. Ex. 5 (Scott Plea 2018) 13:4–14:20 (pleading guilty); Ex. 4 (Scott Dep.) 22:4–20 ("I still have 20 years left on parole, and if I sneeze wrong, there's a strong possibility that could be violated because [plea is to] a violent crime."). As Scott explained at his deposition, he did so because: "You can't allow another human being to continue to be punished for something that they didn't do." Ex. 4 (Scott Dep.) 23:14–20.


Dated: February 15, 2024
New York, New York

                             /s/ Mary Katherine McCarthy
                             Mary Katherine McCarthy
                             Nick Joel Brustin
                             Anna Benvenutti Hoffmann
                             Gerardo Romo

                             NEUFELD SCHECK & BRUSTIN LLP
                             99 Hudson Street, Eighth Floor
                             New York, NY 10013
                             T: (212) 965-9081

                             Donald M. Thompson

                             EASTON THOMPSON KASPEREK

SHIFFRIN LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
T: (585) 423-8290