## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALENTINO DIXON,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF BUFFALO et al.,<br><br>        Defendants. | No. 19-cv-01678 (WMS) (HKS) |

## PLAINTIFF'S RESPONSE TO COUNTY DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACT

1. After a brief fight between Mario Jarmon and Aaron and Toriano Jackson, the Jackson Murder occurred approximately 1:29am on August 10, 1991. [A 1285.[1]]

> **Response**: Admit that after a brief fight initiated by Aaron and Torriano Jackson initiated with Jarmon, the Jackson Murder occurred approximately at 1:15 am on August 10, 1991. Add that police were notified at approximately 1:29 am. Ex. 1 (Homicide File) BPD Comp. 1–2; Ex. 14 (2018 ECDAO Reinvestigation Memo) at COE 4760; Ex. 96 (Shannon Perj. Test.) 653:22–654:16; Ex. 97 (Jackson Perj. Test.) 77:19–78:07. *See* Affirmative Facts at ¶ 1.

2. Evidence now demonstrates that it is more likely that Lamar Scott was the shooter that evening, but he was present that evening as an agent of Valentino Dixon.

> **Response**: Deny. Lamarr Scott was the shooter. On August 10, 1991, Scott used a TEC-9 firearm to fatally shoot Torriano Jackson and wound two other men, Aaron Jackson, and John Sullivan. Ex. 5 (Scott Plea 2018) 13–14 (caused death of Torriano Jackson and shot Aaron Jackson and John Sullivan); Ex. 4 (Scott Dep.)

18:5–19; Ex. 1 (Homicide File (Scott Stmt)) BPD Comp. 196–97 (confessing to being the shooter. Shortly before Scott shot him, Torriano Jackson pulled out a silver handgun and shot at Mario Jarmon. Scott then retrieved the TEC-9 and began shooting, firing 27 shots total. Ex. 1 (Homicide File) BPD Comp. 154, 196–98; Ex. 68 (Jarmon GJ Test.) 8:13–9:04; Ex. 76 (Shannon Decl.) ¶ 1; Ex. 20 (Scott Ltr., 12/11/98) Dixon-003807. Scott's actions in shooting the TEC-9 were committed by him alone; Dixon did not ask or direct Scott to shoot anyone. Ex. 4 (Scott Dep.) 80:7–13 ("He didn't tell me to go kill somebody or anything like that."); *see also* Ex. 23 (Dixon Dep.) 184:2–11 (did not say anything to Scott before or during shooting. *See* Affirmative Facts at ¶ 1–11.

3. Mr. Scott "wouldn't have been at the [crime scene] if it wasn't for [Mr. Dixon]." See Deposition of Lamar Scott, dated March 14, 2022, p. 79:4-5. [A 1147]

> **Response**: Admit Scott testified that he would not have been "there," but deny that Dixon brought Scott to the crime scene or was responsible Scott's actions. Scott's actions in shooting the TEC-9 were committed by him alone; Dixon did not ask or direct Scott to shoot anyone. Ex. 4 (Scott Dep.) 80:7–13 ("He didn't tell me to go kill somebody or anything like that."); *see also* Ex. 23 (Dixon Dep.) 184:2–11 (did not say anything to Scott before or during shooting. Add that earlier Dixon drove Scott to Jarmon's house on East Delavan, not to the crime scene; Jarmon's house was about 80 yards from the Bailey/Delevan intersection. Ex. 23 (Dixon Dep.) 122:18–123:1, 165:20–167:8; Ex. 24 (Dixon City 50-H)) 28:12–19 (Jarmon's house about 80 yards away from shooting).

4. At the scene, Mr. Dixon provided his gun to Mr. Scott (*Id.*, 79:6-7) [A 1147], who saw
himself as a "protector" (*Id.*, 83:9) [A 1151].

> **Response**: Deny. Dixon never provided a gun to Scott. Earlier in the night, Dixon
> and Scott left a mutual friend's house and drove to Jarmon's house; Dixon then
> left to run errands, came back hours later, and dropped the gun in Jarmon's
> hallway. When the fight broke out at the Bailey/Delevan intersection, Scott
> retrieved the TEC-9, ran toward the fight between the Jacksons and Jarmon, and
> started shooting. Scott's actions in shooting the TEC-9 were committed by him
> alone; Dixon did not ask or direct Scott to shoot anyone. Ex. 4 (Scott Dep.) 80:7–
> 13, 15:2–10, 18:5–19; Ex. 23 (Dixon Dep.) 122:18–123:1, 165:20–167:8, 184:2–
> 11 (did not say anything to Scott before or during shooting); Ex. 6 (Frida Dep.)
> 14:5–18; Ex. 86 (Shannon Perj. Test.) 655:4–24; Ex. 5 (Scott Plea) 13:4–8; *See*
> Affirmative Facts at ¶ 1–2, 10–11.

5. Regarding motive, the shooting arose from a conflict involving Mr. Dixon and his brothers.
As Mr. Scott put it, the "beef wasn't with him." (Scott Dep. Trans., p. 14:14-15.) [A
1082.]

> **Response**: Deny the conflict involved Dixon.  A few weeks before the shooting,
> Torriano Jackson, his brother Aaron Jackson, and their friends surrounded Antoine
> Shannon after a party. Torriano Jackson pulled out a silver handgun, told Shannon
> to get on his knees, and aimed the gun at his head. Ex. 1 (Homicide File (Brown
> Stmt) BDP Comp. 158; Ex. 14 (DA Memo) COE 4767; Ex. 96 (Shannon Perj.
> Test.) 634:13–635:6; 635:19–636:4. On August 9, in the hours before the
> shooting, Shannon, Brown, and Jarmon saw Aaron Jackson sitting in a parking lot

in his friend Travis Powell's yellow Geo Storm. The three men approached
Jackson about the incident with Shannon weeks earlier, and the men exchanged
words. Ex. 1 (Homicide File (Brown Stmt) BDP Comp. 158; Ex. 76 (Shannon
Decl.) ¶¶ 3–5; Ex. 68 (Jarmon GJ Test.) 3:12–4:23; Ex. 67 (Brown GJ Test.) 24:3–
22; Ex. 14 (DA Memo) COE 4767. Before driving away, Jackson threatened to
"come back and spray all [you] mother f—ers." Ex. 1 (Homicide File (Brown
Stmt) BDP Comp. 158; *see also* Ex. 67 (Brown GJ Test.) 24:23–25:7 (Jackson
threatened to "come back and smoke all of [us]"); Ex. 96 (Shannon Perj. Test.)
641:4–18 (Jackson saying "he was going to come back and shoot us, spray us up,"
making "a lot of serious threats on my life"); Ex. 68 (Jarmon GJ Test.) 5:1–7
(Jackson started going off "like making threats" and saying he'd be "right back");
Ex. 14 (DA Memo) (Jackson stated "he would be back and that he had something
for them").

6. Right before Mr. Scott pulled the trigger, Mr. Dixon told him, "stop them from shooting my
   brother." (*Id.*, 81:21 [A1149])

   **Response**: Deny. *See* Affirmative Facts at ¶ 11.

7. When Leonard Brown pointed out Toriano Jackson as the threat, Lamar Scott began
   shooting. (*Id.*, 81:22 [A1149].)

   **Response**: Admit that Scott so testified.

8. By 5:05 am on August 11, 1991, Emil Adams had identified Valentino Dixon as the shooter.
   [A 1537]

**Response**: Admit police reports so indicate. *See* Affirmative Facts at ¶¶ 14–21, 31–33, 38.

9. Christopher Belling was not present for Emil Adams' identification of Valentino Dixon. [A1536]

**Response**: Admit.

10. Valentino Dixon was detained by police at 1:10 pm (BPD0064, COE001513) [A 1553].

**Response**: Admit but add that Valentino Dixon was detained by police on August 10 at 1:10pm. Ex. 1 (Homicide File) BPD Comp. 64–65 (Stambach Rep).

11. From approximately 1:30pm to 2:30 pm, Valentino Dixon provided a materially inaccurate account of his observations at the Jackson Murder (BPD0071-73; COE 1525-26) [A 1560-62].

**Response**: Deny. Dixon truthfully told police was not involved in the crime and denied being the shooter or firing any weapons. Ex. 1 (Homicide File) BPD Comp. 72 (Dixon Stmt). Even though Dixon knew he was being arrested for something Lamarr Scott did, Dixon did not give the police information implicating Scott in the shooting because of the understanding "in the neighborhood" that "you just don't speak about these type of things, because it can be harmful to you…it just makes your life horrible. Like it travels with you for the rest of your life…unless you move into the Arizona desert somewhere

away from the whole…environment." Ex. 23 (Dixon Dep.) 142:06–43:19. *See*

Affirmative Facts at ¶¶ 35, 37.

12. In the same office at approximately 2:30pm, John Sullivan identified Valentino Dixon as

the perpetrator of the Jackson Murder. (BPD Comp. 0076-77; COE1535-36) (the

"Sullivan Identification") [A 1565-67].

> **Response**: Admit the police reports so indicate. *See* Affirmative Facts at ¶¶ 23–
>
> 30.

13. After meeting with his attorney, Sean Dennis Hill, Esq. (BPD 0064), Dixon was booked

for murder, weapons possession and assault. (BPD0064-65) [A 1553-54]; *see also* Arrest

Documents (COB 00152-91.) [A 1273-1312])

> **Response**: Admit.

14. Detective Mark Stambach completed and executed a criminal complaint supporting the

charge. (COE 1672-1673.) [A 1285-86.]

> **Response**: Admit.

15. During the early morning of August 12, 1991, while accompanied by Valentino Dixon's

father, [A 1742] Lamar Scott came forward to confess to the Jackson Murder. [A 1686-

88.]

> **Response**: Admit that Scott came forward and that Robert Bryant was present, but
>
> add that others were also present, including Leonard Brown and Antoine
>
> Shannon. Ex. 1 (Homicide File) BPD Comp. 158–159 (Brown Stmt.); Ex. 76
>
> (Shannon Decl.) ¶ 5.

16. Later during the day of August 12, 1991, from his hospital bed, Aaron Jackson identified

Valentino Dixon as the perpetrator of the Jackson Murder. (COE001550; BPD Comp.

0185.) [A 1674.]

> **Response**: Deny. Stambach reported that Jackson selected Dixon's photo from a
>
> 6-photo array without suggestion and stated that Dixon was there on the night in
>
> question and "looked like" the shooter, but he could not be sure because
>
> "everything happened so fast." Ex. 1 (Homicide File) BPD Comp. 185 (Stambach
>
> Rep.); BPD Comp. 166 (Jackson affidavit). *See* Affirmative Facts at ¶¶ 75–82.

17. Christopher Belling was not present for Aaron Jackson's identification of Valentino Dixon.

[A 1674.]

> **Response**: Admit.

18. On August 12, 1991, Erie County Assistant District Attorney Christopher Belling took

possession of a copy of the Buffalo Police Department's file on the Jackson Murder.

(COB232; BPD Comp. 0174.) [A 1663.]

> **Response**: Admit that the document reflects Erie County Assistant District
>
> Attorney Christopher Belling received the file on that date with no specified time.
>
> *See* Affirmative Facts at ¶¶ 69.

19. Relying on that criminal complaint, as well as the identification of Valentino Dixon by

John Sullivan, Defendant Belling sought the revocation of Valentino Dixon's bail.

(COE1696- 1698 [A1805-1807]).

**Response**: Admit that DA Belling sought the revocation of Dixon's bail but deny that the citation supports this statement.

20. On January 9, 1992, John J. Malloy was appointed as counsel to Lamas Scott to represent him based on Scott's confession to the Jackson murder. (COE 1692.) [A 1804.]

**Response**: Admit that John J. Malloy was appointed as counsel to Lamarr Scott but deny that the evidence cited supports that it was "based on Scott's confession to the Jackson murder."

21. From November 6, 1991 through January 13, 1992, a grand jury considered testimony from eleven (11) witnesses. [A1320]

**Response**: Admit that a grand jury heard testimony from eleven (11) witnesses on 3 days: November 6 and 20, 1991 and January 13, 1992.

22. At some time during the pendency of grand jury proceedings, Christopher Belling met with Antoine Shannon. (Belling Dep. Trans., p. 251:19-252:5.) [A 252-253.]

**Response**: Admit that on November 21, Belling traveled to Kentucky to meet with Antoine Shannon. Ex. 76 (Shannon Decl.) ¶ 18. *See* Affirmative Facts at ¶¶ 90–93, 133–134.

23. During the course of that interview, Belling captured an affidavit from Shannon that implicated Lamar Scott as the perpetrator of the Jackson Murder. (COB274-279; BPD Comp 249-254.) [A 1313-1318; 1738-1743.]

**Response**: Admit an affidavit was produced during the interview between Belling and Shannon in which Shannon identifies Scott as the shooter. *See* Affirmative Facts at ⸿ 90–93.

24. Antoine Shannon's identification of Lamar Scott as the shooter was disclosed to Dixon's counsel. (ECDAO's Response to Demand to Produce (COE1855-1859).) [A 1809-1813.]

**Response**: Admit that Antoine Shannon's claim that Lamarr Scott did the shooting was disclosed to Dixon's counsel but deny to the extent that this statement claims that Shannon's affidavit was disclosed.

25. Christopher Belling did not engage in misconduct in connection with meeting with Antoine Shannon. *See gen* (Belling Dep. Trans., p. 251:19-252:5.) [A 252-253]; *see also Dixon v. Conway, 613 F. Supp. 2d 330, 365 (W.D.N.Y. 2009)*

**Response**: Deny. Belling pressured Shannon to say Dixon was the shooter. *See* Ex. 76 (Shannon Decl.) ¶¶ 18–21. *See* Affirmative Facts at ¶¶ 90–93, 133–134.

26. At some time during the pendency of grand jury proceedings, Christopher Belling met with Tamara Frida, at which time she failed to identify Lamar Scott as the perpetrator of the Jackson Murder. (Dixon 3801-3804 [A 1484-1487]; Belling Dep. Trans., p. 146:13-15.) [A 147] (*Id.* 162:2-12) [A 163]; Belling Dep. Trans., p. 134:15 – 135:2.) [A 135-136].

**Response**: Admit that Belling, along with a detective, met with Frida sometime after December 4 and she did not identify Scott as the shooter. Add that Frida did not know who Scott was by name at the time and that neither Belling, or the detective, asked her any questions about her anonymous phone call stating that

Dixon was not the shooter. *See* Ex. 6 (Frida Dep) 48:13–18; 58:14–17. *See* Affirmative Facts at ¶¶ 99–104.

27. Christopher Belling met with Tamara Frida on a second occasion after she was subpoenaed to appear for the Grand Jury in the Jackson Murder. (*Id*. 146:3 – 147:11.) [A 147- 148.]

> **Response**: Admit DA Belling so testified.

28. Tamara Frida did not tell Christopher Belling that Lamar Scott was the perpetrator of the Jackson Murder. (Belling (*Id*. at (COE2309). [A 1814.]

> **Response**: Admit Frida did not tell DA Belling that Lamarr Scott, who she did not know by name, was the perpetrator of the Jackson murder. Further, neither Belling, nor the police, asked her any questions about her phone call stating that Dixon was not the shooter. *See* Ex. 6 (Frida Dep) 39:14–23, 48:13–18; 49:5–10, 58:14–21; *See* Affirmative Facts at ¶¶ 99–104.

29. Christopher Belling did not engage in misconduct in connection with meeting with Tamara Frida. *See gen Dixon v. Conway*, 613 F. Supp. 2d 330, 368 (W.D.N.Y. 2009)

> **Response**: Deny. Belling did not ask any questions regarding her anonymous call stating Valentino was not the shooter. *See* Ex. 6 (Frida Dep) 48:13–18 (Belling did not ask questions about her anonymous call); Ex. 41 (Belling Dep) 139:9–20 (stating that he did mention the anonymous call to Frida). *See* Affirmative Facts at ¶¶ 99–104.

30. Tamara Frida did not come forward to provide a complete and truthful account of the events of August 10, 1992 until 1998 (Dixon 3801-3804) [A 1484-1487].

**Response**: Deny *See* Affirmative Facts at ¶¶ 99–104.

31. Tamara Frida does not claim that she made any attempt to convey Lamar Scott's guilt to anyone in law enforcement or the District Attorney's Office. (*See gen* Frida Dep. Trans.)

> **Response**: Deny. Frida did not know who Scott was by name. Add that neither Belling, nor the police, asked her any questions about her anonymous phone call stating that Dixon was not the shooter. *See* Ex. 6 (Frida Dep) 48:13–18; 58:14–121Affirmative Facts at ¶¶ 99–104.

32. When she was approached by police at the scene, Frida denied that she "saw anything" because she "was afraid to become involved." (Dixon 3803.) [A 1486.]

> **Response**: Admit but add that according to the cited affidavit of Frida, she left her name, address, and phone number and told them she was the owner of the Red Tracker. Tamara later called anonymously and identified herself as the driver of the Red Tracker and stated Valentino was not the shooter. Ex. 1 (Homicide File) 203 (Stambach Rep.) *See* Affirmative Facts at ¶¶ 99–104.

33. During his testimony on January 13, 1992, Lamar Scott recanted his confession to the Buffalo Police Department, explained the circumstances surrounding his false confession and identified Valentino Dixon as the perpetrator of the Jackson Murder. [A1432 – 1458]

> **Response**: Admit that Scott recanted his confession but add that it was due to improper coercion and Scott perjured himself at the grand jury. As a result of threats, pressure, and coercion by Defendants, Scott perjured himself in the grand jury—falsely testifying that Dixon committed the shooting, not him. Ex. 66 (Scott GJ Test.) 67:21–68:3; Ex. 20 (Scott Ltr., 12/11/98) Dixon-003809; (recanted

because felt his life was threatened because of harassment from Stambach and Belling); Ex. 60 (1/31/1992 Scott Aff.) 005930 (perjured himself because believed his life and lives of family were in jeopardy from BPD and Das office if did not testify in the way he did); *see also* Ex. 59 (Yates Aff.) Dixon 5183 (Scott stayed with her because he was afraid of the police). As Scott later explained: "I was told that they had who they wanted, and to say that Mr. Dixon's parents' had put me up to confessing. I committed perjury and this is something I deeply regret. But I was young and the pressure from the police was to[o] strong for me to handle." Ex. 1 (Homicide File) BPD Comp. 267 (1/14/03 Letter); Ex. 4 (Scott Dep.) 61:16–62:16 (letter is accurate description of what happened with police, was truthful to best of recollection at the time). Scott's grand jury testimony was the only time in over 30 years that he has falsely maintained he was not the shooter. Ex. 5 (Scott Plea 2018) 4 [Dixon 8447] ("But for an appearance that he did not make in the grand jury, [Scott] has maintained that confession for the last 27 years. He has been confessing to this crime in excess of ten times and has come into our office and confessed to the crime as well.") *See* Affirmative Facts at ¶¶ 105–118.

34. At the time that Lamar Scott recanted his confession, he was represented by counsel. (Dixon001597.) [A 1432.]

> **Response**: Admit that at the time of Scott's grand jury testimony, he was represented by counsel.

35. The Grand Jury was also presented with the live testimony of Mario Jarmon and Leonard Brown identifying Lamar Scott as the shooter, the videotaped confession of Lamar Scott

(Dixon 1606-1609 [A1411-1444]), and the written confession of Lamar Scott (Dixon 1609-1611 [1444-1446]).

      **Response**: Admit.

36. Law enforcement only testified at the grand jury proceedings to convey the existence of another weapon at the scene of the Jackson Murder (which would only tend to complicate the prosecution narrative, whether against Dixon or Scott). (Grand Jury Transcript, (Dixon1556 – 1559 [A1391-1394].)

      **Response**: Admit that Diegelman was the only officer who testified but deny the characterization that his testimony would "only tend to complicate the prosecution narrative, whether against Dixon or Scott."

37. Christopher Belling did not engage in misconduct in connection with the grand jury proceedings. *Dixon v. Conway*, 613 F. Supp. 2d 330, 362 (W.D.N.Y. 2009).

      **Response**: Deny. *See* Affirmative Facts at ¶¶ 1–163.

38. The grand jury ultimately decided to indict Dixon, to the exclusion of Scott, on January 13, 1992. (COE001702 [A 1808])

      **Response:** Admit.

39. The grand jury also indicted Mario Jarmon and Leonard Brown for perjury.

      **Response**: Admit.

40. The trial of Valentino Dixon took place from June 8 through June 16, 1992.

      **Response:** Admit.

41. Jackson, Adams and Sullivan testified and withstood sustained, aggressive cross-examination from Valentino Dixon's counsel. Dixon v. Conway, 613 F. Supp. 2d 330, 334-42 (W.D.N.Y. 2009).

> **Response**: Admit that Jackson, Adams, and Sullivan testified and were cross-examined on evidence that was disclosed. *See* Affirmative Facts at ¶¶ 124, 141–154.

42. Defense counsel did not call any witnesses. *Dixon v. Conway*, 613 F. Supp. 2d 330, 386 (W.D.N.Y. 2009)

> **Response**: Admit but add that due to the perjury charges against Leonard Brown and Mario Jarmon and Lamarr Scott's grand jury testimony, defense counsel could not call them. Ex. 56 (Buff. News Article, COE 2738); Ex. 41 (Belling Dep) 338:3–9, 339:8–14.  *See* Affirmative Facts at ¶¶ 124–126, 138–139.

43. The Plaintiff was found guilty of all counts: murder in the second degree, attempted murder in the second degree, criminal possession of a weapon in the second degree and assault in the third degree. (Affidavit of David Herarty, dated September 17, 2018 [Doc 66-3] (Herarty Aff.) at 3, ¶6.)

> **Response:** Admit but add that Plaintiff was exonerated of murder in the second degree, attempted murder in the second degree, and assault in the third degree after a comprehensive investigation by the ECDAO conclusively determined Dixon was not the shooter. Ex. 32 (440 Order) Dixon-5401–2. *See* Affirmative Facts at ¶¶ 159–163.

44. Christopher Belling did not engage in misconduct in connection with the trial of Valentino Dixon for the Jackson Murder. *Dixon v. Conway*, 613 F. Supp. 2d 330, 362 (W.D.N.Y. 2009).

      **Response**: Deny. *See* Affirmative Facts at ⁋ 1–163.

45. Mr. Dixon appealed his conviction to the Appellate Division, Fourth Department, and it was unanimously affirmed (*Id*. at ¶7.) *See People v. Dixon*, 214 A.D.2d 1010 (4th Dep't 1995) *lv denied* 87 NY2d 900.

      **Response**: Admit.

46. On November 6, 2003, Dixon filed his first motion to vacate his conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL"). (*Id*. at ¶8.)

      **Response:** Admit.

47. The motion was denied by an order of Erie County Court (D'Amico, J.) issued on August 30, 2004, and his application for leave to appeal was denied by the Fourth Department. (*Id*. at ¶8.)

      **Response:** Admit.

48. On April 14, 2005, Dixon filed a petition for a writ of habeas corpus with the United States District Court for the Western District of New York. (*Id*. at ¶9.)

      **Response:** Admit.

49. The petition was denied by an order of District Court (Acara, J., adopting recommendation of Bianchini, Magistrate Judge) issued on May 5, 2009. (*Id*. at ¶9.) *Dixon v. Conway*, 613 F. Supp. 2d 330 (W.D.N.Y. 2009)

**Response:** Admit.

50. On May 28, 2018, Dixon brought a second motion pursuant to Section 440.10 of the CPL. In reply, the Erie County District Attorney's Office conducted a reinvestigation of the Jackson Murder. (*Id*. at 1, ¶4.)

      **Response:** Admit.

51. During the course of the reinvestigation, the Plaintiff continued to falsely downplay his involvement including lying about his prior knowledge of the weapon used in the Jackson Murder. (Dixon Dep. Trans. p. 144-145.) [A 0977-0978.]

      **Response:** Admit that after over two decades in prison for a murder he did not commit Plaintiff initially did not tell the prosecutors he owned the firearm. Deny that the Plaintiff continued to falsely downplay his involvement. As Dixon has maintained for over two decades, he did not shoot Torriano Jackson or anyone else on August 10, 1991. Ex. 24 (Dixon City 50-H)) 30:4–6 (not armed when shooting occurred); Ex. 1 (Homicide File (Dixon Stmt)) BPD Comp. 71 (did not shoot anyone); Ex. 5 (Scott Plea 2018) 2:1–4:19, 13:4–14:20 (pleading guilty to these crimes the same day Dixon was released). Scott's actions in shooting the TEC-9 were committed by him alone; Dixon did not ask or direct Scott to shoot anyone. Ex. 4 (Scott Dep.) 80:7–13 ("He didn't tell me to go kill somebody or anything like that."); see also Ex. 23 (Dixon Dep.) 184:2–11 (did not say anything to Scott before or during shooting). Dixon was not in the immediate vicinity of the shooting; he was in a store when gunshots first rang out and had already ran down the block and towards his car when Scott began shooting. Ex. 18 (Scott Int.

ECDAO Reinvest., Transcript Pt. 2, 8/15/18) at 17 COE 2553 (Dixon was already gone and going towards his car when Scott began shooting); Ex. 4 (Scott Dep.) 45:19–46:12, 57:3–11; Ex. 23 (Dixon Dep.) 122:20–22, 123:10–22, 124:18–125:8, 189:11–16; Ex. 24 (Dixon City 50-H) 31:6–15, 31:23–32:10; Ex. 6 (Frida Dep.) 13:4–19. See Affirmative Facts at ¶¶ 8–11.

52. However, in the course of reinvestigation, Erie County District Attorney personnel concluded that Lamar Scott was the actual shooter of Valentino Dixon. (Herarty Aff. [Doc. 66-3] at 3, ¶12.)

> **Response**: Admit, but add that after its comprehensive investigation, the ECDAO conclusively determined that Dixon did not shoot Torriano Jackson, Aaron Jackson, or John Sullivan on August 10, 1991, and consented to a vacatur of Dixon's convictions for murder, attempted murder, and assault. Ex. 25 (State 440 Resp.) ¶ 4, 12; Ex. 32 (440 Order) at Dixon-5401. On September 19, 2018, the court vacated Dixon's wrongful convictions, and he was released. Ex. 32 (440 Order) Dixon-5401; Ex. 33 (440 Motion Tr.) Dixon 701–02. That same day, Lamarr Scott pled guilty to those crimes. Ex. 5 (Scott Plea 2018) 13:4–14:20 (pleading guilty). *See* Affirmative Facts at ¶¶ 161–163.

53. The Erie County District Attorney's Office therefore consented to the vacatur of Valentino Dixon's conviction on the basis of "newly discovered evidence." (*Id*. at 8.)

> **Response:** Admit.

54. There is no evidence that Aaron Jackson, John Sullivan or Emil Adams have recanted their eyewitness identifications of Valentino Dixon as the perpetrator of the Jackson Murder.

**Response:** Deny. Adams and Jackson have indicated to other witnesses that their identifications were suggestive and not truthful. Ex. 6 (Frida Dep.) 32:2–34:16, 53:7–56:2; 56:17–57:15; Ex. 85 (Bland Dep.) 39:8–13 (pleading the Fifth when asked about Adams having told him on multiple occasions that he was pressured by the police to maintain that Dixon was the shooter, even though he and they knew it was Scott); ███████████████████████████████████

██████████████████████████████████████████████ *see*

*also* COE 4766 (Jackson told Brown in 1992 that he knew Dixon was innocent).Sullivan's identification was the result of suggestive procedures, including showing him mug shots. Ex. 77 (Sullivan Perjury Test.) 233:12–17; Ex. 7 (Masecchia Dep.) 197:3–98:3 (denying showing Sullivan individual mug shots of Valentino Dixon or anyone else, but agreeing doing so would be highly suggestive). Plaintiff tried repeatedly to locate Sullivan to serve him in this civil case but was unable to find him, as Sullivan is now homeless. Ex. 95 D.E. 106-1 (Romo Decl.) ¶¶ 3–5; see also D.E. 121 (postponing hearing due to "service issues posed by Mr. Sulllivan's homelessness"). As a result, Sullivan was not deposed in this matter regarding his interactions with Defendants.

55. Mr. Belling's interaction with the witnesses in this case plainly involved evaluating evidence and interviewing witnesses.

**Response:** Admit that at times Belling was evaluating evidence and interviewing witnesses; at times, Belling was acting as an investigator and fabricating evidence.

56. Mr. Belling complied with his *Brady* obligations in connection with the prosecution of Valentino Dixon. (ECDAO's Response to Demand to Produce (COE1855-1859).) [A 1809- 1813.]

> **Response:** Deny. Belling did not disclose that he told Sullivan and his father that if he cooperated and testified at trial Belling would write a letter on his behalf related to the rape charges that Sullivan was facing in Georgia. Ex. 41 (Belling Dep) 206:13–21; 210:10–25 (admitting that telling Sullivan and his father that if he cooperated and come to trial he would write a letter on his behalf would be a *Brady* violation); Ex. 41 (Belling Dep) 207:20–13 (unable to deny if he failed to disclose that he would write a letter for Sullivan if he cooperated). Belling also did not disclose that he coerced Scott into lying at the grand jury by testifying that Plaintiff, not Scott, was the shooter. Ex. 66 (Scott GJ Test.) 67:21–68:3; Ex. 20 (Scott Ltr., 12/11/98) at Dixon-3809 (recanted because felt his life was threatened because of harassment from Stambach and Belling); Ex. 60 (1/31/92 Scott Aff.) at Dixon-5930 (perjured himself because believed his life and lives of family were in jeopardy from BPD and DAs office if did not testify in the way he did). *See* Affirmative Facts at ¶¶ 105–118, 148–154.

57. Christopher Belling was not present for the development of any evidence that preceded Valentino Dixon's arrest.

> **Response:** Admit but add that Valentino was arrested within a day. Ex. 1 (Homicide File) BPD Comp. 64–65 (Stambach Rep).

58. There is no evidence that Christopher Belling coerced Emil Adams at any time.

**Response:** Deny. *See* Affirmative Facts at ¶¶ 141–147.

59. There is no evidence that Christopher Belling coerced Aaron Jackson at any time.

**Response:** Deny, he engaged in improper suggestion to turn Jackson's tentative into a positive identification. *See* Affirmative Facts ¶¶ 75–82, 155–156.

60. There is no evidence that Christopher Belling coerced Leonard Brown at any time.

**Response:** Deny. Belling charged Brown with perjury for "falsely" implicating Scott in the shooting in his grand jury testimony. Ex. 57 (DA Press Release) [Dep. Ex. 30] COE 2228; *see also* Ex. 56 (Buff. News Article, COE 2738) (publishing that Brown and Jarmon were arraigned on perjury charges). *See* Affirmative Facts at ¶¶ 125–130, 158.

61. There is no evidence that Christopher Belling coerced Mario Jarmon at any time.

**Response:**  Deny. Belling charged Jarmon with perjury for "falsely" implicating Scott in the shooting in his grand jury testimony. Ex 57 (DA Press Release) [Dep. Ex. 30] COE 2228; *see also* Ex. 56 (Buff. News Article, COE 2738) (publishing that Brown and Jarmon were arraigned on perjury charges). *See* Affirmative Facts at ¶¶ 125–130, 158.

62. Christopher Belling did not coerce Lamar Scott at any time. (Scott Dep. Trans., p. 64:5.) [A 1132.]

**Response:** Deny. Belling coerced Scott into lying at the grand jury by testifying that Plaintiff, not Scott, was the shooter. Ex. 66 (Scott GJ Test.) 67:21–68:3; Ex. 20 (Scott Ltr., 12/11/98) Dixon-3809 (recanted because felt his life was threatened

because of harassment from Stambach and Belling); Ex. 60 (1/31/92 Scott Aff.)

Dixon-5930 (perjured himself because believed his life and lives of family were

in jeopardy from BPD and DAs office if did not testify in the way he did). *See*

Affirmative Facts at ¶¶ 105–118.

63. In Plaintiff's CPL § 440 motion, Plaintiff pursued a theory that the defense had failed to

turn over negative gunshot residue testing. (Affirmation of Donald Thompson, dated May

18, 2018 [66-2] at 31-34.)

> **Response:** Admit but add that it was based on an interview with Belling where he
>
> claimed that gunshot residue testing came back negative. Ex. 41 (Belling Dep.)
>
> 249:6–16.

64. That theory proved unfounded and was based exclusively on a misstatement by Mr.

Belling. (Answering Affidavit of David A. Herarty, dated September 17, 2018 [66-3], at 6-7.)

> **Response:** Admit that the ECDAO in its reinvestigation determined it was
>
> unfounded and based on an misstatement from Mr. Belling.  Ex. 25 (State 440
>
> Resp.) ¶¶ 15–17.

65. The Plaintiff filed his Complaint on December 16, 2019. (Compl. [Doc. 1].)

> **Response**: Admit.

66. Both the County and City Defendants answered without moving to dismiss the Complaint

or any portions thereof. (*See* Answers [Doc .27, 28].)

> **Response**: Admit.

67. On motion of the County Defendants and City Defendants, this Court (McCarthy, J.) bifurcated discovery between the Plaintiff's individual claims, which would proceed through discovery and Plaintiff's municipal claims (*i.e. Monell*[2] claims), which would be bifurcated for the purpose of discovery. (Decision and Order, dated March 8, 2022 [73] at 10.)

> **Response:** Admit.

68. Pursuant to this Court's Fifth Amended Case Management Order (McCarthy, J), dated September 15, 2023 [156], the deadline for dispositive motions is December 15, 2023.

> **Response:** Admit.

Dated: February 15, 2024
New York, New York

/s/ Mary Katherine McCarthy

Mary Katherine McCarthy
Nick Joel Brustin
Anna Benvenutti Hoffmann
Gerardo Romo

NEUFELD SCHECK BRUSTIN HOFFMANN FREUDENBERGER, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
T: (212) 965-9081

Donald M. Thompson

EASTON THOMPSON KASPEREK SHIFFRIN LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
T: (585) 423-8290

*Counsel for Plaintiff Valentino Dixon*