# EXHIBIT 3

1                    VIDEO DEPOSITION
                     MARK R. STAMBACH
2


3
    UNITED STATES DISTRICT COURT
4   WESTERN DISTRICT OF NEW YORK

5   ----------------------------------------
    VALENTINO DIXON,
6
                              Plaintiff,
7
                    - vs -      Case No.
8                              1:19-cv-01678-WMS

9   CITY OF BUFFALO and COUNTY OF ERIE;
    and DETECTIVE MARK R. STAMBACH,
10  DETECTIVE RANIERO MASECCHIA, DETECTIVE
    JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
11  CHIEF RICHARD T. DONOVAN, JOHN DOES,
    Unknown Buffalo Police Department Supervisors,
12  and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
    BELLING, in their individual capacities,
13
                              Defendants.
14  ----------------------------------------

15

16          Video recorded deposition of MARK R.

17  STAMBACH Defendant, taken pursuant to the Federal

18  Rules of Civil Procedure, in the law offices of

19  HARRINGTON & MAHONEY, 70 Niagara Street, Third

20  Floor, Buffalo, New York, on June 8, 2022,

21  commencing at 10:01 a.m., before LORI K. BECK, CSR,

22  CM, Notary Public.

23

24

25



1        A.   Well, I was learning, yes, that's
2    correct.
3        Q.   Now, certainly by 1992, one of the
4    things that you would do as a homicide detective --
5    first of all, could you tell me -- I know a little
6    bit about the layout of the Buffalo Police
7    Department in '92, but I want to ask you just a few
8    more question, okay?
9        A.   That would be fine.
10        Q.   So my understanding, for example, is
11    that the homicide unit at that time was one big,
12    open office with a couple of -- with a -- with an
13    interview room and a couple of other offices.
14        Does that sound right?
15        A.   It was always located on the third
16    floor, but we were moved three separate times.
17        Q.   All right.  But each time it was still
18    an open room with some -- with some -- with some
19    offices for the supervisors and an interview room,
20    correct?
21        A.   There would be two interview rooms, two
22    command officers' rooms, a large, open room for all
23    the detectives that were assigned there, and that
24    would be about it.
25        Q.   All right.  And all the detectives



1  worked in the large, open room, correct?

2         A.    That is correct.

3         Q.    Bigger than this room we're in now?

4         A.    Oh, much bigger.

5         Q.    Okay.  But big enough -- but small

6  enough so that everybody knew everybody else's

7  business, fair to say?

8         A.    Well, we all had separate desks that we

9  worked from.

10        Q.    Right.  But like any -- like any city

11 homicide unit with desks, you all spent a lot of

12 time talking to one another about what you were

13 doing, fair to say?

14        A.    That is correct.

15        Q.    That's what detectives do, correct?

16        A.    You are correct.

17        Q.    And where was the narcotics unit in

18 relation to homicide in '92?

19        A.    The narcotics squad at that time was

20 located on the third floor.  You would have to go

21 down a complete long corridor, past the women's

22 cell block, and they were kept in a corner --

23 corner office on the third floor all by themselves.

24        Q.    All right.  Same floor as you, though.

25        A.    Same floor.



```
 1              A.    I did not fill it out.

 2              Q.    How do you know that?

 3              A.    It's prepared by a report technician in

 4      central booking.

 5              Q.    All right.  The information comes from

 6      you.

 7              A.    It does.

 8              Q.    You're responsible for the information

 9      on this document, correct?

10              A.    Yes, sir.

11              Q.    You're listed as a detective here,

12      correct?

13              A.    Yes, sir.

14              Q.    And -- and I'm going to get to this

15      again a little more specifically based on what

16      other people have told me, but as a general matter,

17      my understanding of how things worked in homicide

18      in 1992 was that -- I'm sorry.  I don't know why I

19      keep saying '92.

20              A.    It's '91.

21              Q.    It's 1991.

22              A.    Correct.

23              Q.    In 1991, was that a lead detective was

24      assigned, but that wasn't necessarily the primary

25      investigator in the case.  Would that be fair to
```



 1  say, sir?

 2          A.   That's correct.

 3          Q.   So for example, it's clear from just

 4  looking through the reports in this case that you

 5  conducted more interviews than anybody else.  Would

 6  that be a fair characterization?

 7          A.   I'm not sure.

 8          Q.   Okay.  But certainly you were -- you --

 9  you understand, based on your review of -- of the

10  documents that you created, that you were

11  integral -- integrally involved in this case.

12          A.   I was.

13          Q.   And that's one of the reasons why you

14  were the person who did the arrest report.

15          A.   I would say yes.

16          Q.   All right.

17          A.   Can I take one second, please?

18          Q.   Sure.

19          A.   I'm going to put a jacket on.

20          MR. BRUSTIN:  Sure.  You know, why don't we

21  take a 30-second -- or a one-minute restroom break,

22  actually, while you're doing that.

23          (Off the record: 10:46 a.m.)

24          (On the record: 10:56 a.m.)

25          BY MR. BRUSTIN:



```
1          BY MR. BRUSTIN:
2          Q.   So for example, I understood that in
3   this case, like many cases, Lonergan and Vickerd
4   were working unofficially as partners.
5          Was that your understanding?
6          A.   Correct.
7          Q.   And that Lonergan was higher ranked.
8          A.   He was a sergeant.
9          Q.   And so in actuality, Lonergan was
10  actually a supervisor of all of the detectives
11  working on the case.
12         A.   On that particular tour of duty.
13         Q.   And on this particular case.
14         A.   That's not the chain of command as I --
15  as I understand it.
16         Q.   Well, let me ask you this:
17         Was -- was Lonergan in the same supervisory
18  role in Dixon as he was in Ortiz?
19         A.   He was --
20         MR. RUSS:  Objection to form.  You may
21  answer.
22         THE WITNESS:  He was a sergeant.
23         BY MR. BRUSTIN:
24         Q.   So you reported to Lonergan in Ortiz,
25  correct?
```



1          And you had the same obligation as -- as a

2     lead detective to make sure that any relevant

3     information that you gathered in the case was

4     provided expeditiously to other detectives

5     investigating the case.

6          A.    Correct.

7          Q.    And you would agree that in a homicide

8     investigation, knowledge about what's been gathered

9     thus far is key.

10         A.    It's very important.

11         Q.    You want to -- when you're conducting

12    any meaningful part of a homicide investigation,

13    you want to have as much knowledge as you can about

14    what's been gathered before that time, correct?

15         A.    Correct.

16         Q.    Particularly in regard to the subject

17    matter that you're investigating.

18         A.    Correct.

19         Q.    So for example, if you are interviewing

20    a witness, an eyewitness, potential eyewitness in a

21    homicide, you make it your business to learn as

22    much as you can about what information that witness

23    has already provided before your meeting with them,

24    correct?

25         A.    Sometimes you do it cold.  I mean, I'd



```
 1   correct?

 2           A.    Correct.

 3           Q.    And because there were these sort of

 4   group investigations in Buffalo in homicide in

 5   1991, one of the things that homicide detectives

 6   did is you made it your business to know which

 7   other detectives were working on the case you were

 8   working on, correct?

 9           MR. RUSS:  Objection to form.  You may

10   answer.

11           THE WITNESS:  Correct.

12           BY MR. BRUSTIN:

13           Q.    Because those are the detectives that

14   you wanted to be discussing the evidence that you

15   were gathering and they were gathering, correct?

16           A.    Yes.

17           Q.    That's how you solve crimes, correct?

18           A.    Yes.

19           Q.    And there are a variety of ways that

20   you -- that you communicated with fellow homicide

21   detectives during the course of an investigation,

22   correct?

23           A.    Yes.

24           Q.    One way was -- probably the -- the --

25   the largest way were the informal communications
```



1   that you had in the office and -- and on the street
2   about what you were gathering, correct?
3          A.   Yes, sir.
4          Q.   Another way would be through
5   comprehensive and expeditious P73s.
6          A.   Yes.
7          Q.   Another way would be through
8   comprehensive and expeditious witness statements.
9          A.   Yes.
10         Q.   Making sure that those things made
11  their way to the file so that officers working on a
12  homicide could learn about them, correct?
13         A.   Yes.
14         Q.   And it was particularly important to
15  make sure, if possible, that that information that
16  you were gathering made its way into the file or to
17  other officers on shift changes, correct?
18         A.    If they were present, yes.
19         Q.   You understood that it was very
20  important for you to make sure that, to the extent
21  a detective came on the next shift that was
22  investigating a homicide you were working on, they
23  were up to speed on the information that had been
24  gathered on your shift.
25         A.   Yes.



1    you were an experienced police officer, from that

2    time on, nobody ever criticized how you were

3    documenting interviews, correct?

4            A.    That's correct.

5            Q.    And nobody ever criticized how you were

6    conducting interrogations.

7            A.    Correct.

8            Q.    Or how you were documenting

9    interrogations.

10           A.    Correct.

11           Q.    You received nothing but positive

12   feedback from your supervisors concerning those

13   activities.

14           A.    Correct.

15           Q.    That would include in this case, the

16   Dixon case?

17           A.    Correct.

18           Q.    That would include the Epps case?

19           A.    Correct.

20           Q.    That would include the DeJac case?

21           A.    Correct.

22           Q.    That would include the Ortiz case.

23           A.    Correct.

24           Q.    In fact, it's your understanding that

25   to this day, your supervisors, including Lonergan,



1          BY MR. BRUSTIN:

2          Q.    Now, would it be fair to say that you

3    had a -- you were friends in 1991 with Lonergan and

4    Vickerd and Masecchia?

5          A.    Yes, that's accurate.

6          Q.    And you worked many cases together.

7          A.    Yes.

8          Q.    And you were very comfortable talking

9    to one another about evidence that you were

10   gathering and thoughts you had on a case, correct?

11         A.    Yes.

12         Q.    There was no ego involved.  You shared

13   information openly.

14         A.    Yes.

15         Q.    What was -- in 1991, what was the form

16   of communication you used with those officers when

17   you were in different places?

18         Was it radio?  You didn't have cell phones

19   then, right?

20         A.    We had cell phones and pagers.

21         Q.    Okay.

22         A.    And communications face-to-face,

23   talking on a telephone, or meeting with them.

24         Q.    Now, I asked you some questions earlier

25   about policies and procedures relating to



1        A.   I had never heard his name ever before
2   that happened.
3        Q.   Okay.  And the first -- the -- the
4   first time you learned of Valentino Dixon's name is
5   when Vickerd -- Vickerd came back after you had
6   interviewed Emil Adams and put together a photo
7   array with Valentino Dixon in it, correct?
8        A.   I don't know who put the photo array
9   together.
10        Q.   I can represent to you that he -- that
11   he testified that -- that's in the record.
12        A.   Okay.  I -- I would have to say you're
13   correct, but I don't know who put the array
14   together.
15        Q.   All right.  But the first knowledge
16   that Valentino Dixon was a suspect and the first
17   knowledge of him as a person was when the photo
18   array was shown to Emil Adams, correct?
19        A.   You are correct.
20        Q.   Now, at that time, you obviously,
21   either you or somebody else, did a -- a check into
22   Valentino Dixon and who he was, correct?
23        A.   I believe a check was done.  You are
24   correct.
25        Q.   All right.  And you came to learn that



 1        Q.   According to the reports, Detective
 2   Vickerd created the photo array.
 3        A.   Okay.
 4        Q.   And then according to this P73, you
 5   showed that photo array to Emil Adams, correct?
 6        A.   I believe it was Detective Vickerd.
 7        Q.   You don't believe you were even
 8   present?
 9        A.   I'd have to see the documents.  There's
10   a separate report for that.
11        Q.   There is.
12        A.   If I could see the document, I could
13   tell you --
14        Q.   Well, I can show you in a minute, but
15   are you -- are you --
16        A.   I don't remember.  I would -- if I
17   could look at the document, I'd be able to --
18        Q.   Hold -- hold on.
19        A.   Okay.
20        Q.   This says at the end of the statement a
21   photo array was shown to the witness.
22        Does that suggest to you, based on this
23   report, that you were present for that photo array?
24        A.   I don't -- I would have to -- to be 100
25   percent sure for you, I would -- all I have to do



1  is look at that form and I could tell you I'm a

2  hundred percent sure.

3         Q.   Well, I will represent to you you're

4  not mentioned in that form.  Does that mean that

5  you were not present, or it doesn't -- or it

6  doesn't suggest -- doesn't definitively state one

7  way or the other?

8         A.   It doesn't -- I -- it would not

9  definitively say whether or not I was there.

10        Q.   All right.  But certainly this report

11  suggests you were involved in the process, correct?

12        A.   Correct.

13        Q.   All right.  So whether you were present

14  for the entire photo array or not, you were

15  certainly involved.

16        A.   Correct.

17        Q.   And all of this is being done in the

18  homicide office, correct?

19        A.   I don't know.  Again, I didn't make the

20  photo array.

21        Q.   All right.

22        A.   I believe Detective Vickerd would be

23  the best one to answer that question.

24        Q.   All right.  Now, one basic -- so you

25  did know enough about the crime when you met with



1   Emil Adams to know that it was a late-night

2   shooting at -- at a location you were aware of,

3   correct?

4          A.    I worked in that precinct, yes.

5          Q.    Okay.  And that there were a number of

6   potential witnesses.

7          A.    Correct.

8          Q.    Now, one basic function -- withdrawn.

9          One basic task for a homicide detective,

10  when dealing with a homicide where there are

11  multiple witnesses, is to make sure that you are

12  segregating the witnesses when you're interacting

13  with them, correct?

14         A.    Correct.

15         Q.    So for example, there is no question,

16  although you probably don't remember it, that when

17  Emil Adams was -- between the time when Emil Adams

18  was being interviewed and when he was being shown a

19  photo array, he was segregated in the homicide

20  office.

21         A.    He was.

22         Q.    That would be a very important thing to

23  make sure happened, correct?

24         A.    It did happen.

25         Q.    Okay.  No doubt in your mind.



1          A.    No doubt in my mind.

2          Q.    There is no way that Emil Adams -- you

3    would allow Emil Adams to be contaminated, for

4    example, by other witnesses.

5          A.    Correct.

6          Q.    Now, if you'd take a look at page 47.

7          So this is Vickerd's P73.

8          A.    All right.

9          Q.    Basically that Vickerd -- you haven't

10   reviewed this in preparation for today?

11         A.    I have never seen this until now.

12         Q.    Okay.  And it makes clear that Vickerd

13   put the photo array together, correct?

14         Just read the first paragraph, first

15   sentence.

16         A.    I'm --

17         Q.    I'm just asking you -- I'm asking --

18         A.    I'm --

19         Q.    Sir, I'm not asking you to read it.

20   I'm not going to -- I'm not going to prevent you

21   from reading it.

22         MR. RUSS:  He's entitled to read it if he

23   wants to read it.

24         BY MR. BRUSTIN:

25         Q.    All I'm asking you right now is whether



1          Q.    What you know for sure is that in
2    between the time you -- you interviewed Adams and
3    this photo array, he would have been segregated,
4    correct?
5          A.    Correct.
6          Q.    And it appears that -- obviously, in
7    order to create a photo array, Vickerd must have
8    developed a suspect.
9          A.    Absolutely.
10         Q.    But you just didn't know anything about
11   it.
12         A.    Correct.
13         Q.    All right.  And in fact, if you look at
14   your report, the statement, page 30 to 32 -- which
15   you did review for today, correct?
16         A.    Yes, sir, I'm looking at it.
17         Q.    Now, this is the -- this is your --
18   this is the statement you took from Emil Adams.
19         A.    Yes, sir.
20         Q.    And by the way, it looks like it's a
21   verbatim transcript.
22         A.    What -- what do you mean by verbatim?
23   I'm sorry.
24         Q.    It looks like you're -- it looks like
25   you're writing down all the words you asked him --



1  all the questions you asked him and everything he

2  said, correct?

3          A.   I typed it.  I -- I would -- I would

4  formulate the sentence in my mind, type it, and

5  then ask it to him.

6          Q.   Okay.  And obviously, you had some

7  discussion with Emil Adams before and after this

8  statement was taken, correct?

9          A.   Yes.

10          Q.   Okay.  And you understood, as you told

11  us, that to the extent there was anything

12  substantive or -- anything substantive that was

13  different or additional as to what he reported

14  here, you had an obligation to put it down,

15  correct?

16          A.   You are correct.

17          Q.   So, for example, if you provided him

18  any additional information about this crime or a

19  suspect either before or after, you, of course, had

20  an obligation to document that.

21          A.   You are correct.

22          Q.   And one of the things we've been told

23  is that it's very important -- by a detective --

24  it's very important to put the time when an

25  interview starts and the time when it ends,



 1  correct?
 2         A.   You are correct.
 3         Q.   And sometimes you did that, and
 4  sometimes didn't, right?
 5         A.   You are correct.
 6         Q.   Is -- was that just -- is the absence
 7  of a starting time here just an error?
 8         A.   It is an error.  I was woke up.  You
 9  know, I -- I reported to the homicide squad at
10  two -- two o'clock in the morning.
11         Q.   Okay.  Well, I would -- I can represent
12  to you that the -- that almost all of your
13  interviews don't have a start time.  Is there a
14  reason for that?
15         A.   I have no idea.
16         Q.   Okay.  Now, my understanding -- correct
17  me if I'm wrong -- is that there -- there should be
18  a -- another version -- and Peter, maybe you can
19  help me with this.
20         Is -- there should be another version of
21  this report where there's an end time with a
22  picture of a clock on it?
23         A.   I have no idea what you're talking
24  about.
25         Q.   All right.  So -- all right.  Fair



1  your report.  You actually remember it.

2          A.    I remember interviewing Emil Adams.

3          Q.    Okay.  You remember him --

4          A.    And -- and then I also took a sworn

5  statement that he signed.

6          Q.    I understand, but -- so just to be

7  clear --

8          A.    Sure.

9          Q.    -- you took a sworn statement.  You

10  know how you did things, so that means that you're

11  telling us that's what -- that's how it happened,

12  but you actually, as you sit here today, can

13  picture in your mind sitting in a room with him.

14          A.    Yes.

15          Q.    Okay.  Now, you would agree that, to

16  the extent Emil Adams gave any substantive

17  information about what he saw or heard to Detective

18  Lockwood or any other officer, there should be a

19  report in the file.

20          A.    There should be.

21          Q.    And by the way -- withdrawn.

22          Now, going back to your report on page 30,

23  although you -- you may have been a little tired,

24  you were doing your very best to get as detailed an

25  account of what Emil Adams saw and heard as you

1   could, correct?

2        A.   Yes.

3        Q.   And in particular, you were -- you

4   were -- you were looking for things like as

5   detailed a description as possible about the

6   perpetrator that he saw, correct?

7        A.   Yes.

8        Q.   And you're looking for specific

9   characteristics, correct?

10       A.   Yes.

11       Q.   And I take it that you did a -- I think

12  you've already told us this, but you would have

13  done a preinterview before this, correct?

14       A.   Correct.

15       Q.   Where you talked generally about --

16  about what he saw and heard, correct?

17       A.   Yes, sir.

18       Q.   And the fact that there's no report of

19  that preinterview indicates that there was nothing

20  in that preinterview that you provided to him or

21  that he provided to you that was not part of this

22  statement, correct?  Nothing substantive.

23       A.   No.

24       Q.   You agree with me.

25       A.   I do.



1        Q.   All right.  And you see on page 31

2   the -- about ten lines down:  Can you tell me what

3   the person that had the TEC-9 looked like?

4        A.   I see it.

5        Q.   This is where he's describing the

6   person that he claims he saw commit the homicide,

7   correct?

8        A.   Correct.

9        Q.   One of the most important questions

10  you're asking.

11       A.   Correct.

12       Q.   And he gives a pretty detailed

13  description of the shooter, correct?

14       A.   He does.

15       Q.   Black male, heavyset, maybe about 20,

16  about six feet tall, correct?

17       A.   Correct.

18       Q.   Describing a -- he's describing a big

19  guy as the shooter, correct?

20       MR. RUSS:  Objection to form.  You may

21  answer.

22       THE WITNESS:  I don't think he's a big guy.

23       BY MR. BRUSTIN:

24       Q.   A black male, heavyset, right?  He's

25  describing a -- by the way, heavyset is probably



1  your interpretation of what he's telling you,

2  correct?

3          A.   It's his -- it's his words.

4          Q.   Oh, he used heavyset.

5          A.   Yes.

6          Q.   Okay.

7          A.   I mean, this -- this is his response.

8          Q.   Right.  What does heavyset mean?

9          A.   That he thought --

10         MR. RUSS:  Objection to form.  You may

11  answer.

12         THE WITNESS:  That he thought the guy was

13  heavyset.

14         BY MR. BRUSTIN:

15         Q.   What does heavyset mean?

16         MR. RUSS:  Objection to form.  You may

17  answer.

18         THE WITNESS:  That he's not skinny.

19         BY MR. BRUSTIN:

20         Q.   Yes, he's a big guy.

21         A.   I don't think he's big.

22         MR. RUSS:  Objection to form.  You may

23  answer.

24         BY MR. BRUSTIN:

25         Q.   It's the -- it's -- it's the opposite



```
 1            A.   Correct.
 2            Q.   And you are doing everything in your
 3    power to ascertain his reliability as an
 4    eyewitness, correct?
 5            MR. RUSS:   Objection to form, you may
 6    answer.
 7            THE WITNESS:   Correct.
 8            BY MR. BRUSTIN:
 9            Q.   Because the -- ultimately, any criminal
10    suspect has a right to that, correct?
11            A.   Correct.
12            Q.   It's your job to ascertain whether the
13    description he gives, for example, actually matches
14    the suspect, correct?
15            A.   Correct.
16            Q.   And it's your job to ascertain whether
17    or not this eyewitness actually was in a position
18    to observe the suspect, correct?
19            A.   Correct.
20            Q.   And it's your job to ascertain whether
21    or not this witness had anything that would impede
22    his ability to make an identification, correct?
23            A.   Correct.
24            Q.   Was he drunk, was he high, right?
25            A.   Correct.
```



1        Q.    And by the way, one of the basic things
2    you expect when you have young eyewitnesses for a
3    shooting that happened late at night at a popular
4    restaurant where everyone goes after partying all
5    night is whether or not they're under the influence
6    of drugs or alcohol, correct?
7        A.    Correct.
8        Q.    That's about as basic as it gets,
9    right?
10       A.    Yes.
11       Q.    And you understood that depending on
12   how much alcohol or drugs a witness consumed, that
13   could affect their ability to make an
14   identification, a reliable identification.
15       A.    Correct.
16       Q.    Why didn't you ask him any questions
17   about what he drank or smoked or took?
18       A.    I didn't think that he was intoxicated
19   or high.  He appeared in a normal fashion.  He
20   spoke like we're -- we're talking today.
21           He seemed like a pretty credible young kid.
22   I did not think -- I couldn't smell any marijuana.
23   I didn't think he was intoxicated, and I didn't
24   think he was high at all.
25       Q.    Okay.  By the way, do you remember all



1  truth were afraid to tell you the truth because

2  they didn't trust you.

3        A.    That's sometimes one of the reasons.

4        Q.    Now, you arrested Valentino Dixon,

5  right?

6        A.    Yes, sir, I did.

7        Q.    Fair to say at the time -- at the time

8  when you arrested him, Valentino Dixon could only

9  be described as extremely thin.

10       A.    He's thin.

11       Q.    150 pounds soaking wet, fair to say?

12       A.    That's -- that's about his weight, yes.

13       Q.    He was a very thin-framed man.

14       A.    He would be thin.

15       Q.    Skin and bones, right?

16       A.    I don't think he was skin and bones,

17  but he was thin.

18       Q.    And you also interviewed Lamarr Scott.

19       A.    Correct.

20       Q.    And you understand that Lamarr Scott

21  played linebacker for his high school football

22  team, right?

23       A.    No, I don't --

24       MR. RUSS:  Defensive end.

25       BY MR. BRUSTIN:



1          Q.    Defensive end.

2          A.    No, I don't know that.

3          Q.    All right.

4          A.    That's the first I've heard of it.

5          Q.    And you heard it wrong from me.  You --

6    he was a defensive end.  Claimed to be -- claimed

7    to be pretty good.

8          In any case, you remember him as a tall,

9    heavyset man, correct?

10         A.    I remember he was about six foot and

11   stocky.

12         Q.    Big guy.  Could have been 220.

13         A.    I don't know about that.  I may --

14   might say about 190, 195, but not -- not 220.

15         Q.    No?

16         A.    I'm just guessing.

17         Q.    All right.  But certainly he fit the

18   bill as a big, heavyset guy, fair to say?

19         A.    You are correct.

20         Q.    And you can -- and you can tell from

21   the picture of Valentino Dixon -- I can show it to

22   you, but I don't think I need to.

23         He looks extremely thin in the picture.

24         A.    You keep on --

25         MR. RUSS:  Objection to form.  You may

1   carry a gun?

2        Basic questions any trained homicide

3   investigator asks, right?

4        MR. RUSS:  Objection to form.  You may

5   answer.

6        THE WITNESS:  Yes, I would.

7        BY MR. BRUSTIN:

8        Q.   Okay.  And by the way, you had plenty

9   of time to do this interview.  Nobody was standing

10  over your shoulder saying you got to hurry, right?

11       A.   That's correct.

12       Q.   Nobody -- you have as much time as you

13  need to do this interview.

14       A.   Correct.

15       Q.   All right.  Now, he describes the

16  shooter at page 31 as black male, heavyset, six

17  foot tall, maybe about 20 years old, had a white

18  shirt and a white hat on, right?

19       A.   Where are we in the statement, please?

20       Q.   31.

21       A.   I'm on 31.  Where -- whereabouts?

22       Q.   About eight lines down.

23       A.   Okay.  I see that.

24       Q.   That's what he describes, right?

25       A.   Yes.

1          Q.    You've already told us that when you
2    saw him, you recognized that he was six foot or
3    taller and heavyset, correct?
4          A.    Correct.
5          Q.    And you asked him what he was wearing
6    that night, and he said, about five lines down,
7    white tee shirt, white hat, right?
8          A.    Yes.
9          Q.    And obviously, as soon as you -- when
10   you interviewed Lamarr Scott, you recognized at
11   some point -- withdrawn.
12          Certainly when Emil Adams identified
13   Valentino Dixon, within hours of him describing the
14   shooter as being heavyset, you recognized as a
15   trained detective that Valentino Dixon was thin and
16   not heavyset, correct?
17          A.    Yes.
18          Q.    And that, obviously, was a red flag for
19   you, correct?
20          A.    It was.
21          Q.    And obviously, that was something that
22   you were discussing with other officers at the
23   time.
24          A.    I didn't discuss that with other
25   officers at the time.



1        Q.   It was in your mind, but you didn't

2   tell anybody.

3        A.   That's correct.

4        Q.   All right.  And so -- but it was -- it

5   was something that you noticed.

6        A.   Correct.

7        Q.   All right.  And so when Lamarr Scott

8   came in four days later and not only was he -- did

9   he fit the physical description that Emil -- Emil

10  Adams had given of being -- about how tall he was

11  and being heavyset, he was wearing the same clothes

12  that Emil Adams described, correct?

13       A.   I don't know.

14       Q.   Well, I just -- you just -- you just --

15  I just showed you the two.

16       A.   I -- I know that, but you're showing me

17  Scott's.  I'll go back and look at --

18       Q.   Well, what was --

19       A.   -- Emil Adams where he -- he gives the

20  clothing.

21       Q.   Well, what he said was a white tee

22  shirt and white hat.

23       A.   Correct.

24       Q.   And so obviously, as a trained

25  detective, when Lamarr Scott came in and told you,



1   "It was me who did the shooting and not Valentino

2   Dixon," you made the connection, "Holy cow, he fits

3   the description that the eyewitness I interviewed

4   gave me."

5           A.    There's one --

6           MR. RUSS:  Objection to form.  You may

7   answer.

8           THE WITNESS:  Okay.  There's one small

9   portion that you're missing.

10          The white hat that you're talking about I

11  don't remember him wearing when he came in or when

12  he was brought in; however, the white hat that --

13  that the witness described had a blue or a black

14  rim around it.  It wasn't a white hat.

15          I don't know what -- I can't remember what

16  hat, but I didn't think that they were the same.

17          BY MR. BRUSTIN:

18          Q.    Okay.  So in other words, you went

19  through the process that I'm just describing to you

20  in your head.

21          In other words, you recognized -- you

22  recognized, "Yes, in fact, Emil Adams described the

23  guy I'm looking at except for the difference in the

24  hat," correct?

25          A.    Correct.



1        Q.   And so the combination of Valentino

2   Dixon -- withdrawn.

3        The combination of Emil Adams describing

4   someone who was much smaller (sic) than Valentino

5   Dixon, which you noticed, you said, at the time --

6        A.   Correct.

7        Q.   That combined with Emil Adams

8   describing even more precisely Lamarr Scott --

9   Lamarr Scott, who was coming in and confessing, was

10  an even bigger red flag, correct?

11       MR. RUSS:  Objection to form.  You may

12  answer.

13       THE WITNESS:  It was a flag, yes.

14       BY MR. BRUSTIN:

15       Q.   All right.  So in other words, when you

16  interviewed Emil -- when you interviewed Lamarr

17  Scott, you recognized in your mind, "Wow, I had a

18  concern that his description didn't match Valentino

19  Dixon when he ID'd him in the photo array, and now

20  I see that Emil Adams was actually describing, in

21  many respects, the person who's confessing in front

22  of me," correct?

23       MR. RUSS:  Objection to form.  You may

24  answer.

25       THE WITNESS:  I had some reason.



```
 1        BY MR. BRUSTIN:
 2        Q.   All right.  And before we take a lunch
 3   break, you -- please explain to us why those
 4   concerns and -- and that -- those observations
 5   appear nowhere in the police file.
 6        A.   That's because of the fact that
 7   Assistant District Attorney Christopher Belling
 8   came over, reviewed all the file at that particular
 9   time.  He looked at all the evidence that we had
10   collected, and he had discussed with us to -- to
11   let him go and that he had more information that he
12   was working on.
13        I don't know whether it was in the Grand
14   Jury or not, but it was the District Attorney's
15   request that we not arrest him for it, but he knew
16   about it.  There is -- there is no doubt in my mind
17   that he would have to know about that -- that white
18   hat and the description would match the description
19   prior and also the white hat.
20        But the white hat wasn't definitive.  It's
21   not a real big -- it's a big thing now --
22        Q.   All right.
23        A.   -- but it wasn't definitive.
24        Q.   Yes, I don't know what you're talking
25   about, but in any case, the --
```



1          A.   It wasn't the same type of hat.

2          Q.   Sure.

3          MR. RUSS:  Wait for the question.

4          BY MR. BRUSTIN:

5          Q.   So first of all, you understand that

6   you were the person in this case, of everybody else

7   in the case, who was in the very best position to

8   make the connection between Emil Adams and the

9   description of Lamarr Scott, correct?

10         A.   Correct.

11         MR. RUSS:  Objection to form.  You may

12  answer.

13         THE WITNESS:  Correct.

14         MR. RUSS:  You did answer.

15         BY MR. BRUSTIN:

16         Q.   You interviewed Emil Adams.

17         A.   Correct.

18         Q.   You interviewed Lamarr Scott.

19         A.   Correct.

20         Q.   You observed the photo array of

21  Valentino Dixon.

22         A.   I don't remember that.

23         Q.   You -- you at least saw the picture of

24  Valentino Dixon.

25         A.   I don't remember that.



1          A.    I'm -- I'm not following you at all,
2    and I -- I hate to say this again, but when you say
3    if I saw the photo array, there's two parts to the
4    photo array.  There's the actual affidavit and the
5    physical photo array itself.
6          I don't ever remember seeing the photo
7    array.  That would be the pictures.
8          Q.    All right.  You just told us, sir,
9    under oath that you may well have been present when
10   that photo array was shown --
11         A.    I may have been.
12         Q.    I'm not done with my question.
13         A.    Well, then, you can finish your
14   question.
15         Q.    So you may -- you may well -- this is
16   better.
17         A.    It's really good for you.
18         Q.    This is the real -- the real -- the
19   real Detective Stambach.
20         MR. RUSS:  All right, look.  If you want to
21   ask a question, ask a question.  If you want to
22   argue, we're not doing that.
23         BY MR. BRUSTIN:
24         Q.    Is this how you -- okay.  Is this how
25   you react when you get angry?



1          MR. RUSS:  Objection to form.  Don't answer.

2          BY MR. BRUSTIN:

3          Q.   All right.  You just told us that you

4   may well have been present when the photo array was

5   shown to Mr. -- Mr. Adams, correct?

6          A.   Could you repeat that question for me?

7          Q.   You've told us repeatedly under oath --

8          A.   Could she repeat the question to me,

9   please?

10         Q.   I'm repeating it to you.

11         A.   Please do so.

12         Q.   You just told us that you may well have

13  been present when the photo array of -- of

14  Mr. Dixon, including Mr. Dixon, was shown to

15  Mr. Adams.  Do you recall that?

16         A.   I do recall that, yes.

17         Q.   Are you now changing that testimony and

18  claiming that you never saw that photo array?

19         A.   No, I'm not changing it.  It's

20  different.

21         Q.   All right.  You've also told us that

22  the night of the 10th, you made the connection in

23  your mind that Valentino Dixon did not match the

24  description that Emil Adams had given in terms of

25  size, correct?



1          A.    You're correct.

2          Q.    And you've also told us that you

3    recognized even further, when you interviewed

4    Lamarr Scott, that in many respects, the

5    description Emil Adams gave matched Lamarr Scott,

6    correct?

7          A.    Correct.

8          Q.    And you were in the best position to

9    make those observations of all of the detectives on

10   the case, correct?

11         MR. RUSS:  Objection to form.  You may

12   answer.

13         THE WITNESS:  I would have an opinion on it,

14   yes.

15         BY MR. BLENK:

16         Q.    All right.  And as you sit here today,

17   you have no recollection of raising that issue with

18   DA Belling, correct?

19         MR. RUSS:  Objection to form.  You may

20   answer.

21         THE WITNESS:  I don't remember.

22         BY MR. BRUSTIN:

23         Q.    Fair to say that to the best of your

24   recollection, you never discussed that with DA

25   Belling.



1          A.   I don't remember.

2          Q.   You certainly have no memory of doing

3     it, correct?

4          A.   I don't remember.

5          Q.   Okay.

6          MR. BRUSTIN:  I think now is a good time for

7     a lunch break.

8          (A luncheon recess was then taken at

9     1:08 p.m.)

10         (On the record: 2:07 p.m.)

11         BY MR. BRUSTIN:

12         Q.   Okay.  Detective Stambach, you've

13    already told us that you were responsible for Emil

14    Adams during the early morning hours of the night

15    of the shooting, the morning after the shooting,

16    correct?

17         A.   Yes, sir.

18         Q.   And at all times, he was segregated in

19    the homicide office, correct?

20         A.   That's correct.

21         Q.   And at all times, you had eyes on him

22    during those hours when you were interviewing him

23    and when he was shown photo arrays, correct?

24         A.   No, I would say when he was discharged

25    from either the photo array or the sworn statement,



```
 1   he was placed somewhere for transport.

 2          I don't know who transported him, and I

 3   don't know what time he left.

 4          Q.   All right.  Take a look at page 25 of

 5   your report.  Page 25 of your report.

 6          MR. RUSS:  Of Exhibit 2?

 7          MR. BRUSTIN:  Yes, please.

 8          THE WITNESS:  I'm -- I'm sorry, what page

 9   are you --

10          BY MR. BRUSTIN:

11          Q.   Page 25.

12          A.   All right.

13          Q.   And you see the paragraph beginning at

14   the end of the statement?

15          A.   Yes, sir.

16          Q.   Okay.  And with this statement here,

17   you are describing the exact words that Emil Adams

18   spoke when he made the identifications, correct?

19          You quote him.

20          A.   That is correct.

21          Q.   All right.  And that suggests that you

22   at least were close enough to hear those words,

23   correct?

24          A.   Yes, sir.

25          Q.   Another indication that you were
```



1   present for the photo array, correct?

2          A.   Well, again, it could have been from

3   the writing on the photo array.  He might have --

4   that would be his response that's in the affidavit,

5   I believe.

6          Q.   All right.  But the photo array surely

7   would have taken place in the homicide office,

8   correct?

9          A.   Oh, yes, it would have.

10         Q.   And you were right there.

11         A.   I was there that day.

12         Q.   All right.  And you were responsible --

13  you were obviously interested in what Emil Adams

14  was doing, the person you just interviewed,

15  correct?

16         A.   Yes, sir.

17         Q.   So certainly either -- whether you

18  were -- lots of reason to believe that you observed

19  the photo array, correct?

20         A.   I -- again, I'm not 100 percent sure on

21  that.  I'm sorry.

22         Q.   But lots of evidence suggesting that

23  you did, correct?

24         A.   Yes, sir.

25         Q.   And one of the reasons -- by the way,



 1  Emil Adams, you understood, both based on your

 2  interview and what you learned afterward, was an

 3  important witness in this case, correct?

 4          A.   Yes, he was.

 5          Q.   He didn't have any direct ties to -- or

 6  any -- any familial ties to any of -- either of the

 7  groups involved in the shooting, correct?

 8          A.   I don't know that.

 9          Q.   You told us he appeared to be not

10  intoxicated.

11          A.   Yes, sir.

12          Q.   Appeared to be a credible eyewitness.

13          A.   Yes, sir.

14          Q.   As important a witness as there was in

15  this case, correct?

16          A.   Yes, sir.

17          Q.   And so one of the reasons why -- one of

18  the reasons why you are convinced that Emil

19  Adams -- withdrawn.

20          One of the reasons why you are convinced

21  today that Valentino Dixon shot and killed Torri

22  Jackson is because of the positive ID that Emil

23  Adams made, correct?

24          A.   Yes, sir.

25          Q.   And you understand that, assuming



1          Q.   So let's -- let's be a little more
2     specific.
3          A.   Okay.
4          Q.   So first of all, to the extent that
5     anybody showed photographs to Emil Adams that night
6     in the homicide office, you would have been in a
7     position to see it, correct?
8          A.   I would have, yes.
9          Q.   All right.  And so -- first of all, I
10    take it that you deny showing Emil Adams three
11    individual photographs of Mario Jarmon, Valentino
12    Dixon, and a third person from the scene that
13    night, correct?
14         A.   I deny that.
15         Q.   And if Emil Adams said that, he is
16    either lying or mistaken.
17         MR. RUSS:  Objection to form.  You may
18    answer.
19         THE WITNESS:  He would be lying.
20         BY MR. BRUSTIN:
21         Q.   Okay.  And if anybody had shown Emil
22    Adams that early -- in the early morning hours a
23    picture of Mario Jarmon, Valentino Dixon, and a
24    third person at the scene, you would have been in a
25    position to see it, correct?



 1          A.   Yes, sir.

 2          Q.   And if you failed -- if you saw it and

 3   failed to report it, that would be exactly as -- it

 4   would be the same level of seriousness as if you

 5   did it yourself, correct?

 6          A.   It would be horrible.  It wouldn't be

 7   done.

 8          Q.   Because you would never -- you would

 9   never fabricate evidence, correct?

10          A.   That is correct.

11          Q.   You would never use that kind of

12   suggestion.

13          A.   No, I would not.

14          Q.   And you would agree that whether --

15   whether Emil Adams was shown those three individual

16   photographs before or after the identification

17   procedure, it would be severe misconduct.

18          A.   It would be.

19          MR. RUSS:  Objection to form.  You may

20   answer.

21          THE WITNESS:  It would be.  It would.

22          BY MR. BRUSTIN:

23          Q.   It would be highly suggestive?

24          A.   It would be horrible.  It would be

25   illegal.



1          Q.    Okay.

2          A.    It would be suggestive, yes.

3          Q.    Okay.  And it would be a Constitutional

4    violation?

5          A.    Yes, sir.

6          Q.    It would be Brady material?

7          A.    Yes, sir.

8          Q.    All of those things, correct?

9          A.    Correct.

10          Q.    And that never happened.

11          A.    It did not happen.

12          Q.    And you do -- you recall -- you recall

13    seeing some questioning earlier that I showed you

14    regarding Mario Jarmon, correct?

15          A.    Mario Jarmon.

16          Q.    I asked you -- asked you why you hadn't

17    followed up with him --

18          A.    Yes.

19          Q.    -- about that?

20          A.    Yes.

21          Q.    How they knew each other?

22          A.    Yes.

23          Q.    Okay.  If -- if Emil Adams were to

24    testify that you told him that Mario Jarmon was a

25    criminal, he would be lying about that, too,



 1  correct?

 2       MR. RUSS:  Objection to form.  You may

 3  answer.

 4       THE WITNESS:  I don't know what I told him.

 5  I don't even think I mentioned anything about Mario

 6  Jarmon.

 7       BY MR. BRUSTIN:

 8       Q.   Okay.

 9       A.   I'm not sure.

10       Q.   And it would never be appropriate, for

11  example, for you to be showing him a picture of

12  Mario Jarmon, a picture of Valentino Dixon, and a

13  picture of a third person and to suggest to him

14  that Mario Jarmon was a criminal, correct?

15       A.   I've --

16       MR. RUSS:  Objection to form.  You may

17  answer.

18       THE WITNESS:  I've answered that.  I would

19  not do it, and it didn't -- it didn't happen.

20       BY MR. BRUSTIN:

21       Q.   That would be inappropriate for many

22  reasons, correct?

23       A.   You are --

24       MR. RUSS:  Objection to form.  You may

25  answer.

1         THE WITNESS:  My answer is yes, it would be

2    inappropriate.

3         BY MR. BRUSTIN:

4         Q.   And you deny doing that?

5         A.   I did not do that.

6         Q.   You deny hearing it?

7         A.   I deny hearing it.

8         Q.   And if that happened in the early

9    morning hours during the interview or the photo

10   array procedures, you would have been in a position

11   to hear it, correct?

12        A.   Yes, sir.

13        Q.   Now, you would agree, though, that to

14   the extent, hypothetically, Emil Adams was shown

15   an -- an individual picture of Mario Jarmon, an

16   individual picture of Valentino Dixon, and an

17   individual picture of a third person, that would be

18   an explanation as to why he would have identified

19   Valentino Dixon even if he was not the shooter,

20   correct?

21        MR. RUSS:  Objection to form.  You may

22   answer.

23        THE WITNESS:  He was only shown, I believe,

24   a picture of who Mario was by me.

25        BY MR. BRUSTIN:



1          Q.   Sir, I'm -- I'm suggesting you're

2     lying, okay?  Emil Adams -- Emil Adams has stated

3     on record that he was shown three photos.  That's

4     why I'm reading you that information.

5          A.   I understand.

6          Q.   So now I'm asking you to assume that

7     Emil Adams is telling the truth, okay?  I know you

8     deny it, but I'm asking you to assume it's true.

9          You with me?

10         A.   I am with you.

11         Q.   All right.  Assuming Emil Adams is

12    telling the truth and he was shown a picture of

13    Valentino Dixon along with two other people from

14    the scene before the photo array, that would be the

15    kind of suggestion that could lead to a false

16    identification, correct?

17         A.   Yes.

18         MR. RUSS:  Objection to form.

19         THE WITNESS:  Yes.

20         BY MR. BRUSTIN:

21         Q.   Now, remember when I showed you the

22    question -- take a look at page 30, and you see the

23    questions:

24         Do you know Mario?

25         Answer:  Yes, I do.



1      Q.    203 is you conducting an investigation
2  on this case, correct?
3      A.    Yes, it refers back to Torriano
4  Jackson.
5      Q.    Okay.  And this is you doing what
6  homicide detectives often do, receiving information
7  in a homicide case and following up on it, correct?
8      A.    Correct.
9      Q.    Don't need a DA to tell you to do it.
10  You do it on your own.  That's what -- that's what
11  homicide detectives do, correct?
12      A.    Yes, sir.
13      Q.    And that's what this report indicates,
14  correct?
15      A.    Yes.
16      Q.    And you got an anonymous -- you got an
17  anonymous call suggesting that she had -- that she
18  was an eyewitness, correct?
19      A.    Yes, sir.
20      Q.    And that Valentino was not the shooter.
21      A.    Correct.
22      Q.    And claiming that she was with two
23  other girls.
24      A.    Correct.
25      Q.    And then you asked her if she was the



1  girl from the red Tracker, correct?

2          A.   Yes.

3          Q.   In other words, you recognized -- you

4  remembered from seeing prior reports or receiving

5  information about girls who were at a red Tracker.

6          A.   Yes.

7          Q.   And you had the names of those girls in

8  the report.

9          A.   Yes.

10         Q.   And so if she was one of three girls in

11 the red Tracker in August of 1991, as a homicide

12 detective, it would be very easy for you to find

13 out who that girl was, correct?

14         A.   Correct.

15         Q.   And you took no steps to do that,

16 correct?

17         A.   That's correct.

18         Q.   Why not?

19         A.   I have no idea.

20         Q.   Is that a -- obviously, when you --

21 after you had Lamarr Scott confessing to the crime

22 and you have a new witness who claims she was an

23 eyewitness to the scene, a girl who you hadn't

24 heard of before, what could be more important than

25 trying to find her?



 1        A.   Well --
 2        MR. RUSS:  Objection to form.  You may
 3  answer.
 4        THE WITNESS:  The first thing is to issue
 5  this report and give this report to the District
 6  Attorney.
 7        BY MR. BRUSTIN:
 8        Q.   Well --
 9        A.   I don't know when the trial was, if
10  they were preparing for the trial, but I did not do
11  anything further on it.
12        Q.   Do you think they were preparing for
13  the trial on August 14th?
14        A.   I have no --
15        Q.   The trial was a -- more than a year
16  later.
17        A.   I have no idea.
18        Q.   Obviously, this is something you should
19  have followed up on, correct?
20        A.   You are correct.
21        MR. RUSS:  Objection to form.  You may
22  answer.
23        BY MR. BRUSTIN:
24        Q.   If you were -- if you were acting in
25  accordance with your practices, a conscientious,



 1  careful detective, you would have followed up on
 2  this, correct?
 3        A.   Yes, sir.
 4        Q.   You didn't need anybody to tell you to
 5  do that.  It's very basic as a detective, correct?
 6        A.   Yes, sir.
 7        Q.   Can you think of any legitimate police
 8  reason in August of 1991 why you wouldn't have
 9  followed up with an eyewitness who says -- who
10  said -- says you have the wrong witness?
11        MR. RUSS:  So I thought we were talking
12  about the December report.
13        MR. BRUSTIN:  We're not.  We're talking
14  about page 203.
15        THE WITNESS:  Yes, this is in -- this is in
16  August.
17        MR. RUSS:  Okay.  I'm sorry.
18        BY MR. BRUSTIN:
19        Q.   We haven't gotten there yet.
20        A.   Yes.  I have no idea.
21        Q.   Okay.
22        A.   I'm -- I'm very sorry.  I don't know if
23  we were extremely busy; we had new cases; we were
24  busy running around taking statements, going to
25  crime screens.  I have no idea why we didn't follow

 1  up on this.
 2       Q.   You said you're very sorry.  Who are
 3  you -- who are you apologizing to?
 4       A.   Well, the victim.
 5       Q.   Ah.  Not to Mr. Val -- not to Mr.
 6  Dixon.
 7       A.   Well, I -- I would do the best job I
 8  could, and if Mr. Dixon did not do this shooting, I
 9  would say so.
10       Q.   Okay.  And this is an eyewitness --
11       A.   Yes.
12       Q.   -- who -- who you know from prior
13  reports -- listen to my question -- who you know
14  from prior reports has allegedly no connection to
15  either group involved in this case, who's calling
16  you on her own, correct?
17       A.   Correct.
18       Q.   And you have an -- you have many easy
19  avenues to find her, correct?
20       A.   Correct.
21       Q.   And as you've already told us,
22  oftentimes witnesses are reluctant to come forward,
23  correct?
24       A.   You are correct.
25       Q.   And they need to be -- they need to be



1  handled gently and over time to give them the
2  confidence to tell the truth, correct?
3          That's the job of a detective.
4          A.    That would be accurate, yes.
5          Q.    And you know that she wants to do the
6  right thing here because she called, correct?
7          A.    Correct.
8          Q.    And first of all, the first thing you
9  say to her -- and you write it in your report --
10 was that you told her that if she witnessed the
11 crime, she would have to come in and identify
12 herself, correct?
13         A.    Yes.
14         Q.    That's a surefire way of getting her
15 not to talk anymore, isn't it?
16         MR. RUSS:  Objection to form.  You may
17 answer.
18         THE WITNESS:  No, that's not -- not -- I was
19 telling her the truth.
20         BY MR. BRUSTIN:
21         Q.    Okay.  In any case, what a competent
22 detective would do here, which you claim you are,
23 would be to find this woman, correct?
24         A.    Correct.
25         Q.    And to try to develop a rapport with



 1 | her, correct?
 2 |         A.    Correct.
 3 |         Q.    Try to make her comfortable that you
 4 | could protect her and she should come in and tell
 5 | the truth, correct?
 6 |         A.    Yes.
 7 |         Q.    You took zero of those steps, correct?
 8 |         A.    I did not follow up.
 9 |         Q.    And this is only four days after the
10 | crime.
11 |         A.    You are correct.
12 |         Q.    And two days after Lamarr Scott
13 | confessed to the crime.
14 |         A.    You are correct.
15 |         Q.    The reason you didn't follow up with
16 | this woman is because you understood that you had
17 | engaged in misconduct with Emil Adams; you
18 | understood that Lamarr Scott was the shooter; and
19 | you did not want to do anything to upset the arrest
20 | of Valentino Dixon.
21 |         Isn't that true, sir?
22 |         A.    No.
23 |         MR. RUSS:  Objection to form.
24 |         THE WITNESS:  No.
25 |         MR. RUSS:  You may answer.



 1  report -- at least it appears from this report that
 2  this woman has nothing to do with that dispute.
 3          A.   I don't know that.
 4          Q.   Well, there's nothing suggesting here
 5  that she does, correct?
 6          A.   I don't know that.
 7          Q.   Right.  But this -- this person has the
 8  potential to be a very reliable, credible
 9  eyewitness, correct?
10          A.   Correct.
11          MR. BLENK:  Form.
12          BY MR. BRUSTIN:
13          Q.   And by the way, have you ever had a
14  case before this one where you made an arrest based
15  on an eyewitness identification, and then two days
16  later, somebody else came in and confessed to doing
17  the crime?
18          A.   Could you repeat that question again?
19          Q.   Sure.  Other than this case, have you
20  had any other case where you made an arrest based
21  on eyewitness identifications, and then within a
22  day or two, another person came in and voluntarily
23  confessed that they were the person who committed
24  the crime?
25          A.   No.



```
 1        Q.   It's an extraordinarily unusual
 2   situation, correct?
 3        MR. RUSS:  Objection to form.  You may
 4   answer.
 5        BY MR. BRUSTIN:
 6        Q.   In your experience.
 7        A.   It would be.
 8        Q.   In all of your time in the police
 9   department, has it ever happened again?
10        A.   It's hypothetical.  I don't know.
11        Q.   It's not hypothetical.  Have you ever
12   seen it happen?
13        A.   No.
14        Q.   And obviously, there are a lot of
15   possibilities as to why somebody might confess to a
16   crime they didn't commit, correct?
17        A.   Correct.
18        Q.   But absent mental illness or --
19   withdrawn.  People don't typically come in and
20   confess to murders they don't -- they didn't commit
21   if though don't have some type of mental
22   impairment, correct?
23        MR. BLENK:  Form.
24        MR. RUSS:  Objection to form.  You may
25   answer.
```



 1        THE WITNESS:  I'd have to have that read
 2   back to me again.
 3        BY MR. BRUSTIN:
 4        Q.   You don't have to have it read back.
 5   I'll -- if you want --
 6        A.   I believe I do.  Please.
 7        Q.   No, I'm going to -- I'm going to
 8   rephrase it for you.
 9        Typically, in your experience, people don't
10   come in and voluntarily confess to committing
11   murders that they didn't commit unless they have
12   some type of mental impairment.
13        MR. RUSS:  Objection to form.
14        MR. BLENK:  Form.
15        MR. RUSS:  You may answer.
16        THE WITNESS:  I don't know.
17        BY MR. BRUSTIN:
18        Q.   Okay.  Have you had -- in your entire
19   career, have you had anybody come in and confess to
20   a murder that wasn't the result of some type of
21   mental illness?
22        MR. RUSS:  Objection to form.
23        MR. BLENK:  Form.
24        MR. RUSS:  You may answer.
25        BY MR. BRUSTIN:



1        Q.   I'm sorry.  Let me rephrase the

2   question.

3        In your experience as a detective, in your

4   30 years -- 30 or more years as a -- 35 years as a

5   police officer, do you recall anybody coming in

6   and -- and confessing to a homicide that they

7   didn't commit for reasons other than mental

8   illness?

9        MR. BLENK:  Form.

10       MR. RUSS:  Go ahead.

11       THE WITNESS:  No.

12       BY MR. BRUSTIN:

13       Q.   Okay.  It's an extraordinary, unusual

14   situation, correct?

15       A.   Yes.

16       Q.   And when somebody comes in and

17   confesses to a murder after you've arrested

18   somebody else for that murder -- you with me?

19       A.   Yes.

20       Q.   This case.  That's what happened,

21   right?

22       A.   Okay.  I'm listening to you.

23       Q.   That confection requires the most

24   stringent follow-up investigation, correct?

25       MR. RUSS:  Objection to form.  You may



1  with this alleged eyewitness for four months in a
2  homicide case is because you were really busy.
3          MR. RUSS:  Objection to form.  You may
4  answer.
5          THE WITNESS:  That's correct.
6          BY MR. BRUSTIN:
7          Q.   All right.  That's your testimony under
8  oath.
9          A.   It is.
10         Q.   All right.  Now, you understand how
11  absurd that is, right?
12         MR. RUSS:  Objection to form.  Don't answer.
13         BY MR. BRUSTIN:
14         Q.   You understand how important it is to
15  find and interview an eyewitness as soon as
16  possible after the crime, correct?
17         MR. RUSS:  Objection to form.  You may
18  answer.
19         THE WITNESS:  It is important.
20         BY MR. BRUSTIN:
21         Q.   And you understand how important it is,
22  to the extent that a witness can make an ID, to
23  show that witness photographs or a live lineup as
24  soon as practicable after you become aware of that
25  witness, correct?



```
 1        A.   Yes.
 2        MR. RUSS:  Objection to form.  You may
 3 answer.
 4        BY MR. BRUSTIN:
 5        Q.   Again, as basic as it gets for a
 6 detective, right?
 7        MR. RUSS:  Objection to form.  You may
 8 answer.
 9        THE WITNESS:  You are correct.
10        BY MR. BRUSTIN:
11        Q.   The last thing you would ever do as a
12 detective acting in good faith is wait four months
13 to interview an eyewitness and attempt to make an
14 ID, correct?
15        MR. RUSS:  Objection to form.  You may
16 answer.
17        THE WITNESS:  It was a mistake, and I admit
18 it.
19        BY MR. BRUSTIN:
20        Q.   Do you have any recollection of how you
21 noticed this mistake or who -- who -- who brought
22 it to your attention?
23        A.   You just did.
24        Q.   Well, the -- somehow you came to go
25 find her, or try to find her, four months later,
```



 1  correct?

 2       A.   Yes.

 3       Q.   And that was long after it was

 4  public -- it was made public that despite Lamarr

 5  Scott coming in and confessing, the prosecution was

 6  going forward against Valentino Dixon, correct?

 7       MR. RUSS:  Objection to form.  You may

 8  answer.

 9       THE WITNESS:  That would be correct.

10       BY MR. BRUSTIN:

11       Q.   It was all over the papers, right?  Big

12  news.

13       A.   I don't know.

14       Q.   You remember it being in the newspapers

15  and on the news about the -- about the -- about

16  Lamarr Scott's confession and about this case?

17       A.   I remember a photo clip.  A television

18  reporter was interviewing Mr. Lamarr Scott when we

19  picked him up and placed him into a police car.

20       Q.   Okay.  And do you remember whether or

21  not indictments had gone down against people for

22  allegedly lying about Lamarr Scott being the

23  shooter?

24       A.   No.

25       Q.   One of the things that Emil Adams



1  testified to at the Grand Jury was that he observed

2  the shooting from across the street behind a metal

3  barrier -- barrier around the parking lot.  Okay?

4        A.    All right.

5        Q.    And would you agree that -- that that

6  type of description as to where he was standing

7  might suggest that there was -- that he not might

8  not have a good ability to see?

9        A.    You have a good view of everything that

10 happens at that -- you have a good view of

11 everything that happens at that corner.

12       Q.    If he was standing behind a metal

13 barrier in the parking lot, that's the kind of

14 information that might suggest his view was

15 blocked, correct?

16       A.    His view was not blocked.

17       Q.    Well, you never asked him that, right?

18       A.    I -- I've lived next to that parish,

19 that priest -- I mean, that -- that church.  I went

20 to school in that neighborhood.  I know that

21 parking lot.

22       I know that he would not be obscured from

23 witnessing anything by a barrier.  The barrier is

24 six to 12 inches high.  It's to keep cars from

25 running out of the parking lot.



1  on you to tell them about any problems, correct?

2         A.   We called them and asked them to come

3  to the office.

4         Q.   Okay.  And you understood it was your

5  job, as you told us earlier, to tell them about any

6  problems in the case, correct?

7         A.   It would be, yes.

8         Q.   All right.  And the basis for the

9  complaint here -- the entire basis for the

10 complaint here is John Sullivan, correct?

11        The fact that you know there was a shooting

12 and a death and John Sullivan.

13        MR. BLENK:   Form.

14        BY MR. BRUSTIN:

15        Q.   Did I accurately describe it?

16        A.   It's in -- it's in the section under

17 murder in the second degree.

18        Q.   So the only evidence that you put in

19 support of the arrest is John Sullivan, correct?

20        A.   Yes.

21        Q.   No mention of Emil Adams.

22        A.   There is no mention.

23        Q.   Okay.  And is that because you

24 understood at the time that there were problems

25 with Emil Adams' ID, including that you had



1  utilized suggestion and coercion with him?

2      MR. RUSS:  Objection to form.  You may

3  answer.

4      THE WITNESS:  No, that's incorrect.

5      BY MR. BRUSTIN:

6      Q.  So why didn't you put in this arrest

7  complaint the positive identification from Emil

8  Adams?

9      A.  This was the information I was given

10  for -- by the District Attorney, Mr. Belling, to

11  place into the -- to the information that we were

12  charging with.

13      Q.  You -- you don't even remember if you

14  met with Belling.  How do you know Belling told you

15  to do that?

16      A.  Because that's our -- that was my

17  procedure.  When I charged someone, Mr. Belling

18  would have told me what section of -- how to charge

19  him and what the narrative would be.

20      Q.  You've already told us you're not sure

21  if you met with Belling.  Why do you keep saying

22  Belling?

23      A.  Because Belling was there on this

24  particular day.  I'm not sure as to the very first

25  conversation or who was around for --

1      Q.    This -- this document --

2      A.    Hang -- hang on one second, please.

3      Q.    Look at the date on the document.

4      A.    Okay.  I am -- you're -- you're a

5  hundred percent right.  I'm getting a little

6  confused here.

7       On this particular one, I'm not sure which

8  District Attorney told me to use this narrative,

9  whether it would be Mr. Sedita or Mr. Belling.

10      Q.    So one of them told you.  Obviously you

11  would have informed them about the positive

12  identification you claim from Emil Adams, correct?

13      A.    They would have known about it because

14  they would have read the file before we got to this

15  portion.

16      Q.    Well, whether they would have read the

17  file or not, you would have told them about it.

18  You'd just done it, correct?

19      A.    I wouldn't have told them.  I asked

20  them to read his statement.  They would read the

21  statement.  They'd say, "You have enough.  Do

22  this."

23      Q.    Detective Stambach, you've already told

24  us that the process was you would meet with the

25  busy District Attorney who came down to authorize



1 the arrest, and you would give them a summary of

2 the evidence you had gathered.

3      Do you remember saying that?

4      A.   Yes.

5      MR. RUSS:  Objection to form.  You may

6 answer.

7      BY MR. BRUSTIN:

8      Q.   And so you would have mentioned --

9      A.   Stop.  Can I answer that?

10      I know exactly what you're saying.  The

11 summary that I gave him was "Here is the statement

12 that I took.  There's the file.  What do you want

13 us to do?"

14      BY MR. BRUSTIN:

15      Q.   And so for whatever reason, they --

16 they instructed you not to put in the Emil Adams

17 positive ID.

18      A.   They did not do that.

19      Q.   Why is it in here?

20      A.   I have no idea.  You would have to ask

21 Mr. Belling or Mr. Sedita.

22      Q.   Okay.  But it wasn't your decision, is

23 what you're saying.

24      A.   Oh, absolutely not.

25      Q.   All right.  Now, in order for you to



```
1   for a homicide detective before asking for an
2   arrest, correct?
3           A.   You are correct.
4           Q.   All right.  And so if you were doing
5   your job, you would have read these statements,
6   correct?
7           MR. RUSS:  Objection to form.  You may
8   answer.
9           THE WITNESS:  Correct.
10          BY MR. BRUSTIN:
11          Q.   Do you have any reason to believe that
12  you -- that you didn't read these statements?
13          A.   No.
14          Q.   And one of the things you would be
15  reading these statements for were -- would be to
16  see whether or not John Sullivan was a reliable
17  witness, correct?
18          A.   Correct.
19          Q.   Because, as you told us, it's very
20  important, when you're assessing whether somebody
21  should be arrested for a murder, to critically
22  review the evidence before asking the DA for an
23  arrest, correct?
24          A.   Yes.
25          MR. RUSS:  Objection to form.
```



1    answer.

2              THE WITNESS:  Sure.  I've read it.

3              BY MR. BRUSTIN:

4         Q.   Okay.  So you would agree that the

5    description here is radically different than what

6    he describes in the interview, correct?

7              MR. RUSS:  Objection.

8              BY MR. BRUSTIN:

9         Q.   No mention of a van, no mention of

10   seeing him get the gun, correct?

11             MR. RUSS:  Objection to form.  You may

12   answer.

13             THE WITNESS:  I don't think it's radical,

14   but I think that it's different.

15             BY MR. BRUSTIN:

16        Q.   Okay.  In other words, he is here

17   describing in the Q&A not seeing the person he

18   identifies as Valentino Dixon and not seeing the

19   gun until just before the shooting, correct?

20        A.   You are correct.

21        Q.   That is a -- a major inconsistency;

22   would you agree, sir?

23        A.   It's an inconsistency.

24        Q.   All right.  And obviously something

25   that, had you read these, as a trained detective,



1  you would have noticed.

2         A.    You are correct.

3         Q.    And so presumably, this is something

4  you raised with the DA when you met with them,

5  correct?

6         MR. RUSS:  Objection to form.  You may

7  answer.

8         THE WITNESS:  I don't know if I did that or

9  not.

10        BY MR. BRUSTIN:

11        Q.    Maybe just a mistake?  You didn't

12  notice it?

13        MR. RUSS:  Objection to form.  You may

14  answer.

15        THE WITNESS:  I don't know if I did that or

16  not.

17        BY MR. BRUSTIN:

18        Q.    Now, by the way, if you take a look at

19  the second part of this, this statement includes

20  the ID procedure that was done with John Sullivan,

21  correct?

22        MR. RUSS:  What's the second part?

23        MR. BRUSTIN:  Page 77.  The second part

24  of the -- second page of the statement.

25        BY MR. BRUSTIN:



1          Q.    It documents the actual ID procedure,
2   correct?
3          A.    In other words, it -- it describes?
4          Q.    It actually does a Q&A during the ID
5   procedure, correct?
6          A.    It would be an ID procedure in the
7   sworn statement, yes.
8          Q.    Okay.  And why wasn't that done -- why
9   wasn't there a sworn statement done in connection
10  with the Emil Adams ID procedure like this?
11         A.    He did describe -- Emil Adams did
12  describe two people.
13         Q.    My question is why isn't there a Q&A
14  for the actual ID procedure as there is here, a
15  sworn statement for the ID procedure.
16         A.    It's -- it's in his statement.
17         Q.    The actual ID procedure is not.
18         A.    Not that specific way, but he does
19  describe the two people.
20         Q.    No, my question is why isn't the ID
21  procedure --
22         A.    It didn't have to be done.  He had
23  already done it.
24         Q.    All right.  Now, obviously, that's the
25  kind of contradiction that you, as a homicide



1  detective, would want to explore with the witness,

2  correct?

3         A.    Yes.

4         Q.    You want to know whether that was an

5  innocent mistake or whether or not it actually

6  indicates that he was unreliable.

7         A.    Yes.

8         Q.    In other words, John Sullivan should

9  have been interviewed again and questioned about

10  these inconsistencies, correct?

11         A.    Yes.

12         Q.    And as the person who was responsible

13  for presenting information to the DA on the arrest,

14  including about John Sullivan, you would have

15  shared responsibility for doing that, correct?

16         A.    I would be one of the members, yes.

17         Q.    And the failure to do that in this

18  case, again, just another mistake.

19         A.    Have to ask Detective Masecchia about

20  that.

21         Q.    Well, if you were aware of it because

22  you were presenting it to the DA, you had an equal

23  obligation to follow up on it, correct?

24         A.    I'm not the presenter.  I -- I know

25  that he -- he arrived at our office.  We don't



1  are questions that should have been asked of him,

2  correct?

3         A.    They should have been.

4         Q.    All right.  So now I want to ask you

5  some questions about your interaction with Lamarr

6  Scott.  You recall your interview with Lamarr

7  Scott, correct?

8         A.    Yes, I do.

9         Q.    You've already told us that was the

10  only time in your career when you'd arrested

11  somebody else and a person came in and said, "I

12  committed the crime, not them"; correct?

13        A.    Correct.

14        Q.    So it was memorable for that reason.

15        A.    Correct.

16        Q.    And obviously, you understood when you

17  were interviewing Lamarr Scott that you had an

18  obligation to do a careful and comprehensive

19  interview.

20        A.    Correct.

21        Q.    Particularly -- by the time he came in,

22  you already knew he was confessing to the crime,

23  because he had done so on TV, correct?

24        MR. SAHASRABUDHE:  Object to the form.

25        THE WITNESS:  I did not know he did it on



 1  TV.  I knew there was a TV channel there at the

 2  time.

 3        BY MR. BRUSTIN:

 4        Q.    You knew before you interviewed him.

 5        A.    That there was a TV camera there, yes.

 6        Q.    And that he had confessed.

 7        A.    That he was talking to them.  I don't

 8  know if he confessed.

 9        Q.    So as you -- is it your testimony when

10  you took Lamarr's -- when you took Lamarr Scott's

11  statement, you didn't know that he was taking

12  responsibility for the shooting before you started

13  talking to him?

14        A.    I believe he was, but I don't know if

15  he confessed to it.

16        Q.    Okay.

17        A.    Just a matter of words.

18        Q.    All right.  But you understood before

19  you interviewed him that he was taking

20  responsibility for the shooting despite the fact

21  that you'd arrested somebody else, correct?

22        A.    Yes.

23        Q.    So it was an extremely important

24  interview, correct?

25        A.    Yes.



1        Q.   It was important for you to be careful

2   and comprehensive in the interview you conducted,

3   correct?

4        A.   Yes.

5        Q.   And to develop information that you

6   could follow up on, correct?

7        A.   Yes.

8        Q.   Now, by the way, one of the things that

9   you learned through your Inbau and Reid training --

10  withdrawn.

11       Did you get the Inbau and Reid book along

12  with the training?

13       A.   I don't recall.

14       Q.   Okay.  Do you remember getting the

15  manual?

16       A.   No, I don't.

17       Q.   All right.  But the training that you

18  received from them was a very intensive, three-day

19  course, correct?

20       MR. SAHASRABUDHE:  Object to the form.

21       THE WITNESS:  It was two or three days, and

22  I don't think it was intense.  Very informal.

23       BY MR. BRUSTIN:

24       Q.   A lot of information, though.

25       A.   Oh, yes.



1  particularly are facts that would only be known by

2  the guilty person, e.g., information regarding the

3  location of the murder weapon or the stolen goods,

4  the means of entry into the building, the type of

5  accelerant used to start a fire, the type of

6  clothing on the victim.

7        Okay?

8        A.   Yes.

9        Q.   And so you recall that -- there's two

10  concepts in here that were -- that were critical to

11  the Reid theory of interrogations.

12       MR. SAHASRABUDHE:  Object to the form of the

13  question.

14       BY MR. BRUSTIN:

15       Q.   One -- one of -- one of them is that as

16  an interrogator, the way you determine whether or

17  not a confession is reliable is whether or not the

18  person is able to provide to you on their own

19  nonpublic information about the crime, correct?

20       MR. SAHASRABUDHE:  Object to the form.  You

21  can answer.

22       THE WITNESS:  Yes.

23       BY MR. BRUSTIN:

24       Q.   In other words, they trained you in --

25  in the Reid training that oftentime -- oftentimes,



1  for a variety of reasons, people may lie to you

2  about a crime, but the way to tell whether or not

3  it's reliable is to learn yourself about nonpublic

4  information about the crime and then see if they

5  volunteer that information, correct?

6         A.   Correct.

7         MR. SAHASRABUDHE:  Object to the form.

8         THE WITNESS:  Correct.

9         BY MR. BRUSTIN:

10        Q.   The most effective way to determine

11 whether or not a confession is reliable is whether

12 or not the -- the suspect provides to you nonpublic

13 information about how the crime was committed that

14 only the police and the real perpetrator would

15 know, correct?

16        MR. SAHASRABUDHE:  Object to the form.  Are

17 you asking about Reid or his view?

18        MR. BRUSTIN:  Reid.

19        THE WITNESS:  Reid, yes.

20        BY MR. RUSS:

21        Q.   Okay.  And along with determining

22 whether or not a confession is reliable, the other

23 benefit of getting nonpublic information from a

24 suspect during an admission is powerful evidence in

25 front of a jury that they actually committed the



 1   crime, correct?

 2        A.   Yes.

 3        Q.   And so what you were trained to do in

 4   Reid is to, first of all, ascertain as much -- as

 5   much information about the crime as you could,

 6   correct?

 7        A.   Yes.

 8        Q.   So that you could determine whether or

 9   not a witness or a suspect was providing you

10   nonpublic information, correct?

11        A.   Correct.

12        Q.   And secondly, to make sure that you

13   never provided that information to the witness.

14   You simply got it from them in non-leading

15   questions, correct?

16        A.   Correct.

17        Q.   And they trained you to -- to recognize

18   how powerful an admission can be when it contains

19   information, for example, about what was stolen

20   from the victim or what the victim was wearing, if

21   that information isn't public, correct?

22        A.   Correct.

23        Q.   And you took that training, and you

24   used it in your police work, correct?

25        MR. SAHASRABUDHE:  Object to the form.



1         THE WITNESS:  Yes, sir.

2         BY MR. RUSS:

3         Q.   It was good -- in your view, it was

4    good common sense training that you tried to

5    implement in your work going forward, correct?

6         A.   It was good training.

7         Q.   And the second -- another -- another

8    basic concept that you learned through your Reid

9    training, and probably other training as well, is

10   that it is very important to follow up on

11   information you receive during an admission to

12   determine whether or not it's reliable, correct?

13        A.   I don't remember follow-up, but it's

14   very important.

15        Q.   Okay.  You knew that anyways.

16        A.   I knew that.

17        Q.   All right.  But where it says -- so

18   when it says the interrogator should attempt to

19   develop information that can be corroborated by

20   further investigation, although you don't recall

21   learning that in Reid training, that was something

22   you understood by 1991 was important to do.

23        MR. SAHASRABUDHE:  Object to the form.

24        BY MR. BRUSTIN:

25        Q.   Correct?



1          A.   Yes.

2          Q.   In other words, to try to develop --

3    and by the way, you understood by 1991 that

4    oftentimes people confess to crimes or give you

5    incriminating information that's only partially

6    true.

7          A.   Sometimes they do that, yes.

8          Q.   Doesn't mean that they don't -- they're

9    not accurately confessing to committing the crime.

10   They don't always give the police all the

11   information, correct?

12         A.   You're correct.

13         Q.   For all the reasons -- for a lot of

14   reasons, including the reasons we discussed

15   earlier, which they don't trust the police, right?

16         A.   That's correct.

17         Q.   And one of your jobs as a detective by

18   1991 was to ask questions that would give you

19   information that you could follow up on to

20   determine if it was reliable, correct?

21         A.   Yes.

22         Q.   And one of the things, for example,

23   you're always looking for in a case -- in a -- in a

24   homicide case is physical evidence that can be

25   connected to the shooter, correct?



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   Witnesses make mistakes, right?

5          A.   Yes.

6          Q.   If you can get hard, scientific

7     evidence, you always want that, correct?

8          A.   Correct.

9          Q.   And you understood in 1991 --

10    withdrawn.  This case in particular was a brutal

11    shooting, correct?

12         MR. SAHASRABUDHE:  Form.

13         THE WITNESS:  It was a bad shooting.

14         BY MR. BRUSTIN:

15         Q.   Torri Jackson was hit multiple times

16    with a -- with a -- with an automatic weapon,

17    correct?

18         A.   You're correct.

19         Q.   There was blood everywhere.

20         A.   I don't know.  I wasn't at the scene,

21    but there would be.

22         Q.   You would expect there to be blood

23    everywhere.

24         A.   Four victims, yes.

25         Q.   With -- with more than 30 shots fired,



```
 1  right?

 2        A.   Yes.

 3        Q.   And so one of the things as a trained

 4  detective you would be looking for is whether or

 5  not the shooter -- withdrawn.

 6        You also understood that the shooter was

 7  standing directly over the victim when he was

 8  shooting him.

 9        MR. SAHASRABUDHE:  I object to the form.

10        THE WITNESS:  I'm not sure of that.

11        BY MR. BRUSTIN:

12        Q.   Well, if the reports say that, you

13  would have known it then, correct?

14        MR. SAHASRABUDHE:  Object to the form.

15        THE WITNESS:  Known it when, sir?

16        BY MR. BRUSTIN:

17        Q.   By the time you interviewed Lamarr

18  Scott four days after the shooting and you had

19  Valentino Dixon arrested, you would have known what

20  was described about how the shooting occurred from

21  reports, correct?

22        A.   Yes.

23        Q.   All right.  And so if the shooting was

24  described as the shooter standing over the victim

25  and firing even more shots from an automatic rifle,
```



1  you would know that, correct -- or that -- a

2  pistol, you would know that, correct?

3          MR. SAHASRABUDHE:  Object to the form.

4          THE WITNESS:  I'm -- I'm not sure of that.

5  I'm -- I'm -- I'm trying to remember --

6          MR. SAHASRABUDHE:  Just answer -- just

7  answer the question you're asked.

8          THE WITNESS:  I'm not sure.

9          BY MR. BRUSTIN:

10         Q.   I'm not asking you if you remember it

11 factually.  I'm saying if that's what the reports

12 indicate, you would have known, correct?

13         A.   Correct.

14         MR. SAHASRABUDHE:  Object to the form.

15         BY MR. BRUSTIN:

16         Q.   And you would expect that if the

17 victims, and especially the victim who died, was

18 shot at close range with an automatic weapon -- you

19 would expect that there might be, for example,

20 blood splatter on the shooter.

21         MR. SAHASRABUDHE:  Object to the form of the

22 question.

23         THE WITNESS:  You are correct.

24         BY MR. BRUSTIN:

25         Q.   All right.  And so one of the things



1  you would be interested in gathering, if possible,

2  is any -- is clothing from the suspect to see if

3  there was physical evidence you could connect to

4  the shooting, correct?

5       A.   Yes, sir.

6       MR. SAHASRABUDHE:  Object to the form.

7       BY MR. BRUSTIN:

8       Q.   If, for example, you were able -- you

9  found blood -- in 1991, you understood, although

10 you weren't a forensic expert -- you understood

11 that if Torri Jackson's blood was, for example, on

12 Valentino Dixon's clothing, that would be

13 information that a forensic analyst would be able

14 to determine.

15      MR. SAHASRABUDHE:  Object to the form.

16      THE WITNESS:  Yes.

17      BY MR. BRUSTIN:

18      Q.   And you understood that that could be

19 powerful incriminating evidence, correct?

20      MR. SAHASRABUDHE:  Object to the form.

21      THE WITNESS:  Yes.

22      BY MR. BRUSTIN:

23      Q.   And in the same way, you understood

24 that the absence of blood from clothing that a

25 suspect was wearing would be perhaps not quite as



1  powerful, but would be -- the absence of blood

2  could be exculpatory evidence.

3       A.   Correct.

4       Q.   All right.  And the same is true for

5  Lamarr Scott.  If Lamarr Scott was the shooter and

6  he shot, as I described to you, in close range with

7  the victim, you would expect there's a good

8  likelihood there could be blood.

9       MR. SAHASRABUDHE:  Object to the form.

10       THE WITNESS:  Correct.

11       BY MR. BRUSTIN:

12       Q.   And so a very basic question for a

13  detective to ask somebody who is confessing to a

14  crime is whether they would agree to give you the

15  clothing they wore on the night of the shooting.

16       MR. SAHASRABUDHE:  Object to the form.

17       THE WITNESS:  Correct.

18       BY MR. BRUSTIN:

19       Q.   Particularly if you had doubts about

20  whether they were telling you the truth.

21       A.   Correct.

22       Q.   And in addition to checking for blood,

23  you understood in 1991 that you could check for

24  gunpowder residue on clothing.

25       A.   Correct.



1          THE WITNESS:  You're correct.

2          BY MR. BRUSTIN:

3          Q.   You knew that in 1991.

4          A.   Correct.

5          Q.   And that's a base -- when -- and so

6    when Lamarr Jackson came in --

7          A.   Lamarr Scott.

8          Q.   -- Lamarr Scott came in --

9          MR. SAHASRABUDHE:  The Ravens.  He was

10   playing for the Ravens.

11         MR. BRUSTIN:  Oh, my God.

12         MR. SAHASRABUDHE:  I was making a joke that

13   he's the quarterback for the Baltimore Ravens.

14         BY MR. BRUSTIN:

15         Q.   When Lamarr Scott came in and confessed

16   to you that he committed the murder, that he shot

17   that weapon, automatic weapon, at -- and -- and

18   killed Torri Jackson, one of the most basic

19   questions you would ask him would be "What were you

20   wearing," correct?

21         A.   Correct.

22         MR. SAHASRABUDHE:  Object to the form.

23         BY MR. BRUSTIN:

24         Q.   And "Would you be willing to give us

25   those clothes?"



1           MR. SAHASRABUDHE:  Object to the form.

2           THE WITNESS:  That would be one of the

3    questions, yes.

4           BY MR. BRUSTIN:

5           Q.   Okay.  And you'd -- the things that

6    you'd be looking for in particular would be shoes.

7    That's one thing, right?

8           A.   Yes.

9           Q.   That's a likely place there may be

10   blood.

11          MR. SAHASRABUDHE:  Object to the form.

12          THE WITNESS:  Correct.

13          BY MR. BRUSTIN:

14          Q.   And then whatever outer clothing he was

15   wearing near the gun.

16          A.   Correct.

17          Q.   Because you'd want to -- you'd want to

18   at least try to get that evidence tested to see

19   whether or not there was blood or gunpowder

20   residue, correct?

21          A.   Correct.

22          Q.   And frankly, at that range, there could

23   be skin, there could be all kinds of things, right?

24          MR. SAHASRABUDHE:  Object to the form.

25          THE WITNESS:  There might be, yes.



1        BY MR. BRUSTIN:

2        Q.   And that's the kind of evidence that

3    could be powerful inculpatory evidence or

4    exculpatory evidence, right?

5        A.   Yes.

6        Q.   In any -- in any case, though, a very

7    basic question that you would want to ask somebody

8    confessing to a crime, correct?

9        A.   Yes.

10       Q.   All right.  And so you've already told

11   us that all the information that Lamarr Scott gave

12   to you was contained in this Q&A, correct?

13       A.   Yes.

14       MR. SAHASRABUDHE:  Object to the form.

15       BY MR. BRUSTIN:

16       Q.   And can you explain why, when this man

17   voluntarily came in, confessed to the murder,

18   according to you, you never asked him whether or

19   not he'd be willing to give you his clothing?

20       A.   It was several days later.  I didn't

21   consider him to be wearing the same clothing that

22   he did when he perpetrated the -- the crime.  I

23   don't know whether it was two or three days later.

24       I didn't do it.  I didn't ask him for his

25   clothing, but -- I didn't do it.



1       A.   Today I said that?

2       Q.   Yes.  The way that you would determine

3  whether it was reliable -- one way to determine

4  whether it was reliable would be whether --

5  withdrawn.

6       One way to determine that it was, in fact,

7  reliable would be if you have the clothes tested

8  and there was blood on it, correct?

9       A.   Yes.

10      MR. SAHASRABUDHE:  Object to the form.

11      BY MR. BRUSTIN:

12      Q.   That would be powerful incriminating

13 evidence that would support his confession,

14 correct?

15      A.   Yes.

16      Q.   And that would be a very basic,

17 important question to ask a person confessing,

18 particularly if you doubted the reliability of what

19 they were telling you, correct?

20      MR. SAHASRABUDHE:  Object to the form.

21      THE WITNESS:  I did ask him that, I believe,

22 in his sworn statement.

23      BY MR. BRUSTIN:

24      Q.   Yes?  Show me.

25      MR. SAHASRABUDHE:  Sorry, sorry, can we just



```
 1          Q.   If you -- you've already told us what a

 2    careful, conscientious detective you were.

 3          If you were acting in a careful,

 4    conscientious manner to solve this crime, what

 5    would be the next reasonable question to ask?

 6          MR. SAHASRABUDHE:   Object to the form of the

 7    question.   That's -- if -- if you know, try to

 8    answer.   That's what --

 9          THE WITNESS:   I -- I don't know.

10          BY MR. BRUSTIN:

11          Q.   No ideas?   How about "Are you wearing

12    the same white sneakers now?"

13          A.    I -- that's not in the statement.   I

14    don't know.

15          Q.   Okay.   But I'm -- I know it's not in

16    the statement.   I can read.   My question is:

17          What you should have asked him is "Do you --

18    are you wearing any of those clothes now, and if

19    you're not, would you be willing to give them to

20    me," correct?

21          MR. BLENK:   Form.

22          MR. SAHASRABUDHE:   Object to the form of the

23    question.

24          THE WITNESS:   I did not ask that.

25          BY MR. BRUSTIN:
```



1    Q.   I -- I know you didn't ask it, sir.  My

2  question is why didn't you ask it.

3    A.   I don't -- I don't --

4    MR. SAHASRABUDHE:  Object to the form.  You

5  can answer.

6    THE WITNESS:  I don't -- I don't remember

7  how he appeared at the office.  I don't know if he

8  was wearing that type of clothing which would make

9  me indicate "I want your clothing."

10    BY MR. BRUSTIN:

11    Q.   Okay.

12    A.   I don't remember.

13    Q.   Well, he described to you shooting, at

14  close range, Torri Jackson, correct?

15    A.   That's how he described it to me.

16    Q.   Okay.

17    A.   You're saying close range.  I don't

18  know what he means by that.

19    I don't know if there's transfer of blood,

20  is what I'm trying to say to you.  I don't know.

21    Q.   Well, of course you don't know.  That's

22  why you do the testing, correct?

23    MR. SAHASRABUDHE:  Object to the form.

24    THE WITNESS:  Again, I don't know how he --

25  I don't remember how he appeared at the office.

```
 1          BY MR. BRUSTIN:

 2          Q.   Correct?

 3          A.   I would have asked those questions if I

 4   had belief that he was wearing the same clothes,

 5   but I don't remember what he was wearing.

 6          Q.   Well, it doesn't matter if he's wearing

 7   the same clothes.

 8          A.   But I would have asked that question.

 9          Q.   Sir, listen to what I'm saying to you.

10          A.   All right.

11          Q.   It's just common sense.  Basic common

12   sense.

13          A.   Your sentences are pretty long.

14          Q.   Okay.  Well, I'll try to shorten them

15   for you.

16          A.   Thanks.  Appreciate it.

17          Q.   Once he confessed to this crime, one of

18   your basic goals would be to try to test the

19   clothing he wore the night of the murder, correct?

20          MR. SAHASRABUDHE:  Object to the form.

21          THE WITNESS:  Correct.

22          BY MR. BRUSTIN:

23          Q.   And the way to determine that would be

24   to ask him what clothes he was wearing the night of

25   the murder, correct?
```



```
 1           A.    Correct.
 2           Q.    And then the next question would be
 3   "Since you're confessing to this crime, would you
 4   mind giving us those clothes," correct?
 5           MR. SAHASRABUDHE:  Object to the form.
 6           THE WITNESS:  Correct.
 7           BY MR. BRUSTIN:
 8           Q.    And you claim you did neither of those
 9   things, correct?
10           A.    I did not.
11           Q.    But you agree that those would be basic
12   steps that should have been taken, correct?
13           MR. SAHASRABUDHE:  I object to the form.
14           THE WITNESS:  Correct.
15           BY MR. BRUSTIN:
16           Q.    And you just forgot to ask.
17           A.    No, I don't think I forgot.  I just
18   wasn't convinced that those were the clothes that
19   he was wearing the night of the shooting.
20           Q.    Well, we just established that it
21   doesn't matter if he was wearing the clothes.  The
22   reasonable --
23           A.    Well, I -- I didn't do it.
24           MR. SAHASRABUDHE:  Wait for the question.
25   There was no question.
```



```
 1              THE WITNESS:  Okay.

 2              BY MR. BRUSTIN:

 3         Q.   Because you just made a mistake, is

 4    what you're saying, correct?

 5         A.   You're correct.

 6         Q.   All right.  Now, what Lamarr Scott has

 7    said under oath is that he offered to give you his

 8    clothes; that he told you there was blood on his

 9    white sneakers; and that you said, "I don't want

10    them until you get your story straight."

11         I take it you deny doing that, correct?

12         MR. SAHASRABUDHE:  I object to the form of

13    the question.

14         THE WITNESS:  I do deny that.

15         BY MR. BRUSTIN:

16         Q.   All right.  And it's just a coincidence

17    that although you understood a basic investigative

18    task would have been to try to get his clothes, you

19    deny any discussion whatsoever about obtaining his

20    clothes for testing, correct?

21         MR. SAHASRABUDHE:  Object to the form.

22         THE WITNESS:  You're correct.

23         BY MR. BRUSTIN:

24         Q.   Another thing -- let's take a look --

25    let's go back to the first page.
```



```
 1          (Discussion off the record.)
 2          MR. SAHASRABUDHE:  The first page of the
 3   whole Exhibit?
 4          BY MR. BRUSTIN:
 5          Q.   And I -- I take it, sir, you deny
 6   making any threats of any kind to him either before
 7   or after this statement, correct?
 8          A.   That's correct.
 9          Q.   You never told him anything like "I
10   don't believe you.  Get your story straight or --
11   or -- and get out of here."
12          Nothing like that, correct?
13          A.   I did not.
14          Q.   That would have been totally
15   inappropriate, and you didn't do it.
16          A.   I --
17          MR. SAHASRABUDHE:  Object to the form.
18          THE WITNESS:  I did not.
19          BY MR. BRUSTIN:
20          Q.   And to the extent Lamarr Scott is
21   saying that, he's lying, correct?
22          MR. SAHASRABUDHE:  Object to the form.
23          THE WITNESS:  I believe he would be lying,
24   yes.
25          BY MR. BRUSTIN:
```



1        Q.   All right.  Now, you're on -- you've

2   got 196 open, right?

3        A.   I do.

4        Q.   All right.  Now, just for a second,

5   keep that page, but take a look at page 161.

6        Have you reviewed this report before?

7        A.   Never.

8        Q.   Take a minute and read this.  Let me

9   know when you're done.

10        Actually, you know what?  Just read the

11   second paragraph.  And the third paragraph, sorry.

12        A.   Okay.

13        Q.   So no question that before you took the

14   statement from Lamarr Scott, not only did you know

15   that he was allegedly confessing to the crime, you

16   gave a briefing on the matter to other detectives,

17   correct?

18        MR. SAHASRABUDHE:  Object to the form.

19        THE WITNESS:  That's Detective DiPirro's

20   words that I -- or that your writer met Detective

21   Masecchia and we were briefed by Detective

22   Stambach, meeting and filming by Channel 2.

23        Just -- I'm -- I'm stating to Detective

24   DiPirro that that happened.

25        BY MR. BRUSTIN:



1        Q.   Well, look at the next paragraph:

2        They stated they would make a copy of the

3   confession taped by them.

4        You're in the know here.  You understand

5   that he's confessing, correct?

6        MR. SAHASRABUDHE:  Object to the form.

7        THE WITNESS:  The people who are stating

8   that they make a copy are people from the TV

9   channel, not from me.

10        BY MR. BRUSTIN:

11        Q.   Detective, I'm -- I'm asking you

12   something very simple.

13        A.   You did.

14        Q.   This report makes clear -- you see the

15   last paragraph here?

16        A.   Yes.

17        Q.   So after you're learning about what's

18   happening on TV and after you're briefing the

19   detectives, then you take a statement from Lamarr

20   Scott, correct?

21        A.   Well, again, these are Detective

22   DiPirro's words.  I don't know the sequence of

23   events.

24        Q.   No doubt in your mind that you fully

25   understood that Lamarr Scott was coming in to give



1  a formal confession before you took the statement,
2  correct?
3         MR. SAHASRABUDHE:  Object to the form of the
4  question.
5         THE WITNESS:  There's no doubt in my mind.
6         BY MR. BRUSTIN:
7         Q.   All right.  Let's go to page 196.
8         Again, no time listed for when this
9  interview started, correct?
10        A.   Correct.
11        Q.   No time listed for when it ended,
12 correct, on page 199?
13        A.   Correct.
14        Q.   Again just forgot to do it?
15        A.   It was forgotten, yes.
16        MR. SAHASRABUDHE:  And I -- I would note for
17 the record here that some of the -- some of the
18 documents that have been supplied in discovery do
19 actually contain a picture of witnesses with
20 clocks.
21        To the extent this does, I'll --
22        MR. BRUSTIN:  If you -- if you have it, I
23 would appreciate it.
24        MR. SAHASRABUDHE:  Yes.
25        MR. BRUSTIN:  And I would have appreciated



1  it before this, but please give it to us now if you

2  have it.

3        MR. SAHASRABUDHE:  Yes.

4        BY MR. BRUSTIN:

5        Q.   All right.  Now, one of the things he's

6  providing on page 196 --

7        A.   All right.

8        Q.   I'm sorry.  Take a look -- keep page

9  196 open and look at page 158.

10       A.   158?

11       Q.   Yes.  Just keep it open.

12       A.   Okay.

13       Q.   It appears that around the same time

14  that you're interviewing -- although you don't put

15  your time down, around the same time you're

16  interviewing Lamarr Scott, Masecchia is

17  interviewing Leonard Brown, correct?

18       A.   Yes, sir.

19       Q.   And obviously you're communicating with

20  one another, correct?  All happening in the

21  homicide office.

22       A.   Correct.

23       Q.   All right.  Now let's go back to page

24  196.

25       A.   Okay.



1          Q.   And you see about eight lines down:
2    You were advised of your rights by me at Genesee
3    and Bailey.  Do you remember that?
4          A.   Yes.
5          Q.   Yes?  In other words, you interacted --
6    this is making clear that you interacted with
7    Lamarr Scott previously, correct?
8          A.   Yes.
9          Q.   And you deny any substantive
10   communication with him about the case other than
11   what's contained in this report, correct?
12         A.   Correct.
13         Q.   You deny threatening him at that time,
14   correct?
15         A.   I did not threaten him.
16         Q.   You deny telling him you didn't want to
17   see his clothing, correct?
18         A.   Correct.
19         Q.   You deny telling him to get his story
20   straight before he comes back.
21         A.   You are correct.
22         Q.   And then do you see the question and
23   answer beginning with:  The Buffalo Police Homicide
24   Squad?
25         A.   Which page, please?



1          Q.    Same page, 196.

2          A.    Okay.

3          Q.    Middle of the page.

4          A.    Yes.

5          Q.    He's describing that he -- he shot

6    these men in self-defense, correct?

7          A.    Correct.

8          Q.    And obviously, it would be important,

9    once you get that information, to follow up to

10   investigate whether or not Aaron Jackson or Torri

11   Jackson or both had weapons, correct?

12         MR. SAHASRABUDHE:  Object to the form.

13         THE WITNESS:  Correct.

14         BY MR. BRUSTIN:

15         Q.    For a lot of reasons, correct?

16         A.    For a lot of reasons, yes.

17         Q.    One reason would be that if Aaron

18   Jackson had a weapon or he brought Torri Jackson

19   knowing that he had a weapon, Aaron Jackson

20   committed a crime.

21         MR. SAHASRABUDHE:  Object to the form.

22         THE WITNESS:  Correct.

23         BY MR. BRUSTIN:

24         Q.    Another reason would be that if they

25   actually -- if Lamarr Scott actually shot in



1  self-defense as described, it would be a different

2  charge than second-degree murder, correct?

3        A.   You are correct.

4        Q.   Variety of reasons, critically

5  important to follow up with whether or not Torri

6  Jackson or Aaron Jackson had guns, correct?

7        MR. SAHASRABUDHE:  Object to the form.

8        THE WITNESS:  You are correct.

9        BY MR. BRUSTIN:

10       Q.   And, in fact, the handgun by this time

11  you know was found -- and you -- and you know by

12  this time that, in fact, a handgun was found at the

13  scene.

14       A.   There was.

15       Q.   Consistent -- that would be consistent

16  with Lamarr Scott telling you that they fired at

17  him first, correct?

18       MR. SAHASRABUDHE:  Object to the form.

19  Fired at who?

20       THE WITNESS:  No, that there was someone

21  with a gun.

22       BY MR. BRUSTIN:

23       Q.   So --

24       A.   Someone else could have had --

25  Valentino Dixon could have had a gun.



1          Q.    I didn't say it necessarily meant they

2     had a gun, but finding a gun at the scene would be

3     consistent with Lamarr Scott telling you that they

4     shot at him, correct?

5          MR. SAHASRABUDHE:  Object to the form.

6          THE WITNESS:  Yes.

7          BY MR. BRUSTIN:

8          Q.    Certainly need to follow up on it,

9     correct?

10         A.    Yes.

11         Q.    And you did absolutely nothing to

12    follow up on that, correct?

13         MR. SAHASRABUDHE:  Object to the form.

14         THE WITNESS:  No, I did not.

15         BY MR. BRUSTIN:

16         Q.    Again just a mistake, correct?

17         A.    That's not a mistake.

18         Q.    You -- you made a conscious decision

19    not to do that.

20         A.    I did not make a conscious decision to

21    do that.

22         Q.    Okay.  Now, another question you're

23    asking -- you ask here a little further down the

24    page is:  Where did you get the gun?

25         A.    Yes.

1          Q.    He says:  I bought it off the street.

2          And then you ask him on page 197 -- by the

3    way, do you know whether or not the gun he

4    described, a .38 silver gun with a nickel plate,

5    generally matched the description of the gun found

6    at the scene?

7          MR. SAHASRABUDHE:  Object to the form.

8          THE WITNESS:  I do know that a weapon was

9    recovered that was nickel plated at the scene.

10         BY MR. BRUSTIN:

11         Q.    Okay.  So that's another -- another --

12    another fact indicating reliability, correct?

13         MR. SAHASRABUDHE:  Object to the form.

14         MR. BLENK:  Form.

15         THE WITNESS:  Correct.

16         BY MR. BRUSTIN:

17         Q.    Question:  How many shots did you fire

18    with the TEC-9?  He says:  I emptied the clip.

19         Correct?

20         A.    Yes.

21         Q.    That's -- that's also consistent with

22    the forensic evidence developed from the scene?

23         A.    Correct.

24         Q.    Something you would expect other people

25    could know, but certainly the shooter would know,



1   correct?

2          MR. SAHASRABUDHE:  Object to the form.

3          MR. BLENK:  Form.

4          THE WITNESS:  I believe a lot of people knew

5   about it.

6          BY MR. BRUSTIN:

7          Q.   Lot of people knew that the clip was

8   emptied?  How would they know that?

9          MR. SAHASRABUDHE:  Object to the form.

10          THE WITNESS:  Just by seeing what -- what

11   had transpired at that scene and watching our

12   evidence collection unit.  I mean, there were a lot

13   of people that were there.

14          BY MR. BRUSTIN:

15          Q.   What they would know is that a lot of

16   shots were fired.  They wouldn't know that the --

17   they wouldn't know the clip was emptied, correct?

18          MR. BLENK:  Form.

19          MR. SAHASRABUDHE:  Object to the form.

20          THE WITNESS:  I -- I can't say.

21          BY MR. BRUSTIN:

22          Q.   Well, the way you know a clip is

23   emptied -- I don't know much about guns, but I know

24   that the way you know a clip is empty is because

25   when you pull the trigger, it stops shooting,



1   correct?

2          MR. SAHASRABUDHE:  Object to the form.

3          THE WITNESS:  One of the reasons, yes.

4          BY MR. BRUSTIN:

5          Q.   Another indication of reliability,

6   correct?

7          MR. SAHASRABUDHE:  Object to the form.

8          THE WITNESS:  Correct.

9          BY MR. BRUSTIN:

10         Q.   Looking down further on the page -- and

11  by the way, certainly when he says the clip is

12  emptied, that's another reminder that there may be

13  blood on his clothes, correct?

14         MR. SAHASRABUDHE:  Object to the form.

15         THE WITNESS:  Again, I don't know the

16  distances, but I -- I wouldn't be able to say.  I'm

17  sorry.

18         BY MR. BRUSTIN:

19         Q.   Well, you did know the distances from

20  other reports.  You've already told us that.  You

21  would have known it at the time.

22         You did know the distances from other

23  reports, if they were there, correct?

24         A.   Correct.

25         Q.   And another way to -- to learn the



1   distance would be to ask him, "How close were you

2   to Torri Jackson when you shot the weapon,"

3   correct?

4        A.   There are other -- there are other

5   ways, yes.

6        Q.   Take a look at the -- the bottom of the

7   page on page 197.

8        Why are you asking questions about Mike

9   Bland being on the corner?

10       A.   I have no idea.

11       MR. SAHASRABUDHE:  Object to the form.

12       THE WITNESS:  I have no idea.

13       BY MR. BRUSTIN:

14       Q.   Certainly suggests that Mike Bland may

15   have been a witness, correct?

16       A.   I -- I don't remember.  I don't recall.

17       Q.   Question:  Where did you throw the gun?

18   In a backyard.

19       Do you see that?

20       A.   Yes.

21       Q.   And were any efforts made to locate

22   that gun?

23       MR. SAHASRABUDHE:  Object to the form.

24       THE WITNESS:  Well, I know that the crime

25   scene unit that was there would probably have



1  canvassed that area, so I think that was an effort,

2  but I did not make any efforts, no.

3       BY MR. BRUSTIN:

4       Q.  He -- he gave you a specific

5  description of where that gun was thrown, correct?

6       A.  Yes.

7       Q.  Within a -- within a -- it's certainly

8  within a number of houses --

9       A.  Yes.

10      Q.  -- that could have been checked,

11 correct?

12      A.  Yes.

13      Q.  And that was new information, correct?

14      A.  It was new to me.

15      Q.  And so why wasn't that followed up on?

16      A.  I don't know what the --

17      MR. SAHASRABUDHE:  Object to the form.

18      THE WITNESS:  I don't know what the crime

19 scene unit did at that particular scene.

20      BY MR. BRUSTIN:

21      Q.  I'm not asking you that, sir.  I'm

22 asking you:  When he told you where he threw the

23 weapon --

24      A.  And my answer again is that I --

25      Q.  -- why didn't you follow up?



```
 1          A.    I didn't do it.

 2          Q.    Just a mistake.

 3          A.    It would be a mistake, yes.

 4          Q.    Okay.  Another basic investigative task

 5     that should have been done if you're acting in good

 6     faith, correct?

 7          MR. SAHASRABUDHE:  Object to the form.  You

 8     can answer.

 9          THE WITNESS:  That's correct.

10          BY MR. BRUSTIN:

11          Q.    Correct?

12          A.    That's correct.

13          Q.    If you weren't just trying to protect

14     your bad arrest of Valentino Dixon, correct?

15          MR. SAHASRABUDHE:  Object to the form of the

16     question.  Don't -- Mark, don't answer that.  Come

17     on.

18          BY MR. BRUSTIN:

19          Q.    Okay.  All right.  Another question

20     that you've asked -- asked him on page 198 is:

21     Have there been any threats or promises made to

22     you?  Do you see that?

23          A.    198?

24          Q.    Yes.

25          A.    Whereabouts are you, sir?
```

 1         Q.    About eight lines down.

 2         A.    That's correct.

 3         Q.    And the reason you're asking that

 4   question is because one of your theories here is

 5   that he is confessing based on threats or promises

 6   from Valentino or his family, correct?

 7         A.    No.

 8         Q.    Never heard that allegation?

 9         A.    This question was asked because I'm

10   asking questions.  He's confessing to a murder.

11   "Have any threats or promises been made to you from

12   me?"

13         Q.    Okay.

14         A.    That day.

15         Q.    But you certainly do remember there

16   being discussion amongst the homicide detectives --

17   part of your determination -- withdrawn.

18         Part of your determination that Lamarr

19   Scott's confession was unreliable was your theory

20   that he had either received threats or promises

21   from Valentino or people on Valentino's behalf,

22   correct?

23         MR. SAHASRABUDHE:  Object to the form.

24         THE WITNESS:  I thought there was some

25   threat -- or some promises, monetary promises, made



1  to Lamarr Scott.

2           BY MR. BRUSTIN:

3           Q.   Okay.  And so if that was your theory

4  as to what happened, one basic investigative task

5  would have been to talk to Valentino Dixon's

6  family, correct?

7           MR. SAHASRABUDHE:  Object to the form.

8           THE WITNESS:  Correct.

9           BY MR. BRUSTIN:

10          Q.   Talk to mom.  "Can I ask you some

11  questions about your interactions with Lamarr

12  Scott," correct?

13          MR. SAHASRABUDHE:  Object to the form.

14          THE WITNESS:  We didn't do that.

15          BY MR. BRUSTIN:

16          Q.   I know you didn't do it.  The question

17  is:  If you were a -- if you were conducting a

18  conscientious, good-faith investigation, you would

19  have done it, correct?

20          MR. SAHASRABUDHE:  Object to the form.

21          THE WITNESS:  Correct.

22          BY MR. BRUSTIN:

23          Q.   You would have talked to the father,

24  correct?

25          MR. SAHASRABUDHE:  Object to the form.



1        THE WITNESS:  I didn't know his father was

2   in the picture.

3        BY MR. BRUSTIN:

4        Q.   Well -- and by the way, the time to

5   interview those kinds of witnesses is as soon as

6   possible after you learn of the information to

7   avoid the problem of them potentially working

8   together to get their stories straight, correct?

9        A.   Correct.

10       Q.   So if you're a conscientious detective

11  acting in good faith, as soon as you learn about

12  the potential for threats or promises, you want to

13  attempt to talk to the people who may have made

14  those threats or promises, correct?

15       MR. SAHASRABUDHE:  Object to the form.

16       THE WITNESS:  Correct.

17       BY MR. BRUSTIN:

18       Q.   And you don't need -- you don't need

19  anybody to tell you that.  That's just basic

20  investigative work, correct?

21       A.   It is.

22       Q.   And by the way, it's a pretty heavy

23  deal for a 19-year-old kid to admit to shooting in

24  cold blood and murdering a man on the street if he

25  didn't do it, correct?

MARK R. STAMBACH                                    June 08, 2022
VALENTINO DIXON vs CITY OF BUFFALO                              304

1          Q.   As a detective, you would expect
2    that -- if he was coming in to confess to a murder
3    he didn't commit, you would expect there should be
4    a good reason, correct?
5          MR. SAHASRABUDHE:   Form.
6          THE WITNESS:   Correct.
7          BY MR. BRUSTIN:
8          Q.   One reason could be mental illness.
9          MR. SAHASRABUDHE:   Form.
10         THE WITNESS:   Correct.
11         BY MR. BRUSTIN:
12         Q.   Another reason could be, I guess,
13   money.
14         A.   Correct.
15         MR. SAHASRABUDHE:   Form.
16         BY MR. BRUSTIN:
17         Q.   You'd certainly expect -- somebody
18   confessing to a murder, you'd expect them to demand
19   a lot of money to do that, right?
20         MR. SAHASRABUDHE:   Form.
21         THE WITNESS:   Correct.
22         BY MR. BRUSTIN:
23         Q.   And if that's -- something like that
24   happened, that's the kind of thing that a homicide
25   detective should be able to figure out, right?



1          MR. SAHASRABUDHE:  Object to the form.

2          THE WITNESS:  Correct.

3          BY MR. BRUSTIN:

4          Q.   It's not rocket science, right?

5          MR. SAHASRABUDHE:  Object to the form.  I

6     mean, Nick, come on.  It's not rocket science?

7          BY MR. BRUSTIN:

8          Q.   It should be pretty basic.  There are a

9     number of basic investigative steps that you could

10    take as a detective to -- to determine whether

11    somebody was given promises that caused them to

12    confess to a crime they didn't commit, correct?

13         MR. SAHASRABUDHE:  Object to the form.

14         THE WITNESS:  That's correct.

15         BY MR. BRUSTIN:

16         Q.   And that investigation should have been

17    conducted immediately, correct?

18         MR. SAHASRABUDHE:  Object to the form.

19         THE WITNESS:  Should have been.

20         BY MR. BRUSTIN:

21         Q.   Another mistake.

22         A.   You keep on getting back to the

23    mistakes.  There's also manpower.  I mean, I've

24    discussed this with you since we started this

25    today.



1          Q.    In other words, indicating that you had

2     a theory that Tino's mother was somehow involved in

3     getting him to falsely confess, correct?

4          A.    I believe I saw her at the scene of

5     that -- when he was confessing.

6          Q.    Well, the theory was -- the reason you

7     asked the question --

8          A.    It's a theory.  Yes, it's a theory.

9          Q.    -- was that perhaps she was involved.

10         A.    Yes.

11         Q.    And so the next logical step would be

12    to talk to her, correct?

13         MR. SAHASRABUDHE:  Object to the form.

14         THE WITNESS:  Correct.

15         BY MR. BRUSTIN:

16         Q.    And I take it that you deny, after you

17    took the statement from Lamarr Scott, showing up at

18    different locations in town where he was and trying

19    to convince him to recant and testify that

20    Valentino Dixon was the shooter, correct?

21         A.    I never saw Lamarr Scott after I took

22    that statement.  I deny it.

23         Q.    Oh, you deny it.  So to the extent he's

24    saying that, that would be a lie, correct?

25         A.    That is correct.



```
 1          Q.   In other words, that you engaged in
 2    misconduct that caused him to be convicted without
 3    probable cause, correct?
 4          MR. BLENK:  Form.
 5          THE WITNESS:  Correct.
 6          MR. SAHASRABUDHE:  Form.
 7          BY MR. BRUSTIN:
 8          Q.   And you also understood that you were
 9    accused of fabricating evidence against Mr. Ortiz.
10          A.   There was no fabrication of any
11    evidence.
12          Q.   Sir, I'm not asking you -- I'm going to
13    give you a chance to tell me whether you think you
14    did anything wrong or not, but right now you
15    understood that the claim against you was that you
16    fabricated evidence in the case, correct?
17          A.   Correct.
18          Q.   That you fabricated a police report,
19    correct?
20          A.   A statement.
21          Q.   A statement.  And that you fabricated
22    information that Mr. Ortiz provided to you and what
23    you provided to him, correct?
24          A.   Correct.
25          Q.   And you also understood that you were
```



1  accused of coercing a confession with Mr. Ortiz,

2  correct?

3         A.   I do understand that, yes.

4         Q.   All right.  And the jury found you

5  liable on all three of those counts, correct?

6         A.   Yes, sir.

7         Q.   And in addition to that, you also were

8  found responsible for punitive damages.

9         A.   You're correct.

10        Q.   And you understood that what the jury

11 found, in substance, in layman's terms, was that

12 your conduct was so egregious that they awarded

13 additional damages to punish you, correct?

14        A.   Yes.

15        MR. SAHASRABUDHE:  Form.

16        BY MR. BRUSTIN:

17        Q.   And you understood that the jury

18 awarded $5 million in compensation to Mr. Ortiz.

19        A.   Correct.

20        Q.   And by the way, you under -- you

21 understand that the jury awarded more money than

22 Mr. Ortiz's attorney even asked for.

23        A.   Correct.

24        Q.   And you also understand that -- by the

25 way, are you -- are you going to be responsible for

1  suggestion and coercion in connection with the

2  interview of Keith Cramer?

3          A.   No.

4          Q.   You don't recall that allegation.

5          A.   No.

6          MR. SAHASRABUDHE:  And can we make clear for

7  the record what investigation we're talking about?

8          MR. BRUSTIN:  DeJac.

9          THE WITNESS:  I don't remember that name at

10  all.

11          BY MR. BRUSTIN:

12          Q.   Okay.  So let's put DeJac aside for a

13  minute.  Maybe we'll come back to it if we have

14  time.

15          A.   Sure.

16          Q.   But certainly you would agree that the

17  allegations in Epps and in Dixon and in Ortiz are

18  the same allegations of misconduct.

19          MR. SAHASRABUDHE:  Object to the form.

20          THE WITNESS:  They're similar, yes.

21          BY MR. BRUSTIN:

22          Q.   And you deny them all.

23          A.   Correct.

24          Q.   And the other similarity in all of

25  those cases is that all three -- in all three of



1  those cases, convictions were overturned.

2         A.   Correct.

3         Q.   There were findings that the men and

4  women that were initially convicted of those crimes

5  were innocent.

6         A.   Correct.

7         Q.   And you -- in all three of those cases,

8  you maintain your belief that all three of those

9  persons were guilty or somehow involved in the

10 crimes, correct?

11        A.   I am, but I'm -- I'm very not sure on

12 Cory Epps.  You know, I was pretty positive with

13 Josue Ortiz, and I was very positive in regards to

14 Valentino Dixon.

15        Q.   And DeJac.

16        A.   And DeJac, but on Cory Epps, I really

17 didn't have that much involvement other than taking

18 his statement.

19        Q.   All right.  So you maintain your belief

20 that in the DeJac case, in the Dixon case, in the

21 Ortiz case, those -- those men and women are

22 guilty, correct?

23        MR. SAHASRABUDHE:  Form.

24        THE WITNESS:  I believe they were guilty of

25 a crime.



1        Q.    Now, Mr. Ortiz was convicted of being

2   one of three men who committed multiple homicides

3   on November 11th, 2004, on Niagara Street, correct?

4        A.    Yes.

5        Q.    Believed to be a drug dispute.

6        MR. SAHASRABUDHE:  Object to the form.

7        THE WITNESS:  There was some drug

8   involvement in that case, yes.

9        BY MR. BRUSTIN:

10       Q.    And you were not the lead investigator

11  in the case, correct?

12       A.    No, I was not.

13       Q.    But like Dixon, you played a key -- you

14  played -- withdrawn.

15       You conducted the interview of Mr. Ortiz in

16  which he confessed, correct?

17       A.    Correct.

18       Q.    And you understand that the prosecution

19  was based almost entirely on that confession,

20  correct?

21       A.    Yes, sir, you're correct.

22       Q.    There was no forensic evidence tying

23  Mr. Ortiz to the crime, correct?

24       A.    Correct.

25       Q.    It was the -- the conviction was based



1  solely on the substance of his admission and your

2  reporting of that admission, correct?

3        A.   Yes, sir.

4        Q.   And even more specifically, it was

5  based on your reporting that he provided to you,

6  without any suggestion whatsoever, nonpublic

7  information about the crime that only was known to

8  the police and to the perpetrators, correct?

9        MR. SAHASRABUDHE:  Object to the form.

10       THE WITNESS:  Correct.

11       BY MR. BRUSTIN:

12       Q.   Now, would it be fair to say -- now,

13  you understand today and you understand based on

14  the trial that on November 15th, the day before you

15  met with Mr. Ortiz, he was interviewed in the

16  psychiatric unit of a Buffalo hospital by Buffalo

17  detectives, correct?

18       A.   Correct.

19       Q.   And you understand that earlier that

20  day on the 15th, Detective Lauber was called to the

21  scene to talk to Mr. Ortiz --

22       MR. SAHASRABUDHE:  To the scene?

23       MR. BRUSTIN:  Let me withdraw the question.

24       BY MR. BRUSTIN:

25       Q.   You understand that earlier in the day



1  on the 15th, Detective Lauber was called to a

2  location where Mr. Ortiz was present and that he

3  called an ambulance to take Mr. Ortiz to a

4  psychiatric hospital.

5        MR. SAHASRABUDHE:  Form.

6        THE WITNESS:  Yes.

7        BY MR. BRUSTIN:

8        Q.   And subsequently, Detective Vaughn,

9  Detective Lonergan, Detective Lima, and Officer

10 Torres interviewed Mr. Ortiz at the hospital.

11       A.   Correct.

12       Q.   And they ruled him out as both a

13 suspect in the Niagara Street murders and as having

14 any relevant information about the Niagara Street

15 murders, correct?

16       MR. SAHASRABUDHE:  Object to the form.

17       THE WITNESS:  He didn't provide any

18 information at all.

19       BY MR. BRUSTIN:

20       Q.   If you -- if you could answer my -- I

21 think --

22       A.   Sure.

23       Q.   I think you're answering my question.

24 I want to make sure, though.

25       A.   Yes.



1        Q.   You understand today that it's

2   uncontroverted that when they met with him in the

3   psychiatric unit of the hospital, they determined

4   that he was not a suspect, correct?

5        A.   That he had no information and he was

6   not a suspect.

7        Q.   Okay.  Now, were you in the -- in the

8   courtroom when Dr. Coggins, the psychiatrist,

9   testified about Mr. Ortiz's condition?

10       A.   No, I was not.

11       Q.   You certainly heard the closing

12  arguments about Dr. Coggins, correct?

13       A.   Correct.  I did.

14       Q.   And you understand that Dr. Coggins

15  testified, in substance, that Mr. Ortiz was one of

16  the most severely ill people she had ever treated.

17       MR. SAHASRABUDHE:  Form.

18       THE WITNESS:  I did hear that, yes.

19       BY MR. BRUSTIN:

20       Q.   And that when he was -- including

21  during the time when he was meeting with you on the

22  16th --

23       MR. SAHASRABUDHE:  Object to the form.

24       BY MR. BRUSTIN:

25       Q.   -- he was in the midst of a full



1          A.    Yes.

2          Q.    And other training, right?

3          A.    Correct.

4          Q.    And certainly after you took

5     Mr. Ortiz's confession, later that day, you

6     learned -- or within the following days, you

7     learned that he had been in a psychiatric hospital,

8     correct?

9          A.    You're correct.

10         Q.    And so once you learned that, you

11    understood it was even more important to

12    corroborate, if you could, the information that

13    Mr. Ortiz allegedly volunteered to you in his

14    confession, correct?

15         A.    Correct.

16         MR. SAHASRABUDHE:   I object to the form.

17         BY MR. BRUSTIN:

18         Q.    And as you testified to in Ortiz --

19         MR. SAHASRABUDHE:   What testimony?

20         BY MR. BRUSTIN:

21         Q.    I think all the testimony, but as

22    you -- withdrawn.  Let me ask it a different way.

23         You admit that you took no steps whatsoever

24    to corroborate Mr. Ortiz's confession, correct?

25         MR. SAHASRABUDHE:   Form.



1          THE WITNESS:  That's correct.  There were no

2    new leads.  Nothing.  No anonymous calls, no

3    independent witnesses that came forward.

4          Mr. Ortiz came in and gave a statement.

5    That was it.  There was nothing further.

6          BY MR. BRUSTIN:

7          Q.   You misunderstood my question.  You

8    were trained, as -- as I just read to you from

9    Reid, that you needed to follow up on the

10   information that was provided to you by the suspect

11   to determine whether it was accurate.

12         A.   What could I follow up on?

13         Q.   So your --

14         A.   He gave me specifics about the crime

15   scene.

16         Q.   So your testimony is that there was no

17   information that Mr. Ortiz provided to you that you

18   could follow up on.

19         A.   He gave me specifics about the crime

20   scene that were true.

21         Q.   Okay.  There was no other information

22   that you could follow up on.

23         A.   I don't believe so, no.

24         Q.   Okay.  Did you ask him any questions

25   geared towards information you could follow up on?

1          THE WITNESS:  Lonergan took the statement
2    with me.
3          BY MR. BRUSTIN:
4          Q.   Well, we know that Lonergan didn't take
5    the statement with you in -- when you were -- when
6    you were in the closed office without the windows,
7    right?
8          MR. SAHASRABUDHE:  Object to the form.
9          THE WITNESS:  There is a window in that
10   office, and I was alone with him for about 20
11   minutes.
12         BY MR. BRUSTIN:
13         Q.   Well, actually, you were alone with him
14   for 45 minutes, correct?
15         MR. SAHASRABUDHE:  Object to the form.
16         THE WITNESS:  I guess.
17         BY MR. BRUSTIN:
18         Q.   Okay.  So you were alone with Mr. Ortiz
19   for 45 minutes, correct?
20         A.   I still think it was 20 or 25.
21         Q.   Okay.  I'll give you -- I'll give you
22   the benefit of the doubt.  Let's say it was 20 or
23   25 minutes.
24         You were alone with him in a room for 20 or
25   25 minutes.



1          THE WITNESS:  Correct.

2          BY MR. BRUSTIN:

3          Q.   And at the time, you were taking -- at

4    the time you met with Mr. Ortiz in the office

5    through the time you took his formal statement, you

6    had no idea that he had met with officers --

7    officers at a psychiatric hospital the day before,

8    correct?

9          MR. SAHASRABUDHE:  Object to the form.

10         THE WITNESS:  That's correct.

11         BY MR. BRUSTIN:

12         Q.   Nobody told you.  You had no knowledge

13   about it whatsoever.

14         A.   When Patrolman Torres arrived, he never

15   told me.  When Detective Sergeant Lonergan arrived,

16   he indicated that we had spoke to him before.

17         Q.   Okay.  But no indication whatsoever

18   that they had spoken to him in a psychiatric

19   hospital.

20         A.   No.

21         Q.   No -- no description of what they said

22   to him or what he said to them.

23         A.   Just that they had spoken to him

24   before.

25         Q.   And you never asked.

1  wrong on this -- was he saw two people running away

2  from the crime scene.

3      Q.   What you testified to at the trial,

4  when you looked at the P73, was that Osario was

5  taken to an interview room, there to tell

6  detectives that he could more accurately describe

7  three individuals he saw running from the crime

8  scene.  That's your deposition at page 236.

9      MR. SAHASRABUDHE:  His deposition testimony.

10     MR. BRUSTIN:  Yes, sir.

11     MR. SAHASRABUDHE:  Do you recall that

12 testimony?

13     THE WITNESS:  No, I do not.

14     BY MR. BRUSTIN:

15     Q.   Certainly you don't dispute it if you

16 gave it, right?

17     A.   I would not dispute that, no.

18     Q.   And that he -- and you also

19 acknowledged in your deposition that he described

20 all of the perpetrators as five foot seven inches

21 tall.

22     A.   Yes.

23     Q.   All right.  And you understand that

24 Mr. Ortiz is approximately six foot six inches

25 tall, correct?



1         A.    I'm well aware of that, yes.

2         Q.    He's a very big man, correct?

3         A.    He's a tall -- he's a very tall man.

4         Q.    Nobody could ever mistake Mr. Ortiz for

5    being five seven, right?

6         MR. SAHASRABUDHE:  Object to the form.

7         THE WITNESS:  Correct.

8         BY MR. BRUSTIN:

9         Q.    And you would agree that this is a

10   similar inconsistency to what Emil Adams described

11   as -- as to Valentino Dixon, that he described a

12   stocky man, and then he identified a very thin man,

13   correct?

14        MR. SAHASRABUDHE:  Object to the form.  If

15   you -- you can answer if you agree or disagree.

16   It's similar.

17        THE WITNESS:  They were similar, yes.

18        BY MR. BRUSTIN:

19        Q.    All right.  And so obviously, it's your

20   testimony that you couldn't have known that

21   Mr. Osario was describing three -- three potential

22   perpetrators being five foot seven inches tall,

23   because you would have immediately recognized that

24   couldn't include Mr. Ortiz, correct?

25        A.    Mr. Osario's statement is not a



1          MR. SAHASRABUDHE:  Object to the form.

2          THE WITNESS:  I firmly believed at the time

3   that it was Mr. Ortiz that committed the crime.

4          BY MR. BRUSTIN:

5          Q.   So is it your testimony that you didn't

6   know about that discrepancy or you knew about it

7   and didn't think it was significant?

8          A.   Neither.

9          MR. SAHASRABUDHE:  You doing all right?

10         THE WITNESS:  Yes.  Wish I had some more

11  water.

12         MR. BRUSTIN:  All right.  Let's take another

13  five-minute break.

14              (A recess was then taken at 5:34 p.m.)

15              (On the record: 5:42 p.m.)

16         BY MR. BRUSTIN:

17         Q.   Okay.  I want to ask you some

18  questions, Detective, about the DeJac case, okay?

19         A.   Sure.

20         Q.   You understand that -- that -- you were

21  involved to some degree in the DeJac investigation,

22  correct?

23         A.   Yes, some degree.

24         Q.   And that case involved a murder of a

25  13-year-old girl in February of 1993, correct?

1          A.    Crystallynn Girard.

2          Q.    And the -- the little girl's mother,

3    Lynn DeJac, was convicted of committing that crime,

4    correct?

5          A.    She was.

6          Q.    And she was subsequently exonerated

7    based on DNA evidence.

8          A.    Correct.

9          Q.    DNA evidence indicating that one of the

10   initial suspects, her boyfriend Donohue -- that

11   his -- his DNA was found in the 13-year-old's

12   vagina, correct?

13         A.    Correct.

14         Q.    Pretty powerful evidence that Donohue

15   committed the crime, correct?

16         MR. SAHASRABUDHE:   Object to the form.

17         THE WITNESS:   Pretty powerful evidence that

18   he was having sex with the girl or he touched her

19   in that area.

20         BY MR. BRUSTIN:

21         Q.    All right.  So in your view, not

22   powerful evidence that he --

23         A.    It's power -- it's powerful evidence.

24   Cuts many ways.

25         Q.    Let me finish my question.



1    A.    Sure.

2    Q.    In your view, would you agree that

3  Donohue, who was a suspect in this murder along

4  with another murder years before -- the fact that

5  his semen was found in the 13-year-old vagina of

6  his girlfriend (sic) would be powerful evidence

7  indicating that he is, in fact, the person that

8  killed her?

9    A.    It is powerful, but I thought it was

10 DNA.  I did not know it was semen.

11   Q.    I don't know if it's semen.  His DNA

12 being in her vagina, would that be powerful

13 evidence?

14   A.    It would be.

15   Q.    And in fact, she was found -- you

16 understand that Donohue was previously a suspect in

17 a 1977 unsolved murder of a woman named Carol Reed,

18 who was found raped and naked.

19   A.    I was not aware of the victim's name.

20   Q.    But you knew that there was -- that he

21 was a suspect in a case with those allegations.

22   A.    Correct.

23   Q.    Could you please tell me all the

24 investigative activities that you remember

25 conducting in that case?



1   Detective Lonergan that Ms. DeJac admitted to

2   killing her daughter.

3           MR. SAHASRABUDHE:  Is this an allegation

4   from the Complaint?

5           MR. BRUSTIN:  It's an allegation, yes, from

6   the Complaint.

7           BY MR. BRUSTIN:

8           Q.   Do you recall that?

9           A.   You have your answer.  It's Detective

10  Lonergan.  I did not have any interaction -- I

11  don't believe I had interaction with him.

12          Q.   All right.  And that there was -- there

13  was an allegation that you were involved in

14  coercing him after the fact to maintain his false

15  testimony.

16          Do you deny doing that?

17          A.   I do.

18          MR. SAHASRABUDHE:  Object to the form.  And

19  that again is an allegation from the Complaint.

20          MR. BRUSTIN:  Yes.

21          BY MR. BRUSTIN:

22          Q.   A more specific allegation is that you

23  pressured Wayne Hudson not to recant his false

24  statement regarding DeJac's confession.

25          I take it you deny that.

```
 1          A.   I deny it, and I don't remember it.
 2          MR. SAHASRABUDHE:  Don't remember having
 3   involvement with Wayne Hudson.
 4          THE WITNESS:  I -- I certainly do not
 5   remember.
 6          BY MR. BRUSTIN:
 7          Q.   And you don't recall one way or another
 8   whether or not you also interviewed Keith Cramer,
 9   but you certainly deny any coercion or suggestion
10   with him.
11          A.   I don't recall.
12          MR. SAHASRABUDHE:  You don't recall
13   interacting with him.
14          THE WITNESS:  Not at all.  I'm sorry.  It
15   was quite a while ago.
16          MR. SAHASRABUDHE:  Just don't want to --
17          BY MR. BRUSTIN:
18          Q.   So the final question on this is, just
19   to be clear, that the allegation is that although
20   Lonergan took the false statement from Mr. Hudson,
21   it was alleged that you -- when -- when Mr. Hudson
22   later tried to recant, you pressured him not to.
23          And I take it you deny doing that.
24          MR. SAHASRABUDHE:  Object to the form.
25          THE WITNESS:  I do deny it.
```



1          MR. SAHASRABUDHE:  Do you recall it?

2          THE WITNESS:  I do.

3          BY MR. BRUSTIN:

4          Q.   And that was the crime that Cory Epps

5    was convicted of.

6          A.   I believe so, yes.

7          Q.   And he was -- and he was convicted

8    based on an identification by the passenger in

9    Ms. Means' car, a woman named Bradley.

10         A.   I believe -- I believe you are correct.

11         Q.   Okay.  And that investigation was in

12   1997.  Do you recall that?

13         A.   That's about the right time.

14         Q.   All right.  Now, you were involved in

15   the Pope investigation, correct?

16         A.   Correct.

17         Q.   And there came a time when you took a

18   statement from a woman named Wymoko (phonetic)

19   Anderson.

20         A.   Wymika (phonetic) Anderson.

21         Q.   Is it Wymiko?

22         A.   Wymika.

23         Q.   I think it's --

24         A.   I'll try it for you.  W-Y-O-M-K-A

25   (sic), Anderson.  I think she's known as Pumpkin.



 1  pretty broad.

 2        One of the things that Ms. Anderson claims

 3  that she told you -- and I don't think you dispute

 4  this -- is that Russell Montgomery killed her

 5  boyfriend, Paul Pope.

 6        A.   I don't recall that.  I -- I believe

 7  that to be true, but you're like refreshing my

 8  memory.  I believe that to be true.

 9        Q.   Okay.  And according to --

10        A.   She was not a witness to that, by the

11  way.

12        Q.   That's right.  That her -- that -- that

13  it was reported to her.

14        A.   Yes.  Yes.

15        Q.   All right.  Now --

16        A.   She -- it's a surmised -- she surmised

17  that it was him.

18        Q.   Okay.  And according to her -- and I

19  will represent to you this does not appear anywhere

20  in your interview.

21        A.   Okay.

22        Q.   According to her, she also reported to

23  you during that interview that Montgomery also

24  killed Tameka Means.  That she had information

25  suggesting that Montgomery killed Tameka Means.

 1          MR. SAHASRABUDHE:  Object to the form,
 2   mischaracterizes the testimony.
 3          THE WITNESS:  I don't remember that, and I
 4   don't think that's true.
 5          BY MR. BRUSTIN:
 6          Q.   All right.  And she claims that --
 7   according to her, she claims that when she tried to
 8   tell you that Russell killed Ms. Means, you told
 9   her that Cory Epps did it; that you had evidence
10   against him; and that she was wrong.
11          MR. SAHASRABUDHE:  Object to the form.
12          THE WITNESS:  I don't believe so, no.
13          BY MR. BRUSTIN:
14          Q.   All right.  And obviously -- well, you
15   deny that happening during the interview, because
16   if it happened, you would obviously have to
17   document that, correct?
18          A.   Correct.
19          MR. SAHASRABUDHE:  Object to the form.
20          BY MR. BRUSTIN:
21          Q.   And you also deny saying that to her,
22   because if a woman came in and told you she had
23   information about somebody committing a murder for
24   which you had another suspect, the last thing you
25   would do appropriately as a detective would be to



1  tell her she was wrong, correct?

2        MR. SAHASRABUDHE:  Object to the form.

3        THE WITNESS:  You're correct.  I mean, she

4  is a good person.  She was very distraught when she

5  came in.

6        BY MR. BRUSTIN:

7        Q.   All right.

8        A.   And --

9        Q.   In any case, whether she's -- so you

10 believe her to be a good, honest person.

11       A.   I do.

12       Q.   All right.  And so when she claims that

13 during that interview, she told you that Montgomery

14 also killed Ms. Means, she's lying about that.

15       MR. SAHASRABUDHE:  I object to the form.

16 That's not what she claims.  You can answer if you

17 want.

18       THE WITNESS:  No, she did not tell me that.

19       BY MR. BRUSTIN:

20       Q.   All right.  So let's take a look at --

21 I think we should do a little bit with the

22 Exhibits, so take a look at the marked

23 Exhibit binder.

24       A.   Which case?

25       MR. SAHASRABUDHE:  Dixon Deposition Marked



1  Plaintiff's 15, and it was formerly marked as

2  Exhibit 105 in connection with the Epps case, and

3  it's the -- it's the -- it's testimony -- prior

4  testimony from Wymiko Anderson, I believe in

5  post-trial proceedings in the Epps case.

6         Now, if you'd take a look at page 25, this

7  is Ms. Anderson describing what happened with the

8  Buffalo police on April 17th when you interviewed

9  her, okay?

10        A.   Yes, sir.

11        Q.   All right.  If you could read to

12  yourself -- read to yourself on page 27, lines

13  12 --

14        A.   Okay.

15        Q.   -- to page 29, line 6.  Let me know

16  when you're done.

17        Actually, if you could read all the way

18  through page 31, line 25.

19        A.   Okay.

20        Q.   Now, you would agree that what

21  Ms. Anderson is describing here is that she

22  provided you information about the Means murder,

23  correct?

24        A.   Correct.

25        Q.   That you failed to write it down in



1   your statement, correct?

2        A.   It does not appear in my statement,

3   you're correct.

4        Q.   And that you left the room --

5        A.   Correct.

6        Q.   -- for a period of time, that you came

7   back, and that you told her in substance that she

8   was wrong; you had the right person for that crime.

9        A.   No, I did not.

10       Q.   That's what she's claiming, correct?

11       A.   Correct.

12       Q.   All right.  In other words, she is

13   making up a series of lies about what happened

14   during that interview, correct?

15       A.   Correct.

16       Q.   To the extent that she provided you any

17   information about the Means murder, the last thing

18   that you were supposed to do, if you were following

19   accepted practice, would be to stop typing,

20   correct?

21       A.   Correct.

22       MR. SAHASRABUDHE:  Object to the form.

23       BY MR. BRUSTIN:

24       Q.   You had an obligation to document the

25   information she provided to you if she provided it



1   to you.

2          A.   You are correct.

3          MR. SAHASRABUDHE:  Form.

4          BY MR. BRUSTIN:

5          Q.   And it would be completely improper for

6   you to have told her that she was wrong and not to

7   document that evidence, correct?

8          A.   Correct.

9          MR. SAHASRABUDHE:  Form.

10         BY MR. BRUSTIN:

11         Q.   For whatever reason, Ms. Anderson made

12  that up.

13         MR. SAHASRABUDHE:  Form.

14         THE WITNESS:  Correct.

15         BY MR. BRUSTIN:

16         Q.   And by the way, the information that

17  she -- assuming what she's saying is true, that her

18  boyfriend told her Russell Montgomery agreed to --

19  withdrawn.

20         To the extent that she was telling you that

21  Russell Montgomery told her boyfriend that he

22  killed Tameka Means, that would, in fact, be a

23  hearsay statement, correct?

24         A.   It certainly would.

25         Q.   And that would be something that you



 1  your interaction with her, you don't think she was

 2  sophisticated to know the difference between a

 3  hearsay statement and a non-hearsay statement,

 4  correct?

 5          A.   I would say that's correct.

 6          Q.   And she claims that you told her it was

 7  a hearsay statement, correct?

 8          MR. SAHASRABUDHE:  Form.

 9          THE WITNESS:  I -- I did not say that.

10          BY MR. BRUSTIN:

11          Q.   I know.  She claims you did.

12          A.   That's fine.  Okay.

13          Q.   And if she had made that statement to

14  you, you would have, in fact, understood -- in

15  other words, if she told you that "My boyfriend

16  told me that Russell Means (sic) confessed to him

17  about committing the murder," you would understand

18  that that's a hearsay statement.

19          MR. SAHASRABUDHE:  Form.

20          THE WITNESS:  Correct.

21          BY MR. BRUSTIN:

22          Q.   And you would understand that there

23  would be problems using that statement as

24  affirmative evidence.

25          A.   Correct.



1  8/12/91, so that's page 185.

2        You would agree that one of the important

3  things to -- according to you in this report, Aaron

4  Jackson made a tentative identification, correct?

5        A.    Correct.

6        Q.    And -- of -- of Valentino Dixon.

7        A.    Correct.

8        Q.    And either on this day or in the

9  following days, you understood it would be

10 important to show a photo array of Lamarr Scott to

11 Aaron Jackson, correct?

12       A.    Correct.

13       Q.    And can you explain why that never

14 happened?

15       MR. SAHASRABUDHE:  Object to the form.

16       THE WITNESS:  No, I cannot.

17       BY MR. BRUSTIN:

18       Q.    And obviously, given the information

19 that Lamarr Scott gave, it would have been

20 important to do an investigation and -- including

21 an interview of Aaron Jackson, about whether or not

22 he had a gun or Torri Jackson had a gun.

23       A.    It would have been important.

24       Q.    And there's absolutely no questions

25 whatsoever here, correct?



1           A.    Correct.

2           Q.    And if you'd take a look at page 216.

3           MR. SAHASRABUDHE:  I don't understand this

4    page numbering.

5           THE WITNESS:  I'm on page 216 with DiPirro

6    and Grabowski.

7           BY MR. BRUSTIN:

8           Q.    And on 8/21, more than a week later --

9           A.    Okay.

10          Q.    -- DiPirro and Grabowski are doing a

11   follow-up interview of Aaron Jackson, correct?

12          A.    Correct.

13          Q.    And obviously, you would have expected

14   DiPirro and Grabowski -- Grabowski to talk to you

15   before doing a follow-up investigation of a man you

16   interviewed, right?

17          MR. SAHASRABUDHE:  Object to the form.

18          THE WITNESS:  I don't -- I don't recall

19   that.  Both the Detectives Grabowski and DiPirro

20   are deceased, and I -- this is their -- I don't

21   remember this form or this report at all.

22          BY MR. BRUSTIN:

23          Q.    You certainly would have known about it

24   at the time.

25          MR. SAHASRABUDHE:  Object to the form.



1          THE WITNESS:  I might have, yes.

2          BY MR. BRUSTIN:

3          Q.   Well, certainly no indication in this

4    report that they did any investigation to determine

5    whether or not Aaron Jackson or Torri Jackson had

6    weapons, correct?

7          A.   Correct.

8          Q.   And nothing in this report indicating

9    that a photo array was shown to them with Lamarr

10   Scott.

11         MR. SAHASRABUDHE:  Object to the form.

12         THE WITNESS:  That is correct.

13         BY MR. BRUSTIN:

14         Q.   So it appears as to Aaron Jackson,

15   there was no investigation whatsoever to determine

16   whether or not the allegations that Lamarr Scott

17   confessed to were true.

18         MR. SAHASRABUDHE:  Object to the form.

19         THE WITNESS:  Correct.

20         MR. SAHASRABUDHE:  From -- from this report.

21         THE WITNESS:  From this report.

22         BY MR. BRUSTIN:

23         Q.   From this report or your report.

24         A.   From this report.

25         Q.   Or your report.



1        A.   I did not generate a report to that,

2   no.

3        Q.   You generated a -- you generated a

4   report from August 12th.  Do you remember we just

5   looked at that?

6        A.   I do.

7        Q.   And no indication there of any

8   questions about whether he had a gun, correct?

9        A.   Correct.

10        Q.   And no indication there about whether

11   or not you -- and you didn't -- you did not show

12   him a photo array of Lamarr Scott that day,

13   correct?

14        A.   Correct.

15        Q.   And by the way, the reason there's

16   confusion about whether or not this was before or

17   after you interviewed Lamarr Scott is because, once

18   again, you did not put the time in your report as

19   to when you interviewed him, correct?

20        A.   Correct.

21        Q.   If you had put the time in your report

22   as to when you interviewed him, we would have known

23   whether or not it was before or after Lamarr Scott,

24   correct?

25        A.   Before -- run -- run that by me again.



 1  page 154.

 2       A.   Okay.

 3       Q.   So first of all, on August 11th, the

 4  day before you interviewed Aaron Jackson, you

 5  interviewed Mario Jarmon in the hospital.

 6       A.   Correct.

 7       Q.   And he indicated that Torri Jackson was

 8  the person that shot him, correct?

 9       A.   Correct.

10       Q.   So you have information before you

11  interview Aaron Jackson the next day that his

12  brother actually brought a gun and shot at Mario

13  Jarmon, correct?

14       A.   I -- I don't recall that.

15       Q.   Well, you don't have to recall it.

16  It's in your memo.  That's what it says in the

17  document, right?

18       A.   That's correct.

19       Q.   How do you explain not asking Aaron

20  Jackson a single question the next day about what

21  Mario Jarmon reported to you, that his brother shot

22  him?

23       MR. SAHASRABUDHE:  Object to the form.

24       THE WITNESS:  I don't know.  I can't answer

25  that.



1        BY MR. BRUSTIN:

2        Q.   Would you -- can you think of any --

3   any legitimate police reason not to ask him that

4   question?

5        MR. SAHASRABUDHE:  Object to the form.

6        THE WITNESS:  No, I cannot.

7        BY MR. BRUSTIN:

8        Q.   Would you agree that that would be a

9   basic question that any officer acting in good

10  faith would ask?

11       MR. SAHASRABUDHE:  Object to the form.

12       THE WITNESS:  No, I cannot.

13       BY MR. BRUSTIN:

14       Q.   You agree with me, right?

15       A.   I do.

16       Q.   Another mistake.

17       A.   That's correct.

18       Q.   All right.  Now, take a look at --

19       MR. BRUSTIN:  Go off the record for just a

20  minute.

21            (Off the record: 6:29 p.m.)

22            (On the record: 6:30 p.m.)

23       BY MR. BRUSTIN:

24       Q.   Take a look at page 161, and look at

25  the second and third paragraphs beginning with



1  "Upon arrival at the homicide office" --

2          A.    Okay.

3          Q.    -- through the next paragraph.

4          A.    Okay.

5          Q.    And you would agree it appears that in

6  the early morning hours, about 1 a.m. on the 12th,

7  that's when the confession was made to the TV

8  station, correct?

9          A.    Correct.

10         Q.    So you certainly knew, before you

11 interviewed Aaron Jackson, about the confession of

12 Lamarr Scott.

13         A.    I would say that's correct.

14         Q.    And so that would make it even -- so

15 the most basic investigative task at that point,

16 particularly when you have a suspect --

17 withdrawn -- particularly when you have a witness

18 who's only made a tentative identification, would

19 be to show that witness a photo array containing

20 Lamarr Scott, correct?

21         MR. SAHASRABUDHE:  Object to the form.

22         THE WITNESS:  We could have.

23         BY MR. BRUSTIN:

24         Q.    That would have been a basic

25 investigative task that any officer acting in good



1  faith would have conducted, correct?

2          MR. SAHASRABUDHE:  Object to the form of the

3  question.

4          THE WITNESS:  We could have.

5          BY MR. BRUSTIN:

6          Q.  All right.  In fact, not only did you

7  not show a photo array to Aaron Jackson on the

8  12th, not a single question concerning any of the

9  information Lamarr Scott gave to you, correct?

10         MR. SAHASRABUDHE:  Object to the form.

11         THE WITNESS:  You're correct.

12         BY MR. BRUSTIN:

13         Q.  But that had nothing to do with your

14  trying to cover up your misconduct.

15         MR. SAHASRABUDHE:  Object to the form.

16  Don't answer that question.

17         MR. BRUSTIN:  This is exactly what we're

18  alleging.  I want him to answer it.

19         BY MR. BRUSTIN:

20         Q.  That had nothing to do with our

21  allegation that you were covering up misconduct

22  regarding Valentino Dixon.

23         MR. SAHASRABUDHE:  Object to the form.  That

24  calls for an ultimate issue.  It's a palpably

25  improper question.  Don't answer it.



```
 1  STATE OF NEW YORK)

 2                      ss:

 3  COUNTY OF ERIE   )

 4

 5       I DO HEREBY CERTIFY as a Notary Public in and

 6  for the State of New York, that I did attend and

 7  report the foregoing deposition, which was taken

 8  down by me in a verbatim manner by means of machine

 9  shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18                      --------------------------
19                      LORI K. BECK, CSR, CM,
                        Notary Public.
20

21

22

23

24

25
```


800.211.DEPO (3376)
EsquireSolutions.com