# EXHIBIT 4

**In the Matter Of:**

DIXON V. CITY OF BUFFALO

1:19-cv-01678-WMS

---

# LAMARR SCOTT

*March 14, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

VIDEO DEPOSITION
LaMARR SCOTT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------
VALENTINO DIXON,

                              Plaintiff,

            - vs -       Case No.
                         1:19-cv-01678-WMS

CITY OF BUFFALO and COUNTY OF ERIE;
and DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA, DETECTIVE
JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN, JOHN DOES,
Unknown Buffalo Police Department Supervisors,
and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
BELLING, in their individual capacities,

                              Defendants.
----------------------------------------

        Video recorded deposition of LaMARR

SCOTT, taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of HARRINGTON &

MAHONEY, 70 Niagara Street, 3rd Floor, Buffalo, New

York, on March 14, 2022, commencing at 10:02 a.m.,

before DANIELLE M. FETZER, Notary Public.



```
 1                    LaMarr Scott
 2  Just high school I think is fine.
 3          A.   GED.
 4          Q.   Okay.  And any -- any higher
 5  education --
 6          A.   No.
 7          Q.   -- after that?
 8          A.   No.
 9          Q.   Okay.
10          A.   None documented.
11          Q.   All right.  Where did you go to high
12  school?
13          A.   Riverside.
14          Q.   All right.  I understand you were also
15  a ball player there?
16          A.   Yes, I played football and basketball.
17          Q.   Okay.  Did -- did you consider playing
18  in college?
19          A.   Alfred State, but I went to prison.
20          Q.   But that had been something you were
21  thinking about?
22          A.   Well, I was going to go, but I went to
23  prison.
24          Q.   For football?
25          A.   Yeah.
```



1                        LaMarr Scott

2          Q.    What'd you play?

3          A.    Defensive end.

4          Q.    And I'm sorry, could you -- your date

5     of birth is 9/19/72; is that right?

6          A.    Yes, it is.

7          Q.    Okay.  And could you just tell me in --

8     you mentioned you were a defensive end being

9     recruited -- you were being recruited to play

10    defensive end?

11         A.    Yes.

12         Q.    You were a big guy?

13         A.    Yes, I was.

14         Q.    All right.  What was your height and

15    weight in -- in 2000 -- I'm sorry -- in 1991?

16         A.    6',1".  Maybe 185, 190.

17         Q.    I thought you were a little bigger than

18    that.  Are you sure you weren't --

19         A.    Yeah, maybe --

20         Q.    Maybe 210?

21         A.    -- maybe 2, 205 --

22         MR. SOEHNLEIN:  Objection.

23         THE WITNESS:  -- something similar to that.

24         BY MR. BRUSTIN:

25         Q.    Okay.  But -- but you were a big guy;



1                        LaMarr Scott

2  fair to say?

3          A.    Yeah.

4          Q.    And back then, Valentino Dixon was a

5  very small guy; is that fair to say?  Skinny?

6          A.    Well, he was slim.

7          Q.    Probably 150, 160, something like that?

8          A.    I'm not sure.  Maybe.  A possibility.

9          Q.    But slim?

10         A.    Yes.

11         Q.    Back in 1991, nobody would ever mistake

12  you for Valentino Dixon --

13         MR. SOEHNLEIN:  Form.

14         BY MR. BRUSTIN:

15         Q.    -- in terms of size --

16         MR. RUSS:  Object to the form.

17         BY MR. BRUSTIN:

18         Q.    -- would that be fair to say?

19         A.    No, they wouldn't.  They wouldn't do it

20  now.  We're totally two -- we're totally different

21  people.

22         Q.    Okay.  And you're a much bigger man?

23         A.    Yes.

24         Q.    Now, I want to try to make this as

25  simple for you as you can -- as I can.  I



```
 1                      LaMarr Scott
 2          Q.   All right.  Well, let me ask you some
 3   more specific questions.  My understanding, sir,
 4   and you correct me if I'm wrong, is that Mr. Dixon
 5   had brought a -- the TEC-9 to Mr. Jarmon's house,
 6   and then you took it from the house and that is
 7   when you ended up tragically killing Mr. Jackson;
 8   is that correct?
 9          MR. RUSS:  Object --
10          THE WITNESS:  Yes.
11          MR. SOEHNLEIN:  Form.
12          MR. RUSS:  -- to the form.
13          THE REPORTER:  And just real quick:  Can we
14   do an objection by one is an objection by all?
15          MR. RUSS:  That's fine with me.
16          MR. SOEHNLEIN:  Yeah, that makes sense.
17          THE WITNESS:  No, that's incorrect.  He
18   brought the gun to me personally --
19          BY MR. BRUSTIN:
20          Q.   Okay.
21          A.   -- on Goodyear Street and we drove --
22          Q.   Okay.
23          A.   -- from Goodyear to Delevan to
24   Mario's --
25          Q.   Okay.
```



```
 1                      LaMarr Scott
 2   over there, getting to his -- getting to Mario's
 3   home and, you know, going to the store to get some
 4   beers, and then the shooting happened.
 5         Q.   Okay.  But as you pled to, at
 6   approximately 1:15 a.m., you used the weapon in an
 7   automatic mode and you shot Torriano Jackson; is
 8   that correct?
 9         A.   Yes.
10         Q.   And you also shot Aaron Jackson and
11   John Sullivan?
12         A.   Yes.
13         Q.   And at the time that you shot
14   Torriano Jackson, did you see Torriano Jackson with
15   a weapon?
16         A.   I didn't see -- I didn't see Torri with
17   the weapon after he got shot, but I did see him
18   with a weapon prior to that because he was shooting
19   Mario.
20         Q.   Okay.  So you did see Torri Jackson
21   shoot Mario Joiner?
22         A.   Yeah, Mario --
23         (Objections to the form.)
24         BY MR. BRUSTIN:
25         Q.   Mario Jarmon.
```



LAMARR SCOTT                                         March 14, 2022
DIXON V. CITY OF BUFFALO                                        19

```
1                      LaMarr Scott

2           A.    -- Jarmon, yeah.

3           Q.    I'm sorry.  I apologize.

4           A.    Yeah.

5           Q.    And what kind of weapon did Torri have?

6           A.    I don't know.  I don't know.  It was --

7    it was a handgun.  I'm not sure what kind it was.

8           Q.    Okay.  And what kind of weapon did you

9    have?

10          A.    A TEC-9, semi -- a TEC-9 machine gun.

11   I guess that's what it's called.

12          Q.    And as you had acknowledged both in

13   your plea and other places, Valentino Dixon did not

14   fire any weapons that night; is that correct?

15          A.    No, he didn't.

16          Q.    And my understanding, sir, is that the

17   reason that you pled guilty to this crime in 2018

18   and the reason why -- well, let's start with the

19   reason why you pled guilty in 2018.

20          My understanding is that as a man with a

21   strong spiritual connection, at that time you

22   recognized that you could not continue to allow an

23   innocent man to be in prison; is that correct?

24          (Objections to the form.)

25          THE WITNESS:  At that time and this time.
```



```
1                      LaMarr Scott
2    that right?
3         A.   Yes, I am.
4         Q.   And is it your understanding that given
5    the murder conviction that you pled guilty to in
6    2018, how does that affect your parole, to your
7    knowledge?
8         (Objections to the form.)
9         THE WITNESS:  It affects it in the sense
10   that I -- I still have 20 years left on parole, and
11   if I sneeze wrong, there's a strong possibility
12   that that could be violated because it's a violent
13   crime.
14        BY MR. BRUSTIN:
15        Q.   And that's as a result of your pleading
16   guilty to the murder of Torri Jackson?
17        A.   Yes.
18        Q.   And you knew that when you pled guilty;
19   is that correct, sir?
20        A.   I was aware of it, yes.
21        Q.   Okay.  But you did it, nonetheless,
22   because it was the right thing to do?
23        (Objections to the form.)
24        BY MR. BRUSTIN:
25        Q.   You tell me.  Why did you do it,
```



1                    LaMarr Scott

2  nonetheless, knowing that you could face these

3  additional restrictions on parole, why did you

4  still choose to plead guilty?

5        (Objections to the form.)

6        THE WITNESS:  Because an individual is not

7  responsible -- you know, I understand that you're a

8  lawyer and you have to ask these questions, but one

9  thing I want you all to understand is, is that when

10  a man is innocent of a crime -- if he's innocent of

11  a particular crime and someone can -- that's

12  responsible for it, you have to stand up and say,

13  I'm -- I'm responsible for this.

14        You can't allow another human being to

15  continue to be punished for something that they

16  didn't do, no matter how you feel about them

17  personally, no matter what they've done in their

18  past personally.  If you have the opportunity to do

19  so, do so.  It relieves you spiritually of the

20  burden.

21        BY MR. BRUSTIN:

22        Q.   All right.  Now, take a look at page 12

23  of the plea here if you -- if you don't mind, sir.

24        MR. RUSS:  Exhibit 1.

25        MS. PERSICO:  Sorry --



1                        LaMarr Scott

2    shorts.

3          Q.   Okay.  Do you remember the cap being

4    white?

5          A.   No, I don't remember the specific

6    colors.

7          Q.   Fair enough.  Certainly your memory

8    would have been much better back -- back at the

9    time of what you were wearing --

10         A.   Of course --

11         Q.   -- fair to say?

12         A.   -- it was.  Of course it was.  It

13   happened -- it was right away.

14         Q.   Okay.  So I now want to get to the

15   heart of this, which is your interaction with the

16   police.

17         And I want to start with your going to the

18   television cameras and confessing to the crime on

19   the 11th.  Okay?

20         So, first of all, can you tell me how you

21   came to confess to this crime on television?

22         A.   What do you mean?  How I came -- I

23   don't understand.

24         Q.   How did you decide to do that?

25         A.   It was a decision that I made so I



```
 1                     LaMarr Scott
 2   called the Channel 4, Wanda Starkeson, turned
 3   myself in.
 4         Q.   Okay.  Did -- did anybody force you to
 5   do that?
 6         A.   No, nobody forced me to.  Nobody forced
 7   me to.
 8         Q.   Did anybody offer you anything for
 9   doing that?
10         A.   Nobody offered me anything.
11         Q.   Why did you -- why did you decide to do
12   that at that time, sir?
13         A.   Because it was important to do so.  I
14   mean, you know, more of a protective thing than
15   anything else.  I was a child --
16         Q.   Okay.
17         A.   -- you know.
18         Q.   You mentioned it was a protective
19   thing.  Did you have concerns about going to the
20   police before making your statement public?
21         A.   Well, being in the system and being
22   abused on a consistent basis by authority figures,
23   there's an ingrained fear of authority figures.
24         So regardless of whether it's a police
25   officer or a judge, it's still an authority figure.
```



1                        LaMarr Scott

2   There's a fear there.

3        Q.   Okay.  And so I think I understand.  It

4   sounds like what you did was you went -- you went

5   first to confess on television as a matter of

6   protecting yourself; is that fair to say, sir?

7        A.   Yes, it is.

8        (Objections to the form.)

9        BY MR. BRUSTIN:

10        Q.   Were you concerned when you went on

11   television as to what the police would do to you if

12   in fact you went and confessed to them first?

13        A.   No, I -- I really don't remember if I

14   was concerned in that aspect.  The only thing I

15   knew was that it was best to turn myself in and,

16   you know, hopefully Mr. Dixon didn't go to jail for

17   it, but unfortunately these things happen.

18        Q.   Okay.  And I think I've already -- I've

19   already asked you this, but I just want to make it

20   crystal clear.

21        Did anybody offer you anything for coming

22   forward at that time --

23        A.   You just asked me that two minutes ago.

24        (Objections to the form.)

25        BY MR. BRUSTIN:



 1                     LaMarr Scott

 2   statement from you?

 3          A.    I remember there was a statement taken.

 4          Q.    Okay.  I'm going to ask you some

 5   questions about some statements you made and some

 6   offers that you made at that time, and then some

 7   statements you made since -- since that time about

 8   your interactions with the police.  Okay?

 9          A.    Mm-hmm.

10          Q.    So, first of all, what was the police

11   reaction when you told them that you had -- that

12   you had in fact committed this crime, that you were

13   the shooter?

14          (Objections to the form.)

15          THE WITNESS:  I don't -- I don't remember

16   their reaction.  They just -- you know, sit down,

17   that's it.

18          BY MR. BRUSTIN:

19          Q.    Okay.  Well, for example, do you

20   recall -- you do recall being interviewed by

21   investigators for the district attorney's office in

22   2018, correct?

23          (Objections to the form.)

24          THE WITNESS:  Yes.

25          BY MR. BRUSTIN:



```
 1                        LaMarr Scott

 2         Q.   All right.  And one of the things that

 3    you told them is that the detectives, and

 4    Mr. Stambach in particular, told you that they

 5    had -- they had their guy and it wasn't you; do you

 6    recall that?

 7         A.   Yes, I recall that.

 8         Q.   Okay.  You recall Detective Stambach

 9    telling you that, correct?

10         A.   I remember there was a detective that

11    said that.  I don't know if he was Stalbach or

12    Stalbach.  I don't -- I don't know the guy's name

13    particularly.

14         Q.   Okay.  But it was the guy who did

15    the inter -- the interview with you, correct?

16         A.   Yes.  But, again, how does -- how does

17    the police officer's actions with me have to do

18    with his accusations with the -- you know,

19    the harassment with him?  That -- I don't -- I want

20    you to explain that to me.

21         Q.   Sure.  So any type of misconduct with

22    you, whether it's coercion or -- or failing to

23    disclose information that you provided to them is

24    information that Mr. Dixon also had a right to

25    receive and has a -- has that right to use now in
```



```
 1                    LaMarr Scott
 2  night when you came in, correct?
 3         A.   Yes.
 4         Q.   And did you also offer to give them the
 5  clothing that you had on the night of the shooting?
 6         A.   Yes, I did.
 7         Q.   Okay.  And did you in fact tell them
 8  that you believe there might even be blood from the
 9  shooting on your shoes?
10         A.   There was blood on my shoes.
11         Q.   Okay.  And when you told the police
12  officers that night that you were willing to give
13  them your shoes with blood on them, what did they
14  say to you, sir?
15         A.   I don't remember exactly what was said
16  to me.  I just know that nobody ever took anything
17  that I offered.
18         Q.   Now, do you recall also telling the
19  district attorney and being told by Stambach and
20  other detectives that until you and Leonard Brown
21  get your statements together, you had to -- you had
22  to leave?
23         (Objections to the form.)
24         THE WITNESS:  I remember they were talking
25  to Leonard pertaining to a statement and -- but I
```



```
 1                        LaMarr Scott
 2  don't remember them telling me to -- that we have
 3  to leave until we get it together.
 4        I know that Leonard said something out the
 5  way.  So, you know, I was just happy to be up out
 6  of there.
 7        BY MR. BRUSTIN:
 8        Q.   Okay.  But the police officers made it
 9  clear to you they didn't believe your story,
10  correct?
11        A.   Yes.
12        (Objections to the form.)
13        BY MR. BRUSTIN:
14        Q.   And they also made it clear to you --
15  well, they certainly didn't take you up on your
16  offer to give them -- to take your clothes with
17  blood on them, correct?
18        A.   No, they didn't take me up on them.
19        Q.   And do you remember telling others --
20  withdrawn.
21        Do you recall one of the things that
22  Stambach said to you was, "well, we got who we
23  want"?
24        (Objections to the form.)
25        THE WITNESS:  I don't -- again, I don't
```

1              LaMarr Scott

2  B-U-D-H-E, zero-five, at Gmail.  I can write it

3  down for you.

4          MR. ROMO:  Yeah.

5          MR. SAHASRABUDHE:  Just because our -- it

6  won't allow me to access e-mail away from --

7          MR. ROMO:  Oh, okay.

8          MR. SAHASRABUDHE:  -- from the firm.

9          MR. ROMO:  Got it.  Yeah.

10          THE REPORTER:  Do you want to go off the

11  record?

12          MR. BRUSTIN:  Sure.

13          THE VIDEOGRAPHER:  Okay.  Going off the

14  record.  Time is 10:47.

15          (Off the record at 10:47 a.m.)

16          THE VIDEOGRAPHER:  Going back on the record.

17  Time is 10:51.

18          BY MR. BRUSTIN:

19          Q.   Okay.  Mr. Scott, I'm going to show you

20  what's been marked for identification as

21  Plaintiff's Exhibit 3.  This is a transcript that

22  we made of a videotaped interview that was

23  conducted with you, and Joe Riga, and Sara Dee, and

24  David Heraty.  I'm not sure if I'm pronouncing that

25  right --



```
 1                     LaMarr Scott

 2         MR. THOMPSON:  Heraty.

 3         BY MR. BRUSTIN:

 4         Q.   -- prior to your plea agreement; do you

 5   recall that interview, sir?

 6         A.   Yeah.

 7         Q.   Okay.  And, obviously, during that

 8   interview, Mr. Scott, you did your very best to

 9   tell the truth, correct?

10         A.   Yes.

11         Q.   As you always do, correct?

12         A.   Yes.

13         Q.   All right.  And take a look, if you

14   would, sir, at -- let's begin on page 13.  And I

15   will represent to you this is you speaking -- wait

16   until you get there and you tell me when you're

17   there.

18         Okay.  And I'll represent to you -- if you

19   look back a page, you'll see that this is you

20   describing what happened to the DAs with the --

21   what happened with you -- you're describing to the

22   DAs what happened with the police when you went

23   there in August of 1991.  Okay?

24         (Objections to the form.)

25         MR. RUSS:  I don't know who he's --
```



```
 1                    LaMarr Scott
 2   an accurate recount of what happened.  That's why,
 3   sir.
 4         A.   But we're under oath here.
 5         Q.   That's right.
 6         A.   So I'll the truth, I've been telling
 7   the truth.  So for you to ask me that is -- is kind
 8   of disrespectful to say --
 9         Q.   I don't mean to be disrespectful.
10         A.   Well --
11         Q.   I just --
12         A.   -- that's what you're doing.
13         Q.   I don't mean to be, sir.  But I need to
14   make sure that this is in fact what happened with
15   the police.
16         A.   Well, it's here on record.
17         Q.   Okay.  And in fact, that's what
18   actually happened with the police, correct, what's
19   described here?
20         A.   If this is here on the record, this is
21   what's going on.  This is what happened.
22         Q.   Okay.
23         A.   You're asking me the same questions
24   over and over --
25         Q.   Okay.
```



1                          LaMarr Scott

2          Q.    What I don't want to have to do is get

3    you back here with a court order.  I don't -- I

4    need you to answer my questions, and the question

5    is, did --

6          A.    What do you -- what do you mean a court

7    order?  I don't understand that.  What do you mean?

8          Q.    Sir, you -- I have the right to ask you

9    questions.  You have to answer them.  That's --

10   that's all I can tell you.

11         A.    But I also have a right not to answer

12   them.

13         Q.    You don't.  You're here by subpoena and

14   you have to answer my questions and you have to

15   answer them honestly, and I know you're trying to

16   do that, but that -- that is what you have to do,

17   sir.

18         And in fact, when you told these

19   investigators that -- I'm going to read it to

20   you -- you know, and I said, you want my coat?  I

21   took my coat off.  I was giving him the coat that I

22   had on and I had wiped my sneakers off at the time,

23   but I had white Nikes but there was still small

24   speckles of blood on the bottom of the sneaker and

25   I wanted to give him the sneakers.  He says, no,



1                      LaMarr Scott

2  when you guys get your statements together, you

3  bring all of that back.  Is that in fact what

4  Stambach said to you, sir?

5           A.    This is what --

6           (Objections to the form.)

7           THE WITNESS:  This is in fact what's said

8  right here.  This is exactly what I said on -- in

9  2018.

10          BY MR. BRUSTIN:

11          Q.   And was it truthful when you said it,

12  sir?

13          (Objections to the form.)

14          THE WITNESS:  Of course.  I was under oath

15  and was truthful.  Everything that I've been saying

16  is truthful.  For you to continue to ask me the

17  same questions is extremely irritating, man.

18          So, please, man, don't continue to ask me if

19  it's truthful because I'm not a liar and I haven't

20  been lying.

21          BY MR. BRUSTIN:

22          Q.   Sir, I just need you to confirm that

23  it's true.  That's -- I'm not trying to suggest

24  you're a liar.  I need to confirm it for the

25  record.  That's all I'm doing, sir.



1                     LaMarr Scott

2          A.    But you have it here on record.

3          Q.    I don't believe this was under oath,

4    sir.    That's why I'm asking.

5          A.    But I took a plea agreement to all of

6    these things.    So in order to take the plea

7    agreement, you took a plea agreement to everything

8    that's being said here.

9          So if I said something totally different,

10   then there's a strong possibility that I could go

11   back to prison once again.

12         Q.    All right.

13         MS. YATES RICHARDSON:    Calm down.

14         THE WITNESS:    And I'm calm, Pam.    I'm cool.

15         MS. YATES RICHARDSON:    Okay.    Okay.

16         THE WITNESS:    No, I understand.    I just know

17   this is not --

18         MS. YATES RICHARDSON:    I know, but just --

19         THE WITNESS:    This is -- I understand.    I

20   get it.    I ain't tripping.

21         MS. YATES RICHARDSON:    Okay.

22         BY MR. BRUSTIN:

23         Q.    Okay.    Could you read to yourself on

24   page 14 -- read from where it says, "Leonard

25   Brown," all the way to the bottom of the page --



1                          LaMarr Scott

2   actually, read -- if you could read to the middle

3   of the page where you stop talking on the -- on

4   page -- so read from page 14 in the middle of the

5   page to where it says "Sara Dee" on page 15.  Okay?

6   And let me know when you're done, sir.

7          A.    I don't need to read it.  I know what's

8   here.

9          Q.    Okay.  And could you describe for us

10  today, sir, did Detective Stambach, after you came

11  down and tried to confess, come and speak to you a

12  few days later as you describe here?

13         A.    On a few occasions I've seen him.

14         Q.    Okay.  And what did he say to you, in

15  substance?

16         A.    Asking me was I coming to take a

17  polygraph test.

18         Q.    Okay.  And he also showed up, you said,

19  at places where he was unexpected?

20         A.    Well --

21         (Objections to the form.)

22         THE WITNESS:  -- now that I think of it, of

23  course.  He's a police officer.  So, you know,

24  there's not much investigation you have to do when

25  you're dealing with a kid that goes to the same



1                          LaMarr Scott

2    places all the time.

3          BY MR. BRUSTIN:

4          Q.   Okay.  And as you told the

5    investigators, you felt harassed by Detective

6    Stambach, correct?

7          (Objections to the form.)

8          THE WITNESS:  Yes, I did.

9          BY MR. BRUSTIN:

10         Q.   Okay.  And what specifically did

11   Detective Stambach do that caused you to feel

12   harassed as a young man at the time trying to do

13   the right thing?

14         (Objections to the form.)

15         THE WITNESS:  Well, he -- the showing up

16   himself was a form of harassment, as far as I

17   understood.  You know, just showing up in places

18   that I didn't think anybody should -- should know

19   about and/or show up.

20         BY MR. BRUSTIN:

21         Q.   Okay.  What else?

22         A.   Basically that's it, and asking the

23   question of whether I was going to take a polygraph

24   test or not.

25         Q.   Take a look at page 21.



 1                      LaMarr Scott

 2         Q.   Okay.  And did you write this letter?

 3         A.   I wrote several letters.  As a matter

 4  of fact, I wrote maybe a couple hundred letters.  I

 5  don't remember specifically this one, but this is

 6  my handwriting.

 7         Q.   Okay.  So then since you don't

 8  remember, can I ask you to take a minute and read

 9  it, please?

10         A.   This is just like -- this is a

11  letter -- the same way to so many other ones that I

12  wrote.

13         Q.   Okay.

14         A.   Okay.

15         Q.   You had a chance to read it?

16         A.   Yeah, I gazed through it.  I get it.  I

17  get it.

18         Q.   Okay.  And is this an accurate

19  description of -- is this an accurate description

20  of what happened with -- with the police when you

21  tried to confess?

22         A.   Yes.

23         (Objections to the form.)

24         THE WITNESS:  According to -- according to

25  this, yes, it is.



```
 1                    LaMarr Scott

 2        BY MR. BRUSTIN:

 3        Q.   Okay.  Is there anything in here that's

 4   inaccurate in this letter?

 5        (Objections to the form.)

 6        THE WITNESS:  No, I can't say anything is

 7   inaccurate or accurate.  I know that this is --

 8   these are the letters that I wrote while I was in

 9   Attica --

10        BY MR. BRUSTIN:

11        Q.   Okay.

12        A.   -- and --

13        Q.   And what's -- what's in here is what --

14   what was truthful to the best of your recollection

15   at that time, correct?

16        A.   Yes, it was.

17        MR. BRUSTIN:  Okay.  I think that's all I

18   have right now, Mr. Scott.  Thank you very much --

19        THE WITNESS:  All right.

20        MR. BRUSTIN:  -- for your time.

21        THE WITNESS:  This is Mario.

22                    EXAMINATION

23        BY MR. SOEHNLEIN:

24        Q.   Mr. Scott, I have a few follow-up

25   questions for you.
```



```
 1                      LaMarr Scott
 2          MR. BRUSTIN:  I have just a couple more
 3    questions for you, Mr. Scott.
 4          THE WITNESS:  All right.
 5                    FURTHER EXAMINATION
 6          BY MR. BRUSTIN:
 7          Q.   First of all, Valentino Dixon did not
 8    ask you or direct you to shoot anyone, correct?
 9          A.   No.
10          (Objections to the form.)
11          THE WITNESS:  No, he just told us we had
12    some business to handle.  He didn't tell me to go
13    kill somebody or anything like that.
14          He didn't do that, but you know, when you're
15    looking at the scenarios and what it was, you know,
16    you don't take a guy and give him a gun and then
17    say we have business to handle.  You don't do that.
18          BY MR. BRUSTIN:
19          Q.   And as you told -- as you said, he
20    didn't give you any more specifics other than we
21    have business to handle?  That's your recollection?
22          A.   Yes.
23          Q.   And Mr. Dixon did not say anything to
24    you about shooting anybody, correct?
25          (Objections to the form.)
```



1

2  STATE OF NEW YORK )

3                          ss:

4  COUNTY OF ERIE    )

5

6      I DO HEREBY CERTIFY as a Notary Public in and

7  for the State of New York, that I did attend and

8  report the foregoing deposition, which was taken

9  down by me in a verbatim manner by means of machine

10 shorthand.  Further, that the deposition was then

11 reduced to writing in my presence and under my

12 direction.  That the deposition was taken to be

13 used in the foregoing entitled action.  That the

14 said deponent, before examination, was duly sworn

15 to testify to the truth, the whole truth and

16 nothing but the truth, relative to said action.

17

18

19                _Danielle Fetzer_

20                ---------------
                  DANIELLE FETZER,
21                Notary Public.

22

23

24

25

