# EXHIBIT 7

RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                        1

2                        VIDEO DEPOSITION
                         RANIERO MASECCHIA
3

4
   UNITED STATES DISTRICT COURT
5  WESTERN DISTRICT OF NEW YORK

6  ----------------------------------------
   VALENTINO DIXON,
7
                         Plaintiff,
8
                 - vs -      Case No.
9                            1:19-cv-01678-WMS

10 CITY OF BUFFALO and COUNTY OF ERIE;
   and DETECTIVE MARK R. STAMBACH,
11 DETECTIVE RANIERO MASECCHIA, DETECTIVE
   JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
12 CHIEF RICHARD T. DONOVAN, JOHN DOES,
   Unknown Buffalo Police Department Supervisors,
13 and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
   BELLING, in their individual capacities,
14
                         Defendants.
15 ----------------------------------------

16

17        Video recorded deposition of RANIERO

18 MASECCHIA, Defendant, taken pursuant to the Federal

19 Rules of Civil Procedure, in the law offices of

20 HARRINGTON & MAHONEY, 70 Niagara Street, Buffalo,

21 New York, on March 15, 2022, commencing at

22 9:59 a.m., before DANIELLE M. FETZER, Notary

23 Public.

24

25



```
 1                    Raniero Masecchia

 2   evidence collection unit.

 3        Q.   I'm -- I'm speaking more broadly.  For

 4   example, it was the lead detective's responsibility

 5   to ensure that either that lead detective or

 6   somebody else interviewed all relevant witnesses,

 7   correct?

 8        A.   It's -- it's a group effort, yes.

 9        Q.   Well, I want -- right now I'm focusing

10   on the lead detective --

11        A.   Right.

12        Q.   -- and the lead detective's

13   responsibility.

14        My understanding from other police

15   departments is that the lead detective is

16   responsible for ensuring, along with the

17   supervisors, that all relevant witnesses are

18   interviewed; is that accurate?

19        A.   Yes, I would say so --

20        Q.   Okay.

21        A.   -- and -- but the person in charge to

22   make sure that all -- all the checkmarks were

23   checked would be the lieutenant --

24        Q.   Okay.

25        A.   -- and tell you, Hey, did you finish
```



```
 1                   Raniero Masecchia
 2   your canvas?  Did you have any witnesses?
 3           Q.   Okay.
 4           A.   Was it -- you know, it's the
 5   lieutenant, but the lead detective is the person
 6   you're going to go to.  If you have pertinent
 7   information, you go to the lead detective.  If it's
 8   irrelevant, continue on with it.
 9           Q.   Okay.  So would it be fair to say that
10   the lead detective, as a -- as a matter of practice
11   in 1991, all of the other homicide detectives would
12   understand that any potentially relevant
13   information they gathered had to be brought to the
14   attention of both the lead detective and the
15   supervisor?
16           MR. RUSS:  Objection to form.
17           THE WITNESS:  Well, the two detectives who
18   caught the case are probably the lead detectives.
19           BY MR. BRUSTIN:
20           Q.   Okay.  And did I describe the process
21   accurately, that any relevant evidence that any
22   homicide detective gathered in connection with the
23   case, they would make sure that the lead detectives
24   were in the loop?
25           A.   I would hope so, yes.
```



                    Raniero Masecchia

1

2   you're interviewing eyewitnesses, for example, to

3   document any differences in versions of events they

4   give you about what they saw or heard, correct?

5        A.   Any what?

6        Q.   Any differences in what they saw or

7   heard from interview to interview.

8        A.   Yes.

9        Q.   That, in and of itself, could

10  constitute impeachment evidence, a witness who

11  gives you different versions of events over time?

12       A.   Yes.

13       Q.   Could be an innocent mistake, or it

14  could suggest that they're actually not credible or

15  reliable, correct?

16       A.   Or remembered something they didn't

17  remember earlier.

18       Q.   Right.  But your job is to write it all

19  down and put it into a report, correct?

20       A.   Yes.

21       Q.   The last thing you'd ever want to do as

22  a homicide detective, pursuant to training, is to

23  hide inconsistencies between statements, correct?

24       A.   Yes.

25       Q.   And, in fact, when you get



```
 1                   Raniero Masecchia
 2  inconsistencies in statements from an eyewitness,
 3  it's your job to explore the basis for those
 4  inconsistencies, correct?
 5           A.   In what manner?
 6           Q.   So, for example, if you -- if you're
 7  talking to a witness and on day one that witness
 8  tells you that a perpetrator was wearing a blue
 9  coat, and on day two, that witness tells you that
10  the perpetrator was wearing a white coat, you're
11  going to want to ask questions about that
12  inconsistency, correct?
13           A.   Yes.
14           Q.   For example, you might say, Well,
15  yesterday you told me that he was wearing a white
16  coat, can you explain that?
17           A.   Yes.
18           Q.   It's the kind of question a trained
19  homicide detective asks?
20           A.   Yes.
21           MR. SOEHNLEIN:  Objection as to form.
22           BY MR. BRUSTIN:
23           Q.   The last thing you want to do as a
24  homicide detective is cover up inconsistencies, you
25  want to explore them --
```



```
 1                    Raniero Masecchia

 2         A.    Yes.

 3         Q.    -- correct?

 4         That's as basic as it gets for a homicide

 5   detective, right?

 6         A.    Yes.

 7         Q.    And each of the homicide detectives

 8   that you worked with understood that rule, correct?

 9         A.    I would hope so.

10         Q.    And based on your experience with them,

11   they did?

12         A.    The guys I worked with, yes.

13         Q.    Including Mark Stambach?

14         A.    I believe so.

15         Q.    One of the worst things that you could

16   do as a homicide detective is to receive a piece of

17   information that doesn't fit your theory of the

18   case and then fail to report and document it,

19   correct?

20         A.    Yes.

21         Q.    And would it be fair to say that --

22   that your practice and the practice of all the

23   homicide detectives you worked with was to either

24   dictate or write reports concerning evidence they

25   received within a day of receiving it?
```



```
 1                     Raniero Masecchia
 2          MR. RUSS:  Objection to form.
 3          MR. SOEHNLEIN:  Objection to form.
 4          THE WITNESS:  Yeah.  You would try to, yes.
 5          BY MR. BRUSTIN:
 6          Q.   If possible, you'd try to do it before
 7     the end of your shift?
 8          A.   Yes.
 9          Q.   And when taking a statement or
10     interviewing a witness, there are a variety of --
11     there's a variety of basic information that -- from
12     witness to witness you always want to document;
13     would that be fair to say?
14          A.   Yes.
15          Q.   So, for example, you always want to
16     document the time that that -- that that witness
17     interview is taking place, correct?
18          A.   Yes.
19          Q.   That could be important for a variety
20     of reasons?
21          A.   Yes.
22          Q.   What -- what a witness knows at a
23     certain period of time, who they've had access to
24     before that and after that, could be important?
25          A.   Yes.
```



```
 1                  Raniero Masecchia
 2        Q.    Okay.  So basic rule for homicide
 3   detectives in Buffalo, you write down the time of
 4   the interview?
 5        A.    Correct.
 6        Q.    And you write down the time the
 7   interview ends?
 8        A.    Correct, or you take a picture in front
 9   of a clock.
10        Q.    Okay.  But it's important to know how
11   long an interview lasted?
12        A.    Yes.
13        Q.    For a variety of reasons, including
14   defending against accusations that the meeting was
15   coercive, for example?
16        A.    You're talking about with a suspect or
17   with a witness or ...
18        Q.    Either, potentially, right?
19        A.    Yes.
20        Q.    For a variety of reasons, it's
21   important to write both the start and the end time?
22        MR. RUSS:  Objection to form.
23        THE WITNESS:  Yes, for the most part you
24   should do that.
25        BY MR. BRUSTIN:
```



```
 1                    Raniero Masecchia

 2          A.   Yes.

 3          Q.   And to let the chips fall where they

 4   may?

 5          A.   Yes.

 6          Q.   And obviously any time a suspect -- a

 7   potential suspect is interviewed, it's critically

 8   important to document what they say to you and what

 9   you say to them, correct?

10          A.   Yes.

11          Q.   And it's critically important as a

12   homicide detective to investigate what a

13   potential suspect -- what information a potential

14   suspect provides to you, to the extent that it can

15   be investigated?

16          A.   Yes.

17          Q.   If a -- if a potential suspect gives

18   you an alibi, it's critically important to

19   investigate that alibi, correct?

20          A.   Yes.

21          Q.   Oftentimes an alibi could be false and

22   you can prove it false and that could be evidence

23   of guilt, correct?

24          A.   Yes.

25          Q.   And sometimes an alibi could be true
```



1                  Raniero Masecchia

2  and it could prove that someone actually didn't

3  commit the crime?

4         A.   Yes.

5         Q.   What's important from the perspective

6  of a homicide detective is to investigate that

7  evidence, to the extent practical, as soon as

8  possible after you get it, correct?

9         A.   Yes.

10        Q.   Before -- before -- before, for

11 example, a witness has an opportunity to tamper

12 with other witnesses?

13        A.   Yes.

14        Q.   And the same is true when a suspect

15 provides you admissions about a crime?

16        A.   Yes.

17        Q.   It's critically important to

18 investigate, to the extent you can, the reliability

19 of those admissions?

20        A.   Yes.

21        Q.   So, for example, if a suspect makes

22 confessions or admissions to a crime and tells you

23 that other people witness that crime, it's

24 critically important to interview those other

25 witnesses as soon as possible after you receive



```
 1                    Raniero Masecchia
 2   that information?
 3           A.   Yes.
 4           Q.   Whether or not those witnesses had been
 5   interviewed before or not?
 6           A.   For the most part if they've already
 7   been interviewed and statements taken from them, I
 8   would assume the job is already done --
 9           Q.   Well, if --
10           A.   -- if it wasn't, then I would do it.
11           Q.   That's fair.  Let me -- let me add
12   another factor to it.  If you receive admissions
13   from a suspect --
14           A.   Yes.
15           Q.   -- that con -- about witnesses,
16   including about witnesses, and those witnesses have
17   already given interviews contradicting that
18   information, you're going to want to re-interview
19   those witnesses, correct, with the new information?
20           A.   Somewhere down the road I would assume
21   they -- either through the DA's office they would
22   be brought in to -- to testify and everything would
23   be reviewed.
24           Q.   Well, as a homicide detective, to the
25   extent you can, you want to re-interview those
```



```
1                      Raniero Masecchia
2    witnesses, correct --
3           MR. RUSS:  Objection to form.
4           BY MR. BRUSTIN:
5           Q.   -- that's your job, pre-arrest?
6           A.   Pre-arrest, while the investigation is
7    still going on, yes.
8           Q.   Okay.
9           A.   After the arrest, if statements are
10   already taken, the DA's office should handle that.
11          Q.   Okay.  Well, certainly, you continue to
12   investigate -- even after an arrest, you continue
13   to investigate crimes routinely, correct?
14          MR. RUSS:  Objection to form.
15          THE WITNESS:  Other crimes?
16          BY MR. BRUSTIN:
17          Q.   Same crime even after an arrest is
18   made, if you receive additional information --
19          A.   Yes.
20          Q.   -- you investigate?
21          A.   Yes.
22          Q.   Your job doesn't end with an arrest?
23          A.   No.
24          Q.   And, certainly, if you receive
25   information after an arrest that caused you to
```



1                Raniero Masecchia

2  question the reliability of that arrest, it's even

3  more important that you investigate, correct?

4         A.   Yes, and I've done so.

5         Q.   Now, how was the homicide file kept in

6  1991 in the homicide unit?

7         MR. RUSS:  In general?

8         MR. BRUSTIN:  Yeah.

9         THE WITNESS:  It was being -- folders, not

10  like that, but manilla folders in the cabinet and

11  you'd -- like I said, you had the DA's copy in

12  there, the DA folder, the court folder, as we would

13  call it, the original file, and the work folder in

14  case there's anything added on to it, you know, if

15  you -- there's something you wanted to work with,

16  you take the work folder out with you and you had

17  to bring it out -- out of the office --

18        BY MR. BRUSTIN:

19        Q.   Okay.

20        A.   -- but the files never left the office

21  unless they were requested by the DA's office or by

22  a judge.

23        Q.   And then presumably there would be

24  copies maintained in the file, fair to say?  Or the

25  originals would stay in the file?



1              Raniero Masecchia

2         Q.    Okay.  And you understood any time you

3   were interviewing an eyewitness to a crime who

4   potentially saw a perpetrator, one important

5   question -- series of questions to ask them is to

6   get as -- get as detailed a description of the

7   perpetrator as they can get?

8         A.    Yes.

9         Q.    And you're looking for distinguishing

10  characteristics, for example?  One thing you're

11  looking for are distinguishing characteristics --

12        A.    Yes.

13        Q.    -- right?

14        A specific hair style, tattoos, specific

15  clothing items, those kinds of things?

16        A.    Yes.

17        Q.    And as a detective, you know how to ask

18  questions that get at that information?

19        A.    Yes.

20        Q.    But you want as detailed a description

21  as you can get from a witness, correct?

22        MR. RUSS:  Objection to form.  You may

23  answer.

24        THE WITNESS:  Yes.

25        BY MR. BRUSTIN:



1                    Raniero Masecchia

2        Q.   All right.  And that's important for a

3   variety of reasons, correct?

4        MR. RUSS:  Objection to form.

5        THE WITNESS:  Yes.

6        MR. RUSS:  You may answer.

7        BY MR. BRUSTIN:

8        Q.   One reason is you want to ascertain as

9   a detective whether or not this witness had

10  sufficient ability to see the suspect to make a

11  subsequent ID?

12       A.   Yes.

13       Q.   Another reason is you're going to want

14  to ascertain whether or not to the extent they make

15  any kind of identification later on, whether that

16  identification is consistent with the person they

17  described?

18       A.   Yes.

19       Q.   Those are basic things that you're

20  looking for as a homicide detective, correct?

21       A.   Yes.

22       Q.   Another basic question you want to ask

23  any eyewitness to a crime is whether or not is

24  there -- you want to ask them questions that are

25  geared towards ascertaining their ability to see



1                    Raniero Masecchia

2    the crime?

3         A.    To what?

4         Q.    To ascertain their ability to see the

5    crime.

6         A.    See it?

7         Q.    Yes.

8         A.    Yeah.

9         Q.    And hear it potentially?

10        A.    Right.

11        Q.    Where were they standing, for example,

12   right?

13        A.    Yeah.

14        Q.    Were they under the influence of drugs

15   or alcohol at the time?

16        A.    If -- yeah, that's a good question to

17   ask, but sometimes you don't ask it if the person

18   seems coherent, lucid, and -- you know.

19        Q.    Okay.  But if you got a -- if you got

20   a --

21        A.    I don't -- I don't ask that all the

22   time --

23        Q.    Okay.

24        A.    -- were you drunk, were you under the

25   influence, unless the person was at a bar.  You



```
 1                    Raniero Masecchia
 2    know, every -- every one is different --
 3         Q.    Sure.
 4         A.    -- every interview, every statement is
 5    different.
 6         Q.    But you understood that whether or not
 7    a witness was drinking or doing drugs could affect
 8    their ability to make a reliable identification?
 9         A.    Yes.
10         Q.    And so, for example, if you have -- if
11    you have a school teacher who witnessed a crime in
12    their classroom, you might not ask that person --
13         A.    Right.
14         Q.    -- whether they were drunk?
15         A.    That's correct.
16         Q.    But if you have a witness who was
17    hanging out with his friends --
18         A.    But today, you never know.  They might
19    be high while they're doing --
20         MR. SAHASRABUDHE:  I was going to say, I
21    know some teachers.
22         BY MR. BRUSTIN:
23         Q.    But if you have a --
24         A.    No, but I understand.  And that's what
25    I'm saying.  There's -- in a statement, you could
```



1                    Raniero Masecchia

2  ask -- after I take a statement, I could go over my

3  own statement and say --

4        BY MR. BRUSTIN:

5        Q.   All right.

6        A.   -- there's 22 more questions I could

7  have asked.

8        Q.   Okay.

9        A.   All right?  It's on every one.  There's

10 10,000 questions you could --

11       Q.   Right.

12       A.   -- ask, but you're limited in your

13 time, the case is ongoing, you want to get the most

14 accurate description you can of the incident, and

15 that person later on is going to be able to testify

16 in court as to his statement and expand on it if

17 necessary.  That's the way I always --

18       Q.   All right.  But as a homicide

19 detective, if you're interviewing an eyewitness to

20 a murder --

21       A.   Correct.

22       Q.   -- you take generally as much time as

23 you need to get the information you need, correct?

24       A.   That's correct.

25       Q.   If it takes two hours, you take two



```
 1                 Raniero Masecchia

 2   hours?

 3         A.    Right.

 4         Q.    All right.  And --

 5         A.    And most of them do.

 6         Q.    All right.  And if you have a -- if you

 7   have a witness who is hanging out with his friends

 8   at 1:00 in the morning in front of a hotdog joint

 9   when they see a homicide, one of the questions

10   you're going to ask is, Had you been drinking?

11   Right?

12         A.    I guess, yes.  It would be a good

13   question.

14         Q.    All right.  But one of your jobs as a

15   homicide detective is to evaluate the credibility

16   and reliability of the witnesses that you come into

17   contact with, correct?

18         A.    In what way?

19         Q.    You're -- you're constantly assessing

20   in your own mind and in conversations --

21         A.    If he's being truthful, if he's lying.

22         Q.    That's right.  Something you're always

23   assessing?

24         A.    You might have an opinion on that, but

25   if he's willing to swear to it and testify in
```



1                      Raniero Masecchia

2    put a line-up together, if the person misidentifies

3    someone and picks the wrong person, it's normal.

4          Q.    Okay.

5          A.    It could happen.

6          Q.    No, of course.  I think you're

7    misunderstanding me.

8          You understood that there were rules and

9    regulations and training in place that were

10   designed to prevent a witness from making a mistake

11   to the extent possible?

12         A.    The only thing I'm preventing is to

13   taint it in any way.

14         Q.    That's another way of saying the same

15   thing I think.

16         A.    Making sure they -- they don't see the

17   person before the line-up, making sure they don't

18   see us putting the photo array together or in what

19   position we put the suspect in.  Everything is done

20   in a --

21         Q.    Right.

22         A.    I don't care who he picks out.

23         Q.    Okay.

24         A.    I do care, because I want to solve the

25   murder, but if he picks out the wrong person, he



1                       Raniero Masecchia
2    picks out the wrong person.
3          Q.    Right.  Another way of saying it is you
4    want to avoid any suggestion -- suggestions
5    whatsoever in the process?
6          A.    Right.
7          Q.    And you want to avoid any suggestion
8    before, during, or after the ID procedure, correct?
9          A.    Yes, except after the ID procedure if
10   he picked out the correct person, I have to have
11   him sign a document relating to that and telling
12   them who he picked out.
13         Q.    Right.  But you would never say to
14   them, You picked out Joe Brown and, by the way, Joe
15   Brown is the person we suspected, we think you got
16   the right guy?
17         A.    No.
18         Q.    That would be suggestive?
19         A.    Right.
20         Q.    Or, Joe Brown committed other crimes in
21   the area, we think he did this.  You would never
22   say that?
23         A.    No.
24         Q.    Because that would improperly
25   strengthen their ID potentially?



```
 1                    Raniero Masecchia
 2          A.    It would taint it --
 3          Q.    Yes.
 4          A.    -- very much so.
 5          Q.    Now, in Buffalo in 1991, I take it
 6   there were three separate ways you could do
 7   identifications.  You could do a photo array,
 8   correct, that's one?
 9          A.    Yes.
10          Q.    You could do an in-person physical
11   line-up?
12          A.    Yes.
13          Q.    And under a very limited set of
14   circumstances, you could show a witness the actual
15   suspect one-on-one or a picture of the suspect?
16          A.    I've never done that.
17          Q.    Okay.  Maybe they didn't do that in
18   Buffalo.  Some places, what they were allowed to
19   do, is within minutes of the crime --
20          A.    Within minutes of the crime if the
21   suspect was there, I believe we could do a
22   one-on-one person --
23          Q.    Okay.
24          A.    -- at the time --
25          Q.    All right.
```



1               Raniero Masecchia

2          A.    -- within minutes of the crime.

3          Q.    All right.  But other than that, your

4    understanding is certainly by 1991 in Buffalo, you

5    could never show a witness an individual photo or

6    the suspect one-on-one other than minutes after the

7    crime?

8          A.    Right.

9          Q.    Okay.  And the only way you could do an

10   identification procedure with an eyewitness in

11   Buffalo was either you could show them a six-person

12   photo array --

13         A.    Correct.

14         Q.    -- with one suspect in the photo array?

15         A.    Yes.

16         Q.    Or you could show them a six-person

17   in-person line-up --

18         A.    Yes.

19         Q.    -- with one suspect?

20         A.    Yes.

21         Q.    And in both instances, it was your job

22   to ensure that you had fillers that either

23   looked -- either looked consistent with the suspect

24   or looked consistent with the description of the

25   suspect?



1                    Raniero Masecchia

2          A.    Yeah, you tried your best.

3          Q.    Okay.  And I guess another way that you

4    would be able to show photos to witnesses would be

5    through mug books; is that correct?

6          A.    We didn't use mug books.

7          Q.    You didn't use mug books?

8          A.    We had them, but in '86 when I got up

9    there, they didn't -- they didn't use mug -- mug

10   books anymore.

11         Q.    Okay.

12         A.    They were strictly with the folder.

13   I -- folder six.

14         Q.    All right.  So just so I'm clear now,

15   because I want to make sure I understand all the

16   different possibilities in 1991.

17         In 1991, other than a few minutes after the

18   crime, there would never be a reason to show a

19   witness an individual photo of a suspect, correct?

20         A.    Right.

21         Q.    The only permissible way to show them a

22   photograph of a suspect or that suspect in person

23   would be through a six-person photo array or a

24   six-person line-up?

25         A.    Right.



1                      Raniero Masecchia

2          Q.    There would never be a reason -- a

3     legitimate law enforcement reason to show witnesses

4     pictures for any -- in any other way, correct, of

5     individuals?

6          A.    Correct.

7          Q.    The only legitimate way to show

8     eyewitnesses photos in Buffalo in 1991 in homicide

9     investigation was through those two mechanisms,

10    photo array or a line-up?

11         A.    To the best of my recollection, that's

12    all we used.

13         Q.    And that was clear through training and

14    policy?

15         A.    Right.

16         Q.    Without exception?

17         A.    Correct.

18         Q.    And any time that you were conducting a

19    photo array --

20         A.    Right.

21         Q.    -- you've already told us how important

22    it was not to provide any suggestion to the witness

23    before, during, or after the array, correct?

24         A.    Correct.

25         Q.    And would you also agree that it was



1                   Raniero Masecchia

2    say yes.

3         Q.   Okay.  And sometimes even if you were

4    not the lead detective but it related to a witness

5    you were interviewing, you might read it?

6         A.   Yes.

7         Q.   And you would -- if there wasn't

8    sufficient information in the report, you might go

9    to that officer and ask them questions?

10        A.   It depends.  Yes, no.  Why not just go

11   to the person who you interviewed --

12        Q.   Okay.

13        A.   -- and get the -- get the answers.

14        Q.   All right.  Well, what it appears

15   happened from this report is that within less than

16   15 minutes after the crime, this officer

17   interviewed a woman named Sonja James, correct?

18        A.   Right.

19        Q.   That's what this report describes,

20   right?

21        A.   Yes.

22        Q.   And it appears that while he was

23   interviewing this witness within minutes of the

24   crime, Valentino Dixon, his name was mentioned on

25   the radio as a possible suspect in this homicide,



```
 1                  Raniero Masecchia
 2  correct?
 3          A.   Yes.
 4          MR. RUSS:  Is that what the report says?
 5          THE WITNESS:  That's what it says.
 6          BY MR. BRUSTIN:
 7          Q.   Okay.  And so it appears -- assuming
 8  this report is an accurate description, it appears
 9  that very soon after the crime, Valentino Dixon's
10  name was mentioned as a suspect to the dispatcher,
11  such that the dispatcher put his name out over the
12  radio?
13          MR. RUSS:  Objection to form.  You may
14  answer.
15          THE WITNESS:  Yes.
16          BY MR. BRUSTIN:
17          Q.   Okay.  And it appears that this officer
18  accurately documented that?
19          A.   Yes.
20          MR. RUSS:  Does the report say that Dixon's
21  name was mentioned over the radio?
22          BY MR. BRUSTIN:
23          Q.   So I don't care about the question he's
24  asking you.  I don't want you to answer his
25  questions.  I want you to --
```



```
 1                    Raniero Masecchia

 2         A.   Not -- I would --

 3         Q.   Okay.

 4         A.   -- but a patrolman is -- no, I wouldn't

 5    expect that to be in the report.

 6         Q.   All right.  And, certainly, I've spoken

 7    to Ms. James and she told us that right after the

 8    shooting, she went down the street to speak to the

 9    police officers.

10         A.   Okay.

11         Q.   You certainly have no reason to dispute

12    that, correct?

13         A.   No.

14         Q.   And there's nothing inconsistent with

15    this report about her talking to the police right

16    after the shooting?

17         A.   Right.

18         Q.   And the most reasonable reading of this

19    report is that soon after they arrived, she

20    approached them, correct?

21         A.   Yes.

22         MR. RUSS:  Objection to form.

23         BY MR. BRUSTIN:

24         Q.   All right.  And so you don't -- there's

25    nothing in this -- and it appears that if she -- if
```



1                   Raniero Masecchia

2  she heard Valentino's Dixon -- Valentino Dixon's

3  name over the dispatch radio in the car, that would

4  mean that someone before that had to have provided

5  that information to the dispatcher, correct?

6          MR. RUSS:  Objection to form.

7          THE WITNESS:  Yeah.  You would have to

8  assume that, yes.

9          BY MR. BRUSTIN:

10         Q.   The dispatcher wasn't making up

11 suspects on their own, right?

12         A.   No.

13         Q.   Okay.  Somebody had to have provided

14 that information to the dispatcher sometime before?

15         A.   Correct.

16         MR. RUSS:  Objection to form.

17         BY MR. BRUSTIN:

18         Q.   All right.  And so there is nothing in

19 this report about how Valentino Dixon became a

20 suspect sometime likely soon after 1:39 in the

21 morning, correct?

22         A.   That's correct.

23         Q.   Only that he was?

24         A.   Correct.

25         Q.   All right.  So what you would expect to



```
 1                    Raniero Masecchia
 2   see in the file is another document indicating how
 3   and why Valentino Dixon became a suspect, correct?
 4          MR. RUSS:  Objection to form.  You may
 5   answer.
 6          THE WITNESS:  I'm assuming there should be a
 7   P73 somewhere how Valentino Dixon became the
 8   suspect.
 9          BY MR. BRUSTIN:
10          Q.   Right.  Why was Valentino's Dixon's
11   name -- in other words, a document explaining why
12   Valentino Dixon's name was mentioned by the
13   dispatcher sometime soon after 1:39 in the morning,
14   correct?
15          A.   Correct.
16          Q.   It would be particularly -- given that
17   Valentino Dixon was arrested, prosecuted, and
18   convicted of this crime, it would be particularly
19   important to know how he first became a suspect,
20   correct?
21          MR. RUSS:  Objection to form.  You may
22   answer.
23          THE WITNESS:  Yes.
24          BY MR. BRUSTIN:
25          Q.   Any information provided from any
```



1                      Raniero Masecchia

2     source as -- that put him on the police radar as a

3     suspect, that's critically important information to

4     document?

5           A.    Yes.

6           MR. RUSS:  Objection to form.

7           BY MR. BRUSTIN:

8           Q.    And if, for example, that information

9     came from a witness who didn't want to be

10    identified or a confidential source, the

11    information would still have to be documented, it

12    would just have to say witness doesn't want to be

13    identified, correct?

14          A.    Yes.

15          Q.    Can you think of any exception to the

16    rule that the -- that the basis for how a homicide

17    suspect became a suspect has to be documented?

18          A.    I'm sure it's happened.

19          Q.    Okay.

20          A.    You know, police versus police officers

21    on the scene, maybe someone came up to him and

22    said, Valentino Dixon is the shooter.

23          Q.    Okay.

24          A.    Boom.  He puts that out over the air.

25    It's documented, but it's documented through the



1                        Raniero Masecchia
2    radio transmission.  Those are all recorded.
3            Q.    All right.  But what's --
4            A.    So those are documented --
5            Q.    Okay.  What's really --
6            A.    -- did he -- should he have written a
7    report on that?  Yeah, he should have documented
8    it.
9            Q.    All right.
10           A.    Does it happen that they don't?
11   That's --
12           Q.    Okay.  But what you want to know as a
13   homicide detective investigating this case --
14           A.    Yeah.  How did the name came up?
15           Q.    How did the name came up?  That's a
16   very basic important question you're going to want
17   to get an answer to.
18           A.    Yes.
19           Q.    And even if that information hadn't
20   been properly documented before, if you're a
21   detective asking that question, you document it
22   after the fact, correct?
23           MR. RUSS:  Objection to form.  You may
24   answer.
25           THE WITNESS:  I don't understand.



1                    Raniero Masecchia

2          BY MR. BRUSTIN:

3          Q.   Sure.  So one of the basic questions

4    you have, if you're a lead investigator on the

5    case, or you're an investigator who is very

6    involved in the case, is how did this person become

7    on the radar?  You're going to try to ascertain

8    that, correct?

9          A.   Yes.

10         Q.   And if you ascertain how he became a

11   suspect, you're going to write it down, correct?

12         A.   Or I would tell the person, if he's a

13   police officer, to memorialize that --

14         Q.   Okay.

15         A.   -- for him to document it.

16         Q.   Either you write it down or they write

17   it down?

18         A.   Right.

19         Q.   Okay.  It's important information to

20   have in the file?

21         A.   Yeah, of course.

22         Q.   And if you can't find that information,

23   you don't know how he became a suspect, that's

24   important to write down?

25              In other words, for some reason, he was



```
 1                  Raniero Masecchia

 2   mentioned over the radio as a suspect, we don't

 3   know how that happened --

 4        A.   Well --

 5        Q.   -- that would be important to document?

 6        A.   I would think so.

 7        Q.   Take a look at page 113.

 8        MR. SOEHNLEIN:  I'm sorry.  Could you say

 9   the page again?

10        MR. BRUSTIN:  113.

11        MR. SOEHNLEIN:  Thank you.

12        BY MR. BRUSTIN:

13        Q.   I will represent to you that this is a

14   photograph of Valentino Dixon's -- of the white

15   Cadillac that Valentino Dixon drove during that

16   time period, which is parked within a block of the

17   crime scene.

18        A.   Okay.

19        Q.   Does that refresh your recollection --

20        A.   No.

21        Q.   -- about Valentino Dixon driving a

22   Cadillac, first of all?

23        A.   No.

24        Q.   Or his car being seen at the crime

25   scene?
```



```
 1                   Raniero Masecchia
 2  what he saw at the crime, correct?
 3         MR. RUSS:  What he told the former officers.
 4         MR. BRUSTIN:  What he told their -- yes.
 5         THE WITNESS:  I -- I don't know.
 6         BY MR. BRUSTIN:
 7         Q.   Okay.  Well, if you take a look at
 8  page 16, he's describing -- Vickerd is describing
 9  what John Sullivan allegedly told him about the
10  crime?
11         A.   I understand.  Where are we?  16?
12         Q.   Yeah.
13         Fight broke out --
14         A.   Right.
15         Q.   -- that's where it starts.
16         A.   Right.
17         Q.   Okay.  And according to Vickerd, John
18  Sullivan, on his own, mentions that he saw a black
19  male known to him as Tino go behind the van and
20  come out with a black Uzi.  Okay?  A very -- very
21  specific description of seeing someone he knows as
22  Tino walk to a van, come out from behind the van
23  carrying a specific type of weapon, correct?
24         A.   Correct.
25         Q.   That's a very specific recollection,
```



```
 1                    Raniero Masecchia
 2   correct?
 3         A.    Yes.
 4         Q.    And from this description, it appears
 5   that John Sullivan knows the person who committed
 6   this crime by name, Tino, right?
 7         A.    Yes.
 8         Q.    And he had an opportunity to not only
 9   see him do the shooting, but to watch him walk and
10   get the weapon, come back and then do the shooting,
11   right?
12         A.    That's what it says.
13         Q.    Suggests that he had a long opportunity
14   to see the suspect?
15         A.    Yes.
16         Q.    Okay.  Very important information to
17   follow up on or to be aware of, correct?
18         A.    Correct.
19         Q.    Then he goes on to say after going
20   behind the van getting the black Uzi, walking back
21   towards Torri, the person who died, he pointed it
22   and started firing, and that's when he was shot in
23   the leg.
24         A.    Okay.
25         Q.    Okay.  And then he gives a description
```



1                    Raniero Masecchia

2  of the person he knows as Tino, right?

3        A.   Yes.

4        Q.   And then he gives his real name,

5  Valentino?

6        A.   Yes.

7        Q.   And according to this report, all of

8  that information is volunteered by John Sullivan

9  without any suggestion or any help from the police

10  officers whatsoever, correct?

11        A.   Yes.

12        Q.   And he goes further and says that after

13  observing the person he knows as Tino walk behind a

14  van, get a gun, walk up to Torri and shoot him, he

15  saw him continue to stand over Torri and keep

16  firing, correct?

17        A.   Yes.

18        Q.   And he is saying here that he saw all

19  of those things?

20        A.   Yes.

21        Q.   And at the bottom, it says, Subsequent

22  developments will be reported via additional P73s?

23        A.   That's a normal ending to all --

24        Q.   Okay.

25        A.   -- the P73s.



```
 1                    Raniero Masecchia
 2  don't know.  I -- I don't recall it.
 3         Q.   Fair enough.  So one important --
 4  because -- for the reasons you just described, one
 5  very important thing to do down the road --
 6         A.   Yeah, you could always come back to
 7  that.
 8         Q.   Let me finish.
 9         A.   You're right.
10         Q.   One very important thing down the road
11  to do by the detectives is to look at the two
12  statements and make sure there aren't any big
13  inconsistencies or gaps in information, correct?
14         A.   We let --
15         MR. RUSS:  Objection to form.
16         THE WITNESS:  -- the DA's office handle
17  that.
18         BY MR. BRUSTIN:
19         Q.   Well, the DA's office is not involved
20  until after the arrest, correct?
21         A.   Yes.
22         Q.   All right.  And so one of -- you've
23  already told us under oath that one of your jobs is
24  to follow up on inconsistencies.  Remember that?
25         A.   Yes.
```



```
 1              Raniero Masecchia

 2         Q.   Okay.

 3         MR. RUSS:  You've asked the question 12

 4  times --

 5         MR. BRUSTIN:  All right.

 6         MR. RUSS:  -- if you've asked it once.

 7         BY MR. BRUSTIN:

 8         Q.   And so to the extent that there are

 9  inconsistencies or gaps in information for an

10  important -- important witness like John Sullivan,

11  you have to follow up on it, correct?

12         MR. RUSS:  Objection to form.

13         THE WITNESS:  Yes.  If you see the

14  inconsistencies, yes.

15         BY MR. BRUSTIN:

16         Q.   All right.  And, by the way, as you --

17  as you're -- what you've -- what happened in this

18  case, like all cases --

19         A.   Right.

20         Q.   -- is as these witnesses are being

21  interviewed, especially in the homicide unit,

22  detectives are sitting outside the interview room

23  and they're talking about what's happening on the

24  case, right?

25         MR. RUSS:  Objection to form.
```



```
 1                    Raniero Masecchia
 2          THE WITNESS:  To?
 3          BY MR. BRUSTIN:
 4          Q.   To each other.  Homicide detectives, as
 5   you're writing your reports, you're talking to
 6   other officers about what they're finding on the
 7   case?
 8          A.   Possible.
 9          Q.   That's generally what you do?
10          A.   It's possible.
11          Q.   All right.  Now take a look at page 74.
12          A.   Yes, sir.
13          Q.   All right.  And this is a document you
14   have reviewed in preparation for today?
15          A.   Yes, I've gone over it.
16          Q.   All right.
17          MR. BRUSTIN:  And -- is that mine or yours?
18          MR. ROMO:  Yours.
19          BY MR. BRUSTIN:
20          Q.   You -- early in the interview, you
21   ask -- oh, by the way, this witness is 17 years
22   old, correct?
23          A.   Yes.
24          Q.   Any obligation in 1991 to get
25   permission from his parents or --
```



1                    Raniero Masecchia

2         A.   If he was a suspect I believe, but I

3    don't think as a witness.

4         Q.   Okay.  But obviously as a 17 year old,

5    you have to be a little careful, correct?

6         A.   Well, maybe 16, 15, 14.  17 is -- could

7    be charged as an adult if he were a suspect in

8    anything.

9         Q.   Okay.  And, again, one of the first

10   things that he mentions to you when you ask him

11   what happened that night is that he's with his

12   friend, Fred Stencil?

13        A.   Where's that?  Yes.

14        Q.   Another mention of someone who

15   obviously has to be spoken to and interviewed,

16   correct?

17        A.   Yes.

18        Q.   All right.  And read this description

19   to yourself of the shooting.  Let me know when

20   you're done.

21        MR. RUSS:  Which description?

22        MR. BRUSTIN:  Just -- just -- just the first

23   Q --

24        THE WITNESS:  The first paragraph here?

25        MR. BRUSTIN:  -- substantive -- yeah, the



```
 1                    Raniero Masecchia
 2  big Q and A.  The first -- when he describes the
 3  crime in the top of the page.
 4         MR. RUSS:  It begins, I was with my friend?
 5         MR. BRUSTIN:  Yeah, I'm sorry.  So it
 6  begins, I was with my friend, and ends, They let me
 7  go home about 7:00.
 8         MR. RUSS:  Okay.
 9         THE WITNESS:  Okay.
10         BY MR. BRUSTIN:
11         Q.  So in this description that he gives to
12  you later that day, according to this description,
13  he specifically tells you that he did not see
14  anybody with a gun until somebody hollered, gun,
15  correct?
16         A.  Right.
17         Q.  Right?
18         MR. RUSS:  That's what it says.
19         THE WITNESS:  That's what it says.
20         BY MR. BRUSTIN:
21         Q.  And so the first time he's telling you
22  he saw someone with a gun was when the person he
23  knew to be Tino was standing over the victim,
24  correct?
25         A.  Right.
```



```
 1                   Raniero Masecchia

 2         Q.    In other words, directly contradicting

 3   the statement he gave earlier where he said that he

 4   saw the person he knew as Tino go and retrieve a

 5   gun from behind a van, correct?

 6         A.    Okay.

 7         Q.    Completely different story, correct?

 8         A.    Yes.

 9         Q.    It can't both be true, correct?

10         A.    Yes.

11         Q.    In the version he gives to you, he

12   doesn't see him retrieve a gun, he doesn't even see

13   a gun until he's standing over the victim, correct?

14         A.    He heard the gun, he didn't see it

15   until he turned around and seen him standing

16   over --

17         Q.    All right.  And that's the kind of

18   contradiction that any homicide detective would

19   want to explore because it suggests that this

20   witness may not be reliable, correct?

21         MR. RUSS:  Objection to form.  You may

22   answer.

23         THE WITNESS:  I -- I would think so if you

24   had both things in front of you --

25         BY MR. BRUSTIN:
```



```
 1                 Raniero Masecchia
 2         Q.   Okay.
 3         A.   -- you would question that.
 4         Q.   Okay.  There -- there -- it's a
 5    critical inconsistency about the most important
 6    event in the case, correct?
 7         MR. RUSS:  Objection to form.  You may
 8    answer.
 9         THE WITNESS:  Yes.
10         BY MR. BRUSTIN:
11         Q.   So to the extent that you are aware of
12    it during your interview, it would have been
13    important for you to question him about it,
14    correct?
15         A.   That --
16         MR. RUSS:  Objection to form.
17         THE WITNESS:  If I was --
18         MR. RUSS:  You may answer.
19         THE WITNESS:  -- aware of it.
20         BY MR. BRUSTIN:
21         Q.   And to -- and, obviously, as soon as a
22    detective became aware of it when they looked at
23    the reports, he had to be questioned about it?
24         MR. RUSS:  Objection --
25         THE WITNESS:  Yes, but I --
```



1                   Raniero Masecchia

2        Q.    On page 16.

3        A.    Oh, I'm sorry.

4        Q.    Beginning with, John describes.

5        A.    Right.

6        Q.    And here when he's speaking to Vickerd,

7   for some reason he's able to give a much more

8   specific description of what he was wearing,

9   correct?

10        A.    I see that, yes.

11        Q.    No explanation for why that is,

12   correct?

13        A.    No.

14        Q.    Certainly not something that you

15   followed up on?

16        A.    Not that I recall, no.

17        Q.    And no idea if anybody else followed up

18   on that?

19        A.    I don't.

20        Q.    Obviously important to follow up on

21   that, though, correct?

22        A.    I would think so.

23        Q.    Now, on page 75, it indicates that

24   during this interview, you also showed him a

25   six-person array, correct?



```
1                    Raniero Masecchia

2         A.    Yes, sir.

3         Q.    And even though this witness had

4    already identified Valentino Dixon as somebody he

5    knew and somebody he, according to Vickerd, he

6    claimed did the shooting, you still were careful to

7    only show him a picture of Valentino Dixon among a

8    six-person photo array, correct?

9         A.    Yes.

10         Q.    Because you understood, even under

11   these circumstances, it would have been

12   inappropriate to show him an individual mug shot,

13   correct?

14         A.    Yes.

15         Q.    Of Valentino Dixon or anybody else?

16         A.    Yes.

17         Q.    And you didn't do that?

18         A.    No.

19         Q.    And, to your knowledge, nobody else

20   did?

21         A.    No.

22         Q.    Because that would have been totally

23   contrary to procedure?

24         A.    That's something I would never do.

25         Q.    Okay.  That would be highly suggestive,
```



1              Raniero Masecchia

2    correct?

3         A.    Very.

4         Q.    Okay.  Now, you did not ask

5    Mr. Sullivan any questions about whether he was

6    drinking or doing drugs that evening, correct?

7         A.    Not that I can see here, no.

8         Q.    All right.  Now, at the -- at the

9    trial, Sullivan testified, I'll represent to you,

10   that that night he had been drinking malt liquor,

11   he had a couple of beers, and that he had earlier

12   in the day smoked marijuana with cocaine.

13        A.    Okay.

14        Q.    And you would agree, I take it, that

15   that's -- that's a question you probably should

16   have asked him?

17        MR. RUSS:  Objection to form.

18        THE WITNESS:  I guess.  I didn't.

19        BY MR. BRUSTIN:

20        Q.    Okay.  That's something you probably

21   should have --

22        A.    I didn't.

23        Q.    -- asked, right?

24        A.    Yes.

25        Q.    Okay.  And -- now, another thing that



```
 1                      Raniero Masecchia
 2  John Sullivan testified at the trial, and this is
 3  on the stand on page 220 -- at page 222.
 4          He testified that he told the police that
 5  Valentino was between 5-foot and 10 and 6 feet
 6  tall, that the police typed a statement, but
 7  there's a lot of things that were typed that he
 8  didn't really put in.  That's what John Sullivan
 9  testified to.
10          A.   Okay.
11          Q.   Now, I take it that you deny typing any
12  words or statements from -- from John Sullivan that
13  he didn't actually state, correct?
14          A.   That's correct.
15          Q.   And you deny failing to document any
16  information that John Sullivan gave you during this
17  statement, correct?
18          A.   Yes.
19          Q.   In other words, you didn't stop typing
20  and fail to put in information that you didn't want
21  to put in, correct?
22          A.   Correct.
23          Q.   You typed everything that he said and
24  everything --
25          A.   Correct.
```



```
 1                     Raniero Masecchia

 2          Q.   -- you said?

 3          And that was the procedure, correct?

 4          A.   Yes.

 5          Q.   Not just for you, but for any officer?

 6          A.   Yes.

 7          Q.   In 1991 and at all times when you were

 8   a homicide detective?

 9          A.   Yes.

10          Q.   Again, a very basic rule?

11          A.   Yes.

12          Q.   Okay.  Now, you would agree -- I think

13   you told us earlier that to the best of your

14   recollection, you don't remember ever showing

15   witnesses, in this case or any case as a homicide

16   detective, mug books; is that right?

17          A.   Yeah, I don't.

18          Q.   Okay.  Is it possible that you've done

19   it and don't remember it?

20          A.   No.

21          Q.   You don't think that happened?

22          A.   No.

23          Q.   All right.  But you would agree,

24   though, that to the extent you ever showed a

25   suspect mug books or mug photos of any kind, that
```



1                  Raniero Masecchia

2    conclusion.

3           THE WITNESS:  I'm -- I'm sure it was one of

4    the things that was taken into consideration was my

5    statement --

6           BY MR. BRUSTIN:

7           Q.   I'm sorry.

8           A.   -- that was taken --

9           Q.   The only --

10          A.   -- not the only thing.

11          Q.   Well, the only thing that's mentioned

12   is the John Sullivan statement here, correct?

13          A.   Well, that's whoever made this report

14   out --

15          Q.   Right.

16          A.   -- but I don't know if that's the only

17   basis, or if it was, so be it.

18          Q.   Fair enough.  The only basis stated on

19   this arrest affidavit from Stambach is the

20   statement you took from John Sullivan, correct?

21          A.   That's --

22          MR. SAHASRABUDHE:  Object to the form of the

23   question.

24          BY MR. BRUSTIN:

25          Q.   You agree, sir?



```
 1                    Raniero Masecchia

 2          A.   I -- yeah.  What I read in this

 3    statement, yes.

 4          Q.   Okay.  And so this is August 10th.

 5    Now, if you take a look -- page 158 and 159.

 6          And this is the statement that you took a

 7    little more than a day later at 1:30 in the morning

 8    of a man named Leonard Brown, correct?

 9          A.   Yes.

10          Q.   And I take it this is a statement that

11    you reviewed in preparation for today?

12          A.   Yes.

13          Q.   And you understand, I take it, today

14    that around the same time that you were taking a

15    statement from Leonard Brown, Stambach was taking a

16    statement from LaMarr Scott, correct?

17          MR. SAHASRABUDHE:  Object to form.

18          THE WITNESS:  I don't know, but I'll agree

19    with it if it's in there.

20          BY MR. BRUSTIN:

21          Q.   You didn't see any -- you haven't seen

22    any --

23          A.   I don't remember that.

24          Q.   Okay.  And you haven't reviewed any

25    documents suggesting that?
```



1                    Raniero Masecchia

2          Q.   Now, obviously, independent from the

3    district attorney, if you received information

4    suggesting -- withdrawn.

5          If you're the lead detective on a case and

6    you receive information suggesting that you

7    arrested the wrong person --

8          A.   Right.

9          Q.   -- you have an independent obligation

10   to investigate that, fair to say?

11         A.   Yes, and it was done right here.

12         Q.   Well, this isn't an investigation.

13   This is taking a statement.

14         A.   It's part --

15         MR. RUSS:  Objection to form.

16         THE WITNESS:  -- of the investigation.

17         BY MR. BRUSTIN:

18         Q.   Okay.  And another part of the

19   investigation would be to interview other witnesses

20   at the scene about what this person is reporting;

21   that would be another part, correct?

22         A.   That would be up to the DA's --

23         Q.   So I'm --

24         A.   -- office.

25         Q.   -- not asking who makes the decision.



```
 1                    Raniero Masecchia
 2   I'm just asking you what the investigation would
 3   include.
 4         MR. RUSS:  He's trying to answer your
 5   questions as best he can.
 6         BY MR. BRUSTIN:
 7         Q.   All right.  So let me be clear.  I'm
 8   now not asking you a question about who would
 9   determine what steps would be taken, I'm asking you
10   what a proper investigation would include.
11         A.   I would -- I would hope that the
12   follow-up would be done.
13         Q.   Okay.  Now I'm asking you -- I'm not
14   asking you about who would direct the follow-up --
15         A.   Right.
16         Q.   -- I'm asking you what an appropriate
17   follow-up investigation would include based on your
18   experience.  Okay?
19         A.   Okay.
20         Q.   All right.  You would agree one thing
21   an appropriate follow-up investigation would
22   include would be interviewing witnesses at the
23   scene?
24         MR. RUSS:  Objection to form.
25         THE WITNESS:  All of them?
```



```
1                    Raniero Masecchia

2          MR. RUSS:  You may answer.

3          BY MR. BRUSTIN:

4          Q.  People who might have relevant

5   information about --

6          A.  Yes.

7          Q.  -- this.

8          MR. RUSS:  Objection to form.  You may

9   answer.

10         BY MR. BRUSTIN:

11         Q.  It would include potentially showing

12  photo arrays to witnesses of this new potential

13  suspect?

14         A.  Yes.

15         Q.  And obviously documenting whatever you

16  did?

17         A.  Yes.

18         Q.  Now, you would agree that the last

19  thing you would ever want to do when -- and --

20  withdrawn.

21         Did you also in preparation for today read

22  the statement that LaMarr Scott gave --

23         A.  No.

24         Q.  -- at the same time?

25         A.  No.  I just -- they just gave me
```



 1                    Raniero Masecchia

 2   whatever my name was on.

 3        Q.   All right.  Now, no question that one

 4   of the things that you and Stambach would have been

 5   doing as you were doing these interviews is either

 6   during the interviews or before the interviews or

 7   after the interviews, or all three, you would have

 8   been talking about what you were learning?

 9        MR. RUSS:  Objection to form.  You may

10   answer.

11        THE WITNESS:  I don't recall.

12        BY MR. BRUSTIN:

13        Q.   All right.  I understand you don't

14   recall.  You don't recall any of it, but would

15   you -- you would agree at a minimum, you and

16   Stambach would have been discussing what you

17   learned from these witnesses after the interviews?

18        MR. RUSS:  Objection to form.  You may

19   answer.

20        BY MR. BRUSTIN:

21        Q.   Pursuant to your practices.

22        A.   I'm sure we --

23        MR. RUSS:  Objection to form.

24        THE WITNESS:  I'm sure we --

25        MR. RUSS:  You may answer.



1              Raniero Masecchia

2        THE WITNESS:  -- did.

3        THE REPORTER:  Hold on.  Just -- sir,

4   please, if somebody else is talking --

5        THE WITNESS:  Oh, I didn't --

6        THE REPORTER:  -- I really need --

7        THE WITNESS:  -- hear him.

8        MR. RUSS:  Sorry.

9        THE REPORTER:  -- you to just wait.

10       Go ahead.

11       THE WITNESS:  I'm sure at some point we did.

12       BY MR. BRUSTIN:

13       Q.   Now, you would agree that the last

14   thing a homicide detective acting in good faith

15   would ever want to do when interviewing a witness

16   like Leonard Brown or LaMarr Scott claiming that

17   you have the wrong person would be to try to coerce

18   them into changing their story, correct?

19       A.   Yes.

20       Q.   To threaten them --

21       A.   Yes.

22       Q.   -- with repercussions if they continue

23   to tell the story?

24       A.   Yes.

25       Q.   You might question the veracity of the



```
 1                    Raniero Masecchia
 2   story, right?
 3           A.    Yes.
 4           Q.    But you would never try to strong-arm
 5   them into changing it, correct?
 6           A.    Correct.
 7           Q.    And you would -- like any witness, you
 8   would want to ask them open-ended questions about
 9   the information they were providing you?
10           A.    Yes.
11           Q.    And other witnesses who could
12   corroborate it?
13           A.    Yes.
14           Q.    And for any physical evidence that they
15   might be able to provide you?
16           A.    Okay.
17           Q.    You agree, right?
18           A.    I agree.
19           Q.    And so if, for example, LaMarr Scott
20   came in and said, I committed this murder, and in
21   fact, when I committed the murder, I got blood on
22   my shoes and it's the shoes I'm wearing now.  Would
23   you like to have those shoes --
24           A.    Yes.
25           Q.    -- if something like that happened --
```



1              Raniero Masecchia
2  through like in this case?
3         A.   Yes.
4         Q.   Now, you would agree that -- would it
5  be fair to say that there is -- although you don't
6  remember it, there's no question that you would
7  have actually physically seen LaMarr Scott and
8  Leonard Brown when they were brought into the
9  homicide office?
10        A.   Quite possibly, yes.
11        Q.   Okay.  And you've already told us how
12  important it is to do an objective investigation
13  into information, including information that you
14  have the wrong person, correct?
15        A.   Correct, yes.
16        Q.   And in some ways, that's even more
17  important to carefully investigate that type of
18  information as compared to innocent -- evidence of
19  guilt, correct?
20        A.   Yes.
21        Q.   All right.  And you would agree that
22  the last thing a detective would ever do acting in
23  good faith is to tell a witness who came in and
24  said, You have the wrong person, No, we've got who
25  we want, we don't want to hear it, that's the last



 1                    Raniero Masecchia
 2   thing you would do, correct?
 3          A.   Yes.
 4          Q.   You wouldn't want to make any kind of
 5   statement to that witness that could seem coercive
 6   or threatening, correct?
 7          A.   Correct.
 8          Q.   Even -- even a subtle threat would be
 9   completely inappropriate, correct?
10          A.   A what threat?
11          Q.   A subtle threat.
12          A.   Yes.
13          Q.   Your only job is to get their
14   information and to follow up on it, correct?
15          A.   Yes.
16          Q.   You would never say something like, Get
17   your story -- get your story straight and then come
18   back.  That would never be something you would
19   say --
20          A.   No.
21          Q.   -- to witnesses?
22          That would never be appropriate, correct?
23          A.   Correct.
24          Q.   Now, you would agree that based -- one
25   of the things you became good at as a homicide



```
 1                    Raniero Masecchia

 2   opposed to saying, this person looked to be

 3   20 years old?

 4         MR. RUSS:  Objection to form.  You may

 5   answer.

 6         THE WITNESS:  I'll agree with you on that.

 7         BY MR. BRUSTIN:

 8         Q.   Okay.  Now, take a look at page 197.

 9         A.   97?

10         MR. RUSS:  197.

11         THE WITNESS:  Okay.

12         BY MR. BRUSTIN:

13         Q.   Now, I will represent to you that

14   according to multiple sources, LaMarr Scott was a

15   big man, as big as 210 or 220 pounds at the time;

16   do you recall reading that or learning that?

17         A.   No, I --

18         Q.   Any reason to dispute that?

19         A.   No.

20         Q.   Okay.  Do you understand, at least as a

21   basic matter, that LaMarr Scott was a much heavier

22   man than Valentino Dixon?

23         A.   I'll concede to that.  I don't know.

24         Q.   All right.  But, certainly, you

25   understand from looking at documents that Valentino
```



```
 1              Raniero Masecchia
 2  Dixon was thin?
 3       A.   Yes.
 4       Q.   All right.  Now, take a look --
 5       MR. RUSS:  The documents say that Valentino
 6  Dixon was thin, not -- not that he knew.
 7       MR. BRUSTIN:  That's correct.  That's what I
 8  meant to say.
 9       BY MR. BRUSTIN:
10       Q.   Take a look at page -- you may have
11  known at the time, you don't remember now?
12       You probably knew it at the time, but you
13  don't remember it today?
14       A.   Yeah, I don't recall any of that today.
15       Q.   All right.  Take a look at page 197.
16       A.   I am, sir.
17       Q.   All right.  And this is the interview
18  of LaMarr Scott a day later who claims he did the
19  shooting, right?
20       A.   Yes.
21       Q.   The same time you're interviewing
22  Leonard Brown, right?
23       A.   I believe so, yes.
24       Q.   And we know that Stambach did the
25  interview of Emil Adams a day before, you just saw
```



```
 1                    Raniero Masecchia
 2   that, right?
 3            A.   Yes.
 4            Q.   And take a look at -- and we know that
 5   LaMarr Scott is a heavyset man, correct?
 6            A.   Yes.
 7            MR. RUSS:   You've represented that, yes.
 8            BY MR. BRUSTIN:
 9            Q.   All right.  And if you take a look,
10   what it says here about eight Q and As down on
11   page 197 beginning with, what were you wearing that
12   night?
13            MR. RUSS:   Right here.
14            THE WITNESS:   Yes.
15            BY MR. BRUSTIN:
16            Q.   Okay.  And he's describing that he was
17   wearing a white T-shirt and a white hat, right?
18            A.   Yes.
19            Q.   Those are two distinct descriptive
20   pieces of clothing?
21            A.   Excuse me?
22            Q.   They're distinct descriptive pieces of
23   clothing, correct?
24            A.   Yes.
25            Q.   And they track what Emil Adams says he
```



```
 1                    Raniero Masecchia
 2   saw the shooter wearing?
 3        MR. RUSS:  Objection to form.  You may
 4   answer.
 5        THE WITNESS:  From what I read, yes.
 6        BY MR. BRUSTIN:
 7        Q.   And he -- and Emil Adams also describes
 8   seeing a heavyset man, not a thin man, right?
 9        A.   Yes.
10        Q.   Yet, somehow -- withdrawn.
11        So, first of all, when LaMarr Scott comes in
12   and says -- and is obviously a heavyset man, big
13   man --
14        A.   Okay.
15        Q.   -- and says he was wearing a white hat
16   and a white T-shirt, one of the most important
17   things to do would be to go back to Emil Adams and
18   say, Wait a minute.  Has there been a terrible
19   mistake here?  Did you actually see LaMarr Scott,
20   the person who was wearing a white hat, a white
21   shirt, and was heavyset?
22        MR. RUSS:  Objection.
23        BY MR. BRUSTIN:
24        Q.   That'd be the first thing any homicide
25   detective would want to do, correct?
```



```
 1                    Raniero Masecchia

 2          THE WITNESS:  It should be followed up, and

 3   I think it was.

 4          BY MR. BRUSTIN:

 5          Q.   Okay.  Oh, you do?  When was it

 6   followed up?

 7          A.   I don't know when or what.  I -- that's

 8   what I would do --

 9          Q.   Okay.

10          A.   -- and I think it would have been

11   followed up.

12          Q.   And one question you -- if you're a

13   detective acting in good faith, when Emil Adams

14   describes the shooter as being heavyset and then

15   identifies Valentino Dixon who is a very thin

16   build, that's a red flag, right?

17          MR. RUSS:  Objection to form.

18          MR. SOEHNLEIN:  Objection to form.

19          MR. RUSS:  Go ahead.

20          THE WITNESS:  To certain people it would be

21   a red flag.

22          BY MR. BRUSTIN:

23          Q.   And it's really a red flag when LaMarr

24   Scott comes in a day later who is heavyset and

25   says, I was the shooter, right?
```



```
 1               Raniero Masecchia

 2          MR. RUSS:  Objection to form.

 3          MR. SOEHNLEIN:  Objection to form.

 4          THE WITNESS:  That's why the statement was

 5    taken, I'm assuming.

 6          BY MR. BRUSTIN:

 7          Q.  And, obviously, all of those things had

 8    to be followed up on, regardless of who did it,

 9    correct?

10          A.  And I'm sure they were, one way or the

11    other.

12          Q.  Well, first of all, you agree that

13    those are critically important issues to follow up

14    on, correct?

15          A.  Yes.

16          Q.  And regardless of who directed it, you

17    would have expected to see a re-interview of Emil

18    Adams soon after that statement was taken, correct?

19          A.  I don't know.

20          Q.  Well, my -- my question is not whether

21    it happened.

22          A.  You're asking me what steps should be

23    taken --

24          Q.  That's correct.

25          A.  -- or should have been taken --
```



```
 1                   Raniero Masecchia
 2         THE WITNESS:  He also --
 3         MR. RUSS:  Don't -- don't answer.
 4         BY MR. BRUSTIN:
 5         Q.   So let me ask you a different way.  You
 6   would agree that as a detective acting in good
 7   faith, as soon as you receive information that you
 8   might have the wrong person, you want to do
 9   everything in your power to investigate that
10   information, correct?
11         MR. RUSS:  Objection to form.  You may
12   answer.
13         THE WITNESS:  And I believe it was.  I mean,
14   in my head, I -- yeah, it was.
15         BY MR. BRUSTIN:
16         Q.   Okay.  Well, you have no memory or
17   understanding as to anything that happened here,
18   correct?
19         A.   Well, I have no memory that it didn't
20   happen.
21         Q.   All right.  Now, obviously it would
22   have been completely inappropriate -- withdrawn.
23         You saw a document representing -- Stambach
24   representing that Emil Adams was shown a photo
25   array with Valentino Dixon in the photo array,
```



```
 1                    Raniero Masecchia
 2   believe Bradley had provided a description of both
 3   the shooter and the female driver; do you recall
 4   that?
 5          A.   I --
 6          MR. RUSS:  Does he recall his testimony?
 7          THE WITNESS:  I recall it now that you told
 8   me that, but I -- I haven't really reviewed my
 9   testimony --
10          BY MR. BRUSTIN:
11          Q.   Okay.
12          A.   -- since I gave it.
13          Q.   But my saying it reminds you that, in
14   fact, Bradley had described both?
15          A.   If that's what I said in my statement,
16   yes.
17          Q.   I'll represent to you that's what you
18   said in your deposition.
19          A.   Okay.
20          Q.   That was your recollection at the time?
21          A.   Yes.
22          Q.   And, certainly, you recall that Cory
23   Epps was in fact identified by Ms. Bradley as the
24   shooter?
25          A.   Yes.
```



1                        Raniero Masecchia

2           Q.   And that formed the basis of the

3    prosecution of Cory Epps?

4           A.   Yes.

5           Q.   And Cory Epps was subsequently

6    convicted based on the testimony of Ms. Bradley?

7           A.   Yes.

8           Q.   And in fact, that was really the only

9    evidence against Epps?  There was no physical

10   evidence, no other evidence of any kind, correct?

11          A.   Yes.

12          MR. RUSS:  Objection to form.

13          THE WITNESS:  Oh, I'm sorry.

14          BY MR. BRUSTIN:

15          Q.   Yes, in that you agree with me,

16   correct?

17          A.   Yes.

18          Q.   It was a single witness ID, nothing

19   more?

20          A.   Yes.

21          Q.   And you understood by -- certainly by

22   the time of the Epps case -- what was that '98?

23   '97?

24          A.   I don't recall the exact date.  It

25   could have been '97.



1                    Raniero Masecchia
2    that time that single witness ID cases were -- were
3    frowned upon?
4          MR. RUSS:  Objection to form.
5          THE WITNESS:  I don't believe so at that
6    time they were frowned upon, but I think they
7    were --
8          BY MR. BRUSTIN:
9          Q.   It was a bad question.  Let me
10   withdrawn the question.
11         A.   -- tough ones to bring to trial --
12         Q.   All right.
13         A.   -- you know.
14         Q.   You understood as a -- as a detective
15   by 1997 or 1998 that if all you had was a single
16   witness identification, that could be problematic
17   and you wanted to gather more evidence if you
18   could?
19         A.   Yes.
20         Q.   Because for the simple reason that
21   sometimes eyewitnesses make mistakes?
22         A.   Yes.
23         Q.   You always wanted to have more than a
24   single witness ID?
25         A.   Yes.



1                     Raniero Masecchia

2          Q.    And so you knew that as lead

3    investigator in the Epps case --

4          A.    I did.

5          Q.    -- that's all the evidence you had?

6          A.    Yes.

7          Q.    And did that cause you to have some

8    question, not about probable cause, but about

9    whether or not Cory Epps was actually the

10   perpetrator?

11         A.    Some question?

12         Q.    Yeah, in your mind, did you have -- I'm

13   sure -- you have cases -- let me ask you this way:

14   I'm sure you had cases in your career where you

15   were certain you had the right guy and other

16   cases --

17         THE REPORTER:   Hang on.  Slow down.  I'm

18   sure you had cases in your ...

19         BY MR. BRUSTIN:

20         Q.    I'm sure you had cases in your career

21   where you felt very confident that you had the

22   right perpetrator and other cases where you felt

23   less certain.  Was Cory Epps a case where you felt

24   less certain?

25         A.    Probably on the lesser side, yes.



1                    Raniero Masecchia

2          Q.    Crime scene detective?

3          A.    Yeah, they were the evidence unit and

4    they were also in charge of line-ups.

5          Q.    Now, Ms. Bradley testified in her

6    deposition that she recalled during the

7    investigation being shown photo books in addition

8    to being shown the photo array.

9          MR. RUSS:   You're representing that to him?

10         MR. BRUSTIN:   I am, and that's at page 6

11   and 7 of her deposition of the Epps case.

12         THE WITNESS:   Photo books?

13         BY MR. BRUSTIN:

14         Q.    Photo books.   In other words, books

15   containing photos, like mug book books.   Do you

16   recall ever doing that with her?

17         A.    No.

18         Q.    All right.   Would it be fair to say,

19   though, to the extent that you were lead detective

20   on the case, if that happened, either by you or by

21   another detective, it had to be documented?

22         A.    Yes.

23         Q.    And you also recall from the Epps

24   deposition that in addition to doing both the photo

25   array and the line-up, you also interviewed



RANIERO MASECCHIA                                    March 15, 2022
DIXON vs CITY OF BUFFALO                                          299

```
 1                      Raniero Masecchia
 2          A.    They caught the case, yes.
 3          Q.    Right.  But it appears that other
 4   detectives on the case, including Stambach in
 5   particular, conducted a lot of the investigative
 6   activities?
 7          A.    Yes.
 8          Q.    And that was different than the Epps
 9   case where you actually caught the case and did
10   most of the investigative activities?
11          A.    In that case, yes.  They're all
12   different.
13          Q.    But in the Epps case, you were the lead
14   investigator and you were a true lead investigator,
15   you really did the work?
16          MR. RUSS:  Objection to form.  You may
17   answer.
18          THE WITNESS:  Whatever work needed to be
19   done that could have been done, I did, but there
20   were other detectives also involved in the case.
21          BY MR. BRUSTIN:
22          Q.    Okay.  But most -- just from what we've
23   talked about already --
24          A.    Yeah.
25          Q.    -- most of the key investigative
```



```
 1                 Raniero Masecchia
 2   activities, the line-up, the photo array, the
 3   investigation of -- the interview of Epps, you
 4   conducted those yourself?
 5         A.   I was involved in -- in most of that,
 6   yes.
 7         Q.   Okay.  Now, at the time you were
 8   deposed in the Epps case, you -- you acknowledged
 9   that you were familiar with the name Wymiko
10   Anderson?
11         A.   I became familiar with it later --
12         Q.   Okay.
13         A.   -- not at the time of the
14   investigation.
15         Q.   Okay.  And you understood -- whenever
16   you became aware of it, you understood that she was
17   part of a separate investigation from Means
18   involving the murder of a man named Paul Pope?
19         A.   Yes.
20         Q.   All right.  And you came to learn,
21   according to you, that Ms. Anderson had provided a
22   statement in regard to the Paul Pope murder on or
23   about April 17th of 1998, correct?
24         A.   She gave that statement in April of
25   1998?
```



1              Raniero Masecchia

2         MR. ROMO:  Wymiko.

3         BY MR. BRUSTIN:

4         Q.    Wymiko, I'm sorry.  Wymiko Anderson

5    came in after Epps had been convicted --

6         A.    Okay.

7         Q.    -- and claimed that her boyfriend,

8    Russell Montgomery, killed Paul Pope.

9         A.    I do -- I know that now, yes.

10        Q.    Okay.  And you understand that

11   according to Wymiko Anderson, Paul Pope, her

12   boyfriend, told her in 1997 that Russell Montgomery

13   actually killed Tameka Means, that's what she's

14   claiming today.

15        A.    That's what she's claiming?

16        Q.    Yes.

17        A.    Okay.

18        Q.    And according to Wymiko Anderson, you

19   know that today, she claims that when she came to

20   the precinct, the homicide office, in April of 1998

21   and reported that Russell Montgomery killed Paul

22   Pope, she claims that she also told the detectives

23   who interviewed her that Russell Montgomery killed

24   Tameka Means, correct?  You know that's what she

25   claims today?



```
 1                    Raniero Masecchia
 2        A.   I don't.  I don't recall.
 3        Q.   Okay.  You don't remember anything that
 4   you did?
 5        A.   I don't.
 6        Q.   You don't remember if, in fact, you did
 7   anything?
 8        A.   Correct.
 9        Q.   Your memory on that is a complete
10   blank?
11        A.   Yes.  Everything I say would be
12   guessing --
13        Q.   Right.
14        A.   -- and I don't want to guess at it.
15        Q.   Fair enough.
16        A.   I do not recall.
17        Q.   You know that you received information
18   from Wymiko Anderson that it was her boyfriend who
19   killed Meaks and not Epps, you just don't remember
20   anything you did with that information?
21        A.   Correct.
22        Q.   And, in fact, you don't remember if you
23   did, in fact, do anything with that information?
24        MR. RUSS:  Objection to form.  You may
25   answer.
```



```
 1                    Raniero Masecchia
 2          THE WITNESS:  I don't recall.
 3          BY MR. BRUSTIN:
 4          Q.   And would it be fair to say that to the
 5   extent you conducted any investigative activities
 6   concerning that information from Wymiko Anderson,
 7   even if it was post-conviction, that information --
 8   that investigation had to be documented?
 9          A.   Okay.
10          Q.   You agree, right?
11          A.   Okay.
12          Q.   I'm asking if you agree.  I don't --
13          A.   Yes.
14          Q.   Okay.  And so to the extent that you
15   conducted any investigative activities, that --
16   that should be in the Means homicide file today?
17          A.   Yes.
18          Q.   Any report you created, any notes you
19   created, those would be in the file?
20          A.   Yes.
21          Q.   And, obviously, that would help you
22   remember what, if anything, you did once you
23   learned of these allegations?
24          A.   Yes.
25          Q.   Now, one of the things -- I want to
```



```
 1                    Raniero Masecchia

 2          BY MR. BRUSTIN:

 3          Q.   No, I'm sorry.  I apologize.

 4          A.   161, okay.

 5          Q.   Oh, I'm sorry.  Yeah, take a minute.

 6          Just a couple of follow-ups on this.  Did

 7   you -- when you -- you said -- I think you said you

 8   reviewed this document before, correct?

 9          A.   This one?

10          Q.   Yes.

11          A.   Yes.

12          MR. RUSS:  You mean when he met with us?

13          MR. BRUSTIN:  Yeah.  I think I -- maybe I

14   misunderstood, but I think he said --

15          THE WITNESS:  Yeah, this is one of the ones

16   that --

17          MR. RUSS:  Right.

18          THE WITNESS:  -- you gave me.

19          BY MR. BRUSTIN:

20          Q.   Okay.  So I know you don't remember it

21   today, but this -- this document references before

22   LaMarr Scott and Leonard Brown were interviewed,

23   LaMarr Scott made a statement on the news

24   concerning his involvement in the crime, correct?

25          A.   In what order was that?
```



1                    Raniero Masecchia

2          Q.   So before you interviewed LaMarr Scott

3    and you interviewed Leonard Brown -- before

4    Stambach interviewed LaMarr Scott while you were

5    interviewing Leonard Brown --

6          A.   Right, right.

7          Q.   -- according to this memo, LaMarr Scott

8    made a statement about his involvement in the

9    killing, his shooting -- him being the shooter on

10   the news.

11         A.   Yeah, that's what it says here.

12         Q.   Okay.  And I take it you don't remember

13   that today?

14         A.   No.

15         Q.   All right.  Obviously, you would have

16   known that at the time, correct?

17         MR. RUSS:  That he was on TV?

18         MR. BRUSTIN:  Yes.

19         BY MR. BRUSTIN:

20         Q.   Before you interviewed --

21         A.   Yes.

22         Q.   -- LaMarr Scott, you would have --

23         A.   I think that's --

24         Q.   -- known that, right?

25         A.   -- what it says here, yes.



1              Raniero Masecchia

2         Q.   That doesn't happen every day, right?

3   Suspects --

4         A.   No.

5         Q.   -- don't go and confess on TV?

6         A.   Right.

7         Q.   That would have been a big deal, right?

8         A.   Right.

9         Q.   And you have no recollection of it

10   today?

11        A.   No.

12        Q.   Okay.  But, certainly, you would have

13   known that at the time you interviewed Leonard

14   Brown?

15        A.   Yes.  I was there, so I must have known

16   about it.

17        Q.   Take a look at page 202.

18        A.   202.  Okay.

19        Q.   Did you review this report in

20   preparation for today?

21        A.   I believe so.

22        Q.   Do you have any recollection of -- of

23   these activities?

24        A.   No.

25        Q.   All right.  But no question that you



```
1

2   STATE OF NEW YORK )

3                        ss:

4   COUNTY OF ERIE    )

5

6        I DO HEREBY CERTIFY as a Notary Public in and

7   for the State of New York, that I did attend and

8   report the foregoing deposition, which was taken

9   down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18

19

20  _____

21  DANIELLE FETZER,
    Notary Public.

22

23

24

25
```

