# EXHIBIT 8

```
 1                    VIDEO DEPOSITION
                      JAMES LONERGAN
 2


 3
    UNITED STATES DISTRICT COURT
 4  WESTERN DISTRICT OF NEW YORK

 5  ----------------------------------------
    VALENTINO DIXON,
 6
                          Plaintiff,
 7
                   - vs -      Case No.
 8                             1:19-cv-01678-WMS

 9  CITY OF BUFFALO and COUNTY OF ERIE;
    and DETECTIVE MARK R. STAMBACH,
10  DETECTIVE RANIERO MASECCHIA, DETECTIVE
    JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
11  CHIEF RICHARD T. DONOVAN, JOHN DOES,
    Unknown Buffalo Police Department Supervisors,
12  and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
    BELLING, in their individual capacities,
13
                          Defendants.
14  ----------------------------------------

15

16          Video recorded deposition of JAMES

17  LONERGAN Defendant, taken pursuant to the Federal

18  Rules of Civil Procedure, in the law offices of

19  HARRINGTON & MAHONEY, 70 Niagara Street, Third

20  Floor, Buffalo, New York, on June 9, 2022,

21  commencing at 10:06 a.m., before LORI K. BECK, CSR,

22  CM, Notary Public.

23

24

25
```



1          Q.   No other times that you worked with
2    Amherst Investigations?
3          A.   No, sir.
4          Q.   Did you work for any other detectives
5    during your time as a police officer?
6          A.   No.
7          Q.   Just that one time for Stambach.
8          A.   Yes.
9          Q.   Okay.  Let's talk generally about your
10   role in this case.  So first of all, you do
11   remember this case, fair to say?
12         A.   Yes.
13         Q.   This was a relatively high-profile
14   shooting in 1991, fair to say?
15         MR. SAHASRABUDHE:  Form.  You may answer.
16         THE WITNESS:  Actually, they all were back
17   then, to be honest with you.
18         BY MR. BRUSTIN:
19         Q.   Okay.  And I only want you to be honest
20   with me.
21         So first of all, one of the reasons, I take
22   it, that this case stands out in your mind is this
23   is -- tell me if I'm wrong, but probably the only
24   case in your career where you arrested somebody and
25   then a second person came in and said, "It wasn't



 1  him; it was me."  Fair to say?

 2          MR. BLENK:  Form.

 3          MR. SAHASRABUDHE:  Form.  You may answer.

 4          THE WITNESS:  I didn't arrest Valentino

 5  Dixon.

 6          BY MR. BRUSTIN:

 7          Q.   I'm not suggesting you did.  The

 8  Buffalo -- during the course of the investigation,

 9  he was arrested, and then after that, Lamarr Scott

10  came forward and said, "I was the shooter, not

11  Valentino Dixon," correct?

12          A.   Correct.

13          Q.   And so have you ever seen that scenario

14  happen any other time in your career?

15          A.   Where an individual came forward, you

16  mean?

17          Q.   Where -- where somebody was arrested

18  for a homicide --

19          A.   Yes.

20          Q.   -- and then another individual came

21  forward and said, "It wasn't him; it was me."

22          A.    No, there were -- there was another

23  case where individuals were arrested other than the

24  Defendant, but they didn't come forward.

25          Q.   Okay.  So -- so this is the only case



 1  you can remember in your 40-year career where that
 2  happened.
 3          A.   Correct.
 4          Q.   So it stands out in your mind for that
 5  reason, correct?
 6          MR. SAHASRABUDHE:   Form.   You may answer.
 7          THE WITNESS:   Yes.
 8          BY MR. BRUSTIN:
 9          Q.   It was an extraordinarily unusual
10  circumstance.
11          A.   Yes.
12          Q.   Not every day when you arrest somebody
13  for murder and then somebody else comes in and
14  says, "No, it wasn't him; it was me."
15          A.   Correct.
16          Q.   All right.   Now, my understanding --
17  and you correct me if I'm wrong -- is that in 1991
18  in the homicide unit, the first person that got to
19  the scene of a homicide, the first homicide
20  detective, would be designated lead detective, but
21  in -- in function, it didn't mean very much.   It
22  didn't mean that they were taking the lead in the
23  investigation.
24          Is that accurate?
25          A.   Yes, that's accurate, yes.



1        Q.   By the way, I don't think I've ever

2   seen that in any other police department.  Do you

3   know why it was done that way in Buffalo?

4        MR. SAHASRABUDHE:  Object to the form.  You

5   may answer if you know.

6        THE WITNESS:  To be honest with you, I -- I

7   think it boiled down to overtime where when your

8   shift was up, you would hand off to the shift

9   coming in rather than they pay you to stay.

10       BY MR. BRUSTIN:

11       Q.   Okay.  Now, one of the things Detective

12  Stambach told us yesterday was that in a homicide,

13  if -- if he -- if a detective needed to stay

14  through their shift, they were able to get

15  overtime.  Is that -- is that not how you recollect

16  it?

17       MR. SAHASRABUDHE:  Form.

18       THE WITNESS:  Yes, but very limited back

19  then.

20       BY MR. BRUSTIN:

21       Q.   So the -- the -- your -- your memory is

22  that the -- is that the department was tough on

23  overtime.

24       A.   Yes.

25       Q.   Okay.  In any case, fair to say that in



1  1991, at the time of the Jackson murder, your

2  understanding was that the lead -- that -- that the

3  lead detective didn't necessarily mean that that

4  detective did the bulk of the work on the case; is

5  that accurate?

6        A.   Yes.

7        MR. SAHASRABUDHE:  Form.

8        BY MR. BRUSTIN:

9        Q.   All right.  And in fact, on this case,

10 the Dixon case, you were the -- you were, in form,

11 the lead detective because you were the first on

12 the scene, correct?

13       MR. SAHASRABUDHE:  Form.  You can answer.

14       THE WITNESS:  Correct.

15       BY MR. BRUSTIN:

16       Q.   But other detectives actually did

17 significantly more work than you did on the case.

18       MR. SAHASRABUDHE:  Form.  You can answer.

19       THE WITNESS:  Correct.

20       BY MR. BRUSTIN:

21       Q.   And in fact, the officer who did the --

22 the bulk of the work on this case was Detective

23 Stambach.

24       MR. SAHASRABUDHE:  Form.

25       THE WITNESS:  Yes.



1   with other officers, including Detective Stambach,

2   that's how they did it, correct?

3          A.   Correct.

4          Q.   All right.  Now, as you can see from

5   the -- page 82 -- look at the -- the basis for

6   probable cause beginning with, in the middle of the

7   page, "The above information."

8          Do you see that?

9          A.   Yes.

10         Q.   That is -- that is the -- that is the

11  statement as to the basis for probable cause,

12  correct?

13         A.   Yes.

14         Q.   All right.  And so the probable cause

15  in this case was based on a statement from John

16  Sullivan, correct?

17         MR. SAHASRABUDHE:  Form.  You may answer.

18         THE WITNESS:  For the booking report, yes.

19         BY MR. BRUSTIN:

20         Q.   Well, the -- the -- the only

21  evidence -- other than the fact that the person was

22  shot and died, the only evidence indicating that --

23  that it was -- that it was Valentino Dixon that's

24  mentioned in the report is John Sullivan, correct?

25         A.   It's mentioned in the report is



1  correct, yes.

2         Q.    The only piece of evidence connecting

3  Valentino Dixon in the arrest report is John

4  Sullivan, correct?

5         A.    In the arrest report, correct.

6         Q.    In any of the arrest documents, if you

7  look on page 80 to 82, correct?

8         A.    Correct.

9         Q.    And you recall that, although you

10  didn't conduct any interview of John Sullivan, at

11  your direction, Detective Vickerd, who was working

12  as your partner, interviewed him in the hospital,

13  correct?

14         A.    Yes.

15         Q.    And he was reporting to you what he was

16  finding, correct?

17         A.    Yes.

18         Q.    All right.  Now, at the time -- at the

19  time -- I'm going to go into it more specifically,

20  but I just want to ask you some general questions

21  about it.

22         One of the things you recall is that

23  according to Vickerd, John Sullivan, one of the

24  shooting victims, volunteered without any

25  suggestion or influence whatsoever that Valentino



1  Dixon was the shooter, correct?

2          A.   Correct.

3          Q.   And one of the reasons why you, in

4  particular, found that to be compelling evidence at

5  the time is because at the time he made that

6  statement, you had never heard the name Valentino

7  Dixon in connection with this case.

8          MR. BLENK:  Form.

9          THE WITNESS:  I had never ever heard that

10 name.

11         BY MR. BRUSTIN:

12         Q.   Okay.  In other words, the first person

13 in this case to mention Valentino Dixon was John

14 Sullivan in the early morning hours after the

15 shooting, correct?

16         MR. SAHASRABUDHE:  Form.

17         MR. BLENK:  Form.

18         THE WITNESS:  I don't -- I don't -- I don't

19 know if he said his full name or he called him

20 Tino.

21         BY MR. BRUSTIN:

22         Q.   I -- I think your memory's good on

23 this.  According to the report from Detective

24 Vickerd, he said Tino.

25         A.   Okay.



1         Q.   Okay.  And so the first mention of

2    Tino, which we know is Valentino Dixon, according

3    to you, was in the early morning hours, a few hours

4    after the shooting by John Sullivan, correct?

5              MR. SAHASRABUDHE:  Form.

6              THE WITNESS:  Correct.

7              BY MR. BRUSTIN:

8         Q.   In other words, nobody -- to your

9    knowledge, nobody else in the world had mentioned

10   Valentino Dixon either by name or nickname prior to

11   that, correct?

12             MR. SAHASRABUDHE:  Form.

13             THE WITNESS:  To my knowledge, no.

14             BY MR. BRUSTIN:

15        Q.   And that you're certain about,

16   correct?  Withdrawn.

17             One of the -- one of the reasons why you

18   believed that -- that John Sullivan mentioning Tino

19   was so -- was such important evidence is because

20   that name was not even on anybody's radar, correct?

21             MR. SAHASRABUDHE:  Form.

22             THE WITNESS:  Correct.

23             BY MR. BRUSTIN:

24        Q.   Now, one of your jobs and the jobs of

25   any detective working a homicide case early on, in



1  the first few hours -- withdrawn.

2       The first few hours of a homicide

3  investigation are very important, correct?

4       A.   All minutes, actually, are very

5  important.

6       Q.   Okay.  But the -- the first couple of

7  hours are when you are doing your best to do a few

8  different things, and let me go through them with

9  you.

10      One would be to make sure that you're

11  securing the crime scene.

12      A.   Correct.

13      Q.   Very important, right?

14      A.   Yes.

15      Q.   To make sure that, to the extent

16  there's any physical evidence at the crime scene,

17  you are securing the scene so that that can be

18  properly gathered and evaluated.

19      A.   Yes.

20      Q.   And that was your job.

21      A.   Yes.

22      Q.   Another very important job early on, in

23  the minutes and hours following a shooting, is to

24  try to ascertain any witnesses to the shooting.

25      A.   Correct.



JAMES LONERGAN                                      June 09, 2022
DIXON V. CITY OF BUFFALO                                      51

```
 1            Q.   And -- and even -- and most importantly
 2    to ascertain any persons of interest or potential
 3    suspects, correct?
 4            A.   Yes.
 5            Q.   One of the main things you're doing at
 6    the scene of a crime is trying to ascertain
 7    potential suspects, correct?
 8            A.   Yes.
 9            Q.   And that's probably the -- the most
10    important thing you're doing, fair to say?
11            MR. SAHASRABUDHE:   Form.  You may answer.
12            THE WITNESS:   Yes.
13            BY MR. BRUSTIN:
14            Q.   And you are -- and -- and the same for
15    any homicide detective that's working on the case
16    at that time, correct?
17            A.   Yes.
18            Q.   One of the things you're all doing --
19    and there's a variety of ways to learn about
20    potential suspects in the early morning hours of a
21    shooting, correct?
22            A.   Yes.
23            Q.   In the early hours of a shooting.
24            You are talking informally to people at the
25    scene, correct?
```



1        A.   Yes.

2        Q.   You are talking to patrol officers who

3   may know the area who were at the scene.

4        A.   Yes.

5        Q.   You are talking to housing officers and

6   other types of officers who may be working at the

7   scene.

8        MR. SAHASRABUDHE:   Form.

9        THE WITNESS:   Whatever officers were there,

10  yes.

11       BY MR. BRUSTIN:

12       Q.   Okay.  You are monitoring the -- the

13  radio for any announcements about any potential

14  suspects.

15       A.   No.  I shut the radio off when I get to

16  the scene.

17       Q.   Okay.

18       A.   It's so hectic.

19       Q.   All right.  But you --

20  your understanding -- withdrawn.

21       The way things worked in 1991 was that it

22  was your goal to get, as quickly as possible, any

23  potential suspects, correct?

24       A.   Yes.

25       Q.   Some -- some pan out, some don't, but



 1  you want to know them all, right?

 2          A.    All information, yes.

 3          Q.    All right.  But particularly

 4  information about who did the crime.

 5          A.    Of course, yes.

 6          Q.    And so fair to say that Buffalo police

 7  officers, and based on your experience, understood

 8  that to the extent there was any information about

 9  a potential suspect, you needed to provide that

10  information to the lead detective at the scene.

11          MR. SAHASRABUDHE:  Form.

12          THE WITNESS:  Yes.

13          BY MR. BRUSTIN:

14          Q.    That was understood by the Buffalo

15  Police Department officers, correct?

16          A.    I would say yes.

17          Q.    They -- and -- and it was clear that

18  when you -- when you were at the scene of this

19  homicide, you were in charge, correct?

20          MR. SAHASRABUDHE:  Form.

21          THE WITNESS:  There were several lieutenants

22  there who outranked me.

23          BY MR. BRUSTIN:

24          Q.    Okay.

25          A.    As far as the homicide squad, yes, I



```
 1   agree.
 2         Q.   All right.  But to the extent that
 3   anybody -- any police officer had received
 4   information of a potential suspect, you would
 5   expect that information to make its way to you
 6   immediately, correct?
 7         MR. SAHASRABUDHE:  Form.
 8         THE WITNESS:  Yes.
 9         BY MR. BRUSTIN:
10         Q.   All right.  I want to the ask you some
11   questions about something called tunnel vision.
12   Are you familiar with that term -- term in
13   policing?  Have you ever heard that?
14         A.    In life.  I don't know about policing.
15         Q.    Well, let me -- let me -- let me give
16   it a shot and see if you -- if it makes sense to
17   you.
18         So have you ever received any training,
19   whether it be in Buffalo or in -- outside of
20   Buffalo, out -- outside training, that, in
21   substance, taught that detectives, in particular,
22   have to be very careful not to engage in tunnel
23   vision in their criminal investigations?
24         And what I mean by that is to lock on to a
25   suspect or a theory of the case that you have
```



 1 | of the crime, right?
 2 |         A.    Could, yes.
 3 |         Q.    But it -- it often took place in the
 4 | homicide unit, right?
 5 |         A.    Yes.
 6 |         Q.    And the homicide unit in 1991 was a --
 7 | was a big, open office, right?
 8 |         A.    Yes.
 9 |         Q.    With some desks.
10 |         A.    Correct.
11 |         Q.    Maybe as big as a classroom.  Does that
12 | sound about right, a high school classroom?
13 |         A.    That would be about right, I guess,
14 | yes.
15 |         Q.    With a couple of private office --
16 | offices for the supervisors, right?
17 |         A.    Correct.
18 |         Q.    And an interview room, right?
19 |         A.    Yes.
20 |         Q.    But it was one big, open room with
21 | desks where homicide detectives worked with one
22 | another to solve crimes.
23 |         A.    Yes.
24 |         Q.    Constantly communicating about what
25 | evidence you were finding and what you were



1  hearing, correct?

2        A.    Correct.

3        Q.    In fact, that was one of the most

4  effective tools for solving crimes.

5        A.    I would say yes.

6        Q.    For officers working on a particular

7  homicide, there were no secrets about what officers

8  were finding.  There was constant communication.

9        A.    Yes.

10        MR. SAHASRABUDHE:  Form.

11        BY MR. BRUSTIN:

12        Q.    And one of the things that Detective

13  Stambach described to us yesterday was that he

14  considered himself to be a very careful and

15  conscientious detective.

16        Was that your experience with Detective

17  Stambach?

18        A.    Yes.

19        MR. SAHASRABUDHE:  Form.

20        THE WITNESS:  Yes.

21        MR. SAHASRABUDHE:  You can answer.

22        THE WITNESS:  Yes.

23        BY MR. BRUSTIN:

24        Q.    In other words, based on your

25  experience, Detective Stambach fully understood the



1          THE WITNESS:  It's a strong bond.  I -- I

2    don't know if I -- yes.

3          BY MR. BRUSTIN:

4          Q.   All right.  Let's take a look at

5    page 11.  I want you to take a minute -- this is

6    not a document you've reviewed, correct?

7          A.   Tell you in a minute.  Hang on.

8          I have not.

9          Q.   Please review it.  Let me know when

10   you're done, sir.

11         Have you had a chance to read it?

12         A.   Yes.

13         Q.   All right.  And what this report is

14   describing is that in -- in the -- soon after

15   arriving at the crime scene, a woman named Sonya

16   James is -- soon -- soon after the shooting when

17   the crime scene is set off, a woman named Sonya

18   James is interviewed, correct?

19         A.   Yes.

20         Q.   It appears from this report it's within

21   minutes, right?

22         A.   Yes.

23         Q.   And while Sonya James is being

24   interviewed, there's a broadcast over the radio,

25   the police radio, with the name Valentino Dixon,



1  correct?

2        A.   I'm not aware of that.  I don't know.

3        Q.   Sir, I'm not asking if you're aware of

4  it.  I'm asking if this is what -- if that's what

5  this report indicates.

6        MR. SAHASRABUDHE:  I object to the question.

7        MR. BLENK:  Form.

8        BY MR. BRUSTIN:

9        Q.   You know what?  It was not a good

10  question.  I apologize, sir.

11        This report indicates that during the

12  interview with Sonya James in the minutes after the

13  shooting, Valentino Dixon's name was -- was put out

14  over the radio.

15        A.   Yes.

16        Q.   All right.  And then this officer is

17  asking questions about Valentino Dixon, correct?

18        A.   Yes.

19        Q.   And -- well, you've -- and I -- I take

20  it that despite the fact that Valentino --

21  withdrawn.

22        You don't have any reason to dispute that,

23  in fact, Valentino Dixon's name was mentioned over

24  the radio in the minutes following the shooting or

25  that Sonya James was interviewed about that, do



1  you?

2          A.    No.

3          Q.    All right.  What you're telling us,

4  though, is that that information never made its way

5  to you, correct?

6          A.    At that time, no.

7          Q.    All right.  So although it appears that

8  Valentino Dixon's name was mentioned in the moments

9  after the shooting as a potential suspect, and

10 despite the fact that you've -- as you've already

11 told us, everybody at the scene would have

12 understood that any such information should have

13 been provided to you, your testimony here today is

14 that you didn't hear it, correct?

15         A.    I don't recall hearing it.

16         Q.    Well, you've already told us under oath

17 that one of the reasons why John Sullivan's

18 statement was so powerful to you is because the

19 name Valentino Dixon had never been mentioned

20 before in connection with this crime.

21         Do you remember that, sir?

22         A.    Yes.

23         MR. SAHASRABUDHE:  Object to the form.

24         BY MR. BRUSTIN:

25         Q.    So in order for that to be true, that



1   would mean that this information would have never

2   made its way to you, because this all happened

3   before John Sullivan was interviewed in the

4   hospital, correct?

5          A.   Yes.

6          Q.   So your testimony is that although

7   Valentino Dixon was mentioned over the radio and

8   although Sonya James was interviewed about

9   Valentino Dixon and although you were in charge of

10  the scene of the crime, your testimony is that

11  information never made its way to you.

12         A.   At that point, no.

13         Q.   Any explanation for that?

14         A.   I -- I don't know why.  I mean, it was

15  a hectic scene.

16         Q.   All right.

17         A.   My thing is preserving evidence,

18  keeping the scene clean.  There's -- there's just a

19  million things going on at a crime scene.

20         Q.   I know, and one of the things you've

21  already told us, which was your primary

22  responsibility at the scene -- and again, I asked

23  you questions earlier knowing I was going to show

24  you this.

25         A.   Of course.



1       Q.   And -- and the reason I did -- the

2  reason I asked you what was important at the --

3  withdrawn.

4       What you told me earlier was most important

5  at the scene was to ascertain potential suspects.

6  Do you remember that?

7       A.   It's important, not most important.

8       Q.   All right.  And so now you're changing

9  your testimony and you're telling me that because

10  you were so busy, you weren't trying to ascertain

11  potential suspects; is that right?

12       MR. SAHASRABUDHE:  Object to the form.

13  That's not what he said.  Go ahead.

14       THE WITNESS:  We will do that time

15  permitting.  There are so many things at a crime

16  scene that have to be taken care of before I worry

17  about what people outside the tape are doing.  I --

18       BY MR. BRUSTIN:

19       Q.   All right.  The truth, sir, is that you

20  understood that Valentino Dixon was a suspect long

21  before John Sullivan was interviewed at the

22  hospital, and when you said you didn't, that was a

23  lie.

24       MR. SAHASRABUDHE:  Object to the form.

25       BY MR. BRUSTIN:



 1  Scott give -- gave, I want to ask you some

 2  questions about what you would have expected

 3  competent detectives acting in good faith to do in

 4  order to investigate the statement, okay?

 5          A.    Okay.

 6          Q.    Is that a fair -- is that a fair thing

 7  to do, based on your experience?

 8          A.    I don't -- everybody does --

 9          MR. BLENK:   Form.

10          THE WITNESS:   Everybody asks different

11  questions different ways.

12          BY MR. BRUSTIN:

13          Q.    So I'm going to ask you about some of

14  your ways --

15          A.    Oh, I see.  Okay.

16          Q.    -- all right?  So you've already told

17  us how unusual it is for a -- a suspect --

18  withdrawn.

19          You've already told us that the only time in

20  your career when a person has come in and claimed

21  to have committed a crime that somebody else

22  committed was this case, correct?

23          A.    No.  Where somebody else came in and

24  said they did it.

25          Q.    That's right.



1        A.   Okay.  That's what you're -- yes,

2   that's correct.

3        Q.   Only time.

4        A.   As far as I recall, yes.

5        Q.   In 40 years.

6        A.   Yes.

7        Q.   Okay.  And so -- and by the way, other

8   than for reasons of mental illness, are you aware

9   of any suspect -- withdrawn.  Put mental -- mental

10  illness aside.

11       In your career, have you had anybody in your

12  career voluntarily come in -- withdrawn again.

13       You understand that even before Lamarr Scott

14  was interviewed by Stambach, he confessed to this

15  crime, to being the shooter, on television.

16       A.   Yes.

17       MR. SAHASRABUDHE:  Form.

18       THE WITNESS:  Yes.

19       BY MR. BRUSTIN:

20       Q.   Okay.  Do you remember seeing it on

21  television?

22       A.   I don't recall if I saw it or not.

23       Q.   You remember that was big news in the

24  department, though, right?

25       A.   I don't know so much in the department,



1  but it was big on the news, yes.

2          Q.   Well, it was big in the homicide unit.

3  Nothing like that had ever happened before, right?

4          A.   Well, you -- the homicide unit, not the

5  whole department.

6          Q.   Okay.

7          A.   You said department.

8          Q.   Fair enough.  In the homicide unit, it

9  was big news, right?

10         A.   I would say, yes.

11         Q.   Everybody was talking about it.

12         MR. SAHASRABUDHE:  Form.

13         THE WITNESS:  I would assume, yes.

14         BY MR. BRUSTIN:

15         Q.   And so have you ever in your career had

16  another situation where a person voluntarily

17  confessed, say on the news or somewhere even before

18  they came to you, to a crime that they didn't

19  commit?

20         A.   Yes.

21         Q.   When did that happen?

22         A.   Josue -- Josue -- Josue Ortiz.

23         Q.   The Ortiz case.

24         A.   Ortiz, yes.

25         Q.   Okay.  So the only other example is the



```
 1          A.    Correct.
 2          Q.    You -- you remember that at the -- you
 3    just testified in that trial a few weeks ago,
 4    correct?
 5          A.    Yes.
 6          Q.    And do you remember testifying in that
 7    trial that despite the fact that Ortiz was found to
 8    have been innocent through an independent
 9    investigation, you still believed he was guilty?
10          A.    I did.
11          Q.    And you still do.
12          A.    I do.
13          Q.    Okay.  But the only -- the -- the only
14    two cases you can think of where -- withdrawn.
15          There was -- you -- you recognize that there
16    is certainly evidence in both Ortiz and in Dixon
17    that the wrong man was convicted, correct?
18          MR. SAHASRABUDHE:  Form.
19          THE WITNESS:  Must be, but I'm not aware of
20    it.
21          BY MR. BRUSTIN:
22          Q.    Right.  The only other example you can
23    think of where an innocent man may have
24    committed -- may have confessed to a crime he
25    didn't commit was Ortiz, correct?
```



```
 1              MR. SAHASRABUDHE:  Form.

 2              BY MR. BRUSTIN:

 3         Q.   You're certain of it, correct?

 4         A.   Yes.

 5         Q.   You're certain he didn't fabricate

 6    evidence in the Ortiz case, correct?

 7         A.   Correct.

 8         Q.   And you're certain he didn't fabricate

 9    evidence in the Dixon case.

10         A.   Correct.

11         Q.   Equally certain, fair to say?

12         A.   Yes.

13         Q.   And you understand that the jury found

14    against Detective Stambach in the Ortiz case.

15         A.   Yes.

16         Q.   And it's -- it's your position that

17    that jury was just wrong.

18         A.   Happens all the time.  Yes.

19         Q.   Okay.  That jury verdict and the

20    evidence that you reviewed in the Ortiz case in --

21    in preparation for that trial didn't in any way

22    change your view that Stambach fabricated evidence.

23    You -- you're convinced he didn't, correct?

24              MR. SAHASRABUDHE:  Form.

25              THE WITNESS:  I am.
```



1        Q.   Right?

2        A.   I would personally, yes.

3        Q.   Can you think of any legitimate reason

4   not to ask those questions?

5            MR. SAHASRABUDHE:  Form.

6            THE WITNESS:  If I -- if I knew that they

7   had been destroyed, then I wouldn't ask the

8   question.

9            BY MR. BRUSTIN:

10       Q.   Okay.  The only way you would know that

11  is if he told you.

12           MR. SAHASRABUDHE:  Form.

13           THE WITNESS:  True.

14           BY MR. BRUSTIN:

15       Q.   And so one of the basic things you

16  would be doing if you were trying to determine

17  whether this -- whether this confession was true

18  would be to attempt to test the clothing that he

19  was wearing, correct?

20           MR. SAHASRABUDHE:  Form.

21           THE WITNESS:  Attempt to locate the

22  clothing, yes.

23           BY MR. BRUSTIN:

24       Q.   Right.  Now, you would agree -- now,

25  according to Lamarr Scott, he offered -- he told --



1  he told Detective Stambach that he had blood on his

2  shoes, and he offered -- he offered to give him his

3  clothing, and Detective Stambach refused him.

4          MR. SAHASRABUDHE:  Form.

5          BY MR. BRUSTIN:

6          Q.  Now, assuming that Lamarr Scott is

7  telling the truth about that, that would be serious

8  police misconduct, correct?

9          MR. SAHASRABUDHE:  Form.

10         MR. BLENK:  Form.

11         THE WITNESS:  Lamarr Scott told Stambach his

12  clothing had blood on it.

13         BY MR. BRUSTIN:

14         Q.  That's what he's claimed.

15         A.  Who's claimed?

16         Q.  Lamarr Scott.

17         A.  I've never -- this is the first I've

18  ever heard of that.

19         Q.  I understand that, sir, but if he -- if

20  that actually happened, that would be serious

21  misconduct by Detective Stambach --

22         MR. SAHASRABUDHE:  Object to the form.

23         BY MR. BRUSTIN:

24         Q.  -- correct?

25         MR. BLENK:  Form.



```
 1          BY MR. BRUSTIN:
 2          Q.   I -- I'll -- Detective Stambach denies
 3  that happening.
 4          A.   So do I.  I don't -- I don't know
 5  anything about it.
 6          Q.   Okay.  But you deny it happening, too,
 7  because if Stambach says it didn't happen, that's
 8  good enough for you, right?
 9          MR. SAHASRABUDHE:  Form.
10          THE WITNESS:  It would have been documented.
11  I mean --
12          BY MR. BRUSTIN:
13          Q.   That would be something you would
14  obviously have to document, correct?
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  Correct.
17          BY MR. BRUSTIN:
18          Q.   But you would agree that this is the
19  kind of crime where you would expect there might
20  well be drops of blood on somebody's -- on the
21  shooter's shoes, correct?
22          MR. SAHASRABUDHE:  Form.
23          MR. BLENK:  Form.
24          THE WITNESS:  Correct.
25          BY MR. BRUSTIN:
```



1          A.   Correct.

2          Q.   But it suggests there might be blood on

3    his shoes, correct?

4          A.   Again, it depends.

5          MR. SAHASRABUDHE:   Form.

6          THE WITNESS:   What is close range?

7          BY MR. BRUSTIN:

8          Q.   You -- in a shooting like this, you

9    would expect that there could be blood on his shoes

10   from as close as ten feet away, right?

11         MR. SAHASRABUDHE:   Form.

12         THE WITNESS:   That's stretching it.  I'd

13   have to say no.

14         BY MR. BRUSTIN:

15         Q.   Five feet?

16         A.   Yes.

17         MR. SAHASRABUDHE:   Form.

18         BY MR. BRUSTIN:

19         Q.   All right.  Now, one of the things you

20   would want to ascertain in determining whether or

21   not this confession was true was all of the people

22   at the scene who would have seen him do the

23   shooting, correct?

24         A.   Yes.

25         Q.   And so you'd want to ascertain from



1  this person any witnesses that weren't already

2  identified that could confirm that he was the

3  shooter, correct?

4        A.   Yes.

5        Q.   And then what you -- what you'd want to

6  do immediately is interview those people, correct?

7        MR. SAHASRABUDHE:  Form.

8        THE WITNESS:  As soon as possible, yes.

9        BY MR. BRUSTIN:

10       Q.   And you want to do that as soon as --

11 you can't wait on that, because you want to

12 eliminate the possibility of contamination,

13 correct?

14       MR. SAHASRABUDHE:  Form.

15       THE WITNESS:  As far as a witness?

16       BY MR. BRUSTIN:

17       Q.   Yes.

18       A.   Sometimes you have to wait.

19       Q.   All right.  But it would -- you would

20 agree that it -- it would be extraordinarily

21 important to interview any new eyewitnesses that he

22 raised who saw him do the shooting as quickly as

23 possible, correct?

24       A.   Right.  I agree.

25       Q.   And that it would also be important to



1        MR. SAHASRABUDHE:  Object to the form.

2        BY MR. BRUSTIN:

3        Q.   In a competent investigation.

4        MR. SAHASRABUDHE:  Object to the form.

5        THE WITNESS:  Well, I'm sure the area was

6   searched.

7        BY MR. BRUSTIN:

8        Q.   You are?

9        A.   Yes.

10       Q.   If there was an area -- if -- so if --

11  if the area was searched after this admission for

12  the gun and the gun wasn't found, that would be

13  very important to document, correct?

14       It would suggest that his -- his admission

15  wasn't true, correct?

16       MR. SAHASRABUDHE:  Form.

17       THE WITNESS:  Or somebody picked up the gun

18  and took it.

19       BY MR. BRUSTIN:

20       Q.   But it would be important to document

21  for all those reasons, correct?

22       MR. SAHASRABUDHE:  Form.

23       THE WITNESS:  Yes.

24       BY MR. BRUSTIN:

25       Q.   Okay.  So you would expect to see



1   documentation in the file about their efforts to

2   locate the gun based on his description, correct?

3           A.   Normally, yes.

4           MR. SAHASRABUDHE:   Form.

5           BY MR. BRUSTIN:

6           Q.   Now, do you remember hearing, in

7   conversation in the homicide office back at this

8   time when Lamarr Scott came in and confessed to

9   being the shooter, discussion about Valentino or

10  his parents providing pressure or incentives for

11  Lamarr Scott -- Lamarr Scott to falsely confess?

12          A.   Yes.

13          Q.   Okay.  And so certainly, although you

14  didn't do it, you would have expected there to be a

15  full investigation into those allegations, correct?

16          MR. SAHASRABUDHE:   Form.

17          THE WITNESS:  Yes.

18          BY MR. BRUSTIN:

19          Q.   For example, some of the basic things

20  you would want to do would be to interview the

21  mother and father, if they were willing, correct?

22          MR. SAHASRABUDHE:   Form.

23          THE WITNESS:  Yes.

24          BY MR. BRUSTIN:

25          Q.   And obviously, it would be important to



```
 1  document whether they -- if they -- if they agreed
 2  to speak to the police, it would be important to
 3  document what they said, correct?
 4          MR. SAHASRABUDHE:  Form.
 5          THE WITNESS:  If they agreed to speak, yes.
 6          BY MR. BRUSTIN:
 7          Q.   And if they didn't agree to speak to
 8  the police, that would be important to document,
 9  because it might suggest that they had something to
10  hide, right?
11          MR. SAHASRABUDHE:  Form.
12          THE WITNESS:  Yes.  Yes.
13          BY MR. BRUSTIN:
14          Q.   Either way, you'd have to write it
15  down.
16          MR. SAHASRABUDHE:  Form.
17          THE WITNESS:  If my memory serves me
18  correct, I believe Chris Belling was involved in
19  the -- the initial confession of Lamarr Scott on TV
20  or wherever it was.
21          BY MR. BRUSTIN:
22          Q.   Well, this --
23          A.   I believe.
24          Q.   Well, this report makes clear that the
25  only person in the room -- and I -- I will
```



1   correct?

2          MR. SAHASRABUDHE:   Form.

3          BY MR. BRUSTIN:

4          Q.   That's your understanding.

5          A.   My understanding.

6          Q.   And that's good enough for you.

7          A.   Of course.

8          Q.   You believe it.

9          A.   Yes.

10         Q.   And you have no idea what was done that

11   night to determine that Lamarr Scott wasn't the

12   shooter, correct?

13         MR. SAHASRABUDHE:   Form.

14         THE WITNESS:   Correct.

15         BY MR. BRUSTIN:

16         Q.   And by the way, I -- I asked you a

17   little bit about this, but I want to get a little

18   more specific.

19         You've taken many confessions in your life,

20   correct?

21         A.   Yes.

22         Q.   And you've told us that the only false

23   confession -- in other words, confession from

24   someone who didn't actually commit the crime -- was

25   Lamarr Scott, correct?



```
 1            MR. SAHASRABUDHE:   Form.

 2            BY MR. BRUSTIN:

 3       Q.   That you're aware of.

 4       A.   And Ortiz.  Mr. Ortiz.

 5       Q.   Mr. Ortiz.  Okay.  But you told us you

 6  think Ortiz actually committed the crime, remember?

 7       A.   Yes, I do remember.

 8       Q.   So then it was not a false confession

 9  if he had committed the crime, right?

10       A.   Well, according to me, yes.

11       Q.   Okay.  So in any case, putting aside

12  Ortiz for now --

13       A.   Okay.

14       Q.   -- Lamarr Scott's the only time,

15  correct?

16       A.   Yes.

17       Q.   All right.  And you've taken many other

18  confessions where people confessed to crimes and

19  they were prosecuted, correct?

20       A.   Oh, yes.

21       Q.   Now, would it be fair to say that in

22  many, if not most of those confessions, the

23  confessor did not tell the truth about all the

24  circumstances of the crime?

25       A.   Correct.
```



```
 1  Vaughn, Lima, and also Torres, correct?
 2          MR. SAHASRABUDHE:  Form.
 3          THE WITNESS:  Yes.
 4          BY MR. BRUSTIN:
 5          Q.   And you understood that -- you knew
 6  Detective Lauber at that time, correct?
 7          A.   Yes.
 8          Q.   Did you supervise Lauber?
 9          A.   I don't know if he was a member of my
10  crew or not, to be honest with you.
11          Q.   All right.  But you understand that the
12  reason that Ortiz was in a psychiatric unit on
13  November 15th was because Detective Lauber had
14  called an ambulance to bring him there, correct?
15          MR. SAHASRABUDHE:  Form.
16          THE WITNESS:  Yes.
17          BY MR. BRUSTIN:
18          Q.   Because he was -- he was exhibiting
19  psychiatric issues, correct?
20          A.   Apparent --
21          MR. SAHASRABUDHE:  Form.
22          THE WITNESS:  Yes, apparently.
23          BY MR. BRUSTIN:
24          Q.   And you knew that -- you knew that on
25  November 15th, correct?
```



 1 | or lying.

 2 |          MR. SAHASRABUDHE:  Form.

 3 |          THE WITNESS:  Mistaken.

 4 |          MR. SAHASRABUDHE:  He said, "I believe."

 5 |          BY MR. BRUSTIN:

 6 |          Q.   So is it -- is it your testimony that

 7 | when an officer -- an officer states a fact that's

 8 | not true, that's a mistake, but when a witness or a

 9 | suspect states a fact that's not true, that's

10 | lying?

11 |          MR. SAHASRABUDHE:  Form.

12 |          THE WITNESS:  I would say everybody at times

13 | makes mistakes when they speak.  It doesn't mean

14 | that they were lying.

15 |          BY MR. BRUSTIN:

16 |          Q.   Okay.  Now -- now, based on the

17 | interaction that you had with Mr. Ortiz at the

18 | hospital on November 15th, you would agree it was

19 | clear that not only was he not a suspect after that

20 | interview, it was your opinion and the opinion of

21 | the other detectives that he had no reliable

22 | information about the crime, correct?

23 |          A.   Correct.

24 |          MR. SAHASRABUDHE:  Form.

25 |          BY MR. BRUSTIN:



1        Q.   And it was clear, although you're not a

2   psychiatrist or a mental health professional, that

3   he was in some type of psychiatric distress, fair

4   to say?

5        MR. SAHASRABUDHE:  Form.

6        THE WITNESS:  I don't know if he was or not.

7        BY MR. BRUSTIN:

8        Q.   He didn't seem all there, fair to say?

9        MR. SAHASRABUDHE:  Form.

10       THE WITNESS:  What's all there mean?

11       BY MR. BRUSTIN:

12       Q.   Did it -- did he -- you've -- you've

13  dealt with a lot of emotionally disturbed persons,

14  correct?

15       A.   Yes.

16       Q.   Did he -- would it be fair to say that

17  he appeared to be somebody who might be exhibiting

18  symptoms of being emotionally disturbed?

19       MR. SAHASRABUDHE:  Form.

20       THE WITNESS:  I guess you could say that.

21       BY MR. BRUSTIN:

22       Q.   So by the time that Detective Stambach

23  was interviewing Ortiz on the 16th, you knew that

24  Ortiz had been, on the 15th, in a psychiatric unit

25  of a hospital, correct?



1          MR. SAHASRABUDHE:  Form.

2          THE WITNESS:  Yes.

3          BY MR. BRUSTIN:

4          Q.   You knew that he was brought there by

5    ambulance, correct?

6          MR. SAHASRABUDHE:  Form.

7          THE WITNESS:  Yes.

8          BY MR. BRUSTIN:

9          Q.   At the direction of one of your

10   detectives.

11         MR. SAHASRABUDHE:  Form.

12         THE WITNESS:  Correct.

13         BY MR. BRUSTIN:

14         Q.   And you knew that he was exhibiting

15   symptoms that at least could be suggestive of being

16   emotionally disturbed.

17         MR. SAHASRABUDHE:  Form.

18         THE WITNESS:  Correct.

19         BY MR. BRUSTIN:

20         Q.   And obviously, that would be critically

21   important information to provide to Detective

22   Stambach prior to his interviewing this witness

23   again in the homicide unit, correct?

24         MR. SAHASRABUDHE:  Form.

25         THE WITNESS:  Correct.



1       BY MR. BRUSTIN:

2          Q.   And you testified at the Huntley -- you

3   testified at the trial that you firmly believed

4   that that's information -- withdrawn.  Fair to say

5   there's no question in your mind -- withdrawn

6   again.

7          It's also clear that you were at -- you were

8   in the homicide office, that -- that -- that small,

9   open office, at 7:15 when Mr. Ortiz was brought in,

10  correct?

11         A.   Yes.

12         Q.   And there's no question that you were

13  aware that he was being brought in allegedly to

14  provide information about the Niagara Street

15  homicides, correct?

16         A.   Yes.  He was confessing.

17         Q.   And you knew at that time that just the

18  day before, he had provided you what you believed

19  to be unreliable information, correct?

20         MR. SAHASRABUDHE:  Form.

21         THE WITNESS:  Correct.

22         BY MR. BRUSTIN:

23         Q.   And obviously, the first thing you

24  would have done, when you learned that he was

25  coming in and that Stambach was meeting with him,



1  would be to provide that information about what you

2  knew of this witness to Stambach, correct?

3          A.   Yes.

4          MR. SAHASRABUDHE:   Form.

5          BY MR. BRUSTIN:

6          Q.   There's no doubt in your mind that you

7  spoke to Stambach before he interviewed this

8  witness and -- and told him what you knew, correct?

9          MR. SAHASRABUDHE:   Form.

10         THE WITNESS:   I don't recall what I told

11  Stambach.

12         BY MR. BRUSTIN:

13         Q.   Well, based on -- based on how you

14  operated and the circumstances as you know them,

15  there is no question you would have made it your

16  business to make sure Stambach was informed of what

17  you knew about Ortiz, correct?

18         MR. SAHASRABUDHE:   Form.

19         THE WITNESS:   That I saw him at the

20  hospital?   Yes.

21         BY MR. BRUSTIN:

22         Q.   In a psych unit and that he gave you

23  unreliable information the day before, correct?

24         MR. SAHASRABUDHE:   Form.

25         THE WITNESS:   I don't think he gave us any



```
 1  404(b) evidence?

 2        MR. BRUSTIN:  Well, I -- give me a little

 3  leeway.

 4        MR. SAHASRABUDHE:  I've -- I've given you

 5  enough leeway.

 6        MR. BRUSTIN:  Sure.  All right.  I'll --

 7  I'll move on.

 8        BY MR. BRUSTIN:

 9        Q.   You testified at the Huntley hearing

10  that you met with Mr. Ortiz for about 30 minutes.

11  Does that sound about right?

12        A.   Yes.

13        Q.   And that he appeared to be very

14  frightened.

15        A.   Yes.

16        Q.   And you also testified at the trial

17  just a couple of weeks ago that after speaking with

18  Mr. Ortiz on the 15th, you dismissed the idea that

19  he had any credible information on the murders,

20  correct?

21        MR. SAHASRABUDHE:  Form.

22        THE WITNESS:  Yes.

23        BY MR. BRUSTIN:

24        Q.   And that's true, right?

25        A.   Yes.
```



1          Q.    In other words, he was not a suspect or

2    even a credible witness at the time that he left

3    the hospital, correct?

4          A.    Yes.

5          Q.    And that's the -- withdrawn.

6          Now, you've already told us you were -- you

7    were Detective Stambach's supervisor at the time he

8    interviewed Ortiz, correct?

9          A.    I believe so.

10         Q.    And it was clear that when Ortiz came

11   in, he was allegedly coming in to confess to the

12   homicide, correct?

13         A.    Correct.

14         Q.    And you've already told us that you

15   would have informed Detective Stambach about what

16   you learned at the hospital, correct?

17         A.    Yes.

18         MR. SAHASRABUDHE:    Form.

19         BY MR. BRUSTIN:

20         Q.    And obviously, as you've already told

21   us, one of the most basic things for Detective

22   Stambach to do, before interviewing a suspect who

23   is coming in to allegedly confess to a crime, would

24   be to review the file, correct?

25         MR. SAHASRABUDHE:    Form.



```
 1              MR. BLENK:  Form.

 2              THE WITNESS:  Correct.

 3              BY MR. BRUSTIN:

 4         Q.   For a whole variety of reasons.  One

 5    reason is you would want to make sure that you --

 6    you -- that you learn, as -- as -- as you

 7    described, about any prior interaction with this

 8    witness, right?

 9              MR. SAHASRABUDHE:  Form.

10              THE WITNESS:  Yes.

11              BY MR. BRUSTIN:

12         Q.   Another reason would be you'd want to

13    know whether or not what this witness was telling

14    you matched up or was -- or disputed other evidence

15    in the case, correct?

16         A.   Correct.

17              MR. SAHASRABUDHE:  Form.

18              BY MR. BRUSTIN:

19         Q.   For all of those reasons, it would be

20    critically important to review the file before you

21    interviewed this witness, correct?

22              MR. SAHASRABUDHE:  Form.

23              THE WITNESS:  If -- if you weren't up to

24    date, yes, on the file.

25              BY MR. BRUSTIN:
```



1          THE WITNESS:  There was a witness being

2     interviewed at that time; however, I don't recall

3     the witness's name.

4          BY MR. BRUSTIN:

5          Q.   Okay.  I will represent to you that

6     it's Osario.  Do you have any reason to dispute

7     that?

8          A.   No.

9          Q.   Okay.  And according to reports and

10    testimony, Osario reported that around the time of

11    the crime, he saw three suspects -- withdrawn.

12         Osario reported that around the time of the

13    crime, he saw three men running from the crime

14    scene.  Do you recall that?

15         A.   Yes.

16         Q.   And at that time you believed that

17    there might well be three perpetrators, correct?

18         A.   That's correct.

19         Q.   So it was -- it -- it stood to reason

20    that Osario might be describing the actual

21    perpetrators of the crime, correct?

22         MR. SAHASRABUDHE:  Form.

23         THE WITNESS:  Correct.

24         BY MR. BRUSTIN:

25         Q.   And you understand that -- that Osario



```
 1  described the perpetrators as all being five seven
 2  or shorter, correct?
 3          MR. SAHASRABUDHE:  Form.
 4          THE WITNESS:  I don't recall the description
 5  he gave.
 6          BY MR. BRUSTIN:
 7          Q.   Any reason to dispute that?
 8          MR. SAHASRABUDHE:  Form.
 9          THE WITNESS:  I just don't know.  I don't
10  know what he --
11          BY MR. BRUSTIN:
12          Q.   Do you remember that -- you -- you
13  remember -- you remember Mr. Ortiz, correct?
14          A.   Yes.
15          Q.   He was an enormous man, fair to say?
16          MR. SAHASRABUDHE:  Form.
17          THE WITNESS:  He was a big man, yes.
18          BY MR. BRUSTIN:
19          Q.   He was probably -- he -- he -- he was
20  clearly over six foot six inches tall, correct?
21          MR. SAHASRABUDHE:  Form.
22          THE WITNESS:  I guess, correct.
23          BY MR. BRUSTIN:
24          Q.   He would be the opposite of five seven,
25  right?
```



1   what the witness said, yes, there would be a

2   follow-up question.

3           BY MR. BRUSTIN:

4       Q.   Well, you were aware -- you -- we know

5   from the records that Osario was being interviewed

6   at the same time as Ortiz, correct?

7       A.   Yes.

8       Q.   So you would have been made aware by

9   the officers interviewing Osario that Osario was

10  reporting that there were -- withdrawn.

11          You would have known, as the -- as the

12  supervisor of these detectives, that two witnesses

13  on the -- regarding the Camacho murders were being

14  interviewed at the same time, correct?

15          MR. SAHASRABUDHE:   Form.

16          THE WITNESS:   A witness and a suspect.

17          BY MR. BRUSTIN:

18      Q.   Okay.   And of course, you would have

19  been interested about what each was saying,

20  correct?

21          MR. SAHASRABUDHE:   Form.

22          THE WITNESS:   I was more interested what the

23  suspect was saying.

24          BY MR. BRUSTIN:

25      Q.   You weren't interested what the alleged



 1          A.   I was a detective at the homicide

 2   office.

 3          Q.   And --

 4          A.   And if I --

 5          Q.   Go ahead.

 6          A.   I -- my involvement was minimal.

 7          Q.   Okay.  I'm going to tell you my

 8   understanding of your involvement, and you tell me

 9   if you agree with it, okay?

10          A.   Okay.

11          Q.   My understanding is that you took a

12   statement from a person named Wayne Hudson about an

13   alleged admission that Lynn DeJac made to him.

14          Do you recall that?

15          A.   I do.

16          Q.   And I take it that you deny

17   misrepresenting what you said to Wayne Hudson and

18   what -- what Wayne Hudson said to you.

19          A.   I what?

20          Q.   You deny misrepresenting in your report

21   what Wayne Hudson said to you and what you said to

22   him, correct?

23          A.   It's -- what he --

24          MR. SAHASRABUDHE:  Form.

25          THE WITNESS:  What was said is true in my



```
 1   report.
 2          BY MR. BRUSTIN:
 3          Q.   Okay.  And you understand that after
 4   Wayne Hudson reported that Ms. DeJac made
 5   admissions, he later recanted that statement.
 6          Do you recall that?
 7          MR. SAHASRABUDHE:  Form.
 8          THE WITNESS:  At some point he did, yes.
 9          BY MR. BRUSTIN:
10          Q.   And the statement -- according to you,
11   the statement he gave to you was that DeJac
12   confessed to him that she committed the murder,
13   correct?
14          A.   Yes.
15          Q.   And later he recanted that statement,
16   correct?
17          A.    I believe so.
18          Q.   And at the time that he gave that
19   statement, you understood that he was facing up to
20   25 years in prison, correct?
21          MR. SAHASRABUDHE:  Form.
22          THE WITNESS:  I don't recall that.
23          BY MR. BRUSTIN:
24          Q.   Do you remember Mr. Hudson receiving
25   any favors or any benefits for his testimony?
```



1     BY MR. BRUSTIN:

2         Q.   Do you remember ever being at the -- at

3    the bar where Dennis Donohue worked?

4         MR. SAHASRABUDHE:   Form.

5         BY MR. BRUSTIN:

6         Q.   Not -- not -- not as part of an

7    investigation, but there to drink.

8         A.   Oh, never.

9         Q.   Okay.  Let's go back to -- I'm -- I'm

10   getting ready to -- to wrap things up.

11        MR. BRUSTIN:   In fact, let's -- let's take

12   five.

13             (A recess was then taken at 3:06 p.m.)

14             (On the record: 3:21 p.m.)

15        BY MR. BRUSTIN:

16        Q.   Sergeant, just a couple of more

17   questions about DeJac.

18        Do you recall being tasked in DeJac -- DeJac

19   to interview Wayne Hudson and determine whether or

20   not he was reliable based on his criminal history?

21        A.   I was tasked to interview him.

22        Q.   All right.  And were you further tasked

23   with -- did you know when you interviewed him

24   that -- that he was someone who might have a motive

25   to be -- to be less than truthful?



```
 1            A.   I don't believe so.
 2            Q.   You don't -- you don't recall
 3    learning -- knowing that he was facing 25 years or
 4    more in prison at the time?
 5            A.   I don't recall that.
 6            Q.   He never asked you for any favors or
 7    any benefits for his testimony?
 8            A.   No, sir.
 9            Q.   Seemed like a perfectly credible
10    witness to you?
11            A.   At that time, yes.
12            Q.   By the way, do you believe that he's
13    still a credible witness?
14            MR. SAHASRABUDHE:   Form.
15            BY MR. BRUSTIN:
16            Q.   Do you -- withdraw the question.
17            Despite what happened following your
18    interview, do you believe that the information he
19    gave you was, in fact, true and accurate?
20            A.   No.
21            Q.   All right.  So you testified in
22    connection with Dixon in two different proceedings.
23            You testified in the trial of Mr. Dixon in
24    June of 1992, correct?
25            A.   Yes.
```



1  STATE OF NEW YORK)

2                      ss:

3  COUNTY OF ERIE   )

4

5       I DO HEREBY CERTIFY as a Notary Public in and

6  for the State of New York, that I did attend and

7  report the foregoing deposition, which was taken

8  down by me in a verbatim manner by means of machine

9  shorthand.  Further, that the deposition was then

10 reduced to writing in my presence and under my

11 direction.  That the deposition was taken to be

12 used in the foregoing entitled action.  That the

13 said deponent, before examination, was duly sworn

14 to testify to the truth, the whole truth and

15 nothing but the truth, relative to said action.

16

17

18                    _____

19                    LORI K. BECK, CSR, CM,
                      Notary Public.

20

21

22

23

24

25

