# EXHIBIT 12

2                       VIDEO DEPOSITION
                       JOHN THOMAS VICKERD
3


4
    UNITED STATES DISTRICT COURT
5   WESTERN DISTRICT OF NEW YORK

6   ----------------------------------------
    VALENTINO DIXON,
7
                            Plaintiff,
8
                    - vs -      Case No.
9                              1:19-cv-01678-WMS

10  CITY OF BUFFALO and COUNTY OF ERIE;
    and DETECTIVE MARK R. STAMBACH,
11  DETECTIVE RANIERO MASECCHIA, DETECTIVE
    JAMES P. LONERGAN, DETECTIVE JOHN VICKERD,
12  CHIEF RICHARD T. DONOVAN, JOHN DOES,
    Unknown Buffalo Police Department Supervisors,
13  and ASSISTANT DISTRICT ATTORNEY CHRISTOPHER
    BELLING, in their individual capacities,
14
                            Defendants.
15  ----------------------------------------

16

17          Video recorded deposition of JOHN THOMAS

18  VICKERD Defendant, taken pursuant to the Federal

19  Rules of Civil Procedure, in the law offices of

20  HODGSON RUSS LLP, The Guaranty Building, 140 Pearl

21  Street, Suite 100, Buffalo, New York, on March 24,

22  2022, commencing at 10:08 a.m., before ANDREA J.

23  HOBBS, Notary Public.

24

25



```
 1                     John Vickerd

 2  So you -- you worked closely with Lonergan on many

 3  cases, correct?

 4          A.   Yes.

 5          Q.   Okay.  And what you would -- what you

 6  would have done if you went to the scene and what

 7  you would have expected Lonergan to do, is to talk

 8  to the police officers who had gotten them -- who

 9  had gotten there before him to ask them questions

10  about what they had learned, correct?

11          MR. RUSS:  Objection to form.

12          MS. PERSICO:  Form.

13          MR. RUSS:  You may answer.

14          THE WITNESS:  I would believe so.  Yes.

15          BY MR. BRUSTIN:

16          Q.   Okay.  That's certainly what you would

17  have done when you got to the scene of a homicide

18  when a police officer had -- when police officers

19  had been there for some minutes before you got

20  there, correct?

21          A.   That's --

22          MR. RUSS:  Objection to form.  You may

23  answer.

24          THE WITNESS:  That's what I would -- that's

25  what I would have done, yes.
```



```
1                        John Vickerd

2           BY MR. BRUSTIN:

3           Q.   Okay.  And what you'd be looking for is

4    potential witnesses, correct?

5           A.   Depends on the circumstances.

6           Q.   If there's a shooting with 100 people

7    there, one of the things you're going to be asking

8    the police officers who respond to the scene is are

9    there any potential witnesses, right?

10          A.   Yes, because they -- they should

11   have -- did they or did they not approach the

12   police officers before I got there, yes.

13          Q.   And you're going to want to know has

14   anyone mentioned any suspects, are there any

15   suspects in mind, correct?

16          A.   Yep.  That would be the general

17   knowledge, yes.

18          Q.   That's a basic question that any

19   homicide detective would ask the police officers

20   when they get to the scene of a crime?

21          A.   Correct.

22          Q.   And as soon as a suspect is mentioned,

23   you're going to want to ascertain who that suspect

24   is, correct?

25          A.   If a suspect was mentioned to them,
```



```
 1                      John Vickerd

 2  yes.

 3          Q.    Okay.   And -- and start investigating?

 4          A.    If the subject was under investigation,

 5  then yes.

 6          Q.    All right.   But that's the basic --

 7  that's the kind of basic question you ask police

 8  officers at the scene of a homicide when you get

 9  there?

10          A.    Correct.

11          MR. RUSS:   Objection to form.   You may

12  answer.

13          BY MR. BRUSTIN:

14          Q.    Now, so just based on -- you mentioned

15  you -- you had a chance to read your report,

16  correct?

17          A.    I did.

18          Q.    All right.   And it looks like so you

19  get -- you get to headquarters at -- at

20  approximately 1:45 in the morning?

21          A.    Correct.

22          Q.    And then you go to -- you're directed

23  at some point thereafter, probably within 15,

24  20 minutes, you're directed to go to the hospital.

25  Does that sound about right?
```



 1                    John Vickerd

 2  scenes or at hospitals with victims and you would

 3  want to know what, if anything, they learned that

 4  could help your case, right?

 5          MR. RUSS:  Objection to form.  You may

 6  answer.

 7          THE WITNESS:  Yes.

 8          BY MR. BRUSTIN:

 9          Q.   All right.  And so you spoke to PO --

10  PO O'Neill and then you went back -- then you went

11  for the first time to the crime scene, correct?

12          A.   Bailey and East Delavan, yes.

13          Q.   And how far is that from the hospital?

14          A.   That was from ECMC, no more than like

15  five minutes.

16          Q.   Okay.  So probably at this point you've

17  done all the things you've done, going to

18  headquarters, going to ECMC, going to the crime

19  scene.  Probably something like 3:00 or so in the

20  morning, sound right, maybe a little later?

21          A.   I believe so, yes.

22          Q.   Okay.  And then you go from -- after

23  you go to the crime scene, you speak to Lonergan?

24          A.   Correct.

25          Q.   And you -- and you -- you fill him in



```
 1                      John Vickerd
 2   on the information you've gathered, right?
 3         A.   Yes.
 4         Q.   Okay.  And, again, this would be the
 5   time when you'd be talking to Lonergan, you'd be
 6   talking to police officers about what information
 7   they've gathered.
 8         Are there any witnesses, are there any
 9   suspects, those are the kinds of questions you're
10   asking, right?
11         A.   I -- I would -- I would not recollect,
12   but I would reason that that would be the case,
13   yes.
14         Q.   Okay.  And then after that, you go --
15   you learn about another victim and -- in the
16   hospital, John Sullivan, correct?
17         A.   Yes.  That would be at Sisters
18   Hospital.
19         Q.   Okay.  And how far is Sisters Hospital
20   from the scene?
21         A.   Probably another 10 minutes.
22         Q.   Okay.  So it was sometime 3:30, 4:00
23   you're at Sisters Hospital, sound about right?
24         A.   About right, yes.
25         Q.   All right.  And you're going there --
```



```
 1                     John Vickerd
 2   presumably, correct me if I'm wrong, but based on
 3   this report, you're going there to interview a
 4   victim in an effort to try to determine who
 5   committed this crime, correct?
 6        A.   Yes.
 7        Q.   And then you describe an interview that
 8   you had at that hospital with John Sullivan,
 9   correct?
10        A.   Yes.
11        Q.   And you don't put a time, but it has to
12   be sometime after 3:00, 3:30 in the morning, right?
13        A.   I would assume so, yes.
14        Q.   And I take it you understood you were
15   obligated to document all the information that he
16   provided to you, correct?
17        A.   Yes.
18        Q.   And all the information you provided to
19   him, correct?
20        A.   Correct.
21        Q.   And I take it -- you mentioned what a
22   careful and meticulous detective you were.  I take
23   it that within -- withdrawn.
24        Later that evening, John Sullivan is
25   questioned by Detective Masecchia in a formal Q&A.
```



1                        John Vickerd

2          THE WITNESS:  It could have been a phone

3     call, it could have been somebody with a -- I don't

4     know, a difference of opinion.  I have no idea.

5          BY MR. BRUSTIN:

6          Q.   Wherever it came from, it would be

7     important that that information be documented,

8     correct?

9          MR. RUSS:  Objection to form.  You may

10    answer.

11         THE WITNESS:  I never worked in another

12    squad besides what I told you.

13         BY MR. BRUSTIN:

14         Q.   Okay.  Now, so it sounds like you have

15    no idea if you knew by the time that you got to

16    John Sullivan in the hospital, as to whether or not

17    Valentino Dixon was a suspect, correct?

18         MS. PERSICO:  Objection to form.

19         MR. RUSS:  Objection to form.  You may

20    answer.

21         THE WITNESS:  According to my report, he

22    mentioned somebody by the name of Tino and said

23    that the first name was Valentino.

24         He did not report that the name was Dixon

25    and that's just what I wrote and do I remember



```
 1                    John Vickerd
 2   writing it, no.
 3        BY MR. BRUSTIN:
 4        Q.   So I'm asking you a totally different
 5   question than the one you just answered so I want
 6   you to answer my question.
 7        My question is, when you went to the
 8   hospital to visit with John Sullivan, you don't
 9   recall today one way or another whether you had
10   learned by that point in time that Valentino Dixon
11   was a suspect in the case, correct?
12        MS. PERSICO:  Form.
13        THE WITNESS:  Do I remember?  No, I don't.
14        BY MR. BRUSTIN:
15        Q.   You don't know one way or the other,
16   correct?
17        A.   Correct.
18        Q.   And you can't tell from the report
19   whether or not you asked John Sullivan whether he
20   knew Valentino Dixon before he told you that he was
21   the shooter, correct?
22        MS. PERSICO:  Objection to form.
23        MR. RUSS:  Objection to form.  You may
24   answer.
25        THE WITNESS:  No, I don't.
```



```
 1                    John Vickerd
 2         BY MR. BRUSTIN:
 3         Q.   You don't know one way or another
 4   whether or not you talked to him about
 5   Valentino Dixon before he said Valentino Dixon was
 6   the shooter, correct?
 7         MR. RUSS:  Objection to form.  You may
 8   answer.
 9         MS. PERSICO:  Form.
10         THE WITNESS:  No.
11         BY MR. BRUSTIN:
12         Q.   And obviously this reports is not a
13   verbatim account, not an exact account of
14   everything you said to John Sullivan and everything
15   John Sullivan said to you, correct?
16         A.   If I wrote it back 28, 30 years ago and
17   it was typed the way I wrote it, yes, it would be
18   exact.
19         Q.   All right.  Well, let me try it a
20   different way.  So take a look at page -- your
21   report's on page 15 and 16.  Okay?  Let me know
22   when you're there.
23         A.   I've got 15 and 16.
24         Q.   All right.  Look at the bottom of
25   page 15 where it says your writer.  Do you see
```



```
 1                     John Vickerd
 2   that?
 3        A.   Your writer then proceeded to Sisters
 4   Hospital.
 5        Q.   No.
 6        A.   That area?
 7        Q.   Your writer then spoke with
 8   John Sullivan.  The bottom of the page.
 9        A.   With John Sullivan, yeah.
10        Q.   Okay.  Read that all the way through
11   the next page.  Let me know when you're done.
12        MR. RUSS:  The whole next page?
13        MR. BRUSTIN:  Yeah.
14        THE WITNESS:  It's just short.
15        MR. RUSS:  Okay.
16        THE WITNESS:  Well, kind of short.
17        MR. BRUSTIN:  If you need to.  You've read
18   it just a moment ago, but if you want to refresh
19   your recollection, that's fine.
20        THE WITNESS:  Yeah.  This is where he
21   mentioned Tino.
22        BY MR. BRUSTIN:
23        Q.   Yes, sir.
24        A.   Last name unknown.  And what he was
25   wearing.  Okay.
```



```
 1                  John Vickerd
 2        Q.   All right.  And so -- and by the way,
 3   you never reviewed even this report prior to today,
 4   you haven't looked at this report for many years,
 5   correct?
 6        A.   Correct.
 7        Q.   But you would agree that what you're
 8   attempting to do here is you're attempting to
 9   summarize the important information that
10   John Sullivan provided to you, correct?
11        MR. RUSS:  Objection to form.  You may
12   answer.
13        THE WITNESS:  I would have back at that
14   time, yes.
15        BY MR. BRUSTIN:
16        Q.   You're not writing down every word you
17   said to him and every word that he said to you,
18   correct?
19        A.   No.  I've got -- my next page is 17 and
20   it's got handwritten notes by me.
21        Q.   Okay.  The handwritten notes I will
22   represent to you almost directly track what --
23   what's in this report.
24             Was it your process to simply read that into
25   a -- a Dictaphone and have it typed up?
```



```
 1                    John Vickerd
 2        A.   No.  I would have handed it to the
 3   secretary and she would have typed it up for me.
 4        Q.   Okay.  So when you were taking notes of
 5   your meeting with John Sullivan, you did not
 6   include in your notes every word that you said to
 7   him and every word that he said to you, you tried
 8   to summarize what you thought was important,
 9   correct?
10        MR. RUSS:  Objection to form.  You may
11   answer.
12        THE WITNESS:  I believe so, yes.
13        BY MR. BRUSTIN:
14        Q.   All right.  For example, you -- you
15   don't -- you haven't written any of the questions
16   that you asked him in this report, correct?
17        A.   Correct.
18        Q.   And there's nothing in this report that
19   describes what information, if any, you had about
20   Valentino Dixon prior to this meeting, correct?
21        MR. RUSS:  Objection to form.
22        MS. PERSICO:  Form.
23        MR. RUSS:  You may answer.
24        THE WITNESS:  I didn't read my handwritten
25   notes, but I would believe so, yes.
```



1                        John Vickerd

2          BY MR. BRUSTIN:

3          Q.   I mean, it was a little tough to read

4    for me.  But it appears to me when you look at

5    them, that they almost directly track your report.

6          And is that -- is that the process, you

7    would hand your notes to the secretary and she

8    would type them up?

9          MS. PERSICO:  Form.

10         MR. RUSS:  Objection to form.  You may

11   answer.

12         THE WITNESS:  Yes.  It would have been the

13   secretary in the office and she would have typed it

14   up and I would have reread it at that time.

15         BY MR. BRUSTIN:

16         Q.   Okay.  In any case, you would agree

17   though that based on your review of this report

18   today, there's nothing in this report indicating

19   what, if anything, you knew about Valentino Dixon

20   prior to this interview, correct?

21         MR. RUSS:  Objection to form.

22         MS. PERSICO:  Form.

23         MR. RUSS:  You may answer.

24         MS. PERSICO:  How many times are you going

25   to ask this question?



```
 1                    John Vickerd
 2         THE WITNESS:  According to this report, yes.
 3         BY MR. BRUSTIN:
 4         Q.   According to this report, there's no
 5   information about it, it doesn't say anything about
 6   it, correct?
 7         A.    Correct.
 8         MR. RUSS:  Objection to form.
 9         MS. PERSICO:  Form.
10         MR. RUSS:  You may answer.
11         BY MR. BRUSTIN:
12         Q.   You don't know, for example --
13   withdrawn.
14         And you can't tell from this report whether
15   or not you spoke -- you spoke to John Sullivan
16   about Valentino Dixon prior to him telling you that
17   Valentino Dixon or Tino was the shooter, correct?
18         MS. PERSICO:  Form.
19         MR. RUSS:  Objection to form.  You may
20   answer.
21         THE WITNESS:  By reading --
22         BY MR. BRUSTIN:
23         Q.   I didn't hear you.
24         A.    -- this report from this many years
25   ago, no.
```



1                        John Vickerd

2          Q.   All right.  And by the way, you don't

3   know, for example, whether or not prior to this

4   interview, you knew that Valentino Dixon's nickname

5   was Tino, correct?

6          A.   I did not know, no.

7          Q.   Well, are you telling me you remember

8   you didn't know?

9          A.   No.

10         Q.   How could you -- how could you remember

11  that today?

12         A.   Because I'm reading this report and it

13  says that he gave me that information and that's

14  the first time I've heard Tino mentioned.

15         Q.   Where does it say that, that that's the

16  first time you heard Tino mentioned?

17         A.   Let me get back to the page that was

18  typewritten.  It's easier to read.  It's actually

19  not Torri, it's Tino -- it's Torri, not Tino

20  fighting Mario and his name is Mario last name

21  unknown.

22         MR. RUSS:  Yeah.  No, I think --

23         THE WITNESS:  And here's Tino.  Is -- is --

24  is -- yeah, Tino is -- name is Valentino, last name

25  unknown.



```
 1                     John Vickerd
 2          BY MR. BRUSTIN:
 3          Q.   But he doesn't know the last name.  It
 4    doesn't mean you don't know the last name, right?
 5          A.   Do --
 6          MR. RUSS:  Objection to form.
 7          THE WITNESS:  Do I recall back from then, no
 8    I don't.
 9          BY MR. BRUSTIN:
10          Q.   This report doesn't indicate -- this
11    report indicates that he doesn't known the name
12    Tino.  He doesn't know Valentino's last name,
13    correct?
14          In other words, let me -- let me ask you a
15    better question.  Okay?  There's nothing in this
16    report that indicates whether or not you had heard
17    the name Tino prior to this interview, correct?
18          MS. PERSICO:  Form.
19          THE WITNESS:  Yes.
20          BY MR. BRUSTIN:
21          Q.   You don't know one way or the other
22    whether you did or didn't, correct?
23          MR. RUSS:  Objection to form.  You may
24    answer.
25          THE WITNESS:  I don't remember Tino being
```



```
 1                    John Vickerd
 2  observed the crime?
 3          MS. PERSICO:  Objection.
 4          MR. RUSS:  Objection to form.  You may
 5  answer.
 6          THE WITNESS:  At the time, they -- somebody
 7  should have been aware of that I would imagine
 8  talking to -- to an individual that was a witness.
 9          BY MR. BRUSTIN:
10          Q.  Well, so this is your report of your
11  interview with John Sullivan.  There's no mention
12  of drugs or alcohol in this -- in this report,
13  correct?
14          A.  Correct.
15          Q.  Is it your testimony though that you
16  may have talked with him about that and it just
17  didn't make its way into the report?
18          MS. PERSICO:  Objection.
19          MR. RUSS:  Objection to form.  You may
20  answer.
21          THE WITNESS:  If I would have noted that
22  back at that time, it would have been in my report.
23          BY MR. BRUSTIN:
24          Q.  All right.  But I -- I think what you
25  just told me -- and you correct me if I'm wrong.
```



```
 1                    John Vickerd
 2   what he saw during the homicide?
 3        MS. PERSICO:  Objection to form.
 4        MR. RUSS:  Objection to form.  You may
 5   answer.
 6        THE WITNESS:  How I remember the type of
 7   detective work I did back then, yes.
 8        BY MR. BRUSTIN:
 9        Q.   And would it be fair to say that you
10   were attempting to carefully and meticulously
11   document what he told you about what he saw and
12   heard during the homicide?
13        MS. PERSICO:  Objection to form.
14        THE WITNESS:  According to this report, it's
15   what he -- how he described Tino.
16        BY MR. BRUSTIN:
17        Q.   So my question is at the time, was it
18   your process to carefully and meticulously document
19   what a witness to a homicide told you about what
20   they saw and heard during the homicide?
21        A.   According to back that date, yes.
22        Q.   And you would agree that there's
23   nothing in this report indicating that
24   Valentino Dixon's last name is unknown to you,
25   correct?
```



1                        John Vickerd

2    that.  As you sit here today, you have no

3    recollection of it, you don't know whether or not

4    you learned about it at the time, correct?

5           A.   Correct.

6           Q.   All right.  And would it be fair to say

7    that -- well, first of all, can you remember any

8    other case that you were involved in or even heard

9    about in the Buffalo Police Department where

10   somebody was arrested for a homicide and somebody

11   else came in and confessed to the crime?

12          MR. RUSS:  Objection to form.  You may

13   answer.

14          THE WITNESS:  I wish I could tell you I did,

15   but I haven't and I don't remember and no, not --

16   not once.  Not once that I recall.

17          BY MR. BRUSTIN:

18          Q.   Okay.  Now, is that something you think

19   is an issue of memory or you think that's probably

20   never happened before?

21          A.   That could be part of both.

22          Q.   Okay.  Fair enough.  In any case, you

23   have no memory of it today?

24          A.   Correct.

25          Q.   Would it be fair to say though that to



```
 1                    John Vickerd

 2        A.   It's possible.

 3        MR. RUSS:  Objection to form.  You may

 4   answer.

 5        BY MR. BRUSTIN:

 6        Q.   Now, you would agree that there is a

 7   lot of information in this statement that needs to

 8   be followed up on, correct?

 9        MR. RUSS:  Objection to form.  You may

10   answer.

11        THE WITNESS:  Yes.

12        BY MR. BRUSTIN:

13        Q.   For example, there needs to be an

14   investigation into trying to locate the gun,

15   correct?

16        A.   I saw in this question and answer sworn

17   statement that he threw it away.

18        Q.   Right.  So there needs to be a search

19   for where he claims to have thrown the gun, right?

20        A.   That would have -- that would have been

21   normal procedure.

22        Q.   And -- and that -- and that

23   investigation needs to be documented, correct?

24        A.    If it was found, it should have been,

25   yes.
```



1                   John Vickerd

2        Q.   Or if it wasn't found, it had to be

3   documented that it was searched for and not found,

4   correct?

5        A.   It should have been back then, yes.

6        Q.   And the statement that he fired at

7   Torriano Jackson because Torriano Jackson was

8   firing at him, that also -- that information had to

9   be investigated, correct?

10        MR. RUSS:  Objection to form.  You may

11   answer.

12        THE WITNESS:  That would have been

13   advisable, yes.

14        BY MR. BRUSTIN:

15        Q.   And that -- and that investigation had

16   to be documented?

17        A.   Correct.

18        MS. PERSICO:  My fuse is like this short

19   right now.

20        BY MR. BRUSTIN:

21        Q.   Now, if you take a look at -- you

22   see -- do you recall from reading this just a

23   moment ago that there are questions about any

24   threats or promises that were made to him including

25   by Valentino's family?



```
 1                    John Vickerd
 2         MR. RUSS:  Does he remember reading that
 3    today?
 4         MR. BRUSTIN:  Yes.
 5         THE WITNESS:  No, I didn't.
 6         BY MR. BRUSTIN:
 7         Q.   Take a look at page 198 at the top.
 8    About five lines down, have there been any threats
 9    or promises made to you.
10         A.   No was the answer.
11         Q.   Yeah.  And then take a look at
12    page 199.
13         A.   Yeah.  He said he got --
14         Q.   About middle of the page, did Tino's
15    mother make you turn yourself in.  Do you see that?
16         A.   Yes, I did.
17         Q.   Another important area to follow up on
18    and investigate based on this information is what,
19    if any, interaction he had with -- with Valentino's
20    family, correct?
21         MR. RUSS:  Objection to form.  You may
22    answer.
23         THE WITNESS:  Yes.
24         BY MR. BRUSTIN:
25         Q.   Take a look at page 207 and just read
```



1

2  STATE OF NEW YORK    )

3                        ss:

4  COUNTY OF ERIE)

5

6       I DO HEREBY CERTIFY as a Notary Public in and

7  for the State of New York, that I did attend and

8  report the foregoing deposition, which was taken

9  down by me in a verbatim manner by means of machine

10  shorthand.  Further, that the deposition was then

11  reduced to writing in my presence and under my

12  direction.  That the deposition was taken to be

13  used in the foregoing entitled action.  That the

14  said deponent, before examination, was duly sworn

15  to testify to the truth, the whole truth and

16  nothing but the truth, relative to said action.

17

18

19       _____

20       ANDREA J. HOBBS,
         Notary Public.

21

22

23

24

25

