# EXHIBIT 79

```
                                                      425

COUNTY COURT OF THE STATE OF NEW YORK

COUNTY OF ERIE : CRIMINAL TERM : PART 1

-------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK    :  Indictment
                                          No. 91-1476-003
          -against-                    :

LEONARD BROWN & MARIO JARMON,          :  Perjury

                    Defendant.         :  Trial

-------------------------------------x

                              Erie County Hall
                              Buffalo, New York  14202
                              Tuesday, November 10, 1992

B e f o r e :

          HONORABLE MICHAEL L. D'AMICO

                                     Judge

A p p e a r a n c e s :

     KEVIN M. DILLON, ESQ.
        District Attorney, Erie County
        BY:  FRANK A. SEDITA, III, ESQ.
             Assistant District Attorney
             Appearing for the People

     EDWARD COUGHLIN, ESQ.
        Appearing for the Defendant Brown

     TERENCE B. NEWCOMB, ESQ.
        Appearing for the Defendant Jarmon




                              Kenneth D. Meier, C.S.R.
                              Senior Court Reporter
```

93 FEB 26 AM 11:16 ERIE COUNTY CLERK

```
                    Maxian - Sedita - Direct                446
```

(Witness excused.)

MR. SEDITA: People call Thomas Maxian.

THOMAS MAXIAN, a witness located in Amherst, New York, having been first duly sworn, was examined, and testified as follows:

MR. SEDITA: Please mark this as the next exhibit.

(Whereupon, People's Exhibit Number 54 was marked for identification.)

DIRECT EXAMINATION
BY MR. SEDITA:

Q. Mr. Maxian, would you tell the jury how you are presently employed, sir?

A. Presently employed as a paramedic.

Q. Who do you work for now?

A. Now I work for Twin City Ambulance in the City of Tonawanda.

Q. In August of 1991 were you employed?

A. Yes, I was, for Lasalle Ambulance as a paramedic.

Q. I am sorry, I didn't hear that?

A. I was employed at Lasalle Ambulance as a paramedic.

MR. NEWCOMB: I can't hear.

THE COURT: Could you speak up a little bit.

```
                                                                447
 1                        Maxian - Sedita - Direct

 2         Lasalle Ambulance, is that what you said, as a

 3         paramedic.

 4              THE WITNESS:  That is correct.
 5   BY MR. SEDITA:

 6        Q.   Mr. Maxian, you either have to project your voice

 7   or speak directly into the microphone, okay?

 8        Now, you indicate you were a paramedic.  Is that also

 9   known as an EMT?

10        A.   EMT for paramedic, that is correct.

11        Q.   Explain what qualifications you have for the jury

12   so they understand?

13        A.   I have been certified by New York State as a

14   paramedic for 6 years.

15        Q.   Sir, I would like to refer your attention to August

16   10th of 1991 at approximately 1:32 p.m.  Did you have

17   occasion to receive a dispatch to respond to the scene of

18   East Delevan and Bailey Avenues in the City of Buffalo for

19   the Lasalle Ambulance Company?

20        A.   Yes, I did, that's correct.

21        Q.   And, did you eventually arrive at that scene, sir?

22        A.   Yes, I did.

23        Q.   And, just in terms of general observations, what

24   did you observe relative to the scene?

25        A.   When I arrived, I found one gentleman in the
```

Maxian - Sedita - Direct    448

2 street. It appeared to me that he had been shot.

3    Q.   Was that gentleman Mario Jarmon?

4    A.   Apparently it was, according to what I had written
5 down. I could not identify him just by looking at him, but
6 according to my --

7    Q.   You cannot identify Mr. Jarmon in the courtroom
8 today?

9    A.   No, I cannot.

10    Q.   He gave his name as Mario Jarmon?

11    A.   I probably had asked him his first name just to
12 communicate with him, and when I got to the hospital,
13 somebody there probably asked him what his name was, and I
14 had gotten his last name from there.

15    Q.   Can you indicate on the map, sir, which is People's
16 Number 22 in evidence, where you found Mr. Jarmon? Please
17 come off the stand, and, mark your initials where you found
18 Mr. Jarmon.

19       Your Honor, may the record reflect that the witness has
20 identified where he found Mr. Jarmon with the initials TM on
21 the map between, or I'm sorry, on Bailey Avenue, between 2502
22 and 2506 Bailey.

23       THE COURT: Sure.

24 BY MR. SEDITA:

25    Q.   Now, did Mr. Jarmon appear to be injured to you,

```
                                                                    449
 1                    Maxian - Sedita - Direct
 2   sir?
 3        A.   Yes, he did.
 4        Q.   And, is it your duty to try to assess those
 5   injuries by talking to a patient?
 6        A.   Yeah, that would be very much part it have.
 7        Q.   Did you attempt to speak to Mr. Jarmon?
 8        A.   Yes, I did.
 9        Q.   First of all, can you indicate for the jury Mr.
10   Jarmon's level of alertness or orientation in order to speak
11   with you?
12        A.   Without looking at the run form that I completed,
13   my standard report, I wouldn't be able to do that.
14        Q.   You are indicating an ambulance run form?
15        A.   That's correct.
16        Q.   Sir, I show you what has been marked as People's
17   Exhibit Number 54 for identification and ask you to identify
18   what that document is?
19        A.   This is the standard pre-hospital care report
20   completed for every time I saw a patient, whether he was
21   transported to the hospital or not.  This would be filled out
22   so that I would have some recollection of things that I did
23   and treatments that I had rendered at a future date.
24        Q.   When do you fill out that form, sir?
25        A.   Shortly after the patient would be delivered to the
```

450

Maxian - Sedita - Direct

2  hospital.

3  Q. Is it important that you be as accurate as possible
4  in that form, sir?

5  A. Yes, it is.

6  Q. Why is that?

7  A. A lot of the time the pre-hospital, or I'm sorry,
8  the hospital staff, nurses or doctors, take a look at how I
9  found the patient and treatment that I had rendered, and that
10 would direct them in the way they would treat the patient
11 from that point on.

12 Q. Now, are you a medical doctor, sir?

13 A. No, I'm not.

14 Q. So your assistance in terms of physical treatment
15 and so forth are basically preliminary; is that correct?

16 A. That's correct.

17 Q. Now, does your form indicate what Mr. Jarmon's
18 level of alertness or orientation was?

19 A. Yes, under level of consciousness I have him listed
20 as consciousness, alert and oriented times 3, and that would
21 indicate that he was able to tell me the time, date and the
22 place that he was at the time that I was speaking with him.

23              MR. COUGHLIN: Excuse me --

24              MR. SEDITA: When you are discussing matters
25         with the patient --

```
                                                              451
                     Naxian - Sedita - Direct

           MR. COUGHLIN:  I'm just wondering where on the
     form --

           THE COURT:  Well, you can ask him when it's
     your turn.  Go ahead.
BY MR. SEDITA:

     Q.   When you are discussing matters with the patient,
is there some portion of your form where you indicate in your
notes what that patient may have said to you?

     A.   Yes, sir, it's under the subjective part of the
assessment.

     Q.   And why do you make out that part of the
assessment?

     A.   To give me a better understanding of exactly what
the problem was, circumstances involving that, and history of
the present complaint so that he can elaborate to me exactly
what hurt and what didn't hurt, and things like that.

     Q.   What did Mr. Jarmon tell you happened?

     A.   I have written down here that, I wrote down patient
apparently injured in a drive-by shooting, and I always write
that in terms of apparently, because I wasn't there
witnessing it, and that would be what the patient told me
when I arrived and asked how did it happen.  I also have
written down that, under mechanism of injury, it's
unidentified gun, and I would be concerned with that because
```

Maxian - Newcomb - Cross                                          452

of the size of the gun and how close the victim or the patient was at the time he was shot, or whatever the mechanism of injury happened to be.

Q. And again, that would come from the patient's lips; is that correct?

A. That's correct, everything under subjective would come from what the patient told me.

MR. SEDITA: I have nothing further, your Honor.

MR. COUGHLIN: No questions, Judge.

CROSS-EXAMINATION
BY MR. NEWCOMB:

Q. Mr. Maxian, why don't you hang onto this; when you asked the victim what happened, you do that to help assess his injuries, correct?

A. That's correct.

Q. You're not concerned with the detail of events that lead up to that injury?

A. Not every detail. Some of the details would be relevant to the treatment I would render, and also to be relayed to the emergency room staff for the treatment they would render.

Q. Was Mr. Jarmon in a state of trauma?

A. He was in a state of trauma, that's correct.

                                                                    453
1                   Maxian - Newcomb - Cross

2        Q.   To the best of your ability, as a paramedic, would
3   you tell the jury what that means?
4        A.   Trauma is used to oppose any injury or any
5   pre-hospital injury that is medical in origin.  Medical would
6   be something like chest pain, a heart attack.  Trauma is any
7   soft tissue injury.  It could be a bump on the head, it could
8   be a gun shot wound.
9             MR. SEDITA:  I am sorry, I didn't hear that.
10            THE COURT:  Try to keep your voice up a little
11       would you, Mr. Maxian, please.
12            THE WITNESS:  Anything medical in origin would
13       be used to oppose anything traumatic.  Trauma could
14       be any soft tissue injury, bump on the head,
15       gunshot wound would both be trauma as opposed to
16       something in origin medically, like chest pains or
17       difficulty breathing.
18  BY MR. NEWCOMB:
19       Q.   When you say he was at a conscious level 3 --
20       A.   That is correct.
21       Q.   -- that is in the objective part of the chart?
22       A.   No.  That's correct, objective would be level of
23  consciousness.
24       Q.   What is the highest level of consciousness?
25       A.   Conscious, alert, oriented times 3 would be the

```
                                                                    454
                        Maxian - Newcomb - Cross
```

most alert. We are all conscious, alert, oriented times 3 now.

Q. What would be the low?

A. Unresponsive to pain or to voice.

Q. What number would that be?

A. There is no number for that.

Q. So Mr. Jarmon was fully alert?

A. As alert as I would expect him to be. Answered me what time it was, what date it was, basically where we were.

Q. And he had a number of injuries?

A. According to the run form, I have marked what appeared to be an a gunshot wound to the right of the sternum and gunshot wound to the lower right side of the abdomen just before the iliac crest. The iliac crest is the bone on your hip that you can feel if you palpate it.

Q. That's two gunshot wounds?

A. Two apparent gunshot wounds, that's correct.

Q. Any other injury?

A. I have, it appears he had a dislocated right index finger.

Q. Anything else?

A. Nothing really noteworthy here. There may have been some other lacerations or bruises that would have fallen far below my priority to treat other than the two gunshot

```
                                                               455
                       Maxian - Sedita - Redirect
 2   wounds.
 3
             MR. NEWCOMB:  Nothing further, Judge.  Thank
 4   you.
 5
             THE COURT:  Mr. Sedita?
 6   REDIRECT EXAMINATION
 7   BY MR. SEDITA:
 8        Q.  Did you perform any type of operative procedure on
 9   Mr. Jarmon?
10        A.  Operative -- you have to define that a little
11   better.
12        Q.  Like surgery?
13        A.  No.
14
             MR. SEDITA:  Nothing.
15
             THE COURT:  Is that it?  Thank you.  You may
16   step down.
17
             (Witness excused.)
18
             MR. SEDITA:  People call Raniero Masecchia.
19
             (Whereupon, People's Exhibit Number 55
20            was marked for identification.)
21   R A N I E R O   M A S E C C H I A, a witness located in
22   Buffalo, New York, having been first duly sworn, was
23   examined, and testified as follows:
24   DIRECT EXAMINATION
25   BY MR. SEDITA:
```