UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

VALENTINO DIXON,

      Plaintiff,                    Civil Action No. 19-cv-01678

  v.

CITY OF BUFFALO, et al.,

      Defendants.

---

### COUNTY DEFENDANTS' OBJECTIONS TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF ADDITIONAL FACTS

Pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure, Defendants County of Erie (the "County") and former Assistant District Attorney Christopher Belling (collectively the "County Defendants") submit these objections to Plaintiff's statement of additional material facts pursuant to Rule 56(c)(2)[1]:

> 34. Dixon was taken into custody shortly thereafter and transported to the Buffalo Police Department ("BPD") homicide office. At the station, Dixon truthfully told BPD Defendant Stambach that he did not do the shooting. Dixon then voluntarily waived his rights and gave a statement, in which he again truthfully denied being the shooter or having any weapons. Ex. 1 (Homicide File) (BPD Comp.) 64–65 (Stambach Report) 72 (Dixon tmt.).

---

[1] The purpose of this document is to assist this Court's understanding of record evidence and to object to the Plaintiff's characterization of testimony, as necessary. The County Defendants do not formally deny or admit any of the 163 facts asserted by Plaintiff.

1

| |
|---|
| The record evidence does not establish that Dixon's statement was truthful. (*See* Response to ¶55, *infra*.) |
| 36. Even though Dixon knew he was being arrested for something Lamarr Scott did, Dixon did not give the police information implicating Scott in the shooting because of the understanding "in the neighborhood" that "you just don't speak about these type of things, because it can be harmful to you…it just makes your life horrible. Like it travels with you for the rest of your life…unless you move into the Arizona desert somewhere away from the whole…environment." Ex. 23 (Dixon Dep.) 142:06–43:19. |
| The County Defendants concede that this accurately captures Valentino Dixon's testimony but add that Valentino Dixon did, in fact, describe his observation of the murder of Toriano Jackson and chose to describe the events inaccurately, which is an independent and appropriate consideration in a probable cause determination. *See Morris v. City of Buffalo*, 151 A.D.3d 1723, 1724 (4th Dept. 2017) (plaintiff's initial lie to officer about brand of cigarettes was relevant in analysis concerning whether officer had arguable probable cause to arrest plaintiff for violations of NY Tax Law § 1814(b)); *People v. Febus*, 11 A.D.3d 554, 556 (2d Dept. 2004) (defendant's response that he had "nothing" in his pocket after officer observed him putting bags in his pocket during officer's approach was probable cause to believe that the defendant possessed narcotics, justifying search and arrest of this person). |
| 47. As result, Belling admits he took a more substantial role in directing the investigation from that point forward than he otherwise would have in a typical homicide investigation. Ex. 41 (Belling Dep.) 65:22–66:4. As Defendant Lonergan described: "Belling was very active in Lamarr Scott's confession." Ex. 8 (Lonergan Dep.) 200:4–13. Belling interviews Scott. |

| |
|---|
| Defendant Lonergan's characterization of Christopher Belling's involvement is inconsistent with Defendant Lonergan's description of Christopher Belling's involvement. At deposition, Lonergan confirmed that Leonard Brown and Lamarr Scott had confessed on television and was interviewed by the Buffalo Police Department before Christopher Belling was even contacted by detectives. (Lonergan Dep. Trans., p. 199:15-17 [174-19].) |
| 49. Belling repeatedly claimed that his interview of Scott lasted only five minutes, and that he intentionally "tried to stay away from substantive information about what he said because [he] didn't want to end up a witness at [his] own Huntley hearing." Ex. 41 (Belling Dep.) 68:23–69:3; see also 69:6–7 ("I tried to avoid the substance of what was going on and tried to get the context."), 75:25–76:4 (spoke approximately five minutes night Scott came in). |
| 50. But Belling's handwritten notes entitled "Lamarr Scott, taken on 8-12-91 confession" have several substantive points showing this was an investigative interview—including "LS returns fire, panic and out of control, shooting threats, self-protection, and poor shooting control," and a notation "can't come up with underlying reason. 19 years old, no prior." Ex. 80 (Belling Perj. Test.) 528:3–21 (reading Belling notes into the trial record). |
| There is no conflict between Chistopher Belling's description and the cited notes. The evidence cited by Plaintiff [181-83] reflects that Belling's notes contained seventy (70) words. |
| 55. In addition to Scott matching Adams' earlier description of the shooter, Scott's confession that night included other credible indicia of his involvement and was consistent with evidence in the investigation up to that point a number of respects:<br>(a)      Scott's description of the sequence of events preceding the shooting including that he fired from the right-hand side of the street coming from Bailey; |

3

(b) Scott's knowledge of the individuals present and where they were located during the events, including the Jacksons and one of the bystanders (Michael Bland), whose name had not publicly surfaced, whom Scott described seeing before the shooting and remaining on the corner, consistent with information the detectives obtained from other sources;

(c) Scott's descriptive details of the revolver recovered next to the body of Torriano Jackson, in particular that it was a silver gun with a nickel plate;

(d) and the fact that Scott had emptied the entire clip of the TEC-9 that night.

Ex. 3 (Stambach Dep.) 292:10–-293:6, 294:3–15, 294:17–296:8, 297:8–16; Ex. 1 (Homicide File) Comp. BPD 197 (Scott Stmt.); BPD Comp. 216 (Grabowski Rep. Re: Jackson 8/21 Intv.).

The record evidence does not support that Scott's confession was credible. At his deposition, Mr. Dixon acknowledged that several portions of Mr. Scott's confession were untrue, including that Mr. Scott arrived at the crime scene on a bicycle and that an Uzi, rather than a TEC-9, was used in the shooting. Ex. 4 (Dixon Dep.), 56:18-57:2; 61:13-62:2; 71:20-72:9.

The record evidence does not support that Scott's confession was consistent with evidence in the investigation up to that point:

- In his August 11, 1991 confession, Lamarr Scott stated that he shot in self-defense after "they jumped out of a yellow Dodge Shadow and opened fire on [Scott] and [his] friends. [A1685.] At the time of the shooting, Lamarr Scott was accompanied by Valentino Dixon, Leonard Brown, Antoine Shannon and Mario Jarmon. [A1686.] Lamarr Scott claimed that he bought the TEC-9 off the street months ago. [A1685.]

4

- As of August 10, 1991, the BPD was informed by Valentino Dixon that he was present for the murder of Toriano Jackson but he was in the store not near to the shooting [A1560.] Dixon states that Mario Jarmon was with Dixon at the time that that the shooting started. (BPD File [A1560].). Dixon denied knowing the shooter. [A1561.] The shooting emerged from a group of "six people in the middle of the street." [A1562.] Despite describing the people who he was with, Dixon made no mention of Lamarr Scott. [A1560] Dixon admitted that he drives a white Cadillac. [A1561.]

- As of August 11, 1991, the BPD were aware of the following: Aaron Jackson's mother reported to the Buffalo Police Department that Aaron Jackson had identified Valentino Dixon as the shooter; Aaron Jackson's father had reported that he had seen a white Cadillac drive by his home three times, at which time Aaron and Toriano reported to their father that Valentino Dixon was going to shoot them. [A1644.]

- On August 12, 1991, Dixon's half-brother, Leonard Brown, essentially contemporaneously with Lamarr Scott, described a fist fight between Jarmon and the Jacksons preceding the shooting. [A1647.] His account did not include Toriano Jackson possessing a gun at the scene [A1647] or anyone else possessing a gun [A1648]. Leonard Brown denied that Valentino Dixon had a gun on the night of the shooting. [A1648.] Leonard Brown recounted that Valentino Dixon arrived with Lamarr Scott. [A1647.] Leonard Brown was nearby the fight and then the shooting, and Valentino and Lamarr were behind him. [*Id.*]

5

| |
|---|
| • On August 20, 1991, Mario Jarmon stated that Lamarr Scott and Dixon brought the TEC-9 to Jarmon's home. [A1704.] When the conflict started between Jarmon and the Jacksons, Lamarr Scott and Valentino Dixon retrieved the gun. [A1704.] Upon return, Lamarr Scott began shooting, with Dixon behind him. [A1704.] Jarmon does not say that Lamarr Scott shot him [1704]. Jarmon described fighting with Valentino Dixon and Aaron Jackson after he was shot. [A1704.] Jarmon reported that Leonard Brown (Dixon's half-brother) is his best friend. [A1704.] |
| 61-73, 82-103, 104-107 (*See* Plaintiff's Statement of Additional Facts, pp. 17-23, 25-30 [181-2].) |
| The County Defendants add that the purported actions and inactions of Christopher Belling took place "in the context of preparation of the case for Grand Jury" (Belling Dep. Trans., p. 34:7-12 [A0035[167-2]]) and after two eyewitnesses, through ostensibly sound identification procedures[2], had already identified Valentino Dixon as the shooter of Toriano Jackson after Valentino Dixon had already been arrested and a criminal complaint [A1802] had already been filed. |
| 77-81 (*See* Plaintiff's Statement of Additional Facts, pp. 23-25 [181-2].) |
| The County Defendants note that the record evidence reflects the following:<br>• Aaron Jackson maintains that Valentino Dixon was, in fact, the shooter. (Jackson Dep. Trans., pp. 69-70 [A0529-530].) Assuming this is in correct, there is no possibility that this theory was seeded by Christopher Belling. |

---

[2] The Plaintiff concedes that Christopher Belling was not aware of any constitutional or technical infirmity in Sullivan's identification of Dixon (P's Statement of Additional Facts [181-2], ¶¶28, 30) or Emil Adams' identification of Dixon (*id*., ¶¶31-32).

6

- Mr. Belling was not present for Aaron Jackson's initial tentative identification of Dixon. (P's Statement of Additional Statement of Facts [181-2], ¶74.) Even before that identification, Aaron Jackson's parents were convinced that Valentino Dixon was the shooter by August 11, 1991. [A1308].

- An additional eyewitness identification was not necessary to a probable cause determination, as two eyewitnesses had already identified Valentino Dixon through ostensibly valid interrogation procedures (*see* FN2, *supra*) and no record evidence reflects that the Jackson identification was material and necessary to that determination.

- The County Defendants note further that Plaintiff's criminal counsel was highly critical of Aaron Jackson's improved recollection and explored his family's role in Mr. Jackson's improved recollection and specifically explored the possibility that his family influenced the identification. (Criminal Trial Transcript [181-5], p. 251.)

108-124 (*See* Plaintiff's Statement of Additional Facts, pp. 31-30 [181-2].)

The County Defendants concede that Lamarr Scott, at the urging of Valentino Dixon, has made a series of sworn and unsworn statements conclusory statements that blame Buffalo Police personnel and Christopher Belling for his recantation.

- The record evidence does not establish (or even support) that Lamarr Scott ever met with Christopher Belling between his confession and attendance at grand jury proceedings. This is consistent with Lamarr Scott's recollection as of 2018. (Scott Interview Part I, dated August 15, 2018 [181-20] (Sara Dee: Did you ever talk to Chris Belling or --? Lamarr Scott: I spoke to Chris Belling that day. Sara Dee: The

day of the trial?   Lamarr Scott: No, no, the Grand Jury.  **That was it**. (emphasis added.))

- Mr. Scott's testimony does not support his parents even having the opportunity to influence his testimony.  Mr. Scott recalled the presence of his parents at the time of the grand jury testimony, and he remembered attended prayer services with his father after his testimony.  (Scott Dep. Trans. [A1137],  p. 69:6-20.)  Although Mr. Scott acknowledged the presence of his parents outside the grand jury proceedings, Scott did not recount speaking to his parents about his testimony.  (See gen Scott Dep. Trans. [A1132], p. 64:18-23.)

- Lamarr Scott has described the harassment that he was subjected to that caused him to recant, the conduct was not improper or illegal.  He testified:

  In 2018, Lamarr Scott conceded that he did not interact outside the context of the grand jury proceedings: Well, he [(Detective Stambach]) – showing up himself was a form of harassment, as far as I understood.  You know, just showing up in places that I didn't think anybody should – should know about and/or show up…Basically that's it, and asking the question of whether I was going to take a polygraph or not.

  (Scott Dep. Trans. [A1127], p. 59.)

- None of the fanciful allegations of Lamarr Scott describe a conversation between Christopher Belling and Scott that was unrelated to Lamarr Scott's appearance for and testimony at grand jury proceedings.

- The Plaintiff points to the circumstantial fact that Mr. Belling's notes reflect that he served a grand jury subpoena on Lamarr Scott to suggest that the Christopher Belling and Lamarr Scott might have had a substantive meeting before his appearance at grand jury.  However, the Plaintiff mischaracterizes this note to suggest that Mr.

Belling might have used this interaction to influence Lamarr Scott. To the contrary, the note reflects (i) service to a "front desk" rather than to Lamar Scott personally, (ii) service subsequent to John Molloy being assigned to represent Lamarr Scott, and, in all probability, (iii) service to John Molloy's office. (Plaintiff's Ex. 69 [182-72].) Moreover, Lamarr Scott had no recollection of receiving a grand jury subpoena from Belling or anyone else. (Scott Dep. Trans. [A1136], p. 68:14-17.) The note is captured here:



137. At his deposition, Bland was asked whether he knew Dixon was not the shooter and had nothing to do with the shooting, and whether he was pressured by ADA Belling to maintain the lie that he had not seen the shooting as opposed to having seen Scott shoot his friends. Bland was also asked if ADA Belling caused him to be arrested so that he could force him to testify in the grand jury, and whether the reason he lied in the grand jury was fear of the police and Belling.

| |
|---|
| Bland was also asked whether anyone has told him that the substance of their testimony was influenced by ADA Belling. Bland invoked his Fifth Amendment rights against self-incrimination to all of these questions. Ex. 85 (Bland Dep.) 10:25–11:10, 25:16–23, 28:18–29:5, 44:4–19, 49:9–18. |
| Michael Bland pleaded the Fifth Amendment to every question that was asked of him during this deposition.  No inference can be drawn his testimony.  (*See* Plaintiff's Ex. 85 [181-88].) |
| 154. At his deposition, Belling agreed that his letter could have been very helpful in connection with Sullivan's rape charges. At first, that he "didn't think" he would have told Sullivan or his father that he would write a letter on Sullivan's behalf in exchange for his cooperation at trial, "because had I done that, it would have been a Brady issue, so I didn't do it." Ex. 41 (Belling Dep.) 206:13–21. Belling then admitted he "didn't know" whether or not he did make that representation to Sullivan. Ex. 41 (Belling Dep.) 207:2–3, 208:11–13. But by the end of his deposition, Belling testified that he absolutely not did not say that, because it would not have been an "appropriate" thing to do. Ex. 41 (Belling Dep.) 221:9–10, 222:16–17 (now "sure" about that). Instead, Belling claims that he thought of writing the letter "after the fact" as a reward. Ex. 41 (Belling Dep.) 221:11–14; see also 208:19–21 ("He was a nice kid, I could have written it out of the goodness of my heart.")<br>Jackson testifies that his "memory gets better with time." |
| The trial transcript reflects that on June 10, 1992, Christopher Belling affirmatively disclosed to the court and counsel that "John Sullivan has a pending charge of rape in DeKalb County, Georgia."  (*See* Criminal Trial Transcript [181-5], pp. 32-33.)  Plaintiff's theory that an |

10

agreement between Sullivan and Christopher Belling existed, despite Christopher Belling's denial, is pure speculation.

Dated: March 15, 2024
       Buffalo, New York

Respectfully submitted,

**LIPPES MATHIAS LLP**

By:   */s/James P. Blenk*
      Jennifer C. Persico
      James P. Blenk
      *Attorneys for Defendants, County of Erie and former Assistant District Attorney Christopher Belling*
      50 Fountain Plaza, Suite 1700
      Buffalo, New York 14202
      (716) 853-5100
      jpersico@lippes.com
      jblenk@lippes.com