UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VALENTINO DIXON,

                              Plaintiff,

        v.                                                    Civil No.: 1:19-cv-01678

CITY OF BUFFALO and COUNTY OF ERIE, and
DETECTIVE MARK R. STAMBACH,
DETECTIVE RANIERO MASECCHIA,
DETECTIVE JAMES P. LONERGAN,
DETECTIVE JOHN VICKERD,
CHIEF RICHARD T. DONOVAN,
JOHN DOES, Unknown Buffalo Police Department
Supervisors, and ASSISTANT DISTRICT
ATTORNEY CHRISTOPHER BELLING,
in their individual capacities,

                              Defendants.

# CITY DEFENDANTS'
# REPLY MEMORANDUM OF LAW

**HODGSON RUSS LLP**
*Attorneys for City of Buffalo*
*and other City Defendants*
*Hugh M. Russ III, of counsel*
*Peter A. Sahasrabudhe, of counsel*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202-4040
716.856.4000

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................3

ARGUMENT ....................................................................................................9

POINT I. CRIMINAL PROCEEDINGS HAVE NOT TERMINATED IN
DIXON'S FAVOR..............................................................................................9

    A.    Dixon Cannot Meet the Favorable Termination Standard
        Applicable to Malicious Prosecution Claims...........................................9

    B.    Dixon Cannot Meet the Favorable Termination Standard
        Applicable to Due Process Fabrication of Evidence Claims ................12

POINT II. DIXON DOES NOT CREATE TRIABLE ISSUES OF FACT AS TO
WHETHER THE CITY DEFENDANTS FABRICATED EVIDENCE......................14

POINT III. DIXON CANNOT MAINTAIN HIS DUE PROCESS CLAIM TO
THE EXTENT IT IS PREDICATED UPON *BRADY*..................................................15

POINT IV. PROBABLE CAUSE EXISTED FOR DIXON'S PROSECUTION .........16

POINT V. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO
QUALIFEID IMMUNITY ON DIXON'S MALICIOUS PROSECUTION
CLAIM...........................................................................................................17

POINT VI. DIXON'S § 1983 CONSPIRACY CLAIM MUST BE DISMISSED.......18

POINT VII. DIXON DOES NOT OPPOSE DISMISSAL OF CERTAIN
CLAIMS ........................................................................................................19

CONCLUSION.................................................................................................19

# TABLE OF AUTHORITIES

PAGE

**Federal Cases**

*Belot v. Wieshaupt,*
    No. 96 Civ. 3005, 197 WL 218449, at *4 (S.D.N.Y. Apr. 291, 1997) .................................... 12

*DiBlasio v. City of New York,*
    102 F.3d 654 (2d Cir. 1996) .................................................................................................... 10

*Felske v. Hirschmann,*
    2012 WL 716632(S.D.N.Y. 2012) ......................................................................................... 19

*Gondola v. City of New York,*
    No. 16-cv-369, 2020 WL 1433874 (E.D.N.Y. Mar. 24, 2020) ............................................... 12

*Kee v. City of New York,*
    12 F.4th 150 (2d Cir. 2021) .................................................................................................... 12

*Malley v. Briggs,*
    475 U.S. 335 (1986) ............................................................................................................... 17

*Mara v. Rilling,*
    921 F.3d 48 (2d Cir. 2019) ..................................................................................................... 18

*McLennon v. New York City,*
    No 14 Civ. 128, 2015 WL 1475819 (E.D.N.Y. Mar. 31, 2015) ............................................. 11

*Miles v. Levac,*
    2014 WL 1338808 (W.D.N.Y. 2014) ..................................................................................... 19

*Mullenix v. Luna,*
    577 U.S. 7 (2015) ............................................................................................................. 17, 18

*Myers v. Cty. of Nassau,*
    825 F. Supp. 2d 359 (E.D.N.Y. 2011) .................................................................................... 15

*Ortiz v. Wagstaff,*
    523 F. Supp. 3d 347 (W.D.N.Y. 2021) ................................................................................ 8, 15

*Reyes v. Paul,*
    658 F. Supp. 3d 94 (N.D.N.Y. Mar. 1, 2023) ......................................................................... 14

## TABLE OF AUTHORITIES - cont'd

PAGE

*Rizk v. City of New York*,
    462 F.Supp. 3d 203 (S.D.N.Y. 2020)........................................................................18

*Saucier v. Katz*,
    533 U.S. 194, 121 S.Ct. 2151 (2001).......................................................................17

*Smalls v. Collins*,
    10 F.4th 117 (2d Cir. 2021) ........................................................................9, 12, 13

*Smith v. Riccelli Brokerage Services*,
    LLC, 2011 WL 2007209 (W.D.N.Y. 2011)..............................................................19

*Stansbury v. Wertman*,
    721 F.3d 84 (2d Cir. 2013)........................................................................................18

*Thompson v. Clark*,
    596 U.S. 36 (2022)........................................................................................9, 10, 12

*Valentin v. City of Rochester*,
    11-CV-6238, 2018 WL 5281799 (W.D.N.Y. Oct. 2018) .......................................16

*Warren v. Fischl*,
    15–CV–2829, 2015 WL 6760230 (E.D.N.Y. Mar. 2015) .................................10, 11

**Federal Statutes**

42 U.S.C. § 1983..............................................................................................9, 18, 19

## PRELIMINARY STATEMENT

Even crediting his version of events, Valentino Dixon committed a serious criminal offense in August of 1991.  He unlawfully possessed a dangerous assault weapon and gave that weapon to his associate, Lamar Scott.  As a result of Dixon's criminal conduct, Lamar Scott committed a brutal homicide of Torriano Jackson, seriously injured Aaron Jackson and Mario Jarmon, and wounded John Sullivan.  Thus, Dixon is not "innocent" as he repeatedly claims throughout his submission in opposition to the City Defendants' summary judgment motion.  Most importantly, there is still an ongoing prosecution of Dixon related to his criminal conduct.  Dixon is still charged with unlawful possession of a weapon in the second degree –and rightfully so, as the undisputed facts show that he at least committed that offense.  Because there is still an ongoing prosecution of Dixon –a prosecution which relates to the overall criminal transaction or series of events which led to the 1991 shooting, Dixon cannot meet the "favorable termination" element of his two main claims in this action –fabrication of evidence and malicious prosecution.

Dixon's counsel accuses the City Defendants of not citing leading cases on the "favorable termination" element for Dixon's two main claims.  But a simple read of the cases Dixon invokes reveals that they in no way undermine the City Defendants' argument.  Nothing in the two cases relied upon by Dixon addresses the situation here, where there remains an ongoing criminal prosecution against a civil plaintiff who claims that criminal charges were wrongfully brought against him.  The status of Dixon's weapons charge creates a situation where there is a potential for conflicting criminal and civil judgements and the potential for impugnment of an ongoing criminal case.  This reality alone dooms Dixon's two primary causes of action.

In addition, Dixon's opposition does not undermine the three eyewitness identifications which led to his arrest and prosecution in 1991. Dixon resorts to speculation and unsupported inferences to argue that the identifications by John Sullivan, Emil Adams, and Aaron Jackson were invalid or fabricated. All three of these witnesses still maintain their identifications of Dixon as the shooter.  And all of the actual evidence demonstrates that those identifications were brought about by legitimate police procedure. The criminal jury which convicted Dixon was entitled to credit the identifications –and it obviously did.   Because Dixon was convicted due to three legitimate eyewitness identifications, the City Defendants are entitled to summary judgment as to each of Dixon's claims.

This is not a case where someone was convicted of a crime in which he was neither involved nor present.  It is not as though Dixon was sitting at home away from the chaos of the murder scene.  Dixon was indisputably at the scene of the crime when it happened.  The crime stemmed from a dispute involving *his* brothers, who had recently enlisted *his* help, and requested that *he* provide them protection.   In response to his brothers' calls for aid, Dixon brought the murderer and murder weapon, a Tec-9 assault style gun, to the scene of the crime. Dixon was standing behind Scott when he opened fire. Seconds after the shooting, Dixon sped away from (fled) the scene in a red Mazda, which would have been seen by the dozens of eyewitnesses present.  That three eyewitnesses legitimately identified Dixon and believed him to have been the perpetrator under these circumstances is not implausible.  That scenario is actually likely and is the version of events actually supported by the undisputed evidence in this case.

For these simple but compelling reasons, and for the reasons addressed more fully below, the Court should grant the City Defendants' motion for summary judgment in its entirety.

**STATEMENT OF FACTS**

The City Defendants principally rely on their Statement of Undisputed Facts submitted in their initial motion papers (Dkt No. 170), as well as their Statement of Facts in their previously filed Memorandum of Law (Dkt. No. 169). However, certain factual contentions raised by Dixon in his opposition papers necessitate discussion.

**No City Defendant Threatened or Harassed Lamar Scott**

Dixon claims that certain City Defendants harassed and intimidated Lamar Scott after he confessed to the Torriano Jackson homicide.[1] But that is not what the evidence shows. Prior to his deposition in this case, Scott had made very general, unsubstantiated assertions over the years that he was harassed by police detectives after giving his confession, but he never gave any details.[2] His claims of intimidation and harassment were so general and lacking in detail that Magistrate Judge Victor Bianchini ruled that they had no evidentiary value when deciding a previous habeas petition brought by Dixon.[3]

At his deposition, Scott was finally given the chance to provide detail as to what he meant when he claimed that police officers, including Detective Stambach, harassed him. When given this opportunity, Scott explained that when he was young, he did not appreciate that it would be easy for a police officer to determine his whereabouts or to discover which places he frequented.[4] Thus, as Scott viewed things when he was a teenager, it was a form of harassment

---

[1]    *See, e.g.*, Dkt. No. 180-2 at ¶ 52.

[2]    See, e.g., Dkt. No. 180-22; 180-23.

[3]    Dkt. No. 58-3 at p. 48 ("apart from Scott's bald assertions, Dixon has come forward with no evidence to substantiate these contentions of misconduct on the part of A.D.A Belling and Detective Stambach").

[4]    Dkt. No. 174-3-174-5 ("Scott Dep.") at p. 58-59.

merely for police officers to arrive in locations he frequented to ask if he would submit to a lie detector test. That is the extent of the City Defendants' "harassment" or intimidation" of Scott – police officers found out where he was and asked if he would take a lie detector test.[5] This clearly does not rise to the level of unconstitutional intimidation or harassment. Such conduct is not even improper. The Court should disregard Dixon's claim that police detectives acted improperly in their interactions with Scott after he confessed to the Torriano Jackson homicide.

### Dixon Armed Lamar Scott Prior to the Shooting

Dixon asks this Court to credit Lamar Scott's version of events but then ignores some of his most critical testimony. Scott testified in no uncertain terms that Dixon gave him the Tec-9 gun that was used to kill Torriano Jackson.[6] Scott confirmed that Dixon brought him and the gun to the crime scene. Scott also stated that, upon revealing the firearm to him, Dixon stated they had "some business to handle."[7] Scott testified that Dixon gave him faulty instructions as to how to use the gun, claiming that the "S" setting on the gun stood for "safety" and the "F" setting on the gun stood for "fire."[8] Moreover, Scott confirmed that he brought the gun with him to the corner of Bailey and Delevan avenue before the fight broke out between Mario Jarmon and the Jackson brothers.[9] Scott also testified that before he started shooting, Dixon encouraged him to intervene by yelling: "they (meaning the Jackson brothers) are

---

[5]        (*Id.*).

[6]        (*Id.*). at p. 77.

[7]        (*Id.*).

[8]        (*Id.*). at p. 16-17.

[9]        (Id.). at p. 16.

shooting my brother."[10]  Scott testified that if it were not for Dixon's actions and direction, he

never would have shot Torriano Jackson.[11]

## Valentino Dixon's Name is Mentioned on Police Radio After he Conspicuously Speeds Away From the Crime Scene in a Red Mazda

Throughout his opposition, Dixon intimates that there is some clandestine reason

why his name was mentioned on a police radio shortly after the shooting.[12]  Dixon was a

notorious drug dealer.  And the undisputed evidence shows that Dixon was at the crime scene

and fled the crime scene in a noticeable red vehicle.[13]  He sped away from the shooting seconds

after it occurred.[14]  That Dixon was noticed speeding away by either a patrol officer responding

to the scene or a witness who was present during the shooting is not in any way unexpected or

surprising.  Thus, the fact that Dixon's name was mentioned on police radio does not, as Dixon

suggests, demonstrate that he was targeted by police or that the police had some pre-existing

motivation  to frame him for the shooting.

## The Unreliable Tape Recording of Emil Adams Compared to Emil Adams's Deposition

The recording of the purported conversation between Emil Adams and Dixon's

father, mother, and half-brother, Antoinne Shannon, is barely audible and certainly does not

definitively say what Dixon claims it does.  That Dixon now relies on this secret tape recording

---

[10]    (*Id.*). at p. 81.

[11]    (*Id.*). at p. 84 ("but what I will say is that if Valentino Dixon wouldn't have brought me there that day, we wouldn't be here now").

[12]    *See*, *e.g.*, Dkt. No. 180-2 at ¶ 19.

[13]    Dkt. No. 174-6 ("Dixon Dep.") at p. 169.

[14]    (*Id.*).

smacks of desperation.  Moreover, contrary to what Dixon argues, Adams did not verify that he was shown individual photographs as opposed to photo arrays when he testified under oath at his deposition.  In fact, during his deposition testimony, Adams unequivocally testified that police officers showed him "groups of pictures," which is entirely consistent with police reports reflecting that Adams was shown a non-suggestive photo array containing Valentino Dixon's photograph.[15]

**John Sullivan was not Shown Individual Mugshots**

As the Court is undoubtedly aware, photo arrays are typically comprised of six mugshots – one mugshot of a suspect and five mugshots of individuals of the same age and relative appearance as the suspect.  Accordingly, that John Sullivan at one point testified that he was shown "mugshots" does not in anyway undermine the City Defendants' account of Sullivan picking out Dixon's photo in a non-suggestive photo array.  The photo array shown to Sullivan contained six mugshots, one of which was Dixon's.[16]  There is no evidence whatsoever that Mr. Sullivan was shown individual mugshots at any point in the investigation.

**There is no Evidence that Detective Lonergan Interacted with John Sullivan**

Dixon theorizes that Detective Lonergan may have fabricated evidence against him because, during his deposition testimony given over thirty years after the investigation of the Torriano Jackson homicide, Lonergan assessed the value of statements given by Sullivan during

---

[15]    Dkt. No. 174-26 ("Adams Dep.") at p. 42 ("I remember being shown groups of pictures of people"); Dkt. No. 174-55 (photo array shown to Adams).

[16]    Dtk. No. 174-52 (photo array consisting of mugshots shown to Sullivan).

his initial interview at Sister's Hospital.[17]  But the record shows Lonergan had no interaction whatsoever with Sullivan.[18]  There is also no evidence that Lonergan made any representations regarding Sullivan's interview to prosecutors during the time of the investigation. Nothing about the circumstances of Sullivan's identification of Dixon, therefore, in any way implicate Detective Lonergan.

### The Evidence does not show that the Detectives Encouraged Belling to Disbelieve Scott's Confession

Dixon's opposition speculates that the City Defendants, particularly Detective Stambach, tried to convince ADA Belling that Lamar Scott's confession should not be believed.[19]  Dixon claims that Detective Stambach told Belling that Dixon's parents had put Scott up to confessing.[20]  But the record shows nothing of the sort.  The record shows only that the detectives accurately reported to ADA Belling that Dixon's family was present when Scott confessed to Channel 2 News.[21]  But the parties do not dispute this fact.  There is no dispute that, when Scott confessed to Channel 2, Dixon's father, step-brother, and half-brother were standing right behind him.[22]  Belling, after learning of this fact and independently reviewing Scott's sworn statement in conjunction with the statement of Leonard Brown, instructed the Detectives

---

[17]     Dkt. No. 180 at p. 6.

[18]     Dkt. No. 174-50, 174-51, 174-52 (showing only detectives to interact with Sullivan were Vickerd and Masecchia).

[19]     *See*, *e.g.*, Dkt. No. 180 at p. 10.

[20]     (*Id.*).

[21]     Dkt. No. 174-27 ("Belling Dep.") at p. 97 (stating that only thing that he discussed was presence of Dixon's family on the video of Scott's confession and the fact that Dixon's family brought Scott to confess).

[22]     Dkt. No. 174-34 ("Bryant Dep.") at p. 185-186.

to let Scott go.[23]  This is not surprising because neither Brown nor Scott were being completely

truthful in their statements and, therefore, their stories simply did not add up.

### Standard Procedure in 1991 did not Call for Gunshot Residue Testing on Scott or Dixon's Clothing

Dixon argues that the City Defendants failure to test either his or Scott's clothing

for gunshot residue demonstrates some form of bad faith misconduct.[24]  But Dixon's argument

ignores evidence that, in 1991, BPD followed FBI guidelines which set forth that gunshot residue

testing should not be performed more than five hours after a shooting.[25]  Here, Dixon was

interviewed far more than five hours after the shooting, and Scott was not interviewed until

multiple days after the shooting.  So, testing Dixon or Scott's clothing would not have been

consistent with recommended police practices at the time of the investigation.

### Other Factual Contentions

The Court is encouraged to reject the other portions of Dixon's statement of

additional facts which are clearly contradicted by the record.[26]  Again, due to limited spacing in

this reply brief, the City Defendants will not address each and every misstatement of the record

which Dixon makes in his opposition papers.

---

[23]    Belling Dep. at 345; 374.

[24]    Dkt. No. 182-2 at ¶ 138-139.

[25]    Dkt. No. 183 at p. 16 (explaining that Plaintiff's own "unretained" expert testified that, in 1991, BPD did not conduct gunshot residue testing after five hours had elapsed since a shooting).

[26]    For example, the Court should disregard Dixon's unfounded assertions regarding unrelated lawsuits of other plaintiffs from Buffalo whose homicide convictions have been vacated.  Dixon's self-serving account of those lawsuits fails to mention that the plaintiff agreed to dismissal of Detective Masecchia the *Epps* case, that Detective Lonergan was not even sued in the *Ortiz* case, or that those cases involve distinct, dissimilar allegations of police misconduct.  The cases also involve events taking place many years apart.

## ARGUMENT

The City Defendants respectfully submit that all of Dixon's causes of action must be dismissed for the reasons stated in their opening Memorandum of Law (Dkt. No. 169). In this reply submission, the City Defendants address only certain specific arguments raised by Dixon in his opposition papers.

## POINT I.  CRIMINAL PROCEEDINGS HAVE NOT TERMINATED IN DIXON'S FAVOR

Dixon argues that the City Defendants' opening brief fails to cite prevailing case law on the standard for the "favorable termination" element of two of his claims: (1) malicious prosecution; and (2) due process fabrication of evidence. Specifically, Dixon suggests that the City Defendants failed to consider *Thompson v. Clark*, 596 U.S. 36 (2022) and *Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021). But the Court need only read those cases to determine that Dixon vastly overstates their application here. Indeed, nothing about the two decisions undermines the City Defendants' overall point regarding favorable termination for either of Dixon's two primary claims.

### A.    Dixon Cannot Meet the Favorable Termination Standard Applicable to Malicious Prosecution Claims

In *Thompson*, the prosecution dismissed the charges against the plaintiff without explanation. 596 U.S. at 40. After dismissal of each charge brought against him in criminal proceedings, the plaintiff brought a claim for malicious prosecution pursuant to 42 U.S.C. § 1983. *Id.* at 39. The Supreme Court ultimately ruled that the plaintiff's claim could be maintained even though the charges against him were not dismissed in a manner that affirmatively indicated his innocence. *Id.* In other words, because the criminal proceedings

against the plaintiff ended without a conviction, the plaintiff had satisfied the "favorable termination" element of his malicious prosecution claim. *Id.*

Invoking *Thompson*, Dixon argues that the City Defendants applied the incorrect standard for favorable termination in their motion for summary judgment. Dixon is wrong. The City Defendants never once argued that Dixon needed to demonstrate an affirmative finding of innocence on each of the criminal charges brought against him. Rather, the City Defendants argued that, because Dixon's weapons charge is still pending, and because the weapons charge stems from the same criminal transaction which caused Dixon to be indicted in the first place, he has not demonstrated favorable termination. In other words, Dixon is not able to show that all criminal proceedings initiated against him have ended without a conviction, which is fatal to his malicious prosecution claim in this specific context.

Because *Thompson* does not deal with an instance where certain charges against the plaintiff ended with a conviction and certain charges were dismissed, it is of limited value for the Court. All of the charges brought against the plaintiff in *Thompson* were dismissed, so the question before this Court is entirely different than the one decided by the Supreme Court in *Thompson*. The Court here is confronted with the following question: should Dixon's malicious prosecution claim be allowed to proceed when his murder, attempted murder, and assault convictions have been vacated, but his related weapons charge remains pending? The City Defendants have cited persuasive authority demonstrating that the Court should answer that question in the negative. *See, e.g., DiBlasio v. City of New York*, 102 F.3d 654, 658-659 (2d Cir. 1996); *Warren v. Fischl*, 15–CV–2829, 2015 WL 6760230, at *6 (E.D.N.Y. Mar. 2015) (holding that civil rights claims could not be maintained where only some counts of a multi-

count indictment had terminated in Plaintiff's favor). Because Dixon's weapons charge is a serious offense which is inextricably intertwined with the other charges brought against him, he cannot establish favorable termination if his weapons charge remains pending. *See id.*

Dixon argues that his weapons charge is sufficiently distinct from the other charges brought against him such that he should be allowed to proceed with his malicious prosecution claim. Had he brought a different weapon than the Tec-9 that was not used to kill and wound the victims, he might have an argument. But he brought the very weapon which caused the carnage. As such, much of the case-law relied on by Dixon is inapposite. For example, in *Dukes v. City of Albany*, the charge for which the plaintiff was convicted and the charge for which he was acquitted were based on "entirely different events" occurring four months apart. 289 F. Supp. 3d 387, 397 (N.D.N.Y. 2018). Further, in *Reid v. New York County District Attorney Marrinaccio*, the distinct charges involved "two separate acts directed at two separate people." No. 00 Civ. 5164, 2004 WL 1488194, at *5 (S.D.N.Y. July 1, 2004). Unlike the charges in *Reid* and *Dukes*, the charges here all involve the same criminal transaction, which occurred on the same day and were directed at the same people –namely Torriano and Aaron Jackson. As such, Dixon's malicious prosecution claim fails because all of the charges brought against him which relate to that criminal transaction have not terminated in his favor. Unless and until Dixon's weapons charge comes to a final favorable resolution, he cannot maintain a cause of action for malicious prosecution.

Dixon cites other non-binding, unpublished decisions from different District Courts to argue that his murder conviction and weapons charge are sufficiently distinct. *See, e.g.*, *McLennon v. New York City*, No 14 Civ. 128, 2015 WL 1475819, at *6 (E.D.N.Y. Mar. 31,

11

2015); *Belot v. Wieshaupt*, No. 96 Civ. 3005, 197 WL 218449, at *4 (S.D.N.Y. Apr. 291, 1997). Those cases, however, do not consider facts similar to this case –where one individual's unlawful possession of a weapon enables another individual to commit murder.  Under such circumstances, which are indisputably present here, logic compels the conclusion that Dixon's weapons charge and his murder and assault charges are indistinct.  Dixon's possession of an unlawful, dangerous firearm made the murder of Torriano Jackson possible.  Lamar Scott never would have been able to shoot Torriano if Dixon had not given him the Tec-9.  Dixon's crime also made the assault of Aaron Jackson and John Sullivan possible, as those individuals never would have been injured if Dixon had not give Scott the Tec-9.  Because the charge which remains against Dixon relates to the same course of criminal conduct which led to the death of Torriano Jackson and the wounding of Aaron Jackson and John Sullivan, Dixon cannot maintain his cause of action for malicious prosecution –even under the reasoning presented by the Supreme Court in *Thompson*.

   For these reasons, Dixon's federal and state law malicious prosecution claims should be dismissed.

**B. Dixon Cannot Meet the Favorable Termination Standard Applicable to Due Process Fabrication of Evidence Claims**

   Dixon invokes *Smalls* to argue that, for due process fabrication of evidence claims, the favorable termination rule requires that the underlying criminal proceeding be terminated in such a manner that the lawsuit does ***not impugn an ongoing prosecution***.  10 F.4th at 139; *see also Kee v. City of New York*, 12 F.4th 150, 169 (2d Cir. 2021) (emphasis added). But that standard is, for all intents and purposes, the same standard advanced by the City Defendants in their initial motion papers.  Dkt. No. 169 at p. 32 (citing *Gondola v. City of New*

*York*, No. 16-cv-369, 2020 WL 1433874, at *5 (E.D.N.Y. Mar. 24, 2020)).  Indeed, the City Defendants argued that, because there is a potential for inconsistent civil and criminal judgments given the status of Dixon's weapons charge, he cannot demonstrate favorable termination for his fabrication of evidence claim.  The risk of inconsistent criminal and civil judgments is the same as the risk of a civil lawsuit "impugning an ongoing prosecution."  *Smalls*, 10 F.4th at 139.  So, Dixon is mistaken to suggest that the City Defendants somehow advocated for an improper or inapplicable standard.

More importantly, under *Smalls*, Dixon's lawsuit charge ***does*** impugn an ongoing prosecution and ***does*** obviously create a potential for inconsistent civil and criminal judgments. If Dixon is found guilty of his weapons charge, he will have been found guilty of a serious crime, the commission of which caused the death of Torriano Jackson.  Allowing Dixon to recover damages based on his allegation that he was wrongfully investigated and prosecuted for involvement in the Torriano Jackson murder would thus be inconsistent with a potential conviction for his weapons charge. A conviction on the weapons charge would unequivocally confirm that Dixon ***was*** in fact involved in the shooting. Thus, this lawsuit necessarily impugns the ongoing prosecution of Dixon for criminal possession of a weapon.  Under *Smalls*, this fact compels a finding that Dixon is not entitled to maintain his due process fabrication of evidence claim.

For these reasons, Count I of the complaint should be dismissed to the extent it is premised upon the City Defendants' alleged fabrication of evidence.

**POINT II.  DIXON DOES NOT CREATE TRIABLE ISSUES OF FACT AS TO WHETHER THE CITY DEFENDANTS FABRICATED EVIDENCE**

An opponent of a summary judgment motion may not rely on speculation and conjecture to create a triable issue of fact.  *Reyes v. Paul*, 658 F. Supp. 3d 94, 104 (N.D.N.Y. Mar. 1, 2023) (granting summary judgment on fabrication of evidence claim where plaintiff offered only speculation that statements given to law enforcement were coerced or that circumstances of statement were misrepresented).  Here, that is precisely what Dixon attempts claiming that the three eyewitness identifications implicating him in the shooting were fabricated by the City Defendants or brought about by impermissible suggestion.

Dixon essentially asks this Court to rule that, because Lamar Scott was the shooter and Dixon was not, this automatically creates a question of fact as to whether the City Defendants fabricated or misrepresented the circumstances of the eyewitness identifications of Adams, Sullivan, and Aaron Jackson.  But much more is required.   To demonstrate an issue of fact, Dixon was required to establish reasonable inferences which can be drawn from the actual evidence adduced in discovery.  He has failed to do so.  Indeed, the report submitted by Dixon's expert confirms that she is assuming that suggestion must have occurred simply because Lamar Scott ultimately pled guilty to the shooting.[27]  This type of speculation cannot create an issue of fact, and the City Defendants are therefore entitled to summary judgment. *See Reyes*, 658 F. Supp. 3d at 104.

---

[27]    *See* Dkt. No. 180-32 at p. 6 ("Given the relatively fair arrays  . . . it is my opinion that the most reasonable explanation for how three witnesses all came to select Mr. Dixon -who was not the shooter- from the arrays is suggestion or influence.")

There is no record evidence from which it can be inferred that the eyewitness identifications were fabricated or that the City Defendants misrepresented what took place during identification procedures. The fact remains that each of the three eyewitnesses maintains his identification of Dixon. Based on this undisputed fact, the City Defendants are entitled to judgment on Dixon's due process fabrication of evidence claim.

### POINT III.  DIXON CANNOT MAINTAIN HIS DUE PROCESS CLAIM TO THE EXTENT IT IS PREDICATED UPON *BRADY*

Dixon argues that he can premise his *Brady*-based due process claim on the same evidence that allegedly supports his due process fabrication of evidence claim. But Chief Judge Wolford already held otherwise in *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 366-67 (W.D.N.Y. 2021). There, Chief Judge Wolford granted summary judgment in favor of Detective Stambach on the plaintiff's *Brady* claim precisely because the plaintiff's *Brady* claim was premised upon the same evidence as his fabrication of evidence claim. Judge Wolford wrote that "fabrication of evidence is not redressable as a *Brady* violation."  *Id*. at 367 (citing *Myers v. Cty. of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011)). So too here. Because Dixon acknowledges that the same conduct which allegedly supports his fabrication of evidence claim also supports his *Brady* claim, the Court should dismiss the *Brady* claim.

Dixon's *Brady*-based claim must also be dismissed because the record shows that any exculpatory evidence which the City Defendants actually could have turned over to prosecutors was in fact turned over. Because all of the exculpatory evidence contained within the City Defendants' homicide file was turned over to ADA Belling, Dixon cannot maintain a

Brady claim against the City Defendants.  *Valentin v. City of Rochester*, 11-CV-6238, 2018 WL 5281799, at *12-*13 (W.D.N.Y. Oct. 2018).

For all of these reasons, Count I of the complaint must be dismissed to the extent it is premised upon the City Defendants' alleged violations of *Brady*.

### POINT IV.  PROBABLE CAUSE EXISTED FOR DIXON'S PROSECUTION

The City Defendants respectfully refer the Court to Point II of their opening brief for a discussion of why there was probable cause for Dixon's prosecution.  For the purposes of reply, the City Defendants wish only to highlight for the Court undisputed evidence which shows that, when ADA Belling interviewed Aaron Jackson in preparation for grand jury proceedings, Aaron Jackson positively identified Dixon as the shooter.[28]

Pursuant to the Second Circuit's decision in *Bermudez v. City of New York*, this identification by Aaron Jackson created probable cause for Dixon's prosecution.  790 F.3d 368 at 377 (2d Cir. 2015).  This is true even if Dixon were correct that ADA Belling was misled by the City Defendants regarding their identification procedures, which he was not.  In *Bermudez*, two eyewitnesses told a prosecutor that they witnessed the plaintiff commit a shooting after photo identification procedures had been implemented by the police.  *Id.*  The Second Circuit held that these two identifications fostered probable cause for the plaintiff's prosecution "even if the ADA had been misled about  overly suggestive photo identification and array procedures."  *Id.*  The same concept applies here.

---

[28]   Dkt. No. 174-24 ("Jackson Dep.") at p. 138-141.

Because at least one witness independently identified Dixon as the shooter during conversations with ADA Belling, there was probable cause to initiate Dixon's prosecution. This is further grounds to grant the City Defendants summary judgment on Count II of Dixon's complaint.

### POINT V.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFEID IMMUNITY ON DIXON'S MALICIOUS PROSECUTION CLAIM

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  In keeping with this principle, federal courts hold that police officers are entitled to qualified immunity and are thus shielded from individual liability unless they violate a plaintiff's clearly established constitutional right. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156 (2001). For qualified immunity purposes, courts look to whether the law was sufficiently clear at the time of the alleged violation such that "every reasonable [officer] would have understood that what he was doing violated [the right at issue]." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015).

Here, even if Dixon is correct that the City Defendants used improper suggestion to bring about the identifications, the City Defendants are still entitled to qualified immunity as to Dixon's malicious prosecution claim.  Even if the identification procedures were defective, reasonable police officers in 1991 might still believe that the identifications fostered probable cause.  As the Second Circuit has explained, the critical question for "determining whether an identification can support probable cause, is not whether the identification procedure was suggestive, but whether it was so defective that, as a matter of law, probable cause could not

17

reasonably be based on it." *Mara v. Rilling*, 921 F.3d 48, 75 (2d Cir. 2019) (citing *Stansbury v. Wertman*, 721 F.3d 84, 91 n.7 (2d Cir. 2013)).

Indeed, in *Stansbury*, a 2013 decision from the Second Circuit, the Court explained that identifications brought about by single photo displays, while inadmissible and suggestive, could still create probable cause. *Id.* at 91. *Stansbury* thus shows that, even if witnesses did view single photos of Dixon as he claims, it was still reasonable for the officers to believe that there was probable cause to arrest and prosecute him. It certainly cannot be said that no reasonable officer in 1991 would have believed there was probable cause to proceed with charges against Dixon after the three identifications were obtained. *See Mullinix*, 577 U.S. at 11. Accordingly, the City Defendants are entitled to qualified immunity on Dixon's malicious prosecution claim, which must be dismissed.

**POINT VI.  DIXON'S § 1983 CONSPIRACY CLAIM MUST BE DISMISSED**

The City Defendants cited persuasive authority demonstrating that the intra-corporate conspiracy doctrine bars Dixon's § 1983 conspiracy claim. *Rizk v. City of New York*, 462 F.Supp. 3d 203, 225 (S.D.N.Y. 2020) (explaining that intra-corporate conspiracy doctrine barred conspiracy claim against NYPD officers) (collecting cases). Dixon's opposition does little to downplay or rebut this authority. Accordingly, Dixon's conspiracy claim should be dismissed to the extent it alleges that the City Defendants conspired together to violate Dixon's rights.

Moreover, Dixon offers nothing but speculation to argue that the City Defendants conspired with either ADA Belling or the three eyewitnesses to violate his rights. There is no

evidence –none- of any such conspiracy. Speculation is not enough.  Accordingly, summary judgment is warranted as to Dixon's § 1983 conspiracy claim.

### POINT VII.  DIXON DOES NOT OPPOSE DISMISSAL OF CERTAIN CLAIMS

Dixon offers no substantive opposition to the City Defendants' request for summary judgment on certain causes of action including: his § 1983 supervisory liability cause of action; his claims against the unidentified supervisors;  his negligence claim; and his negligent/intentional infliction of emotional distress claims.  Since Dixon fails to oppose the City Defendants' arguments related to certain causes of action, the Court should treat this failure as a concession that summary judgment is warranted as to those claims.  *See Miles v. Levac*, 2014 WL 1338808, *3 (W.D.N.Y. 2014) (dismissing deliberate indifference claims that were not addressed in plaintiff's opposition to the defendant's motion for summary judgment); *Smith v. Riccelli Brokerage Services*, LLC, 2011 WL 2007209, *5 (W.D.N.Y. 2011) ("[p]laintiff does not respond to Defendants' argument in her memorandum of law, thus it appears she concedes there is no aider and abettor liability"); *Felske v. Hirschmann*, 2012 WL 716632, *3(S.D.N.Y. 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them").

### CONCLUSION

For the foregoing reasons, the City Defendants respectfully request that the Court grant their motion for summary judgment.

Dated:      Buffalo, New York
            March 15, 2024

<p style="margin-left: 40%;">

**HODGSON RUSS LLP**

*Attorneys for City of Buffalo*
*and other City Defendants*


By:  <u>//s Peter A. Sahasrabudhe</u>
       Hugh M. Russ III, of counsel
       Peter A. Sahasrabudhe, of counsel
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

</p>

17176634v1