UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VALENTINO DIXON,

Plaintiff,

DECISION AND ORDER

-vs-

19-CV-1678-MAV-JJM

CITY OF BUFFALO, *et al.*,

Defendants.

## INTRODUCTION

Following the vacatur of his conviction for the murder of Toriano Jackson (the "Jackson Murder"), Plaintiff Valentino Dixon commenced the instant case with a complaint against Defendants which includes, among other things, claims under 42 U.S.C. § 1983 for fabrication of evidence, withholding material exculpatory and impeachment evidence, and malicious prosecution. ECF No. 1. The matter is presently before the Court on a motion for summary judgment by the "City Defendants," including the City of Buffalo, New York (the "City"), and several members of the Buffalo Police Department ("BPD"): Detective Mark R. Stambach, Detective Raniero Masecchi, Detective James P. Lonergan, Detective John Vickerd, Chief Richard T. Donovan, and Unknown John Doe BPD Supervisors. ECF No. 168. For the reasons stated below, the City Defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The following factual background is drawn from the apparent agreement between the parties on material facts as indicated in Plaintiff's response to the City's

Statement of Material Facts. *See* ECF No. 180-3.

In the early morning hours of August 10, 1991, Plaintiff was at the corner of Bailey Avenue and Delevan Avenue in Buffalo, New York. ECF No. 180-3 ¶ 11. He was with his step-brother, Leonard Brown; his half-brother, Antoine Shannon; his friend, Mario Jarmon; and his acquaintance, LaMarr Scott. *Id.* ¶¶ 4, 8, 11. Sometime after Plaintiff and his group arrived, brothers Aaron and Toriano Jackson arrived with their friend, Travis Powell, and a fist fight ensued between Jarmon and the Jackson brothers. *Id.* ¶¶ 12–13. During the fight and its aftermath, Jarmon was shot, Aaron Jackson was shot, Toriano Jackson was shot and killed, and bystander John Sullivan was shot. *Id.* ¶¶ 15–17. Plaintiff fled the area. *Id.* ¶ 19.

Defendant BPD Detective James Lonergan was the first detective from the BPD's homicide division to arrive at the scene. *Id.* ¶ 89. Detective Lonergan reported that he recovered a .32 caliber revolver from the scene, but that it was not the murder weapon. *Id.* ¶ 90.

Sullivan was transported via ambulance to Sister's Hospital in the City after the shooting to receive treatment for his injuries. *Id.* ¶ 20. While there, Sullivan was interviewed by Defendant BPD Detective John Vickerd. *Id.* ¶ 21. Detective Vickerd's report from the interview indicated that Sullivan told Vickerd that he observed a man known to him as "Tino" grab a gun which Sullivan believed to be an Uzi, and that Tino was the individual who shot him and Toriano Jackson. *Id.* ¶¶ 22–23. Vickerd's report also indicated that Sullivan described Tino as a black male who was

approximately six feet tall and weighed 160 pounds, whose real name was "Valentino," and who was from Sullivan's neighborhood. *Id.* ¶¶ 24–25.

After Sullivan was released from the hospital, he gave a formal sworn statement to Defendant BPD Detective Raniero Masecchia. *Id.* ¶ 27. As recorded by Detective Masecchia, Sullivan's statement was similar in substance to the account from Detective Vickerd's report based on the hospital interview. *Id.* ¶ 28. Detective Masecchia prepared a six-person photo array with Plaintiff's photo present and five fillers of individuals of the same age and general appearance as Plaintiff. *Id.* ¶ 29. Detective Masecchia reported that Sullivan picked out Plaintiff's photo and identified him as the individual who shot and killed Toriano Jackson. *Id.* ¶ 30.

Emil Adams was at the corner of Bailey and Delavan Avenue when the Jackson brothers and Jarmon began fighting. *Id.* ¶ 33. Shortly after the shooting, Adams gave a sworn statement describing the shooting to Defendant BPD Detective Mark Stambach, which suggested there were two shooters present, one of whom he described as a heavy-set male who was over six feet tall, which was inconsistent with Plaintiff's stature and appearance. *Id.* ¶¶ 34–35. Adams told Detective Stambach that he did not know the name of the shooter or shooters he had observed. *Id.* ¶ 37.

That same day, Detective Vickerd prepared a photo array for Adams, which included a photo of Plaintiff and pictures of five other males who were of the same relative age and appearance as Plaintiff. *Id.* ¶¶ 38–39. According to the respective reports of Detective Stambach and Detective Vickerd, Adams identified Plaintiff as the shooter who killed Toriano Jackson. *Id.* ¶ 40. Also that day, Detective Lonergan reported that he received an anonymous call about the case during the late afternoon

implicating Plaintiff, but the call was not used as a basis to prosecute him. *Id.* ¶¶ 91–94.

During the afternoon of August 10, 1991, Plaintiff was arrested by the BPD and gave a sworn Mirandized statement to Detective Stambach. *Id.* ¶¶ 42–43. In his statement, Plaintiff denied involvement in the crime, but he did not tell Detective Stambach who the actual shooter was. *Id.* ¶ 44.

Soon thereafter, LaMarr Scott told Plaintiff's father, Robert Bryant, that Scott himself was the one who committed the Jackson Murder. *Id.* ¶ 45. Scott then went on camera with a local news station on August 12, 1991, and confessed to the crime. *Id.* ¶¶ 46–47. Detective Stambach arrived at the scene of Scott's confession to the news station, placed Scott in handcuffs, and put him in the back of a police car. *Id.* ¶¶ 48–49. Scott then gave a sworn Mirandized confession to Detective Stambach, admitting that he used a Tec 9 machine gun to shoot and kill Toriano Jackson. *Id.* ¶¶ 50–51. Leonard Brown also gave a statement that day, to Detective Masecchia, in which he stated that Scott was the one who killed Toriano Jackson. *Id.* ¶¶ 53–54.

Detective Stambach shared Scott's and Brown's respective statements with Defendant Assistant District Attorney Christopher Belling ("ADA Belling"). *Id.* ¶ 56. ADA Belling reviewed Scott's and Brown's statements, reviewed the video-recording of Scott's confession to the news, and instructed that Scott be released. *Id.* ¶ 57. Scott was scheduled to return for a lie detector test, but never did so. *Id.* ¶¶ 58, 62.

That same day, despite serious injury from gunshot wounds and while still in the hospital, Aaron Jackson participated in an unsworn interview with Detective Stambach. *Id.* ¶ 63. Detective Stambach showed Jackson a photo array, after which

Detective Stambach reported that Jackson had tentatively identified Plaintiff as the individual who shot him and his brother, Toriano. *Id.* ¶¶ 64–65. Jackson signed a sworn affidavit that stated that Plaintiff's photo looked like the shooter, but that he could not be sure that he was in fact the shooter. *Id.* ¶ 66.

Jarmon also participated in an interview with Detective Stambach while hospitalized from his gunshot wounds. *Id.* ¶ 121. Jarmon indicated that he was shot by Toriano Jackson, not Plaintiff, and that Plaintiff did not have a gun. *Id.* ¶ 122.

Next, Detective Stambach received an anonymous call from a woman he later learned to be Tamara Frieda, who indicated that Plaintiff was not the shooter. *Id.* ¶¶ 124–25. Detective Stambach made a record of this conversation and included it in the homicide file. *Id.* ¶ 126; *see also* ECF No. 174-68.

In November 1991, Sullivan and Aaron Jackson both appeared before a grand jury and positively identified Plaintiff as the individual who committed the Jackson Murder. ECF No. 180-3 ¶ 69. In January 1992, Adams appeared before the grand jury and also identified Plaintiff as the shooter, noting that he had picked Plaintiff's photo out from a group of photos. *Id.* ¶¶ 71–72. Additionally, LaMarr Scott appeared before the grand jury, recanted his confession, and testified that Plaintiff was the shooter. *Id.* ¶ 75. Leonard Brown and Mario Jarmon, on the other hand, testified before the grand jury that LaMarr Scott was the shooter. *Id.* ¶ 81. The grand jury issued an indictment against Plaintiff, charging him with murder in the second degree, attempted murder in the second degree, assault in the third degree, and criminal possession of a weapon in the second degree. *Id.* ¶ 73.

Plaintiff was tried on these charges in a jury trial in Erie County Court during

the summer of 1992, with ADA Belling as the trial prosecutor. *Id.* ¶ 76. Adams, Sullivan, and Aaron Jackson were witnesses for the prosecution, and each testified that Plaintiff was the shooter and identified him in court. *Id.* ¶ 76. Adams, Sullivan, and Jackson were cross-examined by Plaintiff's counsel, including on the facts that Jackson's initial identification of Plaintiff was only tentative, and that Adams' initial description of the shooter did not appear to match Plaintiff's physical characteristics. *Id.* ¶¶ 77–78.

## PROCEDURAL BACKGROUND

On August 7, 1992, Plaintiff was convicted of murder in the second degree under New York Penal Law ("PL") § 125.25[1], attempted murder in the second degree (PL §§ 110.00, 125.25[1]), assault in the third degree (PL § 120.00[2]), and criminal possession of a weapon in the second degree (PL § 265.03). ECF No. 180-5 (trial transcript). The conviction was unanimously affirmed by the Supreme Court of the State of New York Appellate Division, Fourth Department. *People v. Dixon*, 214 A.D.2d 1010 (N.Y. App. Div. 1995).

In 2018 the Erie County District Attorney's Office ("ECDAO") conducted a reinvestigation of the Jackson Murder. 180-3 ¶ 83. As a result of the reinvestigation, the ECDAO consented to the vacatur of Plaintiff's convictions for murder in the second degree, attempted murder in the second degree, and assault in the third degree. *Id.* ¶ 85. After his release from incarceration, Plaintiff also challenged his conviction on criminal possession of a weapon, and the trial court vacated that conviction, as well. ECF No. 180-3 ¶ 87. The Fourth Department subsequently

reinstated the criminal possession of a weapon conviction. ECF Nos. 203-1, 208.

In December 2019, Plaintiff commenced this action for alleged constitutional violations and New York State law claims arising from his prosecution. ECF No. 1. Specifically, Plaintiff pleaded multiple counts against the City Defendants under federal law, including claims under 42 U.S.C. § 1983 for violation of his rights under the Fourteenth Amendment by fabricating evidence and withholding material exculpatory and impeachment evidence (Count I; ECF No. 1 ¶¶ 224–30); violation of his rights under the Fourth and Fourteenth Amendments for malicious prosecution (Count II; *Id.* ¶¶ 231–35); civil rights conspiracy (Count III; *Id.* ¶¶ 236–40); failure to intercede (Count IV; ¶¶ 241–46); supervisory liability (Count V; ¶¶ 247–54); and *Monell* liability for fabrication of the evidence, abuse of authority, excessive force, and suppressing exculpatory evidence (Count VI; ¶¶ 255–59). He also pleaded multiple counts under New York state law: malicious prosecution (Count VIII; ¶¶ 265–68); intentional, reckless, or negligent infliction of emotional distress (Count IX; ¶¶ 269–73); negligence (Count X; ¶¶ 274–80); *respondeat superior* (Count XI; ¶¶ 281); and negligent hiring, supervision, and training (Count XIII; ¶¶ 289–92).

Defendants answered the complaint without moving to dismiss any portion of it. ECF No. 27. After preliminary discovery, United States Magistrate Judge Jeremiah McCarthy granted Defendants' motion to bifurcate discovery between Plaintiff's individual claims, which would proceed through discovery, and Plaintiff's municipal claims. ECF No. 73. After discovery was completed on Plaintiff's individual claims, the City Defendants filed the motion for summary judgment presently before

the Court. ECF No. 168.

## LEGAL STANDARD

It is well-settled that summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment bears the burden of establishing that no genuine issue of material fact exists by citing to "particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–58 (1970). "'Where, as here, the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To make this showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Rather, the non-moving party "must come forward with specific evidence . . . ." *Brown*,

654 F.3d at 358.

In considering the merits of the summary judgment motion, the Court must view the underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-movant. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). A grant of summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993).

"It is not the province of the court itself to decide what inferences should be drawn[;] . . . if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). Nevertheless, "'[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) (quoting 1 Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 6.01, instr. 6–1 (1997)).

## DISCUSSION

In the motion presently before the Court, the City Defendants maintain they are entitled to summary judgment because Plaintiff has failed to identify record evidence sufficient to support the essential elements of each of his claims against them. ECF No. 169. The City Defendants present a multitude of arguments, including

that: (A.) Plaintiff's malicious prosecution and fabrication of evidence claims are not viable because the possession of a weapon charge against him was still pending, and therefore the action did not terminate in his favor[1]; (B.) Plaintiff cannot establish other essential elements of his malicious prosecution claim; (C.) Plaintiff's fabrication of evidence claim must fail because he has not shown that the identifications were fabricated; (D.) Plaintiff's withholding of evidence (i.e., *Brady*) claim must fail because the undisputed facts show that the exculpatory evidence was turned over to the prosecutor; (E.) Plaintiff's conspiracy claim is barred by the intra-corporate conspiracy doctrine, and there is no evidence in the record demonstrating any conspiracy between the detectives and ADA Belling; (F.) Plaintiff's failure to intercede claim fails because Plaintiff has failed to demonstrate a constitutional violation; (G.) Plaintiff's supervisory liability claim fails because the Second Circuit no longer recognizes a special rule for supervisory liability in § 1983 cases; and, (H.) the individual defendants are entitled to qualified immunity. ECF No. 169.

For ease of discussion, the Court will address the City Defendants' arguments out of order.

## I. Fabrication of Evidence and *Brady* Claims (Count I)

Plaintiff alleges that City Defendants Detective Stambach, Detective Lonergan, Detective Vickerd, and Detective Masecchia are liable under 42 U.S.C. § 1983 for violating his due process rights by fabricating evidence and committing various *Brady* violations by not disclosing suggestive identification procedures. The

[1] At the time of briefing the charge was still pending. However, as noted above, Plaintiff's conviction of that charge was reinstated by the Fourth Department in 2024. ECF Nos. 203, 208.

City Defendants maintain that Plaintiff has presented no evidence that they fabricated any evidence in this case. ECF No. 169 at 38–39.[2] They argue that there is no admissible record evidence that the witnesses who identified Plaintiff as the shooter have recanted their identification, that Detectives Stambach, Masecchia, and Vickerd conducted improperly suggestive identifications, or that Detective Lonergan invented the anonymous call he received on the day of the shooting. *Id.* Because there is no evidence that the City Defendants fabricated evidence by using suggestive identification procedures, they argue the *Brady* claims, too, should be dismissed.

In response, Plaintiff maintains that there is "ample evidence" that Defendants fabricated evidence against him. ECF No. 180 at 30. Specifically, Plaintiff argues that: (1) the "bare circumstances alone support a reasonable inference that what Defendants reported about the identification was not true"; (2) the record contains direct evidence of suggestive identification procedures by Defendant Vickerd, Defendant Lonergan, and Defendant Stambach; and, (3) Defendants' "persistent deviation from applicable professional standards" with respect to their investigation of LaMarr Scott after his confession permits the inference of intentional or reckless conduct violating Plaintiff's constitutional rights. *Id.* at 29–37.

After a thorough review of the record, the Court finds it must defer a ruling on this particular claim until the parties clarify two evidentiary issues that are raised in the briefing regarding the expert opinion of Dr. Dysart, and the alleged conversation between Robert Bryant and Emil Adams after Plaintiff's conviction.

---

[2] The page numbers cited in this decision and order reference the pagination generated by the Court's CM/ECF system, located in the upper right-hand corner of the page in the cited document.

**A. Rule 56**

Fed. R. Civ. P. 56(c) provides that "[a] party may object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." The Second Circuit has recognized that the district court has "numerous alternative available options" when faced with an objection to the admissibility of evidence presented in support of or opposition to summary judgment. *Nick's Garage, Inc.*, 875 F.3d at 116 n. 4. As the drafters of the 2010 amendments to the Federal Rules of Civil Procedure noted in their Advisory Committee Notes, "[i]n many circumstances" the preferred first step will be to allow the parties an opportunity to properly support or address the alleged evidentiary deficiency, and "[t]he choice among possible orders should be designed to encourage proper presentation of the record."

**B. Dr. Dysart's Expert Report**

Plaintiff argues that the "bare circumstances" of this case support the inference that the City Defendants fabricated evidence: (1) three eyewitnesses – Emil Adams, Aaron Jackson, and John Sullivan – identified Plaintiff as the shooter in the Jackson Murder, and (2) it was later determined that Plaintiff was not the shooter in the Jackson Murder. The parties agree on the basic facts underlying Plaintiff's argument, but do not agree on the inferences that may be drawn from them.

In opposing the City Defendants' motion for summary judgment on the fabrication of evidence claim, Plaintiff relies heavily on the opinion of eyewitness identification expert, Jennifer Dysart, Ph.D. ECF No. 180 at 30–31. After reviewing over 50 exhibits relevant to this case, Dr. Dysart opined that "the most reasonable

explanation for how three witnesses all came to select [Plaintiff] – who was not the shooter – from the arrays is suggestion or influence during the identification procedures." ECF No. 180-32 at 6. Plaintiff maintains that this evidence raises a genuine dispute of material fact because a reasonable juror could find that it supports the inference that the City Defendants fabricated evidence. ECF No. 180 at 31.

In reply, the City Defendants argue that Dr. Dysart's opinion in this regard is merely speculative, and that "[t]his type of speculation cannot create an issue of fact." ECF No. 191 at 18. In other words, the City Defendants challenge the admissibility of Dr. Dysart's testimony under Fed. R. Evid. 702.

Under Fed. R. Evid. 702, district courts perform a "gatekeeping" function and are charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the issues in the case. *See In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 982 F.3d 113, 122–23 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Not only is it permissible for the district court at summary judgment "to take a hard look at plaintiff['s] experts' reports, the court [i]s required to do so to ensure reliability." *In re Mirena*, 982 F.3d at 123.

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Pronti v. Hanover Ins. Co.*, 645 F. Supp. 3d 146, 153 (W.D.N.Y. 2022) (internal quotation marks and citation omitted). In the instant case, the Court finds that it has heard insufficient argument from the

parties to adequately perform its gatekeeping role with respect to Dr. Dysart's opinion. Accordingly, the Court exercises its discretion under Fed. R. Civ. P. 56(e) to direct further briefing from the parties as discussed below.

**C. Alleged Adams – Bryant Conversation**

In addition to Dr. Dysart's report, Plaintiff also points to statements he claims to be direct evidence of fabrication which were made during an alleged conversation between eyewitness Emil Adams and Plaintiff's father, Robert Bryant, in March 1993. ECF No. 180 at 33–34; ECF No. 180-25. During this alleged conversation, which Bryant testified that he recorded without Adams' knowledge, Adams stated that the BPD "took down my statement and showed me three pictures, like three to six pictures. And they just – they were asking about [Plaintiff]." ECF No. 180-25 at 5. Later in the discussion, Adams allegedly explained:

> It seemed [Plaintiff] would have did it, but no, what I'm saying in front the police lieutenant was I can't really just point the finger . . . . [A] heavy set guy with a hat and I kind of saw the guy. And so I never said who it were, because I wasn't really sure . . . . And I thought if [I] just said . . . I'm not really sure, he said if I show you a picture. You know, if he's in or not. They brought me three pictures . . . . I saw three pictures first and they showed me Mario [Jarmon], [Plaintiff], and somebody else . . . . [the police lieutenant] said, well, do you know this guy? . . . .
>
> They wanted [Plaintiff] back in. That's what they were saying . . . .

*Id.* at 14–22.

In a cursory argument, the City Defendants argued that the Court cannot consider this alleged fact – i.e., that Adams was first shown only three pictures, including one of Jarmon and one of Plaintiff – because the recording was inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2). In a footnote in his opposition papers, Plaintiff

argues that Adams' alleged statement to Bryant is admissible under Fed. R. Evid. 804(b)(3) as a statement against interest, 803(5) as a recorded recollection, 803(16) as the tape was prepared before 1998 and has been authenticated, and 807 as the audio recording is corroborated by other evidence. ECF No. 180 at 34 n. 17.

The Court finds that it has heard insufficient argument from the parties on this issue, as well, and exercises its discretion under Fed. R. Civ. P. 56(e) to direct further briefing from the parties as discussed below.

**D. Additional Argument from the Parties**

For the foregoing reasons, the City Defendants are directed to submit on or before December 18, 2026 a supplemental brief of no more than 20 pages elaborating on their objections to the admissibility of both Dr. Dysart's opinion, and the alleged Adams-Bryant conversation. Plaintiff's response of no more than 20 pages is due on or before January 8, 2027. After review of the papers, the Court shall determine whether a hearing on these issues is required. If so, that hearing shall be held on February 5, 2027. Thereafter, the Court will make a determination of admissibility, and resolve the City Defendant's motion for summary judgment with respect to the fabrication of evidence claim.

Further, because Plaintiff maintains that "the same evidence that establishes Defendants' fabrications of evidence about the identification procedures also establishes that they withheld exculpatory evidence of the suggestion they used to obtain the identifications," the Court will defer decision on the *Brady* claim, as well. ECF No. 180 at 31.

## II. Malicious Prosecution (Count II)

Plaintiff claims City Defendants Detective Stambach, Detective Lonergan, Detective Vickerd, and Detective Masecchia are liable under 42 U.S.C. § 1983 and New York state law for malicious prosecution in violation of his Fourth and Fourteenth Amendment rights. ECF No. 1. The City Defendants argue that Plaintiff cannot establish the essential elements of a malicious prosecution claim because he cannot overcome the presumption of probable cause created by the grand jury indictment, there was independent evidence of probable cause, and charges were pursued due to the independent judgment of ADA Belling. ECF No. 169 at 25–29. In response, Plaintiff claims that the City Defendants are liable for malicious prosecution because the evidence "easily supports a finding there was no probable cause" to prosecute Plaintiff. ECF No. 180 at 34.

### A. Legal Principles

"A § 1983 claim for malicious prosecution looks to the relevant state common law." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 162 (2d Cir. 2013). The elements of a malicious prosecution claim are well-settled:

> In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law . . . . To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions . . . .

*Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (internal citations and quotation marks omitted).

**B. Favorable Termination**

The City Defendants argue that Plaintiff cannot demonstrate the challenged proceedings terminated in his favor because the criminal possession of a weapon in the second degree conviction was not vacated, but Plaintiff responds that recent caselaw developments in both the Supreme Court and the Second Circuit make clear that the termination of the murder, attempted murder, and assault charges constitute favorable termination for the purposes of Plaintiff's malicious prosecution claims.

*i. Legal Principles*

As the Supreme Court has recognized, "[t]he favorable termination requirement serves multiple purposes: (i) it avoids parallel litigation in civil and criminal proceedings over the issues of probable cause and guilt; (ii) it precludes inconsistent civil and criminal judgments where a claimant could succeed in the tort action after having been convicted in the criminal case; and (iii) it prevents civil suits from being improperly used as collateral attacks on criminal proceedings." *Thompson v. Clark*, 596 U.S. 36, 44 (2022) (citing, *inter alia*, *Heck v. Humphrey*, 512 U.S. 477, 484–85 (1994)).

To serve the foregoing purposes, the Supreme Court has held that the plaintiff need not show the criminal prosecution ended with an "affirmative indication of innocence," only that it ended without a conviction. *Id.* at 49. Further, the Second Circuit has consistently found that a plaintiff can satisfy "the favorable termination requirement even when there has been a conviction on a related charge, or one arising from the same incident or event." *Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989).

This is particularly true where the charge or conviction that was terminated is "sufficiently distinct from the charge of conviction . . . not only as to its elements, but also as to the seriousness of the offense . . . . *Carruthers v. Colton*, 153 F.4th 169, 189 (2d Cir. 2025) (applying "our framework in *Janetka*").

*ii. Application*

Here, the Court finds that the three convictions that were vacated in Plaintiff's underlying criminal case (murder in the second degree, attempted murder in the second degree, and assault in the third degree) are sufficiently distinct from the remaining conviction (criminal possession of a weapon in the second degree) such that the vacated convictions satisfy the favorable termination requirements. For one, the Court notes that the elements of the vacated convictions are distinct from the elements of the remaining conviction. Under PL § 125.25(1), "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person . . . ." For attempted murder, "[a] person is guilty of an attempt to commit [murder] when, with intent to commit [murder], he engages in conduct which tends to effect the commission of [murder]." PL § 110.00. With respect to assault in the third degree, a person is guilty when "[h]e recklessly causes physical injury to another person." PL § 120.00(2). On the other hand, criminal possession of a weapon in the second degree requires possession of a machine gun or loaded firearm and intent to use the same unlawfully

against another person. PL § 265.03.[3] In short, "the elements of each charge are different . . . ." *Janetka*, 892 F.2d at 190.

In addition, although criminal possession of a weapon is certainly a serious felony offense, New York state law does not classify it on the same level of seriousness as murder and attempted murder. Murder in the second degree is a class A-I felony punishable by up to life in prison (PL §§ 70.00(2), 125.25), and attempted murder in the second degree is a class B felony punishable by up to 25 years in prison (PL §§ 70.00(2)(b), 110.05). But criminal possession of a weapon in the second degree is a class C felony (PL §§ 70.00(2)(c), 265.03), punishable by up to 15 years in prison. *See, e.g., Ricks v. Brown*, No. 20-CV-43-LJV, 2024 WL 4362837, at *7 (W.D.N.Y. Sept. 30, 2024) (distinguishing between the seriousness of two felonies).

Lastly, the offenses differ in time and location. Although the parties disagree as to the precise circumstances surrounding Plaintiff's possession of the firearm, both parties agree that he transported it to Jarmon's house prior to proceeding to the scene of the murder, and did not take the weapon with him to the scene. ECF No. 180-3 ¶¶ 10, 11. Rather, Scott retrieved the firearm himself. *Id.* ¶ 14. Therefore, the criminal possession of a weapon offense is distinct from the three vacated offenses.

**C. Absence of Probable Cause**

The City Defendants maintain that Plaintiff's indictment by a grand jury

[3] Until the statute was amended in 1998, PL 265.03 had no numbered subdivisions. It read, in its entirety, "A person is guilty of criminal possession of a weapon in the second degree when he possesses a machine-gun or loaded firearm with intent to use the same unlawfully against another. Criminal possession of a weapon in the second degree is a class C felony." *See GUN CONTROL Published Firearms Laws of Political Subdivisions and States*, 41 FR 25652-01, 25784 (June 22 ,1976) (reprinting the statute).

created a presumption of probable cause for his malicious prosecution claim which could only be overcome by a showing of fraud, perjury or other bad faith misconduct. ECF No. 169 at 34. The City Defendants argue that not only has Plaintiff failed to show such misconduct, but that even if he were able to make that showing, the malicious prosecution claim must fail because independent probable cause existed to warrant Plaintiff's prosecution. *Id.* at 36–37.

On the other hand, Plaintiff argues that the evidence "easily supports a finding that there was no probable cause," because the evidence indicates the witness identifications were the result of the City Defendants' suggestive identification procedures. ECF No. 180 at 41. Plaintiff further argues that the presumption of probable cause can be overcome by the City Defendants' failure to make further inquiry into the circumstances surrounding Scott's confession when a reasonable person would have done so, and because the City Defendants "deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures." *Id.* at 42.

*i. Legal Principles*

The New York Court of Appeals has distinguished the law with respect to the probable cause element of a malicious prosecution claim from that in other jurisdictions:

> Once a suspect has been indicted, however, the law holds that the Grand Jury action creates a presumption of probable cause. The rule is founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly. The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence,

> that they have withheld evidence or otherwise acted in bad faith. The rule in New York differs in this respect from that in some jurisdictions which permit the presumption to be overcome by any evidence tending to show the absence of probable cause. In this State, the trial court may not weigh the evidence upon which the police acted or which was before the Grand Jury after the indictment has issued. If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.

*Colon v. City of New York*, 455 N.E.2d 1248, 1250–51 (1983) (internal citations omitted); *see also, e.g., Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017) (applying *Colon*). A plaintiff may also overcome the presumption of probable cause by a showing "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures . . . ." *Richards v. City of New York*, No. 97 CIV. 7990 (MBM), 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) (quoting *Harris v. State*, 302 A.D.2d 716 (N.Y. App. Div. 2003)); *see also Lee v. City of Mount Vernon,* 407 N.E.2d 404, 405 (N.Y. 1980) ("[P]laintiff was required to show that [the defendant]'s procedure deviated so egregiously from proper police activity as to indicate intentional or reckless action on [defendant]'s part.").

*ii. Rebuttable Presumption of Probable Cause*

Resolving all ambiguities and drawing all permissible factual inferences in Plaintiff's favor as it must on summary judgment, the Court finds for the purposes of this motion that there remains a genuine dispute of material fact as to whether the City Defendants' conduct deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedure sufficient to rebut the presumption of probable cause. Specifically, the City Defendants' failure to

adequately investigate, particularly following LaMarr Scott's confession, the possibility that Scott and not Plaintiff committed the Jackson Murder, is sufficient to rebut the presumption of probable cause at this stage of the case. *Id.* ¶¶ 58, 62.

In this regard, the deposition testimony of Detective Stambach is illustrative. At his deposition, Detective Stambach was asked a series of questions about the BPD's investigation of Scott as the possible shooter. ECF Nos. 174-11 to 174-15. For instance, with respect to the clothing LaMarr Scott was wearing on the evening of the shooting, Detective Stambach stated that it was a mistake that he did not ask Scott for the clothes or shoes he was wearing, as those were potential sources of evidence. ECF No. 174-14 at 33. He also stated that he thought there were some "monetary promises" made to Scott by Plaintiff's family to induce Scott's confession, but that the police did not inquire with Plaintiff's father or mother. *Id.* at 27–31. Detective Stambach stated that Scott agreed to take a lie detector test, but that he did not show up for his first scheduled appointment and the BPD "didn't follow-up intensely" in their efforts to bring him in for the test. *Id.* 34–36. In short, a reasonable juror could find that the BPD Detectives ignored or overlooked several direct opportunities to collect probative evidence relevant to a determination of the true identity of the shooter in the Jackson Murder.

Further, Detective Stambach stated that his involvement in the case went only "about four or five days" after Plaintiff's arrest in August 1991, and then a follow-up in December of that year with Tamara Frieda. ECF No. 174-13 at 13–14. With respect to Ms. Frieda, Detective Stambach acknowledged he received an anonymous phone call days after LaMarr Scott's confession, in which the female caller indicated she

was present at the scene and that Plaintiff was not the shooter. *Id.* at 15–16. Yet Detective Stambach stated that he took no steps to find out who the caller was and interview her, despite information (i.e., "the girl from the red Tracker") that would make her readily identifiable from previous police reports of the shooting. *Id.* Again, Detective Stambach ignored or overlooked a direct opportunity to collect evidence relevant to a determination of the true identity of the shooter in the Jackson Murder.

As to the other BPD Detectives named in this claim, the evidence of record suggests that Detective Lonergan was or may have been the lead detective in the case. ECF No. 174-12 at 10. The evidence further indicates that the other two detectives – Detective Masecchia and Detective Vickerd – were also involved in the investigation. Where the issue is the extent of the BPD's failure to conduct an adequate investigation into the true identity of the shooter in the Jackson Murder, the Court finds that there is a genuine dispute of material fact as to whether Detective Lonergan, Detective Masecchia, and Detective Vickerd may also share responsibility for the investigation.

*iii. Independent Probable Cause*

With respect to the City Defendants' argument that they are entitled to summary judgment on the malicious prosecution claims because ADA Belling relied upon independent information to establish probable cause, the Court disagrees. To be sure, if the prosecution relied on independent, untainted information to establish probable cause, a complaining official will not be responsible for the prosecution that follows. *Rentas v. Ruffin,* 816 F.3d 214, 221 (2d Cir. 2016) (citing *Townes v. City of New York,* 176 F.3d 138, 147 (2d Cir.1999)). "In that situation, the chain of causation

between a police officer's unlawful arrest and a subsequent conviction and incarceration [would be] broken by the intervening exercise of [the prosecutor's] independent judgment." *Id.*

Here, however, there is a question of fact as to whether ADA Belling utilized independent, untainted information to establish probable cause, where the evidence reveals a break in grand jury proceedings between November 1991 and January 1992, and a letter from ADA Belling to the BPD Defendants arguably identifying defects or shortcomings in the investigation to date. *See* ECF No. 180-29 ("after review of the statement [from Antoine Shannon], it becomes apparent that we have major discrepancies in regard to who committed [the Jackson murder] . . . . that [can] . . . only be cleared up by continuing investigation."). With these circumstances in mind, the Court declines to find at this point that the information ADA Belling utilized was untainted by the apparent shortcomings in the BPD investigation.

**D. Malice**

The Court notes that in the context of a malicious prosecution claim, "malice" means "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996). Alternatively, malice may also be shown "'by proving the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff.'" *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996) (quoting 52 Am.Jur.2d *Malicious Prosecution* § 152, at 277–78 (1970)). In either case, "malice may be inferred from the lack of probable cause." *Id.* "Thus, if there is a question of fact

for probable cause, there is also a question for malice." *Noga v. City of Schenectady Police Officers*, 169 F. Supp. 2d 83, 90 (N.D.N.Y. 2001) (citing *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir. 1994) ("stating that New York courts traditionally consider the issue of malice to be a jury question")). Thus, the Court declines to find here that Plaintiff has failed to show malice.

**E. Qualified Immunity**

The City Defendants maintain that even if there is an issue of fact as to whether Plaintiff's constitutional rights have been violated, summary judgement should still be granted to Detective Stambach, Detective Lonergan, Detective Masecchia, and Detective Vickerd on qualified immunity grounds. ECF No. 169 at 44–45; ECF No. 191 at 21. Plaintiff argues that the City Defendants waived their qualified immunity arguments, and alternatively that their conduct is not protected by qualified immunity. ECF No. 180 at 45–46.

The Second Circuit summarized the well-settled standard for qualified immunity in the context of malicious prosecution:

> Qualified immunity establishes a defense for a government actor acting in his official capacity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* In the context of false arrest and malicious prosecution claims, an officer is entitled to qualified immunity if he had either probable cause or "arguable probable cause." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (internal quotation marks omitted). Arguable probable cause exists "if officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

*Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017).

Here, the Court finds that the City Defendants have not waived their qualified immunity arguments. Nevertheless, the Court concludes that it would be inappropriate to grant qualified immunity to the City Defendants at this stage. Plaintiff has established a dispute of fact as to whether the Defendants' conduct deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures. In other words, Plaintiff has raised a question as to whether the conduct of the City Defendants in the investigation of the shooting rose to the level of "plainly incompetent," and whether there was even arguable probable cause for Plaintiff's prosecution in light of LaMarr Scott's confession in the days immediately following Plaintiff's arrest.

Therefore, on the record before it, the Court declines to find the City Defendants are entitled to qualified immunity from the malicious prosecution claim, and their motion for summary judgment on Plaintiff's malicious prosecution claim is denied.

## III. Civil Rights Conspiracy Under 42 U.S.C. § 1983

Plaintiff claims City Defendants Detective Stambach, Detective Lonergan, Detective Vickerd, Detective Masecchia, and ADA Belling are liable under 42 U.S.C. § 1983 for engaging in a "civil rights conspiracy." ECF No. 1. The City Defendants argue that this claim must be dismissed because it is barred by the intra-corporate conspiracy doctrine, and because Plaintiff has failed to demonstrate a conspiracy between the BPD Defendants and ADA Belling. ECF No. 169 at 41–42.

"To successfully assert a § 1983 claim for conspiracy, plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private

entity, (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal causing harm to plaintiff." *Little v. City of New York*, 487 F. Supp. 2d 426, 441 (S.D.N.Y. 2007) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).

With respect to both fabrication of the evidence and malicious prosecution, Plaintiff has failed to point to any evidence that any of the City Defendants agreed to act in concert regarding the investigation. To satisfy the agreement element of a conspiracy claim, a plaintiff "must provide some factual basis supporting a meeting of the minds." *Ivery v. Baldauf*, 284 F. Supp. 3d 426, 439 (W.D.N.Y. 2018) (quoting *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003)). That is, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Id.* (citing *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999)). Plaintiff has not done so here.

Further, the Court agrees that Plaintiff's conspiracy claim with respect to the City Defendants is barred by the intra-corporate conspiracy doctrine. "Under the intra[-]corporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999). While the Second Circuit has not yet applied the doctrine in § 1983 cases, in the absence of mandatory authority one way or the other, "courts in this circuit have applied the doctrine to § 1983 cases." *McCrae v. Town of Brookhaven*, 759 F. Supp. 3d 372, 396 (E.D.N.Y. 2024) (collecting cases). Here, the City Defendants were all members of the police department acting

within the scope of their employment, and there is no evidence that they had a personal connection to Plaintiff or were motivated by personal reasons wholly separate and apart from their employment as police officers such that the "personal stake exception" to the doctrine would apply. *Ivery*, 284 F. Supp. 3d at 440.

Finally, Plaintiff asserts that the BPD Defendants "worked hand-in-hand" with ADA Belling to pressure LaMarr Scott to recant his confession. "The intra-corporate conspiracy doctrine does not bar claims which allege a conspiracy between individuals in different agencies. *See Dunlop v. City of New York*, No. 06-cv-433 (RJS), 2008 WL 1970002, at *13 (S.D.N.Y. May 6, 2008). Nevertheless, Plaintiff's assertion that the City Defendants and ADA Belling "worked hand-in-hand" is too vague and conclusory to avoid summary judgment. Even drawing all reasonable inferences in Plaintiff's favor, there is no basis here upon which a reasonable factfinder could conclude that the BPD and ADA Belling entered into a conspiracy to deprive plaintiff of his constitutional rights. Where there is no evidence of agreement, summary judgment on a § 1983 conspiracy claim is warranted and Plaintiff's claim for civil rights conspiracy under 42 U.S.C. § 1983 is dismissed. *Ostensen v. Suffolk County*, 236 F. App'x 651, 653 (2d Cir. 2007).

## IV. Failure to Intercede

Plaintiff claims City Defendants Detective Stambach, Detective Lonergan, Detective Vickerd, Detective Masecchia, BPD Chief Donovan, and other John Doe Defendants are liable under 42 U.S.C. § 1983 for "failure to intercede." The City Defendants argue this claim should be dismissed because Plaintiff has failed to demonstrate a constitutional violation, and because "none of the defendant detectives

were present or aware of any constitutional violations for which they had a realistic opportunity to intervene to prevent harm from occurring." ECF No. 169 at 42 (citation and internal quotation marks omitted).

At the outset, the Court notes its agreement with an argument raised later in the City Defendants' motion papers (ECF No. 191 at 23) that Plaintiff's failure to respond in his opposition papers to the City Defendants' argument that the John Doe Unknown BPD Supervisor Defendants should be dismissed constitutes abandonment of the issue. *See, e.g., McKnight v. Dormitory Auth. of State*, 189 F.R.D. 225, 232–33 (N.D.N.Y. 1999) (finding the plaintiff's lack of opposition to portions of defendants' motion for summary judgment constituted abandonment of those claims); *see also Gayot v. Maldonado,* No. 14-CV-4339 (RPK) (AYS), 2024 WL 5239203, at *7 (E.D.N.Y. Dec. 28, 2024) ("[w]here a plaintiff 'has had ample time to identify' a John Doe defendant but gives 'no indication that he has made any effort to discover the defendant's name,' . . . the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant.") (quoting *Coward v. Town & Village of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009)). Accordingly, the John Doe Defendants are dismissed from this case.

With respect to the remaining City Defendants, "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994). An officer who fails to intercede in a constitutional violation is liable for the preventable harm

caused by the actions of other officers. *Terebesi v. Torreso*, 764 F.3d 217, 243–44 (2d Cir. 2014).

Here, insofar as the malicious prosecution claim surviving summary judgment relates to an investigation in which Defendants Detective Stambach, Detective Vickerd, Detective Lonergan, and Detective Masecchia, were all involved, the facts suggest the possibility that each of those four Defendants had the opportunity to intervene. Whether the officer had a "realistic opportunity" to intervene is normally a question for the jury, unless, "considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Terebesi,* 764 F.3d at 244. Additionally, as noted above, the Court has deferred ruling on Plaintiff's fabrication of evidence and *Brady* claims until after it has resolved evidentiary concerns. Accordingly, the Court finds the City Defendants are not entitled to summary judgment on the failure to intervene claim at this time.

**V. Supervisor Liability under 42 U.S.C. § 1983**

Plaintiff alleges a supervisor liability claim against BPD Chief Donavan and the John Doe BPD Supervisors under 42 U.S.C. § 1983, claiming that Detective Stambach, Detective Lonergan, Detective Vickerd, and Detective Masecchia "acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendants Donovan [or] John Does . . . ." ECF No. 1 ¶ 248. The City Defendants maintain that this claim should be dismissed because the Second Circuit no longer recognizes a special rule for supervisor liability in 42 U.S.C. § 1983 cases, and because Plaintiff never identified or named the unnamed John Doe supervisors. ECF No. 169 at 43, 45–46.

Indeed, the Second Circuit has held that:

> . . . [A]fter [*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)] there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Because the John Doe Defendants in this action have been dismissed, and because Plaintiff does not allege that Defendant Donovan took any individual actions that violated Plaintiff's constitutional rights, Plaintiff's supervisory liability claim must be dismissed.

**VI. Monell Liability**

Plaintiff alleges that the City is liable for the violation of his constitutional rights under a theory of *Monell* liability under 42 U.S.C. § 1983. The City Defendants seek dismissal of all of Plaintiff's federal claims against the City under a *Monell* theory of liability.

"The elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).

In the present case, discovery was bifurcated to allow discovery on Plaintiff's claims against individuals to proceed, while discovery on Plaintiff's *Monell* theory was stayed pending dispositive motion practice. ECF No. 73. Thus, discovery with respect to Plaintiff's claim that the City is liable under a *Monell* theory has not yet been completed. Further, at least one constitutional tort claim against the individual

City Defendants – malicious prosecution – is proceeding to trial. The Court therefore finds it premature to consider dismissal of Plaintiff's *Monell* claims.

**VII. Intentional, Reckless or Negligent Infliction of Emotional Distress**

Plaintiff alleges a claim against Detective Stambach, Detective Lonergan, Detective Vickerd, and Detective Masecchia for the intentional, reckless, or negligent infliction of emotional distress under New York State Law. In response, the City Defendants argue that "New York law specifically bars recovery for negligent or intentional infliction of emotional distress claims where such claims fall within the ambit of other traditional tort liability." ECF No. 169 at 46 (citing *Poulos v. City of New York*, 14-CV-3023, 2015 WL 5707496, *10 (S.D.N.Y. 2015).

The City Defendants' position is well-supported by state and federal caselaw. *See, e.g., Salmon v.* Blesser, 802 F.3d 249, 256 (2d Cir. 2015) ("[T]he New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability[;] [a]ll four Appellate Division courts have answered the question and held that it cannot." (internal quotation marks and citation omitted)).

Nevertheless, the Court need not reach the issue because Plaintiff failed to respond to the City Defendants' argument in his opposition papers. Accordingly, the Court considers Plaintiff to have abandoned his state law claim for the intentional, reckless, or negligent infliction of emotional distress. *McKnight*, 189 F.R.D. at 232–33 (N.D.N.Y. 1999).

**VII. Negligence**

Plaintiff alleges a claim against Detective Stambach, Detective Lonergan, Detective Vickerd, and Detective Masecchia for negligence. However, "[o]rdinary negligence is not applicable for police misconduct . . . in police investigations . . . . Other torts, such as false arrest or malicious prosecution, address instances of police misconduct." *Strobridge v. City of Elmira*, No. 20-CV-1125S, 2022 WL 597464, at *11 (W.D.N.Y. Feb. 28, 2022) (citing *Medina v. City of New York*, 102 A.D.3d 101, 108 (N.Y. App. Div. 2012) (collecting cases)). Accordingly, Plaintiff's negligence claim is dismissed. *See Hicks v. City of Buffalo*, 124 F. App'x 20, 25 (2d Cir. 2004) ("[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution.").

**VIII. Respondeat Superior**

Plaintiff alleges a claim against the City under the doctrine of *respondeat superior*, arguing "the City of Buffalo is liable for its agents' state law torts of malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, and negligence." ECF No. 1 ¶ 284. Defendants argue that Plaintiff's *respondeat superior* claim should be dismissed "because the record does not establish that any City agent or employee committed a tort against" Plaintiff. ECF No. 169 at 47.

Under New York law, there are two ways that a municipal employer can be held liable for negligence based on the acts of an employee: *respondeat superior* and negligent hiring, training, and supervision. *Baumeister v. Erie Cnty*, No. 23-CV-1150-LJV, 2024 WL 4362311, at *13 (W.D.N.Y. 2024). If the employee acted within the

scope of his or her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of *respondeat superior*. *Id.* (citing *Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013) (italics omitted)).

"[A]n employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or with what disregard of instructions." *Powell v. City of Jamestown*, No. 1:21-CV-721, 2022 WL 1913581, at *20 (W.D.N.Y. 2022) (quoting *White v. Montesano*, 466 F. Supp. 3d 331, 335 (W.D.N.Y. 2020) (internal quotation marks omitted)). By contrast, an employee will not be considered within the scope of employment "if, for purely personal reasons unrelated to the employer's interests, the employee engages in conduct which is a substantial departure from the normal methods of performing his duties." *Id.*

In the present case, all of the tortious acts that Plaintiff alleges regarding the misconduct of Detective Stambach, Detective Lonergan, Detective Vickerd, and Detective Masecchia relate to their investigation of the Jackson Murder and Plaintiff's subsequent prosecution. Therefore, they were acting within the scope of their employment as police officers of the City, and *respondeat superior* applies. *See, e.g., Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 267 (N.D.N.Y. 2014) (collecting state court cases to support the proposition that "[a]lthough a municipality cannot be held vicariously liable on a section 1983 claim, under New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior*.").

Because the malicious prosecution claim against the City Defendants is proceeding to trial, the *respondeat superior* claim against the City must also survive with respect to malicious prosecution. *Id.* ("[B]ecause there are viable battery claims against some of the individual officers, Defendants' motion [for summary judgment] relative to the" *respondeat superior* claim is denied). Similarly, because the Court has deferred ruling on Count I, *respondeat superior* claim must survive on that claim. However, for the reasons stated above, the *respondeat superior* claims with respect to negligence and the intentional or negligent infliction of emotional distress must be dismissed.

**VII. Negligent Hiring, Training, and Supervision**

Plaintiff's complaint alleges that the City, BPD Chief Donovan, and the John Doe Supervisor Defendants are liable under New York law for negligent hiring, training, and supervision. "A claim for negligent hiring or supervision . . . can only proceed against an employer for an employee acting outside the scope of her [or his] employment." *Baumeister*, 2024 WL 4362311 at *13 (quoting *Colodney v. Continuum Health Partners, Inc.*, 2004 WL 829158, at *8 (S.D.N.Y. 2004)). As discussed above, the claims against the City Defendants in the instant case involve the Detectives' conduct within the scope of their employment with the BPD. Accordingly, Plaintiff's claim for negligent hiring, training, and supervision must be dismissed.

**CONCLUSION**

For the reasons stated above, it is hereby

ORDERED that the City Defendants' motion for summary judgment [ECF No. 168] is GRANTED in part, and DENIED in part; and it is further

ORDERED that the John Doe Unknown BPD Supervisors are dismissed, and the Clerk of Court is directed to terminate them as Defendants in this case; and it is further

ORDERED that the following Counts against the City Defendants are dismissed: Count III (civil rights conspiracy), Count V (supervisor liability), Count IX (intentional, reckless, or negligent infliction of emotional distress), Count X (negligence), and Count XIII (negligent hiring, training, and supervision); and it is further

ORDERED that, with respect to the supplemental briefing on the evidentiary issues discussed above for Count I (fabrication of evidence and *Brady* violation), the City Defendants shall file their brief of no more than 20 pages on or before December 18, 2026, and Plaintiff may file his reply of no more than 20 pages on or before January 8, 2027; and it is further

ORDERED that the following Counts against the City Defendants shall proceed to trial: Count II (malicious prosecution, federal), Count IV (failure to intercede), Count VIII (malicious prosecution, state), and Count XI (*respondeat superior*); and it is further

ORDERED the Court will address Plaintiff's *Monell* claim (Count VI) and his motion to bifurcate the trial (ECF No. 225) under separate order following resolution of the City Defendants' motion for summary judgment on Count I.

SO ORDERED.

Dated: November 24, 2026
Rochester, New York

HON. MEREDITH A. VACCA
United States District Judge