UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VALENTINO DIXON,

Plaintiff,

-vs-

CITY OF BUFFALO, *et al.*,

Defendants.

DECISION AND ORDER

19-CV-1678-MAV-JJM

## INTRODUCTION

This matter is presently before the Court on the motion of the "County Defendants" – Defendants County of Erie (the "County") and Assistant District Attorney Christopher Belling ("ADA Belling") – for Summary Judgment on Plaintiff Valentino Dixon's complaint. ECF No. 167. Plaintiff's complaint alleges, among other things, claims of fabrication of evidence, withholding material exculpatory and impeachment evidence (*Brady* violations), and malicious prosecution. ECF No. 1. For the reasons stated below, the County Defendants' motion is granted in part, and denied in part.

## FACTUAL BACKGROUND

The following facts are drawn from the apparent agreement between the parties on material facts as indicated in Plaintiff's response to the County's Statement of Material Facts. *See* ECF No. 181-3.

Toriano Jackson was shot to death between 1:15 and 1:30 A.M. on August 10, 1991 (the "Jackson Murder") after he and Aaron Jackson engaged in a brief fist fight with Mario Jarmon. ECF No. 181-3 ¶ 1. Police reports indicate that by 5:05 A.M. on

August 10,[1] 1991, Emil Adams had given a sworn statement identifying Plaintiff as the shooter. *Id.* ¶ 8. ADA Belling was not present for the identification made by Adams. *Id.* ¶ 9.

Plaintiff was detained by police at 1:10 P.M. on the day Adams identified him as the shooter, and gave a statement denying his involvement in the murder. *Id.* ¶ 10–11. Police reports indicate that a little more than one hour later, John Sullivan also gave a sworn statement identifying Plaintiff as the shooter. *Id.* ¶ 12. After Plaintiff had an opportunity to meet with counsel, he "was booked for murder, weapons possession and assault" on a criminal complaint executed by BPD Detective Stambach. *Id.* ¶ 13–14.

On August 12, 1991, LaMarr Scott came forward in the early morning hours and confessed to being the shooter in the Jackson Murder. *Id.* ¶ 15. Police records indicate that that same afternoon, Aaron Jackson gave a sworn statement indicating that the photograph in slot 4 of the six-person photo array – which the BPD knew to be Plaintiff – looked like the person who shot his brother Toriano, but that he could not be sure because "it happened so quick." *Id.* ¶ 16; ECF No. 180-4 at 168. ADA Belling was not present when Aaron Jackson gave his statement, but he did receive copies of the BPD's homicide file that day and sought the revocation of Plaintiff's bail. ECF No. 181-3 ¶¶ 17–19 (referencing, *inter alia*, ECF No. 167-5 at 63).

---

[1] The County's statement of material facts records the date as August 11, 1991 (ECF No. 181-3 ¶ 8), but the document cited by the County indicates that Adams signed the photo array affidavit on August 10. ECF No. 167-4 at 237 ("A1537"). So, too, does the array photo referenced by Plaintiff in his statement of additional material facts. ECF No. 181-2 ¶ 16 (referencing the "BPD Homicide File" at ECF No. 181-4 at 147).

The grand jury considered testimony regarding the Jackson Murder from eleven witnesses between November 6, 1991 and January 13, 1992. *Id.* ¶ 20. Among those witnesses were John Sullivan, Emil Adams, and Aaron Jackson, who identified Plaintiff as the shooter, as well as Mario Jarmon and Leonard Brown, who testified that Scott was the shooter. *Id.* ¶ 35. In addition, while the grand jury proceedings were pending, ADA Belling met with Antoine Shannon, who also implicated Scott as the shooter in a sworn statement. *Id.* ¶¶ 22–23.

On January 9, 1992, counsel was appointed to represent Scott in the grand jury proceedings. *Id.* ¶ 21. On January 13, 1992, Scott testified before the grand jury, recanted his confession, and identified Plaintiff as the shooter in the Jackson Murder. *Id.* ¶ 33. Later that day, the grand jury voted to indict Plaintiff on charges as the perpetrator of the Jackson Murder. *Id.* ¶ 38. Jarmon and Brown were later indicted on perjury charges. *Id.* ¶ 39.

## PROCEDURAL BACKGROUND

Plaintiff's jury trial took place from June 8 through June 16, 1992. *Id.* ¶ 40. During the trial, Aaron Jackson, Emil Adams, and John Sullivan testified as to their identifications of Plaintiff as the shooter, and were subject to cross-examination by defense counsel. *Id.* ¶ 41. Plaintiff was convicted of murder in the second degree under New York Penal Law ("PL") § 125.25[1], attempted murder in the second degree (PL §§ 110.00, 125.25[1]), assault in the third degree (PL § 120.00[2]), and criminal possession of a weapon in the second degree (PL § 265.03). ECF No. 181-3 ¶ 43. The conviction was unanimously affirmed by the Supreme Court of the State of New York

Appellate Division, Fourth Department. *Id.* ¶ 45.

Plaintiff filed his first motion to vacate his conviction under § 440.10 of the New York Criminal Procedure Law ("CPL") in November 2003, but the motion was denied in August 2004. *Id.* ¶ 46–47. In April 2005, Plaintiff filed a petition for a writ of habeas corpus in the United States District Court for the Western District of New York, but that petition, too, was denied. *Id.* ¶ 48–49.

In May 2018, however, Plaintiff brought a second motion under CPL § 440.10 which caused the Erie County District Attorney's Office ("ECDAO") to conduct a reinvestigation of the Jackson murder. *Id.* ¶ 50. One of Plaintiff's theories was that ADA Belling had failed to turn over negative gunshot residue testing. *Id.* ¶ 63. In the course of the reinvestigation, the ECDAO concluded that the gunshot residue testing theory was unfounded and based on a misstatement by ADA Belling. *Id.* ¶¶ 63–64. Nevertheless, for other reasons, the ECDAO concluded that Scott and not Plaintiff perpetrated the Jackson Murder, and consented to the vacatur of Plaintiff's convictions of murder in the second degree, attempted murder in the second degree, and assault in the third degree. *Id.* ¶¶ 52–53.

In December 2019, Plaintiff commenced this action against the County Defendants, the City of Buffalo, and various members of the BPD. ECF No. 1. Plaintiff pleaded multiple claims against the County Defendants, including: fabricating evidence and *Brady* violations (Count I; *Id.* ¶¶ 224–30); civil rights conspiracy (Count III; *Id.* ¶¶ 236–40); failure to intercede (Count IV; *Id.* ¶¶ 241–46); *Monell* liability for violations of Plaintiff's constitutional rights (Count VII; *Id.*

¶¶ 260–64); intentional, reckless, or negligent infliction of emotional distress (Count IX; *Id.* ¶¶ 269–73); negligence (Count X; *Id.* ¶¶ 274–80); *respondeat superior* (Count XII; *Id.* ¶¶ 285–88); and negligent hiring, supervision and training (Count XIV; *Id.* ¶¶ 293–95).

The County Defendants answered the complaint without moving to dismiss any portion of the complaint. ECF No. 181-3 ¶ 66. After preliminary discovery, United States Magistrate Judge Jeremiah McCarthy granted Defendants' motion to bifurcate discovery between Plaintiff's individual claims, which would proceed through discovery, and Plaintiff's municipal claims. ECF No. 73. On December 15, 2023, the County Defendants filed a motion for summary judgment arguing, among other things, that the Court should grant summary judgment to ADA Belling because he is entitled to absolute immunity, and because Plaintiff has failed to demonstrate that ADA Belling violated his constitutional rights. ECF No. 167-1.

In anticipation that this matter would survive summary judgment and proceed to trial, Plaintiff thereafter filed a motion to bifurcate the trial consistent with Judge McCarthy's earlier order. ECF No. 225.

## LEGAL STANDARD

It is well-settled that summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment bears the burden of establishing that no genuine issue of material fact exists by citing to "particular parts of materials in the record . . . ." Fed. R. Civ.

P. 56(c)(1)(A). *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–58 (1970). "'Where, as here, the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To make this showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Rather, the non-moving party "must come forward with specific evidence . . . ." *Brown*, 654 F.3d at 358.

In considering the merits of the summary judgment motion, the Court must view the underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-movant. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). A grant of summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is

sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993).

"It is not the province of the court itself to decide what inferences should be drawn[;] . . . if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). Nevertheless, "'[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) (quoting 1 Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 6.01, instr. 6–1 (1997)).

## DISCUSSION

In the motion presently before the Court, the County Defendants maintain they are entitled to summary judgment because ADA Belling has absolute prosecutorial immunity, and because the evidence in the record is insufficient to support any of Plaintiff's federal- or state-law claims.

### I. Absolute Immunity

A large part of both the County Defendants' and Plaintiff's briefing on the instant motion was devoted to arguing whether or not ADA Belling was entitled to absolute immunity on the claims against him. *See* ECF No. 167-1 at 13–22[2] (County Defendants); ECF No. 181 at 14–29 (Plaintiff). The County Defendants maintain that

---

[2] All page numbers listed in this decision reference the pagination generated by the Court's CM/ECF system, located in the upper right-hand corner of the page.

ADA Belling is entitled to absolute immunity because all of the wrong-doing alleged against him came in his role as an advocate, which was intimately associated with the judicial phase of the criminal process, rather than as an administrator or investigator. Plaintiff maintains that ADA Belling's alleged wrongdoing came in the course of him acting as an investigator, not as an advocate.

The Second Circuit has many times discussed the issue of prosecutorial immunity, and has summarized the law as follows:

> Absolute immunity bars a civil suit against a prosecutor for advocatory conduct that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). This immunity attaches to conduct in court, as well as conduct "preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.* at 431 n. 33.
>
> An official claiming immunity bears the burden of showing that the particular immunity claimed applies. *See Burns v. Reed*, 500 U.S. 478, 486–87 (1991). In determining whether absolute prosecutorial immunity attaches, we apply a "functional approach." [*Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995)]. "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" *Id.* at 661 (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). The Supreme Court has explained that a prosecutor's functions preliminary to the initiation of proceedings include "whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." *Imbler*, 424 U.S. at 431 n. 33.
>
> Analysis of a claim of immunity requires us to view the relevant circumstances as would a reasonable official in the claimant's position. *See Hill*, 45 F.3d at 662 ("[T]he 'functional' test for absolute immunity is an objective one; it does not depend upon the state actor's subjective intent."); *Dory*, 25 F.3d at 83; *see also Burns*, 500 U.S. at 487–88 (allegations that prosecutor "deliberately misled the Court" during preliminary hearing were deemed irrelevant where the prosecutor's objective act—presenting evidence at the hearing—enjoyed absolute

immunity). The relevant question, therefore, is whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor. If the generic acts are within those functions, absolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts. *See id.* at 489–90. Otherwise, the absolute immunity would not be absolute.

Under a functional approach, actions are not shielded by absolute immunity merely because they are performed by a prosecutor. "A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). In *Buckley*, the plaintiff sought damages from prosecutors for, inter alia, allegedly "fabricating evidence during the preliminary investigation of a crime." *Id.* at 261. In holding that the prosecutors were not entitled to absolute immunity, the Court stated that a prosecutor "neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274.

"[A]ctions taken as an investigator enjoy only qualified immunity." *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000). "Although all investigative activity could be considered in some sense to be 'prepar[ation] for the initiation of judicial proceedings,' the Supreme Court has sought to draw a line between those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and those investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley*, 509 U.S. at 273). The Supreme Court "has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Id.* at 94 (quoting *Buckley*, 509 U.S. at 273).

Therefore, not every interview, interrogation, or other act by a prosecutor with the potential of revealing new information is an investigative act entitled to only qualified immunity. *See Warney*, 587 F.3d at 124 (prosecutors' actions to deal with post-trial initiatives challenging a criminal conviction, even though they could be seen as investigative and administrative, were "also integral to the overarching advocacy function"). Good prosecutors may—usually should—perform acts reasonably characterized as investigative at all phases of a criminal proceeding. The investigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that

> involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators. *Smith*, 147 F.3d at 94.
>
> In contrast, investigative acts reasonably related to decisions whether or not to begin or to carry on a particular criminal prosecution, or to defend a conviction, are shielded by absolute immunity when done by prosecutors. To be sure, as the Supreme Court cautioned in *Buckley,* even the presence of probable cause "does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." 509 U.S. at 274 n. 5. Such acts are shielded by absolute immunity only when they are of a kind reasonably related to the ordinary functions of a prosecutor with such probable cause.

*Giraldo v. Kessler*, 694 F.3d 161, 165–67 (2d Cir. 2012).

Because analysis of a claim of immunity requires the Court to view the relevant circumstances as would a reasonable official in the claimant's position, the Court will review the issue of immunity in the context of each particular claim against the County Defendants.

## II. Count I: Fabrication of Evidence

Plaintiff's complaint alleges that ADA Belling is liable under 42 U.S.C. § 1983 for violating Plaintiff's fair trial rights by coercing false identifications from Emil Adams and LaMarr Scott. ECF No. 1 ¶¶ 226. In response to the County Defendants' motion for summary judgment, Plaintiff maintains that ADA Belling coerced the false confessions of LaMarr Scott and Aaron Jackson.[3] ECF No. 181. Specifically, Plaintiff maintains that "[v]iewing the evidence and reasonable inferences in [Plaintiff]'s

---

[3] The Court will therefore treat Plaintiff's claims with respect to Emil Adams as abandoned. *See, e.g., Boans v. Town of Cheektowaga*, 5 F. Supp. 3d 364, 375 (W.D.N.Y. 2014) (collecting cases) ("Plaintiff presents no argument in opposition to summary judgment in support of his Eighth Amendment claim. As such, the court may deem such claims abandoned."). Following discovery, the parties appear to agree that ADA Belling "was not present for Emil Adams' identification of Valentino Dixon." ECF No. 181-3 ¶ 9.

favor, it is clear that [ADA] Belling engaged in the *unprotected* type of conduct . . . . [namely,] fabricat[ing] identifications of him from two witnesses, Aaron Jackson and La[M]arr Scott, while acting in an investigative capacity . . . ." *Id.* at 19.

As recounted above, Scott confessed to the Jackson Murder on August 12, 1991, but later recanted his confession and testified before the grand jury in January 1992 that Plaintiff was the shooter. Plaintiff maintains that there is both documentary evidence and subsequent statements from Scott himself demonstrating that there is at least a question of fact as to whether ADA Belling coerced Scott into falsely testifying against Plaintiff before the grand jury. Plaintiff maintains that ADA Belling is not entitled to absolute immunity for his conduct in that regard because he was acting in an investigative capacity.

**A. Plaintiff's Evidence of the Coercion of LaMarr Scott**

With respect to documentary evidence, Plaintiff points to notes from ADA Belling's case file on the Toriano Jackson murder that indicate that ADA Belling had Scott's phone number by December 4, 1991 (ECF No. 181-39), as well as Scott's parents' address, his mother's name, and the address and telephone number of Scott's aunt (ECF No. 181-72). Plaintiff also points to a note that seems to indicate, "shockingly," that ADA Belling personally served Scott with his grand jury subpoena, and exchanged phone calls with him, even though an attorney was not appointed until January 9, 1992. ECF No. 181 at 24 (referencing ECF Nos. 181-29, 181-53, 181-72, 181-78, and 181-90).

Scott also made several statements indicating that he was coerced into

recanting his confession. In a sworn statement from January 31, 1998, Scott stated that he told the grand jury that Plaintiff was the shooter "because, in my mind, my life and the lives of my family were in jeopardy from the [BPD] and the District Attorney's Office if I did not testify the way I did." ECF No. 181-63. Later that year, Scott wrote another statement that indicated he so testified before the grand jury "because I felt my life was threatened and because the harrassment [sic] done by Det. Stambach and the District Attorney Chris Belling." ECF No. 181-23. Finally, in 2005, Scott stated that approximately six months after he confessed to being the shooter, "after constant threats by members of the [BPD] and the D.A. on the case Christopher Belling, I was forced to recant my confession at the grand jury proceeding." ECF No. 181-37. In his sworn statements, Scott offered no specific facts as to the nature of the harassment or threats he perceived against him. *Id.*

He did offer a few details, however, in a Golf Digest interview and the interview with ECDAO investigators in 2018. In the Golf Digest interview, Scott told the interviewer that "criminal justice personnel pressured him into changing his story by bringing his foster parents into the meeting room [prior to his grand jury testimony] and threatening their well being after [his foster parents] left." ECF No. 180-4 at 280. Scott's ECDAO interview is more specific as to ADA Belling's alleged threat. Scott stated that after his foster parents had left the meeting room prior to his grand jury testimony, ADA Belling said to him, "[w]ell, you know, your parents can be held accountable for your actions . . . legally binding accountable." ECF No. 181-20 at 18.

**B. Plaintiff's Evidence of the Coercion of Aaron Jackson**

Plaintiff maintains that the evidence demonstrates ADA Belling also

fabricated Aaron Jackson's identification of Plaintiff as the perpetrator of the Jackson Murder because Jackson's tentative identification of Plaintiff based on his initial review of a photo array with a law enforcement officer became more definite only after a meeting with ADA Belling prior to Jackson's grand jury testimony. ECF No. 181 at 32–33. Plaintiff points out that at some point prior to meeting with Jackson, the evidence shows ADA Belling had made a note that he needed to "firm up" Jackson's identification of Plaintiff. ECF No. 181-85. Plaintiff further observes that Jackson later testified at his deposition for this case that ADA Belling had shown him a loose photo of Plaintiff in preparation for the grand jury proceedings, and infers that ADA Belling must have fabricated the identification. ECF No. 181 at 33.

**C. ADA Belling is Entitled to Absolute Immunity**

Plaintiff correctly concludes that he has identified a genuine dispute of material fact, at least with respect to Scott's recantation. Nevertheless, even were the Court to resolve all factual disputes in Plaintiff's favor, and find that ADA Belling did, in fact, coerce Scott to recant his original confession and Jackson to definitively identify Plaintiff as the shooter before the grand jury, the claims against ADA Belling must be dismissed because he is entitled to absolute immunity from liability.

Determining the prosecutor's immunity turns "chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Ogunkoya v. Monaghan*, 913 F.3d 64, 67 (2d Cir. 2019) (quoting *Warney v. Monroe Cty.*, 587 F.3d 113, 123 (2d Cir. 2009)). Thus, "a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Anilao v. Spota*, 27 F.4th

855, 864 (2d Cir. 2022) (citing *Hill*, 45 F.3d at 661).

Here, ADA Belling's alleged misconduct occurred in preparation for grand jury proceedings which occurred in November 1991 and January 1992, months after Plaintiff's initial arrest on a criminal complaint. The Second Circuit has "consistently stated that prosecutors are immune from § 1983 liability for their conduct before a grand jury," and its holding that "absolute prosecutorial immunity extends even to conspiracies to present false evidence at trial, compels the same result in the grand jury setting." *Hill*, 45 F.3d at 662 (2d Cir. 1995) (citing *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)).

Plaintiff's argument that absolute immunity does not apply because probable cause had "dissipated" following Scott's original confession, and therefore that ADA Belling's conduct was investigative rather than prosecutorial, is unpersuasive. ECF No. 181 at 25–27. As noted above, prosecutors are entitled to absolute immunity when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process . . . . [which includes] initiating a prosecution and . . . presenting the State's case." *Imbler*, 424 U.S. at 430–31. Thus, "even in the absence of probable cause, 'as long as a prosecutor acts with colorable authority, absolute immunity shields his performance of advocative functions regardless of motivation . . . .'" *Anilao*, 27 F.4th at 866 (discussing *Bernard v. County of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004)).

Here, Plaintiff does not allege that ADA Belling was acting in the clear absence of jurisdiction, and he was not acting in "the detective's role in searching for clues and corroboration that might give him probable cause to recommend a suspect be arrested

. . . ." *Buckley,* 509 U.S. at 273. That is, he was not seeking to unearth evidence to create a new case against Plaintiff; he was preparing to present the State's existing case against Plaintiff to a grand jury. *Bernard*, 356 F.3d at 503 (citing *Buckley*, 509 U.S. at 274 n. 5 (acknowledging that absolute immunity shields "a prosecutor's decision to bring an indictment, whether he has probable cause or not"). Therefore, the Court finds that ADA Belling is entitled to absolute immunity for his alleged fabrication of evidence.

**IV. Plaintiff's Conspiracy and Failure to Intercede Claims**

In his complaint, Plaintiff alleges that ADA Belling is liable under 42 U.S.C. § 1983 for civil rights conspiracy against Plaintiff (Count III), and for failure to intercede to prevent the City Defendants' from violating his constitutional rights (Count IV). The County Defendants maintain these claims must be dismissed because ADA Belling is absolutely immune, and because they are unsupported by the facts in the record. ECF No. 167-1 at 27–28. In response, Plaintiff argued that ADA Belling was not immune, and that the evidence of record was such that a reasonable jury could find ADA Belling liable.

**A. Conspiracy**

"To successfully assert a § 1983 claim for conspiracy, plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity, (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal causing harm to plaintiff." *Little v. City of New York*, 487 F. Supp. 2d 426, 441 (S.D.N.Y. 2007) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). To satisfy the agreement element of a conspiracy claim, a

plaintiff "must provide some factual basis supporting a meeting of the minds." *Ivery v. Baldauf*, 284 F. Supp. 3d 426, 439 (W.D.N.Y. 2018) (quoting *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003)). That is, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Id.* (citing *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999)).

Absolute immunity applies "with full force" to conduct by a prosecutor where it was "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (internal quotation marks and citations omitted). This includes such pre-trial activity as preparing to initiate a judicial proceeding, or presenting evidence in support of a search warrant application. *Id.* However, the Supreme Court has found that "absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation . . . ." *Id.*

As discussed above, the Court finds that ADA Belling is entitled to absolute immunity for his conduct in preparing for and conducting the grand jury proceedings and Plaintiff's subsequent criminal trial. As the County Defendants rightly note, "absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate . . . . [including] allegedly conspiring to present false evidence at a criminal trial." *Dory*, 25 F.3d at 83.

Still, the Court must consider whether the evidence of record supporting Plaintiff's allegations of conspiracy and failure to intervene *prior to the Plaintiff's*

*arrest on the criminal complaint* raises a genuine dispute of material fact sufficient to overcome summary judgment. The Court finds that it does not.

The Court notes a genuine dispute of fact regarding the extent of ADA Belling's involvement in the case against Plaintiff prior to the filing of a criminal complaint against him. In particular, ADA Belling testified at his deposition that he did not recall being involved in a criminal case against Plaintiff until he was first called to the homicide office on August 12, more than a day after Plaintiff's arrest and immediately after Scott made his confession to the news. ECF No. 174-27 at 62. However, Detective Stambach testified that he completed the criminal complaint against Plaintiff in the manner he did – i.e., referencing the identification of Sullivan but not of Adams – because "[t]his was the information I was given [by ADA Belling] to place into the . . . information that we were charging with." ECF No. 174-13 at 47. Thus, the level of ADA Belling's involvement prior to Plaintiff's arrest is unclear.

That genuine dispute is not material, however, because Plaintiff has failed to point to any evidence from which the reasonable inference could be drawn that ADA Belling and the City Defendants agreed to act in concert to inflict an unconstitutional injury on Plaintiff. In order to demonstrate the agreement element of a conspiracy claim, a plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Ivery*, 284 F. Supp. 3d at 439 (citing *Warren*, 33 F. Supp. 2d at 177). In the present case, other than Detective Stambach's suggestion that ADA Belling advised him how

to fill out the criminal complaint, no inference may be drawn of an agreement to achieve an unlawful end that is not rooted in speculation or conjecture.

**B. Failure to Intercede**

In his complaint, Plaintiff alleges that ADA Belling had opportunities to intercede on behalf of Plaintiff, "particularly in an investigative context," before developing any probable cause for his arrest or prosecution, to prevent his deprivation of liberty without due process of law," but that he "declined to stop fabrication of evidence, improper suggestion, and coercion." ECF No. 1 ¶ 244.

At the outset, the Court notes that it is unclear whether a prosecutor may be liable on a failure to intercede claim when functioning as either an advocate or in an investigative context. Certainly, the Second Circuit has stated that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," and that "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official," *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). However, that principle appears to be limited to law enforcement, and not prosecutors. *See, e.g., Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) ("A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force.").

In any event, the Court again re-iterates that ADA Belling is entitled to absolute immunity for his conduct in preparing for and conducting the grand jury

proceedings and Plaintiff's subsequent criminal trial. *See Dory*, 25 F.3d at 83. In that regard, the Court finds that Plaintiff was not acting in an investigative capacity with respect to the alleged "coercion" of LaMarr Scott to recant his confession, but rather was entitled to absolute immunity while acting in his role as an advocate. *See, supra* at p. 13–14.

Moreover, assuming, without finding, that a prosecutor may be liable under a failure to intercede theory when acting in an investigative capacity, and even assuming that ADA Belling was acting in an investigative capacity, the Court finds that Plaintiff has failed to point to sufficient evidence for the claim to survive summary judgment. In particular, Plaintiff has failed to demonstrate that ADA Belling failed to act after discovering, or having reason to know, that Plaintiff's constitutional rights were being violated. In particular, Plaintiff has not pointed to evidence to suggest that he had any knowledge of the allegedly suggestive identification techniques used by the BPD or efforts on the part of City Defendants to coerce Plaintiff, and his *Brady* claims against the City Defendants in fact suggest that ADA Belling did not have any knowledge. *See, e.g.,* ECF No. 180 at 39 ("Belling admitted he was not aware of any suggestion in the identification procedures, but if he had been he would have disclosed it as *Brady* material.").

Accordingly, Plaintiff's failure to intercede claim must be dismissed.

**V. *Monell* Liability**

Plaintiff alleges that the County is liable for the violation of his constitutional rights under a theory of *Monell* liability under 42 U.S.C. § 1983. The County Defendants seek dismissal of all of Plaintiff's federal claims against the City under a

*Monell* theory of liability. As Plaintiff correctly points out, though, "*Monell* liability can arise even when individual liability is absent because of immunity." ECF No. 181 at 34; *see also, e.g., Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013) ("[t]he entitlement of the individual municipal actors to qualified immunity . . . is also irrelevant to the liability of the municipality.")

"The elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).

In the present case, discovery was bifurcated to allow discovery on Plaintiff's claims against individuals to proceed, while discovery on Plaintiff's *Monell* theory was stayed pending dispositive motion practice. ECF No. 73. Thus, discovery with respect to Plaintiff's claim that the City is liable under a *Monell* theory has not yet been completed. Further, as indicated in the discussion of fabrication of the evidence above, there does appear to be a genuine issue of material fact raised regarding whether LaMarr Scott's confession was coerced by threats of legal ramifications for Scott's foster parents if he failed to recant. *See, supra* at p. 11–13. The Court therefore finds it premature to consider dismissal of Plaintiff's *Monell* claims.

## VI. Intentional, Reckless or Negligent Infliction of Emotional Distress; Negligence; *Respondeat Superior*

Plaintiff alleges claims against ADA Belling for the intentional, reckless, or negligent infliction of emotional distress under New York State Law by deliberately causing his wrongful prosecution, and negligence for breaching his duty of care to Plaintiff. ECF No. 1 at 260–64; 274–80. Additionally, Plaintiff alleges a *respondeat*

*superior* claim against the County for the conduct alleged in claims against ADA Belling for the infliction of emotional distress and negligence. *Id.* ¶¶ 285–88.

In response, the County Defendants argue that Plaintiff's emotional distress claim is not actionable because the conduct alleged "falls within the ambit of traditional tort liability." ECF No. 167-1 at 28 (citing, *inter alia*, *Hansel v. Sheridan*, 991 F. Supp. 69, 75 (N.D.N.Y. 1998)). The County Defendants further argue that the negligence claim should be dismissed because ADA Belling has absolute immunity, and because the claim fails to state a cause of action. *Id.* at 29. Lastly, with respect to the *respondeat superior* claim, the County Defendants argue that the claim should be dismissed because the underlying counts fail, and because the County of Erie cannot exercise control over assistant district attorneys while representing the State of New York in quasi-judicial matters. *Id.* at 30.

The Court need not reach any of these issues, because Plaintiff failed to respond to the County Defendants' arguments in his opposition papers. Accordingly, the Court considers Plaintiff to have abandoned his state law claims for the intentional, reckless, or negligent infliction of emotional distress, negligence, and *respondeat superior*. *See, e.g.*, *McKnight v. Dormitory Auth. of State*, 189 F.R.D. 225, 232–33 (N.D.N.Y. 1999) (finding the plaintiff's lack of opposition to portions of defendants' motion for summary judgment constituted abandonment of those claims).

**VII. Negligent Hiring, Training, and Supervision**

Plaintiff's complaint alleges that the County is liable under New York law for negligent hiring, training, and supervision by failing to exercise reasonable care in its hiring, supervision and training of employees. ECF No. 1 ¶ 293–95.

To begin with, with respect to Plaintiff's argument that discovery of this claim was stayed along with Plaintiff's Monell claim, the Court reads Judge McCarthy's decision (ECF No. 73) as staying discovery only of the Monell claim. More to the point, "[a] claim for negligent hiring or supervision . . . can only proceed against an employer for an employee acting outside the scope of her [or his] employment." *Baumeister v. Erie Cnty*, No. 23-CV-1150-LJV, 2024 WL 4362311, at *13 (W.D.N.Y. 2024) (quoting *Colodney v. Continuum Health Partners, Inc.*, 2004 WL 829158, at *8 (S.D.N.Y. 2004)). The claims against ADA Belling in the instant case, however, involve his conduct within the scope of his employment with the County.

Plaintiff's argument that the claim should survive summary judgment because the claim is "based on the County's own conduct" (ECF No. 181 at 29) and not vicarious liability for ADA Belling's conduct is unpersuasive. The very essence of a negligent hiring, training, and supervision claim is the attribution of liability to the employer for the conduct of a tortfeasor employee where the employee, acting outside the scope of his employment, was "'aided in accomplishing the tort by the existence of the agency relation.'" *Moore Charitable Found. v. PJT Partners, Inc.*, 217 N.E.3d 8 (N.Y. 2023) (quoting the Restatement [Second] of Agency § 219(2)(d)). ADA Belling was acting within the scope of his employment, and therefore this claim is without merit.

Accordingly, Plaintiff's claim for negligent hiring, training, and supervision must be dismissed.

## CONCLUSION

For the reasons stated above, it is hereby

ORDERED that the County Defendants' motion for summary judgment [ECF No. 167] is GRANTED in part, and DENIED in part; and it is further

ORDERED that the following Counts against the County Defendants are dismissed: Count I (fabrication of evidence), Count III (civil rights conspiracy), Count IV (failure to intercede), Count IX (intentional, reckless, or negligent infliction of emotional distress), Count X (negligence), Count XII (*respondeat superior*), and Count XIII (negligent hiring, training, and supervision); and it is further

ORDERED the Court will further address Plaintiff's *Monell* claim (Count VII) and his motion to bifurcate the trial (ECF No. 225) under separate order.

SO ORDERED.

Dated: November 24, 2026
Rochester, New York

HON. MEREDITH A. VACCA
United States District Judge